**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY_____**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admissions *pro hac vice* pending)

*PROPOSED ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Judge: Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br>Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br>Defendants | Adv. No.: 23-01092 (MBK)<br><br>**Hearing Date and Time:**<br>**April __, 2023 at ___** |

## DEBTOR'S MOTION FOR AN ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS TO CERTAIN ACTIONS AGAINST NON-DEBTORS, (II) PRELIMINARILY ENJOINING SUCH ACTIONS, AND (III) GRANTING A TEMPORARY RESTRAINING ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY INJUNCTION

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# <u>TABLE OF CONTENTS</u>

Page

NATURE OF PROCEEDING ............................................................. 1

JURISDICTION AND VENUE ......................................................... 3

SUMMARY OF ARGUMENT .......................................................... 4

FACTUAL BACKGROUND ............................................................. 10

I.     THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE ............................... 10

    A.    THE DEBTOR'S PREDECESSORS AND RELATED RESTRUCTURINGS ............... 10

        1.    J&J ADOPTS DECENTRALIZATION POLICY ................... 10

        2.    OLD JJCI'S RESPONSIBILITY FOR ALL LIABILITIES ASSOCIATED WITH JOHNSON'S BABY POWDER ....... 11

        3.    OLD JJCI'S RESPONSIBILITY FOR ALL LIABILITIES ASSOCIATED WITH SHOWER TO SHOWER ................... 15

        4.    FINANCIAL COURSE OF PERFORMANCE FOR PAYMENT OF TALC LIABILITIES ................... 17

        5.    THE 2021 CORPORATE RESTRUCTURING ..................... 18

        6.    NEW JJCI/ HOLDCO ........................................ 18

        7.    THE DEBTOR ............................................... 19

        8.    J&J ........................................................ 20

        9.    PREVIOUS FINANCING ARRANGEMENTS ..................... 20

        10.    OTHER AGREEMENTS ........................................ 21

II.    EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE ........................ 22

    A.    THE DEBTOR TALC CLAIMS ........................................ 22

        1.    TALC-RELATED CLAIMS AGAINST THE DEBTOR AND J&J ARE THE SAME ................... 24

        2.    HEALTH AND MEDICAL SAFETY DECISIONS WERE MADE BY OLD JJCI ................... 27

    B.    THE DEBTOR'S INSURANCE COVERAGE ............................. 28

    C.    THE DEBTOR'S RETAILERS AND OTHER INDEMNIFIED PARTIES ...... 31

    D.    COSMETIC TALC LITIGATION AND ITS ASSOCIATED COSTS AND BURDENS ................... 34

    E.    THE 2021 CHAPTER 11 CASE ...................................... 35

        1.    BANKRUPTCY COURT PROCEEDINGS ...................... 35

2.    THIRD CIRCUIT PANEL OPINION DISMISSING THE 2021
CHAPTER 11 CASE ............................................................................. 37

F.    PLAN SUPPORT AGREEMENTS.................................................................... 38

G.    THE DECISION TO FILE THIS CASE ............................................................ 39

1.    TERMINATION OF 2021 FUNDING AGREEMENT AND
ENTRY INTO NEW AGREEMENTS.................................................... 40

ARGUMENT ............................................................................................................................ 44

I.    THE COURT HAS SUBJECT MATTER JURISDICTION............................................ 45

II.    THE AUTOMATIC STAY APPLIES OR EXTENDS TO PROHIBIT
PROSECUTION OF DEBTOR TALC CLAIMS AGAINST THE PROTECTED
PARTIES. ........................................................................................................................ 52

A.    SECTION 362(a)(1) APPLIES OR EXTENDS TO STAY THE DEBTOR
TALC CLAIMS ............................................................................................... 52

1.    AN IDENTITY OF INTERESTS EXISTS BETWEEN THE
DEBTOR AND THE PROTECTED PARTIES...................................... 53

2.    STAY PROTECTION IS ESSENTIAL TO PROTECT THE
DEBTOR'S REORGANIZATION EFFORTS. ...................................... 57

B.    SUITS THAT WOULD DEPLETE INSURANCE POLICIES ARE
AUTOMATICALLY STAYED BECAUSE THE POLICIES ARE
PROPERTY OF THE DEBTOR'S ESTATE....................................................... 64

III.    THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER SECTION
105(a) TO ENJOIN THE CONTINUATION OR COMMENCEMENT OF THE
DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES. ........................ 66

A.    THE COURT HAS AUTHORITY TO ENJOIN THE PURSUIT OF
DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES. ............ 66

B.    THE PRELIMINARY INJUNCTION FACTORS ALL SUPPORT
ENJOINING THE PURSUIT OF DEBTOR TALC CLAIMS AGAINST
THE PROTECTED PARTIES. .......................................................................... 69

1.    THE DEBTOR'S SUCCESSFUL REORGANIZATION IS
LIKELY. ............................................................................................... 71

2.    FAILURE TO ENJOIN LITIGATION OF DEBTOR TALC
CLAIMS WOULD IRREPARABLY HARM THE DEBTOR.............. 75

3.    THE IRREPARABLE HARM THAT THE DEBTOR WOULD
SUFFER IN THE ABSENCE OF AN INJUNCTION
SUBSTANTIALLY OUTWEIGHS ANY PREJUDICE TO
CLAIMANTS. ....................................................................................... 77

NAI-1535638547

4.      INJUNCTIVE RELIEF WILL FURTHER THE PUBLIC
        INTEREST BY ENSURING THE DEBTOR'S SUCCESSFUL
        REORGANIZATION AND EQUITABLE TREATMENT OF
        DEFENDANTS. ................................................................................. 80

IV.    THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER
       TO EFFECTUATE THE RELIEF SOUGHT BY THE DEBTOR PENDING A
       FINAL HEARING. ........................................................................................ 83

        1.      REQUEST FOR AN EX PARTE TEMPORARY RESTRAINING
                ORDER ............................................................................................ 83

        2.      THE VALADEZ CASE ...................................................................... 86

CONCLUSION ............................................................................................................ 90

NAI-1535638547

## TABLE OF AUTHORITIES

**Page**

CASES

A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.),
    788 F.2d 994 (4th Cir. 1986) ........................................................................... passim

ACandS, Inc. v. Travelers Cas. & Sur. Co.,
    435 F.3d 252 (3d Cir. 2006)...........................................................................29

ADP, Inc. v. Levin,
    2022 WL 1184202 .............................................................................76

Am. Can Co. v. Mansukhani,
    742 F.2d 314 (7th Cir. 1984) ...........................................................................89

Anderson et al. v. Borg Warner Corp. et al.,
    No. BC666513 (Jun. 27, 2017) ...........................................................................26

Belcufine v. Aloe,
    112 F.3d 633 (3d Cir. 1997)...........................................................................53, 57

Berg v. Johnson & Johnson,
    940 F.Supp.2d 983 (D.S.D. 2013) ...........................................................................22

Carolin Corp. v. Miller,
    886 F.2d 693 (4th Cir. 1989) ...........................................................................74

Celotex Corp. v. Edwards,
    514 U.S. 300 (1995)...........................................................................48

Chase Manhattan Bank (N.A.) v. Third Eighty-Ninth Assocs.,
    138 B.R. 144 (S.D.N.Y. 1992)...........................................................................47

DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP
    LLC),
    2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021)...........................................6, 45, 76

Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.,
    54 B.R. 353 (Bankr. W.D. Wis. 1985)...........................................................................72

Edwards v. McElliotts Trucking, LLC,
    No. 3:16-1879, 2017 WL 5559921 (S.D. W. Va. Nov. 17, 2017)...........................................55

FDIC v. Hirsch (In re Colonial Realty Co.),
    980 F.2d 125 (2d Cir. 1992).....................................................................................................53

Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A.,
    479 N.E.2d 1386 (Mass. 1985) ................................................................................................32

for the Raudonis 2016 Revocable Trust v. RealtyShares, Inc.,
    507 F.Supp 378 (D. Mass. 2020) .............................................................................................65

FPSDA II, LLC v. Larin (In re FPSDA I, LLC),
    No. 10-75439, Adv. No. 12-08032, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec.
    21, 2012) ..............................................................................................................................46, 47

FTC v. Garvey,
    383 F.3d 891 (9th Cir. 2004) ...................................................................................................60

Gerard v. W.R. Grace & Co. (In re W.R. Grace & Co.),
    115 F. App'x 565 (3d Cir. 2004) .........................................................................48, 63, 67, 75

Hernandez-Valadez v. Johnson & Johnson, et al.,
    Case No. 22CV012759 ...........................................................................................................9, 86

Hood, et al. v. Acme et al.,
    No. 2020-CP10-03946 ...............................................................................................................27

In re ACandS, Inc.,
    No. 02-12687 (PJW), Adv. No. 02-5581 (PJW) (Bankr. D. Del. Sept. 27,
    2002) .............................................................................................................................................69

In re Aearo Techs. LLC,
    642 B.R. 891 (Bankr. S.D. Ind. 2022) .....................................................................................68

In re Aldrich Pump LLC,
    No. 20-30608 (JCW), Adv. No. 20-03041 (JCW) (Bankr. W.D.N.C. Aug. 23,
    2021) ..................................................................................................................................... passim

In re Am. Film Techs., Inc.,
    175 B.R. 847 (Bankr. D. Del. 1994) .................................................................50, 55, 61, 68

NAI-1535638547

In re The Babcock & Wilcox Co.,
    No. 00-10992 (JAB), Adv. No. 00-1029 (JAB) (Bankr. E.D. La. Apr. 17,
    2000) .................................................................................................................69

In re Bestwall LLC,
    No. 17-31795, Adv. No. 17-03105 (Bankr. W.D.N.C. Nov. 8, 2017)............................ passim

In re Brier Creek Corp. Ctr. Assocs. Ltd.,
    486 B.R. 681 (Bankr. E.D.N.C. 2013) ............................................................... passim

In re Caesars Entm't Operating Co.,
    561 B.R. 441 (Bankr. N.D. Ill. 2016) .......................................................................75

In re Calpine Corp.,
    365 B.R. 401 (S.D.N.Y. 2007).................................................................................67

In re Combustion Eng'g, Inc.,
    391 F.3d 190 (3d Cir. 2004)....................................................................................82

In re Combustion Eng'g, Inc.,
    No. 03-10495 (JKF), Adv. No. 03-50839 (JKF) (Bankr. D. Del. Mar. 7, 2003)....................69

In re Congoleum Corp.,
    362 B.R. 198 (Bankr. D.N.J. 2007) .........................................................................81

In re DBMP LLC,
    No. 20-30080 (JCW), Adv. No. 20-03004 (JCW) (Bankr. W.D.N.C. Aug. 10,
    2021) .................................................................................................................69, 85

In re Denby-Peterson,
    941 F.3d 115,122 (3d Cir. 2019).............................................................................52

In re Dow Corning Corp.,
    211 B.R. 545 (Bankr. E.D. Mich. 1997)..................................................................81

In re E. Orange Gen. Hosp., Inc.,
    587 B.R. 53 (D.N.J. 2018) .....................................................................................45

In re Eagle-Picher Indus., Inc.,
    963 F.2d 855 (6th Cir. 1992) ..................................................................................72

In re Elsinore Shore Assocs.,
    91 B.R. 238 (Bankr. D.N.J. 1988) ..........................................................................48

In re Family Health Servs., Inc.,
    105 B.R. 937 (Bankr. C.D. Cal. 1989) ..............................................................50, 68

In re Federal-Mogul Glob., Inc.,
    684 F.3d 355 (3d Cir. 2012) ...........................................................................73, 79

In re G-I Holdings, Inc.,
    327 B.R. 730 (Bankr. D.N.J. 2005) .........................................................................48

In re G-I Holdings, Inc.,
    420 B.R. 216 (D.N.J. 2009) ...................................................................69, 70, 71

In re G-I Holdings, Inc.,
    580 B.R. 388 (Bankr. D.N.J. 2018) .........................................................................47

In re G-I Holdings, Inc.,
    No. 01-30135 (RG) .................................................................................68, 85

In re Gander Partners LLC,
    432 B.R 781 (Bankr. N.D. Ill. 2010) ................................................................80, 82

In re Garlock Sealing Techs. LLC,
    No. 10-31607, Adv. No. 10-03145 (Bankr. W.D.N.C. June 21, 2010) ......................45, 69, 86

In re Gathering Rest., Inc.,
    79 B.R. 992 (Bankr. N.D. Ind. 1986) ........................................................................72

In re Harbison-Walker Refractories Co.,
    No. 02-21627 (JKF), Adv. No. 02-02080 (Bankr. W.D. Pa. Feb. 14, 2002) ...........................69

In re Heron, Burchette, Ruckert & Rothwell,
    148 B.R. 660 (Bankr. D.D.C. 1992) ................................................................50, 68

In re Hillsborough Holdings Corp.,
    123 B.R. 1004 (Bankr. M.D. Fla. 1990) ....................................................................72

In re Integrated Health Servs., Inc.,
    281 B.R. 231 (Bankr. D. Del. 2002) ........................................................................82

In re Irish Bank Resolution Corp. Ltd.,
    2019 WL 4740249 (D. Del. Sept. 27, 2019) ................................................................71

In re Johns-Manville Corp.,
    26 B.R. 420 (Bankr. S.D.N.Y. 1983) ................................................................61, 66, 80

NAI-1535638547

In re Johns-Manville Corp.,
40 B.R. 219 (S.D.N.Y. 1984)...................................................................................61, 62, 64, 66

In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs., & Prod. Liab.
Litig.,
No. 3:16-MD-02738-FLW-LHG (D.N.J. Dec. 12, 2020)........................................................24

In re Kaiser Gypsum Co., Inc.,
No. 16-31602 (JCW), Adv. No. 16-03313 (JCW) (Bankr. W.D.N.C. Nov. 4,
2016) .................................................................................................................................69, 85

In re Lazarus Burman Assocs.,
161 B.R. 891 (Bankr. E.D.N.Y. 1993).....................................................................................67

In re Leslie Controls, Inc.,
No. 10-12199 (CSS), Adv. No. 10-51394 (CSS) (Bankr. D. Del. July 14,
2010) .................................................................................................................................68, 85

In re LTL Mgmt. LLC,
58 F.4th 738 (3d. Cir. 2023) ......................................................................................4, 37, 78

In re LTL Mgmt. LLC,
637 B.R. 396 (Bankr. D.N.J. 2022) rev'd and remanded by In re LTL Mgmt.
LLC, 58 F.4th 738 (3d. Cir. 2023)...........................................................................................36

In re LTL Mgmt. LLC,
No. 21-03032, Adv. No. 21-03032 (Bankr. D.N.J. Mar. 4, 2022)...........................................85

In re LTL Mgmt. LLC,
No. 22-2003 (3d Cir. Feb. 13, 2023), Dkt. 153.......................................................................37

In re Manley Toys Ltd.,
No. 16-15374 (JNP), 2020 WL 1580244 (Bankr. D.N.J. Mar. 31, 2020) ...............................52

In re Metro Mortg. & Secs. Co.,
325 B.R. 851 (Bankr. E.D. Wash. 2005) .................................................................................65

In re Mid Valley, Inc.,
No. 03-35592 (JKF), Adv. No. 03-3296 (JKF) (Bankr. W.D. Pa. Dec. 17,
2003) .......................................................................................................................................69

In re Monroe Well Serv., Inc.,
67 B.R. 746 (Bankr. E.D. Pa. 1986) .......................................................................................48

NAI-1535638547

In re Montreal Me. & Atl. Ry., Ltd.,
     No. 1:13-MC-00184-NT, 2014 WL 1155419 (D. Me. Mar. 21, 2014) ...................................65

In re Ms. Kipps, Inc.,
     34 B.R. 91 (Bankr. S.D.N.Y. 1983) .......................................................................................55

In re Myerson & Kuhn,
     121 B.R. 145 (Bankr. S.D.N.Y. 1990) ..............................................................................50, 68

In re N. Am. Refractories Co.,
     No. 02-20198 (JKF), Adv. No. 02-2004 (JKF)..................................................................69, 85

In re Phila. Newspapers, LLC,
     407 B.R. 606 (E.D. Pa. 2009) ........................................................................................ passim

In re Phila. Newspapers, LLC,
     423 B.R. 98 (E.D. Pa. 2010) ......................................................................................45, 69, 70

In re Pittsburgh Corning Corp.,
     No. 00-22876 (JKF), Adv. No. 00-2161 (JKF) (Bankr. W.D. Pa. Apr. 16,
     2000) ....................................................................................................................................69

In re Purdue Pharms. L.P.,
     No. 19-08289-shl (Bankr. S.D.N.Y. Oct. 11, 2019) [Dkt. 82], aff'd 619 B.R.
     38 (S.D.N.Y. 2020)................................................................................................................50

In re Purdue Pharms. L.P.,
     No. 19-23649, Adv. No. 19-08289 (Bankr. S.D.N.Y. Oct. 11, 2019) aff'd 619
     B.R. 38 (S.D.N.Y. 2020).......................................................................................................68

In re Purdue Pharms., L.P.,
     619 B.R. 38 (S.D.N.Y. 2020)............................................................................................56, 75

In re Quigley Co., Inc.,
     No. 04-15739, Adv. No. 04-04262 (Bankr. S.D.N.Y. Dec. 17, 2004) [Dkt.
     122] ................................................................................................................................63, 69

In re Seven Fields Dev. Corp.,
     505 F.3d 237 (3d Cir. 2007)...................................................................................................47

In re Specialty Prods. Holding Corp.,
     No. 10-11780, Adv. No. 10-51085, [Dkt. 72] (Bankr. D. Del. Oct. 13, 2010)............45, 69, 85

NAI-1535638547

In re SunEdison, Inc.,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017) ...................................................................50

In re TK Holdings Inc.,
    Case No. 17-50880, Adv. No. 17-50880 (Bankr. D. Del. Aug. 22, 2017) ............................68

In re TK Holdings Inc.,
    No. 17-50880-BLS (Bankr. D. Del. Aug. 22, 2017)........................................................50, 55

In re United Health Care Org.,
    210 B.R. 228 (S.D.N.Y. 1997).............................................................................78

In re USA Gymnastics,
    No. 18-09108, Adv. No. 19-50075 (Bankr. S.D. Ind. Apr. 22, 2019) ....................................68

In re USA Gymnastics,
    No. 19-50075 (Bankr. S.D. Ind. Apr. 22, 2019), [Dkt. 71]......................................................50

In re VistaCare Grp., LLC,
    678 F.3d 218 (3d Cir. 2012).............................................................................66

In re W.R. Grace & Co.,
    475 B.R. 34 (D. Del. 2012), aff'd sub nom. In re WR Grace & Co., 729 F.3d
    332 (3d Cir. 2013)............................................................................64, 67

In re W.R. Grace & Co.,
    900 F.3d 126 (3d Cir. 2018)...........................................................................48

In re W.R. Grace & Co.,
    No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) .........................55, 56

In re W.R. Grace & Co.,
    No. 01-01139 (KJC), Adv. No. 01-00771 (KJC) (Bankr. D. Del. May 3, 2001) ...................69

In re Winstar Commc'ns, Inc.,
    554 F.3d 382 (3d Cir. 2009).............................................................................51

Ingham v. Johnson & Johnson,
    608 S.W.3d 663 (Mo. App. 2020) .........................................................................34

Ingham v. Johnson & Johnson,
    No. 1522-CC10417, Circuit Court of the City of St. Louis,..............................................27, 34

NAI-1535638547

Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,
    458 F.3d 244 (3d Cir. 2006) ..................................................................... 60

Kaiser Group Int'l, Inc. v. Kaiser Aluminium and Chem. Corp. (In re Kaiser
    Aluminum Corp., Inc.),
    315 B.R. 655 (D. Del. 2004) .................................................................... 53

Kocher v. Dow Chem. Co.,
    132 F.3d 1225 (8th Cir. 1997) ................................................................. 50

Kreisler v. Goldberg (In re Kreisler),
    478 F.2d 209 (4th Cir. 2007) ................................................................... 71

Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Conn.
    (In re Dow Corning Corp.), 86 F.3d 482 (6th Cir. 1996), as amended on denial
    of reh'g and reh'g en banc (June 3, 1996) ......................................... 50, 51

LTL Mgmt. LLC v. San Diego Cnty. Emps. Ret. Ass'n (In re LTL Mgmt. LLC),
    640 B.R. 322 (Bankr. D.N.J. 2022) ......................................................... 44

LTL Mgmt. LLC v. State of NM (In re LTL Mgmt. LLC),
    645, B.R. 59, 67 (Bankr. D.N.J. 2022) .................................................... 44

LTL Mgmt. LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL
    Mgmt. LLC),
    638 B.R. 291 (Bankr. D.N.J. 2022) ............................................... passim

Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem.
    Co.),
    402 B.R. 571 (Bankr. S.D.N.Y. 2009) ....................................... 48, 50, 68

Maaco Enters., Inc. v. Corrao,
    No. Civ. A. No. 91-3325, 1991 WL 255132 (E.D. Pa. Nov. 25, 1991) ................. 53

Maertin v. Armstrong World Indus., Inc.,
    241 F. Supp. 2d 434 (D.N.J. 2002) .......................................................... 65

Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC),
    No. 20-408, 2021 WL 523625 (D. Del. Feb. 11, 2021) ....................... 50, 56

McBride et al. v American International Industries, Inc., et al.,
    No. 49D13-2110-MI-034781 Marion County Superior Court for the State of
    Indiana (Oct. 15, 2021) ........................................................................... 26

NAI-1535638547

McCartney v. Integra Nat'l. Bank N.,
106 F.3d 506 (3d Cir. 1997)............................................................................. passim

Mine Mgmt, Inc. v. Wolfe (In re Mountain Laurel Res. Co.),
210 F.3d 361 (4th Cir. 2000) ......................................................................50

Oberg v. Aetna (In re A.H. Robins Co. Inc.),
828 F.2d 1023 (4th Cir. 1987) ...............................................................44, 53

Pacor, Inc. v. Higgins,
743 F.2d 984 (3d Cir. 1984).....................................................................48, 50

Parklane Hosiery Co. v. Shore,
439 U.S. 322 (1979).........................................................................................60

Pfizer Inc. v. Angelos (In re Quigley Co., Inc.),
676 F.3d 45 (2d Cir. 2012)..............................................................................65

Promaulayko v. Johns Manville Sales Corp.,
562 A.2d 202 (N.J. 1989)....................................................................32, 61, 80

Purdue Pharm. L.P. v. Mass. (In re Purdue Pharm. L.P.),
No. 19-23649 (Bankr. S.D.N.Y. Oct. 11, 2019) .........................................56

Queenie v. Nygard Int'l,
321 F.3d 282 (2d Cir. 2003)...........................................................................53

Reilly v. City of Harrisburg,
858 F.3d 173 (3d Cir. 2017)......................................................................70, 71

Reliant Energy Servs., Inc. v. Enron Canada Corp.,
349 F.3d 816 (5th Cir. 2003) .........................................................................53

Richards, et al. v. Johnson & Johnson, et al.,
No. 21-2-10988-4 Superior Court of the State of Washington in and for the
County of King (Aug. 18, 2021) ...................................................................26

Ritchie Cap. Mgmt., L.L.C. v. Jeffries,
653 F.3d 755 (8th Cir. 2011) .........................................................................53

Roggio v. Roggio (In re Roggio),
612 B.R. 655 (Bankr. M.D. Pa. 2020) ..........................................................46

NAI-1535638547

Russell v. SunAmerica Sec., Inc.,
    962 F.2d 1169 (5th Cir. 1992) ............................................................................60

Singer Co. B.V. v. Groz Beckert KG (In re Singer Co. N.V.),
    2000 WL 33716976 (Bankr. S.D.N.Y. Nov. 3, 2000) ...........................................55

Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.),
    502 F.3d 1086 (9th Cir. 2007) ........................................................................70, 72

Stoe v. Flaherty,
    436 F.3d 209 (3d Cir. 2006)...............................................................................46

Sudbury, Inc. v. Escott,
    140 B.R. 461 (Bankr. N.D. Ohio 1992) ...........................................................61, 80

T&E Indus., Inc. v. Safety Light Corp.,
    680 F. Supp. 696 (D. N.J. 1988) ........................................................................67

True Health Diagnostics LLC v. Azar (In re THG Holdings LLC),
    604 B.R. 154 (Bankr. D. Del. 2019) ...................................................................71

U.S. v. 5 Unlabeled Boxes,
    572 F.3d 169 (3d Cir. 2009)...............................................................................60

Union Tr. Phila., LLC v. Singer Equip. Co. (In re Union Tr. Phila., LLC),
    460 B.R. 644 (E.D. Pa. 2011) ...........................................................................62

United States v. Whiting Pools, Inc.,
    462 U.S. 198 (1983).........................................................................................80

Vanklive v. Johnson & Johnson,
    No. RC20062734, Superior Court of California,..................................................27

W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),
    386 B.R. 17 (Bankr. D. Del. 2008) ............................................................... passim

**STATUTES**

11 U.S.C. § 105........................................................................................... passim

11 U.S.C. § 362........................................................................................... passim

11 U.S.C. § 524.........................................................................................5, 40, 82

NAI-1535638547

11 U.S.C. § 541 .................................................................................................................65

11 U.S.C. § 1107 ...............................................................................................................10

11 U.S.C. § 1108 ...............................................................................................................10

28 U.S.C. §§ 157 .................................................................................................................3

28 U.S.C. § 1334 ...........................................................................................................3, 45

28 U.S.C. § 1409 .................................................................................................................4

Ariz. Rev. Stat. Ann. § 12-684...........................................................................................32

Ark. Code Ann. § 16-116-207 ...........................................................................................32

Iowa Code Ann. § 613.18 ..................................................................................................32

Tex. Civ. Prac. & Rem. Code Ann. § 82.002 ....................................................................32

## Other Authorities

Fed. R. Bankr. P. 7001 .........................................................................................................1

Fed. R. Bankr. P. 7008 .........................................................................................................3

Fed. R. Bankr. P. 7065 ...................................................................................1, 63, 83, 84

Fed. R. Civ. P. 65 ...............................................................................................83, 84, 86, 90

Fed. E. Evid. 1006.......................................................................................................28, 32

*Mass Tort Bankruptcy Cases*, Federal Judicial Center, at 1 (2005),
    https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf ....................................73

13 Moore's Federal Practice § 65.36 (2019) ...................................................................84

Restatement (Second) of Torts § 886B ..............................................................................32

Restatement (Third) of Torts § 22 .....................................................................................32

NAI-1535638547

## **NATURE OF PROCEEDING**

Pursuant to Rules 7001(7), 7001(9) and 7065 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), Plaintiff LTL Management LLC, a North Carolina limited

liability company and the debtor in the above-captioned chapter 11 case (the "Debtor"), seeks a

declaration that section 362(a) of the Bankruptcy Code applies or extends to prohibit the

commencement or continuation of certain actions against the Protected Parties (as defined

below) while the Debtor's chapter 11 case (the "Chapter 11 Case") remains pending.  The Debtor

also requests a preliminary injunction under section 105(a) of the Bankruptcy Code.

