# Exhibit 20

**FILED**
2021 AUG 18 02:22 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 21-2-10988-4 KNT

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

| | |
|---|---|
| **BETHANY J. RICHARDS,** Individually and as Personal Representative of the Estate of **VERNA J. RICHARDS,**<br><br>                                        Plaintiff,<br><br>        v.<br><br>**JOHNSON & JOHNSON;**<br>**JOHNSON & JOHNSON CONSUMER INC.** f/k/a JOHNSON & JOHNSON CONSUMER COMPANIES, INC.;<br>**AVON PRODUCTS, INC.;**<br>**BRENNTAG NORTH AMERICA, INC.**<br>    individually and as successor to Mineral and Pigment Solutions, Inc., successor to Whittaker, Clark & Daniels, Inc.;<br>**BRENNTAG SPECIALTIES, LLC**<br>    individually and as successor to Mineral and Pigment Solutions, Inc., successor to Whittaker, Clark & Daniels, Inc.;<br>**COTY, INC.,**<br>    individually and as successor to COVERGIRL COSMETICS, INC.;<br>**COTY US LLC**<br>    f/k/a COTY US INC., individually and as successor to COVERGIRL COSMETICS, INC.;<br>**MAYBELLINE LLC;**<br>**PFIZER INC.**<br>    individually and as successor-in-interest to COTY, INC. and COTY INTERNATIONAL, INC.;<br>**REVLON, INC.;**<br>**REVLON CONSUMER PRODUCTS CORP.**<br>    individually and as successor to Revlon Research Laboratories, Inc.; | No.<br><br>**COMPLAINT FOR PERSONAL INJURIES, WRONGFUL DEATH AND FRAUD** |

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 1

1  **RITE AID CORPORATION**
         individually and as successor-in-interest
2          to THE BARTELL DRUG COMPANY;
   **RITE AID HDQTRS. CORP.**
3          individually and as successor-in-interest
           to THE BARTELL DRUG COMPANY;
4  **ROSAUERS SUPERMARKETS, INC.;**
   **SAFEWAY INC.;**
5  **THE BARTELL DRUG COMPANY;**
   **YOKE'S FOODS, INC.;**
6  **WHITTAKER, CLARK & DANIELS,**
      **INC.,**
7
                     Defendants.
8

9

10                    **I.    PARTIES**

11        1.    Plaintiff Bethany J. Richards is the surviving daughter of decedent Verna J.

12  Richards.  Bethany J. Richards was appointed as the Personal Representative of the Estate of

13  Verna J. Richards.  Plaintiff Bethany J. Richards resides in Spokane, Washington.

14        2.    Defendants and/or their predecessors-in-interest are corporations who, at all times

15  relevant herein, manufactured, sold, distributed, and/or purchased asbestos fibers, dust, minerals,

16  particles, and other finished and unfinished asbestos-containing products, including asbestos-

17  containing talc and talcum powder products that decedent Verna J. Richards used and/or to which

18  she was exposed.

19                 **II.    JURISDICTION & VENUE**

20        3.    This Court has jurisdiction over this cause pursuant to RCW 4.12.025 because, at

21  all times relevant herein, defendants transacted business and/or may be served with process in

22  King County, Washington. This Court has specific jurisdiction over all out-of-state defendants

23  because they each purposefully performed acts or consummated transactions in Washington State,

24  including business directly related to plaintiff's allegations herein; plaintiff's cause of action arises

25  out of and/or relates to defendants' activities and/or transactions in the State of Washington; said

26  activities and/or transactions were directed in whole or in part toward the state; and assumption

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 2

BERGMAN DRAPER OSLUND
821 2ᵗʰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

of jurisdiction over such out-of-state defendants by this Court does not offend traditional notions of fair play and substantial justice. By selling, supplying, distributing, and/or causing to be used asbestos-containing talc or talcum powder products to which decedent Verna J. Richards was exposed in Washington, defendants purposefully availed themselves of the privilege of doing business in Washington, thus invoking the benefits and protections of Washington's laws. Furthermore, each of the out-of-state defendants: (A) (i) regularly does or solicits (and/or during the relevant time period did or solicited) business; (ii) engages (and/or during the relevant time period engaged) in one or more other persistent courses of conduct, including conduct related to plaintiff's allegations herein; and/or (iii) derives (and/or during the relevant time period derived) substantial revenue from goods used or consumed or services rendered in the state, including from products and/or services at issue herein; or (B) expected or should reasonably have expected (and/or during the relevant time period expected or should have reasonably expected) its acts to have consequence in Washington and derives (and/or during the relevant time period derived) substantial revenue from interstate or international commerce.

4.    Venue is appropriate pursuant to RCW 4.12.025 because defendants "reside" in King County, Washington: by currently transacting business in King County and/or by transacting business at the time the cause of action arose in King County.

