# **<u>Exhibit 21</u>**

E-SERVICE
67042468
Oct 25 2021
05:07PM
File & ServeXpress

| | | |
|---|---|---|
| STATE OF INDIANA | ) | MARION COUNTY SUPERIOR COURT |
| | ) | CIVIL DIVISION ROOM NO. 13 |
| COUNTY OF MARION | ) | CAUSE NO. 49D13-2110-MI-034781 |

RONALD McBRIDE and MICHELLE McBRIDE, )
    Plaintiffs, )
)
v. )
AMERICAN INTERNATIONAL INDUSTRIES, INC., )
    individually and as successor to Pinaud, Inc., )
    Barbara Alice, Inc., Ed. Pinaud, Inc., d/b/a )
    Ed. Pinaud, and Nestle-Le-Mur Company, )
    All for the Clubman line of products, )
AMERICAN INTERNATIONAL INDUSTRIES, )
    individually and as successor to Pinaud, Inc., )
    Barbara Alice, Inc., Ed. Pinaud, Inc., d/b/a )
    Ed. Pinaud, and Nestle-Le-Mur Company, )
    All for the Clubman line of products, )
ARKEMA INC., f/k/a Pennwalt Corporation, )
BRENNTAG NORTH AMERICA, INC., individually )
    and as successor-in-interest to Mineral and )
    Pigment Solutions, Inc. and Whittaker, )
    Clark & Daniels, Inc., )
BRENNTAG SPECIALTIES, LLC f/k/a Brenntag )
    Specialties, Inc. f/k/a Mineral and Pigment )
    Solutions, Inc. successor-in-interest to )
    Whittaker, Clark & Daniels, Inc., )
COLGATE-PALMOLIVE COMPANY, individually )
    and as successor-in-interest to The Mennen )
    Company, )
FISONS CORPORATION, )
GLAMOUR INDUSTRIES, CO., individually and as )
    Successor-in-interest to American International )
    Industries, )
GRACE FOODS, LLC d/b/a Safeway Foods, Inc., )
GSK CONSUMER HEALTH, INC., )
INSIGHT PHARMACEUTICALS CORPORATION, )
INSIGHT PHARMACEUTICALS LLC, )
<u>JOHNSON & JOHNSON,</u>
THE NESLEMUR COMPANY, f/k/a The )
    Nestle-Lemur Company )
NOVARTIS PHARMACEUTICALS CORPORATION,)
PRESTIGE CONSUMER HEALTHCARE INC., )
THE PROCTER & GAMBLE COMPANY, )
SANOFI-AVENTIS U.S. LLC, individually and as )
    Successor-in-interest to FISONS Corporation, )

LTL 0018439

| | |
|---|---|
| SHULTON, INC., | ) |
| VI-JON, LLC f/k/a VI-JON, INC., | ) |
| WALGREEN CO., | ) |
| WHITTAKER, CLARK & DANIELS, INC., | ) |
| WYETH HOLLDINGS, LLC f/k/a Wyeth Holdings | ) |
|     Corporation f/k/a American Cyanamid | ) |
|     Company, individually and as successor-in- | ) |
|     interest to The Proctor & Gamble Company, | ) |
|     Defendants. | |

## FIRST AMENDED CASE-SPECIFIC COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
## CIVIL THIRTEEN MASS TORT ASBESTOS DOCKET CASE

### General Allegations

1. DOBS & Farinas Living Master Complaint and Jury Demand, TID 66533695, is incorporated by reference. **Ronald McBride** is referred to as "Exposed Plaintiff" in the Master Complaint and in this Case-Specific Complaint.

2. Exposed Plaintiff was diagnosed with malignant pleural mesothelioma on or about August 8, 2021.

3. Asbestos caused Exposed Plaintiff's disease.

4. Further case specific information will be provided in the Verified Disclosure Statement as provided by Local Rule.

### Premises Defendants

5. The following Defendants owned, operated, or controlled premises where Exposed Plaintiff was exposed to asbestos. They are referred to as "Premises Defendants" in the Master Complaint and in this Case-Specific Complaint.

**NONE**

6. Exposed Plaintiff was exposed to asbestos attributable to Premises Defendants.

## COUNT XIII: Fraud as to Johnson & Johnson

15. Defendant Johnson & Johnson ("J&J") made false representations regarding the asbestos content of its cosmetic talc products, including Johnson's Baby Powder used by Plaintiff Ronald McBride, misrepresentations that Plaintiff relied on to his detriment and which caused the development of his mesothelioma. J&J's misrepresentations were deliberate and were effectuated through a campaign to hide and destroy laboratory testing detecting asbestos in Johnson's Baby Powder, to manipulate the protocols for such testing to falsely suggest no asbestos was found in Johnson's Baby Powder, and to repeatedly assert to the public and federal regulatory agencies that Johnson's Baby Powder was safe.

16. Johnson's Baby Powder was a critical cornerstone product for J&J, referenced as the company's "golden egg" and "sacred cow." See Exhibit 1 (04/28/1997 The Johnson & Johnson Advantage: Emotional Trust); *see also* Exhibit 2 (08/18/1997 Mother-Baby Strategic Mission); *see also* Exhibit 3 (08/20/1997 Johnson & Johnson "Golden Egg" Advertising Strategy); *see also* Exhibit 4 (excerpt of 08/04/1999 Johnson & Johnson Baby Camp PowerPoint); *see also* Exhibit 5 (excerpt of 08/10/1999 Johnson & Johnson Baby Camp PowerPoint with Koffman (Golden Egg presentation)).

