# Exhibit 25.1

# EXHIBIT B

```
 1      IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                    STATE OF MISSOURI
 2

 3    GAIL LUCILLE INGHAM    )
      and ROBERT INGHAM, et  )
 4    al.,                   )
                             )
 5            Plaintiffs,    )  Case Number:
                             )  1522-CC10417
 6    v.                     )
                             )
 7    JOHNSON & JOHNSON, et  )
      al.,                   )
 8                           )
              Defendants.    )
 9
      CROSS-NOTICED IN DISTRICT OF COLUMBIA AND MDL
10
                WEDNESDAY, APRIL 19, 2017
11
                         - - -
12
13         Videotaped deposition of Joanne
14    Waldstreicher, M.D., held at the offices of
15    McCarter and English, 4 Gateway Center, 100
16    Mulberry Street, Newark, New Jersey,
17    commencing at 8:59 a.m., on the above date,
18    before Carrie A. Campbell, Registered
19    Diplomate Reporter, Certified Realtime
20    Reporter, Illinois, California & Texas
21    Certified Shorthand Reporter, Missouri &
22    Kansas Certified Court Reporter.
23                       - - -
                GOLKOW TECHNOLOGIES, INC.
24       877.370.3377 ph| 917.591.5672 fax
                  deps@golkow.com
25
```

```
 1    hundreds of companies that are in the

 2    umbrella or related somehow.

 3              Was there one specific company

 4    that you were working for?

 5              MS. SHARKO:  Object to the form

 6         of the question.

 7              THE WITNESS:  When I joined

 8         Johnson & Johnson, I joined a specific

 9         company, Johnson & Johnson

10         Pharmaceutical Research and

11         Development, which was a research

12         company within Johnson & Johnson, one

13         of its operating companies.

14    QUESTIONS BY MR. LANIER:

15         Q.    All right.  And then at some

16    point in time you took the title of Johnson &

17    Johnson chief medical officer; is that right?

18         A.    I was appointed as Johnson &

19    Johnson chief medical officer.  At the end of

20    2012 and at the beginning of 2013, took on

21    that position.

22         Q.    All right.  So, yes, you became

23    the chief medical officer.

24              And then I was going to ask

25    you -- the next question was going to be
```

```
 1   when, but I think you've already answered
 2   that:  appointed in 2012, effective 2013?
 3        A.     Started the position at the
 4   beginning of 2013, yes.  End of 2012,
 5   beginning of 2013.
 6        Q.     And are you still that today?
 7        A.     Yes, I am.
 8        Q.     So that is your current job?
 9        A.     Yes.
10        Q.     Who was the chief medical
11   officer before you at Johnson & Johnson?
12        A.     It was a new position.
13        Q.     So until 2013, Johnson &
14   Johnson did not have a chief medical officer;
15   is that right?
16        A.     Johnson & Johnson did not have
17   a chief medical officer before then.
18               The individual sectors had
19   either a chief medical officer or a chief
20   safety officer.
21        Q.     And when you became the chief
22   medical officer for Johnson & Johnson, you
23   brought about some changes or at least
24   represented a new focus for the company,
25   fair?
```

```
 1   company's position statements about talc

 2   after the jury awards that came out last

 3   year?

 4              MS. SHARKO:  Object to the form

 5       of the question.

 6              THE WITNESS:  I'm familiar with

 7       some of the statements.

 8   QUESTIONS BY MR. LANIER:

 9       Q.   In fact, you gave one of the

10   video statements, didn't you?

11       A.   I recorded a video.

12              (Waldstreicher Exhibit 3 marked

13       for identification.)

14   QUESTIONS BY MR. LANIER:

15       Q.   I'm going to give you a

16   document we're marking as Exhibit Number 3.

17              And Exhibit Number 3 is one of

18   these PR statements or releases dated May 2,

19   2016, entitled "A Message About Talc, Johnson

20   & Johnson."

21              Do you have Exhibit 3 in front

22   of you?

23       A.   I do.

24              MS. SHARKO:  Object to the form

25       of the question.
```

 1   QUESTIONS BY MR. LANIER:

 2       Q.    And are you able to see it and

 3   see the little baby powder container on the

 4   front?

