# Exhibit 41

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No. 21-30589 (JCW) |
| Debtor. | |
| LTL MANAGEMENT LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 21-03032 (JCW) |
| THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000, | |
| Defendants. | |

**EXPERT REPORT OF CHARLES H. MULLIN, PHD**

**October 29, 2021**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

Expert Report of Charles H. Mullin, PhD

(17) Finally, in recent years, the Debtor received more than 10,000 claim filings per year.[22,23] As such, paying traditional cost-avoidance settlements at the historical claiming rates would not be cost effective. Not only would such a strategy require a large upfront payment, it also would cement the economic incentive to recruit future claims regardless of the merit of those recruited claims. Instead, the Debtor has elected to litigate ovarian cancer claims. While continued litigation may be economically preferable to LTL compared to cost-avoidance settlements, the process is particularly inefficient regarding ovarian cancer claims, as a key defense is common to each claim—general causation. Thus, the litigants relitigate this same issue in each case, which is both cost prohibitive and burdens the tort system with unnecessarily drawn-out litigation. Even if there were no future claim filings, based on the historical pace of resolution, it would take decades to resolve the currently pending claims in the tort system.

(18) The traditional mechanisms otherwise used to resolve large-scale litigations in a timely manner, either a class action or mass matrix framework (which dramatically reduce transaction costs), are not available to talc defendants. Thus, plaintiffs and defendants keep relitigating the same issues and expending repetitive transaction costs. Continuing to fully investigate, litigate, and value talc claims in the tort system would be prohibitively expensive. Doing so on a claim-by-claim basis requires proceeding to trial and final judgment. For defendants, these transaction costs are almost entirely avoidable costs, as they primarily comprise defense counsel fees paid hourly.

(19) The plaintiffs also have transaction costs, but most of those costs are not avoidable. Plaintiffs' counsel fees, generally paid as contingency fees, comprise the primary plaintiff costs. Typically, contingency rates in asbestos cases are between 33% and 45% of the compensatory award,[24] which means that the claimant typically receives between 55% and 67% of what the defendant pays. However, contingency

---

Baby Powder in the United States," news release, Oct. 18, 2019, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-voluntarily-recall-single-lot-johnsons-baby-powder-united-states; Johnson & Johnson, "15 New Tests from the Same Bottle of Johnson's Baby Powder Previously Tested by FDA Find No Asbestos," news release, Oct. 29, 2019, https://www.jnj.com/15-new-tests-from-the-same-bottle-of-johnsons-baby-powder-previously-tested-by-fda-find-no-asbestos.

[22] Kim Declaration, ¶ 43.

[23] Analysis of the historical claims will be necessary to determine whether these claiming rates are consistent with historical use patterns of talcum products. Based on epidemiological studies, as of the mid to late 1990s, at most 53% of women have *ever* used talc genitally (regardless of frequency). (*See, e.g.,* Serena C. Houghton et al., "Perineal Powder Use and Risk of Ovarian Cancer," *Journal of the National Cancer Institute* 106, no. 9 (2014): Table 1.) As of 2013, less than 26% of women had ever used talc at least weekly and less than 15% ever used talc daily. (Katie M. O'Brien et al., "Association of Powder Use in the Genital Area with Risk of Ovarian Cancer," *JAMA* 323, no. 1 (2020): Table 1; Margaret A. Gates et al., "Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer," *Cancer Epidemiology Biomarkers & Prevention* 17, no. 9 (2008): Table 3.) Further, that percentage declines with successive birth cohorts, as talc use overall steadily declined since the 1970s. (*See, e.g.,* Daniel Cramer et al., "The Association between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States," *Epidemiology* 27, no. 3 (2016): 338.)

[24] Amended Memorandum, Orders, and Final Judgment, *In re Johns-Manville Corporation et al.*, No. 90-3973 (E.D.N.Y.), 90-7518 (S.D.N.Y.), 82 B 11656 (BRL)–82 B 11676 (BRL) (Jan. 19, 1995), p. 561; Stephanie Kidd, "Mesothelioma Lawyer Costs," Mesothelioma Justice Network, May 15, 2020, https://www.asbestos.net/legal/mesothelioma-lawyer/costs/.

Expert Report of Charles H. Mullin, PhD

option should the claimants not find the payment amount offered by the trust acceptable. However, claimants electing this trial option are effectively non-existent.[29] This lack of trials against trusts reveals that the administrative process produces reasonable payment amounts—otherwise, plaintiffs would reject the trust offers and try cases.

(24) Finally, a trust typically clears a claim backlog within a couple of years. Figure 1 displays the volume of claims processed by certain asbestos trusts in their first three years of operation. As the figure shows, many asbestos trusts are capable of processing and paying tens or hundreds of thousands of claims shortly after they are established.

**Figure 1: Volume of claims paid by trusts during first three years of operation[30]**

| Trust name | Count of claims paid |
|---|---|
| ARMSTRONG WORLD INDUSTRIES ASBESTOS PERSONAL INJURY SETTLEMENT TRUST | 95,920 |
| BABCOCK & WILCOX COMPANY ASBESTOS PERSONAL INJURY SETTLEMENT TRUST | 84,280 |
| CELOTEX ASBESTOS SETTLEMENT TRUST | 57,963 |
| G-I ASBESTOS SETTLEMENT TRUST | 67,288 |
| H.K. PORTER ASBESTOS TRUST | 216,750 |
| MANVILLE PERSONAL INJURY SETTLEMENT TRUST | 138,000 |
| OWENS CORNING FIBREBOARD ASBESTOS PERSONAL INJURY TRUST - FB SUBFUND | 126,083 |
| OWENS CORNING FIBREBOARD ASBESTOS PERSONAL INJURY TRUST - OC SUBFUND | 115,455 |
| UNITED STATES GYPSUM ASBESTOS PERSONAL INJURY SETTLEMENT TRUST | 109,131 |

## II.C. Conclusions on efficiency

(25) A trust resulting from bankruptcy reorganization provides numerous efficiencies relative to litigation in the tort system. First, trusts pay claimants materially faster than the time required to resolve claims in the tort system (from filing through trial). Second, a trust can discourage non-meritorious claims and prompt truthful revelation of information by all parties thereby reducing transaction costs. Third, defendant transaction costs would decline to less than 10% of trust expenditures. Fourth, the claimant would keep a larger fraction of their recovery due to a reduction in claimants' transaction costs, particularly if the trust capped claimants' counsel contingency fees.

---

[29] Were this happening with any frequency, Bates White would expect to be aware of it from our regular review of asbestos litigation verdicts. We have seen no such trend. Further, our regular review of trust annual reports do not reflect reporting of legal fees consistent with defending jury trials.

[30] This list includes trusts that have paid over 250,000 claims from inception through 2018. The counts exclude claims settled prior to bankruptcy petitions.