# Exhibit 42.1

1

1                UNITED STATES BANKRUPTCY COURT
             WESTERN DISTRICT OF NORTH CAROLINA
2                   CHARLOTTE DIVISION

3  IN RE:                 :    Case No. 21-30589-JCW

4  LTL MANAGEMENT LLC,       :    Chapter 11

5     Debtor,          :    Charlotte, North Carolina
                         Thursday, November 4, 2021
6                   :    9:33 a.m.

7  : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

8  LTL MANAGEMENT LLC,       :    AP 21-03032-JCW

9     Plaintiff,         :

10       v.             :

11  THOSE PARTIES LISTED ON    :
    APPENDIX A TO COMPLAINT and
12  JOHN AND JANE DOES 1-1000,  :

13     Defendants.       :

14  : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

15

                     **VOLUME 1**
16             TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE J. CRAIG WHITLEY,
17          UNITED STATES BANKRUPTCY JUDGE

18

19  Audio Operator:          COURT PERSONNEL

20

    Transcript prepared by:     JANICE RUSSELL TRANSCRIPTS
21                    1418 Red Fox Circle
                    Severance, CO  80550
22                    (757) 422-9089
                    trussell31@tdsmail.com
23

    Proceedings recorded by electronic sound recording; transcript
24  produced by transcription service.

25

KIM - DIRECT                                                              97

1   predecessors became responsible for that liability associated

2   with cosmetic talc?

3   A    Well, both from the corporate assumption records, the, the,

4   the records that we've seen in this, in this case and also from

5   my experience handling the litigation and other various

6   litigations for the, the JJCI, for JJCI.

7        So based upon that, I've come to the understanding about,

8   that, that JJCI bore all the liability and expenses for that

9   litigation.

10  Q    I think you mentioned Old JJCI or predecessors were

11  responsible from the '70s forward, is that right?

12  A    That's correct.

13  Q    Or some point in the '70s forward.

14       Tell me, were there decisions being made in the late '70s

15  that, as you understand it, that bear on this?

16  A    Well, so we've seen the board resolution from 1978 that

17  reflects, basically, a, a strategy that was incorporated in the

18  '70s, which was that the, J&J was trying to decentralize

19  operations, and, you know, as a part of a growth and innovation

20  strategy it just made sense, as, as JJI was getting bigger, it

21  wanted to take the operation --

22            MR. SATTERLEY:  Object to lack of foundation.  He has

23  no personal knowledge whatsoever regarding that the intentions

24  of somebody in 1978 or '79 was doing.

25            THE COURT:  Overruled.

KIM - DIRECT                                                                  98

1   BY MR. JONES:

2   Q    You may proceed, sir.

3   A    So based on my experience and looking at the corporate

4   documents, you can see that in the '70s there was a, again, a

5   decentralization strategy which -- where the -- J&J wanted to

6   become a holding company.  And so it wanted its operations,

7   the, the, the operational aspects put into separate

8   subsidiaries who would be -- which -- which would take on the

9   responsibility for products and take, and assume the

10  liabilities for those products, you know, get all the assets

11  transferred for those products, and then give an

12  indemnification to, to J&J.  So that's -- throughout the

13  records, you can see that.

14  Q    And let's look at one of those records, sir.

15       I'm going to ask you to view with the Court and, and those

16  assembled Exhibit 6.

17            MR. JONES:  I assume it's LTL's Exhibit 6, your Honor,

18  but I'm not certain how they're framed.  But it certainly is

19  the Debtor's Exhibit 6.

20            THE COURT:  Okay.  Go ahead.

21  BY MR. JONES:

22  Q    And, sir, have you seen Debtor's Exhibit 6 before?

23  A    Yes.  This is --

24            THE COURT:  Hang on one moment.

25            Let's see if we can't tilt those screens outwardly so

KIM - DIRECT                                                                    120

1   litigation, the talc product liability litigation?

2   A   I have.

3   Q   And you've described that for his Honor in your

4   declaration, is that fair?

5   A   In the declaration and in the informational brief as well.

6   Q   And can you generally tell us the arc of that litigation?

7   A   Sure.

8       So prior to, I would say, 2013 we had sporadic cases

9   involving Baby Powder, talc, and those basically related to

10  talcosis.  I think there may have been one mesothelioma case

11  filed earlier, but, you know, they were sort of sporadic.

