# **<u>Exhibit 42.2</u>**

```
1                  UNITED STATES BANKRUPTCY COURT
                 WESTERN DISTRICT OF NORTH CAROLINA
2                         CHARLOTTE DIVISION

3   IN RE:                           :    Case No. 21-30589-JCW

4   LTL MANAGEMENT LLC,              :    Chapter 11

5        Debtor,                     :    Charlotte, North Carolina
                                          Friday, November 5, 2021
6                                    :    9:04 a.m.

7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

8   LTL MANAGEMENT LLC,              :    AP 21-03032-JCW

9        Plaintiff,                  :

10            v.                     :

11  THOSE PARTIES LISTED ON          :
    APPENDIX A TO COMPLAINT and
12  JOHN AND JANE DOES 1-1000,       :

13       Defendants.                 :

14  : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

15
                                VOLUME 2
16                      TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE J. CRAIG WHITLEY,
17                  UNITED STATES BANKRUPTCY JUDGE

18

19  Audio Operator:              COURT PERSONNEL

20
    Transcript prepared by:      JANICE RUSSELL TRANSCRIPTS
21                               1418 Red Fox Circle
                                 Severance, CO  80550
22                               (757) 422-9089
                                 trussell31@tdsmail.com
23
    Proceedings recorded by electronic sound recording; transcript
24  produced by transcription service.

25
```

1  A    It -- it  -- it varies from, from retailer to retailer,
2  yes.
3  Q    Mr. Kim, I'm going to ask you to look at a few other things
4  for me.  In particular, I'm going to pull up some, a transcript
5  from the Olson trial that Mr., I think it was, Block reviewed
6  with you yesterday.
7           MR. JONES:  Slide No. 9.
8  BY MR. JONES:
9  Q    And you recall this testimony yesterday, or do you recall
10 giving testimony about this piece of the Olson trial transcript
11 with Mr. Block yesterday?
12 A    The, the subject matter, I remember, yes.
13 Q    All right.  So let's, ask you to look at a little bit more
14 of this testimony with me.
15      Let's look at the testimony a little farther down in the
16 same transcript of the same case, in any event.
17           MR. JONES:  And that's going to be Slide No. 10, Eric.
18 BY MR. JONES:
19 Q    This is Exhibit 6, Defendants' Exhibit 6.  And I'm going to
20 ask you to read the question and the answer that Dr. Hopkins
21 gave here.  This is Dr. Hopkins' testimony.
22 A    The question is:
23 "Q   If Johnson & Johnson tells Johnson & Johnson Consumer Inc.,
24 'We want a warning about cancer or asbestos on Johnson's Baby
25 Powder,' Johnson & Johnson has the authority to do that,

1   correct?
2   "A   No.   I think the origin of the guidance or the warning
3   would come from the Consumer Inc.   So they would be telling
4   themselves."
5        So this, this relates to yesterday Mr. Block showed me the
6   -- the -- the -- a statement that, that Johnson & Johnson
7   can -- can -- has the authority to, to put a warning on the
8   label.  And I said I disagreed with that.  And this confirms
9   that.  It's just not true.  Johnson & Johnson -- the, the, the
10  warnings on the product are controlled by the operating
11  company.  Johnson & Johnson may have a view.  They may have an
12  opinion.  They may give advice, but the -- putting a warning
13  on, on that product is the sole responsibility of the operating
14  company.
15  Q   Let me ask you to look at just a, one more snippet of this
16  testimony, Mr. Kim.
17            MR. JONES:  And that's Slide 11, which is, again, from
18  the same exhibit, defendants' exhibit, not debtor's exhibit.
19  BY MR. JONES:
20  Q   Can you share with the Court the, this question and answer?
21  A   (Reading):
22  "Q   If Johnson & Johnson tells the subsidiary, Johnson &
23  Johnson Consumer Inc., that they want a certain warning on
24  Johnson's Baby Powder, then the subsidiary, Johnson & Johnson
25  Consumer Inc., has to follow it, correct?

