UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
       crobinson@pszjlaw.com
       pkeane@pszjlaw.com

*Counsel to Arnold & Itkin LLP*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,<br><br>                  Debtor. [1] | Chapter 11<br><br>Case No. 23-12825 (MBK) |
| LTL MANAGEMENT LLC,<br><br>                  Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>                  Defendants. | Adv. No. 23-01092 (MBK)<br><br>**Hearing Date: April 18, 2023 at 10:00 a.m.** |

## <u>OBJECTON OF ARNOLD & ITKIN LLP TO DEBTOR'S PRELIMINARY INJUNCTION MOTION</u>

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# Table of Contents

                                                                                      **Page**

I. PRELIMINARY STATEMENT ................................................................................. 1

II. BACKGROUND........................................................................................................ 8

    A.    Talc Litigation against the Debtor's Parent and Predecessor ............................... 8

    B.    The 2021 Corporate Restructuring and Divisional Merger .................................. 8

    C.    The 2021 Funding Agreement .............................................................................. 9

    D.    New JJCI ............................................................................................................. 10

    E.    The Debtor's First Bankruptcy Filing and Procedural History............................ 11

    F.    The Third Circuit's Decision and Dismissal of LTL I......................................... 12

    G.    The New Funding Agreements ............................................................................. 13

    H.    The Motion............................................................................................................ 14

III. ARGUMENT. ........................................................................................................... 16

    A.    The Motion Should Be Denied in Its Entirety. .................................................... 16

        (1)    The Debtor Cannot Establish a "Reasonable Likelihood of a
                Successful Reorganization" if the Debtor and J&J Require a Plan
                with a Channeling Injunction that Includes All of the "Protected
                Parties" and "Debtor Talc  Claims," as Defined in the Motion. .............. 16

        (2)    The Debtor's Request for Equitable Relief for Its Benefit and that
                of J&J Should Be Denied Because They Have Unclean Hands. ............. 17

    B.    Any Injunction Should Be Limited to Parties and Claims that would Fall
        Within the Permissible Scope of a Section 524(g)(4) Channeling
        Injunction Under a Confirmed Plan.................................................................... 19

        (1)    The Preliminary Injunction Sought by the Debtor Goes Far Beyond
                the Scope of Any Third-Party Channeling Injunction Permitted
                Under a Plan by Section 524(g)(4). ........................................................ 19

        (2)    Section 105 Cannot Be Used to Expand the Parties or Claims that
                Can Be Included in a Channeling Injunction under a Plan for a
                Chapter 11 Asbestos Debtor Beyond the Scope of a Channeling
                Injunction Permitted under Section 524(g).............................................. 24

IV. CONCLUSION............................................................................................................ 26

1

# TABLES OF AUTHORITY

## CASES

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.),*
13 F.4th 279 (3d Cir. 2022) ........................................................................... 20

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.),*
900 F.3d 126 (3d Cir. 2018) ........................................................................... 20

*Feld v. Zale Corp. (In re Zale Corp.),*
62 F.3d 746 (5th Cir. 1995) ........................................................................... 25

*Grimes v. Green Point Sav. Bank,*
147 B.R. 307 (Bankr. E.D.N.Y. 1992)..................................................... 18, 19

*In re Barbieri,*
199 F.3d 616 (2d Cir. 1999)........................................................................... 24

*In re Combustion Eng'g, Inc.,*
391 F.3d 190 (3d Cir. 2004)........................................................................... 24

*In re Fesco Plastics Corp.,*
996 F.2d 152 (7th Cir. 1993) ......................................................................... 24

*In re Morristown & Erie R.R. Co.,*
885 F.2d 98, 100 (3d Cir. 1989)..................................................................... 24

*In re W.R. Grace & Co.,*
475 B.R. 34 (D. Del. 2012)............................................................................. 21

*Keystone Driller Co. v. General Excavator Co.,*
290 U.S. 240 (1933)........................................................................................ 17

*LTL Mgmt., LLC v. Those Parties Listed in Appendix A to Complaint (In re LTL Mgmt., LLC),*
58 F.4th 738 (3d Cir. 2022) ..................................................................... passim

*New Valley Corp. v. Corporate Prop. Assocs. 2 and 3 (In re New Valley Corp.),*
181 F.3d 517 (3d Cir. 1999)........................................................................... 18

*Norwest Bank Worthington v. Ahlers,*
485 U.S. 197 (1988).................................................................................. 24, 25

*Resorts Int'l v. Lowenschuss (In re Lowenschuss),*
67 F.3d 1394 (9th Cir. 1995) ......................................................................... 25

*Salomon Smith Barney, Inc. v. Vockel,*
137 F. Supp. 2d 599 (E.D. Pa. 2000) ............................................................ 18

*Scherer Design Grp, LLC v. Ahead Eng'g LLC,*
764 Fed. Appx. 147 (3d Cir. 2019)...................................................... 17, 18, 19

*United States v. Pepperman,*
976 F.2d 123 (3d Cir. 1992)........................................................................... 24

## STATUTES

11 U.S.C, § 105(a) ............................................................................... 7, 10, 24
11 U.S.C. § 362.............................................................................................. 7
11 U.S.C. § 524(e) ......................................................................................... 19
11 U.S.C. § 524(g) .................................................................................. passim
11 U.S.C. § 524(g)(4) .............................................................................. passim
11 U.S.C. § 524(g)(4)(A).............................................................................. 25
11 U.S.C. § 524(g)(4)(A)(ii) ........................................................................ 21
11 U.S.C. § 524(g)(ii) .............................................................................. 22, 23

11 U.S.C. § 1112(b) ................................................................................................................. 11

## OTHER AUTHORITIES

Story's Equity Jurisprudence, 14th ed., § 397 ............................................................. 17

The law firm of Arnold & Itkin LLP ("Arnold & Itkin"), on behalf of certain talc

personal injury claimants represented by Arnold & Itkin (the "Objectors"), hereby submits this

objection (the "Objection") to the *Debtor's Motion for an Order (I) Declaring That the*

*Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily*

*Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a*

*Hearing on a Preliminary Injunction* (the "Motion") [Adv. D.I. 2]. In support of this Objection,

the Objectors state the following:

