**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b) | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael S. Winograd, Esq.<br>Eric R. Goodman, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>egoodman@brownrudnick.com<br>Seven Times Square<br>New York, NY  10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801 |
| **GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Matthew I.W. Baker, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>mbaker@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Proposed Local Counsel to the Official*<br>*Committee of Talc Claimants* | |
| | and |
| | Jeffrey L. Jonas, Esq.<br>Sunni P. Beville, Esq.<br>jjonas@brownrudnick.com<br>sbeville@brownrudnick.com<br>One Financial Center<br>Boston, MA  02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Proposed Co-Counsel for the Official*<br>*Committee of Talc Claimants* |
| **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>Rachel S. Morse, Esq.<br>jmassey@masseygail.com<br>rmorse@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC  20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br><br>*Proposed Special Counsel for the Official*<br>*Committee of Talc Claimants* | **OTTERBOURG P.C.**<br>Melanie L. Cyganowski, Esq.<br>Richard G. Haddad, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>David A. Castleman, Esq.<br>mcyganowski@otterbourg.com<br>rhaddad@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>dcastleman@otterbourg.com<br>230 Park Avenue<br>New York, NY  10169<br>Tel: (212) 661-9100<br>Fax: (212) 682-6104<br>*Proposed Co-Counsel for Official*<br>*Committee of Talc Claimants* |

|  | Chapter 11 |
| --- | --- |
| In re: | Case No.: 23-12825 (MBK) |
| **LTL MANAGEMENT LLC**, [1] | Honorable Michael B. Kaplan |
| Debtor. | |
| **LTL MANAGEMENT LLC**, | Adv. Pro. No. 23-01092 (MBK) |
| Plaintiff, | |
| v. | |
| **THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT** and **JOHN AND JANE DOES 1-1000**, | |
| Defendants. | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS
TO DEBTOR'S MOTION FOR AN ORDER
(I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS
TO CERTAIN ACTIONS AGAINST NON-DEBTORS,
(II) PRELIMINARILY ENJOINING SUCH ACTIONS, AND
(III) GRANTING A TEMPORARY RESTRAINING
ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY INJUNCTION**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ..................................................................................1

**FACTUAL BACKGROUND**...................................................................................12

    **I.**      **Background of Talc Litigation**.................................................. 12

    **II.**     **J&J Orchestrates LTL's Creation and LTL 1.0, which the
Third Circuit Determined Was Not Filed in Good Faith**................................ 14

    **III.**    **The Debtor's Replacement of the 2021 Funding Agreement
and the Filing of  LTL 2.0** ..................................................... 17

          **A.**     **The Replacement of the 2021 Funding Agreement with
the 2023 Funding Agreement**.................................................17

          **B.**     **LTL Files LTL 2.0**..............................................................19

**ARGUMENT**...........................................................................................................22

    **I.**      **LTL CANNOT ESTABLISH THAT IT FILED LTL 2.0 IN
GOOD FAITH, WHICH IS A THRESHOLD ISSUE** ................................... 22

          **A.**     **LTL Is Still Not in Immediate Financial Distress**................................23

          **B.**     **LTL Offers No Explanation for Why It Gave Away
$30-50 Billion in Value**..........................................................26

          **C.**     **LTL Has Failed to Show Financial Distress, Even if Its
Attempts to Engineer Such Distress Were Credited** ..........................30

          **D.**     **LTL Has No Prospect to Reorganize** .....................................31

    **II.**     **SOLVENT NON-DISTRESSED THIRD PARTIES CANNOT RECEIVE
THE BENEFIT OF THE § 362(A) AUTOMATIC STAY** ............................. 32

          **A.**     **Section 362(a) Only Applies to the Debtor with No Exceptions** .........33

          **B.**     **Negatively Impacting the Debtor's Reorganization
Efforts Is Insufficient to Warrant Application of
the Unusual Circumstances Exception**.....................................34

          **C.**     **Even Under an Adverse Impact Analysis, an Extension
of the Stay Is Not Warranted in This Case**...........................37

i

       D.       The Stay Under § 362(a)(3) is Inapplicable Here...................................41

III.       LTL IS NOT ENTITLED TO PRELIMINARY INJUNCTIVE
        RELIEF UNDER § 105 OF THE BANKRUPTCY CODE............................ 42

       A.       The Court Does Not Have Subject Matter Jurisdiction
          to Issue the Requested Injunction Enjoining Actions
          Between Non-Debtors ...............................................................................43

       B.       The Debtor Has Not Satisfied Its Burden of Establishing
          the Requirements for Granting the Extraordinary Relief
          of a Preliminary Injunction....................................................................46

CONCLUSION .............................................................................................................51

# TABLE OF AUTHORITIES

Page(s)

*A.H. Robins Co., Inc. v. Piccinin*,
 788 F.2d 994 (4th Cir. 1986) ...............................................................................35, 38, 39, 48

*Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint
(In re Aldrich Pump LLC)*,
 Case No. 20-30608, Adv. Proc. No. 20-03041, 2021 WL 3729335
 (Bankr. W.D.N.C. Aug. 23, 2021) ...........................................................................................29

*Atl. Coast Line R. Co. v. Bhd. of Locomotive Engineers*,
 398 U.S. 281 (1970).................................................................................................................46

*AYR Composition, Inc. v. Rosenberg*,
 619 A.2d 592 (N.J. App. Div. 1993).......................................................................................25

*Bader v. Johnson & Johnson*,
 86 Cal. App. 5th 1094 (Cal. Ct. App. 2022), *review denied* (Apr. 12, 2023).........................13

*Balogh Associates VII LLC v. Dick's Sporting Goods, Inc.*,
 2022 WL 4624827 (M.D.N.C. Sept. 30, 2022).......................................................................28

*Bankers Trust Co. v. Bethlehem Steel Corp.*,
 761 F.2d 943 (3d Cir. 1985)......................................................................................................2

*Bouton v. Litton Industries, Inc.*,
 423 F.2d 643 (3d Cir. 1970).....................................................................................................41

*Bradberry v. Carrier Corp.*,
 86 So. 3d 973 (Ala. 2011)........................................................................................................34

*Brenner v. Little Red School House, Ltd.*,
 274 S.E.2d 206 (N.C. 1981)...............................................................................................27, 28

*Carl v. Johnson & Johnson*,
 237 A.3d 308 (N.J. App. Div. 2020), *cert. denied*, 244 A.3d 270 (N.J. 2021).......................13

*Cedar Shore Resort, Inc v. Mueller*,
 235 F.3d 375 (8th Cir. 2000) ..................................................................................................31

*Congoleum Corp. v. Pergament (In re Congoleum Corp.)*,
 Bankr. No. 03-51524(KCF), Adversary No. 05-06245,
 2007 WL 4571086, (Bankr. D.N.J. Dec. 28, 2007) ...............................................................29

*DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*,
 Case No. 20-30080, Adv. Proc. No. 20-03004,
 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021)....................................................26, 29

*Delaware v. Van Arsdall*,
 475 U.S. 673 (1986)........................................................................................................44

*D.S. Simmons, Inc. v. Steel Group, LLC*,
 2008 WL 488845 (E.D.N.C. Feb. 19, 2008)...........................................................................28

*EEOC v. Kronos Inc.*,
 694 F.3d 351 (3d Cir. 2012)................................................................................................2

*Fairfield Harbour Property Owners Ass'n, Inc. v. Midsouth Golf, LLC*,
 715 S.E.2d 273 (N.C. App. 2011).........................................................................................28

*Faulconer v. Wysong and Miles Co.*,
 574 S.E.2d 688 (N.C. App. 2002).........................................................................................28

*FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*,
 No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012),
 *as corrected* (Dec. 26, 2012)............................................................................................37

*Gold v. Johns-Manville Sales Corp.*,
 723 F.2d 1068 (3d Cir. 1983)..............................................................................................39

*Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*,
 194 B.R. 318 (Bankr. S.D.N.Y. 1996)...................................................................................42

*Halper v. Halper*,
 164 F.3d 830 (3d Cir. 1999)..............................................................................................44

*Hartig Drug Co. Inc. v. Senju Pharm. Co.*,
 836 F.3d 261 (3d Cir. 2016)..............................................................................................43

*In re Aldan Indus., Inc.*,
 No. 00-10360DWS, 2000 WL 357719 (Bankr. E.D. Pa. Apr. 3, 2000) ...................................35

*In re Combustion Eng'g, Inc.*,
 391 F.3d 190 (3d Cir. 2004)................................................................................. *passim*

*In re Federal–Mogul Global, Inc.*,
 300 F.3d 368 (3d Cir. 2002)...............................................................................11, 45, 46

*In re G-I Holdings Inc.*,
 420 B.R. 216 (D.N.J. 2009) ..............................................................................................47

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*,
  509 F. Supp. 3d 116 (D.N.J. 2020) ..........................................................................13

*In re Imerys Talc America, Inc*,
  2019 WL 3253366 (D. Del. 2019) ....................................................................42, 46

*In re Lower Bucks Hosp.*,
  488 B.R. 303 (Bankr. E.D. Pa. 2013) ......................................................................46

*In re LTL Mgmt., LLC*,
  637 B.R. 396 (Bankr. D.N.J. 2022) .......................................................8, 12, 15, 16

*In re Magnus Harmonica Corp.*,
  237 F.2d 867 (3rd Cir. 1956) ...................................................................................46

*In re Millennium Lab Holdings II LLC*,
  945 F.3d 126 (3d Cir. 2019)......................................................................................39

*In re Owens Corning*,
  419 F.3d 195 (3d Cir. 2005)......................................................................................39

*In re Phila. Newspapers, LLC*,
  407 B.R. 606 (E.D. Pa. 2009) ......................................................................35, 44, 47

*In re Scarborough-St. James Corp.*,
  535 B.R. 60 (Bankr. D. Del. 2015) ..........................................................................34

*In re SGL Carbon Corp.*,
  200 F.3d 154 (3d Cir. 1999)......................................................................................78

*Ingham v. Johnson & Johnson*,
  608 S.W.3d 663 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) ..............12, 13, 50

*Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*,
  456 U.S. 694 (1982).................................................................................................43

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
  882 F.2d 797 (3d Cir. 1989)......................................................................................47

*Johnson & Johnson Talcum Powder Cases*,
  249 Cal. Rptr. 3d 642 (Cal. Ct. App. 2019).............................................................13

*Johnson & Johnson v. Aetna Cas. & Sur. Co.*,
  285 N.J. Super. 575 (App. Div. 1995) ......................................................................41

*Law v. Seigel*,
    571 U.S. 415 (2014) ................................................................................10, 34

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint et al.,*
*(In re LTL Management, LLC)*,
    638 B.R. 291 (Bankr. D.N.J. 2022) ...............................................................16

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint et al.*
*(In re LTL Mgmt., LLC)*,
    --- F.4th ---, 2023 WL 2760479 (3d Cir. Mar. 31, 2023) ............................. *passim*

*Maritime Elec. Co. v. United Jersey Bank*,
    959 F.2d 1194 (3d Cir. 1991) ....................................................... *passim*

*McCartney v. Integra Nat'l Bank N.*,
    106 F.3d 506 (3d Cir. 1997) ......................................................... *passim*

*Millard v. Developmental Disabilities Inst., Inc.*,
    266 B.R. 42 (E.D.N.Y. 2001) .......................................................37, 38

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ......................................................................47

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.*
*(In re Integrated Telecom Express, Inc.)*,
    384 F.3d 108 (3d Cir. 2004) ...........................................................39

*Novartis Consumer Health, Inc. v. Johnson & Johnson –*
*Merck Consumer Pharmaceuticals Co.*,
    290 F.3d 578 (3d Cir. 2002) ...........................................................47

*NutraSweet Co. v. Vit-Mar Enterprises, Inc.*,
    176 F.3d 151 (3d Cir. 1999) ...........................................................47

*Nuveen Mun. Tr. v. WithumSmith Brown, P.C.*,
    692 F.3d 283 (3d Cir. 2012) ...........................................................43

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988) .............................................................8

*Pacor Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984) ........................................................11, 45

*Patton v. Beardon*,
    8 F.3d 343 (6th Cir. 1993) .............................................................37

*Phar-Mor, Inc. v. Gen. Elec. Capital Corp.*,
   166 B.R. 57 (W.D. Pa. 1994) ............................................................... 39

*Plastronics Socket Partners, Ltd. v. Hwang*,
   2022 WL 108948 (Fed. Cir. Jan. 12, 2022) ........................................ 25

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945) ........................................................................... 10

*Queenie, Ltd. v. Nygard Int'l*,
   321 F.3d 282 (2d. Cir. 2003) .............................................................. 37

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
   415 U.S. 1 (1974) .............................................................................. 48

*Stanford v. Foamex L.P.*,
   Civ. A. No. 07–4225, 2009 WL 1033607, (E.D. Pa. Apr.15, 2009) ......... 37

*Stoe v. Flaherty*,
   436 F.3d 209 (3d Cir. 2006) ......................................................... 44, 45

*Superior Contracting Group Inc. v. Rachmale (In re LTC Holdings, Inc.)*,
   587 B.R. 25 (Bankr. D. Del. 2018) ..................................................... 43

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
   309 F.3d 144 (3d Cir. 2002) ............................................................... 47

*Tucker v. Charter Med. Corp.*,
   299 S.E.2d 800 (N.C. App. 1983) ...................................................... 30

*United Steelworkers of Am. v. Fort Pitt Steel Casting*,
   598 F.2d 1273 (3d Cir. 1979) ............................................................. 49

*Univ. Med. Ctr. v. American Sterilizer Co. (In re Univ. Med. Ctr.)*,
   82 B.R. 754 (Bankr. E.D. Pa. 1988) ................................................... 38

*U.S. Trustee v. Gryphon at the Stone Mansion, Inc.*,
   166 F.3d 552 (3d Cir. 1999) ............................................................... 44

*Vendo Co. v. Lektro-Vend Corp.*,
   433 U.S. 623 (1977) ........................................................................... 46

*Wedgewood Investment Fund, Ltd. v. Wedgewood Realty Group, Ltd.*
 *(In re Wedgewood Realty Group, Ltd.)*,
   878 F.2d 693 (3d Cir. 1989) ........................................................ 37, 46

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................47

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
    No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ..............34

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
    591 F.3d 164 (3d Cir. 2009) ................................................................11, 43, 44, 45

*15375 Mem'l Corp. v. BEPCO, L.P.*,
    589 F.3d 605 (3d Cir. 2009) ................................................................................30

*3M Occupational Safety LLC v. Those Parties Listed on
Appendix A to the Complaint (In re Aearo Technologies LLC)*,
    642 B.R. 891 (Bankr. S.D. Ind. 2022), *appeal pending*, No. 22-2606 (7th Cir.) ..............48, 49

