Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011

# In The
# United States Court of Appeals
# for the Third Circuit

---

IN RE: LTL MANAGEMENT LLC,

*Debtor*

---

*OFFICIAL COMMITTEE OF TALC CLAIMANTS,

*Appellant*

*(Amended per Court's Order dated 06/10/2022)

---

On direct appeal from the United States Bankruptcy Court
for the District of New Jersey, No. 21-30589, Adv. Proc. No. 21-3023

---

**MOTION TO STAY THE MANDATE**

---

| | |
|---|---|
| GREGORY M. GORDON | NEAL KUMAR KATYAL |
| BRAD B. ERENS | SEAN MAROTTA |
| DAN B. PRIETO | WILLIAM E. HAVEMANN |
| JONES DAY | JO-ANN TAMILA SAGAR |
| 2727 North Harwood Street | PATRICK C. VALENCIA |
| Dallas, Texas 75201 | HOGAN LOVELLS US LLP |
| | 555 Thirteenth Street, N.W. |
| C. KEVIN MARSHALL | Washington, D.C. 20004 |
| DAVID S. TORBORG | (202) 637-5600 |
| JONES DAY | neal.katyal@hoganlovells.com |
| 51 Louisiana Avenue, N.W. | |
| Washington, D.C. 20001 | |

March 22, 2023                                          *Counsel for LTL Management LLC*

**MOTION TO STAY THE MANDATE PENDING THE FILING AND
DISPOSITION OF A PETITION FOR A WRIT OF CERTIORARI**

Debtor LTL Management LLC intends to seek certiorari of the Court's judgment. To avoid the chaos that would occur if LTL's petition were dismissed by the Bankruptcy Court then reinstated by the Supreme Court, LTL respectfully requests the Court stay the mandate pending LTL's filing of its petition and until the Supreme Court's final disposition. *See* Fed. R. App. P. 41(d). Appellants all oppose the motion.

**INTRODUCTION**

"Courts have not been unanimous about what constitutes 'good faith' in the Chapter 11 filing context." *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999). The Court found that LTL's petition did not meet this standard, Op. 54, but acknowledged that LTL had "[g]ood intentions" and a "sincerely held" belief that bankruptcy was justified, Op. 18, 56.

All of that would have forced a different outcome in the Fourth Circuit where "a lack of good faith" requires both " 'objective futility' and 'subjective bad faith.' " *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 279-280 (4th Cir. 2007) (quoting *Carolin Corp. v. Miller*, 886 F.2d 693, 700-701(4th Cir. 1989)); *see also In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) (considering both "financial condition[s]" and "motives"). And while the Court treated good faith as "essentially[]" a question of law reviewed de novo, Op. 33 (citation omitted), its

1

sister circuits review a bankruptcy court's good-faith finding under "the clearly erroneous standard," *Premier Auto. Servs.*, 492 F.3d at 279 (quoting *Carolin Corp.*, 886 F.2d at 702); *accord In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000); *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994).

Because, as the Bankruptcy Court put it, one "cannot help but ponder how a bankruptcy filing, which took place in North Carolina and most likely satisfied the good faith standards under the applicable law in that jurisdiction, suddenly morphs post-petition into a bad faith filing simply because the case travels 400 miles up I-95 to Trenton, New Jersey," A13, there is a very real possibility the Supreme Court will grant certiorari to reverse the panel's decision and provide much-needed clarity regarding the good-faith standard.  *See* Fed. R. App. P. 41(d)(2); *see also Nara v. Frank*, 494 F.3d 1132, 1133 (3d Cir. 2007).  The Court obviously believes in the correctness of its decision.  But it should nonetheless stay the mandate because the issues here are important, unsettled, and subject to reasonable "debat[e]." *American Mfrs. Mut. Ins. Co. v. American Broad.-Paramount Theatres, Inc.*, 87 S. Ct. 1, 2 (1966) (Harlan, J., in chambers).

Finally, if the mandate issues, and then the Supreme Court reviews and reverses, chaos and confusion will ensue.  The Bankruptcy Court will have to pick up where it left off after having dismantled the infrastructure that supported the bankruptcy case.  The Bankruptcy Court will dissolve the TCC, who then will not

2

have the opportunity to respond to LTL's certiorari petition; will approve final fee arrangements; and will discharge the fee examiner and future claims representative, all for naught. Meanwhile in courts across the country, claimants and LTL will need to move cases forward once more at the risk that they could be stayed again, this time mid-trial. This bankruptcy is large and affects a lot of people in a lot of ways. The Court should preserve the status quo until the Supreme Court has its say.

