UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| | . | Clarkson S. Fisher U.S. |
| LTL MANAGEMENT LLC, | . | Courthouse |
| | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| Debtor. | . | |
| | . | April 11, 2023 |
| . . . . . . . . . . . . . . | . | 9:59 a.m. |

TRANSCRIPT OF MOTION BY MOVANT ANTHONY HERNANDEZ VALADEZ FOR AN
ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY, SECOND
AMENDED EX PARTE TEMPORARY RESTRAINING ORDER, AND ANTICIPATED
PRELIMINARY INJUNCTION, AND (II) WAITING THE FOURTEEN DAY STAY
UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(A)(3) [71];
DEBTOR'S MOTION FOR AN ORDER EXTENDING THE TIME WITHIN WHICH IT
MUST FILE ITS (I) SCHEDULES OF ASSETS AND LIABILITIES AND (II)
STATEMENT OF FINANCIAL AFFAIRS [14]; DEBTOR'S MOTION FOR AN
ORDER: (I) APPROVING THE CONTINUED USE OF ITS BANK ACCOUNT AND
BUSINESS FORMS AND (II) AUTHORIZING THE DEBTOR'S BANK TO CHARGE
CERTAIN FEES AND OTHER AMOUNTS [13]; DEBTOR'S APPLICATION
PURSUANT TO 28 U.S.C. § 156(C) AND 11 U.S.C. § 105(A) FOR ENTRY
OF AN ORDER AUTHORIZING THE APPOINTMENT OF EPIQ CORPORATE
RESTRUCTURING, LLC AS CLAIMS AND NOTICING AGENT NUNC PRO TUNC
TO THE PETITION DATE [11]; DEBTOR'S APPLICATION FOR DESIGNATION
AS COMPLEX CHAPTER 11 CASE [6]; DEBTOR'S MOTION FOR AN ORDER
SUSPENDING ENTRY AND SERVICE OF STANDARD NOTICE OF COMMENCEMENT
[5]; DEBTOR'S MOTION FOR AN ORDER: (I) AUTHORIZING IT TO FILE A
LIST OF THE TOP LAW FIRMS WITH TALC CLAIMS AGAINST THE DEBTOR
IN LIEU OF THE LIST OF THE 20 LARGEST UNSECURED CREDITORS; (II)
APPROVING CERTAIN NOTICE PROCEDURES FOR TALC CLAIMANTS; AND
(III) APPROVING THE FORM AND MANNER OF NOTICE OF COMMENCEMENT
OF THIS CASE [10]; DEBTOR'S MOTION PURSUANT TO 11 U.S.C. § 1505
FOR AN ORDER AUTHORIZING IT TO ACT AS FOREIGN REPRESENTATIVE ON
BEHALF OF THE DEBTOR'S ESTATE [12]
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:                    Wendy Quiles

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES:

```
For the Debtor:            Jones Day
                           By:  GREGORY M. GORDON, ESQ.
                                DAN B. PRIETO, ESQ.
                                AMANDA S. RUSH, ESQ.
                           2727 North Harwood Street, Suite 500
                           Dallas, TX  75201

                           Skadden Arps Slate Meagher &
                             Flom, LLP
                           By:  ALLISON M. BROWN, ESQ.
                           One Manhattan West
                           New York, NY  10001

Various Talc Personal      Watts Guerra LLP
Injury Claimants:          By:  MIKAL C. WATTS, ESQ.
                           5726 W. Hausman Road, Suite 119
                           San Antonio, TX  78249

For Ad Hoc Committee       Genova Burns LLC
of Certain Talc            By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc       494 Broad Street
Committee of Creditors:    Newark, NJ  07102

                           Brown Rudnick
                           By:  JEFFREY L. JONAS, ESQ.
                                DAVID J. MOLTON, ESQ.
                           7 Times Square
                           New York, NY  10036

                           Otterbourg PC
                           By:  MELANIA CYGANOWSKI, ESQ.
                           230 Park Avenue
                           New York, NY  10169-0075

For Anthony Hernandez      Kazan McClain Satterley & Greenwood
Valadez:                   By:  JOSEPH SATTERLEY, ESQ.
                           55 Harrison St. Suite 400
                           Oakland, CA  94607

For the Office of the      Office of the United States Trustee
United States Trustee:     By:  LINDA RICHENDERFER, ESQ.
                                JEFF SPONDER, ESQ.
                           J. Caleb Boggs Federal Building
                           844 King Street, Suite 2207
                           Lockbox 35
                           Wilmington, DE 19801
```

