```
1        Q.    And they purchased the Vermont talc
2   mines in southern Vermont from a company called
3   Eastern Magnesia, correct?
4        A.    Eastern Magnesia Talc Company.
5        Q.    And then, in about 1967, Johnson &
6   Johnson started using talc from Vermont for its baby
7   powder, correct?
8        A.    Yes.
9        Q.    And they continued to use the talc for
10  baby powder and Shower to Shower, throughout the
11  1970s, throughout the 1980s, throughout the 1990s,
12  until about 2003, correct?
13       A.    Correct.
14       Q.    And just so I'm -- I'm clear, Shower
15  to Shower and -- in the 1970s and 1980s, was sourced
16  from the same mine that baby powder was, correct?
17       A.    Yes.
18       Q.    And you told us just a few minutes ago
19  that baby powder, Johnson & Johnson, the big company,
20  had the baby powder as part of -- until 1979, where
21  they created what's now called J&J Consumer, correct?
22       A.    Yes.  It became part of a separate
23  company within -- within Johnson & Johnson.
24       Q.    Johnson & Johnson consumer --
25  Johnson & Johnson formed a company and sort of spun
```

LTL 0022071

Page 50

```
 1   off its Baby Products division into a different
 2   subsidiary, correct?
 3        A.   That's my understanding, correct.
 4        Q.   But you told me in your deposition
 5   with regards to Shower to Shower, Johnson & Johnson
 6   the mothership, always had the Shower to Shower until
 7   they sold it in 1995, correct?
 8        A.   What you describe as the mothership is
 9   the -- the main Johnson & Johnson.
10        Q.   The main Johnson & Johnson.
11        A.   Yes.  Yes.  It was still part of
12   Johnson & Johnson, but my understanding, or maybe I
13   didn't make it clear, was that it was -- that division
14   was separated out into the consumer products.
15        Q.   In your deposition, you testified
16   under oath that Johnson & Johnson owned Shower to
17   Shower until they sold it to another company, correct?
18        A.   It was sold to Valiant, another
19   company, from -- from Johnson & Johnson, yes.
20        Q.   And what year was it sold to Valiant,
21   I may have misstated the date, it wasn't '95, I was
22   thinking of Colgate stuff, was it 2015?
23        A.   2012 was it?
24        Q.   2012?
25        A.   Around about there, yeah.
```

LTL 0022072

Page 51

1  Q.  So Johnson & Johnson was the
2  manufacturer and the seller of the Shower to Shower
3  product all the way through the '70s, '80s, '90s, all
4  the way till it sold to Valiant in 2012, correct?
5  A.  The main -- the main -- what you call
6  mothership, the main Johnson & Johnson, was -- was the
7  main owner of the Consumer Products company, but like
8  I said a little while ago, my understanding is that
9  the Shower to Shower section was put into a separate
10 division, or separate company, under Johnson & Johnson
11 in the early '70s.
12 Q.  We'll come back to that.  We'll come
13 back to that because in your deposition -- you
14 remember testifying?
15 A.  I do, and again, maybe I -- maybe I
16 didn't speak clearly or maybe I didn't understand the
17 question, but it's -- it was still part of Johnson &
18 Johnson, which you call the mothership, until it was
19 sold to Valiant, I think it was 2012.
20 Q.  Johnson & Johnson corporate, the main
21 mother -- what I call the mothership in New Brunswick,
22 made all the health and safety policy decisions with
23 regard to asbestos and talc products, correct?
24 A.  I'm not -- I'm not sure where -- where
25 the separation.  The --

LTL 0022073

Page 52

```
 1        Q.      You're not sure?
 2        A.      The responsibility for making the
 3   decisions was with the individual company that was
 4   separated out, either Consumer Products, Baby
 5   Products.
 6        Q.      You recall testifying last Monday in
 7   New Jersey?
 8        A.      Yes.
 9        Q.      And last Monday in New Jersey, on
10   July 22nd, you were sworn to tell the truth, were you
11   not?
12        A.      Yes.
13        Q.      And last Monday, you were being
14   examined by an attorney named Mr. Panatier, correct?
15        A.      Yes.
16        Q.      And Mr. Panatier, last Monday, asked
17   you this question:  Johnson & Johnson Corporate in New
18   Brunswick --
19                MR. DUBIN:  Objection.
20                THE COURT:  You want to approach?
21                (BENCH CONFERENCE)
22        Q.      Isn't it true, Dr. Hopkins, that
23   Johnson & Johnson, in New Brunswick, made all the
24   health and safety policy decisions with regard to
25   asbestos and talc products, correct?
```

