**Hopkins - Cross/Mr. Block**

1  CROSS-EXAMINATION

2  BY MR. BLOCK: (Continued)

3    Q   And then there's expenses associated with the extra
4  testing, correct?

5    A   Yes.

6    Q   And the cost of the extra testing would be $65,000,
7  correct?

8    A   (Reviewing document.) Yes.

9    Q   Is that correct?

10    A   Yes. The jury can't see that.

11    Q   Okay. Should we show them?

12        THE COURT: No, no, no, no.

13        MR. BLOCK: Your Honor, I tried to get the
14  testimony.

15        THE COURT: No, no, no.

16        MR. BLOCK: I can ask the question again, see if I
17  can get a response.

18        THE COURT: Try it again.

19    Q   The cost of the additional testing would have been
20  $65,000, correct?

21    A   According to this document, yes.

22    Q   Okay.

23        And Johnson & Johnson has never adopted the
24  recommendation to do weekly TEM testing, not in 1978, not in the
25  1980s, and not until all the way up until today, correct?

**Hopkins - Cross/Mr. Block**

1    A    For these foreign talcs?

2    Q    You cannot show this jury a document that shows Johnson
3    & Johnson has ever done testing every week for talc to determine
4    asbestos by TEM, can you, every week?

5    A    For these foreign talcs?

6    Q    No, sir.

7         We've looked at the material specifications that
8    Johnson & Johnson has.  And you recall that they have different
9    test methods, 7024 for TEM, correct?

10   A    Yes.

11   Q    They say how often the testing is to occur, correct?

12   A    Yes.

13   Q    And isn't it true that the material specifications
14   Johnson & Johnson has for the testing of its talc by TEM does
15   not require the talc to be tested every week, correct?

16   A    Right.  We're now back in the U.S.

17        MR. BLOCK:  I move to strike everything after
18   "right," your Honor.

19        THE COURT:  Reask the question.

20        MR. BROCK:  Objection.

21        THE COURT:  Overruled.

22   Q    Let me ask the question again.

23        The material specifications that Johnson & Johnson
24   have for the testing of its talc in the United States does not
25   require the talc to be tested on a weekly basis, correct, for

**Hopkins - Cross/Mr. Block**

1  asbestos?

2      A    Not on a weekly basis.

3      Q    All right.

4          And this -- and do you have any document that you
5  can show the jury that Alternative 1-A as outlined in this
6  document, was adopted by Johnson & Johnson?

7      A    Alternative 1-A testing for --

8      Q    Yes, we have a proposed alternative --

9      A    I just want to make sure we're on the same page.
10 You're saying Alternative 1-A for U.S. or worldwide or foreign?

11     Q    I'm saying very clearly, this document that's in
12 evidence for the jury, 835, sets forth this Alternative
13 Procedure 1-A and there's a cost to it.

14         Do you have any evidence in writing that Johnson &
15 Johnson ever adopted Alternative Procedure 1-A; yes or no?

16     A    I do not.

17     Q    Okay.  Dr. Hopkins, I want to go back to where we left
18 off yesterday and we were talking about Johnson & Johnson and I
19 want to ask you about Johnson's Baby Powder and the manufacture,
20 sale, distribution and testing of the product.  Okay?

21     A    Yes.

22     Q    All right.  And from the 1950s and even going back
23 before the 1950s, up until 1972, was Johnson & Johnson the
24 company that manufactured, sold, distributed and tested
25 Johnson's Baby Powder?

**Hopkins - Cross/Mr. Block**

1     A    Johnson & Johnson as an umbrella company, yes.

2     Q    Okay.  So Johnson & Johnson and you're referring to the

3 company Johnson & Johnson, the Johnson & Johnson based in New

4 Brunswick, New Jersey, correct?

5     A    Yes.

6     Q    Now from 1972 through 1978 until by December of 1978,

7 there was a company called Johnson's Baby Product Company,

8 correct?

9     A    Yes.

10    Q    So Johnson & Johnson, I'll put BPC, Baby Product

11 Company, okay?

12    A    Okay, yes.

13    Q    Just to be clear, during these years, I think, up

14 through December of 1978, Johnson & Johnson Baby Products

15 Company was a division of Johnson & Johnson, correct?

16    A    A subsidiary division, yes.

17    Q    I want to make sure we agree here.

18          Up until December of 1978, we're talking about the

19 period 1972 up until December of 1978, Johnson & Johnson Baby

20 Products Company was part of Johnson & Johnson, it was a

21 division and not a separate company during those years, correct?

