```
               UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF NEW JERSEY

IN RE:                         .   Case No. 21-30589(MBK)
                               .
LTL MANAGEMENT LLC,            .
                               .
          Debtor.              .
. . . . . . . . . . . . . . . .
LTL MANAGEMENT, LLC,           .   Adversary No. 21-03032(MBK)
                               .
          Plaintiff,           .
                               .   Clarkson S. Fisher U.S.
v.                             .     Courthouse
                               .   402 East State Street
THOSE PARTIES LISTED ON        .   Trenton, NJ 08608
APPENDIX A TO THE              .
COMPLAINT, ET AL.,             .
                               .
          Defendants.          .   Wednesday, February 16, 2022
. . . . . . . . . . . . . . . .    9:05 a.m.
```

TRANSCRIPT OF TRIAL DAY THREE
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  GREGORY M. GORDON, ESQ.
                            DANIEL B. PRIETO, ESQ.
                            AMANDA RUSH, ESQ.
                       2727 North Harwood Street, Suite 500
                       Dallas, TX 75201

                       Jones Day
                       By:  ROBERT W. HAMILTON, ESQ.
                       325 John H. McConnell Blvd., Suite 600
                       Columbus, Ohio  43215-2673

Audio Operator:        Wendy Romero

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**
**(609) 586-2311    Fax No. (609) 587-3599**

Kim - Cross/Glasser 51

1 pursue the non-debtors, Johnson & Johnson and Old, well, JJCI.
2 I just want a yes or no.
3 You think it's more fair to engage in a negotiation while
4 non-debtors Johnson & Johnson and JJCI are insulated, protected
5 from, and are not -- claims can't be pursued against those non-
6 debtors. That's what you think is fair and equitable?
7 A I do think that would be fair and equitable.
8 Q Okay. Thank you, sir. No further questions.
9     MR. JONAS: Thank you, Your Honor.
10     THE COURT: Thank you, Mr. Jonas.
11     CROSS-EXAMINATION
12 BY MR. GLASSER:
13 Q Mr. Kim, on your examination just a few minutes ago, you
14 were talking about Exhibit 68, the valuation, right?
15 A Yes.
16 Q The VCO? This kind of cash flow, $61 billion?
17 A Yes. Yes. Yes, thank you.
18 Q It is true, Mr. Kim, that you told the Court and the
19 people in North Carolina that the value of JJCI was
20 approximately $60 billion. Isn't that a fact?
21 A It is a fact. Yes, I did say that, again, based upon a
22 conversation I had with Eric Haas that my belief was that or my
23 understanding was that there was a valuation in the $60-billion
24 range. Yes.
25 Q That conversation you had with Mr. Haas occurred prior to

WWW.JJCOURT.COM

Case 23-06092-MBK Doc 15-21 Filed 01/04/22 Entered 01/04/22 13:48:22 Desc Main
Document Page 53 of 898
Exhibit 21 Page 3 of 8

Kim - Cross/Glasser 52

1 October 14th, 2021. Isn't that a fact?
2 A It did.
3 Q And at the October 14th, 2021 board meeting, you did not
4 tell the board about the $60-billion valuation conversation
5 with Mr. Haas, correct?
6 A That is correct.
7 Q I want to walk through your PowerPoint a little bit on the
8 ELMO.
9 (Pause)
10 (Counsel confer briefly)
11 BY MR. GLASSER:
12 Q All right. Here we go. You're familiar with this
13 PowerPoint timeline, right, Mr. Kim?
14 A I am.
15 Q Isn't it true that in December of 2018 right here Health
16 Canada issued its finding about indicative of a causal
17 connection between ovarian cancer and talc? December 2018
18 Health Canada issued that report, true?
19 A I don't know when they issued a report. I'd have to look
20 at the document.
21 Q Okay. But the date of it is in our informational brief.
22 The Court can find it later. But you don't dispute that Health
23 Canada issued a report at some point on this timeline?
24 A Yeah, I -- I don't dispute the issue to report. I don't
25 know when.

1 Q    And you don't dispute that it said they found that a
2 causal connection between talc powder and ovarian cancer was
3 indicated by their data?  Didn't they, Mr. Kim?
4 A    Again, I'd have to look at the exact wording that they
5 used.  It was a very -- the wording was very specific and
6 precise.
7 Q    Okay.
8 A    So I'd have to look at that because of -- of what it
9 actually meant.  So I'd like to -- I'd defer to the actual
10 wording that they used.
11 Q    All right.  You agree with me that in 2019, the United
12 States FDA issued its report finding asbestos in some talc,
13 some Johnson's baby powder, correct?
14 A    I believe -- I'm sorry, in 2019?
15 Q    Yes.
16 A    Yeah.
17 Q    October 2019.
18 A    '19.  Yeah, I believe there was a finding of subtrace
19 amounts in one sample by the FDA lab.
20 Q    You agree that Judge Wolfson issued her Daubert ruling
21 that the science was sufficient to get to a jury in April of
22 2020?  Isn't that a fact, Mr. Kim?
23 A    Well, I don't know that I would describe it that way.  No,
24 Judge Wolfson issued a ruling.  The contents of that ruling
25 were -- were mixed in our opinion, but that ruling was issued

