| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** <br><br> **BAILEY & GLASSER LLP** <br> Brian A. Glasser (admitted pro hac vice) <br> Thomas B. Bennett (admitted pro hac vice) <br> Kevin W. Barrett (admitted pro hac vice) <br> Maggie B. Burrus (admitted pro hac vice) <br> 1055 Thomas Jefferson St. NW, Suite 540 <br> Washington, DC 20007 <br> Tel: (202) 463-2101 <br> Fax: (202) 463-2103 <br> Email: bglasser@baileyglasser.com <br> tbennett@baileyglasser.com <br> kbarrett@baileyglasser.com <br> mburrus@baileyglasser.com <br><br> *Proposed Co-Counsel to the Official Committee of Talc Claimants II* | **COOLEY LLP** <br> Cullen D. Speckhart (admitted pro hac vice) <br> Michael Klein (admitted pro hac vice) <br> Erica J. Richards (pro hac vice to be filed) <br> Lauren A. Reichardt (pro hac vice to be filed) <br> Evan Lazerowitz <br> 55 Hudson Yards <br> New York, NY 10001 <br> Tel: (212) 479-6000 <br> Fax: (212) 479-6275 <br> Email: cspeckhart@cooley.com <br> mklein@cooley.com <br> erichards@cooley.com <br> lreichardt@cooley.com <br> elazerowitz@cooley.com <br><br> *Proposed Co-Counsel to the Official Committee of Talc Claimants II* |
| **WALDREP WALL BABCOCK & BAILEY PLLC** <br> Thomas W. Waldrep, Jr. (admitted pro hac vice) <br> Kevin L. Sink (admitted pro hac vice) <br> James C. Lanik (admitted pro hac vice) <br> Jennifer B. Lyday (admitted pro hac vice) <br> 370 Knollwood Street, <br> Suite 600 <br> Winston-Salem, NC 27103 <br> Tel: (336) 717-1280 <br> Fax: (336) 717-1340 <br> Email: notice@waldrepwall.com <br><br> *Proposed Co-Counsel to the Official Committee of Talc Claimants II* | **MASSEY & GAIL LLP** <br> Jonathan S. Massey, Esq. (admitted pro hac vice) <br> 100 Main Ave. SW, Suite 450 <br> Washington, DC 20024 <br> Tel: (202) 652-4511 <br> Fax: (312) 379-0467 <br> Email: jmassey@masseygail.com <br><br> *Proposed Co-Counsel to the Official Committee of Talc Claimants II* |

EXHIBIT
Exhibit 377

| | |
|---|---|
| **SHERMAN, SILVERSTEIN,** <br> **KOHL, ROSE & PODOLSKY, P.A.** <br> Arthur J. Abramowitz <br> Alan I. Moldoff <br> Ross J. Switkes <br> 308 Harper Drive, Suite 200 <br> Moorestown, NJ 08057 <br> Tel: (856) 662-0700 <br> Email: aabramowitz@shermansilverstein.com <br> amoldoff@shermansilverstein.com <br> rswitkes@shermansilverstein.com <br><br> *Proposed Local Counsel to* <br> *the Official Committee of Talc Claimants II* | |
| In re: <br><br> LTL MANAGEMENT LLC, <br><br>                 Debtor. | Chapter 11 <br><br> Case No.: 21-30589 (MBK) <br><br> Honorable Michael B. Kaplan |

**Expert Report of Matthew Diaz**

**January 28, 2022**

2

# ▬ Table of Contents

| | | |
|---|---|---|
| I. | Professional Background | 4 |
| II. | Relevant Case Background | 6 |
| III. | Scope of Assessment | 10 |
| IV. | Summary of Findings | 11 |

    A. J&J, Along with Old JJCI, Has Been Held Separately and Individually Responsible for Liability in Many Recent Talc Powder Rulings .................................................................................................. 13

    B. Following a Series of Transactions, Two Disparate Companies Were Formed: a "Good Company" to Retain the Go Forward Business and a "Talc Powder Liability Company" That Was Saddled with All of the Talc Powder Liabilities and Subsequently Filed for Bankruptcy ............ 15

    C. J&J is One of the Most Valuable Companies in the World ...................................................... 34

    D. The Debtor's Officers and Managers Are or Were All Affilated with J&J and Have Entered Into Various Agreements That Were Not Negotiated at an Arms' Length .......................................... 38

    E. J&J and Old JJCI Left LTL Essentially Wholly Dependent on the Funding Agreement Between LTL and J&J/New JJCI ........................................................................................................... 46

