UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**Order Filed on February 24, 2022
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

In Re:

LTL MANAGEMENT LLC

| | |
|---|---|
| Case No.: | 21-30589 |
| Chapter: | 11 |
| Hearing Date: | |
| Judge: | Michael B. Kaplan |

## JOINT STIPULATION AND AGREED ORDER BETWEEN MOVANTS AND DEBTOR REGARDING THE ADMISSION OF DEPOSITION DESIGNATIONS AT MOTION TO DISMISS TRIAL

The relief set forth on the following pages  is **ORDERED**.

**DATED: February 24, 2022**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**COOLEY LLP**<br>Cullen D. Speckhart (admitted pro hac vice)<br>Michael Klein (admitted pro hac vice)<br>Erica J. Richards (pro hac vice to be filed)<br>Lauren A. Reichardt (pro hac vice to be filed)<br>Evan Lazerowitz<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Fax: (212) 479-6275<br>Email: cspeckhart@cooley.com<br>    mklein@cooley.com<br>    erichards@cooley.com<br>    lreichardt@cooley.com<br>    elazerowitz@cooley.com<br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* | **BAILEY GLASSER LLP**<br>Brian A. Glasser, Esq. (admitted pro hac vice)<br>Thomas B. Bennett, Esq. (admitted pro hac vice)<br>Kevin W. Barrett, Esq. (admitted pro hac vice)<br>Maggie B. Burrus, Esq. (admitted pro hac vice)<br>105 Thomas Jefferson St. NW, Suite 540<br>Washington, DC 20007<br>Tel: (202) 463-2101<br>Fax: (202) 463-2103<br>Email: bglasser@baileyglasser.com<br>    tbennett@baileyglasser.com<br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* |
| **WALDREP WALL BABCOCK & BAILEY PLLC**<br>Thomas W. Waldrep, Jr. (admitted pro hac vice)<br>Kevin L. Sink (admitted pro hac vice)<br>James C. Lanik (admitted pro hac vice)<br>Jennifer B. Lyday (admitted pro hac vice)<br>370 Knollwood Street,<br>Suite 600<br>Winston-Salem, NC 27103<br>Tel: (336) 717-1280<br>Fax: (336) 717-1340<br>Email: notice@waldrepwall.com<br><br>*Proposed Co-Counsel to the Official Committee of*<br>*Talc Claimants II* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq. (admitted pro hac vice)<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC 20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br>Email: jmassey@masseygail.com<br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* |
| **SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Alan I. Moldoff<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, New Jersey 08057<br>Tel: (856) 662-0700<br>Email: aabramowitz@shermansilverstein.com<br>    amoldoff@shermansilverstein.com<br>    rswitkes@shermansilverstein.com<br>*Proposed Local Counsel to*<br>*the Official Committee of Talc Claimants II* | |

| | |
|---|---|
| In re:<br><br>**LTL MANAGEMENT LLC,**<br><br>    Debtor. | Chapter 11<br><br>Case No.:  21-30589 (MBK)<br><br>Honorable Michael B. Kaplan |

### JOINT STIPULATION AND AGREED ORDER BETWEEN MOVANTS AND DEBTOR REGARDING THE ADMISSION OF DEPOSITION DESIGNATIONS AT MOTION TO DISMISS TRIAL

The relief set forth on the following pages is hereby **ORDERED**.

This stipulation and agreed order (this "<u>Stipulation</u>") is made on this 18th day of February, 2022 (the "<u>Stipulation Date</u>") by the Official Committee of Talc Claimants I (the "<u>TCC I</u>"), the Official Committee of Talc Claimants II (the "<u>TCC II</u>"), Aylstock, Witkin, Kreis & Overholtz, PLLC ("<u>AWKO</u>"), and Arnold & Itkin LLP on behalf of certain personal injury tort plaintiffs (collectively, "<u>Movants</u>"), and LTL Management LLC, the debtor and debtor-in-possession ("<u>Debtor</u>"), regarding the evidentiary record for the Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case [Docket No. 632] and Motion to Dismiss Bankruptcy Case filed by Arnold & Itkin LLP on behalf of certain personal injury tort plaintiffs [Docket No. 766] (the "<u>Motions to Dismiss</u>").

## <u>Recitals</u>

WHEREAS, the Preliminary Hearing on the Motions to Dismiss commenced on February 14, 2022 (the "<u>MTD Trial</u>");

WHEREAS, the Movants have designated certain portions of the following depositions that they wish the Court to consider ("Movants' Designations"), and the Debtor has counter-designated other portions of these depositions that it wishes the Court to consider ("Debtor's Counters"):

- Michelle Goodridge (Dec. 20, 2021);

- Robert Wuesthoff (Dec. 22, 2021);

- Thibaut Mongon (Jan. 19, 2022);

- Jose Azevedo (Jan. 24, 2022);

- Richard Dickinson (Jan. 26, 2022);

- Michelle Ryan (Jan. 27, 2022);

- John Kim (Jan. 31, 2022);

3

- John Kim (30(b)(6)) (Feb. 1, 2022);

- Adam Lisman (Feb. 8, 2022);

- Arthur Wong (Feb. 11, 2022); and

- David Kaplan (Feb. 11, 2022).

