| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**GENOVA BURNS LLC**<br>Angelo J. Genova, Esq.<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Matthew I.W. Baker, Esq.<br>agenova@genovaburns.com<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>mbaker@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Local Counsel to the Official Committee of Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael S. Winograd, Esq.<br>Jeffrey L. Jonas, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>jjonas@brownrudnick.com<br>Seven Times Square<br>New York, NY 10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Sunni P. Beville, Esq.<br>sbeville@brownrudnick.com<br>One Financial Center<br>Boston, MA 02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Co-Counsel for the Official Committee of Talc Claimants* |
| **BAILEY GLASSER LLP**<br>Brian A. Glasser, Esq.<br>Thomas B. Bennett, Esq.<br>bglasser@baileyglasser.com<br>tbennett@baileyglasser.com<br>105 Thomas Jefferson St. NW, Suite 540<br>Washington, DC 20007<br>Tel: (202) 463-2101<br>Fax: (202) 463-2103<br>*Co-Counsel for the Official Committee of Talc Claimants* | **OTTERBOURG P.C.**<br>Melanie L. Cyganowski, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>mcyganowski@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>230 Park Avenue<br>New York, NY 10169<br>Tel: (212) 905-3628<br>Fax: (212) 682-6104<br>*Co-Counsel for the Official Committee of Talc Claimants* |

| PARKINS LEE & RUBIO LLP | MASSEY & GAIL LLP |
|---|---|
| Leonard M. Parkins, Esq. | Jonathan S. Massey, Esq. |
| Charles M. Rubio, Esq. | jmassey@masseygail.com |
| lparkins@parkinslee.com | 100 Main Ave. SW, Suite 450 |
| crubio@parkinslee.com | Washington, DC 20024 |
| Pennzoil Place | Tel: (202) 652-4511 |
| 700 Milan St., Suite 1300 | Fax: (312) 379-0467 |
| Houston, TX 77002 | *Special Counsel for the Official Committee of* |
| Tel: (713) 715-1666 | *Talc Claimants* |
| *Special Counsel to the Official Committee of* | |
| *Talc Claimants* | |

|  |  |
|---|---|
| In re: | Chapter 11 |
| | Case No.: 21-30589(MBK) |
| **LTL MANAGEMENT, LLC,** | Honorable Michael B. Kaplan |
| Debtor. | |

|  |  |
|---|---|
| **LTL MANAGEMENT LLC,** | Adv. Pro. No. 21-03032 (MBK) |
| Plaintiff, | |
| v. | |
| **THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT** and **JOHN AND JANE DOES 1-1000**, | |
| Defendants. | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS TO DEBTOR'S MOTION FOR AN ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS OR (II) PRELIMINARILY ENJOINING SUCH ACTIONS AND (III) GRANTING A TEMPORARY RESTRAINING ORDER PENDING A FINAL HEARING**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT .......................................................................1

FACTUAL BACKGROUND ...........................................................................5

    I.     The Debtor, Its Estate and Its Creditors .................................................. 5

    II.    Events Culminating in the Debtor's Bankruptcy Filing ........................... 7

         A.    J&J and Its Talcum Powder Products ......................................... 7

         B.    Talcum Powder Litigation ...................................................... 14

         C.    J&J's Prior Preference for the Tort System over Bankruptcy Court ........ 22

         D.    J&J Decides to Shift Course ..................................................... 25

         E.    The "Texas Two-Step" ........................................................... 28

         F.    The Bankruptcy Filing and Announced Stay of Litigation ...................... 39

    III.    Relevant Procedural History ................................................................ 41

ARGUMENT ...............................................................................................44

    I.     THE DEBTOR HAS NOT ESTABLISHED THAT ANY EXTENSION OF THE
         STAY under § 362(a) IS WARRANTED .......................................... 44

         A.    Section 362(a) Was Enacted to Give a Reprieve to the Debtor ............... 44

         B.    The Stay Should Not Be Extended Here Under § 362(a)(1) ................... 47

         C.    The Stay Under §362(a)(3) is Inapplicable Here ...................................... 73

    II.    THE DEBTOR HAS NOT DEMONSTRATED ITS ENTITLEMENT TO
         PRELIMINARY INJUNCTIVE RELIEF UNDER § 105(A) OF THE
         BANKRUPTCY CODE .................................................................. 77

         A.    The Court Does Not Have Subject Matter Jurisdiction to Issue the
            Requested Injunction Enjoining Actions Between Non-Debtors ............. 78

          B.    The Debtor Has Not Satisfied Its Burden of Establishing the Requirements
            for Granting the Extraordinary Relief of a Preliminary Injunction .......... 82

i

C.      The Debtor's Request for Equitable Relief Should Be Denied Due to The
        Debtor's (and J&J's) Unclean Hands ....................................................... 93

CONCLUSION .................................................................................................................... 95

# Table of Authorities

Page

<u>Cases</u>

A.H. Robins Co., Inc. v. Piccinin,
788 F.2d 994 (4th Cir.) ................................................................................................ passim

Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.,
133 B.R. 176 (W.D. Pa. 1991) ...................................................................................... 70, 88

Allen v. McCurry,
449 U.S. 90 (1980) .............................................................................................................. 72

Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.,
682 F.2d 446 (3d Cir. 1982) ............................................................................................... 45

Austin v. Unarco Industries, Inc.,
705 F.2d 1 (1st Cir. 1983) .................................................................................................. 61

Bippus v. Norton Co.,
437 F. Supp. 104 (E.D. Pa. 1977) ...................................................................................... 66

Blackstone Valley Elec. Co. v. Stone & Webster, Inc.,
867 F. Supp. 73 (D. Mass. 1994) ....................................................................................... 66

Bouton v. Litton Indus., Inc.,
423 F.2d 643 (3d Cir. 1970) .......................................................................................... 66, 67

Bradberry v. Carrier Corp.,
86 So. 3d 973 (Ala. 2011) ............................................................................................. 48, 59

CAE Indus. Ltd. v. Aerospace Holdings Co.,
116 B.R. 31 (S.D.N.Y. 1991) ............................................................................................. 69

City of Chicago v. Fulton,
141 S. Ct. 585 (2021) .......................................................................................................... 45

Constitution Bank v. Tubbs,
68 F.3d 685 (3d Cir. 1995) ................................................................................................. 45

Cowan v. Harris Corp.,
1982 WL 602774 (D. Kan. 1982) ....................................................................................... 66

Darcy v. Brooklyn & N.Y. Ferry Co.,
89 N.E. 461 (N.Y. 1909) .................................................................................................... 64

Deutsche Bank Nat. Trust Co. v. FDIC,
109 F. Supp. 3d 179 (D.D.C. 2015) .............................................................................. 65, 66

*Eastern Refractories Co. v. Forty Eight Insulations Inc.*,
    157 F.3d 169 (2d Cir. 1998) ................................................................................................ 44, 45

*Edwards v. McElliotts Trucking, LLC*,
    2017 WL 5559921 (S.D. W. Va. Nov. 17, 2017) ................................................................. 49

*Elsinore*,
    91 B.R. 238 ........................................................................................................................ 80

*Federal–Mogul Global, Inc.*,
    300 F.3d 382 .................................................................................................................. 79, 81

*Federal-Mogul*,
    282 B.R. 308 ...................................................................................................................... 70

*Ferguson v. Arcata Redwood Co.*,
    2004 WL 2600471 (N.D. Cal.  2004) ............................................................................... 66

*Feuer v. Merck & Co.*,
    187 A.3d 873 (N.J. App. Div. 2018) ................................................................................. 65

*Forcine Concrete & Const. Co. v. Manning Equip. Sales & Serv.*,
    426 B.R. 520 (E.D. Pa. 2010) ..................................................................................... 70, 71

*Gold v. Johns-Manville Sales Corp.*,
    723 F.2d 1068 (3d Cir. 1983) ..................................................................................... 60, 61

*Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*,
    194 B.R. 318 (Bankr. S.D.N.Y. 1996) ............................................................................ 76

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) ............................................................................................................ 92

*Gray v. Hirsch*,
    230 B.R. 239 (S.D.N.Y.1999) .......................................................................................... 47

*Halper v. Halper*,
    164 F.3d 830 ..................................................................................................................... 78

*Haring v. Prosise*,
    462 U.S. 306 (1983) .......................................................................................................... 72

*Harrison Lumber & Hardware Co. v. C. I. R.*,
    15 T.C.M. (CCH) 281 (Tax 1956) ................................................................................... 66

*Holland v. High Power Energy*,
    248 B.R. 53 (S.D. W. Va. 2000) ....................................................................................... 60

*Huylar v. Cragin Cattle Co.*,
    7 A. 521 (N.J. Ch. 1887) .................................................................................................. 65

*In re Aldan Indus., Inc.*,
   No. 00-10360DWS, 2000 WL 357719 (Bankr. E.D. Pa. Apr. 3, 2000) ...................................... 48, 49, 60

*In re Aldrich Pump, LLC*,
   20-30608 (JCW), 2021 WL 3729335 (Bank. W.D.N.C. Aug. 23, 2021) .................................. 25, 55, 85

*In re All Seasons Resorts, Inc.*,
   79 B.R. 901 (Bankr. C.D. Cal. 1987) ......................................................................................... 49, 57

*In re Am. Cap. Equip., LLC*,
   688 F.3d 145 (3d Cir. 2012) ........................................................................................................ 86, 87

*In re Am. Film Techs., Inc.*,
   175 B.R. 847 (Bankr. D. Del. 1994) ........................................................................................... 72, 73

*In re Bestwall LLC*,
   606 B.R. 243 (Bankr. W.D.N.C. 2019) ............................................................................. 55, 56, 84, 85

*In re Bora Bora, Inc.*,
   424 B.R. 17 (Bankr. D.P.R. 2010) ........................................................................................................ 49

*In re Briarpatch Film Corp.*,
   281 B.R. 820 (Bankr. S.D.N.Y. 2002) ................................................................................................ 46

*In re Brier Creek Corporate Center Associates Ltd.*,
   486 B.R. 681 (Bankr. E.D.N.C. 2013) ............................................................................................ 51, 80

*In re Colonial Realty*,
   980 F.2d 125 (2d Cir. 1992) .................................................................................................................. 46

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004) ......................................................................................................... passim

*In re DBMP LLC*,
   Case No. 20-30080 (JCW), 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021) ............ 25, 55, 56, 85

*In re Denby-Peterson*,
   941 F.3d 115 (3d Cir. 2019) ...................................................................................................... 45, 52, 84

*In re F.T.L., Inc.*,
   152 B.R. 61 (E.D. Va. 1993) ................................................................................................................ 49

*In re Federal-Mogul Global Inc.*,
   411 B.R. 148 (Bankr. D. Del. 2008) .................................................................................................... 63

*In re First Cent. Fin. Corp.*,
   238 B.R. 9 (Bankr. E.D.N.Y. 1999) .................................................................................................... 57

*In re FPSDA I, LLC*,
   No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) ....................................... 49, 56, 83

*In re G-I Holdings Inc.*,
420 B.R. 216 (D.N.J. 2009) ............................................................... 82

*In re G-I Holdings*,
580 B.R. 388 (Bankr. D.N.J. 2018) ................................................... 80

*In re Heating Oil Partners*,
No. 3:08-CV-1976 CSH, 2009 WL 5110838 (D. Conn. Dec. 17,2009) ............... 50

*In re Imerys Talc America, Inc, Inc.*,
2019 WL 3253366(D. Del. 2019) ......................................... 74, 81

*In re Integrated Telecom Express, Inc.*,
384 F.3d 108 (3d Cir. 2004) ............................................................... 53

*In re Irwin*,
457 B.R. 413 (Bankr. E.D. Pa. 2011) ............................................... 51

*In re Johns-Manville Corp.*,
26 B.R. 405 (Bankr. S.D.N.Y. 1983) ............................................... 45

*In re Johns-Manville Corp.*,
801 F.2d 60 (2d Cir. 1986) ................................................................ 79

*In re Johnson & Johnson Talcum Products*,
509 F. Supp. 3d 116 (D.N.J. 2020) ................................................... 17

*In re Kaiser Aluminum Corp.*,
456 F.3d 328 (3d Cir. 2006) ............................................................... 52

*In re KB Toys Inc.*,
736 F.3d 247 (3d Cir. 2013) ............................................................... 84

*In re Lower Bucks Hosp.*,
488 B.R. 303 (E.D. Pa. 2013) ..................................................... 58, 81

*In re MCSi, Inc.*,
371 B.R. 270 (S.D. Ohio 2004) ......................................................... 72

*In re Metal Center, Inc.*,
31 B.R. 458 (Bankr. D. Conn. 1983) ............................................... 72

*In re Millennium Lab Holdings II LLC*,
945 F.3d 126 (3d Cir. 2019) ............................................................... 53

*In re Monroe Well Serv., Inc.*,
67 B.R. 746 (Bankr. E.D. Pa. 1986) ......................................... 51, 80, 91

*In re New Valley Corp.*,
181 F.3d 517 (3d Cir. 1999) ......................................................... 92, 93

vi

*In re Owens Corning,*
419 F.3d 195 (3d Cir. 2005) ................................................................................ 53

*In re Phila. Newspapers, LLC,*
418 B.R. 548 (E.D. Pa. 2009) ............................................................................. 52

*In re Phila. Newspapers, LLC,*
407 B.R. 606 (E.D. Pa. 2009) .......................................................... 49, 78, 79, 82

*In re Quigley Co., Inc.,*
676 F.3d 45 (2d Cir. 2012) ........................................................................... 75, 87

*In re Saxby's Coffee Worldwide, LLC,*
440 B.R. 369 (Bankr. E.D. Pa. 2009) ........................................................... 51, 82

*In re Scarborough-St. James Corp.,*
535 B.R. 60 (Bankr. D. Del. 2015) ................................................................ 45, 51

*In Re Seven Fields Dev. Corp.,*
505 F.3d (3d Cir. 2007) ...................................................................................... 80

*In re Trans-Service Logistics, Inc.,*
304 B.R. 805 (Bankr. S.D. Ohio 2004) ............................................................... 49

*In re Uni-Marts, LLC,*
399 B.R. 400 (Bankr. D. Del. 2009) ......................................................... 47, 48, 57

*In re Univ. Med. Ctr.,*
82 B.R. 754 (Bankr. E.D. Pa. 1988) ................................................................... 50

*In re W.R. Grace & Co.,*
No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ............... 48

*In re Wedgewood Realty Group, Ltd.,*
878 F.2d 693 (3d Cir. 1989) ......................................................................... 49, 77

*In SGL Carbon Corp.,*
200 F.3d 154 (3d Cir. 1999) ............................................................................... 53

In *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),*
386 B.R. 17 (Bankr. D. Del. 2008) ..................................................................... 72

*Ingham v. Johnson & Johnson,*
608 S.W.3d 663 (Mo. Ct. App. 2020) ..................................................... 19, 20, 90

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,*
882 F.2d 797 (3d Cir. 1989) ............................................................................... 81

*Int'l Union of Painters & Allied Trades Dist. Council No. 21 Health & Welfare Fund v.
Serv. Painting, Inc.,*
No. CV 18-3480, 2019 WL 2143370 (E.D. Pa. May 16, 2019) ........................... 72

*Jackson v. Trump Ent. Resorts, Inc.*,
  No. CV 13-1605 (JHR/JS), 2015 WL 13637411 (D.N.J. Feb. 11, 2015)........................................46, 70

*Jaycox v. Terex Corp.*,
  No. 4:19-CV-02650 SRC, 2021 WL 2187907 (E.D. Mo. May 28, 2021)..............................................63

*Kaiser Group Int'l, Inc. v. Kaiser Aluminum and Chem. Corp. (In re Kaiser Aluminum Corp., Inc.)*,
  315 B.R. 655 (D. Del. 2004) .......................................................................................................50

*Keystone Driller Co. v. General Excavating Co.*,
  290 U.S. 240 (1933) ..................................................................................................................93

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs., Inc.*,
  402 B.R. 571 ....................................................................................................................51, 80

*Maaco Enters., Inc. v. Corrao*,
  91-3325, 1991 WL 255132 (E.D. Pa. Nov. 25, 1991) ..................................................................50

*Mallinckrodt PLC v. Connecticut*,
  20-408-LPS, 2021 WL 523625 (D. Del. Feb. 2, 2021) .................................................................50

*Maritime Elec. Co. v. United Jersey Bank*,
  959 F.2d 1194 (3d Cir. 1991) ..............................................................................................45, 46

*Matter of S.I. Acquisition, Inc.*,
  817 F.2d 1142 ...........................................................................................................................83

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ............................................................................................................82, 83

*McCartney v. Integra Nat. Bank N.*,
  106 F.3d 506 (3d Cir. 1997) ...............................................................................45, 46, 47, 49

*Milchalko v. Cooke Color & Chem. Corp.*,
  91 N.J. 386 (1982) .....................................................................................................................69

*Millard v. Developmental Disabilities Institute, Inc.*,
  266 B.R. 42 (E.D.N.Y. 2001) ........................................................................................49, 50, 57

*Mitchell v. Horn*,
  318 F.3d 523 (3d Cir. 2003) ......................................................................................................52

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ..................................................................................................................81

*Muskrat v. United States*,
  219 U.S. 346 (1911) ..................................................................................................................54

*Novartis Consumer Health, Inc. v. Johnson & Johnson – Merck Consumer Pharmaceuticals Co.*,
  290 F.3d 578 (3d Cir. 2002) ......................................................................................................82

*NutraSweet Co. v. Vit-Mar Enterprises, Inc.*,
  176 F.3d 151 (3d Cir. 1999) .................................................................................................. 82

*Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*,
  692 F.3d 283 (3d Cir. 2012) .................................................................................................. 78

*Official Unsecured Creditors Committee of Phar-Mor, Inc. v. Bowen, et al. (In re Phar-Mor, Inc.
  Sec. Litig.)*,
  164 B.R. 903 (W.D. Pa. 1994) ...................................................................................... 57, 74, 82

*Pacor, Inc. v. Higgins*,
  743 F.2d 984 (3d Cir. 1984) ...................................................................................... 72, 78, 79

*Paden v. Union for Experimenting Colleges and Universities*,
  7 B.R. 289 (N.D. Ill. 1980) .................................................................................................... 45

*Patton v. Bearden*,
  8 F.3d 343 (6th Cir. 1993) ..................................................................................................... 49

*Phar-Mor, Inc. v. Gen. Elec. Capital Corp. (In re Phar-Mor, Inc. Sec. Litig.)*,
  166 B.R. 57 (W.D. Pa. 1994) ................................................................................................. 59

*Pierre-Louis v. DeLonghi America, Inc.*,
  66 A.D.3d 859, 887 N.Y.S.2d 628 (2d Dep't 2009) ............................................................. 69

*Poe v. Ullman*,
  367 U.S. 497 (1961) .............................................................................................................. 54

*Queenie, Ltd. v. Nygard Int'l*,
  321 F.3d 282 (2d. Cir. 2003) ...................................................................................... 48, 71, 72

*Richards v. Musselman*,
  267 S.E.2d 164 ...................................................................................................................... 92

*Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*,
  502 F.3d 1086 (9th Cir. 2007) ............................................................................................... 82

*Stanford v. Foamex L.P.*,
  2009 WL 1033607 (E.D. Pa. Apr. 15, 2009) ........................................................................ 60

*Stoe v. Flaherty*,
  436 F.3d 209 (3d Cir. 2006) ........................................................................................... 78, 80

*Teachers Ins. & Annuity Ass'n of Am. v. Butler*,
  803 F.2d 61 (2d Cir. 1986) .................................................................................................... 49

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002) .................................................................................................. 82

*Travelodge Hotels, Inc. v. Patel*,
  C.A. No. 13-03719 (WHW), 2013 WL 4537906 (D.N.J. Aug. 27, 2013) ............................ 46

*United States Trustee v. Gryphon at the Stone Mansion, Inc.,*
  166 F.3d 552 (3d Cir.1999) ................................................................................78

*United States v. Johnson,*
  319 U.S. 302 (1943) ..........................................................................................54

*United States v. Ron Pair Enters., Inc.,*
  489 U.S. 235 (1989) ..........................................................................................52

*Wedgeworth v. Fibreboard Corp.,*
  706 F.2d 541 (5th Cir. 1983) ........................................................................61, 62

*Williford v. Armstrong World Industries, Inc.,*
  715 F.2d 124 (4th Cir. 1983) ...............................................................60, 61, 90

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008) ..........................................................................................81, 83

*Worldcom, Inc. v. Boyne,*
  68 Fed. App'x. 447 (4th Cir. 2003) ..................................................................92

## Statutes

11 U.S.C. § 101 .................................................................................................85

11 U.S.C. § 105 ............................................................................................passim

11 U.S.C. § 105(a) .......................................................................................passim

11 U.S.C. § 129(a)(10) ......................................................................................86

11 U.S.C. § 301(b) .............................................................................................85

11 U.S.C. § 362 ............................................................................................passim

11 U.S.C. § 362(a)(1) .........................................................................................44

11 U.S.C. § 362(a)(3) .........................................................................................44

11 U.S.C. § 362(a) .......................................................................................passim

11 U.S.C. § 362(a)(3) .........................................................................................46

11 U.S.C. § 502(e)(1)(B) ...................................................................................89

11 U.S.C. § 524 ..................................................................................................86

11 U.S.C. § 524(g)(4)(a) ....................................................................................87

11 U.S.C. § 524(g) ......................................................................................passim

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ...............................................................86

11 U.S.C. § 524(g)(4)(A)(ii) .................................................................................................. 87

11 U.S.C. § 524(g)(4)(A)(ii)(I) ............................................................................................. 85

11 U.S.C. § 524(g)(4)(A)(ii)(II) ............................................................................................ 85

11 U.S.C. § 524(g)(4)(A)(iii) ................................................................................................ 85

11 U.S.C. § 548(a) ................................................................................................................ 58

28 U.S.C. § 157(b)(5) ........................................................................................................... 23

28 U.S.C. § 1334(b) ........................................................................................................ 23, 78

28 U.S.C. § 1407 ............................................................................................................... 5, 92

N.J.S.A. 14A:5–28 ................................................................................................................ 65

N.J.S.A. 14A:5–28(4) ........................................................................................................... 65

Rules

Fed. R. Civ. P. 8(a) .............................................................................................................. 17

Fed. R. Civ. P. 9(b) .............................................................................................................. 17

Fed. R. Bankr. P. 7001(7) ..................................................................................................... 41

Other Authorities

6 Norton Bankr. L. & Prac. § 112:10 (3d ed. 2012) ............................................................. 86

11A Wright, Miller & Kane, Federal Practice and Procedure § 2948, p. 129-30 (1995) ........................... 82

63 Am. Jur. 2d Products Liability § 91 (Aug. 2021 update) ..................................................... 68

Fletcher Cyc. Corp. §§ 2189, 2191, 2193 ............................................................................. 65

H.R. Rep. No. 95–595 ........................................................................................................... 45

Restatement, Torts 2d, § 402A ............................................................................................. 69

The Official Committee of Talc Claimants (the "**Official Committee**")[1] appointed in the

above-referenced chapter 11 case (the "**Bankruptcy Case**") of LTL Management LLC ("**LTL**" or

the "**Debtor**"), hereby submits this memorandum of law in support of its Objection to the *Debtor's*

*Motion for an order (I) Declaring That the Automatic Stay Applied to Certain Actions Against*

*Non-Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary*

*Restraining Order Pending a Final Hearing* [Adv. Pro. Dkt. No. 2] (the "**Motion**") and in response

to the *Debtor's Supplemental Memorandum of Law in Support of Preliminary Injunction Motion*

[Adv. Pro. Dkt. No. 128] (the "**Supplemental Memorandum**"),[2] and respectfully states as

follows:

## PRELIMINARY STATEMENT

LTL was created two days before its Chapter 11 filing with the stated purpose of filing for

bankruptcy. Through this bankruptcy, generally, and by this motion, specifically, Johnson &

Johnson ("**J&J**") seeks to "borrow" for itself and its commercial partners LTL's automatic stay

(without itself filing for bankruptcy), seize up all cosmetic talcum powder-related litigation being

prosecuted *against J&J*, and gain a litigation advantage over dying of cancer. From the perspective

of J&J and the Debtor, this case (as ugly as can be) is about litigation advantage, plain and simple.

The automatic stay, though, is no small thing: It is a statutory injunction, indiscriminately

imposed, that serves as a complete restraint on Seventh Amendment entitlements. It is brutal in

effect. And, because it is so powerful, it is very carefully circumscribed. By its plain terms, it

protects the estate, and the estate alone. And, even then, it is temporary and subject to exceptions

and relief therefrom (including, especially hardship relief). There is no explicit statutory basis in

---

[1]    The Official Committee is a party to the adversary proceeding by virtue of a Stipulation and Order between
the Debtor and the Official Committee entered on November 24, 2021. Adv. Pro. Dkt. No. 109.

[2]    References to the Supplemental Memorandum are cited as "Mem. at __."

§ 362(a) to extend the stay beyond the estate and, in fact, any such extension is inconsistent with the words of the statute. Courts have allowed such extensions under their general equity powers conferred in § 105(a). But, as the highest appellate courts have reiterated over and over, the courts' § 105(a) powers are limited and must be used sparingly. As such, extending the automatic stay beyond the estate is a rare, exceptional, almost emergency occurrence. The Debtor's burden here is perhaps the heaviest in all of bankruptcy law.

This is LTL's fourth attempt to extend the stay to J&J and hundreds of J&J's affiliates, insurers and retailers. All three of the Debtor's prior attempts to extend the automatic stay for the duration of the bankruptcy case were rejected by the prior bankruptcy court. And for good reason. If successful, the Debtor's effort to extend the stay would indefinitely and completely halt tens of thousands of lawsuits, including a five-year-old multi-district litigation pending in this District. All of those cases are filed against J&J and others — *none* have been filed against LTL.

The Debtor's first attempt at extending the stay was denied as procedurally infirm by the United States Bankruptcy Court for the Western District of North Carolina (the "**North Carolina Court**"). The second attempt — an oral application for a temporary restraining order — was denied by the North Carolina Court, which, after a half-day evidentiary hearing, expressed "grave concerns" with the requested extension. On the third attempt — a preliminary injunction motion decided after another day and a half of evidentiary hearings and following the announcement that the bankruptcy case would be transferred to this District — the North Carolina Court, "influenced heavily by the fact that I'm . . . sending the case to another court" and "the last thing I want to do is send it with it on fire," granted interim relief for only 60 days and with the express intention "not . . . to bind" the recipient court.

