Marc E. Wolin, Esq.
mwolin@saiber.com
John M. August, Esq.
jaugust@saiber.com
SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
Tel: (973) 622-8401

-and-

Joseph D. Satterley, Esq. (Pro Hac Vice Pending)
jsatterley@kazanlaw.com
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
Tel: (510) 302-1000

*Counsel for Claimant Kristie Lynn Doyle*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LTL MANAGEMENT LLC, | : | Case No. 23-12825 (MBK) |
| Debtor. | : | |
| | : | Judge: Michael B. Kaplan |
| | : | |
| LTL MANAGEMENT LLC, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. No.: 23-1092 (MBK) |
| | : | |
| THOSE PARTIES LISTED ON APPENDIX | : | |
| A TO COMPLAINT AND JOHN AND | : | |
| JANE DOES 1-1000 | : | |
| Defendants. | : | |

### CLAIMANT KRISTIE LYNN DOYLE'S OPPOSITION TO DEBTOR'S MOTION FOR ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS TO CERTAIN ACTIONS AGAINST NON-DEBTORS, (II) PRELIMINARILY ENJOINING SUCH ACTIONS, AND (III) GRANTING A TEMPORARY RESTRAINING ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY <u>INJUNCTION</u>

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND....................................................................................3

     I.    Claimant's Asbestos Case Has Been Pending in State Court Since August
2018............................................................................................................3

     II.   Claimant's Decedent Was Exposed to J&J's Asbestos. ...........................4

     III.  Decedent's Exposure to Asbestiform Fibers from Johnson's Baby Powder
Increased His Risk of Developing Mesothelioma ....................................6

     IV.  Given the Repeated Trial Continuances, the State Court Is Ready To Set
This Case for Trial Within a Few Months From May 2023. ....................7

DISCUSSION ..........................................................................................................8

     I.    Preliminary Injunctive Relief Must Be Denied Because The Debtor
Cannot Establish a Reasonable Probability of Success on the Merits When
Its Bankruptcy Petition Was Not Filed in Good Faith. ...........................8

          A.    Preliminary Injunctive Relief is not Appropriate when the Debtor
Cannot Establish Reasonable Probability of Success on the Merits...........8

          B.    Debtor Cannot Establish Good Faith Because It Lacks A Valid
Bankruptcy Purpose. ...................................................................9

          C.    Debtor Cannot Establish Good Faith Because It Is Not In Financial
Distress.................................................................................11

     II.   The Debtor Has Not Established That Any Extension of the Stay Under
Section 362(a) to Non-Debtors is Warranted.........................................13

          A.    Section 362(a) Was Enacted to Give a Reprieve to the Debtor................13

          B.    The Stay Should Not Be Extended Here Under § 362(a)(1) .....................16

               1.    Standards for extending the stay. ...................................................16

               2.    This Court lacks jurisdiction to enjoin Movant's claims
against Non-Debtors under section 105.........................................19

               3.    Denying extension of the stay would have no impact on the
Debtor's estate. ........................................................................21

               4.    The stay cannot be extended to joint tortfeasors with direct
liability to Claimant. ...................................................................23

                5.    Debtor fails to establish entitlement to enjoin third-party
litigation. ................................................................................26

CONCLUSION.......................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.H. Robins Co., Inc. v. Piccinin*,
788 F.2d 994 (4th Cir.), cert. denied, 479 U.S. 876 (1986) ........................................16, 17, 24

*In re Aldan Indus., Inc.*,
No. 00-10360DWS, 2000 WL 357719 (Bankr. E.D. Pa. Apr. 3, 2000) ..................................17

*In re All Seasons Resorts, Inc.*
79 B.R. 901(1987)........................................................................................................................17

*Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*,
682 F.2d 446 (3d Cir. 1982)........................................................................................................15

*Austin v. Unarco Industries, Inc.*,
705 F.2d 1 (1st Cir. 1983)............................................................................................................25

*Bradberry v. Carrier Corp.*,
86 So. 3d 973 (Ala. 2011)......................................................................................................17, 23

*In re Briarpatch Film Corp.*,
281 B.R. 820 (Bankr. S.D.N.Y. 2002).......................................................................................15

*Celotex Corp. v. Edwards*,
514 U.S. 300 (1995)................................................................................................................19, 21

*City of Chicago v. Fulton*,
141 S. Ct. 585 (2021)...................................................................................................................15

*In re Combustion Engineering, Inc.*,
391 F.3d 190 (3d Cir. 2004)..............................................................................................19, 20, 23

*Czyzewski v. Jevic Holding Corp.*,
137 S.Ct. 973 (2017)....................................................................................................................27

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006)......................................................................................................................20

*In re Denby-Peterson*,
941 F.3d 115 (3d Cir. 2019).........................................................................................................14

*Eastern Refractories Co. v. Forty Eight Insulations Inc.*,
157 F.3d 169 (2d Cir. 1998).........................................................................................................14

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
   765 F.3d 205 (3d Cir. 2014)............................................................................26

*In re First Cent. Fin. Corp.*,
   238 B.R. 9 (Bankr. E.D.N.Y. 1999)................................................................22

*In re FPSDA I, LLC*,
   No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) ..............18, 21

*Gold v. Johns-Manville Sales Corp.*,
   723 F.2d 1068 (3d Cir. 1983)......................................................................24, 25

*Holland v. Rosen*,
   895 F.3d 272 (3d Cir. 2018)........................................................................21, 27

*Jackson v. Trump Ent. Resorts, Inc.*,
   No. CV 13-1605 (JHR/JS), 2015 WL 13637411 (D.N.J. Feb. 11, 2015) ..............15

*In re Jamo*,
   283 F.3d 392 (1st Cir. 2002)..........................................................................26

*In re Johns-Manville Corp.*,
   26 B.R. 405 (Bankr. S.D.N.Y. 1983).............................................................14

*In re LTL Management, LLC*,
   2023 WL 2760476 ..........................................................................................13

*In re LTL Management, LLC*,
   2023 WL 2760479 ..........................................................................1, 11, 12

*In re LTL Management LLC*,
   Case No. 21-30589...........................................................................................7

*Maritime Elec. Co. v. United Jersey Bank*,
   959 F.2d 1194 (3d Cir. 1991).........................................................................15

*McCartney v. Integra Nat. Bank N.*,
   106 F.3d 506 (3d Cir. 1997)...................................................................14, 15, 17

*McTernan v. City of York, Pa.*,
   577 F.3d 521 (3d Cir. 2009)..........................................................................2, 8

*Millard v. Developmental Disabilities Institute*,
   266 B.R. 42 (E.D.N.Y. 2001) .......................................................................18, 22

*In re Memorial Corp. v. BEPCO, L.P.*,
   589 F.3d 605 (3d Cir. 2009)...............................................................2, 9, 10, 11

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.*,
  384 F.3d 108 (3d Cir. 2004)...........................................................................10

*Official Unsecured Creditors Committee of Phar-Mor, Inc. v. Bowen, et al.* (*In re Phar-Mor, Inc. Sec. Litig.*),
  164 B.R. 903 (W.D. Pa. 1994)........................................................................22

*Patton v. Bearden*,
  8 F.3d 343 (6th Cir. 1993) .............................................................................18

*Phar-Mor, Inc. v. Gen. Elec. Capital Corp. (In re Phar-Mor, Inc. Sec. Litig.)*,
  166 B.R. 57 (W.D. Pa. 1994)..........................................................................23

*In re Phoenix Piccadilly*,
  849 F.3d 1393 (11th Cir. 1988) .......................................................................9

*Queenie, Ltd. v. Nygard Int'l*,
  321 F.3d 282 (2d. Cir. 2003)..........................................................................17

