# Exhibit 1

Fax Server          7/8/2020 9:14:08 AM  PAGE    1/001    Fax Server

Case 23-01092-MBK   Doc 46-2   Filed 04/17/23   Entered 04/17/23 15:40:58   Desc
Exhibit Exhibits 1-8 to Satterley Declaration   Page 2 of 179

7/6/2020 10:29:31 AM    Paula Katayanagi    Kazan, McClain et al    Page 8

Joseph D. Satterley, Esq. (C.S.B. #286890)
jsatterley@kazanlaw.com
Michael T. Stewart, Esq. (C.S.B. #253851)
mstewart@kazanlaw.com
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, California 94607
Telephone: (510) 302-1000
Facsimile: (510) 835-4913

Attorneys for Plaintiff

FILED BY FAX
ALAMEDA COUNTY
July 06, 2020
CLERK OF
THE SUPERIOR COURT
By Gina Fu, Deputy
CASE NUMBER:
RG20066950

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA

| | |
|---|---|
| SUSAN S. BARKLEY,<br><br>Plaintiff,<br><br>vs.<br><br>JOHNSON & JOHNSON;<br><br>JOHNSON & JOHNSON CONSUMER INC., individually and as successor-in-interest to JOHNSON & JOHNSON CONSUMER COMPANIES, INC.;<br><br>BRENNTAG NORTH AMERICA, INC., individually and, as alter-ego of, and as successor-in-interest to MINERAL AND PIGMENT SOLUTIONS, INC. and WHITTAKER, CLARK & DANIELS, INC.;<br><br>BRENNTAG SPECIALTIES, INC. (formerly known as MINERAL AND PIGMENT SOLUTIONS, INC.), individually, as alter-ego of, and as successor-in-interest to WHITTAKER, CLARK & DANIELS, INC.;<br><br>BRISTOL-MYERS SQUIBB COMPANY, individually, as alter-ego of, and as successor-in-interest to CHARLES OF THE RITZ;<br><br>COLGATE-PALMOLIVE COMPANY;<br><br>CYPRUS MINES CORPORATION; | Case No.<br><br>**COMPLAINT FOR PERSONAL INJURIES**<br><br>**DEMAND FOR JURY TRIAL** |

*Kazan, McClain, Satterley & Greenwood*
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

LONGS DRUG STORES CALIFORNIA,
L.L.C., individually, as alter-ego of, and as
successor-in-interest to LONGS DRUG
STORES CALIFORNIA, INC.;

REVLON CONSUMER PRODUCTS
CORPORATION;

SAFEWAY INC., individually, as alter-ego of,
and as successor-in-interest to THE VONS
COMPANIES, INC.;

THE VONS COMPANIES, INC.;

WHITTAKER, CLARK & DANIELS, INC.;
and

FIRST DOE through ONE HUNDREDTH
DOE,

Defendants.

**GENERAL BACKGROUND**

**I.**

**The Plaintiff**: Susan S. Barkley is the Plaintiff. Her malignant mesothelioma was caused by her cumulative lifetime dose of asbestos, asbestiform fibers, and asbestiform talc – collectively referred to herein as asbestos – including the asbestos exposures for which Defendants bear responsibility. She lives in California.

**II.**

**The Defendants**: All Defendants are listed in the case caption. The true names of the Defendants sued as DOE's are unknown to Plaintiff. Each Defendant was the agent, employee, or joint venturer of its co-defendants, and was acting in the full course and scope of the agency, employment, or joint venture.

**III.**

**Alternate Entities**: All Defendants are individually liable for their own defective products and wrongful conduct; and some Defendants are liable for the defective products and wrongful conduct of their alternate entities. Each such Defendant is liable for the torts of each of its alternate entities because:

2

- there were express or implied agreements between the companies to transfer and assume the liabilities;

- the transactions between the companies amounted to a consolidation or merger;

- the purchasing company is a mere continuation of the seller;

- the transfer of assets to the purchasing company was for the fraudulent purpose of escaping liability for the seller's debts;

- strict products liability was transferred because (1) there was a virtual destruction of Plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor has the ability to assume the original manufacturer's risk-spreading role, and (3) it is fair to require the successor to assume responsibility for defective products that was a burden necessarily attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business; and

- the companies are alter egos because (1) there is such a unity of interest, ownership, and business operations between the companies that their separate personalities do not in reality exist, and (2) there would be an inequitable result if the torts in question were treated as those of one company alone.

The identities of the Defendants and their alternate entities are as follows:

| Defendant | Alternate Entities |
|---|---|
| JOHNSON & JOHNSON CONSUMER INC. | JOHNSON & JOHNSON CONSUMER COMPANIES, INC. |
| BRENNTAG NORTH AMERICA, INC. | MINERAL AND PIGMENT SOLUTIONS, INC. and WHITTAKER, CLARK & DANIELS, INC. |
| BRENNTAG SPECIALTIES, INC. (formerly known as MINERAL AND PIGMENT SOLUTIONS, INC.) | WHITTAKER, CLARK & DANIELS, INC. |
| BRISTOL-MYERS SQUIBB COMPANY | CHARLES OF THE RITZ |
| LONGS DRUG STORES CALIFORNIA, L.L.C. | LONGS DRUG STORES CALIFORNIA, INC. |
| SAFEWAY INC. | THE VONS COMPANIES, INC. |

**IV**.

**Venue**: Venue is proper in Alameda County because certain Defendants reside in Alameda County.

**V**.

**The Asbestos Exposures**: Plaintiff was exposed – mainly in California – to significant elevated levels of hazardous asbestos dust that was released from Defendants' cosmetic talc powder products.  Plaintiff was exposed to asbestos in California because of all Defendants'

*Kazan, McClain, Satterley & Greenwood*
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

3

products that were sold in California, and because of all Defendants' related conduct that occurred in California.  At all times, Defendants purposefully availed themselves of California, through marketing and sales of their relevant asbestos-containing products, and through their other related conduct.  Additionally, Defendants are "at home" in California, because California is one of their largest, if not the largest, markets in the United States.  Plaintiff had numerous exposures to asbestos, including:

| Brand | Location and Time Period | Manner of Use |
|-------|--------------------------|---------------|
| Johnson's Baby Powder | Pennsylvania, Massachusetts, and New Jersey (early 1970's through mid-1970's); and California (mid-1970's through mid-1990's) | Plaintiff used Defendants' cosmetic talc powder products on a daily basis, after her showers and baths |
| Cashmere Bouquet | Same as above | Same as above |
| Jean Naté | Same as above | Same as above |

## VI.

**The Harm**: Plaintiff has malignant mesothelioma caused by her exposures to asbestos. The mesothelioma has caused, and will cause, Plaintiff to experience financial harm.  The mesothelioma also has caused, and will cause, Plaintiff to experience physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, emotional distress, and other similar harm.  And the mesothelioma will cause Plaintiff's untimely death.

Plaintiff relies upon the liability theories described below.

## VII.

**State-of-the-Art Knowledge of Asbestos Hazards**: The following facts are illustrative, but not exhaustive, of the evolution of the knowledge of the health hazards of asbestos and what was known and knowable to Defendants:

1. Health hazards from asbestos exposure were identified in the 1890's. During this time, the Lady Inspector of Factories in Great Britain noted that individuals working with asbestos were suffering various lung injuries.

2. Defendants since the early 1900's possessed medical and scientific data that raised concerns regarding the presence of asbestos in talcum powder and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products. Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth. Talc is used in

*Kazan, McClain, Satterley & Greenwood*
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

the manufacture of goods such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in consumer powder products, talc is known as "talcum powder."

3. Geologists and mining companies, including Defendants, have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite, and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800's in the United States, note the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

4. As early as the 1920's, the term "asbestosis" was used to describe pulmonary fibrosis caused by asbestos exposure. Case reports in Great Britain and the United States detailed asbestosis in various workers.

5. By 1929, lawsuits for disability related to exposure to asbestos were filed against Johns Manville.

6. In the late 1930's, case reports were published addressing the relationship between asbestos and cancer.

7. Several reports, studies, and guidelines published as early as the 1930's, including California's Dust, Fumes, Vapors, and Gases Safety Orders, all recognized that asbestos is a dust which creates health hazards, and that certain precautions are required to mitigate human exposure to dust. Such measures include, but are not limited to, using water to suppress the dust at its source, as well as providing those who might be exposed to dust with adequate ventilation, showers, and changing facilities. These same measures that were recommended to protect workers from asbestosis in the 1930's would also have substantially reduced the risk that bystanders, household members, and other persons would contract mesothelioma from inhaling asbestos-containing dust that those who worked with and around asbestos and asbestos-containing products carried into their households on their person and personal effects. Defendants, and each of them, knew or should have known that anyone, including household members of those who used asbestos-containing products were at risk of developing an asbestos-related disease after inhaling dust from such asbestos-containing products.

8. In 1931, the United Kingdom allowed workers to receive compensation for asbestosis.

9. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc, and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated, "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."

10. As early as 1934, the National Safety Council was publishing information

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium."

11.     In the September 1935 issue of National Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

12.     In 1936, California's Division of Industrial Safety issued Safety Orders establishing the standard of care for work with asbestos.

13.     Also in 1936, Illinois enacted legislation recognizing asbestosis as a compensable occupational disease under its Occupational Disease Act.

14.     By the 1940's, asbestos carcinogenicity was noted in reviews in fields of industrial medicine, cancer research, and pneumoconiosis.

15.     In 1946, the American Conference of Governmental Industrial Hygienists established a maximum allowable concentration for occupational exposure.

16.     During the 1940's and 1950's, asbestos hazards were discussed in popular magazines, including Scientific American (January 1949) and Newsweek (May 15, 1950), as well as the Encyclopedia Britannica (1952). On April 7, 1959, the Los Angeles Times and Wall Street Journal reported that California health officials did additional research linking asbestos with cancer. Following a number of subsequent reports in the New York Times, Paul Brodeur published a series of articles in the New Yorker.

17.     In addition, beginning in the 1940's and 1950's, it was recognized that individuals who worked with asbestos materials, as well as those who did not work directly with asbestos products but only had relatively brief or intermittent exposures to asbestos products, could develop fatal asbestos diseases.

18.     In 1955, Richard Doll published a study linking asbestos to lung cancer.

19.     In 1960, Chris Wagner published a study linking asbestos to mesothelioma.

20.     DEFENDANT JOHNSON & JOHNSON started selling its Baby Powder in the late 1800's. As the parent company, JOHNSON & JOHNSON made Baby Powder until 1978, when a new subsidiary corporation, now known as JOHNSON & JOHNSON CONSUMER INC., was formed. Both J&J Defendants shared with each other all of their health-and-safety information about the talc products. Throughout this Complaint, DEFENDANTS JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. are collectively referred to as "J&J."

21.     In the 1950's and 1960's, J&J contracted with the Battelle Laboratory in

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Ohio to examine its talc for the presence of dangerous minerals. Battelle reported back to J&J and William Ashton, a J&J managerial employee, that J&J's talc had tremolite, fibrous tremolite, and fibrous talc. J&J thus had knowledge for many decades that J&J's talc was dangerous to breathe.

22. In the early 1960's, Dr. Irving Selikoff engaged in studies of groups of asbestos workers. By 1965, he had conducted various studies, published several articles, conducted special scientific symposia, been interviewed by the New York Times, and organized the international conference on the "Biological Effects of Asbestos" under the auspices of the renowned New York Academy of Sciences. The results of these presentations were published in Volume 132 of the Annals of the New York Academy of Sciences published in 1965.

23. In 1966, J&J knew of published medical and scientific articles that warned it that breathing talc could lead to asphyxiation and death in infants. J&J knew that this information could hurt its baby products franchise and chose not to warn about the dangers of breathing talc for many decades.

24. In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a...fiber content...averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits...Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).]

25. In 1969, product-liability lawsuits were brought against asbestos manufacturers. Also, under the Walsh Healy Act, federal contractors with contracts of more than $10,000 were required to adhere to a workplace standard of no more than 12 fibers per cubic centimeter of air.

26. In April 1969, J&J medical doctor, Dr. Timothy Thompson, wrote that J&J should consult the law department for potential litigation arising out of breathing tremolite. This J&J medical doctor specifically discussed the risk of cancer and other diseases from inhalation of needle-like tremolite.

27. In the 1970's, J&J knew of the risk of ovarian cancer and never warned regarding any type of cancer. Ovarian cancer occurs via inhalation and translocation of the asbestiform minerals in the body. J&J failed to warn of all Cancer risks, including mesothelioma.

28. In the early 1970's, J&J submitted false information to the FDA claiming J&J's products did not have asbestos in them when J&J had internal documents demonstrating its submission was false. J&J and other companies jointly convinced the FDA to not regulate the issues of asbestos in talc. The FDA allowed the talc industry to self-regulate regarding the health impact of breathing talc.

29. J&J claims to have had a facility since the early 1970's to retain samples of each batch of its talc for future analysis. J&J has destroyed those samples and all underlying testing data including photographs, Transmission

Complaint for Personal Injuries; Demand for Jury Trial

Electron Microscopy grids, Energy Dispersive X-ray Spectroscopy grids, and Selected Area (Electron) Diffraction grids.

30.    In the 1970's, J&J worked jointly with other companies, including members of the Cosmetic, Toiletry & Fragrance Association ("CTFA"), to adopt a testing method that would not find the asbestos in their talc. That method, known as the J4-1, was adopted by the industry in 1976.

31.    In the 1970's, J&J misled physicians and nurses into believing that J&J's product was safe and falsely telling them in mailings that there was no asbestos in J&J's Baby Powder.

32.    In 1970, OSHA established the first Federal guidelines for workplace asbestos exposure, which took effect in 1971.  Those regulations did not identify any known safe level of exposure for asbestos and mesothelioma. The OSHA asbestos regulations were strengthened during the 1970's and 1980's; and by 1986 the regulations explained: (1) the legally "permissible" levels for workplace asbestos exposures, even at just 0.2 f/cc, actually were inadequate to protect people against the risk of mesothelioma and lung cancer; (2) for carcinogens including asbestos, "no safe threshold level was demonstrable"; and (3) mesothelioma and lung cancer developed even after "low cumulative exposures to asbestos."  J&J management employees worked to keep fibrous talc and asbestiform minerals in their product from being regulated by OSHA.

33.    In 1971, J&J met with scientists at Mt. Sinai Hospital in New York who warned J&J of the risk of asbestos in its products and the risk of disease. J&J knew that fibrous talc and asbestos from talc translocated through the body after inhalation and were found in the ovaries of women.

34.    In 1971, the Colorado School of Mines advised J&J managerial employee, Robert S. Russell, that there is fibrous tremolite and actinolite (asbestos), and fibrous talc in J&J samples submitted to them. Later in the mid-1970's, J&J agents and employees, including Mr. Russell, used J&J Baby Powder in a study on live babies, thereby exposing these babies to risk of disease.

35.    In 1972, the private American Conference of Governmental Industrial Hygienists listed asbestos as a carcinogen.  Those industry standards did not identify any known safe level of exposure for asbestos and mesothelioma.

36.    In 1974, J&J employee, Dr. Fuller, told the Food and Drug Administration ("FDA") that the risk of *any* harm would be reason to take J&J's talcum powder off the market. Dr. Fuller and J&J did not live up to their promise to the FDA and falsely reassured the FDA for decades J&J's product was safe.

37.    A 1976 follow-up study conducted by researchers at Mt. Sinai concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc...We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." [Rohl, A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. Toxicol. Environ. Health 255 (1976).] The results of the Mount Sinai study were soon picked up and reported by both the New York Times and the Washington Post that same year. The study and subsequent newspaper articles listed explicitly popular consumer

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

cosmetic talcum powders as containing high percentages of asbestos.

38. In the early 1970's, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Defendants, who were part of an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products.

39. In the 1970's and 1980's, J&J employee, William Ashton, knowing that fibrous talc and asbestos was dangerous, worked to keep J&J's product from being subject to any industry standards, including joining the American Society for Testing and Materials, and insuring J&J's product would not be subject to scrutiny by the scientific community.

40. In the 1970's and 1980's, J&J continued to mislead the public by engaging in an anti-warning marketing campaign to tell consumers that J&J's product was "pure" and would "protect" the user of the product. The marketing campaign consisted of print, radio, and television advertisements to falsely reassure the public about the safety of talc.

41. In 1983, Anthony and Mary Rose Gambino sued J&J for injuries Mr. Gambino sustained from his use of Baby Powder talc. J&J did nothing to preserve evidence of the talc samples it was allegedly testing from the early 1980's forward.

42. In 1991, J&J knew that Dr. Alice Blount published on the presence of asbestos in its Baby Powder. Dr. Blount told J&J about the asbestos several times in the 1990's, and yet J&J did nothing to warn consumers of the dangers associated with J&J's product.

43. J&J in the 1990's continued its pattern and practice of marketing talcum powder as safe despite knowing of the "cancer linkage." In 1992, J&J knew its major opportunities would be to market to minorities, but also knew the major obstacles would be the inhalation risk and cancer linkage.

44. J&J employees were in charge of worldwide testing of talc to determine how much asbestos was in each talc source. They created a testing scheme to appear like there was no asbestos in their talc. However, they knew the testing methods used were inadequate and would not detect the asbestos in the talc.

45. J&J engaged in a pattern and practice of not warning the public through 2018 when its Chief Executive Officer, Alex Gorsky, falsely told American consumers that J&J's talcum products have always been free of asbestos.

All Defendants failed to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained asbestos, asbestiform fibers, and asbestiform talc at any point, up to and including present day, despite the clear hazard and direct information that their products *did* contain asbestos, asbestiform fibers, and asbestiform talc.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**VIII**.

**Additional Allegations as to J&J**: The following facts are illustrative, but not exhaustive, of J&J's wrongful conduct.

J&J knew that the needle-like shape of asbestos fibers, found in some talc deposits, makes the fibers causative of mesothelioma. And J&J knew that babies inhaled the talc, at variable levels, whenever Baby Powder was applied. J&J therefore understood that if its talc contained asbestos, and if that fact were publicized, it would be bad for J&J's business and reputation.

To avoid the risk of end-users' asbestos exposures, J&J always had the option to use cornstarch, instead of talc, as its Baby Powder's active ingredient. However, J&J waited until 1980 to start selling a cornstarch version alongside the talc version. Thereafter, J&J advertised that its cornstarch version was the "safest powder you can use on your baby." J&J never warned anyone about the asbestos content of its talc.

Despite admittedly knowing that its talc Baby Powder contained toxic asbestos from at least the 1960's through the 2000's, J&J concealed or otherwise misrepresented that fact from its products' consumers. In part, J&J engaged in the following acts and omissions:

1. J&J lied to the FDA about the presence of asbestos in the talc used in J&J's products, including Baby Powder. J&J hid these results and, in some cases, asked that these results be altered or destroyed. For example, in January 1974, J&J's managing agents Dr. R. Fuller, Dr. G. Hildick-Smith, and Dr. W. Nashed met with the FDA regarding "Talc/Asbestos." In that meeting, J&J promoted its Baby Powder as the "best talc available," despite knowing the talc's asbestos content. J&J also falsely claimed to the FDA that "substantial asbestos can be allowed safely in a baby powder." J&J further assured the FDA that, if studies showed that the talc was unsafe, J&J "will not hesitate to take it off the market." J&J never took its Baby Powder off the market despite knowing that the product contained asbestos. J&J, itself and through the CTFA, also withheld original documents and reports identifying asbestos in its talc and talc-containing products, including J&J's Baby Powder, and instead falsely reported to the FDA there was no asbestos. After providing this false information to the FDA, the CTFA, including J&J, met privately and congratulated themselves on the "success" of the "presentations" to the FDA, and agreed that they should not bind themselves to having to further update the FDA. Despite its admission that asbestos is a carcinogen, J&J never suggested—or revealed—to the FDA any asbestos in its Baby powder or talc products, including the list of positive asbestos findings in its talc ore, talc, and products throughout the decades.

2. In or around 1978, J&J and other members of the CTFA destroyed evidence showing positive findings of asbestos in round-robin testing of J&J and

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Complaint for Personal Injuries; Demand for Jury Trial

other manufacturers' consumer talcum products for asbestos content. The FDA initially proposed regulating the cosmetic talc industry. However, J&J and other members of the CTFA contended that they should be able to self-regulate. As a result, the FDA had no authority to "go into [J&J's] files"; it was up to J&J to voluntarily provide information to the FDA. Because the cosmetic talc industry was self-regulating, the CTFA rejected the FDA's proposal to have CTFA disclose the results of CTFA's respective periodic monitoring for asbestos. At J&J's direction, the CTFA was instructed to "[d]estroy your copy of the table" containing the results of the CTFA Task Force on Round Robin Testing of Consumer Talcum Products for Asbestiform Amphibole Minerals.

3.     J&J fraudulently labeled and advertised its Baby Powder as being pure and protective of health, and free of asbestos fibers. J&J maintained the trust of mothers and other consumers who used its Baby Powder products through print advertisements and other methods. In the 1940's, J&J emphasized that doctors and nurses preferred J&J's Baby Powder because of its effectiveness and alleged purity. J&J described the product as the "purest." J&J also directly promoted its baby powder to medical personnel. J&J provided samples for doctors to distribute.  A 1965 brochure for doctors claimed that the powder was safe and had medical benefits. The bottle itself even said, "Purest Protection." Another version of the bottle said, "Good for baby, Good for you." However, J&J well knew that its Baby Powder was not pure because it contained asbestos. J&J also knew that its Baby Powder provided no medical protection or any other medicinal value.

4.     J&J and its officers, directors, and managing agents including, but not limited to, Bill Ashton, Dr. R. Fuller, Dr. G. Hildick-Smith, Dr. Al Goudie, Dr. W. Nashed, and members of J&J's Talc Advisory Group, kept from or otherwise misrepresented to the public test results showing the presence of asbestos and asbestiform fibers in its talcum products, including Baby Powder. For example, in or around October 1972, Dr. Nashed stated to Dr. Goudie that he "thought tremolite was mistakenly identified in view of similarity to Na [sodium] sesquicitrate!" Dr. Goudie replied, "There are trace quantities present confirmed both by McCrone & Bill Ashton. Levels are extremely low but occasionally can be detected optically. *This is not new*." In or around June 1973, the University of Minnesota lab reported to J&J that its Shower to Shower talc powder contained "1/100th of 1 percent asbestos," as shown by electron microscopy, both in the material from J&J and from Dr. Lewin's sample. Shortly thereafter, J&J and the McCrone lab authored their own report in which they misquoted the University of Minnesota lab's report by using misleading ellipses that concealed the asbestos findings. In its November 1974 letter to a concerned consumer in California, J&J (i) falsely claimed that it used only the "purest talc available," (ii) described contrary articles as "sensational and scary," and (iii) claimed to be "highly ethical and responsible" because its products were safe.

## FIRST CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY

### I.

**Design Defect**: All Defendants, and the 1st through 100th Doe Defendants, are strictly liable, under the consumer-expectations test, for placing defectively designed products into the

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   stream of commerce, ultimately exposing Plaintiff to asbestos from these products.  First,

2   Defendants designed, manufactured, supplied, marketed, distributed, and sold the products.

3   Second, each product did not perform as safely as an ordinary consumer would have expected it to

4   perform when used or misused in an intended or reasonably foreseeable way, because each

5   product caused hazardous asbestos to become airborne, exposing Plaintiff to asbestos.  Third,

6   Plaintiff developed mesothelioma.  Fourth, each product's failure to perform safely was a

7   substantial factor in causing Plaintiff's mesothelioma.

8                                              II.

9          **Failure-to-Warn Defect**: All Defendants, and the 1st through 100th Doe Defendants, are

10  strictly liable for placing products with failure-to-warn defects into the stream of commerce,

11  ultimately exposing Plaintiff to asbestos from these products.  First, Defendants designed,

12  manufactured, supplied, marketed, distributed, and sold the products.  Second, each product had

13  potential risks that were known or knowable in light of the scientific and medical knowledge that

14  was generally accepted in the scientific community at the time of design, manufacture, supply,

15  marketing, distribution, and sale.  Third, the potential risks presented a substantial danger when

16  each product was used or misused in an intended or reasonably foreseeable way, because each

17  product caused hazardous asbestos to become airborne.  Fourth, ordinary consumers would not

18  have recognized the potential risks.  Fifth, Defendants failed to adequately warn or instruct of the

19  potential risks.  Sixth, Plaintiff developed mesothelioma.  Seventh, the lack of sufficient warnings

20  or instructions was a substantial factor in causing Plaintiff's mesothelioma.

21                    **SECOND CAUSE OF ACTION FOR NEGLIGENCE**

22                                             I.

23         **General Negligence**: All Defendants, and the 1st through 100th Doe Defendants, are liable

24  for their general negligence.  First, Defendants failed to use reasonable care to prevent harm to

25  others, because they caused hazardous asbestos to become airborne, through Defendants' active

26  participation and contribution to specific activities that caused asbestos to become airborne.

27  Second, Defendants did so by unreasonably acting and failing to act.  They acted in ways that a

28  reasonably careful person would not do in the same situation, and failed to act in ways that a

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   reasonably careful person would do in the same situation.  Third, Plaintiff developed

2   mesothelioma.  Fourth, each Defendant's general negligence was a substantial factor in causing

3   Plaintiff's mesothelioma.

4                                          **II**.

5        **Negligence Per Se**: All Defendants, and the 1st through 100th Doe Defendants, are liable

6   for negligently violating the applicable state and federal asbestos regulations.  Defendants

7   negligently violated those regulations by failing to properly label asbestos-containing products;

8   failing to monitor for the presence of asbestos dust; failing to provide changing facilities and

9   showers to exposed persons; allowing exposures of asbestos to exceed permissible exposure

10  limits; failing to warn as to the presence of asbestos; and failing to implement industrial hygiene

11  practices to eliminate or decrease exposures to asbestos.  Those violations were a substantial factor

12  in causing Plaintiff's exposures to asbestos, and in causing Plaintiff's mesothelioma.  The

13  regulations were designed to prevent overexposure to asbestos dust, and Plaintiff was within the

14  class of persons that the regulations were designed to protect.  Accordingly, because Defendants

15  violated the regulations, Defendants' conduct is presumed to have been negligent.

16                                         **III**.

17       **Negligent Design, Marketing, Sale, Supply, Installation, Inspection, Repair, and**

18  **Removal of Products**: All Defendants, and the 1st through 100th Doe Defendants, are liable for

19  their negligent design, marketing, sale, supply, installation, inspection, repair, and removal of

20  products.  First, Defendants designed, marketed, sold, supplied, installed, inspected, repaired, and

21  removed the products.  Second, Defendants were negligent in designing, marketing, selling,

22  supplying, installing, inspecting, repairing, and removing the products, because the products

23  released hazardous asbestos which become airborne.  Defendants failed to use the amount of care

24  that a reasonably careful person would use in similar circumstances to avoid exposing others to a

25  foreseeable risk of harm.  Third, Plaintiff developed mesothelioma.  Fourth, each Defendant's

26  negligence was a substantial factor in causing Plaintiff's mesothelioma.

27

28

Complaint for Personal Injuries; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**IV**.

    **Negligent Failure to Warn about Products**: All Defendants, and the 1st through 100th Doe Defendants, are liable for their negligent failure to warn about their products.  First, Defendants designed, manufactured, supplied, marketed, distributed, and sold the products.  Second, Defendants knew or reasonably should have known that each product was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner, because each product caused hazardous asbestos to become airborne.  Third, Defendants knew or reasonably should have known that users would not realize the danger.  Fourth, Defendants failed to adequately warn of the danger or instruct on the safe use of each product.  Fifth, a reasonably careful person under the same or similar circumstances would have warned of the danger or instructed on the safe use of each product.  Sixth, Plaintiff developed mesothelioma.  Seventh, each Defendant's negligent failure to warn or instruct was a substantial factor in causing Plaintiff's mesothelioma.

**V**.

    **Negligent Failure to Recall and Retrofit Products**: All Defendants, and the 1st through 100th Doe Defendants, are liable for their negligent failure to recall and retrofit their products.  First, Defendants designed, manufactured, supplied, marketed, distributed, and sold the products.  Second, Defendants knew or reasonably should have known that each product was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner, because each product caused hazardous asbestos to become airborne.  Third, Defendants became aware of this defect after they placed each product into the stream of commerce.  Fourth, Defendants failed to recall and retrofit each product.  Fifth, a reasonably careful person under the same or similar circumstances would have recalled and retrofitted each product.  Sixth, Plaintiff developed mesothelioma.  Seventh, each Defendant's negligent failure to recall and retrofit each product was a substantial factor in causing Plaintiff's mesothelioma.

Complaint for Personal Injuries; Demand for Jury Trial

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1

### THIRD CAUSE OF ACTION FOR FRAUD

**I.**

All Defendants, and the 1st through 100th Doe Defendants, are liable for fraud, including fraudulent misrepresentation, fraudulent concealment, conspiracy to commit fraudulent misrepresentation, and conspiracy to commit fraudulent concealment, as set forth herein.

**II**.

**Fraudulent Misrepresentation:** All Defendants, and the 1st through 100th Doe Defendants, are liable for their fraudulent misrepresentations.

