**UNITED STATES BANKRUPTCY COURT**
**THE DISTRIC OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)
E. Richard Dressel, Esquire (ED1793)
Lex Nova Law LLC
10 E. Stow Road, Suite 250
Marlton, NJ  08053
(856) 382-8211
rdressel@lexnovalaw.com

*Attorneys for Claimant Evan Plotkin*

|  |  |
|---|---|
| In re:<br><br>LTL MANAGEMENT, LLC,<br><br>                             Debtor. | Chapter 11<br><br>Case No.: 23-12825(MBK)<br><br>Honorable Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br><br>                     Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A<br>TO COMPLAINT and JOHN AND JANE<br>DOES 1-1000,<br><br>Defendants | Adv. No.:  23-01092 (MBK) |

## JOINDER OF EVAN PLOTKIN TO OBJECTIONS TO DEBTOR'S MOTION TO SEAL AND DEBTOR'S RELATED COMPLAINT FOR INJUNCTIVE RELIEF

Dean Omar Branham Shirley, LLP, on behalf of Evan Plotkin and other Talc Asbestos Claimants, joints in the Committee's Objection of the United States Trustee at Adversary Docket 39 and adopt all arguments contained therein.

Dated:  April 17, 2023                    By:    */s/ E. Richard Dressel*
                                                      E. Richard Dressel, Esquire

Lex Nova Law LLC
10 E. Stow Road, Suite 250
Marlton, NJ  08053
Telephone: (856)382-8211
rdressel@lexnovalaw.com


/s/ *J. Bradley Smith*_____
J. Bradley Smith
TX State Bar No.: 24027872
Admitted *Pro Hac Vice*
Dean Omar Branham Shirley, LLP
302 N. Market Rd.
Suite 300
Dallas, TX 75202
Telephone: (214) 722-5990
Bsmith@dobslegal.com

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Matthew I.W. Baker, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>mbaker@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Proposed Local Counsel to the Official*<br>*Committee of Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael S. Winograd, Esq.<br>Eric R. Goodman, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>egoodman@brownrudnick.com<br>Seven Times Square<br>New York, NY  10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Jeffrey L. Jonas, Esq.<br>Sunni P. Beville, Esq.<br>jjonas@brownrudnick.com<br>sbeville@brownrudnick.com<br>One Financial Center<br>Boston, MA  02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Proposed Co-Counsel for the Official*<br>*Committee of Talc Claimants* |
| **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>Rachel S. Morse, Esq.<br>jmassey@masseygail.com<br>rmorse@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC  20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br><br><br>*Proposed Special Counsel for the Official*<br>*Committee of Talc Claimants* | **OTTERBOURG P.C.**<br>Melanie L. Cyganowski, Esq.<br>Richard G. Haddad, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>David A. Castleman, Esq.<br>mcyganowski@otterbourg.com<br>rhaddad@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>dcastleman@otterbourg.com<br>230 Park Avenue<br>New York, NY  10169<br>Tel: (212) 661-9100<br>Fax: (212) 682-6104<br>*Proposed Co-Counsel for Official*<br>*Committee of Talc Claimants* |

|  | Chapter 11 |
| In re: | Case No.: 23-12825 (MBK) |
| **LTL MANAGEMENT LLC,** [1] | Honorable Michael B. Kaplan |
| Debtor. | |
| **LTL MANAGEMENT LLC,** | Adv. Pro. No. 23-01092 (MBK) |
| Plaintiff, | |
| v. | |
| **THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,** | |
| Defendants. | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS
TO DEBTOR'S MOTION FOR AN ORDER
(I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS
TO CERTAIN ACTIONS AGAINST NON-DEBTORS,
(II) PRELIMINARILY ENJOINING SUCH ACTIONS, AND
(III) GRANTING A TEMPORARY RESTRAINING
ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY INJUNCTION**

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

**PRELIMINARY STATEMENT** ................................................................................1

**FACTUAL BACKGROUND** ...............................................................................12

    **I.**     Background of Talc Litigation ................................................ 12

    **II.**    J&J Orchestrates LTL's Creation and LTL 1.0, which the
             Third Circuit Determined Was Not Filed in Good Faith ............................. 14

    **III.**   The Debtor's Replacement of the 2021 Funding Agreement
             and the Filing of  LTL 2.0 ..................................................... 17

         **A.**    The Replacement of the 2021 Funding Agreement with
                the 2023 Funding Agreement ...............................................17

         **B.**    LTL Files LTL 2.0................................................................19

**ARGUMENT** ........................................................................................22

    **I.**     LTL CANNOT ESTABLISH THAT IT FILED LTL 2.0 IN
             GOOD FAITH, WHICH IS A THRESHOLD ISSUE ................................... 22

         **A.**    LTL Is Still Not in Immediate Financial Distress ...............................23

         **B.**    LTL Offers No Explanation for Why It Gave Away
                $30-50 Billion in Value................................................................26

         **C.**    LTL Has Failed to Show Financial Distress, Even if Its
                Attempts to Engineer Such Distress Were Credited .........................30

         **D.**    LTL Has No Prospect to Reorganize .....................................31

    **II.**    SOLVENT NON-DISTRESSED THIRD PARTIES CANNOT RECEIVE
             THE BENEFIT OF THE § 362(A) AUTOMATIC STAY ............................. 32

         **A.**    Section 362(a) Only Applies to the Debtor with No Exceptions .........33

         **B.**    Negatively Impacting the Debtor's Reorganization
                Efforts Is Insufficient to Warrant Application of
                the Unusual Circumstances Exception....................................34

         **C.**    Even Under an Adverse Impact Analysis, an Extension
                of the Stay Is Not Warranted in This Case............................37

D.      The Stay Under § 362(a)(3) is Inapplicable Here.................................41

III.    LTL IS NOT ENTITLED TO PRELIMINARY INJUNCTIVE
        RELIEF UNDER § 105 OF THE BANKRUPTCY CODE............................ 42

        A.      The Court Does Not Have Subject Matter Jurisdiction
                to Issue the Requested Injunction Enjoining Actions
                Between Non-Debtors ..............................................................43

        B.      The Debtor Has Not Satisfied Its Burden of Establishing
                the Requirements for Granting the Extraordinary Relief
                of a Preliminary Injunction.....................................................46

CONCLUSION ..............................................................................................................51

# <u>TABLE OF AUTHORITIES</u>

Page(s)

*A.H. Robins Co., Inc. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ................................................................35, 38, 39, 48

*Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint*
*(In re Aldrich Pump LLC)*,
Case No. 20-30608, Adv. Proc. No. 20-03041, 2021 WL 3729335
(Bankr. W.D.N.C. Aug. 23, 2021) ...........................................................................29

*Atl. Coast Line R. Co. v. Bhd. of Locomotive Engineers*,
398 U.S. 281 (1970)..................................................................................................46

*AYR Composition, Inc. v. Rosenberg*,
619 A.2d 592 (N.J. App. Div. 1993).........................................................................25

*Bader v. Johnson & Johnson*,
86 Cal. App. 5th 1094 (Cal. Ct. App. 2022), *review denied* (Apr. 12, 2023).........13

*Balogh Associates VII LLC v. Dick's Sporting Goods, Inc.*,
2022 WL 4624827 (M.D.N.C. Sept. 30, 2022)........................................................28

*Bankers Trust Co. v. Bethlehem Steel Corp.*,
761 F.2d 943 (3d Cir. 1985).......................................................................................2

*Bouton v. Litton Industries, Inc.*,
423 F.2d 643 (3d Cir. 1970).....................................................................................41

*Bradberry v. Carrier Corp.*,
86 So. 3d 973 (Ala. 2011).........................................................................................34

*Brenner v. Little Red School House, Ltd.*,
274 S.E.2d 206 (N.C. 1981)................................................................................27, 28

*Carl v. Johnson & Johnson*,
237 A.3d 308 (N.J. App. Div. 2020), *cert. denied*, 244 A.3d 270 (N.J. 2021).......13

*Cedar Shore Resort, Inc v. Mueller*,
235 F.3d 375 (8th Cir. 2000) ...................................................................................31

*Congoleum Corp. v. Pergament (In re Congoleum Corp.)*,
Bankr. No. 03-51524(KCF), Adversary No. 05-06245,
2007 WL 4571086, (Bankr. D.N.J. Dec. 28, 2007) .................................................29

*DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*,
   Case No. 20-30080, Adv. Proc. No. 20-03004,
   2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021) ...................................................26, 29

*Delaware v. Van Arsdall*,
   475 U.S. 673 (1986) ...........................................................................................................44

*D.S. Simmons, Inc. v. Steel Group, LLC*,
   2008 WL 488845 (E.D.N.C. Feb. 19, 2008) .......................................................................28

*EEOC v. Kronos Inc.*,
   694 F.3d 351 (3d Cir. 2012) .................................................................................................2

*Fairfield Harbour Property Owners Ass'n, Inc. v. Midsouth Golf, LLC*,
   715 S.E.2d 273 (N.C. App. 2011) .......................................................................................28

*Faulconer v. Wysong and Miles Co.*,
   574 S.E.2d 688 (N.C. App. 2002) .......................................................................................28

*FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*,
   No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012),
   *as corrected* (Dec. 26, 2012) ............................................................................................37

*Gold v. Johns-Manville Sales Corp.*,
   723 F.2d 1068 (3d Cir. 1983) .............................................................................................39

*Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*,
   194 B.R. 318 (Bankr. S.D.N.Y. 1996) ................................................................................42

*Halper v. Halper*,
   164 F.3d 830 (3d Cir. 1999) ...............................................................................................44

*Hartig Drug Co. Inc. v. Senju Pharm. Co.*,
   836 F.3d 261 (3d Cir. 2016) ...............................................................................................43

*In re Aldan Indus., Inc.*,
   No. 00-10360DWS, 2000 WL 357719 (Bankr. E.D. Pa. Apr. 3, 2000) ...............................35

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004) .................................................................................... *passim*

*In re Federal–Mogul Global, Inc.*,
   300 F.3d 368 (3d Cir. 2002) ................................................................................11, 45, 46

*In re G-I Holdings Inc.*,
   420 B.R. 216 (D.N.J. 2009) ................................................................................................47

iv

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*,
 509 F. Supp. 3d 116 (D.N.J. 2020) .........................................................................13

*In re Imerys Talc America, Inc*,
 2019 WL 3253366 (D. Del. 2019) ....................................................................42, 46

*In re Lower Bucks Hosp.*,
 488 B.R. 303 (Bankr. E.D. Pa. 2013) ......................................................................46

*In re LTL Mgmt., LLC*,
 637 B.R. 396 (Bankr. D.N.J. 2022) .....................................................8, 12, 15, 16

*In re Magnus Harmonica Corp.*,
 237 F.2d 867 (3rd Cir. 1956) ...................................................................................46

*In re Millennium Lab Holdings II LLC*,
 945 F.3d 126 (3d Cir. 2019)......................................................................................39

*In re Owens Corning*,
 419 F.3d 195 (3d Cir. 2005).......................................................................................39

*In re Phila. Newspapers, LLC*,
 407 B.R. 606 (E.D. Pa. 2009) ...................................................................35, 44, 47

*In re Scarborough-St. James Corp.*,
 535 B.R. 60 (Bankr. D. Del. 2015) ...........................................................................34

*In re SGL Carbon Corp.*,
 200 F.3d 154 (3d Cir. 1999).......................................................................................78

*Ingham v. Johnson & Johnson*,
 608 S.W.3d 663 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) ..............12, 13, 50

*Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*,
 456 U.S. 694 (1982).....................................................................................................43

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
 882 F.2d 797 (3d Cir. 1989).......................................................................................47

*Johnson & Johnson Talcum Powder Cases*,
 249 Cal. Rptr. 3d 642 (Cal. Ct. App. 2019) ...........................................................13

*Johnson & Johnson v. Aetna Cas. & Sur. Co.*,
 285 N.J. Super. 575 (App. Div. 1995) .....................................................................41

*Law v. Seigel,*
    571 U.S. 415 (2014) ..................................................................................10, 34

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint et al.,*
*(In re LTL Management, LLC),*
    638 B.R. 291 (Bankr. D.N.J. 2022) ...........................................................16

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint et al.*
 *(In re LTL Mgmt., LLC),*
    --- F.4th ---, 2023 WL 2760479 (3d Cir. Mar. 31, 2023)...............................*passim*

*Maritime Elec. Co. v. United Jersey Bank,*
    959 F.2d 1194 (3d Cir. 1991).................................................................*passim*

*McCartney v. Integra Nat'l Bank N.,*
    106 F.3d 506 (3d Cir. 1997)...................................................................*passim*

*Millard v. Developmental Disabilities Inst., Inc.,*
    266 B.R. 42 (E.D.N.Y. 2001) ................................................................37, 38

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)...................................................................................47

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.*
*(In re Integrated Telecom Express, Inc.),*
    384 F.3d 108 (3d Cir. 2004).......................................................................39

*Novartis Consumer Health, Inc. v. Johnson & Johnson –*
*Merck Consumer Pharmaceuticals Co.,*
    290 F.3d 578 (3d Cir. 2002).......................................................................47

*NutraSweet Co. v. Vit-Mar Enterprises, Inc.,*
    176 F.3d 151 (3d Cir. 1999).......................................................................47

*Nuveen Mun. Tr. v. WithumSmith Brown, P.C.,*
    692 F.3d 283(3d Cir. 2012)........................................................................43

*Oneida Motor Freight, Inc. v. United Jersey Bank,*
    848 F.2d 414 (3d Cir. 1988) ........................................................................8

*Pacor Inc. v. Higgins,*
    743 F.2d 984 (3d Cir. 1984)....................................................................11, 45

*Patton v. Beardon,*
    8 F.3d 343 (6th Cir. 1993) ........................................................................37

*Phar-Mor, Inc. v. Gen. Elec. Capital Corp.*,
   166 B.R. 57 (W.D. Pa. 1994) .................................................................39

*Plastronics Socket Partners, Ltd. v. Hwang*,
   2022 WL 108948 (Fed. Cir. Jan. 12, 2022) ...........................................25

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945) .............................................................................10

*Queenie, Ltd. v. Nygard Int'l*,
   321 F.3d 282 (2d. Cir. 2003) ...............................................................37

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
   415 U.S. 1 (1974) .................................................................................48

*Stanford v. Foamex L.P.*,
   Civ. A. No. 07–4225, 2009 WL 1033607, (E.D. Pa. Apr.15, 2009).....................37

*Stoe v. Flaherty*,
   436 F.3d 209 (3d Cir. 2006)............................................................44, 45

*Superior Contracting Group Inc. v. Rachmale (In re LTC Holdings, Inc.)*,
   587 B.R. 25 (Bankr. D. Del. 2018) .......................................................43

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
   309 F.3d 144 (3d Cir. 2002)................................................................47

*Tucker v. Charter Med. Corp.*,
   299 S.E.2d 800 (N.C. App. 1983) ........................................................30

*United Steelworkers of Am. v. Fort Pitt Steel Casting*,
   598 F.2d 1273 (3d Cir. 1979)..............................................................49

*Univ. Med. Ctr. v. American Sterilizer Co. (In re Univ. Med. Ctr.)*,
   82 B.R. 754 (Bankr. E.D. Pa. 1988) .....................................................38

*U.S. Trustee v. Gryphon at the Stone Mansion, Inc.*,
   166 F.3d 552 (3d Cir. 1999)................................................................44

*Vendo Co. v. Lektro-Vend Corp.*,
   433 U.S. 623 (1977).............................................................................46

*Wedgewood Investment Fund, Ltd. v. Wedgewood Realty Group, Ltd.*
 *(In re Wedgewood Realty Group, Ltd.)*,
   878 F.2d 693 (3d Cir. 1989)...........................................................37, 46

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) .............................................................................................47

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
    No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ............................34

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
    591 F.3d 164 (3d Cir. 2009) .............................................................11, 43, 44, 45

*15375 Mem'l Corp. v. BEPCO, L.P.*,
    589 F.3d 605 (3d Cir. 2009) .............................................................................30

*3M Occupational Safety LLC v. Those Parties Listed on*
*Appendix A to the Complaint (In re Aearo Technologies LLC)*,
    642 B.R. 891 (Bankr. S.D. Ind. 2022), *appeal pending*, No. 22-2606 (7th Cir.) .............48, 49

<u>Statutes</u>

11 U.S.C. § 105(a) ........................................................................................... *passim*

11 U.S.C. § 362 ............................................................................................... *passim*

11 U.S.C. § 362(a)(1) ...................................................................................... *passim*

11 U.S.C. § 362(a)(3) ...................................................................................... *passim*

11 U.S.C. § 524(g) ...............................................................................10, 26, 29, 31

11 U.S.C. § 541(a)(1) ...........................................................................................34

11 U.S.C. § 548(a)(1)(A) ......................................................................................25

11 U.S.C. § 548(a)(1)(B) ......................................................................................25

11 U.S.C. § 1112(b) ..............................................................................................16

11 U.S.C. § 1129(a)(7) ....................................................................................10, 32

28 U.S.C. § 1334(b) ..............................................................................................44

28 U.S.C. § 2283 ...................................................................................................46

Tex. Bus. Orgs. Code Ann. § 10.003 .....................................................................25

Tex. Bus. Orgs. Code Ann. § 10.901 .....................................................................25

The Official Committee of Talc Claimants (the "**TCC**" or the "**Committee**") in the above-caption case, of LTL Management, LLC (the "**Debtor**" or "**LTL**"), hereby submits this memorandum of law in support of its objection (the "Objection") to the *Debtor's Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction* [Adv. Pro. Dkt. No. 2] (the "**Motion**"), and respectfully states as follows:

## PRELIMINARY STATEMENT

In dismissing the first bankruptcy filed by LTL ("**LTL 1.0**"), after noting that the desire "to resolve a more-than-thorny problem" is commendable, the Third Circuit held that a potential settlement is not a valid basis to open the Bankruptcy Court's doors to LTL (or by extension, LTL's ultimate corporate parent Johnson & Johnson, Inc. ("**J&J**")). *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint et al. (In re LTL Mgmt., LLC)*, --- F.4th ---, 2023 WL 2760479, at *17 (3d Cir. Mar. 31, 2023) (amended opinion). The Third Circuit held:

> These [settlement desires] cannot displace the *rule* that resort to Chapter 11 is appropriate *only* for entities *facing* financial distress. . . . Our ground for dismissal is LTL's lack of financial distress. . . . And we cannot currently see how the lack of financial distress could be overcome.

*Id.* (emphases added). And, as if clairvoyant, the Third Circuit cautioned against the very machination employed here—unilateral [*i.e.*, between J&J and LTL] termination of the 2021 Funding Agreement—observing that such legerdemain would only lead to fraudulent conveyance litigation:

> Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is also premature, we note interested parties may seek to "avoid any transfer" made within two years of any bankruptcy filing by a debtor who "receive[s] less than a reasonably equivalent value in exchange for such transfer" and "became insolvent as a result of [it]." 11

1

U.S.C. § 548(a).  So if the question becomes ripe, the next one might be:  Did LTL
receive reasonably equivalent value in exchange for forgoing its rights under the
Funding Agreement?

*Id*. at *16 n.18.[2]  This Court "must implement *both the letter and spirit* of the mandate, taking into

account the appellate court's opinion and the circumstances it embraces."  *EEOC v. Kronos Inc.*,

694 F.3d 351, 361 (3d Cir. 2012) (emphasis added; internal quotation marks and citation omitted).

The Third Circuit's Judgment is particularly broad, perhaps anticipating the potential for post-

mandate maneuvering by LTL.  The Judgment provides that:

> [T]he order of the Bankruptcy Court entered March 2, 2022 is reversed and the case
> is remanded with the instruction to dismiss Appellee's Chapter 11 petition.  The
> order of the Bankruptcy Court entered March 4, 2022 is vacated as moot.  . . . *All
> of the above in accordance with the Opinion of this Court*.

Judgment, Third Circuit Case No. 22-2003, Doc. 181-1 (emphasis added).[3]  The italicized

language sends a message.  "Where the reviewing court in its mandate prescribes that the court

shall proceed in accordance with the opinion of the reviewing court, such pronouncement operates

to make the opinion a part of the mandate as completely as though the opinion had been set out at

length."  *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985) (internal

quotation marks omitted).

Given this clear and explicit ruling by the Third Circuit, LTL cannot meet its burden of

proof on this Motion—a burden it bears on each and every element of the relief it seeks.  Therefore,

the Motion must be denied.

*       *       *       *       *

---

[2]    How LTL's board of directors could possibly have satisfied its fiduciary duties by releasing a $60 billion
support agreement is left unsaid by LTL.  ██████████████████████████  *See* Exhibit 1 attached to the Declaration of Daniel M. Stolz ("**Stolz
Decl.**"), filed herewith ("**Ex.**"), at 3.

[3]    Ex. 2.

Thirteen days ago, this Court dismissed LTL 1.0, as instructed by a Third Circuit opinion holding that LTL—facing the same talc-related litigation that it seeks to enjoin now—was not financially distressed and filed LTL 1.0 in bad faith.  2023 WL 2760479, at *1 (the analysis must "start, and stay, with good faith").  LTL sought rehearing; not a single judge voted to reconsider the unanimous Third Circuit decision.

Despite this dismissal, LTL received an enormous benefit from LTL 1.0:  an overbroad 18-month litigation stay against thousands of cases not just against LTL, but also against hundreds of highly solvent entities, many of which had independent liability to third-party plaintiffs.  The non-bankrupt beneficiaries of the bankruptcy stay included LTL's ultimate corporate parent J&J, other J&J entities, and even retailers that sold J&J products.  During those eighteen months, hundreds of victims of J&J's talc products have died waiting for their chance to avail themselves of our justice system to vindicate their rights under American law.  Although the Third Circuit did not expressly rule on the injunctive relief entered in LTL 1.0, it specifically "note[d] certain pertinent factors lack full discussion" in this Court's prior analysis of injunctive relief and opined that "it is not obvious LTL must indemnify J&J for the latter's independent, post-1979 conduct that is the basis of a verdict rendered against it."  2023 WL 2760479, at *15 n.16.

LTL filed a last-ditch attempt to stay the Third Circuit's mandate (purportedly to file a petition for a writ of certiorari from the Supreme Court, which it conveniently abandoned in order to file LTL 2.0), telling the Court of Appeals that, without a stay, "the complex mass-tort machinery could swiftly spring to life in dozens upon dozens of courts across the country," and "[e]ach of these cases would suddenly spring back into activity and proceed towards trial absent a

3

stay." LTL Motion to Stay Mandate, Third Circuit No. 22-2003, Doc. 173, at 3, 19.[4] On March 31, the Third Circuit denied LTL's motion to stay and issued the mandate. Docs. 180-81.[5]

Before the ink was dry on the Third Circuit's decision, and while seeking to stay the mandate, LTL and J&J began devising ways to circumvent it. Mr. Kim testified that on the very day the Third Circuit decision issued, he came up with the idea that the 2021 Funding Agreement might be deemed "void or voidable," and LTL began discussing "whether we should be refiling for bankruptcy."[6] Just two hours and eleven minutes after this Court's Third Circuit-mandated dismissal order in LTL 1.0 was entered, LTL filed this bankruptcy ("**LTL 2.0**"). LTL immediately filed this adversary proceeding against thousands of tort victims, seeking a sweeping injunction against their pursuit of their claims against LTL, J&J, and hundreds of additional non-debtors (the "**Adv. Pro.**"). LTL 2.0 was commenced with even more bad faith than LTL 1.0, the result of LTL and J&J attempting to manufacture financial distress by cooking up the largest intentional fraudulent transfer in United States history, a scheme hatched while LTL was still a debtor-in-possession in LTL 1.0. The only meaningful action in the two hours between dismissal of LTL 1.0 and refiling of LTL 2.0—the attempted stripping of LTL's most significant asset in clear breach of LTL's directors' fiduciary duties in what LTL's general counsel called a decision "consensus"[7] between LTL and J&J—makes a mockery of the Third Circuit's admonition that "[f]inancial distress must not only be apparent, but it must be immediate enough to justify a filing." 2023 WL 2760479 at *9.

---

[4]    Ex. 3.
[5]    Exs. 2, 4.
[6]    Ex. 5, Dep. Tr. of John Kim, April 14, 2023 ("**Kim Dep. Tr.**"), at 74:23-75:10, 76:3-13; 77:2-18, 82:11-23. A redacted version of Ex. 5 is attached as Ex. 6, subject to n.2 of the Stolz Decl.
[7]    *Id*. at 189:13-190:3, 191:5-8.

LTL now attempts to strip itself of its funding backstop, despite its repeated representations to this Court and the Third Circuit that the funding backstop would apply outside of bankruptcy, and the express terms of their contract which provided that it applies outside of bankruptcy. As Mr. Gordon candidly admitted to this Court, the funding backstop would continue to apply even if LTL 1.0 was dismissed[8]—exactly the situation LTL now claims frustrated the entire purpose of that very backstop. The minutes from LTL's April 2, 2023 Board Meeting—just two days before the filing while LTL was still a debtor in possession—expressly state the purpose of LTL 2.0 is to facilitate resolution of the LTL's talc liability, and that pursuing such option would require, inter alia, that LTL to modify its existing funding arrangements. ███████████████████

████████████████████████████████████████████

████████[9]

The Third Circuit dismissed LTL 1.0 because the projections of liability cannot ignore "the possibility of meaningful [in the tort system] settlement, as well as successful defense and dismissal, of claims." *Id.* at *14. The Third Circuit posited whether the "progression of litigation *outside of bankruptcy*" might alter circumstances at some distant point in future, but for now, LTL's "filing was premature." *Id.* at *16. The Court even wrote that "the progression of multidistrict litigation on a separate track would continue to sharpen all interested parties' views of mutually beneficial settlement values." *Id.* at *14.

Instead, LTL cynically filed LTL 2.0 to avoid that progression of litigation and to obtain a tactical advantage in all of J&J's talc-related litigation. Indeed, at the First Day Hearing in this case, Mr. Gordon candidly admitted that the "purpose of the filing remains the same."[10] LTL filed

---

[8]    Ex. 7, at 60:16-61:20 (Feb. 18, 2022 Hearing Tr.).
[9]    Ex. 1, at 4 (April 2, 2023 Board Minutes).
[10]   Ex. 8, at 7:25 (April 11, 2023 Hearing Tr.).

5

this Motion as the centerpiece of its (and J&J's) bad-faith strategy—a preliminary injunction

covering hundreds of parties in defiance of the Third Circuit's clear command to allow the talc-

related litigation against non-distressed third parties to proceed in state and federal courts.  And

yet, even despite its machinations to give up $30-50 billion in value, LTL still has not shown that

the current and projected future liabilities from the talc litigation have put the Debtor in immediate

financial distress.  LTL's general counsel, John Kim, testified at deposition just three days ago that

LTL "**has sufficient funds to pay off its debts currently as they come due**."[11] ███████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████ [2]  As the Third Circuit has explained, "absent

financial distress,"—which is "immediate enough to justify a filing,"—"there is no reason for

Chapter 11 and no valid bankruptcy purpose."  2023 WL 2760479, at *9.  LTL's failure to show

financial distress or good faith, along with the actual intentional bad faith present in the weeks,

days and hours leading up to LTL 2.0, deprives this Court of subject matter jurisdiction to enter

the relief requested by this Motion, and also requires denial of the Motion for several reasons:

*First*, the financial distress LTL attempted to manufacture is illusory.  The Third Circuit

determined that the 2021 Funding Agreement functioned "not unlike an ATM" and provided LTL

with a right to at least $61.5 billion in cash with minimal conditions.  2023 WL 2760479, at *13-16.

Realizing that agreement doomed its right to be in bankruptcy, LTL conspired with its corporate

parent to give up this valuable funding backstop and replace it with a far less valuable funding

agreement worth $30-50 billion less than the first agreement.  LTL's general counsel testified a

---

[11]        Ex. 5, at 117:14-15 (Kim Dep. Tr.).
[12]        Ex. 9, at 10; *see also* Ex. 5, at 169:5-15 (Kim Dep. Tr.).

"consensus" was reached between LTL and J&J to void the 2021 Funding Agreement,[13] and that

it never occurred to him to see if one of the other counterparties thought the agreement was void

or voidable.[14] That cannot stand. The creditors (or a trustee) will pursue and recover that value as

a fraudulent conveyance, restoring LTL to its post-dismissal financial condition, and once again

mandating dismissal of the case. The Third Circuit wisely anticipated this potential maneuver,

suggesting that if LTL "part[ed] with its funding backstop to render itself fit for a renewed filing,"

the question becomes "Did LTL receive reasonably equivalent value in exchange for forgoing its

rights under the Funding Agreement?" *Id*. at *16 n.18. Nothing in LTL's voluminous filings

suggested that it received *anything* in return for forgoing $30-50 billion in value, and the collusion

between LTL and J&J, and clear intent to force another intervening bad faith bankruptcy as an

obstacle to creditors' constitutional rights and ability to prosecute claims against non-debtors may

lead to an avoidance claim for actual fraud. And even if, arguendo, this case is not dismissed, no

plan can be confirmed because the value a trustee would recover from reinstatement of the 2021

Funding Agreement will provide more value to creditors—who in a Chapter 7 liquidation would

also retain the value of their claims against solvent non-debtors—than the collusive plan being

proposed by LTL and its corporate parent.

LTL argues that it terminated the 2021 Funding Agreement because it might be "void or

voidable" on the grounds that the Third Circuit's decision ordering dismissal of the bankruptcy

failed the 2021 Funding Agreement's central purpose. Kim Decl. II ¶ 78.[15] LTL provides no

analysis as to why its corporate parents never intended to honor the original Funding Agreement

---

[13]     Ex. 5, at 189:13-190:3, 191:5-8 (Kim Dep. Tr.). The collusion is further evidenced by Mr. Kim's lawyers instructing him not to answer questions about J&J's views on the funding agreement because of a "common interest privilege," even though LTL and J&J were counterparties to the transaction at issue. *Id*. at 83:14-25.

[14]     *Id*. at 85:23-86:3.

[15]     Kim Declaration [Doc. No. 4] (the "**Kim Decl. II**").

outside of bankruptcy, even though LTL repeatedly assured this Court and the Third Circuit of the opposite,[16] and the agreement itself so provides.  The Third Circuit relied on LTL's statement that it "had the right, outside of bankruptcy, to [enforce the Funding Agreement]," 2023 WL 2760479, at *13, and this Court noted that "all of the assets and funding sources extant pre-restructuring remain available through this proceeding."  *In re LTL Mgmt., LLC*, 637 B.R. 396, 404 (Bankr. D.N.J. 2022).  LTL offers no explanation for how the 2021 Funding Agreement's central purpose could be frustrated by the dismissal of LTL 1.0 when it applied "***at any time when there is no proceeding under the Bankruptcy Code pending with respect to Payee***."[17]  Mr. Gordon told this Court, in the presence of Mr. Haas, J&J's head of worldwide litigation, that the 2021 Funding Agreement applied outside of bankruptcy, and would continue to apply even if the bankruptcy case were dismissed.[18]  He added that the provision was included "to assure this isn't treated or consider[ed] a fraudulent conveyance."[19]  Mr. Kim admitted at his deposition just three days ago that the 2021 Funding Agreement applied outside of bankruptcy.[20]  Unless LTL is now claiming that it was not being truthful to the Court in LTL 1.0, those admissions are fatal to LTL 2.0.[21]

There is also no indication in any of LTL's filings in LTL 2.0 that LTL or its directors had taken any action to save LTL's most valuable asset—its funding guarantee. In fact, Mr. Kim testified that the Debtor parted with its most valuable asset so that "its pre-filing financial condition" would be "sufficiently distressed to satisfy the standard established by the Third

---

[16]    *See, e.g.*, Ex. 10, at 83:21-25 (Sept. 19, 2022 Third Circuit Oral Arg. Tr.) ("Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something.  I understand that the funding agreement does have provisions for funding outside of bankruptcy.  The Court: Yeah, that's what I thought.").

[17]    Ex. 11, at 5-6 (emphasis added) (2021 Funding Agreement).

[18]    *See* Ex. 7, at 61:8-10 (Feb. 18, 2022 Hearing Tr.) ("Whether there was no case filed or whether the case is filed or dismissed, the money's available for that purpose.").

[19]    *Id.* at 61:18-19.

[20]    Ex. 5, at 62:15-21 (Kim Dep. Tr.).

[21]    *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419-20 (3d Cir. 1988) (party can be judicially estopped from taking position in second bankruptcy inconsistent with position in first bankruptcy).

Circuit." Kim Decl. II ¶ 83. Thus, the Debtor admits that it attempted to create "financial distress" simply in an effort to justify its second bankruptcy filing.

The central premise of LTL's purported "fix" to the Third Circuit is rooted in bad faith. And even with the reduced 2023 Funding Agreement, LTL has failed to meet its burden of showing "immediate" financial distress such that it warrants Chapter 11 protection. 2023 WL 2760479, at *9. Counsel for LTL stated at the First Day Hearing that LTL was not insolvent under the 2023 Funding Agreement.[22] █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ When asked what funding would be available under the 2023 Funding Agreement "to satisfy talc claims and other obligations" if this bankruptcy is dismissed or the proposed plan fails, LTL's general counsel answered: "That would be whatever – it would be the – the HoldCo. Funding arrangements."[25]

LTL has failed its burden of establishing that it is in immediate financial distress under the framework of the Third Circuit's analysis of LTL's protected talc-related litigation liability in LTL 1.0. A plan of reorganization under these circumstances, in clear defiance of the Third Circuit's opinion in LTL 1.0, will not survive appellate review a second time. The only purpose of LTL 2.0 is to achieve more delay and to support the continued efforts by LTL and its corporate parent to abuse the bankruptcy system to gain a litigation advantage. Without good faith there can be no right to bankruptcy relief or successful plan of reorganization, and for that reason alone this Court should deny the Motion. And, without good faith, there can be no basis to issue the injunction—

---

[22]    *See* Ex. 8, at 20, 25-26 (April 11, 2023 Hearing Tr.).

███████████████████████████████████████    ███████████████████

[25]    Ex. 5, at 71:23-72:5 (Kim Dep. Tr.).

for it is a maxim of equity that one "who comes into equity must come with clean hands." *See, e.g.*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Defying the Third Circuit hardly qualifies as "clean hands."

**Second**, LTL has dramatically overstated the level of support it has for its purported plan. More than 100 law firms (including all of MDL leadership), representing over 40,000 ovarian cancer and mesothelioma claimants in the majority of cases that have been filed in state and federal courts around the country, vehemently **oppose** the Debtor's plan. These are the very claimants who would be most harmed by the continued delay sought by LTL **in this Motion**, as well as the very claimants whose support would be necessary to confirm a plan. It is also dubious whether any LTL Plan could satisfy 11 U.S.C. § 1129(a)(7), when its plan would: (1) extinguish independent claims against solvent J&J; and (2) where a Chapter 7 trustee would be able to avoid the fraudulent transfer. Further, the best interests test cannot be waived by proceeding under § 524(g), nor can creditors' rights to pursue claims against solvent third parties (like J&J) be extinguished by such a plan. LTL is nowhere close to a consensual or confirmable plan of reorganization, and as such, issuing the proposed injunction would only serve to benefit non-distressed non-debtors by giving them an unwarranted litigation advantage.

**Third**, to the extent that LTL is seeking an extension of the automatic stay under 11 U.S.C. § 362 to non-debtor parties, the Court should deny such an extension for several reasons. The plain text of the statute states that the automatic stay only applies to debtors, and recent Supreme Court rulings emphasizing a strict interpretation of bankruptcy statutes render the "unusual circumstances" test obsolete. *See Law v. Seigel*, 571 U.S. 415, 427-28 (2014) (ruling that a bankruptcy court cannot "contravene express provisions of the Code"). And even if "unusual circumstances" were a valid reason to depart from clear statutory language, LTL's definition of

"unusual circumstances," to include any litigation against related third parties that might impact the estate—is an exception so broad that it essentially swallows the rule.  Applying the § 362 automatic stay to hundreds of non-debtors turns the very text and purpose of § 362 on its head, which is to give the debtor—and only the debtor—a litigation reprieve.

**Fourth**, this Court does not have jurisdiction to enter an injunction under § 105, as none of the tort cases brought by talc-claimants sought to be enjoined is a core proceeding.  These cases existed independently before the bankruptcy was filed, and they will continue to exist after this bankruptcy is dismissed.  Nor are they related to the bankruptcy for jurisdictional purposes, as the Third Circuit has repeatedly declined to extend related-to jurisdiction to cases against non-debtors in several asbestos bankruptcy cases, even when the third party had an indemnification right against the estate.  *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984); *In re Federal–Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002); *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004); *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 591 F.3d 164 (3d Cir. 2009).

**Fifth**, even if this Court did have jurisdiction to enter a preliminary injunction, all four elements (the failure of any one of which would be dispositive) weigh against granting an injunction in this case.  LTL 2.0 has no prospects for reorganization, having been filed in bad faith and with far more illusory support than indicated, and based on a proposed plan that is likely to be subject to significant legal and factual challenges given the astonishing breadth of the releases LTL seeks for J&J.  Allowing litigation to proceed in the state and federal courts is not irreparable harm—it is what the Third Circuit recommended in LTL 1.0, and is in any event nothing more than monetary harm.  Most importantly, the balance of the harms weighs heavily in favor of allowing victims to avail themselves of the American justice system—even if denigrated by LTL

as the "tort system"—as is their constitutional right after having been allegedly harmed by J&J's products.

**FACTUAL BACKGROUND**

## I.    Background of Talc Litigation

### A.    J&J's Tortious Conduct

J&J manufactured talc-based JOHNSON'S Baby Powder until 1979.  Since then, various J&J subsidiaries and ultimately Old JJCI produced it.[26]  J&J retained responsibility for health-and-safety policy decisions for Baby Powder: It had the power to require product warnings or stop selling talc products, but failed to do so.[27]  Instead, in 2018 and 2019, J&J, including its CEO Alex Gorsky, issued public statements assuring consumers that its talc products were safe.[28]  In December 2018, Health Canada identified a causal connection between genital exposure to talc and ovarian cancer.[29]  In October 2019, the FDA detected asbestos, the only known cause of mesothelioma, in J&J's Baby Powder.[30]  From November 2019 to October 13, 2021 (one day before LTL's first bankruptcy), seven mesothelioma plaintiffs won trials against J&J and Old JJCI.[31]  Juries also found J&J and Old JJCI liable for ovarian cancer caused by their talc products.[32] *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 724-25 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021).

Although J&J had long known talc could cause cancer, it did not stop selling talc-based Baby Powder in the U.S. and Canada until May 2020.[33]  Today, J&J sells only baby powder made

---

[26]    *In re LTL Mgmt., LLC*, 637 B.R. at 400-01.
[27]    Ex. 13, at 52:22-53:10, 55:1-12; Ex. 14, at 7751:23-7752:15, 7833:12-18 (Hopkins Testimony).
[28]    Exs. 15-18 (Trial Exhibits).
[29]    Ex. 19 (2018 Assessment); Ex. 20 (2021 Assessment).
[30]    Ex. 21, at 53:11-19 (Feb. 16, 2022 Hearing Tr., Kim Testimony).
[31]    *Id.* at 54:14-55:9; *see* Ex. 22, at 49 (Debtor W.D.N.C. Informational Br. of Oct. 14, 2021).
[32]    Ex. 23 ¶¶ 36-39 (2021 First Day Declaration of John Kim ("**Kim Decl. I**")).
[33]    Ex. 24, at 45:20-46:13 (Hopkins Testimony); Ex. 23 ¶ 33 (Kim Decl. I).

of cornstarch in the U.S. and Canada, a product it has sold for decades.[34]  In August of 2022, J&J

announced it would stop selling talc-based baby powder globally in 2023.[35]  By the time LTL filed

its first bankruptcy petition, J&J and Old JJCI faced more than 38,000 ovarian cancer claims—

about 35,000 in a Multi-District Litigation proceeding ("**MDL**") in the District of New Jersey,

roughly 2,200 claims consolidated in California and New Jersey state courts, and another 1,100

claims in other state courts.[36]  J&J and Old JJCI also faced more than 400 mesothelioma cases,

with more than 250 in one New Jersey state court.[37]

J&J disputes the causal link between its talc-related products and cancer.  After hearing

extensive evidence, however, the MDL court admitted (with limited exceptions) expert testimony

establishing a causal relationship between talc products and ovarian cancer.  *See In re Johnson &*

*Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 198

(D.N.J. 2020).  Trial and appellate courts have repeatedly rejected J&J's position on talc's safety.

*See, e.g.*, *Ingham*, 608 S.W.3d at 718; *Bader v. Johnson & Johnson*, 86 Cal. App. 5th 1094, 1129

(Cal. Ct. App. 2022), *cert. denied* (Apr. 12, 2023); *Carl v. Johnson & Johnson*, 237 A.3d 308, 311

(N.J. App. Div. 2020), *cert. denied*, 244 A.3d 270 (N.J. 2021); *Johnson & Johnson Talcum Powder*

*Cases*, 249 Cal. Rptr. 3d 642, 676 (Cal. Ct. App. 2019).

### B.    J&J and Old JJCI Satisfy Talc Liabilities in the Ordinary Course

Until its first bankruptcy, J&J and Old JJCI satisfied talc and other liabilities in the ordinary

course.  In May 2020, J&J told a bankruptcy court in a different talc liability case that it was

---

[34]    Ex. 25, at 37:1-22 (Hopkins Testimony)

[35]    Ankur Banerjee and Diana Jones, *J&J to end global sales of talc-based baby powder*, REUTERS (Aug. 12, 2022), https://tinyurl.com/bd86jpds.

[36]    Ex. 22, at 124 (Debtor W.D.N.C. Informational Br. of Oct. 14, 2021).

[37]    *Id*. at 125.

"absurd" to suggest that "J&J may lack the financial wherewithal to meet its obligations."[38]  J&J boasted being "one of the top 10 companies in the United States by market value," which "can provide the claimants far greater protection than . . . the bankruptcy claims trust ever could."[39]  J&J is one of the world's most liquid companies: As of October 2021, it had roughly $30 billion in annual earnings before interest, taxes, and amortization;[40] over $41 billion in cash, marketable securities, and credit lines; and, despite talc liabilities, a credit rating better than the United States.[41] And, throughout LTL 1.0, J&J continued its practice of distributing dividends averaging one billion dollars *per month*.

## II.    J&J Orchestrates LTL's Creation and LTL 1.0, which the Third Circuit Determined Was Not Filed in Good Faith

On July 19, 2021, J&J's corporate treasurer told Standard & Poor's that J&J "feel[s] failed by courts," and might "seek to cap [talc] liability"—through a scheme involving a "re-org," a "split," and a "Texas corp."[42]  She told Moody's: "We are looking at a number of ways of capping our talc liability, especially" in light of the denial of certiorari in *Ingham*, 141 S. Ct. 2716 (2021).[43] "One scenario being considered," she elaborated, "would be to capture the liability in one subsidiary, and fund that subsidiary for current and future losses, and then basically bankrupt that subsidiary."[44]  She never suggested J&J or any existing affiliate confronted financial distress.

In the restructuring, Old JJCI's business assets, including a range of well-known brands (such as Tylenol, Band-Aid, and Neutrogena), together with non-talc liabilities (*e.g.*, trade claims),

---

[38]    Ex. 26, at 7 (Diaz Report).
[39]    *Id*.
[40]    Ex. 27, at 36:13-14 (Kaplan Dep.).
[41]    Ex. 26, at 6 (Diaz Report); Ex. 28, at 25-38 (Burian Report).
[42]    Ex. 29, at 1 (Kaplan Notes).
[43]    Ex. 30.
[44]    *Id*.

were assigned to New JJCI.[45]  As LTL's chief legal officer explained, "the entity that was formerly

JJCI and the entity that is the new JJCI were . . . virtually identical except for it no longer had the

talc liabilities."[46]  The talc liabilities went to LTL ("Legacy Talc Litigation").[47]  LTL was given

no operating business.[48]  LTL has no employees of its own.  Its board, management, and

professionals are paid by J&J and work (or worked) for J&J.[49]  LTL's office is "hoteling" space

in a J&J building.[50]  As of its first bankruptcy petition, LTL's bank account was not in its own

name.[51]  LTL has no bonds, trade creditors, or pension liabilities.[52]  Its sole purpose is resolving

talc liabilities, as planned and directed by J&J.

LTL was funded with a $6 million bank account and the rights to royalty streams valued at

$367.1 million as of the petition date of LTL 1.0.  *In re LTL Mgmt.*, 637 B.R. 396, 402 (Bankr.

D.N.J. 2022).  J&J and New JJCI jointly and severally committed, under the 2021 Funding

Agreement, to fund LTL's expenses (*i.e.*, to resolve talc liabilities assigned to LTL) outside of

bankruptcy, up to the value of New JJCI.  *Id.* at 423 n.27.  In LTL 1.0, this Court accepted LTL's

assertions that the 2021 Funding Agreement provided $61 billion in potential liquidity.  *Id.* at

404.[53]  If LTL filed for bankruptcy, the 2021 Funding Agreement provided that J&J and New JJCI

would fund a trust under a confirmed plan to resolve talc liabilities.  *Id*. at 423 n.27.  Thus, before

bankruptcy, LTL faced no restrictions on paying talc liabilities on a current basis up to the 2021

Funding Agreement cap.[54]  After bankruptcy, LTL would receive nothing under the 2021 Funding

---

[45]    Ex. 23 ¶¶ 16, 19, 23-24 (Kim Decl. I); Ex. 31, at 41:7-22 (Feb. 15, 2022 Hearing Tr., Mongon Testimony).
[46]    Ex. 31, at 201:16-19 (Feb. 15, 2022 Hearing Tr., Kim Testimony)
[47]    Ex. 27, at 13:18-23 (Kaplan Dep.).
[48]    Ex. 26, at 44-45 (Diaz Report).
[49]    *Id*. at 38-40, 44-45 (Diaz Report).
[50]    Ex. 32, at 125:8-23 (Feb. 14, 2022 Hearing Tr., Wuesthoff Testimony).
[51]    Ex. 33 ¶ 8 (LTL 1.0 Doc. No. 548) (Debtor's Chapter 11 Monthly Operating Report).
[52]    Ex. 32, at 126:23-27:13 (Wuesthoff Testimony); Ex. 34, at 36:23-24, 37:5-13, 45:15-23 (Kim Dep.).
[53]    *See also* Ex. 21, at 51:13-24 (Kim Testimony).
[54]    Ex. 26, at 32 (Diaz Report).

Agreement to satisfy a single talc claim until entry of a final non-appealable order confirming a reorganization plan with a trust for victims.[55]

On October 14, 2021, two days after LTL's creation, LTL's board met and authorized LTL to file for bankruptcy.[56]  A critical goal of the bankruptcy was to freeze pending actions against J&J and other non-debtors, putting an end to jury trials.  J&J announced that "all pending cosmetic talc cases will be stayed," and that J&J and its affiliates "will continue to operate their business as usual," before such relief had even been sought in the bankruptcy case.[57]  Then, just as now, LTL argued that absent an injunction halting talc litigation against J&J and other non-debtors, "[t]he entire purpose of this" bankruptcy "would be thwarted."[58]

On December 1, 2021, the Official Committee of Talc Claimants in LTL 1.0 moved to dismiss the First Bankruptcy Case under §1112(b) of the Code for (among other reasons) lack of a valid bankruptcy purpose. 637 B.R. at 399 n.2.  The U.S. Trustee supported dismissal, or appointment of a Chapter 11 trustee.  This Court denied the motions.  The same day, over the objection of many of the members of this Committee, this Court granted LTL's motion for a sweeping order that halted litigation against some 670 nondebtors, including J&J, hundreds of its affiliates, around 145 retailers (groceries, drugstores, sporting-goods stores, etc.), and 105 insurance companies that deny liability.  *LTL Mgmt. v. Those Parties Listed on Appendix A to Complaint et al., (In re LTL Mgmt.)*, 638 B.R. 291 (Bankr. D.N.J. 2022).  The Court noted an "unsettled" issue of subject-matter jurisdiction, *id*. at 301, but ruled that it could extend stay relief to non-debtors because "a lawsuit asserting talc related claims against" those non-debtors "is

---

[55]    *Id*.; Ex. 11 at 6 (2021 Funding Agreement).
[56]    Ex. 35 (Board Minutes).
[57]    Ex. 36 (J&J Oct. 19, 2021 8-K).
[58]    Ex. 37, at 51 (Omnibus Reply in Support of PI).

essentially a suit against Debtor," *id.* at 305, and because such suits would have an "undeniable impact on Debtor's estate," *id.* at 307.

On direct appeal from this Court, the U.S. Court of Appeals for the Third Circuit held that the Debtor's first bankruptcy petition must be dismissed because it failed to satisfy the good faith requirement of the Bankruptcy Code. 2023 WL 2760479. The Third Circuit opined: "Our ground for dismissal is LTL's lack of financial distress. . . . *And we cannot currently see how its lack of financial distress could be overcome.*" *Id.* at *17 (emphasis added).

The Debtor sought rehearing. Not a single judge on the Third Circuit voted for rehearing. The Third Circuit then unanimously denied the Debtor's motion to stay the mandate (supposedly) to enable LTL to pursue Supreme Court review – review that the Debtor has no intention of pursuing, it turns out.[59] On April 4, 2023, LTL's First Bankruptcy Case was dismissed.[60]

## III. The Debtor's Replacement of the 2021 Funding Agreement and the Filing of LTL 2.0

### A. The Replacement of the 2021 Funding Agreement with the 2023 Funding Agreement

During the two hours and eleven minutes that it spent outside of bankruptcy on April 4, 2023, in an effort to make the Debtor appear eligible for bankruptcy, the Debtor, a subsidiary of and beholden to J&J, parted with its most significant asset—the 2021 Funding Agreement. The Third Circuit stated that the 2021 Funding Agreement functioned "not unlike an ATM" and provided the Debtor with a right to at least $61.5 billion in cash with minimal conditions. 2023 WL 2760479 at *16. In support of its decision to terminate the 2021 Funding Agreement, Mr. Kim's declaration baldly asserted that he believed the agreement was "void or voidable." Kim

---

[59]     Ex. 38, Bankr. Case No. 21-30589-MBK, Doc. 3939.
[60]     Ex. 39, Bankr. Case No. 21-30589-MBK, Doc. 3938.

Decl. II ¶ 78.  However, no explanation or analysis—legal or factual—is provided to substantiate this assertion, and it is contrary to representations LTL's counsel made to this Court.

According to LTL's counsel, the 2021 Funding Agreement "is different from all other cases in the sense that it includes also a Johnson & Johnson, the ultimate parent, agreeing to obligate itself to the extent of the value of Old JJCI.  So you have basically two sources of asset availability."[61]  In fact, according to Mr. Gordon, "the whole idea with these funding agreements… [is] to basically say to the Court, to say to the parties, look, you haven't been hurt because the entity that was standing behind or the value of assets that were effectively standing behind the liability or were available to pay the liability, that value is fully preserved through that funding agreement.  So that was fully preserved.  The only difference is that instead of having the company there, you have a funding agreement that provides direct right to those assets through this funding agreement."  *Id*. at 59:7-16.

Advocating against dismissal, Mr. Gordon also pointed out to the Court that "there's literally no conditions or any material conditions on the permitted uses under this document", and he expressly included "funds available to pay settlements, to pay judgments in the tort system. So it makes it very clear this is what we're talking about if there's no proceeding in bankruptcy. Whether there was no case filed or whether the case is filed or dismissed, the money's available for that purpose. So this is there to protect the claimants. ***It's there to assure this isn't treated or consider a fraudulent conveyance***.  The idea was and the intent was the claimants are covered either way in bankruptcy or outside."  *Id*. at 60:16-20, 61:5-20 (emphasis added).

Under the new agreements, unabashedly planned, prepared and agreed to during the pendency of LTL 1.0 while LTL's directors, officers and counsel owed fiduciary duties to the talc

---

[61]     Ex. 7, at 56:1-8 (Feb. 18, 2022 Hearing Tr.).

victims, "J&J's balance sheet [is] not available to the Debtor," and "Holdco's [formerly New JJCI's] assets … no longer include the consumer health business."  Kim Decl. II ¶ 83.  J&J's funding obligation under the J&J Support Agreement arises if, and only if, the Court confirms J&J's desired plan, and such plan goes effective after all appeals are exhausted.  Thus, while non-debtor J&J asks this Court to award it the benefit of a sweeping injunction, it has declined to assume any current funding obligation to debtor LTL.

The extent to which the remaining value of HoldCo is available to LTL, and the amount of that value, has not been made clear by LTL either in its filings or the First Day Hearing.  To the extent that such value remains available and is substantial—around $30 billion according to the estimates presented to the LTL's board in preparation to file this bankruptcy—the funding available to LTL likely exceeds its liabilities such that LTL cannot carry its burden to show that it is in immediate financial distress.

Clearly the negotiation and documentation by which these transactions occurred was conducted while LTL was a debtor-in-possession, held a fiduciary duty to its creditors and while its assets and estate were under the supervision of this Court.  Yet not a word was uttered, and no effort was made to apprise the Court and parties that such an out-of-the-ordinary-course of business transaction was being developed.

### B.    LTL Files LTL 2.0

LTL filed this bankruptcy two hours and eleven minutes after the dismissal of the LTL 1.0 as a bad faith filing.  LTL did not conduct any "business" in the two hours and eleven minutes aside from purportedly signing papers—prepared and agreed to during the pendency of LTL 1.0. LTL contends that this bankruptcy is different because it has reached a deal with some claimants' attorneys, stating that "with the assistance of the mediators and the encouragement of this Court," it engaged in negotiations with "various plaintiff law firms," and that those "negotiations

ultimately culminated in an agreement with thousands of claimants" on a plan that will "fully resolve all of LTL's liability for talc-related claims." Kim Decl. II ¶ 72 (emphasis added). This assertion is both troubling—to the extent that it suggests the mediators aided and encouraged J&J's fraudulent scheme—and misleading.

In entering the TRO, this Court pointed to the support claimed by LTL as a justification for injunctive relief, opining "there is now a potential resolution favorable to all claimants through the newly-filed bankruptcy case." Doc. 16, ¶ 3. But that support is illusory.

*First*, more than 100 law firms representing ovarian cancer and mesothelioma claimants oppose J&J's plan. Most of these law firms have been active participants in the federal MDL or state courts for years, have filed talc claims against J&J and its affiliates, and represent talc claimants with cancer diagnoses that have a scientific link to exposure to J&J's toxic products. The TCC can confirm that ***not a single*** law firm that was placed on the Plaintiffs' Steering Committee in the MDL supports the J&J deal or this bankruptcy case.[62]  And only four (4) law firms identified by LTL in the list of the Top 30 Law Firms that represent talc claimants filed in the first bankruptcy—Onder Law, Nachawati Law Group, Johnson Law Group, and Trammell PC—have pledged their allegiance to J&J's plan. If LTL were to solicit votes on a plan today, it would not obtain the required level of acceptance and would face vigorous and vociferous opposition. LTL did not return to this Court with a deal in hand, as its pleadings suggest.

*Second*, the Debtor does not have the support of 60,000 to 70,000 claimants.  Certain of the settling law firms are strangers to the MDL or other consolidated litigation and have never filed a talc-related lawsuit against J&J.  The U.S. Trustee cast doubt on these numbers at the First Day

---

[62]    The "confidential" term sheet belies why the J&J plan is an obvious farce.  For example, it assigns Mr. Valadez a value in the low five figures.  Many of the ovarian cancer matrix values fall short of objective components of damages for medical costs and lost wages, as noted at the first-day hearing.

20

Hearing on April 11, wondering how these numbers could be accurate based on the U.S. Trustee's calculations.[63]

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

    ***Third***, the settlement is illusory. The Debtor says J&J is now offering to pay $8.9 billion. But the definition of talc liability that J&J is purporting to "settle" is, unsurprisingly, extremely broad. The $8.9 billion payment is for "all talc claims for all time"—meaning that the $8.9 billion is intended to satisfy all current and future talc claims for mesothelioma, ovarian cancer, and other cancers linked to talc in the future, billions of dollars of claims asserted by third-party payors and governmental units, and billions of dollars of claims for indemnification and other damages asserted by co-defendants, retailers, talc suppliers such as bankrupt Imerys and Cyprus companies, and any drugstore or supermarket that sold J&J's toxic baby-powder.  For example, it includes a hypothetical talc claim asserted by an individual who develops mesothelioma in "2080 and beyond," as the Debtor acknowledges, and is consistent with established long latency period between first exposure to asbestos and development of mesothelioma. Kim Decl. at ¶ 42.  And it includes claims asserted by governmental units against J&J alleging false advertising, unfair competition, and deceptive trade practices, which claims could be massive. It also includes indemnification claims and claims for damages asserted by Imerys and Cyprus.  Under J&J's

---

[63]    Ex. 8, First Day Hearing at 103:5-23.

████████████████████████████████████████

desired plan, all talc claims will be channeled to a single pot. And Holdco's funding obligations

will be capped, with potentially no support at all from J&J. All claimants will be entitled to a pro

rata distribution of the trust funds. If the amounts asserted by governmental claims are allowed,

such claims will substantially dilute the funds available to pay individual claimants.

## **ARGUMENT**

To obtain the relief sought on this Motion, LTL must (a) show that this Court has subject

matter jurisdiction, (b) satisfy the burden of proof on every element of its requested relief, and (c)

overcome the defenses asserted by the TCC and others.  LTL fails in each respect.

## I.    **LTL CANNOT ESTABLISH THAT IT FILED LTL 2.0 IN GOOD FAITH, WHICH IS A THRESHOLD ISSUE**

The Third Circuit recognized that the analysis of an LTL bankruptcy must "start, and stay,

with good faith."  2023 WL 2760479, at *1.  Good faith, and therefore financial distress, is central

for two reasons.  First, it is a threshold issue before any Chapter 11 relief is issued.  "[A]bsent

financial distress there is no reason for Chapter 11 and no valid bankruptcy purpose."  *Id*. at *9.

As such, "the good-faith gateway asks whether the debtor faces the kinds of problems that justify

Chapter 11 relief."  *Id*.  Moreover, "[f]inancial distress must be not only be apparent, but it must

be immediate enough to justify a filing."  *Id*. at *9.  Second, without good faith, there is simply no

prospect for a successful reorganization, which is itself a precondition for the issuance of any

injunction under § 105.  Once good faith in put at issue in a case, "the burden to establish good

faith is on the debtor."  *Id*. at *8.

That lack of financial distress continues to mandate dismissal.  As the Court of Appeals

explained in LTL 1.0: "J&J's belief that this bankruptcy creates the best of all possible worlds for

it and the talc claimants is not enough, no matter how sincerely held. Nor is the Bankruptcy Court's

commendable effort to resolve a more-than-thorny problem. These cannot displace the rule that

resort to Chapter 11 is appropriate only for entities facing financial distress." *Id*. at *17. "[G]iven Chapter 11's ability to redefine fundamental rights of third parties, only those facing financial distress can call on bankruptcy's tools to do so." *Id*. LTL is not facing financial distress and is therefore not eligible to call upon the bankruptcy system.

### A.    LTL Is Still Not in Immediate Financial Distress

The Third Circuit found no financial distress because of the 2021 Funding Agreement, such that it could "pay current and future talc claimants in full." 2023 WL 2760479, at *15. The Third Circuit noted that the 2021 Funding Agreement functioned "not unlike an ATM disguised as a contract," allowing LTL to "draw on [it] to pay liabilities without any disruption to its business or threat to its financial viability." *Id*. at *16. This holding was based directly on LTL's appellate brief, which explained why the 2021 Funding Agreement was in place: "Old JJCI could not just saddle LTL with its talc-related debts, give New JJCI all of its assets, and call it a day. Old JJCI made sure that LTL had the same, if not a great, ability to resolve present and future talc claims. . . . [T]hough the agreement sets a floor of Old JJCI's [$61 billion] enterprise value at the time of the divisional merger, the agreement's value is expected to increase as New JJCI's value increases post-restructuring."[66] (LTL App. Br. at 21.) The Third Circuit also analyzed LTL's liabilities and found that "on its filing, LTL did not have any likely need in the present or the near-term, or even in the long-term, to exhaust its funding rights to pay talc liabilities" in light of the litigation history prior to the creation of LTL. 2023 WL 2760479, at *15. The Third Circuit found the lack of financial distress conclusive, observing "Our ground for dismissal is LTL's lack of financial distress. . . . And we cannot currently see how its lack of financial distress could be overcome." *Id.* at *17.

---

[66]    Ex. 42, at 21 (LTL App. Br. filed Aug. 15, 2022).

And yet, despite the Third Circuit's clear holding that LTL was not in financial distress, LTL waited just two hours from this Court's final dismissal of LTL 1.0 to file LTL 2.0. Realizing that nothing had changed that would give LTL any likely need to exhaust its funding right to pay talc liabilities, as the Third Circuit had just held, LTL attempted to manufacture financial distress by engineering one of the largest intentional fraudulent transfers in United States history. LTL voluntarily walked away from the 2021 Funding Agreement and surrendered its rights to more than $61 billion on demand, available inside or outside of bankruptcy. LTL also unilaterally gave up its right to future appreciation of J&J's consumer business, which would have increased the value of the 2021 Funding Agreement above and beyond $61.5 billion. It gave up its right to use J&J's balance sheet of roughly half-a-trillion dollars as a backstop for the Funding Agreement. For no legitimate reason, the Debtor replaced the 2021 Funding Agreement (worth more than $61 billion) with a version under which LTL no longer has access to J&J's balance sheet or the value of JJCI's consumer health business, valued somewhere between $8.9 and around $29 billion depending on the strength of HoldCo and its backstop.

The Third Circuit anticipated this exact maneuver. It warned LTL that parting with the 2021 Funding Agreement would not cure the defects in its bankruptcy filing:

> Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is also premature, we note interested parties may seek to "avoid any transfer" made within two years of any bankruptcy filing by a debtor who "receive[s] less than a reasonably equivalent value in exchange for such transfer" and "became insolvent as a result of [it]." 11 U.S.C. § 548(a). So if the question becomes ripe, the next one might be: Did LTL receive reasonably equivalent value in exchange for forgoing its rights under the Funding Agreement?

2023 WL 2760479, at *16 n.18. If the amendment to the 2021 Funding Agreement resulted in a massive decline in that agreement's value, such that LTL's financial condition materially changed

in the two-hour gap, then the amendment was plainly an avoidable fraudulent conveyance that could be avoided by LTL's creditors or a bankruptcy trustee.[67]

Companies should not be allowed to give away their assets and seek relief claiming financial distress any more than (in Abraham Lincoln's example) a child can kill his parents and seek mercy as an orphan. Yet at the First Day Hearing on April 11, LTL's counsel expressed great umbrage at the assertion that LTL participated in an intentional fraudulent transfer, arguing that it did nothing of the sort. Counsel also asserted (citing no evidence to support his speculation) that (i) the surrender of the 2021 Funding Agreement *was* a sufficiently massive giveaway of value that it created financial distress for LTL, but (ii) the giveaway *was not* so substantial that it rendered LTL "insolvent" for purposes of a constructive fraudulent conveyance claim under 11 U.S.C. § 548(a)(1)(B). LTL's concession that it is not insolvent is damning, because the Third Circuit made clear that insolvency (while not required for bankruptcy) "is likely always relevant" to financial distress, 2023 WL 2760479, *9, and that bankruptcy filings "usually involve 'impending insolvency.'" *Id.* at *11 n.14 (citation omitted). Moreover, LTL shoulders the burden of proof on this Motion, and its counsel's speculative assertions fail to meet that burden. In any event, LTL's argument ignores its liability for an actual fraudulent conveyance action under 11 U.S.C. § 548(a)(1)(A), for which insolvency is not an element, and other remedies available to unwind the fraudulent surrender of the 2021 Funding Agreement.[68] LTL's transparent attempt to circumvent

---

[67]    As LTL conceded in its Appellate Brief, responding to an argument that "some future conveyance may place assets out of LTL's creditors' reach," Ex. 42, at 72 [Tab 35], "for any hypothetical future transfer by LTL, New JJCI, and J&J, . . . [t]he Bankruptcy Court will always have jurisdiction to protect against fraudulent conveyances." *Id*. at 73.

[68]    *See AYR Composition, Inc. v. Rosenberg*, 619 A.2d 592, 595-97 (N.J. App. Div. 1993) (transfer of company's sole asset in breach of fiduciary duty constitutes "a fraudulent conveyance as a matter of law" under New Jersey law). In addition, relief is available under the Texas divisive merger statute, Tex. Bus. Orgs. Code Ann. §§ 10.003, 10.901, which cannot be used to "disadvantage" creditors. *Plastronics Socket Partners, Ltd. v. Hwang*, 2022 WL 108948, *3-4 (Fed. Cir. Jan. 12, 2022). The remedy for a violation "would generally be to reallocate all or a portion of the allocated liability to one or more of the surviving entities in the merger or to make some or all of the resulting entities

footnote 18 of the Third Circuit's opinion demonstrates the need for prompt appellate review, so the Court of Appeals can consider LTL's attempt to parse between "financial distress" and "insolvency" and render an authoritative decision on the matter.

But even assuming there was no intentional fraudulent transfer, LTL's argument mandates dismissal. If, as LTL argued to this Court, the 2023 Funding Agreement was not a massive giveaway of value, then LTL cannot (and did not) point to any material change in its financial condition between LTL 1.0 and LTL 2.0. And that means no financial distress, no good faith, no bankruptcy, and certainly no need to issue an oppressive nationwide injunction to prevent thousands of people from exercising their rights to access the American justice system in courts that deserve comital respect.

### B.      LTL Offers No Explanation for Why It Gave Away $30-50 Billion in Value

LTL argues that, because the Third Circuit found that LTL was not in financial distress as a result of its rights under the 2021 Funding Agreement, that "determination defeated the fundamental purpose of the 2021 Funding Agreement which purpose was to facilitate Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code." (Mem. at 40.) LTL then explains that it determined there was a "material risk that the 2021 Funding Agreement was no longer enforceable because it had become void or voidable." (*Id*.) LTL's use of the passive voice obfuscates the obvious question—enforceable against who? The counterparties to the Funding Agreement were J&J and New JJCI, now known as Holdco. At the time of the amendment to the 2021 Funding Agreement, during the two-hour gap between LTL

---

liable for all or a portion of the liabilities of the predecessor debtor corporation." *In re DBMP LLC*, 2021 WL 3552350, at *26 (Bankr. W.D.N.C. Aug. 11, 2021) (citation omitted).

1.0 and LTL 2.0 (in theory),[69] LTL was a subsidiary of J&J. Nothing would have prevented J&J

from continuing to honor its 2021 Funding Agreement to its subsidiary even if a theoretical risk

of frustration of purpose—normally an affirmative defense—existed, especially in light of LTL's

repeated assurances to this Court and the Third Circuit that the 2021 Funding Agreement applied

outside of bankruptcy.[70] And yet, the day the Third Circuit's decision was issued, LTL's general

counsel admitted that it was he who was looking for a reason to abandon the funding backstop.[71]

LTL is wrong in arguing that the 2021 Funding Agreement was "void or voidable" because

the Third Circuit decision "frustrated the purpose" of the 2021 Funding Agreement. Frustration

of purpose is merely an affirmative defense to a breach of contract action, *Brenner v. Little Red

School House, Ltd*., 274 S.E.2d 206, 209 (N.C.1981),[72] rather than a basis for deeming a contract

"void or voidable." LTL never litigated that affirmative defense.

LTL cannot come close to showing the elements of the frustration of purpose defense.

"Essentially, there must be an implied condition to the contract that a changed condition would

excuse performance; this changed condition causes a failure of consideration or the expected value

---

[69] It strains credulity to assume that Project Plato II (the internal code name for LTL 2.0) occurred during incredibly shortened time frame between the dismissal of LTL 1.0 and the refiling LTL 2.0. What actions LTL may have taken while still a debtor-in-possession in LTL 1.0 may be the subject of future discovery and motion practice, especially to the extent LTL gave away value without the approval of the Bankruptcy Court.

[70] *See* Ex. 23, *Declaration of John K. Kim in Support of First Day Pleadings, In re LTL Management LLC*, Case No. 21-30589 [Docket No. 5] (Bankr. D.N.J. Oct. 14, 2021) ("Significantly, the Funding Agreement imposes no repayment obligation on the Debtor; it is not a loan. ***It obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case*** and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses. *In addition, the Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case*** and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.) (emphasis added).

[71] Ex. 5, at 74:23-75:10 (Kim Dep. Tr. of Apr. 14, 2023).

[72] The 2021 Funding Agreement is governed by North Carolina law. Ex. 11 § 9 (2021 Funding Agreement).

of performance; and that the changed condition was not reasonably foreseeable." *Faulconer v. Wysong and Miles Co.*, 574 S.E.2d 688, 691 (N.C. App. 2002).

*First*, there is no implied condition.  Because the 2021 Funding Agreement expressly provided for J&J's funding obligation outside bankruptcy, there cannot be an "implied condition" that funding outside bankruptcy would constitute frustration of purpose.  The 2021 Funding Agreement contains an "entire agreement" provision,[73] preventing any implied provision that the 2021 Funding Agreement would be limited to bankruptcy.  *See D.S. Simmons, Inc. v. Steel Group, LLC*, 2008 WL 488845, *3 (E.D.N.C. Feb. 19, 2008) (rejecting frustration of purpose defense where "defendant has not produced any facts which would indicate that the parties expressly or impliedly agreed that a [specific scenario] would discharge defendant's performance").

*Second*, LTL has failed to show "a failure of the consideration or a practically total destruction of the expected value of the performance." *Brenner*, 274 S.E.2d at 209 (quoting 17 Am. Jur. 2d Contracts § 401 (1964)).  Here, the 2021 Funding Agreement had important functions outside bankruptcy, which LTL and its witnesses touted.  *See also Balogh Associates VII LLC v. Dick's Sporting Goods, Inc.*, 2022 WL 4624827, *17 (M.D.N.C. Sept. 30, 2022) (rejecting defense where subject of contract was not "destroyed").

*Third*, "[i]f the frustrating event was reasonably foreseeable, the doctrine of frustration is not a defense." *Brenner*, 274 S.E.2d at 209.  *See also Fairfield Harbour Property Owners Ass'n, Inc. v. Midsouth Golf, LLC*, 715 S.E.2d 273, 284 (N.C. App. 2011) (rejecting frustration of purpose defense: "the doctrine is inapplicable where the frustrating event is reasonably foreseeable").  The 2021 Funding Agreement expressly contemplated funding outside of a bankruptcy and was not conditioned on bankruptcy.  The Third Circuit was not a supervening event at all, but merely a

---

[73]      Ex. 11 § 11 (2021 Funding Agreement).

declaration of what bankruptcy law requires and an application of existing Third Circuit precedent. *See Congoleum Corp. v. Pergament (In re Congoleum Corp.)*, Bankr. No. 03-51524(KCF), Adversary No. 05-06245, 2007 WL 4571086, at *9-11 (Bankr. D.N.J. Dec. 28, 2007) (rejecting argument that the Court's interpretation of the Third Circuit's *Combustion Engineering* decision "frustrated" the purpose of agreements reached between the debtor's and two classes of claimants).

Moreover, at the time the Debtor and its counsel represented that the 2021 Funding Agreement was available outside bankruptcy, they knew that prior Texas two-step transactions in North Carolina had been subject to vigorous challenge in court, even though the North Carolina restructurings were less ambitious than what J&J was seeking. J&J was on notice, at the time it was drawing up the 2021 Funding Agreement, that even less ambitious transactions had been vigorously challenged in court.[74]

LTL suggests that, without bankruptcy, J&J would not receive the benefits of a channeling injunction under section 524(g). But a channeling injunction was expressly not a requirement for funding under the 2021 Funding Agreement. The Funding Agreement did not even require LTL to file a bankruptcy case at all, let alone successfully use a bankruptcy filing to obtain a channeling injunction. And a channeling injunction is of material consequence only for J&J. The absence of an anticipated benefit to a single party is insufficient to form the basis of a frustration-of-purpose defense. For the defense to apply, "the subject of the contract must be destroyed." *Tucker v.*

---

[74] Unlike J&J, the Aldrich and Murray entities in *Aldrich Pump* were themselves parties to a Texas divisional merger with Trane Technologies Company LLC, successor by merger to Ingersoll-Rand Company, and Trane U.S. Inc. *See Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC)*, Case No. 20-30608, Adv. Proc. No. 20-03041, 2021 WL 3729335, at *1 (Bankr. W.D.N.C. Aug. 23, 2021). Similarly, the DBMP entity was itself a party to a Texas divisional merger with CertainTeed Corporation. *See DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, Case No. 20-30080, Adv. Proc. No. 20-03004, 2021 WL 3552350, at *1 (Bankr. W.D.N.C. Aug. 11, 2021)). Neither *Aldrich Pump* nor *DBMP* involved a separate parent entity like J&J seeking the benefit of a divisional merger to which it was not a party.

*Charter Med. Corp.*, 299 S.E.2d 800, 804 (N.C. App. 1983) (finding the purpose of a commercial

lease was not frustrated).  LTL cannot meet this standard.

### C.    LTL Has Failed to Show Financial Distress, Even if its Attempts to Engineer Such Distress Were Credited

The 2021 Funding Agreement was only part of the reason that the Third Circuit concluded

that LTL had failed to show sufficient financial distress.  It also found that "a lack of meaningful

operations show that LTL did not suffer from sufficient kinds of financial distress," 2023 WL

2760479, at *17, and pointed to the fact that Debtor's post hoc, lawyer-driven estimates of its talc

exposure were not credible.  *Id*. at *15-16.

LTL's second bankruptcy petition does nothing to cure these defects.  LTL remains a "shell

company" with no business operations and no "need to reorganize."  *Id*. at *16.  The Third Circuit's

reasoning remains fully applicable: "[I]f a petitioner has no need to rehabilitate or reorganize, its

petition cannot serve the rehabilitative purpose for which Chapter 11 was designed."  *Id*. at *9

(citation omitted).  *See also 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 619 (3d Cir. 2009)

(debtor had "no going concerns to preserve—no employees, offices, or business other than the

handling of litigation").

Nor did anything happen in the intervening 2 hours and 11 minutes on April 4 to cure the

impermissible "casualness" of the "back-of-the-envelope forecasts" of LTL's talc liability that the

Third Circuit rejected.  2023 WL 2760479, at *15.  The Third Circuit explained that this Court

arrived at a $190-billion estimate of defense costs by unrealistically assuming every case would

go to trial.  *Id*. at *14.  This Court also "'multipl[ed] multi-million dollar or multi-billion-dollar

verdicts by tens of thousands'" of claims.  *Id*.  The Third Circuit held there was no basis for the

assumptions underlying these calculations.  Similarly, there was no reason to think Ingham-like

verdicts were "the new norm."  *Id*.  The Third Circuit ruled that those forecasts were not

"inferences permissibly drawn" from the record. *Id*. There was no memorandum, analysis, or warning from businesspeople that talc liabilities threatened Old JJCI. Quite the opposite: J&J assured investors and analysts that talc costs were manageable. *Id*. at *15.

The Third Circuit further concluded that LTL could not show "immediate" financial difficulty. 2023 WL 2760479, at *9. "The 'attenuated possibility' that talc litigation may require it to file for bankruptcy in the future does not establish its good faith as of its petition date. At best the filing was premature." *Id*. at *16. The Third Circuit drew comparisons to other mass tort litigation, such as the Johns Manville case, where the debtor faced true financial distress, including "'forced liquidation of key business segments.'" *Id*. at *11 (citation omitted).

If anything, the Third Circuit's reasoning has only been strengthened by the second bankruptcy filing. In rejecting this Court's previous forecasts, the Third Circuit held that this Court ignored "the possibility of meaningful settlement." *Id*. at *15. The Debtor's assertion that it has reached agreements with tens of thousands of claimants (Kim Decl. II ¶ 8), if taken at face value, simply proves the Third Circuit's point that the potential for settlement precludes a finding of financial distress warranting bankruptcy.

### D.    LTL Has No Prospect to Reorganize

As the Third Circuit observed, the purpose of Chapter 11 is reorganization—it is designed "to give those businesses teetering on the verge of a fatal financial plummet an opportunity to *reorganize* on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability." 2023 WL 2760479, at *10 (citing *Cedar Shore Resort, Inc v. Mueller*, 235 F.3d 375, 381 (8th Cir. 2000)) (emphasis added). Yet, under the Bankruptcy Code, reorganization implies a plan that creditors will accept, and even in an asbestos case under § 524(g)—the applicability of which is not conceded by the TCC—75% support is required. Yet more than 100 law firms, representing over 40,000 claimants and the majority of cases that have

been filed in state and federal courts around the country, vehemently *oppose* LTL's plan.  LTL is nowhere close to a consensual or confirmable plan of reorganization.  As this Court heard at the First Day Hearing on April 11, even the U.S. Trustee doubted LTL's numbers.  Without any prospect of reorganization, LTL has no business in Chapter 11.  This Court should not give LTL and its corporate parents the benefits of drastic Chapter 11 remedies such as the requested preliminary injunction, when there is no realistic prospect for reorganization in good faith.

Further, because the plan J&J desires will release J&J from its own independent liability, it will face terminal challenges under controlling Third Circuit precedent.  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 233 (3d Cir. 2004) (Circuit Judges Scirica, Ambro, and Fuentes) (Bankruptcy Code does not "permit the extension of a channeling injunction to the non-derivative claims against non-debtors").  And LTL's plan will face objections from parties alleging that it fails the best interest test under 11 U.S.C. § 1129(a)(7), as creditors will be likely gain far more in a liquidation once the fraudulent transfer of the 2021 Funding Agreement is avoided.

## II.    SOLVENT NON-DISTRESSED THIRD PARTIES CANNOT RECEIVE THE BENEFIT OF THE § 362(A) AUTOMATIC STAY

Despite J&J's strategic decision to place LTL—and only LTL—into bankruptcy for a second time, LTL once again seeks to expand the automatic stay to its corporate parent and affiliates as well as hundreds of non-debtors.  The proposed operation of this automatic stay is vast, freezing over 38,000 non-talc lawsuits asserting direct liability claims against hundreds of non-debtors, shutting down relief for dying claimants.  One of the express purposes for seeking this relief in LTL 2.0 is to shut down a specific trial brought by a 24-year-old with a terminal illness—a clear attempt at nothing more than litigation advantage.

Debtor's proposed extension of the § 362(a) automatic stay should fail for several reasons. First, the plain text of § 362(a) applies only to *debtors*, and not to third parties, and should not be

subject to any exceptions under recent Supreme Court precedent strictly construing provisions of the Bankruptcy Code.  Second, the "unusual circumstances" exception allowed by the Third Circuit cannot be construed to include any potential third-party action that will negatively impact the Debtor's reorganization.  An exception that broad would swallow the rule, would be contrary to the automatic nature of the stay, and would create an unworkable standard for federal and state courts that have an obligation to apply the stay absent any order from a bankruptcy court.  Third, even if the "unusual circumstances" test could be read to allow the automatic stay to apply to actions that will negatively impact the Debtor's reorganization, the Debtor has not shown that extending the stay as requested will do so.

### A.    Section 362(a) Only Applies to the Debtor with No Exceptions

Section 362(a) of the Bankruptcy Code provides in pertinent part:

[A] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\*        \*        \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

11 U.S.C. § 362(a)(1), (3).

On its face, the stay applies automatically only to the *debtor.*  "Although the scope of the automatic stay is broad, the clear language of section 362(a)[1] stays actions only against a 'debtor.'"  *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509-510 (3d Cir. 1997) (quoting *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991)).  "As a consequence, '[i]t is universally acknowledged that an automatic stay of proceedings accorded by

33

§ 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the . . . debtor.'" *Id.* (quotations and citations omitted)). Similarly, by its plain words, § 362(a)(3) protects only property in which a "debtor" had an interest as of the commencement of the bankruptcy case — whether the debtor's property was in the possession of the debtor or a third party. *See* 11 U.S.C. § 362(a)(3) (protecting estate property); § 541(a)(1) (defining estate property to include all pre-petition interests of the debtor "wherever located and by whomever held"). As the Supreme Court has made clear in recent cases, bankruptcy courts are discouraged from extending statutes beyond their plain language even for purportedly laudable policy preferences. *Law v. Seigel*, 571 U.S. 415, 427-28 (2014).

A strict construction of § 362(a) to debtors, as the text commands, is consistent with the limited use of the powerful stay as a shield rather than as a sword to gain a litigation advantage, as LTL proposes. The purpose of the automatic stay, which is to give debtors "a breathing spell," *Maritime Elec.*, 959 F.2d at 1204, has led courts to universally acknowledge that "the stay is a shield, not a sword." *In re Scarborough-St. James Corp.*, 535 B.R. 60, 67, 70 (Bankr. D. Del. 2015) (noting, that "the stay is a shield, not a sword that should help the debtor deal with his bankruptcy for the benefit of himself and his creditors," and concluding that a debtor's use of the automatic stay to gain a litigation advantage justified lifting the automatic stay afforded by § 362(a)); *see also Bradberry v. Carrier Corp.*, 86 So. 3d 973, 983 (Ala. 2011) ("Extending the stay to protect solvent co-defendants would not advance either of the purposes underlying the automatic stay.").

### B.    Negatively Impacting the Debtor's Reorganization Efforts Is Insufficient to Warrant Application of the Unusual Circumstances Exception

The "unusual circumstances" exception is intended to be narrow, and is reserved only for "extreme" circumstances. *See, e.g., W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,

No. 01-01139 (JKF), 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004) ("Although the automatic stay can be extended to situations involving nondebtors, courts are careful to reserve such power to the most extreme and 'unusual circumstances.'"); *In re Aldan Indus., Inc.*, No. 00-10360DWS, 2000 WL 357719, at *4 (Bankr. E.D. Pa. Apr. 3, 2000) (referring to *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986), "as a narrow exception to the prohibition against extending the protection of the automatic stay").   Some courts have interpreted "unusual circumstances" to include any negative impact on the debtor's management and reorganization efforts. *In re Phila. Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009) (citing *McCartney*, 106 F.3d 506).   The TCC respectfully submits that this interpretation is inconsistent with the statute and not required by *McCartney*.

In *McCartney*, the Third Circuit applied the "unusual circumstances" exception in an unusual case—where the debtor attempted to limit the application of the § 362(a) automatic stay to a related party, in order to create an irreconcilable conflict for a creditor between complying with the Bankruptcy Code and complying with state law in order to seek a remedy on a single loan with a third party guaranteed by the debtor.   In that case, the debtor (Lamar McCartney) attempted to use the § 362(a) automatic stay provision as a sword to prevent a foreclosing bank from pursuing a deficiency judgment against a related third party (Lamar's Restaurant & Lounge, Inc.) on a loan that the debtor guaranteed, because doing so would have required the bank to name the debtor under Pennsylvania state law, in violation of the automatic stay. *McCartney*, 106 F.3d 506.   The Third Circuit refused to allow the debtor to prevent the stay from applying to a related entity whose sole purpose at that point was to be named in a deficiency action so that the creditor could pursue

the debtor-guarantor under state law.  *Id*. at 510-11.[75]  Nothing in *McCartney* suggests the application of "unusual circumstances" to stay actions against solvent third parties with independent liability to creditors.  Quite the opposite – *McCartney* also states that "it is universally acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the … debtor." *Id*. at 509-10 (citations and quotations omitted).  And yet LTL's entire justification for extending the stay to solvent third parties is that resolution of similar litigation could have a negative impact on LTL's ability to reorganize.  That simply cannot be the test.

Allowing negative impact, without anything more, would also create an unworkable standard for federal and state courts that have to apply the automatic stay.  As Judge Wood recently observed in the *Aearo* oral argument on a similar issue at the Seventh Circuit, the stay is automatic.[76]  The § 362(a) stay was written by Congress to apply upon the filing of a petition, without the need for any further order by a bankruptcy court, and "irrespective of whether the parties to the proceedings stayed are aware that a petition has been filed." *Maritime Elec. Co.*, 959 F.2d at 1204.  If Debtor's expansive view of § 362 is allowed to stand, any court overseeing any litigation between non-debtor third parties could be called upon to determine whether that litigation has sufficient impact on a particular debtor's reorganization effort and therefore *must* be stayed under § 362.  Such a view is not mandated by *McCartney*, a case based on the tactical machinations of the debtor, and it is directly contrary to the Third Circuit's opinion in *Maritime Electric*, which involved related claims among related parties and in which only the claim against the specific

---

[75]      Concurring in the opinion only, Judge Stapleton took prescient issue with the majority's allowing unusual circumstances to warrant an exception to the plain text of § 362, noting that the Court's "conclusion, while it makes no difference here, is likely to lead to mischief in the context of other cases." *Id*. at 513 (Stapleton, J., concurring). This case is a clear example of such mischief, where the Debtor is attempting to use the automatic stay as a sword to gain a litigation advantage for its highly solvent corporate parent.
[76]      Ex. 43, at 5:10-19 (7th Cir. Oral Arg. Tr. of Apr. 4, 2023).

debtor was stayed by § 362.  This Court should decline to follow the *Philadelphia Newspapers* formulation that adverse impact on a debtor's ability to accomplish reorganization is sufficient to warrant the application of the "unusual circumstances" exception.  And because the only "unusual circumstance" in this case is "that a debtor comes to bankruptcy with the insurance accorded LTL," *In re LTL Mgmt., LLC*, 2023 WL 2760479, at *17 (3d Cir. 2023), this Court should not extend the stay to any non-debtors.

### C.  Even Under an Adverse Impact Analysis, an Extension of the Stay Is Not Warranted in This Case

Even under LTL's view that the § 362(a) stay may be extended where the action to be stayed would have an "immediate adverse economic consequence for the debtor's estate," *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287–88 (2d. Cir. 2003), LTL cannot meet that standard.  LTL has not established that staying the cases against solvent independently liable third parties will have such an effect.[77]  Moreover, the relief sought by the Debtor here should be exercised by the Court only upon a clear and convincing showing of an "extraordinary set of circumstances."  *Millard v. Developmental Disabilities Inst., Inc.*, 266 B.R. 42, 44 (E.D.N.Y. 2001) ("Extension of the Automatic Stay to non-bankrupt defendants is a matter of discretion");

---

[77]     The Third Circuit has not directly decided whether any extension of the automatic stay—even if proper generally—must be implemented with an injunction under § 105. *See Wedgewood Investment Fund, Ltd. v. Wedgewood Realty Group, Ltd. (In re Wedgewood Realty Group, Ltd.)*, 878 F.2d 693, 701 (3d Cir. 1989) (allowing § 105 to apply where § 362 was unavailable, but not in the context of a stay against non-debtors; *see also McCartney*, 106 F.3d at 506 (noting in parenthetical that Fourth Circuit relied on both the "automatic stay provision and the bankruptcy court's equitable powers under 11 U.S.C. § 105 to enjoin actions against nondebtor codefendants").  "The courts cited by *McCartney* . . . relied on 11 U.S.C. § 105(a), not § 362(a), to enjoin the actions against the non-bankrupt parties." *Stanford v. Foamex L.P.*, Civ. A. No. 07–4225, 2009 WL 1033607, at *1 n. 7 (E.D. Pa. Apr.15, 2009). *See also Patton v. Beardon*, 8 F.3d 343, 349 (6th Cir. 1993) ("such extensions [of the stay], although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court").  Because the stay is automatic and based in federal law, and therefore could be interpreted and applied by any court of the United States, bankruptcy courts have generally entered injunctions under § 105 to extend the application of the automatic stay. Although the TCC does not believe that an extension of the stay is permitted at all, to the extent this Court wishes to have an injunction take effect in any other court, it must be issued under § 105 provided that such an injunction is permitted.  For the reasons explained in Part III, *infra*, this Court does not have jurisdiction to enter a § 105 injunction against non-debtor third parties, which also independently forbids this Court from extending the § 362 stay to them.

*see FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*, No. 10-75439, 2012 WL 6681794, at *8 (Bankr.

E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012) ("[E]xtensions of the stay to protect non-

debtor parties are the exception, not the rule, and are generally not favored. Thus, the movant must

show by 'clear and convincing evidence' that extension of the stay is warranted.") (citing *Millard.*,

266 B.R. 42);   *Univ. Med. Ctr. v. American Sterilizer Co. (In re Univ. Med. Ctr.)*, 82 B.R. 754,

757 (Bankr. E.D. Pa. 1988) (noting that "invocation of § 105(a) must be reserved for a truly

'extraordinary set of circumstances'").   As set forth in the TCC's Objection to the Preliminary

Injunction in LTL 1.0 [Adv. Pro. Doc. No. 142, at 47-73],[78] incorporated by reference herein, and

for the following additional reasons, the Debtor has not come close to meeting this burden.

**Identity of Interests**.  LTL claims that the stay should be extended to hundreds of protected

parties because they have an "identity of interests" such that a suit against a protected party is a

suit against the Debtor.  [Adv. Pro. Doc. No. 2, at 53-54.]  Yet LTL's proffered reason for its

shared identity with these hundreds of parties, many of which do not even have common ownership

with LTL, is that the talc claims "seek recoveries for the same alleged conduct under the same or

similar theories."  [*Id.* at 56.]  In other words, the claims have a nexus of fact and nexus of law.

But that is precisely what the Third Circuit has held *cannot be the basis* for extending the stay to

non-debtors even if they are co-defendants:  "[T]he automatic stay is not available to non-bankrupt

co-defendants of a debtor even if they are in a similar legal or factual nexus with the debtor."

*Maritime Elec.*, 959 F.2d at 1205.[79]  LTL offers no further explanation as to why there is an identity

---

[78]    Ex. 44.

[79]    LTL cites as the primary case for this section of its brief the Fourth Circuit case *A.H. Robins Co., Inc. v.
Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986), in which the automatic stay was extended to non-bankrupt codefendants
in unusual circumstances. Far from being adopted as law by the Third Circuit, *A.H. Robins* was cited **negatively** by
*Maritime Electric* on the very legal and factual nexus point quoted above.  *Maritime Elec.*, 959 F.2d at 1205.  And
while *McCartney* did rely on *A.H. Robins* for the extension of unusual circumstances generally, as set forth above,
*McCartney* also kept in place *Maritime Electric*'s prohibition on extending the automatic stay to non-debtors based
on a legal or factual nexus.  *McCartney*, 106 F.3d at 509-10.  Therefore, even if *A.H. Robins* could be read to provide

of interests with each of the hundreds of protected parties beyond the purported legal and factual

nexus, and thus there is no identity of interests under controlling Third Circuit law.[80]

      **Joint and Several Liability**.   Many of the protected parties are alleged to have been

independently liable as a joint tortfeasor in many cases, which does not justify extension of the

stay to them in those cases.  As an initial matter, the Third Circuit has made clear that in a suit with

multiple claims, "[a]ll proceedings in a single case *are not* lumped together for purposes of

automatic stay analysis," *Maritime Elec.*, 959 F.2d at 1204 (emphasis added), and the only claims

to be stayed are those that are against the debtor.   Even *A.H. Robins*, on which LTL so heavily

relies, held the stay was "inapplicable to the facts of th[e] case the situation where the third-party

defendant was independently liable as, for example, where the debtor and another are joint tort

feasors or where the nondebtor's liability rests upon his own breach of duty."  *A.H. Robins*, 788

F.2d at 999 (citation omitted); *see also Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076

(3d Cir. 1983) (denying to apply the stay to a joint tortfeasor); *Phar-Mor, Inc. v. Gen. Elec. Capital

Corp.*, 166 B.R. 57, 62 (W.D. Pa. 1994) (denying to apply the stay to independently liable third

---

the expansive relief LTL seeks based on its legal and factual nexus with the protected parties, *Maritime Electric* expressly forecloses that relief, and *McCartney* does not alter that aspect of *Maritime Electric*.

[80]    LTL's argument that the potential for collateral estoppel, res judicata, and evidentiary prejudice warrant application of the stay to non-debtors cannot be squared with the *Maritime Electric*'s prohibition against applying the stay to non-debtor codefendants even if they are in a common legal or factual nexus with the debtor—which is necessary for collateral estoppel, res judicata, and evidentiary prejudice to apply.  In any event, given the numerous pre-bankruptcy adverse talc judgments against J&J, the horse is out of the barn – any risk of preclusion or record taint would already exist.  Notably, there has been no finding that any J&J entity, in any talc case, has ever been subject to any preclusion based on a judgment against a different entity, showing that Debtor's argument on this score is baseless.

    In addition, any identity of interests between LTL and the protected parties was manufactured by LTL's corporate parents in an effort to game the Bankruptcy Code through manipulation and artifice.  *See, e.g.*, *In re Owens Corning*, 419 F.3d 195, 200, 216 (3d Cir. 2005);  *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 129 (3d Cir. 2004); *In SGL Carbon Corp.*, 200 F.3d 154, 157 (3d Cir. 1999); *In re Millennium Lab Holdings II LLC*, 945 F.3d 126, 139 (3d Cir. 2019); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 238 (3d Cir. 2004).  Regardless whether the underlying Texas Two-Step transactions that led to the creation of LTL were legitimate, those collusive transactions cannot then be the basis for extending the stay to the protected parties.  Such a formulation would allow any non-distressed party to engineer receiving the protection of a litigation stay while avoiding the supervision of a bankruptcy court—the definition of artifice.

parties).  As such, the stay should not be extended to any claim where a plaintiff has alleged joint

tortfeasor or independent liability, most notably J&J in many cases.

**Liquidation of Claims**.  LTL also warns that allowing continued litigation against third

parties could also result in an indirect liquidation of claims through actions against third parties

with indemnity rights.  [Adv. Pro. Doc. No. 2, at 59.]  But LTL fails to explain why satisfaction of

a plaintiff's legitimate tort claim by a third party would do anything other than reduce LTL's tort

liability,  in  exchange  for  no  more  than  a  potential  equal  increase  in  LTL's  potential

indemnification liability.  And, to the extent that the third party is J&J—the real party LTL is

attempting to protect in this entire bankruptcy—such a parallel indemnification claim would likely

be subordinated.  While J&J might complain such an outcome would not give J&J the benefits of

bankruptcy it seeks despite being one of the wealthiest and most solvent companies in the world,

LTL would benefit by being able to subordinate an unsecured general liability.

Indemnity Rights Not Clearly Established.  In its LTL 2.0 brief, LTL rehashes the nearly

identical argument in LTL 1.0 concerning Old JJCI's obligation to indemnify J&J, which LTL

claims to have inherited in the Texas Two-Step.  [Adv. Pro. Doc. No. 2, at 11-15.]  Yet when the

Third Circuit dismissed LTL 1.0, it did so on the assumption that LTL's indemnity obligations

were indeed as broad as LTL had indicated.  2023 WL 2760479, at *15 n.16.  However, the Third

Circuit also expressed doubt as to whether these obligations were as solid as LTL indicated:  "For

example, it is not obvious LTL must indemnify J&J for the latter's independent, post-1979 conduct

that is the basis of a verdict rendered against it. . . . It is also not clear the indemnity should be read

to reach punitive damage verdicts rendered against J&J for its own conduct."  *Id*.  The Third Circuit

also cast doubt on whether "Old Consumer assumed responsibility from J&J for *all* claims relating

to Shower to Shower."  *Id*. (emphasis in original).  In response, LTL offers nothing more in LTL

2.0 that would answer any of the Third Circuit questions, much less establish an indemnity right by clear and convincing evidence. Indeed, LTL might even choose to defend against an indemnification claim submitted by J&J for punitive damages by pointing to New Jersey's public policy against indemnification for such damages. *Johnson & Johnson v. Aetna Cas. & Sur. Co.*, 285 N.J. Super. 575, 580-89 (App. Div. 1995). LTL's willingness to give billions of dollars away to its corporate parent also warrants additional skepticism as to whether LTL and its directors are negotiating LTL's obligations in the best interest of LTL's creditors.[81]

### D.     The Stay Under § 362(a)(3) is Inapplicable Here

In addition to invoking § 362(a)(1)'s stay of "actions against the Debtor," LTL also invokes § 362(a)(3)'s stay of "any act to obtain possession of property of the estate," pointing to shared insurance coverage to justify the stay of litigation against hundreds of non-debtors. The Third Circuit has, however, instructed that courts should not just "assume[] that independent claims

---

[81]    The Third Circuit noted the 1979 Agreement's plain language under which the Baby Products Company agreed to assume all "liabilities and obligations of every kind and description *which are allocated on the books or records of J&J* as pertaining to its BABY Division." 2023 WL 2760479, at *15 n.16 (emphasis in original). The phrase "books or records" has a specific meaning in corporate law. N.J.S.A. 14A:5–28 (describing "books," "records," "minutes" and other documents). LTL has never offered any evidence as to which, if any, liabilities were "allocated on the books or records" in 1979. The first talc-related tort case was not filed against J&J until 1982. LTL's chief legal officer testified that he never looked for the 1978 or 1979 books and records. 11-4-21 Tr. 257:23-258:1.

This Court has relied on *Bouton v. Litton Industries, Inc.*, 423 F.2d 643 (3d Cir. 1970). But there the assumption agreement contained broad language referring to "all liabilities and obligations . . . in respect of the contracts and commitments . . . and all other contracts and commitments entered into in the regular and ordinary course of . . . business at any time." *Id.* at 648. The contrast with the 1979 Transfer Agreement is stark.

This Court has also pointed to a practice of intercompany charges between J&J and Old JJCI allocating legal expenses for talc-related litigation. But internal accounting allocations and inter-company payments within the J&J group do not prove legal liability to talc claimants on the part of Old JJCI and thus LTL. At most, such transfers reflect J&J's discretionary decisions about how to account for expenses within the J&J group. J&J's assistant controller testified that J&J's internal allocation is "an accounting decision," not an assessment of legal liability. Ex. 45, at 140:23 (Oct. 30, 2021 Lisman Dep.). The internal allocation does not consider legal liability as assessed by courts. *Id*. at 141:10-142:7; Ex. 46, at 255:20-22, 256:7-256:20 (Nov. 4, 2021 Hearing Tr.). The assistant controller conceded that the allocation of expenses was "subjective," Ex. 45, at 45:7-11 (Oct. 30, 2021 Lisman Dep.); Ex. 21, at 93:14-17, 94:5 (Feb. 16, 2022 Hearing Tr.), and not mandated by GAAP. Ex. 45, at 90:14-17, 139:14-24 (Oct. 30, 2021 Lisman Dep.). LTL's chief legal officer testified which entity (J&J or Old JJCI) paid a specific expense was a matter of "administrative convenience." Ex. 46, at 255:23-256:6 (Nov. 4, 2021 Hearing Tr.).

against [non-debtors] would reduce the insurance proceeds available to the estate." *Combustion Eng'g*, 391 F.3d at 232-33 (finding no "related to" jurisdiction in the absence of "factual findings regarding the terms, scope or coverage of the allegedly shared insurance policies"). But LTL admits in its motion that its purported coverage is illusory, with Mr. Kim declaring that "none of [the] insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid the costs of defense, or indemnified J&J or Old JJCI for settlements or judgments." (Kim Decl. II ¶ 48.) Because the carriers are currently disputing coverage—even filing a declaratory action which LTL now claims is stayed—there is no actual present risk of depletion of available insurance proceeds. That speculative risk fails to provide a basis for extending the automatic stay. *See Combustion Eng'g*, 391 F.3d at 226; *Phar-Mor*, 164 B.R. at 906; *In re Imerys Talc America, Inc.*, 2019 WL 3253366, at *2–9 (D. Del. 2019).[82] Moreover, even if coverage exists, LTL has failed to show that the $2 billion policy limit was not overtopped by the $3.5 billion in talc judgments and settlements J&J paid in the five years before LTL filed for bankruptcy in LTL 1.0.

## III.    LTL IS NOT ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF UNDER § 105 OF THE BANKRUPTCY CODE

LTL also requests that this Court preliminarily enjoin, under 11 U.S.C. § 105, defendants in the adversary proceeding "from commencing or prosecuting Debtor Talc Claims against the Protected Parties." [Adv. Pro. Dkt. 2, at 83.] The scope of the injunction sought should not be understated—LTL seeks a nationwide injunction against thousands of cases and potential cases brought by tens of thousands of tort victims against hundreds of solvent entities—including some

---

[82]    To the extent that the Court concludes that the alleged shared insurance proceeds do constitute property of the estate, the Debtor still has not proven that it would impact the Debtor's property, as the Court can fashion relief to protect the purported shared insurance policies, including preventing any party claiming an interest in the proceeds (such as J&J) from making a claim to the proceeds of the policies absent relief from the Debtor's automatic stay. *See Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 337-38 (Bankr. S.D.N.Y. 1996) ("We are not convinced that an action by a third party to recover a judgment against another third party, whose liability may be covered under an insurance policy that also grants the debtor separate rights, implicates the automatic stay.").

of the richest corporations in America—based on J&J's attempt to manufacture a financially distressed subsidiary created solely for the purpose of obtaining this injunction.  The Third Circuit has promulgated a two-step analytic process for any bankruptcy court considering whether to issue a § 105(a) injunction:  First, the court must determine whether it has an independent source of federal subject matter jurisdiction to enter the requested injunction.  *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 591 F.3d 164, 170 (3d Cir. 2009).  Second, the court must then consider the merits of the requested injunction.  *Id.*  LTL's requested injunction, disrupting proceedings in hundreds of sister federal and state courts entitled to comital respect by this Court, is outside the limited jurisdiction of this federal court, and is any event not warranted by the circumstances of LTL 2.0.

### A.     The Court Does Not Have Subject Matter Jurisdiction to Issue the Requested Injunction Enjoining Actions Between Non-Debtors

Because federal courts are of limited jurisdiction, they have a continuing non-waivable independent obligation to determine that subject matter jurisdiction exists, even in the absence of a challenge from a party.  *See, e.g.*, *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 267 (3d Cir. 2016); *Superior Contracting Group Inc. v. Rachmale (In re LTC Holdings, Inc.)*, 587 B.R. 25, 29 (Bankr. D. Del. 2018) (confirming that this duty extends to bankruptcy courts).  Parties cannot consent to jurisdiction, *Hartig Drug*, 836 F.3d at 267, nor can any "action of the parties [] confer subject-matter jurisdiction upon a federal court." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).  A party asserting jurisdiction bears the burden of the necessary jurisdictional facts.  *See Nuveen Mun. Tr. v. WithumSmith Brown, P.C.*, 692 F.3d 283, 293 (3d Cir. 2012).

Because it is well settled that "§ 105 does not provide an independent source of federal subject matter jurisdiction," the Court must determine that jurisdiction "exist[s] independently of

any [request to] enjoin claims against non-debtors" *Combustion Eng'g*, 391 F.3d at 224-25. Pursuant to 28 U.S.C. § 1334(b), a bankruptcy court has jurisdiction over (i) cases under the Bankruptcy Code, as well as all matters or proceedings that (ii) "arise under" the Bankruptcy Code; (iii) "arise in" a case under the Bankruptcy Code—the "core" proceedings—or (iv) "relate to" a proceeding under the Bankruptcy Code—commonly referred to as "related-to jurisdiction." *Phila. Newspapers*, 407 B.R. at 612; *Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006).

In order for a § 105 injunction to issue to stay a proceeding involving non-debtors, the bankruptcy court must establish jurisdiction (core or related-to) over the subject case, rather than ending the inquiry over whether the bankruptcy court has jurisdiction simply over the adversary proceeding in which the injunction is sought. *In re W.R. Grace*, 591 F.3d at 174 ("If we were to accept Grace and Montana's position, however, a bankruptcy court would have power to enjoin any action, no matter how unrelated to the underlying bankruptcy it may be, so long as the injunction motion was filed in the adversary proceeding. . . . The existence of a bankruptcy proceeding itself has never been and cannot be an all-purpose grant of jurisdiction.") (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 692 (1986)). The question is therefore not whether § 362 is a "core-proceeding" or whether the court has jurisdiction over the adversary proceeding filed by LTL, but rather whether the bankruptcy court has core or related-to jurisdiction over the claims in the tort cases sought to be enjoined. *In re W.R. Grace*, 591 F.3d at 174.

As the Third Circuit has explained, a "core" proceeding is one where the Bankruptcy Code creates the cause of action or provides the substantive right being invoked, or if such proceeding has "no existence outside of the bankruptcy." *Stoe v. Flaherty*, 436 F.3d at 216 (citing *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999), and *U.S. Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999)). In *Stoe*, the Third Circuit looked to the source of the

underlying claims at issue—Pennsylvania state law—and determined that they were not "core" claims because they arose outside bankruptcy law and could exist outside bankruptcy court, even though application of the Bankruptcy Code was a potential defense. 436 F.3d at 217-18. LTL cannot deny that the tort claims in the litigation they seek to enjoin arose outside bankruptcy law and could exist outside bankruptcy court. Indeed, the entire point of this bankruptcy is to halt that pre-existing non-bankruptcy litigation. This Court therefore does not have "core" subject matter jurisdiction to issue the § 105 injunction.

That leaves "related-to" jurisdiction as the only potential source of jurisdiction for this Court, but that too fails under a long line of controlling law. Four times, the Third Circuit declined to extend related-to jurisdiction to cases against non-debtors in asbestos bankruptcy cases, even when the third party had an indemnification right against the estate. *Pacor Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984); *In re Federal–Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002); *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004); *In re W.R. Grace*, 591 F.3d 164. In *Combustion Eng'g*, for example, the Third Circuit rejected the arguments (similar to the arguments here) that related-to jurisdiction could be established by a "unity of interest" between the debtor and non-debtors, based in part on "joint operations at single sites leading to the asbestos personal injury claims at issue" and "extensive financial inter-dependence." 391 F.3d at 230. The Third Circuit has rejected Debtor's other justifications for relief as well. *See, e.g., In re W.R. Grace*, 591 F.3d at 172 (debtor "will not be bound by any judgment against the third party in question"); *Pacor*, 743 F.2d at 995 ("Since Manville is not a party to the Higgins-Pacor action, it could not be bound by res judicata or collateral estoppel").

Even if an indemnification right by the proposed protected parties could be the basis for related-to jurisdiction, and it cannot, that right only exists against this Debtor because of the

allocation of agreements on the eve of the bankruptcy filing solely for the purpose of issuing the proposed injunction. Such a fabrication cannot be the basis for this Court's jurisdiction, as it runs afoul of the longstanding principle that federal jurisdiction cannot be manufactured. *See In re Combustion Eng'g, Inc.*, 391 F.3d at 228 (holding that, in an asbestos case, a debtor could not create subject matter jurisdiction over an affiliate simply by assignment).[83] The lack of subject matter jurisdiction ends the inquiry—the Court is a federal court of limited jurisdiction without the power to issue the requested injunction, and for that reason alone LTL's request should be denied.

### B.    The Debtor Has Not Satisfied Its Burden of Establishing the Requirements for Granting the Extraordinary Relief of a Preliminary Injunction

Even if the Court had jurisdiction to enter the § 105 injunction proposed by LTL, and it does not, LTL has failed to establish the requirements necessary for injunctive relief. The Third Circuit has recognized that § 105 can operate to enjoin proceedings that are excepted from the § 362 automatic stay (such as those against non-debtors), *provided that* the movant "meet[s] the standards for injunctive relief." *Wedgewood Realty Group*, 878 F.2d at 701.[84] A preliminary injunction—even one that is a fraction of the breadth requested here—is "an extraordinary

---

[83]    The Third Circuit has also made clear that "related to" bankruptcy jurisdiction exists only where "the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit." *Federal–Mogul*, 300 F.3d at 382; *see also Combustion Eng'g*, 391 F.3d at 231–32; *In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (Bankr. E.D. Pa. 2013) ("The existence of an indemnification agreement between a defendant in a proceeding outside the bankruptcy action and a non-party bankrupt debtor does not automatically supply the nexus necessary for the exercise of 'related to' jurisdiction. Only when the right to indemnification is clearly established and has accrued upon the filing of a civil action is the proceeding deemed 'related to' the bankruptcy case.") (citing *Federal–Mogul,* 300 F.3d at 382); *Imerys*, 2019 WL 3253366, at *3.

[84]    Federal stays of state-court litigation are strongly disfavored. The bankruptcy stay is a narrow exception to the otherwise "absolute prohibition against any injunction of any state-court proceedings." *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630 (1977); *see* 28 U.S.C. § 2283. That prohibition reflects the "fundamental principle of a dual system of courts" and respect for the sovereign authority of the States and their courts. *Atl. Coast Line R. Co. v. Bhd. of Locomotive Engineers*, 398 U.S. 281, 285-86, 297 (1970). That principle of respecting state-court autonomy weighs strongly in favor of returning jurisdiction to them to exercise as they see fit, not further extending federal "intervention." *Id.* at 296-97. *See In re Magnus Harmonica Corp.*, 237 F.2d 867, 869 (3rd Cir. 1956) (citing § 2283 in declining to enjoin a state-court lawsuit between a bankruptcy creditor and third party with related indemnity rights against the bankruptcy estate, and finding that bankruptcy court's "control is unaffected by whatever goes on outside the bankruptcy court in litigation between one of the bankrupt's creditors and a party who has independent liability on one of the bankrupt's contracts. . . . If the creditor wins the state suit . . . [the third parties] may find themselves having to satisfy their obligation [without being] fully repaid").

46

remedy." *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) ("injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course"); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989) (same); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson – Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578 (3d Cir. 2002) (same); *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151 (3d Cir. 1999) (same).

To obtain a preliminary injunction, LTL must establish *each* of the traditional four elements: (1) a reasonable likelihood of a successful plan of reorganization; (2) irreparable harm to its ability to reorganize without the requested relief; (3) that the relative balance of the harms weighs in favor of granting the injunction; and (4) that the requested relief would serve the public interest. *See Phila. Newspapers*, 407 B.R. at 617 (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)); *In re G-I Holdings Inc.*, 420 B.R. 216, 281 (D.N.J. 2009). Given the extraordinary nature of preliminary injunctive relief, the burden of proof is on LTL, to establish, by clear and convincing evidence, each of the foregoing elements. *See Phila. Newspapers*, 407 B.R. at 616-17. While the failure to establish even one factor must doom LTL's requested relief, LTL cannot establish any of the four elements.

***First***, as set forth in detail in Part I, *supra*, the entire enterprise of LTL 2.0 is infected with bad faith. LTL simply was not in financial distress from an asset or a liability side at the time of its filing, notwithstanding its efforts to give away over $50 billion in value in just two hours. Contrary to "fixing" the flaws identified by the Third Circuit in LTL 1.0, as LTL disingenuously claims now, this bankruptcy is rooted in even less good faith than LTL 1.0. There is no reasonable likelihood that any plan will survive because the entire bankruptcy must be dismissed. And, in any event, as the U.S. Trustee wisely noted at the First Day Hearing on April 11, the level of

47

support proffered by LTL may be far less than indicated, and the opposition far greater, further dooming the likelihood of a successful confirmation.

***Second***, any allegation of irreparable harm—which must include more than merely monetary harm—has been foreclosed by the Third Circuit's opinion in LTL 1.0.  The Court expressly stated that further talc litigation would facilitate rather than hinder reorganization:

> Risks associated with premature filing may be particularly relevant in the context of a mass tort bankruptcy. Inevitably those cases will involve a bankruptcy court estimating claims on a great scale—introducing the possibility of undervaluing future claims (and underfunding assets left to satisfy them) and the difficulty of fairly compensating claimants with wide-ranging degrees of exposure and injury. On the other hand, a longer history of litigation outside of bankruptcy may provide a court with better guideposts when tackling these issues . . . .

2023 WL 2760479, at *10.  The Third Circuit noted, for example, that the A.H. Robins bankruptcy "had the benefit of data from 15 years of tort litigation by A.H. Robins before its filing." *Id.* at *10 n.13.

Irreparable harm cannot be established by a course of action specifically recommended by the Third Circuit.  And, as defense counsel in the Valadez case demonstrated at the First Day Hearing, the protected parties are more than capable of defending themselves.  Litigation is not irreparable harm.  The possibility of having to pay money damages is not irreparable harm. *See, e.g., Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expenses, even substantial and unrecoupable cost, does not constitute irreparable injury.").

Moreover, because the surrender of the 2021 Funding Agreement is avoidable and otherwise subject to being unwound, the prosecution of claims against non-debtors cannot impact LTL's estate.  *See 3M Occupational Safety LLC v. Those Parties Listed on Appendix A to the Complaint (In re Aearo Technologies LLC)*, 642 B.R. 891, 911-12 (Bankr. S.D. Ind. 2022), appeal

pending, No. 22-2606 (7th Cir.) (denying § 105(a) relief where debtor protected by funding agreement).

Nor has the Debtor ever tried to make any concrete showing to support its speculation that continued litigation against J&J would somehow otherwise impair the Debtor's ability to reorganize.  The Debtor has no business to reorganize.  The Debtor's skeletal staff no longer have any responsibilities for products liability claims brought against J&J.  Any "distraction" could occur only if the Debtor's seconded staff insinuated themselves in J&J's defense of talcum powder claims, and of course, the Debtor cannot manufacture its own impairment of estate administration to justify extension of the stay. *See In re Aearo Technologies LLC*, 642 B.R. at 911 (rejecting argument that litigation would "create a significant distraction" where "Aearo and 3M have been embroiled in the MDL for over three years").

***Third***, the balance of harms heavily favors allowing litigation by tort victims to proceed, who are continuing to die as LTL continues abusing the bankruptcy process for delay.  Hundreds perished during the pendency of the first bankruptcy.  In *Gold v. Johns-Manville Sales Corp.*, the Third Circuit declined to stay actions against Johns Manville's co-defendants, citing the "hardship" to victims from "being forced to wait for an indefinite and ... lengthy time before their cases are heard," while "plaintiffs and crucial witnesses are dying, often from the very diseases" that led to that litigation.  723 F.2d 1068, 1076 (3d Cir. 1983).  Delay in their ability to pursue compensation and support for medical expenses is "'substantial and irreparable injury.'"  *United Steelworkers of Am. v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir. 1979).

LTL's brief blithely dismisses the extreme prejudice suffered by tort victims whose cases are ready to be litigated now, instead attempting to misdirect the Court by stating that "it would take decades to resolve them all." (Mem. at 78.)  LTL then argues that there is no harm at all by

denigrating the "tort system"—in other words, the American justice system—as "likely to harm

claimants." (*Id.* at 79.)  This Court should not countenance an ad hominem attack of federal and

state courts all around the country, which are entitled to comital respect, especially where the Third

Circuit has indicated that further talc litigation would help reorganization.

The injuries suffered by the affected victims are real. In *Ingham*, the appellate court

eloquently described the devastation experienced by these victims in describing what it found to

be J&J's "reprehensible" conduct:

> The harm suffered by Plaintiffs was physical, not just economic. Plaintiffs each
> developed and suffered from ovarian cancer. Plaintiffs underwent chemotherapy,
> hysterectomies, and countless other surgeries. These medical procedures caused
> them to experience symptoms such as hair loss, sleeplessness, mouth sores, loss of
> appetite, seizures, nausea, neuropathy, and other infections. Several Plaintiffs
> died, and surviving Plaintiffs experience recurrences of cancer and fear of relapse.
> All Plaintiffs suffered mentally and emotionally. Their ovarian cancer diagnoses
> caused them constant worry and fear.

*Ingham*, 608 S.W.3d at 721.  The harms to these victims deserve to be taken seriously, without

J&J's patronizing denigration of their choice to avail themselves of the American justice system.

*Fourth*, LTL's argument that the public interest is served by denying citizens of this

country their constitutional rights to have their day in court turns the very concept of public interest

on its head.  The public interest is not served by LTL's invitation to this Court to usurp the

policymaking function that properly belongs in the democratic process, rather than J&J's attempt

to unilaterally and undemocratically implement its self-serving form of tort reform via this filing.

The public interest is served by letting the American justice system continue to function without

intentional interference by one of the world's most powerful corporations.  The public interest is

served by giving claimants their right to a jury trial ensconced in the Seventh Amendment.  LTL's

proposed injunction is therefore not warranted under any of the traditional four injunctive relief

elements that apply to § 105, and its request should be denied.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Committee respectfully requests that the Court deny

the Motion in its entirety.

Respectfully submitted,

**GENOVA BURNS LLC**

Dated: April 17, 2023

By: <u>*/s/ Daniel M. Stolz*</u>
    Daniel M. Stolz, Esq.
    Donald W. Clarke, Esq.
    110 Allen Road, Suite 304
    Basking Ridge, NJ 07920
    Tel: 973-467-2700
    Fax: 973-467-8126
    Email:   dstolz@genovaburns.com
            dclarke@genovaburns.com

*Proposed Local Counsel to the Official*
*Committee of Talc Claimants*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Proposed Local Counsel to the Official<br>Committee of Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael S. Winograd, Esq.<br>Eric R. Goodman, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>egoodman@brownrudnick.com<br>Seven Times Square<br>New York, NY 10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Jeffrey L. Jonas, Esq.<br>Sunni P. Beville, Esq.<br>jjonas@brownrudnick.com<br>sbeville@brownrudnick.com<br>One Financial Center<br>Boston, MA 02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Proposed Co-Counsel for the Official<br>Committee of Talc Claimants* |
| **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>Rachel S. Morse, Esq.<br>jmassey@masseygail.com<br>rmorse@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC 20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br><br>*Proposed Special Counsel for the Official<br>Committee of Talc Claimants* | **OTTERBOURG P.C.**<br>Melanie L. Cyganowski, Esq.<br>Richard G. Haddad, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>David A. Castleman, Esq.<br>mcyganowski@otterbourg.com<br>rhaddad@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>dcastleman@otterbourg.com<br>230 Park Avenue<br>New York, NY 10169<br>Tel: (212) 661-9100<br>Fax: (212) 682-6104<br>*Proposed Co-Counsel for Official<br>Committee of Talc Claimants* |

Chapter 11

In re:

**LTL MANAGEMENT LLC,** [1]

               Debtor.

Case No.: 23-12825 (MBK)

Honorable Michael B. Kaplan

**LTL MANAGEMENT LLC,**

               Plaintiff,

    v.

**THOSE PARTIES LISTED ON
APPENDIX A TO COMPLAINT
and JOHN AND JANE
DOES 1-1000,**

               Defendants.

Adv. Pro. No. 23-01092 (MBK)

### DECLARATION OF DANIEL M. STOLZ IN SUPPORT OF
### OBJECTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS
### TO DEBTOR'S MOTION FOR AN ORDER
### (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS TO
### CERTAIN ACTIONS AGAINST NON-DEBTORS,
### (II) PRELIMINARILY ENJOINING SUCH ACTIONS, AND
### (III) GRANTING A TEMPORARY RESTRAINING
### ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY INJUNCTION

       I, Daniel M. Stolz, pursuant to 28 U.S.C. § 1746, declare, under penalty of perjury, that

the following is true and correct:

       1.     I am a partner with law firm Genova Burns LLC, proposed local counsel to the

Official Committee of Talc Claimants (the "**TCC**" or "**Committee**").

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

2. I submit this declaration to place in the record on the *Debtor's Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on a Preliminary Injunction* [Adv. Pro. Dkt. No. 2] (the "Motion") certain documents that have not been previously submitted in connection with the Motion.

3. Attached hereto as Exhibit 1, **filed under seal**,[2] is a true and correct copy of a document entitled "Minutes of Board of Managers" dated April 2, 2023, bearing Bates numbers LTLMGMT-00000006 to LTLMGMT-00000019 produced by the Debtor in this Adversary Proceeding.

4. Attached hereto as Exhibit 2 is a true and correct copy of the March 31, 2023 Judgment and Mandate issued by the United States Court of Appeals for the Third Circuit in *In re LTL Management LLC*, Case No. 22-2003, Dkt. 181-1.

5. Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the Motion to Stay Mandate filed on March 22, 2023 by LTL Management LLC with the United States Court of Appeals for the Third Circuit in *In re LTL Management LLC*, Case No. 22-2003, Dkt. 173.

6. Attached hereto as Exhibit 4 is a true and correct copy of the March 31, 2023 Order entered by the United States Court of Appeals for the Third Circuit denying the Motion to Stay Mandate filed by LTL Management LLC in *In re LTL Management LLC*, Case No. 22-2003, Dkt. 180.

---

[2] The Committee is filing this exhibit and certain other exhibits under seal given the designation of the document as confidential by LTL Management LLC (the "Debtor"), pending the entry of a protective order in this case. By filing these exhibits under seal, the Committee does not waive any rights as to the confidentiality designation or use of any such exhibit, and expressly reserves all applicable rights.

7.      Attached hereto as Exhibit 5, **filed under seal**, is a true and correct copy of excerpts of the transcript of the deposition of John K. Kim taken on April 14, 2023, in this Adversary Proceeding, subject to the reservation of rights as stated in note 2, *supra*.

8.      Attached hereto as Exhibit 6 is a true and correct copy of excerpts of the transcript of the deposition of John K. Kim taken on April 14, 2023, in this Adversary Proceeding, with certain portions redacted pursuant to Debtor's confidentiality designations, subject to the reservation of rights as stated in note 2, *supra*.

9.      Attached hereto as Exhibit 7 is a true and correct copy of excerpts of the transcript of proceedings held on February 18, 2022 in the bankruptcy case *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.).

10.      Attached hereto as Exhibit 8 is a true and correct copy of excerpts of the transcript of proceedings held on April 11, 2023 in the bankruptcy case *In re LTL Management LLC*, Case No. 23-12825 (MBK) (Bankr. D.N.J.).

11.      Attached hereto as Exhibit 9, **filed under seal**, is a true and correct copy of a presentation dated April 2, 2023, bearing Bates numbers LTLMGMT-00000260 to LTLMGMT-00000271 produced by the Debtor in this Adversary Proceeding, subject to the reservation of rights as stated in note 2, *supra*.

12.      Attached hereto as Exhibit 10 is a true and correct copy of excerpts of the transcript of proceedings held on September 19, 2022 before the United States Court of Appeals for the Third Circuit in *In re LTL Management LLC*, Case No. 22-2003.

13.      Attached hereto as Exhibit 11 is a true and correct copy of the Amended and Restated Funding Agreement dated October 12, 2021.

14.     Attached hereto as Exhibit 12, **filed under seal**, is a true and correct copy of a presentation dated March 28, 2023, bearing Bates numbers LTLMGMT-00000233 to LTLMGMT-00000259 produced by the Debtor in this Adversary Proceeding, subject to the reservation of rights as stated in note 2, *supra.*

15.     Attached hereto as Exhibit 13 is a true and correct copy of Trial Ex. No. 600.028, admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (transcript of July 30, 2019 proceeding in *Hayes v. Colgate Palmolive Co.*, Case No. 16-CI-03503 (Ky. Cir. Ct. Jefferson Jul. 30, 2019), Testimony of Dr. John Hopkins [excerpt in original: pages 49-56]).

16.     Attached hereto as Exhibit 14 is a true and correct copy of Trial Ex. No. 601.006, admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.) (transcript of proceeding in *Olson v. J&J et al.*, Supreme Court of New York County, New York; Index No. 190328/2017; May 3, 2019, Testimony of Dr. John Hopkins [excerpt in original: pages 7743-7753; 7831-7833]).

17.     Attached hereto as Exhibit 15 is a true and correct copy of the Trial Ex. No. 601.012 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.) (J&J "What We Know" Advertisement Review Email 12/17/2018).

18.     Attached hereto as Exhibit 16 is a true and correct copy of the Trial Ex. No. 601.013 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.) (J&J Letter to U.S. House Subcommittee 3/11/2019).

19.     Attached hereto as Exhibit 17 is a true and correct copy of the Trial Ex. No. 601.014 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.) (Screenshot of J&J CEO Alex Gorsky Twitter Video December 2018) (video available upon request to counsel).

20.     Attached hereto as Exhibit 18 is a true and correct copy of the Trial Ex. No. 601.015 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.) (CNN "Mad Money" Screenshot Featuring J&J CEO Alex Gorsky).

21.     Attached hereto as Exhibit 19 is a true and correct copy of the Trial Ex. No. 601.173 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.) (2018 Draft Screening Assessment on Talc - Health Canada [excerpt in original: pages i-v; 1-10]).

22.     Attached hereto as Exhibit 20 is a true and correct copy of the Trial Ex. No. 601.174 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (2021 Final Screening Assessment on Talc - Health Canada [excerpt in original: pages i-v; 1-5])

23.     Attached hereto as Exhibit 21 is a true and correct copy of excerpts of the transcript of proceedings held on February 16, 2022 in the bankruptcy case *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.).

24.     Attached hereto as Exhibit 22 is a true and correct copy of excerpts of the October 14, 2021 Informational Brief of LTL Management LLC, filed in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.), Dkt. 3.

25.     Attached hereto as Exhibit 23 is a true and copy of the October 14, 2021 Declaration of John K. Kim in Support of First Day Pleadings filed in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.), Dkt. 5.

26.     Attached hereto as Exhibit 24 is a true and correct copy of the Trial Ex. No. 601.001 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.) (*Barden et al. v. Brenntag et al.* Transcript 7/22/2019 [excerpt: pages 41-47]).

27.     Attached hereto as Exhibit 25 is a true and correct copy of the Trial Ex. No. 601.003 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Transcript of

Deposition of John Hopkins in *In re LAOSD Asbestos Cases*, Superior Court of Los Angeles County, California; J.C.C.P. No. 4674; 4/11/2018 [excerpt: pages 37-39]).

28.     Attached hereto as Exhibit 26 is a true and correct copy of excerpts of the Trial Ex. No. 377 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Expert Report of Matthew Diaz).

29.     Attached hereto as Exhibit 27 is a true and correct copy of the Joint Stipulation and Agreed Order Between Movants and Debtor Regarding the Admission of Deposition Designations at Motion to Dismiss Trial filed in *In re LTL Management LLC*, Case No. 21-30589 (MBK), Dkt. 1566 [Excerpt pages in original: 1-7, 17-18, 25-26, 134-141 (David Kaplan deposition transcript), 195-196 (John Kim 30(b)(6) deposition transcript)].

30.     Attached hereto as Exhibit 28 is a true and correct copy of the Trial Ex. No. 332 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Expert Report of Saul E. Burian).

31.     Attached hereto as Exhibit 29 is a true and correct copy of the Trial Ex. No. 746 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (David Kaplan Notes re: Johnson & Johnson (7.19.21)).

32.     Attached hereto as Exhibit 30 is a true and correct copy of the Trial Ex. No. 110 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Email re: Litigation follow-up).

33.     Attached hereto as Exhibit 31 is a true and correct copy of excerpts of the transcript of proceedings held on February 15, 2022 in the bankruptcy case *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.).

34. Attached hereto as Exhibit 32 is a true and correct copy of excerpts of the transcript of proceedings held on February 14, 2022 in the bankruptcy case *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Bankr. D.N.J.).

35. Attached hereto as Exhibit 33 is a true and correct copy of the Monthly Operating Report of LTL Management LLC filed in *In re LTL Management LLC*, Case No. 21-30589 (MBK), Dkt. 548.

36. Attached hereto as Exhibit 34 is a true and correct copy of deposition designations of John Kim submitted to this Court in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Doc. 1566).

37. Attached hereto as Exhibit 35 is a true and correct copy of the Trial Ex. No. 23 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (Minutes of Board of Managers).

38. Attached hereto as Exhibit 36 is a true and correct copy of the Trial Ex. No. 601.132 admitted at trial in *In re LTL Management LLC*, Case No. 21-30589 (MBK) (J&J Form 8-K, dated October 19, 2021).

39. Attached hereto as Exhibit 37 is a true and correct copy of excerpts of Debtor's Omnibus Reply In Support of Motion for an order (I) Declaring That the Automatic Stay Applied to Certain Actions Against Non-Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing filed in *LTL Management LLC v. Those Parties Listed On Appendix A To Complaint et al. (In re LTL Management LLC)*, Ad. Pro. No. 21-03032 (MBK), Dkt. 146.

40.     Attached hereto as Exhibit 38 is a true and correct copy of the Notice of Debtor's Intent Regarding Appeals filed in *In re LTL Management LLC*, Case No. 21-30589 (MBK), Dkt. 3939.

41.     Attached hereto as Exhibit 39 is a true and correct copy of the Order Dismissing Debtor's Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b); (II) Establishing Procedures with Respect to Request for Compensation; and (III) Granting Related Relief filed in *In re LTL Management LLC*, Case No. 21-30589 (MBK), Dkt. 3938.

42.     Attached hereto as Exhibit 40, **filed under seal**, is a true and correct copy of excerpts of the transcript of the deposition of Erik Haas taken on April 14, 2023, in this Adversary Proceeding, subject to the reservation of rights as stated in note 2, *supra*.

43.     Attached hereto as Exhibit 41, **filed under seal**, is a true and correct copy of excerpts of the transcript of the deposition of Adam Pulaski taken on April 15, 2023, in this Adversary Proceeding, subject to the reservation of rights as stated in note 2, *supra*.

44.     Attached hereto as Exhibit 42 is a true and correct copy of excerpts of the Brief for Debtor-Appellee filed with the United States Court of Appeals for the Third Circuit in *In re LTL Management LLC*, Case No. 22-2003, Dkt. 104.

45.     Attached hereto as Exhibit 43 is a true and correct copy of excerpts of a transcript of an oral argument held before the United States Court of Appeals for the Seventh Circuit, in a case captioned *In re Aereo Technologies, LLC, et al.*, Case No. 22-2606.

46.     Attached hereto as Exhibit 44 is a true and correct copy of the Objection of The Official Committee of Talc Claimants to the Debtor's Motion for an order (I) Declaring That the Automatic Stay Applied to Certain Actions Against Non-Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing filed in

*LTL Management LLC v. Those Parties Listed On Appendix A To Complaint et al. (In re LTL Management LLC)*, Ad. Pro. No. 21-03032 (MBK), Dkt. 142.

47.     Attached hereto as Exhibit 45 is a true and correct copy of excerpts of the transcript of the October 30, 2021 deposition of Adam Lisman.

48.     Attached hereto as Exhibit 46 is a true and correct copy of excerpts of the transcript of proceedings held on November 21, 2021 in the bankruptcy case *In re LTL Management LLC*, Case No. 21-30589.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York State on April 17, 2023.

*/s/ Daniel M. Stolz*
Daniel M. Stolz

# EXHIBIT 1

# UNDER SEAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-0007,
22-2008, 22-2009, 22-2010, 22-2011

———————

In re:  LTL MANAGEMENT, LLC

Debtor

LTL MANAGEMENT, LLC

v.

THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT
AND JOHN AND JANE DOES 1-1000

*OFFICIAL COMMITTEE OF TALC CLAIMANTS,
Appellant in case Nos. 22-2003, 22-2004 and 22-2005

*OFFICIAL COMMITTEE OF TALC CLAIMANTS; PATRICIA COOK;
EVAN PLOTKIN; RANDY DEROUEN; KRISTIE DOYLE,
as estate representative of Dan Doyle; KATHERINE TOLLEFSON;
TONYA WHETSEL, as estate representative of Brandon Wetsel;
GIOVANNI SOSA; JAN DEBORAH MICHELSON-BOYLE,
Appellants in case Nos. 22-2006, 22-2007 and 22-2008

ARNOLD & ITKIN LLP, on behalf of certain personal injury
claimants represented by Arnold & Itkin,
Appellant in case No. 22-2009

AYLSTOCK WITKIN KREIS & OVERHOLTZ PLLC, on behalf of more
than three thousand holders of talc claims,
Appellant in case Nos. 22-2010 and 22-2011

*(Amended per Court's Order dated 06/10/2022)

———————

Appeal from the United States Bankruptcy Court
for the District of New Jersey
(District Court No.:  21-bk-30589; 21-ap-03032)
Bankruptcy Judge:  Honorable Michael B. Kaplan

_____

Argued September 19, 2022

Before AMBRO, RESTREPO, and FUENTES, <u>Circuit Judges</u>

## <u>JUDGMENT</u>

These cases came to be heard on the record before the United States Bankruptcy
Court for the District of New Jersey and were argued on September 19, 2022.

On consideration whereof, IT IS ORDERED AND ADJUDGED by this Court that
the order of the Bankruptcy Court entered March 2, 2022 is reversed and the case is
remanded with the instruction to dismiss Appellee's Chapter 11 petition. The order of the
Bankruptcy Court entered March 4, 2022 is vacated as moot. Costs taxed against the
Appellee.

All of the above in accordance with the Opinion of this Court.

ATTEST:

s/ Patricia S. Dodszuweit
Clerk

Dated: January 30, 2023

Certified as a true copy and issued in lieu
of a formal mandate on ___03/31/2023___

Teste: *Patricia A. Dodszuweit*
**Clerk, U.S. Court of Appeals for the Third Circuit**

Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011

IN THE

# United States Court of Appeals
# for the Third Circuit

———————————

IN RE: LTL MANAGEMENT LLC,

*Debtor*

———————————

*OFFICIAL COMMITTEE OF TALC CLAIMANTS,

*Appellant*

*(Amended per Court's Order dated 06/10/2022)

———————————

On direct appeal from the United States Bankruptcy Court
for the District of New Jersey, No. 21-30589, Adv. Proc. No. 21-3023

———————————

## MOTION TO STAY THE MANDATE

———————————

GREGORY M. GORDON
BRAD B. ERENS
DAN B. PRIETO
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201

C. KEVIN MARSHALL
DAVID S. TORBORG
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

NEAL KUMAR KATYAL
SEAN MAROTTA
WILLIAM E. HAVEMANN
JO-ANN TAMILA SAGAR
PATRICK C. VALENCIA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

March 22, 2023

*Counsel for LTL Management LLC*

## MOTION TO STAY THE MANDATE PENDING THE FILING AND DISPOSITION OF A PETITION FOR A WRIT OF CERTIORARI

Debtor LTL Management LLC intends to seek certiorari of the Court's judgment.  To avoid the chaos that would occur if LTL's petition were dismissed by the Bankruptcy Court then reinstated by the Supreme Court, LTL respectfully requests the Court stay the mandate pending LTL's filing of its petition and until the Supreme Court's final disposition.  *See* Fed. R. App. P. 41(d).  Appellants all oppose the motion.

## INTRODUCTION

"Courts have not been unanimous about what constitutes 'good faith' in the Chapter 11 filing context."  *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999).  The Court found that LTL's petition did not meet this standard, Op. 54, but acknowledged that LTL had "[g]ood intentions" and a "sincerely held" belief that bankruptcy was justified, Op. 18, 56.

All of that would have forced a different outcome in the Fourth Circuit where "a lack of good faith" requires both " 'objective futility' and 'subjective bad faith.' "  *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 279-280 (4th Cir. 2007) (quoting *Carolin Corp. v. Miller*, 886 F.2d 693, 700-701(4th Cir. 1989)); *see also In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) (considering both "financial condition[s]" and "motives").  And while the Court treated good faith as "essentially[]" a question of law reviewed de novo, Op. 33 (citation omitted), its

1

sister circuits review a bankruptcy court's good-faith finding under "the clearly

erroneous standard," *Premier Auto. Servs.*, 492 F.3d at 279 (quoting *Carolin*

*Corp.*, 886 F.2d at 702); *accord In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379

(8th Cir. 2000); *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994).

Because, as the Bankruptcy Court put it, one "cannot help but ponder how a

bankruptcy filing, which took place in North Carolina and most likely satisfied the

good faith standards under the applicable law in that jurisdiction, suddenly morphs

post-petition into a bad faith filing simply because the case travels 400 miles up I-

95 to Trenton, New Jersey," A13, there is a very real possibility the Supreme Court

will grant certiorari to reverse the panel's decision and provide much-needed

clarity regarding the good-faith standard. *See* Fed. R. App. P. 41(d)(2); *see also*

*Nara v. Frank*, 494 F.3d 1132, 1133 (3d Cir. 2007). The Court obviously believes

in the correctness of its decision. But it should nonetheless stay the mandate

because the issues here are important, unsettled, and subject to reasonable

"debat[e]." *American Mfrs. Mut. Ins. Co. v. American Broad.-Paramount*

*Theatres, Inc.*, 87 S. Ct. 1, 2 (1966) (Harlan, J., in chambers).

Finally, if the mandate issues, and then the Supreme Court reviews and

reverses, chaos and confusion will ensue. The Bankruptcy Court will have to pick

up where it left off after having dismantled the infrastructure that supported the

bankruptcy case. The Bankruptcy Court will dissolve the TCC, who then will not

have the opportunity to respond to LTL's certiorari petition; will approve final fee

arrangements; and will discharge the fee examiner and future claims

representative, all for naught. Meanwhile in courts across the country, claimants

and LTL will need to move cases forward once more at the risk that they could be

stayed again, this time mid-trial. This bankruptcy is large and affects a lot of

people in a lot of ways. The Court should preserve the status quo until the

Supreme Court has its say.

## ARGUMENT

This Court will stay the mandate pending the filing of a petition for a writ of

certiorari if the movant "show[s] that the petition would present a substantial

question and that there is good cause for a stay." Fed. R. App. P. 41(d)(1). This

case qualifies. LTL's petition will present substantial questions regarding the

good-faith standard and the standard of review that applies to it, and the potential

chaos from the mandate issuing and the Supreme Court then reversing is good

cause to hold the mandate until the Supreme Court weighs in.

## I.  LTL's CERTIORARI PETITION WILL PRESENT SUBSTANTIAL QUESTIONS FOR SUPREME COURT REVIEW.

A certiorari petition will present a "substantial question"—and thus warrants

a stay of the mandate pending its disposition—if there is "a reasonable probability

that the Supreme Court will grant certiorari," and "a reasonable possibility that at

least five Justices would vote to reverse this Court's judgment." *Nara*, 494 F.3d at

3

1.  Allowing the mandate to take effect will create chaos in the Bankruptcy
Court and across mass-tort proceedings nationwide if the Supreme Court reverses
this Court.

The Bankruptcy Court has noted that upon the mandate issuing, it will
dismiss the petition and retain jurisdiction over only administrative matters, like
fees.  Dismissal of the bankruptcy brings with it dissolution of the TCC and
discharge of its retained professionals, meaning claimants represented by the TCC
would lack representatives to respond to LTL's petition for certiorari.  *See* 11
U.S.C. § 103(g); *In re Great N. Paper, Inc.*, 299 B.R. 1, 5 (D. Me. 2003) ("When
the statutory basis of the case is changed, either through dismissal
or . . . conversion, the statute under which the Committee was created no longer
applies and the committee is automatically dissolved.") (quotation marks omitted).
In addition, dismissal will result in the discharge of the Bankruptcy Court's
retained professionals, such as the mediators, the fee examiner, and the future
claims representative.  Then, if the Supreme Court reverses, the Bankruptcy Court
would have to rewind all its efforts and rebuild the significant infrastructure that it
had just dismantled.

Moreover, in the absence of a stay, there would be significant chaos and
confusion across the mass-tort proceedings.  Approximately 1,000 individually set
ovarian-cancer claims are pending in various state courts outside of the federal

18

MDL and consolidated state proceedings in California and New Jersey. That

means there are roughly 1,000 ovarian-cancer claims that are not subject to

deliberate and measured docket-wide coordination procedures, and each will

require state court judges and their staff to expend resources to "on track" the cases

back into the system. Moreover, an additional 470 mesothelioma claims are

pending in state courts across the country, none of which are coordinated, and

many of which are filed on specialized, asbestos-specific accelerated dockets.

Each of these cases would suddenly spring back into activity and proceed towards

trial absent a stay.

 The mesothelioma docket alone makes the point. The currently pending

mesothelioma claims would return to 44 different courts across 25 different States.

Many of the cases have proceeded in the interim against other defendants and

without LTL's involvement, but suddenly LTL would be thrown into the mix—

potentially significantly impacting the progress, scope, and nature of the cases.

Worse, there are at least 20 mesothelioma cases now on the eve of trial or which

could be set for trial in the next 60 days, each of which would demand significant

investment in expedited, catch-up discovery; expert-witness engagement; trial-

lawyer time; and other resources.

 In other words, the complex mass-tort machinery could swiftly spring to life

in dozens upon dozens of courts across the country, requiring unexpected time and

19

resources from not just LTL but also court personnel, only to potentially grind to a halt (again)—possibly even in the middle of multiple trials—if the Supreme Court were to grant review. And to be clear, this machinery does not run itself. From just LTL's perspective, prior to the bankruptcy petition, 30 firms and 40 experts were retained to handle the mesothelioma cases referenced above. Reconstituting this complex operation would be for naught if the Supreme Court decides to hear the case. This Court can—and should—avoid this chaos by maintaining the status quo while LTL seeks certiorari.

2. LTL will also suffer irreparable harm absent a stay pending certiorari. *See Nara*, 494 F.3d at 1133 (an applicant can demonstrate good cause by showing "a likelihood of irreparable injury absent a stay."). The purpose of LTL's bankruptcy petition was to channel into post-confirmation trusts all present and future asbestos-related tort claims against it, permitting compensation to be paid in a manner that ensures fair and equitable treatment of present and future claimants. As LTL explained in defending the automatic stay, its efforts to reorganize would be irreparably harmed if the mandate issues before final review of this case. *See* Dkt. 104, LTL Response Br. 76-99.

Furthermore, if the mandate issues, LTL will be forced to resume litigation of the tens of thousands of stayed claims. *See supra* pp. 18-20. Before bankruptcy, defense costs alone ran upwards of $10-20 million per month, A458, a

20

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 22-2003/22-2004/22-2005/22-2006/22-2007/22-2008/22-2009/22-2010/22-2011

In Re: LTL MANAGEMENT LLC, Debtor

OFFICIAL COMMITTEE OF TALC CLAIMANTS, Appellant

v.

THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT AND JOHN AND
JANE DOES 1-1000

(Agency No. 21-bk-30589, 21-ap-03032)

Present: AMBRO*, RESTREPO and FUENTES, <u>Circuit Judge</u>

1.  Motion filed by Appellee LTL Management LLC in 22-2003, 22-2004, 22-
    2005, 22-2006, 22-2007, 22-2008, 22-2009, 22-2010, 22-2011 to stay mandate.

2.  Response filed by Appellant Official Committee of Talc Claimants in 22-2003
    to motion to stay mandate.

3.  Response filed by Appellant Arnold & Itkin LLP in 22-2009 to motion to stay
    mandate.

4.  Reply by Appellee LTL Management LLC to Appellees' Responses to motion
    to stay mandate.

Respectfully,
Clerk/JK

_____ORDER_____
The foregoing motion to stay mandate is DENIED.

By the Court,

s/ Thomas L. Ambro
Circuit Judge

_____

* Judge Ambro assumed senior status on 02/06/2023

Dated:  March 31, 2023
JK/cc: All Counsel of Record

# EXHIBIT 5


# UNDER SEAL

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
IN RE:                      .    Case No. 21-30589(MBK)
                            .
LTL MANAGEMENT LLC,         .
                            .
        Debtor.            .
. . . . . . . . . . . . . .
LTL MANAGEMENT, LLC,        .    Adversary No. 21-03032(MBK)
                            .
        Plaintiff,          .
                            .    Clarkson S. Fisher U.S.
v.                          .      Courthouse
                            .    402 East State Street
THOSE PARTIES LISTED ON     .    Trenton, NJ 08608
APPENDIX A TO THE           .
COMPLAINT, ET AL.,          .
                            .    Friday, February 18, 2022
        Defendants.         .    9:01 a.m.
. . . . . . . . . . . . . .
```

TRANSCRIPT OF TRIAL DAY FIVE
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtor:         Jones Day
                        By:  GREGORY M. GORDON, ESQ.
                             DANIEL B. PRIETO, ESQ.
                             AMANDA RUSH, ESQ.
                        2727 North Harwood Street, Suite 500
                        Dallas, TX 75201

                        Jones Day
                        By:  ROBERT W. HAMILTON, ESQ.
                        325 John H. McConnell Blvd., Suite 600
                        Columbus, Ohio  43215-2673


Audio Operator:         Wendy Romero
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**
**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For the Debtor:                Jones Day
                               By:  DAVID S. TORBORG, ESQ.
                               51 Louisiana Avenue, N.W.
                               Washington, D.C.  20001-2113

                               Jones Day
                               By:  CAITLIN K. CAHOW, ESQ.
                               77 West Wacker, Suite 3500
                               Chicago, IL  60601-1692

                               Skadden, Arps, Slate, Meagher &
                                 Flom LLP and Affiliates
                               By:  ALLISON M. BROWN, ESQ.
                               One Manhattan West
                               New York, NY  10001-8602

                               Otterbourg P.C.
                               By:  MELANIE L. CYGANOWSKI, ESQ.
                                    ADAM C. SILVERSTEIN, ESQ.
                               230 Park Avenue
                               New York, NY 10169-0075

For the Official              Brown Rudnik, LLP
Committee of Talc             By:  JEFF JONAS, ESQ.
Claimants 1:                        MICHAEL WINOGRAD, ESQ.
                               7 Times Square
                               New York, NY 10036

                               Genova Burns, LLC
                               BY:  DANIEL M. STOLZ, ESQ.
                               110 Allen Road, Suite 304
                               Basking Ridge, NJ 07920

                               Bailey & Glasser, LLP
                               By:  BRIAN GLASSER, ESQ.
                               105 Thomas Jefferson Street NW
                               Suite 540
                               Washington, DC 20007

For the Official              Sherman Silverstein
Committee of Talc             By:  ARTHUR ABRAMOWITZ, ESQ.
Claimants 2:                  East Gate Corporate Center
                               308 Harper Drive, Suite 200
                               Moorestown, NJ 08057

APPEARANCES (Cont'd):

```
For the Official        Cooley LLP
Committee of Talc       By:  IAN SHAPIRO, ESQ.
Claimants 2:            55 Hudson Yards
                        New York, NY 10001

                        Cooley LLP
                        By:  SHAMIS BECKLEY, ESQ.
                        500 Boylston Street, 14th Floor
                        Boston, MA  02116-3736

                        Cooley LLP
                        By:  MATTHEW KUTCHER, ESQ.
                        444 W. Lake Street, Suite 1700
                        Chicago, IL  60606

For Johnson & Johnson:  White & Case LLP
                        By:  JESSICA LAURIA, ESQ.
                        1221 Avenue of the America
                        New York, NY  10020

                        Lowenstein Sandler
                        By:  KENNETH ROSEN, ESQ.
                        One Lowenstein Drive
                        Roseland, NJ 07068

                        Johnson & Johnson
                        By:  ERIK HAAS, ESQ.
                             ANDREW WHITE, ESQ.
                        1 Johnson & Johnson Plaza
                        New Brunswick, New Jersey, 08933

For the U.S. Trustee:   U.S. Department of Justice
                        By:  LAUREN BIELSKIE, ESQ.
                             LINDA RICHENDERFER, ESQ.
                             JEFFREY M. SPONDER, ESQ.
                        One Newark Center, Suite 2100
                        Newark, NJ  07102

For Arnold & Itkin, LLP: Pachulski Stang Ziehl Young & Jones,
                           PC
                        By:  LAURA DAVIS JONES, ESQ.
                        919 Market Street
                        16th Floor, PO Box 8705
                        Wilmington, DE 19899
```

APPEARANCES (Cont'd):

For DeSanto Canadian          Lite DePalma Greenberg & Afanador,
Class Action Plaintiffs:        LLC
                              By:  ALLEN JOSEPH UNDERWOOD, II, ESQ.
                              570 Broad Street, Suite 1201
                              Newark, NJ 07102


For Aylstock, Witkin,         Klee, Tuchin, Bogdanoff & Stern, LLP
Kreiss & Overholtz,           By:  ROBERT J. PFISTER, ESQ.
PLLC:                         1801 Century Park East, 26th Floor
                              Los Angeles, CA 90067

                      *  *  *  *  *

55

1  movants' own experts on this point.  Again, Mr. Burian, the LTL

2  transaction's a single pre-planned integrated transaction

3  comprised of five related interdependent steps.  He said it

4  again, it's a single transaction and the debtor was created for

5  one purpose, bankruptcy.

6      And, again, Mr. Diaz, the defined term he used to

7  cover both the restructuring and the bankruptcy was "integrated

8  transaction series."  And, in fact, he went on to say ignoring

9  JJCI's financial distress is the purposely -- or purposefully

10  misapprehend the facts that led to this bankruptcy proceeding.

11  You would be misapprehending the facts, ignoring the facts.

12  It's interesting, notwithstanding that, he did not analysis of

13  -- he did not focus on Old JJCI.  He focused on J&J because

14  that's what the movants asked him to do.

15      And Mr. Burian, just to go on, basically said, well,

16  not only does his report basically contradict what you're

17  hearing from the movants that Old JJCI is irrelevant, he spent

18  17 slides in his report on the issue of whether Old JJCI was in

19  financial distress.  And, of course, if you look at this

20  adjusted income chart that he used, this is the chart that

21  makes very plain that he ignored talc litigation costs.  So you

22  look at 2020 and 2021, he has the adjusted income going up and

23  he has it going up because he hasn't accounted for any of the

24  talc litigation costs.  That's how he got there.

25      So I think Your Honor's pretty well aware the basics

56

1   of the corporate restructuring.  At this point, this is just a

2   depiction of it that we put together before.  The one thing I

3   would note, of course, is, you know, the funding agreement here

4   is different from all the other cases in the sense that it

5   includes also a Johnson & Johnson, the ultimate parent,

6   agreeing to obligate itself to the extent of the value of Old

7   JJCI.  So you have basically two sources of asset availability

8   to LTL.

9          So Mr. Molton yesterday, again, used the phrase BadCo

10  that LTL is a BadCo.  Otherwise, I think until that, the

11  movants were pretty careful in not using that term.  I mean you

12  saw that Mr. Diaz referred to it as I think a talc powder

13  company or something like that.  But here we know that it

14  actually does, aside from the funding agreement or in addition

15  to the funding agreement, it has significant assets.

16         And, of course, it came into this court with an

17  agreement from J&J and New JJCI to -- for them to advance under

18  the funding agreement $2 billion to be deposited in a QSF.

19  And, of course, we've put that off.  You know, we filed a

20  motion to have Your Honor approve that.  We put that off at the

21  request of the other side.

22         But, again, you heard in the testimony I think from

23  Mr. Kim that that was done to show the good faith.  And I think

24  Mr. Wuesthoff said the same thing, to show the good faith here

25  that we're serious, that we're willing to put up a lot of money

 1  as a start here just to not even have to argue about this issue

 2  of whether there's undercapitalization or unfairness or harm.

 3  We just wanted to be past that issue.  We want to get to the

 4  guts of this case, which is to negotiate an agreement on a

 5  resolution of the talc claims.

 6          Now the funding agreement, I want to spend a little

 7  time on this because it's obviously extremely important to

 8  understanding what the situation is.  But, again, you have two

 9  payors here.  You have not only JJCI, but you have J&J.  And

10  part of the reason for that, Your Honor, is that in the other

11  cases, we heard complaints about, w ell, but we're worried that

12  the entity, the obligor, the payor in those cases is going to

13  be dividending assets away -- dividending assets up to the

14  parent.  At the end of the day, we're going to be left with an

15  empty bag.

16          And, you know, we try to learn from the other cases.

17  And so we thought let's take that issue off the table.  We'll

18  actually have an obligation from the ultimate parent.  So that

19  was based on learning that we had received from the North

20  Carolina cases, and frankly, you know, we've been criticized

21  greatly for forum shopping and filing in North Carolina.  But

22  part of the thinking was that we have a jurisdiction that's

23  actually confronted some of these issues.  We tried to learn

24  from those issue and actually address some of those issues in

25  how things were designed in connection with the restructuring.

58

1          Also, I should just point out because of all the time

2    that was spent trying to suggest some nefarious connection

3    between the corporate restructuring and the spinoff, the fact

4    that J&J is now including as a payor or isn't included as a

5    payor in this funding agreement should eliminate any concern

6    about that because it doesn't matter.  If assets are spun out,

7    if that actually occurs, a transaction like that occurs,

8    there's full protection because J&J is sitting there with an

9    obligation to pay up to the value of Old JJCI.

10          And what's important, unlike the other cases, this

11    funding agreement sets the floor on the value.  It sets a

12    floor.  So whatever the value was basically the day because the

13    restructuring, that value is locked in.  So it can only go up.

14    It can't go down.  That's unlike other cases where it's

15    potentially the payor based on developments with its business

16    operations or what have you, you know, could suffer some

17    diminution in value.  That can't happen here.

18          There's another reason for doing this, again, to try

19    to eliminate some of the objections and concerns that we heard

20    with respect to the earlier funding agreements.

21          THE COURT:  Mr. Gordon, you said value of Old JJCI.

22    It's the value of New JJCI, is it not, under the funding

23    agreement?

24          MR. GORDON:  Well, no, it's the value of Old JJCI.

25    Actually, whatever that -- I hope I'm getting this right.  It's

 1  whatever that value was basically at the time that the

 2  restructuring occurred.  Let me just -- maybe my nomenclature's

 3  off.

 4          THE COURT:  I thought it's the 60 billion cap --

 5          MR. GORDON:  Correct.  It's the value of Old JJCI.

 6          THE COURT:  Right.

 7          MR. GORDON:  But Mr. Prieto pointed out excluding the

 8  talc liability.  So it's the value whatever it was on the day

 9  before excluding the talc liability.  That's the whole idea

10  with these funding agreements.  It's to basically to be able to

11  say to the Court, to say to the parties, look, you haven't been

12  hurt because the entity that was standing behind or the value

13  of assets that were effectively standing behind the liability

14  or were available to pay the liability, that value is fully

15  preserved through that funding agreement.  So what that was is

16  fully preserved.

17          The only difference is is that instead of having the

18  company there, you have a funding agreement that provides

19  direct right to those assets through this funding agreement.

20          THE COURT:  All right.

21          MR. GORDON:  Did I answer your question, Your Honor?

22          THE COURT:  Yeah.  I guess I have to take a look

23  back.  I thought the language of the funding agreement, it

24  references the value of New JJCI.  And I've seen it stated

25  differently --

1          MR. GORDON:  Yeah.

2          THE COURT:  -- in different briefs.

3          MR. GORDON:  Yeah.  I think what you're referring --

4     and these are good questions, Your Honor.  This is complicated,

5     so I appreciate your asking me.  I think what you're referring

6     to is the fact that, again, we tried to make clear in this

7     funding agreement that if the value of New JJCI actually goes

8     up post the transaction, then the value under the funding

9     agreement also goes up.

10          And that goes to my point about it sets a floor based

11    on the value of what Old JJCI was in the moment in time before

12    this transaction minus or excluding the talc costs.  And then

13    if that value goes up, the estate would get the benefit of that

14    value, as well.

15          THE COURT:  Okay.  Thank you.

16          MR. GORDON:  And I just wanted to point out also in

17    this slide, and I think Your Honor's probably seen there's

18    literally no conditions or any material conditions on the

19    permitted funding uses under this document.  I'll come back to

20    this.

21          So I did want to focus on permitted funding use

22    because the other side I think has fashioned a new argument

23    that we hadn't heard before with respect to the funding

24    agreement.  So there's basically two different scenarios where

25    funding is available.

61

1    The first is funding in the tort system. And as you

2    would expect, what that funding says is that the payors are

3    obligated to pay the liabilities to the extent they're

4    established by a judgement or a settlement in the tort system.

5    That's what you would expect and that's what happens. You want

6    funds available to pay settlements, to pay judgments in the

7    tort system. So it makes very clear this is what we're talking

8    about if there's no proceeding in bankruptcy. Whether there

9    was no case filed or whether the case is filed or dismissed,

10   the money's available for that purpose.

11   And you can imagine, Your Honor, by the way, the hue

12   and cry you would have heard if this provision weren't in there

13   because they would have said that we've manipulated the whole

14   system because you filed bankruptcy and now you're going to

15   tell the Court you can't dismiss our case because there's no

16   money available if we go back in the tort system.

17   So this is there to protect the claimants. It's

18   there to assure this isn't treated or consider a fraudulent

19   conveyance. The idea was and the intent was the claimants are

20   covered either way in bankruptcy or outside.

21   Now where the criticism I think has been focused is

22   on this provision. And this talks about how the funding is

23   used if a bankruptcy case is commenced. And what it talks

24   about is if the payors are obligated to pay the liabilities in

25   connection with the funding of one or more trusts for the

benefit of claimants created pursuant to a plan that's

confirmed by a final non-appealable order of the bankruptcy

court and, to the extent required, the district court.

And all that -- you know, the other side has said

that puts the claimants in a worse position.  It puts a variety

of limitations and conditions on the funding.  It's not fair.

It doesn't exist in the tort system.  And I would say to that,

Your Honor, all this does is recognize the way the rules and

the law work in bankruptcy.  The idea is that if you have a

bankruptcy case, the intent is to ultimately reach a plan or

reorganization and then you want the funding available to fund

the trust.  This is what has happened in every asbestos case,

Your Honor.  This is where these cases end up.

And you heard some hypotheticals.  I think Mr. Diaz

said, well, what if the stay were lifted -- if the stay is

lifted and somebody's allowed to go back and collect a

judgment, the money wouldn't be available.  That's technically

correct, but we wouldn't expect that to happen in a bankruptcy

case.

The way I think about it is in these mass tort cases,

you either have a bankruptcy case or you don't.  And if you

don't have a bankruptcy case, then you have the money available

to you to pay the judgments and the settlements in the tort

system.  And if you do have a bankruptcy case, it's available

for when you need it which is in connection with a plan.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                              .    Case No. 23-12825(MBK)
                                    .
                                    .    Clarkson S. Fisher U.S.
LTL MANAGEMENT LLC,                 .      Courthouse
                                    .    402 East State Street
                                    .    Trenton, NJ 08608
        Debtor.                     .
                                    .    April 11, 2023
. . . . . . . . . . . . . . . .     .    9:59 a.m.

TRANSCRIPT OF MOTION BY MOVANT ANTHONY HERNANDEZ VALADEZ FOR AN
    ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY, SECOND
AMENDED EX PARTE TEMPORARY RESTRAINING ORDER, AND ANTICIPATED
  PRELIMINARY INJUNCTION, AND (II) WAITING THE FOURTEEN DAY STAY
    UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(A)(3) [71];
DEBTOR'S MOTION FOR AN ORDER EXTENDING THE TIME WITHIN WHICH IT
MUST FILE ITS (I) SCHEDULES OF ASSETS AND LIABILITIES AND (II)
   STATEMENT OF FINANCIAL AFFAIRS [14]; DEBTOR'S MOTION FOR AN
ORDER: (I) APPROVING THE CONTINUED USE OF ITS BANK ACCOUNT AND
BUSINESS FORMS AND (II) AUTHORIZING THE DEBTOR'S BANK TO CHARGE
   CERTAIN FEES AND OTHER AMOUNTS [13]; DEBTOR'S APPLICATION
PURSUANT TO 28 U.S.C. § 156(C) AND 11 U.S.C. § 105(A) FOR ENTRY
   OF AN ORDER AUTHORIZING THE APPOINTMENT OF EPIQ CORPORATE
  RESTRUCTURING, LLC AS CLAIMS AND NOTICING AGENT NUNC PRO TUNC
TO THE PETITION DATE [11]; DEBTOR'S APPLICATION FOR DESIGNATION
 AS COMPLEX CHAPTER 11 CASE [6]; DEBTOR'S MOTION FOR AN ORDER
SUSPENDING ENTRY AND SERVICE OF STANDARD NOTICE OF COMMENCEMENT
[5]; DEBTOR'S MOTION FOR AN ORDER: (I) AUTHORIZING IT TO FILE A
LIST OF THE TOP LAW FIRMS WITH TALC CLAIMS AGAINST THE DEBTOR
IN LIEU OF THE LIST OF THE 20 LARGEST UNSECURED CREDITORS; (II)
   APPROVING CERTAIN NOTICE PROCEDURES FOR TALC CLAIMANTS; AND
 (III) APPROVING THE FORM AND MANNER OF NOTICE OF COMMENCEMENT
OF THIS CASE [10]; DEBTOR'S MOTION PURSUANT TO 11 U.S.C. § 1505
FOR AN ORDER AUTHORIZING IT TO ACT AS FOREIGN REPRESENTATIVE ON
               BEHALF OF THE DEBTOR'S ESTATE [12]
           BEFORE THE HONORABLE MICHAEL B. KAPLAN
           UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:                     Wendy Quiles

Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES:

For the Debtor:    Jones Day
           By: GREGORY M. GORDON, ESQ.
              DAN B. PRIETO, ESQ.
              AMANDA S. RUSH, ESQ.
           2727 North Harwood Street, Suite 500
           Dallas, TX  75201

           Skadden Arps Slate Meagher &
            Flom, LLP
           By: ALLISON M. BROWN, ESQ.
           One Manhattan West
           New York, NY  10001

For Various Talc Personal   Watts Guerra LLP
Injury Claimants:     By: MIKAL C. WATTS, ESQ.
           5726 W. Hausman Road, Suite 119
           San Antonio, TX  78249

For Ad Hoc Committee    Genova Burns LLC
of Certain Talc      By: DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc    494 Broad Street
Committee of Creditors:  Newark, NJ  07102

           Brown Rudnick
           By: JEFFREY L. JONAS, ESQ.
              DAVID J. MOLTON, ESQ.
           7 Times Square
           New York, NY  10036

           Otterbourg PC
           By: MELANIA CYGANOWSKI, ESQ.
           230 Park Avenue
           New York, NY  10169-0075

For Anthony Hernandez   Kazan McClain Satterley & Greenwood
Valadez:         By: JOSEPH SATTERLEY, ESQ.
           55 Harrison St. Suite 400
           Oakland, CA  94607

For the Office of the    Office of the United States Trustee
United States Trustee:   By: LINDA RICHENDERFER, ESQ.
              JEFF SPONDER, ESQ.
           J. Caleb Boggs Federal Building
           844 King Street, Suite 2207
           Lockbox 35
           Wilmington, DE 19801

APPEARANCES CONT'D:

For Various Talc            Maune Raichle Hartley Frency &
Claimants:                    Mudd, LLC
                           By:  CLAYTON L. THOMPSON, ESQ.
                           150 West 30th Street, Suite 201
                           New York, NY 10001

                           Levy Konigsberg, LLP
                           By:  JEROME H. BLOCK, ESQ.
                                MOSHE MAIMON, ESQ.
                           101 Grovers Mill Road, Suite 105
                           Lawrence Township, NJ  08648

                           Simon Greenstone Panatier, PC
                           By:  LEAH CYLIA KAGAN, ESQ.
                           1201 Elm Street, Suite 3400
                           Dallas, TX  75720

For Claimant Alishia       Beasley Allen
Landrum:                   By:  ANDY BIRCHFIELD, ESQ.
                           218 Commerce Street
                           Montgomery, AL  36104

For Arnold & Itkin:        Pachulski Stang Ziehl & Jones LLP
                           By:  LAURA DAVIS JONES, ESQ.
                           919 North Market Street
                           17th Floor
                           Wilmington, DE 19801

For Paul Crouch,           Ruckdeschel Law Firm, LLC
individually and on        By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of        8357 Main Street
Cynthia Lorraine Crouch:   Ellicott City, MD 21043

For the Ad Hoc Committee   Womble Bond Dickinson
of Attorney Generals:      BY:  ERICKA JOHNSON, ESQ.
                           1313 North Market Street
                           Suite 1200
                           Wilmington, DE, US 19801


                    - - - - -

4

1          (Proceedings commenced at 9:59 a.m.)

2          THE COURT:  We have new technology here.  Everything

3  is supposed to work better, more enhanced.  Not just for you

4  all.

5          Well, okay.  Good morning, again.  This is the LTL

6  Management LLC matter and -- log in.

7          All right.  We have a full plate on for today.  A

8  number of matters.  If I may, I'd like to take the liberty of

9  making a few preliminary comments.

10          My goal today is really to listen.  Listen to

11 presentations, listen to arguments from all parties.  Because

12 that's the intent, I am going to be somewhat generous in

13 allowing the use of the PowerPoints, the presentations, the

14 hyperbole, all of it.  I want to hear from you all about this

15 case and the respective positions.

16          I've read a lot.  We hear a lot.  But this is where

17 it's important.  In that regard, I'm cognizant that there's

18 been a significant amount of vitriol, ad hominem attacks,

19 lawyer versus lawyer, lawyers versus the Court, directed at

20 Johnson and Johnson, directed at groups.  That's unfortunate.

21          I think we all need to a degree to have a bit of a

22 thin skin.  I like to think the Court has a thick -- a thin

23 skin -- a thicker skin.  Wrong analogy.  A thicker skin.  Some

24 may be familiar.  I was a mayor of a small town in North Jersey

25 and there came a point in time when I would say more than half

 1  my neighbors hated me and wanted me out.  I would walk my

 2  children to school and I would see lawn signs that were more

 3  caustic than cats paws or stooge or any of the language what

 4  we're seeing.

 5        I did then what I hope to do now is just put my head

 6  down and do what I think is right, and I urge everybody to do

 7  the same.  But let's try to raise our game.  The world -- it's

 8  a horrible phrase, but the world is watching, horribly overused

 9  phrase.  Let's show professionalism to each other, respect to

10  each other, civility to each other, and advocate zealously.  I

11  expect that.  As I said, I have a thick skin.  I will do what I

12  think is right.  I always try to do what I think is right and I

13  think you all do the same for your clients, and I respect that.

14        Let's start.  I know we've been told there are a

15  plethora of PowerPoints to be had.  We might as well start the

16  process.  There are a number of matters on traditional first-

17  day matters and some more unusual first-day matters.  Let me

18  turn to the debtor.

19        What I anticipate is an opening, and then I would go

20  to the Ad Hoc Committee for their opening, and then we can get

21  on to the specific relief being sought.

22        Good morning, Mr. Gordon.  Long time.

23        MR. GORDON:  Good morning, Your Honor.  Greg Gordon,

24  Jones Day, on behalf of the Debtor.  And I appreciate Your

25  Honor's opening remarks and thank you for scheduling the

6

1  hearing on shortened notice and making yourself available to us

2  so promptly after the filing of the case.

3        And I'll just say for the benefit of the record, I

4  think in some respects you've already done this.  Our view was

5  that Agenda Item Number 1, the motion to lift stay filed by

6  Mr. Satterley, we think that should be heard at the end because

7  there's scheduling issues with respect to that that relate to

8  some of the other matters that we're going to be discussing

9  today.  And so that would be our recommendation in terms of the

10  schedule.

11        I'm prepared to make an opening and then we'll be

12  prepared at the appropriate time after the responses to present

13  the motions for relief that we filed for today.

14        THE COURT:  Great.  Please continue.

15        As a housekeeping matter.  Again, as we did in the

16  prior case, I'm not going to go through and have everybody

17  enter appearances.  We'll do so when you rise to talk.

18        MR. GORDON:  Thank you, Your Honor.

19        So shockingly, I'm not one of the ones who has a

20  PowerPoint presentation today.  Your Honor is obviously very

21  familiar with the debtor.  You're familiar with its corporate

22  structure.  And that, of course, would include the corporate

23  restructuring that was done in 2021 shortly before the first

24  bankruptcy filing.  You have good familiarity with the talc

25  litigation that had been plaguing LTL and J&J, and the former

7

1 J&J Consumer, Inc., well known as old JJCI, prior to the first
2 bankruptcy filing. So I don't plan to go over those things
3 again today.

4 But I did want to provide an update on corporate
5 structure. And what I wanted to focus on was the fact that,
6 and Your Honor probably saw this in the papers that we filed,
7 in December of last year, the debtor's parent company, J&J
8 Consumer, Inc., which we were referring to in the old case as
9 New JJCI, changed its name to Johnson and Johnson HoldCo
10 (NA), Inc., which I'll refer to today as HoldCo.

11 And in early January 2023, HoldCo distributed its
12 consumer business, it's consumer health business, that is, to
13 its parent company. So that is a change that's occurred with
14 respect to corporate structure. And although that business, as
15 Your Honor knows I think, represented a substantial portion of
16 HoldCo's assets, HoldCo does continue to have significant
17 value. And we mentioned in the papers that, among other
18 things, it holds $400 million in cash. It also holds interest
19 in foreign subsidiaries that have a material value. And it
20 seems, based on the papers we've seen filed in the last few
21 days, that the other parties are overlooking the fact that that
22 other value exists.

23 Then I want to address, Your Honor, why LTL has filed
24 for bankruptcy a second time. And as with the first case, Your
25 Honor, I would say the purpose of the filing remains the same.

1    talc claimants.  Committing to pay claimants the largest sum

2    that's ever been paid belies any allegations that an actual

3    fraudulent transfer or actual intent to harm claimants exists.

4           There's no constructive transfer either because LTL

5    has not been rendered insolvent by the new financing

6    arrangements.  That issue is completely ignored in the pleading

7    that was filed by this Ad Hoc group yesterday.  The new funding

8    arrangement from HoldCo is available to pay talc claims in and

9    outside bankruptcy, and it has significant values.  And

10   importantly, J&J's support is available to ensure a trust is

11   funded in the amounts agreed to with the claimant's supporting

12   this plan.

13          So the question is, why is it the Committee doesn't

14   address insolvency?  Was LTL rendered insolvent?  The Third

15   Circuit pointed out and the Third Circuit knows that a showing

16   of insolvency is required.  It said so in the Footnote 18 that

17   the other side characterizes as a warning in terms of what LTL

18   could do or not do.

19          And, Your Honor, as I indicated before, there were

20   questions that the company had as to whether the original

21   financing arrangements remained enforceable in the wake of the

22   Third Circuit's opinion.  That decision was not reasonably

23   foreseeable.  It defeated the fundamental purpose of J&J's

24   backstop.  It called into question the enforceability of that

25   backstop and the funding agreement as a whole.  But

 1  notwithstanding that, LTL was able to secure new financing

 2  arrangements that provided the funding it needs to provide the

 3  amount negotiated with the claimants.  In short, there was

 4  reasonably equivalent value, too.  There's no basis for these

 5  accusations about fraudulent transfer and certainly no evidence

 6  has been submitted to support any of that.

 7          Even more extreme than the accusations about

 8  fraudulent transfer are the Committee's arguments that the plan

 9  support agreements are premised, as they say, "on a lie."  They

10  claim that we have not reached a settlement with over 60,000

11  claimants.  They claim that the plan support agreements have

12  been fraudulently and collusively constructed with exaggerated

13  claim populations.  And I ask again, Your Honor, what is the

14  factual basis for any of those accusations?  The Committee

15  offers none.  These accusations are false.  They're outrageous.

16  And you're going to hear from one of the plaintiff's firms who

17  supports the plan support agreements, who wants to address

18  those allegations.

19          But, ultimately, Your Honor, in our view, the proof

20  of the support will be in the voting.  If this opposing handful

21  of firms are so sure that LTL's support is all a fabrication,

22  they should welcome a quick plan confirmation process and an

23  opportunity for claimants, and I say claimants not law firms,

24  to vote on a proposed plan.

25          Instead, what they're asking Your Honor to do is to

22

1 prevent any process. They've asked for an immediate stay of

2 this case. They've asked for an immediate dismissal of this

3 case. They don't want the debtor to obtain any further

4 support. They don't want the FCR to have an opportunity to

5 weigh in. They don't want the claimants to have an opportunity

6 to vote. That's simply not appropriate that a group of firms

7 who represent a minority of the claimants could ask this Court

8 to stop this process for their own interests, which are not

9 entirely clear because they don't appear to be in the interests

10 of their own clients.

11        Now, in connection with what can only be viewed as a

12 scorched earth litigation strategy in opposition to this case

13 and the unprecedented $8.9 billion settlement on the table, the

14 Committee is seeking a number of depositions. They have asked

15 for depositions of Mr. Kim, of Mr. Hass with J&J, with

16 Mr. Wuesthoff, the chair of the LTL board, you may remember.

17 It also seeks depositions from two of the plaintiff's firms who

18 signed plan support agreements.

19        THE COURT: I'm sorry.

20        MR. GORDON: No problem.

21        THE COURT: Do we need to address this now?

22        We're having a technological issue. With everybody

23 hooked up to the Court's WiFi in various capacities, we've lost

24 bandwidth, so --

25        THE CLERK: (Indiscernible)

 1            THE COURT:  What camera have we lost?

 2            THE CLERK:  The iPad is connected to WiFi and it

 3 keeps losing the signal.

 4            UNIDENTIFIED SPEAKER:  Can I make a suggestion, Your

 5 Honor?

 6            THE COURT:  Absolutely.

 7            UNIDENTIFIED SPEAKER:  Anyone that's not making a

 8 presentation, why don't we just get off the WiFi.

 9            THE COURT:  That would help.  Go to your own 5G or

10 whatever other network you have, if you can.

11            UNIDENTIFIED SPEAKER:  I've been watching it go, get

12 kicked off, get back on.  I'm just wondering if other folks are

13 having the same issue.

14            THE COURT:  I knew we should have gotten the better

15 plan.

16                        (Laughter)

17            THE CLERK:  The other option is for the time being,

18 just turn your camera around, Judge (indiscernible).

19            THE COURT:  Turn this camera around?

20            THE CLERK:  (Indiscernible) courtroom.  At least that

21 provides (indiscernible) Mr. Gordon.

22            THE COURT:  (Indiscernible) Mr. Gordon.  Nobody needs

23 to see me.

24            How's that?

25            THE CLERK:  Good.  (Indiscernible)

24

1          MR. GORDON:  We ready?

2          THE COURT:  Continue.

3          MR. GORDON:  Let me just go back.

4          THE COURT:  Yes.

5          MR. GORDON:  As I was saying, Your Honor, I think you

6   may have missed part of this.  As part of what we would view as

7   a scorched earth litigation strategy and opposition to this

8   case, and an opposition to an unprecedented $8.9 billion

9   settlement on the table, the Committee is seeking the

10  depositions of Mr. Kim, that Your Honor may recall is the chief

11  legal officer at LTL; Mr. Haas, who's with J&J; Mr. Wuesthoff,

12  who is on the board of LTL.  It also seeks depositions from two

13  of the plaintiff's firms who signed plan support agreements.

14          We, in turn -- the debtor, in turn, intends to depose

15  members of the Ad Hoc Committee.  There's also been some

16  written discovery served, I think just yesterday, by this Ad

17  Hoc Committee.  I mention this only to say that we believe this

18  discovery will show that there's no basis whatsoever for any of

19  the inflammatory accusations contained in the Committee's

20  filing.  Instead, we believe the discovery will show an

21  aggressive concerted effort by the plaintiff firms on this

22  Committee to scuttle this agreement through threats and

23  intimidation directed at LTL, J&J, and their respective boards,

24  their respective directors and officers, and the plaintiff

25  firms who support the plan.  That's the headline that should be

1  written about this case, that a group of firms representing a

2  minority of claimants seeks to defy the will of the substantial

3  majority of the claimants.

4          Let me move on.

5          Interesting, Your Honor, in the midst of a lengthy

6  tirade about the fraudulent nature of everything, the new

7  financing arrangements, the bankruptcy filing, the plan

8  support, the Committee argues that LTL is still not in

9  financial distress.  And they, in fact, I think the words they

10  use are that LTL, notwithstanding the new financing

11  arrangements, cannot provide any evidence that it was in

12  financial distress.

13          In other words, Your Honor, at the same time the

14  Committee breathlessly accuses LTL and J&J of deliberately

15  harming talc claimants by effectuating the largest fraudulent

16  transfer in history, they maintain that LTL, despite the new

17  financing arrangements, is not in financial distress.  So which

18  is it?

19          You know, we've seen these contradictory positions

20  before.  Is LTL financially distressed or not?  Is it insolvent

21  or not?  The answers to these questions, Your Honor, are

22  critical because as recognized by the Third Circuit, there's a

23  difference between financial distress and insolvency.  You may

24  recall that the Court said to say that a debtor is in financial

25  distress is not to say it must necessarily be insolvent.

 1          The Code conspicuously does not contain any

 2  particular insolvency requirement.  LTL is financially

 3  distressed.  As a result, bankruptcy is available to it.  LTL

 4  is not insolvent.  As a result, there is no basis for a

 5  fraudulent transfer claim.

 6          So to conclude, Your Honor, the second Chapter 11

 7  case, this case, has drawn substantial support.  It's supported

 8  by the unprecedented $8.9 billion financial commitment by LTL

 9  and J&J.  It's supported by over 60,000 claimants who have

10  signed and delivered plan support agreements, and support is

11  continuing to come in.  This claimant's support validates the

12  good faith basis of this filing.  It validates the proper

13  purpose of this proceeding.

14          The Court should not permit a group of firms who

15  represent a minority of the claimants to hijack this case

16  before it can even begin.  That is especially the case given

17  the utter absence of factual support for the inflammatory and

18  defamatory accusations this group of firms is making.

19          Thank you, Your Honor.

20          THE COURT:  Thank you, Mr. Gordon.  Before we hear

21  from the Ad Hoc group and other plaintiffs, is there anyone

22  supporting the debtor's position as far as an introductory

23  statement?

24          MR. WATTS:  Good morning, Your Honor.

25          THE COURT:  Good morning.

1          Ms. Richenderfer?

2          MS. RICHENDERFER:  I want to thank you, Your Honor.

3  I'm looking for the clock.  I guess it is good afternoon.

4          THE COURT:  Oh, it's afternoon.

5          MS. RICHENDERFER:  Afternoon, yes, it's afternoon.

6          Linda Richenderfer from the Office of the United

7  States Trustee.  Your Honor, I can't say that I ever expected

8  myself to be back here on this case.  I like the trip to

9  Trenton and very much appreciate the ability to appear in front

10 of Your Honor but never thought it was going to be again in

11 terms of this case.  Never, ever.

12         Just a few quick points.  First of all, the United

13 States Trustee is moving as quickly as it possibly can to

14 appoint committees in this case.  As of Friday, we had the

15 questionnaire for both a Tort Claimants Committee and an

16 Unsecured Creditors Committee posted on the website.  And, in

17 addition, we have sent out the questionnaire to all the law

18 firms.

19         We took the top 30 list from the first case, many of

20 whom have disappeared.  We took the 18 firms that are listed in

21 the second case, asked the debtor for the other 12 and haven't

22 received it yet.  But we sent that out to everyone.  So this is

23 also my way of making a public announcement that if anybody

24 here hasn't seen it yet, it's on the website.  And if you have

25 a problem finding it, there's three of us here from the U.S.

100

1 Trustee's Office, and we'll make sure that you can get a copy

2 of it.

3 We are moving as quickly as quickly as we can, Your

4 Honor.  With any luck, we'll have at least a Tort Claimants

5 Committee by the next hearing which is on the 18th, but I can't

6 promise that.  And I have no unsecured creditor information yet

7 from the debtor, so I don't know when that committee, if one

8 will be appointed.  It may be that there's no interest; I don't

9 know.  But I do know there were a lot of parties who never got

10 paid in the first case before it was dismissed.

11 The interviewing in fact is going to start tomorrow

12 just so people are aware of that.

13 Your Honor, I think that's leading up to my first

14 point that I did want to make before the Court was that we are

15 very concerned about their request to move forward to appoint

16 the FCR and the mediators by the April 18th hearing or I guess

17 on the April 18th hearing when we will not yet have a formal

18 committee yet formed.

19 And so I don't know whether the request is going to

20 be heard later today or not.  I didn't meant to jump ahead if

21 it is, but we would request that the FCR, the mediators, that

22 that be delayed until after we can get a committee in place who

23 can also be heard on those topics which are extremely

24 important.

25 Your Honor, I think that they are very important, and

1  I'm ad libbing here a little bit because from what I'm hearing

2  today about the timetable, there seems to have been some

3  activity during the first case that is now being carried over

4  that really benefitted the second case.  And I think that we're

5  going to have to get some clearer understanding of where the

6  first case ended and where the second case started because it

7  doesn't seem like the first case ended at 1:49 on April 4th and

8  that the second case started 2 hours and 11 minutes later.  It

9  seems like there was a large overlap, a month, two months.  To

10 me, that's still a large overlap between the two cases.

11         Your Honor, we are told that I think Mr. Gordon said

12 two-thirds of the claimants are represented by parties that

13 have signed on to plan support agreements.  I think it was two-

14 thirds, so we'll say 66 percent.  And it was 60- or 70,000

15 claimants.

16         Your Honor, I'm struggling with reconciling that

17 because I've gone back and there are 18 firms that were listed

18 in the first case as part of the top 30 firms that are not

19 listed for the second case.  And there are of the top 30 firms

20 that were listed in the first case, only five of them are

21 purported signatories to this plan or this support agreement,

22 whatever it's being called.  I'm not quite sure.

23

24         And I think that of the top 18 that were identified

25 in this case, there are 11 who purportedly are not part of any

1  plan support agreement or whatever it is that they're calling

2  it.  Your Honor, my point is this, that we heard several times

3  Mr. Gordon state that it's this large majority of the claimants

4  and that it's two-thirds of the claimants.

5       Your Honor, I don't know how the math works out.  I

6  really don't.  And I will tell you this, that Mr. Watts' firm

7  didn't appear in the first list.  Now all of a sudden, it's on

8  the second list.  Mr. Watts also made statements about being

9  involved in the Imerys case.  Your Honor may or may not know

10 that I along with one of my other trial attorneys in the

11 Delaware office have been the trial attorneys from the United

12 States Trustee's Office on that case since day one.  He did not

13 vote.  He had no claimants that voted in that case when the

14 first plan was up.

15      I don't know what positions he's playing in these

16 cases.  I did hear him identify a number of claimants which is

17 one of the concerns of the U.S. Trustee's Office.  Where are

18 these claimants coming from and who are these claimants?

19 Because we just can't reconcile them with the numbers that we

20 had that we were discussing and that were in front of us in the

21 first case.  And I can't reconcile some of the statements with

22 things that I know about from the Imerys case.

23      I know the attorneys there very well.  I know who's

24 involved in that case.  I know who voted in that case.  I

25 myself checked.  There were no votes that were made in that

103

1  case on the first plan, which eventually was not -- I think it

2  fell short by three percent.  But there were no votes submitted

3  on behalf of his firm, so I don't know what his role is in all

4  of this.

5         But I will say this, I don't know where the 67 or

6  60,000 or 70,000 come from.  It's certainly something that

7  we'll be looking into when we vote to form the Talc Claimants

8  Committee here.  I wonder where the numbers are.  And I was

9  very interested in the math that was just done because that's

10  presuming that all 60- or 70,000 of these claimants that we're

11  told are represented by these firms.  It's assuming that

12  they're going to get past the stage of filling out the

13  questionnaire that they'll have to get through.

14         And I don't know  because most of those claimants

15  evidently did not file a lawsuit because otherwise they would

16  have been accounted for in the first case, in the list of top

17  30 law firms.  So I don't know where these other law firms are

18  coming from.  I have asked debtors to give us a list of the

19  complete top 30 which is what we normally get.  I believe

20  they're working on it.  I don't have it yet, though.  And we're

21  marching forward.  And Your Honor will be hearing from us later

22  when we get to certain motions that are before Your Honor

23  today.

24

25         I just want to make those points and make sure that

104

1  this case, that we don't get off on some of the tangents and

2  that we look at who the true parties in interest here are, Your

3  Honor and that we hear from them. And as to the 60- or 70,000

4  claimants, I don't know where that number comes from. I can't

5  reconcile it with what we heard in the first case. Thank you,

6  Your Honor.

7  THE COURT: I appreciate your concerns. The Court

8  shares much of it. And we'll await.

9  Mr. Ruckdeschel, I can give you four and a half

10 minutes.

11 MR. RUCKDESCHEL: Your Honor, thank you very much.

12 Jonathan Ruckdeschel on behalf of Paul Crouch, individually,

13 and as the Executor of his mother's estate. And I will meet

14 that deadline.

15 Your Honor, the filing as we've heard and I'm going

16 to try and not repeat things that have been said before, but

17 the overall scheme here is taking state law rights of claimants

18 sickened by Johnson & Johnson's asbestos-contaminated products,

19 unrestricted state law rights that had access with respect to

20 Johnson & Johnson Consumer to at least $61 billion of assets

21 and, with respect to Johnson & Johnson, an unlimited pot of

22 assets and to transform them into restricted rights against an

23 artificially limited pot of money that will be created by this

24 plan.

25

# EXHIBIT 9

# UNDER SEAL

```
                    UNITED STATES COURT OF APPEALS
                       FOR THE THIRD CIRCUIT

IN RE:                        .    Case No. 22-2003/22-2004
                              .
LTL MANAGEMENT LLC,           .    21400 U.S. Courthouse
              Debtor,         .    601 Market Street
                              .    Philadelphia, PA 19106
OFFICIAL COMMITTEE OF TALC    .
CLAIMANTS,                    .    Monday, September 19, 2022
              Appellant.      .
. . . . . . . . . . . . . . . ..
IN RE                         .    Case No. 22-2005
                              .
LTL MANAGEMENT LLC,           .
              Debtor.         .
                              .
LTL MANAGEMENT, LLC.          .
                              .
        v.                    .
                              .
THOSE PARTIES LISTED ON       .
APPENDIX A TO COMPLAINT AND   .
JOHN AND JANE DOES 1-1000     .
OFFICIAL COMMITTEE OF TALC    .
CLAIMANTS,                    .
              Appellant.      .
. . . . . . . . . . . . . . . ..
IN RE:                        .    Case No. 22-2006/22-2007
                              .
LTL MANAGEMENT LLC,           .
              Debtor.         .
                              .
OFFICIAL COMMITTEE OF TALC    .
CLAIMANTS, ET AL.             .
              Appellants.     .
. . . . . . . . . . . . . . . ..
IN RE:                        .    Case No. 22-2008
                              .
LTL MANAGEMENT LLC,           .
              Debtor.         .
                              .
LTL MANAGEMENT LLC            .
                              .
        v.                    .
                              .
THIRD PARTIES LISTED ON       .
APPENDIX A TO COMPLAINT AND   .
JOHN AND JANE DOES 1-1000,    .
OFFICIAL COMMITTEE OF TALC    .
CLAIMANTS, ET AL.             .
```

```
OFFICIAL COMMITTEE OF TALC        .
CLAIMANTS, ET AL.                 .
                 Appellants.      .
. . . . . . . . . . . . . . . . . .
IN RE:                            .    Case No. 22-2009
                                  .
LTL MANAGEMENT LLC,               .
                 Debtor.          .

ARNOLD & ITKIN LLP, ON BEHALF     .
OF CERTAIN PERSONAL INJURY        .
CLAIMANTS REPRESENTED BY          .
ARNOLD & ITKIN,                   .
                 Appellant.       .
. . . . . . . . . . . . . . . . . ..
IN RE:                            .    Case No. 22-2010
                                  .
LTL MANAGEMENT LLC,               .
                 Debtor.          .
                                  .
AYLSTOCK WITKIN KRIES &           .
OVERHOLTZ PLLC, ON BEHALF OF      .
MORE THAN THREE THOUSAND          .
HOLDERS OF TALC CLAIMS,           .
                 Appellant.       .
. . . . . . . . . . . . . . . . . ..
IN RE:                            .    Case No. 22-2011
                                  .
LTL MANAGEMENT LLC,               .
                 Debtor.          .
                                  .
LTL MANAGEMENT LLC                .
                                  .
        v.                        .
                                  .
THOSE PARTIES LISTED ON           .
APPENDIX A TO COMPLAINT AND       .
JOHN AND JANE DOES 1-1000         .
                                  .
AYLSTOCK WITKIN KRIES &           .
OVERHOLTZ, PLLC., ON BEHALF OF    .
MORE THAN THREE THOUSAND          .
HOLDERS OF TALC CLAIMS,           .
                 Appellant        .
. . . . . . . . . . . . . . . . . ..
```

TRANSCRIPT OF ORAL ARGUMENT
BEFORE
THE HONORABLE JUDGE THOMAS L. AMBRO
UNITED STATES THIRD CIRCUIT JUDGE
THE HONORABLE L. FELIPE RESTREPO
UNITED STATES THIRD CIRCUIT JUDGE
THE HONORABLE JULIO M. FUENTES
UNITED STATES THIRD CIRCUIT JUDGE

APPEARANCES:

For the Appellants:          MoloLamken
                             By:  JEFFREY A. LAMKEN, ESQ.
                             600 New Hampshire Avenue, N.W.
                             Washington, D.C.  20037

                             Kellogg Hansen Todd Figel & Frederick
                             BY:  DAVID C. FREDERICK, ESQ.
                             1615 M Street, N.W., Suite 400
                             Washington, D.C.  20036

For U.S. Trustee:            U.S. Department of Justice
                             By:  SEAN JANDA, ESQ.
                             Appellate Section
                             Room 7260
                             950 Pennsylvania Avenue, N.W.
                             Washington, D.C.  20530

For Appellees:               Hogan Lovells US
                             By:  NEAL K. KATYAL, ESQ.
                             555 Thirteenth Street, N.W.
                             Washington, D.C.  20004

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311     Fax No. (609) 587-3599**

**WWW.JJCOURT.COM**

1      THE COURT:  They're pointing out the gateway

2  provision that you have to file a bankruptcy in good faith.

3  And they're claiming that this was not done.  So that's what

4  we're talking about.  That's the primary issue today.

5      MR. KATYAL:  And if that's what they're isolating, we

6  think Judge Kaplan found four different reasons why that -- why

7  the valid purpose of bankruptcy has been served.

8      THE COURT:  One just fact question, in terms of the

9  proposal made here to deal with the liabilities of LTL and the

10  funding, were those types of proposals, any variation of that

11  made in connection with the MDL litigation?

12      MR. KATYAL:  I don't believe the funding agreement

13  had anything to do with the MDL litigation.  Rather, as the

14  Court found in --

15      THE COURT:  Yeah, I'm just saying the concept.

16      MR. KATYAL:  Yeah, I don't know about the concept.  I

17  mean I think the only thing I'm aware of is the Court's finding

18  in A15 relying on their own expert that this was a single

19  integrated transaction and so -- with the restructuring and

20  funding agreement.

21      Now you had asked before, Your Honor, I just have to

22  slightly correct something.  I understand that the funding

23  agreement does have provisions for funding outside of

24  bankruptcy.

25      THE COURT:  Yeah, that's what I thought.

## AMENDED AND RESTATED FUNDING AGREEMENT

This AMENDED AND RESTATED FUNDING AGREEMENT, dated October 12, 2021 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement"), is by and among JOHNSON & JOHNSON, a New Jersey corporation ("J&J"), JOHNSON & JOHNSON CONSUMER INC., a New Jersey corporation ("JJCI"), and LTL MANAGEMENT LLC, a North Carolina limited liability company ("LTL").

## RECITALS

A.      On the date hereof, but prior to the execution of this Agreement, in contemplation of the divisional merger (the "Divisional Merger") of Chenango Zero LLC, a Texas limited liability company ("Chenango"), pursuant to Chapter 10 of the Texas Business Organizations Code, J&J and Currahee Holding Company Inc., a New Jersey corporation ("Currahee"), as payors, and Chenango, as payee, executed and delivered a funding agreement dated as of October 12, 2021 (the "Original Funding Agreement").

B.      Immediately following the execution and delivery of the Original Funding Agreement, Currahee, in its capacity as the sole member of Chenango approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

C.      At the effective time of the Divisional Merger, (1) certain property of Chenango as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of Chenango as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("Chenango One"), (2) the remaining property, liabilities and obligations of Chenango were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("Chenango Two"), and (3) Chenango ceased to exist.

D.      Pursuant to the Original Funding Agreement, J&J and Currahee agreed, on a joint and several basis, to provide funding to Chenango sufficient to pay the costs of operations of Chenango's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

E.      The Allocated Assets and Liabilities included the rights and obligations of Chenango under the Original Funding Agreement and, at the effective time of the Divisional Merger, pursuant to the terms of the Plan of Divisional Merger, the rights and obligations of Chenango under the Original Funding Agreement were allocated to Chenango One such that, following the effectiveness of the Divisional Merger, Chenango One had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Talc Related Liabilities.

F.      Following the Divisional Merger, (1) Chenango One effected a conversion (the "NC Conversion") into a North Carolina limited liability company and changed its name to "LTL Management LLC" and (2) Chenango Two effected a merger (the "TX-to-NJ Merger") with and into Currahee, which changed its name to "Johnson & Johnson Consumer Inc."

LTL 0002300

G.    Payors and Payee desire to amend and restate the Original Funding Agreement to reflect that the Divisional Merger, the NC Conversion and the TX-to-NJ Merger have occurred and that JJCI, now a New Jersey corporation having the name "Johnson & Johnson Consumer Inc.," and Payee, now a North Carolina limited liability company having the name "LTL Management LLC," are the parties to such agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.    <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"<u>Agreement</u>" has the meaning specified in the first paragraph hereof.

"<u>Allocated Assets and Liabilities</u>" has the meaning specified in the recitals to this Agreement.

"<u>Bankruptcy Case</u>" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"<u>Base Rate</u>" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"<u>Board</u>" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

2

LTL 0002301

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Chenango" has the meaning specified in recitals to this Agreement.

"Chenango One" has the meaning specified in the recitals to this Agreement.

"Chenango Two" has the meaning specified in the recitals to this Agreement.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"Currahee" has the meaning specified in first paragraph of this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Divisional Merger" has the meaning specified in the recitals to this Agreement.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on Schedule 2 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payors from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

3

LTL 0002302

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"J&J" has the meaning specified in first paragraph of this Agreement.

"JJCI" has the meaning specified in first paragraph of this Agreement.

"JJCI Value" means the greater of:

(a)     the fair market value of the businesses and other assets (including equity interests) held by Chenango, as determined (i) immediately prior to the effective time of the Divisional Merger, (ii) assuming the Allocated Assets and Liabilities are not held by Chenango, and (iii) based on the aggregate amount that would be received upon a sale of such businesses and other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length, under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses and other assets; and

(b)     the sum of:

(i)     the fair market value of the businesses and other assets (including equity interests) held by Chenango Two or, after the TX-to-NJ Merger, JJCI, as determined (A) as of the applicable calculation date, (B) assuming neither Chenango Two nor, after the TX-to-NJ Merger, JJCI has any obligations under this Agreement, and (C) based on the aggregate amount that would be received upon a sale of such businesses and other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length, under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses and other assets; and

(ii)     the fair market value of any businesses or other assets (including equity interests) held by Chenango Two or, after the TX-to-NJ Merger, JJCI that, following the effective time of the Divisional Merger and prior to the applicable calculation date, are distributed by Chenango Two or, after the TX-to-NJ Merger, JJCI to its members, as determined (A) at the time of such distribution and (B) based on the aggregate amount that would be received upon a sale of such businesses or other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length,

4

LTL 0002303

under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses or other assets.

"LTL" has the meaning specified in the first paragraph of this Agreement.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" means LTL Management LLC, a North Carolina limited liability company.

"Payee Affiliate" means any controlled Affiliate of the Payee.

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payors under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor Affiliate" means any Affiliate of a Payor, excluding the Payee and any Payee Affiliate.

"Payor Material Adverse Effect" means with respect to a Payor: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of such Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of such Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against such Payor.

"Payors" means J&J and JJCI.

"Permitted Funding Use" means each of the following:

    (a)    the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time

5

LTL 0002304

when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

    (b)    the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

    (c)    the funding of any amounts to satisfy:

    (i)    the Payee's Talc Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

    (ii)    following the commencement of any Bankruptcy Case, the Payee's Talc Related Liabilities in connection with the funding of one or more trusts for the benefit of existing and future claimants created pursuant to a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and, to the extent required, the District Court (for the avoidance of doubt, regardless of whether such plan of reorganization provides that the Payors will receive protection pursuant to section 105 or section 524(g) of the Bankruptcy Code and regardless of whether the Payors support such plan of reorganization); and

    (iii)    in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Talc Related Liabilities and any litigation thereof, including the costs of any appeals;

    (d)    the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time;

    (e)    the funding of any obligations of the Payee owed to any Payor or Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

    (f)    the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payors, or either of them, of any provision of this Agreement;

in the case of clauses (a) through (e) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to satisfy the Payee's Talc Related Liabilities in connection with the funding of such trust or trusts.

6

LTL 0002305

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding Voting Stock of which is owned or controlled by such Person or by one or more other Subsidiaries of such Person and that is consolidated in such Person's accounts.

"Talc Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"TX-to-NJ Merger" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.    Funding Obligations and Procedures.

(a)    Funding Obligations.  The Payors hereby agree, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for a Permitted Funding Use. Nothing in this Agreement shall obligate the Payors to (i) make Payments under this Agreement that in the aggregate exceed the lesser of (A) the JJCI Value and (B) the aggregate amount of all Permitted Funding Uses or (ii) make any individual Payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.  The JJCI Value shall be calculated at, and only at, any date on which (x) the Payors refuse to make a requested Payment under this Agreement based on clause (i) of the immediately preceding sentence and (y) the Payments made by the Payors under this Agreement prior to such date, together with the requested Payment, are in the aggregate not in excess of the aggregate amount of all Permitted Funding Uses.

(b)    Funding Requests.  To request a Payment, the Payee shall deliver to the Payors a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payors and signed by the Payee (each, a "Funding Request").  Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is at least five Business Days following the delivery of such Funding Request (each such date, a "Funding Date").  Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.  Except as required to comply with the minimum amount specified in Section 2(b)(i), the Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

LTL 0002306

(c)     Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on or before any Funding Date, the Payors shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payors do not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payors shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d)     Conditions to Payments.  The Payors' obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment:  (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and (ii) there shall have been no violation by the Payee of the covenant set forth in Section 5.

3.     Representations and Warranties.

(a)     Representations and Warranties of the Payor.  Each Payor represents and warrants to the Payee that:

(i)     Existence, Qualification and Power.  Such Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect with respect to such Payor.

(ii)     Authorization; No Contravention.  The execution, delivery and performance by such Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect with respect to such Payor.

8

LTL 0002307

(iii) <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, such Payor.

(iv) <u>Binding Effect</u>.  This Agreement has been duly executed and delivered by such Payor.  This Agreement constitutes a legal, valid and binding obligation of such Payor, enforceable against such Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b) <u>Representations and Warranties of the Payee</u>.  The Payee represents and warrants to the Payors that:

(i) <u>Existence, Qualification and Power</u>.  The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii) <u>Authorization; No Contravention</u>.  The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii) <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, the Payee.

9

LTL 0002308

(iv)    Binding Effect. This Agreement has been duly executed and delivered by the Payee. This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.    Covenants of the Payors.

(a)    Provision of Financial Information.

(i)    No later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), (A) J&J will furnish to the Payee audited annual and unaudited quarterly consolidated financial statements of J&J prepared in accordance with GAAP, subject, with respect to quarterly financial statements, normal year-end audit adjustments, and (B) Currahee will furnish to the Payee unaudited annual and quarterly income statements and balance sheets of Currahee prepared in accordance with GAAP and Currahee's historical cost basis of its subsidiaries, subject to the absence of notes to the financial statements and related disclosures and, with respect to quarterly financial statements, normal year-end adjustments.

(ii)    By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor furnishing such financial information that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify such Payor promptly thereof); *provided, however*, that the Payee may deliver a copy thereof to counsel for any official committee of claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(iii)    Notwithstanding the foregoing, but subject to the last sentence of this Section 4(a)(iii), the financial information required to be furnished as described in Section 4(a)(i) may be, rather than that of a Payor, those of any direct or indirect parent of such Payor. Notwithstanding the foregoing, a Payor may fulfill the requirement to furnish such financial information by filing the information with the SEC within the applicable time periods required by the SEC. Subject to the last sentence of this Section 4(a)(iii), a Payor will be deemed to have satisfied the requirements of Section 4(a)(i) if any direct or indirect parent of such Payor has filed such reports containing the required information with the SEC within the applicable time periods required by the SEC and such reports are publicly available. To the extent a direct or indirect parent of a Payor furnishes financial information pursuant to the first sentence of this Section 4(a)(iii) or such parent files a report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of such Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent, on the one

10

LTL 0002309

hand, and the information relating to such Payor and its Subsidiaries on a standalone basis, on the other hand.

      (b)    <u>Successor to J&J upon Consolidation or Merger</u>.

      (i)    Subject to the provisions of <u>Sections 4(b)(ii)</u> and <u>4(b)(iii)</u>, nothing contained in this Agreement shall prevent any consolidation or merger of J&J with or into any Person, or successive consolidations or mergers in which J&J or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of J&J (for the avoidance of doubt, calculated by including any equity interests held by J&J), to any Person; *provided, however*, that J&J hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than J&J, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of J&J's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by J&J, shall be expressly assumed, by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee executed and delivered to the Payee, by the Person formed by such consolidation, or into which J&J shall have been merged, or by the Person which shall have acquired or leased such property. This covenant will not apply to (A) a merger of J&J with an Affiliate thereof solely for the purpose of reincorporating J&J in another jurisdiction within the United States, (B) any conversion of J&J from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of J&J from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state. Notwithstanding the foregoing, this <u>Section 4(b)(i)</u> will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among J&J and its Subsidiaries.

      (ii)    Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of J&J (for the avoidance of doubt, calculated by including any equity interests held by J&J) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with J&J or into which J&J is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to J&J, including as a Payor, shall refer instead to the successor Person and not to J&J), and may exercise every right and power of, J&J, including as a Payor, under this Agreement with the same effect as if such successor Person had been named herein. In the event of a succession in compliance with this <u>Section 4(b)(ii)</u>, the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

      (iii)    Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted

LTL 0002310

under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

5.  <u>Covenants of the Payee</u>. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use. The Payee will perform its indemnification obligations under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6.  <u>Events of Default</u>.  Each of the following events constitutes an "<u>Event of Default</u>":

(a)  the Payors default in the funding obligations pursuant to <u>Section 2</u> and such default continues for a period of 10 Business Days;

(b)  a Payor defaults in the performance of, or breaches, any covenant or representation or  warranty of such Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this <u>Section 6</u>) and such default or breach continues for a period of 30 days, or, in the case of any failure to comply with <u>Section 4(a)</u> of this Agreement, 60 days, in each case after there has been given, by registered or certified mail, to such Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c)  a Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d)  a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against a Payor, (ii) appoints a custodian of a Payor for all or substantially all of the property of a Payor, or (iii) orders the liquidation of a Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, a Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7.  <u>Remedies</u>.  Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

LTL 0002311

8.    _Notices._   All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payors:

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Attention:  Michelle Ryan, Treasurer
Email:  mryan1@its.jnj.com

Johnson & Johnson Consumer Inc.
199 Grandview Road
Skillman, NJ 08558
Attention:  Michelle Goodridge, President
Email:  mgoodrid@its.jnj.com

Payee:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  Robert Wuesthoff, President
Email:  rwhuestho@its.jnj.com

with a copy to:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  John Kim, Chief Legal Officer
Email:  JKim8@its.jnj.com

9.    _Governing Law; Submission to Jurisdiction._   This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina.  Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in Charlotte, North Carolina; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court.  Each Payor and the Payee hereby irrevocably and unconditionally submit to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

13

LTL 0002312

10.    No Implied Waiver; Amendments.  No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payors, or either of them, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on the Payors, or either of them, in any case shall entitle the Payors, or either of them, to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand.  The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payors and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.    Counterparts; Entire Agreement; Electronic Execution.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties hereto relating to the subject matter hereof and supersedes, in its entirety, the Original Funding Agreement and any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.    Severability.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13.    Transfer; Assignment.  This Agreement shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  A Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; *provided, however*, that no such consent of the Payee shall be required in connection with any transfer effectuated in compliance with Section 4(b).  The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payors.  Any purported assignment of rights or obligations under this Agreement other than as permitted by this Section 13 shall be null and void.

14

LTL 0002313

14.    <u>Construction</u>.   The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15.    <u>Rights of Parties</u>.   This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

16.    <u>Joint and Several Obligations</u>.   Obligations of the Payors under this Agreement are joint and several.

[*Signature Page Follows*]

15

LTL 0002314

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _Michelle Ryan_____

      Michelle Ryan,
      Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _____

      Michelle Goodridge,
      President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

      Robert Wuesthoff,
      President

*[Signature Page to A&R Funding Agreement]*

LTL 0002315

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

    Michelle Ryan,
    Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _____

    Michelle Goodridge,
    President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

    Robert Wuesthoff,
    President

*[Signature Page to A&R Funding Agreement]*

LTL 0002316

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

     Michelle Ryan,
     Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _____

     Michelle Goodridge,
     President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

     Robert Wuesthoff,
     President

*[Signature Page to A&R Funding Agreement]*

LTL 0002317

# SCHEDULE 1

## Definition of Talc Related Liabilities

For purposes of this Agreement, "Talc Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to, talc, including talc contained in any product, or to the risk of, or responsibility for, any such damage or injury, including such Liabilities based on the contamination, or alleged contamination, of talc, including talc contained in any product, with asbestos or any other material.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a)     "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)     "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)     "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)     "Law" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)     "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss

LTL 0002318

of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f)     "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g)     "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)     "Plan" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)     "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

LTL 0002319

**SCHEDULE 2**

**Funding Account**

LTL Management LLC
Account Number:  237025463987
ABA/Routing Number:  053000196
Swift: BOFAUS3N

LTL 0002320

# EXHIBIT 12


# UNDER SEAL

```
1            Q.      And they purchased the Vermont talc
2    mines in southern Vermont from a company called
3    Eastern Magnesia, correct?
4            A.      Eastern Magnesia Talc Company.
5            Q.      And then, in about 1967, Johnson &
6    Johnson started using talc from Vermont for its baby
7    powder, correct?
8            A.      Yes.
9            Q.      And they continued to use the talc for
10   baby powder and Shower to Shower, throughout the
11   1970s, throughout the 1980s, throughout the 1990s,
12   until about 2003, correct?
13           A.      Correct.
14           Q.      And just so I'm -- I'm clear, Shower
15   to Shower and -- in the 1970s and 1980s, was sourced
16   from the same mine that baby powder was, correct?
17           A.      Yes.
18           Q.      And you told us just a few minutes ago
19   that baby powder, Johnson & Johnson, the big company,
20   had the baby powder as part of -- until 1979, where
21   they created what's now called J&J Consumer, correct?
22           A.      Yes.  It became part of a separate
23   company within -- within Johnson & Johnson.
24           Q.      Johnson & Johnson consumer --
25   Johnson & Johnson formed a company and sort of spun
```

LTL 0022071

```
 1    off its Baby Products division into a different

 2    subsidiary, correct?

 3          A.      That's my understanding, correct.

 4          Q.      But you told me in your deposition

 5    with regards to Shower to Shower, Johnson & Johnson

 6    the mothership, always had the Shower to Shower until

 7    they sold it in 1995, correct?

 8          A.      What you describe as the mothership is

 9    the -- the main Johnson & Johnson.

10          Q.      The main Johnson & Johnson.

11          A.      Yes.  Yes.  It was still part of

12    Johnson & Johnson, but my understanding, or maybe I

13    didn't make it clear, was that it was -- that division

14    was separated out into the consumer products.

15          Q.      In your deposition, you testified

16    under oath that Johnson & Johnson owned Shower to

17    Shower until they sold it to another company, correct?

18          A.      It was sold to Valiant, another

19    company, from -- from Johnson & Johnson, yes.

20          Q.      And what year was it sold to Valiant,

21    I may have misstated the date, it wasn't '95, I was

22    thinking of Colgate stuff, was it 2015?

23          A.      2012 was it?

24          Q.      2012?

25          A.      Around about there, yeah.
```

LTL 0022072

1          Q.       So Johnson & Johnson was the

2     manufacturer and the seller of the Shower to Shower

3     product all the way through the '70s, '80s, '90s, all

4     the way till it sold to Valiant in 2012, correct?

5          A.       The main -- the main -- what you call

6     mothership, the main Johnson & Johnson, was -- was the

7     main owner of the Consumer Products company, but like

8     I said a little while ago, my understanding is that

9     the Shower to Shower section was put into a separate

10    division, or separate company, under Johnson & Johnson

11    in the early '70s.

12         Q.       We'll come back to that.  We'll come

13    back to that because in your deposition -- you

14    remember testifying?

15         A.       I do, and again, maybe I -- maybe I

16    didn't speak clearly or maybe I didn't understand the

17    question, but it's -- it was still part of Johnson &

18    Johnson, which you call the mothership, until it was

19    sold to Valiant, I think it was 2012.

20         Q.       Johnson & Johnson corporate, the main

21    mother -- what I call the mothership in New Brunswick,

22    made all the health and safety policy decisions with

23    regard to asbestos and talc products, correct?

24         A.       I'm not -- I'm not sure where -- where

25    the separation.  The --

LTL 0022073

1          Q.          You're not sure?

2          A.          The responsibility for making the

3     decisions was with the individual company that was

4     separated out, either Consumer Products, Baby

5     Products.

6          Q.          You recall testifying last Monday in

7     New Jersey?

8          A.          Yes.

9          Q.          And last Monday in New Jersey, on

10    July 22nd, you were sworn to tell the truth, were you

11    not?

12         A.          Yes.

13         Q.          And last Monday, you were being

14    examined by an attorney named Mr. Panatier, correct?

15         A.          Yes.

16         Q.          And Mr. Panatier, last Monday, asked

17    you this question:  Johnson & Johnson Corporate in New

18    Brunswick --

19                    MR. DUBIN:  Objection.

20                    THE COURT:  You want to approach?

21                    (BENCH CONFERENCE)

22         Q.          Isn't it true, Dr. Hopkins, that

23    Johnson & Johnson, in New Brunswick, made all the

24    health and safety policy decisions with regard to

25    asbestos and talc products, correct?

LTL 0022074

1          A.          That is my understanding.

2          Q.          And they made those health and safety

3     decisions about asbestos and talc for all the global

4     companies, correct?

5          A.          The --

6          Q.          Is that correct?

7          A.          You need to define what you mean by

8     Johnson & Johnson New Brunswick.

9          Q.          The parent company.

10         A.          The parent company is a legal entity.

11         Q.          That's right.

12         A.          They -- the subsidiary companies are

13    those that are called Consumer Products.  They were

14    the ones who made the decision.

15         Q.          Okay.  The parent company in New

16    Jersey is the one that made all the corporate

17    decisions regarding asbestos, talc, health and safety

18    decisions for all the global companies, correct?

19         A.          We're getting into semantics of what

20    you mean by parent company.  The decisions on the

21    safety of talc were made by the individual operating

22    companies, which would be, in this case, Consumer

23    Products, which is a separate company within, as you

24    call it, the mothership, the parent company.

25         Q.          Well, turn to Page 20, lines 6 through

LTL 0022075

1    12.  Let me know when you're there.

2         A.      We're there.

3         Q.      And last Monday, eight days ago, you

4    raised your hand and swore to tell the truth, did you

5    not?

6         A.      Absolutely, yes.

7         Q.      And you did tell the truth, did you

8    not?

9         A.      That's my understanding, yes.

10        Q.      And you were asked this question, 6

11   through 12.

12               MR. SATTERLEY:  Request for permission

13   to read, Your Honor.

14               THE COURT:  Mr. Dubin, any objection?

15               MR. DUBIN:  I'm sorry, page what?

16               MR. SATTERLEY:  Page 20.

17               THE COURT:  Page 20, 6 through 12.

18               MR. DUBIN:  This just doesn't make

19   sense to me.  It appears to start in the middle of a

20   question.

21               MR. SATTERLEY:  No.  Page -- Page 20,

22   I apologize.  Lines 11 through 17.

23               MR. DUBIN:  Of Page 20?

24               MR. SATTERLEY:  Of Page 20.

25               MR. DUBIN:  Okay.  No objection.

LTL 0022076

```
 1              Q.        The question posed to you under oath

 2    in New Jersey eight days ago:

 3                       "QUESTION:   Johnson & Johnson

 4    Corporate in New Brunswick made all health and safety

 5    policy decisions with regards to asbestos in talc

 6    products, correct?

 7                       "ANSWER:   The -- yes.   The company in

 8    New Jersey is the parent company for all the global

 9    companies made those decisions, yes."

10                       That was your sworn testimony?

11              A.        Yes.   The company -- the corporate in

12    New Jersey is the parent company, yes.

13              Q.        And the testing, the whole process of

14    testing for talc for the presence of asbestos was done

15    by the corporate parent, Johnson & Johnson, correct?

16              A.        I'm sorry, where are you reading?

17              Q.        I'm not reading.

18              A.        Oh, right.

19              Q.        I'm asking you a different question.

20              A.        Oh, sorry.   Ask the question again,

21    please.

22              Q.        Yes.   You can put that transcript

23    aside.

24              A.        Thank you.

25              Q.        The whole worldwide testing program,
```

LTL 0022077

1   testing for the presence of asbestos, was run by

2   Johnson & Johnson Corporate, correct?

3          A.      The testing program, worldwide

4   testing, was run by the Baby Products company, the

5   testing program.

6          Q.      From -- before 1979?

7          A.      You're talking about before 1979?  No.

8   The Baby Products company was set out from 1979

9   onwards.

10         Q.      All right.  So the -- just so the

11  record is clear, the parent company, before 1979, was

12  in charge of worldwide testing for the presence of

13  asbestos in all talc product, correct?

14         A.      That is my understanding.

15         Q.      And is it your testimony now, in 1979,

16  the Consumer Products company did the worldwide

17  testing with regards to baby powder, but not Shower to

18  Shower?

19         A.      Baby Products company evaluated the

20  safety of talc on a global basis.

21         Q.      After 1979?

22         A.      Yes.

23         Q.      We'll come back to Shower to Shower in

24  a little bit.  You have the ability, if you wanted to,

25  to go through Johnson & Johnson's database production,

LTL 0022078

**Hopkins - Cross/Mr. Block**

1   CROSS-EXAMINATION

2   BY MR. BLOCK:  (Continued)

3       Q    And then there's expenses associated with the extra

4   testing, correct?

5       A    Yes.

6       Q    And the cost of the extra testing would be $65,000,

7   correct?

8       A    (Reviewing document.)  Yes.

9       Q    Is that correct?

10      A    Yes.  The jury can't see that.

11      Q    Okay.  Should we show them?

12              THE COURT:  No, no, no, no.

13              MR. BLOCK:  Your Honor, I tried to get the

14   testimony.

15              THE COURT:  No, no, no.

16              MR. BLOCK:  I can ask the question again, see if I

17   can get a response.

18              THE COURT:  Try it again.

19      Q    The cost of the additional testing would have been

20   $65,000, correct?

21      A    According to this document, yes.

22      Q    Okay.

23              And Johnson & Johnson has never adopted the

24   recommendation to do weekly TEM testing, not in 1978, not in the

25   1980s, and not until all the way up until today, correct?

**Hopkins - Cross/Mr. Block**

1      A     For these foreign talcs?

2      Q     You cannot show this jury a document that shows Johnson

3   & Johnson has ever done testing every week for talc to determine

4   asbestos by TEM, can you, every week?

5      A     For these foreign talcs?

6      Q     No, sir.

7            We've looked at the material specifications that

8   Johnson & Johnson has.  And you recall that they have different

9   test methods, 7024 for TEM, correct?

10     A     Yes.

11     Q     They say how often the testing is to occur, correct?

12     A     Yes.

13     Q     And isn't it true that the material specifications

14  Johnson & Johnson has for the testing of its talc by TEM does

15  not require the talc to be tested every week, correct?

16     A     Right.  We're now back in the U.S.

17           MR. BLOCK:  I move to strike everything after

18     "right," your Honor.

19           THE COURT:  Reask the question.

20           MR. BROCK:  Objection.

21           THE COURT:  Overruled.

22     Q     Let me ask the question again.

23           The material specifications that Johnson & Johnson

24  have for the testing of its talc in the United States does not

25  require the talc to be tested on a weekly basis, correct, for

**Hopkins - Cross/Mr. Block**

1    asbestos?

2        A    Not on a weekly basis.

3        Q    All right.

4            And this -- and do you have any document that you

5    can show the jury that Alternative 1-A as outlined in this

6    document, was adopted by Johnson & Johnson?

7        A    Alternative 1-A testing for --

8        Q    Yes, we have a proposed alternative --

9        A    I just want to make sure we're on the same page.

10   You're saying Alternative 1-A for U.S. or worldwide or foreign?

11       Q    I'm saying very clearly, this document that's in

12   evidence for the jury, 835, sets forth this Alternative

13   Procedure 1-A and there's a cost to it.

14           Do you have any evidence in writing that Johnson &

15   Johnson ever adopted Alternative Procedure 1-A; yes or no?

16       A    I do not.

17       Q    Okay.  Dr. Hopkins, I want to go back to where we left

18   off yesterday and we were talking about Johnson & Johnson and I

19   want to ask you about Johnson's Baby Powder and the manufacture,

20   sale, distribution and testing of the product.  Okay?

21       A    Yes.

22       Q    All right.  And from the 1950s and even going back

23   before the 1950s, up until 1972, was Johnson & Johnson the

24   company that manufactured, sold, distributed and tested

25   Johnson's Baby Powder?

**Hopkins - Cross/Mr. Block**

1    A    Johnson & Johnson as an umbrella company, yes.

2    Q    Okay.  So Johnson & Johnson and you're referring to the

3    company Johnson & Johnson, the Johnson & Johnson based in New

4    Brunswick, New Jersey, correct?

5    A    Yes.

6    Q    Now from 1972 through 1978 until by December of 1978,

7    there was a company called Johnson's Baby Product Company,

8    correct?

9    A    Yes.

10   Q    So Johnson & Johnson, I'll put BPC, Baby Product

11   Company, okay?

12   A    Okay, yes.

13   Q    Just to be clear, during these years, I think, up

14   through December of 1978, Johnson & Johnson Baby Products

15   Company was a division of Johnson & Johnson, correct?

16   A    A subsidiary division, yes.

17   Q    I want to make sure we agree here.

18        Up until December of 1978, we're talking about the

19   period 1972 up until December of 1978, Johnson & Johnson Baby

20   Products Company was part of Johnson & Johnson, it was a

21   division and not a separate company during those years, correct?

22   A    I don't know the company structure.  I can't comment.

23   It was called Johnson's Baby Products Company, but that's a

24   legal area that I'm not familiar with.

25   Q    Can we go to your deposition testimony from

**Hopkins - Cross/Mr. Block**

1    September 27th, 2018.

2              So we're looking at your sworn testimony from

3    September 27th, 2018, and Page 39 Line 3.  All right.

4              Are you there?

5    A    Yes.

6    Q    Okay.  So this is your sworn testimony on

7    September 27th, 2018:

8              "QUESTION:  You will agree that Johnson & Johnson

9    Baby Product Division in the 1970s up through 1978 was, was

10    not a separate corporation distinct from Johnson & Johnson,

11    correct?

12             "ANSWER:  Baby, Baby Products Company initially

13    was a division of Johnson & Johnson, it was a division.

14             "QUESTION:  Yes.

15             "ANSWER:  And it later became a separate company."

16             Was that your testimony?

17    A    Yes.

18    Q    Okay.  So it was a division of Johnson & Johnson up

19    through 1978 and later --

20             MR. BROCK:  Excuse me.

21    Q    -- became a separate company, correct?

22             MR. BROCK:  I would ask the next question and

23    answer be read to the jury for completeness.

24             THE COURT:  I can't see what it is.

25             MR. BROCK:  I'll show you, your Honor.  This

JOHN PHELPS SENIOR COURT REPORTER

**Hopkins - Cross/Mr. Block**

1    question right here (indicating).

2              MR. BLOCK:  Sure.  The next question and answer.

3    It's the same thing.

4              MR. BROCK:  No.  And "J&J admits," the question

5    begins "J&J admits."

6              MR. BLOCK:  Your Honor, that's for redirect.

7              THE COURT:  That's for redirect.  Thank you.

8              Overruled.

9    Q    Then on Page 13 of the same deposition, you said:

10             "QUESTION:  Up until 1978, it was not a separate

11   corporation, it was simply a division, correct?"

12             Your answer was:  "Correct."

13             Right?

14   A    Yes.

15   Q    So then from 1979 and I'm going to go up to today, this

16   Johnson & Johnson Baby Product Company has had a number of names

17   going up until today, correct?

18   A    It has, yes.

19   Q    All right.  And so today, the name is called Johnson &

20   Johnson Consumer, Inc., correct?

21   A    Yes.

22   Q    All right.  And the jury heard testimony and this is

23   just a demonstrative exhibit that the names, we had Johnson &

24   Johnson Baby Products Company, Johnson & Johnson Consumer

25   Products, Inc., Johnson & Johnson Consumer Companies, Inc. and

## Hopkins - Cross/Mr. Block

1  then from 2015 to the present, Johnson & Johnson Consumer, Inc.,

2  And was that the progression of these different entities leading

3  up until the name of the company that's called today Johnson &

4  Johnson Consumer, Inc.?

5      A    To the best of my knowledge, yes.

6      Q    Okay.  So from 1979 to today, Johnson & Johnson Baby

7  Products Company which is now known as Johnson & Johnson

8  Consumer, Inc. has been a subsidiary of Johnson & Johnson,

9  correct?

10      A    Yes.

11      Q    Okay.  And these companies, Johnson & Johnson Baby

12  Products Company and the different names of these companies all

13  up until today Johnson & Johnson Consumer, Inc., do they have a

14  separate board of directors from Johnson & Johnson?

15      A    I don't know.  It's a legal question, company law is

16  something I'm not familiar with.

17      Q    Are you aware that Johnson & Johnson Consumer, Inc. has

18  a board of directors?

19      A    I believe it did.  Whether it does today, I don't know.

20      Q    Okay.  All right.

21           So then Shower to Shower, I'll put up a little box

22  here.  We talked about Johnson's Baby Powder.  So Shower to

23  Shower.

24           Shower to Shower is not a baby product, correct?

25      A    Correct.

**Hopkins - Cross/Mr. Block**

1    Q    And Shower to Shower has been around for what, since

2    1960?

3    A    Very late sixties, yes.

4    Q    So 1960s.

5          And Johnson & Johnson, what happened in 2012 with

6    Shower to Shower in Johnson & Johnson?

7    A    Oh, it was sold to, I can't remember another

8    corporation, completely different.

9    Q    Valiant?

10   A    Valiant.  Thank you, yes, on the tip of my tongue.

11   Q    Did Johnson & Johnson keep, any I don't know, anything

12   like ongoing, did they have any royalties or anything from that

13   or they just out and out sold Shower to Shower to Valiant in

14   2012?

15   A    Again, that's their corporate law where I'm not

16   familiar with.

17   Q    And just so the jury understands, Shower to Shower has

18   always been manufactured, distributed, sold and tested by

19   Johnson & Johnson, correct?

20   A    Some of the manufacture I think in recent years is

21   subcontracted.

22   Q    Right.  What I'm saying is that Johnson & Johnson has

23   been ultimately responsible for manufacturing, selling,

24   distributing and testing Shower to Shower through the entire

25   history of that product with Johnson & Johnson, correct?

**Hopkins - Cross/Mr. Block**

1    A    Yes, up until its sale to Valiant.

2    Q    And just to be clear, the subsidiary Johnson & Johnson,

3    Johnson's Baby Product Company from 1979 until today, where it's

4    called Johnson & Johnson Consumer, Inc., that's now the company

5    that manufacturers, sells, distributes and tests Johnson's Baby

6    Powder, correct?

7    A    Yes.

8    Q    And I just want to go back to Johnson & Johnson one

9    more time, this chart we were working on yesterday.

10            Another thing that you would agree with is that

11    Johnson & Johnson sets the parameters -- strike that.

12            Johnson & Johnson sets the guidelines for health

13    and safety which should be adopted by all Johnson & Johnson

14    affiliates worldwide, correct?

15    A    Sorry.  Can you define what you mean by "guidelines for

16    health and safety"?  Worker employee health?

17    Q    Yes.  Can you look at your testimony from October 23,

18    2018, please.  Thank you.

19            Going to Page 17, Line 24 -- I'm sorry, Page 138,

20    Line 21.

21            Okay.  Are you there?

22    A    138, yes.

23    Q    138, line 21, your deposition testimony from

24    October 23, 2018:

25            "QUESTION:  Now you have also told me in the past

### Hopkins - Cross/Mr. Block

1    that all of the guidance for all of the different operating

2    companies around the world on policy with regard to health

3    and safety analysis of potential hazards comes right out of

4    New Brunswick, the headquarters in New Jersey, correct?"

5          Your answer:  "Well, the general principal is he

6    run an office, the New Jersey office he sets the

7    parameters, sets the guidelines for health and safety which

8    should be adopted everywhere."

9          Did you give that testimony?

10   A    Yes.

11   Q    And you would agree that Johnson & Johnson has the

12   authority to require warnings on Johnson's Baby Powder about

13   cancer, correct?

14   A    They have the authority to require warnings.  If that

15   were a medical requirement, they would, yes.

16   Q    What I'm saying is if Johnson & Johnson says that it

17   wants warnings about cancer on Johnson's Baby Powder, then

18   warnings about cancer would go on Johnson's Baby Powder,

19   correct?

20   A    I can't see any reason why they would not if head

21   office required any warning whether it's keep away from eyes,

22   keep away from children, yeah.

23   Q    Right.  The buck stops with Johnson & Johnson New

24   Brunswick, New Jersey, if they say there should be a warning

25   about anything on Johnson's Baby Powder, then that command will

**Hopkins - Cross/Mr. Block**

1    be followed, correct?

2                    MR. BROCK:  Objection.  Foundation.

3                    THE COURT:  Overruled.

4                    THE WITNESS:  Thank you.

5        A    The way we use is guidance and on the other hand there

6    maybe regulations in certain overseas countries which you'd have

7    to abide by.

8        Q    Let's talk about the United States.

9        A    But if you're talking about the United States, then

10   I'll answer the question as yes.

11       Q    Okay.  So Johnson & Johnson, if they tell Johnson &

12   Johnson Consumer Inc. that they want a certain warning on

13   Johnson's Baby Powder, that instruction will be followed,

14   correct?

15       A    I'm sorry, who's "they"?  You said "they."

16       Q    If Johnson & Johnson tells Johnson & Johnson Consumer,

17   Inc., we want a warning about cancer or asbestos on Johnson's

18   Baby Powder, Johnson & Johnson has the authority to do that,

19   correct?

20       A    No.  I think -- the origin of the guidance or the

21   warning would come from the Consumer, Inc., so they would be

22   telling themselves.

23       Q    Listen to my question.

24                    If Johnson & Johnson tells its subsidiary, Johnson

25   & Johnson Consumer, Inc., that they want a certain warning on

## Hopkins - Cross/Mr. Block

1    THE COURT:  Overruled.

2    A    Again, I do not know.

3    Q    And Dr. Gottlieb says here in the next sentence, "We

4    believe" -- after the sentence about adverse event reports, Dr.

5    Gottlieb says, "We believe this information will help us better

6    identify specific cosmetic products and raw ingredient suppliers

7    that may be more likely to be contaminated and inform steps with

8    the FDA may be able to take to better protect consumers."

9            Did I read that correctly?

10           MR. BROCK:  Objection.

11           THE COURT:  Sustained.  Next topic.

12   Q    Just a few more areas for you, Dr. Hopkins.

13           Let me show you what's in evidence as Plaintiffs'

14   Exhibit 456 and, Dr. Hopkins, I'm using Plaintiffs' Exhibit 456

15   just to ask you about the container of Johnson's Baby Powder

16   that was used during various years and this -- this is a

17   container of Johnson's Baby Powder, correct?

18   A    Yes.

19   Q    And the Johnson's Baby Powder container has the name

20   "Johnson & Johnson" on it, right?

21   A    Yes.

22   Q    That's the logo name of Johnson & Johnson from New

23   Brunswick, New Jersey, correct?

24   A    Yes.

25   Q    And the container says "Purest Protection," right?

## Hopkins - Cross/Mr. Block

1    A    Yes.

2    Q    And if you go to the back of the container, this is a

3    container from 1985, correct?

4    A    Yes.  It's dated 1985.

5    Q    1985.  And there is nothing on this container about --

6    well, we can see what we've been talking about, it says "talc

7    and fragrance are the only ingredients," correct?

8    A    Yes.

9    Q    It doesn't say anything about contaminants, right?

10        MR. BROCK:  Objection.  Asked and answered.

11    A    It says "talc and fragrance."

12        THE COURT:  Overruled.

13    Q    Nothing about tremolite, right?

14    A    It says "talc and fragrance."

15    Q    Nothing about asbestos, right?

16    A    It says "talc and fragrance."

17    Q    Nothing about amphibole, right?

18    A    Says "talc and fragrance."

19    Q    Nothing about cummingtonite?

20    A    It says "talc and fragrance."

21    Q    There's a caution that says "close tightly" --

22    A    Shall I read it?

23    Q    Yes.

24    A    "Close tightly after use and keep out of children's

25    reach."

**Hopkins - Cross/Mr. Block**

1    Q    Okay.  And it doesn't say anything there about the

2    breathing in of respirable particles during normal use like we

3    looked at those studies where they were doing experiments on

4    live babies and adults, correct?

5                    MR. BROCK:  Objection.

6                    THE COURT:  Sustained.

7    Q    That's the only thing they say, to keep a child from

8    grabbing it, right?

9                    MR. BROCK:  Objection, your Honor.  Objection.

10        Argumentative.

11                   THE COURT:  Also asked and answered.

12   Q    There's no warning about the normal use of the product

13   on a baby or an adult's skin, correct?

14   A    No, it describes the product.

15   Q    Yes or no, there's no warning about the normal use of

16   the product on a baby or on an adult's body, correct?

17   A    No, there's directions when to use it, but there's no

18   word "warning," it's just directions when to use it.

19   Q    And Johnson & Johnson used this phrase "purest

20   protection" even though it couldn't validate using the word

21   "purest," right?

22   A    It's a hypothetical.

23                   MR. BROCK:  I object on relevance.

24                   THE COURT:  Overruled.

25                   MR. BROCK:  Object on relevance.

| | |
|---|---|
| **From:** | Kertesz, Maria E. [CPCUS] </O=JNJ/OU=EXTERNAL (FYDIBOHF25SPDLT)/CN=RECIPIENTS/CN=A418F9D806374E978E37A86EA845B46C> |
| **To:** | Sneed, Michael [JJCUS]; Devine, Danielle J [JJCUS] |
| **Sent:** | 12/17/2018 5:00:34 PM |
| **Subject:** | FW: [EXTERNAL] FW: FW: revised copy |
| **Attachments:** | DBXCP00000780_C3.pdf |

Hi Michael and Danielle,
New "what we know" copy For your final review. We got the deadline extension and agency is working fast! this will be our print ad for tomorrow ☺
Take a quick final look, but it's moving fast – we have to deliver by 1pm
Thank you

---

**From:** Andy Langer <andy.langer@velocityomc.com>
**Date:** Monday, December 17, 2018 at 11:50 AM
**To:** MARIA EDUARDA KERTESZ <Mkertesz@its.jnj.com>
**Cc:** "Lovering, Joe" <Joseph.LoveringIII@bbdo.com>
**Subject:** [EXTERNAL] FW: FW: revised copy

Here is the newest version.
Please check and approve.
Thanks.

---

DDB Worldwide Communications Group Inc. Email Disclaimer: http://e-maildisclaimer.com/ddb.com.html

**EXHIBIT**

**601.012**

JNJTALC001127272

# What we know.



Johnson & Johnson knows that the talc in our baby powder is the purest, safest pharmaceutical-grade talc on earth.

We know that Johnson's Baby Powder does not contain asbestos and never will. We test every single lot to ensure it.

We know that thousands of independent tests by universities, research labs and government regulators have consistently found that our talc is safe.

We know that talc is a common mineral that's part of all of our lives. It's in our foods. Our cosmetics. Our gyms. And yes, it's in Johnson's Baby Powder.

We know that we have always cooperated fully and openly with the FDA and other regulators and have given them full access to our talc testing results.

We know that we have always acted with the transparency in this matter. Nothing is more important to us than the health and safety of our customers. We're parents and grandparents, just like you. If we had any reason to believe our talc was unsafe, it would be off our shelves immediately.

We know that we did not hide anything. Our openness and collaboration with the FDA and regulatory agencies is well documented.

We know that there is overwhelming scientific evidence that our talc is safe and beneficial to use. But don't take our word for it. Go to factsabouttalc.com. There you'll find independent studies from leading universities, research from medical journals and third-party opinions. So you can learn the facts and make up your own mind.



©Johnson & Johnson Services, Inc. 2019

JNJTALC001127273

Johnson&Johnson

March 11, 2019

Subcommittee on Economic and Consumer Policy,
  Committee on Oversight and Reform
U.S. House of Representatives
Washington, D.C. 20515

Dear Members of the Subcommittee:

Tomorrow's hearing on public health risks in consumer products raises significant and important public policy issues that deserve to be examined in a thorough, rigorous, and impartial manner. Johnson & Johnson has dedicated significant resources to providing the public with open and transparent information regarding Johnson's Baby Powder, cosmetic talc, and talc safety, including through a dedicated website, Facts About Talc, where the company has posted more than 1,500 documents of studies, letters, and other materials covering decades of information about cosmetic talc. This letter summarizes key information about talc safety and seeks to correct erroneous information that has been recently repeated by the media.

**Johnson's Baby Powder Is Safe**

The science is clear. Decades of independent scientific testing has confirmed that Johnson & Johnson's cosmetic talc and Johnson's Baby Powder are safe, are not contaminated with asbestos, and do not cause cancer. The FDA, global regulators, and leading independent labs have collectively tested Johnson & Johnson's cosmetic talc for decades and repeatedly affirmed that it does not contain asbestos.

Indeed, just last week, the FDA restated its findings from an earlier study in which it tested both Johnson's Baby Powder and the cosmetic talc supplied to Johnson & Johnson, in addition to 34 other cosmetics products. Using "the most sensitive techniques available," the FDA found that none of the products tested, including Johnson's Baby Powder and the cosmetic talc used in Johnson's Baby Powder, contained asbestos.[1] Numerous global regulators have recently affirmed the safety of Johnson & Johnson's cosmetic talc products.[2] Likewise, scientists from Harvard, MIT, Princeton, Dartmouth, Mt. Sinai Medical Center, the National Institute for Occupational Safety and Health, and many others have time and again confirmed

---

[1] Food and Drug Administration, Statement from FDA Commissioner Scott Gottlieb, M.D., and Susan Mayne, Ph.D., Director of the Center for Food Safety and Applied Nutrition (Mar. 5, 2019), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm632736.htm (citing results from FDA's 2009-10 study, which surveyed over 34 products, including Johnson's Baby Powder, and linking to FDA's general webpage on talc, https://www.fda.gov/Cosmetics/ProductsIngredients/Ingredients/ucm293184.htm).

[2] *See Government of India Reaffirms the Safety of Johnson & Johnson's Talc* (Feb. 28, 2019), https://www.factsabouttalc.com/assets/pdfs/news/Feb28-2019.pdf; JFDA, *"Johnson Baby Powder" Is Free from Carcinogens*, Jordan News Agency (Dec. 17, 2018) (translation).

EXHIBIT

601.013

that Johnson & Johnson's cosmetic talc products do not contain asbestos.[3]  Multiple scientific, peer-reviewed studies of tens of thousands of men and women reflect that cosmetic talc does not cause cancer.[4]

Johnson & Johnson has been working cooperatively with regulators on these issues for decades.  When media reports first raised issues regarding cosmetic talc in the 1970s, Johnson & Johnson worked swiftly with the FDA and leading scientists to demonstrate that its baby powder was safe.[5]  After performing its own testing, the FDA concluded, in 1976, that Johnson & Johnson's products were not contaminated with asbestos.[6]  Unfortunately, plaintiffs' lawyers and others have sought to misuse or mischaracterize historical documents in an attempt to rewrite history, but the facts and documentary record are clear.

### Johnson & Johnson's Decades of Testing of Cosmetic Talc

In 1976, the cosmetics industry established a testing standard to ensure the safety of cosmetic talc, called the CTFA J4-1 specification, which was subsequently acknowledged by FDA as well.  The J4-1 standard requires the use of x-ray diffraction (XRD), and, where necessary for additional screening, polarized light microscopy (PLM).  Johnson & Johnson has used XRD and PLM for decades, and indeed, currently uses both methods in accordance with the United States Pharmacopeia recommendations for ensuring that pharmaceutical-grade talc is asbestos free.  In addition to using XRD and PLM in accordance with the United States Pharmacopeia and J4-1 methods, Johnson & Johnson uses transmission electron microscopy (TEM) to assess its cosmetic talc.[7]  Johnson & Johnson tests the sites where its cosmetic talc is mined, the raw ore taken out of the earth, and the milled powder before it is bottled.[8]

In addition to Johnson & Johnson's own testing, independent experts and authorities have analyzed its sources and products.  Government agencies such as the FDA and the National Institute for Occupational Safety and Health, leading labs including the McCrone Group, and scientists from world-class universities like Harvard and MIT have all confirmed that Johnson & Johnson's cosmetic talc products are safe and do not contain asbestos.

---

[3] *See*, e.g., Boundy et al., Occupational Exposures to Non-Asbestiform Talc in Vermont *in* DUSTS AND DISEASE 365 (R. Lemen & J.M. Dement eds., 1979); Martin Buerger, REPORT TO DR. A. L. GOUDIE, (1972); R.C. Reynolds, X-RAY AND OPTICAL EXAMINATION OF TALC PRODUCTS (1971); Press Release, Mt. Sinai Medical Center, Statement by Dr. Thomas Chalmers (Mar. 23, 1976).

[4] *See*, e.g., Rubino et al., *Mortality Study of Talc Miners and Millers*, 18 J. OCCUP. MED. 186 (1976), Pira et al., *Updated Mortality Study of a Cohort of Asbestos Textile Workers*, CANCER MEDICINE (2017); Gertig et al., *Prospective Study of Talc Use and Ovarian Cancer*, 92 J. NATL. CANCER INST. 249 (2000); Gates et al., *Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype*, 171 AM. J. EPIDEMIOL. 45 (2010).

[5] *See*, e.g., Letter from W. Nashed of Johnson & Johnson to FDA (Oct. 17, 1972).

[6] *See* Memorandum from Ronald Yates, FDA, to Heinz Eiermann, FDA (Jan. 7, 1976).

[7] *See* JOHNSON & JOHNSON RAW MATERIAL SPECIFICATION (2014).

[8] *See* Fred Pooley, REPORT ON THE EXAMINATION OF ROCK SAMPLES FORM THE VERMONT TALC MINE (1972); Fred Pooley, AN EXAMINATION OF MINE SAMPLES AND RELEVANT POWDERS (1972); Memo from A. Frank to G. Lee on Audit Testing of Windsor 66 Talc for Asbestos (June 28, 1977).

**FDA's Past Conclusions on Talc's Safety**

Since the 1970s, the FDA has repeatedly examined talc safety and investigated allegations regarding public health and cosmetic talc.  On each occasion, the FDA has concluded that Johnson & Johnson's products do not contain asbestos and do not cause cancer.  In 1986, the FDA responded to a citizen petition and determined that cosmetic talc did not warrant a warning about the presence of asbestos.  Importantly, the FDA determined that certain of the early analytical results from the early 1970s and before—many of the same materials cited by plaintiffs' lawyers and news reports today to suggest the presence of asbestos in talc—were of "questionable reliability" due to the lack of agreement around which methods were well-suited for analyzing cosmetic talc.[9]

In 2010, the FDA released the results of its own testing of talcum powder products and sources.  The agency found that Johnson & Johnson's products and source materials did not contain asbestos.[10]  In 2014, after years of additional scientific research being published, the FDA concluded that cosmetic talc did not warrant warnings about cancer.  The FDA reviewed decades of scientific investigations of possible links between ovarian cancer and talc and concluded that there was "no conclusive evidence to support" a causal connection between talc and ovarian cancer.[11]

**Cosmetic Talc Does Not Cause Cancer**

Numerous epidemiological studies over several decades have examined whether differences in exposure to talc are associated with differences in disease occurrence.  For example, studies have followed thousands of miners and millers working in talc production in Italy, Vermont, France, and elsewhere.[12]  Because these personnel work in talc producing occupations, the miners and millers are exposed to talc at massively larger quantities than consumers.  Yet these studies have not identified a single person with mesothelioma, the cancer associated with asbestos.  These studies include workers dating to the 1920s and have been updated as recently as 2017, continuing to show no instances of mesothelioma.[13]

Additionally, several studies have examined whether there is a causal link between the use of cosmetic talc and ovarian cancer.  Three large, prospective cohort studies of tens of thousands of women did not find any such link.  In 2000 and 2010, the Nurses' Health Study, which considered more than 40,000 nurses who reported use of cosmetic talc as of 1982,

---

[9] Letter from H.W. Swanson, FDA, to Phillippe Douillet, Docket No. 83P-0404 (July 11, 1986).

[10] *Cosmetics Ingredients: Talc*, FDA (last updated Aug. 21, 2018).

[11] Letter from Steven Musser, FDA, to Dr. Samuel Epstein, Cancer Prevention Coalition, Docket Nos. 94P-0420, FDA-2008-0309-0001/CP (Apr. 1, 2014).  FDA also observed that there is still no "cogent biological mechanism by which talc might lead to ovarian cancer." *Id.*

[12] *See*, e.g., Rubino et al., *Mortality Study of Talc Miners and Millers*, 18 J. OCCUP. MED. 186 (1976), Pira et al., *Updated Mortality Study of a Cohort of Asbestos Textile Workers*, CANCER MEDICINE (2017), Selevan et al., *Mortality Patterns Among Miners and Millers of Non-Asbestiform Talc: Preliminary Report*, 2 J. ENV. PATH. & TOXIC. 273 (1979), Wild et al., *A Cohort Mortality and Nested Case-Control Study of French and Austrian Talc Workers*, 59 J. OCCUP. ENVIRON. MED. 98 (2002).

[13] Pira et al., *Updated Mortality Study of a Cohort of Asbestos Textile Workers*, CANCER MEDICINE (2017).

concluded that the use of cosmetic talc had no overall effect on the occurrence of ovarian cancer.[14]  A separate study in 2014, and part of the Women's Health Initiative, considered more than 30,000 perineal users of cosmetic talc and concluded there is no increased risk of ovarian cancer from the use of cosmetic talc.[15]  In 2016, a third study, the Sister Study, considered nearly 6,000 women who were talc users and again found no association between cosmetic talc use and ovarian cancer.[16]

### Litigation Results

Although Johnson & Johnson has both won and lost some jury trials, no jury verdict against Johnson & Johnson has been upheld on appeal.  Johnson & Johnson has received six trial judgments in our favor.  There have been nine judgments in favor of plaintiffs; three have been reversed, five are on or nearing appeal, and one reached a conclusion of zero damages.  Additionally, dozens of lawsuits against Johnson & Johnson have been dismissed.

### Commitment to Public Health and Safety

Johnson & Johnson recognizes that we have an obligation to our customers to ensure that our products are safe.  And Johnson & Johnson expresses its deepest sympathies to the patients and families struggling with cancer.  For that reason, Johnson & Johnson has gone above and beyond the industry standard when ensuring the safety of our cosmetic talc products.  We support efforts to examine the science and evidence concerning talc safety in a thorough, rigorous, and impartial manner.

Nothing is more important to us than the safety of consumers and maintaining their trust in our products.  We have long supported legislation to modernize the FDA's regulatory authority over cosmetics and personal care products, and believe this reform is essential to enabling the agency to increase its ability to protect the public.  We are committed to continuing to work with Congress and the FDA to advance meaningful change.

We encourage the Subcommittee members, your staff, and the interested public to review the information and documents posted on Facts About Talc.  Johnson & Johnson is committed to an open and transparent discussion about talc safety, and we thank the Subcommittee for its interest in this important matter.

Sincerely,
Johnson & Johnson

---

[14] Gertig et al., *Prospective Study of Talc Use and Ovarian Cancer*, 92 J. NATL. CANCER INST. 249 (2000); Gates et al., *Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype*, 171 AM. J. EPIDEMIOL. 45 (2010).

[15] Houghton et al., *Perineal Powder Use and Risk of Ovarian Cancer*, J. NATL. CANCER INST., September 2014.

[16] Gonzalez et al., *Douching, Talc Use, and Risk of Ovarian Cancer*, 27 EPIDEMIOLOGY 797 (2016). Notably, this group of women was already at a significantly higher risk than the normal population for developing ovarian cancer.

Exhibit 14 - Video available upon request to counsel







**In this video**

  JNJ -0.49 (-0.30%)

SHARE

MAD MONEY WITH JIM CRAMER

# Johnson & Johnson CEO: 'We unequivocally believe' our baby powder does not contain asbestos

Jim Cramer sits down with Johnson & Johnson Chairman and CEO Alex Gorsky to address reports of his company knowing that its talc-based baby powder contained traces of asbestos.

MON, DEC 17 2018 • 7:01 PM EST

**EXHIBIT**
**601.015**

**RELATED**





**Johnson & Johnson CEO: 'We unequivocally believe'
our baby powder does not contain asbestos**

**'We unequivocally believe' our baby powder does
not contain asbestos: Johnson & Johnson CEO**





**Clorox CEO says price increases enabled company
to return to margin growth**

**Clorox CEO addresses 'temporary' issues in
earnings with charcoal products, RenewLife**





**'Too many patients' struggling to pay cholesterol
drug: Amgen CEO on price cut**

**JNJ CEO on Apple collaboration: 'Ultimately, we're
going to save lives'**







---

## TOP VIDEOS



### WeWork is a long-term play, board member says

4 HOURS AGO



### Vita Coco goes public via IPO, starts trading on Nasdaq at $15 a share

4 HOURS AGO



**Nucor CEO Leon Topalian on Q3 earnings an...**

5 HOURS AGO



**Southwest Airlines CEO on Covid: Companies...**

4 HOURS AGO



**Cramer's first take: 'I would...**

---

LOAD MORE ⌄

---



Subscribe to CNBC PRO

CNBC Councils

CNBC on Peacock

Join the CNBC Panel

Licensing & Reprints

Supply Chain Values

Advertise With Us

Digital Products



# Internships

# Podcasts

# Careers

# Contact

# Site Map

# Ad Choices

# Help



## News Tips

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

## CNBC Newsletters

Sign up for free newsletters and get more CNBC delivered to your inbox

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

# Privacy Policy

# Do Not Sell My Personal Information

# CA Notice

# Terms of Service

© 2021 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

**Market Data Terms of Use and Disclaimers**

Data also provided by REFINITIV

MARKETS   CNBC TV   WATCHLIST   MENU

# Draft Screening Assessment

## Talc
## (Mg$_3$H$_2$(SiO$_3$)$_4$)

## Chemical Abstracts Service Registry Number
## 14807-96-6

## Environment and Climate Change Canada
## Health Canada

## December 2018

i

EXHIBIT

601.173

JNJTALC001094046

## Synopsis

Pursuant to section 74 of the *Canadian Environmental Protection Act, 1999* (CEPA), the Minister of the Environment and the Minister of Health have conducted a screening assessment of talc. The Chemical Abstracts Service Registry Number (CAS RN[1]) for talc is 14807-96-6. This substance is among those substances identified as priorities for assessment as it met categorization criteria under subsection 73(1) of CEPA.

Talc is a naturally occurring mineral. According to information reported under section 71 of CEPA and publically available information, in 2011 talc was manufactured in Canada in quantities ranging between 50 to 75 million kg, and in 2016, approximately 100 million kg of talc was imported. In Canada talc is used in adhesives and sealants; automotive, aircraft, and transportation applications; building and construction materials; ceramics; electrical and electronics; textiles; floor coverings; ink, toner, and colourants; lubricants and greases; oil and natural gas extraction applications; paints and coatings; paper and paper products, mixtures, and manufactured items; plastic and rubber materials; toys, playground, and sporting equipment; and in water treatment. The major uses in Canada align with major global uses of talc. Talc is an ingredient in self-care products and is a permitted food additive. In North America, approximately 3 to 4 % of the talc produced and sold is used in cosmetics. High-purity talc is used in cosmetics, while lower-grade talc is used in commercial applications.

The ecological risk of talc was characterized using the Ecological Risk Classification of Inorganic Substances (ERC-I) approach. The ERC-I is a risk-based approach that employs multiple metrics, considering both hazard and exposure in a weight of evidence. Hazard characterization in ERC-I included a survey of past predicted no-effect concentrations (PNECs) and water quality guidelines, or the derivation of new PNEC values when required. Exposure profiling in ERC-I considered two approaches: predictive modelling using a generic near-field exposure model for each substance, and an analysis of measured concentrations collected by federal and provincial water quality monitoring programs. Modelled and measured predicted environment concentrations (PECs) were compared to PNECs, and multiple statistical metrics were computed and compared to decision criteria to classify the potential for causing harm to the environment. The ERC-I identified talc as having a low potential to cause ecological harm.

Considering all available lines of evidence presented in this draft screening assessment, there is a low risk of harm to the environment from talc. It is proposed to conclude that talc does not meet the criteria under paragraphs 64(*a*) or (*b*) of CEPA as it is not entering the environment in a quantity or concentration or under conditions that have or

---

[1] The Chemical Abstracts Service Registry Number (CAS RN) is the property of the American Chemical Society, and any use or redistribution, except as required in supporting regulatory requirements and/or for reports to the Government of Canada when the information and the reports are required by law or administrative policy, is not permitted without the prior written permission of the American Chemical Society.

JNJTALC001094047

may have an immediate or long-term harmful effect on the environment or its biological diversity or that constitute or may constitute a danger to the environment on which life depends.

Talc has been reviewed internationally by other organizations, including the International Agency for Research on Cancer (IARC) and the Danish Environmental Protection Agency. These assessments informed the human health risk assessment.

No critical health effects were identified via the oral or dermal routes of exposure. As such, oral exposure to talc resulting from food intake and self-care products is not of concern. Inhalation exposure from industrial and commercial uses of talc was not identified to be of concern for human health given the limited number of sites producing and processing talc in Canada. Rather, the focus of the assessment is on inhalation and perineal exposure to certain self-care products containing cosmetic- or pharmaceutical-grade talc.

With respect to inhalation exposure, non-cancer lung effects were identified as a critical health effect for risk characterization on the basis of United States National Toxicology Program studies conducted with rats and mice exposed to cosmetic-grade talc. There is potential for inhalation exposure to talc powder during the use of certain self-care products (e.g., cosmetics, natural health products, non-prescription drugs formulated as loose powders). Self-care products formulated as pressed powders (e.g., face makeup) are not of concern. Margins of exposure between air concentrations following the use of dry hair shampoo and critical lung effects observed in animal studies are considered adequate to address uncertainties in the health effects and exposure databases. Margins of exposure between air concentrations following the use of loose powders (e.g., body powder, baby powder, face powder, foot powder) and critical lung effect levels observed in animal studies are considered potentially inadequate to address uncertainties in the health effects and exposure databases.

The meta-analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. Further, available data are indicative of a causal effect. Given that there is potential for perineal exposure to talc from the use of various self-care products (e.g., body powder, baby powder, diaper and rash creams, genital antiperspirants and deodorants, body wipes, bath bombs), a potential concern for human health has been identified.

Based on the available information, it is proposed that there is potential for harm to human health in Canada at current levels of exposure. Therefore, on the basis of the information presented in this draft screening assessment, it is proposed to conclude that talc meets the criteria under paragraph 64(c) of CEPA as it is entering or may enter the environment in a quantity or concentration or under conditions that constitute or may constitute a danger in Canada to human life or health.

JNJTALC001094048

It is therefore proposed to conclude that talc meets one of the criteria set out in section 64 of CEPA.

Talc is proposed to meet the persistence criteria but not the bioaccumulation criteria as set out in the *Persistence and Bioaccumulation Regulations* of CEPA.

iv

JNJTALC001094049

# Table of Contents

Synopsis ........................................................................................................ ii
1. Introduction ............................................................................................... 1
2. Identity of substance .................................................................................. 2
3. Physical and chemical properties ................................................................. 3
4. Sources and Uses ...................................................................................... 4
5. Potential to cause ecological harm ............................................................. 6
    5.1 Characterization of ecological risk .......................................................... 6
6. Potential to cause harm to human health ..................................................... 7
    6.1 Health effects assessment ..................................................................... 7
    6.2 Exposure assessment ............................................................................ 20
    6.3 Characterization of risk to human health ................................................. 25
    6.4 Uncertainties in evaluation of risk to human health ................................. 27
7. Conclusion ................................................................................................ 28
References .................................................................................................... 29
Appendix A. Inhalation exposure estimates ................................................... 39
    Table A-1. Estimated inhalation exposure concentrations from self-care products
    containing loose powder talc available to consumers ................................... 39

# List of Tables

Table 3-1. Experimental physical and chemical property values (at standard
        temperature) for talc ................................................................... 4
Table 5-1. Ecological risk classification of inorganics results for talc ............... 7
Table 6-1. Available human epidemiological studies investigating the association of
        perineal use of talc and ovarian cancer (Taher et al. 2018, in preparation). 15
Table 6-2. Inhalation exposure estimates to talc from self-care products available to
        consumers .................................................................................. 23
Table 6-3. Relevant exposure and hazard values for talc, and margins of exposure, for
        determination of risk .................................................................... 25

v

JNJTALC001094050

# 1. Introduction

Pursuant to section 74 of the *Canadian Environmental Protection Act, 1999* (CEPA) (Canada 1999), the Minister of the Environment and the Minister of Health have conducted a screening assessment of talc to determine whether this substance presents or may present a risk to the environment or to human health. This substance was identified as a priority for assessment as it met categorization criteria under subsection 73(1) of CEPA (ECCC, HC [modified 2017]).

The ecological risk of talc was characterized using the Ecological Risk Classification of Inorganic Substances (ERC-I) approach (ECCC 2018). The ERC-I is a risk-based approach that employs multiple metrics, considering both hazard and exposure in a weight of evidence. Hazard characterization in ERC-I included a survey of past predicted no-effect concentrations (PNECs) and water quality guidelines, or the derivation of a new PNEC value when required. Exposure profiling in ERC-I considered two approaches: predictive modelling using a generic near-field exposure model for each substance, and an analysis of measured concentrations collected by federal and provincial water quality monitoring programs. Modelled and measured predicted environmental concentrations (PECs) were compared to PNECs, and multiple statistical metrics were computed and compared to decision criteria to classify the potential for causing harm to the environment.

With respect to human health, this draft screening assessment includes the consideration of information on chemical properties, environmental fate, hazards, uses, and exposures, including additional information submitted by stakeholders. Relevant data were identified up to August 2018. Empirical data from key studies, as well as results from models, were used to reach proposed conclusions. Talc has been reviewed internationally through the International Agency for Research on Cancer (IARC) Monographs Programme, United States Environmental Protection Agency (U.S. EPA), the Joint Food and Agriculture Organization of the United Nations (FAO) and the World Health Organization (WHO) Expert Committee on Food Additives (JECFA) and the Danish Environmental Protection Agency (Danish EPA). Talc was also assessed by the Permanent Senate Commission for the Investigation of Health Hazards of Chemical Compounds in the Work Area (MAK-Commission) in Germany and the Cosmetic Ingredient Review (CIR) Expert Panel. These evaluations and reviews were used to inform the health effects characterization in this screening assessment. This assessment focuses on health effects associated with cosmetic-grade talc and not on potential impurities, such as asbestos. Engineered nanomaterials composed of or containing talc are not explicitly considered in this assessment.

This draft screening assessment was prepared by staff in the CEPA Risk Assessment Program at Health Canada and Environment and Climate Change Canada and incorporates input from other programs within these departments. The ecological portion of the assessment is based on the ERC-I document (published May 11, 2018), which was subject to an external peer review and a 60-day public comment period. The human health portion of

1

JNJTALC001094051

this assessment has undergone external peer review and/or consultation. Comments on the technical portions relevant to human health were received from Ms. Lopez, Ms. Super, and Ms. Jeney of Tetra Tech. Although external comments were taken into consideration, the final content and outcome of the screening assessment remain the responsibility of Health Canada and Environment and Climate Change Canada.

This draft screening assessment focuses on information critical to determining whether substances meet the criteria as set out in section 64 of CEPA by examining scientific information and incorporating a weight of evidence approach and precaution.[2] This draft screening assessment presents the critical information and considerations on which the proposed conclusion is based.

## 2. Identity of substance

Talc (CAS RN[3] 14807-96-6) is one of the softest naturally occurring minerals, made up of magnesium, silicon, and oxygen (ChemIDplus 1993-). The term talc refers to both the pure mineral and a wide variety of soft, talc-containing rocks that are mined and used for a variety of applications (Kogel et al. 2006). Relatively pure talc ore is also referred to as steatite, and soapstone refers to impure, massive talc rock (Fiume et al. 2015).

The mineral talc is composed of triple-sheet crystalline units, consisting of two silicate sheets composed of $SiO_4$ tetrahedra joined by edge-link $MgO_4(OH)_2$ (Zazenski et al. 1995). These layers, held together loosely via van der Waals forces, slide over one another easily, giving talc its slippery feel and accounting for its softness (Fiume et al. 2015). The size of an individual talc platelet (i.e., a few thousand elementary sheets) can vary from approximately 1 μm to over 100 μm, depending on the conditions of formation of the deposit (Eurotalc 2017). The individual platelet size determines the lamellarity of a sample of talc. Highly lamellar talc will have large individual platelets, whereas microcrystalline talc will have small platelets. Other inorganics in place of magnesium and silicon are common in talc; for example, aluminum and iron may substitute for silicon in the tetrahedral sites, or manganese may substitute for magnesium in the octahedral positions (Zazenski et al. 1995).

---

[2] A determination of whether one or more of the criteria of section 64 of CEPA are met is based upon an assessment of potential risks to the environment and/or to human health associated with exposures in the general environment. For humans, this includes, but is not limited to, exposures from ambient and indoor air, drinking water, foodstuffs, and products available to consumers. A conclusion under CEPA is not relevant to, nor does it preclude, an assessment against the hazard criteria specified in the *Hazardous Products Regulations*, which are part of the regulatory framework for the Workplace Hazardous Materials Information System for products intended for workplace use. Similarly, a conclusion on the basis of the criteria contained in section 64 of CEPA does not preclude actions being taken under other sections of CEPA or other acts.

[3] The Chemical Abstracts Service Registry Number (CAS RN) is the property of the American Chemical Society and any use or redistribution, except as required in supporting regulatory requirements and/or for reports to the Government of Canada when the information and the reports are required by law or administrative policy, is not permitted without the prior written permission of the American Chemical Society.

2

JNJTALC001094052

Commercially exploited talc contains 20 to 99 % of the pure mineral (Kogel et al. 2006). Some of the most common minerals that occur with talc are carbonates (e.g., dolomite, calcite, magnesite) and chlorite (i.e., magnesium aluminum silicate) (CIR 2013). Less common minerals include quartz, mica, iron oxides, pyrite, serpentine, and amphibole. Selective mining, ore processing, and beneficiation can remove many of the impurities (Kogel et al. 2006). There is a trend towards upgrading and higher-purity talc; however, many applications require the properties of the minerals associated with talc (Kogel et al. 2006). The purity of the source talc will influence its uses.

There are different grades of talc that refer to the purity (presence of other minerals). Pharmaceutical-grade talc conforms to the United States Pharmacopeia (USP) specifications (or similar specifications); these specifications require the absence of asbestos and set limits on iron, lead, calcium, and aluminum (USP 2011). As per B.01.045 of the *Food and Drug Regulations*, when used as a food additive talc must comply with Food Chemical Codex specifications or the Combined Compendium of Food Additive Specifications, prepared by the Joint FAO/WHO Expert Committee on Food Additives, and must be free from asbestos (FAO 2006).

Cosmetic-grade talc should comply with USP standards that require a limit of 20 ppm lead and an absence of asbestos (Fiume et al. 2015). Historically, some talc source materials were contaminated with asbestos; however, in 1976 the Cosmetic Toiletry Fragrance Association (CTFA) set purity standards for cosmetic-grade talc (Fiume et al. 2015). In Canada, the *Prohibition of Asbestos and Products Containing Asbestos Regulations* to be made under CEPA 1999 will prohibit asbestos above trace levels in consumer products, including cosmetics. Health effect studies on cosmetic-grade talc cited in this assessment were considered to be free of asbestos.

Talc is milled to different particle sizes for specific commercial applications. Most talc for cosmetics and pharmaceuticals are pure 200-mesh roller-milled talc (Kogel et al. 2006). In 200-mesh talc (preferred for body powder and deodorants), the particle size distribution allows 95 to 99 % of the product to pass through a 200-mesh (74 μm) screen (Zazenski et al. 1995; Kogel et al. 2006). The finer 325-mesh talc is also used in cosmetic-, pharmaceutical-, and food-grade formulations, where 95 to 99 % of the product passes through a 325-mesh (44 μm) screen.

## 3. Physical and chemical properties

A summary of physical and chemical properties of talc is presented in

3

JNJTALC001094053

Table 3-1. Talc is hydrophobic and lipophilic (Kogel et al. 2006).

4

JNJTALC001094054

**Table 3-1. Experimental physical and chemical property values (at standard temperature) for talc**

| Property | Range | Key reference |
|---|---|---|
| Physical state | solid, powder | HSDB 2005 |
| Melting point (°C) | 1500 | Eurotalc 2017 |
| Vapour pressure (mm Hg) | approx. 0, negligible at 20°C | OSHA 1999; NIOSH 2014 |
| Water solubility (mg/L) | insoluble | HSDB 2005 |
| Specific gravity (unitless) | 2.58–3.83 | HSDB 2005 |

# 4. Sources and Uses

Talc is a naturally occurring mineral, and there are deposits of talc in most provinces of Canada (Kogel et al. 2006). Currently, there is one producing mine (open-pit) and concentrator facility in Canada, in Penhorwood Township near Timmins, Ontario, and one micronizing facility in Timmins (Kogel et al. 2006; MAC 2016; NPRI 2018). The talc ore from the mine is approximately 45 % pure, with magnesite, magnetite, chlorite, and serpentine as the major impurities (Kogel et al. 2006). After beneficiation, this mine and micronizing facility produces talc primarily for the paper, plastics, paint, and ceramic sectors (Kogel et al. 2006). In 2017, China was the largest producer of talc, followed by India, Brazil, Mexico, and Korea (USGS 2018). The major uses of talc globally include paper, plastics, paint, ceramics, putties, and cosmetics (USGS 2000; Kogel et al. 2006; EuroTalc 2017; USGS 2018) and are aligned with Canadian uses.

On the basis of information submitted pursuant to a CEPA section 71 survey for the year 2011, talc was reported to be manufactured and imported in Canada at quantities ranging from 50 to 75 million kg (EC 2013).[4] According to the Canadian International Merchandise Trade (CIMT) database, in 2016, 99 549 000 kg of natural steatite and talc, crushed or powdered (Harmonized System, HS code 252620) and 4 656 000 kg of natural steatite and talc, not crushed, not powdered (HS code 252610) were imported into Canada (CIMT 2017).

According to information reported pursuant to a CEPA section 71 survey, results from voluntary stakeholder engagement (ECCC, HC 2017), and a search of websites from talc producers, manufactured or imported talc is used in Canada in: adhesives and sealants; automotive, aircraft, and transportation applications; building and construction materials (e.g., wood and engineered wood); ceramics; electrical and electronics; textiles; floor coverings; ink, toner, and colourants; lubricants and greases; oil and natural gas extraction applications; paints and coatings; paper and paper products,

---

[4] Values reflect quantities reported in response to the survey conducted under section 71 of CEPA (EC 2013). See survey for specific inclusions and exclusions (schedules 2 and 3).

5

JNJTALC001094055

mixtures, or manufactured items; plastic and rubber materials; toys, playground, and sporting equipment; and in water treatment.

Talc is a formulant in pest control products registered in Canada (Health Canada 2010, Personal communication, email from the Pest Management Regulatory Agency, Health Canada to the Risk Management Bureau, Health Canada, dated March 29, 2017; unreferenced).

Additionally, in Canada talc is on the List of Permitted Food Additives with Other Accepted Uses for limited uses in a small number of foods (Health Canada [modified 2017]). Talc can be used as a coating agent on dried legumes and rice and as a filler and dusting powder for chewing gum as per the List of Permitted Food Additives with Other Accepted Uses, incorporated by reference into its respective Marketing Authorization issued under the *Food and Drugs Act*. It may be present in food packaging materials and in incidental additives[5] used in food processing establishments (email from the Food Directorate, Health Canada, to Existing Substances Risk Assessment Bureau, Health Canada, dated March 31, 2017; unreferenced).

Talc is present in approximately 8500 self-care products.[6] Talc is marketed or approved as a non-medicinal ingredient in approximately 1600 human and veterinary drug products in Canada, including approximately 150 over-the-counter (OTC) or non-prescription products (email from the Therapeutic Products Directorate, Health Canada, to the Existing Substances Risk Assessment Bureau, Health Canada, dated March 20, 2017; unreferenced). Talc is listed in the Natural Health Products Ingredients Database (NHPID [modified 2018]) with a medicinal role and classified as a natural health product (NHP) substance falling under item 7 (a mineral) of Schedule 1 to the *Natural Health Products Regulations* and with a non-medicinal role (NHPID [modified 2018]). Talc is listed in the Licensed Natural Health Products Database (LNHPD) as being present as a medicinal or non-medicinal ingredient, in currently licensed natural health products in Canada (LNHPD [modified 2018]). Talc is present as a medicinal or a non-medicinal ingredient in approximately 2000 active licensed NHPs. Talc is listed as a medicinal ingredient in diaper rash products in concentrations ranging from 45 to 100 % in the Diaper Rash Monograph (Heath Canada 2007); however, there are no diaper rash products listed in the LNHPD containing talc as a medicinal ingredient (LNHPD [modified 2018]). Talc is permitted as a medicinal ingredient in the monograph for Traditional Chinese Medicine Ingredients (Health Canada 2015).

---

[5] While not defined under the Food and Drugs Act (FDA), incidental additives may be regarded, for administrative purposes, as those substances that are used in food processing plants and that may potentially become adventitious residues in foods (e.g., cleaners, sanitizers).

[6] Self-care products are products available for purchase without a prescription from a doctor, and fall into one of three broad categories: cosmetics, natural health products, and non-prescription drugs.

6

JNJTALC001094056

Based on notifications submitted under the *Cosmetic Regulations* to Health Canada, talc is an ingredient in approximately 6500 cosmetic products in Canada (dated April 5, 2017, emails from the Consumer Product Safety Directorate, Health Canada, to the Existing Substances Risk Assessment Bureau, Health Canada; unreferenced). Talc is considered a restricted ingredient in cosmetics.[7] The Cosmetic Ingredient Hotlist entry for cosmetics containing talc in powder form intended to be used on infants and children indicates that product labels should display text to the effect of "keep out of the reach of children" and "keep powder away from child's face to avoid inhalation that can cause breathing problems." High-purity talc (fewer impurities of other minerals) is used in cosmetics, while lower-grade talc is used in the many commercial applications mentioned above. In North America, approximately 3 to 4 % of the talc produced and sold is used in cosmetics (Kogel et al. 2006; USGS 2018).

Condoms and medical gloves are regulated as Class II medical devices in Canada under the *Medical Devices Regulations* and may be sources of exposure if talc is present as a dry lubricant. However, a 1998 study did not find talc in a small survey of condoms tested in Canada (Douglas et al. 1998). Condom standards require dry lubricants to be bioabsorbable, such as starch and calcium carbonate (WHO, UNFPA, FHI 2013). Starch is more commonly used as dry powder lubricant on condoms (Douglas et al. 1998). There was also a shift from the use of talc as a dry lubricant on medical patient examination gloves to cornstarch in the 1980s (Lundberg et al. 1997). In 2016, the U.S. Food and Drug Administration banned powdered patient examination gloves (United States 2016).

# 5. Potential to cause ecological harm

## 5.1 Characterization of ecological risk

The ecological risk of talc was characterized using the Ecological Risk Classification of Inorganic Substances (ERC-I). The ERC-I is a risk-based approach that employs multiple metrics that consider both hazard and exposure in a weight of evidence. Hazard characterization in ERC-I included a survey of past domestic and international assessment PNECs and water quality guidelines. When no suitable existing PNEC or water quality guideline was found, hazard endpoint data were collected and, dependent on data availability, either a species sensitivity distribution (SSD) or an assessment factor (AF) approach was taken to derive a new PNEC value. In the case of talc, hazard endpoint data from the Organisation for Economic Co-operation and Development

---

[7] Talc is described as a restricted ingredient on the List of Prohibited and Restricted Cosmetic Ingredients (more commonly referred to as the Cosmetic Ingredient Hotlist or simply the Hotlist), an administrative tool that Health Canada uses to communicate to manufacturers and others that certain substances may contravene the general prohibition found in section 16 of the *Food and Drugs Act* (FDA), or may contravene one or more provisions of the *Cosmetic Regulations*. Section 16 of the FDA states that "no person shall sell any cosmetic that has in or on it any substance that may cause injury to the health of the user." In addition, the Hotlist includes certain substances that may make it unlikely for a product to be classified as a cosmetic under the FDA (Health Canada [modified 2018]).

7

JNJTALC001094057

Screening Information Dataset (SIDS) for synthetic amorphous silicates (OECD 2004) were identified for read across (ECCC, HC 2017) and an AF approach was used to derive a PNEC value of 40 mg/L.

Exposure profiling in ERC-I considered two approaches: predictive modelling using a generic near-field exposure model, and an analysis of measured concentrations collected by federal and provincial water quality monitoring programs. The generic near-field exposure model used input data, when available, from the National Pollutant Release Inventory (NPRI), the DSL–Inventory Update (DSL-IU), international trade data from the Canada Border Services Agency (CBSA), and third-party market research reports to generate PECs. In the case of talc, input data from the DSL-IU and CBSA were available.

Modelled PECs were compared to PNECs, and statistical metrics considering both the frequency and magnitude of exceedances were computed and compared to decision criteria to classify the potential for ecological risk as presented in ECCC (2018). The results are summarized in Table 5-1. The ERC-I identified talc as being of low ecological concern.

**Table 5-1. Ecological risk classification of inorganics results for talc**

| Monitoring (total/extractable) | Monitoring (dissolved) | Modelling (DSL-IU) | Modelling (NPRI) | Modelling (CBSA) | Overall ERC-I score |
|---|---|---|---|---|---|
| NA | NA | Low | NA | Low | Low |

Abbreviations: NA, Not Available.

# 6. Potential to cause harm to human health

## 6.1 Health effects assessment

Talc was previously reviewed internationally by the IARC, and an IARC monograph is available (IARC 2010). Additionally, talc was reviewed by the United States Environmental Protection Agency (U.S. EPA), the Joint FAO/WHO Expert Committee on Food Additives (JECFA), the Permanent Senate Commission for the Investigation of Health Hazards of Chemical Compounds in the Work Area (MAK-Commission) in Germany, and the Danish Environmental Protection Agency (Danish EPA) (U.S. EPA 1992; JECFA 2006; MAK-Commission 2012; Danish EPA 2016). Talc's safety in cosmetic uses was also assessed by the CIR Expert Panel (CIR 2013; Fiume et al. 2015).

A literature search was conducted from the year prior to the most recent assessment (the 2016 Danish EPA review), i.e., from January 2015 to January 2018. No health effects studies that could impact the non-cancer risk characterization (i.e., result in different critical endpoints or lower points of departure than those stated in existing reviews and assessments) for oral, dermal, or inhalation exposures were identified. For perineal exposures, recently published literature was identified and considered in the assessment.

8

JNJTALC001094058

The health effects of talc are outlined by route of exposure in the following sections.

## Toxicokinetics

Talc is poorly absorbed via the oral route of exposure. Following gavage administration of radiolabelled talc to rodents, the majority of the administered dose (AD) remained in the gastrointestinal (GI) tract and was eliminated and recovered in the faeces (≥ 95.8 % of AD) within three to four days of dosing (Wehner et al. 1977a; Phillips et al. 1978). Less than 2 % of the AD was recovered in the urine; however, this was mainly attributed to contamination from faeces during collection, with true absorption and urinary clearance expected to be even lower. At 24 hours post administration, less than 2 % of the AD remained in the carcass of hamsters; no radioactivity was detected in mouse carcasses at this time point. In rats and guinea pigs, only trace amounts of radioactivity remained in the GI tract at 10 days post administration.

As an insoluble solid, talc is not expected to be absorbed when applied to healthy and intact skin. There are no indications of dermal absorption following talc exposure (MAK-Commission 2012).

Inhalable talc particles (<10 μm) are eliminated from the respiratory tract via mucociliary clearance. In female Syrian hamsters that were administered aerosolized neutron-activated cosmetic talc at concentrations of 40 to 75 mg/m³ (95% pure; MMAD 6.4 to 6.9 μm) over a 2-hour exposure period, 6 to 8 % of the AD was deposited into the alveoli (Wehner et al. 1977b). The biological half-life following a single exposure was estimated to be between 7 and 10 days, with complete alveolar clearance after 4 months. There was no translocation of talc from the respiratory tract to the liver, kidneys, ovaries, or other parts of the body. Lung clearance was noted to be longer in other species. The Danish EPA (2016) noted that talc, including the respirable fraction (< 4 μm), is not absorbed following inhalation, but is retained in the lung tissue. They further stated that lung burdens were proportional to respired concentrations, and clearance became impaired with increasing exposures. Pulmonary retention half-lives for talc particles in the lungs of rats from a chronic inhalation study were estimated to be as long as 300 days (Oberdorster 1995). Other authors (Pickrell 1989; MAK-Commission 2012) noted similar findings indicating that with repeat exposures, alveolar clearance in rats may be impaired at concentrations of only 2 mg talc/m³ air.

Talc particles have been observed and detected in the ovaries of humans (Heller et al. 1996a, 1996b), and perineal exposure to talc has also been associated with a presence of talc in lymph nodes and ovaries of women diagnosed with ovarian cancer (Heller et al. 1996b; Cramer et al. 2007). Migration of talc particles from the vagina to the ovaries has been identified as a plausible explanation of these findings (Henderson et al., 1986), and retrograde movement of talc particles in humans through the reproductive tract to the ovaries has been suggested (Heller et al. 1996b; Cramer et al. 2007). Inert particles with the same size as talc (5 to 40 μm in diameter) and placed in the vagina can be transported to the upper genital tract (Egli and Newton 1961; De Boer 1972; Venter and Iturralde 1979).

9

According to a review by the MAK-Commission (2012), there are no indications of metabolism via typical degradation pathways from which toxicologically relevant degradation products may develop.

## Health Effects

### Oral route of exposure

Talc was considered be of low concern with respect to human health via oral exposure. Repeated-dose testing with talc in animals did not produce any adverse effects via oral exposure with respect to repeated-dose toxicity, carcinogenicity, reproductive/developmental toxicity, or mutagenicity (Gibel et al. 1976; Wagner et al. 1977; NTP 1993; IARC 2010; Danish EPA 2016).

Talc has not been shown to produce adverse effects when ingested orally; as a result, the use of talc in various tablet formulations was not considered hazardous via the ingestion route (Hollinger 1990; U.S. EPA 1992).

In addition, the Commission of the European Communities' report on Dietary Food Additive Intake in the European Union identified talc as having an Acceptable Daily Intake (ADI) of "not-specified." The JECFA has also assessed talc and assigned an ADI as "not specified" due to the lack of toxicity from oral exposure. The substance was considered not to be a hazard to human health at oral intake levels noted in total diet surveys, which represent the majority of the sources of oral exposure for this substance (IARC 1987; EU [modified 2001]). Furthermore, talc is considered as "generally recognized as safe" when used as a food additive in the United States (U.S. FDA GRAS list) without being subject to pre-market approval requirements (U.S. FDA 2015; 2016).

### Dermal route of exposure

There are limited data available on repeated-dose studies via dermal exposure to talc (Danish EPA 2016). In the available literature, only one repeated-dose dermal toxicity study was identified (Wadaan 2009). Severe limitations were noted for this study, including a lack of information on the test substance and the dose applied, as well as a lack of detail regarding the test animals. Skin dryness and erosion were noted; however, application sites were shaved, indicating that talc may have been applied to broken skin. As such, the results of this study were not considered appropriate to inform the characterization of health effects via dermal exposure. Additionally, there were no indications of irritation, sensitization, or dermal absorption following exposure to unabraded and/or non-diseased skin (MAK-Commission 2012). A three-day occlusive application of pharmaceutical-grade talc did not show any signs of irritation in 5 human volunteers (Frosch and Kligman 1976, as reported in MAK-Commission 2012).

Case reports, however, do indicate that the application of talc to diseased or broken skin can cause the formation of granulomas, particularly if the talc particles have a large diameter (MAK-Commission 2012; CIR 2013; Fiume et al. 2015). Granulomas have

10

JNJTALC001094060

 Government Gouvernement
of Canada du Canada

 Canada

# Screening Assessment

# Talc
# (Mg$_3$H$_2$(SiO$_3$)$_4$)

# Chemical Abstracts Service Registry Number
# 14807-96-6

# Environment and Climate Change Canada
# Health Canada

# April 2021

EXHIBIT

601.174

JNJTALC001494350

Cat. No.: En84-227/2021E-PDF

ISBN 978-0-660-37965-4

Information contained in this publication or product may be reproduced, in part or in whole, and by any means, for personal or public non-commercial purposes, without charge or further permission, unless otherwise specified.

You are asked to:

- Exercise due diligence in ensuring the accuracy of the materials reproduced;
- Indicate both the complete title of the materials reproduced, as well as the author organization; and
- Indicate that the reproduction is a copy of an official work that is published by the Government of Canada and that the reproduction has not been produced in affiliation with or with the endorsement of the Government of Canada.

Commercial reproduction and distribution is prohibited except with written permission from the author. For more information, please contact Environment and Climate Change Canada's Inquiry Centre at 1-800-668-6767 (in Canada only) or 819-997-2800 or email to ec.enviroinfo.ec@canada.ca.

© Her Majesty the Queen in Right of Canada, represented by the Minister of the Environment and Climate Change, 2021.

Aussi disponible en français

JNJTALC001494351

# Synopsis

Pursuant to section 74 of the *Canadian Environmental Protection Act, 1999* (CEPA), the Minister of the Environment and the Minister of Health have conducted a screening assessment of talc. The Chemical Abstracts Service Registry Number (CAS RN[1]) for talc is 14807-96-6. This substance is among those substances identified as priorities for assessment as it met categorization criteria under subsection 73(1) of CEPA.

Talc is a naturally occurring mineral. In 2011, talc was manufactured in Canada in quantities ranging between 50 to 75 million kg, and in 2016, approximately 100 million kg of talc was imported into Canada. In Canada, talc is used in adhesives and sealants; automotive, aircraft, and transportation applications; building and construction materials; ceramics; electrical and electronics; textiles; floor coverings; inks, toners, and colourants; lubricants and greases; oil and natural gas extraction applications; paints and coatings; paper and paper products, mixtures, and manufactured items; plastic and rubber materials; toys, playground equipment and sporting equipment; and in water treatment. The major uses in Canada align with major global uses of talc. Talc is a permitted food additive and is an ingredient in self-care products. In North America, approximately 2% to 4% of the talc produced and sold is used in cosmetics. High-purity talc is used in self-care products including cosmetics, while lower-grade talc is used in commercial applications.

The ecological risk of talc was characterized using the Ecological Risk Classification of Inorganic Substances (ERC-I), which is a risk-based approach that employs multiple metrics for both hazard and exposure, with weighted consideration of multiple lines of evidence for determining risk classification. Hazard characterization in ERC-I included a survey of published predicted no-effect concentrations (PNECs) and water quality guidelines, or the derivation of new PNEC values when required. Exposure profiling in ERC-I considered two approaches: predictive modelling using a generic near-field exposure model for each substance and an analysis of measured concentrations collected by federal and provincial water quality monitoring programs. Modelled and measured predicted environmental concentrations (PECs) were compared to PNECs, and multiple statistical metrics were computed and compared to decision criteria to classify the potential for causing harm to the environment. Based on the outcome of the ERC-I analysis, talc is considered unlikely to be causing ecological harm.

Considering all available lines of evidence presented in this screening assessment, there is a low risk of harm to the environment from talc. It is concluded that talc does not meet the criteria under paragraphs 64(*a*) or (*b*) of CEPA as it is not entering the

---

[1] The Chemical Abstracts Service Registry Number (CAS RN) is the property of the American Chemical Society, and any use or redistribution, except as required in supporting regulatory requirements and/or for reports to the Government of Canada when the information and the reports are required by law or administrative policy, is not permitted without the prior written permission of the American Chemical Society.

JNJTALC001494352

environment in a quantity or concentration or under conditions that have or may have an immediate or long-term harmful effect on the environment or its biological diversity or that constitute or may constitute a danger to the environment on which life depends.

Talc has been reviewed internationally by other organizations, including the International Agency for Research on Cancer (IARC) and the Danish Environmental Protection Agency. These assessments informed the human health risk assessment.

No critical health effects were identified via the oral or dermal routes of exposure. As such, oral exposure to talc resulting from food intake and oral and dermal exposure from the use of self-care products are not of concern. Inhalation exposure via ambient air for the general population from industrial and commercial uses of talc was not identified to be of concern for human health given the limited number of sites producing and processing talc in Canada. Rather, the focus of the assessment is on inhalation and perineal exposure to certain self-care products containing cosmetic- or pharmaceutical-grade talc.

With respect to inhalation exposure, non-cancer lung effects (e.g., inflammation, impaired lung function, fibrosis) were identified as a critical health effect for risk characterization on the basis of United States National Toxicology Program studies conducted with rats and mice exposed to cosmetic-grade talc. There is potential for inhalation exposure to talc powder during the use of certain self-care products (e.g., cosmetics, natural health products, non-prescription drugs formulated as loose powders). Self-care products formulated as pressed powders (e.g., face makeup) are not of concern for inhalation exposure. Margins of exposure between air concentrations following the use of dry hair shampoo and foot powder and critical lung effects observed in animal studies are considered adequate to address uncertainties in the health effects and exposure databases. Margins of exposure between air concentrations following the use of body powder, baby powder, and loose face powder and critical lung effect levels observed in animal studies are considered potentially inadequate to address uncertainties in the health effects and exposure databases.

With regards to perineal exposure, analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. The available data are indicative of a causal effect. Given that there is potential for perineal exposure to talc from the use of certain self-care products (e.g., body powder, baby powder, diaper and rash creams, genital antiperspirants and deodorants, body wipes, bath bombs, bubble bath), a potential concern for human health has been identified.

Considering all the information presented in this screening assessment, it is concluded that talc meets the criteria under paragraph 64(c) of CEPA as it is entering or may enter the environment in a quantity or concentration or under conditions that constitute or may constitute a danger in Canada to human life or health.

iii

JNJTALC001494353

It is therefore concluded that talc meets one of the criteria set out in section 64 of
CEPA. It has also been determined that talc meets the persistence criteria but not the
bioaccumulation criteria as set out in the *Persistence and Bioaccumulation Regulations*
of CEPA.

iv

JNJTALC001494354

# Table of Contents

**Synopsis** ......................................................................................................... ii
**1. Introduction** ................................................................................................. 1
**2. Identity of substance** .................................................................................. 2
**3. Physical and chemical properties** ............................................................. 4
**4. Sources and uses** ........................................................................................ 4
**5. Environmental fate and behaviour** ............................................................ 7
    5.1 Environmental persistence ........................................................................ 7
    5.2 Potential for bioaccumulation .................................................................... 7
**6. Potential to cause ecological harm** ........................................................... 8
    6.1 Characterization of ecological risk ............................................................ 8
**7. Potential to cause harm to human health** ................................................. 9
    7.1 Health effects assessment ......................................................................... 9
    7.2 Exposure assessment ................................................................................ 36
    7.3 Characterization of risk to human health ................................................... 41
    7.4 Uncertainties in evaluation of risk to human health ................................... 43
**8. Conclusion** ................................................................................................... 45
**References** ....................................................................................................... 47
**Appendix A. Inhalation exposure estimates** ................................................. 64

# List of Tables

Table 3-1. Experimental physical and chemical property values (at standard
        temperature) for talc ............................................................................ 4
Table 6-1. Ecological risk classification of inorganics results for talc .............................. 9
Table 7-1. Available human epidemiological studies investigating the association
        between perineal use of talc and ovarian cancer (Berge et al. 2018;
        Penninkilampi and Eslick 2018; Taher et al. 2019) ...................................... 27
Table 7-2. Inhalation exposure estimates to talc from self-care products available to
        consumers .......................................................................................... 40
Table 7-3. Relevant exposure and hazard values for talc, and margins of exposure, for
        determination of risk ............................................................................ 42

JNJTALC001494355

# 1. Introduction

Pursuant to section 74 of the *Canadian Environmental Protection Act, 1999* (CEPA) (Canada 1999), the Minister of the Environment and the Minister of Health have conducted a screening assessment of talc to determine whether this substance presents or may present a risk to the environment or to human health. This substance was identified as a priority for assessment as it met categorization criteria under subsection 73(1) of CEPA (ECCC, HC [modified 2017]).

The ecological risk of talc was characterized using the Ecological Risk Classification of Inorganic Substances (ERC-I) (ECCC 2018), which is a risk-based approach that employs multiple metrics for both hazard and exposure, with weighted consideration of multiple lines of evidence for determining risk classification. Hazard characterization in ERC-I included a survey of published predicted no-effect concentrations (PNECs) and water quality guidelines, or the derivation of a new PNEC value when required. Exposure profiling in ERC-I considered two approaches: predictive modelling using a generic near-field exposure model for each substance and an analysis of measured concentrations collected by federal and provincial water quality monitoring programs. Modelled and measured predicted environmental concentrations (PECs) were compared to PNECs, and multiple statistical metrics were computed and compared to decision criteria to classify the potential for causing harm to the environment.

With respect to human health, this screening assessment includes the consideration of information on chemical properties, environmental fate, hazards, uses, and exposures, including additional information submitted by stakeholders. Relevant data were identified up to October 2020. Empirical data from key studies, as well as results from models, were used to reach conclusions. Talc has been reviewed internationally through the International Agency for Research on Cancer (IARC) Monographs Programme, the United States Environmental Protection Agency (U.S. EPA), the Joint Food and Agriculture Organization of the United Nations (FAO) and World Health Organization (WHO) Expert Committee on Food Additives (JECFA), and the Danish Environmental Protection Agency (Danish EPA). Talc was also assessed by the Permanent Senate Commission for the Investigation of Health Hazards of Chemical Compounds in the Work Area (MAK-Commission) in Germany and the Cosmetic Ingredient Review (CIR) Expert Panel.[2] These evaluations and reviews were used to inform the health effects characterization in this screening assessment. This assessment focuses on health effects associated with cosmetic- and pharmaceutical-

---

[2] The Cosmetic Ingredient Review was established in 1976 by the industry trade association (then the Cosmetic, Toiletry, and Fragrance Association, now the Personal Care Products Council), with the support of the U.S. Food and Drug Administration and the Consumer Federation of America.

JNJTALC001494356

grade talc and not on potential impurities, such as asbestos. Engineered nanomaterials composed of or containing talc are not explicitly considered in this assessment.

This screening assessment was prepared by staff in the CEPA Risk Assessment Program at Health Canada and Environment and Climate Change Canada and in the Consumer and Hazardous Products Safety Directorate at Health Canada and incorporates input from other programs within these departments. Health Canada scientists conducted research to characterize airborne particles emitted during application of cosmetic talc products (Rasmussen et al. 2019). This peer-reviewed published research has informed the assessment. The ecological portion of the assessment is based on the ERC-I (published May 11, 2018), which was subject to an external peer review and a 60-day public comment period. The human health portion of this assessment has undergone external peer review. Comments on the technical portions relevant to human health were received from T. Lopez, MSPH, K. Super, DABT, and Z. Jeney, MPH, of Tetra Tech. Additionally, the draft of this screening assessment was subject to a 60-day public comment period. Additional information submitted during the public comment period was reviewed and considered for the final screening assessment. While external comments were taken into consideration, the final content and outcome of the screening assessment remain the responsibility of Health Canada and Environment and Climate Change Canada.

This screening assessment focuses on information critical to determining whether substances meet the criteria as set out in section 64 of CEPA by examining scientific information and incorporating a weight of evidence approach and precaution.[3] This screening assessment presents the critical information and considerations on which the conclusion is based.

## 2. Identity of substance

Talc (CAS RN[4] 14807-96-6) is one of the softest naturally occurring minerals, made up of magnesium, silicon, hydrogen and oxygen (ChemIDplus 1993- ). The term talc refers

---

[3] A determination of whether one or more of the criteria of section 64 of CEPA are met is based upon an assessment of potential risks to the environment and/or human health associated with exposures in the general environment. For humans, this includes, but is not limited to, exposures from ambient and indoor air, drinking water, foodstuffs, and products available to consumers. A conclusion under CEPA is not relevant to, nor does it preclude, an assessment against the hazard criteria specified in the *Hazardous Products Regulations*, which are part of the regulatory framework for the Workplace Hazardous Materials Information System for products intended for workplace use. Similarly, a conclusion on the basis of the criteria contained in section 64 of CEPA does not preclude actions being taken under other sections of CEPA or other acts.

[4] The Chemical Abstracts Service Registry Number (CAS RN) is the property of the American Chemical Society and any use or redistribution, except as required in supporting regulatory requirements and/or for reports to the Government of Canada when the information and the reports are required by law or administrative policy, is not permitted without the prior written permission of the American Chemical Society.

JNJTALC001494357

to both the pure mineral and a wide variety of soft, talc-containing rocks that are mined and used for a variety of applications (Kogel et al. 2006). Relatively pure talc ore is also referred to as steatite, and soapstone refers to impure, massive talc rock (Fiume et al. 2015).

The mineral talc is composed of triple-sheet crystalline units, consisting of two silicate sheets composed of $SiO_4$ tetrahedra joined by edge-linked $MgO_4(OH)_2$ (Zazenski et al. 1995). These layers, held together loosely via van der Waals forces, slide over one another easily, giving talc its slippery feel and accounting for its softness (Fiume et al. 2015). The size of an individual talc platelet (i.e., a few thousand elementary sheets) can vary from approximately 1 µm to over 100 µm, depending on the conditions of formation of the deposit (EuroTalc 2017). The individual platelet size determines the lamellarity of a sample of talc. Highly lamellar talc will have large individual platelets, whereas microcrystalline talc will have small platelets. Other inorganics in place of magnesium and silicon are common in talc; for example, aluminum and iron may substitute for silicon in the tetrahedral sites, or manganese may substitute for magnesium in the octahedral positions (Zazenski et al. 1995).

Commercially exploited talc contains 20% to 99% of the pure mineral (Kogel et al. 2006). Some of the most common minerals that occur with talc are carbonates (e.g., dolomite, calcite, magnesite) and chlorite (i.e., magnesium aluminum silicate) (CIR 2013). Less common minerals include quartz, mica, iron oxides, pyrite, serpentine, and amphibole. Selective mining, ore processing, and beneficiation can remove many of the impurities (Kogel et al. 2006). There is a trend towards upgrading to higher-purity talc; however, many applications require the properties of the minerals associated with talc (Kogel et al. 2006) and the purity of the source talc influences its uses.

There are different grades of talc that refer to the purity (presence of other minerals). Pharmaceutical-grade talc complies with the United States Pharmacopeia (USP) standards (or similar standards), which require the absence of asbestos and set limits on iron, lead, calcium, and aluminum (USP 2011). As per B.01.045 of the *Food and Drug Regulations*, when used as a food additive, talc must meet the food-grade specifications set out in with the most recent edition of the *Food Chemicals Codex*, published by the United States Pharmacopeial Convention or the *Combined Compendium of Food Additive Specifications*, prepared by the Joint FAO/WHO Expert Committee on Food Additives, and must be free from asbestos (Canada [1978]; FAO 2006; FCC 2016).

Historically, some talc source materials were contaminated with asbestos. However, in 1976, the Cosmetic Toiletry and Fragrance Association (CTFA) set purity standards for cosmetic-grade talc resulting in a reduction in asbestos levels in cosmetic products (Fiume et al. 2015). Cosmetic-grade talc should comply with USP standards that require a limit of 20 ppm lead and an absence of asbestos (Fiume et al. 2015). Currently the USP standard for talc is under review (USP 2019; USP 2020a, USP b) and the United States Food and Drug Administration (U.S. FDA) is working on recommendations on

JNJTALC001494358

testing methods for asbestos in talc and products available to consumers containing talc (U.S. FDA 2020a). Internationally, a number of regulatory agencies continue to conduct testing on talc-based cosmetic products for the presence of asbestos (NVWA 2018; U.S. FDA 2020b).

In Canada, the *Prohibition of Asbestos and Products Containing Asbestos Regulations* (updated 2018) under CEPA prohibit asbestos above trace levels in products available to consumers, including cosmetics. The cosmetic-grade talc used in the health effect studies cited in this assessment were considered to be free of asbestos.[5]

Talc is milled to different particle sizes for specific commercial applications. Most talc for cosmetics and pharmaceuticals is pure 200-mesh roller-milled talc (Kogel et al. 2006). In 200-mesh talc (preferred for body powder and deodorants), the particle size distribution allows 95% to 99% of the product to pass through a 200-mesh (74 μm) screen (Zazenski et al. 1995; Kogel et al. 2006). The finer 325-mesh talc is also used in cosmetic-, pharmaceutical-, and food-grade formulations, where 95% to 99% of the product passes through a 325-mesh (44 μm) screen.

# 3. Physical and chemical properties

A summary of physical and chemical properties of talc is presented in Table 3-1. Talc is a chemically inert, solid powder that is insoluble in water (Kogel et al. 2006, EuroTalc 2017).

**Table 3-1. Experimental physical and chemical property values (at standard temperature) for talc**

| Property | Range | Key reference |
|---|---|---|
| Physical state | solid, powder | HSDB 2005 |
| Melting point (°C) | 1500 | EuroTalc 2017 |
| Vapour pressure (mm Hg) | approx. 0, negligible at 20°C | OSHA 1999; NIOSH 2014 |
| Water solubility (mg/L) | Insoluble | HSDB 2005 |
| Specific gravity (unitless) | 2.58–3.83 | HSDB 2005 |

# 4. Sources and uses

Talc is a naturally occurring mineral, and there are talc deposits in most Canadian provinces (Kogel et al. 2006). Currently, there is one producing mine (open-pit) and

---

[5] met the USP standards for absence of asbestos

JNJTALC001494359

concentrator facility in Canada, in Penhorwood Township near Timmins, Ontario, and one micronizing facility in Timmins (Kogel et al. 2006; MAC 2019; NPRI 2018). The talc ore from the mine is approximately 45% pure, with magnesite, magnetite, chlorite, and serpentine as the major impurities (Kogel et al. 2006). After beneficiation, this mine and micronizing facility produces talc primarily for the paper, plastics, paint, and ceramic sectors (Kogel et al. 2006). In 2019, China was the largest producer of talc, followed by India and Brazil (USGS 2020). The major uses of talc globally include paper, plastics, paint, ceramics, putties, and cosmetics (USGS 2000; Kogel et al. 2006; EuroTalc 2017; USGS 2020).

Talc was included in a survey issued pursuant to a CEPA section 71 notice. Talc was reported to be manufactured in Canada at quantities ranging from 50 to 75 million kg in 2011 (EC 2013).[6] According to the Canadian International Merchandise Trade (CIMT) database, in 2016, 99 549 000 kg of natural steatite and talc, crushed or powdered (Harmonized System, HS code 252620) and 4 656 000 kg of natural steatite and talc, not crushed, not powdered (HS code 252610) were imported into Canada (CIMT 2017).

According to information submitted in response to a CEPA section 71 survey (EC 2013), results from voluntary stakeholder engagement (ECCC, HC 2017), and a search of websites from talc producers, manufactured or imported talc is used in Canada in adhesives and sealants; automotive, aircraft, and transportation applications; building and construction materials (e.g., wood and engineered wood); ceramics; electrical and electronics; textiles; floor coverings; inks, toners, and colourants; lubricants and greases; oil and natural gas extraction applications; paints and coatings; paper and paper products, mixtures, or manufactured items; plastic and rubber materials; toys, playground equipment and sporting equipment; and in water treatment.

Talc is a formulant in pest control products registered in Canada (Health Canada 2010; personal communication, email from the Pest Management Regulatory Agency, Health Canada, to the Risk Management Bureau, Health Canada, dated March 29, 2017; unreferenced).

Additionally, in Canada talc is on the *List of Permitted Food Additives with Other Accepted Uses* (List 8) for limited uses in a small number of foods (Health Canada [modified 2020]). Talc can be used as a coating agent on dried legumes and rice and as a filler and dusting powder for chewing gum as per the *List of Permitted Food Additives with Other Accepted Uses*, incorporated by reference into its respective Marketing Authorization issued under the *Food and Drugs Act*. It may be used as a component in

---

[6] Values reflect quantities reported in response to the survey conducted under section 71 of CEPA (EC 2013). See survey for specific inclusions and exclusions (schedules 2 and 3).

JNJTALC001494360

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                            .      Case No. 21-30589(MBK)
                                  .
LTL MANAGEMENT LLC,               .
                                  .
         Debtor.                  .
. . . . . . . . . . . . . . .
LTL MANAGEMENT, LLC,              .      Adversary No. 21-03032(MBK)
                                  .
         Plaintiff,               .
                                  .      Clarkson S. Fisher U.S.
v.                                .        Courthouse
                                  .      402 East State Street
THOSE PARTIES LISTED ON           .      Trenton, NJ 08608
APPENDIX A TO THE                 .
COMPLAINT, ET AL.,                .
                                  .
         Defendants.              .      Wednesday, February 16, 2022
. . . . . . . . . . . . . .       .      9:05 a.m.

                  TRANSCRIPT OF TRIAL DAY THREE
            BEFORE THE HONORABLE MICHAEL B. KAPLAN
             UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:           Jones Day
                          By:  GREGORY M. GORDON, ESQ.
                               DANIEL B. PRIETO, ESQ.
                               AMANDA RUSH, ESQ.
                          2727 North Harwood Street, Suite 500
                          Dallas, TX 75201

                          Jones Day
                          By:  ROBERT W. HAMILTON, ESQ.
                          325 John H. McConnell Blvd., Suite 600
                          Columbus, Ohio  43215-2673


Audio Operator:           Wendy Romero

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**
**(609) 586-2311   Fax No. (609) 587-3599**

Kim - Cross/Glasser                                    51

1  pursue the non-debtors, Johnson & Johnson and Old, well, JJCI.

2  I just want a yes or no.

3      You think it's more fair to engage in a negotiation while

4  non-debtors Johnson & Johnson and JJCI are insulated, protected

5  from, and are not -- claims can't be pursued against those non-

6  debtors.  That's what you think is fair and equitable?

7  A    I do think that would be fair and equitable.

8  Q    Okay.  Thank you, sir.  No further questions.

9          MR. JONAS:  Thank you, Your Honor.

10          THE COURT:  Thank you, Mr. Jonas.

11                    CROSS-EXAMINATION

12  BY MR. GLASSER:

13  Q    Mr. Kim, on your examination just a few minutes ago, you

14  were talking about Exhibit 68, the valuation, right?

15  A    Yes.

16  Q    The VCO?  This kind of cash flow, $61 billion?

17  A    Yes.  Yes.  Yes, thank you.

18  Q    It is true, Mr. Kim, that you told the Court and the

19  people in North Carolina that the value of JJCI was

20  approximately $60 billion.  Isn't that a fact?

21  A    It is a fact.  Yes, I did say that, again, based upon a

22  conversation I had with Eric Haas that my belief was that or my

23  understanding was that there was a valuation in the $60-billion

24  range.  Yes.

25  Q    That conversation you had with Mr. Haas occurred prior to

1  October 14th, 2021.  Isn't that a fact?

2  A    It did.

3  Q    And at the October 14th, 2021 board meeting, you did not

4  tell the board about the $60-billion valuation conversation

5  with Mr. Haas, correct?

6  A    That is correct.

7  Q    I want to walk through your PowerPoint a little bit on the

8  ELMO.

9                          (Pause)

10                   (Counsel confer briefly)

11 BY MR. GLASSER:

12 Q    All right.  Here we go.  You're familiar with this

13 PowerPoint timeline, right, Mr. Kim?

14 A    I am.

15 Q    Isn't it true that in December of 2018 right here Health

16 Canada issued its finding about indicative of a causal

17 connection between ovarian cancer and talc?  December 2018

18 Health Canada issued that report, true?

19 A    I don't know when they issued a report.  I'd have to look

20 at the document.

21 Q    Okay.  But the date of it is in our informational brief.

22 The Court can find it later.  But you don't dispute that Health

23 Canada issued a report at some point on this timeline?

24 A    Yeah, I -- I don't dispute the issue to report.  I don't

25 know when.

1  Q    And you don't dispute that it said they found that a

2  causal connection between talc powder and ovarian cancer was

3  indicated by their data?  Didn't they, Mr. Kim?

4  A    Again, I'd have to look at the exact wording that they

5  used.  It was a very -- the wording was very specific and

6  precise.

7  Q    Okay.

8  A    So I'd have to look at that because of -- of what it

9  actually meant.  So I'd like to -- I'd defer to the actual

10  wording that they used.

11  Q    All right.  You agree with me that in 2019, the United

12  States FDA issued its report finding asbestos in some talc,

13  some Johnson's baby powder, correct?

14  A    I believe -- I'm sorry, in 2019?

15  Q    Yes.

16  A    Yeah.

17  Q    October 2019.

18  A    '19.  Yeah, I believe there was a finding of subtrace

19  amounts in one sample by the FDA lab.

20  Q    You agree that Judge Wolfson issued her Daubert ruling

21  that the science was sufficient to get to a jury in April of

22  2020?  Isn't that a fact, Mr. Kim?

23  A    Well, I don't know that I would describe it that way.  No,

24  Judge Wolfson issued a ruling.  The contents of that ruling

25  were -- were mixed in our opinion, but that ruling was issued

1  in 2020.  Yes.

2  Q    All right.  In June of 2020, the Missouri Court of Appeals

3  issued its decision in Ingham upholding the science in the

4  Ingham trial.  Isn't that a fact, Mr. Kim?

5  A    The Ingham decision was rendered.  I don't know that I

6  would agree with your characterization, but it was rendered

7  then.

8  Q    Okay.  The Carl decision in New Jersey reversing a trial

9  court on the science of causation was issued in July of 2020 by

10  the New Jersey Appellate Division.  Isn't that true, Mr. Kim?

11  A    There was the Carl decision.  I'd have to go back to see

12  what date it was, but that was I think around that time period,

13  yes.

14  Q    And from basically call it November of 2019 to literally

15  October 13th, 2021, seven mesothelioma plaintiffs won their

16  trials one after another.  Isn't that true, Mr. Kim?

17  A    I'd have to go back to see the chart to see how many

18  trials we had and when they were won.  But there were a number

19  of trials in favor of mesothelioma plaintiffs.  I recall that,

20  yes.

21  Q    Mesothelioma trials, Johnson & Johnson has lost the last

22  seven in a row.  Isn't that a fact, Mr. Kim?

23  A    Again, I'd have to go look at the chart.  I don't think

24  that's true but, again, I'd have to go look and see.

25  Q    We'll bring up the chart when Mr. Diaz testifies.  Can you

 1  remember the last time Johnson & Johnson won a mesothelioma

 2  trial?

 3  A    I think it may have been Rimondi.

 4  Q    What year?

 5  A    20-, I want to say 2019.

 6  Q    Okay.  So Johnson & Johnson has not won a mesothelioma

 7  trial since 2019 to your knowledge, right, Mr. Kim?

 8  A    Yeah.  Again, I'd have to go check to see the trial

 9  listings.

10  Q    And those trials didn't all take place in St. Louis,

11  Missouri, did they, Mr. Kim?

12  A    No.  They took place in --

13  Q    California?

14  A    Alameda County, yes.

15  Q    Florida?

16  A    Yes.

17  Q    New Jersey?  Where did Prudencio get tried?

18  A    I thought Prudencio was California.

19  Q    Great.  Where did Johnson get tried?

20  A    Johnson, I believe, also was a California case.

21  Q    So it wasn't all St. Louis, was it, Mr. Kim?

22  A    Oh, for the -- for the meso cases, no.  The meso cases

23  were generally in Alameda County.

24  Q    I think you said this on direct, but just to be very

25  clear.  These four verdicts that you -- did you show the board

1 A    This would be a fair representation of a building block of

2 GAAP that is used.  Yes.

3 Q    To your knowledge, no one in the accounting department

4 ever asked for a legal opinion from any inside or outside

5 counsel that your corporate accounting interpretation of that

6 one sentence in FASB trumps a court's assignment of liability

7 by order.  Isn't that true?

8 A    Not that I'm aware of, no.

9 Q    So you were unaware -- you are unaware of any specific

10 GAAP rule that says notwithstanding a legal obligation to pay,

11 we can assign punitive damages to another entity?

12 A    I'm not aware of that rule, but generally GAAP would not

13 be that precise.

14 Q    In fact, the accounting for legal liabilities is, in your

15 view, one of the most subjective areas of GAAP interpretation.

16 Isn't that true?

17 A    Correct.

18 Q    You apply this subjective GAAP interpretation to

19 compensatory damages as well.  Even if they -- the jury assigns

20 them to Johnson & Johnson itself in the accounting group, you

21 assign them to JJCI, correct?

22 A    If that's the fundamental entity with legal liability,

23 yes.

24 Q    But the J&J policies that we have referenced --

25          MR. GLASSER:  And we can take down the FASB --

Lisman - Direct/Glasser                                    94

1  BY MR. GLASSER:

2  Q    -- are not actually mandated by GAAP, correct?

3  A    J&J policies are a practical application of GAAP.

4  Q    But not mandated by it?

5  A    They're an interpretation and a practical application of

6  GAAP is what they are.

7  Q    Showing you Exhibit 600.002, which was Exhibit 12 in your

8  first deposition and you've -- you testified -- which was this

9  agreement to transfer assets in 1978 which you're familiar with

10 now, right?

11 A    I recall seeing it at the first one.  Yes.

12 Q    Right.  Prior to your first deposition in the case, you

13 had never seen the document before, right?

14 A    I had not.

15 Q    And so, to the best of your knowledge, none of the

16 accounting allocation treatment of talc liabilities that

17 occurred prior to October 2021, to your knowledge, was premised

18 on this document, right?

19 A    Not that I'm aware of.

20 Q    The accounting policy, which is Exhibit 284 -- let's call

21 that up -- does have a date upon which it was adopted on the

22 last page, right?

23 A    Yep.  Correct.

24 Q    In this instance, it's 2005.  Is that right?

25 A    Yes.

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |
|---|---|
| In re | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No. 21-30589 (JCW) |
| Debtor. |  |

## <u>INFORMATIONAL BRIEF OF LTL MANAGEMENT LLC</u>

Gregory M. Gordon
Dan B. Prieto
Amanda Rush
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201

Brad B. Erens
Caitlin K. Cahow
JONES DAY
77 West Wacker
Chicago, Illinois 60601

C. Richard Rayburn, Jr.
John R. Miller, Jr.
RAYBURN COOPER & DURHAM, P.A.
227 West Trade Street, Suite 1200
Charlotte, North Carolina 28202

Kristen R. Fournier
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036

Kathleen A. Frazier
SHOOK, HARDY & BACON L.L.P.
JPMorgan Chase Tower
600 Travis Street, Suite 3400
Houston, TX 77002

Dated: October 14, 2021

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is
501 George Street, New Brunswick, New Jersey 08933.

100 or so new cases per year,[192] mesothelioma filings against J&J/Old JJCI have more than made

up the difference with 257 cases filed in 2017, 371 cases filed in 2018, 326 cases filed in 2019,

271 cases filed in 2020, and over 120 cases filed in 2021 (to-date).

## 2.    The Asbestos Mass Tort Bar Adjusts Its Strategy to Talc.

As cosmetic talc litigation ramped up, the plaintiff bar adjusted its strategy to ensure that

this new mass tort would endure as traditional asbestos litigation began to subside.  From

January 2016 through September 2020, 61.5% of the mesothelioma cases filed against J&J/Old

JJCI were mixed exposure cases, meaning that the J&J defendants were simply added as an

additional defendant to a mesothelioma case that also alleged exposure to traditional

asbestos-containing products.  71% of these mixed exposure cases were filed in Madison

County, Illinois—historically, a plaintiff-favored jurisdiction for asbestos litigation where most

cases end in settlement.

However, as the cosmetic talc litigation continued, plaintiffs began filing more and more

"talc-only" mesothelioma cases in other jurisdictions.  Over the last year, only 32% of the new

mesothelioma cases filed against J&J/Old JJCI have been mixed exposure cases; meaning, the

vast majority of the cosmetic talc cases filed against J&J/Old JJCI are now "talc-only" cases.

The reason for this shift in filing practices is purely strategic.  By focusing the case on talc-only

allegations and minimizing plaintiffs' exposure to traditional asbestos products (examples of

which are further described below), plaintiffs strip talc defendants like Old JJCI of alternative

exposure defenses, which are key in mesothelioma cases.  As a result, Old JJCI was forced to

undertake extensive and expensive investigations to uncover information regarding a plaintiff's

alternative asbestos exposures.  Moreover, these "talc-only" cases are perceived to be insulated

---

[192]    *Id.*

NAI-1519748187

from the threat that traditional asbestos companies may disappear from active tort litigation.

The following are just a few examples of the sorts of cases filed to implement the "talc-only" strategy:

- In one trial, plaintiff's counsel and experts focused their case on allegedly sub-trace levels of asbestos in Johnson's Baby Powder, despite the fact that the plaintiff had for years smoked Kent asbestos-containing cigarettes. Each Kent cigarette that the plaintiff smoked would have contained 80 billion fibers of the deadliest type of asbestos, crocidolite.

- In another trial, neither side disputed that the plaintiff had handled asbestos-containing brakes, had been present when her husband removed and sanded those brakes, and that she then laundered his asbestos-covered clothes. Plaintiff expert Dr. Longo had previously testified in traditional asbestos litigation that sanding brakes, which he alleged were designed to contain 80% asbestos, was "like hitting a pinata of dust." But now with J&J/Old JJCI as the primary litigation target, Dr. Longo downplayed the brake exposures, opining that the allegedly sub-trace levels of asbestos in Johnson's Baby Powder resulted in higher exposure levels. Ultimately, in that trial, the jury returned a verdict of $25.75 million against J&J and Old JJCI, finding that they were 67% at fault.

- One of the most frequent plaintiff causation experts in mesothelioma cases is Dr. Jacqueline Moline. In one case, Dr. Moline issued a report with her opinion that Johnson's Baby Powder caused a particular plaintiff's mesothelioma, but did not conduct the most basic of investigations, which would have revealed that the plaintiff lived, went to school, and worked 1.5 kilometers from an asbestos cement factory.

### B. The Lack of Support for Ovarian Cancer Claims Caused by Talc

#### 1. What is Ovarian Cancer?

Ovarian cancer comprises several distinct diseases, which are categorized into separate subtypes. These different types of ovarian cancer develop in different types of cells, they look different under a microscope, they involve mutations of different genes, and they have different risk factors and causes. Notably, in the largest prospective analysis of ovarian cancer risk factors ever conducted—pooling individual data for more than 1.3 million women from 21 studies—researchers who considered 14 risk factors found that "[e]ach subtype [of ovarian cancer] had a qualitatively unique pattern of associations" and that "[o]nly parity and height were associated

-50-

NAI-1519748187

And, there is little doubt that cosmetic talc litigation will only continue to grow, and the

extraordinary costs continue to mount.  Beyond the sudden influx of ovarian cancer claims being

filed, while the company disputes that its cosmetic talc products contain any asbestos, plaintiff

experts estimate that the latency period for mesothelioma can be as high as 60 years—and,

similarly, have begun to allege extended latency periods for ovarian cancer allegedly caused by

asbestos exposure.[466]  This means that, even though Old JJCI stopped selling its talc-based

Johnson's Baby Powder in North America in 2020, individuals who develop mesothelioma in

2080 and beyond may still sue J&J-related defendants, potentially drawing out the litigation to

the end of this century.

## VI.    The Debtor Currently Faces Overwhelming On-Going Litigation Claims.

### A.    Ovarian Cancer Claims

As a result of the onslaught of litigation, currently the Debtor is facing approximately

38,000 ovarian cancer claims.  Approximately 35,000 of those plaintiffs' suits are pending in the

MDL, nearly 3,300 claims are pending in multiple state court jurisdictions across the country,

with roughly 2,200 of those claims consolidated in formal state court proceedings in California

and in New Jersey.  More than the sheer number of pending lawsuits, the acceleration of ovarian

cancer claims has been staggering.  In 2014, J&J/Old JJCI were served with 46 ovarian cancer

complaints.  In 2017—just three years later—that number was nearly 5,000.  This extraordinary

acceleration in ovarian cancer claims asserted against J&J/Old JJCI has shown no signs of

abating.  As of the petition date, J&J/Old JJCI had been served with *over 12,300* ovarian cancer

complaints in just the first ten and a half months of 2021.

---

[466]      *See, e.g.*, Expert Report of Jaqueline Moline (November 4, 2019).

NAI-1519748187

| Year | Ovarian Cancer Complaints | Number of Plaintiffs |
|------|---------------------------|----------------------|
| 2014 | 46 | 426 |
| 2015 | 131 | 907 |
| 2016 | 325 | 2,082 |
| 2017 | 4,824 | 6,300 |
| 2018 | 5,745 | 6,328 |
| 2019 | 4,425 | 4,727 |
| 2020 | 9,856 | 9,856 |
| 2021[467] | Over 12,300 | Approximately 13,000 |

To put the pace of this litigation in perspective, from 2017 through 2019, the company was served on average with one or more ovarian cancer complaints *every other hour of the day, every single day of the week*. From January 2020 to the present, however, the company has been served on average with one or more ovarian cancer complaints *every hour of the day, every single day of the week*.

With roughly 21,000 new ovarian cancer diagnoses each year,[468] and little preventing the plaintiff bar from alleging that the company's products were at fault, there is no end to the claims that may be asserted against the Debtor.

### B.    Mesothelioma Claims

In addition, as of the petition date, there were more than 430 mesothelioma cases pending against J&J/Old JJCI nationwide, nearly all of which were pending in state court.[469] The majority of these cases (well over 250) are pending in Middlesex County Superior Court in New Jersey. However, a substantial number of cases are pending in state courts in New York, Illinois, California, Missouri, and Ohio, with the remainder of the cases pending in various state court

---

[467]    Numbers listed for 2021 are as of the petition date.

[468]    SEER Data.

[469]    At no time has there been more than five mesothelioma cases pending in federal courts across the country.

NAI-1519748187

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

In re

LTL MANAGEMENT LLC,[1]

Debtor.

Chapter 11

Case No. 21-30589 (JCW)

## DECLARATION OF JOHN K. KIM
## IN SUPPORT OF FIRST DAY PLEADINGS

John K. Kim, being first duly sworn, deposes and states as follows:

1.     I am the Chief Legal Officer of LTL Management LLC, a North Carolina limited liability company (the "Debtor") and the debtor in the above-captioned chapter 11 case.  I have held this position with the Debtor since its formation on October 12, 2021.

2.     I am employed by Johnson & Johnson Services, Inc. ("J&J Services"), a non-debtor affiliate of the Debtor and a subsidiary of the Debtor's ultimate non-debtor parent company, Johnson & Johnson ("J&J").  Just prior to my role as the Chief Legal Officer of the Debtor, I was J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group.  In that role, I was responsible for product liability litigation globally.  I began my employment with J&J and its affiliates in 2001 as a Senior Counsel in the Litigation Group, handling a variety of cases ranging from commercial disputes and international arbitrations to product liability litigation.

3.     Prior to my employment with J&J and its affiliates, I was associated with the law firm of Simpson Thacher & Bartlett in its Litigation Group from 1989 to 2001, where I

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

handled a number of complex litigation engagements, including bankruptcy proceedings, anti-trust disputes, insurance coverage arbitrations and securities actions.

4.        I earned a Juris Doctor degree from Fordham University School of Law in 1989 and a Bachelor of Arts degree from Tufts University in 1985.

5.        On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (collectively, the "First Day Pleadings").

6.        I submit this Declaration to support the First Day Pleadings and provide certain information about the Debtor, its decision to commence this chapter 11 case and its objectives for this case.  I have reviewed each of the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtor, (b) maximize and preserve the value of the Debtor's chapter 11 estate, (c) assist in the smooth transition of the Debtor into chapter 11 and/or (d) promote the efficient administration of this case.

7.        As the Chief Legal Officer, I am familiar with the Debtor's day-to-day operations, assets, financial condition, business affairs and books and records.  Except as otherwise indicated, all facts and statements set forth in this Declaration are based upon:  (a) my personal knowledge; (b) information supplied to me by other members of the Debtor's management, professionals or employees; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtor's assets, liabilities and financial condition.  If called upon to testify, I could and would testify to the facts and opinions set forth herein.

8.     Section I of this Declaration provides an overview of the Debtor's history and corporate structure.  Section II describes the corporate restructuring that was completed on October 12, 2021.  Section III describes the circumstances surrounding the commencement of this chapter 11 case and the Debtor's objectives for this case.  Section IV sets forth relevant facts in support of the First Day Pleadings.

## I.     THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

9.     The Debtor traces its roots back to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly-owned subsidiary of J&J.

10.     J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products.  In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder.  In 1979, J&J transferred all its assets associated with the Baby Products division to J&J Baby Products.  In connection with this transfer, J&J Baby Products assumed all liabilities associated with the Baby Products division.  Following this transaction, J&J no longer manufactured or sold baby products, including JOHNSON'S® Baby Powder.

11.     In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly-owned subsidiary of J&J Baby Products.  In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program.  Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company.[2]

---

[2]     In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.

12.     In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc.

13.     In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").

14.     In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc.  The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "Old JJCI").

15.     Following these intercompany transactions, Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products cause cancer or other diseases.

16.     In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate Restructuring"), which was completed on October 12, 2021.  As a result of that restructuring:  Old JJCI ceased to exist and two new entities were created:  (a) the Debtor in this case, which was initially formed as a Texas limited liability company and then converted into a North Carolina limited liability company; and (b) another entity, which was initially formed as a Texas limited liability company and then merged into a New Jersey corporation that was its direct parent (as well as the direct parent of the Debtor), whereupon this entity changed its name to "Johnson & Johnson Consumer Inc." ("New JJCI").  As a result of the 2021 Corporate Restructuring, the Debtor holds certain of Old JJCI's assets and is solely responsible for the talc-related liabilities of Old JJCI and New JJCI holds all other assets of Old JJCI and is solely responsible for all other liabilities of Old JJCI.

17.     New JJCI is the direct parent of the Debtor; and the Debtor is the direct parent of Royalty A&M LLC ("Royalty A&M"), a North Carolina limited liability company. A chart depicting the Debtor's corporate structure is attached to this Declaration as Annex 1.

18.     The Debtor was formed to manage and defend thousands of talc-related claims and to oversee the operations of its subsidiary, Royalty A&M. Royalty A&M owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of LACTAID®, MYLANTA® / MYLICON® and ROGAINE® products. It plans to review royalty monetization opportunities in the Healthcare industry and grow its business by reinvesting the income from these existing royalty revenue streams into both the acquisition of additional external royalty revenue streams as well as financings to third parties secured by similar royalty streams.

19.     New JJCI manufactures and sells a broad range of products used in the baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-counter pharmaceutical products. The Debtor's ultimate parent company, J&J, is a holding company that through its operating subsidiaries conducts business in virtually all countries in the world, focused primarily on products related to human health and well-being. J&J is a global innovator and leader in public health and has been at the forefront of healthcare innovation for over 130 years. That innovation includes novel oncology, immunology and vaccine products, including its COVID-19 vaccine that it developed and supplied at non-profit pricing. J&J's shares of common stock are publicly traded under the symbol JNJ on the New York Stock Exchange.

## II.     THE 2021 CORPORATE RESTRUCTURING

20.     As described above, Old JJCI and its affiliates have engaged in multiple restructurings through the years to achieve business and operational objectives. Since it was

formed in 1970, Old JJCI has merged with other companies, been repositioned in its corporate family and acquired and transferred a number of assets.

21. Most recently, Old JJCI implemented the 2021 Corporate Restructuring to enable the Debtor to globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding. A key objective of this restructuring was to make certain that the Debtor has the same, if not greater, ability to fund the costs of defending and resolving present and future talc-related claims as Old JJCI did prior to the restructuring. This was achieved through the establishment of a funding agreement between the Debtor, on the one hand, and J&J and New JJCI (on a joint and several basis) on the other, which is in addition to the value of and revenues generated by Royalty A&M, the Debtor's wholly-owned operating subsidiary.

22. The 2021 Corporate Restructuring was effectuated through a series of steps. On October 11, 2021, Old JJCI organized Royalty A&M as a direct subsidiary and, in exchange for full ownership of Royalty A&M's equity, contributed to it $367.1 million. Subsequently, Royalty A&M used those funds to acquire certain royalty streams from Old JJCI and certain of its affiliates. That same day, the following transactions were effected, in sequence:

- Old JJCI's then-direct parent, Janssen Pharmaceuticals, Inc., organized Currahee Holding Company Inc. ("Currahee"), contributing to it all of the issued and outstanding stock of Old JJCI, whereupon Currahee became the direct parent of Old JJCI; and

- Currahee organized Chenango Zero LLC, a Texas limited liability company, as its wholly owned subsidiary.

23.     On October 12, 2021, the remaining transactions in the 2021 Corporate Restructuring occurred in the following sequence:

- Old JJCI merged with and into Chenango Zero LLC, with Chenango Zero LLC as the surviving entity;

- J&J and Currahee, as payors (on a joint and several basis), and Chenango Zero LLC, as payee, entered into a funding agreement (as amended from time to time, the "Funding Agreement");

- Old JJCI effected a divisional merger under Chapter 10, Subchapter A of the Texas Business Organizations Code;

  ▪ Upon the effectiveness of the divisional merger, (a) Old JJCI ceased to exist; (b) two new Texas limited liability companies—Chenango One LLC and Chenango Two LLC—were created; and (c) all of the assets and liabilities of Old JJCI were allocated between Chenango One LLC and Chenango Two LLC, as described below;

- Immediately following the effectiveness of the divisional merger, (a) Chenango One LLC and Chenango Two LLC entered into certain agreements, including a divisional merger support agreement that, among other things, provides that Chenango One LLC will indemnify and hold harmless Chenango Two LLC and its affiliates for any losses, liabilities or other damages relating to claims against Chenango Two LLC and its affiliates in respect of the assets and liabilities of Chenango Two LLC, including talc-related liabilities and (b) Chenango One LLC entered into

certain agreement with other affiliates, including the secondment and services agreements discussed further below;

- Following the effectiveness of the divisional merger, (a) Chenango Two LLC merged with and into Currahee, with Currahee as the surviving entity, which then changed its name to "Johnson and Johnson Consumer Inc."; and (b) Chenago One LLC converted from a Texas Limited liability company into a North Carolina limited liability company and changed its name to "LTL Management LLC";

- Among its agreements with non-debtor affiliates, the Debtor entered into a divisional merger support agreement with New JJCI (which was initially entered into between Chenango One LLC and Chenango Two LLC immediately after the divisional merger) that, among other things, provides that the Debtor will indemnify and hold harmless New JJCI and its affiliates for any losses, liabilities or other damages relating to claims against New JJCI and its affiliates in respect of the Debtor's assets or liabilities, including the Debtor's talc-related liabilities; and

- Finally, the Funding Agreement, the divisional merger support agreement and the other intercompany agreements, including the secondment and services agreements discussed further below (which were initially entered into between Chenango One LLC and non-debtor affiliates prior to the divisional merger), were amended and restated to reflect the names of

the parties to those agreements at the conclusion of the 2021 Corporate Restructuring.[3]

24.     Pursuant to the divisional merger, the Debtor became solely responsible for Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws), and the defense of those claims.  In addition, the Debtor received the following assets:

(a)     A bank account and approximately $6 million in cash;

(b)     Old JJCI's rights and interests as payee under the Funding Agreement;

(c)     All contracts of Old JJCI related to its talc-related litigation, including settlement agreements, interests in qualified settlement trusts, indemnity rights, service contracts and engagement and retention contracts, if any;

(d)     All equity interests in Royalty A&M;

(e)     Causes of action that relate to the assets and liabilities allocated to the Debtor;

(f)     Privileges that relate to the assets and liabilities allocated to the Debtor; and

(g)     Records that relate to the assets and liabilities allocated to the Debtor.

25.     Pursuant to the divisional merger, the predecessor to New JJCI received all other assets and liabilities of Old JJCI, and became solely responsible for those other liabilities.

26.     As I mentioned above, the design of the 2021 Corporate Restructuring ensures that the Debtor has at least the same, if not greater, ability to fund talc-related claims and

---

[3]     A copy of the Funding Agreement in effect as of the Petition Date (without its Schedule 2 that includes confidential bank account information) is attached hereto as Annex 2.  The summary of the terms of the Funding Agreement in this Declaration is provided for the convenience of the Court and parties in interest and is qualified in all respects by the more detailed terms contained in the Funding Agreement.

other liabilities as Old JJCI had before the restructuring. The Debtor received the equity of

Royalty A&M, which the Debtor has projected will generate approximately $50 million in

revenue per year over the next five years. The Debtor estimates the fair market value of its

interest in Royalty A&M to be approximately $367.1 million as of the Petition Date. In addition,

as noted, as part of the 2021 Corporate Restructuring, the Debtor received $6 million in cash and

became party to the Funding Agreement with New JJCI and J&J. In total, therefore, the

Debtor's value is approximately $373.1 million, without taking into account the Funding

Agreement with New JJCI and J&J.

27.     Significantly, the Funding Agreement imposes no repayment obligation on

the Debtor; it is not a loan. It obligates New JJCI and J&J, on a joint and several basis, to

provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor

incurred in the normal course of its business (a) at any time when there is no bankruptcy case and

(b) during the pendency of any chapter 11 case, including the costs of administering the

chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor

from Royalty A&M are insufficient to pay such costs and expenses. In addition, the Funding

Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts

necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is

no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust,

in both situations to the extent that any cash distributions received by the Debtor from Royalty

A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a

trust, the Debtor's other assets are insufficient to provide that funding.

28.     In addition, J&J and New JJCI have committed to fund as early as

January 31, 2022 a North Carolina trust (the "QSF Trust") that will constitute a "qualified

settlement fund" with an aggregate amount of $2 billion for the payment of current and future talc-related claims asserted against or related to the Debtor. These funds will be dedicated exclusively for use in paying such claims. Although J&J and JJCI have no obligation to make this contribution, they have agreed to do so as a pre-funding of Permitted Funding Uses (as such term is defined in the Funding Agreement) under the Funding Agreement. The funds in the QSF Trust will be immediately available for the Debtor's eventual use when and as needed to resolve its talc-related claims.

29. To ensure that the Debtor has access to services it needs to effectively operate its business, in connection with the 2021 Corporate Restructuring, the Debtor entered into a services agreements (the "Services Agreements") with J&J Services. Pursuant to the Services Agreement, J&J Services has agreed to provide the Debtor with certain corporate and administrative services, including treasury and procurement, corporate finance, accounting, human resources, information technology, legal, risk management, tax and other support services. In addition, the Debtor and J&J Services entered into a secondment agreement pursuant to which J&J Services has agreed to second to the Debtor certain of its employees, including the Debtor's Chief Legal Officer, on a full-time basis to manage the Debtor's business.

30. Royalty A&M similarly has agreements it needs to conduct its business. In particular, Royalty A&M has entered into a services agreement with J&J Services pursuant to which J&J Services has agreed to provide certain corporate and administrative services and an intercompany loan facility agreement with J&J. Under the loan facility agreement, Royal A&M has the ability to borrow up to $50 million from J&J on terms consistent with those provided to other J&J affiliates. In addition, Royalty A&M has entered into a services agreement with the Debtor pursuant to which the Debtor will provide ongoing access to and support from the

Debtor's chief executive officer and chief financial officer (in their capacities as officers of

Royalty A&M) to perform their roles as such, including supporting Royalty A&M's operations,

tracking, administering and auditing any royalty streams or other sources of income, and

providing strategic planning and analysis, including to seek out opportunities to invest in

additional external royalty revenue streams.

## III.    EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND
THE DEBTOR'S OBJECTIVES FOR ITS CHAPTER 11 REORGANIZATION

### A.    Cosmetic Talc Litigation Against the Debtor

31.    As described more fully in the *Informational Brief of LTL*

*Management LLC* (the "Informational Brief"), filed concurrently with this Declaration, this

chapter 11 case has been precipitated by the filings of thousands of cosmetic talc lawsuits against

Old JJCI and J&J.  The Debtor believes, for the reasons set forth in the Informational Brief, that

these claims have no valid scientific basis, as Old JJCI's talc products never contained asbestos

and the safety of cosmetic-grade talc has been confirmed by dozens of peer-reviewed studies and

multiple regulatory and scientific bodies for decades.  Nevertheless, the number of claims has

continued to increase, and the Debtor anticipates that the litigation and its associated burdens

will continue for decades more.

32.    Cosmetic talc litigation against the Debtor, Old JJCI and J&J focused

primarily on JOHNSON'S® Baby Powder as the purported cause of ovarian cancer and

mesothelioma.  JOHNSON'S® Baby Powder has been used by hundreds of millions of people

worldwide for over 125 years.

33.    The Debtor traces its history to J&J's Baby Products business that was

acquired by Old JJCI from J&J in 1979.  Old JJCI continued to sell these talc-based products

following this acquisition.  On May 19, 2020, Old JJCI announced it would permanently

discontinue its line of talc-based Baby Powder in the U.S. and Canada. The decision was based

on business considerations, including lack of sales due to misinformation about the safety of Old

JJCI's talc-based Baby Powder.

34.     Prior to 2010, only a small number of isolated cases involving cosmetic

talc had been filed against Old JJCI and J&J. These cases alleged a range of claims, including

talcosis due to substantial misuse of Johnson's Baby Powder, mesothelioma, dermatitis, and

rashes.

35.     The number of claims began to skyrocket after the *Berg* (2013) and *Fox*

(2016) trials. *Berg v. J&J*, filed in December 2009, was the first case alleging ovarian cancer as

a result of genital exposure to Old JJCI's cosmetic talc-based products. The jury found for the

plaintiff, but awarded no damages. By the end of 2015, there were over thirteen hundred ovarian

cancer lawsuits filed against Old JJCI and J&J.

36.     In February 2016, the first St. Louis ovarian cancer case, *Fox*, went to

trial. The jury awarded the plaintiff $72 million dollars. While ultimately overturned on appeal,

the verdict sparked even more interest on the part of plaintiff lawyers. Five more cases were

tried in that venue over the next year and a half, resulting in plaintiff verdicts totaling more than

$235 million dollars (in addition to a defense verdict and a mistrial). All of those verdicts

subsequently were reversed on appeal.

37.     New filings alleging that JOHNSON'S® Baby Powder caused

mesothelioma also dramatically increased. At the time of the *Fox* trial, there were only six

mesothelioma cases naming Old JJCI or J&J as a defendant and alleging JOHNSON'S® Baby

Powder as a cause of the plaintiff's disease. Within two months of the *Fox* trial, that number had

increased to 23 mesothelioma cases. By the beginning of 2017, more than 100 mesothelioma

cases had been filed naming Old JJCI or J&J as a defendant.  The number of mesothelioma cases

steadily grew in the years that followed

B.      **The Costs and Burdens of the Cosmetic Talc Litigation**

38.      Prior to the Petition Date, roughly 1,300 ovarian cancer and over 250

mesothelioma cases were dismissed without payment, and Old JJCI achieved 16 key defense

verdicts, including in four trials in 2021 alone.  Old JJCI also succeeded in obtaining reversals of

many plaintiff verdicts on appeal.  Despite these results, Old JJCI was also subject to a number

of plaintiff verdicts involving unpredictable and wildly divergent compensatory and punitive

damages awards.

39.      Notably, all of the ovarian cancer plaintiff verdicts to date have been

reversed on appeal with the exception of *Ingham.*  Although the verdict in that case was reversed

in part and reduced, the total damages award was still $2.243 billion.  The St. Louis, Missouri

trial court had improperly permitted the consolidation of 22 ovarian cancer plaintiffs, 17 of

whom were non-residents, for a single trial.  The jury found defendants Old JJCI and J&J liable

for every claim.  The jury awarded compensatory damages in the aggregate amount of $550

million and punitive damages in the aggregate amount $4.1 billion.  On appeal, the punitive

damages award was later reduced to $1.6 billion.

40.      Prior to the commencement of this case, Old JJCI incurred nearly

$1 billion in defending personal injury lawsuits relating to alleged talc exposure, nearly all of

which was spent in only the last five years.  In the months prior to the Petition Date, Old JJCI

was paying anywhere from $10 million to $20 million in defense costs on a monthly basis.  In

addition to these costs, Old JJCI paid approximately $3.5 billion in indemnity in connection with

settlements and verdicts.

41.     Cosmetic talc litigation against the Debtor was anticipated to continue for decades more and grow, as were the extraordinary costs of defending and resolving tens of thousands of expected claims.  Beyond the sudden influx of ovarian cancer claims, plaintiffs were filing mesothelioma claims, alleging in the case of mesothelioma claims that Old JJCI's cosmetic talc products contained asbestos, which the Debtor disputes.  Plaintiff experts estimate that the latency period for mesothelioma can be as long as 60 years and have begun to allege extended latency periods for ovarian cancer allegedly caused by asbestos exposure.  As a result, even though Old JJCI stopped selling its talc-based JOHNSON'S® Baby Powder in North America in 2020, individuals who develop mesothelioma in 2080 and beyond could sue the Debtor, potentially drawing out the litigation to the end of this century.

42.     As of the Petition Date, there were approximately 38,000 ovarian cancer cases pending against the Debtor, including approximately 35,000 cases pending in a federal multi-district litigation in New Jersey, and approximately 3,300 cases in multiple state court jurisdictions across the country.

43.     Moreover, the number of ovarian cancer cases skyrocketed.  In 2014, Old JJCI was served with 46 ovarian cancer complaints. In 2017—just three years later—that number was nearly 5,000.  This acceleration in ovarian cancer claims asserted against Old JJCI showed no signs of abating.  As of the Petition Date, Old JJCI had been served with over 12,300 ovarian cancer complaints in just the first ten and a half months of 2021.

44.     In addition to the ovarian claims, more than 430 mesothelioma cases were pending against the Debtor on the Petition Date.  These claims, like the ovarian cancer claims, spanned the U.S. with cases pending in New Jersey, California, Illinois, Missouri, New York, and Ohio.

45.     The Debtor expects that, absent its bankruptcy filing, thousands of additional ovarian cancer and mesothelioma cases would have been filed against it for decades to come.

C.     **The Debtor's Insurance Coverage and Related Litigation**

46.     The Debtor believes it has insurance coverage for its talc-related liabilities.  In particular, the Debtor has access to certain primary and excess liability insurance policies that cover, among other things, defense and/or indemnity costs related to talc bodily injury claims, subject to the terms of the policies.[4]  I provide below a general overview of the Debtor's insurance coverage.

47.     Aetna Casualty and Surety Company ("Travelers")[5] issued primary general liability policies to J&J (which policies cover the Debtor) for the period 1957 to 1980 (the "Travelers Policies").  The combined limits of the Travelers Policies (not accounting for deductibles or erosion/exhaustion of limits) total more than $214 million per occurrence and $293 million in the aggregate.  The deductibles increase over time, starting at a minimal level and increasing to $5 million per occurrence by 1977.  The limits of the Travelers Policies before 1973 are not eroded by defense costs; under later policies, defense costs erode limits.

48.     From 1957 to 1985, Travelers also provided excess liability coverage to J&J that covers the Debtor.  The combined aggregate limits of those policies total approximately $563 million.

49.     From 1973 to 1985, a variety of other insurers issued excess policies that cover the Debtor.  Those insurers include subsidiaries or affiliates of the following companies:

---

[4]     The policies that cover the Debtor were issued to J&J as the Named Insured.  Those policies cover the period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI was a subsidiary of J&J.

[5]     Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

American International Group, Allstate Insurance Company, The Hartford, Home Insurance Company, Nationwide Indemnity Company, and North River Insurance Company. The combined limits of those excess policies total more than $1.09 billion in the aggregate. Certain of the insurers that issued these excess policies are insolvent (including, in particular, Home Insurance Company).

50. From 1981 to 1985, American Motorists Insurance Company ("AMICO") issued primary coverage that covers the Debtor (the "AMICO Policies"). AMICO is insolvent, having been placed into liquidation in 2013. The Debtor currently believes that the applicable limits of the AMICO Polices were exhausted by payments made by AMICO on claims while it was still solvent.

51. From 1973 through 1985, Middlesex Insurance Company ("Middlesex"), a captive insurance company that is a wholly-owned subsidiary of J&J, issued policies that cover J&J and the Debtor. Those policies insured J&J and Old JJCI for large deductibles under the Travelers Policies and the AMICO Policies. From 1977 to 1985, Middlesex also issued excess insurance policies that cover J&J and Old JJCI. After 1985, Middlesex issued liability coverage to J&J and the Debtor. As described below, there is a dispute between J&J, the Debtor, and Middlesex, on the one hand, and the third-party insurers (i.e., insurers other than the Middlesex captive), on the other hand, regarding the applicability and extent of coverage the Middlesex policies provide, as well as the potentially applicable Middlesex coverage limits, including in particular with respect to post-1985 Middlesex policies.

52. In total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion.

-17-

53.     J&J and Old JJCI tendered talc-related claims to the third-party insurers. To date, none of those insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid its costs of defense, or indemnified J&J or Old JJCI for settlements or judgments. Instead, the third-party insurers have asserted coverage defenses.

54.     In May 2019, certain of the Debtor's third party insurers filed a lawsuit against Old JJCI and J&J, along with Middlesex, in the Superior Court of Middlesex County (Docket No. MID-L-003563-19) (the "New Jersey Coverage Action"), seeking a declaratory judgment regarding the parties' respective obligations under the plaintiff insurers' policies including, in particular, the plaintiff insurers' duties to pay defense and indemnity costs to, among other things, Old JJCI.  The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020, which is currently the operative complaint.  J&J, Old JJCI, and Middlesex filed answers to the Second Amended Complaint on July 31, 2020, and asserted counterclaims, as well as cross-claims against certain defendants.  Travelers and certain other insurers filed Cross-Claims against J&J, Old JJCI, and Middlesex, to which J&J, Old JJCI, and Middlesex responded later in 2020.  The New Jersey Coverage Action remains pending.

**D.     Chapter 11 Filings by Talc Suppliers**

55.     In February 2019, Old JJCI's talc supplier, Imerys Talc America, Inc. and two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, "Imerys") filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Imerys Bankruptcy").  Imerys has potential liability for personal injury claims arising from exposure to talc it sold to customers, including Old JJCI.  In its bankruptcy case, Imerys has contended that it has claims against Old JJCI and J&J for indemnification and joint insurance proceeds.  The Debtor and J&J dispute those claims.

56.     Cyprus Mines Corporation and its parent company (together, "Cyprus"),
which had owned certain Imerys talc mines, filed in the Imerys Bankruptcy an adversary
proceeding against Old JJCI, J&J, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc.
seeking a declaration of indemnity under certain contractual agreements.  The Debtor and J&J
deny that any indemnification is owed.  In February 2021, Cyprus Mines Corporation filed its
own voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States
Bankruptcy Court for the District of Delaware.

57.     In July 2021, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc.
filed an adversary proceeding against Old JJCI and J&J in the Imerys Bankruptcy seeking
declaratory judgments with respect to certain indemnity agreements with Imerys.  The Debtor
and J&J contest the claims in the adversary complaint.

**E.      The Decision to File This Case**

58.     After consideration of the cost, burden, uncertainty and anticipated
duration of the cosmetic talc litigation, the Debtor determined that the filing of a chapter 11 case
in this Court was prudent and necessary.  The Debtor further concluded that this chapter 11 case
offered the only alternative for equitably and permanently resolving all current and future talc-
related claims against it.  As I described above, Old JJCI was the subject of a virtual tidal wave
of claims during the last five years and the significant number of claims that were being filed
against it were anticipated to continue unabated, if not increase, for decades more.  In addition,
the lottery-like results of the litigation created substantial uncertainty and were inhibiting
Old JJCI's ability to fully focus on its business operations.

59.     The Debtor's goal in this case is to negotiate, obtain approval of and
ultimately consummate a plan of reorganization that would, among other things, (a) establish and
fund a trust to resolve and pay current and future talc-related claims and (b) provide for the

issuance of an injunction that will permanently protect the Debtor, its affiliates and certain other parties from further talc-related claims arising from products manufactured and/or sold by Old JJCI, or for which Old JJCI may otherwise have had legal responsibility, pursuant to sections 105(a) and/or 524(g) of the Bankruptcy Code.

60.     The Debtor is prepared to commit the necessary resources to reach an agreement with representatives of current and future claimants on a fair and equitable plan of reorganization as soon as possible.  In that regard, the Debtor seeks to engage in good faith negotiations to reach a consensual resolution of this chapter 11 case with representatives for current and future claimants as soon as they are appointed and willing to begin discussions.

### F.     Automatic Stay of Prosecution of Talc-Related Claims

61.     As I discussed above, as a result of the 2021 Corporate Restructuring the Debtor became responsible for all of Old JJCI's talc-related liability related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to, talc, including talc contained in any product, or to the risk of, or responsibility for, any such damage or injury, except for any liabilities for which the exclusive remedy is provided under a workers' compensation statute or act ("Talc-Related Liabilities").  As I understand it, because any claims in respect of Talc-Related Liabilities against Old JJCI (which no longer exists) would be efforts to recover on account of claims against the Debtor, they are automatically stayed under the Bankruptcy Code.  See Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC), 2021 WL 3729335, at *30-32 (Bankr. W.D.N.C. Aug. 23, 2021); DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC), 2021 WL 3552350, at *27-28 (Bankr. W.D.N.C. Aug. 11, 2021).

62.     It is my further understanding that any such talc-related claims (collectively, the "Debtor Talc Claims") are likewise automatically stayed as to other parties. Aldrich Pump, 2021 WL 3729335, at *30-32; DBMP, 2021 WL 3552350, at *27-28.  In particular, any claims that seek to hold third parties liable for the Debtor Talc Claims—such as fraudulent transfer, alter ego and successor liability—are property of the Debtor's estate and subject to the automatic stay.  Aldrich Pump, 2021 WL 3729335, at *31-32; DBMP, 2021 WL 3552350, at *28.

63.     Claims that seek to recover against insurers who have provided insurance to the Debtor are subject to the automatic stay.  Aldrich Pump, 2021 WL 3729335, at *32. Similarly, the assertion of the Debtor Talc Claims against J&J or its non-debtor affiliates is also automatically stayed.  These claims would deplete available insurance coverage that J&J and its non-debtor affiliates share with the Debtor.  In addition, I understand that actions against parties who share such an identity of interests with the debtor that the debtor is, in effect, the real-party defendant are likewise automatically stayed.  The Debtor owes indemnity or is otherwise responsible or otherwise agreed to be responsible or is alleged to be contractually responsible for the Debtor Talc Claims asserted against J&J or any of its non-debtor affiliates, retailers who sold Old JJCI's talc-containing products and certain other parties.  In view of these agreements and obligations, I believe that such an identity of interests exists.  Aldrich Pump, 2021 WL 3729335, at *30-31; DBMP, 2021 WL 3552350, at *27.

## IV.     FIRST DAY PLEADINGS

64.     Concurrently with the filing of this chapter 11 case, the Debtor filed First Day Pleadings requesting various forms of relief.

65. The Debtor will move for entry of an order scheduling an expedited hearing on certain of the First Day Pleadings.[6] The Debtor anticipates that the Court will conduct a hearing (the "First Day Hearing") as soon after the commencement of its chapter 11 case as the Court's schedule will permit, at which the Court will hear and consider certain of the First Day Pleadings. The Debtor also anticipates that the Court will consider the remainder of the First Day Pleadings at a later time. The First Day Pleadings that the Debtor anticipates will be heard at the First Day Hearing are described in Section IV.A and IV.B, below. The remaining First Day Pleadings are described in Section IV.C, below.

66. Generally, the purpose of the First Day Pleadings is to: (a) obtain authorization for the continued use of the Debtor's bank account; (b) obtain authorization to establish and fund a qualified settlement fund; and (c) establish procedures for the smooth and efficient administration of this chapter 11 case. I have reviewed each of the First Day Pleadings, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization.

A. **The Case Administration Motions**

*Appointment of Claims, Noticing and Voting Agent*

67. The Debtor will seek the entry of an order appointing Epiq Corporate Restructuring, LLC ("Epiq") as claims, noticing and ballot agent in this chapter 11 case. I understand that Epiq may, among other things: (a) prepare and serve all notices required in the Debtor's chapter 11 case, including the notice of the commencement of this case and the meeting of creditors pursuant to section 341 of the Bankruptcy Code; (b) maintain the official

---

[6] Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings.

claims register; and (c) assist with the mailing and tabulation of ballots in connection with any vote to accept or reject any plan or plans proposed in this chapter 11 case. Two engagement proposals were obtained and reviewed to ensure selection through a competitive process. The Debtor submits, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

### *Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures*

68. The Debtor will request that the Court enter an order establishing certain notice, case management and administrative procedures (collectively, the "Case Management Procedures") to facilitate the orderly administration of the Debtor's chapter 11 case while ensuring that appropriate notice is provided to parties who express an interest in the chapter 11 case and those directly affected by a request for relief.

69. The Debtor believes that implementation of the Case Management Procedures, among other things, will facilitate service of Court Filings and Orders in a manner that will maximize the efficiency and orderly administration of the chapter 11 case, ensure that appropriate notice is provided to parties in interest and alleviate the significant administrative burden and cost that otherwise could be imposed on the Debtor's estate, parties in interest, the Court and the Clerk of Court due to (a) the substantial number of parties in interest expected to be involved and (b) the number of Court Filings anticipated in the Debtor's chapter 11 case.

### *List of the Top Law Firms With Talc Cases Against the Debtor in Lieu of the List of the 20 Largest Unsecured Creditors and Notice Procedures for Talc Claimants*

70. I understand that the Top 20 List primarily would be used by the Bankruptcy Administrator to understand the types and amounts of unsecured claims against the debtor and thus evaluate prospective candidates to serve on an official committee in the debtor's case. I further understand that an official committee of talc claimants is expected to be

appointed. Because committees in mass tort chapter 11 cases typically consists of plaintiff law firms acting on behalf of individual talc claimants, the Debtor will seek authority to file and provide the Bankruptcy Administrator with a list of the 30 law firms with the most significant representations of claimants, based on the volume of filings or other related factors, across the major types of claims faced by the Debtor (a "Top Talc Counsel List"), in lieu of listing the individual talc claimants with the largest unsecured claims against the Debtor on a "Top 20" list of unsecured creditors. The Debtor believes that providing the Bankruptcy Administrator with a Top Talc Counsel List would better facilitate the Bankruptcy Administrator's evaluation of members of an official committee of talc claimants.

71. The Debtor also will seek Court approval for certain notice procedures relating to individuals (collectively, the "Talc Claimants") who are claimants in talc-related personal injury lawsuits or other proceedings involving the Debtor, including to (a) serve all notices, mailings, filed documents and other communications relating to its chapter 11 case, including, without limitation, pleadings, in any contested matter or otherwise, seeking relief that could directly impact Talc Claimants' rights and obligations in this chapter 11 case, on Talc Claimants in care of their counsel (collectively, the "Talc Firms") at such counsel's address, as further described in the Motion; and (b) list the names, addresses and other contact information, as applicable, of the Talc Firms in any creditor or service lists, including the creditor matrix provided to the Court or filed in this case, in lieu of listing the contact information of individual Talc Claimants. To date, the Debtor has communicated solely with the Talc Firms regarding the talc-related claims against the Debtor. The Debtor in many cases cannot be sure that it has the current addresses (or any addresses) for the Talc Claimants. Further, consistent with the rules of professional conduct, communicating with an adversary in litigation generally is conducted

through counsel.  The Debtor therefore believes that providing notice to Talc Claimants through

the Talc Firms, in accordance with past practice, is much more reliable and consistent with the

rules of professional conduct.

72.     The notice procedures proposed in the Motion provide for an effective and

appropriate noticing process for the Talc Claimants.  Further, implementing the proposed Notice

Procedures would alleviate the administrative burden and expense of gathering current contact

information for each of the Talc Claimants, which, in many cases, is not readily available or is

difficult to verify.  The Debtor has access to the names and addresses of the counsel for the Talc

Claimants (including counsel of record in pending lawsuits), but the names and addresses of a

significant number of individual Talc Claimants themselves are not readily available.  It would

be extremely burdensome, costly and time-consuming for the Debtor to attempt to obtain this

information.  In addition, any contact information for the individual Talc Claimants the Debtor

has or is able to obtain may be outdated and unreliable.  Consequently, providing notice in this

chapter 11 case in accordance with the Notice Procedures will be more efficient and reliable than

providing notice to the individual Talc Claimants directly.

### *Extension of Time to File Schedules*

73.     The Debtor believes it will need additional time beyond the time period

allotted under the Bankruptcy Code to assemble all of the information necessary to complete and

file the required schedules of assets and liabilities and statement of financial affairs (collectively,

the "Schedules").  The Debtor will need the additional time because of (a) the size and

complexity of this chapter 11 case and (b) the volume of materials that must be compiled and

reviewed by the Debtor's limited staff to complete the Schedules during the hectic early days of

this restructuring.  Because the Debtor's chapter 11 case will involve tens of thousands of

claimants and other parties in interest, it is my understanding that the Debtor would need to collect, review and assemble a substantial amount of information to complete the Schedules.

74.     Given (a) the large number of claimants and (b) the critical matters that the Debtor and its professionals were required to address prior to the commencement of this chapter 11 case, the Debtor was not in a position to complete the Schedules by the Petition Date, even with the assistance of professionals. The Debtor further estimates that, with the many critical matters to be addressed in the early days of this case, the Debtor will require more than 14 days after the Petition Date to complete the Schedules.

75.     The additional time requested is important to help ensure that the Schedules are as accurate as possible. Given the volume of information that is provided in the Schedules, and the fact that the information must be accurate as of the Petition Date, additional time to complete the Schedules will help ensure that the relevant information is fully collected and evaluated and can be incorporated into the relevant filings. Rushing to complete the Schedules soon after the Petition Date, on the other hand, could compromise their completeness. Accordingly, the Debtor will seek to extend the deadline by which it must file its Schedules to 46 days after the Petition Date, which is November 29, 2021, without prejudice to the Debtor's right to seek a further extension for cause.

**B.     Request to Continue Using Bank Account and Related Relief**

76.     The Debtor will seek approval of the continued use of its prepetition bank account, as well as authority to open and close bank accounts during the chapter 11 case, as necessary or appropriate. In the ordinary course of business, the Debtor maintains a bank account at Bank of America in Charlotte, North Carolina (the "Bank Account"). All payments and other funds that are received by the Debtor are deposited into that account, including cash payments from New JJCI and J&J under the Funding Agreement. The Bank Account also serves

as a disbursement account and is used to pay all of the Debtor's costs and expenses, including professional fees.

77.     In addition, the Debtor will request authority for Bank of America, and any other bank to charge, and the Debtor to pay or honor, both prepetition and postpetition service and other fees, costs, charges and expenses to which a bank may be entitled under the terms of and in accordance with its contractual arrangements with the Debtor.  Further, the Debtor will request that the Court authorize Bank of America and any other bank to charge back returned items to the Bank Account in the ordinary course of business.  The Debtor requires this relief to minimize disruption to its Bank Account and to assist in accomplishing a smooth transition to, and operation in, chapter 11.

78.     The Bank Account is insured by the United States through the Federal Deposit Insurance Corporation (the "FDIC") and is maintained at Bank of America, a large, well-known and well-capitalized institution.  Therefore, the Debtor will seek a waiver of section 345(b) of the Bankruptcy Code in this case to the extent that the funds maintained in the Bank Account or any other domestic accounts during this chapter 11 case exceed the amount insured by the FDIC or the Federal Savings & Loan Insurance Corporation.

79.     To protect against the possible inadvertent payment of prepetition claims, the Debtor will advise Bank of America not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtor. The Debtor has the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Account and opening a new one.

80.     In the ordinary course of its business, the Debtor uses certain business forms (collectively, and as they may be modified, the "Business Forms").  The Debtor will

request that it not be required to include the legend "D.I.P.," or any other debtor in possession

designation, and the corresponding bankruptcy case number, on its Business Forms because such

alteration is not necessary in this case. The Debtor has few business relationships, and the

parties it conducts business with (such as law firms) are expected to be well aware of the

Debtor's status as a debtor in possession.

### C. **Anticipated First Day Pleadings to Be Heard at a Later Hearing**

***Establishment of a Qualified Settlement Fund for Payment of Talc Claims***

81.     As mentioned above, and to promote a prompt resolution of this

chapter 11 case and avoid unnecessary litigation regarding any alleged harm suffered by

claimants as a result of the 2021 Corporate Restructuring, the Debtor will seek approval of the

establishment and funding of the QSF Trust, which J&J and New JJCI have agreed to fund under

the Funding Agreement as early as January 31, 2022. The QSF Trust will constitute a "qualified

settlement fund" and will be funded with an aggregate amount of $2 billion to resolve or satisfy

current and future talc-related claims asserted against or related to the Debtor but excluding any

such claims pursuant to which amounts will be paid or incurred to, or at the direction of, any

government or governmental entity (collectively, the "QSF Talc Claims").

82.     By agreeing to fund the QSF Trust at this time, New JJCI and J&J are

committing to provide funding when they are not required to do so under the Funding

Agreement. The funding of the QSF Trust will be considered as pre-funding for Permitted

Funding Uses (as such term is defined in the Funding Agreement) and treated as a Payment (as

such term is defined in the Funding Agreement) for all purposes. In addition, to the extent

permissible under the terms of the Trust Agreement, a Permitted Funding Use, including funding

for a Talc Trust included in a chapter 11 plan in the Chapter 11 Case, shall first be paid by the

disbursement of funds from the QSF Trust to the full extent such funds are available therefor

before additional funds are sought by the Debtor under the Funding Agreement for such

Permitted Funding Use. The establishment of the QSF Trust will not otherwise affect the

Debtor's rights or J&J's and New JJCI's obligations under the Funding Agreement in any way.

83. The Debtor believes that establishing the QSF Trust by Court order will be

beneficial to all parties. Specifically, it will (a) benefit the Debtor and the talc claimants by

placing a significant amount of funds in an irrevocable trust for the benefit of holders of QSF

Talc Claims and (b) as with most qualified settlement funds, benefit the direct or indirect owners

of the Debtor by giving rise to certain tax benefits. Although the same funding from J&J and

New JJCI would be available to the Debtor in the future under the Funding Agreement even

without this arrangement, obtaining and segregating $2 billion now (a) should eliminate any

doubt regarding the Debtor's financial ability to pay legitimate claims, (b) will assist in funding

any Talc Trust set forth in a chapter 11 plan of reorganization in this chapter 11 case and

(c) inures to the benefit of talc claimants and the Debtor's estate.

### *Motion to Seal Confidential Commercial Information in Connection with QSF Motion*

84. In connection with the QSF Motion, the Debtor attached the Trust

Agreement establishing the QSF Trust as a North Carolina trust without the Fee Agreement,

which establishes the amount and terms of the Trustee's compensation, as an exhibit. The

Debtor understands that while the Trust Agreement requires the disclosure of certain information

with respect to the Trustee's compensation and any expense reimbursement on an annual basis,

the Trustee considers the specific terms of the Fee Agreement to be confidential and proprietary

commercial information. Disclosure of such information could result in competitive harm to the

Trustee. As a result, the Debtor will request authorization to file the Fee Agreement under seal

and will further request that, to the extent a hearing is held on the QSF Motion that requires the

disclosure of the terms of the Fee Agreement, any such portion of the hearing be conducted <u>in</u>
<u>camera</u>.

### *Procedures for Engaging Ordinary Course Professionals*

85.     The Debtor will call upon certain professionals in the ordinary course of
its business (the "<u>Ordinary Course Professionals</u>") to provide professional services to assist the
Debtor's members and management in the performance of their duties and responsibilities in the
ordinary course of the Debtor's business.  These Ordinary Course Professionals provide valuable
assistance in addressing issues of importance to the Debtor and its business in connection with
the management of the Debtor's talc litigation.

86.     The Debtor desires to employ the Ordinary Course Professionals, as and
when requested by the Debtor, to render professional services to its estate in the same manner
and for the same general purposes as such services were provided to Johnson & Johnson
Consumer Inc. prior to the Petition Date.  To avoid potential disruptions, it is important that the
Debtor has the ability to employ the Ordinary Course Professionals (<u>e.g.</u>, for defense counsel, to
provide services related to the cases they have been defending), many of whom are familiar with
the Debtor's history, business and affairs, including the thousands of pending litigation matters.

87.     Although the Ordinary Course Professionals identified to date are counsel
in talc litigation that I understand is expected to remain stayed under section 362 of
the Bankruptcy Code, services from these professionals may be needed from time to time.
For example, the Debtor may require services in talc litigation relating to filing stay notices,
addressing potential stay violations, monitoring dockets and providing information about these
cases that is not available from any other source.  However, without assurance that the Debtor is
authorized to use and pay these parties, I believe that many Ordinary Course Professionals may

be reluctant to assist the Debtor when needed. Therefore, the Debtor will request approval of

certain procedures for the engagement and compensation of Ordinary Course Professionals.

## **CONCLUSION**

88.     For all the reasons described herein and in the First Day Pleadings,

I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.


Dated:  October 14, 2021                        */s/ John K. Kim*_____
                                                John K. Kim

## <u>ANNEX 1</u>

Debtor's Corporate Structure Chart

**Organizational Structure of LTL Management LLC**





<u>**ANNEX 2**</u>

Funding Agreement

## AMENDED AND RESTATED FUNDING AGREEMENT

This AMENDED AND RESTATED FUNDING AGREEMENT, dated October 12, 2021 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement"), is by and among JOHNSON & JOHNSON, a New Jersey corporation ("J&J"), JOHNSON & JOHNSON CONSUMER INC., a New Jersey corporation ("JJCI"), and LTL MANAGEMENT LLC, a North Carolina limited liability company ("LTL").

## RECITALS

A.     On the date hereof, but prior to the execution of this Agreement, in contemplation of the divisional merger (the "Divisional Merger") of Chenango Zero LLC, a Texas limited liability company ("Chenango"), pursuant to Chapter 10 of the Texas Business Organizations Code, J&J and Currahee Holding Company Inc., a New Jersey corporation ("Currahee"), as payors, and Chenango, as payee, executed and delivered a funding agreement dated as of October 12, 2021 (the "Original Funding Agreement").

B.     Immediately following the execution and delivery of the Original Funding Agreement, Currahee, in its capacity as the sole member of Chenango approved a Plan of Divisional Merger contemplating the Divisional Merger (the "Plan of Divisional Merger").

C.     At the effective time of the Divisional Merger, (1) certain property of Chenango as set forth on Schedule 5(b)(i) to the Plan of Divisional Merger and certain liabilities and obligations of Chenango as set forth on Schedule 5(c)(i) to the Plan of Divisional Merger (collectively, the "Allocated Assets and Liabilities") were allocated to a new Texas limited liability company created upon the effectiveness of the Divisional Merger ("Chenango One"), (2) the remaining property, liabilities and obligations of Chenango were allocated to another new Texas limited liability company created upon effectiveness of the Divisional Merger ("Chenango Two"), and (3) Chenango ceased to exist.

D.     Pursuant to the Original Funding Agreement, J&J and Currahee agreed, on a joint and several basis, to provide funding to Chenango sufficient to pay the costs of operations of Chenango's business and other liabilities and obligations included in the Allocated Assets and Liabilities as and when they become due.

E.     The Allocated Assets and Liabilities included the rights and obligations of Chenango under the Original Funding Agreement, and, at the effective time of the Divisional Merger, pursuant to the terms of the Plan of Divisional Merger, the rights and obligations of Chenango under the Original Funding Agreement were allocated to Chenango One such that, following the effectiveness of the Divisional Merger, Chenango One had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Talc Related Liabilities.

F.     Following the Divisional Merger, (1) Chenango One effected a conversion (the "NC Conversion") into a North Carolina limited liability company and changed its name to "LTL Management LLC" and (2) Chenango Two effected a merger (the "TX-to-NJ Merger") with and into Currahee, which changed its name to "Johnson & Johnson Consumer Inc."

G.     Payors and Payee desire to amend and restate the Original Funding Agreement to reflect that the Divisional Merger, the NC Conversion and the TX-to-NJ Merger have occurred and that JJCI, now a New Jersey corporation having the name "Johnson & Johnson Consumer Inc.," and Payee, now a North Carolina limited liability company having the name "LTL Management LLC," are the parties to such agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

1.     <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"<u>Affiliate</u>" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"<u>Agreement</u>" has the meaning specified in the first paragraph hereof.

"<u>Allocated Assets and Liabilities</u>" has the meaning specified in the recitals to this Agreement.

"<u>Bankruptcy Case</u>" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"<u>Base Rate</u>" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"<u>Board</u>" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors, the managing member or members or the board of managers, as applicable, of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person; but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Chenango" has the meaning specified in recitals to this Agreement.

"Chenango One" has the meaning specified in the recitals to this Agreement.

"Chenango Two" has the meaning specified in the recitals to this Agreement.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"Currahee" has the meaning specified in first paragraph of this Agreement.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Divisional Merger" has the meaning specified in the recitals to this Agreement.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on Schedule 2 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payors from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"J&J" has the meaning specified in first paragraph of this Agreement.

"JJCI" has the meaning specified in first paragraph of this Agreement.

"JJCI Value" means the greater of:

(a)     the fair market value of the businesses and other assets (including equity interests) held by Chenango, as determined (i) immediately prior to the effective time of the Divisional Merger, (ii) assuming the Allocated Assets and Liabilities are not held by Chenango, and (iii) based on the aggregate amount that would be received upon a sale of such businesses and other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length, under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses and other assets; and

(b)     the sum of:

(i)     the fair market value of the businesses and other assets (including equity interests) held by Chenango Two or, after the TX-to-NJ Merger, JJCI, as determined (A) as of the applicable calculation date, (B) assuming neither Chenango Two nor, after the TX-to-NJ Merger, JJCI has any obligations under this Agreement, and (C) based on the aggregate amount that would be received upon a sale of such businesses and other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length, under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses and other assets; and

(ii)     the fair market value of any businesses or other assets (including equity interests) held by Chenango Two or, after the TX-to-NJ Merger, JJCI that, following the effective time of the Divisional Merger and prior to the applicable calculation date, are distributed by Chenango Two or, after the TX-to-NJ Merger, JJCI to its members, as determined (A) at the time of such distribution and (B) based on the aggregate amount that would be received upon a sale of such businesses or other assets in one or more (as would maximize the aggregate amount) market transactions between prudent parties, acting at arms' length,

4

under no compulsion to act and having reasonable knowledge of relevant information concerning such businesses or other assets.

"LTL" has the meaning specified in the first paragraph of this Agreement.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means: (a) with respect to any corporation, its certificate or articles of incorporation and bylaws; (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" means LTL Management LLC, a North Carolina limited liability company.

"Payee Affiliate" means any controlled Affiliate of the Payee.

"Payee Material Adverse Effect" means: (a) a material impairment of the rights and remedies of the Payors under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement; or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor Affiliate" means any Affiliate of a Payor, excluding the Payee and any Payee Affiliate.

"Payor Material Adverse Effect" means with respect to a Payor: (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of such Payor and its Subsidiaries, taken as a whole; (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of such Payor to perform its material obligations under this Agreement; or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against such Payor.

"Payors" means J&J and JJCI.

"Permitted Funding Use" means each of the following:

(a)    the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time

5

when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(b)     the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee);

(c)     the funding of any amounts to satisfy:

(i)     the Payee's Talc Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee;

(ii)     following the commencement of any Bankruptcy Case, the Payee's Talc Related Liabilities in connection with the funding of one or more trusts for the benefit of existing and future claimants created pursuant to a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and, to the extent required, the District Court (for the avoidance of doubt, regardless of whether such plan of reorganization provides that the Payors will receive protection pursuant to section 105 or section 524(g) of the Bankruptcy Code and regardless of whether the Payors support such plan of reorganization); and

(iii)     in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Talc Related Liabilities and any litigation thereof, including the costs of any appeals;

(d)     the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time;

(e)     the funding of any obligations of the Payee owed to any Payor or Payor Affiliate, including any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Divisional Merger; and

(f)     the payment of any and all costs and expenses of the Payee incurred in connection with the pursuit of available remedies to collect any unfunded Payments due and owing to the Payee or otherwise to enforce the performance by the Payors, or either of them, of any provision of this Agreement;

in the case of clauses (a) through (e) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to satisfy the Payee's Talc Related Liabilities in connection with the funding of such trust or trusts.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Divisional Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding Voting Stock of which is owned or controlled by such Person or by one or more other Subsidiaries of such Person and that is consolidated in such Person's accounts.

"Talc Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"TX-to-NJ Merger" has the meaning specified in the recitals to this Agreement.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.    Funding Obligations and Procedures.

(a)    Funding Obligations.   The Payors hereby agree, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for a Permitted Funding Use. Nothing in this Agreement shall obligate the Payors to (i) make Payments under this Agreement that in the aggregate exceed the lesser of (A) the JJCI Value and (B) the aggregate amount of all Permitted Funding Uses or (ii) make any individual Payment under this Agreement that exceeds the amount requested by the Payee in the applicable Funding Request.  The JJCI Value shall be calculated at, and only at, any date on which (x) the Payors refuse to make a requested Payment under this Agreement based on clause (i) of the immediately preceding sentence and (y) the Payments made by the Payors under this Agreement prior to such date, together with the requested Payment, are in the aggregate not in excess of the aggregate amount of all Permitted Funding Uses.

(b)    Funding Requests.   To request a Payment, the Payee shall deliver to the Payors a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payors and signed by the Payee (each, a "Funding Request").   Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $500,000, and (ii) the date of the requested Payment, which shall be the date that is at least five Business Days following the delivery of such Funding Request (each such date, a "Funding Date").    Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.  Except as required to comply with the minimum requirements in Section 2(b)(i), the Payee shall not deliver a Funding Request for an amount in excess of the aggregate amount necessary for the Payee to fund all current Permitted Funding Uses and all projected Permitted Funding Uses over the 30 days following the date of such Funding Request.

(c)     Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on or before any Funding Date, the Payors shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request. All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payors do not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payors shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d)     Conditions to Payments.  The Payors' obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment:  (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and (ii) there shall have been no violation by the Payee of the covenant set forth in Section 5.

3.     Representations and Warranties.

(a)     Representations and Warranties of the Payor.  Each Payor represents and warrants to the Payee that:

(i)     Existence, Qualification and Power.  Such Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement, and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect with respect to such Payor.

(ii)     Authorization; No Contravention. The execution, delivery and performance by such Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect with respect to such Payor.

        (iii)    <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, such Payor.

        (iv)    <u>Binding Effect</u>.  This Agreement has been duly executed and delivered by such Payor.  This Agreement constitutes a legal, valid and binding obligation of such Payor, enforceable against such Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

        (b)    <u>Representations and Warranties of the Payee</u>.  The Payee represents and warrants to the Payors that:

        (i)    <u>Existence, Qualification and Power</u>.  The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

        (ii)    <u>Authorization; No Contravention</u>.  The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law; except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

        (iii)    <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance of this Agreement by, or enforcement of this Agreement against, the Payee.

(iv)    Binding Effect.  This Agreement has been duly executed and delivered by the Payee.  This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.    Covenants of the Payors.

(a)    Provision of Financial Information.

(i)    No later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 60 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), (A) J&J will furnish to the Payee audited annual and unaudited quarterly consolidated financial statements of J&J prepared in accordance with GAAP, subject, with respect to quarterly financial statements, normal year-end audit adjustments, and (B) Currahee will furnish to the Payee unaudited annual and quarterly income statements and balance sheets of Currahee prepared in accordance with GAAP and Currahee's historical cost basis of its subsidiaries, subject to the absence of notes to the financial statements and related disclosures and, with respect to quarterly financial statements, normal year-end adjustments.

(ii)    By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor furnishing such financial information that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify such Payor promptly thereof); *provided*, *however*, that the Payee may deliver a copy thereof to counsel for any official committee of claimants and any future claimants' representative appointed in any Bankruptcy Case on a confidential basis under a protective order entered in such Bankruptcy Case.

(iii)    Notwithstanding the foregoing, but subject to the last sentence of this Section 4(a)(iii), the financial information required to be furnished as described in Section 4(a)(i) may be, rather than that of a Payor, those  of any direct or indirect parent of such Payor.  Notwithstanding the foregoing, a Payor may fulfill the requirement to furnish such financial information by filing the information with the SEC within the applicable time periods required by the SEC.  Subject to the last sentence of this Section 4(a)(iii), a Payor will be deemed to have satisfied the requirements of Section 4(a)(i) if any direct or indirect parent of such Payor has filed such reports containing the required information with the SEC within the applicable time periods required by the SEC and such reports are publicly available.  To the extent a direct or indirect parent of a Payor furnishes financial information pursuant to the first sentence of this Section 4(a)(iii) or such parent files a report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of such Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent, on the one

hand, and the information relating to such Payor and its Subsidiaries on a standalone basis, on the other hand.

      (b)    <u>Successor to J&J upon Consolidation or Merger.</u>

      (i)    Subject to the provisions of <u>Sections 4(b)(ii)</u> and <u>4(b)(iii)</u>, nothing contained in this Agreement shall prevent any consolidation or merger of J&J with or into any Person, or successive consolidations or mergers in which J&J or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all the property of J&J (for the avoidance of doubt, calculated by including any equity interests held by J&J), to any Person; *provided*, *however*, that J&J hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than J&J, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of J&J's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by J&J, shall be expressly assumed, by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee executed and delivered to the Payee, by the Person formed by such consolidation, or into which J&J shall have been merged, or by the Person which shall have acquired or leased such property. This covenant will not apply to (A) a merger of J&J with an Affiliate thereof solely for the purpose of reincorporating J&J in another jurisdiction within the United States, (B) any conversion of J&J from an entity formed under the laws of one state to the same type of entity formed under the laws of another state, or (C) any conversion of J&J from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state. Notwithstanding the foregoing, this <u>Section 4(b)(i)</u> will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among J&J and its Subsidiaries.

      (ii)    Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets, of J&J (for the avoidance of doubt, calculated by including any equity interests held by J&J) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation with J&J or into which J&J is merged, or to which such sale, assignment, transfer, lease, conveyance or other disposition is made, shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to J&J, including as a Payor, shall refer instead to the successor Person and not to J&J), and may exercise every right and power of, J&J, including as a Payor, under this Agreement with the same effect as if such successor Person had been named herein. In the event of a succession in compliance with this <u>Section 4(b)(ii)</u>, the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

      (iii)    Any consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition referred to in the preceding clause (i) shall not be permitted

under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

5.     <u>Covenants of the Payee</u>. The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use.  The Payee will perform its indemnification obligations under the agreements provided for in the Plan of Divisional Merger in all material respects, subject, in the event that a proceeding under the Bankruptcy Code is pending with respect to the Payee, to the resulting automatic stay under section 362 of the Bankruptcy Code.

6.     <u>Events of Default</u>.   Each of the following events constitutes an "<u>Event of Default</u>":

(a)     the Payors default in the funding obligations pursuant to <u>Section 2</u> and such default continues for a period of 10 Business Days;

(b)     a Payor defaults in the performance of, or breaches, any covenant or representation or  warranty of such Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this <u>Section 6</u>) and such default or breach continues for a period of 30 days, or, in the case of any failure to comply with <u>Section 4(a)</u> of this Agreement, 60 days, in each case after there has been given, by registered or certified mail, to such Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c)     a Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d)     a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against a Payor, (ii) appoints a custodian of a Payor for all or substantially all of the property of a Payor, or (iii) orders the liquidation of a Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, a Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7.     <u>Remedies</u>.   Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8.   <u>Notices</u>.   All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below.   Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

<u>Payors</u>:

Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ 08933
Attention:  Michelle Ryan, Treasurer
Email:  mryan1@its.jnj.com

Johnson & Johnson Consumer Inc.
199 Grandview Road
Skillman, NJ 08558
Attention:  Michelle Goodridge, President
Email:  mgoodrid@its.jnj.com

<u>Payee</u>:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  Robert Wuesthoff, President
Email:  rwhuestho@its.jnj.com

with a copy to:

LTL Management LLC
501 George Street
New Brunswick, NJ 08933
Attention:  John Kim, Chief Legal Officer
Email:  JKim8@its.jnj.com

9.   <u>Governing Law; Submission to Jurisdiction</u>.   This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina.   Any legal proceeding seeking to enforce any provision of, or based on any matter arising under, this Agreement may be brought: (a) at any time there is not a proceeding under the Bankruptcy Code pending with respect to the Payee, in state or federal court in Charlotte, North Carolina; or (b) at any time there is a proceeding under the Bankruptcy Code pending with respect to the Payee, in the Bankruptcy Court.   Each Payor and the Payee hereby irrevocably and unconditionally submit to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such legal proceeding.

10.    <u>No Implied Waiver; Amendments</u>.  No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payors, or either of them, on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No notice to or demand on the Payors, or either of them, in any case shall entitle the Payors, or either of them, to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand.  The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payors and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.  A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.    <u>Counterparts; Entire Agreement; Electronic Execution</u>.  This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties hereto relating to the subject matter hereof and supersedes, in its entirety, the Original Funding Agreement and any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by each party hereto and each party hereto shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.    <u>Severability</u>.  If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired.  If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13.    <u>Transfer; Assignment</u>.  This Agreement shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns.  A Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; <u>*provided*</u>, <u>*however*</u>, that no such consent of the Payee shall be required in connection with any transfer effectuated in compliance with <u>Section 4(b)</u>.  The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payors.  Any purported assignment of rights or obligations under this Agreement other than as permitted by this <u>Section 13</u> shall be null and void.

14.     <u>Construction</u>.   The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The word "including" means without limitation by reason of enumeration. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless specifically stated otherwise, all references to Sections and Schedules are to the Sections and Schedules of or to this Agreement.

15.     <u>Rights of Parties</u>.   This Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

16.     <u>Joint and Several Obligations</u>.   Obligations of the Payors under this Agreement are joint and several.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

Michelle Ryan,
Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _____

Michelle Goodridge,
President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

Robert Wuesthoff,
President

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

Michelle Ryan,
Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _Michelle Woodridge_

Michelle Goodridge,
President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

Robert Wuesthoff,
President

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**JOHNSON & JOHNSON**, a New Jersey corporation, as a Payor

By: _____

    Michelle Ryan,
    Treasurer

**JOHNSON & JOHNSON CONSUMER INC.**, a New Jersey corporation, as a Payor

By: _____

    Michelle Goodridge,
    President

**LTL MANAGEMENT LLC**, a North Carolina limited liability company, as the Payee

By: _____

    Robert Wuesthoff,
    President

# SCHEDULE 1

## Definition of Talc Related Liabilities

For purposes of this Agreement, "Talc Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to, talc, including talc contained in any product, or to the risk of, or responsibility for, any such damage or injury, including such Liabilities based on the contamination, or alleged contamination, of talc, including talc contained in any product, with asbestos or any other material.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a)    "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)    "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)    "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative or regulatory authority, agency, court, arbitration tribunal, board, department or commission, or other governmental or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)    "Law" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law) of any Governmental Authority, including rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)    "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including (i) those arising or that may arise under any past, present or future Law or Contract or pursuant to any Cause of Action or Proceeding and (ii) all claims for economic or noneconomic damages or injuries of any type or nature whatsoever (including claims for physical, mental and emotional pain and suffering, loss

of enjoyment of life, loss of society or consortium and wrongful death, as well as claims for damage to property and punitive damages).

(f)     "<u>License</u>" means any license, sublicense, agreement, covenant not to sue or permission.

(g)     "<u>Person</u>" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union or other entity or Governmental Authority.

(h)     "<u>Plan</u>" means, with respect to any Person, (i) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (ii) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code, and (iii) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering, such Person.

(i)     "<u>Proceeding</u>" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit, or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.

Page 1

```
 1            SUPERIOR COURT OF NEW JERSEY
              LAW DIVISION - MIDDLESEX COUNTY
 2            DOCKET NO. MID-1809-17AS
              APPELLATE DOCKET NO._____
 3
 4   DOUGLAS AND ROSALYN BARDEN,       )
                                       )  TRIAL
 5            Plaintiff,               )
                                       )
 6            v.                       )
                                       )  (VOLUME 1 OF 2)
 7   BRENNTAG NORTH AMERICA, et al., )
              Defendants.              )
 8   ------------------------------ )
     DAVID CHARLES ETHERIDGE AND       )
 9   DARLENE PASTORE ETHERIDGE,        )  MID-L-0932-17AS
                                       )
10            Plaintiffs,              )
                                       )
11            v.                       )
                                       )
12   BRENNTAG NORTH AMERICA, et al., )
                                       )
13            Defendants.              )
     ------------------------------ )
14   D'ANGELA McNEILL-GEORGE,          )
                                       )  MID-L-7049-16AS
15            Plaintiff,               )
                                       )
16            v.                       )
                                       )
17   BRENNTAG NORTH AMERICA, et al., )
                                       )
18            Defendants.              )
     ------------------------------ )
19   WILLIAM AND ELIZABETH RONNING,    )
                                       )  MID-L-6040-17AS
20            Plaintiffs,              )
                                       )
21            v.                       )
                                       )
22   BRENNTAG NORTH AMERICA, et al., )
                                       )
23            Defendants.              )
24
25   Job No. NJ3446610
```

EXHIBIT

601.001

Page 41

1          A.       Sounds crazy.  That's my

2     understanding, that they own the domain name but

3     they do not control what goes onto the website.

4          Q.       I agree with you, it does sound

5     crazy.  Because you're saying --

6                   MS. SULLIVAN:  Objection, your Honor,

7     lawyer argument.

8                   MR. PANATIER:  It does sound crazy.

9                   THE COURT:  Objection sustained.

10                  No speaking objections.  That's the

11    second time.

12    BY MR. PANATIER:

13         Q.       Dr. Hopkins, your testimony to this

14    jury is that Johnson & Johnson -- by the way, this

15    is a huge company, right, everybody knows that?

16         A.       Yes.

17         Q.       Okay.  That Johnson & Johnson owns a

18    website domain name and they conceded all control of

19    that domain name to somebody else; is that correct?

20         A.       I've not seen the terms of the

21    agreement.  But what I do know is that the content

22    of what is written on that website is not approved

23    or disapproved by Johnson & Johnson.  They don't

24    take responsibility for what is written on that

25    website.

Page 42

1          Q.      Let's take a look at BabyCenter.com.

2                  MS. SULLIVAN:  Your Honor, based on

3    the testimony, objection as to hearsay.

4                  THE COURT:  I'm going to allow him to

5    try to establish foundation for it.

6                  Go ahead.

7                  MR. PANATIER:  We'll get the

8    document.  We'll move ahead and do that.

9                  THE COURT:  Okay.

10   BY MR. PANATIER:

11         Q.      We'll come back to Baby Center, okay.

12                 We can bookmark this with this

13   question.

14                 Johnson & Johnson, certainly, doesn't

15   put on its baby powder or any of its talc a warning

16   that says, this may contain asbestos, does it?

17         A.      No, it doesn't.

18         Q.      It doesn't put a warning on it that

19   says, do not use on babies?

20         A.      No, it doesn't.

21         Q.      Right.  Because it's, specifically,

22   marketed for babies, right?

23         A.      Yes.

24         Q.      Johnson & Johnson has always stated

25   that it has a zero tolerance policy for asbestos,

Page 43

1  correct?

2       A.      Yes.

3       Q.      And Johnson & Johnson has always told

4  the public that there's never been a single fiber of

5  asbestos in any of its talc for Johnson's Baby

6  Powder or Shower to Shower, correct?

7       A.      Yes.

8       Q.      It told that to customers, nurses,

9  doctors and regulators and hospitals, correct?

10      A.      Yes.

11      Q.      Johnson & Johnson has stated that

12 there should never ever ever be asbestos in baby

13 powder, not a single fiber, zero, correct?

14      A.      I can't remember the exact

15 phraseology, but the principle is the same.  I'll

16 agree with the principle, correct.

17      Q.      Well, okay.  And just to separate

18 that out, Johnson & Johnson agrees today now in 2019

19 that baby powder should never have any asbestos in

20 it, correct?

21      A.      Yes.

22      Q.      That means zero asbestos, correct?

23      A.      Yeah, it's non-detected.  You can't

24 find it.  There's none there, yes.

25      Q.      We're going to get into what

Page 44

1    "non-detect" means.

2                    MS. SULLIVAN:  Objection, your Honor.

3                    THE COURT:  Overruled.

4          Q.       There shouldn't be any asbestos in

5    baby powder, period, correct?

6          A.       Yes.

7          Q.       It should be asbestos-free, correct?

8          A.       Yes.

9          Q.       "Asbestos-free" means zero, correct?

10         A.       Yes.

11         Q.       As you have said before, any amount

12   of tremolite in the form of asbestos, quote, "those

13   needles," like you say, any amount is not allowed,

14   correct?

15         A.       Tremolite -- I know what I said.

16   Tremolite asbestos is not allowed.  Tremolite is a

17   relatively harmless mineral in its block or rock

18   form.

19         Q.       You have stated before that asbestos

20   in the form of needles such as tremolite shouldn't

21   be in the baby powder?

22         A.       Asbestos should not be in baby

23   powder.  Tremolite can occur -- most tremolite

24   occurs in the form of a nonasbestos form or rod

25   form.

Page 45

1          Q.      Has Johnson & Johnson always

2     internally believed in a zero tolerance policy for

3     asbestos?

4          A.      That is my understanding, yes.

5          Q.      You agree any asbestos in baby powder

6     is too much?

7          A.      Yeah, that's what we just said, yes.

8          Q.      The reason is that no mother or

9     father would ever buy any baby powder if it even had

10    one fiber of asbestos in it, correct?

11         A.      Well, you're asking me to speculate.

12    But if the product had asbestos in it, I wouldn't

13    buy it.

14         Q.      Right.

15                 And Johnson & Johnson's expectation

16    would be that no one else would buy it either,

17    right?

18         A.      Well, it's speculative, but it's a

19    reasonable speculation.

20         Q.      And Johnson & Johnson knows that

21    asbestos in its talc could make people sick because

22    Johnson & Johnson knows that asbestos is a

23    carcinogen and causes mesothelioma, correct?

24         A.      Several questions there.

25                 Asbestos causes -- can cause

Page 46

1  mesothelioma, correct, yes.

2      Q.    Well, let's just go to -- go to

3  8/15/17, it's the first one, Page 33.

4          MS. SULLIVAN:  What line, Counsel?

5          MR. PANATIER:  Give me a second.

6  BY MR. PANATIER:

7      Q.    Okay.  First of all, Johnson &

8  Johnson agrees asbestos is a carcinogen, correct?

9      A.    Yes.

10     Q.    And Johnson & Johnson agrees that no

11  carcinogen should be contained in the Johnson's Baby

12  Powder, correct?

13     A.    Yes.

14     Q.    Okay.  Go to 4/11/2018 on Page 108.

15  Are you there?

16     A.    Yes.

17     Q.    Okay.  On Line 18, you were asked

18  this question.

19          MS. SULLIVAN:  Objection, your Honor,

20  in terms of the procedure.  This is not (INAUDIBLE).

21  I'm not sure --

22          MR. PANATIER:  It is.

23          THE COURT:  Sidebar.

24          (Sidebar.)

25          THE COURT:  Okay.  Page, what are

Page 47

1  we --

2               MR. PANATIER:  108, Line 18 through

3  22.  This is the exact question I asked him before

4  and he didn't answer.  He said, I agree it's a

5  carcinogen, but that's not the question.  He said, I

6  agree it's a carcinogen --

7               THE COURT:  Well, this time the same

8  question.  You said it's a compound question.  So

9  I'll allow it.  Go ahead.

10              MR. PANATIER:  Thank you, your Honor.

11              MS. SULLIVAN:  Thank you.

12              (Sidebar ends.)

13 BY MR. PANATIER:

14       Q.      Doctor, you were asked this question,

15 "Johnson & Johnson knows that asbestos in its talc

16 could make people sick because Johnson & Johnson

17 knows asbestos is a carcinogen and can cause

18 mesothelioma?"

19              And what was your answer?

20       A.      What page are you on, again?

21       Q.      Same Page, 108.

22       A.      108.  Beg your pardon, I was on a

23 different page.

24       Q.      Line 18 through 22.  Your answer was,

25 "That is correct."

John Hopkins, Ph.D.

37

1          Q    Johnson & Johnson always had the
2    ability and knowledge to sell cornstarch instead of
3    talc if it had wanted to, correct?
4    A          Well, since the 1960s cornstarch was sold.
5          Q    Are you saying that cornstarch was
6    sold by Johnson & Johnson since the '60s?
7    A          Yes, '60s or '70s -- maybe it was early
8    '70s.
9          Q    I think you told me it was 1980 in our
10   first deposition and we can -- we can look at it.
11              MR. BICKS:  Objection to the form of
12       the question.
13   A          Yeah, rephrase the question.
14         Q    Sure.  When did Johnson & Johnson
15   first start marketing and selling cornstarch, sir?
16   A          Baby cornstarch powder, cornstarch baby
17   powder?
18         Q    Yes.
19   A          As opposed to Shower to Shower.  I'm not
20   exactly sure, I don't want to speculate, but
21   estimating around the late '70s, I think, but maybe
22   1980.
23         Q    Okay.  Johnson & Johnson was aware and
24   is aware that cornstarch was used -- used as a body
25   powder in the late 1800s, correct?

John Hopkins, Ph.D.

38

1  A       It -- cornstarch has been used in -- in

2  some body powder uses, yes, since the -- turn --

3  turn of the last century.

4        Q   Okay.  If Johnson & Johnson had wanted

5  to, Johnson & Johnson, throughout the entire 1900s

6  to the present, could have chosen to sell a

7  cornstarch baby powder instead of a talc baby

8  powder, correct?

9             MR. BICKS:  Objection.  Speculation.

10     Hypothetical.

11  A       Yeah, you know, I -- I don't want to

12  speculate on what marketing managers and product

13  development people would've done in the '40s, '50s,

14  '60s.  It's speculation.  I mean, a product, as you

15  say, quite likely existed and could have been made

16  as a body powder based on cornstarch, but I can't

17  speculate any further.

18        Q   Yeah, and I'm not asking you to

19  speculate.

20        Did Johnson & Johnson have the ability, if

21  Johnson & Johnson had chosen to, to sell cornstarch

22  instead of talc for baby powder?

23             MR. BICKS:  Objection.  Calls for

24     speculation.

25  A       Again, it is speculation, because the kind

1  of quantity we're talking about is -- is quite

2  significant.  Cornstarch is a very different product

3  from talc.  It has to be sterile and free from germs

4  and bacteria.  Producing cornstarch in large

5  quantities, they may've wanted to, but maybe the

6  technology did not exist, so, again, I'm

7  speculating.  I don't want to speculate.

8          Q    Okay.  You -- you are speculating when

9  you say maybe the technology didn't exist, fair?

10  A       Yes.

11         Q    Okay.

12  A       That's why that -- the question you asked

13  is a difficult one to answer without speculation.

14         Q    Your -- your concern is could they

15  have done it on as big of a scale as they were

16  selling the talc baby powder, correct?

17  A       Well, that was --

18             MR. BICKS:  Objection to the form.

19  A       That was an issue that I raised.  To answer

20  the main question is they could've done it, I don't

21  know if they could've done it.

22         Q    Certainly it was a product that was

23  being used by others for baby powder, correct?

24  A       In small quantities, I believe so, yes.

25         Q    Well, and you don't know about the

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| Caption in Compliance with D.N.J. LBR 9004-1(b) | |
|---|---|
| **BAILEY & GLASSER LLP**<br>Brian A. Glasser (admitted pro hac vice)<br>Thomas B. Bennett (admitted pro hac vice)<br>Kevin W. Barrett (admitted pro hac vice)<br>Maggie B. Burrus (admitted pro hac vice)<br>1055 Thomas Jefferson St. NW, Suite 540<br>Washington, DC 20007<br>Tel: (202) 463-2101<br>Fax: (202) 463-2103<br>Email: bglasser@baileyglasser.com<br>tbennett@baileyglasser.com<br>kbarrett@baileyglasser.com<br>mburrus@baileyglasser.com<br><br><br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* | **COOLEY LLP**<br>Cullen D. Speckhart (admitted pro hac vice)<br>Michael Klein (admitted pro hac vice)<br>Erica J. Richards (pro hac vice to be filed)<br>Lauren A. Reichardt (pro hac vice to be filed)<br>Evan Lazerowitz<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Fax: (212) 479-6275<br>Email: cspeckhart@cooley.com<br>mklein@cooley.com<br>erichards@cooley.com<br>lreichardt@cooley.com<br>elazerowitz@cooley.com<br><br>*Proposed Co-Counsel to the Official*<br>*Committee of Talc Claimants II* |
| **WALDREP WALL BABCOCK & BAILEY PLLC**<br>Thomas W. Waldrep, Jr. (admitted pro hac vice)<br>Kevin L. Sink (admitted pro hac vice)<br>James C. Lanik (admitted pro hac vice)<br>Jennifer B. Lyday (admitted pro hac vice)<br>370 Knollwood Street,<br>Suite 600<br>Winston-Salem, NC 27103<br>Tel: (336) 717-1280<br>Fax: (336) 717-1340<br>Email: notice@waldrepwall.com<br><br>*Proposed Co-Counsel to the Official Committee*<br>*of Talc Claimants II* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq. (admitted pro hac vice)<br>100 Main Ave. SW, Suite 450<br>Washington, DC 20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br>Email: jmassey@masseygail.com<br><br><br><br><br><br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* |

1

**EXHIBIT**
Exhibit 377

**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Alan I. Moldoff
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email: aabramowitz@shermansilverstein.com
       amoldoff@shermansilverstein.com
       rswitkes@shermansilverstein.com

*Proposed Local Counsel to*
*the Official Committee of Talc Claimants II*

| In re: | Chapter 11 |
|---|---|
| LTL MANAGEMENT LLC, | Case No.:  21-30589 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

## Expert Report of Matthew Diaz

**January 28, 2022**

# — Table of Contents

I.     Professional Background ............................................................................................................ 4

II.    Relevant Case Background ....................................................................................................... 6

III.   Scope of Assessment.............................................................................................................. 10

IV.   Summary of Findings............................................................................................................. 11

    A. J&J, Along with Old JJCI, Has Been Held Separately and Individually Responsible for Liability in Many Recent Talc Powder Rulings ........................................................................ 13

    B. Following a Series of Transactions, Two Disparate Companies Were Formed: a "Good Company" to Retain the Go Forward Business and a "Talc Powder Liability Company" That Was Saddled with All of the Talc Powder Liabilities and Subsequently Filed for Bankruptcy ............ 15

    C. J&J is One of the Most Valuable Companies in the World ...................................................... 34

    D. The Debtor's Officers and Managers Are or Were All Affilated with J&J and Have Entered Into Various Agreements That Were Not Negotiated at an Arms' Length ........................................... 38

    E. J&J and Old JJCI Left LTL Essentially Wholly Dependent on the Funding Agreement Between LTL and J&J/New JJCI ................................................................................................................. 46

    F. The 2021 Corporate Restructuring Modified the Creditor Rights of Talc Powder Victims to their Detriment ...................................................................................................................................... 48

    G. The Bankruptcy Filing of LTL Further Diminished the Position  of Talc Powder Victims, Enhanced the Position of J&J and New JJCI, and Eliminated the Ability of LTL to Pay its Talc Powder Victims on a Current Basis ............................................................................................... 52

    H. New JJCI's Non-Talc Powder Creditors' Rights Were Not Modified by the Integrated Transaction Series ........................................................................................................................ 53

    I. The Highly Structured Bankruptcy of LTL Protects J&J's and New JJCI's Equity Holders .... 53

    J. Old JJCI Appears to be a Valuable and Robust Company. If Old JJCI was in Financial Distress Due to its Talc Powder Liabilities, to Treat All Creditors Equally, it Should Have Filed for Bankrutpcy Itself Instead of Subjecting Only a Select Subset of its Creditors to Bankruptcy ...... 54

    K. The Integrated Transaction Series is Highly Unusual; Approval of the Integrated Transaction Series Would Sanction a Process for Companies to Offload Unwanted Liabilities Without Shouldering the Burdens of Bankruptcy, Which Include Court Scrutiny, Oversight, and Interruption of Payments on Account of Equity ................................................................................................. 57

Appendix A – Expert Qualifications.................................................................................................. 61

Appendix B – Documents Considered................................................................................................ 65

Appendix C – Remanded Cases......................................................................................................... 71

## I.    PROFESSIONAL BACKGROUND

1.    I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a leading, NYSE-listed international financial advisory firm. I am a member of its Corporate Finance and Restructuring segment and am located in the New York office. I have been providing financial advisory services to companies and creditor groups undergoing in-court and out-of-court restructurings in a variety of industries for over 20 years. Such services include assessing cash flow projections, conducting detailed investigations of pre-petition transactions, evaluating creditor positions, assessing financing agreements, reviewing business plans, analyzing claims, and developing strategies to maximize recoveries for stakeholders.

2.    I have been involved in over 50 bankruptcy or bankruptcy-related matters in the capacities above. Some of the matters in which I have been involved include working for various non-mass tort unsecured creditor groups, including Abengoa Bioenergy, Barnes Bay Development, Cengage Learning, Energy Future Holdings, iHeartMedia, JC Penney, Sears, and Toys R Us. Additionally, I have worked for, or am currently working for, various groups of mass tort creditors, including those in Bestwall, Purdue Pharma, Mallinckrodt, Bondex, Blitz USA, DBMP, Aldrich Pump, Murray Boiler, and Paddock Enterprises. Prior to joining FTI, I served as Chief Financial Officer for Graham Field Health Products and as the Restructuring Director of Impath Laboratories, both companies that were operating in Chapter 11.

3.    Over the course of my professional career, on numerous occasions, I have led investigations of pre-petition transactions and evaluated potential causes of action. In particular, I have analyzed and critically challenged pre-petition insider and related party transactions, liability management programs, payments to certain vendors, and restructurings of legal entities and lender liability claims.

4.    In my career, I have examined documentation memorializing a wide range of complex financing arrangements. In addition, I have had the occasion to review and analyze many loan and other

4

financing arrangements that companies have entered into to provide funding for their corporate activities, including intercompany lending practices.

5.       I am also familiar with and, regularly in the course of my business, review and analyze accounting and accounts payable records. I have analyzed many vendor programs, accounts payable ledgers, and claims documents.

6.       In the DBMP LLC case, I testified in connection with my engagement with the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative regarding the *Debtor's Complaint for Injunctive and Declaratory Relief (I) Preliminarily Enjoining Certain Actions Against Non-Debtors or, (II) In The Alternative, Declaring that the Automatic Stay Applies to Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing on the Merits* [Adv. Proc. No. 20-03004, Dkt. No. 1]. Additionally, in the Aldrich Pump LLC case, I testified in connection with my engagement with the Official Committee of Asbestos Personal Injury Claimants regarding the *Debtors' Complaint for Injunctive and Declaratory Relief (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (II) Declaring that the Automatic Stay Applies to Such Actions, and (III) Granting a Temporary Restraining Order Pending a Final Hearing* [Adv. Proc. No. 20-03041 Dkt. No. 1].

7.       I am a Certified Public Accountant (CPA), Certified Insolvency and Restructuring Advisor (CIRA), Certified Turnaround Professional (CTP), hold a Master of Business Administration (MBA) degree, with concentrations in finance and management, from Columbia Business School, and hold a Bachelor of Science from New York University with a major in accounting and finance. My biography and detailed prior testimony experience, attached as **Appendix A** to this report, further describe my professional credentials, experience, and qualifications.

## II.     RELEVANT CASE BACKGROUND

8.      Johnson & Johnson ("J&J") is one of the most financially strong, solvent, and liquid companies in the world, boasting a credit rating better than the United States of America[1] and disclosing over $41 billion in cash, marketable securities, and available credit lines as of October 3, 2021.[2] Despite its financial strength, J&J set out through a series of maneuvers to isolate its talc powder liabilities into a brand new, bankrupt legal entity in order to offload its talc powder claims, to the exclusive detriment of numerous victims suffering from mesothelioma ("Meso"), ovarian cancer ("OC"), and other diseases as a result of exposure to J&J's talc powder products.

9.      Recently, a handful of companies with mass tort liabilities have attempted to use Chapter 10, Subchapter A of the Texas Business Organizations Code to create a new subsidiary to offload these responsibilities through a bankruptcy of the new subsidiary.[3] These strategies have been vigorously opposed in their respective court proceedings and J&J is the latest company that has attempted to utilize this approach.

10.     LTL Management LLC, a North Carolina limited liability company ("LTL" or the "Debtor") commenced this Chapter 11 case on October 14, 2021 (the "Petition Date") in the Western District of North Carolina, with a goal to resolve its talc powder liabilities through a Chapter 11 reorganization without subjecting the whole former Johnson & Johnson Consumer, Inc. ("Old JJCI") enterprise or J&J itself to a bankruptcy proceeding.[4]

---

[1] See "Johnson & Johnson 'AAA' Ratings Affirmed on Divestiture Announcement; Outlook Remains Negative" S&P Global Ratings, November 12, 2021 and "U.S. 'AA+/A-1+' Sovereign Ratings Affirmed; Outlook Remains Stable" S&P Global Ratings, March 16, 2021.
[2] See Exhibit 2, Johnson & Johnson's third quarter 2021 10-Q, dated October 3, 2021.
[3] These bankruptcy cases include Bestwall LLC, DBMP LLC, Aldrich Pump LLC, and Murray Boiler LLC.
[4] See Exhibit 46, *Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. No. 5] (the "Kim Declaration"), ¶ 21.

11.     Despite LTL's bankruptcy filing, J&J very recently stated to the Court  in the *Imerys* case that it would prefer to resolve its talc powder obligations outside a bankruptcy proceeding.  In May of 2020, J&J pled that "...the [Imerys] Debtors contend, in four full paragraphs, that J&J may lack the financial wherewithal to meet its obligations...this is the most absurd argument the [Imerys] Debtors make...as of the date hereof, J&J has a market capitalization of <u>over $385 billion</u> and extensive insurance coverage of its own. It is one of the top 10 companies in the United States by market value. J&J can provide the claimants far greater protection than the [Imerys] Debtors or the bankruptcy claims trust ever could."[5]

12.     Additionally, J&J stated in its 2020 10-K, "[J&J] anticipates that operating cash flows, the ability to raise funds from external sources, borrowing capacity from existing committed credit facilities and access to the commercial paper markets will continue to provide sufficient resources to fund operating needs, including the talc litigation and agreement in principle to settle opioid litigation of which the majority may be paid over the next two to three years."[6]

13.     Further, in its first quarter 2021 10-Q, J&J stated, "[J&J] anticipates that operating cash flows, the ability to raise funds from external sources, borrowing capacity from existing committed credit facilities and access to the commercial paper markets will continue to provide sufficient resources to fund operating needs, including [J&J's] approximate $1.0 billion in contractual supply commitments associated with its development of the COVID-19 vaccine, the talc litigation and agreement in principle to settle opioid litigation of which the majority may be paid over the next two to three years."[7] Despite these positions by J&J, it reversed its position by filing the LTL bankruptcy.

---

[5] *See Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Imerys Dkt. No. 1769], ¶ 41.
[6] *See* Johnson & Johnson's 2020 10-K.
[7] *See* J&J's first quarter 2021 10-Q, dated April 4, 2021.

and future claimants created pursuant to a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and, to the extent required, the District Court..."[65]

40.    Outside a bankruptcy proceeding, there are no restrictions on paying talc powder liabilities on a current basis and LTL essentially has an unfettered ability to pay judgments and settle talc powder liabilities until the Funding Agreement payment cap (e.g., the fair market value of New JJCI as of the Divisional Merger, or $61.6 billion according to the Debtor) is reached. In a bankruptcy proceeding, payments to satisfy talc powder liabilities can only be made in connection with the funding of a trust for the benefit of talc powder victims pursuant to a plan. [66] By filing for bankruptcy, LTL assumed a level of uncertainty in connection with creating a plan and a trust that it otherwise would not have had to deal with outside of a bankruptcy proceeding. Given these significant differences, it is not clear why the bankruptcy occurred on such a condensed timeline.

41.    In considering whether to restructure LTL in connection with a bankruptcy proceeding, I would expect the board of managers and officers of LTL to initiate and review a comprehensive analysis, including (i) an assessment of LTL's prospects both in and out of bankruptcy, taking into account the potential impact of the bankruptcy proceeding, (ii) a comprehensive evaluation of the existing and future talc powder liabilities, and (iii) an evaluation of the Funding Agreement both in connection with the bankruptcy proceeding and outside of the bankruptcy proceeding. I'm not aware that this type of analysis was performed.

42.    Given that I'm not aware of such an analysis, I analyzed information available on LTL's assets and liabilities. In terms of assets, I understand that the Debtor is of the view that it has access to assets totaling approximately $62 billion.

---

[65] *See* Exhibit 1.52, LTL 0002300 – LTL 0002320.
[66] *See* Exhibit 1.52, LTL 0002300 – LTL 0002320.

($ in Millions)

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 1-3Q2021 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **J&J Historical Dividends and Share Repurchases** | | | | | | | | | | | | |
| Repurchase of Common Stock | $ 2,525 | $ 12,919 | $ 3,538 | $ 7,124 | $ 5,290 | $ 8,979 | $ 6,358 | $ 5,868 | $ 6,746 | $ 3,221 | $ 2,460 | **$ 65,028** |
| Dividends to Shareholders | 6,156 | 6,614 | 7,286 | 7,768 | 8,173 | 8,621 | 8,943 | 9,494 | 9,917 | 10,481 | 8,241 | **91,694** |

54.     J&J had net debt of just $2.9 billion (calculated as $33.9 billion of total debt as of October 3, 2021 less the sum of cash and marketable securities of $31.0 billion as of the same date),[81] extremely low in relation to earnings, which indicates that it can support significant additional borrowing capacity if needed.

55.     J&J has a current market capitalization of approximately $450 billion (as of January 27, 2022), up from approximately $420 billion as of the Petition Date.[82]

### D. THE DEBTOR'S OFFICERS AND MANAGERS ARE OR WERE ALL AFFILIATED WITH J&J AND HAVE ENTERED INTO VARIOUS AGREEMENTS THAT WERE NOT NEGOTIATED AT AN ARMS' LENGTH

*Lack of Separate Managers and Officers*

56.     LTL's managers and officers consist of Robert Wuesthoff (Manager and President, as well as RAM President), Richard Dickinson (Manager, Chief Financial Officer, and Treasurer), John Kim (Chief Legal Officer and Secretary), and Russell Deyo (Manager).[83] Each of these officers have strong and extensive ties to J&J and none of these individuals are separate from J&J.

57.     Robert Wuesthoff, formerly the Vice President of Supply Chain at Johnson & Johnson,[84] first joined J&J in the early 1980s and spent nine and a half years working for J&J.[85] Mr. Wuesthoff rejoined J&J in 2013, where he most recently has run the Enterprise Acceleration Program for the supply

---

[81] *See* Johnson & Johnson's third quarter 2021 10-Q.
[82] *See* https://www.bloomberg.com/quote/JNJ:US.
[83] *See* Exhibit 24, *Schedule of Assets and Liabilities for LTL Management LLC* [Dkt. No. 728].
[84] *See* https://www.linkedin.com/in/robert-wuesthoff-2862062/.
[85] *See* Deposition of Robert Wuesthoff, 13:3-5, December 22, 2021.

chain.[86] He was approached by Michael Ullmann, J&J's Executive Vice President and General Counsel,[87] and Erik Haas, an attorney at J&J,[88] to discuss additional roles as the president of both LTL and RAM.[89] Robert Wuesthoff stated that he was told that his "salary would remain as it is" after appointed an officer at both LTL and RAM, except for the addition of a retention bonuses "at the one-year anniversaries of the role."[90]   Mr. Wuesthoff, who formally began at LTL and RAM on October 8, 2021, has indicated that he does not have any bankruptcy experience[91] and has little experience dealing with mass tort/talc powder litigation.[92]

58.   Richard Dickinson, LTL's Chief Financial Officer and Treasurer, previously worked at J&J as its Vice President of New Business Development in the Medical Devices Group at J&J. He joined J&J in 2011.[93] In this role, Mr. Dickinson's responsibilities included new business development in acquisitions, strategic alliances, licenses, agreements, or divestitures.[94] Mr. Dickinson, who was first contacted about the role at LTL in late September 2021,[95] testified that he doesn't have any prior experience with bankruptcy.[96] Mr. Dickinson also testified that following his acceptance of the new position at LTL, his compensation, including incentive bonuses, remained "roughly the same" except for the addition of a retention bonus.[97]

---

[86] *See* Deposition of Robert Wuesthoff, 15: 20-25, 16: 1-8, December 22, 2021.
[87] *See* https://www.jnj.com/leadership/michael-ullmann.
[88] *See* https://www.linkedin.com/in/erik-haas-11379a1bb/.
[89] *See* Deposition of Robert Wuesthoff, 18: 9-25, 19: 1-15, December 22, 2021.
[90] *See* Deposition of Robert Wuesthoff, 30:23-25, 31: 1-4, 32: 5-25, 33: 1-18, December 22, 2021.
[91] *See* Deposition of Robert Wuesthoff, 57: 6-8, December 22, 2021, "Q. Had you had any experience with Chapter 11 bankruptcy prior to this? A. No, not directly."
[92] *See* Deposition of Robert Wuesthoff, 34: 11-16, December 22, 2021, "Q. Okay. Okay. Had you ever done any work at all in your career in connection with managing litigation liabilities? A. Not directly. I've been exposed to them in my career, but I've never managed them directly."
[93] *See* https://www.linkedin.com/in/richard-dickinson-13370a29/.
[94] *See* Deposition of Richard Dickinson, 19: 22-25, January 26, 2022.
[95] *See* Deposition of Richard Dickinson, 24: 6-9, January 26, 2022.
[96] *See* Deposition of Richard Dickinson, 86: 12-18, January 26, 2022.
[97] *See* Deposition of Richard Dickinson, 111: 17-21, 115: 1-25, 116: 1-8, January 26, 2022.

59.     John Kim, LTL's Chief Legal Officer, previously worked as J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group. In that role, he was responsible for general litigation product liability litigation globally and he has worked at J&J since 2001.[98] Prior to his role as chief legal officer at LTL, Mr. Kim supervised lawyers handling litigation, including an active management role in the defense and strategy in certain litigations, including the talc litigation.[99]

60.     Russell Deyo, LTL's Manager, worked for J&J for 27 years where he held a number of positions, including Vice President of Administration and General Counsel. Mr. Deyo served as a member of the J&J Executive Committee, which is its principal management group for global operations. Mr. Deyo retired from J&J in 2012.[100]

61.     Mr. Wuesthoff, Mr. Dickinson, and Mr. Kim are current employees of a J&J subsidiary, Johnson & Johnson Services, Inc. ("J&J Services"); their pay and benefits, including retirement benefits, are not directly incurred by LTL.[101]

***Intercompany Agreements Were Not Negotiated On An Arms' Length Basis***

62.     In connection with the 2021 Corporate Restructuring, LTL entered into several intercompany agreements, none of which appear to have been negotiated on an arms' length basis. The charts below reflect a number of the key agreements executed in connection with the Integrated Transaction Series, including observations for each agreement.[102]

---

[98] *See* Exhibit 46, Kim Declaration, ¶ 2.
[99] *See* the *Transcript of Proceedings Before the Honorable J. Craig Whitley, United States Bankruptcy Judge,* 95: 7-11, November 4, 2021.
[100] *See* https://millercenter.rutgers.edu/staff/russell-c-deyo/.
[101] *See* Exhibit 1.56, LTL 0002358 – LTL 0002368.
[102] *See* Deposition of Michelle Goodridge, December 20, 2021, Deposition of Robert Wuesthoff, December 22, 2021, and Deposition of Michelle Ryan, January 27, 2022.

| Agreement | Date | Counterparties/Authorized Signer | Observations |
|---|---|---|---|
| **Royalty Agreements:** | | | |
| Purchase and Sale Agreement (LACTAID® Royalties) | 10/11/2021 | ○ McNeil Nutritionals, LLC (Michelle Goodridge, President); and<br>○ Royalty A&M LLC (Robert Wuesthoff, President). | ○ "…I did not personally sit down and negotiate this agreement, but I'm aware of the agreement and what I signed on that day." Michelle Goodridge 12/20/2021;<br>○ "I do not know who would have been involved [in the negotiation]. I'm only aware of the agreement that I signed, the intent of it. And so maybe we could as the lawyers who were – who else was involved." Michelle Goodridge, 12/20/2021; |
| Purchase and Sale Agreement (ROGAINE® Royalties) | 10/11/2021 | ○ Johnson & Johnson Consumer, Inc. (Michelle Goodridge, President); and<br>○ Royalty A&M LLC (Robert Wuesthoff, President). | ○ "I can't answer or speak to that question [of if the royalty stream was shopped to third parties]. I can only speak to my capacity as president of McNeil Nutritionals [LLC] when signing the document. And I was not involved in those kind of discussions personally." Michelle Goodridge, 12/20/2021; |
| Purchase and Sale Agreement (MYLANTA® Royalties) | 10/11/2021 | ○ McNeil Consumer Pharmaceutical Co. (Michelle Goodridge, President); and<br>○ Royalty A&M LLC (Robert Wuesthoff). | ○ "I'm not aware of who would have negotiated [the agreement]." Robert Wuesthoff, 12/22/2021;<br>○ "I do not know [who settled on the purchase price]." Robert Wuesthoff, 12/22/2021; and<br>○ "I'm not aware that any [negotiations] took place." Robert Wuesthoff, 12/22/2021. |
| Purchase and Sale Agreement (TENA® Royalties) | 10/11/2021 | ○ Johnson & Johnson Consumer, Inc. (Michelle Goodridge, President); and<br>○ Royalty A&M LLC (Robert Wuesthoff, President). | ○ All observations reflected herein pertain specifically to the LACTAID® Purchase and Sale Agreement.<br> ▪ "Yes, [if asked generally the same questions with respect to understanding of the other Purchase and Sale Agreements, answers would generally be the same]." Robert Wuesthoff, 12/22/2021. |

### *LTL is an Offshoot of Old JJCI, Does Not Have a Physical Presence, and is Essentially a Talc Powder Liability Management Vehicle*

63.    <u>No Operations:</u> LTL has no operations and does not develop, manufacture, or produce any products or brands.[103]

64.    <u>No Back Office:</u> LTL relies on J&J Services for its treasury and procurement services, corporate finance services, legal and compliance support services, risk management services, and other crucial business services. LTL doesn't have its own standalone services for these types of functions.

---

[103] *See* Exhibit 47, LTL 0030334 – LTL 0030348.

65.    <u>No Employees of its Own:</u> LTL was created with no direct employees of its own, but instead relies upon services provided by employees of J&J Services. These services are provided pursuant to a Services Agreement with J&J Services in which J&J Services provides certain crucial business functions to LTL, including treasury and procurement services, corporate finance services, legal and compliance support services, information technology services, and several others.[104] Additionally, LTL is party to a secondment agreement with J&J Services in which three employees are seconded on a full-time basis to LTL while still remaining employees of J&J Services.[105]

66.    <u>No Physical Space:</u> Mr. Wuesthoff, president of LTL, stated that LTL doesn't have its own physical office location, but instead uses a "hoteling" system at a J&J building location. Mr. Wuesthoff described that the space is available for booking as needed but is not leased or owned by LTL and there is not any space within the facility that is specifically dedicated to LTL.[106]

67.    <u>Only Holds Interests in Royalty Assets:</u> Besides the Funding Agreement, LTL's largest asset is its wholly owned, non-bankrupt subsidiary, RAM, which has an interest in certain royalty streams, as previously discussed. Despite being party to several purchase and sale agreements pursuant to certain royalty streams, RAM does not own any underlying brands, and only holds an interest in the royalty revenue streams. New JJCI retained responsibility for the product license agreements and employees of New JJCI will continue to fulfill all responsibilities pursuant to the product license agreements. Internally, J&J prepared a communications script that indicated that RAM's purchase of certain royalty streams would not have any impact on employees, on the way they work with the royalty agreement partners, or on the specific brands.[107]

---

[104] *See* Exhibit 1.54, LTL 0002328 – LTL 0002343.
[105] *See* Exhibit 1.56, LTL 0002358 – LTL 0002368.
[106] *See* Deposition of Robert Wuesthoff, 48: 1- 25, 49: 1-25.
[107] *See* Exhibit 47, LTL 0030334 – LTL 0030348.

Order Filed on February 24, 2022
by Clerk
U.S. Bankruptcy Court
District of New Jersey

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

| | |
|---|---|
| In Re: | Case No.: _____21-30589_____ |
| LTL MANAGEMENT LLC | Chapter: _____11_____ |
| | Hearing Date: _____ |
| | Judge: ___Michael B. Kaplan___ |

### JOINT STIPULATION AND AGREED ORDER BETWEEN MOVANTS AND DEBTOR REGARDING THE ADMISSION OF DEPOSITION DESIGNATIONS AT MOTION TO DISMISS TRIAL

The relief set forth on the following pages  is  **ORDERED**.

**DATED: February 24, 2022**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**COOLEY LLP**<br>Cullen D. Speckhart (admitted pro hac vice)<br>Michael Klein (admitted pro hac vice)<br>Erica J. Richards (pro hac vice to be filed)<br>Lauren A. Reichardt (pro hac vice to be filed)<br>Evan Lazerowitz<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Fax: (212) 479-6275<br>Email: cspeckhart@cooley.com<br>    mklein@cooley.com<br>    erichards@cooley.com<br>    lreichardt@cooley.com<br>    elazerowitz@cooley.com<br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* | **BAILEY GLASSER LLP**<br>Brian A. Glasser, Esq. (admitted pro hac vice)<br>Thomas B. Bennett, Esq. (admitted pro hac vice)<br>Kevin W. Barrett, Esq. (admitted pro hac vice)<br>Maggie B. Burrus, Esq. (admitted pro hac vice)<br>105 Thomas Jefferson St. NW, Suite 540<br>Washington, DC 20007<br>Tel: (202) 463-2101<br>Fax: (202) 463-2103<br>Email: bglasser@baileyglasser.com<br>    tbennett@baileyglasser.com<br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* |
| **WALDREP WALL BABCOCK & BAILEY PLLC**<br>Thomas W. Waldrep, Jr. (admitted pro hac vice)<br>Kevin L. Sink (admitted pro hac vice)<br>James C. Lanik (admitted pro hac vice)<br>Jennifer B. Lyday (admitted pro hac vice)<br>370 Knollwood Street,<br>Suite 600<br>Winston-Salem, NC 27103<br>Tel: (336) 717-1280<br>Fax: (336) 717-1340<br>Email: notice@waldrepwall.com<br><br>*Proposed Co-Counsel to the Official Committee of*<br>*Talc Claimants II* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq. (admitted pro hac vice)<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC 20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br>Email: jmassey@masseygail.com<br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* |
| **SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Alan I. Moldoff<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, New Jersey 08057<br>Tel: (856) 662-0700<br>Email: aabramowitz@shermansilverstein.com<br>    amoldoff@shermansilverstein.com<br>    rswitkes@shermansilverstein.com<br>*Proposed Local Counsel to*<br>*the Official Committee of Talc Claimants II* | |

| In re: | Chapter 11 |
|---|---|
| **LTL MANAGEMENT LLC,** | Case No.: 21-30589 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

## JOINT STIPULATION AND AGREED ORDER BETWEEN MOVANTS AND DEBTOR REGARDING THE ADMISSION OF DEPOSITION DESIGNATIONS AT MOTION TO DISMISS TRIAL

The relief set forth on the following pages is hereby **ORDERED**.

2

This stipulation and agreed order (this "Stipulation") is made on this 18th day of February, 2022 (the "Stipulation Date") by the Official Committee of Talc Claimants I (the "TCC I"), the Official Committee of Talc Claimants II (the "TCC II"), Aylstock, Witkin, Kreis & Overholtz, PLLC ("AWKO"), and Arnold & Itkin LLP on behalf of certain personal injury tort plaintiffs (collectively, "Movants"), and LTL Management LLC, the debtor and debtor-in-possession ("Debtor"), regarding the evidentiary record for the Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case [Docket No. 632] and Motion to Dismiss Bankruptcy Case filed by Arnold & Itkin LLP on behalf of certain personal injury tort plaintiffs [Docket No. 766] (the "Motions to Dismiss").

## Recitals

WHEREAS, the Preliminary Hearing on the Motions to Dismiss commenced on February 14, 2022 (the "MTD Trial");

WHEREAS, the Movants have designated certain portions of the following depositions that they wish the Court to consider ("Movants' Designations"), and the Debtor has counter-designated other portions of these depositions that it wishes the Court to consider ("Debtor's Counters"):

- Michelle Goodridge (Dec. 20, 2021);

- Robert Wuesthoff (Dec. 22, 2021);

- Thibaut Mongon (Jan. 19, 2022);

- Jose Azevedo (Jan. 24, 2022);

- Richard Dickinson (Jan. 26, 2022);

- Michelle Ryan (Jan. 27, 2022);

- John Kim (Jan. 31, 2022);

3

- John Kim (30(b)(6)) (Feb. 1, 2022);

- Adam Lisman (Feb. 8, 2022);

- Arthur Wong (Feb. 11, 2022); and

- David Kaplan (Feb. 11, 2022).

WHEREAS, the Debtor has designated certain portions of the following depositions that it wishes the Court to consider ("Debtor's Designations"), and the Movants have designated other portions of these depositions that they wish the Court to consider ("Movants' Counters"):

- Michelle Ryan (Jan. 27, 2022);

- Arthur Wong (Feb. 11, 2022); and

- David Kaplan (Feb. 11, 2022).

WHEREAS, a listing of (a) Movants' Designations, (b) Debtor's Counters, (c) Debtor's Designations, and (d) Movants' Counters (collectively, the "Stipulated Designations") to which the parties either have no objections or have waived objections, together with agreed-upon confidentiality treatment in accordance with the Agreed Protective Order Governing Confidential Information [Docket No. 948] (the "Protective Order"), is attached hereto as Exhibit A;

WHEREAS, the Parties wish the Court to accept the Designations into evidence, and consider the Designations in connection with deciding the MTD Trial;

WHEREAS, those Stipulated Designations that are, pursuant to the Protective Order, available for public view are annexed hereto as Exhibit B.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, AND UPON APPROVAL BY THE BANKRUPTCY COURT OF THIS STIPULATION, IT IS SO ORDERED AS FOLLOWS:

1.      The Stipulated Designations in Exhibit B hereto are admitted into evidence and are made part of the public record herewith

2.      The remaining Stipulated Designations (*i.e.*, those listed in Exhibit A hereto that are subject to confidential treatment in accordance with the Protective Order) are also admitted into evidence and shall be filed in accordance with the Protective Order or otherwise in the form and manner agreed between and among the parties and the Court.

3.      This Stipulation shall constitute the entire agreement and understanding between Movants and Debtor relating to the subject matter hereof and supersedes all prior agreements and understandings between Movants and Debtor relating to the subject matter hereof.

4.      The Court shall retain jurisdiction to resolve any disputes, controversies, or ambiguities arising from this Stipulation.

*{Signature page follows}*

AGREED AS TO FORM AND SUBSTANCE:

**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**
*Proposed Local Counsel to the*
*Official Committee of Talc Claimants II*


By:  */s/ Arthur J. Abramowitz*
    Arthur J. Abramowitz
    Ross J. Switkes
    308 Harper Drive, Suite 200
    Moorestown, NJ
    Tel: (856) 662-0700
    aabramowitz@shermansilverstein.com
    rswitkes@shermansilverstein.com

Dated: February 18, 2022

**GENOVA BURNS, LLC**
*Proposed Local Counsel to the*
*Official Committee of Talc Claimants I*


By:  */s/ Daniel M. Stolz*
    Daniel M. Stolz
    Donald W. Clarke
    110 Allen Road, Suite 304
    Basking Ridge, NJ 07920
    Tel: (973) 533-0777
    dstolz@genovaburns.com
    dclarke@genovaburns.com

Dated: February 18, 2022


**WOLLMUTH MAHER & DEUTSCH LLP**
*Counsel to the Debtor*


By:  */s/ Paul R. DeFilippo*
    Paul R. DeFilippo
    500 Fifth Avenue
    New York, New York 10110
    Tel: (212) 382-3300
    pdefilippo@wmd-law.com

Dated: February 18, 2022

**OFFIT KURMAN, P.A.**
*Counsel to Aylstock, Witkin, Kreis &*
*Overholtz, PLLC*


By:  */s/ Paul J. Winterhalter*
    Paul J. Winterhalter
    99 Wood Avenue South, Suite 302
    Iselin, New Jersey 08830
    Tel: (267) 338-1370
    pwinterhalter@offitkurman.com

Dated: February 18, 2022


**PACHULSKI STANG ZIEHL & JONES LLP**
*Counsel to Arnold & Itkin LLP*


By:  */s/ Colin Robinson*
    Laura Davis Jones
    Colin Robinson
    919 N. Market Street, 17th Floor
    Wilmington, DE 19801
    Tel: (302) 652-4100
    ljones@pszjlaw.com

Dated: February 18, 2022

**DAVID KAPLAN – FEBRUARY 11, 2022**

| Movants' Designation (Kaplan) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 13:18 - 13:21 | | 160:3-161:12 | 161:13-163:12 |
| 13:23 - 14:4 | | 165:6-166:7 (just A. Not – not specifically) | 166:7-167:3 |
| 14:7 - 14:13 | | 171:7-172:13 | 172:14-15 |
| 17:2 - 19:8 | | 174:25-176:5 | |
| 20:20 - 20:24 | | 177:18-180:19 | 180:20-21 |
| 20:25 - 21:25 | | 180:22-181:6 | |
| 22:8 - 23:4 | 23:5 – 23:19 | 191:12-192:24 | 191:6-10 |
| 23:20 - 25:20 | | 193:10-193:13 | |
| 26:10 - 26:19 | 26:20 – 27:14 | 197:23-198:14 | 198:15-16 |
| 27:15 - 28:24 | | 198:17-199:4 | 199:5-23 |
| 30:1 - 30:22 | 30:23 – 34-15 | 199:24-200:4 | |
| 34:16 - 37:20 | | 203:6-16 | |
| 38:24 - 40:25 | | 205:24-206:6 | |
| 42:22 - 43:18 | | 208:19-209:23 | |
| 44:3 - 44:10 | 44:11 | 211:16-213:5 | |
| 44:12 - 44:24 | | 214:1-214:9 | |
| 45:5 - 45:7 | | 214:24-216:25 | |
| 45:13 - 48:3 | | 219:24-220:7 | |
| 48:4 - 49:11 | | 248:8-249:23 | |
| 51:4 - 51:16 | | | |
| 53:10 - 53:22 | | | |
| 56:24 - 59:24 | | | |
| 59:25 - 60:12 | 60:13 – 60:25 | | |
| 61:1 - 62:19 | | | |
| 70:12 - 71:6 | | | |
| 78:23 - 80:21 | | | |
| 82:2 - 82:20 | 82:21 – 83:5 | | |
| 83:25 - 84:8 | | | |
| 84:10 - 87:8 | | | |
| 88:18 - 89:1 | 89:2 | | |
| 91:11 - 91:16 | 91:17 – 94:16 | | |
| 94:17 - 96:5 | 96:6 – 96:9 | | |
| 96:10 - 97:2 | | | |
| 98:8 - 98:23 | | | |
| 102:21 - 103:16 | 105:9 – 106:9 | | |
| 106:10 - 106:13 | | | |
| 108:17 - 110:24 | 110:25 – 111:15 | | |
| 111:16 - 111:19 | 111:20 – 112:10 | | |
| 112:12 - 112:19 | | | |

| Movants' Designation (Kaplan) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 119:4 - 119:15 | | | |
| 120:16 - 121:8 | | | |
| 121:24 - 122:21 | 122:22 – 123:2; 124:24 – 125:9; 130:4 – 132:9; 137:13 – 138:25; 144:16 – 146:21; 149:10 – 149:24; 150:7 – 150:18; 150:20 – 151:13; 160:3 – 160:20; 160:21 – 161:12; 162:3 – 163:12; 164:16 – 165:1 | | |
| 165:20 - 166:16 | 167:4 – 167:13; 168:3 – 168:6 | | |
| 169:14 - 170:16 | 172:1 – 172:13; 174:25 – 176:10; 178:13 – 179:23; 194:3 – 194:13; 197:10 – 198:14; 199:5 – 200:4; 200:5-206:06; 208:19 – 211:15; 211:16 – 211:25; 212:1 – 212:23; 213:9 – 213:25 | | |
| 214:1 - 214:16 | 214:17 – 214:23; 216:12 – 217:2; 217:3 – 217:9; 219:24 – 220:7; 224:21 – 225:1; 225:2 – 226:20 | | |
| 228:2 - 233:25 | | | |
| 234:14 - 234:25 | | | |
| 235:21 - 236:8 | | | |
| 243:14 - 244:20 | | | |
| 246:6 - 247:24 | 248:8 – 249:23 | | |
| 251:15 - 252:25 | 253:1 – 253:8 | | |

**JOHN KIM 30(B)(6) – FEBRUARY 1, 2022**

| Movants' Designation (Kim – 30(b)(6)) | Debtor's Counter Designation |
|---|---|
| 13:7 - 15:13 | |
| 15:16 - 16:16 | |
| 21:7 - 23:1 | |
| 23:20 - 28:21 | |
| 30:9 - 30:18 | 32:20 – 33:9 |
| 33:10 - 35:7 | |
| 35:13 - 36:7 | 36:8 – 36:16 |
| 36:23 - 36:24 | |
| 37:5 - 37:13 | |
| 45:10 - 45:13 | |
| 45:15 - 45:18 | |
| 45:21 - 46:17 | |
| 50:21 - 51:4 | |
| 52:25 - 53:10 | |
| 58:15 - 58:18 | |
| 60:4 - 60:7 | |
| 60:21 - 60:25 | |
| 61:2 - 61:8 | |
| 64:1 - 64:15 | |
| 64:18 - 64:23 | |
| 68:1 - 69:9 | |
| 69:16 - 70:5 | 70:18 – 71:1 |
| 76:1 - 76:15 | |
| 77:1 - 77:14 | 79:13 – 80:6 |
| 82:4 - 83:8 | |
| 84:5 - 84:19 | |
| 88:15 - 88:25 | |
| 90:17 - 91:6 | |
| 92:6 - 93:3 | |
| 94:8 - 94:11 | |
| 95:15 - 95:23 | |
| 102:24 - 103:10 | |
| 105:1 - 106:2 | |
| 111:5 - 111:22 | |
| 113:24 - 115:20 | |
| 116:16 - 116:23 | |
| 118:23 - 120:22 | |
| 122:17 - 123:4 | |
| 125:21 - 126:7 | |
| 130:7 - 132:11 | |
| 134:21 - 136:1 | |

| Movants' Designation (Kim – 30(b)(6)) | Debtor's Counter Designation |
|---|---|
| 138:15 - 139:20 | |
| 141:20 - 142:11 | |
| 145:10 - 145:19 | |
| 149:7 - 149:18 | |
| 149:21 - 151:4 | |
| 155:19 - 155:23 | 155:24 |
| 155:25 - 156:8 | |
| 157:3 - 157:5 | 157:6 – 157:7 |
| 157:8 - 157:13 | |
| 158:24 - 158:25 | 159:1 – 159:7 |
| 168:15 - 169:6 | |
| 170:17 - 171:9 | 172:13 – 173:2 |
| 178:23 - 179:6 | |
| 186:25 - 187:8 | |
| 192:16 - 194:17 | |
| 194:23 - 196:4 | |
| 199:9 - 199:22 | |
| 200:9 - 200:25 | 203:9 – 203:23 |

# KAPLAN, DAVID

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 13**

13 :18         Do you understand that last
19    fall, Johnson & Johnson undertook a corporate
20    restructuring that resulted in the creation of
21    a company called "Legacy Talc Litigation?"

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 13**

13 :23         A. Yes.
24         Q. And do you understand that
25    Johnson & Johnson and Johnson & Johnson's
14 :1    consumer health subsidiaries, Talc
2    Liabilities, were placed into that newly
3    created company, Legacy Talc Litigation?
4         A. Yes.

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 14**

14 :7         Q. And if I use the shorthand, "LTL,"
8    for Legacy Talc Litigation, do you understand
9    what I'm referring to?
10         A. Yes.
11         Q. And do you understand that LTL filed
12    for bankruptcy?
13         A. Yes.

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 17**

17 :2         Q. And have you been the Director of
3    Corporate Ratings Healthcare, at Standard and
4    Poor's, for the last 14 years?
5         A. No. So, my current role is
6    director. And I've been at Standard and
7    Poor's, in the Credit Ratings Department, for
8    14 years. But I've not been director for the
9    full 14 years.
10         Q. And for how long have you been
11    director?
12         A. I don't recall, offhand. But it's
13    a -- a good number of years.
14         Q. Okay. At least three or four years?
15    Is that fair?
16         A. Yes.
17         Q. And what is your role as a Director
18    of Corporate Ratings, Healthcare?
19         A. So, the department that I work in,
20    Corporate Ratings, we establish a grading
21    system, like Triple A, for -- which is an
22    evaluation of credit risk. The risk that a
23    company will go bankrupt.
24         My -- in my role, I focus currently,
25    primarily on pharmaceutical companies, but
18 :1    also, other types of healthcare companies like
2    medical device, or healthcare service
3    companies.

```
 4        And I have a group of more junior
 5   analysts who don't report directly to me, but
 6   are on my team. Kind of a dotted line. And
 7   I'm responsible for their work, and quality
 8   control training, et cetera.
 9        Q. Got it. Thank you. Do you have
10   responsibility for covering Johnson & Johnson
11   in your role?
12        A. Yes.
13        Q. And for how long have you been
14   covering Johnson & Johnson?
15        A. I think it was since 2019 was when I
16   picked up coverage from a colleague.
17        Q. And does your coverage of
18   Johnson & Johnson include Johnson & Johnson
19   subsidiaries?
20        A. Yes. I mean, I -- well, to clarify,
21   our rating is on the parent, but the -- the
22   activities of the subsidiaries influence the
23   credit rating of the parent.
24           So, if it's related to the
25   creditworthiness of the overall entity, then
19 :1   yes. You know, it gets technical when we
 2   think about how we rate different entities
 3   within a group.
 4           But, generally, they have a single
 5   family rating that reflects the comprehensive
 6   activities of the entities that are part of
 7   the group which is backing the
 8   creditworthiness of the parent.
```

**KAPLAN, DAVID** - *02/11/2022*

**Page 20**
```
20 :20        Q. Got it. And in the course of
21   covering Johnson & Johnson as part of your
22   role at Standard and Poor's, do you
23   communicate with people at the company?
24        A. Yes.
25        Q. And who are the principal people
21 :1   that you communicated with from 19 -- 2019 to
 2   the present?
 3        A. So, we -- we typically try to
 4   schedule a meeting annually, that involves a
 5   large group of analysts or a group of analysts
 6   from my team, Standard and Poor's credit
 7   ratings group.
 8           May be three to half a dozen, or
 9   sometimes more. And on JNJ side, there will
10   also be, kind of a handful of people. Often
11   the treasurer; some people from investor
12   relations. Sometimes the CFO. Sometimes
13   legal folks, if it's -- we have some questions
14   about legal matters.
15           And then, there is kind of an annual
16   thing. And the company will share with us
17   forecasts and other information that maybe
18   sometimes is not shared publicly. So it's
19   kind of confidential information.
20           And then we also kind of maintain a
21   single person who is our primary contact.
22   That was Michelle Ryan, for the last couple
23   years. It's recently switched to
24   Duane Van Arsdale, I believe is the name of
```

25    the individual, who is the treasurer.

**KAPLAN, DAVID** - *02/11/2022*

Page 22

22 :8          Q. And as the director on that account,
9    if that's the right terminology, were you the
10    principal point of contact with Michelle Ryan,
11    during the period that she was the point
12    person at JNJ?
13          A. I was the primary point person, with
14    the exception of a short period of leave in
15    September and October of 2021. I would say
16    yeah.
17          It's not always the director who's
18    the primary point of contact. Typically,
19    names that are credits that are larger and
20    more complex, are allocated to directors to be
21    the primary analyst.
22          Companies that are smaller and less
23    complicated are often -- associates are the
24    primary point of contact.
25          So it's not -- the role -- the title
23 :1    is not necessarily for that role. But yes, to
2    your original -- I guess to the key question,
3    I am the primary point of contact with the
4    company on JNJ.
5          Q. And how often would you have
6    telephone calls with Michelle Ryan in, let's
7    say, 2020 and 2021?
8          A. So, again, it could vary. If
9    everything is very stable, it could be, you
10    know, just when a company issues debt. So
11    maybe once a year, aside from the annual
12    meeting.
13          In the case of Johnson & Johnson,
14    there were various developments, so it was
15    more frequent. It's hard for me to say
16    whether it was twice a year or four or five
17    times a year. Just don't recall.
18          Q. Somewhere in that range?
19          A. Yes.
20          Q. And when you did have telephone
21    calls with Michelle Ryan, how did you record
22    the substance of those telephone calls?
23          A. If the conversations are
24    substantive, the practice is --
25          MR. STARNER: I may object
24 :1    occasionally. Just give me a moment.
2          Obviously, you can answer the
3    question, if you understand, after that.
4    But if you just give me one second, so --
5    if you don't mind. Thank you.
6          Go ahead.
7          THE WITNESS: Sure.
8          Yeah. Our practice is to take
9    written notes if they are substantive
10    matters that, you know, wouldn't be
11    documented.
12          So, for example, if a company plans
13    on issuing debt, you might just take a
14    few notes. But then, when the issuance
15    is -- when you publish your note,
16    everything is there, so there is nothing
17    really that is meaningful or material,

```
18        that needs to be recorded.
19            But if there's notes that are
20        meaningful, the practice -- the practice
21        in the organization and the department is
22        to save them into a specific depository
23        for the record.
24            We are a regulated entity. And so,
25        we are required to save the material
25 :1      information we gather, as part of that
2         rating analysis.
3     BY MR. SHAPIRO:
4         Q. And what is the name of that system
5     where you maintain your notes?
6         A. We refer to it as "RDR."
7         Q. RDR. And what does "RDR" stand for?
8         A. Probably something like "rating
9     depository" -- yeah. We use a lot of
10    acronyms.
11        Q. We can call it "RDR." And is -- and
12    is RDR a database of notes that the S&P
13    analyst take to record the conversations that
14    they have with the companies that they cover?
15            MR. STARNER: Objection.
16            You can answer.
17        A. It's a system where those documents
18    are saved. We often use, kind of, the
19    administrative assistants to help file it
20    there. Yes.
```

**KAPLAN, DAVID** - *02/11/2022*

**Page 26**
```
26 :10        Q. Let me ask you the question this
11    way. Do you rely on those notes in the course
12    of developing ratings for the companies that
13    you cover?
14        A. Certainly, those are an input that
15    go into it. And we'll refer back to it.
16        Q. And do you rely on those notes for
17    the purpose of preparing the reports that S&P
18    prepares?
19        A. We could. Certainly, yeah.
20        Q. And -- and in the course of your
21    career at S&P, have you always intended for
22    those notes to be as accurate as possible?
23        A. They are shorthand. But they are
24    supposed to be a reference for -- at least for
25    me, to be able to decipher what I was thinking
26
27
27 :1      or hearing.
2             I guess that is to say that, they
3     are not edited, or they are usually drafted as
4     the conversation is going.
5             So there is a little bit of a --
6     there is a looseness in the note-taking that's
7     obviously not going to be present in something
8     we would publish, or even something that we
9     would share with a committee, like a -- a
10    package for others to review.
11            They are really not generally
12    reviewed by anyone else. So, you know, if
13    they have a grocery list on the side, that
14    wouldn't be a problem.
15            MR. SHAPIRO: Let me mark as
```

16        Exhibit 384, a document that's Bates
17    stamped SPG100 -- or "SPGI0001078_001"
18    through "002."
19        And for the videographer, it's tab C
20    in the binder. You can put that on the
21    screen.
22        (Exhibit 384 marked for identification)
23    BY MR. SHAPIRO:
24        Q. Mr. Kaplan, do you have the ability
25    to control the notes? To control the screen
28 :1  to go through it?
2        A. Yes.
3        Q. Okay. Let me know when you've had a
4    chance to review them.
5            [Witness perused document.]
6        A. Okay.
7        Q. Do you recognize these as your
8    notes, Mr. Kaplan?
9        A. I recognize these as mine. This
10    would not be -- these are not notes that were
11    taken during a conversation with the company.
12        This would be notes that I drafted
13    for our conversation with my colleagues to
14    discuss the rating on JNJ, or the outlook on
15    JNJ. In addition to having a rating, we also
16    have an outlook which could be stable,
17    positive or negative.
18        So, this was October of 2020. This
19    was, I guess, an internal conversation we had
20    scheduled to discuss JNJ's rating and some of
21    the developments.
22        Q. Are these notes that you prepared in
23    advance of the internal conversation?
24        A. Yes.

KAPLAN, DAVID - *02/11/2022*

Page 30
30 :1      Q. That's okay. And what was the
2    purpose of the meeting?
3        A. So, based on, you know, the
4    contents, there were two legal matters that
5    were facing Johnson & Johnson, that seemed to
6    be -- had reached the point where the
7    liability could be material.
8        And so, we were discussing whether
9    this has, or should have an influence on the
10    rating or the rating outlook.
11        Q. And what was the source of the
12    information that you included in these notes?
13        A. So, it could be conversations we had
14    with the company. It could be information we
15    digested from media sources we viewed as
16    reliable.
17        It could be information that the
18    company had shared publicly with investors, or
19    had put in its SEC filings, like its 10K or
20    10Q.
21        You know, we kind of gathered from
22    multiple sources.
23        Q. Okay. I want to ask you, if we can
24    scroll up. I guess I can't control it. Let
25    me -- let's scroll up to the part that says,
31 :1  "Talc settlements."
2            Do you see the section at the

```
 3    bottom of the page, which is Bates stamped --
 4    I guess it's the first page, "001," which
 5    says, "Talc settlements?"
 6              You're there, Mr. Kaplan? If
 7    you scroll down.
 8       A. Sure.
 9       Q. Do you see that the first sentence
10    says:
11              "Company has capitulated on
12    talc, talcum powder/baby powder litigation
13    settlements in contrast to fiercely litigating
14    that."
15              Do you see that?
16       A. Yes.
17       Q. And is that based on a conversation
18    you had with Michelle Ryan?
19       A. That would have been my -- my view.
20    So the term, "capitulated," in particular, is
21    just a word that came to me. But it's -- this
22    is my interpretation of the events that I'm
23    observing.
24              So, I doubt that the company would
25    have said that to me, specifically. But the
32 :1  company, in my experience, has been -- has
 2    taken the strategy -- and I believe
 3    Michelle Ryan had mentioned this -- of, you
 4    know, of generally being very assertive in
 5    litigating claims.
 6              Michelle had expressed that J --
 7    that the company feels -- Johnson & Johnson
 8    feels that they are unfairly challenged by
 9    litigation because of their financial
10    strength.
11              And so, their strategy is generally
12    to litigate even things that might be economic
13    to ignore, or just to settle, to avoid
14    nuisance cases.
15              So, it was therefore a change for us
16    to see that they started to reserve some --
17    some amounts on their financial statements as
18    expected losses or exhibited liabilities for
19    talc.
20              So that -- that's what that first
21    sentence refers to. Is that the company has
22    basically shifted in strategy from fighting
23    talc to starting to settle some cases, at
24    least.
25       Q. And the basis for your observation,
33 :1  that the company had begun to settle some of
 2    the cases is the fact that, as reflected in
 3    your notes, that they had accrued $350 million
 4    in Q2, and $540 million in Q4?
 5              Is that fair?
 6       A. I'm not sure if it was -- was it Q4?
 7       Q. Q3, sorry.
 8       A. But the fact that they had reserved
 9    the 350, and expect to reserve another 540.
10    Right. Correct.
11       Q. And what was your understanding of
12    the significance of the fact that the company
13    had reserved $890 million in Q2 and Q3, for
14    this litigation? What was the significance of
15    that, to your understanding?
16       A. So, you know, we see litigation very
17    often in healthcare. And the overwhelming
```

18  majority of the time, it ends up not being
19  material -- not end up being a material
20  liability for the company.
21       And so, when we think about credit
22  risk, that's an important observation. But
23  when we see a company take a reserve, it --
24  it's one development that suggests that the
25  liability may be material here.
34 :1       It's not the only way. And it's not
2  a certainty. But that's one development that
3  is suggestive; the liabilities might be
4  material.
5       And so, that is something we try to
6  incorporate in the credit -- in the thinking
7  around the credit risk is -- well, it looks
8  like now the company is going to take some
9  degree of liability.
10      Q. And did you understand, or do you
11  understand, that when a company takes a
12  reserve, the company is making a judgment that
13  the liability is probable and estimable?
14      A. Yes. Based on the SEC or GAP
15  definitions. Correct. Yeah.
16      Q. And then, let me ask you about the
17  third bullet point that refers to the 25,000
18  talc cases. Do you see that?
19      A. Uh-huh. Yes.
20      Q. In that bullet point, it says that:
21       "The company estimates that the
22  liability could reach as much as $7 billion to
23  $7.5 billion, inclusive of all future cases."
24       Do you see that?
25      A. Yes.
35 :1      Q. And when you refer to the company in
2  that bullet point, who are you referring to in
3  particular, as the source of that information?
4       MR. STARNER: Objection.
5       You can answer.
6      A. That would be our -- that would be
7  from conversation we had with the company.
8      Q. Okay.
9      A. Most likely, Michelle Ryan.
10      Q. And what did you understand was the
11  significance of that estimate, that the
12  liability could reach as much as $7 billion to
13  $7.5 billion, inclusive of all future cases?
14       What did that mean?
15       MR. STARNER: Objection.
16      Q. Or what did you understand, based on
17  your conversation?
18      A. It sounds -- well, I don't recall.
19  But based on my reading of my notes, as I
20  would have written them, I think what I was
21  trying to communicate here to my colleagues
22  was that we had a conversation with
23  Johnson & Johnson. And, you know, although --
24  excuse me.
25       Although, you know, the company --
36 :1  you know, there's a lot of uncertainty from
2  the benefit of -- for the purposes of our
3  credit risk, it's important to understand what
4  the -- you know, maximum liability could be.
5       And I think what we gathered from
6  the company is that -- and maybe based on some
7  of the math in the two bullet points above,

8      the company is estimating that its liability
9      will be -- could be as much as $7.75
10     billion -- $7 billion to $7.5 billion.
11             Which is, again, helpful for us to
12     think about it, you know, in the context of
13     Johnson & Johnson. The company generates, you
14     know, $30 billion of EBITDA.
15             As a worst case scenario, you know,
16     what's -- what's the worst case scenario. So
17     even if it's not probable, but at least to
18     have some numbers around it can be very
19     helpful for us.
20             You know, I know the media had some
21     speculation with numbers that were higher than
22     that. So being able to say, you know, media
23     numbers are, you know, just, completely -- you
24     know, meaning when some of my colleagues will
25     sometimes see stuff in the media, and then,
37 :1   you know, send me a link or an article.
2              You know, hearing from the company
3      that they feel that the maximum is $7 billion
4      to $7.5 billion is reassuring in a sense,
5      relative to, maybe something that we read in
6      the media that said the liabilities could be
7      much more than that.
8              So it's helpful, even if it's not --
9      it doesn't become our base case expectation.
10         Q. And let me ask you to take a look at
11     your next bullet point at the top of the next
12     page. Do you see where it says:
13             "The company expects payment
14     would be $2.5 billion per year, in each of the
15     next three years."
16         A. Yes.
17         Q. And is that also based on your
18     conversation with Michelle Ryan?
19         A. Yes. That's what -- that's what the
20     notes indicate.

**KAPLAN, DAVID** - *02/11/2022*

**Page 38**

38 :24         Q. And let me just ask you a couple of
25     more questions about these notes. You were
39 :1   explaining this at the beginning. These are
2      notes that you prepared in advance of your
3      internal meeting with other analysts at S&P?
4          A. Yes.
5          Q. And those -- this -- this type of
6      internal note is something that you regularly
7      prepared in advance of internal meetings like
8      that?
9              MR. STARNER: Objection.
10         A. So, we have two types of internal
11     conversations. There is a more formal one,
12     which is when we kind of formally gather a
13     committee. There's various formalities and
14     processes around that.
15             The internal conversation is kind of
16     a less formal. So it's typically for
17     developments that are where we don't expect
18     there to be a change in the rating, but we
19     just want to run it by our colleagues to make
20     sure they feel similarly.
21             Or in a company that, you know, is

25      A: The board was given all the underlying
34 :1    information about it.
2      Q: I know.
3      Do you know why -- do you know why the
4      board wasn't just given the number?
5      A: I think it was unnecessary for the board's
6      determination. Again, what's in the reserve is not --
7      again, it's probable and estimable. But the information
8      we gave the board was far more than what the reserve
9      number is.
10     So, you know, again, the information given
11     to the board encompassed all that, but --
12     Q: But the -- I apologize. I don't mean to step
13     on your words.
14     A: The information given to the board encompassed
15     all the information that would go into setting the
16     reserve plus more, plus advice of counsel.
17     So, again, the underlying information
18     about the reserves -- about how reserves are set or the
19     basis of the reserves was given to the board. It just
20     wasn't told to the board that this was the reserve.
21     Q: And the difference between what was given to
22     the board, those are facts that reflect the actual cost
23     and the number of cases and the actual settlements,
24     correct?
25     A: Plus the board was told what was expected, what
35 :1    we could expect. So the future was -- the future of the
2      litigation was discussed at length with the board.
3      So it's not just -- again, all the
4      information that goes into calculating reserve was given
5      to the board. We just did not give the board the
6      reserve number that was in the books because we thought
7      we were giving the board more information than that.

### KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 35**

35 :13   Q: Has LTL or anyone acting on its behalf prepared
14     any draft Chapter 11 plan of reorganization?
15     A: It has not.
16     Q: Has anyone -- withdrawn.
17     Has LTL or anyone acting on its behalf
18     created any projections of future financial performance
19     of a post-reorganized LTL?
20     A: We have not at this point done that.
21     Q: Has LTL or anybody acting on its behalf
22     prepared any type of feasibility analysis with respect
23     to any contemplated Chapter 11 reorganization plan?
24     A: Not a written feasibility analysis. We believe
25     that a plan is feasible and that we hope to develop one.
36 :1    Q: Okay. Anything other than your hopes that the
2      debtor has undertaken to try to determine whether
3      there's a feasible plan of reorganization?
4      A: Well, based upon discussion with counsel -- so
5      it's not only our hopes, it's, you know, based upon
6      discussions, we believe that there's a plan that's
7      feasible, yes.
8      Q: Okay. But no feasibility analysis has been
9      undertaken, correct?
10     A: So I'm not sure what you mean by feasibility
11     analysis. There's no -- we don't have a written
12     document that goes -- titled Feasibility Analysis. But
13     we have had discussions, and we believe that based upon
14     the experience and expertise of our bankruptcy counsel
15     and the facts of the case, we believe that a Chapter 11

16          plan will be feasible.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 36**

36 :23      Q: Okay. Does LTL have any secured creditors?
   24       A: I do not believe it does.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 37**

37 :5       Q: Okay. As the corporate representative, are you
   6        aware of any secured debt that the debtor needs to
   7        address or resolve within the bankruptcy?
   8        A: I do not. I am not aware of any.
   9        Q: Are you aware of any asset that LTL owns that
   10       is subject to a lien or security interest of any kind?
   11       A: I do not believe that there are any, no.
   12       Q: Okay. Does LTL have any trade creditors?
   13       A: I do not believe it does.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 45**

45 :10      Other than contracts that concern claims
   11       based on talc and intercompany agreements, is LTL party
   12       to any other contract that you're aware of?
   13       A: I am not aware of any.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 45**

45 :15      LTL has no employees, correct?
   16       MS. BROWN: Objection, foundation.
   17       A: LTL's employees that have been seconded to it
   18       from Johnson & Johnson Services, Inc.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 45**

45 :21      Are you aware of any tax claims that have
   22       been asserted against LTL?
   23       A: I am not aware of any claims asserted.
   24       Q: Okay. We talked yesterday -- not we, but other
   25       lawyers and yourself spent some time on the funding
46 :1       agreement. Do you remember that?
   2        A: I do recall that, yes.
   3        Q: Okay. Does LTL have any reason to believe that
   4        Johnson & Johnson and JJCI will not honor its
   5        obligations under the funding agreement?
   6        A: It has no reason to believe that Johnson &
   7        Johnson and JJCI will not honor the terms of the funding
   8        agreement.
   9        Q: In fact, LTL expects Johnson & Johnson and JJCI
   10       to honor their obligations under the funding agreement,
   11       correct?
   12       A: LTL does and has already undertaken -- gotten
   13       funds from the funding agreement.
   14       Q: Okay. Does LTL have any reason to believe that
   15       Johnson & Johnson or JJCI will be unable to fulfill
   16       their obligations under the funding agreement?



EXHIBIT

Exhibit 332

exhibitsticker.com

# In re: LTL Management LLC

EXPERT REPORT OF SAUL E. BURIAN

PROFESSIONAL EYES ONLY | HIGHLY CONFIDENTIAL

JANUARY 28, 2022

# Company Overview

**Headquarters:** New Brunswick, NJ

**Founded:** 1886

**Ticker:** JNJ (NYSE)

**Employees:** ~135,000

**Investors:** BlackRock, Vanguard, State Street

J&J is a global company primarily focused on products related to human health and wellbeing. J&J is organized into three business segments:

- **Consumer Health** – includes a broad range of products focused on personal healthcare used in the skin health/beauty, OTC medicines, baby care, oral care, women's health and wound care markets
  - Key Brands/Products: Zyrtec, BAND-AID, Listerine, Motrin, Aveeno, Neutrogena
- **Pharmaceutical** – focused on six therapeutic areas including Immunology, Infectious Diseases (e.g., HIV/AIDS) and Neuroscience
  - Key Brands/Products: Stelara, Erleada, Darzalex, Uptravi, Imbruvica
  - The Company produced one of the three authorized COVID-19 vaccines in the United States
    - ~15 million Americans have received the Johnson & Johnson single-dose vaccine
- **Medical Devices** – includes a broad range of products used in the Interventional Solutions, Orthopaedics, Surgery, and Vision fields
  - Key Brands/Products: Contact lenses; surgical vision tools; electrophysiology products; products in support of hips, knees, trauma and spine; and advanced and general surgical offerings

**FY 2021 Net Sales Breakdown by Segment**



**FY 2021 Net Sales Breakdown by Geography**



**PEO | HIGHLY CONFIDENTIAL**

# Neither J&J Nor Old or New JJCI Needs a Bankruptcy to Resolve Talc Litigation

**A** J&J's Size and Scale

Johnson & Johnson is one of the most valuable companies in the world. It has the 9th highest market value of any S&P 500 constituent company, which is more than 14 times greater than the S&P 500 median market value of $32.0 billion[1]

**J&J Market Value[1]**

*($ in billions)*

**J&J Total Enterprise Value (TEV) Build[1,2]**

| | |
|---|---:|
| Stock Price | $170.59 |
| Shares Outstanding (Basic) | 2.6 |
| **Market Capitalization** | **$449.1** |
| Plus: Total Debt | 33.9 |
| Less: Cash | (17.6) |
| Less: Marketable Securities | (13.4) |
| **Total Enterprise Value** | **$452.0** |

**Market Value Comparison: S&P Constituents[1]**

*($ in billions)*



| | Company | Market Cap |
|---|---|---:|
| 1 | Apple | $2,600.8 |
| 2 | Microsoft | 2,247.9 |
| 3 | Alphabet (Class A) | 1,713.3 |
| 4 | Amazon | 1,416.3 |
| 5 | Tesla | 834.4 |
| 6 | Meta Platforms | 819.6 |
| 7 | Berkshire Hathaway | 687.0 |
| 8 | Nvidia | 548.6 |
| **9** | **J&J** | **449.1** |
| 10 | UnitedHealth Group | 434.8 |
| 11 | Visa | 434.7 |
| 12 | JPMorgan Chase | 427.8 |

*Source: Company SEC filings, CapIQ*
*(1)   Market capitalization as of Jan. 27, 2022 per CapIQ*
*(2)   Total debt, cash and marketable securities as reported in J&J's 3Q 2021 10-Q; Data for 4Q 2021 is not yet available at the time of this report*

HOULIHAN LOKEY    26

PEO | HIGHLY CONFIDENTIAL

# Neither J&J Nor Old or New JJCI Needs Bankruptcy to Resolve Talc Litigation

**A** J&J's Size and Scale

J&J stands among the most financially strong and stable companies in the world – using its annual revenue as a proxy for GDP would place J&J in the top third of all countries in the world ranked by GDP. J&J is also one of the largest companies in the S&P 500, falling in the top 10% of all constituents on an LTM revenue basis



**FY 2021 Revenue Comparison: Country GDPs**[1]

*($ in billions)*

| | |
|---|---|
| Puerto Rico (63) | $100.7 |
| Ecuador (64) | $100.6 |
| Ethiopia (65) | $94.0 |
| J&J | $93.8 |
| Sri Lanka (66) | $84.5 |
| Luxembourg (67) | $84.1 |
| Dominican Republic (68) | $83.9 |

**LTM Revenue Comparison: S&P 500 Constituents**[2]

*($ in billions)*

| | |
|---|---|
| Marathon Petroleum (29) | $103.0 |
| Phillips 66 (30) | $95.3 |
| Lowe's Companies (31) | $95.2 |
| United Parcel Service (32) | $94.4 |
| J&J (33) | $93.8 |
| Bank of America (34) | $93.7 |
| FedEx Corporation (35) | $89.6 |
| Valero Energy Corporation (36) | $89.2 |
| Archer-Daniels-Midland (37) | $85.2 |

*Source: CapIQ, IMF*
*(1)    Country GDPs given by the IMF's World Economic Outlook database as of April 2021. GDP is not provided for certain countries*
*(2)    LTM Revenue is calculated using the most recently announced four quarterly results for each company as of Jan. 27, 2022 per CapIQ*

# Neither J&J Nor Old or New JJCI Needs Any Bankruptcy to Resolve Talc Litigation

Case 23-10092-MBK Doc 530 Filed 04/18/23 Entered 04/07/23 22:31:13 Desc Main
Document Exhibit 28 Page 321 of 506

## A  J&J's Creditworthiness

J&J is one of the most credit-worthy entities in the world. J&J's debt is rated AAA by S&P, the highest rating possible. Only one other company in the world and only 11 countries in the world have a AAA credit rating, giving J&J a higher credit rating than 95% of all countries in the world, including the United States of America (AA+)

**Sovereign S&P Credit Rating Comparison**



Australia, Canada, Denmark, Germany, Liechtenstein, Luxembourg, The Netherlands, Norway, Singapore, Sweden and Switzerland

**S&P 500 S&P Credit Rating Comparison**



J&J and Microsoft are the only two companies in the world with AAA credit ratings from S&P – Apple and Google are both rated AA+ and the median rating for companies in the S&P 500 Index is BBB+

Source: CapIQ, S&P Global
Note: For uniformity, only S&P's credit ratings are used in this analysis

**PEO | HIGHLY CONFIDENTIAL**

# Neither J&J Nor Old or New HoldCo Needed Bankruptcy to Resolve Talc Litigation

**A** J&J Does Not Exhibit Indicators of Distress

> Since 2016, the first year in which J&J reported a significant increase in the number of talc-related claims, J&J has experienced sales growth every year and maintained profitability margins. Furthermore, J&J's sales for the twelve-month period ended October 3, 2021 – less than 2 weeks prior to LTL's Chapter 11 filing – grew 13.1% compared to the twelve-month period ended September 27, 2020

**Financial Summary**



Source: Company SEC filings

(1)  Depreciation and Amortization for 4Q 2021 is not yet available at the time of this report
(2)  Adjusted EBITDA is calculated as: Income Before Tax + Intangible Asset Amortization + Restructuring Related Expenses + Litigation Expense + Other Adjustments + Interest Expense, net + Depreciation and Amortization (excluding Intangible Asset Amortization)

HOULIHAN LOKEY    29

**PEO | HIGHLY CONFIDENTIAL**

# Neither J&J Nor Old or New JJCI Needs a Bankruptcy to Resolve Talc Litigation

**B** Wall Street Forecasts Continued Strength

Looking to the future, equity research analysts forecast higher sales growth and margin expansion for J&J through 2025 than it delivered in 2019 and 2020. Notably, analysts expect sales growth of 14.2% in 2021, and forecast EBITDA margin to increase steadily to surpass 2019 levels in 2024

**Equity Research Consensus Estimates**



*Source: Company SEC filings, Consensus Estimates per CapIQ*
*(1)  Depreciation and Amortization for 4Q 2021 is not yet available at the time of this report*
*(2)  Adjusted EBITDA is calculated as: Income Before Tax + Intangible Asset Amortization + Restructuring Related Expenses + Litigation Expense + Other Adjustments + Interest*
*Expense, net + Depreciation and Amortization (excluding Intangible Asset Amortization)*

HOULIHAN LOKEY    30

# Neither J&J Nor Old or New JJCI Needs Bankruptcy to Resolve Talc Litigation

Case 23-01092-MBK Doc 530-1 Filed 04/27/23 Entered 04/27/23 16:32:13 Desc Main
Document Exhibit 28 Page 324 of 506

**C** J&J's Cash Expenditures and Cash Distributions to Shareholders

J&J has spent billions of dollars on reinvestment and growth expenditures by means of cash M&A and additions to PP&E, all while delivering sizeable, discretionary returns to shareholders via cash dividends and share repurchases

## Cash M&A and Capital Expenditures



*($ in billions)*

**Key Acquisitions:**[1]
- 2016: Vogue International ($3.3bn)
- 2017: Actelion ($29.6bn), AMO ($4.3bn)
- 2019: Auris Health ($3.4bn), DR. CI:LABO (~$2.1bn)
- 2020: Momenta Pharma ($6.1bn)

■ Since 2016, when talc-related litigation began to accelerate, J&J has invested significantly in M&A and PP&E, spending more than $70 billion of cash on acquisitions and additions to PP&E throughout its business segments

## Cash Dividends & Share Repurchases[2,3]



*($ in billions)*

**2016-21 Cumulative:**

**$92.1 billion**

■ J&J increased its dividend in 2021 for the 59th consecutive year

■ J&J paid the 6th most in cash dividends of all S&P 500 companies during the last twelve months as of January 2022[4]

■ J&J has also delivered significant sums of cash to shareholders via share repurchases, totaling $33.6 billion from 2016 through 3Q 2021

*Source: Company SEC filings, press releases and presentations, Bloomberg*
*(1) Vogue International and DR. CI:LABO are included in the Consumer Health segment; (2) Data for 4Q 2021 is not yet available at the time of this report; (3) Full year 2021 cash dividend of $11.0 billion as disclosed in 4Q 2021 earnings call presentation, p. 20; Share repurchases as reported through 3Q 2021; (4) Per Bloomberg as of Jan. 27, 2022*

**PEO | HIGHLY CONFIDENTIAL**

Ⓒ J&J's Operating Expenses

J&J has increased R&D investment every year since 2016, and maintained consistent selling, marketing, and administrative expenses

**Research and Development (R&D) Expense**

*($ in billions)*



**Selling, Marketing and Administrative (SM&A) Expense**[1]

*($ in billions)*



Source: Company SEC filings and presentations
(1)   Advertising expense is included within SM&A; (2) Advertising expense for FY 2021 is not yet available at the time of this report

HOULIHAN LOKEY | 32

# Neither J&J Nor Old or New JJCI Needs the Bankruptcy to Resolve Talc Litigation

**C** J&J's Liquidity & Cash Flow Generation

As of the end of its third fiscal quarter 2021, J&J reported over $31 billion in cash and marketable securities. Factoring in J&J's $10 billion credit facility brings its total liquidity to approximately $41 billion. J&J's impressive free cash flow generation has allowed the Company to make the aforementioned significant investments and distributions while maintaining this healthy liquidity profile

## Free Cash Flow[1]

*($ in billions)*



- J&J's free cash flow has grown each year since 2016

- As a percentage of sales, free cash flow has grown by 283 bps

- Over the past 5 calendar years, the Company has reported a cumulative $92 billion of free cash flow

- J&J's significant, stable cash flow profile points to its ability to self-fund its operating activities, growth initiatives and shareholder distributions

## Liquidity[3]

*($ in billions)*



- Following the $29.6 billion acquisition of Actelion in 2017,[4] J&J's liquidity has increased by more than $12 billion

- J&J's liquidity of $41.0 billion, on its own, is greater than the market value of over 55% of S&P 500 constituent companies[5]

*Source: Company SEC filings and presentations, Bloomberg*
*(1)    Calculated as Net Cash Flow from Operations less Additions to Property, Plant & Equipment*
*(2)    Data for 4Q 2021 is not yet available at the time of this report*
*(3)    Liquidity calculated as the sum of cash, marketable securities and credit facility availability of $10bn as of the end of 3Q 2021*
*(4)    J&J 2017 10-K, p. 71*
*(5)    Market capitalization as of Jan. 27, 2022*

# Neither J&J Nor Old or New JJCI Need a Bankruptcy to Resolve Talc Litigation

**D** Segment Overview: Consumer Health

> As I do not have detailed financial statements or projections for New or Old JJCI as of the time of this report, I evaluated the publicly available information for J&J's Consumer Health segment as a proxy, specifically the U.S. Consumer Health segment, where such information is available

## Consumer Health Overview

- The Consumer Health segment includes a broad range of products focused on the major list of sub categories listed below:
- **Skin health/beauty:** Aveeno; Clean & Clear; Neutrogena; and OGX
- **Over-the-counter (OTC):** Tylenol acetaminophen products; Sudafed cold, flu and allergy products; Benadryl and Zyrtec allergy products; Motrin ibuprofen products; Nicorette smoking cessation products; Zarbee's Naturals and the Pepcid line of acid reflux products
- **Baby Care:** Johnson's and Aveeno Baby product lines
- **Oral Care:** Listerine
- **Women's Health:** Stayfree and Carefree sanitary pads and o.b. tampon brands
- **Wound Care:** BAND-AID Brand Adhesive Bandages and Neosporin First Aid product lines
- Products are marketed to the general public and sold online and to retail outlets and distributors around the world

## Key Brands and Products

  





## 2021 Consumer Health Sales Breakdown by Product



## 2021 Consumer Health Sales Breakdown by Geography



# Neither J&J Nor Old Or New JJCI Needs Bankruptcy to Resolve Talc Litigation

**D** Consumer Health Performance Amidst Talc Litigation

Despite the increase in talc-related claims filed against J&J and JJCI, the Consumer Health segment has been outperforming prior years in key financial metrics

## Pending Talc-Related Lawsuits

*(Cases in thousands)*



- J&J first listed talc-related claims in its 10-K in 2016
- Since 2016, talc-related lawsuits have grown to over 38,000 cases

## Sales & Adjusted Income Before Tax[2]

*($ in billions)*



- Total Consumer Health sales have grown steadily at a CAGR of 1.9% from 2016 to 2021, with the U.S. portion growing at 3.8%
- Adjusted Income Before Tax Margin has expanded 387 bps over the same period

*Source: Company SEC filings*
*(1)   Data for 4Q 2021 is not yet available at the time of this report*
*(2)   Adjusted Income Before Tax ("Adj. IBT") is a non-GAAP metric provided in J&J's Reconciliation of Non-GAAP Measures*

# Neither J&J Nor Old Or New JJCI Faces Significant Bankruptcy to Resolve Talc Litigation

**D** Public Market Sentiment on Consumer Health

As shown in the exhibits below, equity research analysts forecast stronger top-line growth and margin expansion for the Consumer Health segment through 2025 than the segment delivered during 2018, 2019, or 2020. Analysts cited the Consumer Health segment's strong brand portfolio[1] and global presence[2]

## Sales Estimates

*($ in billions)*





## Adjusted Income Before Tax Estimates

*($ in billions)*





## Select Analyst Commentary During 2021

*"J&J Consumer Health is one of the global leaders in the category alongside GSK, Reckitt and others"*

**Barclays – Nov 2021**

*"We believe Consumer's improving performance warrants an in-line comp multiple"*

**Credit Suisse – Nov 2021**

*"Consumer rounds out the story with durable growth prospects"*

**Morgan Stanley – Nov 2021**

*"All in all, we think Consumer remains well on track to deliver growth over the long term thanks to its strong brands"*

**Société Générale – Mar 2021**

Source: Equity research reports
Note: Estimates used in charts are simple averages of estimates from Wells Fargo as of Nov. 12, 2021, Morgan Stanley as of Nov. 12, 2021, Cantor Fitzgerald as of Nov. 18, 2021 and Credit Suisse as of Oct. 20, 2021
(1)   "Johnson & Johnson – Diversification to help in navigating the crisis and recovery" – Société Générale, Mar. 22, 2021
(2)   "Assessing the Competitive Implications of J&J Consumer Health" – Barclays, Nov. 19, 2021

# Neither J&J Nor Old Or New JJCI Needed a LTL Bankruptcy to Resolve Talc Litigation
**D** J&J Commentary on Consumer Health's Performance & Outlook

> In the months *immediately* leading up to and following LTL's bankruptcy filing, executives at J&J touted the Consumer Health segment's recent performance improvements, its current position of strength, and the opportunity for it to be an industry leader

*"Q: And the J&J consumer sector, you said then, and you believe now, is <u>solidly positioned in the top quartile of the industry for profitability while delivering top-line growth at the same time</u>. That's a true statement then in September of 2021, and it's a true statement today, right?" "A: Correct."*
**Thibaut Mongon, EVP and Worldwide Chairman of Consumer Health – January 2022(1)**

*"I want to remark we are doing this [separation of the Consumer Health business] from a position of strength. <u>This is the best moment of our Consumer Health sector, at least in the last five years</u>… we have the conviction that this $15 billion Consumer Health company, <u>it's going to be a global leader</u> able to compete in the consumer health industry… <u>our investors are going to see the strength of our Consumer Health business</u>, the number of iconic brands, the global scale and our penetration, the unique relationship that consumers have with our brands."*
**Joaquin Duato, CEO and Director – January 2022(2)**

*"I would also say the Consumer Health business specifically, if you look maybe <u>four or five years ago, we had trouble on a quarterly basis hitting market growth. Now we do that routinely and often exceed it</u>. And the operating margins, which were significantly below the peer set are now at peer set. So even still a little bit of room to run there."*
**Joseph Wolk, EVP and CFO – November 2021(3)**

*"<u>The consumer segment continues to experience very strong momentum</u>. So we are very pleased with how <u>the portfolio continues to perform around the world</u>… As we get into Q4 and <u>into 2022, we expect our portfolio of brands continue to be very well positioned</u> in the markets and categories in which we compete."*
**Thibaut Mongon, EVP and Worldwide Chairman of Consumer Health – October 2021(4)**

*"<u>We are increasing our margin profile, achieving the highest operating profit improvement in our competitive set</u>, generating approximately 400 basis points of improvement between 2018 and 2020. And so far, in 2021, our adjusted segment IBT improved approximately another 250 basis points versus last year. And this achievement was driven by our efforts on end-to-end profitability enhancement, including portfolio optimization, network improvements and overall cost control."*
**Thibaut Mongon, EVP and Worldwide Chairman of Consumer Health – September 2021(5)**

(1) *Mongon Dep. 186:23-187:5, Jan. 19, 2022*
(2) *"JP Morgan Healthcare Conference, 10-January-2022 9:45 AM ET" per Reorg*
(3) *"Johnson & Johnson (JNJ-US), Business Update Call, 12-November-2021 8:30 AM ET" per Reorg*
(4) *"Johnson & Johnson (JNJ-US), Q3 2021 Earnings Call, 19-October-2021 8:30 AM ET" per Reorg*
(5) *"Johnson & Johnson NYSE: JNJ Company Conference Presentation Friday, September 10, 2021 2:20 PM GMT" per CapIQ*

HOULIHAN LOKEY    37

# Neither J&J Nor Old Or New JJCI Needed Bankruptcy to Resolve Talc Litigation

**E** J&J previously has dealt with tens of thousands of similar tort claims without resorting to bankruptcy

> J&J has significant experience dealing with large product liability cases, but has not used Chapter 11 to resolve these processes

- The company has dealt with many product liability cases, encompassing tens of thousands of plaintiffs, without previously resorting to bankruptcy. Instead, J&J has adjudicated to settlement or trial numerous product liability cases over the years.

- At the end of its fiscal year 2017, J&J reported more than 109,000 active plaintiffs across a range of significant product liability cases,[1] and talc-related cases made up only 6,610 of those cases (see table below).

  - Since then, although talc cases have increased meaningfully, J&J has managed to reduce the number of total plaintiffs across all significant product liability cases.

  - The number of non-talc plaintiffs dropped from 103,300 to 36,800 (a 64% decrease) from 2017 to 3Q 2021, due primarily to the reduction in claims related to pelvic mesh devices.

## J&J Significant Product Liability Plaintiffs by Product

| Product | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Q3 2021[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DePuy ASR | 4,700 | 10,750 | 12,340 | 11,200 | 5,300 | 2,000 | 2,000 | 1,800 | 1,100 | 560 | 300 |
| PINNACLE | 860 | 3,300 | 5,560 | 7,300 | 8,700 | 9,400 | 10,000 | 10,500 | 10,300 | 7,800 | 5,400 |
| RISPERDAL | 420 | 425 | 500 | 1,200 | 10,700 | 18,500 | 13,700 | 13,400 | 11,900 | 9,300 | 9,000 |
| Pelvic Meshes | 480 | 4,000 | 28,810 | 36,600 | 46,700 | 54,800 | 53,600 | 34,800 | 17,600 | 14,900 | 10,700 |
| XARELTO | | | | | 5,000 | 16,900 | 22,900 | 25,600 | 29,000 | 12,600 | 6,600 |
| Talc | | | | | | 3,100 | 6,610 | 13,000 | 17,900 | 25,000 | 38,200 |
| INVOKANA | | | | | | | 1,100 | 1,050 | 400 | 300 | 100 |
| PHYSIOMESH | | | | | | | | 2,100 | 3,300 | 4,200 | 4,700 |
| **Total** | **6,460** | **18,475** | **47,210** | **56,300** | **76,400** | **104,700** | **109,910** | **102,250** | **91,500** | **74,660** | **75,000** |

**32% reduction**

*Source: Company SEC filings*
*(1)   For the avoidance of doubt, this does not include the approximate 3,300 lawsuits filed against J&J regarding its opioid-related products and practices*
*(2)   Data for FY 2021 is not yet available at the time of this report*

- Michelle Ryan - SNS
- David Kaplan        Johnson & Johnson    Conversation ①   7/19/2021
- Sherman Murphy
- Art Wang/Sulip him              14 News

Treasurer - was surprised to see it   (Reference to Brede of P
        - No comment                                    Liabilities )
        7 - confirmation
            - shampoo
            - Skin Suntan lotion  ] right

co feel - egregious outrageous
n feel failed by courts
seek to cap liability -
        all will have to go through state court
approval legal remedy

        reorg - are subsidiary
        @ Texas corp -
        split - 2
        [ one gets assets liability ]
        Funded -
            Third party - current + future
                            Liability
            [ Best estimate ]
            Timing / deline

May conclude even do

debt - amounts - a couple billion [ 5 Billion ]
        Cap + be done with it

No accrual
        @ under - Asbestos

EXHIBIT
746

CONFIDENTIAL                                    SPGI0001150_0001

②

asbestos
Ovarian - Not all to be asbestos ] all tolc

Timing -                                    Limited - to Asbestos
        soon as possible - early to mid - Q4 -
                                3 - months
        Many cases - Lawyers - to be more
                        aggressive, ~~~~~~~~
        don't expect ~~~~ many more cases

Texas -
        Ensure whether need lender Consent

JWS - has no Command
        - Rumors -

Pockg's - disaggregated                     ⌐ WR Grace

            Trane                           ├ defined recurse
            Cervisa
                    - honeywell ·          ↗ auto - garrod Notion
                                            [O1 glora]
                                            - Liabilities
                                            - Senior

CDR - [News]

    - CRA - ⌐
            Sensitivities - [Modest] - hold
    [Rumer] - #5 Billion
            ⌐                       - 1b -
            └ Reputation

| From: | Ryan, Michelle [JJCUS] </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=47BEC354062F489489BC6D904992C1F5-MRYAN1> |
|---|---|
| To: | Levesque, Michael |
| Sent: | 7/19/2021 5:12:22 PM |
| Subject: | RE: Litigation follow-up |

Thanks, will do

Michelle

CONFIDENTIAL

**From:** Levesque, Michael <Michael.Levesque@moodys.com>
**Sent:** Monday, July 19, 2021 1:08 PM
**To:** Ryan, Michelle [JJCUS] <MRyan1@its.jnj.com>
**Subject:** [EXTERNAL] RE: Litigation follow-up

Thanks Michelle.

The short answer is that we are highly likely to evaluate such a development using a fundamental approach (cash outflow, impact on balance sheet, credit metrics etc.). So the technical aspect of a bankruptcy in and of itself does not add any extra concern -- apart from issues that could be problematic in the debt agreements. So as you continue that analysis we would still be interested in what you learn and whether any waivers or modifications need to be sought. Happy to chat further if you like.

Michael

**From:** Ryan, Michelle [JJCUS] <MRyan1@its.jnj.com>
**Sent:** Monday, July 19, 2021 9:59 AM
**To:** Levesque, Michael <Michael.Levesque@moodys.com>
**Subject:** RE: Litigation follow-up

**CAUTION:** This email originated from outside of Moody's. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Michael – sorry it has taken me a while to follow up on this question.  We are looking at a number of ways of capping our talc liability, especially with the recent disappointing Supreme Court inaction on our case. One scenario being considered would be to capture the liability in one subsidiary, and fund that subsidiary for current and future losses, and then basically bankrupt that subsidiary.  This is possible under Texas bankruptcy law related to asbestos claims specifically.  We have not determined that this will be our approach.  We are currently exploring the implications if we did take a step like this, to all aspects of our business, including debt and revolver agreements. Please let me know if you wild like to discuss further.  Also, please let me know, if you can, how Moody's would view an action such this… meaning, would there be an impact on our credit rating or how Moody's views J&J from a financial policy perspective

Thanks very much

Michelle

**From:** Levesque, Michael <Michael.Levesque@moodys.com>
**Sent:** Thursday, July 1, 2021 1:39 PM



LTL 0030195

Case 23-30092-MBK   Doc 589-30   Filed 04/04/23   Entered 04/04/23 15:58:26   Desc Main
To: Ryan, Michelle [JJCUS] <MRyan1@i... Document 30   Page 335 of 506
Subject: [EXTERNAL] Litigation follow-up

Michelle,

We had a technical question related to the debt agreements, and whether there would be potential for any channeling injunction scenarios to cause technical breaches or the listed events of default. We realize the contemplated scenario involves a subsidiary other than a J&J subsidiary, but we were thinking through what happens in the event the process went through and involved a J&J subsidiary after all.

While the bond indenture events of default looked extremely straightforward (referring only to the bankruptcy of J&J itself), the revolving credit agreement lists a lot of other scenarios that would be an event of default, some referring to any named Borrowers and some to Significant Subsidiaries; these are listed in Section 6. For example:

6e refers to a Borrower or Significant Subsidiary being unable to pay its debt
6f refers to a Borrower or Significant Subsidiary voluntarily filing for Chapter 11

We were curious whether these can be ruled out as issues (and under what basis) or whether some type of amendment would be needed. Also whether we may have missed anything else in the credit agreement or bond indenture.

Thank you in advance,
Michael


**From:** Ryan, Michelle [JJCUS] <MRyan1@its.jnj.com>
**Sent:** Wednesday, June 2, 2021 12:03 PM
**To:** Levesque, Michael <Michael.Levesque@moodys.com>
**Subject:** Question

Michael – I spoke to our legal team on your Imerys question.  They confirmed that wat we are negotiating is: the bankruptcy is filed by Imerys, not a JNJ company, and we step in to cover obligations of Imerys.  Please let me know if you have any other questions

Michelle
-------------------------------------------
Moody's monitors email communications through its networks for regulatory compliance purposes and to protect its customers, employees and business and where allowed to do so by applicable law. The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.
-------------------------------------------
-------------------------------------------
Moody's monitors email communications through its networks for regulatory compliance purposes and to protect its customers, employees and business and where allowed to do so by applicable law. The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no

responsibility and have no liability for any transmission offered via this e-mail message.

--------------------------------------------

LTL 0030197

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                          .    Case No. 21-30589(MBK)
                                .
LTL MANAGEMENT LLC,             .
                                .
          Debtor.              .
. . . . . . . . . . . . . .    .
LTL MANAGEMENT, LLC,           .    Adversary No. 21-03032(MBK)
                                .
          Plaintiff,           .
                                .    Clarkson S. Fisher U.S.
v.                              .      Courthouse
                                .    402 East State Street
THOSE PARTIES LISTED ON         .    Trenton, NJ 08608
APPENDIX A TO THE               .
COMPLAINT, ET AL.,              .
                                .
          Defendants.          .    Tuesday, February 15, 2022
. . . . . . . . . . . . . .    .    9:05 a.m.

                  TRANSCRIPT OF TRIAL DAY TWO
          BEFORE THE HONORABLE MICHAEL B. KAPLAN
          UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Jones Day
                         By:  GREGORY M. GORDON, ESQ.
                              DANIEL B. PRIETO, ESQ.
                              AMANDA RUSH, ESQ.
                         2727 North Harwood Street, Suite 500
                         Dallas, TX 75201

                         Skadden, Arps, Slate, Meagher &
                          Flom LLP and Affiliates
                         By:  ALLISON M. BROWN, ESQ.
                         One Manhattan West
                         New York, NY  10001-8602

Audio Operator:          Wendy Romero

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**
**(609) 586-2311   Fax No. (609) 587-3599**

Case 2:23-cv-01092-WBK   Document 94-31   Filed 00/07/23/25   Entered 00/07/23/25 03:02:12   Desc Main
Document 31   Page 338 of 506

1  sector around the world.

2  Q    And, Mr. Mongon, I was surprised to hear how many of those

3  employees report to you.  Would you share that with us, please?

4  A    Directly around 8,000.  The others are in manufacturing,

5  other areas that do not report directly to me but work on

6  behalf of the business.

7  Q    And would you tell us -- we saw some slides yesterday, but

8  can you give us an idea of some of the products that the

9  Consumer Health sector makes that we might all know about?

10 A    So we have over-the-counter products.  You may know

11 Tylenol, Motrin, Nicorette outside the United States and

12 others.  We have skin health and beauty products, Neutrogena,

13 Aveeno, Lubriderm, and others.  And we have all -- you know,

14 other brands that you may not be as familiar with in other

15 parts of the world; and -- and what we call specialty products

16 or babycare products, Johnson's Baby, what's what we are

17 talking about here today; feminine care products, OB, Carefree,

18 Stayfree; oral health products like Listerine; and wound-care

19 products like Band-Aid.

20 Q    So that sounds like a lot.  Could you estimate how many

21 products?

22 A    Thousands of products.

23 Q    As I understand it, Mr. Mongon, you actually have

24 experience in each one of the three sectors at Johnson &

25 Johnson?

Kim - Cross/Jonas                    201

1  shell.  It's got no reason to exist, and so it disappeared.

2  Q    Let me ask you, why -- do you understand that Chenango Two

3  then merged into Currahee --

4  A    Yeah.

5  Q    -- and changed its name back to Johnson & Johnson Consumer

6  Products, Inc.?

7  A    Yes, because -- and do you want to -- I'm sorry.  Yes.

8  Q    And why was it --

9  A    Yeah.

10 Q    -- necessary to change its name back to Johnson & Johnson

11 Consumer Products?

12 A    Yeah.  So as I stated in the first day declaration, the

13 whole purpose of the restructuring was to enable LTL, the

14 company, to file for bankruptcy without subjecting the rest of

15 the assets of JJCI to the bankruptcy procedure.  In order to

16 get there, you had a series of transactions so that the entity

17 that was formerly JJCI and the entity that is the new JJCI were

18 both -- virtually identical except for it no longer had the

19 talc liabilities.  So in order to do that, you had to create

20 other companies, one a New Jersey company, so that once the

21 assets were split, the company that had the non-talc

22 liabilities could merge back into the New Jersey company so

23 that it became another -- a New Jersey company again.  So

24 that's the purpose of the transaction.

25        MR. JONAS:  Your Honor, it's 4:30.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
IN RE:                      .      Case No. 21-30589(MBK)
                            .
LTL MANAGEMENT LLC,         .
                            .
         Debtor.            .
. . . . . . . . . . . . . . .
LTL MANAGEMENT, LLC,        .      Adversary No. 21-03032(MBK)
                            .
         Plaintiff,         .
                            .      Clarkson S. Fisher U.S.
     v.                     .       Courthouse
                            .      402 East State Street
THOSE PARTIES LISTED ON     .      Trenton, NJ 08608
APPENDIX A TO THE           .
COMPLAINT, ET AL.,          .
                            .
         Defendants.        .      February 14, 2022
. . . . . . . . . . . . . .        9:30 a.m.
```

TRANSCRIPT OF TRIAL DAY ONE
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtor:         Jones Day
                        By:  GREGORY M. GORDON, ESQ.
                             DANIEL B. PRIETO, ESQ.
                             AMANDA RUSH, ESQ.
                        2727 North Harwood Street, Suite 500
                        Dallas, TX 75201

                        Skadden, Arps, Slate, Meagher &
                         Flom LLP and Affiliates
                        By:  ALLISON M. BROWN, ESQ.
                        One Manhattan West
                        New York, NY  10001-8602

Audio Operator:         Wendy Romero
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

 1  Q    Okay.  So let me just ask you, we looked at this entity
 2  here Johnson & Johnson Consumer, Inc.  That's our old friend
 3  Chenango Two, right?
 4  A    Yes.
 5  Q    Chenango Two changed its name, converted.  It went back to
 6  being JJCI, right?
 7  A    Yeah.  We refer to it as New JJCI.
 8  Q    New JJCI.  Okay.  All right.  We'll come back, we'll spend
 9  a little time a little later on that.  The debtor uses some
10  hoteling space in a Johnson & Johnson building in New Jersey,
11  right?
12  A    Yes.
13  Q    There's no sign on the space that says LTL or anything
14  like that, right?
15  A    No.
16  Q    You don't keep any files in that space, right?
17  A    I don't personally.
18  Q    And there's no LTL desk there, right?
19  A    There's offices and there's desk space available if we
20  need it.
21  Q    There's just general space there.  There's no LTL office,
22  right?
23  A    That's how J&J operates its buildings.
24  Q    Right.  It's J&J building, right?
25  A    JJCI does not say JJCI.  I mean, it's just --

1  Q    There's no LTL filing cabinet there, is there?

2  A    I don't know.  There may be.  Our CFO might have one.

3  Q    Really?

4  A    Mm-mm.

5  Q    Well, let's take a look because you told me that once

6  before.  And I do want to get this right.  So if we look at

7  your deposition transcript Page 50, Line 13.

8  "Q    Okay, so far as you know, and I appreciate you may need to

9  check with others, but as far as you know there's no LTL

10  office, LTL desk, LTL filing cabinet, or any other owned office

11  materials by LTL."

12  Q    Could you read your answer?

13  A    Yes.  Mm-mm.

14  Q    Could you read your answer?

15  A    Oh.

16  "A    Yes.  So far as you know" -- oh, that's your question.

17  Q    No.  Line 18.  Read your answer.

18  "A    Correct.  And that's consistent with how J&J operates."

19  A    So if I can clarify.

20  Q    Nope.  Your lawyers will have an opportunity to redirect

21  you and you can certainly clarify.

22  A    Okay.

23  Q    Okay.  LTL doesn't have any employees, correct?

24  A    Correct.

25  Q    LTL has no bank debt, correct?

1   A   Correct.

2   Q   LTL has no bond debt, correct?

3   A   To my knowledge, no.

4   Q   LTL has no lease, no landlord, correct?

5   A   We have office space, but, no, no direct lease.  Yeah.

6   Q   No lease, right?

7   A   No lease.

8   Q   LTL doesn't have any past due taxes owing, right?

9   A   No.

10  Q   LTL doesn't have any pension type liabilities, right?

11  A   Not to my knowledge.

12  Q   LTL doesn't have any trade creditors, right?

13  A   No.

14  Q   Mr. Wuesthoff prior to this date you didn't have any

15  direct experience with Chapter 11 Bankruptcy, right?

16  A   Correct.

17  Q   You don't know what fiduciary duty means, right?

18  A   I do know what it means.

19  Q   At your deposition when I asked you if you knew what

20  fiduciary duty means you did not know.

21  A   I looked it up since.

22  Q   You looked it up since.  Okay.  You're not familiar what

23  the duty of care is, right?

24  A   Not sure.

25  Q   Have you looked that one up?

# UNITED STATES BANKRUPTCY COURT

THE ___ DISTRICT OF ___ NEW JERSEY ___

In Re. LTL Management LLC §
§
§
§
_____
Debtor(s)

Case No. 21-30589 ___

☐ Jointly Administered

## Monthly Operating Report

Chapter 11

Reporting Period Ended: 10/31/2021 ___       Petition Date: 10/14/2021 ___

Months Pending: 1       Industry Classification: 6 7 1 9

Reporting Method:       Accrual Basis ⦿       Cash Basis ○

Debtor's Full-Time Employees (current):       0 ___

Debtor's Full-Time Employees (as of date of order for relief):       0 ___

### Supporting Documentation (check all that are attached):

(For jointly administered debtors, any required schedules must be provided on a non-consolidated basis for each debtor)

☒ Statement of cash receipts and disbursements
☒ Balance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficit
☒ Statement of operations (profit or loss statement)
☐ Accounts receivable aging
☐ Postpetition liabilities aging
☐ Statement of capital assets
☐ Schedule of payments to professionals
☐ Schedule of payments to insiders
☒ All bank statements and bank reconciliations for the reporting period
☐ Description of the assets sold or transferred and the terms of the sale or transfer

/s/ James Lawlor ___
Signature of Responsible Party

11/23/2021 ___
Date

James Lawlor ___
Printed Name of Responsible Party

90 Washington Valley Road, Bedminster, NJ 07921 ___
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

Debtor's Name LTL Management LLC            Case No. 21-30589

| Part 1: Cash Receipts and Disbursements | Current Month | Cumulative |
|---|---|---|
| a. Cash balance beginning of month | $6,000,000 | |
| b. Total receipts (net of transfers between accounts) | $0 | $0 |
| c. Total disbursements (net of transfers between accounts) | $0 | $0 |
| d. Cash balance end of month (a+b-c) | $6,000,000 | |
| e. Disbursements made by third party for the benefit of the estate | $0 | $0 |
| f. Total disbursements for quarterly fee calculation (c+e) | $0 | $0 |

| Part 2: Asset and Liability Status (Not generally applicable to Individual Debtors. See Instructions.) | Current Month |
|---|---|
| a. Accounts receivable (total net of allowance) | $2,002,404,286 |
| b. Accounts receivable over 90 days outstanding (net of allowance) | $0 |
| c. Inventory (Book ○ Market ○ Other ◉ (attach explanation)) | $0 |
| d. Total current assets | $2,008,404,286 |
| e. Total assets | $2,375,533,231 |
| f. Postpetition payables (excluding taxes) | $2,404,286 |
| g. Postpetition payables past due (excluding taxes) | $0 |
| h. Postpetition taxes payable | $0 |
| i. Postpetition taxes past due | $0 |
| j. Total postpetition debt (f+h) | $2,404,286 |
| k. Prepetition secured debt | $0 |
| l. Prepetition priority debt | $0 |
| m. Prepetition unsecured debt | $8,275,800 |
| n. Total liabilities (debt) (j+k+l+m) | $10,680,085 |
| o. Ending equity/net worth (e-n) | $2,364,853,146 |

| Part 3: Assets Sold or Transferred | Current Month | Cumulative |
|---|---|---|
| a. Total cash sales price for assets sold/transferred outside the ordinary course of business | $0 | $0 |
| b. Total payments to third parties incident to assets being sold/transferred outside the ordinary course of business | $0 | $0 |
| c. Net cash proceeds from assets sold/transferred outside the ordinary course of business (a-b) | $0 | $0 |

| Part 4: Income Statement (Statement of Operations) (Not generally applicable to Individual Debtors. See Instructions.) | Current Month | Cumulative |
|---|---|---|
| a. Gross income/sales (net of returns and allowances) | $0 | |
| b. Cost of goods sold (inclusive of depreciation, if applicable) | $0 | |
| c. Gross profit (a-b) | $0 | |
| d. Selling expenses | $0 | |
| e. General and administrative expenses | $31,504 | |
| f. Other expenses | $5,754 | |
| g. Depreciation and/or amortization (not included in 4b) | $0 | |
| h. Interest | $0 | |
| i. Taxes (local, state, and federal) | $0 | |
| j. Reorganization items | $2,332,369 | |
| k. Profit (loss) | $-2,369,627 | $-2,369,627 |

UST Form 11-MOR (06/07/2021)        2

Debtor's Name  LTL Management LLC                                              Case No.  21-30589

## Part 5:  Professional Fees and Expenses

|   |   |   | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|
| a. | Debtor's professional fees & expenses (bankruptcy)  *Aggregate Total* | | $0 | $0 | $0 | $0 |
|   | *Itemized Breakdown by Firm* | | | | | |
|   | Firm Name | Role | | | | |
|   | i | | | $0 | $0 | $0 | $0 |
|   | ii | | | $0 | $0 | $0 | $0 |

|   |   |   | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|
| b. | Debtor's professional fees & expenses (nonbankruptcy)  *Aggregate Total* | | $0 | $0 | $0 | $0 |
|   | *Itemized Breakdown by Firm* | | | | | |
|   | Firm Name | Role | | | | |
|   | i | | | $0 | $0 | $0 | $0 |
|   | ii | | | $0 | $0 | $0 | $0 |
| c. | All professional fees and expenses (debtor & committees) | | $0 | $0 | $0 | $0 |

## Part 6:  Postpetition Taxes

|   |   | Current Month | Cumulative |
|---|---|---|---|
| a. | Postpetition income taxes accrued (local, state, and federal) | $0 | $0 |
| b. | Postpetition income taxes paid (local, state, and federal) | $0 | $0 |
| c. | Postpetition employer payroll taxes accrued | $0 | $0 |
| d. | Postpetition employer payroll taxes paid | $0 | $0 |
| e. | Postpetition property taxes paid | $0 | $0 |
| f. | Postpetition other taxes accrued (local, state, and federal) | $0 | $0 |
| g. | Postpetition other taxes paid (local, state, and federal) | $0 | $0 |

## Part 7: Questionnaire - During this reporting period:

a.  Were any payments made on prepetition debt?  (if yes, see Instructions)     Yes ○  No ◉

b.  Were any payments made outside the ordinary course of business without court approval?  (if yes, see Instructions)     Yes ○  No ◉

c.  Were any payments made to or on behalf of insiders?     Yes ○  No ◉

d.  Are you current on postpetition tax return filings?     Yes ◉  No ○

e.  Are you current on postpetition estimated tax payments?     Yes ◉  No ○

f.  Were all trust fund taxes remitted on a current basis?     Yes ◉  No ○

g.  Was there any postpetition borrowing, other than trade credit? (if yes, see Instructions)     Yes ○  No ◉

h.  Were all payments made to or on behalf of professionals approved by the court?     Yes ○  No ○  N/A ◉

i.  Do you have:          Worker's compensation insurance?     Yes ◉  No ○

            If yes, are your premiums current?     Yes ◉  No ○  N/A ○  (if no, see Instructions)

        Casualty/property insurance?     Yes ◉  No ○

            If yes, are your premiums current?     Yes ◉  No ○  N/A ○  (if no, see Instructions)

        General liability insurance?     Yes ◉  No ○

            If yes, are your premiums current?     Yes ◉  No ○  N/A ○  (if no, see Instructions)

j.  Has a plan of reorganization been filed with the court?     Yes ○  No ◉

UST Form 11-MOR (06/07/2021)                                    3

| Debtor's Name LTL Management LLC | | Case No. 21-30589 |
| --- | --- | --- |

k.   Has a disclosure statement been filed with the court?    Yes ○  No ◉

l.   Are you current with quarterly U.S. Trustee fees as    Yes ◉  No ○
    set forth under 28 U.S.C. § 1930?

## Part 8: Individual Chapter 11 Debtors (Only)

| | | |
| --- | --- | --- |
| a. | Gross income (receipts) from salary and wages | $0 |
| b. | Gross income (receipts) from self-employment | $0 |
| c. | Gross income from all other sources | $0 |
| d. | Total income in the reporting period (a+b+c) | $0 |
| e. | Payroll deductions | $0 |
| f. | Self-employment related expenses | $0 |
| g. | Living expenses | $0 |
| h. | All other expenses | $0 |
| i. | Total expenses in the reporting period (e+f+g+h) | $0 |
| j. | Difference between total income and total expenses (d-i) | $0 |
| k. | List the total amount of all postpetition debts that are past due | $0 |

l.   Are you required to pay any Domestic Support Obligations as defined by 11    Yes ○  No ◉
    U.S.C § 101(14A)?

m.   If yes, have you made all Domestic Support Obligation payments?    Yes ○  No ○  N/A ◉

### Privacy Act Statement

28 U.S.C. § 589b authorizes the collection of this information, and provision of this information is mandatory under 11 U.S.C. §§ 704, 1106, and 1107. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6). The United States Trustee will also use this information to evaluate a chapter 11 debtor's progress through the bankruptcy system, including the likelihood of a plan of reorganization being confirmed and whether the case is being prosecuted in good faith. This information may be disclosed to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." See 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**<ins>I declare under penalty of perjury that the foregoing Monthly Operating Report and its supporting documentation are true and correct and that I have been authorized to sign this report on behalf of the estate.</ins>**

/s/ Richard Dickinson                                      Richard Dickinson
_____                      _____
Signature of Responsible Party                          Printed Name of Responsible Party

Chief Financial Officer                                    11/23/2021
_____                      _____
Title                                                          Date

| In re | **LTL Management LLC** | **Case No.** | **21-30589 (MBK)** |
|---|---|---|---|
| | **Debtor** | **Reporting Period:** | **October 14 - 31, 2021** |

## DEBTOR'S SCHEDULE OF CASH RECEIPTS AND DISBURSEMENTS

| *Dollars in Millions* | **LTL Management LLC Acct. 3987** |
|---|---|
| **Total Receipts** | 0.00 |
| **Total Disbursements** | 0.00 |
| **Change in Cash** | |
| Beginning Cash (Book) | 6.00 |
| Net Cash Flow | 0.00 |
| **Ending Cash (Book)** | $ 6.00 |

In re  **LTL Management LLC**                    Case No.              **21-30589 (MBK)**
**Debtor**                                       Reporting Period:     **October 14 - 31, 2021**

---

**LTL Management LLC**

**Balance Sheet**
*(Dollars in Millions)*

| Assets | October 31, 2021 |
|---|---:|
| Current Assets | |
| Cash | $            6.00 |
| Due From Subsidiary | 0.03 |
| Due From Parent | 2,002.37 |
| Total Current Assets | 2,008.40 |
| Investment in Subsidiary | 367.13 |
| **Total Assets** | $      2,375.53 |
| **Liabilities & Shareholders Equity** | |
| Accounts Payable | 2.33 |
| Due to Affiliate | 0.07 |
| Liabilities Subject to Compromise | 8.28 |
| **Total Liabilities** | $          10.68 |
| Shareholders Equity | |
| Paid in Capital | 2,373.13 |
| Accumulated Deficit | (8.28) |
| **Total Shareholders Equity** | $      2,364.85 |
| **Total Liabilities & Shareholders Equity** | $      2,375.53 |

---

**LTL Management LLC**

**Statement of Operations (Profit or Loss Statement)**
*(Dollars in Millions)*

| | October 14 - 31, 2021 |
|---|---:|
| **Income** | |
| Total Income | $                 - |
| **Expenses** | |
| Financial Services | 0.01 |
| General & Adminstrative | 0.03 |
| **Earnings Before Reorganization Items** | **(0.04)** |
| **Reorganization Items** | |
| Legal Expenses | 2.33 |
| **Income/Loss Before Provision for Taxes** | (2.37) |
| Provision for Taxes on Income/Loss | - |
| **Net Income/Loss** | $           (2.37) |



**BANK OF AMERICA**

P.O. Box 15284
Wilmington, DE 19850

**Customer service information**

📱 Customer service: 1.888.400.9009

✉️ bankofamerica.com

✉️ Bank of America, N.A.
P.O. Box 1091
Charlotte, N.C. 28254-3489

JOHNSON & JOHNSON CONSUMER INC.
199 GRANDVIEW RD
SKILLMAN, NJ 08558-1303

🔔 Please see the **Important Messages – Please Read** section of your statement for important details that could impact you.

# Your Full Analysis Business Checking

for October 8, 2021 to October 31, 2021          Account number: ███████ 3987

**JOHNSON & JOHNSON CONSUMER INC.**

## Account summary

| | | | |
|---|---|---|---|
| Beginning balance on October 8, 2021 | $0.00 | # of deposits/credits: 1 | |
| Deposits and other credits | 6,000,000.00 | # of withdrawals/debits: 0 | |
| Withdrawals and other debits | -0.00 | # of days in cycle: 24 | |
| Checks | -0.00 | Average ledger balance: $5,000,000.00 | |
| Service fees | -0.00 | | |
| **Ending balance on October 31, 2021** | **$6,000,000.00** | | |

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

**How to Contact Us** - You may call us at the telephone number listed on the front of this statement.

**Updating your contact information** - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking.

**Deposit agreement** - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our financial centers.

**Electronic transfers: In case of errors or questions about your electronic transfers** - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

- Tell us your name and account number.
- Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will provisionally credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting other problems** - You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you and you agree to not make a claim against us, for the problems or unauthorized transactions.

**Direct deposits** - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us to find out if the deposit was made as scheduled. You may also review your activity online or visit a financial center for information.

© 2021 Bank of America Corporation

Bank of America, N.A. Member FDIC and ⌂ Equal Housing Lender



## Your checking account

████████████████████████████████████████

## Deposits and other credits

| Date | Transaction description | Customer reference | Bank reference | Amount |
|------|------------------------|--------------------|----------------|--------|
| 10/12/21 | WIRE TYPE:BOOK IN ████████████ | | ████████████ | 6,000,000.00 |
| | ████████████ ORIG:Johnson n Johnson | | | |
| | DET:Intra  company funding | | | |

**Total deposits and other credits**  **$6,000,000.00**

## Daily ledger balances

| Date | Balance ($) |
|------|-------------|
| 10/12 | 6,000,000.00 |

This page intentionally left blank

## Important Messages - Please Read

We want to make sure you stay up-to-date on changes, reminders, and other important details that could impact you.

Effective December 2021, the Deposit Agreement and Disclosures booklet (Agreement), which governs your analyzed business account, has been updated. The account will continue to be subject to the Agreement as updated from time to time. Please contact your account representative to receive the updated version or summary of changes. Effective December 1, 2021 the updated version can be found by logging into bofaml.com/depositagreement. Continued use of this account indicates your agreement to be bound by the terms and conditions contained in the Agreement.

This page intentionally left blank

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**MONTHLY OPERATING REPORT**

# GLOBAL NOTES AND STATEMENTS OF LIMITATIONS AND DISCLAIMERS REGARDING THE DEBTOR'S MONTHLY OPERATING REPORT

LTL Management LLC, the debtor (the "**Debtor**") in the above-referenced chapter 11 case (the "**Chapter 11 Case**"), with the assistance of its advisors, is filing  this Monthly Operating Report ("**MOR**") with the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), pursuant to section 521 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") and Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

These *Global Notes and Statements of Limitations and Disclaimers Regarding the Debtor's Monthly Operating Report* (the "**Global Notes**") pertain to, are incorporated by reference in, and comprise an integral part of the MOR.  The Global Notes should be referred to, considered, and reviewed in connection with any review of the MOR.

The MOR does not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles in the United States ("**GAAP**"), nor is it intended to be fully reconciled with the financial statements of the Debtor.

1.      **General Methodology**: The Debtor is filing this MOR to comply with the applicable reporting requirements in the Chapter 11 Case. The financial information contained herein is unaudited, limited in scope, and as such, has not been subjected to procedures that would typically be applied to financial statements in accordance with GAAP. The MOR should not be relied on by any person for information relating to current or future financial condition, events, or performance of the Debtor or its affiliates, as the results of operations contained herein are not necessarily indicative of results that may be expected from any other period or for the full year, and may not necessarily reflect the combined results of operations, financial position, and schedule of receipts and disbursements in the future. There can be no assurance that such information is complete, and the MOR may be subject to revision. The Global Notes should be referred to, and referenced in connection with, any review of the MOR.

2.      **Basis of Presentation**: The Debtor is maintaining its books and records in accordance with GAAP and the information furnished in this MOR uses the Debtor's normal accrual method of accounting. In preparing the MOR, the Debtor relied on financial data derived from its books and records that was available at the time of preparation. Nevertheless, in preparing this MOR, the Debtor made reasonable efforts to supplement the information set forth in its books and records with additional information concerning transactions that may not have been identified therein. Subsequent information may result in material changes to the MOR and errors or omissions may exist.

3.      **Reporting Period**: Unless otherwise noted herein, the MOR generally reflects the Debtor's books and records and financial activity occurring during the applicable reporting period. Except as otherwise noted, no adjustments have been made for activity occurring after the close of the reporting period.

4.      **Accuracy**: The financial information disclosed herein was not prepared in accordance with federal or state securities laws or other applicable non-bankruptcy law or in lieu of complying with any periodic reporting requirements thereunder. Persons and entities trading in or otherwise purchasing, selling, or transferring the claims against the Debtor should evaluate this financial information in light of the purposes for which it was prepared. The Debtor is not liable for and undertakes no responsibility for any evaluations of the Debtor based on this financial information or any other information.

5.      **Accounts Receivable, Postpetition Payables and Funding Agreement**:  The Debtor is party to a funding agreement (the "**Funding Agreement**") with Johnson & Johnson Consumer Inc. ("**New JJCI**") and Johnson & Johnson (together with New JJCI, the "**Payors**").  A copy of the Funding Agreement is attached as Annex 2 to the Declaration of John K. Kim in Support of First Day Pleadings [Dkt. 5] (the "**First Day Declaration**").  Among other things, the Funding Agreement obligates the Payors, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case.  The terms of the Funding Agreement are described in detail in the First Day Declaration.  The Funding Agreement imposes no repayment obligation on the Debtor.  The amount reported in part 2.a. represents (a) the amount of proposed funding of a qualified settlement fund for payment of talc claims, which, if approved, will be considered pre-funding for Permitted Funding Uses (as such term is defined in the Funding Agreement) and treated as a Payment (as such term is defined in the Funding Agreement) for all purposes, (b) the estimated funding under the Funding Agreement in respect of the accrued amount of postpetition retained professionals' fees during the reporting period  and (c) the estimated funding under the Funding Agreement in respect of amounts payable by the Debtor under the Debtor's secondment agreement (the "**Secondment Agreement**") with Johnson & Johnson Services, Inc. ("**J&J Services**") and the Debtor's services agreement (the "**Services Agreement**") with J&J Services.  The postpetition payable amount reported in part 2.f. includes the amounts described in (b) and (c) of the immediately preceding sentence.  Postpetition professional fees remain subject to further reconciliation and, as to retained professionals, will be subject to certain procedures to be set forth in an order of the Court regarding interim compensation.  The amount in part 2.a. does not reflect any other amounts that the Debtor may be entitled to under the Funding Agreement.  The Services Agreement and the Secondment Agreement are described in the First Day Declaration.

6.      **Total Current Assets and Total Assets**:  The amounts reported in parts 2.d. and 2.e. represent, respectively (a) the amount of the Debtor's accounts receivable reported in part 2.a. plus the amount of the Debtor's cash as of October 31, 2021, and (b) the amounts reported in part 2.d. plus the estimated value of the Debtor's equity in its subsidiary Royalty A&M LLC ("**RAM**").  Any additional amounts available to the Debtor under the Funding Agreement are not reflected in the reported assets.  The amount reported on the balance sheet as Due from Subsidiary represents the amount due from RAM to the Debtor in connection with the Secondment Agreement.

7.      **Prepetition Unsecured Debt and Liabilities Subject to Compromise ("LSTC")**:  The amount reported in part 2.m. and as LSTC in the attached balance sheet represents the total amount of outstanding prepetition professionals fees on the Debtor's books and records. This amount differs from the total amount reported by professionals in their retention applications.  The total amount reported by professionals exceeds the amount reflected in the Debtor's books and records, and may include amounts not invoiced to the Debtor as of the commencement of the Chapter 11 Case or other amounts potentially not payable by the Debtor. To the extent the professional fees were incurred in a joint representation with Johnson & Johnson, some or all of the prepetition professionals' fees may be satisfied by Johnson & Johnson consistent with its obligations to such professionals. Amounts reported as Prepetition Unsecured Debt or LSTC do not include any amount for the Debtor's talc-related liability.  Prepetition liabilities that are subject to compromise under ASC 852 are preliminary and may be subject to, among other things, future adjustments depending on Court actions, further developments with respect to disputed claims, rejection of executory contracts, continued reconciliation or other events.

8.      **Bank Account Statement**:  The attached bank statement is in the name of Johnson & Johnson Consumer Inc. ("**Old JJCI**") because the Debtor's bank account was opened by Old JJCI.  On October 12, 2021, Old JJCI completed a corporate restructuring (the "**2021 Corporate Restructuring**"), as a result of which Old JJCI ceased to exist and the Debtor and New JJCI were formed. The Debtor received certain assets in that restructuring, including Old JJCI's bank account at Bank of America, N.A. The Debtor is in the process of updating the bank account information to reflect the Debtor's name. The 2021 Corporate Restructuring is described in detail in the First Day Declaration.

9.      **Insurance**:  The Debtor is an additional insured on various types of insurance maintained by its ultimate parent company, Johnson & Johnson (collectively, the "**J&J Insurance Policies**").  Insurance coverage includes workers' compensation coverage, casualty/property insurance and general liability insurance as reported in part 7.i.

10.     **Amounts Reported in Part 4:** The Debtor did not have income during the reporting period.  However, funding will be available under the Funding Agreement to satisfy the Debtor's expenses, including those reported in part 4.  See notes regarding Accounts Receivable, Accounts Payable and the Funding Agreement above.  The amount reported in part 4.j. represents the estimated accrued amount of postpetition retained professionals' fees during the reporting period (also reported in part 2.f.). The amount reported in part 4.e. as general and administrative expenses represents amounts incurred under the Secondment Agreement.  The amount reported in part 4.f. as other expenses represents amounts incurred under the Services Agreement.  These expenses are also reported in the attached Statement of Operations (Profit or Loss Statement). ASC 852 requires expenses and income directly associated with the Chapter 11 Case to be reported separately in the income statement as reorganization items. Reorganization items primarily include expenses related to legal advisory and representation services, other professional consulting and advisory services, and changes in liabilities subject to compromise recognized as changes in amounts expected to be allowed as claims. Nothing contained in this MOR shall constitute a waiver of the Debtor's rights or an admission with respect to the Chapter 11 Case, including, but not limited to, matters involving objections to claims, equitable subordination, defenses, characterization or re-characterization of contracts, assumption or rejection of contracts under the provisions of chapter 3 of Title 11 of the Bankruptcy Code and/or causes of action under the provisions of chapter 5 of the Bankruptcy Code or any other relevant applicable laws to recover assets or avoid transfers.

11.     **Intercompany Transactions and Balances:** Prior to the Petition Date (and subsequent to the Petition Date, the Debtor engaged (and continues to engage) in certain intercompany transactions.  Intercompany transactions between the Debtor and its non-Debtor affiliate entities are reported in the statement of cash receipts and disbursements, the balance sheet, and statement of income (loss) contained herein.

12.     **Reservation of Rights:** The Debtor reserves all rights to amend or supplement the MOR in all respects, as may be necessary or appropriate, but shall be under no obligation to do so. Nothing contained in this MOR shall constitute a waiver of the Debtor's rights or an admission with respect to the Chapter 11 Case.

16          plan will be feasible.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 36**

36 :23      Q: Okay. Does LTL have any secured creditors?
24          A: I do not believe it does.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 37**

37 :5       Q: Okay. As the corporate representative, are you
6           aware of any secured debt that the debtor needs to
7           address or resolve within the bankruptcy?
8           A: I do not. I am not aware of any.
9           Q: Are you aware of any asset that LTL owns that
10          is subject to a lien or security interest of any kind?
11          A: I do not believe that there are any, no.
12          Q: Okay. Does LTL have any trade creditors?
13          A: I do not believe it does.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 45**

45 :10      Other than contracts that concern claims
11          based on talc and intercompany agreements, is LTL party
12          to any other contract that you're aware of?
13          A: I am not aware of any.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 45**

45 :15      LTL has no employees, correct?
16          MS. BROWN: Objection, foundation.
17          A: LTL's employees that have been seconded to it
18          from Johnson & Johnson Services, Inc.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 45**

45 :21      Are you aware of any tax claims that have
22          been asserted against LTL?
23          A: I am not aware of any claims asserted.
24          Q: Okay. We talked yesterday -- not we, but other
25          lawyers and yourself spent some time on the funding
46 :1       agreement. Do you remember that?
2           A: I do recall that, yes.
3           Q: Okay. Does LTL have any reason to believe that
4           Johnson & Johnson and JJCI will not honor its
5           obligations under the funding agreement?
6           A: It has no reason to believe that Johnson &
7           Johnson and JJCI will not honor the terms of the funding
8           agreement.
9           Q: In fact, LTL expects Johnson & Johnson and JJCI
10          to honor their obligations under the funding agreement,
11          correct?
12          A: LTL does and has already undertaken -- gotten
13          funds from the funding agreement.
14          Q: Okay. Does LTL have any reason to believe that
15          Johnson & Johnson or JJCI will be unable to fulfill
16          their obligations under the funding agreement?

CONFIDENTIAL EXHIBIT

**23**

Wuesthoff, Robert 12/22/21  KLJ

### MINUTES OF BOARD OF MANAGERS

### LTL MANAGEMENT LLC,
**a North Carolina limited liability company**

The Board of Managers (the "Board") of LTL Management LLC, a North Carolina limited liability company (the "Company"), met on Thursday, October 14, 2021 by means of internet communications equipment whereby all persons participating in the meeting were able to see and hear each other.  All members of the Board – Russell Deyo, Robert Wuesthoff, and Richard Dickinson – were in attendance.

At the invitation of the Board, John Kim (the Chief Legal Officer and Secretary of the Company), participated in the meeting.  Mr. Kim presided at, and acted as secretary for, the meeting.

In addition, at the invitation of the Board, lawyers from Jones Day, the Company's outside counsel, participated in the meeting.  The participating Jones Day lawyers were Ann Bomberger, Brad Erens, Jim Jones, Troy Lewis and Dan Prieto.

### (INTRODUCTORY REMARKS AND CALL TO ORDER)

Mr. Kim welcomed the members of the Board and other meeting participants. Mr. Kim then took a roll call, and it was confirmed that a quorum of the Board was present and the meeting could be called to order.

Following the roll call, Mr. Kim called the meeting to order and reviewed the agenda, indicating that: (1) first, there would be a review of certain effects of the restructuring of Johnson & Johnson Consumer Inc., a New Jersey corporation ("Old JJCI"), which was completed on October 12, 2021 (the "Restructuring"); (2) then, Jones Day would make a presentation regarding certain protocols and guidelines commended to the Company in connection with the post-Restructuring governance and operation of the Company; (3) then, there would be a presentation regarding the Company's assets and its history with talc-related liabilities; (4) then, Mr. Kim, with the assistance of Jones Day, would review potential strategic options for addressing current and future talc claims; (5) then, Jones Day would make a presentation concerning the potential bankruptcy option, including the possible creation of a qualified settlement fund (the "QSF"); and (6) finally, Mr. Kim would ask the Board to act on resolutions

NAI-1522287543v2

authorizing the Company to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code and a motion to approve the QSF (the "Proposed Resolutions").

Mr. Kim confirmed that the Company's managers and officers had received the confidential memorandum regarding post-Restructuring protocols and guidelines (the "Privileged Memo"), drafts of the informational brief and first day declaration prepared in support of the potential chapter 11 filing, a draft of the trust agreement governing the potential QSF, and a draft of the Proposed Resolutions, each of which had been circulated to them in advance of the meeting.

Mr. Kim then introduced Mr. Prieto of Jones Day and asked that he proceed with a review of certain effects of the Restructuring.

### (REVIEW OF CERTAIN EFFECTS OF THE RESTRUCTURING)

Mr. Prieto then began with a brief overview of the Restructuring and its effects, including the cessation of existence of Old JJCI and the creation of the Company and its wholly-owned subsidiary, Royalty A&M LLC, a North Carolina limited liability company. Mr. Prieto reviewed the assets and liabilities allocated to the Company in the Restructuring, and identified the Company's legal counsel.

Mr. Prieto then provided a brief overview of the three topics addressed in the Privileged Memo to be reviewed in the Jones Day presentation – corporate governance, privileged communications and practical considerations for electronic communications. After confirming there were no questions regarding the effects of the Restructuring, Mr. Prieto then introduced Ms. Bomberger, asking her to begin the Jones Day presentation on post-Restructuring protocols and guidelines.

### (REVIEW OF POST-RESTRUCTURING PROTOCOLS AND GUIDELINES SET FORTH IN PRIVILEGED MEMO)

Ms. Bomberger summarized the corporate governance guidelines set forth in the Privileged Memo. After Ms. Bomberger confirmed there were no questions regarding the corporate governance guidelines, Mr. Prieto introduced Mr. Jones to continue the Jones Day presentation.

Mr. Jones then summarized guidelines for privileged communications and guidelines for the use of email and other electronic communications set forth in the Privileged Memo. After responding to questions regarding these guidelines, Mr. Jones confirmed there were no additional

NAI-1522287543v2

LTL 0019185

questions and returned the floor to Mr. Kim. Thereupon, Mr. Kim thanked Mr. Jones for his presentation and Mr. Jones left the meeting.

### (REVIEW OF THE COMPANY'S ASSETS AND HISTORY WITH TALC-RELATED LIABILITIES)

To begin, Mr. Kim asked Mr. Prieto to address the Company's assets. Mr. Prieto first noted his earlier presentation regarding assets allocated to the Company in the Restructuring and then provided a brief overview of the Company's insurance assets. Mr. Kim then reviewed the Company's history with talc-related liabilities. Mr. Kim's presentation addressed, among other things, the use of talc in products of the Company's predecessors, the evolution of talc-related lawsuits in the tort system, the experience of the Company's predecessors in the tort system, challenges faced by the Company's predecessors in the tort system, and historical and forecasted costs and expenses of the Company's predecessors and the Company, respectively, associated with talc-related lawsuits.

After confirming there were no questions regarding the presentation, Mr. Kim began a review of potential strategic options for addressing current and future talc claims against the Company.

### (REVIEW OF POTENTIAL STRATEGIC OPTIONS FOR ADDRESSING CURRENT AND FUTURE TALC CLAIMS)

Mr. Kim then reviewed options available to the Company with respect to the resolution of current and future talc claims, including the potential use of the Bankruptcy Code. Mr. Kim then asked Mr. Erens and Mr. Prieto to review the potential use of the Bankruptcy Code as a mechanism to resolve current and future talc claims.

Mr. Erens, with the assistance of Mr. Prieto and Mr. Lewis, then reviewed the potential use of the Bankruptcy Code as a mechanism to finally resolve current and future talc claims. As part of the presentation, Mr. Prieto reviewed section 524(g) of the Bankruptcy Code relating to asbestos, and Mr. Lewis reviewed the potential QSF. Throughout the presentation, Mr. Erens responded to comments and questions from members of the Board regarding the potential use of the Bankruptcy Code to resolve current and future talc claims.

As part of the discussion, Mr. Kim noted for the members of the Board that ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

NAI-1522287543v2

LTL 0019186

**(REVIEW OF AND ACTION ON PROPOSED RESOLUTIONS)**

At the request of Mr. Kim, Ms. Bomberger then reviewed the Proposed Resolutions, and confirmed there were no further questions from the members of the Board.  Mr. Kim then asked members of the Board for a motion to adopt the Proposed Resolutions.  Upon a motion, duly made and seconded, the following resolutions, which are identical to the form of the Proposed Resolutions circulated to members of the Board in advance of the meeting, were then adopted by the unanimous vote of the members of the Board:

**Chapter 11 Filing**

**WHEREAS,** the board of managers (the "Board") of LTL Management LLC, a limited liability company organized and existing under the laws of the State of North Carolina (the "Company") has: (1) carefully reviewed the materials and other information presented by the management and the advisors of the Company regarding the Company's talc-related liabilities, and other relevant information; (2) thoroughly evaluated the Company's strategic alternatives, including a possible bankruptcy filing; (3) conferred with the Company's management and advisors regarding these matters; and (4) determined that the filing of a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") is in the best interests of the Company and its stakeholders; and

**NOW, THEREFORE, BE IT RESOLVED,** that in the judgment of the Board, it is desirable and in the best interests of the Company, its creditors and other interested parties that the Company seek relief under the Bankruptcy Code;

**FURTHER RESOLVED,** that the Company be, and it hereby is, authorized to file a voluntary petition (the "Petition") for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the Western District of North Carolina or such other court as any of the managers of the Company, the officers of the Company and their designees (collectively, the "Authorized Persons") may determine to be necessary, desirable or appropriate (the "Bankruptcy Court") and perform any and all such other acts as any Authorized Person may determine to be necessary, desirable or appropriate to effect any of the foregoing, with the filing of such Petition or performance of such other act to be conclusive evidence of such determination; and

**FURTHER RESOLVED,** that the Authorized Persons be, and each of them hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to: (1) execute, acknowledge, deliver and verify, and cause to be filed with the Bankruptcy Court, the Petition and all other ancillary documents, with each in such form, as any Authorized Person may determine to be necessary, desirable or appropriate to carry out the intent and accomplish the purposes of these resolutions; (2) execute, acknowledge,

LTL 0019187

deliver, verify and file, or cause to be filed, all petitions, schedules, statements, lists, motions, complaints, declarations, applications, notices and other papers or documents, with each in such form, as any Authorized Person may determine to be necessary, desirable or appropriate in connection with the foregoing; and (3) execute, acknowledge, deliver and verify any and all other documents, with each in such form, as any Authorized Person may determine to be necessary, desirable or appropriate in connection therewith and to administer the Chapter 11 Case, including by executing, acknowledging, delivering, verifying and filing, or causing to be filed, such petitions, schedules, statements, lists, motions, complaints, declarations, applications, notices and other papers or documents as may be determined to be necessary, desirable or appropriate in connection with the Chapter 11 Case; all with the taking of any such action, including any such execution, acknowledgment, delivery, verification or filing, to be conclusive evidence of such determination.

**Retention of Professionals**

**RESOLVED**, that the Authorized Persons be, and each of them hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to retain (1) Jones Day, (2) Rayburn Cooper & Durham, P.A., (3) King & Spalding LLP, (4) Shook, Hardy & Bacon L.L.P., (5) McCarter & English, LLP, (6) Bates White, LLC, (7) AlixPartners, LLP and (8) such additional professionals, including attorneys, accountants, financial advisors, actuaries, consultants or agents (together with the foregoing identified firms, the "Professionals"), as any Authorized Person may determine to be necessary, desirable or appropriate in connection with the Chapter 11 Case and other related matters, and to execute, deliver and perform retention agreements with the Professionals in such form and reflecting such terms as any Authorized Person may approve, all with the retention of any Professional to be conclusive evidence of such determination and approval; and

**FURTHER RESOLVED**, that the law firms of Jones Day and Rayburn Cooper & Durham, P.A. and any additional special or local counsel selected by any Authorized Persons be, and each of them hereby is, authorized, directed and empowered to represent the Company, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against the Company under the Bankruptcy Code, including the Chapter 11 Case.

**QSF Settlement Facility**

**WHEREAS**, the Company intends to commence the Chapter 11 Case in the Bankruptcy Court in accordance with the foregoing resolutions;

**WHEREAS**, the Company, as payee, and Johnson & Johnson ("J&J") and Johnson & Johnson Consumer Inc. ("JJCI"), as payors, are parties to that certain Amended and Restated Funding Agreement, dated as of October 12, 2021 (the "Funding Agreement"), which Funding Agreement is available to provide the Company with funding for, among other things, the funding of one or more trusts established under the Bankruptcy Code for the benefit of current and future talc claimants as provided in a plan of reorganization for the Company to the extent the Company's other assets are insufficient to satisfy the

LTL 0019188

Case 23-30099-MBK  Doc 589-35 Filed 04/07/23 Entered 04/07/23 18:32:13 Desc Main
Document Exhibit 35 Page 365 of 506

Company's liabilities in connection with such plan and subject to the limitations set forth therein;

**WHEREAS**, the Company desires, with the support of J&J and JJCI, to create a "qualified settlement fund" under section 468B of the Internal Revenue Code of 1986, as amended, for the purpose of resolving and satisfying current and future talc-related claims asserted against or related to the Company (the "Settlement Facility"), with J&J and JJCI to provide the Settlement Facility with aggregate funding of $2 billion in cash; and

**WHEREAS**, the Debtor desires to provide for the creation, funding and administration of the Settlement Facility in accordance with the terms of the settlement facility agreement, in substantially the form presented to the Board, with J&J, JJCI and the trustee thereunder (the "Settlement Facility Agreement").

**NOW, THEREFORE, BE IT RESOLVED**, that it is desirable and in the best interest of the Company, its creditors and other interested parties that the Company enters into the Settlement Facility Agreement;

**FURTHER RESOLVED**, that the Settlement Facility Agreement, and all of the terms and provisions thereof and transactions contemplated thereby, be, and each of them hereby is, approved by the Board;

**FURTHER RESOLVED**, that the Authorized Persons be, and each of them hereby is, authorized, in the name and on behalf of the Company, to file with the Bankruptcy Court in the Chapter 11 Case a motion to approve the Settlement Facility Agreement and the establishment of the Settlement Facility pursuant thereto and perform any and all such other acts as are reasonable, advisable, expedient, convenient, proper or necessary to establish the Settlement Facility pursuant to the Settlement Facility Agreement, with the performance of such acts to constitute conclusive evidence of the reasonableness, advisability, expedience, convenience, propriety or necessity thereof; and

**FURTHER RESOLVED**, that, subject to the approval of the Settlement Facility Agreement and the establishment of the Settlement Facility by the Bankruptcy Court, the Authorized Persons be, and each of them hereby is, authorized to execute, deliver and perform, in the name and on behalf of the Company, the Settlement Facility Agreement, with such modifications thereto as any Authorized Person may determine to be reasonable, advisable, expedient, convenient, proper or necessary, with the execution and delivery of the Settlement Facility Agreement to be conclusive evidence of such determination.

<u>General Authority</u>

**RESOLVED**, that the Authorized Persons be, and each of them hereby is, authorized and empowered to execute and deliver such additional agreements, instruments and documents, and to take such other actions (including the payment of costs and expenses), in the name and on behalf of the Company, in each case, as any Authorized Person may determine to be necessary, desirable or appropriate to implement the purposes and intent

LTL 0019189

of the foregoing resolutions, with the execution and delivery of any such agreement, instrument or document or taking of any such action by any Authorized Person to be conclusive evidence of such determination;

**FURTHER RESOLVED**, that the Authorized Persons be, and each of them hereby is, authorized and empowered to certify and furnish to any person or entity such copies of the resolutions set forth herein, and to certify to any person or entity that the resolutions set forth herein have been duly adopted by the Board, are in full force and effect and are in conformity with the Articles of Organization and Conversion of the Company and the Operating Agreement of the Company, as any Authorized Person may determine to be necessary, desirable or appropriate to implement the purposes and intent of the foregoing resolutions, with the certification and furnishing of such copies or the certification of such matters to be conclusive evidence of such determination; and

**FURTHER RESOLVED**, that, in the event that any Authorized Person determines a specific form of resolutions is necessary or advisable in connection with the implementation of the purposes and intent of the foregoing resolutions, resolutions in such form be, and they hereby are, adopted by the Board as if such resolutions were expressly set forth herein and that any Authorized Person be, and each of them hereby is, authorized and empowered to certify and furnish to any person or entity copies of such resolutions, and to certify to any person or entity that such resolutions have been duly adopted by the Board, are in full force and effect and are in conformity with the Articles of Organization and Conversion of the Company and the Operating Agreement of the Company, with the certification and furnishing of such copies or the certification of such matters to be conclusive evidence of such determination.

## Ratification

**RESOLVED**, that all actions taken in the name and on behalf of the Company prior to the adoption of these resolutions that would have been authorized by the foregoing resolutions had they been taken after the adoption of these resolutions be, and each of them hereby is, approved, adopted, ratified and confirmed in all respects.

### (ADJOURNMENT)

Having no other business to consider, Mr. Kim thanked the participants for their participation, and the meeting was adjourned.

John Kim,
Chief Legal Officer and Secretary

LTL 0019190

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 8-K

CURRENT REPORT
Pursuant to Section 13 or 15(d) of The
Securities Exchange Act of 1934

Date of report (Date of earliest event reported):
October 19, 2021

# Johnson & Johnson
(Exact name of registrant as specified in its charter)

| New Jersey | 1-3215 | 22-1024240 |
|:---:|:---:|:---:|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

One Johnson & Johnson Plaza, New Brunswick, New Jersey  08933
(Address of Principal Executive Offices)
(Zip Code)
Registrant's telephone number, including area code:
732-524-0400

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Common Stock, Par Value $1.00 | JNJ | New York Stock Exchange |
| 0.250% Notes Due January 2022 | JNJ22 | New York Stock Exchange |
| 0.650% Notes Due May 2024 | JNJ24C | New York Stock Exchange |
| 5.50% Notes Due November 2024 | JNJ24BP | New York Stock Exchange |
| 1.150% Notes Due November 2028 | JNJ28 | New York Stock Exchange |
| 1.650% Notes Due May 2035 | JNJ35 | New York Stock Exchange |

**EXHIBIT**

**601.132**

**Item 2.02    Results of Operations and Financial Condition**

On October 19, 2021, Johnson & Johnson issued the attached press release announcing its sales and earnings for the third quarter ended October 3, 2021.

**Item 7.01    Regulation FD Disclosure**

Subsequent to the quarter, the Company's wholly owned subsidiary LTL Management LLC (LTL), a newly created and separate subsidiary of Johnson & Johnson, that was established to hold and manage claims in the cosmetic talc litigation, has filed for voluntary Chapter 11 bankruptcy protection. This filing is intended to resolve all claims related to cosmetic talc in a manner that is equitable to all parties, including any current and future claimants. Johnson & Johnson and its other affiliates did not file for bankruptcy protection and will continue to operate their businesses as usual. To demonstrate its commitment to resolving the cosmetic talc cases and remove any financial objections to the process, Johnson & Johnson has agreed to provide funding to LTL for the payment of amounts the Bankruptcy Court determines are owed by LTL and will also establish a $2 billion trust in furtherance of this purpose. The $2 billion trust resulted in an incremental $1.4 billion litigation charge (recorded in Other income & expense) in the third fiscal quarter. While LTL pursues this equitable resolution, all pending cosmetic talc cases will be stayed. The press release further discussing this announcement is attached below as Exhibit 99.3.

**Item 9.01    Financial Statements and Exhibits**

(d)    Exhibits.

Exhibit No.    Description of Exhibit

99.1      Press Release dated October 19, 2021 for the period ended October 3, 2021
99.2      Unaudited Comparative Supplementary Sales Data and Condensed Consolidated Statement of Earnings for the third quarter
99.3      Press Release dated October 14, 2021
104       The cover page from this Current Report on Form 8-K, formatted in Inline XBRL.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Johnson & Johnson**

(Registrant)

Date:   October 19, 2021                   By: /s/ Robert J. Decker, Jr.

                                                    Robert J. Decker, Jr.
                                                    Controller
                                                    (Principal Accounting Officer)

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
Mark W. Rasmussen, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
mrasmussen@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)
ATTORNEYS FOR DEBTOR

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>           Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Judge:  Michael B. Kaplan |
| LTL MANAGEMENT LLC,<br><br>           Plaintiff,<br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>           Defendants. | Adv. No.:  21-3032 (MBK)<br><br>**Hearing Date and Time:<br>January 11, 2022 at 10:00 a.m.** |

## DEBTOR'S OMNIBUS REPLY IN SUPPORT OF MOTION FOR AN ORDER (A) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS OR (B) PRELIMINARILY ENJOINING SUCH ACTIONS AND (C) GRANTING A TEMPORARY RESTRAINING ORDER PENDING A FINAL HEARING

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

> The Debtor's goal in this case is to negotiate, obtain approval of and ultimately consummate a plan of reorganization that would, among other things, (a) establish and fund a trust to resolve and pay current and future talc-related claims and (b) provide for the issuance of an injunction that will permanently protect the Debtor, its affiliates and certain other parties from further talc-related claims arising from products manufactured and/or sold by Old JJCI, or for which Old JJCI may otherwise have had legal responsibility, pursuant to sections 105(a) and/or 524(g) of the Bankruptcy Code.

First Day Decl. ¶ 59. The Committee has never suggested—nor has any court ever held—that filing bankruptcy to fully and finally resolve mass tort claims is not a valid reorganizational purpose. See Bestwall, 605 B.R. at 49.[37]

### C. The Debtor and Its Reorganizational Efforts Will Be Irreparably Harmed Without a Preliminary Injunction.

As stated above, "the critical, if not decisive, issue" in determining whether to enjoin litigation against non-debtors is whether the litigation would, absent an injunction, "interfere[] with the debtors' reorganization efforts." Brier Creek, 486 B.R. at 694; Kreisler v. Goldberg, 478 F.3d 209, 215 (4th Cir. 2007) (section 105(a) injunction is appropriate if third-party action would "put detrimental pressure on [the debtors'] reorganization effort"); Robins, 788 F.2d at 1003 (injunction is appropriate when third-party litigation "would adversely or detrimentally influence and pressure the debtor through the third party") (internal citation omitted).

The entire purpose of this case—an equitable, final, and complete resolution of tens to hundreds of thousands of current and future Debtor Talc Claims—would be thwarted without a preliminary injunction. There is no dispute that the objectors oppose the injunction so that talc

---

[37]    The Committee asserts additional section 524(g) arguments in a footnote, alleging that certain Protected Parties may not be eligible for permanent injunctive protection under a plan of reorganization. Committee Obj., 88 n.44. The Debtor disputes these misguided arguments and will address them at the appropriate time.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC, | Case No. 21-30589 (MBK) |
| Debtor.[1] | Judge: Michael B. Kaplan |

## NOTICE OF DEBTOR'S INTENT REGARDING APPEALS

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     On April 4, 2023, this Court entered an *Order (I) Dismissing Debtor's*
*Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b); (II) Establishing Procedures with Respect to*
*Requests for Compensation; and (III) Granting Related Relief* [Dkt. 3938] (the "Dismissal

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501
George Street, New Brunswick, New Jersey 08933.

Order").[2]  Pursuant to the Dismissal Order, the official committee of talc claimants (the "TCC")

will be automatically dissolved, and all members and professionals retained by the TCC will be

discharged from all duties, responsibilities and obligations arising from, or related to the TCC,

on the date that LTL files a notice indicating that the Appeals are exhausted or LTL will not

pursue the Appeals.  Dismissal Order, § 9.

       2.      LTL hereby provides notice that it will no longer pursue the Appeals.

       3.      Accordingly, pursuant to the Dismissal Order, the TCC is dissolved as of

April 4, 2023.

---

[2]      Capitalized terms used herein but not otherwise defined have the meanings given to them in the Dismissal Order.

NAI-1536443491v3

Dated:  April 4, 2023

**WOLLMUTH MAHER & DEUTSCH LLP**

/s/ Paul R. DeFilippo
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (*pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

NAI-1536443491v3

| PARKINS & RUBIO LLP | MASSEY & GAIL LLP |
|---|---|
| Lenard M. Parkins, Esq. | Jonathan S. Massey, Esq. |
| Charles M. Rubio, Esq. | Rachel S. Morse, Esq. |
| lparkins@parkinsrubio.com | jmassey@masseygail.com |
| crubio@parkinsrubio.com | rmorse@masseygail.com |
| Pennzoil Place | 1000 Maine Ave. SW, Suite 450 |
| 700 Milan St., Suite 1300 | Washington, DC 20024 |
| Houston, TX 77002 | Tel: (202) 652-4511 |
| Tel: (713) 715-1666 | Fax: (312) 379-0467 |
| *Special Counsel for the* | *Special Counsel for the* |
| *Official Committee of Talc Claimants* | *Official Committee of Talc Claimants* |

| In re: | Chapter 11 |
|---|---|
| **LTL MANAGEMENT, LLC,**[1] | Case No.: 21-30589 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

**[PROPOSED] ORDER (I) DISMISSING DEBTOR'S CHAPTER 11
CASE PURSUANT TO 11 U.S.C. § 1112(b); (II) ESTABLISHING
PROCEDURES WITH RESPECT TO REQUESTS FOR
COMPENSATION; AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages is hereby **ORDERED.**

MICHAEL B. KAPLAN,
USBJ

April 4, 2023

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

2

This Court enters this order (this "Dismissal Order") to effectuate dismissal of the chapter 11 case of LTL Management LLC (the "Debtor" or "LTL") pursuant to 11 U.S.C. § 1112(b) as instructed by the Court of Appeals for the Third Circuit (the "Third Circuit") and to address, pursuant to 11 U.S.C. §§ 105(a) and 349(b), certain related matters as necessary to permit an orderly dismissal and for purposes such as fairness, judicial economy, and convenience to interested parties. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334; venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The TCC (as defined below), the FCR (as defined below) and the Debtor having agreed to the terms of this Dismissal Order. After due deliberation, this Court has found and determined that good and sufficient cause appears under the facts and applicable law for the relief granted herein.

WHEREAS, on October 14, 2021 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") pursuant to chapter 11 of title 11 of the United States Code commencing this case (the "Chapter 11 Case");

WHEREAS, on March 2, 2022, this Court entered the *Order Denying Motions to Dismiss* [ECF No. 1603], denying the motions filed by the Official Committee of Talc Claimants (the "TCC") [ECF No. 632], the law firm of Arnold & Itkin, LLP on behalf of certain talc personal injury claimants [ECF No. 766] and the law firm of Aylstock, Witkin, Kries & Overholtz, PLLC on behalf of certain talc personal injury claimants [ECF No. 1003] that sought an order of this Court dismissing the Chapter 11 Case pursuant to 11 U.S.C. § 1112(b) as not having been filed in good faith;

WHEREAS, on March 4, 2022, this Court entered the *Order (I) Declaring that Automatic Stay Applies to Certain Actions Against Non-Debtors and (II) Preliminarily Enjoining Certain*

3

*Actions* [Adv. No. 21-3032, ECF No. 187] (the "Preliminary Injunction Order")[2] granting LTL's motion for an order extending the automatic stay under 11 U.S.C. § 362 and preliminarily enjoining actions against the Protected Parties (as defined in the Preliminary Injunction Order);

WHEREAS, on January 30, 2023, a panel of the Third Circuit issued its *Opinion of the Court* [3d Cir. Case No. 22-2003, ECF No. 150] (the "Third Circuit Opinion")[3] stating "[w]e thus reverse the Bankruptcy Court's order denying the motions to dismiss and remand this case with the instruction to dismiss LTL's Chapter 11 petition" and further stating that "[d]ismissing its case annuls the litigation stay ordered by the [Bankruptcy] Court and makes moot the need to decide that issue";[4]

WHEREAS, also on January 30, 2023, a panel of the Third Circuit entered a *Judgment* [3d Cir. Case No. 22-2003, ECF No. 151-1] (the "Third Circuit Judgment")[5] providing that "the order of the Bankruptcy Court entered March 2, 2022 is reversed and the case is remanded with the instruction to dismiss Appellee's Chapter 11 petition" and further ordering that "[t]he order of the Bankruptcy Court entered March 4, 2022 is vacated as moot";

WHEREAS, the appointment of each of the co-mediators in this Chapter 11 Case was terminated by this Court by order dated March 23, 2023;

WHEREAS, the appointment of the Federal Rule of Evidence 706 estimation expert (the "Court-Appointed Expert") was terminated by this Court by order dated March 23, 2023; and

---

[2]     Capitalized terms that are used but are not defined herein shall have the meanings given in the Preliminary Injunction Order.

[3]     A certified copy of the Third Circuit Opinion is attached hereto as **Exhibit 1**.

[4]     Third Circuit Opinion at 56.

[5]     A certified copy of the Third Circuit Judgment is attached hereto as **Exhibit 2**.

WHEREAS, on March 31, 2023, in accordance with Fed. R. App. P. 41, the Third Circuit issued its *Certified Judgment* [3d Cir. Case No. 22-2003, ECF No. 181] (the "Third Circuit Mandate")[6] that remanded the case to this Court with the instruction to dismiss the Petition.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     Dismissal. The Chapter 11 Case is hereby dismissed pursuant to section 1112(b) of the Bankruptcy Code as of the date of this Dismissal Order (the "Dismissal Date").

2.     Closing the Chapter 11 Case. This Court directs that the Clerk of this Court close the Chapter 11 Case promptly following the filing of a notice by LTL, with the prior written consent of the Office of the United States Trustee ("U.S. Trustee"), confirming the completion of the following conditions: (i) all monthly operating reports of LTL have been filed, (ii) all fees due and owing in the Chapter 11 Case to the Clerk of this Court and/or the U.S. Trustee pursuant to 28 U.S.C. § 1930 have been paid in full, (iii) all appeals of the Third Circuit Judgment, the Third Circuit Opinion or this Dismissal Order ("Appeals") have been exhausted, (iv) all Substantial Contribution Motions (as defined below) have been heard by this Court and determined pursuant to a final order, (v) all amounts requested pursuant to a Final Fee Statement, a Reimbursement Request or a Post-Dismissal Statement (all as defined below) have been paid by LTL or, if not paid, determined by this Court not to be allowable; and (vi) all amounts owed to the co-mediators, the Court-Appointed Expert and his professionals, and the Fee Examiner (as defined below) and his professionals have been paid by LTL.

3.     Preliminary Injunction Order. On the Dismissal Date, the Preliminary Injunction Order is vacated as moot and, accordingly, to the extent not already terminated by this Court, the extension of the automatic stay and preliminary injunction prohibiting and enjoining all

---

[6]     A certified copy of the Third Circuit Mandate is attached hereto as **Exhibit 3**.

Defendants (as defined in the Preliminary Injunction Order) from continuing to prosecute any Enjoined Talc Claim (as defined in the Preliminary Injunction Order) against any of the Protected Parties (as defined in the Preliminary Injunction Order) are terminated immediately upon the Dismissal Date. Pursuant to section 105 and in accordance with 11 U.S.C. § 108(c), this Dismissal Order shall toll, as of October 14, 2021, to the extent such period had not expired before then, the expiration of any period under any applicable non-bankruptcy law, any order entered in a non-bankruptcy proceeding, or any agreement that fixes a period under which a Defendant is required to commence or continue a civil action in a court other than this Court on any Enjoined Talc Claim asserted against any of the Protected Parties until the later of: (a) the end of such period, including any suspension of such period occurring on or after October 14, 2021; or (b) 30 days after notice of this Dismissal Order.

4.    <u>Termination of Stay</u>.  To the extent not already terminated by an order of this Court, the automatic stay with respect to LTL is terminated immediately upon the Dismissal Date.  In accordance with 11 U.S.C. § 108(c), this Dismissal Order shall toll, as of October 14, 2021 to the extent such period had not expired before then, the expiration of any period under any applicable non-bankruptcy law, any order entered in a non-bankruptcy proceeding, or any agreement that fixes a period for commencing or continuing a civil action in a court other than this Court on Enjoined Talc Claims until the later of: (a) the end of such period, including any suspension of such period occurring on or after October 14, 2021; or (b) 30 days after notice of this Dismissal Order.

5.    <u>Procedures for Final Allowance of Fees and Expenses</u>.  A professional retained pursuant to sections 105, 327, 328 or 1103 of the Bankruptcy Code and the professionals retained by the Ad Hoc Committee of State Attorneys General (each a "<u>Retained Professional</u>" and

collectively the "<u>Retained Professionals</u>") may seek final allowance and payment of compensation

and reimbursement of expenses in accordance with the following procedure and, solely with

respect to the fees and expenses of professionals retained by the Ad Hoc Committee of State

Attorneys General, subject to the expense reimbursement agreement dated May 9, 2022, which

was attached as Exhibit A to ECF. No. 2338:

a.     Each Retained Professional seeking final allowance and payment of its fees and expenses must serve a statement for all of its unpaid fees and expenses incurred in this Chapter 11 Case through the Dismissal Date (a "<u>Final Statement</u>") on LTL no later than 45 days following the Dismissal Date (the "<u>Final Statement Deadline</u>").

b.     Unless otherwise provided in the order authorizing the Retained Professional's retention, and in accordance with the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, the local rules of this Court, and the Guidelines established by the Office of the United States Trustee, each Final Statement shall include invoices with fee and expense detail that describe the fees and expenses incurred by such Retained Professional to the extent such invoices have not previously been filed with the Court.

c.     LTL shall have 21 days after the Final Statement Deadline to raise any informal objection to final allowance of the fees and expenses sought by a Final Statement or any other fees and expenses incurred by a Retained Professional during the Chapter 11 Case that were previously allowed on an interim basis, by serving on the applicable Retained Professional an objection in writing setting forth the nature of the objection and the amount of fees and expenses at issue (an "<u>Objection</u>"). LTL may withhold payment of the portion of a Final Statement to which any Objection is directed and shall promptly pay amounts not subject to an Objection.

d.     Thereafter, LTL and the affected Retained Professional may attempt to resolve the Objection on a consensual basis. If the Objection is not resolved within 14 days after service of the Objection, the affected Retained Professional may file a response to the Objection with the Court. The Court will then schedule a hearing, at the Court's convenience, to consider and dispose of the Objection. LTL may file a reply in support of the Objection within 4 days of the applicable hearing date.

e.     All Retained Professionals' fees for services rendered or expenses incurred in the Chapter 11 Case through the Dismissal Date that are not subject to an Objection or are allowed by the Court after considering and

disposing of an Objection, shall be allowed on a final basis. LTL shall promptly pay any unpaid amounts that are allowed pursuant to this Order.

f.  This Dismissal Order supersedes the *Order Establishing Procedures for the Allowance of Interim Compensation and Reimbursement of Expenses of Retained Professionals* [ECF No. 761] and the *Order Appointing an Independent Fee Examiner and Establishing Procedures* [ECF. No. 1922] to the extent inconsistent with this Dismissal Order.

6.  <u>Reimbursement of Expenses Incurred by Committee Member Representatives</u>. A representative of a member of the TCC (a "<u>Representative</u>") may requests payment of expenses incurred pursuant to this Court's *Agreed Order Regarding Procedures for the Reimbursement of Expenses Incurred By Committee Member Representatives* [ECF 3783] (the "<u>Reimbursement Order</u>") in accordance with the following procedures:

a.  A Representative may submit a written request for payment of expenses incurred through and including the Dismissal Date (a "<u>Reimbursement Request</u>") by serving such request on LTL no later than 30 days following the Dismissal Date. A Reimbursement Request must include copies of any supporting documentation for the Representative Expenses.

b.  LTL shall have 14 days after service of the Reimbursement Request (unless extended by agreement of the parties) to raise any Objection regarding the Reimbursement Requests.

c.  If no Objections are raised or Objections are raised as to some but not all of the Representative Expenses (as defined in the Reimbursement Order), LTL shall pay those Representative Expenses not objected to within 21 days after their submission.

d.  If the parties are not able to resolve any Objection within 14 days after notification of such Objection, the affected Representative may, within 7 days thereafter, file a response to the Objection with the Court, to which LTL may reply within 4 days of the applicable hearing date. The Court will schedule a hearing, at the Court's convenience, to consider and dispose of the Objection to the Reimbursement Request.

e.  This Dismissal Order amends and supersedes the Reimbursement Order to the extent the Reimbursement Order is inconsistent with this Dismissal Order, <u>provided</u>, <u>however</u>, to the extent that any Reimbursement Requests were made prior to the Dismissal Date, LTL shall promptly pay such Reimbursement Requests in accordance with the procedures set forth in the Reimbursement Order.

8

7.   <u>Post-Dismissal Fees</u>.  Any Retained Professionals of the TCC seeking

compensation for services rendered to the TCC in accordance with this Dismissal Order from the

Dismissal Date through and including the date the TCC is dissolved (the "<u>Post-Dismissal</u>

<u>Period</u>"), shall

      a.    serve a statement (the "<u>Post-Dismissal Statement</u>") for all of its fees and
expenses incurred during the Post-Dismissal Period (the "<u>Post-Dismissal</u>
<u>Request</u>") on LTL periodically, but no more than once every 30 days, with
any final Post-Dismissal Statement being served on LTL no later than 45
days following the exhaustion of the Appeals.

      b.    LTL shall have 14 days after service of the Post-Dismissal Statement
(unless extended by agreement of the parties) to raise any Objections
regarding the Post-Dismissal Request.

      c.    If no Objections are raised or Objections are raised as to some but not all
of the Post-Dismissal Request, LTL shall pay those fees and expenses not
objected to within 21 days after their submission.

      d.    If the parties are not able to resolve any Objection within 14 days after
notification of such Objection, the affected Retained Professional may,
within 7 days thereafter, file a response with the Court, to which LTL may
reply within 4 days of the applicable hearing date.  The Court will
schedule a hearing, at the Court's convenience, to consider and dispose of
the Objection to the Post-Dismissal Statement.

8.   <u>Substantial Contribution Motions</u>.  Any party seeking payment of a claim for

substantial contribution may file and serve a motion seeking such relief ("<u>Substantial Contribution</u>

<u>Motion</u>") no later than 30 days following the Dismissal Date.  The Court will schedule a hearing,

at the Court's convenience, to consider the Substantial Contribution Motion.  LTL may object to

the Substantial Contribution Motion no later than 7 days prior to the hearing date, and the movant

may reply no later than 4 days prior to the hearing date.

9.   <u>Limited Continued Existence of TCC</u>.  The TCC shall remain in existence after the

Dismissal Date solely to pursue or defend any Appeals and its Retained Professionals shall be

authorized to continue to perform services on the TCC's behalf.  Upon the date that LTL files a

9

notice with the Court indicating that the Appeals are exhausted or LTL will not pursue the Appeals,

the TCC shall be automatically dissolved, and all members and professionals retained by the TCC

shall be discharged from all duties, responsibilities, and obligations arising from, or related to the

TCC. Following such dissolution, any attorney-client privilege and similar rights previously held

by the TCC shall remain in existence and shall be enforceable by any person or entity that was a

member of the TCC as of its dissolution (directly or indirectly through their respective counsel or

other representative).

10. <u>Discharge of the FCR</u>. On the Dismissal Date, the appointment of the legal

representative for future talc claimants in this Chapter 11 Case (the "<u>FCR</u>") shall be terminated,

and all professionals retained by the FCR shall be discharged from all duties, responsibilities,

and obligations arising from or related to the FCR. Following such termination, any attorney-

client privilege and similar rights previously held by the FCR shall remain in existence and shall

be enforceable by the FCR (directly or indirectly through her respective counsel or other

representative).

11. <u>Discharge of the Co-Mediators</u>. The co-mediators are discharged of all duties,

responsibilities, and obligations from or related to the court-ordered mediation in this Chapter 11

Case. Within 14 days of this Dismissal Order, the co-mediators shall submit to LTL final

invoices for services rendered and expenses incurred, and LTL shall promptly pay such invoices.

12. <u>Discharge of Court-Appointed Expert</u>. The Court-Appointed Expert and all

professional retained by the Court-Appointed Expert are discharged from all duties,

responsibilities, and obligations from or related to the Court-Appointed Expert. Within 30 days

of the entry of this Dismissal Order, the Court-Appointed Expert shall submit to LTL final invoices

for all unbilled services rendered and expenses incurred by him and his professionals in the manner

10

described in the *Order Confirming Procedures for Payment and Reimbursement of the Court-Appointed Estimation Expert's Professionals* [ECF No. 3721], and LTL shall promptly pay such invoices.

13. <u>Discharge of the Fee Examiner</u>. On the Dismissal Date, the appointment of the independent fee examiner in this Chapter 11 Case (the "<u>Fee Examiner</u>") shall be terminated, and his professionals shall be discharged from all duties, responsibilities, and obligations arising from or related to their retention by the Fee Examiner. Within fourteen (14) days of the entry of this Dismissal Order, the Fee Examiner and any professional retained by him shall submit to LTL final invoices for services rendered and expenses incurred, and LTL shall promptly pay such invoices.

14. <u>Services of Epiq Corporate Restructuring, LLC</u>. Epiq is authorized to assist LTL with service of this Dismissal Order. On about 30 days after the entry of this Dismissal Order, Epiq Corporate Restructuring, LLC ("<u>Epiq</u>"), as the Debtor's claims and noticing agent, shall (a) forward to the Clerk of the Court an electronic version of all imaged claims, (b) upload the creditor mailing list into CM/ECF, (c) docket a combined final claims register containing claims against the Debtor, and (d) box and transport all original claims to the Philadelphia Federal Records Center, 14700 Townsend Road, Philadelphia, Pennsylvania 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims. Epiq shall be relieved of its responsibilities as the Debtor's claims and noticing agent in this Chapter 11 Case following the conclusion of such services pursuant to this Dismissal Order. Epiq shall be entitled to payment and reimbursement of its fees and costs from LTL. Epiq is authorized to take all actions necessary and appropriate to effectuate the terms of this Dismissal Order.

15. <u>Dismissal of Adversary Proceedings</u>. On the Dismissal Date, adversary proceedings *LTL Management LLC v. Moline*, Adv. Pro. 22-1393 (MBK); and *LTL Management LLC v. Emory et. al*, Adv. Pro. 23 1022 (MBK) shall each be deemed dismissed without prejudice.

16. <u>Payment of Quarterly Fees</u>. Not later than 30 days of the Dismissal Date, LTL shall pay to the U.S. Trustee any quarterly fees owed through the date of the Dismissal Date pursuant to 28 U.S.C. § 1930(a)(6).

17. <u>Continued Effect of Confidentiality Orders</u>. Notwithstanding any other provision of this Dismissal Order, any obligations arising under confidentiality agreements, joint interest agreements, the order appointing the expert pursuant to Rule of Evidence 706 [ECF No. 2881] and the companion order concerning the payment of his professionals [ECF No. 3721], and protective orders, if any, entered into during the Chapter 11 Case in connection with the Chapter 11 Case shall remain in full force and effect in accordance with their terms; provided, however, that the provisions set forth in paragraph 18 of this Dismissal Order shall supersede any contrary provisions in any agreed protective order entered in this Chapter 11 Case.

18. <u>Destruction of Documents by Third Parties</u>. Reasonably promptly following the closing of the Chapter 11 Case, any mediator appointed in the Chapter 11 Case and the Court-Appointed Expert and his professionals each shall destroy any documents, electronic files or information in his or their possession, custody, or control (or in the possession, custody, or control of their respective agents, experts or consultants) that were provided on a confidential basis by LTL, the FCR, the TCC, or plaintiff law firms or their respective counsel, or any of the TCC members, and shall certify destruction thereof to such providing party.

19. <u>Notice</u>. On or before seven days following the Dismissal Date, LTL shall serve notice of this Dismissal Order (including a copy of this Dismissal Order) pursuant to Bankruptcy

12

Rules 2002(f)(2) and 2002(k) on the TCC, the U.S. Trustee, the Master Service List, all entities that have requested notice pursuant to Bankruptcy Rule 2002, and such additional persons and entities deemed appropriate by LTL.

20.  Retained Jurisdiction.  Notwithstanding the dismissal of the Chapter 11 Case, this Court shall retain jurisdiction to hear and determine all matters arising from or related to the Chapter 11 Case, including without limitation, the interpretation, implementation, or enforcement of this Dismissal Order and the Court's prior orders, and to hear and consider Substantial Contribution Motions and any objection to a Final Fee Statement, a Reimbursement Request or a Post-Dismissal Statement.

21.  Immediate Effectiveness.  Notwithstanding any provisions in the Bankruptcy Rules to the contrary, this Dismissal Order shall be immediately effective and enforceable upon its entry.

13

Form 148 – ntcdsmcs

# UNITED STATES BANKRUPTCY COURT

District of New Jersey
402 East State Street
Trenton, NJ 08608

---

Case No.: 21–30589–MBK
Chapter: 11
Judge: Michael B. Kaplan

In Re: Debtor(s) (name(s) used by the debtor(s) in the last 8 years, including married, maiden, trade, and address):
LTL Management LLC
fka Chenango One LLC
501 George Street
New Brunswick, NJ 08933

Social Security No.:

Employer's Tax I.D. No.:
87–3056622

---

## NOTICE OF ORDER DISMISSING CASE

NOTICE IS HEREBY GIVEN that an Order Dismissing the above captioned Case was entered on 4/4/23.

Any discharge which was granted in this case is vacated. All outstanding fees to the Court incurred by the dismissed debtor(s) are due and owing and must be paid within seven (7) days from the date of this Order.

This dismissal may mean that the debtor is ineligible to file another bankruptcy petition for 180 days under 11 U.S.C. § 109(g).

Dated: April 4, 2023
JAN: wiq

Jeanne Naughton
Clerk

# EXHIBIT 40

# UNDER SEAL

# EXHIBIT 41


# UNDER SEAL

Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011

In The

# United States Court of Appeals
# for the Third Circuit

———————————

In Re: LTL Management, LLC,

*Debtor*

———————————

\*Official Committee of Talc Claimants

*Appellant*

\*(Amended per Court's Order dated 06/10/2022)

———————————

On direct appeal from the United States Bankruptcy Court
for the District of New Jersey, No. 21-30589, Adv. Proc. No. 21-3023

———————————

**BRIEF FOR DEBTOR-APPELLEE**

———————————

| | |
|---|---|
| Gregory M. Gordon | Neal Kumar Katyal |
| Brad B. Erens | Sean Marotta |
| Dan B. Prieto | William E. Havemann |
| Jones Day | Jo-Ann Tamila Sagar |
| 2727 North Harwood Street | Patrick C. Valencia |
| Dallas, Texas 75201 | Hogan Lovells US LLP |
| | 555 Thirteenth Street, N.W. |
| C. Kevin Marshall | Washington, D.C. 20004 |
| David S. Torborg | (202) 637-5600 |
| Jones Day | neal.katyal@hoganlovells.com |
| 51 Louisiana Avenue, N.W. | |
| Washington, D.C. 20001 | *Counsel for Debtor-Appellee* |

August 15, 2022

Of course, Old JJCI could not just saddle LTL with its talc-related debts, give New JJCI all of its assets, and call it a day. Old JJCI made sure that LTL had the same, if not a greater, ability to resolve present and future talc claims. A450. LTL, New JJCI, and J&J entered into a funding agreement whereby New JJCI would pay the administrative costs in LTL's contemplated bankruptcy case and any talc-related-liability costs after LTL exhausted its own assets, up to New JJCI's estimated $61 billion full enterprise value. A450-456, 105-127. And though the agreement sets a floor of Old JJCI's enterprise value at the time of the divisional merger, the agreement's value is expected to increase as New JJCI's value increases post-restructuring. A5-6 & n.5, 3085-87, 4232, 4235, 4316, 4319. J&J and New JJCI also agreed to advance a total of $2 billion into a qualified settlement fund for the exclusive payment of talc claims. A454-455.

## III. PROCEDURAL HISTORY

On October 14, 2021, LTL filed for chapter 11 relief in the Western District of North Carolina. A291. LTL also commenced an adversary action against Claimants seeking confirmation that the automatic bankruptcy stay applies to talc claims asserted against LTL's affiliates—including J&J and New JJCI—as well as LTL's insurers and third-party retailers, or entry of a preliminary injunction enjoining those claims. A3798.

*Finally*, claimants make a host of arguments directed at the perceived injustices of bankruptcy proceedings that haven't happened yet. Claimants suggest, for example, that LTL's proposed bankruptcy plan will not pay them enough. But "[m]any statutory prerequisites designed to ensure fairness must be met before a trust is formed and a channeling injunction entered under § 524(g)." *W.R. Grace I*, 900 F.3d at 130. Chief among them is that claimants "must approve of any plan employing a § 524(g) trust by a 75% super majority." A32; *see* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). LTL has a strong incentive to negotiate a plan that will receive strong support from Claimants; if the bankruptcy fails, LTL will be forced to return to the tort system on future claims.

Some claimants and the U.S. Trustee vaguely suggest either that the funding agreement was a fraudulent conveyance or that some future conveyance may place assets out of LTL's creditors' reach. *See* U.S. Trustee Br. 21; TCC Br. 33. This was one of Claimants principal arguments below, but they now all but abandon it. That is likely because the funding agreement is plainly not fraudulent, because there is no question that LTL will satisfy its obligations, and, most importantly, because this is a question that can be resolved through an adversary proceeding if there are any colorable claims to be made on LTL's behalf. *See* 11 U.S.C.

---

successor in interest to Old JJCI and, consequently, Debtor substitutes for Old JJCI in all federal actions as a matter of law." A29.

§ 544(b); *Buncher Co. v. Official Comm. of Unsecured Creditors of Genfarm Ltd.*
*P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent
conveyance law is to make available to creditors those assets of the debtor that are
rightfully a part of the bankruptcy estate, even if they have been transferred
away."). Claimants have had the opportunity to seek to unwind the funding
agreement as a fraudulent transfer, but have conspicuously declined to do so. The
same goes for any hypothetical future transfer by LTL, New JJCI, and J&J. *See*
A4325 (New JJCI and J&J submitting themselves to bankruptcy court jurisdiction
to enforce the funding agreement). The Bankruptcy Court will always have
jurisdiction to protect against fraudulent conveyances.

Claimants object that funding will be "largely unavailable until there is a
confirmed plan after appeals are exhausted." TCC Br. 22; *see also* A&I Br. 21.
That is also true of tort suits: Defendants typically post a bond to secure any
judgment entered against them and do not pay until appeals are exhausted. *See*,
*e.g.*, Fed. R. Civ. P. 62(b). Claimants' objection to this feature of the funding
agreement is an objection to a feature of tort litigation outside of the bankruptcy
system.

Claimants also suggest that LTL will seek to "pressur[e] claimants to settle
by threatening" to delay the bankruptcy proceedings. A&I Br. 16; *see also* TCC
Br. 49. But Claimants do not cite any evidence of LTL using the bankruptcy

73

```
                 UNITED STATES COURT OF APPEALS
                    FOR THE SEVENTH CIRCUIT

IN RE:                     .    Case No. 22-2606
                           .
AEARO TECHNOLOGIES, LLC,   .
et al.,                    .    Everett McKinley
                           .      Dirksen Courthouse
                           .    219 S. Dearborn St., Room 2722
              Debtor.      .    Chicago, IL  60604
                           .
                           .    April 4, 2023
 . . . . . . . . . . . . . ..   1:19 p.m.

                   TRANSCRIPT OF ORAL ARGUMENT
          BEFORE THE HONORABLE FRANK H. EASTERBROOK
              UNITED STATES SEVENTH CIRCUIT JUDGE
               and THE HONORABLE DIANE P. WOOD
              UNITED STATES SEVENTH CIRCUIT JUDGE
             and THE HONORABLE DAVID F. HAMILTON
              UNITED STATES SEVENTH CIRCUIT JUDGE



APPEARANCES:

For the Appellants:     Clement & Murphy, PLLC
                        By:  PAUL D. CLEMENT, ESQ.
                        706 Duke Street
                        Alexandria, VA 22314

For Amicus Curaie U.S.  Department of Justice
Trustee:                By:  SEAN JANDA, ESQ.
                        950 Pennsylvania Avenue N.W.
                        Washington, DC 20530

For Appellees Official  Kellogg, Hansen, Todd, Figel &
Committee of Unsecured     Frederick, PLLC
Creditors:              By:  DAVID CHARLES FREDERICK, ESQ.
                        1615 M Street, N.W., Suite 400
                        Washington, DC 20036


Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

1       THE COURT:  -- is the best you can say.

2       MR. CLEMENT:  Yeah, I mean, look, I say you applied

3  in the sense that you took them seriously and found them

4  inapplicable on the facts there, and so to me that is -- that's

5  not just dictum.  I also think, for what it's worth, that even

6  if you want to be a pure textualist, the thrust of <u>A.H. Robins</u>

7  and the thrust of the first exceptions this Court has

8  recognized is the idea that when you have a real party in

9  interest, that's still within essentially the text, and --

10      THE COURT:  But, you know, what I'm having -- well, I

11  have a number of problems with your approach, but one of them

12  is how you distinguish the any regular old case of joint and

13  several liability from this case.  We all certainly understand

14  that 3M and Aearo are very closely aligned in this litigation,

15  but the automatic stay is supposed to be automatic.  You're

16  supposed to just see it.  It happens.  You're not supposed to

17  have 25 hearings.  So, I just don't see how, unless you're

18  going to say the automatic stay applies to everybody with joint

19  and several liability, how your position can hold.

20      MR. CLEMENT:  So, I would say -- I obviously wouldn't

21  say it applies to everybody.  I would say that this is --

22      THE COURT:  Because you can't -- because, I mean, no

23  one says that.

24      MR. CLEMENT:  Of course.  Of course.  But, this seems

25  to be, you know, a truly sort of unique case.  This isn't just

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b) <br><br> **GENOVA BURNS LLC** <br> Angelo J. Genova, Esq. <br> Daniel M. Stolz, Esq. <br> Donald W. Clarke, Esq. <br> Matthew I.W. Baker, Esq. <br> agenova@genovaburns.com <br> dstolz@genovaburns.com <br> dclarke@genovaburns.com <br> mbaker@genovaburns.com <br> 110 Allen Road, Suite 304 <br> Basking Ridge, NJ 07920 <br> Tel: (973) 467-2700 <br> Fax: (973) 467-8126 <br> *Local Counsel to the Official Committee of Talc Claimants* | **BROWN RUDNICK LLP** <br> David J. Molton, Esq. <br> Robert J. Stark, Esq. <br> Michael S. Winograd, Esq. <br> Jeffrey L. Jonas, Esq. <br> dmolton@brownrudnick.com <br> rstark@brownrudnick.com <br> mwinograd@brownrudnick.com <br> jjonas@brownrudnick.com <br> Seven Times Square <br> New York, NY 10036 <br> Tel: (212) 209-4800 <br> Fax: (212) 209-4801 <br><br> and <br><br> Sunni P. Beville, Esq. <br> sbeville@brownrudnick.com <br> One Financial Center <br> Boston, MA 02111 <br> Tel: (617) 856-8200 <br> Fax: (617) 856-8201 <br> *Co-Counsel for the Official Committee of Talc Claimants* |
| **BAILEY GLASSER LLP** <br> Brian A. Glasser, Esq. <br> Thomas B. Bennett, Esq. <br> bglasser@baileyglasser.com <br> tbennett@baileyglasser.com <br> 105 Thomas Jefferson St. NW, Suite 540 <br> Washington, DC 20007 <br> Tel: (202) 463-2101 <br> Fax: (202) 463-2103 <br> *Co-Counsel for the Official Committee of Talc Claimants* | **OTTERBOURG P.C.** <br> Melanie L. Cyganowski, Esq. <br> Adam C. Silverstein, Esq. <br> Jennifer S. Feeney, Esq. <br> mcyganowski@otterbourg.com <br> asilverstein@otterbourg.com <br> jfeeney@otterbourg.com <br> 230 Park Avenue <br> New York, NY 10169 <br> Tel: (212) 905-3628 <br> Fax: (212) 682-6104 <br> *Co-Counsel for the Official Committee of Talc Claimants* |

<table>
<tr>
<td>

**PARKINS LEE & RUBIO LLP**
Leonard M. Parkins, Esq.
Charles M. Rubio, Esq.
lparkins@parkinslee.com
crubio@parkinslee.com
Pennzoil Place
700 Milan St., Suite 1300
Houston, TX 77002
Tel: (713) 715-1666
*Special Counsel to the Official Committee of Talc Claimants*

</td>
<td>

**MASSEY & GAIL LLP**
Jonathan S. Massey, Esq.
jmassey@masseygail.com
100 Main Ave. SW, Suite 450
Washington, DC 20024
Tel: (202) 652-4511
Fax: (312) 379-0467
*Special Counsel for the Official Committee of Talc Claimants*

</td>
</tr>
</table>

|  |  |
|---|---|
| In re:<br><br>**LTL MANAGEMENT, LLC,**<br><br>                 Debtor. | Chapter 11<br><br>Case No.: 21-30589(MBK)<br><br>Honorable Michael B. Kaplan |
| **LTL MANAGEMENT LLC,**<br><br>                 Plaintiff,<br><br>   v.<br><br>**THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,**<br><br>                 Defendants. | Adv. Pro. No. 21-03032 (MBK) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS TO DEBTOR'S MOTION FOR AN ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS OR (II) PRELIMINARILY ENJOINING SUCH ACTIONS AND (III) GRANTING A <u>TEMPORARY RESTRAINING ORDER PENDING A FINAL HEARING</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ................................................................................. 5

    I.     The Debtor, Its Estate and Its Creditors ...................................................... 5

    II.    Events Culminating in the Debtor's Bankruptcy Filing ............................. 7

           A.     J&J and Its Talcum Powder Products .......................................... 7

           B.     Talcum Powder Litigation ...................................................... 14

           C.     J&J's Prior Preference for the Tort System over Bankruptcy Court ........ 22

           D.     J&J Decides to Shift Course ..................................................... 25

           E.     The "Texas Two-Step" ........................................................... 28

           F.     The Bankruptcy Filing and Announced Stay of Litigation ...................... 39

    III.   Relevant Procedural History ................................................................ 41

ARGUMENT ................................................................................................. 44

    I.     THE DEBTOR HAS NOT ESTABLISHED THAT ANY EXTENSION OF THE
        STAY under § 362(a) IS WARRANTED .......................................... 44

           A.     Section 362(a) Was Enacted to Give a Reprieve to the Debtor ............... 44

           B.     The Stay Should Not Be Extended Here Under § 362(a)(1) ................... 47

           C.     The Stay Under §362(a)(3) is Inapplicable Here ..................................... 73

    II.    THE DEBTOR HAS NOT DEMONSTRATED ITS ENTITLEMENT TO
        PRELIMINARY INJUNCTIVE RELIEF UNDER § 105(A) OF THE
        BANKRUPTCY CODE ................................................................. 77

           A.     The Court Does Not Have Subject Matter Jurisdiction to Issue the
                Requested Injunction Enjoining Actions Between Non-Debtors ............. 78

           B.     The Debtor Has Not Satisfied Its Burden of Establishing the Requirements
                for Granting the Extraordinary Relief of a Preliminary Injunction .......... 82

C.     The Debtor's Request for Equitable Relief Should Be Denied Due to The
       Debtor's (and J&J's) Unclean Hands ...................................................... 93

CONCLUSION ..........................................................................................................................95

# Table of Authorities

<u>Cases</u>

A.H. Robins Co., Inc. v. Piccinin,
    788 F.2d 994 (4th Cir.) ............................................................................ passim

Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.,
    133 B.R. 176 (W.D. Pa. 1991) ....................................................................... 70, 88

Allen v. McCurry,
    449 U.S. 90 (1980) ...................................................................................... 72

Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.,
    682 F.2d 446 (3d Cir. 1982) ........................................................................... 45

Austin v. Unarco Industries, Inc.,
    705 F.2d 1 (1st Cir. 1983) ............................................................................. 61

Bippus v. Norton Co.,
    437 F. Supp. 104 (E.D. Pa. 1977) .................................................................... 66

Blackstone Valley Elec. Co. v. Stone & Webster, Inc.,
    867 F. Supp. 73 (D. Mass. 1994) ..................................................................... 66

Bouton v. Litton Indus., Inc.,
    423 F.2d 643 (3d Cir. 1970) ....................................................................... 66, 67

Bradberry v. Carrier Corp.,
    86 So. 3d 973 (Ala. 2011) ......................................................................... 48, 59

CAE Indus. Ltd. v. Aerospace Holdings Co.,
    116 B.R. 31 (S.D.N.Y. 1991) .......................................................................... 69

City of Chicago v. Fulton,
    141 S. Ct. 585 (2021) .................................................................................. 45

Constitution Bank v. Tubbs,
    68 F.3d 685 (3d Cir. 1995) ............................................................................ 45

Cowan v. Harris Corp.,
    1982 WL 602774 (D. Kan. 1982) ..................................................................... 66

Darcy v. Brooklyn & N.Y. Ferry Co.,
    89 N.E. 461 (N.Y. 1909) ............................................................................... 64

Deutsche Bank Nat. Trust Co. v. FDIC,
    109 F. Supp. 3d 179 (D.D.C. 2015) .............................................................. 65, 66

iii

*Eastern Refractories Co. v. Forty Eight Insulations Inc.*,
157 F.3d 169 (2d Cir. 1998) ............................................................................................. 44, 45

*Edwards v. McElliotts Trucking, LLC*,
2017 WL 5559921 (S.D. W. Va. Nov. 17, 2017) ............................................................. 49

*Elsinore*,
91 B.R. 238 ........................................................................................................................ 80

*Federal–Mogul Global, Inc.*,
300 F.3d 382 ................................................................................................................. 79, 81

*Federal-Mogul*,
282 B.R. 308 ...................................................................................................................... 70

*Ferguson v. Arcata Redwood Co.*,
2004 WL 2600471 (N.D. Cal. 2004) ................................................................................ 66

*Feuer v. Merck & Co.*,
187 A.3d 873 (N.J. App. Div. 2018) .................................................................................. 65

*Forcine Concrete & Const. Co. v. Manning Equip. Sales & Serv.*,
426 B.R. 520 (E.D. Pa. 2010) ...................................................................................... 70, 71

*Gold v. Johns-Manville Sales Corp.*,
723 F.2d 1068 (3d Cir. 1983) ....................................................................................... 60, 61

*Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*,
194 B.R. 318 (Bankr. S.D.N.Y. 1996) .............................................................................. 76

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) ............................................................................................................ 92

*Gray v. Hirsch*,
230 B.R. 239 (S.D.N.Y.1999) .......................................................................................... 47

*Halper v. Halper*,
164 F.3d 830 .................................................................................................................... 78

*Haring v. Prosise*,
462 U.S. 306 (1983) .......................................................................................................... 72

*Harrison Lumber & Hardware Co. v. C. I. R.*,
15 T.C.M. (CCH) 281 (Tax 1956) .................................................................................... 66

*Holland v. High Power Energy*,
248 B.R. 53 (S.D. W. Va. 2000) ....................................................................................... 60

*Huylar v. Cragin Cattle Co.*,
7 A. 521 (N.J. Ch. 1887) ................................................................................................... 65

iv

*In re Aldan Indus., Inc.*,
  No. 00-10360DWS, 2000 WL 357719 (Bankr. E.D. Pa. Apr. 3, 2000) ...................................... 48, 49, 60

*In re Aldrich Pump, LLC*,
  20-30608 (JCW), 2021 WL 3729335 (Bank. W.D.N.C. Aug. 23, 2021) .................................. 25, 55, 85

*In re All Seasons Resorts, Inc.*,
  79 B.R. 901 (Bankr. C.D. Cal. 1987) ................................................................................ 49, 57

*In re Am. Cap. Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012) ............................................................................................ 86, 87

*In re Am. Film Techs., Inc.*,
  175 B.R. 847 (Bankr. D. Del. 1994) .................................................................................. 72, 73

*In re Bestwall LLC*,
  606 B.R. 243 (Bankr. W.D.N.C. 2019) ................................................................... 55, 56, 84, 85

*In re Bora Bora, Inc.*,
  424 B.R. 17 (Bankr. D.P.R. 2010) ............................................................................................ 49

*In re Briarpatch Film Corp.*,
  281 B.R. 820 (Bankr. S.D.N.Y. 2002) ...................................................................................... 46

*In re Brier Creek Corporate Center Associates Ltd.*,
  486 B.R. 681 (Bankr. E.D.N.C. 2013) ................................................................................ 51, 80

*In re Colonial Realty*,
  980 F.2d 125 (2d Cir. 1992) ..................................................................................................... 46

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004) ............................................................................................. passim

*In re DBMP LLC*,
  Case No. 20-30080 (JCW), 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021) ........... 25, 55, 56, 85

*In re Denby-Peterson*,
  941 F.3d 115 (3d Cir. 2019) ........................................................................................ 45, 52, 84

*In re F.T.L., Inc.*,
  152 B.R. 61 (E.D. Va. 1993) ..................................................................................................... 49

*In re Federal-Mogul Global Inc.*,
  411 B.R. 148 (Bankr. D. Del. 2008) ......................................................................................... 63

*In re First Cent. Fin. Corp.*,
  238 B.R. 9 (Bankr. E.D.N.Y. 1999) .......................................................................................... 57

*In re FPSDA I, LLC*,
  No. 10-75439, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec. 21, 2012) ...................................... 49, 56, 83

*In re G-I Holdings Inc.*,
420 B.R. 216 (D.N.J. 2009) ................................................................................................. 82

*In re G-I Holdings*,
580 B.R. 388 (Bankr. D.N.J. 2018) ...................................................................................... 80

*In re Heating Oil Partners*,
No. 3:08-CV-1976 CSH, 2009 WL 5110838 (D. Conn. Dec. 17,2009) ............................... 50

*In re Imerys Talc America, Inc, Inc.*,
2019 WL 3253366(D. Del. 2019) .................................................................................. 74, 81

*In re Integrated Telecom Express, Inc.*,
384 F.3d 108 (3d Cir. 2004) .................................................................................................. 53

*In re Irwin*,
457 B.R. 413 (Bankr. E.D. Pa. 2011) .................................................................................... 51

*In re Johns-Manville Corp.*,
26 B.R. 405 (Bankr. S.D.N.Y. 1983) ..................................................................................... 45

*In re Johns-Manville Corp.*,
801 F.2d 60 (2d Cir. 1986) .................................................................................................... 79

*In re Johnson & Johnson Talcum Products*,
509 F. Supp. 3d 116 (D.N.J. 2020) ....................................................................................... 17

*In re Kaiser Aluminum Corp.*,
456 F.3d 328 (3d Cir. 2006) .................................................................................................. 52

*In re KB Toys Inc.*,
736 F.3d 247 (3d Cir. 2013) .................................................................................................. 84

*In re Lower Bucks Hosp.*,
488 B.R. 303 (E.D. Pa. 2013) .......................................................................................... 58, 81

*In re MCSi, Inc.*,
371 B.R. 270 (S.D. Ohio 2004) ............................................................................................. 72

*In re Metal Center, Inc.*,
31 B.R. 458 (Bankr. D. Conn. 1983) ..................................................................................... 72

*In re Millennium Lab Holdings II LLC*,
945 F.3d 126 (3d Cir. 2019) .................................................................................................. 53

*In re Monroe Well Serv., Inc.*,
67 B.R. 746 (Bankr. E.D. Pa. 1986) ........................................................................... 51, 80, 91

*In re New Valley Corp.*,
181 F.3d 517 (3d Cir. 1999) ............................................................................................. 92, 93

*In re Owens Corning,*
419 F.3d 195 (3d Cir. 2005) ................................................................................ 53

*In re Phila. Newspapers, LLC,*
418 B.R. 548 (E.D. Pa. 2009) ............................................................................. 52

*In re Phila. Newspapers, LLC,*
407 B.R. 606 (E.D. Pa. 2009) ....................................................... 49, 78, 79, 82

*In re Quigley Co., Inc.,*
676 F.3d 45 (2d Cir. 2012) ......................................................................... 75, 87

*In re Saxby's Coffee Worldwide, LLC,*
440 B.R. 369 (Bankr. E.D. Pa. 2009) ......................................................... 51, 82

*In re Scarborough-St. James Corp.,*
535 B.R. 60 (Bankr. D. Del. 2015)............................................................... 45, 51

*In Re Seven Fields Dev. Corp.,*
505 F.3d (3d Cir. 2007) ...................................................................................... 80

*In re Trans-Service Logistics, Inc.,*
304 B.R. 805 (Bankr. S.D. Ohio 2004) ............................................................. 49

*In re Uni-Marts, LLC,*
399 B.R. 400 (Bankr. D. Del. 2009)...................................................... 47, 48, 57

*In re Univ. Med. Ctr.,*
82 B.R. 754 (Bankr. E.D. Pa. 1988) .................................................................. 50

*In re W.R. Grace & Co.,*
No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ............................... 48

*In re Wedgewood Realty Group, Ltd.,*
878 F.2d 693 (3d Cir. 1989) ......................................................................... 49, 77

*In SGL Carbon Corp.,*
200 F.3d 154 (3d Cir. 1999) ............................................................................... 53

In *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),*
386 B.R. 17 (Bankr. D. Del. 2008).................................................................... 72

*Ingham v. Johnson & Johnson,*
608 S.W.3d 663 (Mo. Ct. App. 2020) ..................................................... 19, 20, 90

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,*
882 F.2d 797 (3d Cir. 1989) ............................................................................... 81

*Int'l Union of Painters & Allied Trades Dist. Council No. 21 Health & Welfare Fund v.*
*Serv. Painting, Inc.,*
No. CV 18-3480, 2019 WL 2143370 (E.D. Pa. May 16, 2019) ....................................... 72

*Jackson v. Trump Ent. Resorts, Inc.*,
 No. CV 13-1605 (JHR/JS), 2015 WL 13637411 (D.N.J. Feb. 11, 2015).........................46, 70

*Jaycox v. Terex Corp.*,
 No. 4:19-CV-02650 SRC, 2021 WL 2187907 (E.D. Mo. May 28, 2021).............................63

*Kaiser Group Int'l, Inc. v. Kaiser Aluminum and Chem. Corp. (In re Kaiser Aluminum Corp., Inc.)*,
 315 B.R. 655 (D. Del. 2004) ..........................................................................................50

*Keystone Driller Co. v. General Excavating Co.*,
 290 U.S. 240 (1933) ......................................................................................................93

*Lyondell Chem. Co. v. CenterPoint Energy Gas Servs., Inc.*,
 402 B.R. 571 ..........................................................................................................51, 80

*Maaco Enters., Inc. v. Corrao*,
 91-3325, 1991 WL 255132 (E.D. Pa. Nov. 25, 1991) ......................................................50

*Mallinckrodt PLC v. Connecticut*,
 20-408-LPS, 2021 WL 523625 (D. Del. Feb. 2, 2021) .....................................................50

*Maritime Elec. Co. v. United Jersey Bank*,
 959 F.2d 1194 (3d Cir. 1991) ...................................................................................45, 46

*Matter of S.I. Acquisition, Inc.*,
 817 F.2d 1142 ..............................................................................................................83

*Mazurek v. Armstrong*,
 520 U.S. 968 (1997) .................................................................................................82, 83

*McCartney v. Integra Nat. Bank N.*,
 106 F.3d 506 (3d Cir. 1997) .........................................................................45, 46, 47, 49

*Milchalko v. Cooke Color & Chem. Corp.*,
 91 N.J. 386 (1982) ........................................................................................................69

*Millard v. Developmental Disabilities Institute, Inc.*,
 266 B.R. 42 (E.D.N.Y. 2001) ..................................................................................49, 50, 57

*Mitchell v. Horn*,
 318 F.3d 523 (3d Cir. 2003) ...........................................................................................52

*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010) ......................................................................................................81

*Muskrat v. United States*,
 219 U.S. 346 (1911) ......................................................................................................54

*Novartis Consumer Health, Inc. v. Johnson & Johnson – Merck Consumer Pharmaceuticals Co.*,
 290 F.3d 578 (3d Cir. 2002) ...........................................................................................82

*NutraSweet Co. v. Vit-Mar Enterprises, Inc.*,
  176 F.3d 151 (3d Cir. 1999) ........................................................................... 82

*Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*,
  692 F.3d 283 (3d Cir. 2012) ........................................................................... 78

*Official Unsecured Creditors Committee of Phar-Mor, Inc. v. Bowen, et al. (In re Phar-Mor, Inc.*
  *Sec. Litig.)*,
  164 B.R. 903 (W.D. Pa. 1994).............................................................. 57, 74, 82

*Pacor, Inc. v. Higgins*,
  743 F.2d 984 (3d Cir. 1984) ................................................................. 72, 78, 79

*Paden v. Union for Experimenting Colleges and Universities*,
  7 B.R. 289 (N.D. Ill. 1980)............................................................................. 45

*Patton v. Bearden*,
  8 F.3d 343 (6th Cir. 1993) .............................................................................. 49

*Phar-Mor, Inc. v. Gen. Elec. Capital Corp. (In re Phar-Mor, Inc. Sec. Litig.)*,
  166 B.R. 57 (W.D. Pa. 1994)........................................................................... 59

*Pierre-Louis v. DeLonghi America, Inc.*,
  66 A.D.3d 859, 887 N.Y.S.2d 628 (2d Dep't 2009)............................................ 69

*Poe v. Ullman*,
  367 U.S. 497 (1961) ...................................................................................... 54

*Queenie, Ltd. v. Nygard Int'l*,
  321 F.3d 282 (2d. Cir. 2003) ............................................................... 48, 71, 72

*Richards v. Musselman*,
  267 S.E.2d 164 ............................................................................................ 92

*Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*,
  502 F.3d 1086 (9th Cir. 2007) ........................................................................ 82

*Stanford v. Foamex L.P.*,
  2009 WL 1033607 (E.D. Pa. Apr. 15, 2009)..................................................... 60

*Stoe v. Flaherty*,
  436 F.3d 209 (3d Cir. 2006) ..................................................................... 78, 80

*Teachers Ins. & Annuity Ass'n of Am. v. Butler*,
  803 F.2d 61 (2d Cir. 1986) ............................................................................. 49

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002) ........................................................................... 82

*Travelodge Hotels, Inc. v. Patel*,
  C.A. No. 13-03719 (WHW), 2013 WL 4537906 (D.N.J. Aug. 27, 2013) .............. 46

*United States Trustee v. Gryphon at the Stone Mansion, Inc.*,
166 F.3d 552 (3d Cir.1999) ............................................................................78

*United States v. Johnson*,
319 U.S. 302 (1943) .....................................................................................54

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989) .....................................................................................52

*Wedgeworth v. Fibreboard Corp.*,
706 F.2d 541 (5th Cir. 1983) ...............................................................61, 62

*Williford v. Armstrong World Industries, Inc.*,
715 F.2d 124 (4th Cir. 1983) ........................................................60, 61, 90

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) .................................................................................81, 83

*Worldcom, Inc. v. Boyne*,
68 Fed. App'x. 447 (4th Cir. 2003) .............................................................92

## Statutes

11 U.S.C. § 101 ...............................................................................................85

11 U.S.C. § 105 ........................................................................................passim

11 U.S.C. § 105(a) ....................................................................................passim

11 U.S.C. § 129(a)(10) .....................................................................................86

11 U.S.C. § 301(b) ...........................................................................................85

11 U.S.C. § 362 ........................................................................................passim

11 U.S.C. § 362(a)(1) .......................................................................................44

11 U.S.C. § 362(a)(3) .......................................................................................44

11 U.S.C. § 362(a) ....................................................................................passim

11 U.S.C. § 362(a)(3) .......................................................................................46

11 U.S.C. § 502(e)(1)(B) ..................................................................................89

11 U.S.C. § 524 ................................................................................................86

11 U.S.C. § 524(g)(4)(a) ..................................................................................87

11 U.S.C. § 524(g) ....................................................................................passim

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb)...............................................................86

11 U.S.C. § 524(g)(4)(A)(ii) ................................................................................................ 87

11 U.S.C. § 524(g)(4)(A)(ii)(I) ........................................................................................... 85

11 U.S.C. § 524(g)(4)(A)(ii)(II) .......................................................................................... 85

11 U.S.C. § 524(g)(4)(A)(iii) ............................................................................................... 85

11 U.S.C. § 548(a) ............................................................................................................... 58

28 U.S.C. § 157(b)(5) .......................................................................................................... 23

28 U.S.C. § 1334(b) ....................................................................................................... 23, 78

28 U.S.C. § 1407 ............................................................................................................. 5, 92

N.J.S.A. 14A:5–28 ............................................................................................................... 65

N.J.S.A. 14A:5–28(4) ......................................................................................................... 65

Rules

Fed. R. Civ. P. 8(a) ............................................................................................................. 17

Fed. R. Civ. P. 9(b) ............................................................................................................. 17

Fed. R. Bankr. P. 7001(7) ................................................................................................... 41

Other Authorities

6 Norton Bankr. L. & Prac. § 112:10 (3d ed. 2012) ........................................................... 86

11A Wright, Miller & Kane, Federal Practice and Procedure § 2948, p. 129-30 (1995) .......................... 82

63 Am. Jur. 2d *Products Liability* § 91 (Aug. 2021 update)....................................................... 68

Fletcher Cyc. Corp. §§ 2189, 2191, 2193 ........................................................................... 65

H.R. Rep. No. 95–595.......................................................................................................... 45

Restatement, Torts 2d, § 402A............................................................................................ 69

The Official Committee of Talc Claimants (the "**Official Committee**")[1] appointed in the
above-referenced chapter 11 case (the "**Bankruptcy Case**") of LTL Management LLC ("**LTL**" or
the "**Debtor**"), hereby submits this memorandum of law in support of its Objection to the *Debtor's
Motion for an order (I) Declaring That the Automatic Stay Applied to Certain Actions Against
Non-Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary
Restraining Order Pending a Final Hearing* [Adv. Pro. Dkt. No. 2] (the "**Motion**") and in response
to the *Debtor's Supplemental Memorandum of Law in Support of Preliminary Injunction Motion*
[Adv. Pro. Dkt. No. 128] (the "**Supplemental Memorandum**"),[2] and respectfully states as
follows:

## PRELIMINARY STATEMENT

LTL was created two days before its Chapter 11 filing with the stated purpose of filing for
bankruptcy. Through this bankruptcy, generally, and by this motion, specifically, Johnson &
Johnson ("**J&J**") seeks to "borrow" for itself and its commercial partners LTL's automatic stay
(without itself filing for bankruptcy), seize up all cosmetic talcum powder-related litigation being
prosecuted *against J&J*, and gain a litigation advantage over dying of cancer. From the perspective
of J&J and the Debtor, this case (as ugly as can be) is about litigation advantage, plain and simple.

The automatic stay, though, is no small thing: It is a statutory injunction, indiscriminately
imposed, that serves as a complete restraint on Seventh Amendment entitlements. It is brutal in
effect. And, because it is so powerful, it is very carefully circumscribed. By its plain terms, it
protects the estate, and the estate alone. And, even then, it is temporary and subject to exceptions
and relief therefrom (including, especially hardship relief). There is no explicit statutory basis in

---

[1]      The Official Committee is a party to the adversary proceeding by virtue of a Stipulation and Order between
the Debtor and the Official Committee entered on November 24, 2021. Adv. Pro. Dkt. No. 109.

[2]      References to the Supplemental Memorandum are cited as "Mem. at __."

§ 362(a) to extend the stay beyond the estate and, in fact, any such extension is inconsistent with the words of the statute. Courts have allowed such extensions under their general equity powers conferred in § 105(a). But, as the highest appellate courts have reiterated over and over, the courts' § 105(a) powers are limited and must be used sparingly. As such, extending the automatic stay beyond the estate is a rare, exceptional, almost emergency occurrence. The Debtor's burden here is perhaps the heaviest in all of bankruptcy law.

This is LTL's fourth attempt to extend the stay to J&J and hundreds of J&J's affiliates, insurers and retailers. All three of the Debtor's prior attempts to extend the automatic stay for the duration of the bankruptcy case were rejected by the prior bankruptcy court. And for good reason. If successful, the Debtor's effort to extend the stay would indefinitely and completely halt tens of thousands of lawsuits, including a five-year-old multi-district litigation pending in this District. All of those cases are filed against J&J and others — *none* have been filed against LTL.

The Debtor's first attempt at extending the stay was denied as procedurally infirm by the United States Bankruptcy Court for the Western District of North Carolina (the "**North Carolina Court**"). The second attempt — an oral application for a temporary restraining order — was denied by the North Carolina Court, which, after a half-day evidentiary hearing, expressed "grave concerns" with the requested extension. On the third attempt — a preliminary injunction motion decided after another day and a half of evidentiary hearings and following the announcement that the bankruptcy case would be transferred to this District — the North Carolina Court, "influenced heavily by the fact that I'm . . . sending the case to another court" and "the last thing I want to do is send it with it on fire," granted interim relief for only 60 days and with the express intention "not . . . to bind" the recipient court.

On the record now before it, this Court should (once again) deny the extraordinary and unjustifiable relief requested by the Debtor. That record leaves no room for doubt that the Debtor's request — manifestly made for the benefit of J&J and its affiliates and commercial partners — seeks to pervert the fundamental language, nature, and purpose of the Bankruptcy Code's automatic stay. The stay was designed to give the honest but unfortunate debtor a breathing spell from the collection efforts of its creditors. But here, LTL seeks to extend that protection to one of the richest companies in the world, J&J, which is not in bankruptcy and has no need to resort to bankruptcy relief, in order to provide J&J with some refuge from mass tort litigation arising out of J&J's own misconduct. In other words, this is the quintessential case of the tail wagging the dog: the debtor was designed for the automatic stay rather than the automatic stay designed for the debtor.

The consequences of extending the automatic stay under these circumstances cannot be overstated. This case would provide a blueprint to transform the Bankruptcy Code into a tool for unbridled corporate greed and manipulation. The bankruptcy filing of a new shell entity formed solely for the purpose of housing inconvenient, embarrassing, or intractable liabilities would become the recipe for any corporation — no matter how solvent — to stonewall its creditors. If successful, the Debtor's strategy would also gut the multi-district litigation system that Congress established in 28 U.S.C. § 1407 to centralize, efficiently manage, and ultimately settle mass tort actions. That entire statutory litigation process would become obsolete, replaced by a system of divisive mergers and bankruptcy filings.

The Third Circuit Court of Appeals and other courts have recognized that the automatic stay may be extended to non-debtors under "unusual circumstances," *i.e.*, where an "identity of interest" has been shown between the debtor and the non-debtors such that claims against the non-

3

debtors are tantamount to claims against the debtor.  However, *no* appellate or district court has *ever* applied the automatic stay in circumstances here, where the purported "identities of interests" were manufactured by the non-debtors on the eve of bankruptcy.  To be clear, the *Debtor* did not sign or assume any of the indemnification agreements, insurance policies or tender letters on which it now relies to claim an identity of interest with J&J and its affiliates, insurers and retailers.  Rather, it was *J&J* and its affiliates that purported to *allocate* all those various liabilities to the Debtor through a Texas "divisional merger."  Outside of a small handful of decisions — *none* precedential or persuasive — in "Texas Two-Step" cases filed exclusively in the North Carolina Court (the manufactured venue in which the Debtor chose to file this case), the Debtor cites to *no* case where, as here, the automatic stay was applied to non-debtors who, by corporate alchemy, fabricated their own identities of interest with the debtor days before putting the debtor into bankruptcy.  This Court should not set precedent by expanding the reach of the automatic stay to such breathtaking lengths and solely on the basis of corporate artifice.

Even if the identities of interest on which the Debtor now relies were *not* manufactured on the eve of its bankruptcy filing (and they were), there still would be no basis for extending the automatic stay here.  As the language and history of the statute evince, the purpose of the automatic stay is to prevent creditor actions that would diminish the debtor's assets.  But that purpose finds no place in this bankruptcy, where the litigation claims are asserted against J&J, a half-*trillion* dollar corporation with practically *no limits* on its distributable assets.  To be sure, the Debtor was allocated certain indemnification obligations, shared insurance, and/or defense payment obligations.  But, this maneuvering was contrived.  And, in any event, the Debtor claims that J&J — among the most solvent and credit-worthy institutions in the world — has agreed to *replenish*

any consequent erosion to the Debtor's assets.  In short, the rationale for applying the automatic stay — to prevent any adverse impact on the Debtor's estate — is glaringly absent.

In all events, were the Court even to reach the issue, the Debtor has not carried its heavy burden of establishing each of its supposed obligations on which it relies for purposes of its Motion.  The Debtor's position on each of these points — indemnification, shared insurance, and accepted tenders of defense — is unsupported by the record and flatly contradicted by the testimony of J&J's own witnesses in numerous talcum powder litigations prior to the bankruptcy filing.  Nor can the Debtor demonstrate any irreparable harm that would result from failure to grant injunctive relief, given its position that J&J has agreed to replenish any erosion in the Debtor's estate.

Conversely, the harm to tens of thousands of litigants dying of cancer from the denial of access to the courts is manifest. This Court should not close its eyes to the human costs of the Debtor's requested relief, which would deny tens of thousands of dying victims their right to a day in court.

The Motion should be denied in its entirety.

## FACTUAL BACKGROUND

### I.    The Debtor, Its Estate and Its Creditors

The Debtor is a special purpose vehicle ("**SPV**") created by J&J and its consumer products subsidiary, Johnson and Johnson Consumer, Inc. ("**JJCI**" or "**Old JJCI**"), two days before its bankruptcy filing.  (First Day Decl. of John K. Kim ("**First Day Decl.**") [Main Dkt. No. 5], at ¶ 23).  Its staff consists of three individuals, working out of J&J's headquarters and other offices in New Jersey, seconded to the Debtor by Johnson & Johnson Services, Inc. ("**J&J Services**"), a J&J

subsidiary. (*Id.* at ¶ 29; Kim Dep. Tr., Oct. 31, 2021 ("**Kim Tr**."), at 255:1-8, 262:9-264:3; [3] Oct.

22, 2021 H'rg Tr. [Joint Claimant Ex. ("**Cl. Ex.**")[4] 5], at 45:2-46:12; [5] Debtor Ex. ("**Dbt. Ex.**") [6]

1 (LTL 0001874-89, LTL 0001890-900)). All three worked for J&J until the Debtor's formation.

(Cl. Ex. 5, at 45:9-46:15; Nov. 4, 2021 H'rg Tr., at 173:7-174:9; 276:11-20; First Day Decl., at ¶

2). The Debtor's Chief Legal Officer ("**CLO**"), John Kim, had been the head of Product Liability

Litigation for J&J, but resigned from that post shortly before the Debtor's formation and was

succeeded by another J&J in-house attorney. (First Day Decl., at ¶ 2; Kim Tr., at 9:22-10:17,

254:14-24). Consequently, none of the Debtor's staff have, or should have, any ongoing

responsibilities with regard to products liability litigation filed against J&J at this point. (Kim Tr.,

at 254:14-24).

The Debtor does not have any operational presence. (Dbt. Ex. 1 (LTL 0001874-89)). It

does not make anything or sell anything. It does not participate in the commercial world in any

capacity. (First Day Decl., at ¶¶ 16-18, ¶¶ 22-24). In that vein, the Debtor did not sign, or

otherwise take any steps to become a party to, any commercial agreement, including (as discussed

---

[3] A copy of the Kim Transcript is attached as Exhibit "A" to the Declaration of Melanie L. Cyganowski in
Support of Objection of the TCC to Debtor's Motion for Preliminary Injunction, filed contemporaneously herewith
(the "**Cyganowski Decl.**"). The Cyganowski Decl. attaches certain documents that were not submitted previously in
connection with the Motion

[4] "Cl. Ex." Refers to the Joint Claimants' exhibits that were admitted into the record during the November 4-
5, 2021 Preliminary Injunction Hearing in the North Carolina Court, Case No. 21-30589 (MBK), and related adversary
proceeding Adv. Pro. No. 21-03032 (MBK).

[5] A copy of the October 22, 2021 hearing transcript is attached as Exhibit "1" to the Declaration of Adam C.
Silverstein in Support of Objection of the TCC to Debtor's Motion for Preliminary Injunction, filed
contemporaneously herewith (the "**Silverstein Decl.**"). The Silverstein Decl. attaches for the convenience of the Court
certain Joint Claimants' exhibits previously admitted into evidence in connection with the Motion, certain transcripts
from proceedings before the North Carolina Court and certain public filings on the dockets of certain other cases,
referred to herein. The Debtor has filed, or is filing, the Debtor exhibits it offered, and which were admitted into
evidence, on the docket of this Adversary Proceeding.

[6] "Debtor Ex." Refers to the Debtor's exhibits that were admitted into the record during the November 4-5,
2021 Preliminary Injunction Hearing in the North Carolina Court, Case No. 21-30589 (MBK), and related adversary
proceeding Adv. Pro. No. 21-03032 (MBK) (Adv. Pro. Dkt. No. 135).

below) any of the indemnification agreements, insurance agreements or tender of defense agreements on which it now relies in an effort to extend the automatic stay. (*See* pp. 29–39, *infra*).

The Debtor asserts that: "At the time of the bankruptcy filing, the Debtor was besieged by talc claims . . . ." (Mem. at 2). That is categorically untrue. As of the bankruptcy filing, the then two-day-old Debtor had *never* been sued. Mr. Kim admitted that fact in open court:

> Q: [A]t the time of the LTL filing on October the 14th there were no talc lawsuits pending against LTL, correct?

> A: True, yes.

(Silverstein Decl, Ex. 2 (Nov. 4 H'rg Tr.), at 244:24–245:1). Befitting a passive SPV, upon its creation, the Debtor was bestowed with a few assets: a royalty stream, a bank account with $6 million, and a funding obligation from J&J and JJCI. (First Day Decl., at ¶¶ 22-24).

According to its bankruptcy schedules, the Debtor does not have any funded or meaningful operational debt. (Schedules of Assets and Liabilities for LTL Management LLC [Main Dkt. No. 908]). Rather, its creditors consist almost entirely of tens of thousands of individuals who are suffering from ovarian cancer or mesothelioma, or who are the personal representatives of individuals who died from ovarian cancer or mesothelioma, alleged to have been caused by J&J's talcum powder products. (*Id.*). As the Chief Medical Officer of JJCI testified, "both of these diseases is typically fatal." (Silverstein Decl. Ex. 3 (Nov. 5, 2021 H'rg Tr.), at 417:1-5).

## II. Events Culminating in the Debtor's Bankruptcy Filing

### A. J&J and Its Talcum Powder Products

J&J is one of the largest multi-national conglomerates in the world, operating in three principal segments: consumer health, pharmaceuticals and medical devices. (*See* JNJ 2021 Form

10-K Annual Report at 1).[7]  Its shares are publicly traded on the New York Stock Exchange under the ticker symbol "JNJ."  (*Id.*).  As of the filing of the Motion, the company had a market capitalization of approximately $430 billion, $31 billion in cash and marketable securities, and was one of two governmental or nongovernmental enterprises in the world (Microsoft being the other) with the highest available credit rating (higher than the United States of America) — notwithstanding the well-known existence of tens of thousands of talcum powder-related lawsuits (discussed below) against it.[8]

In the Motion, the Debtor makes much of the fact that "[i]n the 1970s, J&J adopted a policy to decentralize its operations" "by giving each company autonomy to make decisions without unnecessary constraints." (Mem. at 8).  But the Debtor ignores that — even after decentralization — *multiple* companies, including J&J, had direct involvement with talcum powder production, marketing, sale and safety.  As described below, notwithstanding that J&J is now a holding company, it has its own personnel, who, both before and after decentralization, had, and continue to have, direct involvement with talcum powder products that subject, and have subjected, J&J to direct claims of liability.

1.    **Johnson's Baby Powder**

 For nearly one hundred years, J&J directly manufactured, marketed and sold Johnson's Baby Powder ("**JBP**").  (First Day Decl., at ¶10).  In 1979, J&J transferred the assets of its Baby Products division (through which J&J had most recently sold JBP) into a wholly-owned subsidiary called Johnson and Johnson Baby Products Company ("**J&J Baby Products**").  (First Day Decl.,

---

[7]     Available at https://johnsonandjohnson.gcs-web.com/node/47816/html.

[8]     *See What Do AA+ and AAA Credit Ratings Mean?*, Investopedia, https://www.investopedia.com/stock-analysis/2011/what-do-aa-and-aaa-credit-ratings-mean-jnj-xom-adp-msft0809.aspx.

at ¶ 10; Cl. Ex. 5, at 72:25-74:22). Through a series of asset transfers and mergers, J&J Baby Products ultimately was succeeded by JJCI. (First Day Decl., at ¶¶ 10-14).

Hence, from 1979 through 2020 when it announced that it would discontinue its sale of talcum powder products in the United States and Canada, JJCI (or one of its predecessors) manufactured and sold JBP. (First Day Decl., at ¶ 33). Conversely, at all times prior to 1979, it was J&J, not any subsidiary, that manufactured and sold the product. (Cl. Ex. 5, at 59:6-59:19). That is significant because, as Mr. Kim, testified, "when a plaintiff used the product . . . is, generally, in these cases in the '60s and '70s up through the present." (Nov. 5 H'rg Tr., at 315:10-18). As Mr. Kim later explained, "in the talc cases, there is a latency period, of 60 years." (*Id.* at 343:12-344:6). He further admitted that, consequently, "for pre-1979 exposure" J&J is legally "responsible in the sense that it should be named the party in the lawsuit." (Cl. Ex. 5, at 59:6-19).

Even after 1979, J&J's copyright (owned by J&J) continued to appear in advertisements for JBP, and J&J's logo (owned by J&J) continued to appear on certain JBP packaging. (Cl. Ex. 5, at 77:10-78:19, 89:22-90:17). In fact, at all times, both before and after 1979, J&J owned, and continues to own, *all* intellectual property appearing in advertisements for, and on containers of, JBP. (Nov. 4 H'rg. Tr., at 22:5-220:15).

### 2. Shower to Shower

J&J — again, directly, not through a subsidiary — also manufactured, marketed and sold another talcum powder product called Shower to Shower ("**STS**"), from, at least, the 1960s through the end of 1978. (Cl. Ex. 5, at 78:20-79:10, 80:18-82:12; Nov. 4 H'rg. Tr., at 114:3-114:11, 202:14-20). Beginning in 1979, a wholly-owned subsidiary of J&J called Johnson and Johnson Personal Products Company ("**J&J Personal Products**"), began to manufacture and sell STS. (Nov. 4 H'rg. Tr., at 114:3-12, 205:22-206:7). As with JPB, at all times, J&J owned, and continues

to own, all intellectual property appearing in advertisements for, and on containers of, STS. (Nov. 4 H'rg. Tr., 22:5-220:15).

J&J Personal Products, J&J's wholly owned subsidiary, manufactured and sold STS until about 1987, when the product line was transferred to J&J Baby Products, a predecessor of JJCI. In 2012, the STS product line was then sold outside the J&J group of companies to Valeant Pharmaceuticals International, Inc., now known as Bausch Health Companies Inc. (Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions [Adv. Pro. Dkt. No. 3] ("**Supp. Decl.**"), at ¶ 12; Nov. 4 H'rg Tr. 130:11-131:21, 207:2-21, 208:18-209:4).

The Debtor asserts that, because the "liabilities . . . related to [STS] products were transferred from [J&J Personal Products] to [J&J Baby Products]," "Old JJCI became responsible for all claims alleging that [STS] . . . causes cancer." (Mem. at 12-13). But the Debtor's own witness, Mr. Kim, admitted the Debtor has found no agreement showing (i) that J&J Personal Products assumed any STS liabilities when it took over STS, or (ii) that the J&J Baby Products assumed any liabilities when it took over STS in 1987. (Nov. 4 H'rg Tr., at 206:12-209:12).[9]

### 3. Windsor Minerals

From the 1960's to 1989, J&J, through a wholly owned subsidiary called Windsor Minerals, Inc. ("**Windsor**"), also owned certain Vermont mines that supplied the talc for the

---

[9]    Further, corporate representatives designated by J&J to give binding testimony in talcum powder litigation have acknowledged J&J's independent liability with regard to STS, even after the product line was transferred to J&J Personal Products in 1978. (*See* Silverstein Decl., Ex. 5 (Cl. Ex. 6), at 7750:22-7751:1 ("Q: Johnson & Johnson has been ultimately responsible for manufacturing, selling, distributing and testing Shower to Shower through the entire history of that product with Johnson & Johnson, correct?  A: Yes, up until its sale to Valiant [Valeant].").  In the North Carolina Court, Mr. Kim attempted to disavow this binding testimony, but ultimately admitted that"[i]t may have been Johnson & Johnson. I just don't know." (Oct. 22, 21 H'rg. Tr., at 85: 6-7).  Any suggestion that the witness's reference to "Johnson & Johnson" may have been colloquial is belied by the witnesses' immediately preceding testimony in which he clearly differentiated between "Johnson & Johnson" as the parent company and "Johnson & Johnson Consumer Inc." as the subsidiary. (Cl. Ex. 6, at 7749:6-19).

manufacture of JBP, STS and certain industrial products.  (Nov. 4 Tr. 209:20-210:19, 210:20-211:3, 211:16-211:22, 212:9-15, 213:6-213:11).  Windsor was never owned or operated by JJCI or any predecessor thereto.  (Nov. 4 Tr. 210:14-210:19, 212:2-212:8).  In 1989, J&J sold Windsor to Cyprus Mines Corporation ("**Cyprus**").  (Nov. 4 H'r Tr. 212:25-213:5; Silverstein Decl. Ex. 4 (Cl. Ex. 50)).  In connection with the sale, it was J&J, not JJCI, which gave an indemnity to Cyprus.  (*Id.* 218:7-12; Cl. Ex. 50 §11.2).

At all times until Windsor's sale, J&J maintained complete control of the Vermont mines, including the testing of talc ore (as well as of end-products), and touted *J&J's* mining operations as a means of assuring safety.  A 1976 pamphlet, bearing J&J's copyright, told consumers:

> **Aren't all powders the same?** No. Because talcs are different. *Johnson & Johnson* owns its own talc mines in Vermont. These mines have an exceptionally high quality talc which is constantly checked to insure its safety and purity. The talc has a minimum of impurities and a maximum of the platelet crystals that make talc smooth and adsorbent. You can feel the difference between other powders and the smoothness of JOHNSON'S Baby Powder.

(Cyganowski Decl. Ex B. (JNJ 000881819_0001-00005) (emphasis added)).  A decade later, J&J was still repeating the theme that *its* control over the Vermont mines assured the safety of JBP.  (*See* Cyganowski Decl. Ex C (JNJ 000018966-9024), at JNJ 000018998 ("Johnson & Johnson's own talc mine is located in Vermont. . . . Johnson & Johnson mines only the highest grade talc"); JNJ000018976 ("We own the talc mine which gives us complete control over the quality of talc used in our products")*;* Cyganowski Decl. Ex. D (JNJ 000234904-05) (referring to "our underground operation in Vermont")).

### 4.    Health and Safety Policy Decisions

Despite transferring the manufacture and sale of its talcum powder products to subsidiaries in 1979, J&J continued to make health and safety policy decisions governing the manufacture and sale of its subsidiaries' products, including the decision whether to include health and safety

warnings. (Cl. Ex. 5, at 85:9-86:8, 88:6-89:9). In talcum powder litigation prior to the bankruptcy filing, the corporate representative designated to testify on behalf of J&J and JJCI, Dr. John Hopkins, made that clear in binding testimony:

> Q: Johnson & Johnson Corporate in New Brunswick made all health and safety policy decisions with regard to asbestos and talc products, correct?
>
> A: The -- yes. The company in New Jersey is the parent company for all the global companies, made those decisions, yes.

(*Id.* at 86:16-87:21; Silverstein Decl., Ex. 6 (Cl. Ex. 4), at 25:10-15). Dr. Hopkins further testified:

> Q: And you would agree that Johnson & Johnson has the authority to require warnings on Johnson's Baby Powder about cancer, correct?
>
> A: They have the authority to require warnings. If that were a medical requirement, they would, yes.

(Cl.Ex. 5, at 88:16-89:9; Cl. Ex. 6, at 7752:11-15).

In the bankruptcy, when asked about Dr. Hopkins' testimony, Mr. Kim testified that he "ha[d] to assume there were some [public health and safety policy] decisions made elsewhere [other than J&J]," but did not deny the fact that J&J continued to make its own independent health and safety policy decisions affecting the manufacture and sale of its subsidiaries' products, including whether to include warnings. (Cl. Ex. 5, at 87:24-88:3, 88:16-89:9). Further, in reference to Dr. Hopkins' repeated testimony that J&J made "all health and safety policy decisions" and that J&J had the authority to require warnings on its products, Mr. Kim further testified that "we live by the testimony that was given." (Nov. 4 H'rg. Tr., at 221:23-226:13).

In 2013, J&J formally instituted a Medical Safety Committee ("**MSC**"), chaired by its Chief Medical Officer ("**CMO**"). (Nov. 4 Tr., at 227:1-228:22; Cl. Ex. 164). The MSC is "the highest body of Johnson & Johnson engaged in setting the standards of medical safety." (Nov. 5 H'rg Tr., at 400:21-401:8; Dbt. Ex. 45). Any health and safety decision made at the product sector,

12

*i.e.,* subsidiary, level can be elevated to the MSC for review, and J&J's CMO, alone, can elevate any such decision for review. (*Id.* at 404:21-24, 407:5-7, 13-21; Cl. Ex. 164). Once elevated to the MSC, the MSC is charged with making health and safety decisions by consensus. But, in the absence of consensus (including, because J&J's CMO disagrees with the sector-level medical officers), the health and safety decision under review is to be made solely by J&J's CMO. (*Id.* at 408:12-20, 415:17-23; Cl. Ex. 164).

### 5. Public Relations

As the ultimate parent company, with public stockholders economically impacted by the operational decisions of J&J's subsidiaries, public relations is another area in which J&J continued to maintain direct involvement with talcum powder products, even after the manufacture and sale of those products was transferred to its subsidiaries in 1979. Thus, when Reuters published an article in December 2018 reporting on the presence of asbestos in JBP, it was *J&J* that responded with full-page newspaper ads, featuring photos of the JBP container, signed "Johnson & Johnson." (Silverstein Decl. Ex. 8 (Cl. Ex. 12); Cl. Ex. 5, at 96:19-102:19). In the ads, J&J — not JJCI — sought to reassure the public:

> Johnson & Johnson knows that the talc in our baby powder is the purest, safest pharmaceutical-grade talc on earth.
>
> [It] does not contain asbestos and never will. We test every single lot to ensure it.
>
> \*　　\*　　\*
>
> [W]e have always acted with the transparency in this matter. Nothing is more important to us than the health and safety of our customers . . . .

(*Id.*). As J&J's head of "strategic communications," Danielle Devine, testified in talcum powder litigation months before the bankruptcy filing, the "Johnson & Johnson ad" campaign was launched "with the goal of having people trust us." (Cyganowski Decl. Ex. E, Transcript of

Deposition of Danielle Devine, January 19, 2021, at 12;22-14:6, 156:1-6). She acknowledged:
"by putting it in an advertisement that ran in major newspapers, it's something that *Johnson &
Johnson* said with the intention that people would believe it." (*Id.* 198:21-25 (emphasis added)).
Indeed, J&J's public relations response to the Reuters article was led from the very top, with J&J's
chief executive officer, Alex Gorsky, directly taking to the airwaves to assure the public personally
that its subsidiaries' products were safe, free of asbestos and could, and should, continue to be
purchased and used. (Cl. Ex. 5, at 96:19-102:19; Nov. 4 H'rg. Tr, at. 229:4-229:20; Silverstein
Decl, Exs. 9 and 10 (Cl. Exs. 14 & 15)).

    **B.**    **Talcum Powder Litigation**

        **1.**    **Ovarian Cancer and Mesothelioma Cases**

    It is well known that J&J faces tens of thousands of lawsuits arising from cancer caused by
its talcum powder products. Those cases fall into two categories: ovarian cancer cases and
mesothelioma cancer cases.

    The first lawsuit against J&J and/or JJCI claiming ovarian cancer resulting from the alleged
use of their talcum powder products was a case known as *Berg* filed in 2009 that went to trial in
2013. (Nov. 4 H'rg Tr., at 120:6-121:3; First Day Decl., at ¶ 35). In February 2016, an ovarian
cancer case against J&J and JJCI known as *Fox* went to trial, and "the jury awarded the plaintiff
$72 million." (*Id.* at ¶ 36). That verdict, according to the Debtor, resulted in the "number of
ovarian cases skyrocket[ing]." (*Id.* at ¶ 43). In 2014, J&J and/or JJCI had been named in 46
ovarian cancer complaints; by 2017, "that number was nearly 5,000;" "[a]s of the Petition Date,
there were approximately 38,000 ovarian cancer cases . . ., including approximately 35,000 cases
pending in a federal multi-district litigation in New Jersey, and approximately 3,300 cases in
multiple state court jurisdictions across the country," including New Jersey. (*Id.* at ¶¶ 42-43; Nov.

5 H'rg. Tr., at 120:6-121:3, 242:2-6). *None* of those cases named the Debtor as a defendant. (*See* p. 7, *supra*).

The first lawsuit against J&J and/or JJCI claiming mesothelioma — a cancer of the lining of the lungs and other organs caused by asbestos inhalation — resulting from the alleged use of talcum powder products was a case known as *Howard* filed in 1996. (Nov. 4 Hr'g Tr., at 200:4-11). By February 2016, "[a]t the time of the *Fox* trial, there were only six mesothelioma cases naming Old JJCI or J&J as a defendant . . .;" "[b]y the beginning of 2017, more than 100 mesothelioma cases had been filed naming Old JJCI or J&J as a defendant;" and, since that time, "[t]he number of cases of mesothelioma cases steadily grew," well into the hundreds. (First Day Decl.,at ¶ 23; Nov. 5 H'rg. Tr., at 241:10-17). Mr. Kim admitted that, over time, J&J and JJCI have settled many of the mesothelioma cases against them. (Nov. 5 H'rg. Tr., at 241:22-242:1). As of the bankruptcy filing, there were less than 500 mesothelioma cases pending against J&J and JJCI. (Nov. 5 H'rg. Tr., at 120:6-121:3, 242:2-6; First Day Decl. ¶ 44). *None* of those cases named the Debtor as a defendant. (*See* p. 7, *supra*).

The Debtor avers that, to date, J&J and/or Old JJCI have "incurred nearly $1 billion in defending personal injury lawsuits relating to alleged talc exposure," and have "paid approximately $3.5 billion . . . in connection with settlements and verdicts." (First Day Decl., at ¶ 40).

## 2.      The MDL

The stated premise of the Debtor's bankruptcy filing, and the thrust of the Motion, is that, with regard to *all* of the foregoing cases, the legal system has failed J&J and JJCI. The Debtor asserts that "[t]he status quo was untenable given the cost, burden, uncertainty and anticipated duration of the cosmetic talc litigation," and that "[t]he *only* available option to appropriately assess, resolve and administer the current and future talc-related claims in an efficient and

equitable manner is this Chapter 11 Case" (which the Debtor elected to file in North Carolina

Court). (Mem. at 32; *see also* First Day Decl., at ¶ 58). That premise flies in the face of J&J's own

experience with mass tort multi-district litigation, in general (Nov. 5 H'rg. Tr., at 262:8-264:16),

and with the substantial progress that the parties have made in the multi-district talcum powder

litigation pending in this District before Chief Judge Wolfson, *In re: Johnson & Johnson Talcum*

*Powder Products Marketing, Sales Practices and Products Liability Litigation*, 3:16-md-02738-

FLW-LHG (the "**MDL**"), in particular. (*See* Silverstein Decl. Ex. 11, Transfer Order).

This MDL was commenced more than five years ago when the United States Judicial Panel

on Multi-District Litigation (the "**MDL Panel**" or "**Panel**") concluded that "centralization in the

District of New Jersey" of "personal injury or wrongful death actions brought by plaintiffs who

allege that they or their decedents developed ovarian or uterine cancer following perineal

application of Johnson & Johnson's talcum powder products" "will serve the convenience of the

parties and witnesses and promote the just and efficient conduct of this litigation." (MDL Dkt.

No. 1). The Panel selected this District, because the "district is a convenient and accessible forum

for this nationwide litigation, and is located in close proximity to a large number of state court

actions pending in New Jersey and other jurisdictions on the East Coast of the United States," and

also because "[a]s Johnson & Johnson is headquartered in New Jersey, relevant evidence and

witnesses likely are located" within the District. (*Id.*). In selecting the District, the MDL Panel

specifically cited the experience of Chief Judge Wolfson, whom the Panel observed "is well

situated to structure this litigation so as to minimize delay and avoid unnecessary duplication of

discovery and motion practice." (*Id.*).

Chief Judge Wolfson has done precisely what the MDL Panel envisioned. After years of

discovery, extensive expert submissions and a full *Daubert* hearing, Chief Judge Wolfson has

16

fulfilled her role as gatekeeper to determine the expert opinions on causation that may be considered by juries. *See In re Johnson & Johnson Talcum Products*, 509 F. Supp. 3d 116 (D.N.J. 2020) (Wolfson, C.J.). In that regard, contrary to the Debtor's position that JPB and STS have "never contained asbestos" and that claims against J&J and JJCI "have no valid scientific basis" (First Day Decl. at ¶ 31; Mem. at 2), the Court determined, among other things, that: (i) the opinion of the MDL plaintiffs' expert on the "the presence of 'ultra-trace' asbestos in Defendants' talc products is . . . admissible" and that plaintiffs' general causation experts are entitled to rely on "the assumption that Defendants' talc products contain asbestos to support their opinions that talc use is associated with ovarian cancer," 509 F. Supp. 3d at 157, and (ii) further, "the opinions [as to the causal relationship between talcum powder use and ovarian cancer] of Plaintiffs' general causation experts [also] are admissible," *id.* at 187. Moreover, as a result of her ongoing active case management, Judge Wolfson has positioned the MDL for the first bellwether trial(s) to begin in April 2022. (MDL Dkt. Nos. 2441 17:6-20, 19:18-20:2; Silverstein Decl. Ex. 12).

### 3. Theories of Liability Pled, Found by Juries and Affirmed on Appeal

In all, or virtually all, of the above-referenced talcum powder litigations, J&J is named as a defendant. The Debtor further bemoans that plaintiffs in talcum powder litigations "make no effort to differentiate between J&J and Old JJCI," but instead "lump J&J and Old JJCI together, asserting collectively against them the same claim based on the same product, the same defect and the same alleged harm." (Mem. at 19-21). But group pleading is a permitted form of pleading in the products liability context, where there is no particularity requirement, and does not support any suggestion that direct and independent claims against J&J do not exist. *Compare*, *e.g.,* Fed. R. Civ. P. 8(a) *with* Fed. R. Civ. P. 9(b). In fact, the allegations involving J&J in the MDL and elsewhere largely hew to the facts concerning J&J's direct involvement with talcum powder products set forth above. For example, the Plaintiffs' Amended Second Amended Master Long

17

Form Complaint in the MDL (Dbt. Ex. 20), contains allegations that:  J&J directly manufactured

and sold JBP for nearly a hundred years through the 1970s (*id.* at ¶¶ 24-25); J&J directly

manufactured and sold STS beginning in the 1960s (*id.* at ¶ 29); J&J knew, from its ownership of

Windsor, of the presence of asbestos and fibrous talc in its cosmetic talcum powder products going

back, at least, to the 1970s (*id.* at ¶ 158); J&J's CEO, Mr. Gorsky, made false statements directly

to the public regarding the safety of JBP and STS (*id.* at ¶ 141); and J&J had been advised to place

a warning on its talcum powder products as far back as 1982 but failed to do so (*id.* at ¶ 49).  All

of these are allegations directed at *J&J* (Dbt. Ex. 20), not, as the Debtor implies, a group of lumped

"Defendants" or "Johnson & Johnson Defendants."

Of course, in every case, J&J is afforded the right, under applicable rules of civil procedure,

to attack any claims against it as legally insufficient, either on a motion to dismiss or a motion for

summary judgment.  But, tellingly, it has not done so.  When asked in an interrogatory "to identify

any lawsuit, arbitration or other proceeding alleging Talc-Related Liabilities by J&J in which J&J

filed or otherwise submitted a motion to dismiss, or motion for summary judgment, as to any claim

on the grounds that J&J owed no duty, or had no liability independent of any liability of Old JJCI,

to the plaintiff," the Debtor (liberally) identified fewer than 10 lawsuits out of the more than 38,000

that have been filed against it in which it supposedly sought such relief, and the cases it cited did

not support its assertion.  (Silverstein Decl. Ex. 13 (Cl. Ex. 138, No. 3)).

Moreover, juries deciding talcum powder claims tried against J&J and JJCI have been

required to find both liability and damages *separately* against *each* defendant.  (Cl. Ex. 5, at

105:14-110:18; Silverstein Decl. Exs. 14-16, 48-51 (Cl. Exd. 17-19, 125-127, 156).  In fact, time

and again, that is exactly what juries have found — finding *J&J*, separately and independently

from JJCI, (i) liable to the plaintiff on claims of negligence and otherwise, (ii) the proximate cause

of the plaintiff's compensatory damages, with a percentage of fault specifically allocated to J&J,

and (iii) responsible for punitive damages in an amount, greater or lesser (depending on the case),

than that found against JJCI.  (*Id.*).  As just one example, in a case identified as *Olson*, the jury

was asked, specifically, on the record to assess the separate liability of J&J and JJCI on *each* of

the plaintiff's claims, *e.g.*:

> COURT CLERK:  Question 1: Were the following defendants negligent in failing
> to adequately warn about any danger related to asbestos associated with the use of
> Johnson's Baby Powder and/or Shower to Shower talc products.
>
> Johnson & Johnson?
>
> THE FOREPERSON: Yes.
>
> COURT CLERK: Johnson & Johnson Consumer Inc.?
>
> THE FOREPERSON: Yes.

(Silverstein Decl., Ex. 17 (Cl. Ex. 16), at 9517:23-9520:16).  Significantly, the Debtor points to

no appellate court decision that has reversed any post-trial judgment entered against J&J on the

grounds that J&J had no separate or independent liability to the plaintiff.

### 4.     The *Ingham* Verdict and Appeal

There is no better illustration of J&J's direct and independent liability than the post-trial

judgment, affirmed in part, and reversed in part, by the Missouri Court of Appeals in *Ingham, et

al. v. Johnson & Johnson, et al.* (Silverstein Decl. Ex. 19 (Cl. Ex. 128)).  *See Ingham v. Johnson

& Johnson,* 608 S.W.3d 663 (Mo. Ct. App. 2020), *reh'g and/or transfer denied,* Missouri Supreme

Court, (Nov. 3, 2020), and *cert. denied*, 141 S. Ct. 2716 (2021).  In *Ingham*, a jury returned a

verdict against both J&J and JJCI in favor of 22 plaintiffs with ovarian cancer, awarding each

plaintiff compensatory damages of $25 million (for a total of $550 million) and awarding punitive

damages in a total amount of $4.14 billion, with J&J responsible for $3.15 billion and JJCI

responsible for $990 million.  *Id.* at 680.  (*See also* Nov. 4 H'rg. Tr., at 2239:1-15; Cl. Ex. 128).

19

The Debtor refers to the *Ingham* verdict as "egregious." (Mem. at 31). But the verdict was affirmed, in substantial part, on appeal. Significantly, the Missouri Court of Appeals rejected the argument that a judgment notwithstanding the verdict should have been entered on the plaintiffs' negligence claims against J&J and JJCI, finding sufficient evidence in the trial record of *each* defendant's duty to the plaintiffs, of *each* defendant's breach of duty to the plaintiffs, and that *each* defendant's breach of duty proximately caused damages to the plaintiffs. *Ingham*, 608 S.W.3d at 711-14.

Nevertheless, the Missouri Court of Appeals reversed judgment as to certain of the plaintiffs on the grounds of lack of personal jurisdiction over the defendants. Notably, in so doing, the appellate court analyzed assertions of jurisdiction over J&J and JJCI completely separately, and rejected any argument that there was sufficient evidence in the record of alter ego or agency sufficient to attribute JJCI's contacts with Missouri to J&J. *Id.* at 687-98, 719-25. The court, thus, proportionately reduced the total award against JJCI (to $1.4 billion) by two non-resident plaintiffs who failed to establish personal jurisdiction over JJCI, and proportionately reduced the total award against J&J (to over $840.9 million) by 15 non-resident plaintiffs who failed to establish personal jurisdiction over J&J. *Id.* at 692-98, 719-25.

The court, further, analyzed J&J and JJCI completely separately in affirming different awards of punitive damages against each of J&J and JJCI, finding that:

> Defendants' decision to chart their course of reprehensible conduct began with J&J long before JJCI was spun off as a separate entity in 1979 and engaged in reprehensible conduct of its own. Given this evidence, the higher ratio of 5.72:1 for J&J is justified.

*Id.* at 719-25. Taken collectively, the Missouri Court of Appeals' holdings — final in every sense, given that both the Missouri Supreme Court (on November 3, 2020) and the United States Supreme Court (on June 1, 2021) denied petitions for *writ of certiorari* —— demolish any notion that

20

separate, direct claims against J&J do not exist and that it is only by dint of derivative theories, such as alter ego and agency, that J&J has been, and can be, held liable.

### 5. J&J's Inconsistent Positions In and Out of Bankruptcy

It bears noting that, during the course of all of this talcum powder litigation, J&J and JJCI repeatedly have taken positions that are strikingly different from those that they are now advancing (through the Debtor) in support of the Motion. J&J's and JJCI's speaking out of both sides of their mouths concerns every, or virtually every, significant issue in this bankruptcy case. Thus, in bankruptcy, J&J (through the Debtor) seeks to reorganize under § 524(g), the "unique" feature of which, the Debtor acknowledges, is to "make[] it possible for future asbestos claimants to obtain substantially similar recoveries as current claimants in a manner consistent with due process." (Mem. at 88 n.51). But outside the bankruptcy, J&J steadfastly maintains "this is *not* an asbestos case." (Silverstein Decl. Ex. 18 (Brief for Defendants-Appellants in *Olson v. Brenntag N. Am. Inc.*), at p. 3) (emphasis added).

In the bankruptcy case, the Debtor asserts that JJCI was, and remains, legally responsible for *all* talcum powder claims asserted by any plaintiff (even if such claims were/are asserted against J&J), but that is *not* the position that J&J and JJCI took prior to the bankruptcy filing. Prior to the bankruptcy, J&J and JJCI took the position before certain juries that "*Johnson & Johnson* is responsible for any liability of Johnson & Johnson Consumer, Inc.," not the other way around. (Silverstein Decl. Ex. 20 (Cl. Ex. 155), at 3000:20-25) (emphasis added). In other cases, J&J's and JJCI's position before juries was that "Johnson & Johnson was responsible for the product up until 1979. After that, it's JJCI." (Silverstein Decl. Ex. 21 (Cl. Ex. 29), at 322:24-323:2; 10/22/21 H'rg. Tr., at 63:5-64:5). They did *not* take the position, as they do now, that *JJCI* was responsible for all claims against J&J.

21

Further, contrary to the Debtor's position now that JJCI agreed to indemnify J&J for all talcum powder liability, when asked in pre-bankruptcy talcum powder litigation to identify any party against which either co-defendant, J&J or JJCI, "asserts a claim for indemnification," the co-defendants gave the same sworn interrogatory response: "None." (Silverstein Decl. Ex. 22 (Cl. Ex. 26), at 21-22; Cl. Ex. 5, at 112:24-114:18). Further when asked directly whether "Johnson & Johnson [has] any indemnification agreements to pay for its talc litigation liabilities," the corporate representative designated to give binding testimony for J&J and JJCI testified: "Not that I am aware of." (Cyganowski Decl., Ex. F, Transcript of Deposition of Christopher Picariello ("**Picariello Tr.**"), January 11, 2019, at 10:5-14, 58:15-18). To the same effect, a mere two months before the Debtor's bankruptcy filing, JJCI's Vice President of Finance, Kevin Neats, *denied* in sworn testimony that JJCI has any "separate litigation expense" account with J&J through which it reimburses J&J for talcum powder liabilities and expenses. (Silverstein Decl. Ex. 23 (Cl. Ex. 51), at 38:3-39:1). Moreover, while J&J (through the Debtor) now relies on shared insurance coverage to support the Motion, when asked in pre-bankruptcy litigation to identify any insurance policies relevant to the plaintiffs' claims, J&J and JJCI responded in effect, as Mr. Kim admitted:

> Don't worry. We have plenty of money to satisfy these judgments. And so our insurance isn't relevant.

(Cl. Ex. 5, at 116:20-117:3).

### C. J&J's Prior Preference for the Tort System over Bankruptcy Court

The inconsistencies in J&J's pre- versus post-bankruptcy positions stand in no starker contrast than in the context of the first time when J&J confronted the choice of litigating its talcum powder cases in bankruptcy court rather than in the mass tort system. That choice was presented when J&J's major talc supplier and co-defendant of J&J and JJCI in tens of thousands of lawsuits, Imerys Talc America, Inc. and its affiliates ("**Imerys**"), filed for bankruptcy protection in February

2019 in the United States Bankruptcy Court for the District of Delaware. *See In re Imerys Talc America, Inc., et al.* ("***In re Imerys***"), Case No. 19–10289 (LSS).

Initially, J&J sought to use Imerys' bankruptcy filing to create, in effect, a second multi-district litigation in District Court, removing the then 2,400 state court talcum powder cases filed against them to various District Courts on the purported grounds of "related to" bankruptcy jurisdiction under 28 U.S.C. §1334(b). *See In re Imerys*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019), Dkt. No. 2 (Memorandum of Law in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)), Dkt. No. 81 (Reply Memorandum of Law in Further Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)).[10]  Once removed, J&J sought to centralize all of those actions in one forum, in the United States District Court for the District of Delaware, pursuant to 28 U.S.C. § 157(b)(5). (*Id.*).  Contrary to J&J's position now that the mass tort system is inefficient and inequitable, J&J specifically touted "the process of efficient adjudication by the MDL court," arguing that it is only through a "single, centralized forum [in District Court] that the interests of all creditors can best be served and harmonized." *See id.*, Dkt. No. 2 at pp. 2-3.  J&J specifically rejected the very arguments that *it* now advances for why MDL litigation of talcum powder claims would be inefficient and inequitable:

> [Any claim] this Court would have to "conduct[] individual trials ad infinitum" because of variation in "[t]he substantive law on causation," "damages," "non-parties and liability," and "differences in the exposure histories" of plaintiffs. This parade of horribles is ill-conceived and disproven by the fact that thousands of state-law claims are currently centralized in the MDL court. As a threshold matter, this Court could centrally resolve the important question of whether the allegations that Debtors' talc supplied to J&J, causes mesothelioma are grounded in sound science; an issue that will be determined by the MDL court as to the ovarian cancer

---

[10]    Annexed to Silverstein Decl. at Exs. 24–25.

allegations in its forthcoming Daubert ruling. These gating questions do not raise a single one of the supposedly difficult and variegated issues cited by Plaintiffs. Likewise, after determining the threshold issues, this Court could hold or transfer select cases to other federal courts for "bellwether" trials. This, too, would not raise any varied issues. What it would do is avoid the need to address these key, common issues in a piecemeal and duplicative fashion.

*Id.*, Dkt. No. 81 at pp. 38-39; *see also In re Imerys*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019), Dkt. No. 2 at pp. 19-20.

After its removal strategy failed, and District Courts remanded the 2,400 cases back to the state courts on the grounds of lack of jurisdiction and/or abstention (*see, e.g.*, *In re Imerys*, Civ. Action No. 19-mc-00103 (MN) (D. Del. July 19, 2019)), J&J re-doubled its efforts to litigate the talcum powder claims in the mass tort system. In March 2020, J&J filed a motion in the *In re Imerys* bankruptcy case to lift the automatic stay to permit J&J to *defend* all talcum powder claims against Imerys in court, rather than have those claims determined by the bankruptcy court. *See In re Imerys*, Case No. 19–10289 (LSS) (Bankr. D. Del.) Dkt. Nos. 1567, 1769 (Silverstein Decl. Exs. 26-27). (Nov. 4 H'rg. Tr., at 265:18-267:15; Cl. Exs. 129 & 136). J&J asserted the very opposite of the position it now asserts: J&J argued that its litigation of talcum powder claims in open court and payment in full of any such successful claims asserted, jointly and severally, against both J&J and the debtor (Imerys) would benefit *all* of J&J, the debtor *and* the talc claimants. *See id.*, Dkt. Nos. 1567 (Silverstein Decl. Exs. 26-27 (Cl. Ex. 129), at ¶¶ 45, 48 & 1769 (Cl. Ex. 136)), at ¶¶ 2, 3, 17, 41. Indeed, J&J called "absurd" and "grasping at straws" any notion that the debtor or claimants would be worse off by having *J&J* put its full faith and credit into defending talcum powder claims in open court, rather than having those claims decided in the debtor's bankruptcy case. J&J asserted:

As of the date hereof, J&J has a market capitalization of over $385 billion and extensive insurance coverage of its own. It is one of the top 10 companies in the United States by market value. J&J can provide the claimants far greater protection

24

than the Debtors or the bankruptcy claims trust ever could (as discussed above).
More fundamentally, the Debtors' own plan relies on J&J's ability to pay individual
claims.

Cl. Ex. 136, at ¶ 41. Notably, J&J made no mention of *JJCI's* financial wherewithal. Further, in

polar opposition to the position it now takes that a § 524(g) trust is more equitable to tort claimants

than the "lottery-like results" of litigation (Mem. at 3, 5), J&J asserted then that:

> For numerous reasons, including the potential need to reserve funds to satisfy future
> claims, distribution procedures for trusts under section 524(g) typically involve
> paying only a percentage of allowed claim amounts determined pursuant to those
> procedures—unlike the indemnity offered by J&J, which will result in final
> determinations of claim amounts in the tort system (potentially including through
> settlements) and, if necessary, full payment thereof.

Cl. Ex. 129, at ¶ 45 n.33. Thus, J&J declared that it strongly "prefers to exercise its right to take

over the defense of the claims and litigate those claims in the tort system." Cl. Ex. 136, at ¶ 54.

The motion by J&J, too, was denied.

### D.     J&J Decides to Shift Course

In March 2021, after the Missouri Supreme Court declined to review the more than $2.2

billion judgment in *Ingham* and J&J and JJCI were left with a long-shot bid of petitioning the

United States Supreme Court for *writ of certiorari* (*see* pp. 19–20, *supra*), the two companies

began to shift course: At that time, they received a presentation from the Debtor's counsel here,

the Jones Day law firm, on the potential for resolving the companies' talcum powder exposure

through a divisive merger/bankruptcy strategy that Jones Day had developed and deployed in the

asbestos litigation context in the North Carolina Court. (Kim Tr., at 90:4-91:12; Nov. 4 H'rg. Tr.,

at 248:10-249:4; *see, e.g.*, *In re DBMP LLC*, Case No. 20-30080 (Bankr. W.D.N.C. Aug. 11,

2021); *In re Aldrich Pump, LLC*, Case No. 20-30608 (JCW) 2021 WL 3729335 (Bank. W.D.N.C.

Aug. 23, 2021). As Mr. Kim testified at his deposition, at or about the time of that presentation, it

was in-house lawyers employed by J&J who decided by consensus to hire Jones Day.  (Kim Tr., at 93:8-21).

In the six or so months that followed, according to Mr. Kim, "Project Plato," a closely held project known only to about 30 to 40 J&J personnel and, "at some point" "probably . . . also people from" JJCI, was launched and vigorously pursued.  (Kim Tr., at 102:16-105:20; Nov. 4 H'rg. Tr., at 249:5-18, 274:10-17).  Mr. Kim testified that "members of the corporate development teams" "head[ed]" by Chris Andrew, a J&J Assistant General Counsel (according to his public LinkedIn profile[11]), spearheaded the project.  (*Id.*; *see also* Kim Tr., at 117:20-118:24).

During the summer of 2021, reports of J&J's retention of Jones Day and exploration of a "talc bankruptcy" began appearing in the press.  (*See, e.g, In re Imerys*, Case No. 19-10289 (LSS), Adv. Pro. No. 21-51006, Dkt. Nos. 5-6 (Silverstein Decl. Exs. 28–29)).  Claimants immediately sought injunctive relief to prevent the reported divisive merger, which relief J&J successfully opposed.  (*See id.*)  Claimants also demanded in their individual cases that defendants J&J and Old JJCI state clearly on the record their intentions to undertake a divisive merger and bankruptcy filing, so that claimants would know the status of their scheduled trials.  J&J and Old JJCI repeatedly misrepresented and/or concealed the truth.  On July 23, 2021, in a case referred to as *Reyes*, for example, plaintiffs' counsel raised on the record a then recently published Reuters article reporting that "Johnson & Johnson is contemplating doing a divisive merger bankruptcy process, sometimes colloquially known as the Texas two-step" and stated that [i]f that's in fact the case, then it becomes all the more important that this case try and that we are able to get a bonded judgment before that time."  (Silverstein Decl. Ex. 30 (Transcript in *Reyes v. Johnson & Johnson,*

---

[11]      Available at https://www.linkedin.com/in/chris-andrew-5525b420/.

*et al.*, July 23, 2021), at 5:23-6:8) Yet even though "Project Plato" was in full swing, J&J's and

JJCI's attorneys dismissed the Reuters article as "rumors" and assured the court that:

> J&J defendants are continuing to defend and try these cases before the juries, as we
> will do here in Reyes. Everything else is rumor, and we have no information to
> substantiate those rumors.

(*Id.* at 8:2-7) The *Reyes* trial did not take place: Only a few months after dismissing the Texas

Two-Step as "rumors" and assuring the court that the "J&J defendants are continuing to defend

and try" cases, the very same lawyers advised the court that "following a corporate restructuring"

and bankruptcy filing, the case was stayed. (Cyganowski Decl. Ex. G (Notice of Bankruptcy Filing

and Stay of Proceedings in *Reyes v. Johnson & Johnson, et al.*, Oct. 15, 2021 and E-mail from Jay

Bhimani, dated November 16, 2021, attaching PI Order); *see* pp. 39–44, *infra*).

In fact, the human toll on the cancer patients (and their survivors) that J&J and Old JJCI

exacted through its whipsawing — first by denying and/or concealing the companies' bankruptcy

strategy only then to spring later it on litigants (who, in the face of J&J's denials, continued to

invest emotionally, physically and financially in litigation) — cannot be overstated. In the case of

Nedelka Vanklive, a mesothelioma and ovarian cancer victim and single mother granted a trial

preference because doctors gave her six months to live, J&J and JJCI, in August 2021, assured the

court, in response to its direct questioning, that, notwithstanding recent press reports, Ms. Vanklive

had "the right defendants." (Main Dkt. No. 102) Each of J&J and Old JJCI unequivocally stated

on the record that it was "the right company with respect to Johnson's Baby Powder," and that

they "are the proper defendants." (*Id.*) Only after a jury was empaneled, Ms. Vanklive was in

the middle of her case in chief at trial, and this bankruptcy case was filed, did J&J and Old JJCI

finally reveal the truth in claiming a litigation stay, which the trial court found "troubling." (*Id.*).

In the case of Shawn Johnson, a father of seven children suffering from mesothelioma, J&J

and Old JJCI did not say a word about its ongoing efforts to restructure and file for bankruptcy

during his five-week jury trial, placed in the hands of the jury for deliberations on October 6, 2021 — treating the trial instead as a mere option. (Cyganowski Declaration Ex. H (Transcript of *Johnson v. Johnson and Johnson*, October 6, 2021)). Only after the jury returned a plaintiff's verdict against J&J and Old JJCI on October 12, 2021 for over $2.4 million in compensatory damages and $25 million in punitive damages, but before Mr. Johnson could obtain a bonded judgment, did J&J and Old JJCI finally disclose its bankruptcy strategy in arguing for an immediate stay. (Cyganowski Declaration Exs. I and J (Transcript of *Johnson v. Johnson and Johnson*, October 12, 2021 and Entry of Judgment, dated October 15, 2021)).

After months of denials and concealments, on October 11, 2021, Mr. Andrew and a corporate development colleague requested, and received, approval from executives of J&J and/or its subsidiaries to proceed with a "restructuring" of JJCI "pursuant to a divisional merger," summarized below, that would assign all of JJCI's "current and future product liability related claims associated with talc and talc-containing products," and a handful of new assets (a royalty stream, a bank account and a funding agreement), to LTL, which would be created to "proceed with a voluntary petition under chapter 11 of the Bankruptcy Code," and assigning all of JJCI's assets and operations to an entirely separate entity (a "**New JJCI**"), which would "continue to operate Johnson & Johnson's Consumer Health business in the United States without interruption." (Cyganowski Decl. Ex. K, LTL 0021791-801). As Mr. Kim testified, the three individuals seconded to LTL "were the only individuals [who] changed job titles . . . as a result of the transaction." (Kim Tr., at 142:16-20).

### E. The "Texas Two-Step"

The sequence of transactions effectuating the "restructuring" of JJCI, widely referred to as the "Texas Two-Step," approved on October 11, 2021, is described in the First Day Decl. and is documented, in substantial part, in Dbt. Ex. 1.

1.     **The Transactions**

In brief, on or about October 11, 2021, JJCI formed as a wholly-owned subsidiary a North Carolina limited liability company called Royalty A&M LLC ("**Royalty**"), which JJCI capitalized with $367.1 million. (First Day Decl., at ¶ 21). The next day, on October 12, 2021, JJCI merged into a newly formed Texas limited liability company called Chenango Zero, LLC ("**Chenango Zero**"), with Chenango Zero being the surviving entity. (*Id.* at ¶ 22). That same day, Chenango Zero effectuated a divisional merger under Texas law, pursuant to which Chenango Zero ceased to exist and its assets and liabilities were "allocated" to two new Texas limited liability companies formed in the divisional merger, Chenango One LLC ("**Chenango One**") and Chenango Two LLC ("**Chenango Two**"). (First Day Decl., at ¶ 23; Dbt. Ex. 1 (LTL 0001327-801)). Chenango One then "converted from a Texas Limited liability company into a North Carolina limited liability company and changed its name to 'LTL Management LLC.'" (First Day Decl., at ¶ 23). Chenango Two merged into a newly formed New Jersey corporation called Currahee Holding Company Inc. ("**Currahee**"), with Currahee being the surviving entity and changing its name to "Johnson and Johnson Consumer Inc." (New JJCI). (*Id.*; Dbt. Ex. 1 (LTL 0001058-61)). According to the Debtor, New JJCI, which "is the direct parent of the Debtor," "manufactures and sells a broad range of products used in the baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-counter pharmaceutical products," *i.e.*, the same business that JJCI carried out before the divisional merger. (First Day Decl., at ¶¶ 1, 17-18).

In connection with the foregoing transactions, various parties — including the Debtor, J&J and New JJCI — entered into a series of agreements, including the Plan of Divisional Merger and Schedules to the Plan of Divisional Merger (collectively, the "**Divisional Merger Plan/ Schedules**"), that were prepared before the Debtor ever came into existence. (*See* Dbt. Ex. 1 (LTL 0001327-817)). Notable among such agreements is an Amended and Restated Funding Agreement

among the Debtor, New JJCI and J&J, dated October 12, 2021, the date of the Debtor's formation (the "**Funding Agreement**"), on which the Debtor relies to support the *bona fides* of its bankruptcy filing. (Dbt. Ex. 1 (LTL 0002300-20); Dbt. Ex. 4). In the Funding Agreement, J&J and New JJCI, on a joint and several basis, agreed to provide non-assignable funding, up to the full value of New JJCI, to which the Debtor refers "as a backstop" and which the Debtor assures the Court "will ensure funding for a trust in the amount required by a confirmed plan of reorganization." (Mem. at 81 n. 44, 90). They agreed to do so "regardless of whether [a confirmed] plan of reorganization provides that [they] will receive [channeling injunction ] protection pursuant to section 105 or section 524(g) of the Bankruptcy Code." (Dbt. Ex. 4 (Def. of "Permitted Funding Use")).

As Mr. Kim admitted, "there [was] *no* negotiation" of any of these agreements, including the Divisional Merger Plan/Schedules and Funding Agreement, executed among J&J and/or its subsidiaries, in connection with the Texas Two-Step. (Kim Tr., at pp. 228:5-231:18; Nov. 4 H'rg. Tr., at 274:18-275:19). Nor was any external fairness opinion sought or obtained in connection with the Funding Agreement and/or any of the other inter-company agreements that the parties executed. (Kim Tr., at p. 228:5-231:18; Nov. 4 H'rg. Tr., at 274:18-22). Rather, according to Mr. Kim, the agreements simply were "reviewed by certain levels of executives in order for the transaction to be approved," which executives were "just looking at it for whether it's fair or not." (Kim Tr., at pp. 229:22-230:20). But, in that regard, Mr. Kim testified that the process was no different internally than the process for reviewing a transaction with a third-party where there actually were arm's length negotiated terms. (*Id.* at pp. 228:5-231:18).

When asked what gave him confidence as the Debtor's CLO that the transactions entered into on October 11 and 12, 2021 were "fair to the debtor," Mr. Kim answered: "A review of the terms and my experience and understanding of the litigation and my discussions with the folks that

help put the transaction together. Advice of counsel." (Kim Tr., at p. 237:7-23). He identified the counsel to which he was referring as "Jones Day." (*Id.*). Mr. Kim further testified that, in connection with the foregoing transactions, Jones Day and J&J's internal counsel, were not representing the interests of the Debtor in the transactions, but, rather, "all the attorneys were looking at this from a joint perspective." (*Id.* at pp. 234:22-236:4; Nov. 4 H'rg. Tr., at 276:4-10). When asked whether "the lawyers who were involved in the funding agreement and the merger support agreement and every other agreement executed in connection with the transactions were the same lawyers representing the interests of everyone," Mr. Kim responded: "Essentially, yes . . . . That would be part of the internal fairness review, yes." (Nov. 4 H'rg Tr., at 276:4-10).

### 2. The Liabilities Assigned to the Debtor After the Fact

Among the assets and liabilities assigned to the Debtor by those orchestrating the Texas Two-Step were: (i) "All Contracts related to the transfer of assets from Johnson & Johnson to Johnson & Johnson Baby Products Company effective January 1, 1979"; (ii) "All rights to make claims under any and all insurance policies as to which the Company [Chenango Zero] has rights as an insured, additional insured, successor, beneficiary or otherwise"; and (iii) "Any tenders for defense and indemnity in respect of Talc Related Liabilities and any Contracts accepting such tenders, including such tenders and/or Contracts with the following retailers" listed on four pages. (Dbt. Ex. 1 (LTL 0001400, LTL 0001395 & LTL 0001401-05)). It is on the basis of each of these so-called "indemnification obligations to J&J, other Non-Debtor Affiliates, and other Protected Parties," "allocated" to the Debtor in the Texas Two-Step, on which the Motion is now based. (Mem. at 3). Each category of claimed indemnification is discussed below.

#### a. The 1979 Agreement Discovered During the Bankruptcy

The centerpiece of the Debtor's argument for extending the stay to J&J is an Agreement for Transfer of Assets and Bill of Sale (which the Debtor refers to as the "**1979 Agreement**")

31

(Mem. at 10-11, 80) that the Debtor did not discover until ten days into the bankruptcy case, *after* it had filed a motion for emergency relief.  (Cl. Ex. 5, at 76:8-15; Nov. 4 H'rg. Tr., at 103:11-19; Silverstein Decl., Ex. 32 (Transcript of Deposition of Susan Schirger-Ward, October 31, 2021 ("**Schirger-Ward Tr.**")), at 18:16-20:12).  The Debtor asserts that it "has a contractual obligation to indemnify J&J pursuant to the 1979 Agreement" between J&J and J&J Baby Products (as predecessor to JJCI).  (Mem. at 10-11, 80).  In the 1979 Agreement, according to the Debtor, "J&J Baby Products became the real party in interest for all actions, suits or proceedings relating to the talc previously sold by J&J or in any way arising out of the talc business that was being transferred."  (Mem. at 10-11, 80).  In fact, as Mr. Kim admitted on the stand, "the 1979 Transfer Agreement does not even mention the word 'talc.'"  (Nov. 4 H'rg. Tr., 216:14-19).

Rather, the agreement — in which J&J agreed to transfer the assets and liabilities of its Baby Products division to J&J Baby Products in exchange for 188,100,000 shares of J&J Baby Products stock — provides in pertinent part:

> Subsidiary [J&J Baby Products] *agrees to assume* and hereby does assume and agrees to pay, perform or discharge, as the case may be, *all the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to its BABY Division* and the Subsidiary hereby covenants and agrees with J&J that the Subsidiary will forever indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed and agreed to be paid, performed or discharged . . .

(Dbt. Ex. 2 (LTL 0000561) (emphasis added)).[12]

---

[12]     The limitation of the assumption of liabilities to those "allocated . . . on the books or records" recurred in subsequent transfer agreements with different corporate entities (Omni Education Corporation in 1981 and Johnson & Johnson Dental Products Company in 1988) pursuant to which, according to the Debtor (Mem. at 10-12).  "Old JJCI bec[ame] responsible for all claims alleging that Johnson's Baby Powder causes cancer or other diseases.  (*See, e.g.,* Dbt. Ex. 52 (LTL 0012494); Dbt. Ex. 54 (LTL 0012511)).  In order to show that J&J's talcum powder liabilities were ultimately transferred to Old JJC (and thence to the Debtor), the Debtor would need to show that the same "books or records" requirement was met with respect to Omni Educational Corporation in 1981 and Johnson & Johnson Dental Products Company in 1988.  The Debtor has not even attempted such a showing.

As Mr. Kim admitted, to identify the specific "indebtedness, liabilities and obligations . . . allocated on the books or records" of the Baby Products division that were assumed, "you would have to look at books or records." (Nov. 4 H'rg. Tr., at 194:2-12). Yet as Mr. Kim further admitted, he has "not looked." (Kim Tr., at 54:6-11; Nov. 4 H'rg. Tr., at 196:6-16). Susan Schirger-Ward, J&J's Senior Legal Records Coordinator, was never asked to look for them. (Schirger-Ward Tr., at 11:1-2, 13:21-14-11, 53:16-54:6, 55:16-56:1, 58:22-63:4, 64:6-16; Nov. 4 H'rg. Tr., at 194:19-24). For certain, no "indebtedness, liabilities and obligations" relating STS were "allocated on the books and records" of J&J's Baby Products division when the 1979 Agreement was executed, as that product was not even manufactured or sold by the Baby Products division at the time. (Nov. 4 H'rg. Tr., at 207:2-13). Nor is there any question that liabilities arising from J&J's Windsor talc mines were not "allocated on the books or records" of the Baby Products division when J&J Baby Products assumed liabilities in the 1979 Agreement. (*Id.* at 210:14-210:19).

More, neither Mr. Kim nor any other representative of the Debtor could identify "a single document where J&J has talc liabilities described in books" or records prior to execution of the 1979 Agreement. (Kim Tr., at 54:6-11; Nov. 4 H'rg. Tr., at 196:6-199:7). That is not surprising, given (as Mr. Kim further admitted) that "prior to January 1, 1979 there were no lawsuits claiming any personal injury arising from the alleged use of Johnson's Baby Powder and/or Shower to Shower filed against any of the J&J companies." (Nov. 4 H'rg. Tr., at 198:4-11; *see* pp. 14–15, *supra*). The Debtor has admitted that not until the fourth quarter of 2018 did J&J's consolidated financial statements reflect any reserve for defense and indemnity costs outside of insurance coverage for *talc-related* claims. (Silverstein Decl. Ex. 31 (Debtor's Answers and Objections to Defendants' First Set of Interrogatories and Request for Admission No. 7)).

33

### b. Insurance Coverage that No Insurance Carrier Acknowledges

The Debtor also contends that "J&J and the Debtor are both covered for talc-related claims under various shared insurance policies" pursuant to which "the Debtor believes that it has rights to insurance coverage." (Mem. at 25, 45). According to the Debtor, the insurance rights derive from two types of insurance policies: (i) third-party insurance, *e.g.*, Aetna Casualty and Surety Company, American International Group, Allstate Insurance Company, The Hartford, etc.; and (ii) self-insurance through "a captive insurance company that is a wholly-owned subsidiary of J&J" called Middlesex Insurance Company ("**Middlesex**"). (First Day Decl., at ¶¶ 46-51). The Debtor avers that "[i]n total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion." (*Id.* at ¶ 52).

But, as the Debtor concedes, "none of th[e] [third party] insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid its costs of defense, or indemnified J&J or Old JJCI for settlements or judgments." (First Day Decl., at ¶ 53; Mem. at 28). Nor is there a shred of evidence in the record to suggest that, at any time during the course of this bankruptcy proceeding, that longstanding *status quo* is likely to change. To the contrary, even a cursory review of the multitudinous coverage defenses asserted by insurers that sued J&J and JJCI reveals that any coverage determination is unlikely to occur in the foreseeable future, if at all. (Silverstein Decl., Ex. 33 (Second Amended Complaint, *Atlanta International Insurance v. Johnson & Johnson*, MID-L-003563-19 (N.J. Super.) ("**Insurance Complaint**")), at ¶¶ 93-103; First Day Decl., at ¶ 54).

There is ample support for the insurers' denial of coverage.  Many of the policies produced in discovery by the Debtor (but are not in the record[13]) only cover unexpected and unintentional "occurrences."[14]  Other policies contain explicit limitations on personal injury coverage, such as policies covering only accidental injuries[15] or specific torts like false arrest, malicious prosecution, defamatory torts, or privacy torts.[16]  Numerous policies disclaim liability for injuries arising from asbestos exposure.[17]  And virtually all policies contain specific assistance and cooperation and claims control provisions with which the insurers assert J&J has failed to comply.[18]

As for its captive insurance, provided by Middlesex, there is no coverage remaining.  As J&J Assistant Corporate Controller, Adam Lisman, testified:  "[Old JJCI] related to the talc matter exhausted its coverage within the Middlesex self-insurance captive in the — around the fourth quarter of 2018."  (Transcript of Deposition of Adam Lisman, October 30, 2021 ("**Lisman Tr**."), 126:10-15).

---

[13]    The Debtor has not placed more than a few insurance policies in the record.  Instead, the Debtor relies on a summary chart purporting to summarize all of the policies that it contends provides coverage of talcum powder claims. (Dbt. Ex. 8).  The witness, Mr. Kim, who sought to introduce the chart did not prepare it.  (Nov. 4 Hrg. Tr., at 290:11-16).  He merely reviewed it, without the underlying policies, one day earlier.  (*Id.*).

[14]    Many policies define an occurrence as "an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury. . . during the policy period." (*E.g.,* Insurance Complaint, at ¶¶ 61, 75 (quoting Granite Insurance policy 6484-0068 (1984–1987) and North River policy JU0276 (1977–1980)); LTL 0009267 (American Centennial policy endorsement incorporating North River terms), LTL 0009251 (Aetna endorsement doing same), LTL 0009918 (Wasau endorsement incorporating Granite terms)).

[15]    *E.g.,* LTL 0000003138, LTL 0003221, LTL 0003311, LTL 0003554, and LTL 0003917.

[16]    *E.g.,* LTL 0003149–50, LTL 0003359-60, LTL 0003565–66, LTL 0003965–66.

[17]    *E.g.,* LTL 0011518 (letter regarding AIU asbestos exclusion providing "that there is no coverage for bodily injury, disease, sickness, shock, death, mental anguish and mental injury at any time, arising out of the exposure to asbestos products, asbestos fibers or asbestos"); LTL 0010900 (AIU policy asbestos exclusion); LTL 0011957 (letter asserting that coverage under a Hartford policy is precluded by an asbestos exclusion); LTL 0011780–81 (quoting asbestos exclusion in three Fireman's Fund policies).

[18]    LTL 0003141, LTL 0003148, LTL 0003197, LTL 0003214, LTL 0003224, LTL 0003314, LTL 0003557, LTL 0003667, and LTL 0003920 (listing such provisions in insurance policies). *See also* LTL 0008666 ("Whenever the Insured has information of an occurrence involving injuries or damages which may involve this policy, written notice shall *immediately* be given to Gibraltar." (emphasis added)); LTL 0008065 ("Notices, as required to be given to the primary insurer, shall also be given to Aetna Casualty in the event of any accident, occurrence, claim or suit which is reasonably likely to give rise to a claim for indemnity under this policy.").

It is not surprising, therefore, that in talcum powder litigation prior to the bankruptcy filing, J&J and JJCI repeatedly have indicated that they *lack* insurance coverage. As recently as August 2021, a corporate representative for both J&J and JJCI testified under oath that the companies are "self-insured" and do not "maintain liability insurance for products liability." (Cl. Ex. 51, at 76:23-77:19). Another designated Rule 30(b)(6) witness for both J&J and JJCI testified that J&J is self-insured for talc-related litigation expenses. (Picariello Tr., at 59: 24-25 ("To my best knowledge, we have an internal insurance in-house")). In responses to interrogatories, J&J has provided the sworn response that it is "self-insured" and that tort claims are unlikely to implicate any insurance policies. (Silverstein Decl. Exs. 34-37 (Cl. Ex. 52), Interrogatory No. 10; Cl. Ex. 53, Interrogatory No. 19; Cl. Ex. 54, Interrogatories No. 4.1; *see also* Cl. 55 at p. 10).

Furthermore, the Debtor is not named as an insured on any of the policies in the record, and the definition of "Named Insured" or "Insured" in at least certain of the policies in the record do not appear to include the Debtor, at least absent notice to, and/or consent of, the insurance carrier (nowhere in the record). (*See* Dbt. Exs. 10 (LTL 0000172), 12 (LTL0000388)). In fact, the Debtor concedes that the policies "were issued to J&J as the Named Insured," but nonetheless asserts that such policies "cover the period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI was a subsidiary of J&J." (First Day Decl., at ¶ 46 n.4). Even if JJCI were an insured under the policies, JJCI merged into, and out of existence with, Chenango Zero. (*See* p. 29, *supra*). The Debtor has not shown that, by operation of law or otherwise, coverage under the policies transferred to Chenango Zero, and from there were able to be, and were, allocated to the Debtor.

### c.   Acceptances of Tort Defenses Years After the Torts

The Debtor further asserts that "[w]hen a Retailer was sued on a . . . Talc Claim, the Retailer would notify Old JJCI by submitting a tender request" and that "Old JJCI would then determine

whether to accept the Retailer's tender of its defense and indemnify the Retailer pursuant to a tender agreement (each, a "**Tender Agreement**")." (Mem. at 29). The process itself belies that the retailers have any absolute right to indemnification; if the retailers had an absolute right of defense, there would be no need for Old JJCI to determine whether or not to accept the tender of defense. Indeed, the Debtor admitted that it produced no more than, at most, a handful of "supply agreements" with retailers containing indemnification obligations by J&J, Old JJCI or both. (Cl. Ex. 5, at 122:20-125:14).

According to the Debtor, "[s]ince 2018, Old JJCI has indemnified and agreed to assume the defense of nearly 600 talc-related claims against the Retailers pursuant to Tender Agreements," "450 [of which agreements] were pending as of the Petition Date." (Mem. at 29). In fact, the record reveals that only recently, after an "internal review" was undertaken following the *Imerys* bankruptcy, was an effort made to "standardize" the Tender Agreements in order to make them indemnifications only from Old JJCI. (Kim Tr., at 205:16-220:3). Prior to that, indemnifications were given, jointly and severally, by J&J and Old JJCI and may have varied from case to case. (*Id.*). The Debtor admitted that, regardless of when executed "each tender agreement is case specific," and in order "to understand who provided the indemnity and under what conditions someone actually needs to look at each of these indemnity agreements." (Nov. 4 H'rg. Tr., at 282:18-2, 288:20-25). But the Debtor has placed only a small handful of such exhibits in the record. (*See* Dbt. Exs. 18-19).[19]

The few Tender Agreements in the record demonstrate that any indemnification from Old JJCI thereunder was and is conditional. (*See* Dbt. Exs. 18 & 19). The agreements provide, for

---

[19] In lieu of the actual Tender Agreements, the Debtor introduced a summary chart purporting to summarize all of the Tender Agreements under which it contends the Debtor is obligated. (Dbt. Ex. 17). Again, Mr. Kim, who sought to authenticate the chart, had seen it for the first time only the day before, had done none of the work in preparing it and could not attest that it was accurate. (11/4/21 H'rg. Tr. 280:12-282:11, 286:244-288:3).

example, that:  (i) "should discovery reveal that the product or products plaintiff allegedly used were not manufactured by JJCI or on JJCI's behalf or that the unspecified JJCI subject product or products were not purchased at [Retailer] or that [Retailer] made representations that extended beyond the scope of JJCI's warranties express or implied and inconsistent with product labeling, JJCI expressly reserves the right to re-tender the defense back to [Retailer];" (ii) "should evidence become available through deposition testimony or otherwise that decedent was not exposed to JJCI talcum powder purchased from [Retailer], JJCI will re-tender [Retailer's] defense back to [Retailer];" and (iii) "[i]f it is determined in final non-appealable judgment by court of competent jurisdiction that [Retailer] is at fault in whole or in part for the incident alleged in plaintiff's complaint or any subsequent amendments thereto due to [Retailer's] acts related to the JJCI subject products . . . [Retailer] shall be responsible for that portion of the verdict rendered against [Retailer] and shall reimburse JJCI's reasonable attorneys' fees and costs . . . ." (*Id.*).  In all events, Mr. Kim could not testify that the Tender Agreements would make the Retailers anything other than unsecured creditors, just like the claimants.  (Cl. Ex. 5, at 126:21-127:3; Kim Tr., at 87:16-88:1).

### d.     The Alleged "Financial Course of Performance"

In an effort to bolster its argument that JJCI had the legal obligation to indemnify all talcum powder liabilities and expenses (which obligation the Debtor contends it now has by virtue of the divisional merger), the Debtor asserts that, prior to the bankruptcy, "J&J initially paid costs associated with litigation concerning talc products from its concentration account and then charged 100% of those costs to Old JJCI through intercompany charges."  (Mem. at 17-18).  But the so-called "financial course of performance" on which the Debtor relies was purely a function of accounting policy, not legal responsibility.  The witness whom the Debtor put forward to testify about the intercompany charges, Mr. Lisman, testified that "if there are costs associated with the product or a franchise that is owned and managed by an operating company or sub, those costs

38

required by GAAP need to be recorded on the ledgers of that company as a fundamental accounting

GAAP requirement." (Lisman Tr., at 117:15-23). Mr. Lisman further acknowledged that it is a

"fundamental GAAP requirement [that] is at the root of" *all* of the intercompany charges. (*Id.*).

In other words, the inter-company charges reflect "an accounting decision." (*Id.* at 142:14-143:1).

In that vein, Mr. Lisman further acknowledged that the allocation of expenses under GAAP is

"subjective." (Lisman Tr., at 45:7-11, 139:20-24). He testified that "GAAP isn't that specific.

GAAP provides a broad framework of which you are required to report. And every company has

individual policies and procedures in how they interpret and apply GAAP." (*Id.* at 90:14-17).

Thus, it is J&J's own interpretation of GAAP that underlies its inter-company charge policy. (*Id.*

at 139:14-24).

In all events, Mr. Lisman admitted that any inter-company charges between J&J and JJCI,

in his words, "have nothing to do with" the 1979 Agreement or any other agreement between the

two companies, the existence of which Mr. Lisman was entirely unaware. (*Id.* at 130:14-131:21,

158:23-159:19, 161:1-7). He testified that the allocation between J&J and Old JJCI of talcum

powder liabilities and expenses was purely a matter of "policy issued by the corporate controller's

office," not an "agreement signed off by the executives." (Lisman Tr., at 144:6-18). Mr. Kim also

testified that he has not seen *any* agreements regarding allocation of payments of judgments or

settlements between J&J and JJCI. (Nov. 4 Hrg. Tr., at 252:14-253:13).

### F.     The Bankruptcy Filing and Announced Stay of Litigation

Two days after it was created, on October 14, 2021 (the "**Petition Date**"), the Debtor

commenced this bankruptcy case by filing a petition for relief under chapter 11 of the Bankruptcy

Code in the North Carolina Court. (Main Dkt. No. 1). Then and/or the next day, before it even

had stepped foot in, let alone, received any order of relief from, the North Carolina Court, the

Debtor blanketed courts across the country in which talcum powder litigations — *none* filed

against the Debtor — were pending with "Notice[s] of Bankruptcy Filing and Stay of Proceedings"

("**Stay Notices**"), declaring that "LTL is now responsible for the talc-related claims" and that "as

a result of the Automatic Stay, no further action may be taken to prosecute the talc-related claims

against any LTL Defendant," a term defined to include hundreds of entities, including J&J, tens

of its affiliates, tens of insurance companies and tens of retailers, including defendants in the

various litigations in which the notice was filed.  (*See, e.g.,* Silverstein Decl. Ex. 39 (MDL Dkt.

No. 25298); Silverstein Decl. Exs. 40-42 (Cl. Exs. 133-35); 11/4/21 H'rg. Tr., at 270:2-4).  On

October 19, 2021 (again, before the Debtor had made even an initial appearance in the North

Carolina Court), J&J followed on by filing a Form 8-K with the United States Securities and

Exchange Commission, publicly announcing that, as a result of LTL's bankruptcy filing, "*all*

pending cosmetic talc cases will be stayed."  (Silverstein Decl. Ex. 43 (Cl. Ex. 132); Nov. 4 H'rg.

Tr., at 269:6-15) (emphasis added).  At the same time, J&J assured the public markets that it was

only a "newly created and separate subsidiary of Johnson & Johnson . . . established to hold and

manage claims," LTL, that had filed for bankruptcy protection, and that "Johnson & Johnson and

its other affiliates did not file for bankruptcy protection and will continue to operate their

businesses as usual."  (*Id.*).

Indeed, that the very purpose of the Debtor's bankruptcy filing was to enable *J&J* to seek

— and, in the interim, to claim — the existence of a stay of all talcum powder litigation *against*

*J&J* is crystal clear in the record.  When asked whether J&J — one of two enterprises in the world

with the highest credit rating, *despite* what he described as a tidal wave of talcum powder lawsuits

against it — "could survive the litigation," Mr. Kim responded:

> I think if, if the litigation continued as it, as it was going and, and it would continue
> for the next 60 years because of the latency period and if we were getting verdicts
> routinely like the verdict that we got in the Ingham case . . ., no, I don't, I don't think
> any company would survive that.

(Nov. 4 H'rg. Tr. 261:4-262:2).  Yet when questioned why, in light of that, J&J did not undertake the Texas Two-Step and place its own liabilities in bankruptcy, Mr. Kim's response was:  "We thought this route was the preferable route," because "[w]e believe that according to the law would certainly be entitled to a stay, yes" from the Debtor's bankruptcy filing.  (*Id.*).

## III.    Relevant Procedural History

On October 18, 2021, two days before the "first day" hearing in the bankruptcy case but days *after* the Debtor already had filed Stay Notices in courts across the country, the Debtor filed an Emergency Motion to Enforce the Automatic Stay against Talc Claimants Who Seek to Pursue Their Claims against the Debtor and Its Non-Debtor Affiliates in the North Carolina Court, asserting that, based on "precedent in the Fourth Circuit, actions against Non-Debtor parties to recover claims against the Debtor are automatically stayed under section 362 of the Bankruptcy Code."  (Main Dkt. No. 44 at pp. 2-3).  That emergency motion, in turn, was met with a motion to strike, on the grounds that the Debtor's motion "seeks injunctive relief that can only be granted through commencement of an adversary proceeding under Rule 7001(7) of the Federal Rules of Bankruptcy Procedure."  (*Id.*, Dkt. No. 76 at ¶ 4).   At the first day hearing, on October 20, 2021, the North Carolina Court agreed that "the debtor needs to file the adversary."  (Silverstein Decl., Ex. 44 (Oct. 20, 2021 H'rg. Tr.), at 137:18-22).  Nevertheless, in advance of such filing (which the Debtor committed to do, and did file, the next day (Adv. Pro. Dkt. Nos. 1-3)), the North Carolina Court entertained an oral application by the Debtor for a temporary restraining order ("**TRO**"), which the court scheduled to hear in full on October 22, 2021.  (Oct. 20 H'rg. Tr., at 154:10-157:2).

Two days later, after a half-day evidentiary hearing in which the Debtor's CLO, Mr. Kim, took the stand, the North Carolina Court *denied* the TRO relief *except* for "claims against the debtor and claims against Old JJCI, which no longer exists."  (Cl. Ex. 5, at 159:1-9).  The court

41

indicated that it was "not going any further" and that it had "grave concerns" that "liabilities of the Johnson & Johnson Company that were not . . . liabilities of the debtor." (*Id.*). Consequently, the order that the court entered provided "the Debtor's interim stay motion and its request for a temporary restraining order, but only as provided herein, and only as to the Debtor and Old JJCI," and further provided that "[t]he Motions are DENIED with respect to the Debtor's request for a temporary restraining order in favor of the Alleged Protected Parties other than the Debtor and Old JJCI." (Adv. Pro. Dkt. No. 28). The court scheduled a preliminary injunction hearing for November 4 and 5, 2021, and ordered expedited discovery in connection therewith. (*See, e.g.*, Adv. Pro. Dkt. No. 73).

At the preliminary injunction hearing on November 4 and 5, 2021, the North Carolina Court heard testimony from three witnesses — (i) Mr. Kim, (ii) JJCI's Chief Medical Officer, Dr. Edwin Kuffner, and (iii) an "expert in statistical and econometric analysis and economic modeling as it relates to mass tort personal injury claims," Dr. Charles Mullin. (Nov. 4 H'rg. Tr.; Nov. 5 Hrg. Tr.). By agreement of the parties, the court also admitted into evidence (i) the declarations, and deposition transcripts of, two other witnesses — Mr. Lisman and Ms. Schirger-Ward (Dbt. Exs. 48 & 49; Silverstein Decl. Exs. 32 and 38 (Cl. Dep. Exs. 2 & 3)) — and (ii) hundreds of other exhibits listed on the parties' exhibit lists and/or utilized during the course of the hearing. (Adv. Pro. Dkt. No. 75). At the conclusion of the hearing, the court reserved judgment and indicated that it would read a ruling into the record on November 10, 2021, following the hearing on various parties' and the Court's own motions to transfer venue of the bankruptcy case. (Silverstein Decl. Ex. 45 (Nov. 5 H'rg. Tr.), at 568:15-569:9). In the interim, the court left in place the TRO, which it noted "didn't really grant an injunction except as to the debtor and that was, and Old JJCI." (*Id.*).

42

On November 10, 2021, the North Carolina Court, after hearing argument on the venue

motions, concluded that it was "obliged to send this case to the District of New Jersey for a variety

of reasons," which the court described on the record and set out in an 11-page Order Transferring

Case to the District of New Jersey.  (Nov. 10, 2021 H'rg. Tr., at 125:19-132:4; Main Dkt. No.

416).  After announcing the change in venue, the court turned to the preliminary injunction motion,

stating on the record:

> What I believe at the moment is that I need to stop the litigation against the would-
> be protected parties, including J&J, for a short time period. Sixty days is what I
> have in mind. That is influenced heavily by the fact that I'm not making a decision
> today for myself. I'm making a decision and sending the case to another court. The
> new judge is going to have to be appointed, get up to speed, and have a chance to
> weigh in on this. It has been pointed out that there may be different law in the Third
> Circuit. I haven't had the occasion to go review their Rules on, on dismissals or
> divisional mergers or good faith/bad faith, all those things, except to the extent that
> we've covered them in the other cases.
>
> But the point is somebody else is going to have to wrestle with this question and I
> don't want to bind them any more than possible . . . .

(Nov. 10 H'rg Tr., at 134:24-135:21).  The court went on to indicate its own views of the issues,

"look[ing] at the bankruptcy filing of LTL . . . under the bankruptcy laws and binding Fourth

Circuit precedent" (*id.* 134:14-143:11), but concluded all of those remarks by returning to the

overarching point that:

> I think that, particularly given that I am moving the case, the last thing I want to do
> is send it with it on fire to the, to the recipient court. And so we need to, to slow
> down just for a little bit here and let a new judge take a look at this situation, read
> what we've written before, and then get the other constituencies onboard before we
> go any further with that.

(*Id.* at 143:18).  The Order Granting the Debtor's Request for Preliminary Injunctive Relief

accords fully with that premise, expressly providing that:  (i) "all of the Court's findings and

conclusions herein are without prejudice, as set forth in the record, to . . . any further finding by a

subsequent court with jurisdiction over this proceeding (the 'Presiding Court') . . .; (ii) the "Order

is not intended to bind a subsequent Presiding Court"; and (iii) "[t]he injunction and the Court's interim stay ruling herein shall expire on the date that is 60 days after the entry of this Order (the 'Termination Date'), unless modified or extended by an order of the Presiding Court." (Adv. Pro. Dkt. 102 at ¶¶ E & 4).

On December 1, 2021, the Committee filed a motion to dismiss the Debtor's chapter 11 bankruptcy case on the grounds that it was not filed in good faith. (Main Dkt. No. 632). On December 8, 2021, the Debtor filed its Supplemental Memorandum, asserting that "Talc Claims against the Protected Parties, including J&J, [are] automatically stayed" and seeking a preliminary injunction enjoining the prosecution of Talc Claims. (Mem. at 4-5). For the reasons set forth herein, the Motion should be denied.

## ARGUMENT

## I.     THE DEBTOR HAS NOT ESTABLISHED THAT ANY EXTENSION OF THE STAY UNDER § 362(A) IS WARRANTED

### A.     Section 362(a) Was Enacted to Give a Reprieve to the Debtor

Section 362(a) of the Bankruptcy Code provides in pertinent part:

[A] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\*        \*        \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

11 U.S.C. § 362(a)(1), (3).

The legislative history underlying Congress's enactment of an "automatic stay" upon a debtor's bankruptcy filing is well known and oft observed. Congress created the stay as "'one of

the fundamental debtor protections provided by the bankruptcy laws,' designed to relieve 'the financial pressures that drove [debtors] into bankruptcy.'" *Eastern Refractories Co. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998) (quoting H.R. Rep. No. 95–595, at 340 (1977)). As the Third Circuit Court of Appeals has observed:

> The automatic stay imposed by the Bankruptcy Code has a 'twofold' purpose:
>
> (1) to protect the debtor, by stopping all collection efforts, harassment, and foreclosure actions, thereby giving the debtor a respite from creditors and a chance 'to attempt a repayment or reorganization plan or simply be relieved of the financial pressures that drove him [or her] into bankruptcy;' and (2) to protect 'creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors.'

*In re Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019) (first quoting *Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir. 1995); and then quoting *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991)).

In other words, "[t]he stay gives a debtor a breathing spell from creditors by stopping all collection efforts and all foreclosure actions." *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 509–10 (3d Cir. 1997). (citing *Maritime Elec. Co.*, 959 F.2d at 1204 ).[20]  Additionally, it "serves the debtor's interests by protecting the estate from dismemberment," while "benefit[ting] creditors as a group by preventing individual creditors from pursuing their own interests to the detriment of the others." *City of Chicago v. Fulton*, 141 S. Ct. 585, 589 (2021).[21]

---

[20]     *See also In re Johns-Manville Corp.*, 26 B.R. 405, 410 (Bankr. S.D.N.Y. 1983) ("[T]he automatic stay is designed . . . 'to prevent the dissipation or diminution of the bankrupt's assets during the pendency of' [the bankruptcy proceeding] . . . . 'Without it, certain creditors would be able to pursue their own remedies against the debtor's property.'" (quoting *Paden v. Union for Experimenting Colleges and Universities*, 7 B.R. 289 (N.D. Ill. 1980); H.R. Rep. No. 95-595, pp. 5787, 6297) (emphasis original)).

[21]     *See also, e.g., Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982) (noting that stay is intended to "prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor.").

Given its purpose, courts universally acknowledge that "the stay is a shield, not a sword."
*In re Scarborough-St. James Corp.*, 535 B.R. 60, 67, 70 (Bankr. D. Del. 2015) (noting, that "the
stay is a shield, not a sword that should help the debtor deal with his bankruptcy for the benefit of
himself and his creditors," and concluding that a debtor's use of the automatic stay to gain a
litigation advantage justified lifting the automatic stay afforded by § 362(a)); *In re Briarpatch Film
Corp.*, 281 B.R. 820, 834 (Bankr. S.D.N.Y. 2002) ("It has often been stated that the automatic stay
is a shield, not a sword.").

Because the automatic stay's protections are so broad, its applications are expressly
limited.  On its face, the stay applies automatically only to the *debtor* and the *debtor's* property.
"Although the scope of the automatic stay is broad, the clear language of section 362(a)[1] stays
actions only against a 'debtor.'"  *McCartney*, 106 F.3d at 509–10 (quoting *Maritime Elec. Co.*,
959 F.2d at 1204).  "As a consequence, '[i]t is universally acknowledged that an automatic stay of
proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-
obligors, or others with a similar legal or factual nexus to the . . . debtor.'"  *Id.* (quotations and
citations omitted)).[22]  Similarly, by its plain words, § 362(a)(3) protects only property in which a
"debtor" had an interest as of the commencement of the bankruptcy case — whether the debtor's
property was in the possession of the debtor or a third party.  *See* 11 U.S.C. § 362(a)(3) (protecting

---

[22]     *See also Maritime Elect. Co.*, 959 F.2d at 1205 ("[T]he automatic stay is not available to non-bankrupt co-
defendants of a debtor even if they are in a similar legal or factual nexus with the debtor."); *Jackson v. Trump Ent.
Resorts, Inc.*, No. CV 13-1605 (JHR/JS), 2015 WL 13637411, at *2 (D.N.J. Feb. 11, 2015) ("Section 362(a)(1) only
stays actions against the debtor and may not be invoked by solvent codefendants, even if they are in a similar legal or
factual nexus with the debtor." (citing *Travelodge Hotels, Inc. v. Patel*, C.A. No. 13-03719 (WHW), 2013 WL
4537906, at *5 (D.N.J. Aug. 27, 2013))).

The Debtor also suggests that § 362(a)(1)'s stay of actions to "recover a claim against the debtor" also
necessarily encompasses claims against non-debtors (otherwise, according to the Debtor, the provision would be
rendered "surplusage." (Mem. at 41-42).  The one case that the Debtor cites for that proposition, however, is wholly
inapposite.  *See In re Colonial Realty*, 980 F.2d 125, 131–32 (2d Cir. 1992).  At issue in *Colonial Realty* was a claim
against a third party to recover a fraudulent conveyance — a claim literally to recover the property of the debtor that
allegedly was improperly transferred.  As set forth herein, that is *not* the nature of the claims that this Debtor seeks to
stay.

46

estate property); § 541(a)(1) (defining estate property to include all pre-petition interests of the debtor "wherever located and by whomever held"); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986) ("Subsection (a)(3) directs stays of any action, whether against the debtor or third-parties, to obtain possession or to exercise control over property of the debtor.").

**B.      The Stay Should Not Be Extended Here Under § 362(a)(1)**

**1.      Standards for Extending the Stay**

Courts have extended the reach of the statute's stay to non-debtor parties in limited circumstances, where doing so would effectuate the language and purpose of § 362(a) — namely, to protect the debtor and its assets from creditors while it attempts to reorganize. *See, e.g., In re Uni-Marts, LLC*, 399 B.R. 400, 416 (Bankr. D. Del. 2009) ("The broader rule here is that a debtor's stay may extend to a non-debtor only when necessary to protect the debtor's reorganization.") (quoting *Gray v. Hirsch*, 230 B.R. 239, 243 (S.D.N.Y.1999)).  The seminal case in that regard is *Robins*, in which the Fourth Circuit Court of Appeals held that the stay may be extended to non-debtors in "unusual circumstances" where failing to do so would "defeat" the stay's "very purpose and intent."  788 F.2d at 999.  The Fourth Circuit elaborated: "This 'unusual' situation, it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Id.*  As an example of such a "situation," the court cited "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *Id.*  As the court explained, actions against such non-debtors "are so intimately intertwined with those of the debtor that the latter may be said to be the real party in interest." *Id.* at 1001.

47

The Third Circuit Court of Appeals has adopted *Robins*' "identity of interest" rationale for extending § 362(a)(1)'s stay to non-debtors. *See, e.g.*, *McCartney*, 106 F.3d at 509 ("[C]ourts have found 'unusual circumstances' where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant . . . .'" (quoting *Robins*, 788 F.2d at 999)). Thus, in determining whether to extend the stay afforded by § 362(a)(1), the Third Circuit and other courts look to whether the action against the non-debtor will either (i) have a substantial and immediate economic impact on a debtor's property or estate, or (ii) adversely affect the debtor's management. *See Uni-Marts, LLC*, 399 B.R. at 416 ("The threatened harm may be to needed debtor funds (*e.g.,* when non-debtors are entitled to indemnification) or personnel (*e.g.*, when debtor needs the services of non-debtors facing crushing litigation)."); *see also Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287–88 (2d. Cir. 2003) (asking whether the action to be stayed will have an "immediate adverse economic consequence for the debtor's estate").

The "unusual circumstances" exception is intended to be narrow, and is reserved only for "extreme" circumstances. *See, e.g., In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004) ("Although the automatic stay can be extended to situations involving nondebtors, courts are careful to reserve such power to the most extreme and 'unusual circumstances.'"); *In re Aldan Indus., Inc.*, No. 00-10360DWS, 2000 WL 357719, at *4 (Bankr. E.D. Pa. Apr. 3, 2000) (referring to *Robins* "as a narrow exception to the prohibition against extending the protection of the automatic stay"). To extend the stay otherwise would present great risk to the rights of the non-debtor's creditors. *See, e.g.*, *Bradberry v. Carrier Corp.*, 86 So. 3d 973, 983 (Ala. 2011) ("Extending the stay to protect solvent co-defendants would not advance either of the purposes underlying the automatic stay.").

48

Contrary to the Debtor's position that the application of § 362(a)(1) applies "of its own force," without the need for any "extension" (Mem. at 40), courts within and outside of this Circuit, in light of §362(a)(1)'s plain words, have justified the application of the stay to non-debtors as an exercise of the Court's equitable powers granted under § 105(a).[23] *See, e.g., Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993) ("Even if we were to adopt the unusual circumstances test, the bankruptcy court would first need to extend the automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105."); *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65–66 (2d Cir. 1986) (construing stay extension as an exercise of § 105 authority, and stating that it "cannot extend to efforts made in bad faith by non-bankrupt co-defendants in order to escape from . . . liability").[24]

As such, the relief sought by the Debtor here should be committed to the discretion of the Court, to be exercised only upon a clear and convincing showing of an "extraordinary set of

---

[23]     The Third Circuit has not directly decided this issue.  The Third Circuit has concluded that "section 105(a) . . . permits the court to do equity where" § 362 is not available, but not in the context here of applying the automatic stay to non-debtors.  *In re Wedgewood Realty Group, Ltd.*, 878 F.2d 693, 701 (3d Cir. 1989).  In adopting *Robins'* "unusual circumstances" test, the Third Circuit simply noted, without further comment, that the *Robins* court relied on both § 362(a) (the automatic stay provision) and § 105(a) (relating to ancillary "necessary and appropriate" orders). *See McCartney*, 106 F.3d at 506 (noting in parenthetical that Fourth Circuit relied on both the "automatic stay provision and the bankruptcy court's equitable powers under 11 U.S.C. § 105 to enjoin actions against nondebtor codefendants").  *McCartney* then cited cases relying on both § 362(a) and § 105(a). *Id.*; *see also Aldan Indus.*, 2000 WL 357719, at *8 (noting same).

[24]     *See also Edwards v. McElliotts Trucking, LLC*, 2017 WL 5559921, at *4 (S.D. W. Va. Nov. 17, 2017) (noting that bankruptcy court's authority to expand the scope of the stay derives from § 105); *In re Bora Bora, Inc.*, 424 B.R. 17, 23 (Bankr. D.P.R. 2010) ("Although called an extension of the automatic stay provisions of the Bankruptcy Code to non-debtor parties, these are in fact injunctions issued by a bankruptcy court under 11 U.S.C. § 105(a) . . . ."); *In re Trans-Service Logistics, Inc.*, 304 B.R. 805, 807 (Bankr. S.D. Ohio 2004) (citing § 105 as statutory predicate for extension of the stay); *Millard v. Developmental Disabilities Institute, Inc.*, 266 B.R. 42, 44 (E.D.N.Y. 2001) ("where extension of the Automatic Stay to non-bankrupt defendants is recognized as appropriate," "[t]he power to enter such a stay in derived from 11 U.S.C. § 105"); *In re Phila. Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009) (explaining that an extension of the stay requires a showing under both §§ 362(a)(1) and 105(a)); *Aldan Indus.*, 2000 WL 357719, at *8 (stating that, even if "unusual circumstances" were present, "extensions of the stay under such circumstances are granted in conjunction with a court's authority under § 105"); *In re F.T.L., Inc.*, 152 B.R. 61, 63 (E.D. Va. 1993) (stating that extension of the stay for "unusual circumstances" is an exercise of authority under § 105(a)); *In re All Seasons Resorts, Inc.*, 79 B.R. 901, 903 (Bankr. C.D. Cal. 1987) ("It is clear to me that the Fourth Circuit in *Robins* agrees that the automatic stay under § 362 of the Code may be extended to cover non-debtors in special situations. However, to achieve this result, a debtor must proceed through § 105(a).").

circumstances." *Millard*, 266 B.R. at 44 ("Extension of the Automatic Stay to non-bankrupt

defendants is a matter of discretion"); *see In re FPSDA I, LLC*, No. 10-75439, 2012 WL 6681794,

at *8 (Bankr. E.D.N.Y. Dec. 21, 2012), as corrected (Dec. 26, 2012) ("[E]xtensions of the stay to

protect non-debtor parties are the exception, not the rule, and are generally not favored. Thus, the

movant must show by 'clear and convincing evidence' that extension of the stay is warranted.")

(citing *Millard.*, 266 B.R. 42)); *In re Univ. Med. Ctr.*, 82 B.R. 754, 757 (Bankr. E.D. Pa. 1988)

(noting that "invocation of § 105(a) must be reserved for a truly 'extraordinary set of

circumstances'"). As set forth below, the Debtor has not come close to meeting this burden.

### 2. Identities of Interest May Not Be Manufactured Shortly Before the Bankruptcy Filing For Purpose of § 362(a)(1)

The Debtor's principal argument for why the Court should extend the stay under

§ 362(a)(1) to hundreds of "Protected Parties" that are *not* in bankruptcy, including one of the

richest companies in the world, J&J, is because, according to the Debtor, "Old JJCI no longer

exists" and, thus, "the *Debtor* is [now] responsible for the Debtor Talc Claims." (Mem. at 41). As

a basis for that, the Debtor cites to various indemnity agreements, insurance agreements, and tender

agreements with the Protected Parties to which Old JJCI is or was a party. (*Id.* at 41, 44). Setting

aside the flawed factual premise for the argument (discussed below), the Debtor's reasoning also

is flawed.

With the exception of a small handful of isolated decisions from the North Carolina Court

involving different circumstances discussed below (*see* pp. 55–56, *infra*), *all* of the cases cited by

the Debtor supporting its request for relief under § 362(a) involved commercial contracts that an

operating *debtor* signed, or assumed, in the ordinary course of its business, well in advance of its

bankruptcy filing.[25]  Yet completely omitted, or disregarded, by the Debtor in its Supplemental

Memorandum is the fact that *all* of *its* agreements were unilaterally and intentionally allocated to

the Debtor by J&J and its affiliates — the very parties that now seek to have the protections of the

stay extended to them — just two days before the bankruptcy filing.  (*See* pp. 29–31, *supra*).  In

other words, outside of a few isolated and distinguishable cases, the Debtor's request is

unprecedented.

This is *not* the case in which the Court should seek to set new precedent.  The requested

extension of the stay here would transform the stay from a shield into a sword — to be wielded by

non-debtors seeking to avail themselves of the benefits, but not the burdens, of the Bankruptcy

Code by allocating assets and liabilities to a new entity formed specifically for the purpose of a

bankruptcy filing to stop non-bankruptcy litigation.[26]  *See, e.g., Scarborough-St. James Corp.*, 535

B.R. at 70; *In re Irwin*, 457 B.R. 413, 418 (Bankr. E.D. Pa. 2011) ("[T]he stay must, in some sense,

be 'earned' by the beneficiary of the stay submitting to the invasive authority of the bankruptcy

court into his private financial life . . . [thus] assur[ing] a comprehensive commitment of the

beneficiary's assets to the satisfaction of his obligations, a fundamental aspect of the

---

[25]     *See, e.g., In re Heating Oil Partners*, No. 3:08-CV-1976 CSH, 2009 WL 5110838, at *6–7 (D. Conn. Dec.
17,2009) (debtor was successor in interest after purchasing subsidiary's assets three years before bankruptcy);
*Mallinckrodt PLC v. Connecticut (In re Mallinckrodt)*, Misc. No. 20-408-LPS, 2021 WL 523625 (D. Del. Feb. 2,
2021) (debtors were named co-conspirators in actions sought to be enjoined); *Kaiser Group Int'l, Inc. v. Kaiser
Aluminum and Chem. Corp. (In re Kaiser Aluminum Corp., Inc.)*, 315 B.R. 655, 658 (D. Del. 2004) (staying suit
against insurer by KGI (another debtor) where debtor was only party with established right to proceeds); *Maaco
Enters., Inc. v. Corrao*, No. CIV. A. 91-3325, 1991 WL 255132, at *2 (E.D. Pa. Nov. 25, 1991) (holding that, where
debtor's principals were parties to a franchise agreement that was never properly assigned to corporate debtor
responsible for franchise business, and franchisor had pre-petition suit against principles, the suit against the principals
related to franchise agreement was stayed as debtor had identity with its principals); *In re Monroe Well Serv., Inc.*, 67
B.R. 746 (Bankr. E.D. Pa. 1986); *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs., Inc.*, 402 B.R. 571; *In re
Brier Creek Corporate Center Associates Ltd.*, 486 B.R. 681 (Bankr. E.D.N.C. 2013).

[26]     In fact, the Texas divisional merger statute on which J&J and Old JJCI relied in allocating liabilities to LTL,
Chapter 10 of Title 1 of the Texas Business Organization Code ("**TBOC**") reinforces the point.  Section 10.901 of
Subchapter Z of the TBOC provides:  "This code does not . . . abridge any right or rights of any creditor under existing
laws."  Denying tens of thousands of claimants continued access to the courts in order to pursue direct claims against
J&J and hundreds of retailers for *their* own conduct, because LTL was allocated Old JJCI's indemnity liabilities in
the Texas Two Step, would constitute an abridgement of creditor rights that the statute precludes.

51

debtor/creditor readjustment process that justifies the extraordinary effect of a stay of creditor pursuit of self-interest." (quoting *In re Saxby's Coffee Worldwide, LLC*, 440 B.R. 369, 378 (Bankr. E.D. Pa. 2009))).

Further, any resort to equity here, in order to extend the automatic stay to J&J and hundreds of its commercial partners, would be wholly inappropriate under the facts of this case, because of: (i) the non-arm's length nature of the agreements pursuant to which the Debtor was "allocated" the indemnifications, shared insurance coverage and tender agreements at issue: (ii) the inconsistencies in the positions J&J advances in favor of a stay post-bankruptcy compared to the positions it advanced prior to the bankruptcy; (iii) J&J's inequitable conduct in inducing claimants to continue investing emotionally, physically and financially in litigation when J&J knew it would be seeking to halt the litigations; and (iv) the devastating impact on J&J's dying victims from being denied their right to a jury trial.   (*See* pp. 21–38, *supra*; pp. 89–91, *infra*).

Even if the Debtor were correct that § 362(a)(1) applied to non-debtors "of its own force" without the need for any equitable extension (which is not the case), the requested stay should still be denied.  It is well settled that, in interpreting and applying a statute, "a court must look beyond that plain language where a literal interpretation would lead to an absurd result, or would otherwise produce a result 'demonstrably at odds with the intentions of the drafters.'"   *In re Phila. Newspapers, LLC* 418 B.R. 548, 560 (E.D. Pa. 2009) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989)); *see also In re Kaiser Aluminum Corp.*, 456 F.3d 328, 330 (3d Cir. 2006) ("A basic principle of statutory construction is that we should avoid a statutory interpretation that leads to absurd results."); *Mitchell v. Horn*, 318 F.3d 523, 535 (3d Cir. 2003) ("We do not look past the plain meaning unless it produces a result demonstrably at odds with the intentions of its drafters . . . or an outcome so bizarre that Congress could not have intended it." (citations and

52

quotations omitted)).  Rather, any interpretation and application of § 362(a) should accord with "the legislative purpose and underlying policy goals of the automatic stay."  *Denby-Peterson*, 941 F.3d at 122.  The result advocated by the Debtor here — that non-debtors can avail themselves of the automatic stay simply by unilaterally allocating to the debtor indemnity and other obligations on the eve of the bankruptcy filing — is an absurd result that would turn the purpose of automatic stay on its head, enabling non-debtors seeking litigation advantage to abuse it.  Any such construction should not be countenanced.

In that vein, it bears noting that there is no apparent limit to the principle that the Debtor implicitly asks this Court to apply — that any debtor could simply be formed as receptacle for, or even voluntarily enter into or assume, agreements with non-debtors on the eve of a bankruptcy filing for the purpose of broadening the scope of the stay.  Application of any such principle would pervert the language and purpose of the stay that Congress determined to confer, automatically but not without limitation, upon a bankruptcy filing.  (*See* pp. 44–47, *supra*).

Indeed, the Third Circuit has rejected similar attempts to "game" the Bankruptcy Code through, as here, manipulation or artifice.  *See, e.g.*, *In re Owens Corning*, 419 F.3d 195, 200, 216 (3d Cir. 2005) (reversing an order allowing "deemed" consolidation of Chapter 11 estates of corporate-debtor-borrowers and related corporate entities that guaranteed their loan obligations, on the ground it was "a ploy to deprive one group of creditors of their rights while providing a windfall to other creditors"); *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 129 (3d Cir. 2004) (finding bad faith where "the company had no significant debt apart from the Landlord's claim," which formed the basis of strategic bankruptcy petition); *In SGL Carbon Corp.*, 200 F.3d 154, 157 (3d Cir. 1999) ("The bankruptcy filing contained a proposed reorganization plan under which only one type of creditor would be required to accept less than full cash payment for its

account, namely the antitrust plaintiffs who obtained judgments against SGL Carbon."); *accord In re Millennium Lab Holdings II LLC*, 945 F.3d 126, 139 (3d Cir. 2019) (eschewing "gamesmanship" in connection with seeking bankruptcy court approval of third party releases "simply because" third parties "demand them"); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 238 (3d Cir. 2004) (rejecting notion that non-debtors can manufacture subject matter jurisdiction necessary to support a channeling injunction in favor of the non-debtors by providing financial support to the debtor; "[i]f that were true, a debtor could create subject matter jurisdiction over any non-debtor third party by structuring a plan in such a way that it depended upon third-party contributions").

Moreover, federal courts reject "feigned" or "collusive" cases, like the charade staged by J&J in this case, because, among other things, they undermine "the integrity of the judicial process." *Poe v. Ullman*, 367 U.S. 497, 505 (1961) (internal quotation marks and citation omitted). In *United States v. Johnson*, 319 U.S. 302 (1943), for example, the Court dismissed for want of a case or controversy a cooperative lawsuit brought by a tenant against a landlord, at the landlord's behest and expense, to vindicate the landlord's interests. The Court noted that the case "was instituted as a 'friendly suit' at [the defendant's] request;" that the plaintiff was represented by "counsel who was selected by [defendant's] counsel" in advance of the lawsuit; and that the defendant agreed in advance to pay the plaintiffs' counsel for bringing the suit. *See id.* at 304 ("Even in a litigation where only private rights are involved, the judgment will not be allowed to stand where one of the parties has dominated the conduct of the suit by payment of the fees of both."); *see also Muskrat v. United States*, 219 U.S. 346, 360-61 (1911) (dismissing staged and friendly suit designed to obtain a judicial ruling on the legality of a claims resolution scheme, because the defendant (like J&J in the present case) had invited the lawsuit and agreed in advance

54

to pay the plaintiffs' attorneys fees, and had "no interest adverse to the claimants"). This case bears all the hallmarks of a feigned and collusive case. It is a "friendly" bankruptcy dominated by J&J, financed by J&J, orchestrated by J&J, and instituted to provide J&J (and other non-debtor parties) with the benefits of the stay and litigation advantages over talc claimants. The faux nature of this case is confirmed by the fact that the Debtor in this case does what few if any genuine debtors ordinarily do: affirmatively seek to assume liability upon liability for hundreds of affiliated and non-affiliated parties, all in a brazen attempt to ensure that the injunctive relief sought by the Motion is as broad as possible.

The three cases from the North Carolina Court on which the Debtor relies do not dictate a different conclusion. *See In re Aldrich Pump*, LLC, Case No. 20-30608 (JCW) 2021 WL 3729335 (Bank. W.D.N.C. Aug. 23, 2021); *In re Bestwall LLC*, 606 B.R. 243 (Bankr. W.D.N.C. 2019), *In re DBMP LLC*, Case No. 20-30080 (JCW), 2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021). Each of those decisions applied the automatic stay to non-debtors following the Texas Two-Step under an entirely different set of facts. In all of those cases, the principal entities seeking protection of the stay were themselves parties to the Texas divisional merger. There was no parent company, like J&J here, seeking to stay direct, pre-merger personal injury claims against that parent company and its commercial partners. *Aldrich Pump* involved the divisional merger of two entities, Ingersoll-Rand Company ("**Old IRNJ**") and Trane US, Inc. ("**Old Trane**"). Old IRNJ divided into entities, Trane Technologies Company LLC ("**New TTC**") and debtor Aldrich Pump LLC; and Old Trane divided into two entities, Trane US Inc. ("**New Trane**") and debtor Murray Boiler LLC. 2021 WL 3729335, at *1. At the time of the merger, there were no claims for personal injury asserted against any parent company of Old IRNJ and/or Old Trane. Rather, the claims sought to be stayed in the bankruptcy were those principally against New TTC and New Trane on

theories of "alter ego" or "fraudulent conveyance." *Id.* at *21. In *Bestwall*, Georgia-Pacific LLC ("**Old GP**") underwent a divisional merger, in which it was succeeded by two entities, Georgia-Pacific LLC ("**New GP**") and the debtor Bestwall LLC. As in *Aldrich*, there was no parent company of Old GP seeking a stay of direct, pre-merger tort claims against it. Rather, the focus of the stay motion was claims against New GP, as to which the court found "[t]he liability being asserted against New GP and Bestwall would be identical and co-extensive in every respect." 606 B.R. at 251. And in *DBMP*, CertainTeed Corporation ("**Old CertainTeed**") divided by merger into CertainTeed LLC ("**New CertainTeed**") and the debtor DBMP LLC. No party was alleging direct tort claims against any parent company of Old CertainTeed. Rather, the focus of the motion was on post-merger tort claims against New CertainTeed. The court found that "[p]ost-merger, the only way that these tort claims themselves might be asserted against third parties like New CertainTeed would be through remedial equitable doctrines like alter ego and successor liability, or by attacking them as fraudulent transfers," and granted the motion. 2021 WL 3552350, at *20. In short, none of the cases on which the Debtor relies involved a separate parent entity seeking the benefit of a divisional merger to which it was not a party in order to stay direct pre-merger tort claims against it — which is what J&J seeks here.

For all of the foregoing reasons, this Court should reject the request of the Debtor to extend the stay to hundreds of non-debtors, where the claim of shared identities of interests is based solely on the allocation of agreements to the debtor on the eve of the bankruptcy filing for the very purpose of extending the stay.

### 3.     In All Events, Denying the Stay Would Have No Impact on the Debtor's Estate

The Debtor still bears the burden of showing that continuation of the actions sought to be stayed would have actual and substantial consequences to the Debtor's estate, even if an identify

56

of interests were to exist (which it does not). *See FPSDA I*, 2012 WL 6681794, at *8 ("It is not enough for the movant to show some limited risk, or that there is a theoretical threat to the reorganization, because it is always the case that a lawsuit against principals of the Debtor *could* have *some* effect on the reorganization. Rather, and in keeping with the principle that extending the stay to non-debtors is extraordinary relief, the party seeking extension of the stay must put forth real evidence demonstrating an actual impact upon, or threat to, the reorganization efforts if the stay is not extended.").[27]  Here, because this bankruptcy case and the Debtor itself are a charade, denying the extension of the stay to the Protected Parties can have no impact on the Debtor's estate as a practical matter.  Nor has the Debtor shown otherwise.

Case law makes clear that the existence of an indemnification from the debtor to a non-debtor (the Debtor's principal argument for extending the stay under § 362(a)(1)) is an insufficient ground for extension of the automatic stay.  Rather, for the stay to apply, the debtor has the burden to show that the indemnification obligation threatens the debtor's assets or reorganization.  *See, e.g., Uni-Marts*, 399 B.R. at 416 (concluding that indemnification obligation did not constitute "unusual circumstances" where it did not threaten reorganization); *Millard*, 266 B.R. at 45 ("Ultimately, the decisive issue is consideration of the same policy underlying the Automatic Stay — whether extension of the stay is necessary to foster the reorganization process."); *All Seasons Resorts*, 79 B.R. at 904 ("Although there is a closeness between debtor and co-defendants by reason of their officer and agent status and their right to indemnification . . . the magnitude of the

---

[27]     *See also In re First Cent. Fin. Corp.*, 238 B.R. 9, 19 (Bankr. E.D.N.Y. 1999) (concluding that, absent "massive depletion of estate assets" and distraction to management, no *basis to extend the stay existed); Official Unsecured Creditors Committee of Phar-Mor, Inc. v. Bowen, et al. (In re Phar-Mor, Inc. Sec. Litig.)*, 164 B.R. 903, 906 (W.D. Pa. 1994)  (declining to extend the stay where the action would not will not "materially affect or diminish the Debtor's claims.").

harm to debtor if no stay is in force does not approach the scope of the potential injuries besetting the debtors in *Robins*").

Here, the Debtor cannot meet its burden because the Debtor is a shell and has no actual estate to be impacted. The Debtor claims that it might face indemnification obligations – which, of course, it cannot meet because J&J stripped it of all real assets. However, in place of those assets J&J left the Funding Agreement which the Debtor (*i.e.*, J&J) asserts allows the Debtor to access the funds of J&J and New JJCI to meet all of its talc liabilities. Of course, these claims are not true — but true or not, the Funding Agreement and the various corporate shell games that comprised the Texas Two-Step mean that the Debtor can never actually have an adverse effect from a talc judgment against J&J (or any of the other purported Protected Parties).

First, for arguments' sake, take J&J at its word that the Funding Agreement works the way J&J claims it does: J&J or New JJCI picks up the tab for any talc liability of the Debtor and does not seek to use the Funding Agreement to hinder, delay, and defraud their creditors and the creditors of the Debtor. In that case, J&J tenders an adverse talc judgment to the Debtor — and the Debtor simply tenders that liability right back to J&J to pay. No effect on the Debtor's estate.[28]

Next, take the more accurate view: that the Funding Agreement is a scheme to hinder, delay, and defraud talc powder creditors — in other words, if J&J tenders an adverse talc powder judgment to the Debtor, it will not honor its reimbursement obligations under the Funding Agreement and will seek to maroon that liability at the Debtor for some length of time (or forever). That would have an adverse impact on the Debtor — but it would demonstrate that the scheme to

---

[28]     Moreover, the circularity of J&J's indemnity does not assist it in obtaining a stay. In this Circuit, indemnities requiring future litigation to resolve precludes sufficient impact on the debtor's estate to justify extending the stay to a non-debtor, here, J&J. *See In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (E.D. Pa. 2013) ("[W]here the right to indemnification is contingent on a factual finding in an action not involving the bankruptcy debtor and requires the commencement of another lawsuit to establish that right," jurisdiction is lacking to extend the stay to a non-debtor), *aff'd*, 571 F. App'x 139 (3d Cir. 2014).

allocate those liabilities to the Debtor was a fraudulent transfer, and those liabilities should be transferred right back to where they belong — at J&J and New JJCI (or the assets of those entities transferred to the Debtor to satisfy those obligations). *See, e.g.*, 11 U.S.C. § 548(a) ("[T]he trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor . . . if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .").

J&J cannot have it both ways. Either the Funding Agreement is what they claim it is, and such indemnification obligations merely round-trip by virtue of the Funding Agreement. Or it is not (it is not), and such indemnification obligations instead round-trip by virtue of the avoidance of the fraudulent transfers at the heart of the Texas Two-Step and the creation of the Debtor. In either case, there is no ultimate harm to the Debtor's estate, and an extension of the stay to J&J and the "Protected Parties" would serve no purpose other than to frustrate non-debtors' legitimate claims. *See Bradberry*, 86 So. 3d at 983 ("It would make no sense to extend the automatic stay protections to solvent co-defendants. They don't need it, and at the same time it would work a hardship on plaintiffs, by giving an unwarranted immunity from suit to solvent co-defendants." (citations and quotations omitted)). For this reason, too, the Debtor's request to apply to J&J and hundreds of its affiliates, insurers and retailers should be rejected.

4. **As a Factual Matter, Despite Efforts to Manufacture One, There Is No Identity of Interest**

a. **The Debtor has not proven an "identity of interest" with J&J**

i. **The record is clear that J&J is a joint tortfeasor with direct liability to claimants**

As courts often observe, "the Code was not intended to stay actions . . . where the nondebtor's liability rests upon his own breach of duty" or to "trample the rights of the Creditor-Defendants to assert their independent and distinct claims against a non-bankrupt third party." *Phar-Mor, Inc. v. Gen. Elec. Capital Corp. (In re Phar-Mor, Inc. Sec. Litig.)*, 166 B.R. 57, 62 (W.D. Pa. 1994); *accord Combustion Eng'g*, 391 F.3d at 234 (holding injunctive relief could not extend to "independent non-derivative claims against non-debtor third parties," because it "would improperly extend bankruptcy relief to non-debtors" and "would jeopardize the interests of future . . . claimants" against the non-debtors); *see Stanford v. Foamex L.P.*, 2009 WL 1033607, *2 (E.D. Pa. Apr. 15, 2009) (concluding "unusual circumstances" did not permit automatic stay to extend to non-debtor entities because "plaintiff in this action alleges that each of the non-bankrupt defendants is independently liable").[29]

Thus, it is settled law that "joint tortfeasors" are not entitled to the benefit of the automatic stay upon a co-defendant's bankruptcy filing. *Williford v. Armstrong World Industries, Inc*., 715 F.2d 124, 127-28 (4th Cir. 1983); *Robins*, 788 F.2d at 999 (opining, in cases where a separate party, even a co-defendant with a debtor in pending litigation, is "independently liable as, for example, where the debtor and another are joint tortfeasors or where the nondebtor's liability rests upon his own breach of duty . . . the automatic stay would clearly not extend to such non debtor");

---

[29]    *See also Aldan Indus.*, 2000 WL 357719, at *7 (automatic stay did not extend to non-debtor where separate proceeding against non-debtor could proceed in debtor's absence: "arbitration of the Escrow Claim can be held without the Debtor"); *Holland v. High Power Energy*, 248 B.R. 53, 58 (S.D. W. Va. 2000) (automatic stay is inapplicable when a third party has "obligations that are 'independent' and primary, not derivative of those of the debtor.").

60

*Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983) (upholding denial of a

stay to co-defendants after the Johns-Manville defendants filed for bankruptcy, explaining that the

suits could proceed because "the Chapter 11 debtors are potential joint tortfeasors").

Indeed, given the harms to alleged victims claiming tort injury are especially high, the grant

of any to a joint tortfeasor must exceed a high bar.  As stated by the Third Circuit in the *Johns-*

*Manville* case:

> the clear damage to the plaintiffs is the hardship of being forced to wait for an
> indefinite and, if recent experience is any guide, a lengthy time before their causes
> are heard. Moreover, we cannot ignore the fact that plaintiffs and crucial witnesses
> are dying, often from the very diseases that have led to these actions. We are not
> persuaded that the hardship imposed on defendants by proceeding to trial without
> Johns-Manville or our legitimate interest in judicial economy is sufficient to force
> these plaintiffs to forbear until the bankrupt defendants emerge from the
> reorganization proceedings. The defendants may be seriously inconvenienced by
> the resumption of the actions against them; under the standard announced in Landis,
> however, the balance of hardship weighs in favor of the injured plaintiffs.

*Johns-Manville Sales Corp.,* 723 F.2d at 1076; *see also Austin v. Unarco Industries, Inc*., 705 F.2d

1, 5 (1st Cir. 1983) (denying discretionary stay because plaintiffs and crucial witnesses are dying

and "the damage to the plaintiff would be the financial hardship of being forced to wait for an

undefined but potentially lengthy period before receiving the money to which she may be

entitled"); *Williford*, 715 F.2d at 127-28 (holding, in denying extension of stay, that "[o]f particular

significance in balancing the competing interests of the parties in the case at bar are the human

aspects of the needs of a plaintiff in declining health as opposed to the practical problems imposed

by the proceedings in bankruptcy, which very well could be pending for a long period of time. A

stay under such circumstances would work manifest injustice to the claimant."); *Wedgeworth v.*

*Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983) (determining discretionary stay was properly

denied because "the requisite balancing of the competing interests involved in these cases weighs

in favor of allowing the remaining actions to proceed.  The realities of the hardship of a stay on

the plaintiffs, many of whom allege that they are dying from asbestosis, is substantial and, in some

instances, permanent. The grim reaper has called while judgment waits.").

Here, the record overwhelmingly establishes that the claims in the MDL and thousands of

state court actions against J&J that are pending, or have been tried to judgment, are based on *J&J's*

conduct and are, thus, direct. (*See* pp. 17−20, *supra*). Indeed, as set forth above, juries have been

required to, and have, found J&J liable for talcum powder product liability claims, separately and

independently from Old JJCI. (*See id.*). *No* appellate court has reversed a judgment against J&J

on the grounds that, as a matter of law, it does, or did, not have a legal duty to the plaintiff. (*See*

*id.*). To the contrary, in *affirming,* in substantial part, one of the largest personal injury awards in

history, the appellate court in *Ingham* found J&J liable to the plaintiffs based on the evidence in

the record, *rejecting* any notion that J&J's liability was based on derivative principles of *alter ego*

or agency. (*See id.*). Hence, even if the Debtor were the valid successor to Old JJCI, J&J is nothing

more than a mere joint tortfeasor that, given the devastating impact of a stay on those suing it for

personal injuries, absent clearly and convincingly proven "unusual circumstances" (not shown

here), is not entitled to application of the *Debtor's* stay.

The Debtor's mantra that the claims against J&J are based "on the same products, same

defect, and same alleged harm" as claims against Old JJCI (Mem. at 19) — even if true — does

not alter that conclusion. The assertion of claims involving overlapping theories of liability, harm

and damages is the very nature of joint tortfeasor liability, which the courts have made crystal clear

is *insufficient* for application of the automatic stay. In all events, the Debtor's contention simply

disregards the record demonstrating *distinct* findings of liability, damages and culpability made

against *each* of J&J and Old JJCI. (*See* pp. 17–20, *supra*).

Nor has the Debtor even tried to make any concrete showing that continued litigation against J&J would somehow otherwise impair the Debtor's ability to reorganize. (Mem. at 72–73). In fact, the Debtor can make no such showing. The Debtor has no business to reorganize. (*See* pp. 6–7, *supra*). Moreover, the record is clear that the Debtor's skeletal staff no longer have

(if they ever had) any responsibilities for products liability claims brought against J&J. (*See* p. 6, *supra*). In short, it would only be if the Debtor's seconded staff insinuated themselves in J&J's defense of talcum powder claims that the Debtor would be distracted from the reorganization. Of course, the Debtor cannot manufacture its own impairment of estate administration to justify extension of the stay.

In sum, the Debtor has *not* demonstrated any cognizable "identity of interest" between it and J&J.

## ii.    The Debtor's invocation of the 1979 Agreement is unavailing.

The Debtor asserts that it nevertheless has demonstrated an identity of interest with J&J "because the Debtor has a contractual obligation to indemnity *[sic]* J&J pursuant to the 1979 Agreement" that was allocated to it in the Texas Two-Step. (Mem. at 80.) In the 1979 Agreement, according to the Debtor, Old JJCI "assumed all liabilities" associated with J&J's talcum powder products. (Mem. at 8-12). The argument is baseless.

To start, even if Old JJCI did "assume all liabilities" relating to J&J's talcum powder products (which, as set forth herein, it did not), that assumption would not alter J&J's status as a joint tortfeasor. It is settled law that "[c]orporations cannot discharge liabilities for their torts against third parties through contract." *Jaycox v. Terex Corp.*, No. 4:19-CV-02650 SRC, 2021 WL 2187907, *12 (E.D. Mo. May 28, 2021). Hence, "[e]ven if a successor assumes the tort liability of the predecessor through an asset purchase agreement, a plaintiff may still bring a claim

63

against the predecessor." *Id.* (citing 15 Fletcher's Cyclopedia of the Law of Corporations § 7123 (2020)); *see also In re Federal-Mogul Global Inc.*, 411 B.R. 148, 161 (Bankr. D. Del. 2008) ("The indemnity provisions allocated liabilities between Wagner and Pneumo Abex. They did not impact the claims against either party that may be brought directly by an asbestos claimant."). Rather, for any assumption to be binding on creditors, the creditors would have to indicate acceptance of the assumption. *See* Fletcher's Cyclopedia of the Law of Corporations § 7114 (Sept. 2021 update) ("[W]here an assumption agreement is based on a valuable consideration and the receipt of the property of the other company is a sufficient consideration, the company assuming such debts or liabilities may become liable, provided, it seems, *there has been an acceptance of, or acquiescence in, the agreement by the creditors of the corporation that was originally indebted*." (emphasis added)); *Darcy v. Brooklyn & N.Y. Ferry Co.*, 89 N.E. 461, 462 (N.Y. 1909) ("The consent of the creditor to accept the substituted debtor is essential to make such an agreement valid as against him."). That did not occur.

In any event, the record does not support the Debtor's position that Old JJCI did assume "all liabilities" associated with J&J's talcum powder products. That is especially so, given the contradictory positions both J&J and JJCI repeatedly took in talcum powder litigations before the filing of this bankruptcy case. (*See* pp. 21–28, *supra*). Up until the bankruptcy filing, J&J and Old JJCI were uniform in asserting that there were *no* indemnification agreements between them, and, further, as to any claim of pre-1979 exposure, if not post-1979 exposure, as well, it was *J&J* — not JJCI — that was the legally responsible party. (*Id.*). In fact, J&J and JJCI's prior positions are grounded in the record. (*See id.*).

To effectuate an assumption by contract, "[t]he agreement must be clear and unambiguous." Fletcher's Cyclopedia of the Law of Corporations § 7114 (Sept. 2021 update).[30] Here, based on its plain wording, the only assumption that the 1979 Agreement effectuated was an assumption of "indebtedness, liabilities and obligations of every kind and description . . . *allocated on the books or records of J&J as pertaining to its BABY Division.*" (*See* p. 32, *supra*). But there is *nothing* in the record identifying the specific "indebtedness, liabilities and obligations . . . allocated on the books or records of J&J as pertaining to its BABY Division" — let alone that such indebtedness, liabilities, and obligations included *talcum powder* liabilities and expenses — when the 1979 Agreement was executed. (*See* pp. 32–33, *supra*). Indeed, it is indisputable that the first cases alleging cancer resulting from J&J's talcum powder products were not filed until decades later.

Nor is there any legal support for the Debtor's suggestion that "liabilities . . . allocated on the books or records" means *all* liabilities — past, present or future — associated with a company's product lines. (Mem. at 10). The phrase "books or records" has a specific meaning in the context of corporate law, which cannot be broadly construed and does not encompass *every* corporate communication or document. N.J.S.A. 14A:5–28 5A (statute delineates limited categories of documents that corporations have a duty to maintain); Fletcher Cyc. Corp. §§ 2189, 2191, 2193 (describing standard provisions); *Huylar v. Cragin Cattle Co.,* 7 A. 521, 522 (N.J. Ch. 1887) ("[Then-existing] statutory authority to order a company to bring its books into the state does not

---

[30]     Notably, J&J knew how to draft broader indemnification provisions when it wished. When J&J sold Windsor to Cyprus in 1989, for example, J&J agreed to indemnify Cyprus against "any product liability-based claim, suit, demand or cause of action directed against Cyprus, Windsor or Western or any of their affiliates arising out of the sale of talc or talc-containing products manufactured by Windsor, Western, J&J or the affiliates of Windsor, Western or J&J, prior to Closing." (Cl. Ex. 50, at § 11.2, p. 62). Exhibit I to the agreement contained an itemized list of pending product liability lawsuits specifically covered by the indemnity provision. (*Id.*).

embrace, by implication, the authority to order it to bring all its papers and memoranda here also.");

*Feuer v. Merck & Co.*, 187 A.3d 873, 888 (N.J. App. Div. 2018), *aff'd*, 207 A.3d 264 (N.J. 2019)

(right to inspect corporation's "books" did not include "analyses or tentative studies," which were

"in the nature of confidential inter-office communications" and prepared solely for management's

information). Thus, the phrase "books or records" does not necessarily encompass a particular

past, present or future tort liability simply because the company may possess a "document"

referring to that liability or potential liability.[31]

In fact, in *Deutsche Bank Nat. Trust Co. v. FDIC*, 109 F. Supp. 3d 179 (D.D.C. 2015), the

court rejected the argument the Debtor makes here. The court held that a buyer's assumption of

"liabilities . . . reflected on the books and records" of the seller encompassed only liabilities

"reflected at a stated Book Value on . . . accounting records." *Id.* at 199. The court concluded that

the term "records" meant accounting records and rejected the contention that the term included

any document. The term, the court explained, could not "be stretched beyond its purpose to impose

liability on JPMC for *any* potential liability written down on *any* medium in *any* WaMu office" —

an argument that "fails from its own sheer hyperbole." *Id.* at 201. So, too, here.[32] The language in

the 1979 Agreement expressly *limits* the liabilities being assumed to those "allocated on the books

or records of J&J as pertaining to its BABY Division" as of January 1, 1979. In the absence of

any showing (of which there is none) that the talcum powder claims against J&J that the Debtor

---

[31]    Subsection 4 of Section 14A:5–28 belies the Debtor's position. It provides that a court may order a corporation to bring into New Jersey "books, documents and records." N.J.S.A. 14A:5–28(4). The statute, on its face, thus draws a distinction between "documents," "books" and "records."

[32]    Courts have also repeatedly held that even provisions assuming liabilities referenced in books and records do not encompass contingent liabilities. *Harrison Lumber & Hardware Co. v. C. I. R.,* 15 T.C.M. (CCH) 281 (Tax 1956); *Blackstone Valley Elec. Co. v. Stone & Webster, Inc*., 867 F. Supp. 73, 75–76 (D. Mass. 1994); *Ferguson v. Arcata Redwood Co.*, 2004 WL 2600471, at *4 (N.D. Cal. 2004); *Cowan v. Harris Corp*., 1982 WL 602774, at *1 (D. Kan. 1982)).

66

now seeks to stay were "allocated on the books or records of J&J" as of January 1, 1979, the Debtor has *not* proven the identity of interest it claims.

The cases cited by the Debtor, *Bippus v. Norton Co.*, 437 F. Supp. 104 (E.D. Pa. 1977) and *Bouton v. Litton Indus., Inc.*, 423 F.2d 643 (3d Cir. 1970), do not dictate another result. In *Bippus*, the assumption agreement included language that was the opposite of the language in the 1979 Agreement: The agreement in that case referred not only to "all recorded liabilities," but, "in addition, those liabilities and obligations under the contracts, agreements, commitments and unaccepted or irrevocable bids . . . which are *not recorded* at the date of the Closing Balance Sheet and *unrecorded liabilities* for services actually rendered or materials or supplies delivered . . . ." *Bippus*, 437 F. Supp. at 106 (emphases added). The court, applying Pennsylvania law, found an indemnity obligation by the seller of a business with respect "to tools manufactured prior to the date of sale." *Id.* Similarly, in *Bouton*, the assumption agreement contained broad language referring to "*all* liabilities and obligations . . . in respect of the contracts and commitments referred to in paragraph (f) of Section 3, and all other contracts and commitments entered into in the regular and ordinary course of . . . business *at any time*." 423 F.2d at 648 (emphasis added). Applying New York law, the court found an indemnity obligation by the seller of a business for personal injuries claims arising after the sale based on products sold before the sale. The contrast between the agreements in those cases and the 1979 Agreement is thus stark, and defeats any reliance on those cases to support the Debtor's unsupported reading of the language in the 1979 Agreement. Moreover, nothing in either case (neither applying New Jersey law, which governs the 1979 Agreement) supports any contention that the language in the 1979 Agreement applies prospectively to cover claims against J&J *after* 1979 resulting from *J&J's* conduct. In short, the

67

Debtor's reliance on the 1979 Agreement to establish an identity of interest with J&J sufficient to justify extending the stay to stop all talcum powder litigation against J&J is unavailing.

> **b.** **The Debtor has not proven an "identity of interest" with J&J's affiliates**

In a single part of a single sentence in its 93-page brief, the Debtor also contends that an extension of the stay to over 400 subsidiaries of J&J is warranted "pursuant to a merger support agreement" — an agreement that the Debtor does not even discuss, let alone quote, in its brief. (Mem. at 80). In the Amended and Restated Divisional Merger Support Agreement (Dbt. Ex. 1 (LTL 0002321-27) (the "**MSA**") — one of the agreements prepared before the Debtor's existence without any negotiation from, any representation by, or any independent regard for the fairness to, the Debtor (*see* pp. 29–31, *supra*) — the Debtor "agreed" on the date of its formation to "indemnify and hold harmless [New] JJCI and each of its affiliates . . . from and against all Losses (or Proceedings in respect thereof) to which [New] JJCI or any of its affiliates may become subject, insofar as such Losses (or Proceedings in respect thereof) relate in any way to (a) a claim in respect of any Chenango One Assets or Chenango One Liabilities" (LTL 0002322), comprising the assets and liabilities "allocated" to the Debtor in the Divisional Merger Plan/Schedules. (*See* pp. 29–38, *supra*).

The Debtor's reliance on a non-arm's length agreement that was foisted upon it on the day that it was formed in order to argue in favor of an extension of the stay to over 400 J&J subsidiaries is patently unwarranted. Indeed, the argument undermines any claim of independence by the Debtor and the credibility of its Motion. (*See* pp. 29–31, 50–55, *supra*). As Mr. Kim testified when questioned about the MSA, its reach "[d]epends on how you define affiliates." (11/4/21 H'rg. Tr. 278:15-18). There is *no* definition of "affiliate" in the MSA. (Dbt. Ex. 1 (LTL 0002321-27)). Without any definition, according to Mr. Kim, "the fact that this is JJCI agreement talking about

affiliates it's really just, you know, other companies, operating companies that had product." (*Id.*
279:9-18). Even if the MSA were arm's length, the Debtor makes no showing that the 400 J&J
subsidiaries to which it seeks to extend the stay under § 362(a)(1) fall within the contemplated
scope of its indemnification. Nor does the Debtor show that there even are any actions, or even
any threats of actions, being taken against these 400 subsidiaries. The Debtor's attempt to confer
the automatic stay on 400 J&J affiliates is, thus, pure overreach.

### c. The Debtor has not proven an "identity of interest" with J&J's retailers

The 145 Retailers to which the Debtor seeks to extend the stay, like J&J, are joint
tortfeasors, and thus, absent clearly and convincingly established "unusual circumstances," are
undeserving of any extension of a co-defendant's bankruptcy stay. In many states, "[a] retailer
who sells a product in a defective condition may be held liable in a products liability action.
Furthermore, a retailer, along with others engaged in distributing a defective product, may be held
strictly liable for personal injuries caused by the product's defects, even though the retailer has no
control as to hidden or latent defects, as where the product is prepackaged." 63 Am. Jur. 2d
*Products Liability* § 91 (Aug. 2021 update) (citing cases) ; *see also, e.g., Milchalko v. Cooke Color
& Chem. Corp.*, 91 N.J. 386, 394 (1982) ("Under New Jersey law, manufacturers, as well as all
subsequent parties in the chain of distribution, are strictly liable for damages caused by defectively
designed products."); *Pierre-Louis v. DeLonghi America, Inc.*, 66 A.D.3d 859, 860, 887 N.Y.S.2d
628, 630 (2d Dep't 2009) (denying retailer's motion for summary judgment and explaining "a
manufacturer may be held liable for placing into the stream of commerce a defective product which
causes injury" and "[t]his burden is also imposed on a wholesaler, distributor, or retailer who sells
a product in a defective condition" ) (internal quotation marks and citations omitted); Restatement,
Torts 2d, § 402A, comment f (strict products liability "applies to any manufacturer of such a

product [and] to any wholesale or retail dealer or distributor"). Furthermore, as set forth above, the fact that Old JJCI, after the fact, may have entered into Tender Agreements with the retailers does not eliminate such liability. (*See* pp. 63–65, *supra*). Thus, as set forth above (*see* p. 59–60, *supra*), the extension of the stay to a non-debtor is inappropriate where, as here, the non-debtor is "independently liable" to the creditor. *See CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 33 (S.D.N.Y. 1991) (quoting *Robins*, 788 F.2d at 999).

The Debtor's argument for extending the stay to non-debtor retailers is based on the claimed existence of Tender Agreements that Old JJCI had signed in connection with 450 pending lawsuits. (Mem. at 29.) But the Debtor has not proven the existence, let alone, terms, of all of these claimed Tender Agreements. Scant few are in the record. (*See* p. 37, *supra*). Indeed, not every Tender Agreement in the record is one solely from Old JJCI. To the contrary, certain of the Tender Agreements in the record provide for indemnification of the retailers from *J&J* (in addition to Old JJCI). (*See, e.g.*, Silverstein Decl., Exs. 46-47; Cl. Exs. 141 & 142).

In any event, even as to those Tender Agreements in the record that are exclusively from Old JJCI, the Debtor's position that they justify an extension of the stay to the non-debtor indemnitees thereunder is unsupported by the law. In this Circuit, "an indemnity provision is not in and of itself sufficient to satisfy the *A.H. Robins* standard" to permit extension of the stay to a non-debtor. *Jackson v. Trump Entertainment Resorts, Inc.*, 2015 WL 13637411, at *3; *Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.*, 133 B.R. 176, 180 (W.D. Pa. 1991) (the "debtor and the nonbankrupt defendant are not 'closely related' in the sense contemplated by the circuits extending the stay provisions to non-bankrupt defendants, merely by virtue of the indemnification agreement"). Rather, to give rise to "identity of interest" necessary to create the "unusual circumstance" sufficient to extend the automatic stay to a non-debtor indemnitee, the debtor's

70

indemnification obligation must be "absolute." *Forcine Concrete & Const. Co. v. Manning Equip. Sales & Serv.*, 426 B.R. 520, 525 (E.D. Pa. 2010) ("Because there is no indication that such obligations would be "absolute" in this case, the prospect of indemnification does not provide the "unusual circumstances" required by *McCartney* to extend the automatic stay to the non-debtor parties."); *Federal-Mogul*, 282 B.R. at 308 ("The possibility that the loser of an unrelated dispute might seek to recover its losses from the debtor does not make the dispute between non-debtors subject to the jurisdiction of the bankruptcy court.").

Here, the Tender Agreements to which the Debtor points, on their faces, fall far short of "absolute" indemnification. Rather, all versions of Old JJCI Tender Agreements[33] contain at least one, and usually more than one, of the following clauses: (a) reserving rights to re-evaluate this acceptance should new facts come to light indicating that the assumption is incorrect, that the claim arises as a result of the negligent or intentional acts of the retailer or any other appropriate basis determined in the future; (b) reserving rights to re-tender the defense back to retailer if claimant was not exposed to talcum powder product or that the Old JCI subject products were not purchased from retailer, or that retailer made representations that extended beyond the scope of JJCI's warranties; (c) reserving rights to adjust the proportion of defense costs it will pay if claimant was exposed to not only a JJCI talcum powder product, but also to another talcum powder product at issue; or (d) reserving rights to tender the defense back if JJCI did not manufacture or provide the products at issue in the above-referenced matter." (*See* pp. 37–38, *supra*). As such, the Tender Agreements on which the Debtor relies do *not* warrant the extension of the stay to the 145 retailers, which, at most, are conditional indemnitees.

---

[33] All of the Tender Agreements produced by the Debtor contain at least one of the examples of language cited in the text. *See, e.g.*, LTL 0012785-788, LTL 0013496-499, LTL 0019870-874, LTL 0020862-863, 971, LTL 0021236-237, LTL 0021287-288.

#### d. The Debtor has not proven an "identity of interest" based on "collateral estoppel"

As a "catch all," the Debtor argues that, even if had no indemnification obligations, shared insurance coverage or defense payment requirements, it nevertheless would have an "identity of interest" with the hundreds of "Protected Parties," because continued litigation against such parties "creates risks of binding the Debtor through res judicata and collateral estoppel." (Mem. at 71). The argument fails.

It is well settled that mere apprehension that a creditor may later attempt to assert collateral estoppel, or a related doctrine, based on a finding by a court in a non-stayed action is insufficient grounds for applying the automatic stay. *See Queenie*, 321 F.3d at 288 ("If such apprehension could support application of the stay, there would be vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants."); *see also Forcine Concrete*, 426 B.R. at 526 ("Moreover, while several courts have considered potential collateral estoppel effects as a factor supporting extension of the automatic stay to non-debtor parties, the *Queenie* court "located [no] decision[s] applying the stay to a non-debtor" solely on collateral estoppel grounds, id., and this court has discovered no post-Queenie cases in this district extending a stay on such grounds."); *Int'l Union of Painters & Allied Trades Dist. Council No. 21 Health & Welfare Fund v. Serv. Painting, Inc.*, No. CV 18-3480, 2019 WL 2143370, at *7 (E.D. Pa. May 16, 2019).

In all events, the Debtor's apprehension is misplaced. Collateral estoppel may not be asserted against a party in a subsequent proceeding where the party did not have a full and fair opportunity to litigate the claim or issue in the prior proceeding. *See, e.g.*, *Allen v. McCurry*, 449 U.S. 90, 96–97 (1980); *Haring v. Prosise*, 462 U.S. 306, 213 (1983). Here, the automatic stay precludes the commencement or continuation of any action against the Debtor. Because the Debtor

72

necessarily will not be a party to any continued litigation against any non-debtor entities, it cannot be collaterally estopped from later litigating any issue decided in those actions. *See, e.g., Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984). Speculative arguments to the contrary in support of a requested stay have been rejected. *See, e.g., In re Metal Center, Inc.*, 31 B.R. 458, 463 (Bankr. D. Conn. 1983) ("the debtor would not be bound by any judgment [the creditor] might obtain against [the co-debtor] in state court, and consequently, [the co-debtor] is not protected by the automatic stay"); *In re MCSi, Inc.*, 371 B.R. 270, 275 (S.D. Ohio 2004); *accord Combustion Eng'g*, 391 F.3d at 233, 242 (finding record "insufficient" to support channeling injunction).[34]

In sum, the Debtor has not established any extension of the stay to any non-debtor under § 362(a)(1). Its Motion, to the extent it relies on § 362(a)(1), should be denied.

## C. The Stay Under § 362(a)(3) is Inapplicable Here

In addition to invoking § 362(a)(1)'s stay of "actions against the Debtor," the Debtor also invokes § 362(a)(3)'s stay of "any act to obtain possession of property of the estate," to justify the stay of litigation against hundreds of non-debtors. (Mem. at 44-62). The "property of the estate" to which the Debtor points in order to justify a stay of tens of thousands of litigations against non-

---

[34]      The cases cited by the Debtor (Mem. at 70-71) are inapposite. In *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 386 B.R. 17 (Bankr. D. Del. 2008), the court addressed a motion to "expand" an injunction to a non-debtor under §105. *Id.* at 20. The court found an "identity of interest" where (i) "no direct action" was asserted against non-debtor, and (ii) the claims against the non-debtor would trigger over 1,000 indemnification claims against the debtor, requiring a duty to defend, that the court found would result in the "diversion of resources would retard the administration of the chapter 11 cases by requiring the time and commitment of individuals intimately involved in the chapter 11 cases at this critical time, seven years into the case." 386 B.R. at 22-24. Against that backdrop, and with an admitted "broader view of the potential impact on the debtor's estate," the court found it could "take[] into account the risks of collateral estoppel and record taint." *Id.* at 29. Those risks arose for reasons inapplicable here — a duty to defend on the part of the debtor, not present here. In *In re Am. Film Techs., Inc.*,175 B.R. 847 (Bankr. D. Del. 1994), on which the Debtor also relies, the court observed that the "automatic stay affords protection only to debtors and does not extend to 'cotortfeasors,' 'joint obligors,' 'guarantors,' 'sureties,' or other non-debtor 'co-defendants'" and, thus, that "third-party suits are permitted to proceed if the nondebtor is a joint tortfeasor with the debtor or where the nondebtor's liability rests upon his own breach of duty." *Id.* at 850-53. The court nevertheless granted a preliminary injunction in favor of a nondebtors who had an "absolute" right of indemnification from the debtor. *Id.* While the court also found that the claims against the debtor "expose[d] [the debtor] to collateral estoppel prejudice," it also stated that the identity of interests created by the absolute indemnity was "a more important issue." *Id.* 853-55.

debtors falls into two broad categories. (*Id.*). The Debtor asserts that the "right to insurance coverage is property of the estate," and, thus, that "[s]ection 362(a)(3) bars plaintiffs from bringing suits, against the Debtor's Insurers, the Retailers and J&J, that would deplete the Debtor's insurance on account of Debtor Talc Claims." (*Id.* at 44-46). Further, the Debtor asserts that the tens of thousands of claims asserted by talcum powder plaintiffs against J&J and retailers (the Debtor identifies no lawsuits by claimants against insurance companies) are property of the estate because the claims supposedly assert "derivative liability" (such as *alter ego* or piercing the corporate veil), are based on "successor liability," or involve "fraudulent conveyance" — all of which the Debtor asserts are claims that "belong" to the Debtor, even if asserted by claimants. (*Id.* at 46-62). The Debtor's position finds no more support in the language and purpose of § 362(a)(3) than it does under § 362(a)(1).

### 1. The Assertion of Shared Insurance Coverage Here Does Not Satisfy § 362(a)(3)

The lynchpin to the Debtor's argument that § 362(a)(3) compels the stay of tens of thousands of lawsuits against non-debtor J&J based on shared insurance coverage is that "J&J and the Debtor are both covered for talc-related claims under various shared insurance policies." (Mem. at 45). In fact, "[u]nder the weight of authority, insurance contracts have been said to be embraced in this statutory definition of 'property'" for purposes of § 362(a)(3). *Robins*, 788 F.2d at 1001. Nonetheless, the Third Circuit has instructed that courts should not just "assume[] that independent claims against [non-debtors] would reduce the insurance proceeds available to the estate." *Combustion Eng'g*, 391 F.3d at 232-33 (finding no "related to" jurisdiction in the absence of "factual findings regarding the terms, scope or coverage of the allegedly shared insurance policies").

74

Here, by the Debtor's own admission, the third party insurance carriers for Old JJCI and J&J have *never* acknowledged any coverage obligation or paid a penny for talc-related liabilities — through decades of litigation — and have always asserted, and continue to assert, defenses to such coverage. (*See* pp. 34–36, *supra*). Nothing in the record demonstrates that this *status quo* is likely to change at any time during the course of this bankruptcy case. Because the carriers are currently disputing coverage, there is nothing more than speculation that actions against co-insured non-debtor third parties actually risks depletion of available insurance proceeds. Such speculation over shared insurance fails to provide a basis for extending the automatic stay. *See Combustion Eng'g*, 391 F.3d at 226 (finding insufficient evidence to resolve the issue of shared insurance, including the issue of the debtor's purported automatic liability and declined to exercise jurisdiction); *Phar-Mor*, 164 B.R. at 906 (no basis for extending stay where movant "has failed to establish that [nondebtor] would be unable to satisfy judgments that exceed the insurance coverage"); *In re Imerys Talc America, Inc, Inc.*, 2019 WL 3253366, at *2–9(D. Del. 2019) (declining to assert jurisdiction in motion made by J&J to transfer venue of talcum powder cases on, among other grounds, that J&J failed to provide detail specifying how purported shared insurance policies with the debtor might apply to claims by each of the many plaintiffs). *Cf., e.g.*, *In re Quigley Co., Inc.*, 676 F.3d 45, 53–54, 58 (2d Cir. 2012) (noting that litigation against a non-debtor may be stayed where it "*would almost certainly* result in the drawing down of insurance policies" (emphasis added)).[35]

---

[35] Moreover, the Debtor has failed to prove that, in fact, it *is* covered under the various insurance policies it invokes, the vast majority of which are not even in the record. (*See* p. 35, *supra*). Even if Old JJCI were covered, there is nothing in the record to establish that the "allocation" to the Debtor of policies covering Old JJCI, which merged out of existence in a merger with Chenango Zero, which then itself merged out of existence when the Debtor was created, has been accepted by any insurance carrier. (*See* pp. 29, 35, *supra*).

But even if the Debtor has third party insurance coverage, continued litigation against J&J and other "Protected Parties" would cause no shrinkage in coverage.  The Debtor states that limits of its shared third party insurance coverage with J&J and others is approximately $2 billion.  (*See* p. 34, *supra*).  But J&J and its affiliates already have well-exceeded that coverage limit through defense costs and verdict and settlement payments incurred *prior* to the bankruptcy.  (*See* pp. 19–20, *supra*).  Indeed, J&J's payment in the summer of 2021 of more than $2 billion in satisfaction of the *Ingham* judgment alone exceeded the limits of its third-party insurance coverage.  Thus, even if J&J and the Debtor were to prevail in their insurance coverage dispute with third party carriers, the coverage to which they would be entitled already has been exhausted by *past* litigation expenses and liabilities.  Further, their captive insurance coverage through Middlesex was also exhausted, before J&J made the *Ingham* payment that (assuming there is coverage) exhausted the third party coverage.  (*See* p. 35, *supra*).  In short, any *continued* talcum powder litigation will not impact the Debtor's *available* insurance one iota.  Either no coverage exists or, if it does, it has been exhausted.  In either case, there can be no depletion in shared insurance if litigation against "Protected Parties" continues.

For these reasons, as well as those set forth above (*see* pp. 57–59, *supra*), any resort to a shrinkage in shared insurance coverage as a basis for extending the stay to hundreds of "Protected Parties" under § 362(a)(1) or (3) is unavailing. [36]

---

[36]     To the extent that the Court concludes that the alleged shared insurance proceeds do constitute property of the estate, the Debtor still has not proven that it would impact the Debtor's property, as the Court can fashion relief to protect the purported shared insurance policies, including preventing any party claiming an interest in the proceeds (such as J&J) from making a claim to the proceeds of the policies absent relief from the Debtor's automatic stay.  *See Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 337-38 (Bankr. S.D.N.Y. 1996) ("We are not convinced that an action by a third party to recover a judgment against another third party, whose liability may be covered under an insurance policy that also grants the debtor separate rights, implicates the automatic stay.").

### 2. The Assertion that the Debtor "Owns" the Claims to Be Stayed Does Not Satisfy § 362(a)(3)

The Debtor devotes tens of pages in its brief to discussing legal standards governing claims for alter ego, fraudulent conveyance and successor liability — all of which claims the Debtor asserts are property of the estate (Mem. at 44-62). It does so on the unstated theory that the tens of thousands of claims against J&J (and less against retailers) that the Debtor is now seeking to stay under § 362(a)(3) qualify as such claims and, thus, are property of the estate. The theory, and the entire discussion, is a red herring.

As is abundantly clear in the record (*see* pp. 17–20, *supra*), the claims asserted against J&J and retailers based on the manufacture, marketing, and sale of J&J cosmetic talcum powder claims are *not* based on derivative, successor liability, or fraudulent conveyance theories. Rather, the claims are *direct* claims based on J&J's and/or the retailers' conduct. (*See id.*) In fact, this is the very opposite of the situation in which § 362(a)(3) usually has been applied to stay litigation: Claimants here are not suing J&J and retailers to recover the assets of the Debtor. Claimants — none of whom even have sued LTL — have expressed no interest in LTL's assets at all. Instead, it is crystal clear that claimants have been suing, and absent injunction will continue to sue, J&J and Retailers to get to *their assets* based on *their liability*. Under such circumstances, § 362(a)(3) is entirely inapposite.

For all of the foregoing reasons, the Debtor's Motion, to the extent it seeks to extend the stay under § 362(a) of the Bankruptcy Code to hundreds of non-debtors, should be denied.

## II. THE DEBTOR HAS NOT DEMONSTRATED ITS ENTITLEMENT TO PRELIMINARY INJUNCTIVE RELIEF UNDER § 105(A) OF THE BANKRUPTCY CODE

As the Third Circuit has observed:

> The legislative history . . . clearly indicates that Congress intended section 105(a) to be available to the debtor to enjoin . . . proceedings even where the proceedings

are specifically excepted from the automatic stay of section 362. The relief under
section 105(a), however, is neither automatic nor may it be imposed *sua sponte* by
the court. The movant must meet the standards for injunctive relief . . . .

*Wedgewood Realty Group*, 878 F.2d at 701. Here, the Debtor asserts that, assuming § 362(a) does

not extend to the "Protected Parties" (to which, as set forth above, it does not), it nevertheless is

entitled to a preliminary injunction under § 105(a) enjoining tens of thousands of lawsuits against

J&J and other non-debtors "to maintain the integrity of the debtor's estate and fully effectuate the

protections of the automatic stay." (Mem. at 64). As set forth herein, the Debtor has not met its

heavy burden for obtaining such relief.

### A. The Court Does Not Have Subject Matter Jurisdiction to Issue the Requested Injunction Enjoining Actions Between Non-Debtors

As a threshold matter, to establish its entitlement to preliminary injunctive relief under

§ 105(a), the Debtor must first demonstrate that the Court has subject matter jurisdiction to grant

that requested relief. It is well settled that while "[s]ection 105(a) permits a bankruptcy court to

'issue any order, process or judgment that is necessary or appropriate to carry out the provisions'

. . . , § 105 does not provide an independent source of federal subject matter jurisdiction."

*Combustion Eng'g*, 391 F.3d at 224-25. Rather, "jurisdiction must . . . exist independently of any

[request to] enjoin claims against non-debtors." *Id.* at 225. In that vein, it is the Debtor's burden

to establish that the Court has subject matter jurisdiction over this matter. *See Nuveen Mun. Tr. ex*

*rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 293 (3d Cir.

2012). It cannot meet that burden.

Pursuant to 28 U.S.C. § 1334(b), a Bankruptcy Court has jurisdiction over cases under the

Bankruptcy Code, as well as all matters or proceedings that (i) "arise under" the Bankruptcy Code;

(ii) "arise in" a case under the Bankruptcy Code; or (iii) "relate to" a proceeding under the

Bankruptcy Code. *Phila. Newspapers*, 407 B.R. at 612. The Debtor contends that the Court has jurisdiction to issue the preliminary injunction on all three grounds. (Mem. at 37-39).

Both "arises under" and "arises in" jurisdiction are considered "core" proceedings in bankruptcy. *Combustion Eng'g*, 391 F.3d at 225. A proceeding is deemed to "arise under" the Bankruptcy Code when the Bankruptcy Code creates the cause of action or provides the substantive right being invoked. *Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006) (citing *Halper v. Halper*, 164 F.3d 830, 836, 836–37 n. 7 (3d Cir.1999). A proceeding is deemed to "arise in" a bankruptcy case if such proceeding has "no existence outside of the bankruptcy." *Stoe*, 436 F.3d at 216 (quoting *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir.1999)); *see also Halper*, 164 F.3d at 836 (a proceeding is "core" "if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case").

Proceedings are considered "non-core" when they fall under a court's "related to" jurisdiction, which is triggered if "the outcome of [a]proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor*, 743 F.2d at 994. The *Pacor* court elaborated: "an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate." *Id.*; *see also Phila. Newspapers*, 407 B.R. at 612. With respect to whether a lawsuit would invoke "related to" jurisdiction, the "test articulated in *Pacor* for whether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit." *Federal–Mogul Global, Inc.*, 300 F.3d at 382.

For the reasons set forth below, the Debtor has not met, and cannot meet, its burden to establish that the Court has jurisdiction to consider issuance of preliminary injunctive relief enjoining tens of thousands of non-debtor claimants from continuing to prosecute claims against non-debtor J&J and hundreds of other non-debtors.

### 1. The Request for Injunctive Relief Is Not a Core Proceeding, as It Neither "Arises Under" the Bankruptcy Code Nor "Arises In" the Bankruptcy Case

The Debtor asserts "arising under" and "arising in" jurisdiction based on the contention that it is seeking a "section 105(a) injunction . . . to guarantee the integrity of the automatic stay," a matter that, according to the Debtor, both "invokes a substantive right created by the Bankruptcy Code" and "is unique to bankruptcy." (Mem. at 35-37). The Debtor is wrong.

Injunctive relief is certainly not unique to a bankruptcy case, and injunctions of litigation frequently occur *outside* of bankruptcy in actions having nothing to do with bankruptcy. That the injunctive relief is being sought under § 105 of the Bankruptcy Code does not change its fundamental nature. *See, e.g.*, *Combustion Eng'g*, 391 F.3d at 224–25; *see also In re Johns-Manville Corp.*, 801 F.2d 60, 63 (2d Cir. 1986) ("Section 105(a) does not, however, broaden the bankruptcy court's jurisdiction, which must be established separately[.]"); *Phila. Newspapers*, 407 B.R. at 611.

Ultimately, the Debtor's mere invocation of § 105 (or § 362, for that matter) is insufficient to establish that the injunction it seeks enjoining litigations between non-debtors "arises under" the Bankruptcy Code or "arises in" the Debtor's bankruptcy case. Even if these statutory provisions fall under the Court's "core" jurisdiction in a general sense, the Court is without any jurisdiction to stay actions between non-debtors unless those actions could have some conceivable

impact on the estate.[37]   However, as set forth above (pp. 56–73, *supra*) and explained further

below, the Debtor has not, and cannot, make this showing.

2.  <strong>The Debtor Has Failed to Establish "Related To" Jurisdiction</strong>

Nor can the Debtor show "related to" jurisdiction.  The criteria for establishing "related to"

jurisdiction is essentially co-extensive with the criteria for establishing an extension of § 362(a) to

the hundreds of "Protected Parties" that the Debtor seeks alternatively to benefit with an injunction.

*See Combustion Eng'g*, 391 F.3d at 226.  Accordingly, for the same reasons, stated above (*see* pp.

56–73, *supra*), that the automatic stay under § 362(a) should not be extended to the "Protected

Parties," there is no conceivable effect on the Debtor's bankruptcy estate and, thus, no "related to"

jurisdiction.  That is: (a) the claims against J&J are independent from any claims against the Debtor

(of which none have been asserted) or even Old JJCI; (b) the Debtor has not established any

"absolute" indemnification obligation in favor of J&J, J&J's 400 affiliates, the 145 retailers and/or

any of the other Protected Parties (in fact, pre-petition it denied such indemnification liabilities);[38]

---

[37] None of the cases cited by the Debtor (Mem. at 37) supports a different conclusion.  *See*, *e.g.*, *Stoe*, 436 F.3d at 216-17 (holding that a bankruptcy court *lacked* "arising in" jurisdiction where a former employee brought an action to recover unpaid severance benefits from current and former officers of a bankrupt employer); *In re G-I Holdings*, 580 B.R. 388 (Bankr. D.N.J. 2018) (finding "arising in" jurisdiction to enforce the injunction provisions of its plan confirmation order); *In Re Seven Fields Dev. Corp.*, 505 F.3d 260, 260-62 (3d Cir. 2007) (finding that the court had "arising in" jurisdiction over a post-confirmation alleged malpractice that occurred inside of the bankruptcy proceeding as it related to the administration of the estate.); *Monroe Well Serv.,* 67 B.R. at 749-50 (issuing a § 105 injunction to prevent suits "to terminate the last source of income to the debtors"); *Lyondell Chem. Co.,* 402 B.R. 571 (issuing limited, 60-day injunctions with carveouts to prevent disruption of debtor-in-possession financing and prevent involuntary insolvency proceedings in other countries); *Brier Creek*, 486 B.R. at 687  (granting a § 105 injunction against an arbitration proceeding that duplicated an adversary proceeding within the bankruptcy that "directly affects the administration of the bankruptcy proceedings and impedes on the court's ability to administer the estate."); *Elsinore*, 91 B.R. 238 (enjoining a creditors' committee from calling a meeting of the shareholders to replace Manville directors in an effort to undermine the reorganization plan).  Moreover, as noted above, all of these cases involve genuine —as opposed to imagined or utterly speculative — threats to the reorganization of operating businesses, not shell entities seeking a litigation stay like the one requested here.

[38] The Third Circuit has made clear that "related to" bankruptcy jurisdiction exists only where "the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit."  *Federal–Mogul*, 300 F.3d at 382; *see also Combustion Eng'g*, 391 F.3d at 231–32; *In re Lower Bucks Hosp.*, 488 B.R. 314 (("The existence of an indemnification agreement between a defendant in a proceeding outside the bankruptcy action and a non-party bankrupt debtor does not automatically supply the nexus necessary for the exercise of 'related to' jurisdiction. Only when the right to indemnification is clearly established and has accrued upon the filing of a civil

81

(c) the Debtor has not established that it shares insurance coverage with J&J and the retailers and that such shared insurance coverage is being, or is in jeopardy of being, depleted, or that there is even any automatic right to defend or indemnify J&J and Old JJCI;[39] and (d) the Debtor has not established that, by collateral estoppel or otherwise, it will be bound by any judgment against any of the "Protected Parties." (*See* pp. 59–73, *supra*).

### B.        The Debtor Has Not Satisfied Its Burden of Establishing the Requirements for Granting the Extraordinary Relief of a Preliminary Injunction

Even if the Court were to have subject matter jurisdiction to consider the Debtor's request for preliminary injunctive relief, the Debtor has failed to meet its burden of establishing each of the requirements for the issuance of a preliminary injunction. A preliminary injunction — even one that is a fraction of the breadth requested here — is "an extraordinary remedy." *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) ("injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course"); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989) (an injunction is an "extraordinary remedy, which should be granted only in limited circumstances"); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson – Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578 (3d Cir. 2002) (same); *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151 (3d Cir. 1999) ("A preliminary injunction is an extraordinary remedy")*.* "The determination whether to grant or deny a § 105 injunction is intensely fact driven." *Saxby's Coffee*, 440 B.R. at 380.

---

action is the proceeding deemed 'related to' the bankruptcy case.") (citing *Federal–Mogul,* 300 F.3d at 382); *Imerys*, 2019 WL 3253366, at *3.

[39]        The need for additional lawsuits has already been established in concrete terms. Insurers are already suing J&J and Old JJCI seeking a declaratory judgment they have no duty to defend or indemnify J&J and Old JJCI. (*See* pp. 34–35, *supra*).

To obtain a preliminary injunction, a debtor seeking an injunction must demonstrate: (1) a reasonable likelihood of a successful plan of reorganization; (2) irreparable harm to the debtors' ability to reorganize without the requested relief; (3) that the relative balance of the harms weighs in favor of granting the debtor an injunction; and (4) that the requested relief would serve the public interest. *See Phila. Newspapers*, 407 B.R. at 617 (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002)); *In re G-I Holdings Inc.*, 420 B.R. 216, 281 (D.N.J. 2009); *see also Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1094 (9th Cir. 2007).[40]

Given the extraordinary nature of preliminary injunctive relief, the burden of proof is on the movant, *i.e.,* the Debtor, to establish, by clear and convincing evidence, each of the foregoing elements to obtain a preliminary injunction. *See Phila. Newspapers*, 407 B.R. at 616-17 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (a preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'") (quoting 11A Wright, Miller & Kane, Federal Practice and Procedure § 2948, p. 129-30 (1995); *Phar-Mor*, 164 B.R. at 907 (the movant has the burden of justifying the need for an injunction "by clear and convincing circumstances outweighing potential harm to the party against whom [the injunction would be] operative.").

In that vein, speculation is not enough for an injunction extending the reach of the stay to non-debtors. "It is not enough for the movant to show some limited risk, or that there is a theoretical threat to the reorganization. . . Rather, and in keeping with the principle that extending the stay to non-debtors is *extraordinary* relief, the party seeking extension of the stay must put

---

[40]    As the Debtor recognizes, there is some inconsistency in the cases regarding whether all four prongs of the test are considered together or whether the first two prongs must be established first, before considering the last two prongs of the test. Mem. at 76, n. 40). Any such inconsistency is academic here, as the Debtor cannot satisfy *any* prong of the test.

forth real evidence demonstrating an actual impact upon, or threat to, the reorganization efforts if the stay is not extended." *FPSDA I, LLC*, 2012 WL 6681794, at *8; *see also Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1146, n. 3 (5th Cir.1987) (movant "must justify the stay by clear and convincing circumstances outweighing the potential harm to the party against whom it is to be operative"); *see also Winter*, 555 U.S. at 22("[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (citing *Mazurek*, 520 U.S. at 972). Here, the Debtor has not come close to meeting its heavy burden.

### 1.    The Debtor Has Not Shown Likelihood of a Successful Reorganization

The Debtor has offered nothing but speculation — contradicted by the facts — that a reorganization is likely to succeed here. First, the Debtor is a shell entity created for litigation advantage, and there is nothing to actually reorganize. Indeed, the Official Committee has filed a motion to dismiss the bankruptcy on that basis. (*See* p. 44, *supra*).

Second, even if it were to establish a legitimate purpose for this bankruptcy case, the Debtor has not demonstrated any likelihood that it could confirm a plan of reorganization. According to the Debtor, it is seeking in a confirmed plan of reorganization "the issuance of an injunction that will permanently protect [it], its affiliates and certain other parties from further talc-related claims arising from products manufactured and/or sold by Old JCCI, or for which Old JJCI may otherwise have had legal responsibility, pursuant to section 105(a) and/or 524(g) of the Bankruptcy Code." (First Day Decl., at ¶ 59; *see also* Mem. at 92 ("[The Debtor and the Protected Parties] fully understand that all liability arising out of the Debtor Talc Claims will be 'resolved and channeled only if [the Debtor] succeeds in confirming a plan of reorganization that contains a channeling injunction that extends to the Protected Parties'" (quoting *Bestwall*, 606 B.R. at 258)). Yet, The

Debtor has not shown that its stated goal of reorganizing under § 524(g) is achievable, based on the current record, for at least two fundamental reasons: (1) the Debtor has not demonstrated that § 524(g) is available to it; and (2) the Debtor has not demonstrated any likelihood of obtaining a consenting class necessary for plan confirmation under §524(g).

Section 524(g) provides, in relevant part:

(g)(1)(A) After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection to supplement the injunctive effect of a discharge under this section.

…

(2)(B) *The requirements of this subparagraph are that—*

(i) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization--

(I) *is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant* in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products; …

11 U.S.C. § 524(g) (emphasis added). "If . . . a [statutory] provision 'is clear and unambiguous, [courts] must simply apply it.' " *Denby-Peterson*, 941 F.3d at 124 (quoting *In re KB Toys Inc.*, 736 F.3d 247, 251 (3d Cir. 2013)). Here, by the plain terms of the statute, § 524(g) "require[s]" that, as of the Petition Date (the "entry of the order for relief"),[41] the "debtor" "be named as a defendant in [a] personal injury" lawsuit. *See Combustion Eng'g,* 391 F.3d at 234 n.45 ("There are many statutory prerequisites imposed by § 524(g). To qualify for its protections, a court must find that the debtor has been named in an action for damages allegedly caused by asbestos . . . .").

---

[41]    "The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter." 11 U.S.C. § 301(b).

Principles of statutory construction (*see* immediately above) establish that "debtor" means LTL; it does not mean its predecessor-in-interest, Old JJCI. The Bankruptcy Code defines the "debtor" as the "person or municipality concerning which a case under this title has been commenced." 11 U.S.C. § 101. That is LTL, not Old JJCI. Indeed, § 524(g), on its face, distinguishes the "debtor" (LTL) from a "predecessor in interest of the debtor." *See*, *e.g.*, 11 U.S.C. § 524(g)(4)(A)(ii)(I) and (II) (listing the relationships that may benefit from the injunction and specifically enumerating a "predecessor in interest of the debtor"); § 524(g)(4)(A)(iii) (a related party is defined to include a "predecessor in interest of the debtor" and an entity that owned a financial interest in the debtor or a "predecessor in interest of the debtor").[42]

The Debtor has not shown that it was named in any lawsuit prior to the bankruptcy filing ("the order for relief"). To the contrary, as set forth above, the Debtor's CLO has admitted under oath — not surprisingly, given that the Debtor was a mere 48–hours or so old when it filed for bankruptcy — that, when it petitioned for bankruptcy relief, it had *not* been named in any lawsuits. (*See* p. 7, *supra*). Accordingly, the Debtor has not shown that it can avail itself of, and reorganize under, § 524(g).[43]

Even if § 524(g) were available, the Debtor will need the support of claimants to confirm a plan. The Debtor can make no showing that it is likely to get it. The Debtor does not have any

---

[42] The North Carolina Court cases granting preliminary injunctive relief to non-debtors following a Texas divisional merger did not reach a contrary conclusion. The issue of whether §524(g) is available to debtors not named in a lawsuit prior to the bankruptcy filing was neither raised nor decided in any of those cases. *See In re Aldrich Pump, LLC*, 2021 WL 3729335, *33-36 (finding the debtor had demonstrated a likelihood of success of reorganizing under §524(g) without addressing, or deciding, any argument that the debtor had not been "named as a defendant" in any personal injury lawsuit as of the petition date); *In re Bestwall LLC*, 606 B.R. at 254-56 (same), *In re DBMP LLC*, 2021 WL 3552350, *39-41 (same).

[43] The Debtor's failing in this regard is entirely self-inflicted. Old JJCI had been named in lawsuits alleging injury caused by the presence of asbestos prior to the Petition Date and, thus, could have sought to avail itself of the benefits of §524(g). But, in an effort to obtain the benefits, without any of the burdens, of bankruptcy, J&J deliberately elected not to put Old JJCI into bankruptcy. It should have to live with the consequences of that decision. It certainly should not be entitled to rely on an interpretation of §524(g) at odds with the statute's plain words in order to compensate for its own choices.

86

funded or operational debt. There are no banks, bondholders, landlords, unions/pensions, vendors/suppliers, or taxing authorities. The Debtor's debt structure really reduces down to one line-item: the 38,000 pending tort claims arising from the use of J&J's talcum powder products. Thus, there is only one creditor class that possibly could support a plan. A channeling injunction under § 524(g) requires that at least 75 percent of the members of "a separate class or classes of the claimants whose claims are to be addressed" by the trust must vote in favor of the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). By all evidence (including a pending motion to dismiss), the Debtor cannot demonstrate it will come anywhere close to the requisite level of support. *See also* 11 U.S.C. § 129(a)(10) (requiring that, if any classes are impaired, that at least one class must accept the plan). Beyond that, § 1129(a)(3) mandates that any plan be proposed in good faith. *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012) ("A prior determination that a bankruptcy petition was filed or proceeded in good faith does not necessarily preclude a later inquiry into whether a plan under that petition is proposed in good faith for purposes of confirmation. The question of whether a Chapter 11 bankruptcy petition is filed in good faith is a judicial doctrine, distinct from the statutory good faith requirement for confirmation pursuant to § 1129(a)(3).") (citing *Combustion Eng'g,* 391 F.3d at 247 n. 67; 6 Norton Bankr. L. & Prac. § 112:10 (3d ed. 2012)). The requisite "good faith" inquiry for plan confirmation focuses on "whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Id.* Here, there is no reorganizational goal or purpose other than to enjoin and channel direct claims against J&J, which is seeking the benefits of bankruptcy and none of the burdens, into a trust, the adequacy of which is entirely speculative. This is contrary to the purposes of the Bankruptcy Code, making any presumption of good faith unwarranted. For all of these

reasons, the Debtor has not demonstrated a likelihood of a successful reorganization. Rather, any

reorganization effort is, at best at this point, speculative.[44]

### 2. The Debtor Has Not Shown That Continued Prosecutions of Claims Against Non-Debtors Will Cause It Irreparable Harm

The Debtor fails to demonstrate by clear and convincing evidence that the commencement

or continuation of talcum powder products liability claims against any, let alone, all, of the

hundreds of Protected Parties will cause it irreparable harm. The Debtor's principal argument in

---

[44] That the Debtor has not demonstrated the likelihood of a successful reorganization is particularly significant here, where the preliminary injunctive relief that the Debtor seeks — in support of an unlikely bid to reorganize — is far broader than any permanent channeling injunction to which the Debtor would be entitled under either §524(g) or §105(a). "Section 524(g) injunctions barring third party claims against non-debtors cannot be entered in favor of just any non-debtor." *In re Purdue Pharma, L.P.*, Case No. 21 cv 7532 (CM) (S.D.N.Y. Dec. 16, 2021) (Decision and Order on Appeal) (citing 11 U.S.C. § 524(g)(4)(A)). Rather, the injunction is available to a party only when "that party is alleged to be liable 'for the conduct of, claims against, or demands on' the debtor and to the extent that such liability arises 'by reason of'" one of the four relationships between the third party and the debtor." *In re Quigley Co., Inc.*, 676 F.3d 45, 58-59 (2d Cir. 2012). Those four (4) categories of relationships, as prescribed in the statute, are as follows:

> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>
> (III) the third party's provision of insurance to the debtor or a related party; or
>
> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—
>
> > (aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
> >
> > (bb) acquiring or selling a financial interest in an entity as part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii). The hundreds of retailers that the Debtor seeks to protect do not fit into *any* of the above categories of third parties eligible for a channeling injunction under § 524(g). Moreover, *J&J* would not be entitled to a channeling injunction of the direct tort claims (*i.e.*, claims that were *not* filed against it "by reason of its" ownership interest in the Debtor) in any plan of reorganization under § 524(g). *See Quigley*, 676 F.3d at 61. Furthermore, the Third Circuit has held that § 105(a) may not "be employed to extend a channeling injunction to non- debtors in an asbestos case where the requirements of § 524(g) are not otherwise met." *Combustion Eng'g*, 391 F.3d at 233-34, 236-37 ("As both the plain language of the statute and its legislative history make clear, § 524(g) provides no specific authority to extend a channeling injunction to include third-party actions against non-debtors where the liability alleged is not derivative of the debtor. Because § 524(g) expressly contemplates the inclusion of third parties' liability within the scope of a channeling injunction — and sets out the specific requirements that must be met in order to permit inclusion — the general powers of § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g)." (footnotes excluded)). Accordingly, the Debtor is seeking preliminarily an injunction that it cannot obtain permanently under either § 524(g) or § 105(a).

support of an injunction enjoining tens of thousands of claims from proceeding is that it purportedly has certain indemnification obligations that "*could* make judgments against certain Protected Parties on those claims tantamount to judgments against the Debtor." (Mem. at 80 (emphasis added)).

The Debtor's reliance on conjectural obligations to indemnify fails. For all of the reasons set forth above in the context of § 362(a), even if the unilateral allocation of Old JJCI's indemnification obligations to the Debtor on the eve of the bankruptcy filing passed muster (which it does not), the Debtor has not proven the existence of any "absolute" indemnification obligations that *Old JJCI* had to the alleged Protected Parties. (*See* pp. 36–38, 70–71, *supra*). That is not surprising, given the record of J&J's and Old JJCI's repeated *denials* of the existence of any such indemnification obligations prior to the bankruptcy filing in multiple talcum powder litigations. (*See* pp. 21–22, *supra*). Further, even if the claimed indemnification obligations did exist, they are conditional and/or would require intervening lawsuits to enforce. (*See* pp. 36–38, 70–71, *supra*).

In all events, the claimed indemnity obligations would not cause continued litigation against the so-called "Protected Parties" to undermine the reorganization process. Even if the Debtor's factual assertions are taken at face value in all respects, the Debtor has still not demonstrated that the effect of the indemnity agreements would be anything other than to replace talcum powder claimants with indemnity claims. *See Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.*, 133 B.R. at 180 ("If anything, allowance of judgment against Hallwood now might assist RAC's reorganization by replacing the claims of Algemene, a clearly hostile creditor, with Hallwood's claim for indemnification."). Alternatively, if claims against a Non-Debtor entity with indemnification rights did not proceed to judgment during the bankruptcy, such claim would

continue to be, at best, a contingent general unsecured claim subject to the automatic stay and

subject to the same review and allowance procedures as any other general unsecured pre-petition

claim before the Court, and could be subject to expungement as contingent and unliquidated

pursuant to § 502(e)(1)(B) of the Bankruptcy Code.[45]  More to the point, the Debtor claims that,

by virtue of the Funding Agreement, J&J is backstopping any funding requirements the Debtor

would otherwise be unable to make (and in the likely event that J&J seeks to shirk that obligation,

it will instead be met by the ability to avoid fraudulent transfers under the Bankruptcy Code).

Thus, even if the Debtor had indemnity obligations, the Funding Agreement assures that such

depletion will be replenished by one of the most credit worthy enterprises in the world, J&J.

Hence, there can be no harm to the estate. For the same reason, there can be no harm to the estate

even if the Debtor found itself subject to collateral estoppel and/or *res judicata*.

Therefore, the Debtor has not shown, and cannot show, irreparable harm.

### 3. The Debtor Has Not Shown That the Balance of Equities Weigh In Favor of an Injunction.

The Debtor has not shown that the balance of equities weighs in favor of an injunction.

Nor can it.  As the Fourth Circuit has observed,

> [o]f particular significance in balancing the competing interests of the parties . . .
> are the human aspects of the needs of a plaintiff in declining health as opposed to
> the practical problems imposed by the proceedings in bankruptcy, which very well
> could be pending for a long period of time. A stay under such circumstances would
> work manifest injustice to the claimant.

---

[45]     Section 502(e)(1)(B) provides:

(e)(1)   Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this
subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is
liable with the debtor on or has secured the claim of a creditor, to the extent that . . .

(B)   such claim for reimbursement or contribution is contingent as of the time of allowance or
disallowance of such claim for reimbursement or contribution . . . .

11 U.S.C. § 502(e)(1)(B).

*Williford v. Armstrong World Indus.*, 715 F.2d at 127–28.

Here, a manifest injustice is precisely what the Debtor is seeking to achieve through its request for injunctive relief. Indeed, the contrast between the negligible, if any, harm to the Debtor's estate, claimed by the Debtor to be backstopped by one of the richest companies in the world, and the immense harm to dying victims whom J&J has actually invited to pursue claims against it in the tort system (so that J&J could "defend" its products "in open court") only to now try to stop them dead in their tracks, is staggering. The victims of J&J are sick and dying. In *Ingham*, the appellate court eloquently described the devastation experienced by these victims in describing what it found to be J&J's "reprehensible" conduct:

> The harm suffered by Plaintiffs was physical, not just economic. Plaintiffs each developed and suffered from ovarian cancer. Plaintiffs underwent chemotherapy, hysterectomies, and countless other surgeries. These medical procedures caused them to experience symptoms such as hair loss, sleeplessness, mouth sores, loss of appetite, seizures, nausea, neuropathy, and other infections. Several Plaintiffs died, and surviving Plaintiffs experience recurrences of cancer and fear of relapse. All Plaintiffs suffered mentally and emotionally. Their ovarian cancer diagnoses caused them constant worry and fear.

*Ingham*, 608 S.W.3d at 721.

Many of the victims have been litigating against J&J for years. The MDL has been pending for five years, and bellwether trials are set to begin in the MDL in April (*See* pp. 16–17, *supra*). Other cases were trial ready or had in fact begun. As set forth above, J&J and Old JJCI, by omitting and misrepresenting its plans to create and put into bankruptcy LTL, induced one dying victim to empanel a jury and put on evidence during trial. After the trial was underway, upon the bankruptcy filing, they immediately argued in favor of halting the proceeding. (*See* p. 27, *supra*). It induced another sick plaintiff to try a case through verdict, only to reveal its bankruptcy plans after receiving a plaintiff's verdict and before the judgment could be bonded. (*See* pp. 27–28, *supra*).

91

While J&J previously argued for the continuation of litigation outside of bankruptcy —
daring victims to prove their causes of action and for J&J to be able to defend itself in the MDL
and other litigations — now J&J says is does not matter if the victims have to wait.  But waiting
has real-world, immediate consequences to the victims here.  The women and men who have been
seeking to hold J&J accountable through years of litigation — as is their right under the United
States Constitution — have invested financially, physically and emotionally in the litigation.  They
are entitled to have their days in court, and to try to prove the wrong, and to seek compensation
for the harm done to them by J&J.  Many of these victims will die before they can see justice done
and will potentially forfeit claims for pain and suffering compensatory damages under the laws of
many States.  Victims are dying, while the Debtor suffers no harm.  Granting an injunction, in
these circumstances, would turn the concept of irreparable harm on its head.

> **4.    The Debtor Has Not Shown That the Public Interest Weighs Against
> an Injunction**

Finally, the Debtor has not shown that any public interest will be served by granting the
extraordinary injunction of enjoining tens of thousands of personal injury lawsuits against non-
bankrupt companies who, until recently, were content to defend themselves in court.  Considering
whether an injunction serves the public interest "requires a balancing of the public interest in
successful bankruptcy reorganizations with other competing societal interests.  *Monroe Well Serv.*,
67 B.R. at 753.  Here, however, there is no purpose served to the Debtor's reorganization efforts,
as there is nothing to reorganize, nor is there any likelihood that the Debtor can achieve a successful
plan of reorganization.  The only interests that would be advanced here is the interest of *J&J* in
halting all litigation and gaining a litigation advantage over tens of thousands of pending cases.

Moreover, as shown above, there is no logical stopping point to the Debtor's strategy.  Any
rich company facing liabilities could completely stymie them simply by allocating them to a new

entity and putting the entity into bankruptcy. The bankruptcy courts would be flooded with abusive petitions, courts would be unduly burdened, and public confidence in the fair administration of the bankruptcy system would be undermined. If permitted to succeed, the Debtor's strategy would undermine the multi-district litigation system that Congress established in 28 U.S.C.§ 1407 to centralize, efficiently manage and ultimately settle mass tort actions and other litigations alleging the same claims and injuries. The charade that the Debtor seeks to stage is not in the public interest.

That is especially so given that, at its core, what the Debtor seeks to deprive the claimants of, beyond their dignity, is their fundamental right to a jury trial of their claims enshrined in the Seventh Amendment of the United States Constitution. *See, e.g., Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 59–61 (1989) ("Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity.").

For each and every one of these reasons, no injunctive relief should issue.

## C. The Debtor's Request for Equitable Relief Should Be Denied Due to The Debtor's (and J&J's) Unclean Hands

Finally, it is well settled that "[t]he doctrine of unclean hands prevents a [movant] from obtaining equitable relief if the plaintiff has been 'guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.'" *Worldcom, Inc. v. Boyne*, 68 Fed. App'x. 447, 451 (4th Cir. 2003) (quoting *Richards v. Musselman*, 267 S.E.2d 164, 166 n. 1 (Va. 1980) (quoting W. deFuniak, Handbook of Modern Equity § 24 (2d ed.1956))); *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999) ("[W]hen 'some unconscionable act of one coming for relief has immediate and necessary relation to the equity that' the party seeks, . . . the doctrine [will] bar recovery." (quoting *Keystone Driller Co. v. General Excavating Co*., 290 U.S. 240, 245

(1933))).  "As an equitable doctrine, application of unclean hands rests within the sound discretion of the trial court."  *New Valley Corp.*, 181 F.3d at 525.

Here, the litany of inequitable and wrongful conduct engaged in by the Debtor and its ultimate parent company, J&J, with respect to this application should disqualify them from the benefits of equity.  Such conduct includes, but is not limited to, engaging in a divisive merger that was structured to abridge creditor rights in violation of Texas law (*see* p. 51 n.26, *supra*), filing a bankruptcy for the sole purpose of obtaining litigation advantage (*see* pp. 25–29, 39–40, *supra*), misrepresenting or concealing their efforts in that regard, thereby causing dying cancer patients to continue investing emotionally, physically and financially in continuing to pursue litigation that J&J knew it would be seeking to halt (*see* pp. 26–28, *supra*), and taking positions in bankruptcy court to support its request for equitable relief that are flatly contradicted by the positions that J&J and its affiliates consistently took up until the bankruptcy filing.  (*See* pp. 22-25, *supra*).  On this record, the Debtor and J&J are undeserving of equity.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Official Committee respectfully requests that the Court

should deny the Motion in its entirety.

Respectfully submitted,

**GENOVA BURNS LLC**

Dated: December 22, 2021

By: */s/ Daniel M. Stolz* _____
    Daniel M. Stolz, Esq.
    Donald W. Clarke, Esq.
    110 Allen Road, Suite 304
    Basking Ridge, NJ 07920
    Tel: 973-467-2700
    Fax: 973-467-8126
    Email:   dstolz@genovaburns.com
              dclarke@genovaburns.com

*Local Counsel to the Official
Committee of Talc Claimants*

1               UNITED STATES BANKRUPTCY COURT
              WESTERN DISTRICT OF NORTH CAROLINA
2                    CHARLOTTE DIVISION

3   IN RE:                     :    Case No. 21-30589-JCW

4   LTL MANAGEMENT LLC,        :    Chapter 11

5       Debtor,               :    Charlotte, North Carolina
                                    Thursday, November 4, 2021
6                              :    9:33 a.m.

7   : : : : : : : : : : : : : : : : : : : : : : : : : : :

8   LTL MANAGEMENT LLC,        :    AP 21-03032-JCW

9       Plaintiff,            :

10           v.                :

11  THOSE PARTIES LISTED ON    :
    APPENDIX A TO COMPLAINT and
12  JOHN AND JANE DOES 1-1000, :

13      Defendants.           :

14  : : : : : : : : : : : : : : : : : : : : : : : : : : :

15
                            **VOLUME 1**
16                  TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE J. CRAIG WHITLEY,
17                 UNITED STATES BANKRUPTCY JUDGE

18

19  Audio Operator:            COURT PERSONNEL

20
    Transcript prepared by:    JANICE RUSSELL TRANSCRIPTS
21                             1418 Red Fox Circle
                               Severance, CO  80550
22                             (757) 422-9089
                               trussell31@tdsmail.com
23
    Proceedings recorded by electronic sound recording; transcript
24  produced by transcription service.

25

1   from Johnson & Johnson parent, true?

2   A    This is an SOP document from the parent, yes.

3   Q    From the parent.  It's -- and, and I was provided these,

4   looks like four pages.  There's no signators to it.  It's not

5   like it's an arm's-length negotiation where somebody on behalf

6   of J&J is negotiating with JJCI regarding payment of anything?

7   A    I don't see any signature lines or, or anything.

8   Q    So what we know, then, is that Johnson & Johnson, the

9   parent company, has a, has created a policy regarding the

10  payment of legal fees and impose that upon JJCI, correct?

11  A    No.  I -- I would -- I would say this basically

12  memorializes what the, the standard has always been, which is

13  because of the strategy of decentralization all liability and

14  responsibility for products are given to the operating company.

15  And so this just memorializes that the accounting for that

16  would follow that, that, you know, all the liability would

17  come, again, for any product expense, product liability

18  expenses or, or other expenses would be pushed down to the, to

19  the operating company.

20  Q    Nowhere in this policy is there any reference to payment of

21  judgments or payment of settlements, correct?

22  A    Not specifically, no.

23  Q    And you said in your supplemental declaration on Paragraph

24  7 -- this was, I think, Exhibit 6, Defendants' Exhibit 6 --

25  that this is done for administrative convenience, correct?

1  A    The original payment.  So when a large judgment comes in,

2  there is a specific account that is held by Johnson & Johnson

3  that makes the initial payment and then it is put on the books

4  and records of the, of the operating company.

5       So the administrative part is having a master account that

6  all, you know, the judgments, can be used to, to pay judgments.

7  Q    So examples.  The Leavitt case, which I tried to verdict in

8  2019, the jury put 78 percent responsibility on Johnson &

9  Johnson, the parent company, 20 percent on Johnson & Johnson,

10 the Consumer company, and 2 percent on Cyprus, Cyprus Mines

11 Company.  You know that, right?

12 A    I do.

13 Q    And that case is all briefed at the California Supreme

14 Court and if they do not petition, my client may get

15 compensation at some point in it.  But what J&J does internally

16 is J&J, the parent company, even though the court system

17 allocates 78 percent responsibility, internally, privately,

18 they have, they put all that on JJCI, correct?

19 A    Right, pursuant to the assumption of all that liability,

20 that's the responsibility of JJC, of Old JJCI.  And that's

21 always been the case.  That's always how we, we've accounted

22 for that.

23 Q    Well, you wouldn't say that's always been the case.  The

24 only document that was provided to me is from yesterday.  They,

25 a four-page document dated March 2005, right?