**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
Clayton L. Thompson, Esq.
cthompson@mrhfmlaw.com
Suzanne M. Ratcliffe, Esq.
sratcliffe@mrhfmlaw.com
150 West 30th Street, Suite 201
New York, NY 10001
Tel: (800) 358-5922

*Counsel for Mesothelioma Plaintiff Katherine Tollefson*
*and Certain Mesothelioma Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 23-ap-1092-MBK |
| LTL MANAGEMENT LLC, | ) | |
| | ) | Lead BK Case: 23-12825-MBK |
| Debtor. | ) | |

**MRHFM'S OPPOSITION TO DEBTOR'S MOTION TO EXTEND STAY / FOR PRELIM. INJUNCTION ON BEHALF OF RESPONDENTS KATHERINE TOLLEFSON, SANDRA WEATHERS, MARY JACKSON, ELIZABETH MEIKLE, <u>MARZENA ZACHARA, ROBERT RADIN, AND CHRISTINE WOODFIN</u>**

## Table of Contents

*I.  Background: A Half-Trillion Dollar Tortfeasor, its Manufactured Bad Faith Debtor, and their Dying Victims* .............................................................................. 5

   **A.  The Decision.** ................................................................................................. 6

   **B.  The Fraudulent Transfer.** ....................................................................... 7

   **C.  The Third Circuit Foresaw This.** ........................................................... 8

*II.  Argument* ............................................................................................................... 9

   **A.  No Financial Distress = No Bankruptcy Jurisdiction. This Court Lacks Power to do Anything but Dismiss.** .................................................... 10

     1.  LTL Admits it has at least the same ability to fund talc-related claims as Old JJCI had before the 2021 Restructuring. Under In re LTL, LTL still faces no financial distress, and the instant Petition lacks good faith. ........................................................ 12

     2.  Dismissal must be immediate. ........................................................................ 14

   **B.  This Court Does Not Have Jurisdiction to Issue Preliminary or Permanent Injunctive Relief To Non-Debtors With Independent Liability.** ................................. 15

     1.  Section 362(a)'s automatic stay does not cover claims against non-debtors ...... 17

     2.  Section 105 does not give this Court jurisdiction to enjoin talc claims against non-debtors. ............................................................................................. 19

   **C.  Enjoining Nationwide Court Proceedings: a Gross Abuse of Discretion.** ......... 27

     1.  Zero likelihood of success on the merits: Debtor's bankruptcy will fail for lack of good faith either because it is not financially distressed, or because any financial distress stems from a § 548 fraudulent transfer. In either case, Debtor is judicially estopped from relief. ............................................................... 28

     2.  Judicial estoppel also bars this entire case, rendering likelihood of success zero. 32

     3.  Only speculation supports Debtor's assertions of irreparable harm. ............... 34

     4.  Grave harm to Respondents: victims of J&J Baby Powder were doubly victimized by LTL's 2021 bad faith bankruptcy, which wrongly barred their day in court. An injunction would make it extremely likely that Respondents here will die before LTL's second bad faith bankruptcy ends. ............................................ 35

     5.  Overwhelming public interest: federalism, the separation of powers, abuse of the bankruptcy system, and the Seventh Amendment are at stake. ...................... 36

*III.  Conclusion* ........................................................................................................... 45

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 23-ap-1092-MBK |
| LTL MANAGEMENT LLC, | ) | |
| | ) | Lead BK Case: 23-12825-MBK |
| Debtor. | ) | |

## MRHFM'S OPPOSITION TO DEBTOR'S MOTION TO EXTEND STAY / FOR PRELIM. INJUNCTION ON BEHALF OF RESPONDENTS KATHERINE TOLLEFSON, SANDRA WEATHERS, MARY JACKSON, ELIZABETH MEIKLE, <u>MARZENA ZACHARA, ROBERT RADIN, AND CHRISTINE WOODFIN</u>

This Bankruptcy Court lacks subject matter jurisdiction and that will never change. As instructed by the Third Circuit *in this case*, this Court must "start and stay" with "good faith": "only a putative debtor in financial distress" can enter bankruptcy's "safe harbor." *In re LTL Mgmt,* LLC, --- F.4th ----, 2023 WL 2760479, * 1 (3d Cir. 2023).

Johnson & Johnson and LTL are *not* here in good faith, so this Court cannot enjoin or stay actions against either and this case should be dismissed. It does *not* matter if 75% or more of alleged claimants purportedly support the unconstitutional and illegal "plan of reorganization" of a fabricated bad faith debtor. The Third Circuit already told this Court and the parties that "given Chapter 11's ability to redefine fundamental rights of third parties [cancer plaintiffs injured by J&J's asbestos-contaminated talc] only those facing financial distress can call on bankruptcy's tools to do so." *LTL Mgmt*, 2023 WL 2760479 at * 17.

2

Financial distress is required to obtain bankruptcy relief; this "safeguard ensures that claimants' pre-bankruptcy-remedies—here, the chance to prove to a jury of their peers injuries claimed to be caused by a consumer product—are disrupted only when necessary." *Id.* A second bad faith bankruptcy, filed less than 131 minutes after the first one was ordered to be dismissed under mandate from the Circuit, is ***not*** grounds to continue disrupting these remedies. Johnson & Johnson has already benefited from an 18-month-long injunction it was ***not*** entitled to. The Company took full advantage, giving away $18,000,000,000.00 in dividends while safely shielded from juries.[1] That's more than long enough.

This second bad faith bankruptcy will be dismissed. Between now and that time, will this Court—which committed clear error in LTL's favor once already—place the burden on the victims ***again***?

On April 5th, this Court granted a temporary restraining order of extraordinary breadth, barring nationwide court proceedings against (1) a debtor which had been dismissed a day earlier for filing a bankruptcy in bad faith, and (2) affiliated companies with independent, non-derivative tort liability, fully separate from the bad faith Debtor.

---

[1] The Company has 2,604,286,303 shares of Common Stock outstanding. Johnson & Johnson Annual Report 2022, Form 10-k, available at: https://www.investor.jnj.com/asm/2022-annual-report. The Company gives away $1.13 per share per quarter. This amounted to $4.45 per share in 2022. *See* Johnson & Johnson Dividend History, available at: https://johnsonandjohnson.gcs-web.com/stock-information/dividends-splits

American courts are at a standstill while this Court—which the Third Circuit ruled does *not* have power over an LTL bankruptcy—continues to credit corporate gamesmanship and ignore the interests of justice.

This Court cannot allow its TRO to become a preliminary injunction. Respondents object to the Debtor's request for unprecedented relief. *See* Adv. Pro. No. 23-1092-MBK, Dkt. 1 (Debtor Compl.) and Dkt. 2 (Debtor Mot.). This Court has neither the jurisdiction nor the discretion to enjoin lawsuits against non-debtors, especially under the circumstances here, on the heels of the Third Circuit's unambiguous and binding rejection of J&J's bankruptcy ploy.[2]

Katherine Tollefson, Sandra Weathers, Mary Jackson, Elizabeth Meikle, Marzena Zachara, Robert Radin, and Christine Woodfin ("Respondents"),[3] all victims of mesothelioma caused by exposure to Johnson & Johnson's asbestos-contaminated talc products, urge this Court to DENY Debtor's motion to broaden the automatic stay and to

---

[2] Respondents incorporate by reference MRHFM's Statement Against LTL Management's Second Bankruptcy (No. 23-12825-MBK, Dkt. 97) and the Ad Hoc TCC's Informational Brief (Dkt. 79, which MRHFM joined in Dkt. 97), and asks the Court to consider these filings and argument by all counsel against the TRO, stay, preliminary injunction, and this case at the hearing of April 11, in ruling on the Debtor's request for a stay and preliminary injunction.

[3] *See* Appendix A to Debtor's Motion, Adv. Pro. No. 23-01092, Dkt. 1. Appendix A is filed in two parts. Part 1 (Dkt. 1-1) lists Mary Jackson (pg. 605). Part 2 (Dkt. 1-2) lists Katherine Tollefson (pg. 558), Sandra Weathers (pg. 623), Elizabeth Meikle (pg. 138), and Marzena Zachara (pg. 699). Robert Radin's and Christine Woodfin's lawsuits were filed in New Jersey state court after this Court dismissed *LTL I* on April 4th, but before it issued its TRO on April 5th.

DENY Debtor's alternative motion to enjoin nationwide court proceedings against all non-debtors (including Johnson & Johnson).[4]

## I.    BACKGROUND: A HALF-TRILLION DOLLAR TORTFEASOR, ITS MANUFACTURED BAD FAITH DEBTOR, AND THEIR DYING VICTIMS

Respondents[5] are Americans diagnosed with mesothelioma who have alleged, in state court, that they developed this aggressive, inevitably fatal cancer[6] from using Johnson & Johnson's talc products. Sandra Weathers was diagnosed on September 16, 2019: filed a state lawsuit on January 27, 2020; and was set for trial on January 31, 2022. Likewise, before *LTL1*, Mary Jackson had an April 2022 trial date, Elizabeth Meikle had a January 2022 trial date, and Marzena Zachara's case was set for trial in March 2022.[7] Katherine Tollefson—a prevailing party in the appellate proceedings that culminated in *LTL1's* dismissal—was diagnosed in April 2021.

Non-distressed non-debtor Johnson & Johnson created Debtor LTL Management LLC with the full expectation that LTL would file for bankruptcy. J&J attempted then, and attempts now, to hide behind this Court's equitable powers to protect *itself* from

---

[4] Maune Raichle Hartley French & Mudd LLC ("MRHFM") only represents mesothelioma victims. The Firm represents seventy-nine plaintiffs with cases filed against Johnson & Johnson. Some of these complaints were filed after dismissal of *LTL1* but before *LTL2*. Sixty-one cases were filed as of the LTL's first bad faith bankruptcy petition in October 2021.

[5] Respondents hereby join in, and adopt the arguments of, the TCC's Opposition (Dkt. 39) and the U.S. Trustee's Opposition (Dkt. 38).

[6] *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996).

[7] *See* <u>Ex. 1</u>, Collected State Court Case Management Orders from Respondents' cases.

state tort cases. On January 30, the Third Circuit announced that LTL's petition merited

dismissal.

A.   **The Decision.**

The Third Circuit categorically rejected LTL's bankruptcy because "Chapter 11 is

appropriate ***only*** for entities facing financial distress" and LTL was not. *LTL Mgmt.*, 2023

WL 2760479, at * 17 (emphasis here). A major factor in the Circuit's decision was the

existence of the Funding Agreement reached before LTL's bankruptcy filing ("2021 FA");

the agreement provided a full backstop for LTL's assigned talc liability. The 2021 FA

acted "not unlike an ATM disguised as a contract," *id.* at *16, and was an asset valued to

be worth at least $61.5 billion, *id.* at *13–14. Critically, the Circuit held that J&J's belief

"that this bankruptcy creates the best of all possible worlds for it and the talc claimants

***is not enough***, no matter how sincerely held."[8] *Id.* (emphasis here).

The Circuit announced on January 30th that "our decision dismisses the

bankruptcy filing of a company created to file for bankruptcy." *Id.* at *17. This Court

"abused its discretion in denying the motions to dismiss" and noted that dismissal

---

[8] Debtor's facile representations that the Third Circuit made a factual finding about LTL's "sincere belief"
border on the laughable. The Third Circuit put that entire matter to the side because it could so easily
dispense with the bankruptcy petition of a non-distressed debtor. The notion that a company now cares
deeply about justice for the people it surreptitiously poisoned is risible, and rejected by Respondents here.
*See Gaslight*, MERRIAM-WEBSTER ("to grossly mislead or deceive (someone) especially for one's own
advantage"), https://www.merriam-webster.com/dictionary/gaslight.

"annuls the litigation stay ordered [by this Court] makes moot the need to decide that issue." *Id.* at *18. *LTL1* was dismissed on April 4th.

**B.    The Fraudulent Transfer.**

Apparently, during February and March, while LTL and its *amici* were urging the Third Circuit to grant *en banc* review, and then to stay the mandate pending LTL's declared intention to petition for *certiorari* (No. 23-1092, Dkt. 4, Kim Decl. ¶ 70), J&J and the Debtor were conspiring about how LTL could rid itself of its $61.5 billion asset. (*See* Kim Decl. ¶¶ 78-81 and Termination and Substitution Agreement, Apr. 4, 2023 (Dkt. 4-4, Annex D)).

According to LTL, the Third Circuit decision defeated the purpose of the 2021 FA, which was to facilitate LTL's goal of resolving all current and future claims pursuant to Section 524(g) of the Bankruptcy Code. Kim Decl. ¶ 78. LTL says the Circuit's decision had the "exact opposite" effect of what LTL intended. *Id.* LTL now says, post-dismissal, there was material risk that the 2021 FA was no longer enforceable because it was void or voidable. *Id.*

To eliminate the alleged "risk" of the 2021 FA being void, LTL, J&J, and Holdco entered into new financing agreements. *Id.* Put another way, after telling the Third Circuit that the 2021 FA was enforceable inside and outside of bankruptcy and that $61 billion to file claims was a floor not a ceiling Ex. 2, Tr., Oral Arg. of Debtor, 9/19/2022, 83:21–24, LTL decided the 2021 FA's existence prevented LTL from manufacturing bankruptcy

7

court jurisdiction. So LTL and J&J perpetrated a fraudulent transfer rather than defend themselves before juries. Tellingly, Johnson & Johnson—at least when lawyers were not involved—never refused to honor the 2021 FA. Ex. 3, Dep. of John Kim, 4/14/2023, 209:9–17, 210:7–18.

The 2023 Funding Agreement ("2023 FA") is between LTL and HoldCo (not Johnson & Johnson), and operates in *or out* of bankruptcy. Kim Decl. ¶ 81. A second arrangement, a so-called J&J Support Agreement, is subject to this Court's approval and is operative only in the Chapter 11 case. *Id.* The Debtor contends these changes "resolve the concerns" that lead the Third Circuit to dismiss *LTL1*. Yet, the 2023 FA is worth $30 billion through HoldCo, and LTL has access to these funds inside or outside of bankruptcy. Ex. 3, 67:22-68:6, 68:19-69:14, 72:9-21. So, LTL and J&J committed a fraudulent transfer by squandering $30 billion to hide it from the estate, and LTL is still not in financial distress. The Third Circuit found that LTL's liabilities over the next 24 months are $2.4 billion. *LTL Mgmt*, 2023 WL 2760479, at *3.[9]

**C.  The Third Circuit Foresaw This.**

The Third Circuit presciently addressed the potential for fraudulent transfer between LTL and J&J in the future:

---

[9] While Mr. Kim maintains his belief that LTL is in financial distress in *LTL2*, the basis for this assertion is no different than the reasons this Court expressed in February 2022.  Ex. 3 at 205:14–206:5.

Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is … premature, we note interested parties may seek to avoid any transfer made within two years of any bankruptcy filing by a debtor who receives less than a reasonably equivalent value in exchange for such transfer and became insolvent as a result of it.

*LTL Mgmt.*, 2023 WL 2760479, at *16 n.18. LTL appears to have received no consideration for giving away its largest asset (the 2021 FA), and has obviously breached its duty to maximize the Estate's assets. These are not "clean hands." *See In re SGL Carbon Corp.*, 200 F.3d 154, 161 (3d Cir. 1999). And yet even after committing a fraudulent transfer, the Debtor still has over $27 billion more than it needs to defend and resolve talc claims over at least the next 24 months.

## II.    ARGUMENT

Bankruptcy courts are of expressly limited subject matter jurisdiction.  This Court wholly lacks the power to (1) maintain jurisdiction over this bad faith Chapter 11 proceeding or (2) to enjoin state court claims against non-debtors with independent, non-derivative tort liability. Even if both jurisdictional hurdles could be cleared, any injunctive relief in favor of non-debtors would violate the preliminary injunction standard, which seeks to maintain the status quo until a merits decision is reached. The status quo is that LTL, at the time of filing its second petition, had been branded a bad faith debtor by the Third Circuit. Granting LTL injunctive relief would upend the status quo in favor of a judicially recognized bad faith debtor.

## A. <u>No Financial Distress = No Bankruptcy Jurisdiction. This Court Lacks Power to do Anything but Dismiss.</u>

The Third Circuit categorically rejected LTL's first bankruptcy because LTL was not in financial distress. And "Chapter 11 is appropriate *only* for entities facing financial distress." *LTL Mgmt.*, 2023 WL 2760479 at *17 (emphasis). A financially un-distressed company cannot file a Chapter 11 petition in good faith. *Id.* at *9 (citing *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 122 (3d Cir. 2004), and *SGL Carbon Corp.*, 200 F.3d 154 at 166. [10]

---

[10] *See also Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) ("One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from *the weight of oppressive indebtedness*, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.") (emphasis added); *Wetmore v. Markoe*, 196 U.S. 68, 77 (1904) ("Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive…"); *In re Capitol Food Corp. of Fields Corner*, 490 F.3d 21, 25 (1st Cir. 2007) (reasoning that a debtor need not be insolvent before filing bankruptcy petition, but that it must be experiencing "some sort of financial distress"); *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 228 (2d Cir. 1991) (debtor must "at least…face such financial difficulty that, if it did not file at that time, it could anticipate the need to file in the future"); *In re SGL Carbon Corp.*, 200 F.3d 154, 164–66 (3d Cir. 1999) (reversing the district court and dismissing the debtor's bankruptcy because, *inter alia*, "[t]he mere possibility of a future need to file, without more, does not establish that a petition was filed in 'good faith,'" and "Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities"); *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 280–81 (4th Cir. 2007) (dismissal upheld because debtor was not "experiencing financial difficulties;" the debtor's filings "reveal a solvent business entity," a fact that "alone may justify dismissal of [the debtor's] Chapter 11 petition"); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072–73 (5th Cir. 1986) ("The 'new debtor' syndrome, in which a one-asset entity has been created … to isolate the insolvent property and its creditors, exemplifies … bad faith cases…Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions."); *In re Cook*, 104 F.2d 981, 985 (7th Cir. 1939) (no valid bankruptcy purpose where "proceeding was instituted not for the purpose of obtaining benefits afforded by the Act to a corporation in financial distress, but to enable appellees to escape the jurisdiction of another court where the day of reckoning … was at hand"; "A Federal Court should not extend its jurisdiction under such circumstances."); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000) (affirming dismissal because, *inter alia*, the bankruptcy court found the primary motivation of the debtor—a healthy company "not in dire financial straits"—was to dispose of a state court lawsuit); *In re Marsch*, 36 F.3d 825, 829 (9th Cir. 1994) (no good faith where debtor "had the financial means to pay" its obligations, which

The good faith requirement is a jurisdictional one, protecting the powerful equitable weapons of bankruptcy from misuse by a debtor who lacks "clean hands." *SGL Carbon*, 200 F.3d at 161 (quoting *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986)). The ***Debtor*** has the burden to establish good faith (and financial distress). *LTL1*, 2023 WL 2760479, at *8. Here, LTL's lack of distress has not changed, even after LTL's fraudulent conveyance of giving away the full value of New JJCI under 2021 FA, so the analysis is simple: as in *LTL1*, *LTL2* must be dismissed.

LTL's asserted goal of global settlement, and this Court's stated desire to foster such a settlement, are irrelevant because they cannot bestow jurisdiction. When a debtor's lack of good faith becomes apparent—as it already has here—dismissal must follow immediately and the Court lacks jurisdiction to take any other action. An alleged "settlement" between the Debtor and 60,000 purported "claimants" does not give this Court jurisdiction it otherwise does not have and does not permit LTL, let alone J&J, to enter the safe harbor of bankruptcy. *LTL Mgmt,* 2023 WL 2760479, at * 1.

---

posed no "danger of disrupting business interests"); *In re Stewart*, 175 F.3d 796, 811 (10th Cir. 1999) (affirming dismissal and recognizing that relieving "oppressive indebtedness" is "[o]ne of the main purposes of bankruptcy law"); *In re Waldron*, 785 F.2d 936, 940 (11th Cir. 1986) (rejecting a debtor's bankruptcy because "[t]he bankruptcy laws are intended as a shield, not as a sword," and recognizing that the purpose of Chapter 11 is to give a fresh start to a "financially troubled debtor" rather than the "financially secure"). *See also Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) ("This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which *certain insolvent* debtors can reorder their affairs … But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest *but unfortunate* debtor.'") (emphasis added).

1. ***LTL Admits it has at least the same ability to fund talc-related claims as Old JJCI had before the 2021 Restructuring. Under In re LTL, LTL still faces no financial distress, and the instant Petition lacks good faith.***

The 2023 FA is worth $30 billion, and LTL has access to these funds inside **or** outside of bankruptcy. <u>Ex. 3</u>, 67:22-68:6, 68:19-69:14, 72:9-21. LTL's representative confirms that LTL, today, has "at least the same, if not greater, ability to fund talc-related claims and other liabilities as Old JJCI had before the prior restructuring." *Id.* at 64:14–18. The Third Circuit found that LTL's liabilities were $2.4 billion over the next 24 months. *LTL Mgmt,* 2023 WL 2760479, at *3. Under the Third Circuit's binding precedent, these facts **by themselves** warrant immediate dismissal and bar this Court from enjoining any actions against non-debtors.

When speaking to the American Bankruptcy Institute conference in April 2022, Debtor's Counsel, Mr. Gregory Gordon said the wealthy tortfeasor bankruptcy ploy known as the Texas Two Step, is intended to "overcome the tort system" without "the obligations of a bankruptcy filing." <u>Ex. 4</u>, Am. Bankr. Institute: Annual Spring Meeting (Texas Two Step), at 40, 50. Tellingly, Mr. Gordon said "the most important thing" in Two Steps is "there [is] a funding agreement that was put in place between the entities that it split….the idea was, and these companies [including J&J] all felt the same way [ ] we would like to avoid an argument that there was any kind of fraudulent transfer here. So we're not interested in ***putting a cap on the funding agreement***." *Id.* at 18 (emphasis added).

12

"We'd like to do it in a way where we can say to the claimants and say to the court, look, the ***same assets*** that were available before the Chapter 11 to support the payment of these claims are available post the Chapter 11." *Id.* at 19 (emphasis added). Here, a "very large company," Old Johnson & Johnson Consumer Inc., was split and "the entirety of its assets remain available…J&J itself agreed to become a co-obligor on the funding agreement to the extent of the value of [Old JJCI] and that was just to provide further comfort that assets—the assets would be available." *Id.* at 21.

But these statements were before the Third Circuit held that LTL filed in bad faith. Then the 2021 FA was less "important" to the Debtor as was having the "same assets" in or out of bankruptcy. The remedy for fraudulent conveyance is unwinding the recent transactions, but the Court doesn't need to reach that issue now. LTL still is not close to being in financial distress, and because Chapter 11 is only appropriate for companies in financial distress, LTL has no access to the powerful equitable weapons of bankruptcy. The end.[11]

Therefore, this Court accordingly has no jurisdiction over LTL's instant Petition. Dkt. 1. That was true the day LTL filed; it is true today; it will be true tomorrow. It is true no matter how many alleged victims of J&J's asbestos-contaminated talc say they would

---

[11] J&J settled nearly 7,000 cases in the tort system over several years for less than it gives away in *one month* in dividends. *See* Ex. 5, Debtor's Supplemental Resp. to Official Committee of Talc Claimants' RPD No. 40.

13

prefer bankruptcy to courts of general jurisdiction.[12] Binding precedent from LTL's first

bad faith bankruptcy means this one must be dismissed too.

### 2. Dismissal must be immediate.

Apparently, in the aftermath of the Circuit's decision, there was a consensus

among the lawyers for LTL and J&J that 2021 FA wasn't important anymore and could

be voided. *See* Ex. 3, Kim Tr., 181:4-9. What happened next was that Mr. Kim and his LTL

"colleagues" gave away a $61.5 billion asset. Such squandering of resources to engage the

machinery of bankruptcy courts is indicia of bad faith meriting dismissal.

The Third Circuit cited and relied upon *SGL Carbon* for its holding that LTL's first

Chapter 11 petition lacked good faith. In turn, *SGL Carbon* invoked *In re Marsch* in its

review of the nationwide rule forbidding non-distressed debtors from bankruptcy relief.

*SGL Carbon*, 200 F.3d at 160–61, 162, 163, 165, 166. *Marsch* is instructive here.

In *Marsch*, the bankruptcy court found a debtor filed in bad faith: the debtor filed

to avoid paying a judgment / posting an appeal bond that he could easily afford to pay.

*In re Marsch*, 36 F.3d 825, 827, 829 (9th Cir. 1994). Though the bankruptcy court found bad

faith, it gave the debtor 60 days to liquidate assets and pay his debts before dismissal. *In

re Marsch*, 36 F.3d at 827–28. The bankruptcy court "thought it had discretion to delay

---

[12] It should have also prompted this Court to dismiss *sua sponte*. The continued exercise of jurisdiction over this case is both an affront to justice and, given the Court's duty to be concerned with its own subject matter jurisdiction before it considers subsequent matters like settlement, clear error.

dismissal to allow debtor to conduct an orderly liquidation." *Id.* at 829. But "[i]n this

bankruptcy court erred; *immediate dismissal was the only appropriate course once the court*

*found that the petition was filed without a legitimate purpose.*" *Id* (emphasis added).

Here, like the debtor in *Marsch*, both LTL and the Court seem to want to put the

cart—forced settlement and the establishment of a § 524(g) trust—before the horse. But

the sincere desire to use one of bankruptcy's tools does not magically bestow a valid

bankruptcy purpose upon a bad faith bankruptcy, or empower this Court with

jurisdiction it does not have. This Court has no power over LTL's second Petition. It must

police its jurisdiction and dismiss immediately. This action—clearly required under

direct Third Circuit precedent—would moot all requests for injunctive relief.

### B.  This Court Does Not Have Jurisdiction to Issue Preliminary or Permanent Injunctive Relief To Non-Debtors With Independent Liability.

Even if the Court had jurisdiction over this bad faith bankruptcy—which it does

not—there is no authority granting the Court the power to enjoin nationwide litigation

as the Debtor seeks. *See In re Phoenix Piccadilly*, 849 F.2d 1393, 1394 (11th Cir. 1988) ("what

amounts to bad faith is the same for both proceedings"—lifting stay for cause due to bad

faith under § 362 and dismissing case for lack of good faith under § 1112). LTL seeks a

stay under 362(a) benefitting itself and almost 150 "protected parties," and/or a

preliminary injunction for the same under section 105(a). Kim Decl. ¶ 105. The stay and

preliminary injunction are "critical" to the Debtor's ability to "equitably" and

permanently resolve all talc claims. *Id.* ¶ 107.  If not given this relief, LTL contends it would "defeat the purpose" of this bankruptcy filing, "cause irreparable harm" to the Debtor's Estate, and "undermine or circumvent" the purpose of the automatic stay and preliminary injunction and divert the Debtor from reorganization efforts. Kim Decl. ¶ 107.

Neither 362(a) nor 105(a) grant this Court the sweeping authority demanded by Debtor. Quite simply—and dispositive by itself—an injunction barring state court litigation facially violates 28 U.S.C. § 2283, the Anti-Injunction Act.[13] This statute was referenced expressly by the 7th Circuit panel at oral argument in 3M's bankruptcy scheme on April 4th.[14] The 3M/Aearo ploy is materially indistinguishable from Johnson & Johnson's, as it aims to provide injunctive relief from a bankruptcy court to protect non-distressed non-debtors (with independent tort liability) from facing justice in courts of general jurisdiction. In exercising its statutory (and inherent) powers, bankruptcy courts "may not contravene specific statutory provisions" like the Anti-Injunction Act. *Law v. Siegel*, 571 U.S. 415, 420–21 (2014).

---

[13] "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

[14] Ex. 6, *In re Aearo Technologies, LLC*, Tr. of Oral Argument, April 4, 2023, at 15 (Easterbrook, J.: "Certainly 2283, which says expressly authorized by law, you don't see any express authorization for injunctions against state litigation in section 105"); at 17 (Hamilton, J.: "The bankruptcy code in other chapters does provide for automatic stays to extend to related parties in 1201 and 1301. We don't see that kind of language in 362 or in Chapter 11. Shouldn't that give us pause?").

Here, even if this were a good-faith bankruptcy, the Court's extraordinary TRO and potential preliminary injunction cannot be rooted anywhere in the Court's limited statutory powers. The injunction sought by the Debtor sweeps far beyond talc claims against LTL, barring good faith litigation against scores of non-debtors (including J&J) for their own independent liability. No statute authorizes that expansive exercise of power, and precedents binding on this Court flatly forbid it.

### 1.  *Section 362(a)'s automatic stay does not cover claims against non-debtors.*

Section 362(a)(1) provides that the filing of a bankruptcy petition "operates as a stay" of any accrued action "against the debtor" or "to recover a claim against the debtor." 11 U.S.C. § 362(a)(1). The automatic stay also covers "any act to obtain possession of," or "exercise control over," "property of the estate." *Id.* § 362(a)(3).

By their terms, these provisions do not apply here. "[T]he clear language of section 362(a) stays actions only against a 'debtor.'" *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509 (3d. Cir. 1997). It is thus "universally acknowledged" that the stay does not include suits against non-debtors for their own liability, like those LTL asks the Court to enjoin here. *Id.* The only time the Third Circuit has interpreted the statute to reach a claim against a non-debtor is when prosecuting the claim would have required, by operation of state law, the debtor's "necessary participation" as a defendant. *Id.* at 511. Because that isn't the case here, section 362(a)(1) does not apply.

17

Nor does section 362(a)(3). The only "property of the estate" even arguably implicated by third-party litigation are insurance policies shared by LTL and some non-debtors. The existence of these policies, however, does not trigger the automatic stay even for claims against those non-debtors. This Court acknowledged in its Opinion on the preliminary injunction in *LTL1* that "a court must make adequate factual findings before staying proceedings against non-debtor co-insureds on the theory that asbestos-related personal injury claims against the non-debtors will automatically deplete the insurance proceeds available to the debtor and, thus, reduce the assets available to the bankruptcy estate." *In re LTL Management, LLC*, 638 B.R. 291, 318–19 (Bankr. N.J. 2022) (*citing In re Combustion Eng'g*, 391 F.3d 190, 233 (3d Cir. 2004)).

But this Court made no such findings in *LTL1*, and cannot make them here. *See id.* Far from concluding that insurance proceeds would be "automatically" depleted, the Court "[a]dmitted[]" that "coverage is disputed" and did not deny that the liabilities had already exceeded any such coverage. *Id.* at 303. It granted sweeping relief in 2022 despite acknowledging that it made "no definitive determination … as to exhaustion," *id.*, and there's a "chance" that LTL "could later prevail with respect to its insurance coverage demands," *Id.* at 319. That was not enough to bring those claims within section 362(a)(3)'s automatic stay then, and it is not enough now.

Acknowledging as much, this Court treated the question before it as "whether to extend the stay" *beyond* what section 362(a) provides. *Id.*, *passim*. But the statute's text

(and guiding case law) answers this question too. Section 362(a) grants "no authority" to bankruptcy judges. *In re Canter*, 299 F.3d 1150, 1155 n.1 (9th Cir. 2002). Instead, it describes the *effect* of filing a petition: it "operates as a stay." 11 U.S.C. § 362(a). The stay is an "automatic consequence of the filing of a bankruptcy petition," imposed directly by section 362. *Chicago v. Fulton*, 141 S. Ct. 585, 589 (2021). Because it is "automatic" and "self-executing," *Gruntz v. Cnty. of Los Angeles*, 202 F.3d 1074, 1081 (9th Cir. 2000) (en banc), it "differ[s] from a bankruptcy court-ordered injunction, which issues under 11 U.S.C. § 105," *Canter*, 299 F.3d at 1155 n.1.

Section 362(a) contains no exception for "unusual circumstances" that would empower bankruptcy courts to expand its scope. Instead, as the Eighth Circuit has explained, "where an 'unusual-circumstances' 'exception' would be needed to justify extension of the automatic stay, § 105 is the more appropriate source of authority for assessing the propriety of a stay," and "a stay issued pursuant to that section should be treated as an injunction." *In re Panther Mountain Land Dev., LLC*, 686 F.3d 916, 926–27 (8th Cir. 2012). The automatic mechanism of Section 362(a) cannot be the basis to extend discretionary injunctive relief in the way LTL asks.

### 2. Section 105 does not give this Court jurisdiction to enjoin talc claims against non-debtors.

Section 105 authorizes bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

But it "does not provide an independent source of federal subject matter jurisdiction." *Combustion Eng'g*, 391 F.3d at 224–25. The dispositive question, then, is whether this court has jurisdiction to enjoin claims against non-debtors. Under binding Third Circuit precedent, it does not.

Congress has granted bankruptcy court jurisdiction over only two kinds of proceedings: (1) core proceedings and (2) proceedings "related to" core proceedings. 28 U.S.C. § 1334(b); *id.* § 157(a). The enjoined claims against non-debtors are neither.

### a)      The Debtor has not established core jurisdiction.

This Court previously held that it had jurisdiction over talc claims against non-debtors because LTL "invokes a substantive right under the Bankruptcy Code" and LTL's adversary proceeding, "by its nature, could arise only in the context of a bankruptcy case," making it a core proceeding. 638 B.R. 291, 302–03. In other words, the Court reasoned that jurisdiction over the adversary proceeding in a Chapter 11 case is sufficient to provide it with a basis for expanding the § 105(a) injunction.

The Third Circuit rejected this argument in *W.R. Grace*. The question isn't whether the *adversary proceeding* is a core proceeding, but whether the claims sought to be enjoined are core proceedings. *In re W.R. Grace & Co.*, 591 F.3d 164, 174 (3d Cir. 2009). Otherwise, "a bankruptcy court would have power to enjoin any action, no matter how unrelated to the underlying bankruptcy it may be, so long as the injunction motion was filed in the adversary proceeding." *Id.* "The existence of a bankruptcy proceeding itself," however,

is not "an all-purpose grant of jurisdiction." *Id. See also Stoe v. Flaherty*, 436 F.3d 209, 217

(3d Cir. 2006). "It is hornbook law that § 105(a) does not allow the bankruptcy court to

override explicit mandates of other sections of the Bankruptcy Code … Section 105(a)

confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do

that by taking action that the Code prohibits." *Law v. Siegel*, 571 U.S. 415, 420–21 (2014).

Talc claims against non-debtors are not "core" proceedings. Hence, there is no

basis for exercising core jurisdiction over them.

### b) The Debtor has not established related-to jurisdiction.

That leaves related-to jurisdiction, which encompasses "suits between third

parties" that "have an effect on the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S.

300, 307 n.5 (1995).  Four times—in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 986 (3d Cir. 1984),

*In re Federal-Mogul Glob. Inc.*, 300 F.3d 382 (3d Cir. 2002), *Combustion Eng'g*, and *W.R.

Grace*—the Third Circuit has enforced strict limits on "related-to" bankruptcy

jurisdiction. Four times, the Circuit has rejected efforts to enjoin asbestos suits against

non-debtors under "related-to" jurisdiction, even where the suits might trigger

indemnification claims against the debtor. *Id*.

Talc lawsuits against non-debtors for their own liability do not affect the Estate.

Although LTL points to J&J's agreement to indemnify a previous subsidiary, the

agreement covers only liabilities "on the books or records of J&J" in 1979—not future

liabilities.[15] 638 B.R. 291, 309. That is the only interpretation that gives this language meaning. *See Wash. Constr. Co. v. Spinella*, 8 N.J. 212, 217–18 (1951). And even if it were ambiguous, as this Court has recognized, ambiguity is construed against indemnification. 638 B.R. at 310. *See also In re LTL Mgmt.*, 2023 WL 2760479, at *15 n. 16 ("…it is not obvious LTL must indemnify J&J for the latter's independent, post-1979 conduct that is the basis of a verdict rendered against it"). Thus, LTL has no legal obligation to indemnify J&J. Its attempt to concede an obligation it does not have is further evidence of bad faith.

The Third Circuit has "rejected 'related to' jurisdiction over third-party claims involving asbestos or asbestos-containing products supplied by the debtor when the third-party claim did not directly result in liability for the debtor." *Combustion Eng'g*, 391 F.3d at 231; *see W.R. Grace*, 591 F.3d at 171–73. It has done so even when non-debtors might later have indemnity claims against the debtor. *Id.* Whenever hypothetical "indemnification claims against" the debtor "would require the intervention of another lawsuit to affect the bankruptcy estate," the claims "cannot provide a basis for 'related to' jurisdiction" because their resolution, by itself, does not affect the estate. *Combustion Eng'g*, 391 F.3d at 232.

As a result, Third Circuit "precedent dictates that a bankruptcy court lacks subject matter jurisdiction over a third-party action if the only way in which that third-party

---

[15] There is no other "record evidence of an indemnity obligation" beyond the 1979 agreement. *Combustion Eng'g*, 391 F.3d at 224 n.35.

action could have an impact on the debtor's estate is through the intervention of yet another lawsuit." *W.R. Grace*, 591 F.3d at 173.

Third Circuit precedent controls here. The enjoined actions seek to hold non-debtors liable as joint tort-feasors, so any judgment(s) wouldn't bind LTL. Those actions might later give rise to an indemnification claim asserted against LTL by the non-debtor for any judgment it paid, but that possibility isn't enough under this Court's cases.[16]

Moreover, contingent indemnification claims are disallowed in bankruptcy, so they cannot affect the estate. 11 U.S.C. § 502(e)(1)(B). And even if a non-debtor were eventually to pay a judgment, it would still have no effect on the estate. In that scenario, the non-debtor would have a right to take over the plaintiff's separate claim against LTL via subrogation. *Id.* ¶ § 509(a). But swapping one claimant for another has no effect on the estate, much less a "direct and substantial adverse effect." *Celotex*, 514 U.S. at 310; *see*

---

[16] The Third Circuit has indicated that a "clear contractual right" to indemnity could confer jurisdiction if liability were "automatic." *W.R. Grace*, 591 F.3d at 173; *see Combustion Eng'g*, 391 F.3d at 226. But it hasn't explained why, and Debtor has adduced no evidence to establish "automatic" liability exists between itself and any non-debtor. Even so, this Court recognized that no "clear" right exists here. It analyzed just one indemnity clause (the 1979 J&J agreement) and found it "to be ambiguous" about "future liability." 638 B.R. at 310. The Court then noted that "any ambiguity" is "construed in favor of … the indemnitor"—that is, *against* indemnification. *Id.* Although the court tried to overcome this textual barrier by relying on *Bouton v. Litton Indus., Inc.*, 423 F.2d 643 (3d Cir. 1970), and the parties' course of dealing, the contract in *Bouton* involved a far broader transfer of liability, *id.* at 648, while internal allocations are "accounting decision[s]" for "administrative convenience" that do not prove *legal liability* to talc claimants. At the very least, LTL has a legitimate argument against indemnification. As debtor in possession and fiduciary of the estate, it cannot unilaterally forfeit that potential argument without committing yet another act of bad faith.

Levitin, *Bankruptcy Markets: Making Sense of Bankruptcy Claims Trading*, 4 Brook. J. Corp.

Fin. & Com. L. 64, 74 (2010) (discussing market for claims trading).

Under the 2021 FA, LTL had the contractual right to look to J&J and New JJCI as

primary obligors," without having to establish independent liability, "—to fund claims

against LTL, including talc-related indemnification claims. *See* No. 21-30589-MBK, Dkt.

956, *passim*. Here, under 2023 FA, if J&J or New JJCI were to tender an adverse talc

judgment to LTL, LTL would simply tender that liability to HoldCo and provide payment

to J&J and New JJCI—a circular flow that both avoids any impact on reorganization and

shows how contrived the indemnity is.

J&J had no right to indemnity from LTL's predecessor, Old JJCI; as a result, LTL

could not have inherited such an obligation. This Court interpreted a 1979 agreement as

having transferred J&J's talc-related liabilities to Old JJCI. 638 B.R. at 309. But the 1979

Agreement stated that Baby Products Company (Old JJCI's predecessor) would assume

"all the indebtedness, liabilities and obligations of every kind and description which are

allocated on the books or records of J&J as pertaining to its BABY Division." *Id.* And the

record is devoid of evidence that any talc claims were "allocated on the books or records

of J&J" in 1979. The first talc-related tort case was not filed against J&J until 1982. No. 21-

30589, Dkt. 3, 48.

This Court earlier found the 1979 indemnity provision "ambiguous," 638 B.R. at

310, but failed to construe that ambiguity against the indemnitee (here J&J) as New Jersey

law requires. *See Kieffer v. Best Buy*, 14 A.3d 737, 743 (N.J. 2011). Likewise, the Court ignored New Jersey's rule against a promise to indemnify against one's own negligence. *See Cozzi v. Owens-Corning Fiber Glass Corp.*, 164 A.2d 69 (N.J. Super. 1960); *Mantilla v. NC Mall Assoc.*, 770 A.2d 1144 (N.J. 2001). Johnson & Johnson was found by juries to have engaged in willful, wanton, or reckless conduct warranting punitive damages. Such conduct *cannot be indemnified*. *See Johnson & Johnson v. Aetna*, 667 A.2d 1087 (NJ Super. 1995). *See also Tryanowski v. Lodi Bd. Of Educ.*, 643 A.2d 1057 (N.J. Super. 1994).

Even if Old JJCI did "assume all liabilities" relating to J&J's talcum powder products, that assumption would not alter J&J's status as a joint tortfeasor. It is settled law that "[c]orporations cannot discharge liabilities for their torts against third parties through contract." *Jaycox v. Terex Corp.*, No. 4:19-CV-02650 SRC, 2021 WL 2187907, *12 (E.D. Mo. May 28, 2021). Hence, "[e]ven if a successor assumes the tort liability of the predecessor through an asset purchase agreement, a plaintiff may still bring a claim against the predecessor." *Id.* (*citing* 15 Fletcher's Cyclopedia of the Law of Corporations § 7123 (2020)).

That very result has been recognized in an asbestos bankruptcy in this circuit. In *In re Federal-Mogul*, one asbestos defendant (Pneumo Abex, a brake manufacturer) attempted to secure relief under § 524(g) because it had entered into an indemnification with the debtor (Federal Mogul). *In re Federal-Mogul Global Inc.*, 411 B.R. 148, 161–67 (Bankr. D. Del. 2008). "The indemnity provisions allocated liabilities between [Federal

Mogul] and Pneumo Abex. They did not impact the claims against either party that may be brought directly by an asbestos claimant." *Id.* at 161.  Because lawsuits against Pneumo Abex "do not derive in any way from the liability of the Debtors, they cannot be enjoined and channeled under § 524(g)." *Id.* at 166.

At worst, LTL has an excellent argument against indemnification. It only ignores that argument because LTL exists only to protect the equity of its corporate masters, and it is not interested in adhering to its fiduciary duty to maximize estate assets. But as debtor in possession and fiduciary of the estate, it cannot unilaterally forfeit its potential argument without committing yet another act of bad faith.

As for the scores of other non-debtors, LTL has adduced insufficient evidence that a non-contingent agreement exists as to each of them. So it cannot overcome the "presum[ption] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).

Here, the Court simply has no statutory authority to enjoin nationwide litigation against non-debtors. Even if it did, such an injunction would be a gross abuse of discretion.

### C. Enjoining Nationwide Court Proceedings: a Gross Abuse of Discretion.

Preliminary injunctions—even ones that do not grind nationwide litigation to a halt—are extraordinary remedies. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A movant must accordingly—by a clear showing—carry the burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The standard has four parts: (1) the movant must demonstrate it is reasonably likely "to prevail eventually in the litigation" and that (2) that they are likely to suffer irreparable injury without relief. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 157 (3d Cir. 2002). If those two threshold requirements are met, the Court must consider (3) whether an injunction would harm the movants more than denying relief would harm the non-movant, and (4) whether granting injunctive relief would serve the public interest. *Id. See also Winter*, 555 U.S. at 20.

Given the extraordinary nature of preliminary injunctive relief, the burden of proof is on the movant—here the Debtor—to establish, by clear and convincing evidence, each of the foregoing elements to obtain a preliminary injunction. *See Mazurek v. Armstrong*, 520 U.S. at 972.

In that vein, speculation is not enough for an injunction. "It is not enough for the movant to show some limited risk, or that there is a theoretical threat to the reorganization. . . Rather, and in keeping with the principle that extending the stay to non-debtors is extraordinary relief, the party seeking extension of the stay must put forth

27

real evidence demonstrating an actual impact upon, or threat to, the reorganization efforts if the stay is not extended." *FPSDA I, LLC*, 2012 WL 6681794, at *8. *Accord Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.").

Here, the Debtor has not come close to meeting its heavy burden. Debtor meets none of the four equitable factors.

> **1. Zero likelihood of success on the merits: Debtor's bankruptcy will fail for lack of good faith either because it is not financially distressed, or because any financial distress stems from a § 548 fraudulent transfer. In either case, Debtor is judicially estopped from relief.**

This bankruptcy will fail, either because this Court correctly recognizes it does not have jurisdiction to wield its equitable tools on behalf of a bad faith debtor, or because it will fail to do so and get reversed again.

There are only two logical positions for LTL to take, and both lead to dismissal. On one hand, LTL swears under oath that it believes it has the same, "if not greater," ability to pay its talc-related liabilities as Old JJCI had before the prior restructuring (and therefore as LTL had during the pendency of *LTL1*). Ex. 3, Kim. Tr., 64:14–18. That binding admission ends LTL's second Chapter 11 petition, and any equitable relief that could hypothetically flow from it. *See* Section II.A, *supra*.

On the other hand, LTL hints that—because it squandered a $60 billion asset—it is somehow less financially robust as it was during *LTL1*, and that it now faces financial distress. But the Third Circuit addressed such malfeasance in its rejection of *LTL1*: "interested parties may seek to avoid any transfer made within two years of any bankruptcy filing by a debtor who receives less than a reasonably equivalent value in exchange for such transfer and became insolvent as a result of it." *LTL Mgmt.*, 2023 WL 2760479, at *16 n.18 (citing 11 U.S.C. § 548 – "Fraudulent transfers and obligations"). LTL's inexplicable abandonment of an asset that the Third Circuit recognized was worth over $60 billion will not withstand scrutiny under § 548. And avoidance of LTL's retreat from the first funding agreement will put LTL precisely where it was during *LTL1*, and lead to the same result: dismissal of a non-distressed debtor for filing a bankruptcy that lacked good faith.

In granting LTL (and scores of non-debtors) an *ex parte* TRO, the Court credited LTL's primary argument during this successive bankruptcy: that "a potential resolution favorable to all claimants" makes the Court "wish[ ] to examine whether this litigation (and others like it) should go forward." No. 23-1092-MBK, Dkt. 15, 7. But the Court's wishes cannot empower it to grant relief in a bad faith bankruptcy; the alleged approval of 60,000 (alleged) potential claimants cannot overcome the jurisdictional bar created by LTL's lack of good faith; Johnson & Johnson's adamant desire for a permanent resolution of its tort liabilities cannot substitute for statutory authority; and the general availability

29

of § 524(g) for *good faith* debtors does not act as some sort of escape hatch for a bad faith

Debtor trying to claim it can round the bases into a § 524(g) trust. The Third Circuit has

already had its say: *LTL2* doesn't get out of the batter's box.

Even if the Court had power to entertain *LTL2*, the notion that non-debtors are

entitled to a final channeling injunction under § 524(g) is misguided. Section 524(g)

provides:

> (g)(1)(A) After notice and hearing, a court that enters an order confirming
> a plan of reorganization under chapter 11 may issue, in connection with
> such order, an injunction in accordance with this subsection to supplement
> the injunctive effect of a discharge under this section.

> (2)(B) The requirements of this subparagraph are that—

> > (i) the injunction is to be implemented in connection with a trust that,
> > pursuant to the plan of reorganization—

> > > (I)    is to assume the liabilities of a debtor which at the time
> > > of entry of the order for relief has been named as a
> > > defendant in personal injury, wrongful death, or
> > > property-damage actions seeking recovery for
> > > damages allegedly caused by the presence of, or
> > > exposure to, asbestos or asbestos-containing products

11 U.S.C. § 524(g). "If . . . a [statutory] provision 'is clear and unambiguous, [courts] must

simply apply it.'" *Denby-Peterson*, 941 F.3d at 124 (*quoting In re KB Toys Inc.*, 736 F.3d 247,

251 (3d Cir. 2013)).

The injunction is available to a party only when "that party is alleged to be liable

for the conduct of, claims against, or demands on' the debtor and to the extent that such

30

liability arises by reason of one of the four relationships between the third party and the

debtor." *In re Quigley Co., Inc.*, 676 F.3d 45, 58-59 (2d Cir. 2012) (cleaned up). Those four

(4) categories of relationships, as prescribed in the statute, are as follows:

> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
> (III) the third party's provision of insurance to the debtor or a related party; or
> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—
>
>> (aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
>> (bb) acquiring or selling a financial interest in an entity as part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii).

The scores of retailers and corporate affiliates that the Debtor seeks to protect do

not fit into any of the above categories of third parties eligible for a channeling injunction

under § 524(g). Moreover, J&J cannot be entitled to a channeling injunction of the direct

tort claims (i.e., claims that were not filed against it "by reason of its" ownership interest

in the Debtor) in any plan of reorganization under § 524(g). *See Quigley*, 676 F.3d at 61.

The Third Circuit has flatly held that § 105(a) may not "be employed to extend a

channeling injunction to non-debtors in an asbestos case where the requirements of

§ 524(g) are not otherwise met." *Combustion Eng'g*, 391 F.3d at 233–34, 236–37 ("As both

the plain language of the statute and its legislative history make clear, § 524(g) provides

no specific authority to extend a channeling injunction to include third-party actions

against non-debtors where the liability alleged is not derivative of the debtor.").

Quite simply, the Debtor is seeking preliminarily an injunction that it cannot

obtain permanently under Chapter 11 generally or any of its subparts (§ 524(g), § 105(a))

specifically. It has no chance of success on the merits.

### 2. *Judicial estoppel also bars this entire case, rendering likelihood of success zero.*

"Judicial estoppel is a fact-specific, equitable doctrine, applied at courts'

discretion." *In re Kane*, 628 F.3d 631, 638 (3rd Cir.2010). Judicial Estoppel "'recognize[s]

the intrinsic ability of courts to dismiss an offending litigant's complaint without

considering the merits of the underlying claims when such dismissal is necessary to

prevent a litigant from playing fast and loose with the courts.'" *Id*. (*quoting Krystal

Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 319 (3rd Cir.

2003).

"'[T]he basic principle of judicial estoppel . . . is that absent any good explanation,

a party should not be allowed to gain an advantage by litigation on one theory, and then

seek an inconsistent advantage by pursuing an incompatible theory.'" *Id*. Identifying

criteria for determining whether or not inconsistent litigation positions justify application

of the doctrine, the Third Circuit concluded:

32

> First, the party to be estopped must have taken two positions that are
> *irreconcilably inconsistent.* Second, judicial estoppel is unwarranted unless
> the party *changed his or her position in bad* faith—i.e., with intent to play fast
> and loose with the court. Finally, a district court may not employ judicial
> estoppel unless it is tailored to address the harm identified and *no lesser*
> *sanction would adequately remedy the damage* done by the litigant's
> misconduct.

*Kane,* 628 F.3d at 638-639 (*quoting Krystal Cadillac,* 337 F.3d at 319–20). *Accord Montrose*

*Medical Group Participating Savings Plan v. Bulger,* 243 F.3d 773, 779–80 (3rd Cir.2001).

Here, LTL and its affiliates gained tremendous advantage in *LTL1* when they won

a nationwide injunction barring tort plaintiffs from seeking justice in courts of general

jurisdiction. LTL's position there—that LTL was fully backstopped and can fully pay all

tort plaintiffs—is inconsistent with its apparent position now (that it faces financial

distress because the new funding agreement is not as expansive as the last). But as

discussed above, any inconsistencies between the first and second funding agreement

are, on their face, the result of a fraudulent transfer, making LTL's waffling a bad faith

effort to play "fast and loose" with the power of this Court. Even if none of the other

(obviously dispositive) bars to this Chapter 11 case were absent, the equitable doctrine of

judicial estoppel warrants dismissal of the entire action, rendering the likelihood of

eventual success on the merits zero.

### 3.    *Only speculation supports Debtor's assertions of irreparable harm.*

The Debtor fails to demonstrate by clear and convincing evidence that products liability claims against any (let alone, all) of the scores of Protected Parties will cause it irreparable harm.

The Debtor's reliance on conjectural obligations to indemnify fails. For all the reasons set forth above in the context of § 362(a), even if the unilateral allocation of Old JJCI's indemnification obligations to the Debtor on the eve of the bankruptcy filing passed muster (which it does not), the Debtor has not proven the existence of any "absolute" indemnification obligations that Old JJCI had to the alleged Protected Parties. (*See* Section B, supra. Even if the claimed indemnification obligations did exist, they are conditional and/or would require intervening lawsuits to enforce, making them much too speculative to support a finding of irreparable harm.

In all events, LTL's claimed indemnity obligations would not cause continued litigation against the so-called "Protected Parties" to undermine the reorganization process. Even if the Debtor's factual assertions are taken at face value, the Debtor has still not demonstrated that the effect of the indemnity agreements would be anything other than to replace talcum powder claimants with indemnity claims. *See Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc.*, 133 B.R. at 180 ("If anything, allowance of judgment against Hallwood now might assist RAC's reorganization by replacing the

claims of Algemene, a clearly hostile creditor, with Hallwood's claim for indemnification.").

More importantly, as the Third Circuit recognized, any harm to LTL is offset by the existence of the funding agreements. A Debtor that "loses" money defending its tort liability, yet has the right to recapture those losses through a contract that acts "not unlike an ATM," cannot be said to face irreparable harm.

### 4. *Grave harm to Respondents: victims of J&J Baby Powder were doubly victimized by LTL's 2021 bad faith bankruptcy, which wrongly barred their day in court. An injunction would make it extremely likely that Respondents here will die before LTL's second bad faith bankruptcy ends.*

The Debtor has not shown that the balance of equities weighs in favor of an injunction.  Nor can it. As the Fourth Circuit has observed, [o]f particular significance in balancing the competing interests of the parties . . . are the human aspects of the needs of a plaintiff in declining health as opposed to the practical problems imposed by the proceedings in bankruptcy, which very well could be pending for a long period of time. A stay under such circumstances would work manifest injustice to the claimant. *Williford v. Armstrong World Indus.*, 715 F.2d at 127–28.

Here, a manifest injustice is precisely what the Debtor is seeking to achieve through its request for injunctive relief. Indeed, the contrast between the negligible (if any) harm to the Debtor's estate, claimed by the Debtor to be backstopped by one of the

richest companies in the world, and the immense harm to dying victims whom J&J has allegedly poisoned is staggering.

Many of these victims will die before they can see justice done. Respondents here, who already had to postpone their lawsuits because of this Court's clearly erroneous factual findings and abuse of discretion in *LTL1*, will potentially forfeit claims for pain and suffering damages under the laws of many States should the Court make the same mistake twice. Victims are dying while the Debtor suffers no irreparable harm. Granting an injunction, in these circumstances, would wreak a grave injustice.

> **5.  *Overwhelming public interest: federalism, the separation of powers, abuse of the bankruptcy system, and the Seventh Amendment are at stake.***

Finally, the Debtor has not shown that any public interest will be served by granting the extraordinary injunction of enjoining tens of thousands of personal injury lawsuits against non-bankrupt companies who, until recently, were content to defend themselves in court. Considering whether an injunction serves the public interest "requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests." *Monroe Well Serv.*, 67 B.R. at 753. The only benefit advanced by an injunction here would flow to one group of private corporate affiliates:

halting all litigation against J&J, its bankruptcy-ready cat's paw,[17] and scores of non-debtors.

In contrast, the *public*'s interest against an injunction is weighty. At stake are the interests of federalism, the separation of powers, the Seventh Amendment, and an open invitation for tortfeasors to open the floodgates to misuse the bankruptcy system.

Federalism is at stake because an injunction here would permit the discretion of a single Article I court to supplant the collective wisdom (or foolishness—it is beyond this Court's power to decide either way) of the States. Bankruptcy courts can sometimes extend their equitable powers that broadly, but *not* in service of a bad faith debtor. *See LTL1, SGL Carbon, etc.*

Separation of powers interests and the Seventh Amendment are both threatened by an injunction under these circumstances. This Court was not given the kind of broad jurisdiction that Article III courts enjoy when they apply state law in § 1332 diversity cases. Rather, it is an artificial, carefully hemmed outgrowth of Article I power. Permitting a bankruptcy court's power to supplant Article III jurisdiction must be permitted only in the narrowest circumstances. And those circumstances cannot include

---

[17] The term cat's paw derives from a fable conceived by Aesop, put into verse by Lo Fontaine in 1679, and injected into American case law in 1990. *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011). In the fable, a monkey induces a cat to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. *Id.* "A coda to the fable … observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward." *Id.*

cases where an alleged corporate poisoner creates a fictional, bankruptcy-ready cat's paw solely to escape from Article III (and state) courts into a single bankruptcy forum.

Article III "provides for the establishment of a court system as one of the separate but coordinate branches of the National Government." *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 15 (1955). In 2015, the Supreme Court wrote "[in *Northern Pipeline*] and more recently in *Stern*, this Court held that Congress violated Article III by authorizing bankruptcy judges to decide certain claims for which litigants are constitutionally entitled to an Article III adjudication." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015).

As to the Seventh Amendment, the civil jury system is *the* legal system in this country. It is not optional. When a United States citizen is harmed by a corporation, the civil jury system provides the remedy. The Seventh Amendment states:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

State legislatures, courts and constitutions "guarantee" and provide as "inviolate" the right of an injured person to have a jury trial.[18] Forty-nine states guarantee the right

---

[18] *See* for example, the constitutions of New York and New Jersey, which both specifically enshrine the right to a trial by jury, N.J. Const. art. I, § 9 ("The right of trial by jury shall remain inviolate."); N.Y. Const. Art. 1, § 2 ("Trial by jury in all cases in which it has heretofore been guaranteed by constitutional provision shall remain inviolate forever . . . ."), and both states make that right applicable to actions for money damages, N.Y. C.P.L.R. § 4101(1) (providing for jury trial of factual questions in actions for money damages).

to a jury trial in all civil or common-law cases within their state constitutions.[19]

The Seventh Amendment cannot abide the sort of injunctive relief contemplated here. A bankruptcy court cannot strip the right to trial from an asbestos-cancer victim. *See* 28 U.S.C. § 157(b) and 11 U.S.C. § 1129 (A)(7)(a)(ii).[20] *See also Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d 1242, 1245 (3d Cir. 1994); *In Re G-I Holdings, Inc.,* 323 B.R. 583, 605–07 (Bankr. D. N.J. 2005) (holding that "claims held by the asbestos claimants are 'legal in nature,' and thus, they carry 'with it the Seventh Amendment's guarantee of a jury trial'" including for purposes of "liquidating their respective claims against [the debtor's] bankruptcy estate.") (quoting *Granfinanciera,* 492 U.S. at 55).[21] This bad faith bankruptcy also unduly burdens cancer victims' right to due process under the 14th Amendment: "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428 (1982).[22]

---

[19] *See* Steven Gow Calabresi, et al., *Individual Rights Under State Constitutions in 2018: What Rights Are Deeply Rooted in a Modern-Day Consensus of the States,* 94 Notre Dame L. Rev. 49, 113-14 (Nov. 2018).

[20] Johnson & Johnson and the other Protected Parties are not the Debtor. In a liquidation of the Debtor they would simply have unsecured claims against the Debtor, they could not be granted any injunctive or other relief. Nor would a liquidation of the Debtor allow any channeling of future claims into a mandatory settlement trust, let alone future claims against the non-debtors Johnson & Johnson and the retailers.

[21] As one respected commentator put it: Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury" by assigning them to a bankruptcy court. *Granfinanciera,* 492 U.S. at 51-52. "[L]egal claims are not magically converted into equitable issues by their presentation to a court of equity," *Ross v. Bernhard,* 396 U.S. 531, 538 (1970), "nor can Congress conjure away the Seventh Amendment by mandating that traditional legal claims be brought there or taken to an administrative tribunal." *Granfinanciera,* 492 U.S. at 53-55 (holding that fraudulent conveyance action was a "private right" that was "not closely intertwined with a federal regulatory program" and had to be decided "by an Article III court"). *See* Dean Chemerinsky Brief, No. 32-30589-MBK, Dkt. 1323-4.

[22] A "protected property interest includes 'the ability to pursue an asbestos claim.'" *In re Energy Future Holdings Corp,* 949 F.3d 806, 822 (3d Cir. 2020) (citing *In re Grossman's Inc.,* 607 F.3d 114, 127 (3d Cir. 2010).

The tension between the Seventh Amendment and Chapter 11 may only be resolved by Congress (or by constitutional amendment). Section 524(g) only applies to (1) financially distressed debtors, (2) overwhelmed by asbestos liabilities, that (3) subject their assets and operations to the jurisdiction of the bankruptcy court. Recent decisions from the Fourth Circuit and Third Circuit reaffirm that non-distressed debtors are not allowed in bankruptcy court. In *In re Kaiser Gypsum*, the Fourth Circuit approvingly cited *In re Quigley Co.*, 676 F.3d 45, 58–59 (2d Cir. 2012), *In re W.R. Grace & Co.*, 13 F.4th 279, 283 (3d Cir. 2021), and legislative history in explaining that § 524(g) is meant to allow a "Chapter 11 debtor with substantial asbestos liabilities" to "emerge from bankruptcy as an economically viable entity." *In re Kaiser Gypsum Co., Inc.*, 60 F.4th 73, 77–78 (4th Cir. 2023).

The entire purpose of 524(g) is premised upon the company with shareholders, employees, and lenders, the one investors care about, the one that made and sold the asbestos products, being the ***same*** company that ***must*** file for Chapter 11[23] to have any chance to qualify for a permanent channeling injunction.[24]

---

[23] Mr. President, this statutory affirmation of the court's existing injunctive authority is designed to help asbestos victims receive maximum value. It does so by assuring investors, lenders, and employees that the reorganized debtor has indeed emerged from Chapter 11 free and clear of all asbestos-related liabilities other than those defined in the confirmed plan of reorganization. . . .*See* 140 Cong. Rec. 28,358 (1994) (emphasis added).

[24] Senator Bob Graham said at the passage of 524(g): "this legislation provides companies who are seeking to fairly address the burden of thousands of current asbestos injury claims and unknown future claims, and who are willing to submit to the jurisdiction of the U.S. Bankruptcy Courts . . . a method to pay their current asbestos claims and provide for equitable treatment of future asbestos claims." 140 Cong. Rec.

The Debtor's tortured reading of 11 U.S.C. § 524(g) stands in stark contrast to the history of asbestos litigation. Johns-Manville filed for protection in 1982. The Texas statute at issue here was passed in 1989. Section 524(g) added to the Code in 1994 and modeled after what was accomplished in *Manville*. The Supreme Court of the United States struck down asbestos class action settlements—for infringing on *future* plaintiffs' Seventh Amendment Rights, among other reasons—in 1997 and 1999.[25] The Supreme Court did not read 524(g) as applying to non-debtors like Fibreboard (then) and would not apply it to LTL Management, "New" Johnson & Johnson Consumer, or Johnson & Johnson now.

During the early 2000s, at the Supreme Court's invitation, Congress debated several bills to address asbestos litigation.[26] Congress chose to pass none of them. Many

---

8,021 (1994) (emphasis added). As further observed by Senator Heflin:

> For companies forced to file bankruptcy any plan of reorganization must contain a mechanism to address equitably the debtor's liability to all creditors, including mass tort claims – both those whose injuries are manifest and those who, although already exposed, will not manifest any [injury] until sometime in the future. Without that mechanism, liquidation may be inevitable and little or nothing would be left to compensate future claimants. *Id.*

[25] *Amchem Prods. v. Windsor*, 521 U.S. 591, 628-29 (1997) ("The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution.") and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845-46 (1999) (recognizing the "serious constitutional concerns that come with any attempt to aggregate individual tort claims on a limited fund rationale" as "a mandatory settlement-only class action with legal issues and future claimants compromises their Seventh Amendment rights without their consent.").

[26] The Fairness in Asbestos Injury Resolution Act of 2005 (S. 852, 109th Cong.); The Fairness in Asbestos Compensation Act of 1999 (S. 758, 106th Cong.), the Asbestos Compensation Act of 2000 (H.R. 1283, 106th Cong.), and the Asbestos Claims Criteria and Compensation Act of 2003 (S. 413, 108th Cong.).

of the legally baseless policy arguments advanced by Two Step debtors were made in

Congress and failed. During this entire time several companies filed real asbestos

bankruptcies because they apparently read all these developments the same way that

MRHFM's plaintiffs read them now.[27]

The Supreme Court decided both *Amchem*[28] and *Ortiz*[29] ***after*** 524(g) was added to

the bankruptcy code. What both rulings in these seminal asbestos cases make clear is that

524(g) is ***not*** an option for non-distressed non-debtors (like J&J) to use instead of litigating

in the jury system and, just because there were a lot of asbestos cases at the time of

*Amchem* and *Ortiz*, each asbestos victim is still guaranteed her right to a jury trial with

uncapped damages under applicable state law. Section 524(g) does ***not*** provide solvent

companies like J&J that have asbestos liabilities with any authority to "overcome the tort

system" even if they have filed for bankruptcy, and especially when they have ***not*** filed

for bankruptcy.

In *Ortiz*, a group of plaintiffs' lawyers, in conjunction with Fibreboard and its

insurer, attempted to negotiate a resolution of all asbestos-related claims against

Fibreboard. *Ortiz*, 527 U.S. at 823-24. To resolve potential future claims, the parties sought

---

[27] By way of example, *see In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013); *In re Armstrong World Indus., Inc.*, 348 B.R. 136 (D. Del. 2006); *In re USG Corp.*, 290 B.R. 223 (Bankr. D. Del. 2003); *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355 (3d Cir. 2012); *In re Celotex Corp.*, 204 B.R. 586 (Bankr. M.D. Fla. 1996); *In re Nat'l Gypsum Co.*, 257 B.R. 184 (Bankr. N.D. Tex. 2000).

[28] *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997).

[29] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

approval for a mandatory settlement class action with no opt-out provision. *Id.* at 823-26. The upshot of this agreement would have been to channel the future claims to an administrative settlement fund that had limited opt-out rights. *Id.* at 827. The Supreme Court flatly rejected this attempt. *Ortiz*, 527 U.S. at 848.

The Court recognized the significant Seventh Amendment implications of the proposed mandatory settlement class and that the limited "opt-out" rights provided in the plan failed to cure this flaw because they failed to provide an opportunity for "withdrawal of class members whose jury trial rights will be compromised, whose damages will be ***capped***, and whose payments will be delayed." *Ortiz*, 527 U.S. at 847 fn. 23, 860.  Juries not only decide winners and losers; juries decide how much a plaintiff's claim is worth and what damages should and should not be awarded.[30]

The Supreme Court commented on 524(g) in *Ortiz*, noting its enactment "enable[d] a ***debtor*** in a Chapter 11 reorganization in certain circumstances to establish a trust to which the ***debtor*** may channel future asbestos related liability."  *Id.* at 859-60, fn. 34 (emphasis added).  In a concurring opinion, Justice Rehnquist meaningfully noted:

> Under the present regime, transactional costs will surely consume more and more of a relatively static amount of money to pay these claims. But

---

[30] The Supreme Court dismissed the "fund" in *Ortiz* as "limited" because it was only "limited" by agreement of the parties; there, Fibreboard had $235 million in assets, $2 billion in insurance, and 45,000 outstanding asbestos cases.  The Court found especially offensive to the rule of law the fact that the settlement, allegedly relying on "limited" resources, permitted Fibreboard to keep nearly all its net worth for itself.  *Ortiz*, 527 U.S. at 860.  This is ***precisely*** what J&J proposes to do in this case through the Texas Two Step.

> *we are not free* to *devise an ideal system* for adjudicating these claims.
> Unless and until the Federal Rules of Civil Procedure are revised, the
> Court's opinion correctly states the existing law, and I join it. But the
> 'elephantine mass of asbestos cases,' [citation omitted], cries out for a
> legislative solution.

*Id.* at 865 (emphasis). The Supreme Court did not view 524(g)—situated within Chapter

11 of the Bankruptcy Code—as a means to resolve large groups of asbestos cases *unless*

an asbestos company overwhelmed by asbestos liabilities filed for bankruptcy under

Chapter 11, a real bankruptcy; not a Texas Two Step.

Tellingly, the Third Circuit recognized that both *Amchem* and *Ortiz* failed as class

action devices to resolve claims of "present and future" asbestos victims because in both

cases the "interests of absent class members" were not adequately protected. *Fed-Mogul,*

648 F.3d at 358-59. After discussing the history of asbestos litigation and legislative

inaction, the Circuit wrote what Johnson & Johnson should take to heart: "we leave such

systematic public policy questions to Congress." *Id.* at 362.

There is no logical stopping point to the Debtor's strategy of putting the cart (a

§ 524(g) channeling injunction) before the horse (Chapter 11's express purpose of

allowing a financially distressed company the breathing room to reorganize). Any rich

company facing liabilities could stymie them simply by allocating them to a new entity

and putting the entity into bankruptcy. The bankruptcy courts would be burdened with

abusive petitions, courts of general jurisdiction would face roiling, uncertain dockets, and

public confidence in the fair administration of the bankruptcy system would be

undermined. If permitted to succeed, the Debtor's strategy would undermine the multi-district litigation system that Congress established in 28 U.S.C. § 1407 to centralize, efficiently manage and ultimately settle mass tort actions and other litigations alleging the same claims and injuries. The charade that the Debtor seeks to perpetrate in New Jersey is not in the public interest.

What the Debtor seeks to deprive the claimants of is their fundamental right to a jury trial of their claims enshrined in the Seventh Amendment of the United States Constitution. *See, e.g., Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 59–61 (1989) ("Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity.").

Debtor cannot carry its burden on even one of the four *Winter* factors. Any grant of injunctive relief to non-debtors would substitute power this Court *doesn't have* for the *entire* American civil justice system. That may be (for selfish reasons) what Johnson & Johnson wants, and it may be (for noble, settlement promoting reasons) what this Court desires. But under the controlling test, it would be a gross abuse of this Court's discretion.

## III.   CONCLUSION

When invoked properly, this Court's jurisdiction provides "powerful equitable weapons" to protect both creditors and good faith debtors. *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 334 (3d Cir. 2015) (quoting *In re Little Creek Dev. Co.*, 779 F.2d

1068, 1072 (5th Cir. 1986)). But those weapons are strictly limited by statute, *Law v. Siegel*,

571 U.S. 415, 421 (2014), and cannot be wielded when a petition has not been brought in

good faith, *see SGL Carbon*, 200 F.3d at 161.

This Court, under the circumstances here, lacks jurisdiction to allow this case to

proceed, lacks jurisdiction to enter the equitable relief sought by Debtor, and would

severely abuse its discretion under the preliminary injunction standard if it granted the

relief Debtor (and its protection-seeking but non-bankrupt corporate overlord) seeks.

Debtor's motion to extend the stay (or, alternatively, for a preliminary injunction) must

be DENIED.

Respectfully submitted,

**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**

*/s/ Suzanne M. Ratcliffe*
_____
Suzanne M. Ratcliffe, Esq.
**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**
150 W. 30th Street, Suite 201
New York, NY 10001
(800) 358-5922
sratcliffe@mrhmflaw.com

# EXHIBIT 1

**CASE:** Jackson, Mary          **DOCKET:** L-8217-20 **DATE:** 9/30/21 **FIRM:** Levy/Maune

**DISCOVERY**                                                                   CMO ___IV___

| | | |
|---|---|---|
| _____ 2021 | Plaintiff shall serve answers to standard interrogatories by this date. | |
| _____ 2021 | Defendants shall serve answers to standard interrogatories by this date. | |
| _____ 2021 | Plaintiff shall propound supplemental discovery by this date. | |
| _____ 2021 | Defendants shall serve answers to supplemental discovery by this date. | |
| _____ 2021 | Defendants shall propound supplemental discovery by this date. | |
| _____ 2021 | Plaintiff shall serve answers to supplemental discovery by this date. | |
| _____ 2021 | Plaintiff depositions shall be conducted by this date. | |
| 11/15 2021 | Fact discovery shall be completed by this date. | |
| _____ 2021 | Depositions of corporate representatives shall be completed by this date. | |

FILED
SEP 3 0 2021
ANA C. VISCOMI J.S.C.

**EARLY SETTLEMENT**

12/15 2021    Settlement demands shall be served on all counsel and the Special Master by this date.

**MEDICAL EXPERT REPORT**

_____ 2021    Plaintiff shall serve executed medical authorizations by this date.

11/30 2021    Plaintiff shall serve medical expert reports and transfer pathology by this date.

1/28 ~~2021~~ 2022    Defendants shall serve medical reports by this date.

**LIABILITY and ECONOMIST EXPERT REPORTS**

11/00 2021    Plaintiff shall serve liability and economist expert reports by this date.

1/28 ~~2021~~ 2022    Defendants shall serve liability and economist expert reports by this date.

**SUMMARY JUDGMENT MOTION PRACTICE**

2/4 ~~2021~~ 2022  Summary judgment filing deadline.          Return date: 3/4 ~~2021~~ 2022

**EXPERT DEPOSITIONS**

4/1 ~~2021~~ 2022    Expert depositions shall be completed by this date.

**PRE-TRIAL AND TRIAL**

TBS 2021 @_____    Settlement conference.          Trial date: 4/28 ~~2021~~ 2022

    **IT IS** hereby **ORDERED** on this date.

/s/ Ana C. Viscomi
ANA C. VISCOMI, J.S.C.

CASE: _Meikle, Elizabeth_   DOCKET: _____   DATE: _4/23/21_ FIRM: _Levy/Maune_

## DISCOVERY

CMO ___III___

_____ 2021   Plaintiff shall serve answers to standard interrogatories by this date.

_____ 2021   Defendants shall serve answers to standard interrogatories by this date.

_____ 2021   Plaintiff shall propound supplemental discovery by this date.

_____ 2021   Defendants shall serve answers to supplemental discovery by this date.

_____ 2021   Defendants shall propound supplemental discovery by this date.

_____ 2021   Plaintiff shall serve answers to supplemental discovery by this date.

_____ 2021   Plaintiff depositions shall be conducted by this date.

__7/30__ 2021   Fact discovery shall be completed by this date.

_____ 2021   Depositions of corporate representatives shall be completed by this date.

**FILED**
APR 23
ANA C. VISCOMI, J.S.C.

## EARLY SETTLEMENT

__8/31__ 2021   Settlement demands shall be served on all counsel and the Special Master by this date.

## MEDICAL EXPERT REPORT

_____ 2021   Plaintiff shall serve executed medical authorizations by this date.

__8/31__ 2021   Plaintiff shall serve medical expert reports and transfer pathology by this date.

__10/29__ 2021   Defendants shall serve medical reports by this date.

## LIABILITY and ECONOMIST EXPERT REPORTS

__8/31__ 2021   Plaintiff shall serve liability and economist expert reports by this date.

__10/29__ 2021   Defendants shall serve liability and economist expert reports by this date.

## SUMMARY JUDGMENT MOTION PRACTICE

__11/5__ 2021 Summary judgment filing deadline.          Return date: __12/3__ 2021

## EXPERT DEPOSITIONS

__12/31__ 2021   Expert depositions shall be completed by this date.

## PRE-TRIAL AND TRIAL

__TBS__ 2021 @_____   Settlement conference.          Trial date: __1/30__ ~~2021~~ 2022

   **IT IS** hereby **ORDERED** on this date.

/s/ Ana C. Viscomi
ANA C. VISCOMI, J.S.C.

CASE: _____Weathers, Sandra_____    DOCKET: _L-549-20_ DATE: _7/2/21_ FIRM: _Levy/Maurre_

## DISCOVERY

CMO __V1__

_____ 2021    Plaintiff shall serve answers to standard interrogatories by this date.

_____ 2021    Defendants shall serve answers to standard interrogatories by this date.

_____ 2021    Plaintiff shall propound supplemental discovery by this date.

_____ 2021    Defendants shall serve answers to supplemental discovery by this date.

_____ 2021    Defendants shall propound supplemental discovery by this date.

_____ 2021    Plaintiff shall serve answers to supplemental discovery by this date.

_____ 2021    Plaintiff depositions shall be conducted by this date.

__8/13__ 2021    Fact discovery shall be completed by this date.

_____ 2021    Depositions of corporate representatives shall be completed by this date.

FILED

JUL 0 2 2021

ANA C. VISCOMI, J.S.C.

## EARLY SETTLEMENT

__12/15__ 2021    Settlement demands shall be served on all counsel and the Special Master by this date.

## MEDICAL EXPERT REPORT

_____ 2021    Plaintiff shall serve executed medical authorizations by this date.

__8/31__ 2021    Plaintiff shall serve medical expert reports and transfer pathology by this date.

__10/29__ 2021    Defendants shall serve medical reports by this date.

## LIABILITY and ECONOMIST EXPERT REPORTS

__8/31__ 2021    Plaintiff shall serve liability and economist expert reports by this date.

__10/29__ 2021    Defendants shall serve liability and economist expert reports by this date.

## SUMMARY JUDGMENT MOTION PRACTICE

__11/5__ 2021 Summary judgment filing deadline.    Return date: __12/3__ 2021

## EXPERT DEPOSITIONS

__1/7__ 2021 ~~2021~~ **2022**    Expert depositions shall be completed by this date.

## PRE-TRIAL AND TRIAL

__TBS__ 2021 @_____    Settlement conference.    Trial date: __1/31__ ~~2021~~ **2022**

**IT IS** hereby **ORDERED** on this date.

/s/ Ana C. Viscomi
ANA C. VISCOMI, J.S.C.

CASE: _Zachara, Marzena_   DOCKET: _L-1928-21_   DATE: _5/25/21_   FIRM: _Levy_

**DISCOVERY**                                                                        CMO ___1___

_____ 2021    Plaintiff shall serve answers to standard interrogatories by this date.

_____ 2021    Defendants shall serve answers to standard interrogatories by this date.

___6/11___ 2021    Plaintiff shall propound supplemental discovery by this date.

___7/16___ 2021    Defendants shall serve answers to supplemental discovery by this date.

___6/11___ 2021    Defendants shall propound supplemental discovery by this date.

___7/16___ 2021    Plaintiff shall serve answers to supplemental discovery by this date.

_____ 2021    Plaintiff depositions shall be conducted by this date.

___8/31___ 2021    Fact discovery shall be completed by this date.

___8/31___ 2021    Depositions of corporate representatives shall be completed by this date.

**EARLY SETTLEMENT**

___1/3___ ~~2021~~ 2022    Settlement demands shall be served on all counsel and the Special Master by this date.

**MEDICAL EXPERT REPORT**

_____ 2021    Plaintiff shall serve executed medical authorizations by this date.

___10/29___ 2021    Plaintiff shall serve medical expert reports and transfer pathology by this date.

___12/23___ 2021    Defendants shall serve medical reports by this date.

**LIABILITY and ECONOMIST EXPERT REPORTS**

___10/29___ 2021    Plaintiff shall serve liability and economist expert reports by this date.

___12/23___ 2021    Defendants shall serve liability and economist expert reports by this date.

**SUMMARY JUDGMENT MOTION PRACTICE**

___1/7___ ~~2021~~ 2022  Summary judgment filing deadline.          Return date: ___2/4___ ~~2021~~ 2022

**EXPERT DEPOSITIONS**

___2/28___ ~~2021~~ 2022    Expert depositions shall be completed by this date.

**PRE-TRIAL AND TRIAL**

___TBD___ 2021 @_____    Settlement conference.          Trial date: ___3/21___ ~~2021~~ 2022

   **IT IS** hereby **ORDERED** on this date.

/s/ Ana C. Viscomi
ANA C. VISCOMI, J.S.C.

FILED
MAY 25 2021
ANA C. VISCOMI, J.S.C.

# EXHIBIT 2

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

```
IN RE:                          .    Case No. 22-2003/22-2004
                                .
LTL MANAGEMENT LLC,             .    21400 U.S. Courthouse
             Debtor,            .    601 Market Street
                                .    Philadelphia, PA 19106
OFFICIAL COMMITTEE OF TALC      .
CLAIMANTS,                      .    Monday, September 19, 2022
             Appellant.         .
. . . . . . . . . . . . . . . . ..
IN RE                           .    Case No. 22-2005
                                .
LTL MANAGEMENT LLC,             .
             Debtor.            .
                                .
LTL MANAGEMENT, LLC.            .
                                .
          v.                    .
                                .
THOSE PARTIES LISTED ON         .
APPENDIX A TO COMPLAINT AND     .
JOHN AND JANE DOES 1-1000       .
OFFICIAL COMMITTEE OF TALC      .
CLAIMANTS,                      .
             Appellant.         .
. . . . . . . . . . . . . . . . ..
IN RE:                          .    Case No. 22-2006/22-2007
                                .
LTL MANAGEMENT LLC,             .
             Debtor.            .
                                .
OFFICIAL COMMITTEE OF TALC      .
CLAIMANTS, ET AL.               .
             Appellants.        .
. . . . . . . . . . . . . . . . ..
IN RE:                          .    Case No. 22-2008
                                .
LTL MANAGEMENT LLC,             .
             Debtor.            .
                                .
LTL MANAGEMENT LLC              .
                                .
          v.                    .
                                .
THIRD PARTIES LISTED ON         .
APPENDIX A TO COMPLAINT AND     .
JOHN AND JANE DOES 1-1000,      .
OFFICIAL COMMITTEE OF TALC      .
CLAIMANTS, ET AL.               .
```

2

```
OFFICIAL COMMITTEE OF TALC     .
CLAIMANTS, ET AL.              .
              Appellants.      .
. . . . . . . . . . . . . . . .
IN RE:                         .    Case No. 22-2009
                               .
LTL MANAGEMENT LLC,            .
              Debtor.          .
                               .
ARNOLD & ITKIN LLP, ON BEHALF  .
OF CERTAIN PERSONAL INJURY     .
CLAIMANTS REPRESENTED BY       .
ARNOLD & ITKIN,                .
              Appellant.       .
. . . . . . . . . . . . . . . . .
IN RE:                         .    Case No. 22-2010
                               .
LTL MANAGEMENT LLC,            .
              Debtor.          .
                               .
AYLSTOCK WITKIN KRIES &        .
OVERHOLTZ PLLC, ON BEHALF OF   .
MORE THAN THREE THOUSAND       .
HOLDERS OF TALC CLAIMS,        .
              Appellant.       .
. . . . . . . . . . . . . . . . .
IN RE:                         .    Case No. 22-2011
                               .
LTL MANAGEMENT LLC,            .
              Debtor.          .
                               .
LTL MANAGEMENT LLC             .
                               .
          v.                   .
                               .
THOSE PARTIES LISTED ON        .
APPENDIX A TO COMPLAINT AND    .
JOHN AND JANE DOES 1-1000      .
                               .
AYLSTOCK WITKIN KRIES &        .
OVERHOLTZ, PLLC., ON BEHALF OF .
MORE THAN THREE THOUSAND       .
HOLDERS OF TALC CLAIMS,        .
              Appellant        .
. . . . . . . . . . . . . . . . .
```

3

TRANSCRIPT OF ORAL ARGUMENT
BEFORE
THE HONORABLE JUDGE THOMAS L. AMBRO
UNITED STATES THIRD CIRCUIT JUDGE
THE HONORABLE L. FELIPE RESTREPO
UNITED STATES THIRD CIRCUIT JUDGE
THE HONORABLE JULIO M. FUENTES
UNITED STATES THIRD CIRCUIT JUDGE

APPEARANCES:

For the Appellants:       MoloLamken
                          By:  JEFFREY A. LAMKEN, ESQ.
                          600 New Hampshire Avenue, N.W.
                          Washington, D.C.  20037

                          Kellogg Hansen Todd Figel & Frederick
                          BY:  DAVID C. FREDERICK, ESQ.
                          1615 M Street, N.W., Suite 400
                          Washington, D.C.  20036

For U.S. Trustee:         U.S. Department of Justice
                          By:  SEAN JANDA, ESQ.
                          Appellate Section
                          Room 7260
                          950 Pennsylvania Avenue, N.W.
                          Washington, D.C.  20530

For Appellees:            Hogan Lovells US
                          By:  NEAL K. KATYAL, ESQ.
                          555 Thirteenth Street, N.W.
                          Washington, D.C.  20004

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311      Fax No. (609) 587-3599**

**WWW.JJCOURT.COM**

4

# I N D E X

ORAL ARGUMENT                                           **PAGE**

    BY MR. LAMKEN                                          6

    BY MR. JANDA                                          35

    BY MR. FREDERICK                                      46

    BY MR. KATYAL                                         58

REBUTTAL ARGUMENT

    BY MR. LAMKEN                                        101

    BY MR. JANDA                                         115

    BY MR. FREDERICK                                     117

**WWW.JJCOURT.COM**

1       THE COURT:  Welcome this afternoon.  We have In re

2   LTL Management LLC, Numbers 22-2003, 2004, 2005, 2006, 2007,

3   2008, 2009, 2010, and 2011.  And in connection with the oral

4   arguments today, I had told counsel previously that we would

5   probably go a bit longer than the two hours.  That said, once

6   upon a time, we had an oral argument we started in the morning

7   in a case called Combustion Engineering and we went from about

8   9:30 until about 5:30, 5:45 and I didn't realize we didn't -- I

9   was reminded years later that we only took two 15-minute

10  breaks, which was not fair.

11      Seth Waxman argued and he told me that and somebody

12  was with him at the time.  Now, Judge Craig Goldblatt said that

13  is exactly right.  And I didn't realize that Mr. Waxman doesn't

14  eat on the day of oral argument.  And so in the afternoon, one

15  of my law clerks was feeling a little faint and went and got

16  some M&Ms, and she's sitting over there and she looks at

17  Mr. Waxman and Mr. Waxman looks at her and they both go, open

18  their hands and each had M&Ms in their hands.  So I've learned

19  my lesson.

20      What we will do is we will not go past five o'clock

21  today and we will take a break after the first hour so that

22  everybody can get some time to regroup.  And also if somebody

23  wishes to have a break sooner than that, just give me a little

24  bit of a high sign and we'll go from there.

25      And with that, why don't we begin with Mr. Lamken.

1  And I've promised Mr. Lamken and Mr. -- come on up --

2  Mr. Katyal that similar to what the Supreme Court has been

3  doing the last few years, will have two minutes of

4  uninterrupted time at the beginning of your argument.

5          MR. LAMKEN:  Thank you, Your Honor.  May it please

6  the Court.  If I may reserve 15 minutes for rebuttal.

7          THE COURT:  You certainly may.

8          MR. LAMKEN:  For more than a century, companies

9  facing genuine financial distress have done what companies like

10 Johns-Manville did.  They submit themselves and their assets to

11 the bankruptcy court and to the Code's requirements and

12 creditor protections.  This is an effort to do the opposite.

13 In LTL's words, to put talc-related claims through the

14 Chapter 11 reorganization without subjecting the rest of the

15 assets of JJCI to bankruptcy procedures and to enjoin suits

16 against 670 non-debtors, including affiliates, even though they

17 have independent non-derivative liability.  That subverts at

18 least four different core bankruptcy principles.

19          First, if J&J or JJCI had declared bankruptcy,

20 priority rules would require creditors to be paid in full

21 before equity gets anything.  But here, J&J and JJCI operate

22 outside bankruptcy with Old JJCI's assets, paying billions in

23 dividends to equity, to shareholders.  Last week, J&J announced

24 a $5 billion stock buyback, more for equity.  But talc victims

25 alone are mired in bankruptcy as they die.

7

1        Old JJCI's trade creditors are compensated in the

2   ordinary course, but the disfavored creditors, talc victims,

3   sit languishing in bankruptcy.  A clearer subversion of the

4   priority rules that ordinarily apply is hard to imagine.

5        Second, debtors-in-possession management ordinarily

6   have a powerful incentive to try and emerge from bankruptcy as

7   quickly as possible so they can get on with their ordinary

8   operations free from bankruptcy supervision.  But here, J&J and

9   JJCI, the tortfeasors funding all of this, have no such

10  interest in swift emergence.  They operate Old JJCI's assets

11  outside of the Bankruptcy Code free and clear of bankruptcy

12  court supervision, paying who they want while talc claimants

13  alone are in bankruptcy.

14       LTL has no incentive.  It exists only for bankruptcy,

15  no operating business, no transactions to engage in.  You need

16  only look at the three other two step bankruptcies to

17  understand exactly what happens to these incentives.  Before

18  bankruptcy, for example, Bestwall had resolved 15,000 asbestos

19  claims.  Now, five years in, not one claimant has received

20  compensation from bankruptcy.  We have no approved plan and all

21  the official committee representatives alive at the case's

22  outset have passed away.  Worse, the delay benefits LTL and

23  JJCI and Johnson and Johnson as talc victims can only get more

24  desperate.  They can only get more likely to cave each day they

25  face unreimbursed medical expenses and they get closer to their

8

1  own deaths.

2          THE COURT:  Is your principal argument that there is

3  not a proper bankruptcy purpose or that the debtor here is not

4  in financial distress or what?

5          MR. LAMKEN:  So the answer is it's not a proper

6  bankruptcy purpose because evading Bankruptcy Code principles

7  is not a valid bankruptcy principle.  As this Court pointed out

8  in SGL, those who seek relief in bankruptcy have to comport

9  with the underlying Bankruptcy Code principles.  And when the

10  bankruptcy is established for the very purpose of evading the

11  ordinary bankruptcy procedures --

12          THE COURT:  And by the ordinary Bankruptcy Code

13  principles, you mean what?

14          MR. LAMKEN:  I mean, for example, what I started out

15  with, which is the priority rules.  This is structured so that

16  all the dividends, all the equity can be paid while one

17  category of claimants, talc creditors, sit in bankruptcy and

18  don't get paid.  Another principle is that you have to have

19  incentives to come to the bankruptcy to come forward with a

20  reasonable plan in order to emerge swiftly.  But the opposite

21  is true when you take all the operating assets, all the

22  businesses, and you can operate them outside bankruptcy and the

23  only people who are mired in bankruptcy are the talc claimants.

24          THE COURT:  Are you referring to economic relief for

25  the victims?

1          MR. LAMKEN:  Yes.  Yeah, that's exactly right.  And

2    the ordinary principle is under the absolute priority rule, the

3    ordinary rule is no equity gets paid until creditors are paid.

4    And we have the exact opposite going on here.

5          THE COURT:  How was that economic relief

6    appropriated?

7          MR. LAMKEN:  I'm sorry, Your Honor.

8          THE COURT:  Is that economic relief delivered to the

9    victims?

10          MR. LAMKEN:  So in the ordinary tort system, the

11   victims bring their lawsuits and they either settle or they go

12   to trial and they get relief.  But they're allowed to proceed

13   and try and seek that compensation through the system that 50

14   states have used for two centuries to compensate victims of

15   misconduct.  But right now --

16          THE COURT:  So you're saying bankruptcy does not

17   allow that to happen?

18          MR. LAMKEN:  Well, bankruptcy delays it while we're

19   going through all the plans and trying to come up with it.  And

20   right now, if you look at how it works when you have these two-

21   step bankruptcies, it goes for <u>Bestwall</u>, five years with nobody

22   getting compensated, no plan, and everybody dying in the

23   meantime.  By contrast, if you don't separate it -- people

24   have, if you don't separate your liabilities and put them off

25   into one entity, an artificial entity with just these talc

1 liabilities and you instead have the people with liabilities

2 and the actual companies in bankruptcy, then there's an

3 incentive to go forward and come up with a plan so people

4 actually get compensated and get compensated promptly because

5 management wants to emerge from bankruptcy.  But right now,

6 there's no incentive actually to do that for J&J and JJCI

7 because they're operating Old JJCI's assets, famous brands of,

8 you know, Tylenol and the like, free and clear of bankruptcy's

9 requirements.

10         Instead, the only ones who are sitting in bankruptcy

11 are the talc claimants.  They pay their ordinary trade

12 creditors, no problem.  Pay them as the money comes due.  Only

13 the talc claimants sit in bankruptcy.  And it's just in that

14 sense like SGL where you've just taken one set of creditors and

15 put them at a disadvantage, talc victims, and everybody else

16 proceeds as before.

17         THE COURT:  If LTL were formed in 1979 to hold the

18 talc products, so instead of it going to baby products, it goes

19 to LTL and LTL operated for a number of years but now is in the

20 process of doing, in effect, an orderly liquidation, would you

21 have a problem?

22         MR. LAMKEN:  So I think that the issue we have in

23 terms of evading the structure of the Bankruptcy Code and all

24 the principles of the Bankruptcy Code, that would be a very

25 difficult argument to make because once you take an entity and

11

1   you operate it and you have a legitimate business purpose for

2   the structure that the entity has and you're operating it for a

3   number of years, then it has a legitimate non-bankruptcy

4   purpose.  Where you cross the line is, where two days before

5   you declare bankruptcy, you do a divisive merger in order to

6   put the talc claimants into bankruptcy alone and take the

7   assets, the operating businesses, the valuable brands of that

8   former company and put them outside bankruptcy, and it's solely

9   for the purpose to ensure that talc claimants are treated one

10  way and all the assets are outside the bankruptcy.  When you do

11  that two days before bankruptcy, I think that clearly crosses

12  the line.

13        THE COURT:  It sounds from what you're saying is,

14  you're saying it would be a different argument.  But it sounds

15  like if they had done that in '79 and ran the company for a

16  number of years, ultimately decided they couldn't go forward,

17  do a liquidating 11, it would be an acceptable bankruptcy

18  purpose in that particular circumstance.  Is that correct?

19        MR. LAMKEN:  So I would not be able to argue today

20  that this is an evasion of bankruptcy purposes because clearly

21  it was done for a purpose, not evading bankruptcy.  It was done

22  because that was a logical way to operate the business in 1979.

23  It was operated --

24        THE COURT:  So, and then you're saying at the other

25  end of the spectrum, what they did by forming on October 12,

12

1  2021, filing two days later, it doesn't work.  Where is the

2  line that is crossed in your view?

3       MR. LAMKEN:  So I think the line is when the sole

4  purpose is not a legitimate business purpose of this is a

5  logical way to operate the company, but the sole purpose is to

6  disrupt, to subvert, to frankly, pervert the Bankruptcy Code,

7  to evade its ordinary principles, I think that crosses the

8  line.  And here --

9       THE COURT:  What do we make of the timing here?  And

10  what I mean by the timing is, is I understand that about four

11  months after the Supreme Court denied cert in <u>Ingham</u>, LTL is

12  formed and shortly thereafter, the day after -- they file for

13  bankruptcy shortly thereafter.  What do you make of the timing

14  here?

15       MR. LAMKEN:  So, Your Honor, I think the timing is

16  clear that in essence, J&J had felt failed and they said this,

17  "We felt failed by the tort system."  And so they went to

18  another system they thought would be more favorable.  They went

19  to bankruptcy.  But the problem is, if they want to evade the

20  tort system and move to bankruptcy, if they have financial

21  distress, and I know that's disputed, and if they have a

22  legitimate purposes, that's fine.  But they also don't want to

23  actually face the usual bankruptcy rules because rather than

24  just taking, we have a distressed tortfeasor, JJCI or J&J, and

25  we'll put it into bankruptcy, which is the ordinary way of

13

1    doing it.  That's how it was done in <u>Johns-Manville</u>.  That's

2    how it's been done for 200 -- well, 100 years since we've had

3    something like a Chapter 11.

4            Rather than do that, they did something fancy and

5    they said we're going to take the talc claimants alone.

6    They're going to go into bankruptcy by themselves and they're

7    the only creditors that will be stuck in bankruptcy.  The

8    assets, these businesses that are producing valuable goods with

9    famous names, those are going to stay outside bankruptcy and

10   that subverts everything that bankruptcy supposed to do.

11           In fact, if I go to the third point is that, you

12   know, the usual rule in bankruptcy is the bankruptcy court has

13   supervision over the debtor's operations to make sure those

14   operations are working for creditor benefit to enforce

15   fiduciary duties towards the creditors.  But if you look at

16   Appendix Page 4463, J&J has now announced it's actually going

17   to spinoff its consumer products division, effectively spinning

18   off JJCI.

19           Now, if J&J or JJCI had declared bankruptcy, the

20   bankruptcy court, under Section 363, would have authority over

21   that non-ordinary course.  Creditors like the talc claimants

22   would then be able to have notice and an opportunity to be

23   heard.  But because they've shifted everything to a new entity

24   and they've only put an artificial entity, a concocted made-

25   for-bankruptcy entity into bankruptcy, none of those

1  protections apply.  There's no ability for the bankruptcy court

2  to look and say, yes, you're spinning off JJCI.  Let's make

3  sure that we put everything in escrow.  Let's make sure we do

4  something to make sure that all those funds are available for

5  the creditors for whom they should benefit.

6          THE COURT:  Your concern is principally for the talc

7  victims.  Is that --

8          MR. LAMKEN:  Absolutely, Your Honor.

9          THE COURT:  And your suggestion, if I'm not mistaken,

10 is to take them out of bankruptcy.  Is that --

11         MR. LAMKEN:  Pardon me?

12         THE COURT:  To take those talc victims out of

13 bankruptcy.  They should not be subject to the --

14         MR. LAMKEN:  That's right.

15         THE COURT:  -- bankruptcy requirements?

16         MR. LAMKEN:  Because this is not a good faith

17 bankruptcy, because the purpose of the bankruptcy by its terms

18 is to evade the usual bankruptcy requirements, the bankruptcy

19 should be dismissed.

20         Now, there's a second question --

21         THE COURT:  So it's a bankruptcy to avoid bankruptcy?

22         MR. LAMKEN:  Pardon?

23         THE COURT:  It's a bankruptcy to avoid bankruptcy.

24 Is that what you're saying?

25         MR. LAMKEN:  This is exactly what it is.  It's a

15

1   bankruptcy designed to avoid the purposes and principles of

2   bankruptcy.  It's been gerrymandered in a sense so as to place

3   only one class of creditors at risk.

4        THE COURT:  You were mentioning the second question,

5   but let me ask you.  If we come to the conclusion this was not

6   done in good faith, this is a bad faith filing, do we need to

7   get to the second question on the stay?

8        MR. LAMKEN:  No, Your Honor, because the mandatory

9   requirement under 1112(b) is if it's not, if there is cause,

10  the Court must dismiss.  It says it shall dismiss.  So if this

11  is not good faith, the standard and only remedy is dismissal.

12       Now, there is an unusual circumstances exception, but

13  there's requirements that have not been met.  One of them is

14  that there was good cause or good justification.  And there's

15  simply no good justification for a bad faith bankruptcy.  And

16  second is that there has to be a cure in a reasonable period of

17  time.  And I think when the entire bankruptcy is structured so

18  that talc victims are on their own in bankruptcy and all the

19  other creditors are outside bankruptcy, when the structure is

20  set up so that talc victims are in bankruptcy but all the

21  assets are outside bankruptcy, there's no cure there that some

22  would come up with and I don't think the bankruptcy court ever

23  suggested there could be a cure.

24       THE COURT:  If you were in the shoes and you call it

25  Old JJCI, I'd probably just call for the sake of people here in

1  the audience, Old Consumer.  So you have Johnson and Johnson,

2  Johnson and Johnson Consumer which took over baby products.  So

3  Consumer doesn't go in, it keeps the other items like, you

4  know, Aveno, Tylenol, et cetera, and you separate out -- it's

5  like good bank, bad bank back in the late '80s when you had

6  -- come in on a Friday night and you separate everything out

7  and you open the bank up on Monday.

8           In light of the verdict in the <u>Ingham</u> case, which I

9  think surprised a lot of people, even though it was ultimately

10 reduced, what would you have advised to do if you were

11 representing J&J Consumer?

12          MR. LAMKEN:  So I think my answer would be the answer

13 that all the companies have confronted for a long time, which

14 is if you're genuinely in financial distress, you can take your

15 company into bankruptcy.  If you're not genuinely in

16 bankruptcy, excuse me, in financial distress, then you may

17 continue your fight.  Yes, you got a bad result in <u>Ingham</u>, but

18 look, after <u>Ingham</u>, what did J&J tell its investors.  After it

19 was denied, it said the facts were "unique and the case is not

20 representative."  That's at Appendix 4 -- excuse me 4404.

21          After the denial in <u>Ingham</u>, what did they tell the

22 investors, that liabilities were "not expected to have a

23 material adverse effect on the company's financial position."

24 Appendix 4506.  And what did it tell the Court about -- what

25 did LTL tell the Court?  It reiterated that there was in light

17

1  of the liabilities, "no likely need of the debtor to invoke the

2  funding agreement," so that's supposedly $61 billion to its

3  maximum amount or anything close to it."  That's at

4  Appendix 3747.

5          This is probably the first planned major bankruptcy,

6  at least the first I've ever heard of, where if you're looking

7  for indicia of financial distress, you don't find any business

8  executive, you don't find any documents at J&J or JJCI before

9  the bankruptcy saying, "Wow, we're financially distressed.

10 We're heading for insolvency."  The first time you see that is

11 in the bankruptcy and where is it coming from?  It's coming

12 from the lawyers.

13         THE COURT:  When you look at financial distress, are

14 you looking at Old Consumer and LTL or just LTL?

15         MR. LAMKEN:  So I think that the proper answer since

16 we're -- if we indulge the facade that LTL as a legitimate

17 entity to put into bankruptcy, and mind you --

18         THE COURT:  You'll have to raise your voice just a

19 tad when you --

20         MR. LAMKEN:  Pardon?

21         THE COURT:  Raise your voice just the tad, sir.

22         MR. LAMKEN:  Yes.

23         So if we indulge the notion, one that I wouldn't

24 accept, that it's okay to take LTL and put LTL into bankruptcy,

25 I think the answer is you have to look at LTL's liabilities

1  because that's the chosen one, the one they've chosen, and you

2  would ask, can LTL -- is it suffering financial distress?

3       This case is live by the LTL, die by the LTL.

4  They've chosen to designate something LTL, claim it's a

5  separate entity, push it into bankruptcy with just the talc

6  victim claimants.  Well, then you're looking for financial

7  distress, you're going to just look at LTL.

8       THE COURT:  But I thought your initial concern was

9  the optics aren't right in breaking off and keeping out of

10  bankruptcy Good Company, while putting into bankruptcy Bad

11  Company with the liabilities.

12       MR. LAMKEN:  That's exactly right, Your Honor.  And

13  that's why if you're going to indulge the notion, but that's

14  the key thing.

15       THE COURT:  Doesn't that sound as if you're taking

16  Old Consumer into account?  It's almost like, I kept wondering

17  why somebody didn't file like a fraudulent conveyance action.

18       MR. LAMKEN:  So, Your Honor, you know, down the road,

19  if we're legitimately in bankruptcy, there are remedies for

20  certain individual transgressions.  But the fact that there are

21  remedies down the road for individual transgressions doesn't

22  make an otherwise bad faith bankruptcy a good faith bankruptcy

23  to begin with.  Good faith is a threshold requirement at the

24  outset.

25       When the entire structure of your bankruptcy is

19

1  designed to evade traditional bankruptcy requirements,

2  traditional priority rules, supervision over spinoffs, all the

3  things that courts do to make sure that the money is there for

4  creditors.  When it's designed to do that, well, it's just not

5  a good faith bankruptcy.  You don't even get to something like

6  a fraudulent conveyance.

7      THE COURT:  Let me go back to financial distress and

8  litigation for a minute.  Opposing counsel makes much of the

9  fact that there are 38,000 plus claims being filed, or have

10  been filed and more coming with respect to the talc litigation,

11  can fear or the cost of this litigation qualify as financial

12  distress?

13      MR. LAMKEN:  So, Your Honor, I don't think the

14  supposed efficiency of bankruptcy counts.  I think the Court

15  has said that in cases like <u>SGL</u>, that that isn't, thinking that

16  you're going to be more efficient in bankruptcy, doesn't count.

17  But even so, that still doesn't tell you whether or not it's --

18      THE COURT:  Not so much more efficient, but less

19  exposure.  Or is the exposure the same?

20      MR. LAMKEN:  Yeah.  So I think, Your Honor, the

21  notion that if one is going to be in financial distress, that

22  is the threshold.  You need immediate financial distress.  The

23  notion that you can just reduce your liabilities from yay to

24  lower isn't a sufficient basis.  And so the real question is,

25  looking at LTL, or if you want to indulge fiction and go back

1  to JJCI as the bankruptcy court did, was there legitimate

2  financial distress that they were not going to be able to make

3  their payments, that they really had a need to go into

4  bankruptcy, which is powerful medicine.  People don't get paid.

5  Forty thousand cases around the country get stayed.  That's

6  powerful medicine.  You have to have some significant showing

7  there, and we don't think they got there.

8          But even apart from it, if there is financial

9  distress, that just reinforces my first point which is, if

10  there's financial distress, that's all the more reason you want

11  the traditional bankruptcy protections to be in place.  If

12  there's financial distress, you don't want money going --

13          THE COURT:  But it sounds like what you're saying,

14  you want the traditional bankruptcy protections to be in place

15  for Old Consumer.

16          MR. LAMKEN:  Exactly.  Exactly.  Because if Old

17  Consumer and, you know, as LTL's telling us, you know, even --

18          THE COURT:  But you just said that you're looking

19  primarily at LTL in connection with this case and Old Consumer

20  is kind of off to the side.

21          MR. LAMKEN:  So we would for financial distress look

22  to LTL.  But remember, what is supposedly funding this

23  bankruptcy?  It's an unsecured funding agreement backed by J&J

24  and JJCI.  So if they face legitimate financial distress,

25  there's every reason to be worried about not supervising what

1  they're doing, every reason to believe that they shouldn't be

2  paying equity ahead of injured talc victims.

3       THE COURT:  Well, if you're a claimant, isn't the

4  only thing that you're really concerned with is that they pay

5  up as to what they say they'll pay up for?

6       MR. LAMKEN:  No, Your Honor.  I think who gets paid

7  first is critically important.  If I am left waiting my turn as

8  people are passing away, that's very different than the

9  absolute priority rule where equity doesn't get paid until I'm

10  paid first.  That's a hugely different endeavor.  It's entirely

11  different in terms of the incentives, as I pointed out.  Why is

12  J&J and JJCI going to push this through bankruptcy if they can

13  continue paying equity, if they can spinoff divisions without

14  bankruptcy court supervision?  If they continue their

15  operations just as before, then there's no reason for them to

16  push this through.  And LTL has no reason to push this forward

17  and have a reasonable plan because they're made for bankruptcy.

18  They have no assets, no operations --

19       THE COURT:  So you're saying is through the backdoor,

20  equity is coming out whole.  Whereas, if it had been Old

21  Consumer in bankruptcy, the absolute priority rule would've

22  played out differently.

23       MR. LAMKEN:  It may well be, Your Honor, but we don't

24  have to guess at an answer because the rules are there to make

25  sure that happens.  And we don't just -- and we don't set aside

1 the rules and say, well, we're going to play monkey business

2 with the absolute priority rule and allow this elaborate scheme

3 where you take one set of claimants out because it might work

4 out in the end.  There's no sort of it might work out in the

5 end exception to the absolute priority rule where you get to

6 pay equity as you go and certainly not without consent,

7 certainly not without a bankruptcy court supervising what's

8 going on.  That's what we count on the bankruptcy courts for.

9 　　　　THE COURT:  What's your thought about individuals who

10 may be exposed but the exposure is not really realized until

11 years, years down the road?

12 　　　　MR. LAMKEN:  Right.  And so look, first, you know, if

13 we're worried about the interests of future claimants, future

14 claimants would be as much protected by a JJCI bankruptcy as an

15 LTL bankruptcy.  That just simply doesn't answer whether or not

16 you should take this concocted made-for-bankruptcy entity and

17 put it in bankruptcy with just the talc claimants alone.  If

18 bankruptcy serves future claimants better --

19 　　　　THE COURT:  Your suggestion is that all these cases

20 should be out of bankruptcy?

21 　　　　MR. LAMKEN:  Pardon?

22 　　　　THE COURT:  Your suggestion is that all of these

23 cases should be out of bankruptcy?

24 　　　　MR. LAMKEN:  That's exactly right.

25 　　　　Everybody should be treated the same.  Either all the

1　creditors are in bankruptcy or all the creditors are out.

2　Either all the assets are in bankruptcy or all the assets are

3　out of bankruptcy.  And that's for future --

4　　　　　　THE COURT:  I assume that would protect people who

5　were exposed years down the road.  They would not be subject to

6　bankruptcy, of course.  But they would be protected.

7　　　　　　MR. LAMKEN:  Yes, they would have their claims as

8　they come up and as they realize they're injured.

9　　　　　　And look, this is not the first mass tort that has

10　something of a tail to it where people end up getting sick over

11　time at later in time.  There's lots of mass torts like that.

12　There was Vioxx from Merck.  There's the diet drugs litigation.

13　These things happen and the tort system has ways of handling

14　them.

15　　　　　　Now, if there is other reasons and a legitimate basis

16　for going into bankruptcy, well, bankruptcy has ways of

17　handling it too.  But concern for future claimants is not

18　itself a reason for bankruptcy.  And there's a little bit of an

19　irony here that we have Johnson and Johnson asserting that it's

20　concerned about future claimants when its position in this

21　litigation is that there was no asbestos, no one was injured,

22　this is just a matter of a litigation lottery and no one should

23　receive anything.

24　　　　　　If we really are interested in the interests of talc

25　claimants, listen to the talc claimants.  There's just not one

24

1  here telling you that they'd rather be in bankruptcy, that they

2  really don't want be in the tort system that 50 states have

3  used for nearly 200 years.

4         THE COURT:  Well, let's assume we find or come to the

5  conclusion that it was a good faith filing.  What do we do with

6  the stay?  Did the bankruptcy court exceed its jurisdiction?

7         MR. LAMKEN:  So I think the bankruptcy court did

8  exceed its jurisdiction because even if one assumes that LTL is

9  a proper debtor, and that's our debtor, that has consequences.

10 And that means when you're looking at 362 and an automatic

11 stay, that applies to the debtor.  And what the bankruptcy

12 court did here is it stayed over 670 actions against over 670

13 non-debtors, including debtors that have their own independent,

14 own tortious conduct, non-derivative liability, and that just

15 exceeds its jurisdiction.

16         And to get there, the district court, or excuse me,

17 the bankruptcy court looked at two things.  It talked about

18 mostly supposedly shared insurance and indemnification

19 agreements.  But the key finding on that is on Appendix 159

20 where the court accepts, I'm quoting, that "Any claim of shared

21 identities of interest is based solely on the allocation of

22 agreements to the debtor on the eve of bankruptcy," and here's

23 the cure part, "for the very purpose of extending the stay."

24         The court, in essence said, look, even though the

25 purpose of this indemnification agreement which we allocated to

1  LTL, even though the purpose of having shared insurance was to

2  extend the stay, that's a good enough reason to give a stay to

3  companies like Johnson and Johnson that have their own tortious

4  conduct.  And that's just error twice over.

5          Combustion Engineering makes it very clear that

6  contrived agreements for purposes of creating jurisdiction just

7  can't be given that type of weight.  Because otherwise,

8  jurisdiction can be created by consent.

9          THE COURT:  What's the usual way that you would argue

10  that there is jurisdiction?

11         MR. LAMKEN:  For non-debtors?

12         THE COURT:  For a stay under 362 that would affect

13  non-debtors, correct.

14         MR. LAMKEN:  So the usual way you would find that is

15  if you found something that's akin to an identity of interest

16  where, if there's liability by the non-debtor, that is

17  automatic liability for the debtor.  And no ability of the

18  bankruptcy court to intervene and say, yes, I know the non-

19  debtor is liable, but I'm not going to let it dissipate the

20  assets of the debtor.  So --

21         THE COURT:  And in that context, is it core

22  jurisdiction or is it by virtue of arising under or arising in?

23  Or is it related to jurisdiction?

24         MR. LAMKEN:  So I think the better answer is to

25  adhere to the text of the statute, which says only the debtor

1 for 362(a)(1), actions against the debtor, literally.  When you

2 go to --

3          THE COURT:  But we know what courts tend to do,

4 practically speaking.  They tend to use 105 and they say, we're

5 going to extend it because there is this "identity of interest"

6 or there is insurance that's being paid out for the non-debtor

7 that would likely be also covering the debtor itself.

8 Therefore, you don't want to dissipate the insurance so

9 therefore, you fit under 362(a)(3) and we're going to combine

10 the two, (a)(1), (a)(3), along with 105, and go from there.

11 And it looks like a lot of courts just tend to deal with it

12 practically.

13          I was just looking for some cases and we found one by

14 Judge Posner on the Seventh Circuit.  You know, it says, no, it

15 wasn't all that much analysis, it's the right thing to do.

16          MR. LAMKEN:  Yeah, and I think the right-thing-to-do

17 theory really is relying on 105 because 105 is sort of the

18 necessary and proper clause that says, "Well, it's necessary

19 and proper."  But 105 doesn't create its own jurisdiction.  You

20 have to go find jurisdiction under another provision of the

21 Bankruptcy Code.  And the problem with 105 is, and here in

22 particular is, you'd have to have the necessary findings in

23 order to invoke it and the findings just are absent.

24          For example, for indemnification, the ordinary rule

25 is it has to be automatic indemnification.  If you need another

 1  lawsuit for the indemnification to occur, as under Federal-

 2  Mogul and W.R. Grace, if you need another lawsuit, then it

 3  doesn't count for 105 because the bankruptcy court can

 4  intervene when the other lawsuit is filed against the debtor.

 5  And there's simply no finding, and I think LTL concedes this on

 6  Page 96, that LTL would certainly face "automatic indemnity

 7  obligations."  And so it just falls short under W.R. Grace and

 8  under Federal-Mogul.

 9          And second, even apart from the fact that these are

10  all eve-of-the bankruptcy indemnifications for the purpose of

11  establishing jurisdiction, the 1979 JJCI agreement, that can't

12  really establish even for Old JJCI an indemnity obligation

13  because that covers only liabilities that are allocated on the

14  books or records of J&J as pertaining to its baby division.

15  But there were no talc liabilities in 1979 allocated to Old

16  JJCI at that point.  And it doesn't really expressly indemnify

17  J&J for its own tortious misconduct.  And to indemnify a

18  company for its own tortious misconduct, you typically have to

19  have language regarding fault, negligence, culpability,

20  something like that in there.  There's no language like that in

21  the 1979 agreement.

22          Finally, I see my red light is on --

23          THE COURT:  That's fine.  You're on our time.

24          I'd like to go into what the benefits and detriments

25  are in considering a 524(g) channeling injunction or trust, if

1  you will, versus the mass tort system because we've had a lot

2  of *amici* file briefs one way or the other.

3       The theme seems to be of the debtor that the 524(g)

4  trust can be set up.  It's adequately funded along with the

5  claims coordinator already in place.  The claims coordinator

6  has a proven track record of ferreting out valid claims from

7  invalid claims and you can do estimations and everything can be

8  resolved in one single venue.  And their point is, what's wrong

9  with that?

10       MR. LAMKEN:  All right.

11       So first, I think you don't get to a remedy like

12  524(g) until you have a legitimate good faith bankruptcy in the

13  first place.  And so that would not solve our problem with the

14  lack of good faith, the fact that we've hived off one set of

15  creditors, talc victims, for differential treatment, the fact

16  that we've taken the actual assets of the entity and put them

17  outside bankruptcy.

18       But one of the problems here is that 524(g) has been

19  distorted by that as well.  Look, for a 524(g) trust, the idea

20  is you take the debtor's securities and you put them in the

21  trust with a right to dividends, it says that in the statute,

22  so that you have sort of that ongoing evergreen source of

23  funding so you can keep coming up with more assets to pay

24  future claimants.  What this court in a footnote referred to or

25  quoted Congress as saying that you have a goose that can "lay

29

1  golden eggs" and continuously fund those victims.

2        But what happened here is, because we swapped out

3  debtors from J&J and somebody with an actual operating

4  business, Famous Brands, to somebody who's just a made-for-

5  bankruptcy entity, you've swapped out a very different goose

6  and it's a goose that doesn't lay golden eggs.  It just is a

7  goose with a right to have a funding agreement.  It's an

8  unsecured funding agreement, subject to defenses, and that's

9  just inconsistent with Combustion Engineering which says on

10 Page 248, it says, look, implicit in this is that you need an

11 ongoing operating business.

12        And that's reinforced by Section 524(g)(2)(B) because

13 that says that you could only have this sort of 524(g) trust

14 when your debtor was named in litigation at the time of the

15 bankruptcy.  And that forecloses the idea of having --

16        THE COURT:  But that seems to be hyper literal in

17 this case because in the end, the LTL I think probably already

18 has been named in cases, has it not?

19        MR. LAMKEN:  No, Your Honor.  I don't think it's

20 hyper literal in the following sense because it serves an

21 important purpose.  Congress wants the real tortfeasor, the

22 real guy who has an operating business to be the one operating

23 the 524(g) trust because then his securities go into the trust.

24 By requiring somebody to have been named when they declared

25 bankruptcy, it ensures that you have a real company there, not

1  a made-for-bankruptcy debtor like LTL that has no real

2  operations and it has no assets --

3       THE COURT:  But we have a real company and

4  liquidating 11s are allowed, and specifically, Integrated

5  Telecom tells you in Footnote 4 that oftentimes you have

6  liquidating 11s and, in my day, we had quite a number that were

7  filed in the 80s, or at least in the 90s all the time.

8       MR. LAMKEN:  So, Your Honor, you know, it's possible

9  that if you had a consensual plan, people could agree to having

10 something like LTL be putting its securities, whatever those

11 might look like, in a 524(g) trust.  I don't think it's

12 consistent with the statute, but one could conceive of it.  But

13 this deprives the claimants of that choice, right?  Now, the

14 debtor that would put its securities in it is LTL, this made-

15 for-bankruptcy entity that doesn't have operating divisions.

16 And everything that it's guaranteeing, everything that is, you

17 know, sort of pledged in some sense that, you know, there's an

18 unsecured funding agreement, all those assets are now being

19 spun-off by J&J and won't even be assets there until it's

20 funded anymore.  So I think it just completely upsets the whole

21 idea of 524(g) of taking the debtor's actual securities.

22      THE COURT:  But what would be the best approach?  I

23 mean, there are a lot of heartbreaking stories here and it's

24 very difficult to come up with a right game plan for everybody.

25 From your perspective, what would be the best approach --

1          MR. LAMKEN:  I think --

2          THE COURT:  -- for these very difficult cases, these

3    talc related disabilities?

4          MR. LAMKEN:  So I can speak from my perspective and

5    my clients.  And from my perspective and my clients, they are

6    happy to go forward with the traditional tort system that has

7    operated in this country to compensate people for 200 years.

8    But if --

9          THE COURT:  How long would that take?

10          MR. LAMKEN:  Your Honor, I don't know how long it

11   would take, but I know that these things do move very quickly.

12   For example, you know, Judge Robreno downstairs, 186,000 talc

13   resolutions, Vioxx resolved, diet drugs resolved.  The tort

14   system can handle these mass torts.  This is not the first.

15   But that also doesn't in the end tell you, what are you going

16   to have?  Is it okay to just go have a JJCI bankruptcy, or are

17   we going to allow there to be this concocted entity, LTL, with

18   only talc victims, no other creditors and all of Old JJCI's

19   assets sitting outside bankruptcy.  That goes too far.

20          THE COURT:  But I think that -- I mean, part of what

21   Judge Fuentes is asking is which system is better, the MDL

22   system or the bankruptcy system, for resolving these types of

23   claims in an orderly way and getting money as quickly as we can

24   to people with valid claims?

25          MR. LAMKEN:  So under this structure, I can tell you

32

1  there's a clear answer and it's the tort system, because if you

2  look at <u>Bestwall</u>, when you separate the assets and the ability

3  to operate from the bankruptcy system, when you take only the

4  talc claimants, only the victims and put them alone in

5  bankruptcy, bankruptcy bogs down and you go five years without

6  a plan, without anybody getting compensated.  Before that --

7          THE COURT:  But with <u>Bestwall</u>, it has been five

8  years.  But in this case, we don't know.  If bankruptcy is

9  found to have a valid purpose here and it goes back, I don't

10  know when it's going to be over.  But it does seem, based on

11  what some people have filed, that MDLs take a long time.

12          And well, perhaps you can have Bellwether Trials.

13  Most of what you do is discovery.  You send it back to the

14  other courts.  You hope to somehow at some point you can get a

15  settlement discussions going, but that also can take many

16  years.

17          MR. LAMKEN:  Your Honor, I agree that no system is

18  perfect here.  But we're the ones looking for compensation and

19  we're happy to be in that system, which can sometimes be slow,

20  but it can also move very quickly as the examples I gave you

21  show.

22          But in the end, I don't think courts should be in the

23  position of saying I think bankruptcy is better because it's

24  more efficient or I think tort is better because it's more

25  consistent with other values like having jury trials and

1  individual justice.  I think that the answer is if you have a

2  bankruptcy that has been structured to bypass the traditional

3  bankruptcy protections, which is what you have here, that is

4  not a good faith bankruptcy.  If the purposes are to benefit

5  the parent, the corporate parent, which is the case here, that

6  is not a proper bankruptcy.

7       THE COURT:  So in your world view, any equities with

8  respect to which system is better or worse shouldn't be baked

9  into the equation?

10      MR. LAMKEN:  I don't think that is because it comes

11  very, very close, Your Honor, to litigation advantage, who

12  thinks which system is better.

13      Is this better for the victims?  Is this better for

14  the defendant or the petitioner?  That's just not someplace the

15  court should be.  And one of the reasons for that is you kind

16  of in the end have to ask more efficient, better for whom.  And

17  in this case, if you look at it, there's supposedly $61 billion

18  available for funding.

19      THE COURT:  I mean, the problem if you're a claimant

20  is it looks like in a lot of these cases you either get a home

21  run or a strikeout.

22      MR. LAMKEN:  Well, I think the framers understood

23  that juries can sort those sorts of things out.  And if you get

24  a strike out, it may well be because the jury determined that

25  you didn't have specific causation, that whatever your

34

1  condition is, it was caused by something else.  And that's --

2          THE COURT:  Well, Mr. Feinberg could probably do that

3  much more quickly and much more efficiently than having a full

4  blown trial.

5          MR. LAMKEN:  Well, Your Honor, I think that's right.

6  But the Seventh Amendment tells us that if you want your jury

7  trial, you're entitled that jury trial.  And the framers

8  understood that the community, the people of the United States

9  who sit in the dock and make the decisions, we trust them to

10  sort those things out.  And the fact that some people win and

11  some people lose, we trust that the juries are able to sort

12  that out.  And the notion that somehow bankruptcy may be more

13  efficient, that's just not a good basis for having a bankruptcy

14  case because in the end, even if it's more efficient, who for

15  is it more efficient and who is it benefitting?

16          Here, if there's anything under $61 billion that's

17  ultimately distributed in this bankruptcy, and believe me, when

18  a plan is proposed by J&J, when that happens, if it happens,

19  it's going to be well short of 61 billion.  Anything short of

20  that, all those efficiencies, all that extra, that accrues to

21  equity.  This is not more efficient for claimants.  It's more

22  efficient and better, perhaps, only for equity.

23          If I may reserve any remaining time for my rebuttal.

24  I thank you very much.

25          THE COURT:  We'll give you plenty of time for

35

1  rebuttal.

2        MR. LAMKEN:  Okay.  If there are further questions,

3  then I'm happy to entertain them.

4        THE COURT:  I've got quite a few, but we'll come

5  back.

6        MR. LAMKEN:  Okay.  I'll brace myself here.

7        THE COURT:  Why don't we get Mr. Frederick, or I

8  guess Mr. Janda --

9        MR. LAMKEN:  Thank you very much.

10        THE COURT:  -- and then, we'll get you back.

11        MR. JANDA:  Thank you, Your Honor.  And may it please

12  the Court.  Sean Janda for the United States Trustee.

13        I think it's helpful to start by just taking a step

14  back to understand what's really happening here.  At bottom,

15  J&J has carved off one set of disfavored creditors' claims,

16  handpicked a selection of assets, and sent only those claims

17  and only those assets into bankruptcy.  If that carefully

18  constructed bankruptcy is permitted to proceed, those claimants

19  will be held hostage against each other with no claimant

20  receiving any money until enough claimants agree to take

21  whatever drips LTL chooses to release from the spigot of the

22  funding agreement.

23        THE COURT:  I'm going to ask you a variation of the

24  question I asked of Mr. Lamken.  Let's assume, instead of 1979,

25  that LTL was formed in 2010 when the first cases really started

36

1  coming, or maybe 2014 when they saw that the cases were for

2  real.  And so you had good assets, bad assets, LTL gets the

3  liabilities in connection with the talc.  So let's, it's now

4  been since 2014, let's say eight years, would you still be

5  objecting if LTL now filed for bankruptcy in 2022, 2021?

6       MR. JANDA:  So I think there's two different pieces

7  here, Your Honor.  The one piece is the sort of valid

8  reorganizational purpose piece, whether there's the sort of

9  financial distress that makes bankruptcy a legitimate choice.

10 And then the other piece is the sort of subverting the

11 structures and purposes of the Code.

12       And on the second piece, you know, I think it's hard

13 to say exactly where the line is.  In this case, the fact that

14 this scheme was implemented two days before the bankruptcy

15 filing was enacted, it's very obvious --

16       THE COURT:  I get it.  You're saying the optics

17 aren't good here, but I'm trying to -- you're writing an

18 opinion here.  Where's the line?

19       MR. JANDA:  And I think, as Mr. Lamken said, the line

20 is whether these machinations or the scheme was undertaken to

21 try to subvert the principles of the Bankruptcy Code.  And so

22 it might be the case that if it happened in 2014 with

23 bankruptcy on the mind, that might be enough.  It might be the

24 case that if it happened in 2014 with sort of valid business

25 purposes on the mind, it wouldn't be enough.  It's hard to give

1   a very clear line.

2           But this case I think very obviously falls on one

3   side of the line.  And I don't think the Court needs to say too

4   much more than that to find that this sort of integrated

5   transaction very much undermines sort of a number of

6   fundamental purposes and structures of the Code.

7           THE COURT:  Where we left off with Mr. Lamken was the

8   reasons to have a 524 channeling trust versus the mass tort

9   system.  Do you have any thoughts on that?

10          MR. JANDA:  I mean, I think the most important thing

11  is, with all respect to the Court, that's not really the

12  Court's job to make the determination about which system is

13  more equitable or which system is fairer or better.  That's

14  Congress's job.  And Congress has created the 524(g) process

15  that sort of assumes a preexisting valid bankruptcy.  And once

16  you are in bankruptcy, Congress has determined that in certain

17  clearly defined circumstances, a 524(g) trust might be the best

18  resolution in those circumstances.

19          Congress has also implemented, you know, the MDL

20  procedures and other procedures to try to make the resolution

21  of mass claims more efficient to balance, the competing

22  interests in that circumstance.  But the overarching thing is

23  that Congress has determined that the strong medicine of the

24  Bankruptcy Code is necessary or is appropriate in certain

25  circumstances, and really I think the sort of job of the Court

1  is to figure out whether those circumstances are met, not to

2  figure out whether at the end of the day one system or the

3  other system is better or fairer or more efficient.

4           THE COURT:  Can the fear of a lot of litigation, tens

5  of thousands of cases and huge jury verdicts, can that satisfy

6  this financial distress concern?

7           MR. JANDA:  So it depends on the particular

8  circumstances.  I'd point the Court to SGL Carbon which has a

9  very long discussion of this.  In SGL Carbon, the test that

10 this Court implemented was sort of an immediate financial

11 difficulty test and so it could be the case that litigation

12 fees or judgments that had been entered are such that there is

13 immediate financial difficulty.  But this Court in SGL Carbon

14 sort of specifically rejected the idea that the prospect even

15 of financial and operational ruin from a judgment, at some

16 point in the future, is not enough to satisfy that test.

17          And in this case, as we explain in our briefs, I

18 mean, LTL had access to the $61 billion funding agreement

19 before bankruptcy.  I don't think anyone is going to stand up

20 here and tell you that there was any immediate concern that the

21 $61 billion would be exhausted, that it wouldn't be enough to

22 satisfy judgments in the short term or to pay the litigation

23 costs in the short term.  And so just under the SGL Carbon test

24 that this Court implemented, LTL was not in financial distress.

25 But --

1          THE COURT:  When you consider financial distress, I

2   asked Mr. Lamken, do you consider Old Consumer and LTL or just

3   LTL?  And he answered LTL, initially.  What do you say?

4          MR. JANDA:  So I think this Court, again, has made

5   clear and Congress has made clear that really bankruptcy is

6   intended to benefit the debtor.  And the debtor here is LTL.

7   And to the extent that LTL, you know, wants to take advantage

8   of carving off this set of claims, I think it has to, as

9   Mr. Lamken suggested, if it's going to live by the sword, it

10  has to die by the sword in that way.

11         And LTL I think narrowly focused (indiscernible) and

12  as I said, no one would tell you, I don't think, that LTL was

13  in any sort of immediate financial difficulty.  That being

14  said, if you zoom out, the question might be --

15         THE COURT:  But wouldn't the argument be that LTL is

16  in financial difficulty, it's just that here it happens to have

17  a very, very big backstop, two backstops, in fact, Old Consumer

18  and Johnson and Johnson?

19         MR. JANDA:  I don't think so, Your Honor.  I mean,

20  the rights under the funding agreement give it access so long

21  as it's not in bankruptcy.  I mean, the money sort of

22  disappears as soon as it files for bankruptcy but give it

23  access when it's not in bankruptcy to $61 billion.  And to the

24  extent that as the bankruptcy court suggested that LTL

25  exercising its rights under that agreement, would have negative

1 effects on J&J or on Old or New JJCI, and I think that just

2 goes to the concern that this bankruptcy is primarily intended

3 to benefit non-debtors who have not submitted themselves to the

4 supervision of the bankruptcy court, who haven't complied with

5 the obligations of the Code, and that as this Court made clear

6 in BEPCO is just not a valid bankruptcy purpose.

7      THE COURT:  So there were some very, one could argue

8 on one side, far out projections by the bankruptcy judge here

9 as to what the potential liability can be or the range of

10 liability, I think at one point, up to 190 billion, which is

11 significantly more than the $61 billion backstop as provided by

12 Johnson and Johnson and Old Consumer.  In that case, would LTL,

13 if that's true, would LTL be in financial distress?

14      MR. JANDA:  No, Your Honor.  And I think -- so the

15 briefs obviously make clear that there are a lot of assumptions

16 baked into that number that are not necessarily valid or

17 supported.  But even assuming it's true, and SGL Carbon makes

18 clear that the test is not all of your potential liability or

19 all of your potential costs sort of stretching out into the

20 future, it's whether there's immediate financial difficulty.

21 And no one is contending, I don't think anyone's going to get

22 up here and tell you that there was that sort of immediate

23 financial difficulty with LTL.

24      THE COURT:  So the key word used in SGL Carbon was

25 premature and your point here is, at this point in time, today,

1 it would be premature for LTL to say it's in financial

2 distress?

3        MR. JANDA:  Correct.  And I think SGL Carbon makes

4 clear that it's not just because it's premature but because in

5 some ways it's speculative, right.  You don't know how suits

6 are going to turn out.  You don't know what costs are going to

7 be in the future.  If you have an operating business, it is

8 sort of --

9        THE COURT:  I think it's just another way of saying

10 premature.  I can speculate but it's not, we don't know.

11        MR. JANDA:  Correct.  But I think thinking about it

12 as speculation helps explain why the bankruptcy court's

13 findings on this are really problematic because they are

14 speculation.  They're based on assumptions that are not

15 necessarily supported and that, you know, may or may not turn

16 out to be true.  But certainly, there's nothing that justified

17 in the short term the invocation of the strong protections of

18 the Bankruptcy Code.

19        THE COURT:  Well, let's assume we reverse the

20 bankruptcy court, what would litigation look like going forward

21 and does J&J have any direct liability?

22        MR. JANDA:  So my understanding, Your Honor, and

23 we're obviously not involved for the most part in the tort

24 cases.  My understanding is that at least some of these

25 judgments have been entered against J&J directly whether sort

1  of that's appropriate, whether there will be more, I have no

2  idea.  You know, I think if this Court concludes that the

3  bankruptcy petition should have been dismissed, at that point,

4  J&J or JJCI sort of, or LTL merged back into new, I mean, who

5  knows what would happen, they could make a decision whether

6  they wanted to continue in the tort system or whether they

7  thought that they were facing the sort of financial difficulty

8  JJCI to justify invoking the protections of the Bankruptcy

9  Code.

10         At that point, they would submit themselves, all of

11  their assets to the supervision of the bankruptcy court and

12  would comply with the Code's obligations.  And, again, that's

13  just sort of fundamentally really the problem here is Congress

14  has given very strong protections to entities facing financial

15  difficulty and has determined that sort of the shield of those

16  protections is necessary and is appropriate in circumstances

17  where the person or the entity taking advantage of them submits

18  itself to the Code, submits itself to the bankruptcy court,

19  complies with the many obligations of the Code.

20         But here, I think sort of LTL or J&J is trying to

21  turn what should be that shield of bankruptcy into a sword by

22  not complying with any of the obligations and by trying to get

23  sort of full resolution indefinitely into the future without

24  undergoing any of those obligations that Congress has

25  determined are required.

1          THE COURT:  Is the biggest concern that the U.S.

2     Trustee's Office has that the optics of this just don't seem

3     normal for the type of bankruptcy that is allowed by the Code

4     in America?

5          MR. JANDA:  So I don't think this is about the optics

6     of this, Your Honor.  It's about just fundamental subversion of

7     the Code.  I mean, the U.S. Trustee cares very deeply about the

8     structure and the integrity of the Code.  And here, I mean, as

9     we explained in our briefs and I'm happy to go through the sort

10    of transaction, the scheme here, just undermines --

11         THE COURT:  So let me try it another way.

12         LTL has existed for a number of years.  LTL has

13    massive liabilities in connection with and potential

14    liabilities in the future, suits being filed every day, with

15    regard to its talc products.  When can LTL be safely assured

16    that there won't be an objection of the Trustee if LTL files

17    for bankruptcy protection?

18         MR. JANDA:  And with apologies, I don't think I can

19    give you an answer that you're going to find satisfactory on

20    that.  I have no idea what in sort of other circumstances the

21    Trustee would or would not decide to object to.  I mean, the

22    key here and we don't think LTL was in financial stress.  We

23    don't think there's a valid reorganizational purpose.  We've

24    made that clear.  But I think the biggest problem from the

25    Trustee's perspective is the subversion of the Code, is the

44

 1  sort of playing games with these really fundamental, important

 2  rules of the Code.  And to the extent that a particular

 3  bankruptcy wasn't doing that, I think the Trustee's interest --

 4          THE COURT:  And just to sum up, the most important

 5  rules of the Code in your view are?

 6          MR. JANDA:  And I think we will focus on three

 7  things.  One is the priority rules that creditors and equity

 8  holders have to be treated in a particular way.  Equity doesn't

 9  get anything until creditors are paid.  And here, equity has

10  been getting stuff all along while creditors languish in

11  bankruptcy.

12          Two is the idea that, I mean at its core, the Code

13  sets up a fundamental quid pro quo where an entity submits

14  itself to a lot of obligations of the Code and the supervision

15  of the bankruptcy court in exchange for the Code's protections.

16  And here, that's just not happening.

17          THE COURT:  It sounds to me like you're talking about

18  Old Consumer, you're not talking about LTL.

19          MR. JANDA:  So, Your Honor, I think there's sort of

20  two things here.  And one is, to the extent that the Court

21  wants to focus sort of just on LTL --

22          THE COURT:  No, but I'm just following along with

23  your answer.

24          MR. JANDA:  I mean, I think the point is that LTL has

25  filed for bankruptcy I don't think anyone would disagree to

45

1   benefit JJCI, to benefit J&J, and those sorts of benefits to

2   non-debtors are just not contemplated by the Code.  The Code is

3   for debtors who submit itself to its obligations and the point

4   of this bankruptcy isn't to benefit LTL, it's to benefit the

5   non-debtors who haven't submitted to the Code's obligations,

6   who haven't done the sort of financial disclosures, who haven't

7   had the supervision of the bankruptcy court, who won't have the

8   supervision of the bankruptcy court.  And that's just not an

9   appropriate purpose for the very strong medicine the bankruptcy

10  court provides truly distressed entities, which again, LTL was

11  not at the time that it filed.

12          THE COURT:  And any other bankruptcy principles that

13  you think are violated.  You mentioned two.

14          MR. JANDA:  And then, I mean the third one I think is

15  sort of in with the second one is the idea that in addition to

16  complying with the obligations of the Code, it's the debtor who

17  submits itself to the supervision of the bankruptcy court and

18  sort of ensures that it's acting in a way to maximize creditor

19  returns.  And here, again, J&J, JJCI just haven't submitted to

20  that supervision.  So that, to the extent that it's separate

21  from the second regarding sort of the various other obligations

22  of the Code that J&J and JJCI are not themselves complying

23  with.

24          THE COURT:  If tort litigants prefer to have their

25  day in Court, doesn't it seem wrong that Old JJIC can decide

1  otherwise by taking advantage of the bankruptcy system?

2         MR. JANDA:  I think that depends on the particular

3  circumstances, Your Honor.  I mean, obviously --

4         THE COURT:  I think that was a softball.

5                     (Laughter)

6         MR. JANDA:  Well, so Congress has constructed the

7  Bankruptcy Code and Old JJCI might well be able to file for

8  bankruptcy and might well have been able to take advantage of

9  Congress' protections even in the face of objections from tort

10  claimants.  I think in this case, obviously, tort claimants are

11  being uniquely disadvantaged relative to equity holders and

12  relative to J&J's other creditors.  And that's something that's

13  just not contemplated by the Code or by, I mean, anything else

14  that Congress has done.  I'd say Congress has established

15  procedures for resolving mass tort litigation, even mass tort

16  litigation that involves substantial liability and has

17  determined that those procedures best balance the relevant

18  interests in the context of mass tort.

19         THE COURT:  Thank you very much.

20         MR. JANDA:  Thank you.

21         THE COURT:  We'll hear from Mr. Frederick and then

22  we'll take a break after that.

23         Welcome.

24         MR. FREDERICK:  Thank you, Your Honors.  And may it

25  please the Court, David Frederick for the Arnold and Itkin

1  appellant.  I'd like to reserve three minutes of time for

2  rebuttal.

3          I'd like to emphasize two points in my presentation.

4  The first is that your cases, Third Circuit cases, should

5  compel reversal.  <u>BEPCO</u>, <u>SGL Carbon</u>, and <u>Integrated Telecom</u>,

6  all set out the appropriate tests for determining what is good

7  faith in a bankruptcy.  In this situation, LTL fails the

8  relevant tests for financial distress and good faith in

9  promoting a bankruptcy.  And I'd like to go into that in a

10  minute.

11          But my second point is that there is no limiting

12  principle to LTL's position.  They cannot tell you when any

13  other corporation would be constrained from doing exactly what

14  they have done, not just for a mass tort, but for any

15  significant liability.  Johnson and Johnson is a company with a

16  market capitalization of a half a trillion dollars that throws

17  off dividend income for its shareholders at the rate of $10 to

18  $11 billion a year, that boasts that for 59 straight years, it

19  has increased its dividend.

20          And so if Johnson and Johnson can get away with

21  filing a bankruptcy to hive off its tort liabilities for talc

22  claimants, what's to stop any other company in America from

23  doing the same thing?

24          THE COURT:  It sounds to me like you're saying is if

25  the backstop, instead of 61 billion for these types of claims

48

1   were, pick a number, 5 billion, then wouldn't LTL be in

2   financial distress enough that it should be able to take

3   advantage of the bankruptcy system?

4          MR. FREDERICK:  Well, I think that you go through the

5   normal test, Judge Ambro, and one of the reasons why I think my

6   colleagues have resisted this hypothetical, which I think

7   you're searching for where is the line to draw.

8          THE COURT:  Right.

9          MR. JANDA:  And I think that the answer to that is

10  that you're going to have to assess was there a good faith

11  purpose and emphasize is the LTL in your hypothesized construct

12  an ongoing concern?  Because one of the purposes of a

13  Chapter 11 is to take a business that has an ongoing economic

14  value and preserve and help through the bankruptcy rules that

15  entity emerge out of bankruptcy.  You don't have that here.

16         THE COURT:  But liquidating 11s are allowed.  I mean,

17  Integrated Telecom tells us that.

18         MR. FREDERICK:  That is true.  But that is also why

19  in this Court's decisions in BEPCO and SGL Carbon, it looked

20  specifically at whether or not the entity claiming bankruptcy

21  in order to use that process to evade certain litigation

22  responsibilities had a parent and that the parent could either

23  provide financing or bail it out of whatever financial

24  difficulty it was in.

25         And so you have exactly that situation here where J&J

1  was paying the talc liabilities and it paid the <u>Ingham</u>

2  judgment.  That's undisputed.  So it was on J&J to pay that.

3  It chose to create an accounting fiction by shifting the

4  liabilities on paper to JJCI.  But Johnson and Johnson did it.

5  Johnson and Johnson paid.  And there's no reason, Judge Ambro,

6  under your hypothesized situation one wouldn't look at the

7  circumstances for that bankrupt entity to determine, yes, it's

8  got a commitment for 5 billion, but is there some other

9  mechanism by which it could get financing in order to pay other

10 claimants?

11         Now, if I could go to some of --

12         THE COURT:  The usual one would be, if in some way it

13 had something going on, like the royalties coming and possibly

14 DIP financing, I don't know.  But I mean, if you are a

15 claimant, it would seem that this bankruptcy is about as good

16 as you can get absent getting punitives to have your claims

17 determined, estimated, and paid.

18         MR. FREDERICK:  Wrong.  I'm sorry, Judge Ambro.

19         THE COURT:  That's fine.

20         MR. FREDERICK:  That is not correct.  Sixty-eight

21 hundred talc claimants have already settled.  There has not

22 been a single settlement since they filed for bankruptcy.  What

23 the bankruptcy does is it bleeds the oxygen out of the room for

24 settlement by making every last claimant wait until there is

25 not just a final plan confirmed but all appeals have been

Case 23-01092-MBK Doc 60 Filed 04/17/23 Entered 04/17/23 19:54:12 Desc Main
Case 3:21-cv-20003 Document 41-7 Page 50 of 113 PageID: 1454
Document     Page 103 of 286

50

1  exhausted.  So there might be a --

2         THE COURT:  But that sounds like what you're -- the

3  problem there is, the stay that was given by the Court under

4  362.

5         MR. FREDERICK:  No.  The problem is the funding

6  agreement.  The funding agreement by its plain terms --

7         THE COURT:  And during the course of the appeal, you

8  have a built-in stay without having asked for it.

9         MR. FREDERICK:  That's exactly right.  But the

10 funding agreement also says no money flows until the last

11 appeal has been exhausted.  And so when you deal with any kind

12 of complicated bankruptcy in which there might be multiple

13 plans --

14        THE COURT:  That the last appeal has been exhausted

15 per that individual claim or per the case as a whole?

16        MR. FREDERICK:  The case as a whole.  No money flows.

17        And that's the problem that the funding agreement is

18 not the be-all end-all to this for the claimants.  And, Judge

19 Fuentes, you asked exactly the right question which is, who's

20 better off in such a system.  And there's no reason to think

21 that where J&J, which knew of talc liabilities for asbestos in

22 1969 and was found to have engaged in reprehensible conduct,

23 would not also be liable for judgments for these victims for

24 the asbestos in a product that seemingly is innocent.

25        They've paid more than $92 billion over the last six

51

1 years to their shareholders in dividends and through stock

2 buy-backs.  So there's no question that outside the bankruptcy

3 system in which J&J is being benefitted as a non-debtor that

4 they would be obligated to make payments for their own

5 culpability for these people's problems.

6      THE COURT:  Let's go back to Judge Ambro's

7 hypothetical.  So if you were on this panel, would you venture

8 to write an opinion identifying the line?  Or would you say, on

9 these facts clearly not a legitimate or a good faith

10 bankruptcy?

11      MR. FREDERICK:  Judge Restrepo, I think fairly, I

12 would urge the Court to say the precedents of your Court compel

13 reversal and explain why.  In doing so, some of those features

14 of what constitutes a reasonable way to draw a line will

15 emerge, but I don't think it's appropriate in a case

16 essentially a first impression where you're looking at the

17 Texas two step as the first appellate court to do that.  You're

18 looking at an entity that is not what Johns-Manville did and

19 what was the precursor to 524(g).  But it is a closed-end

20 capped system in which Johnson and Johnson has an incentive to

21 fix the value of the funding agreement by spinning off that

22 agreement which is permitted under the funding agreement itself

23 so you have an entity that is not like any other entity out

24 there.

25      And so to say, preemptively, these would be the

52

1  circumstances of which that would be permitted, respectfully,

2  feels advisory to me.  It doesn't feel necessary.  And given

3  the creativity that led to the Texas two step phenomenon in

4  which not a single one of these entities has ever emerged with

5  a confirmed plan and in the meantime, we've had victims of all

6  of these various torts go without a remedy, I don't think it

7  would be correct or appropriate for the Court to create a

8  roadmap for corporations to continue to do that.  That should

9  be subject to the warp and woof of litigation.

10       I would like to, though, address Judge Ambro a couple

11  of your questions.

12       THE COURT:  Sure.

13       MR. FREDERICK:  You asked whether it was appropriate

14  to look beyond LTL at JJCI.  I think that the way that you

15  appropriately do it under your cases is to look just at the

16  debtor and you look at the debtor's financial distress at the

17  time of filing.  It is an eminent financial distress test for

18  the debtor.  And the reason why you do that is because the Code

19  instructs that the debtor is going to be subject to the

20  strictures of the Code and the opportunities that the Code

21  presents.  And so looking beyond that is not the way you start.

22       Now, your cases have also looked beyond the actual

23  debtor to determine whether or not such things as financial

24  distress is appropriate and so I can't say you shouldn't do

25  that.  I think it is appropriate in this case to look at what

53

1  the assets are available by Johnson and Johnson to provide

2  additional liquidity and additional remedies for the debtor.

3  But that's not typically where you start.  The problem here,

4  though, is that as Mr. Lamken pointed out, what LTL is seeking

5  to do is to create a disfavored set of creditors.  It is only

6  the talc victims that are subject to this bankruptcy and the

7  strictures created by the bankruptcy.

8         Now, Judge Ambro, you also ask which system is

9  better.  Now, leaving aside the academic discussions that I'm

10 sure will ensue as soon as you have written --

11        THE COURT:  We've seen them already.

12        MR. FREDERICK:  -- this opinion, I would just say

13 that -- I would say a couple of things.  For settlement and

14 providing remedies to victims, the tort system is

15 unquestionably better.  Why?  Because Johnson and Johnson has

16 every incentive to engage in negotiations that are going to

17 inure to its benefit, but will pay money.  So the 6,800 talc

18 victims that have already received a settlement from Johnson

19 and Johnson was because Johnson and Johnson decided it was time

20 to settle with them.

21        Now, it might have been that the law firm that was

22 the firm superintending those particular claimants proposed a

23 trial threat.  That is a perfectly valid reason for J&J to

24 decide we want to settle with that law firm and get them off

25 the board.

54

1           THE COURT:  And the tort system pays money also,

2   doesn't it?

3           MR. FREDERICK:  That's what I'm saying.  That's what

4   I'm saying.  You can't do what I just said in bankruptcy.  You

5   can do it in the tort system.  And that has happened in the

6   tort system.  It's no secret that the way that the company

7   would go about doing is from a top down.  We are afraid of this

8   law firm and we do not want to go against them in court.  We're

9   going to resolve those cases for that law firm, or we're not

10  afraid of this law firm, but we think if we can set a low

11  enough floor by settling out cheap, then that becomes the

12  market price.  And companies do that all the time.  It is a

13  perfectly rational way to go about resolving these.

14          That could happen in the mass tort MDL system.  And

15  it does not happen in bankruptcy because of the way the classes

16  of the different creditors are set up and the voting rules that

17  go along with relieving that system from the stricture of the

18  bankruptcy rules.

19          Now --

20          THE COURT:  Just a factual question.  For some

21  reason, I had assumed normally that punitives are not available

22  in bankruptcy.  But when I look at the briefs, there's not a

23  strong statement that that's one way or the other.  Are

24  punitives available in a bankruptcy?

25          MR. FREDERICK:  Well, we're now talking about

55

1  negotiating.  I think that the question of does a bankruptcy

2  confirmed plan take into account punitive damages, I don't

3  think the law is clear on that point.  There is unsettled --

4          THE COURT:  I agree.

5          MR. FREDERICK:  And so the question then is, what can

6  you negotiate and what is confirmable as a plan?  Here, the

7  anomaly is that Johnson and Johnson was hit with a higher level

8  of punitive damages than Old JJCI.  Why?  Because it was the

9  parent company that was misleading the scientists.  It was the

10 parent company that was dealing with the FDA and other foreign

11 regulators with respect to asbestos.

12         And so the parent company was viewed by juries as

13 more culpable for the reprehensible conduct than the consumer

14 entity.  And so when you look at the multiple upheld by the

15 Missouri Court of Appeals in the _Ingham_ case, that's why

16 Johnson and Johnson was hit with higher punitives.

17         Now, how you would do the valuation of that in a

18 confirmation of a plan, I hope that we never get to that

19 because I would fervently urge you to rule that this was not a

20 good faith bankruptcy.  But I would suggest that that will be a

21 much litigated question that will further delay the

22 finalization of any bankruptcy plan.

23         You asked, Judge Ambro, about what if LTL had been

24 created years earlier?  I think part of the test of what you

25 look at is whether it was still part of the parent company and

56

1  that the parent company was continuing to finance.  In which

2  case, I don't think you would find financial distress.  But

3  again, the test would be under SGL Carbon and Integrated

4  Telecom, whether there was immediate or imminent financial

5  distress at the particular time, years later, that it was

6  seeking to declare bankruptcy.

7        But the second thing I'd like to say is that under

8  that construct, one of the reasons why the Texas two step is so

9  problematic in bankruptcy is that it does not provide for asset

10  maximization for creditors.  It is designed to starve off the

11  claims of creditors who are claimants in the tort system.

12        And that purpose is a very important purpose of a

13  Chapter 11 because the idea of allowing the reorganization is

14  so that you can maximize the assets available to the creditors.

15  But the Texas Divisional Merger Statute, as conceived and

16  implemented in these various cases that are pending, doesn't do

17  that at all.  It tries to create a fixed cap.  And, in fact,

18  that was what the J&J treasurer said in July of, the year that,

19  July of '21, that they were seeking to cap their talc

20  liability.  And so --

21        THE COURT:  Yeah, but if they cap it at 61 billion

22  and it turns out in a lot of the briefing that I've seen from

23  your side that the actual amounts are going to be far less than

24  that, does that make much difference?

25        MR. FREDERICK:  We don't know and that's the problem,

57

1  Judge Ambro.  I can't give you a definitive answer to the

2  question of what the value or what is going to be maximized or

3  not.  What I can tell you is that the incentives for J&J are to

4  drive the number as far down as they can and to wait out the

5  talc claimants who are dying at some, you know, horrible rate

6  every day while we're waiting for this.  And that's where the

7  incentives are being drawn in this case.

8         The problem that you also have with this is that

9  you're targeting one particular class.  So, Judge Ambro, if

10 you're going to talk about any of the features that might go

11 into what would be an acceptable plan for this, you have to

12 take into account the fact that any kind of divisional merger

13 that is seeking to skive off particular liabilities is going to

14 treat all the creditors the same way so that if an entity like

15 LTL goes into bankruptcy at some point in time, it has to meet

16 the financial distress test.  It has to meet the maximizing

17 creditor value test.  It has to have a valid purpose and not be

18 for litigation.  But it also can't target one class over

19 another so that the current creditors of LTL, or J&J for that

20 matter, get benefits that only the talc claimants uniquely

21 suffer from.

22         So I think --

23         THE COURT:  But in the course of a plan, I mean, you

24 would have a classification under 1122 or whatever it is that

25 specifically puts these people into their own class, would you

58

1 not?

2          MR. FREDERICK:  Well, if you did that, you are

3 talking about an inordinately large class which creates its own

4 confirmation challenges and problems.  And you're also dealing,

5 respectfully, with people of different ages, different

6 conditions, different states of ovarian cancer or situations

7 with respect to mesothelioma.  So you've got -- it's a much

8 more complicated situation and that's why in the tort system,

9 the way these are traditionally done, is that a group of cases

10 will be settled and then a special master will be designated by

11 the court to go through the circumstances of each individual

12 claimant and determine based on that pop that has been achieved

13 what each person is going to get.  That is a much more

14 challenging feature than would I think in the bankruptcy

15 system.

16          THE COURT:  All right.  Thank you.  Then we'll get

17 you back on rebuttal.

18          We'll take a -- do you want a 10-minute break or a

19 15-minute break, gentlemen?

20          UNIDENTIFIED SPEAKER:  Whatever you like.

21          THE COURT:  What do you guys want?

22          UNIDENTIFIED SPEAKER:  Ten.

23          THE COURT:  Ten-minute break.  The boss spoke.

24                    (Recess taken)

25          THE COURT:  Mr. Katyal, whenever you're ready.

1        MR. KATYAL:  Thank you, Judge Ambro.  May it please

2   the Court.

3        I very much appreciate the argument of my three

4   friends and I'd like to start by discussing three interlocking

5   problems with what you just heard.  Now, my friends said a lot

6   and if it's okay with the Court, I'd like to take about four

7   minutes, not two --

8        THE COURT:  Fine.

9        MR. KATYAL:  -- to try and describe these three

10  points because they reinforce each other.

11       First is the narrow scope of your review.  At this

12  point, you're being asked to decide two questions.  First, was

13  the petition filed by LTL made in good faith, and second,

14  should protected party litigation be stayed.

15       Now, my friends' arguments about harm to the

16  claimants is premature.  Those are plan confirmation questions,

17  or at least ones for the 524(g) 75 percent vote.  After all, as

18  Judge Ambro reminded my friends, Congress handcrafted a

19  specific solution to asbestos bankruptcy cases, which among

20  other things requires a super majority to approve a plan.  What

21  my friends are doing is taking all of their complaints about

22  the bankruptcy process and pushing that all into the good faith

23  question.  Those are questions for plan confirmation, not ones

24  for today.

25       What is before you today is the bankruptcy court's

60

1   conclusion that LTL acted in good faith.  That court spent five

2   trial days hearing from witnesses and crafted two detailed

3   opinions, all of which rejects what you just heard.  The

4   standard to overturn Judge Kaplan is daunting.  As the Supreme

5   Court in Lakeridge put it, "Factual findings are reviewable

6   only for clear error with a serious thumb on the scale for the

7   bankruptcy court."

8          Or as this Court just said in I-Fiber (phonetic), "In

9   a complex case where the bankruptcy court does substantial work

10  in seeking to understand the facts, great care must be

11  exercised to defer to those findings."  As for the other

12  questions about protected parties and the stay, the bankruptcy

13  court identified five separate bases for an injunction, and

14  even the U.S. Trustee doesn't dispute them.  That's the first

15  point.

16         The second, the transfer of liability.  Much of my

17  friends' argument hinges on the notion that J&J, not LTL, last

18  year evaded claims by restructuring.  But the key fact is this,

19  J&J didn't owe anything, didn't owe anything for these claims

20  last year.  J&J didn't owe anything the year before.  J&J

21  didn't owe anything for the preceding 43 years.  That is

22  because in 1979, J&J transferred its entire baby business and

23  all of that liability to JJCI, a separate entity.  And JJCI

24  agreed to fully indemnify J&J for all claims.

25         So what actually happened last year?  JJCI

1 restructured and created two entities, New JJCI and LTL. Every

2 dollar that the Old JJCI was liable for, every dollar of its

3 own conduct and anything alleged by J&J, the New JJCI had

4 agreed to pay 100 percent. The restructuring and bankruptcy

5 petition didn't debate anything. It was a full one-to-one

6 placement. Indeed, it was even more than one-to-one for

7 reasons our brief explains.

8     Now my friends say, well, they represent the victims

9 and speak for them. That proves our point and proves

10 Congress's point. They are all current claimants. Our

11 argument is that each of their tort lawsuits has tunnel vision.

12 It examines only their individual case and delays future ones.

13 It's a home run or a strikeout and precious few get up to bat.

14 The only way to get a system wide resolution that's

15 comprehensive, that protects future claimants, is through

16 bankruptcy.

17     Third, and finally, they ignore several key limiting

18 principles of our argument, particularly Mr. Frederick, and

19 four things make this case unique. First, a latency period of

20 nearly 50 years with many, many future claimants who can't get

21 any relief now and who risk not getting paid.

22     Second, wild lottery style judgments like Ingham,

23 including some for billions, and a massive number of cases,

24 40,000, with more filed every hour of every day of every year,

25 creating a tsunami of litigation.

1    Third, Congress has expressed handcrafted rules for

2    asbestos bankruptcy cases under 524(g), including a 75 percent

3    super majority requirement and a rule that two courts, not one,

4    a bankruptcy court plus a federal district court, must approve

5    the plan and scrutinize it for fairness and equity, and D,

6    finally, all -- or fourth finally, all in the context of a 1979

7    full transfer of liability from J&J to Old JJCI, as well as Old

8    JJCI providing full indemnity back to J&J.

9    So this isn't a case of a parent dumping its

10   liability the day before restructuring or anything like that.

11   J&J has not been liable for decades.  In short, nothing in the

12   restructuring hurts the claimants.  And even if you disagreed,

13   the proper time to evaluate that is far down the road, and here

14   you must just simply decide whether the petition is filed in

15   good faith.

16   THE COURT:  The blank response when you hear about

17   the divisional merger statute and how it's used and people use

18   the name pejoratively, Texas two step, is why didn't you just

19   file Old Consumer?  Life would be so much easier.

20   Now, you might still have a battle as to whether

21   there was financial distress, but it would at least be arguably

22   a cleaner battle.

23   MR. KATYAL:  So, Your Honor, there's several

24   responses, but the most important one is the one that the

25   bankruptcy court gave after listening to the testimony.  And

63

1  you never really actually heard a response to it from my other

2  side which, as Judge Kaplan found, is if you forced that

3  entity, Old JJCI, to go bankrupt, it would have "a horrific

4  impact" because Old JJCI makes all sorts of -- JJCI makes all

5  sorts of things like, you know, Bandaids, Tylenol, things like

6  that.

7      THE COURT:  It sounds to me like only that's an

8  attempt to preserve goodwill, which of course has been earned

9  over the years.  But it sounds like the argument that's being

10  made from your side is that it's a whole lot of inconvenience,

11  a whole lot of inefficiency, a whole lot of harm to goodwill

12  and why not allow this more creative way to separate out the

13  bad from the good.

14      MR. KATYAL:  Your Honor, that is part of the

15  argument.  It is not by any stretch the whole argument.

16      So just to take a step back, I think what the

17  Bankruptcy Code would ask is the relevant question is, is the

18  bankruptcy petition maximizing the value of the debtor's

19  estate.  That's the goal, the purpose that we are isolating

20  from Page 120 of Integrated Telecom.

21      So I don't think the Bankruptcy Code says you're to

22  burden debtors for their own sake.  You're supposed to do it

23  because in some sense, it's going to maximize the value.  And

24  so one thing, and this is my first answer to you, what Judge

25  Kaplan found is that you are maximizing the value by going

64

1  through the divisional merger statute, because otherwise there

2  will be actually less money available including to claimants

3  because of the loss of goodwill, the loss of all that, you

4  know, forcing the entire company into bankruptcy, all the

5  different findings he found.

6         Now another key part of this is there's two possible

7  reasons I think my friends isolate for why you'd want this

8  larger entity, to force this larger entity to go bankrupt.  One

9  is because you want to guarantee the amount of money that this

10  larger entity, JJCI, has for claimants.  And that's exactly

11  what the funding agreement does.

12         THE COURT:  So does Old JJCI qualify for financial

13  distress?

14         MR. KATYAL:  We believe it does, as does LTL --

15         THE COURT:  So if it --

16         MR. KATYAL:  -- as my friend, the U.S. Trustee --

17         THE COURT:  If it does, then isn't it the real party

18  in interest?

19         MR. KATYAL:  Well, I don't know if it's a real party

20  at this point because LTL is the one that filed the petition.

21  We agree with Judge Kaplan.  Either way you slice it, whether

22  it's LTL or JJCI, there's massive financial distress.  And I

23  can go through that evidence.

24         But I do want to first really deal with your first

25  question because I think it's the heart of what --

1           THE COURT:  Excellent.  They're dovetailing together.

2           MR. KATYAL:  Yeah, they dovetail.  But Mr. Lamken

3 really spent a lot of time on this idea that Old JJCI was the

4 entity that had to go bankrupt.

5           And our first point to you is the one main reason why

6 he's isolating is because you want claimants to get paid.  But

7 this funding agreement gives the entire value of JJCI, the

8 entire value, $61 billion free and clear to the potential

9 claimants so that entire pot of money is available.

10          Now my friend says maybe JJCI will squander the

11 assets and that's why you need bankruptcy court jurisdiction,

12 maybe they'll transfer it to equity.

13          The funding agreement, this is quite important to our

14 argument, the funding agreement itself bars that or if it

15 occurred if there were any payment to J&J or to shareholders or

16 anything like that, distributions, all of that increases the

17 $61-billion pot; $61 billion is only a floor, not a ceiling.

18          I'd like to walk you through the language of the

19 funding agreement so that you understand so that it's clear why

20 my friend's argument is wrong.

21          So the funding agreement says that you would take the

22 greater of either, one, the fair market value of Old JJCI

23 immediately prior to the divisional merger.  That amount is

24 $61.56 billion, that's Appendix Page 7422.  Or it says it's the

25 fair market value on the date that LTL and the new JJCI refused

1  to pay under the funding agreement.  That's at Appendix Page

2  4316 and 4619.

3          Here's the most important point about 4619.  If a

4  hypothetical that my friend says happens and it materializes

5  that JJCI does something to try and give J&J money to -- you

6  know, in the form of distributions or something like that, that

7  just bumps up the amount of the funding guarantee under the

8  agreement.  That is Page 4319.

9          So the funding agreement solves for exactly the

10 problem.  We don't think there's anything in the Code that

11 requires, of course, you know, the larger entity to declare

12 bankruptcy.  But to the extent you're worried about it, to the

13 extent you're worried, oh, you know, maybe this is going to

14 create some bad incentive, the funding agreement does that.

15 And here's the second most important point.  J&J guarantees

16 that funding agreement, not just JJCI.

17         In the current world, in the pre-restructuring, pre-

18 bankruptcy baseline world, they could maybe try and sue JJCI.

19 We know those lawsuits take time and so on.  We could talk

20 about that in a moment.  But the most important point is

21 whatever their lawsuits would get, it would only get up to $61

22 billion and not even that because that money is not free and

23 clear.  It would be subject to all of the other creditors that

24 JJCI have and stuff like that.

25         And, of course, there's no J&J guarantee under the

1  pre-restructuring world.

2         THE COURT:  Let me work backwards.  When do funds

3  come out of the funding agreement to pay claimants in a

4  bankruptcy?

5         MR. KATYAL:  So under the terms of the agreement,

6  first, LTL has to pay whatever they have.  And then New JJCI is

7  to pay whatever they have.  And then afterwards, anything else

8  if there's any excess, it goes to --

9         THE COURT:  What about the points Mr. Frederick makes

10  that no monies come out until all the appeals are resolved?

11         MR. KATYAL:  Well, I think that's true of course in

12  the regular tort system in the bonds under Rule 62 of Federal

13  Rules of Civil Procedures.  I don't think that's any different

14  from the standard system.

15         And, of course, here I think you've got to grapple

16  with Judge Kaplan's finding that there are -- you know, 49

17  trials have happened, Your Honor, to date in all of these

18  cases.

19         THE COURT:  Thirty-five have gone to verdict, right?

20         MR. KATYAL:  Yeah, very very few out of --

21         THE COURT:  So 18 you won, 17 you lost?

22         MR. KATYAL:  Yeah.  And then some of those were

23  reversed on appeal.  And as Judge Kaplan said, you know, we

24  have a very good batting rate for all of the reasons that our

25  briefs explain.  But, nonetheless, at the end of the day,

1 there's going to be financial distress because of the massive

2 number; 40,000 lawsuits and more being filed every day.

3       THE COURT:  Well, let's go back to you said the full

4 amount of all assets of Old JJCI are available to pay

5 claimants.  So, once again, you come back to my question.  Why

6 not file Old JJCI in the first place?

7       MR. KATYAL:  Yeah, for two reasons.  One is it would

8 reduce the number of the dollars actually available to

9 claimants because, forcing as Judge Kaplan found, Old JJCI into

10 bankruptcy reduces the value of JJCI.

11       THE COURT:  Except you've got a company that has --

12 is ongoing with very very profitable products that have been

13 well earned over decades.

14       MR. KATYAL:  And that's exactly Judge Kaplan's point,

15 which is you don't have to -- because of the funding agreement

16 because you get all of the good without the bad, you get the

17 full value of the company not subject to any creditors or

18 anything like that.  It's free and clear up to $61 billion, and

19 then you get a backstop from J&J.

20       And remember my friends, their brief says J&J has

21 better credit than the United States government.  So in terms

22 of which deal is better for the claimants, for all the

23 claimants, not just my friends sitting at the table but

24 including future claimants, which is a huge chunk as Congress

25 noted in 524(g) because of the latency period for asbestos.

1          THE COURT:  If I understand you correctly, if I'm

2    hearing you correctly, it almost sounds like J&J did this to

3    benefit the claimants.  They had the claimants' best interest

4    at heart and then they do this Texas Two Step.

5          But the timing doesn't suggest that.  The timing

6    suggests that this was really done for a litigation advantage.

7    As I understand it, LTL is created four months after the

8    Supreme Court denies cert in the Missouri litigation, and the

9    next day they declare bankruptcy.

10          So how do you reconcile that for me because I'm a

11    little troubled.

12          MR. KATYAL:  Absolutely, Your Honor.

13          And this is exactly what my friends said to Judge

14    Kaplan, and he rejected it on the facts, not litigation

15    advantage but four separate purposes.

16          The first purpose --

17          THE COURT:  But you concede that there is a

18    litigation advantage by doing this?

19          MR. KATYAL:  Well, I think it's a byproduct of this.

20    Absolutely.

21          THE COURT:  So there is a litigation advantage?

22          MR. KATYAL:  Well, I think it's a byproduct but, as

23    Judge Kaplan found, that wasn't the reason.

24          LTL has been transparent.  There's been lots of

25    discovery on this that Judge Kaplan referred to and said, no,

70

1  the reason for this is four-fold: First, that there's huge

2  defense costs to the tune of two- to five-million dollars per

3  case multiplied by as many as 40,000 cases.  You didn't hear a

4  word from my friends, they had a lot of time up here, they

5  didn't have an answer to what Judge Kaplan found.  That's a

6  huge deadweight loss.

7       Every one of these cases costs us millions to fight,

8  and even if the claims are meritless.  So that's all money that

9  could be going to the claimants but now is not going to the

10 claimants.  Instead, it's going to pay attorneys.

11      The second is, as I was saying to Judge Ambro, the

12 horrific impact is what Judge Kaplan called the massive

13 disruptions that would endure if Old JJCI was forced into

14 bankruptcy.  That's at Page A-47.

15      Third, the equity concerns for future claimants,

16 which is of particular concern here given Congress' hand-

17 crafted statute in 524(g) and this very long latency period.

18 We understand my friends have to zealously represent their

19 client before this Court.  They represent current clients.

20      What Congress is telling you is there's a worry about

21 latency and about future claimants, and this is a solution

22 that's comprehensive for everyone.

23      And, lastly, Your Honor, it's because Judge Kaplan

24 found that the bankruptcy process is a lot faster than the tort

25 process.  My friend talked about 6,800 settlements but doesn't

71

1   mention what Judge Kaplan said about that, which is he said two

2   things: One, that will be dwarfed by the 40,000 cases that have

3   already been filed and the many more that will come and, also,

4   he said that the past number of settlements won't occur in the

5   future -- and this returns to your question, Your Honor --

6   because of _Ingham_.

7           What _Ingham_ did was basically create a shiny object

8   for folks to try and keep their cases in the tort system with

9   the hope of a lottery-style big pay day.  Some people will get

10  home runs.  Most people, Judge Kaplan found, don't get a turn

11  at the bat.

12          That's what J&J -- excuse me, that's what LTL was

13  dealing with in this restructuring and that's why the funding

14  agreement is written the way it does.  It provides my friends

15  as well as future claimants a guarantee of at least $61

16  billion.

17          Now, Judge Ambro, I think you pointed out, well,

18  there's some kind of contradictions here, how much are the

19  claims really worth.  You know, and Judge Kaplan, of course,

20  talked about that in his opinion.  He said --

21          THE COURT:  Yeah.  I didn't see any strong defense of

22  his 190 billion.

23          MR. KATYAL:  Well, it's up to 190 billion.  And it

24  was just the defense costs.  And he got it by simply saying two

25  to five million dollars per case multiplied by 40,000 cases.

1          THE COURT:  But it was the high end of every --

2          MR. KATYAL:  Correct.  And we're not defending

3 necessarily --

4          THE COURT:  -- every case.

5          MR. KATYAL:  -- the high end, of course.

6          But we do -- we are defending vehemently Judge

7 Kaplan's conclusion after hearing from expert after expert

8 including Dr. Bell about the level of financial distress that

9 the company faced.  And my friends are asking you to re-weigh

10 the evidence and say, oh, well, these lawsuits actually don't

11 impose as much of a present liability or this or that.

12          Judge Kaplan evaluated all of that and found

13 financial distress, including most significantly in 2019 the

14 Consumer Division had a $2.1 billion profit.  And just the very

15 next year because, Your Honor, because of Ingham along with

16 other talc litigation, they had a $1.1 billion loss in one

17 year.  And talc liability, Judge Kaplan found, was responsible

18 for that.

19          If you look at the years 2018 to 2020 --

20          THE COURT:  Talc liability was responsible for a

21 significant portion of that, wasn't that correct?

22          MR. KATYAL:  Correct.  Yes, a significant portion of

23 that.

24          And the talc litigation, for example, Judge Kaplan

25 found from the years 2018 to 2020 costs 32 -- 27 percent of all

**WWW.JJCOURT.COM**

1  costs of Old JJCI and 32 percent in the year 2021.

2  THE COURT: But coming back to the -- at the outset,

3  if you have a parent company and it has a subsidiary that's

4  changed its name but the subsidiary's been there for 43 years.

5  And the subsidiary has a major problem with one of its products

6  that's caused mass tort litigation and some fear of what could

7  happen in the future.

8  Usually what happens over all these decades is you

9  file the subsidiary and you go from there. The concern -- and

10  you said that all of the assets of Old JJCI will be put into

11  play for funding the claimants' claims that are valid. And you

12  look at the next case, I think as Mr. Frederick said, and

13  you're worried about, okay, you don't have a Johnson & Johnson

14  consumer, you have Acme, you know, Acme, Inc.

15  I don't mean the grocery chain, by the way. I

16  apologize to them. I'm thinking of the old Warner Brothers

17  cartoons.

18  But that they don't have 61 billion. They are there

19  with maybe four or five billion at tops. They're going to run

20  out of things, and they're saying we're going to do this

21  divisional merger and go from there. And you can see that the

22  slippery slope comes into play and people are saying let's stop

23  this before it really gets out of hand.

24  MR. KATYAL: Right. Totally.

25  THE COURT: That's the concern.

74

1          MR. KATYAL:  We are very sympathetic to exactly that

2   argument, Your Honor.  So refer to three points.  One is you're

3   exactly right that the ordinary course is a subsidiary would

4   declare bankruptcy.  That's your own opinion joined by Judge

5   Fuentes in In re Owens Corning back in 2005.  That's exactly

6   what happened.  That's what this Court approved.

7          Second, we're not here defending something in the

8   absence of a funding agreement.  If there is no funding

9   agreement, that valid bankruptcy purposes that Judge Kaplan

10  isolated those four look very different.  They look like

11  litigation advantages.

12         But here, if you were to ask what is the litigation

13  advantage that is served that could somehow dwarf Judge

14  Kaplan's four different findings of valid purpose, it would be

15  -- you're hard pressed to do so because this deal gives -- this

16  restructuring and this petition gives actually more to the

17  claimants, now all the claimants including future claimants.

18         And that's what Congress is telling you've got to do.

19         THE COURT:  This funding agreement has a bifurcation.

20  It will fund in bankruptcy and out of bankruptcy.  Isn't that

21  correct?

22         MR. KATYAL:  I believe it only funds in bankruptcy.

23  I mean --

24         THE COURT:  So what's it do outside of bankruptcy?

25         MR. KATYAL:  I don't think it has any life outside of

75

1  the bankruptcy.

2          So, you know, basically it's a --

3          THE COURT:  So in <u>Ingham</u> when Johnson & Johnson

4  stepped up and paid, it did it for what reason?  Because of a

5  judgment was against it?

6          MR. KATYAL:  So, actually, it's just flatly wrong,

7  Your Honor.  <u>Ingham</u> was paid not by Johnson & Johnson.

8          THE COURT:  Okay.

9          MR. KATYAL:  It was paid by JJCI.  I don't know where

10  my friend is getting that from.  And, you know, indeed, I can

11  point you to different parts of the record which directly

12  contradict what he's saying.

13          THE COURT:  Of the 17 verdicts or of the portion of

14  the 17 verdicts not overturned on appeal, how many of those

15  verdicts also were against J&J?

16          MR. KATYAL:  I think some may have been against J&J

17  for derivative liability or something like that.  But all of

18  them were paid for by JJCI or now LTL.  Every one.  Every

19  dollar.

20          And so, you know, the 1979 agreement actually is

21  written to say it's a full transfer of liability to JJCI but it

22  also says full indemnification for J&J and everything has to be

23  paid for by JJCI or now LTL.  So any suit against J&J at any

24  point is always going to be paid by now LTL.  That's the logic

25  behind Judge Kaplan's finding on question two about whether the

1  stay should be extended to protected parties.

2      THE COURT:  One of the questions I asked the other

3  side, more than one counsel, is when you look at this picture,

4  are you taking into account just LTL or LTL and Old JJCI, and

5  their answer uniformly was LTL.

6      It sounds like from what you're saying that part of

7  the equation here is taking into account Old JJCI.

8      MR. KATYAL:  Well, we think actually -- we agree with

9  the U.S. Trustee that the relevant question is actually is

10 whether LTL as the petitioner is facing financial distress, but

11 we can understand why Judge Kaplan also made findings on Old

12 JJCI which --

13     THE COURT:  Yeah, because he specifically -- he

14 meshed them together.

15     MR. KATYAL:  Yes.  He found either way that there was

16 going to be financial distress.  And so we agree with -- you

17 know, we agree with the way Judge Kaplan approached it.  So

18 either way, whether you look at LTL and the litigations they

19 faced or you looked at Old JJCI and the litigations they face,

20 either way it's going to meet this Court's test for financial

21 distress.

22     What Mr. Frederick said is take a look at the three

23 cases that this Court has decided, BEPCO, SGL Carbon, and

24 Integrated Telecom.  We very much want you to look at those

25 cases because all three I think are miles away from this case.

1  In <u>BEPCO</u>, there were six litigations in total, six.  In <u>SGL</u>

2  <u>Carbon</u>, six complaints in the United States, one in Canada.

3  <u>Integrated Telecom</u>, a whopping one securities case at issue

4  there.

5          And most importantly, each of those cases --

6          THE COURT:  But in -- let's just take for example <u>SGL</u>

7  <u>Carbon,</u> it looked like what was being done was ultimately to

8  file for bankruptcy and in the end when you have a dissolution,

9  it will be under state law that will return equity back to the

10  equityholders which one would under the absolute priority rule

11  in bankruptcy not see happening.

12          MR. KATYAL:  So I think -- you know, I think <u>SGL</u>

13  <u>Carbon</u> really goes on the notion of few litigations and this is

14  done for litigation advantage.  That's Page 124 and 125 of that

15  decision.

16          Of course, here to the extent you're worried, Your

17  Honor, about what my friends said about somehow money being

18  paid to equity and a violation of the absolute priority rule,

19  as I was saying, the funding agreement captures that because

20  every dollar that goes to J&J from JJCI in the form of a

21  distribution at Page 4319 of the record makes very clear this

22  funding agreement says that just bumps up the value of new

23  JJCI, the amount available to the claimants.

24          THE COURT:  How would you propose in the example I

25  noted that you'd have a much less funded entity in bankruptcy

78

1  and a much less funded backstop, how would you propose that bad

2  consequences be blunted?

3          MR. KATYAL:  Through the Court's review process.  So

4  -- and even before the review process, of course, was the

5  524(g) solution because 75 percent of the claimants would have

6  to approve it and, Your Honor, as you said to my friend on the

7  other side, you always have the possibility of filing an

8  adversary action for fraudulent conveyance.

9          And, indeed, they tried some of that language in the

10  bankruptcy court.  They tried to suggest this was a fraudulent

11  conveyance.  But at this Court as this case comes to the Court,

12  they dropped all of that out because I think it doesn't cut the

13  mustard.  Here this funding agreement is --

14          THE COURT:  The only answer I got was it's premature

15  to do so now.  Let's figure out whether the filing was in good

16  faith and then they'll cross that bridge when they come to it.

17  I mean that's the answer that I got.

18          MR. KATYAL:  Yeah.  And I just don't think that

19  ultimately answers the question.

20          And I just want to return for a moment to those three

21  cases that my friend was referring to because pointedly they

22  distinguish between those six or seven litigations and the many

23  thousands, I think 16,000 that were at issue in Johns-Manville.

24  And they said that is the kind of -- certainly the kind of

25  flood of litigation that would create financial distress.

79

1          And here Judge Kaplan looked at the existing 40,000

2   litigations and said that is certainly enough for financial

3   distress given the numbers, the testimony from Dr. Bell that I

4   referred to earlier, and the like.

5          THE COURT:  Is LTL fully capable of satisfying the

6   talc claims?

7          MR. KATYAL:  By itself without a resort to the

8   funding agreement, we think the answer to that is no.  But with

9   the funding agreement, absolutely.

10         Our position, and Judge Kaplan found this too, is

11  that we believe that $61 billion, which is of course only a

12  floor, it could go up, is enough to pay a hundred percent of

13  all valid claims.  And when I say valid claims, it excludes two

14  things.  It excludes the deadweight losses of billions and

15  billions of dollars paid to lawyers for defending against this.

16         So the bankruptcy system avoids that, as Judge Kaplan

17  explained.  And second, this gets to a question that, Your

18  Honor, you asked Mr. Frederick, it excludes lottery-style

19  punitive damages.  You're absolutely right, we spent a long

20  time looking trying to understand does the bankruptcy system

21  bar punitive damages.  I think the answer to that is, no, it

22  doesn't bar them.  And we certainly think that -- but we think

23  that it would even it out to the extent there were any

24  available.

25         The way that I think the process would unfold, Judge

1  Ambro, is there's been an estimation expert appointed by the

2  name of Ken Feinberg, you know, obviously an expert in this

3  field.  He is going to look at the amount of liability and he

4  could, I suppose and probably we'll get briefing on, should

5  punitive damages be part of that estimation process.

6        THE COURT:  Does J&J have any direct liability in

7  this case?  And given the 50-year latency period of these talc

8  claims, right, does J&J have any direct liability or direct

9  exposure?

10       MR. KATYAL:  We don't think they have -- we certainly

11  don't think they have any exposure.  I'll walk you through the

12  language of the 1979 transfer.

13        So it first transfers, quote, all of the business of

14  the Baby Division to this subsidiary, JJCI, and all assets and

15  liabilities.  Judge Kaplan excerpted it at A-163 and A-164.

16  And then it says JJCI, quote, agrees to assume all the

17  indebtedness, liabilities, and obligations of every kind and

18  the subsidiary will forever indemnify and save harmless J&J

19  against all the indebtedness, liabilities, and obligations.

20  That is a very very strong indemnification.

21        So J&J -- and that's why since this has been written

22  in 1979, J&J hasn't paid a dime.  It has always been Old JJCI.

23  Now it's true there was a centralized account which is used in

24  lots of parents and subsidiaries in which J&J initially may

25  have sometimes paid that cash out.  But as the record shows, it

1 was always booked back to Old JJCI.  That's Appendix Pages 4107

2 and Appendix 8103.

3          And, you know, as I say, if you look at who paid

4 Ingham, it was not J&J.  It was JJCI.

5          THE COURT:  Why would punitive damages be a factor to

6 consider?

7          MR. KATYAL:  Because I think -- and Congress was

8 worried about this in 524(g).  Because you have the massive

9 number of future claimants with this long 50-year latency

10 period, you have to worry that a $2-billion verdict in Ingham

11 added to other punitive damage verdicts will take away from the

12 ability of future claimants to recover.

13          That's why we're here, Your Honor.  That's the

14 purpose.  You know, that's what Judge Kaplan found was the

15 purpose based on looking at this evidence.  I know it makes for

16 a good story to say, you know, this big company that has all

17 these profits is somehow trying to evade responsibility or

18 something like that.  And as I said, the agreements from 1979

19 on has always transferred all of that liability.

20          Now, Judge Ambro, you asked my friend on the other

21 side, well, what if this were done in 2014 or what if the

22 restructuring as opposed to now is the use of this Texas

23 divisional merger statute, what is the problem there.

24          And I think the Bankruptcy Code takes the debtor's

25 corporate structure as a given as it comes under state law.

82

1  And we followed here Texas law meticulously.  And I think it

2  would be a very dangerous rule for this Court if you were to

3  start line-drawing.  And I couldn't hear my friend's answer to

4  the questions about line-drawing, is 2014 okay, is last year

5  okay, is two days different or something like that.

6          And so I think that's one important point.  The other

7  is actually that 524(g) itself contemplates pre-petition

8  restructuring, and I would point you to 524(g)(4)(A)(ii)(IV).

9  Sorry about the --

10          THE COURT:  The long statute.

11          MR. KATYAL:  Exactly.  It is a long statute.

12          But it provides that a channeling injunction can bar

13  actions, quote, directed against a third party and arising by

14  reason of its involvement in a transaction changing the

15  corporate structure of the debtor or a related party.

16          And so if Congress thought that a full company is the

17  thing that must declare bankruptcy, I don't think it would have

18  included this provision in it.  Rather, I think Congress

19  anticipated basically that there would be pre-petition

20  restructuring.

21          I think it's notable that my friends for all their

22  saying they say we're inconsistent with the Bankruptcy Code,

23  what provision are we inconsistent with?  What provision are we

24  violating?  There's some meta principle I guess that they're

25  isolating, but they can't point to any particular provision.

1          THE COURT:  They're pointing out the gateway

2    provision that you have to file a bankruptcy in good faith.

3    And they're claiming that this was not done.  So that's what

4    we're talking about.  That's the primary issue today.

5          MR. KATYAL:  And if that's what they're isolating, we

6    think Judge Kaplan found four different reasons why that -- why

7    the valid purpose of bankruptcy has been served.

8          THE COURT:  One just fact question, in terms of the

9    proposal made here to deal with the liabilities of LTL and the

10   funding, were those types of proposals, any variation of that

11   made in connection with the MDL litigation?

12         MR. KATYAL:  I don't believe the funding agreement

13   had anything to do with the MDL litigation.  Rather, as the

14   Court found in --

15         THE COURT:  Yeah, I'm just saying the concept.

16         MR. KATYAL:  Yeah, I don't know about the concept.  I

17   mean I think the only thing I'm aware of is the Court's finding

18   in A15 relying on their own expert that this was a single

19   integrated transaction and so -- with the restructuring and

20   funding agreement.

21         Now you had asked before, Your Honor, I just have to

22   slightly correct something.  I understand that the funding

23   agreement does have provisions for funding outside of

24   bankruptcy.

25         THE COURT:  Yeah, that's what I thought.

84

1          MR. KATYAL:  Yes.  So I apologize for that.  But our

2 --

3          THE COURT:  What are the opt-outs that are being

4 considered?

5          MR. KATYAL:  So the 524(g) process has --

6          THE COURT:  People who can say I don't want to be

7 part of the bankruptcy, I'm going to opt out and go forward

8 with respect to my litigation.

9          MR. KATYAL:  Yeah.  So, I mean, I think Congress put

10 that into the statute itself saying there has to be a 75

11 percent requirement for the plan and then, of course, there's

12 two-court review.  So there's a lot that has to happen.

13          And I think the most important point about that is --

14          THE COURT:  You contemplate that this plan even

15 though it's not yet in place will allow for any type of opt-

16 out?

17          MR. KATYAL:  I don't know that we have gotten that

18 far.  I think that's a pre -- to use a word from earlier, I

19 think that's a premature question.  But I would say that, you

20 know, 75 percent threshold is of course very daunting.  We are

21 highly incentivized to put a good plan together because

22 otherwise we get returned to the mass tort system with all of

23 the uncertainty and all of the problems attendant to it.

24          And Judge Kaplan -- you know, my friend Mr. Frederick

25 said he wants you to write a decision really about these facts.

85

1  We absolutely agree.  Judge Kaplan has said time and again his

2  goal is to move this thing incredibly expeditiously.  My

3  friends on the other side said they thought this process could

4  be done as early as the first quarter of next year.

5         And Judge Kaplan has rejected time and again any

6  attempt to delay the bankruptcy process which looks very

7  different, of course, than what's going on in the tort system

8  as Your Honor was asking my friends on the other side.  Massive

9  delay, only a few trials to verdict.  And, you know, as Judge

10  Kaplan found, future trials are going to be even more delayed

11  and very few settlements because of the <u>Ingham</u> verdict and

12  other things.

13         And so you are asked to compare two different worlds.

14  One is the baseline of the pre-restructuring, pre-bankruptcy

15  world in which Johnson & Johnson owes nothing, in which some

16  people slowly get paid but that's subject of course to any

17  other claims against Old JJCI, any recovery.  There are huge

18  defense costs, and future claimants risk not getting paid with

19  all the latency.

20         And under the restructuring and the funding

21  agreement, instead, you have a very different world, one with a

22  $61-billion plus floor.  That money is guaranteed free and

23  clear.  You have a faster process so current claimants get paid

24  and future claimants have a voice at the table.  They have a

25  representative because that is under 524(g).  And, of course,

1  the claimants, including everyone sitting at that table, will

2  -- we have to persuade three-quarters of them that this is a

3  fair and equitable solution and then we have to persuade two

4  different courts about that, the bankruptcy court and the

5  district court after that.

6          And we will have, you know, Ken Feinberg's estimation

7  as part of that to start to break what otherwise has been an

8  intractability between the parties.

9          THE COURT:  Is LTL going to continue as a going

10  concern afterwards or is this just a liquidating trust, in

11  effect?

12          MR. KATYAL:  Well, we suspect that, you know, LTL

13  does have, for example a royalty business that will continue.

14          THE COURT:  How much does that bring in a year?

15          MR. KATYAL:  It brings in about $50 million, the

16  record shows, a year and is worth about $350 million.  So by

17  itself, Your Honor, to answer one of your earlier questions,

18  that isn't enough to -- that money isn't enough to avoid

19  financial distress.

20          And so if LTL doesn't restructure and doesn't have

21  the funding agreement available to it, then obviously, it's

22  going to be under water and have all the problems Judge Kaplan

23  referred to.

24          THE COURT:  What do you make of the stay?  Your

25  friends, as you keep referring to them, are adamant that the

87

1  Court would exceed its jurisdiction with respect to the stay,

2  issue number two.

3          MR. KATYAL:  Yeah.  We think that Judge Kaplan, as I

4  say, he identified five reasons why there is and crucial to all

5  five, and they're all independent of one another, they have to

6  run the table.  But I think one central idea he had is that

7  this involves the same basic claims during the same time

8  period.

9          And what he did is a limited stay against certain

10 parties, and it's a surgical one.  In order for a stay to

11 occur, two things have to happen.  One is --

12         THE COURT:  Surgical with 670 parties?

13         MR. KATYAL:  Yes.

14         THE COURT:  Non-debtors.

15         MR. KATYAL:  Yeah.  Well, but again, Your Honor,

16 we're talking about a massive amount of litigation.  670

17 versus, as I say, 40,000 claims that are currently in

18 existence.  I'll read to you the terms of this --

19         THE COURT:  How many insurers are we talking about of

20 that 670?  Is the whole shooting match 670?

21         MR. KATYAL:  I think it is; the whole shooting match

22 is 670.  The insurers, the list is at Pages A-249 and 250.  I

23 don't think it's very many.  It's like AIG, Prudential, and the

24 like.  Let me read to you the terms --

25         THE COURT:  How many retailers?

88

1            MR. KATYAL:  The retailers are -- that's a three-page

2   list at A-245 to '48.  There are a number of them.  It

3   includes, you know, CVS and things like that.  And here's what

4   it includes, and then let me tell you what it doesn't include.

5            THE COURT:  Okay.

6            MR. KATYAL:  It includes two things: one, claims --

7   or two things must have to happen.  The claim must first arise

8   from the manufacture or sale of talc-containing products by Old

9   JJCI or J&J and, second, that were asserted against or could

10  have been asserted against Old JJCI.  That's Joint Appendix

11  Page 195.

12            And so it's not, for example, a stay on unrelated

13  things like mesh litigation against J&J or anything like that.

14  And it's done, and this is crucial, it's done for a simple

15  reason, because if you can start suing, Judge Ambro, the

16  retailers like CVS or the insurers, that reduces the overall

17  pot of money that is available to the claimants, both present

18  and future.  And particularly in a world in which Congress has

19  said a 75 percent super majority threshold that we have to

20  convince --

21            THE COURT:  CVS has its own insurance, right?

22            MR. KATYAL:  CVS may have some of its own insurance,

23  but certainly, you know, I think that there will be

24  indemnification obligations that Judge Kaplan found were

25  automatic at Page A-181.  And so -- and I don't think automatic

1  is even the test, but even to the extent you thought it was,

2  there were automatic indemnity obligations.

3        And so I think what Judge -- what the logic behind

4  this stay is is that otherwise that limited amount of money

5  will be going to these other things and, therefore, reduce our

6  ability to actually persuade 75 percent of them to confirm a

7  plan which is of course what Congress is asking for here.

8        Congress looked at the problems with the mass tort

9  system, the problems with the MDL, which by the way here

10  include no state claims, include no meso claims.  It wouldn't

11  include <u>Ingham</u>, for example.  So -- and Congress decided that

12  MDLs wasn't the way to deal with this specific problem.

13        And so return to an earlier question you had, Your

14  Honor, about the precedent that's set, those four limiting

15  principles that I said at the outset we think are crucial here.

16  We're not saying that you can do this in other areas where you

17  don't have a latency problem.  But here you do.  You have a

18  huge number of future claimants, and Congress has isolated

19  specifically that out.

20        THE COURT:  But can be taken into account were one to

21  get a settlement in an MDL.

22        MR. KATYAL:  I'm sorry.  Could you --

23        THE COURT:  That could be taken into account were one

24  to get a global settlement in an MDL --

25        MR. KATYAL:  But an MDL will never give you the stay

90

1  that --

2         THE COURT:  -- litigation.

3         MR. KATYAL:  An MDL will never give you the stay on

4  litigation that is necessary to craft a kind of comprehensive

5  plan.  All an MDL does is coordinate pretrial proceedings.  And

6  --

7         THE COURT:  But they often do result in settlements.

8         MR. KATYAL:  They may result in settlements, but in

9  order to, Your Honor, I think to go that way, you're going to

10 have to jump over Judge Kaplan's findings about settlements in

11 which he found that because of Ingham and because of a variety

12 of other things, the past settlement rate is no guarantee and,

13 indeed, is not going to happen in the future, that fewer

14 parties are willing to settle because of Ingham and because of

15 other things like the FDA test and things he isolated at Joint

16 Appendix Page A-41.

17        THE COURT:  If settlement is a viable option in the

18 context of a bankruptcy via a plan, of course, why would it not

19 also be a viable option in an MDL?

20        MR. KATYAL:  Because you don't have -- for one thing

21 you don't have future claimants at the table.  So Congress has

22 specifically put in 524 --

23        THE COURT:  But a settlement could have provisions

24 for future claimants.  Could it not?

25        MR. KATYAL:  It could, but they don't have any voice

1    in the process.  And so the incentive is -- as, you know,

2    again, and I don't fault my friends, but their job is to

3    zealously advocate for current claimants, their clients.  There

4    is no -- that's why I think Congress wrote the statute in 524

5    that it did.

6          And, you know, could you imagine some hypothetical

7    world in which the MDLs do actually do all this?  I suppose you

8    could.  It's just there's literally no evidence that that's

9    ever happened in the amici briefs that are before you including

10   I would suggest The National Association of Manufacturers brief

11   at Pages 15 to 16 really goes into detail about the inability

12   of MDLs to actually provide any relief or any settlements,

13   actually, that generate payments to the claimants.

14         And so, again, to return Your Honor to the question

15   you asked my friend on the other side, which is what's the more

16   efficient solution, what's the way.  We've gone through this

17   process for year after year, and it's not working.  Congress

18   has given you a different approach, a different way to go in

19   524(g).  And what we've done is, through the use of this

20   funding agreement, provide a backstop that's much better than

21   they could get under the mass tort system, not for any one of

22   their individual clients but comprehensively and overall.

23         If I could, you had asked about the stay before, as

24   well.  And I'd also point you to I think the language of

25   362(a)(3) and this Court's decision in McCartney, which I think

1  as Judge Kaplan found was square precedent in saying --

2          THE COURT:  How many of the 670 are J&J entities

3  besides J&J itself and J&J Consumer?

4          MR. KATYAL:  I suspect that most of them are not and

5  you know -- are not J&J entities.  And our point is not to

6  benefit --

7          THE COURT:  Roughly how many are?

8          MR. KATYAL:  Your Honor, I haven't looked at those

9  appendix pages.  It would be I think it's Appendix Page 245 to

10 '50 list all of the protected parties.  So I'd point you to

11 those.  I just don't want to characterize them.

12         THE COURT:  It's in the hundreds, is it not?

13         MR. KATYAL:  I think there's many many other

14 entities.  Our point is this stay is not being done to benefit

15 them.  It's not being done to benefit --

16         THE COURT:  Have they been sued in these various 49

17 actions that have gone to trial so far in the United States or

18 almost went to trial, I should say?

19         MR. KATYAL:  I'm not sure if they were sued in them.

20 I'm sorry, Your Honor.  I don't believe so but I'm not

21 positive.  I think there are litigations against them.  And the

22 purpose that we're seeking for the stay is not to benefit them

23 or to benefit J&J.  It's rather to hit pause and make sure that

24 the corpus of funds is not available.

25         And we feel so strongly about this that if we weren't

1 able to get the 362 or 105 stay, this first question about

2 financial distress and valid bankruptcy purpose doesn't help

3 us.  The petition is basically meaningless for the reasons

4 Judge Kaplan found.  We need that stay because otherwise

5 plaintiffs will sue for these very same claims.  They'll sue

6 some other entity, and that will hurt us in forms of the

7 indemnification.

8         THE COURT:  But if it's not Johnson & Johnson or

9 Johnson & Johnson Consumer, which have been involved in

10 connection with this process, how could they possibly win

11 against Johnson & Johnson, you know, Floor Covering or

12 whatever?

13         MR. KATYAL:  They'll be indemnified.  So whoever the

14 entity is that's sued, they'll be indemnified, they'll share

15 insurance policies.

16         THE COURT:  But the point being that the suit's not

17 going to win against them.  I mean Johnson & Johnson was the

18 one involved until 1979 with the talc products  Then it was

19 Baby Products which later became Consumer, and now it's LTL.

20         These other entities in the hundreds, what I don't

21 understand is why this stay is so broad.

22         MR. KATYAL:  Because those are, and Judge Kaplan

23 looked at the claims, the same claims.  It's just a different

24 place in the supply chain.  And it's pretty common in these

25 mass tort cases to sue, you know, everyone in the chain, the

1  insurer, the retailer, and the manufacturer.

2          And to be sure, we think at least with respect to

3  suits against J&J, they wouldn't have viability.  But as Judge

4  Kaplan also found, you know, even a very low success rate is

5  enough to create financial distress.

6          THE COURT:  That's because of the indemnification

7  agreements, correct?  It would bleed --

8          MR. KATYAL:  The indemnification, insurance.

9          THE COURT:  It would bleed the fund.

10          MR. KATYAL:  Exactly.  It would bleed the fund.

11 Exactly.

12          And, again, with a 75 percent threshold that we have

13 to meet in order to confirm a plan, you know, if the fund is

14 bled and insurance proceeds are dropped or things like that,

15 it's very hard.  And then there's also of course the

16 possibility of record taint, as Judge Kaplan also found.

17          So those are all different reasons why the stay looks

18 the way it does.  And, you know, I understand it's a large

19 number of parties, but it's a large number of parties for a

20 very important reason.  There's a large amount of litigation in

21 this space, and 670 is an appropriate amount.

22          Now if you disagree and you're worried about it, as

23 Judge Kaplan also said, I think it's at A-173, he will have the

24 parties come back and have to continually justify the breadth

25 of the stay.  And, of course, anyone can come in and try and

95

1    lift the stay or something like that.

2    We're incentivized throughout this entire process to

3    make sure that we move expeditiously and quickly to try and

4    develop a plan that 75 percent of them can agree because

5    otherwise, as Judge Kaplan has said, he's going to dismiss the

6    bankruptcy petition.  He said it's really important that this

7    all move incredibly fast, and we are as incentivized as it

8    comes to make sure of that because otherwise, we're stuck in

9    the old pre-restructuring world.

10    THE COURT:  And the U.S. Trustee is saying with

11    respect to that, that's a matter for Congress in terms of

12    picking one system versus the other.

13    MR. KATYAL:  Well, we do think Congress has exactly

14    picked that in 524(g), Your Honor.  And so, you know, to be

15    sure, if we violated some state law, violated the Texas

16    divisional merger statute in some way, shape, or form, that's a

17    problem and Congress would have to fix that by allowing

18    something.

19    But here, we complied with everything in that

20    statute.  And the Bankruptcy Code takes state law as it finds

21    it.  And we understand that there's a way to abuse the

22    divisional merger statute.  We don't doubt that.  It's just

23    that in this case, we think you should write a limited opinion

24    just as the bankruptcy court did that says with this funding

25    agreement, this is a valid purpose and this is an appropriate

1  amount of parties to be stayed.

2          THE COURT:  In connection with the stay, which Judge

3  Restrepo brought up, an opening question I have is the

4  jurisdiction of the Court, is it a core proceeding, in other

5  words saying that it's core by virtue of 362(a)(1) dealing with

6  a debtor or 362(a)(3) dealing with the debtor's property or is

7  it related to?

8          I have a dumb question.  If it's just related to and,

9  therefore, non-core, doesn't a bankruptcy judge have to go to

10  the district court with a report and recommendation and have

11  the district court sign off?

12          MR. KATYAL:  I'm always scared, Your Honor, when you

13  ask a dumb bankruptcy question.  I'm starting to get worried,

14  but I think the answer --

15          THE COURT:  I've said to a couple of people this is a

16  dumb question, but --

17          MR. KATYAL:  No, I think the answer is --

18          THE COURT:  -- if it's related to --

19          MR. KATYAL:  -- I think you have it exactly right

20  that it is something that the district court would have to

21  approve if it's related-to jurisdiction.  Of course, here, it's

22  362 that we're placing predominant emphasis on and also the

23  other parts of 105 under arising-in and arising-under.

24          And if I could walk you through that.  So for

25  362(a)(1), there are two different theories the bankruptcy

97

 1  court found.  One is that this is -- these are lawsuits that

 2  are virtually against the debtor.  And so he said it fits under

 3  the very first clause of a proceeding against the debtor.

 4       And then he also said it's, quote, a claim against

 5  the debtor under the second part of 362(a)(1).  We think the

 6  second part is the right way to think about this, that these

 7  lawsuits are in effect for reasons that Your Honor mentioned

 8  before effectively against the debtor, and it's a claim against

 9  them.

10       And as the Second Circuit said in <u>Colonial Realty</u>,

11  that second part of (a)(1) has to have some meaning.  It can't

12  just literally be suits against the debtor.  It includes third

13  parties.  At least here where the third-party lawsuits involve

14  the same basic claims during the same time period.

15       And then there are questions about 105 and arising-in

16  and arising-under.  And we think there that, you know, the

17  automatic stay is --

18       THE COURT:  Well, arising-in and arising -- it's hard

19  for me to say 105's arising-in or arising-under.  Arising-under

20  means it's explicitly given to you in the Code.  Arising-under

21  means it comes to you as a result of something else that's in

22  the Code.  105 is sort of one of those things that implements

23  something that otherwise may be given to you.  It's --

24       MR. KATYAL:  But I think here the theory is, and many

25  courts have done it, including the court below, is to say that

Case 23-01092-MBK Doc 003 Document Filed 04/17/23 Page 151 of 286 Entered 04/17/23 19:45:43 Desc Main
Document     Page 151 of 286

98

 1  362 is the thing given to you in the Code, the automatic stay.

 2           THE COURT:  As for the debtor.

 3           MR. KATYAL:  Exactly.

 4           And then as -- in order to safeguard the vitality of

 5  that and to make that process work, you need a stay against

 6  others, not that the Court will adjudicate on the merits, of

 7  course, those other cases.  It's just a temporary pause under

 8  362 and 105 to make that process work.

 9           THE COURT:  My perception based on a lot of anecdotes

10  over the course of years is that most courts just say, okay,

11  we're going to be practical about this, we're going to put this

12  in play and go from there.  Basically it's a pause, we need

13  this pause in order for people to negotiate on and on and on.

14  And --

15           MR. KATYAL:  And we don't --

16           THE COURT:  And they glide over some of the

17  jurisdictional issues.

18           MR. KATYAL:  Yes.  I certainly think that's happened.

19  But I do think like the court in McCartney really did, I think,

20  you know, go into some of those jurisdictional issues.  And of

21  course A.H. Robins in the Fourth Circuit really in detail tried

22  to flesh out these different points.

23           But, Your Honor, absolutely, to the extent this Court

24  is worried about the breadth of this stay, if you don't think

25  it's surgical, we obviously do, but the remedy for that is that

1 very practical one which Judge Kaplan has already said he will

2 do, which is to make sure and police this stay for the

3 protected parties to make sure it is the same claims and that

4 it is justified.

5         Were not here to try and just stop litigation for its

6 own sake.  We're doing it in order to protect the integrity of

7 the process.  And as I say, it's so important to us.  The

8 entire first question is just not helpful to us unless we have

9 this stay in place.

10         THE COURT:  You have about -- since you don't get

11 rebuttal, as the appellee, I'm going to give you a chance to do

12 some summing up.

13         MR. KATYAL:  Great.

14         And if I could, there's just one -- I want to respond

15 to one other thing my friend said on the other side --

16         THE COURT:  Go right ahead.

17         MR. KATYAL:  -- which is that JJCI could be spun off,

18 he said, under this and that that will be problematic.  But the

19 funding agreement itself says that if there is a spinoff,

20 Paragraph 4(b) of this and this is Appendix Page 4239, says

21 that itself will be considered part of the fair market value.

22         So, again, this is an agreement that increases in

23 value over time as JJCI increases in value.  The claimants get

24 the upside of all of it.  And if they're -- to the extent

25 they're concerned whether it's distributions or spinoffs, the

1  agreements itself polices those things.

2          And we're asking you here, Your Honor, for a limited

3  ruling to affirm Judge Kaplan based on his factual findings.

4  We know this is a painful case.  We know this is hard for

5  everyone involved.  But Judge Kaplan in the very last page of

6  his second opinion, he said, you know, delay is something that

7  he thinks about all the time as the claimants die.

8          And the best way, the most efficient way to actually

9  provide claimants with relief, both present and future, in an

10  even-handed equitable way that avoids the deadweight losses of

11  millions and millions of dollars being given to lawyers is

12  through this solution.

13          And if you're worried about whether it's fair or not,

14  they have remedies, the 75 percent vote, the two-court review

15  vote.  And that's why we think Judge Kaplan got it right.

16          THE COURT:  Thank you.

17          MR. KATYAL:  Thank you.

18          THE COURT:  What we will do is we'll take about a

19  five-minute break and we'll come back -- well, let's see.

20  We'll come back at 4:30 and be out of here at 5.

21                     (Recess)

22          THE CLERK:  All rise.

23          THE COURT:  Thank you.

24          We'll have rebuttal.  Mr. Lamken?

25          Can I ask you one of the things, and maybe you're not

1  the one to deal with it but if not maybe Mr. Frederick can.

2  How are you going to deal with the future claimants?  How do

3  you propose that be done?

4          MR. LAMKEN:  So, Your Honor, I think that for future

5  claimants, that doesn't tell us what an answer to my

6  fundamental pitch which is it doesn't tell us whether you

7  should have JJCI in bankruptcy or you should have LTL --

8          THE COURT:  I agree.  I agree.  But the point is that

9  if you don't have a bankruptcy, you're going to have an MDL

10 process.  And in an MDL process, how do you make sure that

11 future claimants are dealt with fairly?

12         MR. LAMKEN:  Right.  And I think in cases like the

13 diet drug cases, they did actually come up with a mechanism to

14 deal with future claimants because those cases also have a

15 tail.  There are ways of appointing people in order to

16 represent future claimants and come up with a structured

17 settlement that will handle it consistent with due process.

18         But until we actually have a valid bankruptcy, we

19 don't have a way of dealing with future claimants in

20 bankruptcy.  And I think that's really where I want to start

21 with is, look, the difficulty here is we don't have a good-

22 faith bankruptcy in the first place because the whole thing is

23 structured to evade bankruptcy's principles.

24         THE COURT:  So if we undo the bankruptcy, what

25 happens?  How  does this case go forward?

1          MR. LAMKEN:  There's two options there.  One would be

2    that J&J may decide we're going to put Old JJCI in bankruptcy.

3    And then we actually have just like <u>Johns-Manville</u>, just like

4    every other bankruptcy in history --

5          THE COURT:  But how does that advance the ball for

6    your client?

7          MR. LAMKEN:  Well, it advances the ball in multiple

8    ways.  First, when it comes to the priority rules, it means

9    that equity doesn't get paid ahead of creditors here.  It means

10   that we don't sit in bankruptcy literally dying while billions

11   of dollar go out to equityholders --

12         THE COURT:  But doesn't the funding agreement address

13   that concern?

14         MR. LAMKEN:  Actually, it doesn't.  The funding

15   agreement will increase the amount that's available by the

16   amount that's paid to equity.  But the absolute priority rule

17   doesn't say go ahead and pay equity as long as you have an

18   unsecured promise to pay an equal amount to creditors later on.

19         The absolute priority rule says until you have

20   satisfied your creditors, you don't give anything to equity, at

21   least not without their consent 75 percent and the court

22   approval.  And that is one of the reasons why it just

23   fundamentally undermines the incentives here, because J&J can

24   operate its businesses as before including all the assets of

25   Old JJCI outside bankruptcy without bankruptcy court

1  supervision, paying equity, paying other creditors, while one

2  category of creditors sits in bankruptcy.

3       And I think that's the critical thing is that you've

4  actually taken one set of creditors, injured talc victims, and

5  put them in bankruptcy alone.  Trade creditors get paid ahead

6  of us.  We're behind, and that is a fundamental distortion of

7  the bankruptcy process.

8       Since history, the way to do it is to just simply

9  take your bankrupt company if you're financially distressed and

10  put that company in bankruptcy.  And I think the problem is

11  that --

12       THE COURT:  But their point is that no claimant with

13  a valid claim fairly estimated is going to be out a dollar.

14  Now there may be a significant delay if there is an appeal, but

15  in the end, that full claim will be paid.

16       MR. LAMKEN:  Your Honor, first, I don't think the

17  Bankruptcy Code says you may follow my principles unless you

18  give us an unsecured funding agreement that eventually may pay

19  everybody.  The Bankruptcy Code has structures that are meant

20  to be followed.  And if you've created your structure in order

21  to evade those bankruptcy --

22       THE COURT:  I think what they're saying is that this

23  is a case that's *sui generis*.  We're not talking about the next

24  case.  We're saying that with this, you are never or perhaps

25  almost never ever going to get this kind of backstop again.

1          MR. LAMKEN:  Not only that, Your Honor, but if this

2     goes forward, if J&J can do this, this is actually the model

3     for the future.  Who wouldn't do a build-your-own bankruptcy

4     where you choose, okay, which creditors I'm going to keep

5     outside of bankruptcy and pay them right away, which creditors

6     I'm going to put in bankruptcy and make them wait, which assets

7     am I going to put outside bankruptcy, and which assets will I

8     put in bankruptcy, or will I just put an unsecured funding

9     agreement subject to defenses like if you fail to indemnify me,

10    I can stop paying the funding.

11         Those are dramatically different things and with

12    bankruptcy --

13         THE COURT:  But I think what they're saying is that

14    or the response to that would be, okay, the creditors that we

15    paid before were because we hadn't gone into bankruptcy yet.

16    Once we've gone into bankruptcy, those creditors, those

17    claimants are all going to be treated in a way in which there

18    won't be as many strikeouts as there might otherwise be if

19    there were litigation.

20         MR. LAMKEN:  So, Your Honor, to the extent that

21    sometimes people prevail before juries and sometimes they

22    don't, that's a function of the system that the framers

23    established 200 years ago, where we entrust the common man, 12

24    of them, to make these determinations and to find facts and

25    make determinations.

1    The notion that, well, bankruptcy might actually sort

2    of even out the balance isn't a way of indicting the tort

3    system that 50 states have operated to compensate victims for

4    200 years.  But even setting that aside, that still doesn't

5    answer the question of why LTL as opposed to JJCI?  Why not

6    take the company that was the tortfeasor, that supposedly was

7    in financial distress and put it and its assets into bankruptcy

8    to satisfy the way it's done it before?

9    And what we were told here is, well, the bankruptcy

10   court looked at that and the bankruptcy court said, gee, that's

11   going to be very costly.  And I think the -- actually the court

12   said it's too much value to waste.  But when it comes to the

13   Bankruptcy Code, it's not a waste to enforce the absolute

14   priority rule so that people don't pay equity ahead of

15   creditors.

16   It's not a waste to --

17   THE COURT:  To further round that, I mean maybe it

18   was just an offhand comment that Mr. Katyal made, but -- and

19   I'm going to add on to it.  Almost every right that's given to

20   a creditor in bankruptcy like who is secured, who's not, is

21   something that's outside bankruptcy.  Non-bankruptcy law tells

22   you who has these particular rights inside of a bankruptcy.

23   And that's basically following the Butner case from '79.

24   Transpose that to the corporate area that corporate

25   law is not affected by the bankruptcy.  And corporate law

1 allows for a divisional merger. And if corporate law allows

2 that so all that we are dealing, as you say, is just LTL

3 itself, why is LTL not in some type of financial distress if

4 that's the only one we're looking to and luckily has somebody

5 who's willing to come to its -- meet all of its funding needs

6 with respect to the future of the bankruptcy?

7    MR. LAMKEN: So, Judge Ambro, I think from the outset

8 when we say we take the a debtor as we find them, when you're

9 describing, when deciding good faith, under cases like the new

10 debtor syndrome cases, courts ask who's my debtor, where did it

11 come from, and why is he here.

12    And the answer to those questions here is whose my

13 debtor, it's an artificial entity created for bankruptcy; why

14 is he here, he's here so talc claimants will be in a single

15 class by themselves in bankruptcy and everybody else is outside

16 bankruptcy; why is he here, he's here so that JJCI's assets,

17 its operating business is outside bankruptcy beyond the

18 bankruptcy court's reach.

19    And only, only an unsecured funding agreement subject

20 to defenses is available to talc claimants. That means that,

21 you know, you don't just accept them as they find them when you

22 have that sort of a purpose. And I think, Judge Ambro, that

23 actually distinguishes the Chapter 11 rundown cases you

24 described.

25    When you have a Chapter 11 rundown case as I

1 understand it, Goodco and Badco are both in the bankruptcy,

2 both subject to the court's supervision. This is the exact

3 opposite. One company is in bankruptcy subject to the court

4 bankruptcy -- the bankruptcy court's jurisdiction. But

5 everything else that happens, all of Old JJCI's assets as

6 they're operated, this spinoff, everything else that happens --

7      THE COURT: What provisions of the Code if Old JJCI

8 were in bankruptcy, what provisions of the Code do you think

9 would apply that you would want to take into account with

10 respect to Old JJCI?

11      MR. LAMKEN: So the absolute priority to begin with,

12 which is not a specific provision of the Code, but it's an

13 inflection from history and the structure of the Code where you

14 don't pay creditors, you don't pay equity ahead of creditors.

15      And that puts a lot of pressure on people to come up

16 with a good plan to the benefit of the creditors, and not do

17 what Bestwall is doing now and let things go for five years as

18 people are rapidly failing.

19      The second one would be --

20      THE COURT: And I should have asked this before.

21 Spin out the absolute priority concept here. This is not like

22 SGL where they're going to do a state court -- or a state

23 dissolution and have all the money go to equity after the

24 bankruptcy.

25      What monies are going to equity during the course of

1 this bankruptcy?  Are you saying dividends?  Is that what

2 you're talking about?

3         MR. LAMKEN:  Yeah, well, there's dividends and

4 there's also $5 billion for a spinoff that was announced or $5

5 billion for a stock buyback that was announced last week.

6         So -- and the fact that you can continuously in

7 bankruptcy pay equity means that there's far less pressure to

8 actually achieve a plan that the creditors can live with.  You

9 can wait longer and longer just as <u>Bestwall</u> did.

10         But I'd also point to Section 363 which is your non

11 --

12         THE COURT:  Wait, you say stock buyback.  The stock

13 buyback is not for LTL.  The stock buyback is for Old JJCI.

14         MR. LAMKEN:  Exactly.

15         And the divisional merger was structured and the

16 funding agreement is structured specifically to allow J&J to

17 spinoff assets without anybody, any of our creditors, being

18 able to do what they would be able to do under Section 363, if

19 you had put the actual tortfeasor, the people funding this,

20 JJCI -- Old JJCI into bankruptcy, which would be they get

21 notice and an opportunity to be heard.

22         And the bankruptcy court would be able to supervise

23 it and to make sure that those assets are indeed available to

24 the creditors at the end of the day.  None of that, none of

25 that exists because instead of doing what one does ordinarily

1 and putting a bankruptcy -- the whole entity into bankruptcy,

2 they've simply hived off one set of claims, put them into

3 bankruptcy and taken all the assets, all the operating things

4 and all the famous brands and operate them outside of

5 bankruptcy.

6 And just I think the key thing here is <u>Jevec</u> makes it

7 clear from the Supreme Court that it's just not permissible to

8 say I have provided something that I think is better for the

9 creditors.  When you're talking about bankruptcy, the specific

10 provisions of the Code are important.  And the Code here

11 ordinarily requires absolute priority rule, Section 363

12 supervision of spinoffs and other non-ordinary course

13 transactions.

14 And even 524(g) requires that you put in equity

15 securities, securities of the debtor, with a right to

16 dividends.  But we have now swapped out one debtor, a valuable

17 business JJCI with famous brands, for a completely different

18 debtor which is LTL.

19 And I'd like to sort of turn if I could for a moment

20 to the injunction.  And I think the serious problem with the

21 injunction is this.  Section 105 simply doesn't say you can

22 reach out to non-debtors, 670 of them, and enjoin them on the

23 basis of, well, gee, I think it has some relationship to the

24 estate.  You actually have to have a clear right to relief.

25 The problem --

1          THE COURT:  What you're saying is that there's not an

2    identity of interest other than the fact that it has the same

3    corporate parent?

4          MR. LAMKEN:  Exactly, Your Honor.

5          In fact, the record is very clear that you can't do

6    this here because J&J has its own independent liability for its

7    own tortuous misconduct.  For example, in <u>Ingham</u>, as we've

8    mentioned, J&J had a higher multiple on punitive damages

9    because.

10         And I'll quote:

11         "Because defendants decision to chart their course of

12              reprehensible conduct began long before JJCI was spun

13              off as a separate entity."

14         J&J made all the health and safety decisions.  It

15    ignored its own scientists for decades on end.  And actually,

16    it worked tirelessly to make sure that industry standards would

17    not change to make asbestos that's otherwise undetectable

18    detectable."

19         That's on Pages 716 to 717 of <u>Ingham</u> and Pages 5841

20    to 5892.  And it personally individually told -- falsely

21    advertised that baby powder does not contain asbestos and never

22    will and that it tested every lot to make sure.

23         And juries have repeatedly found J&J liable

24    separately from JJCI.  This is not a case of derivative

25    liability.  It is an instance of independent liability.  For

1  example, Echeverria in California, 97.8 percent of the

2  liability was given to J&J, not JJCI.

3        If you look at Page -- the verdict sheets on Page

4  4532, 4592, and there's a summary at 4704 and 4627.  They are

5  regularly giving more liability to J&J than JJCI,  This is not

6  a case of derivative liability where J&J because it's the

7  corporate parent has some liability.  This is J&J's own

8  misconduct.  And when one is going to enjoin that type of

9  liability, you need more than what the Court came up with here.

10       For example, and even 524(g), if you want a

11  channeling injunction, it says the channeling injunction and --

12  Combustion Engineering addresses this specific issue -- 524(g)

13  says when you have a channeling injunction, it applies only to

14  the debtor, and you can go beyond the debtor when the liability

15  is derivative because it comes from those corporate

16  relationships.

17       But the liability here isn't from corporate

18  relationships.  It's liability for J&J's own misconduct.  And

19  so you couldn't get a channeling injunction under 524(g) for

20  the liability of J&J.  Why under 105 on a preliminary basis are

21  you going to give that injunction and prevent talc claimants

22  from actually getting satisfaction when waiting for the

23  possibility of a 524(g) plan?  It simply doesn't make sense.

24  It takes those statutory provisions and it sets them on their

25  heads.

1       And the net result is there's simply no ability of

2   tort claimants to come forward and have any ability to pursue a

3   reasonable plan here because they're frozen in their tracks.

4   J&J, it's got all the liability against it frozen.  650 other

5   people, that's frozen.  LTL, our made for bankruptcy debtor,

6   frozen, as well.

7       What is the leverage they have?  Nothing.  It simply

8   shuts everything down.  And you can't do that under 105.  You

9   can't do that under 362(a) when it is its own independent

10  liability.  And there's a key provision here that I don't --

11  key finding by the district court that I don't think I heard

12  Mr. Katyal mention, and it is this.

13      The district court found, and this is again 159,

14  that the shared identities of interest were based on allocation

15  of agreements to the debtor -- that means indemnification

16  agreements that they hived off and gave to the debtor -- shared

17  insurance agreements that they gave to the debtor on the eve of

18  bankruptcy, quote, "for the very purpose of extending the

19  stay."

20      That is an effort to create equity through agreements

21  on the eve of bankruptcy.  And that doesn't work for two

22  reasons.  One is Combustion Engineering saying you can't by

23  agreement establish jurisdiction.  But it also doesn't work as

24  a matter of equity.  As a matter of equity, two parties can't

25  enter into a contrivance and agreements on the eve of

1 bankruptcy and say, aha, we now have a right to injure third

2 parties and prevent them from pursuing other parties that have

3 their own independent liability.

4         Ultimately, the problem here is that J&J decided to

5 take a corporate shell, LTL, and put it into bankruptcy.  But

6 then it turns around and says now that we've put this corporate

7 shell into bankruptcy, we want an injunction that protects not

8 just the corporate shell, it protects us from our own

9 independent liability, that protects retailers from their own

10 independent liability, that protects everybody from their own

11 independent liability.

12         But that's completely topsy-turvy.  If we're going to

13 accept putting LTL in bankruptcy, the automatic stay and any

14 possible stay under 105 would extend to just LTL.  It wouldn't

15 extend to everybody else.  But we really shouldn't be saying

16 we're going to accept LTL as our debtor here because of the

17 very purpose of putting LTL into bankruptcy was to make sure

18 that talc claimants were treated differently or -- treated

19 differently.

20         I know one of the questions that came up here was,

21 well, how do we determine, what if it was, you know, 1994 when

22 they did the divisional merger or what happens if it was 1979.

23 And I think the short answer is two-fold.  One is in this case,

24 it was two days before bankruptcy.  In this case we know

25 exactly why it was done.  It was done to manipulate the

114

1  bankruptcy.  It was done to make sure that it was structured in

2  a way where JJCI would be out of bankruptcy and -- or its

3  assets would be out of bankruptcy and only talc claimants would

4  be in bankruptcy.

5          And that provides a very clear answer alone.  So it's

6  not just a matter of time; it's a matter of what the purpose

7  was.  If we look back and we have a non-bankruptcy purpose for

8  years on end that says, yeah, we've established this as a

9  meaningful way, we've not only given liabilities, we've

10 actually given them a business and they're operating that

11 business for years and they're building up assets and goodwill.

12 And it's a real company that's operating.

13         That's a very different scenario from saying we've

14 now created a company solely for the purpose of bankruptcy.

15 We've given it all the liabilities for just one set of

16 claimants, and we've done it for the purpose of keeping certain

17 assets out of bankruptcy so we continue to pay dividends,

18 continue to operate the brands, and continue to do so without

19 the bankruptcy court supervision that would otherwise be --

20         THE COURT:  Indeed, what you just said, that's your

21 principle theme, isn't it?

22         MR. LAMKEN:  That is my principle theme, Your Honor.

23 I think that really sums up the problem here.  I think -- and,

24 in addition, I think I should also stress in the end, it can't

25 be both it's all right to put LTL in bankruptcy and then to

1 extend the injunction to everybody else.  By definition, you

2 just end up going way beyond all party -- the parties specified

3 by 362 --

4 　　　　　THE COURT:  Yeah.

5 　　　　　MR. LAMKEN:  -- the norm under 105.  You understand.

6 　　　　　THE COURT:  Thank you.

7 　　　　　MR. LAMKEN:  Thank you, Your Honor.  I appreciate

8 that.  If there's no further questions, thank you, Your Honor.

9 　　　　　THE COURT:  No further questions.

10 　　　　　I know Mr. Frederick reserved some time.

11 　　　　　Mr. Janda, did you have anything further to say?

12 　　　　　MR. JANDA:  I did not reserve any time, Your Honor.

13 But if you would like to hear from me?

14 　　　　　THE COURT:  Yeah, I'll give you two minutes.  Do you

15 want two minutes?  It's your call.

16 　　　　　MR. JANDA:  Thank you, Your Honor.

17 　　　　　Just three points I'd like to make real quick.

18 　　　　　So first is, you know, we've heard a lot of talk

19 today about what system, tort system or the MDL system or the

20 bankruptcy system, is better for which set of parties, current

21 claimants, future claimants, defendants.

22 　　　　　And I think the point here is just that there's a

23 very complicated admittedly balancing of interests of trying to

24 get claims resolved efficiently, to get claims resolved

25 correctly, to get claims resolved equitably, and to ensure that

1  people are able to exercise the rights that they have, their

2  constitutional rights, their due process rights, their jury

3  trial rights.

4           And that complicated balancing of interests has been

5  done by Congress.  Congress has enacted a number of different

6  aggregation mechanisms and has enacted the Bankruptcy Code.

7  But the Bankruptcy Code Congress has enacted and provides

8  strong tools to defendants only in a limited set of

9  circumstances as this Court said, those strong tools invite

10 abuse.  And it's really up to the courts to police the

11 boundaries of that system to ensure that it's not being used

12 for reasons that Congress didn't intend it be used.

13          And I don't think 524(g) changes the analysis in any

14 way.  524(g) pre-supposes you have a valid bankruptcy and

15 Congress has determined that 524(g) provides an appropriate

16 tool in bankruptcy once you have a bankruptcy to make sort of

17 the best of a bad situation.  But I don't think you can sort of

18 bootstrap your way into bankruptcy to try and take advantage of

19 the tool that pre-supposes the valid bankruptcy in the first

20 place.

21          Second, just very quickly on financial distress, I

22 heard my friend on the other side say two things that I think

23 together could resolve this case on their own.  I mean one is

24 that he says LTL is the appropriate entity and, two, is that in

25 his view or in LTL's view, the total legitimate value of all of

1  the current and future tort claims against it is less than $61

2  billion which he has access to under the funding agreement.

3          You put those two things together and I don't see how

4  you can make any argument that there is a legitimate financial

5  distress here on the part of the debtor that justifies invoking

6  bankruptcy maybe ever and certainly not at this point.

7          And then, third, just very briefly, you know, as we

8  said, bankruptcy provides a lot of tools.  It's a very strong

9  medicine.  It curtails creditors' rights in significant ways

10  including allowing debtors to bind non-consenting creditors,

11  possibly many non-consenting creditors to one particular

12  resolution.

13          And that is appropriate when you have a debtor facing

14  financial distress that needs that time to reorganize its

15  affairs or to pursue an orderly liquidation.  But it's not

16  appropriate every time you just have a lot of tort claims

17  against an entity when those pre-conditions aren't met.  And

18  that's just the case here.

19          THE COURT:  Thank you very much.

20          MR. JANDA:  Thank you, Your Honor.

21          THE COURT:  Mr. Frederick, I know you reserved three

22  minutes.  We'll give you five.  Since you're batting clean-up.

23          MR. FREDERICK:  Thank you very much, Your Honors.

24          I want to start with the trilogy of Third Circuit

25  cases because the main point made on the other side was that

118

1  they didn't confront mass torts.  But the <u>SGL Carbon</u> case in

2  announcing why the good-faith standard was so important had an

3  extensive discussion of <u>Johns-Manville</u>.

4          And the point that it was making was that <u>Johns-</u>

5  <u>Manville</u> had tried for many many years to pay off claimants and

6  until it got to a point where it did face imminent financial

7  distress because --

8          THE COURT:  There was no doubt that <u>Johns-Manville</u>

9  was in financial distress.

10          MR. FREDERICK:  And the question here is, is LTL in

11  financial distress.

12          Now you can either take the fundamental contradiction

13  of their position which is the funding agreement will fund

14  everything in which case LTL is not in financial distress or

15  the funding agreement depends on Johnson & Johnson and JJCI, in

16  which case this is not a proper bankruptcy purpose because

17  those two entities are not in the bankruptcy.

18          Either way, that contradiction should end the case on

19  as a matter of good faith and the Court need not go further in

20  order to decide how far it needs to go.

21          Now the point is made that after <u>Ingham</u>, it's

22  impossible to settle these cases.  Our expert said 98 percent

23  of asbestos cases settle or dismiss.  The bankruptcy law

24  professors who provided an amicus brief on their side said 97

25  percent of MDL cases settle or dismiss.  Common sense tells you

119

 1  that you don't have to litigate all 38,000 to judgment.  We

 2  weren't born yesterday.  And that point made by the bankruptcy

 3  court is on its face not credible and is subject to plenary

 4  review by this Court.

 5          Now the main argument that they make for financial

 6  distress is based on the speculation that they're going to have

 7  to pay out many many tens of billions of dollars.  But SGL

 8  Carbon says you don't look at speculation for future.  You look

 9  at what is imminently before you.  Do you have a present

10  inability to meet present financial obligations?

11          And here, LTL unquestionably did that two days after

12  it was created.  There's no serious issue at the moment it had

13  filed its bankruptcy it was not facing financial distress.

14  Importantly, Mr. Katyal does not deny that not a dime gets paid

15  until the last appeal of the last objector has been resolved.

16  And we know from judgments and settlements in the civil system

17  that money has flowed.

18          Johnson & Johnson shouldn't be permitted to stop that

19  process.  But the spinoff of JJCI which is permitted, and he

20  acknowledges, under the financing agreement is what creates the

21  cap.  As soon as that cap is done, there is no greater value

22  that can be done.  And for that reason, their plan is not

23  consistent with the statute 524(g) that says you have to have

24  an evergreen source of continually growing assets and money to

25  pay the future claimants.  This plan undisputably does not do

1  that.

2        Now he takes me to task for saying that <u>Ingham</u> was

3  paid by Johnson & Johnson.  Look at the Appendix Page 6379.  It

4  was paid out of a central account.  He eventually acknowledges

5  that.  The point is Johnson & Johnson charged back to JJCI as

6  an accounting matter.

7        Now this wouldn't be -- this might be important if

8  JJCI had its own independent shareholders.  It is a wholly

9  owned subsidiary of Johnson & Johnson.  But Johnson & Johnson

10 wanted to be able to say that it's continuing streak of paying

11 higher dividends year after year has continued, so it fobbed

12 off the accounting deficit to JJCI.  I don't know why that

13 should warrant good faith in a bankruptcy.

14       Now he says that there are real limiting principles

15 here based on the facts.  He talks about the latency.  That's

16 true for all asbestos cases, not just those that are created

17 out of talc.  And it is true of many mass torts, as well.  He

18 says there's lottery-style but that's true in any case where

19 there are really good lawyers who know how to try cases and

20 there are really bad lawyers who don't know how to try cases

21 and you have the special problem of specific causation, which

22 is an evident problem and issue in establishing the legitimacy

23 of any person's claim.

24       Their fundamental problem with their 524(g) is that

25 they don't create an evergreen funding mechanism.  And when he

 1 talks about the 79 transfer of liability, he doesn't respond

 2 that J&J itself was engaged in reprehensible conduct for which

 3 people have found them to be liable.

 4          Now the last point I'd like to make is that Johnson &

 5 Johnson did not go to all of this trouble in order to pay

 6 claimants more money.  They went to this trouble to pay

 7 claimants less money more slowly.  The civil system is designed

 8 with whatever flaws that it has to promptly move along cases

 9 and not to stop and stay all action.

10          This particular bankruptcy is intended to benefit

11 non-debtor affiliates.  It is a litigation tactic to stop civil

12 litigation.  And there is no increase in value to the

13 creditors, the tort claimants.  And for all of those reasons,

14 we urge you to reverse the bankruptcy court.

15          THE COURT:  Thank you very very much.

16          I would ask that a transcript be prepared of this

17 oral argument and just split the costs half this side, half

18 that side.

19          And I would also like to thank counsel for extremely

20 well presented arguments not only today but in your briefing

21 and also I should broaden that to thank those who took time to

22 write the amicus briefs, very helpful on both sides.  And we'll

23 take the matter under advisement.

24          Thank you.  It's a privilege having you here.

25          MR. FREDERICK:  Thank you.

122

1        THE CLERK:  All rise.  Court is adjourned until

2   tomorrow at 9:30 a.m.

3            (Proceedings concluded at 2:21 p.m.)

4                    * * * * *

5            **C E R T I F I C A T I O N**

6        We, KAREN WATSON and DIPTI PATEL, court approved

7   transcribers, certify that the foregoing is a correct

8   transcript from the official electronic sound recording of the

9   proceedings in the  above-entitled matter, and to the best of

10  our ability.

11

12  /s/ Karen K. Watson

13  KAREN K. WATSON, CET-1039

14

15  /s/ Dipti Patel

16  DIPTI PATEL, CET-997

17  J&J COURT TRANSCRIBERS, INC.      DATE:  September 30, 2022

18

19

20

21

22

23

24

25

**WWW.JJCOURT.COM**

# EXHIBIT 3

**In the Matter Of:**

*IN RE LTL Management LLC Bankruptcy*

*JOHN KIM*

*April 14, 2023*



Case 23-01092-MBK   Doc 60   Filed 04/17/23   Entered 04/17/23 19:45:37   Desc Main
IN RE LTL Management LLC Bankruptcy   Document   Page 178 of 286
Confidential

John Kim
April 14, 2023

63

1          Deane.

2                    (Whereupon, exhibit is

3          received and marked Kim Deposition

4          Exhibit 4 for identification.)

5                    MR. JONAS:  Kim Number 4.

6          Oh, what's this one?

7                    MR. BENSON:  I gave you two.

8          She takes two.  She keeps one.

9                    MR. JONAS:  Oh, she takes

10         two.  See, I didn't know that.  Thank

11         you.

12                    THE REPORTER:  Kim 4 for

13         identification.

14                    THE WITNESS:  Thank you.

15    BY MR. JONAS:

16         Q.   Okay.  Mr. Kim, again, we'll be quick

17    about this.  This is the declaration of John Kim

18    in support of the first day pleadings that was

19    filed in the first bankruptcy.  It's dated October

20    14th, '21.  I just have a few questions.

21         A.   Mm-hmm.

22         Q.   I want to turn to page 9 of the document

23    at the bottom and it's paragraph 26.  And you said

24    "As I mentioned above, the" --

25         A.   I'm sorry --

64

```
 1        Q.   Sure, take your time.

 2        A.   Twenty-six?

 3        Q.   Page 9.

 4        A.   Got it.

 5        Q.   And paragraph 26.  It says "As I

 6   mentioned above" -- and the "I" is you, right?

 7        A.   Mm-hmm, yes.

 8        Q.   "As I mentioned above, the design of the

 9   2021 corporate restructuring ensures that the

10   debtor has at least the same, if not greater,

11   ability to fund talc-related claims and other

12   liabilities as Old J -- JJCI had before the

13   restructuring."

14             Do you see that?

15        A.   I do see that.

16        Q.   And is that true today?

17        A.   I'm sorry, is --

18        Q.   Is it true today that the debtor, LTL,

19   has at least the same, if not greater, ability to

20   fund talc-related claims and other liabilities as

21   Old JJCI had before the prior restructuring?

22        A.   I believe it is.

23        Q.   So you think today that -- well, strike

24   that.

25             What is the basis of your belief that
```

Case 23-01092-MBK   Doc 60   Filed 04/17/23   Entered 04/17/23 19:45:37   Desc Main
IN RE LTL Management LLC Bankruptcy     Page 180 of 286                    John Kim
                          Document                                    April 14, 2023
                          Confidential

65

 1  the debtor today has at least the same, if not

 2  greater, ability to fund talc-related claims and

 3  other liabilities as Old JJCI had before the prior

 4  restructuring?

 5       A.   So what I would say is that the -- after

 6  the funding agreement was restructured with the

 7  new funding agreement and the support agreement of

 8  J & J, which I'm sure you'll -- you'll get to

 9  later, it currently has the same ability to fund

10  the talc-related liabilities which, again, I think

11  we are -- you know, we are able to -- to meet that

12  liability in the same way as we did prior to the

13  restructuring.

14       Q.   Well, let me ask you about that.

15            Isn't it the case that under -- that Old

16  JJCI had up to roughly $61 billion of -- of

17  ability to fund claims?

18       A.   I --

19                 MS. BROWN:   I -- I object.

20            Misstates the evidence.

21       A.   Yeah, I --

22       Q.   Okay.  I'm -- okay.  Strike that.  Fair

23  enough.  Let me -- let me rephrase.

24            What was the -- what was Old JJC's

25  -- JJCI's ability to fund talc-related claims

Case 23-01092-MBK   Doc 60   Filed 04/17/23   Entered 04/17/23 19:45:37   Desc Main
IN RE LTL Management LLC Bankruptcy   Page 181 of 286
Document
Confidential

John Kim
April 14, 2023

66

1   and other liabilities before the last

2   restructuring?

3        A.   We didn't calculate that.

4        Q.   Oh, okay.  We're going to do this

5   again?

6        A.   Well, we can cut to the -- cut to the

7   chase.  You know, if you're -- the -- the -- I

8   think you referenced some $60 billion number.

9   That's the fair market value of the assets of

10  JJCI.  That's not its ability to fund liability.

11  You have to take into account it's operation --

12  operating business --

13       Q.   Hold on.

14            MR. JONAS:  Could somebody --

15       could we just have folks mute who --

16       who are listening in, please?  Thank

17       you.

18       Q.   Go ahead.  Sorry.

19       A.   It's an operating business.  And that's

20  just what -- you know, you have to look at, you

21  know, what -- so $60 billion is not a way to look

22  at how much you can use to fund because that

23  would -- that would just decimate the business if

24  you had to spend $61 billion.

25            Secondly, we don't think that the

1    liability is that great.  And what we think is

2    that the liability of the -- you know, of the --

3    the talc liability, we could have met it with the

4    JJCI.  You know, we were not insolvent.

5            The same is true with LTL after the --

6    the revisions to the funding agreement and the,

7    you know, support agreement.  It's not insolvent,

8    but it would be, you know, in financial distress.

9        Q.   Okay.  I -- I get it, but what I want

10   to -- I don't want talk about the liabilities for

11   a second.

12       A.   Mm-hmm.

13       Q.   So let's just focus on the asset --

14   the -- the asset side.

15           What was the total amount of value that

16   could have -- that would have -- strike that --

17   that could have been available to LTL under

18   Funding Agreement One?

19       A.   I think it was the fair -- it was the

20   fair market value of the assets which would have

21   been around $60 billion.

22       Q.   Okay.  And today under Funding Agreement

23   Two, what is the total value that's available to

24   LTL under Funding Agreement Two?

25       A.   The total assets available?  Well, I

68

1    mean, one way to look at it would be the fund --

2    the fair market value of Holdco, which has the

3    principal responsibility, is, I would say, I think

4    around 30 -- $30 billion.  But, of course, there's

5    liquidity issues with that $30 billion, but it is

6    $30 billion.

7              And but, also, there is a -- a proposal

8    on the table to take care of all the talc

9    liability that J & J would fund for 8. -- $8.9

10   billion which has the support of law firms

11   representing 60,000 claimants.  So I would say

12   that's really an appropriate number.

13        Q.   Yeah.  Okay.  I don't -- I don't want to

14   talk about the claims for now.  I'm a simple

15   person.  I just want to focus on --

16        A.   Mm-hmm.

17        Q.   -- the value that's available to LTL

18   under the funding agreement.  Just -- you told

19   me -- I just want to make sure I understand -- the

20   value available to LTL under Funding Agreement One

21   was roughly $60-odd billion, correct?

22        A.   That's correct.

23        Q.   Okay.  And the value available to LTL

24   under Funding Agreement Two is roughly $30

25   billion?

69

1          MS. BROWN:  Objection;

2          misstates the evidence.

3     A.   Yeah, $30 billion with all the caveats.

4     Q.   What -- what -- I'm just looking at

5  assets not -- and value, not settlements and

6  claims.

7          What -- what caveats are there?

8     A.   The caveat would be the $30 billion is

9  something that -- it's an internal evaluation that

10 was done for other purposes.  I'm not actually

11 intimately involved.  I wasn't intimately

12 involved.  I wasn't involved at all in getting

13 that value, but that's -- that's my understanding

14 of -- of what that number represents.

15    Q.   Okay.  So just using -- and I appreciate

16 that.  But just using the two values that we have

17 as best available to us, 60 billion and 30

18 billion, right?  Funding Agreement One was 60;

19 Funding Agreement Two was 30?

20    A.   But then you're ignoring the support

21 agreement which J & J is going to support a plan

22 for $8.9 billion that has -- again, that would

23 take care of all the liability and has the support

24 of law firms that represent 60,000 plaintiffs.  So

25 that -- you have to take that into account as well

Case 23-01092-MBK   Doc 60   Filed 04/17/23   Entered 04/17/23 19:45:37   Desc Main
IN RE LTL Management LLC Bankruptcy   Document     Page 185 of 286
John Kim
Confidential
April 14, 2023

72

```
 1   what is available to LTL under the funding

 2   agreement, the -- the new funding agreement, to

 3   satisfy talc claims and other obligations?

 4        A.   That would be whatever -- it would be

 5   the -- the Holdco funding arrangements.

 6        Q.   Okay.  So that's -- and you think the

 7   value of Holdco is roughly -- again, I know --

 8        A.   No.

 9        Q.   I'm not holding you to it.  I know you

10   -- is roughly $30 billion.

11        A.   Well, that's the -- that's the current

12   fair market value of the assets of Holdco.  What

13   Holdco will be doing in the future, you know, if

14   the -- you know, if -- under this hypothetical, if

15   the, you know -- if bankruptcy gets dismissed,

16   yeah, I don't know that I can answer what that --

17   what that number is going to be.

18        Q.   Oh, it might be less than $30 billion?

19        A.   Could be more.

20        Q.   Could be more?  How could it be more?

21        A.   Holdco could -- could increase in value.

22        Q.   Oh, okay.

23             And under Funding Agreement One, if it

24   was still in existence and if you were outside of

25   bankruptcy, what value under Funding Agreement One
```

Case 23-01092-MBK   Doc 60   Filed 04/17/23   Entered 04/17/23 19:45:37   Desc Main
IN RE LTL Management LLC Bankruptcy          Page 186 of 286                    John Kim
                        Document                                               April 14, 2023
                        Confidential

79

1    discussed this with have indicated that they

2    believe that the Third Circuit -- the Third

3    Circuit was wrong and that it should have been

4    reheard.

5          Q.   What law firms have you discussed this

6    with?

7                     MS. BROWN:  Well, I -- yeah,

8               I don't want you to get into any --

9                     THE WITNESS:  I know, yeah.

10                    MS. BROWN:  You can identify

11              counsel that you have, but beyond that

12              you should not discuss the specifics

13              of discussions about the Third Circuit

14              decision.

15   BY MR. JONAS:

16         Q.   I'm not -- I'm certainly not asking for

17   specifics of discussions.  I just -- you said

18   you've discussed the Third -- in connection with

19   everyone agreeing that the Third Circuit was

20   wrong.

21         A.   Yeah --

22         Q.   Let me finish, please.  Let me finish,

23   please.

24              You said that you discussed that with

25   law firms.  I just want to know which law firms

180

1       Q.   Okay.  And as of the date of its

2   formation, LTL had access to the funding agreement

3   outside of the bankruptcy even before LTL filed

4   for bankruptcy on October 14th, 2021, correct?

5       A.   Yes.  For that period of time before

6   filing, it had access to the funding agreement.

7       Q.   Okay.  And then do you recall, sir,

8   that -- it was either the day before or a couple

9   days before LTL filed for bankruptcy in October

10  14th, 2021.  Do you remember there was a board

11  meeting to discuss options including whether to

12  file for bankruptcy?

13      A.   I do recall that.

14      Q.   Okay.  And -- and we've looked at the

15  minutes of that meeting before, correct?

16      A.   In the prior proceeding, we did, yes.

17      Q.   Okay.  And what you explained to us, and

18  what the meetings reflect, was that various

19  options were presented to the LTL board and

20  ultimately you made a recommendation that

21  bankruptcy be filed and the board did decide to

22  file for bankruptcy which was filed on October

23  14th, 2021, correct?

24      A.   I believe that's true.  I -- I don't

25  have the -- the filing in front of me for the

Case 23-01092-MBK   Doc 60   Filed 04/17/23   Entered 04/17/23 19:45:37   Desc Main
IN RE LTL Management LLC Bankruptcy   Document   Page 188 of 286
Confidential
John Kim
April 14, 2023
205

1  securities litigation, and there's the runaway

2  verdict issue.

3          So, you know, your time frame of -- I

4  think -- I think what you're really getting at is

5  the immanency.  I -- I would say that we are in

6  imminent financial distress if we get dismissed.

7      Q.   If you get dismissed and other things

8  happen, then there's a possibility --

9      A.   No.

10     Q.   -- that LTL might not be able to meet

11 its obligations.  Is that fair?

12     A.   No.  I would say we are in imminent

13 financial distress.

14     Q.   Okay.  So what is the imminent -- what

15 is the factual basis for the imminent financial

16 distress of LTL given the fact that it's backed by

17 Holdco which has a market value of somewhere

18 around $30 billion and LTL's own considerable

19 entity?

20              MS. BROWN:  And, again, I'll

21          caution you.  Just reveal factual

22          information not legal advice.

23     A.   So I would rely on the testimony from

24 the last proceeding that -- where the court found

25 that we were in financial distress just based --

Case 23-01092-MBK   Doc 60   Filed 04/17/23   Entered 04/17/23 19:45:37   Desc Main
IN RE LTL Management LLC Bankruptcy     Page 189 of 286
Document
Confidential

John Kim
April 14, 2023

206

```
 1    based upon when -- when it was -- when we had New

 2    JJCI funding agreement.

 3         Q.   All right.

 4         A.   It's the same -- the same -- the same

 5    basis.

 6              And, in fact, I think our liabilities

 7    probably have increased since then because of

 8    the -- you know, the -- the -- the passage of

 9    time.  And so I think based upon all -- all the

10    factors that were in the prior proceeding would be

11    applicable to the current proceeding.

12         Q.   Okay.  Mr. Kim, the court that you just

13    referred to in that answer is the bankruptcy

14    court, Judge Kaplan, correct?

15         A.   That is.

16         Q.   Okay.  Great.

17              Different questions.

18              Johnson & Johnson never formally

19    rescinded the funding agreement prior to its

20    rescission and agreement with LTL, correct?

21                   MS. BROWN:  Objection; vague.

22              I don't understand the question.

23         Q.   All right.  Let me try it a different

24    way.

25              Did Johnson & Johnson ever refuse to pay
```

209

```
 1                 MR. RUCKDESCHEL:  Okay.  No

 2          further questions from me.

 3   CROSS-EXAMINATION

 4   BY MR. THOMPSON:

 5      Q.   Hello, Mr. Kim.  Clay Thompson with

 6   Maune Raichle on behalf of Katherine Tollefson.

 7          Can you hear me okay?

 8      A.   I can, Mr. Thompson.

 9      Q.   Okay.  Just following up on Mr.

10   Ruckdeschel's comments, are you saying that

11   outside of legal conversations with lawyers, you

12   never were told by anyone at Johnson & Johnson

13   that Johnson & Johnson was refusing to honor the

14   funding agreement?

15      A.   Outside of any conversations I may have

16   had, I -- yeah, I don't have any information about

17   that.

18      Q.   What I'm saying is that no one came to

19   you -- you never went to Johnson & Johnson with no

20   lawyers involved and they refused to honor the

21   funding agreement in your capacity as the LTL

22   Management chief legal officer, is that right?

23      A.   I've -- I've never approached anyone at

24   Johnson & Johnson about that, no.

25      Q.   And no one --
```

Case 23-01092-MBK    Doc 60    Filed 04/17/23    Entered 04/17/23 19:45:37    Desc Main
IN RE LTL Management LLC Bankruptcy    Page 191 of 286
Document
Confidential
John Kim
April 14, 2023

210

```
 1       A.   Other than --

 2            (Unintelligible cross talk; reporter

 3   requests one speaker.)

 4       A.   I'm sorry.  I'm sorry.  Other than

 5   through lawyers.

 6       Q.   Understood.

 7            And -- and no one at Johnson & Johnson

 8   told you, outside of communications with lawyers

 9   that there's some assertion of potential privilege

10   for, no one at Johnson & Johnson ever told you

11   that they refused to honor the funding agreement

12   to LTL Management of which you are the chief legal

13   officer, is that right?

14                 MS. BROWN:  Objection; asked

15            and answered.

16                 You can --

17       A.   Other than through -- through

18   discussions with lawyers.

19       Q.   Understood.  Okay.

20            The purpose of LTL Management LLC, which

21   was formed in 2021, is to coordinate a mass

22   settlement of both LTL's talc liability and

23   Johnson & Johnson's talc liability in a

24   bankruptcy.  Is that fair?

25                 MS. BROWN:  Objection to the
```

# EXHIBIT 4

Page 1

```
 1
 2
 3
 4
 5
 6
 7
 8              Transcription of File:
 9   American Bankruptcy Annual Spring Meeting
10               Texas Two Step
11
12
13            Runtime:  01:02:02
14
15
16
17
18
19
20
21
22
23
24
25
```

| | | |
|---|---|---|
| 1 | MR. GLEIT:  Yeah, now you do. | 00:10 |
| 2 | MS. TSIOURIS:  Okay. Good morning, everyone. | 00:11 |
| 3 | It's 10:01.  We'll just give it another minute for | 00:15 |
| 4 | people to find their seats, and then we'll -- we'll | 00:16 |
| 5 | get started.  Just have some people in the back. | 00:20 |
| 6 | All right.  So good morning, everyone.  Welcome to | 00:43 |
| 7 | the panel on the Texas Two Step. | 00:46 |
| 8 | As I'm sure you saw in the materials, we really | 00:49 |
| 9 | have three stated objectives for the panel.  One is | 00:52 |
| 10 | to go over and describe just the basics of what the | 00:56 |
| 11 | Texas Two Step is in a divisive merger.  Two, to | 00:59 |
| 12 | give a little bit of an overview of the current LTL | 01:03 |
| 13 | case and what is going on there.  And three, to have | 01:06 |
| 14 | a healthy debate about the pros and cons of the Texas | 01:10 |
| 15 | Two Step and maybe get a little bit into policy | 01:13 |
| 16 | considerations around the Texas Two Step. | 01:18 |
| 17 | So, and then of course, our -- our unstated | 01:19 |
| 18 | objective is to have a little bit -- a little bit of | 01:21 |
| 19 | fun here. | 01:22 |
| 20 | So, before we get into the panel, I just want to | 01:27 |
| 21 | have my colleagues introduce themselves and maybe also | 01:31 |
| 22 | just give a quick background and maybe any connection | 01:34 |
| 23 | that you have to a Texas Two Step case.  So, Jeffrey, | 01:38 |
| 24 | maybe if I can start with you. | 01:39 |
| 25 | MR. GLEIT:  Okay, sure.  I'm Jeff Gleit.  I'm a | 01:43 |

Page 3

1  partner at ArentFox, and I came across the Texas Two    01:49

2  Step basically following the Change A through the        01:50

3  press and, you know, my thoughts on it have evolved      01:54

4  over the past few months.  And, you know, we're          01:57

5  evaluating it, you know, for one or two companies        01:58

6  including a nonprofit, so I'm looking forward to         02:01

7  hearing Greg's thoughts and Judge Jones' thoughts,       02:04

8  and Brya's thoughts on it.  And that's who I am.         02:08

9      MS. TSIOURIS:  Thanks, Jeff.  Brya?                  02:10

10     MS. KIELSON:  Yes.  Hi, I'm Brya Kielson.  I'm a     02:12

11 partner at Morris James in Wilmington, Delaware.         02:15

12 My background is prior to joining Morris James I was     02:18

13 at the U.S. Trustee's office in Delaware, so I have      02:21

14 an interesting perspective, and I kind of struggle       02:23

15 with the perspective that I had there versus in          02:27

16 practice.                                                02:27

17     I don't have any cases also involving the Texas      02:31

18 Two Step, so it's academic for me for now, and           02:35

19 definitely an interesting issue.                         02:36

20     MS. TSIOURIS:  Thanks, Brya.  Your Honor, Judge      02:38

21 Jones.                                                   02:39

22     JUDGE JONES:  Good morning, everyone.  I am Judge    02:41

23 Jones.  I am the chief bankruptcy judge in the           02:43

24 Southern District of Texas.  It is a pleasure to be      02:46

25 here and speak with you all this morning, and I do       02:49

Page 4

1  hope that what we have is a conversation.                    02:52

2      I grew up with this statute as a practitioner,           02:56

3  and I hope that you will take advantage of the panel         03:00

4  that we have here this morning and ask questions.            03:02

5  Remember, the only bad question is one that you don't        03:05

6  ask.  In terms of connections, you know, there are no        03:09

7  Texas Two Step cases in Texas, and we can -- we can          03:14

8  certainly talk about that as well.                           03:16

9      MS. TSIOURIS:  Thank you.  Greg?                          03:18

10      MR. GORDON:  I am Greg Gordon, a partner with            03:20

11  Jones Day.  I am a long-time bankruptcy and                  03:26

12  restructuring lawyer probably longer than I would like       03:31

13  to think about.                                              03:32

14      But I'm involved in I think probably all the             03:38

15  divisional merger cases that are pending at the              03:40

16  moment starting with the Bestwall Chapter 11 Case,          03:46

17  an affiliate of Georgia Pacific that we filed in            03:48

18  November of 2017 through to the LTL case that we            03:53

19  filed in October of last year.  That's the affiliate       03:58

20  of J&J as you probably know.                                03:59

21      And I, of course, think the divisional merger           04:02

22  is the greatest innovation in the history of                04:04

23  bankruptcy, and we'll talk about that more today.          04:07

24      MS. TSIOURIS:  Thank you, Greg.  So, and -- and          04:10

25  I'm Natasha Tsiouris.  I'm a partner in the                 04:13

Page 5

1   restructuring group at Davis Polk.                          04:15

2       Recently, my touchpoint not necessarily with the       04:18

3   Texas Two Step, but I've had a case where we                04:21

4   utilized the Texas Divisive State Merger in a case          04:26

5   called Fieldwood where we used it to get the company        04:30

6   out of bankruptcy, so that is -- that's my touchpoint       04:32

7   with the Texas Two Step.                                    04:34

8       Just a bit of housekeeping admin.  As Judge Jones       04:38

9   said, you know, feel free to ask questions during the       04:41

10  panel.  We also have up here I think comments that          04:47

11  we're getting I think virtually for folks who are           04:50

12  dialed in by Zoom, but I think also you can send in         04:52

13  questions and we'll do our best and I'll do my best         04:55

14  to keep my eye on this and incorporate those                04:58

15  questions in the panel as we get going.  So, feel free      05:01

16  to interrupt us at any time with questions and keep         05:04

17  it a healthy back and forth.                                05:04

18      So, just to kick us off, sort of just going             05:10

19  through what is -- who would like to describe what          05:13

20  is the Texas Two Step and what is the Divisive State        05:17

21  Merger?                                                     05:18

22      JUDGE JONES:  Greg, why don't you start?  If you        05:21

23  get it wrong, I am right here watching (inaudible)          05:22

24  watching.                                                   05:23

25      MR. GORDON:  I'll -- I'll try to remember what          05:25

Page 6

1  it's about.  So, the -- it's interesting, because the       05:30

2  Texas Divisional Merger Statue's actually been on           05:33

3  the books for a long time.  I think it dates back to        50:35

4  1989. It's not a statute, however, even though I            05:38

5  practice in Texas that I was aware of until 2016            05:43

6  when we were starting to look at ways to potentially        05:46

7  proceed with a corporate restructuring for Georgia          05:50

8  Pacific prior to a bankruptcy filing.                       05:53

9      But in its essence, it's a statute that basically       05:56

10  permits a -- acompany to divide.  To me, it's a bit of     06:02

11  an oxymoron to say it's a -- it's a divisive merger.       06:05

12  That doesn't seem right to me, but it literally            06:08

13  allows a company to divide and allows it to basically      06:13

14  -- it provides full flexibility for the company to         06:17

15  allocate assets and liabilities any way it wants.          06:20

16  And --                                                     06:21

17      JUDGE JONES:  Greg, let me ask you.  I mean,           06:22

18  that -- that -- that concept's been around for             06:24

19  hundreds of years.  Why -- why -- why do you need a        06:26

20  statute to do what can already be done?                    06:29

21      MR. GORDON:  Well, because this statute allows         06:32

22  it to be -- allows this allocation of assets and           06:35

23  liabilities to be done in a way that's much simpler.       06:37

24  It's done by operation of law.  As a result, you           06:40

25  don't have to worry about consent to assignment            06:43

Page 7

1   issues and contracts.  They're not deemed to be any          06:47

2   any transfers for contractual purposes.                      06:50

3        It's sort of been blown out of proportion in the        06:54

4   sense that people look at it and say this is brand           06:56

5   new.  This allows companies to do things they could          06:59

6   never do before.  That's really not true.  Companies         07:01

7   could do these types of things before.  I mean, you          07:05

8   could spin out assets, move assets otherwise, have           07:07

9   intercompany transfers.  It was just a lot more              07:10

10  complicated, and this allowed it to be done in a way         07:13

11  where literally you had full flexibility to make the         07:15

12  assignments, allocate liabilities where you wanted,          07:18

13  split your assets the way you wanted.                        07:20

14       And the important thing is that once that               07:23

15  transaction occurred, you -- you would have two new          07:25

16  entities each responsible for their own liabilities.         07:28

17  There's no secondary liability, and then the original        07:31

18  company disappears.  It's gone.  You've created two          07:34

19  new  companies.                                              07:35

20       JUDGE JONES:  So, Greg, what happens if you             07:37

21  forget something?  Because we all make mistakes,             07:39

22  right?  What -- what happens if you forget a liability       07:42

23  or you forget an asset?  What happens under the              07:45

24  statute?                                                     07:45

25       GORDON:  Well, first of all, I would -- first of        07:47

1  all, I would say that at Jones Day we don't make        07:49

2  mistakes.                                                07:50

3      JUDGE JONES:  Never makes a mistake.  Absolutely.   07:51

4      MR. GORDON:  That's a question I don't have an       07:54

5  answer to, because as far as I know, we've never        07:56

6  forgotten anything.                                      07:57

7      JUDGE JONES: Got it.  So, I actually think the      07:58

8  statute addressed that.  I -- I just assumed you        08:02

9  would know that.                                         08:02

10     MR. GORDON: Well, I'm --                             08:01

11     JUDGE JONES:  But actually --                        08:03

12     MR. GORDON:  I'm sorry to disappoint you.           08:05

13     JUDGE JONES:  But I actually think there's an        08:06

14 allocation mechanism in the statute for either          08:09

15 unidentified or either assets or liabilities that       08:14

16 splits between the new entities.                         08:17

17     MS. TSIOURIS:  Yeah.  I think -- I think it'll       08:20

18 go pro rata to the surviving entities, right?  And --   08:22

19     JUDGE JONES:  Pro rata based on what?               08:25

20     MS. TSIOURIS:  That is a little confusing in the    08:26

21 statute to me to be honest, but it's pro rata I        08:29

22 think to the surviving entities and it splits the      08:33

23 assets and liabilities that way.  But I -- I don't      08:35

24 pro rata based on what to be honest.                     08:37

25     JUDGE JONES:  Hmm.                                   08:37

Page 9

1      MS. TSIOURIS:  I don't know if --                08:38

2      MR. GLEIT:  I -- yeah.  Actually, I don't know --  08:39

3      MS. TSIOURIS:  -- (inaudible).  Something --      08:41

4      MR. GLEIT:  Your Honor, do you know?             08:43

5      JUDGE JONES:  My memory of it, and I often get   08:46

6  the Delaware Statute mixed -- mixed up with the Texas.  08:48

7  I know that they both have provisions.  I think one   08:51

8  of them was -- one of them was just simply a -- just  08:55

9  simply a split and I think the other one was based    08:57

10  upon allocated value.                                 08:58

11      MR. GLEIT:  Okay.                                08:59

12      JUDGE JONES:  But I -- I may be wrong about that.  09:03

13      MS. TSIOURIS:  So, this is a -- a little bit of  09:05

14  a set-up question for our panelists because the       09:07

15  legislative history.  And -- and Greg did touch on    09:10

16  this.  But just curious why, you know, if folks on    09:14

17  the panel want to venture what sort of the original   09:16

18  purpose of the Texas State Law was, and -- and why    09:19

19  it was enacted this way?                              09:22

20      MR. GLEIT:  I'll start which is -- my belief is  09:25

21  and what I read from the legislative history and,     09:27

22  you know, from what I've seen in practice, it just    09:30

23  it makes it a -- a faster, easier way to -- to --     09:34

24  to do a spinoff.  And -- and as Greg touched upon,    09:37

25  instead of getting consents and certain permissions   09:39

Page 10

1    that you might need if you were not relying under the          09:41

2    statute, it -- it's a more cost-effective means of            09:46

3    effectuating a spin-off or a split of two companies.          09:49

4    And then earlier also, Judge Jones had mentioned when         09:52

5    we were preparing that there's even like a tax benefit        09:56

6    so you don't have to do a stamp -- pay a stamp tax I          09:57

7    believe.                                                      09:58

8         JUDGE JONES:  Yeah, in the old days there --             10:00

9    there were certain types of asset transfers for which        10:02

10   there was a tax obligation, and it was my                     10:05

11   understanding that when they did that, they wanted to        10:08

12   make it totally neutral which is why you see the no          10:11

13   transfer provision in that statute as well as giving         10:15

14   the ability to deal with your lenders and -- and             10:18

15   other outstanding contracts.                                 10:20

16        MR. GLEIT:  Yeah.  And I would just say more            10:22

17   generally, Texas has tried for a long time to be a          10:25

18   very business-friendly state, and this was                   10:28

19   legislation consistent with that objective.                  10:31

20   The idea was just to basically make it easier for           10:32

21   companies to do the types of things that companies          10:35

22   were already doing but in a manner that was much            10:37

23   simpler and more straightforward.                            10:40

24        JUDGE JONES:  But I do want to pose a question as      10:43

25   we think through this.  You've got that very simple         10:45

1  provision that in the statute that just says that            10:49

2  there's not a transfer.  And there's been an awful           10:52

3  lot of discussion and an awful lot written about             10:54

4  that.  But I want to pose the question, you know, who        10:58

5  genuinely believes that a state can define a transfer        11:02

6  for purposes of Federal fraudulent transfer law?             11:06

7       Yeah, I -- you know, I don't think that that's          11:10

8  possible but I've certainly read an awful lot about          11:12

9  it and I've certainly heard it argued an awful lot.          11:16

10 But I -- I just find that interesting.  Anybody have         11:19

11 thoughts about that?                                         11:20

12      MS. KIELSON:  Well, what --                             11:21

13      JUDGE JONES:  I'm totally going off -- unfair           11:22

14 (inaudible).  I do not take --                               11:23

15      MS. KIELSON:  So, what do you think --                  11:24

16      JUDGE JONES:  -- instructions very well, so             11:25

17 it's -- I'm totally off script here.                         11:27

18      MS. KIELSON:  What do you think then of them            11:28

19 including that language, or --                               11:31

20      JUDGE JONES:  Well, I think it was really done          11:32

21 to deal with the fact that let me think about it.  If        11:35

22 you had to get consents from 29 different lenders            11:38

23 because --  or you had to do on-sale clauses or any          11:40

24 of that.                                                     11:41

25      MS. KIELSON:  Mm-hmm.                                   11:41

Page 12

1      JUDGE JONES:  And again, sort of the tax angle      11:42

2   that back in 1989 existed with respect to some asset   11:47

3   transfers.                                             11:47

4      JUDGE JONES:  So, basically, it's a non-issue       11:50

5   beyond -- you're saying it's a non-issue beyond that   11:52

6   (inaudible).                                           11:52

7      JUDGE JONES:  That's Jones' opinion.  I'm -- I'm     11:53

8   sure other folks have -- have different views on that. 11:56

9      MR. GORDON:  Well, my -- my -- my read of it is      11:58

10  that it wasn't -- they -- they weren't saying it's not 12:01

11  a transfer for fraudulent transfer purposes.           12:02

12  I think it was for the more limited purpose of         12:05

13  allowing these transactions to take place.  And the    12:08

14  reason I conclude that is because they made clear that 12:11

15  the divisional mergers remain subject to state         12:13

16  fraudulent transfer law, and it seemed to me -- I      12:17

17  don't know, in my mind it seems inconsistent to        12:19

18  suggest that they were saying there's no transfer      12:20

19  which would potentially undermine the fact that --     12:24

20  -- that the -- at the same time they were saying       12:25

21  these transactions can be and should be tested by      12:29

22  fraudulent transfer law.                               12:31

23     JUDGE JONES:  I'm learning just from -- from a       12:32

24  bankruptcy perspective, if you could have 50 different 12:35

25  views of what constituted a transfer, I mean, that     12:38

Page 13

1  would be -- that would just be borderline                12:40

2  ridiculous.  I mean, I think a transfer for purposes      12:43

3  of 548, it's federal law.  I got the 544 analysis,        12:48

4  totally understand that, I -- I would -- I could see      12:52

5  that argument.  But for 548 I just -- I just can't        12:54

6  imagine that a particular state can define what           12:58

7  constitutes a transfer under 548.                         13:01

8      MR. GORDON:  Yeah.  And I -- I'm not disagreeing      13:01

9  with 13:02 you.  I'm just saying it wouldn't have         13:04

10 occurred to me to argue in a 548 case that there's no     13:08

11 basis for it because the Texas statute says it's not      13:11

12 a transfer.                                               13:12

13     MR. GLEIT:  Yeah.  And I actually -- I believe        13:13

14 the legislative history, and I think one of the           13:15

15 authors of the statute even said Crittenden rights        13:18

16 are preserved and it's not an intent to -- to             13:21

17 eliminate them, so --                                     13:22

18     MS. TSIOURIS:  Yeah.  So, I want to -- I want to      13:24

19 go there next because obviously, I mean, just going       13:27

20 over the purpose of the statute I think it -- you         13:29

21 know, it seems pretty clear that there was a good,        13:33

22 sound reason and a good justification for putting in      13:37

23 place the divisive merger concept into the Texas          13:40

24 statute, and we've even seen obviously other states       13:43

25 follow suit.  There's similar divisive merger statutes    13:47

Page 14

1  in California, Pennsylvania, Arizona, Delaware now.  13:51

2      So, I think legislatures are seeing the -- the  13:55

3  purpose and that, you know, there is some reason to  13:57

4  put it in place.  But obviously, not everybody agrees  13:59

5  with that, and people are challenging some of these  14:03

6  Texas Two Step cases and the purpose of the divisive  14:06

7  state merger.  14:07

8      So, just moving to that a little bit and getting  14:09

9  to these questions about what is a transfer?  How can  14:11

10  these be attacked?  Maybe Greg could just sort of  14:14

11  kick, it off.  If you can describe how the Texas Two  14:17

12  Step was used in the recent LTL matter, and then we  14:22

13  can kind of take it -- take it from there.  14:24

14      MR. GORDON:  Sure.  So, many of you may know  14:27

15  this, but the idea actually emanated from the -- as I  14:31

16  said earlier, the Bestwall case where Georgia Pacific  14:36

17  decided to move forward with this strategy, and then  14:40

18  it went through two other cases in Charlotte.  We've  14:44

19  filed three cases there, and then we put it in place  14:51

20  for LTL.  14:52

21      But, you know, the LTL situation of all of them  14:56

22  in some -- some respects was the worst -- sorry -- in  15:00

23  some respects was the worst from the standpoint of  15:02

24  for many years I've been involved with companies with  15:07

25  asbestos liability.  And -- and those liabilities are  15:09

Page 15

1   very difficult for companies to deal with because of        15:12

2   the thousands of claims they would get every year.          15:16

3   And just the inability, frankly, to defend themselves       15:18

4   and ended up settling those cases just to save defense      15:22

5   costs was literally impossible to litigate the cases.       15:26

6   But at least with asbestos, you had a situation where       15:29

7   it was recognized that asbestos was a dangerous             15:32

8   product.                                                    15:33

9       Now for a lot of the companies, they had very           15:37

10  strong defenses in the sense that, well, asbestos per       15:41

11  se might be dangerous but it's a matter of sufficient       15:43

12  exposure, and -- and our products were encapsulated         15:46

13  or there are other reasons why the exposure should          15:48

14  have been far more limited than what they were              15:51

15  seeing in terms of the litigation.                          15:53

16      But when J&J came to us, I mean, their situation        15:57

17  was far worse from the perspective of both the              15:59

18  company and the claimants because in only about five        16:05

19  years they had ramped up from virtually zero cases,         16:08

20  and these are cases based on an argument that               16:12

21  Johnson's Baby Powder causes disease.  From literally       16:15

22  nothing to they had almost 40,000 cases pending at the      16:20

23  time of the filing.  And that -- that's just an             16:22

24  unbelievable scenario to me.                                16:25

25      And their costs went up correspondingly.  I mean,       16:29

Page 16

1   they -- they went from virtually nothing in cost to        16:32

2   paying about four and a half billion dollars in that       16:37

3   five -- five-year period, about a billion of which         16:40

4   was defense costs.  And they were actually to the          16:42

5   point of incurring about 10,000 new claims a year.         16:46

6   They had 12,500 I think just in the first part of          16:49

7   2021 alone.                                                16:51

8       So, from the company's perspective, completely        16:54

9   unmanageable.  How do you litigate 40,000 cases?  How      16:57

10  do you deal with the fact you're getting 10,000 more       16:59

11  per year and they're anticipated to continue for the       17:01

12  next 50 years?  What do you do about that as a             17:04

13  company no matter how big you are?                         17:07

14      But then look at it from the standpoint of the         17:09

15  claimants.  It was awful from their perspective too        17:12

16  because it was literally -- and this gets reported         17:14

17  in the press, but I think it's true, it was literally      17:17

18  like a lottery for the claimants.  The large majority      17:20

19  of the claimants lost, and they lost on science            17:23

20  issues based on the fact that the juries just didn't       17:26

21  believe that the product caused disease, either           17:29

22  ovarian cancer or mesothelioma, or they would win         17:34

23  and then the case would get reversed on appeal.           17:37

24      So, the large majority of these claimants who         17:38

25  were actually moving forward weren't getting anything.    17:42

1  And then periodically there would be these gigantic,      17:45

2  gigantic verdicts.                                          17:47

3       One verdict was four and a half billion dollars       17:49

4  for 22 people.  There were several verdicts of             17:53

5  hundreds of millions of dollars.  And so, if you put       17:57

6  it like on a -- on a graph, you would just see it was      17:59

7  just this ridiculous thing.  There was just a few dots     18:02

8  up into the billions or hundreds of millions, and then     18:06

9  all the other ones would be along the bottom at zero.      18:08

10      JUDGE JONES:  So, was the company self-funded on      18:10

11 all of these claims?                                        18:12

12      MR. GORDON:  Largely, yes.                             18:13

13      JUDGE JONES:  What does that mean, yes?                18:14

14      MR. GORDON:  Well, I mean, they had a -- they          18:16

15 had a self-insuring.  They had their own insurance          18:19

16 entity and they had some insurance.                         18:21

17      JUDGE JONES:  Does -- okay.                            18:22

18      MR. GORDON:  But in any event, it was, you know,       18:24

19 very untenable for the company and not working well         18:27

20 for the claimants.                                          18:29

21      And so, we talked to them about this strategy,         18:33

22 and they wanted to do it in a way -- and all these          18:38

23 companies to their credit wanted to -- to -- to file        18:41

24 bankruptcy in a way where they could not subject the        18:44

25 entirety of their enterprise to the filing.  But at         18:48

1   the same time, they didn't want to be criticized for          18:50

2   having harmed the claimants in any way.                       18:53

3        So, in all of these cases including J&J, the             18:56

4   divisional merger was done in a way where the                 18:58

5   liability was allocated to the entity that filed.  So,        19:02

6   in the J&J case, it was the talc liability.  There            19:06

7   were operating assets put into that entity although           19:09

8   they were put into a subsidiary.                              19:11

9        But the most important thing is, and it's often          19:13

10  overlooked in the press, is that there was a                  19:16

11  funding agreement that was put in place between the           19:19

12  entities that it split.  It's a little more                   19:21

13  complicated than this.  I'm simplifying.  But the             19:24

14  entity that received the the larger segment of                19:27

15  the assets agreed to provide funding unlimited, you           19:30

16  you know, basically, capped only by its ability to            19:33

17  pay to back step -- back stop the obligation of the           19:37

18  entity that filed to pay the claims.                          19:39

19       And the idea was, and these companies all felt           19:41

20  the same way, was we don't even want to have an               19:45

21  argument.  We -- we would like to avoid an argument           19:47

22  that there  was any kind of fraudulent transfer here.         19:48

23  So, we're not interested in putting a cap on the              19:54

24  funding agreement.  We're not interested on just              19:55

25  allocating certain assets and putting all the other           19:57

1  ones there and not having a funding agreement.  We'd          20:00

2  like to do it in a way where we can say to the                20:02

3  claimants and say to court, look, the same assets             20:05

4  that were available before the Chapter 11 to support          20:09

5  the payment of these claims are available post the            20:12

6  Chapter 11.                                                   20:13

7       JUDGE JONES:  How -- how has that worked out for         20:14

8  you so far?                                                   20:15

9       MR. GORDON:  That's not worked out too well.            20:15

10  That's not worked out too well.                               20:18

11       JUDGE JONES:  I do have a question.  So, when           20:20

12  you're making -- when you're making that decision as          20:22

13  to the allocation, why it is important that the               20:25

14  company that has the perspective tort liability also   2      0:30

15  have operating assets?  Why wouldn't you just -- why          20:33

16  wouldn't you just dump a bunch of cash in there and           20:36

17  say there you go?                                             20:38

18       MR. GORDON:  Well, from our -- you know, we've          20:39

19  always felt -- you know, we've tried to look forward          20:40

20  into these cases and think through what do you need           20:45

21  to have?  What position do you need to be in order to         20:47

22  ultimately confirm a plan?  And it's been our view            20:50

23  for a long time that you have to have an operation.           20:52

24  You -- you need to have something to reorganize at            20:55

25  the end of the day.                                           20:56

Page 20

1        And you may be aware of the fact that in some of      20:58

2   the earlier asbestos cases, companies actually had to      21:02

3   to literally buy a business or bring in an operating      21:05

4   business in order to meet the requirements under the      21:07

5   code to confirm a plan.  So, we just did that all      21:11

6   from the beginning.  We -- we just said to these      21:13

7   companies, look, it makes sense to put in an      21:15

8   operating business, something that we can reorganize      21:19

9   around at the end of the day.      21:20

10     MS. KIELSON:  So, is the potential recovery then      21:21

11   if the funding is unlimited, the potential recovery      21:25

12   would be the same as if the entire J&J went in?  Is      21:29

13   that (crosstalk) now?      21:30

14     MR. GORDON:  Well, no.  See, that's another      21:31

15   important point I should make.  The -- the      21:35

16   plaintiff's bar likes to argue about J&J, the      21:38

17   ultimate parent, and they like to talk about the net      21:40

18   worth of the ultimate parent.  But what they ignore      21:44

19   is that the -- the entity that filed is the product      21:48

20   of a split of an indirect subsidiary of J&J which is      21:53

21   where the liability actually sat.      21:55

22     Now, it's also a very large company called      21:57

23   Johnson and Johnson Consumer, Inc., but that's the      22:00

24   entity that split.  The entirety of its assets remain      22:04

25   available.  But the other thing that was done in      22:07

Page 21

1  J&J which it wasn't done in any of the other cases,          22:09

2  J&J itself agreed to become a co-obligor on the             22:14

3  funding agreement to the extent of the value of that        22:17

4  indirect subsidiary we refer to as JJCI.  And that          22:23

5  was just to provide further comfort that assets --          22:26

6  the assets would be available.                              22:28

7      Because one of the criticisms we've had from the       22:30

8  plaintiff's bar in the other cases is well, there's         22:32

9  nothing to stop the entity that didn't file from           22:36

10 dividending all its assets away.  And so, we said          22:38

11 okay, well we're -- we're gonna solve that problem         22:41

12 by having the ultimate parent actually be a                22:44

13 co-obligor.  So, if you're worried about assets being      22:48

14 dividended up, the ultimate parent is also there and       22:51

15 agreeing to be a co-obligor to the extend of the           22:53

16 value of that entity.                                      22:56

17     MS. TSIOURIS:  So, I just want to unpack a            22:58

18 little bit for the audience for folks who aren't as        23:01

19 familiar with these cases, because you may be hearing      23:02

20 from us.  At least I think that's the way the              23:06

21 panelists are going which is the statute provides for      23:10

22 a very sort of orderly separation of assets between        23:14

23 two or more entities that would otherwise be allowed.      23:18

24 It just sort of provides more for a short-cut and          23:21

25 allowing it to be done by statute and through a            23:21

1  single plan of merger as opposed to multiple                    23:26

2  conveyances and contractual agreements.                          23:28

3       So, that is a concept that sort of already                  23:30

4  existed.  What was novel and unprecedented there was             23:33

5  just really sort of making it one single much easier             23:39

6  sort of contractual process in terms of doing it                 23:41

7  through a plan of merger.  Too, you're hearing in                23:44

8  the J&J case that there was there was this funding               23:46

9  agreement that was put in place to fund all the                  23:50

10 claims, not to leave behind an insolvent entity.  So,            23:53

11 you might be thinking sort of well, what's, what's               23:56

12 the issue here?  What is the big sort of hullabalu?              23:59

13 What are people raising in the J&J case?                          24:03

14      And I think that there is really sort of two                24:05

15 issues that people are bringing up with the Texas Two            24:08

16 Step, that one, it is a fraudulent conveyance still,             24:13

17 so I want to get people's thoughts.  And we've talked            24:15

18 a little bit about the transfer issue.  Get panelist's           24:18

19 thoughts on what -- how strong of an argument is it              24:22

20 when you're hearing that there is a funding agreement?           24:23

21 How strong of an argument is it that it's a fraudulent           24:27

22 transfer, one?  And two, is it really more just a case           24:30

23 of bad faith that you're abusing the bankruptcy system           24:34

24 in some way, and something here is untoward, and you             24:37

25 are supplanting other systems that exist for dealing             24:41

Page 23

1   with these types of claims with the bankruptcy code   24:44

2   and this shouldn't be allowed?   24:46

3       So, I want to take those in turn.  One, on the   24:49

4   fraudulent conveyance arguments.  Brya or Jeff, do   24:53

5   you want to kind of give thoughts on -- on how strong   24:55

6   those are, and then we'll turn to the bad faith   24:58

7   arguments people are raising?   25:00

8       MR. GLEIT:  Yes, no.  I'm happy.  Is it all right   25:02

9   if I start?   25:02

10      MS. KIELSON:  No, yeah -- yeah, go.   25:03

11      MR. GLEIT:  Yeah oh.  So, when I first looked at   25:06

12  the issue, and I'm ready for Judge Jones to come at me   25:10

13  now with -- with a question or two.  You know, to me   25:14

14  it appeared like it would be an obvious fraudulent   25:17

15  conveyance unless the funding agreement really is,   25:19

16  you know, backs it up and provides sufficient value   25:22

17  to -- to turn it into a viable transaction.   25:26

18  Earlier today, we were talking about whether that's   25:30

19  the right vehicle to -- to file a fraudulent   25:33

20  conveyance complaint, you know, who the defendant   25:35

21  would be.   25:36

22      I would take the position that you would sue J&J   25:38

23  and try to unwind the transaction.  Others on this   25:41

24  panel think that that's not the right way to go about   25:44

25  it.  But in my mind, what -- what -- when you first   25:50

Page 24

1  look at the Texas Two Step and you look at J&J, you                25:54

2  say hey, this is problematic.  It's really trying to               25:56

3  force all these claimants into a bankruptcy court                  25:59

4  where they don't want to be.                                       26:01

5       And then when you dive deeper into it and really              26:04

6  start looking at it, it's really more of a forum of                26:07

7  -- a forum for like negotiation, right?  So, you --                26:10

8  you argue bad faith.  You argue fraudulent conveyance.             26:12

9  And it's really just coming down to what we all deal               26:15

10  with on a daily basis.  It's money, right?  We -- we              26:18

11  are bankruptcy lawyers.  We split up a pie.                       26:19

12       And -- and it -- it enables a company to -- to               26:23

13  deal with the fraudulent conveyance issue because you             26:26

14  -- you then value the, you know, the -- the amount of             26:29

15  claims at issue.  You see whether J&J can back it up.             26:33

16  And assuming they can, you know, I don't believe it               26:35

17  would be a fraudulent conveyance.  And if they can't,             26:38

18  I would file a complaint which Judge Jones might                  26:40

19  dismiss because I didn't name the right defendant,                26:44

20  but I would name Johnson and Johnson and try to                   26:47

21  unwind the transaction.                                           26:48

22       JUDGE JONES:  So, we -- we were having a little              26:50

23  bit of fun before -- before the -- before the                    26:53

24  presentation.  And so, I -- I -- I said tell me --                26:56

25  tell me who the plaintiff is.  Tell me who the                    26:58

Page 25

1  defendants are.  Tell me what the transfer is that          27:01

2  you're seeking to avoid.  Because I've never heard          27:05

3  a really good start to finish answer to that                27:08

4  question.  And in all fairness, I will tell you             27:11

5  Jones' personal view.  I think it's absolutely the          27:14

6  wrong claim.                                                27:16

7      I think it's where all of the discussion is right       27:17

8  now.  I think that there is a much scarier claim out        27:21

9  there that I'm waiting to see brought.  And someone's       27:24

10 gonna say, well what it is, and I'm gonna tell you          27:27

11 that that's the one question I won't answer today          27:28

12 because then it becomes, well Jones said.  And that's       27:31

13 I get in trouble for that all the time.                     27:34

14     But I -- I actually do think that the fraudulent        27:37

15 transfer issue's the wrong claim if what you're             27:41

16 trying to do is you're trying to reach all the way          27:45

17 back.  Because think about it.  From the debtor's           27:48

18 perspective, just 548, what transfer of assets did          27:54

19 the debtor make?  They didn't make any, right?  So,         27:58

20 you've gotta look at the other side of 548 and you          28:00

21 gotta look at the occurrence of the obligation.            28:02

22     Who are you gonna sue?  An entity that doesn't          28:05

23 exist? And what's what gonna get you?  You know, are        28:11

24 you now reaching into 550 and trying to make               28:13

25 creative use of 550 to get there?  And what's the           28:16

1  ultimate result of  that?  And again, I think you          28:20

2  come back to, I mean, all of these are unrelated,          28:22

3  you know.  What does that funding agreement really         28:24

4  say?                                                        28:25

5      You know, in Jones' mind that's not the scary          28:29

6  lawsuit that if this really is a negotiation where         28:31

7  you get people at the table.  But that's -- that's         28:33

8  just my view.                                              28:34

9      MR. GORDON: Yeah, and I -- and I would just say        28:36

10  that when we've seen these fraudulent conveyance           28:40

11  allegations be made or even when there have been some      28:44

12  lawsuits filed, typically when you read the                28:47

13  complaints or you hear the allegations, the -- the         28:49

14  way they get there is they just ignore the funding         28:52

15  agreement.  It's as if it doesn't exist.                   28:54

16  And so, they -- they -- they -- there's a bunch of         28:57

17  pejorative terms that are typically used, but one we       29:00

18  often hear is that, you know, bad co and a good co.        29:04

19      And they just talk about how the bad co has been       29:05

20  left with very limited assets and, you know, all the       29:09

21  good assets were sent to the other entity.  But with       29:12

22  absolutely no discussion, no disclosure about the          29:16

23  funding agreement.  And from our perspective, the          29:18

24  funding agreement's key and it's so important that in      29:21

25  our cases in our first day declarations, we've             29:25

Page 27

1  attached that as an exhibit just to sort of say to          29:29

2  the -- the judge or the court right off the bat,             29:31

3  look, this was done.  It just -- we don't want you to        29:34

4  be confused about it.  This is what we -- we've done.        29:38

5  Then the argument turned to well, it's a loser.              29:40

6      MS. TSIOURIS:  Greg, sorry to interrupt you.             29:41

7      MR. GORDON:  Yeah.                                       29:41

8      MS. TSIOURIS:  Could it be that people are               29:42

9  worried that the funding agreement is illusory?  And         29:46

10 how do you combat those arguments?                           29:47

11     MR. GORDON:  Well, that's what I was just gonna           29:47

12 say.                                                         29:47

13     MS. TSIOURIS:  Okay.  Go for it.                          29:48

14     MR. GORDON:  Yeah.  All right.  That's -- that's          29:50

15 good.  We're in sync, yeah.  So, I was gonna say             29:52

16 then the argument turned to it's illusory.  Well,            29:54

17 how it is illusory?  Well, because it's not the             29:59

18 same as the claimants having a direct claim to the          30:03

19 assets.  Like if the entire company had filed, they          30:04

20 would have a direct claim.  Everything would be             30:07

21 there.                                                      30:08

22     And my view on that is that's sort of a form of          30:11

23 resubstance in a way, and I ever heard -- I've --          30:14

24 I've heard judges say that, you know, the problem is         30:17

25 that you've got the affiliates, and the debtor is           30:20

Page 28

```
 1  never going to enforce the funding agreement.  So,        30:22

 2  that -- that's the problem.  You have the funding          30:24

 3  agreement but the claimants are now a step removed.        30:27

 4  The debtor isn't going to enforce it.                      30:28

 5      And -- and my reaction to that is that's kind of       30:30

 6   an insult to the bankruptcy judge.  So, we're --          30:33

 7  we're There in the bankruptcy court.  We're a debtor       30:36

 8  in possession.  We're a fiduciary.  We elect not --        30:39

 9  the other side breaches, we elect not to enforce?          30:40

10  Is the bankruptcy judge gonna let us get away with         30:42

11  that?  You --                                              30:44

12      JUDGE JONES:  So, let me -- let me --                  30:45

13      MR. GORDON:  What would you do?                        30:46

14      JUDGE JONES:  I try all sorts of things, but           30:47

15  that's certainly (inaudible).  So, -- so, could I ask      30:50

16   you the finding agreement.  Executed pre-petition?        30:53

17  Post-petition?                                             30:54

18      GORDON:  Pre-petition.                                 30:55

19      JUDGE JONES:  What do you view that agreement          30:57

20  is?  Is it an executory contract that must be assumed?     31:00

21      MR. GORDON:  Ah.                                       31:00

22      JUDGE JONES:  Is it something else?  What's --         31:01

23  what -- what does all that mean?                           31:04

24      MR. GORDON:  That's a very complicated issue           31:05

25  which --                                                   31:07
```

Page 29

1        JUDGE JONES:  I have lots of time.                    31:10

2        MR. GORDON:  Yes, but this audience doesn't have      31:12

3    lots of time.  I'm -- I'm not gonna answer that          31:15

4    question.                                                 31:16

5        JUDGE JONES:  Is there a United States Marshall       31:18

6    in the room?                                              31:20

7        MR. GORDON:  So --                                    31:22

8        MS. KIELSON:  Is there -- is there any                31:24

9    negotiation in the funding agreement?  I assume that     31:27

10   with any of the plaintiff's bar or --                    31:31

11       MR. GORDON:  Well, you know, that -- again, that      31:32

12   -- that's an argument we hear all the time.  This is      31:34

13   an agreement.  It wasn't negotiated.  It's between        31:37

14   affiliates.  And we don't deny that.  I mean, it's        31:40

15   not like affiliates negotiate with each other in          31:44

16   that sense.                                               31:45

17       To me, the question is is it a -- is it               31:47

18   a fair agreement?  It is beneficial to the estate or     31:50

19   not?  That's all open.  I mean, we're -- you know,        31:54

20   we're there.  We've tried to be open in all these         31:56

21   cases.  We are here.  We are disclosing everything.       31:59

22   This is what we've done.  We described in detail          32:02

23   every step of these transactions.  We turned over all    32:05

24   the documents for these transactions, and we said        32:08

25   it's -- it's completely open and, you know, we'll        32:11

Page 30

1  answer any questions.                                    32:11

2       And, you know, we -- what we get back are a lot     32:14

3  of very generalized, negative statements.  It's a bad    32:16

4  co.  It's a fraud.  It's -- it harmed claimants, but     32:20

5  there's never any real specifics.  And even with the     32:23

6  funding agreements, it's been frustrating because        32:25

7  we'll hear this is an illusory contract that has         32:28

8  all kinds of problems, and we'll say okay, what are      32:30

9  the problems?  Because we'll listen to your concerns     32:34

10 and we'll try to address them, and that's a dialogue     32:36

11 we generally have not had in many cases.                 32:38

12      JUDGE JONES:  So, I want to come back to my         32:39

13 question.                                                32:39

14      MR. GORDON:  Yeah.                                  32:40

15      JUDGE JONES:  So, what -- what is it?  What do      32:42

16 you do with it?  Do you get it approved by the court?    32:44

17 Does it just --                                          32:45

18      MR. GORDON:  We did not get them approved by the    32:46

19 court, no, because they were in place when the           32:50

20 filing occurred.                                         32:50

21 JUDGE JONES:  So, -- so, you must take the position      32:52

22 that they're not executory, right?                       32:54

23      MR. GORDON:  I'm not going to reduce my -- my       32:57

24 flexibility on that issue.                               32:59

25      FEMALE SPEAKER:  Go (inaudible).                    33:01

1      MR. GLEIT:  You know, I actually have a question          33:02

2  which is, you know, we're talking about the funding          33:03

3  agreement and constructive fraudulent conveyance.            33:05

4  You know, at one point I thought maybe an intentional        33:07

5  fraudulent conveyance could be a stronger argument           33:09

6  with like intent to hinder, delay creditors.  Now,           33:14

7  how'd you tackle that, Greg?                                 33:15

8      MR. GORDON:  Well, I think -- I think to me, the         33:18

9  one -- the one big problem with an intentional               33:20

10  fraudulent conveyance, it seems to me as a practical        33:22

11  matter you have to be able to show that you were hurt.      33:25

12  There has to be some kind of damage.                        33:27

13      So, I would submit you can't even get out of the        33:29

14  starting gates with that because you haven't been --        33:31

15  you -- you just haven't been hurt by it.                    33:35

16      MS. TSIOURIS:  So, Jeff, just that was my --            33:38

17  gonna be my second question.  Do we think that actual       33:39

18  fraudulent transfer claims here are stronger?  And          33:43

19  it sounds like, you know, Greg's view is, you know,         33:46

20  there's no -- you have to show that you're hurt and         33:48

21  there's no harm shown yet.                                  33:50

22      MR. GORDON:  Well, that's one thing.  And I -- I        33:51

23  -- I think the other thing is if you're trying to           33:54

24  make a hinder or delay case, that to me is based on         33:57

25  the fact that there was a bankruptcy filing.  And if        34:00

1  that's the basis for an intentional fraudulent           34:03

2  conveyance claim or actual fraudulent conveyance          34:04

3  claim, it seems to me any time any company files for      34:08

4  bankruptcy you could make that argument.  And that,       34:10

5  to me, doesn't make -- make sense either.                 34:12

6      JUDGE JONES:  So, I also I just want to make          34:14

7  sure that we don't forget that, you know, we talk         34:17

8  about this in broad terms and even while -- even          34:20

9  though I think it's the wrong claim as I've said          34:22

10  before, I -- every one of these is going to be           34:28

11  slightly different.                                      34:28

12      And so, I do think that there are degrees based      34:31

13  upon all sorts of factors that you could reach           34:35

14  different conclusions about a particular transaction.    34:39

15  And I don't -- I don't think that any of us should       34:42

16  leave with the notion that well, this is always good     34:45

17  or this is always bad.  I -- actually think that         34:48

18  there's so many moving parts to this that you have to    34:51

19  look at the entirety of the structure before you start   34:55

20  deciding what to do about it.  I -- I just don't think   34:57

21  it's one of those black and white issues.                34:59

22      MR. GORDON:  So, -- so, I completely agree with      35:02

23  that.  And one of the frustrations I've had --           35:04

24      JUDGE JONES:  And -- and then we can move to the     35:05

25  executory (inaudible), huh?                              35:07

1      MR. GORDON:  And -- and one of the frustrations        35:09

2  I've had is the other side I think always tries to        35:11

3  make it just this black and white thing, and from         35:13

4  their -- what -- what I hear from their arguments is       35:16

5  any divisional merger that's done prior to a              35:19

6  bankruptcy is a problem.  It -- it -- it -- it -- it       35:24

7  -- it leads to a conclusion definitively that it was      35:27

8  a bad faith filing.  It's definitely a fraudulent         35:30

9  conveyance, and I've said in some of these arguments      35:33

10  we've had, that -- that just can't right.                 35:34

11      It can't be that every divisional merger no          35:38

12  matter how it's done, no matter how assets or            35:40

13  liabilities are allocated, whether there's a funding     35:42

14  agreement or there's not a funding agreement, it can't   35:45

15  that they're all bad.  And so, that -- that's why I      35:48

16  strongly agree with what you're saying.                  35:50

17      I -- I do agree they need to be evaluated, and       35:52

18  you can certainly envision ways that a divisional        35:54

19  merger would be done that would be a problem.  But       35:57

20  the question is is -- is the transaction before the      36:01

21  court?  And, you know, its various indicia, is that      36:04

22  a problem or not?                                        36:05

23      MS. TSIOURIS:  So, just touching on the bad          36:08

24  faith argument for a bit, and understanding that,        36:12

25  you know, these cares are nuanced.  But how strong       36:16

Page 34

1    do you think, Brya, the bad faith argument is in          36:19

2    these Texas Two Step cases where it seems that the         36:22

3    clear purpose is taking advantage of either 524G,         36:26

4    the channeling provisions that were put in place          36:29

5    after the asbestos litigation, and/or just dealing        36:33

6    with these, you know, MDL litigations that, you know,     36:36

7    J&J is dealing with?                                      36:38

8        MS. KIELSON:  I think -- I think like we just         36:40

9    said, it's very case specific.  I think I can see a       36:43

10   situation where a company intentionally -- I mean,        36:47

11   it's extreme but right, intentionally creates a           36:50

12   product that they know is poisonous.  There's all         36:53

13   these claimants, and they put it into bankruptcy with     36:55

14   this Texas Two Step.                                      36:55

15       And so, I think that there definitely are degrees     36:59

16   and it's very fact specific, and I think that we          37:02

17   can't lose sight of, as we just said, that -- that        37:05

18   -- that for sure is a possibility.                        37:07

19       MS. TSIOURIS:  Okay.  And so, we've talked a lot      37:10

20   from the company's perspective about the pros of a        37:15

21   company putting itself through this Texas Two Step        37:17

22   plan.  Maybe does anybody want to take, you know, the     37:22

23   side of there's some pros here for claimants or           37:24

24   creditors in terms of having these types of claims        37:28

25   estimated and run through and paid through the            37:30

1  bankruptcy process as opposed to staying outside of    37:33

2  the bankruptcy court?    37:34

3      MR. GLEIT:  Yeah, I'm happy to start with that.    37:36

4  Look, when I first read about J&J I was offended.  I    37:41

5  thought it was outrageous and it was harming    37:43

6  claimants and creditors.  And as I delved into it    37:45

7  more, and, you know, in looking through the Purdue    37:49

8  case as well actually, I -- I believe that the pro    37:53

9  for the claimants would be that it leads to a more    37:55

10 equitable distribution.    37:56

11     So, Greg had mentioned, if you're the first    37:58

12 claimant and you get 4-billion-dollar judgment, you're    38:02

13 not happy about this Texas Two Step.  But if you're    38:05

14 number 40,000 online and waiting for the remaining    38:08

15 assets to be distributed to you, you're never gonna    38:10

16 see a dime.    38:12

17     What -- what -- what this does is it creates a    38:14

18 forum where everyone can file their claims, and on a    38:18

19 more judicial, equitable basis you will provide a    38:22

20 benefit, you know, to all claimants.  And I -- I    38:26

21 actually truly do believe that.  And is it a perfect    38:29

22 system?  No.  We all know that, but -- but it is one    38:33

23 way of -- of -- of -- of protecting claimants.    38:36

24     And -- and when you see some of these cases, I    38:38

25 mean, whether it's Purdue or Johnson and Johnson,    38:41

1   sometimes like a lot of the objectives in the bar or          38:43

2   in, you know, the plaintiff's bar, it's really just          38:45

3   political, you know, to get your name in the press.          38:47

4   And if you really think about it, a fair process          38:52

5   where 76 percent of the creditors, you know, have a          38:55

6   -- have to sign onto, it's a fair process with an          38:59

7   imperfect world.  So --          39:01

8        MS. KIELSON:  It does seem though that which I          39:02

9   just realized or remembered that you had mentioned          39:04

10  the MDL.  Is this -- is this a situation where          39:07

11  bankruptcy potentially is going to supplant that?          39:11

12       MS. TSIOURIS:  That process.          39:12

13       MS. KIELSON:  That process?  And is that          39:15

14  politically or otherwise something that, you know, we          39:18

15  collectively can get behind?  Is that -- is that where          39:22

16  this is going and maybe it's just in certain          39:23

17  situations?  But I think that definitely is an          39:25

18  interesting issue, because from their perspectives          39:28

19  who are we to say that this is the best thing for          39:31

20  the claimants?          39:31

21       But then to analogize it to preferences, it --          39:34

22  it's a similar type of a situation.  Yes, you were          39:37

23  beneficial.  You know, you were benefited by being          39:39

24  paid first, but shouldn't it really be in the spirit          39:42

25  of the code that it's all pooled together and everyone          39:45

Page 37

1  is treated equally?  So, it's -- it's something that   39:48

2  I kind of go back and forth with with regard to that.   39:51

3      MS. TSIOURIS:  Yeah.   39:51

4      JUDGE JONES:  So, and I'm sorry.  If we could go   39:54

5  back in history just a bit that you all are way too   39:58

6  young.  But if we go back to the asbestos world if   40:02

7  you remember what that was like in its heyday, you   40:06

8  had a lot of the same reactions from the plaintiff's   40:09

9  bar, and you had -- you had a pull and a tug going on.   40:12

10  And there -- there was a balance of we want to pay,   40:16

11  we, you know, we have to pay claims.  We want to be   40:18

12  able to go forward.  You're -- you're trying to   40:20

13  balance that with the right of everyone to have their   40:24

14  day in court whatever that means.   40:28

15      And you saw over time that a process developed.   40:32

16  And I think that most folks today would tell you   40:35

17  that that process ended up in a really good place   40:39

18  although it took some time.   40:41

19      And I think you also, and this is just the   40:43

20  different environment at least from my point of view,   40:46

21  what you saw back then was you saw Congress saying   40:50

22  what does the judiciary need in order to become   40:54

23  efficient in the administration of these types of   40:58

24  cases and claims.  And it gets me to if you've read   41:01

25  the legislation as I'm sure that you all have,   41:05

Page 38

1   there's been a entirely different tone.                    41:08

2       It's -- and I have all the respect in the world       41:10

3   for -- for those folks who sit in Congress and -- and     41:13

4   -- and deal with what they with and -- and put forth      41:15

5   legislation.  But it's changed to now we're gonna         41:20

6   tell you what you need and what you can and can't do,      41:23

7   and it really bothers -- it really bothers me that        41:27

8   we're now gonna define a class that we're gonna say       41:30

9   if you fall in this class you can't have access to        41:34

10  the bankruptcy process.  I mean, that just really         41:36

11  bothers me from an open court's prospective.              41:38

12      Do I think that we're at the right place with         41:42

13  respect to the Texas Two Step?  Of course, I don't.       41:45

14  I mean, we've had four cases.  I do think as -- as        41:48

15  we see more cases filed, and I do think that you will,    41:53

16  I think you'll see the process that has worked so well    41:56

17  over so many years is that we'll find the right place     41:59

18  for those claims to get handled.  I -- I hope that at     42:03

19  some point Congress will say judges already have a        42:07

20  host of tools.  Maybe we need to expand 524G which        42:11

21  is something I've advocated for a really long time.       42:14

22  No one listens.                                           42:16

23      But I -- I do think that eventually it'll get         42:20

24  to the right place.  Because as you said, this is all     42:22

25  about money and I -- I know you said it kind of           42:24

1  tongue in check, but economics -- if you assume that        42:27

2  economic actors act in their own self interest which        42:30

3  is something so easy to predict and it's something          42:33

4  that keeps everything fair and open, that we'll end         42:37

5  up in a process that just makes sense.                      42:39

6      And again, I, you know, I don't have one of            42:43

7  these, but I've been thinking about it an awful lot,         42:47

8  and my belief is I have a whole tool chest of things        42:51

9  that I can do to push the A case in my mind in the          42:57

10 right direction, you know, whatever -- whatever that        42:59

11 might be.  That was way longer than it was inside my        43:01

12 head and I apologize.                                       43:03

13     MR. GORDON:  So, I -- so, -- so, I would just          43:06

14 add a couple of things.  The -- you know, the MDLs          43:09

15 can't do what a bankruptcy case can do.  And,              43:13

16 you now, we -- we shouldn't underestimate what can be       43:15

17 accomplished in bankruptcy, but an MDL, for example,        43:18

18 can't do anything with future claims.                       43:21

19     And so, in the LTL case, I mean, you've got            43:24

20 literally projections of another 50 years of tens of        43:29

21 thousands of claims being filed.  An MDL can't do           43:32

22 anything with that.  MDL is a very limited utility.         43:35

23 It's basically at best a settlement vehicle.  It            43:40

24 provides some information to the parties to try to          43:42

25 help them settle, but it can't do anything for future       43:45

Page 40

1    claims.                                                      43:46

2        In -- in addition, it's kind of undisputed by           43:49

3    everyone I think that the tort system doesn't work      4   3:52

4    for mass tort claims.  It just doesn't work.  And       4   3:56

5    the J&J case again is a -- is a great example.  J&J         44:00

6    has been able to -- to litigate only 10 cases per          44:05

7    year.  So, think about that.  You have 40,000 pending      44:08

8    cases.  You can do the math.  What's that, 4,000           44:12

9    years?  I mean, it's just -- it's just not the answer.     44:16

10       And, there's been other attempts to try to            44:19

11   figure out ways to overcome the tort system.  You      4   4:22

12   may -- well, I can remember because I've been around       44:24

13   for a while, but there are efforts to do it by class       44:27

14   action settlements, and those were ultimately rejected    44:31

15   by the Supreme Court.  Supreme Court said you can't        44:33

16   do it this way.                                            44:34

17   And, you know, Congress has recognized in the past         44:37

18   that the -- the tort system doesn't work for mass      4   4:40

19   torts.  And companies like the situation with J&J,     4   4:44

20   unless you're just willing to put yourself in a            44:47

21   position where you have a completely untenable             44:51

22   situation, unmanageable litigation, bankruptcy is         44:55

23   really the only option.  And if you really want to        44:58

24   get a permanent resolution of the liability that          45:01

25   allows you to deal with all current claims and all        45:03

1   future claims, that offers the only option.  And                45:05

2   then the question is how do you do it?                          45:08

3        And in these cases, these companies decided that           45:12

4   this was the best way for them.  The feeling was that           45:14

5   this -- this reduced their risks.  It reduced                   45:17

6   potential value loss for the business, but at the               45:19

7   same time, it was done in a way where the claimants             45:22

8   were essentially in the exact same position.  Yeah,             45:25

9   their litigation has stayed.  They don't like that.             45:29

10  I get that.  But their litigation would've been                 45:30

11  stayed if the entire company filed.                             45:33

12       So, you know, from our perspective, there's just           45:37

13  the -- the status quo was an untenable situation.               45:41

14  Bankruptcy presented the only option.  And bankruptcy           45:44

15  you can -- you can get to a resolution that solves              45:47

16  the problem, and it solves it in a way that I believe          45:50

17  is fair to everyone.                                            45:52

18       MS. TSIOURIS:  So, we have a couple questions              45:55

19  here.  I think we've answered them.  Greg's answered           45:58

20  them in his latest response, but --                             46:00

21       MR. GORDON:  Well, I wonder.  There's one other           46:00

22  thing I wanted to come back to if I could.                     46:02

23       MS. TSIOURIS:  Oh, please, yeah.                          46:02

24       MR. GORDON:  And that was the bad faith --               46:04

25       MS. TSIOURIS:  Okay.                                     46:04

Page 42

1      MR. GORDON:  -- question.  So, I mean obviously,      46:06

2  the -- the -- the other big issue here besides      46:09

3  fraudulent transfer, and to my mind is the bigger      46:11

4  issue, is whether filing a bankruptcy like this after      46:15

5  a divisional merger is bad faith.  Whether the case      46:18

6  should be dismissed as a bad faith filing.      46:20

7      And to me again, going back to what Judge      46:25

8  Jones says, it's a matter of what the facts and      46:27

9  circumstances are and whether the case was -- was      46:31

10  handled properly.  And in the Third Circuit, you      46:34

11  know, the standards are basically, did the case have      46:38

12  a proper purpose?  Judge Kaplan found that it did      46:43

13  because the -- the purpose is to permanently resolve      46:46

14  a very difficult liability that was incapable of      46:49

15  being resolved in the tort system.          4      6:50

16      Was the purpose of the bankruptcy just a      46:54

17  litigation strategy?  Some kind of strategy to get      46:56

18  an advantage in a litigation, in a lawsuit?  And I      47:01

19  think Judge Kaplan correctly found that's not the      47:03

20  situation here.  It's not like there was a lawsuit      47:06

21  or a small handful of lawsuits and you were trying      47:09

22  to change the relative positions of the parties in      47:12

23  that litigation.      47:13

24      And the other component is, is the company in      47:16

25  financial distress?  Was there really a need for a      47:19

1  bankruptcy filing?  And Judge Kaplan again found that      47:22

2  there was financial distress.  And I -- I submit that      47:25

3  in the -- the LTL situation, that was a -- that was a      47:28

4  relatively easy determination to make given what I      47:31

5  described before with the thousands of lawsuits, the      47:35

6  billions of dollars being paid, the prospect of      47:38

7  decades of additional litigation, the -- the potential      47:41

8  for massive verdicts at any time.  That -- that's --      47:45

9  if that's not financial distress, I don't know what      47:48

10  financial distress is.      47:49

11      So, the reason I -- I wanted to come back to      47:51

12  that is, again, to Judge Jones' point, it's not like      47:54

13  every one of these cases could survive a -- a bad      47:58

14  faith attack.  In fact, you know, this case is on      48:01

15  appeal.  Maybe it'll get reversed.  I -- I -- I      48:03

16  don't know.  But you can envision other situations      48:06

17  where companies couldn't make -- you know, could not      48:09

18  overcome these standards.  Maybe they can't really      48:12

19  show they're in financial distress because the      48:14

20  litigation is manageable.  Or -- or, you know, or      48:17

21  maybe it really was a litigation tactic if you look      48:19

22  at it more closely.  Or maybe there really wasn't a      48:23

23  a proper purpose.  Maybe their -- their aim was to do      48:25

24  something else.      48:26

25      So, there are safeguards built in not only in      48:28

Page 44

| | |
|---|---|
| 1  the code itself, but in the, you know, judicial gloss | 48:31 |
| 2  that's been put on the code that seems to me protects | 48:34 |
| 3  against the parade of horribles that we hear about | 48:37 |
| 4  from the other side in all these cases. | 48:39 |
| 5      MS. TSIOURIS:  So, Greg, so there -- we have a | 48:41 |
| 6  set of questions.  I think one you answered, but it's | 48:45 |
| 7  basically if the funding agreement is rock solid, then | 48:48 |
| 8  what's the purpose of the divisional transaction?  I | 48:51 |
| 9  think you answered that in your previous questions. | 48:54 |
| 10      The second -- previous answers.  The second | 48:57 |
| 11  question is does J&J differ from Tronox based on the | 49:02 |
| 12  existence of the funding agreement?  I don't know how | 49:05 |
| 13  familiar you are with Tronox off the top of your head | 49:06 |
| 14  if there was a funding agreement there or not? | 49:10 |
| 15      MR. GORDON:  I don't know that detail of Tronox. | 49:12 |
| 16      MS. TSIOURIS:  Yeah, I'm trying to (crosstalk) -- | 49:13 |
| 17      MR. GLEIT:  I don't think there was one, and I | 49:14 |
| 18  think that was the -- the big issue in the case.  It | 49:15 |
| 19  was spinoff.  They literally just put a bunch of bad | 49:18 |
| 20  assets in the subsidiary and then the case was | 49:21 |
| 21  unwound. | 49:22 |
| 22      FEMALE SPEAKER:  There was no funding agreement. | 49:23 |
| 23      MR. GLEIT:  Okay. | 49:24 |
| 24      MS. TSIOURIS:  No funding agreement.  Thank you | 49:2 |
| 25  to the audience member.  So, I want to shift a little | 49:29 |

Page 45

1  bit more to kind of where we see this going, and yes?      49:33

2       MALE SPEAKER:  I -- was wondering if the -- if      49:34

3  the panel could address.  There's at least two cases      49:38

4  in -- in North Carolina where the tort committee has  4    9:45

5  started a (inaudible) consolidation as a way to bring      49:49

6  in the -- all the assets of the parent company that      49:51

7  divided.  I was wondering what the panel thinks about      49:53

8  that tactic.      49:55

9       MR. GORDON:  Well, I'm not a fan of that.  I      50:01

10  mean, honestly -- well, first of all, Judge Whitley      50:05

11  who I have a great deal of respect for, he's allowed      50:09

12  that litigation to proceed.  We moved to dismiss      50:11

13  those lawsuits, and we thought we had good arguments      50:16

14  on the motion to dismiss.  He -- he denied those      50:19

15  motions.  But to me, it -- it's not a good fit for      50:21

16  this.  It doesn't make sense.      50:23

17       If you look at the standards for substantive      50:26

18  consolidation, they can't -- they can't be met in my      50:29

19  view.  There's no facts that really support      50:31

20  substantive consolidation.  And that's putting aside      50:34

21  the threshold issue that personally I can't get past      50:37

22  which is I've never understood, and I know there's      50:39

23  some courts in the Ninth Circuit that disagree with      50:41

24  me.  I've never understood that you could literally      50:44

25  substantively consolidate a non-debtor into a debtor.      50:47

Page 46

1  That, to me, is effectively an involuntary petition        50:50

2  against a non-debtor.  That -- that just makes no           50:53

3  sense to me.                                                50:54

4      I don't believe those lawsuits will ever have           50:57

5  any real legs even though we didn't prevail on -- on        51:01

6  dismissal.  But -- but even from the standard itself,       51:03

7  you know, as you know, generally you've got to show         51:06

8  that either the assets are so mixed they -- they            51:08

9  can't be separated, or that the company's basically         51:12

10 engaged in some sort of fraudulent shell game or            51:14

11 misrepresented their, you know, corporate status and        51:17

12 the like.  And there's no facts related that the            51:19

13 divisional mergers in my judgement that support any         51:22

14 of that.                                                    51:24

15     So, we're disappointed with the result, but at          51:26

16 the end of the day, I don't lose sleep over -- over         51:28

17 those lawsuits.                                             51:30

18     JUDGE JONES:  So, let me add to that.  And --           51:33

19 and could the gentleman just raise his hand again so        51:35

20 I can --  I'm sorry.  I just I lost track of you.  I        51:38

21 -- I got you.                                               51:38

22     I've only read the complaints.  I don't know any        51:44

23 of the other facts other than what's in the papers.        51:47

24 With what's in the papers, it doesn't make sense to         51:51

25 me.  As I told you before, I actually think there is        51:55

Page 47

1  a scary lawsuit out there.  That's not -- that's --          51:58

2      MALE SPEAKER:  (Inaudible).                               51:58

3      JUDGE JONES:  Nope, that's not it.  But I -- I            52:01

4  applaud you for really narrowing that down.  But             52:03

5  again, if again just what's in the papers it doesn't         52:09

6  make sense to me that that's -- that that's a                52:12

7  direction that's gonna bear fruit.  But obviously,           52:14

8  I could -- I could be wrong.                                 52:16

9      You know, the fact that it survived a motion to          52:20

10 dismiss in today's world doesn't mean very much to           52:24

11 me.  I think one of the next steps to take place we          52:29

12 may all learn something at least with respect to one         52:31

13 judge's view of -- of the claims.  But I, you know, I        52:35

14 think there are better ways to spend time.                   52:37

15     MALE SPEAKER:  I've got a question for Greg.              52:43

16 (Inaudible).  You had said earlier, I think, that the        52:47

17 Texas (inaudible) for a long time going back to 1989,        52:52

18 and that you hadn't really thought about it until            52:55

19 2016.                                                        52:56

20     Can you share with us was there a moment where           53:00

21 it dawned on you that that was the tool that you             53:03

22 wanted to use?  In Bestwall what made you                    53:07

23 decide to go that route when we'd seen other                 53:11

24 (inaudible) exercised in previous mass tort          5        3:14

25 (inaudible)?                                                 53:15

Page 48

1      MR. GORDON:  Yeah.  All -- all I can say about          53:17

2   that is we considered a lot of different options for      53:22

3   preceding with a corporate restructuring.  And after      53:26

4   looking at the options and thinking through what the      53:29

5   issues the company would likely face in a bankruptcy,     53:34

6   we viewed that to be the best option.                     53:36

7      JUDGE JONES:  At some point will we get to meet        53:39

8   the young man or woman that actually came up with the     53:41

9   idea?                                                     53:42

10      MR. GORDON:  Which idea?                               53:44

11      JUDGE JONES:  I was just having -- I'm -- I'm         53:46

12   going back to the whole executory comment.  That was     53:49

13   -- it was a circle.  I see you do have a couple of       53:52

14   other questions.                                         53:53

15      MS. TSIOURIS:  Oh, yes.                               53:54

16      MALE SPEAKER:  A quick question regarding            53:55

17   constructive (inaudible).  The assets, even if          54:00

18   you argue that through the funding agreement the        54:06

19   average will be part of the (inaudible).  The other     54:09

20   other side of the arragement is the liability.  When    54:12

21   the company is coming to the court with a petition,     54:16

22   these tort (inaudible) are unliquidated.           5    4:18

23      How do you address the fact?  What is the           54:22

24   value of (inaudible) liability and whether the         54:24

25   assets are (inaudible)?                                54:27

Page 49

1      MR. GORDON:  Well, I -- I would say that first          54:33

2  of all, to do a -- a standard constructive fraudulent      54:36

3  conveyance analysis, you would need to estimate the        54:39

4  liability.  But I would say that's all irrelevant in       54:43

5  these divisional mergers the way they've bee done,         54:45

6  because all the assets that were available before          54:47

7  remain available, so it doesn't matter whether the         54:51

8  company was technically insolvent before or not.  It       54:54

9  has the same ability to pay as it did before, so in        54:57

10  my mind that just makes that issue irrelevant.            55:01

11      JUDGE JONES:  So, if -- if I could just take a        55:03

12  slightly different approach to that is that there are      55:08

13  professionals out there whose entire careers are built    55:12

14  upon estimating, you know, the average claim in a mass    55:15

15  tort case.  And those are the, you know -- it just    5   5:19

16  becomes a -- a sort of war of the experts if you will.    55:23

17      But I -- there are folks out there who give --        55:25

18  who can -- you know, they've go this model already        55:27

19  built.  They can plug it in.  They can change the         55:30

20  assumptions, and they can -- they can give you --         55:33

21  they can give you their best estimate based upon          55:36

22  whatever set of input you give them.                      55:38

23      If -- if I were doing it, that's what I would         55:40

24  do.  I mean, and that's what I would expect to be         55:43

25  shown if it came to me in the context of litigation.      55:48

Page 50

1  Is that helpful at all?                              55:49

2      MALE SPEAKER:  Yeah.  Thank you.                 55:51

3      JUDGE JONES:  Okay.                              55:51

4      MS. TSIOURIS:  I saw a second hand.  Yeah?       55:52

5      MALE SPEAKER:  I'm still confused, I guess.  If  55:56

6  all of these assets remain available, I'm having a   56:02

7  hard time understanding the purpose of the additional 56:05

8  transaction and why you just don't put the entire    56:08

9  entity into bankruptcy and then propose the same     56:12

10 sort of mass tort resolution scheme as part of the   5 6:16

11 class both present and future.  What's the purpose of 56:20

12 the divisional transaction if everything is still    56:22

13 available?                                           56:22

14     MR. GORDON:  Well, the -- the purpose is that    56:26

15 you avoid having the entire company and all it's     56:30

16 other stakeholders subjected to a bankruptcy filing. 56:33

17     So, imagine with a Georgia Pacific or a -- this  56:37

18 Johnson and Johnson and subsidiary, how much more    56:41

19 complex and difficult the bankruptcy case would be.  56:46

20 I mean, you'd have all other manner of stakeholders  56:50

21 you would have to deal with, much larger company     56:55

22 subjected to, you know, all the -- the obligations   56:59

23 of a bankruptcy filing.  Far more complicated, and   57:02

24 for -- from my perspective for no real -- for no real 57:05

25 purpose.                                             57:06

Page 51

1     And -- and I would submit that the claimants are          57:08

2  actually better off by companies that do it this way.       57:14

3  Because from their perspective, they -- they don't          57:16

4  have the worry that the entity that's a backstop for        57:20

5  the funding is subjected to the risk of a bankruptcy        57:23

6  filing and the potential loss in value.  But -- but         57:25

7  that's the reason to avoid the complexity, the cost,        57:30

8  the impact on customers, suppliers, and others, and         57:33

9  just instead focusing on the liability that needs to        57:36

10  be addressed.                                               57:37

11     MALE SPEAKER:  And is the funding agreement just         57:40

12  one secured obligation of the entity?  So, in other        57:44

13  words --                                                    57:44

14     MR. GORDON:  It is.                                      57:44

15     MALE SPEAKER:  -- that you know that -- that --          57:46

16  that entity that is free of the liabilities goes out       57:50

17  into the marketplace but it could in theory encumber       57:54

18  all of its assets and that funding agreement would be      57:58

19  subordinate to all that secure net?                        57:59

20     MR. GORDON:  Theoretically it could do that.            58:00

21     MALE SPEAKER:  That might be a reason why you'd          58:02

22  want the (inaudible) go in.                                 58:03

23     MR. GORDON:  Well, and I -- that -- that's an            58:05

24  argument that's been made on the other -- on the           58:07

25  other side.  I mean, from my perspective, it -- it         58:10

Page 52

1  wouldn't make sense.                                    58:12

2  It's always to me been impractical and illogical        58:15

3  for people to argue that a company would go through      58:17

4  this process for the purpose of resolving its            58:21

5  liabilities, then would take steps to basically          58:24

6  undermine the whole purpose of the transaction.          58:27

7  Because then you could imagine well-founded              58:30

8  fraudulent conveyance suits. You could imagine the       58:32

9  case being dismissed as a bad faith filing or            58:35

10 dismissed for other -- on other grounds.  And I --       58:38

11 that just seems very impractical.  To me, in -- in       58:40

12 all of these cases, there's never been a default         58:43

13 under the funding agreements.  The payments are being    58:45

14 made regularly to support the funding of the             58:48

15 professional fees which are substantial in the cases.    58:52

16     JUDGE JONES:  So, I if -- if I could just add to     58:54

17 that just a bit to try to take your question in a        58:57

18 little different direction.                              58:58

19     There aren't any rules that I'm aware of as to       59:02

20 what a funding agreement has to say, what it has to      59:05

21 be, what it is comprised of.  And I do think that all    59:09

22 of those issues -- and again, coming back around to      59:12

23 the executory nature of the obligation if it is one,     59:16

24 I think there are a whole host of things that can be     59:19

25 done if there's a concern about the relative strengths   59:23

Page 53

1  or weaknesses of that funding agreement.  Haven't          59:25

2  really seen that play out.  I mean, it's -- we              59:28

3  haven't gotten to the point yet where we've really         59:31

4  started to test what -- to test the composition of         59:34

5  those agreements.                                           59:36

6       But I also want to come back to where you             59:37

7  started why do it?  I'm gonna come back to a prior          59:42

8  comment I made where every single one of these is          59:45

9  different.  And let me pick an example which I hope         59:49

10 pertains to nothing that's pending.                         59:51

11      You know, think about if you -- if you had a          59:54

12 situation where you had a mass tort liability but    5      9:56

13 your business model included relationships with            60:00

14 foreign governments.  I mean, you could -- and, you        60:03

15 know, when you -- when a governmental entity, and          60:06

16 I've had a couple of these, when they find out that        60:09

17 there is a U.S. bankruptcy, there is a horrible            60:14

18 reaction to that concept.                                   60:15

19      So, I mean, there could be all sorts of              60:17

20 strategic reasons both driven by business as well as       60:20

21 ultimate resolution that you could make that decision.     60:23

22 And I don't think that there's a -- there's a simple       60:26

23 answer as to why do it.  I think you have to say          60:30

24 which case, what the issues are, what's trying to be       60:33

25 accomplished because I think that they will vary.          60:36

Page 54

1    I -- I certainly think there could be a well, I        60:39

2  went to this seminar and I saw Texas Two Step and,       60:42

3  you know, that just seems really fun.  Which since        60:44

4  -- since we're almost done, I have to share with you.     60:46

5  I was -- I was speaking -- I was speaking to the New      60:50

6  York TMA earlier this week, and we were talking about     60:55

7  the Texas Two Step and I got asked a lot of questions.    60:58

8  And again, you guys do realize I don't have one of        60:59

9  these, so it's just an opinion.                           61:03

10    And I -- I continue to talk to a lot of -- a lot       61:07

11  of the folks that I came up with who are doing these     61:10

12  transactions, have done them for years, and it's         61:13

13  really interesting.  Because I came out of -- I came     61:15

14  out of (inaudible).  I know that's not surprising        61:17

15  given where I live.  And I talk to a lot of the folks    61:21

16  that do these transactions and they go, well, you        61:23

17  know, it's all funny.  The Texas Two Step is, you        61:26

18  know, we're all laughing at that, you know.              61:27

19  We do, you know -- we use the Pennsylvania statute,      61:30

20  and we have in an effort to follow suit, we have         61:33

21  named it the Pennsylvania Polka.  That -- that's --      61:37

22  that's all the wisdom I got today.                       61:40

23    MS. TSIOURIS:  All right.  We're past the hour.        61:42

24  I saw one more hand, but I feel free for folks who       61:45

25  have questions to come up the panelists.  I just want    61:48

Page 55

1  to thank the panelists very much for all their time     61:50

2  today, and the audience (crosstalk) --                  61:52

3      JUDGE JONES:  No, thank you guys.  Really           61:52

4  appreciate it.                                           61:53

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2

3                              - - -

4

5        I, Wendy Letner, Transcriptionist, do hereby certify

6    that I was authorized to and did listen to and transcribe the

7    foregoing recorded proceedings and that the transcript is a

8    true record to the best of my professional ability.

9

10       Dated this 25th day of May, 2022.

11

12

13

14    _____

15    Wendy Letner

16

17

18

19

20

21

22

23

24

25

# Exhibit 5



**Confidential – Professional Eyes Only**
**Subject to Protective Order**

**In re LTL Management, Case No. 21-30589 (MBK)**

**Debtor's Supplemental Response to Official Committee of Talc Claimants' RPD No. 40**

Subject to and without waiving its objections to the Official Committee of Talc Claimants' Request for Production of Documents No. 40, the Debtor provides the following supplemental information in lieu of production.

Before the filing of the petition in Debtor's chapter 11 case,

- 5,738 talc-related ovarian cancer claims were resolved for payments totaling $526,632,000.00; and
- 1,098 talc-related mesothelioma claims were resolved for payments totaling $439,730,000.00.

The table below shows the amount of payments per year for talc-related mesothelioma claims and talc-related ovarian cancer claims:

| Year | Talc-Related Mesothelioma Payments | Talc-Related Ovarian Cancer Payments |
|------|-----------------------------------|--------------------------------------|
| 2017 | $950,000.00 | $0 |
| 2018 | $750,000.00 | $0 |
| 2019 | $15,600,000.00 | $0 |
| 2020 | $300,390,000.00 | $265,000,000.00 |
| 2021 | $122,040,000.00 | $261,632,000.00 |
| Total | $439,730,000.00 | $526,632,000.00 |

At the time of the filing of the petition in Debtor's chapter 11 case, the Debtor owed:

- $144,000.00 in connection with the resolution of 24 talc-related ovarian cancer claims; and
- $325,000.00 in connection with the resolution of 1 talc-related mesothelioma claim.

**Confidential – Professional Eyes Only**
**Subject to Protective Order**



# EXHIBIT 6

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

```
IN RE:                      .    Case No. 22-2606
                            .
AEARO TECHNOLOGIES, LLC,    .
et al.,                     .    Everett McKinley
                            .      Dirksen Courthouse
                            .    219 S. Dearborn St., Room 2722
            Debtor.         .    Chicago, IL  60604
                            .
                            .    April 4, 2023
. . . . . . . . . . . . ..        1:19 p.m.
```

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE FRANK H. EASTERBROOK
UNITED STATES SEVENTH CIRCUIT JUDGE
and THE HONORABLE DIANE P. WOOD
UNITED STATES SEVENTH CIRCUIT JUDGE
and THE HONORABLE DAVID F. HAMILTON
UNITED STATES SEVENTH CIRCUIT JUDGE


APPEARANCES:

For the Appellants:      Clement & Murphy, PLLC
                         By:  PAUL D. CLEMENT, ESQ.
                         706 Duke Street
                         Alexandria, VA 22314

For Amicus Curaie U.S.   Department of Justice
Trustee:                 By:  SEAN JANDA, ESQ.
                         950 Pennsylvania Avenue N.W.
                         Washington, DC 20530

For Appellees Official   Kellogg, Hansen, Todd, Figel &
Committee of Unsecured      Frederick, PLLC
Creditors:               By:  DAVID CHARLES FREDERICK, ESQ.
                         1615 M Street, N.W., Suite 400
                         Washington, DC 20036


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

1           THE COURT:  Good morning, ladies and gentlemen.  Our

2   first case for argument today is, In the Matter of Aearo

3   Technologies.  Mr. Clement?

4           MR. CLEMENT:  Good morning, Your Honors, and may it

5   please the Court, Paul Clement for the appellants.  I'll

6   endeavor to save five minutes for rebuttal.  Nobody doubts that

7   the automatic stay precluded further earplug litigation against

8   the Debtor Aearo in the MDL and in Minnesota, but the

9   Bankruptcy Court held that neither the automatic stay, nor its

10  related to jurisdiction, extended to the same litigation

11  against 3M despite, despite the complete overlap of fat and

12  defenses, the possibility of estoppel and record taint, shared

13  insurance, Aearo's indemnification obligations, and appellee's

14  ongoing efforts to use statements by the MDL Court post

15  petition against Aearo in this bankruptcy.

16          That decision misunderstood both circuit law and the

17  funding agreement.  On the law, the Bankruptcy Court misread

18  this Court's case law on the scope of the automatic stay and

19  related to jurisdiction.  This Court recognizes two exceptions

20  to the general rule that the automatic stay applies only to

21  claims against the Debtor.  And, as to related to jurisdiction,

22  this Court --

23          THE COURT:  Mr. Clement, how is it possible for there

24  to be exceptions to the language of the automatic stay?  The

25  one thing that's been consistent in the Supreme Court's last

1 ten years of bankruptcy cases is the language controls, there

2 are no exceptions, and it doesn't matter how extreme the

3 circumstances are.  All of the cases you rely on predate the

4 modern Supreme Court's approach to bankruptcy law.  So, why

5 should we recognize any exceptions at all?

6     MR. CLEMENT:  So, two responses to that, Judge

7 Easterbrook.  I mean, obviously if we were here on a complete

8 clean slate that would be a sort of more difficult question for

9 me and --

10     THE COURT:  Well, it is the question for you, because

11 we often say, you know, thirty years ago or twenty years ago,

12 we said or the Fourth Circuit said, tada, tada, tada, but there

13 have been a lot of Supreme Court decisions since then and we

14 have to be consistent with them, so that's the question I'm

15 asking you.  In light of the Supreme Court's decisions, not

16 ours, how can there be exceptions?

17     MR. CLEMENT:  So I think that -- I mean, I wish the

18 Supreme Court, in the bankruptcy area, had been quite as

19 textualist as you suggested, because if it were, then I

20 wouldn't have a petition up there in a case I lost in the Fifth

21 Circuit where the Fifth Circuit applied some pre-bankruptcy

22 sort of, you know, dictum about nonsolvent debtors and said the

23 Supreme Court made me do it.

24     So, I think in order for there to be a situation

25 where you'd have to say, look, the mood music from the Supreme

1  Court about how to interpret statutes and this statute in

2  particular is so clear, we're going to walk away from our

3  circuit precedent.  For better or for worse, I don't think the

4  Supreme Court has been that clear yet.

5         The other thing that makes it kind of tricky is that

6  in the <u>Celotex</u> case, in the Supreme Court, which is obviously

7  relevant to the related to issue, the Supreme Court, I mean, it

8  was a drive-by citation to be sure, but it cited the <u>A.H.</u>

9  <u>Robins</u> case favorably, which is sort of the source of the

10 exceptions that this Court applied --

11        THE COURT:  Well, we do know what drive-by citations

12 count for.

13        MR. CLEMENT:  No, I --

14        THE COURT:  And what exceptions did we actually

15 apply?

16        MR. CLEMENT:  So, as I read -- well, as I read this

17 Court's cases, in <u>Fernstrum</u> and <u>Fox Valley</u>, the exceptions that

18 this Court has applied have been a --

19        THE COURT:  Discussed maybe.

20        THE COURT:  No applied.

21        THE COURT:  Yes.  I'm not sure we applied anything.

22 We discussed some things.

23        THE COURT:  We mentioned it.  We didn't rule it out

24 --

25        MR. CLEMENT:  Right and --

1          THE COURT:  -- is the best you can say.

2          MR. CLEMENT:  Yeah, I mean, look, I say you applied

3  in the sense that you took them seriously and found them

4  inapplicable on the facts there, and so to me that is -- that's

5  not just dictum.  I also think, for what it's worth, that even

6  if you want to be a pure textualist, the thrust of <u>A.H. Robins</u>

7  and the thrust of the first exceptions this Court has

8  recognized is the idea that when you have a real party in

9  interest, that's still within essentially the text, and --

10          THE COURT:  But, you know, what I'm having -- well, I

11  have a number of problems with your approach, but one of them

12  is how you distinguish the any regular old case of joint and

13  several liability from this case.  We all certainly understand

14  that 3M and Aearo are very closely aligned in this litigation,

15  but the automatic stay is supposed to be automatic.  You're

16  supposed to just see it.  It happens.  You're not supposed to

17  have 25 hearings.  So, I just don't see how, unless you're

18  going to say the automatic stay applies to everybody with joint

19  and several liability, how your position can hold.

20          MR. CLEMENT:  So, I would say -- I obviously wouldn't

21  say it applies to everybody.  I would say that this is --

22          THE COURT:  Because you can't -- because, I mean, no

23  one says that.

24          MR. CLEMENT:  Of course.  Of course.  But, this seems

25  to be, you know, a truly sort of unique case.  This isn't just

6

joint and several liability.  This is a case where essentially

3M's liability in these cases is premised on a memo that Aearo

wrote before 3M was in the picture.

THE COURT:  So, it's a successor owner --

THE COURT:  This is --

THE COURT:  Go ahead.

THE COURT:  This is every MDL virtually, right.  I

mean, the -- one of the points that some of the amicus make,

they suggest that if this maneuver works, why won't it

automatically happen any time a defendant in an MDL starts to

get uncomfortable with the MDL Court's rulings?

MR. CLEMENT:  Well, I mean, Judge Hamilton -- you

know, I think that that question really goes more to the

underlying merits of this than the questions that arise under

the automatic stay and related to jurisdiction.  And, you know,

obviously, you could have a situation where you'd say that, all

right, they're related to jurisdiction, but I'm not going to

exercise it because of some concern on the merits, and I think

if you focus on the question that I think it squarely before

you, which is the automatic stay, and if you are uncomfortable

with the automaticness of the automatic stay then I think

related to, under 105, provides sort of the clear answer here,

because I think it sort of blinks reality to say --

THE COURT:  And what the -- well, I mention the

Supreme Court's decisions, but the key one there is law from

1    2014, which long post dates <u>A.H. Robins</u> and these other cases,

2    which says you can't use Section 105 to fix what you think of

3    as flaws in the bankruptcy code.  You carry out the bankruptcy

4    code, but you can't extent it, contradict it, modify it, and so

5    on.  Isn't that a problem?

6         MR. CLEMENT:  No.  No, I don't think so.  We don't

7    think there's anything wrong with the bankruptcy code, but one

8    of the reasons we don't think there's anything wrong with the

9    bankruptcy code is because it includes Section 105(a) and --

10        THE COURT:  No.  That's not the point of law.  The

11   point of law is you can't use Section 105(a) to do anything

12   other than implement what's in the code, and of course what's

13   in the code is Section 362.  I don't see how you use Section

14   105 to give you relief that Section 362 does not provide.

15        MR. CLEMENT:  Well, Judge, with respect, that would

16   be a complete revolution in the precedent in this circuit and

17   every circuit --

18        THE COURT:  Not in this circuit where we held exactly

19   that in the <u>Kmart</u> case, even before law.

20        MR. CLEMENT:  Well, I don't think that is consistent

21   with circuit law.  I don't think that's consistent -- I mean, I

22   must be wrong because you wrote <u>Bush</u>, but I don't think that's

23   --

24        THE COURT:  No --

25        MR. CLEMENT:  -- consistent with <u>Bush</u>.

1           THE COURT:  No.  Courts are wrong plenty of times, as

2    you often persuade the Supreme Court about Courts of Appeals.

3           MR. CLEMENT:  Well, and I don't think this Court was

4    wrong in <u>Bush</u> and I don't think law carries all of the weight

5    that you are suggesting, and I think then law would have

6    silently sub silentio overruled <u>Celotex</u>, and I don't think

7    there's any suggestion of that.  And, so I do think the related

8    to jurisdiction under 105(a), which itself is something of a

9    misnomer, right.  The question is really related to

10   jurisdiction under 1343(b).

11          THE COURT:  Well, I think, Mr. Clement, we're talking

12   past one another.  The question is not the scope of the related

13   to jurisdiction.  The question is what remedies does Section

14   105 permit a bankruptcy code -- bankruptcy judge to provide

15   when those remedies are in excess of considered limitations

16   elsewhere in the code.  The limitation in 362 is so the stay

17   extends only to the Debtor and its assets.

18          MR. CLEMENT:  But with respect, Judge, that's the

19   automatic stay, and 105(a) is stay that's not automatic.  As

20   Judge Wood sort of suggested, it doesn't happen just

21   immediately, so it is susceptible to a process where the

22   Bankruptcy Court finds out more information before it decides

23   whether to stay this litigation.  I mean, that's the thrust of

24   a number of this Court's decisions where this Court has said,

25   well, you know, maybe you don't come under the automatic stay,

1 but you do come under 105(a).  The test there is related to.

2 As Judge Wood was suggesting earlier, I mean, you know, if the

3 automatic stay can't apply to all cases of joint and several

4 liability, 105(a) allows a Court to look at the specifics of

5 the particular case, and you know it's hard for me to imagine a

6 case that's more related to both the bankruptcy and the actions

7 that have already been stayed against Aearo.

8 THE COURT:  I'm not sure how far that gets you

9 though, because even if we were to agree with the position that

10 105(a) is there, and some circuits have suggested that you just

11 can't distort the language of 362 any further, but what you

12 should do is look to 105(a), and even if you could get over the

13 related to jurisdictional barrier, now you're in a

14 discretionary world.

15 Now, you're in a world where we would assess a

16 District Court's decision not to issue that kind if injunction,

17 and we'd be talking about an injunction, not a stay, for abuse

18 of discretion.  We have all the facts on this record.  The

19 District -- sorry, the Bankruptcy Court made it quite clear

20 that it wasn't inclined to issue this kind of stay given the

21 nature of the injunction, given the nature of the funding

22 agreement, so I don't know if it gets you all the way home.

23 MR. CLEMENT:  Well, Judge Wood, let me say two things

24 about that.  One is, I think really when you get to the

25 decision to exercise discretion to not issue relief under

1  105(a) here, we're talking about one paragraph and we're

2  talking about a paragraph that I would submit is profoundly

3  distorted by misunderstanding of the jurisdiction, which is

4  what plainly seemed to drive the Court's analysis.  I also

5  think there's a misunderstanding of how the funding agreement

6  works and I'd be happy to talk about that in a second.

7          But, I guess what I would say is, look, if I have to

8  lose this appeal, I would much rather lose it on the ground

9  that you are sketching out, which is to say, okay, 105(a)

10  related to jurisdiction applies, but we're just going to, even

11  though it's a paragraph, we're just going to sort of defer to

12  that paragraph and we're --

13          THE COURT:  It's a paragraph that comes after 30

14  pages of the discussion of the case and the circumstances which

15  don't really call for that kind of relief.

16          MR. CLEMENT:  With respect though, what it really

17  comes after is about ten pages of misguided discussion about

18  related to jurisdiction and then it's followed by a paragraph

19  that, to me, sort of puts the exclamation point on the

20  misunderstanding because he essentially says, well, if I

21  accepted Heaton's testimony, then there would be an actual

22  economic effect, and it seems to me that if testimony is true,

23  there would be an economic effect, it's sort of the definition

24  of a potential economic effect, which should be enough for the

25  jurisdictional inquiry and --

1          THE COURT:  Can I ask you a question about the

2    funding agreement, Mr. Clement?

3          MR. CLEMENT:  Sure.

4          THE COURT:  Under what conditions would 3M be excused

5    from paying reimbursement requests from Aearo?

6          MR. CLEMENT:  So, if there was a failure in the reps

7    and warranties, for example, that would satisfy.  But, I think

8    here's the most important thing that the Bankruptcy Court

9    misunderstood, is if the -- if Aearo makes a request for

10   funding under the funding agreement before it has exhausted its

11   own resources, then that is an improper request and --

12         THE COURT:  Well, exhaustion is not actually the

13   language of the agreement though, is it?

14         MR. CLEMENT:  It's solely to the extent that is the

15   language of the agreement.

16         THE COURT:  Well, it's -- but it let's Aearo make its

17   own judgment.  Let me go --

18         MR. CLEMENT:  No, but --

19         THE COURT:  My question about under what conditions

20   3M could refuse a reimbursement request.  For example, one of

21   the conditions is Aearo is supposed to provide a budget every

22   two weeks.  I assume it's been complying with that.

23         MR. CLEMENT:  It has, Your Honor.

24         THE COURT:  And -- but, would it be possible for 3M

25   to order its wholly-owned subsidiary, Aearo, to breach so that

1  -- to breach the terms of that agreement so that 3M could

2  repudiate the reimbursement obligation?

3          MR. CLEMENT:  So, I mean, you know, I'm not sure the

4  answer to that question frankly and -- but and that's why --

5          THE COURT:  Well, it seems pretty obvious to me that

6  it could, right.  It's a wholly-owned subsidiary and to the

7  extent that anybody wants to take comfort from Aearo's tying

8  itself to the mast or maybe the rudder of 3M by its

9  indemnification promise in return for this reimbursement

10 request, the reimbursement request seems to me to be at the

11 will of 3M.

12         MR. CLEMENT:  Well, that would actually strongly

13 strengthen the case for granting relief against 3M.

14         THE COURT:  No.  Well, it would really call into

15 question Aearo's promise for to -- to indemnify 3M, right?

16         MR. CLEMENT:  I suppose --

17         THE COURT:  You lose all the circularity.

18         MR. CLEMENT:  Yeah, exactly, and the circularity was

19 what was critical to the bankruptcy judge's decision here, and

20 I think it's -- you know, the combination of the circularity

21 and the uncapped nature of the commitment --

22         THE COURT:  But it's inconceivable that Aearo would

23 have gone forward with just a one way indemnification agreement

24 voluntarily two days before it filed for bankruptcy, right?

25         MR. CLEMENT:  I suppose that's right, though, I

13

1  supposed that you know -- I mean, Aearo is facing enormous

2  liabilities in this litigation, wholly apart from the

3  indemnification agreement.  But, what I would say is, to me,

4  the critical feature of the -- of the funding agreement that I

5  think the Bankruptcy Court either misunderstood or failed to

6  fully appreciate, is that under the agreement the

7  indemnification responsibility of Aearo starts with the first

8  dollar, the first dollar of liability for 3M.

9       But, the reimbursement responsibility, if you will,

10  doesn't start until the resources of Aearo have been exhausted,

11  and Aearo continues to generate revenue from lines of business

12  that are unrelated to the earplug litigation, which has been

13  discontinued, and so there is a real difference here in terms

14  of the what's in the estate if you stayed the litigation

15  against 3M.  Under those circumstances, you have the cash on

16  hand that Aearo has.  You have the ability to make claims on

17  the shared insurance, and then you have 3M backstopping it all.

18       THE COURT:  But the shared insurance is problematic,

19  isn't it, because if it's really under 3M's control then is it

20  in the estate?

21       MR. CLEMENT:  I think it is in the estate.

22       THE COURT:  How can it be in the estate if 3M

23  controls it, if 3M can just drain it off?

24       MR. CLEMENT:  I don't know that 3M can just drain it

25  off, which is to say, I mean, if 3M tried to --

14

1           THE COURT:  Well, then it isn't in the estate --

2           MR. CLEMENT:  If 3M tried to drain it off, I think

3  the automatic stay would apply to that effort.  It might not

4  even be (a)(3), it might be (a)(1).

5           THE COURT:  Well, would 3M then consent to an

6  injunction against 3M drawing on that insurance?

7           MR. CLEMENT:  I mean, it might well but --

8           THE COURT:  If you think that's an asset of the

9  estate, even though 3M is an independent owner, then presumably

10 the Bankruptcy Court could and should enjoin 3M from drawing on

11 it --

12          MR. CLEMENT:  Right, but it shouldn't stop there.

13          THE COURT:  -- but the question I'm asking is whether

14 3M would consent to such an injunction?

15          MR. CLEMENT:  I think it would.  I mean, I'd have to

16 consult them, but it shouldn't stop there because --

17          THE COURT:  Yes, I know you want more relief than

18 that, but I'm trying to figure out where 3M stands.  I also

19 wonder whether 3M is prepared to post a bond to cover the full

20 value of all claims in the MDL litigation?

21          MR. CLEMENT:  I don't know the answer to that.

22          THE COURT:  Because under our circuit's law, the

23 United Airlines case from 2005, if you're seeking any kind of

24 injunctive relief beyond the stay, a full value bond is

25 required.  I mean, you -- 3M is going to have to tell us

1  whether it wants that.  I've got one further questions, which

2  is your brief is a little cagey about this, but are you seeking

3  an injunction against the pursuit of the 2000 State Court cases

4  in Minnesota?

5           MR. CLEMENT:  Yes, we are.

6           THE COURT:  How would that be consistent putting the

7  -- if you're relying on Section 105, how would that be

8  consistent with 28 U.S.C. 2283, the Anti-Injunction Act?

9           MR. CLEMENT:  I don't think -- I mean, first of all,

10 obviously you're asking me a question that has not been briefed

11 by my friends on the other side --

12          THE COURT:  I understand that.

13          MR. CLEMENT:  -- and I think it's the kind of issue

14 that could be waived, but maybe you think it's jurisdictional

15 in a way that it can't be waived.  In which case, I'd be happy

16 to try to provide supplemental briefing on that.  My --

17 certainly my understanding is there's not an Anti-Injunction

18 problem with a 105(a) injunction that's directed to State Court

19 litigation.

20          THE COURT:  Well, certainly 2283, which says

21 expressly authorized by law, you don't see any express

22 authorizations for injunctions against state litigation in

23 Section 105.

24          MR. CLEMENT:  So, again --

25          THE COURT:  The Court expressly means, well,

1  expressly.  That's a big problem.

2         MR. CLEMENT:  I would like to tell you and if you

3  want me to, I'd be happy to have the chance to you know brief

4  it, that 105(a) is express for those purposes.  It is -- again,

5  my understanding is I can cite you a raft of cases that have

6  exercised 105 related to jurisdiction to enjoin state

7  litigation, as well as federal litigation.  And on top of all

8  of that, it is true that, at least when this case started, the

9  principle focus was directed to the MDL litigation, and it's --

10 just in case, this is in the briefs, but just for the Court's

11 edification, I mean, you know this is a situation where based

12 on intervening developments in the MDL litigation, the MDL

13 litigation against 3M has been stayed for other reasons, and

14 that's part of the reason why I think that, you know, if this

15 Court is convinced that the Bankruptcy Court erred in its

16 construction of the scope of 105 related to jurisdiction and

17 wants to vacate and send it back for the Bankruptcy Court to

18 reaffirm that it meant what it said in that paragraph, or to

19 address that issue anew, I think that would be an appropriate

20 relief.

21        If it weren't for the intervening stay, I would

22 probably be saying our hair is still on fire, and we'd really

23 like you to rule on the whole thing, but that does take a

24 significant amount of the pressure off of things.

25        That said, I don't think it in any way moots this or

1  the like, because that stay is contingent on the Eleventh

2  Circuit accepting interlocutory review in an appeal there and

3  the Eleventh Circuit has been noteworthy in neither accepting

4  nor rejecting that interlocutory appeal, no less consent to --

5          THE COURT:  If I may ask one more quick question

6  about 362 and its text.  The bankruptcy code in other chapters

7  does provide for automatic stays to extend to related parties

8  in 1201 and 1301.  We don't see that kind of language in 362 or

9  in Chapter 11.  Shouldn't that give us pause?

10          MR. CLEMENT:  No.  I don't think so, just for two

11  quick reasons.  One is, I mean, it's true that (a)(1) doesn't

12  apply by its terms beyond sort of parties, but things like

13  (a)(3) apply to property of the estates without regard to -- of

14  the estate, without regard to the Debtor, so it's even as to

15  Chapter 11, there are provisions that go beyond, but --

16          THE COURT:  Well, let's focus on (a)(1) since that's

17  the provision that's parallel to 12 -- or that is not parallel

18  to 1201(a) and 1301(a).

19          MR. CLEMENT:  Yeah, and what I would say is, you

20  know, that would be another reason for, but for circuit

21  precedent, perhaps to say we're not going to extend it beyond

22  the Debtor, but then you'd still get to 105(a), and I think

23  that this Court has and other Courts have said that, as to

24  105(a), there's a greater related to scope when it comes to

25  reorganizations under Chapter 11 than under liquidations under

1  Chapter 7.  If I may, thank you, sir.

2          THE COURT:  Mr. Clement, I'll -- we asked you a lot

3  of questions, so I'll -- you can prepare for two minutes of

4  rebuttal.  Mr. Frederick?

5          MR. FREDERICK:  Thank you, Judge Easterbrook, and may

6  I please the Court, David Frederick for the appellees.  Aearo

7  asks you to be the first Appellate Court ever to hold that a

8  bankruptcy stay should extend to a non-debtor to halt

9  litigation that will have no economic effect on the estate or

10  creditors.  The Bankruptcy Court found as a fact that 3M is

11  more than able to meet its financial obligations under the

12  funding agreement, so the attempt to stay cases against 3M

13  doesn't help Aearo's creditors at all.

14          It's designed to protect 3M, Aearo's wealthy parent

15  corporation, by giving it more leverage in negotiating

16  defective earplug litigation claims.  Because of the funding

17  agreement, the Bankruptcy Court correctly found that the

18  earplug suits will not affect Aearo's estate or its

19  reorganization at all.  3M contrived this bankruptcy to help

20  itself, not Aearo or its creditors.

21          The second major point I'd like to make is that Aearo

22  offers no limiting principal for its position.  Under its

23  position, and Judge Wood and Judge Hamilton, your questions

24  have teased out some of this, any joint tortfeasor, any wealthy

25  parent corporation, any fully funded Debtor, can orchestrate a

1 bankruptcy to get out of the civil justice system.  That's

2 functionally what they are doing and they do not offer in their

3 briefing or in the argument this morning, any way in which

4 ruling for them would not delimit the entire bankruptcy system.

5 For those two major reasons, we submit that you have to affirm.

6        Now, I'm happy to go through the individual specific

7 points.  We don't think that 362(a)(1) applies because the

8 earplug suits against 3M are not claims against the Debtor.

9 Your questions about the text, we think are right on.  The

10 Bankruptcy Court was correct in saying some other circuits have

11 recognized a textual exceptions.  It applies the same test

12 though for unusual circumstances and the Bankruptcy Court, we

13 think, properly situated that analysis under 105.  The --

14        THE COURT:  And I would actually like you to focus on

15 105 for a bit, because as my questions earlier indicated, I

16 have trouble getting over the text of 362, which seems to speak

17 of the Debtor, not other people near the Debtor.  But, 105 is a

18 pretty broad discretion and one could approach it, as Judge

19 Easterbrook was saying, by saying the Supreme Court has warned

20 Bankruptcy Courts and other Courts not to take 105 as just a

21 running license to do whatever you feel like doing.  But, maybe

22 this isn't that.  Maybe it's a way of looking at the particular

23 facts and circumstances.

24        MR. FREDERICK:  Well, I think that the Bankruptcy

25 Court properly did two things.  It decided that it didn't have

1  jurisdiction because the effect of this would not alter the

2  partition of monies to the creditors.

3       THE COURT:  Now, this depended on, in a sense, a

4  finding of fact, didn't it?  There was some question about

5  whether -- I mean, 3M for a long time was saying, sure, you

6  know, we've got enough money to cover all of this, and then it

7  backtracked and said, well, gee, maybe we don't.

8       MR. FREDERICK:  Right.  But, what the Bankruptcy

9  Court did was it took testimony both from 3M witness, Mr. Dai

10 and the Aearo disinterested director Mr. Stein, and Mr. Stein's

11 testimony was particularly persuasive to the Bankruptcy Court.

12 Mr. Stein said he didn't foresee any circumstance in which 3M

13 would not be able to fund, and that is logical if you look at

14 its latest financial statements.  3M is an $80 billion company.

15 It's ranked 102nd on the Fortune 500 list.  It made revenues of

16 35 billion last year.  It made profits of $5.9 billion and

17 there's never been a serious argument that it can't make the

18 funding for the funding agreement and --

19      THE COURT:  Well, and -- but, in fairness, one can

20 also point out that this MDL that lies often, right here it's

21 kind of the elephant in the courtroom, what 290,000 claims or

22 so.  The biggest one ever.  That's a lot of -- that's a lot of

23 exposure.

24      MR. FREDERICK:  It is a lot of potential exposure,

25 Judge Wood, that has not yet been given a valuation.  And, so

21

1  the problem is whether or not when you look at this from an ex-

2  anti perspective and you have a funding agreement that say the

3  subsidiary is going to wholly indemnify the parent, but the

4  parent is going to pay every last liability under that

5  indemnification, whether you can say is an ex-anti matter,

6  that's not enough.

7          THE COURT:  So, is there a factual dispute then

8  between you and Mr. Clement, because he's saying, well,

9  actually, 3M isn't going to pay all of this, that Aearo has to

10  exhaust its own resources first, that there's some bundle of

11  money that's not under the indemnification --

12          MR. FREDERICK:  I was surprised to hear Mr. Clement

13  say that, because recital (c) to the funding agreement, which

14  is on Page 272 of the appendix, says that 3M is warranting its

15  ability to pay and that it will pay.  That is important because

16  if it had not made that kind of recital representation, there

17  would be a serious argument that this was a fraudulent

18  transfer.

19          In order to get out of a fraudulent transfer problem,

20  3M had to make that representation.  So, for counsel now to

21  say, oh, we're reconsidering that and there, and answer to

22  Judge Hamilton's questions, there may be an order by the parent

23  to the subsidiary to breach this so that 3M doesn't have to

24  pay, would get us into a very bizarre land where the bankruptcy

25  system is being manipulated by a very wealthy parent that has

22

1  every financial wherewithal to satisfy the claims, the

2  potential claims, of these service members who were sent into

3  battle on a lie.  That they were going to be given earplugs

4  that were going to protect them from the sound that they were

5  going to be exposed to, and 3M and Aearo knew that there was no

6  data to back that up.  And, so it would be very odd to suppose

7  that the bankruptcy system is now going to displace the entire

8  civil justice system, which would enable juries to consider

9  evidence of individual members and all of the other evidence

10 attended to the civil justice system and say --

11        THE COURT:  I'm --

12        MR. FREDERICK:  -- we're going to put everybody in a

13 big lot.

14        THE COURT:  To go by your brief and many of the

15 amicus briefs, that's the question.  But, why wouldn't the

16 bankruptcy judge relinquish jurisdiction rather than try to

17 resolve a whole bunch of proceedings that otherwise would be in

18 the province of the State Courts or the Article III Courts?  We

19 obviously aren't there yet, but to make a simple assumption

20 that the bankruptcy judge will resolve all of the tort cases

21 seems heroic.

22        MR. FREDERICK:  Your Honor, the question before you

23 is whether the --

24        THE COURT:  I know what's before us, but I'm not

25 asking about that.

1          MR. FREDERICK:  No, I understand that, but --

2          THE COURT:  I'm asking why you're assuming that the

3    alternatives are to resolve the tort claims in the MDL or to

4    resolve them in the Bankruptcy Court with no jury and so on?

5    Why isn't relinquishing jurisdiction a likely, if not, the

6    required outcome?

7          MR. FREDERICK:  Well, we believe it is, if what you

8    mean by relinquish jurisdiction is for the Bankruptcy Court to

9    say that --

10          THE COURT:  Send it to a district judge.

11          MR. FREDERICK:  That is correct and that is where it

12    is now.

13          THE COURT:  In light of Article III concerns.

14          MR. FREDERICK:  That --

15          THE COURT:  That's another line of Supreme Court

16    cases.

17          MR. FREDERICK:  And we're in accord with the notion

18    that this was an improperly brought bankruptcy.  In two weeks

19    the Bankruptcy Court will be conducting a hearing on a motion

20    to dismiss --

21          THE COURT:  For all I know, the Bankruptcy Court

22    might relinquish jurisdiction, send it to a district judge, and

23    the panel on multi-district litigation would send it all to

24    Florida.

25          MR. FREDERICK:  Well, I'm not here --

1          THE COURT:  And, we would have had a very long and

2    interesting excursion.

3          THE COURT:  In other words, send it to a district

4    judge in Indianapolis who would --

5          THE COURT:  Yes.

6          THE COURT:  -- where the JPML would then --

7          THE COURT:  It has an element of circularity to it.

8    The prospect --

9          MR. FREDERICK:  I'm not here to argue about the MDL

10   process.  I'm here to rebut the arguments that have been made

11   to extend a stay to this parent corporation that has the

12   ability and has been taking sole responsibility for four years

13   in litigating, and it took that position because it felt that

14   it was in its economic interest to do so.  Why?  Because under

15   many states' laws, non-economic damages get capped at $1

16   million per defendant.  There were multiple Aearo defendants

17   along with 3M.  Aearo proceeded to be in its interest -- sorry,

18   3M proceeded to be in its interest to take sole responsibility

19   and it litigated on that basis throughout the entirety of the

20   MDL process, and so when --

21         THE COURT:  And do you agree that the -- I mean, it

22   sounded to me as though the MDL process was on hold largely

23   because 3M stopped doing things, but is there a formal order in

24   place?

25         MR. FREDERICK:  There is an appeal that has been

25

1  taken from a sanctions order issues by the MDL judge against 3M

2  for changing its position four years into the litigation in

3  saying never mind that we have said we were going to defend

4  these, it's actually on Aearo, it's Aearo's fault.  And, the

5  judge sanctioned 3M for that change of position on which

6  everyone had relied for four years and that appeal is up on the

7  -- on appeal to the Eleventh --

8          THE COURT:  That's the one that's awaiting the

9  Eleventh Circuit's --

10          MR. FREDERICK:  That's correct, and there's been an

11  administrative say for purposes of allowing that appeal to go

12  forward.

13          THE COURT:  And that's a stay by Judge Rogers?

14          MR. FREDERICK:  That's correct.

15          THE COURT:  Yes.

16          MR. FREDERICK:  That's correct.  But, I think that

17  further to your point, Judge Wood, about the 105(a), whether

18  you view this from jurisdictional perspective as these aren't

19  really related to because they aren't going to affect the

20  partition of the creditors or you view it from the Bankruptcy

21  Court's perspective that the Judge also would not issue a

22  105(a) injunction, which is a discretionary standard because it

23  would not advance the purposes of the reorganization, I think

24  you get to the same place, and if you were to say that there is

25  some unusual circumstances inquiry to be done here, you

1  wouldn't find that as a matter of fact for the reasons that the

2  Bankruptcy Court gave, which is that there are no immediate

3  economic adverse consequences by allowing this funding

4  agreement because the estate -- Aearo's estate is going to be

5  taken care of for purposes of the creditors and for whatever

6  reorganization purposes Aearo was seeking to achiever, other

7  than protecting its parent company from MDL litigation.

8          THE COURT:  So, that takes us back really to the key

9  finding that the bankruptcy judge made, which was that this was

10  just a circular exercise with no real economic impact.

11          MR. FREDERICK:  That's correct.  And, I think for

12  that reason, you know, it is important to understand from the

13  creditor's perspective, and that's who I'm representing in this

14  argument, from the creditor's perspective, if the funding

15  agreement means what it says and if the 3M executives correctly

16  said they would be responsible for those payments, the

17  creditors are going to be taken care of.

18          Now, Mr. Clement makes an exhaustion argument.  Judge

19  Hamilton, you're correct, the word exhaustion does not appear

20  in the funding agreement, and what 3M has -- or Aearo has

21  ignored, is that the provision under the permitted funding use

22  has the words projected to be, so it's insufficient or

23  projected to be insufficient, and Mr. Stein testified at the

24  bankruptcy hearing that he believed that the Aearo people could

25  make that projection if circumstances warranted, and so the

27

1 question is not whether or not there's a problem about taking

2 the assets all the way down to nothing.  The question from the

3 creditor's perspective is, are they going to be paid by the

4 invocation of this permitted funding use request for 3M to

5 actually pay those claims.

6         So, if there's an exhaustion problem at all, it

7 doesn't affect the creditors.  It might affect the

8 stockholders, except that 3M wholly owns Aearo, and so as a

9 matter of equity, we're talking about the difference between

10 the equity of whatever value there is for 3M in that exercise

11 versus what the creditors would be able to get out of a

12 successful reorganization.  And, so for all these reasons, this

13 circularity, it is important for the Court to disavowal the

14 idea that wealthy corporations can get around their civil

15 justice system requirements and demands by invoking the

16 bankruptcy code in seeking to extend the stay provisions to

17 that action.

18         I'm happy to address the text of (a)(1) and (a)(3) if

19 the Court has questions about it, but we do think that these

20 are not provided in (a)(1).  The Bankruptcy Court was right to

21 say that more recent cases, 30 years after Robins, have

22 properly situation any exceptions under 105(a) where there is

23 more discretion, and we read the Cesar's (phonetic) opinion

24 from this Court as saying that 105(a) can't contravene a

25 particular bankruptcy provision, but it can work in

28

1  complimentary fashion to the protection of the estate, and so

2  to the extent that there is a concern there, we think that the

3  discretion exercised by the Bankruptcy Court more than

4  satisfies it.

5         THE COURT:  Mr. Frederick, can I ask you, suppose the

6  facts were to change in the next year or two, the MDL

7  proceedings get worse and worse for the defendants, maybe there

8  are larger economic shakeups in the world, and 3M's credit

9  rating drops and the promise of funding starts to look a lot

10  shakier, can you imagine circumstances in which the kind of

11  relief 3M is seeking now or that Aearo is seeking on behalf of

12  3M, could become permissible?

13         MR. FREDERICK:  I think it would be hard to imagine

14  and I will give you the historical example of the asbestos

15  cases from Johns Manville in the 90s and the A.H. Robins case

16  itself, which involved years, and years, and years, of

17  litigation that was directed against the parent, in which the

18  parent ultimately concluded it had to go into bankruptcy.  It's

19  hard for me, Judge Hamilton, sitting here today knowing what is

20  on 3M's balance sheet and its boast that for 64 consecutive

21  years it has increased its dividends to imagine a situation in

22  which it would not be able to meet its financial obligations

23  and have to declare bankruptcy, but if it did, the point of the

24  bankruptcy process is to take the bitter with the sweet.  3M

25  would have to disclose all of its information.  It would have

1  to subject itself to the bankruptcy process, if there were

2  financial grounds in which to do so.  3M would have to comply

3  with all the other requisites of the bankruptcy process.  But,

4  in our view, it can't do that by hiding behind and pushing or

5  prodding a wholly-owned subsidiary to do its work for it.

6          THE COURT:  Thank you.

7          MR. FREDERICK:  If the Court has no further

8  questions, we submit.

9          THE COURT:  Thank you, Mr. Frederick.  Mr. Janda?

10         MR. JANDA:  Thank you, Your Honor, and may I please

11  the Court, Sean Janda for the United States Trustee.  So,

12  there's been a lot of discussion today about the specific

13  provisions at issue in this case and I'm happy to address any

14  remaining questions that the Court has about those provisions,

15  but in the absence of specific questions, I think it might be

16  helpful just to take a step back and make a couple of

17  fundamental points about the sort of power that Aearo was

18  asking the Bankruptcy Court to exercise here and the problems

19  that we, as the United States Trustee, have with that.

20         So, first, I think it's important to emphasize

21  through the extraordinary nature of this sort of 105

22  injunction.  It interferes, if it's entered, with ongoing

23  proceedings in other Article III Court, maybe ongoing

24  proceedings in State Court, and even if it doesn't sort of,

25  ultimately, stop tort claimants from resolving their claims

1  through the civil tort system that congress has established, it

2  certainly interferes with that process that delays that

3  process.

4         And, you know, candidly, we think <u>Fisher</u> establishes

5  that the 105 injunction in this circuit maybe appropriate in

6  some circumstances, but I think both the extraordinary nature

7  of that power and the Supreme Court's recent repeated clarity

8  that 105 is not sort of a roving commission to do equity, has

9  to be tailored quite closely, that any exercise of power under

10 105 has to be tailored to the specific provisions of the

11 bankruptcy code that the Court is trying to implement, really

12 help underscore the very high bar that Aearo would have to meet

13 before it could justify the exercise of that power.

14         THE COURT:  So, let me ask you a question.  The

15 Supreme Court has indeed said those things about the bankruptcy

16 code, but the other thing the Supreme Court has been on a

17 campaign about is to make sure that we don't classify all sorts

18 of things as jurisdictional if they really are more of a claims

19 processing nature, and I wonder about the related to assessment

20 here in that light.  The Bankruptcy Court thought applying the

21 ex-anti perspective and so forth that related to jurisdiction

22 itself didn't exist.  Then there is the paragraph that we've

23 been talking about where the Court says, "And anyway, if I'm

24 wrong about that, I actually would not issue an injunction for

25 all the reasons I've just been discussing for the last so many

1  pages."  So, where do you come down on the jurisdictional or

2  non-jurisdictional nature of the related to question here?

3      MR. JANDA:  So, Your Honor, we think that certainly

4  the related to question that is a jurisdictional question.  I

5  think there's a separate merits question about whether 105

6  authority sort of could or should be exercised in these

7  circumstances, and our reading of this circuit's case law is

8  that the related to definitely jurisdictional aspect, is an

9  ex-anti inquiry, but one that really requires from the ex-anti

10  perspective, an actual affect on the bankruptcy estate, and we

11  don't think that's been shown here.

12      I mean, to the extent that the Court disagrees about

13  how best to read this Court's precedents and thinks the bar is

14  something lower than that, then we think sort of for almost

15  exactly the same reasons, the Court -- the Bankruptcy Court was

16  correct to say that it would in any event not exercise whatever

17  jurisdiction it might have.

18      THE COURT:  Yes, I was --

19      THE COURT:  I'm not sure you're getting Judge Wood's

20  question.  It's one of mine, too.

21      THE COURT:  You can retry it.

22      THE COURT:  And perhaps it would help just to mention

23  the cornerstone here, which it <u>Bell against Hood</u>, right.  To

24  have jurisdiction, you have to make certain allegations and

25  make a claim of a certain kind, but the Supreme Court has said

32

1  failure to prove your claim just means you lose.  It doesn't

2  mean retroactively you had no jurisdiction.  And, it seems, one

3  could understand what the bankruptcy judge is saying is, well,

4  they failed to prove their claim, therefore retroactively

5  there's no jurisdiction.  I wonder if that's where you think

6  the Supreme Court is these days on jurisdiction versus

7  substance?

8        MR. JANDA:  So, that's not how we read the Bankruptcy

9  Court's opinion and that's not how I think we would read <u>Bush</u>,

10  certainly.  What we read the Bankruptcy Court to being saying

11  is that sort of on the sort of facts before me, I can't find

12  this sort of effect that would be required to exercise

13  jurisdiction under 105 --

14        THE COURT:  Yes, and so why doesn't that just mean

15  the party making this assertion loses, and then you cite <u>Bell</u>

16  <u>against Hood</u>?

17        THE COURT:  Right, and that was kind of where I was

18  going, because I'm having trouble seeing much sunlight between

19  your jurisdictional argument and your merits argument, which

20  might mean that it's actually a merits argument, in which case

21  you would say, yes, jurisdiction is all right.  There's an

22  allegation of an impact on the estate.  There are allegations

23  and everybody's arguing here and there.  And, the bankruptcy

24  judge is just saying I just don't think there's enough of an

25  impact.  You haven't persuaded me.  Maybe even if there's any

1    and so I'm going to make you lose on the merits.

2            MR. JANDA:  So, that's just not how we read this

3    Court's precedents.  I mean, I don't want to fight the Court to

4    hard on this because I think we are perfectly comfortable

5    saying that on the merits the 105 power shouldn't have been

6    exercised and we think, as you said, the questions really do

7    merge in this context, at least sort of the threshold merits

8    question, that the Bankruptcy Court resolved the 105 issue on

9    in the alternative, but that's just how we read this Court's

10   precedents and I think if the Court disagrees, then a merits

11   determination of the Bankruptcy Court could be affirmed.

12           THE COURT:  Okay, thank you.

13           MR. JANDA:  Thank you.

14           THE COURT:  Thank you, counsel.  Mr. Clement anything

15   further?

16           MR. CLEMENT:  Yes.  I'd like to make three very quick

17   points.  Three points in two minutes.  First, you can look at

18   272(a) of the joint appendix and you will find no contradiction

19   with anything I have said here today.  All that says is 3M will

20   represent that it will pay, but the question is what does it

21   have to pay, and the important point to keep in mind is that it

22   doesn't have to pay as long as Aearo has its own resources and

23   they have to use those first, and it doesn't use the word

24   exhaust, but it does use the word solely to the extent that.

25           And the projected to language -- this is my second

1  point, the projected to language doesn't sort of create some

2  loophole or make that language not say what it actually says.

3  That just means that if Aearo projects that it's about to get

4  $20 million in new revenues in, it has to take that into

5  account and can only ask for reimbursement from 3M to the

6  extent that its on-hand resources that it projects to have,

7  gets it down.

8        There's a $5 million cushion.  But, that's why, if

9  you go to our reply brief and there's the example.  If there's

10 an indemnification obligation for a billion, they have a $100

11 million in cash or projected cash, they can only make a

12 reimbursement request for $905 million.  That's why the estate

13 is better off with the litigation stayed against 3M.

14       But, here's my last point and just gets to this

15 discussion you were just having about jurisdiction versus the

16 merits.  So, there are important distinctions between

17 jurisdiction and the merits and it's worth getting it right.  I

18 think one of the distinctions is that if it's jurisdictional

19 you have to figure it out at the beginning of the case.  That's

20 why the bush case says that it's an ex-anti inquiry and that's

21 why the ex-anti inquiry is to potential economic effect, not

22 actual economic effect, which is why the Bankruptcy Court got

23 an important question 100 percent wrong, and it would be fine

24 -- again, as I said, I don't want to lose this appeal, but if I

25 have to lose this appeal, I would really like to lose this

1  appeal on the ground that the Bankruptcy Court was wrong about

2  jurisdiction, we'll affirm him because he probably meant to

3  exercise some discretion, and that way, if the circumstances

4  change, he could revisit it, but also that way, if you have a

5  different case where there's a channeling injunction or

6  something else where related to jurisdiction matters, the hands

7  won't be tied.  Thank you very much.

8          THE COURT:  Thank you, counsel.  The case is taken

9  under advisement.

10                         * * * * *

11

12              **C E R T I F I C A T I O N**

13          I, WENDY ANTOSIEWICZ, court approved transcriber,

14  certify that the foregoing is a correct transcript from the

15  official electronic sound recording of the proceedings in the

16  above-entitled matter, and to the best of my ability.

17

18

19  /s/ Wendy Antosiewicz

20  WENDY ANTOSIEWICZ

21  J&J COURT TRANSCRIBERS, INC.   DATE:   April 11, 2023

22

23

24

25