# JONES DAY

2727 NORTH HARWOOD STREET • DALLAS, TEXAS 75201.1515

TELEPHONE: +1.214.220.3939 • JONESDAY.COM

DIRECT NUMBER: 2149693759
GMGORDON@JONESDAY.COM

April 19, 2023

**VIA ECF**
Honorable Michael B. Kaplan
United States Bankruptcy Court for the District of New Jersey
402 East State Street Courtroom #8
Trenton, New Jersey 08608

Re:  In re LTL Management LLC, Adv. Proc. 23-1092 (MBK)

Dear Chief Judge Kaplan:

Due to the long series of closing arguments by plaintiff firms and the lateness of the hour yesterday, the Debtor did not have an opportunity to offer any rebuttal argument. Below are certain of the arguments we would have offered if time permitted.

## Inconsistency in Plaintiff Firm Arguments

Multiple counsel argued that the Debtor's new financing arrangements are the result of a fraudulent transfer while others argued the Debtor is not in financial distress. Some argued both. As Your Honor noted, the firms cannot have it both ways. If a fraudulent transfer occurred, financial distress must exist because the Debtor was either rendered insolvent or unable to pay the talc liability. Conversely, if there is no financial distress, no fraudulent transfer could have occurred because the Debtor is solvent and able to pay the talc liability. This inconsistency was evident in Mr. Jonas's argument yesterday. On the one hand, he argued that the Debtor engaged in a fraudulent transfer; on the other, he claimed that the Debtor suffers no financial distress because of its access to Holdco's assets valued at $30 billion. Notably, although he accused the Debtor of orchestrating a fraudulent transfer, Mr. Jonas never contended that the Debtor has been rendered insolvent or unable to pay the talc liability, presumably to preserve his ability to argue both. As discussed below, the record establishes that the Debtor is solvent, in or outside bankruptcy, but nonetheless is in financial distress.

## Termination of Funding Agreement

Multiple counsel argued that the termination of the initial Funding Agreement was improper, that it harmed claimants, that it reflected unclean hands. These arguments are wrong on multiple levels.

First, many counsel mischaracterized the initial Funding Agreement. They argued that its value was $61 billion and the value of the new Funding Agreement is only $30 billion and thus LTL "gave the claimants' money away." That is incorrect. The value of the initial Funding

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Honorable Michael B. Kaplan
April 19, 2023
Page 2

Agreement was equal to the extent of the **talc liability** minus the value of the Debtor.  The same is true for the new Funding Agreement.  That is because both agreements were and are only available as a backstop to cover the **talc liability** to the extent the Debtor could not.  The refinancing did not increase LTL's liability.

Second, the refinancing did not render LTL insolvent.  The initial Funding Agreement provided sufficient resources to pay the talc liability.  The second Funding Agreement likewise provides sufficient resources to pay the talc liability.  There is nothing fraudulent or improper about LTL engaging in a refinancing that continues to ensure its ability to pay talc claims, particularly where the transaction furthers its mission to equitably resolve the talc claims.

Third, and to that point, the refinancing provided LTL with additional assurance that it could achieve its mission to equitably resolve all current and future talc claims. The second Funding Agreement was supplemented by the Support Agreement, pursuant to which J&J agreed to backstop Holdco's obligation to provide plan funding. That was the very intent of the initial Funding Agreement, as the bankruptcy filing was a fundamental consideration, and condition of, and an integral part of, the single-integrated transaction that created LTL.[1] **The intent to resolve all claims could not be achieved outside of bankruptcy.[2]** The refinancing provided the requisite funding to accomplish LTL's intent through bankruptcy. There is nothing fraudulent or improper about LTL effectuating a transaction to achieve its mission and the intent of its initial agreements and bankruptcy case.

Fourth, LTL properly engaged in the refinancing to address the Third Circuit decision. That ruling had thwarted the purpose of the initial Funding Agreement, potentially rendering it void or voidable. *See Union County Utilities Authority v. Bergen County Utilities Authority*, 995 F. Supp. 506, 516-17  (D.N.J. 1998).[3]  As stated, the purpose of the initial Funding

---

[1]     Also, the opponents of the reorganization consistently assert that J&J is jointly and severally liable for LTL's talc liability.  Consequently, to the extent this bankruptcy is dismissed, plaintiffs, by their own admission and based on past practice, will pursue J&J for all LTL's liability.

[2]     Consistently, a lead member of the committee in opposition to the Debtor's filing conceded that future claims could only be resolved in bankruptcy.  It is for that reason he had proposed resolving all current and future ovarian cancer claims through the Imerys bankruptcy in 2020, for a fraction of what LTL now offers.

[3]     Performance under a contract may be excused "whenever a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance," even if performance is still possible. *Brenner v. Little Red School House, Ltd*., 302 N.C. 207, 211 (1981) (quoting 17 Am. Jur. 2d Contracts § 401 (1964)).  A subsequent ruling from a court that frustrates the primary purpose of the agreement may excuse performance. *See Union County Utilities Authority v. Bergen County Utilities Authority,* 995 F. Supp. 506, 516-17 (D.N.J. 1998).  The Restatement (Second) of Contracts § 265 provides that frustration of purpose may excuse performance when:  (1) a party's principal purpose is substantially frustrated; (2) the frustration is so severe that it is

JONES DAY

Honorable Michael B. Kaplan
April 19, 2023
Page 3

Agreement and, in particular, J&J's co-obligation was to facilitate a bankruptcy filing.  The Third Circuit determined that the agreement had the exact opposite effect.  The Court concluded that the J&J co-obligation and the access it provided to J&J balance sheet eliminated bankruptcy as an option for LTL.

