**brown**rudnick

MICHAEL S. WINOGRAD
Ph :  (212) 209-4917
mwinograd@brownrudnick.com

April 25, 2023

Honorable Michael B. Kaplan
U.S. Bankruptcy Judge
U.S. Bankruptcy Court for the
  District of New Jersey
402 East State Street
Trenton, New Jersey  08608
chambers_of_mbk@njb.uscourts.gov

### Re:  In re LTL Management LLC, No. 23-1092 (MBK)

Dear Judge Kaplan:

We are proposed counsel to the Official Committee of Talc Claimants in the above-referenced Adversary Proceeding.

J&J seeks to maintain its confidential designation of the Term Sheet that Mikal Watts, counsel for purported unfiled claimants, negotiated with James Murdica, counsel for J&J, and used in an effort to solicit support for a potential plan as outlined in the Term Sheet.  In addition to being discussed verbally with various plaintiffs' lawyers, the Term Sheet was attached to Plan Support Agreements that some (but not all) of those plaintiffs' lawyers signed.  If there were any basis to designate the Term Sheet confidential in the first place — there was not — that confidentiality was waived by the public disclosure of its terms.  Perhaps most stunning, however, is the fact that after having repeatedly touted to the public (in court and in the media) the purported support they have for the terms set forth in the Term Sheet, J&J and the Debtor now refuse to let the public know what those terms are.  For several independent reasons, as set forth below, there is no basis to require that the Term Sheet to be treated as confidential.

*First*, J&J alleges confidentiality based on the fact that it purportedly obtained signed Non-Disclosure Agreements ("NDAs") from counsel to whom it showed, or with whom it discussed, the Term Sheets.  Despite the TCC's repeated requests for their production, J&J continues (improperly) to refuse to produce the set of signed NDAs or even a list of the firms that signed them.  J&J may not assert the existence of signed NDAs as the basis for its confidentiality designation and then refuse to produce those NDAs.  On that basis alone, the Term Sheet must be de-designated.

*Second*, at the Preliminary Injunction Hearing on April 18, 2023, the Term Sheet was introduced as an exhibit and its terms were discussed freely in open court without any objection by J&J (or anyone else) whatsoever.  Mr. Jonas introduced the Term sheet as Exhibit 4 during his examination of Mr. Kim without any objection (or any other effort to maintain confidentiality).  Tr. 85:25-86:13.  The terms of the Term Sheet themselves were discussed numerous times throughout Mr. Kim's examinations and at other points during the Hearing as well, again without any objection or effort to maintain confidentiality.  For example, in his



Hon. Michael B. Kaplan
April 25, 2023
Page 2

opening statement, Mr. Maimon stated that "nowhere in the term sheet…is there anything for the third-party parent claims."  Tr.  28:17-19.  On the stand, Mr. Kim discussed the general nature of the term sheet and the specific term concerning Ms. Ellis' purported selection as claims administrator and her use of Archer Systems to assist her in that role.  Tr. 86:7-93:3.  The provision concerning Ms. Ellis was actually read directly from the Term Sheet into the record by Mr. Jonas.  89:1-11.  Mr. Maimon likewise addressed the Term Sheet during his examination of Mr. Kim and read into the record and discussed both the provision requiring that the FCR not assign more than one-third of the trust corpus to qualifying future claims, as well as the provision selecting Ms. Ellis as FCR.  Tr. 135:7-141:5.  During his closing argument, Mr. Satterley addressed specific distributions under the Terms Sheet:  "Well, you know how much Mr. Valadez would be entitled to under this plan . . . ?  Mr. Valadez would be entitled to $50,000 under this plan. $50,000.  So I would say to Your Honor that this is a manufacturing attempt to cram-down."  Tr. 314:15-20.  Ms. Johnson, in her closing argument, addressed the Term Sheet as well, including the specific allocation in it for governmental claims:  "There's no agreement that the $400 million that's allocated for all government claims is sufficient."  Tr. 336:2-25.  All of this was discussed in open court without so much as a peep from the J&J's or Debtor's counsel (or from Mr. Watts, who was present in the courtroom).  In fact, just the opposite.  J&J's own counsel told the Court in her closing argument that "some of the terms of the offer that Mr. Birchfield made to resolve all of the current and future ovarian claims back in 2020," — counsel then went ahead and stated the specific purported offer amount — "tracks almost perfectly with some of the provisions put forth in the plan support agreement and the term sheet."  Tr. 245:25-246:7.  This constitutes yet another independent reason to deny Debtor's efforts

*Third*, while counsel for J&J has informed us that it disputes it, we understand on information and belief that at least Mr. Watts (if not others) discussed the Term Sheet in detail with at least some plaintiffs' lawyers who did not sign an NDA.  We have reached out to Mr. Watts to confirm and are awaiting his response.

*Fourth*, as noted above, the Debtor and J&J have squarely told the public that 60,000 or more unfiled claimants support the proposed plan as set forth in the Term Sheet.  Setting aside the veracity of that representation, it is stunning that they would at the same time refuse to allow the public to see exactly what those terms are for which they allegedly have garnered support.

For each and all of these reasons, there is no basis to maintain a confidentiality designation concerning the Term Sheet, and we therefore respectfully request that the Court order its de-designation.

Respectfully,

Michael S. Winograd

cc:  All counsel of record