# **EXHIBIT 1**

| | |
|---|---|
| *Attorney(s):* | COHEN, PLACITELLA & ROTH, P.C. |
| *Office Address & Tel. No.:* | 127 Maple Avenue, Red Bank, NJ  07701 |
| | 732-747-9003 |
| *Attorney(s) for:* | Plaintiff(s) |

| | |
|---|---|
| **LUCILA CRUZ AND GUADALUPE CRUZ,** husband and wife,<br><br><br><br>Plaintiffs,<br><br>vs.<br><br>KENVUE INC. AND JANSSEN PHARMACEUTICALS, INC<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br><br><br>MIDDLESEX          COUNTY<br><br>LAW              DIVISION<br><br>Docket No.:    **MID-L-**<br><br><br>*CIVIL ACTION*<br>**SUMMONS** |

The State of New Jersey, to the Above Named Defendant(s):

      **The Plaintiff**, named above, has filed a lawsuit against you in the Superior Court of New Jersey.  The complaint attached to this summons states the basis for this lawsuit.  If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the County listed above within 35 days from the date you received this summons, not counting the date you received it.  (The address of each deputy clerk of the Superior Court is provided.)  If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice complex, CN—971, Trenton, NJ 08625.  A $135.00 filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the deputy clerk if the Superior Court) must accompany your answer or motion when it is filed.  You must also send a copy of your answer or motion to Plaintiffs' attorney whose name and address appear above, or to Plaintiffs, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee and completed Case Information Statement) if you want the court to hear your defense.

      If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief Plaintiffs demand, plus interest and costs of suit.  If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

      If you cannot afford an attorney, you may call the Legal Services office in the county where you live.  A list of these offices is provided.  If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.  A list of these numbers is also provided.

    *Dated:*  April 13, 2023

                     _/s/ Michelle M. Smith_____
                     MICHELLE M. SMITH
                     Clerk of the Superior Court

                     **JANSSEN PHARMACEUTICALS, INC.**
                     **1125 Trenton-Harbourton Road**
*Name/Address of Defendant to be served:*     **Titusville, NJ 08560**

**COHEN, PLACITELLA & ROTH, P.C.**
CHRISTOPHER M. PLACITELLA
ID# 02778-1981
127 Maple Avenue
Red Bank, NJ 07701
(732) 747-9003
*Attorneys for Plaintiffs*

|  |  |
|---|---|
| **LUCILA CRUZ AND GUADALUPE CRUZ,** husband and wife,<br><br>       Plaintiffs<br><br>       vs.<br><br>**KENVUE INC**., individually and as successor in interest to Johnson & Johnson Consumer Inc.;<br><br>**JANSSEN PHARMACEUTICALS, INC.,** individually and as successor in interest to Johnson & Johnson subsidiaries named Johnson & Johnson Consumer Inc., both prior to and after its 2021 restructurings and colloquially known as "Old JJCI" and "New JJCI";<br><br>**JOHN DOE CORPORATIONS 1-50;**<br><br>       Defendants | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MIDDLESEX COUNTY<br><br>DOCKET NO.<br><br>CIVIL ACTION<br>ASBESTOS LITIGATION<br><br>**COMPLAINT AND JURY DEMAND** |

       Plaintiffs, by way of Complaint against Defendants, upon information and belief, allege as follows:

## I.    PARTIES

### A.    PLAINTIFFS

       1.    Plaintiffs Lucila Cruz ("Plaintiff") and Guadalupe Cruz ("Spouse Plaintiff"), Husband and Wife, (collectively "Plaintiffs") reside at 145 Aquila Drive, Algonquin, Illinois 60102. Plaintiff, Lucila Cruz, was exposed to talc containing asbestos on a regular and frequent

basis through the use of Johnson & Johnson's talc products.

2.      Dust particles and fibers from Johnson & Johnson's ("**J&J**") and its corporate subsidiaries' asbestos-containing talc products came in contact with and permeated Plaintiff's person and clothing.

3.      As a direct and proximate result of Plaintiff's exposure to and inhalation and ingestion of dust particles and fibers, Plaintiff was diagnosed with mesothelioma on or around May 3, 2022.

4.      This suit is brought, in part, under the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1, et seq., the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq., and the common law of the State of New Jersey to recover damages and other relief, including the costs of suit and reasonable attorneys' and expert fees, for the injuries Plaintiff sustained as a result of the Defendants' and/or their corporate predecessors' negligent and wrongful conduct in connection with the design, development, formulation, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or sale of the PRODUCTS, including, but not limited, to the fraudulent concealment of the hazards of asbestos present in the talc component of the PRODUCTS and the fraudulent concealment of evidence establishing the existence of such hazards.

5.      "PRODUCTS" is defined by talc products utilized by Plaintiff, including Johnson's Baby Powder.

**B.      DEFENDANTS**

6.      Defendant Kenvue Inc. ("**Kenvue**") is a Delaware corporation with its principal place of business in the State of New Jersey. Kenvue may be served with process by serving its General Counsel at 199 Grandview Road, Skillman, NJ 08558.

7.      At all relevant times, upon information and belief, Kenvue, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which the Plaintiff was exposed. At all relevant times, Kenvue, or its predecessors, regularly transacted, solicited, and conducted business in all fifty States of the United States.

8.      Defendant Janssen Pharmaceuticals, Inc. ("**Janssen"**) is a New Jersey Corporation with its principal place of business in the State of New Jersey. Janssen may be served with process by serving its General Counsel at 1125 Trenton-Harbourton Road, Titusville, NJ 08560.

9.      At all relevant times, upon information and belief, Janssen through its predecessors was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which the Plaintiff was exposed. At all relevant times, Janssen regularly transacted, solicited, and conducted business in all fifty states of the United States.

10.      Defendants **John Doe Corporations 1-50** are the fictitious names of corporations, partnerships, or other business entities or organizations whose identities are not presently known, and who are the alter egos of or are otherwise responsible for the conduct or liability of those who mined, milled, manufactured, sold, supplied, purchased, marketed, installed, and/or removed asbestos or asbestos-containing PRODUCTS to which Plaintiff was exposed.

11.      Defendants as used in this Complaint refers to and means Defendants Kenvue, Janssen, and the John Doe parties, either or both in its own right or as a corporate successor to an entity or person whose acts, omissions, undertakings, or activities are attributed to it by contract or operation of law.

12.      The Defendants named and identified herein are either (a) corporations organized

under the laws of the various states of the United States of America that were and are doing business in the State of New Jersey that mined, milled, manufactured, sold, supplied, distributed, purchased, and/or marketed asbestos-containing PRODUCTS to which Plaintiff was exposed; or (b) are a successor in interest of such corporations described in clause "(a)" which the law holds responsible and liable for injuries and harm caused by their predecessor(s) or by their predecessor's asbestos-containing product lines it or they acquired which, as a consequence, renders them liable under law to the Plaintiffs for the injuries and damages that are the subject of this suit.

