**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*PROPOSED ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Judge: Michael B. Kaplan |
| In re:<br><br>LTL MANAGEMENT LLC,<br><br>Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,<br><br>Defendants. | Adv. No. 23-01092 (MBK)<br><br>**Hearing Date and Time**:<br>June 13, 2023 at 10:00 a.m. |

## DEBTOR'S MOTION (I) TO EXTEND AND MODIFY THE PRELIMINARY INJUNCTION ORDER AND (II) FOR CONFIRMATION THAT SUCCESSOR LIABILITY ACTIONS ARE SUBJECT TO THE AUTOMATIC STAY

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

The above-captioned debtor (the "Debtor") moves the Court for the entry of an

order (a) extending and modifying the *Order Dissolving Temporary Restraining Order,*

*Extending the Automatic Stay, and Granting Limited Preliminary Restraints* [Adv. Dkt. 91]

(the "PI Order") as specified herein and (b) confirming that actions asserting Debtor Talc Claims

(as defined below) wholly or principally under theories of successor liability against certain of

the Debtor's affiliates are automatically stayed pursuant to section 362(a)(3) of title 11 of the

United States Code (the "Bankruptcy Code").  In support of this Motion, the Debtor incorporates

the *Declaration of Amanda Rush* (the "Counsel Declaration"),[2] filed contemporaneously

herewith, and respectfully represents as follows:

## Preliminary Statement

Entry of an order extending the PI Order and confirming that the automatic stay

applies to successor liability actions against certain of the Debtor's affiliates is critical to the

Debtor's reorganization.  Without it, talc claimants will seek to liquidate talc-related personal

injury claims against the Debtor through pending or yet to be filed litigation against non-debtor

third parties, including Johnson & Johnson ("J&J"), other affiliates of the Debtor and retailers.

Allowing tens of thousands of tort claimants, in litigation outside of this chapter 11 case, to

either proceed to trial on their claims or assert claims that belong to the Debtor's estate would

effectively lift the section 362 automatic stay of litigation against the Debtor, which in all these

cases is the real party in interest.  This would significantly interfere with the Debtor's

reorganization efforts and ultimately defeat the purpose of this chapter 11 case.[3]

---

[2]    Unless otherwise noted, citations to exhibits herein refer to the exhibits attached to the Counsel Declaration.

[3]    In re LTL Mgmt., LLC, 638 B.R. 291, 305-07 (Bankr. D.N.J. 2022) (finding identity of interest between Debtor, J&J, retailers and certain other parties and that continued litigation against those parties would frustrate the purpose of the automatic stay and impair the chapter 11 case).

NAI-1536915383

Maintenance of the preliminary injunction is justified by the substantial progress the Debtor has made in pursuing confirmation of a plan supported by counsel representing the substantial majority of talc claimants.  In particular, on May 15, 2023, the Debtor filed a proposed plan of reorganization [Dkt. 525] and a related disclosure statement [Dkt. 526] in accordance with its commitment under the plan support agreements with counsel representing approximately 60,000 talc claimants.  The Debtor also has filed a motion seeking to promptly schedule a hearing on the adequacy of its proposed disclosure statement, and the Court has scheduled a hearing to consider that motion on June 13, 2023.  Further, at the Court's direction, the Debtor is engaged in discussions with the co-mediators, whom the Court appointed to address all issues in this case, including the Debtor's proposed plan.  And, the Debtor has obtained Court approval of the appointment of a future claimants' representative, as required by section 524(g) of the Bankruptcy Code.  Extending the PI Order will permit the Debtor to continue moving forward with confirmation of its proposed plan, which will resolve all pending talc-related claims as well as all future claims.  It is precisely because the claims for which the Debtor seeks injunctive relief are the exact same claims the Debtor seeks to resolve through its plan that the requested limited injunction is necessary.

In addition, confirmation that the automatic stay applies to estate causes of action, including successor liability claims, is necessary for the same reasons.  Despite the automatic stay, plaintiff attorneys have named, attempted to name or pursued discovery against:  Old JJCI[4] (a predecessor of the Debtor that no longer exists); Johnson & Johnson Consumer Companies, Inc. ("JJCCI") (another predecessor of the Debtor that no longer exists); Holdco (the Debtor's

---

[4]    Capitalized terms not otherwise defined herein have the meanings given to them in the *Memorandum Opinion* [Adv. Dkt. 94] (the "PI Opinion").

direct parent that never manufactured or sold talc products); Janssen Pharmaceuticals, Inc.

("Janssen")[5] (an affiliate of the Debtor that never manufactured or sold talc products in North

America); and Kenvue Inc. ("Kenvue") (a separately-owned entity that never manufactured or

sold talc products in North America).

Commencing or continuing litigation against Old JJCI and JJCCI is a violation of

the automatic stay because, as a result of the 2021 Corporate Restructuring, the Debtor now is

responsible for all of the talc-related liability of Old JJCI and JJCCI (each of which no longer

exists).  In point of fact, the Court previously ruled that the pursuit of Debtor Talc Claims against

Old JJCI is automatically stayed because it is tantamount to a claim against the Debtor.  In re

LTL Mgmt., LLC, 645 B.R. 59, 74, 75-76 (Bankr. D.N.J. 2022).  It should do so again here with

respect to the assertion of Debtor Talc Claims against Old JJCI and JJCCI.

Commencing or continuing litigation against Holdco, Janssen and Kenvue is

likewise a violation of the automatic stay because the claims asserted against them are property

of the Debtor's estate.  Holdco was created on October 12, 2021 and was allocated no talc

liabilities in connection with the 2021 Corporate Restructuring that created it.  This Court has

already ruled that the 2021 Corporate Restructuring was lawful and conclusively vested all talc-

related claims against Old JJCI in the Debtor by operation of Texas law.[6]  Janssen is the parent

of Holdco, and Kenvue is a public company launched in 2023 (following public announcements

dating back to 2021 and planning efforts that long preceded such announcements) to take

ownership of Holdco's consumer health business.  None of these entities ever manufactured or

---

[5]    Claimants have also named Janssen Global Services, LLC as a defendant although it is unclear why this
entity, which never sold cosmetic talc-containing products, is included.  Because the only potential basis
for a claim would be an estate cause of action, the Debtor requests the same relief as to this entity.

[6]    LTL Mgmt., 638 B.R. at 305-06 (finding "Debtor was created pursuant to—and in compliance with—a
long-standing Texas statute" and that the "Objecting Parties do not—and cannot—deny the corporate
transactions and indemnity agreements that left Debtor ultimately responsible for talc-related liabilities.").

distributed cosmetic-talc products in North America.  In fact, sales of talc-based Johnson's Baby

Powder in North America were discontinued before Holdco or Kenvue even existed.[7]  Because

these entities never manufactured or sold talc products in North America, the plaintiffs' attorneys

have asserted meritless successor-liability theories based on the transfer of the consumer-health

business assets from Holdco to Janssen and then Kenvue.  It is black-letter law, however, that

successor-liability claims are property of the Debtor's estate.  Any effort to assert them is thus

prohibited by section 362(a)(3) of the Bankruptcy Code as an attempt to exercise control over

property of the estate.

Claimants' pursuit of the Debtor Talc Claims against entities that no longer exist

or that never manufactured or sold cosmetic talc products is a blatant effort to urge courts to

disregard—and indeed nullify—the 2021 Corporate Restructuring, harass executives of these

entities,[8] litigate issues related to this chapter 11 case outside of this Court and pursue litigation

against the Debtor, all notwithstanding the automatic stay.  As a result, the Debtor respectfully

requests that the Court:  (a) confirm that the commencement or continuation of litigation

asserting Debtor Talc Claims against JJCCI and Old JJCI is enjoined and barred by the automatic

stay; (b) confirm that actions asserting Debtor Talc Claims wholly or principally under theories

of successor liability against the Debtor's affiliates are automatically stayed pursuant to section

362(a)(3); (c) modify the PI Order to add Janssen, Kenvue and JJCCI as Protected Parties; and

(d) modify the PI Order to expressly prohibit the commencement or continuation of Debtor Talc

---

[7]    See *Decl. of John K. Kim in Supp. of First Day Pleadings* [Dkt. 4] (the "Kim Declaration") ¶ 42 ("Old JJCI
stopped selling its talc-based JOHNSON'S® Baby Powder in North America in 2020").

[8]    Plaintiffs have issued subpoenas for apex depositions of the Chief Executive Officer and Chief Financial
Officer of Kenvue, based solely on these parties' signatures of Kenvue's public filings, as well as the Chief
Financial Officer of Janssen.  See Ex. A (subpoenas issued to Thibaut Mongon, Chief Executive Officer
and Director of Kenvue, Paul Ruh, Chief Financial Officer of Kenvue and Darren Snellgrove, Chief
Financial Officer of Janssen).

NAI-1536915383

Claims against Old JJCI and JJCCI and any successor liability claims against Janssen, Kenvue and Holdco.

Finally, the Third Circuit, in dicta, raised three issues relating to the Debtor's indemnification obligations:  (a) whether the Debtor is obligated to indemnify J&J for its alleged independent post-1979 liability; (b) whether the Debtor is obligated to indemnify J&J for any punitive damages; and (c) whether Old JJCI (and now the Debtor) was obligated to indemnify J&J for liabilities relating to Shower to Shower products.  In re LTL Mgmt., LLC, 64 F.4th 84, 108 n.16 (3d Cir. 2023).  This Court has asked the Debtor to address each of these issues in connection with a request for a further preliminary injunction.  In each instance, the Debtor is obligated to indemnify J&J.  There is thus no reason for the Court to modify any of its prior findings on these issues.

**Jurisdiction and Venue**

1.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, dated September 18, 2012 (Simandle, C.J.) (the "Standing Order of Reference").  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtor is authorized to continue to manage its property and operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     The statutory predicates for the relief requested herein are sections 105(a) and 362 of the Bankruptcy Code.

NAI-1536915383

**Background**

3.         On April 4, 2023, the Debtor filed the *Motion for an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a Hearing on the Preliminary Injunction* [Adv. Dkt. 2] (the "PI Motion") in the above-captioned adversary proceeding.  The PI Motion sought, among other things, a narrowly targeted request for a temporary restraining order.

4.         On April 5, 2023, the Court entered a temporary restraining order [Adv. Dkt. 9] (as amended, the "TRO") that temporarily prohibited and enjoined named and prospective plaintiffs in talc-related lawsuits from commencing or continuing to prosecute Debtor Talc Claims[9] against four affiliates of the Debtor (collectively, the "Protected Affiliates") as well as various retailers and other indemnified parties.  TRO ¶ 2.  The four Protected Affiliates were selected because, as of the commencement of the Debtor's chapter 11 case on April 4, 2023 (the "Petition Date"), they were the only affiliates of the Debtor that were parties to pending lawsuits asserting Debtor Talc Claims.

