**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Matthew I.W. Baker, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
mbaker@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ  07920
Tel: (973) 467-2700
Fax: (973) 467-8126
*Proposed Local Counsel to the Official
Committee of Talc Claimants*

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
Eric R. Goodman, Esq.
dmolton@brownrudnick.com
rstark@brownrudnick.com
mwinograd@brownrudnick.com
egoodman@brownrudnick.com
Seven Times Square
New York, NY  10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
One Financial Center
Boston, MA  02111
Tel: (617) 856-8200
Fax: (617) 856-8201
*Proposed Co-Counsel for the Official
Committee of Talc Claimants*

**MASSEY & GAIL LLP**
Jonathan S. Massey, Esq.
Rachel S. Morse, Esq.
jmassey@masseygail.com
rmorse@masseygail.com
1000 Maine Ave. SW, Suite 450
Washington, DC  20024
Tel: (202) 652-4511
Fax: (312) 379-0467
*Proposed Special Counsel for the Official
Committee of Talc Claimants*

**OTTERBOURG P.C.**
Melanie L. Cyganowski, Esq.
Richard G. Haddad, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
David A. Castleman, Esq.
mcyganowski@otterbourg.com
rhaddad@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
dcastleman@otterbourg.com
230 Park Avenue
New York, NY  10169
Tel: (212) 661-9100
Fax: (212) 682-6104
*Proposed Co-Counsel for the Official
Committee of Talc Claimants*

| | |
|---|---|
| In Re: | Chapter 11 |
| **LTL MANAGEMENT, LLC,**[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

**MOTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS TO DISMISS
THE SECOND BANKRUPTCY PETITION OF LTL MANAGEMENT, LLC**

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................9

    A.    The 2021 Funding Agreement ...................................................9

    B.    J&J and LTL Machinations Starting in January 2023 ......................11

    C.    LTL's Attempt to Create the Illusion of Support
        for its Second Filing ..................................................................16

ARGUMENT ...........................................................................................................21

    I.    LTL Cannot Meet Its Burden to Show that It Is in
       Financial Distress ....................................................................22

    II.    LTL's Unsuccessful Attempt to Manufacture Financial Distress
       Cannot Create a Good Faith Filing ...........................................27

    III.    LTL's Latest Bankruptcy Filing Displays Other
       Indicia of Bad Faith ................................................................37

CONCLUSION ........................................................................................................41

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aldrich Pump LLC v. Those Parties to Actions Listed on*
*Appendix A to Complaint (In re Aldrich Pump LLC)*,
    2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021) ............................................. 35

*AYR Composition, Inc. v. Rosenberg*,
    619 A.2d 592 (N.J. App. Div. 1993) ......................................................... 32

*Balogh Associates VII LLC v. Dick's Sporting Goods, Inc.*,
2022 WL 4624827 (M.D.N.C. Sept. 30, 2022) ................................................. 34

*Bankers Trust Co. v. Bethlehem Steel Corp.*,
    761 F.2d 943 (3d Cir. 1985) .................................................................. 30

*Brenner v. Little Red School House, Ltd.*,
    274 S.E.2d 206 (N.C. 1981) .............................................................. 33, 34

*Congoleum Corp. v. Pergament (In re Congoleum Corp.)*,
    2007 WL 4571086 (Bankr. D.N.J. Dec. 28, 2007) ..................................... 36

*D.S. Simmons, Inc. v. Steel Group, LLC*,
    2008 WL 488845 (E.D.N.C. Feb. 19, 2008) ............................................ 33

*EEOC v. Kronos Inc.*,
    694 F.3d 351 (3d Cir. 2012) ............................................................... 29

*Fairfield Harbour Property Owners Ass'n, Inc. v. Midsouth Golf, LLC*,
    715 S.E.2d 273 (N.C. App. 2011) ........................................................ 34

*Faulconer v. Wysong and Miles Co.*,
574 S.E.2d 688 (N.C. App. 2002).............................................................33

*Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC*,
    2022 WL 3048320 (Sup. Ct. N.C. Aug. 2, 2022) ..................................... 35

*Hackel v. FDIC*,
    858 F. Supp. 289 (D. Mass. 1994) ...................................................... 37

*In re Combustion Engineering, Inc.*,
    391 F.3d 190 (3d Cir. 2004) ............................................................... 31

*In re DBMP LLC,*
   2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021) ...................................... 32, 35

*In re Fruehauf Trailer Corp.,*
   444 F.3d 203 (3d Cir. 2006) .................................................................................. 29

*In re Integrated Telecom Express, Inc.,*
   384 F.3d 108 (3d Cir. 2004) ...................................................................................40

*In re Johnson & Johnson Talcum Powder Products*
*Marketing, Sales Practices and Products Litigation,*
   509 F. Supp. 3d 116 (D. N.J. Apr. 27, 2020) ...................................................... 5, 20

*In re LTL Mgmt.,*
   637 B.R. 396 (Bankr. D.N.J. 2022) ...................................................................... 11

*In re Marvel Entm't Grp., Inc.,*
   140 F.3d 463 (3d Cir. 1998) .................................................................................. 12

*In re PWS Holding Corp.,*
   303 F.3d 308 (3d. Cir. 2002) ................................................................................ 29

*In re SGL Carbon Corp.,*
   233 B.R. 285 (D. Del. 1999) ................................................................................ 39

*In re SGL Carbon Corp.,*
   200 F.3d 154 (3d Cir. 1999) .................................................................... 36, 39, 40

*In re Taylor,*
   642 B.R. 912 (W.D. Ark. 2022) ............................................................................ 31

*Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,*
   456 U.S. 694 (1982) ..............................................................................................30

*JB Pool Mgmt., LLC v. Four Seasons at Smithville Homeowners Ass'n, Inc.,*
   431 N.J. Super. 233 (App. Div. 2013) .................................................................... 33

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A*
*to Complaint et al. (In re LTL Mgmt., LLC),*
   64 F.4th 84 (3d. Cir. 2023) ................................................................................ *passim*

*Moss v. First Premier Bank,*
   2020 WL 5231320 (E.D.N.Y. Sept. 2, 2020) .......................................................... 37

*Plastronics Socket Partners, Ltd. v. Hwang,*
   2022 WL 108948 (Fed. Cir. Jan. 12, 2022) .............................................................. 32

*Tucker v. Charter Med. Corp.*,
   299 S.E.2d 800 (N.C. App. 1983) ................................................. 36

*Union County Utilities Authority v. Bergen County Utilities Authority*,
   995 F. Supp. 506 (D.N.J. 1998) ................................................. 36

*United States v. Kennedy*,
   682 F.3d 244 (3d Cir. 2012) ................................................. 30

*15375 Mem'l Corp. v. BEPCO, L.P.*,
   589 F.3d 605 (3d Cir. 2009) ............................................. 21, 27, 40

## **Statutes and Rules**

11 U.S.C. § 524(g) .............................................................. 8

11 U.S.C. § 548(a)(1)(A) ....................................................... 31

11 U.S.C. § 1112 ........................................................ 1, 20, 21, 40

11 U.S.C. § 1129(a)(7) .......................................................... 8

28 U.S.C. § 1359 .............................................................. 30

Bankruptcy Rule 9011 .......................................................... 1

Tex. Bus. Orgs. Code Ann. § 10.003 ............................................. 32

Tex. Bus. Orgs. Code Ann. § 10.901 ............................................. 32

## **Other Authorities**

5 Collier on Bankruptcy ¶ 548.04[1][b][iii] ................................... 31

The Official Committee of Talc Claimants ("TCC") in the above captioned case, by and through its undersigned counsel, hereby submits this Motion to Dismiss the Second Bankruptcy Petition of LTL Management, LLC (the "Debtor" or "LTL") for cause, pursuant to Section 1112(b) of the Bankruptcy Code and Rule 9011 of the Bankruptcy Rules.

## INTRODUCTION

On April 20, 2023, this Court recognized that, "with regard to the anticipated motion to dismiss," LTL "has an uphill battle."[1]  Although declining to sua sponte dismiss this second bankruptcy ("LTL 2.0"), the Court expressed significant skepticism that LTL could show that it is in financial distress, recognizing that LTL bears the burden to make "a well-supported and timely showing . . . that this reorganization has a meaningful chance."[2]  The Third Circuit has clearly stated the burden LTL faces:  "Once at issue, the burden to establish good faith is on the debtor." *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint et al. (In re LTL Mgmt., LLC)*, 64 F.4th 84, 100 (3d Cir. 2023) (amended opinion).  LTL bears the burden to show that it ***is*** in financial distress, and such financial distress "must be ***immediate*** enough to justify a filing."  *Id.* at 102 (emphasis added).  It is not the TCC's burden to prove that there is no scenario that could result in LTL's financial distress.  LTL has the incontrovertible burden to establish good faith, and therefore financial distress.  It cannot.

At the April 18 Hearing, LTL continued to offer its canard that all the machinations between January 30 and April 4 were intended to address and comply with the Third Circuit's opinion.  Yet LTL has failed to and cannot overcome the Third Circuit's explanation for LTL's lack of financial distress:  "LTL did not have any likely need in the present or the near-term, or

---

[1]  *See* Exhibit 1 attached to the Declaration of Daniel M. Stolz filed herewith ("Ex."), at 9:8-10 (Apr. 20, 2023 Hearing Tr.).

[2]  *Id.*, at 9:22-23.

even in the long-term, to exhaust its funding rights to pay talc liabilities." *Id.* at 108.  Mr. Kim

testified, answering questions from his own lawyer, that "we believe that we have sufficient funds

to meet the liability" but that there was "financial distress because of the magnitude of the

liability."[3]  But that is not the test.  The Third Circuit never conditioned distress on the magnitude

of the liability, but rather whether the particular debtor seeking Chapter 11 protection "was highly

solvent"—conceded by LTL—"with access to cash to meet comfortably its liabilities as they

[come] due for the foreseeable future."  64 F.4th at 108.  And as LTL's counsel freely admitted on

April 18: "The value of the funding agreement is equal to the amount of the liability . . . LTL was

of the view that under the first funding agreement, it had sufficient resources to cover its talc

liability.  It feels the exact same way under the second funding agreement."[4]  That is not financial

distress.

