# Exhibit 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | |
| Defendants. | . | Tuesday, April 18, 2023 |
| . . . . . . . . . . . . . . | . | 10:00 a.m. |

TRANSCRIPT OF HEARING ON
MEMORANDUM OF LAW IN SUPPORT OF MOTION BY MOVANT ANTHONY
HERNANDEZ VALADEZ FOR AN ORDER (I) GRANTING RELIEF FROM THE
AUTOMATIC STAY, SECOND AMENDED EX PARTY TEMPORARY RESTRAINING
ORDER, AND ANTICIPATED PRELIMINARY INJUNCTION, AND (II) WAIVING
THE FOURTEEN-DAY STAY UNDER FEDERAL RULE OF BANKRUPTCY
PROCEDURE 400l(a)(3) [DOCKET 7l]; AND DEBTOR'S MOTION FOR AN
ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS
TO CERTAIN ACTIONS AGAINST NON DEBTORS OR (II) PRELIMINARILY
ENJOINING SUCH ACTIONS AND (III) GRANTING A TEMPORARY
RESTRAINING ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY
INJUNCTION [ADVERSARY DOCKET 2]; AND MOTION TO SEAL; AND
SERVICE PROCEDURES MOTION
**BEFORE THE HONORABLE MICHAEL B. KAPLAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                    Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

Case 23-01092-MBK   Doc -4   Filed 04/26/23   Entered 04/26/23 17:35:24   Desc
Exhibit Exh 4 - LTL Transcript 4-18-2023   Page 3 of 16

2

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By:  GREGORY M. GORDON, ESQ.<br>     DAN B. PRIETO, ESQ.<br>     AMANDA S. RUSH, ESQ.<br>2727 North Harwood Street, Suite 500<br>Dallas, TX  75201 |
| | Skadden Arps Slate Meagher &<br>  Flom, LLP<br>By:  ALLISON M. BROWN, ESQ.<br>One Manhattan West<br>New York, NY  10001 |
| Various Talc Personal<br>Injury Claimants: | Watts Guerra LLP<br>By:  MIKAL C. WATTS, ESQ.<br>5726 W. Hausman Road, Suite 119<br>San Antonio, TX  78249 |
| For Ad Hoc Committee<br>of Certain Talc<br>Claimants and Ad Hoc<br>Committee of Creditors: | Genova Burns LLC<br>By:  DANIEL M. STOLZ, ESQ.<br>494 Broad Street<br>Newark, NJ  07102 |
| | Brown Rudnick<br>By:  JEFFREY L. JONAS, ESQ.<br>     DAVID J. MOLTON, ESQ.<br>     MICHAEL WINOGRAD, ESQ.<br>7 Times Square<br>New York, NY  10036 |
| | Otterbourg PC<br>By:  MELANIE CYGANOWSKI, ESQ.<br>230 Park Avenue<br>New York, NY  10169-0075 |
| For Anthony Hernandez<br>Valadez: | Kazan McClain Satterley & Greenwood<br>By:  JOSEPH SATTERLEY, ESQ.<br>55 Harrison St. Suite 400<br>Oakland, CA  94607 |
| For the Office of the<br>United States Trustee: | Office of the United States Trustee<br>By:  LINDA RICHENDERFER, ESQ.<br>     JEFF SPONDER, ESQ.<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801 |

3

APPEARANCES CONT'D:

| | |
|---|---|
| For Various Talc Claimants: | Maune Raichle Hartley Frency & Mudd, LLC<br>By: CLAYTON L. THOMPSON, ESQ.<br>150 West 30th Street, Suite 201<br>New York, NY 10001 |
| | Levy Konigsberg, LLP<br>By: JEROME H. BLOCK, ESQ.<br>MOSHE MAIMON, ESQ.<br>101 Grovers Mill Road, Suite 105<br>Lawrence Township, NJ 08648 |
| | Simon Greenstone Panatier, PC<br>By: LEAH CYLIA KAGAN, ESQ.<br>1201 Elm Street, Suite 3400<br>Dallas, TX 75720 |
| For Claimant Alishia Landrum: | Beasley Allen<br>By: ANDY BIRCHFIELD, ESQ.<br>218 Commerce Street<br>Montgomery, AL 36104 |
| For Arnold & Itkin: | Pachulski Stang Ziehl & Jones LLP<br>By: LAURA DAVIS JONES, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE 19801 |
| For Paul Crouch, individually and on behalf of Estate of Cynthia Lorraine Crouch: | Ruckdeschel Law Firm, LLC<br>By: JONATHAN RUCKDESCHEL, ESQ.<br>8357 Main Street<br>Ellicott City, MD 21043 |
| For the Ad Hoc Committee of Attorney Generals: | Womble Bond Dickinson<br>BY: ERICKA JOHNSON, ESQ.<br>1313 North Market Street<br>Suite 1200<br>Wilmington, DE, US 19801 |

- - - - -

Kim - Cross/Jonas                                88

1  were bound to the PSA that says we're bound to the attached

2  term sheet and there's no term sheet?

