Levy Konigsberg, LLP
605 Third Avenue, 33rd Floor
New York, New York 10158
(212) 605-6200
*Counsel for Paul Crouch, Individually and as*
*Executor and as Executor Ad Prosequendum of*
*the Estate of Cynthia Lorraine Crouch*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 23-ap-1092-MBK |
| LTL MANAGEMENT LLC, ) | |
| ) | Lead BK Case: 23-12825-MBK |
| Debtor. ) | |

**MOTION TO DISMISS OF PAUL CROUCH, INDIVIDUALY AND AS EXECUTOR *AD PROSEQUENDUM* OF THE ESTATE OF CYNTHIA CROUCH**

Paul Crouch, individually and as executor *as prosequendum* of the Estate of Cynthia Lorraine Crouch, respectfully files the following Motion to Dismiss the petition in this case. As grounds therefore, Mr. Crouch states as follows:

1. In the interests of judicial economy, Mr. Crouch adopts the arguments advanced in the Motion to Dismiss filed by the Official Committee of Talc Claimants (Doc. No. 286-1) and the arguments of the Ad Hoc Group of Mesothelioma Claimants. Mr. Crouch does not restate those cogent and compelling arguments here, but instead highlights additional arguments and evidence that require dismissal of this case.

    **A. LTL's Statements Under Oath In Its Bankruptcy Petitions Are Evidence Of Bad Faith Supporting Dismissal.**

2. There is no dispute that, in the first petition ("LTL1"), the Debtor (as executed by Mr. Kim under penalty of perjury), asserted that it's liabilities were between $1-10 billion and its

assets were, similarly between $1-10 billion. There is no dispute however that LTL's largest asset was its funding agreement with J&J and JJCI that had a value of *at least* $61.5 billion.

> Q Okay. So now, you just told us that on that date, the funding agreement of $61.5 billion was its largest asset. Take a look on Page 4, Number 15, estimated assets.
>
> A Yes.
>
> Q Are you there?
>
> A I do see that.
>
> Q You marked the section that the estimated assets were between 1 billion and $10 billion, and you did so under penalty of perjury, correct?
>
> A I did.

Testimony of John Kim, April 18, 2023 p. 125.7-125.17. There is no way to reconcile these two statements.

3.   Mr. Kim testified before this Court that the most valuable asset to LTL in the current petition is LTL's rights under the 2023 Funding Agreement and related contracts (collectively "FA2"), which have a value of approximately $30 billion.

> Q Great. Today, how much does the debtor have available to it under its funding agreement to satisfy talc claims?
>
> A I think there's a calculation about what the value of -- an internal valuation of the principal assets of Holdco which 25 is around $30 billion, plus the amounts that LTL has through (indiscernible).
>
> Q Well, pick a number. Is it 30, is it 40? I don't know. You're the chief legal officer of the debtor, right? Let me ask you a few questions. You're the chief legal officer of the debtor, right?
>
> A I am.
>
> Q Now, do you understand that these funding agreements, they're the most valuable asset of the debtor, right?
>
> A That's true.

Id. at 62.21-63.9. Nevertheless, like it did in LTL1, the debtor swore in the Petition that its assets were between $1-10 billion. (Dock. 1, LTL2 Petition).

[Image of Petition form showing Estimated assets and Estimated liabilities checkboxes, with $1,000,000,001-$10 billion selected for both, and signature of John K. Kim, Chief Legal Officer, executed on 04/04/2023.]

In short, LTL has now twice filed Petitions with this Court that contain representations regarding the value of LTL's assets that cannot be squared with the testimony of LTL's chief legal officer. These statements in the Petitions which are plainly inconsistent with the evidence constitute bad faith supporting dismissal.

### B. The Court Must Focus On LTL And May Not Speculate About Future Events Or Fill Evidentiary Gaps In Debtor's Case With Assumptions

4. The Debtor in this case is LTL Management ("LTL"). Johnson & Johnson is not a debtor. When this Court evaluates the Debtor's liabilities, only claims against the Estate matter.

