**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**WOMBLE BOND DICKINSON (US) LLP**
Ericka F. Johnson (NJ #032162007)
Lisa Bittle Tancredi (*pro hac vice* pending)
1313 N. Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Email: ericka.johnson@wbd-us.com
Email: lisa.tancredi@wbd-us.com

*Counsel for Ad Hoc Committee of States*

| | |
|---|---|
| In re: | Case No.: 23-12825 (MBK) |
| LTL MANAGEMENT LLC, | Chapter: 11 |
| Debtor.[1] | Hon. Michael B. Kaplan |

**MOTION OF THE AD HOC COMMITTEE OF STATES HOLDING CONSUMER PROTECTION CLAIMS TO DISMISS CHAPTER 11 CASE**

The Ad Hoc Committee of States Holding Consumer Protection Claims (the "Ad Hoc Committee"), by its undersigned counsel Womble Bond Dickinson (US) LLP, pursuant to section §1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), respectfully moves (the "Motion")[2] the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") to dismiss the above-captioned case (the "Chapter 11 Case"), stating the following:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2] Pursuant to Rule 9013-1(a)(3) of the Local Rules of the United States Bankruptcy Court for the District of New Jersey, the Ad Hoc Committee relies on the legal bases set forth in this Motion in lieu of filing a separate memorandum.

**I.**

**PRELIMINARY STATEMENT**

1.      LTL Management LLC's ("LTL" or the "Debtor") desire to resolve mass tort claims, no matter how sincere, is an insufficient justification for its second bankruptcy filing.  The many tools provided by the Bankruptcy Code are available only in limited circumstances where the debtor's financial distress justifies substantively impairing the rights of its creditors.  The law does not allow a company that is not in financial distress to prejudice its creditors and ignore the requirement of financial distress in the name of convenience and efficiency.

2.      The Debtor's bankruptcy case should be dismissed as a bad faith filing.  LTL filed its second bankruptcy case in defiance of the letter and spirit of the Bankruptcy Code and the precedential ruling of the United States Court of Appeals for the Third Circuit (the "Third Circuit"). The Third Circuit mandated that the Debtor's first bankruptcy case be dismissed because the Debtor was not in financial distress.  LTL is still not in financial distress.  To manufacture financial distress, the Debtor allowed its most valuable asset, its funding arrangement with Johnson & Johnson ("J&J") to be terminated.  While the Third Circuit did not want to discourage lawyers from being "inventive" or a debtor's "management from experimenting with novel solutions," the Third Circuit undoubtedly did not mean for its decision to serve as guidance for the deliberate and secretive dissipation of assets by a debtor during bankruptcy in order to manufacture financial distress that is then used to justify a second bankruptcy filing almost immediately after dismissal.  Highlighting its lack of financial distress, the Debtor has also advised the Bankruptcy Court that it is solvent and that it has sufficient funds to pay talc claims.

3.      In addition to the lack of financial distress, the Debtor's conduct evidences bad faith. The termination of its valuable funding agreement was an intentional bad act.  To draw attention away from its prejudicial conduct and cast the second bankruptcy in a favorable light, LTL

2

announced to the world that J&J had agreed to fund a $8.9 billion dollar trust to pay all talc-related

claims, and that more than 60,000 talc claimants had agreed to support the terms of a chapter 11

plan. However, the purported agreement that LTL imagines will resolve talc claims is illusory. LTL

admits that basic terms have not been agreed and are still under discussion. The affected parties, the

claimants, are not signatories to the agreements and have not been provided adequate information as

to the agreements' terms (to the extent that there are any) and how their rights would be affected.

4.      LTL's imagined plan is also not confirmable under the Bankruptcy Code. Among

other things, it would violate the absolute priority rule and the best interest of the creditors test. In

addition, if parties do not consent to the materially unequal treatment proposed under the current

plan support agreements, then the proposed plan cannot be confirmed under Bankruptcy Code

section 1129 because it would unfairly discriminate against certain classes, including holders of

governmental claims. Accordingly, the Debtor being in bankruptcy serves no valid bankruptcy

purpose.

5.      Cause exists to dismiss this bankruptcy case pursuant to Bankruptcy Code section

1112(b). LTL has acted in bad faith. It is not in financial distress. The nature of the purported

"support" for a plan has been misstated. The plan that it would propose is not confirmable under the

Bankruptcy Code. The Debtor's machinations before the Bankruptcy Court are antithetical to the

integrity of the bankruptcy process. LTL filed the second Chapter 11 Case not for any valid

bankruptcy purpose, but instead to gain a litigation advantage over its creditors, to artificially cap its

liability (and J&J's liability), and to create delay while its parent companies move the value of

consumer products assets out of the reach of creditors, by transferring the assets upstream to other

affiliates. For these and other reasons, the Bankruptcy Court should dismiss the Chapter 11 Case.

