# **EXHIBIT B**

# **Imerys Bench Ruling**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| IMERYS TALC AMERICA, INC., et al.,[1] | : | Case No. 19-10289 LSS |
| | : | |
| Debtor. | : | (Jointly Administered) |
| | : | |

**BENCH RULING ON MOTION TO APPOINT JAMES L. PATTON, JR.
AS THE LEGAL REPRESENTATIVE FOR FUTURE TALC
PERSONAL INJURY CLAIMANTS [Dkt. No. 100][2]**

Imerys Talc America, Inc. and certain affiliated entities filed their bankruptcy cases on February 13, 2019.  On February 27, Debtors filed their motion ("Debtors' Motion") asking the Court to appoint James L. Patton, Jr. as the Legal Representative for Future Talc Personal Injury Claimants.  Debtors' Motion was originally scheduled for a hearing on March 20, with an objection deadline of March 13.  That hearing date was adjourned for reasons unrelated to the case and was rescheduled for March 25.

At the March 25 hearing, I was informed that Debtors and the Office of the United States Trustee ("UST") had discussed a schedule for Debtors' Motion.  They agreed that the hearing would be adjourned to April 26, the response deadline would be April 10 (which response could include an objection or a motion to propose another candidate) and Debtors would reply on April 23.  Debtors' counsel specifically stated that if the Trustee proposed additional candidates, Debtors would conduct interviews or mini depositions of those candidates in advance of their reply deadline.  The staff attorney for the UST addressed the Court regarding the schedule stating that the UST's office needed this schedule to assess the needs of this particular case with respect to one or more legal representatives, and to interview and/or depose Mr. Patton.  I accepted this schedule.

On April 10, the Office of the UST filed an objection and also separately filed his own motion to Appoint a Legal Representative for Future Talc Personal Injury Claimants [Dkt. No. 348].  In the UST's Motion to appoint a legal representative, the UST does not propose a particular candidate, or a particular process, but rather simply "requests that the Court permit other parties in interest to nominate alternative candidates" at what he terms

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. ("Imerys") (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2] This Bench Ruling was read in court on May 7, 2019.  Minimal minor, non-substantive corrections were made, and proper citation forms have been added.

"a collective proceeding." The proposed form of order attached to the UST's motion has a space for a hearing date with no other deadlines or operative dates.

The Certain Excess Insurers had previously filed an objection to Debtor's Motion. And, on April 19, they also filed a motion to compel discovery responses from Debtors and/or to postpone the hearing.

Both Debtors and the Official Committee of Tort Claimants filed a reply in support of Debtors' Motion and an objection or response to the UST motion. In Debtors' reply, they argued that the Certain Excess Insurers did not have standing to be heard in connection with Debtors' Motion.

I held a hearing on April 26 at which Debtors' Motion, the UST's motion and the objections were addressed. In addition to argument, Mr. Patton testified and I admitted into evidence (without objection) the six exhibits offered at the hearing. I permitted the Certain Excess Insurers to participate at the hearing and stated that I would rule on the standing issue and the UST's motion asking for a different process in the context of my ruling on Debtors' Motion. At the conclusion of the hearing, I took the matters under advisement.

Before addressing Debtors' Motion, I will rule on Debtors' argument that the Certain Excess Insurers do not have standing and on the UST's Motion to Appoint a Legal Representative for Future Talc Personal Injury Claimants.

*Standing*

As in other settings, for a party to have bankruptcy standing it must satisfy the constitutional requirements that all litigants in federal cases must meet. An examination of standing really invokes the court's subject matter jurisdiction to hear a case. This is reflected in the standard applied: a party must establish (i) a personal injury, (ii) fairly traceable to the challenged action, (iii) likely to be redressed by the relief sought. Here, Debtors seek relief from the court, not the Certain Excess Insurers. My subject matter jurisdiction is not an issue. The parties really dispute whether the Certain Excess Insurers are parties-in-interest under section 1109.

A person can be a party-in-interest for one purpose in a case, and not another. I find that for purposes of this particular motion—Debtors' Motion to appoint Mr. Patton as the legal representative—the Certain Excess Insurers are parties-in-interest. In doing so, I take note of the singular nature of what is before me. While Debtors have teed up the issue, I must make the appointment decision. And, unlike in so many other provisions of the Bankruptcy Code, the Code does not specify who can bring the motion. Nor, as I will discuss in a few moments, does it give me any guidance on how I am to select the legal representative. In these circumstances, I find that any party that brings me relevant information is helpful and I will consider it.

