**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b) | **BROWN RUDNICK LLP** |
| | David J. Molton, Esq. |
| **GENOVA BURNS LLC** | Robert J. Stark, Esq. |
| Daniel M. Stolz, Esq. | Michael S. Winograd, Esq. |
| Donald W. Clarke, Esq. | Eric R. Goodman, Esq. |
| Matthew I.W. Baker, Esq. | Kenneth J. Aulet, Esq. |
| dstolz@genovaburns.com | dmolton@brownrudnick.com |
| dclarke@genovaburns.com | rstark@brownrudnick.com |
| mbaker@genovaburns.com | mwinograd@brownrudnick.com |
| 110 Allen Road, Suite 304 | egoodman@brownrudnick.com |
| Basking Ridge, NJ 07920 | kaulet@brownrudnick.com |
| Tel: (973) 467-2700 | Seven Times Square |
| Fax: (973) 467-8126 | New York, NY 10036 |
| *Local Counsel for the Official Committee of Talc Claimants* | Tel: (212) 209-4800 |
| | Fax: (212) 209-4801 |
| | |
| | and |
| | |
| | Jeffrey L. Jonas, Esq. |
| | Sunni P. Beville, Esq. |
| | Sharon I. Dwoskin, Esq. |
| | jjonas@brownrudnick.com |
| | sbeville@brownrudnick.com |
| | sdwoskin@brownrudnick.com |
| | One Financial Center |
| | Boston, MA 02111 |
| | Tel: (617) 856-8200 |
| | Fax: (617) 856-8201 |
| | *Proposed Co-Counsel for the Official Committee of Talc Claimants* |
| **MASSEY & GAIL LLP** | **OTTERBOURG P.C.** |
| Jonathan S. Massey, Esq. | Melanie L. Cyganowski, Esq. |
| jmassey@masseygail.com | Richard G. Haddad, Esq. |
| 1000 Maine Ave. SW, Suite 450 | Adam C. Silverstein, Esq. |
| Washington, DC 20024 | Jennifer S. Feeney, Esq. |
| Tel: (202) 652-4511 | David A. Castleman, Esq. |
| Fax: (312) 379-0467 | mcyganowski@otterbourg.com |
| | rhaddad@otterbourg.com |
| *Proposed Special Counsel for the Official Committee of Talc Claimants* | asilverstein@otterbourg.com |
| | jfeeney@otterbourg.com |
| | dcastleman@otterbourg.com |
| | 230 Park Avenue |
| | New York, NY 10169 |
| | Tel: (212) 661-9100 |

| | Fax: (212) 682-6104<br>*Proposed Co-Counsel for the Official<br>Committee of Talc Claimants* |
|---|---|
| In re:<br><br>**LTL MANAGEMENT LLC,** [1]<br><br>Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Honorable Michael B. Kaplan |

**MOTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS
FOR ENTRY OF AN ORDER, PURSUANT TO BANKRUPTCY CODE
SECTIONS 1103(c) AND 1109(b), GRANTING EXCLUSIVE LEAVE, STANDING,
AND AUTHORITY TO COMMENCE, PROSECUTE AND, IF APPROPRIATE,
SETTLE CERTAIN CAUSES OF ACTION ON BEHALF OF DEBTOR'S ESTATE**

**THE TCC HAS ASSERTED AND CONTINUES TO ASSERT THAT THE DEBTOR'S CHAPTER 11 CASE WAS FILED IN BAD FAITH AND SHOULD BE DISMISSED. THE TCC'S STANDING MOTION AND COMPLAINT ASSUME, *ARGUENDO*, THAT THE COURT FINDS THAT THE DEBTOR IS IN FINANCIAL DISTRESS AND THE DEBTOR'S CHAPTER 11 CASE IS NOT DISMISSED AS A BAD FAITH FILING. THE TCC RESERVES ALL RIGHTS TO CONTINUE TO ARGUE THAT DISMISSAL IS REQUIRED UNDER THE BANKRUPTCY CODE.**

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

JURISDICTION AND VENUE ........................................................................................... 5

RELIEF REQUESTED ........................................................................................................ 6

BACKGROUND .................................................................................................................. 6

ARGUMENT ...................................................................................................................... 12

    I.   Applicable Legal Standard ........................................................................................ 12

    II.  The TCC Satisfies the Requirements for Obtaining Derivative Standing. ......................... 14

        A.  The Causes of Action Asserted in the Draft Complaint Are Colorable ...................... 15

            1.   Claims Arising From the 2023 Restructuring Transactions Are Colorable ........... 16

            2.   A Declaratory Judgment Claim That the 2021 Funding Agreement Is Not Void or Voidable Is Colorable. ............................................................................. 24

            3.   In The Alternative, Claims Arising From the Divisive Merger and the Kenvue Transfer Are Colorable. ............................................................................ 27

            4.   Section 502(d) Claims Are Colorable. ............................................................... 31

        B.  The Debtor Will Not Assert the Causes of Action. ................................................. 31

        C.  The TCC Should be Granted the Right to Pursue the Causes of Action. .................... 32

RESERVATION OF RIGHTS ............................................................................................ 33

WAIVER OF MEMORANDUM OF LAW ......................................................................... 33

NO PRIOR REQUEST ....................................................................................................... 33

NOTICE .............................................................................................................................. 33

CONCLUSION .................................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns
    Corp.)*, 330 B.R. 364 (Bankr. S.D.N.Y. 2005) .........................................................15

*In re Answers Corp. S'holders Litig.*,
    No. 6170-VCN, 2012 WL 1253072 (Del. Ch. Apr. 11, 2012) ................................22

*Banco Popular N. Am. v. Gandi*,
    876 A.2d 253 (N.J. 2005)........................................................................................23

*Boles v. Filipowski (In re Enivid, Inc.)*,
    345 B.R. 426 (Bankr. D. Mass. 2006) ....................................................................22

*Bondi v. Citigroup, Inc.*,
    No. BER-L-10902-04, 2005 WL 975856 (N.J. Super. Ct. Law Div. Feb. 28,
    2005) .......................................................................................................................23

*Brenner v. Little Red School House, Ltd.*,
    274 S.E.2d 207 (N.C. 1981)........................................................................4, 10, 26

*Bridgeport Holdings, Inc. v. Boyer (In re Bridgeport Holdings, Inc.)*,
    388 B.R. 548 (Bankr. D. Del. 2008) .......................................................................22

*In re Chesapeake*,
    Case No. 20-33233 (Bankr. S.D. Tex.)....................................................................15

*Commodity Futures Trading Comm'n v. Weintraub*,
    471 U.S. 343 (1985)................................................................................................21

*Contractor Creditor's Comm. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)*,
    832 F.2d 1391 (5th Cir. 1987) ................................................................................14

*Dana Commercial Credit Corp. v. Nisselson (In re Center Teleproductions, Inc.)*,
    112 B.R. 567 (Bankr. S.D.N.Y. 1990).....................................................................21

*In re DBMP LLC*,
    2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021)............................................29

*In re Distributed Energy Sys., Corp.*,
    Case No. 08-11101 (KG) (Bankr. D. Del.) ..............................................................15

*Dobin v. Hill (In re Hill)*,
    342 B.R. 183 (Bankr. D. N.J. 2006) ........................................................................16

*Faulconer v. Wysong and Miles Co*.,
   574 S.E.2d 688 (N.C. Ct. App. 2002) ...................................................................26

*In re Fedders N. Am., Inc*.,
   405 B.R. 527 (Bankr. D. Del. 2009) ......................................................................17

*In re Federal-Mogul Global Inc.*,
   684 F.3d 355 (3d Cir. 2012)...................................................................................8

*G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*,
   313 B.R. 612 (Bankr. D.N.J. 2004) .......................................................................31

*Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*,
   574 B.R. 446 (Bankr. D. Del. 2017) ......................................................................22

*Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC*,
   No. 19 CVS 13580, 2022 WL 3048320 (Sup. Ct. N.C. Aug. 2, 2022)...................26

*In re Green Field Energy Servs*.,
   594 B.R. 239 (Bankr. D. Del. 2018) ......................................................................16

*Hodinka v. Delaware Cty.*,
   759 F. Supp. 2d 603 (E.D. Pa. 2011) .....................................................................24

*Infinity Inv'rs Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*,
   316 B.R. 141 (D. Del. 2004)............................................................................14, 31

*In re iPCS, Inc.*,
   297 B.R. 283 (Bankr. N.D. Ga. 2003) ..............................................................13, 15

*Johnson v. Clark (In re Johnson)*,
   518 F.2d 246 (10th Cir. 1975) ...............................................................................21

*In re Joyanna Holitogs, Inc.*,
   21 B.R. 323 (Bankr. S.D.N.Y. 1982)......................................................................13

*In re LTL Mgmt.*,
   637 B.R. 396 (Bankr. D.N.J. 2022) ....................................................................8, 25

*In re LTL Mgmt., LLC*,
   64 F.4th 84 (3d. Cir. 2023) .......................................................................... *passim*

*Meinhard v. Salmon*,
   164 N.E. 545 (N.Y. 1928)......................................................................................21

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
   971 F.2d 1056 (3d. Cir. 1992)..............................................................3, 17, 18, 19

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
930 A.2d 92 (Del. 2007) ............................................................................21

*In re Novell, Inc. S'holder Litig.*,
No. 6032-VCN, 2013 WL 322560 (Del. Ch. Jan. 3, 2013) ....................................22

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*,
330 F.3d 548 (3d Cir. 2003).......................................................................... *passim*

*Official Comm. of Unsecured Creditors v. Barron (In re Polaroid Corp.)*,
No. 03-56404, 2004 WL 1397582 (Bankr. D. Del. June 22, 2004)........................13

*Official Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley
Media, Inc.)*, No. 01-11353, 2003 WL 21956410 (Bankr. D. Del. Aug. 14,
2003) ...................................................................................................13

*Official Comm. of Unsecured Creditors v. CIBC Wood Gundy Ventures, Inc. (In
re Temtechco, Inc.)*, No. 95-00596, 1998 WL 887256 (Bankr. D. Del. Dec. 18,
1998) ...................................................................................................14

