# **EXHIBIT B**

DRAFT COMPLAINT

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b) | **BROWN RUDNICK LLP** |
| | David J. Molton, Esq. |
| **GENOVA BURNS LLC** | Robert J. Stark, Esq. |
| Daniel M. Stolz, Esq. | Michael Winograd, Esq. |
| Donald W. Clarke, Esq. | Eric R. Goodman, Esq. |
| Matthew I.W. Baker, Esq. | Kenneth J. Aulet, Esq. |
| dstolz@genovaburns.com | dmolton@brownrudnick.com |
| dclarke@genovaburns.com | rstark@brownrudnick.com |
| mbaker@genovaburns.com | mwinograd@brownrudnick.com |
| 110 Allen Road, Suite 304 | egoodman@brownrudnick.com |
| Basking Ridge, NJ  07920 | kaulet@brownrudnick.com |
| Tel: (973) 467-2700 | Seven Times Square |
| Fax: (973) 467-8126 | New York, NY  10036 |
| *Proposed Local Counsel to the Official Committee of Talc Claimants* | Tel: (212) 209-4800 |
| | Fax: (212) 209-4801 |
| | |
| | and |
| | |
| | Jeffrey L. Jonas, Esq. |
| | Sunni P. Beville, Esq. |
| | Sharon I. Dwoskin, Esq. |
| | jjonas@brownrudnick.com |
| | sbeville@brownrudnick.com |
| | sdwoskin@brownrudnick.com |
| | One Financial Center |
| | Boston, MA  02111 |
| | Tel: (617) 856-8200 |
| | Fax: (617) 856-8201 |
| | *Proposed Co-Counsel for the Official Committee of Talc Claimants* |
| **MASSEY & GAIL LLP** | **OTTERBOURG P.C.** |
| Jonathan S. Massey, Esq. | Melanie L. Cyganowski, Esq. |
| jmassey@masseygail.com | Richard G. Haddad, Esq. |
| 1000 Maine Ave. SW, Suite 450 | Adam C. Silverstein, Esq. |
| Washington, DC  20024 | Jennifer S. Feeney, Esq. |
| Tel: (202) 652-4511 | David A. Castleman, Esq. |
| Fax: (312) 379-0467 | mcyganowski@otterbourg.com |
| | rhaddad@otterbourg.com |
| *Proposed Special Counsel for the Official Committee of Talc Claimants* | asilverstein@otterbourg.com |
| | jfeeney@otterbourg.com |
| | dcastleman@otterbourg.com |
| | 230 Park Avenue |

|  | New York, NY  10169<br>Tel: (212) 661-9100<br>Fax: (212) 682-6104<br>*Proposed Co-Counsel for the Official Committee of Talc Claimants* |
|---|---|
| In re:<br><br>**LTL MANAGEMENT, LLC,**<br><br>                    Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Honorable Michael B. Kaplan |
| **OFFICIAL COMMITTEE OF TALC CLAIMANTS**,<br><br>                    Plaintiff,<br><br>        v.<br><br>J&J; JOHNSON & JOHNSON HOLDCO (NA) INC; JANSSEN PHARMACEUTICALS, INC.; KENVUE, INC.; J&J SERVICES, INC.; JOHN K. KIM; ROBERT WUESTHOFF; RUSSELL DEYO; RICHARD DICKINSON; MICHELLE GOODRIDGE; CHRIS ANDREW; ERIK HAAS; MICHELLE RYAN; MICHAEL ULLMANN; JOAQUIN DUATO; THIBAUT MONGON; JOSEPH WOLK; TINA FRENCH; SARAH BRENNAN; JOSE AZEVEDO; RANDY NIXON; NIMISH AMIN; LEONARDO DECANDIA; SHARON MASON; PAUL RUH; LOUISE WEINGROD; MATTHEW ORLANDO; ROBERT DEBERARDINE; LAURA MCFALLS; DUANE VAN ARSDALE; DAVID MCDONALD; AND JOHN DOES 1-100,<br><br>                    Defendants. | JURY TRIAL DEMANDED<br><br><br>Adv.  Pro.  No.  _____<br>(MBK) |

## COMPLAINT

The Official Committee of Talc Claimants (the "Committee" or "TCC" or the "Plaintiff")
of LTL Management, LLC ("LTL" or the "Debtor"), in the above captioned chapter 11 case, by
and through its counsel, submits this complaint (the "Complaint") against defendants J&J, Johnson
& Johnson Holdco (NA) Inc., Janssen Pharmaceuticals, Inc.; Kenvue, Inc., J&J Services, Inc.,
John K. Kim, Robert Wuesthoff, Russell Deyo, Richard Dickinson, Michelle Goodridge, Chris
Andrew, Erik Haas, Michelle Ryan, Michael Ullmann, Joaquin Duato, Thibaut Mongon, Joseph
Wolk, Tina French, Sarah Brennan, Jose Azevedo, Randy Nixon, Nimish Amin, Leonardo
DeCandia, Sharon Mason, Paul Ruh, Louise Weingrod, Matthew Orlando, Robert DeBerardine,
David McDonald, and John Does 1-100 (collectively, the "Defendants") and alleges as follows:

## PRELIMINARY STATEMENT

1.      Following LTL's ejection from bankruptcy for lack of financial distress, LTL
purports to have created financial distress for itself within the 131 minutes prior to its second
bankruptcy filing such that it qualifies for the protection of the Bankruptcy Code.  Either it is
wrong, and it is now a serial bad-faith bankruptcy filer, or it has confessed to conducting perhaps
the largest fraudulent transfer in United States history.

2.      If LTL is incorrect that it succeeded in creating immediate financial distress or fails
to meet its burden of proof that it did so, then according to binding Third Circuit precedent it is
ineligible to be a debtor.  In that event, LTL must (again) be ejected from bankruptcy as a now-
serial bad-faith bankruptcy filer on the same grounds it was ejected from bankruptcy the first time,
in which case this Complaint would not be required.[1]

---

[1]   For the avoidance of doubt, claims identified in this Complaint may still exist following the dismissal of LTL's
second bankruptcy, and all rights with respect to those claims are reserved.

3.      If LTL is successful in showing it is (now) in immediate financial distress when, 131 minutes beforehand it was not, that is cold comfort to LTL.  It necessarily means that LTL and Johnson & Johnson ("J&J") engaged in transactions with the actual intent to hinder, delay, and defraud dying cancer victims and prevent such victims from exercising their Constitutional rights, and that LTL made a transfer where it did not receive reasonably equivalent value and, following such transfer, was insolvent, left with unreasonably small capital, or was left unable to pay its debts as they came due.  It is, thus, a necessary conclusion that LTL and J&J have committed, and confessed to, what may be the largest fraudulent transfer in United States history. This Complaint is brought in the event that it is determined the latter is correct and, thus, every allegation set forth herein assumes, as threshold matter, that LTL has proven that it is in financial distress and eligible to be a debtor in a chapter 11 proceeding.

4.      The first such transaction occurred on April 4, 2023, when LTL parted with its rights under the 2021 Funding Agreement for the purpose of creating financial distress.[2]  The 2021 Funding Agreement was LTL's most valuable asset and was provided to LTL as consideration for the talc liabilities allocated to LTL in connection with the Divisive Merger.

5.      The 2021 Funding Agreement had to be absolute for the Divisive Merger to not constitute a blatant fraud.  The 2021 Funding Agreement had a floor of $61.5 billion, could only increase in value, and was guaranteed by J&J itself.  As the Third Circuit held, the 2021 Funding Agreement was "not unlike an ATM disguised as a contract" and provided LTL with sufficient funding to pay its talc liabilities inside and outside of bankruptcy.  *In re LTL Mgmt. LLC*, 64 F.4th 84, 109 (3d Cir. 2023) (as amended).  Based on the funding available to LTL under the 2021

---

[2]     Capitalized terms not otherwise herein shall have the meaning given to them in the Standing Motion, as applicable.

Funding Agreement, the Third Circuit found that LTL was not in financial distress. In response,

J&J caused LTL to abandon its most valuable asset.

6.      The Third Circuit warned LTL and J&J that the consequences of engaging in such

conduct would not solve their problems:

> Some might read our logic to suggest LTL need only part with its funding backstop
> to render itself fit for a renewed filing. While this question is also premature, we
> note interested parties may seek to "avoid any transfer" made within two years of
> any bankruptcy filing by a debtor who "receive[s] less than a reasonably equivalent
> value in exchange for such transfer" and "became insolvent as a result of [it]."
> 11 U.S.C. § 548(a). So if the question becomes ripe, the next one might be: Did
> LTL receive reasonably equivalent value in exchange for forgoing its rights under
> the [2021] Funding Agreement?

*Id.* at 109 n.18.

7.      Of course, LTL did not receive "reasonably equivalent" value in exchange for

releasing its rights under the 2021 Funding Agreement. LTL was given rights under the 2023

Funding Agreement, which LTL admits are of far lesser value, to create financial distress. LTL

and J&J did not try to hide what they did. LTL admits that the intent of terminating the 2021

Funding Agreement was to not to achieve any value for LTL or its creditors. LTL destroyed its

most valuable asset in an attempt to create financial distress and hinder and delay its creditors—

*i.e.*, the talc claimants. And LTL did so at the direction and control of J&J.

8.      In that event, then one or more fraudulent transfers made by LTL must be avoided.

Such avoidance will either restore LTL's rights under the 2021 Funding Agreement (meaning that

LTL could no longer be in financial distress) or, alternatively, restore JJCI to the financial

condition it was in prior to the Texas Two-Step (when it owned its consumer health business and

was liable for talc claims).

9.      Why has J&J gone to such lengths to hinder, delay and defraud the talc claimants?

J&J submits that it had no liability for talc claims and that they are not supported by science. But

in the United States, J&J does not get to decide whether it is liable for selling products containing asbestos. Under the Constitution and the American judicial system, courts and juries decide whether J&J is liable for selling products containing asbestos. If J&J elects not to enter into a fair and reasonable settlement with parties, the consequence is that parties may litigate their claims to judgment and then collect that judgment from J&J.

10.     J&J—one of the wealthiest companies on the planet—does not have the right to use the bankruptcy system to deny talc claimants their Constitutional rights or prevent them from recovering from J&J. J&J's objectives are not compatible with the American judicial system.

11.     But J&J remains defiant. J&J's conduct here (in LTL's first and second bankruptcy) and J&J's conduct for the past half century are remarkably consistent. For half a century or more, J&J has, directly and through its subsidiaries, sold talc products containing asbestos, fibrous talc, and other ingredients that, individually or in combination, are dangerous carcinogens. J&J did so despite being aware of scientific studies, conducted by researchers at different institutions, in different countries, using different study designs that almost uniformly showed a 30-60% increased risk of ovarian cancer. J&J did so despite incontrovertible scientific knowledge that asbestos causes mesothelioma.

12.     Despite this evidence, J&J advertised this talcum powder to parents to use on their newborn babies; it advertised this talcum powder for women to use on their perineal or genital region; and it advertised this talcum powder for general everyday use by men and women. J&J warned consumers of none of the relevant facts. J&J misled the public about the asbestos contamination in its products. J&J failed to warn women of the potential risk of ovarian cancer when talcum powder was used in the genital area. J&J failed to warn anyone of the risk of mesothelioma to anyone breathing air that contained talcum powder contaminated with asbestos.

J&J sought FDA approval to allow asbestos in powder to be used on newborn infants, again without warning anyone of these dangers to those infants (and everyone around them) of developing these cancers. J&J did this knowing that it had a safe alternative to talc—corn starch.

13.    The human toll of J&J's choice is staggering. Over the decades, tens of thousands of women have developed ovarian cancer caused by the migration of the talc and its contaminants from the exterior of their body to their ovaries, where it has accumulated and remained in the same way asbestos and other contaminants accumulate in the lungs. Thousands of men and women have developed mesothelioma from inhaling the asbestos in J&J's baby powder. Both cancers are lethal and often incurable.

14.    The costs of treating and caring for these patients deal another devastating blow to the victims and their families:  they can run in the hundreds of thousands of dollars per patient, and on frequent occasions even exceed a million dollars per patient. As a result, their families face not only the prospect of their loved ones dying prematurely, but the cancer victims die knowing their family may have been financially ruined because of both the costs of their fight to survive the cancer that J&J inflicted upon them, and the loss of their earnings for their families.

15.    For decades, J&J has covered up the asbestos contamination in its talc. It has suppressed scientific research into the link between talcum powder use and ovarian cancer and mesothelioma. For years, victims who realized the likely cause of their cancer and sued were unable to obtain relevant documents or prove the scientific link between J&J's talc products and their cancer and were threatened with damages by J&J if they did not drop their lawsuits. However, in the past decade, this wall has crumbled.

16.    Victims have been able to obtain internal documents showing what J&J knew— that its talcum powder contained asbestos and caused a risk of ovarian cancer and mesothelioma;

when it knew it—decades earlier; and what the impact it has had—women and men who have died— from incurable and fatal cancer, or who are hoping their J&J-caused cancer can be beaten before they die from it.  When J&J first detected the asbestos contamination in its products and learned of the link to ovarian cancer and mesothelioma, rather than remove it from the market or replace it with a safe alternative (corn starch), J&J engaged in a 'deny' strategy straight out of the tobacco company playbook.  J&J denied publicly that its products ever contained asbestos.

17.     Despite these proclamations, behind closed doors, J&J lobbied the FDA to allow a "safe" level of asbestos in its talcum powder products—a request the FDA, of course, refused, explicitly telling J&J that no mother would powder her infant with a "safe" level of asbestos (as there is no such safe level).  J&J was successful in largely forcing the FDA to avoid regulating talcum powder altogether, and J&J stepped in with purported "self-regulation" to reassure the public that its products contained no asbestos.

18.     However, the testing methods J&J selected were flawed, such that they could not detect lower levels of asbestos contamination—in effect, giving J&J the permitted level of asbestos contamination in talc that it sought.  Further, J&J's testing method was incapable of detecting chrysotile asbestos—the form the FDA found in J&J's baby powder in 2019.

19.     As a result, juries throughout the country have been holding J&J accountable.  J&J has been found liable by juries for causing ovarian cancer and mesothelioma in victims, and due to its "reprehensible" conduct (as confirmed by a Missouri appeals court) in hiding the asbestos and other contaminants in its product, significant punitive damages have been awarded against J&J and its subsidiaries to punish and deter its indefensible actions.

20.     Courts, including the federal court overseeing the federal talcum powder litigation and state courts in New Jersey, Missouri, California, South Dakota, and Georgia have found that

there is reliable scientific evidence linking talcum powder to ovarian cancer.  Recently, a California appellate court not only affirmed the trial court's adverse inference instruction against J&J for spoliation of key evidence, but unequivocally determined that, notwithstanding any destruction of evidence, there was still "abundant evidence" that J&J's talc "contained asbestos."  *Bader v. Johnson & Johnson*, 303 Cal. Rptr. 3d 162 at 194-95 (Cal. Ct. App. 2022).  Courts have repeatedly held J&J liable for mesothelioma caused by the asbestos in its talcum powder.

21.    J&J remains defiant.  It repeats its claims—rejected by juries and judges—that there is no scientific basis for the linkage between its asbestos-contaminated talcum powder and both ovarian cancer and mesothelioma.  It has continued to repeat its claims—belied by testing of the FDA, and decades of internal J&J tests and documents—that its talcum powder does not contain asbestos.  It continues to assert that the numerous scientific authorities that have demonstrated a strong link between talcum powder use and ovarian cancer are all, simply, mistaken or fabricated.

22.    Like many guilty parties facing lawsuits, J&J has resorted to destruction of evidence (*see*, *e.g.*, *Bader*, 303 Cal. Rptr 3d at 194-95) and distraction from the merits.  In fact, confronted with the mounting evidence of its wrongdoing, J&J has shifted to its standard playbook of misdirection through attacks on the plaintiffs, their lawyers, or their lawyers' experts.  J&J's lawyers proudly boasted, following several plaintiffs' verdicts, that J&J had shifted its tactics to pushing a theory of the talc lawsuits as a "sham" or fraud perpetrated by plaintiffs' lawyers.  Those attacks on the plaintiffs' bar—rather than addressing the merits of the talc lawsuits—left one New Jersey judge "horrified."

23.    With juries and judges no longer accepting J&J's claims, the tide of the talc litigation shifting against J&J, and bellwether trials scheduled to begin in April 2022, J&J entered the "Texas Two-Step."  On October 12, 2021, J&J used a maneuver that has been banned for close

- 9 -

to 500 years since the United Kingdom passed the Statute of Elizabeth.  Specifically, it instructed
JJCI (the subsidiary that manufactured Johnson's Baby Powder and was worth over $61 billion
(according to J&J's own calculations) to effectuate a series of transactions using the Texas divisive
merger statute (T.B.O.C § 10.001 et seq.), which resulted in the termination of its corporate
existence and the ultimate formation of two new entities:  LTL Management LLC ("<u>LTL</u>" or
"<u>Debtor</u>") and Johnson & Johnson Consumer Inc. ("<u>New JJCI</u>").  Decl. of John K. Kim in Support
of First Day Pleadings, *In re LTL Mgmt., LLC*, (Bankr. W.D.N.C.) No. 21-30589 [D.I. 5 ¶¶ 16,
22-23].

24.    Through the Divisive Merger transactions, LTL was allocated all of Old JJCI's talc-
related liabilities, but only certain limited assets and rights under a funding agreement.  *Id*. ¶ 24.
Meanwhile, New JJCI was allocated all of Old JJCI's other assets, including those related to a
broad range of well-known consumer health products, and remaining liabilities.  *Id*. ¶¶ 16, 19,
23-24.  LTL was then moved to North Carolina to take advantage of what its lawyers perceived to
be a more lenient good faith standard for bankruptcy filings, and New JJCI was moved to New
Jersey, where its parent J&J resides.  *Id*. ¶ 10, 16, 22-23; Transfer Order, at 10.  LTL is a passive
entity with no employees that exists solely for bankruptcy.  *Id*. at 2, 9.

25.    To avoid having this divisive merger unwound as a fraudulent transfer, J&J left a
"Funding Agreement" inside LTL that allowed LTL to access the full value of Old JJCI—
estimated to be more than $61 billion, and that would grow as the value of Old JJCI's consumer
health business grew, and with access to cash through a guarantee from J&J.

26.    As the Third Circuit recognized, this functioned as an ATM—access to cash
sufficient to satisfy talc claims as they became due in the ordinary course of business.  This
agreement was not a generous gift.  Anything less than giving LTL full access to the same value

that formerly was available to satisfy talc claims—and the same access to liquid assets (*i.e.* cash) to satisfy those claims—would mean the Divisive Merger was a fraudulent transfer.

27.     Once its integrated transaction was complete and the 2021 Funding Agreement reflecting J&J's commitment to fund at least $61 billion to pay talc liabilities was in place, J&J and JJCI caused LTL to be placed into bankruptcy.  J&J declared the automatic stay in LTL's bankruptcy case halted "all" talcum powder litigation across the country, even while assuring the capital markets that it was only LTL, and not the rest of the J&J enterprise, that had filed for bankruptcy relief.  J&J's goal was to halt this litigation for good, through utilizing the provisions of the Bankruptcy Code that are intended for the honest but unfortunate debtor that files for bankruptcy in good faith due to its financial distress.

28.     On September 19, 2022, the Third Circuit heard oral argument in an appeal by the talc creditors of the Bankruptcy Court's denial of their motion to dismiss and its extension of the automatic stay to hundreds of non-debtors.  At that oral argument, after some earlier confusion, LTL's counsel confirmed that "the funding agreement does have provisions for funding outside of bankruptcy," to which Judge Ambro replied, "Yeah, that's what I thought."[3]  The oral argument previewed that financial distress was going to be a threshold issue, and that the existence of the 2021 Funding Agreement was a significant impediment to a finding of financial distress.

29.     In late December 2022, after oral argument but before a decision was announced, despite (or because of) the fact that the measure of J&J's liability under the 2021 Funding Agreement was the value of New  JJCI, J&J took steps to transfer the immensely valuable Consumer Health Business out of New JJCI—now renamed Johnson & Johnson Holdco (NA) Inc. ("Holdco") or "New JJCI")—to another J&J subsidiary called Janssen Pharmaceuticals Inc.

---

[3]     *In re LTL Mgmt., LLC*, Case No. 22-2003/22-2004 (3d Cir.) Sept. 19, 2022, Oral Arg. Tr. 83:21-25.

("Janssen Pharmaceuticals"), with the eventual destination of the business being Kenvue Inc. ("Kenvue"), itself to be spun off with its own initial public offering in a separate publicly tradeable security.

30.     J&J even indemnified Kenvue from talc liabilities—giving Kenvue and the Consumer Health Business a fresh start that is ordinarily the goal of chapter 11, but without having to be subject to management oversight that would have resulted had J&J placed the whole of Old JJCI into chapter 11.  Although the transfer of value from Holdco to another J&J entity could have been a subsequent fraudulent transfer, the 2021 Funding Agreement continued to obligate J&J to provide a funding backstop to LTL and so covered (at the time) the loss related to the Debtor's property rights in the value of New JJCI.

31.     Ultimately the Third Circuit did not permit J&J to utilize bankruptcy in this manner. The Third Circuit found that LTL had full access to at least $61 billion of value, and there was no reliable estimate of talc liability that showed LTL was in immediate financial distress.  LTL had no business in bankruptcy, and its professed claims to want a "fair and equitable" settlement for talc claimants did not overwhelm its bad faith in filing for bankruptcy.  The Third Circuit was not blind to J&J's potential next move—to fraudulently transfer away LTL's assets to artificially create financial distress—and specifically warned against it.  The Third Circuit noted that it could not see any (legitimate) way that LTL would qualify for bankruptcy through (legitimate) immediate financial distress and mandated that LTL be ejected from bankruptcy.

32.     But J&J would not be deterred.

33.     First, during the pendency of its original bankruptcy, J&J caused "New JJCI" to transfer away its valuable consumer health business (worth well more than $40 billion dollars)— thus, removing those assets from being reached by New JJCI.  J&J, in turn, caused the consumer

health business to be transferred to its wholly-owned subsidiaries Janssen Pharmaceuticals and Kenvue through a series of complex maneuvers specifically designed to place New JJCI's consumer health business—and all future profits generated thereby—beyond the reach of LTL and talc claimants.

