## **EXHIBIT C**

DBMP DECISION

```
 1                  UNITED STATES BANKRUPTCY COURT
                   WESTERN DISTRICT OF NORTH CAROLINA
 2                        CHARLOTTE DIVISION

 3   IN RE:                     :     Case No. 20-30080-JCW

 4   DBMP LLC,                  :     Chapter 11

 5      Debtor,                 :     Charlotte, North Carolina
                                      Thursday, July 7, 2022
 6                              :     9:30 a.m.
     : : : : : : : : : : : : : : : : : : : : : : : : : :
 7
     OFFICIAL COMMITTEE OF      :     AP 21-03023 (JCW)
 8   ASBESTOS PERSONAL INJURY
     CLAIMANTS and SANDER L.    :
 9   ESSERMAN, etc.,
                                :
10      Plaintiffs,
                                :
11           v.
                                :
12   DBMP LLC and CERTAINTEED LLC,
                                :
13      Defendants,
                                :
14   : : : : : : : : : : : : : : : : : : : : : : : : : :

15   OFFICIAL COMMITTEE OF      :     AP 22-03000 (JCW)
     ASBESTOS PERSONAL INJURY
16   CLAIMANTS and SANDER L.    :
     ESSERMAN, etc.,
17                              :
        Plaintiffs,
18                              :
             v.
19                              :
     CERTAINTEED LLC, CERTAINTEED
20   HOLDING CORPORATION, and   :
     SAINT-GOBAIN CORPORATION,
21                              :
        Defendants.
22                              :
     : : : : : : : : : : : : : : : : : : : : : : : : : :
23

24

25
```

```
 1   OFFICIAL COMMITTEE OF           :     AP 22-03001 (JCW)
     ASBESTOS PERSONAL INJURY
 2   CLAIMANTS, on behalf of         :
     the estate of DBMP LLC,
 3                                   :

         Plaintiff,
 4                                   :

             v.
 5                                   :

     COMPAGNIE DE SAINT-GOBAIN
 6   S.A., ET AL.,                   :

 7       Defendants.                 :


 8   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 9                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE J. CRAIG WHITLEY,
10                UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES (via Teams):

12   For Debtor/Defendant,          Robinson, Bradshaw & Hinson, P.A.
     DBMP LLC:                      BY:  RICHARD C. WORF, ESQ.
13                                  101 N. Tryon Street, Suite 1900
                                    Charlotte, NC  28246
14
                                    Jones Day
15                                  BY:  JEFFREY B. ELLMAN, ESQ.
                                    1221 Peachtree Street, N.E., #400
16                                  Atlanta, GA  30361

17                                  Jones Day
                                    BY:  JAMES M. JONES, ESQ.
18                                  250 Vesey Street
                                    New York, NY  10281
19

20   Audio Operator:               COURT PERSONNEL

21   Transcript prepared by:       JANICE RUSSELL TRANSCRIPTS
                                    1418 Red Fox Circle
22                                  Severance, CO  80550
                                    (757) 422-9089
23                                  trussell31@tdsmail.com


24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
```

```
 1   APPEARANCES (via Teams continued):

 2   For Debtor/Defendant,          Jones Day
     DBMP LLC:                      BY:  GREGORY M. GORDON, ESQ.
 3                                  2727 North Harwood St., Suite 500
                                    Dallas, Texas  75201
 4
     For Plaintiff, ACC:            Robinson & Cole LLP
 5                                  BY:  NATALIE RAMSEY, ESQ.
                                    1201 N. Market Street, Suite 1406
 6                                  Wilmington, DE  19801

 7                                  Robinson & Cole LLP
                                    BY:  KATHERINE M. FIX, ESQ.
 8                                  1650 Market Street, Suite 3600
                                    Philadelphia, PA  19103
 9
                                    Caplin & Drysdale, Chartered
10                                  BY:  TODD E. PHILLIPS, ESQ.
                                    One Thomas Circle, N.W.,
11                                  Washington, DC  20005

12                                  Winston & Strawn LLP
                                    BY:  CARRIE V. HARDMAN, ESQ.
13                                       DAVID NEIER, ESQ.
                                    200 Park Avenue
14                                  New York, NY  10166-4193

15                                  Hamilton Stephens
                                    BY:  GLENN THOMPSON, ESQ.
16                                  525 North Tryon St., Suite 1400
                                    Charlotte, NC  28202
17
     For Plaintiff, Future          Young Conaway
18   Claimants' Representative,     BY:  SHARON ZIEG, ESQ.
     Sander L. Esserman:                 EDWIN HARRON, ESQ.
19                                       SEAN GREECHER, ESQ.
                                         ROBERT S. BRADY, ESQ.
20                                  1000 North King Street
                                    Wilmington, DE  19801
21
                                    Alexander Ricks PLLC
22                                  BY:  FELTON E. PARRISH, ESQ.
                                    1420 E. 7th Street, Suite 100
23                                  Charlotte, NC  28204

24

25
```

Case 23-03092-MBK Doc 8 Doc Filed 07/11/25 11/25 Entered 07/11/25 12:38:06 10:18 Desc Main
Exhibit Document Decision Page 4 Page 5 of 51

4

```
 1   APPEARANCES (via Teams continued):

 2   For Defendants, CertainTeed    Rayburn Cooper & Durham, P.A.
     LLC, et al.:                   BY:  JOHN R. MILLER, JR., ESQ.
 3                                  227 West Trade Street, Suite 1200
                                    Charlotte, NC  28202
 4
                                    Goodwin Procter LLP
 5                                  BY:  HOWARD S. STEEL, ESQ.
                                         MICHAEL H. GOLDSTEIN, ESQ.
 6                                  620 Eighth Avenue
                                    New York, NY  10018
 7

 8   ALSO PRESENT (via telephone): SANDER L. ESSERMAN
                                    Future Claimants' Representative
 9                                  2323 Bryan Street, Suite 2200
                                    Dallas, TX  75201-2689
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        P R O C E E D I N G S

2        (Call to Order of the Court)

3            THE COURT:  Okay.  Have a seat, everyone.  Good

4   morning.

5            We are back in the DBMP base case and adversary.  This

6   is a videoconference hearing, given that what we're doing

7   today, primarily, is announcing rulings and talking about

8   scheduling matters.

9            I see we have some folks in the courtroom.  We're glad

10  to have you.  I don't know if y'all are announcing, but looks

11  like we've got building staff.

12           But in any event, we do not have an appearances list

13  today.  That got overlooked.  So I'm going to have to ask,

14  first of all, that we get appearances by all the parties and I

15  would suggest, in the interest of not talking over one another,

16  that the lead attorney, or whoever is going to be the spokesman

17  today, primary spokesman, announce other appearances for those

18  allied with yourselves.  Then we'll come back and pick up

19  anyone who else, who wasn't listed otherwise and feels the need

20  to make an appearance.

21           So starting with that, let me ask who's on the line

22  for the debtor?  Control --

23           MR. GORDON:  Morning, your Honor.

24           THE COURT:  Yes, Mr. Gordon.

25           MR. GORDON:  Good morning.  Greg Gordon, Jones Day, on

