# **EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-12825(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . . | . | |
| | . | |
| LTL MANAGEMENT LLC, | . | Adv. No. 23-01092(MBK) |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| THOSE PARTIES LISTED ON | . | |
| APPENDIX A TO COMPLAINT AND | . | |
| JOHN AND JANE DOES 1-1000, | . | |
| | . | |
| Defendants. | . | Tuesday, April 18, 2023 |
| . . . . . . . . . . . . . . | . | 10:00 a.m. |

TRANSCRIPT OF HEARING ON
MEMORANDUM OF LAW IN SUPPORT OF MOTION BY MOVANT ANTHONY
HERNANDEZ VALADEZ FOR AN ORDER (I) GRANTING RELIEF FROM THE
AUTOMATIC STAY, SECOND AMENDED EX PARTY TEMPORARY RESTRAINING
ORDER, AND ANTICIPATED PRELIMINARY INJUNCTION, AND (II) WAIVING
THE FOURTEEN-DAY STAY UNDER FEDERAL RULE OF BANKRUPTCY
PROCEDURE 400l(a)(3) [DOCKET 71]; AND DEBTOR'S MOTION FOR AN
ORDER (I) DECLARING THAT THE AUTOMATIC STAY APPLIES OR EXTENDS
TO CERTAIN ACTIONS AGAINST NON DEBTORS OR (II) PRELIMINARILY
ENJOINING SUCH ACTIONS AND (III) GRANTING A TEMPORARY
RESTRAINING ORDER EX PARTE PENDING A HEARING ON A PRELIMINARY
INJUNCTION [ADVERSARY DOCKET 2]; AND MOTION TO SEAL; AND
SERVICE PROCEDURES MOTION
**BEFORE THE HONORABLE MICHAEL B. KAPLAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:                    Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES:

For the Debtor:                Jones Day
                               By:  GREGORY M. GORDON, ESQ.
                                    DAN B. PRIETO, ESQ.
                                    AMANDA S. RUSH, ESQ.
                               2727 North Harwood Street, Suite 500
                               Dallas, TX  75201

                               Skadden Arps Slate Meagher &
                                 Flom, LLP
                               By:  ALLISON M. BROWN, ESQ.
                               One Manhattan West
                               New York, NY  10001

Various Talc Personal          Watts Guerra LLP
Injury Claimants:              By:  MIKAL C. WATTS, ESQ.
                               5726 W. Hausman Road, Suite 119
                               San Antonio, TX  78249

For Ad Hoc Committee           Genova Burns LLC
of Certain Talc                By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc           494 Broad Street
Committee of Creditors:        Newark, NJ  07102

                               Brown Rudnick
                               By:  JEFFREY L. JONAS, ESQ.
                                    DAVID J. MOLTON, ESQ.
                                    MICHAEL WINOGRAD, ESQ.
                               7 Times Square
                               New York, NY  10036

                               Otterbourg PC
                               By:  MELANIE CYGANOWSKI, ESQ.
                               230 Park Avenue
                               New York, NY  10169-0075

For Anthony Hernandez          Kazan McClain Satterley & Greenwood
Valadez:                       By:  JOSEPH SATTERLEY, ESQ.
                               55 Harrison St. Suite 400
                               Oakland, CA  94607

