# EXHIBIT M

## Trust Distribution Procedures

## Table of Contents

**Page**

Article 1 INTRODUCTION & OVERVIEW ................................................................................- 1 -

    1.1    Purpose ................................................................................................- 1 -

    1.2    Interpretation .......................................................................................- 1 -

    1.3    Exclusivity ..........................................................................................- 1 -

    1.4    General Principles ..............................................................................- 1 -

Article 2 INTERPRETATION & DEFINITIONS .......................................................................- 2 -

    2.1    Interpretation .......................................................................................- 2 -

    2.2    Incorporation of Plan Definitions ......................................................- 2 -

    2.3    Definitions ...........................................................................................- 2 -

Article 3 TDP ADMINISTRATION ...........................................................................................- 8 -

    3.1    General Administration ......................................................................- 8 -

        3.1.1    Coordination of Trustees, Claims Administrator & Claims Processor .................- 8 -

        3.1.2    Preparation of and Deadline for Distribution of Trust Rules and Submission Procedures ................................................................................- 8 -

        3.1.3    Consent & Consultation with the Payor, the TAC, and the FCR .........................- 9 -

    3.2    Appropriateness of Costs ...................................................................- 9 -

    3.3    Lien Resolution ..................................................................................- 9 -

    3.4    Trust Disclosure of Information ........................................................- 10 -

    3.5    Notice Requirements ..........................................................................- 10 -

    3.6    Auditing .............................................................................................- 11 -

        3.6.1    Cross-Trust Audit Program ...............................................................- 11 -

        3.6.2    Claims Audit Program .......................................................................- 11 -

        3.6.3    Consequences of Audit Programs .....................................................- 12 -

Article 4 INDIVIDUAL CLAIMS ALLOWANCE PROCESS .................................................- 12 -

    4.1    General Principles ..............................................................................- 12 -

        4.1.1    Recovery Only With Respect to a Single Individual Claim ...............- 12 -

        4.1.2    Treatment of Individual Claims Previously Resolved ........................- 12 -

        A.    Individual Claims Previously Settled but Unpaid ...............................- 12 -

        B.    Individual Claims Previously Settled and Paid ..................................- 13 -

        C.    Claims Previously Rejected or Dismissed ........................................- 13 -

        D.    Claims Otherwise Subject to Final Judgment ...................................- 13 -

    4.2    Submission Deadlines ........................................................................- 13 -

4.2.1    Deadline to Submit Existing Individual Claims to Trust .......................................- 13 -

4.2.2    Effect of Statutes of Limitations and Repose ......................................................- 13 -

A.    Existing Individual Claims Previously Filed in Tort System ..............................- 13 -

B.    Unfiled Existing Individual Claims ....................................................................- 14 -

C.    Tolling and Timeliness ........................................................................................- 14 -

(i)    Existing Individual Claims .............................................................................- 14 -

(ii)    Future Individual Claims ..............................................................................- 14 -

4.3    Submission Procedures ..........................................................................................- 14 -

4.3.1    FIFO Processing Queue .......................................................................................- 14 -

4.3.2    Withdrawal of Submitted Claims .........................................................................- 15 -

4.3.3    Deferral of Submitted Claims ..............................................................................- 15 -

4.3.4    Non-Responsive Individual Claimants .................................................................- 15 -

4.3.5    Submission Requirements ....................................................................................- 16 -

4.3.6    Disallowed Claims ...............................................................................................- 17 -

4.4    Claim Evaluation Procedures .................................................................................- 17 -

4.4.1    FIFO Processing ...................................................................................................- 17 -

4.4.2    Preliminary Evaluation of Claim Submissions ...................................................- 18 -

4.4.3    General Principles for Evaluation of Confirmed Claims .....................................- 19 -

4.4.4    Standard Qualification Evaluation Process ..........................................................- 19 -

A.    Ovarian Cancer Qualification Criteria ................................................................- 19 -

B.    Mesothelioma Qualification Criteria ...................................................................- 20 -

4.4.5    Accelerated Evaluation Process ...........................................................................- 20 -

A.    In General ............................................................................................................- 20 -

B.    Accelerated Claims Criteria ................................................................................- 21 -

Article 5 VALUATION OF ALLOWED CLAIMS ...............................................................- 21 -

5.1    In General ...............................................................................................................- 21 -

5.2    Determination of Scheduled Values for Qualifying Claims ...................................- 21 -

5.2.1    Qualifying Ovarian Cancer Claims ......................................................................- 21 -

A.    Initial Point Values .............................................................................................- 22 -

B.    Point Value Adjustment Factors ..........................................................................- 22 -

C.    Talc Use and Risk Factor Reductions .................................................................- 23 -

(i)    Step I Reductions:  Length of J&J Talc Use ..................................................- 23 -

(ii)    Step II Reductions:  Time Since Last Use ....................................................- 24 -

(iii)    Step III Reductions:  Less than Regular Use ...............................................- 24 -

    (iv)    Step IV Reductions:  Medical Risk Factors ..................................................- 24 -

    (v)    Step V Reductions:  Non-J&J Talc Use................................................- 25 -

  D.   Scheduled Value ...........................................................................................- 25 -

  5.2.2   Qualifying Mesothelioma Claims ......................................................- 25 -

  A.   Initial Point Value .......................................................................................- 26 -

  B.   Point Value Adjustment Factors .................................................................- 26 -

  C.   Talc Use & Risk Factor Reductions ...........................................................- 27 -

    (i)    Step I Reductions:  J&J Talc Use ...............................................- 27 -

    (ii)    Step II Reductions:  Less than Regular Use..................................- 27 -

    (iii)    Step III Reductions:  Non-J&J Talc Use.......................................- 27 -

  D.   Scheduled Value ...........................................................................................- 28 -

  5.3     Scheduled Values for Approved Accelerated Claims...........................- 28 -

  5.3.1   Individual Claims Which Could Have Appropriately Elected to Proceed Under the Qualification Evaluation Process ........................................................................- 28 -

  5.3.2   Canadian Claims ..............................................................................- 28 -

  5.3.3   Other Allegedly Talc-Related Diseases ...........................................- 28 -

Article 6 RECONSIDERATION REQUESTS & ADR PROCEDURES ..............................- 29 -

  6.1     Reconsideration of Determination ...........................................................- 29 -

  6.1.1   Requirements for Reconsideration Requests ....................................- 29 -

  6.1.2   Forfeiture of Right to Request Reconsideration ...............................- 29 -

  6.1.3   Failure to Request Reconsideration Deemed Acceptance .................- 29 -

  6.1.4   Reconsideration Request Procedures ................................................- 30 -

  6.2     Post-Reconsideration Litigation..............................................................- 30 -

Article 7 INDIVIDUAL CLAIMS PAYMENT PROCESS ...................................................- 31 -

  7.1     Points-Based Monetary Values ...............................................................- 31 -

  7.1.1   Uncertainty of Debtor's Talc Liabilities ..........................................- 31 -

  7.1.2   Description & Application of Points Valuation System .....................- 31 -

  A.   In General......................................................................................................- 31 -

  B.   Supplemental Payments Owed Due to Increases to the Point Value....................- 32 -

  C.   Determination of Value...............................................................................- 32 -

  7.2     General Guidelines for Liquidating & Paying Allowed Claims ..............- 33 -

  7.2.1   Documentation Requirements............................................................- 33 -

  A.   Acceptance & Release .................................................................................- 33 -

  B.   Documents Establishing Legal Representation ...........................................- 33 -

  7.2.2   Offsets ..............................................................................................- 33 -

7.3      Payment of Claims ................................................................................- 33 -

   7.3.1    Allowed Claim Amounts Held in Escrow ........................................- 33 -

   7.3.2    Payment of Allowed Claims ............................................................- 34 -

   7.3.3    Payment of Legal Fees .....................................................................- 34 -

7.4      Payment Processing .............................................................................- 35 -

   7.4.1    FIFO Payment Processing.................................................................- 35 -

   7.4.2    Discretion to Vary the Order & Amounts of Payments in Event of Limited Liquidity - 35 -

7.5      Punitive Damages ................................................................................- 36 -

Article 8 RESOLUTION OF GOVERNMENTAL ACTION CLAIMS..................................- 36 -

8.1      Governmental Action Claims Are Subject to These TDP ....................- 36 -

8.2      Settlement Offer and Negotiations.......................................................- 36 -

8.3      Mediation .............................................................................................- 37 -

8.4      Arbitration ............................................................................................- 37 -

8.5      Litigation ..............................................................................................- 38 -

8.6      Statute of Limitations & Repose ..........................................................- 38 -

Article 9 MISCELLANEOUS ..........................................................................................- 39 -

9.1      Non-Binding Effect of Trust and/or Litigation Outcome ...................- 39 -

9.2      Independence of Trust..........................................................................- 39 -

9.3      Amendments .........................................................................................- 39 -

9.4      Severability ..........................................................................................- 39 -

9.5      Governing Law .....................................................................................- 39 -

iv

**<u>TRUST DISTRIBUTION PROCEDURES</u>**

The LTL Personal Injury Trust Distribution Procedures (hereafter "<u>TDP</u>") contained herein provide the means for resolving all Talc Personal Injury Claims, including Individual Claims and Governmental Action Claims, as provided in and required by the Plan and the Talc Personal Injury Trust Agreement (the "<u>Trust Agreement</u>").

The Plan and the Trust Agreement establish the Talc Personal Injury Trust (the "<u>Trust</u>"). The trustee(s) of the Trust (the "<u>Trustees</u>") shall implement and administer these TDP in accordance with the Trust Agreement.

**Article 1**
**<u>INTRODUCTION & OVERVIEW</u>**

**1.1    <u>Purpose</u>**

These TDP have been adopted pursuant to the Trust Agreement and are intended to provide reasonable assurance that the Talc Personal Injury Trust will evaluate, value, and pay Talc Personal Injury Claims that involve similar claims in substantially the same manner, and otherwise comply with the requirements of a trust set forth in section 524(g) of the Bankruptcy Code.  To achieve this goal, these TDP set forth procedures for liquidating and paying Governmental Action Claims and processing, evaluating, resolving, and paying (as appropriate) Individual Claims through either the Qualification Evaluation Process or the Accelerated Evaluation Process as set forth, herein. These procedures are designed to be consistent with characteristics known to drive valuation of similar personal injury claims in the tort system, such as specific disease type and age at diagnosis, and/or are tied to the scientific theories promulgated by plaintiffs' experts in the Johnson & Johnson Talcum Powder Products Marking, Sales Practices and Products Liability Litigation multidistrict litigation, such as time since last talc use.

**1.2    <u>Interpretation</u>**

Except as expressly provided below, nothing in these TDP shall be deemed to create a substantive right for the holder of any Talc Personal Injury Claim.  To the extent these TDP provide certain rights and benefits to holders of Talc Personal Injury Claims, such rights and benefits shall vest as of the Effective Date.

**1.3    <u>Exclusivity</u>**

These TDP and any related procedures set forth or designated herein shall be the sole and exclusive method by which a Person may seek allowance and distribution on a Talc Personal Injury Claim.

**1.4    <u>General Principles</u>**

These TDP are founded on the following principles:

1)      The efficient resolution of all Talc Personal Injury Claims and equitable valuation of all similarly situated Talc Personal Injury Claims;

- 1 -

2)      Clear and objective qualification and valuation criteria;

3)      Clear and reliable evidentiary requirements;

4)      A rigorous review and evaluation process requiring the Trustee to determine the appropriate Scheduled Values for Individual Claims in accordance with these TDP and applicable law;

5)      Independence of the Trust and the Trustee;

6)      Administrative transparency; and

7)      Fraud detection and prevention.

## Article 2
## INTERPRETATION & DEFINITIONS

**2.1**     **Interpretation**

The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these TDP.

**2.2**     **Incorporation of Plan Definitions**

Capitalized terms used but not defined in these TDP have the meanings ascribed to them in the Plan or the Trust Agreement, and such definitions are incorporated by reference herein.  To the extent a term is defined in these TDP, as well as in the Plan and/or the Trust Agreement, the definition contained in these TDP shall control.

**2.3**     **Definitions**

1.     **"Accelerated Evaluation Process"** shall mean the claims evaluation process by which the Claims Administrator shall evaluate Confirmed Claims to determine whether they are Other Approved Claims and shall be allowed, as set forth in Section 4.4.5.

2.     **"Accelerated Claims Criteria"** shall mean the requirements set forth in Section 4.4.5, which a Confirmed Claim proceeding under the Accelerated Evaluation Process must satisfy in order to be deemed an Other Approved Claim.

3.     **"Acceptance and Release"** shall have the meaning set forth in Section 7.2.1(A).

4.     **"ADR Procedures"** shall mean the alternative dispute resolution procedures set forth in Article 6.

