**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Email: krosen@lowenstein.com

**WHITE & CASE LLP**
Jessica C. Lauria, Esq.
Gregory Starner, Esq.
Joshua D. Weedman, Esq.
Samuel P. Hershey, Esq.
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email:  jessica.lauria@whitecase.com
        gstarner@whitecase.com
        jweedman@whitecase.com
        sam.hershey@whitecase.com

**WHITE & CASE LLP**
Matthew E. Linder, Esq.
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mlinder@whitecase.com

*Co-Counsel to Johnson & Johnson and Johnson &*
*Johnson Holdco (NA) Inc.*

| | |
|---|---|
| In re | Chapter 11 |
| LTL MANAGEMENT LLC, [1] | Case No. 23-12825 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

### J&J PARTIES' MOTION FOR ENTRY OF A PROTECTIVE ORDER

Johnson & Johnson ("J&J"), and Johnson & Johnson Holdco (NA) Inc. ("Holdco")

(together, the "J&J Parties") hereby submit this motion (the "Motion") for entry of a protective

---

[1]   The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George
      Street, New Brunswick, New Jersey 08933.

order precluding the Official Committee of Talc Claimants (the "TCC") from seeking discovery

relating to the Consumer Health Transactions (as defined herein), which the TCC purports to seek

in connection with its *Motion of the Official Committee of Talc Claimants to Dismiss the Second*

*Bankruptcy Petition of LTL Management, LLC* [Dkt. No. 286-1] ("TCC Motion to Dismiss"). In

support of this Motion, the J&J Parties respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      This motion is brought to foreclose purely harassing demands for irrelevant

disclosures made by the TCC on the J&J Parties, the Debtor, and non-parties, through subpoenas

that the TCC surreptitiously served without requisite notice to the Debtor and the J&J Parties.

2.      In its latest effort to prop up purely conjectural (and meritless) fraudulent transfer

claims against the J&J Parties and LTL Management LLC (the "Debtor" or "LTL"), the TCC seeks

overbroad and burdensome discovery regarding the transfer of the consumer health business from

Holdco's predecessor company, Johnson & Johnson Consumer Inc., and the separate spin-off of

Kenvue Inc. (together, the "Consumer Health Transactions"). Specifically, under the guise of

purportedly appraising LTL's "financial distress" in connection with the TCC's Motion to

Dismiss, and despite informing this Court less than a month ago that no new discovery was

necessary in connection with its motion, the TCC served broad discovery requests on the J&J

Parties and LTL, a Rule 30(b)(6) deposition notice on Holdco, and issued six non-party subpoenas

to certain banks, rating agencies, and a PR firm, all seeking broad discovery regarding the

Consumer Health Transactions (collectively, the "Consumer Health Transaction Discovery").

There is no plausible link between the issues relevant to the Motion to Dismiss and the requested

discovery about the Consumer Health Transactions, and the TCC should not be permitted to take

2

wide-ranging discovery for putative fraudulent transfer claims that are not before this Court, and that the TCC lacks standing to bring.

3.    As established at the motion to dismiss hearing in LTL's first bankruptcy case ("*LTL I*"), the Consumer Health Transactions are completely separate from—and have no relationship to—LTL's bankruptcy filings.  In fact, the Consumer Health Transactions were planned years before the *LTL I* filing, and the consumer business assets previously held by Holdco were transferred to the new consumer business entity months before LTL's second bankruptcy filing and, indeed, before the Third Circuit issued its decision dismissing LTL's first bankruptcy case on January 30, 2023.

4.    The Consumer Health Transactions thus have no bearing on the merits of the pending motions to dismiss.  As the TCC recognizes in the TCC Motion to Dismiss, the relevant inquiry under Third Circuit law is whether LTL was in financial distress when it filed its Chapter 11 petition in this case (*LTL II*).  That inquiry requires the Court to consider LTL's liabilities and the value of the assets available to LTL *at the time it filed LTL II*.  Such assets include the current funding agreement (the "2023 Funding Agreement"), which obligates Holdco to provide funding to LTL to satisfy LTL's talc-related liability under a Supported Plan (as defined in the 2023 Funding Agreement) to the extent LTL does not have sufficient cash to pay those costs and expenses.  The TCC has requested, and is being provided, discovery regarding the 2023 Funding Agreement and Holdco's assets as of the *LTL II* filing, which the TCC acknowledges were valued at about $30 billion.  Discovery regarding the consumer assets that are no longer held by Holdco is irrelevant and inappropriate, and would serve only to burden the J&J Parties and distract from the core issues in dispute.

