**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*PROPOSED ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>           Debtor. | Chapter 11<br><br>Case No.:  23-12825 (MBK)<br><br>Judge:  Michael B. Kaplan<br><br>**Hearing Date and Time:**<br>June 27, 2023 at 10:00 a.m. |

**DEBTOR'S OMNIBUS OBJECTION TO MOTIONS TO DISMISS CHAPTER 11 CASE**

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 6

I.    THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE ................................. 6

    A.    The Debtor's Predecessors and Related Restructurings ....................................... 6

    B.    The 2021 Corporate Restructuring........................................................... 7

    C.    New JJCI/HoldCo ................................................................................. 7

    D.    The Debtor .......................................................................................... 9

    E.    Previous Financing Arrangements ........................................................... 9

II.    EVENTS LEADING TO THE COMMENCEMENT OF THE 2021 CHAPTER 11 CASE AND THIS CHAPTER 11 CASE .............................................................. 10

    A.    Talc Claims Against the Debtor........................................................... 10

    B.    The Costs and Burdens of Cosmetic Talc Litigation ............................. 10

    C.    The Imerys and Cyprus Cases.............................................................. 12

    D.    The 2021 Chapter 11 Case .................................................................. 14

          1.    Motions to Dismiss ................................................................... 14

          2.    The Third Circuit Opinion ......................................................... 15

    E.    Claimant Support ............................................................................... 16

    F.    Prepetition Transactions Relating to the Filing of the Chapter 11 Case ............. 17

ARGUMENT .......................................................................................................... 20

I.    THE MOVANTS HAVE THE BURDEN OF PROOF TO SHOW CAUSE. ................. 22

II.    THE DEBTOR WAS IN FINANCIAL DISTRESS ON THE PETITION DATE. ........ 26

    A.    The Movants' Attempts to Equate Financial Distress to Insolvency Fail. .......... 26

    B.    Financial Distress Requires Consideration of All Relevant Facts and Circumstances. .................................................................................. 28

    C.    Taking Into Account All of the Facts and Circumstances, the Debtor Was Clearly in Financial Distress on the Petition Date. ............................. 31

          1.    Balance Sheet............................................................................ 32

          2.    Ability to Pay Debts as They Come Due .................................... 35

          3.    Other Factors............................................................................ 40

III.    THE RESTRUCTURING OF THE FUNDING AGREEMENTS WAS NOT IN BAD FAITH. ....................................................................................................... 42

# TABLE OF CONTENTS
(continued)

Page

1.    The 2023 Funding Agreement Is at Least as Valuable to the Debtor's Estate and Claimants as the 2021 Funding Agreement. ........... 44

2.    The Risk That the 2021 Funding Agreement Was Not Enforceable Against J&J ...................................................................................... 46

3.    All Fraudulent Transfer Theories Are Premature and Refuted by the Record. ............................................................................................ 53

4.    The Debtor's Management Fulfilled Its Fiduciary Duties. ...................... 56

IV.    THE MOVANTS' OTHER ALLEGATIONS OF BAD FAITH ARE MISPLACED. .................................................................................................. 58

    A.    The Debtor Filed This Chapter 11 Case with a Valid Reorganizational Purpose. .................................................................................................... 58

    B.    The Confirmation Objections Are Premature. ....................................... 60

    C.    This Chapter 11 Case Is Not an Abusive Litigation Tactic. ................... 61

V.    ALTERNATIVELY, THE COURT SHOULD EXERCISE THE DISCRETION GRANTED IT BY SECTION 1112(b)(2) OF THE BANKRUPTCY CODE AND NOT DISMISS THIS CHAPTER 11 CASE. ................................................... 62

    A.    Unusual Circumstances Exist Establishing that Dismissal Is Not in the Best Interests of Claimants and the Estate. .......................................... 64

    B.    There Is a Reasonable Likelihood that a Plan Will Be Confirmed Within a Reasonable Period of Time. .................................................................... 65

    C.    Any Acts or Omissions by the Debtor Were Reasonably Justified. ................... 66

    D.    Any Act or Omission Warranting Dismissal Can be Cured Within a Reasonable Time. ..................................................................................... 67

CONCLUSION ................................................................................................................ 68

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

1500 Min. Spring Assocs., LP v. Gencarelli,
353 B.R. 771 (D.R.I. 2006)....................................................................................................27

15375 Mem'l Corp. v. BEPCO, Op (In re 15375 Mem'l Corp.),
589 F.3d 605 (3d Cir. 2009)..................................................................................................22

A.F.I.K. Holding SPRL v. Fass,
216 F.R.D. 567 (D.N.J. 2003)................................................................................................36

Am. Prairie Constr. Co. v. Hoich,
594 F.3d. 1015 (8th Cir. 2010) .............................................................................................49

Archdiocese of New Orleans,
632 B.R. 593, 610–11 (Bankr. E.D. La. 2021) ...............................................................29, 31

Arons v. Charpentier,
36 A.D.3d 636, 828 N.Y.S.2d 482 (2007) ............................................................................49

Avalon Hotel Partners, LLC,
302 B.R. 377, 384 (Bankr. D. Or. 2003)...............................................................................23

Brenner v. Little Red School House, Ltd.,
302 N.C. 207 (1981) .............................................................................................................49

Case v. Los Angeles Lumber Prod. Co.,
308 U.S. 106 (1939)..............................................................................................................26

Congoleum Corp. v. Pergament (In re Congoleum Corp.),
Case No. 03-51524, Adv. No. 05-06245, 2007 WL 4571086 (Bankr. D.N.J.
Dec. 28, 2007).................................................................................................................51, 52

Daugherty v. Johnson & Johnson,
No. RG19013937 ..................................................................................................................37

Ellis v. Westinghouse Elec. Co., LLC,
11 F.4th 221 (3d Cir. 2021) ..................................................................................................30

**TABLE OF AUTHORITIES**

(continued)

**Page**

Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC,
    215 N.C. App. 66 (2011) ...........................................................................................49

Grayson v. K-Mart Corp.,
    849 F. Supp. 785 (N.D. Ga. 1994) .............................................................................36

Hailey v. City of Camden,
    631 F. Supp. 2d 528 (D.N.J. 2009) ............................................................................36

In re A.H. Robins Co.,
    No. 85-01307 (Bankr. E.D. Va.) ...............................................................................59

In re AIG Fin. Prods. Corp.,
    No. 22-11309 (MFW), 2023 WL 3360562 (Bankr. D. Del. May 10, 2023) ...........................39

In re Alston,
    756 Fed. Appx. 160 (3d. Cir. 2019) ..........................................................................68

In re Attack Properties, LLC,
    478 B.R. 337 (N.D. Ill. 2012) ...................................................................................25

In re Austin Ocala Ltd.,
    150 B.R. 279 (Bankr. M.D. Fla. 1993) .....................................................................23

In re Auto Money N. LLC,
    No. C/A 22 03309 HB, 2023 WL 2991825 (Bankr. D.S.C. Mar. 28, 2023) ...........................27

In re Bestwall LLC,
    605 B.R. 43 (Bankr. W.D.N.C. 2019).......................................................................58

In re Bestwall LLC,
    606 B.R. 243 (Bankr. W.D.N.C. 2019)....................................................................66

In re Bestwall LLC,
    No. 17-31795 (Bankr. W.D.N.C. 2017)....................................................................59

In re Boy Scouts of Am. & Delaware BSA, LLC,
    650 B.R. 87 (D. Del. 2023).......................................................................................29

In re Colbran, LLC,
    475 B.R. 289 (Bankr. D. Mass. 2012) ......................................................................25

## TABLE OF AUTHORITIES
(continued)

**Page**

In re Combustion Engineering, Inc.,
   391 F.3d 190 (3d Cir. 2005)...................................................................................51

In re Consol. Parlodel Litig.,
   182 F.R.D..............................................................................................................37

In re DBMP LLC,
   No. 20-30080 (Bankr. W.D.N.C. 2020)..................................................................60

In re Dow Corning Corp.,
   No. 95-20512 (Bankr. E.D. Mich.) .........................................................................59

In re Edybul Foods, Inc.,
   No. 02-83997, 2003 WL 1860520 (Bankr. M.D.N.C. Apr. 8, 2003) ......................23

In re Fed.-Mogul Glob. Inc.,
   684 F.3d 355 (3d Cir. 2012)...................................................................................66

In re Fruehauf Trailer Corp.,
   444 F.3d 203 (3d Cir. 2006)...................................................................................54

In re Garlock Sealing Techs. LLC,
   No. 10-31607 (Bankr. W.D.N.C.)...........................................................................28

In re Halpern,
   229 B.R. 67 (Bankr. E.D.N.Y. 1999).....................................................................23

In re Honx, Inc.,
   2022 WL 17984313 (Bankr. S.D. Tax. Dec. 28, 2022) .........................................28

In re Imerys Talc Am., Inc.,
   No. 19-10289 (Bankr. D. Del. 2019) ......................................................................59

In re Johns-Manville Corp.,
   36 B.R. 727 (Bankr. S.D.N.Y. 1984).........................................................28, 40, 41

In re Johns-Manville Corp.,
   No. 82-11656 through 82-11676 (Bankr. S.D.N.Y.) ..............................................59

In re Kaiser Aluminum Corp.,
   456 F.3d 328 (3d Cir. 2006)...................................................................................68

**TABLE OF AUTHORITIES**

(continued)

**Page**

In re Liberate Techs.,
    314 B.R. 206 (Bankr. N.D. Cal. 2004) ....................................................29

In re LTL Mgmt. LLC,
    637 B.R. 396 (Bankr. D.N.J. 2022) rev'd and remanded by In re LTL Mgmt.
    LLC, 64 F.4th 84 (3d. Cir. 2023) ........................................................ passim

In re LTL Mgmt. LLC,
    64 F.4th 84 (3d. Cir. 2023) ................................................................ passim

In re Maremont Corp.,
    No. 19-10118 (Bankr. D. Del. 2019) .......................................................59

In re Marshall,
    300 B.R. 507 (Bankr. C.D. Cal. 2003), aff'd, 403 B.R. 668 (C.D. Cal. 2009),
    aff'd, 721 F.3d 1032 (9th Cir. 2013) .......................................................27

In re McTiernan,
    59 B.R. 860 (Bankr. D. Wyo. 2014) ........................................................64

In re Mid-Valley, Inc.,
    305 B.R. 425 (Bankr. W.D. Pa. 2004) .....................................................28

In re Mid-Valley, Inc.,
    No. 03-35592-JKF [Dkt. 482] (Bankr. W.D. Pa. Jan. 29, 2004) ...........35

In re Mirant Corp.,
    2005 WL 2148362 (Bankr. N.D. Tex. Jan. 26, 2005) ............................28

In re Muralo,
    301 B.R 690 (Bankr. D.N.J. 2003). .........................................................59

In re Muskogee Env't Conservation Co.,
    236 B.R. 57 (Bankr. N.D. Okla. 1999) ....................................................23

In re N. Am. Refractories Co.,
    No. 02-20198 (Bankr. W.D. Pa.) .............................................................28

In re Namer,
    141 B.R. 603 (Bankr. E.D. La. 1992) ......................................................23

TABLE OF AUTHORITIES

(continued)

**Page**

In re New Towne Dev., LLC,
404 B.R. 140 (Bankr. M.D. La. 2009) ......................................................................65

In re ON Marine Servs. Co.,
No. 20-20007 (Bankr. W.D. Penn. 2020) ................................................................60

In re Orbit Petroleum, Inc.,
395 B.R. 145 (Bankr. D.N.M. 2008) ......................................................................64

In re Paddock Enters., LLC,
No. 20-10028 (Bankr. D. Del. 2020) ......................................................................60

In re PG & E Corp.,
No. 19-30088 (Bankr. N.D. Cal.)............................................................................28

In re Pittsfield Weaving Co.,
393 B.R. 271 (Bankr. D.N.H. 2008) ......................................................................63

In re R.M.L., Inc.,
92 F.3d 139 (3d Cir. 1996)......................................................................................55

In re Rent-a-Wreck, Inc.,
580 B.R. 364 (Bankr. D. Del. 2018) ..........................................................29, 40, 41

In re Rezulin Prods. Liab. Litig.,
168 F. Supp. 2d 136 (S.D.N.Y. 2001).....................................................................37

In re SGL Carbon Corp.,
200 F.3d 154 (3rd Cir. 1999) ......................................................................... passim

In re Southwest Enters., Inc.,
261 F. Supp. 721 (W.D. Ark. 1966).........................................................................20

In re Stolrow's Inc.,
84 B.R. 167 (9th Cir. BAP 1988) ............................................................................27

In re Ultra Petroleum Corp.,
51 F.4th 138 (5th Cir. 2022) ....................................................................................28

In re United Gilsonite Labs.,
No. 11-02032 (Bankr. M.D. Pa.) .............................................................................28

**TABLE OF AUTHORITIES**

(continued)

**Page**

In re USG Corp.,
    No. 01-2094 (Bankr. D. Del.) ...................................................................28

In re V Companies,
    274 B.R. 721 (Bankr. N.D. Ohio 2002) ....................................................23

In re Victoria Ltd. P'ship,
    187 B.R. 54 (Bankr. D. Mass. 1995) ........................................................21

In re Victory Const. Co., Inc.,
    9 B.R. 549 (Bankr. C.D. Cal. 1981), vacated, 37 B.R. 222 (B.A.P. 9th Cir.
    1984) .........................................................................................................20

In re Victory Const. Co., Inc.,
    37 B.R. 222, 223 (B.A.P. 9th Cir. 1984) ..................................................21

In re W.R. Grace & Co.,
    900 F.3d 126 (3d Cir. 2018) .....................................................................58

In re W.R. Grace & Co.,
    Nos. 01-1139, 01-1140 (Bankr. D. Del.) ..................................................28

In re Wigley,
    557 B.R. 671 (B.A.P. 8th Cir. 2016) ........................................................30

Ingham v. Johnson & Johnson,
    608 S.W.3d 663 (Mo. App. 2020) ............................................................11

Ketchum v. MacDonald,
    85 F.2d 436 (3d Cir. 1936) .......................................................................26

Loop Corp. v. U.S. Tr.,
    379 F.3d 511 (8th Cir. 2004) ....................................................................23

Matter of Santiago Vela,
    61 A.F.T.R.2d 88-698 (Bankr. D.P.R. 1988) ...........................................23

Matter of Woodbrook Assocs.,
    19 F.3d 312 (7th Cir. 1994) ......................................................................23

Moody v. Sec. Pac. Bus. Credit, Inc.,
    971 F.2d 1056 (3d Cir. 1992) ...............................................................26, 56

**TABLE OF AUTHORITIES**

(continued)

**Page**

Nester v. Gateway Access Sols., Inc. (In re Gateway Access Sols., Inc.),
   374 B.R. 556 (Bankr. M.D. Pa. 2007) ................................................................62, 63

Norfolk S. Ry. Co. v. Reading Blue Mountain & N. R. Co.,
   346 F. Supp. 2d 720 (M.D. Pa. 2004) ....................................................................49

Polansky v. Exec. Health Res. Inc.,
   17 F.4th 376 (3d Cir. 2021), cert. granted sub nom. United States ex rel.
   Polansky v. Exec. Health Res., Inc., 213 L. Ed. 2d 1063, 142 S. Ct. 2834
   (2022) ........................................................................................................................25

Sidari v. Orleans Cnty.,
   174 F.R.D. 275 (W.D.N.Y. 1996) ............................................................................36

UNCC Properties, Inc. v. Greene,
   111 N.C. App. 391, 432 S.E.2d 699 (1993) ...........................................................49

Unihealth v. U.S. Healthcare, Inc.,
   14 F. Supp. 2d 623 (D.N.J. 1998) ..........................................................................49

Union County Utils. v. Bergen County Utils. Auth.,
   995 F.Supp. 506 (D.N.J. 1998) ..............................................................................49

United States v. Moulder,
   141 F.3d 568 (5th Cir. 1998) ..................................................................................49

**STATUTES**

11 U.S.C. § 102 ............................................................................................................64

11 U.S.C. § 105 ............................................................................................................35

11 U.S.C. § 363 ............................................................................................................57

11 U.S.C. § 524 ...................................................................................................... passim

11 U.S.C. § 548 ...................................................................................................... 54-56

11 U.S.C. § 1112 .................................................................................................... passim

11 U.S.C. § 1123 ..........................................................................................................29

11 U.S.C. § 1129 .....................................................................................................60, 61

### TABLE OF AUTHORITIES
#### (continued)

**Page**

11 U.S.C. § 530 (repealed 1978)..................................................................................20

**OTHER AUTHORITIES**

156 CONG. REC. H7158-01 (2010).........................................................................24, 25

1994 U.S.C.C.A.N. 3340 ............................................................................................30

H.R. REP. 103-835, 40-41 (1994) ..............................................................................30

Report of the Commission on the Bankruptcy Laws of the United States, H.R.
Doc. No. 137, 93rd......................................................................................................21

Peggy L. Ableman, *et al.*, *The Consolidation Effect: New York City Asbestos
Verdicts, Due Process and Judicial Efficiency* ..........................................................37

Janet A. Flaccus, *Have Eight Circuits Shorted? Good Faith and Chapter 11
Bankruptcy Petitions*, 67 Am. Bankr. L.J. 401, 402-03 (1993) ...............................20

Frank R. Kennedy & Gerald K. Smith, *Postconfirmation Issues: The Effects of
Confirmation and Postconfirmation Proceedings*, 44 S.C. L. Rev. 621, 732, n.
409 (1993)....................................................................................................................21

Mealy's Asbestos Bankr. Rep. 9 (2015) .....................................................................37

LTL Management LLC (the "Debtor"), the debtor in the above-captioned case
(the "Chapter 11 Case"), files this omnibus objection (the "Objection") in response to the
motions to dismiss the Chapter 11 Case and related joinders (collectively, the "Dismissal
Motions") filed by the following parties (collectively, the "Movants"):  (a) the Official
Committee of Talc Claimants (the "TCC") [Dkt. 286] (the "TCC Motion"); (b) the Ad Hoc
Group of Mesothelioma Claimants [Dkt. 335]; (c) Paul Crouch [Dkt. 346] (the "Crouch
Motion"); (d) the Ad Hoc Committee of States Holding Consumer Protection Claims (the "Ad
Hoc States") [Dkt. 350] (the "States Motion"); (e) law firms on behalf of various mesothelioma
claimants [Dkt. 352]; (f) Maune Raichle Hartley French & Mudd, LLC [Dkt. 358]; (g) the Office
of the United States Trustee for the District of New Jersey (the "U.S. Trustee") [Dkt. 379]
(the "UST Motion"); (h) Arnold & Itkin LLP ("Arnold & Itkin") [Dkt. 384] (the "A&I Motion");
(i) certain claimants represented by The Barnes Law Group [Dkt. 473]; and (j) the States of New
Mexico and Mississippi [Dkt. 480] (the "NM/MS Motion").[1]

In support of this Objection, the Debtor incorporates the *Declaration of John K. Kim in
Support of First Day Pleadings* [Dkt. 4] (the "First Day Declaration"), the *Declaration of Daniel
J. Merrett*, filed contemporaneously herewith (the "Counsel Declaration"), and respectfully
states as follows:

## PRELIMINARY STATEMENT

Like its first chapter 11 case filed in October 2021 (the "2021 Chapter 11 Case"), the
Debtor commenced this case to equitably and efficiently resolve current and future talc claims
through confirmation of a claimant-supported chapter 11 plan of reorganization and the

---

[1]    The Dismissal Motions include, in addition to those identified above, two motions adopting the arguments
asserted in the TCC Motion that were incorrectly filed in an adversary proceeding related to this Chapter 11
Case. See Adv. Pro. No. 23-01092; Dkts. 117 (motion of Estate of Melissa Fleming), 118 (motion of
Robert Gendelman).

establishment of a trust that will provide timely compensation to current claimants while

protecting the right of future claimants to receive equivalent recoveries.  There are key

differences between the two cases, however.  This bankruptcy filing, unlike the first, has

extensive support from plaintiff firms—not only for the commencement of this second

bankruptcy but for the material terms of a chapter 11 plan of reorganization.  In fact, as of

April 4, 2023, the date this second case was filed (the "Petition Date"), plaintiff firms

representing more than 60,000 talc claimants had entered into plan support agreements (the "Plan

Support Agreements") memorializing their support for the terms of the Debtor's proposed plan

and their commitment to recommend that their respective clients vote to approve the plan.

