**EXHIBIT 7**

```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF NEW JERSEY

IN RE:                              .    Case No. 23-12825(MBK)
                                    .
                                    .    Clarkson S. Fisher U.S.
LTL MANAGEMENT LLC,                 .       Courthouse
                                    .    402 East State Street
                                    .    Trenton, NJ 08608
          Debtor.                   .
                                    .    April 11, 2023
. . . . . . . . . . . . . . . .     .    9:59 a.m.
```

TRANSCRIPT OF MOTION BY MOVANT ANTHONY HERNANDEZ VALADEZ FOR AN ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY, SECOND AMENDED EX PARTE TEMPORARY RESTRAINING ORDER, AND ANTICIPATED PRELIMINARY INJUNCTION, AND (II) WAITING THE FOURTEEN DAY STAY UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(A)(3) [71]; DEBTOR'S MOTION FOR AN ORDER EXTENDING THE TIME WITHIN WHICH IT MUST FILE ITS (I) SCHEDULES OF ASSETS AND LIABILITIES AND (II) STATEMENT OF FINANCIAL AFFAIRS [14]; DEBTOR'S MOTION FOR AN ORDER: (I) APPROVING THE CONTINUED USE OF ITS BANK ACCOUNT AND BUSINESS FORMS AND (II) AUTHORIZING THE DEBTOR'S BANK TO CHARGE CERTAIN FEES AND OTHER AMOUNTS [13]; DEBTOR'S APPLICATION PURSUANT TO 28 U.S.C. § 156(C) AND 11 U.S.C. § 105(A) FOR ENTRY OF AN ORDER AUTHORIZING THE APPOINTMENT OF EPIQ CORPORATE RESTRUCTURING, LLC AS CLAIMS AND NOTICING AGENT NUNC PRO TUNC TO THE PETITION DATE [11]; DEBTOR'S APPLICATION FOR DESIGNATION AS COMPLEX CHAPTER 11 CASE [6]; DEBTOR'S MOTION FOR AN ORDER SUSPENDING ENTRY AND SERVICE OF STANDARD NOTICE OF COMMENCEMENT [5]; DEBTOR'S MOTION FOR AN ORDER: (I) AUTHORIZING IT TO FILE A LIST OF THE TOP LAW FIRMS WITH TALC CLAIMS AGAINST THE DEBTOR IN LIEU OF THE LIST OF THE 20 LARGEST UNSECURED CREDITORS; (II) APPROVING CERTAIN NOTICE PROCEDURES FOR TALC CLAIMANTS; AND (III) APPROVING THE FORM AND MANNER OF NOTICE OF COMMENCEMENT OF THIS CASE [10]; DEBTOR'S MOTION PURSUANT TO 11 U.S.C. § 1505 FOR AN ORDER AUTHORIZING IT TO ACT AS FOREIGN REPRESENTATIVE ON BEHALF OF THE DEBTOR'S ESTATE [12]
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:              Wendy Quiles

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

84

1  her minor children, one with autism who's struggling mightily.
2  And I told Kimberly in her final days when she was asking me
3  what was going on, I told her that just like she told Senator
4  Whitehouse in the U.S. Senate that she would never give up,
5  that she wouldn't quit, I promised her that we wouldn't quit.
6  And we're not going to.  Thank you.
7           MR. BIRCHFIELD:  Good afternoon, Your Honor.  Andy
8  Birchfield with Beasley Allen on behalf of Alishia Landrum.  I
9  think it's time we get back to a PowerPoint, Your Honor.
10          Your Honor, for the record, I want to say that we
11 oppose this bankruptcy.  We consider this to be a sham
12 bankruptcy that is founded on a massive fraudulent conveyance,
13 and we urge that it be dismissed.  I say that for the record
14 because I do not want it to be misconstrued because most of the
15 time that you allow me to have before you today, I want to
16 focus on the proposed deal, the proposed plan that J&J has put
17 forward.
18          We oppose this plan because it is a bad deal for the
19 claimants.  That is the only reason that we oppose this plan.
20 It is bad for the claimants.  And it's bad for many reasons,
21 but that's the only reason that we oppose it is because it's
22 bad for the claimants.  There has been much that's much been
23 said, and Mr. Gordon insinuated with his questions that there
24 must be something else.  He raised that why would a what he
25 describes as a minority of claimants, a handful of law firms,

Case 23-01092-MBK    Doc -8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 4 of 13

