**EXHIBIT 9**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC, | Case No.: 21-30589 (MBK) |
| Debtor | Judge: Michael B. Kaplan |

**Expert Report of Gregory K. Bell, Ph.D.**

**January 28, 2022**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Expert Report of Gregory K. Bell, Ph.D. January 28, 2022

### IV. CONTEXT FOR EVALUATING THE BURDEN OF THE TALC LITIGATION

38. The costs and risks associated with the Talc Litigation are substantial and appear to be growing. The Talc Litigation charges were identified in J&J's 2020 10-K as a primary driver that caused the income before tax for the business segment containing Old JJCI (the global Consumer Health business) to drop from a $2.1 billion profit (14.8 percent of sales) in 2019 to a $1.1 billion loss (-7.6 percent of sales) in 2020.[75] This section evaluates the existing and potential financial burden of the Talc Litigation for Old JJCI and compares that burden to the burden imposed by mass tort litigation on other companies.

#### A. Existing Talc Litigation Burden Faced by Old JJCI

39. To evaluate the existing burden of Talc Litigation, I consider the expenses (charges) and cashflows (payments) related to Talc Litigation recognized in the past, as shown on Exhibit K. The context for these amounts is provided by my review of the financial results of operations for Old JJCI from 2018 through the first three quarters of 2021, as shown on Exhibit L, and the associated balance sheets for Old JJCI, as shown on Exhibit M. I estimate the cashflows associated with Old JJCI operations from 2018 through the first three quarters of 2021, as shown on Exhibit N.

40. As shown on Exhibit K, charges (expenses) related to the Talc Litigation had become a substantial burden related to the business of Old JJCI. In total, from 2018 through the first three quarters of 2021, Talc Litigation charges amounted to $6.4 billion, burdening the income associated with the business of Old JJCI with expenses that totaled $5.6 billion in 2020 and the first three quarters of 2021. Similarly, cash outflows related to Talc Litigation have increased over the years, totaling $4.0 billion from 2018 through the first three quarters of 2021, with $3.6 billion paid in 2020 and the first three quarters of 2021 alone.

---

[75] J&J 2020 10-K, p. 28.

Expert Report of Gregory K. Bell, Ph.D.                                                                    January 28, 2022

41. In comparison, as shown on Exhibit L,

   (a) Annual sales for Old JJCI range from $5.7 to $6.1 billion for 2018 through 2020 with sales of $4.8 billion through the first three quarters of 2021;

   (b) Marketing expenses range from $1.1 to $1.4 billion for 2018 through 2020 with marketing expenses of $1.0 billion through the first three quarters of 2021; and

   (c) Old JJCI profits before consideration of the Talc Litigation and taxes range from $0.8 to $1.4 billion for 2018 through 2020 with profits before consideration of the Talc Litigation and taxes of $1.4 billion through the first three quarters of 2021.

42. Also in comparison, as shown on Exhibit N, I estimate that Old JJCI's pre-tax cashflows from operations, net of capital expenditures and before consideration of the Talc Litigation payments, range from $0.9 to $2.0 billion for 2018 through 2020, being $0.9 billion through the first three quarters of 2021.

43. Exhibit O places the burden of Talc Litigation in the context of relevant financial metrics for Old JJCI. Notably, for the seven quarters prior to the 2021 Corporate Restructuring:

   (a) Charges related to the Talc Litigation were equal to 51 percent of Old JJCI sales;

   (b) Charges related to the Talc Litigation led to a pre-tax loss on the business of Old JJCI that totaled $2.8 billion;

   (c) Payments related to the Talc Litigation were equal to 33 percent of sales; and

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Case 23-01092-MBK    Doc -10    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 9 to Declaration of Daniel J. Merrett    Page 5 of 7

Expert Report of Gregory K. Bell, Ph.D.                    January 28, 2022

(d)  Payments related to the Talc Litigation led to a cash drain that exceeded all pre-tax operating cashflows for Old JJCI, net of capital expenditures, by $0.7 billion.[76]

44. Thus, as shown on Exhibits L and N, the charges and payments associated with the Talc Litigation rendered the business of Old JJCI unprofitable and cashflow negative for the seven quarters preceding the 2021 Corporate Restructuring. Further, the exposure to Talc Litigation was going to worsen, as it was expected to continue for years into the future.

### B.  Potential Future Talc Litigation Burden Facing Old JJCI

45. In 2017, panelists at national asbestos conferences reportedly stated that the "talc litigation has the potential to be the next asbestos—a multi-billion-dollar litigation involving thousands of plaintiffs and defendants over decades."[77] Considering the increased case filings documented on Exhibit E, plaintiff lawyers' contentions that they will continue to file cases for the next 40 to 60 years,[78] the increased talc litigation advertising noted on Exhibit F, the potential indemnification exposure characterized on Exhibit G, the magnitude of external defense costs depicted on Exhibit H (notwithstanding the slowdown in trials during the COVID-19 pandemic), and the magnitude and variability of Talc Litigation verdicts shown on Exhibit I, it is apparent that the costs associated with the Talc Litigation will increase in the future and could persist for decades.