The injunction will enjoin the prosecution of actions outside of the Chapter 11 Case on account

of the same talc claims that exist against the Debtor in the Chapter 11 Case.  The Debtor seeks

immediate emergency relief in the form of a temporary restraining order, which the Debtor

requests be issued on an ex parte basis pending a hearing on whether to enter a preliminary

injunction, for the reasons set forth below.

The defendants sought to be enjoined by this adversary proceeding (collectively,

the "Defendants") are all named plaintiffs in talc-related lawsuits against the Debtor or for which

the Debtor is responsible or alleged to be responsible.  The Defendants, who are identified on

Appendix A to the Complaint, as well as John and Jane Does 1-1000,[1] would be enjoined from

prosecuting actions outside of the Chapter 11 Case that seek to hold the following entities

(collectively, the "Protected Parties") liable for talc claims against the Debtor in the Chapter 11

Case:  (i) certain affiliates of the Debtor; and (ii) third-party retailers or transaction parties, in

---

[1]     Appendix A identifies the civil action number (where available) for each lawsuit and the law firms
representing each of the Defendants on account of their talc claims.  The Debtor reserves the right to
supplement, amend or otherwise modify Appendix A.  For the avoidance of doubt, the inclusion of a
talc-related claim on Appendix A is not an admission that such Defendant holds a currently pending claim
against either the Debtor or the Protected Parties (as defined herein).

each case as a result of the Debtor's indemnification of such entities for talc claims against the

Debtor, and for the several other reasons set forth in this Motion.  More specifically, the

Protected Parties are:[2]

a)  former Johnson & Johnson Consumer Inc. ("Old JJCI"), an entity that no longer exists and whose talc-related liability was allocated to the Debtor;

b)  Johnson & Johnson Inc. ("J&J Canada"), a federal corporation incorporated under the laws of Canada;

c)  Johnson & Johnson Holdco (NA) Inc., a New Jersey company ("Holdco");[3]

d)  Johnson & Johnson ("J&J"); and

e)  third-party retailers who sold Old JJCI's talc-containing products (the "Retailers") and other third parties whom Old JJCI and now the Debtor has indemnified contractually (the "Indemnified Parties"), identified on Appendix B to the Complaint.

The Debtor seeks a declaration that section 362(a) of the Bankruptcy Code applies

or extends to prohibit the commencement or continuation of any action seeking to hold a

Protected Party liable on account of any "Debtor Talc Claim" while the Chapter 11 Case remains

pending.  "Debtor Talc Claims" means, collectively, any talc-related claim against the Debtor,

including all claims relating in any way to talc or talc-containing materials that formerly were

asserted against (or that could have been asserted against) Old JJCI on any theory of liability

(whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or

voidable transfer or conveyance, alter ego or otherwise).[4]

---

[2]    The Protected Parties are listed on Appendix B to the Complaint.  The Debtor reserves the right to seek to supplement, amend or otherwise modify the list of Protected Parties, including, in particular, to request that additional parties be included as Protected Parties.

[3]    Holdco was formerly known as Johnson & Johnson Consumer Inc.

[4]    For the avoidance of doubt, Debtor Talc Claims include all talc personal-injury claims and other talc-related claims allocated to the Debtor from Old JJCI in the documents implementing the 2021 Corporate Restructuring (as defined herein).  The Debtor Talc Claims do not include talc-related claims for which the exclusive remedy is provided under workers' compensation statutes and similar laws.

NAI-1535638547

The Debtor also seeks an injunction enjoining the Defendants from prosecuting any such action against the Protected Parties on account of any Debtor Talc Claim.  In addition, the Debtor requests that the Court enter a temporary restraining order, on an ex parte basis, to immediately effectuate the requested declaratory or injunctive relief pending a final hearing on this Motion.

Along with this Motion, the Debtor has filed the *Debtor's Verified Complaint for Declaratory and Injunctive Relief (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing On a Preliminary Injunction* (the "Complaint") that initiated this adversary proceeding.  In support of this Motion, the Debtor incorporates the following declarations and all exhibits thereto:  (i) the *Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. 4 in Case No. 23-12825] (the "First Day Declaration"), filed in the Chapter 11 Case; and (ii) the *Declaration of Daniel J. Merrett in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motion* (the "Counsel Declaration"), filed contemporaneously herewith.[5]  The Debtor further states as follows:

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this adversary proceeding and this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to

---

[5]    The Counsel Declaration incorporates as exhibits relevant portions of the record regarding the Debtor's request in the 2021 Chapter 11 Case (as defined herein) whereby the Debtor sought substantially the same relief requested in this adversary proceeding, including:  (i) declarations of certain witnesses, including the *Declaration of John K. Kim in Support of First Day Pleadings* filed in the 2021 Chapter 11 Case [Dkt. 5 in Case No. 21-30589] (the "2021 First Day Declaration"); (ii) transcripts of the hearings in the Chapter 11 Case regarding such relief (together, the "PI Hearings"); and (iii) certain exhibits that were admitted into evidence at the PI Hearings.  Except as otherwise stated, any reference in this Motion to an exhibit signifies the applicable exhibit to the Counsel Declaration.

28 U.S.C. § 157(b)(2).  Pursuant to Bankruptcy Rule 7008, the Debtor consents to the entry of

final orders or a final judgment by this Court in this adversary proceeding.  Venue is proper in

this District pursuant to 28 U.S.C. § 1409.

## SUMMARY OF ARGUMENT

This Court, on a full evidentiary record, ruled in the 2021 Chapter 11 Case (as

defined herein) that all litigation in respect of talc claims against the Protected Parties was stayed

by section 362(a) and preliminary enjoined under section 105(a).  See LTL Mgmt. LLC v. Those

Parties Listed on Appendix A to Complaint (In re LTL Mgmt. LLC), 638 B.R. 291, 308-11

(Bankr. D.N.J. 2022) (the "PI Opinion") mooted by In re LTL Mgmt. LLC, 58 F.4th 738 (3d.

Cir. 2023).

Significant developments lead the Debtor to commence this Chapter 11 Case

shortly after dismissal of the 2021 Chapter 11 Case.  Most notably, the Debtor has obtained the

support of various plaintiff law firms and over 60,000 claimants—including ovarian cancer and

mesothelioma claimants—on the material terms of a plan of reorganization.  And each of those

claimants has agreed not to oppose the relief requested by this Motion.  The Debtor has also

entered into new arrangements with its affiliates to, among other things, (i) address the concerns

raised by the Third Circuit in its dismissal opinion and (ii) facilitate confirmation and

consummation of a plan containing the terms supported by thousands of claimants.  But the

material facts are otherwise the same as they were in connection with the Debtor's motion filed

in the 2021 Chapter 11 Case to extend the stay to, and preliminary enjoin, talc claims, including

the (i) identity of interests among the Debtor and the Protected Parties concerning the Debtor

Talc Claims, (ii) the Debtor's corporate history and structure, (iii) the nature of the Debtor Talc

Claims and (iv) the irreparable harm that the Debtor would suffer if this Court does not enjoin

the Debtor Talc Claims during the pendency of this Chapter 11 Case.  For the same reasons that

NAI-1535638547

this Court granted the Debtor's prior request, this Court should grant the relief requested by this Motion.

As of the filing of the 2021 Chapter 11 Case, the Debtor was besieged by talc claims premised on the false allegation that JOHNSON'S® Baby Powder (hereinafter, "Johnson's Baby Powder") contained asbestos and caused cancer.  See First Day Decl. ¶ 35.  Notwithstanding that these claims have no valid scientific basis, a few blockbuster plaintiff verdicts in plaintiff-friendly jurisdictions fueled a boom in talc claims, causing Old JJCI to incur astronomical costs:  nearly $1 billion in defense costs on account of cosmetic talc litigation, most of which has been spent in only the five years immediately before the filing of the 2021 Chapter 11 Case; and over $3.5 billion in indemnity payments, primarily over the same time period.  Id.  Although Old JJCI prevailed against most claims, including securing unanimous defense verdicts in six of the eight claims tried to verdict during the 12 months prior to the 2021 Chapter 11 Case, the costs of this litigation and the intermittent outsized plaintiff verdicts made the litigation of these cases in the tort system for the next 50 years or more (as claimants seek to do) untenable, unsustainable, and inequitable.  Id. ¶ 36.

Halting the litigation is critical to the Debtor's reorganization.  Without it, talc claimants would be permitted to restart litigation or file new lawsuits, in each case in other forums, asserting the exact same talc claims the Debtor is seeking to resolve in this Chapter 11 Case pursuant to the terms set forth in plan support agreements.  Id. ¶ 109.  And that litigation will proceed in literally tens of thousands of individual actions across the country.  See Id. ¶ 42-43.  This litigation resurgence "would undoubtedly interfere with, and almost surely end, the Debtor's reorganization effort.  With thousands of claims and proceedings spread out across the country, it would be all but impossible to negotiate or confirm a Section 524(g), or any other,

NAI-1535638547

plan." DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC),

2021 WL 3552350, at *43 (Bankr. W.D.N.C. Aug. 11, 2021).  That, of course, is why every

court asked to enjoin such piecemeal litigation to permit a debtor to pursue a full resolution of its

mass tort claims has done so.  See infra § III.A.

        To allow these tens of thousands of pending tort claims to proceed outside of

chapter 11 would—given the Debtor's indemnification obligations to J&J, Holdco and other

Protected Parties—effectively lift section 362's automatic stay of litigation against the Debtor,

the real party in interest.  See First Day Declaration ¶ 109;  see also Ex. 43 (2021 First Day

Decl.) ¶ 18.  At the same time, it would usurp this Court's ability to preside over this case and to

consider and approve any resolution of the claims proposed herein.[6]  This unprecedented result

would, contrary to Third Circuit precedent, defeat the purpose of this case.  See McCartney v.

Integra Nat'l. Bank N., 106 F.3d 506, 511 (3d Cir. 1997) (one purpose of section 362 is "to

centralize all prebankruptcy civil claims against a debtor in the bankruptcy court"); see also A.H.

Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.), 788 F.2d 994, 999 (4th Cir. 1986) ("To

refuse application of the statutory stay in that case would defeat the very purpose and intent of

the statute.").

        Unusual circumstances exist that justify an extension of the automatic stay as a

result of the identity of interests between the Debtor and each of the Protected Parties, together

with the adverse impact of continued litigation on the Debtor's estate and reorganization efforts.

There is an identity of interests between the Debtor and Old JJCI because Old JJCI no longer

exists and all of its talc liabilities were allocated to the Debtor in the 2021 Corporate

---

[6]    See In re Brier Creek Corp. Ctr. Assocs. Ltd., 486 B.R. 681, 697 (Bankr. E.D.N.C. 2013) ("Many courts
have also stayed non-debtor litigation when such litigation would impair the court's jurisdiction over the
bankruptcy case or an adversary proceeding pending before the court.") (citing cases).

NAI-1535638547

Restructuring (as defined herein).  First Day Decl. ¶ 23.  And there is an identity of interests between the Debtor and each of the other Protected Parties because, among other reasons, the Debtor is actually or allegedly contractually obligated to indemnify each of them for any talc liabilities.  Id. ¶ 107.  Moreover, the Debtor Talc Claims asserted against the Protected Parties involve "the same products, same time periods, same alleged injuries, and same evidence as claims against Debtor."  PI Op., 638 B.R. at 306.

Continued litigation of the Debtor Talc Claims would also have an adverse impact on the Debtor's estate.  The prosecution of the Debtor Talc Claims against the Protected Parties, including J&J, would, among other things:  (i) liquidate contractual indemnification claims against the Debtor outside of chapter 11; (ii) effectively seek to collect on claims against the Debtor; (iii) deplete available insurance coverage; (iv) interfere with negotiation and mediation efforts; (v) eliminate the protections of the automatic stay; and (vi) imperil the Debtor's reorganization.  See PI Op., 638 B.R. at 307 ("continued litigation against the Protected Parties would liquidate pending tort claims, as well as indemnification claims, against Debtor outside of chapter 11 and potentially deplete available insurance coverage – frustrating the purpose of the automatic stay").

This Motion also satisfies each of four factors that bankruptcy courts typically consider in reviewing a request to enjoin litigation against non-debtors.  The first—likelihood of success—is satisfied because the Debtor unquestionably has the financial capacity to implement a plan of reorganization on the terms agreed with the supporting claimants, and it is prepared promptly to continue negotiations to resolve this case.  See First Day Decl. ¶¶ 7, 80.  The Debtor believes that its entry into new financing arrangements resolves the concerns that led the Third Circuit to conclude that the Debtor's first chapter 11 case had to be dismissed.  It further believes

NAI-1535638547

that there should be no legitimate dispute that this Chapter 11 Case satisfies the good-faith-filing standard as articulated by the Third Circuit in its dismissal opinion. Id. ¶¶ 8, 82. In addition, the Debtor now has the support of thousands of talc claimants for this Chapter 11 Case and the terms of a potential plan of reorganization. Id. ¶ 7. And the Debtor has sufficient resources to fund the costs of this Chapter 11 Case and a plan of reorganization on the terms agreed to in the plan support agreements to equitably and finally resolve its talc liabilities. Id. ¶ 80. The Debtor is committed to building on the substantial progress made to date and continuing to engage with claimant representatives and key stakeholders to obtain further support for a plan that contains the terms set forth in the plan support agreements. Id. ¶¶ 7, 74. Thus, the Debtor's prospects for a successful reorganization are strong.

The second factor—irreparable harm—is met because the very purpose of this Chapter 11 Case would be defeated in the absence of the requested injunction. It is beyond dispute that a preliminary injunction is critical to the fundamental purpose of the case—to obtain confirmation of a plan of reorganization that will achieve an equitable, final, and full resolution of the Debtor's talc liabilities. Id. ¶ 109; see also PI. Op. 638 B.R. at 320-21.

The third—the balance of harms—weighs decidedly in favor of a preliminary injunction because it will preserve the Debtor's opportunity to pursue a successful reorganization. At the same time, halting the pursuit of the Debtor Talc Claims outside this Court will not materially harm the Defendants. See PI. Op. 638 B.R. at 321. Indeed, based on the historical pace of resolution of these claims, it would take decades to resolve them in the tort system. See First Day Decl. ¶ 36. And, in the majority of cases, the Defendants would receive no recovery. Id. In contrast, a bankruptcy trust will provide those claimants with "a far simpler and streamlined process than currently available in the tort system." PI Op., 638 B.R. at 321.

NAI-1535638547

The fourth factor—public interest—also supports granting this Motion.  Not only will the requested injunction help foster a successful chapter 11 reorganization here, which is always in the public interest, it will—in stark contrast to the lottery-like results in the tort system—do so by fostering a rational, equitable resolution of the Debtor Talc Claims.  See id. at 322 ("[T]his Court holds no doubts that claim resolution through the bankruptcy process is in the public interest.").

To avoid the immediate and irreversible harm that would occur absent the requested injunction, the Debtor requests that the Court issue a temporary restraining order on an ex parte basis pending a final hearing on the merits.  Ex parte relief is appropriate given the exigent circumstances, the Court's familiarity with the Debtor and the material facts underlying this Motion, and that the Court previously granted similar relief in the 2021 Chapter 11 Case.

Throughout the 2021 Chapter 11 Case, plaintiffs' counsel repeatedly stated their desire to assert, or sought relief from the stay to assert, the Debtor Talc Claims against the Protected Parties following dismissal of the case.  In one particular case, Hernandez-Valadez v. Johnson & Johnson, et al., Case No. 22CV012759 (the "Valadez Case"), the claimant obtained relief from the automatic stay to pursue his claim after the Third Circuit's dismissal opinion on January 30, 2023.  A trial is scheduled to begin in the Valadez Case later this month, and the propriety of the filing of the 2021 Chapter 11 Case will be a centerpiece of the arguments. In preparation for trial, the claimant is seeking significant discovery from the Debtor and J&J. Id.  The imminent trial in the Valadez Case, and any similar proceeding targeting Protected Parties while this Chapter 11 Case is pending, risks impeding the Debtor's efforts to gain further support for a chapter 11 plan, harming the Debtor's interests by potentially liquidating claims against the estate or otherwise binding the Debtor with respect to talc claims against it.  Id.

NAI-1535638547

Moreover, without immediate injunctive relief, the Debtor will be compelled to divert key estate resources away from its reorganization efforts to focus on that ongoing litigation, jeopardizing the successful resolution of this Chapter 11 Case.  Id.

## FACTUAL BACKGROUND[7]

On the date hereof (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession of its property and is managing its business, as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## I.    THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

### A.    The Debtor's Predecessors and Related Restructurings

The Debtor traces its roots back to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly owned subsidiary of J&J.  First Day Decl. ¶ 12.

J&J, a New Jersey company incorporated in 1887, first began selling Johnson's Baby Powder in 1894, launching its baby care line of products.  Id. ¶ 13.  In 1972, J&J established a formal operating division for its baby products business, which included Johnson's Baby Powder.  Id.

#### 1.    J&J Adopts Decentralization Policy

In the 1970s, J&J adopted a policy to decentralize its operations as a part of a growth and innovation strategy.  Id. ¶ 14; see also Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 97:14-21.  As a part of this decentralization policy, J&J converted into a holding company, and certain J&J subsidiaries accepted all assets and operational responsibilities, and assumed all

---

[7]    The Court's findings of fact issued in the PI Opinion are incorporated herein.

NAI-1535638547

liabilities associated with, designated operating divisions of J&J.  See Ex. 42.1 (Hr'g Tr., Nov. 4,

2021, Kim Direct) at 98:3-13.  The purpose of the decentralization policy was to drive creativity

and productivity by giving each company autonomy to make decisions without unnecessary

constraints.  Ex. 1 (1981 Annual Report, 401 and 404).  J&J's public SEC disclosures,[8] and

Board meeting minutes, emphasize the importance of J&J's decentralization strategy and

philosophy to its businesses.  Ex. 7 (Board of Directors Meeting Minutes, dated Dec. 12, 1978)

at 6-7.

> **2.      Old JJCI's Responsibility For All Liabilities Associated With
>           Johnson's Baby Powder**

Consistent with J&J's policy of decentralizing its businesses, on December 12,

1978, J&J's Board of Directors approved the transfer of all assets and liabilities of the Baby

Products division, including those associated with Johnson's Baby Powder, to J&J Baby

Products.  First Day Decl. ¶ 14.  This was part of a larger restructuring of J&J that included the

transfer of assets and liabilities of seven principal operating divisions to wholly owned

subsidiaries:

> **[T]he incorporation of seven principal operating divisions of
> Johnson & Johnson effective January 1, 1979 as wholly-owned
> subsidiaries** . . . will be accomplished by a transfer of assets from
> the divisions to the corporations respectively which **will also
> assume the liabilities of the divisions** respectively … In keeping
> with Johnson & Johnson's long standing policy of decentralization
> of corporate business, and in light of substantial potential state tax
> savings, as well as additional legal considerations, the matter has

---

[8]      E.g., Ex. 2 (Debtor's PI Hr'g Ex. 66, J&J 10-K, dated Dec. 30, 1979), at 3 ("Johnson & Johnson is
organized on the principles of decentralized management and conducts its business through operating
subsidiaries which are themselves, for the most part, integral, autonomous operations."); Ex. 3 (Debtor's PI
Hr'g Ex. 65, J&J 10-K, dated Jan. 2, 1977), at 3; Ex. 4 (Debtor's PI Hr'g Ex. 67, 1986 Johnson & Johnson
Annual Report), at 5 "… this growth will continue into the future if we adhere to our basic philosophies:
continue our unique form of decentralization") (emphasis added); Ex. 5 (Debtor's PI Hr'g Ex. 68, Johnson
& Johnson 10-K, dated Jan. 1, 1978), at 3; Ex. 6 (Debtor's PI Hr'g Ex. 69, Johnson & Johnson 10-K, dated
Dec. 31, 1978), at 3.

NAI-1535638547

been approved by the Executive Committee in June 1978 and reported to the Board on July 1978.

Id.; Ex. 7 (Debtor's PI Hr'g Ex. 6, Dec. 12, 1978 Board of Directors Meeting Minutes) at 6-7

(emphasis added).

Subsequently, to effectuate the transaction, J&J and J&J Baby Products entered

into an *Agreement for Transfer of Assets and Bill of Sale*, effective January 1, 1979 (the "1979

Agreement"), pursuant to which J&J transferred all assets and liabilities associated with the Baby

Products division to J&J Baby Products:

> WHEREAS, J&J has a number of operating divisions conducting various lines of business; and
>
> WHEREAS, one of these operating divisions is named the JOHNSON & JOHNSON BABY PRODUCTS COMPANY Division (sometimes hereinafter called the "BABY Division"); and
>
> WHEREAS, the Subsidiary corporation, is wholly-owned by J&J and J&J is desirous of **transferring to this Subsidiary all assets and liabilities** which are now allocated to the BABY Division on the books or records of Johnson & Johnson; . . .

Ex. 8 (Debtor's PI Hr'g Ex. 2, 1979 Agreement) at 1 (emphasis added); accord id. §1 ("J&J . . .

does grant, bargain, sell, assign, alien, remise, release, convey, transfer, set over and confirm,

**unto the Subsidiary**, **its successors and assigns**, forever, all the **businesses**, franchises,

properties and assets . . . which are now allocated on its books or records of J&J to its Baby

Division . . .") (emphasis added).

The 1979 Agreement provides that J&J Baby Products assumed all liabilities of

every kind and description associated with the Baby Products division and indemnified J&J for

such liabilities:

> . . . Subsidiary agrees to **assume** . . . **all the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to its BABY Division** and the Subsidiary hereby covenants and agrees

-12-

> with J&J that the **Subsidiary will forever** . . . **indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed** . . . .
>
> . . .the covenants and agreements herein contained shall inure to the benefit of and shall bind the respective parties hereto and their respective successors and assigns.

Id. §1 (emphasis added).  The assumed liabilities included contingent and future product liability claims. Ex. 47 (Hr'g Tr., Nov. 10, 2021) at 138:15-19.  The 1979 Agreement also provided J&J Baby Products with an irrevocable power of attorney to substitute itself "**for J&J and in its [J&J's] name and stead** . . . **on behalf of and for the benefit of the Subsidiary**" to, among other things, "**defend and compromise any and all actions**, suits or proceedings in respect of any said Properties" – defined as the Baby Products division's "businesses, franchises, properties and asset".  Ex. 8 (Debtor's Hr'g Ex. 2) § 2 (emphasis added).

Following the 1979 Agreement, J&J no longer manufactured or sold baby products, including Johnson's Baby Powder.  First Day Decl. ¶ 14.  Thus, in 1979, J&J Baby Products became the real party in interest for all actions, suits or proceedings relating to the talc previously sold by J&J or in any way arising out of the talc business that was being transferred.

In 1981, J&J Baby Products transferred all of its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned subsidiary of J&J Baby Products.  First Day Decl. ¶ 15; Ex. 9 (Debtor's PI Hr'g Ex. 52, Johnson & Johnson Baby Products Company Action Authorized by Unanimous Consent, dated July 21, 1981) at 2.  In turn, Omni assumed all liabilities of J&J Baby Products, except those liabilities related to its diaper program, and agreed to indemnify J&J Baby Products against all assumed liabilities.  First Day Decl. ¶ 15.  Immediately following the transaction, J&J Baby Products merged into Personal Products Company, with J&J Baby Products as the surviving corporation

-13-

but renamed Personal Products Company, and Omni changed its name to Johnson & Johnson
Baby Products Company.  Id.

       In 1988, Johnson & Johnson Baby Products Company transferred all of its assets
in respect of its baby products business to Johnson & Johnson Dental Products Company, which
assumed all of the liabilities of, and agreed to indemnify, Johnson & Johnson Baby Products
Company and was renamed Johnson & Johnson Consumer Products, Inc.  Id. ¶ 16; Ex. 10
(Debtor's PI Hr'g Ex. 54, Agreement for Transfer of Assets and Bill of Sale, dated Jan. 3, 1988).

       In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to
Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").  First Day Decl.
¶ 17; Ex. 11 (Debtor's PI Hr'g Ex. 55, Certificate of Incorporation, dated July 1, 1997).  In 2015,
J&J Consumer Companies merged with and into an affiliate, which then merged into
McNeil-PPC, Inc.  The resulting entity was renamed Johnson & Johnson Consumer Inc. (which,
including all former names and historical forms, was Old JJCI).  First Day Decl. ¶ 18; Exs. 12-14
(Debtor's PI Hr'g Exs. 57-59, Certificates of Merger, dated Nov. 2, 1998, June 15, 2015, and
June 25, 2015, respectively).

       The timeline below reflects these intercompany transactions that resulted in Old
JJCI becoming responsible for all claims alleging that Johnson's Baby Powder causes cancer or
other diseases:

NAI-1535638547

| 1894 | 1972 | 1979 | 1981 | 1988 | 1997 | 2015 |
|------|------|------|------|------|------|------|
| J&J begins selling JOHNSON's® Baby Powder | Baby Products Division created | Baby Products Division is transferred to J&J Baby Products Company subsidiary, which assumed all liabilities of Division | J&J Baby Products Company transfers all but diaper assets to Omni Education Corporation, wholly-owned subsidiary, which assumes liabilities associated with transferred assets. Omni changes name to Johnson Baby Products Company | Johnson Baby Products Company transfers all Baby Powder assets to J&J Dental Products Company, which assumes all liabilities and is renamed J&J Consumer Products, Inc. | J&J Consumer Products, Inc. renamed J&J Consumer Companies, Inc. | J&J Consumer Companies, Inc. mergers with and into McNeil-PPC, Inc. Resulting entity is renamed J&J Consumer Inc. ("JJCI") |

### 3. Old JJCI's Responsibility For All Liabilities Associated with Shower to Shower

Similar to Johnson's Baby Powder, Old JJCI became responsible for all claims alleging that Shower to Shower products, which contained talc, causes cancer or other diseases. First Day Decl. ¶ 20. Prior to the institution of the 1970s decentralization policy, Shower to Shower products were marketed by a division of J&J, the Johnson & Johnson Domestic Operating Company division. Id. Consistent with J&J's decentralization efforts and its transition to a holding company, effective January 1, 1978, J&J transferred all assets and liabilities related to Shower to Shower products to Personal Products Company, a wholly owned subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility for the Shower to Shower products. Id.; Ex. 15 (Debtor's PI Hr'g Ex. 51). This transaction was discussed in an internal Personal Products Company letter dated October 31, 1977:

> As we discussed, **Personal Products Company will take full responsibility for SHOWER TO SHOWER\*** on January 1, 1978. During January, I will take the necessary steps to register with FDA and our Consumer Affairs Department will be taking over the complaint handling.