5.    Therefore, defendants may be served with process in Washington pursuant to RCW 4.12 et seq., 4.28.185, and Washington case law.

6.    Defendant THE BARTELL DRUG CO. is a Washington corporation licensed to do business in this state, maintaining its principal place of business in King County, Washington.

### III.    FACTS

7.    Decedent Verna J. Richards (DOB: March 9, 1946) was exposed to asbestos and asbestos-containing talcum products which had been mined, manufactured, produced, and/or placed into the stream of commerce by the defendants. Throughout her life, decedent Verna J. Richards was exposed to defendants' asbestos-containing talc products while using defendants'

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 3

BERGMAN DRAPER OSLUND
821 2ⁿᵈ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

1  talc products from approximately 1946, through approximately 2018. Decedent's mother used

2  Johnson & Johnson Baby Powder on Verna J. Richards from approximately March 9, 1946, until

3  approximately the 1950s in Ritzville, Washington. Decedent Verna J. Richards also personally

4  used, on a regular and frequent basis, Johnson & Johnson Baby Powder on her body, or on her

5  daughter from approximately the late 1950s, through approximately 2000s in Spokane,

6  Washington. Furthermore, decedent Verna J. Richards was exposed to defendants' asbestos-

7  containing products while using certain of the defendants' cosmetic talc products on her face from

8  approximately from approximately the 1960s, through approximately 2018 in Spokane,

9  Washington. As a direct and proximate result of this exposure, decedent Verna J. Richards

10  developed mesothelioma, and later died from the disease on or about September 7, 2018. Plaintiff

11  provides the following information:

12        A.    Specific Disease:    Mesothelioma

13        B.    Date of Diagnosis:    on or about 09/07/2018

14        C.    Occupation:    Secretary

15        D.    Places of Exposure:    Residence

16        E.    Former Address:    5803 N. Post Street, Spokane, WA 99205

17            **IV.    LIABILITY**

18        8.    Plaintiff claims liability based upon the theories of product liability, negligence,

19  conspiracy, strict liability for abnormally dangerous activities and any other applicable theory of

20  liability. The liability-creating conduct of defendants consisted, *inter alia*, of negligent and unsafe

21  design; failure to inspect, test, warn, instruct, monitor, and/or recall; failure to substitute safe

22  products; marketing or installing unreasonably dangerous or extra-hazardous and/or defective

23  products; marketing, maintaining, or installing products not reasonably safe as designed;

24  marketing, maintaining, or installing products not reasonably safe as designed; marketing,

25

26

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 4

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

1  maintaining, or installing products not reasonably safe for lack of adequate warning and

2  marketing, maintaining, or installing products with misrepresentations of product safety.

### V.  FRAUD AS TO DEFENDANTS JOHNSON & JOHNSON AND JOHNSON & JOHNSON CONSUMER INC.

9.    Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively "J&J") made false representations regarding the asbestos content of their cosmetic talc products, including Johnson's Baby Powder used by Decedent Verna J. Richards, misrepresentations that Decedent relied on to her detriment and which caused the development of her mesothelioma. J&J's misrepresentations were deliberate and were effectuated through a campaign to hide and destroy laboratory testing detecting asbestos in Johnson's Baby Powder, to manipulate the protocols for such testing to falsely suggest no asbestos was found in Johnson's Baby Powder, and to repeatedly assert to the public and federal regulatory agencies that Johnson's Baby Powder was safe.

10.    Johnson's Baby Powder was a critical cornerstone product for J&J, referenced as the company's "golden egg" and "sacred cow." See Exhibit 1 (04/28/1997 The Johnson & Johnson Advantage: Emotional Trust); see also Exhibit 2 (08/18/1997 Mother-Baby Strategic Mission); see also Exhibit 3 (08/20/1997 Johnson & Johnson "Golden Egg" Advertising Strategy); see also Exhibit 4 (excerpt of 08/04/1999 Johnson & Johnson Baby Camp PowerPoint); see also Exhibit 5 (excerpt of 08/10/1999 Johnson & Johnson Baby Camp PowerPoint with Koffman (Golden Egg presentation)).

11.    J&J knew that its cosmetic talc products, including Johnson's Baby Powder, contained asbestos fibers, knew those asbestos fibers could cause cancer, and knew that it was not safe to be selling such products to the public for use on babies, children, and adults. In a memorandum dated April 9, 1969, J&J internally expressed concern that the presence of

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 5

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

tremolite asbestos in its talc products would cause pulmonary diseases and cancer and increased the risk that the company would be drawn into litigation. J&J acknowledged that trace amounts of tremolite were unavoidable, and that efforts should be made to keep the amount of tremolite to a minimum.