17. J&J knew that its cosmetic talc products, including Johnson's Baby Powder, contained asbestos fibers, knew those asbestos fibers could cause cancer, and knew that it was not safe to be selling such products to the public for use on babies, children, and adults. In a memorandum dated April 9, 1969, J&J internally expressed concern that the presence of tremolite asbestos in its talc products would cause pulmonary diseases and cancer and increased the risk that the company would be drawn into litigation. J&J acknowledged that trace amounts of tremolite were unavoidable, and that efforts should be made to keep the amount of tremolite to a minimum.

talc-based products. <u>It did so in the CTFA's</u> Comments in Response to a Citizens Petition dated June 27, 1995.

38.   As recently as 2016, in a document dated March 17, 2016, J&J represented to the FDA that no asbestos structures have ever been found in its talc-based products in any testing anywhere in the world. This statement made to the FDA was false.

39.   In an advertisement to the public dated December 19, 2018, J&J falsely claimed that it has cooperated fully and openly with the FDA and other regulators. In fact, J&J did not provide the FDA with positive asbestos tests from its hired consultants, including McCrone, and the Colorado School of Mines. J&J did not tell the FDA that it possessed test results finding asbestos in the mine ore and the finished talc product nor did it give those results to the FDA.

40.   J&J also used its consultants as vehicles to intentionally mislead the FDA. A letter dated October 12, 1971, evidences that J&J knew that its standby consultant McCrone purposely omitted findings of asbestos in its talc-based products because it "would only tend to confuse the issue perhaps with the FDA" and that McCrone offered that if J&J "decide[d] to use these reports with the FDA" to "please call us."

41.   As a part of its testing protocol for J&J's talc products, McCrone would segregate any test results that were positive for the presence of asbestos in talc ore or cosmetic talc products from those that allegedly found "no quantifiable" asbestos. For instance, on April 29, 1986, under McCrone Project No. ME-2275 and Purchase Order WS-0503, McCrone authored two separate reports of test results for Windsor Minerals. The first was for 11 talc samples in which "no quantifiable" amounts of asbestiform were found. The second was for the three talc samples (noticeably extracted from the numbering sequence) in which traces of chrysotile were found.

LTL 0018449

known to contain tremolite asbestos while using the CTFA's J4-1 method. There is no evidence that CTFA or J&J ever shared this remarkable failure with the FDA or the public.

47. J&J also knew that the "concentration method" of sample preparation was most able to detect the presence of asbestos in its talc and thus provide more accurate results. Internal memorandums from 1973 show that J&J understood that the concentration method was "much more sensitive than our proposed specifications" and when used found traces of tremolite which the J&J testing methods would fail to expose. J&J's stated concern with using a concentration method, set forth in a memorandum dated May 16, 1973, was that it was too good at detecting asbestos – it was too sensitive. Correspondence dated February 18, 1975 indicates that J&J rejected the concentration method because the effective and sensitive testing was not "in the worldwide company interest." Indeed, many of J&J's consultants — including the Colorado School of Mines, Professor Pooley of Cardiff University, Professor Reynolds of Dartmouth College, and Professor Alice Blount of Rutgers University — found asbestos in J&J's talc-based cosmetic products using the concentration method. J&J did not provide any of those test results to the FDA, however.

48. When J&J finally decided to use TEM on a limited basis in 1995, it implemented a TEM reporting methodology designed to yield negative, rather than accurate results. J&J called its method TM7024. According to this method, a lab would report the test results as negative and "not quantifiable" unless the scientist counted 5 or more asbestos fibers of the same variety in an incredibly small sample (it varied but was well under 50 milligrams). Thus, even if the examiner identified, counted and quantified as many as 16 asbestos fibers (four fibers of tremolite, four fibers of actinolite, four fibers of anthophyllite, and four fibers of chrysotile) the finding of asbestos was **not** to be reported. This method instructed labs who confirm the presence of asbestos in incredibly small samples to "couch" the results in specific and deceptive language that the lab "did

LTL 0018452

==not find any quantifiable amount of asbestosforms minerals." J&J's position about the scientific propriety of its TM7024 testing protocol was and remains inconsistent with EPA protocols for counting asbestos fibers.==

49.     Even though J&J tested miniscule amounts of product, and utilized methods specifically designed to yield negative results, asbestos was still found in J&J's cosmetic talc. J&J never produced these test results to the public until 2017. In editing information for its website in about 2016, J&J acknowledged internally that it "cannot say our talc-based consumer products have always been asbestos free."

50.     J&J represented to the FDA that the most sensitive testing was not needed because "substantial asbestos can be allowed safely in baby powder." J&J also claimed that "extensive" animal studies of its Vermont and Italian talc revealed no cancer risk from their talc. J&J now admits that only one study was done of its Vermont talc and only one study of its Italian talc as it relates to the risk of cancer from talc. The FDA was not told tests were conducted on a special lot of "extremely clean" talc. This information was first disclosed in litigation from J&J internal records, first produced no earlier than 2017.

51.     J&J knew that it had liability to persons who developed asbestos-related diseases as a result of exposure to its cosmetic talc products. In an internal communication dated April 15, 1969, the Medical Director for J&J wrote to advise the company of danger relative to "inhalation" of the "needle-like" crystals of tremolite asbestos in J&J's talc. J&J was cautioned that "since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that [J&J] could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations." To that end, Dr. Thompson recommended that "someone in the Law Department