 5       A.    I see that.

 6       Q.    Now, if you'll look -- and if

 7   you need to take more time, we can certainly

 8   do that, but this is pretty easy down here.

 9             There's a section called

10   "safety."

11             Do you see that?

12       A.    I do see that.

13       Q.    Now, that's important to be

14   transparent on that.  This is important that

15   you be honest, right?

16       A.    It's very important to be

17   honest.

18       Q.    Did anybody run this by you

19   before it was put out there for the public?

20       A.    I don't believe this was --

21   this complete communication was run by me.

22   It was run by my medical expert.

23       Q.    And who is your medical expert?

24       A.    I believe Dr. Jijo James, who

25   is the chief medical officer for the consumer

```
 1   group, reviewed this and worked on it.

 2        Q.    Our court reporter would really

 3   appreciate it if you would spell that name.

 4   It'll save her from looking it up later.

 5        A.    Sure.

 6              Jijo, J-i-j-o, last name James,

 7   J-a-m-e-s.

 8        Q.    Thank you very much.

 9              Now, under safety it says,

10   "When concerns about an association between

11   talc and ovarian cancer were first raised in

12   the early 1980s, Johnson & Johnson took them

13   very seriously and did the things you would

14   expect from a company you trust, including,

15   colon."

16              Do you see that?

17        A.    Yes, I do.

18        Q.    First of all, we already know

19   that that's false, don't we?

20        A.    No, I don't agree.

21        Q.    Ma'am, did you think that

22   concerns about an association between talc

23   and ovarian cancer were first raised in the

24   early 1980s?

25        A.    I wasn't at the company at the
```

```
 1    of the scientific literature.

 2              MR. LANIER:  Objection.

 3       Nonresponsive.

 4    QUESTIONS BY MR. LANIER:

 5        Q.    Did you just miss these?

 6              I'm talking about you.  What

 7    did you do before you got on that video and

 8    told the world, as the chief medical officer,

 9    that you were vouching for the safety of

10    talc?

11              Did you do your research right?

12        A.    I did.

13        Q.    Did you take it seriously?

14        A.    Absolutely seriously.

15        Q.    Did you find these articles in

16    the '70s and in the '60s?

17        A.    It's impossible for --

18        Q.    It wasn't my question.

19              Did you find them?

20              MS. SHARKO:  No.  Let her

21       finish her answer.

22              THE WITNESS:  It's

23       impossible -- one person couldn't and

24       shouldn't be an expert on the safety

25       of every single product that Johnson &
```

```
 1       Johnson has.
 2              The safety expert in our
 3       company is Dr. Susan Nicholson, and I
 4       met with her to discuss the safety of
 5       talc before I did the video.
 6              MR. LANIER:  Objection.
 7       Nonresponsive.
 8  QUESTIONS BY MR. LANIER:
 9       Q.     Answer my question, please.
10              MS. SHARKO:  Objection.  Asked
11       and answered.  She answered the
12       question.
13              THE WITNESS:  I met with
14       Dr. Susan Nicholson and reviewed her
15       assessment on the safety of the
16       product.
17  QUESTIONS BY MR. LANIER:
18       Q.     What question do you think
19  you're answering?
20       A.     Your last question, but if you
21  would --
22       Q.     Do you know what it was?
23       A.     Please ask it again.
24       Q.     Did you find these articles?
25              That's a "yes" or "no," or
```

```
 1   maybe it's an "I don't remember."
 2        A.    I did not go back and do an
 3   extensive scientific literature search.  I
 4   met with the person responsible for the
 5   safety of this product, Dr. Susan Nicholson,
 6   and it's her responsibility to understand all
 7   of the safety and all the literature.
 8        Q.    Well, then why are you the one
 9   who's standing up there vouching for it being
10   safe when all you're doing is relying on
11   hearsay of someone else?
12        A.    I don't agree with that.  I
13   don't believe hearsay is an appropriate way
14   to characterize --
15        Q.    That's what it's called in a
16   court of law.
17        A.    -- a scientific evaluation by a
18   medical safety expert, Dr. Susan Nicholson.
19        Q.    Well, you don't even say that
20   on the video.  You don't say on the video,
21   "Look, I hadn't researched this stuff, but I
22   talked to one of our people on the payroll,
23   and they've assured me that this talc is safe
24   stuff, that they've done the research."
25              That's not what you say on that
```