12      The, the first big ovarian cancer case was the Berg case,

13  which was tried in, in 2013 and even though -- what -- the, the

14  jury in that case found that there was liability, but did not

15  award any damages and when that verdict hit there was increased

16  interest by the plaintiffs' bar in, in this issue.  The next

17  point would be the next case that was tried in, in St. Louis,

18  which, basically, resulted in a $71 million verdict in, in, in

19  2017.  And after that, there was an explosion of litigation

20  involving Baby Powder and I think currently or just prior to

21  the petition I think people have heard that, you know, we've

22  had about 38,000 ovarian cancer cases, over 450 mesothelioma

23  cases filed against us.  We've had numerous trials, most of

24  which we have been successful in, but there are the outlier

25  massive verdicts, one of which I think everyone knows, the

1   Ingham case, which is about, you know, $2.2 billion.

2       Our expenses are running at about 10 to $20 million a month

3   on, on average.

4   Q   And, sir, do you have an estimate -- I think you have it in

5   your declaration, but if we could share it for the Court to

6   refresh our recollection.

7       Do you have an estimate of the total indemnity payments

8   made through the course of the litigation?

9   A   Sure.

10      So indemnity, we've paid about 3., I want to say 3.2, $3.5

11  billion in, in indemnity.  A lot of that, of course, is the,

12  the Ingham verdict.  We also have, in total, about a billion

13  dollars in, in expenses, most of which came about in the last

14  five years.

15  Q   And, sir, those expenses, both the defense costs and the

16  indemnity payments to which you referred, how were those

17  internally booked at Johnson & Johnson or Old JJCI?

18  A   They, they've always been booked on the books of, of Old

19  JJCI.

20  Q   And speaking of Old JJCI for a moment, who was the

21  responsible, who was responsible for medical safety of cosmetic

22  talc sold by Old JJCI?

23  A   The, the responsibility for the safety of a product is, is

24  always on the operating company who is manufacturing and

25  selling the product.

KIM - DIRECT                                                                130

1   Shower on January 1, 1978."

2   Q   And that was the date you mentioned right before the break,

3   is that right?

4   A   Correct.

5   Q   Thank you, sir.

6       We're going to pull up now Exhibit 66 to have you review it

7   for a moment.

8           MR. JONES:   And Exhibit 66, we're going to blow the

9   page up so we get the date visible.   Thank you.

10  BY MR. JONES:

11  Q   Sir, what is Exhibit 66?

12  A   Exhibit 66 is a SEC filing.   It's a Form 10-K for the year

13  ended December 30, 1979.

14  Q   And that is a Form 10-K for which company, sir?

15  A   This is a Form -- for, for Johnson & Johnson, which is the

16  public, the publicly held company that files securities

17  filings.

18  Q   And I'm going to ask you to refer to a particular page for

19  me.   I think it's Page 7 of the 10-K.   It may end with the

20  Bates Digits 401.   There it is.

21      And at the bottom of the page, sir, could you share what

22  the -- the -- this regulatory document says in the, under the

23  heading Personal Products Company?

24  A   Right.   So this is a description of the businesses that has

25  to be filed with the SEC.   Under Personal Products Company, it

1    says, "The field of interest of this subsidiary is primarily

2    products for feminine hygiene.  Among its principal products

3    are MODESS, Stayfree, and Sure & Natural brands of sanitary

4    napkins and Carefree Panty Shields, a brand of feminine

5    protective pads.  Other products include Coets brand cosmetic

6    squares and Shower to Shower brand body powder."

7    Q    Thank you, sir.

8         One more and that's the next exhibit in order, which is

9    Exhibit 67.

10        And do you -- have you seen Exhibit 67 before?

11   A    I have.

12   Q    And what is Exhibit 67?

13   A    It's a -- this is the 1986 Annual Report, again filed by

14   Johnson & Johnson as part of its securities filings.

15   Q    And it -- it -- you mentioned some dates.  I think you

16   mentioned 1987 --

17   A    Uh-huh (indicating an affirmative response).

18   Q    -- but this is contemporaneous?

19   A    This is contemp -- so again, the 1986 Annual Report would

20   be for the period ending 1986, but the document is prepared

21   sometime after, usually in the first quarter of 1987, yeah.