1        "Objection.  Asked and answered."
2        The court overrules it.
3        "The Court:  You may answer.
4   "A   I think that's a misinterpretation.  The ownership and
5   responsibility would be with Johnson & Johnson Consumer Inc."
6   Q   And that's Dr. Hopkins' testimony on that day given in the
7   Olson trial to Mr. Block?
8   A   That -- that's -- that's generally -- that's, that's the
9   way it works, yes.
10  Q   Thank you, sir.
11          MR. JONES:  You can take that down.
12  BY MR. JONES:
13  Q   Mr. Kim, yesterday, you talked about the kinds of claims
14  and how they're pursued in the underlying tort system regarding
15  J&J and JC, JJCI with respect to talc, correct?
16  A   Yes.
17  Q   And you talked about that some plaintiffs file suit after
18  bankruptcy, correct?
19  A   Yes.
20  Q   I want to now turn you to a couple slides that will show,
21  I, I hope, some information about how those claims were pursued
22  before and after.
23          MR. JONES:  So let's take a look at Slide 12.
24  BY MR. JONES:
25  Q   So, sir, side by side here, you're aware of, of the right-

1   hand side of the slide.  That is the McBride complaint that we
2   reviewed yesterday.  Do you recall the McBride complaint?
3   A    I do.
4   Q    And that's a complaint that only lists Johnson & Johnson as
5   a defendant?
6   A    It is.
7   Q    And on the left-hand -- and that complaint was filed after
8   the bankruptcy.  Do you recall that testimony?
9   A    It -- it -- that's true.
10  Q    And on the left-hand side of the case you see another
11  complaint.  And who's the plaintiff there?
12  A    It's Bethany Richards.
13  Q    And you see the filing dates at the bottom of the slide,
14  correct?
15  A    Yes.
16  Q    So one is in August of 2021.  That's before bankruptcy?
17  A    Yes.
18  Q    And the other, the McBride complaint, is after bankruptcy?
19  A    Yes.
20  Q    And the McBride complaint, I think Mr. Rasmussen is going
21  to confirm for me is Debtor's Exhibit 26.  And he just nodded
22  his head.
23       But you recall you reviewed it yesterday?
24  A    Yeah, I do.
25  Q    And I just mention that for the record.

1        Who are the defendants in the Richards case, sir?
2   A    Well, the, the ones that are listed for Johnson & Johnson
3   companies are Johnson & Johnson and Johnson & Johnson Consumer
4   Inc.
5   Q    And we already established that there was only one
6   defendant in the post-bankruptcy McBride case and that's
7   Johnson & Johnson, right?
8   A    Yeah.  One Johnson & Johnson defendant, yes.
9   Q    Let's look just briefly at a few of the allegations in
10  these complaints.
11           MR. JONES:  Let's look at Slide 13.
12  BY MR. JONES:
13  Q    On the left-hand side, we stick with the Richards
14  complaint, Mr. Kim, and on the right-hand side, the McBride
15  complaint, pre and post.  Are you with me?
16  A    I am.
17  Q    And can you share with me the namings of the two counts
18  we're referring to on each slide?
19  A    The names are, on the left slide, is fraud as to
20  defendants, Johnson & Johnson and Johnson & Johnson Consumer
21  Inc.  And on the right-hand slide, is fraud as to Johnson &
22  Johnson.
23  Q    And then can you look just briefly at the opening sentences
24  of each complaint about what they say about fraud both before
25  and after the filing of the bankruptcy?