## I.

## PRELIMINARY STATEMENT

1.        This case raises the issue of the level of financial manipulation by a chapter 11

debtor that a bankruptcy court should tolerate in the name of a "reorganization." In the short

interval between the dismissal of its first chapter 11 case for want of good faith and the filing of

this second one, the debtor, LTL Management LLC (the "Debtor"), gave up its extremely

valuable right to have its parent, Johnson & Johnson ("J&J"), fund up to $61.5 billion to satisfy

the Debtor's liability to cancer victims for talc-related injuries ("Talc Claimants") and pay its

normal course expenses outside of bankruptcy. In this fashion, the Debtor placed itself in

"financial distress" to justify its new chapter 11 filing. But, in so doing, it also gutted the ability

of Talc Claimants to recover compensation for their injuries from the Debtor outside of a

bankruptcy case. Additionally, in anticipation of the new filing, the Debtor also agreed to limit

J&J's then-existing obligation to fund a trust for Talc Claimants under a confirmed chapter 11

plan to a trust under a plan that J&J supports – a limitation on J&J's plan trust funding obligation

that did not previously apply – thereby giving J&J an absolute veto over any chapter 11 plan.

1

2.      These "new arrangements with [the Debtor's] affiliates"[2] put Talc Claimants in a
vise: As a practical matter, they cannot recover compensation for their injuries from the Debtor
outside of bankruptcy (at least not without fraudulent conveyance and other litigation against
those involved that would entail additional delay), because the Debtor relieved J&J of its funding
obligation outside of bankruptcy; and they cannot recover compensation for their injuries from
the Debtor *in* a chapter 11 case unless J&J supports the chapter 11 plan. This new coercive
construct – which creates inordinate pressure on Talc Claimants to acquiesce in a plan to J&J's
liking – is no accident, and makes it more imperative than ever that Talc Claimants be able to
pursue their claims for talc-related personal injuries ("Talc Claims") against J&J directly. Under
these circumstances, the Court, as a court of equity should not permit the Debtor and J&J to add
insult to injury to Talc Claimants by granting equitable, injunctive relief that would prevent Talc
Claimants from pursuing their Talc Claims against J&J.

3.      The Debtor has "unclean hands." It agreed to relinquish substantial and valuable
funding rights against J&J, thereby impairing its ability to satisfy Talc Claims, in order to create
the "financial distress" necessary to file this chapter 11 case. It now seeks to use this chapter 11
case as a springboard to seek injunctive relief against the very Talc Claimants who were
materially harmed by this stratagem. Such conduct precludes the Debtor from obtaining
equitable relief in the form of the requested injunction.

4.      The Debtor's first chapter 11 case ("LTL I") was dismissed on April 4, 2023, at
the direction of the Third Circuit Court of Appeals, on the basis that it was not filed in good
faith, because the Debtor was not in financial distress. *See LTL Mgmt., LLC v. Those Parties
Listed in Appendix A to Complaint* (*In re LTL Mgmt., LLC*), 58 F.4th 738, 746 (3d Cir. 2023)

---

[2] Motion at 4.

("*LTL Mgmt.*"). Two hours and eleven minutes later, the Debtor filed this second chapter 11 case ("LTL II"). The Debtor claims that, during that brief interlude, it "address[ed] the concerns raised by the Third Circuit in its dismissal opinion" by "enter[ing] into new arrangements with its affiliates." Motion at 4; *see id.* at 7, 40, 42.

5.      The "concern" that led the Third Circuit to mandate dismissal was that the Debtor was not in financial distress, as required for a good faith chapter 11 filing. That finding was based on the Debtor's rights under a funding agreement (the "2021 Funding Agreement") that obligated J&J and "New JJCI" (defined below) to fund the payment of the Debtor's talc liabilities and normal course expenses "outside of bankruptcy" subject to a cap estimated at $61.5 billion. *See LTL Mgmt.,* 58 F.4th at 749-50. The 2021 Funding Agreement was an integral part of a "divisional merger" of the Debtor's predecessor entity, Johnson & Johnson Consumer, Inc. ("Old JJCI"), which terminated Old JJCI's existence, and replaced it with two new entities: (i) the Debtor, which received a transfer of all of Old JJCI's talc-related liabilities and certain assets, the most important of which was the 2021 Funding Agreement; and (ii) a new entity that ultimately took the name Johnson & Johnson Consumer, Inc. ("New JJCI") that received a transfer of Old JJCI's multi-billion dollar global consumer health business, along with Old JJCI's non-talc liabilities (the "2021 Corporate Restructuring"). *See generally Declaration of John K. Kim in Support of First Day Orders* [LTL I, D.I. 5] ("2021 Kim Dec.") ¶¶ 19, 24.

6.      In finding that the Debtor was not in "financial distress," the Court of Appeals found it "[m]ost important, though, the payment right [under the 2021 Funding Agreement] gave [the Debtor] direct access to J&J's exceptionally strong balance sheet." *LTL Mgmt,* 58 F.4th at 759. The Court also noted that the 2021 Funding Agreement provided "access to [the] cash-

flowing brands and products along with the profits they produced" that New JJCI had received from Old JJCI. *See id.*

7.        The Debtor apparently mistook the Third Circuit's opinion as a primer on how to *create* "financial distress" in advance of a second chapter 11 filing. The Debtor "addressed" the Third Circuit's "concerns" by agreeing to new funding arrangements that placed the Debtor in financial distress (and impaired the ability of Talc Claimants to recover on their claims against the Debtor). The Debtor agreed to scrap the 2021 Funding Agreement and replace it with two new agreements (the "New Funding Agreements"). One of those agreements is between only New JJCI and the Debtor (the "2023 Funding Agreement"), and the other includes J&J as a party (the "J&J Support Agreement"). By agreeing to this makeover, the Debtor largely destroyed its prior ability to pay its talc liabilities outside of bankruptcy.

8.        The 2021 Funding Agreement required *both* J&J *and* New JJCI to fund the payment of, among other "Permitted Funding Use[s]," "the funding of any amount to satisfy" the Debtor's talc-related liabilities "*at any time when there is no proceeding under the Bankruptcy Code pending with respect to [the Debtor]*." *See* 2021 Funding Agreement (Exh. A to 2021 Kim Dec.), at 6 (definition of "Permitted Funding Use," ¶ (c)(i)). J&J's position as a co-obligor with New JJCI under the 2021 Funding Agreement assumed added importance in January of this year, when New JJCI transferred its consumer health business to its parent, and was left with very limited sources of value to satisfy Talc Claims. *See* Motion at 18-19.