Statutes

11 U.S.C. § 105(a) ..................................................................................... *passim*

11 U.S.C. § 362 ........................................................................................... *passim*

11 U.S.C. § 362(a)(1) ................................................................................... *passim*

11 U.S.C. § 362(a)(3) ................................................................................... *passim*

11 U.S.C. § 524(g) ................................................................................10, 26, 29, 31

11 U.S.C. § 541(a)(1) ....................................................................................34

11 U.S.C. § 548(a)(1)(A) ...............................................................................25

11 U.S.C. § 548(a)(1)(B) ...............................................................................25

11 U.S.C. § 1112(b) ......................................................................................16

11 U.S.C. § 1129(a)(7) ..............................................................................10, 32

28 U.S.C. § 1334(b) ......................................................................................44

28 U.S.C. § 2283 ..........................................................................................46

Tex. Bus. Orgs. Code Ann. § 10.003 ...............................................................25

Tex. Bus. Orgs. Code Ann. § 10.901 ...............................................................25

The Official Committee of Talc Claimants (the "**TCC**" or the "**Committee**") in the above-captioned case, of LTL Management, LLC (the "**Debtor**" or "**LTL**"), hereby submits this memorandum of law in support of its objection (the "Objection") to the *Debtor's Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction* [Adv. Pro. Dkt. No. 2] (the "**Motion**"), and respectfully states as follows:

## PRELIMINARY STATEMENT

In dismissing the first bankruptcy filed by LTL ("**LTL 1.0**"), after noting that the desire "to resolve a more-than-thorny problem" is commendable, the Third Circuit held that a potential settlement is not a valid basis to open the Bankruptcy Court's doors to LTL (or by extension, LTL's ultimate corporate parent Johnson & Johnson, Inc. ("**J&J**")). *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint et al. (In re LTL Mgmt., LLC)*, --- F.4th ---, 2023 WL 2760479, at *17 (3d Cir. Mar. 31, 2023) (amended opinion). The Third Circuit held:

> These [settlement desires] cannot displace the *rule* that resort to Chapter 11 is appropriate *only* for entities *facing* financial distress. . . . Our ground for dismissal is LTL's lack of financial distress. . . . And we cannot currently see how the lack of financial distress could be overcome.

*Id*. (emphases added). And, as if clairvoyant, the Third Circuit cautioned against the very machination employed here—unilateral [*i.e.*, between J&J and LTL] termination of the 2021 Funding Agreement—observing that such legerdemain would only lead to fraudulent conveyance litigation:

> Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is also premature, we note interested parties may seek to "avoid any transfer" made within two years of any bankruptcy filing by a debtor who "receive[s] less than a reasonably equivalent value in exchange for such transfer" and "became insolvent as a result of [it]." 11

1

U.S.C. § 548(a).  So if the question becomes ripe, the next one might be:  Did LTL receive reasonably equivalent value in exchange for forgoing its rights under the Funding Agreement?

*Id*. at *16 n.18.[2]  This Court "must implement *both the letter and spirit* of the mandate, taking into account the appellate court's opinion and the circumstances it embraces."  *EEOC v. Kronos Inc.*, 694 F.3d 351, 361 (3d Cir. 2012) (emphasis added; internal quotation marks and citation omitted).  The Third Circuit's Judgment is particularly broad, perhaps anticipating the potential for post-mandate maneuvering by LTL.  The Judgment provides that:

> [T]he order of the Bankruptcy Court entered March 2, 2022 is reversed and the case is remanded with the instruction to dismiss Appellee's Chapter 11 petition.  The order of the Bankruptcy Court entered March 4, 2022 is vacated as moot.  . . . *All of the above in accordance with the Opinion of this Court.*

Judgment, Third Circuit Case No. 22-2003, Doc. 181-1 (emphasis added).[3]  The italicized language sends a message.  "Where the reviewing court in its mandate prescribes that the court shall proceed in accordance with the opinion of the reviewing court, such pronouncement operates to make the opinion a part of the mandate as completely as though the opinion had been set out at length."  *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985) (internal quotation marks omitted).

Given this clear and explicit ruling by the Third Circuit, LTL cannot meet its burden of proof on this Motion—a burden it bears on each and every element of the relief it seeks.  Therefore, the Motion must be denied.

*       *       *       *       *

---

[2]    How LTL's board of directors could possibly have satisfied its fiduciary duties by releasing a $60 billion support agreement is left unsaid by LTL. ████████████████████████████████████████████████████ *See* Exhibit 1 attached to the Declaration of Daniel M. Stolz ("**Stolz Decl.**"), filed herewith ("**Ex.**"), at 3.

[3]    Ex. 2.

Thirteen days ago, this Court dismissed LTL 1.0, as instructed by a Third Circuit opinion holding that LTL—facing the same talc-related litigation that it seeks to enjoin now—was not financially distressed and filed LTL 1.0 in bad faith.  2023 WL 2760479, at *1 (the analysis must "start, and stay, with good faith").  LTL sought rehearing; not a single judge voted to reconsider the unanimous Third Circuit decision.

Despite this dismissal, LTL received an enormous benefit from LTL 1.0:  an overbroad 18-month litigation stay against thousands of cases not just against LTL, but also against hundreds of highly solvent entities, many of which had independent liability to third-party plaintiffs.  The non-bankrupt beneficiaries of the bankruptcy stay included LTL's ultimate corporate parent J&J, other J&J entities, and even retailers that sold J&J products.  During those eighteen months, hundreds of victims of J&J's talc products have died waiting for their chance to avail themselves of our justice system to vindicate their rights under American law.  Although the Third Circuit did not expressly rule on the injunctive relief entered in LTL 1.0, it specifically "note[d] certain pertinent factors lack full discussion" in this Court's prior analysis of injunctive relief and opined that "it is not obvious LTL must indemnify J&J for the latter's independent, post-1979 conduct that is the basis of a verdict rendered against it."  2023 WL 2760479, at *15 n.16.

LTL filed a last-ditch attempt to stay the Third Circuit's mandate (purportedly to file a petition for a writ of certiorari from the Supreme Court, which it conveniently abandoned in order to file LTL 2.0), telling the Court of Appeals that, without a stay, "the complex mass-tort machinery could swiftly spring to life in dozens upon dozens of courts across the country," and "[e]ach of these cases would suddenly spring back into activity and proceed towards trial absent a

stay."  LTL Motion to Stay Mandate, Third Circuit No. 22-2003, Doc. 173, at 3, 19.[4]  On March

31, the Third Circuit denied LTL's motion to stay and issued the mandate.  Docs. 180-81.[5]

      Before the ink was dry on the Third Circuit's decision, and while seeking to stay the

mandate, LTL and J&J began devising ways to circumvent it.  Mr. Kim testified that on the very

day the Third Circuit decision issued, he came up with the idea that the 2021 Funding Agreement

might be deemed "void or voidable," and LTL began discussing "whether we should be refiling

for bankruptcy."[6]  Just two hours and eleven minutes after this Court's Third Circuit-mandated

dismissal order in LTL 1.0 was entered, LTL filed this bankruptcy ("**LTL 2.0**").  LTL immediately

filed this adversary proceeding against thousands of tort victims, seeking a sweeping injunction

against their pursuit of their claims against LTL, J&J, and hundreds of additional non-debtors (the

"**Adv. Pro.**").  LTL 2.0 was commenced with even more bad faith than LTL 1.0, the result of LTL

and J&J attempting to manufacture financial distress by cooking up the largest intentional

fraudulent transfer in United States history, a scheme hatched while LTL was still a debtor-in-

possession in LTL 1.0.  The only meaningful action in the two hours between dismissal of LTL

1.0 and refiling of LTL 2.0—the attempted stripping of LTL's most significant asset in clear breach

of LTL's directors' fiduciary duties in what LTL's general counsel called a decision "consensus"[7]

between LTL and J&J—makes a mockery of the Third Circuit's admonition that "[f]inancial

distress must not only be apparent, but it must be immediate enough to justify a filing."  2023 WL

2760479 at *9.

---

[4]     Ex. 3.
[5]     Exs. 2, 4.
[6]     Ex. 5, Dep. Tr. of John Kim, April 14, 2023 ("**Kim Dep. Tr.**"), at 74:23-75:10, 76:3-13; 77:2-18, 82:11-23.
A redacted version of Ex. 5 is attached as Ex. 6, subject to n.2 of the Stolz Decl.
[7]     *Id*. at 189:13-190:3, 191:5-8.

LTL now attempts to strip itself of its funding backstop, despite its repeated representations to this Court and the Third Circuit that the funding backstop would apply outside of bankruptcy, and the express terms of their contract which provided that it applies outside of bankruptcy.  As Mr. Gordon candidly admitted to this Court, the funding backstop would continue to apply even if LTL 1.0 was dismissed[8]—exactly the situation LTL now claims frustrated the entire purpose of that very backstop.  The minutes from LTL's April 2, 2023 Board Meeting—just two days before the filing while LTL was still a debtor in possession—expressly state the purpose of LTL 2.0 is to facilitate resolution of the LTL's talc liability, and that pursuing such option would require, inter alia, that LTL to modify its existing funding arrangements.  ████████████████████

████████████████████████████████████████

████████████[9]

The Third Circuit dismissed LTL 1.0 because the projections of liability cannot ignore "the possibility of meaningful [in the tort system] settlement, as well as successful defense and dismissal, of claims."  *Id.* at *14.  The Third Circuit posited whether the "progression of litigation *outside of bankruptcy*" might alter circumstances at some distant point in future, but for now, LTL's "filing was premature."  *Id.* at *16.  The Court even wrote that "the progression of multidistrict litigation on a separate track would continue to sharpen all interested parties' views of mutually beneficial settlement values."  *Id.* at *14.

Instead, LTL cynically filed LTL 2.0 to avoid that progression of litigation and to obtain a tactical advantage in all of J&J's talc-related litigation.  Indeed, at the First Day Hearing in this case, Mr. Gordon candidly admitted that the "purpose of the filing remains the same."[10]  LTL filed

---

[8]    Ex. 7, at 60:16-61:20 (Feb. 18, 2022 Hearing Tr.).
[9]    Ex. 1, at 4 (April 2, 2023 Board Minutes).
[10]   Ex. 8, at 7:25 (April 11, 2023 Hearing Tr.).

this Motion as the centerpiece of its (and J&J's) bad-faith strategy—a preliminary injunction

covering hundreds of parties in defiance of the Third Circuit's clear command to allow the talc-

related litigation against non-distressed third parties to proceed in state and federal courts.  And

yet, even despite its machinations to give up $30-50 billion in value, LTL still has not shown that

the current and projected future liabilities from the talc litigation have put the Debtor in immediate

financial distress.  LTL's general counsel, John Kim, testified at deposition just three days ago that

LTL "**has sufficient funds to pay off its debts currently as they come due**."[11] ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ [2]  As the Third Circuit has explained, "absent

financial distress,"—which is "immediate enough to justify a filing,"—"there is no reason for

Chapter 11 and no valid bankruptcy purpose."  2023 WL 2760479, at *9.  LTL's failure to show

financial distress or good faith, along with the actual intentional bad faith present in the weeks,

days and hours leading up to LTL 2.0, deprives this Court of subject matter jurisdiction to enter

the relief requested by this Motion, and also requires denial of the Motion for several reasons:

*First*, the financial distress LTL attempted to manufacture is illusory.  The Third Circuit

determined that the 2021 Funding Agreement functioned "not unlike an ATM" and provided LTL

with a right to at least $61.5 billion in cash with minimal conditions.  2023 WL 2760479, at *13-16.

Realizing that agreement doomed its right to be in bankruptcy, LTL conspired with its corporate

parent to give up this valuable funding backstop and replace it with a far less valuable funding

agreement worth $30-50 billion less than the first agreement.  LTL's general counsel testified a

---

[11]     Ex. 5, at 117:14-15 (Kim Dep. Tr.).
[12]     Ex. 9, at 10; *see also* Ex. 5, at 169:5-15 (Kim Dep. Tr.).

"consensus" was reached between LTL and J&J to void the 2021 Funding Agreement,[13] and that

it never occurred to him to see if one of the other counterparties thought the agreement was void

or voidable.[14]  That cannot stand.  The creditors (or a trustee) will pursue and recover that value as

a fraudulent conveyance, restoring LTL to its post-dismissal financial condition, and once again

mandating dismissal of the case.  The Third Circuit wisely anticipated this potential maneuver,

suggesting that if LTL "part[ed] with its funding backstop to render itself fit for a renewed filing,"

the question becomes "Did LTL receive reasonably equivalent value in exchange for forgoing its

rights under the Funding Agreement?"  *Id*. at *16 n.18.  Nothing in LTL's voluminous filings

suggested that it received *anything* in return for forgoing $30-50 billion in value, and the collusion

between LTL and J&J, and clear intent to force another intervening bad faith bankruptcy as an

obstacle to creditors' constitutional rights and ability to prosecute claims against non-debtors may

lead to an avoidance claim for actual fraud.  And even if, arguendo, this case is not dismissed, no

plan can be confirmed because the value a trustee would recover from reinstatement of the 2021

Funding Agreement will provide more value to creditors—who in a Chapter 7 liquidation would

also retain the value of their claims against solvent non-debtors—than the collusive plan being

proposed by LTL and its corporate parent.