## ARGUMENT

This Court will stay the mandate pending the filing of a petition for a writ of certiorari if the movant "show[s] that the petition would present a substantial question and that there is good cause for a stay." Fed. R. App. P. 41(d)(1). This case qualifies. LTL's petition will present substantial questions regarding the good-faith standard and the standard of review that applies to it, and the potential chaos from the mandate issuing and the Supreme Court then reversing is good cause to hold the mandate until the Supreme Court weighs in.

**I.    LTL'S CERTIORARI PETITION WILL PRESENT SUBSTANTIAL QUESTIONS FOR SUPREME COURT REVIEW.**

A certiorari petition will present a "substantial question"—and thus warrants a stay of the mandate pending its disposition—if there is "a reasonable probability that the Supreme Court will grant certiorari," and "a reasonable possibility that at least five Justices would vote to reverse this Court's judgment." *Nara*, 494 F.3d at

3

1. Allowing the mandate to take effect will create chaos in the Bankruptcy Court and across mass-tort proceedings nationwide if the Supreme Court reverses this Court.

The Bankruptcy Court has noted that upon the mandate issuing, it will dismiss the petition and retain jurisdiction over only administrative matters, like fees. Dismissal of the bankruptcy brings with it dissolution of the TCC and discharge of its retained professionals, meaning claimants represented by the TCC would lack representatives to respond to LTL's petition for certiorari. *See* 11 U.S.C. § 103(g); *In re Great N. Paper, Inc.*, 299 B.R. 1, 5 (D. Me. 2003) ("When the statutory basis of the case is changed, either through dismissal or . . . conversion, the statute under which the Committee was created no longer applies and the committee is automatically dissolved.") (quotation marks omitted). In addition, dismissal will result in the discharge of the Bankruptcy Court's retained professionals, such as the mediators, the fee examiner, and the future claims representative. Then, if the Supreme Court reverses, the Bankruptcy Court would have to rewind all its efforts and rebuild the significant infrastructure that it had just dismantled.

Moreover, in the absence of a stay, there would be significant chaos and confusion across the mass-tort proceedings. Approximately 1,000 individually set ovarian-cancer claims are pending in various state courts outside of the federal

18

MDL and consolidated state proceedings in California and New Jersey. That means there are roughly 1,000 ovarian-cancer claims that are not subject to deliberate and measured docket-wide coordination procedures, and each will require state court judges and their staff to expend resources to "on track" the cases back into the system. Moreover, an additional 470 mesothelioma claims are pending in state courts across the country, none of which are coordinated, and many of which are filed on specialized, asbestos-specific accelerated dockets. Each of these cases would suddenly spring back into activity and proceed towards trial absent a stay.

The mesothelioma docket alone makes the point. The currently pending mesothelioma claims would return to 44 different courts across 25 different States. Many of the cases have proceeded in the interim against other defendants and without LTL's involvement, but suddenly LTL would be thrown into the mix—potentially significantly impacting the progress, scope, and nature of the cases. Worse, there are at least 20 mesothelioma cases now on the eve of trial or which could be set for trial in the next 60 days, each of which would demand significant investment in expedited, catch-up discovery; expert-witness engagement; trial-lawyer time; and other resources.

In other words, the complex mass-tort machinery could swiftly spring to life in dozens upon dozens of courts across the country, requiring unexpected time and

19

resources from not just LTL but also court personnel, only to potentially grind to a halt (again)—possibly even in the middle of multiple trials—if the Supreme Court were to grant review. And to be clear, this machinery does not run itself. From just LTL's perspective, prior to the bankruptcy petition, 30 firms and 40 experts were retained to handle the mesothelioma cases referenced above. Reconstituting this complex operation would be for naught if the Supreme Court decides to hear the case. This Court can—and should—avoid this chaos by maintaining the status quo while LTL seeks certiorari.

2. LTL will also suffer irreparable harm absent a stay pending certiorari. *See Nara*, 494 F.3d at 1133 (an applicant can demonstrate good cause by showing "a likelihood of irreparable injury absent a stay."). The purpose of LTL's bankruptcy petition was to channel into post-confirmation trusts all present and future asbestos-related tort claims against it, permitting compensation to be paid in a manner that ensures fair and equitable treatment of present and future claimants. As LTL explained in defending the automatic stay, its efforts to reorganize would be irreparably harmed if the mandate issues before final review of this case. *See* Dkt. 104, LTL Response Br. 76-99.

Furthermore, if the mandate issues, LTL will be forced to resume litigation of the tens of thousands of stayed claims. *See supra* pp. 18-20. Before bankruptcy, defense costs alone ran upwards of $10-20 million per month, A458, a

20