APPEARANCES CONT'D:

| | |
|---|---|
| For Various Talc<br>Claimants: | Maune Raichle Hartley Frency &<br>  Mudd, LLC<br>By:  CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |
| | Levy Konigsberg, LLP<br>By:  JEROME H. BLOCK, ESQ.<br>    MOSHE MAIMON, ESQ.<br>101 Grovers Mill Road, Suite 105<br>Lawrence Township, NJ  08648 |
| | Simon Greenstone Panatier, PC<br>By:  LEAH CYLIA KAGAN, ESQ.<br>1201 Elm Street, Suite 3400<br>Dallas, TX  75720 |
| For Claimant Alishia<br>Landrum: | Beasley Allen<br>By:  ANDY BIRCHFIELD, ESQ.<br>218 Commerce Street<br>Montgomery, AL  36104 |
| For Arnold & Itkin: | Pachulski Stang Ziehl & Jones LLP<br>By:  LAURA DAVIS JONES, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE 19801 |
| For Paul Crouch,<br>individually and on<br>behalf of Estate of<br>Cynthia Lorraine Crouch: | Ruckdeschel Law Firm, LLC<br>By:  JONATHAN RUCKDESCHEL, ESQ.<br>8357 Main Street<br>Ellicott City, MD 21043 |
| For the Ad Hoc Committee<br>of Attorney Generals: | Womble Bond Dickinson<br>BY:  ERICKA JOHNSON, ESQ.<br>1313 North Market Street<br>Suite 1200<br>Wilmington, DE, US 19801 |

- - - - -

4

1          (Proceedings commenced at 9:59 a.m.)

2          THE COURT:  We have new technology here.  Everything

3   is supposed to work better, more enhanced.  Not just for you

4   all.

5          Well, okay.  Good morning, again.  This is the LTL

6   Management LLC matter and -- log in.

7          All right.  We have a full plate on for today.  A

8   number of matters.  If I may, I'd like to take the liberty of

9   making a few preliminary comments.

10          My goal today is really to listen.  Listen to

11   presentations, listen to arguments from all parties.  Because

12   that's the intent, I am going to be somewhat generous in

13   allowing the use of the PowerPoints, the presentations, the

14   hyperbole, all of it.  I want to hear from you all about this

15   case and the respective positions.

16          I've read a lot.  We hear a lot.  But this is where

17   it's important.  In that regard, I'm cognizant that there's

18   been a significant amount of vitriol, ad hominem attacks,

19   lawyer versus lawyer, lawyers versus the Court, directed at

20   Johnson and Johnson, directed at groups.  That's unfortunate.

21          I think we all need to a degree to have a bit of a

22   thin skin.  I like to think the Court has a thick -- a thin

23   skin -- a thicker skin.  Wrong analogy.  A thicker skin.  Some

24   may be familiar.  I was a mayor of a small town in North Jersey

25   and there came a point in time when I would say more than half

1  my neighbors hated me and wanted me out.  I would walk my

2  children to school and I would see lawn signs that were more

3  caustic than cats paws or stooge or any of the language what

4  we're seeing.

5       I did then what I hope to do now is just put my head

6  down and do what I think is right, and I urge everybody to do

7  the same.  But let's try to raise our game.  The world -- it's

8  a horrible phrase, but the world is watching, horribly overused

9  phrase.  Let's show professionalism to each other, respect to

10 each other, civility to each other, and advocate zealously.  I

11 expect that.  As I said, I have a thick skin.  I will do what I

12 think is right.  I always try to do what I think is right and I

13 think you all do the same for your clients, and I respect that.