LTL 0022074

Case 23-03010-MBK  Doc 1397-16  Filed 04/27/23  Entered 04/27/23 17:33:18  Desc
Exhibit Ex(Part 13 of 2) Page 5 of 84 of 183

Page 53

```
 1      A.      That is my understanding.
 2      Q.      And they made those health and safety
 3   decisions about asbestos and talc for all the global
 4   companies, correct?
 5      A.      The --
 6      Q.      Is that correct?
 7      A.      You need to define what you mean by
 8   Johnson & Johnson New Brunswick.
 9      Q.      The parent company.
10      A.      The parent company is a legal entity.
11      Q.      That's right.
12      A.      They -- the subsidiary companies are
13   those that are called Consumer Products.  They were
14   the ones who made the decision.
15      Q.      Okay.  The parent company in New
16   Jersey is the one that made all the corporate
17   decisions regarding asbestos, talc, health and safety
18   decisions for all the global companies, correct?
19      A.      We're getting into semantics of what
20   you mean by parent company.  The decisions on the
21   safety of talc were made by the individual operating
22   companies, which would be, in this case, Consumer
23   Products, which is a separate company within, as you
24   call it, the mothership, the parent company.
25      Q.      Well, turn to Page 20, lines 6 through
```

Page 54

```
 1   12.  Let me know when you're there.
 2        A.    We're there.
 3        Q.    And last Monday, eight days ago, you
 4   raised your hand and swore to tell the truth, did you
 5   not?
 6        A.    Absolutely, yes.
 7        Q.    And you did tell the truth, did you
 8   not?
 9        A.    That's my understanding, yes.
10        Q.    And you were asked this question, 6
11   through 12.
12              MR. SATTERLEY:  Request for permission
13   to read, Your Honor.
14              THE COURT:  Mr. Dubin, any objection?
15              MR. DUBIN:  I'm sorry, page what?
16              MR. SATTERLEY:  Page 20.
17              THE COURT:  Page 20, 6 through 12.
18              MR. DUBIN:  This just doesn't make
19   sense to me.  It appears to start in the middle of a
20   question.
21              MR. SATTERLEY:  No.  Page -- Page 20,
22   I apologize.  Lines 11 through 17.
23              MR. DUBIN:  Of Page 20?
24              MR. SATTERLEY:  Of Page 20.
25              MR. DUBIN:  Okay.  No objection.
```

Page 55

```
 1        Q.    The question posed to you under oath
 2   in New Jersey eight days ago:
 3              "QUESTION:  Johnson & Johnson
 4   Corporate in New Brunswick made all health and safety
 5   policy decisions with regards to asbestos in talc
 6   products, correct?
 7              "ANSWER:  The -- yes.  The company in
 8   New Jersey is the parent company for all the global
 9   companies made those decisions, yes."
10              That was your sworn testimony?
11        A.    Yes.  The company -- the corporate in
12   New Jersey is the parent company, yes.
13        Q.    And the testing, the whole process of
14   testing for talc for the presence of asbestos was done
15   by the corporate parent, Johnson & Johnson, correct?
16        A.    I'm sorry, where are you reading?
17        Q.    I'm not reading.
18        A.    Oh, right.
19        Q.    I'm asking you a different question.
20        A.    Oh, sorry.  Ask the question again,
21   please.
22        Q.    Yes.  You can put that transcript
23   aside.
24        A.    Thank you.
25        Q.    The whole worldwide testing program,
```

LTL 0022077

Page 56

1  testing for the presence of asbestos, was run by
2  Johnson & Johnson Corporate, correct?
3       A.     The testing program, worldwide
4  testing, was run by the Baby Products company, the
5  testing program.
6       Q.     From -- before 1979?
7       A.     You're talking about before 1979?  No.
8  The Baby Products company was set out from 1979
9  onwards.
10      Q.     All right.  So the -- just so the
11 record is clear, the parent company, before 1979, was
12 in charge of worldwide testing for the presence of
13 asbestos in all talc product, correct?
14      A.     That is my understanding.
15      Q.     And is it your testimony now, in 1979,
16 the Consumer Products company did the worldwide
17 testing with regards to baby powder, but not Shower to
18 Shower?
19      A.     Baby Products company evaluated the
20 safety of talc on a global basis.
21      Q.     After 1979?
22      A.     Yes.
23      Q.     We'll come back to Shower to Shower in
24 a little bit.  You have the ability, if you wanted to,
25 to go through Johnson & Johnson's database production,

LTL 0022078