22    A    I don't know the company structure.  I can't comment.

23 It was called Johnson's Baby Products Company, but that's a

24 legal area that I'm not familiar with.

25    Q    Can we go to your deposition testimony from

**Hopkins - Cross/Mr. Block**

1  September 27th, 2018.

2  So we're looking at your sworn testimony from

3  September 27th, 2018, and Page 39 Line 3.  All right.

4  Are you there?

5  A    Yes.

6  Q    Okay.  So this is your sworn testimony on

7  September 27th, 2018:

8  "QUESTION:  You will agree that Johnson & Johnson

9  Baby Product Division in the 1970s up through 1978 was, was

10  not a separate corporation distinct from Johnson & Johnson,

11  correct?

12  "ANSWER:  Baby, Baby Products Company initially

13  was a division of Johnson & Johnson, it was a division.

14  "QUESTION:  Yes.

15  "ANSWER:  And it later became a separate company."

16  Was that your testimony?

17  A    Yes.

18  Q    Okay.  So it was a division of Johnson & Johnson up

19  through 1978 and later --

20  MR. BROCK:  Excuse me.

21  Q    -- became a separate company, correct?

22  MR. BROCK:  I would ask the next question and

23  answer be read to the jury for completeness.

24  THE COURT:  I can't see what it is.

25  MR. BROCK:  I'll show you, your Honor.  This

**Hopkins - Cross/Mr. Block**

1    question right here (indicating).
2             MR. BLOCK:  Sure.  The next question and answer.
3    It's the same thing.
4             MR. BROCK:  No.  And "J&J admits," the question
5    begins "J&J admits."
6             MR. BLOCK:  Your Honor, that's for redirect.
7             THE COURT:  That's for redirect.  Thank you.
8             Overruled.
9    Q    Then on Page 13 of the same deposition, you said:
10            "QUESTION:  Up until 1978, it was not a separate
11   corporation, it was simply a division, correct?"
12            Your answer was:  "Correct."
13            Right?
14   A    Yes.
15   Q    So then from 1979 and I'm going to go up to today, this
16   Johnson & Johnson Baby Product Company has had a number of names
17   going up until today, correct?
18   A    It has, yes.
19   Q    All right.  And so today, the name is called Johnson &
20   Johnson Consumer, Inc., correct?
21   A    Yes.
22   Q    All right.  And the jury heard testimony and this is
23   just a demonstrative exhibit that the names, we had Johnson &
24   Johnson Baby Products Company, Johnson & Johnson Consumer
25   Products, Inc., Johnson & Johnson Consumer Companies, Inc. and

**Hopkins - Cross/Mr. Block**

1  then from 2015 to the present, Johnson & Johnson Consumer, Inc.,
2  And was that the progression of these different entities leading
3  up until the name of the company that's called today Johnson &
4  Johnson Consumer, Inc.?
5     A   To the best of my knowledge, yes.
6     Q   Okay.  So from 1979 to today, Johnson & Johnson Baby
7  Products Company which is now known as Johnson & Johnson
8  Consumer, Inc. has been a subsidiary of Johnson & Johnson,
9  correct?
10    A   Yes.
11    Q   Okay.  And these companies, Johnson & Johnson Baby
12 Products Company and the different names of these companies all
13 up until today Johnson & Johnson Consumer, Inc., do they have a
14 separate board of directors from Johnson & Johnson?
15    A   I don't know.  It's a legal question, company law is
16 something I'm not familiar with.
17    Q   Are you aware that Johnson & Johnson Consumer, Inc. has
18 a board of directors?
19    A   I believe it did.  Whether it does today, I don't know.
20    Q   Okay.  All right.
21        So then Shower to Shower, I'll put up a little box
22 here.  We talked about Johnson's Baby Powder.  So Shower to
23 Shower.
24        Shower to Shower is not a baby product, correct?
25    A   Correct.