Kim - Cross/Glasser 54

1  in 2020.  Yes.
2  Q    All right.  In June of 2020, the Missouri Court of Appeals
3  issued its decision in Ingham upholding the science in the
4  Ingham trial.  Isn't that a fact, Mr. Kim?
5  A    The Ingham decision was rendered.  I don't know that I
6  would agree with your characterization, but it was rendered
7  then.
8  Q    Okay.  The Carl decision in New Jersey reversing a trial
9  court on the science of causation was issued in July of 2020 by
10 the New Jersey Appellate Division.  Isn't that true, Mr. Kim?
11 A    There was the Carl decision.  I'd have to go back to see
12 what date it was, but that was I think around that time period,
13 yes.
14 Q    And from basically call it November of 2019 to literally
15 October 13th, 2021, seven mesothelioma plaintiffs won their
16 trials one after another.  Isn't that true, Mr. Kim?
17 A    I'd have to go back to see the chart to see how many
18 trials we had and when they were won.  But there were a number
19 of trials in favor of mesothelioma plaintiffs.  I recall that,
20 yes.
21 Q    Mesothelioma trials, Johnson & Johnson has lost the last
22 seven in a row.  Isn't that a fact, Mr. Kim?
23 A    Again, I'd have to go look at the chart.  I don't think
24 that's true but, again, I'd have to go look and see.
25 Q    We'll bring up the chart when Mr. Diaz testifies.  Can you

Case 1:23-06809-MBK Doc 538-21 Filed 01/04/22/23 Entered 01/04/22/23 48:22:18 Desc Main
Document Exhibit 21 Page 55 of 898

Kim - Cross/Glasser                                        55

1  remember the last time Johnson & Johnson won a mesothelioma
2  trial?
3  A    I think it may have been Rimondi.
4  Q    What year?
5  A    20-, I want to say 2019.
6  Q    Okay. So Johnson & Johnson has not won a mesothelioma
7  trial since 2019 to your knowledge, right, Mr. Kim?
8  A    Yeah. Again, I'd have to go check to see the trial
9  listings.
10 Q    And those trials didn't all take place in St. Louis,
11 Missouri, did they, Mr. Kim?
12 A    No. They took place in --
13 Q    California?
14 A    Alameda County, yes.
15 Q    Florida?
16 A    Yes.
17 Q    New Jersey? Where did Prudencio get tried?
18 A    I thought Prudencio was California.
19 Q    Great. Where did Johnson get tried?
20 A    Johnson, I believe, also was a California case.
21 Q    So it wasn't all St. Louis, was it, Mr. Kim?
22 A    Oh, for the -- for the meso cases, no. The meso cases
23 were generally in Alameda County.
24 Q    I think you said this on direct, but just to be very
25 clear. These four verdicts that you -- did you show the board

Lisman - Direct/Glasser                                         93

1  A    This would be a fair representation of a building block of
2  GAAP that is used.  Yes.
3  Q    To your knowledge, no one in the accounting department
4  ever asked for a legal opinion from any inside or outside
5  counsel that your corporate accounting interpretation of that
6  one sentence in FASB trumps a court's assignment of liability
7  by order.  Isn't that true?
8  A    Not that I'm aware of, no.
9  Q    So you were unaware -- you are unaware of any specific
10 GAAP rule that says notwithstanding a legal obligation to pay,
11 we can assign punitive damages to another entity?
12 A    I'm not aware of that rule, but generally GAAP would not
13 be that precise.
14 Q    In fact, the accounting for legal liabilities is, in your
15 view, one of the most subjective areas of GAAP interpretation.
16 Isn't that true?
17 A    Correct.
18 Q    You apply this subjective GAAP interpretation to
19 compensatory damages as well.  Even if they -- the jury assigns
20 them to Johnson & Johnson itself in the accounting group, you
21 assign them to JJCI, correct?
22 A    If that's the fundamental entity with legal liability,
23 yes.
24 Q    But the J&J policies that we have referenced --
25           MR. GLASSER:  And we can take down the FASB --

Case 23-12825-MBK    Doc 1538-21 Filed 10/17/23    Entered 10/17/23 18:22:18    Desc Main
Document    Page 94 of 398
Exhibit 21    Page 94 of 898

Lisman - Direct/Glasser                                    94

 1  BY MR. GLASSER:
 2  Q     -- are not actually mandated by GAAP, correct?
 3  A     J&J policies are a practical application of GAAP.
 4  Q     But not mandated by it?
 5  A     They're an interpretation and a practical application of
 6  GAAP is what they are.
 7  Q     Showing you Exhibit 600.002, which was Exhibit 12 in your
 8  first deposition and you've -- you testified -- which was this
 9  agreement to transfer assets in 1978 which you're familiar with
10  now, right?
11  A     I recall seeing it at the first one.  Yes.
12  Q     Right.  Prior to your first deposition in the case, you
13  had never seen the document before, right?
14  A     I had not.
15  Q     And so, to the best of your knowledge, none of the
16  accounting allocation treatment of talc liabilities that
17  occurred prior to October 2021, to your knowledge, was premised
18  on this document, right?
19  A     Not that I'm aware of.
20  Q     The accounting policy, which is Exhibit 284 -- let's call
21  that up -- does have a date upon which it was adopted on the
22  last page, right?
23  A     Yep.  Correct.
24  Q     In this instance, it's 2005.  Is that right?
25  A     Yes.