    F. The 2021 Corporate Restructuring Modified the Creditor Rights of Talc Powder Victims to their Detriment ..................................................................................................................................... 48

    G. The Bankruptcy Filing of LTL Further Diminished the Position of Talc Powder Victims, Enhanced the Position of J&J and New JJCI, and Eliminated the Ability of LTL to Pay its Talc Powder Victims on a Current Basis ........................................................................................... 52

    H. New JJCI's Non-Talc Powder Creditors' Rights Were Not Modified by the Integrated Transaction Series ..................................................................................................................... 53

    I. The Highly Structured Bankruptcy of LTL Protects J&J's and New JJCI's Equity Holders .... 53

    J. Old JJCI Appears to be a Valuable and Robust Company. If Old JJCI was in Financial Distress Due to its Talc Powder Liabilities, to Treat All Creditors Equally, it Should Have Filed for Bankrutpcy Itself Instead of Subjecting Only a Select Subset of its Creditors to Bankruptcy ...... 54

    K. The Integrated Transaction Series is Highly Unusual; Approval of the Integrated Transaction Series Would Sanction a Process for Companies to Offload Unwanted Liabilities Without Shouldering the Burdens of Bankruptcy, Which Include Court Scrutiny, Oversight, and Interruption of Payments on Account of Equity ............................................................................................. 57

Appendix A – Expert Qualifications ................................................................................................... 61

Appendix B – Documents Considered .................................................................................................. 65

Appendix C – Remanded Cases ............................................................................................................ 71

## I. PROFESSIONAL BACKGROUND

1. I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a leading, NYSE-listed international financial advisory firm. I am a member of its Corporate Finance and Restructuring segment and am located in the New York office. I have been providing financial advisory services to companies and creditor groups undergoing in-court and out-of-court restructurings in a variety of industries for over 20 years. Such services include assessing cash flow projections, conducting detailed investigations of pre-petition transactions, evaluating creditor positions, assessing financing agreements, reviewing business plans, analyzing claims, and developing strategies to maximize recoveries for stakeholders.

2. I have been involved in over 50 bankruptcy or bankruptcy-related matters in the capacities above. Some of the matters in which I have been involved include working for various non-mass tort unsecured creditor groups, including Abengoa Bioenergy, Barnes Bay Development, Cengage Learning, Energy Future Holdings, iHeartMedia, JC Penney, Sears, and Toys R Us. Additionally, I have worked for, or am currently working for, various groups of mass tort creditors, including those in Bestwall, Purdue Pharma, Mallinckrodt, Bondex, Blitz USA, DBMP, Aldrich Pump, Murray Boiler, and Paddock Enterprises. Prior to joining FTI, I served as Chief Financial Officer for Graham Field Health Products and as the Restructuring Director of Impath Laboratories, both companies that were operating in Chapter 11.

3. Over the course of my professional career, on numerous occasions, I have led investigations of pre-petition transactions and evaluated potential causes of action. In particular, I have analyzed and critically challenged pre-petition insider and related party transactions, liability management programs, payments to certain vendors, and restructurings of legal entities and lender liability claims.

4. In my career, I have examined documentation memorializing a wide range of complex financing arrangements. In addition, I have had the occasion to review and analyze many loan and other

4

financing arrangements that companies have entered into to provide funding for their corporate activities, including intercompany lending practices.

5. I am also familiar with and, regularly in the course of my business, review and analyze accounting and accounts payable records. I have analyzed many vendor programs, accounts payable ledgers, and claims documents.

6. In the DBMP LLC case, I testified in connection with my engagement with the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative regarding the *Debtor's Complaint for Injunctive and Declaratory Relief (I) Preliminarily Enjoining Certain Actions Against Non-Debtors or, (II) In The Alternative, Declaring that the Automatic Stay Applies to Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing on the Merits* [Adv. Proc. No. 20-03004, Dkt. No. 1]. Additionally, in the Aldrich Pump LLC case, I testified in connection with my engagement with the Official Committee of Asbestos Personal Injury Claimants regarding the *Debtors' Complaint for Injunctive and Declaratory Relief (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (II) Declaring that the Automatic Stay Applies to Such Actions, and (III) Granting a Temporary Restraining Order Pending a Final Hearing* [Adv. Proc. No. 20-03041 Dkt. No. 1].