WHEREAS, the Debtor has designated certain portions of the following depositions that it wishes the Court to consider ("Debtor's Designations"), and the Movants have designated other portions of these depositions that they wish the Court to consider ("Movants' Counters"):

- Michelle Ryan (Jan. 27, 2022);

- Arthur Wong (Feb. 11, 2022); and

- David Kaplan (Feb. 11, 2022).

WHEREAS, a listing of (a) Movants' Designations, (b) Debtor's Counters, (c) Debtor's Designations, and (d) Movants' Counters (collectively, the "Stipulated Designations") to which the parties either have no objections or have waived objections, together with agreed-upon confidentiality treatment in accordance with the Agreed Protective Order Governing Confidential Information [Docket No. 948] (the "Protective Order"), is attached hereto as Exhibit A;

WHEREAS, the Parties wish the Court to accept the Designations into evidence, and consider the Designations in connection with deciding the MTD Trial;

WHEREAS, those Stipulated Designations that are, pursuant to the Protective Order, available for public view are annexed hereto as Exhibit B.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, AND UPON APPROVAL BY THE BANKRUPTCY COURT OF THIS STIPULATION, IT IS SO ORDERED AS FOLLOWS:

1.      The Stipulated Designations in Exhibit B hereto are admitted into evidence and are made part of the public record herewith

2.      The remaining Stipulated Designations (*i.e.*, those listed in Exhibit A hereto that are subject to confidential treatment in accordance with the Protective Order) are also admitted into evidence and shall be filed in accordance with the Protective Order or otherwise in the form and manner agreed between and among the parties and the Court.

3.      This Stipulation shall constitute the entire agreement and understanding between Movants and Debtor relating to the subject matter hereof and supersedes all prior agreements and understandings between Movants and Debtor relating to the subject matter hereof.

4.      The Court shall retain jurisdiction to resolve any disputes, controversies, or ambiguities arising from this Stipulation.

*{Signature page follows}*

AGREED AS TO FORM AND SUBSTANCE:

**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**
*Proposed Local Counsel to the*
*Official Committee of Talc Claimants II*


By: ___/s/ Arthur J. Abramowitz_____
    Arthur J. Abramowitz
    Ross J. Switkes
    308 Harper Drive, Suite 200
    Moorestown, NJ
    Tel: (856) 662-0700
    aabramowitz@shermansilverstein.com
    rswitkes@shermansilverstein.com

Dated: February 18, 2022


**GENOVA BURNS, LLC**
*Proposed Local Counsel to the*
*Official Committee of Talc Claimants I*


By: ___/s/ Daniel M. Stolz_____
    Daniel M. Stolz
    Donald W. Clarke
    110 Allen Road, Suite 304
    Basking Ridge, NJ 07920
    Tel: (973) 533-0777
    dstolz@genovaburns.com
    dclarke@genovaburns.com

Dated: February 18, 2022


**WOLLMUTH MAHER & DEUTSCH LLP**
*Counsel to the Debtor*


By: ___/s/ Paul R. DeFilippo_____
    Paul R. DeFilippo
    500 Fifth Avenue
    New York, New York 10110
    Tel: (212) 382-3300
    pdefilippo@wmd-law.com

Dated: February 18, 2022


**OFFIT KURMAN, P.A.**
*Counsel to Aylstock, Witkin, Kreis &*
*Overholtz, PLLC*


By: ___/s/ Paul J. Winterhalter_____
    Paul J. Winterhalter
    99 Wood Avenue South, Suite 302
    Iselin, New Jersey 08830
    Tel: (267) 338-1370
    pwinterhalter@offitkurman.com

Dated: February 18, 2022


**PACHULSKI STANG ZIEHL & JONES LLP**
*Counsel to Arnold & Itkin LLP*


By: ___/s/ Colin Robinson_____
    Laura Davis Jones
    Colin Robinson
    919 N. Market Street, 17th Floor
    Wilmington, DE 19801
    Tel: (302) 652-4100
    ljones@pszjlaw.com