2

On the record now before it, this Court should (once again) deny the extraordinary and unjustifiable relief requested by the Debtor. That record leaves no room for doubt that the Debtor's request — manifestly made for the benefit of J&J and its affiliates and commercial partners — seeks to pervert the fundamental language, nature, and purpose of the Bankruptcy Code's automatic stay. The stay was designed to give the honest but unfortunate debtor a breathing spell from the collection efforts of its creditors. But here, LTL seeks to extend that protection to one of the richest companies in the world, J&J, which is not in bankruptcy and has no need to resort to bankruptcy relief, in order to provide J&J with some refuge from mass tort litigation arising out of J&J's own misconduct. In other words, this is the quintessential case of the tail wagging the dog: the debtor was designed for the automatic stay rather than the automatic stay designed for the debtor.

The consequences of extending the automatic stay under these circumstances cannot be overstated. This case would provide a blueprint to transform the Bankruptcy Code into a tool for unbridled corporate greed and manipulation. The bankruptcy filing of a new shell entity formed solely for the purpose of housing inconvenient, embarrassing, or intractable liabilities would become the recipe for any corporation — no matter how solvent — to stonewall its creditors. If successful, the Debtor's strategy would also gut the multi-district litigation system that Congress established in 28 U.S.C. § 1407 to centralize, efficiently manage, and ultimately settle mass tort actions. That entire statutory litigation process would become obsolete, replaced by a system of divisive mergers and bankruptcy filings.

The Third Circuit Court of Appeals and other courts have recognized that the automatic stay may be extended to non-debtors under "unusual circumstances," *i.e.*, where an "identity of interest" has been shown between the debtor and the non-debtors such that claims against the non-

debtors are tantamount to claims against the debtor.  However, *no* appellate or district court has *ever* applied the automatic stay in circumstances here, where the purported "identities of interests" were manufactured by the non-debtors on the eve of bankruptcy.  To be clear, the *Debtor* did not sign or assume any of the indemnification agreements, insurance policies or tender letters on which it now relies to claim an identity of interest with J&J and its affiliates, insurers and retailers. Rather, it was *J&J* and its affiliates that purported to *allocate* all those various liabilities to the Debtor through a Texas "divisional merger."  Outside of a small handful of decisions — *none* precedential or persuasive — in "Texas Two-Step" cases filed exclusively in the North Carolina Court (the manufactured venue in which the Debtor chose to file this case), the Debtor cites to *no* case where, as here, the automatic stay was applied to non-debtors who, by corporate alchemy, fabricated their own identities of interest with the debtor days before putting the debtor into bankruptcy.  This Court should not set precedent by expanding the reach of the automatic stay to such breathtaking lengths and solely on the basis of corporate artifice.

Even if the identities of interest on which the Debtor now relies were *not* manufactured on the eve of its bankruptcy filing (and they were), there still would be no basis for extending the automatic stay here.  As the language and history of the statute evince, the purpose of the automatic stay is to prevent creditor actions that would diminish the debtor's assets.  But that purpose finds no place in this bankruptcy, where the litigation claims are asserted against J&J, a half-*trillion* dollar corporation with practically *no limits* on its distributable assets.  To be sure, the Debtor was allocated certain indemnification obligations, shared insurance, and/or defense payment obligations.  But, this maneuvering was contrived.  And, in any event, the Debtor claims that J&J — among the most solvent and credit-worthy institutions in the world — has agreed to *replenish*

any consequent erosion to the Debtor's assets.  In short, the rationale for applying the automatic stay — to prevent any adverse impact on the Debtor's estate — is glaringly absent.

In all events, were the Court even to reach the issue, the Debtor has not carried its heavy burden of establishing each of its supposed obligations on which it relies for purposes of its Motion.  The Debtor's position on each of these points — indemnification, shared insurance, and accepted tenders of defense — is unsupported by the record and flatly contradicted by the testimony of J&J's own witnesses in numerous talcum powder litigations prior to the bankruptcy filing.  Nor can the Debtor demonstrate any irreparable harm that would result from failure to grant injunctive relief, given its position that J&J has agreed to replenish any erosion in the Debtor's estate.

Conversely, the harm to tens of thousands of litigants dying of cancer from the denial of access to the courts is manifest. This Court should not close its eyes to the human costs of the Debtor's requested relief, which would deny tens of thousands of dying victims their right to a day in court.

The Motion should be denied in its entirety.

## <u>FACTUAL BACKGROUND</u>

### I.        The Debtor, Its Estate and Its Creditors

The Debtor is a special purpose vehicle ("**SPV**") created by J&J and its consumer products subsidiary, Johnson and Johnson Consumer, Inc. ("**JJCI**" or "**Old JJCI**"), two days before its bankruptcy filing.  (First Day Decl. of John K. Kim ("**First Day Decl.**") [Main Dkt. No. 5], at ¶ 23).  Its staff consists of three individuals, working out of J&J's headquarters and other offices in New Jersey, seconded to the Debtor by Johnson & Johnson Services, Inc. ("**J&J Services**"), a J&J

subsidiary. (*Id.* at ¶ 29; Kim Dep. Tr., Oct. 31, 2021 ("**Kim Tr**."), at 255:1-8, 262:9-264:3; [3] Oct.

22, 2021 H'rg Tr. [Joint Claimant Ex. ("**Cl. Ex.**")[4] 5], at 45:2-46:12; [5] Debtor Ex. ("**Dbt. Ex.**") [6]

1 (LTL 0001874-89, LTL 0001890-900)). All three worked for J&J until the Debtor's formation.

(Cl. Ex. 5, at 45:9-46:15; Nov. 4, 2021 H'rg Tr., at 173:7-174:9; 276:11-20; First Day Decl., at ¶

2). The Debtor's Chief Legal Officer ("**CLO**"), John Kim, had been the head of Product Liability

Litigation for J&J, but resigned from that post shortly before the Debtor's formation and was

succeeded by another J&J in-house attorney. (First Day Decl., at ¶ 2; Kim Tr., at 9:22-10:17,

254:14-24). Consequently, none of the Debtor's staff have, or should have, any ongoing

responsibilities with regard to products liability litigation filed against J&J at this point. (Kim Tr.,

at 254:14-24).

    The Debtor does not have any operational presence. (Dbt. Ex. 1 (LTL 0001874-89)). It

does not make anything or sell anything. It does not participate in the commercial world in any

capacity. (First Day Decl., at ¶¶ 16-18, ¶¶ 22-24). In that vein, the Debtor did not sign, or

otherwise take any steps to become a party to, any commercial agreement, including (as discussed

---

[3]    A copy of the Kim Transcript is attached as Exhibit "A" to the Declaration of Melanie L. Cyganowski in Support of Objection of the TCC to Debtor's Motion for Preliminary Injunction, filed contemporaneously herewith (the "**Cyganowski Decl.**"). The Cyganowski Decl. attaches certain documents that were not submitted previously in connection with the Motion

[4]    "Cl. Ex." Refers to the Joint Claimants' exhibits that were admitted into the record during the November 4-5, 2021 Preliminary Injunction Hearing in the North Carolina Court, Case No. 21-30589 (MBK), and related adversary proceeding Adv. Pro. No. 21-03032 (MBK).

[5]    A copy of the October 22, 2021 hearing transcript is attached as Exhibit "1" to the Declaration of Adam C. Silverstein in Support of Objection of the TCC to Debtor's Motion for Preliminary Injunction, filed contemporaneously herewith (the "**Silverstein Decl.**"). The Silverstein Decl. attaches for the convenience of the Court certain Joint Claimants' exhibits previously admitted into evidence in connection with the Motion, certain transcripts from proceedings before the North Carolina Court and certain public filings on the dockets of certain other cases, referred to herein. The Debtor has filed, or is filing, the Debtor exhibits it offered, and which were admitted into evidence, on the docket of this Adversary Proceeding.

[6]    "Debtor Ex." Refers to the Debtor's exhibits that were admitted into the record during the November 4-5, 2021 Preliminary Injunction Hearing in the North Carolina Court, Case No. 21-30589 (MBK), and related adversary proceeding Adv. Pro. No. 21-03032 (MBK) (Adv. Pro. Dkt. No. 135).

below) any of the indemnification agreements, insurance agreements or tender of defense
agreements on which it now relies in an effort to extend the automatic stay. (*See* pp. 29–39, *infra*).

The Debtor asserts that: "At the time of the bankruptcy filing, the Debtor was besieged by
talc claims . . . ." (Mem. at 2). That is categorically untrue. As of the bankruptcy filing, the then
two-day-old Debtor had *never* been sued. Mr. Kim admitted that fact in open court:

> Q: [A]t the time of the LTL filing on October the 14th there were no talc lawsuits
> pending against LTL, correct?
>
> A: True, yes.

(Silverstein Decl, Ex. 2 (Nov. 4 H'rg Tr.), at 244:24–245:1). Befitting a passive SPV, upon its
creation, the Debtor was bestowed with a few assets: a royalty stream, a bank account with $6
million, and a funding obligation from J&J and JJCI. (First Day Decl., at ¶¶ 22-24).

According to its bankruptcy schedules, the Debtor does not have any funded or meaningful
operational debt. (Schedules of Assets and Liabilities for LTL Management LLC [Main Dkt. No.
908]). Rather, its creditors consist almost entirely of tens of thousands of individuals who are
suffering from ovarian cancer or mesothelioma, or who are the personal representatives of
individuals who died from ovarian cancer or mesothelioma, alleged to have been caused by J&J's
talcum powder products. (*Id.*). As the Chief Medical Officer of JJCI testified, "both of these
diseases is typically fatal." (Silverstein Decl. Ex. 3 (Nov. 5, 2021 H'rg Tr.), at 417:1-5).

## II.     Events Culminating in the Debtor's Bankruptcy Filing

### A.      J&J and Its Talcum Powder Products

J&J is one of the largest multi-national conglomerates in the world, operating in three
principal segments: consumer health, pharmaceuticals and medical devices. (*See* JNJ 2021 Form

10-K Annual Report at 1).[7]  Its shares are publicly traded on the New York Stock Exchange under the ticker symbol "JNJ."  (*Id.*).  As of the filing of the Motion, the company had a market capitalization of approximately $430 billion, $31 billion in cash and marketable securities, and was one of two governmental or nongovernmental enterprises in the world (Microsoft being the other) with the highest available credit rating (higher than the United States of America) — notwithstanding the well-known existence of tens of thousands of talcum powder-related lawsuits (discussed below) against it.[8]

In the Motion, the Debtor makes much of the fact that "[i]n the 1970s, J&J adopted a policy to decentralize its operations" "by giving each company autonomy to make decisions without unnecessary constraints." (Mem. at 8).  But the Debtor ignores that — even after decentralization — *multiple* companies, including J&J, had direct involvement with talcum powder production, marketing, sale and safety.  As described below, notwithstanding that J&J is now a holding company, it has its own personnel, who, both before and after decentralization, had, and continue to have, direct involvement with talcum powder products that subject, and have subjected, J&J to direct claims of liability.

### 1.    Johnson's Baby Powder

For nearly one hundred years, J&J directly manufactured, marketed and sold Johnson's Baby Powder ("**JBP**").  (First Day Decl., at ¶10).  In 1979, J&J transferred the assets of its Baby Products division (through which J&J had most recently sold JBP) into a wholly-owned subsidiary called Johnson and Johnson Baby Products Company ("**J&J Baby Products**").  (First Day Decl.,

---

[7]      Available at https://johnsonandjohnson.gcs-web.com/node/47816/html.

[8]      *See What Do AA+ and AAA Credit Ratings Mean?*, Investopedia, https://www.investopedia.com/stock-analysis/2011/what-do-aa-and-aaa-credit-ratings-mean-jnj-xom-adp-msft0809.aspx.

at ¶ 10; Cl. Ex. 5, at 72:25-74:22). Through a series of asset transfers and mergers, J&J Baby Products ultimately was succeeded by JJCI. (First Day Decl., at ¶¶ 10-14).

Hence, from 1979 through 2020 when it announced that it would discontinue its sale of talcum powder products in the United States and Canada, JJCI (or one of its predecessors) manufactured and sold JBP. (First Day Decl., at ¶ 33). Conversely, at all times prior to 1979, it was J&J, not any subsidiary, that manufactured and sold the product. (Cl. Ex. 5, at 59:6-59:19). That is significant because, as Mr. Kim, testified, "when a plaintiff used the product . . . is, generally, in these cases in the '60s and '70s up through the present." (Nov. 5 H'rg Tr., at 315:10-18). As Mr. Kim later explained, "in the talc cases, there is a latency period, of 60 years." (*Id.* at 343:12-344:6). He further admitted that, consequently, "for pre-1979 exposure" J&J is legally "responsible in the sense that it should be named the party in the lawsuit." (Cl. Ex. 5, at 59:6-19).

Even after 1979, J&J's copyright (owned by J&J) continued to appear in advertisements for JBP, and J&J's logo (owned by J&J) continued to appear on certain JBP packaging. (Cl. Ex. 5, at 77:10-78:19, 89:22-90:17). In fact, at all times, both before and after 1979, J&J owned, and continues to own, *all* intellectual property appearing in advertisements for, and on containers of, JBP. (Nov. 4 H'rg. Tr., at 22:5-220:15).

## 2.    Shower to Shower

J&J — again, directly, not through a subsidiary — also manufactured, marketed and sold another talcum powder product called Shower to Shower ("**STS**"), from, at least, the 1960s through the end of 1978. (Cl. Ex. 5, at 78:20-79:10, 80:18-82:12; Nov. 4 H'rg. Tr., at 114:3-114:11, 202:14-20). Beginning in 1979, a wholly-owned subsidiary of J&J called Johnson and Johnson Personal Products Company ("**J&J Personal Products**"), began to manufacture and sell STS. (Nov. 4 H'rg. Tr., at 114:3-12, 205:22-206:7). As with JPB, at all times, J&J owned, and continues

9

to own, all intellectual property appearing in advertisements for, and on containers of, STS. (Nov. 4 H'rg. Tr., 22:5-220:15).

J&J Personal Products, J&J's wholly owned subsidiary, manufactured and sold STS until about 1987, when the product line was transferred to J&J Baby Products, a predecessor of JJCI. In 2012, the STS product line was then sold outside the J&J group of companies to Valeant Pharmaceuticals International, Inc., now known as Bausch Health Companies Inc. (Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions [Adv. Pro. Dkt. No. 3] ("**Supp. Decl.**"), at ¶ 12; Nov. 4 H'rg Tr. 130:11-131:21, 207:2-21, 208:18-209:4).

The Debtor asserts that, because the "liabilities . . . related to [STS] products were transferred from [J&J Personal Products] to [J&J Baby Products]," "Old JJCI became responsible for all claims alleging that [STS] . . . causes cancer." (Mem. at 12-13). But the Debtor's own witness, Mr. Kim, admitted the Debtor has found no agreement showing (i) that J&J Personal Products assumed any STS liabilities when it took over STS, or (ii) that the J&J Baby Products assumed any liabilities when it took over STS in 1987. (Nov. 4 H'rg Tr., at 206:12-209:12).[9]

### 3.    Windsor Minerals

From the 1960's to 1989, J&J, through a wholly owned subsidiary called Windsor Minerals, Inc. ("**Windsor**"), also owned certain Vermont mines that supplied the talc for the

---

[9]    Further, corporate representatives designated by J&J to give binding testimony in talcum powder litigation have acknowledged J&J's independent liability with regard to STS, even after the product line was transferred to J&J Personal Products in 1978. (*See* Silverstein Decl., Ex. 5 (Cl. Ex. 6), at 7750:22-7751:1 ("Q: Johnson & Johnson has been ultimately responsible for manufacturing, selling, distributing and testing Shower to Shower through the entire history of that product with Johnson & Johnson, correct? A: Yes, up until its sale to Valiant [Valeant].")). In the North Carolina Court, Mr. Kim attempted to disavow this binding testimony, but ultimately admitted that"[i]t may have been Johnson & Johnson. I just don't know." (Oct. 22, 21 H'rg. Tr., at 85: 6-7). Any suggestion that the witness's reference to "Johnson & Johnson" may have been colloquial is belied by the witnesses' immediately preceding testimony in which he clearly differentiated between "Johnson & Johnson" as the parent company and "Johnson & Johnson Consumer Inc." as the subsidiary. (Cl. Ex. 6, at 7749:6-19).

manufacture of JBP, STS and certain industrial products.  (Nov. 4 Tr. 209:20-210:19, 210:20-211:3, 211:16-211:22, 212:9-15, 213:6-213:11).  Windsor was never owned or operated by JJCI or any predecessor thereto.  (Nov. 4 Tr. 210:14-210:19, 212:2-212:8).  In 1989, J&J sold Windsor to Cyprus Mines Corporation ("**Cyprus**").  (Nov. 4 H'r Tr. 212:25-213:5; Silverstein Decl. Ex. 4 (Cl. Ex. 50)).  In connection with the sale, it was J&J, not JJCI, which gave an indemnity to Cyprus. (*Id.* 218:7-12; Cl. Ex. 50 §11.2).

At all times until Windsor's sale, J&J maintained complete control of the Vermont mines, including the testing of talc ore (as well as of end-products), and touted *J&J's* mining operations as a means of assuring safety.  A 1976 pamphlet, bearing J&J's copyright, told consumers:

> **Aren't all powders the same?** No. Because talcs are different. *Johnson & Johnson* owns its own talc mines in Vermont. These mines have an exceptionally high quality talc which is constantly checked to insure its safety and purity. The talc has a minimum of impurities and a maximum of the platelet crystals that make talc smooth and adsorbent. You can feel the difference between other powders and the smoothness of JOHNSON'S Baby Powder.

(Cyganowski Decl. Ex B. (JNJ 000881819_0001-00005) (emphasis added)).  A decade later, J&J was still repeating the theme that *its* control over the Vermont mines assured the safety of JBP. (*See* Cyganowski Decl. Ex C (JNJ 000018966-9024), at JNJ 000018998 ("Johnson & Johnson's own talc mine is located in Vermont. . . . Johnson & Johnson mines only the highest grade talc"); JNJ000018976 ("We own the talc mine which gives us complete control over the quality of talc used in our products")*;* Cyganowski Decl. Ex. D (JNJ 000234904-05) (referring to "our underground operation in Vermont")).

### 4.    Health and Safety Policy Decisions

Despite transferring the manufacture and sale of its talcum powder products to subsidiaries in 1979, J&J continued to make health and safety policy decisions governing the manufacture and sale of its subsidiaries' products, including the decision whether to include health and safety

warnings. (Cl. Ex. 5, at 85:9-86:8, 88:6-89:9). In talcum powder litigation prior to the bankruptcy

filing, the corporate representative designated to testify on behalf of J&J and JJCI, Dr. John

Hopkins, made that clear in binding testimony:

> Q: Johnson & Johnson Corporate in New Brunswick made all health and safety policy decisions with regard to asbestos and talc products, correct?
>
> A: The -- yes. The company in New Jersey is the parent company for all the global companies, made those decisions, yes.

(*Id.* at 86:16-87:21; Silverstein Decl., Ex. 6 (Cl. Ex. 4), at 25:10-15). Dr. Hopkins further testified:

> Q: And you would agree that Johnson & Johnson has the authority to require warnings on Johnson's Baby Powder about cancer, correct?
>
> A: They have the authority to require warnings. If that were a medical requirement, they would, yes.

(Cl.Ex. 5, at 88:16-89:9; Cl. Ex. 6, at 7752:11-15).

 In the bankruptcy, when asked about Dr. Hopkins' testimony, Mr. Kim testified that he

"ha[d] to assume there were some [public health and safety policy] decisions made elsewhere

[other than J&J]," but did not deny the fact that J&J continued to make its own independent health

and safety policy decisions affecting the manufacture and sale of its subsidiaries' products,

including whether to include warnings. (Cl. Ex. 5, at 87:24-88:3, 88:16-89:9). Further, in

reference to Dr. Hopkins' repeated testimony that J&J made "all health and safety policy

decisions" and that J&J had the authority to require warnings on its products, Mr. Kim further

testified that "we live by the testimony that was given." (Nov. 4 H'rg. Tr., at 221:23-226:13).

In 2013, J&J formally instituted a Medical Safety Committee ("**MSC**"), chaired by its

Chief Medical Officer ("**CMO**"). (Nov. 4 Tr., at 227:1-228:22; Cl. Ex. 164). The MSC is "the

highest body of Johnson & Johnson engaged in setting the standards of medical safety." (Nov. 5

H'rg Tr., at 400:21-401:8; Dbt. Ex. 45). Any health and safety decision made at the product sector,

*i.e.,* subsidiary, level can be elevated to the MSC for review, and J&J's CMO, alone, can elevate any such decision for review. (*Id.* at 404:21-24, 407:5-7, 13-21; Cl. Ex. 164). Once elevated to the MSC, the MSC is charged with making health and safety decisions by consensus. But, in the absence of consensus (including, because J&J's CMO disagrees with the sector-level medical officers), the health and safety decision under review is to be made solely by J&J's CMO. (*Id.* at 408:12-20, 415:17-23; Cl. Ex. 164).

### 5.  Public Relations

As the ultimate parent company, with public stockholders economically impacted by the operational decisions of J&J's subsidiaries, public relations is another area in which J&J continued to maintain direct involvement with talcum powder products, even after the manufacture and sale of those products was transferred to its subsidiaries in 1979. Thus, when Reuters published an article in December 2018 reporting on the presence of asbestos in JBP, it was *J&J* that responded with full-page newspaper ads, featuring photos of the JBP container, signed "Johnson & Johnson." (Silverstein Decl. Ex. 8 (Cl. Ex. 12); Cl. Ex. 5, at 96:19-102:19). In the ads, J&J — not JJCI — sought to reassure the public:

> Johnson & Johnson knows that the talc in our baby powder is the purest, safest pharmaceutical-grade talc on earth.
>
> [It] does not contain asbestos and never will. We test every single lot to ensure it.
>
> *       *       *
>
> [W]e have always acted with the transparency in this matter. Nothing is more important to us than the health and safety of our customers . . . .

(*Id.*). As J&J's head of "strategic communications," Danielle Devine, testified in talcum powder litigation months before the bankruptcy filing, the "Johnson & Johnson ad" campaign was launched "with the goal of having people trust us." (Cyganowski Decl. Ex. E, Transcript of

Deposition of Danielle Devine, January 19, 2021, at 12;22-14:6, 156:1-6). She acknowledged: "by putting it in an advertisement that ran in major newspapers, it's something that *Johnson & Johnson* said with the intention that people would believe it." (*Id.* 198:21-25 (emphasis added)). Indeed, J&J's public relations response to the Reuters article was led from the very top, with J&J's chief executive officer, Alex Gorsky, directly taking to the airwaves to assure the public personally that its subsidiaries' products were safe, free of asbestos and could, and should, continue to be purchased and used. (Cl. Ex. 5, at 96:19-102:19; Nov. 4 H'rg. Tr, at. 229:4-229:20; Silverstein Decl, Exs. 9 and 10 (Cl. Exs. 14 & 15)).

**B.    Talcum Powder Litigation**

**1.    Ovarian Cancer and Mesothelioma Cases**

It is well known that J&J faces tens of thousands of lawsuits arising from cancer caused by its talcum powder products. Those cases fall into two categories: ovarian cancer cases and mesothelioma cancer cases.

The first lawsuit against J&J and/or JJCI claiming ovarian cancer resulting from the alleged use of their talcum powder products was a case known as *Berg* filed in 2009 that went to trial in 2013. (Nov. 4 H'rg Tr., at 120:6-121:3; First Day Decl., at ¶ 35). In February 2016, an ovarian cancer case against J&J and JJCI known as *Fox* went to trial, and "the jury awarded the plaintiff $72 million." (*Id.* at ¶ 36). That verdict, according to the Debtor, resulted in the "number of ovarian cases skyrocket[ing]." (*Id.* at ¶ 43). In 2014, J&J and/or JJCI had been named in 46 ovarian cancer complaints; by 2017, "that number was nearly 5,000;" "[a]s of the Petition Date, there were approximately 38,000 ovarian cancer cases . . ., including approximately 35,000 cases pending in a federal multi-district litigation in New Jersey, and approximately 3,300 cases in multiple state court jurisdictions across the country," including New Jersey. (*Id.* at ¶¶ 42-43; Nov.

5 H'rg. Tr., at 120:6-121:3, 242:2-6). *None* of those cases named the Debtor as a defendant. (*See* p. 7, *supra*).

The first lawsuit against J&J and/or JJCI claiming mesothelioma — a cancer of the lining of the lungs and other organs caused by asbestos inhalation — resulting from the alleged use of talcum powder products was a case known as *Howard* filed in 1996. (Nov. 4 Hr'g Tr., at 200:4-11). By February 2016, "[a]t the time of the *Fox* trial, there were only six mesothelioma cases naming Old JJCI or J&J as a defendant . . .;" "[b]y the beginning of 2017, more than 100 mesothelioma cases had been filed naming Old JJCI or J&J as a defendant;" and, since that time, "[t]he number of cases of mesothelioma cases steadily grew," well into the hundreds. (First Day Decl.,at ¶ 23; Nov. 5 H'rg. Tr., at 241:10-17). Mr. Kim admitted that, over time, J&J and JJCI have settled many of the mesothelioma cases against them. (Nov. 5 H'rg. Tr., at 241:22-242:1). As of the bankruptcy filing, there were less than 500 mesothelioma cases pending against J&J and JJCI. (Nov. 5 H'rg. Tr., at 120:6-121:3, 242:2-6; First Day Decl. ¶ 44). *None* of those cases named the Debtor as a defendant. (*See* p. 7, *supra*).

The Debtor avers that, to date, J&J and/or Old JJCI have "incurred nearly $1 billion in defending personal injury lawsuits relating to alleged talc exposure," and have "paid approximately $3.5 billion . . . in connection with settlements and verdicts." (First Day Decl., at ¶ 40).

### 2. The MDL

The stated premise of the Debtor's bankruptcy filing, and the thrust of the Motion, is that, with regard to *all* of the foregoing cases, the legal system has failed J&J and JJCI. The Debtor asserts that "[t]he status quo was untenable given the cost, burden, uncertainty and anticipated duration of the cosmetic talc litigation," and that "[t]he *only* available option to appropriately assess, resolve and administer the current and future talc-related claims in an efficient and

equitable manner is this Chapter 11 Case" (which the Debtor elected to file in North Carolina

Court). (Mem. at 32; *see also* First Day Decl., at ¶ 58). That premise flies in the face of J&J's own

experience with mass tort multi-district litigation, in general (Nov. 5 H'rg. Tr., at 262:8-264:16),

and with the substantial progress that the parties have made in the multi-district talcum powder

litigation pending in this District before Chief Judge Wolfson, *In re: Johnson & Johnson Talcum*

*Powder Products Marketing, Sales Practices and Products Liability Litigation*, 3:16-md-02738-

FLW-LHG (the "**MDL**"), in particular. (*See* Silverstein Decl. Ex. 11, Transfer Order).