*In re Scarborough-St. James Corp.*,
  535 B.R. 60 (Bankr. D. Del. 2015) ..................................................................15

*In re SGL Carbon Corp.*,
  200 F.3d 154 (3d Cir. 1999).............................................................................9

*Smith v. Bayer Corp.*,
  564 U.S. 299 (2011)........................................................................................26

*Stanford v. Foamex L.P.*,
  2009 WL 1033607 (E.D. Pa. Apr. 15, 2009) .....................................................24

*Stoe v. Flaherty*,
  436 F.3d 209 (3d Cir. 2006)............................................................................19

*Teachers Ins. & Annuity Ass'n of Am. v. Butler*,
  803 F.2d 61 (2d Cir. 1986)..............................................................................18

*In re Uni-Marts, LLC*,
  399 B.R. 400 (Bankr. D. Del. 2009) ......................................................16, 17, 22

*In re Union Tr. Philadelphia, LLC*,
  460 B.R. 644 (E.D. Pa. 2011) ...........................................................................8

*In re Univ. Med. Ctr.*,
  82 B.R. 754 (Bankr. E.D. Pa. 1988) .................................................................18

*In re W.R. Grace & Co.*,
  No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) .........17, 19, 20, 21

*Wash. Constr. Co. v. Spinella*,
  8 N.J. 212 (1951) ........................................................................................................20

*Wedgeworth v. Fibreboard Corp.*,
  706 F.2d 541 (5th Cir. 1983) ......................................................................................25

*Williford v. Armstrong World Industries, Inc.*,
  715 F.2d 124 (4th Cir. 1983) ................................................................................24, 25

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................................21

**Statutes**

11 U.S.C. § 105 ..............................................................................18, 19, 21, 26

11 U.S.C. § 105(a) ..............................................................................18, 19, 26

11 U.S.C. § 157(a) ..........................................................................................19

11 U.S.C. § 301 ..............................................................................................13

11 U.S.C. § 302 ..............................................................................................13

11 U.S.C. § 362 ..............................................................................................15

11 U.S.C. § 362(a) ..........................................................................13, 15, 16

11 U.S.C. § 362(a)(1) ................................................14, 15, 16, 17, 18, 22

11 U.S.C. § 362(a)(3) ................................................................14, 15, 16

11 U.S.C. § 502(e)(1)(B) ..............................................................................21

11 U.S.C. § 509(a) ..........................................................................................21

11 U.S.C. § 541(a)(1) ......................................................................................16

11 U.S.C. § 548(a) ..............................................................................1, 12, 13

11 U.S.C. § 1112 ..............................................................................................9

11 U.S.C. § 1112(b) ..........................................................................................9

22 U.S.C. 2283 ..............................................................................................26

28 U.S.C. § 1334(b) ........................................................................................19

Cal. Code Civ. Proc. § 583.310 ......................................................................8

Kristie Lynn Doyle ("Claimant") in the above-captioned case, by and through her counsel Kazan, McClain, Satterley & Greenwood, A Professional Law Corporation, and local counsel Saiber LLC, hereby submits this opposition to the Motion of Debtor LTL Management LLC ("Debtor") for Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction [Adv. Dkt. 2] (the "Motion").[1]

## INTRODUCTION

1.      Claimant begins where LTL 1.0 ended—with what turned the Third Circuit to dismiss Debtor's original bankruptcy petition:

> "We start, and stay, with good faith. Good intentions—such as to protect the J&J brand or comprehensively resolve litigation—do not suffice alone. What counts to access the bankruptcy Code's safe harbor is to meet its intended purposes. Only a putative debtor in financial distress can do so. LTL was not."

*In re LTL Management, LLC*, 2023 WL 2760479, *1.

2.      LTL 2.0 did not start with good faith. It stayed where LTL 1.0 ended—failing for lack of a valid bankruptcy purpose. Debtor refiled its bankruptcy petition mere hours after the first was dismissed by this Court. In that time, it apparently accomplished two things: (a) divesting $61 billion in assets, and (b) reaching agreement with 60,000 claimants to resolve its liabilities for $8.9 billion. The first is a facially fraudulent divesture. See 11 U.S.C. § 548(a). The second has left all claimants, the United States Trustee Office, and even this Court, perplexed— who are these claimants? And, why has no one heard of them until now?

---

[1] In support of this Opposition, Claimant also submits the Declaration of Joseph Satterley ("Satterley Decl.").

3.      Here, Debtor moves for preliminary injunctive relief—in order to succeed, it must

establish "reasonable probability of success on the merits." *McTernan v. City of York, Pa.*, 577

F.3d 521, 527 (3d Cir. 2009) (quoting *United States v. Bell*, 414 F.3d 474, 478 n.4 (3d Cir.

2005)). Even if we were to ignore the cloud of fraud over LTL's refiling and take Debtor's

statements at face-value, the end-result is no different. Debtor's bankruptcy petition fails for

want of a valid bankruptcy purpose, and therefore, it cannot succeed on the merits. Injunctive

relief must be denied.

4.      LTL's purported valid bankruptcy purpose is to achieve the resolution of its talc

liabilities, and effectuate its proposed settlement of $8.9 billion. But, a valid bankruptcy purpose

must "add or preserve value that would otherwise be unavailable to creditors outside of

bankruptcy." *In re Memorial Corp. v. BEPCO, L.P.*, 589 F.3d 605, 620 (3d Cir. 2009). LTL has

made no showing that its creditors could not achieve this same (or better) resolution outside of

bankruptcy. Therefore, no valid bankruptcy purpose is served, and Debtor's petition would be

dismissed.

5.      In addition, as in LTL 1.0, Debtor fails to establish financial distress. Either

Debtor has access to funds reasonably equivalent to the $61 billion is divested, or Debtor's

divesture was fraudulent and subject to void. In either case, the Third Circuit has determined that

Debtor's specific factual circumstances, including its asset values, do not render it in financial

distress. Its bankruptcy petition will be denied, and therefore, it cannot be reasonable that it will

succeed on the merits. Debtor's motion must be denied.

6.      Claimant is an active member of the Talc Claimant Committee and the widow of

decedent Daniel Doyle. The survivorship and wrongful-death action brought by Claimant and

her son (collectively, "Plaintiffs") has been pending in the Superior Court of California, County

of Santa Clara (the "State Court") since August 2018 and has been ready for trial since

September 2021. But for Debtor's re-filing of its Chapter 11 petition and this Court's Third

Amended Ex Parte Order Granting Temporary Restraining Order [Adv. Dkt. 20] ("TRO"),

Plaintiffs would have sought a date in State Court for their long overdue trial against Johnson &

Johnson ("J&J").

7.      Claimant requests that this Court deny Debtor's request for an order declaring the

Automatic Stay extends to J&J and a Preliminary Injunction, which would allow Plaintiffs' case

to proceed to trial in State Court against J&J. If such an order is issued, then the State Court will

set this case for trial within a few months from the Trial Setting Conference on May 30, 2023.

## FACTUAL BACKGROUND

### I.      Claimant's Asbestos Case Has Been Pending in State Court Since August 2018.

8.      In June 2018, Mr. Doyle was diagnosed with epithelial/sarcomatoid

mesothelioma, an incurable and inevitably fatal cancer. [Initial Complaint, Exh. 1 to Satterley

Decl. at 4:3-4.] Mr. Doyle was only 47 years old at the time of his diagnosis. [*Id.* at 3:17.]