First, each Defendant, via its employees, agents, advertisements, or any other authorized person or document, represented that certain facts were true when they were not.

Second, each Defendant falsely represented that the products they marketed, used, sold, supplied, or specified for use were not hazardous; and/or that each Defendant's conduct did not create serious or deadly dust hazards. Those misrepresentations were made before and during the years that Plaintiff was exposed to asbestos for which Defendants are responsible. Those misrepresentations were made either directly to Plaintiff, to a group of persons including Plaintiff, or to third parties intending and reasonably expecting that the substance of those misrepresentations would be repeated to Plaintiff.

Third, each Defendant knew that the misrepresentations were false when they made them, or Defendants made the misrepresentations recklessly and without regard for the truth.

Fourth, each Defendant intended that Plaintiff and/or the same class of persons would rely on the misrepresentations or their substance.

Fifth, Plaintiff reasonably relied on Defendants' misrepresentations or their substance.

Sixth, Plaintiff developed mesothelioma.

Seventh, Plaintiff's reliance on each Defendant's misrepresentations was a substantial factor in causing Plaintiff's mesothelioma.

**III**.

**Fraudulent Concealment (Nondisclosure):** All Defendants, and the 1st through 100th Doe Defendants, are liable for their fraudulent concealment (nondisclosure).

1    First, each Defendant made affirmative statements that were so misleading (e.g.,

2    misleading "half-truths") that they gave rise to a fraud cause of action even in the absence of a

3    specific relationship or transaction as between Defendants and Plaintiff.  Specifically, Defendants

4    stated that their products could be used safely, while concealing that they were in fact lethal

5    because they released asbestos fibers; and/or Defendants stated that their conduct did not create

6    serious or deadly dust hazards, while concealing that Defendants' conduct in fact created risks of

7    asbestos-related cancer.

8    Second, each Defendant (i) had exclusive knowledge of material facts not known to

9    Plaintiff, (ii) actively concealed these material facts from Plaintiff, (iii) made partial

10    representations but also suppressed material facts, as set forth above, and (iv) made factual

11    representations, but did not disclose facts that materially qualified those representations.  Such

12    nondisclosures included Defendants representing their products as safe when used as intended and

13    as fit for the particular purpose for which they were marketed, while not disclosing the facts that

14    these products contained asbestos that would become airborne during the intended and/or

15    foreseeable use of the products, rendering them dangerous and unfit for their intended purpose.

16    Third, each Defendant entered into a relationship and/or a transaction with Plaintiff

17    sufficient to give rise to a duty to disclose.  For example, Plaintiff used or otherwise encountered

18    Defendants' products that were purchased either directly from Defendants, Defendants' authorized

19    dealer or supplier, or any other entity upon which Defendants derived a direct monetary benefit.

20    Defendants derived direct monetary benefit from the industry and these individuals' use of these

21    products because Plaintiff and/or her family members decided to use or purchase Defendants'

22    products.

23    Fourth, Plaintiff did not know of the concealed facts.

24    Fifth, Defendants intended to deceive Plaintiff by concealing the facts, and/or by making

25    certain representations without disclosing additional facts that would have materially qualified

26    those representations.

27    Sixth, had the omitted information been disclosed, Plaintiff reasonably would have

28    behaved differently.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Complaint for Personal Injuries; Demand for Jury Trial

1       Seventh, Plaintiff developed mesothelioma.

2       Eighth, each Defendant's concealment was a substantial factor in causing Plaintiff's

3  mesothelioma.

4                                           **IV**.

5       **Conspiracy to Commit Fraudulent Misrepresentation**: All Defendants, and the 1st

6  through 100th Doe Defendants, are liable for their conspiracy to commit fraudulent

7  misrepresentation.  First, Defendants were aware that their conspirators, which included all co-

8  Defendants and others, planned to commit fraudulent misrepresentation against Plaintiff.  Second,

9  Defendants agreed with their conspirators and intended that the fraudulent misrepresentation be

10  committed.  Third, Plaintiff developed mesothelioma.  Fourth, each Defendant's participation in

11  the conspiracy was a substantial factor in causing Plaintiff's mesothelioma.

12                                         **V**.

13       **Conspiracy to Commit Fraudulent Concealment**: All Defendants, and the 1st through

14  100th Doe Defendants, are liable for their conspiracy to commit fraudulent concealment.  First,

15  Defendants were aware that their conspirators planned to commit fraudulent concealment against

16  Plaintiff.  Second, these Defendants agreed with their conspirators and intended that the fraudulent

17  concealment be committed.  Third, Plaintiff developed mesothelioma.  Fourth, each Defendant's

18  participation in the conspiracy was a substantial factor in causing Plaintiff's mesothelioma.

19                                         **VI**.

20       **Knowledge of Hazards:** At all times pertinent hereto, all Defendants, and the 1st through

21  100th Doe Defendants, owed Plaintiff a duty, as provided for in California Civil Code sections

22  1708, 1709, and 1710, to abstain from injuring Plaintiff's person, property, or rights.  In violation

23  of that duty, each Defendant engaged in the acts and omissions when a duty to act was imposed as

24  set forth herein, thereby proximately causing injury and harm to Plaintiff.  Such acts and

25  omissions consisted of deceit as prohibited by Civil Code section 1710, and more specifically

26  were (i) suggestions of fact which were not true and which the Defendants did not believe to be

27  true, (ii) assertions of fact of that which was not true, which the Defendants had no reasonable

28  ground for believing to be true, and (iii) the suppression of facts when a duty existed to disclose it,

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  all as are more fully set forth herein, and the violation of which as to any one such item gave rise

2  to a cause of action for violation of Plaintiff's rights as provided for in the above code sections.

3      Each of the foregoing acts, suggestions, assertions, and failures to act when a duty existed

4  to act, Defendants having such knowledge, knowing Plaintiff did not have such knowledge, was

5  done falsely and fraudulently and with full intent to induce Plaintiff to remain in a dangerous

6  environment and to cause Plaintiff to remain unaware of the true facts, all in violation of the Civil

7  Code and other applicable law.

8  **BASIS FOR PUNITIVE DAMAGES**

9  **I.**

10      **Malice, Oppression, or Fraud**: Plaintiff hereby incorporates by reference the allegations

11  of all causes of action as if fully stated herein.  All Defendants, and the 1st through 100th Doe

12  Defendants, are liable for punitive damages because they engaged in the conduct that caused

13  Plaintiff's harm with malice, oppression, or fraud.

14      First, Defendants committed malice in that they acted with intent to harm when they

15  caused Plaintiff's asbestos exposures, and because their conduct was despicable and was done

16  with a willful and knowing disregard of the rights and safety of others.

17      Second, Defendants committed oppression in that their conduct was despicable and

18  subjected Plaintiff to cruel and unjust hardship in knowing disregard of Plaintiff's rights.

19      Third, Defendants committed fraud in that they intentionally concealed and misrepresented

20  material facts and did so intending to harm Plaintiff.

21      Defendants' conduct constituting malice, oppression, or fraud was committed by,

22  authorized by, or adopted by one or more officers, directors, or managing agents of each

23  Defendant, who acted on behalf of each Defendant.

24  **PRAYER FOR DAMAGES**

25  **I.**

26      Plaintiff prays for judgment against all Defendants, and the 1st through 100th Doe

27  Defendants, for:

28

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1.      All economic and non-economic compensatory damages in excess of $25,000;

2.      Punitive damages according to proof;

3.      Pre- and post-judgment interest;

4.      Costs of suit; and

5.      Such other relief as is fair, just, and equitable.

## DEMAND FOR JURY TRIAL

### I.

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  July 6, 2020                KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation


By: _____
          Michael T. Stewart

Attorneys for Plaintiff

*Kazan, McClain, Satterley & Greenwood*
*A Professional Law Corporation*
*Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607*
*(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com*

Complaint for Personal Injuries; Demand for Jury Trial

# Exhibit 2

```
1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  FOR THE COUNTY OF ALAMEDA

3

4      _____
                                     )
5      SUSAN BARKLEY,                )
                                     )
6            Plaintiff,              )
                                     )
7         vs.                        ) No. RG20066950
                                     )
8      JOHNSON & JOHNSON, et al.,    )
                                     )
9            Defendants.            )
       _____)
10

11

12

13

14         REMOTE DEPOSITION OF SUSAN S. BARKLEY

15                ZOOM VIDEOCONFERENCE

16              Monday, October 26, 2020

17                    Volume I

18

19

20

21     Reported by:
       VALERIE D. GRANILLO
22     CSR No. 11469
       Job No. 4296786

23

24

25     PAGES 1 - 110
```

Page 1

1             SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   FOR THE COUNTY OF ALAMEDA

3

4   _____
                                    )
5   SUSAN BARKLEY,                  )
                                    )
6             Plaintiff,            )
                                    )
7         vs.                       ) No. RG20066950
                                    )
8   JOHNSON & JOHNSON, et al.,      )
                                    )
9             Defendants.           )
    _____)

10

11

12

13

14             Remote Deposition of SUSAN S. BARKLEY,

15   Volume I, taken on behalf of Plaintiff, via Zoom

16   Videoconference, beginning at 10:23 a.m. and ending at

17   2:03 p.m., on Monday, October 26, 2020, before VALERIE

18   D. GRANILLO, Certified Shorthand Reporter No. 11469.

19

20

21

22

23

24

25

                                              Page  2

1    APPEARANCES:

2

3    For Plaintiff:

4         KAZAN MCCLAIN SATTERLEY GREENWOOD

5         BY:  MARK SWANSON

6         Attorney at Law

7         55 Harrison Street, Suite 400

8         Oakland, California 94607

9         (510) 302-1000

10        mswanson@kazanlaw.com

11

12   For Defendant:

13        KING & SPALDING

14        BY:  AMY ZUMSTEG

15        Attorney at Law

16        633 West Fifth Street, Suite 1600

17        Los Angeles, California 90071

18        (213) 443-4314

19        azumsteg@kslaw.com

20

21

22

23

24

25

                                        Page 3

```
 1    APPEARANCES (continued):

 2

 3    For Defendant Revlon Consumer Products Corporation and
      Bristol-Myers Squibb Company:

 4

          HAWKINS PARNELL & YOUNG

 5

          BY:  MIRNA SCHEFFY

 6

          Attorney at Law

 7

          One Post Street, Suite 2400

 8

          San Francisco, California 94101

 9

          (415) 766-3200

10

          mscheffy@hpylaw.com

11

12    For Defendant Colgate-Palmolive Company:

13        FOLEY & MANSFIELD

14        BY:  GARY D. SHARP

15        Attorney at Law

16        130 East Nine Mile Road

17        Ferndale, Michigan 48220

18        (248) 721-4200

19        gsharp@foleymansfield.com

20

21

22

23

24

25
```

Page  4

```
 1   APPEARANCES (continued):
 2
 3   For Defendant Cyprus Mines Corporation:
 4       DENTONS
 5       BY:  KAREN LUONG
 6       Attorney at Law
 7       4675 MacArthur Court
 8       Newport Beach, California 92660
 9       (949) 732-3700
10       karen.luong@dentons.com
11
     For Defendant Whittaker, Clark & Daniels, Inc.:
12
         BERKES CRANE ROBINSON & SEAL
13
         BY:  TAYLOR M. MATSUMOTO
14
         Attorney at Law
15
         515 South Figueroa Street, Suite 1500
16
         Los Angeles, California 90071
17
         (213) 955-1150
18
         tmatsumoto@bcrslaw.com
19
20
21
22
23
24
25
```

Page 5

1    APPEARANCES (continued):

2

3    For Defendant Longs Drugs Stores California, LLC;
     Safeway, Inc.; The Vons Company, Inc.:

4

         BARNES & THORNBURG

5

         BY:  MITCHELL R. CHARCHALIS

6

         Attorney at Law

7

         2029 Century Park East, Suite 300

8

         Los Angeles, California 90067

9

         (310) 284-3768

10

         mcharchalis@btlaw.com

11

12   Videographer:

13       DREW DORSEY, VERITEXT

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page  6

1    please swear in the witness.

2

3                      SUSAN S. BARKLEY,

4    having been first duly sworn, was examined and

5    testified as follows:                              10:25:45

6           VIDEOGRAPHER:  Thank you.  You may proceed.

7                        EXAMINATION

8    BY MR. SWANSON:

9       Q    Good morning, Ms. Barkley.

10      A    Good morning.                               10:26:08

11      Q    My name is Mark Swanson, as you know, and I'm

12   representing you here today.  I'll be asking you

13   questions over the next two to three hours or so.  Are

14   you prepared to proceed?

15      A    Yes.                                        10:26:19

16      Q    And can you state your full name for the

17   record, please.

18      A    Susan -- excuse me.  Susan Swanson Barkley.

19      Q    Okay.  And what is your date of birth?

20      A    7-25-54.                                    10:26:31

21      Q    So you are how many years old now?

22      A    66.

23      Q    Today I am going to be asking you questions

24   about a few major areas of your life, your family --

25   you and your family, your background.  I'm going to ask  10:26:47

                                                  Page 11

```
 1        Q    So around the year 2000?

 2        A    Yes.

 3        Q    In broad strokes, can you list the various

 4   uses of talcum powder that you had throughout your

 5   life?                                            10:55:32

 6        A    Yes.

 7             DEFENSE COUNSEL:  Objection; overbroad.

 8             THE WITNESS:  I said before using it to keep

 9   sand off my body when I was younger, used it after

10   showering and bathing, used it as dry shampoo, used it   10:55:39

11   inside my shoes, used it on my son when he was an

12   infant, and I also used it on my husband when he was

13   ill and I was taking care of him.

14   BY MR. SWANSON:

15        Q    Now, you mentioned that you remember talcum   10:56:03

16   powder being around the house when you grew up; is that

17   right?

18        A    Correct.

19        Q    And where did you see talcum powder around the

20   house when you were growing up?                   10:56:14

21        A    There was a container in my bathroom and in my

22   parents' bathroom.

23        Q    And do you recall what brand you recall

24   seeing?

25        A    Yes.  It was Johnson's Baby Powder.      10:56:25
```

Page 34

1     Q    And how did you know it was Johnson's Baby

2   Powder?

3     A    Because of the container.

4     Q    What was it about the container?

5     A    The shape and it said "Johnson's Baby Powder"    10:56:37

6   on it.

7     Q    Okay.  And so you recall it in your parents'

8   bathroom and in your bathroom?

9     A    Yes.

10     Q    Did the bathroom that you have, was that a    10:56:46

11   bathroom you shared with your sister?

12     A    That is correct.

13     Q    Do you know -- let me ask you first about your

14   use of talcum powder to prevent sand from sticking to

15   you when you went to the beach.  You mentioned that you    10:57:11

16   were 7 or 8 years old when that first happened.  Is

17   that right?

18     A    That's when I applied it to myself.  My mother

19   used it before that on me.

20     Q    Okay.  And where did you go to the beach when    10:57:23

21   you were young?

22     A    We went to Ocean City, New Jersey.  We -- my

23   parents rented for several years a house right on the

24   beach for a month.  And even if we weren't at the house

25   that we rented, we would go several times a summer to    10:57:41

Page 35

```
 1    and shaking it on the body, rubbing it in until your

 2    body was covered with a nice thin layer.

 3        Q    And how long would that take to apply it and

 4    rub it in?

 5        A    About two to three minutes.                    10:59:31

 6        Q    And when you shook the powder out of the

 7    container, could you see it?

 8        A    Yes.

 9            DEFENSE COUNSEL:  Objection; leading.

10    BY MR. SWANSON:                                         10:59:43

11        Q    What did it look like?  What did it look like?

12        A    A fine, dusty, white powder.

13        Q    And where did the powder go when you applied

14    it?

15        A    On my body, in the air and on surfaces around  10:59:54

16    me.

17        Q    Could you smell the Johnson's Baby Powder when

18    you applied it?

19        A    Yes.

20        Q    What did it smell like?                        11:00:06

21        A    Johnson's Baby Powder.

22        Q    And did you breathe it?

23        A    Yes.

24        Q    And you -- when your family would rent a house

25    at the New Jersey shore, during what time frame are we  11:00:35
```

Page 37

1    talking about?

2        A    During the summer months, June through

3    September.  We typically rented in -- sometime in July

4    and August, maybe a month in -- the month of July, the

5    month of August, or two weeks in July, two weeks in          11:00:53

6    August.

7        Q    And how often would you go to the beach when

8    you were there for that month?

9        A    Every day.

10       Q    And how often when you went to the beach would    11:01:02

11   you apply Johnson's Baby Powder?

12       A    Every day.

13       Q    And do you remember this -- you mentioned that

14   your mother applied it to you before you started at 7

15   or 8 years old.  Until what age did your family rent a     11:01:20

16   house on the shore in New Jersey?

17       A    Just approximately ten years old.

18       Q    And you also mentioned that you would go to

19   your grandparents' house near the -- at the -- or near

20   the shore and would go to the beach when you went          11:01:41

21   there; is that correct?

22       A    That is correct.

23       Q    During what period of your childhood growing

24   up would you visit your grandparents at the New Jersey

25   shore?                                                     11:01:56

                                                          Page 38

1              THE WITNESS:  Every time.

2    BY MR. SWANSON:

3        Q    Okay.  And until what age did you apply

4    Johnson's Baby Powder for the purpose of preventing a

5    beach sand from sticking?                              11:03:28

6        A    Approximately 10, 11.

7        Q    Okay.  You mentioned when I asked you to list

8    your uses of talcum powder, that you used talcum powder

9    after showering; is that right?

10       A    Correct.                                       11:03:53

11       Q    Now, growing up and as an adult, did you

12   sometimes shower and sometimes bathe?

13       A    Yes.  Primarily showering, but I did take a

14   bath every once in a while.

15       Q    Okay.  And how old were you when you started   11:04:09

16   using talcum powder after showering or bathing?

17       A    Approximately 10 years old.

18       Q    And at ten years old, what was the occasion

19   that you would use talcum powder after showering?

20       A    I would generally use that during the summer   11:04:30

21   months when it is hotter and more humid and sticky back

22   on the East Coast, and I would use it to stay cooler.

23       Q    And how often during the summer months would

24   you use it?

25       A    Every time I showered or bathed.               11:04:48

                                                     Page 40

1        Q    And how often did you shower and bathe?

2        A    Typically every day.

3        Q    In the summer months, that would be what

4    months?

5        A    June through September.  It stays pretty hot        11:05:03

6    in September.

7        Q    And when you started this practice of using

8    talcum powder after shower or baths in the summer when

9    you lived on the East Coast at 10 years old, what brand

10   or brands did you use?                                        11:05:25

11       A    Johnson's Baby Powder.

12       Q    And how did you apply it?

13       A    Starting from the neck down, shaking it out on

14   my body, rubbing it in with my hands until I had

15   covered all the parts that were necessary.                    11:05:38

16       Q    And how long did that process take?

17       A    About two to three minutes.

18       Q    And again, could you see the powder when you

19   shook it out?

20       A    Yes.                                                 11:05:51

21            DEFENSE COUNSEL:  Objection; leading.

22   BY MR. SWANSON:

23       Q    Where did it go?

24       A    On my body, in the air and on the surrounding

25   areas.                                                        11:06:00

                                                     Page 41

1      Q    And could you smell it, the Johnson's Baby

2  Powder --

3      A    Yes.

4      Q    -- when you applied?

5           And did you breathe it?                      11:06:08

6      A    Yes.

7      Q    Was there a time when you began using talcum

8  powder for more than just staying cool in the summer?

9      A    Yes.

10     Q    What age did that happen?                    11:06:21

11     A    At approximately 12.

12     Q    Do you recall what grade you were in?

13     A    6th or 7th grade.

14     Q    And how did your use change at 12 years old?

15     A    I used a different brand starting at that    11:06:38

16  time.

17     Q    And were you using it more frequently?

18          DEFENSE COUNSEL:  Objection; leading.

19          THE WITNESS:  Yeah.  I was using it

20  year-round.                                          11:06:52

21  BY MR. SWANSON:

22     Q    Oh, year-round.  I'm sorry.  I think I

23  confused you.  So all right.  So you're using it

24  start -- at 12 years old you started using talcum

25  powder after bathing or showering year-round; is that  11:07:04

                                                   Page 42

1      A    Okay.  Approximately two to three minutes.

2      Q    And why did you use the Jean Nate talcum

3  powder when you started routinely using talcum powder

4  after every shower or bath instead of Johnson's Baby

5  Powder, which you had previously been using after        11:13:51

6  showering in the summer as a 10- and 11-year-old?

7      A    Well, at 12 years old preteen, you want to --

8  young girls want to be using things that maybe older

9  girls would use, certainly not something maybe that

10  says "baby" on it.  But definitely want to using some    11:14:15

11  that's a little bit different than what you've been

12  using before.  You're now, you know, becoming a

13  teenager, a young woman.  You want to be -- do things

14  that seem older than maybe what you are.

15      Q    And until when did you use Jean Nate talcum    11:14:33

16  powder after showering or bathing?

17      A    Until the mid '80s.

18      Q    Was Jean Nate the only talcum powder that you

19  used after showering or bathing from approximately 12

20  years old until the mid '80s?                            11:14:53

21      A    No, it was not.

22      Q    And what other brands during that entire

23  period of time did you use?

24      A    Johnson's Baby Powder.

25      Q    Was there any period during -- was there any   11:15:03

Page 48

1    time during that period from 12 years old to the mid

2    '80s that Jean Nate was the only talcum powder that you

3    used after showers or baths?

4           DEFENSE COUNSEL:  Objection; leading.

5    Overbroad.                                        11:15:23

6           THE WITNESS:  Yes.  Approximately from 12 to

7    when I went to Wheaton College.

8    BY MR. SWANSON:

9       Q    Okay.

10      A    There were two instances that I can recall   11:15:36

11   between that time that I also used Johnson's Baby

12   Powder.

13      Q    Okay.  So let's see if we can break that down.

14   All right.  So from around 12 years old to when you

15   went to Wheaton College, which was fall of 1974; is     11:15:53

16   that right?

17      A    Correct.

18      Q    Okay.  So from 12 years old to the fall of

19   1974, you are using exclusively Jean Nate after showers

20   or baths except for these two other occasions; is that  11:16:09

21   right?

22      A    Correct.

23      Q    And what were these two other occasions?

24      A    They were when I was traveling in 1970 and

25   1972.                                              11:16:24

                                                   Page 49

1      Q    Okay.

2      A    During the summer months.

3      Q    And how long were you traveling on those

4  occasions?

5      A    In '70 I was gone approximately seven weeks        11:16:29

6  and '72, approximately six weeks.

7      Q    And you mentioned that during these vacations,

8  during those times you were using Johnson's Baby Powder

9  after showering; is that right?

10     A    Correct.                                            11:16:46

11     Q    All right.  And when you went to Wheaton

12  College in 1974 what -- what -- I take it from your

13  answer that you, then, at least for a time, switched

14  to or were using another brand; is that right?

15     A    Correct.                                            11:17:06

16     Q    And what brand did you use?

17     A    Johnson's Baby Powder.

18     Q    Okay.  And why did you use Johnson's Baby

19  Powder at Wheaton College instead of Jean Nate?

20     A    In the dormitory where I lived, it was -- we        11:17:15

21  had a very large communal bathroom and shower area, and

22  it was just not practical to be carrying a box that

23  could come open with a big powder puff in it.  The

24  packaging of the Johnson's Baby Powder in the closeable

25  container was a much more practical item to use.  It's    11:17:40

Page 50

1    also why I used it traveling.

2        Q    How long did you live in the dormitories at

3    Wheaton College?

4        A    From the fall of -- the school year 1974-1975,

5    that would be from the fall to the spring, and then        11:17:57

6    from the fall of 1975 until I graduated in 1976.

7        Q    And what brand of talcum powder did you use --

8    oh, sorry.  You were using Johnson's -- did you say

9    Johnson's Baby Powder?

10       A    Yes, I did.                                        11:18:14

11       Q    Okay.  And in terms of your routine of how you

12   used it and how long it took I asked you about before,

13   was that the same at Wheaton College as you had

14   described before or different?

15       A    It was different.                                  11:18:25

16           DEFENSE COUNSEL:  Objection; vague.

17   Overbroad.

18   BY MR. SWANSON:

19       Q    Were there any other times when you lived in a

20   dormitory or other space where you were not -- where      11:18:33

21   you couldn't use the Jean Nate talcum powder box

22   because it would have been inconvenient and had to use

23   Johnson's Baby Powder instead?

24       A    In 19 -- in the summer of 1975 I again was

25   traveling in Europe for approximately five weeks this     11:18:49

Page 51

1    time.  And then in the summer of 1976 after I graduated

2    from college, I spent approximately five weeks, six

3    weeks at a -- at the Delta Epsilon fraternity house at

4    MIT.

5        Q    And during those periods you were using            11:19:12

6    Johnson's Baby Powder instead; is that right?

7        A    Correct.

8        Q    Now, other than those sort of exceptions where

9    you're either traveling or living in a dormitory when

10   you're using Johnson's Baby Powder because it's more       11:19:32

11   convenient, from the time you were 12 years old until

12   the mid '80s, were there other times where you used a

13   powder other than Jean Nate after showering or bathing?

14       A    Can you repeat the question?  I'm sorry.

15       Q    Sure.  From -- you had said that you used Jean    11:19:55

16   Nate from about 12 years old to the mid '80s, correct?

17       A    Correct.

18       Q    And you said that it was exclusive until 1974

19   except for a couple of vacations, correct?

20       A    Correct.                                           11:20:20

21       Q    And then after that in '75 and '76 you had

22   another vacation -- you had a vacation in the summer

23   and MIT dormitory for about six weeks, correct?

24       A    Correct.

25       Q    And so from that period from 1976 now until       11:20:35

                                                      Page 52

1   1985, were you exclusively using Jean Nate or other

2   powders too?

3        A    No, I was not exclusively using Jean Nate.  I

4   was also using Johnson's Baby Powder.

5        Q    Okay.  And which one did you use more often?       11:20:55

6        A    At the beginning of the time, it was more

7   often Jean Nate.  As we got into the late '70s, early

8   '80s, it was more Johnson's Baby Powder.

9        Q    And what -- when would you use Johnson's Baby

10  Powder after showering or bathing versus Jean Nate?       11:21:18

11       A    It would really be dependent on what I was

12  doing or what I was planning to do.  Jean Nate has a

13  very distinctive scent, which is one of the reasons I

14  liked it because it's a lemony scent.  And if I wanted

15  to wear another kind of perfume, I would use the       11:21:35

16  Johnson's Baby Powder so that the Jean Nate would not

17  interfere with the perfume scent.

18       Q    Okay.  So by around 1980 or so you -- or the

19  late '70s, 1980, around that time, your -- you had

20  gotten to a point where you were using perfume more       11:21:57

21  often, and so you were using Johnson's Baby Powder as

22  your powder; is that correct?

23       A    Correct.

24            MR. SWANSON:  Okay.  All right.  Why don't we

25  go ahead and take a break.  We've been going about an       11:22:10

Page 53

1    hour.

2          THE WITNESS:  Okay.

3          MR. SWANSON:  Let's go ahead and do that.  Can

4    we go off the record.

5          THE VIDEOGRAPHER:  This marks the end of media    11:22:20

6    number 1.  The time is 11:22 a.m.  We are off the

7    record.

8          (Recess.)

9          THE VIDEOGRAPHER:  This marks the beginning of

10   media number 2.  The time is 11:41 a.m.  We are on the   11:41:31

11   record.

12   BY MR. SWANSON:

13      Q    You mentioned earlier that you were a regular

14   user of talcum powder until your mid 40s; is that

15   right?                                                   11:41:51

16      A    Correct.

17      Q    And at the point at which you were using

18   predominantly Johnson's Baby Powder after showering and

19   bathing around 1980 until the mid 40s, what powders did

20   you use after showering?  Sorry, let me strike that     11:42:11

21   question.  Let me start over.

22          Until what year did you regularly use

23   Johnson's Baby Powder after showering or bathing?

24      A    In approximately -- until approximately 2000.

25      Q    Okay.  And after the year 2000, did you ever    11:42:32

                                                   Page 54

1    use talcum powder after showering or bathing?

2        A    Yes.

3        Q    For -- under what circumstances or what

4    purpose?

5        A    Typically when I would travel.  I did a lot of    11:42:51

6    like cruising or traveling to tropical places and would

7    use the baby powder on those trips to help keep me cool

8    and dry.

9        Q    When's the last time you recall using

10   Johnson's Baby Powder on a vacation?                       11:43:09

11       A    Approximately 2017.

12       Q    And where did you go?

13       A    It was a Caribbean cruise.

14       Q    And you had earlier described using Johnson's

15   Baby Powder in the routine and how long it took and all   11:43:27

16   of that.  Was it always the same throughout your life?

17       A    Yes.

18            DEFENSE COUNSEL:  Objection; vague.

19   Overbroad.

20            THE WITNESS:  It was.                             11:43:36

21   BY MR. SWANSON:

22       Q    Okay.  Let me ask then.  From 1980 until 2000

23   when you were using Johnson's Baby Powder after

24   showering or bathing, where on your body did you apply

25   it?                                                        11:43:49

Page 55

1    like.

2            MR. SWANSON:  No, no, no, no, really.  We're

3    doing -- we're doing fine.  Thank you.