While it is true, as many counsel argued yesterday, that the initial Funding Agreement by its terms was operative both in and outside bankruptcy, the parties did not foresee—and it was not reasonably foreseeable—that the existence of the agreement itself; in particular, J&J's co-obligation thereunder, would cause a dismissal.  That is not to say, as was suggested yesterday, that the Debtor has changed position and now argues that the initial agreement was not available outside bankruptcy.  To the contrary, if dismissal had occurred for other reasons; e.g., for failure to confirm a plan, the agreement would have remained available to the Debtor.

The record makes clear that all the actions taken by LTL and J&J, including the LTL Board, following the Third Circuit's ruling were taken to benefit claimants.  By the time the new financing arrangements became effective, counsel to tens of thousands of talc claimants were committed to supporting a bankruptcy resolution and recommending such resolution to their respective clients.  The Debtor believed and continues to believe it had an obligation to pursue that resolution and to do so in a way that comported with the Third Circuit's decision.  There was no improper purpose, fraud, breach of fiduciary duty, or other improper behavior.  To the contrary, the Debtor was merely taking steps to ultimately implement a plan that would result in faster, more efficient, certain and equivalent payments to talc claimants.

### Fraudulent Transfer

Counsel's arguments about the purported occurrence of a fraudulent transfer were merely conclusory and not supported by evidence.  Stated simply, no actual fraudulent transfer occurred because there is no evidence that LTL sought to hinder, delay or defraud claimants.  To the contrary, the evidence establishes that LTL's intent has been and continues to be to pay claimants amounts that have been approved by a vote of the claimants themselves, and by the Future Claimants' Representative, this Court and the District Court.

No constructive fraudulent transfer occurred because LTL, backed by the $30 billion of Holdco assets available through the new Funding Agreement, is solvent.  None of the plaintiff firms appears to argue otherwise nor could they in view of their earlier arguments to this Court

---

not fairly regarded as within the risks that the parties assumed under the contract; and (3) the parties did not assume the risk of the occurrence of the frustrating event.  *Unihealth v. U.S. Healthcare*, 14 F. Supp. 2d 623, 635 (D.N.J. 1998); *see also Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC*, 215 N.C. App. 66, 79 (2011).

JONES DAY

Honorable Michael B. Kaplan
April 19, 2023
Page 4

and the Third Circuit, as well as the Third Circuit's findings regarding the extent of the liability. The fact that Holdco transferred its consumer business prior to the Third Circuit decision and in a wholly unrelated transaction is simply irrelevant.

### Financial Distress

The record establishes that LTL was in financial distress at the time of filing of the instant chapter 11 case on April 4, 2023. LTL is still subject to all the same talc-related risks this Court found in its first bankruptcy. These included lottery-like verdicts, enormous and increasing defense costs, increasing claimant demands, state attorneys general actions and investigations, Canadian class actions, securities litigation and the specter of the talc litigation continuing for another 50 to 60 years. Although Holdco, LTL's source of backstop funding outside of bankruptcy, has rights to dividends and substantial interests in mostly foreign subsidiaries, the timing and amount of the dividends is uncertain and Holdco's assets, other than $400 million in cash, are illiquid. Given the massive, increasing, and highly unpredictable costs imposed by the talc liability in the tort system, Holdco would likely be forced to sell assets in order to cover the liability, leaving fewer assets available for future claims.

### Claimant Support

Multiple counsel continued their attacks on the broad claimant support that exists for the proposed plan terms. Their principal argument was that LTL does not have commitments from the claimants themselves (as opposed to the law firms that have signed plan support agreements). But the evidence was uniform that it is standard practice not to seek such commitments at this stage of the negotiations. And this was confirmed by the testimony of Mr. Birchfield himself. Also, the credibility of these attacks on the claimant support is suspect given that two of the supporting firms, Fears Nachawati Law Firm (which represents 4,956 claimants) and OnderLaw, LLC (which represents 21,099 claimants); were members of the TCC in the first bankruptcy case.

Further, the plaintiff firms presented no evidence regarding the extent of any actual opposition to the proposed plan terms. This was consistent with their position in the depositions where they refused to answer questions on this subject on the purported basis of privilege.

### Plan Process

The US trustee and some of the firms proclaimed that the Debtor will never be able to file a plan by May 14, 2023. But the Court has already indicated that it is considering limiting the

JONES DAY

Honorable Michael B. Kaplan
April 19, 2023
Page 5

duration of any injunction so it can take into account the Debtor's progress or lack of progress towards a plan.

### **Claimants' Right to Decide for Themselves**

The ultimate question in a chapter 11 mass tort case involving alleged asbestos liabilities is whether more than 75% of the claimants will support the proposed resolution of the liability. An injunction is needed here to preserve that right for the plaintiffs. As Mr. Simon put it yesterday, "what works is informed choice." Claimants should be afforded that right here.

### **Scope of Injunction**

The Court has indicated it is considering limiting any injunction to the commencement or continuation of trials. Although the Debtor believes a full injunction is appropriate, it respectfully requests that, if the Court decides to limit the scope of the injunction, it stay and enjoin (i) any discovery directed to corporate representatives of LTL, J&J or their affiliates, whether in the form of a 30(b)(6) deposition or otherwise; and (ii) the presenting of any argument in any pretrial matter, whether made orally or in writing, regarding the first or second LTL bankruptcy case, including arguments regarding the intent, propriety or impact of the cases.

Thank you for your consideration of this letter.

Respectfully submitted,

*/s/ Gregory M. Gordon*
Gregory M. Gordon

cc:  Counsel of Record (via ECF)