13.     Each Defendant acted at all times material herein by and through their respective or joint actual, apparent, or ostensible agents, servants, employees, and/or officers, each and all of whom were acting under, pursuant and in accordance with their authority or duties, actual, apparent, or ostensible.

## C.     FACTS RELATING TO DEFENDANTS' SUCCESSOR LIABILITY STATUS

14.     The Declaration of John K. Kim in Support of First Day Pleadings in LTL's second Bankruptcy filing on April 4, 2023 ("**Kim LTL Decl.**"), *In re: LTL Management LLC*, Case No.: 23-12825, United States Bankruptcy Court District of New Jersey ("**LTL 2**"), summarizes J&J's and its affiliates' corporate history that is pertinent to the claims alleged herein against the Defendants as follows:

a.     "J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products."

b.     "In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder…. J&J transferred all its assets and liabilities associated with the baby products division to J&J Baby Products."

c.     "In 1981, J&J Baby Products transferred all its assets, except those assets allocated

to its diaper programs, to Omni Education Corporation ("**Omni**"), a wholly owned subsidiary of J&J Baby Products. In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program. Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company."

d.      "In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc."

e.      "In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson & Johnson Consumer Companies, Inc. ("**J&J Consumer Companies**")."

f.      "In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "**Old JJCI**")."

g.      "Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby Powder and other talc-containing products cause cancer or other diseases…. Old JJCI also became responsible for all claims alleging that Shower to Shower products, which contained talc, cause cancer or other diseases."

15.     J&J and its subsidiary, "Johnson & Johnson Consumer, Inc.," both in the form of "Old JJCI" and "New JJCI" (which is identified and described below), were at all times material responsible for the design, labeling, marketing, distribution, and sale of J&J's body powder product lines, including the iconic Johnson & Johnson Baby Powder product line.

16.     Each and every one of the J&J's corporate entities, including itself and its affiliated companies involved or associated with talc business and PRODUCTS, were at all times material

5

to this case aware that raw talc ingredient and/or resulting talc-based PRODUCTS contained asbestos, and each and all collectively actively concealed such fact from the public for decades.

17.    Prior to the implementation of J&J's multifaceted restructuring of its consumer product subsidiaries in 2021, Old JJCI and its predecessors milled, manufactured, labeled, sold, supplied, distributed, and/or marketed asbestos-containing PRODUCTS to which Plaintiff was exposed.

18.    In an effort to avoid or eliminate J&J and Old JJCI's respective responsibility and liability for injuries and harm caused by Johnson & Johnson Baby Powder, as well as other talc PRODUCTS, in or about October 2021, Old JJCI underwent a series of corporate restructuring transactions under Texas state corporation and business law in which it split itself into two separate entities through a device referred to as a "divisive merger," more commonly known as the "Texas Two Step."

19.    The corporate restructuring was designed and undertaken with the intent to isolate the talc liabilities of Old JJCI into a newly invented company created by J&J called "LTL Management LLC" ("**LTL**"). "LTL" is an acronym for "Legacy Talc Liability."

20.    LTL was immediately thereafter put into a Chapter 11 Bankruptcy wherein LTL and other J&J entities sought the protection of the Bankruptcy Code's processes and machinery to obtain a stay of all pending litigation and construct an aggregate resolution of its outstanding present and future asbestos liabilities that would foreclose jury trials and reduce the compensation they would owe to those harmed by its PRODUCTS and their families, given that J&J and its subsidiaries were increasingly being held liable by juries in lawsuits brought by talc asbestos claimants and were being ordered to pay compensatory and exemplary damages.

21.    As part of J&J's liability avoidance/limiting corporate restructuring, all of the

productive assets of Old JJCI, including those used to manufacture and market J&J Baby Powder, were transferred to a newly minted corporate entity named "Johnson & Johnson Consumer Inc." ("**New JJCI**"). New JJCI upon receipt of the Old JJCI's operating assets continued to sell J&J Baby Powder, as had Old JJCI previously before when J&J itself directly marketed the product line through an internal division.

22.     Over the objection of tens of thousands of personal injury and wrongful death tort plaintiffs, the Bankruptcy Court presiding over LTL's 2021 bankruptcy case stayed and enjoined prosecution of all litigation against not only the Debtor LTL but all cosmetic talc injury related litigation involving J&J and New JJCI.

23.     During LTL's bankruptcy proceedings, representatives of the affected personal injury and wrongful death tort victims challenged J&J's Texas Two Step scheme before the Bankruptcy Court. After losing their challenges before the Bankruptcy Court, they were ultimately successful on appeal before the United States Court of Appeals for the Third Circuit, which on January 30, 2023, ruled that the Bankruptcy filing by LTL was not proper and ordered that LTL's 2021 Bankruptcy case be dismissed. *In re: LTL Management, LLC*, No. 22-0007, 2023 WL 2760479 (3d Cir., decided Jan. 30, 2023; opinion entered Mar. 31, 2023).

24.     LTL's efforts to obtain re-argument before the Third Circuit panel hearing its appeal or an *en banc* hearing were denied, and the Appeals Court's mandate to the Bankruptcy Court was issued by the Third Circuit Clerk on March 31, 2023, thereby triggering the lower court's duty to enter an order dismissing the case.

25.     Within hours of the LTL Bankruptcy Court issuing its ensuing dismissal order on April 4, 2023, LTL filed a second Chapter 11 petition for bankruptcy protection in the same court seeking the same relief as in the dismissed case, claiming its funding sources and arrangements

had been replaced and reconfigured in such way that purportedly overcomes the Third Circuit's

reasons for ordering the earlier bankruptcy case be dismissed.

26.    Unbeknownst to Plaintiffs, during the time the Third Circuit Court of Appeals was

considering the propriety of LTL's bankruptcy filing, New JJCI began the process of moving its

assets and business to yet another J&J subsidiary, Defendant Kenvue, Inc., by transfers through

JJCI's direct parent, Janssen Pharmaceuticals, Inc.

27.    According to the Kim Declaration, as part of J&J's further corporate restructuring,

New JJCI changed its name to "Johnson & Johnson Holdco (NA) Inc." ("**Holdco**"), a New Jersey

corporation. His declaration before the Bankruptcy Court additionally revealed that "in early

January 2023, [New JJCI] transferred its Consumer Business assets to its parent entity." *See* Kim

LTL Decl. at ¶26.

28.    While Mr. Kim's declaration does not expressly state who the parent entity is, a

careful examination of the affidavit demonstrates that Janssen Pharmaceuticals, Inc, is the parent

entity of Defendant New JJCI. *Id.* Figure 1 below is from an Exhibit to Mr. Kim's Declaration and

shows that Janssen is the parent that received all of the JJCI assets used to manufacture, market,

and sell J&J Baby Powder.

[Balance of page intentionally blank]

Figure 1



29.    Accordingly, under New Jersey law, Janssen is a successor to Old JJCI and responsible for the contractual undertakings and tortious conduct of Old JJCI.

30.    The information gleaned from Mr. Kim's Declaration and a J&J subsidiary's SEC filings shows that J&J is in the process once again of manipulating assets and responsibilities related to the sale of J&J's Baby Powder.