5.         On April 5, 2023, the day after the Petition Date and the same day that the Court entered the original TRO, plaintiffs' attorneys sued—for the first time—two affiliates that were not covered by the TRO's terms:  Janssen and Kenvue.  A string of substantively identical lawsuits followed close behind the April 5 filing (all such lawsuits, collectively, the "NJ

---

[9]        Debtor Talc Claims means, collectively, any talc-related claim against the Debtor, including all claims relating in any way to talc or talc-containing materials that formerly were asserted against (or that could have been asserted against) Old JJCI on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise).  For the avoidance of doubt, Debtor Talc Claims include all talc personal-injury claims and other talc-related claims allocated to the Debtor from Old JJCI in the documents implementing the 2021 Corporate Restructuring.  The Debtor Talc Claims do not include talc-related claims for which the exclusive remedy is provided under workers' compensation statutes and similar laws.

NAI-1536915383

Successor Liability Actions").[10]  Janssen or Kenvue have now been named as defendants in dozens of both ovarian cancer and mesothelioma talc-related cases all across the country, and they have already been served with multiple discovery requests and deposition subpoenas.[11]

6.     On April 17, 2023, the Debtor filed a notice of supplemented appendices with respect to Appendices A and B to the complaint [Adv. Dkt. 1] (the "Complaint") that initiated this adversary proceeding [Adv. Dkt. 55].  Janssen and Kenvue were added to Appendix B on the basis that they were beginning to be named in talc lawsuits.  At a hearing held on April 20, 2023, following an objection raised on the record at the hearing held April 18, 2023 and again on April 20, 2023, the Court declined to include Kenvue and Janssen as Protected Parties, but also stated that it would "preserve the debtor's right to come back before me to include them at a later date if it becomes relevant."  See Ex. J, Apr. 20, 2023 Hr'g Tr. 20:15-19; see also id. at 19:10-20:14; Ex. K, Apr. 18, 2023 Hr'g Tr. 322:14-323:14.

7.     On April 25 and 27, 2023, respectively, the Court entered the PI Order and PI Opinion.  The PI Order dissolved the TRO then in place, and replaced it with "a far more limited preliminary injunction" that prohibits the commencement or continuation of any trial against the Protected Parties identified in Appendix B to the Complaint, as amended.  PI Op., 28.

---

[10]     See, e.g., Ex. B, Compl. and Jury Demand, Cruz v. Kenvue, No. MID-L-002093-23, (N.J. Super. Ct. April 13, 2023) ("Cruz Complaint") ¶¶ 1-3, 6-9; Ex. C, Compl. and Jury Demand, Bergeron v. Kenvue Inc., No. MID-L-002089-23, (N.J. Super. Ct. Apr. 13, 2023) ("Bergeron Complaint") ¶¶ 1-3, 6-9; Ex. D, Compl. and Jury Demand, Dumas v. Kenvue, Inc., No. MID-L-002090-23, (N.J. Super. Ct. Apr. 13, 2023) ("Dumas Complaint") ¶¶ 1-3, 6-9; Ex. E, Compl. and Jury Demand, El-Ramadi v. Kenvue, Inc., No. MID-L-002092-23, (N.J. Super. Ct. Apr. 13, 2023) ("El-Ramadi Complaint") ¶¶ 1-3, 6-9; Ex. F, Compl. and Jury Demand, Boyle v. Kenvue, Inc., No. MID-L-002094-23 (N.J. Super. Ct. Apr. 13, 2023) ("Boyle Complaint") ¶¶ 1-4, 7-10; Ex. G, Compl. and Jury Demand, Drolet v. Kenvue Inc., No. MID-L-002095-23, (N.J. Super. Ct. Apr. 13, 2023) ("Drolet Complaint") ¶¶ 1-3, 6-9; Ex. H, Compl. and Demand for Jury Trial, Magee v. Janssen Pharmaceuticals, Inc., No. MID-L-002268-23 (N.J. Super. Ct. Apr. 21, 2023) ("Magee Complaint") ¶¶ 1-5, 10-11; Ex. I, Compl. and Demand for Jury Trial, Pressler v. Johnson & Johnson, No. MID-L001944-23, (N.J. Super. Ct. Apr. 5, 2023) ("Pressler Complaint") ¶¶ 1-5, 7.

[11]     Based on the Debtor's records, there are pending approximately 145 motions to amend complaints, which motions seek to add Holdco, Kenvue and Janssen as defendants in mesothelioma talc-related cases, in New Jersey alone.

-8-

8.      The relief granted in the PI Order does not include Janssen and Kenvue.

<u>See</u> PI Order ¶ 3; PI Op., 2 n.4, 29 n.15.[12]  Additionally, the Protected Parties do not include

JJCCI, a defendant named in a Canadian class action.  JJCCI became Old JJCI in 2015 following

mergers and a name change.  <u>See</u> Kim Decl. ¶¶ 18-20.  Old JJCI no longer exists.  <u>Id.</u> ¶ 24.

Following the entry of the PI Order, certain parties have sought to continue litigation against

JJCCI.

9.      The PI Order does not enjoin or restrain the filing of any new complaints

against non-debtor third parties, any ongoing discovery or other pre-trial matters, subject to

certain provisions of the PI Order.[13]  <u>See</u> PI Op., 29; PI Order ¶ 6.  In its PI Opinion, the Court

made clear that the automatic stay remains in place as to the Debtor.  PI Op., 28.

10.     The relief set forth in the PI Order extends through and including

June 15, 2023.  <u>Id.</u> at 29; PI Order ¶ 3.  On May 16, 2023, the Court indicated that any request by

the Debtor to extend the preliminary injunction beyond June 15, 2023 would be heard on

June 13, 2023.  <u>See</u> <u>Ex. O</u>, May 16, 2023 Hr'g Tr. 38:20-39:1, 43:1-5.

11.     On May 31, 2023, the Debtor filed its *Motion for a Bridge Order*

*Confirming the Automatic Stay Applies to Certain Actions Asserted Against Affiliates or*

---

[12]     On May 24, 2023, the Superior Court of New Jersey, Middlesex County held a hearing on the NJ Successor Liability Actions where it indicated that it would not dismiss the meritless claims asserted therein.  <u>See</u> <u>Ex. L</u>, May 24, 2023 Hr'g Tr., <u>Naranjo v. Johnson & Johnson, et al.</u>, Case No. L-6108-21AS, Volume 1, at 69:13-14 ("The Court is satisfied that this is not a case that should be dismissed").  Instead, the court ruled that it would allow discovery to proceed and consolidate the NJ Successor Liability Actions.  <u>Ex. M</u>, May 24, 2023 Hr'g Tr., <u>Naranjo v. Johnson & Johnson, et al.</u>, Case No. L-6108-21AS, Volume 2, at 34:10-12 ("I'm ordering discovery.  I'm putting together consolidation [of the NJ Successor Liability Actions], that's going to require discovery.").  On June 1, 2023, the court entered an order allowing all discovery to proceed, including the apex depositions of Kenvue's Chief Executive Officer and Chief Financial Officer and Janssen's Chief Financial Officer, and ordering the defendants to produce these individuals.  <u>See</u> <u>Ex. N</u>, 2 (acknowledging the "the central issue of successor liability").  The court also entered the order denying the defendants' motion to dismiss on the same day.

[13]     The PI Order provides that the amended *Temporary Restraining Order* [Adv. Dkt. 20] remains in effect as to the MDL Litigation (as defined in the PI Order), subject to a further status conference, now scheduled to occur on June 13, 2023.  PI Order ¶ 4; PI Op., 29.

*Temporarily Extending the Stay and Preliminary Injunction to Such Actions Pending a Final Hearing on the Requested Relief* [Adv. Dkt. 147], which sought confirmation that the NJ Successor Liability Actions are automatically stayed pursuant to section 362(a)(3) of the Bankruptcy Code or, alternatively, entry of an order temporarily extending the stay and preliminarily enjoining such actions pending a final hearing on the Debtor's request to modify and extend the preliminary injunction currently in effect.  At a hearing on June 2, 2023, the Court ruled that it would consider the requested relief at the hearing scheduled for June 13, 2023, or thereafter based upon an understanding that discovery directed to the affiliates in the NJ Successor Liability Actions would be deferred until the Court's ruling.[14]  See Ex. P, June 2, 2023 Hr'g Tr. 9:2-11:15.

### Relief Requested

12.     By this Motion, the Debtor requests that the Court enter a further order, pursuant to sections 362 and 105(a) of the Bankruptcy Code, that:  (a) extends the preliminary injunction for 90 days, subject to the Court revisiting the continuation of the preliminary injunction for additional, similar periods, as necessary; (b) confirms that the commencement or continuation of litigation asserting Debtor Talc Claims against JJCCI and Old JJCI is enjoined and barred by the automatic stay; (c) confirms that the commencement or continuation of actions asserting Debtor Talc Claims wholly or principally under theories of successor liability against the Debtor's affiliates, including Holdco, Janssen and Kenvue, is enjoined and barred by the automatic stay; (d) includes JJCCI, Janssen and Kenvue as Protected Parties; and (e) expressly prohibits the commencement or continuation of Debtor Talc Claims against Old JJCI and JJCCI

---

[14]     The Court also instructed the parties to meet-and-confer on scheduling for the Debtor's request for confirmation that the automatic stay applies to actions asserting Debtor Talc Claims wholly or principally under theories of successor liability against the Debtor's affiliates.  A meet and confer is not expected to occur until Mr. Placitella returns from vacation.

-10-

and Debtor Talc Claims wholly or principally under theories of successor liability against

Janssen, Kenvue and Holdco.  In support of this Motion, the Debtor incorporates the findings and

conclusions of the Court set forth in the PI Opinion and the PI Order, the evidence submitted at

the April 18, 2023, hearing and the additional facts and legal bases set forth in the PI Motion.

The Debtor also supplements the PI Motion to address certain issues raised by the Third Circuit,

none of which requires any change to or limitation on the terms of the preliminary injunction.

See LTL Mgmt., 64 F.4th at 108 n.16.

**Basis for Relief Requested**

I.    **THE PRELIMINARY INJUNCTION SHOULD BE EXTENDED FOR AN
      ADDITIONAL 90 DAYS SUBJECT TO FURTHER EXTENSIONS.**

      13.    The PI Order, with the modifications requested herein, should be extended

for an additional 90 days, subject to further extensions for similar periods of time, consistent

with the Court's practice in the Debtor's prior chapter 11 case (the "2021 Chapter 11 Case").

The requested extension is critical to the Debtor's ability to continue to make progress in this

reorganization case.