At both hearings in this case, LTL presented this Court with slide after slide about how the

"tort system has failed the plaintiffs," how that system results in "lottery-like jury verdicts," and

(after the Court asked about taking "into account these [defense] verdicts and potential settlements

in calculating distress") how much it costs to defend these cases.[5]  Other than a casual mention by

LTL's litigation counsel of a $190 billion figure that was specifically rejected by the Third Circuit,

64 F.4th at 107, LTL failed to present this Court with any meaningful analysis of the potential talc

liabilities. █████████████████████████████████████████████████████████████████

██████████████████████████████████████████  Incredibly, again answering

---

[3]    Ex. 2, at 180:20-23 (Apr. 18, 2023 Hearing Tr.).

[4]    *Id.* at 212:3-12.  Mr. Dickinson, LTL's CFO, similarly testified at deposition that he could not "identify any
financial consequence to LTL from terminating the 2021 Funding Agreement."  Ex. 3, at 136:21-25 (Apr. 17,
2023 Dickinson Dep. Tr.).

[5]    Ex. 2, at 251:9-254:5 (Apr. 18, 2023 Hearing Tr.).
████████████████████████████████████████

his own lawyer's question "on whether or not the liability changed under funding agreement one and funding agreement two," Mr. Kim answered that "[t]he talc liability is enormous. We don't have an aggregate number for it, but it is, you know, huge."[7] Mr. Dickinson, LTL's CFO, testified that after the Third Circuit decision on January 30, he was not aware of any evaluation by LTL as to how much money it would take to fund a return to litigating talc claims in the tort system over the following twelve months or even three years.[8] After the Third Circuit took LTL to task for failing to analyze its talc liability sufficiently before coming to this Court for bankruptcy protection, what did it (or its corporate parent Johnson & Johnson, Inc. ("J&J")) do to fix that fatal defect for this new filing? Nothing.

After weeks of planning this second bankruptcy, after days of depositions, and after hours of examination of LTL's primary corporate witness, what has LTL actually established? That it has long-term contingent and unliquidated liability—which it is unable to calculate—and that it has sufficient funds to meet that liability. Despite every opportunity, LTL failed to present to this Court even the most summary evidence that it cannot meet its liabilities as they come due for the foreseeable future. LTL instead raised the specter of the possibility of some undefined hypothetical future financial distress that might occur in a worst-case scenario (for LTL), and then tried to shift the burden to the TCC to establish that there was no possible or conceivable scenario under which LTL could be in financial distress. The TCC is not seeking the protection of the bankruptcy system, LTL is. LTL bears the burden to establish that it is in financial distress. It has not, will not, and cannot carry that burden. This case must be dismissed.

*    *    *    *    *

---

[7]    Ex. 2, at 180:4-12 (Apr. 18, 2023 Hearing Tr.).

[8]    Ex. 3, at 162:21-163:23 (Apr. 17, 2023 Dickinson Dep. Tr.).

Even though LTL is not in financial distress, LTL plainly realized that under the controlling Third Circuit decision, it would have to feign financial distress in order to try to once again take advantage of the bankruptcy system.  After all, as the Third Circuit opined: "Our ground for dismissal is LTL's lack of financial distress."  64 F.4th at 110.  This Court has recognized that financial distress is a threshold issue, holding on April 20 that the "Third Circuit now has made clear that it views the gateway to good faith being a determination that a debtor is in financial distress."[9]  This threshold issue trumps any desire by LTL and J&J to resolve its talc liability through the bankruptcy system, no matter how strong "J&J's belief that this bankruptcy creates the best of all possible worlds."  64 F.4th at 111.  As the Third Circuit continued, the requirement for financial distress is a "safeguard," necessary to ensure that the talc claimants' "chance to prove to a jury of their peers injuries claimed to be caused by a consumer product [is] disrupted only when necessary."  *Id.*

So, although the Third Circuit found that it could not "currently see how its lack of financial distress could be overcome," *id*. at 110, LTL continued its burden-flipping exercise and tried to find a way to become financially distressed so that it could use the bankruptcy system to resolve mass tort liabilities.  LTL's legerdemain took two forms, one on the liability side and one on the asset side.  On the liability side, there is the specter of thousands of new claimants, based on its purported Plan Support Agreements with a number of new law firms that just happened to come out of the woodwork when LTL needed them the most.  The TCC, represented by lawyers who have decades of collective experience in significant mass tort cases, including the lawyers leading the Multidistrict Litigation (the "MDL") concerning this very talc liability, is well-positioned to see through LTL's sleight-of-hand:  To try to create the impression of broadened support for a

---

[9]    Ex. 1, 6:14-16 (April 20, 2023 Hearing Tr.).

plan, LTL broadened the definition of harm from only those certain subtypes of epithelial ovarian cancer that form the basis of compensable and scientifically based claims under the *Daubert* decision in the MDL, to instead include claimants with generic "gynecological" cancers for which there is no evidence supporting a scientific causal connection with the use of talcum powder.[10] Tellingly, LTL has admitted that it has not done a detailed analysis of the validity of these claims. Instead, LTL hopes to use these highly suspect claims to stack the deck with purported support for rushing through a reorganization plan, despite having failed to meet the good faith standard required to seek any relief in this Court.

Even so, this Court should not be drawn into sitting as an alternate trial court in judgment of these supposed potential unfiled claims. The question for this Court, sitting in bankruptcy, is whether the actual or even forecasted liability caused by all these new alleged potential unfiled claims puts LTL in financial distress, as this Court stated in its April 20 ruling. And the burden for establishing that financial distress is on LTL. Yet, LTL was unable (or unwilling) to even make an estimate for such liability when it decided to file LTL 2.0. LTL instead buried its head in the sand and refused to perform even an internal analysis to present to its own Board, and Mr. Kim admitted that he did not know the scope of the talc liabilities.[11] LTL's Board knew it did not have an estimate for these liabilities, refused to do the work to find out, and filed this bankruptcy anyway.[12]

---

[10] For example, uterine cancer, vaginal cancer, cervical cancer, or vulvar cancer. Notably, neither J&J nor LTL appealed the Daubert decision in the MDL. *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d 116, 181 (D.N.J. 2020).

[11] Ex. 2, at 180:4-12 (Apr. 18, 2023 Hearing Tr.).

[12] LTL's litigation counsel did, however, spend substantial time at the April 11 and April 18 hearings boasting of its record of wining trials, which this Court noted weighs against finding distress. Ex. 2, at 253:12-15 (Apr. 18, 2023 Hearing Tr.).

That left LTL with only one choice—a bald attempt to manufacture financial distress by stripping LTL of its largest asset (the 2021 Funding Agreement) and cooking up the largest intentional fraudulent transfer in United States history.  On March 16, while still waiting for the Third Circuit to rule on its petition for rehearing and while still in bankruptcy with fiduciary duties to talc claimants, LTL's Board met to discuss ███████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████    In order to manufacture distress, LTL sought a new funding agreement, which in its counsel's words were because the original "funding agreement had the exact opposite effect of what it was intended to do."[15]  At some point, LTL also had to abandon the existing, highly valuable 2021 Funding Agreement, which rightly created for this Court "a very concerning question regarding th[e] loss of value."[16]  LTL's excuse, about which the Court heard lengthy testimony on April 18, was that the 2021 Funding Agreement was rendered "void or voidable" (LTL never said which) by the Third Circuit opinion announced on January 30.

Absent from the Board minutes of that March 16 meeting, though, is ███████████████

████████████████████████████████    On March 28, after rehearing had been denied by the Third Circuit and while LTL's motion to stay the mandate was pending, LTL's Board met again to discuss ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████    On April 2, after the stay had been denied and the Third Circuit mandate issued,

---

[13]   LTL did not produce any board minutes to the TCC for meetings between January 30 and March 16, 2023.
████████████████████████████

[15]   Ex. 2, at 209:3-4 (Apr. 18, 2023 Hearing Tr.).
[16]   Ex. 1, at 8:20-23 (Apr. 20, 2023 Hearing Tr.).
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

LTL's Board met one more time while still in the LTL 1.0 bankruptcy ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ And yet, when Mr. Kim

was asked for details about the discussion about how it was ***decided*** that the 2021 Funding

Agreement was "void or voidable," Mr. Kim and his lawyers hid behind the privilege, what his

attorney characterized as "discussions about a legal issue [] between lawyers."[19]  This Court should

recognize "void or voidable" for what it is—a post-hoc pretext cooked up by LTL's lawyers as a

last-minute excuse to manufacture financial distress and justify "the potentially largest fraudulent

transfer undertaken in history."[20]  Indeed, had LTL (or J&J) actually thought the 2021 Funding

Agreement was void or voidable, it could have sought a ruling from this Court on its validity.  As

Mr. Kim admitted, LTL sought no such ruling.[21]

The Third Circuit foresaw LTL's strategy and expressly warned that such a tactic might be

avoidable as a fraudulent transfer.  64 F.4th at 109 n.18.  Despite LTL's attempts to justify

abandoning its most valuable asset (without first seeking approval from this Court while a debtor

in possession) under its "void or voidable" theory, its pretext simply cannot withstand scrutiny.

LTL had access to the ATM-like funding in the 2021 Funding Agreement whether inside and

outside bankruptcy, and as LTL previously told this Court, even in the event of a dismissal of LTL

1.0.  The implications for LTL's "void or voidable" pretext are stunning, as the 2021 Funding

---

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

19  Ex. 2, at 68:3-70:3 (April 18, 2023 Hearing Tr.).
20  Ex. 1, at 9:12-13 (Apr. 20, 2023 Hearing Tr.).
21  Ex. 2, at 101:16-21 (Apr. 18, 2023 Hearing Tr.).

Agreement was the consideration LTL received in exchange for assuming the talc liability.  By voiding one part of a "single integrated transaction"[22] that made up the divisive merger, LTL may have created a justification to pierce its own corporate veil on the grounds that voiding one part of an integrated transaction voids the entire transaction.