3  A    Again, according to Mr. Murdica, all the plaintiffs knew

4  what the terms were.

5  Q    Okay.  So, as early as mid-March, there's PSAs getting

6  signed up and, I guess, maybe they have a term sheet attached

7  and maybe they don't; right?

8  A    Yeah, I don't know exactly what was attached.

9  Q    Okay.  The term sheet is the centerpiece of LTL's Chapter

10 11 plan to go forward and resolve talc claims; correct?

11 A    Well, the terms are the important terms, but some of these

12 terms, as I think I explained to you in my deposition, some of

13 these are just placeholders and some are still subject to

14 negotiation.

15 Q    Sir, the plan -- the term sheet is the centerpiece of the

16 Chapter 11 plan; right?

17 A    No, I would say -- I disagree with that.  I would say some

18 terms are material and the centerpiece, I would say some of the

19 terms in here are not the centerpiece, they're just typical

20 terms that appear in many agreements and that are necessary for

21 a plan.

22 Q    Let's try it this way:  Is the term sheet important in

23 this bankruptcy case?

24 A    I would say most of the terms of that term sheet are

25 important, some terms are more important than others.

Kim - Cross/Jonas                                    89

1  Q    Okay.  Let's take a look at page 5.  At the top of this

2  term sheet, which you were signing people up to during the

3  pendency of the first bankruptcy case, while Ms. Ellis had a

4  court-appointed official, she was the FCR, during that period

5  of time, on paragraph -- on page 5, at the top, (b)(1), "Randi

6  Ellis shall serve as claims administrator of the Talc Trust for

7  purposes of qualifying claimants and allocating proceeds to be

8  distributed amongst all existing and future qualifying

9  claimants.  Ms. Ellis shall utilize and supervise Archer

10 Systems, LLC in the qualification and allocation of talc

11 claims."

12      Do you see that?

13 A    I do see that.

14 Q    And in fact that was in March, at least the first term

15 sheet that was attached to a PSA was in mid-March; right?

16 A    Yes.  Understand, this is a placeholder name that Mr.

17 Murdica put in without really consultation because he thought

18 that this was a -- she would be a good choice.  But, again,

19 this is one of these terms that is not really material and that

20 is subject to a negotiation.

21 Q    Sir, it may not be material to you, but are you aware --

22 give me a second.  I'm not trying to be -- cause a firestorm, I

23 just want to know, are you aware that it is a bankruptcy crime

24 under 18 U.S.C. 152(6) to knowingly and fraudulently give,

25 offer, receive, or attempt to attain any money, property,

Kim - Cross/Jonas                          93

1  money into a fund and then how it gets administered and the

2  administration of that, that's generally left up to the

3  plaintiffs.

4  Q    Well, let's take a look at some board minutes of March

5  16th.

6                       (Crosstalk)

7            MR. JONAS:  May I approach, Your Honor?

8            THE COURT:  You may.

9            THE WITNESS:  Thank you.

10 BY MR. JONAS:

11 Q    Okay, let's just take a quick look -- I hope we're in the

12 home stretch, Mr. Kim -- at what will be, I think, TCC No. 5.

13 This is the debtor's minutes from a board of managers meeting

14 on March 16th, 2023; correct?

15 A    Yes.

16 Q    And you were at this meeting; right?

17 A    I was.

18 Q    And down below, on March 16th, 2023, the board was talking

19 about contingency planning; right?

20 A    Correct.

21 Q    And they talked about seeking approval from the board to

22 file another bankruptcy; right?

23 A    That's one of the things that -- contingencies they were

24 looking at, yes.

25 Q    Yeah.  And another thing you talked about -- turn the page

Kim - Cross/Jonas                                    94

1  over, please, and if you look at the fourth bullet, you talked

2  about gauging whether the future claimants representative would

3  support a further bankruptcy in the contours of a plan; right?

4  A    I see that, yes.

5  Q    Because you thought it was important to get the future

6  claimants representative on board with your new plan; right?

7  A    No, we were not trying to get the future claimants

8  representative on board.  We were having discussions to see

9  what her reaction would be if a new bankruptcy were filed.

10 Q    But let me ask you what I asked you at your deposition.

11 The debtor's board thought it was important to get the FCR on

12 board to support a second bankruptcy and the contours of a

13 plan; isn't that right?

14 A    If that was the question, I mean, the -- well, I think

15 getting on board would be objectionable.  I don't know that we

16 tried getting her on board.  We were trying to determine what

17 the -- what her views were on it.