As repeatedly argued by Mr. Crouch, J&J's contingent and dubious assertion that J&J is entitled to indemnification from LTL for J&J's own independent non-derivative liability to talc claimants has no legal or factual support under controlling New Jersey law. *See e.g.* Crouch Objection to Preliminary Injunction and Supplemental Objection (Adv. Proc. Dock. 57 and 62). The same is true for any contingent and—definitely uncertain—claims of indemnity liability to any retailers. *Id.* Mr. Crouch incorporates these arguments herein, as well as his Motion for Certification regarding the Court's Preliminary Injunction ruling discussing the alleged retailer indemnity liability of LTL and the Debtor and Court's failure to demonstrate automatic liability for any of the retailer indemnity claims. (Adv. Proc. Dock. 89). The Third Circuit rejected any suggestion that the alleged 1979 indemnity agreement automatically applied to non-debtor J&J's post 1979 conduct and this Court held the 1979 agreement was ambiguous. *See LTL Mgmt., LLC*, 64 F.4th 84, 108 n.16 (3d Cir. 2023) ("For example, it is not obvious LTL must indemnify J&J for the latter's independent, post-1979 conduct.").

5.    Despite Mr. Crouch repeatedly raising this issue and the controlling New Jersey law that governs it, the Debtor consistently and conspicuously ignores it. LTL has not presented facts or evidence to support any assertion that LTL's alleged indemnity liabilities are so automatic and indisputable that bringing a claim against J&J or any of the retailers is, effectively, the same as bringing a claim against the Estate. Nor has the Court addressed this issue under New Jersey law. Rather, in LTL1, the Court held the 1979 Agreement to be ambiguous and then, in the *reverse* of what New Jersey law requires with respect to such claimed indemnity contracts, interpreted the ambiguity in favor of indemnity.

6.    There simply is no dispute that New Jersey law requires specific and explicit language for an indemnity contract to extend to the independent tortious conduct of the alleged

indemnitee and the 1979 Agreement does not contain any such language. *See e.g., Cozzi v. Owens-Corning Fiber Glass Corp.*, 164 A.2d 69 (N.J. Super. 1960); *Mantilla v. NC Mall Assoc.*, 770 A.2d 1144 (NJ 2001). Nor does New Jersey law allow indemnification of conduct that is wanton and reckless. *Johnson & Johnson v. Aetna*, 667 A.2d 1087 (N.J. Super. 1995); *Tyranowski v. Lodi Bd. Of Educ.*, 643 A.2d 1057 (N.J. Super 1994). To date, LTL and the Court have breezed past this controlling New Jersey law.

7. In any analysis of financial distress in this case, *only* LTL's liability can be considered. And LTL admits that, prior to filing this petition, it did not perform any analysis of its liability, in the aggregate or with respect to its ability to fund its talc litigation obligations if it was returned to the tort system for the next year, three years, or more. *See* Crouch Supplemental Objection (Adv. Pro. Dkt. 62). These admissions came from LTL's chief legal officer, John Kim and from LTL's Chief Financial Officer, Richard Dickinson. This abject failure to evaluate or quantify the numerator of any evaluation of financial distress is fatal to LTL's petition. LTL cannot now attempt to backstop its lack of any analysis of the question of financial distress prior to filing the petition with *post hoc* information that was unknown to LTL's Chief Financial Officer and Chief Legal Officer at the time the petition was filed.

8. While the Court has, in *LTL1* and here, focused on the *number* of claims or potential claims against LTL, the Third Circuit's decision in *LTL1* made crystal clear that speculation about events that might cause financial distress in the future if LTL was in the tort system is irrelevant to the question of financial distress. This Court is bound to follow the rulings of the Third Circuit – particularly those regarding this case.

9. The *number* of claims, by itself, is irrelevant to the question of imminent financial distress, because *LTL1* mandates that any claim of imminent financial distress must be supported

with non-speculative evidence. This requires an evaluation, at a minimum, of (a) the likelihood that some (or any) of the newly-discovered claims would result in payment, (b) the likely magnitude of such payment and, equally important, (c) *when* any such payments might need to be made. The number of claims, standing alone, is simply irrelevant.

10. In this regard, LTL's constant refrain about claimants facing years and years of delay in the tort system for claimants to get to a trial date creates a paradox that precludes any reliance upon the purported tens of thousands of newly-discovered, unfiled and un-vetted claims as a basis for claiming imminent financial distress. According to LTL, it would be many years before any of these claims ever was in line for payment in the tort system – not to mention that LTL maintains they all of the claims are worthless anyway because all these cases are specious and its talc products were and are safe. That leaves only the question of costs of defense and unfiled cases don't have costs of defense.