**II.**
**JURISDICTION AND VENUE**

6.      The Bankruptcy Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157(b)(2) and the *Amended Standing Order of Reference from the United States District Court for the District of New Jersey*, dated September 18, 2012. Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Bankruptcy Court may enter a final order adjudicating this Motion consistent with Article III of the United States Constitution. The statutory basis for the relief requested herein is section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code").

**III.**
**BACKGROUND FACTS**

A.      The Creation of LTL and the First Funding Agreement

7.      In 2021, Johnson & Johnson Consumer Inc. ("Old JJCI") implemented a corporate restructuring accomplished by, in part, a divisional merger under Texas law.  *See Declaration of John K. Kim in Support of First Day Pleadings* filed in *In re LTL Management LLC*, Case No. 21-30589 ("LTL 1.0"), ¶ 16.  On October 12, 2021, at the conclusion of the 2021 restructuring, Old JJCI had ceased to exist and in its stead were two new entities, Johnson & Johnson Consumer Inc. ("New JJCI") and LTL.  New JJCI was the direct parent of the Debtor.  *Id*. at ¶¶ 16-17.  The ultimate parent of New JJCI and the Debtor was, and continues to be, J&J.

8.      The Debtor was formed to manage and defend talc-related claims and to oversee the operation of its subsidiary, Royalty A&M LLC ("Royalty A&M").  *Id.* at ¶ 18.  Royalty A&M owned a portfolio of royalty streams and planned to grow its business by acquiring additional royalty streams and providing third-party financing secured by similar royalty streams.  *Id.*

9.      As of October 12, 2021, New JJCI, the Debtor's parent, manufactured and sold a broad range of products used in baby care, beauty, oral care, wound care and women's health care, as well as over-the-counter pharmaceutical products.  *Id.*

10.      In connection with the 2021 restructuring, the Debtor, New JJCI and J&J entered into an Amended and Restated Funding Agreement dated October 12, 2021 (the "J&J Funding Agreement").  *See* Exhibit 1 attached to the Declaration of Ericka F. Johnson filed herewith ("Ex. 1").

11.      The J&J Funding Agreement contemplated that J&J and New JJCI would be obligated to make payments to the Debtor to fund talc liabilities "at any time" when there was no proceeding under the Bankruptcy Code.  Specifically, the Funding Agreement directly obligated J&J and New JJCI to make payments to the Debtor for the purpose of satisfying, among other things, (a) LTL's ordinary costs and expenses "at any time when there is no proceeding under the Bankruptcy Code" pending with respect to LTL, (b) the costs and expenses of LTL when it was in bankruptcy, (c) talc-related liabilities established by a court of competent jurisdiction "at any time when there is no proceeding under the Bankruptcy Code" pending with respect to LTL, and (d) after the commencement of any bankruptcy proceeding, LTL's talc-related liabilities in connection with a confirmed chapter 11 plan. Ex. 1, J&J Funding Agreement, § 1, Definition of "Permitted Funding Use."

12.      The parties further agreed that any legal proceeding to enforce the Funding Agreement could be brought "at any time there is not a proceeding under the Bankruptcy Code pending" with respect to LTL, in a state or federal court in Charlotte, North Carolina.  Ex. 1, J&J Funding Agreement, § 9.

13.     Two days after the date of the Funding Agreement, the Debtor commenced its first bankruptcy case, LTL 1.0.

14.     During LTL 1.0, representations were made to the Bankruptcy Court and to the Third Circuit confirming that the J&J Funding Agreement gave the Debtor the right, outside of bankruptcy, to cause New JJCI and J&J to fund talc-related liabilities up to the value of New JJCI, subject to a floor of approximately $61.5 billion.  *In re LTL Management, LLC*, 64 F.4th at 96-97.

15.     The J&J Funding Agreement was an extraordinarily valuable asset.  It gave LTL a right to an estimated $61.5 billion of cash that was reliable, likely to grow, and minimally conditional.  *Id*. at 106.

16.     On December 1, 2021, the original TCC, joined by various talc plaintiffs, filed a motion to dismiss LTL 1.0.  LTL 1.0, Docket No. 632.  The Bankruptcy Court conducted a hearing and it denied the requests to dismiss LTL 1.0.  *See In re LTL Management, LLC*, 637 B.R. 396 (Bankr. D.N.J. 2022).  Appeals followed.

B.     The Debtor Represents to the Bankruptcy Court that Sales of Talc Products Have Ceased

17.     Subsequently, the Debtor filed a complaint against the States of New Mexico and Mississippi, commencing Adversary Proceeding No. 22-01231, to enjoin those states from exercising their police and regulatory authority over the Debtor and certain non-Debtor parties (the "State Regulatory Adversary Proceeding").