2

The cases relied on by Debtors to support lack of standing are either inapposite or unpersuasive. In *Fed. Ins. Co. v. W.R. Grace*, Nos. 04–844, 04–845, 2004 WL 5517843 (D. Del. Nov. 22, 2004), the Delaware District Court ruled that certain insurance companies did not have appellate standing to appeal an order of the bankruptcy court appointing a future claims representative. As the District Court explained, the appellate standard, "persons aggrieved," is different from bankruptcy standing which involves "parties in interest." As the District Court further explained, the purpose of the appellate court "persons aggrieved" standard is prudential, to enable efficient judicial administration. Further, "Courts have retained this standard for prudential reasons as bankruptcy proceedings involve disputes in which numerous persons are interested and, thus, "efficient judicial administration requires that appellate review be limited to those persons whose interests are directly affected."

In *In re Mid-Valley, Inc.*, 305 B.R. 425 (Bankr. W.D. Pa. 2004), certain insurance companies moved to dismiss the bankruptcy case and also objected to the appointment of a future claims representative. The bankruptcy court found the insurance companies lacked standing both to bring the motion to dismiss and to object to the future claims representative. With respect to the objection, the court found that the insurance companies did not have standing to object because their interests were adverse to both current asbestos creditors and future asbestos claimants. *Id.* at 433, 435. And, the bankruptcy court ruled that pursuant to section 327(c) of the Bankruptcy Code only a creditor could object to the disinterestedness of a proposed legal representative, and the insurance companies were not creditors.

I do not find *Mid-Valley* persuasive on the issue of standing to object to a proposed legal representative on the grounds that he does not meet the requisite standard. As for adversity, except for the UST, each party who has made a submission on this motion is adverse in some respects or at some time with respect to the future claims representative. Debtors and the legal representative are adverse, the Official Committee of Tort Claimants and the legal representative are adverse and the Certain Excess Insurers and the legal representative are adverse. If I were to exclude from consideration the views of any party who had or will have an interest adverse to the legal representative, I question who I could hear from.

As for section 327(c), even assuming disinterestedness is the correct standard, the appointment of a legal representative is not governed by section 327, and thus that section is inapplicable. Moreover, subsection (c) only addresses a single instance in which the court should not approve a professional; it does not address other grounds, such as adversity to the estate. To the extent that subsection (c) is meant to limit who can raise disinterested issues, and I do not think that was the intention of the drafters, it does not limit who can raise other issues with employment. In any event, I do not find section 327 applicable to the appointment of an legal representative.

I find more instructive the Third Circuit's opinion in *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005). In *Congoleum*, certain insurers appealed the decision of the bankruptcy court approving the debtor's choice of professionals to represent them with respect to

3

insurance issues. The Third Circuit ruled that the insurers had appellate standing—which the Circuit described as more restrictive than bankruptcy standing. In particular, I am guided by the following passage of the opinion:

> Here, the insurers are entitled to standing even under the more restrictive standard applied to bankruptcy proceedings. The retention of special insurance counsel is an important preliminary matter that will profoundly affect the determination of the validity of a proposed plan *ab initio*. It is an issue based on procedural due process concerns that implicate the integrity of the bankruptcy court proceeding as a whole. The retention of Gilbert as special insurance counsel will affect the resolution of issues that may directly affect the rights of insurers and fairness to the asbestos claimants.

*Id.* at 685. The selection of a legal representative for future claimants is also one of procedural due process that implicates the integrity of the bankruptcy court proceeding as a whole. Under these circumstances, I conclude that for purposes of Debtors' Motion, the Certain Excess Insurers have bankruptcy standing, which is a less restrictive standing than that examined in *Congoleum*.

Having so concluded, I am also mindful of the statement in *Congoleum* that there are always concerns about the tactical use of disqualifications motions to harass opposing counsel. It is argued here that the Certain Excess Insurers have filed this objection (and their discovery) for the very purpose of harassment. I am able to understand and consider each parties' motivations in filing their submissions.

*Process*

As for process, I find the process here appropriate for this case, consistent with the process in other cases and provided parties with sufficient time to obtain information about Mr. Patton and/or propose other candidates.