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*,
304 B.R. 214 (Bankr. W.D. Pa. 2004), aff'd 326 B.R. 532 (W.D. Pa. 2005)........................13

*Official Comm. of Unsecured Creditors v. Credit Suisse First Bos. (In re Exide
Techs., Inc.)*, 299 B.R. 732 (Bankr. D. Del. 2003) ..................................14

*Official Comm. of Unsecured Creditors v. Hudson United Bank (In re Am.'s
Hobby Ctr., Inc.)*, 223 B.R. 275 (Bankr. S.D.N.Y. 1998) .......................15

*RCJJ, LLC v. RCWIL Enters., LLC*,
2016 WL 3850403 (N.C. Super. Ct. June 20, 2016).................................21

*Paez v. Paez*,
837 S.E.2d 214 (N.C. Ct. App. 2020) ......................................................26

*In re Reich*,
54 B.R. 995 (Bankr. E.D. Mich. 1985) ....................................................21

*In re SGL Carbon*,
200 F.3d 154 (3d Cir. 1999)...............................................................2, 19

*In re Thorpe Insulation Co.*,
677 F.3d 869 (9th Cir. 2012) .....................................................................8

*Timbercreek Land & Timber Co., LLC v. Robbins*,
No. 17 CVS 140, 2017 WL 3214427 (N.C. Super. July 28, 2017) ........................20

*Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*,
   779 F.2d 901 (2d Cir. 1985)..............................................................................14, 31

*Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)*,
   527 B.R. 169 (D. Del. 2015) ........................................................................................14

**Statutes**

11 U.S.C. § 101(54) ...............................................................................................................28

11 U.S.C. § 105(a) ...................................................................................................................6

11 U.S.C. § 502(d) .................................................................................................................31

11 U.S.C. § 524(g)...................................................................................................8, 12, 25, 27

11 U.S.C. § 544(b)(1)..............................................................................................................27

11 U.S.C. § 548 ......................................................................................................................28

11 U.S.C. § 548(a) .........................................................................................................2, 27, 28

11 U.S.C. § 548(a)(1)(A) ........................................................................................................16

11 U.S.C. § 548(a)(1)(B) .......................................................................................................3, 17

11 U.S.C. § 548(a)(1)(B)(ii) ...................................................................................................17

11 U.S.C. § 548(a)(1)(B)(ii)(II) ............................................................................................3, 18

11 U.S.C § 1103(c) .........................................................................................................1, 6, 13

11 U.S.C. §1103(c)(5)...................................................................................................12, 13, 14

11 U.S.C. § 1107 ....................................................................................................................20

11 U.S.C. § 1107(a) ...............................................................................................................21

11 U.S.C. § 1108 ................................................................................................................20, 21

11 U.S.C § 1109(b) ...................................................................................................1, 6, 12, 13. 14

11 U.S.C. § 1121(d) .................................................................................................................6

28 U.S.C. § 157(b) ..................................................................................................................5

28 U.S.C. § 1334 ....................................................................................................................5

28 U.S.C. § 1408...................................................................................................................6

28 U.S.C § 1409 ...................................................................................................................6

28 U.S.C. § 2201 .................................................................................................................24

Uniform Fraudulent Transfer Act (UFTA) .........................................................................27

Uniform Voidable Transactions Act ................................................................................... 27

N.C.G.S. § 57D-2-30(e) ......................................................................................................20

N.C.G.S. § 57D-3-21(b) ......................................................................................................20

Tex. Bus & Comm. Code § 24.002(12) ..............................................................................28

Tex. Bus. Org. Code § 10.008(a)(2) ...................................................................................28

Tex. Bus. Org. Code § 10.008(a)(3) ...................................................................................28

**Rules**

Fed. R. of Bankr. P. 9019 ....................................................................................................32

**Other Authorities**

7 *Collier on Bankruptcy* ¶ 1109.05 [2][a] ........................................................................32

Restatement (Second) of Torts § 876(b) .............................................................................23

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ............................13

The Official Committee of Talc Claimants (the "<u>TCC</u>") of LTL Management LLC ("<u>LTL</u>"

or the "<u>Debtor</u>"), in the above captioned chapter 11 case, by and through its proposed counsel,

respectfully submits this motion (the "<u>Motion</u>"), pursuant to sections 1103(c) and 1109(b) of the

Bankruptcy Code, for entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>,

granting the TCC exclusive leave, standing, and authority to commence, prosecute and, if

appropriate, settle any causes of action (the "<u>Causes of Action</u>") that could be asserted against the

Debtor's parent and affiliates, and the Debtor's directors and officers, including but not limited to

those arising out of the 2023 Transaction (as defined below), the Divisive Merger (as defined

below), the Consumer Health Spinoff (as defined below), and/or any claims arising out of the

corporate actions taken by or on behalf of LTL or any of the talc liability assigned to LTL, as more

fully described herein and in the draft adversary complaint (collectively, the "<u>Draft Complaint</u>")[2]

attached hereto as <u>Exhibit B</u>.  In support of this Motion, the TCC respectfully states as follows:

### INTRODUCTION

1.    In the Third Circuit, a committee may obtain standing to pursue an estate cause of

action where a colorable claim exists, the debtor unjustifiably refuses to pursue the claim, and the

Court grants permission to initiate the action on behalf of the debtor's estate.  *See Official Comm.

of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 569 (3d Cir. 2003).

2.    The Third Circuit has already found that a colorable claim would exist to avoid

LTL's transfer of its rights under the 2021 Funding Agreement in an attempt to manufacture

financial distress.  *See In re LTL Mgmt., LLC*, 64 F.4th 84, 109 fn. 18 (3d. Cir. 2023).  The Third

Circuit recognized, in its opinion holding that LTL's first bankruptcy was filed in bad faith, that if

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings given to them in the Draft Complaint.

LTL parted with "its funding backstop to render itself fit for a renewed filing" interested parties may seek to avoid that transfer as fraudulent under 11 U.S.C. § 548(a). *Id.*

3.      Here, LTL parted with its rights under the 2021 Funding Agreement that functioned like an "ATM" machine and afforded LTL with access to at least "$61.5 billion" in cash funding to pay talc claims. *See In re LTL Mgmt., LLC*, 64 F.4th 84, 108-09 (3d Cir. 2023). By its own admission, LTL did so with the specific intent of manufacturing financial distress in an effort to make itself eligible for bankruptcy, *Decl. of John K. Kim in Support of First Day Pleadings* ("2nd Kim Decl.") [Dkt. No. 4] at ¶ 83, and in doing so, LTL acted with the intent to hinder, delay, and defraud talc claimants by denying such claimants access to the 2021 Funding Agreement.

4.      LTL's first bankruptcy case was dismissed because LTL was not in financial distress. An ordinary company might be in financial distress—but solvent—where liabilities pose a "serious threat [to a] company's operational well-being," or where a company has "difficulty raising or borrowing money, or otherwise ha[s] impaired access to the capital markets." *See In re SGL Carbon Corp.*, 200 F.3d 154, 162, 166 (3d Cir. 1999). But LTL is not an ordinary company. Its sole reason for existence is to pay, and its sole liabilities consist of, talc claims.

5.      LTL has thus boxed itself (or been boxed by J&J) into an impossible situation. The TCC asserts that LTL is not in financial distress and that LTL's second bankruptcy must be dismissed. To rebut this argument, LTL must prove that it is in financial distress—*i.e.*, that it did not have "access to cash" to pay talc claims in full as they come due "for the foreseeable future." *LTL Mgmt.*, 64 F.4th at 108. If LTL cannot make this showing, it is not in financial distress and its second bankruptcy fails out of the gate and must be dismissed. But if it does, then LTL will have admitted (and proven) that its decision to part with the 2021 Funding Agreement left it with unreasonably small capital to pay talc claims.

6.      In the Third Circuit, the standard for proving unreasonably small capital is whether it is "reasonably foreseeable" that the debtor will be able to "generate sufficient profits to sustain operations." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070, 1073 (3d Cir. 1992). The legal standard for proving "financial distress" under the Third Circuit's decision in *LTL Management* is essentially the same standard for proving "unreasonably small capital" under section 548(a)(1)(B)(ii)(II).[3]

7.      The Third Circuit foresaw this issue:  if LTL parted with the 2021 Funding Agreement (as it has), the next question would be whether LTL received "reasonably equivalent value" in exchange. *LTL Mgmt.*, 64 F.4th at 109 n.18.  Assuming, *arguendo*, that LTL can show lack of fraudulent intent (contrary to its own admissions), to be in bankruptcy LTL must prove that it is in financial distress.  And if LTL is successful, then the issue under section 548(a)(1)(B) is whether LTL received "reasonably equivalent value." *Id.*

8.      But LTL obviously did not receive reasonably equivalent value.  In exchange for parting with its ATM worth at least $61.5 billion, LTL received rights under the 2023 Funding Agreement—an estimated loss of over $30 billion.  In January 2023, JJCI transferred its consumer health business to its parent.  LTL lost the benefit of the cash-flowing brands whose revenues previously backed JJCI's payment obligations under the 2021 Funding Agreement.  And the 2023 Funding Agreement, unlike the 2021 Funding Agreement, is not backed by J&J.  If LTL can prove that it is in financial distress, then it became distressed by committing fraud, and colorable claims exist to undo that fraud (and, therefore, the financial distress), as the Third Circuit recognized.

---

[3]    *Compare Moody*, 971 F.2d at 1073 ("[W]e hold the test for unreasonably small capital is reasonable foreseeability"); *with LTL Mgmt.*, 64 F.4th at 108 (LTL "was highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future.").

And these transactions were conceived and largely executed at a time when LTL was a debtor in possession with fiduciary duties to talc claimants, and not to its equity holder.

9.     LTL may contend that it simply had to part with the 2021 Funding Agreement because the Third Circuit's ruling dismissing its bankruptcy was a frustrating event which meant that there was a "material risk" that the 2021 Funding Agreement was "void or voidable." 2nd Kim Decl. at ¶ 78. Under this contrived theory, LTL saved the day by securing a new funding agreement that likewise applies outside of bankruptcy in the event of dismissal.