34.    Then, once the Third Circuit rendered its opinion, J&J implemented the second half of its scheme.  LTL's general counsel claims that as early as the day the Third Circuit decision was announced he concluded there was a material risk the 2021 Funding Agreement had been rendered "void or voidable"—a representation which neither LTL, nor J&J, has provided any support or basis for so concluding and which is contrary to controlling law.  If this were true, it would mean that legally the 2021 Funding Agreement *never existed in the first place* and, thus, the Divisive Merger was a fraudulent transfer of gigantic proportions—as was the subsequent transfer of the consumer health business from New JJCI to Kenvue.

35.    But it was not true.  LTL acknowledged (including to the Bankruptcy Court and the Third Circuit) that the 2021 Funding Agreement applied outside of bankruptcy, which it plainly does according to its own terms.  And LTL admitted that dismissal was a "reasonably foreseeable" event and that LTL understood that its case might be dismissed at some point.  Each of these admissions is fatal to any claim that the Third Circuit's ruling suddenly meant that the 2021 Funding Agreement was "void or voidable" under all legal precedent, making LTL's alleged concerns facially absurd.

36.    Nonetheless, LTL purported to "settle" claims that the 2021 Funding Agreement was "void or voidable" (having made no effort to litigate them or defend against them) with J&J—without negotiation.  Instead, "by consensus" LTL gave up the J&J guarantee, compromising its access to liquid cash, and access to the consumer health division J&J had taken from New JJCI.

- 13 -

LTL sought to create financial distress.  But in "settlement" J&J "agreed" that after LTL filed its second bankruptcy, and upon approval by the Bankruptcy Court, it would provide access to cash to fund a plan *in bankruptcy*—as long as that plan was the specific plan that J&J demanded and that would release J&J from all liability at a price of its choosing.

37.     By doing all this, LTL, J&J, and their co-conspirators knowingly and intentionally conducted what may be the largest fraudulent transfer in history.

38.     LTL thus alleged it had created "financial distress" (though, made no mention of the Third Circuit's requirement that it be "immediate") through these transfers.  It refiled for bankruptcy a mere 131 minutes after its ejection from its first bankruptcy had been implemented.

39.     If this case is not dismissed, these transfers cannot stand and J&J and its conspirators must be held to account.  The termination of the 2021 Funding Agreement is a fraudulent transfer of value from LTL, to J&J, conceived and largely executed at a time when LTL was debtor in possession with fiduciary duties to the talc creditors and not to its equity owner. That fraudulent transfer of value must be avoided, and the J&J backstop restored to continue to ensure that Talc Liabilities are funded to the extent they were before the termination of the 2021 Funding Agreement.

40.     In the alternative, in the event that the 2021 Funding Agreement is held to be void or have been voided, then the Divisive Merger was an even larger fraudulent transfer, and it instead must be unwound.  Further, the fraudulent transfer of the consumer heath business from New JJCI to Kenvue must be unwound to place the creditors of LTL back in the same position they were prior to J&J's fraudulent transfers.  J&J believes that it can do whatever it wants and that it will never be held accountable for its actions, no matter how egregious.  This must end.  If this case is not dismissed, J&J's fraud must be undone.

## JURISDICTION AND VENUE

41.     This Court has jurisdiction to consider this Complaint pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a noncore proceeding under 28 U.S.C. § 157(b).

42.     Pursuant to Local Rule 9013-1(f), the Committee does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

43.     The Committee demands a jury trial on all issues so triable.

## PARTIES

44.     The Debtor is a North Carolina limited liability company with an address at 501 George Street, New Brunswick, New Jersey 08933.

45.     The Official Committee of Talc Claimants (the "Committee"), Plaintiff in this adversary proceeding, was appointed by the U.S. Trustee on April 14, 2023. [D.I. 162].

46.     Defendant J&J ("J&J"), a New Jersey corporation, is a holding company with various subsidiaries.  J&J is the Debtor's ultimate parent company.

47.     Defendant Johnson & Johnson Holdco (NA) Inc., a New Jersey corporation, is a subsidiary of J&J.  Old JJCI's consumer health business (including assets and operations) was transferred through a series of transactions to New JJCI, which thereafter continued to operate the business without interruption.

48.     Defendant Janssen Pharmaceuticals, Inc. is a subsidiary of J&J.  New JJCI's consumer health business (included asserts and operations) was transferred through a series of transactions to Janssen Pharmaceuticals and then Kenvue, which thereafter continued to operate the business without interruption.

- 15 -

49.     Defendant Kenvue, Inc. is a subsidiary of J&J.  New JJCI's consumer health business (included asserts and operations) was transferred through a series of transactions to Kenvue, which thereafter continued to operate the business without interruption.

50.     Defendant J&J Services, Inc. ("J&J Services"), a subsidiary of J&J, employs the Debtor's officers—Mr. Kim, Mr. Wuesthoff, and Mr. Dickinson (each defined below)—each of whom are seconded to the Debtor by J&J Services.[4]

51.     Defendant John K. Kim ("Mr. Kim") is the Chief Legal Officer of the Debtor and an employee of J&J Services.  A former attorney in J&J's legal department, Mr. Kim played a direct role in the Divisive Merger and managed all the talc powder claims against J&J.[5]

52.     Defendant Robert Wuesthoff ("Mr. Wuesthoff") is the President of the Debtor and a member of the board of managers of the Debtor.  Mr. Wuesthoff is an employee of J&J Services.  Mr. Wuesthoff signed documents effectuating the Divisive Merger and the 2023 Transaction, including the Termination and Substitution Agreement, the 2023 Funding Agreement, and the J&J Support Agreement.

53.     Defendant Russell Deyo ("Mr. Deyo") is a member of the board of managers of the Debtor and a former General Counsel of J&J.  Mr. Deyo signed documents effectuating the Divisive Merger.

54.     Defendant Richard Dickinson ("Mr. Dickinson" and together, with the individuals in paragraphs 51-53, the "Managers and Officers of LTL") is the Chief Financial Officer of the

---

[4]     February 14, 2021 H'rg. Tr., at 97:7 – 97:9.

[5]     *See* Decl. of John K. Kim in Support of First Day Pleadings, *In re LTL Mgmt., LLC* (Bankr. W.D.N.C.) No. 21-30589  [D.I. 5] (the "Kim First Day Decl."), ¶ 2 ("I am employed by Johnson & Johnson Services, Inc. ('J&J Services'), a non-debtor affiliate of the Debtor and a subsidiary of the Debtor's ultimate non-debtor parent company, Johnson & Johnson ('J&J').  Just prior to my role as the Chief Legal Officer of the Debtor, I was J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group.  In that role, I was responsible for product liability litigation globally.  I began my employment with J&J and its affiliates in 2001 as a Senior Counsel in the Litigation Group. . . .").

Debtor and a member of the board of managers of the Debtor.  Mr. Dickinson is an employee of J&J Services.  Mr. Dickinson signed documents effectuating the Divisive Merger.

55.     Defendant Michelle Goodridge ("Ms. Goodridge") is the President of New JJCI and was the President of Old JJCI.  Ms. Goodridge signed documents effectuating the Divisive Merger.

56.     Defendant Chris Andrew ("Mr. Andrew") is an Assistant General Counsel at J&J. Mr. Andrew signed documents effectuating the Divisive Merger and was the recipient of an approval request memorandum regarding the Divisive Merger.

57.     Defendant Erik Haas ("Mr. Haas") is Head of Litigation at J&J and was instrumental to the design and orchestration of the Divisive Merger.

58.     Defendant Michelle Ryan ("Ms. Ryan") is the former Treasurer of J&J.  Ms. Ryan signed documents effectuating the Divisive Merger and was the recipient of an approval request memorandum regarding the Divisive Merger and approved the Divisive Merger.

59.     Defendant Michael Ullmann ("Mr. Ullmann") is the General Counsel of J&J and a member of J&J's executive committee.

60.     Defendant Joaquin Duato ("Mr. Duato") is the Chief Executive Officer of J&J and the leader of J&J's executive committee, and approved the Divisive Merger.

61.     Defendant Thibaut Mongon ("Mr. Mongon") is Executive Vice President, Worldwide Chairman, Consumer Health at J&J and a member of J&J's executive committee. Mr. Mongon was the recipient of an approval request memorandum regarding the Divisive Merger and approved the Divisive Merger.

62.     Defendant Joseph Wolk ("Mr. Wolk") is Chief Financial Officer of J&J and a member of J&J's executive committee.

63.     Defendant Tina French ("Ms. French") is Assistant Corporate Secretary at J&J. Ms. French signed documents effectuating the Divisive Merger.

64.     Defendant Sarah Brennan ("Ms. Brennan") is Vice President, New Business Development & Alliance Management at J&J's Janssen Pharmaceutical Companies. Ms. Brennan signed documents effectuating the Divisive Merger.

65.     Defendant Jose Azevedo ("Mr. Azevedo") is Vice President of Finance, Chief Financial Officer, Janssen Global R&D at J&J. Mr. Azevedo signed documents effectuating the Divisive Merger.

66.     Defendant Randy Nixon ("Mr. Nixon") is Vice President, Law at J&J's Janssen Pharmaceuticals, Inc. Mr. Nixon signed documents effectuating the Divisive Merger.

67.     Defendant Nimish Amin ("Mr. Amin") is Assistant General Counsel at J&J. Mr. Amin signed documents effectuating the Divisive Merger.

68.     Defendant Leonardo DeCandia ("Mr. DeCandia") is Chief Procurement Officer, President at J&J Services, Inc. Mr. DeCandia signed documents effectuating the Divisive Merger.

69.     Defendant Sharon Mason ("Ms. Mason") signed documents effectuating the Divisive Merger.

70.     Defendant Paul Ruh ("Mr. Ruh") is Group CFO, Consumer Health at J&J Consumer Health. Mr. Ruh was the recipient of an approval request memorandum regarding the Divisive Merger and approved the Divisive Merger.

71.     Defendant Louise Weingrod ("Ms. Weingrod") is Vice President, Global Taxation at J&J. Ms. Weingrod was the recipient of an approval request memorandum regarding the Divisive Merger and approved the Divisive Merger.

72.     Defendant Matthew Orlando ("Mr. Orlando") is Corporate Secretary and Worldwide Vice President, Corporate Governance at J&J.  Mr. Orlando was the recipient of an approval request memorandum regarding the Divisive Merger and approved the Divisive Merger.

73.     Defendant Robert DeBerardine ("Mr. DeBerardine") is Chief Intellectual Property Counsel at J&J.  Mr. DeBerardine was the recipient of an approval request memorandum regarding the Divisive Merger and approved the Divisive Merger.

74.     Defendant Laura McFalls ("Ms. McFalls") is the President of Holdco.  Ms. McFalls signed documents effectuating the 2023 Transaction, including the Termination and Substitution Agreement, the 2023 Funding Agreement, and the J&J Support Agreement.

75.     Defendant Duane Van Arsdale ("Mr. Arsdale") is the Treasurer of J&J.  Mr. Arsdale signed documents effectuating the 2023 Transaction, including the Termination and Substitution Agreement and the J&J Support Agreement.

76.     Defendant David McDonald ("Mr. McDonald" and together with the defendants named in paragraphs 55–75 the "Individual J&J Defendants") is Chief Trademark Counsel at J&J. Mr. McDonald was the recipient of an approval request memorandum regarding the Divisive Merger and approved the Divisive Merger.

77.     Defendants John Does 1-100 are persons or legal entities, whose names and addresses are unknown, who are subject to certain avoidance actions set forth herein and/or aided and abetted certain fraudulent transfers and/or certain breaches of fiduciary duties.

## PROCEDURAL BACKGROUND

78.     On October 14, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 (the "First LTL Bankruptcy" or "LTL 1.0") of title 11 of the Bankruptcy Code in the Western District of North Carolina ("North Carolina Bankruptcy Court").

79.     On November 16, 2021, the North Carolina Bankruptcy court entered an order transferring venue of the case to the District of New Jersey *In re LTL Management, LLC* (Bankr. D.N.J.) No. 21-30589 [D.I. 416].

80.     On January 30, 2023, a unanimous panel of the Third Circuit found that LTL's bankruptcy was not filed in good faith (the "Third Circuit Opinion").  On March 22, 2023, with no reported dissents, the Third Circuit rejected a petition for *en banc* review, and on March 31, 2023, the Third Circuit issued an order that incorporated the Third Circuit Opinion (in full) and certified the opinion as the mandate to the Bankruptcy Court.  On April 4, 2023, in compliance with the Third Circuit Opinion (as mandate), the Bankruptcy Court dismissed the First LTL Bankruptcy.

81.     On that same day (the "Petition Date")—131 minutes later—LTL filed a second voluntary petition for relief under Chapter 11 (the "Second LTL Bankruptcy" or "LTL 2.0") of title 11 of the Bankruptcy Code in the District of New Jersey.  Since the Petition Date, LTL has continued to operate and manage its business, such as it is, as debtor-in-possession.

82.     On April 14, 2023, the United States Trustee for Region 3 (the "U.S. Trustee") filed the Notice of Appointment of Official Committee of Talc Claimants.  Later that day, the Committee selected Brown Rudnick LLP, Genova Burns LLC, Otterbourg PC, and Massey & Gail LLP as proposed counsel to the Official Committee of Talc Claimants.

83.     On [●], the Bankruptcy Court issued an order granting standing for the Committee to pursue, *inter alia*, the transactions, claims, and circumstances described in this Complaint.

## FACTUAL ALLEGATIONS

84.     J&J has known, since *at least* the 1950s, that it was selling asbestos-contaminated talcum powder.  It has denied this asbestos contamination despite numerous independent parties

detecting asbestos in its talc products.  It has sought to suppress the knowledge of this contamination by implementing flawed testing methods in a supposed 'self-regulation' regime to ensure the FDA it would not regulate its talcum powder after the FDA refused to agree to an acceptable "safe" level of asbestos contamination.

85.    The source of the revelation of this decades-long "reprehensible conduct" (as found by an appeals court, and numerous juries) has been discovery obtained by victims' counsel, over J&J's fierce opposition, in courts throughout the country.  The result has been that juries have awarded damages against JJCI for its acts and products and have held J&J liable for its independent negligence and intentional conduct—and awarded separate punitive damages against each.

86.    Once J&J's conduct was made public and juries began awarding damages against the company and its subsidiaries, J&J—together with many accomplices—executed a scheme through a series of corporate transactions.  This scheme was intended to prevent J&J's victims from getting their day in court and obtaining their rightful compensation.  To date, this scheme has largely succeeded.  Some of J&J's victims will never get their day in court because they died after their trials were taken off the calendar.

## I.    J&J Corporate History with Talc

87.    J&J has been in the talcum powder business for over a century.  Its baby powder was one of the world's most recognizable products, producing vast profits to J&J and—as or more importantly—helping to establish its brand for the purposes of selling its other products.

### A.    J&J Gets into the Talc Business

88.    J&J, as a corporation, dates back to 1886, founded by Robert Wood Johnson and his younger brothers.  It has asserted a motto of "Safety First" and advertised that motto to its customers, causing them to believe that its products are safe, and that J&J takes pains to ensure their safety and quality.

89.     When some early J&J products (specifically, a line of medicated plasters) caused skin irritation, the Johnson brothers sent affected customers packets of talcum powder.  Upon discovering that parents had begun soothing children's diaper rash with the packets of talcum powder, J&J determined to market the product.  In 1893, J&J added a fragrance to the talcum powder and began distributing the talcum powder to midwives to give to new mothers.  The following year, J&J began selling this talcum powder product at retail, and the scent became ubiquitous and associated in the public mind with babies themselves.

90.     In the century following the creation of Johnson's Baby Powder, it became a huge business.  Talcum powder became a vast, vertically integrated product line at J&J, where J&J bought and operated talc mines, crushed the talc into powder and separated it by grade (*e.g.*, industrial or cosmetic), processed it and sold it.  Although sales had declined from its peak, as late as 2018, Johnson's Baby Powder still grossed over $400 million in annual sales in the United States alone.

91.     Even after sales declined from its peak, Johnson's Baby Powder remained a critical part of the company's marketing:  establishing J&J as a safe and trusted company to new parents in the first years of their child's life.  This pays dividends as the company then markets its other products to those parents, such as baby shampoo, sunscreen, and a host of other consumer products.

**B.    J&J Realizes Talc Is a Liability**

92.     J&J has been aware for decades that its talc was contaminated with asbestos and that asbestos was harmful to human health, even if it may not have known both facts when it began marketing its product in 1893.

**i.    Asbestos Science and Cancer**

93.     Asbestos has been used for millennia for its fire-resistant properties, found in tombs of Egyptian pharaohs who ruled as far back as 2500 BCE, but even back in Greek and Roman

times it was noticed that it had serious health hazards. Ancient writers Strabo and Pliny both mentioned the sickness that seemed to follow those who worked with asbestos, and it was well known to the Romans that miners in asbestos quarries often died young (and that lung disease was the culprit). However, knowledge of the health risks of asbestos became less well known after the end of the Roman Empire.

94.     In the modern era, lung disease caused by asbestos was identified as early as 1897, with the first documented death of an asbestos victim recorded in 1906, when a 33-year-old asbestos miner died with (as his autopsy showed) large amounts of asbestos in his lungs. Within years, insurance companies took notice and began decreasing coverage and benefits, while increasing premiums, for workers employed in the asbestos industry. Medical literature first addressed the risks of asbestos in 1924, and by the 1950s scientists had determined that there was likely a strong link between asbestos and lung cancer. However, knowledge of the dangers of asbestos was not broadly understood among the public and was suppressed by the asbestos industry. As a result of this suppression of scientific knowledge of the dangers of asbestos, asbestos production boomed in the United States (and worldwide) until the 1970s.

95.     The health hazards of asbestos come from its shape (rather than its mineral composition). Asbestos can be formed from six different kind of minerals, but its properties are largely defined by its shape—fiber-like. Five of the asbestos-forming minerals—Crocidolite, Amosite, Anthophyllite, Tremolite, Actinolite—form straight, jagged fibers called amphibole asbestos. The sixth mineral, Chrysotile, forms curved fibers called serpentine asbestos. Each of these minerals exists in nature in non-asbestiform forms as well (*i.e.*, not in its fibrous form).

96.     Today, it is understood that asbestos is a carcinogen because the physical shape of the fibers damages cells and inhibits ordinary cell processes in ways that can cause cancer and

other diseases.  There is not currently believed to be a chemical interaction between the minerals present in asbestos that causes disease—it is the size and shape of the fibers that is dangerous (as well as their durability).  A rough analogy is a shiv:  the damage a shiv causes to a human body is not dependent on the material used to make the shiv or from a reaction between the shiv material and the human body.  The material matters only to the extent that it affects the durability or sharpness of the shiv, and thus the damage it does to the body.

97.     Widespread public awareness of the dangers of asbestos—and that the asbestos industry had hidden those dangers and exposed countless millions of Americans to asbestos—caused a wave of bankruptcies as injured victims of the asbestos industry demanded justice in the tort system.  However, asbestos was never banned in the United States and remained in use far beyond what was reasonable in supposedly "safe" contexts, and victims of asbestos (both mesothelioma cancer victims and other cancer victims) continue to develop cancer and die, decades after the public became fully aware of the health dangers of asbestos.

### ii.     J&J's Discovery of Asbestos Contamination in Its Talc

98.     In the 1950's, J&J determined to test its talc for contaminants.  J&J was not doing so to determine the safety of its talc:  instead, it was concerned that the contaminants in its talc—"acicular and granular" particles—were giving the talc it obtained from its Italian mines a 'gritty' feel rather than the smooth feel from "platy" talc that J&J preferred.  The results of this testing—hidden for decades—were memorialized in reports from 1957 and 1958 (the "57-58 Reports") that showed significant asbestos contamination of J&J talc.

99.     In dry, technical language, the 57-58 Reports described "acicular and fibrous" "amphiboles" that were "presumed" to be "tremolite or enstatite[,]" and confirmed this presumption by determining that "[t]he amphibole component has been established to be the

variety tremolite[.]"  To simplify, amphiboles are a family or supergroup of minerals that form in

a crystalline shape—and, notably, the talc mineral itself is not amphibole.  It does, however,

include tremolite, which in its fibrous or acicular form, is one of the six kinds of materials

commonly referred to as asbestos.  As a result, these findings meant that the 57-58 Reports had

found fibrous contaminants from the amphibole group, and determined that those amphibole

contaminants were tremolite: a detection of fibrous tremolite, better known as asbestos.  The

samples tested were taken directly off J&J's production lines for its baby powder at weekly

intervals, so there was no doubt about where this talc was being directed.

100.    J&J has since "reinterpreted" the 57-58 Reports (as their author has died and cannot

correct the record) to claim that the tremolite detected was only "cleavage fragments" of *non-*

*asbestiform* tremolite.  But even if true (it is not), this is a distinction relevant to geologists, not to

public health.  It is, technically, correct that "non-asbestiform tremolite" exists in nature, but in

terms of health risk there is not a difference between fibrous forms of tremolite, and "cleavage

fragments" from non-asbestiform tremolite—both are equally hazardous to human health.  The

danger from tremolite comes from the shape, and cleavage fragments formed from previously non-

asbestiform tremolite has a similar shape, and thus similar health risk, as naturally asbestiform

tremolite.  Furthermore, as the product safety director for J&J's talc supplier acknowledged in a

2008 email to colleagues: "if a deposit contains 'non-asbestiform' tremolite, there is also

asbestiform tremolite naturally present as well."

101.    J&J might claim that the health risks identified in the 57-58 Reports were simply

not understood by J&J.  However, the risks of asbestos were first identified in medical literature

in 1924 and by the 1950s scientists had determined that there was likely a strong link between

asbestos and lung cancer.  As a result, J&J should have understood that the 57-58 Reports had

indicated that its talcum powder was not safe for its intended use given the asbestos contamination reported.

102.    J&J purchased talc mines in Vermont in 1964.  J&J testing conducted in 1967 showed that these mines, too, produced talc that contained tremolite—one of the minerals that forms asbestos fibers.