```
 1   behalf of the debtor.  Also with me is Jim Jones from Jones Day
 2   and Jeff Ellman from Jones Day.
 3             THE COURT:  Very good.
 4             MR. GORDON:  Thank you.
 5             THE COURT:  Anyone else for the debtor, local counsel
 6   or otherwise?
 7             MR. WORF:  Good morning, your Honor.  Richard Worf
 8   from Robinson Bradshaw for the debtor this morning.
 9             THE COURT:  Okay.
10             Anyone else?
11        (No response)
12             THE COURT:  All right.  Affiliates?
13             MR. STEEL:  Morning, your Honor.  Howard Steel at
14   Goodwin on behalf of CertainTeed LLC, CertainTeed Holding
15   Corp., and Saint-Gobain Corp.  With me is my partner, Michael
16   Goldstein, and Jack Miller of Rayburn Cooper.
17             THE COURT:  Thank you.
18             Anyone else on, on the affiliates' side needing to
19   announce?
20        (No response)
21             THE COURT:  How about the ACC, then?  Better unmute.
22             MS. RAMSEY:  Apologies, your Honor.  I'm rusty.
23             Good morning, your Honor.
24             THE COURT:  Good morning.
25             MS. RAMSEY:  Natalie Ramsey from Robinson & Cole on
```

1  behalf of the Committee, along with my colleague, Katherine Fix

2  from Robinson & Cole.  Also appearing for the Committee are

3  Todd Phillips from Caplin & Drysdale, David Neier and Carrie

4  Hardman from Winston & Strawn, and Glenn Thompson from Hamilton

5  Stephens.

6            THE COURT:  Okay, very good.

7            MS. RAMSEY:  Thank you.

8            THE COURT:  Anyone else on behalf of the ACC?

9       (No response)

10           THE COURT:  FCR, then.  Ms. Zieg?

11           MS. ZIEG:  Good morning, your Honor.  Sharon Zieg from

12  Young Conaway Stargatt & Taylor on behalf of the Future

13  Claimants' Representative.  Mr. Esserman is on the phone this

14  afternoon as well, this morning as well.  And we also have Ed

15  Harron, Robert Brady, and Sean Greecher from Young Conaway and

16  North Carolina counsel, Felton Parrish.

17           Thank you.

18           THE COURT:  All right, very good.

19           Any, anyone else needing to announce?

20       (No response)

21           THE COURT:  That got it?

22       (No response)

23           THE COURT:  Okay.

24           There's a filed agenda in the base case -- it's, I

25  guess, Docket No. 1495 -- that explains what's before the Court

Case 22-03092-MBc 8DocFiled Fil7éd10521 1/26tered Fit07éd10521132318706 D18:scD 4es:in
Exhibit Do DBN4FPnDeciBéage 8 Rpdg09 of 51

8

1   this morning.

2          Let me ask first.  It's traditional to get case

3   updates before we start.

4          Anything on the debtor's end?

5          MR. GORDON:  Good morning, your Honor.  It's Greg

6   Gordon again.  Just a very short list of things and I'll start

7   with the one that's maybe a little mystifying to us.

8          I, I think we reported at the last hearing that we had

9   a ruling in Virginia on a motion to transfer.

10          THE COURT:  Uh-huh (indicating an affirmative

11   response).

12          MR. GORDON:  And there you may recall there was a

13   motion to quash filed by matching claimants.  The debtor filed

14   a motion to transfer.  That motion was granted.  And nothing's

15   appeared in the docket of either the Virginia court or this

16   Court and we're puzzled by that because we just found out that

17   according to Virginia, they actually transferred the matter on

18   June the 1st.

19          THE COURT:  Hmm.

20          MR. GORDON:  And so we don't know whether it somehow

21   got lost in transit or is lost somewhere in North Carolina, but

22   that's something that I guess we need to follow up on and I'd

23   appreciate any guidance your Honor might have in terms of how

24   to do that.

25          THE COURT:  Well, I think the simplest way on our end

1  would be for me to ask the clerk to see if they have anything

2  and then we'll send you an e-mail either way.  Beyond that, I

3  don't know that I've got much influence with the Virginia

4  court, but, or the post office, for that matter, but I'm not

5  sure how they transferred this.  I assume they did it by paper

6  means.

7       MR. GORDON:  Yeah.  I, I don't know if we know the

8  answer to that.  Jeff Ellman's on.

9       Jeff, do you know what the means of transfer were?

10      MR. ELLMAN:  I, I do not.  I'm sure we could find out.

11 We, we had talked to the, the clerk this morning just to get an

12 update and, and they said it was transferred the normal way.

13 We didn't, we didn't inquire.

14      THE COURT:  Okay.

15      MR. ELLMAN:  I, I would assume it could be electronic,

16 but I really don't know, your Honor.

17      THE COURT:  If --

18      THE COURTROOM DEPUTY:  Electronic, we'll get it like

19 right away.

20      THE COURT:  Right.

21      THE COURTROOM DEPUTY:  What we --

22      THE COURT:  Well, we'll go back and, and check.  I

23 don't think we've got anything in a SPAM folder, but who knows.

24 If y'all will work on your end, though, and try to talk to the

25 Virginia clerk and see if they can ascertain how it was

Case 23-03090-MBK  Doc 8  Filed 07/11/23  Entered 07/11/23 13:38:06  Desc Main
Exhibit Document Deckage 11 of 51  Page 11 of 51

10

     1   transmitted, that would be helpful.

     2           Anyone else got an interest in that?  Need to say

     3   anything?

     4       (No response)

     5           THE COURT:  Okay.

     6           Any other updates, Mr. Gordon?

     7           MR. GORDON:  Yes.  And, and I would say with respect

     8   to that particular matter, the Virginia transfer, we would like

     9   to, to get that motion to quash up for hearing in August in

    10   this court, assuming that we can track down the paperwork on

    11   that.  So just --

    12           THE COURT:  Okay.  That would be helpful.

    13           MR. GORDON:  Yeah.  I'm just advising your Honor and

    14   the other parties --

    15           THE COURT:  Okay.

    16           MR. GORDON:  -- that would be our intention.

    17           And then otherwise, your Honor may recall there was

    18   also a motion to quash filed in Delaware --

    19           THE COURT:  Uh-huh (indicating an affirmative

    20   response).

    21           MR. GORDON:  -- by the trusts and certain matching

    22   claimants and that matter is still pending.  We haven't heard

    23   anything on that at this point.

    24           THE COURT:  Okay.

    25           MR. GORDON:  Otherwise, we are intending to have a

1    meet and confer with the Committee and the FCR about discovery

2    matters --

3              THE COURT:  Uh-huh (indicating an affirmative

4    response).

5              MR. GORDON:   -- in the pending adversary proceedings

6    and also, we're intending to have a meet and confer with the

7    Committee and the FCR on their request for product-related

8    information.

9              THE COURT:  Uh-huh (indicating an affirmative

10   response).

11             MR. GORDON:  And in fact, that's scheduled, actually,

12   for later today.

13             THE COURT:  Okay.

14             MR. GORDON:  I think, your Honor, that's, that's all

15   I've got.  Otherwise, we obviously have the status conference

16   today on privilege log matters, but Mr. Jones will handle that

17   when that matter comes up.

18             THE COURT:  Okay.

19             Anything on behalf of --

20             MR. GORDON:  Thank you.

21             THE COURT:  -- the ACC?  Ms. Ramsey?

22             MS. RAMSEY:  Apologies, your Honor, again, for the

23   delay.

24             No, nothing for us, your Honor.

25             THE COURT:  How about the FCR, then?

 1              Was it Control 6?

 2              MS.  ZIEG:  Nothing else, your Honor.

 3              THE COURT:  Okay, very good.

 4              Okay.  Ready to move on, then, I suppose.

 5              We've got one status matter and then two

 6    announcements.  I don't know how y'all prefer to approach this.

 7    Why don't we talk briefly about the, what is denominated as

 8    Exhibit, as No. 3, the case management order in the adversaries

 9    with regard to the negotiations and the updates to the

10    privilege log and the status of, of next steps.

11              MR. JONES:  Thank you, your Honor.  This is Jim Jones

12    at Jones Day for the debtor.

13              THE COURT:  Okay.

14              MR. JONES:  And I believe -- and I see Ms. Hardman --

15    and we exchanged e-mails last evening or yesterday afternoon,

16    last evening, on this topic.  So with, with Carrie's

17    permission, I, I will give what I understand to be the status

18    and then she can weigh in and let me know what I got sideways.

19              THE COURT:  Okay, very good.

20              MR. JONES:  I believe, your Honor, that status is

21    this, that is, the debtor, as it had committed, revised,

22    reviewed and revised its previously served privilege log, which

23    at last count numbered roughly 4,000 entries, and that log had

24    been served as a part of the adversary proceeding on the

25    preliminary injunction early in the case.

13

1          THE COURT:  Uh-huh (indicating an affirmative

2   response).

3          MR. JONES:  That process was undertaken after the

4   debtor received the February 4 letter from, 2022, letter from

5   the ACC and the FCR about what they considered to be concerns

6   and challenges with the log.  So we undertook that, as we

7   committed we would, the review and revision process and served

8   the revised log when we said we would, on June 17, 2022.  And

9   with that log we provided a cover letter that explained the re-

10  review and revision process in fairly short form, addressed at

11  least certain of the concerns that weren't themselves directed

12  to log entries but to privilege matters more generally in that

13  cover letter, which was dated June 17 as well, and then we also

14  produced that same day a relative few number of documents that

15  upon the re-review were deemed to be not privileged.  I think