For the Office of the          Office of the United States Trustee
United States Trustee:         By:  LINDA RICHENDERFER, ESQ.
                                    JEFF SPONDER, ESQ.
                               J. Caleb Boggs Federal Building
                               844 King Street, Suite 2207
                               Lockbox 35
                               Wilmington, DE 19801

```
APPEARANCES CONT'D:

For Various Talc          Maune Raichle Hartley Frency &
Claimants:                  Mudd, LLC
                          By:  CLAYTON L. THOMPSON, ESQ.
                          150 West 30th Street, Suite 201
                          New York, NY 10001

                          Levy Konigsberg, LLP
                          By:  JEROME H. BLOCK, ESQ.
                               MOSHE MAIMON, ESQ.
                          101 Grovers Mill Road, Suite 105
                          Lawrence Township, NJ  08648

                          Simon Greenstone Panatier, PC
                          By:  LEAH CYLIA KAGAN, ESQ.
                          1201 Elm Street, Suite 3400
                          Dallas, TX  75720

For Claimant Alishia      Beasley Allen
Landrum:                  By:  ANDY BIRCHFIELD, ESQ.
                          218 Commerce Street
                          Montgomery, AL  36104

For Arnold & Itkin:       Pachulski Stang Ziehl & Jones LLP
                          By:  LAURA DAVIS JONES, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE 19801

For Paul Crouch,          Ruckdeschel Law Firm, LLC
individually and on       By:  JONATHAN RUCKDESCHEL, ESQ.
behalf of Estate of       8357 Main Street
Cynthia Lorraine Crouch:  Ellicott City, MD 21043

For the Ad Hoc Committee  Womble Bond Dickinson
of Attorney Generals:     BY:  ERICKA JOHNSON, ESQ.
                          1313 North Market Street
                          Suite 1200
                          Wilmington, DE, US 19801


                    - - - - -
```

**INDEX**

**WITNESSES**

                                                                    **PAGE**

**FOR THE PLAINTIFF:**

JOHN KIM

  Cross-Examination by Mr. Jonas                            42

  Cross-Examination by Mr. Satterly                         98

  Cross-Examination by Mr. Maimon                          120

  Cross-Examination by Ms. Richenderfer                   150

  Cross-Examination by Mr. Placitella                     159

  Cross-Examination by Mr. Thompson                       176

  Cross-Examination by Mr. Ruckdeschel                    176

  Redirect Examination by Mr. Brown                       178

  Recross Examination by Mr. Satterly                     182

  Recross Examination by Mr. Maimon                       183

Kim - Cross/Jonas                                               62

1  Q    Sir, very, very important question, okay?  Yes or no.

2  Today, under funding agreement two, the total value available

3  to LTL is tens of billions of dollars less than was available

4  under funding agreement one.  Yes or no?

5  A    That is not true.

6  Q    So you think today, LTL-2 -- no, strike that.  You think

7  that the debtor today under funding agreement two has available

8  to it to satisfy talc claims around $60 billion?

9  A    No, that's not what I said.  What I said was that it's not

10 the -- not tens of billions of dollars less because you have to

11 take into account that because of the Third Circuit decision,

12 funding agreement two was rendered void or voidable, and

13 there's material risk that it was not enforceable.  So

14 therefore, if you're trying to compare those two, I think that

15 statement would not be true.

16 Q    I don't want to compare anything.  I just want -- let's --

17 I'll tell you what.  Let's do it this way.  Funding agreement

18 one, the debtor had $60-odd billion available to it to satisfy

19 my client's claims, right?

20 A    Prior to the Third Circuit decision, I would say yes.

21 Q    Great.  Today, how much does the debtor have available to

22 it under its funding agreement to satisfy talc claims?

23 A    I think there's a calculation about what the value of --

24 an internal valuation of the principal assets of Holdco which

25 is around $30 billion, plus the amounts that LTL has through

Kim - Cross/Jonas                                                63

1 (indiscernible).

2 Q    Well, pick a number.  Is it 30, is it 40?  I don't know.

3 You're the chief legal officer of the debtor, right?  Let me

4 ask you a few questions.  You're the chief legal officer of the

5 debtor, right?

6 A    I am.

7 Q    Now, do you understand that these funding agreements,

8 they're the most valuable asset of the debtor, right?

9 A    That's true.

10 Q    Do you understand how critically important they are to

11 talc victims who the only way they're going to be able to

12 recover effectively is under the funding agreement?

13 A    I do.

14 Q    Okay.  So when you negotiated funding agreement two, you

15 had that in mind how critically important it was, right?