5.     **"Allowed Claim Amount"** shall mean the actual dollar value for an Allowed Claim whether based on the Scheduled Value proposed and offered by the Trust for any such Allowed Claim, or whether based on the resolution of the Individual

Claim pursuant to any ADR Procedures or post-reconsideration litigation in the tort system pursuant to Article 6 of these TDP.

6.    **"Allowed Claim(s)"** shall mean all Qualifying Claims and Other Approved Claims, collectively.

7.    **"Allowed Claimant(s)"** shall mean Individual Claimants whose Submitted Claims are determined to be Allowed Claims.

8.    **"Claimant's Jurisdiction"** shall mean either (a) the jurisdiction in which the Individual Claim was filed against the Debtor or any of its Affiliates in the tort system prior to the Petition Date or, (b) if the Individual Claim was not filed against the Debtor or any of its Affiliates in the tort system prior to the Petition Date, then at the claimant's election (i) the jurisdiction in which the Individual Claimant resided on the Date of Diagnosis; (ii) the jurisdiction in which the Individual Claimant resides at the time he/she submits her Individual Claim to the Trust; or (iii) a jurisdiction in which the claimant Regularly Used J&J Talc Products.

9.    **"Claim Submission"** shall mean the substantially complete submission to the Trust of all Claims Materials required by these TDP by an Individual Claimant.

10.   **"Claim Submission Form"** shall mean the form developed and adopted by the Trustees, in concert with the Claims Administrator and the Claims Processor, which Individual Claimants must to submit to the Trust pursuant to the Submission Procedures as set forth herein.

11.   **"Claims Materials"** shall mean any evidence and other materials submitted in support of Individual Claims, including but not limited to the materials required pursuant to Section 4.3.5.

12.   **"Claims Administrator"** shall mean ARCHER Systems LLC and/or any other Talc Trust Claims Administrator subsequently appointed pursuant to the Plan, Trust Agreement, and these TDP.

13.   **"Claims Processor"** shall mean Pattern Data, Inc., which shall be engaged by the Claims Administrator to assist in the development of procedures and protocols to implement these TDP effectively and efficiently.

14.   **"Common Benefit Fund"** shall mean the common benefit fund established pursuant to Case Management Order No. 7(A) entered by the United States District Court for the District of New Jersey in the multidistrict litigation *In re: Johnson & Johnson Talcum Powder Products Marking, Sales Practices and Products Liability Litigation*, Civil Action No. 3:16-md-02738.

15.   **"Common Benefit Fund Obligations"** shall mean any common benefit fund obligations arising from that certain multidistrict litigation known as the Johnson & Johnson Talcum Powder Litigation, Master Docket 3:16-md-02738 in the United States District Court for the District of New Jersey.

16.     **"Confirmation Order"** shall mean the order of the Bankruptcy Court and the District Court acting jointly or the order of the District Court affirming an order entered separately by the Bankruptcy Court, in either case which order confirms the Plan pursuant to section 1129 of the Bankruptcy Code.

17.     **"Confirmed Claim"** shall mean a Submitted Claim which the Claims Administrator determines has satisfied the Preliminary Evaluation Criteria.

18.     **"Claims Audit Program"** shall mean  the audit program adopted and implemented by the Trust pursuant to Section 3.6.2.

19.     **"Cross-Trust Audit Program"** shall mean the audit program adopted and implemented by the Trust pursuant to Section 3.6.1.

20.     **"Date of Diagnosis"** shall mean the date on which an Individual Claimant received the original pathologic diagnosis that is the basis of his/her Individual Claim.

21.     **"Evaluation Track(s)"** shall mean the Qualification Evaluation Process and/or the Accelerated Evaluation Process that is elected by Individual Claimants in their Claim Submissions.

22.     **"Existing Claimant(s)"** shall mean, collectively, all Existing Mesothelioma Claimants, Existing Ovarian Cancer Claimants, as well as any Individual Claimants who submit an Other Talc Claim to the Trust which involved a Date of Diagnosis prior to April 1, 2023.

23.     **"Existing Individual Claim(s)"** shall mean Individual Claims held by Existing Ovarian Cancer Claimants and Existing Mesothelioma Claimants, collectively.

24.     **"Existing Mesothelioma Claimant(s)"** shall mean Mesothelioma Claimant who asserts a Mesothelioma Claim involving a Date of Diagnosis before June 1, 2023, not otherwise barred by applicable statutes of limitations.

25.     **"Existing Ovarian Cancer Claimant(s)"** shall mean any Individual Claimant who holds an Ovarian Cancer Claim not otherwise barred by applicable statutes of limitations, involving an initial date of diagnosis prior to April 1, 2023, and if retained by counsel, having executed a retention agreement with his/her lawyer prior to June 1, 2023.

26.     **"FIFO Payment Queue"** shall mean the processing queue for the payment of Qualifying Claims and Other Approved Claims, as described in Section 7.4.

27.     **"FIFO Processing Queue"** shall mean the processing queue for the evaluation of Submitted Claims, as described in Sections 4.3 and 4.4.

28.     **"Future Claimant(s)"** shall mean, collectively, Future Mesothelioma Claimant(s) and Future Ovarian Cancer Claimants.

29.     **"Future Mesothelioma Claimant(s)"** shall mean any Mesothelioma Claimant who is not an Existing Mesothelioma Claimant.

30.     **"Future Ovarian Cancer Claimant(s)"** shall mean any Ovarian Cancer Claimant who is not an Existing Ovarian Cancer Claimant.

31.     **"Governmental Action Trust"** shall mean the Talc Personal Injury Governmental Action Claims Sub-Trust described in the Plan.

32.     **"Gynecologic Claim"** shall mean any Individual Claim that involves allegations that the Individual Claimant developed a gynecologic cancer that is not an Ovarian Cancer Claim.

33.     **"Identifying Information"** shall mean, with respect to Individual Claims, the (i) full legal name, (ii) date of birth, (iii) address, and (iv) social security number, of both the relevant injured/deceased individual and his/her legal representative, as well as the law firm and attorney serving as the holder's Representative (if any) and such counsel's address.

34.     **"Individual Claim"** shall mean any Talc Personal Injury Claim other than a Governmental Action Claim.

35.     **"Individual Claimant"** shall mean the holder of any unresolved Individual Claim. Unless otherwise specified herein, Individual Claimant also collectively refers to any relevant minors, decedents or other derivative claimants and the person(s) asserting the Individual Claim on behalf of such claimants and/or their estates in a representative capacity.  For avoidance of doubt, Individual Claimant specifically excludes any person whose Individual Claim was previously filed and dismissed with prejudice or whose Individual Claim was adjudicated and resulted in an unfavorable final judgment prior to October 14, 2021.

36.     **"Initial Filing Date"** shall mean the date on which the Trust first begins to accept claims.

37.     **"J&J"** shall mean Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each, excluding the Debtor.

38.     **"J&J Talc Product(s)"** shall mean any and all products manufactured, distributed, and/or sold by the Debtor and/or J&J containing talcum powder, to which Individual Claimants allege they were exposed, including but not limited to Johnson's Baby Powder and Johnson & Johnson's Shower to Shower. Talc Products also includes any product containing talcum powder manufactured, distributed, and/or sold by any of the Debtor and/or J&J affiliates, subsidiaries, divisions, parent companies, predecessors, or successors.

39.     **"Lien Resolution Administrator"** shall mean shall mean ARCHER Systems LLC and/or any other Talc Trust Lien Resolution Administrator subsequently appointed pursuant to the Plan, Trust Agreement, and these TDP.

40.     **"Maximum Value"** shall be the maximum amount any Individual Claimant may receive in payment from the Settlement Trust and shall be defined as three times (3x) the Initial Point Value as defined under Article V for a given Allowed Claim based on the Individual Claimant's age on the Date of Diagnosis and disease type.

41.     **"Mesothelioma"** shall mean the type of cancer that develops from the mesothelium (*i.e.*, the thin layer of tissue that covers certain internal organs including the pleural, peritoneal, and pericardial cavities). For purposes of evaluating Individual Claims pursuant to these TDP, this definition is limited to malignant mesothelioma that develops in the lining of the lungs, chest wall, abdomen, heart, and testes.

42.     **"Mesothelioma Claim"** shall mean any Individual Claim involving a claim alleging use of J&J Talc Products and in which the relevant Individual Claimant developed Mesothelioma.

43.     **"Mesothelioma Claimant"** shall mean any Individual Claimant who asserts a Mesothelioma Claim.

44.     **"Mesothelioma Qualification Criteria"** shall mean the requirements set forth in Section 4.4.4(B), which an Individual Claim alleging Mesothelioma must satisfy in order to be deemed a Qualifying Claim.

45.     **"Non-J&J Talc Products"** shall mean any and all talc-containing products which are not J&J Talc Products.

46.     **"Other Approved Claim"** shall mean an Individual Claim that has satisfied the Accelerated Claim Criteria, as determined by the Claims Administrator pursuant to Section 4.4.4.

47.     **"Other Approved Claimant"** shall mean an Individual Claimant who's Individual Claim has been determined to be an Other Approved Claim.

48.     **"Other Talc Claim"** shall mean any Individual Claim that is not an Ovarian Cancer Claim or Mesothelioma Claim.

49.     **"Ovarian Cancer"** shall mean, collectively, epithelial cancer, that originates in the ovaries, fallopian tubes, and/or peritoneum (*i.e.*, primary peritoneal cancer), with serous, endometrioid, clear cell, or undifferentiated subtypes (or a mixture of subtypes that includes one or more of these subtypes). This definition specifically includes tumors designated as "borderline" or of "low malignant potential."

50.     **"Ovarian Cancer Claim"** shall mean any Individual Claim involving allegations that the relevant Individual Claimant developed Ovarian Cancer.

51.    **"Ovarian Cancer Claimant"** shall mean any Individual Claimant who asserts an Ovarian Cancer Claim.

52.    **"Ovarian Cancer Qualification Criteria"** shall mean the requirements set forth in Section 4.4.4(A) which an Ovarian Cancer Claim must satisfy in order to be deemed a Qualifying Claim.

53.    **"Payor"** shall mean Johnson & Johnson.

54.    **"Points Valuation System"** shall mean as the points-based claim valuation system described in Article 5 of these TDP.

55.    **"Preliminary Evaluation"** shall mean the preliminary evaluation process described in Section 4.4.2, pursuant to which determinations shall be made as to whether each Submitted Claim constitutes a Confirmed Claim and should further evaluated via either the standard Qualification Evaluation Process or Accelerated Evaluation Process.

56.    **"Preliminary Evaluation Criteria"** shall mean the four (4) preliminary criteria set forth in Section 4.4.2 which Individual Claims must satisfy in order to progress to either the standard Qualification Evaluation Process or Accelerated Evaluation Process.

57.    **"Qualification Criteria"** shall collectively mean the Ovarian Cancer Qualification Criteria and the Mesothelioma Qualification Criteria.

58.    **"Qualifying Claim(s)"** shall mean any Individual Claim that the Claims Administrator determines, pursuant to Sections 4.4.3 and 4.4.4, has satisfied the applicable Qualification Criteria.

59.    **"Qualifying Claimant"** shall mean an Individual Claimant who's Individual Claim has been determined to be a Qualifying Claim.

60.    **"Regular J&J Talc Use"** shall mean an Individual Claimant's regular use of J&J Talc Products on his/her own body, as proven by sworn testimony or affidavit.

61.    **"Regular Perineal J&J Talc Use"** shall mean an Individual Claimant's regular use of J&J Talc Products in her own perineal area after puberty, as proven by sworn testimony or affidavit.

62.    **"Scheduled Value"** shall mean the final scheduled Point-Value for any Qualifying Claim or Other Approved Claim, as determined by the Claims Administrator pursuant to Section Article 5 of these TDP.

63.    **"Settlement Trust"** shall mean the Talc Personal Injury Tort Claims Sub-Trust described in the Plan.

64.    **"Qualification Evaluation Process"** shall mean the claims-resolution method in which an Individual Claim is evaluated as described in Sections 4.4.3 and 4.4.4 of these TDP.

65.    **"Submitted Claim"** shall mean an Individual Claim that has been submitted to the Trust pursuant to these TDP.

66.    "**Submission Procedures**" shall mean the procedures developed and adopted by the Trustees, in conjunction with the Claims Administrator and Claims Processor, which

67.    **"TAC"** shall mean the Trust Advisory Committee that represents (i) the interests Existing Individual Claimants identified and (ii) the interests of the Payor, and ensures that these TDP are properly implemented and the Trust properly administered.

68.    **"Talc Personal Injury Claimant"** shall mean the holder of a Talc Personal Injury Claim.

69.    **"Trust"** shall mean the Talc Personal Injury Trust as defined in the Plan.