5.      In an effort to engineer relevance, the TCC contends that the requested discovery is pertinent to its yet-to-be-allowed claims that the J&J Parties engaged in a fraudulent conveyance to "fabricate" financial distress.  Not only is this thinly veiled attempt to obtain a premature adjudication of fraudulent conveyance claims for which it lacks standing highly inappropriate, but it is also legally and factually without merit.  As a matter of law, the relevant inquiry on a motion to dismiss for "bad faith" is the debtor's status at the time of the filing.  And where, as here, the alleged bad faith pertains to a purported lack of financial distress, the Third Circuit has made clear (and the TCC has acknowledged) that the relevant inquiry on a motion to dismiss is financial distress and does not include assets that were not available to the Debtor at the time it filed for bankruptcy.  As noted, the record also demonstrates that the Consumer Health Transactions were long planned separately from LTL's bankruptcy filing, and the consumer health business was transferred out of Holdco *before* the Third Circuit dismissed LTL's first bankruptcy, which set the stage for LTL's subsequent filing of this proceeding.

6.      Even if this was the time to adjudicate a fraudulent transfer claim (it is not), the TCC does not need (and is not entitled to) the Consumer Health Transaction Discovery to do so. In addition to its own assets, LTL's recourse to pay talc-related claims—before and after the pending bankruptcy case was filed—was and is governed by its funding-related agreements with the J&J Parties.  The intent, purpose, and plain terms of those agreements were and are to commit the J&J Parties to fund LTL's talc-related claims through a chapter 11 reorganization proceeding. As a predicate for its fraudulent conveyance allegations, the TCC itself asserts that it is those funding-related agreements that effectively entitled LTL to receive $61 billion before the filing and $30 billion after.  Those allegations ignore the express cap on LTL's recourse under the funding-related agreements to the amount of its aggregate liability on the talc-related claims, which

under any rational analysis is less than either amount. Regardless, it is those agreements themselves that are relevant—not the assets of the consumer business that is now an independent company.

7.      The TCC's effort to obtain sweeping Consumer Health Transaction Discovery is also contrary to its prior representations to this Court. The TCC represented to this Court that it "does not believe *that any sweeping new discovery is necessary* at this point given the high degree of overlap between the issues that were litigated on the Preliminary Injunction Motion and those that are relevant to the pending Motion to Dismiss." *See* Letter from the TCC to Judge Kaplan, dated April 28, 2023 [Dkt. No. 345], at 2 (emphasis added). However, having filed a standing motion to pursue fraudulent transfer claims against the J&J Parties and the Debtor, the TCC reversed course and is now seeking sweeping discovery that it previously represented is not needed. This is no coincidence, and the TCC's attempt to seek discovery regarding fraudulent transfer claims that it has not obtained standing to bring is inappropriate and should not be permitted.

8.      In short, the TCC's attempt to seek broad discovery beyond the scope of the TCC Motion to Dismiss to harass and burden the parties (and many non-parties) should not be permitted. This Court should decline to allow the TCC to engage in a costly fishing expedition that goes far beyond the issues relevant to the TCC Motion to Dismiss and is designed only to get discovery regarding putative fraudulent transfer claims the TCC has no basis or standing to assert. The Court should issue a protective order precluding the Consumer Health Transaction Discovery.

## JURISDICTION AND VENUE

9.      The United States Bankruptcy Court for the District of New Jersey has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Standing Order of Reference to

the Bankruptcy Court Under Title 11 of the United States District Court for the District of New

Jersey, dated September 18, 2012 (Simandle, C.J.).  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b).