Moreover, and justifying this significant support, this second bankruptcy filing includes a

funding commitment that is a four-fold increase over the commitment made in connection with

the first filing.  The proposed reorganization plan (the "Plan") calls for the funding of a talc

resolution trust with $8.9 billion net present value, as compared to the $2 billion commitment

made in the first case, by the Debtor, Johnson & Johnson ("J&J") and Johnson & Johnson

Consumer, Inc., now known as Johnson & Johnson Holdco (NA) Inc. ("Holdco" and, together

with J&J, the "J&J Parties").  The current commitment is unprecedented.  If confirmed, the plan

would represent the largest settlement in any mass tort bankruptcy case ever and, indeed, the

largest settlement in any asbestos bankruptcy case ever, including cases where—unlike here—

the debtor admitted that its products contain asbestos (e.g., insulation, roofing, piping).  That

distinction renders the proposed funding amount even more extraordinary:  The Debtor and the

J&J Parties dispute, based on all the available science, that the talc products at issue in the

litigation were not safe, ever contained asbestos or caused the diseases alleged by plaintiffs.

Nonetheless, the Debtor and the J&J Parties have committed to provide this funding, not because

they believe that the talc products at issue cause cancer, but because continued litigation in the

tort system of tens of thousands of claims over the ensuing five or six decades is not tenable,

either for the Debtor, the J&J Parties or claimants.  A resolution of the claims through a trust

established in bankruptcy is in the interests of all parties, including current and future talc

claimants.

Further still, the current Plan affords the opportunity to resolve—in whole or material

part—two other pending bankruptcies.  The companies that mined talc used in the Debtor's

products—Imerys and Cyprus—have been frozen in bankruptcy for years, facing in large part the

same underlying claims asserted by the same claimants and counsel involved in this case.

The Plan contemplates the resolution of those claims, in exchange for incremental contributions

by those debtors to the trust established in this case.

Notwithstanding the unprecedented amount of funding proposed in the Plan, the

significant support for the Plan from firms representing both ovarian cancer claimants and

mesothelioma claimants and the opportunity to achieve a prompt and final resolution of the talc

claims pending in three bankruptcies, a group of plaintiff firms representing a minority of

claimants have sought in a multiplicity of ways to frustrate, if not prevent altogether, the Debtor

and the plan supporters from moving forward with a plan process.  In addition to filing eight,

duplicative motions to dismiss, they have sought the extraordinary remedy of mandamus in the

Third Circuit, asked the Court to outright suspend the plan process, opposed any stay of talc

litigation and sought standing to file a fraudulent transfer/breach of fiduciary duty lawsuit against

multiple defendants.  The firms that appear to be leading the opposition effort have no interest in

negotiation or proposing a workable alternative plan, but rather have repeatedly represented to

the Court that they will ***never*** agree to ***any*** settlement; they have made these representations in

both the 2021 Chapter 11 Case and this Chapter 11 Case.  And many of them are members of the

steering committee in the federal multi-district litigation pending in this district (the "MDL"),

who have a conflicting economic incentive not to settle because *the law firms themselves* stand

to receive hundreds of millions of dollars in common-benefit funds only if claims are resolved in

the MDL.  This vocal minority of stonewalling law firms should not be permitted to hijack this

Chapter 11 Case and derail the Debtor's efforts to put the $8.9 billion plan proposal to an

up-or-down vote of claimants, thereby elevating their own parochial financial interests over the

best interests of their clients.

    The burden is on the Movants to establish a lack of good faith under section 1112(b),[2]

and they fall woefully short.  The Movants' leading argument for dismissal is that the Debtor is

still not in financial distress.  Conflating financial distress with equitable insolvency, they assert

that the Debtor cannot be in financial distress because it admits it should be able to meet its

obligations.  But as the Third Circuit recently held, insolvency is not the standard.[3]  To the

contrary, financial distress turns primarily on whether a debtor's liabilities will, in the near term,

adversely and significantly affect its assets, operations or business.  The Third Circuit made clear

that whether a debtor is in financial distress requires a fact-based, case-by-case analysis that

considers all relevant factors, including, for instance, liquidity, estimates of actual or likely

liability, the extent and uncertainty of threatened litigation and the possibility that assets will

---

[2]    As addressed in detail herein, Movants' contention that Third Circuit law places the burden on the Debtor is predicated on outdated case law that was indisputably abrogated by amendments to the Bankruptcy Code in 2005.

[3]    Nor is "unreasonably small capital" the standard, as suggested by the TCC and Arnold & Itkin.  The Third Circuit's financial distress requirement serves an entirely different purpose from the unreasonably-small-capital requirement, which is an element of the inquiry for a constructive fraudulent transfer.  The Debtor is aware of no decision, in the Third Circuit or otherwise, that even suggests (much less holds) that a debtor must show unreasonably small capital to qualify for relief under the Bankruptcy Code.

need to be liquidated.  These factors unequivocally establish that the Debtor was in financial

distress at the commencement of this Chapter 11 Case.

The Movants' alternative arguments are inconsistent with their position on financial

distress.  They assert that the Debtor engaged in transactions between the dismissal of the 2021

Chapter 11 Case and the commencement of this Chapter 11 Case that were fraudulent transfers

and breaches of fiduciary duty.  That is wrong, as the Debtor's substitution of funding

agreements between the two cases was not a fraudulent transfer or breach of fiduciary duty

because in each case the financing available to the Debtor just prior to its chapter 11 filing was

sufficient to satisfy the talc claims.  Further, that argument is completely inconsistent, in that the

Movants cannot argue there is no financial distress, on the one hand, but that transactions the

Debtor undertook in connection with this Chapter 11 Case constituted fraudulent transfers and

breaches of fiduciary duty, on the other.  If the Debtor was not in financial distress prior to filing,

there could not have been any fraudulent conveyance or breach of fiduciary duty.

In point of fact, the Debtor was not insolvent at the time of the transactions, and the

transactions were effectuated—not to hinder, delay or defraud claimants—but to achieve the

purpose of the original arrangements, which was to pursue a bankruptcy resolution of claims that

would provide timely, full recoveries to claimants faster than, and in a considerably more

equitable manner than, in the tort system.  Nor did the Debtor contravene any requirement of the

Bankruptcy Code by continuing to engage in settlement discussions and mediation during the

2021 Chapter 11 Case—as did many of the Movants—and then taking steps to potentially

effectuate an agreement that was reached.

Some of the Movants rehash old arguments raised and rejected in the 2021 Chapter 11

Case that the Debtor does not have a valid reorganizational purpose, cannot confirm a chapter 11

plan and commenced this Chapter 11 Case as a litigation tactic.  The Debtor's reorganizational

purpose in this Chapter 11 Case is the same as it was in the 2021 Chapter 11 Case, albeit now

supported by counsel representing the vast majority of the talc claimants.  The Movants'

confirmation objections are unfounded and, in any event, premature.  Finally, the record will

demonstrate that the Debtor is not using this Chapter 11 Case as an abusive litigation tactic.

No "cause" therefore exists requiring dismissal of this Chapter 11 Case under

section 1112(b)(1) of title 11 of the United States Code (the "Bankruptcy Code").  Even if such

cause did exist, however, the Debtor respectfully submits that the Court should exercise its

discretion not to dismiss the Chapter 11 Case under section 1112(b)(2).  In particular, unusual

circumstances exist overcoming any cause based upon the interests of talc claimants, including

the absence of protections for future claimants outside of this Chapter 11 Case, as well as the

Debtor's ability, with the support of the J&J Parties, to satisfy all claims through the

establishment of a trust.  The Debtor's conduct is fully justified by the wave of support it has

received on the material terms of its Plan, which is already on file, and timely confirmation of

that Plan following a claimant vote will cure any acts or omissions determined to constitute

cause.  The Dismissal Motions should be denied.

### **BACKGROUND**

I.    **THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE**[4]

A.    **The Debtor's Predecessors and Related Restructurings**

The Debtor traces its roots back to Johnson & Johnson Baby Products Company ("J&J

Baby Products"), a New Jersey company incorporated in 1970 as a wholly owned subsidiary of

---

[4]    Because the Court is familiar with the Debtor's circumstances, an abbreviated version of the facts is
provided below.  A longer recitation of the factual background is available in the Debtor's earlier filings,
including:  (i) the First Day Declaration; (ii) the *Debtor's Statement Regarding Refiling of Chapter 11 Case*
[Dkt. 3]; (iii) the *Debtor's Motion For an Order (I) Declaring That the Automatic Stay Applies or Extends*

J&J.  First Day Decl. ¶ 12.  J&J, a New Jersey company incorporated in 1887, first began selling

Johnson's Baby Powder in 1894, launching its baby care line of products.  Id. ¶ 13.  In 1972, J&J

established a formal operating division for its baby products business, which included Johnson's

Baby Powder.  Id.  In the 1970s, J&J adopted a policy to decentralize its operations as a part of a

growth and innovation strategy.  Id. ¶ 14.  As part of the implementation of that policy, J&J

Baby Products and, ultimately, the Debtor's immediate predecessor, Johnson & Johnson

Consumer Inc. ("Old JJCI"), assumed operational responsibility for all J&J cosmetic-talc

products and all related liabilities.  See PI Mot., 10-18.

### B.    The 2021 Corporate Restructuring

In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate

Restructuring"), which was completed on October 12, 2021.  First Day Decl. ¶ 23.  As a result of

that restructuring, Old JJCI ceased to exist and two new entities were created:  (i) the Debtor; and

(ii) Johnson & Johnson Consumer Inc. ("New JJCI").  First Day Decl. ¶ 23.  In the 2021

Corporate Restructuring, the Debtor was allocated certain of Old JJCI's assets and became solely

responsible for the talc-related liabilities of Old JJCI, and New JJCI was allocated all other assets

of Old JJCI and became solely responsible for all other liabilities of Old JJCI.  Id.

### C.    New JJCI/HoldCo

Following the 2021 Corporate Restructuring, New JJCI manufactured and sold a broad

range of products used in the baby care, beauty, oral care, wound care and women's health care

fields, as well as over-the-counter pharmaceutical products (collectively, the "Consumer

---

*to Certain Actions Against Non Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a*
*Temporary Restraining Order Ex Parte Pending a Hearing On a Preliminary Injunction* [Adv. Pro.
No. 23-01092; Dkt 2] (the "PI Motion"); and the Debtor's other filings in this Chapter 11 Case and the
2021 Chapter 11 Case.

Business").[5] Id. ¶ 25.  In December 2022, New JJCI changed its name to Johnson & Johnson

Holdco (NA) Inc. (i.e., Holdco), and in early January 2023, in connection with a spin-off of the

Consumer Business publicly announced in November 2021[6] and planned for months

beforehand,[7] Holdco transferred the Consumer Business assets to its parent entity to prepare it

for the announced public offering.  Id.

Holdco is now a holding company whose value is estimated internally at approximately

$30 billion on a going-concern basis.  Counsel Decl., Ex. 1 (Apr. 18 Hr'g Tr.), Kim cross,

at 62:23-25.  As of the Petition Date, Holdco had access to approximately $400 million in cash.

First Day Decl. ¶ 27.  Aside from that liquidity, Holdco's other assets consist primarily of

minority interests in foreign subsidiaries.  Id. ¶ 26.  The most substantial of Holdco's ownership

interests are held through its wholly owned subsidiary Apsis SAS (France) ("Apsis").  Apsis

owns (through its wholly owned subsidiary Johnson & Johnson Holding GmbH (Germany)) a

36.1% ownership interest in GH Biotech Holdings Limited (Ireland) ("GH Biotech").  Id.  GH

Biotech holds ownership interests, either directly or through wholly owned subsidiaries, in four

entities, Janssen Sciences Ireland Unlimited Company, Janssen Irish Finance Unlimited

Company, C Consumer Products Denmark ApS, and Impulse Dynamics (71% interest).  Id.

---

[5]    New JJCI never manufactured Johnson's Baby Powder containing talc for sale in North America.
The production of talc-based Johnson's Baby Powder in North America was discontinued over a year
before the 2021 Corporate Restructuring.  See Press Release, Johnson & Johnson, *Johnson & Johnson
Consumer Health Announces Discontinuation of Talc-based Johnson's Baby Powder in U.S. and Canada*
(May 19, 2020), https://www.jnj.com/our-company/johnson-johnson-consumer-health-announces-
discontinuation-of-talc-based-johnsons-baby-powder-in-u-s-and-canada, attached as Exhibit 2 to the
Counsel Declaration.

[6]    See Press Release, Johnson & Johnson, *Johnson & Johnson Announces Plans to Accelerate Innovation,
Serve Patients and Consumers, and Unlock Value through Intent to Separate Consumer Health Business*
(Nov. 12, 2021), https://www.jnj.com/johnson-johnson-announces-plans-to-accelerate-innovation-serve-
patients-and-consumers-and-unlock-value-through-intent-to-separate-consumer-health-business, attached
as Exhibit 3 to the Counsel Declaration.

[7]    There was no relationship between the spin-off of the Consumer Business and the filing of the 2021
Chapter 11 Case.  See Counsel Decl. Ex. 4 (Feb. 16, 2022 Hr'g Tr. in Case No. 21-30589) at 30:7-10
(testimony of John Kim); id. at 133:3-5 (testimony of Adam Lisman).

Apsis also owns, either directly or indirectly, interests in various limited risk distributors (which

distribute J&J products in foreign countries), a German-based subsidiary that manufactures

3D-printed titanium interbody implants for spinal fusion surgery, and various other subsidiaries.

Id.

### D.     The Debtor

The Debtor was formed to pursue an equitable and efficient bankruptcy resolution of

thousands of talc-related claims and to oversee the operations of its subsidiary, Royalty A&M

LLC ("Royalty A&M"). Id. ¶ 28. Royalty A&M owns a portfolio of royalty revenue streams,

including royalty revenue streams based on third-party sales of CLOROX®, ECOLAB®,

ESSITY®, LACTAID®, MYLANTA® / MYLICON®, ROGAINE®, SPARTAN® and

TENA® products. Id. The Debtor's assets also included approximately $14.51 million in cash

as of the Petition Date,[8] interests as payee under the 2023 Funding Agreement (defined below),

and certain insurance coverage rights. Id. ¶ 29.

### E.     Previous Financing Arrangements

Old JJCI and its affiliates engaged in multiple restructurings through the years, including

the 2021 Corporate Restructuring. Id. ¶ 31. The 2021 Corporate Restructuring was effectuated

through a series of steps, which are described in detail in the declaration of Mr. Kim filed in

support of the 2021 Chapter 11 Case and incorporated herein (the "2021 First Day

Declaration").[9] Id. A key component of the 2021 Corporate Restructuring was a funding

---

[8]     See *Monthly Operating Report* for the period ended April 30, 2023 [Dkt. 570] (the "April 2023 MOR")
(beginning cash balance of $14,514,516).

[9]     Case No. 21-30589; Dkt. 5.

agreement between the Debtor, on the one hand, and J&J and New JJCI on the other (the "2021

Funding Agreement").[10]  First Day Decl. ¶ 31.

The fundamental purpose of the 2021 Funding Agreement was to facilitate the resolution

of cosmetic talc claims through a chapter 11 filing by the Debtor.  Id.  The 2021 Funding

Agreement obligated New JJCI and J&J, on a joint-and-several basis, to provide funding, up to

the value of New JJCI, for, among other things, (i) the administrative costs of the Debtor's

chapter 11 case and (ii) a trust that would satisfy current and future talc claims, in both situations

to the extent that any cash distributions received by the Debtor from Royalty A&M were

insufficient to pay such costs and further, in the case of the funding of a trust, the Debtor's other

assets are insufficient to provide that funding.  Id.  In other words, the terms of the 2021 Funding

Agreement limited the Debtor's right to funding from the J&J Parties to the amount of the

Debtor's aggregate liability for talc related claims, minus the value of the Debtor.

## II.      EVENTS LEADING TO THE COMMENCEMENT OF THE 2021 CHAPTER 11 CASE AND THIS CHAPTER 11 CASE

### A.      Talc Claims Against the Debtor

Cosmetic talc litigation against the Debtor has focused primarily on Johnson's Baby

Powder.  2021 First Day Decl. ¶ 32.  As of the filing of the 2021 Chapter 11 Case, there were

almost 40,000 plaintiffs with filed claims against the Debtor, including almost 36,000 plaintiffs

with claims pending in the federal MDL, and more than 3,800 plaintiffs with claims in multiple

state court jurisdictions across the country.  First Day Decl. ¶ 42.

### B.      The Costs and Burdens of Cosmetic Talc Litigation

Before the commencement of the 2021 Chapter 11 Case, Old JJCI and J&J defended

talc-related claims on the basis, among other things, that there is no scientific or other proof that

---

[10]      A copy of the 2021 Funding Agreement is attached as Annex 2 to the 2021 First Day Declaration.

Johnson's Baby Powder either contained asbestos or was a cause of ovarian cancer,

mesothelioma or other diseases. Old JJCI and J&J had multiple successes in the cosmetic talc

litigation, including securing dismissals of roughly 1,300 alleged ovarian cancer and over

250 mesothelioma cases without payment, and trying 16 cases to defense verdicts. 2021 First

Day Decl. ¶ 38. Old JJCI was also successful on appeal, obtaining reversal of numerous plaintiff

verdicts. Id. Despite these results, and the lack of credible proof that its products were unsafe,

Old JJCI nonetheless suffered a number of plaintiff verdicts involving unpredictable and wildly

divergent compensatory and punitive damages awards. Id.[11]

Before the commencement of the 2021 Chapter 11 Case, Old JJCI had incurred nearly

$1 billion in defending a tidal wave of personal-injury lawsuits relating to alleged talc exposure,

nearly all of which was spent in the last five years. 2021 First Day Decl. ¶ 40. On top of these

costs, Old JJCI paid approximately $3.5 billion in indemnity in connection with settlements and

verdicts. Id. And cosmetic talc litigation against the Debtor was anticipated to continue for

decades more, as were the extraordinary costs of resolving tens of thousands of expected claims.

Id. ¶ 41.

In addition, there was a "huge spike in new claims" during the 18-month pendency of the

2021 Chapter 11 Case. Counsel Decl. Ex. 1 (Apr. 18, 2023 Hr'g Tr.), Birchfield argument,

at 307:13; see also id., Kim redirect, at 180:13-17 ("That liability, if anything, has gotten bigger.