85

1  oppose this.  The only reason, the only reason that we oppose
2  the proposed deal is because it is bad for claimants.
3            There are statements that are made in the
4  informational brief that all of the leadership firms, all of
5  the leadership firms oppose this deal.  What's that a reference
6  to?  That's a reference to the lawyers and the law firms that
7  litigated this case in this courtroom in the MDL through all of
8  the Daubert proceedings.  It is the lawyers who stood in front
9  of juries across this country.  These are the lawyers that have
10 taken the depositions who know this case.
11           These are the lawyers on behalf of ovarian claimants
12 just like Ms. Kagan said on behalf of the meso claimants.
13 These are the lawyers.  These are the lawyers who have held the
14 hands of their clients as they have walked through in
15 depositions what they have experienced after the diagnosis of
16 ovarian cancer.  These are the lawyers who have held the hands
17 of widows as they described what their wife went through.
18 These are the lawyers who have been in the trenches.
19
20           But is is not just the leadership lawyers.  It is not
21 a handful of firms.  It is not a minority of firms or a
22 minority of the claimants that oppose this deal.  There are
23 over -- well over, well over 100 firms that oppose this
24 proposed plan.  Those firms represent over 40,000 claimants.
25 These are claimants that the majority of those have been filed.

Case 23-01092-MBK    Doc -8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 5 of 13

86

1  They are pending.  They were pending before J&J filed its first
2  bankruptcy in October of '21.
3           But to say that this is a bad deal on behalf of
4  claimants, in order to say that, there must be some indicia of
5  what a good deal would look like.  And so I want to walk
6  through in just a few moments, Your Honor, what are some of the
7  indicia of what a reasonable, a fair and equitable agreement
8  would look like on behalf of a claimant.  Some of these factors
9  are objective factors.
10          So if you're looking at a claim and you're evaluating
11 that claim in the tort system, you would look at what are the
12 medical expenses that are involved in treating the injury,
13 whether that is mesothelioma or whether it is ovarian cancer.
14 What are the medical expenses?  That's objective.  What are the
15 lost wages?  Those are objective.  Those are knowable.
16          Pain and suffering, that's subjective.  And the loss
17 of consortium, that's subjective.  The Supreme Court has
18 provided some guidance on punitives, but all of those are
19 elements.  If you're going to assess what is a fair and
20 reasonable deal on behalf of a claimant, we submit you must
21 take into consideration these factors, at least the objective
22 factors.
23          On behalf of ovarian cancer claimants, we know what
24 the average medical cost would be.  And the average medical
25 cost would be over 220,000.  You see here 224,786.  And I

Case 23-01092-MBK    Doc -8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 6 of 13

87

1  submit to you that these are conservative figures.  And, of
2  course, these vary based on the stage of diagnosis.  It also
3  varies based on the age of the claimant at the time she's
4  diagnosed.
5         So you would have someone, it may be a 42-year-old
6  that is diagnosed with Stage 4.  The cost of treatment is going
7  to be significantly higher.  Those costs for that young woman
8  who is diagnosed with ovarian cancer often exceed a million
9  dollars.  If you have an 82-year-old that is diagnosed with
10 Stage 1 or Stage 2, the medical costs are going to be
11 significantly less, less than 100,000.
12        But if you look at across the board, if you look at
13 how many claimants are going to be diagnosed with Stage 4 and
14 how many will be diagnosed at Stage 3 and 2 and 1, and you look
15 at how many of those would be diagnosed when they are 40 years
16 old versus when they are 70 to 75 years old, we know those
17 numbers.  We have that analysis.
18        And that weighted average is 224,000.  And I submit
19 that is conservative, and it is supported by what we have seen
20 in the trials.  In the trials of these cases, many times there
21 were stipulations that were entered into by J&J, their lawyers,
22 and the plaintiffs' lawyers representing the victim.  And so
23 you look at these medical bills, these are what was stipulated
24 to once the medical bills were compiled and J&J's lawyers
25 analyzed those, they stipulated that these are the medical

Case 23-01092-MBK    Doc -8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 7 of 13