46. Not only would one expect new claims to be filed—particularly given plaintiff lawyers' characterization of the opportunity,[79] the estimated $41 million in Talc Litigation advertising for 2020 through November 2021 (Exhibit F), and the more than 12,300 new claims filed in just the nine months leading up to the 2021 Corporate Restructuring—Old JJCI was facing Talc Litigation costs associated

---

[76] Exhibit N.
[77] "Hot Topic: Talc Litigation Part 1," KCIC, https://www.kcic.com/trending/feed/hot-topic-talc-litigation-part-1/.
[78] See, for example, Geise, et al. Complaint, ¶¶ 37-44; Kim Declaration, ¶ 41.
[79] See, for example, Geise, et al. Complaint, ¶¶ 37-44.

Case 23-01092-MBK    Doc -10    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 9 to Declaration of Daniel J. Merrett    Page 6 of 7

Expert Report of Gregory K. Bell, Ph.D.                                                           January 28, 2022

with the more than 38,000 ovarian cancer and mesothelioma cases that were pending as of the 2021 Corporate Restructuring (Exhibit E). In addition, there were at least the existing and possible future cases brought by state AGs and the indemnification issue associated with Imerys to consider with respect to budgeting for the potential impact of the Talc Litigation.

47. Further, I understand that Talc Litigation defense costs over the seven quarters prior to the 2021 Corporate Restructuring likely were lessened by the impact of the COVID-19 pandemic and mitigated by a consolidation of most ovarian cancer cases in the multi-district litigation ("MDL"). These cases eventually would undergo discovery, up to and including trials, either in the MDL or in their home jurisdictions upon remand. The costs associated with this discovery thus far have been substantially deferred in the MDL so are not reflected in the historical spend. As a result, one would expect a substantial increase in future Talc Litigation defense costs.

48. More problematic with respect to budgeting for Talc Litigation is the magnitude and variability of the Talc Litigation verdicts shown on Exhibit I. In addition to the $4.69 billion *Ingham* verdict, plaintiffs have won initial verdicts of $787.3 million (*Barden, et al.*), $417 million (*Echeverria*), $325 million (*Olson*), $117 million (*Lanzo*), $110.4 million (*Slemp*), $72 million (*Fox*), $70.08 million (*Giannecchini*), $55 million (*Ristesund*), $40.1 million (*Cabibi*), $29 million (*Leavitt*), $27.5 million (*Johnson*), $26.57 million (*Prudencio*), $25.75 million (*Anderson*), $12 million (*Schmitz*), and $9 million (*Moure-Cabrera*).[80] A post-COVID-19, post-MDL resumption of trials in the Talc Litigation subjects Old JJCI to an increased possibility of large, random verdicts in the future. Such a resumption of trials also would increase pressure to settle claims in the future.

49. As discussed above, the Talc Litigation had rendered the business of Old JJCI unprofitable and cashflow negative for the seven quarters prior to the 2021

---

[80] As noted on Exhibit I, certain of these verdicts have been reversed or reduced on appeal.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Case 23-01092-MBK    Doc -10    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 9 to Declaration of Daniel J. Merrett    Page 7 of 7

Expert Report of Gregory K. Bell, Ph.D.                                    January 28, 2022

Corporate Restructuring. Increasing activity in the Talc Litigation, potentially associated with increased costs, could worsen that situation and deprive the business of the cashflow needed to support the brands, maintain the capital equipment, and invest in other initiatives that may be required to compete in the marketplace. Notably, the variability in the Talc Litigation costs is potentially as problematic for the business as the magnitude of the Talc Litigation costs. Consider the range of jury verdicts noted above, from $9 million to $4.69 billion. A business such as Old JJCI would not be able to operate efficiently or effectively with the possibility of forthcoming Talc Litigation payments that could be another $4.69 billion verdict, which would represent 77 percent of 2020 sales (Exhibit L) and 233 percent 2020 pre-tax operating cashflow, net of capital expenditures (Exhibit N). One could not plan for significant effective and efficient marketing campaigns, R&D programs, capital equipment, or other investments without the expectation of cashflows necessary to support such initiatives.

### C. Other mass torts

50. Other industries and products have faced mass tort litigations. In this subsection, I consider some examples of the financial burdens associated with other mass tort litigations in comparison to the financial burden sustained by Old JJCI related to the Talc Litigation. In particular, as shown on Exhibit O, I consider the relative financial burden associated with mass torts related to tobacco, opioids, silicone breast implants, asbestos, and contraceptive IUDs in comparison to the financial burden associated with the Talc Litigation for Old JJCI.[81]

#### 1. Tobacco

51. Tobacco and asbestos (discussed below) remain the two largest mass tort litigations to date.[82] On November 23, 1998, Philip Morris Incorporated, R.J.

---

[81] I understand that the Third Circuit has referenced Dow Corning Corporation (silicone breast implants), Johns-Manville Corporation (asbestos), and A.H. Robins Company (contraceptive IUDs) as examples of entities to file bankruptcy to resolve mass tort liability (Debtor's Objection to Motions to Dismiss Chapter 11 Case, p. 3, 15, 18).

[82] Rheingold, Paul, "The History of Mass Torts Litigation," *Mass Torts in the United States* (Ed: Courtney E Ward-Reichard), 2020, p. 2.