NAI-1535638547

Id. (emphasis added).  Contemporaneous public filings by J&J confirm that Personal Products

Company in fact took responsibility for the Shower to Shower product line.[9]  Likewise, internal

accounting records for year-end December 31, 1978 show that expenses associated with the

Shower to Shower product line were recorded on the books of the Personal Products

Company.  Ex. 27 (2021 Second Supp. Kim Decl., Ex. P)].

       The operational responsibilities, liabilities, and assets related to Shower to Shower

products were transferred from Personal Products Company to Johnson & Johnson Baby

Products Company by early 1987.  First Day Decl. ¶ 21; compare Ex. 16 (Debtor's PI Hr'g Ex.

70, excerpt from J&J 1985 Annual Report) (identifying Shower to Shower as a product of

Personal Products Company) with Ex. 17 (Debtor's PI Hr'g Ex. 71, excerpt from J&J 1986

Annual Report) (identifying Shower to Shower as a product of Johnson & Johnson Baby Product

Company); First Day Decl. ¶ 21.

       In 2012, Old JJCI sold the assets and liabilities related to certain products,

including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc.

("Valeant").  First Day Decl. ¶ 22.  Thereafter, in 2019, Old JJCI and Valeant (now known as

Bausch Health Companies Inc. ("Bausch")) entered into an indemnification agreement.  Id.

Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for any

liability arising from Shower to Shower products and for certain other regulatory actions arising

out of the manufacture, use, or sale of Shower to Shower products, as set forth more fully in the

agreement.  Id.

---

[9]    Compare Ex. 3 (Debtor's PI Hr'g Ex. 65, J&J 10-K, for the FYE Jan. 2, 1977) (not identifying Shower to
Shower as a product of Personal Products Company) with Ex. 5 (Debtor's PI Hr'g Ex. 68, J&J 10-K, for
the FYE Jan. 1, 1978) (identifying Shower to Shower as a product of Personal Products Company) and Ex.
2 (Debtor's PI Hr'g Ex. 66, J&J 10-K, for the FYE Dec. 30, 1979) (identifying Shower to Shower as a
product of Personal Products Company); Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 130:6-131:6.

NAI-1535638547

At all times after 1978, all Shower to Shower liabilities—including costs for

talc-related litigation claims—were ultimately charged to Personal Products Company, Johnson

& Johnson Baby Products Company, or Old JJCI.  Ex. 42.2 (Hr'g Tr., Nov. 5, 2021, Kim

Redirect) at 341:1-10.

### 4.    Financial Course of Performance for Payment of Talc Liabilities

Prior to the 2021 Corporate Restructuring (as described below), except where

insurance coverage was available to pay talc-related costs, all costs associated with litigation

concerning any talc products—including defense costs, settlements and any verdict amounts—

were borne by Old JJCI.  Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 121:15-19;  Ex. 46

(Debtor's PI Hr'g Ex. 50, Lisman Decl.) ¶¶ 8-12.  J&J and Old JJCI used an integrated,

centralized cash management system to collect, manage, and disburse funds.  Id.  Pursuant to

company policy, cash collected by Old JJCI was generally swept to J&J's concentration account

on a daily basis.  Id. ¶ 8.  For administrative convenience and pursuant to company policy, J&J

initially paid costs associated with litigation concerning talc products from its concentration

account and then charged 100% of those costs to Old JJCI through intercompany charges.  Id.

These intercompany charges are reflected on Old JJCI's general ledger.  Id. ¶ 9.

Since 2007, Old JJCI had used SAP accounting software to maintain its general ledger

electronically.  Id.  Old JJCI's debit entries in its general ledger from 2007 to the present confirm

that Old JJCI had been charged through intercompany payables all defense costs and any

settlement or verdict amounts related to litigation concerning talc products.  Id.  J&J reports its

financial statements on a consolidated basis with all of its subsidiaries.  Id. ¶ 12.  J&J's

consolidated financial statements reflected a reserve for defense and indemnity costs for Old

JJCI associated with personal injury claims related to talc.  Id.  Although the reserve is reported

on a consolidated basis, it is allocated by segment, as required by Generally Accepted

-17-

Accounting Principles and SEC reporting requirements.  Id.  The talc-related reserve in J&J's consolidated financial statements is allocated to the consumer segment, which included Old JJCI. Id.

### 5.      The 2021 Corporate Restructuring

In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate Restructuring"), which was completed on October 12, 2021.  First Day Decl. ¶ 23; Ex. 40 (2021 Funding Agreement, dated as of October 12, 2021) at 1.  As a result of that restructuring:  Old JJCI ceased to exist and two new entities were created:  (i) the Debtor, which was initially formed as a Texas limited liability company and then converted into a North Carolina limited liability company; and (ii) Holdco, which was initially formed as a Texas limited liability company and then merged into a New Jersey corporation that was its direct parent (as well as the direct parent of the Debtor), whereupon this entity changed its name to Johnson & Johnson Consumer Inc. ("New JJCI").  First Day Decl. ¶ 23.  In the 2021 Corporate Restructuring, the Debtor was allocated certain of Old JJCI's assets and became solely responsible for the talc-related liabilities of Old JJCI, and New JJCI was allocated all other assets of Old JJCI and became solely responsible for all other liabilities of Old JJCI.  Id.

Old JJCI implemented the 2021 Corporate Restructuring to facilitate a chapter 11 filing by the Debtor that would permit the Debtor to fully resolve current and future talc-related claims through a plan of reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding.  Id. ¶ 24.

### 6.      New JJCI/ Holdco

New JJCI operated its business following the 2021 Corporate Restructuring.  Id. ¶ 25.  This included the manufacture and sale of a broad range of products used in the baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-counter

-18-

pharmaceutical products (collectively, the "Consumer Business").  Id.  In December 2022, New

JJCI changed its name to Johnson & Johnson Holdco (NA) Inc. (Holdco), and in early January

2023, Holdco transferred its Consumer Business assets to its parent entity.  Id.

Holdco is the direct parent of the Debtor; and the Debtor is the direct parent of

Royalty A&M LLC ("Royalty A&M"), a North Carolina limited liability company.  Holdco is a

holding company with ownership interests in various subsidiaries.  Id. ¶ 26.  The most

substantial of Holdco's ownership interests are held through its wholly owned subsidiary Apsis

SAS (France) ("Apsis").  Apsis owns (through its wholly owned subsidiary Johnson & Johnson

Holding GmbH (Germany)) a 36.1% ownership interest in GH Biotech Holdings Limited

(Ireland) ("GH Biotech").  Id.  GH Biotech holds ownership interests, either directly or through

wholly owned subsidiaries, in four entities, Janssen Sciences Ireland Unlimited Company,

Janssen Irish Finance Unlimited Company, C Consumer Products Denmark ApS, and Impulse

Dynamics (71% interest).  Id.  Apsis also owns, either directly or indirectly, interests in various

limited risk distributors (which distribute J&J products in foreign countries), a German-based

subsidiary that manufactures 3D-printed titanium interbody implants for spinal fusion surgery,

and various other subsidiaries.  Id.[10]

As of the Petition Date, Holdco has access to approximately $400 million in cash

through J&J's cash management system.  Id. ¶ 27.

### 7.    The Debtor

The Debtor was formed to manage and defend thousands of talc-related claims

and to oversee the operations of its subsidiary, Royalty A&M.  Id. ¶ 28.  Royalty A&M owns a

portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales

---

[10]      A chart depicting the Debtor's corporate structure is attached as Annex B to the First Day Declaration.

of CLOROX®, ECOLAB®, ESSITY®, LACTAID®, MYLANTA® / MYLICON®,

ROGAINE®, SPARTAN® and TENA® products.  Id.  It reviews royalty monetization

opportunities in the healthcare industry and seeks to grow its business by financing and/or

reinvesting the income from the existing royalty revenue streams into both the acquisition of

additional external royalty revenue streams as well as financings to third parties secured by

similar royalty streams.  Id.  In June 2022, Royalty A&M entered into a royalty purchase

agreement whereby it acquired rights to certain royalty streams from a third-party.  Id.

   The Debtor also has cash, interests as payee under the 2023 Funding Agreement

(as defined herein), and certain insurance coverage rights described below.  Id. ¶ 29.

   **8.**  **J&J**

   The Debtor's ultimate parent company, J&J, is a holding company that through its

operating subsidiaries conducts business in virtually all countries in the world, focused primarily

on products related to human health and well-being.  Id. ¶ 30.  J&J is a global innovator and

leader in public health and has been at the forefront of healthcare innovation for over 130 years.

Id.  That innovation includes novel oncology, immunology and vaccine products, including its

COVID-19 vaccine that it developed and supplied at non-profit pricing.  Id.

   **9.**  **Previous Financing Arrangements**

   As described above, Old JJCI and its affiliates engaged in multiple restructurings

through the years, including the 2021 Corporate Restructuring.  Id. ¶ 31.  The 2021 Corporate

Restructuring was effectuated through a series of steps, which are described in detail in the 2021

First Day Declaration.  Id.; see also Ex. 43 (2021 First Day Decl.) ¶¶ 22-27.  A key component

of the 2021 Corporate Restructuring was a funding agreement between the Debtor, on the one

hand, and J&J and New JJCI on the other (the "2021 Funding Agreement").  First Day Decl.

¶ 31.

NAI-1535638547

The primary purpose of the 2021 Funding Agreement was to facilitate the resolution of talc-related claims through a chapter 11 filing by the Debtor.  Id.  The 2021 Funding Agreement obligated New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, for, among other things, (i) the administrative costs of the Debtor's chapter 11 case and (ii) a trust that would satisfy current and future talc claims, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M were insufficient to pay such costs and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.  Id.

In connection with the 2021 Funding Agreement, New JJCI and J&J entered into a commitment and loan agreement, dated October 12, 2021, pursuant to which New JJCI and J&J agreed that:  (i) New JJCI would be the primary obligor under the 2021 Funding Agreement; (ii) upon the request of New JJCI, J&J would make revolving credit loans to New JJCI, with the proceeds of the loans to be used by New JJCI solely to satisfy its obligations under the 2021 Funding Agreement; and (iii) if New JJCI failed to make any payment to the Debtor required by the 2021 Funding Agreement, and instead J&J made such payment under the 2021 Funding Agreement, New JJCI would reimburse J&J for that payment and, if it failed to do so, the amount New JJCI owed would be deemed to be financed with a loan from J&J.  Id. ¶ 32.

## 10.    Other Agreements

To ensure that the Debtor had access to services it needs to effectively operate its business, in connection with the 2021 Corporate Restructuring, the Debtor entered into a services agreement and a secondment agreement with Johnson & Johnson Services, Inc. ("J&J Services").  Id. ¶ 33; see also Ex. 43 (2021 First Day Decl.) ¶¶ 29-30.  In addition, Royalty A&M entered into similar agreements with J&J Services and the Debtor, respectively, and an intercompany loan facility agreement with J&J.  First Day Decl. ¶ 33; Ex. 43 (2021 First Day

NAI-1535638547

Decl.) ¶ 30.  As a result of these agreements, the Debtor and Royalty A&M have been able to

operate their respective businesses efficiently and effectively.  First Day Decl. ¶ 33.

## II.    EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE

### A.    The Debtor Talc Claims

Cosmetic talc litigation against the Debtor has focused primarily on Johnson's

Baby Powder as a purported cause of ovarian cancer and mesothelioma.  Ex. 43 (2021 First Day

Decl.) ¶ 32.  For over 125 years Johnson's Baby Powder has been used by hundreds of millions

of consumers worldwide.  Id.  On May 19, 2020, Old JJCI announced it would permanently

discontinue its line of talc-based Johnson's Baby Powder in the U.S. and Canada.  Id. ¶ 33.

The decision was based on business considerations, including lack of sales due to misinformation

about the safety of Old JJCI's talc-based Johnson's Baby Powder.  Id.

Before 2010, there were few lawsuits alleging claims related to Johnson's Baby

Powder or Shower to Shower.  See Ex. 43 (2021 First Day Decl.) ¶¶ 34.  Claims started to

increase after the jury in a 2013 talc-related ovarian cancer case, Berg,[11] found for the plaintiff

but awarded no damages.  Id. ¶ 35; *Informational Brief of LTL Management LLC*, [Dkt. 3 in

Case No. 21-30589], at 47; Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 120:12-121:1.

In 2014, Old JJCI was served with 46 ovarian cancer complaints.  Ex. 43 (2021 First Day Decl.)

¶ 43.  In 2017, that number was nearly 5,000.  Id.

As of the filing of the 2021 Chapter 11 Case, there were almost 40,000 plaintiffs

asserting ovarian-cancer claims against the Debtor, including almost 36,000 plaintiffs with

claims pending in a federal multi-district litigation in New Jersey (the "MDL"), and more than

---

[11]    Berg v. Johnson & Johnson, 940 F.Supp.2d 983, 993 (D.S.D. 2013).

NAI-1535638547

3,800 plaintiffs with claims in multiple state court jurisdictions across the country.  First Day

Decl. ¶ 42.  These claims were all stayed during the pendency of the 2021 Chapter 11 Case.  Id.

    Approximately 470 mesothelioma cases were also pending against the Debtor as

of the filing of the 2021 Chapter 11 Case.  Id. ¶ 44.  These claims, like the ovarian cancer claims,

spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York,

and Ohio and were stayed during the pendency of the 2021 Chapter 11 Case.  Id.

    In addition to the thousands of talc claims pending in the United States as of the

2021 Chapter 11 Case, Old JJCI, J&J, J&J Canada and Bausch are named defendants in one

certified class action, three proposed class actions and one individual action in four Canadian

provinces (Alberta, British Columbia, Ontario and Quebec).  Id. ¶ 37.  The certified class action

and the proposed class actions commenced in Alberta, British Columbia, Ontario and Quebec are

brought on behalf of classes (or proposed classes) of Canadian individuals who allege injury or

damages arising from the use or purchase of talc-containing products manufactured, marketed

and/or sold by Old JJCI, J&J, J&J Canada or Bausch.  Id.  The individual action was commenced

in British Columbia by an individual who likewise alleges injury arising from the use of

talc-containing products manufactured or sold by Old JJCI, J&J or J&J Canada.  Id. Although

subject to a stay of proceedings arising from the recognition of the 2021 Chapter 11 Case in

Canada in December 2021, 12 additional Ontario-based Canadian claims were served in March

2022, and 26 additional British Columbia-based claims were filed in January and February 2023.

Id.

    Due to the long alleged latency periods for mesothelioma and ovarian cancer,

cosmetic talc litigation against the Debtor is anticipated to continue for decades more, as are the

extraordinary costs of defending and resolving the tens of thousands of expected claims.

NAI-1535638547

Plaintiff experts estimate that the latency period for mesothelioma can run as long as 60 years and have begun to allege extended latency periods for ovarian cancer allegedly caused by asbestos exposure.  First Day Decl. ¶ 41.  As a result, although Old JJCI stopped selling its talc-based Johnson's Baby Powder in North America in 2020, individuals who develop mesothelioma in 2080 and beyond could sue the Debtor, potentially drawing out the litigation to the end of this century.  Id.

### 1.    Talc-Related Claims against the Debtor and J&J Are the Same

Even though J&J has not manufactured or sold talc-containing products for over 40 years, the Debtor Talc Claims are asserted in virtually every case against both the Debtor and J&J.  Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 134:21-139:11.  In many jurisdictions, the plaintiffs seek to hold the Debtor and J&J jointly and severally liable for the Debtor Talc Claims. The plaintiffs rarely, if ever, attempt to differentiate between talc-containing products sold by J&J and Old JJCI.  Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 134:5-18;  Ex. 44 (2021 Supp. Kim Decl.) ¶ 6.

For example, in the MDL pending in the District Court of New Jersey, the alleged claims against J&J and Old JJCI are all identical—based on same products, same defect, and same alleged harm.  Id.  The MDL plaintiffs allege that they were diagnosed with various forms of cancer caused by Johnson's Baby Powder and Shower to Shower, which are defined in the operative complaint (the "MDL Complaint") as the "PRODUCTS":

> 2.    Plaintiffs were diagnosed with various forms of cancer of the female reproductive system, including epithelial ovarian cancer, fallopian tube cancer, and primary peritoneal cancer, which were directly and proximately caused by their regular and prolonged exposure to talcum powder contained in the PRODUCTS. …

Ex. 18 (Debtor's PI Hr'g Ex. 20, In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs., & Prod. Liab. Litig., No. 3:16-MD-02738-FLW-LHG (D.N.J. Dec. 12, 2020)); Ex. 42.1

NAI-1535638547

(Hr'g Tr., Nov. 4, 2021, Kim Direct) at 134:21-137:3 ("they've now clumped together Johnson's

Baby Powder and Shower to Shower and treat them for the purposes of the complaint as, as the

same product…").

The MDL plaintiffs make no effort to differentiate between J&J and Old JJCI and

instead refer throughout the MDL Complaint to two separate entities collectively as "Johnson &

Johnson Defendants":

> 3.      Defendant, Johnson & Johnson, is a New Jersey corporation
> with its principal place of business at One Johnson & Johnson Plaza,
> New Brunswick, New Jersey 08933. Johnson & Johnson may be
> served with process by serving its registered agent at One Johnson
> & Johnson Plaza, New Brunswick, New Jersey 08933. . . .
>
> 8.      Defendant Johnson & Johnson Consumer Inc. is and has
> been at all relevant times a wholly-owned subsidiary of Defendant
> Johnson & Johnson, under the complete dominion of and control of
> Defendant Johnson & Johnson. Hereinafter, unless otherwise
> delineated, these two entities together shall be referred to as the
> "Johnson & Johnson Defendants." . . . .

Ex. 18 (Debtor's PI Hr'g Ex. 20; Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 138:10-

139:11.

The mesothelioma cases are pled and prosecuted in a similar manner.  In a case

tried to verdict in the Superior Court for the State of California, County of Los Angeles, the

plaintiffs lumped J&J and Old JJCI together, asserting collectively against them the same claim

based on the same product, the same defect, and the same alleged harm:

| 5 | DEFENDANT | ALTERNATE ENTITY |
|---|---|---|
| 22 23 | JOHNSON & JOHNSON CONSUMER, INC. | JOHNSON & JOHNSON |

> 18(a). **"Defendants, their 'alternate entities', and each of them**,
> suppressed from all consumers, including Plaintiffs . . ., medical and

NAI-1535638547

> scientific information concerning the health hazards associated with
> inhalation of asbestos, including the substantial risk of injury or
> death therefrom . . ."
>
> 18(d). **"Defendants, their 'alternate entities', and each of them**,
> failed to warn Plaintiffs … and others of the nature of Defendants'
> Products which were dangerous when breathed . . ."

Ex. 19 (Debtor's PI Hr'g Ex. 22, <u>Anderson et al. v. Borg Warner Corp. et al.</u>, No. BC666513,

(Jun. 27, 2017) (emphasis added)) at 6, 10-12.

This pattern of filing identical claims against J&J and Old JJCI is seen starkly by

comparing two complaints—one filed before the 2021 Chapter 11 Case and one filed after.

<u>Compare</u> Ex. 20 (Debtor's PI Hr'g Ex. 86, <u>Richards, et al. v. Johnson & Johnson, et al.</u>,

No. 21-2-10988-4, Superior Court of the State of Washington in and for the County of King

(Aug. 18, 2021)) with Ex. 21 (Debtor's PI Hr'g Ex. 26, <u>McBride et al. v American International</u>

<u>Industries, Inc., et al.</u>, No. 49D13-2110-MI-034781, Marion County Superior Court for the State

of Indiana (Oct. 15, 2021)).  In both the <u>Richards</u> and <u>McBride</u> complaints, the plaintiffs allege,

among other things, that false representations were made regarding the asbestos content of their

cosmetic talc products, including Johnson's Baby Powder.  <u>Compare</u> Ex. 20 (Debtor's PI Hr'g

Ex. 86) ¶¶ 9, 35, 42 <u>with</u> Ex. 21 (Debtor's PI Hr'g Ex. 26) ¶¶ 15, 41, 48.  The only difference is

that in <u>Richards</u> the defendants are both J&J and Old JJCI, whereas in <u>McBride</u> the only named

defendant is J&J.  <u>Id.</u>; Ex. 42.2 (Hr'g Tr., Nov. 5, 2021, Kim Redirect) at 324:13-328:21.

Courts presiding over Debtor Talc Claims have likewise treated both J&J and Old

JJCI as the same for evidentiary purposes.  For example, after the commencement of the 2021

Chapter 11 Case but before the North Carolina Bankruptcy Court's preliminary injunction ruling,

a court in South Carolina ruled that the filing of the Chapter 11 Case did not impact in any way

the evidence that could be presented at trial, holding that all evidence would be received

regardless of whether it was against J&J or Old JJCI:

NAI-1535638547

> I tell you one thing, . . ., if you think anybody in any of these cases
> is going to allow the stay against liability on behalf of Old Johnson
> & Johnson Consumer Inc. to somehow affect the evidence that is
> going to be received, whether that evidence was from Johnson &
> Johnson, Old Johnson or New Johnson, that is a very different kettle
> of fish, and I can tell you right now, that is not going to happen in
> this case as far as I'm concerned.

Ex. 22 (Debtor's PI Hr'g Ex. 27, <u>Hood, et al. v. Acme et al.</u>, No. 2020-CP10-03946, County of

Charleston for the State of South Carolina (Oct. 28, 2021)) at 58; Ex. 42.1 (Hr'g Tr., Nov. 4,

2021, Kim Direct) at 142:17-144:9.  A California state court ruled similarly.  <u>Id.</u> at 144:10-145:1

(testifying that court in <u>Vanklive v. Johnson & Johnson</u>, No. RC20062734, Superior Court of

California, Alameda County, denied request to limit evidence to focus only on J&J); <u>see</u> <u>also</u>

Ex. 23 (Debtor's PI Hr'g Ex. 25, <u>Vanklive v. Johnson & Johnson</u>, No. RC20062734, Superior

Court of California, Alameda County, Hearing Transcripts) at 2834.

## 2.    Health and Medical Safety Decisions Were Made By Old JJCI

Old JJCI was responsible for making all health and safety *decisions* relating to its

operations, while J&J was responsible for establishing health and safety *policy*.  Ex. 42.2 (Hr'g

Tr., Nov. 5, 2021, Kuffner Direct) at 374:13-376:8 ("I have ultimate responsibility for the safety

of the products within [Old JJCI].  That lies with me."); Ex. 24 (Debtor's PI Hr'g Ex. 81, J&J

Medical Safety Standard, dated Jan. 1, 2014)] at 1 ("Each sector within Johnson & Johnson …

shall establish policies and process that adhere to the … Safety Standard").

This has been confirmed by the Chief Medical Officer of J&J, Dr. Joanne

Waldstreicher, who has testified in the talc products liability litigation that decisions about the

safety of talc products were made by the safety and medical officers at Old JJCI, not those at

J&J.  Ex. 25 (2021 Second Supp. Kim Decl., Ex. B) (excerpts of Waldstreicher testimony from

<u>Ingham v. Johnson & Johnson</u>, No. 1522-CC10417, Circuit Court of the City of St. Louis, State

of Missouri, Dep. Tr., April 19, 2017, at 14:15-15:9; 60:15-62:1; 92:5-94:7; 102:5-103:6; 168:2-

-27-

NAI-1535638547

168:17; 171:7-172:17; 182:6-182:18; 192:3-192:11; 212:21-213:11, and Leavitt v. Johnson &

Johnson, RGI 7882401, Superior Court of California, County of Alameda, Dep. Tr., Sept. 14,

2018, at 131:8-133:9).  Dr. Waldstreicher further testified that Old JJCI's safety officers were

responsible for reviewing and approving J&J's public statements about the safety of talc

products before the statements were released to the public.  Id.  Likewise, the Chief Safety

Officer of Old JJCI, Dr. Susan Nicholson, has testified that she was responsible for the medical

oversight of the consumer products, including Johnson's Baby Powder, and that her team

evaluated the safety of any product Old JJCI made.  Ex. 26 (2021 Second Supp. Kim Decl.,

Ex. C) (excerpts of Nicholson testimony from Prudencio v. Johnson & Johnson, RG20061303,

Superior Court of the State of California, County of Alameda, Dep. Tr., 706:14-707:23, Jun. 4,

2021).[12]

### B.     The Debtor's Insurance Coverage

The Debtor believes that it has insurance coverage for its Debtor Talc Claims.

First Day Decl. ¶ 45.  The Debtor has access to primary and excess liability insurance policies

that cover, among other things, defense or indemnity costs related to talc bodily injury claims,

subject to the terms of the policies.[13]  Id.; see Ex. 29 (Debtor's PI Hr'g Ex. 8, FRE 1006

Insurance Coverage Evidence Summary).  All of these insurance policies provide that J&J and

all its subsidiaries and affiliates are named insureds, and many also include Retailers as

insureds.  Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 146:22-153:14; Exs. 29, 28, 30, 31

---

[12]     The Debtor's corporate representative, John Kim, also testified that JJCI was responsible for the safety of
Johnson's Baby Powder.  Ex. 42.2 (Hr'g Tr., Nov. 5, 2021, Kim Redirect) at 322:9-324:9.

[13]     The policies that cover the Debtor were issued to J&J as the named insured.  Those policies cover the
period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI
was a subsidiary of J&J.  Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 148:1-17; see, e.g., Ex. 28
(Debtor's PI Hr'g Ex. 11, Aetna Insurance Agreement 38 XN 07 SCA), at 9.

NAI-1535638547

(Debtor's PI Hr'g Exs. 8, 11, 12, 14). In addition, the policies contain annual aggregate limits shared by all of the named insureds. Id.