12.    In a memorandum dated July 30, 1971, J&J was informed that there is no place for asbestos in talc, trace amounts were not acceptable, and any talc with asbestos should be removed from the market. J&J was informed that no level of asbestos in talc is acceptable for cosmetic use.

13.    In a memorandum dated October 16, 1997, J&J acknowledged that there is no doubt that "mesothelioma can be caused by non-occupational exposure to mineral fibers" and that "mesothelioma may occur after brief or indirect exposure to asbestos." This memorandum further stated that tremolite is considered one of "the most potent mesothelioma producers" and that scientists contend that trace amounts of tremolite in other minerals is responsible for mesotheliomas.

14.    In its memorandum of October 16, 1997, J&J acknowledged that "in several mesothelioma patients studied, both talc fibers and tremolite were detected.  In fact, the majority of asbestos bodies isolated from the lungs of women in the general population have tremolite or anthophyllite and because tremolite and anthophyllite are known contaminants of talc, this data suggests that rare cases of mesothelioma among women with no other identifiable exposure might be related to exposure to cosmetic talc." Further, an environmental factor that must be given "major consideration in the incidence of Mesothelioma" includes "tremolite asbestos" which "is a known contaminant [of] some deposits of talc."

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 6

BERGMAN DRAPER OSLUND
821 2ᵗʰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

15.    J&J's corporate representative has acknowledged in litigation that it has known for years that the talc used in Johnson's Baby Powder could be inhaled and reach deep into the lung.  For decades, J&J has known about the dangers of talc powder inhalation during the normal use of its talc-based cosmetic products, especially to babies.

16.    The relationship between asbestos exposure and mesothelioma has been well understood since the 1960s and numerous studies confirm that causal relationship. J&J was <u>aware of this causal relationship through its knowledge of the scientific literature and its membership in trade organizations through which such knowledge was distributed.</u>

17.    Beginning at least in the 1950s, J&J tested its talc for impurities or cominerals, including "asbestos" and "tremolite," because the company knew they are deleterious minerals that could be harmful to a person's health and thus should not be found in talc-based cosmetic products. At all relevant times, J&J understood the dangers posed by asbestos exposure and that asbestos was a known impurity of talc.

18.    J&J, internally and through hired testing laboratories such as the Battelle Memorial Institute, McCrone Associates, and the Colorado School of Mines Research Institute, tested for asbestos impurities in the source talc ore, processed ore, and finished products used to manufacture J&J cosmetic talc products. All of these testing laboratories found asbestos minerals in J&J source talc ore or cosmetic talc products. Independent labs have also found asbestos in the talc used in J&J cosmetic talc products.

19.    The existence of laboratory tests finding asbestos in J&J cosmetic talc products and source talc used in those products has been verified by J&J under cross examination in recent litigation. J&J knew about these positive test results all along. In 1972, J&J executives acknowledged internally that the results of testing demonstrating the presence of asbestos in

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 7

BERGMAN DRAPER OSLUND
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

J&J's cosmetic talc products and the source ore used to make these products. At that time, J&J

confirmed that McCrone found trace tremolite and that these findings are "not new."

20.    In May 1973, Roger Miller, the President of J&J's mining company, Windsor

Minerals, informed J&J that "the ore body contains actinolite." This talc ore body was actively

used to produce J&J's cosmetic talc products. One week later, J&J's records note that "[t]he

first showing of actinolite we know about is October 1972."

21.    J&J consistently lied about these positive test results for decades. In response

to consumer inquires, J&J has assured consumers that "asbestos has never been found in

Johnson's Baby Powder and it never will." In print advertisements as late as December 19,

2018. J&J told the public that "Baby Powder does not contain asbestos and never will. We test

every single lot to ensure it." The Johnson's Baby Powder product label says it was the "Purest

Protection" and it was advertised as "the best you can buy" and "the purest."

22.    J&J has acknowledged that the intent of these representations to consumers has

always been to "to reassure them they could feel safe and comfortable using Johnson's Baby

Powder because it does not contain asbestos" and to convey that in using Johnson's Baby

Powder, there was "zero chance" of exposing their families to asbestos. The statements that

Johnson's Baby Powder does not contain asbestos, that there was "zero chance" consumers

were exposing their families to asbestos were false when they were made, and J&J knew they

were false when they made those statements. As a direct result of J&J's false representations

that Johnson's Baby Powder never contained asbestos, millions of people, including babies,

were unwittingly and needlessly exposed to asbestos.

23.    J&J has never placed warnings on its talc-based powder products about the

potential hazards presented by the product being aerosolized in normal application. J&J never

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 8

BERGMAN DRAPER OSLUND
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

1   placed warnings on its powder products about the risk of asbestos exposure or cancer.