Joanne Waldstreicher, M.D.

```
 1        Q.      So when you were making it, did
 2   you tell them, "Hey, I don't know if these
 3   are the facts.  I wasn't at the company" --
 4   what's your line?
 5                Did you tell the people who had
 6   you speaking, "I wasn't at the company in the
 7   '70s and '80s, so I can't give you context
 8   about this"?
 9                Did you tell them that?
10        A.      I wouldn't tell them that
11   because I spoke to our safety expert,
12   Dr. Susan Nicholson.
13        Q.      So you can't rely upon one
14   person for all of your knowledge, can you?
15        A.      Absolutely.  We have a safety
16   standard within Johnson & Johnson.  We have
17   teams of people within each of the operating
18   companies, and we have a safety officer for
19   each of our products.
20                Dr. Susan Nicholson is the
21   expert and safety officer for that product.
22   She works with other experts within that
23   company to make the decisions about the
24   safety of our products.  So, absolutely, I
25   can rely on her.
```

```
 1        Q.     So you can rely on just one
 2   person to give you all the knowledge you
 3   need?
 4        A.     I rely on her to give me the
 5   assessment, her assessment, and the team's
 6   assessment of the safety of the product.
 7        Q.     Why didn't she make the video?
 8        A.     There was a team that met, and
 9   they asked me to do the video, and I was
10   happy to do so.
11        Q.     Did you tell them, "But I don't
12   really know about this.  I'm just taking the
13   word for one of our people who doesn't have
14   my job"?
15        A.     I felt very comfortable making
16   the video --
17        Q.     Wasn't my question.
18               I said:  Did you tell them
19   that?
20        A.     I wouldn't tell them.  I didn't
21   and I wouldn't tell them that because I did
22   feel comfortable making the video --
23               MR. LANIER:  Objection.
24        Nonresponsive.
25               THE WITNESS:  -- based on my
```

Joanne Waldstreicher, M.D.

```
 1    asbestos.
 2         Q.    Okay.  You know enough to know
 3    that Johnson & Johnson has no asbestos in
 4    their talc and that that's important
 5    because -- right?
 6         A.    Yes.  I'm aware that we have
 7    experts in our company who test our product
 8    and assure that it does not contain asbestos.
 9         Q.    Well, you've been worried about
10    whether or not your product contains
11    asbestos, haven't you?
12         A.    Me personally?
13         Q.    Yeah.
14         A.    I have not been worried about
15    that because there are experts within our
16    company, within the consumer group, that
17    assures us that it does not contain asbestos.
18              (Waldstreicher Exhibit 14
19         marked for identification.)
20    QUESTIONS BY MR. LANIER:
21         Q.    Well, I'm going to show you a
22    copy of Exhibit 14, and it's an e-mail from
23    you.
24         A.    Okay.
25         Q.    You are the Joanne
```