22   Q    Thank you, sir.

23        We're going to ask --

24   A    Yeah.

25   Q    -- you to look at just one page of this document as well

1    A    I did.

2    Q    And notwithstanding clarifications like that, can you share

3    for us how plaintiffs generally pursue these claims in the

4    underlying tort litigation?

5    A    So generally, these are unitary claims.  The central

6    allegation is that a Johnson & Johnson product, you know,

7    produced by one of the Johnson & Johnson companies causes, is,

8    is defective and it causes cancer in a plaintiff.  So it's,

9    generally, it's always -- it's the same -- for every, every

10   case, it's the same product, the same defect, and the same

11   injury that's claimed.

12        So essentially, you know, they don't -- it's not

13   differentiated between when Johnson & Johnson sold talc in the,

14   you know, pre-'87.  It's not differentiated between Shower to

15   Shower or, or Johnson's Baby Powder.  You know, the -- the --

16   all the claims sort of run a, a, a timeline.  So every exposure

17   to a Johnson & Johnson product was defective and it caused

18   cancer.

19   Q    That's the allegation?

20   A    That is the allegation.

21   Q    Let me ask you to look at an exhibit with me and that's

22   Exhibit 20.

23   A    And are you familiar with this pleading, your Honor --

24   Mr. Kim?

25   A    Yes, I am.

1    Q    What is this pleading?

2    A    This is the, the Master Complaint in the MDL cases.

3    Q    And the MDL cases are cases we've heard about --

4    A    Right.

5    Q    -- in this proceeding.

6         Could you just generally describe for his Honor what the

7    MDL proceeding is?

8    A    Sure.

9         So under the Federal Rules the MDL Panel at the request of

10   parties puts together all claims that are, are similar -- and

11   it's basically defined by the order -- into a single court for

12   pre-trial purposes.  And so what happens for pre-trial

13   proceedings is often, because there might be more claims that

14   are filed as the MDL is proceeding, there is a master complaint

15   form to make it uniform, make it easier for plaintiffs to

16   actually file a complaint.  And, and for defendants, we don't

17   have to deal with answering all different types of complaints.

18        So this is the, the master long-form complaint that's used

19   when, when an MDL plaintiff is bringing a claim.

20   Q    All right.  And, and we talked about a significant volume

21   of claims at issue in that MDL, is that right?

22   A    I think there's now 35,000 claims in the MDL.

23   Q    Thank you, sir.

24        Let's, ask, let's ask you to review just a couple

25   paragraphs from this master complaint with me.  First, the

1  unnumbered Paragraph 2 at the bottom of the page.

2              MR. JONES:  If we could blow that up.

3              THE WITNESS:  Uh-huh (indicating an affirmative

4  response).

5  BY MR. JONES:

6  Q    You see here the language that starts with, "The Second

7  Amended Complaint"?

8  A    I do.

9  Q    I'd like you to look at the, what looks to be the third

10 sentence, "Plaintiffs make the following allegations."  Can you

11 read that for us --

12 A    Yes.

13 Q    -- as it rolls?

14 A    (Reading):

15    "Plaintiffs make the following allegation based upon their

16 personal knowledge and upon" --

17 Q    Now we're going to go up to the top of the next page and

18 you may continue.

19 A    All right.  (Reading):

20    -- "information and belief as well as upon their attorneys'

21 investigative efforts regarding defendants' talcum-powder

22 containing products known as Johnson's Baby Powder and Shower

23 to Shower, hereinafter together or individually 'the

24 Products.'"

25    So basically, in these complaints they've now clumped

1   together Johnson's Baby Powder and Shower to Shower and treat

2   them for the purposes of the complaint as, as the same product,

3   "the Products."

4   Q    Thank you, Mr. Kim.

5        I'm going to ask you to look at numbered Paragraph 2, which

6   should be fairly soon after the one you just read to us.   And

7   we're calling that out for you now.

8        Do you see that?

9   A    Yeah.

10       So again, this is -- so I'll read it:

11       "Plaintiffs were diagnosed with various forms of cancer of

12  the female reproductive system, including epithelial ovarian

13  cancer, fallopian tube cancer, and primary peritoneal cancer,

14  which were directly and proximately caused by their regular and

15  prolonged exposure to talcum powder contained in the Products."