1   A    They're identical pleadings, except for the fact that one
2   names both Johnson & Johnson and Johnson & Johnson Consumer and
3   one only names Johnson & Johnson.
4            MR. JONES:  Let's --
5            THE WITNESS:  It's, it's the same.
6            MR. JONES:  Let's --
7            THE WITNESS:  It's the same allegation.
8            MR. JONES:  Let's skip to the next slide.  Thank you.
9   BY MR. JONES:
10  Q    Thank you, Mr. Kim.
11       And here, we have a description of some of the factual
12  predicate, is that right?
13  A    Yes.
14  Q    Paragraphs 35 and Paragraphs 41, respectively, correct?
15  A    Correct.
16  Q    And this factual predicate refers to which things?
17  A    It's the -- the -- the testing protocol for, for J&J's talc
18  products.
19       So this is the under -- it's the -- you know, every
20  complaint, again, regardless of whether you're calling it fraud
21  by Johnson & Johnson or, or the typical complaint that we get,
22  the, the basis is, is always the same, which is the product was
23  defective.  It has, it's the same injuries.  So it's a cancer.
24  It's the same defect that the product either contains asbestos
25  or itself causes cancer and the, and the same harm.

```
 1        So this is just -- this goes to the, the theory that it's
 2   defective.  So the testing protocol is, is, is a defect theory
 3   about asbestos.
 4   Q   And, sir, one last slide from these two complaints.
 5            MR. JONES:  That's the next one.
 6   BY MR. JONES:
 7   Q   And here, we have two slides that address, what?
 8   A   The -- the -- again, this is the, the testing protocol
 9   that's used by JJC, Old JJCI to test its product for asbestos.
10        So again, one, you know, and here -- the -- so again --
11   they made it easy because they just call it J&J, but, of
12   course, one of them includes JJCI.  One of them is just J&J.
13   But the allegation is identical, which is the test method that
14   we use was defective and, and led to, and led to the product
15   containing asbestos.
16        So again, it's, it's the identical core allegations that
17   make up every single complaint in the litigation.
18            UNIDENTIFIED SPEAKER:  What's the last one you used?
19            MR. JONES:  85.
20            So we're going to mark this as Exhibit 86, Debtor's
21   Exhibit 86.  That is the Richards complaint.
22   BY MR. JONES:
23   Q   Thank you, Mr. Kim.
24        Mr. Kim, you were also asked yesterday a, a few things
25   about Windsor Mine, or Windsor Minerals.  Forgive me.
```

1        I'm going to ask Patrick to kick us right back to
2   Exhibit 2 for a moment, Paragraph 1, little Romanette (iv).
3   BY MR. JONES:
4   Q    And this, again, is in the transfer of the assets
5   paragraph.  Do you, do you see little Romanette (iv), Mr. Kim?
6   A    Yes.
7   Q    And, in fact, deals with such things as plants and where
8   they're located, does it not?
9   A    It does.
10  Q    What does it say there?
11  A    It says, "All real estate, improvements, and appurtenances
12  thereto shall be transferred to be the property of the
13  subsidiary."
14  Q    Effective when, sir?
15  A    Effective January 1, 1979.
16  Q    Thank you, Mr. Kim.
17       I'm going to change topics and talk just for a moment about
18  the Ingham verdict.
19       You were asked yesterday about the verdict form in that
20  case, is that right?
21  A    Yeah, that is true.
22  Q    And you were asked, more specifically, about punitive
23  damages, am I right?
24  A    Yes.  I was, I was directed to the punitive damages lines.
25  Q    What do you know about what each of the 22 plaintiffs in

1   the Ingham case received as a matter of compensatory damages?
2   A    They all received the same amount.
3   Q    And did that matter -- did exposure period, that is, when
4   in time they were exposed to or alleged to have been exposed to
5   talc, matter?
6   A    No.  So there are 22 plaintiffs in one case ranging in, in
7   exposure time periods and, and ranging in what products they
8   used at what periods of time, you know.  There was differences
9   in their injuries in terms of how severe they were.  We had --
10  some were, had been deceased.  Others were in remission.
11  Regardless of all that, they, they were all awarded the same
12  amount in compensatory damages.
13  Q    We're going to pull up a slide here, sir, and ask you to
14  look at it with me, which will be a summary of the plaintiffs'
15  fact sheets in, in that case.
16           MR. JONES:  That's going to be new Exhibit, Debtor's
17  Exhibit 80 --
18           UNIDENTIFIED SPEAKER:  8.
19           MR. JONES:  - 8.  88.
20           THE COURT:  88?
21           MR. JONES:  88.  That was either Carl Eller or Jim
22  Page.  It'll come back.
23  BY MR. JONES:
24  Q    Sir, the -- here we have different years of exposure -- I'm
25  sorry -- reflected that you just discussed --

```
 1   A    Yeah.
 2   Q    -- but the same compensatory award, is that right?
 3   A    Yes.
 4   Q    And these are listing the plaintiffs on the left-hand side?
 5   A    They are.
 6   Q    The alleged period of exposure in the second column?
 7   A    Yes.
 8   Q    Whether or not they were exposed to Shower to Shower in the
 9   third column --
10   A    Yes.
11   Q    -- on the left?
12        And then the total compensatory award you referred to, is
13   that right?
14   A    That's true, yes.
15   Q    And those numbers are all the same?
16   A    They are all the same.
17              MR. SILVERSTEIN:  Your, your Honor?  I'm sorry.
18   Just --
19              THE COURT:  Yes, sir, Mr. Silverstein.
20              MR. SILVERSTEIN:  Can -- can we -- we've, we've never
21   seen this before.  Can we get some foundation for what this is
22   that we're all looking at?
23              THE COURT:  I'll take that as an objection.
24              Sustained.
25              MR. SILVERSTEIN:  Yes.
```