9.        The New Funding Agreements eliminated J&J's obligation to fund the payment of the Debtor's talc liabilities outside of bankruptcy (thereby eliminating the "direct access to J&J's exceptionally strong balance sheet" that the Court of Appeals had found "[m]ost

important"), and limited that funding obligation to a shrunken New JJCI. The Debtor was well aware of this reality, but gave up its prior funding rights against J&J anyway.

10.     The 2021 Funding Agreement also required J&J and New JJCI to fund the payment of the Debtor's talc liabilities in a chapter 11 case under a trust for Talc Claimants established under a confirmed chapter 11 plan, ***whether or not J&J and New JJCI supported the plan***. In contrast, the New Funding Agreements limit the obligation of J&J and New JJCI to fund payments to a plan trust for Talc Claimants to one established under a plan that they support. As a practical matter, this dramatic change makes it impossible to confirm a plan filed by anyone but the Debtor with J&J's support, and gives J&J inordinate leverage.

11.     The Debtor's pretext for accepting this new funding arrangement is that the Third Circuit's finding that the Debtor was not in financial distress as a result of its rights under the 2021 Funding Agreement "defeated the fundamental purpose of the 2021 Funding Agreement, which purpose was to facilitate the Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code." Motion at 40. This, the Debtor claims, created a "material risk that the 2021 Funding Agreement was no longer enforceable because it had become void or voidable." *Id*.

12.     This excuse rings hollow. It does not jibe with the fact that the 2021 Funding Agreement required J&J, as well as New JJCI, to fund "amounts to satisfy . . . [LTL's] Talc-Related Liabilities" ***outside of bankruptcy***. 2021 Funding Agreement (Exh. A to 2021 Kim Dec.) at 6. There was no reason to require J&J to fund talc-related payments ***outside*** of a bankruptcy proceeding if the "fundamental purpose" of the 2021 Funding Agreement was to facilitate the resolution of talc claims ***in*** a chapter 11 case.

13.     In fact, the New Funding Agreements *frustrated* what the Debtor's Chief Legal

Officer characterized as a "key objective" of the 2021 Corporate Restructuring: "to make certain

that the Debtor has the same, if not greater, ability to fund the costs of defending and resolving

present and future talc-related claims as Old JJCI did prior to the restructuring." 2021 Kim Dec.

¶ 21. This "key objective" was the same whether the Debtor was out of bankruptcy or in

bankruptcy. *See id.* ¶ 27 (noting that 2021 Funding Agreement required New JJCI and J&J to

"fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities *at any time when there*

*is no bankruptcy case* . . ." (emphasis added)). J&J's liability as a co-obligor, in or out of

bankruptcy, was the means by which the 2021 Funding Agreement achieved this "key

objective."

14.     The Debtor itself highlighted this point in LTL I when it explained to the Court

that an important purpose of having J&J as a co-Payor with New JJCI under the 2021 Funding

Agreement was "*providing protection against any theoretical future diminishment of New*

*JJCI's ability to pay Talc Claims*." *Debtor's Objection to Motion to Dismiss Chapter 11 Case*

[LTL I, D.I. 956] ("2021 Dismissal Objection") at 30 (emphasis added). When the Official

Committee of Talc Claimants ("TCC") in LTL I complained about the planned spin-off of New

JJCI's consumer health business to J&J shareholders, the Debtor responded that J&J's joint

obligation under the 2021 Funding Agreement "moots any concern about the impact of the

proposed spin-off on New JJCI's value." 2021 Dismissal Objection at 25, n.33. But after the

upstream transfer of New JJCI's consumer health business earlier this year produced a sharp

drop in New JJCI's value, the Debtor agreed to *eliminate* the "protection" provided by J&J's

joint funding obligation outside of bankruptcy. In so doing, the Debtor frustrated the "key

objective" articulated by Mr. Kim and the "protection" purpose promised by the Debtor.

15.     The automatic stay under section 362 of the Bankruptcy Code (the "Code") and the bankruptcy court's power to enjoin creditor actions against a non-debtor under section 105(a) are both essentially equitable remedies. Because of the Debtor's (and J&J's) conduct in creating new eve-of-filing funding arrangements that materially harmed Talc Claimants while materially benefitting J&J, in order to create the financial distress necessary to justify a second chapter 11 filing, the Debtor should not be able to obtain the equitable remedies it seeks. And such remedies certainly should not be available for the benefit of J&J.

16.     In the alternative, even if the Court determines that the entry of a preliminary injunction would otherwise be appropriate, the preliminary injunction in the form requested by the Debtor should be denied, because it is far too broad. The scope of the requested preliminary injunction, both as to the non-debtor parties it would protect and as to the types of claims that would be enjoined, goes far beyond the scope of any channeling injunction that would be permitted by section 524(g)(4) of the Code under a plan.

17.     It would be unduly prejudicial to Talc Claimants to enjoin the prosecution of claims that in any event could not be the subject of a channeling injunction under a section 524(g) plan. Such a preliminary injunction would serve no purpose other than to delay the prosecution of claims that will ultimately be free to go forward even if a plan is confirmed.

18.     Moreover, if the Debtor and J&J insist that any plan they support must include a channeling injunction that extends to all "Protected Parties" and "Debtor Talc Claims," as those terms are currently defined in the Motion, there is virtually no likelihood of a successful reorganization. This is because, under applicable Third Circuit authority, such a channeling injunction would exceed the permissible scope of a channeling injunction under a chapter 11 plan for an asbestos debtor. Under such circumstances, the Motion must be denied in its entirety,

because the Debtor would be unable to show that there is a reasonable likelihood of a successful

reorganization, as required in order to obtain a preliminary injunction.

## II.

## BACKGROUND

A.    Talc Litigation against the Debtor's Parent and Predecessor

19.    J&J has sold Johnson's Baby Powder made with talcum powder (talc) since

1894, but has not always sold baby powder directly. Through a series of transfers that began in

1979, various wholly owned subsidiaries have sold baby powder; and the baby powder operation

was ultimately transferred to Old JJCI. *See LTL Mgmt.*, 58 F.4th at 746.

20.    In recent years, increasing numbers of people suffering from ovarian cancer or

mesothelioma have sued J&J and Old JJCI, claiming that their illnesses resulted from the use of

talc-based baby powder. Over 38,000 ovarian cancer actions (most consolidated in federal

multidistrict litigation in New Jersey) and over 400 mesothelioma actions were pending against

Old JJCI and J&J when the Debtor filed LTL I in October, 2021. *See id.* at 747.