LTL argues that it terminated the 2021 Funding Agreement because it might be "void or

voidable" on the grounds that the Third Circuit's decision ordering dismissal of the bankruptcy

failed the 2021 Funding Agreement's central purpose.  Kim Decl. II ¶ 78.[15]  LTL provides no

analysis as to why its corporate parents never intended to honor the original Funding Agreement

---

[13]      Ex. 5, at 189:13-190:3, 191:5-8 (Kim Dep. Tr.).  The collusion is further evidenced by Mr. Kim's lawyers instructing him not to answer questions about J&J's views on the funding agreement because of a "common interest privilege," even though LTL and J&J were counterparties to the transaction at issue.  *Id*. at 83:14-25.
[14]      *Id*. at 85:23-86:3.
[15]      Kim Declaration [Doc. No. 4] (the "**Kim Decl. II**").

outside of bankruptcy, even though LTL repeatedly assured this Court and the Third Circuit of the opposite,[16] and the agreement itself so provides.  The Third Circuit relied on LTL's statement that it "had the right, outside of bankruptcy, to [enforce the Funding Agreement]," 2023 WL 2760479, at *13, and this Court noted that "all of the assets and funding sources extant pre-restructuring remain available through this proceeding."  *In re LTL Mgmt., LLC*, 637 B.R. 396, 404 (Bankr. D.N.J. 2022).  LTL offers no explanation for how the 2021 Funding Agreement's central purpose could be frustrated by the dismissal of LTL 1.0 when it applied "***at any time when there is no proceeding under the Bankruptcy Code pending with respect to Payee***."[17]  Mr. Gordon told this Court, in the presence of Mr. Haas, J&J's head of worldwide litigation, that the 2021 Funding Agreement applied outside of bankruptcy, and would continue to apply even if the bankruptcy case were dismissed.[18]  He added that the provision was included "to assure this isn't treated or consider[ed] a fraudulent conveyance."[19]  Mr. Kim admitted at his deposition just three days ago that the 2021 Funding Agreement applied outside of bankruptcy.[20]  Unless LTL is now claiming that it was not being truthful to the Court in LTL 1.0, those admissions are fatal to LTL 2.0.[21]

There is also no indication in any of LTL's filings in LTL 2.0 that LTL or its directors had taken any action to save LTL's most valuable asset—its funding guarantee. In fact, Mr. Kim testified that the Debtor parted with its most valuable asset so that "its pre-filing financial condition" would be "sufficiently distressed to satisfy the standard established by the Third

---

[16]    *See, e.g.*, Ex. 10, at 83:21-25 (Sept. 19, 2022 Third Circuit Oral Arg. Tr.) ("Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something.  I understand that the funding agreement does have provisions for funding outside of bankruptcy.  The Court: Yeah, that's what I thought.").

[17]    Ex. 11, at 5-6 (emphasis added) (2021 Funding Agreement).

[18]    *See* Ex. 7, at 61:8-10 (Feb. 18, 2022 Hearing Tr.) ("Whether there was no case filed or whether the case is filed or dismissed, the money's available for that purpose.").

[19]    *Id.* at 61:18-19.

[20]    Ex. 5, at 62:15-21 (Kim Dep. Tr.).

[21]    *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419-20 (3d Cir. 1988) (party can be judicially estopped from taking position in second bankruptcy inconsistent with position in first bankruptcy).

Circuit." Kim Decl. II ¶ 83. Thus, the Debtor admits that it attempted to create "financial distress" simply in an effort to justify its second bankruptcy filing.

The central premise of LTL's purported "fix" to the Third Circuit is rooted in bad faith. And even with the reduced 2023 Funding Agreement, LTL has failed to meet its burden of showing "immediate" financial distress such that it warrants Chapter 11 protection. 2023 WL 2760479, at *9. Counsel for LTL stated at the First Day Hearing that LTL was not insolvent under the 2023 Funding Agreement.[22] ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ When asked what funding would be available under the 2023 Funding Agreement "to satisfy talc claims and other obligations" if this bankruptcy is dismissed or the proposed plan fails, LTL's general counsel answered: "That would be whatever – it would be the – the HoldCo. Funding arrangements."[25]

LTL has failed its burden of establishing that it is in immediate financial distress under the framework of the Third Circuit's analysis of LTL's protected talc-related litigation liability in LTL 1.0. A plan of reorganization under these circumstances, in clear defiance of the Third Circuit's opinion in LTL 1.0, will not survive appellate review a second time. The only purpose of LTL 2.0 is to achieve more delay and to support the continued efforts by LTL and its corporate parent to abuse the bankruptcy system to gain a litigation advantage. Without good faith there can be no right to bankruptcy relief or successful plan of reorganization, and for that reason alone this Court should deny the Motion. And, without good faith, there can be no basis to issue the injunction—

---

[22]     *See* Ex. 8, at 20, 25-26 (April 11, 2023 Hearing Tr.).

█████████████████████████████████████████████

[25]     Ex. 5, at 71:23-72:5 (Kim Dep. Tr.).

for it is a maxim of equity that one "who comes into equity must come with clean hands." *See, e.g.*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  Defying the Third Circuit hardly qualifies as "clean hands."

*Second*, LTL has dramatically overstated the level of support it has for its purported plan. More than 100 law firms (including all of MDL leadership), representing over 40,000 ovarian cancer and mesothelioma claimants in the majority of cases that have been filed in state and federal courts around the country, vehemently ***oppose*** the Debtor's plan.  These are the very claimants who would be most harmed by the continued delay sought by LTL ***in this Motion***, as well as the very claimants whose support would be necessary to confirm a plan.  It is also dubious whether any LTL Plan could satisfy 11 U.S.C. § 1129(a)(7), when its plan would: (1) extinguish independent claims against solvent J&J; and (2) where a Chapter 7 trustee would be able to avoid the fraudulent transfer.  Further, the best interests test cannot be waived by proceeding under § 524(g), nor can creditors' rights to pursue claims against solvent third parties (like J&J) be extinguished by such a plan.  LTL is nowhere close to a consensual or confirmable plan of reorganization, and as such, issuing the proposed injunction would only serve to benefit non-distressed non-debtors by giving them an unwarranted litigation advantage.

*Third*, to the extent that LTL is seeking an extension of the automatic stay under 11 U.S.C. § 362 to non-debtor parties, the Court should deny such an extension for several reasons.  The plain text of the statute states that the automatic stay only applies to debtors, and recent Supreme Court rulings emphasizing a strict interpretation of bankruptcy statutes render the "unusual circumstances" test obsolete.  *See Law v. Seigel*, 571 U.S. 415, 427-28 (2014) (ruling that a bankruptcy court cannot "contravene express provisions of the Code").  And even if "unusual circumstances" were a valid reason to depart from clear statutory language, LTL's definition of

10

"unusual circumstances," to include any litigation against related third parties that might impact the estate—is an exception so broad that it essentially swallows the rule. Applying the § 362 automatic stay to hundreds of non-debtors turns the very text and purpose of § 362 on its head, which is to give the debtor—and only the debtor—a litigation reprieve.

**Fourth**, this Court does not have jurisdiction to enter an injunction under § 105, as none of the tort cases brought by talc-claimants sought to be enjoined is a core proceeding. These cases existed independently before the bankruptcy was filed, and they will continue to exist after this bankruptcy is dismissed. Nor are they related to the bankruptcy for jurisdictional purposes, as the Third Circuit has repeatedly declined to extend related-to jurisdiction to cases against non-debtors in several asbestos bankruptcy cases, even when the third party had an indemnification right against the estate. *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984); *In re Federal–Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002); *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 591 F.3d 164 (3d Cir. 2009).

**Fifth**, even if this Court did have jurisdiction to enter a preliminary injunction, all four elements (the failure of any one of which would be dispositive) weigh against granting an injunction in this case. LTL 2.0 has no prospects for reorganization, having been filed in bad faith and with far more illusory support than indicated, and based on a proposed plan that is likely to be subject to significant legal and factual challenges given the astonishing breadth of the releases LTL seeks for J&J. Allowing litigation to proceed in the state and federal courts is not irreparable harm—it is what the Third Circuit recommended in LTL 1.0, and is in any event nothing more than monetary harm. Most importantly, the balance of the harms weighs heavily in favor of allowing victims to avail themselves of the American justice system—even if denigrated by LTL

as the "tort system"—as is their constitutional right after having been allegedly harmed by J&J's products.

## FACTUAL BACKGROUND

### I.    Background of Talc Litigation

#### A.    J&J's Tortious Conduct

J&J manufactured talc-based JOHNSON'S Baby Powder until 1979.  Since then, various J&J subsidiaries and ultimately Old JJCI produced it.[26]  J&J retained responsibility for health-and-safety policy decisions for Baby Powder: It had the power to require product warnings or stop selling talc products, but failed to do so.[27]  Instead, in 2018 and 2019, J&J, including its CEO Alex Gorsky, issued public statements assuring consumers that its talc products were safe.[28]  In December 2018, Health Canada identified a causal connection between genital exposure to talc and ovarian cancer.[29]  In October 2019, the FDA detected asbestos, the only known cause of mesothelioma, in J&J's Baby Powder.[30]  From November 2019 to October 13, 2021 (one day before LTL's first bankruptcy), seven mesothelioma plaintiffs won trials against J&J and Old JJCI.[31]  Juries also found J&J and Old JJCI liable for ovarian cancer caused by their talc products.[32] *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 724-25 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021).

Although J&J had long known talc could cause cancer, it did not stop selling talc-based Baby Powder in the U.S. and Canada until May 2020.[33]  Today, J&J sells only baby powder made

---

[26]    *In re LTL Mgmt., LLC*, 637 B.R. at 400-01.
[27]    Ex. 13, at 52:22-53:10, 55:1-12; Ex. 14, at 7751:23-7752:15, 7833:12-18 (Hopkins Testimony).
[28]    Exs. 15-18 (Trial Exhibits).
[29]    Ex. 19 (2018 Assessment); Ex. 20 (2021 Assessment).
[30]    Ex. 21, at 53:11-19 (Feb. 16, 2022 Hearing Tr., Kim Testimony).
[31]    *Id.* at 54:14-55:9; *see* Ex. 22, at 49 (Debtor W.D.N.C. Informational Br. of Oct. 14, 2021).
[32]    Ex. 23 ¶¶ 36-39 (2021 First Day Declaration of John Kim ("**Kim Decl. I**")).
[33]    Ex. 24, at 45:20-46:13 (Hopkins Testimony); Ex. 23 ¶ 33 (Kim Decl. I).

of cornstarch in the U.S. and Canada, a product it has sold for decades.[34]  In August of 2022, J&J

announced it would stop selling talc-based baby powder globally in 2023.[35]  By the time LTL filed

its first bankruptcy petition, J&J and Old JJCI faced more than 38,000 ovarian cancer claims—

about 35,000 in a Multi-District Litigation proceeding ("**MDL**") in the District of New Jersey,

roughly 2,200 claims consolidated in California and New Jersey state courts, and another 1,100

claims in other state courts.[36]  J&J and Old JJCI also faced more than 400 mesothelioma cases,

with more than 250 in one New Jersey state court.[37]

J&J disputes the causal link between its talc-related products and cancer.  After hearing

extensive evidence, however, the MDL court admitted (with limited exceptions) expert testimony

establishing a causal relationship between talc products and ovarian cancer.  *See In re Johnson &*

*Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 198

(D.N.J. 2020).  Trial and appellate courts have repeatedly rejected J&J's position on talc's safety.

*See, e.g.*, *Ingham*, 608 S.W.3d at 718; *Bader v. Johnson & Johnson*, 86 Cal. App. 5th 1094, 1129

(Cal. Ct. App. 2022), *cert. denied* (Apr. 12, 2023); *Carl v. Johnson & Johnson*, 237 A.3d 308, 311

(N.J. App. Div. 2020), *cert. denied*, 244 A.3d 270 (N.J. 2021); *Johnson & Johnson Talcum Powder*

*Cases*, 249 Cal. Rptr. 3d 642, 676 (Cal. Ct. App. 2019).

### B.    J&J and Old JJCI Satisfy Talc Liabilities in the Ordinary Course

Until its first bankruptcy, J&J and Old JJCI satisfied talc and other liabilities in the ordinary

course.  In May 2020, J&J told a bankruptcy court in a different talc liability case that it was

---

[34]      Ex. 25, at 37:1-22 (Hopkins Testimony)

[35]      Ankur Banerjee and Diana Jones, *J&J to end global sales of talc-based baby powder*, REUTERS (Aug. 12, 2022), https://tinyurl.com/bd86jpds.

[36]      Ex. 22, at 124 (Debtor W.D.N.C. Informational Br. of Oct. 14, 2021).

[37]      *Id*. at 125.

"absurd" to suggest that "J&J may lack the financial wherewithal to meet its obligations."[38]  J&J boasted being "one of the top 10 companies in the United States by market value," which "can provide the claimants far greater protection than . . . the bankruptcy claims trust ever could."[39]  J&J is one of the world's most liquid companies: As of October 2021, it had roughly $30 billion in annual earnings before interest, taxes, and amortization;[40] over $41 billion in cash, marketable securities, and credit lines; and, despite talc liabilities, a credit rating better than the United States.[41] And, throughout LTL 1.0, J&J continued its practice of distributing dividends averaging one billion dollars *per month*.

## II.    J&J Orchestrates LTL's Creation and LTL 1.0, which the Third Circuit Determined Was Not Filed in Good Faith

On July 19, 2021, J&J's corporate treasurer told Standard & Poor's that J&J "feel[s] failed by courts," and might "seek to cap [talc] liability"—through a scheme involving a "re-org," a "split," and a "Texas corp."[42]  She told Moody's: "We are looking at a number of ways of capping our talc liability, especially" in light of the denial of certiorari in *Ingham*, 141 S. Ct. 2716 (2021).[43] "One scenario being considered," she elaborated, "would be to capture the liability in one subsidiary, and fund that subsidiary for current and future losses, and then basically bankrupt that subsidiary."[44]  She never suggested J&J or any existing affiliate confronted financial distress.

In the restructuring, Old JJCI's business assets, including a range of well-known brands (such as Tylenol, Band-Aid, and Neutrogena), together with non-talc liabilities (*e.g.*, trade claims),

---

[38]    Ex. 26, at 7 (Diaz Report).
[39]    *Id*.
[40]    Ex. 27, at 36:13-14 (Kaplan Dep.).
[41]    Ex. 26, at 6 (Diaz Report); Ex. 28, at 25-38 (Burian Report).
[42]    Ex. 29, at 1 (Kaplan Notes).
[43]    Ex. 30.
[44]    *Id*.

were assigned to New JJCI.[45]  As LTL's chief legal officer explained, "the entity that was formerly

JJCI and the entity that is the new JJCI were . . . virtually identical except for it no longer had the

talc liabilities."[46]  The talc liabilities went to LTL ("Legacy Talc Litigation").[47]  LTL was given

no operating business.[48]  LTL has no employees of its own.  Its board, management, and

professionals are paid by J&J and work (or worked) for J&J.[49]  LTL's office is "hoteling" space

in a J&J building.[50]  As of its first bankruptcy petition, LTL's bank account was not in its own

name.[51]  LTL has no bonds, trade creditors, or pension liabilities.[52]  Its sole purpose is resolving

talc liabilities, as planned and directed by J&J.

LTL was funded with a $6 million bank account and the rights to royalty streams valued at

$367.1 million as of the petition date of LTL 1.0.  *In re LTL Mgmt.*, 637 B.R. 396, 402 (Bankr.