14      Let's start.  I know we've been told there are a

15 plethora of PowerPoints to be had.  We might as well start the

16 process.  There are a number of matters on traditional first-

17 day matters and some more unusual first-day matters.  Let me

18 turn to the debtor.

19      What I anticipate is an opening, and then I would go

20 to the Ad Hoc Committee for their opening, and then we can get

21 on to the specific relief being sought.

22      Good morning, Mr. Gordon.  Long time.

23      MR. GORDON:  Good morning, Your Honor.  Greg Gordon,

24 Jones Day, on behalf of the Debtor.  And I appreciate Your

25 Honor's opening remarks and thank you for scheduling the

1 hearing on shortened notice and making yourself available to us

2 so promptly after the filing of the case.

3         And I'll just say for the benefit of the record, I

4 think in some respects you've already done this.  Our view was

5 that Agenda Item Number 1, the motion to lift stay filed by

6 Mr. Satterley, we think that should be heard at the end because

7 there's scheduling issues with respect to that that relate to

8 some of the other matters that we're going to be discussing

9 today.  And so that would be our recommendation in terms of the

10 schedule.

11         I'm prepared to make an opening and then we'll be

12 prepared at the appropriate time after the responses to present

13 the motions for relief that we filed for today.

14         THE COURT:  Great.  Please continue.

15         As a housekeeping matter.  Again, as we did in the

16 prior case, I'm not going to go through and have everybody

17 enter appearances.  We'll do so when you rise to talk.

18         MR. GORDON:  Thank you, Your Honor.

19         So shockingly, I'm not one of the ones who has a

20 PowerPoint presentation today.  Your Honor is obviously very

21 familiar with the debtor.  You're familiar with its corporate

22 structure.  And that, of course, would include the corporate

23 restructuring that was done in 2021 shortly before the first

24 bankruptcy filing.  You have good familiarity with the talc

25 litigation that had been plaguing LTL and J&J, and the former

1  J&J Consumer, Inc., well known as old JJCI, prior to the first

2  bankruptcy filing.  So I don't plan to go over those things

3  again today.

4         But I did want to provide an update on corporate

5  structure.  And what I wanted to focus on was the fact that,

6  and Your Honor probably saw this in the papers that we filed,

7  in December of last year, the debtor's parent company, J&J

8  Consumer, Inc., which we were referring to in the old case as

9  New JJCI, changed its name to Johnson and Johnson HoldCo

10  (NA), Inc., which I'll refer to today as HoldCo.

11         And in early January 2023, HoldCo distributed its

12  consumer business, it's consumer health business, that is, to

13  its parent company.  So that is a change that's occurred with

14  respect to corporate structure.  And although that business, as

15  Your Honor knows I think, represented a substantial portion of

16  HoldCo's assets, HoldCo does continue to have significant

17  value.  And we mentioned in the papers that, among other

18  things, it holds $400 million in cash.  It also holds interest

19  in foreign subsidiaries that have a material value.  And it

20  seems, based on the papers we've seen filed in the last few

21  days, that the other parties are overlooking the fact that that

22  other value exists.

23         Then I want to address, Your Honor, why LTL has filed

24  for bankruptcy a second time.  And as with the first case, Your

25  Honor, I would say the purpose of the filing remains the same.

1  talc claimants.  Committing to pay claimants the largest sum

2  that's ever been paid belies any allegations that an actual

3  fraudulent transfer or actual intent to harm claimants exists.

4          There's no constructive transfer either because LTL

5  has not been rendered insolvent by the new financing

6  arrangements.  That issue is completely ignored in the pleading

7  that was filed by this Ad Hoc group yesterday.  The new funding

8  arrangement from HoldCo is available to pay talc claims in and

9  outside bankruptcy, and it has significant values.  And

10  importantly, J&J's support is available to ensure a trust is

11  funded in the amounts agreed to with the claimant's supporting

12  this plan.