**Hopkins - Cross/Mr. Block**

1  Q    And Shower to Shower has been around for what, since
2  1960?
3  A    Very late sixties, yes.
4  Q    So 1960s.
5       And Johnson & Johnson, what happened in 2012 with
6  Shower to Shower in Johnson & Johnson?
7  A    Oh, it was sold to, I can't remember another
8  corporation, completely different.
9  Q    Valiant?
10 A    Valiant.  Thank you, yes, on the tip of my tongue.
11 Q    Did Johnson & Johnson keep, any I don't know, anything
12 like ongoing, did they have any royalties or anything from that
13 or they just out and out sold Shower to Shower to Valiant in
14 2012?
15 A    Again, that's their corporate law where I'm not
16 familiar with.
17 Q    And just so the jury understands, Shower to Shower has
18 always been manufactured, distributed, sold and tested by
19 Johnson & Johnson, correct?
20 A    Some of the manufacture I think in recent years is
21 subcontracted.
22 Q    Right.  What I'm saying is that Johnson & Johnson has
23 been ultimately responsible for manufacturing, selling,
24 distributing and testing Shower to Shower through the entire
25 history of that product with Johnson & Johnson, correct?

**Hopkins - Cross/Mr. Block**

1   A   Yes, up until its sale to Valiant.

2   Q   And just to be clear, the subsidiary Johnson & Johnson,
3   Johnson's Baby Product Company from 1979 until today, where it's
4   called Johnson & Johnson Consumer, Inc., that's now the company
5   that manufacturers, sells, distributes and tests Johnson's Baby
6   Powder, correct?

7   A   Yes.

8   Q   And I just want to go back to Johnson & Johnson one
9   more time, this chart we were working on yesterday.

10          Another thing that you would agree with is that
11  Johnson & Johnson sets the parameters -- strike that.

12          Johnson & Johnson sets the guidelines for health
13  and safety which should be adopted by all Johnson & Johnson
14  affiliates worldwide, correct?

15  A   Sorry.  Can you define what you mean by "guidelines for
16  health and safety"?  Worker employee health?

17  Q   Yes.  Can you look at your testimony from October 23,
18  2018, please.  Thank you.

19          Going to Page 17, Line 24 -- I'm sorry, Page 138,
20  Line 21.

21          Okay.  Are you there?

22  A   138, yes.

23  Q   138, line 21, your deposition testimony from
24  October 23, 2018:

25          "QUESTION:  Now you have also told me in the past

**Hopkins - Cross/Mr. Block**

1   that all of the guidance for all of the different operating
2   companies around the world on policy with regard to health
3   and safety analysis of potential hazards comes right out of
4   New Brunswick, the headquarters in New Jersey, correct?"
5           Your answer:  "Well, the general principal is he
6   run an office, the New Jersey office he sets the
7   parameters, sets the guidelines for health and safety which
8   should be adopted everywhere."
9           Did you give that testimony?
10  A    Yes.
11  Q    And you would agree that Johnson & Johnson has the
12  authority to require warnings on Johnson's Baby Powder about
13  cancer, correct?
14  A    They have the authority to require warnings.  If that
15  were a medical requirement, they would, yes.
16  Q    What I'm saying is if Johnson & Johnson says that it
17  wants warnings about cancer on Johnson's Baby Powder, then
18  warnings about cancer would go on Johnson's Baby Powder,
19  correct?
20  A    I can't see any reason why they would not if head
21  office required any warning whether it's keep away from eyes,
22  keep away from children, yeah.
23  Q    Right.  The buck stops with Johnson & Johnson New
24  Brunswick, New Jersey, if they say there should be a warning
25  about anything on Johnson's Baby Powder, then that command will

Exhibit 14    Page 11 of 14

7753

**Hopkins - Cross/Mr. Block**

1   be followed, correct?

2              MR. BROCK:  Objection.  Foundation.

3              THE COURT:  Overruled.

4              THE WITNESS:  Thank you.

5        A    The way we use is guidance and on the other hand there

6   maybe regulations in certain overseas countries which you'd have

7   to abide by.

8        Q    Let's talk about the United States.

9        A    But if you're talking about the United States, then

10  I'll answer the question as yes.

11       Q    Okay.  So Johnson & Johnson, if they tell Johnson &

12  Johnson Consumer Inc. that they want a certain warning on

13  Johnson's Baby Powder, that instruction will be followed,

14  correct?