7. I am a Certified Public Accountant (CPA), Certified Insolvency and Restructuring Advisor (CIRA), Certified Turnaround Professional (CTP), hold a Master of Business Administration (MBA) degree, with concentrations in finance and management, from Columbia Business School, and hold a Bachelor of Science from New York University with a major in accounting and finance. My biography and detailed prior testimony experience, attached as **Appendix A** to this report, further describe my professional credentials, experience, and qualifications.

## II. RELEVANT CASE BACKGROUND

8. Johnson & Johnson ("J&J") is one of the most financially strong, solvent, and liquid companies in the world, boasting a credit rating better than the United States of America[1] and disclosing over $41 billion in cash, marketable securities, and available credit lines as of October 3, 2021.[2] Despite its financial strength, J&J set out through a series of maneuvers to isolate its talc powder liabilities into a brand new, bankrupt legal entity in order to offload its talc powder claims, to the exclusive detriment of numerous victims suffering from mesothelioma ("Meso"), ovarian cancer ("OC"), and other diseases as a result of exposure to J&J's talc powder products.

9. Recently, a handful of companies with mass tort liabilities have attempted to use Chapter 10, Subchapter A of the Texas Business Organizations Code to create a new subsidiary to offload these responsibilities through a bankruptcy of the new subsidiary.[3] These strategies have been vigorously opposed in their respective court proceedings and J&J is the latest company that has attempted to utilize this approach.

10. LTL Management LLC, a North Carolina limited liability company ("LTL" or the "Debtor") commenced this Chapter 11 case on October 14, 2021 (the "Petition Date") in the Western District of North Carolina, with a goal to resolve its talc powder liabilities through a Chapter 11 reorganization without subjecting the whole former Johnson & Johnson Consumer, Inc. ("Old JJCI") enterprise or J&J itself to a bankruptcy proceeding.[4]

---

[1] *See* "Johnson & Johnson 'AAA' Ratings Affirmed on Divestiture Announcement; Outlook Remains Negative" S&P Global Ratings, November 12, 2021 and "U.S. 'AA+/A-1+' Sovereign Ratings Affirmed; Outlook Remains Stable" S&P Global Ratings, March 16, 2021.
[2] *See* Exhibit 2, Johnson & Johnson's third quarter 2021 10-Q, dated October 3, 2021.
[3] These bankruptcy cases include Bestwall LLC, DBMP LLC, Aldrich Pump LLC, and Murray Boiler LLC.
[4] *See* Exhibit 46, *Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. No. 5] (the "Kim Declaration"), ¶ 21.

6

11.    Despite LTL's bankruptcy filing, J&J very recently stated to the Court in the *Imerys* case that it would prefer to resolve its talc powder obligations outside a bankruptcy proceeding. In May of 2020, J&J pled that "...the [Imerys] Debtors contend, in four full paragraphs, that J&J may lack the financial wherewithal to meet its obligations...this is the most absurd argument the [Imerys] Debtors make...as of the date hereof, J&J has a market capitalization of over $385 billion and extensive insurance coverage of its own. It is one of the top 10 companies in the United States by market value. J&J can provide the claimants far greater protection than the [Imerys] Debtors or the bankruptcy claims trust ever could."[5]

12.    Additionally, J&J stated in its 2020 10-K, "[J&J] anticipates that operating cash flows, the ability to raise funds from external sources, borrowing capacity from existing committed credit facilities and access to the commercial paper markets will continue to provide sufficient resources to fund operating needs, including the talc litigation and agreement in principle to settle opioid litigation of which the majority may be paid over the next two to three years."[6]

13.    Further, in its first quarter 2021 10-Q, J&J stated, "[J&J] anticipates that operating cash flows, the ability to raise funds from external sources, borrowing capacity from existing committed credit facilities and access to the commercial paper markets will continue to provide sufficient resources to fund operating needs, including [J&J's] approximate $1.0 billion in contractual supply commitments associated with its development of the COVID-19 vaccine, the talc litigation and agreement in principle to settle opioid litigation of which the majority may be paid over the next two to three years."[7] Despite these positions by J&J, it reversed its position by filing the LTL bankruptcy.