Dated: February 18, 2022

**DAVID KAPLAN – FEBRUARY 11, 2022**

| Movants' Designation (Kaplan) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 13:18 - 13:21 | | 160:3-161:12 | 161:13-163:12 |
| 13:23 - 14:4 | | 165:6-166:7 (just A. Not – not specifically) | 166:7-167:3 |
| 14:7 - 14:13 | | 171:7-172:13 | 172:14-15 |
| 17:2 - 19:8 | | 174:25-176:5 | |
| 20:20 - 20:24 | | 177:18-180:19 | 180:20-21 |
| 20:25 - 21:25 | | 180:22-181:6 | |
| 22:8 - 23:4 | 23:5 – 23:19 | 191:12-192:24 | 191:6-10 |
| 23:20 - 25:20 | | 193:10-193-13 | |
| 26:10 - 26:19 | 26:20 – 27:14 | 197:23-198:14 | 198:15-16 |
| 27:15 - 28:24 | | 198:17-199:4 | 199:5-23 |
| 30:1 - 30:22 | 30:23 – 34-15 | 199:24-200:4 | |
| 34:16 - 37:20 | | 203:6-16 | |
| 38:24 - 40:25 | | 205:24-206:6 | |
| 42:22 - 43:18 | | 208:19-209:23 | |
| 44:3 - 44:10 | 44:11 | 211:16-213:5 | |
| 44:12 - 44:24 | | 214:1-214:9 | |
| 45:5 - 45:7 | | 214:24-216:25 | |
| 45:13 - 48:3 | | 219:24-220:7 | |
| 48:4 - 49:11 | | 248:8-249:23 | |
| 51:4 - 51:16 | | | |
| 53:10 - 53:22 | | | |
| 56:24 - 59:24 | | | |
| 59:25 - 60:12 | 60:13 – 60:25 | | |
| 61:1 - 62:19 | | | |
| 70:12 - 71:6 | | | |
| 78:23 - 80:21 | | | |
| 82:2 - 82:20 | 82:21 – 83:5 | | |
| 83:25 - 84:8 | | | |
| 84:10 - 87:8 | | | |
| 88:18 - 89:1 | 89:2 | | |
| 91:11 - 91:16 | 91:17 – 94:16 | | |
| 94:17 - 96:5 | 96:6 – 96:9 | | |
| 96:10 - 97:2 | | | |
| 98:8 - 98:23 | | | |
| 102:21 - 103:16 | 105:9 – 106:9 | | |
| 106:10 - 106:13 | | | |
| 108:17 - 110:24 | 110:25 – 111:15 | | |
| 111:16 - 111:19 | 111:20 – 112:10 | | |
| 112:12 - 112:19 | | | |

| Movants' Designation (Kaplan) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 119:4 - 119:15 | | | |
| 120:16 - 121:8 | | | |
| 121:24 - 122:21 | 122:22 – 123:2; 124:24 – 125:9; 130:4 – 132:9; 137:13 – 138:25; 144:16 – 146:21; 149:10 – 149:24; 150:7 – 150:18; 150:20 – 151:13; 160:3 – 160:20; 160:21 – 161:12; 162:3 – 163:12; 164:16 – 165:1 | | |
| 165:20 - 166:16 | 167:4 – 167:13; 168:3 – 168:6 | | |
| 169:14 - 170:16 | 172:1 – 172:13; 174:25 – 176:10; 178:13 – 179:23; 194:3 – 194:13; 197:10 – 198:14; 199:5 – 200:4; 200:5-206:06; 208:19 – 211:15; 211:16 – 211:25; 212:1 – 212:23; 213:9 – 213:25 | | |
| 214:1 - 214:16 | 214:17 – 214:23; 216:12 – 217:2; 217:3 – 217:9; 219:24 – 220:7; 224:21 – 225:1; 225:2 – 226:20 | | |
| 228:2 - 233:25 | | | |
| 234:14 - 234:25 | | | |
| 235:21 - 236:8 | | | |
| 243:14 - 244:20 | | | |
| 246:6 - 247:24 | 248:8 – 249:23 | | |
| 251:15 - 252:25 | 253:1 – 253:8 | | |

**JOHN KIM 30(B)(6) – FEBRUARY 1, 2022**

| Movants' Designation (Kim – 30(b)(6)) | Debtor's Counter Designation |
|---|---|
| 13:7 - 15:13 | |
| 15:16 - 16:16 | |
| 21:7 - 23:1 | |
| 23:20 - 28:21 | |
| 30:9 - 30:18 | 32:20 – 33:9 |
| 33:10 - 35:7 | |
| 35:13 - 36:7 | 36:8 – 36:16 |
| 36:23 - 36:24 | |
| 37:5 - 37:13 | |
| 45:10 - 45:13 | |
| 45:15 - 45:18 | |
| 45:21 - 46:17 | |
| 50:21 - 51:4 | |
| 52:25 - 53:10 | |
| 58:15 - 58:18 | |
| 60:4 - 60:7 | |
| 60:21 - 60:25 | |
| 61:2 - 61:8 | |
| 64:1 - 64:15 | |
| 64:18 - 64:23 | |
| 68:1 - 69:9 | |
| 69:16 - 70:5 | 70:18 – 71:1 |
| 76:1 - 76:15 | |
| 77:1 - 77:14 | 79:13 – 80:6 |
| 82:4 - 83:8 | |
| 84:5 - 84:19 | |
| 88:15 - 88:25 | |
| 90:17 - 91:6 | |
| 92:6 - 93:3 | |
| 94:8 - 94:11 | |
| 95:15 - 95:23 | |
| 102:24 - 103:10 | |
| 105:1 - 106:2 | |
| 111:5 - 111:22 | |
| 113:24 - 115:20 | |
| 116:16 - 116:23 | |
| 118:23 - 120:22 | |
| 122:17 - 123:4 | |
| 125:21 - 126:7 | |
| 130:7 - 132:11 | |
| 134:21 - 136:1 | |