This MDL was commenced more than five years ago when the United States Judicial Panel

on Multi-District Litigation (the "**MDL Panel**" or "**Panel**") concluded that "centralization in the

District of New Jersey" of "personal injury or wrongful death actions brought by plaintiffs who

allege that they or their decedents developed ovarian or uterine cancer following perineal

application of Johnson & Johnson's talcum powder products" "will serve the convenience of the

parties and witnesses and promote the just and efficient conduct of this litigation." (MDL Dkt.

No. 1). The Panel selected this District, because the "district is a convenient and accessible forum

for this nationwide litigation, and is located in close proximity to a large number of state court

actions pending in New Jersey and other jurisdictions on the East Coast of the United States," and

also because "[a]s Johnson & Johnson is headquartered in New Jersey, relevant evidence and

witnesses likely are located" within the District. (*Id.*). In selecting the District, the MDL Panel

specifically cited the experience of Chief Judge Wolfson, whom the Panel observed "is well

situated to structure this litigation so as to minimize delay and avoid unnecessary duplication of

discovery and motion practice." (*Id.*).

Chief Judge Wolfson has done precisely what the MDL Panel envisioned. After years of

discovery, extensive expert submissions and a full *Daubert* hearing, Chief Judge Wolfson has

fulfilled her role as gatekeeper to determine the expert opinions on causation that may be considered by juries. *See In re Johnson & Johnson Talcum Products*, 509 F. Supp. 3d 116 (D.N.J. 2020) (Wolfson, C.J.). In that regard, contrary to the Debtor's position that JPB and STS have "never contained asbestos" and that claims against J&J and JJCI "have no valid scientific basis" (First Day Decl. at ¶ 31; Mem. at 2), the Court determined, among other things, that: (i) the opinion of the MDL plaintiffs' expert on the "the presence of 'ultra-trace' asbestos in Defendants' talc products is . . . admissible" and that plaintiffs' general causation experts are entitled to rely on "the assumption that Defendants' talc products contain asbestos to support their opinions that talc use is associated with ovarian cancer," 509 F. Supp. 3d at 157, and (ii) further, "the opinions [as to the causal relationship between talcum powder use and ovarian cancer] of Plaintiffs' general causation experts [also] are admissible," *id.* at 187. Moreover, as a result of her ongoing active case management, Judge Wolfson has positioned the MDL for the first bellwether trial(s) to begin in April 2022. (MDL Dkt. Nos. 2441 17:6-20, 19:18-20:2; Silverstein Decl. Ex. 12).

### 3.    Theories of Liability Pled, Found by Juries and Affirmed on Appeal

In all, or virtually all, of the above-referenced talcum powder litigations, J&J is named as a defendant. The Debtor further bemoans that plaintiffs in talcum powder litigations "make no effort to differentiate between J&J and Old JJCI," but instead "lump J&J and Old JJCI together, asserting collectively against them the same claim based on the same product, the same defect and the same alleged harm." (Mem. at 19-21). But group pleading is a permitted form of pleading in the products liability context, where there is no particularity requirement, and does not support any suggestion that direct and independent claims against J&J do not exist. *Compare, e.g.,* Fed. R. Civ. P. 8(a) *with* Fed. R. Civ. P. 9(b). In fact, the allegations involving J&J in the MDL and elsewhere largely hew to the facts concerning J&J's direct involvement with talcum powder products set forth above. For example, the Plaintiffs' Amended Second Amended Master Long

17

Form Complaint in the MDL (Dbt. Ex. 20), contains allegations that:  J&J directly manufactured and sold JBP for nearly a hundred years through the 1970s (*id.* at ¶¶ 24-25); J&J directly manufactured and sold STS beginning in the 1960s (*id.* at ¶ 29); J&J knew, from its ownership of Windsor, of the presence of asbestos and fibrous talc in its cosmetic talcum powder products going back, at least, to the 1970s (*id.* at ¶ 158); J&J's CEO, Mr. Gorsky, made false statements directly to the public regarding the safety of JBP and STS (*id.* at ¶ 141); and J&J had been advised to place a warning on its talcum powder products as far back as 1982 but failed to do so (*id.* at ¶ 49).  All of these are allegations directed at *J&J* (Dbt. Ex. 20), not, as the Debtor implies, a group of lumped "Defendants" or "Johnson & Johnson Defendants."

Of course, in every case, J&J is afforded the right, under applicable rules of civil procedure, to attack any claims against it as legally insufficient, either on a motion to dismiss or a motion for summary judgment.  But, tellingly, it has not done so.  When asked in an interrogatory "to identify any lawsuit, arbitration or other proceeding alleging Talc-Related Liabilities by J&J in which J&J filed or otherwise submitted a motion to dismiss, or motion for summary judgment, as to any claim on the grounds that J&J owed no duty, or had no liability independent of any liability of Old JJCI, to the plaintiff," the Debtor (liberally) identified fewer than 10 lawsuits out of the more than 38,000 that have been filed against it in which it supposedly sought such relief, and the cases it cited did not support its assertion.  (Silverstein Decl. Ex. 13 (Cl. Ex. 138, No. 3)).

Moreover, juries deciding talcum powder claims tried against J&J and JJCI have been required to find both liability and damages *separately* against *each* defendant.  (Cl. Ex. 5, at 105:14-110:18; Silverstein Decl. Exs. 14-16, 48-51 (Cl. Exd. 17-19, 125-127, 156).  In fact, time and again, that is exactly what juries have found — finding *J&J*, separately and independently from JJCI, (i) liable to the plaintiff on claims of negligence and otherwise, (ii) the proximate cause

18

of the plaintiff's compensatory damages, with a percentage of fault specifically allocated to J&J,
and (iii) responsible for punitive damages in an amount, greater or lesser (depending on the case),
than that found against JJCI. (*Id.*). As just one example, in a case identified as *Olson*, the jury
was asked, specifically, on the record to assess the separate liability of J&J and JJCI on *each* of
the plaintiff's claims, *e.g.*:

> COURT CLERK: Question 1: Were the following defendants negligent in failing
> to adequately warn about any danger related to asbestos associated with the use of
> Johnson's Baby Powder and/or Shower to Shower talc products.
>
> Johnson & Johnson?
>
> THE FOREPERSON: Yes.
>
> COURT CLERK: Johnson & Johnson Consumer Inc.?
>
> THE FOREPERSON: Yes.

 (Silverstein Decl., Ex. 17 (Cl. Ex. 16), at 9517:23-9520:16).  Significantly, the Debtor points to
no appellate court decision that has reversed any post-trial judgment entered against J&J on the
grounds that J&J had no separate or independent liability to the plaintiff.

### 4.     The *Ingham* Verdict and Appeal

There is no better illustration of J&J's direct and independent liability than the post-trial
judgment, affirmed in part, and reversed in part, by the Missouri Court of Appeals in *Ingham, et
al. v. Johnson & Johnson, et al.* (Silverstein Decl. Ex. 19 (Cl. Ex. 128)).  *See Ingham v. Johnson
& Johnson,* 608 S.W.3d 663 (Mo. Ct. App. 2020), *reh'g and/or transfer denied,* Missouri Supreme
Court, (Nov. 3, 2020), and *cert. denied*, 141 S. Ct. 2716 (2021).  In *Ingham*, a jury returned a
verdict against both J&J and JJCI in favor of 22 plaintiffs with ovarian cancer, awarding each
plaintiff compensatory damages of $25 million (for a total of $550 million) and awarding punitive
damages in a total amount of $4.14 billion, with J&J responsible for $3.15 billion and JJCI
responsible for $990 million.  *Id.* at 680.  (*See also* Nov. 4 H'rg. Tr., at 2239:1-15; Cl. Ex. 128).

The Debtor refers to the *Ingham* verdict as "egregious." (Mem. at 31). But the verdict was affirmed, in substantial part, on appeal. Significantly, the Missouri Court of Appeals rejected the argument that a judgment notwithstanding the verdict should have been entered on the plaintiffs' negligence claims against J&J and JJCI, finding sufficient evidence in the trial record of *each* defendant's duty to the plaintiffs, of *each* defendant's breach of duty to the plaintiffs, and that *each* defendant's breach of duty proximately caused damages to the plaintiffs. *Ingham*, 608 S.W.3d at 711-14.

Nevertheless, the Missouri Court of Appeals reversed judgment as to certain of the plaintiffs on the grounds of lack of personal jurisdiction over the defendants. Notably, in so doing, the appellate court analyzed assertions of jurisdiction over J&J and JJCI completely separately, and rejected any argument that there was sufficient evidence in the record of alter ego or agency sufficient to attribute JJCI's contacts with Missouri to J&J. *Id.* at 687-98, 719-25. The court, thus, proportionately reduced the total award against JJCI (to $1.4 billion) by two non-resident plaintiffs who failed to establish personal jurisdiction over JJCI, and proportionately reduced the total award against J&J (to over $840.9 million) by 15 non-resident plaintiffs who failed to establish personal jurisdiction over J&J. *Id.* at 692-98, 719-25.

The court, further, analyzed J&J and JJCI completely separately in affirming different awards of punitive damages against each of J&J and JJCI, finding that:

> Defendants' decision to chart their course of reprehensible conduct began with J&J long before JJCI was spun off as a separate entity in 1979 and engaged in reprehensible conduct of its own. Given this evidence, the higher ratio of 5.72:1 for J&J is justified.

*Id.* at 719-25. Taken collectively, the Missouri Court of Appeals' holdings — final in every sense, given that both the Missouri Supreme Court (on November 3, 2020) and the United States Supreme Court (on June 1, 2021) denied petitions for *writ of certiorari* —— demolish any notion that

20

separate, direct claims against J&J do not exist and that it is only by dint of derivative theories, such as alter ego and agency, that J&J has been, and can be, held liable.

### 5. J&J's Inconsistent Positions In and Out of Bankruptcy

It bears noting that, during the course of all of this talcum powder litigation, J&J and JJCI repeatedly have taken positions that are strikingly different from those that they are now advancing (through the Debtor) in support of the Motion. J&J's and JJCI's speaking out of both sides of their mouths concerns every, or virtually every, significant issue in this bankruptcy case. Thus, in bankruptcy, J&J (through the Debtor) seeks to reorganize under § 524(g), the "unique" feature of which, the Debtor acknowledges, is to "make[] it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process." (Mem. at 88 n.51). But outside the bankruptcy, J&J steadfastly maintains "this is *not* an asbestos case." (Silverstein Decl. Ex. 18 (Brief for Defendants-Appellants in *Olson v. Brenntag N. Am. Inc.*), at p. 3) (emphasis added).

In the bankruptcy case, the Debtor asserts that JJCI was, and remains, legally responsible for *all* talcum powder claims asserted by any plaintiff (even if such claims were/are asserted against J&J), but that is *not* the position that J&J and JJCI took prior to the bankruptcy filing. Prior to the bankruptcy, J&J and JJCI took the position before certain juries that "*Johnson & Johnson* is responsible for any liability of Johnson & Johnson Consumer, Inc.," not the other way around. (Silverstein Decl. Ex. 20 (Cl. Ex. 155), at 3000:20-25) (emphasis added). In other cases, J&J's and JJCI's position before juries was that "Johnson & Johnson was responsible for the product up until 1979. After that, it's JJCI." (Silverstein Decl. Ex. 21 (Cl. Ex. 29), at 322:24-323:2; 10/22/21 H'rg. Tr., at 63:5-64:5). They did *not* take the position, as they do now, that *JJCI* was responsible for all claims against J&J.

21

Further, contrary to the Debtor's position now that JJCI agreed to indemnify J&J for all talcum powder liability, when asked in pre-bankruptcy talcum powder litigation to identify any party against which either co-defendant, J&J or JJCI, "asserts a claim for indemnification," the co-defendants gave the same sworn interrogatory response: "None." (Silverstein Decl. Ex. 22 (Cl. Ex. 26), at 21-22; Cl. Ex. 5, at 112:24-114:18). Further when asked directly whether "Johnson & Johnson [has] any indemnification agreements to pay for its talc litigation liabilities," the corporate representative designated to give binding testimony for J&J and JJCI testified: "Not that I am aware of." (Cyganowski Decl., Ex. F, Transcript of Deposition of Christopher Picariello ("**Picariello Tr.**"), January 11, 2019, at 10:5-14, 58:15-18). To the same effect, a mere two months before the Debtor's bankruptcy filing, JJCI's Vice President of Finance, Kevin Neats, *denied* in sworn testimony that JJCI has any "separate litigation expense" account with J&J through which it reimburses J&J for talcum powder liabilities and expenses. (Silverstein Decl. Ex. 23 (Cl. Ex. 51), at 38:3-39:1). Moreover, while J&J (through the Debtor) now relies on shared insurance coverage to support the Motion, when asked in pre-bankruptcy litigation to identify any insurance policies relevant to the plaintiffs' claims, J&J and JJCI responded in effect, as Mr. Kim admitted:

> Don't worry. We have plenty of money to satisfy these judgments. And so our insurance isn't relevant.

(Cl. Ex. 5, at 116:20-117:3).

### C. J&J's Prior Preference for the Tort System over Bankruptcy Court

The inconsistencies in J&J's pre- versus post-bankruptcy positions stand in no starker contrast than in the context of the first time when J&J confronted the choice of litigating its talcum powder cases in bankruptcy court rather than in the mass tort system. That choice was presented when J&J's major talc supplier and co-defendant of J&J and JJCI in tens of thousands of lawsuits, Imerys Talc America, Inc. and its affiliates ("**Imerys**"), filed for bankruptcy protection in February

2019 in the United States Bankruptcy Court for the District of Delaware. *See In re Imerys Talc America, Inc., et al.* ("***In re Imerys***"), Case No. 19–10289 (LSS).

Initially, J&J sought to use Imerys' bankruptcy filing to create, in effect, a second multi-district litigation in District Court, removing the then 2,400 state court talcum powder cases filed against them to various District Courts on the purported grounds of "related to" bankruptcy jurisdiction under 28 U.S.C. §1334(b). *See In re Imerys*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019), Dkt. No. 2 (Memorandum of Law in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)), Dkt. No. 81 (Reply Memorandum of Law in Further Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)).[10]  Once removed, J&J sought to centralize all of those actions in one forum, in the United States District Court for the District of Delaware, pursuant to 28 U.S.C. § 157(b)(5).  (*Id.*).  Contrary to J&J's position now that the mass tort system is inefficient and inequitable, J&J specifically touted "the process of efficient adjudication by the MDL court," arguing that it is only through a "single, centralized forum [in District Court] that the interests of all creditors can best be served and harmonized." *See id.*, Dkt. No. 2 at pp. 2-3.  J&J specifically rejected the very arguments that *it* now advances for why MDL litigation of talcum powder claims would be inefficient and inequitable:

> [Any claim] this Court would have to "conduct[] individual trials ad infinitum" because of variation in "[t]he substantive law on causation," "damages," "non-parties and liability," and "differences in the exposure histories" of plaintiffs. This parade of horribles is ill-conceived and disproven by the fact that thousands of state-law claims are currently centralized in the MDL court. As a threshold matter, this Court could centrally resolve the important question of whether the allegations that Debtors' talc supplied to J&J, causes mesothelioma are grounded in sound science; an issue that will be determined by the MDL court as to the ovarian cancer

---

[10]     Annexed to Silverstein Decl. at Exs. 24–25.

allegations in its forthcoming Daubert ruling. These gating questions do not raise a single one of the supposedly difficult and variegated issues cited by Plaintiffs. Likewise, after determining the threshold issues, this Court could hold or transfer select cases to other federal courts for "bellwether" trials. This, too, would not raise any varied issues. What it would do is avoid the need to address these key, common issues in a piecemeal and duplicative fashion.

*Id.*, Dkt. No. 81 at pp. 38-39; *see also In re Imerys*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019), Dkt. No. 2 at pp. 19-20.

After its removal strategy failed, and District Courts remanded the 2,400 cases back to the state courts on the grounds of lack of jurisdiction and/or abstention (*see, e.g.*, *In re Imerys*, Civ. Action No. 19-mc-00103 (MN) (D. Del. July 19, 2019)), J&J re-doubled its efforts to litigate the talcum powder claims in the mass tort system. In March 2020, J&J filed a motion in the *In re Imerys* bankruptcy case to lift the automatic stay to permit J&J to *defend* all talcum powder claims against Imerys in court, rather than have those claims determined by the bankruptcy court. *See In re Imerys*, Case No. 19–10289 (LSS) (Bankr. D. Del.) Dkt. Nos. 1567, 1769 (Silverstein Decl. Exs. 26-27). (Nov. 4 H'rg. Tr., at 265:18-267:15; Cl. Exs. 129 & 136). J&J asserted the very opposite of the position it now asserts: J&J argued that its litigation of talcum powder claims in open court and payment in full of any such successful claims asserted, jointly and severally, against both J&J and the debtor (Imerys) would benefit *all* of J&J, the debtor *and* the talc claimants. *See id.*, Dkt. Nos. 1567 (Silverstein Decl. Exs. 26-27 (Cl. Ex. 129), at ¶¶ 45, 48 & 1769 (Cl. Ex. 136)), at ¶¶ 2, 3, 17, 41. Indeed, J&J called "absurd" and "grasping at straws" any notion that the debtor or claimants would be worse off by having *J&J* put its full faith and credit into defending talcum powder claims in open court, rather than having those claims decided in the debtor's bankruptcy case. J&J asserted:

> As of the date hereof, J&J has a market capitalization of over $385 billion and extensive insurance coverage of its own. It is one of the top 10 companies in the United States by market value. J&J can provide the claimants far greater protection

than the Debtors or the bankruptcy claims trust ever could (as discussed above).
More fundamentally, the Debtors' own plan relies on J&J's ability to pay individual
claims.

Cl. Ex. 136, at ¶ 41.  Notably, J&J made no mention of *JJCI's* financial wherewithal.  Further, in

polar opposition to the position it now takes that a § 524(g) trust is more equitable to tort claimants

than the "lottery-like results" of litigation (Mem. at 3, 5), J&J asserted then that:

> For numerous reasons, including the potential need to reserve funds to satisfy future
> claims, distribution procedures for trusts under section 524(g) typically involve
> paying only a percentage of allowed claim amounts determined pursuant to those
> procedures—unlike the indemnity offered by J&J, which will result in final
> determinations of claim amounts in the tort system (potentially including through
> settlements) and, if necessary, full payment thereof.

Cl. Ex. 129, at ¶ 45 n.33.  Thus, J&J declared that it strongly "prefers to exercise its right to take

over the defense of the claims and litigate those claims in the tort system."  Cl. Ex. 136, at ¶ 54.

The motion by J&J, too, was denied.

### D.      J&J Decides to Shift Course

In March 2021, after the Missouri Supreme Court declined to review the more than $2.2

billion judgment in *Ingham* and J&J and JJCI were left with a long-shot bid of petitioning the

United States Supreme Court for *writ of certiorari* (*see* pp. 19–20, *supra*), the two companies

began to shift course:  At that time, they received a presentation from the Debtor's counsel here,

the Jones Day law firm, on the potential for resolving the companies' talcum powder exposure

through a divisive merger/bankruptcy strategy that Jones Day had developed and deployed in the

asbestos litigation context in the North Carolina Court.  (Kim Tr., at 90:4-91:12; Nov. 4 H'rg. Tr.,

at 248:10-249:4;  *see, e.g.*, *In re DBMP LLC*, Case No. 20-30080 (Bankr. W.D.N.C. Aug. 11,

2021); *In re Aldrich Pump, LLC*, Case No. 20-30608 (JCW) 2021 WL 3729335 (Bank. W.D.N.C.

Aug. 23, 2021).  As Mr. Kim testified at his deposition, at or about the time of that presentation, it

was in-house lawyers employed by J&J who decided by consensus to hire Jones Day.  (Kim Tr., at 93:8-21).

In the six or so months that followed, according to Mr. Kim, "Project Plato," a closely held project known only to about 30 to 40 J&J personnel and, "at some point" "probably . . . also people from" JJCI, was launched and vigorously pursued.  (Kim Tr., at 102:16-105:20; Nov. 4 H'rg. Tr., at 249:5-18, 274:10-17).  Mr. Kim testified that "members of the corporate development teams" "head[ed]" by Chris Andrew, a J&J Assistant General Counsel (according to his public LinkedIn profile[11]), spearheaded the project.  (*Id.*; *see also* Kim Tr., at 117:20-118:24).

During the summer of 2021, reports of J&J's retention of Jones Day and exploration of a "talc bankruptcy" began appearing in the press.  (*See, e.g, In re Imerys*, Case No. 19-10289 (LSS), Adv. Pro. No. 21-51006, Dkt. Nos. 5-6 (Silverstein Decl. Exs. 28–29)).  Claimants immediately sought injunctive relief to prevent the reported divisive merger, which relief J&J successfully opposed.  (*See id.*)  Claimants also demanded in their individual cases that defendants J&J and Old JJCI state clearly on the record their intentions to undertake a divisive merger and bankruptcy filing, so that claimants would know the status of their scheduled trials.  J&J and Old JJCI repeatedly misrepresented and/or concealed the truth.  On July 23, 2021, in a case referred to as *Reyes*, for example, plaintiffs' counsel raised on the record a then recently published Reuters article reporting that "Johnson & Johnson is contemplating doing a divisive merger bankruptcy process, sometimes colloquially known as the Texas two-step" and stated that [i]f that's in fact the case, then it becomes all the more important that this case try and that we are able to get a bonded judgment before that time."  (Silverstein Decl. Ex. 30 (Transcript in *Reyes v. Johnson & Johnson,*

---

[11]     Available at https://www.linkedin.com/in/chris-andrew-5525b420/.

*et al.*, July 23, 2021), at 5:23-6:8).  Yet even though "Project Plato" was in full swing, J&J's and

JJCI's attorneys dismissed the Reuters article as "rumors" and assured the court that:

> J&J defendants are continuing to defend and try these cases before the juries, as we
> will do here in Reyes. Everything else is rumor, and we have no information to
> substantiate those rumors.

(*Id.* at 8:2-7).  The *Reyes* trial did not take place:  Only a few months after dismissing the Texas

Two-Step as "rumors" and assuring the court that the "J&J defendants are continuing to defend

and try" cases, the very same lawyers advised the court that "following a corporate restructuring"

and bankruptcy filing, the case was stayed.  (Cyganowski Decl. Ex. G (Notice of Bankruptcy Filing

and Stay of Proceedings in *Reyes v. Johnson & Johnson, et al.*, Oct. 15, 2021 and E-mail from Jay

Bhimani, dated November 16, 2021, attaching PI Order); *see* pp. 39–44, *infra*).

  In fact, the human toll on the cancer patients (and their survivors) that J&J and Old JJCI

exacted through its whipsawing — first by denying and/or concealing the companies' bankruptcy

strategy only then to spring later it on litigants (who, in the face of J&J's denials, continued to

invest emotionally, physically and financially in litigation) — cannot be overstated.  In the case of

Nedelka Vanklive, a mesothelioma and ovarian cancer victim and single mother granted a trial

preference because doctors gave her six months to live, J&J and JJCI, in August 2021, assured the

court, in response to its direct questioning, that, notwithstanding recent press reports, Ms. Vanklive

had "the right defendants."  (Main Dkt. No. 102).  Each of J&J and Old JJCI unequivocally stated

on the record that it was "the right company with respect to Johnson's Baby Powder," and that

they "are the proper defendants."  (*Id.*).  Only after a jury was empaneled, Ms. Vanklive was in

the middle of her case in chief at trial, and this bankruptcy case was filed, did J&J and Old JJCI

finally reveal the truth in claiming a litigation stay, which the trial court found "troubling."  (*Id.*).

  In the case of Shawn Johnson, a father of seven children suffering from mesothelioma, J&J

and Old JJCI did not say a word about its ongoing efforts to restructure and file for bankruptcy

during his five-week jury trial, placed in the hands of the jury for deliberations on October 6, 2021 — treating the trial instead as a mere option. (Cyganowski Declaration Ex. H (Transcript of *Johnson v. Johnson and Johnson*, October 6, 2021)). Only after the jury returned a plaintiff's verdict against J&J and Old JJCI on October 12, 2021 for over $2.4 million in compensatory damages and $25 million in punitive damages, but before Mr. Johnson could obtain a bonded judgment, did J&J and Old JJCI finally disclose its bankruptcy strategy in arguing for an immediate stay. (Cyganowski Declaration Exs. I and J (Transcript of *Johnson v. Johnson and Johnson*, October 12, 2021 and Entry of Judgment, dated October 15, 2021)).

After months of denials and concealments, on October 11, 2021, Mr. Andrew and a corporate development colleague requested, and received, approval from executives of J&J and/or its subsidiaries to proceed with a "restructuring" of JJCI "pursuant to a divisional merger," summarized below, that would assign all of JJCI's "current and future product liability related claims associated with talc and talc-containing products," and a handful of new assets (a royalty stream, a bank account and a funding agreement), to LTL, which would be created to "proceed with a voluntary petition under chapter 11 of the Bankruptcy Code," and assigning all of JJCI's assets and operations to an entirely separate entity (a "**New JJCI**"), which would "continue to operate Johnson & Johnson's Consumer Health business in the United States without interruption." (Cyganowski Decl. Ex. K, LTL 0021791-801). As Mr. Kim testified, the three individuals seconded to LTL "were the only individuals [who] changed job titles . . . as a result of the transaction." (Kim Tr., at 142:16-20).

### E.    The "Texas Two-Step"

The sequence of transactions effectuating the "restructuring" of JJCI, widely referred to as the "Texas Two-Step," approved on October 11, 2021, is described in the First Day Decl. and is documented, in substantial part, in Dbt. Ex. 1.

28

### 1.    The Transactions

In brief, on or about October 11, 2021, JJCI formed as a wholly-owned subsidiary a North

Carolina limited liability company called Royalty A&M LLC ("**Royalty**"), which JJCI capitalized

with $367.1 million.  (First Day Decl., at ¶ 21).  The next day, on October 12, 2021, JJCI merged

into a newly formed Texas limited liability company called Chenango Zero, LLC ("**Chenango**

**Zero**"), with Chenango Zero being the surviving entity.  (*Id.* at ¶ 22).  That same day, Chenango

Zero effectuated a divisional merger under Texas law, pursuant to which Chenango Zero ceased

to exist and its assets and liabilities were "allocated" to two new Texas limited liability companies

formed in the divisional merger, Chenango One LLC ("**Chenango One**") and Chenango Two LLC

("**Chenango Two**").  (First Day Decl., at ¶ 23; Dbt. Ex. 1 (LTL 0001327-801)).  Chenango One

then "converted from a Texas Limited liability company into a North Carolina limited liability

company and changed its name to 'LTL Management LLC.'"  (First Day Decl., at ¶ 23).