9.      On August 27, 2018, Mr. Doyle and Claimant were the named plaintiffs in a

personal injury action filed in State Court. [Exh. 1 to Satterley Decl.] They alleged that "[a]t all

times since his birth on November 29, 1970, Mr. Doyle was exposed to asbestos through his and

his family members' personal, daily use of Johnson & Johnson's asbestos-containing talc powder

products." [*Id.* at 3:17-25.]

10.     On December 27, 2018, Mr. Doyle died from mesothelioma. [Amended

Complaint, Exh. 2 to Satterley Decl. at 2:3-8 and Exh. A thereto at ¶ 6.] As a result, the trial date

was vacated. [*Id.*] Mr. Doyle is survived by Claimant and his son Ethan Doyle. [*Id.*]

11.     On March 11, 2019, Plaintiffs filed an amended complaint alleging claims for survivorship and wrongful death against J&J and the Debtor's predecessor. [Amended Complaint, Exh. 2 thereto.]

## II.    Claimant's Decedent Was Exposed to J&J's Asbestos.

12.     Plaintiffs' decedent Daniel Doyle was a lifelong user of Johnson's Baby Powder talc. [Daniel Doyle Depo., Exh. 3 to Satterley Decl. at 9:15-23.] It was the brand that he "trusted." [*Id.* at 31:10-17.]

13.     The presence of talc, asbestos fibers, and certain minerals in Mr. Doyle's tissue is a fingerprint for his exposure to asbestos-containing talc which has previously been considered to cause mesothelioma. [Abraham Decl., Exh. 4 to Satterley Decl. at ¶¶ 6-13 and Exhs. 2 and 3 thereto; Dodson Reports, Exh. 5 to Satterley Decl.; Poye Reports, Exh. 6 to Satterley Decl.]

14.     Analysis of two Johnson's Baby Powder bottles that belonged to Mr. Doyle and contained Chinese talc documented the presence of asbestos fibers and fibrous talc. [Longo Report, Exh. 7.] This is unsurprising because J&J knew that Chinese talc "contain small but easily recognizable components comprised of metal particles, animal and vegetable fibers, talc ribbons and **needle-shaped talc particles which could be misconstrued to be asbestiform mineral fibers**." [2/21/85 Letter, Exh. 8 to Satterley Decl. (emphasis added).]

15.     J&J in its internal documents knew that asbestos was present in the talc used in Johnson's Baby Powder before and during the years that Decedent used that product. Below is a small subset of those documents:

| Exhibit(s) to Satterley Declaration | Date | Description |
|---|---|---|
| 9 at 6-7, 37, 41 (emphasis added) | 05/14/1974 | Windsor Minerals report – even with new flotation methods, the finished talc product still contained amphibole and chrysotile asbestos fibers; that asbestos |

| Exhibit(s) to Satterley Declaration | Date | Description |
| --- | --- | --- |
| | | was a "**severe health hazard**" that was "potentially present in all talc ores" used for Johnson & Johnson's baby powder; the Hammondsville mine ore body contained "fibrous amphibole minerals and chrysotile asbestos." |
| 10 | Early 1990s | J&J has known about Dr. Alice Blount's article identifying asbestos in Johnson's Baby Powder since the early 1990's. |
| 11 at 2 | 1992 | Cyprus reports that "fibrous minerals," namely "tremolite and actinolite are ubiquitous in several zones of the Vermont mines." |
| 12 at 2 | 03/25/1992 | "The other serious mineralogical contaminant in the talc ores of Vermont is the fibrous variety of amphibole minerals, tremolite and actinolite…which have been classified as asbestiform minerals by OSHA and EPA." |
| 13 and 14 | 04/23/1998 | Dr. Blount's letter to Johnson & Johnson's counsel – Dr. Blount confirmed that "***Johnson & Johnson's Vermont talc contains trace amounts of asbestos which are well below those specified by OSHA***"; in Dr. Blount's 1991 publication, Sample I was Johnson & Johnson's Vermont talc. (emphasis added). |
| 15 | 05/23/2002 | Fibrous tremolite found in Argonaut mine. |
| 16 | 01/05/2004 | Johnson & Johnson on notice of Forensic Analytical lab report – Johnson's Baby Powder contained asbestos. |
| 17 | 10/03/2019 | Johnson & Johnson on notice that AMA found chrysotile in a lot of Johnson's Baby Powder. |

16.     Prior to 2003, Johnson's Baby Powder contained Vermont talc. Dr. Longo found asbestos in approximately 83 percent of the baby powder samples containing Vermont talc he has tested. [Longo Decl., Exh. 18 to Satterley Decl. at ¶ 17 and Exh. D thereto at last page.] After 2003, Johnson's Baby Powder contained Chinese talc. Dr. Longo identified and reported regulated asbestos in 77 of 81 (95%) J&J Chinese talcs and Chinese talc sourced products. [*Id.*]

17.     Mr. Doyle and his mother's use of Johnson's Baby Powder exposed Mr. Doyle to asbestos well-above ambient levels. [Longo Report, Exh. 7 to Satterley Decl. at 13-14.]

18.     J&J admits that a hypothetical exposure from an adult's use of Johnson's Baby Powder is 4.5 fibers per cubic centimeter of air, which is about 90,000 times above background. [*Prudencio* Trial Transcript, Exh. 19 to Satterley Decl. at 4784:18-4786:7; McCarthy J&J Report, Exh. 20 to Satterley Decl. at 8.]

### III.     Decedent's Exposure to Asbestiform Fibers from Johnson's Baby Powder Increased His Risk of Developing Mesothelioma

19.     Mr. Doyle's lifelong exposure to Johnson's Baby Powder talc increased his risk of developing mesothelioma. [Abraham Decl., Exh. 4 to Satterley Decl. at ¶¶ 15-16.] First, the presence of asbestos in Mr. Doyle's tissue cannot be divorced from his exposure history. [*Id.*] The only documented and confirmed exposure that would account for the asbestiform fibers in Mr. Doyle's tissue was his longstanding use of and exposure to Baby Powder. [*Id.*] Second, cosmetic talc is the only consumer product that contains the combination of anthophyllite, tremolite, and actinolite fibers. [Egilman Decl., Exh. 21 to Satterley Decl. at ¶¶ 113-118.] The combination of asbestos, talc, and other minerals found in Mr. Doyle's tissue are also found in Baby Powder. [*Id.*] Mr. Doyle has no exposures to any other product that contained any of these fibers or talc. [*Id.* at ¶¶ 127, 129-130; Abraham Decl., Exh. 4 to Satterley Decl. at ¶ 16.] In addition to having an adequate exposure history, we also have here the appropriate latency period and the resulting fibers from cosmetic-talc exposure in Mr. Doyle's tissue. [Abraham Decl., Exh. 4 to Satterley Decl. at ¶ 15.] Hence, the combination of talc with asbestos fibers in Mr. Doyle's tissue is a fingerprint for his exposure to asbestos-containing talc which has previously been considered to cause mesothelioma. [*Id.* at ¶ 12; Egilman Decl., Exh. 21 to Satterley Decl. at ¶ 114.]

20.     J&J admits internally that Mr. Doyle's "[m]esothelioma [is] known to be exclusively caused by asbestos." [Telofski Presentation, Exh. 22 to Satterley Decl. at 17.]

21.     J&J admits that there is no safe level of asbestos exposure. [Hopkins Trial Testimony, Exh. 23 to Satterley Decl. at 5436:2-24.]