4            MR. SHARP:  No worries.

5    BY MR. SWANSON:                                        11:49:27

6        Q    What brand of talcum powder did you use for --

7    as a dry shampoo?

8        A    Johnson's Baby Powder.

9        Q    And when did you start using Johnson's Baby

10   Powder as a dry shampoo?                               11:49:44

11       A    Probably around the time I started high

12   school.  So it was about 15, 16.

13       Q    And until when did you use Johnson's Baby

14   Powder as a dry shampoo?

15       A    Until approximately 2000.                     11:49:56

16       Q    How often did you use Johnson's Baby Powder as

17   a dry shampoo?

18       A    Several times -- several times a month.

19       Q    Okay.  Did that vary from the time you, you

20   know, entered high school until the year 2000?  In     11:50:17

21   other words, were there some periods of your -- that

22   time where you were using it less than others?

23       A    Yes, I'm sure there were.  I can't recall

24   exactly what dates that they would be.  But probably a

25   little bit less when I was maybe in college.  I went to  11:50:38

                                                    Page 60

1    A    Correct.

2    Q    When did you use talcum powder in your shoes?

3    A    Primarily during summer months when it was --

4  when your feet get hot and sweaty and to put the powder

5  in the shoes to dry them out a little bit and keep them    11:53:14

6  smelling better.

7    Q    And when you would put it in your shoes, when

8  you were wearing the shoes when it was warmer, would

9  that be when you were not wearing socks?

10    A    Correct.    11:53:29

11    Q    Okay.  And when did you start using -- at what

12  age did you start using talcum powder in your shoes?

13    A    Approximately 10 years old.

14    Q    What brand did you use?

15    A    Johnson's Baby Powder.    11:53:43

16    Q    And how often did you use it?

17    A    Several times a week.

18    Q    And as a -- as an -- until -- with the

19  frequency -- until what age did you use talcum powder

20  in your shoes?    11:54:05

21    A    Consistently until the mid -- my mid 40s, and

22  then I did use it when -- up until 2017 when I traveled

23  to warmer climates.

24    Q    Okay.  And how often did you use it?

25    A    When I was young.    11:54:30

Page 63

1        A    About one to two minutes, approximately.

2        Q    Could you see the powder when you shook it

3    out?

4        A    Yes.

5        Q    Could you smell it?                          11:57:24

6        A    Yes.

7        Q    Did you breathe it?

8        A    Yes.

9             DEFENSE COUNSEL:  Objection; calls for

10   speculation.                                          11:57:30

11   BY MR. SWANSON:

12       Q    You mentioned that you used talcum powder on

13   Trevor when he was a baby; is that right?

14       A    That is correct.

15       Q    What brand did you use on Trevor?            11:57:39

16       A    Johnson's Baby Powder.

17       Q    And was this powder in connection with diaper

18   changing?

19       A    Yes, it was.

20       Q    Describe how you used Johnson's Baby Powder on   11:57:48

21   Trevor when you changed his diaper.

22       A    Okay.  It would be changing his diaper or

23   putting on a new diaper after bathing.  Take the

24   powder, shake it out into like mid -- mid torso to his

25   groin area, pulling up his legs, making sure that his    11:58:10

Page 66

1  little bottom got covered and then putting the diaper

2  on.

3      Q    So would you sprinkle it on his front and then

4  pick up his legs and sprinkle it on the back and rub it

5  on both sides or?                                    11:58:25

6      A    Yes.

7      Q    Okay.  So first you'd do the front?

8      A    First I would do the front and then pick up

9  his legs and make sure do the back, and then rub it in

10 on the bottom.                                       11:58:34

11     Q    On the back, did you also -- did you

12 separately sprinkle?

13     A    Yes.

14     Q    Okay.  And where in the house was that done?

15     A    That was done in his room on his changing     11:58:43

16 table.

17     Q    And how long would the process take from the

18 time you started sprinkling until you were done rubbing

19 in?

20     A    Oh, it -- approximately one to two minutes.   11:58:59

21     Q    And for how many months of Trevor's young life

22 did you powder him with Johnson's Baby Powder?

23     A    Approximately nine months.  Six to nine

24 months.  Nine months.

25     Q    How many times per day would you put a fresh   11:59:23

Page 67

1   diaper on Trevor during that approximate nine-month

2   period?

3       A    Approximately five, maybe six times a day.

4       Q    When you shook the powder and rubbed it in,

5   could you see it?                                       11:59:49

6       A    Yes.

7       Q    What did the powder look like?

8       A    It was a fine, white, dusty powder.

9       Q    Could you smell it?

10      A    Yes.                                           11:59:55

11      Q    Did you breathe it?

12      A    Yes.

13           DEFENSE COUNSEL:  Objection; calls for

14   speculation.

15   BY MR. SWANSON:                                        12:00:00

16      Q    Your husband Jim was diagnosed with multiple

17   myeloma in 2002; is that right?

18      A    That's correct.

19      Q    Okay.  You had mentioned that you used powder

20   on him.  Is that right?                                12:00:17

21      A    That is correct.

22      Q    Okay.  During -- and he died in July of 2007?

23      A    Correct.

24      Q    During that -- which years or periods during

25   that time, just generally now overall, did you at least  12:00:32

                                                    Page 68

1   sometimes apply powder to him?

2      A    When he was home -- he was in the hospital

3   during those five years quite a lot of time.  But when

4   he was home and especially the last two years of his --

5   his life when he was home, I would, to help make him          12:00:51

6   more comfortable, I would be applying powder to him.

7      Q    Okay.  So let's start with the last two years,

8   then, and then we'll sort of work back from there.  So

9   during that last two years, first of all, how much time

10  was he at home versus in the hospital?                        12:01:11

11     A    About 50 percent in both places.

12     Q    Okay.  And when he was home, how often did you

13  powder him?

14     A    Approximately every day.

15     Q    What brand did you use?                               12:01:30

16     A    Johnson's Baby Powder.

17     Q    Where was he when you powdered him?

18     A    It was very difficult for him to be in our

19  bed.  It was just a regular flat bed not adjustable.

20  So he spent most of his time in our TV room in a             12:01:46

21  recliner.

22     Q    And -- I'm sorry.  What position was he when

23  you powdered him?

24     A    He would be standing.  Also, sometimes I would

25  powder him -- if he did take a shower, I would powder        12:02:01

Page 69

```
 1    him after the shower in our bathroom area.

 2         Q    Okay.  And what position was he in when you

 3    powdered him?

 4         A    He was standing holding on to his walker.

 5         Q    And where would you powder him?            12:02:19

 6         A    From the neck down.

 7         Q    And can you describe the routine that you used

 8    to powder him.

 9         A    Okay.  Unless he was just getting out of the

10    shower, if he was in the TV room getting out of the    12:02:30

11    recliner to get powdered, I'd take off his T-shirt if

12    he had on or whatever he had on covering his top, apply

13    the powder, shaking it on, rubbing it in with my hands,

14    putting the shirt back on, and then going down to

15    removing his pants, whatever he had on the bottom half,  12:02:53

16    and then doing the bottom half of his body.

17         Q    How long did that process take?

18         A    About four to five minutes.  It would be a

19    little bit less if he was getting out of the shower,

20    because I wasn't removing and putting back clothing at   12:03:14

21    that point.

22         Q    Okay.  So you said four to five minutes?

23         A    Approximately four to five minutes.

24         Q    Okay.  And I think I asked you the brand,

25    but -- did I ask you the brand?                          12:03:28
```

Page 70

1    was done in the last two years of his life.

2        Q    When you powdered Jim, could you see the

3    powder when you shook it up?

4        A    Yes.

5        Q    What did it look like?                              12:05:14

6        A    The fine, white, dusty powder.

7        Q    And could you smell the powder?

8        A    Yes.

9        Q    And did you breathe it?

10       A    Yes.                                                 12:05:22

11           DEFENSE COUNSEL:  Objection; calls for

12    speculation.

13    BY MR. SWANSON:

14       Q    I want to ask you a bit about what you

15    remember about where you purchased talcum powders.  Are    12:05:39

16    you prepared to do that?

17       A    Yes.

18       Q    When you were living on the East Coast, at

19    what age did you start buying your own talcum powder?

20       A    Approximately 16 when I was able to drive.         12:05:51

21       Q    And living on the East Coast, do you recall

22    what types of stores you bought talcum powder at?

23       A    Drugstores.

24       Q    And do you recall the names of the drugstores?

25       A    I do not recall.                                    12:06:12

                                                          Page 72

1          I, the undersigned, a Certified Shorthand
2    Reporter of the State of California, do hereby
3    certify:
4          That the foregoing proceedings were taken
5    before via Zoom me at the time and place herein set
6    forth; that any witnesses in the foregoing proceedings,
7    prior to testifying, were administered an oath; that
8    a record of the proceedings was made by me using
9    machine shorthand which was thereafter transcribed
10   under my direction; that the foregoing transcript is
11   a true record of the testimony given.
12          Further, that if the foregoing pertains
13   to the original transcript of a deposition in a Federal
14   Case, before completion of the proceedings, review
15   of the transcript [ ] was [ ] was not requested.
16          I further certify I am neither
17   financially interested in the action nor a relative or
18   employee of any attorney or any party to this action.
19          IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21
22   Dated: November 10, 2020
23
24
          *Valerie D. Granillo*
25          VALERIE D. GRANILLO
          CSR No. 11469

                              Page 110

# Exhibit 3

Fax Server          5/21/2021 10:05:25 AM  PAGE   1/001   Fax Server
     Case 23-01092-MBK   Doc 46-2   Filed 04/17/23   Entered 04/17/23 15:40:58   Desc
            Exhibit Exhibits 1-8 to Satterley Declaration   Page 54 of 179

5/19/2021 3:11:32 PM     Kristine Harrison     Kazan, McClain et al     Page 29

1 | Joseph D. Satterley, Esq. (C.S.B. #286890)
    jsatterley@kazanlaw.com
2 | Denyse F. Clancy, Esq. (C.S.B. #255276)
    dclancy@kazanlaw.com
3 | Laurel Halbany, Esq. (C.S.B. #226549)
    lhalbany@kazanlaw.com
4 | KAZAN, McCLAIN, SATTERLEY & GREENWOOD
    A Professional Law Corporation
5 | Jack London Market
    55 Harrison Street, Suite 400
6 | Oakland, California 94607
    Telephone: (510) 302-1000
7 | Facsimile: (510) 835-4913

8 | Attorneys for Plaintiff

FILED BY FAX
ALAMEDA COUNTY
May 20, 2021
CLERK OF
THE SUPERIOR COURT
By Cheryl Clark, Deputy
CASE NUMBER:
RG20066950

9 |                    SUPERIOR COURT OF CALIFORNIA

10 |                      COUNTY OF ALAMEDA

11 |

12 | TREVOR BARKLEY, individually and as          Case No. RG20066950
     successor-in-interest to decedent SUSAN S.
13 | BARKLEY,                                      Assigned for All Purposes to
                                                   Judge Jo-Lynne Q. Lee
14 |          Plaintiff,                           Department 18

15 |     vs.                                       **FIRST AMENDED COMPLAINT FOR
                                                   PERSONAL INJURIES (SURVIVORSHIP)
16 | JOHNSON & JOHNSON;                            AND WRONGFUL DEATH**

17 | JOHNSON & JOHNSON CONSUMER INC.,              **DEMAND FOR JURY TRIAL**
     individually and as successor-in-interest to
18 | JOHNSON & JOHNSON CONSUMER
     COMPANIES, INC.;
19 |
     BRENNTAG NORTH AMERICA, INC.,
20 | individually, as alter-ego of, and as successor-
     in-interest to MINERAL AND PIGMENT
21 | SOLUTIONS, INC. and WHITTAKER,
     CLARK & DANIELS, INC.;
22 |
     BRENNTAG SPECIALTIES, INC. (formerly
23 | known as MINERAL AND PIGMENT
     SOLUTIONS, INC.), individually, as alter-ego
24 | of, and as successor-in-interest to
     WHITTAKER, CLARK & DANIELS, INC.,
25 |
     BRISTOL-MYERS SQUIBB COMPANY,
26 | individually, as alter-ego of, and as successor-
     in-interest to CHARLES OF THE RITZ;
27 |
     COLGATE-PALMOLIVE COMPANY;
28 |

     3042644.1

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market · 55 Harrison Street, Suite 400 · Oakland, California 94607
(510) 302-1000 · Fax (510) 835-4913 · www.kazanlaw.com

1  CYPRUS MINES CORPORATION;

2  LONGS DRUG STORES CALIFORNIA,
   L.L.C., individually, as alter-ego of, and as
3  successor-in-interest to LONGS DRUG
   STORES CALIFORNIA, INC.;

4
   REVLON CONSUMER PRODUCTS
5  CORPORATION;

6  REVLON, INC., individually, as alter-ego of,
   and as successor-in-interest to CHARLES OF
7  THE RITZ GROUP, LTD. and LANVIN-
   CHARLES OF THE RITZ, INC. (Formerly
8  DOE 1);

9  SAFEWAY INC., individually, as alter-ego of,
   and as successor-in-interest to THE VONS
10 COMPANIES, INC.;

11 THE VONS COMPANIES, INC.;

12 WHITTAKER, CLARK & DANIELS, INC.;
   and
13
   SECOND DOE through ONE HUNDREDTH
14 DOE,

15          Defendants.

16

17

18          **GENERAL BACKGROUND**

19                   **I.**

20      **The Plaintiff**: Susan S. Barkley died of malignant mesothelioma on December 14, 2020.

21 Her mesothelioma was caused by her cumulative lifetime dose of asbestos and asbestiform talc,

22 including the asbestos exposures for which Defendants bear responsibility.

23      Plaintiff Trevor Barkley is Susan S. Barkley's son and heir. He is also the successor-in-

24 interest to Ms. Barkley, who was the plaintiff in the underlying personal injury matter, under

25 California Code of Civil Procedure sections 377.11, 377.20, and 377.30.  He lives in California, as

26 did his mother at the time of her death.

27                   **II**.

28      **The Defendants**: All Defendants are listed in the case caption.  The true names of the

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   Defendants sued as the SECOND DOE through ONE HUNDREDTH DOE defendants are

2   unknown to Plaintiff.  Each Defendant was the agent, employee, or joint venturer of its co-

3   defendants, and was acting in the full course and scope of the agency, employment, or joint

4   venture. Each defendant listed in the case caption, each DOE defendant, and their alternate entities

5   are referred to collectively as "Defendants".

6                                                      III.

7          **Alternate Entities**: All Defendants are individually liable for their own defective products

8   and wrongful conduct; and some Defendants are liable for the defective products and wrongful

9   conduct of their alternate entities.  Each such Defendant is liable for the torts of each of its

10  alternate entities because:

11         •       there were express or implied agreements between the companies to transfer
                   and assume the liabilities;

12
           •       the transactions between the companies amounted to a consolidation or
13                 merger;

14         •       the purchasing company is a mere continuation of the seller;

15         •       the transfer of assets to the purchasing company was for the fraudulent
                   purpose of escaping liability for the seller's debts;
16
           •       strict products liability was transferred because (1) there was a virtual
17                 destruction of Plaintiff's remedies against the original manufacturer caused
                   by the successor's acquisition of the business, (2) the successor has the
18                 ability to assume the original manufacturer's risk-spreading role, and (3) it
                   is fair to require the successor to assume responsibility for defective
19                 products that was a burden necessarily attached to the original
                   manufacturer's goodwill being enjoyed by the successor in the continued
20                 operation of the business; and

21         •       the companies are alter egos because (1) there is such a unity of interest,
                   ownership, and business operations between the companies that their
22                 separate personalities do not in reality exist, and (2) there would be an
                   inequitable result if the torts in question were treated as those of one
23                 company alone.

24

25

26         The identities of the Defendants and their alternate entities are as follows:

| Defendant | Alternate Entities |
| --- | --- |
| JOHNSON & JOHNSON CONSUMER INC. | JOHNSON & JOHNSON CONSUMER COMPANIES, INC. |

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

| BRENNTAG NORTH AMERICA, INC. | MINERAL AND PIGMENT SOLUTIONS, INC. |
| | WHITTAKER, CLARK & DANIELS, INC. |
| BRENNTAG SPECIALTIES, INC. (formerly known as MINERAL AND PIGMENT SOLUTIONS, INC.) | WHITTAKER, CLARK & DANIELS, INC. |
| BRISTOL-MYERS SQUIBB COMPANY | CHARLES OF THE RITZ |
| LONGS DRUG STORES CALIFORNIA, L.L.C. | LONGS DRUG STORES CALIFORNIA, INC. |
| REVLON CONSUMER PRODUCTS CORPORATION | CHARLES OF THE RITZ GROUP LTD. LANVIN-CHARLES OF THE RITZ, INC. |
| REVLON, INC. | CHARLES OF THE RITZ GROUP LTD. LANVIN-CHARLES OF THE RITZ, INC. |
| SAFEWAY INC. | THE VONS COMPANIES, INC. |

Throughout this Complaint, defendants JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. are collectively referred to as "J&J."

**IV.**

**Venue**: Venue is proper in Alameda County because certain Defendants reside in Alameda County.

**V.**

**The Exposures**: Ms. Barkley was exposed – mainly in California – to significant elevated levels of hazardous asbestos and asbestiform talc that was released from Defendants' cosmetic talc powder products. She was exposed to asbestos and asbestiform talc in California because of all Defendants' products that were sold in California, and because of all Defendants' related conduct that occurred in California. At all times, Defendants purposefully availed themselves of California, through marketing and sales of their relevant asbestos-containing and asbestiform talc-containing products, and through their other related conduct. Additionally, Defendants are "at home" in California, because California is one of their largest markets in the United States, and likely is the largest market. Ms. Barkley had numerous exposures to asbestos and asbestiform talc, including:

| Brand | Location and Time Period | Manner of Use |
| --- | --- | --- |
| Johnson's Baby Powder | Pennsylvania, Massachusetts, and New Jersey (early 1970's through mid-1970's); and | Ms. Barkley used Defendants' cosmetic talc powder products on a daily basis, after her |

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

| Brand | Location and Time Period | Manner of Use |
|---|---|---|
| | California (mid-1970's through mid-1990's) | showers and baths |
| Cashmere Bouquet | Same as above | Same as above |
| Jean Naté | Same as above | Same as above |

**VI**.

**The Harm**: In about April of 2018, Ms. Barkley began to suffer symptoms that ultimately led to her diagnosis of malignant pleural mesothelioma, an incurable and inevitably fatal cancer that is a 'signal disease' of asbestos exposure. As a result of her mesothelioma, Ms. Barkley experienced financial harm, physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, emotional distress, and other similar harm, beginning from no later than his diagnosis and continuously until the day of her untimely death. Plaintiff, as successor-in-interest to Ms. Barkley, does not claim any damages for pain, suffering, or disfigurement that are barred by California Code of Civil Procedure section 377.34.

Ms. Barkley's injuries and wrongful death from mesothelioma caused her son, plaintiff Trevor Barkley, to suffer the loss of her love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance.

Plaintiff relies upon the liability theories described below.

**VII**.

**State-of-the-Art Knowledge of Asbestos Hazards**: The following facts are illustrative, but not exhaustive, of the evolution of the knowledge of the health hazards of asbestos and asbestiform talc, and what was known and knowable to Defendants:

1.  Health hazards from asbestos exposure were identified in the 1890's. During this time, the Lady Inspector of Factories in Great Britain noted that individuals working with asbestos were suffering various lung injuries.

2.  Defendants, since the early 1900's, possessed medical and scientific data that raised concerns regarding the presence of asbestos in talcum powder, and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products. Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth. Talc is used in the manufacture of goods such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    in consumer powder products, talc is known as "talcum powder."

2    3.    Geologists and mining companies, including Defendants, have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite, and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800's in the United States, note the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

4.    As early as the 1920's, the term "asbestosis" was used to describe pulmonary fibrosis caused by asbestos exposure. Case reports in Great Britain and the United States detailed asbestosis in various workers.

5.    By 1929, lawsuits for disability related to exposure to asbestos were filed against Johns-Manville, a leading manufacturer and seller of asbestos and asbestos-containing products.

6.    In the late 1930's, case reports were published in medical journals addressing the relationship between asbestos and cancer.

7.    Several reports, studies, and guidelines published as early as the 1930's, including California's *Dust, Fumes, Vapors, and Gases* Safety Orders, all recognized that asbestos is a dust which creates health hazards, and that certain precautions are required to mitigate human exposure to dust. Such measures include, but are not limited to, using water to suppress the dust at its source, as well as providing those who might be exposed to dust with adequate ventilation, showers, and changing facilities. These same measures that were recommended to protect workers from asbestosis in the 1930's would also have substantially reduced the risk that bystanders, household members, and other persons would contract mesothelioma from inhaling asbestos-containing dust that those who worked with and around asbestos and asbestos-containing products carried into their households on their person and personal effects. Defendants, and each of them, knew or should have known that anyone, including household members of those who used asbestos-containing products, were at risk of developing an asbestos-related disease after inhaling dust from such asbestos-containing products.

8.    In 1931, the United Kingdom allowed workers to receive compensation for asbestosis.

9.    In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc, and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated, "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."

10.    As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

magnesium."

11.    In the September 1935 issue of National Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

12.    In 1936, California's Division of Industrial Safety issued Safety Orders establishing the standard of care for work with asbestos.

13.    Also in 1936, Illinois enacted legislation recognizing asbestosis as a compensable occupational disease under its Occupational Disease Act.

14.    By the 1940's, asbestos carcinogenicity was noted in reviews in fields of industrial medicine, cancer research, and pneumoconiosis.

15.    In 1946, the American Conference of Governmental Industrial Hygienists established a maximum allowable concentration for occupational exposure.

16.    During the 1940's and 1950's, asbestos hazards were discussed in popular magazines, including Scientific American (January 1949) and Newsweek (May 15, 1950), as well as the Encyclopedia Britannica (1952). On April 7, 1959, the Los Angeles Times and Wall Street Journal reported that California health officials did additional research linking asbestos with cancer. Following a number of subsequent reports in the New York Times, Paul Brodeur published a series of articles in the New Yorker.

17.    In addition, beginning in the 1940's and 1950's, it was recognized that individuals who worked with asbestos materials, as well as those who did not work directly with asbestos products but only had relatively brief or intermittent exposures to asbestos products, could develop fatal asbestos diseases.

18.    In 1955, Richard Doll published a study linking asbestos to lung cancer.

19.    In 1960, J. Christopher Wagner published a study linking asbestos to mesothelioma.

20.    Defendant JOHNSON & JOHNSON started selling its Baby Powder in the late 1800's. As the parent company, JOHNSON & JOHNSON made Baby Powder until 1978, when a new subsidiary corporation, now known as JOHNSON & JOHNSON CONSUMER INC., was formed. Both Defendants shared with each other all of their health-and-safety information about the talc products.

21.    In the 1950's and 1960's, J&J contracted with the Battelle Laboratory in Ohio to examine its talc for the presence of dangerous minerals. Battelle Laboratory reported back to J&J and William Ashton, a J&J managerial

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

employee, that J&J's talc had tremolite, fibrous tremolite, and fibrous talc. J&J thus had knowledge for many decades that its talc was dangerous to breathe.

22.    In the early 1960's, Dr. Irving Selikoff engaged in studies of groups of asbestos workers. By 1965, he had conducted various studies, published several articles, conducted special scientific symposia, been interviewed by the New York Times, and organized the international conference on the "Biological Effects of Asbestos" under the auspices of the renowned New York Academy of Sciences. The results of these presentations were published in Volume 132 of the *Annals of the New York Academy of Sciences* published in 1965.

23.    In 1966, J&J knew of published medical and scientific articles that warned it that breathing talc could lead to asphyxiation and death in infants. J&J knew that this information could hurt its baby products franchise and chose not to warn about the dangers of breathing talc for many decades.

24.    In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a...fiber content...averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits...Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).]

25.    In 1969, product-liability lawsuits were brought against asbestos manufacturers. Also, under the Walsh-Healey Public Contracts Act, by 1969, federal contractors with contracts for more than $10,000 were required to adhere to a workplace asbestos standard of no more than 12 asbestos fibers per cubic centimeter of air.

26.    In April 1969, J&J medical doctor Dr. Timothy Thompson wrote that J&J should consult its law department for potential litigation arising out of breathing tremolite. This J&J medical doctor specifically discussed the risk of cancer and other diseases from inhalation of needle-like tremolite.

27.    In the 1970's, J&J knew of the risk of ovarian cancer and never warned regarding any type of cancer. Ovarian cancer occurs via inhalation and translocation of asbestiform minerals in the body. J&J failed to warn of all cancer risks, including mesothelioma.

28.    In the early 1970's, J&J submitted false information to the United States Food and Drug Administration ("FDA"), claiming that J&J's products did not have asbestos in them, when J&J had internal documents demonstrating its submission was false. J&J and other companies jointly convinced the FDA to not regulate the issues of asbestos in talc. The FDA allowed the talc industry to self-regulate regarding the health impacts of breathing talc.

29.    J&J claims to have had a facility since the early 1970's to retain samples of each batch of its talc for future analysis. J&J has destroyed those samples and all underlying testing data, including photographs, Transmission

3042644.1

8

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Electron Microscopy grids, Energy Dispersive X-ray Spectroscopy grids, and Selected Area (Electron) Diffraction grids.

30. In the 1970's, J&J worked jointly with other companies, including members of the Cosmetic, Toiletry & Fragrance Association ("CTFA"), to adopt a testing method that would not find the asbestos in their talc. That method, known as the J4-1, was adopted by the industry in 1976.

31. In the 1970's, J&J misled physicians and nurses into believing that J&J's product was safe, and falsely telling them in mailings that there was no asbestos in J&J's Baby Powder.

32. In 1970, the Occupational Safety and Health Administration ("OSHA") established the first Federal guidelines for workplace asbestos exposure, which took effect in 1971. Those regulations did not identify any known safe level of exposure for asbestos and mesothelioma. The OSHA asbestos regulations were strengthened during the 1970's and 1980's. By 1986. the regulations explained: (1) the legally "permissible" levels for workplace asbestos exposures, even at just $0.2$ f/cc, actually were inadequate to protect people against the risk of mesothelioma and lung cancer; (2) for carcinogens including asbestos, "no safe threshold level was demonstrable"; and (3) mesothelioma and lung cancer developed even after "low cumulative exposures to asbestos." J&J management employees worked to keep fibrous talc and asbestiform minerals in their product from being regulated by OSHA.

33. In 1971, J&J met with scientists at Mt. Sinai Hospital in New York, who warned J&J of the risk of asbestos in its products and the risk of disease. J&J knew that fibrous talc and asbestos from talc translocated through the body after inhalation and were found in the ovaries of women.

34. In 1971, the Colorado School of Mines advised J&J managerial employee, Robert S. Russell, that there was fibrous tremolite and actinolite (asbestos), and fibrous talc in J&J samples submitted to them. Later in the mid-1970's, J&J agents and employees, including Mr. Russell, used J&J Baby Powder in a study on live babies, thereby exposing these babies to risk of disease.

35. In 1972, the private American Conference of Governmental Industrial Hygienists ("ACGIH") listed asbestos as a carcinogen. Those industry standards did not identify any known safe level of exposure for asbestos and mesothelioma.

36. In 1974, J&J employee, Dr. Fuller, told the FDA that the risk of **any** harm would be sufficient reason to take J&J's talcum powder off the market. Dr. Fuller and J&J did not live up to their promise to the FDA, and falsely reassured the FDA for decades J&J's product was safe.

37. A 1976 follow-up study conducted by researchers at Mt. Sinai concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc...We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." [Rohl, A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. Toxicol. Environ. Health 255 (1976).] The results of the Mt. Sinai study were soon picked up and reported by both

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

the New York Times and the Washington Post that same year. The study and subsequent newspaper articles listed explicitly popular consumer cosmetic talcum powders as containing high percentages of asbestos.

38.    In the early 1970's, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Defendants, who were part of an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products.

39.    In the 1970's and 1980's, J&J employee, William Ashton, knowing that fibrous talc and asbestos was dangerous, worked to keep J&J's product from being subject to any industry standards, including joining the American Society for Testing and Materials ("ASTM"), and ensuring that J&J's product would not be subject to scrutiny by the scientific community.

40.    In the 1970's and 1980's, J&J continued to mislead the public by engaging in an anti-warning marketing campaign to tell consumers that J&J's product was "pure" and would "protect" the user of the product. The marketing campaign consisted of print, radio, and television advertisements to falsely reassure the public about the safety of talc.

41.    In 1983, Anthony and Mary Rose Gambino sued J&J for injuries Mr. Gambino sustained from his use of Baby Powder talc. J&J did nothing to preserve evidence of the talc samples it was allegedly testing from the early 1980's forward.

42.    In 1991, J&J knew that Dr. Alice Blount published on the presence of asbestos in its Baby Powder. Dr. Blount told J&J about the asbestos several times in the 1990's, and yet J&J did nothing to warn consumers of the dangers associated with J&J's product.

43.    J&J in the 1990's continued its pattern and practice of marketing talcum powder as safe despite knowing of the "cancer linkage." In 1992, J&J knew its major opportunities would be to market to minorities, but also knew the major obstacles would be the inhalation risk and cancer linkage.