31.    On January 4, 2023, Defendant Kenvue, another J&J subsidiary, submitted its first filing with the Securities and Exchange Commission ("**SEC**"), an S-1 registration of securities form. (Kenvue Inc. Form S-1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023)). Figure 2 below reproduces a portion of the filing's cover page.

Figure 2



32.    In its SEC registration filing, Kenvue sets forth the products that it claims to manufacture and sell in the United States. In this regard, Kenvue represented to the SEC and the public: "A number of **our products marketed in the United States,** including many of our products in our Skin Health and Beauty segment, are considered cosmetics regulated by the FDA through the Federal Food, Drug, and Cosmetic Act and the Fair Packaging and Labeling Act. **Our cosmetic products include** Aveeno Restorative Skin Therapy Oat Repairing Cream, Aveeno Restorative Skin Therapy Sulfate-Free Body Wash, **Johnson's Baby Powder** and certain of our Listerine mouthwash products." *Id.* (emphasis added).

33.    Kenvue acknowledged in its SEC S-1 filing that it may be held accountable for the harm caused by the talc-based PRODUCTS it is responsible for: "It is also possible that various parties will seek to bring **and will be successful** in bringing claims against us, including by raising allegations that we are liable for the Talc-Related Liabilities." *Id.*

34.    Kenvue further acknowledges itself as the company responsible for the manufacture of Johnson's Baby Powder indicating that it "may be subject to additional claims . . . related to the sale of **talc-based Johnson's Baby Powder in markets where we have discontinued** this product (**such as in the United States** and Canada), including potential governmental inquiries, investigations, claims and consumer protection cases from state attorneys general." *Id.* (emphasis added).

35.     Kenvue also acknowledges that it is "responsible for all liabilities on account of or relating to harm arising out of, based upon, or resulting from, directly or indirectly, the presence of or exposure to talc or talc-containing products sold outside the United States or Canada." *Id.*

36.     As such, Kenvue is responsible individually and as successor to all predecessor entities involved in the manufacturing, marketing, and sale of the asbestos-containing talc PRODUCTS to which the Plaintiff was exposed.

## II.     CLAIMS NOT ASSERTED

37.     For purposes of clarity and avoidance of doubt, this Complaint is not asserting and does not assert claims against, or seek any relief from, LTL during or while a stay, injunction or bar order is imposed by the bankruptcy court in connection with its Chapter 11 Proceedings, and no relief obtained by Plaintiffs pursuant to the Complaint will be used by the Plaintiffs against LTL in any manner. Plaintiffs reserve all rights to assert claims against LTL in the event any stay of litigation concerning J&J is lifted or otherwise discontinued.

38.     For purposes of clarity and avoidance of doubt, this Complaint is not asserting and does not assert claims against, or seek any relief from, J&J during or while a stay order is imposed by the bankruptcy court, and no relief obtained by Plaintiffs pursuant to the Complaint will be used by the Plaintiffs against LTL Management or J&J. Plaintiff reserves all rights to assert claims against J&J in the event any stay of litigation concerning J&J is lifted or otherwise discontinued.

39.     For purposes of clarity and avoidance of doubt, this Complaint is not asserting and does not assert claims against, or seek any relief from, Imerys Talc Vermont, Inc., or any of its affiliates (collectively, "Imerys"), and no relief obtained by Plaintiffs pursuant to the Complaint will be used by the Plaintiffs against Imerys in any manner.

### III.     FACTUAL ALLEGATIONS

**A.     OVERVIEW OF TALC AND PRODUCTS**

40.     Talc is an inorganic magnesium silicate mineral that may occur in a variety of forms (massive or platy, foliated, and fibrous).

41.     Talc is used in a wide array of industrial, commercial, and cosmetic substances. It is the main substance in talcum powders, talc-based body powders, and the PRODUCTS.

42.     Talc is mined from deposits in the earth that can contain asbestos, heavy metals (nickel, cadmium, cobalt, chromium, arsenic, etc.), and other toxic minerals.

43.     Defendants acting as aforesaid manufactured and marketed Johnson's Baby Powder ("**JBP**") and Shower to Shower.

44.     J&J began the manufacture of Johnson's Baby Powder in approximately 1894.

45.     In the late 1970's, J&J incorporated a new division that over several name changes became Johnson & Johnson Consumer Inc. ("**JJCI**"), which sold Johnson's Baby Powder.

46.     Although JJCI manufactured and marketed the product, starting in the late 1970s, J&J was involved in critical decisions concerning safety and health including marketing, public relations, interaction with federal authorities, fraudulent concealment, and the refusal to warn people like the Plaintiff that J&J's talc PRODUCTS were capable of causing cancer.

47.     J&J in conjunction with and as the authorized spokesperson, representative and agent for Defendants made representations to federal authorities and the consuming public concerning the safety of Defendants' PRODUCTS.

48.     Defendants and J&J, at all times relevant hereto, represented to consumers, doctors, regulators, and courts that JBP and other talc PRODUCTS were safe and free of asbestos.

49.     During all relevant times, JBP was composed primarily of talc along with other constituent elements found in talc such as asbestos, fibrous talc, heavy metals (e.g., nickel,

cadmium, cobalt, chromium, arsenic), and fragrance chemicals.

50.     The Defendants obtained the talc for Johnson's Baby Powder and other talc PRODUCTS from various sources including Guangxi, China, the Fontana mine in the Germanasca Valley and Val Chisone region in Italy, as well as the Johnson, Hammondsville, Rainbow, Hamm, and Argonaut mines in Vermont (collectively referred to as "Vermont mines"). *See* 2/15/2019 Deposition of Musco 63:7–64:5 (Hammondsville and Johnson mines were sources of cosmetic talc for Johnson's Baby Powder); *see also* 3/8/2019 Deposition of Nancy Musco 451:2–453:22 (Emtal 500 from Johnson Mine used in Cosmetics); 10/29/1982 Deposition of Roger Miller; *see also* July 22, 2019 Trial Testimony of John Hopkins *Barden et al. v. Johnson & Johnson* at 18:15-19:21.

51.     From approximately 1967 until 2003, the primary source of talc for the PRODUCTS was Vermont mines including the Hammondsville, Rainbow, Hamm, and Argonaut mines. The mines were owned and operated by J&J's subsidiary, Windsor Minerals, with J&J exercising control over all key decisions concerning the mines.

52.     Over time, the trade names for the talc ore used by J&J and the Defendants in Johnson's Baby Powder and Shower to Shower included "Emtal," "Grade 66," "Grade 96," "1615," "Italian 00000," and "Supra," all of which contain asbestos.

53.     At all relevant times, a feasible and safe alternative to talc has existed. For example, cornstarch is an organic carbohydrate that is quickly broken down by the body with no known adverse health effects. Cornstarch powders have been sold and marketed for the same uses as the PRODUCTS with nearly the same effectiveness as talcum powders. *See* Johnson & Johnson Baby Powder Questions and Answers, October 1985 (JNJ 000011777); cornstarch "can be absorbed into the body, tending not to cause severe granuloma as may be the case with talc." November 3, 1964

Letter to Ashton from Stalker (JNJ 000332195). See *also* Johnson's Baby Powder, pure cornstarch, being marketed as "a change for the better."