      14.    In determining whether the Debtor had satisfied its burden of "show[ing]

the prospect or possibility that he or she will succeed," the Court rejected arguments that the

Debtor has no realistic possibility of success because the bankruptcy was not filed in good

faith.[15]  PI Op., 16, 17.  Rather, the Court held that "[a]t this juncture, Debtor has met its

burden," noting that the Debtor had executed a funding agreement and "has outlined its

---

[15]    The Court acknowledged that the objections to the PI Motion were "premised primarily on [the] contention
that the instant bankruptcy case was filed in bad faith," PI Op., 9, and addressed good faith in detail.  Id.
at 17-23.  The Court raised a number of questions regarding a determination of whether the Debtor is in
financial distress, but concluded that none of them could be answered on the existing, limited record
(developed in connection with the PI Motion litigation and on an extremely expedited basis).  Id. at 17- 23.
The Court concluded that it could not, "at this juncture, *sua sponte* dismiss the case or rely on bad faith as
basis to deny the Preliminary Injunction."  Id. at 23.

NAI-1536915383

reorganizational strategy for which it alleges it has the support of 60,000 claimants as evidenced

by the Plan Support Agreements." Id. However, the Court also indicated that it would "require

well-supported and timely showings by the Debtor that this reorganization continues to have a

chance of success." Id. at 23.

15.     The Debtor submits that it is continuing to make substantial progress in

pursuing a fair and equitable resolution of talc-related claims. First, on May 15, 2023, the

Debtor filed a proposed plan of reorganization [Dkt. 525] and a disclosure statement [Dkt. 526]

in accordance with its commitment under the plan support agreements with counsel for

approximately 60,000 talc claimants. The Court also has scheduled a hearing on the Debtor's

motion to set a hearing to consider the adequacy of the disclosure statement for June 13, 2023.

Further, the trial on the motions to dismiss the chapter 11 case is scheduled to occur from June

27, 2023 to June 30, 2023.[16] Ex. O, May 16, 2023 Hr'g Tr. 37:5-7, 39:8-10. Accordingly, in the

near term, the parties will have greater clarity regarding the future of the chapter 11 case, and, if

the dismissal motions are denied (as the Debtor believes they should be), the schedule with

respect to the Debtor's proposed plan.[17]

16.     Second, a future claimants' representative has been appointed [Dkt. 551],

as required by section 524(g) of the Bankruptcy Code, and the Court has entered an order

appointing co-mediators and establishing a mediation protocol [Dkt. 459, 602 (as amended)] for

---

[16]     The Court has indicated that it is "still pursuing and allowing a dual track," of dismissal litigation and a plan process, but "in a manner that will make the most sense to allow the Court and the parties to gauge, should the case go forward beyond the motion to dismiss, how it goes forward and how creditors have the opportunity to express their opinions by voting." Ex. O, May 16, 2023 Hr'g Tr. 39:8-15.

[17]     At the May 16, 2023 hearing, the Court invited the TCC to, by June 5, 2023, "file a motion if they wish to pursue a competing plan and think it's warranted." Id. at 39:2-4. A hearing on any such motion is also scheduled for June 13, 2023. Id. at 39:4-7.

NAI-1536915383

the parties to address all issues in this case, including the Debtor's proposed plan. Discussions among the co-mediators and the parties are in fact underway.

17.    Given the progress that has been made in the chapter 11 case, even in the short time since the entry of the PI Order approximately one month ago, the Debtor respectfully submits that an order extending the relief set forth in the PI Order for 90 days, with the modifications requested herein, is appropriate and necessary. That extension, consistent with the Debtor's 2021 Chapter 11 Case, would be subject to the Court revisiting the continuation of the preliminary injunction for similar periods thereafter.

18.    The proposed extension is appropriate because, in the next several weeks, this Court will have determined whether or not the chapter 11 case should be dismissed. If the Court determines not to dismiss the chapter 11 case, then it will have determined, on a full factual record, that the case was filed in good faith, addressing fully the primary objection leveled at the PI Motion. Otherwise, the legal and factual bases supporting the entry of the PI Order set forth in the PI Opinion will remain unchanged—

> **continued litigation of talc claims against the Protected Parties**—especially to the point of liquidation of a claim through trial . . . **effectively seeks to collect and liquidate claims against the Debtor, could deplete available insurance coverage, and could trigger indemnification obligations. More to the point, verdicts outside of bankruptcy** will set a dollar amount to liability, and—whether those verdicts are in favor of Debtor or of individual claimants—they **will certainly impact claims valuations, estimation, insurance, and mediation efforts inside this bankruptcy.**

NAI-1536915383

PI Op., 11 (emphasis added); see also id. at 14-15, 24.[18]  On the other hand, if the Court

determines to dismiss the chapter 11 case, the preliminary injunction relief will no longer be

relevant.

19.     Any greater restriction on the duration of the preliminary injunction,

particularly given its very limited scope and the Court's periodic revisiting of the order, would be

unnecessary.  Moreover, to the extent parties believe that facts or circumstances warrant relief

from the preliminary injunction order, they are free to seek such relief.  Accordingly, the Debtor

submits that the terms of the PI Order, modified as requested herein, should be extended subject

to periodic review as provided herein.

## II.     THE PI ORDER SHOULD BE MODIFIED TO MAKE CLEAR THAT CLAIMS AGAINST OLD JJCI AND JJCCI, WHICH ARE CLAIMS AGAINST THE DEBTOR, ARE STAYED.

20.     The current PI Order does not alter the automatic stay in place as to the

Debtor.  PI Op., 28.  Nevertheless, certain plaintiffs, in an apparent attempt to circumvent the

stay have, ostensibly in compliance with the PI Order, commenced or continued claims against,

and directed discovery to, Old JJCI, which is a Protected Party that ceased to exist on

October 12, 2021.  See PI Op., 4.[19]  Claimants have also sought to continue litigation against

---

[18]     Consistent with the bases for the preliminary injunction set forth in the PI Opinion and for the reasons set forth below, the preliminary injunction order should also include as Protected Parties, Janssen and Kenvue. And, as set forth herein, the issues raised by the Third Circuit in LTL provide no basis to limit the preliminary injunction.

[19]     See also Ex. Q, *Pl.'s Notice of Dep. of Def. Johnson & Johnson Consumer Inc., Individually and as Successor-in-Interest to Johnson & Johnson Consumer Companies, Inc.'s Custodian(s) of Records and Person(s) Most Qualified*, Barkley v. Johnson & Johnson, No. RG20066950 (Cal. Super. Ct. May 12, 2023) (the "Barkley Action") (noticing deposition of Old JJCI on June 12, 2023); Ex. R, *Pl.'s Form Interrogs. to Def. Johnson & Johnson Consumer Inc., Individually and as Successor-in-Interest to Johnson & Johnson Consumer Companies, Inc., Set One*, Barkley Action;  Ex. S, *Pl.'s Req. for Produc. of Docs. to Def. Johnson & Johnson Consumer Inc., Individually and as Successor-in-Interest to Johnson & Johnson Consumer Companies, Inc., Set Three*, Barkley Action; Ex. T, *Pl.'s Suppl. Req. for Produc. of Docs. to Def. Johnson & Johnson Consumer Inc.*, Barkley Action; Ex. U, *Pl.'s Suppl. Interrog. to Def. Johnson & Johnson Consumer Inc., Individually and as Successor-in-Interest to Johnson & Johnson Consumer Companies, Inc.*, Barkley Action; Ex. V, *Pl.'s Req. for Produc. of Docs. to Def. Johnson & Johnson Consumer Inc., Individually, and As Successor-in-Interest, Parent, Alter Ego, and Equitable Trustee of*

NAI-1536915383

JJCCI, another entity that no longer exists and is a predecessor of Old JJCI. This is inconsistent with this Court's prior rulings and in violation of the automatic stay. As this Court acknowledged in the 2021 Chapter 11 Case,

> The Objecting Parties do not—and cannot—dispute that Old JJCI no longer exists and that Debtor assumed its liabilities. . . . Likewise, the Objecting Parties do not—and cannot—deny the corporate transactions and indemnity agreements that left Debtor ultimately responsible for talc-related liabilities.

LTL Mgmt., 638 B.R. at 306. Consistent with that finding, the Court also held that state consumer action claims against Old JJCI, which claims the Court found were "inextricably intertwined" with the Debtor's talc claims, were stayed:

> **[T]he States' claims against Old JJCI are, fundamentally, an attempt to liquidate and recover claims against the Debtor**. The State Actions are directed against Old JJCI, which no longer exists as a result of the 2021 Corporate Restructuring. By virtue of the 1979 Agreement and the 2021 Corporate Restructuring, Debtor is responsible for any and all liabilities associated with the talc products. **Accepting the premise that Debtor is a true defendant in the State Actions—as opposed to nonexistent Old JJCI—then the claims in the State Actions constitute 'action[s] or proceeding[s] against the debtor,' for which the Debtor is entitled to protection under § 362(a)(1)**.

LTL Mgmt., 645 B.R. at 74, 75-76 (emphases added).

21.     Old JJCI currently is a Protected Party and JJCCI currently is not a Protected Party. Arguably, the commencement and/or continuation of litigation against these entities is permissible under the PI Order. See PI Order ¶¶ 3, 6. However, this would be entirely inconsistent with the Court's prior rulings (which acknowledge that any claim against Old JJCI, which no longer exists, is a claim against the Debtor and therefore stayed), the terms and spirit of

---

*Johnson & Johnson Consumer Inc. and Johnson & Johnson Baby Products Company (New JJCI"), Set One,* Barkley Action; Ex. W, *Pl.'s Form Interrogs. to Def. Johnson & Johnson Consumer Inc., Individually, and as Successor-in-Interest, Parent, Alter Ego, and Equitable Trustee of Johnson & Johnson Consumer Inc. and Johnson & Johnson Baby Products Company ("New JJCI"), Set One,* Barkley Action.

NAI-1536915383

the PI Order (which do not alter the automatic stay as to the Debtor) and the PI Opinion (which

expressly provides that the PI Order does not alter the automatic stay as to the Debtor).

22.     Accordingly, the Debtor respectfully requests that the PI Order be

modified to add JJCCI as a Protected Party and to provide that the Defendants (as defined in the

PI Order) are stayed, pursuant to section 362 of the Bankruptcy Code, and enjoined from

commencing or continuing Debtor Talc Claims against Old JJCI and JJCCI, notwithstanding

anything to the contrary in the PI Order, including paragraphs 3 and 6 thereof.

## III.    THE COURT SHOULD ENTER AN ORDER THAT PROHIBITS THE COMMENCEMENT AND/OR CONTINUATION OF LITIGATION AGAINST HOLDCO, KENVUE AND JANSSEN AND ADD HOLDCO, KENVUE AND JANSSEN AS PROTECTED PARTIES.

### A.    Actions Seeking to Hold Holdco, Kenvue and Janssen Liable for Debtor Talc Claims Are Property of the Debtor's Estate.

23.     Kenvue and/or Janssen, together with Holdco and other affiliated entities,

have been named in dozens of actions alleging personal injury as a result of exposure to

Old JJCI's talc-containing products, including Johnson's Baby Powder.  At bottom, the

allegations against Kenvue, Janssen and Holdco are premised on an argument that, even

following the 2021 Corporate Restructuring,[20] Holdco, Janssen and Kenvue are liable for

Old JJCI's (and now the Debtor's) talc-related liability.[21]  But, "[a]s this Court's prior opinions

observe, Debtor is responsible for any and all liabilities associated with the talc products by

---

[20]    Following the 2021 Corporate Restructuring, the Debtor is solely responsible for Old JJCI's liabilities arising from talc-related claims against it, other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws.