LTL argues that claimants should be allowed to decide for themselves how to resolve their claims and submits that some would prefer to settle on J&J's terms.  But LTL is not entitled to propose a plan for a vote unless LTL qualifies for bankruptcy protection.  Moreover, no one is preventing LTL or J&J (a non-debtor) from resolving cases with willing claimants through voluntary settlements.  After LTL 1.0 was dismissed, LTL was free to settle with any claimants who wanted to do so.  Instead, LTL is trying to abuse the bankruptcy system to force a resolution on claimants who do not want to settle on the terms offered by J&J.  J&J is seeking to use bankruptcy to cram down its proposal on nonconsenting claimants.  That attempt is illegitimate and unlawful.[23]

This abusive second bankruptcy cannot be allowed to continue.  Even with the purported reduction of available funding in the 2023 Funding Agreement, LTL cannot carry its burden to show that it is in financial distress, which the Third Circuit and this Court on April 20 recognized is a "gateway" issue.  Nor can the change from the 2021 to the 2023 Funding Agreement be any basis for finding financial distress and good faith.  Not only will such an obvious fraudulent

---

[22]  A phrase used by LTL to describe the transaction as late as March 22, 2023, in a brief to the Third Circuit, well after LTL had allegedly decided by "consensus" with J&J that the 2021 Funding Agreement was "void or voidable." Ex. 9, at 14 (Motion to Stay Mandate, Doc. No. 173, Case No. 22-2003 (3d Cir. filed Mar. 22, 2023)).

[23]  Even if, *arguendo*, this case is not dismissed, the TCC submits that LTL's intended proposal (as currently described) cannot satisfy 11 U.S.C. § 1129(a)(7).  The value a trustee would recover from reinstatement of the 2021 Funding Agreement will provide more value to creditors—who in a Chapter 7 liquidation would also retain the value of their claims against solvent non-debtors—than the collusive scheme proposed by LTL and its corporate parent.  Further, the best interests test cannot be waived by proceeding under § 524(g), nor can creditors' rights to pursue claims against solvent third parties (like J&J) be extinguished by such a plan.  LTL is nowhere close to a consensual or confirmable plan of reorganization.

transfer eventually be reversed, but it would be perverse for fraud and breach of fiduciary duty to provide a basis for good faith. Perhaps most significantly, LTL's latest petition is an abuse of the bankruptcy system and an affront to our justice system, created to further a massive corporation seeking a litigation advantage over victims harmed by its own products. Talc claimants have already been forced to endure an 18-month delay that the Third Circuit has now authoritatively established was impermissible. The claimants have waited long enough. Hundreds died during the Debtor's first bankruptcy without receiving fair compensation or their day in court. And, because of LTL's renewed abuse, that tragedy will continue. LTL's fraudulent conduct cannot be rewarded with another 18 months in bankruptcy while talc victims continue to suffer and die. The TCC therefore respectfully requests that LTL's second bankruptcy petition be dismissed.

**BACKGROUND**

**A.    The 2021 Funding Agreement**

In LTL 1.0, LTL repeatedly touted to this Court the protections afforded claimants by the 2021 Funding Agreement.    In opposing the motion to dismiss, for example, Mr. Gordon told this Court that LTL 1.0 was "different from all other cases in the sense that it includes also a Johnson & Johnson, the ultimate parent, agreeing to obligate itself to the extent of the value of Old JJCI. So you have basically two sources of asset availability."[24]   In fact, according to Mr. Gordon, "the whole idea with these funding agreements… [is] to basically to be able to say to the Court, to say to the parties, look, you haven't been hurt because the entity that was standing behind or the value of assets that were effectively standing behind the liability or were available to pay the liability, that value is fully preserved through that funding agreement. So that was [] fully preserved. The

---

[24]   Ex. 10, at 56:1-8 (Feb. 18, 2022 Hearing Tr.).

only difference is that instead of having the company there, you have a funding agreement that provides direct right to those assets through this funding agreement."[25]

Mr. Gordon told this Court, in the presence of Mr. Haas, J&J's head of worldwide litigation, that the 2021 Funding Agreement applied outside of bankruptcy and would continue to apply even if the bankruptcy case were dismissed.  He explained that "there's literally no conditions or any material conditions on the permitted uses under this document," and he expressly included "funds available to pay settlements, to pay judgments in the tort system. So it makes it very clear this is what we're talking about if there's no proceeding in bankruptcy. Whether there was no case filed or *whether the case is filed or dismissed*, the money's available for that purpose…. So this is there to protect the claimants. *It's there to assure this isn't treated or consider a fraudulent conveyance*.  The idea was and the intent was the claimants are covered either way in bankruptcy or outside."[26]  And Mr. Gordon told this Court after the Third Circuit ruled, again in the presence of Mr. Haas, that dismissal was a "reasonably foreseeable" event and that LTL understood that its case "might [be] dismiss[ed] at some point."[27]

Indeed, the terms of the 2021 Funding Agreement expressly provide that it applies outside bankruptcy and enables "the payment of any and all costs and expenses of the Payee incurred in the normal course of its business," such as talc judgments and settlements, "*at any time when there is no proceeding under the Bankruptcy Code* pending with respect to the Payee."[28]   Mr. Kim reassured this Court that the 2021 Funding Agreement applied outside bankruptcy.[29]   Mr.

---

[25]  *Id.*, at 59:7-16.

[26]  *Id.*, at 60:16-20, 61:5-20 (emphases added).

[27]  Ex. 2, at 209:14:210-5 (Apr. 18, 2023 Hearing Tr.).

[28]  Ex. 11, at 5 (2021 Funding Agreement) (emphasis added).

[29]  *See* Ex. 12 ¶ 27 (2021 First Day Declaration of John Kim ("Kim Decl. I")) ("Significantly, the Funding Agreement imposes no repayment obligation on the Debtor; it is not a loan.  *It obligates New JJCI and J&J, on a joint and*

Kim reiterated under oath, in deposition and at the April 18 hearing, that the 2021 Funding Agreement applied outside of bankruptcy.[30]

Accordingly, this Court found that the 2021 Funding Agreement obligated New JJCI and J&J "to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time **when there is no bankruptcy case**" and "requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when **there is no bankruptcy case**." *In re LTL Mgmt.*, 637 B.R. 396, 423 n.27 (Bankr. D.N.J. 2022) (emphasis added).

Mr. Katyal, LTL's appellate counsel, told the Third Circuit that the 2021 Funding Agreement applied outside bankruptcy, and Judge Ambro agreed.[31]  Relying on the plain language of the Funding Agreement, as well as this Court's findings and LTL's representations, the Third Circuit concluded that LTL "had the right, outside of bankruptcy, to [enforce the Funding Agreement]." 64 F.4th at 106.  The Third Circuit also pointed to the benefit to claimants of New JJCI's role in the Funding Agreement: "The value of the payment right could not drop below a floor defined as the value of New Consumer measured as of the time of the divisional merger, estimated by LTL at $61.5 billion, and was subject to increase as the value of New Consumer

---

several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses. *In addition, the Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case* and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.)) (emphasis added).

30   Ex. 13, at 62:15-21, 182:10-17 (April 14, 2023 Kim Dep. Tr.); Ex. 2, at 61:7-14 (April 18, 2023 Hearing Tr.).

31   *See, e.g.*, Ex. 14, at 83:21-25 (Sept. 19, 2022 Third Circuit Oral Arg. Tr.) ("Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something.  I understand that the funding agreement does have provisions for funding outside of bankruptcy.  The Court: Yeah, that's what I thought.").

increased after it." *Id.* at 97.  Thus, the value of the Funding Agreement "would increase as the value of New Consumer's business and assets increased." *Id.* at 106.  In addition, New JJCI "had access to Old Consumer's cash-flowing brands and products along with the profits they produced, which underpinned the $61.5 billion enterprise value of New Consumer as of LTL's filing. And the sales and adjusted income of the consumer health business showed steady growth in the last several years when talc costs were excluded." *Id.*

**B.** **J&J and LTL Machinations Starting in January 2023**

Starting in January 2023, however, both J&J and LTL took steps to significantly prejudice claimants, during the pendency of LTL 1.0, at a time when LTL as a Chapter 11 debtor-in-possession owed the claimants a fiduciary duty, *see In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998), and owed legal obligations to both the U.S. Trustee's Office and this Court. J&J and LTL did not disclose their actions to the Official Committee in existence at the time (similar to this TCC), to the U.S. Trustee's Office, or to this Court.

First, in early January 2023, New JJCI, renamed HoldCo, transferred its consumer health business to its parent entity.[32]  Mr. Kim acknowledged, "[a]s a result" of the transfer of the consumer health business, "HoldCo's assets, which were prior to this filing (and are) available through the 2023 Funding Agreement, no longer include the consumer health business."[33]  As a result of the transfer, claimants lost the benefit of what the Third Circuit described as the "cash-flowing brands and products along with the profits they produced," as well as the benefit of the appreciation in value of the consumer business.  64 F.4th at 106.

---

[32]  Kim Declaration [Doc. No. 4] (the "Kim Decl. II") ¶ 26.
[33]  *Id.* ¶ 83.

Instead, HoldCo's assets are limited to $400 million in cash[34] and ownership interests in various other companies, [35] which LTL values at approximately $30 billion.[36]  In addition, LTL has cash on hand of $15.78 million,[37] and Royalty A&M,[38] which owns a portfolio of royalty streams deriving from consumer brands and is valued by LTL at approximately $402 million.[39]

Second, LTL and J&J witnesses have also testified in deposition and in this Court as to how and when they allegedly concluded that the 2021 Funding Agreement was "void or voidable" (although never specifying which).  Mr. Kim testified that on the very day the Third Circuit decision issued, he came up with the idea in his head that the 2021 Funding Agreement might be deemed "void or voidable," and LTL began discussing "whether we should be refiling for bankruptcy."[40] ███████████████████████████████████████

███████████████████████████████████ And Mr. Dickinson, LTL's CFO, testified that no business person at J&J or JJCI ever told him that they believed the 2021 Funding Agreement was void, voidable, or unenforceable.[42]  Mr. Kim acknowledged that no business person at J&J reached out to him to say that J&J would refuse to honor the Funding

---

[34]  Kim Decl. II ¶ 28.

[35]  Ex. 15, at 10 (February 2023 Monthly Operating Report, Case No. 21-30589-MBK, Doc. No. 3886-1 (Mar. 21, 2023) (the "Feb. 2023 MOR")).

[36]  Ex. 13, at 68:3-6 (April 14, 2023 Kim Dep. Tr.).

[37]  Ex. 15, at 4 (Feb. 2023 MOR).

[38]  Kim Decl. II ¶ 27.

[39]  Ex. 15, at 10 (Feb. 2023 MOR).