18 Q    Okay.  Let's look at hopefully the last exhibit, which

19 will be a presentation on March 28th to the board.

20          MR. JONAS:  May I approach, Your Honor?

21          THE COURT:  Yes.

22          MR. JONAS:  TCC Exhibit 6.

23          THE WITNESS:  Thank you.

24                    (Pause)

25 BY MR. JONAS:

Kim - Cross/Jonas                                      95

1  Q    Mr. Kim, I want to show you what's been marked as TCC-6,

2  it's a presentation to the board of managers of LTL on March

3  28th; right?

4  A    It is.

5  Q    And you were at that board meeting too; right?

6  A    I was.

7  Q    And if you go to page 7 of the presentation, it has the

8  Bates number 239, the last digits on the bottom.

9  A    Yes.

10 Q    It says -- the title is "Support of Future Claimants

11 Representative."  Do you see that?

12 A    I see that.

13 Q    And you were having separate discussions about your new

14 plan with the FCR during the old bankruptcy case; right?

15 A    No.  We weren't actually -- at that point, it was just a

16 support for the bankruptcy.  I don't know about she was

17 presented or discussed any plan with her.

18 Q    Sir, the top bullet, it says, "Separate discussions have

19 occurred with FCR."

20      Those discussions were about the yet-to-be-filed new

21 bankruptcy; were they not?

22 A    Yeah, they were about the bankruptcy, not the plan.  In

23 other words, it wasn't -- I don't think at this time we were --

24 we had started -- I think there were talks about starting to

25 talk also about a plan, but at the time we were trying to her

Kim - Cross/Jonas                                          96

1 support just on a new bankruptcy filing.

2 Q    Really?  Okay.

3      And it says here that she -- I guess the good news, she

4 was supportive of a second LTL Chapter 11 case in the event the

5 current case is dismissed; right?

6 A    That's what this says, but, you know, eventually, she

7 decided that she was not going to take a position on the

8 filing.

9 Q    But, sir, I heard what you said, but the last bullet says,

10 "In addition, discussions are ongoing to obtain a plan support

11 agreement from the FCR."

12     Do you see that?

13 A    I do, but this is not the same plan support agreements

14 that we would have signed by the plaintiffs' counsel, this is

15 -- you know, if you look at the form, it would make no sense

16 for her to sign the plan support agreement that we were looking

17 at.  I think discussions were ongoing as to what kind of -- if

18 she would support a plan and what kind of plan she would

19 support.  But, again, nothing happened because she decided that

20 she was not going to take a position on this.

21 Q    But you tried to get her to take a position; did you not,

22 sir?

23 A    Well, we wanted to see if she was supportive of what we

24 were trying to do.

25 Q    Yeah.  And I assume, in connection with getting her to

Kim - Cross/Maimon                          135

1  agreement as Exhibit B," right?

2  A    Correct.

3  Q    So we know, whatever else, is that as of March 21, 2023,

4  the date of this, it says that a term sheet is attached to this

5  agreement as Exhibit B, correct?

6  A    That's what it says, yes.

7  Q    Okay.  Let's take a look at the term sheet, which was

8  Exhibit 4.

9       And if you take a look, the first page has a section

10 called "agreement."  Do you see that?

11 A    Yes.

12 Q    And it lists certain qualifications that the payment terms

13 are contingent on.  Do you see that?

14 A    I see that, yes.

15 Q    Okay.  And then it lists 1, 2, and I'd like to go on to

16 Page 2, the third contingency item.  Do you see that?

17 A    I see that.

18 Q    Within the term sheet that was attached to the PSA dated

19 March 21, 2023, one contingency was, "The futures claims

20 representative agreement that she will not assign more than one

21 third of the trust corpus to qualifying future claims."  That's

22 what it says.

23 A    I do see that.

24 Q    And that was a contingency that was put into the term

25 sheet that Mr. Murdica drafted on your behalf, true?

Kim - Cross/Maimon                    137

 1  wavelength.  The future's claims representative agreement that

 2  she -- Do you see that?

 3  A    Yeah, it's not an agreement by the future claims

 4  representative.  This is a contingency.

 5  Q    Sir, if you could listen to my questions.

 6          MS. BROWN:  Judge, could he just be allowed to

 7  answer, please?

 8          MR. MAIMON:  But he's not listening to my question.

 9          THE WITNESS:  But he said the agreement.

10          THE COURT:  Mr. Kim, I think he's asking you just to

11  read the agreement.

12          THE WITNESS:  Okay.

13          THE COURT:  All right.

14          MR. MAIMON:  The term sheet.

15          THE COURT:  So just read the terms.

16  BY MR. MAIMON:

17  Q    Number 3, "The future claims representatives agreement

18  that she will not assign more than one third of the trust

19  corpus to qualifying future claims."  Did I read that

20  correctly?