11. For example, Mr. Watts has merely provided a list of names, with no confirmation of any medical diagnoses and no information about J&J talc product exposure. Without such information, it is impossible for any of Mr. Watts' entirely amorphous claims to form any non-speculative basis about imminent financial distress. Sticking with Mr. Watts, not one of his of his approximate 16,000 clients has a case pending in the tort system. Zero. So, LTL is not facing any costs of defense regarding Mr. Watts' alleged 16,000 "claimants" – or any other of the nearly 40,000 unfiled "claimants" it asserts support this regurgitated version of LTL's first failed bankruptcy.

12. Additionally, the Court's ruling in the Preliminary Injunction fundamentally misconstrues the record before the Court – something that must be corrected in the context of the

numerous Motions to Dismiss. In the Memorandum issued on April 27, 2023 (Adv. Pro. Doc. 94), the Court stated:

> [S]ince the first bankruptcy filing, the acknowledged floor for the Debtor's talc liability has increased from $2 billion to $8.9 billion, with questions remaining as to whether this sum would cover the billions claimed due for third-party providers, state regulators, Canadian class actions, and indemnified parties, among others. It is unclear whether this increased floor of debt adds to—or creates—financial distress for this Debtor.

Id. at 18. Respectfully, this is incorrect and directly contrary to the record in this case.

13.    There is no dispute that the $8.9 billion figure comes from the so-called Plan Support Agreements, which J&J negotiated with various lawyers who claim to represent individuals with talc-related personal injury claims. *See e.g.*, Kim Testimony April 18, 2023, p. 65.20-65.24; Kim Declaration, Annex C – Plan Support Agreement (Dock. 4). This figure, however, does not purport to represent *LTL's liability* for talc-related claims. To the contrary, this amount is the express maximum that non-debtors J&J and Holdco have agreed to pay into a trust that channels and discharges not only the liability of LTL, but also the liability of J&J – including J&J's independent non-derivative liability. *See e.g.*, Kim Declaration, p. 2 (Dock. 4)($8.9 billion relates to plan that discharges all present and future claims against "all Debtor-related parties").

14.    Put slightly differently, the Court's statement is wrong on both ends. On the front end, the $8.9 billion is not a *floor*, it is expressly a *ceiling*. And on the back end, it does not refer to *LTL's liability*, it expressly includes all liability of non-debtor J&J to both present and all future victims for its own independent non-derivative negligent, wanton and reckless conduct, and deadly products – and it further includes a demand that all liability of retailers for selling J&J talc products also be channeled and discharged.

15.    The Court's consideration of this $8.9 billion figure in the context of the question of financial distress of LTL also ignores the contractual reality of the FA2. Under FA2, Holdco

7

and J&J both have agreed to fund the $8.9 billion maximum payment. So even if the $8.9 billion maximum payment was relevant to the question of financial distress, the fact that Holdco and J&J must fund the payment means that the $8.9 billion figure – which exists only in bankruptcy - can never create financial distress *for LTL*.

16. This raises another foundational issue glossed over by LTL in its claims about this case and for which the Court's consideration of these issues in the context of the Preliminary Injunction was mistaken and contrary to the factual record. In addition to (a) being a *ceiling* and not being a *floor*, (b) not being *LTL's liability*, and (c) being covered by Holdco and J&J and therefor incapable of creating financial distress, the $8.9 billion "deal" under the Plan Support Agreement expressly *only applies in bankruptcy*.

17. Before LTL's second petition was filed, there was no obligation of LTL, Holdco or J&J to fund $8.9 billion because the obligations of FA2 only apply if there is a trust and only applies if that trust channels and discharges non-debtor Johnson & Johnson's independent non-derivative liability. If this second petition is dismissed—and it should be—there will be no obligation for LTL, Holdco or J&J to fund $8.9 billion because the obligations regarding this so-called $8.9 billion dollar deal disappear if the case does not result in a trust that discharges not only LTL's liabilities, but also non-debtor J&J's independent non-derivative liability.

18. In sum, the Court's conclusion that the "floor" of LTL's liability had increased by over $6.9 billion from the time LTL1's filing in October 2021 through the time of LTL2's filing on April 4, 2023, is not supported by the evidence and cannot be considered when evaluating whether LTL was in financial distress at the time it filed the instant petition.