18.     The relief requested, an injunction of the prosecution of state consumer protection laws in two states, was extraordinary considering the provisions of 11 U.S.C. § 362(b)(4).  In support of its request, the Debtor represented to the Bankruptcy Court that "[l]ike Johnson's Baby Powder, Johnson's Medicated Powder sold in the U.S. and Canada no longer contains talc as of 2020."  *Declaration of John K. Kim in Support of Debtor's Verified Complaint for Injunctive Relief*

*and Related Motion with Respect to the New Mexico and Mississippi State Actions*, State

Regulatory Adversary Proceeding, Docket No. 5, ¶ 21.

19.    In a later paper, the Debtor also asserted that

> as in the case of <u>Takata</u>, **the States' need to protect their citizens is not at issue here because the Talc Products sold in the U.S. and Canada have not contained talc since 2020** and, even before then, were never conclusively shown to be dangerous.

*See Debtor's Reply in Support of Motion for An Order (I) Preliminarily Enjoining the Prosecution*

*of the New Mexico and Mississippi State Actions and (II) Granting a Temporary Restraining Order*

*Pending a Further Hearing*, State Regulatory Adversary Proceeding, Docket No. 24, p. 19

(emphasis added).[3]

20.    In reliance on these representations, among others, the Bankruptcy Court granted

the Debtor's requested preliminary injunction. *See In re LTL Management, LLC*, 645 B.R. 59, 86

(Bankr. D.N.J. 2022) (noting that "the Consumer Protection Defendants have ceased selling

talc-related products in the United States").

---

[3] On May 19, 2020, J&J issued a carefully worded statement that it would "wind down the commercialization of talc-based Johnson's Baby Powder in the U.S. and Canada in the coming month." J&J admitted in the same press release that "existing inventory will continue to be sold through retailers until it runs out." https://www.jnj.com/our-company/johnson-johnson-consumer-health-announces-discontinuation-of-talc-based-johnsons-baby-powder-in-u-s-and-canada (last accessed Apr. 25, 2023). In its 2022 Notice of Annual Meeting and Proxy Statement, J&J's management urged shareholders to vote against a shareholder proposal to discontinue global sales of talc baby powder. https://www.sec.gov/Archives/edgar/data/200406/000020040622000026/a2022jnjproxy.htm. Upon information and belief, on April 28, 2022, shareholders voted against cessation of global sales. On August 11, 2022, in another carefully worded statement, J&J announced that "talc-based JOHNSON'S® Baby Powder will be discontinued globally in 2023." https://www.jnj.com/johnson-johnson-consumer-health-to-transition-global-baby-powder-portfolio-to-cornstarch. (last accessed Apr. 25, 2023).

21.     The Bankruptcy Court stated that "[t]he Court deems any return of talc-based products to the marketplace as being far-fetched and undermined by recent actions – specifically the cessation of selling talc-containing products globally." *Id*.  The Bankruptcy Court cautioned, however, that "this Court would treat the resumption in sales of talc-containing product as a substantial factor in deciding whether to continue or modify the injunction issued by way of this Opinion." *Id*. at 86 n.15.

C.     New JJCI Divests Itself of the Consumer Business

22.     In December of 2022, New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc., a New Jersey Corporation ("Holdco"), and in early January 2023, Holdco transferred its consumer business assets to another related entity.  *See Declaration of John K. Kim In Support of First Day Pleadings* [Docket No. 4] ("Kim First Day Declaration"), ¶ 25.[4]  This transfer was prejudicial to LTL.  As the Third Circuit noted, LTL had the right under the J&J Funding Agreement to cause J&J and New JJCI to pay it cash up to the value of New JJCI, which "value would increase as the value of [New JJCI']s business and assets increased."  *LTL*, 64 F.4th at 106. By stripping the consumer business assets away from New JJCI, LTL (and its creditors) lost a component of the value to which it was entitled under the J&J Funding Agreement.

D.     The Third Circuit Issues Its Ruling and J&J Orchestrates LTL 2.0

23.     On January 30, 2023, the Third Circuit reversed the Bankruptcy Court's order denying the motions to dismiss LTL 1.0.  *LTL*, 64 F.4th at 96-97.

---

[4] On April 24, 2023, J&J announced that "Kenvue Inc. ('Kenvue'), a wholly owned subsidiary of [J&J] comprising its Consumer Health Business, has launched a roadshow for the initial public offering ('IPO') of 151,204,000 shares of its common stock. . . . After the completion of the IPO, [J&J] will own 1,716,160,000 shares of Kenvue's common stock. . ."
https://www.jnj.com/johnson-johnson-announces-launch-of-kenvue-inc-ipo-roadshow

24.     On February 16, 2023, J&J filed its 10-K Annual Report for the period ending January 1, 2023, with the United States Securities and Exchange Commission. https://johnsonandjohnson.gcs-web.com/static-files/06bc3388-603b-4768-bf95-e6d43fda9fd3.   In its Annual Report, J&J disclosed that as of January 1, 2023, there were approximately 40,300 plaintiffs with direct claims in pending lawsuits regarding injuries allegedly due to talc. *Id*., p. 84 n.19.