The totality of the guidance in the Bankruptcy Code on the appointment of a future claims representative is as follows:

> as part of the proceedings leading to the issuance of such injunction [i.e. an injunction under a plan of reorganization], the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind.

11 U.S.C. § 524(g). The Bankruptcy Code does not set up any process or provide who may initiate a request for appointment of the legal representative. It is possible the request could be made as part of the plan process by any plan proponent. But, as discussed in the filings

4

submitted on this motion, waiting until the plan is proposed would not give the legal representative an ability to have input into the plan. Certainly, the filing of a motion by a debtor requesting such relief is consistent with section 524(g) and the idea that the debtor will propose a plan.

In his objection, the UST has asked me to defer ruling on Debtors' Motion and consider additional candidates. And, in his own motion to appoint a legal representative, the UST suggests that the appointment of the legal representative should not be the subject of an adversary proceeding or a contested matter. Rather, the UST contends that the appointment process should be a "collective proceeding where the candidates are evaluated by the Court on an equal footing."

The UST does not suggest a specific collective proceeding. The proposed form of order attached to the UST motion simply provides that the motion is granted and would set a hearing "at which time the Court shall consider candidates for appointment as the Legal Representative for Future Talc Personal Injury Claimants." There is some suggestion in the UST's position that such a collective proceeding would do away with interviews, discovery, and perhaps with witness testimony. The UST contends that the current process is an adversarial one that "would likely have a chilling effect on attracting qualified candidates" and needlessly imposes costs on the estate. Finally, the UST argues that I should not give any deference to Debtors' choice.

I do not see that a collective process (whatever that is) will change the nature of the hearing before me in any appreciable manner. The process must be instituted in some fashion, and I am not in a position to determine the timing or appropriateness of the process in any given case. Some party-in-interest must file a motion. I note, as an aside, that in *In re Johns-Manville Corp.*, 36 B.R. 743 (Bankr. S.D.N.Y. 1984), the motion was filed by Keene Corporation—a co-defendant in the underlying asbestos litigation.

Here, Debtors filed a motion. The UST also filed a motion, albeit after Debtors filed their motion. If another party had filed a motion to appoint the legal representative, we could have moved forward on that motion. In any event, had another party filed the motion first, no doubt Debtors and the Committee would chime in with respect to the timing of the request and a preferred candidate.

If the concern is over the litigious nature of the selection process, that can be addressed in whatever motion or process is before the court. I can regulate, as appropriate, interviews or depositions and set up a specific schedule to address the qualifications of the candidates including time and/or location limitations, if appropriate. I do not, however, see a scenario in which there would be no exchange of information before the approval hearing if information is requested.

Here—at the request of Debtors and the UST—I blessed a schedule. That schedule provided plenty of time for other candidates to be nominated or come forward. The hearing was held almost 60 days after the motion was filed. And, no one has suggested that another party or candidate needed additional time to put forth his or her nomination.

5

The fact that after the schedule was put in place, the UST chose to go down a different path and apparently chose not to interview or depose Mr. Patton was just that—a choice. But, it does not make the process used in this case deficient.

Similarly, the Certain Excess Insurers propounded discovery to Debtors and were unsatisfied with the responses received. The discovery was propounded on March 22. Debtors responded on April 5. The Certain Excess Insurers did not take action on these responses until April 19—two weeks after receiving the response. Further, the record does not reflect that the Certain Excess Insurers noticed any depositions.

The hearing was adjourned so that other nominations could be made and so that discovery could take place. Had discovery disputes been promptly brought before me, they could have been addressed before the hearing. As I have noted on numerous occasions in this and other matters, formal motions on discovery disputes are not necessary; I am always available for a telephone conference on discovery disputes. No requests were made here.

For all these reasons, I find the process in this case sufficient.

One final observation before I get to the standard. Who files a motion and whether or not the movant proposes one or more candidates is simply not determinative of the process or of the selection. In that regard, I agree with Judge Carey in *Maremont*, that neither more nor less deference should be given to a candidate simply because he is proposed by a debtor. *Maremont Corp.*, No. 19-10118 (KJC), Transcript at 100 (Bankr. D. Del. Mar. 8, 2019), Dkt. No. 126. And, I would add that there should be neither more nor less deference given to a candidate proposed by any movant. My task under section 524 is to appoint a legal representative. So, I need to determine whether a record has been established on which I can find that the candidate or candidates placed before me meet the requisite standard.