10.     But this makes no sense. The 2021 Funding Agreement's express terms required J&J to pay outside of bankruptcy—*i.e.*, there could be no "implied condition" of the 2021 Funding Agreement that dismissal of LTL's bankruptcy would excuse J&J's performance—and LTL has conceded that dismissal was "reasonably foreseeable." Either of these facts is fatal to any assertion that the Third Circuit's opinion was a frustrating event under applicable law. *See Brenner v. Little Red Sch. House, Ltd.*, 274 S.E.2d 207, 211 (N.C. 1981).

11.     But even if one were to assume *arguendo*—contrary to logic and basic common sense—that LTL was right to be concerned that the 2021 Funding Agreement was void or voidable, this would mean that the 2021 Funding Agreement was essentially illusory and could not be enforced against J&J or JJCI outside of bankruptcy, and colorable claims exist to avoid the entire Divisive Merger as a fraudulent transfer.

12.     There is no basis to selectively unwind only half of what LTL always insisted was a "single integrated transaction," while leaving LTL saddled with Old JJCI's talc liabilities. *LTL Mgmt.*, 64 F.4th at 99, 105. LTL conceded that the provisions in the 2021 Funding Agreement obligating J&J to pay talc liabilities outside bankruptcy were included to address objections that the Divisive Merger was a fraudulent conveyance. *See* Feb. 18, 2022 Hr'g Tr. at 60:16-64:10. If

those provisions were somehow "void or voidable" and J&J had no such obligation, then the Divisive Merger was a fraudulent transfer.

13.     All roads lead to the same place—if LTL can somehow establish financial distress, then it necessarily follows that J&J orchestrated the largest fraudulent transfer in United States history, it is just a question of *when*.  If the Court takes LTL at its word that—in line with the express terms of the 2021 Funding Agreement and the Third Circuit's view—the 2021 Funding Agreement was available outside of bankruptcy, then the termination of that agreement can be avoided, and claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and civil conspiracy related to that fraudulent transfer are colorable.

14.     If not, then colorable claims exist to avoid the Divisive Merger and the January 2023 transfer and the ultimate spinoff of JJCI's consumer health business—which is the business that produced the very talcum powder at issue—to Kenvue, Inc. (the "Consumer Health Spinoff" or the "Kenvue Transfer"), as well as claims for civil conspiracy related to these fraudulent transfers, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.

15.     LTL is incapable of acting contrary to J&J's demands.  LTL is essentially faceless and only acts when commanded to do so by J&J.  J&J will never authorize LTL to assert fraudulent transfer claims to undo the 2023 Transaction, the Divisive Merger, or the Consumer Health Spinoff.  Doing so would be inconsistent with J&J's overall objective and goal of preventing talc claimants from exercising the rights afforded to them by the Constitution.  Everyone knows what J&J did.  And everyone knows why J&J did it.  The TCC must be granted standing, under *Cybergenics*, to pursue the Causes of Action for the benefit of LTL's estate and the talc claimants.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a) and 1121(d) of the Bankruptcy Code.

## RELIEF REQUESTED

17.    By this Motion, the TCC seeks an order, pursuant to sections 1103(c) and 1109(b) of the Bankruptcy Code, granting the TCC exclusive leave, standing, and authority to commence, prosecute and, if appropriate, settle the Causes of Action.

## BACKGROUND

18.    Over the course of the past two years, LTL and its affiliates have presented evidence and arguments to this Court and to the Third Circuit that talc claimants were not harmed by the series of 2021 transactions that created LTL and shifted all of JJCI's talc liabilities to it (the "Divisive Merger") because the 2021 Funding Agreement obligated J&J and JJCI to pay all talc claims (as determined by settlement or judgment), either outside of bankruptcy or pursuant to a confirmed plan, whether or not such plan provided J&J and JJCI with a channeling injunction.

19.    The 2021 Funding Agreement was LTL's most valuable asset. Mr. John Kim, LTL's Chief Legal Officer, represented to this Court that the 2021 Funding Agreement provided LTL with access to funding up to the full value of JJCI to pay talc claims outside of bankruptcy. Mr. Kim testified under penalty of perjury:

> Significantly, the [2021] Funding Agreement imposes **no repayment obligation** on the Debtor; it is not a loan. It obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the **full value of New JJCI**, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) **at any time when there is no bankruptcy case** and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses. In addition, the [2021] Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) **to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case** and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such

costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.

*Decl. of John K. Kim in Support of First Day Pleadings, In re LTL Mgmt. LLC*, Case No. 21-30589 (Bankr. D.N.J. Oct. 14, 2021) (the "<u>1st Kim Decl.</u>") [Dkt. No. 5] at ¶ 27 (emphasis added).

20.    Mr. Gordon, counsel to LTL, represented to this Court, in the presence of Mr. Haas—J&J's head of worldwide litigation—and other representatives of J&J at a hearing held on February 18, 2022, on a motion to dismiss LTL's bankruptcy as a bad faith filing, that the 2021 Funding Agreement meant that there was available funding to pay talc claims in bankruptcy or outside bankruptcy.  Mr. Gordon stated:

> **There's literally no conditions or any material conditions on the permitted funding uses under this document**.  I'll come back to this.  So I did want to focus on permitted funding use because the other side I think has fashioned a new argument that we hadn't heard before with respect to the funding agreement.  So there's basically two different scenarios where funding is available.  **The first is funding in the tort system.  And as you would expect, what that funding says is that the payors are obligated to pay the liabilities to the extent they're established by a judgement or a settlement in the tort system.**  That's what you would expect and that's what happens.  **You want funds available to pay settlements, to pay judgments in the tort system**  **So it makes very clear this is what we're talking about if there's no proceeding in bankruptcy**.  Whether there was no case filed or whether the case is filed or **dismissed**, the money's available for that purpose.  And you can imagine, Your Honor, by the way, the hue and cry you would have heard if this provision weren't in there because they would have said that we've manipulated the whole system because you filed bankruptcy and now you're going to tell the Court you can't dismiss our case because there's no money available if we go back in the tort system.  So this is there to protect the claimants.  **It's there to assure this isn't treated or consider a fraudulent conveyance.  The idea was and the intent was the claimants are covered either way in bankruptcy or outside**.

Feb. 18, 2022, Hr'g Tr. (Statements of Mr. Gordon) at 60:16-61:20 (emphasis added).

21.    The 2021 Funding Agreement states that it applies outside of bankruptcy and enables "the payment of any and all costs and expenses of the Payee incurred in the normal course of its business" such as talc judgments and settlements, "at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee."  2021 Funding Agreement, p. 5.

22.     This Court, in reliance upon on LTL's representations, held that the 2021 Funding Agreement obligated New JJCI and J&J "to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case" and "requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case." *In re LTL Mgmt.*, 637 B.R. 396, 423 n.27 (Bankr. D.N.J. 2022).

23.     This Court further found that the 2021 Funding Agreement's promise of at least $61.5 billion to pay talc claims was "available upon confirmation of a plan—**whether or not the plan is acceptable to J&J or New JJCI, and whether or not the plan offers payors protections under § 524(g)**." *Id.* at *424 (emphasis added).  The $61.5 billion was **never** contingent upon the confirmation of a chapter 11 plan that resolved all talc claims against J&J or JJCI.

24.     As Mr. Gordon explained, the 2021 Funding Agreement could have been used to fund a creditor plan proposed by the TCC over J&J's objection.[4]

25.     Following this Court's ruling denying the TCC's motion to dismiss, Mr. Katyal, LTL's appellate counsel, represented to the Third Circuit that the 2021 Funding Agreement gave "entire value of JJCI, the entire value, $61 billion free and clear to the potential claimants so that entire pot of money is available."  *In re LTL Mgmt. LLC*, Case No. 22-2003/22-2004 (3d Cir.) Sept. 19, 2022, Oral Arg. Tr. 65:7-9.  Of course, $61 billion was "only a floor, not a ceiling"— payments to J&J or to shareholders increased the "$61 billion pot."  *Id.* at 65:13-17.  Mr. Katyal

---

[4]  *In re LTL Mgmt., LLC*, No. 21-30589 (Bankr. D.N.J. Oct. 14, 2021) Feb. 18, 2022, Hr'g Tr. 64:11-15 ("THE COURT:  So just to clarify, if a plan is confirmed and it's a TCC plan as a proponent, the funding agreement – and they can include in that plan the funding agreement?  MR. GORDON:  Yes.").  The ability of a TCC plan to utilize the Debtor's rights under the 2021 Funding Agreement followed from the Bankruptcy Code and Circuit precedent.  *See In re Federal-Mogul Global Inc.*, 684 F.3d 355, 382 (3d Cir. 2012).  Since a plan trust could be appointed as representative of the Debtor's estate under section 1129(b)(3)(B) (*i.e.*, the trust is an extension of the estate), it could step into the Debtor's shoes and exercise its rights under the 2021 Funding Agreement without any technical assignment.  *See In re Thorpe Insulation Co.*, 677 F.3d 869, 889-90 (9th Cir. 2012).

also argued that talc claimants were not harmed by the Divisive Merger because the 2021 Funding Agreement meant that LTL would always be "fully capable of satisfying the talc claims."[5]

26.    The Third Circuit also relied on LTL's representations.  The Third Circuit found that LTL's bankruptcy was filed in bad faith because LTL was not in financial distress.  *See LTL Mgmt.*, 64 F.4th at 106-10.  Critical to this finding was 2021 Funding Agreement.  *See id.*

27.    The Third Circuit found that the 2021 Funding Agreement gave LTL access to at least $61.5 billion to resolve talc liabilities—funds available inside and "outside of bankruptcy."  *Id.* at 96-97, 106, 109.  The 2021 Funding Agreement made LTL "highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future."  *Id.* at 108.  Nor could the Third Circuit "see how [LTL's] lack of financial distress could be overcome":  The 2021 Funding Agreement made LTL "highly solvent," and any surrender of that asset would be subject to challenge as a fraudulent conveyance.  *Id.* at 108, 110 & n.18.