103.    By 1969, J&J was acutely aware of the health risks of asbestos in its talc.  In 1969, a memo from the executive in charge of J&J's talc supply to a doctor raised questions regarding the health risks of tremolite.  The executive noted that he "gather[ed] there has been a lot of attention given to the hazards" of inhaling asbestos and asbestos-like materials, and asked "How bad is Tremolite medically, and how much of it can safely be in a talc base we might develop?"

104.    The response was clear:  J&J should "limit any possible content of Tremolite in our powder formulations to an absolute minimum."

Furthermore, we have occasionally received inquiries from various individuals, including General Johnson and several pediatricians, expressing concern over the possibility of the adverse effects on the lungs of babies or mothers who might inhale any substantial amounts of our talc formulations.  In the past, we have replied to the effect that since our talc is essentially all of the platelet-type of crystalline structure, and is of a size which would not be likely to enter the pulmonary alveoli, we would not regard the usage of our powders as presenting any hazard.  Obviously, if we do include Tremolite in more than unavoidable trace amounts, this sort of negation of such inquiries could no longer pertain.

- 26 -

Upon various occasions we have discussed the possibility of carrying out studies on animals which might provide factual information with regard to whether or not variable exposures to talc suspended in the environmental atmosphere might be productive of fibrotic and/or inflammatory reactions in lungs. For a variety of reasons, these have never been carried out here.

Since pulmonary diseases, including inflammatory, fibroplastic, and neoplastic types, appear to be on the increase, it would seem to be prudent to limit any possible content of Tremolite in our powder formulations to an absolute minimum. To the best of my knowledge, we have never been faced with any litigation involving either skin or lung penetration by our talc formulations. Some years ago, we were faced with a more or less serious problem resulting from what we consider to have been an unjust accusation of danger due to the presence of a small amount of boric acid in our talc. This created such a furor that we were more or less compelled to remove boric acid from the formulation. It is conceivable that a similar situation might eventually arise if it became known that our talc formulations contained any significant amount of Tremolite. Since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that we could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations. It might be that someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise.

It is my personal feeling that until we have at least substantial evidence, based on animal work, to the effect that the presence of Tremolite in our talc does not produce adverse effects, we should not extend its usage beyond an absolute minimum previously mentioned.

T. M. Thompson, M.D.

105.    Unfortunately, the doctor noted that much of the litigation risk would come from *public awareness* of Tremolite contamination. This appears to have been the part that J&J focused on most, because the public was becoming aware of these risks.

106.    For example, in 1973, the Environment Subcommittee of the United States Senate Committee on Commerce held public hearings in connection with the Toxic Substances Control Act of 1973. Among other things, witnesses who testified proposed that talc be forbidden in consumer products "including vaginal deodorant sprays." This recommendation was made both for the possibility of a risk of asbestos induced mesothelioma and the possibility that talc products were being found in ovarian tumors. Regarding Johnsons Baby Powder specifically, the witnesses

at this 1973 hearing made clear that safer alternatives existed even in the 1800's—corn starch—and recommended a return to that safer substitute.

107.    J&J did conduct one study.  J&J funded a study by a Dr. Albert Kligman in which inmates at a prison were injected with two different kinds of asbestos, and talc.  Ten prisoners were recruited in 1971 and given injections of tremolite and chrysotile asbestos, along with a talc shot in their lower backs.  There was no possible health benefit to the prisoners: instead, it was merely to test how damaging the minerals were on the human body.

108.    These tests showed that the chrysotile form of asbestos (the form J&J's preferred testing regimen that would later be implemented could not detect) had the most deleterious effect.  Separately, in 1968, J&J tested the effects of talc from various canisters used to store baby powder on 50 other prisoners.  One prisoner who was a subject of the Kligman tests (though he could not recall if he was a victim of the J&J asbestos test) left such grave scars on his body that his young daughter ran screaming from him when she first saw his scars, telling her mother that her father had turned into a monster.  There was no medical benefit to the subjects of this study.

109.    Dr. Kligman (and J&J) have subsequently claimed that these tests on prison inmates did not violate research standards at the time.  This claim can be summarily dismissed by the history of those tests:  three years later, public revelation of Dr. Kligman's tests caused a public outcry that forced their end.  If the tests were appropriate at the time, public disclosure would not have caused a termination of those studies.  They were as unethical by the standards at the time as they are today.

### C.    J&J Adopts a 'Deny' Strategy

110.    Rather than take the medical risks of talcum powder seriously, J&J executives instead hid those risks from the public and engaged on a strategic campaign to pervert scientific investigation into talcum powder and J&J' products.  While market share and profit trumped good

corporate citizenship, these executives started J&J and its subsidiaries down the road of exponentializing the liabilities now foisted on LTL—a path that future executives knew or should have known about and failed to diverge from.

### i.   J&J Blocks FDA Regulation of The Asbestos in Its Talc

111.   In 1971, New York City's environmental protection chief announced that asbestos contamination had been found in unidentified brands of talcum powder.  In response, J&J claimed that "fifty years" of research showed "there is no asbestos contained in the powder manufactured by J&J."  As detailed above, that was false.  J&J showed it knew this statement was false when it spoke to the FDA.  In its statements to the FDA, it instead said that J&J's talc contained "less than 1%" asbestos particles (not zero)—but asked that the FDA not make the data or information that J&J submitted public.

112.   This is not to say that J&J was honest with the FDA.  For example, Arthur Langer, a professor at the Mt. Sinai School of Medicine, had alerted J&J in 1971 that he had found chrysotile asbestos in a sample sent by J&J.  J&J responded by placing Mr. Langer on an internal enemies list of "antagonistic personalities" in 1972.  J&J also had an internal memo dated July 29, 1971, that stated that its talc ore from Vermont contained "trace amounts" of tremolite and actinolite fibrous materials—asbestos.  Finally, J&J was also aware that University of Minnesota professor Thomas E. Hutchinson had identified in J&J talcum powder products[6] what he described as "incontrovertible asbestos" in 1972.

---

[6]   "Shower to Shower" was a talcum powder product J&J marketed to adults.

Total Concentration Calculation (Shower to Shower)
Prints of the micrographs were cut
to estimate the relative ~~see~~ area of asbestos
and ~~was~~ talc ~~areas~~. One fifth of one square
contained in convertible asbestos. while
approximately 1550 squares were covered
with talc. This yield an area percentage
of one part in 7500 or roughly one one
hundreth of one percent,
    The total concentration of all "fibers"
was near .one percent.

113.    Each of these examples was known to J&J and hidden from the FDA.

114.    Rather than reformulate its cosmetic talc products in the 1970's to address the
potential risk of mesothelioma and ovarian cancer or to disclose relevant research, J&J took to
lobbying the FDA for less stringent safety testing methods.

115.    In lobbying the FDA in the 1970s, J&J sought a *de facto* standard that its talcum
powder could contain asbestos, as long as it was less than 1% of the talcum powder.  J&J did so
by pushing the FDA to use an x-ray scanning technique that was, as the company knew
fundamentally incapable of detecting 1% or less asbestos contamination.  To justify this testing
methodology, J&J claimed in writing to the FDA, "methods of determining less than 1% asbestos
in talc are not necessary to assure the safety of cosmetic talc."

Robert M. Schaffner, Ph. D.
Associate Director for Technology
Bureau of Foods
Food and Drug Administration
Department of Health, Education, and Welfare
200 "C" Street, S. W.
Washington, D. C. 20204

Dear Dr. Schaffner:

Johnson & Johnson has been cooperating with the Cosmetic,
Toiletry and Fragrance Association Subcommittee on Asbestos in
Talc. In an effort to answer the question about the required degree
of sensitivity of the method of assay for asbestos in talc, our
statistical group has made an estimation of a theoretical safe level
of asbestos fiber in a baby powder utilizing the official TLV for
asbestos and the data on dusting of baby powder. The calculation
shows that a substantial safety factor can be expected with talc
containing 1% w/w asbestos fibers. Therefore, methods capable
of determining less than 1% asbestos in talc are not necessary to
assure the safety of cosmetic talc. The report is attached herewith.

116.    Of course, parents using talcum powder on their children (or women using it in

their genital areas) would disagree on the level of asbestos they would tolerate as "safe" in that

powder. That was why when speaking to the public, J&J claimed that fifty years of research

showed **no** amount of asbestos in its talc (rather than a purportedly "safe" amount of asbestos).

117.    The FDA was similarly aware that the public had zero tolerance for asbestos in

talcum powder and told J&J so. According to an internal J&J memo of a meeting with the FDA,

they were told that J&J's position was "foolish" and that "no mother was going to powder her baby

with 1% of a known carcinogen[.]"

> Mr. G. Sandland stated that a regulation of 1% asbestos in talc was not only achievable by throughly tested methods, but also gave a safety factor of 48,300 (Sivertson calculation). Mr. Eiermann bluntly said that the calculation was wrong since the standard of 2 fibers/cc. is not a time weighted average. Before we had a chance for rebuttal Dr. Schaffner said that the Sivertson calculation was foolish since no mother was going to powder her baby with 1% of a known carcinogen irregardless of the large safety factor. Because of Dr. Schaffner's strong stand we did not correct Mr. Eiermann's misunderstanding of the calculation.

118.   J&J eventually chose to pressure the FDA to back off its proposed testing regimen. J&J claimed in a letter dated March 15, 1976, that its testing had showed "no" (emphasis in original) asbestos in its products, based on extensive testing. However, this was false.

119.   J&J knew that several tests by outside consultants at various prestigious universities had found asbestos in its products (including the University of Minnesota professor discussed above). J&J also knew that a report, dated November 5, 1975, and directed to Windsor Minerals (J&J's Vermont talc mining subsidiary), showed that tests had detected "fibers of asbestos" in 9 samples tested, and described some as "rather high" amounts of asbestos fibers and noted which methods were effective at detecting the asbestos and which were not.

Mr. Vernon Zeitz
Windsor Minerals Company
P. O. Box 680
Windsor, Vermont    05089

Dear Mr. Zeitz:

This letter will supplement our report of 1 July 1975 on a series of talc
ore samples which we have analyzed for you.  Table 1 shows the actual
fiber counts and the approximate equivalent concentration in parts per
million of the amphibole particles which we found in these samples.  Some
of them seemed rather high, one had 10 and one had 9 amphiboles.  Most
of these come in bundles of 1, 2 or 3 fibers with anywhere from 2-5 amphiboles
in a bundle.

The examination of the fines suspension seems to be much more sensitive
to the presence of amphibole than looking at the sediments.  In several
occasions we found amphibole particles in the fines which we did not find
in the sediment.  Since most of these amphibole particles are rather small
they would stay suspended in our ultrasoneration procedures, whereas the
larger, blocky, amphiboles or chunks of amphiboles generally are not fibrous
and are obscured by the large talc particles which are in the sediment.  I would
suggest that when we analyze these we should concentrate primarily on examin-
ing the fine fraction of the ultrasoneration suspension.

Thank you for consulting McCrone Associates and if there are any further
questions concerning this report, please feel free to contact me.

Yours sincerely,

Gene R. Grieger
Gene R. Grieger
Senior Research Physicist

120.    J&J claims that these samples were intended for industrial, not cosmetic, use.

However, this is contradicted by an internal Windsor Minerals report from 1974 that stated

asbestos fibers were "potentially present in **all** talc ores in use at this time" (emphasis added) and

advocated that J&J take further steps to remove asbestos from its talc.

The use of citric acid in the depression of chrysotile asbestos
and other mineral species has been developed at Windsor Minerals in
response to the potential need for a means to exclude extremely low
levels of these contaminants from the finished product of the bene-
ficiation process.

The use of these systems is strongly urged by this writer, to
provide the protection against what are currently considered to be

-5-

d Document--Subject to Protective Order                                    JNJM:

materials presenting a severe health hazard and are potentially present
in all talc ores in use at this time.

In closing, based on Windsor's knowledge of the physical chemistry
of talc, and upon the results of all work performed to date, it is our
strong belief that the use of these new reagent systems will not
alter the salient consumer properties of the raw material supply or
the finished baby powder sold under the Johnson and Johnson name.

Vernon Zeitz
Manager, Research and Development
Windsor Minerals Inc.
5/14/74

121.    J&J's strategy worked.  Although the FDA was unwilling to endorse J&J's proposal

for an 'acceptable' level of asbestos in products used for infants, the FDA agreed to permit "self-

regulation" of asbestos contamination in baby powder—*i.e.*, J&J was given free rein to pretend to

implement whatever standards it wished to impose on itself.  As expected, J&J wished to impose

standards on itself that would not detect the asbestos that J&J knew contaminated in its baby

powder and other talcum powder products.

122.    Free to choose its own standard, J&J selected a form of "testing" for asbestos in its

baby powder that (like its proposals to the FDA) would not actually detect the asbestos in its talcum

- 34 -

powder. J&J's selected testing technique was unsuited to detect chrysotile asbestos—which had already been detected in J&J baby powder. Mr. Ashton, a high-ranking J&J executive in charge of J&J's baby powder explained the need to avoid better testing methodologies when he wrote that if accurate testing methodologies were used, "there are many talcs on all markets which will be hard pressed in supporting purity claims[.]" Mr. Ashton found an FDA testing methodology "disturbing" as a result—because it would, in fact, detect the asbestos contamination in J&J's products.

123.    However, J&J wanted to give the impression that someone was checking its work. It made misleading public statements that give the impression that J&J's products are regulated and tested to ensure they are safe by a legitimate third party using legitimate, accurate methods. Of course, neither was true, and by using this flawed methodology, J&J continued to claim its talc was asbestos-free for decades to come.

124.    In 2018, a New Jersey court relied on J&J's history of seeking to mislead the FDA in rejecting an effort by J&J to throw out a verdict rendered by a jury of American citizens. The court wrote that "[p]roviding the FDA favorable results showing no asbestos and withholding or failing to provide unfavorable results, which show asbestos, is a form of a misrepresentation…."[7]

125.    Similarly, in December 2022, a California appeals court not only affirmed the trial court's adverse inference instruction against J&J for spoliation of key evidence regarding the presence of asbestos in talc, but unequivocally determined that, notwithstanding any destruction of evidence, there was still "abundant evidence" that J&J's talc "contained asbestos."[8]

---

[7]    Transcript of Decision, *Lanzo v. Cyprus Amex Minerals Co., Inc.,* No. L-7385-16AS (N.J. Super. Ct. Law Div.) June 29, 2018, *available at* https://www.documentcloud.org/documents/5027646-2018-ruling-by-Middlesex-County-NJ-Superior.html#document/p18/a464477

[8]    *Bader v. Johnson & Johnson*, 303 Cal. Rptr.3d 162, 195 (Cal. Ct. App. 2022).

## ii.    **J&J Perverts Scientific Study of Its Products**

126.    In addition to blocking FDA efforts to regulate its products, J&J engaged in a
scheme to suppress and manipulate scientific research into the dangers of talc.

127.    J&J laid out this scheme and the rationale behind it in a strategy memo created in
1975 and marked "STRICTLY CONFIDENTIAL".    First, the strategy memo laid out J&J's
existing strategy of blocking scientific studies:

> Our current posture with respect to sponsorship of talc
> safety studies has been to initiate studies only as
> dictated by confrontation.  This philosophy, so far,
> has allowed us to neutralize or hold in check data
> already generated by investigators who question the
> safety of talc.  The principal advantage for this
> operating philosophy lies in the fact that we minimize
> the risk of possible self-generation of scientific data
> which may be politically or scientifically embarrassing.

128.    But this memo argued that J&J could not merely suppress independent studies.  The
memo argued if J&J did not commission its own studies to create "data" it could purport to rely
on, its false claims and its public image were subject to "repeated erosion by prior public disclosure
of suspected hazard."  Further, if it did not create research of its own now, when the truth came
out, "the latent period for generating J&J data might be too great for the data to be effective"—
*i.e.*, it would not be able to concoct credible-seeming studies in time to attempt to discredit
legitimate scientific research.  The memo noted that this risk was becoming real and disclosed a
study that would shortly be made public showing an increase in respiratory deaths from workers
exposed to talc dust in a factory.

129.    As a result, there was a successful push inside J&J adopt an "anticipative approach"
to carry out studies "to continue [its] contradiction of generated negative data"—or, in plain
English, to commission select studies designed to allow J&J to claim that its talcum powder was

safe.  This strategy memo recognized that studies might reveal "data which may be difficult to deal

with politically and/or scientifically" but recommended proceeding "[i]n spite of this risk[.]"

```
An alternative philosophy has been presented in recent
discussions at the Talc Advisory Group which would favor
us assuming a more anticipative approach.  We would carry
out other reasonable safety studies to continue our
contradiction of generated negative data and to anticipate
questions on safety which will probably be raised.  This
philosophy offers maximal leverage for defending the
product and is consistent with the policy practised with
regards to clearance of a new product.  However, it faces
the risk of revealing marginal data which may be difficult
to deal with politically and/or scientifically.  In spite
of this risk, we believe that the potential benefits far
outweigh the risks, and provide for a more solid scientific
base for baby powder.  Following this alternative posture
will necessitate an additional expenditure of $30,000
for a Neutron Activation Study in Hamsters (B in appendix)
thus totaling $90,000.
```

130.    J&J succeeded in creating such made-to-order studies.  As one example, J&J

commissioned a study on Italian talc miners—but to "minimize the risks" J&J determined that

someone would need to first "visit the mines, ascertain the conditions in them and interview the

owners in relation to the health status of the miners" before deciding to proceed with the research.

In short:  check the data first to make sure it was not too damaging and the results sought could be

obtained—and if not, do not conduct the study.

131.    In a letter to the study's author, J&J was blunt about the result it sought:  it wanted

data presented that would show "the incidence of cancer in these subjects [the talc miners] is no

different from that of the Italian population or the rural control group."  It obtained those results

as directed—but written in "a form and style that is unacceptable" to the planned scientific journal,

and so J&J directed that it would be given to a ghostwriter to be rewritten "in confidence" for the

scientific journal.

132.    The study results asserted that there were fewer lung cancer deaths than anticipated and supported the theory there was no cancerogenic effect attributable to pure talc.  However, the study was "underpowered" for such a conclusion given the rarity of the cancers being examined—*i.e.*, the amount of study subjects was small enough that random chance played an unacceptably large role, and thus the conclusions were not scientifically valid.  Further, J&J's involvement in creating and funding this study was not disclosed.

133.    In recent years, the effects of corporate sponsorship of studies in biasing those studies has become well known and understood, and this study offers an excellent example of the pernicious effect of such covert bias.  As a result, this sort of covert support of research is no longer permitted.  For example, the journal that J&J published its Italian talc study—the Journal of Occupational and Environmental Medicine—today requires the disclosure of "all possible conflicts of interest on the title page, including financial, consultant, institutional and other relationships that might lead to bias or a conflict of interest" and requires an author disclose "[a]ll relevant sources of funding […] on the title page of the manuscript" and to specifically disclose if the result of the research directly corresponds to the specific aims of the sponsor.  Needless to say, the article as published in 1976 included no mention whatsoever of J&J's support, let alone that the result reached corresponded directly to J&J's aims.

134.    Internal documents show that J&J knew it had exposed consumers to asbestos.  On a public-facing website, a J&J employee had originally asserted that J&J baby powder "*have always been*" asbestos-free.  But an internal editor (who was aware of the truth) revised this in 2013 to merely assert that its talc was *presently* free of asbestos, with the note that "we cannot say 'always[.]'"  Of course, this too was false (though, perhaps, unknown to the editor of the webpage).

### iii. **Mesothelioma Cancer**

135.    As a result of the asbestos contamination of J&J's baby powder, numerous people whose only exposure to asbestos was through J&J baby powder have developed the "signature cancer" of mesothelioma.  Hundreds of such cases are (or were) currently pending against J&J and JJCI.  Of course, there are potentially thousands of mesothelioma victims who were exposed to J&J's talc products in addition to other potential exposures.

136.    Mesothelioma is an aggressive and deadly form of cancer that occurs in the thin layer of tissue that covers the majority of your internal organs (most notably, the lung). Mesothelioma is caused by asbestos fibers that have been inhaled and settle in the chest and/or abdomen.  These fibers remain permanently, a ticking time bomb that may one day (which may be years or even decades after exposure) explode into mesothelioma.

137.    There are no known causes of mesothelioma *other than* asbestos, and it is undisputed that asbestos causes mesothelioma.  If a person develops mesothelioma, they know why:  they were exposed to asbestos.  It is then necessary to determine where, and how, they were exposed to asbestos to obtain redress.  Even J&J scientists (internally, away from litigation) admit that mesothelioma is caused exclusively by asbestos—though, of course, in litigation J&J occasionally tries to dispute this scientific fact.

138.    Asbestos exposure in childhood is disproportionately significant (as even J&J experts have admitted)—as are exposure to most poisons in early stages of development.  J&J, as discussed above, *specifically sought* authorization to allow asbestos in its baby powder (up to a purported "safe" limit) and, thus, expose newborn infants to asbestos.  Of course, J&J was unwilling to argue this to the public and has confirmed that baby powder should contain ***no*** asbestos—but, never lived up to that promise.

139.     Mesothelioma has a long "latency period" measured in decades:  exposure to asbestos does not cause immediate cancer but causes cancer decades later.  As a result, the asbestos in J&J's baby powder does not cause cancer in the infants exposed to it immediately, but instead causes mesothelioma as adults decades later.  Further, J&J marketed talcum powder to adults (both its baby powder and its Shower to Shower product) and exposed adult caregivers to asbestos.

140.     A recent peer-reviewed article considered dozens of mesothelioma patients whose only known exposures to asbestos were from repeated exposures to cosmetic talcum powders.  This study concluded that cosmetic talcum powder exposure caused the victims' mesothelioma.[9]

### iv.     Ovarian Cancer

141.     Ovarian cancer is a very dangerous type of cancer because it is difficult to detect (and, thus, is rarely caught early) and has a low survival rate.

142.     Studies as far back as the 1960s showed that frequent use of talcum powder in the genital area posed a serious risk of ovarian cancer.  Talc particles were identified deep in ovarian tissue in 1971, and by the early 1970s doctors were raising awareness regarding environmental toxins like talc as a factor in ovarian cancer.  IARC, a universally accepted international authority on determining the classification of substances as carcinogenic (*i.e.*, if they can cause cancer), concluded that studies from around the world consistently found an increased risk of ovarian cancer in women who used talc in the perineal area in 2010.  In 2012, it further concluded that asbestos exposure could cause ovarian cancer.