16  the total was 110 documents, 64 in whole, 46 in redacted form.

17         And then we waited for some period of time for

18  reaction or response from the ACC and the FCR -- it's, it's

19  4,000 entries.  So it, it would take some time to review -- and

20  reached out thereafter, which I think was maybe Tuesday

21  afternoon, to the ACC and the FCR via e-mail and asked if they

22  were still in process of reviewing, as we expected they might

23  be, and if they would like to gather and meet and confer about

24  the revised log.  We heard from Ms. Hardman yesterday

25  afternoon, I believe, that they were indeed still reviewing

1  and, yes, they still had some concerns and would like to meet

2  and confer.

3        And then the last bit of status, I think, is my

4  response last evening that we're happy to and I batted up some

5  times next week when that could be accomplished.

6        THE COURT:  Okay.

7        MR. JONES:  So I think that is status as of now.

8        And I believe privilege-related matters on the go

9  forward would include these.  After the review of the log, I

10  believe it is incumbent upon the ACC and the FCR to identify up

11  to 50 documents off the log that they would like your Honor to

12  review in camera and up to 25 privilege assertions that they

13  think were inappropriate during the PI and that would occur, I

14  think it's scheduled to occur within 30 days of service of the

15  log.  So 30 days from June 17.

16        THE COURT:  Uh-huh (indicating an affirmative

17  response).

18        MR. JONES:  We're to respond with anything that we

19  wish your Honor to review by way of counterdesignations 14 days

20  thereafter which, if everybody took the maximum amount of time,

21  I think would get us to, roughly, the end of July.  And then

22  there is a, a submission date that is, that the debtor is, I

23  believe, obliged to provide to your Honor that which has been

24  designated for in-camera review on, five days after the last

25  identification.  So if everybody took all their time, that

1  would come the first week of August.

2  And then, I think the only other thing in the CMO that

3  addresses or is directed, rather, to these matters is a status

4  conference after your Honor has had a chance to receive,

5  review, and consider whatever he wishes to receive and review

6  and consider which I think is the, will be the balance of

7  whatever is submitted.

8  So I think that is, to the best of my ability, an

9  update for your Honor.

10  THE COURT:  All right.

11  Ms. Hardman, where do you think matters lie?

12  MS. HARDMAN:  I echo -- Carrie Hardman from Winston &

13  Strawn on behalf of the Committee.

14  I echo a lot of what Mr. Jones has said.  So I will

15  not, will try my best not to repeat them.

16  The only, I think, issues I wanted to raise were, or

17  points to make were simply that I think we might have received

18  a few more documents than, than Mr. Jones had on his number.

19  We had 185 in terms of the documents we received, but, you

20  know, a hundred versus 185, I don't know that that makes a huge

21  practical difference for, for these purposes.  Some of the

22  documents we received which we reviewed initially certainly

23  provide some relevant information from those that were de-

24  designated from the log --

25  THE COURT:  Uh-huh (indicating an affirmative

1   response).

2           MS. HARDMAN:  -- and are providing a lot of the detail

3   that we thought we would have questions about and we've been

4   trying to understand relative to privileged communications

5   documents that we think were otherwise subject to claims of

6   privilege.

7           And we certainly appreciate the efforts of the debtor

8   to review and revise the log and provide those limited

9   documents to the estate representatives.  We are, as Mr. Jones

10  said, continuing to review those 4,000 entries because nearly

11  all of them were edited in some manner.  So we just simply need

12  to get through them.  As you may suspect, there will likely be

13  additional issues that we will work through with the parties,

14  or endeavor to, and if we cannot, we will be before your Honor.

15  At this point we've identified a number of issues that do

16  continue to permeate the log initially and remain unanswered

17  from our perspective with respect to that February 4th letter

18  that we sent.  Those include sufficiency of description,

19  including the claims of common interest which permeate 90, more

20  than 95 percent of the log, and the fact that there are still

21  no subject matter lines in the log at all.  And those are

22  issues that we'll talk about with Mr. Jones and his colleagues

23  in the coming days and weeks.  We look forward to addressing

24  those issues in further detail on those calls.

25          And in the meantime, Mr. Jones is right.  We do have a

1  deadline of providing those 50 documents and 25 instructions

2  not to answer to your Honor from our perspective.  And that

3  deadline is coming up and the 30-day window runs July 17th --

4      THE COURT:  Uh-huh (indicating an affirmative

5  response).

6      MS. HARDMAN:  -- which is a Sunday.

7      While we certainly appreciate the Court's dedication

8  to these cases, we thought if it was okay with the debtor and

9  non-debtor affiliates and with the Court, that we would provide

10  those to you on July 18th, which is a Monday, instead.

11      THE COURT:  Uh-huh (indicating an affirmative

12  response).

13      MS. HARDMAN:  That way, the response deadline for

14  Mr. Jones as well will be on a business day and we don't have

15  to deal with any practical or mechanical concerns that the

16  parties may have in submitting documents under seal or

17  identifying information on, that would need to be under seal on

18  a Sunday.  It's just an odd, something I'd offer if --

19      THE COURT:  Uh-huh (indicating an affirmative

20  response).

21      MS. HARDMAN:  -- the parties were amenable to it and

22  the Court was as well.

23      THE COURT:  Does the FCR have a stake in any of this?

24  Do they need to be heard?

25      (No response)

 1       THE COURT:  Well, I'm glad you said "mechanical" and

 2  "practical" because I have one to add.  Since we've moved out

 3  this far, on the 21st of July I have to have an arthroscopic

 4  procedure on my ankle.  That means I'm going to be out of the

 5  office for three or four days afterwards and it will be

 6  practically difficult for me to -- well, I could review them,

 7  but if I, to the extent I'm on pain meds for a few of those

 8  days, it might not be a fruitful exercise for anyone.

 9       But I would like to back up just a week or so so that

10  I will have the opportunity to review those documents.  I plan

11  to be back here -- we've got an Aldrich hearing on the 28th and

12  I'm planning to do that hearing.  So if we could get those --

13  if we can back all the deadlines up so that the production is

14  August the 1st, I think that would behoove all of us.

15       MR. JONES:  Your, your Honor, this is Jim Jones for

16  the debtor.

17       The production itself doesn't happen until August 5 --

18       THE COURT:  Okay.

19       MR. JONES: -- under the current deadline.  So the

20  identifications come first.

21       THE COURT:  Okay.

22       MR. JONES:  You won't be seeing, you won't be seeing

23  documents for in-camera inspection until the first week of

24  August --

25       THE COURT:  Okay.

1          MR. JONES:  -- at the soonest.

2          MS. HARDMAN:  I -- for what it's worth, your Honor, I

3   agree with Mr. Jones.  This was simply to not file publicly

4   information that maybe Mr. Jones or his colleagues believe is

5   privileged.  And so if we are identifying things that he would

6   like to remain redacted --

7          THE COURT:  Okay.

8          MS. HARDMAN:  -- I just simply didn't want to do that

9   on a Sunday.

10          THE COURT:  All right.

11          MS. HARDMAN:  It's not about submission of the

12   documents to you until, until August.

13          THE COURT:  I misunderstood what you were saying,

14   then.

15          So that, that works fine.  We've got a pretty full

16   week the week after the 5th, but I'll try to get something back

17   to you, some kind of reaction.  I would suggest that we --

18   gracious.  We go all the way to September the 15th before we

19   have another hearing after that.  If I get them on the 5th, I'm

20   unlikely to be able to give you a feedback on the 11th of

21   August.  So I think we're talking about September, then.

22          So that's not ideal, but we'll do what we can.

23          Does anyone see a major --

24          MS. HARDMAN:  Understood, your Honor.

25          THE COURT:  -- headache there?

20

 1     (No response)

 2          THE COURT:  Okay.

 3          MR. JONES:  Not, not for the debtor, your Honor.

 4          THE COURT:  Okay.

 5          MR. JONES:  And September 18 or, rather, July 18 is,

 6   the Monday, is perfectly fine with us.

 7          And one quick footnote for Ms. Hardman.  In the 185

 8   document versus 110 document difference, Carrie, I believe is

 9   and, and I'm informed is a consequence of stuff you already

10   have.  It's -- we, we produced on June 17 with family members.

11   So there will be documents that were not withheld before that

12   are attached to the now newly produced documents.

13          So the diff, the delta there of whatever it is, 75,

14   should be stuff you already have.

15          THE COURT:  Okay, very good.

16          All right.  So -- well, let's just aim for the, unless

17   something else goes awry, I'll try to give you my reactions to

18   those on the 15th of September, okay, at that omnibus hearing

19   day.

20          MS. HARDMAN:  Thank you, your Honor.

21          THE COURT:  Okay.  Anything else there?  No other --

22          MS. ZIEG:  Your Honor, Sharon Zieg from Young Conaway.

23          I just want to let you know that we're working with

24   the Committee.  I was a little late to the, turning on the

25   camera and the --