16 A    Well, when we agreed to funding agreement two, I did.

17 Yes.

18 Q    So did you think to yourself I better make sure I get at

19 least $60 billion of value for these people because I'm a

20 debtor in Chapter 11.  I have fiduciary duties to these people.

21 And I better make sure I get them at least the same amount of

22 value.  Did that go through your mind?

23 A    No, because at the time that -- after the Third Circuit

24 decision, the -- it was clear, there was consensus reached that

25 the first funding agreement was void or voidable, at least the

Kim - Cross/Jonas                                          64

1  J&J guarantee part of that.  And so when we were entering into

2  funding agreement two, we took out this risk of enforceability

3  and put in a new agreement that would benefit all the parties.

4  Q    Sir, do my clients have the same amount that they can

5  recover from under funding agreement two as under funding

6  agreement one?  Yes or no?

7  A    No, because of the Third Circuit decision, not because of

8  what we did.

9  Q    It's the Third Circuit's fault?

10          MS. BROWN:  Your Honor, I object.  It's

11 argumentative.

12          THE COURT:  Sustained.

13 BY MR. JONAS:

14 Q    Are you saying that the Third Circuit is responsible for

15 my clients having tens of billions of dollars less that they

16 can recover from?

17          MS. BROWN:  Same objection, Judge.

18          MR. JONAS:  I'd like to know, Your Honor.

19          THE COURT:  Overruled.

20          THE WITNESS:  What I'm saying is that when the Third

21 Circuit made its decision, one of the ramifications of the

22 decision was that it frustrated the purpose of the first

23 funding agreement, rendering it void or voidable.  So I don't

24 think -- the Third Circuit didn't meant do that.  I don't blame

25 the Third Circuit for doing that.  It's just a consequence of

Kim - Cross/Jonas                                        65

1  how the Third Circuit ruled.

2         Therefore, when we were looking at this, from LTL's

3  position, we're now looking at an agreement, a funding

4  agreement which is the most valuable asset that has been

5  rendered void or voidable.  And so we came up with the solution

6  to try to rectify the situation, get -- get sufficient funding

7  for the claimants, and turn to a plan, a support agreement with

8  J&J where they would provide enough liquidity to come up with

9  the -- a solution to the issue which is embodied in the

10 proposal.

11 BY MR. JONAS:

12 Q    So when you gave up funding agreement one and you entered

13 into funding agreement two, you were trying to take care of my

14 clients?  Is that what you're saying?

15 A    Yes, absolutely, because we did not give up funding

16 agreement one.  Funding agreement one became void or voidable

17 and unenforceable, particularly the J&J guarantee as a result

18 of the Third Circuit decision.

19       What we did, we took that situation and tried to come up

20 with a situation for the benefit of all parties.  So we

21 exchanged an unenforceable funding agreement with an

22 enforceable funding agreement with Holdco, and a plan support

23 agreement that would provide, you know, $8.9 billion in a

24 settlement that has been -- that has the overwhelming support

25 of claimants.

Kim - Cross/Jonas                                                68

1  Q    Well, let's wait.

2  A    Yeah.

3  Q    Wait, because at deposition, you wouldn't answer that

4  question.  So let's see whether your counsel now for the first

5  time wants to let you, allow you to answer these types of

6  questions.

7       MS. BROWN:  Well, Your Honor, I think that is also

8  argumentative.  And certainly, what was true in the deposition

9  is true here.  To the extent answering that question is going

10 to reveal attorney/client communications, protected by work

11 product or common interest, then Mr. Kim shouldn't reveal

12 conversations he had with lawyers.  But certainly, he should be

13 able to answer that in the way that he understands he can do

14 without violating the privilege.

15      THE WITNESS:  So what I would say is my understanding

16 -- I had numerous conversations with J&J attorneys.  My

17 understanding from going away with that was that they were

18 asserting that the -- it was -- the contract was void or

19 voidable because of the Third Circuit decision based on a

20 number of legal principals that they had researched, my lawyers

21 had researched.  And we came to the conclusion there's a

22 material risk that the contract was void or voidable.