## Article 3
## TDP ADMINISTRATION

### 3.1    General Administration

#### 3.1.1    Coordination of Trustees, Claims Administrator & Claims Processor

The Trustees shall implement these TDP to resolve any and all existing and future Individual Claims pursuant to the Plan and Trust Agreement, with the assistance of the Claims Administrator and the Claims Processor.  Further, the Trustees, the Claims Administrator, and the Claims Processor shall consult and coordinate with each other to develop and implement administrative and background processes intended to (i) provide the Trustees with all information necessary to implement these TDP, (ii) streamline the submission procedures for Individual Claimants, (iii) ensure maximally efficient evaluation of the Individual Claims and the Reconsideration Requests, and (iv) promote prompt payment of Allowed Claims.

#### 3.1.2    Preparation of and Deadline for Distribution of Trust Rules and Submission Procedures

Within sixty (60) days following entry of the Confirmation Order, the Trustees shall (i) adopt and distribute detailed Submission Procedures required by these TDP to counsel for all known Existing Individual Claimants, and (ii) make such Submission Procedures publicly available on a website addressing the same.

To that end, immediately upon confirmation of the Plan, the Trustees, the Claims Administrator, and the Claims Processor shall coordinate with respect to the development and

finalization of the comprehensive platforms, systems, procedures, rules, documents, and actions necessary to implement these TDP.

### 3.1.3   Consent & Consultation with the Payor, the TAC, and the FCR

The Trustees shall administer the Trust and implement these TDP in consultation with the Payor, TAC, and the FCR.  Specifically, pursuant to the Plan, the Trust Agreement, and these TDP, the Trustees shall (i) obtain the consent of the Payor, the TAC, and the FCR with respect to any substantive amendment, change, or modification to these TDP, and on such other matters as are required herein or in the Trust Agreement; and (ii) consult and coordinate with the Claims Administrator and Claims Processor with respect to any proposed amendment, change, or modification that could significantly impact the submission, evaluation, and processing of Individual Claims.

In the event that consultation with or consent of the Payor, the TAC, and the FCR is required, the Trustees shall provide written notice to the Payor, the TAC, the FCR, the Claims Administrator, and the Claims Processor of the specific amendment, change, modification, or other action proposed.  The Trustees shall not implement any such proposed amendment, change, or modification, or take such other action unless and until the parties have engaged in the Consultation Process or the Consent Process described in the Trust Agreement.

## 3.2   <u>Appropriateness of Costs</u>

The Trustees shall seek to ensure that the costs incurred by the Trust with respect to evaluating and investigating the validity of the Claims Materials submitted by an Individual Claimant are necessary and reasonable in light of the expected benefit to the Trust.  Nothing herein, however, shall prevent the Trustees from either (i) contesting the validity of any Individual Claim, whatever the costs, or (ii) declining to accept the Claims Materials from sources determined to be deceptive, fraudulent, or otherwise unreliable.

The Trustees shall periodically, and at least annually, review the cost of evaluating and investigating the Submitted Claims and take steps to reduce such costs where feasible and appropriate, while still ensuring that the Trust's obligations pursuant to the Plan, the Trust Agreement, and these TDP are appropriately satisfied.

## 3.3   <u>Lien Resolution</u>

Upon completion of (i) the applicable evaluation process for each Allowed Claim, and (ii) resolution of any Reconsideration Request of the Claim Administrator's determinations, the Settlement Trust shall pay the final Allowed Claim Amount to a segregated account pending the satisfaction of liens and other administrative issues until final payment to the relevant Individual Claimant and/or his/her respective attorneys is made.  Subject to the terms of the Trust Agreement, ARCHER Systems LLC shall serve as the Lien Resolution Administrator, which among other things is responsible for the distribution of net proceeds for Allowed Claims to the appropriate Approved or Qualifying Claimants.

On or as soon as possible following the Effective Date, the Lien Resolution Administrator shall begin working to satisfy any and all known medical liens arising from or related to the

Ovarian Cancer Claims or the Mesothelioma Claims, with the goal of negotiating the satisfaction of any such liens and claims as to each Allowed Claim by the time the Trustees have finalized the relevant Allowed Claim Amount determined by the Claims Administrator. The Lien Resolution Administrator shall be responsible for the satisfaction of any and all known medical liens arising from or related to each Allowed Claim, and shall provide written verification of the same to the Debtor prior to distributing any portion of the Allowed Claim Amount from the Settlement Trust to the relevant Individual Claimant or his/her counsel. Following distribution of the net proceeds for an Allowed Claim (*i.e.*, the Allowed Claim Amount minus attorneys' fees and satisfaction of lien amounts), neither the Debtor nor any Payor shall bear any responsibility for payment of any Individual Claimant's liens.

**3.4**    **Trust Disclosure of Information**

Periodically, and at least annually, the Trust shall publish a report summarizing the Individual Claims resolved pursuant to these TDP, including breakdowns with respect to (i) the types of Individual Claim involved; (ii) application of the standard Qualification Process, Accelerated Evaluation Process, and/or any ADR Procedures described herein, and (iii) the average Allowed Claim Amounts by type of Individual Claim, specific category of injury within the Qualification Criteria and Accelerated Claim Criteria. The Trustees also shall provide the Payor, the TAC, and the FCR with (i) a more detailed version of the above-mentioned report that also includes breakdowns as to Claimant Jurisdiction and the law firm and/or attorneys representing Individual Claims submitted to the Trust, and (ii) detailed monthly status reports regarding the evaluation status of all Submitted Claims, as well as the valuation and payment status of all Approved Claims and Qualifying Claims for which Scheduled Values have been determined.

**3.5**    **Notice Requirements**

Following entry of the Confirmation Order, the Trustees shall coordinate with the Claims Administrator to develop formal procedures for providing notice to Individual Claimants of determinations made pursuant to these TDP, which shall be adopted by the Trust upon consent of the TAC and the FCR. Such notice procedures must include both hard copy and electronic methods of notice and incorporate the applicable notice deadlines as set forth in these TDP.

Individual Claimants shall be provided with notice pursuant to the notice requirements adopted by the Trust after any determination is made by either the Claims Administrator or Trustees with respect to Individual Claims. This includes the following: (i) determinations as to whether any Submitted Claim satisfied the Preliminary Evaluation Criteria; (ii) determinations as to whether any Confirmed Claim satisfies the required Qualification Criteria or Accelerated Claim Criteria, whichever is applicable; (iii) determinations as to whether or not any Individual Claim is an Allowed Claim; (iv) determinations as to the Scheduled Value and/or Allowed Claim Amount for an Individual Claim; and (v) determinations regarding the outcome of any Reconsideration Request.

3.6     **Auditing**

    3.6.1   **Cross-Trust Audit Program**

       The Trust, with the consent of the Payor, the TAC, and the FCR, shall develop a Cross-Trust Claims Audit Program, which shall include methods for auditing the reliability of medical evidence, as well as the reliability of evidence of usage of talc or talc-containing products for which the Trust has legal responsibility and the reliability of reporting on other asbestos exposure. This Cross-Trust Audit Program will be designed to compare Individual Claims submitted to the Trust against claims filed with any other bankruptcy trusts at the sole discretion of the Auditor (defined below), and is not limited in count to the number of bankruptcy trusts that are subject to the Cross Trust Claims Audit Program.  Further, as part of its coordination with other bankruptcy trusts the Trust shall fully comply with reasonable subpoenas served against it by other bankruptcy trusts or mass-tort trusts seeking to conduct a similar claim audit.

       By submitting an Individual Claim to the Trust, regardless of the treatment sought, an Individual Claimant shall be deemed to have affirmatively consented to (i) any release by the Trust of necessary and sufficient information sought either through the Cross-Trust Audit Program or in response to any subpoena served against the Trust; (ii) any release by any other bankruptcy or mass-tort trusts that participate in the Cross-Trust Audit Program or the Trust has served a subpoena on, to the entity overseeing the Cross-Trust Audit Program (the "Auditor") of all information submitted to such other trusts by or on behalf of the relevant Individual Claimant pursuant to the provisions of the Cross-Trust Audit Program, or subpoena, if applicable, and (ii) disclosure by or to the Auditor of the status, amount, and date of payment made with respect to the claim asserted or filed by the relevant Individual Claimant to the  Trust or any other bankruptcy or mass-tort trust.

       To the extent that the Trustees believe it is relevant, nothing herein shall preclude the Trust or the Auditor, in the Trustees' sole discretion, from reviewing or taking into consideration filed state or federal court complaints, available discovery from any such case, or other claims filed against other mass-tort trusts.  Any Individual Claimant subject to the Cross-Trust Audit Program shall cooperate with and provide the Trust with (i) any non-privileged information reasonably requested by the Trust, and (ii) upon request by the Trust, authorization to obtain from other mass tort trusts any information such claimant has provided to such other trusts.

    3.6.2   **Claims Audit Program**

       Separate from the Cross-Trust Audit Program, the Payor is authorized, but not required, under these TDP to design and implement its own annual Claims Audit Program, and to audit up to ten percent (10%) of the determinations by the Claims Administrator and/or Trustees with respect to any and all Individual Claims submitted to the Trust, which may be either based on 10% of the total universe of Submitted Claims, or be a stratified subset of claims of particular interest to the Payor.  Any Claims Audit Program pursuant to this Section shall be implemented by Barnes & Thornburg as the Payor's agent.  Except as otherwise detailed herein, the Payor has the sole discretion regarding whether and/or when to implement such Claims Audit Program.

### 3.6.3   Consequences of Audit Programs

In the event that an audit under either the Cross-Trust Audit Program or the Claims Audit Program reveals that deceptive or fraudulent information has been provided to the Trust, the Trust may penalize the relevant Individual Claimant and his/her counsel by (a), disallowing the relevant Individual Claim, (b) seeking to require the source of such deceptive or fraudulent information to reimburse the Payor for all costs incurred in connection with the audit and any future audit or audits, (c) reordering the priority of payment of all affected Individual Claimants, (d) placing reasonable restrictions, limitations, or affirmative requirements on Individual Claims submitted to the Trust in the future by Individual Claimants represented by such counsel, (e) subjecting all Individual Claims represented by the same counsel to audit, and (f) any other appropriate action, including seeking  sanctions.

Individual Claims determined to be subject to heightened scrutiny pursuant to any part of these TDP shall be considered to be automatically subject to audit under either the Cross-Trust Audit Program or the Claims Audit Program, or both.

### Article 4
### INDIVIDUAL CLAIMS ALLOWANCE PROCESS

## 4.1   General Principles

### 4.1.1   Recovery Only With Respect to a Single Individual Claim

An Individual Claimant may assert no more than one Individual Claim to the Trust, and may recover only in respect of such Individual Claim from the Trust, based on the Individual Claim asserted at the time he/she submitted the claim to the Trust.  For the avoidance of doubt, after submitting his/her claim to the Trust, an Individual Claimant may not allege or seek to assert an additional or different Individual Claim, with the exception that an Individual Claimant may at any time during the pendency of his/her claim, request that his/her Individual Claim be processed pursuant to the Accelerated Evaluation Process, as set forth in Section 4.4.4.

### 4.1.2   Treatment of Individual Claims Previously Resolved

#### A.   Individual Claims Previously Settled but Unpaid

If, prior to October 14, 2021, (i) an Individual Claimant submitted his/her Individual Claim to the Debtor and/or J&J for settlement consideration, and thereafter (ii) reached an agreement with Debtor and/or J&J to settle said Individual Claim at an amount certain, but (iii) the Debtor and/or J&J were unable to process the related transfer of settlement funds before October 14, 2021, then such Individual Claimant may choose to either: (i) submit his/her Individual Claim to the Trust for evaluation pursuant to the procedures set forth in these TDP; or (ii) agree to accept the amount certain that was previously agreed upon of his/her claim up to the Maximum Value allowed under these TDP.  In the event that an Individual Claim is submitted to the Trust pursuant to this Section, the prior settlement agreement shall be immediately deemed null and void and relevant Individual Claimant's right to recover pursuant to such prior agreement waived.

B.     **Individual Claims Previously Settled and Paid**

Any Individual Claimant that previously (i) reached a settlement with the Debtor or any of its predecessors related to an Individual Claim, (ii) settled in principle subject to a Master Settlement Agreement, (iii) submitted a release (with the exception of Individual Claims subject to the preceding Section 4.1.2(A)), or (iv) received payment with respect to Individual Claim his/her may not receive any additional payment from the Settlement Trust.  Further, any Individual Claim being submitted on behalf of or derivative of a previously released Individual Claimant may not receive any additional payment from the Settlement Trust. As part of the establishment of the Trust, the Debtor will provide the Trust and the Trustees with a list of all Individual Claimants subject to this Section, their Identifying Information, and basic settlement information.