10.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

11.    The relief requested herein is authorized by Rules 26, 34, and 45 of the Federal

Rules of Civil Procedure (the "Federal Rules") and Rules 2004, 7026, 7034, 9014, and 9016 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9016 of the Local

Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## BACKGROUND

12.    On November 12, 2021, J&J publicly announced its intent to separate its consumer

health business into a new, publicly traded company that was "better positioned to deliver

improved health outcomes for patients and consumers through innovation, pursue more targeted

business strategies, and accelerate growth." *See* Ex. 1 (Press Release, Johnson & Johnson, Johnson

& Johnson Announces Plans to Accelerate Innovation, Serve Patients and Consumers, and Unlock

Value through Intent to Separate Consumer Health Business (Nov. 12, 2021)).[2]  The long-planned

separation would allow J&J to focus on biopharmaceutical and medical device innovation and

technology, while the new company would focus on at-home and consumer health care.  In short,

the strategy was to divide and conquer the market.  *See id*.

13.    That same day, J&J explained that it expected the planned Consumer Health

Transactions would be completed in 18 to 24 months.  *Id*.  Consistent with that timeline, by January

2023, the consumer health care business formerly within Holdco was transferred to Kenvue Inc.,

a newly-created and separate entity from J&J or Holdco.  *See, e.g*., Kenvue Inc., Registration

---

[2]    https://www.jnj.com/johnson-johnson-announces-plans-to-accelerate-innovation-serve-patients-and-consumers-
and-unlock-value-through-intent-to-separate-consumer-health-business.

Statement Under the Securities Act of 1933 (Form S-1) (Jan. 4, 2023); Michael Hytha, *J&J Files to Spin-Off Consumer-Health Business as Kenvue*, Bloomberg, Jan. 4, 2023, Bloomberg.[3]

14.     As the record from *LTL I* made clear, the Consumer Health Transactions were distinct from, and contemplated long before, LTL's first bankruptcy filing on October 14, 2021. It was also put in place long before the Third Circuit issued its decision dismissing LTL's initial bankruptcy petition on January 30, 2023.

15.     For example, LTL's Chief Legal Officer, John Kim, testified that the team handling LTL's bankruptcy "had no involvement, never knew about this spin-off . . . that was done wholly separately . . . there was no overlap between . . . us doing this [bankruptcy] and the spin-off." Transcript of Hearing at 147:1-10, *In re LTL Management LLC.*, No. 21-30589 (MBK) (Bankr. D.N.J. Feb. 16, 2022) [Dkt. 1494]; *see also* Transcript of Hearing at 79:23-24, *In re LTL Management LLC.*, No. 21-30589 (MBK) (Bankr. D.N.J. Feb. 17, 2022) [Dkt. 1518] ("They're separate transactions…and one had nothing to do with the other.")

16.     Similarly, Thibaut Mongon, the former Worldwide Chairman of Consumer Health of J&J and current Chief Executive Officer of Kenvue, Inc., testified that LTL's bankruptcy and the Consumer Health Transactions were "two distinct projects" with two different objectives. Transcript of Hearing at 30:4-13, *In re LTL Management LLC.*, No. 21-30589 (MBK) (Bankr. D.N.J. Feb. 16, 2022) [Dkt. 1494].  Additionally, Michelle Ryan, the former Treasurer of J&J, stated during her deposition in *LTL I* that the first time she heard of the proposed Consumer Health Transactions was May 2019, and that the transactions had been analyzed by the company for "quite a while." *See* Ex. 2, Excerpt of Deposition Tr. of Michelle Ryan, at 295:25-296:5 ("Q: When was

---

[3]    https://www.bloomberg.com/news/articles/2023-01-04/j-j-files-to-spin-off-its-consumer-health-business-as-kenvue#xj4y7vzkg.

the first time you heard of the proposed spin-off? A: May 2019.").  Thus, the Consumer Health

Transactions were contemplated long before even LTL's first bankruptcy filing.

17.    Despite uncontroverted evidence that the Consumer Health Transactions were

entirely unrelated to LTL and LTL's first or second bankruptcy filing, and despite the TCC's

representation to this Court just one month ago that it would not seek "any sweeping new

discovery," the TCC issued the Consumer Health Transaction Discovery, purportedly in

connection with the TCC Motion to Dismiss, seeking broad discovery about the Consumer Health

Transactions from the J&J Parties, LTL and multiple non-parties.  In particular, the TCC has

sought: (i) the production of all documents "concerning the transfer of the Holdco 'Consumer

Business' assets to its parent company in 2023"and any documents related to the Consumer Health

Transactions, and (ii) the Rule 30(b)(6) deposition of a J&J corporate representative regarding the