We know that after a year of being in bankruptcy, we have at least—I think it almost doubled

---

[11]     The most egregious example was the Ingham verdict, Ingham v. Johnson & Johnson, 608 S.W.3d 663, 680
(Mo. App. 2020), which was the fifth largest personal injury verdict in the history of the United States.
Although the verdict in that case was reversed in part and reduced, the total damages award was still
$2.243 billion for 22 plaintiffs (who were improperly consolidated). 2021 First Day Decl. ¶ 39. Notably,
each plaintiff received the exact same compensatory damage award, $25 million, regardless of the alleged
product used (Shower to Shower or Johnson's Baby Powder) and the duration of use (e.g., 60 years or five
years). Counsel Decl. Ex. 5 (Nov. 5, 2021 Hr'g Tr.), Kim redirect, at 336:17-339:17.

from what we know from unknown claims.").  As a result, there "is a big difference in the

number of claims that would have been, current claims that would have [] existed in 2020 and

what there are today."  Id., Birchfield argument, at 307:23-25.  The reason for that difference is

that the wave of talc claims against the Debtor and J&J continued to grow even though claimants

were prohibited from filing lawsuits as a result of the 2021 Chapter 11 Case.  See id. at 308:7-9

("So since LTL filed its bankruptcy, there could be no new claims.  But law firms, they are

following the process."); id. at 308:16-22 ("And so all of that was put on hold in October of 2021

when J&J [sic] filed bankruptcy.  And so there could be no new filed claims. . . .  So those claims

are still coming into lawyer's offices.  They're still being evaluated . . . . [B]ut they're not

filed.").

### C.    The Imerys and Cyprus Cases

In February 2019, Old JJCI's talc supplier, Imerys Talc America, Inc. and two of its

affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, "Imerys") filed

voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

Court for the District of Delaware (the "Imerys Bankruptcy").  First Day Decl. ¶ 56.  Imerys has

potential liability for personal injury claims arising from exposure to talc it sold to customers,

including Old JJCI.  Id.  In its bankruptcy case, Imerys has contended that it has claims against

Old JJCI and J&J for indemnification and joint insurance proceeds, claims alleged to be in the

billions of dollars.  Id.  Settlement discussions among the parties ended in May 2021 with no

resolution.  Id.

In May 2020, Imerys, its parent Imerys S.A., the tort claimants' committee and the future

claimants' representative in the Imerys Bankruptcy (collectively, the "Imerys Plan Proponents")

filed a plan of reorganization and a related disclosure statement.  Id. ¶ 58.  A hearing on the Plan

Proponents' disclosure statement was eventually held in January 2021, and the court entered an

order approving the disclosure statement, permitting Imerys to proceed with soliciting votes on

the plan. Id. In March 2021, Old JJCI and J&J voted to reject the plan and opted out of the

consensual releases in the plan. Id. ¶ 59. In April 2021, the Imerys Plan Proponents announced

that the plan had received the requisite number of accepting votes to confirm the plan. Id. Old

JJCI and J&J challenged certain portions of the vote based on improprieties that had been

discovered and sought to disqualify those votes. Id. In October 2021, the Imerys bankruptcy

court issued a ruling deeming thousands of votes withdrawn. Id. In October 2021, Imerys

cancelled the confirmation hearing on the plan. Id. The Imerys Bankruptcy remains pending.[12]

Id.

Cyprus Mines Corporation and its parent company (together, "Cyprus"), which had

owned certain Imerys talc mines, commenced an adversary proceeding in the Imerys Bankruptcy

seeking a declaration of indemnity rights against Old JJCI, J&J and certain Imerys debtors.[13] Id.

¶ 60. Old JJCI and J&J denied that any indemnification was owed, and filed a motion to dismiss

the adversary complaint. Id. In February 2021, Cyprus Mines Corporation filed its own

chapter 11 petition in the United States Bankruptcy Court for the District of Delaware together

with a proposed plan of reorganization and disclosure statement. Id. The Cyprus plan

contemplates a settlement with Imerys and talc claimants involving a monetary contribution from

Cyprus to a trust established in the Imerys case in exchange for an injunction against it and

certain protected parties. Id. Cyprus has not yet sought approval of its disclosure statement or

---

[12]    In July 2021, Imerys Talc America, Inc. and Imerys Talc Vermont, Inc. filed an adversary proceeding
against Old JJCI and J&J in the Imerys Bankruptcy. Id. ¶ 57. The Debtor and J&J moved to dismiss the
adversary proceeding and, in October 2021, the Debtor filed a notice that the automatic stay arising upon
the filing of the 2021 Chapter 11 Case applied to this adversary proceeding. Id. No further activity has
taken place in this adversary proceeding since the filing of the 2021 Chapter 11 Case. Id.

[13]    In October 2021, the Debtor filed a notice of bankruptcy filing and stay of proceedings clarifying that the
automatic stay arising upon the filing of the 2021 Chapter 11 Case applies to the Cyprus adversary
proceeding. Id.

plan.  Id.  The Cyprus chapter 11 case remains pending, and no further activity has taken place in

the Cyprus adversary proceeding since the filing of the 2021 Chapter 11 Case.  Id.

### D.    The 2021 Chapter 11 Case

#### 1.    Motions to Dismiss

Multiple parties, including the Official Committee of Talc Claimants, filed motions to

dismiss the 2021 Chapter 11 Case, contending it was filed in bad faith.  After a five-day trial, the

Court denied the motions.  Among other things, the Court found that "the chapter 11 filing

serve[d] to maximize the property available to satisfy creditors by employing the tools available

under the Bankruptcy Code to ensure that all present and future tort claimants will share

distributions through the court-administered claims assessment process."  In re LTL Mgmt. LLC,

637 B.R. 396, 407 (Bankr. D.N.J. 2022) rev'd and remanded by In re LTL Mgmt. LLC, 64 F.4th

84 (3d. Cir. 2023) (the "Dismissal Opinion").  As a result, the Court held that "the filing of a

chapter 11 case with the expressed aim of addressing the present and future liabilities associated

with ongoing global personal injury claims to preserve corporate value [was] unquestionably a

proper purpose under the Bankruptcy Code."  Id. at 407–08.

On the issue of financial distress, the Court first found that the Debtor's financial distress

and Old JJCI's financial distress were one and the same, noting that the 2021 Corporate

Restructuring and the Debtor's subsequent bankruptcy filing occurred as part of a single

integrated transaction.  Id. at 417.  Pointing to "a series of events" supporting the need for

bankruptcy consideration, the Court identified in particular:  "the $4.16 billion Ingham verdict

and ultimate denial of appellate review, the shift by claimants to multi-billion dollar damage

demands, as well as the failure to reach an accord" in the Imerys chapter 11 cases.  Id. at 421.

The Court then concluded "that the weight of evidence supports a finding that J&J and Old JJCI

were in fact facing a torrent of significant talc-related liabilities for years to come."  Id.

14

The Court thus determined that "such [financial] distress [was] patently apparent in the case at bar." Id. at 419.

With respect to allegations that the filing of the 2021 Chapter 11 Case was undertaken to secure an unfair tactical advantage, the Court found, among other things:  (i) nothing improper in the Debtor's effort to seek resolution of its present and future talc claims within the bankruptcy system; (ii) no evidence of bad faith in the facts and circumstances of the 2021 Corporate Restructuring; (iii) no prejudice to the interests of present and future talc litigation creditors by the filing, which, to the contrary, served their interests; (iv) that the filing was not an abusive litigation strategy intended to do nothing more than delay judgment or forestall collection without any real prospect of reorganization; and (v) that the filing was consistent with congressional objectives and public policy.  Id. at 426-28.

### 2.    The Third Circuit Opinion

On January 30, 2023, a panel of the Third Circuit issued an opinion directing this Court to dismiss the 2021 Chapter 11 Case based on its determination that the Debtor lacked financial distress.  See In re LTL Mgmt. LLC, 64 F.4th 84, 111 (3d. Cir. 2023) (the "Third Circuit Opinion").  The court indicated that the "most important" reason for its determination was the J&J backstop in the 2021 Funding Agreement.  As a result of that backstop, the Debtor had "direct access to J&J's exceptionally strong balance sheet" at the time of filing, with "well over $400 billion in equity value with a AAA credit rating and $31 billion just in cash and marketable securities."  Id. at 106.  The Third Circuit thus concluded that the Debtor "did not have any likely need in the present or near-term, or even in the long-term, to exhaust its funding rights to pay talc liabilities."  Id. at 108.  On that basis, the Third Circuit instructed this Court to dismiss the 2021 Chapter 11 Case.  Id. at 111.

In so ruling, the Third Circuit "did not duck an apparent irony:  that J&J's triple A-rated payment obligation for [the Debtor's] liabilities, which it views as a generous protection it was ***never required to provide*** to claimants, weakened [the Debtor's] case to be in bankruptcy."  Id. at 110-11 (emphasis added).  The court also contemplated the possibility that the Debtor might "part with its funding backstop to render itself fit for a renewed filing" but noted that such an action could be subject to fraudulent transfer law if the Debtor did not "receive reasonably equivalent value in exchange for forgoing its rights under the [2021] Funding Agreement."  Id. at 109 n.18.  The court appropriately refrained from speculating as to the merits of any potential fraudulent transfer claim that might in the future be asserted in connection with modified financial arrangements among the Debtor and the J&J Parties.

## E.    Claimant Support

While the appeal was pending, an agreement was developing between the Debtor and counsel for tens of thousands of claimants on a broad outline of terms for a plan of reorganization that would fully resolve all the Debtor's liability for talc-related claims.  First Day Decl. ¶ 72.  That agreement ultimately was memorialized in a series of Plan Support Agreements that had been executed and delivered by counsel representing over 60,000 claimants as of the Petition Date, and signed by the Debtor and the J&J Parties.  Id.[14]

The Plan Support Agreements provided that the Debtor, the J&J Parties and the claimants would work together to finalize, file and seek confirmation of a plan of reorganization that provided for the establishment of a trust funded in the amount of $8.9 billion on a net-present-value basis ($12.08 billion in nominal value over 25 years).  Id. ¶ 73.  On May 15, 2023, the

---

[14]    A copy of a form of Plan Support Agreement (without exhibits) is attached as Annex C to the First Day Declaration.

Debtor filed its Plan and Disclosure Statement proposing to establish a trust funded by this agreed amount.  If confirmed, the proposed trust funding amount of $8.9 billion would be the largest settlement amount in any asbestos bankruptcy case and the largest settlement amount in any mass tort bankruptcy.  Id.

### F.    Prepetition Transactions Relating to the Filing of the Chapter 11 Case

In view of the support of the substantial majority of talc claimants, and taking into account the excessive cost, burden, uncertainty and anticipated decades-long duration of the cosmetic talc litigation, the Debtor determined that the filing of this Chapter 11 Case was prudent, necessary and in the best interests of all constituents.  Id. ¶ 77.  The Debtor continues to believe that chapter 11 proceedings are the only method through which the Debtor and talc claimants can fully, equitably and permanently resolve all current and future talc-related claims.  Id.

The Third Circuit's finding that the Debtor was not in financial distress due to J&J's co-obligation in the 2021 Funding Agreement (LTL Mgmt., 64 F.4th at 110-11) defeated the fundamental purpose of J&J's support, which was to facilitate the Debtor's goal of resolving all current and future talc claims in a chapter 11 proceeding.  First Day Decl. ¶ 78; Counsel Decl. Ex. 1 (Apr. 18, 2023 Hr'g Tr.), Kim cross, at 64:20-23 ("What I'm saying is that when the Third Circuit made its decision, one of the ramifications of the decision was that it frustrated the purpose of the first funding agreement").  From J&J's perspective, its co-obligation was no longer enforceable.  From the Debtor's perspective, the availability of J&J's support was no longer certain.  First Day Decl. ¶ 78.  To eliminate that uncertainty *while retaining the same level of funding available to talc claimants*, the Debtor and the J&J Parties entered into new financing arrangements.  Id.  The funding arrangement with Holdco (formerly New JJCI)—the entity primarily obligated to fund the Debtor's talc expenses—remains largely unchanged:  its

value is still the amount of the Debtor's talc liability minus the value of the Debtor, and it is still

sufficient to fully pay talc claimants.  In addition, the Debtor and Holdco secured an agreement

from J&J to support the funding of the proposed Plan.  The new funding agreement and support

agreement together eliminate the risk of unenforceability of J&J's obligations under, and

conform to the original intent of, the 2021 Funding Agreement.  Id.

The Debtor's new financing arrangements were effectuated through three new

agreements.  Id. ¶ 79.  The Debtor and the J&J Parties entered into a termination and substitution

agreement (the "T&S Agreement") by which the 2021 Funding Agreement and a related

intercompany loan were terminated, and the parties, in substitution therefor, agreed to enter into

two new agreements.  Id.  Simultaneously with their entry into the T&S Agreement, the Debtor

and Holdco then entered into a new funding agreement without J&J (the "2023 Funding

Agreement" and, together with the 2021 Funding Agreement, the "Funding Agreements"), and

the Debtor, Holdco and J&J entered into a separate support agreement to effectuate J&J's

financial support for the Debtor (the "J&J Support Agreement").  Id.[15]

The 2023 Funding Agreement is similar to the 2021 Funding Agreement, other than J&J

is not a party.  Id. ¶ 80.  It imposes no repayment obligation on the Debtor and is not a loan.  Id.

It obligates Holdco to provide funding to the Debtor to pay for costs and expenses of the Debtor

incurred in the normal course of its business (i) at any time when there is no bankruptcy case;

and (ii) during the pendency of any chapter 11 case filed by the Debtor, including the costs of

administering the chapter 11 case, in both situations to the extent that any cash distributions

---

[15]    Copies of the T&S Agreement, the 2023 Funding Agreement and the J&J Support Agreement are attached
to the First Day Declaration as Annexes D, E and F, respectively.  The summaries herein of the terms of the
T&S Agreement, the 2023 Funding Agreement and the J&J Support Agreement are provided for the
convenience of the Court and parties in interest and are qualified in all respects by the terms of such
agreements.

received by the Debtor from Royalty A&M are insufficient to pay those costs and expenses.  Id.
In addition, the 2023 Funding Agreement requires Holdco to fund amounts necessary:  (i) to
satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case; and
(ii) in the event of a chapter 11 filing by the Debtor, to provide the funding for a trust created
pursuant to a plan of reorganization for the Debtor, in both situations to the extent that any cash
distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and
expenses and further, in the case of the funding of a trust, the Debtor's other assets are
insufficient to provide that funding.  Id.  As such, like the 2021 Funding Agreement, the 2023
Funding Agreement limits the Debtor's right to funding from Holdco to the amount of the
Debtor's aggregate liability for talc-related claims, minus the value of the Debtor.  But unlike the
2021 Funding Agreement, the obligations to fund a trust under a plan of reorganization in
chapter 11 are limited to the terms for a plan and trust set forth in the Plan Support Agreement,
as such terms may be amended or supplemented with the consent of the parties thereto.

The J&J Support Agreement, like restructuring support agreements typically used in
non-mass tort chapter 11 cases, is subject to the approval of the Court and is operative only in the
Chapter 11 Case.  Id. ¶ 81.  It obligates J&J to provide the trust funding Holdco is required to
provide under the 2023 Funding Agreement but only if Holdco fails to provide the funding.  Id.
The Debtor has the right to enforce J&J's obligation under the J&J Support Agreement.  Id.

Under the new financing arrangements, J&J's support is available only in bankruptcy and
only if approved by this Court.  As a result, J&J's balance sheet and liquidity were no longer
available to the Debtor before the filing of this Chapter 11 Case.  J&J's funding support, which
was always intended to facilitate, not frustrate, a bankruptcy filing by the Debtor now serves its
intended purpose.

**ARGUMENT**

Section 1112(b) of the Bankruptcy Code provides for dismissal of a chapter 11 case "for cause" upon the "request of a party in interest" and enumerates a list of sixteen "causes" for dismissal. See 11 U.S.C. § 1112(b)(4)(A)–(P). Failure to file a chapter 11 case in "good faith" is not an enumerated ground, yet most courts interpret "cause" to include such circumstances, largely based on pre-Code caselaw and its progeny. The good faith doctrine traces its roots to Chapter X under the Bankruptcy Act, entitled "Corporate Reorganizations." Bankruptcy Act of 1898, 11 U.S.C. §§ 501–676 (repealed 1978) (the "Act"). Chapter X required each bankruptcy petition to affirmatively show that (a) the debtor was "insolvent or unable to pay its debts as they mature," (b) the debtor has a "need for relief under this chapter" and (c) the petition was "filed in good faith."[16]

Extensive caselaw developed under Chapter X for dismissal of Chapter X cases based on these requirements. See, e.g., In re Southwest Enters., Inc., 261 F. Supp. 721, 724 (W.D. Ark. 1966). At the same time, courts often confused the dismissal standards in Chapter X with other chapters of the Act, "insert[ing] a 'good faith' filing requirement [into chapters even where it was] not contained in the statute." In re Victory Const. Co., Inc., 9 B.R. 549, 557 (Bankr. C.D. Cal. 1981) ("Victory"), vacated, 37 B.R. 222 (B.A.P. 9th Cir. 1984).

In 1978, Congress repealed the Act and replaced it with the Bankruptcy Code. In doing so, Congress intentionally removed the "good faith" requirement for filing a case (but kept it for confirmation of a plan) and eliminated the insolvency requirement for chapter 11 eligibility (although insolvency is required for municipal bankruptcy filings and chapter 7 liquidations).[17]

---

[16]    See Act, §§ 530(1), (7); 541; and 546.

[17]    Janet A. Flaccus, *Have Eight Circuits Shorted? Good Faith and Chapter 11 Bankruptcy Petitions*, 67 Am. Bankr. L.J. 401, 402-03 (1993) ("Chapter X of the Bankruptcy Act expressly required that petitions be filed

As the initial drafters of the Code explained, "the *'good faith' test* [for filing] a petition is *eliminated*."  Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 137, 93rd Cong., 1st Sess. (1973) at 183 (emphasis added).  Specifically, the Commission "generally agreed that the good-faith test should be replaced with specific grounds for dismissing or adjudicating" a bankruptcy petition.[18]  Congress incorporated these recommendations into the Code—omitting "bad faith filing" from the newly codified list of "causes" for dismissal, but retaining the Act's good faith requirement for plan confirmation.

Despite the repeal of the Act and introduction of the Code, many courts continued to engraft a good faith filing requirement under chapter 11.[19]  "The doctrine's genesis is largely the decision in [Victory]," where the bankruptcy court, "ruled [that] good faith was an implicit prerequisite to the filing of a chapter 11 petition."[20]  Victory, however, did not acknowledge that Congress had eliminated the good faith filing requirement.  Three years later, Victory was vacated by the Bankruptcy Appellate Panel, In re Victory Const. Co., Inc., 37 B.R. 222, 223 (B.A.P. 9th Cir. 1984).

*        *        *

---

in good faith.  The legislative history of the Bankruptcy Code shows that this express requirement was intentionally removed.  The omission of a good faith filing requirement was not inadvertent.  Given this legislative history, a question is raised whether the courts have any power to add a good faith filing requirement back in.")