88

1  bills.
2  So you see 854,000, 1.3 million, almost 1.4.  So you
3  see these values.  These show that what I presented to you as
4  an average medical cost, they're conservative.  The lowest -- I
5  do think that this point is worth the Court's consideration, as
6  well.  The lowest compensatory award of any plaintiffs' verdict
7  on the ovarian cancer side was over $2.5 million.  The lowest.
8  When you look at the medical cost, you look at the
9  compensatory awards, these just looking at the objective
10 criteria, you see the significance of what is involved in these
11 cases.  Again, the lost wages, that is another objective
12 criteria.  And, again, you will have someone who is diagnosed
13 at Stage 4, you know, someone who dies as a result of ovarian
14 cancer in their 40s is going to be significantly higher than
15 someone who is diagnosed at a lower stage at age 60.
16 But the weighted average across that span would be
17 over $230,000.  That's lost wages.  You look at the lost wages,
18 you look at the medical expenses, those are objective criteria.
19 But, Your Honor, I want to take you back to and it was
20 referenced earlier, Mr. Henry, Mr. Bill Henry.  When he
21 appeared before the Court I believe by Zoom, he reminded the
22 Court, he reminded us all these claims are about people.  They
23 are not about numbers.  He walked through his 56 years of -- or
24 46 years of wedding and what it was like to lose his wife, the
25 love of his life.

Case 23-01092-MBK    Doc -8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 8 of 13

89

1              He says there is -- there's no apologies, there are
2    no do-overs.  Please hear the 38,000 echos of this voice.  We
3    are people, not numbers.  So when I walked through the
4    objective criteria, I don't want to lose sight that we're
5    talking about, we are talking about people.  We are talking
6    about families that have been ripped apart.
7              Now in addition to the objective criteria, you should
8    also take into consideration the pain and suffering.  So what
9    happens when a woman is diagnosed with ovarian cancer?  One of
10   the first steps in the course of treatment is a debulking
11   surgery.  It is a major significant surgery.  The torso is
12   incised and all of the female reproductive organs are removed.
13   That leads to many of these women, may of these women die.
14   They die of starvation because the results of the scarring of
15   their tissue, is a painful painful process.  That's what these
16   women go through.
17             When we look at those medical records, when we look
18   at the medical records and the cost, the debulking surgery then
19   followed by chemo gives a glimpse of the significance, the
20   magnitude of the injury that we're talking about here.  So when
21   we look at the objective criteria, so when I say that we oppose
22   the proposed J&J deal, it is because of these criteria because
23   we know what these women went through.  We know what these
24   families went through.  We know what the men who suffered from
25   mesothelioma went through.

Case 23-01092-MBK    Doc -8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 9 of 13

90

1                    So against that backdrop, we can say that this is a
2   bad deal and we oppose it.  So what do we know about the deal,
3   the proposed plan that J&J has put forward?  I mean, first,
4   that it includes all ovarian cancer claims and all mesothelioma
5   claims.  It includes not only the current claims but the future
6   claims, as well.  And it includes all of the governmental
7   entity claims, all of the state AG claims.  All of that for a
8   pot of $8.9 billion.
9                    And so what has been put forward by Mr. Gordon today
10  that there is a vast majority that support this proposal.  We
11  take issue with the vast majority.  We see, and Mr. Watts
12  addressed this earlier and he referenced, and we see the 13
13  firms that were listed that support this deal.  There are well
14  over 100 firms that oppose this deal for the very reasons that
15  I just described.
16                   And here's what we do know about the deal, and Mr.
17  Watts and Mr. Gordon describe this for us.  So look, we see
18  that in the first year, two things would happen.  One, they
19  will pay $5.9 billion and that is to satisfy all current
20  claims.  So here's what we can look at.  One of the things that
21  is the most sinister, and that's saying a lot, one of the
22  things that is the most sinister about this proposed deal is
23  that J&J through this proposal is seeking to engender
24  endfighting.
25                   This proposed deal would seek to pit the ovarian

Case 23-01092-MBK    Doc -8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 10 of 13

91

1  cancer claimants against the mesothelioma claimants.  This
2  proposed deal would seek to pit the future claimants against
3  the current claimants.  And this proposed deal would seek to
4  pit the state attorney generals against all of the personal
5  injury claimants.
6           But it does even more, and Mr. Watts discussed the
7  debate that we will have and Mr. Watts, I've known Mr. Watts, I
8  have tried cases with Mr. Watts, and we can have a civil debate
9  about the merits and the lack of merits of this proposed deal.
10 One thing that I am confident that Mr. Watts will tell you or
11 would tell anyone that when he talked about the three meetings
12 that we had and in addition to those meetings, we had phone
13 conferences, as well, phone discussions, and I am confident
14 that one thing that Mr. Watts will tell you is while we may
15 disagree on the merits of this deal, the only discussion that
16 we had in regards to a deal was based on the value to the
17 claimants, nothing else.
18           You want to know, well, what would drive the
19 claimants.  I've just described that for you.  It is because of
20 the merits and the value of these claims, and it is nothing
21 more.  And Mr. Watts described -- addressed the issue of side
22 deals.  I have never said and I do not believe that Mr. Watts
23 is engaged in any side deal.  There is a difference based on
24 the merits of these claims.
25           And if Mr. -- I want to walk through very briefly in