Aetna Casualty and Surety Company ("Travelers")[14] issued primary general liability policies to J&J (which policies cover the Debtor) for the period from 1957 to 1980 (the "Travelers Policies"). Ex. 43 (2021 First Day Decl.) ¶ 47; see, e.g., Ex. 32 (Debtor's PI Hr'g Ex. 10, Aetna Insurance Agreement, #38 AL 12880 SR(Y)_1-1-1967 to 1-1-1970). The combined limits of the Travelers Policies (not accounting for deductibles or erosion/exhaustion of limits) total more than $214 million per occurrence and $263 million in the aggregate. Ex. 43 (2021 First Day Decl.) ¶ 47; Ex. 29 (Debtor's PI Hr'g Ex. 8). The deductibles increase over time, starting at a minimal level and increasing to $5 million per occurrence by 1977. Ex. 43 (2021 First Day Decl.) ¶ 47; see, e.g., Ex. 31 (Debtor's PI Hr'g Ex. 14, Aetna Insurance Agreement, Aetna Primary 38 PK 15 SCA)].

The limits of the Travelers Policies before 1973 are not eroded by defense costs; under later policies, defense costs erode limits. Ex. 43 (2021 First Day Decl.) ¶ 47; see, e.g., Ex. 32 (Debtor's PI Hr'g Ex. 10). From 1957 to 1985, Travelers also provided excess liability coverage to J&J that covers the Debtor. See, e.g., Ex. 28 (Debtor's PI Hr'g Ex. 11, Aetna Insurance Agreement, 38 XN 07 SCA). The combined aggregate limits of those policies total approximately $563 million. Ex. 43 (2021 First Day Decl.) ¶ 48; see Ex. 29 (Debtor's PI Hr'g Ex. 8).

From 1973 to 1985, a variety of other insurers issued excess policies that cover the Debtor. Ex. 43 (2021 First Day Decl.) ¶ 49; see Ex. 29 (Debtor's PI Hr'g Ex. 8). Those insurers include subsidiaries or affiliates of the following companies: American International

---

[14]     Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

Group, Allstate Insurance Company, The Hartford, Home Insurance Company, Nationwide

Indemnity Company and North River Insurance Company.  Id.  The combined limits of those

excess policies total more than $1.09 billion in the aggregate.  Id.  Certain of the insurers that

issued the above-described excess policies are insolvent (including, in particular, Home

Insurance Company).  Ex. 43 (2021 First Day Decl.) ¶ 49.

From 1981 to 1985, American Motorists Insurance Company ("AMICO") issued

primary and excess coverage that covers the Debtor (the "AMICO Policies").  Ex. 43 (2021 First

Day Decl.) ¶ 50; see Ex. 29 (Debtor's PI Hr'g Ex. 8).  AMICO is insolvent, having been placed

into liquidation in 2013.  Ex. 43 (2021 First Day Decl.) ¶ 50.  The Debtor currently believes that

the applicable limits of the AMICO Polices were exhausted by payments made by AMICO on

claims while it was still solvent.  Id.

From 1973 through 1985, Middlesex Insurance Company ("Middlesex"), a

captive insurance company that is a wholly owned subsidiary of J&J, issued policies that cover

J&J and the Debtor.  Id. ¶ 51.  Those policies insured J&J and Old JJCI for large deductibles

under the Travelers Policies and the AMICO Policies.  Id.  From 1977 to 1985, Middlesex also

issued excess insurance policies that cover J&J and Old JJCI.  Id.  There is a dispute between

J&J, the Debtor, and Middlesex, on the one hand, and the third-party insurers (i.e., insurers other

than the Middlesex captive), on the other hand, regarding the applicability, extent of coverage

and limits of the Middlesex policies, in particular with respect to the post-1985 Middlesex

policies.  Id.

In total, the limits of solvent primary and excess insurance policies issued to J&J

by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion.

First Day Decl. ¶ 46.  The annual limits for these policies are aggregated.  Ex. 42.1 (Hr'g Tr.,

Nov. 4, 2021, Kim Direct) at 148:18-150:1.

Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered talc-related claims

to the third-party insurers.  First Day Decl. ¶ 47.  Since then, none of those insurers has

acknowledged its coverage obligations, defended Old JJCI or J&J, paid the costs of defense, or

indemnified J&J or Old JJCI for settlements or judgments.  Id.  Instead, the third-party insurers

have asserted various coverage defenses.  Id.

In May 2019, certain of the Debtor's third-party insurers filed a lawsuit against

Old JJCI, J&J and Middlesex in the Superior Court of Middlesex County (Case No. MID-L-

003563-19) (the "NJ Coverage Action"), seeking a declaratory judgment regarding the parties'

respective obligations under the plaintiff insurers' policies.  Id. ¶ 48.  The insurer plaintiffs filed

a Second Amended Complaint on June 22, 2020.  Id.  On July 31, 2020, J&J, Old JJCI, and

Middlesex filed answers to the Second Amended Complaint, and asserted counterclaims and

cross-claims against certain defendants.  Id.  Travelers and certain other insurers filed cross-

claims against J&J, Old JJCI, and Middlesex to which J&J, Old JJCI, and Middlesex responded

later in 2020.  Id.

In the 2021 Chapter 11 Case, certain insurers filed motions to lift the automatic

stay to permit the NJ Coverage Action to proceed.  Id. ¶ 49.  This Court denied those motions but

permitted certain third-party discovery to occur.  Id.  The NJ Coverage Action remains pending.

Id.

## C.    The Debtor's Retailers and Other Indemnified Parties

Old JJCI had relationships with various Retailers, who sold Old JJCI's

talc-containing products.  Id. ¶ 51.  Old JJCI agreed to indemnify the Retailers for claims related

to the sale of Old JJCI's talc-containing products, and these contractual indemnities were

-31-

allocated to the Debtor in the 2021 Corporate Restructuring.  Id.; see, e.g., Ex. 33 (Debtor's PI

Hr'g Ex. 15, 1989 Agreement with Safeway for indemnification); Ex. 34 (Debtor's PI Hr'g

Ex. 16, 2020 Agreement with HEB for indemnification).  In addition, to the extent a Retailer is

held liable for a claim arising out of the products manufactured and/or sold by Old JJCI, and not

by independent actions of the Retailers (i.e., such that those claims are Debtor Talc Claims),

certain state laws could require the Debtor to indemnify the Retailers.[15]  First Day Decl. ¶ 50.

Claims asserted against the Retailers for their sale of Old JJCI products are

virtually identical to the claims asserted against Old JJCI.  First Day Decl. ¶ 51.  These claims

against Retailers generally serve to defeat removal to federal court based on diversity

jurisdiction, and the Retailers are often dismissed before trial without payment.  Id.

Old JJCI would periodically accept from the Retailers tenders of talc-related

claims related to the sale of its products.  Id. ¶ 52; Ex. 35 (Excerpts from Debtor's PI Hr'g

Ex. 17, FRE 1006 Tender Agreement Evidence Summary); see, e.g., Ex. 36 (Debtor's PI Hr'g

Ex. 18, Tender Agreement wherein Johnson & Johnson Consumer Inc. agrees to tender defense

and indemnify Safeway for claims by Abbott, Richard, dated May 13, 2019); Ex. 37 (Debtor's PI

Hr'g Ex. 19, Tender Agreement wherein Johnson & Johnson Consumer Inc. agrees to tender

defense and indemnify Albertson for claims by Lane, Ardys, dated October 8, 2018).  When a

---

[15]     See, e.g., Restatement (Second) of Torts § 886B (Am. Law Inst., 1979) (establishing obligation to
indemnify party that is held vicariously liable for the conduct of the indemnitor); Restatement (Third) of
Torts § 22 (Am. Law Inst., 2000) (same, and also expressly establishing a right to recover indemnity where
indemnitee was held liable only as the seller of a product supplied to the indemnitee by the indemnitor); see
also Promaulayko v. Johns Manville Sales Corp., 562 A.2d 202, 206 (N.J. 1989) (recognizing "claims for
common-law indemnification [for asbestos-related tort claims] by one party in the chain of distribution
against a party higher up the chain" in New Jersey and other states); Fireside Motors, Inc. v. Nissan Motor
Corp. in U.S.A., 479 N.E.2d 1386, 1389 (Mass. 1985) ("[T]he retailer may recover in indemnity against the
manufacturer."); Tex. Civ. Prac. & Rem. Code Ann. § 82.002 ("A manufacturer shall indemnify and hold
harmless a seller against loss arising out of a products liability action, except for any loss caused by the
seller's negligence, intentional misconduct, or other act or omission…"); Ariz. Rev. Stat. Ann. § 12-684;
Ark. Code Ann. § 16-116-207; Iowa Code Ann. § 613.18.

NAI-1535638547

Retailer was sued on a Debtor Talc Claim, the Retailer would notify Old JJCI by submitting a tender request.  First Day Decl. ¶ 52.  Old JJCI would then determine whether to accept the Retailer's tender of its defense and indemnified the Retailer pursuant to a tender agreement (each, a "Tender Agreement").  Id.  Since the commencement of the talc-related litigation, Old JJCI has agreed to indemnify and assume the defense of nearly 790 talc-related claims against the Retailers pursuant to Tender Agreements.  Id.

Old JJCI agreed to indemnify certain other transaction counterparties for liability arising from Debtor Talc Claims.  Id. ¶ 53.  For example, in 2005, Old JJCI entered into an asset purchase agreement with Pharma Tech Industries, Inc. ("PTI" and subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing plant (where various products, including certain talc-containing products, were bottled) to PTI, which continued to operate the facility and manufacture certain talc products until early 2020.  Id.; see Ex. 39 (PI Hr'g Ex. 36, Asset Purchase Agreement, dated April 4, 2005).  In connection with the asset sale, Old JJCI and PTI entered into a manufacturing and supply agreement, which was subsequently amended and restated.  First Day Decl. ¶ 53.  Under the manufacturing and supply agreement, Old JJCI agreed to indemnify, and has indemnified, PTI and its affiliates for certain claims related to talc products.  Id.  The claims against PTI are generally identical to and based on the claims against Old JJCI.  Id.

Further, pursuant to an indemnification agreement, Old JJCI agreed to indemnify Valeant (now Bausch) and its affiliates (including Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International and Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC f/k/a Valeant Pharmaceuticals North America) for personal injury and products liability actions arising from alleged exposure to "Shower to Shower" products and for certain

NAI-1535638547

other regulatory actions arising out of the manufacture, use or sale of "Shower to Shower"

products, as set forth more fully in the agreement.[16]  Id. ¶ 54; see Ex. 38 (Debtor's PI Hr'g

Ex. 41, Indemnification Agreement).  The claims against Valeant (now Bausch) are generally

identical to the claims asserted against Old JJCI.  First Day Decl. ¶ 54.

### D.      Cosmetic Talc Litigation and Its Associated Costs and Burdens

Before the 2021 Petition Date, Old JJCI and J&J defended the talc-related claims

on the basis, among other things, that there is no scientific or other proof that Johnson's Baby

Powder either contained asbestos or was a cause of ovarian cancer or mesothelioma.  Old JJCI

and J&J had multiple successes in the cosmetic talc litigation, including, among others things,

securing dismissals of roughly 1,300 ovarian cancer and over 250 mesothelioma cases without

payment, and trying 16 cases to defense verdicts.  Ex. 43 (2021 First Day Decl.) ¶ 38.  Old JJCI

was also successful on appeal, obtaining reversal of numerous plaintiff verdicts.  Id.  Despite

these results, and the lack of credible proof that its product was unsafe, Old JJCI nonetheless

suffered a number of plaintiff verdicts involving unpredictable and wildly divergent

compensatory and punitive damages awards.  Id.

The most egregious example is the Ingham[17] verdict, which was the fifth largest

personal injury verdict in the history of the United States.  Although the verdict in that case was

reversed in part and reduced, the total damages award was still $2.243 billion for 22 plaintiffs

(which were improperly consolidated).  Id. ¶ 39.  Notably, each plaintiff received the exact same

compensatory damage award, $25 million, regardless of the alleged product used (Shower to

---

[16]     Upon information and belief, "Shower to Shower" products sold in the U.S. and Canada no longer include
         talc.  First Day Decl. n.9.  Like Johnson's Baby Powder, Johnson's Medicated Powder sold in the U.S. and
         Canada no longer contains talc as of 2020.  Id.

[17]     Ingham v. Johnson & Johnson, 608 S.W.3d 663, 680 (Mo. App. 2020).

NAI-1535638547

Shower or Johnson's Baby Powder) and the duration of use (e.g., 60 years or five years).

Ex. 42.2 (Hr'g Tr., Nov. 5, 2021, Kim Redirect) at 336:17-339:17.

Before the commencement of the 2021 Chapter 11 Case, Old JJCI had incurred

nearly $1 billion in defending a tidal wave of personal-injury lawsuits relating to alleged talc

exposure, nearly all of which was spent in the last five years.  Ex. 43 (2021 First Day Decl.) ¶ 40.

In the months prior to the 2021 Chapter 11 Case, Old JJCI was paying anywhere from

$10 million to $20 million monthly in defense costs.  Id.  On top of these costs, Old JJCI paid

approximately $3.5 billion in indemnity in connection with settlements and verdicts.  Id.  And,

cosmetic talc litigation against the Debtor was anticipated to continue and grow for decades

more, as were the extraordinary costs of resolving tens of thousands of expected claims.  Id. ¶ 41.

E.     **The 2021 Chapter 11 Case**

1.     **Bankruptcy Court Proceedings**

The Debtor commenced a chapter 11 case, No. 21 30589 (Bankr. D.N.J.)

(the "2021 Chapter 11 Case") by filing a voluntary petition for relief [Dkt. 1 in Case

No. 21-30589] under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court

for the Western District of North Carolina (the "North Carolina Bankruptcy Court").  The Debtor

also commenced an adversary proceeding against talc claimants seeking (i) a declaration that the

automatic stay applied to and (ii) a preliminary injunction enjoining, claims against the Debtor's

affiliates, including J&J and New JJCI, as well as the Debtor's insurers and third-party retailers

and other indemnified parties, a group referred to as the "Protected Parties."  See No. 21-03032,

Dkts. 1, 2.[18]  After discovery and a two-day evidentiary hearing, on November 15, 2021, the

---

[18]     Certain entities, including all insurers and all affiliates other than Old JJCI, J&J, Holdco and JJI, that were
defined as "Protected Parties" in the 2021 Chapter 11 Case are excluded from the definition of Protected
Parties for purposes of the relief requested by this adversary proceeding.

NAI-1535638547

North Carolina Bankruptcy Court entered an order [Dkt. 102 in Adv. Pro. No. 21-03032] determining that the automatic stay applied to, and also preliminarily enjoining, the commencement or continuation of talc claims against the Protected Parties for 60 days (i.e., until January 14, 2022), subject to modification or extension by this Court.

On November 16, 2021, the North Carolina Bankruptcy Court entered an order [Dkt. 416 in Case No. 21-3059] transferring the 2021 Chapter 11 Case to the District of New Jersey, which referred the case to this Court.

After transfer, the official committee of talc claimants and two plaintiff law firms [No. 21-30589, Dkts. 632, 766, 1003] moved to dismiss the 2021 Chapter 11 Case as a bad-faith filing. On February 25, 2022, following months of discovery and a five-day trial to address the motions to dismiss and the Debtor's adversary proceeding to enjoin the talc claims, this Court issued an opinion denying the motions to dismiss. In re LTL Mgmt. LLC, 637 B.R. 396 (Bankr. D.N.J. 2022) rev'd and remanded by In re LTL Mgmt. LLC, 58 F.4th 738 (3d. Cir. 2023) (the "Dismissal Opinion").[19] That same day, the Court issued the PI Opinion.[20]

The TCC and two plaintiff law firms, on behalf of talc claimants they represented, filed notices of appeal of the Dismissal Opinion and the PI Opinion. They also filed motions requesting that this Court certify its orders for direct appeal to the Third Circuit. On April 4, 2022, this Court granted the petitions for direct appeal to the Third Circuit [Dkt. 1955 in Case No. 21-30589; Dkt. 231 in Adv. Pro. No. 21-3032]. Thereafter, the Third Circuit granted the petitions for direct appeal, and the appellants' motion to consolidate their appeals and to expedite

---

[19] On March 2, 2022, the Court entered an order denying the motions to dismiss [Dkt. 1603 in Case No. 21-30589] (the "Dismissal Order").

[20] On March 4, 2022, the Court entered the *Order (I) Declaring That Automatic Stay Applies to Certain Actions Against Non-Debtors and (II) Preliminarily Enjoining Certain Actions* [Dkt. 187 in Adv. Pro. No. 21-3032] (the "PI Order").

NAI-1535638547

the case.  The parties fully briefed the issues and argued the matters before the Third Circuit on

September 19, 2022.

**2.      Third Circuit Panel Opinion Dismissing the 2021 Chapter 11 Case**

On January 30, 2023, a panel of the Third Circuit issued an opinion directing this

Court to dismiss the 2021 Chapter 11 Case after finding that it was not filed in good faith.  See In

re LTL Mgmt., LLC, 58 F.4th 738 (3d Cir. 2023) (the "Third Circuit Opinion").  Although the

Third Circuit panel recognized that the Debtor "inherited massive liabilities" and faced

"thousands" of future claims (Third Cir. Op., 762-63), it concluded that the Debtor was not in

financial distress before the filing.  Third Cir. Op., 762-63.  The Third Circuit did not reach the

merits of the appeal of the PI Order and PI Opinion, finding only that dismissal of the 2021

Chapter 11 Case "annuls the litigation stay order by the Court and makes moot the need to

decide that issue."  Id.

On February 13, 2023, the Debtor filed a petition for rehearing and rehearing en

banc with the Third Circuit.  See In re LTL Mgmt. LLC, No. 22-2003 (3d Cir. Feb. 13, 2023),

Dkt. 153.  On February 23, 2023, the Third Circuit entered an order directing appellants to file

responses to the petition for rehearing.  Id. at Dkt. 163.  Several responses were filed.

On March 22, 2023, the Third Circuit entered an order denying the Debtor's petition for

rehearing.  That same day, the Debtor filed a motion seeking a stay of the Third Circuit's

mandate pending appeal to the United States Supreme Court.  The Third Circuit entered an order

denying the stay motion on March 31, 2023 and, on the same day, issued its mandate directing

this Court to dismiss the 2021 Chapter 11 Case on April 4, 2023.  See Dkt. 3938 in Case

No. 21-30589.

NAI-1535638547

F.    **Plan Support Agreements**

Throughout the 2021 Chapter 11 Case, the Debtor participated in court ordered mediation with the Debtor's key constituencies to negotiate a potential consensual resolution of the case.  First Day Decl. ¶ 71.  Despite a multitude of discussions with various parties and the efforts of the mediators, no agreement was reached prior to the Third Circuit's decision to dismiss the 2021 Chapter 11 Case.  Id.

Following that ruling, however, and with the assistance of the mediators and the encouragement of this Court, negotiations continued between the Debtor and J&J, and various plaintiff law firms and the Future Claimants' Representative.  Id. ¶ 72.  Those negotiations ultimately culminated in an agreement with thousands of claimants on a broad outline of terms for a plan of reorganization, including financial terms, that, if confirmed and consummated, would fully resolve all the Debtor's liability for talc-related claims.  Id.  That agreement has been memorialized in a series of plan support agreements (collectively, the "Plan Support Agreements") that have been executed and delivered by counsel on behalf of over 60,000 claimants, and signed by the Debtor, Holdco and J&J.  Id.[21]

The Plan Support Agreements provide, among other things, that the Debtor, J&J, Holdco and the claimants will work together to finalize, file and seek confirmation of a plan of reorganization that provides for the establishment of a trust funded in the amount of $8.9 billion on a net present value basis.  Id. at 73.  The Plan Support Agreements further provide that a plan containing the terms to which the parties have agreed must be filed by May 14, 2023 or as soon thereafter as is feasible.  Id.

---

[21]    A copy of a form of Plan Support Agreement (without exhibits) is attached as Annex C to the First Day Declaration.

While there are additional issues that the parties will need to address, the Plan Support Agreements represent significant progress towards a consensual resolution of this Chapter 11 Case.  Id. at 74.  The terms of the plan contemplated by the Plan Support Agreements are equitable and in the best interests of all parties, including current and future talc claimants. Id.  Indeed, the proposed settlement amount of $8.9 billion by the Debtor and J&J would be the largest settlement amount in any asbestos bankruptcy case and one of the largest settlements of personal injury claims in history.  Id.

### G.    The Decision to File This Case

The filing of this second chapter 11 case has the support of thousands of claimants.  That support is evidenced by their entry into the Plan Support Agreements.  First Day Decl. ¶ 75.  The filing of the Chapter 11 Case also has the continuing support of Holdco and J&J who have agreed to enter into new financing arrangements with the Debtor that facilitate the confirmation and consummation of a plan of reorganization containing the terms described in the Plan Support Agreements.  Id. ¶ 76.

In view of the substantial support of talc claimants, Holdco and J&J for both the filing of this case and the material terms of a plan, and taking into account the excessive cost, burden, uncertainty and anticipated decades-long duration of the cosmetic talc litigation, the Debtor determined that the filing of a second chapter 11 case in this Court was prudent, necessary and in the best interests of all constituents.  Id. ¶ 77.  The Debtor continues to believe, as do Holdco and J&J, that chapter 11 proceedings are the only method through which the Debtor and talc claimants can fully, equitably and permanently resolve all current and future talc-related claims.  Id.

NAI-1535638547

1.      **Termination of 2021 Funding Agreement and Entry Into New Agreements**

The Third Circuit found that the Debtor was not in financial distress as a result of its rights under the 2021 Funding Agreement. Id. ¶ 78. That determination defeated the fundamental purpose of the 2021 Funding Agreement, which purpose was to facilitate the Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code. Id. The Third Circuit determined it had the exact opposite effect; i.e., that it required dismissal of the 2021 Chapter 11 Case. Id. As a result, the Debtor believes there was a material risk that the 2021 Funding Agreement was no longer enforceable because it had become void or voidable. Id. To eliminate that risk and secure funding terms consistent with the terms set forth in the Plan Support Agreements, the Debtor, J&J and Holdco have entered into new financing arrangements. Id. These new arrangements, among other things, (i) address the guidance provided by the Third Circuit in its dismissal opinion, (ii) facilitate confirmation and consummation of a plan of reorganization containing the terms supported by thousands of claimants whose counsel have executed and delivered the Plan Support Agreements, and (iii) do not adversely affect the interests of talc claimants. Id.

The Debtor, J&J, and Holdco effectuated these new financing arrangements by entering into three new agreements. Id. ¶ 79. The Debtor, J&J, and Holdco entered into a termination and substitution agreement (the "T&S Agreement") by which the 2021 Funding Agreement and a related intercompany loan were terminated, and the parties, in substitution therefor, agreed to enter into two new agreements. Id. Simultaneously with their entry into the T&S Agreement, the Debtor, J&J, and Holdco then entered into these two new agreements: Holdco and the Debtor entered into a new funding agreement (the "2023 Funding Agreement")

and the Debtor, Holdco and J&J entered into a separate support agreement (the "J&J Support

Agreement"). Id.[22]

The 2023 Funding Agreement is similar to the 2021 Funding Agreement.  Id.

¶ 80.  It imposes no repayment obligation on the Debtor and is not a loan.  Id.  It obligates

Holdco to provide funding to the Debtor to pay for costs and expenses of the Debtor incurred in

the normal course of its business (i) at any time when there is no bankruptcy case and (ii) during

the pendency of any chapter 11 case filed by the Debtor, including the costs of administering the

chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor

from Royalty A&M are insufficient to pay those costs and expenses.   Id.  In addition, the 2023

Funding Agreement requires Holdco to fund amounts necessary (i) to satisfy the Debtor's talc-

related liabilities at any time when there is no bankruptcy case and (ii) in the event of a

chapter 11 filing by the Debtor, to provide the funding for a trust created pursuant to a plan of

reorganization for the Debtor that contains the terms agreed to in the Plan Support Agreement, as

such terms may be amended or supplemented with the consent of the parties, in both situations to

the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient

to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's

other assets are insufficient to provide that funding.  Id.

The J&J Support Agreement is subject to the approval of the Court and is

operative only in the chapter 11 case.  Id. ¶ 81.  It obligates J&J to provide the trust funding

Holdco is required to provide under the 2023 Funding Agreement but only if Holdco fails to

---

[22]     Copies of the T&S Agreement, the 2023 Funding Agreement and the J&J Support Agreement are attached
to the First Day Declaration as Annexes D, E and F, respectively.  The summaries herein of the terms of the
T&S Agreement, the 2023 Funding Agreement and the J&J Support Agreement are provided for the
convenience of the Court and parties in interest and are qualified in all respects by the terms of such
agreements.

NAI-1535638547

provide the funding.  Id.  In return, Holdco is obligated to reimburse J&J for any amounts it pays

to the trust on Holdco's behalf, and any amounts that are not reimbursed by Holdco will be

deemed to be financed with a loan from J&J to Holdco.  Id.  The Debtor is obligated to use

commercially reasonable efforts to obtain final Court approval of the J&J Support Agreement

and to cause a plan of reorganization containing the terms reflected in the Plan Support

Agreements to become effective, in both cases as soon as reasonably practicable.  Id.  The

Debtor has the right to enforce J&J's obligation under the J&J Support Agreement.  Id.

   These new financing arrangements resolve the concerns that led the Third Circuit

to conclude that the 2021 Chapter 11 Case should be dismissed.  In conducting its good faith

inquiry, the Third Circuit determined that the focus should be on the Debtor rather than Old JJCI,

notwithstanding that the corporate restructuring undertaken in 2021 and the bankruptcy filing

were both part of a single integrated transaction.  Third Cir. Op., 757-58.  Moreover, the Third

Circuit made clear that the relevant timeframe to assess whether a filing is made in good faith is

the period of time just before the filing occurs.  Id. at 754, 759.  Under the new financing

arrangements, J&J's support is only available in bankruptcy and only if approved by this Court.

J&J is not a co-obligor under the 2023 Funding Agreement; it is not even a party to that

agreement.  And, under the separate J&J Support Agreement, J&J's obligation to pay arises only

if Holdco fails to fund a trust established under a plan of reorganization that contains the terms

set forth in the plan support agreements.  As a result, J&J's balance sheet and liquidity were no

longer available to the Debtor before the filing of this second chapter 11 case.  J&J's support,

which was always intended to facilitate, not frustrate, a bankruptcy filing by the Debtor now

serves its intended purpose.