2   24.   Instead, J&J represented to the public that Johnson's Baby Powder was safe.

3   J&J withheld from their spokespeople whose job it was to communicate the "no evidence of

4   asbestos" message any reports indicating there was in fact evidence of asbestos in Johnson's

5

6   Baby Powder. J&J's misrepresentations and omissions regarding the safety of Johnson's Baby

7   Powder has resulted in consumer use of this and other cosmetic talc products in a potentially

8   lethal way without any knowledge of the danger.

9   25.   Since the early 1970s the FDA has repeatedly asked J&J whether there was any

10  evidence of any amount of asbestos in any J&J cosmetic talc product.  J&J's answer to the

11  FDA's inquiries was always the same: there is no evidence of any amount of asbestos in any

12  J&J cosmetic talc product.  Over the course of more than four decades, J&J represented to the

13  FDA over and over again that there is not a single instance or report of asbestos – including

14  chrysotile asbestos – in its products.

15

16  26.   In a letter dated September 21, 1971, J&J represented to the FDA that its data

17  "conclusively proves that Johnson's Baby Powder is free of asbestos."  J&J has represented to

18  the FDA that "no amphibole materials have been detected" in the company's talc-based

19  products. Documentation of a meeting between J&J and the FDA in 1972 shows that, when

20  pressed, J&J went so far as to represent to the FDA that "there wasn't a shred of evidence to

21  support the idea that either our Johnson's Baby Powder contained any chrysotile asbestos."

22

23  27.   Although aware of repeated McCrone reports over the course of years to the

24  contrary, J&J falsely represented to the FDA that its consultant McCrone never found asbestos

25  in the talc ore that was used to make Johnson's Baby Powder. In 1976, J&J rejected the FDA's

26  request to provide the results of its respective periodic monitoring for asbestos.

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

28.    J&J also submitted false and misleading statements through its trade association, the Cosmetic, Toiletry & Fragrance Association ("CTFA") (n/k/a Personal Care Products Council) ("PCPC"). The CTFA made false statements to Decedent, the general public, news media, and government agencies, including, but not limited to the FDA, the National Institute of Occupational Health and Safety ("OSHA"), the National Institute for Occupational Safety and Health ("NIOSH"), the Mine Health and Safety Administration ("MHSA"), and the National Toxicology Program ("NTP"), which, in turn, proximately caused Decedent's harm through intentional efforts to deceive the general public and regulatory authorities as to the safety of and presence of carcinogens in Johnson's Baby Powder.

29.    J&J used the CTFA to communicate false information about the purity of its talc and lack of asbestos content, as evidenced by a letter dated March 15, 1976. This false information was then transmitted by the CTFA to the FDA to "give assurance as to the freedom from contamination by asbestos form materials of cosmetic talc products." This was done after J&J was aware of over 50 reports about asbestos minerals and fibers in the talc it used for cosmetic talc products. Two weeks after relaying this false information, J&J met privately in Hillside, New Jersey and congratulated themselves on the "success" of the "presentations" to the FDA and agreed that they should not bind themselves to having to further update the FDA.

30.    J&J and other industry members agreed to do testing on their respective cosmetic talc products in a "round robin" format. The testing was done using a table that identified the manufacturer of the samples that were tested. Multiple samples contained asbestos. In a letter dated March 1, 1978, the Chairman of the CTFA Task Force on Round Robin Testing and then current employee of J&J instructed the CTFA to "destroy your copy of the table" containing the results finding asbestos in cosmetic talcs.

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 10

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

31.     Although possessing test results indicating that the talc used in its talc-based products contained tremolite and chrysotile asbestos — reportable as asbestos under federal regulations — J&J represented to the NTP that there was never any evidence of asbestos in the talc used in Johnson's Baby Powder. And decades after asbestos was first reported, J&J continued to represent to the FDA that it had confirmed "the absence of asbestiform minerals" in its finished talc-based products. It did so in the CTFA's Comments in Response to a Citizens Petition dated June 27, 1995.

32.     As recently as 2016, in a document dated March 17, 2016, J&J represented to the FDA that no asbestos structures have ever been found in its talc-based products in any testing anywhere in the world. This statement made to the FDA was false.

33.     In an advertisement to the public dated December 19, 2018, J&J falsely claimed that it has cooperated fully and openly with the FDA and other regulators. In fact, J&J did not provide the FDA with positive asbestos tests from its hired consultants, including McCrone, and the Colorado School of Mines. J&J did not tell the FDA that it possessed test results finding asbestos in the mine ore and the finished talc product nor did it give those results to the FDA.

34.     J&J also used its consultants as vehicles to intentionally mislead the FDA. A letter dated October 12, 1971 evidences that J&J knew that its standby consultant McCrone purposely omitted findings of asbestos in its talc-based products because it "would only tend to confuse the issue perhaps with the FDA" and that McCrone offered that if J&J "decide[d] to use these reports with the FDA" to "please call us."