Golkow Technologies, Inc.                                Page 168

```
 1                     And then the update came

 2    from -- now, who is -- you pronounced this

 3    name earlier for me, and I had you spell it

 4    for her, but I can't remember how you

 5    pronounced it.

 6         A.     Dr. Jijo James.

 7         Q.     Jijo James.

 8                     This is the same doctor you

 9    were talking about, right?

10         A.     Yes.  He's the chief medical

11    officer for the consumer group.

12         Q.     So Dr. Jijo James says, "Sure,

13    I'll reach out for specifics.  Are you

14    available for a quick call so I can be sure

15    of the information needed?  The reason I ask

16    is that we've had numerous authorities,

17    including those in India, reach out multiple

18    times and test our products.  As you can

19    anticipate, we've not had any major GMP

20    issues, but I'm pretty sure that's not what

21    you're looking for."

22                     And then you said the

23    following:  "Just give me reassurance this is

24    only a result of legal publicity and we don't

25    anticipate any problems with contamination or
```

```
 1    asbestos.  I think that's all I need."
 2                Correct?
 3        A.      Yes, that's what I wanted
 4    reassurance on.
 5        Q.      Yeah.
 6                Because even in June of 2016,
 7    Joanne Waldstreicher needed reassurance on
 8    the issue of talc and asbestos, right?
 9        A.      I needed reassurance about the
10    laboratory testing.  It was unclear if these
11    tests were conducted by us at a high quality
12    lab with assurance of no contamination and
13    good scientific rigor.  And I wasn't sure
14    where this testing was done, and I wanted
15    Dr. Jijo James to confirm for me that we
16    don't anticipate any problems with this kind
17    of testing.
18        Q.      Because the presence of
19    asbestos would be a game-changer, wouldn't
20    it?
21                MS. SHARKO:  Object to the
22        form.
23                THE WITNESS:  I don't want
24        to -- I don't agree with the way that
25        you've phrased that only because it --
```

```
 1   don't think there's one authoritative body.

 2        Q.    I'm talking about an

 3   international body.

 4        A.    I think the National Cancer

 5   Institute is recognized internationally.

 6        Q.    Okay.  And so if I show you

 7   where the National Cancer Institute says it,

 8   you would believe it?

 9        A.    Again, I'm not an expert on

10   asbestos.  I think that you should ask an

11   expert these questions.

12        Q.    But you're the one who got on

13   TV and said that our talc is safe.

14        A.    And that was based on my

15   discussion with Dr. Nicholson and assurances

16   from Dr. James and Dr. Nicholson that we have

17   experts who are evaluating that and assure us

18   that our talc is asbestos-free.

19        Q.    What if your internal experts

20   who are getting paid to sell the product are

21   wrong?

22             MS. SHARKO:  Object to the form

23        of the question.  Lacks foundation.

24             THE WITNESS:  That's not

25        accurate.  Our experts don't get paid
```

```
 1   spoke to an expert who is in charge of the

 2   safety of our product --

 3       Q.    So who swore to you that there

 4   was no asbestos in it?

 5       A.    Both Dr. Susan Nicholson and

 6   Dr. Jijo James have assured me that there's

 7   no asbestos in our products.

 8       Q.    And do they both work for the

 9   company now?

10       A.    They both work for Johnson &

11   Johnson in the consumer group.

12       Q.    Here are the messages on page 4

13   of 16 that people are being taught --

14       A.    I need to just look at the

15   document before I go right to page 16.  I'm

16   not familiar with this.  I've never seen it

17   before.  It looks like an old document that

18   was typed, so I don't know what year it's

19   from.

20       Q.    Ma'am, this is not going to be

21   rocket science.  This just says, "This

22   briefing document is for J&J personnel who

23   attend health care conventions," and then

24   we've got messages on page 4 of 16.

25             Do you see the messages?
```

```
 1   asbestos experts.
 2        A.    Great.  Great.
 3        Q.    My question is to you:  Can
     anybody believe a word you say when you get
     on the videos and you claim as chief medical
     officer you care about transparency, you care
     about being honest, you care about putting
     the patients first, and you know that the
     talc is safe and it doesn't cause cancer,
10   even though you have no clue about what
11   you're talking about vis-à-vis asbestos?
12              MS. SHARKO:  Objection.
13   QUESTIONS BY MR. LANIER:
14        Q.    Are we supposed to believe you?
15              MS. SHARKO:  Objection.
16        Insulting.  Arguing with the witness.
17              Mr. Lanier, this is totally
18        inappropriate.  You're supposed to be
19        taking a discovery deposition, not
20        coming here to insult the witness.
21              THE WITNESS:  My job is
22        oversight of the policies, procedures
23        and personnel who are in place to
24        accomplish our safety goals.
25              We have experts in our
```

1        operating companies who are

2        responsible for reviewing and driving

3        the evaluation of the safety of those

4        products, and we rely on those

5        experts.

6                No single person can know

7        everything about every single product,

8        but we have experts in our company who

9        are experts on individual products,

10       and we rely on them for their overall

11       assessments.

12               (Waldstreicher Exhibit 19

13       marked for identification.)

14  QUESTIONS BY MR. LANIER:

15       Q.    Yeah.

16             Did you know about some more

17  testing that showed asbestos in your baby

18  powder that I'm showing you with Exhibit 19?

19             Have you seen this before?

20       A.    I haven't seen any of these

21  documents before.

22       Q.    Well, Exhibit 19, you'll see,

23  is another document with a high importance

24  marked on it.  This is from your supplier

25  Luzenac.  The subject is J&J news report.