16       So basically, it's just saying that, again, it's the same

17  products, the same, the same defect, alleged defect, and, and

18  the same injury.   So this is, basically -- everyone is alleging

19  that prolonged use of the products.   And again, when it's

20  prolonged use, this is from, from the day that they used it to

21  the end.   So it would encompass pre-'87, post-'87, that, that

22  whole period of time.   Use of that product because it was

23  defective caused the cancers.

24  Q    Thank you, Mr. Kim.

25       I'm going to ask you to look at one, one more paragraph

1  from this complaint, Paragraph 8.

2      Mr. Kim, you just used the, the date 1987, did you mean

3  that?

4  A   I'm sorry.  I keep, I keep reversing this.  1979.

5  Q   Thank you, sir.

6      I'm now looking at Paragraph 8.

7  A   Yeah.

8  Q   And you are, too, I hope.  Are you with me?

9  A   Yeah, I am.

10 Q   Could you tell us what Paragraph 8 says for the record?

11 A   It says:

12     "The defendant, Johnson & Johnson Consumer Inc., in and has

13 been at all relevant times a wholly owned subsidiary of

14 defendant, Johnson & Johnson, under the complete dominion of

15 and control of defendant, Johnson & Johnson.  Hereinafter,

16 unless otherwise delineated, these two entities shall be

17 referred to as 'the Johnson & Johnson Defendants.'"

18     Again, what this paragraph does is basically state that,

19 that they're going to treat Johnson & Johnson and Johnson &

20 Johnson Consumer Company as the same entity because their,

21 their theory is that throughout this whole period of time, you

22 know, they acted, they're, they're one company and, and, and,

23 and all, the actions of all those contributed to the defect

24 and, you know, the same, same defect and the same injury.

25 Q   What about harm and damages?

1    A    I meant to say injury -- harm.   It's harm.

2    Q    Thank you, sir.

3    A    Yeah.

4    Q    And that's been the case for as long as you've been

5    involved in the talc litigation?

6    A    Every, every case has this as the core element, whether

7    you're talking about -- yeah.   Any -- any -- any -- any theory

8    that you may have, at the end of the day it comes down to they

9    believe that a, a product that JJCI's responsible for caused,

10   was defective, either itself or because it includes asbestos,

11   and caused cancer.

12   Q    And has -- have you become aware of the post-hearing

13   conduct of the plaintiffs or claimants, that is, post our last

14   TRO hearing, the conduct after that time?   Have you become

15   aware of any claiming activity on the part of plaintiffs since

16   that date?

17   A    Since, since that time we've had, I think around 200

18   complaints have been filed.   Most of them, again, continue to,

19   to allege the same things, but with the same defendants,

20   Johnson & Johnson and Johnson & Johnson Consumer Inc.

21   Q    Anything different from be, from before?

22   A    In those complaints, no.   There, there have been some

23   complaints that have tried to what I could consider under,

24   undermine this, this bankruptcy by trying to plead around the

25   ruling of this Court that, that cases against JJCI are stayed.

KIM - DIRECT                                                              142

 1  to do is say that it's the misrepresentation that caused the

 2  harm, but, but clearly, the, the harm that's being alleged is

 3  that the product was defective and caused cancer.  So simply by

 4  saying that the misrepresentation was there does, doesn't

 5  change the underlying true allegation here.

 6            MR. JONES:  And just skipping back to the very first

 7  page of the exhibit, Patrick.

 8  BY MR. JONES:

 9  Q   I just want to have, have you again confirm for the Court

10  the filing date at the top of the page, or the service date,

11  anyway.

12  A   This is -- eService by, on October 25, 2021.

13  Q   Thank you, sir.

14      I'm going to ask you to share with us just one more post-

15  TRO hearing event and that involves -- actually, a couple --

16  but they involve two cases, first one in South Carolina.

17      Are you familiar with the Hood case, sir?

18  A   I am.

19  Q   And I'm going to pull up Exhibit 27.

20      And ask -- and is this a transcript of proceedings in that

21  case, sir --

22  A   Yes.

23  Q   -- that, that you have reviewed?

24  A   I have.

25  Q   And what's the date of that transcript of proceedings, do

1    we have it on there?

2    A    I don't see it on there, but this was recent.

3    Q    There it is.

4    A    Yeah.  October 28th.

5    Q    So this is October 28, 2021 in Columbia, South Carolina, is

6    that right?