1                THE COURT:  Go ahead.

2       BY MR. JONES:

3       Q    Mr. Kim, can you tell the Court what this --

4       A    Yes.

5       Q    -- a summary of?

6       A    Yes.

7            So, so I attended the trial of Ingham.  All the -- one of

8       the things that, that plaintiffs' counsel did was they asked

9       every, every plaintiff what years of exposure they were exposed

10      to and what products they used.

11           So this is a just a summary of the alleged -- and it's also

12      in the complaint and fact sheets.  And so this is just a

13      summary of the data from those sources that tell us what the

14      alleged use was of, of Johnson's Baby Powder -- and so that

15      would be the entire usage -- what was the alleged use of Shower

16      to Shower and, and, and the dates.  And then the award is just

17      from the verdict sheet, how much each plaintiff was awarded.

18      Q    And, and, sir, the fact sheets are documents generated by

19      the plaintiffs in the case?

20      A    They are.

21      Q    And they've been all provided to counsel for, our

22      colleagues on the other side of the table here today.

23      A    I -- I --

24      Q    I'm not asking you that question.

25      A    Okay.

1  Q    At all times after 1978 were the liabilities for Shower to
2  Shower ultimately charged to a company's books at J&J?
3  A    They were.
4  Q    And to whose -- who -- which --
5  A    Personal --
6  Q    -- company?
7  A    They were charged to the Personal Products Company.
8  Q    And after that?
9  A    After that, it eventually comes into JJ, Old JJCI.
10 Q    Thank you, sir.
11      You were asked a few questions, as we have already
12 discussed, about the Imerys bankruptcy on cross-examination, do
13 you recall that?
14 A    I do.
15 Q    And I think you started to tell us that J&J attempted to
16 resolve those claims in that bankruptcy, am I right?  And is
17 that, can you tell me what, what the position was?
18 A    Yeah.
19      So early in, in the Imerys bankruptcy case the, Old JJCI
20 and J&J, we decided, we tried to remove all the cases into the
21 bankruptcy, into the Imerys bankruptcy and, and at that time
22 the plaintiffs objected to that and, and filed an objection,
23 which the court -- and, and the debtor did not join in with us.
24 And so at that point the, the bankruptcy court in that case
25 ruled that we, we were not permitted to bring in our, our cases

1    A    This is the medical safety standard that was put in effect

2    officially in January 1st of 2014.

3    Q    Who issued this medical, this medical safety standard?

4    A    It, it was issued by the, the parent company, Johnson &

5    Johnson, and a number of people.  It's -- in the back you can

6    see who signed it.

7    Q    Okay.  And if I could ask you, sir, to focus your

8    attention.

9         MR. HAMILTON:  And, and, Patrick, if you could

10   highlight the, the first sentence of Section 1.0 in the

11   Overview.

12   BY MR. HAMILTON:

13   Q    Sir, it says, "Each sector within Johnson & Johnson,

14   notably, the Pharmaceutical Sector, the Consumer Sector, and

15   the Medical Devices and Diagnostic Sector, shall establish

16   policies and processes that adhere to the Johnson & Johnson

17   medical safety standard."

18        Do you see that, sir?

19   A    I do.

20   Q    Have you done that for the Consumer Sector?

21   A    Absolutely.  We have processes and procedures in place.

22   Q    Okay.  In Section 2.0, the second sentence --

23        MR. HAMILTON:  And, Patrick, if you could highlight

24   the second and third sentence.