21.    J&J explored ways to mitigate Old JJCI's exposure to talc litigation (*id.* at 748)

and, as reflected in the Motion, to mitigate J&J's own exposure to talc litigation, J&J seized

upon a restructuring that would capture all asbestos liability in a subsidiary to be placed into

bankruptcy, *i.e.*, the Debtor. *See id.*

B.    The 2021 Corporate Restructuring and Divisional Merger

22.    On October 12, 2021, Old JJCI proceeded with a corporate restructuring under

Texas law referred to as a "divisional merger," in which it divided its assets and liabilities

between two new entities and ceased to exist. *See generally id.* at 748-49. Through a series of

steps, Old JJCI's divisional merger created two entities, the Debtor and New JJCI, and allocated

Old JJCI's assets and liabilities between them. Importantly, the divisional merger "also featured

the creation of a Funding Agreement," which "ultimately . . . gave [the Debtor] rights to funding

from New JJCI and J&J." *Id.* at 749.

23.     The divisional merger allocated to the Debtor responsibility for essentially all

liabilities of Old JJCI tied to talc related claims and allocated Old JJCI's consumer health

products business to New JJCI. As described by the Third Circuit, the Debtor, "whose employees

are all J&J employees, is essentially a shell company 'formed,' almost exclusively, 'to manage

and defend thousands of talc-related claims,' while insulating at least the assets now in [New

JJCI]." *Id.* at 762 (citation omitted). The assets received by the Debtor in the divisional merger

included Old JJCI's contracts related to talc litigation, indemnity rights, and its interests in a

subsidiary that owned a portfolio of royalty streams derived from consumer brands (valued by

the Debtor at approximately $367.1 million). But the most important asset received by the

Debtor was rights as payee under the 2021 Funding Agreement with J&J and New JJCI. *Id.* at

749.

C.     The 2021 Funding Agreement

24.     As described by the Third Circuit, the 2021 Funding Agreement:

> gave LTL, ***outside of bankruptcy***, the ability to cause [New JJCI]
> and J&J, jointly and severally, to pay it cash up to the value of [New
> JJCI] for purposes of satisfying any talc-related costs. . . In
> bankruptcy, the [2021 Funding Agreement] gave [the Debtor] the
> right to cause [New JJCI] and J&J, jointly and severally, to pay it
> cash . . . to fund a trust, created in a plan of reorganization, to address
> talc liability for the benefit of future and existing claimants. In either
> scenario, there were few conditions to funding. . . .

*Id.* at 749-50. The limit on the aggregate amount of the payments required to be made under the

2021 Funding Agreement could not drop below a floor tied to the value of New JJCI, measured

as of the time of the divisional merger, which was "estimated by LTL at $61.5 billion," and

which was "subject to increase as the value of [New JJCI] increased after that date." *Id.* at 750.

25.     In order to fully comprehend the seismic negative impact that replacing the 2021

Funding Agreement with the New Funding Agreements had on the Debtor and Talc Claimants, it

is worth reviewing the precise terms that established the scope of the obligation of New JJCI and

J&J to fund payment of the Debtor's talc liabilities. That obligation included the obligation to

make payments to fund "any amounts to satisfy:"

> (i) the [Debtor's] Talc Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof *at any time when there is no proceeding under the Bankruptcy Code pending with respect to the [Debtor]*;
>
> (ii) following the commencement of any Bankruptcy Case, the [Debtor's] Talc Related Liabilities in connection with the funding of one or more trusts for the benefit of existing and future claimants created pursuant to a plan of reorganization for the [Debtor] confirmed by a final, nonappealable order of the Bankruptcy Court and, to the extent required, the District Court (for the avoidance of doubt, *regardless of whether such plan of reorganization provides that the Payors will receive protection pursuant to section 105 or section 524(g) of the Bankruptcy Code and regardless of whether the Payors support such plan of reorganization*); and
>
> (iii) in the case of either (i) or (ii), any ancillary costs and expenses of the [Debtor] associated with such Talc Related Liabilities and any litigation thereof, including the costs of any appeals;

2021 Funding Agreement (Exh. A to 2021 Kim Dec.) at 6 (definition of "Permitted Funding

Use," clause (c)) (emphasis added).

D.     <u>New JJCI</u>

26.     New JJCI received Old JJCI's "productive business assets, including its valuable

consumer products. . . ." *LTL Mgmt*., 58 F.4th at 750. It then began operating the business

formerly held by Old JJCI. *Id.*

27.     In December 2022, New JJCI was rechristened Johnson & Johnson Holdco

(N.A.) Inc.[3] In January 2023, New JJCI transferred its "Consumer Business,"[4] "which

represented a substantial portion of its assets" to its parent entity. Motion at 43, *see id.* at 18-19.

New JJCI was then left with only its interest in the Debtor; a handful of foreign subsidiaries;

and access to about $400 million in cash through J&J's cash management system as its sole

sources of value to satisfy its obligation to fund the payment of the Debtor's talc liabilities

under the 2021 Funding Agreement. *See id.* at 19.

E.     The Debtor's First Bankruptcy Filing and Procedural History

28.     On October 14, 2021, two days after its formation, the Debtor filed LTL I in

North Carolina. It also sought to extend the automatic stay to talc claims arising from Johnson's

Baby Powder asserted against over 600 non-debtors (the "Third-Party Claims"), including

affiliates such as J&J and New JJCI, as well as insurers and third-party retailers (such non-

debtors being referred to collectively as the "Protected Parties"), or alternatively, a preliminary

injunction enjoining those claims. *LTL Mgmt.*, 58 F.4th at 750. The North Carolina Bankruptcy

Court issued an order enjoining Third Party Claims against the Protected Parties that would

expire after 60 days. *See id.* at 750-51.