D.N.J. 2022).  J&J and New JJCI jointly and severally committed, under the 2021 Funding

Agreement, to fund LTL's expenses (*i.e.*, to resolve talc liabilities assigned to LTL) outside of

bankruptcy, up to the value of New JJCI.  *Id.* at 423 n.27.  In LTL 1.0, this Court accepted LTL's

assertions that the 2021 Funding Agreement provided $61 billion in potential liquidity.  *Id.* at

404.[53]  If LTL filed for bankruptcy, the 2021 Funding Agreement provided that J&J and New JJCI

would fund a trust under a confirmed plan to resolve talc liabilities.  *Id*. at 423 n.27.  Thus, before

bankruptcy, LTL faced no restrictions on paying talc liabilities on a current basis up to the 2021

Funding Agreement cap.[54]  After bankruptcy, LTL would receive nothing under the 2021 Funding

---

[45]    Ex. 23 ¶¶ 16, 19, 23-24 (Kim Decl. I); Ex. 31, at 41:7-22 (Feb. 15, 2022 Hearing Tr., Mongon Testimony).
[46]    Ex. 31, at 201:16-19 (Feb. 15, 2022 Hearing Tr., Kim Testimony)
[47]    Ex. 27, at 13:18-23 (Kaplan Dep.).
[48]    Ex. 26, at 44-45 (Diaz Report).
[49]    *Id*. at 38-40, 44-45 (Diaz Report).
[50]    Ex. 32, at 125:8-23 (Feb. 14, 2022 Hearing Tr., Wuesthoff Testimony).
[51]    Ex. 33 ¶ 8 (LTL 1.0 Doc. No. 548) (Debtor's Chapter 11 Monthly Operating Report).
[52]    Ex. 32, at 126:23-27:13 (Wuesthoff Testimony); Ex. 34, at 36:23-24, 37:5-13, 45:15-23 (Kim Dep.).
[53]    *See also* Ex. 21, at 51:13-24 (Kim Testimony).
[54]    Ex. 26, at 32 (Diaz Report).

Agreement to satisfy a single talc claim until entry of a final non-appealable order confirming a reorganization plan with a trust for victims.[55]

On October 14, 2021, two days after LTL's creation, LTL's board met and authorized LTL to file for bankruptcy.[56]  A critical goal of the bankruptcy was to freeze pending actions against J&J and other non-debtors, putting an end to jury trials.  J&J announced that "all pending cosmetic talc cases will be stayed," and that J&J and its affiliates "will continue to operate their business as usual," before such relief had even been sought in the bankruptcy case.[57]  Then, just as now, LTL argued that absent an injunction halting talc litigation against J&J and other non-debtors, "[t]he entire purpose of this" bankruptcy "would be thwarted."[58]

On December 1, 2021, the Official Committee of Talc Claimants in LTL 1.0 moved to dismiss the First Bankruptcy Case under §1112(b) of the Code for (among other reasons) lack of a valid bankruptcy purpose. 637 B.R. at 399 n.2.  The U.S. Trustee supported dismissal, or appointment of a Chapter 11 trustee.  This Court denied the motions.  The same day, over the objection of many of the members of this Committee, this Court granted LTL's motion for a sweeping order that halted litigation against some 670 nondebtors, including J&J, hundreds of its affiliates, around 145 retailers (groceries, drugstores, sporting-goods stores, etc.), and 105 insurance companies that deny liability.  *LTL Mgmt. v. Those Parties Listed on Appendix A to Complaint et al., (In re LTL Mgmt.)*, 638 B.R. 291 (Bankr. D.N.J. 2022).  The Court noted an "unsettled" issue of subject-matter jurisdiction, *id*. at 301, but ruled that it could extend stay relief to non-debtors because "a lawsuit asserting talc related claims against" those non-debtors "is

---

[55]    *Id*.; Ex. 11 at 6 (2021 Funding Agreement).
[56]    Ex. 35 (Board Minutes).
[57]    Ex. 36 (J&J Oct. 19, 2021 8-K).
[58]    Ex. 37, at 51 (Omnibus Reply in Support of PI).

essentially a suit against Debtor," *id.* at 305, and because such suits would have an "undeniable impact on Debtor's estate," *id.* at 307.

On direct appeal from this Court, the U.S. Court of Appeals for the Third Circuit held that the Debtor's first bankruptcy petition must be dismissed because it failed to satisfy the good faith requirement of the Bankruptcy Code. 2023 WL 2760479. The Third Circuit opined: "Our ground for dismissal is LTL's lack of financial distress. . . . *And we cannot currently see how its lack of financial distress could be overcome.*" *Id.* at *17 (emphasis added).

The Debtor sought rehearing. Not a single judge on the Third Circuit voted for rehearing. The Third Circuit then unanimously denied the Debtor's motion to stay the mandate (supposedly) to enable LTL to pursue Supreme Court review – review that the Debtor has no intention of pursuing, it turns out.[59] On April 4, 2023, LTL's First Bankruptcy Case was dismissed.[60]

## III. The Debtor's Replacement of the 2021 Funding Agreement and the Filing of LTL 2.0

### A. The Replacement of the 2021 Funding Agreement with the 2023 Funding Agreement

During the two hours and eleven minutes that it spent outside of bankruptcy on April 4, 2023, in an effort to make the Debtor appear eligible for bankruptcy, the Debtor, a subsidiary of and beholden to J&J, parted with its most significant asset—the 2021 Funding Agreement. The Third Circuit stated that the 2021 Funding Agreement functioned "not unlike an ATM" and provided the Debtor with a right to at least $61.5 billion in cash with minimal conditions. 2023 WL 2760479 at *16. In support of its decision to terminate the 2021 Funding Agreement, Mr. Kim's declaration baldly asserted that he believed the agreement was "void or voidable." Kim

---

[59]    Ex. 38, Bankr. Case No. 21-30589-MBK, Doc. 3939.
[60]    Ex. 39, Bankr. Case No. 21-30589-MBK, Doc. 3938.

Decl. II ¶ 78.  However, no explanation or analysis—legal or factual—is provided to substantiate this assertion, and it is contrary to representations LTL's counsel made to this Court.

According to LTL's counsel, the 2021 Funding Agreement "is different from all other cases in the sense that it includes also a Johnson & Johnson, the ultimate parent, agreeing to obligate itself to the extent of the value of Old JJCI.  So you have basically two sources of asset availability."[61]  In fact, according to Mr. Gordon, "the whole idea with these funding agreements… [is] to basically say to the Court, to say to the parties, look, you haven't been hurt because the entity that was standing behind or the value of assets that were effectively standing behind the liability or were available to pay the liability, that value is fully preserved through that funding agreement.  So that was fully preserved.  The only difference is that instead of having the company there, you have a funding agreement that provides direct right to those assets through this funding agreement."  *Id*. at 59:7-16.

Advocating against dismissal, Mr. Gordon also pointed out to the Court that "there's literally no conditions or any material conditions on the permitted uses under this document", and he expressly included "funds available to pay settlements, to pay judgments in the tort system. So it makes it very clear this is what we're talking about if there's no proceeding in bankruptcy. Whether there was no case filed or whether the case is filed or dismissed, the money's available for that purpose. So this is there to protect the claimants. ***It's there to assure this isn't treated or consider a fraudulent conveyance***.  The idea was and the intent was the claimants are covered either way in bankruptcy or outside."  *Id*. at 60:16-20, 61:5-20 (emphasis added).

Under the new agreements, unabashedly planned, prepared and agreed to during the pendency of LTL 1.0 while LTL's directors, officers and counsel owed fiduciary duties to the talc

---

[61]    Ex. 7, at 56:1-8 (Feb. 18, 2022 Hearing Tr.).

18

victims, "J&J's balance sheet [is] not available to the Debtor," and "Holdco's [formerly New JJCI's] assets … no longer include the consumer health business."  Kim Decl. II ¶ 83.  J&J's funding obligation under the J&J Support Agreement arises if, and only if, the Court confirms J&J's desired plan, and such plan goes effective after all appeals are exhausted.  Thus, while non-debtor J&J asks this Court to award it the benefit of a sweeping injunction, it has declined to assume any current funding obligation to debtor LTL.

The extent to which the remaining value of HoldCo is available to LTL, and the amount of that value, has not been made clear by LTL either in its filings or the First Day Hearing.  To the extent that such value remains available and is substantial—around $30 billion according to the estimates presented to the LTL's board in preparation to file this bankruptcy—the funding available to LTL likely exceeds its liabilities such that LTL cannot carry its burden to show that it is in immediate financial distress.

Clearly the negotiation and documentation by which these transactions occurred was conducted while LTL was a debtor-in-possession, held a fiduciary duty to its creditors and while its assets and estate were under the supervision of this Court.  Yet not a word was uttered, and no effort was made to apprise the Court and parties that such an out-of-the-ordinary-course of business transaction was being developed.

### B.    LTL Files LTL 2.0

LTL filed this bankruptcy two hours and eleven minutes after the dismissal of the LTL 1.0 as a bad faith filing.  LTL did not conduct any "business" in the two hours and eleven minutes aside from purportedly signing papers—prepared and agreed to during the pendency of LTL 1.0.  LTL contends that this bankruptcy is different because it has reached a deal with some claimants' attorneys, stating that "with the assistance of the mediators and the encouragement of this Court," it engaged in negotiations with "various plaintiff law firms," and that those "negotiations

ultimately culminated in an agreement with thousands of claimants" on a plan that will "fully resolve all of LTL's liability for talc-related claims." Kim Decl. II ¶ 72 (emphasis added). This assertion is both troubling—to the extent that it suggests the mediators aided and encouraged J&J's fraudulent scheme—and misleading.

In entering the TRO, this Court pointed to the support claimed by LTL as a justification for injunctive relief, opining "there is now a potential resolution favorable to all claimants through the newly-filed bankruptcy case." Doc. 16, ¶ 3. But that support is illusory.

***First***, more than 100 law firms representing ovarian cancer and mesothelioma claimants oppose J&J's plan. Most of these law firms have been active participants in the federal MDL or state courts for years, have filed talc claims against J&J and its affiliates, and represent talc claimants with cancer diagnoses that have a scientific link to exposure to J&J's toxic products. The TCC can confirm that ***not a single*** law firm that was placed on the Plaintiffs' Steering Committee in the MDL supports the J&J deal or this bankruptcy case.[62]  And only four (4) law firms identified by LTL in the list of the Top 30 Law Firms that represent talc claimants filed in the first bankruptcy—Onder Law, Nachawati Law Group, Johnson Law Group, and Trammell PC—have pledged their allegiance to J&J's plan. If LTL were to solicit votes on a plan today, it would not obtain the required level of acceptance and would face vigorous and vociferous opposition. LTL did not return to this Court with a deal in hand, as its pleadings suggest.

***Second***, the Debtor does not have the support of 60,000 to 70,000 claimants.  Certain of the settling law firms are strangers to the MDL or other consolidated litigation and have never filed a talc-related lawsuit against J&J.  The U.S. Trustee cast doubt on these numbers at the First Day

---

[62]    The "confidential" term sheet belies why the J&J plan is an obvious farce.  For example, it assigns Mr. Valadez a value in the low five figures.  Many of the ovarian cancer matrix values fall short of objective components of damages for medical costs and lost wages, as noted at the first-day hearing.

Hearing on April 11, wondering how these numbers could be accurate based on the U.S. Trustee's calculations.[63] ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

  ***Third***, the settlement is illusory. The Debtor says J&J is now offering to pay $8.9 billion. But the definition of talc liability that J&J is purporting to "settle" is, unsurprisingly, extremely broad. The $8.9 billion payment is for "all talc claims for all time"—meaning that the $8.9 billion is intended to satisfy all current and future talc claims for mesothelioma, ovarian cancer, and other cancers linked to talc in the future, billions of dollars of claims asserted by third-party payors and governmental units, and billions of dollars of claims for indemnification and other damages asserted by co-defendants, retailers, talc suppliers such as bankrupt Imerys and Cyprus companies, and any drugstore or supermarket that sold J&J's toxic baby-powder.  For example, it includes a hypothetical talc claim asserted by an individual who develops mesothelioma in "2080 and beyond," as the Debtor acknowledges, and is consistent with established long latency period between first exposure to asbestos and development of mesothelioma. Kim Decl. at ¶ 42.  And it includes claims asserted by governmental units against J&J alleging false advertising, unfair competition, and deceptive trade practices, which claims could be massive. It also includes indemnification claims and claims for damages asserted by Imerys and Cyprus.  Under J&J's

---

[63]  Ex. 8, First Day Hearing at 103:5-23.

██████████████████████████████████████████████

desired plan, all talc claims will be channeled to a single pot. And Holdco's funding obligations

will be capped, with potentially no support at all from J&J. All claimants will be entitled to a pro

rata distribution of the trust funds. If the amounts asserted by governmental claims are allowed,

such claims will substantially dilute the funds available to pay individual claimants.

## **ARGUMENT**

To obtain the relief sought on this Motion, LTL must (a) show that this Court has subject

matter jurisdiction, (b) satisfy the burden of proof on every element of its requested relief, and (c)

overcome the defenses asserted by the TCC and others.  LTL fails in each respect.

## I.    **LTL CANNOT ESTABLISH THAT IT FILED LTL 2.0 IN GOOD FAITH, WHICH IS A THRESHOLD ISSUE**

The Third Circuit recognized that the analysis of an LTL bankruptcy must "start, and stay,

with good faith."  2023 WL 2760479, at *1.  Good faith, and therefore financial distress, is central

for two reasons.  First, it is a threshold issue before any Chapter 11 relief is issued.  "[A]bsent

financial distress there is no reason for Chapter 11 and no valid bankruptcy purpose."  *Id*. at *9.

As such, "the good-faith gateway asks whether the debtor faces the kinds of problems that justify

Chapter 11 relief."  *Id*.  Moreover, "[f]inancial distress must be not only be apparent, but it must

be immediate enough to justify a filing."  *Id*. at *9.  Second, without good faith, there is simply no

prospect for a successful reorganization, which is itself a precondition for the issuance of any

injunction under § 105.  Once good faith in put at issue in a case, "the burden to establish good

faith is on the debtor."  *Id*. at *8.

That lack of financial distress continues to mandate dismissal.  As the Court of Appeals

explained in LTL 1.0: "J&J's belief that this bankruptcy creates the best of all possible worlds for

it and the talc claimants is not enough, no matter how sincerely held. Nor is the Bankruptcy Court's

commendable effort to resolve a more-than-thorny problem. These cannot displace the rule that

resort to Chapter 11 is appropriate only for entities facing financial distress." *Id*. at *17. "[G]iven Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so." *Id*. LTL is not facing financial distress and is therefore not eligible to call upon the bankruptcy system.