13          So the question is, why is it the Committee doesn't

14  address insolvency?  Was LTL rendered insolvent?  The Third

15  Circuit pointed out and the Third Circuit knows that a showing

16  of insolvency is required.  It said so in the Footnote 18 that

17  the other side characterizes as a warning in terms of what LTL

18  could do or not do.

19          And, Your Honor, as I indicated before, there were

20  questions that the company had as to whether the original

21  financing arrangements remained enforceable in the wake of the

22  Third Circuit's opinion.  That decision was not reasonably

23  foreseeable.  It defeated the fundamental purpose of J&J's

24  backstop.  It called into question the enforceability of that

25  backstop and the funding agreement as a whole.  But

21

1  notwithstanding that, LTL was able to secure new financing

2  arrangements that provided the funding it needs to provide the

3  amount negotiated with the claimants.  In short, there was

4  reasonably equivalent value, too.  There's no basis for these

5  accusations about fraudulent transfer and certainly no evidence

6  has been submitted to support any of that.

7          Even more extreme than the accusations about

8  fraudulent transfer are the Committee's arguments that the plan

9  support agreements are premised, as they say, "on a lie."  They

10  claim that we have not reached a settlement with over 60,000

11  claimants.  They claim that the plan support agreements have

12  been fraudulently and collusively constructed with exaggerated

13  claim populations.  And I ask again, Your Honor, what is the

14  factual basis for any of those accusations?  The Committee

15  offers none.  These accusations are false.  They're outrageous.

16  And you're going to hear from one of the plaintiff's firms who

17  supports the plan support agreements, who wants to address

18  those allegations.

19          But, ultimately, Your Honor, in our view, the proof

20  of the support will be in the voting.  If this opposing handful

21  of firms are so sure that LTL's support is all a fabrication,

22  they should welcome a quick plan confirmation process and an

23  opportunity for claimants, and I say claimants not law firms,

24  to vote on a proposed plan.

25          Instead, what they're asking Your Honor to do is to

1 prevent any process.  They've asked for an immediate stay of

2 this case.  They've asked for an immediate dismissal of this

3 case.  They don't want the debtor to obtain any further

4 support.  They don't want the FCR to have an opportunity to

5 weigh in.  They don't want the claimants to have an opportunity

6 to vote.  That's simply not appropriate that a group of firms

7 who represent a minority of the claimants could ask this Court

8 to stop this process for their own interests, which are not

9 entirely clear because they don't appear to be in the interests

10 of their own clients.

11        Now, in connection with what can only be viewed as a

12 scorched earth litigation strategy in opposition to this case

13 and the unprecedented $8.9 billion settlement on the table, the

14 Committee is seeking a number of depositions.  They have asked

15 for depositions of Mr. Kim, of Mr. Hass with J&J, with

16 Mr. Wuesthoff, the chair of the LTL board, you may remember.

17 It also seeks depositions from two of the plaintiff's firms who

18 signed plan support agreements.

19        THE COURT:  I'm sorry.

20        MR. GORDON:  No problem.

21        THE COURT:  Do we need to address this now?

22        We're having a technological issue.  With everybody

23 hooked up to the Court's WiFi in various capacities, we've lost

24 bandwidth, so --

25        THE CLERK:  (Indiscernible)

23

1            THE COURT:  What camera have we lost?

2            THE CLERK:  The iPad is connected to WiFi and it

3   keeps losing the signal.

4            UNIDENTIFIED SPEAKER:  Can I make a suggestion, Your

5   Honor?

6            THE COURT:  Absolutely.

7            UNIDENTIFIED SPEAKER:  Anyone that's not making a

8   presentation, why don't we just get off the WiFi.

9            THE COURT:  That would help.  Go to your own 5G or

10  whatever other network you have, if you can.

11           UNIDENTIFIED SPEAKER:  I've been watching it go, get

12  kicked off, get back on.  I'm just wondering if other folks are

13  having the same issue.