15       A    I'm sorry, who's "they"?  You said "they."

16       Q    If Johnson & Johnson tells Johnson & Johnson Consumer,

17  Inc., we want a warning about cancer or asbestos on Johnson's

18  Baby Powder, Johnson & Johnson has the authority to do that,

19  correct?

20       A    No.  I think -- the origin of the guidance or the

21  warning would come from the Consumer, Inc., so they would be

22  telling themselves.

23       Q    Listen to my question.

24            If Johnson & Johnson tells its subsidiary, Johnson

25  & Johnson Consumer, Inc., that they want a certain warning on

**Hopkins - Cross/Mr. Block**

1         THE COURT:  Overruled.

2    A   Again, I do not know.

3    Q   And Dr. Gottlieb says here in the next sentence, "We

4 believe" -- after the sentence about adverse event reports, Dr.

5 Gottlieb says, "We believe this information will help us better

6 identify specific cosmetic products and raw ingredient suppliers

7 that may be more likely to be contaminated and inform steps with

8 the FDA may be able to take to better protect consumers."

9         Did I read that correctly?

10         MR. BROCK:  Objection.

11         THE COURT:  Sustained.  Next topic.

12    Q   Just a few more areas for you, Dr. Hopkins.

13         Let me show you what's in evidence as Plaintiffs'

14 Exhibit 456 and, Dr. Hopkins, I'm using Plaintiffs' Exhibit 456

15 just to ask you about the container of Johnson's Baby Powder

16 that was used during various years and this -- this is a

17 container of Johnson's Baby Powder, correct?

18    A   Yes.

19    Q   And the Johnson's Baby Powder container has the name

20 "Johnson & Johnson" on it, right?

21    A   Yes.

22    Q   That's the logo name of Johnson & Johnson from New

23 Brunswick, New Jersey, correct?

24    A   Yes.

25    Q   And the container says "Purest Protection," right?

**Hopkins - Cross/Mr. Block**

1     A   Yes.

2     Q   And if you go to the back of the container, this is a
3 container from 1985, correct?

4     A   Yes.  It's dated 1985.

5     Q   1985.  And there is nothing on this container about --
6 well, we can see what we've been talking about, it says "talc
7 and fragrance are the only ingredients," correct?

8     A   Yes.

9     Q   It doesn't say anything about contaminants, right?

10           MR. BROCK:  Objection.  Asked and answered.

11     A   It says "talc and fragrance."

12           THE COURT:  Overruled.

13     Q   Nothing about tremolite, right?

14     A   It says "talc and fragrance."

15     Q   Nothing about asbestos, right?

16     A   It says "talc and fragrance."

17     Q   Nothing about amphibole, right?

18     A   Says "talc and fragrance."

19     Q   Nothing about cummingtonite?

20     A   It says "talc and fragrance."

21     Q   There's a caution that says "close tightly" --

22     A   Shall I read it?

23     Q   Yes.

24     A   "Close tightly after use and keep out of children's
25 reach."

**Hopkins - Cross/Mr. Block**

1    Q   Okay. And it doesn't say anything there about the
2    breathing in of respirable particles during normal use like we
3    looked at those studies where they were doing experiments on
4    live babies and adults, correct?
5              MR. BROCK:  Objection.
6              THE COURT:  Sustained.
7    Q   That's the only thing they say, to keep a child from
8    grabbing it, right?
9              MR. BROCK:  Objection, your Honor. Objection.
10         Argumentative.
11             THE COURT:  Also asked and answered.
12   Q   There's no warning about the normal use of the product
13   on a baby or an adult's skin, correct?
14   A   No, it describes the product.
15   Q   Yes or no, there's no warning about the normal use of
16   the product on a baby or on an adult's body, correct?
17   A   No, there's directions when to use it, but there's no
18   word "warning," it's just directions when to use it.
19   Q   And Johnson & Johnson used this phrase "purest
20   protection" even though it couldn't validate using the word
21   "purest," right?
22   A   It's a hypothetical.
23             MR. BROCK:  I object on relevance.
24             THE COURT:  Overruled.
25             MR. BROCK:  Object on relevance.