---

[5] *See Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Imerys Dkt. No. 1769], ¶ 41.
[6] *See* Johnson & Johnson's 2020 10-K.
[7] *See* J&J's first quarter 2021 10-Q, dated April 4, 2021.

and future claimants created pursuant to a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and, to the extent required, the District Court..."[65]

40. Outside a bankruptcy proceeding, there are no restrictions on paying talc powder liabilities on a current basis and LTL essentially has an unfettered ability to pay judgments and settle talc powder liabilities until the Funding Agreement payment cap (e.g., the fair market value of New JJCI as of the Divisional Merger, or $61.6 billion according to the Debtor) is reached. In a bankruptcy proceeding, payments to satisfy talc powder liabilities can only be made in connection with the funding of a trust for the benefit of talc powder victims pursuant to a plan.[66] By filing for bankruptcy, LTL assumed a level of uncertainty in connection with creating a plan and a trust that it otherwise would not have had to deal with outside of a bankruptcy proceeding. Given these significant differences, it is not clear why the bankruptcy occurred on such a condensed timeline.

41. In considering whether to restructure LTL in connection with a bankruptcy proceeding, I would expect the board of managers and officers of LTL to initiate and review a comprehensive analysis, including (i) an assessment of LTL's prospects both in and out of bankruptcy, taking into account the potential impact of the bankruptcy proceeding, (ii) a comprehensive evaluation of the existing and future talc powder liabilities, and (iii) an evaluation of the Funding Agreement both in connection with the bankruptcy proceeding and outside of the bankruptcy proceeding. I'm not aware that this type of analysis was performed.

42. Given that I'm not aware of such an analysis, I analyzed information available on LTL's assets and liabilities. In terms of assets, I understand that the Debtor is of the view that it has access to assets totaling approximately $62 billion.

---

[65] *See* Exhibit 1.52, LTL 0002300 – LTL 0002320.
[66] *See* Exhibit 1.52, LTL 0002300 – LTL 0002320.

32

($ in Millions)

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 1-3Q2021 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **J&J Historical Dividends and Share Repurchases** | | | | | | | | | | | | |
| Repurchase of Common Stock | $2,525 | $12,919 | $3,538 | $7,124 | $5,290 | $8,979 | $6,358 | $5,868 | $6,746 | $3,221 | $2,460 | **$65,028** |
| Dividends to Shareholders | 6,156 | 6,614 | 7,286 | 7,768 | 8,173 | 8,621 | 8,943 | 9,494 | 9,917 | 10,481 | 8,241 | **91,694** |

54. J&J had net debt of just $2.9 billion (calculated as $33.9 billion of total debt as of October 3, 2021 less the sum of cash and marketable securities of $31.0 billion as of the same date),[81] extremely low in relation to earnings, which indicates that it can support significant additional borrowing capacity if needed.

55. J&J has a current market capitalization of approximately $450 billion (as of January 27, 2022), up from approximately $420 billion as of the Petition Date.[82]

### D. THE DEBTOR'S OFFICERS AND MANAGERS ARE OR WERE ALL AFFILATED WITH J&J AND HAVE ENTERED INTO VARIOUS AGREEMENTS THAT WERE NOT NEGOTIATED AT AN ARMS' LENGTH

*Lack of Separate Managers and Officers*

56. LTL's managers and officers consist of Robert Wuesthoff (Manager and President, as well as RAM President), Richard Dickinson (Manager, Chief Financial Officer, and Treasurer), John Kim (Chief Legal Officer and Secretary), and Russell Deyo (Manager).[83] Each of these officers have strong and extensive ties to J&J and none of these individuals are separate from J&J.

57. Robert Wuesthoff, formerly the Vice President of Supply Chain at Johnson & Johnson,[84] first joined J&J in the early 1980s and spent nine and a half years working for J&J.[85] Mr. Wuesthoff rejoined J&J in 2013, where he most recently has run the Enterprise Acceleration Program for the supply

---

[81] *See* Johnson & Johnson's third quarter 2021 10-Q.
[82] *See* https://www.bloomberg.com/quote/JNJ:US.
[83] *See* Exhibit 24, *Schedule of Assets and Liabilities for LTL Management LLC* [Dkt. No. 728].
[84] *See* https://www.linkedin.com/in/robert-wuesthoff-2862062/.
[85] *See* Deposition of Robert Wuesthoff, 13:3-5, December 22, 2021.

chain.[86] He was approached by Michael Ullmann, J&J's Executive Vice President and General Counsel,[87] and Erik Haas, an attorney at J&J,[88] to discuss additional roles as the president of both LTL and RAM.[89] Robert Wuesthoff stated that he was told that his "salary would remain as it is" after appointed an officer at both LTL and RAM, except for the addition of a retention bonuses "at the one-year anniversaries of the role."[90] Mr. Wuesthoff, who formally began at LTL and RAM on October 8, 2021, has indicated that he does not have any bankruptcy experience[91] and has little experience dealing with mass tort/talc powder litigation.[92]