| Movants' Designation (Kim – 30(b)(6)) | Debtor's Counter Designation |
|---|---|
| 138:15 - 139:20 | |
| 141:20 - 142:11 | |
| 145:10 - 145:19 | |
| 149:7 - 149:18 | |
| 149:21 - 151:4 | |
| 155:19 - 155:23 | 155:24 |
| 155:25 - 156:8 | |
| 157:3 - 157:5 | 157:6 – 157:7 |
| 157:8 - 157:13 | |
| 158:24 - 158:25 | 159:1 – 159:7 |
| 168:15 - 169:6 | |
| 170:17 - 171:9 | 172:13 – 173:2 |
| 178:23 - 179:6 | |
| 186:25 - 187:8 | |
| 192:16 - 194:17 | |
| 194:23 - 196:4 | |
| 199:9 - 199:22 | |
| 200:9 - 200:25 | 203:9 – 203:23 |

# KAPLAN, DAVID

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 13**

13 :18          Do you understand that last
19     fall, Johnson & Johnson undertook a corporate
20     restructuring that resulted in the creation of
21     a company called "Legacy Talc Litigation?"

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 13**

13 :23         A. Yes.
24         Q. And do you understand that
25     Johnson & Johnson and Johnson & Johnson's
14 :1     consumer health subsidiaries, Talc
2     Liabilities, were placed into that newly
3     created company, Legacy Talc Litigation?
4         A. Yes.

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 14**

14 :7         Q. And if I use the shorthand, "LTL,"
8     for Legacy Talc Litigation, do you understand
9     what I'm referring to?
10         A. Yes.
11         Q. And do you understand that LTL filed
12     for bankruptcy?
13         A. Yes.

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 17**

17 :2         Q. And have you been the Director of
3     Corporate Ratings Healthcare, at Standard and
4     Poor's, for the last 14 years?
5         A. No. So, my current role is
6     director. And I've been at Standard and
7     Poor's, in the Credit Ratings Department, for
8     14 years. But I've not been director for the
9     full 14 years.
10         Q. And for how long have you been
11     director?
12         A. I don't recall, offhand. But it's
13     a -- a good number of years.
14         Q. Okay. At least three or four years?
15     Is that fair?
16         A. Yes.
17         Q. And what is your role as a Director
18     of Corporate Ratings, Healthcare?
19         A. So, the department that I work in,
20     Corporate Ratings, we establish a grading
21     system, like Triple A, for -- which is an
22     evaluation of credit risk. The risk that a
23     company will go bankrupt.
24         My -- in my role, I focus currently,
25     primarily on pharmaceutical companies, but
18 :1     also, other types of healthcare companies like
2     medical device, or healthcare service
3     companies.

4      And I have a group of more junior
5  analysts who don't report directly to me, but
6  are on my team. Kind of a dotted line. And
7  I'm responsible for their work, and quality
8  control training, et cetera.
9      Q. Got it. Thank you. Do you have
10  responsibility for covering Johnson & Johnson
11  in your role?
12      A. Yes.
13      Q. And for how long have you been
14  covering Johnson & Johnson?
15      A. I think it was since 2019 was when I
16  picked up coverage from a colleague.
17      Q. And does your coverage of
18  Johnson & Johnson include Johnson & Johnson
19  subsidiaries?
20      A. Yes. I mean, I -- well, to clarify,
21  our rating is on the parent, but the -- the
22  activities of the subsidiaries influence the
23  credit rating of the parent.
24          So, if it's related to the
25  creditworthiness of the overall entity, then
19 :1  yes. You know, it gets technical when we
2  think about how we rate different entities
3  within a group.
4          But, generally, they have a single
5  family rating that reflects the comprehensive
6  activities of the entities that are part of
7  the group which is backing the
8  creditworthiness of the parent.