Chenango Two merged into a newly formed New Jersey corporation called Currahee Holding

Company Inc. ("**Currahee**"), with Currahee being the surviving entity and changing its name to

"Johnson and Johnson Consumer Inc." (New JJCI).  (*Id.*; Dbt. Ex. 1 (LTL 0001058-61)).

According to the Debtor, New JJCI, which "is the direct parent of the Debtor," "manufactures and

sells a broad range of products used in the baby care, beauty, oral care, wound care and women's

health care fields, as well as over-the-counter pharmaceutical products," *i.e.*, the same business

that JJCI carried out before the divisional merger.  (First Day Decl., at ¶¶ 1, 17-18).

In connection with the foregoing transactions, various parties — including the Debtor, J&J

and New JJCI — entered into a series of agreements, including the Plan of Divisional Merger and

Schedules to the Plan of Divisional Merger (collectively, the "**Divisional Merger Plan/**

**Schedules**"), that were prepared before the Debtor ever came into existence.  (*See* Dbt. Ex. 1 (LTL

0001327-817)).  Notable among such agreements is an Amended and Restated Funding Agreement

among the Debtor, New JJCI and J&J, dated October 12, 2021, the date of the Debtor's formation (the "**Funding Agreement**"), on which the Debtor relies to support the *bona fides* of its bankruptcy filing.  (Dbt. Ex. 1 (LTL 0002300-20); Dbt. Ex. 4).  In the Funding Agreement, J&J and New JJCI, on a joint and several basis, agreed to provide non-assignable funding, up to the full value of New JJCI, to which the Debtor refers "as a backstop" and which the Debtor assures the Court "will ensure funding for a trust in the amount required by a confirmed plan of reorganization."  (Mem. at 81 n. 44, 90).  They agreed to do so "regardless of whether [a confirmed] plan of reorganization provides that [they] will receive [channeling injunction ] protection pursuant to section 105 or section 524(g) of the Bankruptcy Code."  (Dbt. Ex. 4 (Def. of "Permitted Funding Use")).

As Mr. Kim admitted, "there [was] *no* negotiation" of any of these agreements, including the Divisional Merger Plan/Schedules and Funding Agreement, executed among J&J and/or its subsidiaries, in connection with the Texas Two-Step.  (Kim Tr., at pp. 228:5-231:18; Nov. 4 H'rg. Tr., at 274:18-275:19).  Nor was any external fairness opinion sought or obtained in connection with the Funding Agreement and/or any of the other inter-company agreements that the parties executed.  (Kim Tr., at p. 228:5-231:18; Nov. 4 H'rg. Tr., at 274:18-22).  Rather, according to Mr. Kim, the agreements simply were "reviewed by certain levels of executives in order for the transaction to be approved," which executives were "just looking at it for whether it's fair or not." (Kim Tr., at pp. 229:22-230:20).  But, in that regard, Mr. Kim testified that the process was no different internally than the process for reviewing a transaction with a third-party where there actually were arm's length negotiated terms.  (*Id.* at pp. 228:5-231:18).

When asked what gave him confidence as the Debtor's CLO that the transactions entered into on October 11 and 12, 2021 were "fair to the debtor," Mr. Kim answered:  "A review of the terms and my experience and understanding of the litigation and my discussions with the folks that

help put the transaction together. Advice of counsel." (Kim Tr., at p. 237:7-23). He identified the counsel to which he was referring as "Jones Day." (Id.). Mr. Kim further testified that, in connection with the foregoing transactions, Jones Day and J&J's internal counsel, were not representing the interests of the Debtor in the transactions, but, rather, "all the attorneys were looking at this from a joint perspective." (Id. at pp. 234:22-236:4; Nov. 4 H'rg. Tr., at 276:4-10). When asked whether "the lawyers who were involved in the funding agreement and the merger support agreement and every other agreement executed in connection with the transactions were the same lawyers representing the interests of everyone," Mr. Kim responded: "Essentially, yes . . . . That would be part of the internal fairness review, yes." (Nov. 4 H'rg Tr., at 276:4-10).

### 2.     The Liabilities Assigned to the Debtor After the Fact

Among the assets and liabilities assigned to the Debtor by those orchestrating the Texas Two-Step were: (i) "All Contracts related to the transfer of assets from Johnson & Johnson to Johnson & Johnson Baby Products Company effective January 1, 1979"; (ii) "All rights to make claims under any and all insurance policies as to which the Company [Chenango Zero] has rights as an insured, additional insured, successor, beneficiary or otherwise"; and (iii) "Any tenders for defense and indemnity in respect of Talc Related Liabilities and any Contracts accepting such tenders, including such tenders and/or Contracts with the following retailers" listed on four pages. (Dbt. Ex. 1 (LTL 0001400, LTL 0001395 & LTL 0001401-05)). It is on the basis of each of these so-called "indemnification obligations to J&J, other Non-Debtor Affiliates, and other Protected Parties," "allocated" to the Debtor in the Texas Two-Step, on which the Motion is now based. (Mem. at 3). Each category of claimed indemnification is discussed below.

### a.     The 1979 Agreement Discovered During the Bankruptcy

The centerpiece of the Debtor's argument for extending the stay to J&J is an Agreement for Transfer of Assets and Bill of Sale (which the Debtor refers to as the "**1979 Agreement**")

(Mem. at 10-11, 80) that the Debtor did not discover until ten days into the bankruptcy case, *after* it had filed a motion for emergency relief.  (Cl. Ex. 5, at 76:8-15; Nov. 4 H'rg. Tr., at 103:11-19; Silverstein Decl., Ex. 32 (Transcript of Deposition of Susan Schirger-Ward, October 31, 2021 ("**Schirger-Ward Tr**.")), at 18:16-20:12).  The Debtor asserts that it "has a contractual obligation to indemnify J&J pursuant to the 1979 Agreement" between J&J and J&J Baby Products (as predecessor to JJCI).  (Mem. at 10-11, 80).  In the 1979 Agreement, according to the Debtor, "J&J Baby Products became the real party in interest for all actions, suits or proceedings relating to the talc previously sold by J&J or in any way arising out of the talc business that was being transferred."  (Mem. at 10-11, 80).  In fact, as Mr. Kim admitted on the stand, "the 1979 Transfer Agreement does not even mention the word 'talc.'"  (Nov. 4 H'rg. Tr., 216:14-19).

Rather, the agreement — in which J&J agreed to transfer the assets and liabilities of its Baby Products division to J&J Baby Products in exchange for 188,100,000 shares of J&J Baby Products stock — provides in pertinent part:

> Subsidiary [J&J Baby Products] *agrees to assume* and hereby does assume and agrees to pay, perform or discharge, as the case may be, *all the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to its BABY Division* and the Subsidiary hereby covenants and agrees with J&J that the Subsidiary will forever indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed and agreed to be paid, performed or discharged . . .

(Dbt. Ex. 2 (LTL 0000561) (emphasis added)).[12]

---

[12]     The limitation of the assumption of liabilities to those "allocated . . . on the books or records" recurred in subsequent transfer agreements with different corporate entities (Omni Education Corporation in 1981 and Johnson & Johnson Dental Products Company in 1988) pursuant to which, according to the Debtor (Mem. at 10-12).  "Old JJCI bec[ame] responsible for all claims alleging that Johnson's Baby Powder causes cancer or other diseases.  (*See, e.g.*, Dbt. Ex. 52 (LTL 0012494); Dbt. Ex. 54 (LTL 0012511)).  In order to show that J&J's talcum powder liabilities were ultimately transferred to Old JJC (and thence to the Debtor), the Debtor would need to show that the same "books or records" requirement was met with respect to Omni Educational Corporation in 1981 and Johnson & Johnson Dental Products Company in 1988.  The Debtor has not even attempted such a showing.

As Mr. Kim admitted, to identify the specific "indebtedness, liabilities and obligations . . . allocated on the books or records" of the Baby Products division that were assumed, "you would have to look at books or records."  (Nov. 4 H'rg. Tr., at 194:2-12).   Yet as Mr. Kim further admitted, he has "not looked."  (Kim Tr., at 54:6-11; Nov. 4 H'rg. Tr., at 196:6-16).   Susan Schirger-Ward, J&J's Senior Legal Records Coordinator, was never asked to look for them. (Schirger-Ward Tr., at 11:1-2, 13:21-14-11, 53:16-54:6, 55:16-56:1, 58:22-63:4, 64:6-16; Nov. 4 H'rg. Tr., at 194:19-24).  For certain, no "indebtedness, liabilities and obligations" relating STS were "allocated on the books and records" of J&J's Baby Products division when the 1979 Agreement was executed, as that product was not even manufactured or sold by the Baby Products division at the time.  (Nov. 4 H'rg. Tr., at 207:2-13).   Nor is there any question that liabilities arising from J&J's Windsor talc mines were not "allocated on the books or records" of the Baby Products division when J&J Baby Products assumed liabilities in the 1979 Agreement.  (*Id.* at 210:14-210:19).

More, neither Mr. Kim nor any other representative of the Debtor could identify "a single document where J&J has talc liabilities described in books" or records prior to execution of the 1979 Agreement.  (Kim Tr., at 54:6-11; Nov. 4 H'rg. Tr., at 196:6-199:7).  That is not surprising, given (as Mr. Kim further admitted) that "prior to January 1, 1979 there were no lawsuits claiming any personal injury arising from the alleged use of Johnson's Baby Powder and/or Shower to Shower filed against any of the J&J companies."  (Nov. 4 H'rg. Tr., at 198:4-11; *see* pp. 14–15, *supra*).  The Debtor has admitted that not until the fourth quarter of 2018 did J&J's consolidated financial statements reflect any reserve for defense and indemnity costs outside of insurance coverage for *talc-related* claims.  (Silverstein Decl. Ex. 31 (Debtor's Answers and Objections to Defendants' First Set of Interrogatories and Request for Admission No. 7)).

33

**b.**     **Insurance Coverage that No Insurance Carrier Acknowledges**

The Debtor also contends that "J&J and the Debtor are both covered for talc-related claims under various shared insurance policies" pursuant to which "the Debtor believes that it has rights to insurance coverage." (Mem. at 25, 45). According to the Debtor, the insurance rights derive from two types of insurance policies: (i) third-party insurance, *e.g.*, Aetna Casualty and Surety Company, American International Group, Allstate Insurance Company, The Hartford, etc.; and (ii) self-insurance through "a captive insurance company that is a wholly-owned subsidiary of J&J" called Middlesex Insurance Company ("**Middlesex**"). (First Day Decl., at ¶¶ 46-51). The Debtor avers that "[i]n total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion." (*Id.* at ¶ 52).

But, as the Debtor concedes, "none of th[e] [third party] insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid its costs of defense, or indemnified J&J or Old JJCI for settlements or judgments." (First Day Decl., at ¶ 53; Mem. at 28). Nor is there a shred of evidence in the record to suggest that, at any time during the course of this bankruptcy proceeding, that longstanding *status quo* is likely to change. To the contrary, even a cursory review of the multitudinous coverage defenses asserted by insurers that sued J&J and JJCI reveals that any coverage determination is unlikely to occur in the foreseeable future, if at all. (Silverstein Decl., Ex. 33 (Second Amended Complaint, *Atlanta International Insurance v. Johnson & Johnson*, MID-L-003563-19 (N.J. Super.) ("**Insurance Complaint**")), at ¶¶ 93-103; First Day Decl., at ¶ 54).

34

There is ample support for the insurers' denial of coverage. Many of the policies produced in discovery by the Debtor (but are not in the record[13]) only cover unexpected and unintentional "occurrences."[14] Other policies contain explicit limitations on personal injury coverage, such as policies covering only accidental injuries[15] or specific torts like false arrest, malicious prosecution, defamatory torts, or privacy torts.[16] Numerous policies disclaim liability for injuries arising from asbestos exposure.[17] And virtually all policies contain specific assistance and cooperation and claims control provisions with which the insurers assert J&J has failed to comply.[18]

As for its captive insurance, provided by Middlesex, there is no coverage remaining. As J&J Assistant Corporate Controller, Adam Lisman, testified: "[Old JJCI] related to the talc matter exhausted its coverage within the Middlesex self-insurance captive in the — around the fourth quarter of 2018." (Transcript of Deposition of Adam Lisman, October 30, 2021 ("**Lisman Tr**."), 126:10-15).

---

[13]     The Debtor has not placed more than a few insurance policies in the record. Instead, the Debtor relies on a summary chart purporting to summarize all of the policies that it contends provides coverage of talcum powder claims. (Dbt. Ex. 8). The witness, Mr. Kim, who sought to introduce the chart did not prepare it. (Nov. 4 Hrg. Tr., at 290:11-16). He merely reviewed it, without the underlying policies, one day earlier. (*Id.*).

[14]     Many policies define an occurrence as "an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury. . . during the policy period." (*E.g.,* Insurance Complaint, at ¶¶ 61, 75 (quoting Granite Insurance policy 6484-0068 (1984–1987) and North River policy JU0276 (1977–1980)); LTL 0009267 (American Centennial policy endorsement incorporating North River terms), LTL 0009251 (Aetna endorsement doing same), LTL 0009918 (Wasau endorsement incorporating Granite terms)).

[15]     *E.g.,* LTL 0000003138, LTL 0003221, LTL 0003311, LTL 0003554, and LTL 0003917.

[16]     *E.g.,* LTL 0003149–50, LTL 0003359-60, LTL 0003565–66, LTL 0003965–66.

[17]     *E.g.,* LTL 0011518 (letter regarding AIU asbestos exclusion providing "that there is no coverage for bodily injury, disease, sickness, shock, death, mental anguish and mental injury at any time, arising out of the exposure to asbestos products, asbestos fibers or asbestos"); LTL 0010900 (AIU policy asbestos exclusion); LTL 0011957 (letter asserting that coverage under a Hartford policy is precluded by an asbestos exclusion); LTL 0011780–81 (quoting asbestos exclusion in three Fireman's Fund policies).

[18]     LTL 0003141, LTL 0003148, LTL 0003197, LTL 0003214, LTL 0003224, LTL 0003314, LTL 0003557, LTL 0003667, and LTL 0003920 (listing such provisions in insurance policies). *See also* LTL 0008666 ("Whenever the Insured has information of an occurrence involving injuries or damages which may involve this policy, written notice shall *immediately* be given to Gibraltar." (emphasis added)); LTL 0008065 ("Notices, as required to be given to the primary insurer, shall also be given to Aetna Casualty in the event of any accident, occurrence, claim or suit which is reasonably likely to give rise to a claim for indemnity under this policy.").

It is not surprising, therefore, that in talcum powder litigation prior to the bankruptcy filing, J&J and JJCI repeatedly have indicated that they *lack* insurance coverage.  As recently as August 2021, a corporate representative for both J&J and JJCI testified under oath that the companies are "self-insured" and do not "maintain liability insurance for products liability."  (Cl. Ex. 51, at 76:23-77:19).  Another designated Rule 30(b)(6) witness for both J&J and JJCI testified that J&J is self-insured for talc-related litigation expenses.  (Picariello Tr., at 59: 24-25 ("To my best knowledge, we have an internal insurance in-house")).  In responses to interrogatories, J&J has provided the sworn response that it is "self-insured" and that tort claims are unlikely to implicate any insurance policies.  (Silverstein Decl. Exs. 34-37 (Cl. Ex. 52), Interrogatory No. 10; Cl. Ex. 53, Interrogatory No. 19; Cl. Ex. 54, Interrogatories No. 4.1; *see also* Cl. 55 at p. 10).

Furthermore, the Debtor is not named as an insured on any of the policies in the record, and the definition of "Named Insured" or "Insured" in at least certain of the policies in the record do not appear to include the Debtor, at least absent notice to, and/or consent of, the insurance carrier (nowhere in the record).  (*See* Dbt. Exs. 10 (LTL 0000172), 12 (LTL0000388)).  In fact, the Debtor concedes that the policies "were issued to J&J as the Named Insured," but nonetheless asserts that such policies "cover the period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI was a subsidiary of J&J."  (First Day Decl., at ¶ 46 n.4).  Even if JJCI were an insured under the policies, JJCI merged into, and out of existence with, Chenango Zero.  (*See* p. 29, *supra*).  The Debtor has not shown that, by operation of law or otherwise, coverage under the policies transferred to Chenango Zero, and from there were able to be, and were, allocated to the Debtor.

### c.  Acceptances of Tort Defenses Years After the Torts

The Debtor further asserts that "[w]hen a Retailer was sued on a . . . Talc Claim, the Retailer would notify Old JJCI by submitting a tender request" and that "Old JJCI would then determine

whether to accept the Retailer's tender of its defense and indemnify the Retailer pursuant to a tender

agreement (each, a "**Tender Agreement**")." (Mem. at 29). The process itself belies that the

retailers have any absolute right to indemnification; if the retailers had an absolute right of defense,

there would be no need for Old JJCI to determine whether or not to accept the tender of defense.

Indeed, the Debtor admitted that it produced no more than, at most, a handful of "supply

agreements" with retailers containing indemnification obligations by J&J, Old JJCI or both. (Cl.

Ex. 5, at 122:20-125:14).

According to the Debtor, "[s]ince 2018, Old JJCI has indemnified and agreed to assume

the defense of nearly 600 talc-related claims against the Retailers pursuant to Tender Agreements,"

"450 [of which agreements] were pending as of the Petition Date." (Mem. at 29). In fact, the

record reveals that only recently, after an "internal review" was undertaken following the *Imerys*

bankruptcy, was an effort made to "standardize" the Tender Agreements in order to make them

indemnifications only from Old JJCI. (Kim Tr., at 205:16-220:3). Prior to that, indemnifications

were given, jointly and severally, by J&J and Old JJCI and may have varied from case to case.

(*Id.*). The Debtor admitted that, regardless of when executed "each tender agreement is case

specific," and in order "to understand who provided the indemnity and under what conditions

someone actually needs to look at each of these indemnity agreements." (Nov. 4 H'rg. Tr., at

282:18-2, 288:20-25). But the Debtor has placed only a small handful of such exhibits in the

record. (*See* Dbt. Exs. 18-19).[19]

The few Tender Agreements in the record demonstrate that any indemnification from Old

JJCI thereunder was and is conditional. (*See* Dbt. Exs. 18 & 19). The agreements provide, for

---

[19]     In lieu of the actual Tender Agreements, the Debtor introduced a summary chart purporting to summarize all
of the Tender Agreements under which it contends the Debtor is obligated. (Dbt. Ex. 17). Again, Mr. Kim, who
sought to authenticate the chart, had seen it for the first time only the day before, had done none of the work in
preparing it and could not attest that it was accurate. (11/4/21 H'rg. Tr. 280:12-282:11, 286:244-288:3).

37

example, that:  (i) "should discovery reveal that the product or products plaintiff allegedly used

were not manufactured by JJCI or on JJCI's behalf or that the unspecified JJCI subject product or

products were not purchased at [Retailer] or that [Retailer] made representations that extended

beyond the scope of JJCI's warranties express or implied and inconsistent with product labeling,

JJCI expressly reserves the right to re-tender the defense back to [Retailer];" (ii) "should evidence

become available through deposition testimony or otherwise that decedent was not exposed to JJCI

talcum powder purchased from [Retailer], JJCI will re-tender [Retailer's] defense back to

[Retailer];" and (iii) "[i]f it is determined in final non-appealable judgment by court of competent

jurisdiction that [Retailer] is at fault in whole or in part for the incident alleged in plaintiff's

complaint or any subsequent amendments thereto due to [Retailer's] acts related to the JJCI subject

products . . . [Retailer] shall be responsible for that portion of the verdict rendered against [Retailer]

and shall reimburse JJCI's reasonable attorneys' fees and costs . . . ." (*Id.*).  In all events, Mr. Kim

could not testify that the Tender Agreements would make the Retailers anything other than

unsecured creditors, just like the claimants.  (Cl. Ex. 5, at 126:21-127:3; Kim Tr., at 87:16-88:1).

### d.     The Alleged "Financial Course of Performance"

In an effort to bolster its argument that JJCI had the legal obligation to indemnify all talcum

powder liabilities and expenses (which obligation the Debtor contends it now has by virtue of the

divisional merger), the Debtor asserts that, prior to the bankruptcy, "J&J initially paid costs

associated with litigation concerning talc products from its concentration account and then charged

100% of those costs to Old JJCI through intercompany charges."  (Mem. at 17-18).  But the so-

called "financial course of performance" on which the Debtor relies was purely a function of

accounting policy, not legal responsibility.  The witness whom the Debtor put forward to testify

about the intercompany charges, Mr. Lisman, testified that "if there are costs associated with the

product or a franchise that is owned and managed by an operating company or sub, those costs

38

required by GAAP need to be recorded on the ledgers of that company as a fundamental accounting GAAP requirement." (Lisman Tr., at 117:15-23). Mr. Lisman further acknowledged that it is a "fundamental GAAP requirement [that] is at the root of" *all* of the intercompany charges. (*Id.*). In other words, the inter-company charges reflect "an accounting decision." (*Id.* at 142:14-143:1). In that vein, Mr. Lisman further acknowledged that the allocation of expenses under GAAP is "subjective." (Lisman Tr., at 45:7-11, 139:20-24). He testified that "GAAP isn't that specific. GAAP provides a broad framework of which you are required to report. And every company has individual policies and procedures in how they interpret and apply GAAP." (*Id.* at 90:14-17). Thus, it is J&J's own interpretation of GAAP that underlies its inter-company charge policy. (*Id.* at 139:14-24).

In all events, Mr. Lisman admitted that any inter-company charges between J&J and JJCI, in his words, "have nothing to do with" the 1979 Agreement or any other agreement between the two companies, the existence of which Mr. Lisman was entirely unaware. (*Id.* at 130:14-131:21, 158:23-159:19, 161:1-7). He testified that the allocation between J&J and Old JJCI of talcum powder liabilities and expenses was purely a matter of "policy issued by the corporate controller's office," not an "agreement signed off by the executives." (Lisman Tr., at 144:6-18). Mr. Kim also testified that he has not seen *any* agreements regarding allocation of payments of judgments or settlements between J&J and JJCI. (Nov. 4 Hrg. Tr., at 252:14-253:13).

### F. The Bankruptcy Filing and Announced Stay of Litigation

Two days after it was created, on October 14, 2021 (the "**Petition Date**"), the Debtor commenced this bankruptcy case by filing a petition for relief under chapter 11 of the Bankruptcy Code in the North Carolina Court. (Main Dkt. No. 1). Then and/or the next day, before it even had stepped foot in, let alone, received any order of relief from, the North Carolina Court, the Debtor blanketed courts across the country in which talcum powder litigations — *none* filed

against the Debtor — were pending with "Notice[s] of Bankruptcy Filing and Stay of Proceedings"

("**Stay Notices**"), declaring that "LTL is now responsible for the talc-related claims" and that "as

a result of the Automatic Stay, no further action may be taken to prosecute the talc-related claims

against any LTL Defendant," a term defined to include hundreds of entities, including J&J, tens

of its affiliates, tens of insurance companies and tens of retailers, including defendants in the

various litigations in which the notice was filed.  (*See, e.g.,* Silverstein Decl. Ex. 39 (MDL Dkt.

No. 25298); Silverstein Decl. Exs. 40-42 (Cl. Exs. 133-35); 11/4/21 H'rg. Tr., at 270:2-4).  On

October 19, 2021 (again, before the Debtor had made even an initial appearance in the North

Carolina Court), J&J followed on by filing a Form 8-K with the United States Securities and

Exchange Commission, publicly announcing that, as a result of LTL's bankruptcy filing, "*all*

pending cosmetic talc cases will be stayed."  (Silverstein Decl. Ex. 43 (Cl. Ex. 132); Nov. 4 H'rg.

Tr., at 269:6-15) (emphasis added).  At the same time, J&J assured the public markets that it was

only a "newly created and separate subsidiary of Johnson & Johnson . . . established to hold and

manage claims," LTL, that had filed for bankruptcy protection, and that "Johnson & Johnson and

its other affiliates did not file for bankruptcy protection and will continue to operate their

businesses as usual."  (*Id.*).

Indeed, that the very purpose of the Debtor's bankruptcy filing was to enable *J&J* to seek

— and, in the interim, to claim — the existence of a stay of all talcum powder litigation *against*

*J&J* is crystal clear in the record.  When asked whether J&J — one of two enterprises in the world

with the highest credit rating, *despite* what he described as a tidal wave of talcum powder lawsuits

against it — "could survive the litigation," Mr. Kim responded:

> I think if, if the litigation continued as it, as it was going and, and it would continue
> for the next 60 years because of the latency period and if we were getting verdicts
> routinely like the verdict that we got in the Ingham case . . ., no, I don't, I don't think
> any company would survive that.

(Nov. 4 H'rg. Tr. 261:4-262:2). Yet when questioned why, in light of that, J&J did not undertake the Texas Two-Step and place its own liabilities in bankruptcy, Mr. Kim's response was: "We thought this route was the preferable route," because "[w]e believe that according to the law would certainly be entitled to a stay, yes" from the Debtor's bankruptcy filing. (*Id*.).

## III.    Relevant Procedural History

On October 18, 2021, two days before the "first day" hearing in the bankruptcy case but days *after* the Debtor already had filed Stay Notices in courts across the country, the Debtor filed an Emergency Motion to Enforce the Automatic Stay against Talc Claimants Who Seek to Pursue Their Claims against the Debtor and Its Non-Debtor Affiliates in the North Carolina Court, asserting that, based on "precedent in the Fourth Circuit, actions against Non-Debtor parties to recover claims against the Debtor are automatically stayed under section 362 of the Bankruptcy Code." (Main Dkt. No. 44 at pp. 2-3). That emergency motion, in turn, was met with a motion to strike, on the grounds that the Debtor's motion "seeks injunctive relief that can only be granted through commencement of an adversary proceeding under Rule 7001(7) of the Federal Rules of Bankruptcy Procedure." (*Id.*, Dkt. No. 76 at ¶ 4). At the first day hearing, on October 20, 2021, the North Carolina Court agreed that "the debtor needs to file the adversary." (Silverstein Decl., Ex. 44 (Oct. 20, 2021 H'rg. Tr.), at 137:18-22). Nevertheless, in advance of such filing (which the Debtor committed to do, and did file, the next day (Adv. Pro. Dkt. Nos. 1-3)), the North Carolina Court entertained an oral application by the Debtor for a temporary restraining order ("**TRO**"), which the court scheduled to hear in full on October 22, 2021. (Oct. 20 H'rg. Tr., at 154:10-157:2).