**IV.     Given the Repeated Trial Continuances, the State Court Is Ready To Set This Case for Trial Within a Few Months From May 2023.**

22.     On August 9, 2019, the State Court set Plaintiffs' case for a jury trial on May 11, 2020. [Satterley Decl. at ¶ 7.] However, because of the COVID-19 pandemic, the State Court vacated the trial date. [*Id.*]

23.     On April 6, 2021, Plaintiffs' case was set for trial on September 7, 2021. [Satterley Decl. at ¶ 8.] Fact discovery closed and was completed on or around July 9, 2021. [*Id.* at ¶ 9.] Expert depositions were completed. [*Id.* at ¶ 10.] Except for J&J's review of certain SEM stubs in Plaintiffs' possession, all expert discovery has been completed. [*Id.*]

24.     On August 27, 2021, Plaintiffs and J&J appeared before Judge Sunil Kulkarni in State Court for a Mandatory Settlement Conference. [Satterley Decl. at ¶ 11.] The parties were unable to resolve the matter. [*Id.*]

25.     During late August and early September 2021, the parties filed and served their motions in limine and oppositions thereto, as well as page-and-line designations. [Satterley Decl. at ¶ 12.]

26.     Plaintiffs' case was awaiting a trial assignment and would have proceeded to trial but for Debtor's filing of its first Chapter 11 petition in *In re LTL Management LLC,* Case No. 21-30589 ("*LTL I*"). [Satterley Decl. at ¶¶ 13-14.] As a result, the trial date was vacated for the third time. [*Id.*]

27.     On February 9, 2023, the State Court held a Status Conference so that it can be apprised of the status of the bankruptcy as a result of the Third Circuit's opinion dismissing *LTL I.* [2/9/23 Reporter's Transcript, Exh. 24 to Satterley Decl. at 1:6-3:1.] J&J chose not to appear.

[*Id.*] As a result, the State Court set a Trial Setting Conference for May 30, 2023. [*Id.* at 3:16-4:19.] "Trials are set five to six months of the Trial Setting date." [*Id.* at 4:9-5:3.] However, given that Plaintiffs' case has been pending since 2021 and to avoid any issues regarding the five-year statute of limitations to bring a case to trial [Cal. Code Civ. Proc. § 583.310], the State Court may set the trial sooner. [*Id.*]

## DISCUSSION

I.  **Preliminary Injunctive Relief Must Be Denied Because The Debtor Cannot Establish a Reasonable Probability of Success on the Merits When Its Bankruptcy Petition Was Not Filed in Good Faith.**

A.  **Preliminary Injunctive Relief is not Appropriate when the Debtor Cannot Establish Reasonable Probability of Success on the Merits**

28.     In determining whether a preliminary injunction is appropriate, Courts consider the following factors (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *McTernan v. City of York, Pa.*, 577 F.3d 521, 527 (3d Cir. 2009) (quoting *United States v. Bell*, 414 F.3d 474, 478 n.4 (3d Cir. 2005).

29.     In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize." *In re Union Tr. Philadelphia, LLC*, 460 B.R. 644, 660 (E.D. Pa. 2011) (quoting *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 752 (Bankr. E.D. Pa. 1986) (explaining reasonable likelihood of success in terms of a successful reorganization)). Unlike in LTL 1.0, where this Court determined that there was nothing in the record to suggest Debtor does not have a reasonable likelihood of success, here in LTL 2.0, Debtor's reorganization has already failed once. Debtor suggests that its circumstances have changed in

the mere hours between when LTL 1.0 was dismissed by writ of mandate from the Third Circuit

and the filing of LTL 2.0. But, if anything, Debtor's actions are more evidence of bad faith that

will doom its petition for a second time. See *In re Phoenix Piccadilly*, 849 F.3d 1393, 1394 (11th

Cir. 1988) (". . . what amounts to bad faith is the same for both . . ." ". . . terminat[ion] for cause .

. ." of an automatic stay and "dismis[sal] for cause pursuant to section 1112 of the Bankruptcy

Code if the petition was not filed in good faith.")). As a result, it cannot show a reasonable

probability of success on the merits, and its request for preliminary injunctive relief must be

denied.

      **B.**      **Debtor Cannot Establish Good Faith Because It Lacks A Valid Bankruptcy Purpose.**

     30.     Chapter 11 bankruptcy petitions are "subject to dismissal under 11 U.S.C. §

1112(b) unless filed in good faith." *In re Memorial Corp. v. Bepco*, 589 F.3d 605, 618 (3d Cir.

2009) (citing *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d

Cir. 2004)). Section 1112(b) provides dismissal for "cause." Lack of good faith has been

determined by this Circuit to be an example of cause—even though it is not statutorily identified.

See *In re SGL Carbon Corp.*, 200 F.3d 154, 159-62 (3d Cir. 1999). The good faith requirement is

grounded in the "equitable nature of bankruptcy" and the "purposes of underlying Chapter 11."

*Id.* at 161-62.

     31.     The debtor has the burden of establishing good faith. *BEPCO*, 589 F.3d at 618

(citing *Integrated Telecom*, 384 F.3d at 118); *SGL Carbon*, 200 F.3d at 162 n.10. The Court's

determination of good faith must be based on "more on [an] objective analysis of whether the

debtor has sought to step outside the 'equitable limitations' of Chapter 11." *Id.* at 618 n.8 (citing

*SGL Carbon*, 200 F.3d at 165).

32.     "[T]wo inquires . . . are particularly relevant": "(1) whether the petition serves a valid bankruptcy purpose and (2) whether [it] is filed merely to obtain a tactical litigation advantage." *Id.* at 618 (internal quotation marks omitted) (citing *Integrated Telecom*, 384 F.3d at 119-20). Valid bankruptcy purposes include "preserv[ing] a going concern" or "maximiz[ing] the value of the debtor's estate." *Id.* at 619. To maximize the value of the estate, "is to say that there is some value that otherwise would be lost outside of bankruptcy." *Id.* at 619 (citing *Integrated Telecom*, 384 F.3d at 120.) Debtor's purported bankruptcy purpose of resolving its talc claims fails this test.

33.     In *BEPCO*, the "Bankruptcy Court identified eleven purported benefits of filing for bankruptcy that it believed maximized the values of the Debtor's estates. *Id.* at 619. Included in these eleven line items, were to "(a) assert the automatic stay in connection with" pending litigation, and (i) "negotiate and propose a settlement" with that same pending litigation. *Id.* at 619-20. This "may appear an extensive list of activities designed to maximize the Debtor's estates." *Id.* at 620. But, as the Third Circuit recognized, on "closer examination [] reveals that the purported benefits did not add or preserve value that would ***otherwise be unavailable to creditors outside of bankruptcy***. *Id.* at 620 (emphasis added).

34.     The automatic stay is not a valid justification for bankruptcy—simply a consequential benefit of an otherwise good faith filing. *Id.* at 620 (citing *Integrated Telecom*, F.3d at 128.). "Courts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation," and any perceived benefit of "the automatic stay, without more, cannot convert a bad faith filing to a good faith one." *Integrated Telecom*, F.3d at 128. The purpose of negotiating and proposing a settlement faired no better. As determined by the Third Circuit,

nothing prevented Debtors from negotiating the same or better settlement if "the Debtors never filed for bankruptcy" in the first place. *BEPCO*, 589 F.3d at 623-24.

35.    Here, as in *BEPCO*, LTL's purported benefits of filing for bankruptcy fail. The automatic stay granted by refiling LTL 2 cannot serve as a valid bankruptcy purpose; nor the preliminary injunction that is the subject of this motion. Likewise, LTL's purported proposed settlement of $8.9 billion does not satisfy the requirement either. LTL has made no showing that its creditors could not achieve this same resolution (or, notably, not a better resolution) outside of bankruptcy. In effect, LTL does not need this bankruptcy to effect a resolution with its creditors. As the "purported benefits [do] not add or preserve value that would otherwise be unavailable to creditors outside of bankruptcy," then a valid bankruptcy purpose is not served. *Id.* at 620. Good faith is not achieved. The bankruptcy petition is subject to dismissal.