44.    J&J employees were in charge of worldwide testing of talc to determine how much asbestos was in each talc source. They created a testing scheme to appear like there was no asbestos in their talc. However, they knew the testing methods used were inadequate and would not detect the asbestos in the talc.

45.    J&J engaged in a pattern and practice of not warning the public through 2018 when its Chief Executive Officer, Alex Gorsky, falsely told American consumers that J&J's talcum products have always been free of asbestos.

All Defendants failed to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained asbestos, asbestiform fibers, and asbestiform talc at any point, up to and including the present day, despite the clear hazard and direct information that their products *did* contain asbestos, asbestiform fibers, and asbestiform talc.

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

# VIII.

**Additional Allegations as to J&J**: The following facts are illustrative, but not exhaustive, of J&J's wrongful conduct.

J&J knew that the needle-like shape of asbestos fibers, found in some talc deposits, makes the fibers causative of mesothelioma. And J&J knew that babies inhaled the talc, at variable levels, whenever Baby Powder was applied to them. J&J therefore understood that if its talc contained asbestos, and if that fact were publicized, it would be bad for J&J's business and reputation.

To avoid the risk of end-users' asbestos exposures, J&J always had the option to use cornstarch, instead of talc, as its Baby Powder's active ingredient. However, J&J waited until 1980 to start selling a cornstarch version alongside its talc version. Thereafter, J&J advertised that its cornstarch version was the "safest powder you can use on your baby." J&J never warned anyone about the asbestos content of its talc.

Despite admittedly knowing that its talc Baby Powder contained toxic asbestos from at least the 1960's through the 2000's, J&J concealed or otherwise misrepresented that fact from its products' consumers. In part, J&J engaged in the following acts and omissions:

1.  J&J lied to the FDA about the presence of asbestos in the talc used in J&J's products, including Baby Powder. J&J hid these results and, in some cases, asked that these results be altered or destroyed. For example, in January 1974, J&J's managing agents Dr. R. Fuller, Dr. G. Hildick-Smith, and Dr. W. Nashed met with the FDA regarding "Talc/Asbestos." In that meeting, J&J promoted its Baby Powder as the "best talc available," despite knowing the talc's asbestos content. J&J also falsely claimed to the FDA that "substantial asbestos can be allowed safely in a baby powder." J&J further assured the FDA that, if studies showed that the talc was unsafe, J&J "will not hesitate to take it off the market." J&J never took its Baby Powder off the market despite knowing that the product contained asbestos. J&J, itself and through the CTFA, also withheld original documents and reports identifying asbestos in its talc and talc-containing products, including J&J's Baby Powder, and instead falsely reported to the FDA there was no asbestos. After providing this false information to the FDA, the CTFA, including J&J, met privately and congratulated themselves on the "success" of the "presentations" to the FDA, and agreed that they should not bind themselves to having to further update the FDA. Despite its admission that asbestos is a carcinogen—or revealed—to the FDA any asbestos in its Baby powder or talc products, including the list of positive asbestos findings in its talc ore, talc, and products throughout the decades.

2.  In or around 1978, J&J and other members of the CTFA destroyed evidence showing positive findings of asbestos in round-robin testing of J&J and

3042644.1

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

other manufacturers' consumer talcum products for asbestos content. The FDA initially proposed regulating the cosmetic talc industry. However, J&J and other members of the CTFA contended that they should be able to self-regulate. As a result, the FDA had no authority to "go into [J&J's] files"; it was up to J&J to voluntarily provide information to the FDA. Because the cosmetic talc industry was self-regulating, the CTFA rejected the FDA's proposal to have CTFA disclose the results of CTFA's respective periodic monitoring for asbestos. At J&J's direction, the CTFA was instructed to "[d]estroy your copy of the table" containing the results of the CTFA Task Force on Round Robin Testing of Consumer Talcum Products for Asbestiform Amphibole Minerals.

3.    J&J fraudulently labeled and advertised its Baby Powder as being pure and protective of health, and free of asbestos fibers. J&J maintained the trust of mothers and other consumers who used its Baby Powder products through print advertisements and other methods. In the 1940's, J&J emphasized that doctors and nurses preferred J&J's Baby Powder because of its effectiveness and alleged purity. J&J described the product as the "purest." J&J also directly promoted its baby powder to medical personnel. J&J provided samples for doctors to distribute.  A 1965 brochure for doctors claimed that the powder was safe and had medical benefits. The bottle itself even said, "Purest Protection." Another version of the bottle said, "Good for baby, Good for you." However, J&J well knew that its Baby Powder was not pure because it contained asbestos. J&J also knew that its Baby Powder provided no medical protection or any other medicinal value.

4.    J&J and its officers, directors, and managing agents including, but not limited to, Bill Ashton, Dr. R. Fuller, Dr. G. Hildick-Smith, Dr. Al Goudie, Dr. W. Nashed, and members of J&J's Talc Advisory Group, kept from or otherwise misrepresented to the public test results showing the presence of asbestos and asbestiform fibers in its talcum products, including Baby Powder. For example, in or around October 1972, Dr. Nashed stated to Dr. Goudie that he "thought tremolite was mistakenly identified in view of similarity to Na [sodium] sesquicitrate!" Dr. Goudie replied, "There are trace quantities present confirmed both by McCrone & Bill Ashton. Levels are extremely low but occasionally can be detected optically. *This is not new.*" In or around June 1973, the University of Minnesota lab reported to J&J that its Shower to Shower talc powder contained "1/100th of 1 percent asbestos," as shown by electron microscopy, both in the material from J&J and from Dr. Lewin's sample. Shortly thereafter, J&J and the McCrone lab authored their own report in which they misquoted the University of Minnesota lab's report by using misleading ellipses that concealed the asbestos findings. In its November 1974 letter to a concerned consumer in California, J&J (i) falsely claimed that it used only the "purest talc available," (ii) described contrary articles as "sensational and scary," and (iii) claimed to be "highly ethical and responsible" because its products were safe.

## FIRST CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY

### I.

**Design Defect**: All Defendants are strictly liable, under the consumer-expectations test, for

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  placing defectively designed products into the stream of commerce, ultimately exposing Ms.

2  Barkley to asbestos and asbestiform talc from these products. First, Defendants designed,

3  manufactured, supplied, marketed, distributed, and sold the products.  Second, each product did

4  not perform as safely as an ordinary consumer would have expected it to perform when used or

5  misused in an intended or reasonably foreseeable way, because each product caused hazardous

6  asbestos to become airborne, exposing Ms. Barkley to asbestos. Third, Ms. Barkley developed

7  mesothelioma.  Fourth, each product's failure to perform safely was a substantial factor in causing

8  Ms. Barkley's mesothelioma and wrongful death.

9                                                    **II**.

10       **Failure-to-Warn Defect**: All Defendants are strictly liable for placing products with

11  failure-to-warn defects into the stream of commerce, ultimately exposing Ms. Barkley to asbestos

12  and asbestiform talc from these products. First, Defendants designed, manufactured, supplied,

13  marketed, distributed, and sold the products. Second, each product had potential risks that were

14  known or knowable in light of the scientific and medical knowledge that was generally accepted in

15  the scientific community at the time of design, manufacture, supply, marketing, distribution, and

16  sale. Third, the potential risks presented a substantial danger when each product was used or

17  misused in an intended or reasonably foreseeable way, because each product caused hazardous

18  asbestos to become airborne.  Fourth, ordinary consumers would not have recognized the potential

19  risks.  Fifth, Defendants failed to adequately warn or instruct of the potential risks.  Sixth, Ms.

20  Barkley developed mesothelioma.  Seventh, the lack of sufficient warnings or instructions was a

21  substantial factor in causing Ms. Barkley's mesothelioma.

22

23                        **SECOND CAUSE OF ACTION FOR NEGLIGENCE**

24                                                    **I**.

25       **General Negligence**: All Defendants are liable for their general negligence.  First,

26  Defendants failed to use reasonable care to prevent harm to others, because they caused hazardous

27  asbestos to become airborne, through Defendants' active participation and contribution to specific

28  activities that caused asbestos to become airborne. Second, Defendants did so by unreasonably

3042644.1

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

1   acting and failing to act. They acted in ways that a reasonably careful person would not do in the

2   same situation, and failed to act in ways that a reasonably careful person would do in the same

3   situation. Third, Ms. Barkley developed mesothelioma. Fourth, each Defendant's general

4   negligence was a substantial factor in causing Ms. Barkley's mesothelioma.

5                                            **II**.

6        **Negligence Per Se**: All Defendants are liable for negligently violating the applicable state

7   and federal asbestos regulations. Defendants negligently violated those regulations by failing to

8   properly label asbestos-containing products; failing to monitor for the presence of asbestos; failing

9   to provide changing facilities and showers to exposed persons; allowing exposures of asbestos to

10  exceed permissible exposure limits; failing to warn as to the presence of asbestos; and failing to

11  implement industrial hygiene practices to eliminate or decrease exposures to asbestos. Those

12  violations were a substantial factor in causing Ms. Barkley's exposures to asbestos, and in causing

13  Ms. Barkley's mesothelioma. The regulations were designed to prevent overexposure to asbestos

14  dust, and Ms. Barkley was within the class of persons that the regulations were designed to

15  protect. Accordingly, because Defendants violated the regulations, Defendants' conduct is

16  presumed to have been negligent.

17                                         **III**.

18        **Negligent Design, Marketing, Sale, Supply, Installation, Inspection, Repair, and**

19  **Removal of Products**: All Defendants are liable for their negligent design, marketing, sale,

20  supply, installation, inspection, repair, and removal of products. First, Defendants designed,

21  marketed, sold, supplied, installed, inspected, repaired, and removed the products. Second,

22  Defendants were negligent in designing, marketing, selling, supplying, installing, inspecting,

23  repairing, and removing the products, because the products released hazardous asbestos which

24  become airborne. Defendants failed to use the amount of care that a reasonably careful person

25  would use in similar circumstances to avoid exposing others to a foreseeable risk of harm. Third,

26  Ms. Barkley developed mesothelioma. Fourth, each Defendant's negligence was a substantial

27  factor in causing Ms. Barkley's mesothelioma.

28                                         **IV**.

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

**Negligent Failure to Warn about Products**: All Defendants are liable for their negligent failure to warn about their products. First, Defendants designed, manufactured, supplied, marketed, distributed, and sold the products. Second, Defendants knew or reasonably should have known that each product was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner, because each product caused hazardous asbestos to become airborne. Third, Defendants knew or reasonably should have known that users would not realize the danger. Fourth, Defendants failed to adequately warn of the danger or instruct on the safe use of each product. Fifth, a reasonably careful person under the same or similar circumstances would have warned of the danger or instructed on the safe use of each product. Sixth, Ms. Barkley developed mesothelioma. Seventh, each Defendant's negligent failure to warn or instruct was a substantial factor in causing Ms. Barkley's mesothelioma.

V.

**Negligent Failure to Recall and Retrofit Products**: All Defendants are liable for their negligent failure to recall and retrofit their products. First, Defendants designed, manufactured, supplied, marketed, distributed, and sold the products. Second, Defendants knew or reasonably should have known that each product was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner, because each product caused hazardous asbestos to become airborne. Third, Defendants became aware of this defect after they placed each product into the stream of commerce. Fourth, Defendants failed to recall and/or retrofit each product. Fifth, a reasonably careful person under the same or similar circumstances would have recalled and/or retrofitted each product. Sixth, Ms. Barkley developed mesothelioma. Seventh, each Defendant's negligent failure to recall and retrofit each product was a substantial factor in causing Ms. Barkley's mesothelioma.

### THIRD CAUSE OF ACTION FOR FRAUD

**I.**

All Defendants are liable for fraud, including fraudulent misrepresentation, fraudulent

15

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  concealment, conspiracy to commit fraudulent misrepresentation, and conspiracy to commit

2  fraudulent concealment, as set forth herein.

3                                            **II**.

4          **Fraudulent Misrepresentation:** All Defendants are liable for their fraudulent

5  misrepresentations.

6          First, each Defendant, via its employees, agents, advertisements, or any other authorized

7  person or document, represented that certain facts were true when they were not.

8          Second, each Defendant falsely represented that the products they marketed, used, sold,

9  supplied, and/or specified for use were not hazardous; and/or that each Defendant's conduct did

10 not create serious or deadly dust hazards. Those misrepresentations were made before and during

11 the years that Ms. Barkley was exposed to asbestos for which Defendants are responsible. Those

12 misrepresentations were made either directly to Ms. Barkley, to a group of persons including Ms.

13 Barkley, and/or to third parties intending and reasonably expecting that the substance of those

14 misrepresentations would be repeated to Ms. Barkley.

15         Third, each Defendant knew that the misrepresentations were false when they made them,

16 or Defendants made the misrepresentations recklessly and without regard for the truth.

17         Fourth, each Defendant intended that Ms. Barkley and/or the same class of persons would

18 rely on the misrepresentations or their substance.

19         Fifth, Ms. Barkley reasonably relied on Defendants' misrepresentations or their substance.

20         Sixth, Ms. Barkley developed mesothelioma.

21         Seventh, Ms. Barkley's reliance on each Defendant's misrepresentations was a substantial

22 factor in causing her mesothelioma.

23                                           **III**.

24         **Fraudulent Concealment (Nondisclosure):** All Defendants are liable for their fraudulent

25 concealment (nondisclosure).

26         First, each Defendant made affirmative statements that were so misleading (e.g.,

27 misleading "half-truths") that they gave rise to a fraud cause of action even in the absence of a

28 specific relationship or transaction as between Defendants and Ms. Barkley.  Specifically,

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    Defendants stated that their products could be used safely, while concealing that they were in fact

2    lethal because they released asbestos fibers; and/or Defendants stated that their conduct did not

3    create serious or deadly dust hazards, while concealing that Defendants' conduct in fact created

4    risks of asbestos-related cancer.

5         Second, each Defendant (i) had exclusive knowledge of material facts not known to Ms.

6    Barkley, (ii) actively concealed these material facts from Ms. Barkley, (iii) made partial

7    representations but also suppressed material facts, as set forth above, and (iv) made factual

8    representations, but did not disclose facts that materially qualified those representations. Such

9    nondisclosures included Defendants representing their products as safe when used as intended and

10   as fit for the particular purpose for which they were marketed, while not disclosing the facts that

11   these products contained asbestos that would become airborne during the intended and/or

12   foreseeable use of the products, rendering them dangerous and unfit for their intended purpose.

13        Third, each Defendant entered into a relationship and/or a transaction with Ms. Barkley

14   sufficient to give rise to a duty to disclose. For example, Ms. Barkley used or otherwise

15   encountered Defendants' products that were purchased either directly from Defendants,

16   Defendants' authorized dealer or supplier, or any other entity such that Defendants derived a direct

17   monetary benefit. Defendants derived direct monetary benefit from the industry and these

18   individuals' use of these products because Ms. Barkley and/or her family members decided to use

19   or purchase Defendants' products.

20        Fourth, Ms. Barkley did not know of the concealed facts.

21        Fifth, Defendants intended to deceive Ms. Barkley by concealing the facts, and/or by

22   making certain representations without disclosing additional facts that would have materially

23   qualified those representations.

24        Sixth, had the omitted information been disclosed, Ms. Barkley reasonably would have

25   behaved differently.

26        Seventh, Ms. Barkley developed mesothelioma.

27        Eighth, each Defendant's concealment was a substantial factor in causing Ms. Barkley's

28   mesothelioma.

**IV**.

**Conspiracy to Commit Fraudulent Misrepresentation**: All Defendants are liable for their conspiracy to commit fraudulent misrepresentation. First, Defendants were aware that their conspirators, which included all co-Defendants and others, planned to commit fraudulent misrepresentation against Ms. Barkley. Second, Defendants agreed with their conspirators and intended that the fraudulent misrepresentation be committed. Third, Ms. Barkley developed mesothelioma. Fourth, each Defendant's participation in the conspiracy was a substantial factor in causing Ms. Barkley's mesothelioma.

**V**.

**Conspiracy to Commit Fraudulent Concealment**: All Defendants are liable for their conspiracy to commit fraudulent concealment. First, Defendants were aware that their conspirators planned to commit fraudulent concealment against Ms. Barkley. Second, these Defendants agreed with their conspirators and intended that the fraudulent concealment be committed. Third, Ms. Barkley developed mesothelioma.  Fourth, each Defendant's participation in the conspiracy was a substantial factor in causing Ms. Barkley's mesothelioma.

**VI**.

**Knowledge of Hazards:** At all times pertinent hereto, all Defendants owed Ms. Barkley a duty, as provided for in California Civil Code sections 1708, 1709, and 1710, to abstain from injuring her person, property, or rights. In violation of that duty, each Defendant engaged in the acts and omissions when a duty to act was imposed as set forth herein, thereby proximately causing injury and harm to Ms. Barkley. Such acts and omissions consisted of deceit as prohibited by Civil Code section 1710, and more specifically were (i) suggestions of fact which were not true and which the Defendants did not believe to be true, (ii) assertions of fact of that which was not true, which the Defendants had no reasonable ground for believing to be true, and (iii) the suppression of facts when a duty existed to disclose it, all as are more fully set forth herein, and the violation of which as to any one such item gave rise to a cause of action for violation of Ms. Barkley's rights, as provided for in the above statutes.

Each of the foregoing acts, suggestions, assertions, and failures to act when a duty existed

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1 to act, Defendants having such knowledge, knowing Ms. Barkley did not have such knowledge,

2 was done falsely and fraudulently and with full intent to induce her to remain in a dangerous

3 environment and to cause her to remain unaware of the true facts, all in violation of the Civil Code

4 and other applicable law.

5

6 ## BASIS FOR PUNITIVE DAMAGES

7 **Malice, Oppression, or Fraud**: Plaintiff hereby incorporates by reference the allegations

8 of all causes of action in this Complaint as if fully stated herein. All Defendants are liable for

9 punitive damages because they engaged in the conduct that caused Ms. Barkley's harm with

10 malice, oppression, or fraud.

11 First, Defendants committed malice in that they acted with intent to harm when they

12 caused Ms. Barkley's asbestos exposures, and because their conduct was despicable and was done

13 with a willful and knowing disregard of the rights and safety of others.

14 Second, Defendants committed oppression in that their conduct was despicable and

15 subjected Ms. Barkley to cruel and unjust hardship in knowing disregard of her rights.

16 Third, Defendants committed fraud in that they intentionally concealed and misrepresented

17 material facts and did so intending to harm Ms. Barkley.

18 Defendants' conduct constituting malice, oppression, or fraud was committed by,

19 authorized by, or adopted by one or more officers, directors, and/or managing agents of each

20 Defendant, who acted on behalf of each Defendant.

21

22 ## PRAYER FOR DAMAGES

23 Plaintiff prays for judgment against all Defendants for:

24 1.     All economic and non-economic compensatory damages in excess of $25,000;

25 2.     Punitive damages according to proof;

26 3.     Pre- and post-judgment interest;

27 4.     Costs of suit; and

28 5.     Such other relief as is fair, just, and equitable.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

3042644.1

19

1

2

## **DEMAND FOR JURY TRIAL**

3

Plaintiff hereby demands a trial by jury on all issues so triable.

4

5

DATED: May 19, 2021

KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation

6

7

8

By: _____

Laurel Halbany

9

Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3042644.1

20

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1

## PROOF OF SERVICE

2

*Susan S. Barkley v. Johnson & Johnson, et al.*
**Alameda County Superior Court Case No. RG20066950**

3

**STATE OF CALIFORNIA, COUNTY OF ALAMEDA**

4

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Alameda, State of California.  My business address is Jack London Market, 55 Harrison Street, Suite 400, Oakland, CA 94607.

5

6

On May 19, 2021, I served true copies of the following document(s) described as:

7

**FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES (SURVIVORSHIP) AND WRONGFUL DEATH**

8

9

on the interested parties in this action as follows:

10

### SEE ATTACHED SERVICE LIST

11

**BY ELECTRONIC SERVICE:**  I electronically filed the document(s) with the Clerk of the Court by using the File & ServeXpress system.  Participants in the case who are registered users will be served by the File & ServeXpress system.  Participants in the case who are not registered users will be served by mail or by other means permitted by the court rules.

12

13

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

14

15

Executed on May 19, 2021, at Richmond, California.

16

17

/s/ Kristine Harrison
Kristine Harrison

18

19

20

21

22

23

24

25

26

27

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

3042644.1

21

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

**SERVICE LIST**

| | |
|---|---|
| BARNES & THORNBURG LLP<br>2029 Century Park East, Suite 300<br>Los Angeles CA 90067<br>Telephone: (310)284-3880<br>Facsimile: (310)284-3894<br>FOR: LONGS DRUGS STORES CA, L.L.C.<br>sii/pae/et LONGS DRUG STORES CA, INC.,<br>LONGS DRUGS STORES CALIFORNIA,<br>L.L.C., SAFEWAY INC., SAFEWAY INC.<br>sii/pae/et THE VONS COMPANIES, INC.,<br>THE VONS COMPANIES, INC. | BERKES CRANE ROBINSON & SEAL, LLP<br>515 SOUTH FIGUEROA STREET<br>SUITE 1500<br>LOS ANGELES CA 90071<br>Telephone: 213-955-1150<br>Facsimile: 213-955-1155<br>FOR: WHITTAKER, CLARK & DANIELS, INC. |
| COUNSEL UNKNOWN<br>FOR: REVLON, INC., REVLON, INC. ae/sii<br>Charles of the Ritz Group Ltd. & Lanvin-<br>Charles | DENTONS US LLP<br>One Market Plaza<br>Spear Tower, 24th Floor<br>San Francisco CA 94105<br>Telephone: (415) 267-4000<br>Facsimile: (415) 267-4198<br>FOR: CYPRUS MINES CORPORATION |
| FOLEY & MANSFIELD, PLLP<br>300 Lakeside Drive<br>Suite 1900<br>Oakland CA 94612<br>Telephone: 510-590-9500<br>Facsimile: 510-590-9595<br>FOR: COLGATE-PALMOLIVE CO. | HAWKINS PARNELL  & YOUNG LLP<br>345 California Street<br>Suite 2850<br>San Francisco CA 94104-2606<br>Telephone: 415-766-3200<br>Facsimile: 415-766-3250<br>FOR: BRISTOL-MYERS SQUIBB<br>COMPANY, BRISTOL-MYERS SQUIBB<br>COMPANY ae/sii CHARLES OF THE RITZ,<br>REVLON CONSUMER PRODUCTS<br>CORPORATION |
| KING & SPALDING LLP<br>633 West  5th Street,<br>Suite 1600<br>Los Angeles CA 90071<br>Telephone: 213-443-4355<br>Facsimile: 213-443-4310<br>FOR: JOHNSON & JOHNSON , JOHNSON &<br>JOHNSON CONSUMER INC. sii  JOHNSON<br>& JOHNSON CONS COMPANIES ,<br>JOHNSON & JOHNSON CONSUMER, INC. | MURRIN & ASSOCIATES LLC<br>3675 Mount Diablo Blvd., Suite 230<br>Lafayette, CA 94549<br>Telephone: (925) 284-5770<br>Facsimile: (925) 262-2111<br>FOR: BRENNTAG SPECIALTIES, INC. and<br>BRENNTAG NORTH AMERICA, INC. |
| SPANOS PRZETAK<br>475 14th St. Ste. 550<br>Oakland CA 94612<br>Telephone: (510) 250-0200<br>Facsimile: (510) 380-6354<br>FOR: DESIGNATED DEFENSE COUNSEL | |

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

FIRST AMENDED COMPLAINT FOR SURVIVAL AND WRONGFUL DEATH

# Exhibit 4

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

Rene C. Davidson Courthouse, Department 18

## JUDICIAL OFFICER: HONORABLE JO-LYNNE LEE

Courtroom Clerk: Timothy Lopez                                           CSR: None

**RG20066950**                                                    October 7, 2022
                                                                       10:00 AM

**Barkley VS Johnson & Johnson**

## MINUTES

**APPEARANCES:**

No Appearances

**NATURE OF PROCEEDINGS: Case Management Conference**

Counsel on Zoom:

Ian Rivamonte, Hillary Huth, Jazmyne Arnett.

REPORTED BY CSR SHEILA PHAM.

ORDER RE: CASE MANAGEMENT AND TRIAL SETTING ORDER WITH NOTICE

The Court has ordered the following at the conclusion of a judicially supervised Case
Management Conference.

TRIAL SETTING ORDERS

Jury Trial is scheduled for 07/10/2023 at 08:30 AM in Department 18.

The parties are ordered to comply with the Standing Pre-Trial Orders for Civil Cases, Local Rule
of Court 3.35.

The Pretrial Conference will be held on the first day of trial. See Pretrial Conference Order
below.

MANDATORY SETTLEMENT CONFERENCE (CRC section 3.1380)

The Court orders the parties to a Mandatory Settlement Conference (MSC) on 07/05/2023 at
09:00 AM in Department 302.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

Lead negotiating counsel, trial counsel, party representatives, insurance carrier representatives with full settlement authority from each insurance policy implicated by plaintiff's demand, and all other persons necessary to consent to settlement must PERSONALLY ATTEND the MSC, unless excused by the court for good cause.

Parties must comply with all applicable rules and code provisions regarding MSCs, including California Rule of Court (CRC) 3.1380. No later than five court days before the MSC, each party must serve on opposing parties, and DELIVER DIRECTLY TO THE SETTLEMENT DEPARTMENT a hard copy Settlement Conference Statement (SCS) that includes a detailed discussion of liability and damages. The SCS must also contain a good faith settlement demand or offer as of the date the settlement conference statement is signed.

DO NOT E-MAIL OR FILE, INCLUDING BY FAX, THE SCS WITH THE COURT.

Any person seeking to appear at the MSC by telephone must file with the clerk's office a formal ex parte application with a proposed order and proof of service showing service on all parties. A courtesy copy of the application and proposed order must be delivered directly to the settlement department. The application will not be granted unless the party shows good cause and delivers to the settlement department its SCS that fully complies with CRC 3.1380(c) and includes a good faith settlement demand or offer as of the date the settlement conference statement is signed. If the application is granted, the person appearing by telephone must be immediately available by telephone throughout the conference until released by the court.

FAILURE TO BE IMMEDIATELY AVAILABLE, INCLUDING AFTER BUSINESS HOURS, CONSTITUTES A NON-APPEARANCE BY THAT PERSON.

If the case settles before the MSC, Plaintiff must promptly notify this department and the settlement department.

FAILURE TO COMPLY WITH THIS ORDER MAY RESULT IN SANCTIONS.
The Mandatory Settlement Conference in Dept. 301/302/303 will be conducted remotely via .

Prior to the scheduled MSC date, the court will send out a BlueJeans Video Conference Invitation Link that will include a Meeting ID and other pertinent information that will enable parties/counsels to participate in the specific conference/hearing. Once received please familiarize yourselves with the software and please conduct a test to make sure your specific electronic equipment that you will be using that day (Smartphone, Laptop, Desktop etc.) is fully updated and both video / audio capabilities are functional.

Settlement Conference Statements

To comply with Rule3.1380(c), each party must email the court at least five court days prior to the conference a settlement conference statement no more than five pages in length. Do not file the settlement conference statement. Send the statement to the court clerk's email address. Your statement must include:

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

Hearing date for any dispositive motion;
Summary of remaining discovery;
Summary of all liability facts and issues;
List of all economic damages claimed;
Current good faith settlement offer or demand of each party;
Name, date, and description of each alternative dispute resolution neutral's attempt to resolve this case.

Because of technical and printing limitations, do not include any attachments or exhibits. Make sure you send a copy of your settlement conference statement to all opposing parties. The statements will not be filed and will be destroyed at the completion of the settlement conference and will be destroyed at the completion of the settlement conference.

Please proceed in sending the required Mandatory Settlement Conference Statement via email to: Dept.301@alameda.courts.ca.gov and rmcguiness@alameda.courts.ca.gov at least five days prior to your conference or submit directly to Dept. 301's Drop Box located outside of the courtroom.

Please proceed in sending the required Mandatory Settlement Conference Statement via email to: Dept.302@alameda.courts.ca.gov and pherbert@alameda.courts.ca.gov at least five days prior to your conference or submit directly to Dept. 302's Drop Box located outside of the courtroom.

Please proceed in sending the required Mandatory Settlement Conference Statement via email to: Dept.303@alameda.courts.ca.gov and trasch@alameda.courts.ca.gov at least five days prior to your conference or submit directly to Dept. 303's Drop Box located outside of the courtroom.

Please provide all email addresses of all parties/counsels/claims representative etc. that will be active participants at the upcoming settlement conference.


FURTHER CONFERENCE
A Case Management Conference is scheduled for 01/13/2023 at 09:00 AM in Department 18.


This matter is continued for status.

Updated Case Management Statements must be filed by Plaintiff and Designated Defense Counsel (DDC) no later than 15 days prior to the CMC and courtesy copy emailed to Dept. 18. If the foregoing date is a court holiday or a weekend, the time is extended to the next business day. Individual defendants may also opt to file their own CMC Statements. All CMC Statement shall be submitted on pleading paper with a brief summary of the status of the case and any specified issues that need to be addressed by the court. Do not use Judicial Council Form CM-110.