54.    At relevant times, J&J and the Defendants advertised and marketed their "Johnson's Baby Powder" product as a symbol of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" to keep skin feeling dry and comfortable, and "clinically proven gentle and mild." J&J and the Defendants induced people through advertisements to dust themselves with this product to mask odors. Johnson's Baby Powder bottle specifically targets women, stating: "For you, use every day to help feel soft, fresh, and comfortable." *See* P-121 (excerpts from www.johnsonbaby.com and www.showertoshower.com; Shower to Shower Task Force – BP Brainstorm July 14, 2004 (JNJ 000058760); and P-49 (picture of Johnson & Johnson's Baby Powder bottle).

55.    Although the labels on the bottles for J&J Baby Powder have changed over time, the core message has been the same: that people can safely use the PRODUCTS on their bodies.

## B.    ASBESTOS AND OTHER CONSTITUENTS IN TALC

56.    The PRODUCTS contain asbestos and fibrous talc, and Defendants failed to warn the public, including Plaintiffs, about the fact that the PRODUCTS contained such carcinogenic substances.

57.    Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos. Over the next several decades, a growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer, and death.

58.     The United States Geological Survey on Commercial Talc Production conducted in 1965, as well as those dating back to the 1800s, noted the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

59.     In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure but rather contained various fibrous minerals, including tremolite, anthophyllite, and chrysotile. This was not unexpected, as the study explains, because these types of fibers are often present in fibrous talc mineral deposits like those mined by Defendants for use in the PRODUCTS. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders contained asbestos, there is no evidence that these positive results or the brand names of contaminated PRODUCTS were communicated to any governmental agency, the media, or the public. The study concluded that "[a]ll of the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%. The fibrous material was predominantly talc but probably contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley et al., Fibrous and Mineral Content of Cosmetic Talcum PRODUCT, 29 AM. INDUSTRIAL HYGIENE ASSOC. J. 350-354 (1968).

60.     In 1971, the New York City Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using transmission

electron microscopy ("TEM") and X-ray diffraction analysis ("XRD") and found them to contain 5-25% tremolite and anthophyllite asbestos fibers.

61.     A 1976 follow-up study of commercially available talcum products concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Arthur Rohl, et al., Consumer talcums and powders: mineral and chemical characterization, 2 J. Tox. Envtl. Health 255-284 (1976).

62.     In 1981, Lockey, in *Nonasbestos fibrous materials* (1981), reported that talc frequently exists in complex deposits containing quartz and asbestos and that talc free from asbestos also contains talc in fibrous form.

63.     Paoletti et al. *Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial,* Cosmetic*, and Pharmaceutical Talcs* (1983), analyzed talc powders from national and international markets in order to assess their fiber contents and the proportion of asbestos in the fibrous material. Analysis of talcum powder samples revealed that the powders contained fiber content up to 30% of total particles. About half of the talc powders revealed the presence of asbestos.

64.     In 1991, Alice Blount tested talcum powder mined from Vermont, including Johnson's Baby Powder, and found that the powder contained asbestos fibers and needles. Blount, A.M. "Amphibole Content of Cosmetic and Pharmaceutical Talcs." *Environmental Health Perspectives* 94 (August 1991): 225–30; *See also* Deposition of Alice Blount (April 13, 2018) at 30:16-33:8; 47:15-25.

65.     On November 14, 2018, Drs. William Longo and Mark Rigler published a report

detailing results from tests they performed on samples of J&J talc PRODUCTS provided by the J&J Defendants dating from the 1960s to the early 2000s. 68% of the samples tested contained amphibole asbestos. The authors further found that 98% of the samples contained fibrous talc.

66.    In 2019, the U.S. Food and Drug Administration ("**FDA**") contracted AMA Analytical Services, Inc. to test samples of talc-containing cosmetics, including Johnson's Baby Powder. AMA identified chrysotile asbestos and talc fibers in a sample of Johnson's Baby Powder. As a result, Johnson & Johnson Consumer Inc. issued a recall of all bottles (approximately 33,000) from the sampled lot.

## C.    EVIDENCE OF ASBESTOS IN DEFENDANTS' PRODUCTS

67.    Beginning at least in the 1950s, J&J tested its talc for contaminant or co-minerals, including "asbestos" and "tremolite," because the company knew they are deleterious minerals that could be harmful to a person's health and thus should not be found in talc-based cosmetic products.

68.    At all times relevant hereto, J&J and Defendants understood the dangers posed by asbestos exposure and that asbestos was a known contaminant of talc used in cosmetic and industrial products.

69.    All information known to J&J concerning the hazards of asbestos-containing talc was shared with and known by the Defendants.

70.    Internally, J&J historically defined "asbestos" as "the fibrous serpentine chrysotile and the fibrous forms of … anthophyllite, … tremolite, and actinolite." *See* Deposition of John Hopkins, August 16, 2018 at 174:24–175:23.

71.    In addition to conducting its own internal tests described above, J&J hired testing laboratories, such as the Battelle Memorial Institute, McCrone Associates, the Colorado School of

Mines Research Institute, and others to test for asbestos contamination (or co-mineralization) in the source talc ore used to manufacture Johnson's Baby Powder and J&J cosmetic products.[1]

72.     All of these testing laboratories found asbestos minerals both in the source talc ore and J&J's cosmetic talc products.[2]

73.     Testing done by J&J, Defendants, and their consultants in the 1960s, 1970s, 1980s, and 1990s demonstrated that there was asbestos in the talc mined from J&J's Vermont mines.

74.     Contaminants satisfying J&J's and Defendants' own definition of asbestos have been found in J&J talc, include "chrysotile," "tremolite," "anthophyllite," and/or "actinolite." *See, e.g.*, 12/4/1970 Colorado School of Mines Institute testing results; 6/30/1971 Colorado School of Mines Institute testing results; *Barden* Trial Ex. P3695-082-86: Summary chart of testing of Johnson's Baby Powder detecting asbestos and asbestos minerals.

75.     The existence of laboratory tests finding asbestos in J&J's cosmetic talc products

---

[1] *See, e.g.*, 4/12/1960 Battelle Memorial Institute report; 10/15/1957 Battelle Memorial Institute report; **5**/23/1958 Battelle Memorial Institute report; 7/31/1959 Battelle Memorial Institute report; 8/31/1959 Battelle Memorial Institute report; 9/15/1959 Battelle Memorial Institute report; 12/31/1959 Battelle Memorial Institute report; 1/24/1968 Battelle Memorial Institute report; 5/9/1958 Battelle Memorial Institute report; 3/8/1960 Battelle Memorial Institute report; 6/6/1961 Battelle Memorial Institute memo from W.L. Smith to W.H. Ashton summarizing observations of Smith Gouverneur, NY and Hammondsville, VT ore deposits, beneficiation products; 8/25/1961 Battelle Memorial Institute memo from W.L. Smith to W.H. Ashton evaluating exploration work on Hammondsville talc deposit.