[21]    The lawsuits focus on meritless successor-liability theories based on the transfer of consumer health business assets from Holdco to Janssen and then Kenvue, and the defendants' subsequent distribution of talc-free products in North America.  See, e.g., Ex. K, Apr. 18, 2023, Hr'g Tr., argument of Mr. Placitella, at 165:19-166:4 ("The purpose is to demonstrate here that Johnson and Johnson, while the Third Circuit's decision was pending, was moving assets out of Old JJCI – out of New JJCI into Janssen with the intention of then moving those assets again to Kenvue. . . .  And my client, Justin Bergeron, under New Jersey law, has every right to proceed against Janssen and Kenvue in the chain of distribution of those assets.").

NAI-1536915383

virtue of the 1979 Agreement and the 2021 Corporate Restructuring." PI Op., 13.  Old JJCI did

not survive the divisional merger in connection with the 2021 Corporate Restructuring and

accordingly could not have retained any liabilities and obligations following the merger.  See

1400 FM 1417 LLC v. CertainTeed Corp., 2022 U.S. Dist. LEXIS, at *8-9 (E.D. Tex. Mar.

28, 2022) (discussing application of relevant sections of Texas Business Organizations Code).

Under Texas state law, as a result of the 2021 Corporate Restructuring, all liabilities for talc

products became vested in the Debtor under the plan of merger.  Tex Bus. Orgs. Code

§ 10.008(a)(2)(C) ("When a merger takes effect: . . . all rights, title, and interests to all real estate

and other property owned by each organization that is a party to the merger is allocated to and

vested, subject to any existing liens or other encumbrances on the property, in one or more of the

surviving or new organizations as provided in the plan of merger.").

      24.     Specifically, plaintiffs claim that Holdco, Kenvue and Janssen are either

(a) liable as successors to **Old JJCI**, and as to Kenvue and Janssen, as the result of transactions

involving **Holdco** (which never held any of Old JJCI's talc-related liability) that occurred after

Old JJCI ceased to exist, or (b) directly liable for injuries alleged to be caused by Johnson's Baby

Powder, although none of Holdco, Kenvue or Janssen ever sold or manufactured talc-based

Johnson's Baby Powder in North America, and sales of talc-based Johnson's Baby Powder in

North America were discontinued before Holdco or Kenvue even existed.[22]  See, e.g., Cruz

Compl. at ¶¶ 6-12, 26-37 ("Accordingly, under New Jersey law, Janssen is a successor to

Old JJCI and responsible for the contractual undertaking and tortious conduct of Old JJCI . . . As

such Kenvue is responsible individually and as successor to all predecessor entities in the

---

[22]    See Kim Decl. ¶ 42.

NAI-1536915383

manufacturing, marketing, and sale of the asbestos-containing talc PRODUCTS to which the Plaintiff was exposed.").[23]

25.    In either case, it cannot seriously be denied that plaintiffs assert Debtor Talc Claims against Holdco, Kenvue and Janssen.  See, e.g., Cruz Compl. ¶ 7 (alleging "Kenvue, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing products to which Plaintiff was exposed"); id. ¶ 8 (alleging Janssen, "through its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing products to which the Plaintiff was exposed"); id. ¶ 17 (prior to 2021 Old JJCI and its predecessors "milled, manufactured, labeled, sold, supplied, distributed, and/or marketed asbestos containing products to which Plaintiff was exposed"); id. ¶ 29 ("[U]nder New Jersey law, Janssen is a successor to Old JJCI and responsible for the contractual undertakings and tortious conduct of Old JJCI").[24]

26.    Plaintiffs also acknowledge both the Debtor's current and former chapter 11 cases and take positions similar to the positions plaintiffs have taken or are taking in

---

[23]    See also Bergeron Compl. ¶¶ 6-12, 26-37 (same); Dumas Compl. ¶¶ 6-12, 26-37 (same); El-Ramadi Compl. ¶ 6-12, 26-37 (same); Boyle Compl. ¶¶ 7-13, 27-38 (same); Drolet Compl. ¶¶ 6-12, 26-37 (same); Magee Compl. ¶¶ 10-11; Pressler Compl. ¶¶ 7-8.

[24]    See also Ex. L, May 24, 2023 Hr'g Tr. 40:1-14, Naranjo v. Johnson & Johnson et al. No. MID-L-1944-23 (N.J. Super. Ct. May 24, 2023) (Placitella) ("[T]he Court said, well, you can disclaim all you want.  That's between the entities that are doing the transfers.  That has nothing to do with third parties . . . .  So J&J and LTL and all the affiliates, they can make whatever deals they want amongst themselves.  The New Jersey law is pretty clear.  You can make whatever deals you want amongst yourself and transfer who is paying what and who is writing what checks just like you can do in an insurance company, but that has no effect on the operation of law"); id. 51:12-53:9 (Long) ("So, the Johnson & Johnson entities at issue with these motions do not dispute that new JJCI took all of the assets and business of old JJCI.  All that was said [sic] to LTL was the liabilities and it's undisputed under New Jersey law and it's clear that when corporations attempt to put their liabilities off and sell a business absent and clear from all liability, that that those corporate machinations may not be binding on plaintiffs under New Jersey law. . . . [W]hat matters is not the defendant's attempt to put the liabilities into a separate company but, rather, what actually happens with that business after the corporate machination . . . [a]nd New Jersey law is clear that the Texas Two Step and other corporate reorganizations that are meant to sell a company, sell a business free from its liability doesn't have that effect in New Jersey.").

the prior and/or current chapter 11 cases, including with respect to the 2021 Corporate

Restructuring and the propriety of the Debtor's current chapter 11 case.[25]  Compare Cruz Compl.

¶ 18 ("In an effort to avoid or eliminate J&J and Old JJCI's respective responsibility and liability

for injuries and harm caused by Johnson & Johnson Baby Powder . . . in or about October 2021,

Old JJCI underwent a series of corporate restructuring transactions under Texas state corporation

and business law . . . more commonly known as the 'Texas Two Step.'") with *Mot. of the*

*Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case*,  No. 21-30589

[Dkt. 632] at 2-3 ("Johnson & Johnson ("J&J") created this Debtor on the eve of its bankruptcy

filing . . . to manage the litigation associated with J&J's decades-long manufacture and sale of a

carcinogenic product. . . . To accomplish this feat, J&J engineered a multi-step transactional

scheme. . . . The purpose of LTL and of this bankruptcy has been crystal clear from the outset . . .

the case was filed to shield J&J from liability. . .") and *Kimberly Naranjo's Joinder to the Obj. to*

*the Continuation of the Injunction as to Johnson & Johnson Filed on Behalf of the Talc*

*Claimants Committee and Others*, No. 21-30589 [Dkt. 2646] ¶¶ 24-25 ("Johnson & Johnson has

not offered a penny to Kimberly Naranjo or her children.  Johnson & Johnson seeks to avoid

responsibility by utilizing its newly formed shell company's bankruptcy filing to shield itself

from the harm it cause"); compare Cruz Compl. ¶ 25 ("[W]ithin hours of the LTL Bankruptcy

Court issuing its ensuing dismissal order on April 4, 2023, LTL filed a second Chapter 11

---

[25]     In fact, after the briefing and argument in the NJ Successor Liability Actions, it has become plain that the
plaintiffs are trying to nullify the 2021 Corporate Restructuring and the effect of Texas's divisional merger
law.  Mr. Placitella argued that "[t]he mere fact that J&J assigned liability to LTL to decide who ultimately
is going to pay inside their little world has no impact on the responsibility to their parties."  Ex. L, May 24,
2023 Hr'g Tr., Naranjo v. Johnson & Johnson, et al., Case No. L-6108-21AS, Volume 1, at 24:5-8.  He
even argued that Janssen and Kenvue "are the **same company** and share the same identity for purposes of
product liability as JJCI."  Id. at 23:12-14 (emphasis added).  Ms. Long also presented on behalf of
plaintiffs.  Despite her protestations that "it's not that plaintiffs are attempting to undo or ignore the Texas
Two Step," she argued in the same breath that "when corporations attempt to put their liabilities off and sell
a business absent and clear from all liability, that that – those corporate machinations **may not be binding
on plaintiffs** under New Jersey law."  Id. at 51:12-52:6 (emphasis added).

-19-

petition for bankruptcy protection . . . claiming its funding sources and arrangements had been

replaced and reconfigured in such way that purportedly overcomes the Third Circuit's reasons

for ordering the earlier bankruptcy case be dismissed.") with *Informational Br. of the Ad Hoc*

*Committee of Certain Talc Claimants Regarding Second Bankruptcy Filing by LTL*

*Management, LLC* [Dkt. 79] at 2-3 ("This bankruptcy–filed two hours and eleven minutes after

the dismissal of the Debtor's earlier bankruptcy as a bad faith filing–must be dismissed . . . in an

alleged effort to make itself eligible for bankruptcy, the Debtor willingly, knowingly, and

outrageously dissipated and transferred its most significant asset just before filing.") and *Obj.of*

*the Official Committee of Talc Claimants to Debtor's Mot. for an Order (I) Declaring that the*

*Automatic Stay Applies or Extends to Certain Actions Against Non-Debtors, (II) Preliminarily*

*Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Ex Parte Pending a*

*Hearing on a Preliminary Injunction* [Adv. Dkt. 39] at 4 ("Just two hours and eleven minutes

after this Court's Third Circuit-mandated dismissal order in LTL 1.0 was entered, LTL filed this

bankruptcy . . . the result of LTL and J&J attempting to manufacture financial distress . . . the

attempted stripping of LTL's most significant asset . . . makes a mockery of the Third Circuit's

admonition . . . .").

27.     Accordingly, at a minimum, Kenvue and Janssen should be included as

Protected Parties for the same reasons other affiliates (including Holdco) and parties have been

included as Protected Parties.  In short, "there is an identity of interests between the Protected

Parties and the Debtor . . . there exist potential indemnification obligations, and . . . continued

litigation has potential adverse impact on [the] debtor's estate and prospect of reorganization."

PI Op., 12.  And, for the reasons explained below, the Court should enter an order that prohibits

the continuation and/or commencement of discovery and litigation against Holdco, Kenvue and

Janssen.