[40]  Ex. 13, at 74:23-75:10, 76:3-13; 77:2-18, 82:11-23 (Apr. 14, 2023 Kim Dep. Tr.).
███████████████████████████████████

[42]  Ex. 3, at 151:17-21, 152:15-22 (Apr. 17, 2023 Dickinson Dep. Tr.).

Agreement.[43]  J&J never refused to pay anything due under the Funding Agreement.[44]  And as

noted above, LTL understood that LTL 1.0 might be dismissed.[45]



  Mr. Kim testified that there were "discussions" with J&J about whether the 2021 Funding

Agreement was voidable.[49]  All discussions were through counsel.[50]  Mr. Kim testified that "there

are various legal theories behind it, but that frustrated the purposes of the funding agreement and

rendered it void or voidable."[51]  According to Mr. Kim, "the law firms that we've discussed this

with" (citing Jones Day and Hogan Lovells) agreed that "the Third Circuit decision" "was

---

43 Ex. 13, at 209:9-210:18 (Apr. 14, 2023 Kim Dep. Tr.); Ex. 2, at 75:8-15 (Apr. 18, 2023 Hearing Tr.).
44 Ex. 13, at 207:7-14. (Apr. 14, 2023 Kim Dep. Tr.).
45 *See supra* n.27 and accompanying text.

49 Ex. 13, at 188:19-190:3, 190:12-20, 191:5-8 (April 14, 2023 Kim Dep. Tr.).
50 *Id.* at 207:17-23.
51 *Id.* at 78:16-18.

something that no one would have -- ·could have anticipated."[52]    Mr. Kim testified that a

"consensus" was reached between LTL and J&J "through their lawyers," all of whom were being

paid by J&J, to void the 2021 Funding Agreement,[53] and that it never occurred to him to see if one

of the other counterparties thought the agreement was void or voidable.[54]

Although Mr. Kim directly and repeatedly put legal advice concerning enforceability at

issue, as reflected above, LTL has not produced a single supporting legal memorandum explaining

why or how the Third Circuit's ruling suddenly meant that LTL had no access to funding under

the 2021 Funding Agreement to pay billions in talc liabilities allocated to it, even though the 2021

Funding Agreement expressly provides for funding outside of bankruptcy to pay talc liabilities.

Nor has LTL produced a single contemporaneous non-privileged document before April 2—just

two days before the filing of LTL 2.0—demonstrating consideration of the enforceability issue.

LTL also never raised with the TCC, the U.S. Trustee's Office, this Court, or the Third

Circuit (in its numerous post-decision appellate motions) its concern that the 2021 Funding

Agreement might be "void or voidable."    Indeed, on March 21, 2023, LTL filed a monthly

operating report, signed by LTL's CFO and its counsel, which indicated the 2021 funding

agreement remained in place.[55]    Yet during this time, prior to the dismissal of LTL 1.0, LTL

embarked on a scheme to evade the Third Circuit's decision and re-file for bankruptcy.    It prepared

to terminate the 2021 Funding Agreement and replace it with new financing agreements (the 2023

Funding Agreement and J&J Support Agreement) in order to manufacture (purported) financial

---

[52]   *Id.* at 78:6-10, 78:25-79:2.

[53]   *Id.*, at 189:13-190:3, 191:5-8.  The collusion is further evidenced by Mr. Kim's lawyers instructing him not to
answer questions about J&J's views on the funding agreement because of a "common interest privilege," even
though LTL and J&J were counterparties to the transaction at issue.  *Id.* at 83:14-25.

[54]   *Id.* at 85:23-86:3.

[55]   Ex. 15, at 2 (Feb. 2023 MOR).

distress.  Under the new agreements, "J&J's balance sheet [is] not available to the Debtor," and "HoldCo's [formerly New JJCI's] assets … no longer include the consumer health business."[56] The LTL Board approved this transaction during the pendency of LTL 1.0, while LTL's directors, officers and counsel owed fiduciary duties to the talc victims.



At the First Day Hearing in this case, LTL's counsel candidly admitted that the "purpose of the filing remains the same."[59]

### C.    LTL's Attempt to Create the Illusion of Support for its Second Filing

Part of Debtor's scheme was to create an illusion of claimant support for the new bankruptcy filing.  Mr. Kim testified that "with the assistance of the mediators," J&J's outside counsel Mr. Murdica engaged in negotiations during the pendency of LTL 1.0 with "various plaintiff law firms" over Plan Support Agreements (PSAs) and an attached term sheet to be used in a second bankruptcy filing.[61]  The PSA template was dated March 21 and was signed by plaintiff

---

[56]  Kim Decl. II ¶ 83.

[59]  Ex. 17, at 7:25 (April 11, 2023 Hearing Tr.).

[61]  Kim Decl. II ¶ 72.

law firms at different times.[62]  For example, the Johnson firm signed a PSA on March 21,[63] and the Slater, Slater & Schulman firm signed on March 27[64] – all during the pendency of LTL 1.0. Although LTL was a party to the PSAs signed by plaintiff law firms, Mr. Kim testified that ███

███████████████████████████████████████████████████

██████████████████████████████   Mr. Kim described LTL as "*faceless*" in the process of negotiating PSAs.[66]

J&J and LTL publicly announced that they had secured commitments from **claimants themselves** to support the second bankruptcy.  For example, on the day LTL filed the second bankruptcy, J&J issued an 8-K stating that LTL "has secured commitments from over 60,000 current **claimants** to support a global resolution on these terms."[67]  LTL's counsel stated at the First Day Hearing that the second filing is "supported by over **60,000 claimants who have signed and delivered** plan support agreements."[68]  LTL and J&J's litigation counsel was quoted in the press as saying that the re-filing is "currently supported by roughly 70,000 claimants **and** numerous plaintiff law firms."[69]  Mr. Kim testified that LTL had "an agreement with **thousands of claimants.**"[70]

---

[62]  Ex. 2, at 108:19-109:5 (Apr. 18, 2023 Hearing Tr.).

[63]  *Id*. at 107:25-108:23.

[64]  *Id*. at 108:24-109:2.

███████████████████████████████████████████████████

[66]  Ex. 2, at 151:25 (Apr. 18, 2023 Hearing Tr.).

[67]  Ex. 18 (J&J 8-K of April 4, 2023) (emphasis added).

[68]  Ex. 17, at 26:9-10 (April 11, 2023 Hearing Tr.) (emphasis added).

[69]  "J&J Begins 'Audacious' Return to Failed Cancer Settlement Tactic," Bloomberg Law (April 5, 2023) (emphasis added).

[70]  Kim Decl. II ¶ 72 (emphasis added).



Yet the truth is that ***not a single claimant*** has signed a plan support agreement.

Moreover, the evidence shows that the "60,000" figure cited by Debtor is unreliable.  The vast majority of these claims are unfiled cases, many of which have only recently been acquired.  Mr. Watts, for example, testified that he had acquired 16,925 unfiled cases since LTL 1.0 was filed, through advertising and referrals from other firms.[76]

Certain of the settling law firms are strangers to the MDL or other consolidated

---

[76] *Id.* at 25:19-26:3, 130:22-132:15.

litigation and have never filed a talc-related lawsuit against J&J.



Nor did anyone seem to care whether the putative claimant even had the disease recognized by the *Daubert* ruling in the MDL Court.

Mr. Kim testified that he did not know whether the list contained duplications.[84]

Tellingly, Mr. Murdica sought to stack the voting deck by expanding the definition of ovarian cancer to include non-ovarian "gynecological" cancers,[85] resulting in potential inclusion of thousands of claims which could never be proven. Judge Wolfson's *Daubert* decision limited the scientifically supported claims not to "gynecological cancers" generally or even to ovarian cancer generally, but to ***epithelial ovarian*** cases specifically. *See In re Johnson & Johnson Talcum*

---



84    Ex. 2, at 60:16-23 (April 18, 2023 Hearing Tr.).
85    Ex. 21 at 54:14-18 (April 16, 2023 Murdica Dep. Tr.).

*Powder Products Marketing, Sales Practices and Products Litigation,* 509 F. Supp. 3d 116, 181

(D.N.J. Apr. 27, 2020) ("The testimony of Plaintiffs' experts demonstrates that their opinions rest

on good grounds and considered scientific evidence to conclude that the association is specific to

ovarian cancer.  The experts do not opine as to any link between talc use and any other genital

cancer.  Their findings are limited to epithelial ovarian cancer.").



The U.S. Trustee's Office cast doubt on LTL's claimed numbers at the First Day Hearing

on April 11, wondering how these numbers could be accurate based on the U.S. Trustee's

calculations.[87]  "Your Honor, I don't know how the math works out. I really don't. . . . Where are

these claimants coming from and who are these claimants?  Because we just can't reconcile them

with the numbers that we had that we were discussing and that were in front of us in the first case.

And I can't reconcile some of the statements with things that I know about from the *Imerys* case."[88]

---

[87]  Ex. 17, at 103:5-23 (April 11, 2023 Hearing Tr.).

[88]  *Id*. at 102:5-22. LTL also apparently attempted to manipulate the composition of the TCC in LTL 2.0 by deleting, from its submitted list of the top 30 law firms with talc claims, law firms with members who had served on the TCC in LTL 1.0.  LTL added to that list firms with unverified numbers of unfiled claims.  Ex. 13, at 26:5-31:15, 34:24-38:10, 46:17-47:7 (Apr. 14, 2023 Kim Dep. Tr.); Ex. 2 at 43:14-48:18 (April 18, 2023 Hearing Tr.).  At the First Day hearing, the U.S. Trustee's Office called the Court's attention to the Debtor's list of top 30 law firms.  The U.S. Trustee's Office noted that "there is some inconsistency here, Your Honor, in what got put on the top list in the first case and what's even on the 18 list here for the second case."  Ex. 17, at 144:21-23 (April 11, 2023 Hearing Tr.).  "[I] the first case, the top 30, 18 of the 30 firms that were listed in the first case are not part of the top 18 that were listed in the second case. . . . So there were eight firms listed in the top 18 for this case that appear nowhere on the list for the first case. So we are rather confused as to where these names are coming

The U.S. Trustee's Office explained that, in *Imerys*, "thousands if not tens of thousands" of votes

were eventually excluded because of double-counting or other issues.[89]

   In contrast, more than 100 law firms representing ovarian cancer and mesothelioma

claimants oppose J&J's proposal as currently described. Most of these law firms have been active

participants in the federal MDL or state courts for years, have filed talc claims against J&J and its

affiliates, and represent talc claimants with cancer diagnoses that have a scientific link to exposure

to J&J's toxic products. The TCC can confirm that *not a single* law firm that was placed on the

Plaintiffs' Steering Committee in the MDL supports the J&J deal or this bankruptcy case. And

only four (4) law firms identified by LTL in the list of the Top 30 Law Firms that represented talc

claimants filed in the first bankruptcy—Onder Law, Nachawati Law Group, Johnson Law Group,

and Trammell PC—have apparently pledged their allegiance to J&J's plan.