21  A    Yes.

22  Q    It refers to the future claims representative as she,

23  correct?

24  A    It does.

25  Q    Because at that point, the only future claims

**WWW.JJCOURT.COM**

                          Kim - Cross/Maimon                    138

1  representative was Randi Ellis, right?

2  A     Yes.

3  Q     And J&J has immediately, upon filing -- or, I'm sorry,

4  withdrawn.

5        LTL, immediately upon filing this bankruptcy, moved for

6  Ms. Ellis to be reappointed as FCR in this bankruptcy, correct?

7  A     We did.

8  Q     Okay.  Now, so we know what that contingency was on

9  Page 2.  Let's go now to Page 5.  This refers to Ms. Ellis by

10 name here, right?

11 A     It does.

12 Q     And it refers to, even if it's a placeholder, first of

13 all, you didn't draft this agreement, did you?

14 A     I did not draft it, no.

15 Q     Okay.  It says, "Randi Ellis shall serve as claims

16 administrator of the talc trust for purposes of qualifying

17 claimants and allocating proceeds to be distributed among all

18 existing and future qualifying claimants."

19      Do you see that?

20 A     I do see that.

21 Q     And so this is talking about somebody whose role it would

22 be to say how much each contingent of the claimant pool was

23 going to get, right?

24 A     I'm not sure what the exact duties would be of the claims

25 administrator.

                          WWW.JJCOURT.COM

Kim - Cross/Maimon                    140

1  be a FCR commit to less than one third of the proceeds going to

2  future representatives and yet be a claims administrator whose

3  duties it was to allocate proceeds to be distributed among all

4  existing and future qualifying claimants?

5          MS. BROWN:  I object, Your Honor.  Lacks Foundation.

6  Calls for speculation.

7          THE COURT:  Sustained.

8  BY MR. MAIMON:

9  Q    Now, when LTL made the motion to have Ms. Ellis appointed

10 as FCR in this case, it did not disclose to the Court that it

11 also put her as a placeholder prospective claims administrator

12 whose responsibilities would be to allocate proceeds to be

13 distributed amongst all existing and future claimants, did it?

14         MS. BROWN:  I object, Your Honor.  That misstates the

15 testimony.  It's also a duplicative questioning of what we had

16 before on this issue.  I'd object to that as well.

17         THE COURT:  Overruled.

18         THE WITNESS:  No.  Because, again, as a placeholder,

19 it did not mean that she was the claims administrator.

20         MR. MAIMON:  move to strike everything after no, Your

21 Honor.

22         THE COURT:  Overruled.

23 BY MR. MAIMON:

24 Q    When LTL moved to have Ms. Ellis appointed futures claims

25 representative in this case, it did not disclose to the Court

Kim - Cross/Maimon                                144

1  A    Yeah.  That's the filing of the case, yes.

2  Q    Well, let's just read what it actually says.  "FCR has

3  agreed to sign and submit a declaration in support of a new

4  Chapter 11 case."  Those are the words, right?

5  A    That's exactly right.  The filing of a new Chapter 11

6  case.

7  Q    Well, it doesn't say "filing."  It says what it says.  Can

8  we agree on that?

9  A    Sure.  Yes, we can.

10  Q    Okay.  And this is phrased in the past tense, that she

11  already has agreed, right?

12  A    Which, yeah, did not turn out to be true.

13  Q    And then -- well, this is what was reported to the board,

14  right?

15  A    Correct.

16  Q    Okay.

17  A    And it was later reported that it was not happening.

18  Q    And then, later it was reported that she was unwilling to

19  sign a declaration, right?

20  A    That she chose not to, yeah, sign a declaration.

21  Q    In addition to a declaration, there's a discussion here

22  about discussions are ongoing to obtain a plan support

23  agreement from the FCR, correct?

24  A    Yes.  Yes, I see that.

25  Q    And the FCR, Ms. Ellis, chose not to execute that as well,

**WWW.JJCOURT.COM**

343

1              **C E R T I F I C A T I O N**

2           We, DIPTI PATEL, TRACEY WILLIAMS, KAREN WATSON, LIESL

3  SPRINGER and TRACY GRIBBEN, court approved transcribers,

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter and to the best of our ability.

7

8  /s/ Dipti Patel

9  DIPTI PATEL

10

11  /s/ Tracey Williams

12  TRACEY WILLIAMS

13

14  /s/ Karen Watson

15  KAREN WATSON

16

17  /s/ Liesl Springer

18  LIESL SPRINGER

19

20  /s/ Tracy Gribben

21  TRACY GRIBBEN

22  J&J COURT TRANSCRIBERS, INC.     DATE:  April 20, 2023

23

24

25

**WWW.JJCOURT.COM**