19. The Court is not free to disregard the sworn admissions of LTL. Rather, as the Third Circuit did in *LTL1*, the Court must take LTL "at its word." This means that the Court must

8

apply and give credit to the admissions of LTL's Chief Legal Officer and CFO that LTL has not calculated either its aggregate liability for talc claims or its ability to fund its liabilities in the tort system for the next year, three years or any time. Nor can LTL now attempt to contradict those damaging admissions with post-hoc proffers of expert opinions or other information not known to LTL at the time this petition was filed.

20. Ultimately, LTL is a prisoner to its own scheme. The Debtor is caught between a rock and a hard place – a predicament it created through its own deliberate, bad faith behavior. LTL admits that to even colorably show good faith under the Third Circuit's decision in *LTL1*, it had to create a claim of immediate financial distress. That's the "rock." Without *evidentiarily-supported* immediate financial distress, *LTL1* mandates dismissal.

21. The "hard place" is that LTL and J&J can't admit that the corporate contortions they orchestrated explicitly to fabricate a claim of immediate financial distress impaired LTL's ability to fund talc litigation compared to its financial position in *LTL1* and that of "Old Consumer" prior to the Texas Two Step that created LTL. If LTL admits that its ability to fund its liabilities has been actually impaired, it would be admitting to a flagrant preferential payment/fraudulent transfer to J&J in rescinding the 2021 Funding Agreement and replacing it with FA2; an agreement reached in secret while LTL was still a debtor in possession in *LTL1* and required to honor its fiduciary obligations to maximize the value of the Estate.[1]

22. LTL's inability to overcome its sworn admissions in this case preclude it from demonstrating immediate financial distress is not the only reason this petition must be dismissed

---

[1] An additional issue here is the fact that LTL's new (and baseless) "frustration of purpose" argument that attempts to impose a secret condition into the unequivocal promise of J&J to honor FA1 inside or outside of bankruptcy is an admission that the Texas Two-Step that created LTL is, itself, a fraudulent transfer because it left LTL without an enforceable funding agreement. LTL and its lawyers' flip-flop on the unconditional nature of J&J's promises under FA1 are, by themselves, irrefutable evidence of bad faith and fraud upon the Court.

for bad faith. Contrary to the doublespeak of LTL since January 30, 2023, the Third Circuit's decision in *LTL1* did not bless J&J's scheme in any way. Rather, the Third Circuit held that the arguments raised by LTL (and largely credited by this Court in denying dismissal) were irrelevant to the question of good faith and did not create "unusual circumstances" to extend the jurisdiction of this Court over the case. That is not a blessing.

23. LTL's sworn admissions, when examined in connection with the Third Circuit's express holding in *LTL1* that speculation about future events cannot form a factual basis for proof of immediate financial distress, mandate dismissal. And LTL and J&J's collusive agreements—while LTL was still the DIP in *LTL1* and owed exclusive fiduciary duties to the Estate and only the Estate are further evidence of objective and subjective bad faith.

24. So too with the set-up of FA2. The entire premise of LTL's petition is dependent upon non-debtor J&J receiving a discharge and permanent channeling injunction for its independent non-derivative liability. Filing a bankruptcy petition that, on its face, is conditioned upon the granting of bankruptcy relief to a non-debtor is bad faith who could never qualify for that relief if it filed its own petition is bad faith.

25. The fact that LTL freely *admits* its entire scheme is dependent upon half-trillion-dollar non-debtor J&J receiving permanent injunctive relief for its own independent, non-derivative liability does not magically transform this abuse of the bankruptcy system into a proper "reorganization" of a good faith debtor. Telling someone you are going to steal their car or punch them in the face doesn't make it legal.

26. Finally, the Debtor's contrived and legally baseless claim of "frustration of purpose" is itself a demonstration of bad faith. FA1 was expressly governed by North Carolina law (p. 13, Section 9), contained an "entire agreement clause" (p. 14, Section 11), and specifically

10

and expressly stated that it applied at any time when there was not bankruptcy proceeding (p. 5 "Permitted Funding Use" sub-section (a)). (Case No. 21-30589, Doc. 5). LTL and its counsel repeatedly represented to this Court and the Third Circuit that this promise was unconditional and applied inside or outside of bankruptcy.

27. Under North Carolina law, in a commercial context, the doctrine of frustration of purpose applies "when the Parties could not reasonably have protected themselves by the terms of the contract against contingencies that later arose." *WRI Raleigh L.P. v. Shaikh*, 644 S.E.2d 245, 254 (2007)(quoting *Brenner v. School House, Ltd.*, 210, 274 S.E.2d 206, 209 (N.C. 1981)). As reflected by the 2023 Funding Agreement and related documents, there can be no dispute that J&J – one of the most wealthy and sophisticated companies in the world, with legions of lawyers from the largest law firms in the world – could "reasonably have protected [itself] by the terms of the contract" against this contingency.