25.     The Debtor filed motions for a rehearing and to stay the issuance of the mandate pending appeal, both of which were denied by the Third Circuit on March 22, 2023 and March 31, 2023, respectively.  The Third Circuit issued the mandate on March 31, 2023.

26.     The Bankruptcy Court dismissed LTL 1.0 on April 4, 2023.

27.     Less than two and a half hours later, the Debtor filed a second petition, commencing LTL 2.0.

28.     Sometime between the announcement of the Third Circuit's January 30, 2023 decision and the filing of LTL 2.0:

a.     The Debtor, J&J, Holdco, and counsel for certain talc claimants entered into "Plan Support Agreements" ("Attorney Plan Support Agreements") pursuant to which all present and future talc claims (personal injury and governmental entity claims) would be resolved for an amount not to exceed the present value of $8.9 billion dollars.  A specimen copy of an Attorney Plan Support Agreement (which was attached to the Kim First Day Declaration) is attached as Exhibit 2 to the Declaration of Ericka F. Johnson ("Ex. 2").

b.     The Debtor, J&J and Holdco (as successor to New JJCI) terminated the J&J Funding Agreement pursuant to a Termination and Substitution Agreement dated April 4, 2023.

    c.      The Debtor and Holdco entered into a new Funding Agreement ("Holdco Funding Agreement").  By this time, however, the value of Holdco had been substantially reduced as a result of the divestiture of the consumer business.

    d.      J&J and Holdco entered into a Support Agreement ("J&J Support Agreement").

29.      On April 4, 2023, J&J issued a press release, which was made part of an 8-K filed with the United States Securities and Exchange Commission, in which J&J stated that "LTL has secured commitments from over 60,000 current claimants to support a global resolution on these terms."      https://www.sec.gov/Archives/edgar/data/200406/000020040623000037/a44238-kexhibit991.htm.

30.      The Attorney Plan Support Agreements executed by attorneys "on behalf of talc-related personal injury claimants" require the "Parties" to "do all things reasonably necessary and appropriate in furtherance of confirming the Chapter 11 Plan in accordance with this Agreement including, as applicable, voting in favor of the Chapter 11 Plan . . . and opting into any consensual releases thereunder."  Ex. 2, Attorney Plan Support Agreement, p. 1 and § 2.01(a)(iv)(B).

31.      The attorneys executing the Attorney Plan Support Agreements indicate that they each represent, in some cases, thousands of individual talc claimants.  Mr. Watts, during the portion of his video deposition played in the hearing before the Bankruptcy Court on April 18, 2023, acknowledged that his clients were not individually consulted concerning the Attorney Plan Support Agreements prior to counsel's execution of the same.

32.      The Ad Hoc Committee was not consulted about the Attorney Plan Support Agreements before LTL 2.0 was filed.  It appears that no governmental entity was consulted.  None of the Debtor's publicly filed papers addressed how governmental entities would be treated;

critically, the "Term Sheet" referenced in the Attorney Plan Support Agreements was omitted from the public filings.

### IV.
### ARGUMENT

A.    <u>Financial Distress is Essential to the Good Faith Analysis</u>

33.    A Chapter 11 debtor may not enjoy the rights and privileges of bankruptcy unless it has filed its bankruptcy petition in good faith.  *LTL*, 64 F.4th at 103 (good faith is necessary in light of bankruptcy's disruption of creditors' claims against the debtor).  "[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons ... available only to those debtors and creditors with 'clean hands.'"  *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1072 (5th Cir.1986).

34.    In short, a debtor must <u>need</u> to use the tools afforded under Chapter 11, not merely <u>want</u> to use them.  *See In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999).  "The theme is clear: absent financial distress, there is no reason for Chapter 11 and no valid bankruptcy purpose." *LTL*, 64 F.4th at 101.  "[A]bsent financial distress, the debtor's desire to benefit from certain Code provisions . . . could not justify its presence in bankruptcy").  *Id*., citing *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.* (*Integrated Telecom Express, Inc.*) 384 F.3d 108, 126-129 (3d Cir. 2004).

35.    The Third Circuit provides examples of the types of financial difficulties that may justify a Chapter 11 filing, including the absence of available financing, managerial difficulties, loss of customers concerned about mass tort claims and tightening of credit terms due to a perceived change in a company's credit risk.  *LTL*, 64 F.4th at 102.  While the list was non-exhaustive, none of the examples, or anything similar, apply here.  Indeed, the Debtor, a shell company, has no operations, customers, managers, or third-party lenders of its own.