### *What is the Standard for a Legal Representative?*

The parties disagree on the standard applicable to the appointment of a legal representative. Debtors and the Committee take the position that the proper standard is "disinterestedness." Debtors and the Committee point to other courts in this district, this circuit and elsewhere that apply the disinterestedness standard.

There is no question that bankruptcy courts have applied this standard, and according to some, including Judge Carey in the *Maremont* case, it stems from the *UNR* Court's direction to parties in that case to submit names of disinterested candidates. *See Maremont Corp.*, No. 19-10118 (KJC), Transcript at 98 (Bankr. D. Del. Mar. 8, 2019), Dkt. No. 126; *In re UNR Indus., Inc.*, 46 B.R. 671 (Bankr. N.D. Ill. 1985). The *UNR* Court, however, provides no reasoning for this request. Debtors and the Committee also point to the reasoning of some courts that the disinterestedness standard is the highest standard in

6

the Bankruptcy Code as a basis for applying it. That may be true. But given the disinterestedness standard is explicitly set forth in many other provisions of the Bankruptcy Code, if it were applicable, it is curious that 524(g) does not incorporate that standard.

The UST takes the position that there should be what he believes is a heightened standard, with the words "independent" and "effective" most frequently used in the objection. In his motion, the UST states that the legal representative should be disinterested, qualified, independent and free from entanglements with his or her adversaries. He also suggests numerous factors the court should consider in the selection process, including billing rates, familiarity with this court and its procedures, other competing demands on the candidate's time, the candidate's relationships with other professionals and parties in this case, the existence of actual or potential conflicts and the candidate's ability or willingness to advocate vigorously against those parties on behalf of future claimants.

The Certain Excess Insurers take the position that the legal representative is more akin to a guardian ad litem and that "appearance of impropriety" is the appropriate test.

While Debtors and the Committee take issue with any standard other than disinterestedness, they believe Mr. Patton meets the standards articulated by the UST and the Certain Excess Insurers.

*Johns-Manville*, and *UNR*, which were decided in the early 1980s, are the seminal cases in the field of asbestos bankruptcies, and section 524(g) was added to the Bankruptcy Code to statutorily permit the pioneering use of trusts developed by those courts. A review of those cases is instructive. In his *Johns-Manville* opinion, Judge Lifland grants the motion to appoint a legal representative, schedules a hearing to consider the precise form and function of the legal representative and invites parties to make submissions. He notes the conflict of interest this legal representative will have with the committee, the debtor and the movant in that case and states "an independent representative for future claimants is essential." *In re Johns-Manville Corp.*, 36 B.R. at 749 n.3. He also suggests, without exclusion, three possible models on which to fashion the legal representative—a guardian ad litem, an amicus curiae, and an examiner.

In the District Court opinion affirming Judge Lifland's decision, we learn that the form of representative appointed was "a legal representative" and that the legal representative was given the duties of a committee under section 1103 of the Bankruptcy Code subject to the reduction or enlargement of such powers and duties by order of the court. *In re Johns-Manville Corp.*, 52 B.R. 940 (S.D.N.Y. 1985). No party has provided me with authority discussing what standard Judge Lifland used in appointing the legal representative and that is not the subject of the appeal. But, the District Court does conclude that it was entirely appropriate for Judge Lifland to authorize the legal representative to exercise the powers and duties listed in section 1103 as those powers and duties assure the future claimants would have a meaningful opportunity to be heard and participate in the case. This conclusion naturally follows from Judge Lifland's decision that

7

future claimants are parties-in-interest under section 1109 of the Bankruptcy Code who deserve a voice in the bankruptcy proceedings.

The party-in-interest conclusion is also the basis of the decision in *UNR* as well as the Third Circuit's decision in *Amatex*, 755 F.2d 1034 (3d Cir. 1985), which came out in 1985. In *Amatex*, the debtor filed a petition to appoint a guardian ad litem. In ruling that the future claimants were entitled to their own spokesperson, the Third Circuit observed that none of the parties in the case had interests similar to those of the future claimants. The court noted that the current claimants and future claimants would fight over the same limited pot of money. And, it found that the debtors' major concern was to receive a discharge from all possible claims, including those of the future claimants—seeking to limit their recoveries to the terms of a plan. The court therefore remanded to the bankruptcy court to appoint one or more legal representatives for future claimants. While I could not find a subsequent decision regarding the appointment, the bankruptcy court appointed a guardian ad litem.