28.    The Third Circuit ordered that LTL's first bankruptcy be dismissed for lack of good faith.  But despite the Third Circuit's warnings,[6] LTL parted with the 2021 Funding Agreement and re-filed for bankruptcy 131 minutes after its first case was dismissed.  To justify its new filing, LTL parted with its most valuable asset so that "its pre-filing financial condition" would *purportedly* be "sufficiently distressed" to make a bankruptcy filing appropriate.  2nd Kim Decl. at ¶ 83.

---

5    *See id.* at 79:5-9 ("MR. KATYAL:  By itself without a resort to the funding agreement, we think the answer to… [the question is LTL fully capable of satisfying the talc claims] is no.  But with the funding agreement, absolutely"); *Id.* at 91:19-22 ("MR. KATYAL:… And what we've done is, through the use of this funding agreement, provide a backstop that's much better than they could get under the mass tort system, not for any one of their individual clients but comprehensively and overall").

6    *See LTL Mgmt.*, 64 F.4th at 109 fn. 18.

29.     LTL's second bankruptcy filing was not prepared overnight.  It was planned, and deliberate.  In January 2023, after oral argument before the Third Circuit, J&J began to orchestrate another scheme to keep LTL in bankruptcy notwithstanding the Third Circuit's ruling.

30.     ***First***, J&J diminished the value of JJCI.  In early January 2023, JCCI, renamed "HoldCo," transferred its consumer health business through a series of integrated transactions to Janssen Pharmaceuticals ultimately, and Kenvue.  As a result of these transactions, Kenvue now owns and operates the consumer health business and the cash-flowing brands that were once owned by JJCI.  As a result of the Consumer Health Spinoff, JJCI's assets no longer include the consumer health business.

31.     ***Second***, LTL was made to part with its rights under the 2021 Funding Agreement.  On the very day the Third Circuit issued its decision ordering that LTL's first bankruptcy be dismissed, Mr. Kim allegedly concluded that the 2021 Funding Agreement might be deemed "void or voidable" because of the Third Circuit's ruling.  Mr. Kim thought the Third Circuit's opinion frustrated the purpose of the 2021 Funding Agreement because it meant that LTL could not stay in bankruptcy for years and keep talc claimants from asserting their claims against J&J.

32.     Mr. Kim consulted with attorneys at Jones Day to see if anyone would support his novel legal theory.  Jones Day apparently failed to advise LTL that an opinion issued by the Supreme Court of North Carolina entirely foreclosed any argument that the Third Circuit's ruling dismissing LTL's first bankruptcy was a frustrating event that J&J could invoke to escape its obligations under the 2021 Funding Agreement.  *See Brenner*, 274 S.E.2d 207.  Mr. Kim is a long-term J&J employee whose salary has always been paid by a J&J affiliate.  Mr. Kim's theory that the Third Circuit's ruling meant that the 2021 Funding Agreement was "void or voidable" was unsupported by law or fact, and adverse to LTL's own interests.

33.     Further proving this obvious truth:  LTL also never raised with the TCC, the United States Trustee's Office, or the Bankruptcy Court its alleged concern that the 2021 Funding Agreement might be "void or voidable" because of the Third Circuit's opinion.  To the contrary, in late March 2023, LTL filed a monthly operating report, signed by LTL's CFO and its counsel, which indicated the 2021 Funding Agreement remained in place.

34.     J&J never refused to make a payment under the 2021 Funding Agreement, continuing to pay fees through dismissal.  Nothing prevented J&J from honoring its obligations under the 2021 Funding Agreement to LTL even if a theoretical risk of frustration of purpose— normally an affirmative defense—existed, especially considering LTL's repeated assurances to this Court and the Third Circuit that the 2021 Funding Agreement applied outside of bankruptcy.

35.     Notwithstanding all of this—prior to the dismissal of LTL's first bankruptcy—LTL prepared to terminate the 2021 Funding Agreement and replace it with new financing agreements (the 2023 Funding Agreement and J&J Support Agreement) in order to manufacture (*purported*) financial distress.  On April 4, 2023, during the brief period that LTL was outside of bankruptcy, LTL terminated the 2021 Funding Agreement and entered into the 2023 Funding Agreement and the J&J Support Agreement (the "2023 Transaction").  The LTL Board approved this transaction during the pendency of LTL's first bankruptcy, while LTL's directors, officers and counsel owed fiduciary duties to the talc claimants.

36.     The result of J&J's maneuvers is that LTL replaced the 2021 Funding Agreement— guaranteed by JJCI as well as J&J—with the 2023 Funding Agreement guaranteed *only* by the remains of JJCI, minus the $42.5 billion consumer health business (HoldCo).  LTL is adamant that it did sufficient harm to itself and its ability to pay its creditors that it is now in financial distress— albeit financial distress that was self-inflicted and caused by intentional conduct.  Given all that

has transpired, it is now apparent that, if LTL is in financial distress (a fact which is obviously disputed), J&J orchestrated one of the most massive fraudulent conveyances in United States history.  It is just a question of when.

37.     If LTL is in financial distress, and if the 2021 Funding Agreement was the "ATM" that LTL represented it to be to this Court and the Third Circuit—and that this Court and the Third Circuit interpreted it to be—then the termination of the 2021 Funding Agreement for the purpose of creating financial distress (and making LTL reliant upon HoldCo to pay talc claims) is avoidable as a fraudulent transfer and the 2021 Funding Agreement must be restored such that LTL is no longer in financial distress.  In this scenario, the TCC must be afforded standing to pursue the very fraudulent transfer claims the Third Circuit predicted would be brought if LTL tried to manufacture financial distress by parting with its rights under the 2021 Funding Agreement.

38.     Alternatively, if LTL is in financial distress, and if the 2021 Funding Agreement was essentially illusory—*i.e.*, there was a material risk that the 2021 Funding Agreement was voidable by J&J and J&J could never have been compelled to pay anything thereunder unless J&J obtains the benefit of payor protections under section 524(g)—then the Divisive Merger was a fraud and the parties who orchestrated it must be held accountable for devising a scheme to strip dying cancer victims of their right to a jury trial and to receive fair and equitable compensation for their injuries.  The TCC must be granted standing.

## ARGUMENT

### I.    Applicable Legal Standard.

39.     It is well-settled within this Circuit that Courts may allow, under appropriate circumstances, a creditors' committee to pursue causes of action on behalf of the estate.[7]  Although

---

7    *See Cybergenics*, 330 F.3d at 553 ("We believe that Sections 1109(b) [and] 1103(c)(5) . . . evince Congress's

the Bankruptcy Code does not expressly authorize a creditors' committee the standing to initiate an adversary proceeding and/or to pursue other causes of action typically brought by the trustee or the debtor-in-possession, the Bankruptcy Code does establish creditors' committees for the express purpose of protecting the rights of their constituents and similarly situated creditors.[8]

40.    To achieve this purpose, section 1103(c) of the Bankruptcy Code, which enumerates the statutory functions of a creditors' committee, authorizes creditors' committees to "perform such other services as are in the interest of those represented."  11 U.S.C. §1103(c)(5). To that end, section 1109(b) of the Bankruptcy Code provides, in pertinent part, that:

> A party in interest, including the debtor, the trustee, *a creditors' committee*, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. §1109(b) (emphasis added).

41.    Indeed, this general right to be heard would ring hollow unless creditors' committees are also given the right to act on behalf of the estate if a debtor-in-possession or a trustee that is explicitly granted the right to act for the estate unjustifiably fails to act.[9]  Courts in

---

[8]  approval of derivative avoidance actions by creditors' committees, and that bankruptcy courts' equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-possession unreasonably refuses to pursue an avoidance claim."); *see also Official Comm. of Unsecured Creditors v. Barron (In re Polaroid Corp.),* No. 03-56404, 2004 WL 1397582, at *2 (Bankr. D. Del. June 22, 2004); *see also Official Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.),* No. 01-11353, 2003 WL 21956410, at *2 (Bankr. D. Del. Aug. 14, 2003); *Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.),* 304 B.R. 214, 223 (Bankr. W.D. Pa. 2004), aff'd 326 B.R. 532, 563 (W.D. Pa. 2005).

[8]  *See* H.R. Rep. No. 95-595, at 91-92 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6053-54.

[9]  *See Cybergenics*, 330 F.3d at 568-69 (holding that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code implicitly authorize a court to grant a creditors' committee derivative standing to prosecute an avoidance action when the trustee or debtor-in-possession cannot or will not do so, or when the debtor-in-possession is unlikely to act); *In re Joyanna Holitogs, Inc.*, 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982) (holding that the general right to be heard would be empty unless those who have such a right are also given the right to act when the debtors refuse to do so); *see also In re iPCS, Inc.,* 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("[I]f a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code [the recovery and collection of estate property] would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead.").

the Third Circuit have granted creditors' committees standing in connection with claims similar to

the Causes of Action asserted here by operation of their equitable powers.[10] Moreover, the practice

of conferring standing upon creditors' committees to pursue actions on behalf of a bankruptcy

estate is widely followed and accepted in other jurisdictions as well.[11]

## II.    The TCC Satisfies the Requirements for Obtaining Derivative Standing

42.    In the Third Circuit, where an official committee seeks to pursue an action without

the consent of the debtor, the committee must satisfy a three-part test to be granted derivative

standing.[12] Under this test, the committee may obtain derivative standing where:

(i)    a colorable claim exists;

(ii)    the debtor-in-possession unjustifiably refuses to pursue the colorable claim;[13] and

(iii)    the bankruptcy court grants the committee permission to initiate the action on behalf of the debtor's estate.[14]

---

[10]    *See Cybergenics*, 330 F.3d at 568 (holding that "the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers."); *see also Official Comm. of Unsecured Creditors v. Credit Suisse First Bos. (In re Exide Techs., Inc.)*, 299 B.R. 732, 739 (Bankr. D. Del. 2003) ("[A] bankruptcy court may utilize its equitable powers to grant a creditors' committee derivative standing to pursue avoidance actions.").