143.     It has been known since as early as 1961 that particles like talc can translocate from the exterior genital area to the ovaries in women: in other words, the contaminated talc that J&J

---

[9]     Emory, Theresa S., M.D., Maddox, John, C., M.D., Kradin, Richard L., M.D., *Malignant Mesothelioma Following Repeated Exposures to Cosmetic Talc: A Case Series of 75 Patients,* Am. J. Ind. Med., 63:484-89 (2020).

marketed to women would be absorbed into their ovaries over time.  Asbestos contamination introduced in this way does not break down in the body over time and accumulates in the ovaries in a way similar to how asbestos accumulates in the lungs:  permanently.  As early as 1964, a J&J internal document noted that talc could not be safely absorbed by the vagina while cornstarch could be.  Nonetheless, J&J marketed its talcum powder to mothers to powder their infants' diapers, and to women to powder their genital areas.  In both contexts, the asbestos and other talc contaminants is introduced into areas of the human body that are not typical for other asbestos exposure.

144.    As discussed above, the danger of asbestos is physical—the shape (and permanence) of the fibers puncture or disrupt cells and persist for long periods of time.  There is no reason to believe (and no scientific basis to suggest) that it causes cancer only in lung cells:  its shape and ability to disrupt cellular function applies across cell types, including that of the ovaries.  Indeed, on May 6, 2022, the EPA recognized that asbestos causes ovarian cancer.

145.    Worse, asbestos is not the only fibrous material present in talcum powder.  Talc itself takes fibrous forms, similar in shape to that of asbestos fibers.  Significant amounts of this fibrous talc have been found in cosmetic talcum powder—twenty-two products were tested and found to have an average fiber content of 19%, according to a study conducted in 1968.  Much of this was talc fiber—but, of course, some was asbestos.  Even in talc that does not contain asbestos, it contains talc in fibrous form.  Fibrous talc *itself* (uncontaminated with asbestos) is a known cause of ovarian cancer, acting in a similar way to other fibrous materials in the asbestos family.

146.    Finally, there are other known carcinogenic mineral contaminants in talcum powder that render it unsuitable for use as a cosmetic.  These include nickel and chromium which, in certain compounds, are known to cause cancer in humans.

147.    Because of all these issues, there is substantial medical evidence that talcum powder causes ovarian cancer even *without* the presence of asbestos.  Environmental factors that cause cancer generally act in a cumulative fashion: each of the carcinogenic compounds in talc increases the risk of developing cancer (and in some cases can act in a synergistic manner, increasing the risk beyond the amount that would be anticipated from their risk factors alone).

148.    For decades, scientific studies have consistently linked talcum powder itself (regardless of its asbestos content) to ovarian cancer—*i.e.*, talcum powder itself is now understood to cause cancer.  Since the early 1980s, there have been numerous epidemiological studies evaluating the link between talcum powder use and the risk of developing ovarian cancer.  In total, there are over 25 case-control studies and three prospective cohort studies on the topic.

149.    Of those, all but two of the case control and cohort studies demonstrated risk of ovarian cancer with the perineal or genital application of talcum powder.  The studies were conducted over the course of thirty-four years, among many patient populations, and by diverse researchers around the world, and had consistent results that were largely statistically significant.  Notably, these studies relate solely to talcum powder use—rather than talcum powder known to be contaminated with asbestos.

150.    In December 2018, Health Canada published a draft screening assessment on the safety of talc.  The comprehensive scientific assessment included a Bradford Hill analysis of relevant epidemiological and animal studies.  Health Canada found that there is a "statistically significant positive association between perineal exposure to talc and ovarian cancer" and "available data are indicative of a causal effect."  Following a years-long review process—that included the review of J&J expert reports and argument against its preliminary conclusions—

Health Canada issued a final report in 2021 reiterating its original findings on a final basis. Importantly, these results did *not* rely on asbestos contamination of talc.

151.    In sum, the body of scientific knowledge shows a consistent strong association between perineal and genital talcum powder use, and a 30%-60% increase in the chances of developing ovarian cancer.

### v.    Other Industries Cease Talc Use, But J&J Refuses to Do So

152.    The dangers of talcum powder have been recognized in numerous industries that have (voluntarily, or under pressure) ceased the use of talcum powder in their products.  For example, around 1996, at the request of the FDA, the condom industry stopped dusting condoms with talcum powder due to the growing health concerns regarding talc.  Further, on December 19, 2016, the FDA issued a ban on the use of talcum powder on surgical gloves, stating that "the risk of illness or injury posted by powdered gloves is unreasonable and substantial."

153.    For decades, J&J has faced internal and external pressure to follow suit:  to replace the talcum powder in its products with corn starch.  Cornstarch is an easy and safe substitute for talc, as demonstrated by Bausch Health's reformulation of Shower to Shower after it purchased that product from J&J to use corn starch instead of talc.

154.    In 1994, the Cancer Prevention Coalition asked J&J to withdraw its talcum powder products, in favor of cornstarch powder products, because of the decades of scientific studies showing that talcum powder caused a serious health risk of ovarian cancer.  In 2000, J&J prepared draft public relations statements while they waffled on whether to switch to cornstarch in 2000.

155.    Nonetheless, until litigation forced its hand in 2020, J&J remained steadfast in using talcum powder in its products.  However, in light of this litigation risk, J&J began

considering ways to separate assets from this potential talc liability while continuing its efforts to cover up the underlying facts.

156.    The beginning of these structural efforts was the spinoff of the "Baby Division" to the predecessor to JJCI—J&J Baby Products Company, in 1979.   In this transaction J&J transferred all assets related to the Baby Division (including the Baby Powder business), and "liabilities which are now allocated to the BABY division on the books or records of J&J[.]"

157.    Aware that liabilities cannot be transferred without the creditor's consent, J&J caused JJCI to execute an indemnity whereby JJCI agreed to pay those allocated liabilities, and "indemnify and save harmless J&J against all the indebtedness, liabilities and obligations aforesaid hereby assumed and agreed to be paid[.]"   However, JJCI was not required to indemnify J&J for liabilities not assumed, or for future liabilities J&J incurred (including tort liabilities for its own independent conduct).   In 1989, J&J realized it had not fully transferred all of its talcum powder business to JJCI and transferred Shower to Shower—a talcum powder marketed to adults. However, it appears no new indemnities were executed in connection with this transfer as J&J has never been able to provide documents containing such indemnity.

158.    J&J also spun off its talc mine subsidiary—Windsor Minerals—in 1989.   At no point, importantly, did J&J transfer control of its talc mines (Windsor Minerals) to JJCI nor did JJCI ever accept any liability related to those mines.   They remained wholly owned by J&J and outside the JJCI corporate entity until their eventual spinoff.   In connection with that spinoff, J&J (not JJCI) executed certain indemnity agreements for talc sold prior to the spinoff.

## II.    Talc Litigation History

159.    It was long suspected that talc caused mesothelioma and ovarian cancer.   Lawsuits began as early as 1997, alleging that J&J talcum powder caused cancer.   But the claimants had a basic problem:   J&J had successfully suppressed public knowledge that its talc contained asbestos

and, by removing this information from the public sphere, had suppressed scientific inquiry into the dangerous nature of its products.  In this respect, J&J victims faced the same challenges encountered by victims of the tobacco industry and the opioid industry—whose playbook J&J eagerly copied.  Consequently, much like early tobacco and opioid litigation, early cases seeking to hold J&J accountable for its talcum powder causing cancer were unsuccessful.

160.    In one of the first cases alleging that J&J's talcum powder had caused cancer, claimants were unable to obtain the documents discussed above that show—in great detail—J&J's awareness of asbestos in its talcum powder.  As a result, they ultimately were unable to prevail on their efforts to hold J&J accountable.  However, as time went on, J&J's deny strategy became less and less tenable.

161.    The first crack in the dam was a case in South Dakota federal court, *Berg v. Johnson & Johnson*, 940 F.Supp.2d 983 (D.S.D. 2013) where a federal jury reached the first verdict holding J&J and Old JJCI liable for causing ovarian cancer in 2013.  *Berg* ultimately awarded the plaintiff no damages—her cancer was in remission at the time—but it was a watershed event.  Through the extensive discovery in *Berg*, the public became aware of J&J's conduct and other victims began filing suit.

162.    Public awareness of J&J's conduct and the contamination in its products led to a significant increase in the claims filed against J&J.  Subsequent trials went to verdict, and juries continued to find J&J liable, and awarded damages.

163.    For example, in 2016, the estate of a deceased ovarian cancer victim Jacqueline Fox was awarded $72 million for her ovarian cancer that the jury found was caused by J&J's products.  Ms. Fox's estate's verdict was ultimately overturned because of a jurisdictional issue caused by an intervening Supreme Court case which the Missouri appellate courts held had divested the

Missouri trial court of personal jurisdiction over the dispute. This same jurisdictional issue led to numerous other plaintiff verdicts being overturned. J&J proudly touts its record of reversing these cases on appeal; however, it generally leaves out that these jurisdictional reversals were not on the merits and do not discredit the juries' liability findings.

164.    In 2017, the Judicial Panel of Multidistrict Litigation (JPML) established *In re: J&J Talcum Powder Marketing, Sales Practices, and Products Litigation*, MDL 2738, and transferred all cases alleging that J&J's talcum powder products cause ovarian cancer to Chief Judge Freda Wolfson of the District of New Jersey for pretrial purposes. Importantly, this was at the request of J&J and New Jersey was J&J's preferred venue (at that time). Chief Judge Wolfson then granted J&J's request for bifurcation of the proceedings to resolve the threshold issue of general causation; specifically, whether there was reliable evidence that talc can cause ovarian cancer.

165.    Thereafter, in a process spanning several years, both parties provided evidence regarding whether there is reliable evidence that talc can cause ovarian cancer in hearings before Chief Judge Wolfson. On April 27, 2020, in a comprehensive 141-page opinion, the Chief Judge Wolfson of the MDL Court deemed plaintiffs' evidence to be sufficiently reliable and denied the bulk of J&J's challenges to plaintiffs' causation evidence and scheduled the first bellwether trials for April 2022. *In re Johnson & Johnson*, 509 F. Supp. 3d 116 (D. N.J. 2019)

166.    This was a massive blow to J&J's litigation strategy and reflected that the plaintiffs' evidence, comprised of decades of epidemiological studies considering the association between the routine application of J&J's talcum powder products to the female genital area and ovarian cancer, was reliable and supported the existence of a causal relationship.

167.    Specifically, Chief Judge Wolfson concluded that plaintiffs' causation experts' methodology was reliable, satisfying the standard under <u>Daubert</u>, based primarily on the experts'

application of the "Bradford Hill" factors, the foundational epidemiologic process for establishing

a causal relationship, and which is endorsed by the Federal Judicial Center's *Reference Manual on*

*Scientific Evidence*.

168.    The MDL Court also addressed and dismissed J&J's primary argument, alleging

that the over two dozen case-control studies showing a nearly uniform association between talc

use and ovarian cancer were unreliable.  Chief Judge Wolfson was unambiguous in her acceptance

of plaintiffs' experts' methodologies, ruling that "[plaintiffs'] decisions to rely on the case-control

studies … is supported by good grounds" and "this is not a situation where the experts purposefully

ignored the cohort studies entirely because they were inconsistent with their opinions."

169.    Approximately three months after Chief Judge Wolfson issued her <u>Daubert</u> Opinion

in the federal MDL, the Appellate Division of the Superior Court of New Jersey weighed in on the

identical issue of general causation in state court.  In a unanimous 36-page opinion, the Appellate

Division overruled a trial judge's finding that plaintiffs' causation evidence was unreliable,

characterizing the trial court's analysis as "slanted away from objective science and towards

advocacy."[10]  The Appellate Division admonished the trial judge for committing a litany of errors,

which collectively amounted to having "selected defendants' scientific methodologies over

plaintiffs', a process well beyond the gatekeeping function," constituting an abuse of discretion

necessitating reversal.[11]  In reaching its conclusion, the New Jersey Appellate Court reviewed the

available studies, evidence, and reports of agencies like the FDA and IARC.  Like Chief Judge

Wolfson, the appeals court held that there was sufficient reliable evidence that talcum powder

products can cause ovarian cancer.  Similar decisions were rendered in other states.

---

[10]    *Carl v. Johnson & Johnson,* 464 N.J. Super. 446, 452 (App. Div. 2020).

[11]    *Id.* at 504

170.    In June of 2018, the *Ingham v. Johnson & Johnson*, trial was submitted to the jury. This case sought compensatory (pain and suffering) damages for 22 plaintiffs suffering from ovarian cancer, or who had died from ovarian cancer.   Following a six-week trial, the jury ultimately returned a verdict for the plaintiffs, finding each plaintiff entitled to approximately $25 million in compensatory damages for pain and suffering, and awarding $4.14 billion in punitive damages against J&J and JJCI for their reprehensible and intentional conduct, with the large majority (approximately 76%) punitive damages allocated to J&J rather than JJCI.

171.    On June 23, 2020, the Missouri Court of Appeals reviewed the *Ingham* verdict and rejected J&J's efforts to overturn the jury's finding that talcum powder caused ovarian cancer. The decision found that certain plaintiffs suffered from a jurisdictional defect and the verdict could not be upheld as to those plaintiffs, but ultimately upheld the compensatory **and** substantially upheld the punitive damages for the remaining plaintiffs.[12]   J&J was unsuccessful at convincing the Missouri Supreme Court to reverse the *Ingham* decision of the Missouri Court of Appeals, and ultimately filed for Supreme Court review on March 2, 2021.  On June 1, 2021, the Supreme Court (with no recorded dissents) denied review of the *Ingham* decision.

172.    Similarly, as the asbestos contamination of J&J's baby powder became clear, mesothelioma victims began winning their cases against J&J as well.  In April 2018 a New Jersey jury awarded Stephen Lanzo and Kendra Lanzo a total of $117 million in compensation (70% allocated to J&J/JJCI, 30% to the talc miner) for the mesothelioma its products caused Stephen Lanzo—including $80 million in punitive damages.

---

[12]    Certain plaintiffs had their claims against J&J (but not JJCI) dismissed.  While this did not reduce the compensatory damages awarded in total, the Missouri Court of Appeals reduced the punitive damages awarded against J&J to maintain the same ratio of punitive damages to compensatory damages for J&J found by the jury.

173.     Although the <u>Lanzo</u> case was later overturned on appeal and remanded for a new trial, it began a string of courtroom losses by J&J with respect to mesothelioma victims.  Indeed, nine straight juries have found J&J liable for mesothelioma caused by its products, many awarding substantial punitive damages for J&J and JJCI's reprehensible conduct.  Mesothelioma plaintiffs have won twelve jury verdicts against J&J and Old JJCI, for a total of over $155 million in compensatory damages and more than $320 million in punitive damages.

174.     Plaintiffs have prevailed in the past seven mesothelioma cases that went to trial against J&J and Old JJCI—**every single case** since the FDA announced it had detected asbestos in talc products.  This string of courtroom defeats for J&J since the FDA confirmed asbestos contamination shows that early J&J victories were, simply, because it was able to convince a jury that its products do not contain asbestos.  Once it could no longer do so, no jury has been willing to sanction J&J's conduct and deny recovery to a mesothelioma victim of J&J's talc products.

175.     These legal decisions did not occur in a vacuum.  In December 2018, Health Canada, the public department of the Government of Canada, preliminarily concluded that there was a consistent and statistically significant link between talcum powder and ovarian cancer, and that the data indicated a causal relationship – *i.e.*, that the talcum powder caused the ovarian cancer.  Despite fierce J&J lobbying, this conclusion was reaffirmed in 2021 and J&J's 255-page submission seeking to rebut it was specifically discussed and rejected.

176.     Further, in 2019, the FDA tested two bottles of J&J baby powder.  One of the two bottles was found to be contaminated with both asbestos and talc fibers—just as plaintiffs' experts had contended for years.

177.     Like many parties facing lawsuits, J&J resorted to destruction of evidence and distraction from the merits.  Recently, a California appellate court affirmed the trial court's adverse

inference instruction against J&J for spoliation of key evidence. *Bader v. Johnson & Johnson,* 303 Cal. Rptr.3d 162 (Cal. Ct. App. 2022).    Nonetheless, the court determined that, notwithstanding any destruction of evidence, there was still "abundant evidence" that J&J's talc "contained asbestos."

178.    Confronted with the mounting evidence of its wrongdoing, J&J repeatedly has shifted to its standard playbook of misdirection through attacks on the plaintiffs, their lawyers, or their lawyers' experts.  J&J's lawyers proudly boasted, following several plaintiffs' verdicts, that J&J had shifted its tactics to pushing a theory of the talc lawsuits as a "sham" or fraud perpetrated by plaintiffs' lawyers.

179.    Those attacks on the plaintiffs' bar — rather than addressing the merits of the talc lawsuits—left one New Jersey judge "horrified."  At trial, that same judge, Judge Ana Viscomi, struck that same J&J lawyer's entire closing for being "replete with conduct this court has already warned you about," most notably "attacking the profession" with bald accusations that the talc claims are "lawsuit fiction" engineered by plaintiffs' lawyers.

180.    The tide had turned against J&J, which faced grim prospects in future litigation and bellwether trials scheduled to begin in April 2022.  J&J was forced to admit its strategy of denial and obfuscation of the facts had reached the end of its useful life, and further litigation and jury trials would only degrade that strategy and drive the knowledge of the dangers of talcum powder— and J&J's role in hiding it—farther into the public awareness.  It was time for a new plan.

III.    **Project Plato: J&J's Secret Plan for A Divisive Merger**

181.    J&J was tired of the tort system.  It was tired of paying to defend itself against victims of its talcum powder products now that it was losing cases.  It was tired of the questions from ratings agencies, about if J&J's sterling credit rating might need to be downgraded because of the potential liability.  J&J was also tired of the press:  exposure of its wrongdoing through jury

trials was having a severe impact as people learned that J&J had, for decades, sold an asbestos-tainted product causing tens of thousands of cases of cancer in present victims (leaving aside future victims and victims who died with no idea what caused their cancer). It was tired of Reuters articles that laid out, in detail, what they knew and when they knew it—and linked directly to J&J internal documents that had been made public through the trials so that American citizens could review what had happened and view the source documents themselves.

182.   Jones Day offered a way out—to utilize its so-called 'Texas Two-Step' scheme to strip talc victims of their access to court, and to hinder, delay, and defraud them into accepting sub-par compensation many years in the future.

183.   Although the Constitution protects the right to a jury trial and protects the right of a victim to seek to take a case to trial rather than accept a coerced settlement, Jones Day advertised that a bankruptcy could effectively terminate both. J&J hoped that by ending jury trials, and by forcing claimants to proceed against a trust (carefully named to avoid any J&J association) the public would forget about J&J's conduct and the tens of thousands (at a minimum) of cancer victims dying from its products would be "yesterday's news." Indeed, during the bankruptcy proceedings, J&J witnesses cited the need for protection of J&J's ***reputation*** as a key rationale for the bankruptcy proceeding, and the desire to avoid further uncomfortable publicity that further trials might cause.

184.   In April 2021, attorneys from Jones Day held a meeting with J&J executives that included John Kim, Erik Haas, Eric Jung, and Christopher Andrew. This meeting occurred after the refusal of the Missouri Supreme Court to overturn the *Ingham* decision, but prior to J&J's long-shot attempt at Supreme Court review being denied.

185.    Jones Day proposed that J&J execute a "Texas Two-Step," a scheme that the law firm had begun using to shield its clients' assets from tort victims seeking recompense.

186.    Jones Day subsequently discussed the proposal with J&J employees including Eric Haas, John Kim, Andrew White, Christopher Andrew, Troy Lewis, Thomas McCann, Amanda Manfre, Laura Giacino, Valerie Coulson, Donald McGraw, Alyson Lawrence, Duane Van Arsdale, Glen Murphy, Elizabeth Scott, Tina French, Mikelis Vasarais, Jennifer Boston, Paul Jeges, Jennifer Sheehy, Scott Borup, David McDonald, Jake Feldman, Myra McCormack, Jon Chiodo, Amanda Kessel, Brandon Greer, and Kim Januzzi.

187.    J&J leapt at this chance.  Dubbed "Project Plato," the project was meant to salvage J&J's reputation by putting a stop to jury trials and, through a bankruptcy, forcing claimants to proceed against an underfunded and capped trust ("Project Plato").  The strategy was approved by Thibaut Mongon, Paul Ruh, Robert ("Bob") J. Decker, Jr., Michelle Ryan, Louise Weingrod, Matthew Orlando, Chris Andrew, Robert Deberardine, David McDonald, Erik Haas, Valeria Cnossen, Donny McGraw, Alyson Lawrence, Catherine Turk, Chuck Borst, Duane Van Arsdale, Luani Alvarado, Peter Kerrane, and Laura Giacino, all of whom received a document titled "Approval Request – Memorandum of Approval."  Each of these individuals approved Project Plato.

188.    J&J and the Individual J&J Defendants began plotting a complex series of transactions (the Divisive Merger or Project Plato) that would utilize an obscure Texas corporate law provision that allows a company to conduct a 'divisive merger' and separate its assets and liabilities into two separate companies, as discussed further below.

189.    This case is, unfortunately, not the first case of a company seeking to use a divisive merger to prejudice dying cancer victims.  Jones Day, the attorneys for J&J (and now, purportedly,

the Debtor) pioneered this scheme in the Bestwall case (split off from solvent Georgia-Pacific) in

2017 and has used it several times since then.  Each time it has been used to block victims of the

company who are suing the company from obtaining compensation for their injuries—often, fatal

cancer.[13]  Each follows the same general pattern.  First, a series of corporate transactions; then, a

bankruptcy filing; and third, an interminable wait for the victims who are blocked from the

courthouse as the company seeks to force the victims to accept an insufficient settlement—or to

simply continue to use the assets that ought to go to victims for its own benefit.