```
 1              THE COURT:  Okay.

 2              MS. ZIEG:  -- off the mute button when you asked if we

 3   had anything to add.

 4              THE COURT:  So that's got it?

 5         (No response)

 6              THE COURT:  All right, very good.

 7              Okay.  Well, we'll move on.

 8              We had two different things that I needed to announce

 9   and it was regarding the case management order and the motion

10   to dismiss.  I don't know if the parties have a preference on

11   which order to take those.  I don't know that -- well, I think

12   to a certain extent we may have more to talk about with regard

13   to the case management matters.

14              So unless y'all have a decided preference -- and I'm

15   asking at this point if you do -- I would just propose that we

16   talk about the motion to dismiss next.

17              Anyone got a reason to think we go in another order?

18   Okay.

19              MS. HARDMAN:  no, your Honor.

20              MR. GORDON:  No preference from the debtor, your

21   Honor.

22              THE COURT:  All right.

23              Okay.  We're picking up in the Adversary 22-3000,

24   Madam Clerk, with the motion of the defendants to dismiss the

25   case.
```

1  I'm going to be short and succinct about this.  I

2  could talk in, at length, but y'all've already said just about

3  everything there is to be said about these matters in the

4  briefs.  I will say that, at least at this point in time, on a

5  motion to dismiss I believe we've got a lawsuit and we've got a

6  complaint that adequately states claims.  Whether they prove

7  out is something else and who knows at this juncture, but the

8  bottom line is in the main, I agree with the plaintiffs'

9  committee reps, future rep, and believe that there is a

10  fraudulent conveyance lawsuit, etc., here and would deny the

11  motion to dismiss.

12  I'm not going to say a lot about that, but at least

13  for present thinking, subject to being, having that thinking

14  changed, I generally agree with the position that the reps have

15  been taking that, essentially, you can look at this two

16  different ways.  You can say this is, these are potential

17  fraudulent conveyances because these would be assets of the

18  debtor had they not been transferred and that the divisional

19  merger effectively sticking one company, the debtor company,

20  with all of the asbestos liabilities where the assets went

21  otherwise, that effectively, you could make that the fraudulent

22  conveyance seen through the debtor's eyes, or, alternatively, I

23  think, given the, the way the Texas statute is constructed, you

24  can alternatively view this as a fraudulent conveyance

25  effectively by Old CertainTeed with the present debtor standing

Case 22-03090-MBK Doc 8 Doc Filed 07/11/21/22 Entered 07/11/22 13:28:15 706 Desc Main
Exhibit Document Doc B to Dec Page Page 24 of 51

23

1   in the shoes of the old company. Because to do otherwise, it

2   would never be raised. We all know the Texas statute

3   contemplates that divisive mergers are not going to be

4   prejudicial to creditors and we know that they retain their

5   remedies if they, if the mergers were.

6         If the company, if you will for present purposes the

7   bad company, the company with the, the asbestos liabilities and

8   fewer assets as compared to the good company, the sibling that

9   was created that has most of the assets, operations, and

10   employees, if the bad company can't be seen to be standing in

11   the shoes of the Old CertainTeed, then I don't know how anyone

12   can challenge, as the Texas statute contemplates that a party

13   would be able to challenge. It -- the bottom line is the good

14   company would never have reason to challenge the divisive

15   merger and the bad company, effectively, is, for fraudulent

16   conveyance purposes, standing as the old company. I think you

17   can look at it both ways, but the bottom line is the way this

18   was structured -- and it was done so intentionally -- otherwise

19   with a bankruptcy following the divisive merger, then no one

20   gets to challenge the divisive merger and the allocations.

21         So I think either way at this point in time -- and I'm

22   subject to having my mind changed later on -- I think that

23   we've got standing here and there are transfers within the

24   Bankruptcy Code. I'm fully sensitive to the plain meaning

25   argument of what the Bankruptcy Code says that can be avoided,

Case 22-03090-MBK 8Doc Filed 07/10/21/26tered 07/10/21 12:13:07 06:08 Desc Main
Exhibit Doc DBMP Deckage 24 of 505 25 of 51

24

1  but plain meaning is subject to absurd results and that's the

2  exception to plain meaning.  If we take this in the very narrow

3  way that the movants are asking me to, then effectively, you

4  end up with the possibility that someone could engineer -- and

5  I'm not saying that's what happened here.  That's to be decided

6  -- but if someone was craven and wanted to divide an otherwise

7  profitable company just to get rid of certain liabilities that

8  you just as soon not pay and you put all of the assets in a

9  good company and all of the liabilities in a bad company, if

10  the bad company cannot sue for that harm or the creditors of

11  that bad company can't sue with a bankruptcy being filed

12  immediately after, there's, the door is wide open to wholesale

13  fraud and that cannot be, as Mr. Huff has opined after the

14  fact, in his mind, was not what the Texas merger statute was

15  designed to do.  There's no indication.  It's supposed to be

16  neutral for debtor-creditor purposes.

17          So that just can't be the way it is.  And again, if

18  you are taking it at plain meaning likewise on the obligation

19  side, the suggestion is, well, if there are obligations to be

20  avoided, then those are the obligations that the, the debtor,

21  DBMP, could avoid the obligations that were, it was saddled

22  with, meaning the asbestos liabilities, and if you avoided

23  those, then DBMP wouldn't owe the liabilities, but so, too, the

24  new company under the wording of the Texas statute wouldn't be

25  liable for those liabilities and Old CT has been dissolved as a

1    result of the merger.  Again, you end up with no recourse

2    whatsoever and that's contrary to the stated intention of the

3    Texas statute and it would be totally contrary to all Anglo-

4    American notions of fraudulent conveyance law.

5           So bottom line is I, I think that part, we don't need

6    to get there.

7           The other thing I wanted to mention.  I, I generally

8    agree with most of the arguments for present purposes made by

9    the plaintiffs, but I did want to talk about in, intentions.

10   One of the things our Circuit, like most, takes the view of is

11   courts should be hesitant to dismiss complaints under Rule 9

12   where the defendant's been made aware of the circumstances

13   which it will have to prepare a defense and which the plaintiff

14   has substantial pre-discovery evidence of the facts.  Those all

15   come out of the Harrison case.

16          And in this instance we're in a very different

17   situation than most parties, defendant parties in a lawsuit.

18   We've been in this bankruptcy for a couple years now.  We have

19   fought a multi-day evidentiary personal, preliminary injunction

20   fight after a year's worth of discovery and there can be no

21   question by anyone as to what this complaint is about.  It's

22   detailed.  But also, we have the backdrop of knowing what it's

23   about and what the contentions are, generally, by the plaintiff

24   group in this case.

25          So between the two, I think we've got an adequate

1    complaint here.  It's a little bit short on, at least in stated

2    language, on whether or not for constructive trust purposes

3    whether we have insolvency adequately pled or lack of

4    reasonably equivalent value.  As to that, I thought about that

5    and wondered whether I, I would require a further amendment to

6    just state what the liabilities were that were assumed in the,

7    in the divisive merger, the asbestos liabilities, so that they

8    could be compared as against the assets received.  I decided

9    after looking through the four corners of the complaint -- and

10   again, knowing what we all know about this case -- that it's

11   adequate.  It's not superlative, but it's adequate.  And we all

12   know that, generally, reasonably equivalent value and

13   insolvency tends to be fact issues at the end of the day.

14           We also know why this debtor was designed the way it

15   was.  It was intentionally set up so that it couldn't be too

16   solvent because otherwise, there would be no need for the

17   affiliates to come to the rescue, much like the calvary, to