23      MR. JONAS:  Your Honor, I'm going to move to strike

24 because at deposition, time and time again we were not allowed

25 -- we were told that the only people, and I'll ask questions to

Kim - Cross/Jonas                                                      75

1  value.  And then there's the J&J basically backstop.  That

2  backstop really was only intended to deal with things in

3  bankruptcy.

4      The J&J -- the JJCI portion of it, you know, is really a

5  function of the fact that we filed the divisional merger and we

6  had to take all the assets, or we wanted to have the assets of

7  JJCI.

8  Q    Did J&J tell LTL that it would not honor the funding

9  agreement outside of bankruptcy after the Third Circuit's

10 decision?

11 A    No, it didn't get that far because we came to a

12 resolution.  We understood the funding agreement was void or

13 voidable.  We never said to J&J well, you must pay us or else.

14 We both came to the conclusion, and a consensus, that the

15 funding agreement was void or voidable, possibly unenforceable.

16 There's a material risk.

17     And so what we did was we negotiated a solution.  We came

18 to a consensus on a solution to it before having a need to how

19 J&J, you know, refused to fund anything.

20 Q    Did you go to the TCC or any of the talc claimants, the

21 beneficiaries of funding agreement one and say hey guys, let's

22 talk about this.  We've got to figure out a strategy against my

23 counter party J&J because I don't want to lose $60 billion.

24 Did you talk to any of these folks who were the beneficiaries

25 about what to do?

Kim - Cross/Jonas                                        77

1 clients had the benefit of a $60 million funding agreement, the

2 first funding agreement, right?

3 A    At that time, yes.

4 Q    And today, maybe, maybe, I guess if they vote in favor of

5 a plan, they'd have the benefit of funding agreement two which

6 I'm not sure what you said, I think you said $30 billion of

7 value.  Is that right?

8 A    It is.  But then you're missing out that there's a plan

9 proposal on the table that a substantial number of claimants

10 have approved, which would be $8.9 billion, which is fully

11 funded under the funding agreement.

12 Q    Okay.  So that's my client.  Now let's just make sure I

13 got the J&J piece right.  J&J was liable for up to $60 billion

14 under funding agreement one, right?

15 A    Again, J&J, without any obligation, put that in in order

16 to enhance the prospects of a bankruptcy.  So that was why it

17 got put in.  At some point, it becomes void or voidable because

18 the Third Circuit decision.  And then they again committed

19 without having to, to an $8.9 billion support agreement in

20 order to facilitate a resolution.

21 Q    Just to wrap up, today, J&J's maximum liability is $8.9

22 billion, right?

23 A    Under the support agreements that it has.

24 Q    So with -- because of the Third Circuit's decision, J&J

25 got off the hook for $50 billion of talc liability?

**WWW.JJCOURT.COM**

Kim - Cross/Jonas                                           78

1  A     Again, it did not get off the hook.  The hook -- the

2  agreement itself, the first funding agreement was not required

3  by J&J.  And as the Third Circuit noted, it put in that

4  guarantee in order to facilitate a resolution of bankruptcy.

5        Once the -- ironically, I think it was the Third Circuit

6  said the very -- the very provision that was supposed to help

7  it in bankruptcy actually turned into a provision that

8  prevented the bankruptcy, causing that guarantee to be void or

9  voidable.

10       And after that, as a resolution to try to resolve all this

11 talc claims in bankruptcy, J&J again committed $8.9 billion

12 which was part of the PSA, part of the plan that was negotiated

13 to try to resolve all the litigation.  And that's what

14 happened.

15            MR. JONAS:  Your Honor, could we have a short break?

16            THE COURT:  Sure.  Let's see.  It's ten to 12.  My

17 plan is to go to 1:00, take a half-hour lunch.  Why don't we

18 come back in ten minutes?