C.     **Claims Previously Rejected or Dismissed**

Any individual who filed an Individual Claim in any state or federal court prior to October 14, 2021, which was thereafter dismissed with prejudice shall not be eligible to recover any payment whatsoever from the Trust.  Individual Claims which were filed before October 14, 2021, and thereafter either (i) dismissed without prejudice or (ii) rejected as ineligible under a Master Settlement Agreement may be submitted to the Trust for evaluation pursuant to these TDP, but shall be subject to heightened scrutiny by the Trustees and the Claims Administrator during their evaluation.

D.     **Claims Otherwise Subject to Final Judgment**

Any individual who filed an Individual Claim in any state or federal court, and whose Individual Claim was adjudicated and resulted in a final unfavorable judgment (*e.g.*, a defense verdict) shall not be eligible to recover any payment whatsoever from the Trust.

## 4.2    <u>Submission Deadlines</u>

### 4.2.1   Deadline to Submit Existing Individual Claims to Trust

Existing Individual Claimants must submit their Individual Claims to the Trust within one-hundred twenty (120) days of the Trust's distribution of its rules and submission procedures.  If an Individual Claimant fails to submit his/her Existing Individual Claim or seek a deferral pursuant to Section 4.3.3 within this time period, such Individual Claimant shall be deemed to have waived the right to submit his/her Existing Individual Claim or otherwise seek compensation from the Trust pursuant to these TDP.

### 4.2.2   Effect of Statutes of Limitations and Repose

A.     **Existing Individual Claims Previously Filed in Tort System**

For each Individual Claim submitted to the Trust that was filed in the tort system against the Debtor and/or a Protected Party prior to October 14, 2021, to be considered timely and therefore eligible to pursue compensation via the procedures set forth in Sections Article 4, the Individual Claim must have been timely filed pursuant to the applicable federal or state statutes of limitations and/or repose that were in effect at the time the related case was filed in the tort system.

- 13 -

### B.    Unfiled Existing Individual Claims

For each Existing Individual Claim submitted to the Trust that was not filed in the tort system against the Debtor, J&J, and/or a Protected Party prior to October 14, 2021, to be considered timely and therefore eligible to pursue compensation via the procedures set forth in Article 4, the Individual Claim must not be time-barred under the applicable federal or state statute of limitations and/or repose that are in effect at the time the Individual Claimant submits his/her Individual Claim to the Trust.  The applicable federal or state statute of limitations and/or repose shall be deemed to have begun running as of the date that J&J publicly announced the discontinuation of the sale of J&J Talc Products, which was May 19, 2020.

### C.    Tolling and Timeliness

#### (i)    Existing Individual Claims

The running of the applicable statute of limitations or repose shall be considered tolled as of the earliest of: (a) October 14, 2021; (b) the actual filing of a claim against Debtor, J&J, and/or a Protected Party in the tort system prior to the October 14, 2021; or (c) the date specified in any tolling agreement between the relevant Individual Claimant and the Debtor and/or J&J, provided such tolling was still in effect as of April 4, 2023.  Any Existing Individual Claim that meets any of these three tolling provisions shall be treated as timely filed so long as (i) the claim was not barred by the applicable federal or state statute of limitations or repose at the time of the relevant tolling event, and (ii) the Submitted Claim is submitted to the Trust within one hundred twenty (120) days after the Initial Filing Date.

#### (ii)    Future Individual Claims

Any Individual Claim involving a Date of Diagnosis after June 1, 2023, irrespective of the application of any relevant federal or state statute of limitations or repose, shall be treated as timely filed if it is submitted to the Trust within three (3) years after (i) the Initial Filing Date, or (ii) the relevant Date of Diagnosis, whichever is later.

## 4.3    Submission Procedures

### 4.3.1    FIFO Processing Queue

The Trust shall order all claims to be reviewed for processing purposes on a FIFO basis in the order each Claim Submission is received, except as otherwise provided herein. For all Individual Claims submitted to the Trust on or before the date that is one hundred and twenty (120) days after the Initial Filing Date, an Individual Claimant's position in the FIFO Processing Queue shall be determined based on the earliest of (i) the date prior to the Petition Date that the Individual Claimant filed a related case against Debtor, J&J, or any other Protected Party in the tort system; (ii) the date prior to the Petition Date that the Individual Claimant filed a related case against another defendant in the tort system, if at the time the related claim against was subject to a tolling agreement with Debtor or J&J; (iii) the date the Individual Claim is submitted to the Trust; (iv) the date after the Petition Date but before the Effective Date that a Proof of Claim was filed by the Individual Claimant against the Debtor in the Debtor's first chapter 11 case; and (v)  the date a

- 14 -

ballot was submitted on behalf of the Individual Claimant for purposes of voting to accept or reject the Plan pursuant to voting procedures approved by the Bankruptcy Court.

For all Individual Claims involving a Claim Submission submitted more than one hundred and twenty (120) days after the Initial Filing Date, an Individual Claimant's position in the FIFO Processing Queue shall be determined based on the date that the Individual Claim was properly and completely submitted to the Trust. If any Claim Submissions are filed on the same date, an Individual Claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day Claim Submissions shall be determined based on the alleged Date of Diagnosis for each, with the earlier Date of Diagnosis having priority over the later. In the unlikely event that two or more Individual Claims are submitted to the Trust on the same date and also have the same Date of Diagnosis, the Individual Claimant with the earliest date of birth shall receive priority in the FIFO Processing Queue over one with a later date of birth.

### 4.3.2    Withdrawal of Submitted Claims

An Individual Claimant may, at any time after submitting his/her Individual Claim to the Trust, withdraw his/her Submitted Claim, by providing written notice to the Trust. The related Individual Claimant shall retain the right to file a new Individual Claim after withdrawal of the first; however, any such subsequent Claim Submission shall be evaluated the same as a new Claim Submission and otherwise unrelated to the first, except that (i) it shall be subject to heightened scrutiny by Claim Administrator, Claim Processor, and Trustees, and (ii) the Individual Claimant's place in the FIFO Processing Queue shall be determined only based on most recent date that the Individual Claim was submitted to the Trust (*i.e.*, the Individual Claim is moved to the end of the queue).

### 4.3.3    Deferral of Submitted Claims

An Individual Claimant also may request that the Trust defer processing the his/her Submitted Claim (a "Deferral Request") so long as the Deferral Request (i) is made in writing pursuant to any procedures adopted by the Trust for such requests, and (ii) is made before the date the Trustees provides notice to the Individual Claimant either that his/her Submitted Claim is being disallowed, or that the Submitted Claim is an Allowed Claim and of the Scheduled Value proposed by the Claims Administrator.

The Trust may not defer any Submitted Claim for longer than two (2) years from the date the Individual Claim was submitted to the Trust, without such deferral affecting the status of the Submitted Claim for statute of limitations or repose purposes. Any Individual Claimant who makes a Deferral Request shall retain his/her original place in the applicable FIFO Processing Queue until the earliest of (i) his/her written request that the Trust end the deferral and proceed with processing the relevant Individual Claim, (ii) the expiration of the deferral, or (iii) two years after the date the deferred Individual Claim was originally submitted to the Trust.

### 4.3.4    Non-Responsive Individual Claimants

Except for those Individual Claimants who (i) hold Submitted Claims as a representative on behalf of a deceased or incompetent individual, and (ii) are required to obtain court approval before accepting any Scheduled Value proposed by Trust, Allowed Claimants shall have one

hundred eighty (180) days from the date an offer is made by the Trust to either accept, reject, or request reconsideration of the offer pursuant to the terms of Section 6.1. In the event that an Allowed Claimant fails to properly submit a Reconsideration Request or to provide written notice to the Trust of his/her acceptance or rejection of the Trust's offer, the Individual Claim shall be deemed rejected, and the Individual Claimant shall not retain any right to re-submit his/her Individual Claim or any other new Individual Claim to the Trust pursuant to these TDP or otherwise.

### 4.3.5    Submission Requirements

Any Individual Claimants who wishes to submit his/her respective Individual Claim to the Trust must satisfy the following applicable requirements with respect to the information and documentation required to prove that the Individual Claim should be allowed pursuant to these TDP. Regardless of the type of treatment sought, every Individual Claimant seeking compensation from the Trust must include the following at the time of submission:

    1)   <u>Citizenship/Residency</u>: Proof that the Individual Claimant (and, to any extent applicable, the minor, deceased, or incapacitated individual represented by such Individual Claimant) is a United States citizen, a lawful permanent resident of the United States, or a Canadian citizen;

    2)   <u>Claimant Information</u>: All claimant information required under the Submission Procedures adopted by the Trust (the "Claimant Information"), including but not limited to the Individual Claimant's Identifying Information.

    3)   <u>Proof of Claim</u>: A properly completed Form 410 (*i.e.*, Proof of Claim form)

    4)   <u>Claim Submission Form</u>: A properly completed Claim Submission Form (the template for which shall be attached to the Claim Submission Procedures adopted by the Trust);

    5)   <u>Retention Agreement</u>: To the extent the Individual Claimant is represented by counsel, a copy of the related retention agreement;

    6)   <u>Talc Use Evidence</u>: A sworn affidavit or other testimony establishing the Individual Claimant's use of any and all talc and talc-containing products (including J&J Talc Products) that the Individual Claimant reasonably believes is sufficient to satisfy the applicable Qualification Criteria or Accelerated Claim Criteria pursuant to these TDP;

    7)   <u>Lack of Asbestos Exposure:</u> In the case of a Mesothelioma Claim a sworn affidavit asserting the Mesothelioma Claimant does not allege any asbestos exposure unrelated to use of talc-based products; and

    8)   <u>Medical Evidence</u>: Medical records that the Individual Claimant reasonably believes is sufficient to (i) satisfy the applicable Qualification Criteria or Accelerated Claim Criteria pursuant to these TDP, and (ii) provide the Claims

Administrator with all information necessary to accurately determine the appropriate Scheduled Value and Allowed Claim Amount.

While the precise extent of medical records required by the above Submission Requirements may vary from claim to claim, as well as generally, depending on the particular types of Individual Claims involved, diseases alleged, and other factors relevant to the valuation of Individual Claims pursuant to these TDP, in general, production of all pathology reports and contemporaneous treatment records, along with records sufficient to establish an Individual Claimant's medical history, would be satisfactory for any Individual Claimant regardless of the type of Individual Claim asserted or Evaluation Track elected. However, medical evidence that does not include either a pathology report related to the Individual Claimant's alleged disease or treating physician's detailed report as to the Individual Claimant's pathologic diagnosis shall not be deemed satisfactory evidence to establish a Qualifying Claim. Individual Claimants who are unable to satisfy these requirements may, however, still be eligible to proceed under the Accelerated Evaluation Process.

Individual Claims that are substantially complete at the time of submission shall be deemed Submitted Claims and be subjected to the Preliminary Evaluation Process set forth below.

### 4.3.6   Disallowed Claims

In the event that an Individual Claimant submits materials that are clearly insufficient (as determined by the Claims Administrator) to satisfy the Submission Requirements, the Trustees shall provide notice of each deficiency to such Individual Claimant and automatically defer the related Submitted Claim for sixty (60) days (the "Deficiency Cure Period"), to ensure the Individual Claimant a fair opportunity to cure any such deficiencies. If the Individual Claimant fails to either supplement his/her Submitted Claim with materials sufficient to resolve any deficiencies identified, or respond to the deficiency notice requesting further relief, the Submitted Claim at issue shall be disallowed (the "Disallowed Claim") and the Trustees shall provide notice to the Individual Claimant of the same (the "Disallowed Claims Notice").

If the Trustees find that a Submitted Claim is a Disallowed Claim, the Trustees will not perform the analysis pursuant to the Qualification Evaluation Process described below in Section 4.4.4. Individual Claimants shall have the ability to seek reconsideration of the Trustees' determination set forth in the Disallowed Claim Notice as described in Article 6 herein.

### 4.4   Claim Evaluation Procedures

To determine whether each Individual Claim submitted to the Trust is either (i) legally valid and therefore should be allowed, or (ii) legally invalid and therefore should be disallowed, the Claims Administrator, in conjunction with the Claims Processor, shall act according to the following uniform procedures and guidelines to thoroughly and individually evaluate all related Claim Submissions.

### 4.4.1   FIFO Processing

Individual Claims shall be processed based on their place or places in the applicable FIFO Processing Queues based upon the election of an Evaluation Track. The Trust shall take all

- 17 -

reasonable steps to resolve Individual Claims as efficiently and expeditiously as possible at each stage of claims processing, including with respect to any Reconsideration Requests and/or ADR Procedures, which steps may include, in the Trust's sole discretion, conducting settlement discussions with Representatives with respect to more than one Individual Claim at a time, provided that the relevant Individual Claimants' respective positions in the applicable FIFO Processing Queues are maintained, and each Individual Claim is individually evaluated pursuant to the valuation factors set forth in Article 7.