"early January 2023 transfer by Holdco of its Consumer Business assets to its parent entity."  *See*

Ex. 3 (TCC 30(b)(6) Deposition Notice to J&J); Ex. 4 (TCC Requests for Production to J&J), at

12 (RFP 9); Ex. 5 (TCC Requests for Production to Debtor), at 13 (RFP 9).  The TCC has also

made clear during meet and confers that it intends to question the J&J Parties' and LTL witnesses

about the Consumer Health Transactions.  Additionally, the TCC has issued subpoenas to six non-

parties (three banks, two rating agencies, and a PR firm) (collectively, the "Consumer Health

Transaction Subpoenas") requesting, among other things, the production of "all documents"

regarding the Consumer Health Transactions.[4]  The Consumer Health Transaction Subpoenas seek

---

[4] The subpoenas were issued to AllianceBernstein L.P., Goldman Sachs, Joele Frank Wilkinson Brimmer Katcher, JP Morgan, Moody's Investors Service, Inc., and S&P Global Inc.  The TCC failed to timely notify the J&J Parties that it had even served the Consumer Health Transaction Subpoenas and the J&J Parties only became aware of the Consumer Health Transaction Subpoenas from one of the recipients.  This conduct violates Fed. R. Civ. P. 45(a)(4), made applicable to this proceeding by Fed. R. Bankr. P. 9016, which required the TCC to serve "a notice and a copy of the subpoena" on the J&J Parties and the Debtor "*before* it is served on the person to whom it is directed." Fed. R. Civ. P. 45(a)(4) (emphasis added).

expansive discovery from those non-parties, including requests for "all documents and communications" concerning the Consumer Health Transactions, Kenvue, and the Kenvue IPO. *See* Ex. 6 (Consumer Health Transaction Subpoenas), at Ex. A, 9-10.

18.     The Consumer Health Transaction Discovery goes well beyond the scope of any relevant issues for the TCC Motion to Dismiss and is a backdoor attempt to seek discovery regarding the TCC's proposed fraudulent transfer claims against the J&J Parties and the Debtor. *See Motion of Official Committee of Talc Claimants for Entry of An Order, Pursuant to Bankruptcy Code Sections 1103 (c) and 1109(b), Granting Exclusive Leave, Standing, and Authority to Commence, Prosecute, and if Appropriate, Settle Certain Causes of Action on Behalf of Debtor's Estate* [Dkt No. 489].   The Court should not permit the TCC's broad, harassing demands for irrelevant disclosures.

## RELIEF REQUESTED

19.     By this Motion, the J&J Parties seek entry of a protective order precluding the TCC from seeking discovery relating to the Consumer Health Transactions.

## LEGAL STANDARD

20.     Pursuant to Fed. R. Civ. P. 26(c), made applicable to this proceeding by Fed. R. Bankr. P. 7026, the Court may issue a protective order for good cause "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). The Court may do so by, *inter alia*, (1) "forbidding the disclosure or discovery"; (2) "specifying terms . . . for the disclosure or discovery"; and (3) "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(A)-(D); *see also In re Faiella*, No. 05-50986 (RTL), Adversary Proceeding Case No. 07-1470 (RTL), 2008 Bankr. LEXIS, at *11 n.2 (Bankr. D.N.J. Apr. 18, 2008) ("A court resolving a discovery dispute on the ground of relevance must . . . focus on the specific claim or defense

alleged in the pleadings. . . . [This] means that the fact must be germane to a specific claim or defense asserted in the pleadings for information concerning it to be a proper subject of discovery.")

21.    Courts may consider several factors in evaluating whether "good cause" exists for a protective order, including: "whether the information is being sought for a legitimate purpose or for an improper purpose," and "whether the sharing of information among litigants will promote fairness and efficiency." *Glenmede Tr. Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995); *see also Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787–88 (3d Cir. 1994).  Further, because a party cannot "subpoena irrelevant documents in a case with impunity," "a party can move for a protective order in regard to a subpoena issued to a non-party which seeks irrelevant information." *Costantino v. City of Atl.*, No. 13-6667, 2015 U.S. Dist. LEXIS 183876, at *9-10 (D.N.J. Nov. 4, 2015); *see also Aetrex Worldwide, Inc. v. Burten Distrib.,* No. 13-1140 (SRC), 2014 U.S. Dist. LEXIS 172857, at *12 (D.N.J. Dec. 12, 2014) (recognizing a party has standing under Rule 26 to move for a protective order to enjoin the production of irrelevant information for subpoenas issued to non-parties).