[18]    Frank R. Kennedy & Gerald K. Smith, *Postconfirmation Issues:  The Effects of Confirmation and Postconfirmation Proceedings*, 44 S.C. L. Rev. 621, 732, n.409 (1993) (citing Gerald K. Smith & Randolph J. Haines, *Chapter 11-Reorganization*, 1988 Ann. Surv. Bankr. L., 495, 498-509 (1989) (reprinting portions of the minutes of the meeting held on February 22–24, 1973, by the Commission)).

[19]    Flaccus, supra note 17, at 401. ("Hundreds of courts and eight circuit courts of appeal have ruled that an implied good faith requirement limits access to chapter 11.  Chapter 11 expressly requires that plans be proposed in good faith in order to be confirmed, but it does not expressly require that petitions be filed in good faith.")

[20]    In re Victoria Ltd. P'ship, 187 B.R. 54, 56 (Bankr. D. Mass. 1995) (citing Victory, 9 B.R. at 554).

The Movants generally attempt to attack this Chapter 11 Case on three fronts.  <u>First</u>, they argue that the Debtor was not in financial distress on the Petition Date and thereby fails to satisfy the requirement of good faith, as interpreted by the Third Circuit.[21]  <u>Second</u>, they argue that the Debtor's actions following the Third Circuit's entry of its opinion through the Petition Date, particularly with respect to the substitution of the 2023 Funding Agreement and the J&J Support for the 2021 Funding Agreement after dismissal of the 2021 Chapter 11 Case, constitute "bad faith *per se*" justifying dismissal.[22]  <u>Third</u>, they argue that the Debtor cannot otherwise demonstrate good faith.[23]

The Movants' arguments contradict each other.  For instance, they argue that the Debtor has no financial distress, but then also argue that the Debtor undertook transactions that constitute a fraudulent transfer, in fact "the potentially largest fraudulent transfer in the history of the United States."[24]  It is more than odd that the Movants assert that the Debtor undertook the largest fraudulent transfer in the history of the United States, yet the transaction allegedly left the Debtor not only solvent, but not even financially distressed.  In any case, the Debtor's evidence will establish that each of the Movants' arguments are unfounded.

## I.  THE MOVANTS HAVE THE BURDEN OF PROOF TO SHOW CAUSE.

As an initial matter, the Movants assert that the burden of proof with respect to the Motions to Dismiss is on the Debtors.[25]  They are wrong.  Prior to 2005, the Third Circuit did hold that "Once at issue, the burden to establish good faith is on the debtor.  <u>15375 Mem'l Corp.</u>

---

[21]    <u>See</u> TCC Mot., 2-6, 22-27, 31; A&I Mot., 25-28; UST Mot., 11-13; States Mot., 12-13.

[22]    <u>See</u> A&I Mot., 5-7, 34-37; TCC Mot., 28-36; UST Mot., 14-15, 18-19; States Mot., 14-17; Crouch Mot., 1-13.

[23]    <u>See</u> TCC Mot., 8-9, 38-40; A&I Mot., 37-45; UST Mot., 16-17, States Mot., 18-19.

[24]    <u>E.g.</u> TCC Mot., 7.

[25]    <u>E.g.</u>, TCC Mot., 1; A&I Mot., 9, 24; UST Mot., 4; States Mot., 12; Crouch Mot., 12.

v. BEPCO, Op (In re 15375 Mem'l Corp.), 589 F.3d 605, 618 (3d Cir. 2009) (citing

NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express,

Inc.), 384 F.3d 108, 118 (3d Cir. 2004)); In re SGL Carbon Corp., 200 F.3d 154, 162 n.10 (3rd

Cir. 1999); LTL Mgmt., 64 F.4th at 100.  Courts outside the Third Circuit placed the burden in a

chapter 11 dismissal motion on the movant, not the debtor.[26]

    In any case, in 2005, Congress amended section 1112(b) to provide that a court must

dismiss a chapter 11 case "if the movant establishes cause."[27]  As a result, whatever law existed

in the Third Circuit prior to 2005 placing the burden of proof on the debtor for a dismissal

motion under section 1112(b), it was abrogated by Congress in 2005.  Congress expressly

legislated at that time that the burden of proof is on the movant, consistent with the law in all

---

[26]    See, e.g., Loop Corp. v. U.S. Tr., 379 F.3d 511, 517 (8th Cir. 2004) (movant bears the burden of proving cause to dismiss under section 1112(b)); Matter of Woodbrook Assocs., 19 F.3d 312, 317 (7th Cir. 1994) ("[T]he movant bears the burden of proving by a preponderance of the evidence that cause existed for dismissal of the debtor's bankruptcy case"); Avalon Hotel Partners, LLC, 302 B.R. 377, 384 (Bankr. D. Or. 2003) ("The moving party has the initial burden of making a prima facie case to support its allegations of bad faith."); In re Edybul Foods, Inc., No. 02-83997, 2003 WL 1860520, at *2 (Bankr. M.D.N.C. Apr. 8, 2003) ("The moving party bears the burden of proving by a preponderance of the evidence that cause exists for dismissal of the debtor's bankruptcy case."); In re V Companies, 274 B.R. 721, 726 (Bankr. N.D. Ohio 2002) ("The party requesting relief bears the burden of proving that cause exists by a preponderance of the evidence."); In re Halpern, 229 B.R. 67, 71 n.9 (Bankr. E.D.N.Y. 1999) ("[Debtor] does not have the burden of proof on the issue [of dismissal]."); In re In re Muskogee Env't Conservation Co., 236 B.R. 57, 59 (Bankr. N.D. Okla. 1999) ("The burden to show cause for dismissal of a Chapter 11 bankruptcy rests on the movant by a preponderance of the evidence."); In re Austin Ocala Ltd., 150 B.R. 279, 282 (Bankr. M.D. Fla. 1993) ("The burden to establish grounds for conversion or dismissal under § 1112(b) is on the moving party."); In re Namer, 141 B.R. 603, 606 (Bankr. E.D. La. 1992) ("When attacking a debtor for lack of good faith in the filing of a petition, the movant must first establish a prima facie showing of bad faith to shift the burden to the debtor to offer proof that the petition was in fact filed in good faith."); Matter of Santiago Vela, 61 A.F.T.R.2d 88-698 (Bankr. D.P.R. 1988) ("The burden of proof for conversion or dismissal lies with the moving party.").

[27]    Section 1112(b)(1) of the Bankruptcy Code, as amended in 2005, provided that:

    Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, ***if the movant establishes cause***.

11 U.S.C.A. § 1112(b)(1) (West 2005) (emphasis added).

other circuits.  This also made sense, because in 2005 Congress made dismissal under

section 1112(b)(1) mandatory if cause was found (subject to the exception set forth in

section 1112(b)(2) discussed below), rather than permissive, as had previously been the case.

Given the now mandatory nature of dismissal, Congress made clear that the movant bore the

burden of proof on the issue.

      The language requiring that "the movant establish[] cause" is no longer in

section 1112(b) solely by virtue of certain clarifying amendments to that section passed by

Congress in 2010 as part of "The Bankruptcy Technical Corrections Act of 2010".  Instead,

section 1112(b) simply states that the court shall dismiss "for cause."  See 11 U.S.C.

§ 1112(b)(1).  However, the legislative history to the Bankruptcy Technical Corrections Act of

2010 is clear that the act was not intended to effectuate any substantive changes to the

Bankruptcy Code.  For example, in his comments to the House in support of the amendment on

September 28, 2010, Representative Robert C. Scott states "since [the 2005 amendment's]

enactment, a number of technical drafting errors have been identified.... The Bankruptcy

Technical Corrections Act of 2010 corrects these purely technical errors.  156 CONG. REC.

H7158-01, H7159 (2010).  Comments from the bill's original sponsor also indicate the

amendments to § 1112(b) were not intended to effect substantive changes to the law.  In a speech

to the House in support of the bill, its original sponsor, Representative John Conyers stated that

the proposed bill "amends Bankruptcy Code section 1112(b), which sets forth the grounds for

converting or dismissing a chapter 11 case. The amendment restructures this provision to

eliminate an internal redundancy."  156 CONG. REC. H7158-01, H7160 (2010).

      Most importantly, drafters of the 2010 Amendments unequivocally state that the

legislation should not, in any way, be interpreted to effect any substantive changes to bankruptcy

law.   In his speech to the House, Representative Lamar Smith of Texas, a co-sponsor of the bill,

stated:

> It is important to highlight on the record that this bill does not, and is not intended
> to, enact any substantive change to the Bankruptcy Code.  The changes made to the
> Code by this bill are purely technical in nature.  No Federal judge should interpret
> any provision of this bill to confer, modify, or delete any substantive bankruptcy
> right, nor should anyone infer a congressional intent to alter substantive rights from
> the bill's attention to one section of the Bankruptcy Code but not another.

156 CONG. REC. H7158-01, H7161 (2010).

As a result, the intent of Congress remains that, consistent with the language of

section 1112(b) in 2005, the burden of proof for a motion to dismiss under section 1112(b) is

squarely with the movant, and nothing in the current language of that section is to the contrary.

See also In re Colbran, LLC, 475 B.R. 289, 294 (Bankr. D. Mass. 2012) ("[E]ven after the

Technical Amendments, the language of §§ 1112(b)(1) and (2) taken together suggests that

initially the burden is on the movant to show cause [under section 1112(b)(1)] which the debtor

must then rebut [under section 1112(b)(2)]."); In re Attack Properties, LLC, 478 B.R. 337, 342

(N.D. Ill. 2012) (agreeing and noting that "[s]uch an interpretation, furthermore, is consistent

with the placement of the burden on the moving party in a motion to dismiss pursuant to Federal

Rule of Civil 12(b)(6)").  Any case law that the burden of proof on such a motion is on the

debtor (which seemed to exist only in this Circuit) is no longer effective and is contrary to

section 1112(b).[28]

---

[28]    The Third Circuit's statement in its opinion that "[o]nce at issue, the burden to establish good faith is on the
debtor," merely recites the rule used in the Third Circuit before it was abrogated by the 2005 amendments.
LTL Mgmt., 64 F.4th at 100 (citing BEPCO, Integrated Telecom and SGL Carbon).  The allocation of
burden was not contested before this Court or the Third Circuit in the 2021 Chapter 11 Case, and thus the
Third Circuit's statement is not binding on this Court.  See Polansky v. Exec. Health Res. Inc., 17 F.4th
376, 385 (3d Cir. 2021), cert. granted sub nom. United States ex rel. Polansky v. Exec. Health Res., Inc.,
213 L. Ed. 2d 1063, 142 S. Ct. 2834 (2022) ("Questions which merely lurk in the record, neither brought to
the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute
precedents.") (quoting Grant v. Shalala, 989 F.2d 1332, 1341 (3d Cir. 1993)).

## II.       THE DEBTOR WAS IN FINANCIAL DISTRESS ON THE PETITION DATE.

The Movants' primary contention—that the Debtor's filing was in bad faith because the Debtor was not in financial distress—is belied by their own inconsistent assertions and by the application of this Circuit's law to the irrefutable facts of this case.  Just as with "good faith" generally, nowhere does the Bankruptcy Code specify that a Debtor must show "financial distress" to be eligible for relief under chapter 11, let alone define what is required to make that showing.  The Third Circuit stands alone in holding that financial distress is a separate requirement of good faith that must exist at the time of the filing.[29]  LTL Mgmt., 64 F.4th at 83 ("We start, and stay, with good faith. . . .  What counts to access the Bankruptcy Code's safe harbor is to meet its intended purposes.  Only a putative debtor in financial distress can do so.").  According to this Circuit, financial distress is a fact-based inquiry that depends on the totality of the circumstances, as determined by the bankruptcy court.  Id. at 100.  Moreover, in dismissing the Debtor's prior case, the Circuit clarified that a debtor need not be insolvent to be in financial distress.  Id. at 102.

### A.       The Movants' Attempts to Equate Financial Distress to Insolvency Fail.

The Movants erroneously equate the requirement of financial distress with insolvency.  The Third Circuit recognizes two types of insolvency:  "insolvency in the 'bankruptcy sense' (a deficit net worth immediately after the conveyance), and insolvency in the 'equity sense' (an inability to pay debts as they mature)."  Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1064 (3d Cir. 1992); see also Ketchum v. MacDonald, 85 F.2d 436, 438 (3d Cir. 1936); accord Case v. Los Angeles Lumber Prod. Co., 308 U.S. 106, 119 (1939).

---

[29]      As such, recognition of the absence of any good-faith requirement to file a chapter 11 case, as discussed above, must eliminate the financial-distress requirement that this Circuit has held is a component of good faith.

The Movants focus in particular on "equitable" or "cash-flow" insolvency—that is, the ability to pay debts as they come due.  E.g., TCC Mot., 24 ("The question is whether LTL can demonstrate that it cannot meet its liabilities as they come due.  If LTL can meet its liabilities as they come due, then LTL is not in financial distress.") (internal citation omitted).[30]  According to these arguments, the Debtor was not financially distressed as of the Petition Date because it does not dispute that it was equitably solvent on that date.[31]  The Movants generally support these arguments with cherry-picked quotes from the Third Circuit Opinion, which, in reality, state the reverse.

As the Third Circuit stated in its opinion:  "To say, for example, that a debtor must be in financial distress ***is not to say it must necessarily be insolvent***.  We recognize as much, as the Code conspicuously does not contain any particular insolvency requirement."  64 F.4th at 102 (emphasis added).[32]  Neither type of insolvency is a prerequisite for finding that a debtor is experiencing financial distress.  See, e.g., SGL Carbon, 200 F.3d at 163 ("[I]t is well established a debtor need not be insolvent before filing for bankruptcy protection."); In re Stolrow's Inc., 84 B.R. 167 (9th Cir. BAP 1988) (citation omitted) ("[n]either insolvency nor inability to pay debts

---

[30]    See also id. (presuming that the Debtor's "ability to meet its debts as they come due," which is undisputed, is "the central question"); UST Mot., 12 (describing the Debtor's "ability to meet its obligations in the ordinary course" as "the crucial factor").

[31]    See, e.g., TCC Mot., 26-27; States Mot., 2 ("Highlighting its lack of financial distress, the Debtor has also advised the Bankruptcy Court that it is solvent and that it has sufficient funds to pay talc claims.").

[32]    See also In re Marshall, 300 B.R. 507, 520 (Bankr. C.D. Cal. 2003), aff'd, 403 B.R. 668 (C.D. Cal. 2009), aff'd, 721 F.3d 1032 (9th Cir. 2013) ("[T]he filing of a bankruptcy case by or with respect to a solvent debtor has always been permitted under bankruptcy law, both under every bankruptcy law enacted in the United States and under every prior law enacted in England."); In re Auto Money N. LLC, No. C/A 22 03309 HB, 2023 WL 2991825, at *10 (Bankr. D.S.C. Mar. 28, 2023) ("The requirement that a debtor must be in financial distress does not mean that it must necessarily be insolvent."); 1500 Min. Spring Assocs., LP v. Gencarelli, 353 B.R. 771, 781 (D.R.I. 2006) ("[A] debtor is not required to await insolvency before filing a bankruptcy petition.").

is a prerequisite to seeking voluntary relief under the Bankruptcy Code."); In re Johns-Manville

Corp., 36 B.R. 727, 732 (Bankr. S.D.N.Y. 1984) (similar).

The Third Circuit Opinion left undisturbed the long history of solvent debtors in this

circuit and others that have sought and obtained the protections of the Bankruptcy Code,

including mass tort debtors.  See, e.g., In re Mid-Valley, Inc., 305 B.R. 425, 429-31 (Bankr.

W.D. Pa. 2004) ("fact of solvency does not require a finding that the bankruptcy filing was in

bad faith"); In re Mirant Corp., 2005 WL 2148362, at *12 (Bankr. N.D. Tex. Jan. 26, 2005)

(denying motion to dismiss bankruptcy case of solvent member of corporate family); In re

PG & E Corp., No. 19-30088 (Bankr. N.D. Cal.); In re N. Am. Refractories Co., No. 02-20198

(Bankr. W.D. Pa.); In re Garlock Sealing Techs. LLC, No. 10-31607 (Bankr. W.D.N.C.); In re

W.R. Grace & Co., Nos. 01-1139, 01-1140 (Bankr. D. Del.); In re USG Corp., No. 01-2094

(Bankr. D. Del.); In re United Gilsonite Labs., No. 11-02032 (Bankr. M.D. Pa.); see also In re

Ultra Petroleum Corp., 51 F.4th 138, 142 (5th Cir. 2022) (debtors became "supremely solvent"

during pendency of bankruptcy cases after natural gas prices increased); In re Honx, Inc.,

2022 WL 17984313, at *2 (Bankr. S.D. Tax. Dec. 28, 2022) ("Congress recognized that while an

asbestos bankruptcy differs from a 'classic' bankruptcy with an insolvent or near-insolvent

debtor, it is still a forward-looking solution meant to treat fairly all parties in interest.  That is the

hallmark purpose of chapter 11.").  Had the Third Circuit wished to equate financial distress with

either type of insolvency, as the Movants urge, it could have done so.  But it did not.

### B.    Financial Distress Requires Consideration of All Relevant Facts and Circumstances.

The Third Circuit confirmed that financial distress is, rather, a standard that takes into

account all relevant facts and circumstances.  LTL Mgmt., 64 F.4th at 100 ("Whether financial

distress exists depends on the underlying basic facts . . . and inferred facts").  The court did not

28

attempt to "predict all forms of financial difficulties that may in some cases justify a debtor's presence in Chapter 11." Id. at 102. Instead, "[w]hat we can do, case-by-case, is consider all relevant facts in light of the purposes of the Code." Id.; see also Archdiocese of New Orleans, 632 B.R. 593, 610–11 (Bankr. E.D. La. 2021) ("[S]olvency is but one of several factors that a court may consider in determining whether a debtor is experiencing financial distress at the time it filed for bankruptcy relief.").

The United States Bankruptcy Court for the District of Delaware, in In re Rent-a-Wreck, Inc., 580 B.R. 364 (Bankr. D. Del. 2018), identified certain helpful considerations for assessing the question of financial distress. That non-exclusive list of considerations includes: "solvency; cash reserves; recent financial performance and profitability; the proportion of debt owed to insiders; realistic estimates of actual or likely liability; the threat of litigation; whether a debt is fixed, substantial, and imminent; current cash position or current liquidity; ability to raise capital; and overdue debts or the ability to pay debts as they come due." Id. at 375-76 (citing cases for each factor). The application, relative importance and interplay of these factors will, of course, vary depending on the circumstances of each case.

Financial distress must be evaluated "in light of the purposes of the Code." LTL Mgmt., 64 F.4th at 102. Among the key purposes of chapter 11 are "avoidance of liquidation," In re Liberate Techs., 314 B.R. 206, 212 (Bankr. N.D. Cal. 2004) (quoting In re Johns–Manville Corp., 36 B.R. 727, 736 (Bankr. S.D.N.Y. 1984)), and treating creditors and other stakeholders fairly and equitably (thereby avoiding a "race to the courthouse" that results in inequitable treatment of similar claims). 11 U.S.C. § 1123(a)(4); In re Boy Scouts of Am. & Delaware BSA, LLC, 650 B.R. 87, 162 (D. Del. 2023). Those aims are heightened in mass tort cases, where liquidation of a going-concern business may cut off recoveries to future claimants. See id.