Case 23-01092-MBK    Doc -8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 11 of 13

92

1 conclusion, Your Honor, I want to walk through the math of this
2 deal and what this deal shows us, what the math of this deal
3 shows us.  If you look at the payment over the 25 years, the
4 nominal payment would be 12.08 billion.  Now J&J has asserted,
5 they have represented they believe there are 90,000 current
6 claims and that they have signed plan support agreements for
7 60,000 of those.  They've said that they have 60,000 plan
8 support agreements.
9           So if you look at this math, at 12.08 billion, if
10 there are 100,000 claims and that would only be 10,000 future
11 claims and I don't believe there's anyone in this room that
12 believes that there would only be 10,000 future claims.  But at
13 10,000 future claims, you're looking at a total of 100,000
14 claims.  That would be 120,000 case average.
15           That's assuming that the state AGs take nothing from
16 this pot.  That's assuming that there is no payment for direct
17 claims from third-party payors.  And it's assuming that the
18 mesos and the ovarians are all taking from the same pot because
19 that is -- that's what this proposal is, is seeking to get
20 60,000 claimants, and maybe there are those claimants like Mr.
21 Watts and Mr. Onder, and Mr. Nachawati represent.  And I
22 understand it.
23           This has been a long hard slog and there may be
24 claimants, maybe it's the lesser injury claimants, maybe there
25 are claimants that just said, look, I'm throwing in the towel,

Case 23-01092-MBK    Doc -8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 12 of 13

121

1  were -- they were dismissed based on jurisdiction.  Those cases
2  remain pending today.  Those cases remain pending today.  The
3  statement that Beasley Allen lost every trial is -- it's
4  another -- it's another effort at misleading the Court.
5           Mr. Gordon says, just let the people vote, as if
6  letting a vote go forward now has no harm.  A vote -- a vote
7  means delay.  The debtor had 18 months to allow a plan to go
8  forward for a vote in the first bankruptcy.  They chose not to
9  do it.
10          So to say that let's just let the people vote, that
11 is as if there's no harm.  It is significant harm.  It deprives
12 every one of these claimants, ovarian cancer, mesothelioma
13 claimants, it deprives them of their day in court.  There has
14 been enough delay already.
15          Mr. Gordon asked, you know, how could firms -- how
16 could firms just categorically reject this amount, without even
17 giving it consideration.  Your Honor, we engaged.  We engaged
18 the leadership of the TCC.  The Court ordered -- following your
19 ruling, you ordered mediation.  We engaged in mediation.
20          As part of that process, there were significant
21 discussions among plaintiff's lawyers and with our clients.  We
22 know -- we know what our clients view as a reasonable offer and
23 what would not be adequate to resolve on an equitable basis all
24 of the current claimants.  So we -- it is not as if this
25 proposal is something that was just categorically rejected.  It

Case 23-01092-MBK    Doc -8    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 7 to Declaration of Daniel J. Merrett    Page 13 of 13

122

1  was rejected because we have been through this process, we know
2  what the values are, and we know that this -- that this plan,
3  an $8.9 billion plan to cover all of the present and future
4  ovarian cancer claims, mesothelioma claims, and Attorney
5  General claims is woefully short.
6             Thank you, Your Honor.
7             THE COURT:  Thank you.
8             UNIDENTIFIED SPEAKER:  Your Honor, can I speak from
9  here?
10            THE COURT:  Yes, please.  Yeah.
11            UNIDENTIFIED SPEAKER:  I'm not sure Mr. Gordon
12 answered any of my questions.  So after the Third Circuit
13 handed down its decision, while we were waiting for an en banc
14 determination, is Mr. Gordon saying that he was negotiating
15 with the FCR as a pretext for this bankruptcy?  Yes or no?
16            Did J&J look at any of the medical records for any of
17 Mr. Watts' clients in determining what is a fair deal here and
18 determining who should vote and who's among the 60,000 people
19 that they say they have support for?
20            And lastly, did the giving up of the funding
21 agreement, was that part of any of these post Third Circuit
22 discussions?
23            Thank you.
24            THE COURT:  All right.
25            UNIDENTIFIED SPEAKER:  Very briefly, Your Honor.