Holdco is the sole obligor under the 2023 Funding Agreement.  As noted above, it transferred its consumer health business, which represented a substantial portion of its assets,[23] in early January 2023.  This Court previously found that Old JJCI was in financial distress based on a myriad of evidence submitted at the hearing on the motions to dismiss the Debtor's prior case.  That evidence included the actual and projected costs of the talc litigation, the risk of lottery-like verdicts, the anticipated duration of the litigation, the plaintiffs' increasing settlement demands in the tort system, the claimants' assertions in the Debtor's prior case regarding the magnitude of the Debtor's aggregate liability, the multitude of state attorneys general investigations and lawsuits, the Canadian class action lawsuits, indemnification claims from talc suppliers, the securities action and Congressional investigations.  And the financial distress caused by this massive, nationwide litigation manifested itself in the performance of J&J's Consumer Health division, of which Old JJCI was a primary part.  That division's performance swung from a $2.1 billion profit to a $1.1 billion loss based solely on the costs of the talc litigation.

Since then, Holdco has transferred its consumer health business.  As a result, not only was J&J's balance sheet not available to the Debtor before this bankruptcy, but Holdco's assets, which were available, no longer include the consumer health business.  The Debtor's financial condition before this filing is sufficiently distressed to satisfy the standard established by the Third Circuit.

Nonetheless, the Debtor's new financing arrangements do not harm talc claimants.  Id. ¶ 84.  This is so because (i) the 2023 Funding Agreement is available to fund a trust consistent with the terms of the Plan Support Agreements and pay expenses incurred in this

---

[23]    Holdco continues to hold interests in various subsidiaries.

NAI-1535638547

bankruptcy case and (ii) subject to this Court's approval, J&J's support is available in this case to provide a backstop to Holdco to ensure it can meet its trust funding obligation.  Id.  The Debtor has the financial support it needs to implement the plan outlined in the Plan Support Agreements. Id.

Bankruptcy is the only forum where the Debtor and the claimants can fully, equitably and permanently resolve all talc-related claims.  Id. ¶ 85.  This second chapter 11 filing and the proposed plan are in the best interests of all parties, including the Debtor and all current and future talc claimants.  Id.  And the temporary stay and injunction of talc litigation that this Motion requests are critical to that outcome.

## **ARGUMENT**

The Court has recognized that "ample authority exists to conclude that § 362(a), § 105(a), or a court's inherent powers can each serve as independent bases for extension of a stay to non-debtor third parties."  PI Op., 638 B.R. at 300; see also Robins, 788 F.2d at 1001–04 (cited with approval in McCartney, 106 F.3d 506) (stating that a bankruptcy court may stay nondebtor lawsuits under (i) section 362(a)(1), (ii) section 362(a)(3); (iii) section 105(a) or (iv) pursuant to "the inherent power of courts under their general equity powers and in the efficient management of the dockets to grant relief") (quoting Williford v. Armstrong World Indus., Inc., 715 F.2d 124, 127 (4th Cir. 1983)); see also Oberg v. Aetna (In re A.H. Robins Co. Inc.), 828 F.2d 1023, 1024 (4th Cir. 1987) (clarifying that the Fourth Circuit held in Robins "that the district court had four independent grounds on which it could stay the plaintiffs' suit against [the nondebtor third party].").

Nevertheless, because several courts in this circuit still view the available bases for a bankruptcy court's authority to stay or enjoin actions against third parties as an open issue, in the 2021 Chapter 11 Case, this Court uniformly applied a three-step inquiry used in several

cases out of the Eastern District of Pennsylvania to determine whether a stay or injunction was appropriate. See PI Op., 638 at 301; see also LTL Mgmt. LLC v. San Diego Cnty. Emps. Ret. Ass'n (In re LTL Mgmt. LLC), 640 B.R. 322, 331 (Bankr. D.N.J. 2022) (the "Securities Claim PI Opinion"); LTL Mgmt. LLC v. State of NM (In re LTL Mgmt. LLC), 645, B.R. 59, 67 (Bankr. D.N.J. 2022) (the "State AG PI Op."). That inquiry asks whether the Court: (i) has jurisdiction to issue the injunction; (ii) may extend the automatic stay under section 362(a) to the non-debtors; and (iii) may properly exercise its discretion in issuing the injunction. See In re Phila. Newspapers, LLC, 423 B.R. 98, 102 (E.D. Pa. 2010) (citing In re Phila. Newspapers, LLC, 407 B.R. 606, 611 (E.D. Pa. 2009)). Each of those factors is satisfied here.

## I. THE COURT HAS SUBJECT MATTER JURISDICTION.

Section 1334(b) of title 28 of the United States Code identifies three types of proceedings over which this Court has jurisdiction: (1) those "arising under title 11," (2) those "arising in" a case under title 11 and (3) those "related to" a case under title 11. 11 U.S.C. § 1334(b). Proceedings arising under and arising in a chapter 11 case are considered "core" proceedings, whereas proceedings related to a chapter 11 case are considered "non-core." In re E. Orange Gen. Hosp., Inc., 587 B.R. 53, 71 (D.N.J. 2018) (citing In re Resorts Int'l, Inc., 372 F.3d 154, 162 (3d Cir. 2004)). A bankruptcy court has jurisdiction to enjoin third-party litigation such as that at issue here under *at least* one of those three bases. Indeed, courts routinely grant preliminary injunctions relating to a debtor's mass tort liabilities.[24] This includes cases in which the court expressly found it had jurisdiction over such third-party claims.[25] This

---

[24]  See, e.g., Bestwall, 606 B.R. at 254 ("Injunctions of the type requested by the Debtor have previously and uniformly been issued in numerous [] asbestos-related cases;" enjoining asbestos-related actions against non-debtor affiliates, and collecting cases).

[25]  See, e.g., DBMP, 2021 WL 3552350, at *18-21 (rejecting challenges to the court's subject-matter jurisdiction and enjoining asbestos-related claims against non-debtor affiliates); Bestwall, 606 B.R. at 249 (same); In re Specialty Prods. Holding Corp., No. 10-11780, Adv. Pro. No. 10-51085, at 2 [Dkt. 72]

Court, too, has repeatedly found that a motion to extend the automatic stay and an injunction to

non-debtor third parties is a "core" proceeding and held that it has jurisdiction over such

motions.[26]

A.    **The Court Has "Arising Under" Jurisdiction to Grant Relief that Ensures the Effectiveness of the Automatic Stay.**

First, a proceeding "aris[es] under" the Bankruptcy Code if it "invokes a

substantive right created by the Bankruptcy Code."[27]  As recognized by this Court in the PI

Opinion, the Debtor's request for declaratory relief aims to confirm or extend the scope of the

automatic stay, "a substantive right under the Bankruptcy Code."  See PI Op., 638 B.R. at 302;

see also Roggio v. Roggio (In re Roggio), 612 B.R. 655, 660 (Bankr. M.D. Pa. 2020) (the

automatic stay is "a substantive right provided by the Bankruptcy Code" and "one of the

fundamental protections provided to debtors when they file for bankruptcy").[28]  That should be

conclusive for this proceeding.  See, e.g., FPSDA II, 2012 WL 6681794, at *5 ("[S]ince the

Bankruptcy Code both imposes the automatic stay and provides the Debtors and the Court with

the means to invoke it and to implement its protections, it is manifest that any proceeding to

determine the scope and applicability of the automatic stay 'arises under' the Bankruptcy

---

(Bankr. D. Del. Oct. 13, 2010) (the bankruptcy court had jurisdiction to rule on the debtors' motion to clarify the scope of the injunction); W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.), 386 B.R. 17, 28-30 (Bankr. D. Del. 2008) (rejecting challenges to the court's subject-matter jurisdiction and extending the automatic stay to enjoin third-party actions); see also In re Garlock Sealing Techs. LLC, No. 10-31607, Adv. Pro. No. 10-03145, at 6 [Dkt. 14] (Bankr. W.D.N.C. June 21, 2010) (after debtor addressed jurisdiction, finding jurisdiction and granting a preliminary injunction).

[26]    See PI Op., 638 B.R. at 302-03; State AG PI Op., 645 B.R. at 69; Securities Claim PI Op., 640 B.R. at 332.

[27]    Stoe v. Flaherty, 436 F.3d 209, 216 (3d Cir. 2006) ("A case 'arises under' title 11 'if it invokes a substantive right provided by title 11.'") (quoting Torkelsen v. Maggio (In re Guild & Gallery Plus), 72 F.3d 1171, 1178 (3d Cir. 1996)); FPSDA II, LLC v. Larin (In re FPSDA I, LLC), No. 10-75439, Adv. No. 12-08032, 2012 WL 6681794, at *4 (Bankr. E.D.N.Y. Dec. 21, 2012), as corrected (Dec. 26, 2012) ("A case 'arising under' the Bankruptcy Code is one that 'invokes a substantive right' created by the Bankruptcy Code.") (citing Atamian v. U.S. Dept. of Educ. (In re Atamian), 368 B.R. 375, 379 (Bankr. D. Del. 2007)), aff'd, No. ADV A-06-50435, 2008 WL 853462 (D. Del. Mar. 31, 2008), aff'd, 300 F. App'x 175 (3d Cir. 2008)).

[28]    See also Robins, 788 F.2d at 999-1000; Brier Creek, 486 B.R. at 685.

NAI-1535638547

Case 23-01092-MBK    Doc 2    Filed 04/04/23    Entered 04/04/23 18:38:19    Desc Main
Document        Page 62 of 108


Code"); <u>Brier Creek</u>, 486 B.R. at 685 ("arising under" jurisdiction existed over motion in which debtor sought declaratory relief or, in the alternative, a section 105(a) injunction, "in that it specifically requested an order confirming that the stay under § 362(a)(1) applies to" the third-party action against non-debtor guarantor).

       The Court also has "arising under" jurisdiction because the Debtor's request for the section 105(a) injunction is necessary to ensure and preserve the integrity of the automatic stay.  The Debtor Talc Claims against the Protected Parties "are really claims against the debtor and therefore impair the automatic stay."  <u>Chase Manhattan Bank (N.A.) v. Third Eighty-Ninth Assocs.</u>, 138 B.R. 144, 147 (S.D.N.Y. 1992); <u>see also</u> <u>McCartney</u>, 106 F.3d at 510–11 (concluding that the automatic stay enjoined an action against nondebtor third party where the debtor "was, in essence, the real party in interest" in the pursuit of a deficiency judgment against the third party).  Given this close link between the injunction sought and the substantive right in the automatic stay, "common sense indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the applicability of the automatic stay," as it plainly does, "then it has jurisdiction over a related motion for preliminary injunctive relief," in the same proceeding.[29]

### B.    The Court Has "Arising In" Jurisdiction to Grant Relief That Would Have No Existence Outside of Bankruptcy.

       The Court independently has "arising in" jurisdiction because the Debtor's request for an extension of the automatic stay of section 362(a) and injunctive relief under section 105(a) is unique to bankruptcy.  A proceeding "arises in" a bankruptcy case when it would "have no existence outside of the bankruptcy."[30]  And a claim for such a stay and

---

[29]    <u>FPSDA I, LLC</u>, 2012 WL 6681794, at *5 (finding "arising under" and "related to" jurisdiction).

[30]    <u>In re G-I Holdings, Inc.</u>, 580 B.R. 388, 415 (Bankr. D.N.J. 2018) (citing <u>Stoe v. Flaherty</u>, 436 F.3d 209, 261 (3d Cir. 2006)); <u>accord</u> <u>In re Seven Fields Dev. Corp.</u>, 505 F.3d 237, 260 (3d Cir. 2007).

-47-

NAI-1535638547

injunction, tied to and lasting only during a bankruptcy case, arises only in bankruptcy cases

because such relief necessarily "encompass[es] matters concerning the administration of the

estate."[31]  At least three courts, in three circuits, across several decades, have recognized this

logic.[32]  This Court further reinforced this reasoning in its PI Opinion.  <u>See</u> PI Op. 638 B.R.

at 302-03 (noting that the [automatic stay and preliminary injunction proceeding] could arise

only in the context of a bankruptcy case and determining that "it is a core proceeding over which

this Court can exercise jurisdiction."); <u>see also</u> Securities Claim PI Op., 640 B.R. at 332; State

AG PI Op., 645 B.R. at 70.

### C.    The Court Has "Related to" Jurisdiction Over Third-Party Claims, Including Direct Claims, Against the Protected Parties.

The Court "at a minimum, [has] 'related to' jurisdiction."[33]  The bar for "related to"

jurisdiction is intentionally low.  The Court has "related to" jurisdiction over third-party claims

against non-debtors when "the outcome of that proceeding could *conceivably* have *any effect* on

the estate being administered in bankruptcy."[34]  Under this standard, jurisdiction is

---

[31]    <u>See</u> <u>In re Elsinore Shore Assocs.</u>, 91 B.R. 238, 255 (Bankr. D.N.J. 1988) (citing <u>In re Johns-Manville Corp.</u>, 801 F.2d 60, 63 (2d Cir. 1986)); <u>see also</u> <u>In re Monroe Well Serv., Inc.</u>, 67 B.R. 746, 754 (Bankr. E.D. Pa. 1986); <u>In re G-I Holdings, Inc.</u>, 327 B.R. 730, 734 (Bankr. D.N.J. 2005) (exercising core jurisdiction over a motion for a preliminary injunction).

[32]    <u>See</u> <u>Monroe Well Serv.</u>, 67 B.R. at 753 n.9 (Bankr. E.D. Pa. 1986) (finding "arising in" jurisdiction over a request for a section 105(a) injunction of third-party action against non-debtor; favorably cited in <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 311 n.8 (1995)); <u>Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)</u>, 402 B.R. 571, 586 (Bankr. S.D.N.Y. 2009) (same; also finding "arising under" jurisdiction); <u>Brier Creek</u>, 486 B.R. at 684 (finding "arising in" jurisdiction over a request for a section 105(a) injunction of third-party action against non-debtor).

[33]    <u>Chakarian</u>, 386 B.R. at 25-30; <u>accord</u> <u>Celotex</u>, 514 U.S. at 309-311, 311 n.8 (a section 105(a) injunction issued to augment the automatic stay was "at least a question 'related to' Celotex's bankruptcy").

[34]    <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984, 994 (3d Cir. 1984); <u>see</u> <u>In re W.R. Grace & Co.</u>, 900 F.3d 126, 139 (3d Cir. 2018) (citing <u>Pacor</u>); <u>Gerard v. W.R. Grace & Co. (In re W.R. Grace & Co.)</u>, 115 F. App'x 565, 567–68 (3d Cir. 2004) (finding that an adversary proceeding to modify an injunction already entered by the bankruptcy court pursuant to section 105 "was assuredly 'related to' the case, and, further, it definitely 'arose under' the bankruptcy proceeding (and was perhaps even a 'core' proceeding)"); <u>In re Phila. Newspapers, LLC</u>, 407 B.R. 606, 615 (E.D. Pa. 2009) (upholding the bankruptcy court's exercise of related to jurisdiction to enjoin state court actions against non-debtors, even absent contractual indemnification obligations).

NAI-1535638547

straightforward.

Litigation of the Debtor Talc Claims against the Protected Parties outside of this Court would *at least* "conceivably have [an] effect" on the Debtor's estate and reorganization. As this Court has already found, those claims are the *exact same claims* the Debtor seeks to resolve through reorganization in bankruptcy. As explained herein, in accordance with Texas law, any liability associated with those claims is the responsibility of the Debtor. Moreover, the Debtor has indemnification obligations to J&J, Holdco, the Retailers and the Indemnified Parties. And the Debtor shares insurance coverage with J&J and the Retailers, who are named as insureds under many of the policies.[35] Any party pursuing the Debtor Talc Claims against another entity is seeking to establish through third-party litigation a claim against the Debtor. Third-party litigation involving these claims could at least "conceivably" affect the Debtor's estate (and, in fact, would materially and adversely impact this case). See PI Op., 638 B.R. at 303 ("[C]ontinued litigation of talc claims against the Protected Parties has a "conceivable effect" on the bankruptcy estate because it effectively seeks to collect and liquidate claims against Debtor and could deplete available insurance coverage."); see also Bestwall, 606 B.R. at 249-51 (confirming court's jurisdiction over third-party claims that assert the same liabilities as the debtor sought to reorganize in bankruptcy).

"[C]ourts have made clear that this standard [for "related to" jurisdiction] applies whether any claims against a third party are alleged to be 'direct' or 'derivative.'" Bestwall, 606

---

[35] All of the pre-1986 occurrence-based insurance policies provide insurance shared by the Debtor and J&J. Ex. 43 (2021 First Day Decl.) ¶¶ 46-54. In addition, the Retailers are identified as insureds in many of the pre-1986 insurance policies. See Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 146:22-153:14; Exs. 29, 28, 30, 31 (Debtor's PI Hr'g Exs. 8, 11, 12, 14). The relevant provisions generally provide coverage to vendors with respect to bodily injury arising out of the distribution or sale in the regular course of the vendor's business of the named insured's products, subject to certain exclusions. Ex. 42.1 (Hr'g Tr., Nov. 4, 2021, Kim Direct) at 146:22-153:14. The only relevant exclusion is where the vendor is alleged to repackage J&J or Old JJCI's products, or where the vendor made a physical or chemical change to the product. Id.

B.R. at 249 (citing Pfizer Inc. v. Angelos (In re Quigley Co., Inc.), 676 F.3d 45, 56-57 (2d Cir.

2012)).[36]  A proceeding "need not necessarily be against the debtor or against the debtor's

property" to confer jurisdiction.  Pacor, 743 F.2d at 994.  Rather, "[a]n action is related to

bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action

(either positively or negatively) and which *in any way impacts upon the handling and*

*administration of the bankrupt estate.*"  Id.[37]  Bankruptcy courts regularly exercise broad

authority over claims against nondebtor entities, including nondebtor affiliates, both in

mass-tort[38] and non-mass-tort bankruptcies,[39] to fully effectuate the automatic stay's protections

---

[36]    See Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC), No. 20-408, 2021 WL 523625, at *2-3 (D. Del. Feb. 11, 2021) (holding that even if non-debtors had independent liability the court had "related to" jurisdiction to issue preliminary injunction enjoining claims against them); In re SunEdison, Inc., 576 B.R. 453, 462 (Bankr. S.D.N.Y. 2017) ("Where a third-party claim may give rise to a potential indemnification or contribution claim against the estate, the third-party claim will have a conceivable effect on the estate, and accordingly, the [c]ourt has the jurisdiction to enjoin it.").

[37]    Robins, 788 F.2d at 1002 n.11 ("The accepted definition of the "related to" [jurisdiction] . . . is that declared in Pacor"); see also Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Conn. (In re Dow Corning Corp.), 86 F.3d 482, 491 (6th Cir. 1996), as amended on denial of reh'g and reh'g en banc (June 3, 1996) ("Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may impact on 'the debtor's rights, liabilities, options, or freedom of action' or the 'handling and administration of the bankrupt estate.'"); Kocher v. Dow Chem. Co., 132 F.3d 1225, 1231 (8th Cir. 1997) (holding that the district court had "related to" jurisdiction over plaintiff's product liability claims against debtor's non-debtor co-defendants because the co-defendants had potential indemnification claims against the debtor and therefore "it is at least arguable that [the plaintiff's] claims against [the co-defendants] conceivably could affect [the debtor's] bankruptcy estate"); see also Mine Mgmt, Inc. v. Wolfe (In re Mountain Laurel Res. Co.), 210 F.3d 361 (4th Cir. 2000) ("A.H. Robins makes clear that a bankruptcy court has the authority under § 105(a) to enjoin suits against a third-party where the third-party could seek indemnification from the estate or where a judgment against the third-party may raise issues of collateral estoppel with respect to suits against the estate.").

[38]    See, e.g., Order Granting in Part Mot. for Prelim. Inj., In re Purdue Pharms. L.P., No. 19-08289-shl (Bankr. S.D.N.Y. Oct. 11, 2019) [Dkt. 82], aff'd 619 B.R. 38 (S.D.N.Y. 2020); Order Enjoining Continued Prosecution of Certain Pre-Petition Lawsuits, In re USA Gymnastics, No. 19-50075 (Bankr. S.D. Ind. Apr. 22, 2019), [Dkt. 71]; Order Granting in Part and Denying in Part Debtors' Mot. for Prelim. Inj., In re TK Holdings Inc., No. 17-50880-BLS [Dkt. 63] (Bankr. D. Del. Aug. 22, 2017); Lyondell Chem. Co., 402 B.R. 571; Robins, 788 F.2d at 999-1000.

[39]    See, e.g., In re Am. Film Techs., Inc., 175 B.R. 847, 855 (Bankr. D. Del. 1994) (staying claims against a debtor's directors); In re Family Health Servs., Inc., 105 B.R. 937, 942-943 (Bankr. C.D. Cal. 1989) (staying claims by certain health care providers against members and enrollees of a debtor HMO); In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660, 690 (Bankr. D.D.C. 1992) (finding that injunction of suits against nondebtor partners should issue); In re Myerson & Kuhn, 121 B.R. 145, 160 (Bankr. S.D.N.Y. 1990) (enjoining suits against nondebtor partners).

NAI-1535638547

and maintain the integrity of the Debtor's estate.  In the 2021 Bankruptcy Case, this Court found three times that it had, at a minimum, such "related to" jurisdiction over motions to extend the automatic stay or authorize a preliminary injunction to protect non-debtors.  See PI Op., 638 B.R. at 303; Securities Claim PI Op., 640 B.R. at 333-34; State AG PI Op., 645 B.R. at 75.

Continued litigation of Talc Claims against non-debtors threatens to create an evidentiary record and to potentially determine issues that could materially affect the value of the Talc Claims pending against the Debtor and impact negotiations regarding a proposed plan of reorganization containing the terms in the Plan Support Agreements.  Thus, the continuation of Talc Claims while the Chapter 11 Case is ongoing jeopardizes the Debtor's legal interests and rights in a way that impacts the administration and handling of its bankruptcy estate, including claims resolution and mediation.  In assessing the potential impact on the Debtor, the *potential* harms to the Debtor of continued litigation against a non-debtor weigh in favor of finding that the Court has "related to" jurisdiction to enjoin claims against non-debtors.  As detailed below, the adjudication of the claims against non-debtors *could conceivably* impact the resolution of Talc Claims in the Debtor's bankruptcy case, and *at least raises the possibility* of collateral estoppel, res judicata and record-taint concerns.  See In re Winstar Commc'ns, Inc., 554 F.3d 382, 405 (3d Cir. 2009) (a bankruptcy court has "related to" jurisdiction if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy"); see generally Chakarian, 386 B.R. at 35 (citing Grace, 115 Fed. Appx. 565) (applying "broader view of potential impact on the debtor" which takes into account the "risks of collateral estoppel and record taint.").  Moreover, any judicial determination regarding issues that underly the Talc Claims could impact the availability of insurance coverage to the Debtor and could also affect damage awards for which the Debtor is liable.  See, e.g., Dow Corning, 86 F.3d at 494 (unfiled

-51-

and contingent indemnification claims against the debtor arising from third-party litigation against nondebtors "unquestionably could ripen into fixed claims," which "suffices to establish a conceivable impact on the estate"). And the potential impact of continued Talc Claim litigation would require the Debtor to monitor the cases, diverting resources and attention away from the Debtor's reorganization efforts. As a result, this Court clearly has "related to" jurisdiction.

## II.    THE AUTOMATIC STAY APPLIES OR EXTENDS TO PROHIBIT PROSECUTION OF DEBTOR TALC CLAIMS AGAINST THE PROTECTED PARTIES.

The automatic stay provided by section 362(a) of the Bankruptcy Code "is intended to 'allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.'" In re Manley Toys Ltd., No. 16-15374 (JNP), 2020 WL 1580244, at *7 (Bankr. D.N.J. Mar. 31, 2020) (quoting S.E.C. v. Brennan, 230 F.3d 65, 70 (2d Cir. 2000)); see also In re Denby-Peterson, 941 F.3d 115,122 (3d Cir. 2019) (the automatic stay protects the debtor by "giving the debtor a respite from creditors and a chance to attempt a repayment or reorganization plan" and "creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors."); McCartney, 106 F.3d at 511 (one purpose of section 362 is "to centralize all prebankruptcy civil claims against a debtor in the bankruptcy court").[40]

### A.    Section 362(a)(1) Applies or Extends to Stay the Debtor Talc Claims

Although "the clear language of section 362(a)(1) stays actions only against 'a debtor,'" courts in this circuit and elsewhere recognize that section 362(a)'s protections extend to

---

[40]    See also Aldrich Pump, 2021 WL 3729335, at *30 (ruling that claims against third parties which "necessarily result in the liquidation and recovery of claims against the Debtors outside of the bankruptcy case" are barred by the automatic stay); see also 11 U.S.C. § 362(a).

NAI-1535638547

nondebtor defendants in "unusual circumstances," including if an identity of interests exists

between the debtor and the third-party defendant or "where stay protection is essential to the

debtor's efforts of reorganization."[41] McCartney, 106 F.3d at 509-10 (citations omitted); see also

Belcufine v. Aloe, 112 F.3d 633, 637 n.5 (3d Cir. 1997) (citing McCartney and stating that the

rationale for applying the automatic stay to nondebtors first articulated in Robins has been

adopted in the Third Circuit); Phila. Newspapers, 407 B.R. at 616 (explaining that unusual

circumstances exist where:  "(i) the non-debtor and debtor enjoy such an identity of interests that

the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will

have an adverse impact on the debtor's ability to accomplish reorganization").[42]

> ### 1.     An Identity of Interests Exists Between the Debtor and the Protected Parties.

An identity of interests "arises when there is such identity between the debtor and

the third-party defendant that the debtor may be said to be the real party defendant and that a

judgment against the third-party defendant will in effect be a judgment or finding against the

debtor."  Robins, 788 F.2d at 999; accord McCartney, 106 F.3d at 510–11 (concluding that the

automatic stay extended to enjoin an action against a non-debtor third party where the debtor

---

[41]     See also Kaiser Group Int'l, Inc. v. Kaiser Aluminium and Chem. Corp. (In re Kaiser Aluminum Corp., Inc.), 315 B.R. 655, 658 (D. Del. 2004) ("The protection of the automatic stay extends to any action or proceeding against an interest of the debtor.  The scope of this protection is not determined solely by whom a party chose to name in the proceeding, but rather, by who is the party with a real interest in the litigation."); Maaco Enters., Inc. v. Corrao, No. Civ. A. No. 91-3325, 1991 WL 255132, at *2 (E.D. Pa. Nov. 25, 1991) ("The automatic stay provision applies to suits against non-debtor defendants who are related to the debtor and to suits the resolution of which may have a significant impact on the debtor."); accord Queenie v. Nygard Int'l, 321 F.3d 282, 288 (2d Cir. 2003) (automatic stay applied to nondebtor third-party corporation "because it is wholly owned by [debtor], and adjudication of a claim against the corporation will have an immediate adverse economic impact on [debtor]"); FDIC v. Hirsch (In re Colonial Realty Co.), 980 F.2d 125, 131-32 (2d Cir. 1992) (automatic stay applied to nondebtor third party who was recipient of property that was allegedly fraudulent transferred from debtors).