35.     As a part of its testing protocol for J&J's talc products, McCrone would segregate any test results that were positive for the presence of asbestos in talc ore or cosmetic talc products from those that allegedly found "no quantifiable" asbestos. For instance, on April

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 11

BERGMAN DRAPER OSLUND
821 2ᵗʰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

29, 1986, under McCrone Project No. ME-2275 and Purchase Order WS-0503, McCrone authored two separate reports of test results for Windsor Minerals. The first was for 11 talc samples in which "no quantifiable" amounts of asbestiform were found. The second was for the three talc samples (noticeably extracted from the numbering sequence) in which traces of chrysotile were found.

36.    McCrone and J&J worked together to manipulate the asbestos testing results of J&J products done by outside laboratories and reported those manipulated findings to the FDA as negative results. For example, in a report dated October 27, 1972, McCrone found tremolite asbestos in J&J talc products but a handwritten note was written in large print on the front of the report stating: "DO NOT USE THIS REPORT." The report was revised to remove the quantification of asbestos found.

37.    Similar asbestos findings by other J&J consultants were also hidden from the FDA. J&J submitted to the FDA testing performed by Professor Hutchinson from the Minnesota Space Center only in excerpts that removed all references to his "incontrovertible" findings of chrysotile asbestos. J&J did not submit a March 1974 test results from Professor Reynolds at Dartmouth College that "Actinolite is the dominant fiberform amphibole in the ore and talc product provided by Windsor Minerals." Instead, J&J submitted test results to the FDA from Dartmouth claiming that no amphiboles were found in the company's talc products.

38.    J&J had its consultants use purposefully misleading laboratory tests to support its false claims that its talc ore and talc products were free of any asbestos. Since at least 1971, J&J has known that transmission electron microscopy ("TEM" or electron microscopy) is the superior microscope to detect asbestos in talc and was its consultants' recommended testing method. In fact, the positive asbestos results obtained by Professor Hutchinson utilized the

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 12

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

TEM method. But J&J convinced the FDA that lesser test methods were effective, knowing that those lesser methods had failed to detect asbestos that was verified to be present in J&J's cosmetic talc products. J&J routinely submitted test reports to the FDA as proof that its talc was asbestos free knowing that the methods used would not detect asbestos at low levels and thus were not reliable to rule out the presence of asbestos. For example, a McCrone report dated April 24, 1974 noted that lesser methods failed to find asbestos in over a dozen samples where the asbestos was confirmed when using the correct tool – TEM.

39.    Despite J&J's knowledge that other testing methods missed verified asbestos in its talc, J&J advocated an industry standard using one of the weaker/lesser methods and claimed it would ensure the talc was asbestos free. This method is known as J4-1. The J4-1 testing method utilized x-ray diffraction ("XRD") as the initial screen to determine if any further testing was necessary. The limit of detection was between .5% and 5% and ensured that millions to trillions of asbestos fibers in a gram of talc could escape detection. Using the J4-1 method, if the XRD test result was negative, no more testing would occur, and the sample would be reported as "none detected." This process virtually guaranteed that low levels of asbestos would never be found. J&J also knew that XRD could not detect chrysotile at levels below two percent of the talc product and was also incapable of detecting low levels of tremolite. In the unlikely event an XRD test result was positive, J&J's second step utilized polarized light microscopy ("PLM"), also a lesser testing method, and J&J instructed the PLM analyst not to count all of the fibers he or she would actually see under the microscope. Short fibers, below a defined size, recognized as carcinogenic, were excluded from any reporting.

40.    The CTFA's December 10, 1973 report confirmed that multiple talc sources, including Italian and Vermont talc, failed the proposed FDA's method because of elevated

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

chrysotile concentrations. Thereafter, the CTFA proposed J4-1 knowing it was a "unreliable" testing method for asbestos in talc. The first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," resulted in six of seven participating laboratories failing to detect the tremolite. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the CTFA's J4-1 method. There is no evidence that CTFA or J&J ever shared this remarkable failure with the FDA or the public.

41.    J&J also knew that the "concentration method" of sample preparation was most able to detect the presence of asbestos in its talc and thus provide more accurate results. Internal memorandums from 1973 show that J&J understood that the concentration method was "much more sensitive than our proposed specifications" and when used found traces of tremolite which the J&J testing methods would fail to expose. J&J's stated concern with using a concentration method, set forth in a memorandum dated May 16, 1973, was that it was too good at detecting asbestos – it was too sensitive. Correspondence dated February 18, 1975 indicates that J&J rejected the concentration method because the effective and sensitive testing was not "in the worldwide company interest." Indeed, many of J&J's consultants -— including the Colorado School of Mines, Professor Pooley of Cardiff University, Professor Reynolds of Dartmouth College, and Professor Alice Blount of Rutgers University — found asbestos in J&J's talc-based cosmetic products using the concentration method. J&J did not provide any of those test results to the FDA, however.