7    A    Yeah.  That is correct.

8    Q    So we're going to ask you to look with us at Page 58, Line

9    5, of the transcript and through Page 58, Line 14 of the

10   transcript and ask you to read what the court on a disputed

11   motion shared with the parties, Johnson & Johnson --

12   A    Right.

13   Q    -- and others in this proceeding.

14   A    So this is a pre-trial hearing.  We had come in and moved

15   that because of the Judge's rule, the Judge's ruling here that,

16   you know, things, that the trial should be limited in some way

17   because Old JJCI was, could no longer be a defendant.  And

18   basically, what the court said was, "I tell you one thing,

19   Mr. Bernardo.  If you think anybody in any" --

20   Q    Let me stop you there.

21        Who is Mr. Bernardo?

22   A    Oh, Mr. Bernardo is our, one, one of our attorneys from

23   Skadden.

24   Q    All right.

25   A    (Reading):

KIM - DIRECT                                                              144

1        "I tell you one thing, Mr. Bernardo.  If you think anybody

2    in any of these cases is going to allow the stay against

3    liability on behalf of Old Johnson & Johnson Consumer Inc. to

4    somehow affect the evidence that is going to be received,

5    whether that evidence was from Johnson & Johnson, Old Johnson &

6    Johnson, or New Johnson & Johnson, that is a very different

7    kettle of fish and I can tell you right now that is not going

8    to happen in this case, as far as I'm concerned."

9    Q    Thank you, Mr. Kim.

10        And have you -- are you aware of developments in the

11   Vanklive trial about which we heard when we were last together?

12   A    Yeah.

13        So a, a similar thing happened in the Vanklive case, which,

14   which we talked about last week.  Right after the hearing in

15   this case, there was a subsequent hearing in Vanklive where we

16   moved the court and on, on the basis that now that Old JJCI is

17   no longer in the case and the case should only be continuing

18   against Johnson & Johnson, that the evidence had to be

19   curtailed because, you know, evidence was brought into the case

20   against -- against -- without distinguishing who the evidence

21   was against, you know.  Of course, the time frames would be

22   different if you're relying on, on, only on Johnson & Johnson

23   and the court basically, similar to this court, said, that's

24   not going to happen.  Denied our motions to, to modify any of

25   the evidence or for jury instructions and the case is

1   continuing as if nothing ever happened.

2   Q   Mr. Kim, do you have a view, having had to hear about and

3   address these matters, about how this conduct, if it continues,

4   will affect this proceeding?

5   A   If plaintiffs' counsel are allowed to go around this

6   bankruptcy by just not naming LTL but having the same conduct

7   that LTL is responsible for be, be litigated, it creates an

8   impossible situation where there's going to be rulings, there's

9   going to be *res judicata* effect.  LTL is going to have to get

10  involved in, in these proceedings and having a dual track where

11  the same claims involving the same plaintiff, involving the

12  same injuries are ruled already or simultaneously in another

13  court would make it impossible for, for us to, to effect the

14  purpose of this bankruptcy, which is try to get an equitable

15  and efficient resolution to these talc claims.  It would just

16  make it impossible if, if we had to at the same time litigate

17  the same issues in, in, in different jurisdictions across the

18  country.

19  Q   Mr. Kim, do you have a view of the burden this would,

20  financial or otherwise, would continue?

21  A   Again, I think -- I, I know that the number of cases we

22  have, you know, I noted some of the outlier verdicts.  There is

23  no company in the, in the world that could withstand a

24  sustained onslaught like the talc cases.  It would just -- it's

25  -- it's just overly burdensome.  It -- it -- no company could,

1  could survive and take on this type of, of litigation.

2  Q    Thank you, Mr. Kim.

3       As a part of your duties that you referred to at the outset

4  of your testimony, have you had to become familiar with

5  insurance coverage in connection with the underlying talc, talc

6  litigation?

7  A    Yeah.  I, I'm actually responsible for insurance litigation

8  for the Enterprise.

9  Q    And can you share with us briefly the extent to which the

10 company has sought insurance coverage in connection with these

11 underlying claims?

12 A    So we've put all the insurers that we are aware of on, on

13 notice of these claims and made, and made a claim against the

14 policies for, for all the talc litigation.

15 Q    And in connection with your work in that regard, have you

16 had to become generally familiar with the, with the terms of

17 the policies?