25   BY MR. HAMILTON:

1  Q    -- it says, "In the spirit of our credo, the Johnson &
2  Johnson medical safety standard has been established to define
3  the requirements for medical safety governance at Johnson &
4  Johnson that must be met throughout the organization.  Each
5  sector and individual operating companies shall be responsible
6  for bringing their processes and capabilities into alignment
7  with the requirements expressed herein."
8       Do you see that, sir?
9  A    I do.
10 Q    Have you made sure that the Consumer Sector and the
11 individual operating companies within the Consumer, Consumer
12 Sectors have brought their processes and capabilities into
13 alignment with the requirements expressed in this document?
14 A    Absolutely.
15            MR. HAMILTON:  And if we can turn, then, to the next
16 page, Patrick, and if you could highlight the paragraph under
17 the heading Sectors at the top.  Yes.
18 BY MR. HAMILTON:
19 Q    The second sentence, Dr. Kuffner, says, "For the purposes
20 of the standard, the term 'Sector' may include the operating
21 companies which are responsible for identifying the needs of
22 patients, consumers, and health care professionals and
23 developing products to meet those needs."
24      The next sentence says, "Responsibilities and requirements
25 assigned to the Sector by this standard may be met through the

```
 1  activities performed at the operating company level as
 2  determined by the Sector Medical Safety Council."
 3       Do you see that, Dr. Kuffner?
 4  A    I do.
 5  Q    And has, have you and the, the Medical Safety Council for
 6  the Consumer Sector met, met the responsibilities that are
 7  referred to in this paragraph?
 8  A    Absolutely.
 9  Q    All right.
10       I want to direct your attention to the Definitions on, in
11  Section 4.0, starting on this page, and, in particular, the
12  second one, there's a definition of the "Chief Medical Officer,
13  Johnson & Johnson."
14       Do you see that, sir?
15  A    I do.
16  Q    And that was the individual you just identified a few
17  moments ago.  That was who?
18  A    Dr. Joanne Waldstreicher.
19  Q    Okay.  And if we go down a little farther we see there's a
20  definition of a "Johnson & Johnson Medical Safety Council."
21       Do you see that, sir?
22  A    I do.
23  Q    And is that what you described earlier as the Council
24  that's at the parent holding company?
25  A    It is.
```

MULLIN - DIRECT                                                            455

1   Q    First, Dr. Mullin, this has been marked as  --

2             MR. JONES:  Exhibit 31.

3             UNIDENTIFIED SPEAKER:  31?

4             MR. JONES:  Yeah.

5   BY MR. JONES:

6   Q    Do you recognize what we've marked as Exhibit, Debtor's

7   Exhibit 31, Dr. Mullin?

8   A    It's a copy of my expert report.

9   Q    And within it, your CV is an appendix, is that right?

10  A    Correct.

11  Q    And within it you've put together a few figures that

12  support your conclusions, is that also right?

13  A    Correct.

14  Q    In fact, Figure 1 addresses the point you and I were just

15  discussing with respect to swiftness of resolution, is that

16  right?

17  A    Correct.

18  Q    Let's turn to Figure 1, which is Exhibit 77, separately

19  pulled out.

20       Is this Figure 1 from your report, sir?

21  A    Yes.

22  Q    And could you tell the Court what this depicts and how it

23  informs your opinion on, on efficiency?

24  A    So this is a set of administrative trusts and it's the

25  count of claims that the trust was able to process in its first

1   three years of operation and it selects all the trusts that, to
2   date, have processed at least 250,000 claims.
3   Q    And these --
4   A    So it's a comprehensive list within that group.
5   Q    And these are trusts involving claims for, regarding
6   exposure to asbestos?
7   A    Correct.
8   Q    And we see tens of thousands of claims paid in the time
9   frame you referenced, is that right?
10  A    Tens or hundreds of thousands, correct.
11  Q    And that compares to the tort system how?
12  A    The tort system varies, but at least the pace of resolving
13  claims in the tort system to date for Old JJCI was
14  substantially slower. They weren't resolving tens of thousands
15  of claims annually.
16  Q    Let me ask you now to turn, very briefly again, to your
17  equity opinion. And you've also depicted in your report -- and
18  we have pulled out into separate exhibits a few figures or
19  tables that address that, is that right?
20  A    Correct.
21  Q    Let me ask you to look, in particular, at Table, Tables 2
22  and 3 in that order. They are Exhibits 78 and 79.
23       Can you tell us what Table 2 is and how it informs your
24  decision, or, rather, your opinion?
25  A    So Table 2 is a summary of all of the verdicts to date