29.     The North Carolina Bankruptcy Court ordered that venue of LTL I be transferred

to this District. *Id.* at 751. Following the transfer, the TCC and others moved to dismiss the

Debtor's chapter 11 petition under section 1112(b) of the Code as not having been filed in good

---

[3] The Debtor refers to New JJCI in its renamed form as "Holdco." *See* Motion at 19. Objectors refer to this entity
throughout as "New JJCI," because "New JJCI" and "Holdco" are the same entity, albeit with "Holdco" being a
stripped-down version of New JJCI.
[4] The Motion defines the "Consumer Business" as "the manufacture and sale of a broad spectrum of products used
in the baby care, beauty, oral care, wound care, and women's health care fields, as well as over-the-counter
pharmaceutical products." Motion at 18-19.

faith. *See id.* Meanwhile, the Debtor sought to have the order enjoining Third-Party Claims

against the Protected Parties extended. *Id.*

30.    Following a hearing on the motions to dismiss and the Debtor's third-party

injunction motion, the Court denied the motions to dismiss and granted the injunction motion. *Id.*

at 751-52. Appeals were taken from both the orders. The Court certified the challenged orders

for direct appeal to the Third Circuit, and the Third Circuit authorized direct appeal of the orders.

*Id.* at 752.

F.    The Third Circuit's Decision and Dismissal of LTL I

31.    The Third Circuit reversed the order denying the motions to dismiss and

remanded the case with instructions to dismiss LTL I. It also found that, because dismissing the

case would annul the litigation stay, there was no need to reach that issue. *Id.* at 764. The Court

of Appeals held that the chapter 11 case had not been filed in good faith, because the Debtor was

not in financial distress. *Id.* at 763.

32.    The Court first explained that, as a matter of law, "a debtor who does not suffer

from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy

purpose supporting good faith." *Id.* at 754. "[A]bsent financial distress, there is no reason for

Chapter 11 and no valid bankruptcy purpose." *Id.* at 754.

33.    The Court then concluded that, "LTL Was Not in Financial Distress." *Id.* at 759.

In so doing, it relied on the availability of funding under the 2021 Funding Agreement: "[W]e

cannot agree [the Debtor] was in financial distress when it filed its Chapter 11 petition. The

value and quality of its assets, which include a $61.5 billion payment right against J&J and [New

JJCI], make this holding untenable." *Id.* The Court of Appeals focused on the Debtor's right

"outside of bankruptcy" to cause J&J and New JJCI to pay in cash up to the value of Old JJCI

(estimated at $61.5 billion) to satisfy any talc related costs and normal course expenses. *Id.*

34.     The Court viewed this right as "reliable." *Id*. It found "[m]ost important" that

"the payment right gave LTL direct access to J&J's exceptionally strong balance sheet." *Id*. It

also noted that New JJCI had access to Old JJCI's cash-flowing brands and products along with

the profits they generated (which underpinned the $61.5 billion enterprise value). *Id*.

35.     After the Third Circuit issued its opinion, the Debtor moved unsuccessfully for

rehearing and, thereafter, moved unsuccessfully to stay the mandate of the Court of Appeals

pending the Debtor's filing of a petition for *certiorari* with the Supreme Court, and until the

Supreme Court's final disposition. The Third Circuit then issued its mandate and LTL I was

dismissed.

G.     The New Funding Agreements

36.     At some point after the Third Circuit issued its opinion, and prior to the dismissal

of LTL I, the Debtor, J&J and New JJCI began working on the "new arrangements" that would

place the Debtor in financial distress in advance of a second chapter 11 filing. The centerpiece of

these "new arrangements" was the elimination of J&J's obligation to fund the payment of the

Debtor's talc-related liabilities outside of bankruptcy – an obligation that the Third Circuit had

found "[m]ost important" in its analysis of the Debtor's alleged financial distress. *Id.* This left

the Debtor with only a funding obligation from a miniature New JJCI that no longer "had access

to [Old JJCI's] cash-flowing brands and products along with the profits they produced, . . ." *Id.*

37.     After LTL I was dismissed, and within hours (or minutes) before LTL II was

filed, the Debtor, J&J, and New JJCI entered into an agreement that terminated the 2021 Funding

Agreement and replaced it with the two New Funding Agreements. New JJCI and the Debtor

entered into the 2023 Funding Agreement, and the Debtor, New JJCI and J&J entered into the

separate J&J Support Agreement. *See* Motion at 40-41.

38.    The 2023 Funding Agreement obligates New JJCI to fund amounts necessary,

among other purposes, (i) to satisfy the Debtor's talc-related liabilities at any time when there is

no bankruptcy case and (ii) in the event of a chapter 11 filing by the Debtor, to fund a trust

created pursuant to a plan of reorganization for the Debtor, but only if that plan contains the

terms agreed to in the Plan Support Agreement, as such terms may be modified with the consent

of the parties to that Agreement.[5] Because both J&J and New JJCI are parties to the Plan Support

Agreement and must consent to any amendment of its terms,[6] this limitation means that New

JJCI is not required to fund a plan trust under a plan that it and J&J do not support, and,

correspondingly, that J&J has no obligation to provide funding for such a plan trust under the

J&J Support Agreement. This limitation effectively gives J&J a veto over any plan in this case.[7]

39.    The J&J Support Agreement is subject to the approval of the Court and is

operative ***only*** in the chapter 11 case. It obligates J&J to provide the plan trust funding New JJCI

is required to provide under the 2023 Funding Agreement, but only if New JJCI fails to provide

the funding. *See id.* at 41-42.

H.    The Motion.

40.    As a result of the preliminary injunction entered in LTL I, Talc Claimants have

already been enjoined from pursuing any Talc Claims, not only against the Debtor but also

against J&J and hundreds of others, for approximately eighteen months – all based on chapter 11

---

[5] *See* 2023 Funding Agreement (Annex E to *Declaration of John K. Kim in Support of First Day Pleadings* (LTL II, D.I. 4) ("2023 Kim Dec.") at 4 (clause (c)(ii) of definition of "Permitted Funding Use"); 6 (definitions of "Supported Plan" and "Supported Plan Terms" and setting forth New JJCI's funding obligations)).
[6] *See* Plan Support Agreement (Annex C to 2023 Kim Dec.) at 7, § 6 (amendment requires consent of "J&J Entities"); 1 (defining "J&J Entities" to include both J&J and New JJCI)).
[7] New JJCI's funding obligation is also subject to limitations based on the availability of internal resources to provide funding to the Debtor. *See id.* at 41.

case that, per the Third Circuit, should not have been filed in the first place. During that same

period, many Talc Claimants have died, but none have received any compensation for their

injuries. Now, having manufactured financial distress by agreeing to terminate the 2021 Funding

Agreement that formed the predicate for the Third Circuit's ruling, the Debtor seeks to use this

chapter 11 case to block Talc Claimants from proceeding against J&J and others and receiving

compensation for their injuries for yet more time.