### A.    LTL Is Still Not in Immediate Financial Distress

The Third Circuit found no financial distress because of the 2021 Funding Agreement, such that it could "pay current and future talc claimants in full." 2023 WL 2760479, at *15. The Third Circuit noted that the 2021 Funding Agreement functioned "not unlike an ATM disguised as a contract," allowing LTL to "draw on [it] to pay liabilities without any disruption to its business or threat to its financial viability." *Id*. at *16. This holding was based directly on LTL's appellate brief, which explained why the 2021 Funding Agreement was in place: "Old JJCI could not just saddle LTL with its talc-related debts, give New JJCI all of its assets, and call it a day. Old JJCI made sure that LTL had the same, if not a great, ability to resolve present and future talc claims. . . . [T]hough the agreement sets a floor of Old JJCI's [$61 billion] enterprise value at the time of the divisional merger, the agreement's value is expected to increase as New JJCI's value increases post-restructuring."[66] (LTL App. Br. at 21.) The Third Circuit also analyzed LTL's liabilities and found that "on its filing, LTL did not have any likely need in the present or the near-term, or even in the long-term, to exhaust its funding rights to pay talc liabilities" in light of the litigation history prior to the creation of LTL. 2023 WL 2760479, at *15. The Third Circuit found the lack of financial distress conclusive, observing "Our ground for dismissal is LTL's lack of financial distress. . . . And we cannot currently see how its lack of financial distress could be overcome." *Id.* at *17.

---

[66]    Ex. 42, at 21 (LTL App. Br. filed Aug. 15, 2022).

And yet, despite the Third Circuit's clear holding that LTL was not in financial distress, LTL waited just two hours from this Court's final dismissal of LTL 1.0 to file LTL 2.0. Realizing that nothing had changed that would give LTL any likely need to exhaust its funding right to pay talc liabilities, as the Third Circuit had just held, LTL attempted to manufacture financial distress by engineering one of the largest intentional fraudulent transfers in United States history. LTL voluntarily walked away from the 2021 Funding Agreement and surrendered its rights to more than $61 billion on demand, available inside or outside of bankruptcy. LTL also unilaterally gave up its right to future appreciation of J&J's consumer business, which would have increased the value of the 2021 Funding Agreement above and beyond $61.5 billion. It gave up its right to use J&J's balance sheet of roughly half-a-trillion dollars as a backstop for the Funding Agreement. For no legitimate reason, the Debtor replaced the 2021 Funding Agreement (worth more than $61 billion) with a version under which LTL no longer has access to J&J's balance sheet or the value of JJCI's consumer health business, valued somewhere between $8.9 and around $29 billion depending on the strength of HoldCo and its backstop.

The Third Circuit anticipated this exact maneuver. It warned LTL that parting with the 2021 Funding Agreement would not cure the defects in its bankruptcy filing:

> Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is also premature, we note interested parties may seek to "avoid any transfer" made within two years of any bankruptcy filing by a debtor who "receive[s] less than a reasonably equivalent value in exchange for such transfer" and "became insolvent as a result of [it]." 11 U.S.C. § 548(a). So if the question becomes ripe, the next one might be: Did LTL receive reasonably equivalent value in exchange for forgoing its rights under the Funding Agreement?

2023 WL 2760479, at *16 n.18. If the amendment to the 2021 Funding Agreement resulted in a massive decline in that agreement's value, such that LTL's financial condition materially changed

in the two-hour gap, then the amendment was plainly an avoidable fraudulent conveyance that could be avoided by LTL's creditors or a bankruptcy trustee.[67]

Companies should not be allowed to give away their assets and seek relief claiming financial distress any more than (in Abraham Lincoln's example) a child can kill his parents and seek mercy as an orphan.  Yet at the First Day Hearing on April 11, LTL's counsel expressed great umbrage at the assertion that LTL participated in an intentional fraudulent transfer, arguing that it did nothing of the sort.  Counsel also asserted (citing no evidence to support his speculation) that (i) the surrender of the 2021 Funding Agreement *was* a sufficiently massive giveaway of value that it created financial distress for LTL, but (ii) the giveaway *was not* so substantial that it rendered LTL "insolvent" for purposes of a constructive fraudulent conveyance claim under 11 U.S.C. § 548(a)(1)(B).  LTL's concession that it is not insolvent is damning, because the Third Circuit made clear that insolvency (while not required for bankruptcy) "is likely always relevant" to financial distress, 2023 WL 2760479, *9, and that bankruptcy filings "usually involve 'impending insolvency.'"  *Id.* at *11 n.14 (citation omitted).  Moreover, LTL shoulders the burden of proof on this Motion, and its counsel's speculative assertions fail to meet that burden.   In any event, LTL's argument ignores its liability for an actual fraudulent conveyance action under 11 U.S.C. § 548(a)(1)(A), for which insolvency is not an element, and other remedies available to unwind the fraudulent surrender of the 2021 Funding Agreement.[68]  LTL's transparent attempt to circumvent

---

[67]    As LTL conceded in its Appellate Brief, responding to an argument that "some future conveyance may place assets out of LTL's creditors' reach," Ex. 42, at 72 [Tab 35], "for any hypothetical future transfer by LTL, New JJCI, and J&J, . . . [t]he Bankruptcy Court will always have jurisdiction to protect against fraudulent conveyances."  *Id*. at 73.

[68]    *See AYR Composition, Inc. v. Rosenberg*, 619 A.2d 592, 595-97 (N.J. App. Div. 1993) (transfer of company's sole asset in breach of fiduciary duty constitutes "a fraudulent conveyance as a matter of law" under New Jersey law). In addition, relief is available under the Texas divisive merger statute, Tex. Bus. Orgs. Code Ann. §§ 10.003, 10.901, which cannot be used to "disadvantage" creditors.  *Plastronics Socket Partners, Ltd. v. Hwang*, 2022 WL 108948, *3-4 (Fed. Cir. Jan. 12, 2022).  The remedy for a violation "would generally be to reallocate all or a portion of the allocated liability to one or more of the surviving entities in the merger or to make some or all of the resulting entities

footnote 18 of the Third Circuit's opinion demonstrates the need for prompt appellate review, so the Court of Appeals can consider LTL's attempt to parse between "financial distress" and "insolvency" and render an authoritative decision on the matter.

But even assuming there was no intentional fraudulent transfer, LTL's argument mandates dismissal.  If, as LTL argued to this Court, the 2023 Funding Agreement was not a massive giveaway of value, then LTL cannot (and did not) point to any material change in its financial condition between LTL 1.0 and LTL 2.0.  And that means no financial distress, no good faith, no bankruptcy, and certainly no need to issue an oppressive nationwide injunction to prevent thousands of people from exercising their rights to access the American justice system in courts that deserve comital respect.

### B.    LTL Offers No Explanation for Why It Gave Away $30-50 Billion in Value

LTL argues that, because the Third Circuit found that LTL was not in financial distress as a result of its rights under the 2021 Funding Agreement, that "determination defeated the fundamental purpose of the 2021 Funding Agreement which purpose was to facilitate Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code."  (Mem. at 40.)  LTL then explains that it determined there was a "material risk that the 2021 Funding Agreement was no longer enforceable because it had become void or voidable." (*Id.*)  LTL's use of the passive voice obfuscates the obvious question—enforceable against who? The counterparties to the Funding Agreement were J&J and New JJCI, now known as Holdco.  At the time of the amendment to the 2021 Funding Agreement, during the two-hour gap between LTL

---

liable for all or a portion of the liabilities of the predecessor debtor corporation." *In re DBMP LLC*, 2021 WL 3552350, at *26 (Bankr. W.D.N.C. Aug. 11, 2021) (citation omitted).

1.0 and LTL 2.0 (in theory),[69] LTL was a subsidiary of J&J.  Nothing would have prevented J&J

from continuing to honor its 2021 Funding Agreement to its subsidiary even if a theoretical risk

of frustration of purpose—normally an affirmative defense—existed, especially in light of LTL's

repeated assurances to this Court and the Third Circuit that the 2021 Funding Agreement applied

outside of bankruptcy.[70]  And yet, the day the Third Circuit's decision was issued, LTL's general

counsel admitted that it was he who was looking for a reason to abandon the funding backstop.[71]

LTL is wrong in arguing that the 2021 Funding Agreement was "void or voidable" because

the Third Circuit decision "frustrated the purpose" of the 2021 Funding Agreement.  Frustration

of purpose is merely an affirmative defense to a breach of contract action, *Brenner v. Little Red

School House, Ltd.*, 274 S.E.2d 206, 209 (N.C.1981),[72] rather than a basis for deeming a contract

"void or voidable."  LTL never litigated that affirmative defense.

LTL cannot come close to showing the elements of the frustration of purpose defense.

"Essentially, there must be an implied condition to the contract that a changed condition would

excuse performance; this changed condition causes a failure of consideration or the expected value

---

[69]     It strains credulity to assume that Project Plato II (the internal code name for LTL 2.0) occurred during incredibly shortened time frame between the dismissal of LTL 1.0 and the refiling LTL 2.0.  What actions LTL may have taken while still a debtor-in-possession in LTL 1.0 may be the subject of future discovery and motion practice, especially to the extent LTL gave away value without the approval of the Bankruptcy Court.

[70]     *See* Ex. 23, *Declaration of John K. Kim in Support of First Day Pleadings*, *In re LTL Management LLC*, Case No. 21-30589 [Docket No. 5] (Bankr. D.N.J. Oct. 14, 2021) ("Significantly, the Funding Agreement imposes no repayment obligation on the Debtor; it is not a loan. ***It obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case*** and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses. ***In addition, the Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case*** and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.) (emphasis added).

[71]     Ex. 5, at 74:23-75:10 (Kim Dep. Tr. of Apr. 14, 2023).

[72]     The 2021 Funding Agreement is governed by North Carolina law.  Ex. 11 § 9 (2021 Funding Agreement).

of performance; and that the changed condition was not reasonably foreseeable." *Faulconer v. Wysong and Miles Co*., 574 S.E.2d 688, 691 (N.C. App. 2002).

*First*, there is no implied condition. Because the 2021 Funding Agreement expressly provided for J&J's funding obligation outside bankruptcy, there cannot be an "implied condition" that funding outside bankruptcy would constitute frustration of purpose. The 2021 Funding Agreement contains an "entire agreement" provision,[73] preventing any implied provision that the 2021 Funding Agreement would be limited to bankruptcy. *See D.S. Simmons, Inc. v. Steel Group, LLC*, 2008 WL 488845, *3 (E.D.N.C. Feb. 19, 2008) (rejecting frustration of purpose defense where "defendant has not produced any facts which would indicate that the parties expressly or impliedly agreed that a [specific scenario] would discharge defendant's performance").

*Second*, LTL has failed to show "a failure of the consideration or a practically total destruction of the expected value of the performance." *Brenner*, 274 S.E.2d at 209 (quoting 17 Am. Jur. 2d Contracts § 401 (1964)). Here, the 2021 Funding Agreement had important functions outside bankruptcy, which LTL and its witnesses touted. *See also Balogh Associates VII LLC v. Dick's Sporting Goods, Inc*., 2022 WL 4624827, *17 (M.D.N.C. Sept. 30, 2022) (rejecting defense where subject of contract was not "destroyed").

*Third*, "[i]f the frustrating event was reasonably foreseeable, the doctrine of frustration is not a defense." *Brenner*, 274 S.E.2d at 209. *See also Fairfield Harbour Property Owners Ass'n, Inc. v. Midsouth Golf, LLC*, 715 S.E.2d 273, 284 (N.C. App. 2011) (rejecting frustration of purpose defense: "the doctrine is inapplicable where the frustrating event is reasonably foreseeable"). The 2021 Funding Agreement expressly contemplated funding outside of a bankruptcy and was not conditioned on bankruptcy. The Third Circuit was not a supervening event at all, but merely a

---

[73]    Ex. 11 § 11 (2021 Funding Agreement).

declaration of what bankruptcy law requires and an application of existing Third Circuit precedent. *See Congoleum Corp. v. Pergament (In re Congoleum Corp.)*, Bankr. No. 03-51524(KCF), Adversary No. 05-06245, 2007 WL 4571086, at \*9-11 (Bankr. D.N.J. Dec. 28, 2007) (rejecting argument that the Court's interpretation of the Third Circuit's *Combustion Engineering* decision "frustrated" the purpose of agreements reached between the debtor's and two classes of claimants).

Moreover, at the time the Debtor and its counsel represented that the 2021 Funding Agreement was available outside bankruptcy, they knew that prior Texas two-step transactions in North Carolina had been subject to vigorous challenge in court, even though the North Carolina restructurings were less ambitious than what J&J was seeking. J&J was on notice, at the time it was drawing up the 2021 Funding Agreement, that even less ambitious transactions had been vigorously challenged in court.[74]

LTL suggests that, without bankruptcy, J&J would not receive the benefits of a channeling injunction under section 524(g). But a channeling injunction was expressly not a requirement for funding under the 2021 Funding Agreement. The Funding Agreement did not even require LTL to file a bankruptcy case at all, let alone successfully use a bankruptcy filing to obtain a channeling injunction. And a channeling injunction is of material consequence only for J&J. The absence of an anticipated benefit to a single party is insufficient to form the basis of a frustration-of-purpose defense. For the defense to apply, "the subject of the contract must be destroyed." *Tucker v.*

---

[74] Unlike J&J, the Aldrich and Murray entities in *Aldrich Pump* were themselves parties to a Texas divisional merger with Trane Technologies Company LLC, successor by merger to Ingersoll-Rand Company, and Trane U.S. Inc. *See Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC)*, Case No. 20-30608, Adv. Proc. No. 20-03041, 2021 WL 3729335, at \*1 (Bankr. W.D.N.C. Aug. 23, 2021). Similarly, the DBMP entity was itself a party to a Texas divisional merger with CertainTeed Corporation. See *DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, Case No. 20-30080, Adv. Proc. No. 20-03004, 2021 WL 3552350, at \*1 (Bankr. W.D.N.C. Aug. 11, 2021)). Neither *Aldrich Pump* nor *DBMP* involved a separate parent entity like J&J seeking the benefit of a divisional merger to which it was not a party.

*Charter Med. Corp.*, 299 S.E.2d 800, 804 (N.C. App. 1983) (finding the purpose of a commercial lease was not frustrated).  LTL cannot meet this standard.

### C.   LTL Has Failed to Show Financial Distress, Even if its Attempts to Engineer Such Distress Were Credited

The 2021 Funding Agreement was only part of the reason that the Third Circuit concluded that LTL had failed to show sufficient financial distress.  It also found that "a lack of meaningful operations show that LTL did not suffer from sufficient kinds of financial distress," 2023 WL 2760479, at *17, and pointed to the fact that Debtor's post hoc, lawyer-driven estimates of its talc exposure were not credible.  *Id*. at *15-16.