14           THE COURT:  I knew we should have gotten the better

15  plan.

16                        (Laughter)

17           THE CLERK:  The other option is for the time being,

18  just turn your camera around, Judge (indiscernible).

19           THE COURT:  Turn this camera around?

20           THE CLERK:  (Indiscernible) courtroom.  At least that

21  provides (indiscernible) Mr. Gordon.

22           THE COURT:  (Indiscernible) Mr. Gordon.  Nobody needs

23  to see me.

24           How's that?

25           THE CLERK:  Good.  (Indiscernible)

24

1        MR. GORDON:  We ready?

2        THE COURT:  Continue.

3        MR. GORDON:  Let me just go back.

4        THE COURT:  Yes.

5        MR. GORDON:  As I was saying, Your Honor, I think you

6   may have missed part of this.  As part of what we would view as

7   a scorched earth litigation strategy and opposition to this

8   case, and an opposition to an unprecedented $8.9 billion

9   settlement on the table, the Committee is seeking the

10  depositions of Mr. Kim, that Your Honor may recall is the chief

11  legal officer at LTL; Mr. Haas, who's with J&J; Mr. Wuesthoff,

12  who is on the board of LTL.  It also seeks depositions from two

13  of the plaintiff's firms who signed plan support agreements.

14       We, in turn -- the debtor, in turn, intends to depose

15  members of the Ad Hoc Committee.  There's also been some

16  written discovery served, I think just yesterday, by this Ad

17  Hoc Committee.  I mention this only to say that we believe this

18  discovery will show that there's no basis whatsoever for any of

19  the inflammatory accusations contained in the Committee's

20  filing.  Instead, we believe the discovery will show an

21  aggressive concerted effort by the plaintiff firms on this

22  Committee to scuttle this agreement through threats and

23  intimidation directed at LTL, J&J, and their respective boards,

24  their respective directors and officers, and the plaintiff

25  firms who support the plan.  That's the headline that should be

25

1  written about this case, that a group of firms representing a

2  minority of claimants seeks to defy the will of the substantial

3  majority of the claimants.

4         Let me move on.

5         Interesting, Your Honor, in the midst of a lengthy

6  tirade about the fraudulent nature of everything, the new

7  financing arrangements, the bankruptcy filing, the plan

8  support, the Committee argues that LTL is still not in

9  financial distress.  And they, in fact, I think the words they

10 use are that LTL, notwithstanding the new financing

11 arrangements, cannot provide any evidence that it was in

12 financial distress.

13        In other words, Your Honor, at the same time the

14 Committee breathlessly accuses LTL and J&J of deliberately

15 harming talc claimants by effectuating the largest fraudulent

16 transfer in history, they maintain that LTL, despite the new

17 financing arrangements, is not in financial distress.  So which

18 is it?

19        You know, we've seen these contradictory positions

20 before.  Is LTL financially distressed or not?  Is it insolvent

21 or not?  The answers to these questions, Your Honor, are

22 critical because as recognized by the Third Circuit, there's a

23 difference between financial distress and insolvency.  You may

24 recall that the Court said to say that a debtor is in financial

25 distress is not to say it must necessarily be insolvent.

26

1          The Code conspicuously does not contain any

2   particular insolvency requirement.  LTL is financially

3   distressed.  As a result, bankruptcy is available to it.  LTL

4   is not insolvent.  As a result, there is no basis for a

5   fraudulent transfer claim.

6          So to conclude, Your Honor, the second Chapter 11

7   case, this case, has drawn substantial support.  It's supported

8   by the unprecedented $8.9 billion financial commitment by LTL

9   and J&J.  It's supported by over 60,000 claimants who have

10  signed and delivered plan support agreements, and support is

11  continuing to come in.  This claimant's support validates the

12  good faith basis of this filing.  It validates the proper

13  purpose of this proceeding.