58.     Richard Dickinson, LTL's Chief Financial Officer and Treasurer, previously worked at J&J as its Vice President of New Business Development in the Medical Devices Group at J&J. He joined J&J in 2011.[93] In this role, Mr. Dickinson's responsibilities included new business development in acquisitions, strategic alliances, licenses, agreements, or divestitures.[94] Mr. Dickinson, who was first contacted about the role at LTL in late September 2021,[95] testified that he doesn't have any prior experience with bankruptcy.[96] Mr. Dickinson also testified that following his acceptance of the new position at LTL, his compensation, including incentive bonuses, remained "roughly the same" except for the addition of a retention bonus.[97]

---

[86] *See* Deposition of Robert Wuesthoff, 15: 20-25, 16: 1-8, December 22, 2021.
[87] *See* https://www.jnj.com/leadership/michael-ullmann.
[88] *See* https://www.linkedin.com/in/erik-haas-11379a1bb/.
[89] *See* Deposition of Robert Wuesthoff, 18: 9-25, 19: 1-15, December 22, 2021.
[90] *See* Deposition of Robert Wuesthoff, 30:23-25, 31: 1-4, 32: 5-25, 33: 1-18, December 22, 2021.
[91] *See* Deposition of Robert Wuesthoff, 57: 6-8, December 22, 2021, "Q. Had you had any experience with Chapter 11 bankruptcy prior to this? A. No, not directly."
[92] *See* Deposition of Robert Wuesthoff, 34: 11-16, December 22, 2021, "Q. Okay. Okay. Had you ever done any work at all in your career in connection with managing litigation liabilities? A. Not directly. I've been exposed to them in my career, but I've never managed them directly."
[93] *See* https://www.linkedin.com/in/richard-dickinson-13370a29/.
[94] *See* Deposition of Richard Dickinson, 19: 22-25, January 26, 2022.
[95] *See* Deposition of Richard Dickinson, 24: 6-9, January 26, 2022.
[96] *See* Deposition of Richard Dickinson, 86: 12-18, January 26, 2022.
[97] *See* Deposition of Richard Dickinson, 111: 17-21, 115: 1-25, 116: 1-8, January 26, 2022.

39

59. John Kim, LTL's Chief Legal Officer, previously worked as J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group. In that role, he was responsible for general litigation product liability litigation globally and he has worked at J&J since 2001.[98] Prior to his role as chief legal officer at LTL, Mr. Kim supervised lawyers handling litigation, including an active management role in the defense and strategy in certain litigations, including the talc litigation.[99]

60. Russell Deyo, LTL's Manager, worked for J&J for 27 years where he held a number of positions, including Vice President of Administration and General Counsel. Mr. Deyo served as a member of the J&J Executive Committee, which is its principal management group for global operations. Mr. Deyo retired from J&J in 2012.[100]

61. Mr. Wuesthoff, Mr. Dickinson, and Mr. Kim are current employees of a J&J subsidiary, Johnson & Johnson Services, Inc. ("J&J Services"); their pay and benefits, including retirement benefits, are not directly incurred by LTL.[101]

***Intercompany Agreements Were Not Negotiated On An Arms' Length Basis***

62. In connection with the 2021 Corporate Restructuring, LTL entered into several intercompany agreements, none of which appear to have been negotiated on an arms' length basis. The charts below reflect a number of the key agreements executed in connection with the Integrated Transaction Series, including observations for each agreement.[102]

---

[98] *See* Exhibit 46, Kim Declaration, ¶ 2.
[99] *See* the *Transcript of Proceedings Before the Honorable J. Craig Whitley, United States Bankruptcy Judge,* 95: 7-11, November 4, 2021.
[100] *See* https://millercenter.rutgers.edu/staff/russell-c-deyo/.
[101] *See* Exhibit 1.56, LTL 0002358 – LTL 0002368.
[102] *See* Deposition of Michelle Goodridge, December 20, 2021, Deposition of Robert Wuesthoff, December 22, 2021, and Deposition of Michelle Ryan, January 27, 2022.