**KAPLAN, DAVID** - *02/11/2022*

**Page 20**
20 :20      Q. Got it. And in the course of
21  covering Johnson & Johnson as part of your
22  role at Standard and Poor's, do you
23  communicate with people at the company?
24      A. Yes.
25      Q. And who are the principal people
21 :1  that you communicated with from 19 -- 2019 to
2  the present?
3      A. So, we -- we typically try to
4  schedule a meeting annually, that involves a
5  large group of analysts or a group of analysts
6  from my team, Standard and Poor's credit
7  ratings group.
8          May be three to half a dozen, or
9  sometimes more. And on JNJ side, there will
10  also be, kind of a handful of people. Often
11  the treasurer; some people from investor
12  relations. Sometimes the CFO. Sometimes
13  legal folks, if it's -- we have some questions
14  about legal matters.
15          And then, there is kind of an annual
16  thing. And the company will share with us
17  forecasts and other information that maybe
18  sometimes is not shared publicly. So it's
19  kind of confidential information.
20          And then we also kind of maintain a
21  single person who is our primary contact.
22  That was Michelle Ryan, for the last couple
23  years. It's recently switched to
24  Duane Van Arsdale, I believe is the name of

25    the individual, who is the treasurer.

---

**KAPLAN, DAVID** - *02/11/2022*

---

Page 22

22 :8        Q. And as the director on that account,
9    if that's the right terminology, were you the
10    principal point of contact with Michelle Ryan,
11    during the period that she was the point
12    person at JNJ?
13        A. I was the primary point person, with
14    the exception of a short period of leave in
15    September and October of 2021. I would say
16    yeah.
17        It's not always the director who's
18    the primary point of contact. Typically,
19    names that are credits that are larger and
20    more complex, are allocated to directors to be
21    the primary analyst.
22        Companies that are smaller and less
23    complicated are often -- associates are the
24    primary point of contact.
25        So it's not -- the title -- the title
23 :1    is not necessarily for that role. But yes, to
2    your original -- I guess to the key question,
3    I am the primary point of contact with the
4    company on JNJ.
5        Q. And how often would you have
6    telephone calls with Michelle Ryan in, let's
7    say, 2020 and 2021?
8        A. So, again, it could vary. If
9    everything is very stable, it could be, you
10    know, just when a company issues debt. So
11    maybe once a year, aside from the annual
12    meeting.
13        In the case of Johnson & Johnson,
14    there were various developments, so it was
15    more frequent. It's hard for me to say
16    whether it was twice a year or four or five
17    times a year. Just don't recall.
18        Q. Somewhere in that range?
19        A. Yes.
20        Q. And when you did have telephone
21    calls with Michelle Ryan, how did you record
22    the substance of those telephone calls?
23        A. If the conversations are
24    substantive, the practice is --
25        MR. STARNER: I may object
24 :1    occasionally. Just give me a moment.
2        Obviously, you can answer the
3    question, if you understand, after that.
4    But if you just give me one second, so --
5    if you don't mind. Thank you.
6        Go ahead.
7        THE WITNESS: Sure.
8        Yeah. Our practice is to take
9    written notes if they are substantive
10    matters that, you know, wouldn't be
11    documented.
12        So, for example, if a company plans
13    on issuing debt, you might just take a
14    few notes. But then, when the issuance
15    is -- when you publish your note,
16    everything is there, so there is nothing
17    really that is meaningful or material,

18     that needs to be recorded.

19         But if there's notes that are

20     meaningful, the practice -- the practice

21     in the organization and the department is

22     to save them into a specific depository

23     for the record.

24         We are a regulated entity. And so,

25     we are required to save the material

25 :1     information we gather, as part of that

2     rating analysis.

3     BY MR. SHAPIRO:

4         Q. And what is the name of that system

5     where you maintain your notes?

6         A. We refer to it as "RDR."

7         Q. RDR. And what does "RDR" stand for?

8         A. Probably something like "rating

9     depository" -- yeah. We use a lot of

10     acronyms.

11         Q. We can call it "RDR." And is -- and

12     is RDR a database of notes that the S&P

13     analyst take to record the conversations that

14     they have with the companies that they cover?

15          MR. STARNER: Objection.

16         You can answer.

17         A. It's a system where those documents

18     are saved. We often use, kind of, the

19     administrative assistants to help file it

20     there. Yes.

---

## KAPLAN, DAVID - *02/11/2022*

**Page 26**

26 :10     Q. Let me ask you the question this

11     way. Do you rely on those notes in the course

12     of developing ratings for the companies that

13     you cover?

14         A. Certainly, those are an input that

15     go into it. And we'll refer back to it.

16         Q. And do you rely on those notes for

17     the purpose of preparing the reports that S&P

18     prepares?

19         A. We could. Certainly, yeah.

20         Q. And -- and in the course of your

21     career at S&P, have you always intended for

22     those notes to be as accurate as possible?

23         A. They are shorthand. But they are

24     supposed to be a reference for -- at least for

25     me, to be able to decipher what I was thinking

26

27

27 :1     or hearing.