Two days later, after a half-day evidentiary hearing in which the Debtor's CLO, Mr. Kim, took the stand, the North Carolina Court *denied* the TRO relief *except* for "claims against the debtor and claims against Old JJCI, which no longer exists." (Cl. Ex. 5, at 159:1-9). The court

41

indicated that it was "not going any further" and that it had "grave concerns" that "liabilities of the Johnson & Johnson Company that were not . . . liabilities of the debtor." (*Id.*).  Consequently, the order that the court entered provided "the Debtor's interim stay motion and its request for a temporary restraining order, but only as provided herein, and only as to the Debtor and Old JJCI," and further provided that "[t]he Motions are DENIED with respect to the Debtor's request for a temporary restraining order in favor of the Alleged Protected Parties other than the Debtor and Old JJCI." (Adv. Pro. Dkt. No. 28).  The court scheduled a preliminary injunction hearing for November 4 and 5, 2021, and ordered expedited discovery in connection therewith. (*See, e.g.*, Adv. Pro. Dkt. No. 73).

At the preliminary injunction hearing on November 4 and 5, 2021, the North Carolina Court heard testimony from three witnesses — (i) Mr. Kim, (ii) JJCI's Chief Medical Officer, Dr. Edwin Kuffner, and (iii) an "expert in statistical and econometric analysis and economic modeling as it relates to mass tort personal injury claims," Dr. Charles Mullin. (Nov. 4 H'rg. Tr.; Nov. 5 Hrg. Tr.).  By agreement of the parties, the court also admitted into evidence (i) the declarations, and deposition transcripts of, two other witnesses — Mr. Lisman and Ms. Schirger-Ward (Dbt. Exs. 48 & 49; Silverstein Decl. Exs. 32 and 38 (Cl. Dep. Exs. 2 & 3)) — and (ii) hundreds of other exhibits listed on the parties' exhibit lists and/or utilized during the course of the hearing. (Adv. Pro. Dkt. No. 75).  At the conclusion of the hearing, the court reserved judgment and indicated that it would read a ruling into the record on November 10, 2021, following the hearing on various parties' and the Court's own motions to transfer venue of the bankruptcy case. (Silverstein Decl. Ex. 45 (Nov. 5 H'rg. Tr.), at 568:15-569:9).  In the interim, the court left in place the TRO, which it noted "didn't really grant an injunction except as to the debtor and that was, and Old JJCI." (*Id.*).

42

On November 10, 2021, the North Carolina Court, after hearing argument on the venue

motions, concluded that it was "obliged to send this case to the District of New Jersey for a variety

of reasons," which the court described on the record and set out in an 11-page Order Transferring

Case to the District of New Jersey.  (Nov. 10, 2021 H'rg. Tr., at 125:19-132:4; Main Dkt. No.

416).  After announcing the change in venue, the court turned to the preliminary injunction motion,

stating on the record:

> What I believe at the moment is that I need to stop the litigation against the would-
> be protected parties, including J&J, for a short time period. Sixty days is what I
> have in mind. That is influenced heavily by the fact that I'm not making a decision
> today for myself. I'm making a decision and sending the case to another court. The
> new judge is going to have to be appointed, get up to speed, and have a chance to
> weigh in on this. It has been pointed out that there may be different law in the Third
> Circuit. I haven't had the occasion to go review their Rules on, on dismissals or
> divisional mergers or good faith/bad faith, all those things, except to the extent that
> we've covered them in the other cases.
>
> But the point is somebody else is going to have to wrestle with this question and I
> don't want to bind them any more than possible . . . .

 (Nov. 10 H'rg Tr., at 134:24-135:21).  The court went on to indicate its own views of the issues,

"look[ing] at the bankruptcy filing of LTL . . . under the bankruptcy laws and binding Fourth

Circuit precedent" (*id.* 134:14-143:11), but concluded all of those remarks by returning to the

overarching point that:

> I think that, particularly given that I am moving the case, the last thing I want to do
> is send it with it on fire to the, to the recipient court. And so we need to, to slow
> down just for a little bit here and let a new judge take a look at this situation, read
> what we've written before, and then get the other constituencies onboard before we
> go any further with that.

 (*Id.* at 143:18).  The Order Granting the Debtor's Request for Preliminary Injunctive Relief

accords fully with that premise, expressly providing that:  (i) "all of the Court's findings and

conclusions herein are without prejudice, as set forth in the record, to . . . any further finding by a

subsequent court with jurisdiction over this proceeding (the 'Presiding Court') . . .; (ii) the "Order

is not intended to bind a subsequent Presiding Court"; and (iii) "[t]he injunction and the Court's interim stay ruling herein shall expire on the date that is 60 days after the entry of this Order (the 'Termination Date'), unless modified or extended by an order of the Presiding Court." (Adv. Pro. Dkt. 102 at ¶¶ E & 4).

On December 1, 2021, the Committee filed a motion to dismiss the Debtor's chapter 11 bankruptcy case on the grounds that it was not filed in good faith. (Main Dkt. No. 632). On December 8, 2021, the Debtor filed its Supplemental Memorandum, asserting that "Talc Claims against the Protected Parties, including J&J, [are] automatically stayed" and seeking a preliminary injunction enjoining the prosecution of Talc Claims. (Mem. at 4-5). For the reasons set forth herein, the Motion should be denied.

## ARGUMENT

**I.  THE DEBTOR HAS NOT ESTABLISHED THAT ANY EXTENSION OF THE STAY UNDER § 362(A) IS WARRANTED**

### A.  Section 362(a) Was Enacted to Give a Reprieve to the Debtor

Section 362(a) of the Bankruptcy Code provides in pertinent part:

[A] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\*        \*        \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

11 U.S.C. § 362(a)(1), (3).

The legislative history underlying Congress's enactment of an "automatic stay" upon a debtor's bankruptcy filing is well known and oft observed. Congress created the stay as "'one of

44

the fundamental debtor protections provided by the bankruptcy laws,' designed to relieve 'the
financial pressures that drove [debtors] into bankruptcy.'" *Eastern Refractories Co. v. Forty Eight
Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998) (quoting H.R. Rep. No. 95–595, at 340 (1977)).
As the Third Circuit Court of Appeals has observed:

> The automatic stay imposed by the Bankruptcy Code has a 'twofold' purpose:
>
> (1) to protect the debtor, by stopping all collection efforts, harassment, and
> foreclosure actions, thereby giving the debtor a respite from creditors and a chance
> 'to attempt a repayment or reorganization plan or simply be relieved of the financial
> pressures that drove him [or her] into bankruptcy;' and (2) to protect 'creditors by
> preventing particular creditors from acting unilaterally in self-interest to obtain
> payment from a debtor to the detriment of other creditors.'

*In re Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019) (first quoting *Constitution Bank v. Tubbs*,
68 F.3d 685, 691 (3d Cir. 1995); and then quoting *Maritime Elec. Co. v. United Jersey Bank*, 959
F.2d 1194, 1204 (3d Cir. 1991)).

In other words, "[t]he stay gives a debtor a breathing spell from creditors by stopping all
collection efforts and all foreclosure actions." *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506,
509–10 (3d Cir. 1997). (citing *Maritime Elec. Co.*, 959 F.2d at 1204 ).[20]  Additionally, it "serves
the debtor's interests by protecting the estate from dismemberment," while "benefit[ting] creditors
as a group by preventing individual creditors from pursuing their own interests to the detriment of
the others." *City of Chicago v. Fulton*, 141 S. Ct. 585, 589 (2021).[21]

---

[20]     *See also In re Johns-Manville Corp.*, 26 B.R. 405, 410 (Bankr. S.D.N.Y. 1983) ("[T]he automatic stay is
designed . . . 'to prevent the dissipation or diminution of the bankrupt's assets during the pendency of' [the bankruptcy
proceeding] . . . . 'Without it, certain creditors would be able to pursue their own remedies against the debtor's
property.'" (quoting *Paden v. Union for Experimenting Colleges and Universities*, 7 B.R. 289 (N.D. Ill. 1980); H.R.
Rep. No. 95-595, pp. 5787, 6297) (emphasis original)).

[21]     *See also, e.g., Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982)
(noting that stay is intended to "prevent certain creditors from gaining a preference for their claims against the debtor;
to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general,
to avoid interference with the orderly liquidation or rehabilitation of the debtor.").

Given its purpose, courts universally acknowledge that "the stay is a shield, not a sword."
*In re Scarborough-St. James Corp.*, 535 B.R. 60, 67, 70 (Bankr. D. Del. 2015) (noting, that "the
stay is a shield, not a sword that should help the debtor deal with his bankruptcy for the benefit of
himself and his creditors," and concluding that a debtor's use of the automatic stay to gain a
litigation advantage justified lifting the automatic stay afforded by § 362(a)); *In re Briarpatch Film
Corp.*, 281 B.R. 820, 834 (Bankr. S.D.N.Y. 2002) ("It has often been stated that the automatic stay
is a shield, not a sword.").

Because the automatic stay's protections are so broad, its applications are expressly
limited. On its face, the stay applies automatically only to the *debtor* and the *debtor's* property.
"Although the scope of the automatic stay is broad, the clear language of section 362(a)[1] stays
actions only against a 'debtor.'" *McCartney*, 106 F.3d at 509–10 (quoting *Maritime Elec. Co.*,
959 F.2d at 1204). "As a consequence, '[i]t is universally acknowledged that an automatic stay of
proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-
obligors, or others with a similar legal or factual nexus to the . . . debtor.'" *Id.* (quotations and
citations omitted)).[22] Similarly, by its plain words, § 362(a)(3) protects only property in which a
"debtor" had an interest as of the commencement of the bankruptcy case — whether the debtor's
property was in the possession of the debtor or a third party. *See* 11 U.S.C. § 362(a)(3) (protecting

---

[22]     *See also Maritime Elect. Co.*, 959 F.2d at 1205 ("[T]he automatic stay is not available to non-bankrupt co-
defendants of a debtor even if they are in a similar legal or factual nexus with the debtor."); *Jackson v. Trump Ent.
Resorts, Inc.*, No. CV 13-1605 (JHR/JS), 2015 WL 13637411, at *2 (D.N.J. Feb. 11, 2015) ("Section 362(a)(1) only
stays actions against the debtor and may not be invoked by solvent codefendants, even if they are in a similar legal or
factual nexus with the debtor." (citing *Travelogue Hotels, Inc. v. Patel*, C.A. No. 13-03719 (WHW), 2013 WL
4537906, at *5 (D.N.J. Aug. 27, 2013))).

        The Debtor also suggests that § 362(a)(1)'s stay of actions to "recover a claim against the debtor" also
necessarily encompasses claims against non-debtors (otherwise, according to the Debtor, the provision would be
rendered "surplusage." (Mem. at 41-42). The one case that the Debtor cites for that proposition, however, is wholly
inapposite. *See In re Colonial Realty*, 980 F.2d 125, 131–32 (2d Cir. 1992). At issue in *Colonial Realty* was a claim
against a third party to recover a fraudulent conveyance — a claim literally to recover the property of the debtor that
allegedly was improperly transferred. As set forth herein, that is *not* the nature of the claims that this Debtor seeks to
stay.

estate property); § 541(a)(1) (defining estate property to include all pre-petition interests of the debtor "wherever located and by whomever held"); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986) ("Subsection (a)(3) directs stays of any action, whether against the debtor or third-parties, to obtain possession or to exercise control over property of the debtor.").

**B.      The Stay Should Not Be Extended Here Under § 362(a)(1)**

**1.      Standards for Extending the Stay**

Courts have extended the reach of the statute's stay to non-debtor parties in limited circumstances, where doing so would effectuate the language and purpose of § 362(a) — namely, to protect the debtor and its assets from creditors while it attempts to reorganize.  *See, e.g., In re Uni-Marts, LLC*, 399 B.R. 400, 416 (Bankr. D. Del. 2009) ("The broader rule here is that a debtor's stay may extend to a non-debtor only when necessary to protect the debtor's reorganization.") (quoting *Gray v. Hirsch*, 230 B.R. 239, 243 (S.D.N.Y.1999)).  The seminal case in that regard is *Robins*, in which the Fourth Circuit Court of Appeals held that the stay may be extended to non-debtors in "unusual circumstances" where failing to do so would "defeat" the stay's "very purpose and intent."  788 F.2d at 999.  The Fourth Circuit elaborated: "This 'unusual' situation, it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor."  *Id.*  As an example of such a "situation," the court cited "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case."  *Id.*  As the court explained, actions against such non-debtors "are so intimately intertwined with those of the debtor that the latter may be said to be the real party in interest."  *Id.* at 1001.

47

The Third Circuit Court of Appeals has adopted *Robins*' "identity of interest" rationale for

extending § 362(a)(1)'s stay to non-debtors. *See, e.g.*, *McCartney*, 106 F.3d at 509 ("[C]ourts have

found 'unusual circumstances' where 'there is such identity between the debtor and the third-party

defendant that the debtor may be said to be the real party defendant . . . .'" (quoting *Robins*, 788

F.2d at 999)).  Thus, in determining whether to extend the stay afforded by § 362(a)(1), the Third

Circuit and other courts look to whether the action against the non-debtor will either (i) have a

substantial and immediate economic impact on a debtor's property or estate, or (ii) adversely affect

the debtor's management.  *See Uni-Marts, LLC*, 399 B.R. at 416 ("The threatened harm may be to

needed debtor funds (*e.g.,* when non-debtors are entitled to indemnification) or personnel (*e.g.*,

when debtor needs the services of non-debtors facing crushing litigation)."); *see also Queenie, Ltd.*

*v. Nygard Int'l*, 321 F.3d 282, 287–88 (2d. Cir. 2003) (asking whether the action to be stayed will

have an "immediate adverse economic consequence for the debtor's estate").

The "unusual circumstances" exception is intended to be narrow, and is reserved only for

"extreme" circumstances.  *See, e.g., In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004 WL

954772, at *2 (Bankr. D. Del. Apr. 29, 2004) ("Although the automatic stay can be extended to

situations involving nondebtors, courts are careful to reserve such power to the most extreme and

'unusual circumstances.'"); *In re Aldan Indus., Inc.*, No. 00-10360DWS, 2000 WL 357719, at *4

(Bankr. E.D. Pa. Apr. 3, 2000) (referring to *Robins* "as a narrow exception to the prohibition

against extending the protection of the automatic stay").  To extend the stay otherwise would

present great risk to the rights of the non-debtor's creditors. *See, e.g.*, *Bradberry v. Carrier Corp.*,

86 So. 3d 973, 983 (Ala. 2011) ("Extending the stay to protect solvent co-defendants would not

advance either of the purposes underlying the automatic stay.").

48

Contrary to the Debtor's position that the application of § 362(a)(1) applies "of its own force," without the need for any "extension" (Mem. at 40), courts within and outside of this Circuit, in light of §362(a)(1)'s plain words, have justified the application of the stay to non-debtors as an exercise of the Court's equitable powers granted under § 105(a).[23] *See, e.g., Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993) ("Even if we were to adopt the unusual circumstances test, the bankruptcy court would first need to extend the automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105."); *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65–66 (2d Cir. 1986) (construing stay extension as an exercise of § 105 authority, and stating that it "cannot extend to efforts made in bad faith by non-bankrupt co-defendants in order to escape from . . . liability").[24]

As such, the relief sought by the Debtor here should be committed to the discretion of the Court, to be exercised only upon a clear and convincing showing of an "extraordinary set of

---

[23]     The Third Circuit has not directly decided this issue. The Third Circuit has concluded that "section 105(a) . . . permits the court to do equity where" § 362 is not available, but not in the context here of applying the automatic stay to non-debtors. *In re Wedgewood Realty Group, Ltd.*, 878 F.2d 693, 701 (3d Cir. 1989). In adopting *Robins'* "unusual circumstances" test, the Third Circuit simply noted, without further comment, that the *Robins* court relied on both § 362(a) (the automatic stay provision) and § 105(a) (relating to ancillary "necessary and appropriate" orders). *See McCartney*, 106 F.3d at 506 (noting in parenthetical that Fourth Circuit relied on both the "automatic stay provision and the bankruptcy court's equitable powers under 11 U.S.C. § 105 to enjoin actions against nondebtor codefendants"). *McCartney* then cited cases relying on both § 362(a) and § 105(a). *Id.; see also Aldan Indus.*, 2000 WL 357719, at *8 (noting same).

[24]     *See also Edwards v. McElliotts Trucking, LLC*, 2017 WL 5559921, at *4 (S.D. W. Va. Nov. 17, 2017) (noting that bankruptcy court's authority to expand the scope of the stay derives from § 105); *In re Bora Bora, Inc.*, 424 B.R. 17, 23 (Bankr. D.P.R. 2010) ("Although called an extension of the automatic stay provisions of the Bankruptcy Code to non-debtor parties, these are in fact injunctions issued by a bankruptcy court under 11 U.S.C. § 105(a) . . . ."); *In re Trans-Service Logistics, Inc.*, 304 B.R. 805, 807 (Bankr. S.D. Ohio 2004) (citing § 105 as statutory predicate for extension of the stay); *Millard v. Developmental Disabilities Institute, Inc.*, 266 B.R. 42, 44 (E.D.N.Y. 2001) ("where extension of the Automatic Stay to non-bankrupt defendants is recognized as appropriate," "[t]he power to enter such a stay in derived from 11 U.S.C. § 105"); *In re Phila. Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009) (explaining that an extension of the stay requires a showing under both §§ 362(a)(1) and 105(a)); *Aldan Indus.*, 2000 WL 357719, at *8 (stating that, even if "unusual circumstances" were present, "extensions of the stay under such circumstances are granted in conjunction with a court's authority under § 105"); *In re F.T.L., Inc.*, 152 B.R. 61, 63 (E.D. Va. 1993) (stating that extension of the stay for "unusual circumstances" is an exercise of authority under § 105(a)); *In re All Seasons Resorts, Inc.*, 79 B.R. 901, 903 (Bankr. C.D. Cal. 1987) ("It is clear to me that the Fourth Circuit in *Robins* agrees that the automatic stay under § 362 of the Code may be extended to cover non-debtors in special situations. However, to achieve this result, a debtor must proceed through § 105(a).").

circumstances." *Millard*, 266 B.R. at 44 ("Extension of the Automatic Stay to non-bankrupt defendants is a matter of discretion"); *see In re FPSDA I, LLC*, No. 10-75439, 2012 WL 6681794, at *8 (Bankr. E.D.N.Y. Dec. 21, 2012), as corrected (Dec. 26, 2012) ("[E]xtensions of the stay to protect non-debtor parties are the exception, not the rule, and are generally not favored. Thus, the movant must show by 'clear and convincing evidence' that extension of the stay is warranted.") (citing *Millard.*, 266 B.R. 42)); *In re Univ. Med. Ctr.*, 82 B.R. 754, 757 (Bankr. E.D. Pa. 1988) (noting that "invocation of § 105(a) must be reserved for a truly 'extraordinary set of circumstances'"). As set forth below, the Debtor has not come close to meeting this burden.

## 2. Identities of Interest May Not Be Manufactured Shortly Before the Bankruptcy Filing For Purpose of § 362(a)(1)

The Debtor's principal argument for why the Court should extend the stay under § 362(a)(1) to hundreds of "Protected Parties" that are *not* in bankruptcy, including one of the richest companies in the world, J&J, is because, according to the Debtor, "Old JJCI no longer exists" and, thus, "the *Debtor* is [now] responsible for the Debtor Talc Claims." (Mem. at 41). As a basis for that, the Debtor cites to various indemnity agreements, insurance agreements, and tender agreements with the Protected Parties to which Old JJCI is or was a party. (*Id.* at 41, 44). Setting aside the flawed factual premise for the argument (discussed below), the Debtor's reasoning also is flawed.

With the exception of a small handful of isolated decisions from the North Carolina Court involving different circumstances discussed below (*see* pp. 55–56, *infra*), *all* of the cases cited by the Debtor supporting its request for relief under § 362(a) involved commercial contracts that an operating *debtor* signed, or assumed, in the ordinary course of its business, well in advance of its

bankruptcy filing.[25] Yet completely omitted, or disregarded, by the Debtor in its Supplemental
Memorandum is the fact that *all* of *its* agreements were unilaterally and intentionally allocated to
the Debtor by J&J and its affiliates — the very parties that now seek to have the protections of the
stay extended to them — just two days before the bankruptcy filing. (*See* pp. 29–31, *supra*). In
other words, outside of a few isolated and distinguishable cases, the Debtor's request is
unprecedented.

This is *not* the case in which the Court should seek to set new precedent. The requested
extension of the stay here would transform the stay from a shield into a sword — to be wielded by
non-debtors seeking to avail themselves of the benefits, but not the burdens, of the Bankruptcy
Code by allocating assets and liabilities to a new entity formed specifically for the purpose of a
bankruptcy filing to stop non-bankruptcy litigation.[26] *See, e.g., Scarborough-St. James Corp.*, 535
B.R. at 70; *In re Irwin*, 457 B.R. 413, 418 (Bankr. E.D. Pa. 2011) ("[T]he stay must, in some sense,
be 'earned' by the beneficiary of the stay submitting to the invasive authority of the bankruptcy
court into his private financial life . . . [thus] assur[ing] a comprehensive commitment of the
beneficiary's assets to the satisfaction of his obligations, a fundamental aspect of the

---

[25]    *See, e.g., In re Heating Oil Partners*, No. 3:08-CV-1976 CSH, 2009 WL 5110838, at *6–7 (D. Conn. Dec.
17,2009) (debtor was successor in interest after purchasing subsidiary's assets three years before bankruptcy);
*Mallinckrodt PLC v. Connecticut (In re Mallinckrodt)*, Misc. No. 20-408-LPS, 2021 WL 523625 (D. Del. Feb. 2,
2021) (debtors were named co-conspirators in actions sought to be enjoined); *Kaiser Group Int'l, Inc. v. Kaiser
Aluminum and Chem. Corp. (In re Kaiser Aluminum Corp., Inc.)*, 315 B.R. 655, 658 (D. Del. 2004) (staying suit
against insurer by KGI (another debtor) where debtor was only party with established right to proceeds); *Maaco
Enters., Inc. v. Corrao*, No. CIV. A. 91-3325, 1991 WL 255132, at *2 (E.D. Pa. Nov. 25, 1991) (holding that, where
debtor's principals were parties to a franchise agreement that was never properly assigned to corporate debtor
responsible for franchise business, and franchisor had pre-petition suit against principles, the suit against the principals
related to franchise agreement was stayed as debtor had identity with its principals); *In re Monroe Well Serv., Inc.*, 67
B.R. 746 (Bankr. E.D. Pa. 1986); *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs., Inc.*, 402 B.R. 571; *In re
Brier Creek Corporate Center Associates Ltd.*, 486 B.R. 681 (Bankr. E.D.N.C. 2013).

[26]    In fact, the Texas divisional merger statute on which J&J and Old JJCI relied in allocating liabilities to LTL,
Chapter 10 of Title 1 of the Texas Business Organization Code ("**TBOC**") reinforces the point. Section 10.901 of
Subchapter Z of the TBOC provides: "This code does not . . . abridge any right or rights of any creditor under existing
laws." Denying tens of thousands of claimants continued access to the courts in order to pursue direct claims against
J&J and hundreds of retailers for *their* own conduct, because LTL was allocated Old JJCI's indemnity liabilities in
the Texas Two Step, would constitute an abridgement of creditor rights that the statute precludes.

debtor/creditor readjustment process that justifies the extraordinary effect of a stay of creditor
pursuit of self-interest." (quoting *In re Saxby's Coffee Worldwide, LLC*, 440 B.R. 369, 378 (Bankr.
E.D. Pa. 2009))).

  Further, any resort to equity here, in order to extend the automatic stay to J&J and hundreds
of its commercial partners, would be wholly inappropriate under the facts of this case, because of:
(i) the non-arm's length nature of the agreements pursuant to which the Debtor was "allocated"
the indemnifications, shared insurance coverage and tender agreements at issue: (ii) the
inconsistencies in the positions J&J advances in favor of a stay post-bankruptcy compared to the
positions it advanced prior to the bankruptcy; (iii) J&J's inequitable conduct in inducing claimants
to continue investing emotionally, physically and financially in litigation when J&J knew it would
be seeking to halt the litigations; and (iv) the devastating impact on J&J's dying victims from being
denied their right to a jury trial.   (*See* pp. 21–38, *supra*; pp. 89–91, *infra*).

  Even if the Debtor were correct that § 362(a)(1) applied to non-debtors "of its own force"
without the need for any equitable extension (which is not the case), the requested stay should still
be denied.  It is well settled that, in interpreting and applying a statute, "a court must look beyond
that plain language where a literal interpretation would lead to an absurd result, or would otherwise
produce a result 'demonstrably at odds with the intentions of the drafters.'"   *In re Phila.
Newspapers, LLC* 418 B.R. 548, 560 (E.D. Pa. 2009) (quoting *United States v. Ron Pair Enters.,
Inc.*, 489 U.S. 235, 242 (1989)); *see also In re Kaiser Aluminum Corp.*, 456 F.3d 328, 330 (3d Cir.
2006) ("A basic principle of statutory construction is that we should avoid a statutory interpretation
that leads to absurd results."); *Mitchell v. Horn*, 318 F.3d 523, 535 (3d Cir. 2003) ("We do not
look past the plain meaning unless it produces a result demonstrably at odds with the intentions of
its drafters . . . or an outcome so bizarre that Congress could not have intended it." (citations and

quotations omitted)). Rather, any interpretation and application of § 362(a) should accord with "the legislative purpose and underlying policy goals of the automatic stay." *Denby-Peterson*, 941 F.3d at 122. The result advocated by the Debtor here — that non-debtors can avail themselves of the automatic stay simply by unilaterally allocating to the debtor indemnity and other obligations on the eve of the bankruptcy filing — is an absurd result that would turn the purpose of automatic stay on its head, enabling non-debtors seeking litigation advantage to abuse it. Any such construction should not be countenanced.

In that vein, it bears noting that there is no apparent limit to the principle that the Debtor implicitly asks this Court to apply — that any debtor could simply be formed as receptacle for, or even voluntarily enter into or assume, agreements with non-debtors on the eve of a bankruptcy filing for the purpose of broadening the scope of the stay. Application of any such principle would pervert the language and purpose of the stay that Congress determined to confer, automatically but not without limitation, upon a bankruptcy filing. (*See* pp. 44–47, *supra*).