### C.    Debtor Cannot Establish Good Faith Because It Is Not In Financial Distress

36.    "A debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith." *In re LTL Management, LLC*, 2023 WL 2760479, *8. "Courts, therefore, have consistently dismissed petitions filed by financially health companies with no need to reorganize under the protection of Chapter 11. If a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed." *Id.* at *9 (quoting Integrated Telecom, 384 F.3d at 122.) "Financial distress must not only be apparent, but it must be immediate enough to justify a filing." *Id.* The financial distress requirement cannot be taken lightly. "'Congress designed Chapter 11 to give those businesses teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability.'" *Id.* at *10 (quoting *Cedar Shore Resort, Inc. v. Mueller*, 235 F.3d 375, 381 (8th Cir. 2000)). The Third Circuit has

already determined that Debtor's financial condition does not warrant this Court's bankruptcy protections.

37.     In its reasoning to dismiss Debtor's Chapter 11 petition, the Third Circuit determined that Debtor "was not in financial distress." *In re LTL*, 2023 WL 2760479, at *16. In reaching this conclusion, the Third Circuit made a factual finding of the value and quality of Debtor's assets—including a Funding Agreement between Debtor, J&J, and Johnson & Johnson Consumer, Inc. *Id*. at *13. The Funding Agreement gave Debtor "the right, outside of bankruptcy, to cause J&J and New Consumer, jointly and severally, to pay it cash up to the value of New Consumer as of the petition date (estimated at $61.5 billion) to satisfy any talc-related costs and normal course expenses." *Id*. In effect, Debtor held a $61.5 billion asset—described by the Third Circuit as a "funding backstop, not unlike an ATM disguised as a contract, that it can draw on to pay liabilities without any disruption to its business or threat to its financial viability." *Id*. at *16.

38.     The Third Circuit foresaw that Debtor may attempt to circumvent the Funding Agreement: "Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is also premature, we note interested parties may seek to 'avoid any transfer' made within two years of any bankruptcy filing by a debtor who 'receives less than a reasonably equivalent value in exchange for such transfer' and 'became insolvent as a result of it.' 11 U.S.C. § 548(a). So if the question becomes ripe, the next one might be: Did LTL receive reasonably equivalent value in exchange for forgoing its rights under the Funding Agreement?" *Id*. at *18, fn. 18.

39.     On April 2, 2023, Debtor agreed to terminate the Funding Agreement— essentially divesting a $61.5 billion asset. [Dkt. 1, p. 10; see also, Dkt. 4, p. 27.) In exchange,

Debtor entered into a new funding agreement with Johnson & Johnson Holdco (NA) Inc.

("Holdco"). [Dkt. 4, pp. 26-28.] The funding agreement gave debtor access to funding from

Holdco's assets. [*Id.* at, pp. 9, 26-28.] In a second agreement, termed by debtor as the "J&J

Support Agreement," J&J obligated itself to provide funding for a bankruptcy trust. [*Id.* at

pp. 27-28.] But, this agreement "is operative only in the chapter 11 case" and must first be

approved by this Court. [*Id.* at p. 28.]

40.    Either (a) Debtor divested a $61.5 billion asset to artificially create financial

distress, or (b) Debtor still has access to the funds. In situation (a), Debtor's divesture was

fraudulent and subject to void. See *In re LTL Management, LLC*, 2023 WL 2760476 *16, n.18

(". . . interested parties may seek to 'avoid any transfer' made within two years of any

bankruptcy filing by a debtor who 'receives less than a reasonably equivalent value in exchange

for such transfer' and 'became insolvent as a result of it.' 11 U.S.C. § 548(a)"). In situation (b),

Debtor's financial condition has not changed, and therefore, is not in financial distress. In either

case, Debtor's bankruptcy petition is subject to dismissal for lack of good faith. Therefore,

Debtor cannot show reasonably probability of success on the merits, and accordingly, Debtor's

request for a preliminary injunction must be denied.

**II.    The Debtor Has Not Established That Any Extension of the Stay Under Section 362(a) to Non-Debtors is Warranted.**

**A.    Section 362(a) Was Enacted to Give a Reprieve to the Debtor**

41.    Section 362(a) of the Bankruptcy Code provides in pertinent part:

> [A] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—
>> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\*\*\*

> (3) any act to obtain possession of property of the estate or of property
> from the estate or to exercise control over property of the estate . . . .

11 U.S.C. § 362(a)(1), (3).

42.    The legislative history underlying Congress's enactment of an "automatic stay"

upon a debtor's bankruptcy filing is well known and oft observed. Congress created the stay as

"'one of the fundamental debtor protections provided by the bankruptcy laws,' designed to

relieve 'the financial pressures that drove [debtors] into bankruptcy.'" *Eastern Refractories Co.*

*v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998) (quoting H.R. Rep. No. 95–595,

at 340 (1977)). As the Third Circuit Court of Appeals has observed:

> The automatic stay imposed by the Bankruptcy Code has a 'twofold' purpose:(1)
> to protect the debtor, by stopping all collection efforts, harassment, and
> foreclosure actions, thereby giving the debtor a respite from creditors and a
> chance 'to attempt a repayment or reorganization plan or simply be relieved of
> thefinancial pressures that drove him [or her] into bankruptcy;' and (2) to
> protect'creditors by preventing particular creditors from acting unilaterally in self-
> interest to obtain payment from a debtor to the detriment of other creditors.'

*In re Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019) (first quoting *Constitution Bank v.*

*Tubbs*, 68 F.3d 685, 691 (3d Cir. 1995); and then quoting *Maritime Elec. Co. v. United Jersey*

*Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991)).

43.    In other words, "[t]he stay gives a debtor a breathing spell from creditors by

stopping all collection efforts and all foreclosure actions." *McCartney v. Integra Nat. Bank N.*,

106 F.3d 506, 509-510 (3d Cir. 1997). (citing *Maritime Elec. Co.*, 959 F.2d at 1204 ).[2]

Additionally, it "serves the debtor's interests by protecting the estate from dismemberment,"

---

[2] See also *In re Johns-Manville Corp.*, 26 B.R. 405, 410 (Bankr. S.D.N.Y. 1983) ("[T]he automatic stay is designed
. . . 'to prevent the dissipation or diminution of the bankrupt's assets during the pendency of' [the bankruptcy
proceeding] . . . . 'Without it, certain creditors would be able to pursue their own remedies against the debtor's
property.'" (quoting *Paden v. Union for Experimenting Colleges and Universities*, 7 B.R. 289 (N.D. Ill. 1980); H.R.
Rep. No. 95-595, pp. 5787, 6297) (emphasis original)).

while "benefit[ting] creditors as a group by preventing individual creditors from pursuing their

own interests to the detriment of the others." *City of Chicago v. Fulton*, 141 S. Ct. 585, 589

(2021).[3]

44.    Given its purpose, courts universally acknowledge that "the stay is a shield, not a

sword." *In re Scarborough-St. James Corp.*, 535 B.R. 60, 67, 70 (Bankr. D. Del. 2015) (noting,

that "the stay is a shield, not a sword that should help the debtor deal with his bankruptcy for the

benefit of himself and his creditors," and concluding that a debtor's use of the automatic stay to

gain a litigation advantage justified lifting the automatic stay afforded by § 362(a)); *In re

Briarpatch Film Corp.*, 281 B.R. 820, 834 (Bankr. S.D.N.Y. 2002) ("It has often been stated that

the automatic stay is a shield, not a sword.").