TENTATIVE CASE MANAGEMENT ORDERS
Counsel and self represented parties are advised that the court will generally issue a tentative case management order in advance of a scheduled case management conference. This tentative

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

order may be viewed in the court's REGISTER OF ACTION for your case (it is NOT posted in TENTATIVE RULINGS which are for law and motion matters). If any party is contesting this tentative case management order, they must email the department clerk and cc opposing counsel no later than 4:00 PM two (2) court days prior to the hearing.

If no one is contesting the tentative no appearances will be needed and the tentative will become the order of the Court.


PRETRIAL CONFERENCE ORDER

All parties shall comply with Local Rule of Court 3.35, with the following modifications and clarification and subject to any further order of the trial judge:


A. JOINT SUBMISSIONS

The parties are ordered to meet and confer in sufficient time prior to the Pretrial Conference, and as many times as necessary, to meaningful assemble the following items to be submitted jointly by all parties to the Court for the Pretrial Conference. Courtesy hard copies of these documents shall be provided to Dept. 18 at the Pretrial Conference.

1. Jury Instructions - with ALL BLANKS FILLED IN - which will be given to the jurors at the conclusion of the trial. This does not mean a set of instructions from each party or side. The court expects the parties to resolve any differences amongst themselves and present a unified set of instruction. It is easier to delete instructions that do not apply after the presentation of evidence than to craft instructions on the eve of argument. Any proposed jury instruction, including any proposed Special Jury Instruction, not agreed upon shall be separately submitted by each party.

2. Verdict Form - A single verdict form which will be used by the jury. Again this does not mean different verdict forms from each party or side. The observation noted above as to the jury instructions applies equally to the verdict form. With both Jury Instructions and Verdict Forms all causes of action and defenses must be included even if counsel expects some may be eliminated on motion or otherwise stricken or modified.

3. Exhibit List - An exhibit list with no duplicate documents. Counsel shall meet and confer to determine an assignment of blocks of exhibit numbers per party. Pre-marked exhibits shall be lodged with the Court on the first day of trial along with an Index identifying each of the numbered exhibits (e.g. 10 page letter from X to Y dated ___). The description on the index will be used by the court to identify in the record the documents that are marked for identification or admitted into evidence during the trial.

4. Witness List - A common witness list limited to those witnesses which the parties actually expect to call to testify (this list will be used in the Juror Questionnaire).

5. Jury Questionnaire - A common juror questionnaire, with questions in disagreement to be highlighted. A form "Instructions to Jurors" should be attached as the first page to any submitted questionnaire.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

6. Time Estimate - A reasonable cumulative time estimate from each side for the number of hours needed to present their case. This reasonable estimate shall include: opening statement, final argument, direct examination of their party's witnesses and cross examination of opposing witnesses. In other words how much time does each party need for the presentation of their case?

7. Statement of the Case - A Statement of the Case to be read to the jury. (Counsel shall advise the court if they are agreeable to making mini-opening statements of no more than 3 minutes each).

8. Evid, Code 401/402 Hearings - A list of those witnesses where a party requests an Evidence Code section 401 or section 402 hearing. Note that after the jury selection process begins, a request for such a hearing will only be entertained if the requesting party could not have reasonably anticipated the need for such a hearing at the time of the Issues/Pretrial Conference.

Any party who does not diligently participate in these discussions runs the risk that he/she or it has waived objection and/or does not contest the above items presented to the court at the pretrial conference.

## B. IN LIMINE MOTIONS

1. Unless otherwise ordered (see paragraph 5, below) each side is limited to a total of 5 motions in limine; however, each defendant may additionally file up to 2 defendant-specific motions in limine.

2. Each motion in limine shall be filed separately from any other motion in limine and shall not be combined, aggregated or consolidated with any other motion. Motions shall not be filed in "subparts." Counsel shall not file "trial briefs" seeking an evidentiary ruling that should have been filed as a motion in limine; so-called "trial briefs" will not be considered by the court or ruled upon.

3. Motions shall be numbered consecutively beginning with the party's name, for example: Plaintiff MIL #1; Defendant Smith MIL #1, #2, #3, etc.; Defendant Jones MIL #1, #2, #3, etc. Motions shall set forth in the title which of the following categories it is in:
a. Expert Testimony
b. Evidence
c. Damages
d. Legal Duty
e. OTHER

4. Each motion in limine shall be accompanied by a separate memorandum of points and authorities as defined in CRC 3.113(b). A notice of hearing is not necessary. All motions seeking to exclude evidence shall set forth factual support as to the exact nature and type of evidence which the party is seeking to exclude, including attaching relevant portions of depositions, interrogatories or other factual support. The court will specifically enforce the standards of Kelly v. New West Federal Savings (1996) 49 CA4th 659, 670. Motions which make unsupported assertions about what witnesses allegedly said in deposition or speculate about what witnesses

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

may say at trial without attaching to the motion a declaration setting forth a factual basis are subject to sanctions.

5. All in limine motions are to be served on opposing counsel at least 14 days prior to the conference. All oppositions to in limine motions are to be served on opposing counsel at least 7 days prior to the conference. These deadlines are mandatory unless, prior to the pretrial conference the court has approved a modification of these deadlines for good cause. Counsel shall meet and confer prior to the pretrial conference to determine which motions will require a court ruling.

A party may seek leave of court to serve additional motions in limine above the maximum number set forth above for good cause shown. The request shall be in writing, served on all parties, and shall include a copy of the proposed motion along with the attorney's declaration of good cause. The request shall be filed and served at least 14 days prior to the conference and any opposition shall be filed at least 7 days prior to the conference.

6. Parties are to comply with revised Local Rule 3.35(e)(2) which states:
"Unless otherwise ordered by the trial judge, all motions in limine subject to this rule must be in writing, numbered consecutively and filed in the clerk's office at least three court days before the pretrial conference or, if there is no pretrial conference, three court days before trial. Motions in limine addressing separate evidence or issues shall not be aggregated into one motion. Reservation numbers are not required for motions in limine subject to this rule."

7. At the time the motions in limine are filed, the parties shall provide the trial judge with ONE list of all in limine motions filed - plaintiffs' listed first and then defendants' motions in numerical order - with the subject of each motion described in less than 10 words and an indication if the motion is stipulated, withdrawn, deferred or contested. This list should be provided to the trial judge, along with a three ring binder with the trial judge's courtesy copies of the motion(s) and opposition brief(s) of the each contested motion(s).

8. TENTATIVE RULINGS ON COMMON MOTIONS IN LIMINE:
The following motions in limine are conditionally granted and, unless contested in writing, should NOT be filed:

PROCEDURE:
1. To amend the Case Caption to Reflect Remaining Defendants only. Defendants will be referred to, introduced and participate at trial in alphabetical order;
2. To preclude reference to any possible future wrongful death action;
3. To preclude reference to plaintiff's counsels' other clients or website;
4. To preclude attribution of fault to any party granted summary judgment.
5. Motion to Exclude Witness from the Courtroom Until Witness' Testimony is Completed.

EVIDENCE:
1. Motion To Preclude Mention of Bankruptcy or other Financial Status of Absent Defendants;
2. Motion to Preclude Reference to Absence of Corporate Representative is granted. However, that does not preclude Plaintiff from commenting on any defendant's failure to produce or refute

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

relevant evidence.

3. Motion to Exclude Evidence or Mention of Insurance, including Plaintiff's Medical Insurance;

4. Motion to Exclude Experts Not Designated Pursuant to CCP 2034;

5. Motion to Preclude Reference to Serpentine as the State Rock;

6. Motion to Preclude Reference to Defendants as "the Asbestos Industry" is granted, provisionally: The dictionary defines "industry" as a group of businesses that provide a particular product or service, often named after their common principal product: e.g. the automobile industry, the textile industry, the cosmetics industry. To the degree plaintiff has evidence that the principal product of any of the defendants is asbestos, such as the mining company or fabricator of raw asbestos, the plaintiff may refer to that defendant as a member of the "asbestos industry. " To the degree plaintiff has not made that showing, he shall not merely assert or argue that a defendant or all defendants are within the asbestos industry.

7. Motion To Exclude Reference to the l989 Proposed EPA Ban which never went into effect;

8. Motion to Exclude "But For" Causation Opinions by Experts.


DAMAGES:

1. Motion To Exclude Any Reference to or Evidence of Prior Settlements is granted.

2. Motion to Bifurcate Punitive Damage claims;

3. Motion to Exclude Collateral Source Evidence;

4. Motion to Preclude Reference to Surviving Spouse Pension Benefits as
Collateral Source;

5. Motion to Preclude Use of Personal Consumption as a Damages Offset in a personal injury case;

6. Motion To Limit Evidence of Plaintiff(s)' Claims for Past and Future Medical Expenses to Those Actually Paid by or on Behalf of Plaintiff is granted.

Evidence of Past Medical Expenses is limited to amounts actually paid by or on behalf of Plaintiff and which were accepted by medical care providers as payment in full. Evidence of currently Outstanding Medical Expenses which have not yet been paid is limited to amounts which were actually incurred and for which plaintiff is personally liable or his insurer is contractually liable. Future Medical Expense evidence is limited to amounts which it is reasonably foreseeable Plaintiff will incur and be liable for either personally or through his insurance coverage. Evidence of the amount billed for medical care but for which Plaintiff is not liable either personally or through his insurer is excluded. Evidence that medical payments were made on behalf of Plaintiff by a collateral source such as Medicare is excluded. (see Howell and Corenbaum)


C. 48 HOUR NOTICE

(1) OPENING STATEMENTS : In opening statements to the jury by counsel, no display to the jury or reference should be made to any document, chart, graph, map, picture, model, video or any other graphic device or presentation except 1)when marked as an exhibit and received in evidence; 2)by stipulation of counsel; or 3)with leave of court. With prior approval of the court, counsel may use paper for illustrative purposes during opening statements. At least 48 hours in advance of the Opening Statement, parties shall exchange any power point screens or other visual or demonstrative aids (e.g.photographs, maps, charts, excerpts of deposition testimony or documents) they intend to display to the jury in their Opening Statement. Objections to any said materials shall be brought the attention of the trial judge immediately so that the court has

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

reasonable time to rule upon any objections prior to Opening Statements being presented.
(2) TRIAL: Parties shall identify to opposing parties the names of the witnesses they will be calling to the stand and exhibits they intend to introduce (in their direct case) and any proposed power point to be used by the witness at least 48 hours in advance (and no later than Friday 5 p.m. for Monday witnesses). Failure to strictly comply with this order shall result in preclusion of the witness or exhibit until the full 48 hours' notice is complied with.

## D. PAGE AND LINE DESIGNATIONS

At least 14 days prior to the Pretrial Conference, counsel shall exchange proposed page and line designations of testimony of witnesses who will not be appearing live at trial. At least 7 days prior to the conference counsel shall exchange objections and counter-designations and shall meet and confer. Deposition designations and counter designations shall not be filed with the court nor shall advance courtesy copies be sent to the court. The parties shall meet and confer prior to the Pretrial Conference in order to narrow the number of depositions, designations and objections. Where objections cannot be resolved and require court ruling, counsel shall prepare an index for each transcript at issue with columns identifying (1) the page and line designations and counter-designations. (2) the objections, if any, to said page and line designations; (3) the response(s) to said objections; and (4) boxes for the court to check whether the objection(s) to the designated page and lines are "sustained" or "overruled." Counsel shall provide the trial judge with each transcript at issue with the contested page and line designations highlighted with a different color for each party. Trial transcripts shall not be filed with the court.

## E. Bankruptcy Claims:

No later than 14 days prior to the Pretrial Conference, plaintiff shall provide defendants copies of all claims made to bankruptcy trusts on behalf of plaintiff.

## F. REMAINING PARTIES and DISMISSALS:

Plaintiff (s) shall provide the court with an alphabetical list of all defendants remaining in the case including names of defense counsel, firm names and defense counsel's email address by no later than five court days prior to the first day of trial. Plaintiff(s) shall also provide the trial court with an alphabetical list of all defendants who were granted summary judgment in their favor including a description as to what product or site was the basis for the summary judgment no later than five court days prior to the first day of trial.

## G. STATUS OF PLEADINGS:

At least five court days prior to the first day of trial, counsel for Plaintiff(s) shall provide the trial court with a courtesy copy of the Complaint or any Amended Complaint on file in this case, including any description/location/site of plaintiff's alleged asbestos exposure and the theory of liability, including correlated causes of action, as to each remaining defendant.

In the event a cost bill is submitted to the court after a jury verdict in this action, counsel are cautioned that the billing or invoice submitted to establish recovery of expert fees and costs should contain a reasonably detailed record of hours or expenses incurred by any expert witness in connection with work performed by said witness in this litigation. An invoice that simply seeks a total sum "for services rendered" or a large number of hours for a vaguely described category may be insufficient for the Court to determine the appropriate recoverable fees and

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

costs, if the cost bill is contested.

The Court orders counsel to obtain a copy of this order from the eCourt portal.


Designated Defense Counsel shall serve all pending defendants in this action.




By:        T. Lopez, Deputy Clerk
                        Minutes of: 10/07/2022
                        Entered on: 10/07/2022

# Exhibit 5

**ERI** **ANALYTICAL**

P. O. Box 2024, Tyler, Texas 75710
2026 Republic Drive, Suite A, Tyler, Texas 75701
Ph: (903) 534-5001  Fax: (903) 534-8701
www.ericonsulting.com

Date:  March 5, 2021

File No: ERI AS # 2101161 A, B, $C_1$, $C_2$, D and E

Case Name-Susan S. Barkley

Specimen:  A package containing wet tissue in the case of Susan S. Barkley was received
January 27, 2021. The material was sent by Nyaradzo Kundidzora of the Kazan,
McClain, Satterley & Greenwood law firm.  The package contained seven bags of wet
tissue. These were labeled as:
 APS-JH-396-20 Barkley, Susan Left Lung 600 grams 12-21-20
 APS-JH-396-20 Barkley, Susan Right Lung 510 grams 12-21-20
 APS-JH-396-20 Barkley, Susan Right Hilar Node 12-21-20
 APS-JH-396-20 Barkley, Susan Peri Aortic Node at the level of the left hilum 12-21-20
 APS-JH-396-20 Barkley, Susan Greater Omentum uninvolved 12-21-20
 APS-JH-396-20 Barkley, Susan Mesentery uninvolved 12-21-20
 APS-JH-396-20 Barkley, Susan Left side ribs 2&3 Pleural Plaques 12-21-20

A communication dated January 27, 2021 from Mr. Joseph D. Satterley of the Kazan,
McClain, Satterley & Greenwood Law Firm requested that a digestion procedure be
conducted on the tissue in order to determine the presence of elongated mineral particles
in the samples.

There were twelve pieces of parenchymal tissue dissected from the left lung.  The left
lung samples were designated as ERI A.S. # 2101161A. The digest pool from the pieces
of left lung tissue (ERI A.S. No. 2101161A) contained 1.0003 gms. wet weight of tissue.

There were twelve pieces of parenchymal tissue dissected from the right lung.  The right
lung samples were designated as ERI A.S. # 2101161B. The digest pool from the pieces
of right lung tissue (ERI A.S. No. 2101161B) contained 1.0819 gms. wet weight of
tissue.

There were ten pieces of peribronchial lymph tissue (five from the left and five from the
right lung) sampled. The lymph samples were designated as ERI A.S. # $2101161C_1$. The
digest pool from the pieces of lymph tissue (ERI A.S. No. $2101161C_1$) contained 0.4477
gms. wet weight of tissue.

There were four pieces of tissue sampled from the material designated as hilar lymph
nodes. The samples from the hilar lymph nodes were designated as ERI A.S. #

# ERI Analytical

$2101161C_2$. The digest pool from the pieces of lymph tissue (ERI A.S. No. $2101161C_2$) contained 0.1358 gms. wet weight of tissue.

There were four pieces sampled from the tissue designated as greater omentum. The greater omentum sample was designated as ERI A.S. # 2101161D. The digest pool from the pieces of greater omentum tissue (ERI A.S. No. 2101161D) contained 0.4352 gms. wet weight of tissue.

There were two pieces sampled from the tissue designated as mesentery. The mesentery sample was designated as ERI A.S. # 2101161E. The digest pool from the pieces of mesentery tissue (ERI A.S. No. 2101161E) contained 0.1323 gms. wet weight of tissue.

Wet tissue was sent by: See above.

Date received:  January 27, 2021 –Wet tissue

Date analyzed: January 29, 2021 (Light Microscopy for Ferruginous Bodies-
           Samples $C_2$ & E -RFD)
           February 1, 2021 (Light Microscopy for Ferruginous Bodies-
           Samples A, B, $C_1$ & D -RFD)
           February 22, 2021 (A Sample-ATEM by J3 Resources)
           February 22, 2021 (B Sample-ATEM by J3 Resources)
           February 23, 2021 ($C_1$ Sample-ATEM by J3 Resources)
           February 23, 2021 ($C_2$ Sample-ATEM by J3 Resources)
           February 23, 2021 (D Sample-ATEM by J3 Resources) Sample unzipped
           February 24, 2021 (E Sample-ATEM by J3 Resources)

Morphology of Specimen:   Authorization from Mr. Joseph Satterley of the Kazan, McClain, Satterley & Greenwood Law Firm for destructive testing of wet tissue was received in the case of Susan S. Barkley (ERI A.S. # 2101161). The process of analysis of the tissue would permit determination of the numbers of ferruginous bodies (FB) and uncoated fibers in the respective samples.

Light Microscopy: For this evaluation the polycarbonate filter containing the digestate from the representative samples of $C_2$ and E were mounted on glass slides. The entire surface of the filters was evaluated at 100-400x in an AO light microscope for the presence of ferruginous bodies prior to the filters being coated for evaluation by ATEM

For this evaluation one fourth of the mixed cellulose ester filter from the representative digestates of A, B, $C_1$ and D were mounted on glass slides, cleared (made transparent) using acetone vapor and then scanned by light microscopy at 100-400x in an AO light microscope for the presence of ferruginous bodies.

Filter 2101161A d1 F4 representing the digested samples from the left lung was scanned by light microscopy and represented by 0.2 gm. wet (0.17822 gm. dry) weight sample of the respective pool.   There were no classical ferruginous bodies found in the area

**ERI Analytical**

scanned. The detection limit for this sample was 20 FB's/gm. wet (22.4 FB's/gm. dry) weight of tissue.

Filter 2101161B d1 F4 representing the digested samples from the right lung was scanned by light microscopy and represented by 0.1967 gm. wet (0.16607 gm. dry) weight sample of the respective pool. There were no classical ferruginous bodies found in the area scanned. The detection limit for this sample was 20.3 FB's/gm. wet (24 FB's/gm. dry) weight of tissue.

Filter $2101161C_1$ d1 F5 representing the digested samples from the peribronchial lymph tissue was scanned by light microscopy and represented by 0.09948 gm. wet (0.07949 gm. dry) weight sample of the respective pool. There were no classical ferruginous bodies found in the area scanned. The detection limit for this sample was 40.2 FB's/gm. wet (50.3 FB's/gm. dry) weight of tissue.

Filter $2101161C_2$ d1 F1 representing the digested samples from the hilar lymph tissue was scanned by light microscopy and represented by 0.07243 gm. wet (0.04833 gm. dry) weight sample of the respective pool. There were no classical ferruginous bodies found in the area scanned. The detection limit for this sample was 13.8 FB's/gm. wet (20.7 FB's/gm. dry) weight of tissue.

Filter 2101161D d1 F4 representing the digested samples from the greater omentum tissue was scanned by light microscopy and represented by 0.19342 gm. wet (0.12588 gm. dry) weight sample of the respective pool. There were no classical ferruginous bodies found in the area scanned. The detection limit for this sample was 20.7 FB's/gm. wet (31 FB's/gm. dry) weight of tissue.

Filter 2101161E d1 F1 representing the digested samples from the mesentery tissue was scanned by light microscopy and represented by 0.08141 gm. wet (0.0578 gm. dry) weight sample of the respective pool. There were no classical ferruginous bodies found in the area scanned. The detection limit for this sample was 12.3 FB's/gm. wet (17.3 FB's/gm. dry) weight of tissue.

ATEM Morphology:  For electron microscopy analysis a strip was cut from the carbon coated polycarbonate filter representing each of the areas sampled.  These strips were mounted on 100 mesh copper grids and the filter matrix dissolved by the use of chloroform.  This resulted in the production of a carbon extraction replica containing the entrapped fibers and other particulates.  Scans were made at 15,000x with counts and analysis including all fibers greater than or equal to 0.5 μm in length and with an aspect ratio of greater than 5:1. The cores of any ferruginous bodies found in the count areas were analyzed.  An additional area was scanned at 2,000x for the presence of ferruginous bodies.  If any ferruginous bodies were found the core material was analyzed. Any fibers (>3μm) found in the area scanned at 2,000x were also analyzed.

Filter 2101161 A d1 F1 represented a 0.08 gm. wet weight (0.07129 gm. dry weight) aliquot of the digestate from the left lung sample.  An area of the prepared grids from this

**ERI Analytical**

sample consisting of 1.218 mm$^2$ was scanned at 15,000x. There were no asbestos fibers found in the area scanned at 15,000x. There were no ferruginous bodies found in the area scanned at 15,000x. The limit of detection in the scan at 15,000x was 3951 fibers/gm. wet (4434 fibers/gm. dry) weight of tissue. An additional scan at 2,000x was carried out on sixty grid squares on three grids for the presence of ferruginous bodies. There were no ferruginous bodies found in the area scanned at 2,000x. There were no fibers ($\geq$3$\mu$m) found in the area scanned at 2,000x. The analyst did record an example of a platy talc particle observed in the area scanned.

Filter 2101161 B d1 F1 represented a 0.07868 gm. wet weight (0.06643 gm. dry weight) aliquot of the digestate from the right lung sample. An area of the prepared grids from this sample consisting of 1.218 mm$^2$ was scanned at 15,000x. There were no fibers found in the area scanned at 15,000x. There were no ferruginous bodies found in the area scanned at 15,000x. The limit of detection in the scan at 15,000x was 4017.5 fibers/gm. wet (4758.4 fibers/gm. dry) weight of tissue. An additional scan at 2,000x was carried out on sixty grid squares on three grids for the presence of ferruginous bodies. There were no ferruginous bodies found in the area scanned at 2,000x. There were no fibers ($\geq$3$\mu$m) found in the area scanned at 2,000x. The analyst did record an example of a platy talc particle observed in the area scanned.

Filter 2101161 C$_1$ d1 F2 represented a 0.03979 gm. wet weight (0.03179 gm. dry weight) aliquot of the digestate from the peribronchial lymph sample. An area of the prepared grids from this sample consisting of 1.146 mm$^2$ was scanned at 15,000x. There was one "Libby amphibole fiber, two anthophyllite asbestos fibers, one tremolite asbestos fiber and one talc fiber/ribbon found in the area scanned at 15,000x. The three asbestos fibers were equivalent to 25,334.4 fibers/gm. wet (31,704.6 fibers/gm. dry) weight of tissue. There were no ferruginous bodies found in the area scanned at 15,000x. The limit of detection in the scan at 15,000x was 8444.8 fibers/gm. wet (10,568.2 fibers/gm. dry) weight of tissue. An additional scan at 2,000x was carried out on sixty grid squares on three grids for the presence of ferruginous bodies. There were no ferruginous bodies found in the area scanned at 2,000x. There was one anthophyllite and one tremolite asbestos fiber ($\geq$3$\mu$m) found in the area scanned at 2,000x.

Filter 2101161 C$_2$ d1 F2 represented a 0.03621 gm. wet weight (0.02416 gm. dry weight) aliquot of the digestate from the hilar lymph sample. An area of the prepared grids from this sample consisting of 1.272 mm$^2$ was scanned at 15,000x. There was one transitional fiber found in the area scanned at 15,000x. There were no ferruginous bodies found in the area scanned at 15,000x. The limit of detection in the scan at 15,000x was 8358.7 fibers/gm. wet (12,528.5 fibers/gm. dry) weight of tissue. An additional scan at 2,000x was carried out on sixty grid squares on three grids for the presence of ferruginous bodies. There were no ferruginous bodies found in the area scanned at 2,000x. There were no fibers ($\geq$3$\mu$m) found in the area scanned at 2,000x. The analyst did record an example of a platy talc particle observed in the area scanned.

## ERI Analytical

Filter 2101161 D d1 F2 was not evaluated for particulate burden due to instability of the carbon film.

Filter 2101161 E d1 F2 represented a 0.0407 gm. wet weight (0.02889 gm. dry weight) aliquot of the digestate from the mesentery sample. An area of the prepared grids from this sample consisting of 1.188 mm$^2$ was scanned at 15,000x. There were no fibers found in the area scanned at 15,000x. There were no ferruginous bodies found in the area scanned at 15,000x. The limit of detection in the scan at 15,000x was 7962.8 fibers/gm. wet (11,217.9 fibers/gm. dry) weight of tissue. An additional scan at 2,000x was carried out on sixty grid squares on three grids for the presence of ferruginous bodies. There were no ferruginous bodies found in the area scanned at 2,000x. There were no fibers ($\geq$3$\mu$m) found in the area scanned at 2,000x. The analyst did record an example of a platy talc particle observed in the area scanned.

Background 489: There were no asbestos or talc fibers equal to or greater than 0.5$\mu$m in length found in a scan of 1.218 mm$^2$ made at 15,000x. There were no asbestos fibers, talc structures or ferruginous bodies found in a scan 2.436 mm$^2$ at 2,000x.

Limit of detection: Limit of detection is defined as that concentration below which a single fiber or ferruginous body would not likely be detected.

Light microscopy analysis for the presence of ferruginous bodies performed by Ronald F. Dodson, Ph.D.

Analytical Transmission Electron Microscopy performed by J3 Resources

Final Report Approved:


_Tracy Foster_ Date 3/5/2021

Tracy Foster, B.S.
Director:
Analytical Laboratory -ERI Consulting


_____ Date _____ 2021

Ronald F. Dodson, Ph.D.
President:
Dodson Environmental Consulting, LLC
Senior Consultant
ERI Consulting, Inc.

# Exhibit 6

Marc E. Wolin, Esq.
mwolin@saiber.com
John M. August, Esq.
jaugust@saiber.com
SAIBER LLC
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
Tel: (973) 622-8401

-and-

Steven Kazan, Esq.
skazan@kazanlaw.com
Joseph D. Satterley, Esq.
jsatterley@kazanlaw.com
Denyse F. Clancy, Esq.
dclancy@kazanlaw.com
KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation
Jack London Market
55 Harrison Street, Suite 400
Oakland, CA 94607
Tel: (510) 302-1000

*Counsel for Movant Anthony M. Hernandez Valadez*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LTL MANAGEMENT LLC, | : | Case No. 21-30589 |
| | : | |
| Debtor. | : | |
| | : | |

## DECLARATION OF WILLIAM E. LONGO, PH.D.

Pursuant to 28 U.S.C. § 1746, I, William E. Longo, Ph.D., declare under penalty of

perjury as follows:

1.      I have personal knowledge of the facts set forth in this Declaration, except for such

facts that have been made known to me in forming an opinion, in which case each such fact is of

a type on which professionals in my field reasonably rely in forming such opinions. The facts stated in this Declaration that are within my personal knowledge are true. If asked, I could and would testify competently to the truth of and foundation for each fact and opinion asserted within this Declaration.

## Background and Qualifications

2.　　Attached hereto as **Exhibit A** is a true and correct copy of my curriculum vitae, which truthfully sets forth my education, experience, and research on asbestos issues.

3.　　I have a Bachelor of Science degree in Microbiology, a Master of Science degree in Engineering, and a Doctorate in Philosophy in Materials Science, from the University of Florida.

4.　　I am currently employed at MAS, LLC ("MAS") as the Chief Executive Officer. For more than 30 years, I have studied the content, type, and release of asbestos fibers from asbestos-containing products, including products that contain talc. MAS is accredited by the American Industrial Hygiene Association for measurement of asbestos fibers by phase contrast microscopy. MAS is also certified by the International Standards Organization ("ISO") for measurement of bulk samples and air samples of asbestos. To date, MAS is the only laboratory in the country accredited by the American Association for Laboratory Accreditation A2LA, on behalf of ISO, for analysis of Asbestos in Cosmetic Talc Products by PLM (Blount prep method using heavy liquid separation: ISO 22262-1) and TEM (ISO 22262-2). MAS is also a registered FDA laboratory that is permitted to perform work for companies that want to submit MAS analysis for FDA approval.

5.　　As a materials scientist, I study the relationships among structures, properties, synthesis, and performance of a wide range of materials. I examine why and how materials behave under various conditions, such as temperature, pressure, stress or exposure to climatic conditions,

and how materials are used in every aspect of people's lives. I have spent the last 30 years studying all aspects of asbestos analysis including the use of air samples to analyze the airborne asbestos dust generated from the use of asbestos-containing products. This would include the use of both midget impinger and air cassettes. Under my direction our laboratory has analyzed approximately 400,000 asbestos bulk samples which does not include many thousands of air samples.