[2] *See, e.g.* 4/14/1971, Colorado School of Mines Institute letter to Johnson & Johnson; 10/27/1972, McCrone report; 2/26/1973, Colorado School of Mines Institute to W. Ashton of Johnson & Johnson re:  Mineralogical Exam of Five Talc Samples; 6/6/1973, Johnson & Johnson memorandum; 2/11/1974, McCrone to JJ Rolle; 4/10/1974, McCrone to JJ Russell; 4/24/1974, McCrone report; 4/27/1973, Microscopic Exam of Johnson's Baby Powder; 5/8/1974, McCrone report; 7/8/1974, McCrone to J.J. Rolle; 10/10/1974, McCrone to Windsor Minerals Inc.; 12/9/1974, McCrone to Johnson & Johnson; 7/1/1975, McCrone to Windsor Minerals Inc.; 8/31/1976, Johnson & Johnson Memo Re: Vermont 66 Talc; 9/11/1975, Stewart to V. Zeitz; 11/5/1975, McCrone to Windsor Minerals Inc.; 11/19/1975 McCrone to Windsor Minerals Inc.; 7/5/1976, Colorado School of Mines Research Institute report; 1/25/1977, F. Pooley to J.J. Rolle; 4/1/1977, EMV Report to Johnson & Johnson; 10/5/1978, McCrone to Windsor Minerals Inc.; 2/9/1979, handwritten notes regarding conversation with Harold Cohen; 11/6/1980, McCrone to Windsor Minerals Inc.; 8/22/1985, McCrone to Windsor Minerals Inc.; 4/29/1986, McCrone to Windsor Minerals Inc.; 3/25/1992, Johnson & Johnson Interoffice Memo by Munro;  12/4/1997, Bain Environmental Report; 5/23/2002, Luzenac America Inc. (hereinafter "Luzenac") Technical Report; 2/26/2004, Luzenac Product Certification Report; 2/27/2004 Luzenac - Product Certification; 3/4/2011, Summary of TEM Asbestos Results: Grade 66/96 USP Product Composites.

and source talc used in those products was verified by J&J under cross examination in recent litigation. *See* Trial Testimony of John Hopkins from *Barden et al v. J&J*, 8/14/19 at 148:17-21.

76.     As detailed in the following paragraphs, J&J executives acknowledged and communicated internally amongst themselves and with Defendants about the results of testing demonstrating the presence of asbestos in J&J's consumer talc products and the source ore used to make these products.

77.     In 1972 for example, J&J's Al Goudie confirmed that McCrone found trace tremolite and that these findings are "not new." *See* handwritten note from W. Nashed to Dr. Goudie.

78.     In May 1973, Roger Miller, the President of J&J's mining company, Windsor Minerals, informed Dr. Dewitt Petterson of J&J that "the ore body contains actinolite." *See* 5/1/1973, Memo from R.N. Miller to Dr. Petterson. This talc ore body was actively used to produce J&J's cosmetic talc products.

79.     One week later, J&J's William Ashton informed Dr. Petterson that "[t]he first showing of actinolite we know about is October 1972." *See* 5/8/1973, Memo from W. Ashton to D. Petterson.

80.     In April 1969, J&J discussed the need to firm up the company's position on tremolite in talc because of potential dangers to human health and safety noted in the medical literature and by environmental health agencies. *See* April 9, 1969 Ashton to Hildick Smith - Alternate Domestic Talc Sources File No. 101.

81.     J&J was concerned that the presence of tremolite in its cosmetic talc products, and thus, the resultant inhalation of talc with these needle-like crystalline structures, was related to the rising incidence of pulmonary diseases and cancer and increased the risk that the company would

be drawn into litigation relating to these diseases and cancer. *See* April 15, 1969 Thompson to Ashton - Alternate Domestic Talc Sources File No. 101.

82.     In July 1971, J&J reported a conversation with Dr. Clark Cooper, a professor at the School of Public Health at the University of California, Berkley, who expressed his concern that there is no place for asbestos in talc and any talc with asbestos should be removed from the market. *See* 7/30/1971 Hildick Smith to R.A. Fuller). According to Dr. Cooper, no level of asbestos in talc is acceptable for cosmetic use. *Id*.

83.     J&J was aware of studies demonstrating that both talc and asbestos have been found in the tissue of women who never worked with asbestos or talc. *See* February 19, 2019 Deposition of Susan Nicholson at 83:6-11.

84.     J&J and the Defendants have known for many years that the talc used in Johnson's Baby Powder could be inhaled and reach deep into the lung.

85.     For decades, J&J and the Defendants (and their predecessors) have known about the dangers of talc powder inhalation during the normal and expected use of its talc-based cosmetic products, especially to babies. *Id*. at 111:2–112:15; *see also id.* at 116:11–119:18 and 5/27/2009 email from Nancy Musco.[3]

## IV.    SUBSTANTIVE COUNTS

## FIRST COUNT – NEGLIGENCE

86.     Plaintiffs reiterate the facts and contentions as set forth above and repeat them herein.

---

[3] *See* 11/10/1971, Letter from A.M. Langer to G. Hildick-Smith; 8/24/1972, Memo from W. Nashed to R.A. Fuller; 9/25/1972, Memo from W. Nashed to Fuller, Hildick-Smith, on Shower-to-Shower/Asbestos FDA Meeting 9/21/1972; 6/12/1972, ES Laboratories Talc Analysis (Asbestos); 12/13/1973, Memo from M.J.M. Oerlemans to J.H. Smids, H.L. Farlow, Re: Asbestos in Baby Powder; 9/9/1975, Memo from G. Lee Re: A.M. Langer Analysis of Talcum Powder Products – Edinburgh Meeting; 4/23/1998, Letter from A.M. Blount to R. Hatcher; Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc; University of Minnesota Investigation of Possible Asbestos Contaminations in Talc Samples.

87.     Defendants, at all times material hereto, acted through their respective officers, employees, and agents, who in turn were acting within the scope of their authority and employment in furtherance of the business of Defendants, including any and all of the Defendants' corporate predecessors and their officers, employees, and agents, and including J&J through the restructuring outlined in Mr. Kim's Declaration and, as acknowledged by Defendants in filings submitted to United States Government agencies, for whose conduct Defendants assumed and have liability.

88.     Defendants were engaged, directly or indirectly, in the mining, milling, producing, processing, compounding, converting, selling, merchandising, supplying, or distributing of asbestos-containing PRODUCTS.

89.     Defendants, directly or indirectly, caused their asbestos-containing PRODUCTS to be sold to or used by Plaintiff in Plaintiff's home.

90.     Plaintiff was exposed to and came in contact with Defendants' asbestos-containing PRODUCTS and inhaled or ingested the asbestos dust and fibers emanating from Defendants' PRODUCTS.