**B.    "Derivative Liability" Actions Seeking to Hold Holdco, Kenvue and Janssen Liable for Debtor Talc Claims Are Property of the Debtor's Estate.**

28.    The claims being asserted against Holdco, Kenvue and Janssen are

derivative liability claims that are property of the estate and stayed pursuant to section 362(a)(3)

of the Bankruptcy Code.[26]

29.    Pursuant to section 541 of the Bankruptcy Code, the Debtor's estate

includes "all legal or equitable interests of the debtor in property as of the commencement of the

case," wherever located and by whomever held.  11 U.S.C. § 541(a)(1).  Thus, "'[a] cause of

action [becomes] property of the estate if the claim existed at the commencement of the

[bankruptcy] filing and the debtor could have asserted the claim on his own behalf under state

law.'"  Artesanias Hacienda Real S.A. DE C.V. v. N. Mill Cap., LLC (In re Wilton Armetale,

Inc.), 968 F.3d 273, 280 (3d Cir. 2020) (quoting Bd. of Trs. of Teamsters Local 863 Pension

Fund v. Foodtown, Inc., 296 F.3d 164, 169 (3d Cir. 2002)); see also Butner v. United States, 440

U.S. 48, 54 (1979).  Such causes of action include alter ego or successor liability claims.  See,

e.g., In re Emoral, Inc., 740 F.3d 875, 880-82 (3d Cir. 2014) (holding that personal injury

claimants' successor liability claims against transferee were property of the debtor's estate);

Steyr-Daimler-Puch of Am. Corp. v. Pappas, 852 F.2d 132, 135 (4th Cir. 1988) (creditor's alter

ego claim against debtor's principal and affiliate was cause of action that debtor could assert

under state law and thus was "'property of the estate' within the meaning of § 541(a)(1)"); Tsai

v. Bldgs. by Jamie, Inc. (In re Bldgs.by Jamie, Inc.), 230 B.R. 36, 43 (Bankr. D.N.J. 1998)

---

[26]    As set forth above, none of Janssen, Kenvue or Holdco ever sold or manufactured talc-containing products in North America.

(holding that trustee succeeded to debtor's right to assert alter ego claim because corporate

debtor's interest in its alter ego's assets is property of the estate).

30.     Section 362(a) of the Bankruptcy Code states that the filing of a

bankruptcy petition "operates as a stay, applicable to all entities, of . . . (3) any act . . . to exercise

control over property of the estate; . . ."  11 U.S.C. § 362(a).  Accordingly, when claims against a

non-debtor "are property of the estate under section 541(a), any similar extraneous lawsuits

brought by individual creditors will be subject to the automatic stay provision of 11 U.S.C.

§ 362(a)(3)."  Baillie Lumber Co., LP v. Thompson (In re Icarus Holding, LLC), 391 F.3d 1315,

1319 (11th Cir. 2004); see also Steyr, 852 F.2d at 136 ("Since the alter ego claim . . . is 'property

of the estate' within the meaning of § 541(a)(1) . . . the automatic stay applies" and "the trustee is

given full authority over it.") (citations omitted).

31.     To determine whether a creditor's claim against a non-debtor constitutes

an act to exercise control over property of the estate, a court must answer two inquiries:

(a) whether "the debtor could have asserted the claim on his own behalf under state law" and

(b) whether the individual creditor's claim against the non-debtor is a "general claim" available

to the debtor's other creditors.  E.g., Emoral, 740 F.3d at 879; Wilton, 968 F.3d at 282;

Foodtown, 296 F.3d at 169 n.5, 170; Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc), 855

F.3d 84, 107 (2d Cir. 2017); St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 701

(2d Cir. 1989); Koch Refining v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339, 1348-49 (7th

Cir. 1987).

32.     Here, any successor liability or similar "derivative" claims that are being

or might be alleged by the Defendants (as defined in the PI Order) against Holdco, Janssen and

NAI-1536915383

Kenvue seek to exercise control over property of the Debtor's estate and are thus stayed by section 362(a)(3). And there is no question that these claims are successor liability claims.

        1.       ***The Debtor Had Standing Under State Law to Assert Successor Liability Claims at the Time It Commenced the Chapter 11 Case.***

            a.      **The Debtor's Standing to Bring Successor Liability Claims Under State Law.**

33.      Whether a debtor had standing to assert a cause of action against another at the time it filed its bankruptcy case is a question of state law. See St. Paul Fire & Marine, 884 F.2d at 700 ("Whether the rights belong to the debtor or the individual creditors is a question of state law."); see also Koch Refining, 831 F.2d at 1344 (whether alter ego claim belongs to estate or creditors is a question of state law); In re Bridgepoint Nurseries, Inc., 190 B.R. 215, 219 (Bankr. D.N.J. 1996) ("[I]n determining property rights courts must look to state law.").

34.      To determine which state law is the "relevant state law" for this inquiry, courts use the choice-of-law rules of the forum state in which the bankruptcy case sits. See In re First Interregional Advisors Corp., 271 B.R. 463, 469 (Bankr. D.N.J. 2001) ("Where state law governs in a federal case, the federal court must apply the choice of law doctrine from the forum state."); In re Alcon Demolition, Inc., 204 B.R. 440, 446 (Bankr. D.N.J. 1997) ("A federal court applies the choice-of-law doctrine in the forum state in which it sits."); In re Kaplan, 186 B.R. 871, 874 (Bankr. D.N.J. 1995) ("In an action where state law governs, federal courts generally look to the law of the forum state to resolve choice of law issues.").

35.      New Jersey (like most jurisdictions) applies the "internal affairs doctrine," which applies the law of the state in which the debtor is incorporated to a corporation's affairs, which affairs include actions involving breaches of fiduciary duty, veil-piercing and successor liability. See Krys v. Aaron, 106 F. Supp. 3d 472, 484 (D.N.J. 2015) ("New Jersey courts adhere to the [internal affairs] doctrine, and direct that the law of the state of incorporation [governs]

-23-

NAI-1536915383

internal corporate affairs.") (internal quotations omitted).[27]  Numerous courts throughout the

country have concluded that the law of the state of incorporation governs questions of successor

liability.[28]  Here, the Debtor was a North Carolina limited liability company when it commenced

its chapter 11 case.  Thus, North Carolina law governs whether it had standing to bring successor

liability claims.

        **b.**      **The Debtor Had Standing to Bring Successor Liability Claims.**

      36.     As is the case in most states, the general rule under North Carolina law is,

"'where one company sells or otherwise transfers all its assets to another company, the latter is

not liable for the debts and liabilities of the transferor.'"  City of Richmond, Va. v. Madison

Mgmt. Grp., Inc., 918 F.2d 438, 450 (4th Cir. 1990) (quoting 15 W. Fletcher, Cyclopedia of the

Law of Private Corporations, § 7122, at 188 (rev. perm. ed. 1983));[29] accord Leonard v. Bed,

---

[27]    The internal affairs doctrine serves as "a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs . . . because otherwise a corporation could be faced with conflicting demands."  Id. at 484.  The choice of law rules of Texas and North Carolina also use the internal affairs doctrine.  See Hollis v. Hill, 232 F.3d 460, 464-65 (5th Cir. 2000) ("Texas, like most other states, follows the 'internal affairs doctrine.'"); Butler v. Enhanced Equity Fund II, LP (In re Am. Ambulette & Ambulance Serv. Inc.), 560 B.R. 256, 269-70 (Bankr. E.D.N.C. 2016) (applying Delaware law to veil-piercing claim pursuant to internal affairs doctrine).

[28]    See Patin v. Thoroughbred Power Boats Inc., 294 F.3d 640, 649 (5th Cir. 2002) (concluding law of the state of incorporation "governs our substantive determination whether Velocity is subject to successor liability"); Action Nissan, Inc. v. Hyundai Motor Am., 2020 WL 7419669, at *6 (M.D. Fla. Nov. 5, 2020) ("the question of successor liability involves [companies]' internal affairs" and the law of the state of incorporation therefore applies); Fly Shoes s.r.l. v. Bettye Muller Designs Inc., 2015 WL 4092392, at *3 n.1 (S.D.N.Y. July 6, 2015) ("[I]t is the law of the successor's state of incorporation that typically determines successor liability."); Sourcing Mgmt., Inc. v. Simclar, Inc., 118 F. Supp. 3d 899, 918 n.7 (N.D. Tex. 2015) ("[U]nder general choice of law principles, the law of the state of incorporation generally applies to successor liability" (citing Restatement (Second) Conflict of Laws § 302)); Reuland Elec. Co. v. Burgi Eng'rs LLC, 2014 WL 12570927, at *6 (C.D. Cal. Dec. 8, 2014) ("For a question of successor liability, the state of incorporation … controls.").

[29]    See also Emoral, 740 F.3d at 879-80 ("[U]nder both New Jersey and New York state law, an acquiring company is generally 'not liable for the debts and liabilities of the selling company simply because it has succeeded to ownership of the assets of the seller,' except in limited circumstances.") (quoting Lefever v. K.P. Hovnanian Enters., Inc., 160 N.J. 307, 310 (N.J. 1999)).

NAI-1536915383

<u>Bath & Beyond, Inc.</u>, 2016 WL 158587, at *2 (E.D.N.C. Jan. 8, 2016).  Most states recognize

four exceptions to the general rule:

> (1) where there is an express or implied agreement by the purchasing
> corporation to assume the debt or liability; (2) where the transfer
> amounts to a *de facto* merger of the two corporations; (3) where the
> transfer of assets was done for the purpose of defrauding the
> corporation's creditors; or (4) where the purchasing corporation is a
> 'mere continuation' of the selling corporation in that the purchasing
> corporation has some of the same shareholders, directors, and
> officers.

<u>Leonard</u>, 2016 WL 158587 at *3 (citations omitted).

37.    In <u>Mitchell</u>, the court noted that whether state law allows a corporation (or

its receiver) to recover on a claim against an alleged successor under one of these exceptions "is

apparently a question of first impression under North Carolina law."  2003 Bankr. LEXIS 2468

at *28-29 (Bankr. W.D.N.C. 2003).  Finding that "[s]uch a claim is substantially similar to an

alter ego claim because it seeks to recover assets of a corporation and to make these available to

satisfy creditor claims," the court held that the debtor could assert a successor liability claim

under North Carolina law and that the claim became property of the estate under section 541(a)

when the corporation's chapter 7 case was commenced.  <u>Id.</u> (citing <u>Keene Corp. v. Coleman (In

re Keene Corp.)</u>, 164 B.R. 844, 853 (Bankr. S.D.N.Y. 1994)).

38.    Similar to <u>Mitchell</u>, Judge Bernstein's reasoning in <u>Keene</u> was based on

the finding that "[t]he principles relating to successor tort liability, and the results which they are

designed to achieve, are similar to piercing the corporate veil."  164 B.R. at 852.  Applying New

York law on successor liability that was the same as the North Carolina law detailed in <u>Leonard,

id.</u>, Judge Bernstein declared that the automatic stay barred the asbestos claimants from pursuing

their actions against the debtor's affiliates on successor liability theories, explaining that "the

remedy against a successor corporation for the tort liability of the predecessor is, like the

piercing remedy, an equitable means of expanding the assets available to satisfy creditor claims"

and that, for "the same reasons stated with respect to the piercing claims, claims based upon

successor liability should be asserted by the trustee on behalf of all creditors." Id. at 853.[30]

39.    The Third Circuit reached the same conclusion in Emoral.  In that case,

the debtor manufactured a chemical used in food flavoring that gave rise to personal injury

claims.  740 F.3d at 877.  After it sold operating assets to a transferee, the debtor filed its

bankruptcy case, and the trustee for the debtor's estate entered into a settlement with the

transferee in which the trustee released it from claims that "are property of the" debtor's estate.