## ARGUMENT

   Under 11 U.S.C. § 1112(b), this Court must dismiss any bankruptcy that is not filed in good

faith. *In re LTL Mgmt., LLC*, 64 F.4th at 99 (citing *15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d

605, 618 (3d Cir. 2009)). As the Third Circuit has explained, a "lack of good faith constitutes

'cause'" under the meaning of § 1112(b), and therefore requires dismissal. *Id*. Moreover, a

bankruptcy petition must both serve a valid bankruptcy purpose which presupposes financial

distress, and it cannot be "filed merely to obtain a tactical litigation advantage." *Id*. at 101. LTL's

filing is not in good faith for three reasons: (1) LTL cannot carry its burden to establish that it is

in financial distress, a threshold and dispositive issue; (2) LTL's attempt to manufacture distress

by fraudulently transferring its prior funding guarantee and stacking the deck with new claimants

---

from. And I think I stated before, they're talking about other factors that they used to create the list. I don't know
what that means." *Id*. at 143:13-24.

[89] Ex. 2 at 37:20-38:12 (April 18, 2023 Hearing Tr.).

cannot form the basis for good faith; and (3) LTL's pre-filing conduct demonstrates a clear desire to use this bankruptcy to obtain a tactical litigation advantage.

### I.      **LTL Cannot Meet Its Burden To Establish It Is In Financial Distress**

The Third Circuit has clearly explained the burden that LTL or any other debtor must bear if it is to seek protection under the bankruptcy system: "Once at issue, the burden to establish good faith is on the debtor." 64 F.4th at 100.  As this Court recognized in its April 20 ruling, the question posed by the Third Circuit is whether "LTL was in financial distress when it filed its Chapter 11 petition," *id*. at 106, which was October 2021 for LTL 1.0 and April 2023 for LTL 2.0.[90]  Critically, however, the question is *not* whether LTL's condition worsened between October 2021 and April 2023—but rather whether LTL can meet its burden to establish that as of April 2023 it was in *immediate* financial distress under the standards set forth by the Third Circuit *for this particular debtor*.

In its opinion, the Third Circuit did much more than just decide that LTL was not in financial distress as of October 2021.  The Third Circuit also undertook a detailed analysis of LTL's financial condition to set the parameters for how to determine that *this* debtor, facing *these* liabilities, is in financial distress.  The Third Circuit looked at the funding "backstop" in place for LTL "when judging its financial condition," as well as the "projections of future liability."  64 F.4th at 107.  The Third Circuit cautioned against using "back-of-the-envelope forecasts," and expressly noted that LTL's litigation successes were also relevant.  *Id*. at 108.

The Third Circuit also considered the immediacy of LTL's proffered distress.  *Id.* at 102.  "The 'attenuated possibility' that talc litigation may require it to file for bankruptcy in the future does not establish its good faith as of its petition date.  At best the filing was premature."  *Id.* at

---

[90] Ex. 1, at 6:21-7:1 (April 20, 2023 Hearing Tr.).

109.  The Third Circuit drew comparisons to other mass tort litigation, such as the Johns Manville case, where the debtor faced true financial distress, including " 'forced liquidation of key business segments.' " *Id.* at 104 (citation omitted).  The Third Circuit opined that further litigation in the tort system would help, not hinder, LTL's reorganization: "the progression of the multidistrict litigation on a separate track would continue to sharpen all interested parties' views of mutually beneficial settlement values." *Id.* at 108.  It noted that in the Dalkon Shield bankruptcy, "the Court and stakeholders had the benefit of data from 15 years of tort litigation by A.H. Robins before its filing." *Id.* at 103 n.13.

LTL has gone to great lengths in this bankruptcy to argue that it is not insolvent even if it is financially distressed, perhaps realizing that the fact of insolvency would create a substantial problem for its corporate parents in defending constructive fraudulent transfer claims.[91]  The Third Circuit did not, however separate financial distress from insolvency in the way LTL implies. Rather, the Third Circuit held that "we cannot ignore that a debtor's balance-sheet insolvency or insufficient cash flows to pay liabilities (or the future likelihood of these issues occurring) are likely always relevant . . . because they pose a problem Chapter 11 is designed to address:  'that the system of individual creditor remedies may be bad for creditors *as a group* when there are *not enough assets* to go around.' "  64 F.4th at 102 (citation omitted) (emphasis in original).  And the Third Circuit applied that standard to LTL specifically by finding that it "was highly solvent with access to cash to meet comfortably its liabilities as they come due for the foreseeable future." *Id.* at 108.  In other words, for the foreseeable future, there was enough to go around.

Under that standard, LTL could not carry its burden in LTL 1.0, and cannot in LTL 2.0. Might the increase in potential claimants—which the TCC does not concede given that many of

---

[91]  Claiming that LTL is not "insolvent" is not a get-out-of-jail-free card. Section 548(a)(1)(B)(ii)'s requirements can be met by showing "unreasonably small capital" or the inability to pay debts as they "mature[]."

these claimants have not yet been vetted and may not have the specific types of cancers that generally lead to significant talc liability—create significant additional liabilities for LTL?  This Court said on April 20, "maybe, maybe not."[92]  Indeed, Mr. Kim testified that the "bona fides" of those largely unfiled claims had not been established and made clear that LTL would never consider paying them without intensive scrutiny and verification.[93]  The Third Circuit found that previous "back-of-the-envelope" calculations were clearly erroneous.  Any rough math based on the 60,000 purported claims would be even worse and cannot meet LTL's burden of proving *immediate* financial distress.

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████   Might that substantial but reduced funding in the 2023 Funding Agreement create significant reduced assets for LTL?  This Court said on April 20, "maybe, maybe not."  However, the question is not whether LTL's financial condition worsened between October 2021 and April 2023.  The question is whether LTL can demonstrate that it cannot meet its liabilities as they come due.  64 F.4th at 108-09.  If LTL can meet its liabilities as they come due, then LTL is not in financial distress.  *Id.*

Yet LTL's ability to meet its debts as they come due, the central question, is not in dispute.  On April 18, LTL admitted that it can meet its liabilities as they come due—in testimony by its

---

92  Ex. 1, at 7:2-7 (April 20, 2023 Hearing Tr.).  LTL's assertion that it has reached agreements with tens of thousands of claimants (Kim Decl. II ¶ 8), if taken at face value, simply proves the Third Circuit's point that the potential for settlement precludes a finding of financial distress warranting bankruptcy.  64 F.4th at 107 (noting "the possibility of meaningful settlement").

93  Ex. 13, at 50:1-51:2 (April 14, 2023 Kim Dep. Tr.).

████████████████████████████████████████████████

████

General Counsel, on questioning from LTL's own lawyer Ms. Brown, in open court, after the TCC

had put LTL's good faith at issue:

> Ms. Brown:  Well, and in terms of the liability, that was the same under funding agreement one -- in terms of whether -- do you have a view on whether or not the liability changed under funding agreement one and funding agreement two?
>
> Mr. Kim:  Well, so the talc liability, so I, yeah I see. The talc liability is enormous. ***We don't have an aggregate number for it***, but it is, you know, huge. I think what I would do is refer to all the testimony I gave in the prior proceeding about the liability and adopt that here. That liability, if anything, has gotten bigger. We know that after a year of being in bankruptcy, we have at least -- I think it almost doubled from what we know from unknown claims. So what I would say is that the liability itself is even much larger than it was when the first bankruptcy was filed.
>
> Ms. Brown:   And how does that liability relate to the value of the funding agreement?
>
> Mr. Kim:  ***Well, at the end of the day, we believe that we have sufficient funds to meet the liability*** except for the -- so we believe we're not insolvent, but we do believe that we are in financial distress because of the magnitude of the liability, the wild and unpredictable verdicts, the cost of the litigation, which is ever increasing.[96]

In this colloquy, Ms. Brown and Mr. Kim went to great lengths to show that LTL's liability is

"huge" and "increasing."  And yet, despite litigating financial distress alone for the last 18 months,

LTL amazingly still had not calculated an aggregate number for its talc liability and decided to

reenter bankruptcy anyway.  This cannot satisfy ***its burden***.  In fact, whether the liabilities are

"huge" is not the test.[97]  Whether the liabilities are "increasing" is not the test.  Whether LTL can

meet "its liabilities as they c[o]me due for the foreseeable future" is the test.  64 F.4th at 108.  And

---

[96]   Ex 2, at 180:4-25 (emphases added) (April 18, 2023 Hearing Tr.).  Mr. Kim also testified in deposition that LTL "has sufficient funds to pay off its debts currently as they come due."  Ex. 13, at 117:14-15 (April 14, 2023 Kim Dep. Tr.).

[97]   Ms. Brown also trumpeted the same $190 billion figure for talc trial costs, Ex. 2, at 254:5 (April 18, 2023 Hearing Tr.), which the Third Circuit specifically cited as meaningless in rejecting this Court's projections as clearly erroneous. LTL simply refuses to accept the Third Circuit's decision.

on that question, Mr. Kim answered that "we have sufficient funds to meet the liability."[98]  Mr. Dickinson testified that, as of April 4, 2023, LTL was "able to meet its liabilities as they came due."[99]

LTL has cash on hand of $15.78 million,[100] and HoldCo has access to an additional $400 million in cash.[101]  LTL owns Royalty A&M,[102] which owns a portfolio of royalty streams deriving from consumer brands and is valued by LTL at approximately $402 million.[103]  HoldCo has ownership interests in various other companies, *id.*, which it values at approximately $30 billion.[104]  LTL's counsel have repeatedly stressed—as part of their argument that the tort system has "failed"—that it faces relatively few trials in the near future.[105]  LTL cannot have it both ways. It has failed to prove ***immediate*** financial distress.