28. A final point regarding LTL's specious "frustration of purpose" argument bears mention. Mr. Kim now swears that, upon entry of the January 30, 2023 decision by the Third Circuit it was immediately apparent to him, to LTL and to J&J and all their lawyers that the Third Circuit's ruling constituted a "frustration of purpose" that rendered FA1 "void or voidable." Despite this allegedly being immediately apparent, LTL never once raised this issue in its petition for en banc review, in its request that the Third Circuit stay the mandate, or in any pleading with this Court prior to LTL – still sitting as the DIP – contractually agreed with J&J to rescind FA1. If there was a risk that the largest asset of LTL, as a debtor in possession, was being threatened by J&J, the largest and most solvent obligor to the Estate, it was incumbent upon LTL as the DIP to bring this to the attention of this Court, the Third Circuit and the creditors – to whom it owed a

fiduciary duty as the DIP. That it did none of these things is conclusive proof of the false and pretextual nature of this specious claim.

29. This Court cannot allow LTL and its lawyers to flip-flop on the foundational issue of the unconditional nature of J&J's commitment to FA1 – a claim made over and over in LTL1 – and never raised with this Court or the Third Circuit prior to the filing of this regurgitated "bankruptcy." Allowing such a fundamental and outrageous flip-flop would undermine the justice system. Parties cannot play fast and loose with the facts and LTL is the Fast And The Furious in this case.

30. As argued by Mr. Crouch with respect to the Preliminary Injunction, the duty of this Court is to call balls and strikes, not to favor any particular outcome (settlement vs. dismissal), not to fix holes in the Debtor's evidence or legal arguments, and most of all, not to flip the burden of proof from the Debtor to the cancer victims. It is the Debtor's burden to prove its case with evidence – not with arguments of counsel, not with speculative claims of unsworn witnesses, not with hypothetical fantasies about what might happen in the future, and not with rank hearsay. The Debtor must meet each and every element necessary to meet its burden. It cannot do so.

31. Instead of holding the Debtor to its burden, in its Preliminary Injunction ruling of April 20th and Memorandum of April 27th, the Court treated ambiguity and gaps in the factual record as a reason to exercise jurisdiction and defer a determination of good faith. The Court expressly noted the incomplete and ambiguous factual record and the questionable nature of this regurgitated scheme by LTL in express coordination with solvent, non-distressed non-debtor J&J—*all while LTL1 was still pending*—and in spite of all this, deferred ruling on good faith and exercise subject matter jurisdiction over this case and the non-debtors. This approach stands the law on its head and is precisely what the Third Circuit found to be an abuse of discretion in *LTL1*.

Case 23-01092-MBK    Doc    Filed 04/28/23    Entered 04/28/23 13:59:16    Desc Main
Document    Page 13 of 13

32. Mr. Crouch urges the Court to hold the Debtor to its burden and to take the Debtor at its word regarding what it has done, what it has not done and what it is trying to do. So doing is mandated by *LTL1* and so doing will result in dismissal.

**WHEREFORE**, Mr. Crouch requests that the Court enter an Order DISMISSING this case with prejudice and, to the extent that the Court declines to do so, Mr. Crouch requests that the Court certify its decision for immediate direct appeal to the Third Circuit Court of Appeals.

Respectfully submitted:

Dated: April 28, 2023

*/s/ Moshe Maimon*
Moshe Maimon (I.D. 042691986)
LEVY KONIGSBERG, LLP
605 Third Avenue, 33rd FL
New York, NY 10158
Tel: (212) 605-6200
Fax: (212) 605-6290
Email: mmaimon@levylaw.com
Attorneys for Talc Claimant
Paul Crouch, Individually and as Executor
and as Executor Ad Prosequendum of the
Estate of Cynthia Lorraine Crouch
and
JONATHAN RUCKDESCHEL
The Ruckdeschel Law Firm, LLC
8357 Main Street
Ellicott City, Maryland 21043
Email: ruck@rucklawfirm.com
Attorneys for Talc Claimant
Paul Crouch, Individually and as Executor
and as Executor Ad Prosequendum of the
Estate of Cynthia Lorraine Crouch
*Admitted Pro Hac Vice