36.     The Third Circuit was crystal clear that certain purported justifications for filing a Chapter 11 case do not pass good faith muster in the absence of financial distress, such as protecting against plaintiff's "excessive" demands (*id.* at 101); achieving an expeditious resolution of claims (*id.*), capping claims (*id.*), or foreclosing an "attenuated possibility" that litigation might require a filing in the future (*id.* at 109).  Just as these reasons were insufficient to demonstrate good faith in LTL 1.0, they are equally insufficient to demonstrate good faith in LTL 2.0.  Indeed, they are even more deficient given LTL's financial maneuverings that were designed to reduce and cap its parents' liabilities while diminishing LTL's assets available to creditors.

37.     Once good faith is at issue, the debtor bears the burden to establish that it filed its petition in good faith.  *LTL*, 64 F.4th at 100.

38.     Determining whether a petition for Chapter 11 was filed in good faith is a fact-specific undertaking that considers all the circumstances of the bankruptcy filing.  *In re SGL Carbon*, 200 F.3d at 162.  Relevant inquiries include whether the petition was filed to obtain a tactical litigation advantage or to "orchestrate" litigation, whether there was any improper prepetition conduct, concealment or evasion, the presence of subjective bad faith, the timing of the filing, and whether there was an intent to abuse the judicial process.  *SGL* at 165 (citing numerous cases).

B.     The Debtor Is Not In Financial Distress

39.     In its zeal to cap the amount payable to talc claimants, the Debtor has unequivocally taken the position that the funding currently available to it, under the Holdco Funding Agreement, is sufficient to meet all its talc liability.  According to Mr. Kim, LTL has enough funds to pay all talc claimants.  Specifically, Mr. Kim testified on April 18, 2022, that "at the end of the day, we believe that we have sufficient funds to meet the liability except for the – so we believe we're not

insolvent . . ." *See* Exhibit 3 attached to the Declaration of Ericka F. Johnson filed herewith ("Ex. 3, April 18, 2023 Hearing Tr.") at 180:20-22.

40.     It is not enough for a debtor to be in financial distress; the Third Circuit has held that the financial distress must be "immediate enough to justify a filing." *LTL*, 64 F.4th at 102. There was no such immediacy here.  Mr. Dickinson, LTL's Chief Financial Officer testified that LTL was "able to meet its liabilities as they came due" on both April 3, 2023, and on April 4, 2023 (after the April 4 restructuring).  *See* Exhibit 4 attached to the Declaration of Ericka F. Johnson filed herewith ("Ex. 4, Apr. 17 2023 Dickinson Dep. Tr.") at 162:11-17.  The Debtor's Chief Financial Officer also testified that he was not aware of any evaluation having been conducted to project the cash flow that would be needed to meet LTL's talc liability in the tort system over the next twelve months.  Ex. 4, Apr. 17, 2023 Dickinson Dep. Tr. at 162:21 – 163:5.

41.     It is the Debtor's burden to demonstrate that it is in financial distress immediate enough to justify a filing.  This the Debtor will be unable to do.

C.     LTL Has Abused the Bankruptcy Code and the Third Circuit's Mandate

42.     The Third Circuit has instructed that a "trial court implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985).  When a mandate prescribes that the lower court shall proceed in accordance with the reviewing court's opinion, the opinion becomes "a part of the mandate as completely as though the opinion had been set out at length." *Id*. at 950 (quoting *Noel v. United Aircraft Corp.*, 359 F.2d 671, 674 (3d Cir. 1966)).

43.     The Third Circuit anticipated that the Debtor might attempt to part with the J&J Funding Agreement.

> Some might read our logic to suggest LTL need only part with its funding backstop to render itself fit for a renewed filing. While this question is also premature, we note interested parties may seek to 'avoid any transfer' made within two years of any bankruptcy filing by a debtor who 'receive[s] less than a reasonably equivalent value in exchange for such transfer' and 'become insolvent as a result of [it].' 11 U.S.C. § 548(a). So if the question becomes ripe, the next one might be:  Did LTL receive reasonably equivalent value in exchange for foregoing its rights under the Funding Agreement?

*LTL*, 64 F.4th at 109 n.18.  While it contemplated that the Debtor might attempt such a maneuver, the Third Circuit also opined that "we cannot currently see how [LTL's] lack of financial distress could be overcome." *Id*. at 110.

44.    In response to footnote 18, the Debtor contends that the termination of the J&J Funding Agreement is not avoidable as a fraudulent transfer because it did not render the Debtor insolvent.[5]  The Bankruptcy Court need not entertain that argument, however, because of the circumstances of the termination of the J&J Funding Agreement, the Debtor's highly valuable asset.  If the transfer was made with "actual intent to hinder, delay, or defraud" creditors, then insolvency is not a required element to avoiding the transfer.  *See* 11 U.S.C. § 548(a)(1)(A).