A review of these cases, and in particular the duties to be performed by the legal representative inform the standard. The legal representative is the spokesperson for the future claimants. He is the substitute for the principal, if you will, or the client in the client/attorney relationship. In bankruptcy terms, he is most like a committee member. Indeed, he is to perform the duties of a committee member, as relevant to future claimants. Those duties include consulting with the debtor on the administration of the case, investigating the assets of the debtor relevant to formulation of a plan, participating in the formulation of a plan and performing such other services as are in the interest of those represented.

A creditors committee is ordinarily composed of those persons willing to serve who hold the seven largest claims against the debtor of the kinds of claims represented on the committee. Or, if a committee was organized before the commencement of the bankruptcy case, those creditors may become the committee if they were fairly chosen and representative of the different kinds of claims to be represented. There is no standard provided in the Code for membership on a committee other than the creditor hold a representative claim and be willing to serve. The UST, in selecting a committee, also looks at all claims/interests a particular creditor may hold and no doubt uses some judgment on which of the creditors who desire to serve will best represent its constituency. Disinterestedness, however, is not the standard.

According to Collier, the term "disinterested person" occurs in the Bankruptcy Code 11 times. 2 *Collier on Bankruptcy* ¶ 101.14 (16th ed. 2019). The term is used with respect to the appointment of trustees under chapters 7, 11, 12 and 13, an examiner, a consumer privacy ombudsman, a patient care ombudsman and with respect to retention of a debtor's professionals. It is also mentioned in connection with compensation of professionals employed under section 327 or 1103. With the possible exception of the last category, the disinterestedness standard makes sense. Debtors and estate representatives have duties to the entire estate. The two ombudsman report their findings to the court as does an

8

examiner. And with respect to many professionals, and all lawyers, they are also subject to applicable rules of professional responsibility, which govern their conduct in the first instance. The 524 legal representative does not fit naturally into this grouping.

So, if the disinterested standard is not the proper standard, what is?

In his recent decision in *In re Fairbanks Co.*, 18-41768-PWB, 2019 WL 1752774 (Bankr. N.D. Ga. Apr. 17, 2019), Judge Bonapfel concluded that a 524 legal representative takes on the role of a guardian ad litem. I find his well-reasoned decision persuasive. As Judge Bonapfel explains:

> The term 'guardian ad litem' is a term of art and literally means guardian 'for the suit.' It is a means by which a court may appoint a person to protect the rights of those persons who cannot represent themselves, such as minors, incapacitated adults, or absent parties.

*Id.* at *7. Judge Bonapfel then enumerates the numerous and various types of actions in which guardians ad litem are appointed by state or federal courts—from assessing the best interests of a child in a dependency hearing to representing unknown or missing owners of land and their heirs in actions involving mineral rights. To his list, I would add another—perhaps more uniquely Delaware category—the judicially supervised winding up of a dissolved corporation under sections 280-282 of the Delaware General Corporation Law.

Pursuant to section 280 of the DGCL, a dissolved corporation that provides notice to claimants to present their claims to the corporation may petition the Court of Chancery to determine the amount and form of security which will be reasonably likely to be sufficient for unknown claims or claims that have not yet arisen but are likely to arise based on facts known to the corporation. If such a petition is made, the Court of Chancery may appoint a guardian ad litem in respect of that proceeding. While there is not a lot of experience with this statute, Wolfe & Pittenger in their treatise on Corporate and Commercial Practice in the Delaware Court of Chancery, state:

> Once appointed, the guardian's role will likely be significant. One suspects that a guardian will ordinarily be afforded the opportunity to inspect the relevant books and records of the dissolved corporation and to employ experts and other agents to assist in ascertaining the scope, nature, and probability of future claims as well as to assess the overall financial position of the dissolved corporation. Section 280 provides that the reasonable fees and expenses of such guardian, including all reasonable expert witness fees, will be borne by the petitioning corporation.

9

Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 10.04 (2d ed. 2018). This sounds much like the role of a section 524 legal representative.

I conclude that the legal representative is much more like a guardian ad litem than those persons in the Code subject to the disinterestedness standard. This does not mean that I am appointing a guardian ad litem so concerns about binding future claimants is not, therefore, an issue.