[11]    *See, e.g., Contractor Creditor's Comm. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)*, 832 F.2d 1391, 1397 (5th Cir. 1987) (discussing how "[a] number of bankruptcy courts have held that in some circumstances, a creditors' committee has standing under 11 U.S.C. §1103(c)(5) and/or §1109(b) to file suit on behalf of debtors-in-possession…or the trustee."); *Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985) (concurring with those bankruptcy courts that have held that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code imply a qualified right for creditors' committees to initiate litigation with the approval of the bankruptcy court).

[12]    *See Infinity Inv'rs Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004).

[13]    The first and second *Cybergenics* factors present an overlapping inquiry, in that a debtor in possession's refusal to pursue a claim is unjustifiable where the claim is colorable and "there [is] potential for a considerable benefit to the estate." *Official Comm. of Unsecured Creditors v. CIBC Wood Gundy Ventures, Inc. (In re Temtechco, Inc.)*, No. 95-00596, 1998 WL 887256, at *7 (Bankr. D. Del. Dec. 18, 1998) (citing *Unsecured Creditors' Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 905 (2d Cir. 1985)).

[14]    *See id.* at 145; *see also Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)*, 527 B.R. 169, 173 (D. Del. 2015) ("Derivative standing requires a party to show three elements: '(1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to initiate the action.'") (quoting *Infinity Investors Ltd. v. Kingsborough (In re Yes! Ent. Corp.)*, 316 B.R. 141, 145 (D. Del. 2004)).

43.     The TCC satisfies each of the elements of this test and should be granted derivative standing to further pursue the Causes of Action.

### A.     The Causes of Action Asserted in the Draft Complaint Are Colorable

44.     Asserting a "colorable claim" is a relatively low threshold to satisfy, requiring the court to find that the claim is "not without merit."[15]  In granting standing to the committee in *In re Chesapeake Energy Corp.*, Judge Jones remarked that the standard for a 'colorable' claim was akin to a claim that was not sanctionable under the Rules of Professional Conduct:  "Colorability is a really low standard.  It doesn't take a lot to get over the colorability standard.  And I do find that the claims asserted by the Committee meet that….[T]here are plenty of lawyers who would put their name pursuant to Rule 11 on a complaint that sets forth those claims, and if that's not exactly the colorability argument or standard, it's awfully close."[16]

45.     In determining if a claim is "colorable," this Court need not conduct a mini-trial. Rather, "the Court may weigh the 'probability of success and financial recovery,' as well as the anticipated costs of litigation as part of a cost/benefit analysis conducted to determine whether the pursuit of the colorable claims are likely to benefit the estate."  *iPCS*, 297 B.R. at 291 (citations omitted).  The TCC need only establish the existence of a plausible claim and that the Causes of Action have value to the Debtor's estate and its creditors.  The TCC has done so here.

---

15    *In re Distributed Energy Sys., Corp.*, Case No. 08-11101 (KG) (Bankr. D. Del.) [Dkt. No. 315] ("[T]he colorable claim issue, of course, is plausibility. . . I don't even have to find that it has merit; I just have to find that it's not without merit."); *see also Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) ("Caselaw construing requirements for 'colorable' claims has made it clear that the required showing is a relatively easy one to make."); *Official Comm. of Unsecured Creditors v. Hudson United Bank (In re Am.'s Hobby Ctr., Inc.)*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998) (observing that only if the claim is "facially defective" should standing be denied

16    *See In re Chesapeake*, Case No. 20-33233, (Bankr. S.D. Tex.) Jan. 13, 2021 Hr'g Tr. at 325:5-11.

      1.     **Claims Arising From
                        the 2023 Restructuring Transactions Are Colorable**

46.     If LTL succeeded in manufacturing financial distress (which, again is hotly disputed), and if this Court takes LTL at its word that the 2021 Funding Agreement was "not unlike an ATM" available to LTL outside of bankruptcy[17], then the estate has colorable claims (a) to avoid its termination as a fraudulent transfer; (b) for a declaratory judgment that it is not "void or voidable"; (c) for breaches of fiduciary duty; and (d) for aiding and abetting breaches of fiduciary duty and civil conspiracy to commit a fraudulent transfer.

47.     **2023 Fraudulent Transfer Claims**.  Counts I through IV of the Draft Complaint focus on the termination of the 2021 Funding Agreement and are the claims that the Third Circuit warned would be brought if LTL tried to create financial distress by parting with its rights under the 2021 Funding Agreement.  *See LTL Mgmt.*, 64 F.4th at 109, fn. 18.

48.     Section 548 of the Bankruptcy Code allows for avoidance of actual fraudulent transfers made on or within two years before the petition date.  11 U.S.C. § 548(a)(1)(A).  To establish actual fraud, the movant must show that the transfer or obligation was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  *Id*.; *see also Dobin v. Hill* (*In re Hill*), 342 B.R. 183, 195-96 (Bankr. D. N.J. 2006).

49.     Here, there was a transfer of the Debtor's interest in property within two years of the petition date.[18]  And LTL terminated the 2021 Funding Agreement with actual intent to hinder, delay, or defraud its creditors.  Ordinarily, actual intent is inferred through circumstantial evidence

---

17  *See LTL Mgmt.*, 64 F.4th at 109.

18  *See, e.g., In re Green Field Energy Servs.*, 594 B.R. 239, 289-90 (Bankr. D. Del. 2018) (noting that "[t]he Third Circuit interprets 'property of the debtor' broadly to include anything of 'value'" and that "the mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the Code.") (quoting *In re R.M.L., Inc*., 92 F.3d 139, 148 (3d Cir. 1996)).

and "badges of fraud." *See, e.g.*, *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).[19]  But LTL *admitted* that it terminated the 2021 Funding Agreement for the purpose of creating financial distress.  *See* 2nd Kim Decl. at ¶¶ 82-83.  Accordingly, a colorable claim exists to challenge the termination of the 2021 Funding Agreement as an actual fraudulent transfer.

50.    The termination of the 2021 Funding Agreement can also be challenged as a constructive fraud—as the Third Circuit predicted.  Constructive fraud requires a movant to show that the debtor received less than reasonably equivalent value in exchange for the transfer, and that the transfer caused the debtor to become insolvent or to be engaged, or about to be engaged, in a business or transaction for which any property remaining with the debtor was an unreasonably small capital, or that the debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.  11 U.S.C. § 548(a)(1)(B).

51.    There are three financial conditions that trigger section 548(a)(1)(B)(ii)—*i.e.*, balance sheet insolvency, cash flow insolvency, and inadequate capital.  Inadequate capital turns on the nature of the debtor's business and whether it is "reasonably foreseeable" that the debtor will be able to "generate sufficient profits to sustain operations."[20]

52.    Importantly, inadequate capital includes financial difficulties short of equitable insolvency[21]—*i.e.*, whether the debtor can generate enough cash to pay its debts and still sustain

---

[19]  Badges of fraud are also present here, including a close relationship between transferor and transferee; lack of consideration; insolvency or indebtedness of the Debtor; the proportion of the Debtor's estate that was transferred; and the concealment of the transaction (including from this Court).  However, LTL's admission of intent to strip value from its creditors is sufficient to establish actual fraud without a need to examine the badges.

[20]  *Moody*, 971 F.2d at 1070, 1073; *see In re Lyondell Chemical Co.*, 567 B.R. 55, 109 (Bankr. S.D.N.Y. 2017) ("[T]he concept of 'unreasonable small capital' encompasses a test that incorporates an element of 'reasonable foreseeability.'") (quoting *Moody*, 971 F.2d at 1083); *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) (unreasonably small capital signifies an inability to generate enough cash flow from operations and the sale of assets to remain financially stable).

[21]  *Peltz v. Hatten*, 279 B.R. 710, 744 (D. Del. 2002) (citing *Moody*, 971 F.2d at 1070); *see In re North Am. Clearing, Inc.*, No. 6:08-ap-00145, 2014 WL 4956848, at *8 (Bankr. M.D. Fla. Sept. 29, 2014) ("Although not defined in

operations.  *See Vadnais Lumber Supply*, 100 B.R. at 137.  The test in the Third Circuit is "reasonable foreseeability."  *Peltz*, 279 B.R. at 744 (quoting *Moody*, 971 F.2d at 1073)).

53.    Among the factors that courts consider in determining foreseeability is the length of time the debtor survived (or avoided a bankruptcy filing) after the challenged transfer.  *See ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 397 (Bankr. S.D. Tex. 2008) (debtor left with unreasonably small capital even though it did not file for bankruptcy for over two years after the transfer).

54.    Here, LTL survived less than two hours after the challenged transfer.  Bankruptcy was not only foreseeable, but it was also planned.  LTL's only creditors are the talc claimants.  LTL's only business is paying talc claimants.  If LTL created financial distress under the Third Circuit's ruling, it must be that LTL's financial ability to pay talc claimants in full as their claims come due "for the foreseeable future" is now in doubt.  *LTL Mgmt.*, 64 F.4th at 108.

55.    Notwithstanding this fact, LTL tries to stand on the head of a pin by proclaiming that it is not insolvent and can still pay its debts, but it still did sufficient harm to itself to be in financial distress under the Third Circuit's standard.  But this response ignores the fact that the legal standard for proving "financial distress" under the Third Circuit's decision in *LTL Management* is essentially the same standard for proving "unreasonably small capital" under section 548(a)(1)(B)(ii)(II).  *Compare Moody*, 971 F.2d at 1070, 1073 ("[W]e hold the test for unreasonably small capital is reasonable foreseeability"); *with LTL Mgmt.*, 64 F.4th at 108 (LTL

---

the Bankruptcy Code, the most common view is that 'unreasonably small capital denotes a financial condition short of equitable insolvency.'") (quoting *Moody*, 971 F.3d at 1070); *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 321 (Bankr. S.D.N.Y. 2013) ("[T]he cases recognize that the unreasonably small capital test may be easier for a plaintiff to satisfy than insolvency because 'unreasonably small capital' means 'difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future.'") (quoting *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989)).

"was highly solvent with access to cash to meet comfortably its liabilities as they came due for the foreseeable future.").