### i.   The Divisive Merger – General Overview

190.   The Divisive Merger uses a provision of Texas corporate law to conduct a brazen

fraudulent transfer, relying on Texas corporate law to attempt to transfer liabilities without the

consent of the creditors in violation of common law principles older than the United States.  The

company undergoing the Divisive Merger is not deemed to have dissolved, a process that would

require—among other things—the payment of outstanding debts.  Instead, under Texas law, the

dividing company purportedly ceases to exist.

191.   The general strategy of the Divisive Merger was simple.  First, J&J would use this

Texas law to accomplish the full separation of JJCI assets from the talcum powder liabilities to

limit the assets available to the victims.  It would then file the new separated entity housing the

liabilities (and only the liabilities) for bankruptcy, utilizing the automatic stay and an equitable

stay to block further litigation and thus preserve the effects of its "deny" strategy from further

erosion.  Finally, it would follow the path of other companies that have conducted similar divisive

mergers and utilize bankruptcy to "wait out the clock" while purporting to negotiate, placing the

---

[13]   *Aldrich Pump* technically contains two debtors, as two Texas Two-Steps were undertaken, however the cases are
jointly administered, making it four additional debtors.

claimants in an interminable limbo.  The subsidiary newly created to hold the real assets, however, would continue to run its business while sheltered from the scrutiny of a bankruptcy.  Ultimately, it hopes to force claimants to accept a cut-rate settlement to get out of this limbo intended to hinder, delay, and defraud them from obtaining their rightful compensation.

### ii.     Implementation of the Divisive Merger

192.     The Divisive Merger involved no "real-world" changes.  Instead, it was a complex series of corporate transactions effectuated simply by signing appropriate documents created by counsel in the right order to implement various legal fictions, and then filing certain of those documents with applicable state authorities—largely over the course of a single day.

193.     *First*, on October 6, 2021, a company named Chenango Zero was formed under the laws of Texas.

194.     *Second*, at 9:00 a.m. on October 12, Old JJCI—a company incorporated in New Jersey, the state where its offices are based—merged with and into Chenango Zero.  It took with it both billions of dollars of assets and, according to the Debtor, all of the liability for claims related to talcum powder products.

195.     *Third,* exactly one hour later, at 10:00 a.m., Chenango Zero executed a divisional merger under Texas Law.  That divisional merger created two companies: Chenango One and Chenango Two.  Assets and liabilities were allocated between the companies according to the plan of merger.  All assets (other than token assets needed to meet the requirements of the bankruptcy code) were transferred to the "GoodCo"—Chenango Two—along with all liabilities *other than* the talc liabilities J&J sought to impair.  The token assets needed for a bankruptcy filing, and the liabilities sought to be impaired (the claims of talcum powder victims), were transferred to another new corporation, the "TortCo"—Chenango One.

196.    *Fourth*, in this "plan of merger" J&J also terminated the corporate existence of Chenango Zero (in truth, Old JJCI)—allegedly allowing J&J to circumvent Texas law that would otherwise keep Chenango Zero/Old JJCI secondarily liable for the tort liabilities in question.

197.    *Fifth*, like clockwork, and again exactly one hour later, Chenango Two merged into a New Jersey entity called Currahee Holding Co.  The resulting entity (now referred to as New JJCI), to which Old JJCI had allocated almost all of its assets, was quickly reincorporated as a New Jersey corporation called—just as it had been before—J&J Consumer Inc.  New JJCI stepped into the shoes of Old JJCI in practically every respect—except, of course, that it was unencumbered by the talc liabilities transferred to Chenango One thanks to the corporate death of its parent (for one hour), Chenango Zero.

198.    *Sixth*, and simultaneously, Chenango One—the entity into which Old JJCI dumped all its talcum powder liabilities—converted into a North Carolina company called LTL Management. LTL executed unilateral agreements pledging to "indemnify" New JJCI for the liabilities transferred to LTL.  A "Funding Agreement"—the 2021 Funding Agreement—that required New JJCI and J&J to fund LTL's liabilities inside or outside of bankruptcy was also executed.

199.    *Seventh*, on October 14, LTL filed for Chapter 11 bankruptcy.  The next day, New JJCI and J&J filed notices of LTL's bankruptcy in the myriad talc lawsuits pending against them, arguing that the stay halted proceedings against not just LTL but also all of its affiliates—in essence, the entire J&J corporate family.  While in some previous instances the "TortCo" remained in existence for several months, to create a sham argument to remain in North Carolina, LTL filed quickly to block an upcoming trial and strip one of its victims of their day in court.

200.     Upon the completion of the corporate machinations on October 12, 2021 that created LTL, the directors and officers of LTL now had a fiduciary duty to their corporation (LTL). They were duty-bound to maximize its assets—and LTL's principal asset was the 2021 Funding Agreement.    Outside of bankruptcy, LTL had the ability to settle claims and have those immediately paid via the Funding Agreement, backstopped by both New JJCI and J&J up to the full value of at least New JJCI—which the Debtor has estimated at greater than $61 billion.  LTL had the full ability to remain outside of bankruptcy and use the 2021 Funding Agreement to resolve its liabilities.

201.     However, while that would have been in *LTL's* interests, it would not have been in J&J's interests—and Project Plato was all about J&J's interests.  Accordingly, LTL was staffed only with J&J employees, drawing their paychecks from J&J, and employed at the sufferance of J&J—and they knew what their job was.  It was to place LTL immediately into bankruptcy, for the benefit of its non-debtor parent companies.

### iii.     Key Divisive Merger Documents

202.     There are three documents most relevant to understanding how the Divisive Merger was intended to further victimize talcum powder claimants: the "Plan of Merger," the "Merger Support Agreement", and the "2021 Funding Agreement."

203.     The Plan of Merger purported to split the assets and liabilities of "Old JJCI" as follows.  To TortCo (Chenango One, now known as LTL), the Plan of Merger allocated all talc-related liabilities of Old JJCI.   It allocated the following assets: (a) a bank account and approximately $6 million in cash; (b) Old JJCI's rights and interests as payee under the Funding Agreement; (c) all contracts of Old JJCI related to its talc-related litigation, including settlement agreements,  interests  in  qualified  settlement  trusts,  indemnity  rights,  service  contracts  and

engagement and retention contracts, if any; (d) all equity interests in Royalty A&M; (e) causes of

action that relate to the assets and liabilities allocated to the Debtor (which must include the breach

of fiduciary duty, fraud and alter ego claims assertable against the directors and officers of its

affiliates and predecessors, pled herein); (f) privileges that relate to the assets and liabilities

allocated to the Debtor; and (g) records that relate to the assets and liabilities allocated to the

Debtor.  GoodCo—now known as New JJCI, then known as Chenango Two—received everything

else.  It received all favored liabilities (the non-talc liabilities), and received all assets not allocated

to TortCo.

204.    Specifically, the Schedules to the Plan of Merger stated that Chenango One (LTL)

received the following causes of action:

> "All Causes of Action of the Company against any Person **related in any way** to
> the other Chenango One Assets or the Chenango One Liabilities (including the Talc
> Related Liabilities) and all Proceedings related thereto (collectively, the "Chenango
> One Causes of Action"), including all such Causes of Action and Proceedings that
> seek to hold any Person responsible for the Talc Related Liabilities."

205.    The "Merger Support Agreement" was executed at the direction of J&J (and never

negotiated by LTL) as part of the Divisive Merger, and had several key provisions that sought to

create new indemnification obligations to protect J&J.  Old JJCI was burdened by an

indemnification provision in the 1979 spinoff, but this indemnification was limited to the liabilities

allocated on the "books or records" of J&J as pertaining to the Baby Division (and did not extend

to Shower to Shower, or J&J's liabilities associated with indemnities issued in connection with its

talc mine spinoff).  As a result, it was limited to explicitly listed liabilities.  Under no reading could

it have encompassed liabilities not in existence at that time and, thus, was definitively not "all

liabilities associated with talc" as J&J has falsely represented.  In other words, it might not cover

any talcum powder litigation claims (as none were booked on J&J's records), but if it did, it likely

only covered claims from J&J's actions in 1979 or before—and would not cover affirmative wrongdoing that J&J engaged in after 1979, or unrelated to the transfer in 1979.

206.    The 2021 Funding Agreement was drafted by Jones Day.  The terms of the 2021 Funding Agreement (outside of bankruptcy) were necessary:  to give LTL access to the same assets that Old JJCI had available to satisfy talcum powder claims.  The 2021 Funding Agreement expressly contemplated an existence outside of bankruptcy (either before an LTL bankruptcy, or after its dismissal from bankruptcy).  At this point (outside of bankruptcy), it was as good as cash—as the Third Circuit later found, it strongly resembled an ATM that provided LTL with a right to at least $61.5 billion in cash with minimal conditions.

207.    The 2021 Funding Agreement was set up in this way to insulate the Texas Two-Step from criticism that it facilitated a fraudulent transfer—at least whenever J&J wanted to defend against such criticism.  The 2021 Funding Agreement made the entire value of JJCI—at least $61 billion—available to pay talc claimants on a free and clear basis.

208.    In fact, the resources available to LTL under the 2021 Funding Agreement are available regardless of whether or not a plan of reorganization is acceptable to J&J or New JJCI, and whether or not the plan of reorganization offers any payor protections under section 524(g) of the Bankruptcy Code.  Under the 2021 Funding Agreement, J&J was obligated to pay at least $61.5 billion even if the plan of reorganization was proposed by the tort claimants committee.  The 2021 Funding Agreement was drafted to apply outside of bankruptcy, as LTL understood that its case might be dismissed at some point and LTL had to have access to funding sufficient to pay current and future talc claims as they were liquidated in the ordinary course of business.

209.    That a plan was not required to protect or exculpate J&J was, again, required to avoid the Divisive Merger from being unwound as a fraudulent transfer.  J&J itself has independent

liability for the talc claims.  Courts have found J&J to be jointly and severally liable with Old JJCI, and some courts, including in the *Ingham* case, have apportioned a greater share of punitive damages to J&J on account of its "reprehensible conduct."  Regardless of any internal indemnifications or cost allocations between J&J and Old JJCI, described below, a creditor with a judgment against J&J could recover from J&J, up to the value of J&J.

### iv.  The Divisive Merger's Planned End Result: Delay to Underpay

210.  The Texas Two-Step has been done several times before (by the same law firm) and it has followed the same pattern each time.  The Debtor claims to be seeking a fair resolution of liabilities and to pay the full value of all such claims, present and future—but it does not.  Not even one has been resolved.  Instead, they are endlessly mired in bankruptcy while the "GoodCo" dangles a lowball offer and asks if the claimants are willing to take it yet—because they have no actual interest in resolving the bankruptcy case.

211.  Equally perniciously, the non-debtor J&J is allowed to use its captured puppet, LTL, to relitigate positions it lost, desperately, in courts around the country, and to further its cover-up, to the detriment of LTL and its creditors by pursuing unilateral litigation and attacks on the very science and expert reports that seek to unveil seventy years of fraud.

212.  From the "GoodCo"—here, New JJCI—perspective, there is **no** reason to seek a prompt resolution of the bankruptcy.  Every day that the bankruptcy is mired in delay imposes no restrictions on New JJCI.  It is not subject to the supervision of the bankruptcy court.  All litigation is stayed, so there is no risk of an adverse judgment bringing new attention to J&J's wrongdoing.  New JJCI and J&J are untethered and, effectively, are permitted to distribute over $17 billion to its shareholders (to date) with zero court oversight.  Not a single penny has been provided to victims.

213.   The victims—unlike the wrongdoer—are subject to the supervision of the Bankruptcy Court.  Their claims are indefinitely stayed, and they must proceed in Bankruptcy Court to obtain any relief.  They have no ability to bring their claims and demonstrate to a jury, and the world, that their claims are meritorious, and that they deserve compensation for what J&J did to them.  There is no ability to continue to develop discovery into the cover-up perpetrated by J&J and executives throughout the J&J corporate tree.  Every day victims are mired in bankruptcy is another day that their medical bills accrue, their families grow deeper in debt, and the victims become more and more desperate—and eventually die, after a slow and agonizing decline.

214.   As a result, the Divisive Merger—like every Texas Two-Step—is intended to create the most adverse possible negotiating dynamic for the victims of J&J's conduct.  New JJCI and J&J have no incentive to negotiate in good faith.  They control all the assets, earning handsome returns off them, and have no need to pay their victims anything.  The dynamic ensures that, absent relief or the termination of exclusivity, New JJCI and J&J will face no incentive to agree to a fair result.  New JJCI and J&J purport that the 2021 Funding Agreement means that creditors were not ***defrauded***:  over $61 billion in assets are available, and the claims can theoretically be satisfied.

215.   But this claim ignores that creditors—absent relief or the termination of exclusivity—are hindered and delayed—the payment of their claims is delayed indefinitely into the future.  J&J's goal is for the victims to, in essence, *self-defraud*:  accept an insufficient payment of their claim against one of the most solvent corporations in the world just to get paid something that will assist in ameliorating (but not compensating) for the harm done to their families during their agonizing decline and struggle to beat the cancer J&J caused them.  Meanwhile, J&J earns a handsome return of at least hundreds of millions of dollars per year on those funds that it withholds

from victims—ensuring that when it finally pays those victims, it can pay them in large part with the funds it has earned on those victims' deferred compensation and keep the principal.

216.    The intended result is that J&J and New JJCI—after years of hindering and delaying its legitimate creditors—will force talc claimants to accept less than they are owed and abscond with the remainder of the funds that should have gone to those creditors.  In essence, J&J has traded its "deny" strategy for a "delay to underpay" strategy.  J&J and New JJCI hope to delay the resolution of these proceedings indefinitely until talcum powder victims agree to be underpaid for their legitimate claims to end the interminable wait for compensation as they die, and their families edge closer to financial ruin.

217.    The "negotiating forum" that the debtors claim to have created is, thus, created to ensure that any negotiation that happens disadvantages the claimants, and that it will not produce a result in their favor.

218.    Two facts are critical in understanding J&J's goals with the Divisive Merger.

219.    *First*, J&J began threatening tort claimants with the specter of a Texas Two-Step in advance as leverage to force a settlement, as reported by *Reuters* on July 18, 2021.  This fact demonstrated J&J's awareness that the Divisive Merger would hinder, delay, and defraud its creditors—and that those creditors could accept lower settlements to avoid this fraud.

220.    *Second*, J&J misled numerous courts in the lead-up to the Divisive Merger.  In one case, an attorney defending J&J against talc claimants told a judge that news reports regarding the planned Texas Two-Step (which were due to J&J's intentional leaking of its intentions to victims it sought to strong-arm into a lowball settlement) were rumors.  Based on those assurances, the Court moved the case forward to a trial that J&J intentionally timed to be precluded by LTL's bankruptcy filing.  Likewise, after talc claimants sought an injunction barring the Texas Two-Step

they (correctly) suspected was imminent, J&J described the claimants' concerns as "hypothesizing[.]"

221.    To date, no court has confirmed a plan arising from the Texas Two-Step. The only Court to have explicitly considered the propriety of using the Texas divisive merger statute to impair creditors stated that, of course, Texas did not allow such a thing. Courts reviewing other Texas Two-Step bankruptcy cases have similarly noted that they bear all the hallmarks of a transaction taken with actual intent to hinder, delay, or defraud creditors.

222.    The only possible way for a Texas Two-Step bankruptcy to at least appear non-fraudulent is if the 2021 Funding Agreement is absolute, non-voidable, and accessible by LTL with minimal conditions. Or as LTL's appellate counsel represented to the Third Circuit when it was trying to justify LTL's bankruptcy filing as having been done in good faith: "$61 billion free and clear to the potential claimants so that entire pot of money is available."

223.    But this is of cold comfort to the victims, who have indefinitely lost their jury trial rights in those cases and who are compelled to spend years litigating to preserve their rights to merely be placed back in the position they should have been in years ago—losing precious time in the process. None of those creditors, to date, have been able to get paid a penny on their legitimate claims. The first victims of the Texas Two-Step—the victims of Georgia-Pacific's asbestos, who were shunted into the Bestwall bankruptcy—had their trial rights cut off by the Texas Two-Step on November 2, 2017. Close to five years later, they remain unable to pursue their claims and unable to obtain compensation, as there is no end in sight of that bankruptcy. The bankruptcy case itself is an intended instrument of the fraud; it is part of the intended delay.

### v.   Directors and Officers Breach Their Duties in Concert

224.     On October 14, 2021, LTL held its first board meeting (the "LTL Board Meeting")
and approved the bankruptcy filing.  That meeting lasted approximately ninety minutes.  Prior to
the LTL Board Meeting, Mr. Wuesthoff and the LTL Board did not receive or review any written
analysis related to whether LTL should file for bankruptcy.  John Kim was at that Board meeting—
although he had been a J&J lawyer deeply involved in the Divisive Merger and was one of the
core conspirators, Mr. Kim was seconded to LTL and serves as its Chief Legal Officer.  Mr. Kim
purportedly advised the board of key facts relevant to their decision—but those board members
and officers were unable to recall a number of these facts in sworn testimony.

225.     Prior to the LTL Board Meeting, Mr. Wuesthoff and Mr. Dickinson did not receive,
and did not review, any written material related to the talc liability.  No one at LTL undertook any
work to value the potential talc liabilities that had been assigned to LTL, nor did anyone at LTL
undertake any assessment of JJCI's purported indemnification of J&J, or whether either LTL or
JJCI could raise any potential challenges to this purported indemnification.  The forecasted costs
and expenses associated with talc litigation were not presented at the LTL Board Meeting, and
neither was any discussion of what J&J had paid to settle cases in the past or any forecasts about
what LTL could expect to pay to settle the talc litigation.  Prior to voting to place LTL into
bankruptcy, neither Mr. Wuesthoff, nor Mr. Dickinson, nor the LTL Board had any information
relating to the amount of LTL's talc liabilities.

226.     Additionally, neither Mr. Wuesthoff nor Mr. Dickinson, nor the LTL Board knew
the value of LTL's assets.  Even though Mr. Wuesthoff had signed the 2021 Funding Agreement
on behalf of LTL, and even though he understood that the 2021 Funding Agreement was both the
most important asset of LTL and that, after a bankruptcy filing, the value of the 2021 Funding

Agreement would be tied to the value of JJCI, he did not know, and did not ask, what the value of JJCI was.  The value of JJCI was not discussed at the LTL Board Meeting.

227.    While Mr. Wuesthoff and the LTL Board understood that it would be important for LTL to have legal counsel, neither Mr. Wuesthoff nor the LTL Board selected, or had any input, into who would represent LTL in its bankruptcy case.  Rather, Jones Day, which had previously represented both J&J and JJCI in planning the Texas Two-Step, was assigned to represent LTL in its bankruptcy case, and neither Mr. Wuesthoff nor the LTL Board knew whether Jones Day was free of conflicts.  Indeed, both Mr. Wuesthoff and Mr. Dickinson gained their understanding of the restructuring transaction—such as it was—from J&J lawyers including Mr. John Kim, Mr. Chris Andrew, and Mr. Andrew White.

228.    In short, not only was there no independent board at LTL, but there was not even a pretense of independence.  The LTL Board consisted of puppets put in place by J&J to protect J&J's interest.  Their assignment was to rubber stamp anything and everything that needed to be done on behalf of each entity involved to ultimately effect the Texas Two-Step and file LTL into bankruptcy.  Inherent in this rubber-stamping exercise was a complete and utter disregard for any kind of diligence, review, analysis, or objective decision making.

229.    Their orders were simple: do not review, question, analyze, comment on, discuss, or otherwise consider the several transactions involved in the Texas Two-Step.  Simply sign on the dotted line.  If anyone asks, repeat the party line: "so that we could equitably and efficiently resolve the talc claims."[14]

---

[14]    *See e.g., In re LTL Mgmt. LLC*, No. 21-30589 (MBK), Feb. 14, 2022 Hr'g Tr. at 62:24 – 63:1; 68:18-21; 74:8-11; 74:17-20; 75:18-20; 76:19-23; 86:16-18; 87:14-16; 122:11-12; 135:2; 165:12-14; 166:12-15; 167:2-6; 168:24 – 169:1; 174:3-4; 183:14-15; 191:4-5; 191:13-14; 212:25 – 213:2; 277:20-24. Feb. 14, 2022.

230.    The Third Circuit revealed this charade.  It found that LTL faced no imminent

financial distress because—taking J&J and LTL at their word—the 2021 Funding Agreement

could meet all of LTL's talc liabilities in the ordinary course.

## IV.    **Other Pre-LTL 1.0 Bankruptcy Fraudulent Transfers**

231.    Although J&J, New JJCI, and the Debtor contended that Old JJCI was in "financial

distress" J&J nonetheless repeatedly compelled Old JJCI to shoulder J&J liabilities and transferred

Old JJCI's assets to itself for no or inadequate consideration.

232.    Under the 1979 Agreement, Old JJCI had taken on very specific liabilities (and

indemnified J&J for those liabilities):  those allocated on the books or records of J&J as associated

with the Baby Products division *at the time of the agreement*.  It did not provide an indemnity for

all liabilities associated with talc at the time—and could not have, as J&J retained its "Shower to

Shower" talcum powder product.  But most importantly, even if the agreement purported to assign

all liabilities at the time of the agreement, known or unknown, no reasonable reading of this

indemnity could provide an indemnity for independent J&J wrongdoing that occurred after that

date.  However, J&J ignored this, and had a longstanding accounting practice to charge JJCI for

**all** liabilities associated with talc, including litigation costs to defend J&J (not JJCI) and for

verdicts that apportioned liability to J&J and not JJCI.

233.    J&J engaged in this conduct for two reasons.  First, it sought to create a "paper

trail" to claim that its own independent liability was actually a JJCI liability, should it come time

to protect its assets from that liability.  Second, by allocating those costs to JJCI, it reduced the

assets unquestionably available to talcum powder victims and ensured that claimants would be

hindered or delayed from accessing those assets to satisfy their legitimate claims.

234.    Numerous juries have found J&J independently liable for talcum powder exposure,

on grounds that clearly fall outside the narrow indemnities from the 1979 agreement.  For example,

J&J continued its affirmative misrepresentations and deception to the public regarding the safety of talcum powder and its asbestos content—misrepresentations made by J&J executives (not JJCI employees). Additionally, no indemnity has ever been offered by JJCI to J&J for Shower to Shower—on any date.