18   provide funding so that a 524(g) relief could be afforded to

19   them.

20           So I think just by the structure itself, it is, it

21   would defy logic for it to be a solvent entity.

22           We also know that we have the history of the tort

23   litigation that's described in the complaint and we know the

24   sums based on the debtor's informational briefs that the debtor

25   has paid out over the years and we all know asbestos

 1  liabilities, you folks more than, than anyone.  So we wouldn't

 2  be fighting all the facts that we're having at the present time

 3  or even having fraudulent conveyance litigation if all

 4  concerned didn't think that there was a substantial likelihood

 5  that this debtor was insolvent at the time that, based on the

 6  allocations or had reasonably equivalent value, lack of that.

 7       So for pleading purposes, we'll fight about where we

 8  come out on insolvency and the like later on, but I think for

 9  pleading purposes it's sufficient.  The same, too, for the

10  other counts.

11       The one thing I do have a nit with.  I'm not at all

12  certain when it comes to remedies that punitive damages are,

13  are possible in a fraudulent conveyance lawsuit.  I'll keep an

14  open mind about that, but I don't think I have to decide it for

15  present purposes.  Remedies aren't failure to state a claim.

16  It's just some of the remedies you may ask for that claim

17  aren't available to you.  So we'll see where that goes.

18       But otherwise, I believe that the motion should be

19  dismissed largely for the reasons that have been described by

20  the plaintiffs in the action.

21       And would call upon the plaintiffs for a short order

22  to that effect.  Run it by the, the defendants for their

23  comments and we'll go from there, okay?

24       Anybody got anything or are we ready to move on?

25    (No response)

1        THE COURT:  Okay.  Silence, so I assume that we're

2   ready to move on.

3        Ms. Hardman, did you want to say something?

4        MS. HARDMAN:  Just confirming we will submit an order

5   to your Honor.

6        THE COURT:  Okay.

7        MS. HARDMAN:  That's all.

8        THE COURT:  Thank you.

9        MS. HARDMAN:  Thank you.

10       THE COURT:  All right.  Okay.  Now we'll get into the

11  ethereal part of the morning.

12       The CMOs.  I think this would have been difficult

13  under the best of circumstances.  I think, given the short time

14  period between when this was heard and when the Aldrich/Murray

15  matters were heard last week and the fact that there was

16  movement being had in <u>Aldrich/Murray</u> on negotiations between

17  the, the relatively same parties, the ACC there and the debtors

18  on what was going into the estimation case management orders,

19  I'm not even sure I'm totally certain as to what the agreements

20  are there and where the points of disagreement lie in that

21  case.

22       My first question to you in this case -- and, and then

23  the fact is what's been described in that case, or those cases

24  and this one are not entirely the same, even though the cases

25  are very similar.  So I'm not sure I've got all of this and it,

Case 22-03090-MBK 8 Doc Filed 07/01/25 11/28 Entered 07/01/25 11:23:18/06:08 Desc Main
Exhibit D De DB MPn Dec Page 29 ag 30 of 51

29

1  I'm a little reluctant to get too far in the weeds about

2  resolving individual details.  We may have to, but I would

3  prefer not to.

4       My first question to you is has there been any

5  movement since we were last arguing about this with regard to

6  the CMOs and the discovery plan?  Any resolutions whatsoever?

7  Nothing like what's been in Aldrich or Murray.

8       MS. ZIEG:  No, your Honor.

9       THE COURT:  Okay.

10      MS. RAMSEY:  Your Honor, we have a meet and confer

11  immediately following this call with respect to one issue that

12  might be relevant to the case management order on estimation

13  and that is the issue of, I'll call it, sort of upfront

14  discovery with respect to product --

15      THE COURT:  Right.

16      MS. RAMSEY:  -- product information and the like --

17      THE COURT:  Uh-huh (indicating an affirmative

18  response).

19      MS. RAMSEY:  -- distribution information.  Otherwise,

20  that, that is correct.  Ms. Zieg is correct.  We, we have not.

21      THE COURT:  Okay.

22      Everyone good, then?

23    (No response)

24      THE COURT:  Okay.  Well, to the extent that I can do

25  this, I'm going to try my best.  I have tried to do a

1    comparison between your motions and your proposed orders and I

2    have tried to compare them to the Bestwall CMO and to come up

3    with some general thoughts about all of this and what I think

4    I'm going to have to do, at least for, at the moment, is to

5    give you the broad-brush impressions of the Court and then ask

6    you to go back and talk some more about the, the way this would

7    play out and what we do when and the dates and, and the like.

8            Let me just say -- if I can get my notes here -- at

9    the outset that I am -- there we go.  Now we're ready.

10           Let me say at the outset that I think part of our

11   problem in all of this is the breadth and reach of the

12   discovery that we all contemplate here that is going to be

13   necessary in estimation and on a global level I would just like

14   to say at the start here that it strikes me that a lot of the

15   trouble is because the parties are not proposing, at least on

16   their own behalfs, to sample and the parties are desiring to,

17   to do some very broad discovery that is going to involve a

18   great deal of discovery being occasioned on lawyers.  That's

19   going to cause a bunch of privilege problems.  No surprise to

20   any of you on that.

21           I would say on the first hand that as a general

22   principle I'm not a big fan nor are the Rules on doing

23   discovery on lawyers.  You know what those Rules are, but the

24   bottom line is that it, it quickly brings us into a morass of

25   what is privileged and what is not privileged and a great deal

Case 22-03090-MBc 8DocFiled Filed B7et110521121/26terEntered7et110521123281370610Dasc Desin
Exhibit DoDBIMen DecBage 3Page50 32 of 51

31

1  of expense.  And y'all've been telling me about <u>Bestwall</u> and

2  how we started with a half a million, a million and a half

3  documents being sought by the, the claimants in <u>Bestwall</u> and

4  working that down to a mere half million documents that were

5  subject to privilege claims.  And now what?  And all the

6  problems that have been sued from then.  And about, you know,

7  that's not surprising to me at all if you're going to try to

8  ask for every document that the claimants have.  Similarly, if

9  the debtor is contemplating a similar effort on the tort

10 lawyers, we're going to have those problems all over again.

11      I would just at this point in time without ruling urge

12 that we need some reasonableness here, folks.  I see these

13 cases grinding down and not moving anywhere other than

14 spreading out into interminable discovery fights.  Bestwall,

15 these, I suspect the same is going on in front of Judge Kaplan

16 in, in the <u>LTL</u> case, but the bottom line is that I don't know

17 that that works to anyone's benefit and I would suggest to you

18 that, that let's go back and all read Rule 1 of the Federal

19 Rules.  We're here "to secure the just, speedy, and inexpensive

20 determination of every action."  The action here is an

21 estimation hearing, not even an actual adjudication of the

22 claims.

23      So I would suggest to you that we need to have some

24 perspective about what we're doing.  And bear in mind that, if

25 they are to be taken at their word, the claimants aren't going

Case 22-03090-MBK 5 Doc Filed 07/10/21/28 Entered 07/10/21/28 13706 Desc Main
Exhibit Doc BMK Dec Page 32 of 51 33 of 51

32

1  to vote for the plan even after I estimate.  In <u>Garlock,</u> Judge

2  Hodges came in at a low number, $125 million, for the aggregate

3  liabilities.  The claimants, as I recall, were asserting a $1.6

4  billion number.  The ACC -- the FCR, I think, was a little

5  lower at, maybe, 1.2 and we ended up with the case resolving

6  itself not based on the estimation ruling, but two or three

7  years later after a great deal of fighting and you settled for

8  5, 600 million.

9          So let's put this in perspective.  Estimation is

10  supposed to avoid the delays and expense of a full

11  adjudication.  If we're going to be just as gnarly as what,

12  what's going to be done in a full adjudication, we are hardly

13  doing ourselves any good with estimating.  So the bottom line

14  is that I would encourage reasonableness, negotiation,

15  sampling.  I would encourage you to work on, together, on