19            MR. JONAS:  Thank you, Your Honor.

20            (Recess at 11:52 a.m./Reconvene at 12:06 p.m.)

21            THE COURT:  Okay.

22 BY MR. JONAS:

23 Q    Mr. Kim, on what date did the old funding agreement become

24 inoperative and the new funding agreement become operative?

25 A     I think the date of the termination agreement.

Kim - Cross/Jonas                                        79

1  Q    Which is what?

2  A    It became effective right after the case, the bankruptcy

3  case was dismissed.

4  Q    So the funding agreement, even though this risk

5  void/voidability occurred on January 30th, the funding

6  agreement remained operative for the remainder of the

7  bankruptcy case?

8  A    That was our agreement.

9  Q    Your agreement with whom?

10 A    Well, because it's a termination agreement, the agreement

11 was that it would remain operative until the termination

12 agreement.

13 Q    Okay.  Well, on what date did you reach that -- strike

14 that.

15      I take it that agreement was between LTL and J&J; right?

16 A    I think there was a consensus among the lawyers.

17 Q    Consensus among the lawyers.  Well, lawyers don't make

18 deals -- can't bind clients to deals; right?  Clients have to

19 do that themselves; right?

20 A    Right.  The board was apprised ahead of time that there

21 was a termination agreement that was going to be in place and

22 what that would mean is that everything would stay in place so

23 that, you know, LTL would  not remain bare until the

24 termination agreement became effective, which happened as soon

25 as the bankruptcy case was dismissed.  So you'll see, I think,

Kim - Cross/Jonas                                               81

1  dismissed, LTL II commenced a new bankruptcy case; right?

2  A    It did.

3  Q    Okay.  Now, that whole -- you've told about this

4  void/voidability issue, negotiation, discussion, termination

5  agreement, new funding agreement, that all didn't happen in two

6  hours; did it?

7  A    The discussions around it didn't happen in the two hours,

8  the authorization for it, it was -- the authorization for it

9  specifically stated that it would not become effective until

10 the termination of the first bankruptcy.

11 Q    And those -- I think you said those discussions,

12 negotiations, whatever they are, between LTL and J&J, they

13 started pretty quick after the Third Circuit decision; right?

14 A    There were numerous discussions right after the Third

15 Circuit decision, yes.

16 Q    Okay, so February, March.  And over those months, while

17 you were an officer of a Chapter 11 debtor, you were doing a

18 new deal, a new transaction, a new arrangement with J&J to

19 terminate the existing funding agreement and enter into a new

20 funding agreement; right?

21 A    I would say that there were ongoing discussions among the

22 lawyers of a variety of things that could happen, one of them

23 which was the termination of the old funding and the new

24 funding agreement, but there were discussions throughout that

25 period of how to -- how to resolve sort of the talc litigation

Kim - Cross/Jonas                                          82

1  for everyone.

2  Q    And so, obviously, LTL, J&J, they knew what was going on

3  in this connection because they were involved in it; right?

4  A    They were involved in it, yes.

5  Q    Okay.  Did you tell the creditors committee, the TCC, what

6  was going on during this time that you were in Chapter 11?

7  A    Not -- I did not have any conversations with the creditors

8  committee or the TCC.

9  Q    In fact, sir, you hid it from the Bankruptcy Court and the

10 bankruptcy community, meaning the TCC and others, you hid that

11 from them; didn't you?

12 A    I --

13         MS. BROWN:  I object, Your Honor, argumentative.

14         THE COURT:  Overruled.

15         THE WITNESS:  I would say, you know, these are

16 confidential communications, we had no idea what we were going

17 to do.  We were looking at various options and we did not want

18 to make public disclosures about this at the time that we were

19 still involved in looking at these issues.

20         MR. JONAS:  May I approach, Your Honor?

21         THE COURT:  Yes, please.

22         MR. JONAS:  I think we're on --

23         THE COURT:  3.

24         MR. JONAS:  -- 3.

25 BY MR. JONAS:

**WWW.JJCOURT.COM**