### 4.4.2    Preliminary Evaluation of Claim Submissions

Within sixty (60) days of each Individual Claim being submitted to the Trust and thereby becoming a Submitted Claim, the Claims Administrator shall conduct a Preliminary Evaluation of the related Claim Submission to determine whether:

a)    the Submitted Claim was timely submitted to the Trust pursuant to Section 4.2;

b)    the Submitted Claim has not previously been submitted to the Trust pursuant to these TDP or otherwise (except for Individual Claims that were submitted and later formally withdrawn pursuant to Section 4.3.2);

c)    the Submitted Claim had not previously been resolved through litigation and/or settlement involving a Protected Party; and

d)    the Individual Claimant's Proof of Claim and Claim Submission are substantially and substantively completed and signed under penalty of perjury.

Submitted Claims that satisfy these four (4) preliminary criteria (the "Preliminary Evaluation Criteria") shall be deemed Confirmed Claims and thereafter routed to either the standard Qualification Evaluation Process or the Accelerated Evaluation Process, as elected by the Individual Claimant in his/her Claim Submission.  Submitted Claims that fail to satisfy one or more of the Preliminary Evaluation Criteria shall be disallowed and the Trust shall give notice to the Individual Claimant of the disallowance.

In the event that a Submitted Claim is disallowed because it was previously submitted to the Trust with different independent counsel, the Trust shall provide notice to the related Individual Claimant regarding the duplicative submission and such Claimant shall have thirty (30) days to submit to the Trust a certification signed by himself/herself, and both independent counsel who purported to represent the Individual Claimant for one of his/her Individual Submissions confirming which counsel shall be representing the Individual Claimant with respect to the original Submitted Claim and withdrawing any later Submitted Claim.  If the Individual Claimant satisfies this option, he/she may retain his/her place in the FIFO Processing Queue and the Individual Claim may proceed through the evaluation processes set forth in these TDP.  Failure to submit such certification shall result in (i) the original Submitted Claim being indefinitely deferred pending clarification from the Individual Claimant and his/her counsel as to who represents the Individual Claimant and (ii) any later Submitted Claim being deemed withdrawn.

### 4.4.3   General Principles for Evaluation of Confirmed Claims

For each Confirmed Claim, the Claims Administrator shall, in conjunction with the Claims Processor, individually evaluate the related Claim Submission pursuant to the Individual Claimant's selected Evaluation Track to determine whether the Individual Claim should be allowed.  Regardless of the Evaluation Track selected, this process shall involve (i) a thorough review and consideration of all the submitted Claims Materials, (ii) a full evaluation and determination as to the credibility of such evidence, and (iii) determination as to whether such evidence satisfies the substantive criteria for the applicable Evaluation Track.

If the Claims Administrator verifies that a Confirmed Claim (i) satisfies the applicable substantive criteria as set forth in this Section and (ii) the related Claim Materials are not deceptive or fraudulent, then the Confirmed Claim shall be deemed an Allowed Claim.  If, on the other hand, the Claims Administrator verifies that (i) the relevant Claim Materials are not deceptive or fraudulent, but (ii) the Confirmed Claim does not satisfy the applicable substantive criteria, then the Claims Administrator has the discretion to either (i) disallow the claim, or, (ii) alternatively, request supplemental evidence sufficient to resolve the deficiency from the Individual Claimant in question.

In the event, however, that the Claims Administrator determines that any portion of the Claims Materials are deceptive or include fraudulent information, then such Individual Claim shall be disallowed, and the Trustees shall provide the required notice of such disallowance to the related Individual Claimant.  Further, once any such disallowance becomes a final determination pursuant to these TDP, the Trust may subject counsel for that Individual Claimant, to the extent such counsel represents additional Individual Claimants that have submitted, or in the future submit, their Individual Claims to the Trust, to heightened scrutiny, limitations, and/or any other penalties the Trust determines are appropriate.

### 4.4.4   Standard Qualification Evaluation Process

For each Confirmed Claim electing to proceed under the standard Qualification Evaluation Process, the Claims Administrator shall, in conjunction with the Claims Processor, thoroughly review and evaluate the related Claim Submission to determine whether either the Ovarian Cancer Qualification Criteria or the Mesothelioma Qualification Criteria, as applicable, are satisfied.  If, in undertaking this Qualification Evaluation Process, the Claims Administrator determines that a Confirmed Claim satisfies the applicable Qualification Criteria, then such claim shall be deemed a Qualifying Claim and may proceed to the valuation processes set forth in these TDP.  Individual Claimants who do not satisfy the applicable Qualification Criteria are non-qualifying claims under these TDP and shall be disallowed.

### A.      Ovarian Cancer Qualification Criteria

Individual Claimants who submit to the Trust an Ovarian Cancer Claim and satisfy the following three (3) Ovarian Cancer Qualification Criteria shall be deemed Qualifying Ovarian Cancer Claimants.  Ovarian Cancer Claims that fail to satisfy these criteria are non-qualifying claims under these TDP and shall be disallowed.

1) <u>Proof of Regular Perineal Use of J&J Talc Products</u>: the Individual Claimant consistently used J&J Talc Products in her perineal area after puberty for a minimum of four (4) consecutive years (*i.e.*, "Regular Perineal Use"), and proves as much via sworn testimony or affidavit, including the alleged dates of first and last use;

2) <u>Proof of Injury</u>: the Individual Claimant was newly diagnosed with a Ovarian Cancer at least ten (10) years following her first post-pubertal perineal use of J&J Talc Products; and

3) <u>Timeliness</u>: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2.

### B.    Mesothelioma Qualification Criteria

Individual Claimants who submit to the Trust a Mesothelioma Claim and satisfy the following three (3) Mesothelioma Qualification Criteria shall be deemed Qualifying Mesothelioma Claimants.  Mesothelioma Claims that fail to satisfy these criteria are non-qualifying claims under these TDP and shall be disallowed.

1) <u>Proof of Use of J&J Talc Products</u>: the Individual Claimant was consistently used J&J Talc Products for a minimum of four (4) consecutive years (*i.e.*, "Regular Use"), and proves as much via sworn testimony or affidavit;

2) <u>Lack of Asbestos Exposure</u>: the Individual Claimant has no known history of exposure to asbestos and does not allege any asbestos exposure unrelated to use of talc-based products;

3) <u>Proof of Injury</u>: the Individual Claimant was newly diagnosed with malignant Mesothelioma (either pleural [except WDPM], peritoneal, pericardial or testicular) at least ten years following his/her first use of J&J Talc Products; and

4) <u>Timeliness</u>: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2.

### 4.4.5    Accelerated Evaluation Process

### A.    In General

For each Confirmed Claim electing to proceed under the Accelerated Evaluation Process, the Claims Administrator shall, in conjunction with the Claims Processor and with a focus on efficiency, review and evaluate the related Claim Submission to determine whether the Accelerated Evaluation Criteria are satisfied.  If in doing so the Claims Administrator determines that a Confirmed Claim satisfies the Accelerated Criteria, then such claim shall be deemed an Approved Claim.

### B.    Accelerated Claims Criteria

Individual Claimants who submit to the Trust an Other Talc Claim and satisfy the following three (3) Accelerated Claims Criteria shall be deemed Other Approved Claimants:

1)  <u>Proof of Use of J&J Talc Products</u>: the Individual Claimant was consistently exposed to J&J Talc Products for a minimum of four (4) consecutive years (*i.e.*, "Regular Use"), and proves as much via sworn testimony or affidavit;

2)  <u>Lack of Asbestos Exposure</u>: the Individual Claimant has no known history of exposure to asbestos and does not allege any asbestos exposure unrelated to use of talc-based products;

3)  <u>Proof of Injury</u>: the Individual Claimant was newly diagnosed with a Gynecological Cancer, Ovarian Cancer, or Mesothelioma at least ten years following his/her first use of J&J Talc Products; and

4)  <u>Timeliness</u>: the Individual Claim was timely filed pursuant to the submission deadlines set forth in Section 4.2.

## Article 5
## VALUATION OF ALLOWED CLAIMS

### 5.1    In General

The Claims Administrator, in conjunction with the Claims Processor, shall identify and utilize the appropriate multi-stage valuation process, as described in this Article, to determine the Scheduled Value for every Allowed Claim under these TDP. These valuation processes specifically are intended to be a direct continuation of the resolution process for Individual Claimants, immediately upon determination of allowance pursuant to the standard Qualification Evaluation Process or the Accelerated Evaluation Process. Promptly after determination of each Allowed Claim's Scheduled Value, the Trustees shall notify the related Individual Claimant of (i) the determination that his/her Individual Claim is either a Qualifying Claim or Other Approved Claim and (ii) the Scheduled Value determined as to the same pursuant to Sections 5.2 and 5.3, below.

### 5.2    Determination of Scheduled Values for Qualifying Claims

#### 5.2.1   Qualifying Ovarian Cancer Claims

Upon determination that an Ovarian Cancer Claim submitted to the Trust is a Qualifying Claim, the Claims Administrator, in conjunction with the Claims Processor, shall undertake the following seven (7) stage valuation process for any such Ovarian Cancer Claim that elected evaluation under the Qualification Evaluation Process. This process requires the Claims Administrator:

1)   To identify the initial Point Value based on the Individual Claimant's age at diagnosis and specific category of injury; then

2)   To adjust that initial Point Value based on diagnostic disease subtypes; then

3)   To further adjust that Point Value based on the length of use of J&J Talc Products, if applicable; then

4)   To reduce that Point Value based on the length of time between the end of the Individual Claimant's Regular Use and the relevant date of diagnosis, if applicable; then

5)   To further adjust that Point Value based on the frequency of use of J&J Talc Products, if applicable; then

6)   To further adjust that Point Value by a certain percentage discount based on the existence of certain risk factors, if applicable; and finally

7)   To further adjust the resulting Point Value based on the extent of the Individual Claimant's use of non-J&J Talc Products, if applicable

Gynecologic Claims other than Ovarian Cancer claims shall only be eligible to receive a Point Value based on the Accelerated Evaluation Process.

### A.   Initial Point Values

The Initial Point Value for Qualifying Ovarian Cancer Claims, prior to the application of any of the listed adjustments will be determined based on the Individual Claimant's age at diagnosis and stage of cancer as detailed below:

| Age at Diagnosis (in years) | Stage IV OR Related Death | Stage III (with recurrence) | Stage III (no recurrence) OR Stage I-II (with recurrence) | Stage II | Stage I |
|---|---|---|---|---|---|
| Under 45 | 260,000 | 230,000 | 150,000 | 90,000 | 25,000 |
| 45-49 | 230,000 | 200,000 | 140,000 | 80,000 | 20,000 |
| 50-54 | 200,000 | 180,000 | 130,000 | 75,000 | 17,500 |
| 55-59 | 180,000 | 150,000 | 120,000 | 65,000 | 12,500 |
| 60-64 | 140,000 | 115,000 | 80,000 | 50,000 | 10,000 |
| 65-69 | 100,000 | 80,000 | 50,000 | 40,000 | 7,500 |
| 70+ | 65,000 | 50,000 | 40,000 | 25,000 | 5,000 |

### B.   Point Value Adjustment Factors

Each Individual Claimant's initial Point Value will then be adjusted by a series of multiplicative factors to determine the Claim-specific Point Value.

- 22 -

The standard Point Value for all claims is the value of a qualifying serous carcinoma (*i.e.*, "100%"), and claims of other types are treated as being worth a percentage of whatever that standard Point Value is.

| Ovarian Cancer Diagnostic Subtypes | Point Value (as a percentage of a qualifying serous carcinoma) |
|---|---|
| Serous Carcinoma | 100% |
| Endometrioid Carcinoma | 90% |
| Clear Cell Carcinoma | 75% |
| Mixed Epithelial Carcinoma | See below |
|   – Each subtype identified is a qualifying subtype (*e.g.*, serous with clear cell) | 100% |
|   – Primary subtype is a qualifying subtype (*i.e.*, serous, endometrioid, clear cell) but other subtypes are non-qualifying (*e.g.*, serous with mucinous) | 65% |
| Undifferentiated Epithelial Carcinoma | 100% |
| Ovarian Carcinoma with Epithelial Component of Unknown or Unidentified Subtype (*e.g.*, "ovarian adenocarcinoma") | 50% |
| Borderline Ovarian Tumors with Serous, Endometrioid, or Clear Cell Subtypes | 30% |

### C.    Talc Use and Risk Factor Reductions

(i)    Step I Reductions:  Length of J&J Talc Use

The Claim-specific Point Value established by the above process shall be adjusted based on the length of time an Individual Claimant regularly used J&J Talc Products.  Specifically, the Claim-specific Point Value shall be reduced proportional to the Years of Regular Perineal J&J Talc Use relative to the Maximum Years of Regular Perineal J&J Talc Use.  For purposes of this valuation process, "Years of Regular Perineal J&J Talc Use" shall be defined as the lesser of (i) the number of full years of Regular Perineal J&J Talc Use after the Individual Claimant reached puberty[1], or (ii) 40 years.  Similarly, the Maximum Years of Regular Perineal J&J Talc Use is defined as the lesser of (i) 40 years or (ii) the number of years elapsed between puberty and the Individual Claimant's Date of Diagnosis.

$$Reduction\ of\ Point\ Value = 1 - \frac{(Years\ of\ Regular\ Perineal\ J\&J\ Talc\ Use\ )}{(Maximum\ Years\ of\ Regular\ Perineal\ J\&J\ Talc\ Use\ )}$$

This reduction factor shall be referred to as the "Length of Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

---

[1] For purposes of evaluating claims pursuant to these TDP, an Individual Claimant shall be assumed to have reached puberty on her thirteenth birthday.