## ARGUMENT

22.    The TCC seeks broad discovery concerning the Consumer Health Transactions that is not germane to the TCC's Motion to Dismiss and improperly seeks discovery regarding putative fraudulent transfer claims that the TCC has no basis or standing to assert.

23.    As the TCC acknowledges in the TCC Motion to Dismiss, the relevant inquiry on the pending motions to dismiss is whether LTL filed its bankruptcy petition in good faith, and more specifically, whether LTL was in financial distress when it filed its chapter 11 petition. *See* TCC Mot. to Dismiss at 22 ("As this Court recognized in its April 20 ruling, the question posed by the Third Circuit is whether LTL was in financial distress when it filed its Chapter 11 petition");

10

*see also id.* ("Critically, however, the question is not whether LTL's condition worsened between October 2021 and April 2023 – but rather whether LTL can meet its burden to establish that as of April 2023 it was in immediate financial distress under the standards set forth by the Third Circuit for this particular debtor."). That inquiry turns on LTL's assets and liabilities at the time it filed for bankruptcy. *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 106 (3d Cir. 2023) (evaluating whether "LTL was in financial distress when it filed its Chapter 11 petition."). The relevant assets include the current funding agreement (the 2023 Funding Agreement), which, pursuant to its terms, obligates Holdco to provide funding to LTL to satisfy LTL's talc-related liability to the extent LTL does not have sufficient cash to pay those costs and expenses. *See Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. No. 4], at 27. The TCC has sought and is being provided discovery regarding the 2023 Funding Agreement and LTL's assets as of the filing date of this case—the yardstick endorsed by the Third Circuit in its January 30, 2023 ruling (*see In re LTL Mgmt., LLC*, 64 F.4th at 106)—including documents and testimony from a J&J corporate representative regarding Holdco's assets and ability to satisfy its obligations under the 2023 Funding Agreement. Discovery regarding the consumer assets that are no longer held by Holdco, which were transferred months before LTL's filing, is not relevant and would only serve to burden and harass the J&J Parties and non-parties the TCC has subpoenaed.

24.     The Consumer Health Transactions—which resulted in the transfer of the consumer health business assets from Holdco to Kenvue Inc. months before LTL commenced this bankruptcy case—simply have no relevance to the Debtor's financial distress at the time it filed for bankruptcy as set out by the Third Circuit. *See In re LTL Mgmt., LLC*, 64 F.4th at 102. Thus, the TCC is not entitled to discovery on the Consumer Health Transactions. *See, e.g., McLaughlin*

*v. Copeland,* 455 F. Supp. 749, 753 (D. Del. 1978), *aff'd,* 595 F.2d 1213 (3d Cir. 1979) ("[a plaintiff] is not entitled to discovery for the purpose of determining whether or not there may be a factual basis for a claim ... not [yet] made."); *see also In re ML-Lee Acquisition Fund II, L.P.,* 151 F.R.D. 37, 41 (D. Del. 1993) ("While most discovery involves some 'fishing', as with actual fishing, the hook must first be appropriately baited.").

25.     Indeed, as established during the motion to dismiss hearing in *LTL I*, the Consumer Health Transactions were contemplated long before LTL's original bankruptcy filing in *LTL I*, and was always distinct and independent of such filing. *See supra* ¶¶ 14-16. In fact, LTL's bankruptcy and the Consumer Health Transactions were "two distinct projects," and the proposed Consumer Health Transactions were being discussed years before the filing. *Id.* The consumer business assets previously held by Holdco were eventually transferred to a new consumer business entity months before LTL's second bankruptcy filing and, indeed, before the Third Circuit issued its decision dismissing LTL's first bankruptcy case on January 30, 2023.