Congress expressly acknowledged these goals in enacting section 524(g):  "[T]he Committee

also recognizes that the interests of future claimants are ill-served if Johns-Manville and other

asbestos companies are forced into liquidation and lose their ability to generate stock value and

profits that can be used to satisfy claims."  H.R. REP. 103-835, 40-41 (1994), reprinted in 1994

U.S.C.C.A.N. 3340.

Another "principal purpose of the Bankruptcy Code" is providing "a fresh start to the

honest but unfortunate debtor."  Ellis v. Westinghouse Elec. Co., LLC, 11 F.4th 221, 230 (3d

Cir. 2021) (quoting Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367, 127 S.Ct. 1105, 166

L.Ed.2d 956 (2007)).  An equitable resolution of talc claims and establishment of a trust will

provide the Debtor with that fresh start while also protecting the interests of current and future

claimants.

A need to liquidate assets to satisfy judgments is a clear sign of financial distress.  That is

one teaching of SGL Carbon.  Although the Third Circuit held that the debtor lacked financial

distress in that case, it took pains to distinguish the debtor's situation from the "serious financial

. . . difficulties" experienced by the debtor in Johns–Manville.  Id. at 164.  In the Third Circuit's

view, the debtor in Johns-Manville experienced sufficient financial distress because of a

"growing wave of asbestos-related claims" that "could" ultimately "force[] partial liquidation" of

the debtor.  Id.; see also LTL Mgmt., 64 F.4th at 104 (citing finding in Johns-Manville, 36 B.R.

at 730, that asbestos litigation could "possibly result[] in a forced liquidation of key business

segments"); In re Wigley, 557 B.R. 671, 676 (B.A.P. 8th Cir. 2016) (upholding finding of

financial distress where debtor could not satisfy lawsuit "judgment without liquidating assets that

would lead to his own insolvency and the sharing of the financial distress to other entities").

In <u>Johns-Manville</u>, "[l]arge judgments had already been entered" against the debtor and "tens of thousands of asbestos health-related suits" loomed. <u>SGL Carbon</u>, 200 F.3d at 164.

A debtor need not "be *in extremis*" to be in financial distress, but the distress must be "immediate enough" that the debtor "could anticipate the need to file in the future;" an "attenuated possibility" is not enough. <u>LTL Mgmt.</u>, 64 F.4th at 102. The inquiry in the context of a chapter 11 reorganization case is focused on whether the filing will achieve the goals of a reorganization, <u>i.e.</u>, to optimize the amounts available to equitably compensate creditors and allow the viable businesses to continue with minimum impairment.

### C.    Taking Into Account All of the Facts and Circumstances, the Debtor Was Clearly in Financial Distress on the Petition Date.

Under the correct standard for financial distress and by any objective metric, the Debtor's evidence presented at the hearing will show that it was in financial distress at the commencement of this Chapter 11 Case.[33]

The Third Circuit made a number of findings about the Debtor's financial condition prior to its first bankruptcy filing. After first observing that "a debtor's balance-sheet insolvency or insufficient cash flows to pay liabilities (or the future likelihood of these issues occurring) are likely always relevant," the court found that the Debtor "was ***highly solvent*** with access to cash to ***meet comfortably*** its liabilities as they came due for the foreseeable future." 64 F.4th at 109. It based that finding largely on the Debtor's "direct access to J&J's exceptionally strong balance sheet" and the liquidity provided through the 2021 Funding Agreement. <u>Id.</u> at 106. The Debtor, however, no longer has access to the J&J "ATM." <u>Id.</u> at 106, 109.

---

[33]    Certain Movants have argued that the Debtor cannot rely on any evidence, including expert testimony, not in existence as of the Petition Date. <u>See</u>, <u>e.g.</u>, Crouch Mot., 9; TCC Mot., 25. Such arguments are meritless. As in other bankruptcies, the parties and the Court relied extensively on expert reports in the 2021 Chapter 11 Case on matters of financial distress. <u>See</u>, <u>e.g.</u>, <u>Archdiocese of New Orleans</u>, 632 B.R. 593, 606–11 (relying extensively on expert testimony in finding financial distress).

1.    **Balance Sheet**

From a balance-sheet perspective, the Third Circuit Opinion considered the Debtor's

access to an estimated $61.5 billion through the 2021 Funding Agreement and found that those

assets "exceeded any reasonable projections available on the record before us" concerning the

extent of the Debtor's talc liabilities.  In essence, the court found that the "distance" between the

Debtor's solvency and "the brink" was too great.  Id. at 104.

Although the value of the Debtor's assets still exceeds the amount of the talc liabilities as

of the Petition Date, see Counsel Decl. Ex. 1 (Apr. 18, 2023 Hr'g Tr.), Kim cross, at 180:20-22,

the circumstances have changed significantly since the Third Circuit Opinion.  On the asset side,

the Debtor had, prior to filing, $14.51 million in cash, ownership of a business (Royalty A&M)

valued at more than $367 million,[34] and rights under the 2023 Funding Agreement with Holdco.

Holdco, for its part, had approximately $400 million in cash.  See First Day Decl. ¶ 27.  As

described above, Holdco is a holding company with predominantly minority ownership interests

in foreign subsidiaries and indirect affiliates.  Based on valuations performed by third parties in

the regular course of business, the Debtor believes that Holdco's share of the value of those

subsidiaries and indirect affiliates is approximately $30 billion on a going-concern basis.

As to liabilities, there has been a "huge spike" in the number of talc claims against the

Debtor since its initial chapter 11 petition on October 14, 2021.[35]  See also Counsel Decl. Ex. 1

(Apr. 18, 2023 Hr'g Tr.), Kim redirect, at 180:13-17 ("That liability, if anything, has gotten

bigger. We know that after a year of being in bankruptcy, we have at least—I think it almost

---

[34]    See April 2023 MOR, 14.

[35]    Counsel Decl. Ex. 1 (Apr. 18, 2023 Hr'g Tr.), Birchfield argument, at 307:13.  Mr. Birchfield serves on the
Plaintiffs' Steering Committee of the ovarian cancer MDL and as counsel for TCC member Alishia
Landrum.

doubled from what we know from unknown claims."). Given the changes to the financing

arrangements between the Debtor and the J&J Parties, as well as the increase in claims,[36] there

can be no dispute that the extent of the Debtor's solvency has narrowed since October 14, 2021.

While the Debtor is prepared to settle all of its talc liability for $8.9 billion, plaintiff firms

purporting to represent thousands of claimants (the actual number is unknown), as well as states

holding consumer protection claims, third-party payors, and others, have been unwilling to do so.

This suggests, of course, that these parties believe the Debtor's talc liabilities exceed $8.9 billion,

perhaps significantly and by many multiples. The Movants' representations to this Court suggest

exactly that.

In its Informational Brief, the TCC's predecessor maintained that the $8.9 billion would

"***prove[] inadequate*** to pay present and future tort claims in full" and fail to cover "***billions of***

***dollars of claims*** asserted by third-party payors and government units, and likely ***billions of***

***dollars*** for claims for indemnification and other damages asserted by talc suppliers such as

bankrupt Imerys and Cyprus companies, distributors, and hundreds of retailers." Dkt. 79, ¶¶ 30,

72. The TCC further maintains—as does the U.S. Trustee—that the proposed $8.9 billion

settlement would compensate talc liabilities at "***pennies on the dollar***." Dkt. 517, ¶ 12 (TCC

reply in support of cross-motion to temporarily suspend case); UST Mot., 3 ("cents on the

dollar").

And, when asked through an interrogatory to state the "amount of trust funding that

***would be adequate*** to provide fair compensation" to just individual ovarian cancer and

mesothelioma claimants, the TCC answered: "the total value previously available under the

---

[36]    The Debtor expects to provide expert testimony at the hearing on the total and periodic estimated costs to
defend and resolve the talc claims in the tort system.

2021 Funding Agreement" (i.e., *some $61.5 billion*).  Counsel Decl. Ex. 6 (TCC's Resp. to

Interrog. No. 1).

    Mr. Birchfield has repeatedly told this Court that the $8.9 billion proposal is "a ***deeply***

***discounted settlement***" that pays "***deeply discounted*** values" and falls "***woefully short***."

Counsel Decl. Ex. 1 (Apr. 18, 2023 Hr'g Tr.), Birchfield argument, at 306:14-15, 310:24-311:1;

Counsel Decl. Ex. 7 (Apr. 11, 2023 Hr'g Tr.), Birchfield argument, at 121:25-122:5; see also id.

at 84:18-92:14.  In an email to his clients, he said:

> $8.9 billion sounds like a lot of money, and it is.  But it is, ***by far***,
> not enough when you consider the terms of the proposal.  This
> settlement proposal would pay far less than $120,000 per case, if
> that.
>
> The cost of medical care and lost wages alone for ovarian cancer
> victims approach $500,000.  That does not address the pain and
> suffering nor punitive damages for women, and their families have
> suffered tremendously at the hands of J&J's massive and deliberate
> cover-up of the dangers of its asbestos-laden talc products. The
> medical costs incurred by mesothelioma victims are even higher.

Counsel Decl. Ex. 8 (BeasleyAllen000019-20).

    The Ad Hoc States likewise maintain that the $8.9 billion is inadequate.  They argue the

proposed settlement "is ***woefully inadequate*** to satisfy governmental entities' talc-related

claims."

    In sum, while the Debtor maintains that its assets exceeded its liabilities on the Petition

Date, the "distance" between the two is narrower than it was prior to the 2021 Chapter 11 Case.

Indeed, the Movants appear to contend that distance has been eliminated completely.  And this

does not consider billions in escalating legal fees and expenses that would be necessary to defend

the tens to hundreds of thousands of talc claims in the tort system in the ensuing decades.

### 2.    Ability to Pay Debts as They Come Due

As noted, the Third Circuit Opinion found that the Debtor could "***meet comfortably*** its liabilities as they came due for the foreseeable future." 64 F.4th at 109. The Debtor continues to believe that it has the ability to pay its debts as they come due and, therefore, is not equitably insolvent. See Counsel Decl. Ex. 1 (Apr. 18, 2023 Hr'g Tr.), Kim cross, at 180:20-22. But as with balance-sheet insolvency, there can be no reasonable dispute that the Debtor's means to generate cash to pay its talc obligations on an ongoing basis in the tort system has changed significantly since the date of its first bankruptcy petition.

Prior to the Petition Date, the Debtor itself had less than $15 million in cash, which would likely be depleted in less than a month by defense costs alone. See 2021 First Day Decl. ¶ 40. And the Debtor has never received dividends from Royalty A&M. For its part, Holdco had approximately $400 million to satisfy any obligations under the 2023 Funding Agreement. The trend in Old JJCI's historical costs to defend and resolve talc claims indicates that the Debtor likely would—if repeated—exhaust that liquidity in less than six months. Added to this is the increased possibility of more exorbitant verdicts as the trial courts ramp up trials against the Debtor after almost two years of inactivity, and plaintiffs seek to consolidate cases as was done in Ingham. See Counsel Decl. Ex. 9 (Jan. 28, 2022 Expert Report of Gregory K. Bell, Ph.D.), ¶¶ 48-49. One plaintiff verdict could singlehandedly wipe out any existing liquidity at the Debtor and Holdco.[37]

---

[37]    In arguments raised in the Mid-Valley chapter 11 cases after the Third Circuit's decision in SGL Carbon, counsel to asbestos claimants urged the court to "utterly reject" the contention that "'teetering on the verge of a fatal financial plummet' is required before a debtor may seek chapter 11 protection . . . ." *Response of Tort Victims Represented by Baron & Budd and Silber Pearlman to the Motions to Dismiss Filed by Various Insurers* (the "Mid-Valley Asbestos Claimants' Brief"), In re Mid-Valley, Inc., No. 03-35592-JKF [Dkt. 482] (Bankr. W.D. Pa. Jan. 29, 2004), Counsel Decl. Ex. 10 at 12. Counsel argued the Mid-Valley chapter 11 case was "possessed of a clear reorganization purpose: the invocation of 11 U.S.C. §§ 524(g) and 105(a) to ensure equitable treatment of present and future mass tort claimants and provide a mutually

All indications, however, suggest that the Debtor's future defense costs in the tort system would accelerate and far surpass its historical costs. This is due to the build-up of claims prior to and during the pendency of the 2021 Chapter 11 Case, the possibility that the MDL will unleash tens of thousands of talc claims to their home jurisdictions after completion of pretrial proceedings and the burgeoning possibility of consolidated trials. See id. ¶ 47, Ex. H (defense costs rose to $292 million in 2019 and were "substantially deferred" thereafter through commencement of the 2021 Chapter Case by the impact of COVID-19 pandemic and the MDL such that it is appropriate to expect "a substantial increase in future Talc Litigation defense costs").

The trend toward greater trial consolidation is especially prejudicial to the Debtor and the J&J Parties. The mass of evidence makes it impossible for jurors to keep individual cases separate, the multiple claimants naturally make jurors more inclined to find both liability and causation, and jurors inevitably hear evidence that would be inadmissible in individual cases.[38] In addition, when faced with multiple plaintiffs, the jury is inclined to speculate that something must be wrong with the product because multiple plaintiffs are asserting similar claims.[39] These concerns are especially heightened in personal injury and product liability litigation, where the

---

acceptable global resolution of crippling mass tort litigation." Id. at 25; see also id. at 3, 9 (stating section 524(g) was "designed for precisely" the situation faced by the Mid-Valley debtors, noting they were "ideal candidates for § 524(g) protection" given their ability to "ensure both fair and equitable recovery for present and future claimants and the enduring financial viability of the reorganized debtor"). Counsel acknowledged the crushing demands placed on any company facing thousands of asbestos-related claims, observing that "any one" of these claims "might lead to liability in the tens or even hundreds of millions of dollars, and which, in aggregate, could threaten the financial viability of even the healthiest company." Id. at 3.

[38] See, e.g., A.F.I.K. Holding SPRL v. Fass, 216 F.R.D. 567, 570 (D.N.J. 2003) (citations omitted); Hailey v. City of Camden, 631 F. Supp. 2d 528, 553 (D.N.J. 2009).

[39] See, e.g., Sidari v. Orleans Cnty., 174 F.R.D. 275, 282 (W.D.N.Y. 1996) (finding consolidation of two employment discrimination cases unfairly prejudicial to defendants because "lumping" the claims together amounts to "guilt by association"; Grayson v. K-Mart Corp., 849 F. Supp. 785, 790 (N.D. Ga. 1994) ("There is a tremendous danger that one or two plaintiff's unique circumstances could bias the jury against defendant generally, thus, prejudicing defendant with respect to the other plaintiffs' claims.").

plaintiffs' claims turn on case-specific inquiries related to causation and other individualized issues that are likely to become confused.[40]  A study of asbestos litigation in New York state courts found consolidation increased plaintiff's chances of success by 75%.  Verdicts were 250% more per plaintiff than individual awards there and "315% more per plaintiff than the national average award."[41]  The potential for consolidation of many talc claimants' claims in the tort system has already been raised multiple times since dismissal of the 2021 Chapter 11 Case.[42]

The substantial increase in claims, the expected ramp-up in trials in the near term, the consolidation of trials and the inevitable exponential increase in defense costs, expose the fallacy of the argument raised by certain Movants that, with access to potentially $30 billion in assets, the Debtor cannot be in financial distress if its proposed $8.9 billion settlement is a fair resolution of all talc liabilities.[43]  In addition to being a present valuation of total settlement consideration of $12.08 billion, the $8.9 billion settlement amount does not take into account any of these tort system factors that will require substantial cash payments in the near term.

Although Holdco may receive dividends from its subsidiaries and indirect affiliates that could provide additional sources of cash to honor its obligations under the 2023 Funding

---

[40]    See, e.g., In re Consol. Parlodel Litig., 182 F.R.D. at 444, 447 (denying consolidation of cases against drug manufacturer because "[a] consolidated trial . . . would compress critical evidence of specific causation and marketing to a level which would deprive [defendant] of a fair opportunity to defend itself"); In re Rezulin Prods. Liab. Litig., 168 F. Supp. 2d 136, 146 (S.D.N.Y. 2001) ("Joinder 'of several plaintiffs who have no connection to each other in no way promotes trial convenience or expedites the adjudication of asserted claims.'") (internal citation omitted).

[41]    See Peggy L. Ableman, et al., The Consolidation Effect: New York City Asbestos Verdicts, Due Process and Judicial Efficiency, 14 Mealy's Asbestos Bankr. Rep. 9 (2015), attached as Ex. 11 to the Counsel Declaration.

[42]    See, e.g., Counsel Decl. Ex 12 (Apr. 29, 2023, Letter from Hon. Ana C. Viscomi to "All plaintiffs' counsel who have J&J Talc matter venued in Middlesex County") (referencing request to consolidate 22 cases for trial and stating court's historical practice of consolidating cases sua sponte); Counsel Decl. Ex. 13 (May 19, 2023 Hr'g Tr., Daugherty v. Johnson & Johnson, No. RG19013937, Alameda County Superior Court) at 5:21-6:2, 6:10-7:2 (statements by Mr. Satterley regarding his intent to file a motion to consolidate cases); id. at 21:5-22:24 (statements by the Alameda County court ahead of the filing of any motion that it favors consolidation because "we're backlogged").

[43]    UST Mot., 13; A&I Mot., 31.

Agreement, the amount and timing of any dividends is uncertain.  See Black, Corporate

Dividends and Stock Repurchases § 1:1, Westlaw (updated Feb. 2022) (dividends require both

that (1) a "corporation has increased its wealth due to [its] profitability," and (2) it then "has

decided to distribute some of that wealth" to shareholders, instead of reinvesting in the

company).  First, Holdco has no power to compel dividends from any of its subsidiaries or

indirect affiliates.  Moreover, there are foreign statutory restrictions, competing demands for

cash throughout J&J, industry risks, corporate governance issues, tax and accounting

considerations and other factors that would impact the level and timing of dividends that might

flow up to Holdco in any given year.  The risks to receiving regular dividends are particularly

acute here given that Holdco, as a predominantly minority owner, is several steps away from its

indirect dividend-declaring subsidiaries and indirect affiliates.  The wide variability in the

amount of dividends historically paid by the Holdco subsidiaries and indirect affiliates

demonstrates the potential risks to Holdco's ability to receive predictable dividends in the future.

And even if dividends will from time to time flow up to Holdco, there is substantial uncertainty

as to whether they would be sufficient to, or received in time to, satisfy potentially crippling

defense costs, settlements and possible Ingham-like verdicts.

    While the Debtor and Holdco could attempt to liquidate their equity interests to

supplement their existing cash balances, having to do so would epitomize financial distress.

Sales of predominantly minority ownership interests in various subsidiaries and affiliates would

undoubtedly be made at significant discounts to going-concern values.  Further, Holdco has no

authority to require its minority-owned subsidiaries to sell their operational or other assets or to

declare dividends.  And, as the Third Circuit made clear, financial distress is present where a

debtor's contingent liabilities create a threat of "forced liquidation of key business segments."

64 F.4th at 104 (quoting Johns-Manville, 36 B.R. at 730).[44]  Here, Holdco would in fact be forced to liquidate itself to pay talc costs.