[42]     See also Ritchie Cap. Mgmt., L.L.C. v. Jeffries, 653 F.3d 755, 762 (8th Cir. 2011) (acknowledging that bankruptcy court can stay cases against nondebtors in unusual circumstances); Reliant Energy Servs., Inc. v. Enron Canada Corp., 349 F.3d 816, 825 (5th Cir. 2003) (same); Robins, 828 F.2d at 1024 (automatic stay applied to nondebtor third-party insurer of debtor).

NAI-1535638547

"was, in essence, the real party in interest" in the pursuit of a deficiency judgment against the third party).

> "[T]he nondebtor Protected Parties and Debtor enjoy such an identity of interests that a lawsuit asserting talc-related claims against the Protected Parties is essentially a suit against the Debtor." PI Op., 638 B.R. at 305. Old JJCI, for its part, no longer exists, and responsibility for Debtor Talc Claims asserted against Old JJCI was allocated to the Debtor pursuant to the 2021 Corporate Restructuring. See supra, § I.A.5. Thus, the commencement or continuation of the Debtor Talc Claims against Old JJCI—all of which allege liabilities arising out of Old JJCI's actions years before the Petition Date—can have only one purpose: the ultimate liquidation and recovery of claims against the Debtor to recover a prepetition claim. Likewise, all of J&J's liabilities associated with Johnson's Baby Powder or Shower to Shower were transferred to Old JJCI, as explained above. See supra, § I.A.1-2. The pursuit of the Debtor Talc Claims against J&J, therefore, is an effort to liquidate and recover prepetition claims for liabilities that were transferred to the Debtor's predecessor decades ago and are now liabilities of the Debtor. See id.

> The Debtor's indemnification obligations also give rise to an identity of interests with the Retailers and Indemnified Parties, including Holdco and J&J, because the Debtor is ultimately responsible for those Debtor Talc Claims. In Robins, the Fourth Circuit described one situation that would give rise to an identity of interests as "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case."[43] Robins, 788 F.2d at 999. Indeed, the court continued, "[t]o refuse

---

[43]   The Court previously found in the PI Opinion that the Fourth Circuit's reference to "absolute indemnity" in Robins did not create a requirement that any indemnity obligation be automatic. See PI Op., 638 B.R. at 312 (citing cases where the prospect or potential for indemnification was held to warrant application of the stay).

NAI-1535638547

application of the statutory stay in that case would defeat the very purpose and intent of

the statute." Id.[44]

  Courts in the Third Circuit have also found an identity of interest between a

debtor and a non-debtor where the debtor's conduct or product was "at the core of the issues

raised" in actions against the non-debtor.  See Chakarian, 386 B.R. at 30-31.[45]  At their core, all

of the Debtor Talc Claims arise out of alleged harm caused by Johnson's Baby Powder and other

talc-containing products for which the Debtor is responsible as a result of the 2021 Corporate

Restructuring.  See PI Op., 638 B.R. at 306 (finding that "the corporate transactions and

indemnity agreements [] left Debtor ultimately responsible for talc-related liabilities"); id.

(finding that the Debtor Talc Claims involve "the same products, same time periods, same

alleged injuries, and same evidence as claims against Debtor"); id. at 311 (finding same as to

Retailers); see also Chakarian, 386 B.R. at 36 (stating that non-debtor alleged that the debtors'

---

[44]   See also id. (quoting In re Metal Ctr., 31 B.R. 458, 462 (D. Conn. 1983) ("Clearly the debtor's protection must be extended to enjoin litigation against others if the result would be binding upon the debtor's estate.")); Edwards v. McElliotts Trucking, LLC, No. 3:16-1879, 2017 WL 5559921, at *3 (S.D. W. Va. Nov. 17, 2017) (finding that indemnification arrangement between the debtor and non-debtor defendants made action against non-debtor defendants subject to the automatic stay imposed by section 362(a)(1)); In re W.R. Grace & Co., Case No. 01-01139 (JKF), 2004 WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004) (applying automatic stay to litigation between two non-debtor parties where one of the parties was entitled to contractual indemnity from the debtor on account of such claims and amending preliminary injunction order to include such action).

[45]   See also TK Holdings Inc., Adv. Pro. No. 17-50880 (Bankr. D. Del. July 13, 2017) [Dkt. 64] (the "Takata PI Ruling") (finding an identity of interest between the debtors and the non-debtors, even though plaintiffs alleged they asserted direct claims against the non-debtors, because the basis for all the claims was the "delivery and installation of a defective part manufactured by the debtors" and the debtors owed indemnification obligations to the non-debtors); Singer Co. B.V. v. Groz Beckert KG (In re Singer Co. N.V.), 2000 WL 33716976, at *3 (Bankr. S.D.N.Y. Nov. 3, 2000) (finding that action against non-debtor defendant was inextricably intertwined with the debtors given that non-debtor was merely a distributor of the debtors and the core of the action was for patent infringement based on the debtors' product); Am. Film Techs., 175 B.R. at 849-50 (finding identity of interest in part because counts against non-debtors and debtors necessarily involved the same subject matter and would involve facts identical to each other); In re Ms. Kipps, Inc., 34 B.R. 91, 93 (Bankr. S.D.N.Y. 1983) (finding that automatic stay extended to non-debtor principal of the debtor given that action against non-debtor was inextricably intertwined with claim against and liability of the debtor and was premised on "one wrong, one injury and one recovery").

-55-

actions were the cause of plaintiffs' injuries); Takata PI Ruling 14:7-15:4 (finding that basis for

claims was the delivery and installation of a defective part manufactured by debtors).

An identity of interests may exist regardless of whether the Protected Parties have

independent liability.  The Debtor Talc Claims do not distinguish between the actions of the

Debtor or the Protected Parties but instead seek recoveries for the same alleged conduct under

the same or similar theories.  In that respect, this case is comparable to Chakarian, where the

debtor's alleged conduct predominated the claims against the non-debtors, and the court found it

appropriate to enjoin such claims based on an identity of interest.[46]  And this case is also

consistent with other cases where courts have found that even allegedly direct claims against

non-debtors do not cut off an identity of interests between the debtor and the non-debtors.[47]

The identity of interests among the Debtor and the other Protected Parties is

further evidenced by the identity of claims at issue.  Continued prosecution of the Debtor Talc

Claims against the Protected Parties—even if such claims were allegedly for the Protected

Parties' independent conduct —would involve litigation of the same key facts:  the same

---

[46]   See Chakarian, 386 B.R. at 30-36 (rejecting argument that the test for identity of interest could not be
satisfied where the non-debtor was allegedly independently liable and preliminarily enjoining actions
against non-debtor railroad company because the debtors' actions were alleged to be the proximate cause of
the plaintiffs' injuries, i.e., the debtors' operations and conduct were at the "core of the issues" raised in the
actions against the non-debtor, and the debtors were obligated to indemnify the non-debtor).

[47]   See, e.g., Mallinckrodt, 2021 WL 523625 at **3, 6 (stating that a holding that the non-debtors could have
independent liability would not preclude or estop the bankruptcy court's conclusions that the claims are
"inextricably intertwined" for purposes of issuing a preliminary injunction); Purdue Pharm., 619 B.R. at 45,
53 (recognizing identity of factual interest in allegations against non-debtor and debtors and the fact that
objectors would rely on the same facts to prove the claims against the non-debtor as against the debtors);
Purdue Pharm. L.P. v. Mass. (In re Purdue Pharm. L.P.), No. 19-23649 [Dkt. 87] (Bankr. S.D.N.Y. Oct. 11,
2019) (stating that even if "a claim against a third party is independent or not derivative of the debtors, it
still may be enjoined under proper circumstances."); Takata PI Ruling 15:5-16 (rejecting contention that
non-debtors "inability to be indemnified for their own negligent or wrongful acts" vitiated the identity of
interest created by contractual indemnity obligations of the debtors and finding that all the claims against
the non-debtors revolved around the acts and omissions of the debtors); see also W.R. Grace & Co., 2004
WL 954772 at **2-3 (finding that there was an identity of interest between the debtor and the non-debtor
owner of property that was previously owned by the debtor in litigation between two non-debtors given
entitlement to contractual indemnity).

NAI-1535638547

products, time periods and alleged injuries, related to the talc liabilities of Old JJCI, and would

effectively seek to adjudicate the very same claims at issue in this Chapter 11 Case.  See PI Op.,

638 B.R. at 305-06 ("I believe there is, in effect, an identity of interest within the meaning of the

Robins case and that, notwithstanding the potential that some of the claims may be direct, almost

all of them, if not all of them, relate to the debtor's operations.") (quoting Hr'g Tr., 141:8-12,

Nov. 10, 2021); id. at 311 (noting that "the claims against the Retailers involve the same

products, the same time period, the same alleged defect, and the same alleged harm as the claims

against Debtor"); see also Belcufine v. Aloe, 112 F.3d 633, 637 n. 5 (3d Cir. 1997) (adopting the

reasoning in Robins that "an identity between the debtor and the individual officers [existed and]

that allowing the suit to proceed against the officers would, in effect, be allowing the suit to

proceed against the bankrupt debtor"); McCartney, 106 F.3d at 510–11 (describing and applying

the Robins principle).

### 2.    Stay Protection Is Essential to Protect the Debtor's Reorganization Efforts.

"[A] critical factor in deciding whether to extend the stay is the potential adverse

impact on a debtor's estate and prospect of reorganization."  PI Op., 638 B.R. 306.  In the 2021

Chapter 11 Case, both this Court and the North Carolina Bankruptcy Court found that, without

stay protection "it is difficult to envision how a successful reorganization can be achieved in this

case." PI Op., 638 B.R. at 304-05 ("We're not going to have a bankruptcy case of any sort if

everybody can go sue J&J and assert the same claims that they would be asserting there.")

(quoting Hr'g Tr., 142:15-17, Nov. 10, 2021).  The circumstances that led the Court to conclude

in the 2021 Chapter 11 Case that "the talc claims have an undeniable impact on Debtor's estate"

have not changed.  Id. at 307.  Stay protection is essential with respect to the Debtor Talc Claims

to avoid liquidation of claims outside the Chapter 11 Case, the potential preclusive or prejudicial

NAI-1535638547

impact of such litigation and to avoid depleting the Debtor's resources to the detriment of its

estate.

### (a)    Liquidation of Claims Against the Debtor's Estate Outside This Chapter 11 Case

Absent a stay of litigation, "uncontrollable" and "uncoordinated proceedings in

different courts" will resume, Robins, 788 F.2d at 998, which eventually will lead to the

liquidation of Debtor Talc Claims against Protected Parties for which the Debtor ultimately is

liable.  Whether such claims are the responsibility of the Debtor directly—by virtue of the

allocation of those liabilities to the Debtor from Old JJCI—or indirectly through the Debtor's

actual or alleged indemnification obligations, "the continued litigation against the Protected

Parties would liquidate [these claims] against Debtor outside of chapter 11 and potentially

deplete available insurance coverage—frustrating the purpose of the automatic stay."  PI Op.,

638 B.R. at 307.

Under the circumstances of this Chapter 11 Case, many facts establishing an

identity of interests between the Debtor and the Protected Parties also illustrate the impact on the

Debtor's estate that would be caused by continued litigation of Debtor Talc Claims against

Protected Parties.  Because the talc claimants assert the same claims arising from "the same

products, same time periods, same alleged injuries, and same evidence" against the Protected

Parties, the liquidation of any such claim against any Protected Party will affect the assertion of

that same claim against the Debtor.  The Debtor's estate thus typically has dual interests in the

outcome of the litigation of Debtor Talc Claims against Protected Parties:  because the same

claim for the same liability is asserted against the Debtor, as successor to Old JJCI; and because

the Debtor, as indemnitor, may ultimately be liable for any judgment against the Protected Party.

NAI-1535638547

Permitting claimants to continue seeking to indirectly liquidate claims against the Debtor through actions against third parties with indemnity rights would also "impair mediation efforts and negotiations within this bankruptcy and would complicate estimation hearings, with multiple uncoordinated hearings nationwide." Id. The successful outcome of this Chapter 11 Case depends upon the Debtor's ability to obtain additional support for a plan of reorganization that contains the terms in the Plan Support Agreements to establish a trust that will resolve all current and future talc claims against the Debtor. Any individual talc claimant's simultaneous effort to fix its claims in another jurisdiction against related parties would undermine (or defeat) this goal and the ability of the Debtor and claimants who have signed Plan Support Agreements to achieve confirmation of a plan that treats all talc claimants fairly and equitably.

### (b)    Risks of Res Judicata, Collateral Estoppel and Evidentiary Prejudice

Litigation of Debtor Talc Claims outside of this Chapter 11 Case also gives rise to the risk of res judicata, collateral estoppel and evidentiary prejudice. The Debtor is not required to establish definitively the preclusive or evidentiary harm it will suffer. Rather, "employ[ing] a broader view of the potential impact on the debtor," PI Op., 638 B.R. at 314, "it suffices to acknowledge that there *exists a risk* that [such doctrines] could adversely impact Debtor in future litigation." Id. at 316 (emphasis in original) (citing Grace, 115 F. App'x 565 (3d Cir. 2004) (holding that risk of future preclusive consequences was enough to weigh in favor of extending the stay)); see also Securities Claim PI Op., 640 B.R. at 337-38 (the Court "must give great weight to the injury to protect against, as contrasted to the certainty of the threat") (citing In re Lyondell Chem. Co., 402 B.R. 571, 591 (Bankr. S.D.N.Y. 2009). This burden is satisfied here, and there remains "no reason to deviate from the prudent course navigated by the Third Circuit in [Grace]." PI Op., 638 B.R. at 314.

NAI-1535638547

Res judicata bars relitigation in a subsequent action by the parties—or any of their privies—of claims and defenses that were brought—or that could have been brought—in the prior action.  See PI Op., 638 B.R. at 316 (citing Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc., 206 L. Ed. 2d 893, 140 S. Ct. 1589, 1594 (2020)).  Any number of relationships may give rise to privity for purposes of claim preclusion.  A risk of preclusion may exist, for example, between a corporation and its successor, Russell v. SunAmerica Sec., Inc., 962 F.2d 1169, 1175–1176 (5th Cir. 1992), or between an indemnitor and indemnitee, FTC v. Garvey, 383 F.3d 891, 898–899 (9th Cir. 2004).  As a result, unless Debtor Talc Claims are stayed, the risk exists that plaintiffs may attempt to bar the Debtor from raising defenses to Debtor Talc Claims that were not raised by Protected Parties in ongoing litigation outside of this Chapter 11 Case causing an obvious prejudicial impact to the Debtor.

Collateral estoppel—or issue preclusion—bars the re-litigation of issues where "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." U.S. v. 5 Unlabeled Boxes, 572 F.3d 169, 173 (3d Cir. 2009) (quoting Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 249 (3d Cir. 2006)).  Importantly, nonmutual collateral estoppel has been applied offensively by litigants who were not parties to the prior litigation.  See, e.g., Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979) (allowing offensive use of collateral estoppel to prevent a corporation from defending against the stockholder class action of plaintiffs who were not parties to prior SEC litigation against the corporation); see also Jean Alexander Cosmetics, 458 F.3d 244, 248-49 (discussing nonmutual offensive use of collateral estoppel).  A clear risk therefore exists that talc claimants who have never before litigated their claims against the

-60-

NAI-1535638547

Debtor, or against the Protected Parties, could seek to bar the Debtor's defenses by pointing to a

prior judgment on a Debtor Talc Claim against a Protected Party.

Courts consistently have concluded that the risks of collateral estoppel and

res judicata warrant a stay of third-party litigation that could undermine the purposes of the

automatic stay.  See, e.g., Bestwall, 606 B.R. at 256 (determining that the risks posed by the

doctrines of res judicata and collateral estoppel, among other factors, warrant a preliminary

injunction of litigation against non-debtor affiliates); Am. Film Techs., 175 B.R. at 850–55

(staying claims against debtor's directors and holding that a potential finding of liability against

such directors would be based on acts undertaken by directors as agents of the debtor and

therefore would expose the debtor to the risk of being collaterally estopped from denying

liability for the directors' actions); Sudbury, 140 B.R. at 463 (granting injunctive relief after

finding that debtor's liability "may be determined on collateral estoppel principles [by fact

determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors);

Manville, 26 B.R. at 429 (concluding that the risk of collateral estoppel would irreparably injure

the estate and, thus, issuance of a stay of claims against non-debtors was warranted).

Beyond formal preclusion doctrines, litigation of the Debtor Talc Claims against

the Protected Parties could allow parties to use statements, testimony and other evidence elicited

or adduced in those proceedings to try to establish the Debtor's liability for Debtor Talc Claims.

As one court put it, "once a witness has testified to a fact, or what sounds like a fact, that witness

may be confronted with his prior testimony under oath in a future proceeding" involving the

debtor regardless of whether the debtor "was a party to the record on which the initial testimony

was taken."  Johns-Manville, 40 B.R. at 225.  The same concern arises for other evidence:

"Once an admission against interest is made, under oath or otherwise, by the agent of a party,

NAI-1535638547

that admission stands for all time." Id.  Regardless of what the parties to the other proceeding

might "stipulate, the thousands of other claimants and cross-claimants who are after [the

debtor's] assets, would be entitled to use the product of such discovery." Id.; see also Bestwall,

606 B.R. at 256 ("Litigation of the Bestwall Asbestos Claims against the Protected Parties will

create the additional risk that statement, testimony, and other evidence generated in proceedings

against the Protected Parties will be used to try to establish Bestwall Asbestos Claims against the

Debtor."); Chakarian, 386 B.R. at 34 (granting injunction based, among other things, on the

possibility that "record taint" in actions against non-debtors would compel the debtors'

participation and impair the reorganization effort); Union Tr. Phila., LLC v. Singer Equip. Co.

(In re Union Tr. Phila., LLC), 460 B.R. 644, 657 (E.D. Pa. 2011) (in subsequent suits, debtor

could be bound by "critical factual and legal issues" determined in the proceedings against non-

debtor).

   The Court previously recognized that "[b]ecause the talc-related claims against

the Debtor and the Protected Parties implicate the same product, the same time period, the same

alleged defect and the same alleged harm, it is possible that the evidentiary record developed in

continued litigation against the Protected Parties could prejudice Debtor . . . ."  PI Op., 638 B.R.

at 317.  The circumstances here regarding the risks of res judicata, collateral estoppel and record

taint are no different from those the Court previously considered.  Unless the litigation of Debtor

Talc Claims against the Protected Parties is stayed, the Debtor may be compelled to defend its

interests in pending litigation against the Protected Parties to prevent such harm to its estate,

thereby defeating the "breathing spell" intended by the automatic stay.  First Day Decl. ¶ 109.

These are consequences that the Debtor should not be required to suffer or be compelled to

NAI-1535638547

protect against, and the extent of this risk should not be "tested at the debtor's peril." Grace, 115

F. App'x at 570.

### (c)    Potential Diversion of Resources and Disruption of Funding

Courts routinely find that the potential diversion of estate resources to monitor or

participate in external litigation justifies an extension of the automatic stay. See Chakarian, 386

B.R. at 31-32 (finding that actions against non-debtor directly impacted the estate due to the

overlap of issues, contractual indemnity and the implication of the debtors' insurance, which

would all necessitate the debtors' involvement and divert resources to attend to the claims rather

than the reorganization); Takata PI Ruling 19:5-23:5 (finding that continued prosecution of the

state and individual actions against non-debtors would adversely impact the debtors' efforts to

reorganize given need of all stakeholders to focus on reorganization process); Phila. Newspapers,

407 B.R. at 616 (finding that the diversion of resources caused by action against non-debtors

arising from a series of allegedly false and misleading newspaper and internet articles and certain

non-debtors "bad acts" would impact the debtors' ability to engage in a timely and effective

reorganization).

If litigation of Debtor Talc Claims continues outside this Chapter 11 Case, the

Debtor will be distracted from its reorganization efforts by its need to monitor or participate in

litigation because of the identity of claims being liquidated and issues being determined in the

tort system, as well as the Debtor's indemnification obligations, the potential effects of res

judicata, collateral estoppel or record taint.  Moreover, funds and resources necessary for the

Debtor's reorganization efforts may be diverted by any judgments entered by depleting insurance

proceeds available to the Debtor under shared insurance policies or potentially the funding

available under the Amended Funding Agreement.  See, e.g., *Inj. Pursuant to §§ 105(a) and*

*362(a) and Fed. Rule of Bankruptcy Procedure 7065*, In re Quigley Co., Inc., No. 04-15739,

NAI-1535638547

Adv. No. 04-04262 [Dkt. 122] (Bankr. S.D.N.Y. Dec. 17, 2004) at 3-4 (finding that continued

prosecution of any and all asbestos claims against non-debtor parent, whether allegedly direct or

derivative, would deplete shared insurance policies and funds in an insurance trust to the

detriment of the debtor's estate).

This Court previously considered all of these circumstances, finding that "unusual

circumstances" exist justifying an extension of the automatic stay of section 362(a)(1) of the

Bankruptcy Code because of the existence of an identity of interests between the Debtor and the

Protected Parties and the impact that continued litigation of the Debtor Talc Claims would have

on the Debtor's reorganization efforts.  PI Op., 638 B.R. at 305-07.  These unusual

circumstances have not changed, and the Court should declare once again that the stay extends to

the Protected Parties.

> **B.      Suits That Would Deplete Insurance Policies Are Automatically Stayed
> Because the Policies Are Property of the Debtor's Estate.**

Section 362(a)(3) bars plaintiffs from bringing suits against J&J or the Retailers

that would deplete the Debtor's insurance on account of Debtor Talc Claims because the right to

insurance coverage is property of the estate.  See PI Op., 638 B.R. at 317 ("It has long been the

rule in this Circuit that insurance policies are considered part of the property of a bankruptcy

estate.") (citing ACandS, Inc. v. Travelers Cas. & Sur. Co., 435 F.3d 252, 260 (3d Cir. 2006));

see also Robins, 788 F.2d at 1001 (agreeing with "the weight of authority" that insurance

contracts are property of the estate"); In re W.R. Grace & Co., 475 B.R. 34, 149 (D. Del. 2012),

aff'd sub nom. In re WR Grace & Co., 729 F.3d 332 (3d Cir. 2013) (insurance policies constitute

"'valuable property of a debtor, . . . therefore '[a]ny action in which the judgment may diminish

this 'important asset' is unquestionably subject to [the § 362(a) stay[.]'") (quoting Robins, 788

F.2d at 1001); In re Johns-Manville Corp., 40 B.R. 219, 231 (S.D.N.Y. 1984) ("determin[ing]

-64-

NAI-1535638547

that Manville's insurance is property of the estate under the Code"); Maertin v. Armstrong

World Indus., Inc., 241 F. Supp. 2d 434, 446 (D.N.J. 2002) (insurance policies and proceeds of

policies are property of the estate).

   J&J and the Debtor are both covered for talc-related claims under various shared

insurance policies.  See supra, § II.B.  The Retailers are named as insureds in many such policies.

Id.  The right to coverage under these insurance policies is property of the Debtor's estate, and

prosecution of a claim against J&J or the Retailers, each of which is a co-insured party, would

deplete proceeds available to the Debtor, thereby reducing assets available to the bankruptcy

estate.  See, e.g., In re Quigley Co., Inc., 676 F.3d 45, 53-54, 58 (2d Cir. 2012) ("[W]here

litigation of the [lawsuits against non-debtor] would almost certainly result in the drawing down

of insurance policies that are part of the bankruptcy estate of [debtor], the exercise of bankruptcy

jurisdiction to enjoin these suits was appropriate."); Robins, 788 F.2d at 1008 (sustaining

injunction and transfer of claims against non-debtors in part because such claims, if successful,

would reduce insurance funds available to debtor's estate).[48]

   Here, insurance is potentially available to the Debtor, J&J and the Retailers under

various insurance policies for talc-related claims, and "it is unquestionable that shared policies

exist."  See PI Op., 638 B.R. at 318.  Further, "the insurance policies have not yet been

exhausted because only payments made by the policyholder's insurers erode or exhaust the limits

of the policies," and "nearly the entire policy coverage of $2 billion is potentially still available

---

[48] See also In re Montreal Me. & Atl. Ry., Ltd., No. 1:13-MC-00184-NT, 2014 WL 1155419, at *10 (D. Me.
Mar. 21, 2014) (finding jurisdiction and transferring non-debtors' cases based on shared insurance);
Raudonis, as trustee for the Raudonis 2016 Revocable Trust v. RealtyShares, Inc., 507 F.Supp 378, 384 (D.
Mass. 2020) ("Because courts generally recognize insurance policy [sic] as 'property' under 11 U.S.C. §
541(a)(1) – and thus find such policies subject to an automatic stay pursuant to 11 U.S.C. § 362(a)(3) – the
defendants' shared insurance contract arguably sweeps [co-insureds] into the reach of the automatic stay.");
In re Metro Mortg. & Secs. Co., 325 B.R. 851 (Bankr. E.D. Wash. 2005) (holding that shared insurance
policies and their proceeds were property of the debtors' estates and were protected by automatic stay).

NAI-1535638547

to Debtor and J&J.  Id.  If a Debtor Talc Claim is prosecuted against J&J or the Retailers, J&J or

the Retailers may seek coverage under these shared insurance policies to satisfy any judgment,

thereby reducing the coverage available to the Debtor's estate.  Such a depletion of an estate

asset violates the automatic stay and, therefore, Debtor Talc Claims against J&J and the Retailers

are stayed pursuant to section 362(a)(3).

III.   **THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER SECTION 105(a)
       TO ENJOIN THE CONTINUATION OR COMMENCEMENT OF THE DEBTOR
       TALC CLAIMS AGAINST THE PROTECTED PARTIES.**

   A.   **The Court Has Authority to Enjoin the Pursuit of Debtor Talc Claims
        Against the Protected Parties.**

          Section 105(a) of the Bankruptcy Code provides that the Court "may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of

[the Bankruptcy Code]."  11 U.S.C. § 105(a).  This includes "ample power to enjoin actions

excepted from the automatic stay which might interfere in the rehabilitative process" of a

bankruptcy case.  In re Johns-Manville Corp., 26 B.R. 420, 425, 436 (Bankr. S.D.N.Y.

1983) (citing 2 COLLIER ON BANKRUPTCY § 362.05 (15th Ed.)), aff'd 40 B.R. 219 (S.D.N.Y.