42.    When J&J finally decided to use TEM on a limited basis in 1995, it implemented a TEM reporting methodology designed to yield negative, rather than accurate results. J&J called its method TM7024. According to this method, a lab would report the test results as negative and "not quantifiable" unless the scientist counted 5 or more asbestos fibers

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 14

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

of the same variety in an incredibly small sample (it varied but was well under 50 milligrams). Thus, even if the examiner identified, counted and quantified as many as 16 asbestos fibers (four fibers of tremolite, four fibers of actinolite, four fibers of anthophyllite, and four fibers of chrysotile) the finding of asbestos was not to be reported. This method instructed labs who confirm the presence of asbestos in incredibly small samples to "couch" the results in specific and deceptive language that the lab "did not find any quantifiable amount of asbestosforms minerals." J&J's position about the scientific propriety of its TM7024 testing protocol was and remains inconsistent with EPA protocols for counting asbestos fibers.

43.    Even though J&J tested miniscule amounts of product, and utilized methods specifically designed to yield negative results, asbestos was still found in J&J's cosmetic talc. J&J never produced these test results to the public until 2017. In editing information for its website in about 2016, J&J acknowledged internally that it "cannot say our talc-based consumer products have always been asbestos free."

44.    J&J represented to the FDA that the most sensitive testing was not needed because "substantial asbestos can be allowed safely in baby powder." J&J also claimed that "extensive" animal studies of its Vermont and Italian talc revealed no cancer risk from their talc. J&J now admits that only one study was done of its Vermont talc and only one study of its Italian talc as it relates to the risk of cancer from talc. The FDA was not told tests were conducted on a special lot of "extremely clean" talc. This information was first disclosed in litigation from J&J internal records, first produced no earlier than 2017.

45.    J&J knew that it had liability to persons who developed asbestos-related diseases as a result of exposure to its cosmetic talc products. In an internal communication dated April 15, 1969, the Medical Director for J&J wrote to advise the company of danger

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 15

BERGMAN DRAPER OSLUND
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

relative to "inhalation" of the "needle-like" crystals of tremolite asbestos in J&J's talc. J&J was cautioned that "since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that [J&J] could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations." To that end, Dr. Thompson recommended that "someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise." The medical director further forewarned J&J that the company could confront a situation where the company would be more or less compelled to remove its talc products "if it became known that our talc formulations contained any significant amount of Tremolite." This prediction of litigation came to fruition shortly thereafter. J&J has reported that during the 1970s alone, the company was sued in talc-based cases in 1971, 1972, 1973 1974, 1976, 1977, 1978, and 1979.

46.    Due to the litigation process, J&J has been forced to identify documents from as early as 1971 (and every year thereafter) relating to "ongoing," "pending," and "anticipated" litigation regarding Johnson's Baby Powder. Since at least 1971, J&J has known that information in the company's possession relevant to or produced in any particular talc-based lawsuit would be relevant to discovery in future talc-based cases. Although J&J was legally obligated to retain the evidence, it does not know where the documents and evidence related to these cases are located or whether they even exist. Entries on J&J's privilege log indicate that samples of talcum powder used in litigation existed at the time the litigation in the 1970s was pending but are no longer available.

47.    Despite being involved in litigation for decades, J&J never produced a single asbestos test in any case prior to 2017, even when specifically requested. J&J was repeatedly

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 16

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

1  asked in litigation whether the talc used in any of its talc-based cosmetic products contained

2  any amount of asbestos. J&J represented to plaintiffs' counsel that "there was no evidence" of

3  asbestos in its cosmetic talc. These representations exemplified J&J's pattern and practice in

4  defending talc-injury litigation, which was to conceal evidence of asbestos in its cosmetic talc

5  products and represent that no such evidence ever existed. Many of the same J&J executives

6  who were involved in discussions with the FDA about the company's talc-based cosmetic

7  products were involved in defending J&J in litigation alleging asbestos-related injuries from

8  talc-based cosmetic products.

9

10      48.    J&J routinely provided sworn affidavits from company executives falsely

11  asserting that there was no evidence of asbestos in the talc used for J&J cosmetic products. In

12  addition to submitting false affidavits, J&J repeatedly certified answers to interrogatories

13  stating that there was never any evidence of asbestos in any J&J cosmetic talc product when it

14  knew the truth to be otherwise. J&J knew there was tremolite in Johnson's Baby Powder when

15  responding to discovery requests in the Krushinski case. J&J has been forced to admit that

16  these interrogatories, which were answered in conjunction with the company's lawyers, were

17

18  false.