18 A    I, I have, both, both in, in this case and also -- again, I

19 handle insurance coverage for the Enterprise.  So I've been

20 involved in insurance coverage litigation since I've been at

21 J&J and reviewed many of these policies before.

22 Q    So I'm going to pull one up for you as an example, Mr. Kim.

23 I believe you're going to tell me that it is an example,

24 Exhibit 11.

25                MR. JONES:  And we're going to make that a little

KIM - DIRECT                                                                147

1   larger for all concerned.

2   BY MR. JONES:

3   Q   I'm going to ask you if this is an insurance policy with

4   which you have any familiarity?

5   A   Yes.  This is one of the policies that we put, that we are

6   seeking coverage for in the, in the talc litigation.

7   Q   Who is the, this agreement with, sir?

8   A   This agreement is with the Aetna Casualty & Surety Company.

9   Q   And it -- and this agreement is insuring whom?

10  A   In this agreement it's -- the -- in this paragraph it names

11  Johnson & Johnson, but there is a separate endorsement that

12  basically -- like all our policies, we -- we don't -- we want

13  coverage not only for Johnson & Johnson, but for all

14  subsidiaries and affiliates.

15      So there should be a separate page that basically says that

16  all named, named insureds includes all subsidiaries and

17  affiliates.

18              MR. JONES:  Let's scroll down for that.

19              UNIDENTIFIED SPEAKER:  The next page.

20              THE WITNESS:  No.

21              MR. JONES:  Next page.  Very last page.  We'll get

22  there.

23              THE WITNESS:  It should be one in there, yeah.  It's

24  general -- Named Insured.  There it is.

25  BY MR. JONES:

1    Q    So there's the named insureds clause, sir, am I right?

2    A    Yes.  This is -- this is --

3    Q    Could you please share that with the Court?

4    A    It says:

5         "Named insured, Johnson & Johnson, and any affiliated,

6    associated, or subsidiary company in any tier as now or

7    hereafter may be formed, acquired, or constituted or any other

8    company over which Johnson & Johnson has or acquires active

9    control or management so long as Johnson & Johnson or such

10   affiliated, associated, or subsidiary company or any

11   combination thereof owns in excess of 50 percent of the stock

12   of such company."

13        So basically, we've negotiated this clause so that any

14   affiliate, subsidiary, even one that we acquire post, post

15   insurance coverage date all become a named insured.  So this is

16   just sort of a, making sure that everything that's in the

17   Johnson & Johnson family is a named insured.

18   Q    And I'm going to ask you just back at the first page for a

19   minute and in one particular -- upper left-hand corner portion

20   of the document to see -- do you see the, anything that

21   addresses limits?

22   A    Yeah.

23        So there are two limits of liability.  One is an occurrence

24   limit and one is the annual aggregate.

25        So basically, the annual aggregate means that this policy

1   has a $10 million limit, regardless of who claims under the

2   policy so that, for example, in our situation if J&J makes a

3   claim under the policy, then that erodes the annual aggregate

4   leaving less money for JJCI to claim under the policy.

5   Q   And is this, is this the same erosion clause or aggregate

6   limits clause would be in your other policies?

7   A   All our polices have aggregate limits.

8        So, you know, the -- the -- the amounts may differ, but

9   they all contain an aggregate limit so that, there's only so

10  much money each policy will pay, regardless of who takes it out

11  first.  And, and that's just the way the insurance, insurance

12  works.

13  Q   So let's ask you to look at Exhibit 12 for me.

14       Are you there?

15  A   Yes.

16  Q   And what is Exhibit 12, sir?

17  A   This is called a dec page.  This is the beginning pages of

18  the Home insurance policy that we have.

19  Q   And does it, itself, have an aggregate limit?

20  A   It, it does.  And you can see --

21  Q   And --

22  A   -- limit in the aggregate for each and on period,

23  $11,500,000.

24       So again, that means that that's the most this policy is

25  going to pay.  If one of the subsidiaries takes from this pot,

1   that pot gets diminished for everyone else.

2   Q   And I'm going to ask you, since you mentioned subsidiaries,

3   to look at the very next page in the left-hand margin under the

4   head, under the heading Named Insured.