41.     The Motion now seeks an order further prohibiting the commencement or

continuation of any actions by the Defendants that seek to hold any of the "Protected Parties"

liable for any "Debtor Talc Claims." Both terms are defined broadly. The Protected Parties are

defined to include: J&J; Old JJCI; Johnson & Johnson, Inc. (a Canadian corporation); New JJCI;

and

> (e) third-party retailers who sold Old JJCI's talc-containing
> products (the "Retailers") and other third parties whom Old JJCI
> and now the Debtor has indemnified contractually (the
> "Indemnified Parties"), identified on Appendix B to the
> Complaint.

Motion at 2. Appendix B identifies hundreds of parties.

42.     The "Debtor Talc Claims" are defined broadly:

> "Debtor Talc Claims" means, collectively, any talc-related claim
> against the Debtor, including all claims relating in any way to
> talc or talc-containing materials that formerly were asserted
> against (or that could have been asserted against) Old JJCI on
> any theory of liability (whether direct, derivative, joint and
> several, successor liability, vicarious liability, fraudulent or
> voidable transfer or conveyance, alter ego or otherwise). . . . For
> the avoidance of doubt, Debtor Talc Claims include all talc
> personal-injury claims and other talc-related claims allocated to
> the Debtor from Old JJCI in the documents implementing the
> 2021 Corporate Restructuring . . . The Debtor Talc Claims do
> not include talc-related claims for which the exclusive remedy
> is provided under workers' compensation statutes and similar
> laws.

Motion at 2 & n.4.

43.    On April 5, 2023, the Court entered an ex parte temporary restraining order with respect to the relief sought by the Motion (the "TRO") [Adv. D.I. 9] and scheduled the hearing on the preliminary injunctive relief sought by the Debtor for April 18, 2023 at 10:00 a.m. (EST). The TRO was subsequently amended to correct certain errors or make clarifications. *See* Adv. D.I. 15, 16, 20.

# III.

## ARGUMENT.

A.    The Motion Should Be Denied in Its Entirety.

(1)    The Debtor Cannot Establish a "Reasonable Likelihood of a Successful Reorganization" if the Debtor and J&J Require a Plan with a Channeling Injunction that Includes All of the "Protected Parties" and "Debtor Talc Claims," as Defined in the Motion.

44.    The Debtor apparently acknowledges that, in order to obtain a preliminary injunction, it must establish a "reasonable likelihood of a successful reorganization." *See* Motion at 70 ("Under the Third Circuit test, the proponent of an injunction 'must meet the threshold for the first two "most critical" factors.'"). It appears that the Debtor contemplates that a channeling injunction under a plan will cover all of the "Protected Parties" and "Debtor Talc Claims," as those terms are defined in the Motion. However, if the Debtor and J&J will only support (and J&J will only fund a plan trust under) a plan that includes such a broad channeling injunction, then there is virtually no likelihood – let alone a reasonable one – of a successful reorganization. This is because, as demonstrated in Sections III.B.(1) - (2), *infra,* under applicable Third Circuit law, such a channeling inunction would be beyond the permissible scope of a channeling injunction under section 524(g)(4) of the Code.

16

(2)    <u>The Debtor's Request for Equitable Relief for Its Benefit and that of J&J Should
Be Denied Because They Have Unclean Hands.</u>

45.    The Court should deny the Debtor equitable relief in the form of an extension of

the automatic stay to non-debtors and a preliminary injunction, because the Debtor has unclean

hands. Immediately before this chapter 11 filing, the Debtor agreed to disadvantageous new

funding arrangements with J&J in order to create the "financial distress" necessary to qualify

for a second chapter 11 filing. In essence, the Debtor agreed to harm Talc Claimants for the

benefit of J&J. Granting injunctive relief to the Debtor to prevent Talc Claimants from asserting

Talc Claims against J&J and others under such circumstances would be the opposite of equity.

46.    "'It is one of the fundamental principles upon which equity jurisprudence is

founded, that before a complainant can have a standing in court he must first show that not only

has he a good and meritorious cause of action, but he must come into court with clean hands.'"

*Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244 (1933) (quoting Story's

Equity Jurisprudence, 14th ed., § 98). Further, "'whenever a party who, as *actor*, seeks to set the

judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or

other equitable principle, in his prior conduct, then the doors of the court will be shut against

him *in limine*." *Id.* at 245 (quoting Story's Equity Jurisprudence, 14th ed., § 397). The unclean

hands doctrine is "derived from the unwillingness of a court, originally and still nominally one

of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted

himself as to shock the moral sensibilities of the judge." *See Scherer Design Grp, LLC v. Ahead

Eng'g LLC*, 764 Fed. App'x. 147, 149-50 (3d Cir. 2019) (internal citations omitted).

47.    As courts of equity, bankruptcy courts may consider and apply the unclean hands

doctrine. "A preliminary injunction is an equitable remedy and [movant] in seeking such

remedy would invoke the equitable powers of the court. Yet, [movant] comes before the court

sullied and tainted by unclean hands, running afoul of the fundamental tenet that one who seeks

equity must do equity." *Grimes v. Green Point Sav. Bank*, 147 B.R. 307, 316 (Bankr. E.D.N.Y.

1992).

48.    Unclean hands are present where a party seeking equitable relief has committed

an unconscionable act and that act is related to the claim upon which equitable relief is sought.

*Scherer Design Grp, LLC v. Ahead Eng'g LLC*, 764 Fed. App'x at 150; *see also New Valley*

*Corp. v. Corporate Prop. Assocs. 2 and 3 (In re New Valley Corp.*), 181 F.3d 517, 523 (3d Cir.

1999). The focus of the "unclean hands" inquiry is on the actions of the party seeking the

equitable relief. *Salomon Smith Barney, Inc. v. Vockel*, 137 F. Supp. 2d 599, 604 (E.D. Pa.

2000).

49.    Here, the Debtor's actions in manufacturing the financial distress the Third

Circuit found lacking in LTL I, by agreeing to a transaction with its parent that materially

impaired the ability of Talc Claimants to recover compensation for their injuries from the

Debtor, while benefitting the Debtor's parent, qualify as unconscionable. This is especially so

when the Debtor now seeks to use the financial distress those actions created as a pretext for a

new chapter 11 case that enables it to seek broad equitable relief against the very Talc

Claimants who were harmed by those actions.