LTL's second bankruptcy petition does nothing to cure these defects.  LTL remains a "shell company" with no business operations and no "need to reorganize." *Id*. at *16.  The Third Circuit's reasoning remains fully applicable: "[I]f a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed." *Id*. at *9 (citation omitted).  *See also 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 619 (3d Cir. 2009) (debtor had "no going concerns to preserve—no employees, offices, or business other than the handling of litigation").

Nor did anything happen in the intervening 2 hours and 11 minutes on April 4 to cure the impermissible "casualness" of the "back-of-the-envelope forecasts" of LTL's talc liability that the Third Circuit rejected.  2023 WL 2760479, at *15.  The Third Circuit explained that this Court arrived at a $190-billion estimate of defense costs by unrealistically assuming every case would go to trial. *Id*. at *14.  This Court also "'multipl[ed] multi-million dollar or multi-billion-dollar verdicts by tens of thousands'" of claims. *Id*.  The Third Circuit held there was no basis for the assumptions underlying these calculations.  Similarly, there was no reason to think Ingham-like verdicts were "the new norm." *Id*.  The Third Circuit ruled that those forecasts were not

"inferences permissibly drawn" from the record.  *Id*.  There was no memorandum, analysis, or warning from businesspeople that talc liabilities threatened Old JJCI.  Quite the opposite:  J&J assured investors and analysts that talc costs were manageable.  *Id*. at *15.

The Third Circuit further concluded that LTL could not show "immediate" financial difficulty.  2023 WL 2760479, at *9.  "The 'attenuated possibility' that talc litigation may require it to file for bankruptcy in the future does not establish its good faith as of its petition date.  At best the filing was premature."  *Id*. at *16.  The Third Circuit drew comparisons to other mass tort litigation, such as the Johns Manville case, where the debtor faced true financial distress, including "'forced liquidation of key business segments.'"  *Id*. at *11 (citation omitted).

If anything, the Third Circuit's reasoning has only been strengthened by the second bankruptcy filing.  In rejecting this Court's previous forecasts, the Third Circuit held that this Court ignored "the possibility of meaningful settlement."  *Id*. at *15.  The Debtor's assertion that it has reached agreements with tens of thousands of claimants (Kim Decl. II ¶ 8), if taken at face value, simply proves the Third Circuit's point that the potential for settlement precludes a finding of financial distress warranting bankruptcy.

### D.    LTL Has No Prospect to Reorganize

As the Third Circuit observed, the purpose of Chapter 11 is reorganization—it is designed "to give those businesses teetering on the verge of a fatal financial plummet an opportunity to *reorganize* on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability."  2023 WL 2760479, at *10 (citing *Cedar Shore Resort, Inc v. Mueller*, 235 F.3d 375, 381 (8th Cir. 2000)) (emphasis added).  Yet, under the Bankruptcy Code, reorganization implies a plan that creditors will accept, and even in an asbestos case under § 524(g)—the applicability of which is not conceded by the TCC—75% support is required.  Yet more than 100 law firms, representing over 40,000 claimants and the majority of cases that have

been filed in state and federal courts around the country, vehemently *oppose* LTL's plan.  LTL is

nowhere close to a consensual or confirmable plan of reorganization.  As this Court heard at the

First Day Hearing on April 11, even the U.S. Trustee doubted LTL's numbers.  Without any

prospect of reorganization, LTL has no business in Chapter 11.  This Court should not give LTL

and its corporate parents the benefits of drastic Chapter 11 remedies such as the requested

preliminary injunction, when there is no realistic prospect for reorganization in good faith.

Further, because the plan J&J desires will release J&J from its own independent liability,

it will face terminal challenges under controlling Third Circuit precedent.  *In re Combustion Eng'g,*

*Inc.*, 391 F.3d 190, 233 (3d Cir. 2004) (Circuit Judges Scirica, Ambro, and Fuentes) (Bankruptcy

Code does not "permit the extension of a channeling injunction to the non-derivative claims against

non-debtors").  And LTL's plan will face objections from parties alleging that it fails the best

interest test under 11 U.S.C. § 1129(a)(7), as creditors will be likely gain far more in a liquidation

once the fraudulent transfer of the 2021 Funding Agreement is avoided.

## II.    SOLVENT NON-DISTRESSED THIRD PARTIES CANNOT RECEIVE THE BENEFIT OF THE § 362(A) AUTOMATIC STAY

Despite J&J's strategic decision to place LTL—and only LTL—into bankruptcy for a

second time, LTL once again seeks to expand the automatic stay to its corporate parent and

affiliates as well as hundreds of non-debtors.  The proposed operation of this automatic stay is

vast, freezing over 38,000 non-talc lawsuits asserting direct liability claims against hundreds of

non-debtors, shutting down relief for dying claimants.  One of the express purposes for seeking

this relief in LTL 2.0 is to shut down a specific trial brought by a 24-year-old with a terminal

illness—a clear attempt at nothing more than litigation advantage.

Debtor's proposed extension of the § 362(a) automatic stay should fail for several reasons.

First, the plain text of § 362(a) applies only to *debtors*, and not to third parties, and should not be

subject to any exceptions under recent Supreme Court precedent strictly construing provisions of the Bankruptcy Code.  Second, the "unusual circumstances" exception allowed by the Third Circuit cannot be construed to include any potential third-party action that will negatively impact the Debtor's reorganization.  An exception that broad would swallow the rule, would be contrary to the automatic nature of the stay, and would create an unworkable standard for federal and state courts that have an obligation to apply the stay absent any order from a bankruptcy court.  Third, even if the "unusual circumstances" test could be read to allow the automatic stay to apply to actions that will negatively impact the Debtor's reorganization, the Debtor has not shown that extending the stay as requested will do so.

### A.    Section 362(a) Only Applies to the Debtor with No Exceptions

Section 362(a) of the Bankruptcy Code provides in pertinent part:

[A] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\*        \*        \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

11 U.S.C. § 362(a)(1), (3).

On its face, the stay applies automatically only to the *debtor.*  "Although the scope of the automatic stay is broad, the clear language of section 362(a)[1] stays actions only against a 'debtor.'"  *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509-510 (3d Cir. 1997) (quoting *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991)).  "As a consequence, '[i]t is universally acknowledged that an automatic stay of proceedings accorded by

§ 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the . . . debtor.'" *Id.* (quotations and citations omitted)).  Similarly, by its plain words, § 362(a)(3) protects only property in which a "debtor" had an interest as of the commencement of the bankruptcy case — whether the debtor's property was in the possession of the debtor or a third party.  *See* 11 U.S.C. § 362(a)(3) (protecting estate property); § 541(a)(1) (defining estate property to include all pre-petition interests of the debtor "wherever located and by whomever held").  As the Supreme Court has made clear in recent cases, bankruptcy courts are discouraged from extending statutes beyond their plain language even for purportedly laudable policy preferences.  *Law v. Seigel*, 571 U.S. 415, 427-28 (2014).

A strict construction of § 362(a) to debtors, as the text commands, is consistent with the limited use of the powerful stay as a shield rather than as a sword to gain a litigation advantage, as LTL proposes.  The purpose of the automatic stay, which is to give debtors "a breathing spell," *Maritime Elec.*, 959 F.2d at 1204, has led courts to universally acknowledge that "the stay is a shield, not a sword."  *In re Scarborough-St. James Corp.*, 535 B.R. 60, 67, 70 (Bankr. D. Del. 2015) (noting, that "the stay is a shield, not a sword that should help the debtor deal with his bankruptcy for the benefit of himself and his creditors," and concluding that a debtor's use of the automatic stay to gain a litigation advantage justified lifting the automatic stay afforded by § 362(a)); *see also Bradberry v. Carrier Corp.*, 86 So. 3d 973, 983 (Ala. 2011) ("Extending the stay to protect solvent co-defendants would not advance either of the purposes underlying the automatic stay.").

### B.     Negatively Impacting the Debtor's Reorganization Efforts Is Insufficient to Warrant Application of the Unusual Circumstances Exception

The "unusual circumstances" exception is intended to be narrow, and is reserved only for "extreme" circumstances.  *See, e.g., W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,

No. 01-01139 (JKF), 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004) ("Although the automatic stay can be extended to situations involving nondebtors, courts are careful to reserve such power to the most extreme and 'unusual circumstances.'"); *In re Aldan Indus., Inc.*, No. 00-10360DWS, 2000 WL 357719, at *4 (Bankr. E.D. Pa. Apr. 3, 2000) (referring to *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986), "as a narrow exception to the prohibition against extending the protection of the automatic stay"). Some courts have interpreted "unusual circumstances" to include any negative impact on the debtor's management and reorganization efforts. *In re Phila. Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009) (citing *McCartney*, 106 F.3d 506). The TCC respectfully submits that this interpretation is inconsistent with the statute and not required by *McCartney*.

In *McCartney*, the Third Circuit applied the "unusual circumstances" exception in an unusual case—where the debtor attempted to limit the application of the § 362(a) automatic stay to a related party, in order to create an irreconcilable conflict for a creditor between complying with the Bankruptcy Code and complying with state law in order to seek a remedy on a single loan with a third party guaranteed by the debtor. In that case, the debtor (Lamar McCartney) attempted to use the § 362(a) automatic stay provision as a sword to prevent a foreclosing bank from pursuing a deficiency judgment against a related third party (Lamar's Restaurant & Lounge, Inc.) on a loan that the debtor guaranteed, because doing so would have required the bank to name the debtor under Pennsylvania state law, in violation of the automatic stay. *McCartney*, 106 F.3d 506. The Third Circuit refused to allow the debtor to prevent the stay from applying to a related entity whose sole purpose at that point was to be named in a deficiency action so that the creditor could pursue

the debtor-guarantor under state law. *Id*. at 510-11.[75]  Nothing in *McCartney* suggests the application of "unusual circumstances" to stay actions against solvent third parties with independent liability to creditors.  Quite the opposite – *McCartney* also states that "it is universally acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the … debtor." *Id*. at 509-10 (citations and quotations omitted).  And yet LTL's entire justification for extending the stay to solvent third parties is that resolution of similar litigation could have a negative impact on LTL's ability to reorganize.  That simply cannot be the test.

Allowing negative impact, without anything more, would also create an unworkable standard for federal and state courts that have to apply the automatic stay.  As Judge Wood recently observed in the *Aearo* oral argument on a similar issue at the Seventh Circuit, the stay is automatic.[76]  The § 362(a) stay was written by Congress to apply upon the filing of a petition, without the need for any further order by a bankruptcy court, and "irrespective of whether the parties to the proceedings stayed are aware that a petition has been filed." *Maritime Elec. Co.*, 959 F.2d at 1204.  If Debtor's expansive view of § 362 is allowed to stand, any court overseeing any litigation between non-debtor third parties could be called upon to determine whether that litigation has sufficient impact on a particular debtor's reorganization effort and therefore *must* be stayed under § 362.  Such a view is not mandated by *McCartney*, a case based on the tactical machinations of the debtor, and it is directly contrary to the Third Circuit's opinion in *Maritime Electric*, which involved related claims among related parties and in which only the claim against the specific

---

[75]    Concurring in the opinion only, Judge Stapleton took prescient issue with the majority's allowing unusual circumstances to warrant an exception to the plain text of § 362, noting that the Court's "conclusion, while it makes no difference here, is likely to lead to mischief in the context of other cases." *Id*. at 513 (Stapleton, J., concurring). This case is a clear example of such mischief, where the Debtor is attempting to use the automatic stay as a sword to gain a litigation advantage for its highly solvent corporate parent.
[76]    Ex. 43, at 5:10-19 (7th Cir. Oral Arg. Tr. of Apr. 4, 2023).

debtor was stayed by § 362.  This Court should decline to follow the *Philadelphia Newspapers*

formulation that adverse impact on a debtor's ability to accomplish reorganization is sufficient to

warrant the application of the "unusual circumstances" exception.  And because the only "unusual

circumstance" in this case is "that a debtor comes to bankruptcy with the insurance accorded LTL,"

*In re LTL Mgmt., LLC*, 2023 WL 2760479, at *17 (3d Cir. 2023), this Court should not extend the

stay to any non-debtors.

    **C.**    **Even Under an Adverse Impact Analysis, an Extension of the Stay Is Not Warranted in This Case**

        Even under LTL's view that the § 362(a) stay may be extended where the action to be

stayed would have an "immediate adverse economic consequence for the debtor's estate,"

*Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287–88 (2d. Cir. 2003), LTL cannot meet that

standard.  LTL has not established that staying the cases against solvent independently liable third

parties will have such an effect.[77]  Moreover, the relief sought by the Debtor here should be

exercised by the Court only upon a clear and convincing showing of an "extraordinary set of

circumstances."  *Millard v. Developmental Disabilities Inst., Inc.*, 266 B.R. 42, 44 (E.D.N.Y.

2001) ("Extension of the Automatic Stay to non-bankrupt defendants is a matter of discretion");

---

[77]    The Third Circuit has not directly decided whether any extension of the automatic stay—even if proper generally—must be implemented with an injunction under § 105.  *See Wedgewood Investment Fund, Ltd. v. Wedgewood Realty Group, Ltd. (In re Wedgewood Realty Group, Ltd.)*, 878 F.2d 693, 701 (3d Cir. 1989) (allowing § 105 to apply where § 362 was unavailable, but not in the context of a stay against non-debtors; *see also McCartney*, 106 F.3d at 506 (noting in parenthetical that Fourth Circuit relied on both the "automatic stay provision and the bankruptcy court's equitable powers under 11 U.S.C. § 105 to enjoin actions against nondebtor codefendants").  "The courts cited by *McCartney* . . . relied on 11 U.S.C. § 105(a), not § 362(a), to enjoin the actions against the non-bankrupt parties."  *Stanford v. Foamex L.P.*, Civ. A. No. 07–4225, 2009 WL 1033607, at *1 n. 7 (E.D. Pa. Apr.15, 2009).  *See also Patton v. Beardon*, 8 F.3d 343, 349 (6th Cir. 1993) ("such extensions [of the stay], although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court").  Because the stay is automatic and based in federal law, and therefore could be interpreted and applied by any court of the United States, bankruptcy courts have generally entered injunctions under § 105 to extend the application of the automatic stay.  Although the TCC does not believe that an extension of the stay is permitted at all, to the extent this Court wishes to have an injunction take effect in any other court, it must be issued under § 105 provided that such an injunction is permitted.  For the reasons explained in Part III, *infra*, this Court does not have jurisdiction to enter a § 105 injunction against non-debtor third parties, which also independently forbids this Court from extending the § 362 stay to them.

*see FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*, No. 10-75439, 2012 WL 6681794, at \*8 (Bankr.