14          The Court should not permit a group of firms who

15  represent a minority of the claimants to hijack this case

16  before it can even begin.  That is especially the case given

17  the utter absence of factual support for the inflammatory and

18  defamatory accusations this group of firms is making.

19          Thank you, Your Honor.

20          THE COURT:  Thank you, Mr. Gordon.  Before we hear

21  from the Ad Hoc group and other plaintiffs, is there anyone

22  supporting the debtor's position as far as an introductory

23  statement?

24          MR. WATTS:  Good morning, Your Honor.

25          THE COURT:  Good morning.

1            Ms. Richenderfer?

2            MS. RICHENDERFER:  I want to thank you, Your Honor.

3    I'm looking for the clock.  I guess it is good afternoon.

4            THE COURT:  Oh, it's afternoon.

5            MS. RICHENDERFER:  Afternoon, yes, it's afternoon.

6            Linda Richenderfer from the Office of the United

7    States Trustee.  Your Honor, I can't say that I ever expected

8    myself to be back here on this case.  I like the trip to

9    Trenton and very much appreciate the ability to appear in front

10    of Your Honor but never thought it was going to be again in

11    terms of this case.  Never, ever.

12            Just a few quick points.  First of all, the United

13    States Trustee is moving as quickly as it possibly can to

14    appoint committees in this case.  As of Friday, we had the

15    questionnaire for both a Tort Claimants Committee and an

16    Unsecured Creditors Committee posted on the website.  And, in

17    addition, we have sent out the questionnaire to all the law

18    firms.

19            We took the top 30 list from the first case, many of

20    whom have disappeared.  We took the 18 firms that are listed in

21    the second case, asked the debtor for the other 12 and haven't

22    received it yet.  But we sent that out to everyone.  So this is

23    also my way of making a public announcement that if anybody

24    here hasn't seen it yet, it's on the website.  And if you have

25    a problem finding it, there's three of us here from the U.S.

100

1  Trustee's Office, and we'll make sure that you can get a copy

2  of it.

3         We are moving as quickly as quickly as we can, Your

4  Honor.  With any luck, we'll have at least a Tort Claimants

5  Committee by the next hearing which is on the 18th, but I can't

6  promise that.  And I have no unsecured creditor information yet

7  from the debtor, so I don't know when that committee, if one

8  will be appointed.  It may be that there's no interest; I don't

9  know.  But I do know there were a lot of parties who never got

10  paid in the first case before it was dismissed.

11         The interviewing in fact is going to start tomorrow

12  just so people are aware of that.

13         Your Honor, I think that's leading up to my first

14  point that I did want to make before the Court was that we are

15  very concerned about their request to move forward to appoint

16  the FCR and the mediators by the April 18th hearing or I guess

17  on the April 18th hearing when we will not yet have a formal

18  committee yet formed.

19         And so I don't know whether the request is going to

20  be heard later today or not.  I didn't meant to jump ahead if

21  it is, but we would request that the FCR, the mediators, that

22  that be delayed until after we can get a committee in place who

23  can also be heard on those topics which are extremely

24  important.

25         Your Honor, I think that they are very important, and

1  I'm ad libbing here a little bit because from what I'm hearing

2  today about the timetable, there seems to have been some

3  activity during the first case that is now being carried over

4  that really benefitted the second case.  And I think that we're

5  going to have to get some clearer understanding of where the

6  first case ended and where the second case started because it

7  doesn't seem like the first case ended at 1:49 on April 4th and

8  that the second case started 2 hours and 11 minutes later.  It

9  seems like there was a large overlap, a month, two months.  To

10  me, that's still a large overlap between the two cases.

11         Your Honor, we are told that I think Mr. Gordon said

12  two-thirds of the claimants are represented by parties that

13  have signed on to plan support agreements.  I think it was two-

14  thirds, so we'll say 66 percent.  And it was 60- or 70,000

15  claimants.

16         Your Honor, I'm struggling with reconciling that

17  because I've gone back and there are 18 firms that were listed

18  in the first case as part of the top 30 firms that are not

19  listed for the second case.  And there are of the top 30 firms

20  that were listed in the first case, only five of them are

21  purported signatories to this plan or this support agreement,

22  whatever it's being called.  I'm not quite sure.