40

| Agreement | Date | Counterparties/Authorized Signer | Observations |
|---|---|---|---|
| **Royalty Agreements:** | | | |
| Purchase and Sale Agreement (LACTAID® Royalties) | 10/11/2021 | o McNeil Nutritionals, LLC (Michelle Goodridge, President); and<br>o Royalty A&M LLC (Robert Wuesthoff, President). | o "…I did not personally sit down and negotiate this agreement, but I'm aware of the agreement and what I signed on that day." Michelle Goodridge 12/20/2021;<br>o "I do not know who would have been involved [in the negotiation]. I'm only aware of the agreement that I signed, the intent of it. And so maybe we could as the lawyers who were – who else was involved." Michelle Goodridge, 12/20/2021;<br>o "I can't answer or speak to that question [of if the royalty stream was shopped to third parties]. I can only speak to my capacity as president of McNeil Nutritionals [LLC] when signing the document. And I was not involved in those kind of discussions personally." Michelle Goodridge, 12/20/2021;<br>o "I'm not aware of who would have negotiated [the agreement]." Robert Wuesthoff, 12/22/2021;<br>o "I do not know [who settled on the purchase price]." Robert Wuesthoff, 12/22/2021; and<br>o "I'm not aware that any [negotiations] took place." Robert Wuesthoff, 12/22/2021.<br>o All observations reflected herein pertain specifically to the LACTAID® Purchase and Sale Agreement.<br>   ▪ "Yes, [if asked generally the same questions with respect to understanding of the other Purchase and Sale Agreements, answers would generally be the same]." Robert Wuesthoff, 12/22/2021. |
| Purchase and Sale Agreement (ROGAINE® Royalties) | 10/11/2021 | o Johnson & Johnson Consumer, Inc. (Michelle Goodridge, President); and<br>o Royalty A&M LLC (Robert Wuesthoff, President). | |
| Purchase and Sale Agreement (MYLANTA® Royalties) | 10/11/2021 | o McNeil Consumer Pharmaceutical Co. (Michelle Goodridge, President); and<br>o Royalty A&M LLC (Robert Wuesthoff). | |
| Purchase and Sale Agreement (TENA® Royalties) | 10/11/2021 | o Johnson & Johnson Consumer, Inc. (Michelle Goodridge, President); and<br>o Royalty A&M LLC (Robert Wuesthoff, President). | |

***LTL is an Offshoot of Old JJCI, Does Not Have a Physical Presence, and is Essentially a Talc Powder Liability Management Vehicle***

63.  <u>No Operations</u>: LTL has no operations and does not develop, manufacture, or produce any products or brands.[103]

64.  <u>No Back Office</u>: LTL relies on J&J Services for its treasury and procurement services, corporate finance services, legal and compliance support services, risk management services, and other crucial business services. LTL doesn't have its own standalone services for these types of functions.

---

[103] *See* Exhibit 47, LTL 0030334 – LTL 0030348.

65. <u>No Employees of its Own:</u> LTL was created with no direct employees of its own, but instead relies upon services provided by employees of J&J Services. These services are provided pursuant to a Services Agreement with J&J Services in which J&J Services provides certain crucial business functions to LTL, including treasury and procurement services, corporate finance services, legal and compliance support services, information technology services, and several others.[104] Additionally, LTL is party to a secondment agreement with J&J Services in which three employees are seconded on a full-time basis to LTL while still remaining employees of J&J Services.[105]

66. <u>No Physical Space:</u> Mr. Wuesthoff, president of LTL, stated that LTL doesn't have its own physical office location, but instead uses a "hoteling" system at a J&J building location. Mr. Wuesthoff described that the space is available for booking as needed but is not leased or owned by LTL and there is not any space within the facility that is specifically dedicated to LTL.[106]

67. <u>Only Holds Interests in Royalty Assets:</u> Besides the Funding Agreement, LTL's largest asset is its wholly owned, non-bankrupt subsidiary, RAM, which has an interest in certain royalty streams, as previously discussed. Despite being party to several purchase and sale agreements pursuant to certain royalty streams, RAM does not own any underlying brands, and only holds an interest in the royalty revenue streams. New JJCI retained responsibility for the product license agreements and employees of New JJCI will continue to fulfill all responsibilities pursuant to the product license agreements. Internally, J&J prepared a communications script that indicated that RAM's purchase of certain royalty streams would not have any impact on employees, on the way they work with the royalty agreement partners, or on the specific brands.[107]

---

[104] *See* Exhibit 1.54, LTL 0002328 – LTL 0002343.
[105] *See* Exhibit 1.56, LTL 0002358 – LTL 0002368.
[106] *See* Deposition of Robert Wuesthoff, 48: 1- 25, 49: 1-25.
[107] *See* Exhibit 47, LTL 0030334 – LTL 0030348.

45