2         I guess that is to say that, they

3     are not edited, or they are usually drafted as

4     the conversation is going.

5         So there is a little bit of a --

6     there is a looseness in the note-taking that's

7     obviously not going to be present in something

8     we would publish, or even something that we

9     would share with a committee, like a -- a

10     package for others to review.

11         They are really not generally

12     reviewed by anyone else. So, you know, if

13     they have a grocery list on the side, that

14     wouldn't be a problem.

15          MR. SHAPIRO: Let me mark as

16          Exhibit 384, a document that's Bates
17   stamped SPG100 -- or "SPGI0001078_001"
18   through "002."
19          And for the videographer, it's tab C
20   in the binder. You can put that on the
21   screen.
22      (Exhibit 384 marked for identification)
23   BY MR. SHAPIRO:
24      Q. Mr. Kaplan, do you have the ability
25   to control the notes? To control the screen
28 :1   to go through it?
2      A. Yes.
3      Q. Okay. Let me know when you've had a
4   chance to review them.
5          [Witness perused document.]
6      A. Okay.
7      Q. Do you recognize these as your
8   notes, Mr. Kaplan?
9      A. I recognize these as mine. This
10   would not be -- these are not notes that were
11   taken during a conversation with the company.
12          This would be notes that I drafted
13   for our conversation with my colleagues to
14   discuss the rating on JNJ, or the outlook on
15   JNJ. In addition to having a rating, we also
16   have an outlook which could be stable,
17   positive or negative.
18          So, this was October of 2020. This
19   was, I guess, an internal conversation we had
20   scheduled to discuss JNJ's rating and some of
21   the developments.
22      Q. Are these notes that you prepared in
23   advance of the internal conversation?
24      A. Yes.

KAPLAN, DAVID - *02/11/2022*

**Page 30**
30 :1      Q. That's okay. And what was the
2   purpose of the meeting?
3      A. So, based on, you know, the
4   contents, there were two legal matters that
5   were facing Johnson & Johnson, that seemed to
6   be -- had reached the point where the
7   liability could be material.
8          And so, we were discussing whether
9   this has, or should have an influence on the
10   rating or the rating outlook.
11      Q. And what was the source of the
12   information that you included in these notes?
13      A. So, it could be conversations we had
14   with the company. It could be information we
15   digested from media sources we viewed as
16   reliable.
17          It could be information that the
18   company had shared publicly with investors, or
19   had put in its SEC filings, like its 10K or
20   10Q.
21          You know, we kind of gathered from
22   multiple sources.
23      Q. Okay. I want to ask you, if we can
24   scroll up. I guess I can't control it. Let
25   me -- let's scroll up to the part that says,
31 :1   "Talc settlements."
2          Do you see the section at the

3   bottom of the page, which is Bates stamped --
4   I guess it's the first page, "001," which
5   says, "Talc settlements?"
6           You're there, Mr. Kaplan? If
7   you scroll down.
8       A. Sure.
9       Q. Do you see that the first sentence
10  says:
11          "Company has capitulated on
12  talc, talcum powder/baby powder litigation
13  settlements in contrast to fiercely litigating
14  that."
15          Do you see that?
16      A. Yes.
17      Q. And is that based on a conversation
18  you had with Michelle Ryan?
19      A. That would have been my -- my view.
20  So the term, "capitulated," in particular, is
21  just a word that came to me. But it's -- this
22  is my interpretation of the events that I'm
23  observing.
24          So, I doubt that the company would
25  have said that to me, specifically. But the
32 :1 company, in my experience, has been -- has
2   taken the strategy -- and I believe
3   Michelle Ryan had mentioned this -- of, you
4   know, of generally being very assertive in
5   litigating claims.
6           Michelle had expressed that J --
7   that the company feels -- Johnson & Johnson
8   feels that they are unfairly challenged by
9   litigation because of their financial
10  strength.
11          And so, their strategy is generally
12  to litigate even things that might be economic
13  to ignore, or just to settle, to avoid
14  nuisance cases.
15          So, it was therefore a change for us
16  to see that they started to reserve some --
17  some amounts on their financial statements as
18  expected losses or exhibited liabilities for
19  talc.
20          So that -- that's what that first
21  sentence refers to. Is that the company has
22  basically shifted in strategy from fighting
23  talc to starting to settle some cases, at
24  least.
25      Q. And the basis for your observation,
33 :1 that the company had begun to settle some of
2   the cases is the fact that, as reflected in
3   your notes, that they had accrued $350 million
4   in Q2, and $540 million in Q4?
5           Is that fair?
6       A. I'm not sure if it was -- was it Q4?
7       Q. Q3, sorry.
8       A. But the fact that they had reserved
9   the 350, and expect to reserve another 540.
10  Right. Correct.
11      Q. And what was your understanding of
12  the significance of the fact that the company
13  had reserved $890 million in Q2 and Q3, for
14  this litigation? What was the significance of
15  that, to your understanding?
16      A. So, you know, we see litigation very
17  often in healthcare. And the overwhelming