Indeed, the Third Circuit has rejected similar attempts to "game" the Bankruptcy Code through, as here, manipulation or artifice. *See, e.g.*, *In re Owens Corning*, 419 F.3d 195, 200, 216 (3d Cir. 2005) (reversing an order allowing "deemed" consolidation of Chapter 11 estates of corporate-debtor-borrowers and related corporate entities that guaranteed their loan obligations, on the ground it was "a ploy to deprive one group of creditors of their rights while providing a windfall to other creditors"); *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 129 (3d Cir. 2004) (finding bad faith where "the company had no significant debt apart from the Landlord's claim," which formed the basis of strategic bankruptcy petition); *In SGL Carbon Corp.*, 200 F.3d 154, 157 (3d Cir. 1999) ("The bankruptcy filing contained a proposed reorganization plan under which only one type of creditor would be required to accept less than full cash payment for its

account, namely the antitrust plaintiffs who obtained judgments against SGL Carbon."); *accord In re Millennium Lab Holdings II LLC*, 945 F.3d 126, 139 (3d Cir. 2019) (eschewing "gamesmanship" in connection with seeking bankruptcy court approval of third party releases "simply because" third parties "demand them"); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 238 (3d Cir. 2004) (rejecting notion that non-debtors can manufacture subject matter jurisdiction necessary to support a channeling injunction in favor of the non-debtors by providing financial support to the debtor; "[i]f that were true, a debtor could create subject matter jurisdiction over any non-debtor third party by structuring a plan in such a way that it depended upon third-party contributions").

Moreover, federal courts reject "feigned" or "collusive" cases, like the charade staged by J&J in this case, because, among other things, they undermine "the integrity of the judicial process." *Poe v. Ullman*, 367 U.S. 497, 505 (1961) (internal quotation marks and citation omitted). In *United States v. Johnson*, 319 U.S. 302 (1943), for example, the Court dismissed for want of a case or controversy a cooperative lawsuit brought by a tenant against a landlord, at the landlord's behest and expense, to vindicate the landlord's interests. The Court noted that the case "was instituted as a 'friendly suit' at [the defendant's] request;" that the plaintiff was represented by "counsel who was selected by [defendant's] counsel" in advance of the lawsuit; and that the defendant agreed in advance to pay the plaintiffs' counsel for bringing the suit. *See id.* at 304 ("Even in a litigation where only private rights are involved, the judgment will not be allowed to stand where one of the parties has dominated the conduct of the suit by payment of the fees of both."); *see also Muskrat v. United States*, 219 U.S. 346, 360-61 (1911) (dismissing staged and friendly suit designed to obtain a judicial ruling on the legality of a claims resolution scheme, because the defendant (like J&J in the present case) had invited the lawsuit and agreed in advance

54

to pay the plaintiffs' attorneys fees, and had "no interest adverse to the claimants").  This case

bears all the hallmarks of a feigned and collusive case.  It is a "friendly" bankruptcy dominated by

J&J, financed by J&J, orchestrated by J&J, and instituted to provide J&J (and other non-debtor

parties) with the benefits of the stay and litigation advantages over talc claimants.  The faux nature

of this case is confirmed by the fact that the Debtor in this case does what few if any genuine

debtors ordinarily do: affirmatively seek to assume liability upon liability for hundreds of affiliated

and non-affiliated parties, all in a brazen attempt to ensure that the injunctive relief sought by the

Motion is as broad as possible.

The three cases from the North Carolina Court on which the Debtor relies do not dictate a

different conclusion.  *See In re Aldrich Pump*, LLC, Case No. 20-30608 (JCW) 2021 WL 3729335

(Bank. W.D.N.C. Aug. 23, 2021); *In re Bestwall LLC*, 606 B.R. 243 (Bankr. W.D.N.C. 2019), *In*

*re DBMP LLC*, Case No. 20-30080 (JCW), 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021).

Each of those decisions applied the automatic stay to non-debtors following the Texas Two-Step

under an entirely different set of facts.  In all of those cases, the principal entities seeking protection

of the stay were themselves parties to the Texas divisional merger.  There was no parent company,

like J&J here, seeking to stay direct, pre-merger personal injury claims against that parent company

and its commercial partners.  *Aldrich Pump* involved the divisional merger of two entities,

Ingersoll-Rand Company ("**Old IRNJ**") and Trane US, Inc. ("**Old Trane**").  Old IRNJ divided

into entities, Trane Technologies Company LLC ("**New TTC**") and debtor Aldrich Pump LLC;

and Old Trane divided into two entities, Trane US Inc. ("**New Trane**") and debtor Murray Boiler

LLC.  2021 WL 3729335, at *1.  At the time of the merger, there were no claims for personal

injury asserted against any parent company of Old IRNJ and/or Old Trane.  Rather, the claims

sought to be stayed in the bankruptcy were those principally against New TTC and New Trane on

theories of "alter ego" or "fraudulent conveyance." *Id.* at *21. In *Bestwall*, Georgia-Pacific LLC ("**Old GP**") underwent a divisional merger, in which it was succeeded by two entities, Georgia-Pacific LLC ("**New GP**") and the debtor Bestwall LLC. As in *Aldrich*, there was no parent company of Old GP seeking a stay of direct, pre-merger tort claims against it. Rather, the focus of the stay motion was claims against New GP, as to which the court found "[t]he liability being asserted against New GP and Bestwall would be identical and co-extensive in every respect." 606 B.R. at 251. And in *DBMP*, CertainTeed Corporation ("**Old CertainTeed**") divided by merger into CertainTeed LLC ("**New CertainTeed**") and the debtor DBMP LLC. No party was alleging direct tort claims against any parent company of Old CertainTeed. Rather, the focus of the motion was on post-merger tort claims against New CertainTeed. The court found that "[p]ost-merger, the only way that these tort claims themselves might be asserted against third parties like New CertainTeed would be through remedial equitable doctrines like alter ego and successor liability, or by attacking them as fraudulent transfers," and granted the motion. 2021 WL 3552350, at *20. In short, none of the cases on which the Debtor relies involved a separate parent entity seeking the benefit of a divisional merger to which it was not a party in order to stay direct pre-merger tort claims against it — which is what J&J seeks here.

For all of the foregoing reasons, this Court should reject the request of the Debtor to extend the stay to hundreds of non-debtors, where the claim of shared identities of interests is based solely on the allocation of agreements to the debtor on the eve of the bankruptcy filing for the very purpose of extending the stay.

### 3. In All Events, Denying the Stay Would Have No Impact on the Debtor's Estate

The Debtor still bears the burden of showing that continuation of the actions sought to be stayed would have actual and substantial consequences to the Debtor's estate, even if an identify

of interests were to exist (which it does not).  *See FPSDA I*, 2012 WL 6681794, at *8 ("It is not

enough for the movant to show some limited risk, or that there is a theoretical threat to the

reorganization, because it is always the case that a lawsuit against principals of the Debtor *could*

have *some* effect on the reorganization. Rather, and in keeping with the principle that extending

the stay to non-debtors is extraordinary relief, the party seeking extension of the stay must put

forth real evidence demonstrating an actual impact upon, or threat to, the reorganization efforts if

the stay is not extended.").[27]   Here, because this bankruptcy case and the Debtor itself are a

charade, denying the extension of the stay to the Protected Parties can have no impact on the

Debtor's estate as a practical matter.  Nor has the Debtor shown otherwise.

Case law makes clear that the existence of an indemnification from the debtor to a non-

debtor (the Debtor's principal argument for extending the stay under § 362(a)(1)) is an insufficient

ground for extension of the automatic stay.  Rather, for the stay to apply, the debtor has the burden

to show that the indemnification obligation threatens the debtor's assets or reorganization.  *See,*

*e.g., Uni-Marts*, 399 B.R. at 416 (concluding that indemnification obligation did not constitute

"unusual circumstances" where it did not threaten reorganization); *Millard*, 266 B.R. at 45

("Ultimately, the decisive issue is consideration of the same policy underlying the Automatic Stay

— whether extension of the stay is necessary to foster the reorganization process."); *All Seasons*

*Resorts*, 79 B.R. at 904 ("Although there is a closeness between debtor and co-defendants by

reason of their officer and agent status and their right to indemnification . . . the magnitude of the

---

[27]     *See also In re First Cent. Fin. Corp.*, 238 B.R. 9, 19 (Bankr. E.D.N.Y. 1999) (concluding that, absent
"massive depletion of estate assets" and distraction to management, no *basis to extend the stay existed); Official
Unsecured Creditors Committee of Phar-Mor, Inc. v. Bowen, et al. (In re Phar-Mor, Inc. Sec. Litig.)*, 164 B.R. 903,
906 (W.D. Pa. 1994)  (declining to extend the stay where the action would not will not "materially affect or diminish
the Debtor's claims.").

harm to debtor if no stay is in force does not approach the scope of the potential injuries besetting the debtors in *Robins*").

Here, the Debtor cannot meet its burden because the Debtor is a shell and has no actual estate to be impacted.  The Debtor claims that it might face indemnification obligations – which, of course, it cannot meet because J&J stripped it of all real assets.  However, in place of those assets J&J left the Funding Agreement which the Debtor (*i.e.*, J&J) asserts allows the Debtor to access the funds of J&J and New JJCI to meet all of its talc liabilities.  Of course, these claims are not true — but true or not, the Funding Agreement and the various corporate shell games that comprised the Texas Two-Step mean that the Debtor can never actually have an adverse effect from a talc judgment against J&J (or any of the other purported Protected Parties).

First, for arguments' sake, take J&J at its word that the Funding Agreement works the way J&J claims it does: J&J or New JJCI picks up the tab for any talc liability of the Debtor and does not seek to use the Funding Agreement to hinder, delay, and defraud their creditors and the creditors of the Debtor.  In that case, J&J tenders an adverse talc judgment to the Debtor — and the Debtor simply tenders that liability right back to J&J to pay.  No effect on the Debtor's estate.[28]

Next, take the more accurate view: that the Funding Agreement is a scheme to hinder, delay, and defraud talc powder creditors — in other words, if J&J tenders an adverse talc powder judgment to the Debtor, it will not honor its reimbursement obligations under the Funding Agreement and will seek to maroon that liability at the Debtor for some length of time (or forever).  That would have an adverse impact on the Debtor — but it would demonstrate that the scheme to

---

[28]     Moreover, the circularity of J&J's indemnity does not assist it in obtaining a stay.  In this Circuit, indemnities requiring future litigation to resolve precludes sufficient impact on the debtor's estate to justify extending the stay to a non-debtor, here, J&J.  *See In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (E.D. Pa. 2013) ("[W]here the right to indemnification is contingent on a factual finding in an action not involving the bankruptcy debtor and requires the commencement of another lawsuit to establish that right," jurisdiction is lacking to extend the stay to a non-debtor), *aff'd*, 571 F. App'x 139 (3d Cir. 2014).

allocate those liabilities to the Debtor was a fraudulent transfer, and those liabilities should be transferred right back to where they belong — at J&J and New JJCI (or the assets of those entities transferred to the Debtor to satisfy those obligations). *See, e.g.*, 11 U.S.C. § 548(a) ("[T]he trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor . . . if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .").

J&J cannot have it both ways. Either the Funding Agreement is what they claim it is, and such indemnification obligations merely round-trip by virtue of the Funding Agreement. Or it is not (it is not), and such indemnification obligations instead round-trip by virtue of the avoidance of the fraudulent transfers at the heart of the Texas Two-Step and the creation of the Debtor. In either case, there is no ultimate harm to the Debtor's estate, and an extension of the stay to J&J and the "Protected Parties" would serve no purpose other than to frustrate non-debtors' legitimate claims. *See Bradberry*, 86 So. 3d at 983 ("It would make no sense to extend the automatic stay protections to solvent co-defendants. They don't need it, and at the same time it would work a hardship on plaintiffs, by giving an unwarranted immunity from suit to solvent co-defendants." (citations and quotations omitted)). For this reason, too, the Debtor's request to apply to J&J and hundreds of its affiliates, insurers and retailers should be rejected.

4.    **As a Factual Matter, Despite Efforts to Manufacture One, There Is No Identity of Interest**

   a.    **The Debtor has not proven an "identity of interest" with J&J**

      i.    **The record is clear that J&J is a joint tortfeasor with direct liability to claimants**

As courts often observe, "the Code was not intended to stay actions . . . where the nondebtor's liability rests upon his own breach of duty" or to "trample the rights of the Creditor-Defendants to assert their independent and distinct claims against a non-bankrupt third party." *Phar-Mor, Inc. v. Gen. Elec. Capital Corp. (In re Phar-Mor, Inc. Sec. Litig.)*, 166 B.R. 57, 62 (W.D. Pa. 1994); *accord Combustion Eng'g*, 391 F.3d at 234 (holding injunctive relief could not extend to "independent non-derivative claims against non-debtor third parties," because it "would improperly extend bankruptcy relief to non-debtors" and "would jeopardize the interests of future . . . claimants" against the non-debtors); *see Stanford v. Foamex L.P.*, 2009 WL 1033607, *2 (E.D. Pa. Apr. 15, 2009) (concluding "unusual circumstances" did not permit automatic stay to extend to non-debtor entities because "plaintiff in this action alleges that each of the non-bankrupt defendants is independently liable").[29]

Thus, it is settled law that "joint tortfeasors" are not entitled to the benefit of the automatic stay upon a co-defendant's bankruptcy filing.  *Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124, 127-28 (4th Cir. 1983); *Robins*, 788 F.2d at 999 (opining, in cases where a separate party, even a co-defendant with a debtor in pending litigation, is "independently liable as, for example, where the debtor and another are joint tortfeasors or where the nondebtor's liability rests upon his own breach of duty . . . the automatic stay would clearly not extend to such non debtor");

---

[29]    *See also Aldan Indus.*, 2000 WL 357719, at *7 (automatic stay did not extend to non-debtor where separate proceeding against non-debtor could proceed in debtor's absence: "arbitration of the Escrow Claim can be held without the Debtor"); *Holland v. High Power Energy*, 248 B.R. 53, 58 (S.D. W. Va. 2000) (automatic stay is inapplicable when a third party has "obligations that are 'independent' and primary, not derivative of those of the debtor.").

*Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983) (upholding denial of a stay to co-defendants after the Johns-Manville defendants filed for bankruptcy, explaining that the suits could proceed because "the Chapter 11 debtors are potential joint tortfeasors").

Indeed, given the harms to alleged victims claiming tort injury are especially high, the grant of any to a joint tortfeasor must exceed a high bar. As stated by the Third Circuit in the *Johns-Manville* case:

> the clear damage to the plaintiffs is the hardship of being forced to wait for an indefinite and, if recent experience is any guide, a lengthy time before their causes are heard. Moreover, we cannot ignore the fact that plaintiffs and crucial witnesses are dying, often from the very diseases that have led to these actions. We are not persuaded that the hardship imposed on defendants by proceeding to trial without Johns-Manville or our legitimate interest in judicial economy is sufficient to force these plaintiffs to forbear until the bankrupt defendants emerge from the reorganization proceedings. The defendants may be seriously inconvenienced by the resumption of the actions against them; under the standard announced in Landis, however, the balance of hardship weighs in favor of the injured plaintiffs.

*Johns-Manville Sales Corp.,* 723 F.2d at 1076; *see also Austin v. Unarco Industries, Inc.*, 705 F.2d 1, 5 (1st Cir. 1983) (denying discretionary stay because plaintiffs and crucial witnesses are dying and "the damage to the plaintiff would be the financial hardship of being forced to wait for an undefined but potentially lengthy period before receiving the money to which she may be entitled"); *Williford*, 715 F.2d at 127-28 (holding, in denying extension of stay, that "[o]f particular significance in balancing the competing interests of the parties in the case at bar are the human aspects of the needs of a plaintiff in declining health as opposed to the practical problems imposed by the proceedings in bankruptcy, which very well could be pending for a long period of time. A stay under such circumstances would work manifest injustice to the claimant."); *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983) (determining discretionary stay was properly denied because "the requisite balancing of the competing interests involved in these cases weighs in favor of allowing the remaining actions to proceed. The realities of the hardship of a stay on

the plaintiffs, many of whom allege that they are dying from asbestosis, is substantial and, in some

instances, permanent. The grim reaper has called while judgment waits.").

Here, the record overwhelmingly establishes that the claims in the MDL and thousands of

state court actions against J&J that are pending, or have been tried to judgment, are based on *J&J's*

conduct and are, thus, direct. (*See* pp. 17−20, *supra*). Indeed, as set forth above, juries have been

required to, and have, found J&J liable for talcum powder product liability claims, separately and

independently from Old JJCI. (*See id.*). *No* appellate court has reversed a judgment against J&J

on the grounds that, as a matter of law, it does, or did, not have a legal duty to the plaintiff. (*See*

*id.*). To the contrary, in *affirming,* in substantial part, one of the largest personal injury awards in

history, the appellate court in *Ingham* found J&J liable to the plaintiffs based on the evidence in

the record, *rejecting* any notion that J&J's liability was based on derivative principles of *alter ego*

or agency. (*See id.*). Hence, even if the Debtor were the valid successor to Old JJCI, J&J is nothing

more than a mere joint tortfeasor that, given the devastating impact of a stay on those suing it for

personal injuries, absent clearly and convincingly proven "unusual circumstances" (not shown

here), is not entitled to application of the *Debtor's* stay.

The Debtor's mantra that the claims against J&J are based "on the same products, same

defect, and same alleged harm" as claims against Old JJCI (Mem. at 19) — even if true — does

not alter that conclusion. The assertion of claims involving overlapping theories of liability, harm

and damages is the very nature of joint tortfeasor liability, which the courts have made crystal clear

is *insufficient* for application of the automatic stay. In all events, the Debtor's contention simply

disregards the record demonstrating *distinct* findings of liability, damages and culpability made

against *each* of J&J and Old JJCI. (*See* pp. 17–20, *supra*).

Nor has the Debtor even tried to make any concrete showing that continued litigation against J&J would somehow otherwise impair the Debtor's ability to reorganize. (Mem. at 72–73). In fact, the Debtor can make no such showing. The Debtor has no business to reorganize. (*See* pp. 6–7, *supra*). Moreover, the record is clear that the Debtor's skeletal staff no longer have (if they ever had) any responsibilities for products liability claims brought against J&J. (*See* p. 6, *supra*). In short, it would only be if the Debtor's seconded staff insinuated themselves in J&J's defense of talcum powder claims that the Debtor would be distracted from the reorganization. Of course, the Debtor cannot manufacture its own impairment of estate administration to justify extension of the stay.

In sum, the Debtor has *not* demonstrated any cognizable "identity of interest" between it and J&J.

> ## ii. The Debtor's invocation of the 1979 Agreement is unavailing.

The Debtor asserts that it nevertheless has demonstrated an identity of interest with J&J "because the Debtor has a contractual obligation to indemnity *[sic]* J&J pursuant to the 1979 Agreement" that was allocated to it in the Texas Two-Step. (Mem. at 80.) In the 1979 Agreement, according to the Debtor, Old JJCI "assumed all liabilities" associated with J&J's talcum powder products. (Mem. at 8-12). The argument is baseless.

To start, even if Old JJCI did "assume all liabilities" relating to J&J's talcum powder products (which, as set forth herein, it did not), that assumption would not alter J&J's status as a joint tortfeasor. It is settled law that "[c]orporations cannot discharge liabilities for their torts against third parties through contract." *Jaycox v. Terex Corp.*, No. 4:19-CV-02650 SRC, 2021 WL 2187907, *12 (E.D. Mo. May 28, 2021). Hence, "[e]ven if a successor assumes the tort liability of the predecessor through an asset purchase agreement, a plaintiff may still bring a claim

against the predecessor." *Id.* (citing 15 Fletcher's Cyclopedia of the Law of Corporations § 7123 (2020)); *see also In re Federal-Mogul Global Inc.*, 411 B.R. 148, 161 (Bankr. D. Del. 2008) ("The indemnity provisions allocated liabilities between Wagner and Pneumo Abex. They did not impact the claims against either party that may be brought directly by an asbestos claimant."). Rather, for any assumption to be binding on creditors, the creditors would have to indicate acceptance of the assumption. *See* Fletcher's Cyclopedia of the Law of Corporations § 7114 (Sept. 2021 update) ("[W]here an assumption agreement is based on a valuable consideration and the receipt of the property of the other company is a sufficient consideration, the company assuming such debts or liabilities may become liable, provided, it seems, *there has been an acceptance of, or acquiescence in, the agreement by the creditors of the corporation that was originally indebted*." (emphasis added)); *Darcy v. Brooklyn & N.Y. Ferry Co.*, 89 N.E. 461, 462 (N.Y. 1909) ("The consent of the creditor to accept the substituted debtor is essential to make such an agreement valid as against him."). That did not occur.

In any event, the record does not support the Debtor's position that Old JJCI did assume "all liabilities" associated with J&J's talcum powder products. That is especially so, given the contradictory positions both J&J and JJCI repeatedly took in talcum powder litigations before the filing of this bankruptcy case. (*See* pp. 21–28, *supra*). Up until the bankruptcy filing, J&J and Old JJCI were uniform in asserting that there were *no* indemnification agreements between them, and, further, as to any claim of pre-1979 exposure, if not post-1979 exposure, as well, it was *J&J* — not JJCI — that was the legally responsible party. (*Id.*). In fact, J&J and JJCI's prior positions are grounded in the record. (*See id.*).

64

To effectuate an assumption by contract, "[t]he agreement must be clear and unambiguous." Fletcher's Cyclopedia of the Law of Corporations § 7114 (Sept. 2021 update).[30] Here, based on its plain wording, the only assumption that the 1979 Agreement effectuated was an assumption of "indebtedness, liabilities and obligations of every kind and description . . . *allocated on the books or records of J&J as pertaining to its BABY Division.*" (*See* p. 32, *supra*). But there is *nothing* in the record identifying the specific "indebtedness, liabilities and obligations . . . allocated on the books or records of J&J as pertaining to its BABY Division" — let alone that such indebtedness, liabilities, and obligations included *talcum powder* liabilities and expenses — when the 1979 Agreement was executed. (*See* pp. 32–33, *supra*). Indeed, it is indisputable that the first cases alleging cancer resulting from J&J's talcum powder products were not filed until decades later.

Nor is there any legal support for the Debtor's suggestion that "liabilities . . . allocated on the books or records" means *all* liabilities — past, present or future — associated with a company's product lines. (Mem. at 10). The phrase "books or records" has a specific meaning in the context of corporate law, which cannot be broadly construed and does not encompass *every* corporate communication or document. N.J.S.A. 14A:5–28 5A (statute delineates limited categories of documents that corporations have a duty to maintain); Fletcher Cyc. Corp. §§ 2189, 2191, 2193 (describing standard provisions); *Huylar v. Cragin Cattle Co.,* 7 A. 521, 522 (N.J. Ch. 1887) ("[Then-existing] statutory authority to order a company to bring its books into the state does not

---

[30]     Notably, J&J knew how to draft broader indemnification provisions when it wished. When J&J sold Windsor to Cyprus in 1989, for example, J&J agreed to indemnify Cyprus against "any product liability-based claim, suit, demand or cause of action directed against Cyprus, Windsor or Western or any of their affiliates arising out of the sale of talc or talc-containing products manufactured by Windsor, Western, J&J or the affiliates of Windsor, Western or J&J, prior to Closing." (Cl. Ex. 50, at § 11.2, p. 62). Exhibit I to the agreement contained an itemized list of pending product liability lawsuits specifically covered by the indemnity provision. (*Id.*).

embrace, by implication, the authority to order it to bring all its papers and memoranda here also.");

*Feuer v. Merck & Co.*, 187 A.3d 873, 888 (N.J. App. Div. 2018), *aff'd*, 207 A.3d 264 (N.J. 2019)

(right to inspect corporation's "books" did not include "analyses or tentative studies," which were

"in the nature of confidential inter-office communications" and prepared solely for management's

information). Thus, the phrase "books or records" does not necessarily encompass a particular

past, present or future tort liability simply because the company may possess a "document"

referring to that liability or potential liability.[31]

In fact, in *Deutsche Bank Nat. Trust Co. v. FDIC*, 109 F. Supp. 3d 179 (D.D.C. 2015), the

court rejected the argument the Debtor makes here. The court held that a buyer's assumption of

"liabilities . . . reflected on the books and records" of the seller encompassed only liabilities

"reflected at a stated Book Value on . . . accounting records." *Id.* at 199. The court concluded that

the term "records" meant accounting records and rejected the contention that the term included

any document. The term, the court explained, could not "be stretched beyond its purpose to impose

liability on JPMC for *any* potential liability written down on *any* medium in *any* WaMu office" —

an argument that "fails from its own sheer hyperbole." *Id.* at 201. So, too, here.[32] The language in

the 1979 Agreement expressly *limits* the liabilities being assumed to those "allocated on the books

or records of J&J as pertaining to its BABY Division" as of January 1, 1979. In the absence of

any showing (of which there is none) that the talcum powder claims against J&J that the Debtor

---

[31]    Subsection 4 of Section 14A:5–28 belies the Debtor's position. It provides that a court may order a corporation to bring into New Jersey "books, documents and records." N.J.S.A. 14A:5–28(4). The statute, on its face, thus draws a distinction between "documents," "books" and "records."

[32]    Courts have also repeatedly held that even provisions assuming liabilities referenced in books and records do not encompass contingent liabilities. *Harrison Lumber & Hardware Co. v. C. I. R.,* 15 T.C.M. (CCH) 281 (Tax 1956); *Blackstone Valley Elec. Co. v. Stone & Webster, Inc*., 867 F. Supp. 73, 75–76 (D. Mass. 1994); *Ferguson v. Arcata Redwood Co.*, 2004 WL 2600471, at *4 (N.D. Cal. 2004); *Cowan v. Harris Corp*., 1982 WL 602774, at *1 (D. Kan. 1982)).

now seeks to stay were "allocated on the books or records of J&J" as of January 1, 1979, the Debtor has *not* proven the identity of interest it claims.

The cases cited by the Debtor, *Bippus v. Norton Co.*, 437 F. Supp. 104 (E.D. Pa. 1977) and *Bouton v. Litton Indus., Inc.*, 423 F.2d 643 (3d Cir. 1970), do not dictate another result.  In *Bippus*, the assumption agreement included language that was the opposite of the language in the 1979 Agreement:  The agreement in that case referred not only to "all recorded liabilities," but, "in addition, those liabilities and obligations under the contracts, agreements, commitments and unaccepted or irrevocable bids . . . which are *not recorded* at the date of the Closing Balance Sheet and *unrecorded liabilities* for services actually rendered or materials or supplies delivered . . . ." *Bippus*, 437 F. Supp. at 106 (emphases added).  The court, applying Pennsylvania law, found an indemnity obligation by the seller of a business with respect "to tools manufactured prior to the date of sale." *Id.*  Similarly, in *Bouton*, the assumption agreement contained broad language referring to "*all* liabilities and obligations . . . in respect of the contracts and commitments referred to in paragraph (f) of Section 3, and all other contracts and commitments entered into in the regular and ordinary course of . . . business *at any time*." 423 F.2d at 648 (emphasis added).  Applying New York law, the court found an indemnity obligation by the seller of a business for personal injuries claims arising after the sale based on products sold before the sale.  The contrast between the agreements in those cases and the 1979 Agreement is thus stark, and defeats any reliance on those cases to support the Debtor's unsupported reading of the language in the 1979 Agreement. Moreover, nothing in either case (neither applying New Jersey law, which governs the 1979 Agreement) supports any contention that the language in the 1979 Agreement applies prospectively to cover claims against J&J *after* 1979 resulting from *J&J's* conduct.  In short, the

67

Debtor's reliance on the 1979 Agreement to establish an identity of interest with J&J sufficient to justify extending the stay to stop all talcum powder litigation against J&J is unavailing.