45.    Because the automatic stay's protections are so broad, its applications are

expressly limited. On its face, the stay applies automatically only to the debtor and the debtor's

property. "Although the scope of the automatic stay is broad, the clear language of section

362(a)[1] stays actions only against a 'debtor.'" *McCartney*, 106 F.3d at 509–10 (quoting

*Maritime Elec. Co.*, 959 F.2d at 1204). "As a consequence, '[i]t is universally acknowledged that

an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as

sureties, guarantors, co- obligors, or others with a similar legal or factual nexus to the . . .

debtor.'" *Id.* (quotations and citations omitted)).[4] Similarly, by its plain words, § 362(a)(3)

---

[3] See also, e.g., *Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982) (noting that stay is intended to "prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.").

[4] See also *Maritime Elect. Co.*, 959 F.2d at 1205 ("[T]he automatic stay is not available to non-bankrupt co-defendants of a debtor even if they are in a similar legal or factual nexus with the debtor."); *Jackson v. Trump Ent. Resorts, Inc.*, No. CV 13-1605 (JHR/JS), 2015 WL 13637411, at *2 (D.N.J. Feb. 11, 2015) ("Section 362(a)(1) only stays actions against the debtor and may not be invoked by solvent codefendants, even if they are in a similar legal or factual nexus with the debtor." (citing *Travelodge Hotels, Inc. v. Patel*, C.A. No. 13-03719 (WHW), 2013 WL 4537906, at *5 (D.N.J. Aug. 27, 2013))).

protects only property in which a "debtor" had an interest as of the commencement of the

bankruptcy case — whether the debtor's property was in the possession of the debtor or a third

party. See 11 U.S.C. § 362(a)(3) (protecting estate property); § 541(a)(1) (defining estate

property to include all pre-petition interests of the debtor "wherever located and by whomever

held"); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.), cert. denied, 479 U.S. 876

(1986) ("Subsection (a)(3) directs stays of any action, whether against the debtor or third-parties,

to obtain possession or to exercise control over property of the debtor.").

**B.     The Stay Should Not Be Extended Here Under § 362(a)(1)**

**1.     Standards for extending the stay.**

46.     Courts have extended the reach of the statute's stay to non-debtor parties in

limited circumstances, where doing so would effectuate the language and purpose of § 362(a) —

namely, to protect the debtor and its assets from creditors while it attempts to reorganize. *See,*

*e.g., In re Uni-Marts, LLC*, 399 B.R. 400, 416 (Bankr. D. Del. 2009) ("The broader rule here is

that a debtor's stay may extend to a non-debtor only when necessary to protect the debtor's

reorganization.") (quoting *Gray v. Hirsch*, 230 B.R. 239, 243 (S.D.N.Y.1999)). The seminal case

in that regard is *Robins*, in which the Fourth Circuit Court of Appeals held that the stay may be

extended to non- debtors in "unusual circumstances" where failing to do so would "defeat" the

stay's "very purpose and intent." 788 F.2d at 999. The Fourth Circuit elaborated: "This 'unusual'

situation, it would seem, arises when there is such identity between the debtor and the third-party

defendant that the debtor may be said to be the real party defendant and that a judgment against

the third-party defendant will in effect be a judgment or finding against the debtor." *Id*. As an

example of such a "situation," the court cited "a suit against a third-party who is entitled to

absolute indemnity by the debtor on account of any judgment that might result against them in

the case." *Id*. As the court explained, actions against such non-debtors "are so intimately

intertwined with those of the debtor that the latter may be said to be the real party in interest." *Id*.
at 1001.

47.     The Third Circuit Court of Appeals has adopted *Robins*' "identity of interest"
rationale for extending § 362(a)(1)'s stay to non-debtors. See, e.g., *McCartney*, 106 F.3d at 509
("[C]ourts have found 'unusual circumstances' where 'there is such identity between the debtor
and the third-party defendant that the debtor may be said to be the real party defendant . . . .'"
(quoting *Robins*, 788 F.2d at 999)). Thus, in determining whether to extend the stay afforded by
§ 362(a)(1), the Third Circuit and other courts look to whether the action against the non-debtor
will either (i) have a substantial and immediate economic impact on a debtor's property or estate,
or (ii) adversely affect the debtor's management. See *Uni-Marts, LLC*, 399 B.R. at 416 ("The
threatened harm may be to needed debtor funds (e.g., when non-debtors are entitled to
indemnification) or personnel (e.g., when debtor needs the services of non-debtors facing
crushing litigation)."); *see also Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287–88 (2d. Cir.
2003) (asking whether the action to be stayed will have an "immediate adverse economic
consequence for the debtor's estate").

48.     The "unusual circumstances" exception is intended to be narrow, and is reserved
only for "extreme" circumstances. See, e.g., *In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004
WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004) ("Although the automatic stay can be extended
to situations involving nondebtors, courts are careful to reserve such power to the most extreme
and 'unusual circumstances.'"); *In re Aldan Indus., Inc.*, No. 00-10360DWS, 2000 WL 357719,
at *4 (Bankr. E.D. Pa. Apr. 3, 2000) (referring to Robins "as a narrow exception to the
prohibition against extending the protection of the automatic stay"). To extend the stay otherwise
would present great risk to the rights of the non-debtor's creditors. *See, e.g., Bradberry v.*

*Carrier Corp.*, 86 So. 3d 973, 983 (Ala. 2011) ("Extending the stay to protect solvent co-defendants would not advance either of the purposes underlying the automatic stay.").

49.    Contrary to the Debtor's position that the application of § 362(a)(1) applies "of its own force," without the need for any "extension", courts within and outside of this Circuit, in light of §362(a)(1)'s plain words, have justified the application of the stay to non-debtors as an exercise of the Court's equitable powers granted under § 105(a). *See, e.g., Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993) ("Even if we were to adopt the unusual circumstances test, the bankruptcy court would first need to extend the automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105."); *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65–66 (2d Cir. 1986) (construing stay extension as an exercise of § 105 authority, and stating that it "cannot extend to efforts made in bad faith by non-bankrupt co-defendants in order to escape from . . . liability").

50.    As such, the relief sought by the Debtor here should be committed to the discretion of the Court, to be exercised only upon a clear and convincing showing of an "extraordinary set of circumstances." *Millard*, 266 B.R. at 44 ("Extension of the Automatic Stay to non-bankrupt defendants is a matter of discretion"); see *In re FPSDA I, LLC*, No. 10-75439, 2012 WL 6681794, at *8 (Bankr. E.D.N.Y. Dec. 21, 2012), as corrected (Dec. 26, 2012) ("[E]xtensions of the stay to protect non-debtor parties are the exception, not the rule, and are generally not favored. Thus, the movant must show by 'clear and convincing evidence' that extension of the stay is warranted.") (citing Millard., 266 B.R. 42)); *In re Univ. Med. Ctr.*, 82 B.R. 754, 757 (Bankr. E.D. Pa. 1988) (noting that "invocation of § 105(a) must be reserved for a truly 'extraordinary set of circumstances'"). As set forth below, the Debtor has not come close to meeting this burden.

**2.    This Court lacks jurisdiction to enjoin Movant's claims against Non-Debtors under section 105.**

51.    Section 105 authorizes bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). But it "does not provide an independent source of federal subject matter jurisdiction." *Combustion Eng'g*, 391 F.3d at 224-25. The first question, then, is whether this Court has jurisdiction to enjoin claims against non-debtors.

52.    Under the Third Circuit's precedents, this Court does not. Congress has granted bankruptcy courts jurisdiction over only two kinds of proceedings: (1) core proceedings and (2) proceedings "related to" core proceedings. 28 U.S.C. § 1334(b); *id.* § 157(a). The enjoined claims against non-debtors are neither.