6.       I have been qualified many times in courts throughout the United States as an expert witness in both material science and industrial hygiene matters relating to asbestos issues, including cases involving friction and talc powder products. For example, I have been qualified as an expert witness regarding my analysis of Johnson & Johnson talc products in more than 25 cases by courts across the country in 8 different states, including California courts in the counties of Alameda and Los Angeles.

7.       I have published numerous articles on the subject of analysis and testing of asbestos-containing materials, including the quantification of asbestos particles released upon manipulation of these asbestos products in the manner performed in the work environment. My articles include: *Demonstration of the Capability of Asbestos Analysis by Transmission Electron Microscopy in the 1960's* in Microscope; *Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing* in Environmental Choices Technical Supplement; *Fiber Release During the Removal of Asbestos-Containing Gaskets: A Work Practice Simulation*, published in the Applied Occupational and Environmental Hygiene Journal in 2002; and *Zonolite Attic Insulation Exposure Studies*, in the International Journal of Occupational Health, published in 2010.

8.       In February 2020, I and my co-authors published an article in the Journal of Occupational and Environmental Medicine reporting on 10 cases of serous ovarian cancer among

users of Johnson & Johnson cosmetic talc products. [Steffen, et al., *Serous Ovarian Cancer Caused by Exposure to Asbestos and Fibrous Talc in Cosmetic Talc Powders—A Case Series* (Feb. 2020) 62 J. Occup. Environ. Med. e65.] Talc was detected in all 10 tissue samples. As for those same samples, asbestos was detected in eight of them. The main types of asbestos identified in tissue, tremolite and anthophyllite, constitute a fingerprint for talc containing asbestos and indicate that the individuals in those cases were exposed to asbestos through their use of cosmetic talc powder. These cases provide more evidence of the causal link between asbestos, talc, and ovarian cancer. They also show that asbestos is present in consumer talc products at a level sufficient to cause disease. A true and correct copy of that article is attached hereto as **Exhibit B** and incorporated fully herein by reference.

9.     On December 10, 2019, I was invited to testify for the U.S. Congressional Subcommittee on Economic and Consumer Policy entitled, "Examining Carcinogens in Talc and the Best Methods for Asbestos Detection," this testimony was about our use of heavy liquid separation for the detection of amphibole asbestos (tremolite and anthophyllite asbestos) using TEM for Johnson's Baby Powder. On February 4, 2020, I gave a presentation to the FDA's public meeting in Rockwell, Maryland entitled, "Testing Methods for Asbestos Detection in Talc & Cosmetics Products Containing Talc." For this presentation I discussed our use of heavy liquid separation sample preparation using both the Colorado School of Mines with ISO 22262-1 PLM analysis procedure for chrysotile detection, and the use of heavy liquid separation sample preparation with TEM analysis of amphibole asbestos in cosmetic talcs.

10.     MAS has employees with expert knowledge in a broad range of fields including material sciences, organic and inorganic chemistry, physics, biology, microbiology, industrial hygiene, geology, and all types of microscopy. MAS has performed consulting work for

government agencies such as the Centers for Disease Control, National Institutes of Health, Federal Aviation Administration. MAS has also worked as an expert for the Cities of New York, Los Angles, San Francisco, Baltimore, Boston, and Chicago, the States of New York, Utah, Hawaii, and Texas in their respective asbestos products building litigations against former asbestos manufactures of surface treatment products (fireproofing, acoustical plasters etc.).

11.     MAS's studies and video recorded demonstrations have been used for educational and training purposes in conjunction with the AIHA, American Society of Safety Engineers, the Environmental Institute, Asbestos Hazard Emergency Response Act certification training, and the U.S. Public Health Service.

12.     MAS uses the NIOSH 7402 method for Transmission Electron Microscopy ("TEM") to determine whether fibers counted are asbestos versus non-asbestos. The TEM NIOSH 7402 method uses the direct preparation techniques. Such testing techniques are standardized in the scientific community.

13.     It is a generally accepted scientific method to calculate the amount of fibers in the total volume based on the number of fibers found in the grid openings observed on the filter. Specifically, under proper counting TEM protocol, there are a specific number of grid openings that need to be analyzed to maintain the proper sensitivity in order to calculate the number of fibers per the entire volume. Because TEM protocol analyzes the samples based on a certain number of [1/1000 of a meter] grid openings, this is akin to 1-2% of the entire volume. The generally accepted TEM protocol dictates the number of grid openings that must be analyzed to have proper sensitivity as to the entire volume content, which our laboratory follows. [*See, e.g.,* 40 C.F.R. Appen. A, TEM Analytical Methods.]

## Overview of MAS's Johnson & Johnson Testing

14.     I have been qualified many times in courts throughout the United States as an
expert witness in both material science, microscopy, and industrial hygiene matters relating to
asbestos issues, including cases involving talcum powder products, including Johnson & Johnson
products. My methodology in analyzing Johnson & Johnson talcum powder products for the
presence of asbestos was subject to a *Daubert* hearing in the New Jersey MDL and has been
found reliable. Moreover, I have been qualified as an expert witness regarding my analysis of
cosmetic talcum powder products in more than 25 cases by courts across the country in 8
different states.

15.     My laboratory, MAS, has now issued reports for the testing of approximately 146
containers of Johnson & Johnson talc products (primarily Johnson's Baby Powder) that cover a
span of decades. This number will continue to increase as I obtain and test additional containers.
Of the 146 containers, approximately 7 of them were purchased by MAS off-the-shelves of local
drug stores and 67 of them were obtained were obtained from lawyers representing plaintiffs in
lawsuits against Johnson & Johnson. Those 67 containers included Johnson & Johnson talc
products purchased off the shelf or from the attorneys' clients themselves, while others came from
collectors. The other 72 containers were obtained directly from the Johnson & Johnson archive.[1]
The results of the initial 30 containers are contained in my report dated August 2, 2017 and later
updated with additional containers in reports from March 2018, July 2018, February 2019,
February 2020, March 2020, April 2020, December 8, 2020, January 25, 2021, February 9, 2021,

---

[1] Pursuant to the deposition testimony of Margaret Gurowitz on July 12, 2018 in *In Re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, and Products Liability Litigation*, a true and correct copy of the cited excerpts are attached hereto as **Exhibit C**, Johnson & Johnson's corporate historian assembled the containers from the corporate archives museum at Johnson & Johnson. [Exh. C at 18:15-20, 25:19-26:22, 27:14-23, 28:13-29:2, 35:17-36:17.]

March 23, 2021, April 13, 2021, May 25, 2021, and June 4, 2021.[2] The results for the remaining

72 Johnson & Johnson archive containers are contained in my reports dated February 2018,

November 2018, January 2019, February 2019, August 2019, and October 2019.

16.    My lab has also analyzed 15 samples of Imerys Vermont talc produced from its

archive. [January 15, 2019 report.] These Imerys samples represent Vermont milled talc ores that

would have been shipped to Johnson & Johnson for use in its talcum powder products. Recently,

my laboratory analyzed 29 talc and talc ore samples from the Guangxi Chinese talc mines used to

manufacture Johnson & Johnson talcum powder products beginning in approximately 2003 (as

well as various other talcum powder products). The 29 "Supra H" Guangxi Chinese talc samples

were received by my laboratory from three sources: 2 samples from experts working for talc

defendants in litigation (Segrave and Sanchez), collected by them directly from the Imerys mining

and milling facility, 9 from Johnson & Johnson as retained by them in the regular course of their

manufacturing Johnson's Baby Powder, and 18 from Chanel, Inc. as retained by them in the regular

course of their manufacturing Chanel talcum powder products. The results of my laboratory's

testing of the Supra H Guangxi Chinese talc are contained in my reports dated September 16, 2020

and October 8, 2020.

17.    To date, we have identified and reported on regulated asbestos in 88 of 112

containers (79%) of Johnson's Baby Powder and Shower to Shower manufactured in the United

States between the 1920s and 2019 (69/88 or 78% for Johnson's Baby Powder and 19/24 or 79%

for Shower to Shower). Together with the Supra H Guangxi talc samples, and Johnson's Baby

---

[2] Three additional containers of Shower-to-Shower were received as part of the original non-Johnson & Johnson archive containers (M66510-001, M66511-001, M66512-001). Two belonging to individual plaintiffs in litigation and one was purchased new off the shelf from Walmart in 2017. Amphibole asbestos was found in two of the three containers by ATEM. No concentration preparation was used for the analysis of these containers at that time. These containers were manufactured by Valeant Pharmaceuticals and not Johnson & Johnson, and therefore not included in the above totals.

Powder samples manufactured with Chinese talc in the United Kingdom, to date, we have identified and reported on regulated asbestos in 77 of 81 Johnson & Johnson Chinese talcs and Chinese talc sourced products, or 95% (45/48 or 94%) Johnson's Baby Powder, 1/1 or 100% Johnson & Johnson Shower to Shower, 2/3 or 67% Valeant Shower to Shower, 29/29 or 100% Guang Xi Supra H Ore). We have further identified and reported on regulated asbestos in 116 of 146 containers of Johnson's Baby Powder and Shower to Shower, or 79% of the total amount of Johnson & Johnson talc products reported on to date. A true and correct copy of a summary chart of my laboratory's testing of Johnson & Johnson talc products, Imerys Vermont talc, and Supra H Guangxi Chinese talc is attached hereto as **Exhibit D**. I hereby adopt and incorporate that summary chart into this declaration as though it was set forth in full.[3]

18.    For the reports on the samples received from the Johnson & Johnson archives, we expanded our initial testing to include XRD (x-ray diffraction),[4] PLM (polarized light microscopy), PLM with heavy liquid separation (Blount), in addition to the TEM we did in our initial reports. The methods utilized, ISO 22262-1 and 22262-2, are international methods generally accepted in the scientific community and, ISO 22262-2 is specifically tailored to the analysis of talc for asbestos. As with the initial reports, we analyzed both Johnson's Baby Powder and Shower-to-Shower talcum powder products. Our results are summarized in the table below:[5]

| Method | # Containers Positive for Regulated Asbestos |
|---|---|
| TEM (ISO 22262-2 with concentration) | 44 of 72 (61%) |
| Blount PLM (Heavy Liquid Separation) | 41 of 72 (57%) |
| PLM (ISO 22262-1) | 17 of 72 (24%) |

---

[3] The reports my laboratory generated are voluminous. The pertinent data within those reports is reflected in the summary chart (Exhibit D). I hereby adopt and incorporate each of my reports analyzing Johnson & Johnson talc products into this declaration as though they were set forth in full. Copies of each of the reports will be furnished upon request.

[4] We worked together with Lee Poye of J3 Resources for the XRD analysis.

[5] (Exhibit D) Obviously, there was overlap on some of the positive samples between methods, where more than one method detected regulated asbestos. Two positive XRD samples were from Johnson's Baby Powder containers that used a tremolitic talc mine in Korea.

| XRD (ISO 22263-3) | 2 of 72 (3%)* |
|---|---|
| **TOTAL** | **52/72 or 72%** |

19.    Our initial results demonstrate a clear relationship between method and sensitivity. Use of the concentration preparation method with TEM and Blount/PLM were most sensitive, followed by standard PLM. XRD can only detect the presence of a mineral down to about 0.1% to 0.5% (depending on asbestos type). It is not surprising that XRD found only 2 out of 72 samples tested for amphibole minerals as they tended to occur at levels far below XRD's limit of sensitivity of 0.1% to 0.5% by weight. Also, we observed cleavage fragments but they were not counted.

20.    Based on testing done on Supra H/Guangxi Chinese talc and talc-containing products by talc supplier Imerys and Andreas Saldivar under contract for the FDA, it appears that chrysotile is the mineral that is being found in this Chinese ore used by Johnson & Johnson and other companies manufacturing cosmetic talc products. As a result, following ISO 22262, my laboratory began investigating sample preparation techniques sensitive to identifying chrysotile in talc. In my review, I came across a heavy liquid separation ("HLS") sample preparation technique for PLM developed by Johnson & Johnson's consultant, Colorado School of Mines ("CSM") in 1973, specifically for the detection of chrysotile in talc.[6] My laboratory implemented the CSM PLM preparation technique in January 2020.

21.    Initially, using the CSM preparation technique, we demonstrated that the use of HLS at a density of 2.70 g/cc can concentrate the chrysotile if present at a detection limit of 0.0001 wt. % or above by PLM. At that time, our reported weight percentages of chrysotile in cosmetic talc were overestimations caused by our use of the NIST 1886b chrysotile for the spiked weight

---

[6] Colorado School of Mines Research Institute Report Re: Mineralogical Examination of Five Talc Samples to W.H. Ashton from W.P. Reid and W.T. Caneer, February 26, 1973; Colorado School of Mines Research Institute Report Re: Mineralogical Examination of Four Samples for Tremolite and Chrysotile from W.P. Reid and W.H. Ashton, April 2, 1973

standards. The large size of chrysotile bundles from the NIST standard caused our PLM analysts to overestimate the visual volume weight estimation by approximately 2 to 3 orders of magnitude. As a result, we prepared spiked talc standards using Calidria chrysotile asbestos, a smaller milled product consistent with what is expected in cosmetic talcum powder. The Calidria standards (Union Carbide Calidria grade RG144) is a better match for the chrysotile detected in the cosmetic talcs we analyzed for two primary reasons: 1) the average bundle length and width of the Calidria standard is the same range as what we are detecting in the milled cosmetics talc, and 2) the refractive index (RI) ranges for the Calidria are in the range of the milled chrysotile in the talcum powder. The use of an appropriate standard comparison is required by the ISO 22262-1 PLM method.[7]

22.    These modifications do not alter the ISO 22262-1 method for identifying and quantifying asbestos in a talc sample. These modifications relate solely to the CSM preparation technique and, as indicated above, ISO 22262-1 specifically allows for the use of preparation techniques the analyst deems appropriate for the sample being analyzed.[8] The modifications are also appropriate in that they serve as effective updates to a preparation technique developed 47 years ago in 1973. For example, we now measure lead levels in blood with inductively coupled plasma mass spectrometry, which permits great accuracy and precision. But they used to measure lead by a colorimetric method where the reagents used would produce different absorption for a positive sample. As another example, scientists used to use optic microscopes to count red blood cells. But today, red blood cells are counted automatically, most commonly with electronic impedance or laser light scattering (flow cytometry). Scientists build on the efforts of those who came before them.

---

[7] ISO 22262-1 at 17-18.
[8] *Id.* at 14.

23.     Even though the talc industry was aware from as early as 1973 that the heavy liquid separation PLM method increased the sensitivity for the detection of asbestos in talc, the talc industry, through its trade group CTFA, never incorporated concentration techniques for the routine analysis of talc and instead promulgated a substantially inferior method (J4-1) that did not require the use of an electron microscope and could only detect asbestos at levels above 0.5% by weight.

24.     I have tested Johnson & Johnson products that encompass the eras of all three of sources for Johnson & Johnson talc products offered for sale in the United States (Italy, Vermont, China) as well as talc offered for sale in Asia, Australia, and the United Kingdom. As I have stated in the past, in the United States, we are dealing with three mining regions: the Italian region, the Vermont region, and the Chinese region. Our testing has shown regulated asbestos in containers sourced from each of these mines. Moreover, I have reviewed hundreds of Johnson & Johnson and Imerys internal documents demonstrating repeated and consistent instances of asbestos in each of these sources.

## Airborne Concentrations – Shaker Powder Application

25.     To determine the exposure an individual would have to airborne asbestos amphibole fiber during application of talc powder products, MAS conducted a below-the-waist application study using Johnson's Baby Powder talc container M65205-001.[9] Approximately four grams of Johnson's Baby Powder were applied to the lower body of an investigator to determine the potential exposure levels of an individual to asbestos amphibole fibers while

---

[9] Italy was the talc source for this container. Italian talc has been found to contain the highest concentration of tremolite asbestos. The highest concentration allows us to provide a "worst case scenario" exposure assessment. Due to the wide use of Italian talc in numerous talc powder products, including Johnson's Baby Powder, the data from this study is applicable to a variety of products containing Italian-sourced talc.

applying talc powder. Both the NIOSH 7400 PCM method and the NIOSH 7402 TEM method[10]

were performed to determine if any detectable amphibole asbestos fibers from the Johnson's

Baby Powder were released into the breathing zone of the investigator and immediate

surrounding area. The NIOSH 7400 PCM analysis found that the four personal sample results

ranged from 3.85 to 5.86 fibers per cubic centimeter ("f/cc"), with an average mean of 4.52 f/cc.

Area air sample results were 0.28 f/cc to 0.58 f/cc with an average mean of 0.41 f/cc. Four of the

personal PCM filters were analyzed by the NIOSH 7402 TEM method and the percent tremolite

asbestos fiber concentration ranged from 42.9% to 76.9% resulting in a PCM equivalent range of

1.81 f/cc to 4.51 f/cc. A true and correct copy of MAS Project 14-1852 Below the Waist

Application of Johnson & Johnson Baby Powder Supplemental Report #2 dated January 2018 is

attached hereto as **Exhibit E** and incorporated fully herein by reference.

## Anthony M. Hernandez Valadez

26.    I have reviewed the declarations of Anthony M. Hernandez Valadez and his

mother Anna Camacho, a true and correct copy of each is attached hereto as **Exhibits F and G**,

respectively. I understand that Mr. Valadez is 23 years old and was diagnosed with pericardial

mesothelioma. He had virtually lifelong, daily exposures to Johnson's Baby Powder talc. When

Mr. Valadez was a baby, his mother regularly used a lot of Johnson's Baby Powder talc on him

every day, multiple times each day, including during diaper changes, after baths, to treat or

prevent diaper rash, and whenever it was needed. His mother packed the baby powder

throughout his body, including on his private areas, arms, neck, forehead, armpits, and chest. She

applied the powder either directly from the bottle or with her hands. His mother also saw other

family members apply Johnson's Baby Powder on him while he was a baby. Even after

---

[10] These published NIOSH methods are accepted in the scientific community as reliable in determining airborne exposure levels to asbestos.

Mr. Valadez was no longer wearing diapers, his mother continued using Johnson's Baby Powder talc on him throughout his childhood. She applied that product in the same way and in the same areas as described above. In addition, his mother applied Johnson's Baby Powder on his feet and in between his toes, as well as inside his shoes. Mr. Valadez began using Johnson's Baby Powder talc on himself when he was around 13 years old and continued using it for several years thereafter. He used a lot of Johnson's Baby Powder talc throughout his body, including on his chest, armpits, private areas, back, and neck. His mother likewise knows that her son used Johnson's Baby Powder as a teenager because she saw remnants of baby powder on his clothes and armpits. Mr. Valadez used Johnson's Baby Powder talc every day, multiple times each day, including after showers, before going out, or whenever he need to freshen up. He applied that product either directly from the bottle or with his hands. It took at least a couple of minutes for him to apply the powder. Using Johnson's Baby Powder talc in the manner described above always generated visible dust, which he breathed.

27.     Based on my review of the declarations of Mr. Valadez and Ms. Camacho, the manner in which they used Johnson's Baby Powder was similar to the application procedure that MAS followed for the Below-the-Waist exposure study and similar exposure scenarios that have found similar numbers. The results of the Below-the-Waist study and similar representative data show that an individual, such as Mr. Valadez, who used asbestos-containing Johnson's Baby Powder talc with a shaker application can have a significant exposure to airborne amphibole asbestos fibers. The magnitude of the asbestos fiber exposure levels will depend on the concentration level of the asbestos in the talc powder (e.g. as the concentration of asbestos in the product increases, the greater the concentration will be of the respirable airborne fibers). As a result, these findings of the release of asbestos during below-waist application are applicable to

any asbestos-containing talc powder product used in a substantially similar manner. These exposure levels substantially exceed background exposure levels reported in the literature.

28.     Based on our own testing, as well as my review of historic testing of the talc ore used by Johnson & Johnson and historic testing of Johnson & Johnson finished talc products, it is my opinion to a reasonable degree of scientific certainty that individuals who used Johnson's Baby Powder, including Mr. Valadez, would have, more likely than not, been exposed to fibrous amphibole asbestos, especially with repeat purchases. Accordingly, it is my opinion that the asbestos exposure to individuals, like Mr. Valadez, who regularly and consistently used Johnson & Johnson Baby Powder for decades was substantial and well above background or ambient levels.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. I executed this Declaration at Suwanee, Georgia on May 23, 2022.

By: _____
      WILLIAM E. LONGO, PH.D.

# Exhibit D

## MAS CHART OF J&J TESTING (current as of September 16, 2021)

TABLE I – CONTAINERS FROM OUTSIDE J&J ARCHIVE PRE 2003 (ITALIAN & VERMONT)

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 1 |  | M66514-001 | SGPB 4-7-17(1) | JBP – Client Carolyn Weirick<br><br>Retailer: Cal Oaks | Circa 1980 | 247,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 14.8 | N/A |
| 2 |  | M65205-001 | Kazan | JBP – Collector | 1950s | 15,100,000 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 12.0<br>Below Waist Personal Application: 1.81 – 4.51 f/cc | N/A |
| 3 |  | M65208-001 | Kazan | JBP – Collector | 1957 | 376,000 s/g<br><br>Tremolite Richterite<br><br>Average Aspect Ratio: 10.5 | N/A |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| **4** |  | M65228-001 | Kazan | JBP – Collector | 1994 | 445,000 s/g<br><br>Tremolite<br>Richterite<br><br>Average Aspect Ratio: 7.9 | N/A |
| **5** |  | M65329-041 | Lanier | JBP | 1940-42 | 1,310,000 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 11.1 | N/A |
| **6** |  | M65329-043 | Lanier | JBP | 1927-39 | 938,000 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 9.0 | N/A |
| **7** |  | M66173-001 | Lanier | JBP | 1960 | NAD<br><br>Fibrous Talc | N/A |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 8 |  | M66173-002 | Lanier | JBP | 1927-39 | 301,000 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 8.1 | N/A |
| 9 |  | M66173-003 | Lanier | JBP | 1945 | 4,120,000 s/g<br><br>Tremolite Richterite<br><br>Average Aspect Ratio: 11.7 | N/A |
| 10 |  | M66203-001 | Lanier | JBP | 1953-58 | 18,700 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 9.2 | N/A |
| 11 |  | M66203-002 | Lanier | JBP | 1960 | NAD<br><br>Fibrous Talc | N/A |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 12 |  | M66203-003 | Lanier | JBP | 1960 37c | NAD<br><br>Fibrous Talc | N/A |
| 13 |  | M66203-004 | Lanier | JBP | 1953 or prior | NAD | N/A |
| 14 |  | M66203-006 | Lanier | JBP | 1953-58 | 9,120 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 5.9 | N/A |
| 15 |  | M66203-007 | Lanier | JBP | 1953-58 | 9,030 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 9.8 | N/A |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 16 |  | M66309-002 | Lanier | JBP | 1953 or prior | NAD<br><br>Fibrous Talc | N/A |
| 17 |  | M66309-003 | Lanier | JBP | 1950s 53c | NAD<br><br>Fibrous Talc | N/A |
| 18 |  | M66405-001 | Lanier | JBP | 1953 or prior | 45,200 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 18.6 | N/A |
| 19 |  | M66405-002 | Lanier | JBP | 1953 or prior | NAD<br><br>Fibrous Talc | N/A |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 20 |  | M66203-005 | Lanier | JBP | 1953 or prior | 37,000 s/g Tremolite<br><br>Average Aspect Ratio: 13.7 | N/A |
| 21 |  | M70484-001 | SGP 487779 | JBP – client Linda Zimmerman<br><br>Retailer: Thrifty (now Rite Aid) or Ralph's (Kroger) | 1994 | NAD | ISO PLM:<br>NAD<br><br>PLM HLS Chrysotile:<br>0.01-0.10% |
| 22 |  | M71046-001 | SGPB 10-23-17 | JBP – client Marie Colley<br><br>Retailer: client did not recall | 1996 | NAD | ISO PLM:<br>NAD<br><br>PLM HLS Chrysotile:<br>0.002-0.01% |

| Results | Italian | Vermont | JBP Total | STS Total | All Total |
|---|---|---|---|---|---|
| MAS | 11/18 = 61% | 4/4 = 100% | 15/22 = 68% | N/A | 15/22 = 68% |

TABLE II – CONTAINERS FROM OUTSIDE J&J ARCHIVE POST 2003 (CHINESE)

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 1 |  | M66507-001 | SGPB 11-28-16(1) | JBP – Client Gail Koretoff<br><br>Retailer: CVS | 2004 | NAD | CSM PLM w/ HLS<br>Chrysotile:<br>0.0003-0.001%<br>51 bundles<br>779,600 bundles p/g |
| 2 |  | M66508-001 | SGPB 1-28-17(1) | JBP – Off the shelf<br><br>Retailer: CVS | 2017 | NAD | CSM PLM w/ HLS<br>Chrysotile:<br>0.001-0.002%<br>27 bundles<br>412,700 bundles p/g |
| 3 |  | M66509-001 | SGPB 1-28-17(2) | JBP – Off the shelf<br><br>Retailer: CVS | 2017 | NAD | CSM PLM w/ HLS<br>Chrysotile:<br>0.0002-0.001%<br>39 bundles<br>463,700 bundles p/g |
| 4 |  | M66513-001 | SGPB 3-21-17(4) | JBP – Client Earl Wheeler<br><br>Retailer: Fred's Dollar | 2010 | NAD | CSM PLM w/ HLS<br>Chrysotile:<br>0.0002-0.001%<br>17 bundles<br>181,900 bundles p/g |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 5 |  | M66515-001 | SGPB 4-19-17(6) | JBP – Client Pauline Citizen

Retailer: Usually Dollar Store or Family Dollar | 2012 | 8,740 s/g

Tremolite

Average Aspect Ratio: 28.6 | PLM/HLS Chrysotile: 0.01-0.10 % |
| 6 |  | M66516-001 | SGPB 4-1-17(7) | JBP – Client Pauline Citizen

Retailer: Usually Dollar Store or Family Dollar | 2012 | 8,690 s/g

Tremolite

Average Aspect Ratio: 9.3 | N/A |
| 7 |  | M68379-001 | SGPB 11-22-17(1) | JBP – Client JoAnne Anderson

Retailer: client did not recall | 2004 | NAD

Fibrous Talc | N/A |
| 8 |  | M68379-002 | SGPB 11-22-17(2) | JBP – Client JoAnne Anderson