91.     As a direct and proximate result of Plaintiff's inhalation and ingestion of dust particles and fibers from Defendants' asbestos-containing PRODUCTS, Plaintiff developed permanent and disabling personal injuries.

92.     During the time that Defendants mined, milled, produced, processed, compounded, converted, sold, merchandised, distributed, and supplied their asbestos-containing PRODUCTS, Defendants knew, or in the exercise of reasonable care should have known, that their PRODUCTS were defective, ultra-hazardous, dangerous, and otherwise highly harmful to Plaintiff.

93.     Defendants knew, or in the exercise of reasonable care should have known, that the use of their asbestos-containing PRODUCTS would cause talc, asbestos dust, and fibers to be

released into the air and would create a dangerous and unreasonable risk of injury to the lungs,

respiratory systems, larynx, stomach, and other bodily organs of users of their PRODUCTS and to

others breathing that air and coming into contact with that dust.

94.     Plaintiff did not know the nature and extent of the injury that would result from

contact with and exposure to Defendants' asbestos-containing PRODUCTS or from the inhalation

or ingestion of the asbestos dust and fibers.

95.     Defendants knew, or in the exercise of reasonable care should have known, that

Plaintiff would come into contact with and be exposed to their asbestos-containing PRODUCTS

and would inhale or ingest asbestos dust and fibers as a result of the ordinary and foreseeable use

of Defendants' PRODUCTS.

96.     Despite the facts as set forth above, Defendants negligently, recklessly, and

intentionally:

a.      mined, milled, produced, processed, compounded, converted, sold, supplied,

merchandised, distributed, or otherwise placed in the stream of commerce asbestos-containing

PRODUCTS which Defendants knew, or in the exercise of reasonable care should have known,

were defective, dangerous, ultra-hazardous, and otherwise unreasonably harmful to Plaintiff;

b.      failed to take reasonable precautions or exercise reasonable care to warn Plaintiff

adequately of the risks, dangers, and harm to which Plaintiff would be exposed by exposure to,

contact with, use, and handling of Defendants' asbestos-containing PRODUCTS, or by

inhalation or ingestion of the asbestos dust and fibers resulting from the ordinary and foreseeable

use of Defendants' PRODUCTS;

c.      failed to package their asbestos-containing PRODUCTS in a manner that would

assure that Plaintiff would not come into contact with or be exposed to the asbestos dust and

fibers resulting from the ordinary and foreseeable use of Defendants' PRODUCTS;

d.    failed to advise Plaintiff of the necessity to adopt and enforce a safe, sufficient, and proper method and plan of, using, handling, coming into contact with, and being exposed to Defendants' asbestos-containing PRODUCTS so that Plaintiff would not inhale or ingest the asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' PRODUCTS;

e.    ignored and suppressed medical and scientific information, studies, tests, data, and literature which Defendants acquired during the course of their normal business activities concerning the risk of cancer, mesothelioma, respiratory disorders, and other illnesses and diseases to people such as Plaintiff and other persons similarly situated, who were exposed to Defendants' asbestos-containing PRODUCTS;

f.    disregarded medical and scientific information, studies, tests, data, and literature concerning the causal relationship between the inhalation or ingestion of asbestos dust and fibers, and such diseases as mesothelioma, cancer, respiratory disorders, and other illnesses and diseases;

g.    exposed and continued to expose Plaintiff and other persons similarly situated to the risk of developing mesothelioma, cancer, and other illnesses, all of which risks Defendants knew, or in the exercise of reasonable care should have known, were consequences of exposure to asbestos dust and fibers;

h.    failed to seek substitute materials in lieu of the use of their asbestos-containing PRODUCTS;

i.    failed to advise Plaintiff, who Defendants knew, or in the exercise of reasonable care should have known, had been exposed to, inhaled, or ingested asbestos dust and fibers

resulting from the ordinary and foreseeable use of Defendants' asbestos-containing PRODUCTS: to cease further uncontrolled or unprotected exposure to asbestos-containing PRODUCTS and the inhalation or ingestion of asbestos dust and fibers and all other kinds of smoke, dusts and fumes; to be examined by competent medical doctors to determine the nature and extent of any and all diseases caused by inhalation or ingestion of asbestos dust and fibers; and to receive medical care and treatment for such diseases; and

j.    otherwise acted negligently, recklessly, and with intentional disregard for the welfare of Plaintiff in the mining, milling, producing, processing, compounding, converting, selling, merchandising, supplying, distributing, or otherwise placing in the stream of commerce their asbestos-containing PRODUCTS.

97.    As a direct and proximate result of the acts and omissions of Defendants, Plaintiff was exposed to and came in contact with Defendants' asbestos-containing PRODUCTS and inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of said PRODUCTS. Plaintiff developed mesothelioma as a direct and proximate result of said exposure to asbestos-containing PRODUCTS. Plaintiff was caused to endure severe pain and suffering and mental anguish, was required to expend great sums of money for medical care and treatment related thereto, was prevented from pursuing normal activities and employment, and was deprived of ordinary pursuits and enjoyments of life. Plaintiff was also made to suffer lost wages and earnings and severe pecuniary loss, all to Plaintiff's and Plaintiff's family's great loss.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly, severally, or in the alternative, for compensatory damages, punitive damages, and costs of suit as provided by law.

## SECOND COUNT – BREACH OF WARRANTY AND DEFECTIVE DESIGN

98.    Plaintiffs reiterate the facts and contentions as set forth above and repeat them herein.

99.    Defendants expressly or impliedly warranted that their asbestos-containing PRODUCTS, which they mined, milled, produced, compounded, converted, processed, sold, supplied, merchandised, distributed, or otherwise placed in the stream of commerce, were merchantable, reasonably fit for use, and safe for their intended purposes.

100.    Defendants breached said warranties in that their asbestos-containing PRODUCTS were defective, ultra-hazardous, dangerous, unfit for use, not merchantable, and not safe for their intended, ordinary, and foreseeable use and purpose.

101.    As a direct and proximate result of Defendants' breach of warranties, Plaintiff came in contact with Defendants' asbestos-containing PRODUCTS and inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of Defendants' PRODUCTS. Plaintiff was caused to suffer the injuries, expenses and losses alleged in prior counts of this Complaint.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally, or in the alternative, for compensatory damages, punitive damages, and costs of suit as provided by law.

### THIRD COUNT – INTENTIONAL MISREPRESENTATION

102.    Plaintiffs reiterate the facts and contentions as set forth above and repeat them herein.

103.    Defendants and their predecessors failed to disclose and intentionally and negligently misrepresented to Plaintiff the health risks created by the ordinary use of Defendants' asbestos-containing PRODUCTS.

104.    Plaintiff relied upon said representations, and Plaintiff's reliance was foreseeable

to Defendants.

105.    As a result of Defendants' conduct, Plaintiff came in contact with Defendants'
asbestos-containing PRODUCTS and inhaled or ingested asbestos dust and fibers from these
PRODUCTS. Plaintiff was caused to suffer the injuries, expenses, and losses alleged in prior
counts of this Complaint.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally, or in
the alternative, for compensatory damages, punitive damages, and costs of suit as provided by law.