Id.  The personal injury claimants then sued the transferee in state court, alleging that the

transferee was a "mere continuation" of the debtor and thus subject to their successor liability

claims.  Id.

40.    When the bankruptcy court denied the transferee's motion to enforce the

order approving its settlement with the trustee, the district court reversed, and the Third Circuit

affirmed the district court's reversal.  Id. at 882.  The Third Circuit, relying on Keene and cases

finding that a corporation had standing under state law to assert alter ego claims, held that the

personal injury claimants' successor liability claims against the transferee were property of the

estate under the state law of both New York and New Jersey and were thus settled and released

by the trustee.  Id. at 880-82 and n.3.  The court noted that, although that result might seem odd

at first, it nonetheless makes perfect sense:

---

[30]    See also Tronox, 855 F.3d at 104 (holding that the alter ego and successor liability claims of 4,300 toxic tort claimants against a non-debtor transferee were property of the debtor's estate under both Pennsylvania and Delaware law) (citing Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC), 321 B.R. 128, 136-37 (Bankr. D. Del. 2005)); Sterne Agee Grp. Inc., 2015 WL 1651146, at *5 (Bankr. E.D. Va. 2015) (holding Virginia law allows corporation to recover against its alleged successor based on both Steyr and the "weight of authority outside this Circuit" that "supports the conclusion that a successor liability claim constitutes property of the bankruptcy estate under Bankruptcy Code § 541(a)(1)").

NAI-1536915383

As we observed in <u>Phar–Mor</u>, so, too, here it "may seem strange" to hold that a cause of action for successor liability against Aaroma is property of Emoral's bankruptcy estate.  As a practical matter, it is difficult to imagine a factual scenario in which a solvent Emoral, outside of the bankruptcy context, would or could bring a claim for successor liability against Aaroma.  Just as the purpose behind piercing the corporate veil, however, the purpose of successor liability is to promote equity and avoid unfairness, and it is not incompatible with that purpose for a trustee, on behalf of a debtor corporation, to pursue that claim.

<u>Id.</u> at 881 (internal citations omitted).

**2.**    ***Any Alleged Successor Liability Claims Are Based on Facts and Legal Theories that Are Generally Available to Other Creditors of the Debtor.***

41.    State law affords an individual creditor the right in some circumstances to recover a claim against an entity from a third party based on alter ego and successor liability theories.  But once that entity files for bankruptcy, the creditor's pursuit of the claim against the third party is automatically stayed by section 362(a)(3) if it constitutes an act "to exercise control over" the same or similar claim that state law affords to the debtor to assert generally on behalf of its creditors.  When the individual creditor's claim against the third party is based on facts and legal theories "generally available" to the debtor's other creditors, the stay applies because the individual creditor's pursuit of the claim interferes with, and thus constitutes an act "to exercise control over," the same or similar claim that is property of the estate.  Accordingly, an individual creditor's successor liability claim will be automatically barred by section 362(a)(3) unless it is based on facts and legal theories of liability that are "personal" and "unique" to that creditor. <u>Emoral</u>, 740 F.3d at 880; <u>Baillie Lumber</u>, 391 F.3d at 1321.

42.    "To distinguish general from personal claims," the Third Circuit focuses "not on the nature of the injury, but on the 'theory of liability.'"  <u>Wilton</u>, 968 F.3d at 283 (quoting <u>Emoral</u>, 740 F.3d at 879).  "A claim for an injury is personal to the creditor if other creditors generally have no interest in that claim."  <u>Foodtown</u>, 296 F.3d at 170 (citing <u>Koch</u>

-27-

Refining, 831 F.2d at 1348-49.  Conversely, where a theory of recovery "would be based on facts

generally available to any creditor, and recovery would serve to increase the pool of assets

available to all creditors," the claim is general, not personal.  Emoral, 740 F.3d at 881.  "Only

when a particular creditor suffers a direct, particularized injury that can be 'directly traced' to the

defendant's conduct is the claim personal to that creditor and not property of the estate."  Wilton,

968 F.3d at 283 (quoting Tronox, 855 F.3d at 100); see also Marshall v. Picard (In re Bernard L.

Madoff Inv. Sec. LLC), 740 F.3d 81, 89 (2d Cir. 2014).  In undertaking this inquiry, the Court

"should be focused on [the creditor]'s alter ego claim itself—not [the creditor]'s underlying

claim" against the debtor.  Harrison Soroof Int'l, Inc., 320 F. Supp. 3d 302, 619 (D. Del. 2018).

"The case law demonstrates that an alter ego or successorship claim is personal, and thus can be

asserted by an individual creditor, **only if** the conduct that supports the claim is the same conduct

that directly harmed the creditor in the underlying cause of action."  Labarbera v. United Crane

& Rigging Servs, Inc., 2011 WL 1303146 at *7 (E.D.N.Y. March 2, 2011) (emphasis added).

      43.    The successor liability claims plaintiffs assert against Holdco, Janssen and

Kenvue are "general," not "personal," because the facts and legal theories on which the alleged

liability of the affiliates is based could be asserted by any individual claimant.  Although, for all

of the reasons previously stated, there is no basis for the assertion of liability against Janssen or

Kenvue (or Holdco), the number of suits pending against these entities demonstrates that the

claims are generalized claims that would, if successful, accrue to the benefit of all claimants.

Although plaintiffs' personal injury claims against the Debtor may be individualized, their

purported basis for passing those liabilities on to Janssen and Kenvue is generalized.  As the

Third Circuit explained in Emoral:

> To determine whether the Diacetyl Plaintiffs' cause of action against
> Aaroma constitutes property of Emoral's bankruptcy estate, we

must examine the nature of the cause of action itself.  While the Diacetyl Plaintiffs focus on the individualized nature of their personal injury claims against *Emoral*, we cannot ignore the fact, and fact it be, that their only theory of liability as against *Aaroma*, a third party that is not alleged to have caused any direct injury to the Diacetyl Plaintiffs, is that, as a matter of state law, Aaroma constitutes a 'mere continuation' of Emoral such that it has also succeeded to all of Emoral's liabilities. . . .

The Diacetyl Plaintiffs fail to demonstrate how any of the factual allegations that would establish their cause of action based on successor liability are unique to them as compared to other creditors of Emoral.  Likewise, they fail to demonstrate how recovery on their successor liability cause of action would not benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities. . . .

Therefore, the District Court appropriately classified the cause of action as a generalized claim constituting property of the estate.

740 F.3d at 879-81.  Accord Tronox, 855 F.3d at 103 (agreeing with Emoral holding that personal injury claimants' successor liability claim was "general" rather than "individualized," observing:  "That the plaintiffs in Emoral had an underlying harm specific to them did not put the claims automatically outside the estate.  Indeed, every creditor in bankruptcy has an individual claim (set forth in a proof of claim) against the debtor, whether it be in tort (as here), contract, or otherwise.").

44.    The Second Circuit's analysis of the issue in Tronox is instructive here.  In that case, the court emphasized the "critical distinction between the underlying tort claim against" the debtors and the alter ego and successor liability claims against the newly created transferee that received assets from the debtors' predecessors.  855 F.3d at 107.  In holding that the court below had "correctly classified the [tort claimants'] claims as generalized, derivative claims comprising estate property," the Second Circuit explained that

establishing the former [the underlying tort claim] would benefit only [the tort claimants] as individual creditors, whereas establishing the latter—that New Kerr-McGee is the alter ego of the

-29-

relevant Tronox debtors and should therefore be charged with all its liabilities—would benefit all creditors of the Tronox debtors generally.  See Emoral, 740 F.3d at 880.  **The facts necessary to prove that the Tronox debtors committed the underlying torts may be particular to the [tort claimants], but the facts necessary to impute that liability to New Kerr-McGee 'would be . . . generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors**.'

Tronox, 855 F.3d at 107 (quoting Emoral, 740 F.3d at 881) (emphasis added).  The court in Tronox emphasized that, "[i]n distinguishing derivative claims from particularized claims exclusive to individual creditors, labels are not conclusive, since plaintiffs often try, but are not permitted, to plead around a bankruptcy."  855 F.3d at 100.  "In other words," the court explained, "we are wary of putting form over substance.  Thus, we 'inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted.'"  Id. (citations omitted); see also Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc., 187 F.3d 439, 441 (4th Cir. 1999) (holding that sureties' successor liability and conspiracy claims against transferee of certain of debtor's assets were "so similar in object and purpose to claims that the trustee could bring in bankruptcy court that the Sureties lack standing to pursue these claims . . . "); Litchfield Co. of S.C. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. of S.C. Ltd. P'ship), 135 B.R. 797, 804 (W.D.N.C. 1992) (holding that bank's state court action against partners of debtor violated the automatic stay where the action—although not identical to the right of the debtor to compel its general partners to pay its debts—"would necessarily impair the debtor's exercise of its right to compel its general partners to pay its debts, thus interfering with property of the estate.").

45.    Enforcing the automatic stay to prevent individual creditors from pursuing liability claims against non-debtors based on successor or other derivative liability theories is essential to provide the estate with control over the res available for distribution to all claimants.

NAI-1536915383

As the Second Circuit pointed out in <u>Tronox</u>, preserving the estate's control over such claims not only ensures a fair distribution of the res, but also promotes the efficient resolution of those causes of action, which are part of the res:

> The whole point of channeling claims through bankruptcy is to avoid creditors getting ahead of others in line of preference and to promote an equitable distribution of debtor assets. That is why, after a company files for bankruptcy, creditors lack standing to assert claims that are estate property. Instead, the trustee is conferred the right to recover for derivative, generalized claims; only the estate is charged with ensuring equitable distribution of estate assets and preventing individual creditors from pursuing their own interests and thus diminishing the res available to the rest of the creditors. Even more, it encourages, as it did here, orderly settlements—an interest not taken lightly.

855 F.3d at 106 (internal citations omitted).

46.     The bottom line is that the talc claimants here are in the same position as were the diacetyl claimants in <u>Emoral</u>, the individual creditors in <u>Steyr</u>, the bank in <u>Litchfield</u>, the asbestos claimants in <u>Keene</u> and the toxic tort claimants in <u>Tronox</u>. Any alleged successor liability or other derivative liability claims against Holdco, Janssen and Kenvue are based on facts and theories generally available to the Debtor's other claimants and are therefore automatically stayed by section 362(a)(3) because they are acts to exercise control over property of the Debtor's estate.