In case there was any doubt, Mr. Gordon's closing on April 18 made clear that LTL has sufficient funding to cover its liabilities:

> Mr. Gordon:  ***The value of the funding agreement is equal to the amount of the liability***. And so in other words, there's just not -- there's not an obligation to pay 60 billion. There was an ***obligation to provide backup support to cover talc liability***.
>
> And the reason I make that point, it goes to just what I've been saying. LTL was of the view that under the first funding agreement it had ***sufficient resources to cover its talc liability. It feels the exact same way under the second funding agreement***. And to suggest that there's been some huge transfer of value out that creates a fraudulent conveyance we believe mischaracterizes the way those agreements work.

---

[98]  Ex. 2, at 180:20-21 (April 18, 2023 Hearing Tr.).

[99]  Ex. 3, at 162.11-162.17 (Apr. 17, 2023 Dickinson Dep. Tr.).

[100] Ex. 15, at 14 (Feb. 2023 MOR).

[101] Kim Decl. II ¶ 28.

[102] *Id*. ¶ 27.

[103] Ex. 15, at 10 (Feb. 2023 MOR).

[104] Ex. 13, at 68:3-6 (April 14, 2023 Kim Dep. Tr.).

[105] Ex. 2, at 251:19-252:2 (April 18, 2023 Hearing Tr.) ("Only six of [the MDL cases] were selected to have expert discovery and start getting ready for trials. And at the time of the bankruptcy, Your Honor, even though the MDL had been in existence for over five years, no cases had gone to trial at all.  And that's not wholly unrepresentative of what things looked like out in the larger state court system where the state court system didn't have any more success, so to speak, Your Honor, with getting cases through jury trials.").

*Value is equal to the liability*. It's not $60 billion. *It's whatever the liability is*. And that hasn't changed. So I did want to clarify that.[106]

Value sufficient to cover liability, having sufficient resources to cover talc liability, having access to backup support to cover liability—that is what the Third Circuit analyzed when it determined that "LTL was well-funded to do this," specifically "manage and defend thousands of talc-related claims."  64 F.4th at 109.  Neither the TCC nor this Court need to determine whether LTL's funding can cover its liabilities in April 2023 as opposed to in October 2021.  *LTL has already provided the Court with the answer*.  It has the funding.  It has "enough assets to go around."  It is not in distress.  That is dispositive and alone requires dismissal.[107]

## II.    LTL's Unsuccessful Attempt to Manufacture Financial Distress Cannot Create a Good Faith Filing

LTL's admissions in open court on April 18 conclusively demonstrate that it is not in financial distress under the standard the Third Circuit set for LTL.  In addition, and in the alternative, LTL's attempts to manufacture financial distress—unsuccessful as they may have been—cannot serve as the basis for a good faith filing.  Rather, they show bad faith.  As such, LTL cannot simply jettison the 2021 Funding Agreement and now (incorrectly) claim financial distress.

The Third Circuit explained that, under the 2021 Funding Agreement, "LTL had the right, *outside of bankruptcy*, to cause J&J and New Consumer, jointly and severally, to pay it cash up to the value of New Consumer as of the petition date (estimated at $61.5 billion) to satisfy any talc-related costs and normal course expenses."  64 F.4th at 106 (emphasis added).  The Third

---

[106] *Id*., at 212:3-18 (emphases added).

[107] Although LTL's admission that it is not in financial distress is dispositive, the TCC further notes that LTL remains a "shell company" with no business operations and no "need to reorganize."  64 F.4th at 109.  The Third Circuit's reasoning remains applicable: "[I]f a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed."  *Id.* at 101 (citation omitted); *see also 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 619 (3d Cir. 2009) (debtor had "no going concerns to preserve—no employees, offices, or business other than the handling of litigation").

Circuit determined that the 2021 Funding Agreement functioned "not unlike an ATM" and provided LTL with a right to at least $61.5 billion in cash with minimal conditions. *Id.* at 106-09.

The Third Circuit held that LTL had a "duty" "to access its payment assets." *Id.* at 107. As fiduciaries, its directors must do so. Yet in a transparent attempt to evade the Third Circuit's ruling, the Debtor breached this duty and surrendered its rights under the 2021 Funding Agreement to more than $61 billion on demand, ***which was available both inside and outside bankruptcy***, and which was guaranteed by J&J, one of the richest companies in the world. J&J moved all consumer business out of JJCI (renamed HoldCo), and LTL entered into the J&J Support Agreement and a new 2023 Funding Agreement under which "J&J's balance sheet was ***not*** available to the Debtor" outside of bankruptcy, and "HoldCo's [formerly New JJCI's] assets … ***no*** longer include the consumer health business."[108]

LTL openly admits that it attempted to manufacture financial distress by surrendering the 2021 Funding Agreement. Mr. Kim testified that the Debtor parted with its most valuable asset so that "its pre-filing financial condition" would be "sufficiently distressed to satisfy the standard established by the Third Circuit."[109] How can parting with a $61.5 billion asset to create a situation that is "sufficiently distressed" ever constitute good faith? How could that ever constitute anything but bad faith?

Notably, the Third Circuit anticipated the Debtor's maneuvering. It warned the Debtor that parting with the 2021 Funding Agreement might constitute a fraudulent conveyance and therefore could not cure the defects in its bankruptcy filing:

> Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is also premature, we note interested parties may seek to "avoid any transfer" made

---

[108] Kim Decl. II ¶ 83 (emphasis added).
[109] *Id.*

> within two years of any bankruptcy filing by a debtor who "receive[s] less
> than a reasonably equivalent value in exchange for such transfer" and
> "became insolvent as a result of [it]." 11 U.S.C. § 548(a). So if the question
> becomes ripe, the next one might be:  Did LTL receive reasonably
> equivalent value in exchange for forgoing its rights under the Funding
> Agreement?

64 F.4th at 109, n. 18.[110]

The Third Circuit did not invite the Debtor to commit fraud—actual or constructive—so
that it could re-file for bankruptcy.  Indeed, the Third Circuit observed that it did not see how the
Debtor could legitimately cure its lack of financial distress: "Our ground for dismissal is LTL's
lack of financial distress. . . . *And we cannot currently see how its lack of financial distress could
be overcome*."  64 F. 4th at 110 (emphasis added).

This Court "must implement *both the letter and spirit* of the mandate, taking into account
the appellate court's opinion and the circumstances it embraces."  *EEOC v. Kronos Inc.*, 694 F.3d
351, 361 (3d Cir. 2012) (emphasis added; internal quotation marks and citation omitted).  The
Court of Appeals has explained that the requirement that a lower court "comply in full with our
mandate has several important purposes," including "preserv[ing] the proper allocation of
authority within the tiered federal court structure set up by Congress and the Constitution" and
"safeguard[ing] stability in the administration of justice, for the orderly functioning of the judiciary
would no doubt crumble if trial judges were free to disregard appellate rulings."  *Id.* at 362
(emphasis added and internal quotation marks omitted).  "Post mandate maneuvering" in the lower
courts "would undermine the authority of appellate courts and create a great deal of uncertainty in

---

[110] In the Court of Appeals, LTL responded to the objection that "some future conveyance may place assets out of
LTL's creditors' reach," by reassuring the Court of Appeals that "for any hypothetical future transfer by LTL,
New JJCI, and J&J, . . . [t]he Bankruptcy Court will always have jurisdiction to protect against fraudulent
conveyances." Ex. 23, at 72, 73.  *See also In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006) (§ 548
"aims to make available to creditors" assets "that are rightfully a part of the bankruptcy estate, even if they have
been transferred away" (citing *In re PWS Holding Corp.*, 303 F.3d 308, 313 (3d. Cir. 2002)).

the judicial process." *United States v. Kennedy*, 682 F.3d 244, 253 (3d Cir. 2012) (internal quotation marks omitted).

In this case, the Third Circuit's Judgment is particularly broad, perhaps anticipating the potential for post-mandate maneuvering. The Judgment specifically provides that this Court is bound ***by the Third Circuit's Opinion in its entirety***, not merely by the specific actions on remand directed by the Court of Appeals. The Judgment provided that "the order of the Bankruptcy Court entered March 2, 2022 is reversed and the case is remanded with the instruction to dismiss Appellee's Chapter 11 petition. The order of the Bankruptcy Court entered March 4, 2022 is vacated as moot. . . . *All of the above in accordance with the Opinion of this Court*."[111] "Where the reviewing court in its mandate prescribes that the court shall proceed in accordance with the opinion of the reviewing court, such pronouncement operates to make the opinion a part of the mandate as completely as though the opinion had been set out at length." *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985) (internal quotation marks omitted). This Court is bound to respect and implement every aspect of the Third Circuit's opinion.

LTL cannot manufacture jurisdiction or financial distress by engaging in fraud. If that were the case, any solvent company seeking to use bankruptcy to enjoin tort claims in litigation could do so by fraudulently transferring its assets on the eve of a bankruptcy filing. Such machinations run afoul of the fundamental principle that "no action of the parties can confer subject-matter jurisdiction upon a federal court." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Efforts to manufacture federal subject-matter jurisdiction are prohibited by statute. 28 U.S.C. §1359. The Third Circuit has rejected any suggestion that "a

---

[111] Ex. 24 (Judgment, Third Circuit Case No. 22-2003, Doc. 151-1) (emphasis added).

debtor could create subject matter [bankruptcy] jurisdiction" by agreement. *In re Combustion Engineering, Inc.*, 391 F.3d 190, 238 (3d Cir. 2004).

LTL seeks to evade the Third Circuit's decision (and footnote 18 in particular) by positing that (i) it ***is not*** insolvent as a result of its surrender of the 2021 Funding Agreement, although (ii) it ***is*** in financial distress due to the (supposedly) illiquid nature of HoldCo's assets. But the Third Circuit noted that LTL bears the burden of demonstrating good faith, 64 F.4th at 100, and a ***unilateral assertion*** of financial distress or illiquidity does not meet that burden. After all, HoldCo owns ***equity interests*** in companies, which are hardly unmarketable assets. Moreover, any supposed illiquidity would be due to J&J's January 2023 transfer of the consumer business away from HoldCo, resulting in the Debtor's lost access to what the Third Circuit described as "Old Consumer's cash-flowing brands and products along with the profits they produced." *Id.* at 106. This transaction, which occurred in early January 2023, while LTL 1.0 was still pending, was not an ordinary course transaction and was undertaken without Bankruptcy Court approval, or indeed any notice to the TCC, the U.S. Trustee, or this Court. Indeed, Thibaut Mongon, head of JJCI/HoldCo was fully aware of the JJCI obligations under the 2021 Funding Agreement, as he testified at the trial on the Motion to Dismiss in LTL 1.0. LTL cannot rely on that improper transfer to establish illiquidity or financial distress.