45.    According to Mr. Kim, confidential discussions between LTL and J&J concerning termination of the J&J Funding Agreement began right after the Third Circuit rendered its decision at the end of January 2023 while LTL was still a debtor in possession.  Ex. 3, April 18, 2023 Hearing Tr. at 81:3 - 82:4.  Lawyers for J&J and LTL decided among themselves that the J&J

---

[5]  Whether the termination of the J&J Funding Agreement may be avoided is a matter of importance to LTL's creditors and should be a matter of importance to the Debtor.  Yet, the Debtor has shown no interest in challenging the transfer.  The Debtor is instead content with a much reduced and indirect funding arrangement, in contradiction to its simultaneous contention that it is in financial distress.  Because the Debtor is in bankruptcy, at present it is the only party with standing to pursue avoidance of the transaction as a fraudulent conveyance.  Outside of bankruptcy, creditors would have standing to pursue avoidance of the J&J Funding Agreement termination, without having to seek court approval to do so.  Every state has fraudulent conveyance statutes, and non-bankruptcy courts are also well-suited to adjudicating such avoidance actions.

Funding Agreement was "void or voidable," but they agreed that it should stay in place until the

bankruptcy case was dismissed, so that LTL would not be "bare." Ex. 3, April 18, 2023 Hearing

Tr. at 78:23 – 80:3.

46.     Publicly, the Debtor gave no hint that the J&J Funding Agreement was in jeopardy.

It reported to the Bankruptcy Court, on March 21, 2023, in its last Monthly Operating Report, that

> The Debtor is party to a funding agreement (the "**Funding Agreement**") with
> Johnson & Johnson Consumer Inc. ("**New JJCI**") and Johnson & Johnson (together
> with New JJCI, the "**Payors**"). A copy of the Funding Agreement is attached as
> Annex 2 to the Declaration of John K. Kim in Support of First Day Pleadings [Dkt.
> 5] (the "**First Day Declaration**"). Among other things, the Funding Agreement
> obligates the Payors, on a joint and several basis, to provide funding, up to the full
> value of New JJCI, to pay for costs and expenses of the Debtor incurred in the
> normal course of its business during the pendency of any chapter 11 case, including
> the costs of administering the chapter 11 case. The terms of the Funding Agreement
> are described in detail in the First Day Declaration. The Funding Agreement
> imposes no repayment obligation on the Debtor. . .

*Monthly Operating Report for the Reporting Period Ended 02/28/2023*, Case No. 21-30589 MBK,

Docket No. 3886 (bold in original).

47.     LTL did not consult with estate fiduciaries, such as the TCC or the Office of the

United States Trustee, about termination of the J&J Funding Agreement. Ex. 3, April 18, 2023

Hearing Tr. at 82:5 – 8. Nor did LTL raise the issue with the Third Circuit in its motion for a

rehearing. The Debtor was apparently unconcerned about the Third Circuit's view that LTL had

a duty to access its payment assets. *See LTL*, 64 F.4th at 107 ("The assumption seems to be that,

out of concern for its affiliates, LTL may avoid drawing on the payment right to its full amount.

But this is unsupported and disregards the duty of LTL to access its payment assets.").

48.     LTL could not simply terminate the J&J Funding Agreement. It had to create an

excuse. LTL fastened upon the doctrine of "frustration of purpose." The J&J Funding Agreement,

by its terms, is governed by North Carolina law. Under North Carolina law, frustration of purpose

15

applies when a supervening event or changed conditions may excuse performance, because there exists an implied condition in the contract that performance would be excused if the event occurred. *Brenner v. Little Red Schoolhouse, Ltd*., 302 N.C. 207, 211 (1981); *Faulconer v. Wyson and Miles Co*., 155 N.D. App. 598, 601 (N.C. App. 2002). However, for the doctrine to apply, the changed condition cannot have been reasonably foreseeable. *Brenner* at 211; *Faulconer* at 602. Further, if the parties allocated risk in the contract in reference to the frustrating event, then the contract may not be rescinded under the doctrine. *Brenner* at 211; *Faulconer* at 602.

49.    Frustration of purpose has no application to the J&J Funding Agreement and the Third Circuit's decision. There was no implied condition that LTL be in bankruptcy. The only conditions to J&J's payment obligations were set forth in Section 2(d) of the J&J Funding Agreement, and they required that LTL's representations and warranties in Section 3(b) be true and correct "without regard to the impact of any Bankruptcy Case." *See* Ex. 1, J&J Funding Agreement. Indeed, the J&J Funding Agreement articulated the parties' rights *outside* of bankruptcy.

50.    The changed condition (dismissal of the bankruptcy case) was reasonably foreseeable – prior divisive merger bankruptcy cases had been challenged, and the "Texas Two Step" was and continues to be the subject of debate. *See, e.g., In re Aldrich Pump LLC,* Case No. 20-30608 (JCW); 2021 WL 3729335 (Bankr. W.D.N.C. August 23, 2021) (noting that opposition to preliminary injunction sought, in essence, dismissal of bankruptcy case); *In re Bestwall LLC*, 605 B.R. 43 (Bankr. W.D.N.C. 2019) (denying motion to dismiss). The parties expressly allocated their risks if LTL 1.0 were dismissed. Finally, counsel for LTL articulated to the Bankruptcy Court and to the Third Circuit that the J&J Funding Agreement applied if there was no bankruptcy case.