As section 524 states, the legal representative must protect the rights of persons who may make future demands for payment against a debtor. To do so, he must be independent of the debtors and other parties-in-interest in the case and be able to effectively speak for this constituency. His loyalties must lie with the demand holders for whom he acts as a fiduciary, that is – the future claimants. And, it should go without saying, but I'll say it. No judge would appoint someone to be the legal representative if he or she thought the person was not up to the task.

Here, there is no question that Mr. Patton is up to the task. His curriculum vitae, which was admitted into evidence, as well as his testimony show that he has the knowledge, experience and expertise to be the legal representative for demand holders. In fact, no one really questions his experience or professionalism.

The UST does question whether Mr. Patton has time to handle this matter given his other engagements, and his testimony is that he does. I have no reason to disbelieve that testimony. And, I note that it is up to a professional to decline work if his current workload will not permit him to properly handle the new engagement.

The UST also asserts that Mr. Patton's experience should count against him in that the language in the trust agreements and/or the TDPs in cases in which he has either served as legal representative or as counsel for the legal representative is deficient in not taking into account or addressing the existence of fraud in the tort system. The UST further argues that decreases of the percentage payout on claims in multiple asbestos trusts evidences a deficiency in the trust that disadvantages future claimants. Mr. Patton disagrees with the UST's assessment of the effect of a decrease in the percentage payout.

Mr. Patton testified that there were no prepetition negotiations over the terms of a plan or related documents. The terms of the trust and TDP will be addressed when a trust and TDP are proposed in these cases. In any event, these are not today issues.

The UST also argues that I should consider the prepetition engagement. In particular, he argues that a debtor should not be able to select the individual who will represent the future claimants. Simply put, a debtor should not be able to choose its adversary. I agree with the many courts before me who have found that a nominee should not be disqualified solely on this basis. While admittedly an unusual situation, this process has worked in the asbestos/mass tort cases for decades. And, as pointed out by many courts, it would not be possible to propose a prepackaged case if a legal representative were

10

not selected prepetition. The question is not whether the proposed legal representative performed some work prepetition, but whether there is a reason to doubt his independence based on that selection.

Here, except for the indemnification provision, which I will address in a moment, I conclude that the prepetition engagement does not impact independence. The engagement letter is clear that (i) Mr. Patton is being asked to serve as the legal representative for future claimants, (ii) his sole responsibility and loyalty is to the future personal injury claimants, (iii) he is not an employee of Imerys and (iv) Imerys shall have no right to control or influence how he carries out his duties. Imerys acknowledges that in performing his duties, Mr. Patton may be adverse to the interests of the company. While the engagement letter does provide that if Imerys files a bankruptcy proceeding, Imerys anticipates it will ask the Bankruptcy Court to appoint Mr. Patton as the legal representative, there is no promise. And, while it seems apparent that any person retained prepetition as the legal representative has a leg up in the post-bankruptcy appointment process, there is no guarantee.

The Certain Excess Insurers raise an additional issue with the prepetition period. They assert that in providing Mr. Patton with information and/or data relative to the claims of the future claimants, Debtors may have improperly shared with Mr. Patton information subject to a common interest or other privilege. Indeed, much of the discovery propounded by the Certain Excess Insurers went to the information that was shared with Mr. Patton. This is not the first time this concern has been raised to me. The Certain Excess Insurers and Cyprus raised Debtors' sharing of information with Mr. Patton in the adversary proceeding regarding the Cyprus Historical Policies. The specific concern is that information related to defense strategies in the underlying talc litigation has been shared.

I do not see that this is an issue related to the appointment of the legal representative. But, in any event, in their responses to discovery, Debtors state that "only certain publicly available information, including case pleadings, that may be construed as containing statements by defense counsel were provide to Mr. Patton or his counsel." Debtors' counsel has further represented to me on numerous occasions that they have not shared any information which breaches their Confidentiality Agreement with Cyprus. Further, Mr. Patton was questioned at some length regarding the information that was shared with him. And, while he did not have a specific list of documents requested or provided, he testified that when he acts as the legal representative or as counsel in mass tort cases, he does not request, and does not want, information or documents related to defenses in the underlying litigation. He testified that defenses to the underlying claims are not part of the analysis he and his team do in developing a view on future claims. He also testified that he has a specific instruction in all of his cases that his team is not to accept any information that would compromise insurance coverage. Accordingly, to the extent that the sharing of information subject to a common interest (or other) privilege could create an issue, the evidence here is that such information was not shared.