56.    The question that must be posed under the Circuit's ruling in *Moody* is whether LTL can still generate sufficient cash—through the 2023 Funding Agreement—to sustain its business of paying talc claims for the foreseeable future.  If the answer is "yes," then LTL is not in financial distress and its case must be dismissed.  *See LTL Mgmt.*, 64 F.4th at 108 (holding LTL was not in financial distress because it had access "to cash to meet comfortably its liabilities as they came due for the foreseeable future.").  If the answer is "no," then LTL does not have sufficient capital to conduct its business and the 2023 Transaction can be avoided even if LTL is technically solvent.  *See Moody*, 971 F.2d at 1073 ("[W]e hold the test for unreasonably small capital is reasonably foreseeability.").  **There is no pin for LTL to stand on**.

57.    The TCC, of course, is not arguing (and does not need to argue) that financial distress equals insolvency in all situations.  *See SGL Carbon*, 200 F.3d at 164 ("serious financial and/or managerial difficulties at the time of filing" can constitute financial distress sufficient to establish a good-faith filing).  Again, LTL has no business except paying talc claims.  LTL is not seeking to access capital markets or to acquire new debt.  LTL can have no financial difficulties except the inability to pay the talc claims in the foreseeable future.

58.    Thus, the moment LTL proves that it succeeded in manufacturing financial distress, it will also establish that the 2023 Transaction satisfies at least one of the three forms of financial distress under section 548(a)(1)(B)(ii)(I)-(III).  The next issue, at that point, would be whether LTL received "reasonably equivalent value."  *LTL Mgmt.*, 64 F.4th at 109 fn. 18.  But the value LTL received under the 2023 Funding Agreement (a promise from JJCI, minus its consumer health business, backstopped up to $8.9 billion over 25 years from J&J, subject to confirmation of J&J's

preferred plan) is not reasonably equivalent to the 2021 Funding Agreement (at least $61.5 billion, available on demand inside or outside bankruptcy from JJCI and J&J).

59.    It is not just that these claims are colorable—it is practically impossible for J&J and JJCI to avoid summary judgment.  The moment LTL shows that it is in financial distress (a burden that it has yet to meet), the termination of the 2021 Funding Agreement must be avoided, placing LTL back in the same position it was in before its first bankruptcy case was dismissed.  All that remains is for the Court to grant the TCC standing to pursue the claim.

60.    **2023 Breach of Fiduciary Duty Claims**.  Count VI of the Draft Complaint asserts plausible claims pursuant to sections 1107 and 1108 of the Bankruptcy Code and applicable North Carolina state law for breaches of fiduciary duty and corporate waste related to the termination of the 2021 Funding Agreement.

61.    An actionable breach of fiduciary duty claim under state law generally requires that (a) the defendant owed plaintiff a fiduciary duty; (b) the defendant breached his fiduciary duty; and (c) the breach of fiduciary duty was a proximate cause of injury to plaintiff.[22]  Under North Carolina law, the managers and officers of LTL (a North Carolina LLC) owe fiduciary duties to LTL.[23]  *See* N.C.G.S. § 57D-3-21(b); *see also Timbercreek Land & Timber Co., LLC v. Robbins*, No. 17 CVS 140, 2017 WL 3214427, at *4 (N.C. Super. July 28, 2017) ("Under the North Carolina

---

[22]    *See Timbercreek Land & Timber Co., LLC v. Robbins*, No. 17 CVS 140, 2017 WL 3214427, at *4 (N.C. Super. July 28, 2017).

[23]    Section 3.08(f) of LTL's Operating Agreement exculpates LTL's managers and officers from personal liability to LTL "to the full extent permitted by the [North Carolina Limited Liability Company] Act."  This does not eliminate or waive fiduciary duties they owe to the Debtor.  Said another way, this provision concerns the punishment (extent of manager liability) and not the crime (breach of fiduciary duty).  The North Carolina Limited Liability Company Act does not permit the exculpation or indemnification of managers for liabilities arising out of acts or omissions that are in breach of the implied covenant of good faith and fair dealing.  *See* N.C.G.S. § 57D-2-30(e).  This provision does not eliminate the fiduciary duties which LTL's managers owe to the company.  The Draft Complaint includes allegations of bad faith against LTL's managers and officers, for which they could not be exculpated under the Operating Agreement or North Carolina law.

Limited Liability Company Act. . . an LLC's managers and company officials owe fiduciary duties

to the LLC to discharge their duties in good faith, with the care of an ordinary prudent person, and

in the best interests of the LLC" (internal citations omitted).).  It is well settled that managers and

officers owe fiduciary duties to their company.[24]

62.     In chapter 11, a debtor in possession owes statutory duties to operate its estate as a

fiduciary to its stakeholders.  *See* 11 U.S.C. §§ 1107(a), 1108.  And "if a debtor remains in

possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same

fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of

possession.  Indeed, the willingness of courts to leave debtors in possession 'is premised upon an

assurance that the officers and managing employees can be depended upon to carry out the

fiduciary responsibilities of a trustee.'"[25]

63.     Ensuring that corporate assets are preserved is one of the most basic duties of a

corporate fiduciary.  In bankruptcy, failure to preserve corporate assets gives rise to claims for

breach of the duty of care.[26]  Failure to supervise can also give rise to liability.[27]  Similarly, a claim

---

[24]  *See RCJJ, LLC v. RCWIL Enters., LLC*, 2016 WL 3850403, at *7 (N.C. Super. Ct. June 20, 2016).

[25]  *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985), quoting *Wolf v. Weinstein*, 372
U.S. 633, 651 (1963).  While outside of bankruptcy, a director's fiduciary duties to the company may inure only
indirectly to creditors, *see, e.g.*, *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92
(Del. 2007), "[o]ne of the painful facts of bankruptcy is that the interests of shareholders become subordinated to
the interests of creditors." *Weintraub*, 471 U.S. at 355.  As (then Chief Judge) Cardozo has emphasized,
fiduciaries are bound to the highest standards.  "Many forms of conduct permissible in the workaday world for
those acting at arm's length, are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter
than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is then
the standard of behavior." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928).

[26]  *See, e.g.*, *In re Reich*, 54 B.R. 995, 1004 (Bankr. E.D. Mich. 1985) (trustee who negligently failed to remove snow
from roof of property owned by estate was liable for breach of fiduciary duty of care when roof of property
collapsed).

[27]  *See Johnson v. Clark (In re Johnson)*, 518 F.2d 246, 251 (10th Cir. 1975), cert. denied, 423 U.S. 893 (1975)
(trustee liable for breach of the duty of care when he failed to supervise bookkeeper who embezzled funds); *Dana
Commercial Credit Corp. v. Nisselson (In re Center Teleproductions, Inc.)*, 112 B.R. 567, 576 (Bankr. S.D.N.Y.
1990) (not deferring to business judgment rule and holding trustee personally liable for breach of duty of care
where trustee failed to supervise auctioneer and induced consent to sale by negligently misquoting bids).

for corporate waste arises when an exchange is so one sided that no businessperson of ordinary, sound judgment could conclude that the corporation has received adequate consideration[28]  To state a claim for breach of the duty of loyalty for bad faith or intentional misconduct, a plaintiff must plead facts showing that a fiduciary "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his [or her] duties."[29]

64.    Here, the managers and officers of LTL admitted that they terminated the 2021 Funding Agreement and replaced it with the 2023 Funding Agreement and J&J Support Agreement in an attempt to create financial distress—that is, in an attempt to ensure that LTL would *not* have sufficient funds to pay its creditors in full.  They abandoned an "ATM" worth over $61.5 billion. No businessperson of ordinary, sound judgment could conclude that LTL's creditors received adequate consideration for this exchange.

65.    Even more egregious, LTL's managers and officers acted adversely to LTL's interests when they decided to terminate the 2021 Funding Agreement due to a purportedly perceived risk that it was "void or voidable," even though none of the payors had failed to fund or even raised the idea.  LTL's managers and officers abdicated their roles as corporate fiduciaries

---

[28]    *See Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 574 B.R. 446, 477 (Bankr. D. Del. 2017) (finding that trustee adequately pleaded corporate waste under Delaware law where directors transferred company's only asset in exchange for little consideration, failed to seek the highest price available, knowing that such transfer would not benefit general unsecured creditors or non-insiders).

[29]    *In re Answers Corp. S'holders Litig.*, No. 6170-VCN, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012) (quoting *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009)); *see In re Novell, Inc. S'holder Litig.*, No. 6032-VCN, 2013 WL 322560, at *9 (Del. Ch. Jan. 3, 2013) ("A fiduciary's conduct was in bad faith if the fiduciary . . . intentionally failed to respond to a known duty or exhibited a conscious disregard of a known duty."); *Bridgeport Holdings, Inc. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 575 (Bankr. D. Del. 2008) (finding complaint adequately pled breach of the duty of loyalty where directors "abdicated crucial decision-making authority"); *Boles v. Filipowski (In re Enivid, Inc.)*, 345 B.R. 426, 452 (Bankr. D. Mass. 2006) (denying motion to dismiss and holding that claims of bad faith survived where plaintiff alleged that directors "consciously and intentionally disregarded their responsibilities by knowingly failing to make decisions critical to [the company] on an informed basis.").

by allowing LTL to be faceless in negotiations over termination of the 2021 Funding Agreement ceding control over LTL's rights against its counterparties to its counterparties.

66.    **2023 Aiding & Abetting & Civil Conspiracy Claims**.  Counts V and VII of the Draft Complaint assert plausible claims against J&J, JJCI, J&J Services, and individual defendants for aiding and abetting the breaches of fiduciary duty described above, and for civil conspiracy.

67.    Aiding and abetting under New Jersey law requires (i) knowledge that the other's conduct constitutes a breach of duty and (ii) substantial assistance or encouragement to the other in breach of that duty.  *See* Restatement (Second) of Torts § 876(b); *see also Bondi v. Citigroup, Inc.*, No. 10902-04, 2005 WL 975856, *17 (N.J. Super. Ct. Law Div. Feb. 28, 2005).

68.    Similarly, "a creditor in New Jersey may bring a claim against one who assists another in executing a fraudulent transfer." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005).  Plaintiffs must prove (i) an agreement between parties to inflict an injury on another; (ii) an overt act; (iii) and an underlying fraudulent transfer. *See id.* (noting that "[c]ivil conspirators are jointly liable for the underlying wrong and resulting damages.").

69.    J&J and JJCI are parties to the agreement (the "Termination and Substitution Agreement") by which the 2021 Funding Agreement was terminated.  2nd Kim Decl. at Annex D and ¶ 79.  This agreement inflicted injury on LTL by stripping it of value that would otherwise have been available to pay its debts as they came due.  These acts resulted in the fraudulent transfers described above.

70.    Each of the defendants of these counts effectively agreed to terminate the 2021 Funding Agreement and encouraged or assisted Mr. Kim in terminating it against the interests of LTL.  Each of these parties knew that Mr. Kim owed fiduciary duties to LTL.  Therefore, the aiding and abetting and civil conspiracy claims alleged in the Draft Complaint are colorable.

### 2.     A Declaratory Judgment Claim That the 2021 Funding Agreement Is Not Void or Voidable Is Colorable

71.     Count VIII of the Draft Complaint asserts a valid and plausible request for a declaratory judgment that the 2021 Funding Agreement was not "void or voidable" by J&J or any other party.  Under the Declaratory Judgment Act, a Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought" and that "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  28 U.S.C.A. § 2201.

72.     "Whether declaratory relief should be granted in an appropriate case is committed to the sound discretion of the trial court."  *Hodinka v. Delaware Cty.*, 759 F. Supp. 2d 603, 610 (E.D. Pa. 2011) (internal quotation marks and citations omitted).  "The Third Circuit has set out the following general guidelines for the exercise of discretion under the Declaratory Judgment Act: (1) the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in a settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies."  *Id.* (internal quotation marks and citations omitted).  A declaratory judgment is an appropriate remedy under the facts at issue.

73.     **First**, there is a high likelihood that the declaration will definitively resolve the uncertainty that gave rise to the controversy—*i.e.*, whether the 2021 Funding Agreement was void or voidable, which LTL claims was the basis for terminating the 2021 Funding Agreement, entering into the far more meager 2023 Funding Agreement.  The TCC's position is that if there was a material risk that the 2021 Funding Agreement was "void or voidable" such that J&J or JJCI could have refused to comply with their payment obligations thereunder, then the Divisive Merger must be avoided as a fraudulent transfer as set forth below.

74.     **Second**, a declaratory judgment will be convenient to all relevant parties, as it will efficiently resolve a pending uncertainty.   **Third**, the settlement of the uncertainty here is of paramount public interest because it bears directly on whether the termination of the 2021 Funding Agreement was fraudulent or whether the Divisive Merger was fraudulent.   **Fourth**, no other remedies will be as convenient or as readily available as a declaratory judgment from this Court.

75.     The Third Circuit's decision, and the subsequent dismissal of LTL's first bankruptcy case, did not render the 2021 Funding Agreement "void or voidable."   The only justification presented for the "void or voidable" theory is that the Third Circuit's decision "defeated the fundamental purpose of that agreement, which purpose was to facilitate the Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code."   2nd Kim Decl. at ¶ 78.   This is revisionist history.

76.     The purpose of the 2021 Funding Agreement was to "make certain that the Debtor has the same, if not greater, ability to fund the costs of defending and resolving present and future talc-related claims as Old JJCI did prior to the restructuring."[30]   It expressly provides that J&J is obligated to fund these costs both inside and outside of bankruptcy (including "at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee.").[31]

77.     And, again, this Court specifically held that 2021 Funding Agreement's promise of at least $61.5 billion to pay talc claims was "available upon confirmation of a plan—**whether or not the plan is acceptable to J&J or New JJCI, and whether or not the plan offers payors protections under § 524(g)**."   *LTL Mgmt.*, 637 B.R. at *423-24 (emphasis added).

---

30   1st Kim Decl. at ¶ 21 ("This was achieved through the establishment of a funding agreement.").

31   2021 Funding Agreement, definition of "Permitted Funding Use."

78.     For frustration of purpose to excuse performance under a contract, "there must be an implied condition to the contract that a changed condition would excuse performance; this changed condition causes a failure of consideration or the expected value of performance; and that the changed condition was not reasonably foreseeable."[32]

79.     But no "implied" condition of bankruptcy can exist because the 2021 Funding Agreement expressly provides that it applies outside of bankruptcy: "if the parties have contracted in reference to the allocation of risk involved in the frustrating event, they may not invoke the doctrine of frustration to escape their obligations."[33]   And, neither LTL nor J&J has shown "a failure of the consideration or a practically total destruction of the expected value of the performance."[34]   The consideration for the 2021 Funding Agreement was the allocation to LTL of Old JJCI's talc liability under the divisive merger.   To the extent LTL remains liable for the talc liabilities of Old JJCI, there is no failure of consideration.   Moreover, the dismissal of LTL's bankruptcy was reasonably foreseeable, as Mr. Gordon himself conceded.[35]

80.     Frustration of purpose is applicable where parties face a situation from which they could not have protected themselves by contract.[36]   J&J could have, but did not, provide that the 2021 Funding Agreement would be "void or voidable" upon dismissal of a bankruptcy case.

---

[32] *Faulconer v. Wysong and Miles Co.*, 574 S.E.2d 688, 691 (N.C. Ct. App. 2002).

[33] *Brenner*, 274 S.E.2d at 211.

[34] *See id.*

[35] Apr. 18 Hr'g Tr. at 209:14-21 ("THE COURT: So how can it not be reasonably foreseeable to have a situation where the debtor is outside of a bankruptcy as a result of a dismissal of the case by this Court or the reversal? How is that not foreseeable, and why would it make it void or voidable? MR. GORDON: Well, the point I'm making—that's a really good question, Your Honor.  The point I'm making is I'm not saying that a dismissal was not reasonably foreseeable.").

[36] *See Paez v. Paez*, 837 S.E.2d 214 (N.C. Ct. App. 2020) ("The guiding principle underlying the frustration of purpose doctrine is to give 'relief in a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies [that] later arose.'") (quoting *The Currituck Assocs. v. Hollowell*, 601 S.E.2d 256, 264 (N.C. Ct. App. 2004)); *Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC*, No. 19 CVS 13580, 2022 WL 3048320, at * 19 (Sup. Ct. N.C. Aug. 2, 2022) (frustration of purpose not available where parties "had every opportunity to protect their interests via contract but failed to do so.").

Because the 2021 Funding Agreement provides that it is available inside and outside bankruptcy, it is not "void or voidable" either because of frustration of purpose or for any other reason arising from the Third Circuit's ruling dismissing LTL's first bankruptcy.

### 3.    In The Alternative, Claims Arising From the Divisive Merger and the Kenvue Transfer Are Colorable

81.    Alternatively, if the 2021 Funding Agreement was illusory—*i.e.*, there actually was a material risk that the 2021 Funding Agreement was void or voidable by J&J and J&J could never have been compelled to pay anything thereunder unless J&J obtains the benefit of payor protections under section 524(g) and a complete release for all talc claims—then the Divisive Merger and the Kenvue Transfer were fraudulent transfers and can be avoided and unwound.

82.    **2021 Fraudulent Transfer Claims—Divisive Merger**.  Counts IX-XII of the Draft Complaint assert fraudulent transfer claims pursuant to 11 U.S.C. § 548(a) and the Uniform Fraudulent Transfer Act (UFTA) and/or the Uniform Voidable Transactions Act laws made applicable through 11 U.S.C. § 544(b)(1).  These counts focus on the 2021 Restructuring Transactions and the divisive merger that effectuated (i) a transfer of assets out of the reach of talc claimants and (ii) a transfer of talc liabilities into the special purpose LTL entity.

83.    The 2021 Funding Agreement was the keystone of the Divisive Merger and, per Debtor's counsel, the element of the transaction that would rescue the Divisive Merger from being a blatant fraud:

> And Your Honor may remember this, but I remember it very well.  In North Carolina, we were always being criticized in these funding agreements on the basis that what's to stop the [payor] from dividending all its assets up to the parent.  And one of the big justifications or thinking behind this [2021] funding agreement or the J&J support was just to take that issue off the table.  And, again, it was to facilitate a filing to get parties beyond concerns of fraudulent transfer…

April 18, 2023 Hr'g Tr. at 210:16-24.  Without the 2021 Funding Agreement, the entire Divisive Merger served to saddle LTL with JJCI's liabilities and provided *no value* in return.  In this

situation, all of the elements of an actual fraudulent transfer under 11 U.S.C. § 548(a) are present.

84.    **First**, a "transfer" occurred.  Namely, the pre-petition "restructuring" transactions and divisive merger effectuated (i) a transfer of assets out of the reach of talc claimants and (ii) a transfer of talc liabilities into the special purpose LTL entity.

85.    LTL may attempt to allege that the operation of the Divisive Merger did not constitute a "transfer" under Texas state law.  *See* Tex. Bus. Org. Code § 10.008(a)(2).  However, (a) there is no reason why Texas law should control the definition of "transfer" under the Bankruptcy Code; and (b) Texas law does not use the same "no transfer" language with regard to the transfer of liabilities as it does with regard to the transfer of assets, and thus the transfer of the talc liabilities to LTL would remain a "transfer" under Texas law.  *Compare id. with* § 10.008(a)(3).  Further, the Texas Business Organizations Code makes explicit that it "does not abridge any right or rights of any creditor under existing law." *Id.* at § 10.901.

86.    The definition of "transfer" in the Texas Uniform Fraudulent Transfer Act "means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  Tex. Bus. & Comm. Code § 24.002(12); *see* 11 U.S.C. § 101(54).  This definition is broad enough to encompass a divisive merger.

87.    Moreover, this interpretation of Texas law would lead to absurd results.  In a similar Texas Two-Step case, *In re DBMP LLC* (Case No. 20-30080, Bankr. W.D.N.C.), the United States Bankruptcy Court for the Western District of North Carolina (the "North Carolina Court") denied the debtor's motion to dismiss a fraudulent transfer complaint brought by the tort claimants committee.  The debtor in that case argued that the allocation of assets and liabilities under the Texas divisional merger statute did not constitute a transfer within the meaning of section 548 of

the Bankruptcy Code.  The North Carolina Court flatly rejected this argument:

> I'm fully sensitive to the plain meaning argument of what the Bankruptcy Code says that can be avoided, but ***plain meaning is subject to absurd results and that's the exception to plain meaning***.  If we take this in the very narrow way that the movants are asking me to, then effectively, you end up with the possibility that someone could engineer—and I'm not saying that's what happened here.  That's to be decided—but if someone was craven and wanted to divide an otherwise profitable company just to get rid of certain liabilities that you just as soon not pay and you put all of the assets in a good company and all of the liabilities in a bad company, if the bad company cannot sue for that harm or the creditors of the bad company can't sue with a bankruptcy being filed immediately after, there's, ***the door is wide open to wholesale fraud and that cannot be. . . what the Texas merger statute was designed to do***.  There's no indication.  It's supposed to be neutral for debtor-creditor purposes.  So that just can't be the way it is.  And again, if you are taking it at plain meaning likewise on the obligation side, the suggestion is, well, if there are obligations to be avoided, then those are the obligations that the, the debtor, DBMP, could avoid the obligations that were, it was saddled with, meaning the asbestos liabilities, and if you avoided those, then DBMP wouldn't owe the liabilities, but so, too, the new company under the wording of the Texas statute wouldn't be liable for those liabilities and Old CT has been dissolved as a result of the merger.  ***Again, you end up with no recourse whatsoever and that's contrary to the stated intention of the Texas statute and it would be totally contrary to all Anglo-American notions of fraudulent conveyance law***.

*Official Comm. of Asbestos Personal Injury Claimants v. DBMP LLC*, Adv. No. 21-03023-JCW

(Bankr. W.D.N.C. 2021), July 7, 2022 Hr'g Tr. [Dkt. No. 85], at 23:24-25:4 (emphasis added).

(Attached as <u>Exhibit C</u>).[37]

88.     The Divisive Merger was designed to hinder, delay, and defraud talc victims by stripping their claims from the assets that had previously been available to satisfy them.  Further, if there was a material risk that 2021 Funding Agreement was void or voidable by J&J (for any reason), then LTL received less than reasonably equivalent value in return for the talc liabilities assigned to it and LTL was rendered insolvent when the Divisive Merger assigned it those

---

[37]  As the North Carolina Court had previously indicated, the remedy for a violation of the Texas statute "would generally be to reallocate all or a portion of the allocated liability to one or more of the surviving entities in the merger or to make some or all of the resulting entities liable for all or a portion of the liabilities of the predecessor debtor corporation."  *In re DBMP LLC*, 2021 WL 3552350, at *26 (Bankr. W.D.N.C. Aug. 11, 2021) (citation omitted).

liabilities.  As Mr. Gordon admitted, the 2021 Funding Agreement was **the asset** that could have rescued the transaction from being a fraudulent transfer.  *See supra* at ¶ 20.

89.    **Kenvue Transfer**.  Counts XIV to XVII of the Draft Complaint also assert valid and plausible claims to avoid the Kenvue Transfer, which stripped JJCI of its consumer health business, which was valued at $42.5 billion.  By transferring its consumer health business through a series of integrated transactions to Janssen Pharmaceuticals and ultimately, Kenvue, JJCI intentionally hindered, delayed, and defrauded the talc claimants.

90.    The intended consequence of the Kenvue Transfer was to strip talc claimants of assets that would otherwise be available to pay their claims.  *See* 2nd Kim Decl. at ¶¶ 82-83.  Further, it does not appear that JJCI received any meaningful value, let alone reasonably equivalent value, for the Consumer Health Spinoff.  And, again if LTL proves that it is now in financial distress, then once the Divisive Merger is avoided, JJCI would presumably be in a position where it cannot pay talc claims are they come due.

91.    **2021 Breach of Fiduciary Duty Claims**.  Counts XIX and XX of the Draft Complaint assert plausible claims against LTL's managers and officers for breaches of fiduciary duties. The managers and officers of LTL abdicated their roles as corporate fiduciaries and instead acted in the interests of J&J and its affiliates.  LTL's self-interested managers and officers were all seconded to LTL by J&J corporate enterprise and were personally involved in Project Plato since its inception.  The agreements that LTL entered into in connection with the Divisive Merger—including the Divisive Merger Support Agreement—were between insiders, lacked any meaningful negotiation, and were driven by upper management of J&J.

92.    Following these transactions, the managers and officers of LTL continued to take actions to shield J&J at the expense of LTL.  LTL's managers and officers acted in bad faith and

in breach of the duty of loyalty and care when they entered into the Divisive Merger and related intercompany agreements and authorized the bankruptcy to the detriment of LTL and the benefit of J&J, JJCI, and their affiliates.

93.     **2021 Aiding and Abetting and Civil Conspiracy Claims**.  Counts XVIII and XX of the Draft Complaint assert plausible claims against J&J, certain J&J employees, and others for aiding and abetting the breaches of fiduciary duty described above, and for civil conspiracy under the standards set forth above.

94.     J&J knew that LTL's management was in breach of their fiduciary duties to LTL, and nonetheless facilitated this breach.  LTL's management team was employed in high-ranking positions at J&J.  By devising and executing the Divisive Merger, J&J was conspiring with its affiliates to injure the talc claimants by removing assets from their reach, and they are thus also liable for civil conspiracy to commit fraudulent transfer.

4.       **Section 502(d) Claims Are Colorable**

95.     Count XXI of the Draft Complaint seeks disallowance of the claim of any Defendant (including indemnification claims by JJCI and/or J&J) unless and until the fraudulent transfers to such Defendants are turned over to the Debtor.  *See* 11 U.S.C. § 502(d).  If fraudulent transfer claims are colorable, then by operation of law this claim is colorable as well.

B.      **The Debtor Will Not Assert the Causes of Action**

96.     The second element of the derivative standing test requires that either:  (i) the TCC make a demand on the Debtor to assert the Causes of Action, and the Debtor unjustifiably refuse the TCC's demand; or (ii) that such a demand be excused as futile.[38]

---

[38]  *See In re Yes! Entm't Corp.,* 316 B.R. at 141; *G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 630 (Bankr. D.N.J. 2004); *In re STN Enters.,* 779 F.2d at 904.

97.    Here, the Debtor has conceded it will not, and cannot, prosecute the causes of action.[39]  LTL is intertwined with, and beholden to, the targets of the Causes of Action.  LTL's board, management, and professionals are all inexplicably entwined with J&J.  LTL directors work for J&J (or affiliates) and draw J&J salaries.  LTL's Chief Legal Officer is a seconded J&J Assistant General Counsel, who played a direct role in the Divisive Merger and managed all the talc powder claims against J&J.  LTL's bankruptcy counsel has long served J&J, and orchestrated the Divisive Merger for J&J.  LTL essentially concedes that it is in bankruptcy—not to serve tort claimant interests—but to serve J&J interests.  The second element of the standing test is satisfied.

### C.    The TCC Should be Granted the Right to Pursue the Causes of Action

98.    The TCC should be granted the exclusive right to settle the Causes of Action, if deemed appropriate by the Court pursuant to Bankruptcy Rule 9019.  To entrust LTL—an entity created, owned, and controlled by J&J—with settling the Causes of Action would invite mischief.

99.    Rather than maximizing the value of the estate, LTL (at the direction of J&J) will find the lowest rung in the range of reasonableness and settle at exactly that, to the detriment of its creditors.  This is not speculation *because this is exactly what LTL has already done*:  LTL gave away its keystone asset to settle the question of whether the 2021 Funding Agreement was void or voidable—an argument that none of the payors under that agreement had even raised.  There can no longer be any illusions that LTL is controlled by parties willing to act in a manner inconsistent with their fiduciary obligations to the talc claimants.

---

[39]    *See Response to Application For Retention of Professional Jones Day as Attorney*, Docket No. 1190, at ¶ 43 ("The Debtor clearly would never "investigate" the matter as a possible fraudulent transfer…"); ¶ 47 (admitting any challenge to the Divisive Merger would need to come from creditors via a motion for derivative standing); *see also* Letter to The Honorable Michael B. Kaplan [Docker No. 1562] (noting that Debtor would not oppose derivative standing, though seeking to insert an examiner investigation to delay a derivative standing motion); 7 *Collier on Bankruptcy* ¶1109.05 [2][a] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("[I]f the demand is presumptively futile under the circumstances...the failure to make the demand...does not prevent the court from authorizing [a creditor or] some other party in interest from pursuing the matter on behalf of the estate.").

## RESERVATION OF RIGHTS

100.    The TCC reserves its rights to (i) supplement this Motion and the Draft Complaint (including by adding additional counts to the Draft Complaint) at any time prior to the hearing on the same, and (ii) seek authority to commence, prosecute, and settle other claims and/or causes of action on behalf of the Debtor's estates against the Defendants identified in the Draft Complaint or any other party.

## WAIVER OF MEMORANDUM OF LAW

101.    The TCC respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3) because the legal basis upon which the TCC relies is incorporated herein and the Motion does not raise any novel issues of law.

## NO PRIOR REQUEST

102.    No prior request for the relief sought herein has been made by the TCC to this or any other court.

## NOTICE

103.    Notice of this Motion has been provided to:  (i) counsel to the Debtor; (ii) the Office of the United States Trustee for the District of New Jersey; (iii) counsel to J&J; (iv) all parties that have requested notice pursuant to Bankruptcy Rule 2002; and (v) all parties who have appeared in these cases and receive automatic service through the Court's ECF system.  In light of the nature of the relief requested, the TCC respectfully submits that no other or further notice of the Motion is required.

<u>**CONCLUSION**</u>

**WHEREFORE**, the TCC requests that the Court (i) grant the Motion, (ii) grant the TCC

exclusive leave, standing and authority to commence, prosecute, and, if appropriate, settle the

Causes of Action set forth in the Draft Complaint on behalf of the Debtor's estate, and (iii) grant

the TCC such other and further relief as is just and proper.

Respectfully submitted,

**GENOVA BURNS, LLC**

By:    <u>*/s/ Daniel M. Stolz, Esq.*</u>

Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee
of Tort Claimants*