235. Nonetheless, J&J, for accounting reasons, charged the full amount of *all* verdicts (both against JJCI, and against J&J) to the JJCI legal entity. The most egregious example is the *Ingham* case. In *Ingham*, discussed further below, a jury of American citizens found that J&J had independent liability to victims of talcum powder, and apportioned specific liability to J&J. This was upheld on appeal, with the Missouri Supreme Court refusing to review and overturn the decision that found J&J itself had engaged in "reprehensible conduct" justifying not only compensatory, damages awarded against J&J, but punitive damages as well—and punitive damages in a higher ratio than were appropriate for JJCI.

236. As the Missouri Court of Appeals held:

> **We find there was significant reprehensibility in Defendants' conduct**. The harm suffered by Plaintiffs was physical, not just economic. Plaintiffs each developed and suffered from ovarian cancer. Plaintiffs underwent chemotherapy, hysterectomies, and countless other surgeries. These medical procedures caused them to experience symptoms such as hair loss, sleeplessness, mouth sores, loss of appetite, seizures, nausea, neuropathy, and other infections. Several Plaintiffs died, and surviving Plaintiffs experience recurrences of cancer and fear of relapse. All Plaintiffs suffered mentally and emotionally. Their ovarian cancer diagnoses caused them constant worry and fear.
>
> After considering the substantial evidence presented by Plaintiffs that Defendants discussed the presence of asbestos in their talc in internal memoranda for several decades; avoided adopting more accurate measures for detecting asbestos and influenced the industry to do the same; attempted to discredit those scientists publishing studies unfavorable to their Products; and did not eliminate talc from the Products and use cornstarch instead because it would be more costly to do so, **the jury found Defendants knew of the asbestos danger in their Products when they were sold to the public**. **This finding supports that Defendants' exposure of consumers to asbestos over several decades was done with reckless disregard of the health and safety of others.**

*Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 721 (Mo. Ct. App. 2020) (emphasis added).

237.    J&J demanded the Supreme Court review and reverse the Missouri court system, an invitation the Supreme Court declined.  J&J then (internally) flouted that decision which held J&J (not JJCI) liable for the large majority of punitive damages, charging the full amount of the punitive damages assessed for J&J's own conduct to JJCI, though JJCI had no liability for such amounts to J&J.  J&J also charged the full litigation costs for this litigation to JJCI—even though it was defending itself against claims targeting it directly.

238.    Each charging of J&J liability to Old JJCI that should have been borne by J&J was a transfer of liability to Old JJCI for which Old JJCI had no liability.  For example, in 2021—in the three quarters before the LTL 1.0 bankruptcy—JJCI was charged over $1.5 billion in talcum powder litigation costs.

239.    J&J handed out bonuses to key executives for their participation in this scheme, including John Kim and Robert Wuesthoff who received sizeable retention bonuses.  These payments were made to reward the participants in this scheme and to ensure their loyalty in the upcoming litigation over this scheme.

## V.      To Complete This Scheme, LTL Files Its First Chapter 11

240.    On October 14, 2021, although not in any financial distress of its own, at the orders of J&J to complete its Project Plato scheme, LTL filed for protection under Chapter 11 of the Bankruptcy Code in the Western District of North Carolina (the "Chapter 11 Case").  This filing took place only two days after LTL was formed.  As the Bankruptcy Court for the Western District of North Carolina recognized, the filing in North Carolina was blatant forum-shopping, and the North Carolina Bankruptcy Court promptly transferred the case to the District of New Jersey.

241.    As part of the first-day filings in the Chapter 11 case LTL filed a 128 page "Informational Brief."  First, this tome set forth the discredited scientific claims that juries in the United States were increasingly rejecting, presented by lawyers rather than by expert testimony

subject to cross-examination, over close to 90 pages.  Next, the Informational Brief alleged that

the tactics of plaintiff lawyers were "prejudicial" and that state attorney generals (like, apparently,

juries of American citizens) had been hoodwinked by these plaintiff lawyers.

242.    Finally, it relayed the litigation results—which, although J&J (through LTL) tried

mightily to spin in its favor, revealed that juries repeatedly found J&J and JJCI liable on the merits

and repeatedly found J&J and JJCI's conduct so reprehensible that large punitive damages awards

were required to deter and punish their conduct.   J&J complained that the Supreme Court had

failed to intervene and overturn the decision of the Missouri state court system in *Ingham* that had

been upheld by the Missouri appellate courts.

243.    Upon the filing—and prior to any order of the North Carolina Bankruptcy Court—

J&J asserted that all lawsuits were stayed, not only against LTL, not only against "New JJCI" for

the claims transferred to LTL, but also against J&J—which had not transferred any liabilities to

LTL.  Only after several failed attempts—and the last-minute discovery of the 1979 Agreement—

did the North Carolina Bankruptcy Court finally grant J&J the broad and sweeping injunction to

protect it (and other non-debtors) that it sought on an interim basis.

244.    Despite filing a 128 page "Informational Brief" alleging that talcum powder

claimants are owed nothing and have won awards due only to the flawed tort system of the United

States, LTL asserts it performed the Divisive Merger and filed for Chapter 11 *for the benefit of*

*those claimants*.   Each LTL/J&J/JJCI witness recited the PR-tested lines: the goal of the

bankruptcy was to reach a "fair and equitable resolution of the talc claims" (indeed, to such a

degree their attorneys were required to ask them to explain why they all used such similar

language) and that, amazingly, talc litigants (J&J's adversary, overwhelmingly opposed to the

Divisive Merger) were the beneficiaries of the scheme.  Benefits to J&J were, according to these witnesses, apparently incidental to this goal.

245.     However, this stated goal betrayed a plan to strip talcum powder victims of their constitutional rights and deny them fair and equitable compensation.  A party has the right to settle its litigation *or* to demand a trial and full compensation for their injuries, as a due process right and a constitutional property right.  J&J's desire to "resolve" talc claims is, in short, a demand that talcum powder claimants (present and future) be stripped of that right.  And it is often a claimant's exercise of that right that results in a fair and equitable settlement.

246.     In some contexts—where there is a limited fund of assets that cannot satisfy all legitimate claims—the American legal system allows tort claims to be settled against the will of the claim holder.  For example, "limited fund" class actions can be settled without "opt-outs."  And as J&J knew, it is similarly possible in the context of a legitimate, good-faith bankruptcy for an entity to settle the claims against it without the full support of all claimants—because, in a legitimate good-faith bankruptcy, there are not enough assets to go around.[15]  In both cases, the key element is fairness *between similarly situated claimants* in obtaining access to the funds to satisfy their claims.  It is not in giving a wrongdoer the right to simply decide it has had enough of the tort system and demand that the victims agree to settle at less than they are due.

247.     J&J understood how it could resolve the talcum powder claims by talcum powder victims.  In seven quarters (2020 through the LTL bankruptcy filing) it settled over 5,700 ovarian cancer claims, and it had been regularly settling mesothelioma claims for years.  If J&J did not wish to litigate a claim, it could offer to settle.  Just as the plaintiff could not compel J&J to settle,

---

[15]   While in some cases a solvent entity that is, nonetheless, in financial distress can file for bankruptcy and pay its creditors 100 cents on the dollar, it files bankruptcy because *absent the protection of bankruptcy* it will be liquidated, and in being liquidated lose the "going concern" value of the enterprise to the detriment of those creditors.

neither could J&J compel the claimant to settle—but as countless corporations have found after harming thousands to tens of thousands to hundreds of thousands of people, the vast majority of claims can be resolved for fair compensation outside the tort system.

## VI.   The Third Circuit Dismisses LTL 1.0 As Filed In Bad Faith

248.   LTL's initial bankruptcy was filed in bad faith.  It was filed as part of a scheme to hinder, delay, and defraud talc claimants though the bankruptcy filing.  However, the Third Circuit ultimately found that because the 2021 Funding Agreement provided LTL with access to at least $61.5 billion and permitted LTL to meet its obligations in the ordinary course, it was not in immediate financial distress.  Thus, bankruptcy was unavailable to LTL.

249.   The only way for LTL's initial bankruptcy to appear non-fraudulent was for LTL and J&J to hold the 2021 Funding Agreement out as absolute and something that provided LTL with access to funding outside of bankruptcy.

250.   John Kim, LTL's chief legal officer, in his first day declaration setting out the purported purpose of LTL's first bankruptcy filing, represented to the Court that the 2021 Funding Agreement provided LTL with access to funding outside of bankruptcy.  Mr. Kim testified:

> Significantly, the [2021] Funding Agreement imposes no repayment obligation on the Debtor; it is not a loan.  It obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses.  In addition, the [2021] Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.

Decl. of John K. Kim in Support of First Day Pleadings, *In re LTL Mgmt., LLC* (Bankr. W.D.N.C.)

No. 21-30589  [D.I. 5 at ¶ 27].

251.    Mr. Gordon, LTL's counsel, represented to the Bankruptcy Court, in the presence

of Mr. Haas—J&J's head of worldwide litigation—at a hearing held on February 18, 2022 on a

motion to dismiss LTL's bankruptcy as a bad faith filing, that the 2021 Funding Agreement meant

that talc claimants were covered in bankruptcy or outside bankruptcy.  Mr. Gordon stated:

> [T]here's literally no conditions or any material conditions on the permitted funding
> uses under this document.  I'll come back to this.  So I did want to focus on
> permitted funding use because the other side I think has fashioned a new argument
> that we hadn't heard before with respect to the funding agreement.  So there's
> basically two different scenarios where funding is available.  The first is funding in
> the tort system.  And as you would expect, what that funding says is that the payors
> are obligated to pay the liabilities to the extent they're established by a judgement
> or a settlement in the tort system.  That's what you would expect and that's what
> happens.  You want funds available to pay settlements, to pay judgments in the tort
> system. So it makes very clear this is what we're talking about if there's no
> proceeding in bankruptcy.  Whether there was no case filed or whether the case is
> filed or dismissed, the money's available for that purpose. And you can imagine,
> Your Honor, by the way, the hue and cry you would have heard if this provision
> weren't in there because they would have said that we've manipulated the whole
> system because you filed bankruptcy and now you're going to tell the Court you
> can't dismiss our case because there's no money available if we go back in the tort
> system. So this is there to protect the claimants.  It's there to assure this isn't treated
> or consider a fraudulent conveyance.  The idea was and the intent was the claimants
> are covered either way in bankruptcy or outside.

*In re LTL Mgmt., LLC* (Bankr. D.N.J.) No. 21-30589, Feb. 18, 2022 Trial Tr. 60:17-61:20.

252.    Indeed, the terms of the 2021 Funding Agreement expressly provide that it applies

outside of bankruptcy and enables "the payment of any and all costs and expenses of the Payee

incurred in the normal course of its business," such as talc judgments and settlements, "at any time

when there is no proceeding under the Bankruptcy Code pending with respect to the Payee."  2021

Funding Agreement, pp. 5-6.

253.    The Bankruptcy Court relied on LTL's representations and held that the 2021

Funding Agreement obligated New JJCI and J&J "to pay for costs and expenses of the Debtor

incurred in the normal course of its business (a) at any time when there is no bankruptcy case" and "requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case…." *In re LTL Mgmt.*, 637 B.R. 396, 423 n.27 (Bankr. D.N.J. 2022).

254.    Mr. Katyal, LTL's appellate counsel, also told the Third Circuit that the 2021 Funding Agreement applied outside of bankruptcy.  "Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something.  I understand that the [2021] funding agreement does have provisions for funding outside of bankruptcy.  The Court:  Yeah, that's what I thought."[16]

255.    Relying on the plain language of the Funding Agreement, as well as the Bankruptcy Court's findings and LTL's representations, the Third Circuit held that LTL "had the right, outside of bankruptcy, to [enforce the Funding Agreement]."  *In re LTL Mgmt., LLC*, 64 F.4th 84, 106 (3d. Cir. 2023).  The Third Circuit pointed to the benefit to claimants of New JCCI's role in the 2021 Funding Agreement: "The value of the payment right could not drop below a floor defined as the value of New Consumer measured as of the time of the divisional merger, estimated by LTL at $61.5 billion, and was subject to increase as the value of New Consumer increased after it."  *Id.* at 97.

256.    Thus, the value of the 2021 Funding Agreement "would increase as the value of New Consumer's business and assets increased."  *Id.* at 106.  In addition, New JJCI "had access to Old Consumer's cash-flowing brands and products along with the profits they produced, which underpinned the $61.5 billion enterprise value of New Consumer as of LTL's filing.  And the sales

---

[16]    *In re LTL Mgmt. LLC*, Case No. 22-2003/22-2004 (3d Cir.) Sept. 19, 2022, Oral Arg. Tr. 83:21-25.

and adjusted income of the consumer health business showed steady growth in the last several years when talc costs were excluded." *Id.*

257.    The 2021 Funding Agreement was absolute, functioned like an ATM machine, and made over $61 billion available to LTL to pay talc claims outside of bankruptcy.  The problem for LTL and J&J, though, was this meant that LTL was not eligible to be in bankruptcy.

258.    Much to J&J's disappointment, the Third Circuit held that LTL was not eligible for bankruptcy because it was not in financial distress due, in part, to the funding available to LTL under the 2021 Funding Agreement.  But for J&J's scheme to work, LTL had to stay in bankruptcy for as long as possible and maintain a litigation stay that protected J&J and its non-debtor affiliates.  Dismissal meant that J&J would not get the "bang for the buck" that it was promised.  If LTL's case was dismissed too soon, J&J would lose the benefits of the Bankruptcy Court's injunction keeping cancer victims from trying to hold J&J accountable for its conduct.

## VII.    In Response, LTL and J&J Conduct A Second Fraudulent Transfer

259.    J&J had provided the 2021 Funding Agreement to enable it to assert it had not sought to defraud talc claimants, as they would have access to the same assets as they had before the Divisional Merger.  However, the Third Circuit identified that as a result, LTL faced no imminent financial distress and thus could not satisfy the test that its bankruptcy had been filed in good faith.   The Third Circuit, however, specifically cautioned against LTL seeking to manufacture financial distress by parting with the 2021 Funding Agreement.  *See* Third Circuit Opinion at fn. 18.  However, having conducted one fraudulent transfer to access the bankruptcy system, J&J was not deterred from conducting another to re-file for bankruptcy.

260.    As soon are oral argument before the Third Circuit ended and the writing was on the wall, J&J began to orchestrate a second scheme to keep LTL in bankruptcy even if the Third Circuit dismissed LTL's first bankruptcy.

261.    First, in early January 2023, New JJCI, renamed Holdco, transferred its consumer health business through one or more transaction to Janssen Pharmaceuticals and subsequently to Kenvue (the "Kenvue Transfer").  As a result of these transactions, Kenvue now owns and operates the consumer health business and the cash-flowing brands that were once owned by JJCI/Holdco. As a result of the transfer of the consumer health business, Holdco's assets no longer include the consumer health business and the cash-flowing brands and products and profits that they produced. Instead, Holdco's assets are limited to ownership interests in various subsidiaries.  Holdco's assets post-transfer are valued, according to J&J, at approximately $30 billion.

262.    Second, LTL was made to part with its rights under the 2021 Funding Agreement. This required some aggressive maneuvers.  On the very day the Third Circuit decision issued its decision ordering that LTL's first bankruptcy be dismissed, Mr. Kim purportedly came up with the idea that the 2021 Funding Agreement might be deemed "void or voidable" because of the Third Circuit's ruling.  Mr. Kim's thought that perhaps the Third Circuit's opinion frustrated the purpose of the 2021 Funding Agreement because it meant that LTL could not stay in bankruptcy for years and years and keep talc claimants from asserting their claims against J&J.

263.    Mr. Kim consulted with attorneys at Jones Day to see if anyone would support his novel legal theory that the Third Circuit's opinion somehow rendered the 2021 Funding Agreement "void or voidable."  Jones Day apparently did not advise LTL that an opinion issued by the Supreme Court of North Carolina entirely foreclosed any argument that the Third Circuit's ruling dismissing LTL's first bankruptcy was a frustrating event that J&J could invoke to escape its obligations under the 2021 Funding Agreement.  *See Brenner v. Little Red School House, Ltd.*, 274 S.E.2d 206 (N.C. 1981).  Mr. Kim's suggestion that the Third Circuit's ruling meant that the 2021

Funding Agreement was "void or voidable" was complete nonsense and wholly adverse to LTL's own interests.

264.    LTL also never raised with the TCC, the U.S. Trustee's Office, or the Bankruptcy Court its alleged concern that the 2021 Funding Agreement might be "void or voidable" because of the Third Circuit's opinion.  In late March 2023, LTL filed a monthly operating report, signed by LTL's CFO and its counsel, which indicated the 2021 Funding Agreement remained in place. J&J never refused to make a payment under the 2021 Funding Agreement.  In fact, nothing prevented J&J from honoring its obligations under the 2021 Funding Agreement to LTL even if a theoretical risk of frustration of purpose—normally an affirmative defense—existed, especially considering LTL's repeated assurances to the Bankruptcy Court and the Third Circuit that the 2021 Funding Agreement applied outside of bankruptcy.

265.    Notwithstanding all of this—prior to the dismissal of LTL's first bankruptcy—LTL prepared to terminate the 2021 Funding Agreement and replace it with new financing agreements (the 2023 Funding Agreement and J&J Support Agreement) in order to manufacture (purported) financial distress.  Under the new agreements, J&J's balance sheet is not available to the Debtor, and Holdco's (formerly New JJCI's) assets no longer include the consumer health business (since they were transferred to Kenvue).  The LTL Board approved this transaction during the pendency of LTL's first bankruptcy, while LTL's directors, officers and counsel owed fiduciary duties to the talc victims.

266.    On April 4, 2023, during the 131 minutes that LTL was outside of bankruptcy, LTL terminated the 2021 Funding Agreement and entered into the 2023 Funding Agreement and the J&J Support Agreement (the "2023 Transaction").  LTL, J&J, and HoldCo entered into a

termination and substitution agreement by which the 2021 Funding Agreement was terminated, and the parties entered into the 2023 Funding Agreement and the J&J Support Agreement.

267.     Once LTL had parted with its rights under the 2021 Funding Agreement, it re-filed for bankruptcy.  LTL's intent was to manufacture financial distress in an effort to justify a second bankruptcy filing that would impose a litigation stay and keep claimants from pursuing recovery from J&J.  Under the new agreements and new asset base of Holdco, LTL does not have the same access to assets and liquidity to pay talc claims as Old JJCI did prior to the Divisive Merger or termination of the 2021 Funding Agreement.

268.     The result of LTL's strategy to evade the Third Circuit's ruling was that LTL replaced the 2021 Funding Agreement—guaranteed by "New JJCI" as well as J&J—with the 2023 Funding Agreement guaranteed *only* by the remains of New JJCI (Holdco).  Because J&J had caused New JJCI to spin off its consumer health division, New JJCI does not have access to the same level of assets and liquidity to meet its obligations as when the 2021 Funding Agreement was implemented (as LTL proudly announces)—because at least $40 billion was transferred away from New JJCI to J&J.  Further, by stripping operating businesses from New JJCI, J&J sought to deny LTL access to liquid cash that could be used to pay talc claims in the ordinary course.  Again, however, the 2023 Funding Agreement requires New JJCI (now called Holdco) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case.

269.     Consider what a legitimate company does with a valuable contractual asset worth a fraction of $61.5 billion that might have legal vulnerability.  It would retain new, independent counsel to evaluate those claims—counsel who was not involved in drafting the contract.  It would do exhaustive research on those claims.  It would determine every viable basis to retain those contractual rights.  It would not advise its counterparty of those potential challenges.  If its

counterparty asserted those claims, it would inform the party challenging those contractual rights that the challenge was baseless, and would fight any challenge to those contractual rights, tooth and nail.  Finally, if the company was actually concerned that the contract indeed had issues, it would demand to know who had made mistakes and demand compensation for those mistakes.

270.    Compare instead what LTL did.  LTL allegedly consulted Jones Day—J&J's attorneys, who had drafted the Funding Agreement.  LTL claims to have obtained advice from Jones Day, the law firm that drafted the 2021 Funding Agreement so that it would provide LTL with access to funding outside of bankruptcy in the event of dismissal.  LTL then advised J&J of these defenses J&J had to payment from LTL—even though these defenses necessarily failed as a matter of applicable state law.  LTL then "by consensus" and without negotiation prepared and agreed to a *new* agreement, that would swap the 2021 Funding Agreement for new agreements worth at least tens of billions less in value.  LTL asserted "common interest" privilege over these negotiations—which should have been *highly adversarial* considering they went to tens of billions of dollars of value.  LTL then retained Jones Day *again* for a new bankruptcy and filed a mere 131 minutes after it had been expelled from its first bankruptcy.

271.    Each of these actions was taken in knowing violation of the fiduciary duties of the directors and officers of LTL.  The Individual J&J Defendants, as well as J&J, New JJCI, and the other J&J entities involved knowingly participated in those breaches of fiduciary duty.

272.    Given all that has transpired, if LTL can prove that it is truly in immediate financial distress, then it necessarily follows that J&J and LTL orchestrated one of the most massive frauds in U.S history.  It just a question of when.

273.    If the 2021 Funding Agreement was exactly what LTL represented that it was to the Bankruptcy Court and the Third Circuit—and was exactly what the Bankruptcy Court and the

Third Circuit interpreted it to be—then the termination of the 2021 Funding Agreement for the express purpose of creating financial distress is avoidable as a fraudulent transfer. It was an intentional fraudulent transfer because this action was taken with the admitted purpose of creating financial distress (thereby hindering, delaying, or defrauding talc claimants). If LTL is right that it successfully manufactured its own immediate financial distress (and to date LTL has presented no evidence to prove it did so), then the transaction *by definition* is a constructive fraudulent transfer: it took a valuable asset from a company not in financial distress, and replaced it with a lesser asset that could not be of reasonably equivalent value, leaving the company either insolvent, with unreasonably small capital, or unable to pay its debts as they came due because (as LTL proudly claims) it is now in "financial distress." LTL has no liabilities other than talc liabilities— and so, to be in financial distress, it *must* meet one of those three prongs. Consequently, the transaction must be reversed as an intentional or constructive fraudulent transfer, either of which will end any purported financial distress.

274.    Alternatively, if the 2021 Funding Agreement was essentially illusory—*i.e.*, there was a material risk that the 2021 Funding Agreement was voidable by J&J and J&J could never have been compelled to pay anything thereunder unless J&J is showered with every benefit from a prolonged bankruptcy process that it ever thought imaginable—then the Divisive Merger itself was a fraud—both actual and constructive—and must be reversed.

275.    Either way, if LTL is in financial distress, J&J and LTL committed one of the largest, if not the largest, fraudulent transfers in history. It is time for J&J, LTL, and its co-conspirators to be held to account.

**COUNT I**
**ACTUAL FRAUDULENT TRANSFER—TERMINATION OF 2021 FUNDING
AGREEMENT**
(11 U.S.C. §§ 548(a)(1)(A) and 550)

**(Against J&J, and New JJCI)**

276.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

277.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

278.     The 2021 Funding Agreement obligated J&J and New JJCI to pay for the costs associated with LTL's talc liability up to the full value of New JJCI.  The value of the payment right under the 2021 Funding Agreement could not drop below a floor estimated by LTL to be at least $61.5 billion and was subject to increase as the value of New JJCI increased.

279.     The 2021 Funding Agreement, both by its express terms and as represented by LTL and J&J applies with equal force outside of bankruptcy.  In effect, the 2021 Funding Agreement functioned like an ATM to pay talc claims both inside and outside of bankruptcy.  LTL's interest in the 2021 Funding Agreement was the Debtor's most valuable asset.

280.     LTL entered into the Termination and Substitution Agreement as of April 4, 2023 with the intention of creating financial distress sufficient to support a new Chapter 11 bankruptcy case.  The Debtor terminated its interest in its most valuable asset by entering into the Termination and Substitution Agreement.

281.     The transfer was made for the benefit of J&J and New JJCI.

282.     The Debtor's intentional termination of the 2021 Funding Agreement was done with the actual intent to hinder, delay and/or defraud all talc claimants to whom the LTL was indebted on April 4, 2023, and in fact did hinder, delay, or defraud such claimants.

283. The Termination and Support Agreement should be avoided pursuant to 11 U.S.C. § 548(a)(1)(A) and the Debtor's interest in the 2021 Funding Agreement should be recovered pursuant to 11 U.S.C. § 550, thus fully reinstating the 2021 Funding Agreement restoring LTL's rights thereunder.

## COUNT II
## STATE LAW ACTUAL FRAUDULENT TRANSFER—TERMINATION OF 2021 FUNDING AGREEMENT
(11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act)

### (Against J&J, and New JJCI)

284. The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

285. The Uniform Voidable Transactions Act is codified in North Carolina[17] and New Jersey.[18] The Uniform Fraudulent Transfer Act is codified in Texas.[19]

286. The 2021 Funding Agreement obligated J&J and New JJCI to pay for the costs associated with LTL's talc liability up to the full value of New JJCI. The value of the payment right under the 2021 Funding Agreement could not drop below a floor estimated by LTL to be at least $61.5 billion and was subject to increase as the value of JJCI increased.

287. The 2021 Funding Agreement, both by its express terms and as represented by LTL and J&J, applies with equal force outside of bankruptcy. LTL's interest in the 2021 Funding Agreement was the Debtor's most valuable asset.

288. LTL entered into the Termination and Substitution Agreement as of April 4, 2023 with the intention of creating financial distress sufficient to support a new Chapter 11 bankruptcy

---

[17]    *See* N.C. Gen. Stat. Ann. §§ 39-23.1 – 39-23.12

[18]    *See* N.J. Stat. Ann. § 25:2-20 – 25:2-33.

[19]    *See* Tex. Bus. & Com. Code § 24.

case. The Debtor terminated its interest in its most valuable asset by entering into the Termination and Substitution Agreement.

289.    The Debtor's intentional termination of the 2021 Funding Agreement was done with the actual intent to hinder, delay and/or defraud all talc claimants to whom the LTL was indebted on April 4, 2023, and in fact did hinder, delay, or defraud such claimants.

290.    The transfer was made for the benefit of J&J and New JJCI.

291.    The transfer is avoidable under applicable law by LTL's talc creditors.

292.    Therefore, the entry into the Termination and Support Agreement were a fraudulent transfer that may be avoided and the Debtor's interest in the 2021 Funding Agreement should recovered under 11 U.S.C. § 544(b) and the Uniform Fraudulent Transfer Act and/or Uniform Fraudulent Transactions Act, thus fully reinstating 2021 Funding Agreement and at LTL's rights thereunder.

## COUNT III
### CONSTRUCTIVE FRAUDULENT TRANSFER—TERMINATION OF 2021 FUNDING AGREEMENT
(11 U.S.C. §§ 548(a)(1)(B) and 550)

### (Against J&J, and New JJCI)

293.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

294.    LTL entered into the Termination and Substitution Agreement as of April 4, 2023 with the intention of creating financial distress sufficient to support a new Chapter 11 bankruptcy case. The Debtor terminated its interest in its most valuable asset by entering into the Termination and Substitution Agreement.

295.    As the Debtor has acknowledged, the 2023 Funding Agreement is not reasonably equivalent in value to the 2021 Funding Agreement.

296.    If the Debtor is in financial distress, then the replacement of the 2021 Funding Agreement with the 2023 Funding Agreement resulted in the Debtor becoming insolvent, left the Debtor with unreasonably small capital to engage in the business of settling and paying its talc liabilities, or left the Debtor unable to pay its liabilities as they came due.

297.    The transfer was made for the benefit of J&J and New JJCI.

298.    The Termination and Support Agreement should be avoided pursuant to 11 U.S.C. § 548(a)(1)(B) and the Debtor's interest in the 2021 Funding Agreement should be recovered pursuant to 11 U.S.C. § 550, thus fully reinstating the 2021 Funding Agreement restoring LTL's rights thereunder.

<u>COUNT IV</u>
**STATE LAW CONSTRUCTIVE FRAUDULENT TRANSFER—TERMINATION OF 2021 FUNDING AGREEMENT**
(11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act)

**(Against J&J, and New JJCI)**

299.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

300.    The Uniform Voidable Transactions Act is codified in North Carolina[20] and New Jersey.[21]  The Uniform Fraudulent Transfer Act is codified in Texas.[22]

301.    As the Debtor has acknowledged, the 2023 Funding Agreement is not reasonably equivalent in value to the 2021 Funding Agreement.

302.    If the Debtor is in financial distress, then the replacement of the 2021 Funding Agreement with the 2023 Funding Agreement resulted in the Debtor becoming insolvent, left the

---

[20]    *See* N.C. Gen. Stat. Ann. §§ 39-23.1 – 39-23.12

[21]    *See* N.J. Stat. Ann. § 25:2-20 – 25:2-33.

[22]    *See* Tex. Bus. & Com. Code § 24.

Debtor with unreasonably small capital to engage in the business of settling and paying its talc liabilities, or left the Debtor unable to pay its liabilities as they came due.

303.    The transfer was made for the benefit of J&J and New JJCI.

304.    The transfer is avoidable under applicable law by LTL's talc creditors.

305.    Therefore, the entry into the Termination and Support Agreement were a fraudulent transfer that may be avoided and the Debtor's interest in the 2021 Funding Agreement should recovered under 11 U.S.C. § 544(b) and the Uniform Fraudulent Transfer Act and/or Uniform Fraudulent Transactions Act, thus fully reinstating 2021 Funding Agreement and at LTL's rights thereunder.

<u>**COUNT V**</u>
**CIVIL CONSPIRACY / AIDING AND ABETTING FRAUDULENT TRANSFER—
TERMINATION OF 2021 FUNDING AGREEMENT**
(Pursuant to New Jersey Law or other Applicable State Law)

**(Against J&J, New JJCI, and Individual J&J Defendants)**

306.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

307.    As alleged *supra*, the termination of the 2021 Funding Agreement constituted both constructive and actual fraudulent transfers.

308.    Certain parties knowingly assisted in effectuating those transactions, including J&J, New JJCI, J&J Services, Mr. Kim, Mr. Wuesthoff, Mr. Deyo, Mr. Dickinson, Ms. Goodridge, Mr. Andrew, Mr. Haas, Ms. Ryan, Mr. Ullmann, Mr. Duato, Mr. Mongon, and Mr. Wolk.

309.    Under New Jersey law and other applicable state laws, these parties are liable for conspiring to commit and/or aiding and abetting the fraudulent transfers.

310.    Furthermore, these culpable parties bear joint and several liability for the outcome of the fraudulent transfers.

## COUNT VI
## BREACH OF FIDUCIARY DUTY—LTL MANAGEMENT
(Pursuant to 11 U.S.C. §§ 1107 and 1108 and North Carolina Law or other Applicable State Law)

### (Against Managers and Officers of LTL)

311.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

312.     Under North Carolina law, the managers and officers of LTL, a North Carolina LLC, owed fiduciary duties to LTL, including the duties of care and loyalty.

313.     The managers and officers of LTL, as alleged herein, have engaged in misconduct in breach of their fiduciary duties to LTL.

314.     The agreement that LTL entered into in connection with the termination of the 2021 Funding Agreement were between insiders, lacked any meaningful negotiation, and were driven by upper management of J&J.

315.     The managers and officers of LTL, all of whom were seconded to LTL by entities within the J&J corporate enterprise, lacked independence, abdicated their roles as corporate fiduciaries, and instead acted in the interests of J&J and its affiliates.

316.     The managers and officers of LTL breached their fiduciary duties, including the duties of loyalty and care, and acted in bad faith when they caused LTL to terminate the 2021 Funding Agreement, thereby relinquishing rights to valuable assets to pay talc claimants.  The directors and officers of LTL thereafter caused LTL to enter into the 2023 Funding Agreement, under which LTL had access to less, more illiquid assets as compared to under the 2021 Funding Agreement.

317.    The managers and officers of LTL also breached their fiduciary duties, including the duties of loyalty and care, and acted in bad faith when they authorized the bankruptcy to the detriment of LTL and the benefit of J&J, New JJCI, and their affiliates.

318.    Following the effectuation of these transactions, the managers and officers of LTL continued acting in the interests of J&J by taking actions to shield J&J at the expense of LTL.

319.    The actions of the managers and officers of LTL as alleged herein were taken in bad faith and/or constituted intentional misconduct.

320.    Through these and other wrongful actions alleged herein, the managers and officers of LTL breached their fiduciary duties to LTL.

321.    The managers' and officers' breaches of fiduciary duty resulted in damages to LTL in an amount to be proved at trial.

<u>**COUNT VII**</u>
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
(Pursuant to North Carolina Law or other Applicable State Law)

**(Against J&J, New JJCI, J&J Services, and Individual J&J Defendants)**

322.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

323.    Under North Carolina law, the directors and officers of LTL, a North Carolina LLC, owed fiduciary duties to LTL, including the duties of care and loyalty.

324.    The directors and officers of LTL, as alleged herein, have engaged in misconduct in breach of their fiduciary duties to LTL.

325.    The agreement that LTL entered into in connection with the termination of the 2021 Funding Agreement were between insiders, lacked any meaningful negotiation, and were driven by upper management of J&J.

326.    The directors and officers of LTL, all of whom were seconded to LTL by entities within the J&J corporate enterprise, lacked independence, abdicated their roles as corporate fiduciaries, and instead acted in the interests of J&J and its affiliates.

327.    The directors and officers of LTL breached their fiduciary duties, including the duties of loyalty and care, and acted in bad faith when they caused LTL to terminate the 2021 Funding Agreement, thereby relinquishing rights to valuable assets to pay talc claimants.  The directors and officers of LTL thereafter caused LTL to enter into the 2023 Funding Agreement, under which LTL had access to less, more illiquid assets as compared to under the 2021 Funding Agreement.

328.    The directors and officers of LTL also breached their fiduciary duties, including the duties of loyalty and care, and acted in bad faith when they authorized the bankruptcy to the detriment of LTL and the benefit of J&J, New JJCI, and their affiliates.

329.    Following the effectuation of these transactions, the managers and officers of LTL continued acting in the interests of J&J by taking actions to shield J&J at the expense of LTL.

330.    The actions of the directors and officers of LTL as alleged herein were taken in bad faith and/or constituted intentional misconduct.

331.    Through these and other wrongful actions alleged herein, the directors and officers of LTL breached their fiduciary duties to LTL.

332.    J&J, New JJCI, J&J Services, and the Individual J&J Defendants each knowingly participated in the above-mentioned breaches of fiduciary duty and aided and abetted the same.

<u>COUNT VIII</u>
**DECLARATORY JUDGMENT—2021 FUNDING AGREEMENT WAS NOT VOID OR VOIDABLE**
(Pursuant to the Declaratory Judgment Act and New Jersey or North Carolina Law or other Applicable State Law)

**(Against J&J)**

333.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

334.    Following the Third Circuit's ruling to dismiss LTL 1.0 as having been filed in bad faith due to an absence of financial distress of LTL, LTL and J&J determined to manufacture financial distress to skirt the Third Circuit's ruling.  In that effort, LTL and J&J terminated the 2021 Funding Agreement, thereby eliminating what was by far LTL's biggest asset (at least $61.5 billion) and replacing it with a much less valuable asset—*i.e.*, the 2023 Funding Agreement.

335.    To justify such an incredible decision to relinquish valuable estate assets, LTL and J&J have offered the facially absurd justification that there was a material risk that the 2021 Funding Agreement had been rendered "void or voidable"—a representation which neither LTL, nor J&J, has provided any support or basis for so concluding.

336.    Notwithstanding its representation that the 2021 Funding Agreement was rendered void or voidable following the Third Circuit's ruling, 2021 Funding Agreement applied with equal force outside of bankruptcy according to both its plain terms and representations made by LTL.

337.    LTL purported to "settle" claims that the 2021 Funding Agreement was void or voidable without having made any effort to litigate them or defend against them, with J&J.  In terminating the 2021 Funding Agreement, LTL gave up the J&J guarantee, compromising its access to liquid cash, and access to the consumer products division J&J had spun off from New JJCI.  LTL thus sought to intentionally create financial distress by stripping itself of access to cash,

and thus an ability to pay talc claims as they matured even if it had access to tens of billions of equity value now at Holdco.

338.    LTL also never raised with the TCC, the U.S. Trustee's Office, or the Bankruptcy Court its alleged concern that the 2021 Funding Agreement might be void or voidable because of the Third Circuit's opinion.  In late March 2023, LTL filed a monthly operating report, signed by LTL's CFO and its counsel, which indicated the 2021 Funding Agreement remained in place.  J&J never refused to make a payment under the 2021 Funding Agreement.

339.    Notwithstanding the foregoing, LTL asserts that there was a material risk that the 2021 Funding Agreement was not enforceable against J&J and New JJCI and that the 2021 Funding Agreement become "void or voidable" because of the Third Circuit's ruling dismissing LTL's first bankruptcy as a bad faith filing frustrated the alleged purpose of the 2021 Funding Agreement.  The Committee asserts that there was no risk that the 2021 Funding Agreement was "void or voidable" because of the Third Circuit's ruling dismissing LTL's first bankruptcy as a bad faith filing and that LTL assertion on this issue is entirely pretextual.  The Third Circuit's ruling could not have frustrated the purpose of the 2021 Funding Agreement because that agreement expressly provided for funding outside of bankruptcy.  And LTL admitted that dismissal was reasonably foreseeable.

340.    There is a high likelihood that the declaration will definitively resolve the uncertainty that gave rise to the controversy—*i.e.*, whether the 2021 Funding Agreement was "void or voidable," which LTL claims was the basis for terminating the 2021 Funding Agreement.

341.    A declaratory judgment as to whether the Third Circuit's ruling made the 2021 Funding Agreement "void or voidable" will be convenient to all relevant parties, as it will efficiently resolve a pending uncertainty.  The Committee position is that if the 2021 Funding

Agreement "void or voidable" such that J&J or New JJCI could have refused to comply with their payment obligations thereunder, then the Divisive Merger must be avoided as a fraudulent transfer as set forth below.

342.    The settlement of the uncertainty here is of paramount public interest because it bears directly on whether the termination of the 2021 Funding Agreement was fraudulent or whether the Divisive Merger was fraudulent.

343.    No other remedies will be as convenient or as readily available as a declaratory judgment from this Court.

344.    Therefore, the Committee is entitled to a declaratory judgment that the Third Circuit's ruling ordering that LTL 1.0 be dismissed did not render the 2021 void or voidable as suggested by LTL and J&J.

<u>COUNT IX</u>
**ACTUAL FRAUDULENT TRANSFER—DIVISIVE MERGER**
(11 U.S.C. §§ 548(a)(1)(A) and 550)

**(Against J&J and New JJCI)**

345.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

346.    If the Court does not find that the termination of the 2021 Funding Agreement was a fraudulent transfer, in the alternative, the Divisive Merger was an actual fraudulent transfer.

347.    The Divisive Merger was completed over several days in October of 2021.

348.    Through the Divisive Merger, LTL incurred all the outstanding talc liability of JJCI (including J&J liabilities transferred on the books to JJCI). The obligations which LTL incurred were transfers which were made within the two years prior to the Petition Date.

349.    In exchange for incurring all the talc liabilities of JJCI, LTL received rights under the 2021 Funding Agreement and minimal other assets. The Divisive Merger was entered into and

effectuated with the intention of hindering, delaying or defrauding talc claimants by removing assets from their reach.

350.    If there was a material risk that the 2021 Funding Agreement was "void or voidable" such that J&J or New JJCI would have refused to comply with their payment obligations thereunder, then J&J's and New JJCI's funding obligations under the 2021 Funding Agreement were essentially illusory and the Divisive Merger was a fraud and J&J and JJCI effectuated the Divisive Merger—saddling LTL with its present and future talc liability and removing access to the assets—with actual intent to hinder, delay, and defraud talc creditors.

351.    These former talc creditors of J&J and JJCI became talc creditors of LTL following the Divisive Merger.

352.    The transfers were made for the benefit of J&J and New JJCI.

353.    Therefore, the transfers made as part of the Divisive Merger were fraudulent transfers that may be avoided and recovered under 11 U.S.C. §§ 548(a)(1)(A) and 550.

<u>COUNT X</u>
**STATE LAW ACTUAL FRAUDULENT TRANSFER—DIVISIVE MERGER**
(11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act)

**(Against J&J and New JJCI)**

354.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

355.    If the Court does not find that the termination of the 2021 Funding Agreement was a fraudulent transfer, in the alternative, the Divisive Merger was an actual fraudulent transfer made with intent to hinder, defraud, or delay talc creditors.

356.     The Uniform Voidable Transactions Act is codified in North Carolina[23] and New Jersey.[24]  The Uniform Fraudulent Transfer Act is codified in Texas.[25]

357.     Through the Divisive Merger, LTL incurred all the outstanding talc liability of JJCI (including J&J liabilities transferred on the books to JJCI).

358.     The obligations which LTL assumed under the Divisive Merger were from an insider of LTL, namely its corporate parent and affiliates.

359.     In exchange for incurring all the talc liabilities of JJCI, LTL received rights under the 2021 Funding Agreement and minimal other assets.

360.     If there was a material risk that the 2021 Funding Agreement was "void or voidable" such that J&J or New JJCI would have refused to comply with their payment obligations thereunder, then J&J's and New JJCI's funding obligations under the 2021 Funding Agreement were essentially illusory and the Divisive Merger was a fraud and J&J and JJCI effectuated the Divisive Merger—saddling LTL with its present and future talc liability and removing access to the assets—with actual intent to hinder, delay, and defraud talc creditors.

361.     The transfer is avoidable under applicable law by LTL's talc creditors.

362.     The transfers were made for the benefit of J&J and New JJCI.

363.     Therefore, the transfers made as part of the Divisive Merger were fraudulent transfers that may be avoided and recovered under 11 U.S.C. § 544(b) and the Uniform Fraudulent Transfer Act and/or Uniform Fraudulent Transactions Act.

---

[23]     *See* N.C. Gen. Stat. Ann. §§ 39-23.1 – 39-23.12

[24]     *See* N.J. Stat. Ann. § 25:2-20 – 25:2-33.

[25]     *See* Tex. Bus. & Com. Code § 24.

<u>COUNT XI</u>
## CONSTRUCTIVE FRAUDULENT TRANSFER—DIVISIVE MERGER
(11 U.S.C. §§ 548(a)(1)(B) and 550)

**(Against J&J and New JJCI)**

364.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

365.    If the Court does not find that the termination of the 2021 Funding Agreement was a fraudulent transfer, in the alternative, the Divisive Merger was a constructive fraudulent transfer.

366.    If there was a material risk that the 2021 Funding Agreement was "void or voidable" or otherwise illusory, then LTL received less than reasonably equivalent value as a result of the transfers effectuated as part of the Divisive Merger which were made within two years prior to the Petition Date.

367.    To the extent that there was a material risk that the 2021 Funding Agreement was "void or voidable" or otherwise illusory, then the Divisive Merger caused LTL—on the date of the Divisive Merger—to become insolvent or to be engaged, or about to be engaged, in a business or transaction for which any property remaining with LTL was an unreasonably small capital, or LTL intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

368.    LTL made transfers and incurred obligations as part of the Divisive Merger to and for the benefit of J&J and JJCI, which are insiders of LTL.  These transfers and obligations were made outside of the ordinary course of business.

369.    Therefore, the transfers made as part of the Divisive Merger were fraudulent transfers that may be avoided and recovered under 11 U.S.C. §§ 548(a)(1)(B) and 550.

<u>COUNT XII</u>

**STATE LAW CONSTRUCTIVE FRAUDULENT TRANSFER—DIVISIVE MERGER**
(11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable
Transactions Act)

**(Against J&J and New JJCI)**

370.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

371.    If the Court does not find that the termination of the 2021 Funding Agreement was a fraudulent transfer, in the alternative, the Divisive Merger was a constructive fraudulent transfer.

372.    The Uniform Voidable Transactions Act is codified in North Carolina[26] and New Jersey.[27]  The Uniform Fraudulent Transfer Act is codified in Texas.[28]

373.    If there was a material risk that the 2021 Funding Agreement was "void or voidable" or otherwise illusory, then LTL did not receive reasonably equivalent value for assuming JJCI's talc liability (including J&J liabilities transferred on the books to JJCI) as part of the Divisive Merger.

374.    LTL has asserted that there was a material risk that the 2021 Funding Agreement was "void or voidable."  To the extent that there was a material risk that the 2021 Funding Agreement was "void or voidable" or otherwise illusory, then the Divisive Merger caused LTL—on the date of the Divisive Merger—to become insolvent or to be engaged, or about to be engaged, in a business or transaction for which any property remaining with LTL was an unreasonably small capital, or LTL intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

---

[26]    *See* N.C. Gen. Stat. Ann. §§ 39-23.1 – 39-23.12

[27]    *See* N.J. Stat. Ann. § 25:2-20 – 25:2-33.

[28]    *See* Tex. Bus. & Com. Code § 24.

375.    The transfer is avoidable under applicable law by LTL's talc creditors.

376.    The transfers were made for the benefit of J&J and New JJCI.

377.    To the extent that this claim was held by Chenango Zero, it was allocated to the Debtor under the Plan of Merger as a cause of action related to the assets and liabilities allocated to the Debtor.

378.    Therefore, the transfers made as part of the Divisive Merger were fraudulent transfers that may be avoided and recovered under 11 U.S.C. § 544(b) and the Uniform Fraudulent Transfer Act and/or Uniform Fraudulent Transactions Act.

## <u>COUNT XIII</u>
### CIVIL CONSPIRACY / AIDING AND ABETTING FRAUDULENT TRANSFER— DIVISIVE MERGER AND MERGER SUPPORT AGREEMENT
(Pursuant to New Jersey Law or other Applicable State Law)

### (Against J&J, New JJCI, JJCI Services, and Individual J&J Defendants)

379.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

380.    As alleged supra, if the Court does not find that the termination of the 2021 Funding Agreement was a fraudulent transfer, then the Divisive Merger and Merger Support Agreement transactions constituted constructive and actual fraudulent transfers.

381.    Certain parties knowingly assisted in effectuating those transactions, including J&J, New JJCI, J&J Services, Mr. Kim, Mr. Wuesthoff, Mr. Deyo, Mr. Dickinson, Ms. Goodridge, Mr. Andrew, Mr. Haas, Ms. Ryan, Mr. Ullmann, Mr. Duato, Mr. Mongon, and Mr. Wolk.

382.    Under New Jersey law and other applicable state laws, these parties are liable for conspiring to commit and/or aiding and abetting the fraudulent transfers.

383.    Furthermore, these culpable parties bear joint and several liability for the outcome of the fraudulent transfers.

<u>COUNT XIV</u>
**ACTUAL FRAUDULENT TRANSFER—SPINOFF OF CONSUMER BUSINESS**
(11 U.S.C. §§ 548(a)(1)(A) and 550)

**(Against New JJCI, J&J, Janssen Pharmaceuticals, and Kenvue)**

384.   The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

385.   In early January 2023, New JCCI, renamed Holdco, transferred its consumer health business to its parent entity, J&J and then through a series of integrated transactions to Janssen Pharmaceuticals and Kenvue.  The consumer health business is valued at no less than $40 billion. J&J caused Holdco to spin off its consumer health business to free such business from the talc liability burden, thereby making it more attractive to potential investors to J&J's benefit.

386.   Because New JJCI spun off its consumer health division, New JJCI is unable to meet the same obligations Old JJCI could meet.  In the event that the Divisive Merger is unwound and the LTL liabilities are placed back with New JJCI, then New JJCI has less ability to meet those liabilities than Old JJCI could, as a result of the spinoff.

387.   New JJCI spun off its consumer health division with the actual intent to hinder, delay, or defraud one or more creditors of LTL or New JJCI, and to with the intent to cause LTL to be in financial distress.  J&J, Janssen Pharmaceuticals, and Kenvue knew of New JJCI's actual intent to hinder, delay, or defraud one or more talc creditors of LTL or New JJCI, did not act in good faith, participated in the Kenvue Transfer with the specific intent of hindering, delaying, and defrauding talc claims, and otherwise supported the transfer.

388.   The spinoff of the consumer health business transferred valuable assets away from New JJCI—which assets would have been available to pay New JJCI's creditors, including LTL and talc claimants—was made for the benefit of J&J, Janssen Pharmaceuticals, and Kenvue.

389.    Janssen Pharmaceuticals and Kenvue are initial or subsequent transferees of the Kenvue Transfer.

390.    The Kenvue Transfer was for the benefit of J&J and/or J&J was an initial or subsequent transferee of the Kenvue Transfer.

391.    Therefore, the transfer made as part of the spinoff of the consumer health business was a fraudulent transfer that may be avoided and recovered under 11 U.S.C. §§ 548(a)(1)(A) and 550, and the consumer health business may be returned to New JJCI.

<u>COUNT XV</u>
**STATE LAW ACTUAL FRAUDULENT TRANSFER—SPINOFF OF CONSUMER BUSINESS**
(11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act)

**(Against New JJCI, J&J, Janssen Pharmaceuticals, and Kenvue)**

392.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

393.    The Uniform Fraudulent Transfer Act and/or the Uniform Voidable Transactions Act are codified in Texas, North Carolina, and New Jersey.

394.    Through the Kenvue Transfer, the assets of New JJCI's (Holdco) consumer health business were fraudulently transferred away from LTL and New JJCI's creditors.

395.    The assets of the consumer health business were previously available to pay talc claims against LTL pursuant to the 2021 Funding Agreement and talc claims against New JJCI.

396.    Because New JJCI spun off its consumer health division, New JJCI is unable to meet the same obligations Old JJCI could meet.  In the event that the Divisive Merger is unwound and the LTL liabilities are placed back with New JJCI, then New JJCI has less ability to meet those liabilities than Old JJCI could, as a result of the Kenvue Transfer.

397.     New JJCI spun off the consumer health business with actual intent to hinder, delay, and defraud its creditors, including LTL and talc claimants.

398.     The transfer is avoidable under applicable law by New JJCI's creditors, including LTL and talc creditors.

399.     The transfer was made for the benefit of J&J, Janssen Pharmaceuticals, and Kenvue.

400.     Janssen Pharmaceuticals and Kenvue are initial or subsequent transferees of the Kenvue Transfer.

401.     The Kenvue Transfer was for the benefit of J&J and/or J&J was an initial or subsequent transferee of the Kenvue Transfer.

402.     Therefore, the transfer made as part of the spinoff of the consumer health business was a fraudulent transfer that may be avoided and recovered under 11 U.S.C. § 544(b) and the Uniform Fraudulent Transfer Act and/or Uniform Fraudulent Transactions Act, and the consumer health business may be returned to New JJCI.

## COUNT XVI
## CONSTRUCTIVE FRAUDULENT TRANSFER—SPINOFF OF CONSUMER BUSINESS
(11 U.S.C. §§ 548(a)(1)(B) and 550)

### (Against New JJCI, J&J, Janssen Pharmaceuticals, and Kenvue)

403.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

404.     New JJCI received less than reasonably equivalent value as a result of the transfer resulting in the spinoff of the consumer business, which transfer was made within two years prior to the Petition Date.

405.     On the date of the Kenvue Transfer, if LTL, J&J, and New JJCI's claims that LTL is now in financial distress are correct, New JJCI (a) was insolvent or became insolvent as a result

of the Kenvue Transfer, (b) was engaged in business or transaction, or was about to engage in business or transaction for which any property remaining with New JJCI was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

406.     Further, if the Divisive Merger is unwound and if LTL is, as it claims, in financial distress, New JJCI will continue to be in the same financial distress that LTL is in today.

407.     New JJCI made transfers and incurred obligations as part of the spinoff of the consumer business to and for the benefit of J&J, Janssen Pharmaceuticals and Kenvue, which are insiders of New JJCI.  This transfer and obligation were made outside of the ordinary course of business.

408.     The transfers were made for the benefit of J&J, Janssen Pharmaceuticals, and Kenvue.

409.     Janssen Pharmaceuticals and Kenvue are initial or subsequent transferees of the Kenvue Transfer.

410.     The Kenvue Transfer was for the benefit of J&J and/or J&J was an initial or subsequent transferee of the Kenvue Transfer.

411.     Therefore, the transfers made as part of the termination of the spinoff of the consumer business were fraudulent transfers that may be avoided and recovered under 11 U.S.C. §§ 548(a)(1)(B) and 550, and the consumer health business may be returned to New JJCI.

## COUNT XVII
### STATE LAW CONSTRUCTIVE FRAUDULENT TRANSFER—SPINOFF OF CONSUMER BUSINESS
(11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act)

**(Against New JJCI, J&J, Janssen Pharmaceuticals, and Kenvue)**

412.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

413.    The Uniform Fraudulent Transfer Act and/or the Uniform Voidable Transactions Act are codified in Texas, North Carolina, and New Jersey.

414.    New JJCI did not receive reasonably equivalent value for the transfer that spun off the consumer business from New JJCI, which placed the assets of the consumer business out of reach of LTL under the 2021 Funding Agreement and out of the reach of New JJCI creditors. Following the spinoff, New JJCI was left with rights to assets with less value and which were less liquid than prior to the spin off.

415.    On the date of the Kenvue Transfer, if LTL, J&J, and New JJCI's claims that LTL is now in financial distress are correct, New JJCI (a) was insolvent or became insolvent as a result of the Kenvue Transfer, (b) was engaged in business or transaction, or was about to engage in business or transaction for which any property remaining with New JJCI was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

416.    Further, if the Divisive Merger is unwound and if LTL is, as it claims, in financial distress, New JJCI will continue to be in the same financial distress that LTL is in today.

417.    The Kenvue Transfer is avoidable under applicable law by New JJCI's creditors, including LTL and talc claimants.

418.   Janssen Pharmaceuticals and Kenvue are initial or subsequent transferees of the Kenvue Transfer.

419.   The Kenvue Transfer was for the benefit of J&J and/or J&J was an initial or subsequent transferee of the Kenvue Transfer.

420.   The Kenvue Transfer were made for the benefit of J&J, Janssen Pharmaceuticals, and Kenvue.

421.   Therefore, the transfer made as part of the spinoff of the consumer business was fraudulent transfers that may be avoided and recovered under 11 U.S.C. § 544(b) and the Uniform Fraudulent Transfer Act and/or Uniform Fraudulent Transactions Act, and the consumer health business may be returned to New JJCI.

## <u>COUNT XVIII</u>
### CIVIL CONSPIRACY / AIDING AND ABETTING FRAUDULENT TRANSFER—SPINOFF OF CONSUMER BUSINESS
(Pursuant to New Jersey Law or other Applicable State Law)

### (Against J&J, New JJCI, J&J Services, and Individual J&J Defendants)

422.   The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

423.   As alleged supra, the spinoff of the consumer business from New JJCI in January 2023 constituted constructive and actual fraudulent transfers.

424.   Certain parties knowingly assisted in effectuating those transactions, including J&J, Old JJCI, New JJCI, J&J Services, Mr. Kim, Mr. Wuesthoff, Mr. Deyo, Mr. Dickinson, Ms. Goodridge, Mr. Andrew, Mr. Haas, Ms. Ryan, Mr. Ullmann, Mr. Duato, Mr. Mongon, and Mr. Wolk.

425.   Under New Jersey law and other applicable state laws, these parties are liable for conspiring to commit and/or aiding and abetting the fraudulent transfers.

426.     Furthermore, these culpable parties bear joint and several liability for the outcome
of the fraudulent transfers.

### COUNT XIX
### BREACH OF FIDUCIARY DUTY - LTL MANAGEMENT
(Pursuant to North Carolina Law or other Applicable State Law)

**(Against Directors and Officers of LTL)**

427.     The Committee restates and realleges the foregoing paragraphs, which are
incorporated by reference as if set forth fully herein.

428.     Under North Carolina law, the managers and officers of LTL, a North Carolina
LLC, owed fiduciary duties to LTL, including the duties of care and loyalty.

429.     The managers and officers of LTL, as alleged herein, have engaged in misconduct
in breach of their fiduciary duties to LTL.

430.     The agreements that LTL entered into in connection with the Divisive Merger—
including the Divisive Merger Support Agreement—were between insiders, lacked any
meaningful negotiation, and were driven by upper management of J&J.

431.     The managers and officers of LTL, all of whom were seconded to LTL by entities
within the J&J corporate enterprise, lacked independence, abdicated their roles as corporate
fiduciaries, and instead acted in the interests of J&J and its affiliates.

432.     The managers and officers of LTL breached their fiduciary duties, including the
duty of loyalty, and acted in bad faith when they entered into the Divisive Merger and related
intercompany agreements and authorized the bankruptcy to the detriment of LTL and the benefit
of J&J, New JJCI, and their affiliates.

433.     Following the effectuation of these transactions, the managers and officers of LTL
continued acting in the interests of J&J by taking actions to shield J&J at the expense of LTL.

434.    The actions of the managers and officers of LTL as alleged herein were taken in bad faith and/or constituted intentional misconduct.

435.    Through these and other wrongful actions alleged herein, the managers and officers of LTL breached their fiduciary duties to LTL.

436.    The managers' and officers' breach of fiduciary duty resulted in damages to LTL in an amount to be proved at trial.

## COUNT XX
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY OF CARE AND LOYALTY TO LTL MANAGEMENT
(Pursuant to North Carolina and/or New Jersey Law or other Applicable State Law)

### (Against J&J, New JJCI, J&J Services, and Individual J&J Defendants)

437.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

438.    Under North Carolina law, the managers and officers of LTL, a North Carolina LLC, owed fiduciary duties to LTL, including the duties of care and loyalty.

439.    As alleged *supra*, the managers and officers of LTL breached their fiduciary duties to LTL by, *inter alia*, causing and approving LTL to (i) enter into the Divisive Merger and related intercompany agreements, including the Divisive Merger Support Agreement, and (ii) file for bankruptcy.

440.    As alleged herein, certain parties, including J&J, Old JJCI, New JJCI, J&J Services, Jones Day, Mr. Gordon, Ms. Goodridge, Mr. Andrew, Mr. Haas, Ms. Ryan, Mr. Ullmann, Mr. Duato, Mr. Mongon, and Mr. Wolk, participated in the structuring, documenting, and negotiation of the wrongful decisions of LTL's managers and officers.

441.    These parties had actual knowledge that LTL's officers and managers would breach their fiduciary duties to LTL by causing and approving LTL to (i) enter into the Divisive Merger

and related intercompany agreements, including the Divisive Merger Support Agreement, and (ii) file for bankruptcy.

442.    Nonetheless, these parties knowingly participated in the breaches of fiduciary duty of LTL's managers and officers.

443.    Through their conduct, these parties aided and abetted the LTL managers' and officers' breaches of fiduciary duty, causing damage to LTL and its creditors in an amount to be proved at trial.

**COUNT XXI**
**CLAIMS DISALLOWANCE**
(11 U.S.C. § 502(d))

**(Against J&J and New JJCI)**

444.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

445.    J&J and New JJCI were the initial transferee of transfers that are avoidable (as set forth above) or the immediate or mediate transferee of such initial transferee or the person for whose benefit transfers were made that are avoidable (as set forth above).

446.    Pursuant to 11 U.S.C. § 502(d), any claims of J&J or New JJCI against LTL must be disallowed until such time as (a) the 2021 Funding Agreement is fully reinstated, (b) the Divisive Merger and the Kenvue Transfer are avoided, or (c) as J&J or New JJCI have paid LTL an amount equal to the aggregate amount of all avoidable transfers, plus interest thereon and costs.

**ATTORNEYS FEES AND COSTS**

447.    To the extent allowable by applicable law, the Committee requests that the Court award reasonable attorney's fees and costs.

**RESERVATION OF RIGHTS**

448.    The Committee demands a jury trial on all issues so triable.

449.    The Committee reserves the right to bring additional claims, including, without limitation, additional claims that the Committee discerns from its ongoing investigation of defendants' and other parties' related conduct.

450.    The Committee reserves the right to bring the claims asserted herein, and any additional claims in any appropriate forum, including, without limitation, any state or U.S. District Court, notwithstanding the caption for this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, the Committee requests that the Court grant the following relief:

On Count I:

a.    entering a judgment against J&J, and New JJCI, finding that the transfer concerning the termination of the 2021 Funding Agreement constitutes an actual fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

b.    avoiding the transfer concerning the termination of the 2021 Funding Agreement pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550; and

c.    preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count II:

a.    entering a judgment against J&J, and New JJCI, finding that the transfer concerning the termination of the 2021 Funding Agreement constitutes an actual fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

b.    avoiding the transfer concerning the termination of the 2021 Funding Agreement pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

c.    preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count III:

a.    entering a judgment against J&J, and New JJCI, finding that the transfer concerning

the termination of the 2021 Funding Agreement constitutes a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

b.   avoiding the transfer concerning the termination of the 2021 Funding Agreement pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; and

c.   preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count IV:

a.   entering a judgment against LTL, J&J, and New JJCI, finding that the transfer concerning the termination of the 2021 Funding Agreement constitutes a constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

b.   avoiding the transfer concerning the termination of the 2021 Funding Agreement pursuant to 11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

c.   preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count V: entering a judgment against the J&J, New JJCI, and the Individual J&J Defendants, finding that such entities and individuals committed civil conspiracy and/or aided and abetted the fraudulent transfer embodied in the termination of the 2021 Funding Agreement and awarding damages in an amount to be proved at trial.

On Count VI: entering a judgment finding that the managers and officers of LTL breached their fiduciary duties to LTL and acted in bad faith when they (i) entered into the agreement in connection with the termination of the 2021 Funding Agreement, and (ii) authorized the bankruptcy filing referred to as LTL 2.0 to the detriment of LTL, and awarding damages in an amount to be proved at trial.

On Count VII: entering a judgment finding that the managers and officers of LTL breached their fiduciary duties to LTL and acted in bad faith when they (i) entered into the agreement in connection with the termination of the 2021 Funding Agreement, and (ii) authorized the bankruptcy filing referred to as LTL 2.0 to the detriment of LTL, and (iii) that J&J, New JJCI, J&J Services, and the Individual J&J Defendants knowingly participated in and aided and abetted those breaches of fiduciary duty, and awarding damages in an amount to be proved at trial.

On Count VIII: entering a declaratory judgment that the 2021 Funding Agreement was neither void nor voidable in light of the Third Circuit's ruling to dismiss the bankruptcy case referred to as LTL 1.0.

On Count IX:

a.  entering a judgment against J&J and New JJCI, finding that the Divisive Merger constitutes an actual fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

b.  avoiding the Divisive Merger pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550; and

c.  preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551

On Count X:

a.  entering a judgment against J&J and New JJCI, finding that the Divisive Merger constitutes an actual fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

b.  avoiding the Divisive Merger pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

c.  preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count XI:

a.  entering a judgment against J&J and New JJCI, finding that the Divisive Merger constitutes a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

b.  avoiding the Divisive Merger pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; and preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count XII:

a.  entering a judgment against J&J and New JJCI, finding that the Divisive Merger constitutes a constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

b.  avoiding the Divisive Merger pursuant to 11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

c.  preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count XIII: entering a judgment against J&J, New JJCI, and the Individual J&J Defendants, finding that such entities and individuals committed civil conspiracy and/or aided and abetted the fraudulent transfer embodied in the Divisive Merger and

Merger Support Agreement and awarding damages in an amount to be proved at trial.

On Count XIV:

a.  entering a judgment against New JJCI, J&J, Janssen Pharmaceuticals, and Kenvue, finding that the transfer concerning the spinoff of the consumer business constitutes an actual fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550;

b.  avoiding the transfer concerning the spinoff of the consumer business pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550; and

c.  preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count XV:

a.  entering a judgment against New JJCI, J&J, Janssen Pharmaceuticals, and Kenvue, finding that the transfer concerning the spinoff of the consumer business constitutes an actual fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

b.  avoiding the transfer concerning the spinoff of the consumer business pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

c.  preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count XVI:

a.  entering a judgment against New JJCI, J&J, Janssen Pharmaceuticals, and Kenvue, finding that the transfer concerning the spinoff of the consumer business constitutes a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

b.  avoiding the transfer concerning the spinoff of the consumer business pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550; and

c.  preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count XVII:

a.  entering a judgment against New JJCI, J&J, Janssen Pharmaceuticals, and Kenvue, finding that the transfer concerning the spinoff of the consumer business constitutes a constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act;

b.  avoiding the transfer concerning the spinoff of the consumer business pursuant to

11 U.S.C. § 544(b) and applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

c.  preserving such avoided transfer for the benefit of the estate pursuant to 11 U.S.C. § 551.

On Count XVIII: entering a judgment against J&J, New JJCI, and the Individual J&J Defendants, finding that such entities and individuals aided and abetted the fraudulent transfer embodied in the spinoff of the consumer business and awarding damages in an amount to be proved at trial.

On Count XIX: entering a judgment finding that the managers and officers of LTL breached their fiduciary duties to LTL and acted in bad faith when they entered into the Divisive Merger agreement and the various intercompany agreements in support, to the detriment of LTL's creditors, and awarding damages in an amount to be proved at trial.

On Count XX: entering a judgment finding (i) that the managers and officers of LTL breached their fiduciary duties to LTL and acted in bad faith when they entered into the Divisive Merger agreement and the various intercompany agreements in support, to the detriment of LTL's creditors, and (ii) that J&J, New JJCI, J&J Services, and the Individual J&J Defendants knowingly participated in and aided and abetted those breaches of fiduciary duty, and awarding damages in an amount to be proved at trial.

On Count XXI: entering a judgment finding that any claims brought by J&J or New JJCI are disallowed unless and until the fraudulent transfers alleged herein against J&J and New JJCI are recovered by the estate.

And other and further relief as the Court deems just and proper.

Respectfully submitted,

**GENOVA BURNS, LLC**

By: _____

     Daniel M. Stolz, Esq.
     Donald W. Clarke, Esq.
     110 Allen Road, Suite 304
     Basking Ridge, NJ 07920
     Telephone: (973) 533-0777
     Facsimile: (973) 467-8126
     Email: dstolz@genovaburns.com
     Email: dclarke@genovaburns.com

     *Local Counsel to the Official Committee
     of Tort Claimants*