16  privilege logs and the like.

17          So that -- that's the -- that's my preaching to the

18  choir, I guess, in this case.  I'll, I'll go on with what we

19  talk about.

20          I want to hit the general topics and if we have to get

21  into the details, we will.  But as I said, I don't think

22  that -- that's likely to be perilous.  If I start telling you

23  what the deadline are, you got to bear in mind it's been 28

24  years since I practiced law.  I never practiced asbestos law.

25  I never had the, a fight of the, discovery fight of the

1    magnitude that y'all are about to embark upon.

2           So it would be much better and a better result for all

3    concerned if you can work out the details after I tell you what

4    I think about the large principles.

5           The first one, of course, is that we have a

6    fundamental disagreement as to when written discovery is

7    supposed to end, or at least when the deadlines all expire with

8    the debtors wanting me to effectively say that we don't get to

9    those points until they're satisfied with the PIQ responses

10   and, and trust discovery.  They've got to get all of that

11   before we end anything.  So the debtor's dates are all keyed to

12   a, an event that none of us can say with any certainty as to

13   when that is.  Conversely, the reps, on the other hand, want

14   specific dates and deadlines that are hard deadlines and

15   effectively say that PIQ compliance isn't going to -- you're

16   not really directly saying this -- but that putting PIQ

17   compliance off to the side so it doesn't affect the estimation

18   discovery.

19          I read both of those alternatives as an infringement

20   on the function of the Court.  The bottom line is -- I'm not

21   accusing you of bad things.  I understand why you want to do it

22   -- but the bottom line is we're here to decide when y'all can't

23   decide and to make adjustments when they're necessary and where

24   cause is shown.

25          So I agree with the reps.  I think we need some dates,

1 | date-driven deadlines, but I think the deadlines have to be

2 | subject to being moved upon a showing of cause. They're a

3 | little more than guideposts, but they're, they're certainly not

4 | like statutes of limitations, which are immutable.

5 | So the bottom line is that I think we should go with

6 | the representatives' thoughts that we set the deadlines and I

7 | don't mind, in terms of trying to reach a, a Fall of 2024

8 | estimation hearing. We've got some young folks in the

9 | courtroom listening and they might be shocked that we're

10 | talking about a two-year path to get to a motion hearing, but

11 | that's, that's what we're talking about. But the bottom line

12 | is that I don't think we can say now that we're going to set

13 | those dates and they're not going to be moved.

14 | We're talking in the other case, Aldrich and Murray,

15 | about setting dates to take us through written discovery and

16 | then having a further pre-trial conference or a further pre-

17 | trial order to set the follow-on dates that supersede that. I

18 | see some wisdom in that and I would encourage you to consider

19 | it. If y'all want me to give you dates all the way through,

20 | then I'm inclined to, to do it here, but the reality is it's

21 | such a long period of time, the, the subject matter of the

22 | discovery is so broad, and what might come up between here and

23 | the, and an estimation hearing is so uncertain that I think any

24 | dates we put are, are going to be more like mileposts instead

25 | of anything else. They're, they will keep us at least more or

1   less on tact, intact on following the path, but I can't think

2   that we're going to be able to set them without some movement

3   and adjustment as we go along and circumstances dictate.

4          I understand the debtor's desire to make sure that it

5   gets the PIQs, the personal injury questionnaires, and the

6   trust discovery before any deadlines run and before things move

7   along.  I agreed early on that the, with the debtors that that

8   was general information in the case and not specifically tied

9   to the adversary proceedings.  I'm going to stick with that

10  idea, but I recognize, also, that that information will be very

11  important to the debtors, at least in their minds, on their

12  theory of how we estimate and that that infor, they're going to

13  be at a disadvantage if they don't get that information and the

14  trust discovery before the rest of the discovery deadlines run.

15         So the bottom line is I hear you.  I am certainly not

16  going to reward obstreperous behavior.  I'm not going to be

17  very friendly if folks are willfully ignoring court orders and

18  I certainly think that information should be provided because,

19  otherwise, I wouldn't have ordered it.

20         So I'm keeping the PIQs and the trust discovery out of

21  what we're talking about now, but telling you that I see that

22  if there are failures to make discovery there that are

23  wholesale or otherwise materially impairing the ability of the

24  debtors to prepare for the estimation hearing, I'm going to

25  make adjustments to the schedule and the estimation hearing.

1  So word to the wise there.

2       But I do agree with the representatives that we ought

3  to go ahead and set firm dates so that we know what we're

4  talking about and then adjust from there as need.

5       Now that's one place where I want to send y'all back

6  to the drawing board because it is perilous for me to start

7  setting those dates.  I would only tell you than when it comes

8  to these dates -- and I've gone through all of them in

9  detail -- there's a knowledge that you need of what is being

10 attempted here before you can really set them and know what's

11 doable or workable.  I'm not planning to cut anyone off at the

12 knees with dates that aren't workable and I would suggest that

13 you not do so, either.

14      So the bottom line is I want y'all to work on, on what

15 these dates have to be and also consider do we need to go any

16 farther than Aldrich and Murray are proposing in setting

17 written discovery dates or should we do those, get them out of

18 the way, get the disputes resolved, and then along towards the

19 end of that you start negotiating as to what other dates would

20 be usable and then if you can't agree, come back and talk about

21 that maybe about a year down the road from here.

22      I'll leave that to your discretion.  If you want, I'll

23 set the dates all the way through.  It just seems to me that

24 once you get past about a year out or once you get past the

25 written discovery period, whichever is longer, that it starts

Case 23-03090-MBK Doc 8 Doc Filed 07/10/23 11/26 Entered 07/10/23 11/23/23 07:06:08 Desc Main
Exhibit Document Deck Page 37 Page 38 of 51

37

1 becoming fairly ethereal and the likelihood that those dates

2 are going to stick is quite in doubt.  But that's, that's where

3 I want you to go back and talk first.

4 Second thing, initial disclosures.  Obviously, the

5 representatives want a, a broad amount of information from the

6 debtor in the form of initial discovery, initial disclosures

7 which, essentially, is the Court ordering the debtor to produce

8 things.  As in most things, you'll find that I want to follow

9 the Federal Rules as much as I possibly can.  And so I don't

10 think Rule 26 really contemplates that sort of thing.  I don't

11 want to rewrite the Rules of Procedure based on, you know, a

12 party's belief that it's at a disadvantage, especially in the

13 case of the reps, the ACC particularly, where it's comprised of

14 leading plaintiffs' firms in the country and they have access

15 to quite a bit of information.  But as to basic product

16 information, the debtor's already agreed to give that and it

17 was ordered in <u>Bestwall</u> and it doesn't seem to have caused any

18 problems there.

19 So there, there's a good bit of information there that

20 I think can be provided and call it initial disclosures,

21 whatever you want, without causing anyone any heartburn.

22 Now under the ACC's draft or -- excuse me -- the reps'

23 draft of this order in Document 1460 it wanted some more

24 information that gets us off into contested discovery, in my

25 mind.  For example, the, the sites and locations of the

1   products, the serial numbers, the photographs, the identifying

2   information, the names of all distributors and installers,

3   copies of all purchase and sales records, and all testing

4   records.  I think you need to ask those things in

5   interrogatories and then we'll see where we are about doing

6   that.  I know there are questions about burden.  There are

7   questions about whether it's even possible, whether the debtor

8   has that information, questions of proportionality.  I want to

9   use the discovery rules and the protections that exist there to

10  address those.

11          There was also an initial disclosure request wanting

12  to know, basically, the names of custodians and noncustodians

13  with discoverable information.  That was in the Bestwall ruling

14  as well and I'm inclined to allow that.  The number of the

15  parties, we, we're fighting over whether for custodians we'd

16  get 30 or 20 or 15 or 10.  Bottom line -- maybe not 10 -- the

17  bottom line there is I think we ought to start at a reasonable

18  number, like 20, and then if there's, if there are fewer

19  custodians or noncustodians with that information, then, okay,

20  fine.  Give what you can identify.  If there are more, we're

21  going to need to adjust at some point.  But the bottom line,

22  for starters here I think we ought to just go with the, with

23  the 20 that, that had been identified earlier.

24          There was also a question about -- let me see if I can

25  find the part in the ACC that was -- hang on a moment -- shared

1    repositories and drives.  I saw that in the Bestwall order, the

2    debtor identifying those shared databases and drives likely to

3    have discoverable information.  That's close enough, in my

4    mind, to a Rule 26 request to, to allow it.  <u>Bestwall</u> had it.

5    Again, I don't know what problems might have come out of that,

6    but I hadn't, I'm not aware of any.

7         So those things, I think, in initial disclosures are

8    fine.  The bottom line, though, is I think the rest, once we

9    start getting into other things, that -- and -- then I think we

10    ought to use the discovery rules.  Everybody needs to be, rest

11    assured that I'm not going to move into an estimation hearing

12    until everyone's had an, a fair opportunity to obtain discovery

13    that they reasonably need with emphasis on the word "reasonably

14    need" there.  So bottom line, we'll do that.

15         As to the deadlines themselves, I don't mind us aiming

16    for an October of '24 date for the estimation hearing and

17    working back on, on deadlines if you want to go all the way

18    there.  I do think we ought to set the interim deadlines there.

19         Categorical privilege logs.  Chances are with, if

20    we're going to do discovery as broadly as what everyone

21    foresees, we're going to need some of that.  I don't think I

22    have any business dictating it on the frontend, though.  I

23    don't think the law contemplates it in that fashion.  The, the

24    discovery's propounded to the debtor, the debtor reviews it,

25    and the debtor tries to answer.  If there's privilege logs, it

1   falls to the debtor first, assuming the debtor is the party on

2   which discovery is being sought, to do the privilege logs.

3          I would say, though, that it makes a lot of sense for

4   y'all to work those issues out and save yourselves some time

5   and trouble later on and a great deal of expense.  I'm aware of

6   what happened in <u>Bestwall</u>.  I'm aware that neither the

7   claimants nor Judge Beyer were satisfied with what was

8   initially produced.  I fully agree that, that there needs to be

9   sufficient detail, as the Rules require, so that you can

10  evaluate the privilege.  And the bottom line is if we can't

11  tell from categorical logs, then we're going to be talking

12  about going back and doing document-by-document.  Let's save

13  ourselves some time and trouble there and try to work together

14  on, on the idea of what we could agree to if we're going to use

15  categorical logs and what we can agree to if we're not using

16  categorical logs as to the, the categories, the standards, the

17  basic information to be provided.

18         But the bottom line is to the extent you can agree, I

19  think we have to go through the process.  You may be assured

20  that if Judge Beyer found it to be insufficient, I'm likely to

21  find it insufficient as well.  So I would suggest to all

22  parties who are going to be claiming privilege in the

23  estimation process, give us as much information as you possibly

24  can.  As we've already discussed in the adversary context, even

25  with 4,000 documents at issue it's not practicable to expect

1   the Court to do in-camera reviews of all that.  If you're at a

2   half million documents, then entirely impossible.

3        So we need to come up with a process here and I'm open

4   for ideas of whether we need to have sampling on these

5   documents.  It would -- as a person who's not an expert in this

6   field, it would seem to me that if you have a half million

7   dollar privilege, half million privilege logged documents, that

8   it is very likely that they're going to fall into set

9   categories and that if you sample those documents, that you're

10  probably going to end up with the same events that, that you

11  would expect if you looked at all of them.

12       So I, I strongly suggest that you work on the basic

13  contours of a privilege log for use in, in the estimation

14  hearing in advance.  The debtor has started with a proposal

15  about what they would give with categories, plus metadata.  The

16  ACC's got some other thoughts, or the, the reps have other

17  thoughts as to other information.  I think you've, you're on a

18  start there and I would strongly encourage you to work on that.

19       As to the timing of those privilege logs, we have a

20  dispute as to when they should be provided, whether after every

21  document production or whether after it was substantially

22  complete.  I think the latter makes more sense to me.

23       So I'd say that, let's say if you're at 80 percent of

24  the documents, that probably is the time to do this.  We don't

25  need to do this two or three times because of the repetition

Case 22-03092-MBK 8 Doc Filed 07/11/2021/26tered 07/11/2021/2282157061 8 Desc Main
Exhibit Do-DBMP h DecBage 42 of 513 of 51

42

1 | between individual productions.

2 | I think I told you at the last hearing when we're

3 | moving on to the expedited discovery motions and briefs, the

4 | ACC and FCR were proposing cutting down those deadlines to a

5 | 14-day motion, 5-day response, 2-day replies, and as I told you

6 | before, you folks are, for a judge that, in a two-judge court,

7 | you're taking up a lot of time now -- and I've got

8 | Aldrich/Murray as well -- I don't think I can accommodate any

9 | further reductions except in the case of emergencies and still

10 | get all your stuff read.

11 | So I want you to stick with what the, the time periods

12 | we already have in our Local Rules.

13 | The other thing I would say in that regard is not

14 | something y'all argued about, but which I need to mention. I'm

15 | seeing way too many briefs in these cases that exceed the 25-

16 | page page limits and what's happening in most is the parties

17 | file a 50 or 60 or 70-page brief and then file a motion to

18 | permit the, exceeding the, the time periods [sic]. Those are

19 | too long. The bottom line is if you want me to focus on the

20 | important stuff, you don't need to repeat all the extraneous

21 | things and all of the prior case history. And there's just a

22 | limit to what we can use.

23 | So I don't want to start striking pleadings, but I'm

24 | telling you on the frontend you need to, to either adhere to

25 | the 25-page rule, or, if you need to get an exception, ask in

 1   advance of filing your brief and explain why it's not possible

 2   to live with that.

 3           Now I've also noticed a tendency in these two cases

 4   for parties to start using their motion as their brief and,

 5   therefore, try to get out from under the page limits.  I would

 6   discourage that.  We're going to end up with the same thing

 7   going on.  I understand we're fighting over some broad ground

 8   and where there's a need, when we get something as broad as,

 9   for example, the motions to dismiss the adversary that we just

10   talked about, I'm going to give you the extra ground.

11           But otherwise, for routine and mundane case motions,

12   don't try to have 50 or 60 pages instead of 25.  It's, it's

13   counterproductive to you because I'm going to be less inclined

14   to, to pay attention to what you have and if I start telling

15   you to rewrite your briefs, you're going to be in a real

16   disadvantage there.  So that's just an extraneous thought by

17   me.

18           There was a request by the reps for a 502(d) order.  I

19   agree with the debtor here.  The Court cannot mandate that.

20   That would be a wholesale evisceration of attorney-client

21   privilege and work product protections.  On the other hand, I

22   agree, especially if you're going to have discovery as broad as

23   what we're talking about, that it would be a good thing to have

24   some of that, particularly if we're talking about sampled

25   items.

1    In making those rulings, I would also note that the

2    representatives would like to see this case dismissed, been

3    very vocal about it from Day 1.  If I gave you under 502(d) all

4    of the documents of all of the plaintiffs' defense attorneys

5    from the tort system actions and then the case got dismissed,

6    where does that leave the, the debtor or Old, New CertainTeed

7    in defending those tort claims?  You've then given the entirety

8    of the other side's file.

9    So it just can't work that way.  On the other hand, I

10   think that we can start identifying common issues and come up

11   with some examples and some, some sampling and maybe make good

12   use of the 502(d) to illustrate issues and problems that need

13   to be resolved.

14   Finally, the joint discovery plan.  The ACC has taken

15   the Bestwall plan and made what it considers to be minor

16   modifications.  The debtor wants to use the negotiated

17   adversary discovery plan.  I've looked at the various plans and

18   while I'm hardly a tech person, absent agreement, I think we

19   ought to just stick with what's been done in the Bestwall plan.

20   That's kind of a halfway point between the two sides and we'll

21   need to modify it based on the comments I've just made here, or

22   whatever else you can work out.  But that's basically it.

23   Now there were a lot of details about when we do what

24   in this.  If we are absolutely pressed to do that, I suppose I

25   could go through, but, as I said, I'm reluctant to do so.  I've

1   probably caused enough disruption in what y'all've got intended

2   by what I've said so far.  I think the best thing to do would

3   be for y'all to take what I've, I've given you as preliminary

4   rulings and go back and see if you can't make this thing work a

5   little better with deadlines that work for all of you.

6         But if you think there are other things we need to

7   talk about, now's the time to sing out.

8         Anyone?

9         MR. GORDON:  It's Greg Gordon, your Honor, on behalf

10   of the debtor.  Mr. Ellman may want to join in, too.

11         But no, I don't think there's anything else

12   specifically we would raise.  We very much appreciate your

13   Honor's guidance.  We recognize that that was a lot for the

14   Court to work its way through and we appreciate the effort.

15         We will certainly get back together with the other

16   side and, you know, with guidance we've been given and

17   hopefully, reach a full agreement on everything and, if not, I

18   guess we would ask your Honor's indulgence to come back one

19   more time if there are any lingering issues.  But I'm hopeful

20   that that won't happen.

21         THE COURT:  Ms. Ramsey.

22         MS. RAMSEY:  Your Honor, I, I agree.  I think that the

23   Court's guidance was very helpful and, and I think we can

24   probably resolve most of the issues through negotiation.

25   Hopefully, we won't have to come back to the Court, but it

 1   could happen.

 2            THE COURT:  Ms. Zieg, feel differently?

 3            Anyone --

 4            MS. ZIEG:  No, I agree, your Honor.  I think, I think

 5   with your guidance we can and move forward and see what issues

 6   we can resolve and, and most of them should be.  I think the

 7   only issue that, that may lead to some, some dispute will be

 8   timing.

 9            THE COURT:  Okay, very good.

10            Well, you've all made my day by saying that.  I, I've

11   detailed notes and I tried to, a comparison of your CMOs and

12   those are the easy parts as compared to looking through the

13   discovery orders.  But I think that will probably serve you

14   well.  I had intended that if, to the extent we still had

15   lingering disputes, that we talk about them at the next

16   hearing, which is, what, August the 11th.

17            So that work for everyone?

18            MS. ZIEG:  That makes sense to me, your Honor.

19            THE COURT:  Okay, very good.

20            MR. GORDON:  Yes.  And that works for the debtor as

21   well.  Thank you.

22            THE COURT:  All right.

23            Any other matters?

24            MR. ELLMAN:  Your Honor, this is, this is Jeffrey

25   Ellman on behalf of the debtors.

1    I, I do have one update on the report we gave earlier

2  about the Eastern District of Virginia.  While we were on this

3  call, I had a, a colleague reach out to the clerk's office

4  there.

5    I can, I can tell you a couple things.  One, what they

6  do is they mail in regular mail the order --

7    THE COURT:  Right.

8    MR. ELLMAN:  -- that transferred the matter to this

9  court.

10    THE COURT:  Okay.

11    MR. ELLMAN:  They don't (audio skips).  They just

12  mailed it to Clerk, U. S. Bankruptcy Court, not address any

13  person in particular,  And it was just the order.  So they,

14  they don't send any of the other pleadings, like the motion to

15  quash, the responses, all that stuff.

16    So somehow --

17    THE COURT:  Hmm.

18    MR. ELLMAN:  -- once we get it on your Honor's docket,

19  I guess we'll have to find a way to, to refile those papers or

20  have the parties submit them somehow.  So it seems like we need

21  to figure out how this should work.

22    But to the extent it did get to the court there in

23  North Carolina, it would have come in regular mail some,

24  somehow.

25    THE COURT:  Okay.  If we have it, I'm not aware of it.

1    But for those of you who are <u>LTL</u> veterans, when we

2    sent the case to New Jersey, I think our electronic docket went

3    to the bankruptcy court there.  Now whether -- if you're

4    talking about a district court you can send something, I have

5    no idea.  I'm the least tech savvy person in this room.

6        But the -- it would seem to me that we can get those

7    documents filed in the appropriate spot.  I will just go double

8    check with my office and make sure they don't have anything and

9    speak to IT.

10       Is there someone in particular on each party's side

11   that should be the contact person for us to have our clerk's

12   office respond to?  Anyone?

13       MR. ELLMAN:  Well, I mean, I'm happy to do that on

14   behalf of the debtor.  I, I can't really speak for the, the

15   matching claimants, who, I don't think, are really even

16   represented here today.  But we, we could certainly send to the

17   Court copy parties as to who we, who we know has appeared in,

18   in the Eastern District of Virginia.

19       THE COURT:  Okay.

20       MR. ELLMAN:  But that's all we could really -- I think

21   that's probably the best we could do at this point.

22       THE COURT:  Well, this is, to my mind, a ministerial

23   function.  I just want to know who to have my tech people call

24   to try to figure out where these things are and, and to know

25   who you've been speaking to in Virginia, so.  Okay?

1        MR. ELLMAN:  Oh.  Oh, your Honor, I can certainly talk

2   to my colleague about who we've talked to at the clerk's office

3   there and let the Court know that.

4        THE COURT:  Okay, very good.

5        All right.  My law clerk is out of the office at the

6   moment.  She's taking vacation this week.  So I would

7   suggest --

8        Mr. Bender, do you mind if we send that to you?  Okay.

9        Kollin Bender, many of you know from our other cases,

10  is our other law clerk --

11       MR. ELLMAN:  Okay.

12       THE COURT:  -- and he's sitting in with us today.

13  K-O-L-L-I-N; B-E-N-D-E-R, with all the uscourts.gov

14  information.

15       So if you'll send that to him, I think that'll --

16  that'll -- we'll try to get some IT people to take a look and

17  see what we might have and how we can get that information from

18  Virginia, okay?

19       MR. ELLMAN:  We will do that, your Honor.  Thank you.

20       THE COURT:  All right.

21       Anything else?

22     (No response)

23       THE COURT:  Okay.  We'll stand down until 2:00 when we

24  do much of the same thing in the other cases.

25       All right.  Thank you all.

1          MR. ELLMAN:  Thank you, your Honor.

2          MS. ZIEG:  Thank you, your Honor.

3          MR. ELLMAN:  Thank you, your Honor.

4          MR. GORDON:  Thank you.

5          MS. RAMSEY:  Thank you.

6       (Proceedings concluded at 10:38 a.m.)

7

8

9

10                          CERTIFICATE

11          I, court approved transcriber, certify that the

12   foregoing is a correct transcript from the official electronic

13   sound recording of the proceedings in the above-entitled

14   matter.

15   /s/ *Janice Russell*                      July 11, 2022

16   Janice Russell, Transcriber                     Date

17

18

19

20

21

22

23

24

25