(ii)  Step II Reductions:  Time Since Last Use

Next, the Claim-specific Point Value shall be further adjusted based on the length of time between the Individual Claimant's last daily perineal use of J&J Talc Products and Date of Diagnosis, as set forth in the following table:

| Time Since Last Regular Use | Reduction of Point Value |
|---|---|
| 0 to <5 years since last daily use | 0% |
| 5 to <30 years since last daily use | 2% per year[2] |
| 30+ years since last daily use | 55% |

This reduction factor shall be referred to as the "Time Since Last Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

(iii)  Step III Reductions:  Less than Regular Use

Next, the Claim-specific Point Value as established by the other factors shall be further reduced by the Less Than Daily Use Factor if Individual Claimant's use of J&J Talc Products is less frequent than daily. The Less Than Daily Use Factor is based on the relative frequency with which the Individual Claimant used J&J Talc Products through his/her years of use and will be calculated based on the table below:

| Frequency of Regular Use | Reduction of Point Value |
|---|---|
| Daily Use | 0% |
| Weekly Use | 50% |
| Monthly Use | 95% |

This reduction factor shall be referred to as the "Less Than Daily Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

(iv)  Step IV Reductions:  Medical Risk Factors

Next, the Pre-Risk Point Value as established by above process shall be further reduced based on the Individual Claimant's family history and genetic predisposition to Ovarian Cancer, based on the table below.  Only the greatest of the reductions for applicable Step IV risk factors shall apply.  For avoidance of doubt, discounts within this factor itself are not cumulative (i.e., if a claimant has BRCA 1 as well as a family history of ovarian cancer, the total reduction is 45%, not 80%).

| Risk Factor | Reduction of Point Value |
|---|---|
| BRCA 1 or BRCA 2 | 45% |
| Family Hx of ovarian cancer (in 1st degree relative) | 35% |

---

[2] For avoidance of doubt, an Individual Claimant who was diagnosed with a qualifying disease 11 years after her last Regular Use of J&J Talc Products would be subject to a discount of $(11 - 5) \times 2\% = 12\%$.

- 24 -

| | |
|---|---|
| Personal or family history (in 1st degree relative) of colon or breast cancer | 20% |

This reduction factor shall be referred to as the "Medical Risk Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

(v)     Step V Reductions:  Non-J&J Talc Use

Next, the Point Value established by the above process shall be further reduced based on an Individual Claimant's Regular Perineal Use of Non-J&J Talc Products (if applicable and established by affidavit or legal pleadings).

| Discounts | Reduction of Point Value |
|---|---|
| Other Talc Use (applies only if Individual Claimant regularly used a non-J&J Talc Product in her perineal area for a period of greater than 4 years) | 25% (increasing to the total percentage of other non-J&J Talc Product use in pleadings or affidavit) |

This reduction factor shall be referred to as the "Non-J&J Talc Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

**D.     Scheduled Value**

Each Individual Claimant's Scheduled Value shall be determined based on his/her Claim-specific Point Value as adjusted by each of the reduction factors described in Steps I–V, as follows:

$$Scheduled\ Value$$
$$= (Initial\ Point\ Value) \times (Diagnostic\ Adjustment)$$
$$\times (1 - J\&J\ Talc\ Use\ Factor\ Reduction)$$
$$\times (1 - Time\ Since\ Last\ Use\ Factor\ Reduction)$$
$$\times (1 - Less\ Than\ Daily\ Use\ Factor\ Reduction)$$
$$\times (1 - Medical\ Risk\ Factor\ Reduction)$$
$$\times (1 - Non\ J\&J\ Talc\ Use\ Factor\ Reduction)$$

The Scheduled Value shall not exceed the Maximum Value, and shall not be less than 1,000 points.  In the event that this valuation process results in an amount above the Maximum Value, the Scheduled Value for the Individual Claimant shall be equal to the Maximum Value.  Likewise, if this valuation process results in an amount below 1,000 points, then the Scheduled Value shall be equal to 1,000 points.

**5.2.2   Qualifying Mesothelioma Claims**

Upon determination that an Individual Claim submitted to the Trust is a Qualifying Mesothelioma Claim, the Claims Administrator, in conjunction with the Claims Processor, shall undertake the following five (5) stage valuation process for any such Mesothelioma Claim that elected evaluation under the Qualification Evaluation Process.  This process requires the Claims Administrator:

1) To identify the initial Point Value based on the Individual Claimant's age at diagnosis; then

2) To adjust that initial Point Value based on diagnostic disease subtypes; then

3) To further adjust that Point Value based on length of use of J&J Talc Products, if applicable; then

4) To reduce that Point Value based on the frequency of use of J&J Talc Products, if applicable; and finally

5) To further adjust the resulting Point Value based on the extent of the Individual Claimant's use of non-J&J Talc Products, if applicable.

### A. Initial Point Value

The initial Point Value for Qualifying Mesothelioma Claims, prior to the application of any of the listed adjustments will be determined based on the Individual Claimant's age at diagnosis as detailed below:

| Age at Diagnosis | Mesothelioma |
|---|---|
| Under 45 | 500,000 |
| 45-49 | 450,000 |
| 50-54 | 400,000 |
| 55-59 | 350,000 |
| 60-64 | 300,000 |
| 65-69 | 200,000 |
| 70+ | 100,000 |

### B. Point Value Adjustment Factors

Each Qualifying Mesothelioma Claimant's Point Value will then be adjusted by a series of multiplicative factors to determine the appropriate Claim-specific Point Value.

The standard Point Value for all Qualifying Mesothelioma Claims is the value of a qualifying pleural mesothelioma (*i.e.*, "100%"), and claims of other types are treated as being worth a percentage of whatever that standard Point Value is.

| Diagnostic Subtypes | Point Value (as a percentage of a qualifying Pleural Mesothelioma) |
|---|---|
| Pleural Mesothelioma (non-WDPM) | 100% |
| Peritoneal Mesothelioma | 75% |
| Pericardial Mesothelioma | 10% |
| Testicular Mesothelioma | 10% |

### C.    Talc Use & Risk Factor Reductions

(i)    Step I Reductions:  J&J Talc Use

The Claim-specific Point Value established by the above process shall be adjusted based on the length of time an Individual Claimant regularly used J&J Talc Products.  Specifically, the Claim-specific Point Value shall be reduced proportional to the Years of Regular J&J Talc Use relative to the Maximum Years of Regular J&J Talc Use.  For purposes of this valuation process, "Years of Regular J&J Talc Use" shall be defined as the lesser of (i) the number of full years of Regular J&J Talc Use after the Individual Claimant reached puberty[3], or (ii) 40 years.  Similarly, the Maximum Years of Regular J&J Talc Use is defined as the lesser of (i) 40 years or (ii) the number of years elapsed between puberty and the Individual Claimant's Date of Diagnosis.

$$Reduction\ of\ Point\ Value = 1 - \frac{(Years\ of\ Regular\ J\&J\ Talc\ Use)}{(Maximum\ Years\ of\ J\&J\ Talc\ Use)}$$

The J&J Talc Use Reduction of Point Value factor shall not exceed 1.0, and shall not be less than 0.0.

(ii)    Step II Reductions:  Less than Regular Use

Next, the Claim-specific Point Value as established by the other factors shall be further reduced if the Individual Claimant's use of J&J Talc Products is less frequent than daily based on the relative frequency with which the Individual Claimant used J&J Talc Products through his/her years of use and will be calculated based on the table below:

| Frequency of Regular Use | Reduction of Point Value |
|---|---|
| Daily Use | 0% |
| Weekly Use | 50% |
| Monthly Use | 95% |

This reduction factor shall be referred to as the "Less Than Daily Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

(iii)    Step III Reductions:  Non-J&J Talc Use

Next, the Point Value established by the above process shall be further reduced based on an Individual Claimant's Regular Use of Non-J&J Talc Products (if applicable and established by affidavit or legal pleadings).

| Discounts | Reduction of Point Value |
|---|---|
| Other Talc Use | 25%<br>(increasing to the total percentage of other talcum powder use in pleadings or affidavit) |

---

[3] For purposes of evaluating claims pursuant to these TDP, an Individual Claimant shall be assumed to have reached puberty on her thirteenth birthday.

This reduction factor shall be referred to as the "Non-J&J Talc Use Factor" and, as defined, cannot be less than 0.0 or exceed 1.0.

### D.    Scheduled Value

Each Individual Claimant's Scheduled Value shall be determined based on his/her Claim-specific Point Value as adjusted by each of the reduction factors described in Steps I–III, as follows:

$$\begin{aligned} Scheduled\ Value \\ = (Initial\ Point\ Value) \times (Diagnostic\ Adjustment) \\ \times (1 - J\&J\ Talc\ Use\ Factor\ Reduction) \\ \times (1 - Less\ Than\ Daily\ Use\ Factor\ Reduction) \\ \times (1 - Non\ J\&J\ Talc\ Use\ Factor\ Reduction) \end{aligned}$$

The Scheduled Value shall not exceed the Maximum Value, and shall not be less than 1,000 points.  In the event that this valuation process results in an amount above the Maximum Value, the Scheduled Value for the Individual Claimant shall be equal to the Maximum Value.  Likewise, if this valuation process results in an amount below 1,000 points, then the Scheduled Value shall be equal to 1,000 points.

## 5.3    Scheduled Values for Approved Accelerated Claims

Upon determination that an Individual Claim submitted to the Trust is an Other Approved Claim, the Claims Administrator, in conjunction with the Claims Processor, shall determine the Scheduled Value for any such Other Approved Claim, as follows:

### 5.3.1    Individual Claims Which Could Have Appropriately Elected to Proceed Under the Qualification Evaluation Process

If an Individual Claimant could have appropriately elected to submit his/her Individual Claim to the Trust pursuant to the standard Qualification Evaluation Process, but for whatever reason chose to instead elect the Accelerated Evaluation Process, the resulting Other Approved Claim shall have a Scheduled Value of 1,000 points.

### 5.3.2    Canadian Claims

Other Approved Claims that involve an Individual Claimant who is not a citizen or legal permanent resident of the United States, but who is a citizen or legal permanent resident of Canada, shall have a Scheduled Value of 500 points.

### 5.3.3    Other Allegedly Talc-Related Diseases

Other Approved Claims that involve an Individual Claimant who was diagnosed with Mesothelioma or Ovarian Cancer but nonetheless elected to proceed via the Accelerated Evaluation Process shall have a Scheduled Value of 500 points.

## Article 6
## RECONSIDERATION REQUESTS & ADR PROCEDURES

### 6.1    Reconsideration of Determination

#### 6.1.1    Requirements for Reconsideration Requests

An Individual Claimant may submit a request to the Trust that the Trustees reconsider any initial determination (a "Reconsideration Request") (i) that the Individual Claimant's Submitted Claim is a Disallowed Claim (regardless of the stage of the resolution process pursuant to these TDP that this determination occurred), or (ii) of the applicable Scheduled Value for the relevant Allowed Claim.  Each Reconsideration Request must include:

a)    A completed Reconsideration Form, the template for which shall be designed and adopted by the Trustees and included as an Exhibit to the Submission Procedures;

b)    Payment of five hundred dollars ($500) as an administrative reconsideration fee, in the form of either check, money order, or via any electronic payment process deemed acceptable by the Trustees; and

c)    At the requesting Individual Claimant's discretion, further evidence in support of the relevant Submitted Claim.

#### 6.1.2    Forfeiture of Right to Request Reconsideration

Individual Claimants found to have submitted deceptive or fraudulent information or documents to the Trust shall be deemed to have forfeit their right to request reconsideration pursuant to these TDP.  Similarly, where the Trust has determined that deceptive or fraudulent information was submitted in support of an Individual Claim, counsel for that Individual Claimant at the time of such submission shall be deemed to have forfeit the right for other Individual Claimants also represented by the same counsel to request reconsideration pursuant to these TDP.[4]

#### 6.1.3    Failure to Request Reconsideration Deemed Acceptance

The deadline to submit a Reconsideration Request shall be fifteen (15) days after written notice of the determination at issue is given pursuant to these TDP.  Any Individual Claimant who fails to properly submit a Reconsideration Request to the Trust within this fifteen (15) deadline shall be deemed to accept the original determination of the Claims Administrator, which determination shall become final and non-appealable.

---

[4] As an exception to this provision, where an Individual Claimant's counsel was unaware that information or documents later determined to be deceptive or fraudulent were included in the Individual Claimant's submissions to the Trust, and is the party responsible for discovering the deception or fraudulent nature of the submissions, brings the deception or fraudulent information to the attention of the Trust, and withdraws representation of said Individual Claimant, the counsel at issue shall not be deemed to have forfeit future rights to request reconsideration for other Individual Claimants.

### 6.1.4   Reconsideration Request Procedures

Upon receipt of a properly submitted Reconsideration Request, the Trustees shall proceed with an independent evaluation of the Individual Claim and specific determination in question. Within fifteen (15) days of receiving a Reconsideration Request, the Trustees shall provide written notice to the requesting Individual Claimant as to the outcome of the Trustees' independent evaluation, which may either be to maintain or revise the Claims Administrator's original determination or, alternatively to request supplemental information and/or materials necessary to reach a final conclusion.

The Trustees' decision to affirm or revise the Claims Administrator's original determination shall be binding and non-appealable. To the extent that the Trustees determine that a Submitted Claim is, upon reconsideration, an Allowed Claim or should receive a higher proposed Scheduled Value, the Trustees shall return the administrative fee to the relevant Individual Claimant. If, however, the Trustees decide that no change to the Claims Administrator's original determination is warranted, that the Allowed Claim should receive a lower proposed Scheduled Value, or that insufficient information was provided by the Individual Claimant to reach a different conclusion at the time, then the administrative fee shall not be returned. Only in the event that the Trustees affirm the original determination at issue shall the requesting Individual Claimant pursue any further remedy pursuant to the ADR Procedures set forth below.

## 6.2   <u>Post-Reconsideration Litigation</u>

Individual Claimants who have exhausted their Reconsideration Request rights pursuant to Section 6.1 shall retain the right to institute a lawsuit in the tort system against the Trust in the Claimant's Jurisdiction, as defined by these TDP. Such lawsuit may not name the Debtor, Payor, or any Protected Party and must only be filed against the Trust as defendant. Any such lawsuit must be filed by the Individual Claimant in his/her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. Both the Individual Claimant and the Trust shall have all appropriate defenses available to them (including, with respect to the Trust, all defenses which could have been asserted by any Protected Party). Further, the Trust may use any and all information and/or materials submitted to the Trust by the Individual Claimant in its defense of any lawsuit in the tort system, including evidence of deceptive or fraudulent behavior. In the event that the Individual Claimant does not prevail at trial or prevails but is awarded a judgment less than the Allowed Claim amount offered by the Trust, the Individual Claimant shall be responsible for reimbursing the Trust for all attorney fees and costs the Trust incurred in defending against the Individual Claimant's lawsuit.

In the event an Individual Claimant elects to pursue a lawsuit pursuant to this Section which results, after waiver and/or exhaustion of any party's rights of appeal, in a final judgment for monetary damages, then such Individual Claimant shall be eligible for payment of the portion of such judgment that constitutes compensatory damages through the Trust, up to the Maximum Amount for such Individual Claim pursuant to these TDP. Payment of such judgment shall be processed in the same manner as payments made to Individual Claimants who accepted the Claims Administrator's original Scheduled Value determined and proposed for their Allowed Claims, pursuant to Section Article 5, except that upon reaching the front of the FIFO Processing Queue, the Settlement Trust shall distribute to the Individual Claimant only an initial payment equal to

Trust's last offer, if any, to the Individual Claimant (provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system). The balance of the judgment, up to the Maximum Value for the Individual Claim, if any, shall be paid to the Individual Claimant in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment. Under no circumstances shall any non-compensatory monetary damages or any interest be paid under any statute on any judgments obtained in the tort system.

## Article 7
## INDIVIDUAL CLAIMS PAYMENT PROCESS

**7.1** **Points-Based Monetary Values**

**7.1.1** **Uncertainty of Debtor's Talc Liabilities**

Litigation arising from the use of talc or talc-containing products is a relatively new mass tort and there is inherent uncertainty regarding the aggregate value of the Debtor's total talc-related liabilities. As a result of this uncertainty, in undertaking to ensure substantially equitable treatment of all similar Existing and Future Claims, the Trustees must from time to time determine the per-point dollar value of the points used to value Individual Claims under these TDP (the "Point Value").

**7.1.2** **Description & Application of Points Valuation System**

**A.** **In General**

Promptly after the Trust is established, the Trustees, with the consent of the Payor, the TAC, and the FCR, shall establish an initial Point Value for Individual Claims (the "Initial Point Value"). This Initial Point Value shall be calculated on the basis of the initial trust claim submissions, an estimate of future submissions, and the claim valuation procedures outlined in these TDP. The Trust was established with the goal of achieving a Point Value of one dollar ($1) per point and the Debtors believe the Initial Point Value will be between fifty cents ($0.50) and two dollars ($2) per point. Given the uncertainty associated with Individual Claims, and in recognition of the fact that the Trust may increase the Point Value in the future, the Trust shall take a conservative posture in setting the Initial Point Value, and may set a separate Point Value for Mesothelioma and Ovarian Cancer claims.

The totality of the Individual Claims to be paid over time pursuant to these TDP is not certain. In particular, the number and type of Existing Claims, as well as the stage, age, and other key characteristics, are still unknown at this time. The Claim Submissions will provide information on these factors for Existing Claims which will allow the Trust to better assess the Point Value that can be paid for each awarded point. Further, there is also some uncertainty surrounding the value of the Trust's assets in the future. If the value of the Trust's future assets increases materially and/or if the value or volume of Individual Claims actually filed with the Trust is materially lower than originally estimated, the Trust shall use the increase in Trust assets available first to maintain the Point Value then in effect.

### B.    Supplemental Payments Owed Due to Increases to the Point Value

If the Trustees, after consultation with the TAC and the Payor, and with the consent of the FCR, determines that an increase to the Point Value is warranted due to a material change in the estimates of the Trust's future assets and/or liabilities, the Trustees shall also make supplemental payments to Individual Claimants and Indirect Claimants who previously liquidated their Allowed Claims against the Trust and received payments based on a lower Point Value; provided, however, that no additional supplemental payments will be made to any Individual Claimant who previously has already received one such supplemental payment.  The amount of any supplemental payment shall be the liquidated value of the Allowed Claim in question multiplied by the newly adjusted Point Value, less all amounts previously paid by the Settlement Trust with respect to that Allowed Claim.

The Settlement Trust's obligation to make a supplemental payment to any Individual Claimant shall be suspended in the event the payment in question would be less than one hundred dollars and zero cents ($100.00), and the amount of the suspended payment shall be added to the amount of any prior supplemental payment(s) also suspended because they would have been less than one hundred dollars and zero cents ($100.00).  The Settlement Trust's obligation to make a previously suspended supplemental payment shall resume when the payment in question is equal to or greater than one hundred dollars and zero cents ($100.00).

### C.    Determination of Value

The Trustees shall base its determination of the Point Value on (i) current estimates as to the number, types, and Scheduled Values determined for Existing Claims and Future Claims,  (ii) the value of the assets available to the Trust for payment of Allowed Claims, (iii) all anticipated administrative and legal expenses, and any other matters that are reasonably likely to affect the sufficiency of funds to pay on an equal application of the TDP methodology to all Existing Claimants and Future Claimants based on the points awarded to each Individual Claimant.  When making these determinations, the Trustees shall evaluate all relevant factors to determine a conservative Point Value with the goal of assuring that the Trust will be able to treat all similar Existing and Future Claims in a similar manner.

The Point Value shall be subject to change pursuant to the terms of these TDP and the Talc Personal Injury Trust Agreement.  The Trustees shall review the then-applicable Point Value as it deems necessary to assure that it is based on accurate, current information, and shall compare the liability forecast on which the then-applicable Point Value was based with the actual claims submission and payment experience of the Trust to date, and the projected assets of the Trust on which the then-applicable Point Value was based with the current assets, and any updated projections of asset values, of the Trust and Future Claims.  If the results of the comparisons call into question the ability of the Trust to rely upon the current liability and asset forecasts, the Trustees may, if necessary, propose a change in the Point Value. Any change is the Point Value must be approved by the TAC, the FCR, and the Payor.

**7.2**     <u>**General Guidelines for Liquidating & Paying Allowed Claims**</u>

**7.2.1   Documentation Requirements**

**A.        Acceptance & Release**

Individual Claimants who decide to accept an offer of payment from the Trust based on the proposed Scheduled Values for their Allowed Claims shall complete and execute the applicable acceptance and release form to be adopted by the Trust with the consent of the TAC and FCR (the "Acceptance and Release").  The standard Acceptance and Release form provided to Qualifying Claimants and Other Approved Claimants shall include a release of all claims against Debtor, which is discharged, the Payor, and the Protected Parties, to the extent any such claims arise from or are related to the accepting Individual Claimant's alleged use of J&J Talc Products and resulting injury.  The Acceptance and Release form shall be filed as a supplemental exhibit to these TDP prior to the Initial Filing Date and included with in the distribution of the Submission Procedures, As an exception, however, the Acceptance and Release form provided to Individual Claimants seeking payment of a judgment obtained in the tort system pursuant to the procedures described in Section 6.2 of these TDP shall explicitly provide that the Individual Claimant is releasing the Trust's liability in respect of other Protected Parties.  The applicable Acceptance and Release shall be available for completion electronically and may be executed by the accepting Individual Claimant or his/her legal Representative via Adobe Sign or DocuSign, or a similar authorized electronic signature program, or such other simplified and expedient means that the Trust, with the consent of the TAC and FCR, may adopt.

**B.        Documents Establishing Legal Representation**

Individual Claimants asserting an Individual Claim on behalf of a minor, incapacitated, or deceased person, must, before any funds related to such Allowed Claim may be distributed from the Settlement Trust, submit to the Trust appropriate documentation confirming the Allowed Claimant's legal authority to resolve the Individual Claim on behalf of the minor, incapacitated, or the deceased person and his/her estate.

**7.2.2   Offsets**

The Trust shall have the right to offset or reduce payment of an Allowed Claim Amount, on a dollar for dollar basis based on any amounts paid, agreed upon, or reasonably likely to be paid to the relevant Individual Claimant on account of his/her Individual Claim as against a Protected Party (or that reduces the liability thereof under applicable law) from any source other than the Trust.

**7.3**     <u>**Payment of Claims**</u>

**7.3.1   Allowed Claim Amounts Held in Escrow**

Promptly upon receipt of an Individual Claimant's properly executed Acceptance and Release, the final Allowed Claim Amount for the released Allowed Claim shall be set aside and held in escrow within the Settlement Trust pending the final resolution of various administrative issues involving the resolution of the Individual Claim including, but not limited to issues related

to probate, guardianship, personal bankruptcy filings, lien resolution issues, and duplicate sign-up issues.

### 7.3.2 Payment of Allowed Claims

Once all applicable administrative issues related to an Individual Claimant's acceptance of his/her Allowed Claim Amount are resolved, the Trustees shall transfer to the Individual Claimant his/her Net Award Amount (*i.e.*, the total Allowed Claim Amount, less amounts required to satisfy liens and less any attorney's fees and litigation expenses born by the Individual Claimant's counsel.

### 7.3.3 Payment of Legal Fees

Pursuant to these TDP, for any Individual Claimants represented by independent counsel, payment of contingency fees to such independent counsel shall be 25% of the Allowed Claim Amount, unless the Individual Claimant or his/her counsel submits materials to the Trust documenting a contingency fee arrangement of less than 25%, in which case attorney's fees paid to counsel shall be the documented percent of the Allowed Claim Amount. The remainder of the Allowed Claim Amount (generally 75%), less any amount required for payment of the Individual Claimant's liens, shall be paid directly to the Individual Claimant. The intent of allowing attorney's fees at 25% is to maximize the amount of funds available to pay Individual Claimants. For any Individual Claimants representing themselves on a pro-se basis who accept an Allowed Claim Amount offered by the Trust, 100% of the Allowed Claim Amount, less any funds required for payment of liens, shall be paid directly to the Individual Claimant.

The Trust, however, recognizes that Existing Claimants with a Date of Diagnosis prior to the Petition Date may have contracted with their counsel for contingency fee payments in excess of 25%. Accordingly, in the event that counsel for such Existing Claimants produces a valid contingency fee agreement entered into with the relevant Individual Claimant prior to the Petition Date with a contracted upon contingency rate above 25%, the Trust shall honor the such prior fee arrangement. Under no circumstances, however, shall any counsel for an Individual Claim involving a Date of Diagnosis postdating the Petition Date be paid a contingency fee in excess of 25% of the Liquidated Value of the claim.

Attorneys seeking to represent Individual Claimants are or should be aware of this cap when agreeing to represent such Individual Claimants. Notably, in light of these TDP procedures and the proposed trust funding, the representation of Future Claims is subject to different (lesser) risk than the representation of Existing Claims.

For those Individual Claimants represented by counsel with respect to their Allowed Claims, the Settlement Trust shall only pay attorneys' fees or expenses to the attorneys and/or law firms named in the Individual Claimants' client retention agreements with their counsel. For avoidance of doubt, no payments may be made to any attorney not specifically identified on such agreement. Further, this Plan and these TDP do not contemplate any common benefit fund obligations for Allowed Claim Amounts paid by the Settlement Trust. As such, no common benefit fees or costs shall be deducted from Allowed Claim Amounts or paid by the Settlement

Trust, regardless of whether the Allowed Claim Amount was awarded via the procedures set forth in the TDP or outside of the bankruptcy, via the tort system.

**7.4      Payment Processing**

**7.4.1      FIFO Payment Processing**

Individual Claims that have been liquidated in accordance with the terms herein shall be paid from the Settlement Trust in FIFO order based on the date that they accepted an offer from the Trust and their liquidation became final, all such payments being subject to the applicable, the applicable Maximum Payment, and sequencing adjustment provided for in below, and as otherwise provided herein (the "FIFO Payment Queue").

For those Individual Claimants who (i) hold Qualifying Claims or Other Approved Claims as a representative on behalf of a deceased or incompetent individual, and (ii) are required to obtain court or other probate approval before accepting any Scheduled Value proposed by Trust, the Individual Claim shall retain its position in the FIFO Payment Queue so long as the as proceedings to obtain such approval remain pending, and provided that the Individual Claimant has provided the Trust with evidence that the proposed Allowed Claim Amount has been submitted to such court or in that probate process for approval.  If the Individual Claimant ultimately obtains the required court or probate approval and a properly completed Acceptance and Release is submitted to the Trust, the Settlement Trust shall pay the Allowed Claim Amount offered, accepted, and approved.

In the event that any Allowed Claims are liquidated on the same date, each Individual Claimant's position in the applicable FIFO Payment Queue shall be determined by his/her relevant Date of Diagnosis, with the earlier diagnosis having priority over the later diagnosis.  In the unlikely event that any Allowed Claims are liquidated on the same date and also have the same relevant Date of Diagnosis, those Individual Claimants' positions in the FIFO Payment Queue shall be determined by the Trust based on the such Individual Claimants' dates of births, with older claimants given priority over younger claimants.

**7.4.2      Discretion to Vary the Order & Amounts of Payments in Event of Limited Liquidity**

Consistent with the provisions hereof and subject to the FIFO Processing Queue, FIFO Payment Queue, and applicable Maximum Payments, the Trustees shall proceed as quickly as possible to liquidate Allowed Claims and shall promptly make payments to relevant Individual Claimants in accordance with these TDP on an ongoing basis, as funds become available and as Individual Claims are liquidated, while maintaining sufficient resources to pay Future Claimants who submit Individual Claims that are determined to be Allowed Claims in substantially the same manner.

Because the Trust's assets and liabilities over time remain uncertain, and decisions about payments must be based on estimates that cannot be made precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to Individual Claimants.  The Trustees shall, however, use their best efforts to treat similar Individual Claims in substantially the same manner, consistent with their duties as Trustees, the

- 35 -

purposes of the Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Trust faces issues with respect to liquidity, the Trustees may, with the consent of the Payor, the TAC, and the FCR, (a) suspend the normal order of payment, or (b) temporarily limit or suspend payments altogether.

## 7.5     Punitive Damages

In determining the value of any liquidated or unliquidated Individual Claim, punitive or exemplary damages (*i.e.*, damages other than compensatory damages) shall not be considered or allowed, notwithstanding their availability in the tort system.  Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Trust in the tort system pursuant to Article 6 herein.

### Article 8
### RESOLUTION OF GOVERNMENTAL ACTION CLAIMS

## 8.1     Governmental Action Claims Are Subject to These TDP

Each holder of a Governmental Action Claim which (a) prior to the Petition Date, filed a lawsuit against the Debtor or its predecessor asserting a Governmental Action Claim or (ii) filed a Proof of Claim asserting a Governmental Action Claim by the Claims Bar Date (each a "Governmental Holder" and collectively, the "Governmental Holders") shall participate in these TDP.  The Claims Administrator shall have the right at any time to request additional information from any Governmental Holder regarding its Governmental Action Claims.  Notwithstanding the foregoing, the Governmental Action Claims of the State of New Mexico or the State of Mississippi shall receive the treatment the applicable State agrees to with the Debtor prior to the entry of the Confirmation Order.  If no such agreement is reached in respect of such State's Governmental Action Claim, the Governmental Action Claim shall be liquidated and paid pursuant to these TDP.

## 8.2     Settlement Offer and Negotiations

The Claims Administrator shall make a written or oral offer to settle the Governmental Holder's Governmental Action Claim (a "Settlement Offer").  The offer shall be made to counsel for the Governmental Holder or, if no counsel has been identified, the Governmental Holder.

After a Governmental Holder has received a Settlement Offer, the Governmental Holder shall contact the Claims Administrator and provide a written or oral response to the Settlement Offer (the "Response").  The Governmental Holder may accept or reject the Settlement Offer or make a counteroffer.  In the event the Governmental Holder declines to accept the Settlement Offer, the Governmental Holder and the Claims Administrator shall engage in good faith negotiations regarding the Governmental Action Claim.

If the Governmental Holder accepts the Settlement Offer or the Claims Administrator and the Governmental Holder otherwise reach agreement on the amount of the Governmental Holder's Governmental Action Claim (in either case, the "Settlement Amount"), the Governmental Action

Claim shall be fixed at the Settlement Amount and the Talc Personal Injury Governmental Action Claims Sub-Trust shall pay the Settlement Amount in full to the Governmental Holder.

If the parties are unable to reach agreement pursuant to the procedures in this Section 8.2, the Governmental Holder 's Governmental Action Claim shall be referred to mediation.

## 8.3    Mediation

A Governmental Holder 's Governmental Action Claim shall be referred to mediation if the Claims Administrator and the Governmental Holder are unable to reach agreement pursuant to the procedures set forth in Section 8.2 of these TDP.

A mediator (the "Mediator") shall be jointly chosen by the Claims Administrator and the Governmental Holder.  If the parties are unable to reach agreement regarding the Mediator, the Governmental Holder 's Governmental Action Claim shall either, at the option of the Governmental Holder, (i) be referred to arbitration as provided in Section 8.4 of these TDP or (ii) proceed to litigation as provided in Section 8.5 of these TDP.

The Mediator will work with the Claims Administrator and the Governmental Holder to reach a settlement of the Governmental Action Claim that is mutually acceptable to both parties. The Mediator shall not have the authority to unilaterally impose a settlement upon the parties.  The Governmental Holder and the Claims Administrator shall each pay one half of the fees and expenses, including legal fees, incurred by the Mediator.  The parties shall otherwise bear their own costs, including legal fees.

If the mediation results in a settlement agreement, the Talc Personal Injury Governmental Action Claims Sub-Trust shall pay the Settlement Amount in full to the Governmental Holder.  If the mediation concludes with no settlement, the Governmental Holder shall elect to either (i) participate in binding arbitration pursuant to Section 8.4 of these TDP or (ii) proceed to litigation pursuant to Section 8.5 of these TDP.

## 8.4    Arbitration

A Governmental Action Claim may be referred to binding arbitration as provided in Section 8.3 of these TDP and at the option of the Governmental Holder.

If a Governmental Holder's Governmental Action Claim is referred to arbitration, an arbitrator (the "Arbitrator") shall be jointly chosen by the Claims Administrator and the Governmental Holder.  If the parties are unable to reach agreement regarding the Arbitrator, the a Governmental Holder's Governmental Action Claim shall proceed to litigation as provided in Section 8.5 of these TDP.

The arbitration shall be governed by the Federal Arbitration Act, Title 9, United States Code.  The Arbitrator shall determine the amount of the Government Holder's Governmental Action Claim.  Unless otherwise agreed by the parties, the arbitration shall be conducted pursuant to the dispute resolution procedures for commercial claims of the American Arbitration Association, as currently in effect and appropriate.  The Governmental Holder and the Claims

Administrator shall each pay one-half of the fees and expenses, including legal fees incurred by the Arbitrator.  The parties shall otherwise bear their own costs, including legal fees.

The amount of the Governmental Holder's Governmental Action Claim awarded by the Arbitrator (the "Arbitration Award") shall be binding and determined by the Arbitrator, in their discretion.  In no event shall the Arbitration Award include any punitive or exemplary damages.  Neither party shall have the right to appeal the Arbitration Award except on the grounds set forth in the Federal Arbitration Act.  There will be no right to a trial de novo.  Once the Arbitration Award is final and non-appealable, the Talc Personal Injury Governmental Action Claims Sub-Trust shall pay the Arbitration Award in full to the Governmental Holder.

## 8.5    Litigation

Any Governmental Holder that elects to litigate their Governmental Action Claims pursuant to the procedures in this Section 8.5 of these TDP, or is otherwise required to litigate its Governmental Action Claim pursuant to Section 8.4 of these TDP, shall have the right to institute a lawsuit against the Trust in:  (i) the District Court for the District of New Jersey (the "District Court"); or (ii) if Governmental Holder commenced litigation against the Debtor prior to the Petition Date and that litigation remains pending on the Effective Date, at the option of the Governmental Holder, in the District Court or the United States District Court in the jurisdiction in which the pre-petition litigation is pending.  All defenses, which include all defenses that could have been asserted by the Debtor, shall be available to the Talc Personal Injury Trust at trial.

The court adjudicating the Governmental Action Claims shall determine the Debtor's liability for the Governmental Action Claims and shall not consider or allow punitive or exemplary damages.  Once any Governmental Action Claims is litigated to a final, non-appealable judgment in accordance with this Section 8.5, the Talc Personal Injury Governmental Action Claims Sub-Trust shall pay the judgment in full to the Governmental Holder.  The Governmental Holder shall be responsible for its fees and costs, including legal fees.  The Governmental Holder shall also be responsible for the fees and costs, including legal fees, incurred in the litigation by the Claims Administrator if the amount of the final non-appealable judgment is less than the last Settlement Offer made to Governmental Holder by the Claims Administrator.

## 8.6    Statute of Limitations & Repose

To be eligible for payment pursuant to these TDP, a Governmental Holder must have either (i) prior to the Petition Date, filed a lawsuit against the Debtor or its predecessor asserting a Governmental Action Claim or (ii) submitted a Proof of Claim asserting a Governmental Action Claim by the Bar Date, in either case prior to the expiration of any applicable statute of limitations or repose as such statute may have been tolled pursuant to section 108 of the Bankruptcy Code.  At any time during the administration of these TDP, including during arbitration or litigation, the Claims Administrator may agree to a settlement with a Governmental Holder.

## Article 9
## MISCELLANEOUS

### 9.1 Non-Binding Effect of Trust and/or Litigation Outcome

Notwithstanding any other provision of these TDP, the Trust's determination to pay or not to pay any claim shall not be binding in, or have any *res judicata*, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against the Debtor, the Protected Parties, or any other entity other than the Trust. Nor shall the outcome of litigation against the Debtor by the holder of an Indemnified Claim be used in, admissible as evidence in, binding in, or have any other preclusive effect in connection with the Trust's resolution or valuation of an Indemnified Claim.

### 9.2 Independence of Trust

Except as otherwise specifically stated herein, neither the Debtor nor the Payor shall have any rights or involvement whatsoever in the Trust. Neither the Debtor nor the Payor are a third-party beneficiary of the Trust or these TDP, and nothing herein creates any rights or obligations that may give rise to a claim or cause of action by the Debtor or the Payor against the Trust or any Talc Personal Injury Claimant.

### 9.3 Amendments

Except as otherwise provided herein, the Trustees may not amend, modify, delete, or add to any provisions of these TDP, without the written consent of the Payor, the TAC, and the FCR. Nothing herein is intended to preclude the Payor, the TAC, or the FCR from proposing to the Trustees, in writing, amendments to these TDP. For the avoidance of doubt, these TDP may not be amended to alter the allocation of the assets of the Trust between or among Funds.

### 9.4 Severability

Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

### 9.5 Governing Law

Except for purposes of determining the liquidated value of any Talc Personal Injury Claim, administration of these TDP shall be governed by, and construed in accordance with, the laws of the State of New Jersey. The review and evaluation of Individual Claims under these TDP and the law governing mediation, arbitration, or litigation in the tort system shall be the law of the jurisdiction in which the Individual Claimant could have filed a lawsuit alleging an Individual Claim under applicable law.