26.     Notwithstanding these uncontroverted facts, the TCC has tried to manufacture relevance by claiming without any support that the Consumer Health Transactions were a "machination" that "significantly prejudice[s] claimants" by causing Holdco's assets to "no longer include the consumer health business." TCC Mot. to Dismiss at 12. But the TCC has not tied, and cannot tie, the Consumer Health Transactions to the relevant question of whether LTL was in financial distress at the relevant point in time when it filed for bankruptcy, which is the relevant inquiry for the pending TCC Motion to Dismiss. *See id.* Where, as here, the alleged bad faith pertains to a purported lack of financial distress, the Third Circuit has made clear (and the TCC has acknowledged) that the relevant inquiry on a motion to dismiss is financial distress at the time of the bankruptcy filing. This inquiry naturally does not consider assets that were not available to

the Debtor at the time it filed for bankruptcy.  As noted, the record also demonstrates that the

Consumer Health Transactions were long planned separately from LTL's bankruptcy filing, and

the consumer health business was transferred out of Holdco *before* the Third Circuit dismissed

LTL's first bankruptcy.

27.    The TCC's assertion that the Court purportedly recognized the relevance of the

Consumer Health Transactions to the good-faith inquiry during its ruling on the preliminary

injunction is misleading.  *See Letter from TCC to Hon. Michael Kaplan,* dated May 23, 2023, at

1.  The motion for a preliminary injunction was subject to a different standard than the Motion to

Dismiss, and in any case the Court questioned whether the transactions could give rise to any

fraudulent transfer liability particularly where there was no showing of insolvency.  Opinion

Dissolving Temporary Restraining Order, Extending the Automatic Stay, and Granting Limited

Preliminary Restraints [Dkt. No. 94], at 18 (emphasis added).  This only further highlights how

the TCC's effort to get broad discovery regarding Consumer Health Transactions is an improper

attempt to prematurely adjudicate fraudulent conveyance claims for which it lacks standing.

28.    The premise of the TCC's discovery about the Consumer Health Transactions is

also off base.  Contrary to the TCC's assertion, the consumer health business did not "account[ ]

for nearly all of Holdco's approximately $30 billion of value."  *See Letter from TCC to Hon.*

*Michael Kaplan,* dated May 23, 2023, at 1.  The $30 Billion market value of Holdco was *without*

the consumer health business assets that were transferred as part of the Consumer Health

Transactions.  *See* Opinion Dissolving Temporary Restraining Order, Extending the Automatic

Stay, and Granting Limited Preliminary Restraints [Dkt. No. 94], at 18.  And the TCC is being

provided discovery regarding the relevant assets of Holdco.  The TCC also ignores the funding

available under the funding agreements has always been capped by LTL's aggregate liability on

the talc-related claims.  Regardless, it is the applicable funding agreement and Holdco's assets that is relevant to LTL's financial distress at the time it filed—not the assets of the consumer business that is now an independent company.

29.    Tellingly, the TCC has admitted that it does not really need this discovery to prosecute its motion to dismiss, as it previously told the Court that it did not believe "that any sweeping new discovery is necessary." *Letter to Judge Kaplan*, dated April 28, 2023 [Dkt. No. 345], at 2 (emphasis added).  Only after the TCC filed its motion for standing to pursue fraudulent transfer claims did it change its position.  This about-face further demonstrates the J&J Parties' need for a protective order precluding the Consumer Health Transaction Discovery.  *See. e.g, Verity v. Wells Fargo Bank, N.A (In re Verity)*, Nos. 10-02373 (DHS), 10-20880 (DHS), 2011 Bankr. LEXIS 2792, at *9 (Bankr. D.N.J. July 19, 2011) ("It is well established that discovery has limits and that these limits grow more formidable as the showing of need decreases.").

30.    The Consumer Health Transaction Discovery sought by the TCC is particularly harassing and burdensome to the six non-parties from whom the TCC seeks extensive production of documents on an expedited basis.  "[C]ourts afford greater protection to non-parties in discovery, and non-party subpoenas must meet a higher standard of relevance than subpoenas directed toward parties."  *Staff4Jobs, LLC v. List Logistics, LLC*, No. 18-13399 (BRM)(LHG), 2020 U.S. Dist. LEXIS 267689, at *10 (D.N.J. Oct. 19, 2020) (granting protective order precluding "overly broad" discovery requests to non-party that were "not in any way narrowed to elicit information relevant to this action.").  Nor should the TCC be permitted an end run around the proper scope of discovery by seeking improper, irrelevant discovery from non-parties.

31.    The broad discovery that the TCC seeks regarding the Consumer Health Transactions is also unduly burdensome and unrealistic in the context of the incredibly expedited

schedule.  The hearing on the TCC Motion to Dismiss is presently scheduled to start on June 27,

2023.  The parties are currently contemplating a May 31, 2023 deadline for fact discovery, which

is only six days from the filing of this Motion.  In that already-compressed six-day window, the

TCC has indicated it intends to depose at least 11 witnesses.  It would involve a massive

undertaking to search for and collect, review, and produce responsive documents concerning what

were significant corporate transactions.  Forcing the J&J Parties (and many non-parties) to

undertake such an enormous effort in an incredibly short time frame is not only unrealistic but also

would impose an undue and unnecessary burden on all the parties.  *See In re ML-Lee Acquisition*

*Fund II, L.P.*, 151 F.R.D. at 41 (finding that plaintiffs failed to demonstrate "a sufficient degree of

factual relevance" to require a "significant burden on defendants" to produce responsive

documents).

32.    In sum, good cause exists here for entry of a protective order precluding the TCC

from obtaining discovery about the Consumer Health Transactions, which is beyond the scope of

what is relevant for the pending motions to dismiss, is unduly burdensome and designed to

prematurely adjudicate fraudulent transfer claims as to which the TCC has no basis or standing to

assert.  *See, e.g.*, *Shulman v. Chromatex, Inc.*, No. 3:CV-08-0229, 2012 U.S. Dist. LEXIS 161738,

at *6, 8 (M.D. Pa. Nov. 13, 2012*) (granting protective order forbidding discovery of financial

information that "implicates and relates to a future action" where requesting party failed to

demonstrate that the requested discovery "is relevant to the subject matter of the instant

litigation."); *Hastings v. Kennedy,* No. 14-1333, 2014 U.S. Dist. LEXIS 92224, at *12, 14 (E.D.

Pa. July 8, 2014) (granting protective order precluding discovery that sought to "relitigat[e] the

validity" of a prior judgment on the grounds that "any discovery related to that issue is irrelevant

to the present action").

15

33.    For the same reasons, the Consumer Health Transaction Subpoenas directed to the many non-parties[5] should be subject to the same protective order precluding discovery about the Consumer Health Transactions.    Because this discovery is irrelevant, and the TCC cannot demonstrate a sufficient need for the information in connection with the TCC Motion to Dismiss, the TCC should also be precluded from seeking discovery about the Consumer Health Transactions from these non-parties.[6]

*[Remainder of page intentionally left blank.]*

---

[5] As noted, the non-parties that received the Consumer Health Transaction Subpoenas consist of AllianceBernstein L.P., the Goldman Sachs Group, Inc., Joele Frank Wilkinson Brimmer Katcher, JP Morgan International Inc., Moody's Investors Service, Inc., and S&P Global Inc.

[6] *See Corbi v. Marina Assocs.*, 2009 U.S. Dist. LEXIS 142979, at *4-5 (D.N.J. Jul. 14, 2009*) (issuing a protective order precluding Plaintiff from utilizing non-party subpoena to discover documents from an "unreasonably overbroad" time period); *Staff4Jobs, LLC,* 2020 U.S. Dist. LEXIS 267689, at *10 (D.N.J. Oct. 19, 2020).

## CONCLUSION

WHEREFORE, the J&J Parties respectfully request that this Court enter a protective order precluding the TCC from seeking discovery relating to the Consumer Health Transactions.

Dated: May 25 2023

Respectfully submitted,

/s/ *Kenneth A. Rosen*
**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Email: krosen@lowenstein.com
Email: mseymour@lowenstein.com

*Co-Counsel to Johnson & Johnson and*
*Johnson & Johnson Holdco (NA) Inc.*

**WHITE & CASE LLP**
Jessica C. Lauria, Esq.
Gregory Starner, Esq.
Joshua D. Weedman, Esq.
Samuel P. Hershey, Esq.
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email:  jessica.lauria@whitecase.com
     gstarner@whitecase.com
     jweedman@whitecase.com
     sam.hershey@whitecase.com

**WHITE & CASE LLP**
Matthew E. Linder, Esq.
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mlinder@whitecase.com

*Co-Counsel to Johnson & Johnson and*
*Johnson & Johnson Holdco (NA) Inc.*