Nor is there any basis to believe that either the Debtor or Holdco could raise capital through other means, except through possible internal or external borrowing that would be uneconomic and could only be repaid through asset sales.  As this Court previously held in the 2021 Chapter 11 Case, J&J has no "legal duty" to bail out one of its wholly owned or affiliated subsidiaries, either through a loan or otherwise, and there is no basis on this record to believe that it will.  637 B.R. at 418; see also In re AIG Fin. Prods. Corp., No. 22-11309 (MFW), 2023 WL 3360562, at *5 (Bankr. D. Del. May 10, 2023) (in finding subsidiary was in financial distress, noting among other things that "AIG is under no obligation to continue to fund the Debtor indefinitely").  And, should the Debtor or Holdco arrive at a situation where intercompany or third-party financing is necessary to fund talc costs, given Holdco's limited liquidity, any available financing would be expensive and could be repaid only through asset sales.

In sum, although the Debtor believes it has the means to pay debts as they come due, its and Holdco's limited liquidity coupled with the uncertainty in the timing and amount of future dividends means that Holdco and/or the Debtor would have to liquidate assets in order to pay talc costs.  That need to liquidate, by itself, constitutes financial distress.

---

[44]   Some Movants quibble that the Debtor lacks meaningful business operations and therefore "key business segments" to liquidate and, as a result, a valid reorganizational purpose.  See TCC Mot., 27 n.107; A&I Mot., 31-32.  For the reasons described below, see infra § III.A, the Debtor has a valid reorganizational purpose in seeking to equitably resolve current and future talc claims.  The only authority that the TCC cites in support of its argument, BEPCO, was not a mass tort case seeking to establish a trust to resolve current and future claims.  And Arnold & Itkin cites no authority at all.  Moreover, this argument ignores the Debtor's and Holdco's actual operations as owners of significant revenue-generating subsidiaries.

### 3.    Other Factors

To the extent not already discussed above, application of the other relevant factors articulated by the Delaware bankruptcy court in <u>Rent-a-Wreck</u> further demonstrate that the Debtor was in financial distress.

The Debtor faced much more than a mere "threat of litigation." <u>Rent-a-Wreck</u>, 580 B.R. at 375. It faced an actual, overwhelming wave of mass tort cases. The 38,000 filed claims it faced at the time of its first bankruptcy filing had climbed significantly as of the Petition Date. <u>See</u> Counsel Decl. Ex. 1 (Apr. 18, 2023 Hr'g Tr.), Kim redirect, at 180:13-17. Litigation was not merely threatened; it was widespread and ongoing, with more runaway verdicts or burdensome settlements possible at any time.

Even if it wanted to, the Debtor had no ability—financially or practically—to fully defend against the tens of thousands of claims that would have been unleashed after dismissal of its first bankruptcy case. The Debtor could not spend $2 million to $5 million to try each of these cases without exhausting its assets, even if the Debtor could hypothetically staff such an effort (which it could not). The fact that the Debtor has no alternative but to settle what it views as meritless litigation itself is a strong indicator of financial distress.

And there is nothing speculative about the talc liability the Debtor faces. The Debtor has already incurred billions in judgments, settlements and litigation costs. Absent a global resolution in bankruptcy, this pattern ***will*** continue ***for decades***. The considerable uncertainty about the eventual extent of those costs only further supports a finding of financial distress. <u>See</u> <u>Johns-Manville</u>, 36 B.R. at 739 (filing found to be in good faith where debtor faced settlement demand approaching $1 billion to compensate 15,500 prepetition asbestos claimants, with 6,000 more claimants arising in the 16 months after the filing "as future claims back into the present").

The Debtor faces debts that in many ways are "fixed, substantial, and imminent." Id. As of the Petition Date, for example, it had sustained hundreds of millions of dollars in bonded judgments that were pending appeal. Just as in Johns-Manville, "[l]arge judgments ha[ve] already been entered" against the Debtor, tens of thousands of claims are pending, and "the prospect loom[s] of tens of thousands" more for decades to come. SGL Carbon, 200 F.3d at 164.

Most of the Debtor's liability is due to contingent and disputed tort claims. By any measure, the number of claims is more than "substantial;" it is massive. And there is nothing distant about these debts. They are imminent. "[A]ny one" of these claims "might lead to liability in the tens or even hundreds of millions of dollars, and which, in aggregate, could threaten the financial viability of even the healthiest company." Mid-Valley Asbestos Claimants' Br., 3. The Debtor's debts are not "owed to insiders." Rent-a-Wreck, 580 B.R. at 375. They are owed to talc claimants represented by aggressive plaintiffs' counsel who mine for claims through extensive advertising. Debt forgiveness is not a possibility.

\* \* \*

Under the circumstances—which will be further explained through evidence presented at the hearing—the Debtor submits that there should be no reasonable dispute that it was in financial distress immediately prior to the Petition Date. The TCC's own statements and acts acknowledge the significant possibility that this Court will find the Debtor *was* in financial distress. Otherwise, there would be no basis for its recent motion for derivative standing to pursue various estate causes of action [Dkt. 489], including for actual fraudulent transfer, constructive fraudulent transfer, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and civil conspiracy. See Dkt. 489-3 (draft complaint). It is simply impossible to reconcile

the TCC's contention that these largely insolvency-based claims are "colorable" [Dkt. 489-1,

at ¶ 44-59] with any contention that the Debtor was not at least in financial distress.

The circumstances here present more than an "attenuated possibility" of a need to "file

for bankruptcy in the future." LTL Mgmt., 64 F.4th at 102 (quoting SGL Carbon, 200 F.3d

at 164).  The Court should find that the Debtor was experiencing financial distress.

## III.    THE RESTRUCTURING OF THE FUNDING AGREEMENTS WAS NOT IN BAD FAITH.

Several Movants argue that the Debtor's actions in restructuring the Funding Agreements

were themselves bad faith.[45]  These Movants contend that the exchange of the Debtor's rights

under the 2021 Funding Agreement for its rights under the 2023 Funding Agreement constituted

an actual or constructive fraudulent transfer, a breach of fiduciary duty and/or a violation of the

Bankruptcy Code.  These exaggerated arguments, however, rely on mischaracterized facts and

incorrect assumptions.  And they are directly contrary to the Movants' arguments that the Debtor

has no financial distress.

The Debtor had the ability to meet talc expenses under the 2021 Funding Agreement and

has the same ability under the 2023 Funding Agreement.  The Movants recite this Court's

statement that the Debtor's financial distress "certainly appears manufactured by the Debtor,

Holdco and J&J in response to the Third Circuit's ruling" (Counsel Decl. Ex. 14 (Apr. 20, 2023

Hr'g Tr.), at 7:18-19) to argue that the restructuring of the Debtor's funding support constitutes

bad faith *per se*.  However, Holdco's obligations under the 2023 Funding Agreement as of the

Petition Date were fundamentally the same as New JJCI's obligations at the commencement of

the 2021 Chapter 11 Case.  And, as the Debtor has asserted and the Movants do not dispute, the

---

[45]    See A&I Mot., 5-7, 34-37; TCC Mot., 28-36; UST Mot., 14-15, 18-19; States Mot., 14-17; Crouch Mot., 1-13.

value of Holdco, estimated to be $30 billion on a going concern basis, is sufficient to pay the

Debtor's talc liabilities.

The primary change made to the funding arrangements in advance of the second

bankruptcy filing was to making J&J's support available only in reorganization to effectuate the

Plan.  According to the Third Circuit, without that change, the Debtor would be foreclosed from

a reorganization case supported by the firms representing the vast majority of the claimants.

As the Third Circuit noted, J&J's agreement under the 2021 Funding Agreement to backstop

New JJCI's obligation to fund the Debtor's talc expenses, "was generous protection it was never

required to provide to claimants." LTL Mgmt., 64 F.4th at 110-11.  Unfortunately, that

generosity led the Third Circuit to conclude that the Chapter 11 Case had to be dismissed for

lack of financial distress.  Because the fundamental purpose of the J&J backstop was to facilitate

a bankruptcy filing; indeed, the fundamental consideration for J&J providing that backstop was

the filing of a chapter 11 case, the Third Circuit's decision had the effect of defeating the purpose

of the backstop.  From J&J's perspective, this frustration of purpose caused the backstop to be

void or voidable, and the Debtor determined that the Third Circuit's decision created substantial

uncertainty regarding the enforceability of the backstop.  That uncertainty was eliminated when

the Debtor and the J&J Parties entered into new financing arrangements that provided the Debtor

with the financial resources it needs to satisfy its talc liability.  J&J once again agreed to

backstop Holdco's obligations in the Chapter 11 Case, as it originally intended, in order to

facilitate, not impede, the filing of the Chapter 11 Case.  That change, which effectuated the

intent of the original J&J backstop, did not harm claimants because the Debtor has sufficient

resources to fund its obligations under the Plan (to the extent that Holdco needs a backstop to

satisfy the Plan payments), and, as noted, Holdco's value remains sufficient to meet talc

expenses had the Debtor not filed the Chapter 11 Case.

> **1.      The 2023 Funding Agreement Is at Least as Valuable to the Debtor's Estate and Claimants as the 2021 Funding Agreement.**

The values to the Debtor's estate and claimants of the 2021 Funding Agreement and the

2023 Funding Agreement from Holdco/New JJCI are the same.  Under both Funding

Agreements, the Debtor's ability to access funds is strictly limited to certain specific purposes.

In addition to ordinary course expenses outside of chapter 11 and costs of administration of any

chapter 11 case, each Funding Agreement provides the Debtor with funding to satisfy only "Talc

Related Liabilities," as defined therein.  See 2021 Funding Agreement, § 1 (definition of

"Permitted Funding Use");[46] 2023 Funding Agreement, § 1 (same).  And each Funding

Agreement features an ***identical*** definition of Talc Related Liabilities.  Compare 2021 Funding

Agreement, Sch. 1 (definition of "Talc Related Liabilities") with 2023 Funding Agreement,

Sch. 1 (same definition).  For purposes of determining the value of the agreements to the Debtor

and claimants, therefore, the relative values of the obligors thereunder (estimated to be

approximately $61.5 billion with respect to New JJCI originally under the 2021 Funding

Agreement and approximately $30.0 billion with respect to Holdco under the 2023 Funding

Agreement) are irrelevant unless the amount of Talc Related Liabilities approaches those

amounts.

Because all the Movants are alleging that the Debtor is not in financial distress, they

cannot be contending for purposes of the motions to dismiss that the amount of the Talc Related

---

[46]     Pursuant to the definition of "Permitted Funding Use" the amount payable under each Funding Agreement is actually the Talc Related Liabilities less the amount of any dividends the Debtor receives from Royalty A&M and, in the case of the funding of a chapter 11 trust only, less the value of the Debtor's assets.

Liabilities exceeds $30 billion.[47]  Accordingly, the value of each of the Funding Agreements to the Debtor's estate and to claimants necessarily equals the amount of the liability minus the value of the Debtor.

Although the value of the obligors is irrelevant in determining the value of the funding agreements, it is important to note that that transfer of the Consumer Business in early January 2023, prior to the issuance of the Third Circuit Opinion, was completely separate from and had nothing to do with the filing of the Debtor's second bankruptcy case.  The transfer occurred in connection with the previously publicly announced spin-out of that business to the public, which announcement dated all the way back to 2021, by which time the transfer, which was also unrelated to the 2021 Chapter 11 Case, had already long been planned.  Because that transaction had no connection to the modifications to the Debtor's financing arrangements or the filing of the second bankruptcy case, it provides no support for the Movants' bad faith allegations.

The Movants' repeated efforts to substitute the value of the counterparties to the agreements for the value of those agreements to the Debtor are ill founded.[48]  Some go so far as to characterize the estimated value of New JJCI as a "floor" to claimant recoveries.[49]  Others compare the value of New JJCI to the settlement consideration of $8.9 billion to be provided in

---

[47]  See, e.g., Counsel Decl. Ex. 6 (TCC's Resp. to Interrog. No. 1) (responding that "the total value previously available under the 2021 Funding Agreement" (i.e., approximately $61.5 billion) "would be adequate to provide fair compensation" to individual ovarian cancer and mesothelioma claimants").

[48]  See, e.g., UST Mot., 9-10 ("The effect of the T&S Agreement, then, appears to be LTL's surrender of a contract right worth potentially $61.5 billion (or more) to itself and its creditors for one worth far less, possibly tens of billions of dollars less."); Counsel Decl. Ex. 1 (Apr. 18, 2023 Hr'g Tr.), Kim cross, at 62:17-25 ("Q:  Funding agreement one, the debtor had $60-odd billion available to it to satisfy my client's claims, right?  A:  Prior to the Third Circuit decision, I would say yes.  Q:  Great. Today, how much does the debtor have available to it under its funding agreement to satisfy talc claims?  A:  I think there's a calculation about what the value of—an internal valuation of the principal assets of Holdco which is around $30 billion . . . .").

[49]  See, e.g., Crouch Mot., 2 (arguing the 2021 Funding Agreement "had a value of *at least* $61.5 billion.") (emphasis in original); UST Mot., 9 ("Specifically, while under the 2021 Funding Agreement J&J and New JJCI were each jointly and severally liable to LTL for an amount that could never be less than $61.5 billion.").

accordance with the Plan Support Agreements, incorrectly suggesting a $50 billion loss in value.[50]  These arguments are red herrings; the Funding Agreements speak for themselves. Because the value of Holdco under the 2023 Funding Agreement exceeds the amount of the Talc Related Liabilities by all realistic estimates, the face values of the two agreements to the Debtor's estate and its creditors are the same.[51]  In fact, for the reasons discussed below, the 2023 Funding Agreement plus the J&J Support Agreement are more certain for the Debtor's estate because, following dismissal of the 2021 Chapter 11 Case, there was a material risk that the 2021 Funding Agreement was unenforceable against J&J as a result of the Third Circuit Opinion.

**2.      The Risk That the 2021 Funding Agreement Was Not Enforceable Against J&J**

The Third Circuit's ruling had the effect of defeating the fundamental purpose of—and depriving J&J of the material consideration it offered for—J&J's backstop commitment under the 2021 Funding Agreement.  J&J made that commitment to facilitate the Debtor's goal of resolving all current and future talc claims pursuant to section 524(g) of the Bankruptcy Code. See, e.g., Counsel Decl. Ex. 16 (Feb. 18, 2022 Hr'g Tr.), Gordon argument, at 57:6-58:20 (explaining reasons for including J&J as a co-obligor in the Funding Agreement).  J&J was not

---

[50]      See, e.g., States Mot., 21 ("LTL filed a second case after orchestrating transactions to manufacture financial distress and garner perceived support for a plan capping funding at $8.9 billion, more than $50 billion less than what was available in LTL 1.0."); Counsel Decl. Ex. 1 (Apr. 18, 2023 Hr'g Tr.), Kim cross, at 77:21-25 ("Q:  Just to wrap up, today, J&J's maximum liability is $8.9 22 billion, right?  A:  Under the support agreements that it has.  Q:  So with—because of the Third Circuit's decision, J&J got off the hook for $50 billion of talc liability?").  The TCC's counsel attempted this argument again at the May 16, 2023 hearing. See Counsel Decl. Ex. 15 (May 16, 2023 Hr'g Tr.), Jonas argument, at 74:10-13 ("At the preliminary injunction trial on the 18th of April, and among other places, page 66, line 18, through page 67, line 15, Mr. Kim confirmed that J&J's total funding agreement exposure went from $60 billion to $8.9 billion.").

[51]      This fact also refutes Mr. Crouch's leading argument that the Debtor misstated the value of its assets as $1,000,000,001-$10 billion in both the 2021 Chapter 11 Case and this Chapter 11 Case.  See Crouch Mot., 1-3.  The value of both funding agreements is the same; that is, the amount of the Talc Related Liabilities less the value of the Debtor.

required to sign the 2021 Funding Agreement, but it did so to avoid any distraction in the 2021

Chapter 11 Case with respect to the already announced planned transfer of the Consumer

Business from New JJCI.  At the same time, there was never any credible argument that the talc

liabilities would exceed the approximately $30 billion in value that would remain in New JJCI

after that already announced transfer.  Nor is there any credible argument today that such

liabilities exceed $30 billion.  As the Third Circuit noted, J&J's participation in the 2021

Funding Agreement was gratuitous, but it was designed to facilitate the 2021 Chapter 11 Case by

avoiding a distraction that could have arisen in the case as a result of the already-announced

planned transfer of the Consumer Business.[52]

The Third Circuit determined that the participation of J&J had the exact opposite effect;

that is, the J&J commitment effectively rendered bankruptcy unavailable to the Debtor.  64 F.4th

at 110 (noting the "apparent irony" that "J&J's triple A-rated payment obligation for LTL's

liabilities, which it views as a generous protection it was never required to provide to claimants,

weakened LTL's case to be in bankruptcy").  Based on the occurrence of this contingency, which

was the reverse of the parties' expectations, the Debtor determined that a material risk existed

that J&J obligations under the 2021 Funding Agreement were rendered void or voidable, and

would be unenforceable.  E.g., Counsel Decl. Ex. 1 (Apr. 18, 2023 Hr'g Tr.), Kim cross, at

---

[52]     Arnold & Itkin argues that the Debtor has changed its position as the purpose of J&J's support under the
2021 Funding Agreement from avoiding any distraction from the planned transfer of the Consumer
Business.  A&I Mot., 7.  But that is not the case, as noted above.  Nor does Arnold & Itkin's argument
address the fact that J&J's support was designed to facilitate the 2021 Chapter 11 Case but the Third
Circuit Opinion frustrated that purpose.  Arnold & Itkin's argument that the termination of the 2021
Funding Agreement instead is what frustrated the purpose of the 2021 Funding Agreement is also incorrect.
There should be no serious argument in this Chapter 11 Case that the talc liabilities exceed $30 billion.
If there is, then all of the Movants' arguments that the Debtor lacks financial distress are effectively
Rule 11 violations.

68:21-22 ("we came to the conclusion there's a material risk that the contract was void or

voidable"). This risk was based on a potential theory of frustration of purpose, among others.[53]

The Debtor was not required to commence an adversary proceeding in the 2021

Chapter 11 Case following the Third Circuit's entry of its opinion asking the Court to adjudicate

the Debtor's rights under the 2021 Funding Agreement. Nor was the Debtor required to wait for

J&J to refuse to honor its obligations under the 2021 Funding Agreement.[54] So long as the 2021

Chapter 11 Case remained pending, the material risk to enforceability of the 2021 Funding

Agreement upon dismissal as to J&J remained latent. The Debtor vigorously pursued review of

the Third Circuit Opinion in an effort to have it overturned. At the same time, and consistent

with its fiduciary obligations, the Debtor developed a contingency plan to replace the 2021

Funding Agreement with the 2023 Funding Agreement and J&J Support Agreement, which

provides equivalent value to the Debtor's estate and claimants from Holdco, whose value is

sufficient to meet the talc liabilities. The replacement as to J&J, among other things, avoided

any uncertainty as to J&J's obligations under the 2021 Funding Agreement and assured the

availability of J&J's support in bankruptcy, as J&J originally intended. The Debtor's

contingency plan was in fact implemented upon dismissal of the 2021 Chapter 11 Case to permit

the Debtor and the tens of thousands of supporting claimants to move forward with the terms of a

plan they had successfully negotiated.

North Carolina law, which governs the 2021 Funding Agreement,[55] provides that

performance under a contract may be excused "whenever a fortuitous event supervenes to cause

---

[53]    The Debtor provides the analysis below to demonstrate the basis for its good faith belief that a material risk
existed that the prior funding arrangements were rendered void or voidable by the Third Circuit's decision,
not to prove these arguments on behalf of J&J.

[54]    See UST Mot., 14.

[55]    See 2021 Funding Agreement, § 9.

a failure of the consideration or a practically total destruction of the expected value of the

performance," even if performance is still possible. Brenner v. Little Red School House, Ltd.,

302 N.C. 207, 211 (1981) (quoting 17 Am. Jur. 2d Contracts § 401 (1964)). The doctrine "is

based upon the fundamental premise of giving relief in a situation where the parties could not

reasonably have protected themselves by the terms of the contract against contingencies which

later arose." Id. Its application is thus limited to reasonably unforeseeable intervening events:

"If the frustrating event was reasonably foreseeable" or the contract "allocate[ed ] the risk

involved in the frustrating event," no relief will be available. Id. The North Carolina Court of

Appeals has distilled the doctrine to three requirements: "(1) there was an implied condition in

the contract that a changed condition would excuse performance; (2) the changed condition

results in a failure of consideration or the expected value of the performance; and (3) the changed

condition was not reasonably foreseeable." Fairfield Harbour Prop. Owners Ass'n, Inc. v.

Midsouth Golf, LLC, 215 N.C. App. 66, 79 (2011). The changed condition need not be

completely unforeseeable for the purpose of a contract to be frustrated. Norfolk S. Ry. Co. v.

Reading Blue Mountain & N. R. Co., 346 F. Supp. 2d 720, 724 (M.D. Pa. 2004) (citing Opera

Co. of Boston v. Wolf Trap Foundation, 817 F.2d 1094, 1100–01 (4th Cir. 1987)). Rather, the

occurrence must be "unexpected, and not a realistic possibility." Id.[56]

---

[56]    It is clear that the purpose of a contract can be frustrated by government action, including intervening court decisions. See UNCC Properties, Inc. v. Greene, 111 N.C. App. 391, 397, 432 S.E.2d 699, 702 (1993) (county's actions in condemning property frustrated purpose of agreement pursuant to which owner would provide certain easements to plaintiff); see also Am. Prairie Constr. Co. v. Hoich, 594 F.3d. 1015, 1027 (8th Cir. 2010) (bankruptcy court decision converting debtor's chapter 11 case to chapter 7 frustrated purpose of investor in purchasing creditor's claim to remove objection and make it more likely bankruptcy would approve confirmation of chapter 11 plan); United States v. Moulder, 141 F.3d 568, 572 (5th Cir. 1998) (purpose of plea agreement was frustrated by subsequent United States Supreme Court ruling that conduct was no longer criminal); Unihealth v. U.S. Healthcare, Inc., 14 F. Supp. 2d 623, 637 (D.N.J. 1998) (purpose of hospital service agreement frustrated by state legislature decision abolishing billing system); Union County Utils. v. Bergen County Utils. Auth., 995 F.Supp. 506 (D.N.J. 1998) (purpose of waste disposal contracts was frustrated by Third Circuit determination that statutes governing waste disposal were unconstitutional); Arons v. Charpentier, 36 A.D.3d 636, 828 N.Y.S.2d 482 (2007) (purpose of contract

Under this standard, J&J's purpose in participating as an obligor under the 2021 Funding Agreement was frustrated by a changed condition—the basis for the Third Circuit's decision dismissing the 2021 Chapter 11 Case.  As the Third Circuit acknowledged, J&J entered into the 2021 Funding Agreement as part of a single integrated transaction that involved the filing of the 2021 Chapter 11 Case.  64 F.4th at 105.  And the parties to that agreement are in accord that its purpose was to secure J&J's funding for the Debtor to enable a resolution of all Talc Related Liabilities in chapter 11.[57]  But the Third Circuit's decision foreclosed the Debtor's access to chapter 11 precisely because J&J committed to provide that funding by entering into the agreement 48 hours before the chapter 11 case was commenced.  That decision was not reasonably foreseeable; and indeed, it was inconceivable to the parties that the availability of the funding to the Debtor outside of bankruptcy for that 48-hour period would be a basis for dismissal of the bankruptcy—otherwise they would have structured it differently.  That decision unquestionably thwarted the purpose of the 2021 Funding Agreement, deprived J&J of the consideration for which it entered into the agreement, and destroyed all expected value of the agreement to J&J and the Debtor.

The Debtor's recognition that the Third Circuit's decision created substantial uncertainty regarding the continued enforceability of J&J's backstop is not "contrived,"[58] "an excuse,"[59]

---

providing for the payment of certain expert witness fees in lawsuit under Individuals with Disabilities Education Act was frustrated by U.S. Supreme Court decision providing that such fees were not recoverable).

[57]    The purpose of obligating New JJCI under the 2021 Funding Agreement was quite different.  The existence of the agreement between the Debtor and New JJCI ensured that the same assets would be available to satisfy the same liabilities as had been the case prior to the 2021 Corporate Restructuring.  The Court correctly found that those liabilities had been assumed by Old JJCI long before the 2021 Corporate Restructuring and were not liabilities of J&J.

[58]    A&I Mot., 5; Crouch Mot., 10.

[59]    States Mot., 15.

"dubious,"[60] "specious,"[61] "untenable,"[62] or "a post-hoc pretext,"[63] as variously alleged by the

Movants. Rather, the frustration of the central purpose of the J&J backstop raised a serious

question about the status of the J&J backstop, a question that is predicated on arguments that

have been asserted in other bankruptcy cases. In <u>Congoleum Corp. v. Pergament (In re</u>

<u>Congoleum Corp.)</u>, Case No. 03-51524, Adv. No. 05-06245, 2007 WL 4571086 (Bankr. D.N.J.

Dec. 28, 2007)—a case relied upon by the TCC—the debtor entered into prepetition settlement

agreements with certain existing asbestos claimants that provided the claimants with claims

secured by an interest in insurance policy collateral. <u>Id.</u> at *1. The debtor's purpose in entering

into the settlement agreements was "to move towards a consensual Bankruptcy Code § 524(g)

plan of reorganization that would provide for an orderly and efficient means of allowing and

paying tens of thousands of asbestos-related claims and provide the business with the substantial

benefit of a channeling injunction against future claims." <u>Id.</u> at *9. According to the debtor, that

purpose was frustrated by the Third Circuit's supervening decision in <u>In re Combustion</u>

<u>Engineering, Inc.</u>, 391 F.3d 190 (3d Cir. 2005), which required equality of distribution among

asbestos claimants not provided for under the debtor's proposed plan as a result of the exact

same prepetition settlement agreements. <u>Id.</u>

    The bankruptcy court denied summary judgment with respect to the debtor's frustration

of purpose defense not because the defense was not viable, but because the claimants did not

share the debtor's purpose in entering into the settlement agreements. <u>Id.</u> at *10. According to

the court, the settling claimants' purpose was simply "to receive payment for their claims in

---

[60]    UST Mot., 10.

[61]    Crouch Mot., 11.

[62]    A&I Mot., 20

[63]    TCC Mot., 7.

exchange for granting a release to the Debtor" not, as alleged by the debtor, to effectuate an

"orderly resolution of asbestos claims and reorganization of the Debtor pursuant to a 524(g)

plan." Id. To that extent, the bankruptcy court ruled that the debtor was "attempting to ascribe

its own motives . . . to the [claimants]." Id. There was no evidence in the record that the

claimants' primary purpose was for the debtor to reorganize successfully. Id. Hence, the

doctrine of frustration of purpose was inapplicable in that case. Id. at *11.

Here, in stark contrast to Congoleum, there is no dispute that the Debtor and J&J shared a

common purpose in entering into the 2021 Funding Agreement of equitably resolving current

and future Talc Related Liabilities in chapter 11 through confirmation of a plan of reorganization

that provides for the establishment of a trust to satisfy such claims. See 2021 First Day Decl.,

¶ 58 ("The Debtor further concluded that this chapter 11 case offered the only alternative for

equitably and permanently resolving all current and future talc-related claims against it."); J&J

Oct. 14, 2021, Press Release[64] ("To demonstrate its commitment to resolving the cosmetic talc

cases and remove any financial objections to the process, Johnson & Johnson has agreed to

provide funding to LTL for the payment of amounts the Bankruptcy Court determines are owed

by LTL . . . ."). It is undeniable that the supervening Third Circuit Opinion upended that

common purpose by denying the Debtor access to chapter 11 as a result of J&J's prepetition

participation in the Debtor's funding support, creating a material risk that the 2021 Funding

Agreement was void or voidable as to it.

---

[64]    See Press Release, Johnson & Johnson, *Johnson & Johnson Takes Steps to Equitably Resolve All Current and Future Talc Claims* (Oct. 14, 2021), https://www.jnj.com/johnson-johnson-takes-steps-to-equitably-resolve-all-current-and-future-talc-claims, attached as Exhibit 17 to the Counsel Declaration.

**3.     All Fraudulent Transfer Theories Are Premature and Refuted by the Record.**

In footnote 18 of its opinion, the Third Circuit noted that an effort by the Debtor "to part with its funding backstop to render itself fit for a renewed filing" could give rise to constructive fraudulent transfer claims if the Debtor did not receive reasonably equivalent for the transfer and was rendered insolvent thereby.  LTL Mgmt., 58 F.4th 762 n.18.  Seizing on this language, substantially every Movant proclaims that the substitution of the 2023 Funding Agreement for its predecessor by definition gave rise to some form of fraudulent transfer.[65]  Consideration of such arguments is premature.  If there were any basis for them, the Bankruptcy Code provides a comprehensive suite of claims and remedies for the Debtor's estate to pursue at the appropriate time.  Moreover, the record does not in the least support such arguments, which are diametrically opposed to the Movants' position that the Debtor lacks financial distress.

*a.     No Evidence of Fraudulent Intent*

Subject to certain limitations, section 548(a)(1)(A) of the Bankruptcy Code allows a trustee to "avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor," if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  11 U.S.C. § 548(a)(1)(A).

There is no evidence that the Debtor intended to hinder, delay or defraud any entity by replacing the 2021 Funding Agreement with the 2023 Funding Agreement and the J&J Support Agreement.  To the contrary, the evidence supports that the 2023 Funding Agreement is

---

[65]     See, e.g., TCC Mot., 6-7, 31-32; A&I Mot., 34-37; UST Mot., 13; Crouch Mot., 9; States Mot., 14.

sufficient to pay all talc claims in full, and that such agreement, in combination with the J&J

Support Agreement, allows the Debtor to fulfill the intended purpose of the 2021 Funding

Agreement to seek and obtain a resolution of all Talc Related Liabilities in chapter 11.  To that

end, the Debtor has obtained the support of the vast majority of claimants on the material terms

of a plan, and the Debtor has filed its Plan consistent with the accelerated timeline provided for

by the Plan Support Agreements.  The Debtor is now seeking to solicit votes on and confirm the

Plan as promptly as possible so that it can fund a trust and start making distributions to

qualifying claimants.  All of the Debtor's conduct supports a finding that, far from hindering,

delaying or defrauding claimants, the Debtor is attempting to provide them with equitable

compensation as quickly as possible, hindered only by the scorched-earth efforts of the Movants.

> b.    *No Evidence of Constructive Fraud*

Section 548(a)(1)(B) of the Bankruptcy Code generally provides for the avoidance of

transfers made and obligations incurred if a debtor "received less than a reasonably equivalent

value in exchange for such transfer or obligation" and the Debtor, in relevant part:

> (I)    was insolvent on the date that such transfer was made or such obligation
> was incurred or became insolvent as a result of such transfer or obligation;
>
> (II)   was engaged in business or a transaction, or was about to engage in
> business or a transaction, for which any property remaining with the
> debtor was an unreasonably small capital; [or]
>
> (III)  intended to incur, or believed that the debtor would incur, debts that would
> be beyond the debtor's ability to pay as such debts matured . . . .

11 U.S.C. § 548(a)(1)(B)(ii).  The party bringing the fraudulent conveyance action bears the

burden of proving each of these elements by a preponderance of the evidence.  In re Fruehauf

Trailer Corp., 444 F.3d 203, 211 (3d Cir. 2006).

The concept of reasonably equivalent value "requires a comparison of what was

transferred with what was received by the debtor but does not require a dollar-for-dollar

exchange." In re R.M.L., Inc., 92 F.3d 139, 154 (3d Cir. 1996).  Here, the Debtor received at

least equivalent value for substituting the 2023 Funding Agreement and the J&J Support

Agreement for the 2021 Funding Agreement for the reasons discussed above.[66]  Holdco's

obligations under the 2021 Funding Agreement were sufficient to meet the Debtor's talc

liabilities as are its obligations under the 2023 Funding Agreement, and its obligations under the

two agreements did not change.  As to J&J, the Debtor exchanged a gratuitous, and based on

Holdco's value outside of bankruptcy, unnecessary commitment under the 2021 Funding

Agreement—whose enforceability had been called into question by the Third Circuit Opinion—

for a commitment that would be subject to, and therefore enforceable by, bankruptcy court order.

The exchange benefitted the Debtor by ensuring it had the ability to access chapter 11 and had

the funds in chapter 11 to meet its accelerated obligations under the Plan.  No viable cause of

action exists for constructive fraudulent transfer.

While all of the Movants argue that funding agreement substitution was a fraudulent

transfer, none of them is willing to assert that the transaction rendered the Debtor insolvent.

And, in fact, the Debtor is not insolvent under any measure.  The value of the Debtor's assets,

including the 2023 Funding Agreement, is estimated to be approximately $30 billion, which is

greater than any realistic estimate of the Debtor's talc liabilities, although outside of bankruptcy

the Debtor would also incur massive defense costs in the tort system, as discussed previously.

This chapter 11 proceeding avoids those defense costs.

The TCC and Arnold & Itkin equate the Debtor's financial distress with an unreasonably

small capital under section 548(a)(1)(B)(II), but they are not the same thing.[67]  The Third Circuit

---

[66]    See supra, § II.A.1.

[67]    See TCC Mot., 23 n.91 ("Claiming that LTL is not 'insolvent' is not a get-out-of-jail-free card.
Section 548(a)(1)(B)(ii)'s requirements can be met by showing 'unreasonably small capital' or the inability

has commented that "unreasonably small capital denotes a financial condition short of equitable insolvency." Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1070 (3d Cir. 1992) (applying Pennsylvania law). But the Third Circuit went on to define "capital" as "[a]ccumulated goods, possessions, and assets, used for the production of profits and wealth." Id. "Viewed in this light, an 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations." Id. There is no evidence that the replacement of the 2021 Funding Agreement with the 2023 Funding Agreement left the Debtor with insufficient assets to generate proceeds to sustain operations.

Nor is there any evidence of belief or intent on the part of the Debtor to incur debts beyond its ability to pay under section 548(a)(1)(B)(III) of the Bankruptcy Code.[68] For all of the reasons previously stated, with the support of the 2023 Funding Agreement, the Debtor believed at the time of the transaction and believes today that it will be able to satisfy all Talc Related Liabilities, which it has no intent to avoid. As discussed above, if the Third Circuit had intended to equate the financial distress component of good faith with any of the insolvency requirements of section 548(a), it could have done so. It did not.

### 4. The Debtor's Management Fulfilled Its Fiduciary Duties.

The Movants' arguments that the Debtor's management breached their fiduciary duties rely on their prior arguments that the replacement of the 2021 Funding Agreement with the 2023

---

to pay debts as they 'mature.'"); A&I Mot., 36 ("Implicit in a finding of financial distress immediate enough to support a chapter 11 filing under LTL Mgmt. is that the capital that the Debtor had available to it to carry on this "business" was unreasonably small.).

[68]    See A&I Mot., 37 ("But the Debtor also had to know that if its expectation of 'financial distress' panned out, it would be because the Debtor would have demonstrated that it would incur debts for talc liabilities beyond its ability to pay as they matured . . . .").

Funding Agreement was somehow improper.[69]  But the Debtor's management fulfilled their

fiduciary duty by seeking to use the tools of chapter 11 to resolve current and future Talc Related

Liabilities equitably and consensually through a trust established pursuant to a confirmed plan of

reorganization.  The replacement of the 2021 Funding Agreement with the 2023 Funding

Agreement did not harm claimants for all of the reasons previously discussed and, to the

contrary, provided the Debtor with a reliable funding source that permitted it to reenter

chapter 11 with the support of the majority of claimants and the financial ability to fund the plan

to which the Debtor, J&J and claimants had agreed.

Nor did the Debtor's management violate the Bankruptcy Code.  The replacement of the

Debtor's funding support was not effectuated until the interval between dismissal of the 2021

Chapter 11 Case and commencement of this Chapter 11 Case.  Accordingly, court approval

under section 363 for a transaction "other than in the ordinary course of business" was not

required.  11 U.S.C. § 363(b)(1).  There was no requirement that the Debtor's management

obtain court approval for ongoing negotiations (which the Court ordered and later encouraged) or

contingency planning.  Nor is there a requirement that the Debtor disclose such activities to the

U.S. Trustee or the TCC.[70]  The TCC, for its part, was aware of the negotiations and potential

refiling, as it shared with the Court on April 4.  <u>See</u> *End of Case Statement by the Official*

---

[69]    UST Mot., 14 ("Remarkably, LTL does not offer any business justification or any explanation for how its
decision to terminate the 2021 Funding Agreement was consistent with its duties to creditors."); TCC
Mot., 28 ("The Third Circuit held that LTL had a 'duty' 'to access its payment assets.'  As fiduciaries, its
directors must do so.  Yet in a transparent attempt to evade the Third Circuit's ruling, the Debtor breached
this duty and surrendered its rights under the 2021 Funding Agreement to more than $61 billion on demand
. . . .").

[70]    <u>See</u>, <u>e.g.</u>, TCC Mot., 15.  For similar reasons, the TCC's argument that the Debtor improperly failed to
disclose the potential unenforceability of the 2021 Funding Agreement in its March 2023 monthly
operating report is also wrong.  <u>See id.</u>  As long as the 2021 Chapter 11 Case remained pending—a
necessary condition to the requirement to file operating reports—the Debtor had no concerns as to the
enforceability of the 2021 Funding Agreement.

*Committee of Talc Claimants* [Case No. 21-30589; Dkt. 3934] ("As the TCC is responsible for representing the interests of all talc claimants, it must now advise this Court and the public that Johnson & Johnson and/or its affiliates . . . has threatened a second bankruptcy filing.").[71]

## IV.    THE MOVANTS' OTHER ALLEGATIONS OF BAD FAITH ARE MISPLACED.

The Movants challenge the Debtor's good faith on various other grounds,[72] substantially all of which were previously considered and rejected by this Court and not questioned by the Third Circuit.  The record establishes the Debtor's good faith because (i) the Chapter 11 Case was filed with a valid reorganizational purpose; (ii) the Debtor has a reasonable likelihood of rehabilitation at this juncture; and (iii) the petition was not filed merely to obtain a tactical litigation advantage.

### A.    The Debtor Filed This Chapter 11 Case with a Valid Reorganizational Purpose.

In the First Day Declaration, the Debtor stated that it "is filing for bankruptcy a second time to effectuate the intent of its initial bankruptcy filing:  to fully, equitably and efficiently resolve all current and future talc-related claims."  First Day Decl. 8.  Seeking a comprehensive resolution of thousands of unpredictable and ever-mounting mass tort claims is neither unprecedented nor inconsistent with the Bankruptcy Code.  Using chapter 11 to comprehensively address present and future tort liabilities is, in fact, a well-established purpose for a filing.

In the context of mass tort liabilities in particular, seeking to distribute the debtor's estate "in a way that is fair for both present and future asbestos claimants" is a proper purpose of chapter 11.  In re W.R. Grace & Co., 900 F.3d 126, 130 (3d Cir. 2018); see also In re Bestwall

---

[71]      Moreover, TCC professionals themselves were engaged in extensive ongoing strategic negotiations after the Third Circuit Opinion was issued, presumably with the intention of fulfilling the TCC's own duties to its constituents.  See *Am. Supp. Decl. of Randi S. Ellis* [Dkt. 415], Ex. A (summarizing relevant time detail after January 30, 2023 for various TCC professionals in the 2021 Chapter 11 Case).

[72]      See TCC Mot., 8-9, 38-40; A&I Mot., 37-45; UST Mot., 16-17, States Mot., 18-19.

LLC, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019) ("Attempting to resolve asbestos claims through

11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in

the context of an asbestos or mass tort case, need not be due to insolvency.  The Committee

agrees."); In re SGL Carbon, 200 F.3d at 163-64, 169 (distinguishing confined nature of

litigation in SGL Carbon with the debtor's need in Johns-Manville, A.H. Robins, and Dow

Corning to resolve thousands of mass tort claims) (citing Alan N. Resnick, Bankruptcy as a

Vehicle for Resolving Enterprise–Threatening Mass Tort Liability, 148 U. PA. L. REV. 2045,

2050–51 (June 2000)); In re Muralo, 301 B.R 690, 697, 706 (Bankr. D.N.J. 2003) (finding

debtor's "sudden high-risk exposure to thousands of seemingly random and unmanageable

asbestos . . . cases" a "significant factor evidencing the good faith of Debtors' filings").

Contrary to the TCC's argument, allowing the equitable and efficient resolution of tort

claims to be a valid purpose of bankruptcy would not, "eviscerate the 'good faith' standard" that

would cause "tactical litigation advantages [to] become justifications for bankruptcy."  TCC

Mot., 39.  That view was specifically rejected by the Third Circuit and this Court in the 2021

Chapter 11 Case.  See In re LTL Mgmt., 64 F.4th at 104 ("The takeaway here is that when

financial distress is present, bankruptcy may be an appropriate forum for a debtor to address

mass tort liability."); Dismissal Op., 637 B.R. at 407-408 ("Let's be clear, the filing of a chapter

11 case with the expressed aim of addressing the present and future liabilities associated with

ongoing global personal injury claims to preserve corporate value is unquestionably a proper

purpose under the Bankruptcy Code.").[73]

---

[73]    The TCC's position also ignores the lengthy history of similarly situated mass tort debtors that received
chapter 11 relief in this circuit and elsewhere.  See, e.g., In re Johns-Manville Corp., No. 82-11656 through
82-11676 (Bankr. S.D.N.Y.); In re A.H. Robins Co., No. 85-01307 (Bankr. E.D. Va.); In re Dow Corning
Corp., No. 95-20512 (Bankr. E.D. Mich.); In re Bestwall LLC, No. 17-31795 (Bankr. W.D.N.C. 2017);
In re Maremont Corp., No. 19 10118 (Bankr. D. Del. 2019); In re Imerys Talc Am., Inc., No. 19-10289

The Debtor has filed this Chapter 11 Case with the valid reorganizational purpose—
endorsed by this Court and the Third Circuit—of seeking to address present and future liabilities
associated with ongoing mass tort liabilities to preserve corporate value, just as it did in the 2021
Chapter 11 Case. The key difference this time around is that the Debtor now has a wave of
support from representatives of the majority of talc claimants for a fast, equitable and efficient
reorganization and has already filed a Plan consistent with those agreed terms. The Debtor's
conduct, in addition to its words, thus evidence a proper reorganizational purpose.

### B.     The Confirmation Objections Are Premature.

Certain Movants assert a variety of confirmation objections in the Dismissal Motions in
support of their arguments that the Debtor lacks a reasonable likelihood of rehabilitation within
the meaning of section 1112(b)(4)(A) of the Bankruptcy Code.[74] All of these objections are
conditional and presuppose—often concededly—the final form of the Debtor's reorganization.
Consequently, arguments that any such plan would be unconfirmable are premature. Further,
this is not the time to have extensive arguments on potential confirmation issues. For example,
Arnold & Itkin argues that no reorganization of the Debtor is possible that is conditioned upon
the channeling of claims against certain "Protected Parties" under the Plan. While the Debtor
certainly disagrees, now is not the time to litigate these detailed confirmation disputes.

Many of the Movants' confirmation arguments are easily dismissed in any case.
The TCC and Ad Hoc States argue that the Debtor's Plan cannot be confirmed because it would
violate the best interests of creditors test of section 1129(a)(7) of the Bankruptcy Code. TCC

---

(Bankr. D. Del. 2019); In re Paddock Enters., LLC, No. 20-10028 (Bankr. D. Del. 2020); In re ON Marine Servs. Co., No. 20-20007 (Bankr. W.D. Penn. 2020); In re DBMP LLC, No. 20-30080 (Bankr. W.D.N.C. 2020); among many other cases.

[74]    See States Mot., 18-19; TCC Mot., 8 n.23; A&I Mot., 37-44; NM/MS Mot., 7-13.

Mot., 8 n.23; States Mot., 19.  The basis for that argument is that avoidance of the termination of

the 2021 Funding Agreement by a chapter 7 trustee would, allegedly, generate more than

$50 billion of value for distribution to creditors.  See id.  For all of the reasons discussed above,

there is no basis for avoidance of termination of the 2021 Funding Agreement.  Among other

things, no additional value would be generated for distribution to claimants because the value to

claimants of the 2021 Funding Agreement, just like the existing 2023 Funding Agreement, is the

amount of the Talc Related Liabilities (less the value of the Debtor).

The Ad Hoc States also argue that the Debtor's "imagined" plan is not confirmable

because, if it provides the Ad Hoc States with less than full payment on their claims, and if it is

not consented to by the Ad Hoc States, then it would contravene section 1129(b) of the

Bankruptcy Code by discriminating unfairly against holders of governmental claims and not

being fair and equitable.  States Mot., 4, 18-19.  However, if there is no impaired class that

rejects the Plan, section 1129(b) is not even implicated.

### C.    This Chapter 11 Case Is Not an Abusive Litigation Tactic.

The Movants' arguments that the Debtor filed this Chapter 11 Case as an abusive

litigation tactic presuppose the absence of any valid reorganizational purpose.[75]  There was

"nothing inherently unlawful or improper" with the Debtor's use of the 2021 Corporate

Restructuring to "facilitate a chapter 11 filing for one of the resulting new entities."  Dismissal

Op., 637 B.R. at 427.  Moreover, the Debtor has been consistent throughout the 2021 Chapter 11

Case and this Chapter 11 Case that its purpose is to equitably and efficiently resolve talc claims

for the benefit of all claimants, not to obtain a tactical litigation advantage.  This Court agreed.

See id. ("Claimants fail to explain how Debtor's filing effectuated any 'tactical litigation

---

[75]    See, e.g., TCC Mot., 38-40; A&I Mot., 44-45; UST Mot., 17.

advantage' in any of the tens of thousands of talc claims pending as of the Petition Date.  It is

evident from the record that Debtor filed this case to resolve the potentially crippling costs and

financial drain associated with defending—over the next several decades—tens of thousands (if

not hundreds of thousands) of personal injury claims with a multi-billion dollar exposure to

Debtor and nondebtor affiliates.").  Nor did the Third Circuit question the Debtor's "[g]ood

intentions—such as to protect the J&J brand or comprehensively resolve litigation . . . ."  In re

LTL Mgmt., 64 F.4th 93.  While such intentions may not "suffice alone" to overcome an absence

of financial distress, they do support a finding that this Chapter 11 Case is not a mere abusive

litigation tactic.  Id.  Nothing in the record indicates otherwise, and the Movants still "fail to

explain how the Debtor's filing effectuated any 'tactical litigation advantage' in any of the tens

of thousands of Talc Claims pending as of the Petition Date."  Dismissal Op., 637 B.R. at 427.

## V.    ALTERNATIVELY, THE COURT SHOULD EXERCISE THE DISCRETION GRANTED IT BY SECTION 1112(b)(2) OF THE BANKRUPTCY CODE AND NOT DISMISS THIS CHAPTER 11 CASE.

For the reasons previously discussed, no "cause" exists requiring dismissal of this

Chapter 11 Case under section 1112(b)(1) of the Bankruptcy Code.  But even if cause were

determined to exist, this Chapter 11 Case should still not be dismissed because (1) dismissal is

not in the best interests of claimants, (2) there is a reasonable likelihood that a plan will be

confirmed within a reasonable period of time and (3) any act or omission of the Debtor on which

dismissal could be based was reasonably justified and can be cured within a reasonable period of

time.

The 2005 amendments to the Bankruptcy Code "limit[ed] the Court's discretion to refuse

to dismiss or convert a chapter 11 case upon a finding of cause."  Nester v. Gateway Access

Sols., Inc. (In re Gateway Access Sols., Inc.), 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) (citing

In re 3 Ram, Inc., 343 B.R. 113, 118 (Bankr. E.D.Pa. 2006) and In re Broad Creek Edgewater,

LP, 371 B.R. 752, 759 (Bankr. D.S.C. 2007)).  Nevertheless, "conversion or dismissal may be

disallowed if the Debtor specifically identifies 'unusual circumstances' which establish

conversion is not in the best interest of creditors").  Id.

Section 1112(b) does not define unusual circumstances, "but the phrase contemplates

conditions that are not common in chapter 11 cases."  In re Pittsfield Weaving Co., 393 B.R.

271, 274 (Bankr. D.N.H. 2008), (citing In re Fisher, 2008 WL 1775123 at *5 (Bankr. D. Mont.

Apr. 15, 2008)).  "Courts have much discretion in determining whether there are unusual

circumstances that weigh against conversion or dismissal."  Id. at 274–75 (citing In re The 1031

Tax Group, LLC, 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007) (section 1112(b) "explicitly provides

for this discretion where a court is able to identify 'unusual circumstances . . . that establish that

the requested conversion is not or dismissal is not in the best interests of creditors and the

estate'")).

Recently, the Court raised the question of whether, even if there is an absence of financial

distress, the Court could nonetheless find, under section 1112(b)(2), that "unusual

circumstances" exist preventing dismissal as not in the best interests of creditors and the estate.

Counsel Decl. Ex. 15 (May 16, 2023 Hr'g Tr.), at 44:20-21 (Court: "I'm not sure how financial

distress can be the gating factor for 1112(b)(2)").  The answer is dictated by a plain reading of

the statute, which in this respect, turns on the likelihood of plan confirmation.  Financial distress

is not a gating factor for this analysis, but arguably cuts against that outcome.  In fact, if the

Debtor were found to lack financial distress, section 1112(b)(2) would **require** that the Court not

dismiss the case if it found unusual circumstances establishing that dismissal is not in the best

interests of creditors and the estate and the Plan has a reasonable likelihood of being

confirmed—which it does.[76]  This case presents the quintessential circumstance for application

of section 1112(b)(2), because the Debtor faced financial distress entering bankruptcy, but with

J&J's financial backstop available only in chapter 11, confirmation of the Plan is not only likely,

but eminently achievable.

A.    **Unusual Circumstances Exist Establishing that Dismissal Is Not in the Best Interests of Claimants and the Estate.**

This Court previously found that unusual circumstances existed establishing that

dismissal was not in the best interests of claimants and the Debtor's estate based upon "the

interests of current tort creditors and the absence of viable protections for future tort claimants

outside of bankruptcy . . . ."  Dismissal Op., 637 B.R. at 406 n.8.  Indeed, the claimant interests

that this Chapter 11 Case will address include, among others:  the wildly inconsistent results of

the tort system that provides outsized recoveries for a privileged few while leaving the vast

majority of claimants with nothing; the glacial pace of litigation in the tort system meaning that

many claimants receive no recovery in their lifetimes; the race to the courthouse and the inability

of the tort system to protect the rights of future claimants.  See id. at 410-11.

One common situation where courts have found unusual circumstances is the ability of

the debtor to satisfy all prepetition claims and administrative claims in chapter 11, including as a

result of a cash infusion from an affiliate.  In re Orbit Petroleum, Inc., 395 B.R. 145, 149

(Bankr. D.N.M. 2008), for example, the court found that unusual circumstances existed arising

from the debtor's filing of a chapter 11 plan that contemplated a cash infusion from its parent

that would satisfy all claims.  Id. at 149; see also In re McTiernan, 59 B.R. 860, 868-69 (Bankr.

D. Wyo. 2014) (unusual circumstances present based on equity cushion in property subject to

---

[76]    Under section 1112(b)(2), in that instance, the Court "may not" dismiss the case.  Under section 102(4) of the Bankruptcy Code, the term "may not" is "prohibitive, and not permissive".

secured claim overcoming cause arising from debtor's mismanagement of its estate); In re New

Towne Dev., LLC, 404 B.R. 140, 147-48 (Bankr. M.D. La. 2009) (unusual circumstances

present where $13.4 million claim over land worth between $17 and $18 million "create[ed] the

prospect that a party in interest could develop a reorganization plan to pay all administrative

expenses and also all unsecured claims").

Here, no party disputes that the Debtor has the ability in this Chapter 11 Case to satisfy

all claims and expenses as a result of the 2023 Funding Agreement and the J&J Support

Agreement.  Added to that is the widespread claimant support for this Chapter 11 Case and the

terms of the Plan, and the potential that the Plan will resolve—in whole or material part—not

just this case but also the Imerys and Cyprus bankruptcies, which have been pending for years.

The existence of unusual circumstances is clear.

**B.      There Is a Reasonable Likelihood that a Plan Will Be Confirmed Within a
          Reasonable Period of Time.**

For all of the reasons previously described, there is a reasonable likelihood that the Plan

will be confirmed within a reasonable period of time.  The Debtor has already filed the Plan and

Disclosure Statement consistent with the requirements of the Plan Support Agreements and has

the support of the overwhelming majority of talc claimants for its material terms.  A hearing on

approval of the Disclosure Statement currently is scheduled for June 13, 2023, and the Debtor

plans to move forward with solicitation, voting and confirmation promptly thereafter.  Although

the Court has cautioned that "there is no race between the plan and disclosure statement," it also

noted that "they are both proceeding in a reasonable course."  Counsel Decl. Ex. 15 (May 16,

2023 Hr'g Tr.), at 41:10-12.  Thus, there remains a reasonable likelihood the Plan will be

confirmed within a reasonable time.

**C.      Any Acts or Omissions by the Debtor Were Reasonably Justified.**

Ample justification exists under section 1112(b)(2)(B)(i) for any acts or omissions of the

Debtor that may be found to constitute cause under section 1112(b)(1).  The Debtor continues to

believe, and this Court has previously stated, that "the bankruptcy court is the optimal venue for

redressing the harms of both present and future talc claimants in this case—ensuring a

meaningful, timely, and equitable recovery" for all claimants.  Dismissal Op., 637 B.R. at 409;

see also In re Fed.-Mogul Glob. Inc., 684 F.3d 355, 362 (3d Cir. 2012) ("[O]bservers have noted

the trusts' effectiveness in remedying some of the intractable pathologies of asbestos litigation,

especially given the continued lack of a viable alternative providing a just and comprehensive

resolution."); In re Bestwall LLC, 606 B.R. 243, 257 (Bankr. W.D.N.C. 2019) ("[A] section

524(g) trust will provide all claimants—including future claimants who have yet to institute

litigation—with an efficient means through which to equitably resolve their claims.").  All of the

actions the Debtor has taken since its inception have been in furtherance of that goal.

Commencing this Chapter 11 Case and entering into new financing arrangements to

pursue confirmation of a chapter 11 plan consistent with the terms of the Plan Support

Agreements were justified by the salutary purpose of this Chapter 11 Case and the wave of

support from counsel representing thousands of claimants for the terms of the Debtor's proposed

plan.  The proposed net present value of $8.9 billion trust funding is sufficient to satisfy all

claims in full, and the Plan will require the supermajority support of individual claimants to be

confirmed.  A section 524(g) resolution, which the Court has already found in principle is in the

best interests of claimants, is now before the Court in reality and cannot be achieved outside of

this Chapter 11 Case.  Any act or omission that is otherwise found to constitute cause was

therefore entirely justified.

**D.     Any Act or Omission Warranting Dismissal Can be Cured Within a Reasonable Time.**

Confirmation of the Debtor's Plan within a reasonable time will resolve and cure any cause that the Court may find under section 1112(b)(1).  The Debtor filed the Plan less than six weeks after the commencement of this Chapter 11 Case and is seeking to commence solicitation at the earliest opportunity.  Based on the widespread support for the Plan, which continues to grow, the Debtor is confident that claimants will vote in favor of the Plan in sufficient numbers to allow for confirmation to occur as early as this fall.  Upon the effectiveness of the Debtor's confirmed Plan, funding of the trust and distributions to claimants may begin promptly, consistent with approved trust distribution procedures.  Thus, confirmation of the Plan will promptly cure any act or omission that could support a bad faith finding and would do so within a reasonable period of time.  The Debtor and the vast majority of claimants who support the Plan should not be denied the opportunity to continue on their path toward implementing this equitable and historic resolution for the benefit of stakeholders.

Moreover, even if a lack of financial distress is not viewed as an "act or omission of the debtor" that can be "justified" or "cured," then the "justification" and "cure" prongs of section 1112(b)(2)(B)(i) and (ii) should not apply.  For example, some courts have addressed an analogous application of "unusual circumstances" where the basis for dismissal is section 1112(b)(4)(A).  Section 1112(b)(2)(B) requires the debtor to establish that the "grounds for converting or dismissing the case include an act or omission of the debtor other than under [section 1112(b)(4)(A)]" that is both justified and can be cured within a reasonable time fixed by the court.  Some courts have held, based on the statutory language, that a debtor cannot meet its burden under section 1112(b)(2) if the basis for dismissal is section 1112(b)(4)(A).  However, other courts have found that section 1112(b)(2)(B) still applies even if the ground for cause is

section 1112(b)(4)(A).  See In re Alston, 756 Fed. Appx. 160, 164 n.3 (3d. Cir. 2019)

(recognizing the split in authority).  The grounds for dismissal under section 1112(b)(4)(A) are

not "acts or omissions of the debtor," but rather the deteriorating financial condition of the

debtor.  A lack of financial distress similarly involves a debtor's financial condition although that

condition is the polar opposite of the grounds set forth in section 1112(b)(4)(A).  Nonetheless, as

with a debtor's deteriorating financial condition under section 1112(b)(4)(A), a lack of financial

distress should not be required to be "justified" or "cured" in an unusual circumstances analysis.

Any other interpretation of the statute would yield absurd results.  See In re Kaiser Aluminum

Corp., 456 F.3d 328, 330 (3d Cir. 2006) ("A basic principle of statutory construction is that we

should avoid a statutory interpretation that leads to absurd results.") (citing Griffin v. Oceanic

Contractors, Inc., 458 U.S. 564, 575, 102 S. Ct. 3245, 73 L. Ed.2d 973 (1982)).

## CONCLUSION

For all of the foregoing reasons, the Dismissal Motions should be denied.

Dated:  May 26, 2023

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (admitted *pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*PROPOSED ATTORNEYS FOR DEBTOR*

NAI-1536747644