1984), and appeal allowed, decision vacated in part on other grounds, 41 B.R. 926

(S.D.N.Y. 1984).

          Under section 105(a), courts have broad authority "to enjoin parties other than

the bankrupt from commencing or continuing litigation."  Robins, 788 F.2d at 1002 (quoting

In re Otero Mills, Inc., 25 B.R. 1018, 1020 (D.N.M. 1982)); see In re VistaCare Grp., LLC,

678 F.3d 218, 231 n.11 (3d Cir. 2012) ("Bankruptcy courts have broad powers (in addition

to 11 U.S.C. § 362) to protect the property of the estate.  For example, under 11 U.S.C.

§ 105(a), a bankruptcy court may issue injunctive relief.").  An injunction as to third-party

litigation is appropriate where, among other things, "the third-party action will have an adverse

-66-

impact on the debtor's ability to accomplish reorganization." See Chakarian, 386 B.R. at 30;[49]

Phila. Newspapers, 407 B.R. at 616-17; Robins, 788 F.2d at 1003 (enjoining litigation against a

third party where "failure to enjoin would [a]ffect the bankruptcy estate and would adversely or

detrimentally influence and pressure the debtor through the third party" (citation omitted)).[50]

In such cases, an injunction allows the debtor to receive the benefits of the automatic stay

imposed by section 362 of the Bankruptcy Code, which aims to:

> protect the debtor from an uncontrollable scramble for its
> assets in a number of uncoordinated proceedings in different
> courts, to preclude one creditor from pursuing a remedy to
> the disadvantage of other creditors, and to provide the debtor
> and its executives with a reasonable respite from protracted
> litigation, during which they may have an opportunity to
> formulate a plan of reorganization for the debtor.

Robins, 788 F.2d at 998; see also In re W.R. Grace & Co., 475 B.R. 34, 147 (D. Del. 2012)

(quoting Robins).[51]

      Acting under the broad authority granted by section 105(a), courts have

consistently stayed claims against non-debtor entities, including a debtor's affiliates, both in

mass tort and non-mass tort bankruptcies, to maintain the integrity of the debtor's estate and fully

---

[49]    See also Grace, 115 F. App'x at 570 ("The standard for the grant of a stay is generally whether the litigation 'could interfere with the reorganization of the debtor,' or 'would interfere with, deplete or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan of reorganization.'") (internal citations omitted).

[50]    See also In re Calpine Corp., 365 B.R. 401, 409 (S.D.N.Y. 2007) (holding that court may issue a "preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process") (internal quotation omitted); In re Lazarus Burman Assocs., 161 B.R. 891, 897 (Bankr. E.D.N.Y. 1993) ("When an action by a creditor of a debtor against a non-debtor third party threatens a debtor's reorganization, the creditor's action may be enjoined pursuant to section 105(a).").

[51]    This authority is bolstered by the inherent power of all courts "under their general equity powers and in the efficient management of [their] dockets to grant" appropriate injunctive relief. Robins, 788 F.2d at 1003 (internal quotation omitted); see also T&E Indus., Inc. v. Safety Light Corp., 680 F. Supp. 696, 705 (D. N.J. 1988) (reasoning that federal courts do not need statutory authorization to grant injunctive relief, and "absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction") (quoting Califano v. Yamasaki, 442 U.S. 682, 705 (1985)).

NAI-1535638547

effectuate the protections of the automatic stay.[52]  In fact, to the Debtor's knowledge, virtually

every court that has addressed the issue in the context of mass tort claims of a debtor asserted

against non-debtor affiliates has recognized that such claims threaten the debtor's prospects for

reorganization and has implemented a section 105(a) injunction.[53]  See PI Op., 638 B.R.

at 320-21 (issuing preliminary injunction in favor of non-debtor affiliates, insurers, retailers and

indemnified parties and noting that "continued litigation will have an adverse impact on the

bankruptcy estate, will hinder, reorganization efforts, and will serve as a constant drain on

resources and time"); Bestwall, 606 B.R. at 254 ("Injunctions of the type requested by the Debtor

have previously and uniformly been issued in numerous [] asbestos-related cases" (enjoining

asbestos-related actions against non-debtor affiliates)); In re G-I Holdings, Inc., No. 01-30135

(RG), Adv. No. 01-3013 (RG) (Bankr. D.N.J. Feb. 22, 2002) (issuing preliminary injunction in

favor of a non-debtor subsidiary of the debtor, and enjoining the filing or prosecution of asbestos

claims against non-debtor subsidiary); In re Leslie Controls, Inc., No. 10-12199 (CSS), Adv. No.

10-51394, at 4–5 (CSS) (Bankr. D. Del. July 14, 2010) (staying asbestos-related actions against

---

[52]     As to non-asbestos mass tort bankruptcies, see In re Purdue Pharms L.P., No. 19-23649, Adv. No.
19-08289 [Dkt. 82] (Bankr. S.D.N.Y. Oct. 11, 2019] aff'd 619 B.R. 38 (S.D.N.Y. 2020); In re USA
Gymnastics, No. 18-09108, Adv. No. 19-50075 [Dkt. 71] (Bankr. S.D. Ind. Apr. 22, 2019]; In re TK
Holdings Inc., Case No. 17-50880, Adv. No. 17-50880 [Dkt. 63] (Bankr. D. Del. Aug. 22, 2017]; In re
Lyondell Chem. Co., 402 B.R. 571 (Bankr. S.D.N.Y. 2009]; Robins, 788 F.2d at 999-1000.  As to non-
mass tort bankruptcies, see In re Am. Film Techs., Inc., 175 B.R. 847, 855 (Bankr. D. Del. 1994) (staying
claims against a debtor's directors); In re Family Health Servs., Inc., 105 B.R. 937, 942–43 (Bankr. C.D.
Cal. 1989) (staying claims by certain health care providers against members and enrollees of a debtor
HMO); In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660, 690 (Bankr. D.D.C. 1992) (finding that
injunction of suits against non-debtor partners should issue); In re Myerson & Kuhn, 121 B.R. 145, 160
(Bankr. S.D.N.Y. 1990) (enjoining suits against non-debtor partners).

[53]     A notable outlier is the recent decision of the United States Bankruptcy Court for the Southern District of
Indiana in In re Aearo Techs. LLC, 642 B.R. 891 (Bankr. S.D. Ind. 2022).  But that case is highly
distinguishable because it relies on controlling interpretations of law in the Seventh Circuit that are
inapplicable here.   In particular, the court ruled that Seventh Circuit authority did not permit extensions of
the automatic stay of section 362(a)(1), as expressly permitted by McCartney and Robins.  Id. at 905.
Moreover, the court found that it lacked even related to subject matter jurisdiction with respect to the
proceeding under the Seventh Circuit's "more constrained approach to 'related to' jurisdiction," which the
bankruptcy court was required to interpret "narrowly."  Id. at 909.

-68-

current and former affiliates); In re Specialty Prods. Holding Corp., No. 10-11780 (KJC), Adv.

No. 10-51085, at 3–5 (KJC) (Bankr. D. Del. June 4, 2010) (staying asbestos-related actions

against non-debtor parent company and other affiliates); Chakarian, 386 B.R. at 34 (enjoining

actions against a third-party railroad that transported the debtor's asbestos-containing

products).[54]  Such relief is critical for a debtor to equitably resolve all current and future talc

claims against it under the Bankruptcy Code.

> **B.    The Preliminary Injunction Factors All Support Enjoining the Pursuit of Debtor Talc Claims Against the Protected Parties.**

Courts considering the propriety of an injunction under section 105(a) typically

apply the traditional four-pronged test for injunctions, as modified for the bankruptcy context.

See In re G-I Holdings, Inc., 420 B.R. 216, 281 (D.N.J. 2009) (stating the standard for the

issuance of an injunction in the bankruptcy context); Phila. Newspapers, 407 B.R. at 616–17

(citing Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 157 (3d Cir. 2002))

---

[54]    See also In re Aldrich Pump LLC, No. 20-30608 (JCW), Adv. No. 20-03041 (JCW) (Bankr. W.D.N.C. Aug. 23, 2021) (staying asbestos-related actions against non-debtor affiliates, insurers, and indemnified parties); In re DBMP LLC, No. 20-30080 (JCW), Adv. No. 20-03004 (JCW) (Bankr. W.D.N.C. Aug. 10, 2021) (staying asbestos-related actions against non-debtor affiliates and distributors); In re Kaiser Gypsum Co., Inc., No. 16-31602 (JCW), Adv. No. 16-03313, at 3–4 (JCW) (Bankr. W.D.N.C. Nov. 4, 2016) (staying asbestos-related actions against debtors' third-party insurer and non-debtor affiliates); In re Garlock Sealing Techs. LLC, No. 10-31607 (JCW), Adv. No. 10-03145, at 2–3 (JCW) (Bankr. W.D.N.C. June 7, 2010) (staying asbestos-related actions against non-debtor affiliates); In re Quigley Co., Inc., No. 04-15739 (PCB), Adv. No. 04-04262, at 4–5 (PCB) (Bankr. S.D.N.Y. Dec. 17, 2004) (enjoining the continuation of asbestos lawsuits against the parent corporation of the debtor); In re Mid Valley, Inc., No. 03-35592 (JKF), Adv. No. 03-3296 (JKF) (Bankr. W.D. Pa. Dec. 17, 2003); In re Combustion Eng'g, Inc., No. 03-10495 (JKF), Adv. No. 03-50839 (JKF) (Bankr. D. Del. Mar. 7, 2003) (order enjoining asbestos litigation against certain non-debtor affiliates); In re ACandS, Inc., No. 02-12687 (PJW), Adv. No. 02-5581 (PJW) (Bankr. D. Del. Sept. 27, 2002); In re Harbison-Walker Refractories Co., No. 02-21627 (JKF), Adv. No. 02-02080 (Bankr. W.D. Pa. Feb. 14, 2002) (enjoining asbestos lawsuits against the former owner of the debtor); In re N. Am. Refractories Co., No. 02-20198 (JKF), Adv. No. 02-2004 (JKF) Bankr. W.D. Pa. Jan. 4, 2002) (TRO); In re W.R. Grace & Co., No. 01-01139 (KJC), Adv. No. 01-00771, at 36 (KJC) (Bankr. D. Del. May 3, 2001) (order expanding preliminary injunction to enjoin asbestos suits against non-debtor subsidiaries); In re The Babcock & Wilcox Co., No. 00-10992 (JAB), Adv. No. 00-1029 (JAB) (Bankr. E.D. La. Apr. 17, 2000); In re Pittsburgh Corning Corp., No. 00-22876 (JKF), Adv. No. 00-2161 (JKF) (Bankr. W.D. Pa. Apr. 16, 2000).

NAI-1535638547

(explaining the elements of the Third Circuit test for a preliminary injunction in the bankruptcy context).[55]  The four elements, as tailored to a bankruptcy case, are:

1.    The debtor's reasonable likelihood of a successful reorganization;

2.    The imminent risk of irreparable harm to the debtor's estate in the absence of an injunction;

3.    The balance of harms between the debtor and its creditors; and

4.    Whether the public interest weighs in favor of an injunction.

G-I Holdings, 420 B.R. at 281; see also Bestwall, 606 B.R. at 253.

Under the Third Circuit test, the proponent of an injunction "must meet the threshold for the first two 'most critical' factors."  See Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017) (the movant "must demonstrate that it can win on the merits . . . and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief"); Phila. Newspapers, 407 B.R. at 616–17 (applying the Reilly test in the bankruptcy context).  Once the movant establishes the first two elements, the court will balance those with the second two elements to determine whether an injunction is warranted.  See PI Op., 638 B.R. at 320 ("the Court determines whether the first two threshold prongs are established, and if so, only then does it proceed to consider the third and fourth factors.") (internal citation omitted); see also Reilly, 858 F.3d at 179 (stating that "if these gateway factors are met" a court will consider them in conjunction with the remaining two factors of the test).  The Debtor, therefore, must establish that its reorganization is likely to be successful and that irreparable harm to the reorganization

---

[55]    See also Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.), 502 F.3d 1086, 1094 (9th Cir. 2007) (holding that traditional preliminary injunction standard applies to section 105(a) injunctions and stating that "[t]he majority of circuits that have reviewed injunctions staying actions against non-debtors have applied the usual preliminary injunction standard") (internal citations omitted).

NAI-1535638547

effort will result in the absence of the injunction.[56]  This second element is particularly

important, because courts generally look to the impact a request for injunctive relief will have on

a successful reorganization when determining whether to grant the request.  See In re Irish Bank

Resolution Corp. Ltd., 2019 WL 4740249, at *5 (D. Del. Sept. 27, 2019) (quoting Grace,

115 Fed. Appx. at 570) (explaining that "[t]he standard for the grant of a stay is generally

whether the litigation could interfere with the reorganization of the debtor.").[57]

Here, as set forth below, the Debtor has satisfied the threshold showing because

(i) its prospects for a successful reorganization are strong and (ii) the requested injunction is

necessary to achieve the reorganizational goals of this Chapter 11 Case.  In addition, as set forth

below, the injunction is appropriate when considering all four prongs of the test.[58]

### 1.    The Debtor's Successful Reorganization Is Likely.

"In the bankruptcy context, reasonable likelihood of success is equivalent to the

debtor's ability to successfully reorganize."  PI Op., 638 B.R. at 320 (citing Phila. Newspapers,

407 B.R. at 617); see In re G-I Holdings Inc., 420 B.R. at 281 (evaluating the "reasonable

likelihood of a successful plan of reorganization"); Chakarian, 386 B.R. at 33 (Bankr. D. Del.

---

[56]    See Reilly, 858 F.3d at 179 ("How strong a claim on the merits is enough depends on the balance of the
harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be
while still supporting some preliminary relief.") (citation omitted).

[57]    See also Brier Creek, 486 B.R. at 694 ("[T]he Fourth Circuit has made very clear that the critical, if not
decisive, issue over whether injunctive relief should be granted is whether and to what extent the
non-debtor litigation interferes with the debtors' reorganization efforts) (citing Robins, 788 F.2d
at 1003-09); Kreisler v. Goldberg (In re Kreisler), 478 F.2d 209, 215 (4th Cir. 2007)) (same).

[58]    In some instances, both prior and subsequent to Reilly, courts in the Third Circuit nonetheless considered
all four factors together.  See, e.g., G-I Holdings, Inc., 420 B.R. at 281 (decided prior to Reilly and
seemingly requiring the proponent of the injunction to establish each prong of the test).  Post-Reilly, courts
have not uniformly applied the preliminary injunction test.  Compare In EHT US1, Inc., 2021 WL
3828556, at *1 (Bankr. D. Del. 2021) (decided post-Reilly and finding that the party seeking the injunction
must establish the first two prongs of the preliminary injunction test, after which the court will go on to
consider the second two prongs) with True Health Diagnostics LLC v. Azar (In re THG Holdings LLC),
604 B.R. 154, 162 (Bankr. D. Del. 2019) (referencing, without elaboration, a "four-part test for issuing a
preliminary injunction").

NAI-1535638547

2008) (citing <u>Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)</u>,

502 F.3d 1086, 1096 (9th Cir. 2007) (in determining the likelihood of success on the merits, "a

bankruptcy court must consider whether the debtor has a reasonable likelihood of a successful

reorganization")); <u>Bestwall</u>, 606 B.R. at 254 (quoting <u>Sudbury, Inc. v. Escott</u>, 140 B.R. 461, 466

(Bankr. N.D. Ohio 1992)).[59]

       This is not intended to be a particularly high standard.  <u>See Bestwall</u>, 606 B.R.

at 254; <u>Excel Innovations</u>, 502 F.3d at 1097 ("[I]t is not a high burden to show a reasonable

likelihood of success in reorganization"); <u>see also</u> <u>Phila. Newspapers</u>, 407 B.R. at 617 (noting the

speculative nature of the inquiry into the likelihood of a successful reorganization in the early

stages of a case); <u>In re Eagle-Picher Indus., Inc.</u>, 963 F.2d 855, 860 (6th Cir. 1992) ("In view of

the bankruptcy court's protection of [the debtor's] reorganization efforts, it is implicit in its

decision that it believed [the debtor] had some realistic possibility of successfully reorganizing

under Chapter 11.").

       Indeed, "at the early stages" of bankruptcy proceedings, the court "must make at

least a rebuttable presumption that the [debtors] have made a good faith filing and are making a

good faith effort to reorganize."  <u>In re Gathering Rest., Inc.</u>, 79 B.R. 992, 1001 (Bankr. N.D. Ind.

1986); <u>accord</u> <u>Bestwall</u>, 606 B.R. at 254 (quoting <u>Gathering</u>, 79 B.R. at 1001).[60]  In short, "[t]o

demonstrate a reasonable likelihood of success, a movant need only show the prospect or

---

[59]    <u>See also</u> <u>Chicora Life Ctr.</u>, 553 B.R. at 66; <u>Brier Creek</u>, 486 B.R. at 696.

[60]    <u>See also</u> <u>In re Hillsborough Holdings Corp.</u>, 123 B.R. 1004, 1015 (Bankr. M.D. Fla. 1990) (finding that
until it can be determined that debtors "are not viable business entities incapable of achieving a successful
reorganization," it "would be premature to conclude . . . that this reorganization process is doomed and that
there is no legal justification for granting the injunctive relief sought"); <u>Dore & Assocs. Contracting, Inc. v.
Am. Druggists' Ins. Co.</u>, 54 B.R. 353, 359 (Bankr. W.D. Wis. 1985) ("In the early stages of bankruptcy
when it is uncertain if reorganization is feasible or not the bankruptcy court must have broader latitude in
determining whether to grant injunctive relief.").

NAI-1535638547

possibility that he or she will succeed, and need not prove same with certainty." PI Op., 638

B.R. at 320; Securities Claim PI Op., 640 B.R. at 335-36.

Here, the Debtor's prospects for a successful reorganization are strong.

The Debtor has addressed the concerns raised by the Third Circuit and has entered bankruptcy in

good faith and in an effort to permanently, fully and equitably resolve current and future Debtor

Talc Claims through confirmation of a plan of reorganization. The Debtor has already entered

into the Plan Support Agreements with thousands of claimants on the material terms of a plan of

reorganization. As courts have consistently recognized, the bankruptcy court is the most logical

and best positioned forum for the resolution of mass tort liability. See PI Op., 638 B.R.

at 321-22; accord In re Federal-Mogul Glob., Inc., 684 F.3d 355, 359 (3d Cir. 2012)

("Bankruptcy has proven an attractive alternative to the tort system for corporations [facing mass

tort claims] because it permits a global resolution and discharge of current and future liability,

while claimants' interests are protected by the bankruptcy court's power to use future earnings to

compensate similarly situated tort claimants equitably."); S. Elizabeth Gibson, *Judicial

Management of Mass Tort Bankruptcy Cases*, Federal Judicial Center, at 1 (2005),

https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf (noting that "bankruptcy courts have

become a forum for companies seeking the resolution of pending and threatened mass tort

litigation" and that, as of the publication date, "over seventy companies, motivated primarily by

their desire to reach a final resolution of their mass tort liabilities, have sought bankruptcy

protection").

The Debtor submits it has sufficient assets to fund both this Chapter 11 Case and

a trust in the amount set forth in the Plan Support Agreements. As of the Petition Date, the

Debtor owns a portfolio of royalty revenue streams and other assets, including insurance

-73-

coverage rights, and, to the extent its assets are insufficient, it will have access to additional

funds through the 2023 Funding Agreement and J&J Support Agreement.  First Day Decl. ¶¶ 29-

30.  Thus there can be no reasonable dispute that the Debtor has the wherewithal to reorganize.

   The Debtor also has favorable prospects for resolving the Debtor Talc Claims

through a plan of reorganization that conforms with the requirements of the Bankruptcy Code.

A number of similarly situated companies have successfully used bankruptcy to resolve mass tort

claims, and the Debtor is committed to equitably resolving the Debtor Talc Claims.  The Debtor

already has the support of over 60,000 talc claimants for the terms of a proposed plan and will

continue to pursue additional support for the plan from its key constituencies.  Id. ¶¶ 63, 71; see

also PI Op., 638 B.R. at 320 (finding the Debtor had made a sufficient showing where "although

the success of Debtor's reorganization is speculative at this early stage—there is nothing in the

record to suggest that Debtor does *not* have a reasonable likelihood of reorganization");

Securities Claim PI Op., 640 B.R. at 336 (concluding "Debtor has met its burden" to show a

realistic possibility of successfully reorganizing).

   Any opposition from claimants to the Debtor's petition does not undermine the

Debtor's ability to satisfy this factor.  The Bankruptcy Court's injunction was designed to

provide "an opportunity to formulate a plan of reorganization."  Robins, 788 F.2d at 998

(emphasis added).  A party's disagreement with the requested relief therefore cannot serve as a

basis for finding that the Debtor's reorganization is unlikely.  Cf. Carolin Corp. v. Miller, 886

F.2d 693, 701 (4th Cir. 1989) (stringent bad-faith dismissal standard supported by policy of not

"prejudging the likelihood of a successful reorganization").  Objecting parties may later change

their minds.  See, e.g., Aldrich Pump, 2021 WL 3729335, at *35 (rejecting the argument that the

reorganization was unlikely to success because "the asbestos claimants will never agree to a

NAI-1535638547

Plan" and explaining that, "[h]aving sat on two other hotly contested and apparently

irreconcilable asbestos bankruptcy cases that wound up with consensual plans as between these

constituencies . . . this Court is unable to conclude that our parties cannot reach an agreement, as

well"); In re Purdue Pharms., L.P., 619 B.R. 38, 58 (S.D.N.Y. 2020) (affirming section 105

injunction enjoining mass tort claims against nondebtors, noting that "Appellants cannot say that

a reorganization is unlikely simply because they intend to object to the plan as presently

constituted").  Moreover, any objections by other parties to the restructuring support agreement

establishes only that "the parties have disagreements about the [restructuring support agreement],

not that a resolution of those disagreements is out of the question." In re Caesars Entm't

Operating Co., 561 B.R. 441, 452 (Bankr. N.D. Ill. 2016).

In short, the Debtor is likely to successfully reorganize through a plan of

reorganization confirmed in accordance with the Bankruptcy Code.  Accordingly, the Debtor's

prospects for successfully reorganizing strongly weigh in favor of the requested injunction.

### 2. Failure to Enjoin Litigation of Debtor Talc Claims Would Irreparably Harm the Debtor.

In analyzing irreparable harm, the key question is "whether the litigation 'could

interfere with the reorganization of the debtor' or 'would interfere with, deplete or adversely

affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or

diminish [the debtor's] ability to formulate a plan of reorganization.'"  Grace, 115 F. App'x

at 570 (first quoting Robins, 828 F.2d at 1025, then quoting In re Johns-Manville, 26 B.R.

at 436); Aldrich Pump, 2021 WL 3729335, at *33 ("[T]he critical, if not decisive, issue over

whether injunctive relief should be granted is whether and to what extent the non-debtor

litigation interferes with the debtors' reorganization efforts." (quoting Brier Creek, 486 B.R.

at 694)).

NAI-1535638547

Recent Third Circuit authority establishes that the irreparable harm prong of the test for injunctive relief can be satisfied by a showing of potential harm or the risk of harm.  See ADP, Inc. v. Levin, 2022 WL 1184202, at *3 (citing Adams v. Freedom Forge Corp., 204 F.3d 475, 488 n.13 (3d Cir. 2000) (collecting cases)).  Indeed, this Court has recently clarified that "the mere risk of a potentially adverse impact on a debtor's bankruptcy can be sufficient to support a preliminary injunction" and the "plaintiff's theory that the debtor would not suffer an adverse impact should not be tested at the debtor's peril."  See PI Op., 638 B.R. at 314; Securities Claim PI Op., 640 B.R. at 337 (stating that a movant may be entitled to a preliminary injunction if movant demonstrates that "the risk of future harm [is] anything other than speculative") (quoting ADP, Inc. v. Levin, 2022 WL 1184202, at *3).

The ramifications of continued litigation of the Debtor Talc Claims against Protected Parties outside this Chapter 11 Case cannot be overstated.  This Court previously recognized that, without a stay or injunction, "it is difficult to envision how a successful reorganization can be achieved in this case."  See PI Op., 638 B.R. at 304-05 (citing PI Tr. at 142:15-17 ("We're not going to have a bankruptcy case of any sort if everybody can go sue J&J and assert the same claims that they would be asserting there.")).  Other courts agree in similar circumstances.  See Aldrich Pump, 2021 WL 3729335, at *36 ("[P]rosecution of those same claims outside of this case would almost certainly end the Debtors' reorganization efforts"); In re DBMP, 2021 WL 3552350, at *41 (("[T]he litigation of DBMP Asbestos Claims in the tort system while the Chapter 11 Case remains pending would undermine the purposes of chapter 11 and section 524(g) to resolve all such current and future claims in a fair and equitable manner though a chapter 11.").

NAI-1535638547

The Debtor will not burden the Court with extensive repetition of the various means discussed at length above by which continued litigation of Debtor Talc Claims in the tort system would impact this Chapter 11 Case.  These numerous impacts on and risks to the Debtor's restructuring efforts include, among others:  the liquidation of claims outside the Chapter 11 Case for which the Debtor is liable, whether directly or via actual or alleged indemnification obligations; the impact of ongoing litigation on the Debtor's efforts to negotiate or mediate a resolution with present and future claimants; the likelihood of preclusion or other prejudice through res judicata, collateral estoppel and record taint; the potential depletion of available insurance coverage under shared policies; the disruption that continued litigation against J&J or HoldCo could cause to the funding of the Debtor's trust; and the constant drain on the Debtor's resources of monitoring fragmented litigation around the United States while seeking to preserve its rights. See supra §§ I.C, II.A.  Continued litigation of the Debtor Talc Claims against the Protected Parties clearly presents an imminent and substantial risk of irreparable harm to the Debtor's estate.

### 3. The Irreparable Harm that the Debtor Would Suffer in the Absence of an Injunction Substantially Outweighs Any Prejudice to Claimants.

In contrast to the existential risk to the Debtor's reorganization posed by continued litigation of Debtor Talc Claims outside this Chapter 11 Case, any prejudice caused claimants by an injunction would be minimal, to the extent it would exist at all.  The issuance of an injunction will not permanently deprive Defendants of an opportunity to pursue the Debtor Talc Claims.  Instead, it will merely pause those alleged claims, giving the Debtor time to continue its substantial progress toward consensus on a plan of reorganization.  And the length of that pause here is likely to be short, given that the Plan Support Agreements require that a chapter 11 plan containing the terms to which the parties have agreed must be filed by May 14,

2023, or as soon thereafter as is feasible.  Thus, the requested injunction will do nothing more than place the Defendants that seek to litigate the Debtor Talc Claims outside of this Court in their appropriate position:  alongside all other claimants who, through court-appointed representatives, are working with the Debtor to establish a trust that equitably treats and pays all current and future Debtor Talc Claims.

The Defendants are unlikely to suffer prejudice in the form of delay.  Based on the historical pace of resolution of claims in the tort system, it would take decades to resolve them all.  Ex. 42.2 (Hr'g Tr., Nov. 5, 2021, Mullin Direct) at 455:6-456:15; Ex. 41 (Debtor's PI Hr'g Ex. 31, Expert Report of Charles h. Mullin PhD), at ¶ 17.  Such resolutions are costly—Old JJCI incurred nearly $1 billion defending personal-injury talc claims in the five years leading up to the 2021 Petition Date alone—and they result in widely varying recoveries for claimants with comparable damages.  See Ex. 43 (2021 First Day Decl.) ¶¶ 38-40, 58.  In contrast, a bankruptcy trust will provide claimants (and the Debtor) "with an efficient means through which to equitably resolve [the] claims."  PI Op., 638 B.R. at 322 (citing Bestwall, 606 B.R. at 257 (quoting Federal-Mogul, 684 F.3d at 357-62)); see also Ex. 42.2 (Hr'g Tr., Nov. 5, 2021, Mullin Direct) at 455:6-456:15; Ex. 41 (Debtor's PI Hr'g Ex. 31) ¶ 25.

Even if this Court assumes that an injunction might cause delay for some claimants, "it is well established that mere delay is insufficient to prevent the issuance of an injunction."  Bestwall, 606 B.R. at 257; LTL Mgmt. LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt. LLC), Adv. Pro. No. 21-03032, ECF No. 102 (the "NC Prelim. Inj. Order") at 6 ("Delay, in and of itself, is insufficient to overcome irreparable harm caused to the Debtor and its estate."); see also In re United Health Care Org., 210 B.R. 228, 234 (S.D.N.Y. 1997) (finding that delay to the enjoined party from pursuing remedies was heavily outweighed

NAI-1535638547

by potential harm to reorganization efforts).  Otherwise, an injunction could never be issued,

because injunctions inherently involve some delay, yet relief of this type has "uniformly been

issued" by many different courts notwithstanding claimants raising this theoretical consequence.

Bestwall, 606 B.R. at 254 (citing cases).

        Rather than the issuance of an injunction, it is continued litigation of Debtor Talc

Claims in the tort system that is likely to harm claimants.  Outside this Chapter 11 Case, holders

of current Debtor Talc Claims would receive a reduced chance of recovery, or recoveries

materially different from those realized by current or future claimants through a court-approved

trust.  Further, mass tort litigation generally requires extensive discovery, involves numerous

parties and presents complicated questions of causation.  Such litigation is rarely efficient and

often endures for many years of motions, trials and appellate practice.  By contrast, a trust

established by the Debtor in this Chapter 11 Case would "provide all claimants—including

future claimants who have yet to institute litigation—with an efficient means through which to

equitably resolve their claims."  Bestwall, 606 B.R. at 257.  As a result, "a preliminary injunction

will not result in greater harm to the talc claimants.  Instead, it will 'remedy some of the

intractable pathologies of asbestos litigation.'"  PI Op., 638 B.R. at 321 (quoting Federal-Mogul,

684 F.3d at 362).[61]

        The Court previously identified numerous benefits to talc claimants through the

issuance of a preliminary injunction and the "handling of their claims through the bankruptcy

---

[61]    See Federal-Mogul, 684 F.3d at 362 ("Furthermore, the trusts appear to have fulfilled Congress's
expectation that they would serve the interests of both current and future asbestos claimants and
corporations saddled with asbestos liability.  In particular, observers have noted the trusts' effectiveness in
remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of
a viable alternative providing a just and comprehensive resolution.  Empirical research suggests the trusts
considerably reduce transaction costs and attorneys' fees over comparable rates in the tort system.") (citing
studies).

NAI-1535638547

process," including:  (i) "protect[ing] the interests of future claimants;" (ii) "prevent[ing] a race

for proceeds;" (iii) "promot[ing] equality in distribution;" (iv) avoiding (a) "the sluggish pace of

litigation," (b) the "legitimate possibility that they will not succeed in proving their claims" and

(a) the "appellate process, where—at worst—their judgment is overturned, and—at best —

recovery is delayed;" and (v) enjoying through claims reconciliation via a bankruptcy trust

"reduced evidentiary and causation burdens" and "a far more expeditious pace" and "a far

simpler and streamlined process than currently available in the tort system."  Id.  The Debtor

agrees, and the balance of harms clearly weighs in favor of issuing a preliminary injunction.

### 4.    Injunctive Relief Will Further the Public Interest by Ensuring the Debtor's Successful Reorganization and Equitable Treatment of Defendants.

Courts consistently have recognized the public interest in a successful

reorganization.  See, e.g., United States v. Whiting Pools, Inc., 462 U.S. 198, 204 (1983);

Sudbury, 140 B.R. at 465.  As one bankruptcy judge observed:  "[P]romoting a successful

reorganization is one of the most important public interests."  In re Gander Partners LLC,

432 B.R 781, 789 (Bankr. N.D. Ill. 2010) (quoting In re Integrated Health Servs., Inc.,

281 B.R. 231, 239 (Bankr. D. Del. 2002)); see also Manville, 26 B.R. at 428 ("[T]he goal of

removing all obstacles to plan formulation [is] eminently praiseworthy and [this court] supports

every lawful effort to foster this goal while protecting the due process rights of all

constituencies.").

A successful reorganization particularly serves the public interest in the mass tort

context, where "completing the reorganization process . . . [will] resolv[e] thousands of claims in

a uniform and equitable manner."  Chakarian, 386 B.R. at 36 (extending injunction to cover a

non-debtor affiliate railroad that transported products of the debtor).  It is in the public interest

that "the bankruptcy process [is] utilized to the fullest extent" to resolve claims against the

Debtor—a result made possible by a comprehensive injunction. Id.

It also is in the public interest to promote justice in the court system through the

equitable treatment of all holders of current and future Debtor Talc Claims. Inconsistent

judgments are not a desirable means of resolving a dispute with nationwide implications. In re

Dow Corning Corp., 211 B.R. 545, 588 (Bankr. E.D. Mich. 1997) ("[I]t is anything but just when

presenting the identical proofs, one plaintiff suffering nearly identical injuries or illness[] wins a

multimillion dollar verdict against a defendant while another takes nothing."). The Debtor

respectfully submits that an equitable outcome can only be achieved in this Court, by utilizing

bankruptcy-specific tools geared towards encouraging efficient and fair resolution of liabilities.

See In re Congoleum Corp., 362 B.R. 198, 201 (Bankr. D.N.J. 2007) ("Section 524 was created

to provide a comprehensive resolution to asbestos liabilities both present and future.").

In addition, "a bankruptcy trust protects the needs of future talc claimants," whereas such

claimants' "interests are largely unrepresented in the tort system." See PI Op., 638 B.R. at 322.

"Indeed, both present and future 'claimant's interests are protected by the bankruptcy court's

power to use future earnings to compensate similarly situated tort claimants equitably.'" Id.

(citing Federal-Mogul, 684 F.3d at 359).

Permitting Debtor Talc Claims to continue against the Protected Parties would

jeopardize the very purpose of the Debtor's Chapter 11 Case. Undermining this Chapter 11 Case

also undermines the public interest. As set forth above, enjoining "direct" claims against the

Protected Parties is entirely appropriate. Without the requested relief, the Debtor would not

benefit from a reprieve of litigation to focus on its reorganization. The Debtor and the Protected

Parties are not seeking to "escape" any talc liabilities through the injunctive relief requested

NAI-1535638547

herein or through the Chapter 11 Case.  In fact, central to the proposed plan terms in the Plan

Support Agreements are commitments by the Debtor and J&J to pay up to $8.9 billion net

present value to fund a trust to resolve all current and future talc claims.  They fully understand

that all liability arising out of the Debtor Talc Claims will be "resolved and channeled only if

[the Debtor] succeeds in confirming a plan of reorganization that contains a channeling

injunction that extends to the Protected Parties."  Bestwall, 606 B.R. at 258; see also In re

Combustion Eng'g, Inc., 391 F.3d 190, 233-34 (3d Cir. 2004) (holding that a channeling

injunction may be extended to non-debtors where the requirements of section 524(g) are met).

The Court and parties in interest, however, will be unable to comprehensively and equitably

resolve all Debtor Talc Claims in the Chapter 11 Case without the requested injunctive relief.

Courts have consistently affirmed the public's interest in a successful

reorganization,[62] which may be at its greatest in mass-tort bankruptcies.[63]  This Court has also

stated that "it holds no doubts that claim resolution through the bankruptcy process is in the

public interest."  PI Op., 638 B.R. at 321-22; see also Securities Claim PI Op., 640 B.R. at 342

("[T]he Debtor's reorganization and the uniform, timely, and equitable resolution of the Talc

Claims for the benefit of injured parties—existing and future—are at the forefront of this Court's

mind."); NC Prelim. Inj. Order at 6 ("The public interest lies with the Debtor completing its

reorganization process and resolving the Debtor Talc Claims in a uniform and equitable

manner.").  As detailed above, the preliminary injunction is a critical component of the Debtor's

successful reorganization.

---

[62]  Rehabworks, Inc. v. Lee (In re Integrated Health Servs.), 281 B.R. 231, 239 (Bankr. D. Del. 2002) ("In the
context of a bankruptcy case, promoting a successful reorganization is one of the most important public
interests."); In re Gander Partners LLC, 432 B.R 781, 789 (Bankr. N.D. Ill. 2010) (quoting Integrated
Health Servs.).

[63]  See, e.g., Robins, 788 F.2d at 1008 (noting "the unquestioned public interest in promoting a viable
reorganization").

NAI-1535638547

Each of the four factors clearly weighs in favor of this Court issuing a preliminary injunction prohibiting the Defendants from commencing or prosecuting Debtor Talc Claims against the Protected Parties.  This Court has previously reached the same conclusion.  See PI Op. 322 (determining that all factors weigh in favor of Debtor's [request for a preliminary injunction] and a 105(a) injunction is appropriate).  The North Carolina Bankruptcy Court also agreed.  See Ex. 47 (Hr'g Tr., Nov. 10, 2021) at 141:5-6,  (finding "that a 105 injunction should issue consistent with what the debtor has proposed"); id. at 135:22-25 (noting that, were the court keeping the case, it may have made the preliminary injunction "more permanent" than 60 days).  There has been no change in circumstances or the law that warrants a different outcome.

## IV.    THE COURT SHOULD GRANT A TEMPORARY RESTRAINING ORDER TO EFFECTUATE THE RELIEF SOUGHT BY THE DEBTOR PENDING A FINAL HEARING.

### 1.    Request for an Ex Parte Temporary Restraining Order

The Debtor requests that this Court immediately, on an ex parte basis, enter a temporary restraining order to preserve the effectiveness of the automatic stay until this Court has the opportunity to hold a final hearing on the merits.  The Court has authority to issue a temporary restraining order pursuant to Rule 65(b) of the Federal Rules of Civil Procedure (the "Civil Rules"), which is made applicable to this adversary proceeding by Bankruptcy Rule 7065.  Civil Rule 65(b) provides:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:  (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b).[64]  A temporary restraining order is properly granted where it is necessary

to prevent immediate and irreparable injury pending a hearing upon a motion for an injunction.

13 Moore's Federal Practice § 65.36 (2019).

       Permitting plaintiffs to pursue the Protected Parties threatens to harm the Debtor's

interests by fixing claims against the estate or otherwise binding the Debtor with respect to talc

claims against it.  First Day Decl. ¶ 110.  Without immediate injunctive relief, the Debtor will be

compelled to divert key estate resources away from its reorganization efforts to focus on that

ongoing litigation, hampering the Debtor's reorganization from the outset.  Id.  A denial of the

Debtor's request for a temporary restraining order pending a final hearing on the Debtor's

request for declaratory and/or injunctive relief would thus cause the very harm that the Debtor

seeks to prevent by the Motion and the Complaint.

       The commencement or continued prosecution of the Debtor Talc Claims against

the Protected Parties risks significant, immediate and irreversible harm to the Debtor and its

estate.  Id. ¶ 108.  It would create chaos across mass-tort proceedings nationwide, as litigation

over tens of thousands of talc claims resumes, all of which may come grinding to a halt if this

Court grants this Motion.  Id.  Approximately 1,000 individually set ovarian cancer claims (not

subject to docket-wide coordination procedures) are pending in various state courts outside of the

federal MDL and consolidated state proceedings in California and New Jersey.  Id.

An additional 470 mesothelioma claims are pending in state courts across the country—in 44

courts, across 25 different states.  Id.  None of those cases is coordinated, and many are filed on

specialized, asbestos-specific accelerated dockets.  Id.  Each is in the process of suddenly

---

[64]    Although Civil Rule 65(c) requires the posting of a bond as a prerequisite to a preliminary injunction,
Bankruptcy Rule 7065 exempts an application made by a debtor, trustee or debtor in possession from
the bond requirement.  Fed. R. Bankr. P. 7065.

NAI-1535638547

springing back into activity and proceeding towards trial absent extension of the stay or issuance

of a preliminary injunction.  Id.  Many of the cases have proceeded in the interim against other

defendants and without the Debtor's involvement, but suddenly, the Debtor would be thrown

into the mix—potentially significantly impacting the progress, scope and nature of the cases.  Id.

Moreover, there are at least 20 mesothelioma cases now on the eve of trial or that

could be set for trial imminently (in the next 60 days, with trial scheduled to begin in the Valadez

Case on April 17), all of which would demand significant investment in expedited, catch-up

discovery, expert witness engagement, trial lawyer time, and other resources.  Id. ¶ 109.  And

this machinery does not run itself.  From just the perspective of the Debtor, prior to the

commencement of the 2021 Chapter 11 Case, 30 firms and 40 experts were retrained to handle

the mesothelioma cases referenced above.  Id.  These negative effects on the Debtor's estate will

only compound as new Debtor Talc Claims are filed against the Protected Parties.  Id.

Bankruptcy courts in similar mass tort chapter 11 cases have issued temporary

restraining orders enjoining litigation as to third parties to avoid any immediate and irreparable

harm to the debtor or its estate.  See, e.g., In re LTL Mgmt. LLC, No. 21-03032, Adv.

No. 21-03032 (Bankr. D.N.J. Mar. 4, 2022); In re LTL Mgmt. LLC, No. 21-03032, Adv.

No. 21-03032 (Bankr. W.D.N.C. Oct. 26, 2021); In re Leslie Controls, Inc., No. 10-12199, Adv.

No. 10-51394 (Bankr. D. Del. July 14, 2010); In re Specialty Prods. Holding Corp.,

No. 10-11780, Adv. No. 10-51085 (Bankr. D. Del. June 4, 2010); In re N. Am. Refractories Co.,

No. 02-20198, Adv. No. 02-02004 (Bankr. W.D. P.A. Jan. 4, 2002); In re G-I Holdings Inc.,

No. 01-30135, Adv. No. 01-03013 (Bankr. D.N.J. Jan. 19, 2001).[65]  Under the circumstances

---

[65]     See also In re Aldrich Pump LLC, No. 20-30608, Adv. Pro. 20-3041 (Bankr. W.D.N.C. June 25, 2020);
In re DBMP LLC, No. 20-30080, Adv. Pro. No. 20-3004 (Bankr. W.D.N.C. Jan. 29, 2020); In re Bestwall
LLC, No. 17-31795, Adv. No. 17-03105 (Bankr. W.D.N.C. Nov. 8, 2017); In re Kaiser Gypsum Co.,

here, as in these other cases, immediate injunctive relief is required to safeguard the Debtor's

prospects for a successful reorganization.  Moreover, although temporary restraining orders

generally are limited to 14 days, the Court may extend its order for an additional 14 days before

that period expires and for good cause.  Fed. R. Civ. P. 65(b)(2).

### 2.      The Valadez Case

The Valadez Case is a mesothelioma case against J&J, the Debtor and certain

Retailers pending in the Superior Court of the State of California, Alameda County.  First Day

Decl. ¶ 113.  The Valadez Case was automatically stayed as to the Debtor on the Petition Date,

and it should immediately be stayed and enjoined as to J&J and the Retailers for all the same

reasons that every talcum powder personal injury lawsuit pending across the country should be

stayed.  But in light of recent, unequivocal statements by counsel to Valadez that leave no doubt

he intends to put the 2021 Chapter 11 Case—and indeed the bankruptcy system itself—on trial

during the Valadez Case, the risk of permitting the Valadez Case to proceed in the tort system at

the very same time that the Debtor and thousands of claimants work towards a consensual

resolution of this Chapter 11 Case in this Court are acute and warrant specific discussion.

Only after the Third Circuit's dismissal opinion did this Court grant full relief

from the stay to permit the Valadez Case to proceed against the Debtor and the other Protected

Parties.  See Dkt. 3771 in Case No. 21-3059.  The Court, as a result of the Third Circuit's

opinion, determined then that "the pendulum has swung" such that "it is difficult for the Court to

make [the] same finding that there is an effective reorganization in prospect."  Ex. 48 (Hr'g Tr.,

---

No. 16-31602, Adv. No. 16-03313 (Bankr. W.D.N.C. Oct. 7, 2016); In re Garlock Sealing Techs., LLC,
No. 10-31607, Adv. No. 10-03145 (Bankr. W.D.N.C. June 7, 2010).

NAI-1535638547

Feb. 24, 2023) at 41:6-12.  The Court, therefore, gave "less deferen[ce] to the reorganization

needs of the Debtor" and granted stay relief to the plaintiff.  Id. at 41:13-14.

Since stay relief was granted, the Valadez Case has served as a distraction to the

Debtor's and J&J's management, and a drain on resources.  First Day Decl. ¶ 112.

The California state court has scheduled an accelerated trial to begin imminently, on April 17.

Id. ¶ 111.  In the next two weeks, the parties are scheduled to undertake 24 depositions of fact

witnesses, persons most knowledgeable and experts.  Id.  These depositions include the

continued deposition of the Debtor's person most knowledgeable on a number of topics, some of

which indicate that counsel to Valadez will press for irrelevant and, in some instances, privileged

information regarding a wide range of topics related to the 2021 Chapter 11 Case and the

involvement of both specific members of the J&J legal department and various executive-level

personnel to address the same.  Id.  Beyond these depositions, the parties are embroiled in

significant evidentiary disputes over the possible spoliation of key testing materials by the

plaintiff's testing expert and whether or not to proceed with genetic testing of the plaintiff (as

advocated by certain of his own expert witnesses).  Id.

Given the support for this Chapter 11 Case from over 60,000 claimants and the

Debtor's new financing arrangements that address the concerns raised by the Third Circuit, the

pendulum has swung back.  An effective reorganization is in prospect once again, and the

balance of the harms weighs decidedly in favor of enjoining the Valadez Case to allow this

Chapter 11 Case to proceed without the threat posed by a concurrent trial of a single claimant

among many thousands.  Findings in that trial could jeopardize the success of this Chapter 11

Case by undermining the terms of the plan set forth in the Plan Support Agreements,

contradicting findings by this Court, and threatening the delicate balance now in place as both

NAI-1535638547

the Debtor and claimants work to resolve all talc claims on an equitable and permanent basis.

Permitting one talc claimant to proceed to an accelerated trial on the merits of his talc claim,

while thousands of other talc claimants work towards a full, equitable and final resolution of all

talc claims, risks undermining the Debtor's reorganizational efforts.  The Debtor respectfully

submits that there is no basis for providing preferential treatment to the plaintiff in Valadez,

particularly where a plan process is underway and has significant support from talc claimants.

In addition, concerns about the Valadez Case are heightened because counsel to

Valadez has unabashedly made clear his intention to put the 2021 Chapter 11 Case on trial

during the course of trial.  According to a March 6 letter to the Alameda County court

(the "March 6 Letter"),  Trailblazer Studios, "a production company based in Raleigh, NC,

which focuses on documentary filmmaking and post-production services for premium platforms

like Netflix, Hulu, National Geographic, Disney + and ESPN," contacted the trial judge in the

Valadez Case seeking permission to film the trial.  See March 6 Letter, 1.[66]  Trailblazers, and its

counsel in a letter dated March 21 (the "March 21 Letter"),[67]  clarified that Trailblazers intends

to produce a for-profit documentary "focused on the ongoing talc bankruptcy saga," and hopes to

include an "unknown" amount of Valadez Case trial footage, to be released at an "unknown"

time, to "unknown" media outlets, in that documentary.  Id.; March 21 Letter, 2-3.

Given the inevitable distraction of allowing a production company into the

courtroom, let alone the well-known and documented prejudicial impact of such activities,

defendants promptly opposed Trailblazers' request.  In response, counsel for Valadez stated that

"Defendants' *bad-faith bankruptcy* and infliction of *further harm* upon mesothelioma victims . . .

---

[66]     A copy of the March 6 Letter is attached as Annex G to the First Day Declaration.

[67]     A copy of the March 21 letter is attached as Annex H to the First Day Declaration.

NAI-1535638547

is a 'matter of public interest'" such that the court should permit the trial to be recorded by a production company.  See Pl.'s Resp. to Defs.' Opp. to Trailblazer Studios' Req. to Record T. Proceedings, at 2-3 (Mar. 23, 2023) (emphasis added).[68]   Based on these developments, it appears that counsel to Valadez intends to turn the Valadez trial into a referendum on the 2021 Chapter 11 Case and the Debtor's reorganization efforts generally.  Permitting such a "trial within a trial" to proceed about the propriety of the 2021 Chapter 11 Case, including the rulings by this Court and the Third Circuit, at the same time that the Debtor pursues confirmation of a plan that contains the terms in the Plan Support Agreements, will harm the Debtor and its estate, including the talc claimants.

The Valadez Case highlights the critical need for an immediate, ex parte temporary restraining order to avoid exacerbating the very rush to the courthouse that this Motion seeks to prevent.  Id. ¶ 116; In re Vuitton et fils S.A., 606 F.2d 1, 5 (2d Cir. 1979) (notice of temporary restraining order action not required when notice would defeat purposes of the action); see also Am. Can Co. v. Mansukhani, 742 F.2d 314, 322 (7th Cir. 1984) (citing with approval Vuitton, 606 F.2d at 5).  Without immediate injunctive relief, the Debtor—as real party in interest for all of the reasons previously discussed—will be compelled to pull key estate resources from its reorganization efforts immediately to focus on the Valadez Case and all other ongoing litigation, hampering the Debtor's reorganization efforts from the outset.  First Day Decl. ¶ 116.

Moreover, absent immediate and specific relief, developments in the Valadez Case risk undermining support for a plan in this Chapter 11 Case.  For example, an extreme verdict (i) could make it more difficult for the Debtor to obtain additional support for the

---

[68]        A copy of the plaintiff's response is attached as Annex I to the First Day Declaration.

proposed plan, and (ii) would potentially result in substantially different treatment of Valadez's

claim than all other talc claims  under a plan with the terms contained in the Plan Support

Agreements.  Further, unless expressly prohibited, the plaintiff in the Valadez Case and other

litigants are likely to move quickly to take actions available to them to circumvent the

protections of the automatic stay through coordinated efforts against Protected Parties in friendly

forums.  Id.  A denial of the Debtor's request for a temporary restraining order pending a final

hearing on the Debtor's request for declaratory and/or injunctive relief would therefore cause the

very harm that the Debtor seeks to prevent by this Motion.  An immediate, ex parte temporary

restraining order is thus critical to prevent plaintiffs from defeating the purpose of this

Chapter 11 Case of achieving a fair and equitable resolution for the benefit of thousands of talc

claimants.

      The Debtor therefore requests that the Court:  (i) for good cause, enter a

temporary restraining order extended for the maximum period allowed under Civil Rule 65 —

28 days; and (ii) set a hearing on this Motion on or before that date.  This will allow more parties

in interest to participate in the hearing on the requested relief.  Granting such relief also will

conserve time and resources for the Court and the Debtor's estate.  The Debtor further requests

that any order granting the requested temporary restraining order expressly provide that the

Valadez Case is subject to its terms.

## **CONCLUSION**

      For the reasons discussed above, the Debtor requests that the Court enter an order

declaring that the filing or continued prosecution of the Debtor Talc Claims against any of the

Protected Parties while the Chapter 11 Case remains pending violates the automatic stay.

The Debtor also respectfully requests that the Court enter an order preliminarily enjoining the

filing or continued prosecution of Debtor Talc Claims (on any theory of liability) against any of

-90-

the Protected Parties while the Debtor's Chapter 11 Case remains pending.[69]  A proposed form of order granting the Debtor's request for injunctive or declaratory relief is attached hereto as Exhibit A.

Further, the Debtor respectfully requests that the Court enter an ex parte order, substantially in the form attached hereto as Exhibit B, temporarily restraining the Defendants from filing or continuing to prosecute any Debtor Talc Claim against any of the Protected Parties until the Court has had an opportunity to hold a final hearing on the merits.

---

[69]   This injunction would include, without limitation:  (a) the pursuit of discovery from the Protected Parties or their officers, directors, employees or agents; (b) the enforcement of any discovery order against the Protected Parties; (c) further motions practice related to the foregoing and (d) any collection activity on account of a Debtor Talc Claim against any Protected Party or its officers, directors, employees or agents or its respective assets.

-91-

Dated:  April 4, 2023

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (*pro hac vice* pending)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admissions *pro hac vice* pending)

*PROPOSED ATTORNEYS FOR DEBTOR*

NAI-1535638547

**CERTIFICATE OF MOVANT'S ATTORNEY PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 65(b)(1)(B)
AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 7065**

Pursuant to Federal Rule of Civil Procedure 65(b)(1)(B) and Federal Rule of

Bankruptcy Procedure 7065, I hereby certify as counsel for movant herein that, for the reasons

stated in this Motion and the *Declaration of John K. Kim in Support of First Day Pleadings*

[Dkt. 4 in Case No. 23-12825], notice should not be required.  However, the Debtor will cause

copies of this Motion and other papers filed in this adversary proceeding concurrently herewith,

except as otherwise set forth in an order entered by this Court, to be sent via e-mail, facsimile,

hand delivery or overnight carrier as soon as practicable to known, existing counsel for the

Defendants in their respective underlying talc lawsuits, as set forth on Appendix A to the

Complaint.

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo

NAI-1535638547