19      49.    J&J concealed and refused to produce in response to plaintiffs' discovery

20  requests any documents evidencing or relating to tests, studies, investigations, and analyses of

21  Johnson's Baby Powder for the presence of asbestos, despite its knowledge that relevant and

22  material documents existed and were in its possession and that it had the duty to disclose them.

23

24      50.    Although J&J by its own admission had an obligation to preserve evidence once

25  litigation concerning the health effects of its talc products was foreseeable, it failed to do so.

26  J&J knew that evidence adduced in litigation concerning the health effects of its talc products

BERGMAN DRAPER OSLUND
821 2nd AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

1  would be material and relevant to other anticipated cases. Yet J&J failed to preserve records

2  from any of the lawsuits that alleged injuries as a result of Johnson's Baby Powder, talc, or

3  asbestos, even though J&J knew that relevant and material documents existed and were in its

4  possession.

5

6     51. J&J did not retain any samples of its talc ore and milled talc used in its talc-

7  based cosmetic products, which it tested regularly for the presence of asbestos and asbestiform

8  minerals at any time until 2017. Although litigation was pending and anticipated, the samples

9  chosen by J&J specifically to create test results were not retained under the company's

10 evidence retention schedules and were not subject to any litigation-hold. J&J also failed to

11 retain all test results for the presence of asbestos and asbestiform minerals of the talc ore and

12 milled talc used in its talc-based cosmetic products. The failure to institute a litigation hold

13 made certain that the testing results were destroyed in accordance with its document retention

14 policy. In 2008, nearly ten years after the first litigation hold, when asked about retention time

15 for "information related to the CTFA ingredient surveys" J&J directed its employees to

16 "PITCH them." Any test results that J&J has not yet produced are presumed to be destroyed,

17 as the disposal of these results were mandated by the company's evidence retention scheduled

18 absent a litigation hold, which J&J never issued.

19

20    52. The limited underlying scientific data that still exists of J&J's consultants

21 confirms that the reports of "no detectable" asbestos are belied by the underlying scientific

22 data, which shows evidence of asbestos. There are countless similar non-detect letters with no

23 underlying data.

24

25

26

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 18

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

53.     In 1989, after facing litigation related to its talc-based products for nearly two decades and anticipating further litigation, J&J destroyed records relating to its Hammondsville, Vermont mining operations.

54.     J&J historically preserved no records from the majority of cases in which it has been sued for causing talc related injuries. For those cases where there is at least some documentation, J&J either lost or destroyed most of the material evidence related to historical litigation alleging asbestos-related disease from its talc products. Despite being involved in many cases dating back to 1971, J&J could only locate two sets of discovery responses for its corporate representative to review.

55.     J&J once maintained a paper file documenting all of its telephone conversations with the FDA related to its talc-based cosmetic products dating to the early 1970s. The "FDA Call File" no longer exists.

<strong>J&J is Fully Responsible for Conduct<br>Fraudulent Misrepresentation</strong>

56.     J&J intentionally and fraudulently continued to misrepresent to the public that Johnson's Baby Powder was safe, concealing the dangers of asbestos exposure and evidence of asbestos in J&J's talc product. J&J's misrepresentations and omissions regarding the safety of Johnson's Baby Powder have resulted in consumer use of cosmetic talc products in a potentially lethal way without any knowledge of the danger, thus denying Decedent the knowledge with which to avoid further exposure. Specifically, J&J's intentional and fraudulent conduct included the following acts and omissions:

(a)     J&J made a material representation;

(b)     The representation was false;

(c)     J&J knew it was false when made or made it recklessly without knowing it was true as a material positive assertion;

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 19

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

(d)    J&J made the misrepresentation intending that Decedent act on the representation;

(e)    Decedent acted in reliance on it; and

(f)    Decedent, as a result, suffered damage.

### J&J is Fully Responsible for Conduct
### Silent Fraud (a/k/a Fraudulent Concealment)

57.    J&J intentionally and fraudulently concealed the dangers of asbestos exposure and continued to represent to the public that Johnson's Baby Powder was safe, concealing the evidence of asbestos in J&J's talc product. J&J's concealment and omissions regarding the safety of Johnson's Baby Powder have resulted in consumer use of cosmetic talc products in a potentially lethal way without any knowledge of the danger, thus denying Decedent the knowledge with which to avoid further exposure. Specifically, J&J's intentional and fraudulent conduct included the following acts and omissions:

(a)    J&J suppressed a material fact;

(b)    J&J had a duty to disclose the fact; and

(c)    J&J concealed the fact with the intent to defraud.

58.    Verna J. Richards trusted Johnson's Baby Powder. She used it for decades, on herself and on her daughter, believing it to be safe. Decedent Verna J. Richards trusted that the talc products she used were safe and did not have any carcinogens. She relied on J&J to provide any safety information to her and her family and to make sure any life threatening hazards were communicated to her. Had the Decedent known the true facts, she would never have purchased or used the products.

59.    Verna J. Richards developed mesothelioma, a fatal cancer, as a direct and proximate cause of the misrepresentations made by J&J regarding the safety of Johnson's Baby

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 20

BERGMAN DRAPER OSLUND
821 2ᴺᴰ AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

1 Powder and its concealment of evidence that its cosmetic talc products utilized talc that

2 contained asbestos fibers that could cause cancer.

3
## V.    DAMAGES

4       9.      Plaintiff Bethany J. Richards brings this cause of action against all defendants for

5 the loss of parental-child relationship as a result of decedent Verna J. Richards' illness and

6 subsequent death, including a loss of emotional support, love, care, guidance, society,

7 companionship, consortium, and assistance in an amount to be proven at trial.

8       10.     Plaintiff Bethany J. Richards has also sustained loss of economic support due to

9 decedent Verna J. Richards' illness and subsequent death in an amount to be proven at trial.

10      11.     As a direct and proximate result of defendants' tortious conduct as alleged above,

11 decedent Verna J. Richards sustained pain, suffering, mental anguish, physical impairment, loss

12 of enjoyment of life, disfigurement, anxiety, humiliation, fear, disability, and subsequent death in

13 an amount not now known, but will be proven at trial.

14      12.     Decedent Verna J. Richards also sustained medical expenses, funeral expenses

15 and economic losses as a result of her mesothelioma, and subsequent death from the disease, in

16 an amount to be proven at trial. Decedent Verna J. Richards' survival damages are brought under

17 Washington's general and special survival statutes for the injuries incurred by Verna J. Richards

18 prior to her death. These claims are made in the name of the Personal Representative of the Estate

19 as required by Washington law for the beneficiaries named herein who are enumerated under

20 RCW 4.20.020 as beneficiaries.

21      13.     Decedent Verna J. Richards' daughter has sustained a loss of parental-child

22 relationship as a result of Verna J. Richards' illness and subsequent death.

23      WHEREFORE, plaintiff prays for judgment against the defendants and each of them as

24 follows:

25      A.      For all wrongful death and survival damages recoverable by Washington law,

26              including all damages provided for in RCW 4.20.010, 4.20.046 and 4.20.060;

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 21

BERGMAN DRAPER OSLUND
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

B.  For general and special damages specified above, including pain, suffering, loss of enjoyment of life, loss of consortium, loss of parental-child relationship, and disability;

C.  For medical and related expenses, and economic loss, all of which will be proven at the time of trial;

D.  Past and future loss of care, maintenance, services, support, advice, counsel, and consortium, which plaintiff Bethany J. Richards would have received from decedent Verna J. Richards before her illness, disability and subsequent death caused by her asbestos exposure;

E.  Past and future loss of parental-child relationship that plaintiff Bethany J. Richards would have received from decedent Verna J. Richards before her illness, disability and subsequent death caused by her asbestos exposure;

F.  For all other damages that beneficiaries to the Wrongful Death Act are entitled to under Washington law;

G.  For plaintiff's costs and disbursements herein;

H.  For pre- and post-judgment interest in the amount to be proven at trial; and

I.  For such other relief as the Court deems just.

[INTENTIONALLY BLANK]

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 22

BERGMAN DRAPER OSLUND
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510

1    DATED this 18th day of August, 2021.

2                                         BERGMAN DRAPER OSLUND, PLLC

3                                         /s/ Matthew P. Bergman
4                                         Matthew P. Bergman, WSBA #20894
                                          Chandler H. Udo, WSBA #40880
5                                         821 2nd Avenue, Suite 2100
                                          Seattle, WA 98104
6                                         Telephone:   (206) 957-9510
                                          Facsimile:   (206) 957-9549
7                                         Email: matt@bergmanlegal.com
8                                                    chandler@bergmanlegal.com

9                                         and

10                                        DEAN OMAR BRANHAM SHIRLEY, LLP
                                          Jordan Blumenfeld-James CABA No. 235185
11                                        To Be Admitted Pro Hac Vice
                                          302 N. Market Street, Suite 300
12                                        Dallas, TX 75202
13                                        Telephone:   (214) 722-5990
                                          Facsimile:   (214) 722-5991
14                                        Email: jbj@dobslegal.com

15                                        ATTORNEYS FOR PLAINTIFF

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR PERSONAL INJURIES
AND WRONGFUL DEATH - 23

BERGMAN DRAPER OSLUND
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.957.9510