5   A   Yes.

6   Q   Can you read that out for us, sir?  It's just under, "The

7   policy" --

8   A   Yeah.

9   Q   -- "is subject to the following definitions, Named

10  Insured."  There it is.

11  A   (Reading):

12      "Named Insured.  As stated in Item 1 of the declarations

13  forming a part hereof and" -- so it's Named Insured as stated

14  in Item 1 -- "and/or subsidiary, associated, affiliated

15  companies, or owned and controlled companies as now or

16  hereafter constituted and of which prompt notice has been given

17  to the company, hereinafter called the Named Insured."

18      Again, this is a, this is the standard way to say that all

19  affiliates, subsidiaries are, are, are also are named insured

20  under the policy and have rights under the policy.

21  Q   And the named insured here was Johnson & Johnson?

22  A   I believe it was.  We can just look back there.  But --

23          MR. JONES:  The first page.

24          THE WITNESS:  -- again, this would cover, cover Old

25  JJCI and, and now LTL.

1  BY MR. JONES:

2  Q    And the date of this policy, sir?

3  A    Yeah.  It's -- looks like --

4  Q    From the, From line, about --

5  A    3/28/74.  This -- yeah.  The From line is, that's the

6  period of coverage.

7       So the, the policy is dated 3/28/74 and it covers the

8  period from January 1, 1974 to January 1, 1977.

9  Q    Thank you, sir.

10      And have you reviewed the other policies that would be

11 subject to coverage for either LTL or Johnson & Johnson --

12 A    I --

13 Q    -- and/or --

14 A    I believe I've reviewed most of them.  I can't say I've

15 seen every single one of them, but I've been advised that, what

16 they, what they contain.

17 Q    And I'm going to ask you to look at Exhibit 8 for me.

18      Have you seen Exhibit 8 before today?

19 A    Yes.

20 Q    What is Exhibit 8?

21 A    So this is a summary chart of all our insurance coverage.

22 Q    And it includes columns for what items?

23 A    You'd have to go back.

24      So it's the insurance company, policy number, the policy

25 period, the per occurrence limit, the aggregate limit, and then

KIM - DIRECT                                                                152

1   what the Bates number is and, and then insured.  Oh, it says

2   J&J, insured.  So it does, does, you know, does include J&J as

3   an insured.

4   Q    And the answers for that, that column are all?

5   A    Yes.  Yes.

6   Q    What -- are all yeses?

7   A    Yes.

8   Q    Okay.

9   A    They're all yeses.

10  Q    Thank you, sir.

11       Does this fairly and accurately, to the best of your

12  ability to, to make it so, reflect the, the coverage facts set

13  forth within it?

14  A    It does.

15  Q    Thank you, sir.

16       I'm going to ask you now to switch topics with me

17  moderately, not entirely.  And that is to talk a little bit

18  about the role of retailers in the litigation.

19  A    Okay.

20  Q    And do you have an understanding of the role of retailers

21  in the underlying cosmetic talc litigation brought against

22  either Johnson & Johnson or other affiliates?

23  A    Yes.

24       So retailers are, are routinely sued for the mere fact that

25  they sold our product to an individual plaintiff.  The, the

1    reason that, that they're sued is generally because adding a

2    retailer defeats diversity jurisdiction.  And so if a plaintiff

3    wants to stay in state court, then they would routinely add the

4    retailer who has the same state of residence as the plaintiff

5    and then makes it impossible to, to remove on diversity

6    grounds.

7    Q    And speaking of routine, what, what routinely occurs when a

8    retailer is added as a defendant to the litigation?

9    A    Generally, the retailers are, are added.  There may be some

10   discovery that's done on them, primarily for records.  And we

11   actually do a lot of discovery on, on what records they keep of

12   the purchases, but then, generally, by the time the trial comes

13   along, they are dismissed.  No pay.

14   Q    Do the retailers ask anything of any of the Johnson &

15   Johnson affiliated defendants in the litigation?

16   A    So as soon as a retailer is sued, if they're sued for the

17   sale of our product, then they'll come to, to, to us and they

18   will tender the defense and seek indemnity.

19   Q    And I'm going to ask you to look at Exhibit 15 with me and

20   ask you to tell me what Exhibit 15 is by turning to the second

21   page of the exhibit.

22   A    Yeah.

23   Q    Have, have you seen this agreement before, sir?

24   A    I, I have.

25   Q    What is it?