50.    Moreover, the actions of the Debtor (and J&J) in creating the Debtor's new

financial distress are directly related to the requested preliminary injunction. But for these

actions, this chapter 11 case could not have been filed. Without a chapter 11 case, there would

be no legal basis for any of the equitable relief sought in the Motion. Talc Claimants would be

free to prosecute or settle their claims against the Debtor, J&J and other Protected Parties. Put

another way, without the improper conduct to create financial distress that harmed Talc

Claimants, the Debtor could not have sought an injunction against them in a bankruptcy court.

Thus, the requisite "tight connection" between the object of the injunction and the Debtor's

misconduct exists here. *See Scherer Design Grp, LLC v. Ahead Eng'g LLC*, 764 Fed. App'x at

152. When a party seeking relief has committed an unconscionable act immediately related to

the equity the party seeks in respect to the litigation, the court should bar such relief under the

unclean hands doctrine. *Id.* at 150.

51.    Quite simply, the Debtor's unclean hands "compel denial" of its request for

equitable relief. *See Grimes v. Green Point Sav. Bank*, 147 B.R. at 316.

**B.    Any Injunction Should Be Limited to Parties and Claims that would Fall Within the Permissible Scope of a Section 524(g)(4) Channeling Injunction Under a Confirmed Plan.**

(1)    The Preliminary Injunction Sought by the Debtor Goes Far Beyond the Scope of Any Third-Party Channeling Injunction Permitted Under a Plan by Section 524(g)(4).

52.    Section 524(g)(4) of the Bankruptcy Code provides that:

(ii) Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor ***to the extent such alleged liability of such third party arises by reason of-***

(I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial

> transaction affecting the financial condition, of the debtor or
> a related party . . .

11 U.S.C. § 524(g)(4) (emphasis added).

       53.     The Third Circuit Court of Appeals has summarized the limited scope of the

third-party channeling injunction permitted by section 524(g)(4) as follows:

> Largely in order to encourage contributions to the trust, **certain** third
> parties may also benefit from a § 524(g) channeling injunction.
> However, **these protections do not extend to all claims brought
> against third parties**. In order to conform with the statute, (1) these
> claims must be 'directed against a third party who is identifiable
> from the terms of such injunction' and (2) the third party must be
> 'alleged to be directly or indirectly liable for the conduct of, claims
> against, or demands on the debtor'; in addition, (3) **'such alleged
> liability' must arise 'by reason of' one of four statutory
> relationships** . . . .

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*, 13 F.4th 279, 283 (3d Cir. 2022) ('*Grace II*')

(emphasis added). The Third Circuit refers to the second requirement as the "derivative liability"

requirement, and the third requirement as the "statutory relationship" requirement. *Id.* at 284*; see

Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.),* 900 F.3d 126, 135 (3d Cir. 2018) ('*Grace I*')

("We assess only the second and third conditions for protection: whether the Montana Claims

seek to hold CNA 'directly or indirectly liable for the conduct of, claims against, or demands on'

Grace, *i.e.*, the 'derivative liability' requirement, and whether CNA's alleged liability 'arises by

reason of' its provision of insurance to Grace, *i.e.*, the 'statutory relationship' requirement.").

**Both** requirements must be satisfied in order for a claim to fall within the scope of a permissible

section 524(g)(4) channeling injunction.

       54.     Under the plain language of section 524(g)(4), neither Retailers nor Indemnified

Parties are among the parties in whose favor a channeling injunction may be issued under

section 524(g)(4). Neither a party's status as a retailer, nor a party's status as an indemnified

party, qualifies the party for inclusion in any of the four categories of statutorily-defined

relationships set forth in clauses (I) - (IV) of section 524(g)(4)(ii), so as to qualify claims

against that party for inclusion in a third-party channeling injunction. The fact that such parties

may have contractual indemnity rights against the Debtor does not change that result. *See In re*

*W.R. Grace & Co.,* 475 B.R. 34, 99-100 (D. Del. 2012).

55.    In *W.R. Grace*, the District Court held that a section 524(g) channeling

injunction could not be extended to enjoin claims against a party (BSNF) where actions were

brought against it that were allegedly derivative of the debtor's conduct, despite the fact that

BSNF had contractual indemnity agreements with Grace. The Court explained: "If the third

party does not fall into one of [the four categories set forth in section 524(g)(4)(A)(ii)(I)-(IV)],

then its claims will not be considered derivative of the debtor's liability, and thus are not

eligible to be enjoined." *Id*. at 99 (citing numerous cases). The Court further noted: "It has been

explicitly recognized . . . that contractual indemnity agreements that do not otherwise meet the

definitional requirements of section 524(g) cannot serve as the link in the chain connecting a

third party's liability to the debtor for purposes of extending the channeling injunction to non-

debtors." *Id.* at 100. "Thus, because BSNF's claims against Grace do not meet the Code's

definitional requirements of derivative liability, §514(g) explicitly **precludes** the Court from

extending injunctive relief to BSNF under these circumstances." *Id.* (emphasis added).

56.    Moreover, even as to a party who does have one of the four statutory

relationships required by section 524(g)(4), a claim against that party must "arise[] by reason of"

that statutory relationship in order for that claim to be covered by a section 524(g) channeling

injunction. This point is underscored by the decision in *Grace II,* 13 F.4th 279, in which the

Third Circuit recognized that even though insurers are included in clause (III) of section

524(g)(ii), not every claim of an asbestos creditor of the debtor against one of the debtor's

insurers can be subject to a channeling injunction.

57.     In *Grace II*, individuals who had worked at a mine operated by the debtor and

suffered from asbestos disease ("Montana Plaintiffs") filed suit asserting claims for negligence

against an insurer, CNA ("Montana Claims"). Those claims were based on allegations that CNA

was aware of the asbestos exposure at the mine and related dangers and incurred a duty to protect

and warn the workers of the dangers when it undertook to provide them with "industrial hygiene

services" and when it inspected the mines. The Montana Plaintiffs further alleged that by failing

to fulfill this duty, CNA caused their asbestos-related injuries. *Grace II*, 13 F.4th at 285.

58.     In response, CNA filed suit in the Bankruptcy Court seeking a declaration that

the Montana Claims were barred by the section 524(g)(4) channeling injunction under the

debtor's confirmed plan. Following a remand to the Bankruptcy Court from an earlier appeal, the

Bankruptcy Court entered summary judgment in favor of the Montana Plaintiffs, and CNA

appealed. The Third Circuit agreed with CNA that the claims of the Montana Plaintiffs met the

"derivative liability" requirement, but remanded to the Bankruptcy Court to determine whether

the statutory relationship requirement was satisfied, based on guidance provided by the Court of

Appeals. *Grace II*, 13 F.4th at 285.

59.     The Third Circuit explained that, in determining whether the statutory

relationship test was satisfied, the presence of an insurance relationship alone was not sufficient

to satisfy that test. "We did not mean to suggest – as CNA argues – that the presence of an

insurance relationship alone is sufficient to meet the statutory relationship requirement." *Id*. at

290. The Court had to consider the elements necessary to establish the Montana Claims under

applicable state law, and to determine whether the insurer's provision of insurance to the debtor

was relevant legally to those elements. In the Court's view, satisfaction of the "statutory relationship"' test turned on whether CNA's provision of insurance was legally relevant to its alleged negligent undertaking of industrial hygiene and medical monitoring services.

60.     CNA argued that because its alleged undertakings arose solely due to its insurer relationship with Grace, its provision of insurance was legally relevant for purposes of the statutory relationship inquiry. The Court of Appeals disagreed, explaining that if Montana law did not take into consideration "the basis (here, the provision of insurance) for the alleged undertaking," and was concerned only that the insurer did undertake to render the services, that would not be enough to satisfy the "statutory relationship" requirement. *Id.* at 290.

61.     Similarly here, the fact that J&J owns a financial interest in the Debtor or is involved in managing it, *per se*, would not be sufficient for a claim against J&J to satisfy the statutory relationship test and fall within the permissible scope of a section 524(g)(4) channeling injunction. Such a channeling injunction could apply to a claim against J&J only to the extent that its liability "arises by reason of" its ownership of a financial interest in the Debtor or involvement in the management of the Debtor. Under *Grace* II, claims against J&J for alleged misconduct would not "arise [ ] by reason of" its ownership of the Debtor or involvement in the Debtor's management if J&J's ownership of the Debtor or involvement in its management was not "legally relevant" to liability for its alleged misconduct under applicable law. Similarly, claims against the other non-debtor affiliates that are included within the definition of "Protected Parties" could be enjoined under section 524(g) only to the extent that such claims "arise[ ] by reason of" one of the four relationships set forth in clauses (I) - (IV) of section 524(g)(ii).

62.     Thus, based on the plain language of section 524(g)(4) and controlling Third

Circuit authority, the Motion seeks third party injunctive relief as to parties and claims that are

far beyond the permissible scope of a section 524(g) channeling injunction under a plan.

(2)     <u>Section 105 Cannot Be Used to Expand the Parties or Claims that Can Be
Included in a Channeling Injunction under a Plan for a Chapter 11 Asbestos
Debtor Beyond the Scope of a Channeling Injunction Permitted under Section
524(g).</u>

63.     The Third Circuit Court of Appeals has explained that:

> Because § 524(g) expressly contemplates the inclusion of third
> parties' liability within the scope of a channeling injunction - and
> sets out the specific requirements that must be met in order to permit
> inclusion - ***the general powers of § 105(a) cannot be used to
> achieve a result not contemplated by the more specific provisions
> of § 524(g).***

*In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236-37 (3d Cir. 2004) (emphasis added; footnote

omitted).

64.     In explaining this conclusion, the Court observed that:

> Importantly for this case, § 105(a) does not "'give the court the
> power to create substantive rights that would otherwise be
> unavailable under the Code.'" *United States v. Pepperman*, 976 F.2d
> 123, 131 (3d Cir. 1992) (quoting *In re Morristown & Erie R.R. Co.*,
> 885 F.2d 98, 100 (3d Cir. 1989)); *see also In re Barbieri*, 199 F.3d
> 616 (2d Cir. 1999) (warning the "equitable powers emanating from
> § 105(a) . . . are not a license for a court to disregard the clear
> language and meaning of the bankruptcy statutes and rules")
> (citations omitted).
>
> The general grant of equitable power contained in § 105(a) cannot
> trump specific provisions of the Bankruptcy Code, and must be
> exercised within the parameters of the Code itself. *See generally
> Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 99 L. Ed.
> 2d 169, 108 S. Ct. 963 (1988) ("Whatever equitable powers remain
> in the bankruptcy courts must and can only be exercised within the
> confines of the Bankruptcy Code."). When the Bankruptcy Code
> provides a specified means for a debtor to obtain a specific form of
> equitable relief, those standards and procedures must be observed.
> *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154-55 (7th Cir. 1993)
> ("When a specific Code section addresses an issue, a court may not

24

employ its equitable powers to achieve a result not contemplated by the Code."); *Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1402 (9th Cir. 1995) ("Section 105 does not authorize relief inconsistent with more specific law"); *Feld v. Zale Corp (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995) ("A § 105 injunction cannot alter another provision of the Code.").

Here, the Bankruptcy Court relied upon § 105(a) to achieve a result inconsistent with § 524(g)(4)(A). Although the Bankruptcy Court has broad equitable authority to craft remedies necessary to facilitate the reorganization of a debtor, this power is cabined by the Code. *Ahlers*, 485 U.S. at 206.

*Id.* at 236.

65.    Because section 524(g) would not permit a channeling injunction under a plan to include all of the "Protected Parties" and "Debtor Talc Claims" that the Debtor seeks to sweep into the broad net of its proposed preliminary injunction, section 105 could not be used as a basis for such a broad channeling injunction, either. That being the case, granting a preliminary injunction that covers parties or claims that could not be covered by a section 524(g) channeling injunction in a confirmed plan would do nothing but impose needless delay on Talc Claimants.

# IV.

## <u>CONCLUSION</u>

The Motion should be denied in its entirety. Alternatively, if the Court determines that granting this Debtor equitable and injunctive relief would be appropriate notwithstanding the Debtor's inequitable eve-of-petition conduct, the scope of the parties and claims that are covered by any such injunctive relief should be limited to those that could be included in a channeling injunction under a section 524(g) plan.

Dated: April 16, 2023                    **PACHULSKI STANG ZIEHL & JONES LLP**

By: */s/ Colin R. Robinson*_____
Laura Davis Jones
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        crobinson@pszjlaw.com
        pkeane@pszjlaw.com

*Counsel for Arnold & Itkin LLP*