E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012) ("[E]xtensions of the stay to protect non-

debtor parties are the exception, not the rule, and are generally not favored. Thus, the movant must

show by 'clear and convincing evidence' that extension of the stay is warranted.") (citing *Millard.*,

266 B.R. 42); *Univ. Med. Ctr. v. American Sterilizer Co. (In re Univ. Med. Ctr.)*, 82 B.R. 754,

757 (Bankr. E.D. Pa. 1988) (noting that "invocation of § 105(a) must be reserved for a truly

'extraordinary set of circumstances'").    As set forth in the TCC's Objection to the Preliminary

Injunction in LTL 1.0 [Adv. Pro. Doc. No. 142, at 47-73],[78] incorporated by reference herein, and

for the following additional reasons, the Debtor has not come close to meeting this burden.

**Identity of Interests**.  LTL claims that the stay should be extended to hundreds of protected

parties because they have an "identity of interests" such that a suit against a protected party is a

suit against the Debtor.  [Adv. Pro. Doc. No. 2, at 53-54.]  Yet LTL's proffered reason for its

shared identity with these hundreds of parties, many of which do not even have common ownership

with LTL, is that the talc claims "seek recoveries for the same alleged conduct under the same or

similar theories."  [*Id.* at 56.]  In other words, the claims have a nexus of fact and nexus of law.

But that is precisely what the Third Circuit has held *cannot be the basis* for extending the stay to

non-debtors even if they are co-defendants:  "[T]he automatic stay is not available to non-bankrupt

co-defendants of a debtor even if they are in a similar legal or factual nexus with the debtor."

*Maritime Elec.*, 959 F.2d at 1205.[79]  LTL offers no further explanation as to why there is an identity

---

[78]     Ex. 44.

[79]     LTL cites as the primary case for this section of its brief the Fourth Circuit case *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986), in which the automatic stay was extended to non-bankrupt codefendants in unusual circumstances.  Far from being adopted as law by the Third Circuit, *A.H. Robins* was cited **negatively** by *Maritime Electric* on the very legal and factual nexus point quoted above.  *Maritime Elec.*, 959 F.2d at 1205.  And while *McCartney* did rely on *A.H. Robins* for the extension of unusual circumstances generally, as set forth above, *McCartney* also kept in place *Maritime Electric*'s prohibition on extending the automatic stay to non-debtors based on a legal or factual nexus.  *McCartney*, 106 F.3d at 509-10.  Therefore, even if *A.H. Robins* could be read to provide

of interests with each of the hundreds of protected parties beyond the purported legal and factual

nexus, and thus there is no identity of interests under controlling Third Circuit law.[80]

**Joint and Several Liability**.   Many of the protected parties are alleged to have been

independently liable as a joint tortfeasor in many cases, which does not justify extension of the

stay to them in those cases.   As an initial matter, the Third Circuit has made clear that in a suit with

multiple claims, "[a]ll proceedings in a single case *are not* lumped together for purposes of

automatic stay analysis," *Maritime Elec.*, 959 F.2d at 1204 (emphasis added), and the only claims

to be stayed are those that are against the debtor.   Even *A.H. Robins*, on which LTL so heavily

relies, held the stay was "inapplicable to the facts of th[e] case the situation where the third-party

defendant was independently liable as, for example, where the debtor and another are joint tort

feasors or where the nondebtor's liability rests upon his own breach of duty."  *A.H. Robins*, 788

F.2d at 999 (citation omitted); *see also Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076

(3d Cir. 1983) (denying to apply the stay to a joint tortfeasor); *Phar-Mor, Inc. v. Gen. Elec. Capital

Corp.*, 166 B.R. 57, 62 (W.D. Pa. 1994) (denying to apply the stay to independently liable third

---

the expansive relief LTL seeks based on its legal and factual nexus with the protected parties, *Maritime Electric*
expressly forecloses that relief, and *McCartney* does not alter that aspect of *Maritime Electric*.

[80]    LTL's argument that the potential for collateral estoppel, res judicata, and evidentiary prejudice warrant
application of the stay to non-debtors cannot be squared with the *Maritime Electric*'s prohibition against applying the
stay to non-debtor codefendants even if they are in a common legal or factual nexus with the debtor—which is
necessary for collateral estoppel, res judicata, and evidentiary prejudice to apply.   In any event, given the numerous
pre-bankruptcy adverse talc judgments against J&J, the horse is out of the barn – any risk of preclusion or record taint
would already exist.   Notably, there has been no finding that any J&J entity, in any talc case, has ever been subject to
any preclusion based on a judgment against a different entity, showing that Debtor's argument on this score is baseless.

    In addition, any identity of interests between LTL and the protected parties was manufactured by LTL's
corporate parents in an effort to game the Bankruptcy Code through manipulation and artifice.   *See, e.g.*, *In re Owens
Corning*, 419 F.3d 195, 200, 216 (3d Cir. 2005);   *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re
Integrated Telecom Express, Inc.)*, 384 F.3d 108, 129 (3d Cir. 2004); *In SGL Carbon Corp.*, 200 F.3d 154, 157 (3d
Cir. 1999); *In re Millennium Lab Holdings II LLC*, 945 F.3d 126, 139 (3d Cir. 2019); *In re Combustion Eng'g, Inc.*,
391 F.3d 190, 238 (3d Cir. 2004).   Regardless whether the underlying Texas Two-Step transactions that led to the
creation of LTL were legitimate, those collusive transactions cannot then be the basis for extending the stay to the
protected parties.   Such a formulation would allow any non-distressed party to engineer receiving the protection of a
litigation stay while avoiding the supervision of a bankruptcy court—the definition of artifice.

parties).  As such, the stay should not be extended to any claim where a plaintiff has alleged joint

tortfeasor or independent liability, most notably J&J in many cases.

**Liquidation of Claims**.  LTL also warns that allowing continued litigation against third

parties could also result in an indirect liquidation of claims through actions against third parties

with indemnity rights.  [Adv. Pro. Doc. No. 2, at 59.]  But LTL fails to explain why satisfaction of

a plaintiff's legitimate tort claim by a third party would do anything other than reduce LTL's tort

liability, in exchange for no more than a potential equal increase in LTL's potential

indemnification liability.  And, to the extent that the third party is J&J—the real party LTL is

attempting to protect in this entire bankruptcy—such a parallel indemnification claim would likely

be subordinated.  While J&J might complain such an outcome would not give J&J the benefits of

bankruptcy it seeks despite being one of the wealthiest and most solvent companies in the world,

LTL would benefit by being able to subordinate an unsecured general liability.

Indemnity Rights Not Clearly Established.  In its LTL 2.0 brief, LTL rehashes the nearly

identical argument in LTL 1.0 concerning Old JJCI's obligation to indemnify J&J, which LTL

claims to have inherited in the Texas Two-Step.  [Adv. Pro. Doc. No. 2, at 11-15.]  Yet when the

Third Circuit dismissed LTL 1.0, it did so on the assumption that LTL's indemnity obligations

were indeed as broad as LTL had indicated.  2023 WL 2760479, at *15 n.16.  However, the Third

Circuit also expressed doubt as to whether these obligations were as solid as LTL indicated:  "For

example, it is not obvious LTL must indemnify J&J for the latter's independent, post-1979 conduct

that is the basis of a verdict rendered against it. . . . It is also not clear the indemnity should be read

to reach punitive damage verdicts rendered against J&J for its own conduct."  *Id*.  The Third Circuit

also cast doubt on whether "Old Consumer assumed responsibility from J&J for *all* claims relating

to Shower to Shower."  *Id*. (emphasis in original).  In response, LTL offers nothing more in LTL

2.0 that would answer any of the Third Circuit questions, much less establish an indemnity right by clear and convincing evidence.  Indeed, LTL might even choose to defend against an indemnification claim submitted by J&J for punitive damages by pointing to New Jersey's public policy against indemnification for such damages.  *Johnson & Johnson v. Aetna Cas. & Sur. Co.*, 285 N.J. Super. 575, 580-89 (App. Div. 1995).  LTL's willingness to give billions of dollars away to its corporate parent also warrants additional skepticism as to whether LTL and its directors are negotiating LTL's obligations in the best interest of LTL's creditors.[81]

### D.    The Stay Under § 362(a)(3) is Inapplicable Here

In addition to invoking § 362(a)(1)'s stay of "actions against the Debtor," LTL also invokes § 362(a)(3)'s stay of "any act to obtain possession of property of the estate," pointing to shared insurance coverage to justify the stay of litigation against hundreds of non-debtors.  The Third Circuit has, however, instructed that courts should not just "assume[] that independent claims

---

[81]    The Third Circuit noted the 1979 Agreement's plain language under which the Baby Products Company agreed to assume all "liabilities and obligations of every kind and description *which are allocated on the books or records of J&J* as pertaining to its BABY Division."  2023 WL 2760479, at *15 n.16 (emphasis in original).  The phrase "books or records" has a specific meaning in corporate law.  N.J.S.A. 14A:5–28 (describing "books," "records," "minutes" and other documents).  LTL has never offered any evidence as to which, if any, liabilities were "allocated on the books or records" in 1979.  The first talc-related tort case was not filed against J&J until 1982.  LTL's chief legal officer testified that he never looked for the 1978 or 1979 books and records.  11-4-21 Tr. 257:23-258:1.

This Court has relied on *Bouton v. Litton Industries, Inc.*, 423 F.2d 643 (3d Cir. 1970).  But there the assumption agreement contained broad language referring to "all liabilities and obligations . . . in respect of the contracts and commitments . . . and all other contracts and commitments entered into in the regular and ordinary course of . . . business at any time."  *Id.* at 648.  The contrast with the 1979 Transfer Agreement is stark.

This Court has also pointed to a practice of intercompany charges between J&J and Old JJCI allocating legal expenses for talc-related litigation.  But internal accounting allocations and inter-company payments within the J&J group do not prove legal liability to talc claimants on the part of Old JJCI and thus LTL.  At most, such transfers reflect J&J's discretionary decisions about how to account for expenses within the J&J group.  J&J's assistant controller testified that J&J's internal allocation is "an accounting decision," not an assessment of legal liability.  Ex. 45, at 140:23 (Oct. 30, 2021 Lisman Dep.).  The internal allocation does not consider legal liability as assessed by courts.  *Id*. at 141:10-142:7; Ex. 46, at 255:20-22, 256:7-256:20 (Nov. 4, 2021 Hearing Tr.).  The assistant controller conceded that the allocation of expenses was "subjective," Ex. 45, at 45:7-11 (Oct. 30, 2021 Lisman Dep.); Ex. 21, at 93:14-17, 94:5 (Feb. 16, 2022 Hearing Tr.), and not mandated by GAAP.  Ex. 45, at 90:14-17, 139:14-24 (Oct. 30, 2021 Lisman Dep.).  LTL's chief legal officer testified which entity (J&J or Old JJCI) paid a specific expense was a matter of "administrative convenience."  Ex. 46, at 255:23-256:6 (Nov. 4, 2021 Hearing Tr.).

against [non-debtors] would reduce the insurance proceeds available to the estate." *Combustion Eng'g*, 391 F.3d at 232-33 (finding no "related to" jurisdiction in the absence of "factual findings regarding the terms, scope or coverage of the allegedly shared insurance policies"). But LTL admits in its motion that its purported coverage is illusory, with Mr. Kim declaring that "none of [the] insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid the costs of defense, or indemnified J&J or Old JJCI for settlements or judgments." (Kim Decl. II ¶ 48.) Because the carriers are currently disputing coverage—even filing a declaratory action which LTL now claims is stayed—there is no actual present risk of depletion of available insurance proceeds. That speculative risk fails to provide a basis for extending the automatic stay. *See Combustion Eng'g*, 391 F.3d at 226; *Phar-Mor*, 164 B.R. at 906; *In re Imerys Talc America, Inc.*, 2019 WL 3253366, at *2–9 (D. Del. 2019).[82] Moreover, even if coverage exists, LTL has failed to show that the $2 billion policy limit was not overtopped by the $3.5 billion in talc judgments and settlements J&J paid in the five years before LTL filed for bankruptcy in LTL 1.0.

## III.     LTL IS NOT ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF UNDER § 105 OF THE BANKRUPTCY CODE

LTL also requests that this Court preliminarily enjoin, under 11 U.S.C. § 105, defendants in the adversary proceeding "from commencing or prosecuting Debtor Talc Claims against the Protected Parties." [Adv. Pro. Dkt. 2, at 83.] The scope of the injunction sought should not be understated—LTL seeks a nationwide injunction against thousands of cases and potential cases brought by tens of thousands of tort victims against hundreds of solvent entities—including some

---

[82]     To the extent that the Court concludes that the alleged shared insurance proceeds do constitute property of the estate, the Debtor still has not proven that it would impact the Debtor's property, as the Court can fashion relief to protect the purported shared insurance policies, including preventing any party claiming an interest in the proceeds (such as J&J) from making a claim to the proceeds of the policies absent relief from the Debtor's automatic stay. *See Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 337-38 (Bankr. S.D.N.Y. 1996) ("We are not convinced that an action by a third party to recover a judgment against another third party, whose liability may be covered under an insurance policy that also grants the debtor separate rights, implicates the automatic stay.").

of the richest corporations in America—based on J&J's attempt to manufacture a financially distressed subsidiary created solely for the purpose of obtaining this injunction. The Third Circuit has promulgated a two-step analytic process for any bankruptcy court considering whether to issue a § 105(a) injunction: First, the court must determine whether it has an independent source of federal subject matter jurisdiction to enter the requested injunction. *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 591 F.3d 164, 170 (3d Cir. 2009). Second, the court must then consider the merits of the requested injunction. *Id.* LTL's requested injunction, disrupting proceedings in hundreds of sister federal and state courts entitled to comital respect by this Court, is outside the limited jurisdiction of this federal court, and is any event not warranted by the circumstances of LTL 2.0.

### A.   The Court Does Not Have Subject Matter Jurisdiction to Issue the Requested Injunction Enjoining Actions Between Non-Debtors

Because federal courts are of limited jurisdiction, they have a continuing non-waivable independent obligation to determine that subject matter jurisdiction exists, even in the absence of a challenge from a party. *See, e.g.*, *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 267 (3d Cir. 2016); *Superior Contracting Group Inc. v. Rachmale (In re LTC Holdings, Inc.)*, 587 B.R. 25, 29 (Bankr. D. Del. 2018) (confirming that this duty extends to bankruptcy courts). Parties cannot consent to jurisdiction, *Hartig Drug*, 836 F.3d at 267, nor can any "action of the parties [] confer subject-matter jurisdiction upon a federal court." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). A party asserting jurisdiction bears the burden of the necessary jurisdictional facts. *See Nuveen Mun. Tr. v. WithumSmith Brown, P.C.*, 692 F.3d 283, 293 (3d Cir. 2012).

Because it is well settled that "§ 105 does not provide an independent source of federal subject matter jurisdiction," the Court must determine that jurisdiction "exist[s] independently of

any [request to] enjoin claims against non-debtors" *Combustion Eng'g*, 391 F.3d at 224-25. Pursuant to 28 U.S.C. § 1334(b), a bankruptcy court has jurisdiction over (i) cases under the Bankruptcy Code, as well as all matters or proceedings that (ii) "arise under" the Bankruptcy Code; (iii) "arise in" a case under the Bankruptcy Code—the "core" proceedings—or (iv) "relate to" a proceeding under the Bankruptcy Code—commonly referred to as "related-to jurisdiction." *Phila. Newspapers*, 407 B.R. at 612; *Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006).

In order for a § 105 injunction to issue to stay a proceeding involving non-debtors, the bankruptcy court must establish jurisdiction (core or related-to) over the subject case, rather than ending the inquiry over whether the bankruptcy court has jurisdiction simply over the adversary proceeding in which the injunction is sought. *In re W.R. Grace*, 591 F.3d at 174 ("If we were to accept Grace and Montana's position, however, a bankruptcy court would have power to enjoin any action, no matter how unrelated to the underlying bankruptcy it may be, so long as the injunction motion was filed in the adversary proceeding. . . . The existence of a bankruptcy proceeding itself has never been and cannot be an all-purpose grant of jurisdiction.") (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 692 (1986)). The question is therefore not whether § 362 is a "core-proceeding" or whether the court has jurisdiction over the adversary proceeding filed by LTL, but rather whether the bankruptcy court has core or related-to jurisdiction over the claims in the tort cases sought to be enjoined. *In re W.R. Grace*, 591 F.3d at 174.

As the Third Circuit has explained, a "core" proceeding is one where the Bankruptcy Code creates the cause of action or provides the substantive right being invoked, or if such proceeding has "no existence outside of the bankruptcy." *Stoe v. Flaherty*, 436 F.3d at 216 (citing *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999), and *U.S. Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999)). In *Stoe*, the Third Circuit looked to the source of the

underlying claims at issue—Pennsylvania state law—and determined that they were not "core" claims because they arose outside bankruptcy law and could exist outside bankruptcy court, even though application of the Bankruptcy Code was a potential defense.  436 F.3d at 217-18.  LTL cannot deny that the tort claims in the litigation they seek to enjoin arose outside bankruptcy law and could exist outside bankruptcy court.  Indeed, the entire point of this bankruptcy is to halt that pre-existing non-bankruptcy litigation.  This Court therefore does not have "core" subject matter jurisdiction to issue the § 105 injunction.

That leaves "related-to" jurisdiction as the only potential source of jurisdiction for this Court, but that too fails under a long line of controlling law.  Four times, the Third Circuit declined to extend related-to jurisdiction to cases against non-debtors in asbestos bankruptcy cases, even when the third party had an indemnification right against the estate.  *Pacor Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984); *In re Federal–Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002); *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004); *In re W.R. Grace*, 591 F.3d 164.  In *Combustion Eng'g*, for example, the Third Circuit rejected the arguments (similar to the arguments here) that related-to jurisdiction could be established by a "unity of interest" between the debtor and non-debtors, based in part on "joint operations at single sites leading to the asbestos personal injury claims at issue" and "extensive financial inter-dependence."  391 F.3d at 230.  The Third Circuit has rejected Debtor's other justifications for relief as well.  *See, e.g., In re W.R. Grace*, 591 F.3d at 172 (debtor "will not be bound by any judgment against the third party in question"); *Pacor*, 743 F.2d at 995 ("Since Manville is not a party to the Higgins-Pacor action, it could not be bound by res judicata or collateral estoppel").

Even if an indemnification right by the proposed protected parties could be the basis for related-to jurisdiction, and it cannot, that right only exists against this Debtor because of the

allocation of agreements on the eve of the bankruptcy filing solely for the purpose of issuing the proposed injunction. Such a fabrication cannot be the basis for this Court's jurisdiction, as it runs afoul of the longstanding principle that federal jurisdiction cannot be manufactured. *See In re Combustion Eng'g, Inc.*, 391 F.3d at 228 (holding that, in an asbestos case, a debtor could not create subject matter jurisdiction over an affiliate simply by assignment).[83] The lack of subject matter jurisdiction ends the inquiry—the Court is a federal court of limited jurisdiction without the power to issue the requested injunction, and for that reason alone LTL's request should be denied.

### B.    The Debtor Has Not Satisfied Its Burden of Establishing the Requirements for Granting the Extraordinary Relief of a Preliminary Injunction

Even if the Court had jurisdiction to enter the § 105 injunction proposed by LTL, and it does not, LTL has failed to establish the requirements necessary for injunctive relief. The Third Circuit has recognized that § 105 can operate to enjoin proceedings that are excepted from the § 362 automatic stay (such as those against non-debtors), *provided that* the movant "meet[s] the standards for injunctive relief." *Wedgewood Realty Group*, 878 F.2d at 701.[84] A preliminary injunction—even one that is a fraction of the breadth requested here—is "an extraordinary

---

[83]    The Third Circuit has also made clear that "related to" bankruptcy jurisdiction exists only where "the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit." *Federal–Mogul*, 300 F.3d at 382; *see also Combustion Eng'g*, 391 F.3d at 231–32; *In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (Bankr. E.D. Pa. 2013) ("The existence of an indemnification agreement between a defendant in a proceeding outside the bankruptcy action and a non-party bankrupt debtor does not automatically supply the nexus necessary for the exercise of 'related to' jurisdiction. Only when the right to indemnification is clearly established and has accrued upon the filing of a civil action is the proceeding deemed 'related to' the bankruptcy case.") (citing *Federal–Mogul*, 300 F.3d at 382); *Imerys*, 2019 WL 3253366, at *3.

[84]    Federal stays of state-court litigation are strongly disfavored. The bankruptcy stay is a narrow exception to the otherwise "absolute prohibition against any injunction of any state-court proceedings." *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630 (1977); *see* 28 U.S.C. § 2283. That prohibition reflects the "fundamental principle of a dual system of courts" and respect for the sovereign authority of the States and their courts. *Atl. Coast Line R. Co. v. Bhd. of Locomotive Engineers*, 398 U.S. 281, 285-86, 297 (1970). That principle of respecting state-court autonomy weighs strongly in favor of returning jurisdiction to them to exercise as they see fit, not further extending federal "intervention." *Id.* at 296-97. *See In re Magnus Harmonica Corp.*, 237 F.2d 867, 869 (3rd Cir. 1956) (citing § 2283 in declining to enjoin a state-court lawsuit between a bankruptcy creditor and third party with related indemnity rights against the bankruptcy estate, and finding that bankruptcy court's "control is unaffected by whatever goes on outside the bankruptcy court in litigation between one of the bankrupt's creditors and a party who has independent liability on one of the bankrupt's contracts. . . . If the creditor wins the state suit . . . [the third parties] may find themselves having to satisfy their obligation [without being] fully repaid").

remedy." *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) ("injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course"); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989) (same); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson – Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578 (3d Cir. 2002) (same); *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151 (3d Cir. 1999) (same).

To obtain a preliminary injunction, LTL must establish *each* of the traditional four elements: (1) a reasonable likelihood of a successful plan of reorganization; (2) irreparable harm to its ability to reorganize without the requested relief; (3) that the relative balance of the harms weighs in favor of granting the injunction; and (4) that the requested relief would serve the public interest. *See Phila. Newspapers*, 407 B.R. at 617 (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)); *In re G-I Holdings Inc.*, 420 B.R. 216, 281 (D.N.J. 2009). Given the extraordinary nature of preliminary injunctive relief, the burden of proof is on LTL, to establish, by clear and convincing evidence, each of the foregoing elements. *See Phila. Newspapers*, 407 B.R. at 616-17. While the failure to establish even one factor must doom LTL's requested relief, LTL cannot establish any of the four elements.

***First***, as set forth in detail in Part I, *supra*, the entire enterprise of LTL 2.0 is infected with bad faith. LTL simply was not in financial distress from an asset or a liability side at the time of its filing, notwithstanding its efforts to give away over $50 billion in value in just two hours. Contrary to "fixing" the flaws identified by the Third Circuit in LTL 1.0, as LTL disingenuously claims now, this bankruptcy is rooted in even less good faith than LTL 1.0. There is no reasonable likelihood that any plan will survive because the entire bankruptcy must be dismissed. And, in any event, as the U.S. Trustee wisely noted at the First Day Hearing on April 11, the level of

47

support proffered by LTL may be far less than indicated, and the opposition far greater, further

dooming the likelihood of a successful confirmation.

**Second**, any allegation of irreparable harm—which must include more than merely

monetary harm—has been foreclosed by the Third Circuit's opinion in LTL 1.0.  The Court

expressly stated that further talc litigation would facilitate rather than hinder reorganization:

> Risks associated with premature filing may be particularly relevant in the context of a mass tort bankruptcy. Inevitably those cases will involve a bankruptcy court estimating claims on a great scale—introducing the possibility of undervaluing future claims (and underfunding assets left to satisfy them) and the difficulty of fairly compensating claimants with wide-ranging degrees of exposure and injury. On the other hand, a longer history of litigation outside of bankruptcy may provide a court with better guideposts when tackling these issues . . . .

2023 WL 2760479, at *10.  The Third Circuit noted, for example, that the A.H. Robins bankruptcy

"had the benefit of data from 15 years of tort litigation by A.H. Robins before its filing." *Id.* at *10

n.13.

Irreparable harm cannot be established by a course of action specifically recommended by

the Third Circuit.  And, as defense counsel in the Valadez case demonstrated at the First Day

Hearing, the protected parties are more than capable of defending themselves.  Litigation is not

irreparable harm.  The possibility of having to pay money damages is not irreparable harm. *See,*

*e.g., Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation

expenses, even substantial and unrecoupable cost, does not constitute irreparable injury.").

Moreover, because the surrender of the 2021 Funding Agreement is avoidable and

otherwise subject to being unwound, the prosecution of claims against non-debtors cannot impact

LTL's estate.  *See 3M Occupational Safety LLC v. Those Parties Listed on Appendix A to the*

*Complaint (In re Aearo Technologies LLC)*, 642 B.R. 891, 911-12 (Bankr. S.D. Ind. 2022), appeal

pending, No. 22-2606 (7th Cir.) (denying § 105(a) relief where debtor protected by funding agreement).

Nor has the Debtor ever tried to make any concrete showing to support its speculation that continued litigation against J&J would somehow otherwise impair the Debtor's ability to reorganize. The Debtor has no business to reorganize. The Debtor's skeletal staff no longer have any responsibilities for products liability claims brought against J&J. Any "distraction" could occur only if the Debtor's seconded staff insinuated themselves in J&J's defense of talcum powder claims, and of course, the Debtor cannot manufacture its own impairment of estate administration to justify extension of the stay. *See In re Aearo Technologies LLC*, 642 B.R. at 911 (rejecting argument that litigation would "create a significant distraction" where "Aearo and 3M have been embroiled in the MDL for over three years").

*Third*, the balance of harms heavily favors allowing litigation by tort victims to proceed, who are continuing to die as LTL continues abusing the bankruptcy process for delay. Hundreds perished during the pendency of the first bankruptcy. In *Gold v. Johns-Manville Sales Corp.*, the Third Circuit declined to stay actions against Johns Manville's co-defendants, citing the "hardship" to victims from "being forced to wait for an indefinite and ... lengthy time before their cases are heard," while "plaintiffs and crucial witnesses are dying, often from the very diseases" that led to that litigation. 723 F.2d 1068, 1076 (3d Cir. 1983). Delay in their ability to pursue compensation and support for medical expenses is "'substantial and irreparable injury.'" *United Steelworkers of Am. v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir. 1979).

LTL's brief blithely dismisses the extreme prejudice suffered by tort victims whose cases are ready to be litigated now, instead attempting to misdirect the Court by stating that "it would take decades to resolve them all." (Mem. at 78.) LTL then argues that there is no harm at all by

denigrating the "tort system"—in other words, the American justice system—as "likely to harm claimants." (*Id*. at 79.) This Court should not countenance an ad hominem attack of federal and state courts all around the country, which are entitled to comital respect, especially where the Third Circuit has indicated that further talc litigation would help reorganization.

The injuries suffered by the affected victims are real. In *Ingham*, the appellate court eloquently described the devastation experienced by these victims in describing what it found to be J&J's "reprehensible" conduct:

> The harm suffered by Plaintiffs was physical, not just economic. Plaintiffs each developed and suffered from ovarian cancer. Plaintiffs underwent chemotherapy, hysterectomies, and countless other surgeries. These medical procedures caused them to experience symptoms such as hair loss, sleeplessness, mouth sores, loss of appetite, seizures, nausea, neuropathy, and other infections. Several Plaintiffs died, and surviving Plaintiffs experience recurrences of cancer and fear of relapse. All Plaintiffs suffered mentally and emotionally. Their ovarian cancer diagnoses caused them constant worry and fear.

*Ingham*, 608 S.W.3d at 721. The harms to these victims deserve to be taken seriously, without J&J's patronizing denigration of their choice to avail themselves of the American justice system.

*Fourth*, LTL's argument that the public interest is served by denying citizens of this country their constitutional rights to have their day in court turns the very concept of public interest on its head. The public interest is not served by LTL's invitation to this Court to usurp the policymaking function that properly belongs in the democratic process, rather than J&J's attempt to unilaterally and undemocratically implement its self-serving form of tort reform via this filing. The public interest is served by letting the American justice system continue to function without intentional interference by one of the world's most powerful corporations. The public interest is served by giving claimants their right to a jury trial ensconced in the Seventh Amendment. LTL's proposed injunction is therefore not warranted under any of the traditional four injunctive relief elements that apply to § 105, and its request should be denied.

## CONCLUSION

For all of the foregoing reasons, the Committee respectfully requests that the Court deny

the Motion in its entirety.

Respectfully submitted,

**GENOVA BURNS LLC**

Dated: April 17, 2023

By: _/s/ Daniel M. Stolz_
    Daniel M. Stolz, Esq.
    Donald W. Clarke, Esq.
    110 Allen Road, Suite 304
    Basking Ridge, NJ 07920
    Tel: 973-467-2700
    Fax: 973-467-8126
    Email:    dstolz@genovaburns.com
             dclarke@genovaburns.com

_Proposed Local Counsel to the Official_
_Committee of Talc Claimants_