23

24         And I think that of the top 18 that were identified

25  in this case, there are 11 who purportedly are not part of any

1  plan support agreement or whatever it is that they're calling

2  it.  Your Honor, my point is this, that we heard several times

3  Mr. Gordon state that it's this large majority of the claimants

4  and that it's two-thirds of the claimants.

5          Your Honor, I don't know how the math works out.  I

6  really don't.  And I will tell you this, that Mr. Watts' firm

7  didn't appear in the first list.  Now all of a sudden, it's on

8  the second list.  Mr. Watts also made statements about being

9  involved in the Imerys case.  Your Honor may or may not know

10 that I along with one of my other trial attorneys in the

11 Delaware office have been the trial attorneys from the United

12 States Trustee's Office on that case since day one.  He did not

13 vote.  He had no claimants that voted in that case when the

14 first plan was up.

15         I don't know what positions he's playing in these

16 cases.  I did hear him identify a number of claimants which is

17 one of the concerns of the U.S. Trustee's Office.  Where are

18 these claimants coming from and who are these claimants?

19 Because we just can't reconcile them with the numbers that we

20 had that we were discussing and that were in front of us in the

21 first case.  And I can't reconcile some of the statements with

22 things that I know about from the Imerys case.

23         I know the attorneys there very well.  I know who's

24 involved in that case.  I know who voted in that case.  I

25 myself checked.  There were no votes that were made in that

1  case on the first plan, which eventually was not -- I think it

2  fell short by three percent.  But there were no votes submitted

3  on behalf of his firm, so I don't know what his role is in all

4  of this.

5         But I will say this, I don't know where the 67 or

6  60,000 or 70,000 come from.  It's certainly something that

7  we'll be looking into when we vote to form the Talc Claimants

8  Committee here.  I wonder where the numbers are.  And I was

9  very interested in the math that was just done because that's

10 presuming that all 60- or 70,000 of these claimants that we're

11 told are represented by these firms.  It's assuming that

12 they're going to get past the stage of filling out the

13 questionnaire that they'll have to get through.

14         And I don't know  because most of those claimants

15 evidently did not file a lawsuit because otherwise they would

16 have been accounted for in the first case, in the list of top

17 30 law firms.  So I don't know where these other law firms are

18 coming from.  I have asked debtors to give us a list of the

19 complete top 30 which is what we normally get.  I believe

20 they're working on it.  I don't have it yet, though.  And we're

21 marching forward.  And Your Honor will be hearing from us later

22 when we get to certain motions that are before Your Honor

23 today.

24

25         I just want to make those points and make sure that

104

1  this case, that we don't get off on some of the tangents and

2  that we look at who the true parties in interest here are, Your

3  Honor and that we hear from them.  And as to the 60- or 70,000

4  claimants, I don't know where that number comes from.  I can't

5  reconcile it with what we heard in the first case.  Thank you,

6  Your Honor.

7         THE COURT:  I appreciate your concerns.  The Court

8  shares much of it.  And we'll await.

9         Mr. Ruckdeschel, I can give you four and a half

10 minutes.

11        MR. RUCKDESCHEL:  Your Honor, thank you very much.

12 Jonathan Ruckdeschel on behalf of Paul Crouch, individually,

13 and as the Executor of his mother's estate.  And I will meet

14 that deadline.

15        Your Honor, the filing as we've heard and I'm going

16 to try and not repeat things that have been said before, but

17 the overall scheme here is taking state law rights of claimants

18 sickened by Johnson & Johnson's asbestos-contaminated products,

19 unrestricted state law rights that had access with respect to

20 Johnson & Johnson Consumer to at least $61 billion of assets

21 and, with respect to Johnson & Johnson, an unlimited pot of

22 assets and to transform them into restricted rights against an

23 artificially limited pot of money that will be created by this

24 plan.

25