18  majority of the time, it ends up not being
19  material -- not end up being a material
20  liability for the company.
21      And so, when we think about credit
22  risk, that's an important observation. But
23  when we see a company take a reserve, it --
24  it's one development that suggests that the
25  liability may be material here.
34 :1      It's not the only way. And it's not
2  a certainty. But that's one development that
3  is suggestive; the liabilities might be
4  material.
5      And so, that is something we try to
6  incorporate in the credit -- in the thinking
7  around the credit risk is -- well, it looks
8  like now the company is going to take some
9  degree of liability.
10     Q. And did you understand, or do you
11  understand, that when a company takes a
12  reserve, the company is making a judgment that
13  the liability is probable and estimable?
14     A. Yes. Based on the SEC or GAP
15  definitions. Correct. Yeah.
16     Q. And then, let me ask you about the
17  third bullet point that refers to the 25,000
18  talc cases. Do you see that?
19     A. Uh-huh. Yes.
20     Q. In that bullet point, it says that:
21         "The company estimates that the
22  liability could reach as much as $7 billion to
23  $7.5 billion, inclusive of all future cases."
24         Do you see that?
25     A. Yes.
35 :1     Q. And when you refer to the company in
2  that bullet point, who are you referring to in
3  particular, as the source of that information?
4         MR. STARNER: Objection.
5         You can answer.
6     A. That would be our -- that would be
7  from conversation we had with the company.
8     Q. Okay.
9     A. Most likely, Michelle Ryan.
10     Q. And what did you understand was the
11  significance of that estimate, that the
12  liability could reach as much as $7 billion to
13  $7.5 billion, inclusive of all future cases?
14         What did that mean?
15         MR. STARNER: Objection.
16     Q. Or what did you understand, based on
17  your conversation?
18     A. It sounds -- well, I don't recall.
19  But based on my reading of my notes, as I
20  would have written them, I think what I was
21  trying to communicate here to my colleagues
22  was that we had a conversation with
23  Johnson & Johnson. And, you know, although --
24  excuse me.
25         Although, you know, the company --
36 :1  you know, there's a lot of uncertainty from
2  the benefit of -- for the purposes of our
3  credit risk, it's important to understand what
4  the -- you know, maximum liability could be.
5         And I think what we gathered from
6  the company is that -- and maybe based on some
7  of the math in the two bullet points above,

8    the company is estimating that its liability
9    will be -- could be as much as $7.75
10   billion -- $7 billion to $7.5 billion.
11           Which is, again, helpful for us to
12   think about it, you know, in the context of
13   Johnson & Johnson. The company generates, you
14   know, $30 billion of EBITDA.
15           As a worst case scenario, you know,
16   what's -- what's the worst case scenario. So
17   even if it's not probable, but at least to
18   have some numbers around it can be very
19   helpful for us.
20           You know, I know the media had some
21   speculation with numbers that were higher than
22   that. So being able to say, you know, media
23   numbers are, you know, just, completely -- you
24   know, meaning when some of my colleagues will
25   sometimes see stuff in the media, and then,
37 :1  you know, send me a link or an article.
2            You know, hearing from the company
3    that they feel that the maximum is $7 billion
4    to $7.5 billion is reassuring in a sense,
5    relative to, maybe something that we read in
6    the media that said the liabilities could be
7    much more than that.
8            So it's helpful, even if it's not --
9    it doesn't become our base case expectation.
10       Q. And let me ask you to take a look at
11   your next bullet point at the top of the next
12   page. Do you see where it says:
13           "The company expects payment
14   would be $2.5 billion per year, in each of the
15   next three years."
16       A. Yes.
17       Q. And is that also based on your
18   conversation with Michelle Ryan?
19       A. Yes. That's what -- that's what the
20   notes indicate.

## KAPLAN, DAVID - *02/11/2022*

**Page 38**

38 :24     Q. And let me just ask you a couple of
25   more questions about these notes. You were
39 :1  explaining this at the beginning. These are
2    notes that you prepared in advance of your
3    internal meeting with other analysts at S&P?
4        A. Yes.
5        Q. And those -- this -- this type of
6    internal note is something that you regularly
7    prepared in advance of internal meetings like
8    that?
9            MR. STARNER: Objection.
10       A. So, we have two types of internal
11   conversations. There is a more formal one,
12   which is when we kind of formally gather in a
13   committee. There's various formalities and
14   processes around that.
15           The internal conversation is kind of
16   a less formal. So it's typically for
17   developments that are where we don't expect
18   there to be a change in the rating, but we
19   just want to run it by our colleagues to make
20   sure they feel similarly.
21           Or in a company that, you know, is

```
     25        A: The board was given all the underlying
34 :1           information about it.
      2        Q: I know.
      3           Do you know why -- do you know why the
      4           board wasn't just given the number?
      5        A: I think it was unnecessary for the board's
      6           determination. Again, what's in the reserve is not --
      7           again, it's probable and estimable. But the information
      8           we gave the board was far more than what the reserve
      9           number is.
     10           So, you know, again, the information given
     11           to the board encompassed all that, but --
     12        Q: But the -- I apologize. I don't mean to step
     13           on your words.
     14        A: The information given to the board encompassed
     15           all the information that would go into setting the
     16           reserve plus more, plus advice of counsel.
     17           So, again, the underlying information
     18           about the reserves -- about how reserves are set or the
     19           basis of the reserves was given to the board. It just
     20           wasn't told to the board that this was the reserve.
     21        Q: And the difference between what was given to
     22           the board, those are facts that reflect the actual cost
     23           and the number of cases and the actual settlements,
     24           correct?
     25        A: Plus the board was told what was expected, what
35 :1           we could expect. So the future was -- the future of the
      2           litigation was discussed at length with the board.
      3           So it's not just -- again, all the
      4           information that goes into calculating reserve was given
      5           to the board. We just did not give the board the
      6           reserve number that was in the books because we thought
      7           we were giving the board more information than that.
```

### KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 35**

```
35 :13       Q: Has LTL or anyone acting on its behalf prepared
     14          any draft Chapter 11 plan of reorganization?
     15       A: It has not.
     16       Q: Has anyone -- withdrawn.
     17          Has LTL or anyone acting on its behalf
     18          created any projections of future financial performance
     19          of a post-reorganized LTL?
     20       A: We have not at this point done that.
     21       Q: Has LTL or anybody acting on its behalf
     22          prepared any type of feasibility analysis with respect
     23          to any contemplated Chapter 11 reorganization plan?
     24       A: Not a written feasibility analysis. We believe
     25          that a plan is feasible and that we hope to develop one.
36 :1        Q: Okay. Anything other than your hopes that the
      2          debtor has undertaken to try to determine whether
      3          there's a feasible plan of reorganization?
      4       A: Well, based upon discussion with counsel -- so
      5          it's not only our hopes, it's, you know, based upon
      6          discussions, we believe that there's a plan that's
      7          feasible, yes.
      8       Q: Okay. But no feasibility analysis has been
      9          undertaken, correct?
     10       A: So I'm not sure what you mean by feasibility
     11          analysis. There's no -- we don't have a written
     12          document that goes -- titled Feasibility Analysis. But
     13          we have had discussions, and we believe that based upon
     14          the experience and expertise of our bankruptcy counsel
     15          and the facts of the case, we believe that a Chapter 11
```

16          plan will be feasible.

## KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 36**

36 :23     Q: Okay. Does LTL have any secured creditors?
24         A: I do not believe it does.

## KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 37**

37 :5      Q: Okay. As the corporate representative, are you
6          aware of any secured debt that the debtor needs to
7          address or resolve within the bankruptcy?
8          A: I do not. I am not aware of any.
9          Q: Are you aware of any asset that LTL owns that
10         is subject to a lien or security interest of any kind?
11         A: I do not believe that there are any, no.
12         Q: Okay. Does LTL have any trade creditors?
13         A: I do not believe it does.

## KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 45**

45 :10     Other than contracts that concern claims
11         based on talc and intercompany agreements, is LTL party
12         to any other contract that you're aware of?
13         A: I am not aware of any.

## KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 45**

45 :15     LTL has no employees, correct?
16         MS. BROWN: Objection, foundation.
17         A: LTL's employees that have been seconded to it
18         from Johnson & Johnson Services, Inc.

## KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 45**

45 :21     Are you aware of any tax claims that have
22         been asserted against LTL?
23         A: I am not aware of any claims asserted.
24         Q: Okay. We talked yesterday -- not we, but other
25         lawyers and yourself spent some time on the funding
46 :1      agreement. Do you remember that?
2          A: I do recall that, yes.
3          Q: Okay. Does LTL have any reason to believe that
4          Johnson & Johnson and JJCI will not honor its
5          obligations under the funding agreement?
6          A: It has no reason to believe that Johnson &
7          Johnson and JJCI will not honor the terms of the funding
8          agreement.
9          Q: In fact, LTL expects Johnson & Johnson and JJCI
10         to honor their obligations under the funding agreement,
11         correct?
12         A: LTL does and has already undertaken -- gotten
13         funds from the funding agreement.
14         Q: Okay. Does LTL have any reason to believe that
15         Johnson & Johnson or JJCI will be unable to fulfill
16         their obligations under the funding agreement?