    **b.**   **The Debtor has not proven an "identity of interest" with J&J's affiliates**

   In a single part of a single sentence in its 93-page brief, the Debtor also contends that an extension of the stay to over 400 subsidiaries of J&J is warranted "pursuant to a merger support agreement" — an agreement that the Debtor does not even discuss, let alone quote, in its brief. (Mem. at 80).  In the Amended and Restated Divisional Merger Support Agreement (Dbt. Ex. 1 (LTL 0002321-27) (the "**MSA**") — one of the agreements prepared before the Debtor's existence without any negotiation from, any representation by, or any independent regard for the fairness to, the Debtor (*see* pp. 29–31, *supra*) — the Debtor "agreed" on the date of its formation to "indemnify and hold harmless [New] JJCI and each of its affiliates . . . from and against all Losses (or Proceedings in respect thereof) to which [New] JJCI or any of its affiliates may become subject, insofar as such Losses (or Proceedings in respect thereof) relate in any way to (a) a claim in respect of any Chenango One Assets or Chenango One Liabilities" (LTL 0002322), comprising the assets and liabilities "allocated" to the Debtor in the Divisional Merger Plan/Schedules.  (*See* pp. 29–38, *supra*).

   The Debtor's reliance on a non-arm's length agreement that was foisted upon it on the day that it was formed in order to argue in favor of an extension of the stay to over 400 J&J subsidiaries is patently unwarranted.   Indeed, the argument undermines any claim of independence by the Debtor and the credibility of its Motion.   (*See* pp. 29–31, 50–55, *supra*).   As Mr. Kim testified when questioned about the MSA, its reach "[d]epends on how you define affiliates." (11/4/21 H'rg. Tr. 278:15-18).  There is *no* definition of "affiliate" in the MSA.  (Dbt. Ex. 1 (LTL 0002321-27)). Without any definition, according to Mr. Kim, "the fact that this is JJCI agreement talking about

affiliates it's really just, you know, other companies, operating companies that had product." (*Id.*
279:9-18). Even if the MSA were arm's length, the Debtor makes no showing that the 400 J&J
subsidiaries to which it seeks to extend the stay under § 362(a)(1) fall within the contemplated
scope of its indemnification. Nor does the Debtor show that there even are any actions, or even
any threats of actions, being taken against these 400 subsidiaries. The Debtor's attempt to confer
the automatic stay on 400 J&J affiliates is, thus, pure overreach.

### c. The Debtor has not proven an "identity of interest" with J&J's retailers

The 145 Retailers to which the Debtor seeks to extend the stay, like J&J, are joint
tortfeasors, and thus, absent clearly and convincingly established "unusual circumstances," are
undeserving of any extension of a co-defendant's bankruptcy stay. In many states, "[a] retailer
who sells a product in a defective condition may be held liable in a products liability action.
Furthermore, a retailer, along with others engaged in distributing a defective product, may be held
strictly liable for personal injuries caused by the product's defects, even though the retailer has no
control as to hidden or latent defects, as where the product is prepackaged." 63 Am. Jur. 2d
*Products Liability* § 91 (Aug. 2021 update) (citing cases) ; *see also, e.g., Milchalko v. Cooke Color
& Chem. Corp.*, 91 N.J. 386, 394 (1982) ("Under New Jersey law, manufacturers, as well as all
subsequent parties in the chain of distribution, are strictly liable for damages caused by defectively
designed products."); *Pierre-Louis v. DeLonghi America, Inc.*, 66 A.D.3d 859, 860, 887 N.Y.S.2d
628, 630 (2d Dep't 2009) (denying retailer's motion for summary judgment and explaining "a
manufacturer may be held liable for placing into the stream of commerce a defective product which
causes injury" and "[t]his burden is also imposed on a wholesaler, distributor, or retailer who sells
a product in a defective condition" ) (internal quotation marks and citations omitted); Restatement,
Torts 2d, § 402A, comment f (strict products liability "applies to any manufacturer of such a

product [and] to any wholesale or retail dealer or distributor"). Furthermore, as set forth above, the fact that Old JJCI, after the fact, may have entered into Tender Agreements with the retailers does not eliminate such liability. (*See* pp. 63–65, *supra*). Thus, as set forth above (*see* p. 59–60, *supra*), the extension of the stay to a non-debtor is inappropriate where, as here, the non-debtor is "independently liable" to the creditor. *See CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 33 (S.D.N.Y. 1991) (quoting *Robins*, 788 F.2d at 999).

The Debtor's argument for extending the stay to non-debtor retailers is based on the claimed existence of Tender Agreements that Old JJCI had signed in connection with 450 pending lawsuits. (Mem. at 29.) But the Debtor has not proven the existence, let alone, terms, of all of these claimed Tender Agreements. Scant few are in the record. (*See* p. 37, *supra*). Indeed, not every Tender Agreement in the record is one solely from Old JJCI. To the contrary, certain of the Tender Agreements in the record provide for indemnification of the retailers from *J&J* (in addition to Old JJCI). (*See, e.g.*, Silverstein Decl., Exs. 46-47; Cl. Exs. 141 & 142).

In any event, even as to those Tender Agreements in the record that are exclusively from Old JJCI, the Debtor's position that they justify an extension of the stay to the non-debtor indemnitees thereunder is unsupported by the law. In this Circuit, "an indemnity provision is not in and of itself sufficient to satisfy the *A.H. Robins* standard" to permit extension of the stay to a non-debtor. *Jackson v. Trump Entertainment Resorts, Inc.*, 2015 WL 13637411, at *3; *Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.*, 133 B.R. 176, 180 (W.D. Pa. 1991) (the "debtor and the nonbankrupt defendant are not 'closely related' in the sense contemplated by the circuits extending the stay provisions to non-bankrupt defendants, merely by virtue of the indemnification agreement"). Rather, to give rise to "identity of interest" necessary to create the "unusual circumstance" sufficient to extend the automatic stay to a non-debtor indemnitee, the debtor's

indemnification obligation must be "absolute." *Forcine Concrete & Const. Co. v. Manning Equip. Sales & Serv.*, 426 B.R. 520, 525 (E.D. Pa. 2010) ("Because there is no indication that such obligations would be "absolute" in this case, the prospect of indemnification does not provide the "unusual circumstances" required by *McCartney* to extend the automatic stay to the non-debtor parties."); *Federal-Mogul*, 282 B.R. at 308 ("The possibility that the loser of an unrelated dispute might seek to recover its losses from the debtor does not make the dispute between non-debtors subject to the jurisdiction of the bankruptcy court.").

Here, the Tender Agreements to which the Debtor points, on their faces, fall far short of "absolute" indemnification. Rather, all versions of Old JJCI Tender Agreements[33] contain at least one, and usually more than one, of the following clauses: (a) reserving rights to re-evaluate this acceptance should new facts come to light indicating that the assumption is incorrect, that the claim arises as a result of the negligent or intentional acts of the retailer or any other appropriate basis determined in the future; (b) reserving rights to re-tender the defense back to retailer if claimant was not exposed to talcum powder product or that the Old JCI subject products were not purchased from retailer, or that retailer made representations that extended beyond the scope of JJCI's warranties; (c) reserving rights to adjust the proportion of defense costs it will pay if claimant was exposed to not only a JJCI talcum powder product, but also to another talcum powder product at issue; or (d) reserving rights to tender the defense back if JJCI did not manufacture or provide the products at issue in the above-referenced matter." (*See* pp. 37–38, *supra*). As such, the Tender Agreements on which the Debtor relies do *not* warrant the extension of the stay to the 145 retailers, which, at most, are conditional indemnitees.

---

[33] All of the Tender Agreements produced by the Debtor contain at least one of the examples of language cited in the text. *See, e.g.*, LTL 0012785-788, LTL 0013496-499, LTL 0019870-874, LTL 0020862-863, 971, LTL 0021236-237, LTL 0021287-288.

### d.   The Debtor has not proven an "identity of interest" based on "collateral estoppel"

As a "catch all," the Debtor argues that, even if had no indemnification obligations, shared insurance coverage or defense payment requirements, it nevertheless would have an "identity of interest" with the hundreds of "Protected Parties," because continued litigation against such parties "creates risks of binding the Debtor through res judicata and collateral estoppel." (Mem. at 71). The argument fails.

It is well settled that mere apprehension that a creditor may later attempt to assert collateral estoppel, or a related doctrine, based on a finding by a court in a non-stayed action is insufficient grounds for applying the automatic stay.  *See Queenie*, 321 F.3d at 288 ("If such apprehension could support application of the stay, there would be vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants."); *see also Forcine Concrete*, 426 B.R. at 526 ("Moreover, while several courts have considered potential collateral estoppel effects as a factor supporting extension of the automatic stay to non-debtor parties, the *Queenie* court "located [no] decision[s] applying the stay to a non-debtor" solely on collateral estoppel grounds, id., and this court has discovered no post-Queenie cases in this district extending a stay on such grounds."); *Int'l Union of Painters & Allied Trades Dist. Council No. 21 Health & Welfare Fund v. Serv. Painting, Inc.*, No. CV 18-3480, 2019 WL 2143370, at *7 (E.D. Pa. May 16, 2019).

In all events, the Debtor's apprehension is misplaced.  Collateral estoppel may not be asserted against a party in a subsequent proceeding where the party did not have a full and fair opportunity to litigate the claim or issue in the prior proceeding. *See, e.g.*, *Allen v. McCurry*, 449 U.S. 90, 96–97 (1980); *Haring v. Prosise*, 462 U.S. 306, 213 (1983).  Here, the automatic stay precludes the commencement or continuation of any action against the Debtor.  Because the Debtor

72

necessarily will not be a party to any continued litigation against any non-debtor entities, it cannot

be collaterally estopped from later litigating any issue decided in those actions. *See, e.g., Pacor,*

*Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984). Speculative arguments to the contrary in support

of a requested stay have been rejected. *See, e.g., In re Metal Center, Inc.*, 31 B.R. 458, 463 (Bankr.

D. Conn. 1983) ("the debtor would not be bound by any judgment [the creditor] might obtain

against [the co-debtor] in state court, and consequently, [the co-debtor] is not protected by the

automatic stay"); *In re MCSi, Inc.*, 371 B.R. 270, 275 (S.D. Ohio 2004); *accord Combustion*

*Eng'g*, 391 F.3d at 233, 242 (finding record "insufficient" to support channeling injunction).[34]

In sum, the Debtor has not established any extension of the stay to any non-debtor under §

362(a)(1). Its Motion, to the extent it relies on § 362(a)(1), should be denied.

## C.     The Stay Under § 362(a)(3) is Inapplicable Here

In addition to invoking § 362(a)(1)'s stay of "actions against the Debtor," the Debtor also

invokes § 362(a)(3)'s stay of "any act to obtain possession of property of the estate," to justify the

stay of litigation against hundreds of non-debtors. (Mem. at 44-62). The "property of the estate"

to which the Debtor points in order to justify a stay of tens of thousands of litigations against non-

---

[34]     The cases cited by the Debtor (Mem. at. 70-71) are inapposite. In *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17 (Bankr. D. Del. 2008), the court addressed a motion to "expand" an injunction to a non-debtor under §105. *Id.* at 20. The court found an "identity of interest" where (i) "no direct action" was asserted against non-debtor, and (ii) the claims against the non-debtor would trigger over 1,000 indemnification claims against the debtor, requiring a duty to defend, that the court found would result in the "diversion of resources would retard the administration of the chapter 11 cases by requiring the time and commitment of individuals intimately involved in the chapter 11 cases at this critical time, seven years into the case." 386 B.R. at 22-24. Against that backdrop, and with an admitted "broader view of the potential impact on the debtor's estate," the court found it could "take[] into account the risks of collateral estoppel and record taint." *Id.* at 29. Those risks arose for reasons inapplicable here — a duty to defend on the part of the debtor, not present here. In *In re Am. Film Techs., Inc.*,175 B.R. 847 (Bankr. D. Del. 1994), on which the Debtor also relies, the court observed that the "automatic stay affords protection only to debtors and does not extend to 'cotortfeasors,' 'joint obligors,' 'guarantors,' 'sureties,' or other non-debtor 'co-defendants'" and, thus, that "third-party suits are permitted to proceed if the nondebtor is a joint tortfeasor with the debtor or where the nondebtor's liability rests upon his own breach of duty." *Id.* at 850-53. The court nevertheless granted a preliminary injunction in favor of a nondebtors who had an "absolute" right of indemnification from the debtor. *Id.* While the court also found that the claims against the debtor "expose[d] [the debtor] to collateral estoppel prejudice," it also stated that the identity of interests created by the absolute indemnity was "a more important issue." *Id.* 853-55.

debtors falls into two broad categories. (*Id.*). The Debtor asserts that the "right to insurance coverage is property of the estate," and, thus, that "[s]ection 362(a)(3) bars plaintiffs from bringing suits, against the Debtor's Insurers, the Retailers and J&J, that would deplete the Debtor's insurance on account of Debtor Talc Claims." (*Id.* at 44-46). Further, the Debtor asserts that the tens of thousands of claims asserted by talcum powder plaintiffs against J&J and retailers (the Debtor identifies no lawsuits by claimants against insurance companies) are property of the estate because the claims supposedly assert "derivative liability" (such as *alter ego* or piercing the corporate veil), are based on "successor liability," or involve "fraudulent conveyance" — all of which the Debtor asserts are claims that "belong" to the Debtor, even if asserted by claimants. (*Id.* at 46-62). The Debtor's position finds no more support in the language and purpose of § 362(a)(3) than it does under § 362(a)(1).

### 1. The Assertion of Shared Insurance Coverage Here Does Not Satisfy § 362(a)(3)

The lynchpin to the Debtor's argument that § 362(a)(3) compels the stay of tens of thousands of lawsuits against non-debtor J&J based on shared insurance coverage is that "J&J and the Debtor are both covered for talc-related claims under various shared insurance policies." (Mem. at 45). In fact, "[u]nder the weight of authority, insurance contracts have been said to be embraced in this statutory definition of 'property'" for purposes of § 362(a)(3). *Robins*, 788 F.2d at 1001. Nonetheless, the Third Circuit has instructed that courts should not just "assume[] that independent claims against [non-debtors] would reduce the insurance proceeds available to the estate." *Combustion Eng'g*, 391 F.3d at 232-33 (finding no "related to" jurisdiction in the absence of "factual findings regarding the terms, scope or coverage of the allegedly shared insurance policies").

Here, by the Debtor's own admission, the third party insurance carriers for Old JJCI and

J&J have *never* acknowledged any coverage obligation or paid a penny for talc-related liabilities

— through decades of litigation — and have always asserted, and continue to assert, defenses to

such coverage. (*See* pp. 34–36, *supra*). Nothing in the record demonstrates that this *status quo* is

likely to change at any time during the course of this bankruptcy case. Because the carriers are

currently disputing coverage, there is nothing more than speculation that actions against co-insured

non-debtor third parties actually risks depletion of available insurance proceeds. Such speculation

over shared insurance fails to provide a basis for extending the automatic stay. *See Combustion

Eng'g*, 391 F.3d at 226 (finding insufficient evidence to resolve the issue of shared insurance,

including the issue of the debtor's purported automatic liability and declined to exercise

jurisdiction); *Phar-Mor*, 164 B.R. at 906 (no basis for extending stay where movant "has failed to

establish that [nondebtor] would be unable to satisfy judgments that exceed the insurance

coverage"); *In re Imerys Talc America, Inc, Inc.*, 2019 WL 3253366, at *2–9(D. Del. 2019)

(declining to assert jurisdiction in motion made by J&J to transfer venue of talcum powder cases

on, among other grounds, that J&J failed to provide detail specifying how purported shared

insurance policies with the debtor might apply to claims by each of the many plaintiffs). *Cf., e.g.*,

*In re Quigley Co., Inc.*, 676 F.3d 45, 53–54, 58 (2d Cir. 2012) (noting that litigation against a non-

debtor may be stayed where it "*would almost certainly* result in the drawing down of insurance

policies" (emphasis added)).[35]

---

[35]     Moreover, the Debtor has failed to prove that, in fact, it *is* covered under the various insurance policies it
invokes, the vast majority of which are not even in the record. (*See* p. 35, *supra*). Even if Old JJCI were covered,
there is nothing in the record to establish that the "allocation" to the Debtor of policies covering Old JJCI, which
merged out of existence in a merger with Chenango Zero, which then itself merged out of existence when the Debtor
was created, has been accepted by any insurance carrier. (*See* pp. 29, 35, *supra*).

But even if the Debtor has third party insurance coverage, continued litigation against J&J and other "Protected Parties" would cause no shrinkage in coverage.  The Debtor states that limits of its shared third party insurance coverage with J&J and others is approximately $2 billion.  (*See* p. 34, *supra*).  But J&J and its affiliates already have well-exceeded that coverage limit through defense costs and verdict and settlement payments incurred *prior* to the bankruptcy.  (*See* pp. 19–20, *supra*).  Indeed, J&J's payment in the summer of 2021 of more than $2 billion in satisfaction of the *Ingham* judgment alone exceeded the limits of its third-party insurance coverage.  Thus, even if J&J and the Debtor were to prevail in their insurance coverage dispute with third party carriers, the coverage to which they would be entitled already has been exhausted by *past* litigation expenses and liabilities.  Further, their captive insurance coverage through Middlesex was also exhausted, before J&J made the *Ingham* payment that (assuming there is coverage) exhausted the third party coverage.  (*See* p. 35, *supra*).  In short, any *continued* talcum powder litigation will not impact the Debtor's *available* insurance one iota.  Either no coverage exists or, if it does, it has been exhausted.  In either case, there can be no depletion in shared insurance if litigation against "Protected Parties" continues.

For these reasons, as well as those set forth above (*see* pp. 57–59, *supra*), any resort to a shrinkage in shared insurance coverage as a basis for extending the stay to hundreds of "Protected Parties" under § 362(a)(1) or (3) is unavailing. [36]

---

[36] To the extent that the Court concludes that the alleged shared insurance proceeds do constitute property of the estate, the Debtor still has not proven that it would impact the Debtor's property, as the Court can fashion relief to protect the purported shared insurance policies, including preventing any party claiming an interest in the proceeds (such as J&J) from making a claim to the proceeds of the policies absent relief from the Debtor's automatic stay.  *See Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 337-38 (Bankr. S.D.N.Y. 1996) ("We are not convinced that an action by a third party to recover a judgment against another third party, whose liability may be covered under an insurance policy that also grants the debtor separate rights, implicates the automatic stay.").

### 2. The Assertion that the Debtor "Owns" the Claims to Be Stayed Does Not Satisfy § 362(a)(3)

The Debtor devotes tens of pages in its brief to discussing legal standards governing claims for alter ego, fraudulent conveyance and successor liability — all of which claims the Debtor asserts are property of the estate (Mem. at 44-62). It does so on the unstated theory that the tens of thousands of claims against J&J (and less against retailers) that the Debtor is now seeking to stay under § 362(a)(3) qualify as such claims and, thus, are property of the estate. The theory, and the entire discussion, is a red herring.

As is abundantly clear in the record (*see* pp. 17–20, *supra*), the claims asserted against J&J and retailers based on the manufacture, marketing, and sale of J&J cosmetic talcum powder claims are *not* based on derivative, successor liability, or fraudulent conveyance theories. Rather, the claims are *direct* claims based on J&J's and/or the retailers' conduct. (*See id.*) In fact, this is the very opposite of the situation in which § 362(a)(3) usually has been applied to stay litigation: Claimants here are not suing J&J and retailers to recover the assets of the Debtor. Claimants — none of whom even have sued LTL — have expressed no interest in LTL's assets at all. Instead, it is crystal clear that claimants have been suing, and absent injunction will continue to sue, J&J and Retailers to get to *their assets* based on *their liability*. Under such circumstances, § 362(a)(3) is entirely inapposite.

For all of the foregoing reasons, the Debtor's Motion, to the extent it seeks to extend the stay under § 362(a) of the Bankruptcy Code to hundreds of non-debtors, should be denied.

## II. THE DEBTOR HAS NOT DEMONSTRATED ITS ENTITLEMENT TO PRELIMINARY INJUNCTIVE RELIEF UNDER § 105(A) OF THE BANKRUPTCY CODE

As the Third Circuit has observed:

The legislative history . . . clearly indicates that Congress intended section 105(a) to be available to the debtor to enjoin . . . proceedings even where the proceedings

are specifically excepted from the automatic stay of section 362.  The relief under section 105(a), however, is neither automatic nor may it be imposed *sua sponte* by the court.  The movant must meet the standards for injunctive relief . . . .

*Wedgewood Realty Group*, 878 F.2d at 701.  Here, the Debtor asserts that, assuming § 362(a) does not extend to the "Protected Parties" (to which, as set forth above, it does not), it nevertheless is entitled to a preliminary injunction under § 105(a) enjoining tens of thousands of lawsuits against J&J and other non-debtors "to maintain the integrity of the debtor's estate and fully effectuate the protections of the automatic stay."  (Mem. at 64).  As set forth herein, the Debtor has not met its heavy burden for obtaining such relief.

A.    **The Court Does Not Have Subject Matter Jurisdiction to Issue the Requested Injunction Enjoining Actions Between Non-Debtors**

As a threshold matter, to establish its entitlement to preliminary injunctive relief under § 105(a), the Debtor must first demonstrate that the Court has subject matter jurisdiction to grant that requested relief.  It is well settled that while "[s]ection 105(a) permits a bankruptcy court to 'issue any order, process or judgment that is necessary or appropriate to carry out the provisions' . . . , § 105 does not provide an independent source of federal subject matter jurisdiction." *Combustion Eng'g*, 391 F.3d at 224-25. Rather, "jurisdiction must . . . exist independently of any [request to] enjoin claims against non-debtors." *Id.* at 225.  In that vein, it is the Debtor's burden to establish that the Court has subject matter jurisdiction over this matter.  *See Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 293 (3d Cir. 2012).  It cannot meet that burden.

Pursuant to 28 U.S.C. § 1334(b), a Bankruptcy Court has jurisdiction over cases under the Bankruptcy Code, as well as all matters or proceedings that (i) "arise under" the Bankruptcy Code; (ii) "arise in" a case under the Bankruptcy Code; or (iii) "relate to" a proceeding under the

Bankruptcy Code. *Phila. Newspapers*, 407 B.R. at 612. The Debtor contends that the Court has jurisdiction to issue the preliminary injunction on all three grounds. (Mem. at 37-39).

Both "arises under" and "arises in" jurisdiction are considered "core" proceedings in bankruptcy. *Combustion Eng'g*, 391 F.3d at 225. A proceeding is deemed to "arise under" the Bankruptcy Code when the Bankruptcy Code creates the cause of action or provides the substantive right being invoked. *Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006) (citing *Halper v. Halper*, 164 F.3d 830, 836, 836–37 n. 7 (3d Cir.1999). A proceeding is deemed to "arise in" a bankruptcy case if such proceeding has "no existence outside of the bankruptcy." *Stoe*, 436 F.3d at 216 (quoting *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir.1999)); *see also Halper*, 164 F.3d at 836 (a proceeding is "core" "if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case").

Proceedings are considered "non-core" when they fall under a court's "related to" jurisdiction, which is triggered if "the outcome of [a]proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor*, 743 F.2d at 994. The *Pacor* court elaborated: "an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate." *Id.*; *see also Phila. Newspapers*, 407 B.R. at 612. With respect to whether a lawsuit would invoke "related to" jurisdiction, the "test articulated in *Pacor* for whether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit." *Federal–Mogul Global, Inc.*, 300 F.3d at 382.

For the reasons set forth below, the Debtor has not met, and cannot meet, its burden to establish that the Court has jurisdiction to consider issuance of preliminary injunctive relief enjoining tens of thousands of non-debtor claimants from continuing to prosecute claims against non-debtor J&J and hundreds of other non-debtors.

### 1. The Request for Injunctive Relief Is Not a Core Proceeding, as It Neither "Arises Under" the Bankruptcy Code Nor "Arises In" the Bankruptcy Case

The Debtor asserts "arising under" and "arising in" jurisdiction based on the contention that it is seeking a "section 105(a) injunction . . . to guarantee the integrity of the automatic stay," a matter that, according to the Debtor, both "invokes a substantive right created by the Bankruptcy Code" and "is unique to bankruptcy." (Mem. at 35-37). The Debtor is wrong.

Injunctive relief is certainly not unique to a bankruptcy case, and injunctions of litigation frequently occur *outside* of bankruptcy in actions having nothing to do with bankruptcy. That the injunctive relief is being sought under § 105 of the Bankruptcy Code does not change its fundamental nature. *See, e.g.*, *Combustion Eng'g*, 391 F.3d at 224–25; *see also In re Johns-Manville Corp.*, 801 F.2d 60, 63 (2d Cir. 1986) ("Section 105(a) does not, however, broaden the bankruptcy court's jurisdiction, which must be established separately[.]"); *Phila. Newspapers*, 407 B.R. at 611.

Ultimately, the Debtor's mere invocation of § 105 (or § 362, for that matter) is insufficient to establish that the injunction it seeks enjoining litigations between non-debtors "arises under" the Bankruptcy Code or "arises in" the Debtor's bankruptcy case. Even if these statutory provisions fall under the Court's "core" jurisdiction in a general sense, the Court is without any jurisdiction to stay actions between non-debtors unless those actions could have some conceivable

impact on the estate.[37]  However, as set forth above (pp. 56–73, *supra*) and explained further

below, the Debtor has not, and cannot, make this showing.

### 2.  The Debtor Has Failed to Establish "Related To" Jurisdiction

Nor can the Debtor show "related to" jurisdiction.  The criteria for establishing "related to"

jurisdiction is essentially co-extensive with the criteria for establishing an extension of § 362(a) to

the hundreds of "Protected Parties" that the Debtor seeks alternatively to benefit with an injunction.

*See Combustion Eng'g*, 391 F.3d at 226.  Accordingly, for the same reasons, stated above (*see* pp.

56–73, *supra*), that the automatic stay under § 362(a) should not be extended to the "Protected

Parties," there is no conceivable effect on the Debtor's bankruptcy estate and, thus, no "related to"

jurisdiction.  That is: (a) the claims against J&J are independent from any claims against the Debtor

(of which none have been asserted) or even Old JJCI; (b) the Debtor has not established any

"absolute" indemnification obligation in favor of J&J, J&J's 400 affiliates, the 145 retailers and/or

any of the other Protected Parties (in fact, pre-petition it denied such indemnification liabilities);[38]

---

[37]     None of the cases cited by the Debtor (Mem. at 37) supports a different conclusion.  *See*, *e.g.*, *Stoe*, 436 F.3d
at 216-17 (holding that a bankruptcy court *lacked* "arising in" jurisdiction where a former employee brought an action
to recover unpaid severance benefits from current and former officers of a bankrupt employer); *In re G-I Holdings*,
580 B.R. 388 (Bankr. D.N.J. 2018) (finding "arising in" jurisdiction to enforce the injunction provisions of its plan
confirmation order); *In Re Seven Fields Dev. Corp.*, 505 F.3d 260, 260-62 (3d Cir. 2007) (finding that the court had
"arising in" jurisdiction over a post-confirmation alleged malpractice that occurred inside of the bankruptcy
proceeding as it related to the administration of the estate.); *Monroe Well Serv.,* 67 B.R. at 749-50 (issuing a § 105
injunction to prevent suits "to terminate the last source of income to the debtors"); *Lyondell Chem. Co.,* 402 B.R. 571
(issuing limited, 60-day injunctions with carveouts to prevent disruption of debtor-in-possession financing and prevent
involuntary insolvency proceedings in other countries); *Brier Creek*, 486 B.R. at 687  (granting a § 105 injunction
against an arbitration proceeding that duplicated an adversary proceeding within the bankruptcy that "directly affects
the administration of the bankruptcy proceedings and impedes on the court's ability to administer the estate.");
*Elsinore*, 91 B.R. 238 (enjoining a creditors' committee from calling a meeting of the shareholders to replace Manville
directors in an effort to undermine the reorganization plan).  Moreover, as noted above, all of these cases involve
genuine —as opposed to imagined or utterly speculative — threats to the reorganization of operating businesses, not
shell entities seeking a litigation stay like the one requested here.

[38]     The Third Circuit has made clear that "related to" bankruptcy jurisdiction exists only where "the allegedly
related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit."  *Federal–
Mogul*, 300 F.3d at 382; *see also Combustion Eng'g*, 391 F.3d at 231–32; *In re Lower Bucks Hosp.*, 488 B.R. 314
(("The existence of an indemnification agreement between a defendant in a proceeding outside the bankruptcy action
and a non-party bankrupt debtor does not automatically supply the nexus necessary for the exercise of 'related to'
jurisdiction. Only when the right to indemnification is clearly established and has accrued upon the filing of a civil

81

(c) the Debtor has not established that it shares insurance coverage with J&J and the retailers and

that such shared insurance coverage is being, or is in jeopardy of being, depleted, or that there is

even any automatic right to defend or indemnify J&J and Old JJCI;[39] and (d) the Debtor has not

established that, by collateral estoppel or otherwise, it will be bound by any judgment against any

of the "Protected Parties."  (*See* pp. 59–73, *supra*).

### B. The Debtor Has Not Satisfied Its Burden of Establishing the Requirements for Granting the Extraordinary Relief of a Preliminary Injunction

Even if the Court were to have subject matter jurisdiction to consider the Debtor's request

for preliminary injunctive relief, the Debtor has failed to meet its burden of establishing each of

the requirements for the issuance of a preliminary injunction.  A preliminary injunction — even

one that is a fraction of the breadth requested here — is "an extraordinary remedy."  *Winter v.

Natural Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008); *Monsanto Co. v. Geertson Seed

Farms*, 561 U.S. 139, 165 (2010) ("injunction is a drastic and extraordinary remedy, which should

not be granted as a matter of course"); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d

797 (3d Cir. 1989) (an injunction is an "extraordinary remedy, which should be granted only in

limited circumstances"); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson – Merck

Consumer Pharmaceuticals Co.*, 290 F.3d 578 (3d Cir. 2002) (same); *NutraSweet Co. v. Vit-Mar

Enterprises, Inc.*, 176 F.3d 151 (3d Cir. 1999) ("A preliminary injunction is an extraordinary

remedy")*.  "The determination whether to grant or deny a § 105 injunction is intensely fact driven."

*Saxby's Coffee*, 440 B.R. at 380.

---

action is the proceeding deemed 'related to' the bankruptcy case.") (citing *Federal–Mogul,* 300 F.3d at 382); *Imerys*, 2019 WL 3253366, at *3.

[39]     The need for additional lawsuits has already been established in concrete terms.  Insurers are already suing J&J and Old JJCI seeking a declaratory judgment they have no duty to defend or indemnify J&J and Old JJCI.  (*See* pp. 34–35, *supra*).

To obtain a preliminary injunction, a debtor seeking an injunction must demonstrate: (1) a reasonable likelihood of a successful plan of reorganization; (2) irreparable harm to the debtors' ability to reorganize without the requested relief; (3) that the relative balance of the harms weighs in favor of granting the debtor an injunction; and (4) that the requested relief would serve the public interest. *See Phila. Newspapers*, 407 B.R. at 617 (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)); *In re G-I Holdings Inc.*, 420 B.R. 216, 281 (D.N.J. 2009); *see also Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1094 (9th Cir. 2007).[40]

Given the extraordinary nature of preliminary injunctive relief, the burden of proof is on the movant, *i.e.,* the Debtor, to establish, by clear and convincing evidence, each of the foregoing elements to obtain a preliminary injunction. *See Phila. Newspapers*, 407 B.R. at 616-17 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (a preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'") (quoting 11A Wright, Miller & Kane, Federal Practice and Procedure § 2948, p. 129-30 (1995); *Phar-Mor*, 164 B.R. at 907 (the movant has the burden of justifying the need for an injunction "by clear and convincing circumstances outweighing potential harm to the party against whom [the injunction would be] operative.").

In that vein, speculation is not enough for an injunction extending the reach of the stay to non-debtors. "It is not enough for the movant to show some limited risk, or that there is a theoretical threat to the reorganization. . . Rather, and in keeping with the principle that extending the stay to non-debtors is *extraordinary* relief, the party seeking extension of the stay must put

---

[40] As the Debtor recognizes, there is some inconsistency in the cases regarding whether all four prongs of the test are considered together or whether the first two prongs must be established first, before considering the last two prongs of the test. Mem. at 76, n. 40). Any such inconsistency is academic here, as the Debtor cannot satisfy *any* prong of the test.

forth real evidence demonstrating an actual impact upon, or threat to, the reorganization efforts if the stay is not extended." *FPSDA I, LLC*, 2012 WL 6681794, at \*8; *see also Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1146, n. 3 (5th Cir.1987) (movant "must justify the stay by clear and convincing circumstances outweighing the potential harm to the party against whom it is to be operative"); *see also Winter*, 555 U.S. at 22("[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (citing *Mazurek*, 520 U.S. at 972).  Here, the Debtor has not come close to meeting its heavy burden.

### 1.    The Debtor Has Not Shown Likelihood of a Successful Reorganization

The Debtor has offered nothing but speculation — contradicted by the facts — that a reorganization is likely to succeed here.  First, the Debtor is a shell entity created for litigation advantage, and there is nothing to actually reorganize.  Indeed, the Official Committee has filed a motion to dismiss the bankruptcy on that basis.  (*See* p. 44, *supra*).

Second, even if it were to establish a legitimate purpose for this bankruptcy case, the Debtor has not demonstrated any likelihood that it could confirm a plan of reorganization.  According to the Debtor, it is seeking in a confirmed plan of reorganization "the issuance of an injunction that will permanently protect [it], its affiliates and certain other parties from further talc-related claims arising from products manufactured and/or sold by Old JCCI, or for which Old JJCI may otherwise have had legal responsibility, pursuant to section 105(a) and/or 524(g) of the Bankruptcy Code." (First Day Decl., at ¶ 59*; see also* Mem. at 92 ("[The Debtor and the Protected Parties] fully understand that all liability arising out of the Debtor Talc Claims will be 'resolved and channeled only if [the Debtor] succeeds in confirming a plan of reorganization that contains a channeling injunction that extends to the Protected Parties'" (quoting *Bestwall*, 606 B.R. at 258)).  Yet, The

Debtor has not shown that its stated goal of reorganizing under § 524(g) is achievable, based on the current record, for at least two fundamental reasons: (1) the Debtor has not demonstrated that § 524(g) is available to it; and (2) the Debtor has not demonstrated any likelihood of obtaining a consenting class necessary for plan confirmation under §524(g).

Section 524(g) provides, in relevant part:

> (g)(1)(A) After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section.
>
> …
>
> (2)(B) *The requirements of this subparagraph are that—*
>
> (i) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization--
>
> (I) *is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant* in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products; …

11 U.S.C. § 524(g) (emphasis added). "If . . . a [statutory] provision 'is clear and unambiguous, [courts] must simply apply it.' " *Denby-Peterson*, 941 F.3d at 124 (quoting *In re KB Toys Inc.*, 736 F.3d 247, 251 (3d Cir. 2013)). Here, by the plain terms of the statute, § 524(g) "require[s]" that, as of the Petition Date (the "entry of the order for relief"),[41] the "debtor" "be named as a defendant in [a] personal injury" lawsuit. *See Combustion Eng'g,* 391 F.3d at 234 n.45 ("There are many statutory prerequisites imposed by § 524(g). To qualify for its protections, a court must find that the debtor has been named in an action for damages allegedly caused by asbestos . . . .").

---

[41] "The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter." 11 U.S.C. § 301(b).

Principles of statutory construction (*see* immediately above) establish that "debtor" means LTL; it does not mean its predecessor-in-interest, Old JJCI. The Bankruptcy Code defines the "debtor" as the "person or municipality concerning which a case under this title has been commenced." 11 U.S.C. § 101. That is LTL, not Old JJCI. Indeed, § 524(g), on its face, distinguishes the "debtor" (LTL) from a "predecessor in interest of the debtor." *See, e.g.*, 11 U.S.C. § 524(g)(4)(A)(ii)(I) and (II) (listing the relationships that may benefit from the injunction and specifically enumerating a "predecessor in interest of the debtor"); § 524(g)(4)(A)(iii) (a related party is defined to include a "predecessor in interest of the debtor" and an entity that owned a financial interest in the debtor or a "predecessor in interest of the debtor").[42]

The Debtor has not shown that it was named in any lawsuit prior to the bankruptcy filing ("the order for relief"). To the contrary, as set forth above, the Debtor's CLO has admitted under oath — not surprisingly, given that the Debtor was a mere 48–hours or so old when it filed for bankruptcy — that, when it petitioned for bankruptcy relief, it had *not* been named in any lawsuits. (*See* p. 7, *supra*). Accordingly, the Debtor has not shown that it can avail itself of, and reorganize under, § 524(g).[43]

Even if § 524(g) were available, the Debtor will need the support of claimants to confirm a plan. The Debtor can make no showing that it is likely to get it. The Debtor does not have any

---

[42] The North Carolina Court cases granting preliminary injunctive relief to non-debtors following a Texas divisional merger did not reach a contrary conclusion. The issue of whether §524(g) is available to debtors not named in a lawsuit prior to the bankruptcy filing was neither raised nor decided in any of those cases. *See In re Aldrich Pump, LLC*, 2021 WL 3729335, *33-36 (finding the debtor had demonstrated a likelihood of success of reorganizing under §524(g) without addressing, or deciding, any argument that the debtor had not been "named as a defendant" in any personal injury lawsuit as of the petition date); *In re Bestwall LLC*, 606 B.R. at 254-56 (same), *In re DBMP LLC*, 2021 WL 3552350, *39-41 (same).

[43] The Debtor's failing in this regard is entirely self-inflicted. Old JJCI had been named in lawsuits alleging injury caused by the presence of asbestos prior to the Petition Date and, thus, could have sought to avail itself of the benefits of §524(g). But, in an effort to obtain the benefits, without any of the burdens, of bankruptcy, J&J deliberately elected not to put Old JJCI into bankruptcy. It should have to live with the consequences of that decision. It certainly should not be entitled to rely on an interpretation of §524(g) at odds with the statute's plain words in order to compensate for its own choices.

funded or operational debt. There are no banks, bondholders, landlords, unions/pensions, vendors/suppliers, or taxing authorities. The Debtor's debt structure really reduces down to one line-item: the 38,000 pending tort claims arising from the use of J&J's talcum powder products. Thus, there is only one creditor class that possibly could support a plan. A channeling injunction under § 524(g) requires that at least 75 percent of the members of "a separate class or classes of the claimants whose claims are to be addressed" by the trust must vote in favor of the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). By all evidence (including a pending motion to dismiss), the Debtor cannot demonstrate it will come anywhere close to the requisite level of support. *See also* 11 U.S.C. § 129(a)(10) (requiring that, if any classes are impaired, that at least one class must accept the plan). Beyond that, § 1129(a)(3) mandates that any plan be proposed in good faith. *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012) ("A prior determination that a bankruptcy petition was filed or proceeded in good faith does not necessarily preclude a later inquiry into whether a plan under that petition is proposed in good faith for purposes of confirmation. The question of whether a Chapter 11 bankruptcy petition is filed in good faith is a judicial doctrine, distinct from the statutory good faith requirement for confirmation pursuant to § 1129(a)(3).") (citing *Combustion Eng'g*, 391 F.3d at 247 n. 67; 6 Norton Bankr. L. & Prac. § 112:10 (3d ed. 2012)). The requisite "good faith" inquiry for plan confirmation focuses on "whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Id.* Here, there is no reorganizational goal or purpose other than to enjoin and channel direct claims against J&J, which is seeking the benefits of bankruptcy and none of the burdens, into a trust, the adequacy of which is entirely speculative. This is contrary to the purposes of the Bankruptcy Code, making any presumption of good faith unwarranted. For all of these

reasons, the Debtor has not demonstrated a likelihood of a successful reorganization. Rather, any

reorganization effort is, at best at this point, speculative.[44]

### 2. The Debtor Has Not Shown That Continued Prosecutions of Claims Against Non-Debtors Will Cause It Irreparable Harm

The Debtor fails to demonstrate by clear and convincing evidence that the commencement

or continuation of talcum powder products liability claims against any, let alone, all, of the

hundreds of Protected Parties will cause it irreparable harm. The Debtor's principal argument in

---

[44]    That the Debtor has not demonstrated the likelihood of a successful reorganization is particularly significant here, where the preliminary injunctive relief that the Debtor seeks — in support of an unlikely bid to reorganize — is far broader than any permanent channeling injunction to which the Debtor would be entitled under either §524(g) or §105(a). "Section 524(g) injunctions barring third party claims against non-debtors cannot be entered in favor of just any non-debtor." *In re Purdue Pharma, L.P.*, Case No. 21 cv 7532 (CM) (S.D.N.Y. Dec. 16, 2021) (Decision and Order on Appeal) (citing 11 U.S.C. § 524(g)(4)(A)). Rather, the injunction is available to a party only when "that party is alleged to be liable 'for the conduct of, claims against, or demands on' the debtor and to the extent that such liability arises 'by reason of'" one of the four relationships between the third party and the debtor." *In re Quigley Co., Inc.*, 676 F.3d 45, 58-59 (2d Cir. 2012). Those four (4) categories of relationships, as prescribed in the statute, are as follows:

> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>
> (III) the third party's provision of insurance to the debtor or a related party; or
>
> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—
>
>> (aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
>>
>> (bb) acquiring or selling a financial interest in an entity as part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii). The hundreds of retailers that the Debtor seeks to protect do not fit into *any* of the above categories of third parties eligible for a channeling injunction under § 524(g). Moreover, *J&J* would not be entitled to a channeling injunction of the direct tort claims (*i.e.*, claims that were *not* filed against it "by reason of its" ownership interest in the Debtor) in any plan of reorganization under § 524(g). *See Quigley*, 676 F.3d at 61. Furthermore, the Third Circuit has held that § 105(a) may not "be employed to extend a channeling injunction to non- debtors in an asbestos case where the requirements of § 524(g) are not otherwise met." *Combustion Eng'g*, 391 F.3d at 233-34, 236-37 ("As both the plain language of the statute and its legislative history make clear, § 524(g) provides no specific authority to extend a channeling injunction to include third-party actions against non-debtors where the liability alleged is not derivative of the debtor. Because § 524(g) expressly contemplates the inclusion of third parties' liability within the scope of a channeling injunction — and sets out the specific requirements that must be met in order to permit inclusion — the general powers of § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g)." (footnotes excluded)). Accordingly, the Debtor is seeking preliminarily an injunction that it cannot obtain permanently under either § 524(g) or § 105(a).

support of an injunction enjoining tens of thousands of claims from proceeding is that it purportedly has certain indemnification obligations that "*could* make judgments against certain Protected Parties on those claims tantamount to judgments against the Debtor." (Mem. at 80 (emphasis added)).

The Debtor's reliance on conjectural obligations to indemnify fails. For all of the reasons set forth above in the context of § 362(a), even if the unilateral allocation of Old JJCI's indemnification obligations to the Debtor on the eve of the bankruptcy filing passed muster (which it does not), the Debtor has not proven the existence of any "absolute" indemnification obligations that *Old JJCI* had to the alleged Protected Parties. (*See* pp. 36–38, 70–71, *supra*). That is not surprising, given the record of J&J's and Old JJCI's repeated *denials* of the existence of any such indemnification obligations prior to the bankruptcy filing in multiple talcum powder litigations. (*See* pp. 21–22, *supra*). Further, even if the claimed indemnification obligations did exist, they are conditional and/or would require intervening lawsuits to enforce. (*See* pp. 36–38, 70–71, *supra*).

In all events, the claimed indemnity obligations would not cause continued litigation against the so-called "Protected Parties" to undermine the reorganization process. Even if the Debtor's factual assertions are taken at face value in all respects, the Debtor has still not demonstrated that the effect of the indemnity agreements would be anything other than to replace talcum powder claimants with indemnity claims. *See Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.*, 133 B.R. at 180 ("If anything, allowance of judgment against Hallwood now might assist RAC's reorganization by replacing the claims of Algemene, a clearly hostile creditor, with Hallwood's claim for indemnification."). Alternatively, if claims against a Non-Debtor entity with indemnification rights did not proceed to judgment during the bankruptcy, such claim would

continue to be, at best, a contingent general unsecured claim subject to the automatic stay and

subject to the same review and allowance procedures as any other general unsecured pre-petition

claim before the Court, and could be subject to expungement as contingent and unliquidated

pursuant to § 502(e)(1)(B) of the Bankruptcy Code.[45]  More to the point, the Debtor claims that,

by virtue of the Funding Agreement, J&J is backstopping any funding requirements the Debtor

would otherwise be unable to make (and in the likely event that J&J seeks to shirk that obligation,

it will instead be met by the ability to avoid fraudulent transfers under the Bankruptcy Code).

Thus, even if the Debtor had indemnity obligations, the Funding Agreement assures that such

depletion will be replenished by one of the most credit worthy enterprises in the world, J&J.

Hence, there can be no harm to the estate. For the same reason, there can be no harm to the estate

even if the Debtor found itself subject to collateral estoppel and/or *res judicata*.

Therefore, the Debtor has not shown, and cannot show, irreparable harm.

### 3.     The Debtor Has Not Shown That the Balance of Equities Weigh In Favor of an Injunction.

The Debtor has not shown that the balance of equities weighs in favor of an injunction.

Nor can it.  As the Fourth Circuit has observed,

> [o]f particular significance in balancing the competing interests of the parties . . .
> are the human aspects of the needs of a plaintiff in declining health as opposed to
> the practical problems imposed by the proceedings in bankruptcy, which very well
> could be pending for a long period of time. A stay under such circumstances would
> work manifest injustice to the claimant.

---

[45]     Section 502(e)(1)(B) provides:

(e)(1)   Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this
subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is
liable with the debtor on or has secured the claim of a creditor, to the extent that . . .

(B)   such claim for reimbursement or contribution is contingent as of the time of allowance or
disallowance of such claim for reimbursement or contribution . . . .

11 U.S.C. § 502(e)(1)(B).

*Williford v. Armstrong World Indus.*, 715 F.2d at 127–28.

Here, a manifest injustice is precisely what the Debtor is seeking to achieve through its request for injunctive relief. Indeed, the contrast between the negligible, if any, harm to the Debtor's estate, claimed by the Debtor to be backstopped by one of the richest companies in the world, and the immense harm to dying victims whom J&J has actually invited to pursue claims against it in the tort system (so that J&J could "defend" its products "in open court") only to now try to stop them dead in their tracks, is staggering. The victims of J&J are sick and dying. In *Ingham*, the appellate court eloquently described the devastation experienced by these victims in describing what it found to be J&J's "reprehensible" conduct:

> The harm suffered by Plaintiffs was physical, not just economic. Plaintiffs each developed and suffered from ovarian cancer. Plaintiffs underwent chemotherapy, hysterectomies, and countless other surgeries. These medical procedures caused them to experience symptoms such as hair loss, sleeplessness, mouth sores, loss of appetite, seizures, nausea, neuropathy, and other infections. Several Plaintiffs died, and surviving Plaintiffs experience recurrences of cancer and fear of relapse. All Plaintiffs suffered mentally and emotionally. Their ovarian cancer diagnoses caused them constant worry and fear.

*Ingham*, 608 S.W.3d at 721.

Many of the victims have been litigating against J&J for years. The MDL has been pending for five years, and bellwether trials are set to begin in the MDL in April (*See* pp. 16–17, *supra*). Other cases were trial ready or had in fact begun. As set forth above, J&J and Old JJCI, by omitting and misrepresenting its plans to create and put into bankruptcy LTL, induced one dying victim to empanel a jury and put on evidence during trial. After the trial was underway, upon the bankruptcy filing, they immediately argued in favor of halting the proceeding. (*See* p. 27, *supra*). It induced another sick plaintiff to try a case through verdict, only to reveal its bankruptcy plans after receiving a plaintiff's verdict and before the judgment could be bonded. (*See* pp. 27–28, *supra*).

While J&J previously argued for the continuation of litigation outside of bankruptcy —
daring victims to prove their causes of action and for J&J to be able to defend itself in the MDL
and other litigations — now J&J says is does not matter if the victims have to wait.  But waiting
has real-world, immediate consequences to the victims here.  The women and men who have been
seeking to hold J&J accountable through years of litigation — as is their right under the United
States Constitution — have invested financially, physically and emotionally in the litigation.  They
are entitled to have their days in court, and to try to prove the wrong, and to seek compensation
for the harm done to them by J&J.  Many of these victims will die before they can see justice done
and will potentially forfeit claims for pain and suffering compensatory damages under the laws of
many States.  Victims are dying, while the Debtor suffers no harm.  Granting an injunction, in
these circumstances, would turn the concept of irreparable harm on its head.

### 4.    The Debtor Has Not Shown That the Public Interest Weighs Against an Injunction

Finally, the Debtor has not shown that any public interest will be served by granting the
extraordinary injunction of enjoining tens of thousands of personal injury lawsuits against non-
bankrupt companies who, until recently, were content to defend themselves in court.  Considering
whether an injunction serves the public interest "requires a balancing of the public interest in
successful bankruptcy reorganizations with other competing societal interests.  *Monroe Well Serv.*,
67 B.R. at 753.  Here, however, there is no purpose served to the Debtor's reorganization efforts,
as there is nothing to reorganize, nor is there any likelihood that the Debtor can achieve a successful
plan of reorganization.  The only interests that would be advanced here is the interest of *J&J* in
halting all litigation and gaining a litigation advantage over tens of thousands of pending cases.

Moreover, as shown above, there is no logical stopping point to the Debtor's strategy.  Any
rich company facing liabilities could completely stymie them simply by allocating them to a new

92

entity and putting the entity into bankruptcy. The bankruptcy courts would be flooded with abusive petitions, courts would be unduly burdened, and public confidence in the fair administration of the bankruptcy system would be undermined. If permitted to succeed, the Debtor's strategy would undermine the multi-district litigation system that Congress established in 28 U.S.C. § 1407 to centralize, efficiently manage and ultimately settle mass tort actions and other litigations alleging the same claims and injuries. The charade that the Debtor seeks to stage is not in the public interest.

That is especially so given that, at its core, what the Debtor seeks to deprive the claimants of, beyond their dignity, is their fundamental right to a jury trial of their claims enshrined in the Seventh Amendment of the United States Constitution. *See, e.g., Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 59–61 (1989) ("Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity.").

For each and every one of these reasons, no injunctive relief should issue.

## C. The Debtor's Request for Equitable Relief Should Be Denied Due to The Debtor's (and J&J's) Unclean Hands

Finally, it is well settled that "[t]he doctrine of unclean hands prevents a [movant] from obtaining equitable relief if the plaintiff has been 'guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.'" *Worldcom, Inc. v. Boyne*, 68 Fed. App'x. 447, 451 (4th Cir. 2003) (quoting *Richards v. Musselman*, 267 S.E.2d 164, 166 n. 1 (Va. 1980) (quoting W. deFuniak, Handbook of Modern Equity § 24 (2d ed.1956))); *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999) ("[W]hen 'some unconscionable act of one coming for relief has immediate and necessary relation to the equity that' the party seeks, . . . the doctrine [will] bar recovery." (quoting *Keystone Driller Co. v. General Excavating Co*., 290 U.S. 240, 245

(1933))). "As an equitable doctrine, application of unclean hands rests within the sound discretion of the trial court." *New Valley Corp.*, 181 F.3d at 525.

Here, the litany of inequitable and wrongful conduct engaged in by the Debtor and its ultimate parent company, J&J, with respect to this application should disqualify them from the benefits of equity. Such conduct includes, but is not limited to, engaging in a divisive merger that was structured to abridge creditor rights in violation of Texas law (*see* p. 51 n.26, *supra*), filing a bankruptcy for the sole purpose of obtaining litigation advantage (*see* pp. 25–29, 39–40, *supra*), misrepresenting or concealing their efforts in that regard, thereby causing dying cancer patients to continue investing emotionally, physically and financially in continuing to pursue litigation that J&J knew it would be seeking to halt (*see* pp. 26–28, *supra*), and taking positions in bankruptcy court to support its request for equitable relief that are flatly contradicted by the positions that J&J and its affiliates consistently took up until the bankruptcy filing. (*See* pp. 22-25, *supra*). On this record, the Debtor and J&J are undeserving of equity.

## CONCLUSION

For all of the foregoing reasons, the Official Committee respectfully requests that the Court

should deny the Motion in its entirety.

Respectfully submitted,

**GENOVA BURNS LLC**

Dated: December 22, 2021

By: */s/ Daniel M. Stolz*
    Daniel M. Stolz, Esq.
    Donald W. Clarke, Esq.
    110 Allen Road, Suite 304
    Basking Ridge, NJ 07920
    Tel: 973-467-2700
    Fax: 973-467-8126
    Email:   dstolz@genovaburns.com
            dclarke@genovaburns.com

    *Local Counsel to the Official*
    *Committee of Talc Claimants*