53.    Debtor contends that "jurisdiction over the adversary proceeding in [a] Chapter 11 case is sufficient to provide [the Court] with a basis for expanding the § 105(a) injunction." *W.R. Grace*, 591 F.3d at 174.The Third Circuit rejected that argument in *W.R. Grace*. The question isn't whether the adversary proceeding is a core proceeding, but whether the claims sought to be enjoined are core proceedings. *Id.* Otherwise, "a bankruptcy court would have power to enjoin any action, no matter how unrelated to the underlying bankruptcy it may be, so long as the injunction motion was filed in the adversary proceeding." *Id.* "The existence of a bankruptcy proceeding itself," however, is not "an all-purpose grant of jurisdiction." *id.*; *see Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006).

54.    That leaves related-to jurisdiction, which encompasses "suits between third parties" only if they "have an effect on the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995). Simply put: "bankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor." *Id.* at 308 n.6.

55.    Talc claims against non-debtors for their own liability do not affect Debtor's

estate. Although Debtor points to J&J's agreement to indemnify a previous subsidiary, the

agreement covers only liabilities "on the books or records of Johnson & Johnson" in 1979—not

future liabilities. That is the only interpretation that gives this language meaning. See *Wash.*

*Constr. Co. v. Spinella*, 8 N.J. 212, 217-18 (1951). And even if it were ambiguous, ambiguity is

construed against indemnification. Thus, Debtor has no legal obligation to indemnify J&J. Its

attempt to concede an obligation it does not have is further evidence of bad faith.

56.    As for the hundreds of other non-debtors, Debtor didn't even try to show that an

agreement exists as to each of them. So it has not overcome the "presum[ption] that federal

courts lack jurisdiction unless the contrary appears affirmatively from the record."

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).

57.    Even if it were plausible that Debtor might have indemnity obligations to non-

debtors, jurisdiction would still be lacking. This Court has "rejected 'related to' jurisdiction over

third-party claims involving asbestos or asbestos-containing products supplied by the debtor

when the third-party claim did not directly result in liability for the debtor." *Combustion Eng'g*,

391 F.3d at 231; *see W.R. Grace*, 591 F.3d at 171-73. It has done so even when non-debtors

might later have indemnity claims against the debtor. *Id*. Whenever hypothetical

"indemnification claims against" the debtor "would require the intervention of another lawsuit to

affect the bankruptcy estate," the claims "cannot provide a basis for 'related to' jurisdiction"

because their resolution, by itself, does not affect the estate. *Combustion Eng'g*, 391 F.3d at 232.

As a result, the Third Circuit's "precedent dictates that a bankruptcy court lacks subject matter

jurisdiction over a third-party action if the only way in which that third-party action could have

an impact on the debtor's estate is through the intervention of yet another lawsuit." *W.R. Grace*, 591 F.3d at 173.

58.    This precedent controls here. The enjoined actions seek to hold non-debtors liable as joint tortfeasors, so any judgment wouldn't bind Debtor. Those actions might later give rise to an indemnification claim asserted against Debtor by the non-debtor for any judgment it paid, but that possibility isn't enough under the Third Circuit.

59.    Moreover, contingent indemnification claims are disallowed in bankruptcy, so they cannot affect the estate. 11 U.S.C. § 502(e)(1)(B). And even if a non-debtors were eventually to pay a judgment, it would still have no effect on the estate. In that scenario, the non-debtor would have a right to take over the plaintiff's separate claim against Debtor via subrogation. *Id.* § 509(a). But swapping one claimant for another has no effect on the estate, much less a "direct and substantial adverse effect." *Celotex*, 514 U.S. at 310; see Levitin, Bankruptcy Markets: Making Sense of Bankruptcy Claims Trading, 4 Brook. J. Corp. Fin. & Com. L. 64, 74 (2010) (discussing market for claims trading).

### 3.    Denying extension of the stay would have no impact on the Debtor's estate.

60.    Jurisdiction aside, an extension of the stay is improper. Before a court may grant a preliminary injunction under section 105, it must assure itself that the debtor has established, "by a clear showing," *Holland v. Rosen*, 895 F.3d 272, 285 (3d Cir. 2018), a right to this "extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Debtor bears the burden of showing that the extension of the stay to non-debtors would have actual and substantial consequences to the Debtor's estate. See *FPSDA I*, 2012 WL 6681794, at *8 ("It is not enough for the movant to show some limited risk, or that there is a theoretical threat to the reorganization, because it is always the case that a lawsuit against principals of the Debtor

could have some effect on the reorganization. Rather, and in keeping with the principle that

extending the stay to non-debtors is extraordinary relief, the party seeking extension of the stay

must put forth real evidence demonstrating an actual impact upon, or threat to, the reorganization

efforts if the stay is not extended.").[5] Here, significantly, Debtor has shown no competent

evidence of an indemnification agreement between Debtor and Non-Debtors.

61.     Even if Debtor did have competent evidence, case law makes clear that the

existence of an indemnification from the debtor to a non- debtor (the Debtor's principal

argument for extending the stay under § 362(a)(1)) is an insufficient ground for extension of the

automatic stay. Rather, for the stay to apply, the debtor has the burden to show that the

indemnification obligation threatens the debtor's assets or reorganization. See, e.g., *Uni-Marts*,

399 B.R. at 416 (concluding that indemnification obligation did not constitute "unusual

circumstances" where it did not threaten reorganization); *Millard*, 266 B.R. at 45 ("Ultimately,

the decisive issue is consideration of the same policy underlying the Automatic Stay — whether

extension of the stay is necessary to foster the reorganization process."); *All Seasons Resorts*, 79

B.R. at 904 ("Although there is a closeness between debtor and co-defendants by reason of their

officer and agent status and their right to indemnification . . . the magnitude of the harm to debtor

if no stay is in force does not approach the scope of the potential injuries besetting the debtors in

Robins").

62.     Debtor cannot meet its burden. The previous and new Funding Agreements place

any potential liability from Non-Debtors onto the shoulders of J&J. Per Debtor's contention, this

---

[5] See also *In re First Cent. Fin. Corp.*, 238 B.R. 9, 19 (Bankr. E.D.N.Y. 1999) (concluding that, absent "massive depletion of estate assets" and distraction to management, no basis to extend the stay existed); *Official Unsecured Creditors Committee of Phar-Mor, Inc. v. Bowen, et al.* (*In re Phar-Mor, Inc. Sec. Litig.*), 164 B.R. 903, 906 (W.D. Pa. 1994) (declining to extend the stay where the action would not will not "materially affect or diminish the Debtor's claims.").

means that Debtor's estate would be unaffected by any judgment against Non-Debtors—only J&J and Holdco would be affected. If the contrast were true, then Debtor's estate would include the value of J&J—and, therefore, by the Third Circuit's recent opinion, Debtor would not be in financial distress. By Debtor's own argument, either Non-Debtors are not entitled to the benefits of the stay or this bankruptcy must be dismissed.

63.    J&J cannot have it both ways. Either the Funding Agreement is what they claim it is, and such indemnification obligations merely round-trip by virtue of the Funding Agreement. Or it is not, and such indemnification obligations instead round-trip by virtue of the avoidance of the fraudulent transfers at the heart of the Texas Two-Step and the creation of the Debtor. In either case, there is no ultimate harm to the Debtor's estate, and an extension of the stay to J&J and the "Protected Parties" would serve no purpose other than to frustrate non-debtors' legitimate claims. See *Bradberry*, 86 So. 3d at 983 ("It would make no sense to extend the automatic stay protections to solvent co-defendants. They don't need it, and at the same time it would work a hardship on plaintiffs, by giving an unwarranted immunity from suit to solvent co-defendants." (citations and quotations omitted)). For this reason, too, the Debtor's request to apply to J&J and hundreds of its affiliates, insurers and retailers should be rejected.

### 4.    The stay cannot be extended to joint tortfeasors with direct liability to Claimant.

64.    As courts often observe, "the Code was not intended to stay actions . . . where the nondebtor's liability rests upon his own breach of duty" or to "trample the rights of the Creditor-Defendants to assert their independent and distinct claims against a non-bankrupt third party." *Phar-Mor, Inc. v. Gen. Elec. Capital Corp. (In re Phar-Mor, Inc. Sec. Litig.)*, 166 B.R. 57, 62 (W.D. Pa. 1994); accord *Combustion Eng'g*, 391 F.3d at 234 (holding injunctive relief could not extend to "independent non-derivative claims against non-debtor third parties," because it

"would improperly extend bankruptcy relief to non-debtors" and "would jeopardize the interests of future . . . claimants" against the non-debtors); *see Stanford v. Foamex L.P.*, 2009 WL 1033607, *2 (E.D. Pa. Apr. 15, 2009) (concluding "unusual circumstances" did not permit automatic stay to extend to non-debtor entities because "plaintiff in this action alleges that each of the non-bankrupt defendants is independently liable").

65.    Thus, it is settled law that "joint tortfeasors" are not entitled to the benefit of the automatic stay upon a co-defendant's bankruptcy filing. *Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124, 127-28 (4th Cir. 1983); Robins, 788 F.2d at 999 (opining, in cases where a separate party, even a co-defendant with a debtor in pending litigation, is "independently liable as, for example, where the debtor and another are joint tortfeasors or where the nondebtor's liability rests upon his own breach of duty . . . the automatic stay would clearly not extend to such non debtor"); *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983) (upholding denial of a stay to co-defendants after the Johns-Manville defendants filed for bankruptcy, explaining that the suits could proceed because "the Chapter 11 debtors are potential joint tortfeasors").

66.    Indeed, given the harms to alleged victims claiming tort injury are especially high, the grant of any to a joint tortfeasor must exceed a high bar. As stated by the Third Circuit in the Johns- Manville case:

> "the clear damage to the plaintiffs is the hardship of being forced to wait for an indefinite and, if recent experience is any guide, a lengthy time before their causes are heard. Moreover, we cannot ignore the fact that plaintiffs and crucial witnesses are dying, often from the very diseases that have led to these actions. We are not persuaded that the hardship imposed on defendants by proceeding totrial without Johns-Manville or our legitimate interest in judicial economy is sufficient to force these plaintiffs to forbear until the bankrupt defendants emerge from the reorganization proceedings. The defendants may be seriously inconvenienced by the resumption of the actions against them; under the standard

announced in *Landis*, however, the balance of hardship weighs in favor of the injured plaintiffs."

*Johns-Manville Sales Corp.*, 723 F.2d at 1076; see also *Austin v. Unarco Industries, Inc.*, 705 F.2d 1, 5 (1st Cir. 1983) (denying discretionary stay because plaintiffs and crucial witnesses are dying and "the damage to the plaintiff would be the financial hardship of being forced to wait for an undefined but potentially lengthy period before receiving the money to which she may be entitled"); *Williford*, 715 F.2d at 127-28 (holding, in denying extension of stay, that "[o]f particular significance in balancing the competing interests of the parties in the case at bar are the human aspects of the needs of a plaintiff in declining health as opposed to the practical problems imposed by the proceedings in bankruptcy, which very well could be pending for a long period of time. A stay under such circumstances would work manifest injustice to the claimant."); *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983) (determining discretionary stay was properly denied because "the requisite balancing of the competing interests involved in these cases weighs in favor of allowing the remaining actions to proceed. The realities of the hardship of a stay on the plaintiffs, many of whom allege that they are dying from asbestosis, is substantial and, in some instances, permanent. The grim reaper has called while judgment waits.").

     67.    Here, the record overwhelmingly establishes that the claims in the MDL and thousands of state court actions against J&J that are pending, or have been tried to judgment, are based on J&J's conduct and are, thus, direct. Indeed, as set forth above, juries have been required to, and have, found J&J liable for talcum powder product liability claims, separately and independently from Debtor, formerly known as Johnson & Johnson Consumer Inc.. No appellate court has reversed a judgment against J&J on the grounds that, as a matter of law, it does, or did, not have a legal duty to the plaintiff. To the contrary, in affirming, in substantial part, one of the

largest personal injury awards in history, the appellate court in *Ingham* found J&J liable to the

plaintiffs based on the evidence in the record, rejecting any notion that J&J's liability was based

on derivative principles of alter ego or agency. Hence, even if the Debtor were the valid

successor to Old JJCI, J&J is nothing more than a mere joint tortfeasor that, given the

devastating impact of a stay on those suing it for personal injuries, absent clearly and

convincingly proven "unusual circumstances" (not shown here), is not entitled to application of

the Debtor's stay.

**5.      Debtor fails to establish entitlement to enjoin third-party litigation.**

68.      Section 105 empowers bankruptcy courts to issue orders where "necessary to

preserve an identifiable right conferred elsewhere in the Bankruptcy Code." *In re Jamo*, 283 F.3d

392, 403 (1st Cir. 2002). The power asserted here is especially sweeping. The Anti-Injunction

Act requires clear congressional authorization before a federal court may enjoin state-court

proceedings, 22 U.S.C. § 2283, and there is reason to doubt that section 105 authorizes

bankruptcy judges to enjoin any courts. At a minimum, these principles require that Debtor make

a particularly strong showing that the injunction is "necessary." 11 U.S.C. § 105(a). "Any doubts

as to the propriety of a federal injunction against state court proceedings should be resolved in

favor of permitting the state courts to proceed." *Smith v. Bayer Corp.*, 564 U.S. 299, 306 (2011).

69.      Debtor comes nowhere close to making the required showing. It does not

establish any of the traditional equitable factors—let alone all of them, as the Third Circuit

requires. See *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).

70.      The onus is on Debtor to show a likelihood of success on the merits, which in this

context means a successful reorganization. But if anything, Debtor does the opposite: It concedes

that the success of the bankruptcy hinges on a global resolution that is impermissible under the

Third Circuit's cases and is incompatible with basic constitutional principles.

71.     Nor does Debtor show that the balance of equities supports an injunction.

*Holland*, 895 F.3d at 285. Many talc claimants, and especially mesothelioma claimants, have

little time left to live. Freezing their claims against non-debtors will undeniably cause them

irreparable harm and likely strip them of their constitutional rights to jury trials and due process.

72.     In addition, as discussed above, Debtor has not even articulated how the talc

litigation against non-debtors for their own independent liability would be likely to cause

irreparable harm to the estate.

73.     Nor can any such injunction benefit the public. There is nothing about J&J's

strategy that cannot be replicated by other deep-pocketed tortfeasors. And "[o]nce the floodgates

are opened," "debtors . . . can be expected to make every case that 'rare case.'" *Czyzewski*, 137

S. Ct. at 986. This Court cannot allow this to happen.

## **CONCLUSION**

74. For the reasons and based on the authorities set forth above, Claimant respectfully

requests that this Court deny Debtor's motion to extend the preliminary injunction, and permit

her to fully prosecute her wrongful death action in State Court, including Trial, and for such

other relief to which Claimant is entitled.

Respectfully submitted:

KAZAN, McCLAIN, SATTERLEY &
GREENWOOD, A Professional Law Corporation

- and -

SAIBER LLC
*Counsel for Movant Kristie Lynn Doyle*

By:     /s/ John M. August
            JOHN M. AUGUST

DATED:  April __, 2023