Retailer: client did not recall | 2004 | 7,160 s/g

Tremolite | N/A |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 9 |  | M66352-001 | Lanier | JBP – client Krystal Kim<br><br>Retailer: client did not recall | 2012 | NAD | N/A |
| 10 |  | M66352-002 | Lanier | JBP – client Krystal Kim<br><br>Retailer: client did not recall | 2014 | 17,200 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 8.8 | N/A |
| 11 |  | M68483-001 | SGPB 188908 | JBP – Client Nancy Cabibi<br><br>Retailers: client did not recall | 2012 | NAD | N/A |
| 12 |  | M67420-001 | #1 Lanier | JBP – Off the shelf<br><br>Retailer: Imperial Westwood | 2017 | NAD | CSM PLM w/ HLS Chrysotile:<br>0.0002-0.0008%<br>30 bundles<br>428,000 bundles p/g |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 13 |  | M67420-002 | #2 Lanier | JBP – Off the shelf<br><br>Retailer: Imperial Westwood | 2017 | NAD | CSM PLM w/ HLS<br>Chrysotile:<br>0.0002-0.0006%<br>32 bundles<br>489,100 bundles p/g |
| 14 |  | M67420-003 | #3 Lanier | STS – Off the shelf<br><br>Retailer: Imperial Westwood | Pre 2012<br><br>Purchased 2017 | 18,800 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 22.1 | N/A |
| 15 |  | M67420-004 | #4 Lanier | JBP – Off the shelf<br><br>Retailer: Westside Medical Pharmacy | 2017 | NAD | CSM PLM w/ HLS<br>Chrysotile:<br>0.0002-0.0005%<br>28 bundles<br>332,900 bundles p/g |
| 16 |  | M67420-005 | #5 Lanier | JBP – Off the shelf<br><br>Retailer: Westside Medical Pharmacy | 2017 | NAD | CSM PLM w/ HLS<br>Chrysotile:<br>0.0002-0.001%<br>43 bundles<br>460,100 bundles p/g |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 17 |  | M65329-013 | MAS | JBP – Off the shelf (Control)<br><br>Retailer: Publix | 2016 | NAD | CSM PLM w/ HLS Chrysotile:<br>0.0005-0.0008%<br>27 bundles<br>288,900 bundles p/g |
| 18 |  | M70484-002 | SGP 445997 | JBP – client Linda Zimmerman<br><br>Retailer: CVS, Rite Aid, Albertson's | 2014 | NAD | ISO PLM:<br>NAD<br><br>PLM HLS Chrysotile:<br>0.001-0.01% |
| 19 |  | M70877-001 | Kazan 001 | JBP – client Dan Doyle<br><br>Retailer: Usually Kroger's | 2012 | NAD | ISO PLM:<br>NAD<br><br>Blount PLM:<br>NAD<br><br>PLM HLS Chrysotile:<br>0.01-0.02% |
| 20 |  | M70877-002 | Kazan 002 | JBP – client Dan Doyle<br><br>Retailer: Usually Kroger's | 2010 | 6,610 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 7.3 | ISO PLM:<br>NAD<br><br>Blount PLM:<br>NAD<br><br>PLM HLS Chrysotile:<br>0.002-0.004% |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 21 |  | M71095-001 | Simmons Lot#0826RA | JBP – client Janet Titley | 2014 | NAD | ISO PLM: 0.005-0.007% Chrysotile<br><br>Blount PLM w/ HLS: NAD<br><br>CSM PLM w/ HLS Chrysotile: 0.001-0.002% |
| 22 |  | M71166-001 | MAS | JBP – Off the shelf<br><br>Retailer: CVS | Purchased 2020 ©2018 | N/A | ISO PLM: 0.006-0.008% Chrysotile<br><br>Blount PLM w/ HLS: NAD<br><br>CSM-PLM w/ HLS Chrysotile: 0.0015-0.0017% |
| 23 |  | M71166-002 | MAS | JBP – Off the shelf<br><br>Retailer: CVS | Purchased 2020 ©2019 | N/A | ISO PLM: 0.009-0.010% Chrysotile<br><br>Blount PLM w/ HLS: NAD<br><br>CSM-PLM w/ HLS Chrysotile: 0.0013-0.0030% |
| 24 |  | M71166-003 | MAS | JBP – Off the shelf<br><br>Retailer: Walgreens | Purchased 2020 ©2019 | N/A | ISO PLM: 0.009-0.010% Chrysotile<br><br>Blount PLM w/ HLS: NAD<br><br>CSM-PLM w/ HLS Chrysotile: 0.0012-0.0026% |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| **25** |  | M71180-001 | Humphrey, Farrington & McLain | JBP – Off the shelf<br><br>Retailer: Target | Purchased 2020 | N/A | <u>ISO PLM:</u> 0.007-0.010% Chrysotile<br><u>Blount PLM w/ HLS:</u> NAD<br><u>CSM-PLM w/ HLS</u> Chrysotile: 0.0016-0.0030% |
| **26** |  | M71211-001<br><br>20200342-01 | Weitz | JBP – Off the shelf from client Holly Johnson<br><br>Retailer: Walmart.com | 2019 | N/A | <u>ISO PLM w/o HLS:</u> 0.004-0.006% Chrysotile<br><u>CSM/ISO PLM w/ HLS Chrysotile:</u> 0.001-0.002% |
| **27** |  | M71211-002<br><br>20200342-02 | Weitz | JBP – Off the shelf from client Holly Johnson<br><br>Retailer: Walmart.com | 2019 | N/A | <u>ISO PLM w/o HLS:</u> 0.003-0.005% Chrysotile<br><u>CSM/ISO PLM w/ HLS Chrysotile:</u> 0.001-0.002% |
| **28** |  | M71211-003<br><br>20200342-03 | Weitz | JBP – Off the shelf from client Holly Johnson<br><br>Retailer: Kents Grocery | 2019 | N/A | <u>ISO PLM w/o HLS:</u> 0.003-0.005% Chrysotile<br><u>CSM/ISO PLM w/ HLS Chrysotile:</u> 0.001% |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 29 |  | M71211-004<br><br>20200342-04 | Weitz | JBP – Off the shelf from client Holly Johnson<br><br>Retailer: Kents Grocery | 2019 | N/A | ISO PLM w/o HLS: 0.003-0.005% Chrysotile<br>CSM/ISO PLM w/ HLS Chrysotile: 0.0009-0.001% |
| 30 |  | M71211-005<br><br>20200342-05 | Weitz | JBP – Off the shelf from client Holly Johnson<br><br>Retailer: Maceys Grocery | 2019 | N/A | ISO PLM w/o HLS: 0.003-0.006% Chrysotile<br>CSM/ISO PLM w/ HLS Chrysotile: 0.001-0.002% |
| 31 |  | M71211-006<br><br>20200342-06 | Weitz | JBP – Off the shelf from client Holly Johnson<br><br>Retailer: Maceys Grocery | 2019 | N/A | ISO PLM w/o HLS: 0.003-0.004% Chrysotile<br>CSM/ISO PLM w/ HLS Chrysotile: 0.001-0.002% |
| 32 |  | M71211-007<br><br>20200342-07 | Weitz | JBP – Off the shelf from client Holly Johnson<br><br>Retailer: Walmart.com | 2019 | N/A | ISO PLM w/o HLS: 0.003-0.005% Chrysotile<br>CSM/ISO PLM w/ HLS Chrysotile: 0.001-0.002% |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 33 |  | M71211-008<br><br>20200342-08 | Weitz | JBP – Off the shelf from client Holly Johnson<br><br>Retailer: Walmart.com | 2019 | N/A | ISO PLM w/o HLS: 0.004-0.007% Chrysotile<br>CSM/ISO PLM w/ HLS Chrysotile: 0.001-0.002% |
| 34 |  | M71211-009<br><br>20200342-09 | Weitz | JBP – Off the shelf from client Holly Johnson<br><br>Retailer: Amazon | 2019 | N/A | ISO PLM w/o HLS: 0.004-0.006% Chrysotile<br>CSM/ISO PLM w/ HLS Chrysotile: 0.001-0.002% |
| 35 |  | M71211-010<br><br>20200342-10 | Weitz | JBP – Off the shelf from client Holly Johnson<br><br>Retailer: Amazon | 2019 | N/A | ISO PLM w/o HLS: 0.004-0.006% Chrysotile<br>CSM/ISO PLM w/ HLS Chrysotile: 0.001-0.002% |
| 36 |  | M71216-001 | Kazan | JBP – Off the shelf<br><br>Retailer: Lucky in Danville, CA | 2019 | N/A | ISO PLM w/o HLS Chrysotile: 0.007-0.009% 20 bundles 214,000 bundles p/g<br>CSM/ISO PLM w/ HLS Chrysotile: 0.001-0.002% 23 bundles 273,000 bundles pg/ |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| **37** |  | M71216-002 | Kazan | JBP – Off the shelf<br><br>Retailer: Lucky in Danville, CA | 2019 | N/A | ISO PLM w/o HLS Chrysotile:<br>0.006-0.008%<br>16 bundles<br>190,000 bundles p/g<br><br>CSM/ISO PLM w/ HLS Chrysotile:<br>0.0009-0.001%<br>19 bundles<br>254,000 bundles p/g |
| **38** |  | M71241-001 | MAS | JBP – Off the shelf<br><br>Retailer: Ralphs | 2018 | N/A | ISO PLM w/o HLS Chrysotile:<br>NAD<br>CSM/ISO PLM w/ HLS Chrysotile:<br>0.0007-0.001%<br>11 bundles<br>168,142 bundles p/g |
| **39** |  | M71241-002 | MAS | JBP – Off the shelf<br><br>Retailer: Ralphs | 2018 | N/A | ISO PLM w/o HLS Chrysotile:<br>0.004-0.006%<br>9 bundles<br>80,400 bundles p/g<br><br>CSM/ISO PLM w/ HLS Chrysotile:<br>0.001-0.002%<br>23 bundles<br>273,000 bundles p/g |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 40 |  | M71241-003 | MAS | JBP – Off the shelf<br><br>Retailer: Ralphs | 2018 | N/A | ISO PLM w/o HLS Chrysotile:<br>0.005-0.006%<br>16 bundles<br>190,600 bundles p/g<br>CSM/ISO PLM w/ HLS Chrysotile:<br>0.001%<br>23 bundles<br>307,600 bundles p/g |

| Results | Chinese | JBP Total | STS Total | All Total |
|---|---|---|---|---|
| **MAS** | 37/40 = 93% | 36/39 = 92% | 1/1 = 100% | 37/40 = 93% |

TABLE III – VALEANT CONTAINERS FROM OUTSIDE J&J ARCHIVE POST 2003 (CHINESE)

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 1 |  | M66510-001 | SGPB 2-27-17(3) | S2S – Client John Currie<br><br>Retailer: Usually Walmart | 2013 | 18,200 s/g<br><br>Actinolite Richterite<br><br>Average Aspect Ratio: 33.2 | N/A |
| 2 |  | M66511-001 | SGPB 3-7-17(1) | S2S – Off the shelf<br><br>Retailer: Walmart | 2017 | NAD | N/A |
| 3 |  | M66512-001 | SGPB 3-21-17(2) | S2S – Client Earl Wheeler<br><br>Retailer: Dollar General, Fred's Dollar, or Walmart | 2013 | 8,800 s/g<br><br>Richterite<br><br>Average Aspect Ratio: 10.0 | N/A |

| Results | Chinese | STS Total | All Total |
|---|---|---|---|
| MAS | 2/3 = 67% | 2/3 = 67% | 2/3 = 67% |

TABLE IV – J&J ARCHIVE CONTAINERS (U.S.)

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 1 |  | 2018-0060-04 JBP 167 | M68503-010 | MDL | 1960 | 31,400 s/g<br><br>Tremolite<br><br>Average Aspect Ratio:<br>9.1 | ISO:<br>NAD<br><br>Blount:<br><0.1 Trem/Act |
| 2 |  | 2018-0060-03 JBP 166 | M68503-009 | MDL | 1962 | 17,700 s/g<br><br>Tremolite<br><br>Average Aspect Ratio:<br>6.8 | ISO:<br>NAD<br>Blount:<br><0.1 Trem/Act |
| 3 |  | 2018-0060-76 JBP 119 | M68503-024 | MDL | 1963 | NAD | NAD |
| 4 |  | 2018-0056-25 JBP 232 | M68503-004 | MDL | 1964 | NAD | ISO:<br><0.1 Trem/Act<br><br>Blount:<br>NAD |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 5 |  | 2018-0060-20 JBP 183 | M68503-014 | MDL | 1965 | 17,300 s/g<br><br>Tremolite<br><br>Average Aspect Ratio:<br>8.0 | NAD |
| 6 |  | 2018-0060-06 JBP 169 | M68503-011 | MDL | 1966 | NAD | NAD |
| 7 |  | 2018-0061-09 STS 043 | M68503-027 | MDL | 1966 | NAD | NAD |
| 8 |  | 2018-0060-44 JBP 087 | M68503-019 | MDL | 1967 | 8,930 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio:<br>20.0 | NAD |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 9 |  | 2018-0056-31 JBP 238 | M69042-003 | MDL | 1967 | 18,000 s/g<br><br>Tremolite Anthophyllite<br><br>Average Aspect Ratio: 9.2 | ISO:<br><0.1 Trem/Act<br><0.1 Anth<br><br>Blount:<br><0.1 Trem/Act<br><0.1 Anth |
| 10 |  | 2018-0060-25 JBP 188 | M69042-005 | MDL | 1967 | NAD | NAD |
| 11 |  | 2018-0060-49 JBP 092 | M69042-006 | MDL | 1967 | NAD | NAD |
| 12 |  | 2018-0060-50 JBP 093 | M69042-007 | MDL | 1967 | NAD | NAD |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 13 |  | 2018-0061-40 STS 004 | M68503-038 | MDL | 1968 | NAD | NAD |
| 14 |  | 2018-0061-08 STS 042 | M68503-026 | MDL | 1969 | 268,000 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 8.7 | ISO:<br><0.1 Trem/Act<br><br>Blount:<br><0.1 Trem/Act |
| 15 |  | 2018-0056-30 JBP 237 | M68503-005 | MDL | 1970 | NAD | NAD |
| 16 |  | 2018-0060-68 JBP 111 | M69042-009 | Levy (MDL) | 1970 | NAD | ISO:<br><0.1 Trem/Act<br><br>Blount:<br>NAD |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| **17** |  | 2018-0061-17 STS 051 | M68503-029 | MDL | 1971 | NAD | NAD |
| **18** |  | 2018-0060-54 JBP 097 | M68503-021 | MDL | 1972 | NAD | NAD |
| **19** |  | 2018-0060-64 JBP 107 | M68503-023 | MDL | 1973 | 8,760 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 10.7 | ISO:<br><0.1 Anth<br><br>Blount:<br><0.1 Anth |
| **20** |  | 2018-0061-12 STS 046 | M68503-028 | MDL | 1974 | 17,500 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 10.5 | ISO:<br>NAD<br><br>Blount:<br><0.1 Anth |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 21 |  | 2018-0061-02D STS 1611A (STS 36) | 02D | J3 (MDL) | 1975 | NAD | ISO: NAD (J3) <br><br> Blount: NAD |
| 22 |  | 2018-0056-02D JBP 209 | M69042-001 | Levy (MDL) | 1975 | 22,400 s/g <br><br> Anthophyllite <br><br> Average Aspect Ratio: 21.7 | ISO: <0.1 Trem/Act <br><br> Blount: <0.1 Trem/Act |
| 23 |  | 2018-0061-57 STS 021 | M68503-046 | MDL | 1975 | NAD | NAD |
| 24 |  | 2018-0061-49 STS 013 | M68503-042 | MDL | 1976 | 23,600 s/g <br><br> Anthophyllite <br><br> Average Aspect Ratio: 9.8 | ISO: <0.1 Trem/Act <0.1 Anth <br><br> Blount: <0.1 Trem/Act |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| **25** |  | 2018-0015-01A1 JBP 084 | M68233-001 | MDL (Lanier) | 1978 | 7,240 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 7.6 | ISO:<br><0.1 Trem/Act<br><br>Blount:<br><0.1 Trem/Act |
| | | 2018-0015-01A2 JBP 084 | M68233-002 | | | 22,130 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 19.4 | ISO:<br><0.1 Trem/Act<br><br>Blount:<br><0.1 Anth |
| **26** |  | 2018-0070-10 2014-001-0612 JBP | M68503-057 | MDL | 1977 | 8,360 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 5.3 | ISO:<br><0.1 Trem/Act<br><0.1 Anth<br><br>Blount:<br>NAD |
| **27** |  | 2018-0060-53 JBP 096 | M68503-020 | MDL | 1978 | 34,800 s/g<br><br>Anthophyllite Tremolite<br><br>Average Aspect Ratio: 13.8 | ISO:<br><0.1 Trem/Act<br><0.1 Anth<br><br>Blount:<br><0.1 Trem/Act |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 28 |  | 2018-0056-06 JBP 213 | M69042-002 | Levy (MDL) | 1978 | 63,800 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 14.0 | ISO:<br><0.1 Trem/Act<br><0.1 Anth<br><br>Blount:<br><0.1 Trem/Act<br><0.1 Anth |
| 29 |  | 2018-0056-34 JBP 241 | M69042-004 | Levy (MDL) | 1978 | 18,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 21.9 | ISO:<br><0.1 Trem/Act<br><0.1 Anth<br><br>Blount:<br><0.1 Trem/Act<br><0.1 Anth |
| 30 |  | 2018-0060-67 JBP 110 | M69042-008 | Levy (MDL) | 1978 | 18,100 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 7.9 | ISO:<br><0.1 Anth<br><br>Blount:<br><0.1 Anth |
| 31 |  | 2018-0070-07D<br>2014-001-0397<br>STS | 07D | J3 (MDL) | 1978 | 82,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 18.5 | ISO:<br>NAD (J3)<br><br>Blount:<br>0.2 Trem/Act<br>0.5 Anth |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 32 |  | 2018-0061-15D STS 049 | 15D | J3 (MDL) | 1978 | 61,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 20.0 | ISO: NAD (J3)<br><br>Blount: 0.3 Anth |
| 33 |  | 2018-0061-50D STS 1605A STS 014 | 50D | J3 (MDL) | 1978 | NAD | ISO: NAD (J3)<br><br>Blount: <0.1 Anth |
| 34 |  | 2018-0070-16 2-14-001-1363 JBP | M68503-059 | MDL | 1979 | 17,100 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 18.4 | ISO: <0.1 Trem/Act <0.1 Anth<br><br>Blount: <0.1 Trem/Act <0.1 Anth |
| 35 |  | 2018-0061-10D STS 044 | 10D | J3 (MDL) | 1980 | N/A | ISO: NAD (J3)<br><br>Blount: 0.2 Trem/Act <0.1 Anth |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 36 |  | 2018-0061-38D STS 002 | 38D | J3 (MDL) | 1980 | 53,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 9.6 | ISO: NAD (J3)<br><br>Blount: 0.2 Tre/Act 0.2 Anth |
| 37 |  | 2018-0061-63D STS 027D | 63D | J3 (MDL) | 1980 | N/A | ISO: NAD (J3)<br><br>Blount: 0.2 Tre/Act 0.2 Anth |
| 38 |  | 2018-0061-52D STS 016 | 52D | J3 (MDL) | 1981 | 70,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 22.4 | ISO: NAD (J3)<br><br>Blount: 0.2 Tre/Act 0.5 Anth |
| 39 |  | 2018-0061-65D STS 029 | 65D | J3 (MDL) | 1981 | 95,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 18.4 | ISO: NAD (J3)<br><br>Blount: 0.2 Tre/Act 0.2 Anth |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 40 |  | 2018-0061-37D STS 001 | 37D | J3 (MDL) | 1982 | 9,300 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 6.1 | ISO:<br>NAD (J3)<br><br>Blount:<br><0.1 Tre/Act<br><0.1 Anth |
| 41 |  | 2018-0061-45D STS 009 | 45D | J3 (MDL) | 1982 | 9,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 8.0 | ISO:<br>NAD (J3)<br><br>Blount:<br><0.1 Tre/Act |
| 42 |  | 2018-0061-51D STS 1606A STS 015 | 51D | J3 (MDL) | 1982 | NAD | ISO:<br>NAD (J3)<br><br>Blount:<br><0.1 Tre/Act |
| 43 |  | 2018-0061-66D STS 1610A STS 030 | 66D | J3 (MDL) | 1982 | NAD | ISO:<br>NAD (J3)<br><br>Blount:<br>0.1 Tre/Act |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 44 |  | 2018-0061-21D STS 1614A STS 055 | 21D | J3 (MDL) | 1983 | NAD | ISO: NAD (J3)<br><br>Blount: <0.1 Tre/Act <0.1 Anth |
| 45 |  | 2018-0051-34 JBP 294 *Twin pack. Only 1 bottle selected for sampling by MDL. (See note on COC from MDL split) | M68503-001 | MDL | 1984 | 18,700 s/g<br><br>Anthophyllite Tremolite<br><br>Average Aspect Ratio: 11.5 | ISO: <0.1 Tre/Act<br><br>Blount: <0.1 Tre/Act |
| 46 |  | 2018-0070-86 2014.001.5102 JBP | M69042-010 | Levy (MDL) | 1985 | 12,500 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 11.5 | ISO: <0.1 Tre/Act<br><br>Blount: <0.1 Anth |
| 47 |  | 2018-0061-31F STS 065 "Regular" (Left) | 31F | J3 (MDL) | 1986 | 22,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 16.6 | ISO: NAD (J3)<br><br>Blount: 0.3 Tre/Act <0.1 Anth |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 48 |  | 2018-0061-31G STS 065 "Spice" (Right) | 31G | J3 (MDL) | 1986 | 30,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 21.8 | ISO: NAD (J3)<br><br>Blount: <0.7 Tre/Act |
| 49 |  | 2018-0060-33 JBP 001 | M68503-016 | MDL | 1994 | NAD | NAD |
| 50 |  | 2018-0060-38 JBP 006 | M68503-017 | MDL | 1996 | NAD | NAD |

| Results | Italian | Vermont | JBP | STS | All Total |
|---|---|---|---|---|---|
| MAS | 7/14 = 50% | 29/36 = 81% | 18/27 = 67% | 18/23 = 78% | 36/50 = 72% |

TABLE V – J&J ARCHIVE CONTAINERS (ASIA)

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 1 |  | 2018-0060-36D JBP 004 | M69248-001 | Levy (MDL) | Unknown Asian | NAD | NAD |
| 2 |  | 2014.001.3718 2018-0070-28D JBP | M69248-002 | Levy (MDL) | 1979 Asian | 29,100 s/g Tremolite Average Aspect Ratio: 8.2 | PLM: NAD Blount: <0.1 Trem/Act |
| 3 |  | 2014.001.3918 2018-0070-29D JBP | M69248-003 | Levy (MDL) | 1980-1984 Asian | 65,100 s/g Tremolite Average Aspect Ratio: 9.1 | PLM: NAD Blount: 0.3 Trem/Act |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 4 |  | 2014.001.0499 2018-0070-39D JBP | M69248-004 | Levy (MDL) | Unknown Asian | 17,600 s/g Tremolite Average Aspect Ratio: 6.2 | PLM: NAD Blount: 0.1 Trem/Act |
| 5 |  | 2014.001.2021 2018-0070-45D JBP | M69248-005 | Levy (MDL) | Unknown Asian | 35,100 s/g Tremolite Average Aspect Ratio: 10.0 | PLM: NAD Blount: 0.2 Trem/Act |
| 6 |  | 2014.001.3921 2018-0070-60D JBP | M69248-006 | Levy (MDL) | 1982 Asian | 35,000 s/g Tremolite Average Aspect Ratio: 13.9 | PLM: NAD Blount: 0.1 Trem/Act |
| 7 |  | 2014.001.5859 2018-0070-93D JBP | M69248-007 | Levy (MDL) | Unknown Asian | 45,400 s/g Tremolite Average Aspect Ratio: 10.1 | PLM: NAD Blount: <0.1 Trem/Act |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 8 |  | 2014.1.3298 2018-0070-23A JBP | M69925-001 | SGP (MDL) | 1970-1980 Philippines | 17,300 s/g Tremolite Average Aspect Ratio: 16.3 | PLM: NAD Blount: <0.1% Trem/Act |
| 9 |  | 2018-0060-35A JBP 003 | M69925-002 | SGP (MDL) | 1996 Philippines | NAD | NAD |

| Results | Asian | JBP Total | STS Total | All Total |
|---|---|---|---|---|
| MAS | 7/9 = 78% | 7/9 = 78% | N/A | 7/9 = 78% |

TABLE VI – J&J ARCHIVE CONTAINERS (U.K. and AUSTRALIA)

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 1 |  | 2018-0061-72D<br><br>U.K. Facility #3 | M70850-001 | Levy (MDL) | Late 1950s<br><br>Made in Gt. Britain | 6,000 s/g<br><br>Tremolite Fibrous Talc<br><br>Average Aspect Ratio: 32.4 | NAD |
| 2 |  | 2018-0061-73D<br><br>U.K. Facility #1 | M70850-002 | Levy (MDL) | Late 1940s<br><br>Made in Gt. Britain | 26,300 s/g<br><br>Tremolite Fibrous Talc<br><br>Average Aspect Ratio: 13.2 | NAD |
| 3 |  | 2018-0061-74D<br><br>U.K. Facility #4 | M70850-003 | Levy (MDL) | October 1966<br><br>Made in England | NAD<br><br>Fibrous Talc | NAD |
| 4 |  | 2019-0189-01D<br>2014.1.5830 | M70850-004 | Levy (MDL) | 1940<br><br>Made in Gt. Britain | 11,800 s/g<br><br>Tremolite Fibrous Talc<br><br>Average Aspect Ratio: 8.4 | NAD |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 5 |  | 2019-0189-02D<br>2015.001.3449 | M70850-005 | Levy (MDL) | Unknown<br><br>Made in Gt. Britain | NAD<br><br>Fibrous Talc | NAD |
| 6 |  | 2019-0189-04D<br>2019.001.0020 | M70850-006 | Levy (MDL) | c. 1916<br><br>Made in Great Britain | 23,800 s/g<br><br>Tremolite<br><br>Average Aspect Ratio:<br>12.5<br><br>Fibrous Talc | PLM:<br>NAD<br><br>Blount:<br><0.1% Trem/Act |
| 7 |  | 2019-0189-05D<br>2019.001.0021 | M70850-007 | Levy (MDL) | 1943<br><br>Johnson & Johnson (Gt. Britain) | 18,100 s/g<br><br>Tremolite<br><br>Average Aspect Ratio:<br>11.2<br><br>Fibrous Talc | NAD |
| 8 |  | 2019-0189-35D<br>2014.1.0145 | M70850-008 | Levy (MDL) | 1983-1989<br><br>Johnson & Johnson Australia PTY | 18,100 s/g<br><br>Tremolite<br><br>Average Aspect Ratio:<br>7.8 | PLM:<br><0.1% Trem/Act<br><br>Blount:<br><0.1% Trem/Act |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 9 |  | 2018-0070-38D 2014.1.0403 | M70850-009 | Levy (MDL) | 1987/1989 Johnson & Johnson Australia PTY | 12,000 s/g Tremolite Average Aspect Ratio: 10.8 | NAD |
| 10 |  | 2018-0070-13D 2014.1.0939 | M70850-010 | Levy (MDL) | 1980 Made in England | 17,900 s/g Tremolite Average Aspect Ratio: 11.2 Fibrous Talc | PLM: NAD Blount: <0.1% Trem/Act |
| 11 |  | 2018-0070-19D 2014.1.2462 | M70850-011 | Levy (MDL) | Unknown Made in UK | NAD | NAD |
| 12 |  | 2018-0070-30D 2014.1.3976 | M70850-012 | Levy (MDL) | 1972 Made in England | NAD Fibrous Talc | NAD |

| | Photo | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 13 |  | 2018-0070-80D 2015.1.3448 | M70850-013 | Levy (MDL) | 1940s  Made in Gt. Britain | 5,960 s/g  Tremolite  Average Aspect Ratio: 7.8  Fibrous Talc | NAD |

| Results | U.K. | Australian | JBP Total | STS Total | All Total |
|---|---|---|---|---|---|
| **MAS** | 7/11 = 64% | 2/2 = 100% | 8/12 = 67% | 1/1 = 100% | 9/13 = 69% |

TABLE VII – CONTAINERS FROM OUTSIDE J&J ARCHIVE – UNITED KINGDOM

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 1 |  | M70859-001 | P2 | JBP – From client Chris Powell (P2) Retailer: direct from J&J UK office/factory | 2002 | <6,900 s/g | Blount PLM w/ HLS: NAD ISO PLM w/o HLS Chrysotile: In progress CSM-PLM w/ HLS Chrysotile: 0.017-0.019% 69 bundles 921,000 bundles p/g |
| 2 |  | M70859-002 | P2 | JBP – From client Chris Powell (P2) Retailer: direct from J&J UK office/factory | 2002 | <7,110 s/g | Blount PLM w/ HLS: NAD ISO PLM w/o HLS Chrysotile: In progress CSM-PLM w/ HLS Chrysotile: 0.019-0.020% 74 bundles 1,002,000 bundles p/g |
| 3 |  | M70859-003 | P2 | JBP – From client Chris Powell (P2) Retailer: direct from J&J UK office/factory | 2002 | <6,880 s/g | Blount PLM w/ HLS: NAD ISO PLM w/o HLS Chrysotile: In progress CSM-PLM w/ HLS Chrysotile: 0.021-0.023% 83 bundles 713,000 bundles p/g |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| **4** |  | M70859-004 | P2 | JBP – From client Chris Powell (P2)<br><br>Retailer: direct from J&J UK office/factory | 2002 | <7,240 s/g | <u>Blount PLM w/ HLS:</u> NAD<br><br><u>ISO PLM w/o HLS Chrysotile:</u> In progress<br><u>CSM-PLM w/ HLS Chrysotile:</u> 0.018-0.019% 73 bundles 656,000 bundles p/g |
| **5** |  | M70859-005 | P2 | JBP – From client Chris Powell (P2)<br><br>Retailer: direct from J&J UK office/factory | 2002 | <6,960 s/g | <u>Blount PLM w/ HLS:</u> NAD<br><br><u>ISO PLM w/o HLS Chrysotile:</u> In progress<br><u>CSM-PLM w/ HLS Chrysotile:</u> 0.013-0.014% 58 bundles 491,000 bundles p/g |
| **6** |  | M70859-006 | P2 | JBP – From client Chris Powell (P2)<br><br>Retailer: direct from J&J UK office/factory | 2002 | <7,260 s/g | <u>Blount PLM w/ HLS:</u> NAD<br><br><u>ISO PLM w/o HLS Chrysotile:</u> In progress<br><u>CSM-PLM w/ HLS Chrysotile:</u> 0.016-0.018% 63 bundles 592,000 bundles p/g |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 7 |  | M70859-007 | P2 | JBP – From client Chris Powell (P2)<br><br>Retailer: direct from J&J UK office/factory | 2002 | <6,860 s/g | Blount PLM w/ HLS: NAD<br><br>ISO PLM w/o HLS Chrysotile: In progress<br>CSM-PLM w/ HLS Chrysotile: 0.016-0.018% 71 bundles 691,000 bundles p/g |
| 8 |  | M70859-008 | P2 | JBP – From client Chris Powell (P2)<br><br>Retailer: direct from J&J UK office/factory | 2002 | <6,800 s/g | Blount PLM w/ HLS: NAD<br><br>ISO PLM w/o HLS Chrysotile: In progress<br>CSM-PLM w/ HLS Chrysotile: 0.018-0.020% 70 bundles 1,070,000 bundles p/g |
| 9 |  | M70859-009 | P2 | JBP – From client Chris Powell (P2)<br><br>Retailer: direct from J&J UK office/factory | 2002 | <7,130 s/g | Blount PLM w/ HLS: NAD<br><br>ISO PLM w/o HLS Chrysotile: In progress<br>CSM-PLM w/ HLS Chrysotile: 0.015-0.016% 59 bundles 486,000 bundles p/g |

| Results | UK | Chinese | JBP Total | All Total |
|---|---|---|---|---|
| MAS | 9/9 = 100% | 9/9 = 100% | 9/9 = 100% | 9/9 = 100% |

TABLE VIII – CONTAINERS FROM OUTSIDE J&J ARCHIVE - ARGENTINA (BRAZIL)

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 1 |  | M71228-001 | Kelly Uustal | JBP – Off the shelf<br><br>Retailer: Farmacia Botanica in Argentina | 2017 | NAD | Blount PLM w/ HLS: NAD<br><br>ISO PLM w/o HLS Chrysotile: 0.016-0.017% 53 bundles 567,000 bundles p/g<br>CSM-PLM w/ HLS Chrysotile: 0.005-0.006% 70 bundles 749,000 bundles p/g |
| 2 |  | M71228-002 | Kelly Uustal | JBP – Off the shelf<br><br>Retailer: Super Clin in Argentina | 2017 | NAD | Blount PLM w/ HLS: NAD<br><br>ISO PLM w/o HLS Chrysotile: 0.009-0.012% 33 bundles 353,100 bundles p/g<br>CSM-PLM w/ HLS Chrysotile: 0.003% 48 bundles 514,000 bundles p/g |

| | Photo | Container ID | Sender | Source | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 3 |  | M71228-003 | Kelly Uustal | JBP – Off the shelf<br><br>Retailer: Super Clin in Argentina | 2017 | NAD | Blount PLM w/ HLS:<br>NAD<br><br>ISO PLM w/o HLS<br>Chrysotile:<br>0.016-0.017%<br>39 bundles<br>464,000 bundles p/g<br>CSM-PLM w/ HLS<br>Chrysotile:<br>0.004%<br>63 bundles<br>613,000 bundles p/g |

| Results | Brazil | JBP Total | All Total |
|---|---|---|---|
| **MAS** | 3/3 = 100% | 3/3 = 100% | 3/3 = 100% |

TABLE IX – IMERYS MDL SAMPLES

| | Description | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 1 | West Windsor Grade 66 | 2018-0314-03 Imerys | M69751-037 | Beasley (MDL) | 1989 | 59,000 s/g | ISO: <0.1 Tre/Act<br>Blount: <0.7 Tre/Act |
| 2 | | 2018-0343-03A Imerys | M69757-005 | Beasley (MDL) | 1990 | 27,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 11.1 | ISO: <0.1 Tre/Act <0.1 Anth<br>Blount: <0.1 Tre/Act <0.1 Anth |
| 3 | | 2018-0358-01A Imerys | M69757-007 | Beasley (MDL) | 1990 | 39,000 s/g<br><br>Anthophyllite Actinolite<br><br>Average Aspect Ratio: 11.1 | ISO: <0.1 Tre/Act<br>Blount: <0.1 Tre/Act <0.1 Anth |
| 4 | West Windsor Grade 66 | 2018-0320-01A Imerys | M69751-039 | Beasley (MDL) | 1991 | NAD | NAD |
| 5 | West Windsor Grade 96 | 2018-0320-13A Imerys | M69751-040 | Beasley (MDL) | 1991-1992 | 13,000 s/g<br><br>Anthophyllite<br><br>Average Aspect Ratio: 11.1 | ISO: NAD<br>Blount: <0.1 Tre/Act |
| 6 | | 2018-0339-05 Imerys | M69757-004 | Beasley (MDL) | 1994 | NAD | NAD |
| 7 | West Windsor Grade 66 | 2018-0313-02A Imerys | M69751-036 | Beasley (MDL) | 1995 | 4,400 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 35.0 | NAD |

| | Description | Container ID | MAS Sample ID | Sender | Vintage | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 8 | | 2018-0344-04A Imerys | M69757-006 | Beasley (MDL) | 1996 | NAD | NAD |
| 9 | Railcar & Bag Sample Grade 66 | 2018-0315-021A Imerys | M69751-002 | Beasley (MDL) | 1999 | NAD | NAD |
| 10 | Railcar & Bag Sample West Windsor Grade 66 | 2018-0315-01A Imerys | M69751-001 | Beasley (MDL) | 2001-2002 | 4,400 s/g<br><br>Tremolite<br>Average Aspect Ratio: 8.8 | NAD |
| 11 | Railcar & Bag Sample West Windsor Float Feed | 2018-0316-020A Imerys | M69751-006 | Beasley (MDL) | Dec 2000 | 4,600 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 35.0 | ISO:<br>NAD<br><br>Blount:<br><0.1 Tre/Act |
| 12 | Railcar & Bag Sample West Windsor Float Feed | 2018-0316-021A Imerys | M69751-007 | Beasley (MDL) | Feb 2000 | 8,700 s/g<br><br>Tremolite<br><br>Average Aspect Ratio: 12.2 | NAD |
| 13 | West Windsor Grade 66 | 2018-0317-04A Imerys | M69751-038 | Beasley (MDL) | 2000 | NAD | NAD |
| 14 | Railcar & Bag Sample Silo Grade 66 | 2018-0315-040A Imerys | M69751-004 | Beasley (MDL) | 2001 | NAD | NAD |
| 15 | Railcar & Bag Sample West Windsor Float Feed | 2018-0316-022A Imerys | M69751-008 | Beasley (MDL) | Jan 2003 | NAD | NAD |

| Results | All Total |
|---|---|
| MAS | 8/15 = 53% |

TABLE X – SUPRA H CHINESE TALC RETAINS

| | Description | MAS Sample ID | BV/RJLG Sample ID | Imerys Ore Lot | Sender | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| **1** | Mill Guangxi Solid Sample | M71109-001 | BV No. A5152004-006A | | Imerys Mine Segrave (SGP) | NAD | PLM w/o HLS Chrysotile: 0.007-0.01% <br> Blount PLM w/ HLS Trem/Act: NAD <br> CSM-PLM w/ HLS Chrysotile: 0.001-0.002% |
| **2** | Guangxi/crude Solid/loose powder | M71110-001 | RJLG No. 3136120 | | Imerys Mine Sanchez (SGP) | NAD | PLM w/o HLS Chrysotile: 0.008-0.01% <br> Blount PLM w/ HLS Trem/Act: NAD <br> CSM-PLM w/ HLS Chrysotile: 0.001-0.002% |
| **3** | Mill Guangxi loose powder | M71111-001 | RJLG No. 3138491 | MVN C01315C2 | J&J Retain (SGP) | NAD | PLM w/o HLS Chrysotile: 0.006-0.008% <br> Blount PLM w/ HLS Trem/Act: NAD <br> CSM-PLM w/ HLS Chrysotile: 0.0010-0.0013% |
| **4** | Mill Guangxi loose powder | M71111-002 | RJLG No. 313455 | MVN C01315C2 | J&J Retain (SGP) | NAD | PLM w/o HLS Chrysotile: 0.007-0.01% <br> Blount PLM w/ HLS Trem/Act: NAD <br> CSM-PLM w/ HLS Chrysotile: 0.0010-0.0013% |

| | Description | MAS Sample ID | BV/RJLG Sample ID | Imerys Ore Lot | Sender | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| **5** | Mill Guangxi loose powder | M71111-003 | RJLG No. 3140762 | MVN C01315C2 | J&J Retain (SGP) | NAD | PLM w/o HLS Chrysotile: 0.007-0.009% <br><br> Blount PLM w/ HLS Trem/Act: NAD <br><br> CSM-PLM w/ HLS Chrysotile: 0.0010-0.0014% |
| **6** | Mill Guangxi loose powder | M71111-004 | RJLG No. 3141790 | MVN S0246C2 | J&J Retain (SGP) | NAD | PLM w/o HLS Chrysotile: 0.005-0.007% <br><br> Blount PLM w/ HLS Trem/Act: NAD <br><br> CSM-PLM w/ HLS Chrysotile: 0.0008-0.0011% |
| **7** | Mill Guangxi loose powder | M71111-005 | RJLG No. 3143083 | MVN S0246C2 | J&J Retain (SGP) | NAD | PLM w/o HLS Chrysotile: 0.006-0.008% <br><br> Blount PLM w/ HLS Trem/Act: NAD <br><br> CSM-PLM w/ HLS Chrysotile: 0.0010-0.0013% |
| **8** | Mill Guangxi loose powder | M71111-006 | RJLG No. 3144312 | MVN S0246C2 | J&J Retain (SGP) | NAD | PLM w/o HLS Chrysotile: 0.007-0.01% <br><br> Blount PLM w/ HLS Trem/Act: NAD <br><br> CSM-PLM w/ HLS Chrysotile: 0.0011-0.0012% |

| | Description | MAS Sample ID | BV/RJLG Sample ID | Imerys Ore Lot | Sender | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 9 | Mill Guangxi loose powder | M71111-007 | RJLG No. 3145361 | MVN S0246C2 | J&J Retain (SGP) | NAD | PLM w/o HLS Chrysotile: 0.007-0.009%<br>Blount PLM w/ HLS Trem/Act: NAD<br>CSM-PLM w/ HLS Chrysotile: 0.0013-0.0022% |
| 10 | Mill Guangxi loose powder | M71111-008 | RJLG No. 3147067 | MVN S0246C2 | J&J Retain (SGP) | NAD | PLM w/o HLS Chrysotile: 0.007-0.009%<br>Blount PLM w/ HLS Trem/Act: NAD<br>CSM-PLM w/ HLS Chrysotile: 0.0010-0.0013% |
| 11 | Mill Guangxi loose powder | M71111-009 | RJLG No. 3149010 | MVN S0246C2 | J&J Retain (SGP) | NAD | PLM w/o HLS Chrysotile: 0.006-0.008%<br>Blount PLM w/ HLS Trem/Act: NAD<br>CSM-PLM w/ HLS Chrysotile: 0.0013-0.0015% |
| 12 | Supra H RM-04/17/2012 87672 | M71179-001 | BV A1810394-001C | H04022-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.008-0.01%<br>CSM-PLM w/ HLS Chrysotile: 0.002-0.003% |
| 13 | Supra H RM-04/03/2012 87496 | M71179-002 | BV A1810394-002C | H12121-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.009-0.01%<br>CSM-PLM w/ HLS Chrysotile: 0.002-0.003% |

| | Description | MAS Sample ID | BV/RJLG Sample ID | Imerys Ore Lot | Sender | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 14 | Supra H RM-03/09/2011 81621 | M71179-003 | BV A1810394-003C | H11239-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.009-0.02% <br> CSM-PLM w/ HLS Chrysotile: 0.002-0.005% |
| 15 | Supra H RM-03/09/2011 81615 | M71179-004 | BV A1810394-004C | H11230-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.009-0.02% <br> CSM-PLM w/ HLS Chrysotile: 0.002-0.005% |
| 16 | Supra H RM-03/09/11 81628 | M71179-005 | BV A1810394-005C | H08240-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.008-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.002-0.004% |
| 17 | Supra H RM-03/09/2011 81622 | M71179-006 | BV A1810394-006C | H06250-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.009-0.015% <br> CSM-PLM w/ HLS Chrysotile: 0.002-0.004% |
| 18 | Supra H RM-09/20/2013 94513 | M71179-007 | BV A1810394-007C | H05191-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.007-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.001-0.002% |
| 19 | Supra H RM-01/25/2010 74696 | M71179-008 | BV A1810394-008C | H11239-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.007-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.001-0.002% |
| 20 | Supra H RM-08/12/2010 78525 | M71179-009 | BV A1810394-009C | H03270-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.008-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.001-0.002% |

| | Description | MAS Sample ID | BV/RJLG Sample ID | Imerys Ore Lot | Sender | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 21 | Supra H RM-01/04/2011 80529 | M71179-010 | BV A1810394-010C | H10130-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.007-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.001-0.002% |
| 22 | Supra H RM-03/08/2011 81605 | M71179-011 | BV A1810394-011C | H01211-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.008-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.002-0.003% |
| 23 | Supra H RM-05/24/2011 82777 | M71179-012 | BV A1810394-012C | H01281-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.007-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.001-0.002% |
| 24 | Supra H RM-10/26/2011 85213 | M71179-013 | BV A1810394-013C | H06031-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.008-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.002% |
| 25 | Supra H RM-04/03/2012 87497 | M71179-014 | BV A1810394-014C | H11231-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.007-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.003% |
| 26 | Supra H RM-09/24/2012 89752 | M71179-015 | BV A1810394-015C | H08022-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.008-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.001-0.002% |
| 27 | Supra H RM-12/21/2012 90871 | M71179-016 | BV A1810394-016C | H11082-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.008-0.01% <br> CSM-PLM w/ HLS Chrysotile: 0.001% |

| | Description | MAS Sample ID | BV/RJLG Sample ID | Imerys Ore Lot | Sender | Asbestos TEM | Asbestos PLM |
|---|---|---|---|---|---|---|---|
| 28 | Supra H RM-09/09/2013 94514 | M71179-017 | BV A1810394-017C | H04223-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.009-0.01%<br><br>CSM-PLM w/ HLS Chrysotile: 0.001-0.002% |
| 29 | Supra H RM-05/20/2012 92890 | M71179-018 | BV A1810394-018C | H04223-76 | Chanel Retain (SGP) | N/A | PLM w/o HLS Chrysotile: 0.007-0.009%<br><br>CSM-PLM w/ HLS Chrysotile: 0.001% |

| Results | All Total – Supra H Chinese Talc Ores |
|---|---|
| MAS | 29/29 = 100% |

## SUMMARY TABLES

### TABLE I – CONTAINERS FROM OUTSIDE J&J ARCHIVE PRE 2003 U.S. (ITALIAN & VERMONT)

| Results | Italian | Vermont | JBP Total | STS Total | All Total |
|---|---|---|---|---|---|
| MAS | 11/18 = 61% | 4/4 = 100% | 15/22 = 68% | N/A | 15/22 = 68% |

### TABLE II – CONTAINERS FROM OUTSIDE J&J ARCHIVE POST 2003 U.S. (CHINESE)

| Results | Chinese | JBP Total | STS Total | All Total |
|---|---|---|---|---|
| MAS | 37/40 = 93% | 36/39 = 92% | 1/1 = 100% | 37/40 = 93% |

### TABLE III – VALEANT CONTAINERS FROM OUTSIDE J&J ARCHIVE POST 2003 (CHINESE)

| Results | Chinese | STS Total | All Total |
|---|---|---|---|
| MAS | 2/3 = 67% | 2/3 = 67% | 2/3 = 67% |

### TABLE IV – J&J ARCHIVE CONTAINERS (U.S.)

| Results | Italian | Vermont | JBP | STS | All Total |
|---|---|---|---|---|---|
| MAS | 7/14 = 50% | 29/36 = 81% | 18/27 = 67% | 18/23 = 78% | 36/50 = 72% |

### TABLE V – J&J ARCHIVE CONTAINERS (ASIA)

| Results | Asian | JBP Total | STS Total | All Total |
|---|---|---|---|---|
| MAS | 7/9 = 78% | 7/9 = 78% | N/A | 7/9 = 78% |

### TABLE VI – J&J ARCHIVE CONTAINERS (U.K. and AUSTRALIA)

| Results | U.K. | Australia | JBP Total | STS Total | All Total |
|---|---|---|---|---|---|
| MAS | 7/11 = 64% | 2/2 = 100% | 8/12 = 67% | 1/1 = 100% | 9/13 = 69% |

### TABLE VII – CONTAINERS FROM OUTSIDE J&J ARCHIVE – UNITED KINGDOM

| Results | UK | Chinese | JBP Total | All Total |
|---|---|---|---|---|
| MAS | 9/9 = 100% | 9/9 = 100% | 9/9 = 100% | 9/9 = 100% |

### TABLE VIII – CONTAINERS FROM OUTSIDE J&J ARCHIVE - ARGENTINA (BRAZIL)

| Results | Brazil | JBP Total | All Total |
|---|---|---|---|
| MAS | 3/3 = 100% | 3/3 = 100% | 3/3 = 100% |

### TABLE IX – IMERYS MDL

| Results | All Total |
|---|---|
| MAS | 8/15 = 53% |

### TABLE X – SUPRA H CHINESE TALC RETAINS

| Results | All Total – Supra H Chinese Talc Ores |
|---|---|
| MAS | 29/29 = 100% |

### COMBINED U.S. CONTAINER ORE SUMMARY (W/OUT VALEANT STS, IMERYS MDL ORE, and CHINESE RETAINS)

| Italian Ore (U.S.) | Vermont Ore (U.S.) | Chinese Ore (U.S.) | JBP Total Containers (U.S.) | STS Total Containers (U.S.) | Total U.S. Containers |
|---|---|---|---|---|---|
| 18/32 = 56% | 33/40 = 83% | 37/40 = 93% | 69/88 = 78% | 19/24 = 79% | 88/112 = 79% |

### COMBINED ALL CONTAINER SUMMARY (W/OUT VALEANT STS, IMERYS MDL ORE, and CHINESE RETAINS)

| U.S. Containers | U.K. Containers | Australia Containers | Asia Containers | Argentina Containers | JBP Total Containers | STS Total Containers | All Total Containers |
|---|---|---|---|---|---|---|---|
| 88/112 = 79% | 16/20 = 80% | 2/2 = 100% | 7/9 = 78% | 3/3 = 100% | 96/121 = 79% | 20/25 = 80% | 116/146 = 79% |

### COMBINED ALL U.S. CHINESE ORE SUMMARY

| U.S. Containers | JBP Containers | JNJ STS Containers | Valeant STS Containers | Guang Xi/Supra H Ores | All Chinese Ore Total |
|---|---|---|---|---|---|
| 39/43 = 91% | 45/48 = 94% | 1/1 = 100% | 2/3 = 67% | 29/29 = 100% | 77/81 = 95% |

# Exhibit 7

4650

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                     COUNTY OF ALAMEDA

3            BEFORE THE HONORABLE STEPHEN KAUS

4                      DEPARTMENT 19

5                   VIA ZOOM CONFERENCE

6                       ---oOo---

7    CHRISTINA G. PRUDENCIO,

8          Plaintiff,

9    vs.                          No. RG20061303

10   JOHNSON & JOHNSON, et
     al.,

11

12         Defendants.
     _____/

13

          REPORTER'S TRANSCRIPT OF PROCEEDINGS
14

          (Trial - William E. Longo, Ph.D.)
15

               Thursday, July 1, 2021
16

                   Full Session
17

18

19

20      Taken before EARLY K. LANGLEY, B.A., RMR, RSA
                   CSR No. 3537
21

22

23
     VOLUME 30
24

25   PAGES 4650 - 4832

4651

1   APPEARANCES OF COUNSEL ON THE RECORD VIA ZOOM

2   CONFERENCE:

3

4   For the Plaintiff:

5           JOSEPH SATTERLEY
            IAN RIVAMONTE
6           Kazan, McClain, Satterley & Greenwood
            55 Harrison Street, Suite 400
7           Oakland, California 94607
            (510) 302-1000
8           Jsatterley@kazanlaw.com
            Irivamonte@kazanlaw.com
9

10  For the Defendants Johnson & Johnson, Johnson & Johnson
    Consumer Companies, Inc., Johnson & Johnson Inc., sii
11  Johnson & Johnson Cons Companies:

12          MORTON D. DUBIN
            SHAILA R. DIWAN
13          KEVIN HYNES
            King & Spalding LLP
14          1185 6th Ave Of The Americas
            New York, NY 10036
15          (212) 556-2100
            Sdiwan@kslaw.com
16          Mdubin@kslaw.com
            Khynes@kslaw.com
17

18

19

20

21

22

23

24

25

4653

1          INDEX - VOLUME 30 - (Pages 4650 - 4832)

2                 INDEX OF EXAMINATIONS

3                    CHRONOLOGICAL

4

5    WILLIAM E. LONGO, Ph.D. (for the Plaintiff)
                                                    4679
6          Direct Examination By Mr. Satterley
     (Cont'd)
7                                                   4798
           Cross-Examination By Mr. Dubin

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4657

1                          --oOo--

2                  P R O C E E D I N G S

3                          --oOo--

4           Thursday, July 1, 2021 - 8:25 p.m.

5            (Morning and Afternoon Combined)

6           (The following proceedings were held in the

7    virtual breakout room with counsel only outside the

8    presence of the jury:)

9           THE COURT:  All right.  So we're on the record

08:25:52 10  outside the presence of the jury before court in the

11   Prudencio matter.  Mr. Satterley said we had a couple

12   of noncontroversial things to discuss.

13          MR. SATTERLEY:  So the noncontroversial part of

14   it is, we've agreed to further meet and confer this

08:26:07 15  afternoon, spend as much time as necessary and,

16   hopefully, narrow the scope of the objections, and then

17   have a follow-up with Your Honor tomorrow whenever it's

18   appropriate so that we can spend time going through the

19   transcript in a little bit more detail with Your Honor

08:26:22 20  and explain some of our relative positions.

21          And so with that being said, I don't think we

22   have to make any arguments this morning or -- we,

23   obviously, disagree about, you know, certain aspects.

24          THE COURT:  That's fine.  I'm trying to -- so,

08:26:38 25  I mean, we talked about this in the last trial --

4784

1          A.  Yes, sir.  And that's the -- that's the results

2     they got when they changed the data a little bit.

3          Q.  What do you mean, changed their data?

4          A.  Well, the lab that they hired to analyze the

12:16:35   5     air samples called -- initially called the -- he found

6     anthophyllite asbestos and initially called it

7     anthophyllite asbestos and then was told by Exponent to

8     change it to cleavage fragments.

9          Q.  So even at that level, .004, is that 80 times

12:16:58  10     above the old background from the ATSDR from the 1980s?

11          A.  Yes, sir, it is.

12          Q.  Would that be substantial exposure, 80 times

13     the background?

14          A.  Yes, sir.  Anything over background is called a

12:17:13  15     substantial exposure, even using a background

16     concentration of most like -- of chrysotile at 4 zeros

17     and a 5.  So that is substantial exposure.

18          Q.  I'd like for you to assume -- I think you've

19     read it -- Dr. Hopkins, one of the corporate

12:17:31  20     representatives from J&J, testified that J&J's estimate

21     was 4.5 fibers per cc.

22          Assuming that to be the case -- and you read

23     his testimony -- is that 90,000 times above background?

24          A.  Yes, sir, it is.

12:17:48  25          Q.  A J&J diapering estimate of .18 fibers per

4785

1    cc -- you've seen that document; correct?

2         A.  Correct.

3         Q.  Is that 3,600 times above background?

4         A.  Yes, it is.

12:18:01   5         Q.  Is that substantial exposure to asbestos from

6    diapering a baby?

7         A.  It is.

8         Q.  And then the Gordon paper that you told us --

9    was the exposure assessment 1.9 fibers per cc from

12:18:15  10    asbestos from cosmetic talc?

11         A.  Correct.

12         Q.  And would that be 38,000 times above

13    background, assuming a hypothetical background of

14    .00005 fibers per cc?

12:18:29  15         A.  Yes, sir.

16         Q.  And in your opinion, are all those substantial

17    exposures to asbestos from cosmetic talc?

18         A.  Yes, sir, it is.  With this hypothetical

19    background or assuming that there really is --

12:18:45  20    hypothetically, that there is asbestos in the air all

21    the time.

22              But I have testified in the past that, you

23    know, the real level is going to be less than whatever

24    the detection limit is with the sample you run.  You're

12:19:00  25    not going to find background unless there is a source

4786

1   of asbestos.

2        And you won't have sources of asbestos, of

3   tremolite/anthophyllite, because of the lack of

4   products out there, unless you have a house that may

12:19:18   5   have vermiculite loose insulation and you're up there

6   disturbing it.  But that means you have a source of

7   asbestos.

8        Q.  With regards to Ms. Prudencio, you evaluated

9   that she was exposed to both Johnson & Johnson Baby

12:19:33  10   Powder and Longs Baby Powder when she was young;

11   correct?

12        A.  That is correct.

13        Q.  And have you calculated the total personal uses

14   based upon all the testimony you've read, all of the

12:19:49  15   interviews, all of the information you got?

16        A.  Correct.  But that would include both the Longs

17   and the -- and the J&J containers.

18        Q.  I think we're going to break it down in a few

19   minutes.

12:20:04  20        A.  Okay.

21        Q.  If you could talk us through this chart here.

22   What's your opinions about her exposures?

23        A.  My opinions about her exposures, that between

24   when her mother was diapering -- was changing her

12:20:18  25   diapers and bathing her, where she bathed her, and then

4832

1    STATE OF CALIFORNIA      )

2                            )        ss.

3    COUNTY OF ALAMEDA        )

4

5         I, EARLY K. LANGLEY, do hereby certify:

6         That foregoing proceedings were held in the

7    above-entitled action at the time and place therein

8    specified;

9         That said proceedings were taken before me at said

10   time and place, and was taken down in shorthand by me,

11   a Certified Shorthand Reporter of the State of

12   California, and was thereafter transcribed into

13   typewriting, and that the foregoing transcript

14   constitutes a full, true and correct report of said

15   proceedings that took place;

16        IN WITNESS WHEREOF, I have hereunder subscribed my

17   hand on July 1, 2021.

18

19

20

21

22        _____
          EARLY K. LANGLEY, CSR No. 3537
23        State of California

24

25

# Exhibit 8

**File Provided Natively**

JNJ 000133180

Prudencio Pltfs' Ex. 0877 pg 1

# Adding TEM to the Global Talc Specification

Timothy J McCarthy, PhD, DABT

Director, Toxicology

Baby R&D and Product Stewardship

Confidential

Prudencio Pltfs' Ex. 0877 pg 2

# Currently Available Testing Methods for Asbestos in Talc

## IR - Infrared
Lowest detection limit.  In some Compendia requirements but of limited value.

## XRD – X-ray Diffraction
Primary compendia method which is designed to identify potential asbestos form structures.
If suspect crystalline structures are detected, go to light microscopy for confirmation based on morphology.

## OM and PLM – Optical Microscopy and Polarized Light Microscopy
Used to confirm if potential asbestos forms are actually asbestos.
PLM is the preferred method since it provides a higher level of crystalline structure discriminatory capability.

## TEM – Transmission Electron Microscopy
Most sophisticated of the methodologies
Found only in specialized analytical laboratories.
Can see structures more clearly and can confirm chemical composition
Viewed as the "gold standard" by industry subject matter experts.

Confidential

Prudencio Pltfs' Ex. 0877 pg 3

# Analytical Detection Limits

| Analytical Method | Detection Limit | Comment |
|---|---|---|
| XRD | 0.1 – 1 % | Depends on particle size, matrix interference<br><br>Cannot differentiate morphology |
| PLM | 1%<br><br>100/Points Counted % | Visual estimation<br><br>Variable, depends on the number of particles counted (i.e., 400 pts = 0.25%, 1000 pts = 0.1%)<br><br>PLM limited to particles 0.5 – 1 μm and wider |
| TEM | 0.01 – 0.1 % | May be much lower if matrix particles can be removed<br><br>TEM limited to particles shorter than 50 μm or thinner than 5 – 10 μm |

Data provided by RJ Lee

Confidential

# Raw Ore sampling

RJ Lee detected the presence of chrysotile fibers (NMT 6.5 ppm) in certain raw ore samples by Transmission Electron Microscopy (TEM).

<u>No</u> asbestos fibers were detected in J&J talc product samples.

<u>No</u> asbestos fibers were detected by using the pharmacopoeia compendia methods, X-Ray Diffraction (XRD) or Polarized Light Microscopy (PLM).

Confidential

Prudencio Pltfs' Ex. 0877 pg 5

# Hypothetical Consumer Exposure

- Compendia require asbestos to be "not detected" in consumer-use talc
- What does "not detect" mean when more sensitive methods supplement existing compendia testing?
- How much asbestos might a consumer be exposed were there asbestos in the talc ore below the compendia limits of detection?

Confidential

Prudencio Pltfs' Ex. 0877 pg 6

# Hypothetical Consumer Exposure

- During a body powdering event, how much airborne talc might a consumer be exposed?

- During that powdering event, how much hypothetical asbestos might a consumer be exposed, when the asbestos is below the compendia limits of detection?  Assume 10 ppm by TEM.

- How does that compare with occupational exposure levels?
  - 8-hr work day
  - 30-min excursion (spike)

Parity with the occupational exposure limit is not considered an acceptable consumer exposure in this assessment.

(29CFR§1910.1001; DIRECTIVE 2009/148/EC)

Confidential

# Hypothetical Consumer Exposure

Hypothetical exposure during consumer body dusting event
- Adult                           4.5 – 9.3 fibers
- Baby diapering             0.16-0.18 fibers

Normalizing to number of fibers potentially inhaled during the
   duration of the event

- The allowable 8-hour occupational exposures are at least
  **107,000 times higher** than the hypothetical consumer
  exposures
- The allowable 30-min excursion value at least **67,000 times
  higher** than the hypothetical consumer exposures, when.

Confidential

# Implications of Supplementing Compendia Specification with TEM

- No detectable asbestos was found using the compendia methods

- "not detectable" has diminished value when highly sensitive methods are added to existing specifications.

- The hypothetical consumer exposures result in respirable fibers several orders of magnitude lower than occupational exposure limits

- The trace level of chrysotile by TEM in certain raw ore samples does not pose a health hazard to the consumer.

Confidential

Prudencio Pltfs' Ex. 0877 pg 9