## FOURTH COUNT – NEGLIGENT MANIPULATION OF INDUSTRY STANDARDS

106.    Plaintiffs reiterate the facts and contentions as set forth above and repeat them
herein.

107.    Defendants mined, milled, produced, processed, compounded, converted, sold,
merchandised, supplied, and distributed the asbestos-containing PRODUCTS to which Plaintiff
was exposed.

108.    Defendants controlled the market, or a substantial portion of the market, from
which the asbestos-containing PRODUCTS which caused Plaintiff's injuries emanated.

109.    Defendants collectively, through explicit agreement, tacit agreement, and
conscious parallel behavior, controlled industry standards regarding the testing, manufacture, sale,
distribution, and use of asbestos-containing PRODUCTS and controlled the level of knowledge
on the part of the public regarding the hazards of exposure to dust and fibers from Defendants'
asbestos-containing PRODUCTS.

110.    As a direct and proximate consequence of Defendants' acts and omissions, Plaintiff
was exposed to and came into contact with Defendants' asbestos-containing PRODUCTS and
inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of said

PRODUCTS. Plaintiff was caused to suffer the injuries, expenses and losses alleged in prior counts of this Complaint.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally, in the alternative, or in proportion to Defendants' respective market shares, for compensatory damages, punitive damages, and costs of suit as provided by law.

## <u>FIFTH COUNT – CONCERT OF ACTION</u>

111.    Plaintiffs reiterate the facts and contentions as set forth above and repeat them herein.

112.    Defendants acted in concert with each other and with other members of the cosmetic industry, through express agreement, implicit agreement, imitative behavior, and conscious parallel behavior:

a.    to withhold from users of their PRODUCTS, and from persons who Defendants knew or should have known would be exposed to their PRODUCTS, information regarding the health risks of breathing or ingesting asbestos dust and fibers; and

b.    to eliminate or prevent development of adequate procedures and tests relating to the health hazards of exposure to asbestos fibers and dust.

113.    Defendants knew that their activities were in violation of common law standards of care and that their withholding of information, failure to develop tests and procedures, and promotion of widespread use of asbestos-containing cosmetic PRODUCTS would expose persons such as Plaintiff to unreasonable risk of bodily injury.

114.    Defendants nevertheless gave substantial assistance and encouragement to each other and to other members of the cosmetic industry and assisted each other and other members of the cosmetic industry in: withholding information regarding the dangers of asbestos; failing to develop tests and procedures to assure that users of cosmetic PRODUCTS would not be subjected

to risk of injury; and promoting widespread use of PRODUCTS which Defendants knew would expose Plaintiff to unreasonable risk of bodily injury.

115.    As a direct and proximate consequence of the concerted actions of Defendants and other members of the cosmetic industry, Plaintiff was exposed to and came in contact with Defendants' asbestos-containing PRODUCTS and inhaled or ingested asbestos dust and fibers resulting from the ordinary and foreseeable use of said PRODUCTS. Plaintiff was caused to suffer the injuries, expenses, and losses alleged in prior counts of this Complaint.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally or in the alternative, for compensatory damages, punitive damages, and costs of suit as provided by law.

## SIXTH COUNT – STRICT LIABILITY – PRODUCTS LIABILITY ACT

116.    Plaintiffs reiterate the facts and contentions as set forth above and repeat them herein.

117.    Defendants are liable under a theory of strict products liability as set forth in N.J.S.A. 2A:58C-1, et seq. At all relevant times, Defendants mined, milled, processed, sold, and/or otherwise placed into interstate commerce talcum powder which contained asbestos.

118.    At all relevant times, the Defendants were engaged in the business of mining, milling, manipulating, processing, manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the asbestos-containing talcum powders.

119.    All Defendants were knowingly an integral part of the overall manufacture, design, and production of the asbestos-containing talcum powder and the talcum powder's introduction into the stream of interstate commerce.

120.    At all relevant times, the talcum powder PRODUCTS manufactured and supplied by Defendants were defective and unreasonably dangerous because, despite the Defendants'

knowledge that the PRODUCTS contained asbestos and were carcinogenic, the Defendants failed

to provide adequate warning or instruction to consumers, including Plaintiff, regarding the

increased risk of cancer by using the asbestos-containing talcum powder.

121.    Had Plaintiff received warning or instruction regarding the talcum powder

containing asbestos and the increased risk of mesothelioma associated with it, Plaintiff would not

have used the asbestos-containing PRODUCTS.

122.    Due to the absence of any warning or instruction by the Defendants as to the

significant health and safety risks posed by the talcum powder as described herein, Plaintiff was

unaware that the talcum powder was contaminated with asbestos and created an increased risk of

cancer, as this danger was not known to the general public.

123.    As a direct and proximate result of Defendants' failure to warn Plaintiff of the

increased risk of cancer associated with the asbestos-containing talcum powder, despite their actual

knowledge of this material fact, Plaintiff suffered and will continue to suffer damages for which

Plaintiffs are entitled to recovery.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally, and

in the alternative, for compensatory damages, punitive damages, and costs of suit as provided by

law.

## SEVENTH COUNT – DEFECTIVE MANUFACTURE AND DESIGN – PRODUCTS LIABILITY ACT

124.    Plaintiffs reiterate the facts and contentions as set forth above and repeat them

herein.

125.    Defendants are liable under a theory of strict products liability as set forth in

N.J.S.A. 2A:58C-1, et seq.

126.    At all relevant times, Defendants were engaged in the business of mining and

distributing, selling, supplying, and/or processing talcum for use in their PRODUCTS for use by the public via stream of interstate commerce.

127.    At all relevant times, the asbestos-containing PRODUCTS were expected to and did reach Plaintiff without a substantial change in their condition.

128.    At all relevant times, the asbestos-containing PRODUCTS were defectively and improperly manufactured and designed in that, the PRODUCTS contained asbestos, despite the formulation of the PRODUCTS not calling for asbestos as an ingredient. The Defendants had full knowledge that the foreseeable risks of the asbestos-containing talcum powders far outweighed the benefits associated with their design and formulation.

129.    At all relevant times, the asbestos-containing PRODUCTS were defectively manufactured and designed by Defendants in that their design and formulation were more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

130.    At all relevant times, the asbestos-containing PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other talc products on the market used for the same purpose.

131.    As a direct and proximate result of the defective design and manufacture of the asbestos-containing PRODUCTS, Plaintiff suffered and will continue to suffer damages for which Plaintiffs are entitled to recovery.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally, and in the alternative, for compensatory damages, punitive damages, and costs of suit as provided by law.

## <u>EIGHTH COUNT – FRAUD</u>

132.    Plaintiffs reiterate the facts and contentions as set forth above and repeat them herein.

133.    At all relevant times, Defendants acted intentionally, willfully, and/or recklessly with the intent to deceive, misrepresent, and/or conceal material facts to consumers and users, including Plaintiff.

134.    At all relevant times, Defendants misrepresented and/or concealed material facts concerning the PRODUCTS to consumers, including Plaintiff, with knowledge of the falsity of their misrepresentations.

135.    At all relevant times, upon information and belief, the misrepresentations and concealments concerning the PRODUCTS, including Johnson's Baby Powder, made by J&J include, but are not limited to the following:

a.    Defendants falsely labeled and advertised the Johnson's Baby Powder in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable," "a sprinkle a day keeps the odor away," and "your body perspires in more places than just under your arms."

b.    Defendants, through the advertisements described above, knowingly misrepresented to Plaintiff and the public that their PRODUCTS were safe for use all over the body.

c.    Defendants intentionally failed to disclose that talc and the associated Johnson's Baby Powder increase the risk of cancer.

d.    Defendants intentionally failed to disclose and actively concealed that talcum powder PRODUCTS contained carcinogenic constituents such as fibrous talc and asbestos.

e.    Defendants intentionally failed to include adequate warnings with their PRODUCTS and Johnson's Baby Powder regarding the potential and actual risks of using Johnson's Baby Powder and the nature, scope, severity, and duration of any serious injuries

resulting therefrom.

  f. Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of cancer, Defendants falsely marketed, advertised, labeled, and sold their PRODUCTS, including Johnson's Baby Powder, as safe for public consumption and usage.

  136. At all relevant times, Defendants actively, knowingly, and intentionally concealed and misrepresented these material facts to the consuming public with the intent to deceive the public and Plaintiff and with the intent that consumers would purchase and use their PRODUCTS and Johnson's Baby Powder.

  137. At all relevant times, the consuming public, including Plaintiff, would not otherwise have purchased Defendants' asbestos-containing PRODUCTS if they had been informed of the risks associated with the use of said PRODUCTS.

  138. At all relevant times, Plaintiff relied on Defendants' misrepresentations concerning the safety of their PRODUCTS, including Johnson's Baby Powder, when purchasing and using Defendants' PRODUCTS, and Plaintiff's reliance was reasonable and justified.

  139. As a direct and proximate result of J&J's fraudulent conduct concerning their PRODUCTS, as described herein, Plaintiff suffered and continues to suffer from the injuries and damages for which Plaintiffs are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

  **WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally, and in the alternative, for compensatory damages, punitive damages, and costs of suit as provided by law.

## <u>NINTH COUNT – FRAUDULENT CONCEALMENT</u>

  140. Plaintiffs reiterate the facts and contentions as set forth above and repeat them herein.

141.    Prior to Plaintiff's use of PRODUCTS and during the period in which Plaintiff actually used Defendants' PRODUCTS, Defendants suppressed material information regarding the safety and efficacy of their PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding the safe use of cornstarch-based products for the same purposes. Furthermore, Defendants concealed the safety information about the use of their PRODUCTS. Plaintiffs believe the misrepresentations and fraudulent concealment described throughout this Complaint were intentional so as to maintain the sales volume of Johnson's Baby Powder and their PRODUCTS.

142.    Defendants' acts in failing to timely produce its internal documents proving the asbestos contamination of its source mines and PRODUCTS forever prevented Plaintiff from confronting irreplaceable corporate witnesses with Defendants' own documentary evidence of asbestos contamination at deposition.

143.    The suppressing of documents during the fifty years of litigation against J&J and Defendants for their talc PRODUCTS continues to harm litigants as much of the scientific evidence, including bench sheets and photomicrographs, remains missing. This evidence has the potential to further strengthen Plaintiffs' claims proving the asbestos contamination of Defendants' talc and directly contradicts J&J's assertions that its talc was not contaminated.

144.    Defendants' acts before, during and/or after the act causing Plaintiff's injuries prevented Plaintiffs from discovering the injury or cause thereof.

145.    Defendants' conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Defendants must have realized was dangerous, needless, and reckless, without regard to the consequences or the rights and safety of Plaintiff.

146.    As a direct and proximate result of Defendants' fraudulent concealment concerning

the PRODUCTS, as described herein, Plaintiff suffered and continues to suffer from the damages

for which Plaintiffs are entitled to recovery, including but not limited to compensatory damages,

consequential damages, interest, costs, and attorneys' fees.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally, and

in the alternative, for compensatory damages, punitive damages, and costs of suit as provided by

law.

## TENTH COUNT – AIDING AND ABETTING

147.    Plaintiffs reiterate the facts and contentions as set forth above and repeat them

herein.

148.    Upon information and belief, Defendants knowingly and willfully aided and

abetted the fraudulent marketing and sales described herein.

149.    Defendants aided and abetted this fraudulent scheme by providing substantial

assistance to J&J. This substantial assistance included, among other things, the "Facts" section of

this Complaint.

150.    Without Defendants' substantial assistance, involvement, and participation, the

fraudulent scheme would not have been possible.

151.    Plaintiff suffered serious injury and pecuniary losses as a proximate result of

the aiding and abetting of Defendants.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally, and

in the alternative, for compensatory damages, punitive damages, and costs of suit as provided by

law.

## ELEVENTH COUNT – LOSS OF CONSORTIUM

152.    Plaintiffs reiterate the facts and contentions as set forth above and repeat them

herein.

153.    As a consequence of the injuries to Plaintiff, Plaintiff's spouse has suffered loss of consortium, companionship, services, society, and support.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally, and in the alternative, for compensatory damages, punitive damages, and costs of suit as provided by law.

COHEN, PLACITELLA & ROTH, P.C.
Attorneys for Plaintiffs

By: ***/s/ Christopher M. Placitella***
      Christopher M. Placitella
      For the Firm

Dated: April 13, 2023

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues.

COHEN, PLACITELLA & ROTH, P.C.
Attorneys for Plaintiffs

By: ***/s/ Christopher M. Placitella***
      Christopher M. Placitella
      For the Firm

Dated: April 13, 2023

## DEMAND FOR ANSWERS TO INTERROGATORIES

Plaintiffs demand answers to the Standard Interrogatories pursuant to the Court's January 25, 1982 General Order. Said Standard Interrogatory forms may be obtained from the Court upon request.

COHEN, PLACITELLA & ROTH, P.C.
Attorneys for Plaintiffs

By: */s/ Christopher M. Placitella*
Christopher M. Placitella
For the Firm

Dated: April 13, 2023

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Christopher M. Placitella, Esq. is hereby designated as trial counsel in this matter. Mr. Placitella's Attorney Identification Number is 02778-1981.

COHEN, PLACITELLA & ROTH, P.C.
Attorneys for Plaintiffs

By: */s/ Christopher M. Placitella*
Christopher M. Placitella
For the Firm

Dated: April 13, 2023

## <u>CERTIFICATION</u>

I hereby certify that to my knowledge the within matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated with the exception of a possible workers' compensation claim. I have no knowledge at this time of any non-party who should be joined in this action.

COHEN, PLACITELLA & ROTH, P.C.
Attorneys for Plaintiffs

By: */s/ Christopher M. Placitella*
Christopher M. Placitella
For the Firm

Dated: April 13, 2023

37