**C.    The Commencement or Continuation of Litigation Against Holdco, Kenvue and Janssen Should Be Stayed and Enjoined.**

47.     Consistent with the foregoing authority, any successor liability or similar "derivative" claims alleged by talc claimants against Holdco, Janssen and Kenvue seek to exercise control over property of the Debtor's estate and thus are stayed by section 362(a)(3). Prosecution of these derivative claims is not proper without leave of this Court. <u>See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery</u>, 330

NAI-1536915383

F.3d 548, 570 (3d Cir. 2003) ("If the creditors then believe that a suit or other proper proceeding

should be commenced for avoidance or recovery, they have the right to petition the bankruptcy

court wherein the proceedings are pending for an order compelling the trustee to act, or for leave

to prosecute the suit in the name of the trustee and on behalf of the estate.") (citation omitted).

48.    Accordingly, similar to Old JJCI and JJCCI, the Debtor submits that the

Court should enter an order providing that Janssen and Kenvue are Protected Parties, the

Defendants are stayed pursuant to section 362 of the Bankruptcy Code and enjoined from

commencing or proceeding with discovery or other pretrial matters in any suits against Kenvue,

Janssen or Holdco (which is an existing Protected Party but has been named in these successor

liability suits and is claimed to be the initial successor of Old JJCI) and the Defendants are

stayed pursuant to section 362 of the Bankruptcy Code and enjoined from filing any suit against

Kenvue, Janssen or Holdco, notwithstanding anything to the contrary in the PI Order, including

paragraphs 3 and 6 thereof.[31]

## IV.    THE INDEMNIFICATION ISSUES RAISED BY THE THIRD CIRCUIT DO NOT REQUIRE MODIFICATION OF THE PI ORDER.

49.    The Third Circuit raised three questions in connection with the Debtor's

indemnification obligations in its opinion in connection with the Debtor's prior chapter 11 case:

(a) whether the Debtor must indemnify J&J "for the latter's independent, post-1979 conduct;"

(b) whether the indemnity "should be read to reach punitive damage verdicts rendered against

J&J for its own conduct;" and (c) whether "Old JJCI assumed responsibility from J&J for all

---

[31]    Even if actions asserting successor liability claims were not automatically stayed by operation of section 362(a)(3) of the Bankruptcy Code, it is appropriate for the Court to enter an order staying and enjoining the actions under sections 105(a) and 362(a) of the Bankruptcy Code for the reasons set forth in the PI Motion.  Such claims are clearly Debtor Talc Claims, which the plaintiffs have asserted against Holdco, Janssen and Kenvue only in an effort to evade the effect of the automatic stay as applicable to the Debtor.

NAI-1536915383

claims relating to Shower to Shower." <u>LTL Mgmt.</u>, 64 F.4th at 108 n.16.  As set forth below, the

answer to each of these inquiries is "yes"—the Debtor is obligated to indemnify J&J for post-

1979 liability, punitive damages and Shower to Shower claims.  As a result, no modification of

the PI Order is warranted on account of these issues raised by the Third Circuit.

**A.    The Debtor Is Contractually Obligated to Indemnify J&J For Any Post-1979
Debtor Talc Claims.**

50.    To the extent J&J has liability for independent, post-1979 conduct, the

Debtor has assumed that liability and indemnified J&J for it.[32]  In the 2021 Chapter 11 Case, the

Court correctly concluded that the "language of the 1979 Agreement and the relevant

circumstances" demonstrated that the Debtor's predecessor, J&J Baby Products Company,

"assumed all liabilities, including contingent and future product liability claims,"

notwithstanding the use of the phrase "on the books or records."  <u>LTL Mgmt.</u>, 638 B.R. at 308-

311.  The Court's conclusion remains correct in this chapter 11 case—with (a) the language of

the 1979 Agreement, (b) the circumstances and course of performance between J&J and Old

JJCI, (c) relevant case law and (d) the indemnification provisions in the merger support

agreement entered into in connection with the 2021 Corporate Restructuring bolstering the

Court's conclusion.

51.    "As a matter of well-settled legal doctrine, it is clear that an indemnity

provision is to be construed in accordance with the rules for construction of contracts generally,

---

[32]    As previously addressed, allegations that J&J has "direct" liability arising after 1979 are inaccurate and
unsupported by the record.  <u>See</u> *Debtor's Omnibus Reply in Support of Motion for an Order (A) Declaring
that the Automatic Stay Applies to Certain Actions Against Non-Debtors or (B) Preliminary Enjoining Such
Actions and (C) Granting a Temporary Restraining Order Pending a Final Hearing*, <u>In re LTL Mgmt.
LLC</u>, Adv. Pro. No. 21-3032-MBK (Bankr. D.N.J. Jan. 5, 2022) [Adv. Dkt. 146] (the "<u>2022 PI Reply</u>"),
37-42.  Fundamentally, any such allegedly "direct" claims assert the exact same talc claims based on the
exact same facts asserted against the Debtor; the claimants simply seek to recover "directly" from J&J,
though artful pleading, the same underlying damages allegedly caused by the talc containing products.

-33-

and hence that the judicial task is to ascertain the intention of the parties . . . ."  Mantilla v. NC

Mall Assocs., 167 N.J. 262, 272 (N.J. 2001) (quoting Doloughty v. Blanchard Constr. Co., 139

N.J. Super. 110, 116 (Law Div. 1976)); see also Cozzi v. Owens Corning Fiber Glass Corp., 164

A.2d 69, 71 (N.J. Super. 1960) ("The fundamental rule in construing contracts calls for the

ascertainment of the intention of the parties in the light not only of the language used but also of

the surrounding circumstances and the objects sought to be attained by them under their

agreement."); Zbieg v. K. Hovnanian Enters., Inc., 2003 WL 25838891, at *3 (N.J. Super. Ct.

App. Div. Mar. 25, 2003) ("The [New Jersey] Supreme Court reiterated that indemnity

provisions must be construed as contracts generally are construed . . . .").

52.    As explained in detail in the PI Motion, the broad terms of the 1979

Agreement provide that J&J Baby Products Company assumed all liabilities of every kind and

description associated with the Baby Products division and indemnified J&J for such liabilities:

> . . . Subsidiary agrees to **assume . . . all the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to its BABY Division** and the Subsidiary hereby covenants and agrees with J&J that the **Subsidiary will forever . . . indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed** . . . .

> . . . the covenants and agreements herein contained shall inure to the benefit of and shall bind the respective parties hereto and their respective successors and assigns.

See PI Mot. Ex. 8, Debtor's PI Hr'g Ex. 2, 1979 Agreement § 1 (emphasis added); see also

PI Mot., 12-13.  The assumed liabilities thus included contingent and future product liability

claims.  See also PI Mot. Ex. 47, Nov. 10, 2021 Hr'g Tr. 138:15-19 (Judge Whitley finding that

"the language used effectively means that what we had was an assumption of all of the liabilities

of the debtor and that is broad enough to cover future product liability claims.").

53.    Courts that have considered similar broad language have found it to be

inclusive of contingent product liability claims without any specific reference to the assumption

of such claims.  See Bouton v. Litton Inds., Inc., 423 F.2d 643, 652 (3d. Cir. 1970) (asset

purchaser's assumption of all liabilities as of a specified date "whether accrued, absolute,

contingent, or otherwise, to the extent, and only to the extent, that the same are reflected or

reserved against in the financial statements as supplemented" included certain future product

liability claims not enumerated); Bippus v. Norton Co., 437 F. Supp. 104, 107 (E.D. Pa. 1977)

(purchaser's agreement to "assume and agree to pay, perform and discharge all liabilities and

obligations reflected on the Balance Sheet" as of a specified date included products liability

claims relating to the purchased pneumatic tool business even in the absence of any specific

reference to them on the balance sheet because the drafters "used broad categories, not narrow

specifies, so the absence of a reference to products liability is . . . insignificant.").  As found by

the Court, like the parties in Bouton, J&J and Old JJCI expressed a clear intention of carrying the

entire business forward after the transfer.  See LTL Mgmt., 638 B.R. at 309.[33]

54.    If there were any question as to the intent of the parties, evidence of "the

surrounding circumstances and the objects sought to be attained by them under their agreement"

is always admissible under New Jersey law.  Cozzi, 164 A.2d at 71; Conway v. 287 Corp. Ctr.

Assocs., 187 N.J. 259, 270, 901 A.2d 341, 347 (2006) (New Jersey Supreme Court "permit[s] a

---

[33]    See also PI Mot. Ex. 47, Nov. 10, 2021 Hr'g Tr. 138:9-13 (Judge Whitley:  "I went back and, and looked at the cases that you had cited and I really think Bouton out of the Third Circuit and Bippus are closer to what I have than the ones cited by the claimants.  They are consistent with general concepts of, of corporate law. . .").

NAI-1536915383

broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the
parties.").

55.     Consideration of the circumstances surrounding the 1979 Agreement and
the parties' course of performance further supports that the Debtor is obligated to indemnify J&J
for post-1979 Debtor Talc Claims.  As found by the Court, "the [meeting minutes for the J&J
Board of Directors Meeting held on December 12, 1978] reflect that, in furtherance of J&J's
'long standing policy of decentralization of corporate business,'" the 1979 Agreement was
intended to transfer **all** assets to subsidiaries who would, in turn, assume liabilities." LTL
Mgmt., 638 B.R. at 310 (emphasis added); see also PI Mot. 11-13 (explaining J&J's
decentralization policy leading up to the 1979 Agreement); 2022 PI Reply, 16-17 (same and
explaining how, in the 1979 Agreement, the broad range of assumed liabilities complemented
and mirrored the transferred assets to effect an orderly separation of the relevant business
divisions).

56.     Similarly, J&J's and Old JJCI's course of performance under the 1979
Agreement evidences that Old JJCI assumed J&J's talc liabilities under the agreement.  See LTL
Mgmt., 638 B.R. 311 (explaining how deposition and trial testimony from Adam Lisman, who is
the assistant controller for J&J, "confirmed that since the 1979 transaction, Old JJCI is legally
responsible for, and has actually paid, all talc-related expenses."); see also PI Mot. 16-18
(detailing how "all costs associated with litigation concerning any talc products—including
defense costs, settlements and any verdict amounts—were borne by Old JJCI").

57.     Finally, assuming direct claims against J&J exist, the Debtor has a
contractual obligation to indemnify its non-debtor affiliates pursuant to a merger support
agreement in the event those companies are held liable for any Debtor Talc Claims.

In particular, the Debtor has an express contractual obligation to indemnify Holdco and J&J in the event that either entity is held liable for any Debtor Talc Claims.[34]  Ex. X, Amended and Restated Divisional Merger Support Agreement (the "Merger Support Agreement") ¶ 3.

58.    In any event, efforts to infer the parties' intent from the terms of the applicable agreements, surrounding circumstances or course of performance are unnecessary because, as this Court previously recognized, the intent of the parties is undisputed.  See LTL Mgmt., 638 B.R. at 310 ("The Court need not engage further in this analysis as the record demonstrates that both Old JJCI and the Protected Parties share a common understanding as to which party was responsible for talc-related liabilities following the 1979 Agreement.").

**B.    The Debtor is Obligated to Indemnify J&J for Punitive Damages.**

59.    The situation is no different with respect to any punitive damages assessed against J&J.  As set forth above, the "Debtor is responsible for any and all liabilities associated with the talc products by virtue of the 1979 Agreement and the 2021 Corporate Restructuring." PI Op., 13.  Consistent with that liability, the Debtor is contractually obligated to indemnify J&J (and various other parties).  See 1979 Agreement ¶ 4; Ex. X, Merger Support Agreement ¶ 3; see also LTL Mgmt., 638 B.R. at 308-311 (examining the Debtor's indemnifications under the 1979 Agreement); supra § IV.A.b.  The Debtor's indemnification obligations to J&J are broad and do not exclude indemnification for any punitive damages.  See 1979 Agreement ¶ 4 ("[Debtor's predecessor] will forever indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed and agreed to be paid, performed or discharged, as the case may be, by the [Debtor's predecessor].");  LTL Mgmt., 638 B.R. at 311

---

[34]    Any Holdco and J&J indemnity claims would affect the estate because under the 2023 Funding Agreement, as in the 2021 Funding Agreement, the Debtor's assets must be used first to fund a trust to pay these claims under a plan of reorganization.

("In 1979, [Debtor's predecessor] became the real party in interest for all actions, suits or

proceedings relating to the talc previously sold by J&J or in any way arising out of the talc

business that was being transferred.  And, as the result of a series of transactions culminating in

the 2021 Corporate Restructuring, Debtor assumed that liability and substituted in as the real

party in interest."); Ex. X, Merger Support Agreement ¶ 3.

60.    The parties' course of performance further demonstrates that the intent of

the parties was for the Debtor's predecessors to indemnify J&J for all talc-related liabilities,

including punitive damages.  See LTL Mgmt., 638 B.R. at 311 ("[T]he parties' course of

performance since the time of the 1979 Agreement reinforces this Court's conclusion that Old

JJCI was legally responsible for talc-related liabilities as a result of the 1979 Agreement.").

61.    Relying on cases applicable only in the context of insurance policies or

claims against public entities, the TCC or claimants may argue that punitive damage claims

cannot be the subject of an indemnity as a matter of public policy.[35]  See Johnson & Johnson v.

Aetna Cas. & Sur. Co., 667 A.2d 1087 (N.J. Super. 1995) (insuring punitive damage awards

would frustrate public policy by failing to punish the wrongdoer); Tyranowski v. Lodi Bd. of

Educ., 643 A.2d 1057 (N.J. Super 1994) (denying claim for indemnification against board of

eduation).  But such cases are irrelevant to indemnification agreements between corporate

affiliates.  See Mantilla, 167 N.J. at 274 (reviewing an indemnity agreement between two

corporations and concluding that "the Appellate Division's reliance on insurance law was

misplaced and constituted reversible error.  The inapplicability of insurance law to the indemnity

provisions of the [parties] contract was adequately addressed by the court in Geralnik . . . the

---

[35]    See, e.g., *Mot. to Dismiss of Paul Crouch, Individually and as Executor Ad Prosequendum of the Estate of Cynthia Crouch* [Dkt. 346], 5.

principles that guide us in construing insurance contracts are antithetical to those we apply in
other settings.").[36]

62.    And, nothing prevents parties from agreeing to broad indemnification.
As the court in Cozzi explained:

> The modern trend in judicial decision appears to recognize that an
> owner may seek to contract out of the increased risks and hazards
> created when a contractor's employee is brought within the scope of
> his duties.  Realistically viewed, the shift of liability is a shift in the
> burden of providing adequate insurance coverage.  Broad and
> unqualified indemnity agreements may be used to effectuate this
> intent.  If the parties, as here, choose language broad enough to
> attain this goal, the court should not frustrate their intention unless
> the surrounding circumstances are such as clearly and completely
> negate the meaning of the language used.

63 N.J. Super. at 128.  Finally, as one court has noted:  "Although agreements indemnifying the

indemnitee for its own negligent acts are perhaps antithetical to the policy of compelling

tortfeasors to bear responsibility for conduct heedless of the risks to others, the practical reality is

that . . .  allocation of financial responsibility if often part of the bargaining process."  Leitao v.

Damon G. Douglas Co., 301 N.J. Super. 187, 193, 693 A.2d 1209, 1212 (App. Div. 1997).

63.    Here, as set forth above, pursuant to the 1979 Agreement, the Debtor's

predecessor broadly assumed from J&J the liabilities associated with the talc products and

agreed to indemnify J&J for those liabilities.  That agreement, which was not an agreement for

insurance, did not exclude the assumption of or indemnification for punitive damages.

Moreover, following the 1979 Agreement, J&J never sold or manufactured the talc products at

---

[36]    See also Zbieg, 2003 WL 25838891, at *3 ("The [Supreme] Court rejected our conclusion that principles of
insurance law imposed a duty to defend . . . and held instead that principles of insurance law were
inapplicable to the indemnity provisions of the agreement . . . ."); W9/PHC Real Estate LP v. Farm Family
Cas. Ins. Co., 407 N.J. Super. 177, 193 (App. Div. 2009) (quoting Harrah's Atlantic City, Inc. v.
Harleysville Ins. Co., 288 N.J. Super. 152, 159 (App. Div. 1996)) ("Indemnification agreements and
insurance contracts cover separate matters. 'Entirely different principles of law apply to the interpretation
of an indemnification agreement as opposed to an insurance policy.'").

NAI-1536915383

issue in the talc litigation; the Debtor's predecessors did (with the Debtor becoming solely

responsible for liability for those products by virtue of the 2021 Corporate Restructuring).  And,

the parties' course of conduct demonstrated that liability for the talc products following 1979,

including any punitive damages, always was assessed to and paid by the Debtor's predecessors

(not J&J).

64.     There is nothing antithetical to public policy in upholding the Debtor's

obligation to indemnify J&J even for punitive damage claims.  Because the Debtor is a wholly-

owned subsidiary of J&J, any liability assessed against it for punitive damages would also

negatively impact J&J's ultimate equity interest in the Debtor.  The Debtor's obligation to

indemnify J&J even for punitive damages is supported by the law and the facts.

**C.     The Debtor is Obligated to Indemnify J&J for Claims Related to Shower to
         Shower Products Because Old JJCI Assumed Responsibility for Those
         Products and Agreed to Indemnify J&J For Them.**

65.     The Debtor is responsible for all claims alleging that Shower to Shower

products, which contained talc, causes cancer or other diseases, because Old JJCI became

responsible for such claims (as it did with respect to claims relating to Johnson's Baby Powder).

Kim Decl. ¶ 20; see also LTL Mgmt., 638 B.R. at 297 ("Similarly, through a series of transfers

and indemnification agreements, Old JJCI assumed responsibility for all claims alleging that

another J&J product, "Shower to Shower" caused cancer or other diseases.").

66.     Similar to Johnson's Baby Powder, prior to the institution of J&J's

decentralization policy, Shower to Shower products were marketed by a division of J&J, the

Johnson & Johnson Domestic Operating Company division.  Kim Decl. ¶ 20; PI Mot., 15.

In 1978, J&J transferred all assets and liabilities related to Shower to Shower products to

Personal Products Company, a wholly owned subsidiary of J&J, and Personal Products Company

thereafter assumed operational responsibility for the Shower to Shower products.  Kim Decl.

-40-

¶ 20; PI Mot., 15-16; id. at Ex. 15, Debtor's PI Hr'g Ex. 51.  Contemporaneous public filings and internal accounting records confirm that Personal Products Company in fact took responsibility for the Shower to Shower product line.  See PI Mot., 16.

67.     Old JJCI ultimately became responsible for Shower to Shower,[37] and in 2012, Old JJCI sold the assets and liabilities related to Shower to Shower, along with other products, to Valeant Pharmaceuticals International, Inc. ("Valeant").  See PI Mot., 16.[38] The evidence makes clear that all times after 1978, all Shower to Shower liabilities—including costs for talc-related litigation claims—were ultimately charged to Personal Products Company, Johnson & Johnson Baby Products Company, or Old JJCI.  PI Mot. Ex. 42.2, Hr'g Tr., Nov. 5, 2021, Kim Redirect at 341:1-10.  As a result, Old JJCI, and now the Debtor, are responsible for any Debtor Talc Claims allegedly arising out of Shower to Shower products.[39]

68.     In sum, there is no reason for the Court to alter any of its conclusions relating to the issues raised by the Third Circuit.

---

[37]    The operational responsibilities, liabilities and assets related to Shower to Shower products were transferred from Personal Products Company to Johnson & Johnson Baby Products Company by early 1987.  Kim Decl. ¶ 21; compare PI Mot. Ex. 16, Debtor's PI Hr'g Ex. 70, excerpt from J&J 1985 Annual Report (identifying Shower to Shower as a product of Personal Products Company) with id. at Ex. 17, Debtor's PI Hr'g Ex. 71, excerpt from J&J 1986 Annual Report (identifying Shower to Shower as a product of Johnson & Johnson Baby Product Company).

[38]    Old JJCI later agreed to contractually indemnify Valeant (now known as Bausch Health Companies Inc.) for any liability arising from Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use, or sale of Shower to Shower products, as set forth more fully in the agreement.  Kim Decl. ¶ 22; PI Mot., 16.

[39]    Further, as set forth above, the Debtor is obligated to indemnify J&J, and each of its other affiliates who may be held liable for the Debtor Talc Claims, pursuant to a merger support agreement entered into in connection with the 2021 Corporate Restructuring.  Ex. X, Merger Support Agreement ¶ 3.  Accordingly, the Debtor is contractually obligated to indemnify J&J for claims relating to Shower to Shower products.

-41-

**Waiver of Memorandum of Law**

69.     The Debtor respectfully requests that the Court waive the requirement to

file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3) because the legal basis

upon which the Debtor relies on is incorporated herein and the Motion does not raise any novel

issues of law.

**Notice**

70.     Consistent with the *Order Establishing Case Management and*

*Administrative Procedures* [Dkt. 554] (the "Case Management Order"), this Motion has been

served on:  (a) the U.S. Trustee; (b) proposed counsel to the TCC; (c) counsel to the Debtor's

non-debtor affiliates, Holdco and J&J; (d) the legal representative for future talc claimants and

her counsel; (d) counsel to the Ad Hoc Group of Supporting Counsel; and (g) the other parties on

the Master Service List established by the Case Management Order.  In light of the nature of the

relief requested herein, the Debtor respectfully submits that no other or further notice need be

provided.

**No Prior Request**

71.     No prior request for the relief sought in this Motion has been made to this

or any other court in connection with this chapter 11 case.

WHEREFORE, the Debtor respectfully requests that the Court:  (a) enter an

order, substantially in the form submitted herewith, granting the relief requested herein; and

(b) grant such other and further relief to the Debtor as the Court may deem just and proper.

NAI-1536915383

Dated: June 5, 2023

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (admitted *pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*PROPOSED ATTORNEYS FOR DEBTOR*

NAI-1536915383