In addition, LTL ignores its liability for an ***actual*** fraudulent conveyance action under 11 U.S.C. § 548(a)(1)(A), for which insolvency is not an element. *See In re Taylor*, 642 B.R. 912, 921 n.5 (W.D. Ark. 2022) ("The Court need not analyze whether the debtor was actually insolvent on the date of the transfers because proving actual insolvency is not necessary for the trustee to prevail under § 548(a)(1)(A)."); 5 Collier on Bankruptcy ¶ 548.04[1][b][iii] ("[S]ection 548(a)(1)(A) does not require the trustee to show that the debtor was insolvent when the transaction

occurred or that the transaction rendered the debtor insolvent."). The Debtor admits that it attempted to create "financial distress" in an effort to justify its second bankruptcy filing,[112] which shows an evident purpose of hindering, delaying, or defrauding creditors. And there are other remedies available to unwind the fraudulent surrender of the 2021 Funding Agreement, besides the constructive fraudulent conveyance action noted by the Third Circuit in footnote 18 of its opinion.[113]

Nor can LTL show that the 2021 Funding Agreement was "void or voidable" after the Third Circuit's decision. Mr. Gordon flat out admitted that dismissal was a foreseeable event. J&J never refused to make a payment under the 2021 Funding Agreement or ever so much as indicated it would refuse to do so or that it otherwise intended to seek to void the 2021 Funding Agreement. No business person at J&J indicated that it would refuse to do so.[114] Nothing would have prevented J&J from continuing to honor its 2021 Funding Agreement to its subsidiary even if a theoretical risk of frustration of purpose—normally an affirmative defense—existed, especially in light of LTL's repeated assurances to this Court and the Third Circuit that the 2021 Funding Agreement applied outside of bankruptcy. And yet, the day the Third Circuit's decision was issued, LTL's general counsel (a longtime J&J employee who led the defense of the talc litigation) admitted that it was he who was looking for a reason to abandon the funding backstop.[115]

---

[112] Kim Decl. II ¶ 83.

[113] *See AYR Composition, Inc. v. Rosenberg*, 619 A.2d 592, 595-97 (N.J. App. Div. 1993) (transfer of company's sole asset in breach of fiduciary duty constitutes "a fraudulent conveyance as a matter of law" under New Jersey law). In addition, relief is available under the Texas divisive merger statute, Tex. Bus. Orgs. Code Ann. §§ 10.003, 10.901, which cannot be used to "disadvantage" creditors. *Plastronics Socket Partners, Ltd. v. Hwang*, 2022 WL 108948, *3-4 (Fed. Cir. Jan. 12, 2022). The remedy for a violation "would generally be to reallocate all or a portion of the allocated liability to one or more of the surviving entities in the merger or to make some or all of the resulting entities liable for all or a portion of the liabilities of the predecessor debtor corporation." *In re DBMP LLC*, 2021 WL 3552350, at *26 (Bankr. W.D.N.C. Aug. 11, 2021) (citation omitted).

[114] *See supra* n.42 and accompanying text (Dickinson testimony).

[115] Ex. 13, at 74:23-75:10 (Apr. 14, 2023 Kim Dep. Tr.),

Frustration of purpose is merely an affirmative defense to a breach of contract action, *Brenner v. Little Red School House, Ltd*., 274 S.E.2d 206, 209 (N.C. 1981),[116] rather than a basis for deeming a contract "void or voidable." LTL never litigated that affirmative defense. LTL cannot come close to showing the elements of the frustration of purpose defense. "Essentially, there must be an implied condition to the contract that a changed condition would excuse performance; this changed condition causes a failure of consideration or the expected value of performance; and that the changed condition was not reasonably foreseeable." *Faulconer v. Wysong and Miles Co*., 574 S.E.2d 688, 691 (N.C. App. 2002).[117]

***First***, there is no implied condition. Because the 2021 Funding Agreement expressly provided for J&J's funding obligation outside bankruptcy, there cannot be an "implied condition" that funding outside bankruptcy would constitute frustration of purpose. The Supreme Court of North Carolina addressed this issue in *Brenner* when it held that "if the parties have contracted in reference to the allocation of the risk involved in the frustrating event, they may not invoke the doctrine of frustration to escape their obligations." 274 S.E.2d at 211. Here, the 2021 Funding Agreement expressly provides that it applies outside of bankruptcy. There is no valid argument that could have been made by LTL or J&J that dismissal—which placed LTL outside of bankruptcy—was a frustrating event. Moreover, the 2021 Funding Agreement contains an "entire agreement" provision,[118] preventing any implied provision that the 2021 Funding Agreement would be limited to bankruptcy. *See D.S. Simmons, Inc. v. Steel Group, LLC*, 2008 WL 488845, at *3 (E.D.N.C. Feb. 19, 2008) (rejecting frustration of purpose defense because defendant failed

---

[116] The 2021 Funding Agreement is governed by North Carolina law. Ex. 11 § 9 (2021 Funding Agreement).

[117] Although North Carolina law governs the 2021 Funding Agreement, New Jersey law similarly requires a changed condition that is not foreseeable for the frustration of purpose defense to apply. *See, e.g.*, *JB Pool Mgmt., LLC v. Four Seasons at Smithville Homeowners Ass'n, Inc.*, 431 N.J. Super. 233, 245-46 (App. Div. 2013).

[118] Ex. 11 § 11 (2021 Funding Agreement).

to show "that the parties expressly or impliedly agreed that a [specific scenario] would discharge defendant's performance").

**Second**, LTL has failed to show "a failure of the consideration or a practically total destruction of the expected value of the performance." *Brenner*, 274 S.E.2d at 209 (quoting 17 Am. Jur. 2d Contracts § 401 (1964)).  Here, the 2021 Funding Agreement had important functions outside bankruptcy, which LTL and its witnesses touted.  *See also Balogh Associates VII LLC v. Dick's Sporting Goods, Inc.*, 2022 WL 4624827, *17 (M.D.N.C. Sept. 30, 2022) (rejecting defense where subject of contract was not "destroyed").

**Third**, the doctrine of frustration is not a defense if the frustrating event was "reasonably foreseeable." *Brenner*, 274 S.E.2d at 209 ("If the frustrating event was reasonably foreseeable, the doctrine of frustration is ***not a defense***." (emphasis added)); *see also Fairfield Harbour Property Owners Ass'n, Inc. v. Midsouth Golf, LLC*, 715 S.E.2d 273, 284 (N.C. App. 2011) (rejecting frustration of purpose defense: "the doctrine is inapplicable where the frustrating event is reasonably foreseeable").  That principle is dispositive here: LTL's counsel has conceded that dismissal was foreseeable.[119]

Mr. Gordon readily admitted this fact.  At the time the Debtor and its counsel represented that the 2021 Funding Agreement was available outside bankruptcy during LTL 1.0, they knew that prior Texas two-step transactions in North Carolina had been subject to vigorous challenge in court, even though the North Carolina restructurings were less ambitious than what J&J was seeking.  Mr. Gordon explained to this Court:

> And Your Honor may remember this, but I remember it very well. In North Carolina, we were always being criticized in these funding agreements on the basis that what's to stop the [payor] from dividending all its assets up to the parent. And

---

[119] Ex. 2, at 209:20-21 (April 18, 2023 Hearing Tr.) ("I'm not saying that a dismissal was not reasonably foreseeable.").

> one of the big justifications or thinking behind this [2021] funding agreement or
> the J&J support was just to take that issue off the table. And, again, it was to
> facilitate a filing to get parties beyond concerns about fraudulent transfer.[120]

J&J was on notice, at the time it was drawing up the 2021 Funding Agreement, that even less

ambitious transactions had been vigorously challenged in court.[121]  This is why the 2021 Funding

Agreement was drafted to apply outside of bankruptcy and included support from J&J, as Mr.

Gordon explained.

    LTL and J&J had every opportunity to include language in the 2021 Funding Agreement

making it "void or voidable" in the event of dismissal *for any reason* and chose not to do so, which

precludes resort to the doctrine of frustration.  *See Golden Triangle #3, LLC v. RMP-Mallard*

*Pointe, LLC*, No. 19 CVS 13580, 2022 WL 3048320, at * 19 (Sup. Ct. N.C. Aug. 2, 2022).  LTL

and J&J cannot first credibly assert that the 2021 Funding Agreement made over $61 billion

available to LTL from J&J outside of bankruptcy to pay talc claims when they needed to defend

against assertions that the divisive merger was a fraud, and then take the precise opposite position

when they found themselves outside of bankruptcy.

    Mr. Kim's "void or voidable" theory was premised on his personal view that the Third

Circuit decision "changed the law."[122]  But the Third Circuit did not change the law or announce

a new rule.  The Third Circuit made clear that its decision rested on decades of precedent and an

---

[120] *Id*. at 210:16-24.

[121] Unlike J&J, the Aldrich and Murray entities in *Aldrich Pump* were themselves parties to a Texas divisional merger
with Trane Technologies Company LLC, successor by merger to Ingersoll-Rand Company, and Trane U.S. Inc.
*See Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC)*,
Case No. 20-30608, Adv. Proc. No. 20-03041, 2021 WL 3729335, at *1 (Bankr. W.D.N.C. Aug. 23, 2021).
Similarly, the DBMP entity was itself a party to a Texas divisional merger with CertainTeed Corporation.  See
*DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, Case No. 20-30080, Adv.
Proc. No. 20-03004, 2021 WL 3552350, at *1 (Bankr. W.D.N.C. Aug. 11, 2021)).  Neither *Aldrich Pump* nor
*DBMP* involved a separate parent entity like J&J seeking the benefit of a divisional merger to which it was not a
party.

[122] Ex. 13, at 78:14 (April 14, 2023 Kim Dep. Tr.).

application of what bankruptcy law requires.  *See Congoleum Corp. v. Pergament (In re Congoleum Corp.)*, Bankr. No. 03-51524(KCF), Adversary No. 05-06245, 2007 WL 4571086, at *9-11 (Bankr. D.N.J. Dec. 28, 2007) (rejecting argument that the Court's interpretation of the Third Circuit's *Combustion Engineering* decision "frustrated" the purpose of agreements reached between the debtor's and two classes of claimants); *In re SGL Carbon Corp.*, 200 F.3d 154, 164 (3d Cir. 1999).[123]

LTL has suggested that, even though dismissal was reasonably foreseeable, J&J and LTL were surprised by the Third Circuit's rationale.  J&J did not expect dismissal to happen for at least "three years"—*i.e.*, after J&J got the benefit of a three-year litigation stay.[124]  But nothing in the terms or language of the 2021 Funding Agreement imposes conditions or limitations based on the reason that a bankruptcy petition might be dismissed and the reason why LTL finds itself outside of bankruptcy.  And the absence of an anticipated benefit to a single party is insufficient to form the basis of a frustration-of-purpose defense.  For the defense to apply, "the subject of the contract must be destroyed."  *Tucker v. Charter Med. Corp.*, 299 S.E.2d 800, 804 (N.C. App. 1983) (finding the purpose of a commercial lease was not frustrated).  Here, nothing was destroyed.

Moreover, even if the frustration-of-purpose doctrine applied, which it clearly did not, it would not justify the actions LTL took to manufacture financial distress.  The 2021 Funding Agreement was executed as part of the divisive merger.  LTL's right to demand payment from J&J

---

[123] LTL has cited to *Union County Utilities Authority v. Bergen County Utilities Authority*, 995 F. Supp. 506 (D.N.J. 1998), applying New Jersey rather than North Carolina law, but that case does not help LTL.  *Union County* did not actually apply the frustration-of-purpose defense at all – it merely listed that doctrine, along with others, for consideration by state courts.  Further, *Union County* indicated that "parties who contract in highly regulated environments are on notice that the law may change against their interest," *id.* at 517, that "[c]ourts consistently have held that contracts should be construed in ways that preserve the legality and validity of the agreements that the parties have freely entered into," *id.*, and that courts "will have to carefully examine the language of the contract." *Id.*  All of these observations militate strongly against LTL's attempt to invoke frustration of purpose.

[124] Ex. 2, at 209:19-210:5 (Apr. 18, 2023 Hearing Tr. (Gordon Argument)).

and New JJCI for talc liabilities was provided to LTL in consideration for LTL being allocated Old JJCI's talc liabilities. Among the talc liabilities allocated to LTL was the obligation to indemnify J&J and New JJCI. This "integrated transaction"—as LTL has repeatedly called it— was designed to ensure that LTL had the financial capacity sufficient to pay its obligations as they became due in the ordinary course of business.[125] Absent the rights under the 2021 Funding Agreement being allocated to LTL, the divisive merger would have failed for lack of consideration and would have been an obvious fraudulent conveyance.

If the Third Circuit's ruling had the effect of excusing J&J's and New JJCI's performance under the 2021 Funding Agreement, then the divisive merger would also be voided. If LTL could not require payment from J&J or New JJCI for those liabilities, then those liabilities would go back to JJCI. Neither LTL nor J&J could have selectively voided a single aspect of an integrated transaction; they would have been required to unwind the transaction in its entirety.[126]

### III.    LTL's Latest Bankruptcy Filing Displays Other Indicia of Bad Faith

The Third Circuit noted but did not resolve the issue whether the Debtor's first bankruptcy petition was subject to dismissal because it was filed merely to obtain a tactical litigation advantage. 64 F.4th at 110 n.19 ("Because we conclude LTL's petition has no valid bankruptcy purpose, we need not ask whether it was filed 'merely to obtain a tactical litigation advantage.' Yet it is clear LTL's bankruptcy filing aimed to beat back talc litigation in trial courts.") (citation omitted). The Debtor's second petition is similarly accompanied by a sweeping request to stay all litigation against non-debtor J&J and hundreds of other non-debtor defendants. J&J told this Court

---

[125] *See* Ex. 11 at Recital E (2021 Funding Agreement), *cited by In re LTL Mgmt. LLC*, 64 F.4th at 109.

[126] *See, e.g., Moss v. First Premier Bank*, No. 2:13-cv-05438, 2020 WL 5231320 (E.D.N.Y. Sept. 2, 2020) (when multiple documents represent a "single, integrated transaction" the voiding of one voids the other); *Hackel v. FDIC*, 858 F. Supp. 289 (D. Mass. 1994) (holding that when a party repudiates a contract that is part of an integrated transaction, all other agreements that are part of the integrated transaction also become "null and void").

in the first bankruptcy that, unless the preliminary injunction were extended in this manner, "[t]he entire purpose of this case" "would be thwarted."[127]  The second petition is even more clearly filed merely to obtain a tactical litigation advantage and is subject to dismissal on that basis.

Mr. Katyal acknowledged before the Third Circuit that this case would look like a pure litigation ploy absent the 2021 Funding Agreement: "[W]e're not here defending something in the absence of a funding agreement.  If there is no funding agreement, that valid bankruptcy purposes that Judge Kaplan isolated those [for] look very different.  They look like litigation advantages."[128] That statement is squarely applicable to the Debtor's second bankruptcy petition.

Moreover, the shifting identity of the entity contributing to LTL's funding agreements (J&J?  New JJCI?  HoldCo?) underscores the manufactured boundaries of the debtor and the manipulation of those boundaries in an attempt to reap the benefits of bankruptcy for the entire J&J corporate enterprise, without the burdens.  What is driving these sequential bankruptcy filings is not LTL's financial condition—which J&J seeks to manipulate at will—but rather J&J's desire for injunctive relief to protect against responsibility for its own independent tort liability arising from its own separate wrongdoing.  That is the epitome of an attempt to gain an improper litigation advantage.

LTL admits it filed for bankruptcy a second time in order to avoid litigation that would have ensued upon dismissal of the first bankruptcy case,[129] even though the Third Circuit rejected LTL's motion for stay alleging that such litigation would have caused LTL irreparable harm.  LTL filed for bankruptcy 2 hours and 11 minutes after the entry of the dismissal order, without even attempting to see if any of its dire predictions would come to pass.  That is directly contrary to the

---

[127] Doc. 146, Adv. Pro. No. 21-03032, at 51.
[128] Ex. 14, at 74:7-11 (Sept. 19, 2022 Third Circuit Oral Arg. Tr.).
[129] Kim Decl. II ¶¶ 108-110.

Third Circuit's holding that a debtor must show an immediate rather than speculative need for bankruptcy.

LTL argues that adverse verdicts "could make it more difficult for the Debtor to obtain additional support for the proposed plan."[130]   But the Third Circuit took the opposite view, reasoning that additional tort litigation will facilitate reorganization rather than hindering it.   64 F.4th at 103 n.13.

The Debtor contends its filing is warranted in order "to fully, equitably and efficiently resolve" tort claims.[131]   But this argument would eviscerate the "good faith" standard.   Its reasoning could be applied in virtually every case where a debtor faces significant litigation, let alone mass-tort claims.   Under the Debtor's reasoning, tactical litigation advantages would become *justifications* for bankruptcy, rather than indicia of bad-faith filings, as Third Circuit precedent dictates.

In *SGL Carbon Corp.*, for example, the debtor was sued in several antitrust lawsuits, including a class action.   *In re SGL Carbon Corp.*, 200 F.3d 154, 156-57 (3d Cir. 1999).   The debtor filed for bankruptcy and expressed its "hope[] that the [bankruptcy] filing will cause a quicker resolution" of the litigation, compared to the pace of the civil justice system.[132]   The district court found SGL Carbon "has expressed its hope that its Chapter 11 filing will facilitate a speedy and efficient resolution to the pending litigation" in bankruptcy.   *In re SGL Carbon Corp.*, 233 B.R. 285, 290-91 (D. Del. 1999).   The Third Circuit reversed the district court's finding as clearly erroneous and an abuse of discretion, explaining that the debtor acted "merely to obtain tactical

---

[130] Kim Decl. II ¶ 116.
[131] Kim Decl. II ¶ 8.
[132] Appellee's Brief in *SGL Carbon*, 1999 WL 33613444, *24.

litigation advantages," which "is not within the legitimate scope of the bankruptcy laws." 200 F.3d at 165 (internal quotation omitted).

In *15375 Memorial*, the debtor argued that its "valid bankruptcy purpose[]" was "to efficiently and cost effectively resolve and liquidate . . . pending and future claims" and to "allow claimants to obtain the benefit of Debtors' assets on a fair and equitable basis."[133] The bankruptcy court agreed and denied a motion to dismiss, explaining that "[l]itigating these, and other claims, in Bankruptcy Court is the most efficient way to resolve them." 382 B.R. 652, 685 (D. Del. 2008). The Third Circuit reversed, opining that the debtor's claimed efficiencies showed that the bankruptcy was filed as a "litigation tactic." 589 F.3d at 625.

And in *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004)*,* the debtor argued that it filed for bankruptcy to avoid "the costs and delay inherent in litigation."[134] The Third Circuit rejected that argument and described the debtor's strategy as an impermissible "mechanism to orchestrate pending litigation." 384 F.3d at 120 (internal quotation marks and citation omitted). LTL's purported justifications for bankruptcy echo those consistently rejected by the Third Circuit. In fact, LTL's petition bears all the hallmarks of an improper attempt to seek a tactical litigation advantage.

---

[133] Brief of Appellants, *15375 Memorial Corporation and Santa Fe Minerals, Inc.*, 2009 WL 5635433.
[134] Appellee's Brief, *In re Integrated Telecom Express, Inc.*, 2004 WL 5020971.

## <u>CONCLUSION</u>

The TCC respectfully requests that this Court enter an order under 11 U.S.C. § 1112(b)

dismissing LTL's second bankruptcy petition as not filed in good faith.

Dated: April 24, 2023

Respectfully submitted,

**GENOVA BURNS, LLC**


By:/s/   *Daniel M. Stolz*_____
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Proposed Local Counsel to the Official Committee*
*of Talc Claimants*

41