51.     LTL's decision to terminate the J&J Funding Agreement, without attempting to enforce it, without waiting for J&J to assert it was void, without consulting with estate fiduciaries, without seeking judicial interpretation, and in contravention of the Third Circuit's opinion, was a fraudulent conveyance, was in bad faith, and taints the filing of the second bankruptcy case.

52.     Termination of the J&J Funding Agreement transferred value directly from the Debtor (and its creditors) to J&J and an affiliated entity.  The transfer is not "cured" by the Attorney Plan Support Agreements, no matter how many claimants the attorneys represent or how many claimants arguably are, as a matter of law, bound by their attorneys' signatures.  "To be filed in good faith, a petition must do more than merely invoke some distributional mechanism in the Bankruptcy Code.  It must seek to create or preserve some value that would otherwise be lost – not merely distributed to a different stakeholder – outside of bankruptcy.  This threshold inquiry is particularly sensitive where, as here, the petition seeks to distribute value directly from a creditor to a company's shareholders." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 129 (3d Cir. 2004).

53.     A debtor may be denied relief under the Bankruptcy Code where it has "abused the provisions, purpose, or spirit of bankruptcy law." *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) (affirming dismissal of chapter 7 case for bad faith where debtor accrued substantial debt just prior to filing).  Although a debtor may adhere to the letter of the law, its case may be dismissed where it fails to comply with the spirit of the law. *Matter of Northwest Place, Ltd.*, 73 B.R. 978, 982 (Bankr. N.D. Ga. 1987) (dismissing Chapter 11 case).

54.     LTL has defied the letter and spirit of the Bankruptcy Code and the Third Circuit's mandate, and its case should be dismissed.

D.      The Debtor Cannot Show A Likelihood of Success

55.      A case may be dismissed where there is no reasonable likelihood that a plan will be
confirmed within a reasonable time.  11 U.S.C. § 1112(b).  The Ad Hoc Committee was not
consulted in connection with the Attorney Plan Support Agreements or the accompanying term
sheet which, as presented to the Bankruptcy Court on April 18, 2023, would confine governmental
entities to their own class, subject to a $400 million cap.  It is also unclear which "governmental
entities" the Debtor would include in this class.  The Ad Hoc Committee respectfully states that
$400 million is woefully inadequate to satisfy governmental entities' talc-related claims.

56.      In order to be confirmed over the rejection of a dissenting class, a plan must be fair
and equitable.  11 U.S.C. § 1129(b)(1).  With respect to a dissenting class of unsecured claims,
"fair and equitable" means that (i) the plan must provide each holder with property of a value, as
of the effective date, equal to the allowed amount of the claim, or (ii) no holder of any claim or
interest junior to the claims of the dissenting class may receive or retain any property on account
of such claim or interest.  11 U.S.C. § 1129(b)(2)(B).  *See Bank of America Nat. Trust and Sav.
Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 458, 119 S.Ct. 1411, 1424 (1999)
("plans providing junior interest holders with exclusive opportunities free from competition and
without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)"); *In re
Armstrong World Industries, Inc*., 432 F.3d 507, 516 (3d Cir. 2005) (a plan in which equity holders
received warrants and creditors were not paid in full was in violation of the absolute priority rule).
Unless the governmental entities are paid in full, Holdco may not retain ownership of LTL.  *See*
11 U.S.C. § 1129(b)(2)(B)(ii).

57.      A plan may also not discriminate unfairly against a rejecting class.  11 U.S.C. §
1129(b)(1).  The prohibition against unfair discrimination ensures that a dissenting class "will

receive relative value equal to the value given to all other similarly situated classes." *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (quoting *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)).

58.     The Third Circuit articulated the unfair discrimination standard in the recent case of *In re Tribune Company*, 972 F.3d 228 (3d Cir. 2020).  First, the Bankruptcy Court must compare the treatment afforded to an unsecured class that votes to reject a plan to the treatment afforded to other unsecured classes.  *Tribune* at 244.  If there is a difference that results in the dissenting class receiving either a materially lower percentage of recovery or bearing a materially greater risk, a rebuttable presumption of unfair discrimination exists.  *Id*.  A plan based on the Attorney Plan Support Agreements, as understood by the Ad Hoc Committee, is not likely to be confirmed.  Such a plan would discriminate unfairly against the governmental entities by affording them materially lesser recoveries than other unsecured creditors, in violation of section 1129(b)(1).

59.     The plan would also fail to satisfy the best interest of creditors test of section 1129(a)(7).  Reinstatement of the J&J Funding Agreement through an avoidance action pursued by a chapter 7 trustee would augment the value available to creditors by more than $50 billion over the $8.9 billion contemplated by the plan.  The third-party releases contemplated by the Debtor present another obstacle to confirmation.

60.     The defects in the plan roughly described in the Attorney Plan Support Agreements cannot be overcome by creditor voting results.  Indeed, such a plan should not even be solicited under applicable law.  A disclosure statement describing a plan that cannot be confirmed must be denied, regardless of the extent of disclosure it contains.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012).  The purpose behind this rule is common sense: courts will not permit a bankruptcy estate to incur the costs of soliciting votes for a plan that — even if unanimously

accepted by creditors — could never be confirmed.  *See, e.g., In re Main Street AC, Inc.*, 234 B.R.

771, 775 (Bankr. N.D. Cal. 1999); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on

the face of the plan, the plan could not be confirmed, then the court will not subject the estate to

the expense of soliciting votes and seeking confirmation.").

E.      The Consequences of Accrual of Additional Talc Liabilities After 2020

61.      Mr. Kim testified at the April 18, 2023 hearing that the Debtor's talc liabilities have

increased over the last year.  Ex. 3, Apr. 18, 2023 Hearing Tr. at 180:13.  The alleged increase in

the number of claimants does not create the financial distress necessary to seek refuge in the

Bankruptcy Code.  As the Third Circuit stated, "courts must always weigh not just the scope of

the liabilities the debtor faces, but also the capacity it has to meet them."  *LTL*, 64 F.4th at 104.

Here, the evidence demonstrates and LTL states that it is not insolvent.  The evidence further

demonstrates that LTL has allowed the dissipation of its assets without objection or challenge and

that it still believes it is able to satisfy all liabilities.  Such actions and admissions do not reflect a

debtor facing financial distress comparable to Johns-Mansville in its chapter 11 case (where its

mass tort liabilities would have caused it to liquidate key business segments) or A.H. Robins

(which had such a dismal financial picture that no bank was willing to lend it money).  *Id.*

62.      Moreover, the Third Circuit cautioned against use of back-of-the-envelope

calculations to justify finding financial distress.  *Id.* at 107 (refusing to accept on the existing record

the conclusion that talc liabilities exceed LTL's ability to satisfy them).  Other than a deliberate

dissipation of assets, LTL's financial outlook did not change from LTL 1.0 to LTL 2.0.  The Third

Circuit specifically found that in five years of litigation, the aggregate talc-related costs were $4.5

billion and that while talc litigation had surged, J&J (a sophisticated company able to produce

reliable projections) in October 2021 still "valued the probable and reasonably estimable

contingent loss for its products liability litigation, including for talc, under GAAP, at $2.4 billion

for the next two years." *Id.* at 108. With these liabilities, the Third Circuit concluded, LTL was

"highly solvent." *Id.* LTL contends that it is still solvent. As far as additional liability is

concerned, LTL represented to the Bankruptcy Court that "the Talc Products have not been sold

in the U.S. or Canada since 2020." J&J made its financial projection of future talc liability totaling

$2.4 billion for 2022 and 2023 in October 2021. With the alleged cessation of sales in 2020, the

Debtor's liability cannot have so dramatically increased to now place it in imminent financial

distress. Good faith requires more than an "'attenuated possibility' that talc litigation may require"

a bankruptcy filing in the future. *Id.* at 109.

## V.
## ADOPTION OF MOTION TO DISMISS FILED
## BY OFFICIAL COMMITTEE OF TALC CLAIMANTS

63.     The Ad Hoc Committee adopts and incorporates by reference the Motion to

Dismiss filed by the Official Committee of Talc Claimants [Docket No. 286].

## VI.
## CONCLUSION

64.     On the heels of dismissal of its first bankruptcy case, LTL filed a second case after

orchestrating transactions to manufacture financial distress and garner perceived support for a plan

capping funding at $8.9 billion, more than $50 billion less than what was available in LTL 1.0. The

many protections and advantages afforded an honest, but unfortunate debtor must be balanced

against the significant disruptions, attendant disadvantages, and hardship faced by creditors. That

is why bankruptcy relief is limited and not available to all entities. The Bankruptcy Code is not an

all-purpose tool for resolving mass tort liability, and it should not be used to provide litigation

advantages or to artificially cap the liability of financially viable entities. LTL's use of the

Bankruptcy Code to do exactly this is an abuse of the process and should not be condoned. For the

reasons set forth herein, and such other reasons that may be raised at a hearing on this Motion, the

Debtor's Chapter 11 Case should be dismissed.

Dated: April 28, 2023

**WOMBLE BOND DICKINSON (US) LLP**

/s/ Ericka F. Johnson
Ericka F. Johnson (NJ #032162007)
Lisa Bittle Tancredi (*pro hac vice* pending)
1313 N. Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Email: ericka.johnson@wbd-us.com
Email: lisa.tancredi@wbd-us.com

*Counsel for Ad Hoc Committee of States*