None of the issues I have just discussed lead me to conclude that Mr. Patton is unable to be the legal representative or that he is not independent. But, based on the

11

evidence presented at the hearing, I do believe that additional disclosures need to be made on the following fronts. For purposes of this discussion, I am assuming, as argued by the Certain Excess Insurers, that YCST's conflicts should be imputed to Mr. Patton is his individual capacity. At the hearing, I questioned this premise, but Mr. Patton's counsel did not specifically respond to this argument.

**First**, at the hearing, a page from the YCST website was introduced into evidence as Certain Excess Insurers Exhibit 1. This page of the website invited persons who believe they may have contracted ovarian cancer from talcum powder to contact the firm. The webpage specifically references personal hygiene products manufactured by Johnson & Johnson, Debtors' customer.

Mr. Patton was unfamiliar with this portion of the website, but he testified that the firm does not represent any clients who are asserting claims based on exposure to talc. His testimony was based on the necessary conflict searches that would have been run to open such matters and which would have shown the conflict preventing the firm from accepting such clients. While I found this explanation credible and have no reason to doubt the testimony, Mr. Patton must supplement his original Declaration to reflect YCST's engagement, if any, by any clients asserting claims based on exposure to talc.

**Second**, Mr. Patton testified that YCST may represent many if not all of the Certain Excess Insurance companies in insurance coverage litigation related to environmental liabilities, including asbestos liabilities. He testified that none of those representations involve Imerys or talc. He further testified that YCST has waivers from each of the insurance companies.

The Certain Excess Insurers seem to suggest that YCST and perhaps Mr. Patton may have a positional conflict because of these representations that should preclude Mr. Patton from being appointed as the legal representative. Mr. Patton must supplement his original declaration to indicate whether he, personally, has provided representation to any insurance company in the insurance coverage litigation handled by his firm. And, he must also state any constraints on his ability to take a position as the legal representative in these cases because of YCST's representation of the insurance companies in other matters. Assuming no constraints, it would seem prudent for YCST to establish an ethical wall between this matter and matters in which they represent insurance companies in coverage litigation in asbestos related matters. I will observe that the use of ethical walls for committee members is not uncommon in certain situations, including, for example between committee members who are bondholders and their trading desks.

**Third**, the indemnification in the engagement agreement and the proposed form of order needs to be clarified. Mr. Patton testified that this indemnification is not meant to protect him from future claimants, but to protect him from actions wrongfully taken by Debtors in the event that no plan is confirmed. He posits a circumstance in which a demand holder seeks payment from Debtors who then blame Mr. Patton for Debtors' inability to satisfy the demand holder's claims. The indemnification provision appears to

12

be much broader than that. The indemnification provision in the engagement letter also speaks to possible inclusion in provisions of Imerys' certificate of incorporation, bylaw, agreement, vote of stockholders, or disinterested directors, or otherwise. Mr. Patton and/or the Debtors should disclose whether he is aware of any such protection for him in the Debtors' constituent documents. There is also a cap on liability, which quite frankly, I do not understand. To the extent that Mr. Patton seeks these provisions in any order, the indemnification provisions must be appropriately limited consistent with his fiduciary duties.

Finally, the Certain Excess Insurers suggest that more than one legal representative may be necessary in these cases and that this decision needs to be made now. Mr. Patton testified that at this point in time he does not believe a second legal representative is necessary. Should his view change, he would notify the parties and the court. I do not know whether an additional legal representative may be necessary for the case, but note that if it is, the issue is broader than just whether an additional legal representative is necessary. It could also impact the committee. In any event, this is not a today issue. I will address the need for a second legal representative and/or a second committee if the issue is placed squarely before me.

To conclude, I am ruling that the standard for approval of a legal representative under section 524 is that he must be independent of the debtors and other parties-in-interest in the case and must be able to act with undivided loyalty to demand holders. I recognize that this decision departs from a long line of cases in which the disinterestedness standard was applied to appointment of the legal representative. But, the disinterestedness standard has only recently been challenged and courts have only begun to explore the appropriate standard. This Bench Ruling will be placed on the docket of this proceeding and on the Bankruptcy Court's opinion page so that other judges will have the benefit of my thinking as they make their own decisions on the appropriate standard.

Dated: May 8, 2019

_____
LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE