**<u>EXHIBIT 10</u>**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
-----------------------------------------------------------X
In re:                                )        Jointly Administered at
                                      )        Bankruptcy No. 03-35592
MID-VALLEY, INC., et al.,             )
                                      )        Chapter 11
                   Debtors.           )
                                      )        Related to Document Nos. 29 & 58
                                      )
-----------------------------------------------------------X
```

### RESPONSE OF TORT VICTIMS REPRESENTED BY BARON & BUDD AND SILBER PEARLMAN TO THE MOTIONS TO DISMISS FILED BY VARIOUS INSURERS

TO THE HONORABLE JUDITH K. FITZGERALD,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Baron & Budd and Silber Pearlman are law firms that each represent thousands of tort victims ("Tort Victims") asserting personal injury claims against one or more of the Debtors in these jointly administered cases. The Tort Victims' claims arise from toxic exposure to asbestos and/or silica. Liability insurers of one or more of the Debtors (collectively, the "Insurance Companies") have moved to dismiss the Debtors' cases.[1]

---

[1] A group of insurers who style themselves Certain Insurers filed the Motion to Dismiss Pursuant to 11 U.S.C. §1112(b) (the "Certain Insurers' Motion") on behalf of the following insurers: ACE Property & Casualty Insurance Company (formerly CIGNA Property and Casualty Insurance Company, formerly Aetna Insurance Company), Central National Insurance Company of Omaha, Century Indemnity Company (as successor to both CCI Insurance Company (successor to Insurance Company of North America) and CIGNA Specialty Insurance Company (formerly California Union Insurance Company), Pacific Employers Insurance Company, St. Paul Mercury Insurance Company (only with respect to policies issued as an affiliated member company of AFIA, an unincorporated insurance association), U.S. Fire Insurance Company, OneBeacon America Insurance Company (formerly Commercial Union Insurance Company, formerly Employers Commercial Union Insurance Company, formerly Employers Surplus Lines Insurance Company and The Employers Liability Assurance Corporation), Stonewall Insurance Company, Seaton Insurance Company (formerly Unigard Mutual Insurance Company), TIG Insurance Company (solely as successor by merger to International Insurance Company and International Surplus Lines Insurance Company), Mt. McKinley Insurance Company (formerly Gibraltar Casualty Company), Everest Reinsurance Company (formerly Prudential Reinsurance Company), and Federal Insurance Company (the

The Tort Victims respectfully submit this Response in opposition to the Motions to Dismiss, and urge the Court to deny the Motions for the reason that they are ill-founded and filed not to further the interests of any creditor but rather in an attempt to hinder and delay a reorganization that enjoys the overwhelming support of affected creditors.

## I.      SUMMARY:  THIS MOTION IS WITHOUT FOUNDATION AND REPRESENTS MERELY THE LATEST SKIRMISH IN THE INSURANCE COMPANIES' GUERILLA WAR ON CONGRESS' ASBESTOS AMENDMENTS TO THE BANKRUPTCY CODE

The Insurance Companies have filed the Motions to Dismiss in a transparent and self-serving attempt to derail this bankruptcy case before the Court can reach the merits of the Plan of Reorganization filed in this case by the Debtors (the "Plan"), supported by virtually all of the impaired creditors, and approved by the representative of future claimants.  This attempt is fully consistent with the Insurance Companies' well-known distaste for the trust and channeling injunction mechanism added by Congress as § 524(g) of the Bankruptcy Code, and represents nothing more than the latest battle in their campaign to ensure that deserving mass tort victims and overwhelmed debtors never attain the potential benefits of § 524(g).

The Motions to Dismiss seek, primarily, an order from this Court dismissing the bankruptcy case under 11 U.S.C. § 1112(b) for want of good faith.  The allegations leveled by the Insurance Companies in support of the Motions to Dismiss can all be countered by a single unavoidable fact: this Plan is the best possible solution to the

---

"Certain Insurers").  A second group of insurers, Hartford Accident and Indemnity Company, First State Insurance Company, Hartford Casualty Insurance Company, New England Insurance Company, and Twin City Fire Insurance Company (collectively the "Hartford Insurers"), filed the Motion of Hartford Accident and Indemnity Company and Certain of its Affiliates to Dismiss these bankruptcy Cases as Bad Faith Filings (the "Hartford Motion") (collectively with the Certain Insurers' Motion, the "Motions to Dismiss").

potentially ruinous mass tort litigation pending against the Debtors, and is the product of consensual negotiations that produced a result fair and equitable to all.

The Debtors face a huge number of asbestos and silica lawsuits, any one of which might lead to liability in the tens or even hundreds of millions of dollars, and which, in aggregate, could threaten the financial viability of even the healthiest company. Congress, in adding 11 U.S.C. § 524(g) to the Bankruptcy Code, intended the trust and channeling injunction mechanism to be available in precisely the situation presented here. Companies such as the Debtors are ideal candidates for § 524(g) protection, seeking to ensure both fair and equitable recovery for present and future claimants and the enduring financial viability of the reorganized debtor.  This Plan, employing provisions of the Bankruptcy Code by debtors facing the very problems those provisions were designed to address, supported by the overwhelming majority of impaired creditors, cannot reasonably be claimed to have been filed without the good faith required by 11 U.S.C. § 1112(b).

The Insurance Companies take too formalistic a view of the Third Circuit caselaw governing the determination of whether a bankruptcy petition is filed in good faith.  They argue that the holding of the leading case in the Third Circuit, premised on the unique facts before that court, mandates dismissal here.  On the contrary, the Third Circuit directs a bankruptcy court entertaining a 11 U.S.C § 1112(b) motion to dismiss for lack of good faith to "examine the totality of facts and circumstances to determine whether they support a finding of good faith."  *In re SGL Carbon Corporation*, 200 F.3d 154 (3rd Cir. 1999).  Debtors who file for bankruptcy protection for no other reason than to secure tactical advantage over a litigation adversary, who file to frustrate the enforcement of

rights by others or who file without a valid reorganizational purpose all may fall foul of the requirement of good faith in filing, if the circumstances warrant such a finding.  The facts and circumstances of this case permit no other finding than that the Debtors filed in good faith, for valid reorganizational purposes, and with the intention and the likelihood that the Plan, if confirmed, would ensure fair and equitable treatment of impaired creditors and the long term viability of the Debtors.

Bankruptcy courts are courts of equity.  The requirement of filing in good faith is one of the mechanisms of the Bankruptcy Code designed to ensure that those who seek the protections of bankruptcy approach the bankruptcy courts with clean hands.  This Court ought not dismiss the good faith filing of a Debtor facing potentially disastrous mass tort liability and seeking the protection of a trust and channeling injunction with the support of the only creditors impaired by the Plan.  It should certainly not do so at the behest of Insurance Companies who remain utterly opposed to the very existence of § 524(g) and have a demonstrated willingness to use every legal tool at their disposal to ensure § 524(g) does not operate as Congress intended.  The totality of the facts and circumstances of this Case compels a finding that the Debtors filed in good faith, and the Court should reject the Motions to Dismiss. [2]

---

[2] The Insurance Companies also attempt both direct and indirect attacks on the constitutionality of 11 U.S.C. §524(g).  These attacks are meritless, premature, and ultimately futile assaults on the constitutionality of § 524(g).  The Tort Victims focus in this Response upon the attempt to have the case dismissed on good faith grounds.  To the extent the Court considers it necessary to weigh the Insurance Companies' constitutional issues, the Tort Victims join in those portions of the Debtors' response to the Motions to Dismiss dealing with the constitutionality of 11 U.S.C § 524(g).

## II.     THE INSURERS LACK STANDING TO ASSERT THE RIGHTS OF CREDITORS WHO HAVE ENDORSED THE PROPOSED PLAN BY A HUGE MARGIN OR OTHERWISE INJECT THEMSELVES INTO THE BANKRUPTCY PROCESS

The Insurance Companies lack standing to participate in Debtors' reorganization. They are not affected by the proposed Plan or by the bankruptcy filing. *See* Memorandum of Baron & Budd and Silber Pearlman on the Lack of Standing of Various Insurers of One or More Debtors to Participate in Debtors' Reorganization Cases (hereinafter "Memorandum"). The Insurance Companies' participation in the Debtors' reorganization runs afoul of constitutional, prudential, and statutory limitations on standing. The Tort Victims will not repeat their earlier arguments on standing but will remind the Court of only three points.

First, constitutionally, the Insurance Companies fail to establish an individual injury, fairly traceable to Debtors' allegedly unlawful conduct, and which is likely to be redressed by the requested relief. *See, e.g., AMTRAK v. Pa. PUC*, 342 F.3d 242, 254 (3d Cir. 2003). Second, prudentially, the Insurance Companies assert generalized grievances concerning bankruptcy policies more appropriately addressed to the representative branches of the government. They also appear to assert the rights and interests of third parties, and they present claims outside the "zone of interests" protected by the specific law invoked. *See, e.g., Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3d 101, 104 (1st Cir. 1995); *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Bennett v. Spear*, 520 U.S. 154, 162 (1997). Finally, statutorily, the Insurance Companies attempt to cast themselves as "parties in interest," which would allow them be heard on any matter in a Chapter 11 case. *See* 11 U.S.C. 1109(b). But the Insurance Companies are really only peripheral parties, entirely external to the Debtors' bankruptcy cases, and courts are aware that they

should "not to be so liberal in granting applications as to overburden the reorganization

process by allowing numerous parties to interject themselves into the case on every issue,

to the extent that the goal of a speedy and efficient reorganization is hampered." *In re*

*Public Serv. Co.*, 88 B.R. 546, 554 (Bankr. D.N.H. 1988).

### III.   THE OVERWHELMING SUPPORT OF CREDITORS AND THE TOTALITY OF THE CIRCUMSTANCES SURROUNDING THIS FILING SHOWS THAT THE BANKRUPTCY WAS FILED IN GOOD FAITH

Under 11 U.S.C. § 1112(b), a bankruptcy court may dismiss a chapter 11 case for

lack of good faith.  As Collier notes:

> No provision of the Code expressly authorizes a court to dismiss a case on this ground.  Nonetheless, even in the absence of express statutory authorization, the requirement of good faith has been held to be an implicit condition to the filing and maintenance of a bankruptcy case for over a century.

COLLIER ON BANKRUPTCY § 1112.07(1) (Lawrence P. King et al. eds., 15th ed. 2000).[3]

The requirement of good faith guards against misuse of the bankruptcy process

and targets "abuse of the bankruptcy process, or the rights of others, involving conduct or

situations only peripherally related to the economic interplay between the debtor and the

creditor community."  *Id.* (citations omitted).  Bankruptcy courts are courts of equity, and

the power to dismiss for want of good faith ensures that those who seek the protection of

the bankruptcy process do so with clean hands.  As Collier notes:

---

[3] Although clear Third Circuit precedent allows for dismissal under 11 U.S.C. § 1112(b) for lack of good faith, one scholar has even gone so far as to question whether a good faith filing requirement for bankruptcy petitions is appropriate.  Janet A. Flaccus, *Have Eight Circuits Shorted? Good Faith and Chapter 11 Bankruptcy Petitions*, 67 AM. BANKR. L.J. 401 (1993).  Flaccus essentially notes that three Supreme Court decisions addressing dismissal of bankruptcy cases cast doubt on the rationale for finding a good faith requirement for filing bankruptcy petitions.  Essentially, the Court has taken a strict textual approach to cases involving interpretations of the Code, ruling in several cases that where the Code is silent, the courts may not read or imply extraneous requirements. (citing *Taylor v. Freeland & Kronz*, 503

> [I]f the totality of the circumstances demonstrates that continuation of the chapter 11 case would promote injustice and shelter misconduct, the Court may terminate the proceedings.

COLLIER ON BANKRUPTCY § 1112.07(1) (Lawrence P. King et al. eds., 15th ed. 2000).

There is no abuse of the bankruptcy process in this case. The Plan does not promote injustice, but rather promotes justice for a huge creditor constituency, and, clearly, there is no misconduct in need of shelter. The Debtors filed for the protection of chapter 11 in good faith, for valid reorganizational reasons, and without the merest hint of what the Fifth Circuit has referred to as a "sinister or unworthy purpose." *In re Metropolitan Realty Corp.*, 422 F.2d 676, 678 (5th Cir. 1970). This consensual prepackaged bankruptcy filing, carrying with it the support of the vast majority of the only impaired creditor community, and seeking a just and fair result perfectly within the power of the bankruptcy court, ought to be allowed to proceed expeditiously to confirmation. This Court ought to ignore the self-serving and erroneous protestations of the Insurance Companies (possessed of questionable standing to raise the issue of good faith) and reject their unfounded motions for dismissal under 11 U.S.C. § 1112(b).

> **1.    Good faith, for the purposes of § 1112(b), is established by considering the totality of the circumstances, which, in this case, clearly establish the Debtors' good faith.**

A significant case in this circuit governing the standard of good faith is *In re SGL Carbon Corporation*, 200 F.3d 154 (3rd Cir. 1999). Although the Bankruptcy Code does not explicitly define cause for dismissal to include a lack of good faith, the Third Circuit has opted to allow a lack of good faith to constitute cause for dismissal because: (i) the

---

U.S. 638 (1992), *Toibb v. Radloff*, 501 U.S. 157 (1991) and *Johnson v. Home State Bank*, 501 U.S. 78 (1991)).

language of § 1112(b) is permissive, allowing such a construction; (ii) all or most other Courts of Appeal have opted to include a good faith requirement; (iii) the equitable nature of the bankruptcy process and a desire to ensure that debtors approach the court with clean hands; and (iv) the purposes underpinning chapter 11, balancing the interests of debtors and creditors and preventing abuse of the process. *Id.* at 161-62. Once an issue regarding the good faith of the debtor in filing for bankruptcy is raised, the burden of proof is on the bankruptcy petitioner to prove that it filed in good faith. *Id.* at 162.

The Third Circuit requires that the issue of good faith be the subject of a fact intensive inquiry undertaken to determine where the debtor's petition "falls along the spectrum ranging from the clearly acceptable to the patently abusive." *Id.* Eschewing categorical rules and arbitrary determinations, the Third Circuit requires a court deciding upon a motion to dismiss a case for lack of good faith to "examine the totality of facts and circumstances to determine whether they support a finding of good faith." *Id.*[4] In *SGL Carbon* the Third Circuit decided that the bankruptcy petition was not filed in good faith (essentially because the debtor filed as a transparent and egregious ploy to gain tactical advantage in pending antitrust litigation while otherwise financially sound and not purporting to reorganize) and granted the motion to dismiss the case for cause under § 1112(b). Here, an examination of the totality of the facts and the circumstances compels a finding of good faith. The following factors are determinative.

---

[4] The open-ended nature of the good faith inquiry leaves 11 U.S.C. § 1112(b) particularly susceptible to misuse by those pursuing an obstructive agenda. Indeed, some commentators have noted that, "the standards by which good faith is to be judged remain ill-defined and obscure." F. Stephen Knippenberg and Lawrence Ponoroff, *Legal Theory: The Implied Good Faith Filing Requirement: Sentinel of an Evolving Bankruptcy Policy*, 85 N.W. U. L. REV. 919 (1991). The idea of "good faith" is more properly seen as a "moral imperative" rather than a workable legal doctrine. *Id.* at 972. Indeed, as Professors Knippenberg and Ponoroff note, "the term 'good faith' has become little more than a convenient way to refer to a set of criteria by which conduct is tested." *Id*. at 971-72.

a.   **The need for bankruptcy relief in the face of potentially limitless mass tort liability is pressing, imminent and genuine.**

The Debtors have filed for bankruptcy in the face of potentially limitless liability for those asbestos and silica claims presently asserted by current claimants and those asbestos claims yet to arise that will be asserted by future claimants.  Even a single mesothelioma claim could lead to tort liability in the order of tens or even hundreds of millions of dollars,[5] and the potential avalanche of claims this filing and the mechanism set up under the Plan seek to avoid could drown the Debtors and cut off any avenue of recourse for deserving tort victims.  The need for bankruptcy relief is pressing, imminent, and genuine.  The United States Bankruptcy Court for the Southern District of California has noted that, as a threshold matter, a finding of good faith filing required the existence of "real debt" and "real creditors clamoring to enforce that real debt."  *In re South California Sound Systems, Inc.*, 69 B.R. 893, 900 (Bankr. S.D. Cal. 1987).  Few creditors clamor with the vigor of tort plaintiffs seeking compensation for devastating injuries and debilitating ailments.

b.   **The Debtors seek to employ the Bankruptcy Code in precisely the manner contemplated by the Code, and do not seek to twist the Code's provisions to escape liability for claims pressed against them.**

The Debtors seek to gain the protection of mechanisms under the Bankruptcy Code designed for precisely the situation presented here — the resolution of present and future claims by means of a trust and channeling injunction.  The Debtors do not seek to twist portions of the Bankruptcy Code in the aid of some self-serving ploy to escape liability, nor do they abuse the bankruptcy process in a callow attempt to evade liability

---

[5] A single case of mesothelioma, a virulent and aggressive form of cancer caused only by exposure to asbestos, recently saw a jury award a verdict of $250 million to a single plaintiff.  See Peter Page, *Asbestos*

for tort claims pressed against them.  If this bankruptcy case proceeds to confirmation and implementation of the scheme set forth in the chapter 11 Plan proposed by the Debtors and wholeheartedly supported by the only class of claimants impaired under the Plan, the Bankruptcy Code will operate precisely as intended.

By way of example, the United States Court of Appeals for the Third Circuit, in the case of *In re PPI Enterprises (U.S.) Inc., 324 F.3d 197*, (3rd Cir. 2003) (involving a debtor filing for bankruptcy largely in order to take advantage of the cap on landlord's claims under 11 U.S.C. § 502(b)(6)) upheld the bankruptcy court's determination that "it was not necessarily "bad faith" for debtors to file for Bankruptcy to avail themselves of certain Code provisions." *Id.* at 211.  The bankruptcy court had ruled that:

> in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended.

*Id.*  Here, as in *PPI Enterprises*, there is no abuse of the bankruptcy law, merely a plan which proposes to use 11 U.S.C. §§ 524(g) & 105(a) precisely as the Code intended: The creation of a trust and channeling injunction to deal with present and future mass tort claims and ensure the continuing existence of entities faced with massive liability while securing lasting prospects for recovery by claimants.  As noted by one scholar, "use of bankruptcy to protect a business whose viability is threatened by mass tort liability is not foreign to the underlying goals of the Bankruptcy Code."  Alan N. Resnick, *Symposium Mass Torts:  Bankruptcy as a Vehicle for Resolving Enterprise Threatening Mass Tort Liabilities*, 148 U. PA. L. REV. 2045, 2050 (2000).  Resnick views the underlying goals of

---

*Cases Draw Big Awards — Juries Slam Companies the Don't Make Asbestos*, NAT'L LAW J., April 7, 2003 at A4, available online at http://www.law.com/jsp/article.jsp?id=1048518271989.

the Bankruptcy Code in the context of mass tort cases as: (1) providing equal distribution to similarly situated creditors, (2) ameliorating the potential devastation that mass tort liability would have on the value of a business, and (3) compensating all victims. *Id.*

      c.     ***The financial health of the Debtors, in the absence of the relief sought, threatens the viability of the Debtors, and the bankruptcy filing is a timely attempt to resolve problems while resolution is still possible.***

The financial health of the Debtors, in the absence of the negotiated Plan filed in this case, is questionable. The fervent hope and expectation of the Debtors that the bankruptcy filing will allow the Debtors to operate business as usual is contingent upon the implementation of the Plan as negotiated. Without the trust and injunction, and the values set for compensation of tort claimants thereunder, the Debtors face potentially limitless liability of a nature and degree that could devastate the most financially healthy of enterprises. The bankruptcy filings and the Plan negotiated pre-petition is a timely attempt to reorganize the Debtors' asbestos liabilities before the spiraling asbestos litigation might render any attempt to reorganize a fruitless endeavor. The Plan embodies the good faith efforts of the Debtors and the class of tort claimants to act pre-emptively, but not prematurely, to resolve potentially crippling liabilities while an equitable and fair resolution is still possible. As the *SGL Carbon* court held, "the Bankruptcy Code does not require specific evidence of insolvency for a voluntary Chapter 11 filing." *In re SGL Carbon Corporation*, 200 F.3d 154, 164 (3rd Cir. 1999); *see also In re The Muralo Company, Inc.*, No. 03-26723(MS) 2003 Bankr. LEXIS 1593 at **24-25 (December 4, 2003 D.N.J. 2003). Pointedly, there is no requirement of insolvency for a debtor to seek the relief of a trust and channeling injunction under 11 U.S.C. § 524(g). Indeed, a recourse to 11 U.S.C. § 524(g) before the company is irredeemably doomed by litigation

spiraling out of control is the surest guarantee of sustained and meaningful recovery by present and future claimants.[6]  In *SGL Carbon*, the Third Circuit noted that:

> Courts have allowed companies to seek the protections of bankruptcy when faced with pending litigation that posed a serious threat to the companies' long term viability.

*Id.*  In *SGL Carbon*, the Third Circuit found only the "attenuated possibility standing alone" that the debtor might, at some point in the future, need to file for bankruptcy relief.  *Id.*  This was insufficient for a good faith filing.  Here, the possibility, and indeed the likelihood, of adverse financial consequences arising out of a failure to attain the relief sought in this reorganization case, lend support to the good faith nature of the filing.  This court should look to the policies of bankruptcy and § 524(g) and utterly reject the Insurance Companies' contention that "teetering on the verge of a fatal financial plummet" is required before a debtor may seek chapter 11 protection (see Certain Insurers' Motion at 27), a standard found nowhere in the Bankruptcy Code or case law.

        **d.**        ***The financial health of the Debtors' parent is irrelevant to the good faith of the Debtors' bankruptcy filings.***

Although the Insurance Companies make much of the financial health of Halliburton, the parent of the Debtors, such an assertion is fundamentally irrelevant to the

---

[6] As one scholar has observed: "[u]ntil a debtor proposes a plan, it is too speculative to conclude that reorganization is not in the best interests of the debtor and the debtor's creditors simply because the debtor is solvent."  Greg M. Zipes, *After Amchem and Ahearn:  The Rise of Bankruptcy Over the Class Action Option for Resolving Mass Torts on a Nationwide Basis, and the Fall of Finality?*. 1998 DET. C.L. REV. 7, 50 (1998).

good faith of the Debtors' bankruptcy filings.  Halliburton may well be financially sound, but Halliburton is not a debtor in this case and is not seeking bankruptcy protection.  The Debtors are corporate entities facing potentially ruinous mass tort litigation.  Halliburton has, thus far, met the substantial costs of defending and settling asbestos tort cases, but there is no guarantee that it will continue to do so.  Confirmation and implementation of this Plan is vital to the continued financial viability of the Debtors, and this gives further weight to the good faith basis for the bankruptcy filings of the Debtors.

> **e.**    ***This bankruptcy filing seeks a consensual resolution of tort claims asserted against the Debtors, eschewing self-serving tactical advantage for an equitable solution fair to all parties.***

The Debtors did not file for bankruptcy to gain tactical advantage in ongoing litigation.  This case stands in stark contrast to *SGL Carbon*, where the debtor's acknowledged sole motive was to gain a decisive tactical advantage over plaintiffs litigating antitrust lawsuits against it and whose claims were eviscerated under the proposed plan while all other creditors remained unimpaired.  *In re SGL Carbon Corporation*, 200 F.3d 154, 168 (3rd Cir. 1999).  The Plan is this case contemplates a comprehensive and complete resolution of the asbestos claims pressed against the Debtors in a vast number of fora, and it is the result of a diligently and fully negotiated settlement with the opponents of the Debtors in such litigation.  The Plan has the wholehearted support of the only group of claimants whose rights are impaired under the Plan, and it represents an equitable and fair resolution of the claims they hold.  This Plan is a mutually acceptable and universally beneficial resolution of the intractable problems posed by tort claims of this nature and magnitude.

The Plan does not affect any coverage litigation with the Debtors' insurers, a group whose number includes the Insurance Companies. The Plan is financed by the Debtors and their parent, and any recourse against insurance policies is reserved for another day and another forum. The true concern of the Insurance Companies is slightly different: a company faced with huge tort liability is inevitably distracted and disadvantaged in the pursuit of its rights under insurance policies. This bankruptcy filing represents an attempt to resolve pressing asbestos litigation and redress the tactical imbalance currently tilting any coverage litigation in the Insurers' favor. As the Bankruptcy Court for the District of New Jersey has noted, bankruptcy debtors are not the only entities tempted to use the Bankruptcy Code for strategic motivations, and "'litigation tactics' and 'strategical motivations' abound, particularly in mass tort driven chapter 11 cases." *In re The Muralo Company, Inc.*, No. 03-26723(MS) 2003 Bankr. LEXIS 1593 at **39-40 (December 4, 2003 D.N.J. 2003). Here, it is the Insurance Companies who employ "litigation tactics." The Motions to Dismiss, if granted, would work to the complete and decisive strategic advantage of the Insurance Companies and would succeed in scuttling a case in which their standing is entirely questionable and the subject of searching scrutiny by this Court. In any event, the Debtors have a valid reorganizational purpose in filing for chapter 11 protection, and any attempt to mischaracterize the filing as an impermissible litigation tactic is without foundation.

> **f.** **The Plan protects the rights of future claimants in exactly the manner the Bankruptcy Code envisages.**

The Plan also equitably provides for the compensation of future claimants, ensuring that a mechanism to compensate claimants not yet able to press a claim against the Debtors will be available when such claims arise. The individual charged with

representing the interests of the future claimants in the negotiation process leading up to this filing has approved the Plan as in the interests of those he is charged to protect. Rather than leaving the recovery available to such claimants dependent upon the long term survival of the Debtors, itself subject to the vagaries of multi-forum mass tort litigation, the Plan proposed by the Debtors and supported by the guardian of the future claimants' interests will guarantee a fair treatment of future claims as and when they arise. This solicitude for the rights of future claimants can only be characterized as indicative of a good faith attempt to seek the protection of the Bankruptcy Code in precisely the manner intended.

> **g.** **Debtors propose to pay amounts in line with prevailing settlement values to resolve asbestos claims against the Debtors and in other similar bankruptcy cases. In opposition to this clear fact, the Insurance Companies use statistics for support rather than illumination.[7]**

In their endeavor to demonstrate that the amounts Debtors propose to pay to settle asbestos are "inflated," the Insurance Companies take the total dollar amount Halliburton paid for asbestos claims through settlement or court proceedings over the past **twenty-eight years** and simply divide that amount by the number of claims so resolved. Thus, the Insurance Companies conclude, the "historical average cost per claim" is about $920. No one familiar with current asbestos litigation will take such an obviously manipulated "average" seriously. The Insurance Companies consciously ignore their own counsel's acknowledgment that "the cost of defending and settling [asbestos] claims has been going up steadily . . . ." Mark D. Plevin, *Asbestos Bankruptcy Basics and Selected Related*

---

[7] "He uses statistics as a drunken man uses lamp-posts — for support rather than illumination." THE COLUMBIA WORLD OF QUOTATIONS (1996), Number 33704, attributed to Andrew Lang (1844-1912), Scottish author.

*Insurance Issues*, Mealey's Asbestos Bankruptcy Conference, June 3, 2003.  Similarly,

while "cherry-picking" portions of the Halliburton SEC Form 10-Q (Sept. 20,2003) (the

"Halliburton 10-Q") to quote, the Insurance Companies omit the statement that

Halliburton's expert, Dr. Rabinovitz, "projected that the elevated and historically

unprecedented filings of the last several years (particularly 2000 and 2001) . . . would

continue into the future for five more years."  Halliburton 10-Q at 19.  In short, the

Insurance Companies ignore the escalating costs of defending and settling asbestos claim

by factoring in settlement costs from twenty-eight years ago to support their position.

That the Debtors are not proposing a "grossly inflated" global asbestos settlement

is demonstrated by the DII Industries, LLC Asbestos PI Trust Distribution Procedures,

Plan Exhibit 4, Annex 3 ("Debtors' Proposed TDP").  The Scheduled Values for asbestos

personal injury claims set forth in Debtors' Proposed TDP are "based on historical values

for substantially similar claims in the tort system."  Debtors' Proposed TDP at p. 4,

Subsection 2.1.  The Scheduled Value, Average Value and Maximum Value for

Harbison-Walker Asbestos PI Trust Claims for Mesothelioma are $51,300, $61,400, and

$228,000, respectively.  Pursuant to Federal Rule of Evidence 201, made applicable in

this case by Federal Rule of Bankruptcy Procedure 9017, the Tort Victims respectfully

request the Court to take judicial notice of the Combustion Engineering 524(g) Asbestos

PI Trust Distribution Procedures, Exhibit G to Plan of Reorganization, Case No. 03-1049

(the "Combustion Engineering TDP").  The Combustion Engineering TDP provides for

Scheduled Value, Average and Maximum Value for Mesothelioma of $90,000, $120,000,

and $400,000 respectively.  Accordingly, the values proposed by Debtors can hardly be

considered inflated and reflect amounts achieved through arms length negotiations.

h. **The Debtors come to this Court with clean hands, and principles of equity require that this good faith filing proceed to a confirmation hearing.**

The Debtors approach this Court with clean hands, seeking a fair and full consideration of the Plan in the context of a confirmation hearing, and equity demands that the premature attempts by the Insurance Companies to scuttle the process be rejected. Bankruptcy courts are courts of equity, and the bankruptcy process commands an entity seeking relief to act in an equitable fashion. The power afforded to bankruptcy courts by 11 U.S.C. § 1112(b) to dismiss cases not filed in good faith enforces this requirement of equitable behavior. *In re SGL Carbon Corporation*, 200 F.3d 154, 168 (3rd Cir. 1999). The Debtors negotiated and proposed this Plan with its chief creditor constituency and the Plan is supported by a vast majority of those impaired creditors, in full compliance with principles of equity, in furtherance of goals specifically endorsed by the Bankruptcy Code, and seeks relief available to a debtor in the situation presented by this case.

i. **The foregoing factors compel a determination that the Debtors bankruptcy filings were undertaken in good faith, and require rejection of the Insurance Companies' calls for dismissal cases under 11 U.S.C § 1112(b).**

A thorough consideration of the totality of the circumstances surrounding the Debtors' bankruptcy filings compels a finding that the Debtors filed for bankruptcy in good faith. If the Insurance Companies have standing to object to the confirmation of this Plan, which is doubtful, then they shall have their opportunity to be heard on the merits of the Plan in due course. The Debtors have, however, met their burden and can amply illustrate the good faith of their bankruptcy filings, after an examination of the totality of the surrounding circumstances.

**2.** **The Insurance Companies expect too much from their continual invocation of the leading Third Circuit case on good faith, placing too much significance on tenuous similarities between the facts of that case and the facts before this Court, and ignoring cases with more apt factual similarities.**

Seemingly oblivious to the central tenet of the *SGL Carbon* case, that each case must be judged on its own merits after a fact intensive examination of the totality of the circumstances, the Insurance Companies place great reliance on the conclusion of bad faith in *SGL Carbon* in asking this Court to dismiss *these* bankruptcy petitions. Certain Insurers contend that the decision "is on all fours here, and *mandates* the dismissal of these Chapter 11 petitions." Certain Insurers Motion at 23 (emphasis added). The Hartford Motion treads a slightly more cautious path, claiming that "at a bare minimum, the striking parallels to the *SGL Carbon* case point up the need for careful scrutiny here." Hartford Motion at 17. Both Motions repeatedly draw comparisons between *SGL Carbon* and this case to bolster their arguments in favor of dismissal. Yet *SGL Carbon* is a case presenting an entirely different factual posture.

   *a.* ***There is no reasonable similarity between SGL Carbon's finite and readily estimable antitrust liability and the Debtors' potentially unlimited mass tort liability.***

*SGL Carbon* involved a company's filing for bankruptcy on account of a finite number of lawsuits alleging antitrust violations by the company. In *SGL Carbon*, the Third Circuit specifically rejected findings that the distractions caused by the antitrust litigation posed a serious threat to the continued operations of the Debtor, and that the litigation might result in a judgment that could ruin the company. *In re SGL Carbon Corporation*, 200 F.3d 154, 162 (3rd Cir. 1999). The distraction posed by the litigation was unsupported by evidence and the finite and readily estimable liability did not pose a

serious threat to the financial viability of the company.  Indeed, the company had set

aside a reserve for the payment of the claims, which it estimated at $240 million.  *Id.* at

158.

In stark contrast, the litigation at issue here is potentially limitless.  The central

factor distinguishing asbestos liability from the sort of antitrust liability present in *SGL*

*Carbon* is that the scope of asbestos liability may drown even the most financially viable

of companies and may persist far into the future in a magnitude difficult to

determinatively predict at any given time.  The consequences of asbestos litigation

overtaking a business's ability to deal effectively with it are such that the Bankruptcy

Code makes express provision for a mechanism to deal with present and future asbestos

liabilities, allowing a trust and channeling injunction to be set up and ensuring both the

continued viability of the debtor and the prospects for compensation to claimants.  In this

case, the distraction inherent in mass asbestos liability and the potential financial ruin

that it might inflict on an asbestos defendant at any given time are different in kind and

degree from the distraction and ruin faced by the debtor in *SGL Carbon*.

**b.**　　**In SGL Carbon, the debtor admitted that the sole reason for the filing was to gain a tactical advantage.  Here, there is no suggestion that this case has been filed with such self-serving motivation, never mind a bald admission to that effect.**

Another factor influencing the Court in *SGL Carbon* was the fact that officers of

the Debtor "expressly and repeatedly acknowledge that the Chapter 11 petition was filed

solely to gain tactical litigation advantage."  *In re SGL Carbon Corporation*, 200 F.3d

154, 168 (3rd Cir. 1999).  This flies in the face of the requirement that bankruptcy filings

be in pursuit of a valid reorganizational purpose, a lack of which the *SGL Carbon* Court

found was evident.  *Id.* at 166.  In *SGL Carbon* the bankruptcy filing was a callow

exercise in self-serving expediency. The debtor had no genuine desire to reorganize and ensure its creditors were compensated while the company survived intact, but merely saw an opportunity to pervert the Bankruptcy Code to gain unfair advantage in its litigation with the antitrust plaintiffs. The Insurance Companies assert similar motivation here, and a similar lack of valid reorganizational purpose.

The Plan's resolution of present and future tort litigation against the Debtors is a world apart from the self-serving tactics seen at play in *SGL Carbon*. Fully consistent with the requirements of the Bankruptcy Code, born of necessity brought about by crippling multi-forum litigation without foreseeable end, supported by the vast majority of the current claimants engaged in litigation against the Debtors, the result of a long, diligent, and arms-length negotiating process, and representing a consensual and equitable resolution of asbestos and silica claims, the Debtors invocation of the Bankruptcy Code is undertaken with a clearly discernible reorganizational purpose. There is simply no evidence to suggest that the Debtors filed for bankruptcy *to gain tactical litigation advantage*, a perversion of the bankruptcy process so detrimental to the claim of good faith in *SGL Carbon*.

> **c.** **SGL Carbon is a poor fit factually, and if an example is sought to guide the Court's in depth analysis of the facts of this case, In Re The Muralo Company is far more apposite.**

The case cited so extensively by the Insurance Companies provides the rule of decision for this Court's determination, a requirement to look at the totality of the circumstances, but is, regardless of the claims of the Insurance Companies, a poor fit factually. Although the Tort Claimants wish the avoid the error of the Insurance Companies and urge misplaced reliance upon the factual contours of a previously decided

case, a bankruptcy case from the United States District Court for the New Jersey is instructive.  In the case of *In re The Muralo Company, Inc.*, No. 03-26723(MS) 2003 Bankr. LEXIS 1593 (D. N.J. 2003) the court declined to dismiss a bankruptcy case filed as a result of "an avalanche of asbestos related complaints" instituted against the debtor. *Id.* at *2.  Faced with mass asbestos liability, the Muralo Company filed for bankruptcy with a view to instituting an adversary proceeding seeking a declaration that, under principles of successor liability, it was not liable for the asbestos claims lodged against it. *Id.* at *27.  Even if properly characterized as a litigation tactic, the *Muralo* Court, noting that "in some sense, essentially all bankruptcy filings are "litigation tactics" as countermeasures to debt collection efforts," held that "Debtors' strategy in filing is readily distinguishable from what was described as abusive litigation tactics." *Id.* at **28-29.  Such is the case here.  Far from abusing the provisions of the Bankruptcy Code to gain a self-serving advantage, the Debtors are seeking to employ the trust and channeling injunction provisions of the Bankruptcy Code in precisely the manner contemplated by Congress.

The *Muralo* Court notes that the function of a bankruptcy court, charged under *SGL Carbon* with the determination of whether a bankruptcy filing is made in good faith, is to place the petition upon the spectrum ranging from the clearly acceptable to the patently abusive.  *Id*. at *41.  Performing this "spectroscopic analysis", the court

> is left to find case analogs and consider established Bankruptcy Code policies (not the least of which is early access to chapter 11 … as well as access to chapter 11 protections generally.

Id. at *42.  The *Muralo* Court considered the debtors' filing to be closer on the spectrum to the *Johns-Manville* case (the genesis of the trust and channeling mechanism as a means of resolving mass asbestos litigation) than to the *SGL Carbon* case, and held that

> [t]he Third Circuit indicated in *SGL Carbon* that the *Johns-Manville* filing was as a minimum acceptable if not "clearly acceptable," while SGL Carbon's filing was found to be abusive if not "patently abusive." Debtors' circumstances are, in this court's view, plainly most closely related to those of *Johns-Manville.* Again, the mass tort litigation context of *Johns-Manville* and the immediate case is found to be an overwhelming factor favoring a good faith filing determination.

Id. at *42.  Although each case must be determined solely on its own merits, it is evident that this bankruptcy filing by the Debtors shares a greater similarity with the *Johns-Manville* and *Muralo* cases than with *SGL Carbon*.  Both of the former cases involved debtors facing potentially ruinous mass tort litigation, who sought, in good faith, the protection of the Bankruptcy Code.  After an examination of the totality of the circumstances, the bankruptcy filing in this case is, at a minimum, clearly closer along the spectrum towards acceptable than abusive.  The Court should allow this case to proceed on its own merits to confirmation and not succumb to the call of the Insurance Companies for a premature dismissal.

**3.     Although the totality of circumstances controls and each case must be evaluated individually, there are certain prototypical examples of cases filed in bad faith.  The case before this Court does not fit any of the paradigmatic examples of a bad faith case.**

The holding of *SGL Carbon* is clear:  Each case must be decided on its own merits after a review of the totality of the circumstances and an individualized decision regarding whether the petition has been filed in good faith.  This having been said,

however, there are a number of prototypical examples of cases in which courts have found a lack of good faith, none of which fit the case before this Court.

The United States Bankruptcy Court for the District of New Jersey has noted that:

> Courts have dismissed cases as bad faith filings for a variety of reasons, including but not limited to: (1) when the petition is filed merely as a litigation tactic; (2) when the petition was filed solely to frustrate the legitimate efforts of other parties to enforce their rights; (3) when the debtor lacks a valid reorganizational purpose; and (4) when the debtor's sole motive is to avoid a contract.

*In re Walden Ridge Dev., LLC*, 292 B.R. 58, 62 (Bankr. D.N.J. 2003). [8]  A review of the caselaw identifies a number of examples of cases dismissed for the above reasons.

Examples of cases filed solely for tactical advantage include *In re SGL Carbon Corporation*, 200 F.3d 154 (3rd Cir. 1999), which was, as demonstrated above, filed solely to gain a tactical advantage in pending lawsuits.[9]  In contrast, this case is a

---

[8] Collier offers a longer and more specific list: "Although application of the standard necessarily turns on the totality of circumstances of each individual case, situations in which good faith have been found to be lacking include those involving (1) use of bankruptcy as a vehicle to defraud others, (2) the persistent failure to comply with applicable court orders, rules or procedures, (3) use of the bankruptcy process to escape familial obligations, (4) the secretion of property and other efforts to avoid the disclosure of assets, (5) use of the bankruptcy system simply to avoid the consequences of prior misconduct, (6) the filing of a case to avoid an obligation under circumstances in which the debtor is not in need of reorganization, (7) the absence of legitimate debt, (8) the absence of any likelihood of rehabilitation, (9) use of bankruptcy as a vehicle to resolve disputes solely between equity participants, (10) use of the bankruptcy process merely to frustrate the rights of creditors (particularly with respect to single asset cases) or to coerce unfair treatment, (11) successive filings without any change in financial condition, and (12) the so-called new debtor syndrome, in which a debtor is created, or property is transferred, solely for the purpose of commencing a bankruptcy case. In situations like these, although the debtor or some other party might in many instances otherwise proceed to formulate a plan of reorganization, continuing the process is thought to constitute a perversion of the reorganization laws and the court may terminate the proceedings to prevent the abuse." COLLIER ON BANKRUPTCY § 1112.07(1) (Lawrence P. King et al. eds., 15th ed. 2000) (footnotes omitted). None of these examples provide a close analog to this case either.

[9] Other cases dismissed as seeking tactical advantage were *In re Cedar Shore Resort*, 235 F.3d 375 (8th Cir. 2000) (primary motivation of bankruptcy filing was for protection against pending lawsuit brought by minority shareholder), *In re HBA East*, 87 B.R. 248 (Bankr. E.D.N.Y. 1988) (bankruptcy filing intended to secure tactical advantage in pending litigation "rose to a level of egregiousness compelling a conclusion that the reorganization process is being perverted" *Id.* at 262), *In re Furness*, 35 B.R. 1006 (D. Md. 1983) (bankruptcy filed on the eve of civil trial, immediately after debtor's motion for postponement was denied) and *In re Silberkraus*, 253 B.R. 890 (Bankr. C.D. Cal. 2000) (bankruptcy filed to obstruct pending state court litigation).

comprehensive and consensual settlement of mass tort litigation of the kind envisaged by 11 U.S.C. § 524(g) rather than an attempt to secure a tactical advantage in any current or future litigation. Any issues to be resolved between Debtors and their insurers are fully reserved for another day and another forum.

A few cases seem to have been filed solely to frustrate other parties enforcement of their rights. For example, *In re Marsch*, 46 F.3d 825 (9th Cir. 1994) saw a bankruptcy case dismissed because the sole reason for the filing was to avoid paying an adverse judgment or posting an appeal bond, and *In re Tamecki*, 229 F.3d 205 (3rd Cir. 2000) saw a case dismissed on the grounds that the debtor's imminent divorce would provide sufficient funds to pay his only significant debt and enable him to get a fresh start.[10] In contrast, the proposed reorganization in this case impairs only the rights of those holding tort claims against the Debtors. Present claimants have overwhelmingly supported the treatment they will receive under the Plan, and future claimants are best protected, and their prospects for recovery guaranteed, by an enduring trust created to provide recovery as long as liability exists.

This case is readily distinguishable from those cases dismissed on the grounds that the debtors lacked a valid reorganizational purpose. For example, the bankruptcy court in *In re Island Helicopters*, 211 B.R. 453 (Bankr. E.D.N.Y. 1997) dismissed the case where there was no viable entity to reorganize and the case was filed for the sole purpose of frustrating the city of New York's attempts to eject the debtor from city

---

[10] Similarly, a number of cases saw dismissal of bankruptcy filings on the grounds that the only purpose of the filings were to stay imminent foreclosures and frustrate the rights of secured creditors. See, e.g., *In re Primestone*, 272 B.R. 554 (Bankr. D. Del. 2002); *In re Grieshop*, 63 B.R. 567 (D. Ind. 1986); *In re McCormick Road Associates*, 127 B.R. 410 (D. N.D. Ill. 1991).

property pursuant to a fully litigated eviction order.[11]  This Debtor in this case is
possessed of a clear reorganizational purpose: the invocation of 11 U.S.C. §§ 524(g) &
105(a) to ensure fair and equitable treatment of present and future mass tort claimants
and provide a mutually acceptable global resolution of crippling mass tort litigation.

Finally, on occasion, cases have been dismissed on the grounds that they are filed
solely to avoid contractual liability.  For example, the bankruptcy filing in *In re South
California Sound*, 69 B.R. 893 (Bankr. S.D. Cal. 1987) was dismissed on the grounds it
was filed solely to reject an executory contract.  This paradigm is simply irrelevant in this
case, which seeks to implement a negotiated resolution of mass tort liability and does not
implicate the rejection of contracts (or the avoidance of legal liability of any kind).

It is clear that the case before this Court does not fit any of the commonly seen
paradigms of cases filed in bad faith.  In contrast, this case is a comprehensive and
consensual settlement of mass tort litigation of the kind envisaged by 11 U.S.C. § 524(g)
and no tactical advantage is sought through an abusive use of the Bankruptcy Code, there
is neither the attempt nor the effect of frustrating the legitimate efforts of other parties to
enforce their rights, the valid reorganizational purpose is manifest in the Plan's adoption
of a trust and channeling injunction method of resolving asbestos liability, and there is no
attempt to avoid any contract, or other legal obligation.  This lack of fit with any of the
paradigmatic examples of bad faith is not determinative of the Debtors' good faith, but
lends additional weight to the determination that the totality of the evidence weighs
against dismissal.

---

[11] Similarly, any reorganizational purpose that might have arisen in the *SGL Carbon* case if the debtor was
adjudicated liable and found itself unable to meet any resulting judgment had yet to manifest itself, the case
being filed when it was for reasons divorced from reorganization and predicated solely on an attempt to
gain tactical advantage.

## IV      CONCLUSION AND PRAYER FOR RELIEF

The good faith of the Debtors' bankruptcy filings is evident, and this Court should reject meritless Motions to Dismiss, filed by the Insurance Companies with questionable standing in this case, no genuine solicitude for the rights of present of future tort claimants, and a vested interest in seeing this bankruptcy fail. The Third Circuit test for good faith for the purposes of 11 U.S.C. § 1112(b) requires this Court to "examine the totality of facts and circumstances to determine whether they support a finding of good faith." *In re SGL Carbon Corporation*, 200 F.3d 154, 162 (3rd Cir. 1999). In this case, facing potentially ruinous mass tort litigation of inestimable amount and duration, the Debtors have filed a prepackaged Plan that impairs only two classes of creditors, asbestos tort plaintiffs and silica tort plaintiffs and sets up a trust and channeling injunction mechanism under 11 U.S.C. § 524(g) to ensure the fair and equitable compensation of present and future tort claimants. The overwhelming majority of present claimants support the Plan, which has also been approved by a representative appointed to safeguard the interests of future claimants. Filed for a valid reorganizational purpose consistent with the goals of the Bankruptcy Code, rather than merely representing a litigation tactic or a devious attempt to strip the rights of others (cases fit for dismissal for lack of good faith), this case has been filed in good faith. Accordingly, this Court should reject the Insurance Companies' self-serving and meritless attempts to derail this case and allow the Plan to proceed expeditiously to confirmation.

For the foregoing reasons, the Tort Victims represented by Baron & Budd and Silber Pearlman respectfully urge this Court to enter an Order denying the Motions to Dismiss, and for such other and further relief as this Court deems just and proper.

Dated:  January 29, 2004

*/s/ Robert S. Bernstein*
Robert S. Bernstein (PA I.D. #34308)

**BERNSTEIN LAW FIRM, P.C.**
Suite 2200 Gulf Tower
Pittsburgh, PA  15219-1900
(412) 456-8101
(412) 456-8251 (facsimile)

*and*

**STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A Professional Corporation**
Sander L. Esserman
Texas Bar No. 06671500
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
(214) 969-4900
(214) 969-4999 (facsimile)

**ATTORNEYS  FOR  BARON  &  BUDD
and SILBER PEARLMAN**

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that a true and correct copy of the above and forgoing Response was served this 29th day of January, 2004, electronically and by U.S. Mail on the individuals listed on the Official Service List Effective 01/09/04 and those other interested parties on the attached service list.

                                      */s/ Robert S. Bernstein*

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | Jointly Administered at |
| | ) | Case No. 03-35592 JKF |
| MID-VALLEY, INC., *et al.,* | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| _____ | ) | |

**OFFICIAL SERVICE LIST EFFECTIVE 01/09/04**

**Debtors**

| | |
|---|---|
| Albert O. Cornelison<br>Executive Vice President &<br>General Counsel<br>Halliburton Company<br>1401 McKinney, Suite 2400<br>Houston, TX 77010<br>Ph: 713.759.2620<br>Fax: 713.759.2622<br>Email: bert.cornelison@halliburton.com | Bruce Stanski<br>Senior Vice President and CFO<br>Kellogg Brown & Root<br>4100 Clinton Drive<br>Houston, TX 77020<br>Ph: 713.753.4908<br>Fax: 713.753.2017<br>Email: bruce.stanski@halliburton.com |

**Counsel to Mid-Valley, Inc.,** *et al.*

| | |
|---|---|
| Jeffrey N. Rich, Esquire<br>Kirkpatrick & Lockhart LLP<br>599 Lexington Avenue<br>New York, NY 10022-6030<br>Ph: 212.536.4097<br>Fax: 212.536.3901<br>Email: jrich@kl.com | Michael G. Zanic, Esquire<br>Kirkpatrick & Lockhart LLP<br>Henry W. Oliver Building<br>535 Smithfield Street<br>Pittsburgh, PA 15222<br>Ph: 412.355.6219<br>Fax: 412.355.6501<br>Email: mzanic@kl.com |

Frank H. Griffin, III, Esquire
Gollatz, Griffin & Ewing
Four Penn Center, Suite 200
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103-2803
Ph:  215.563.9400
Fax:  215.665.9988
Email:  fgriffin@ggelaw.com

## Accountants & Financial Consultants to Mid-Valley, Inc., *et al.*

| | |
|---|---|
| Thomas D. Bibby<br>KPMG<br>717 North Harwood Street<br>Suite 3100<br>Dallas, TX 75201<br>Ph: 214.840.2479<br>Fax: 214.840.2180<br>Email:  tbibby@kpmg.com | Dr. Francine K. Rabinovitz<br>6033 W. Century Boulevard, Suite 890<br>Los Angeles, CA  90045<br>Ph:  310.645.9000<br>Fax:  310.645.8999<br>Email:  frabinov@aol.com |

## Counsel to Committee of Asbestos Creditors

| | |
|---|---|
| Peter Van N. Lockwood, Esquire<br>Caplin & Drysdale, Chartered<br>One Thomas Circle N.W.<br>Washington, DC  20005<br>Ph:      202.862.5000<br>Fax:     202.429.3301<br>Email:  pvnl@capdale.com | Elihu Inselbuch, Esquire<br>Caplin & Drysdale, Chartered<br>399 Park Avenue, 27th Floor<br>New York, NY  10022-4614<br>Ph:      212.319.7125<br>Fax:     212.644.6755<br>Email:  ei@capdale.com |
| Philip E. Milch, Esquire<br>Campbell & Levine, LLC<br>1700 Grant Building<br>Pittsburgh, PA  15219<br>Ph:      412.261.0310<br>Fax:     412.261.5066<br>Email:  pem@camlev.com | |

**Counsel to Halliburton and HESI**

| | |
|---|---|
| Jack L. Kinzie, Esquire<br>Michael C. Li, Esquire<br>Baker Botts LLP<br>2001 Ross Avenue<br>Dallas, TX  75201<br>Ph:      214.953.6500<br>Fax:     214.953.6503<br>Email:  jack.kinzie@bakerbotts.com<br>Email:  michael.li@bakerbotts.com | |

**Office of the U.S. Trustee**   **Counsel to Legal Representative for Future Claimants**

| | |
|---|---|
| Joseph Sisca, Esquire<br>Office of the U.S. Trustee<br>970 Liberty Center<br>1001 Liberty Avenue<br>Pittsburgh, PA  15222<br>Ph:      412.644.4756<br>Fax:     412.644.4785<br>Email:  joseph.s.sisca@usdoj.gov | James L. Patton Jr., Esquire<br>Edwin J. Harron, Esquire<br>Young Conaway Stargatt & Taylor LLP<br>The Brandywine Building, 17th Floor<br>1000 West Street<br>Wilmington, DE  19801<br>Ph:      302.571.6600<br>Fax:     302.571.1253<br>Email:  jpatton@ycst.com<br>Email:  eharron@ycst.com |
| | Joel M. Helmrich, Esquire<br>Meyer, Unkovic & Scott LLP<br>1300 Oliver Building<br>Pittsburgh, PA  15222<br>Ph:      412.456.2841<br>Fax:     412.456.2864<br>Email:  jmh@muslaw.com |

**Others**

| | |
|---|---|
| L. John Argento, Esquire<br>Jason A. Archinaco, Esquire<br>John W. Burns, Esquire<br>Dickie, McCamey & Chilcote, P.C.<br>Two PPG Place – Suite 400<br>Pittsburgh, PA  15222<br>Ph:      412.392.5413<br>Fax:    412.392.5367<br>Email:  argentl@dmclaw.com<br>Email:  archinj@dmclaw.com<br>Email:  burnsj@dmclaw.com | Mark D. Plevin, Esquire<br>Clifton S. Elgarten, Esquire<br>Robert T. Ebert, Esquire<br>Frederick W. Claybrook, Jr., Esquire<br>Leslie A. Epley, Esquire<br>James T. Hubler, Esquire<br>Crowell & Moring LLP<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC 20004-2595<br>Ph:      202.624.2500<br>Fax:    202.628.5116<br>Email:  mplevin@crowell.com<br>Email:  celgarten@crowell.com<br>Email:  rebert@crowell.com<br>Email:  rclaybrook@crowell.com<br>Email:  lepley@crowell.com<br>Email:  jhubler@crowell.com |
| Steven P. Rice, Esquire<br>Peter B. Ackerman, Esquire<br>Crowell & Moring LLP<br>3 Park Plaza, 20th Floor<br>Irvine, CA 92614-8505<br>Ph:      949.263.8400<br>Fax:    949.263.8414<br>Email:  srice@crowell.com<br>Email:  packerman@crowell.com | Paul R. Koepff, Esquire<br>Andrew J. Frackman, Esquire<br>Tancred V. Schiavoni, Esquire<br>O'Melveny & Myers LLP<br>Citigroup Center<br>153 East 53rd Street<br>New York, NY 10022-4611<br>Ph:      212.326.2000<br>Fax:    212.326.2061<br>Email:  pkoepff@omm.com<br>Email:  afrackman@omm.com<br>Email:  tschiavoni@omm.com |
| Philip D. Anker, Esquire<br>Wilmer, Cutler & Pickering<br>399 Park Avenue<br>New York, NY 10022<br>Ph:      212.230.8800<br>Fax:    212.230.8888<br>Email:  philip.anker@wilmer.com | Duane Morse, Esquire<br>Nancy Manzer, Esquire<br>Linda Chanow, Esquire<br>Wilmer, Cutler & Pickering<br>1600 Tysons Boulevard<br>10th Floor<br>Tysons Corner, VA 22102<br>Ph:      703.251.9700<br>Fax:    703.251.9797<br>Email:  duane.morse@wilmer.com<br>Email:  nancy.manzer@wilmer.com |

| | |
|---|---|
| Katherine Worthman, Esquire | Samuel R. Grego, Esquire |
| James A. Shepherd, Esquire | Vinita K. Sinha, Esquire |
| Knight Elsberry, Esquire | DKW Law Group LLC |
| Jeremy Simon, Esquire | 58th Floor, US Steel Tower |
| Lillian Potter, Esquire | 600 Grant Street |
| Wilmer, Cutler & Pickering | Pittsburgh, PA  15219 |
| 2445 M. Street, N.W. | Ph:  412.355.2600 |
| Washington, DC 20037 | Fax:  412.355.2609 |
| Ph:       202.663.6000 | Email:  sgrego@dkwlaw.com |
| Fax:     202.663.6363 | Email:  vsinha@dkwlaw.com |
| Email:  katherine.worthman@wilmer.com | |
| Email:  james.shepherd@wilmer.com | |
| Email:  knight.elsberry@wilmer.com | |
| Email:  jeremy.simon@wilmer.com | |
| Email:  lillian.potter@wilmer.com | |

## OTHER INTERESTED PARTIES

William J. Bowman
James P. Ruggeri
Edward B. Parks
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, DC  20004
(202) 637-5600
Facsimile:  (202)
wjbowman@hhlaw.com
jpruggeri@hhlaw.com
ebparks@hhlaw.com

William P. Shelley
John J. Dwyer
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103
wshelly@cozen.com
jdwyer@cozen.com

David P. McClain
McClain & Leppert, PC
909 Fannin
Suite 4050
Houston, TX  77010
mcclain@mcclainleppert.com

George Snyder
Stonecipher, Cunningham, Beard
  & Schmitt, P.C.
125 First Avenue
Pittsburgh, PA  15222-1590
gts@scbsla.wcom

Steven M. Crane
Berkes Crane Robinson & Seal LLP
515 South Figueroa Street
Suite 1500
Los Angeles, CA  90071
scrane@berslaw.com

Elit R. Felix, II
Margolis Edelstein
The Curtis Center
4th Floor
601 Walnut Street
Philadelphia, PA  19106-3304
efelix@margolisedelstein.com

James S. Yoder
White and Williams LLP
824 Market Street
Suite 902
Wilmington, DE  19899-0709
yoderj@whiteandwilliams.com

Philip R. King
John K. Daly
Meckler Bulger & Tilson
123 North Wacker Drive
Suite 1800
Chicago, IL  60606
philip.king@mbtlaw.com
John.daly@mbtlaw.com

Scott M. Seaman
John K. Daly
Meckler, Bulger & Tilson
123 North Wacker Drive
Suite 1800
Chicago, IL  60606
scott.seaman@mbtlaw.com
john.daly@mbtlaw.com

Robert B. Millner
Sonnenschein Nath & Rosenthal LLP
8000 Sears Tower
Chicago, IL  60606
rmillner@sonnenschein.com

Alan S. Miller
Picadio Sneath Miller & Norton, PC
4710 USX Tower
Pittsburgh, PA  15219
amiller@psmn.com

John J. Dwyer
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103
jdwyer@cozen.com

Andrew K. Craig
Stefano Calogero
Cuyler Burk, LLP
4 Century Drive
Parisppany, NJ  07054
acraig@cuyler.com
scalogera@cuyler.com

Anthony Gambardella
Rivkin Radler LLP
EAB Plaza
Uniondale, NY  11556
anthony.gambardella@rivkin.com

H. Lee Godfery
Neal S. Manne
Charles Eskridge
Robert Rivera
Susman Godfrey, LLP
1000 Louisiana
Suite 5100
Houston, TX  77002-5096
lgodfrey@susmangodfrey.com
rrivera@susmangodfrey.com
nmanne@susmangodfrey.com
ceskridge@susmangodfrey.com

Katherine M. Windler
Russell W. Roten
Coudert Brothers LLP
333 South Hope Street
Los Angeles, CA  90071
kwindler@coudert.com
rroten@coudert.com

Michael A. Shiner
Tucker Arensberg, P.C.
1500 One PPG Place
Pittsburgh, PA  15222
mshiner@tuckerlaw.com

Paul H. Saint-Antone
Daniel L. McAuliffe
Drinker Biddle & Reath
One Loan Square
18th & Cherry Streets
Philadelphia, PA  19103
Paul.saint-antone@dbr.com
daniel.mcauliffe@dbr.com

John E. Rodewald
Robert J. Bates, Jr.
Bates & Carey
333 West Wacker Drive
Suite 900
Chicago, IL  60606
jrodewald@batescarey.com
rbates@batescarey.com

Katherine L. Billingham
Katherine L. Billingham Co., LPA
7985 Washington Woods Drive
Centerville, OH  45459
katherineb@ameritech.net

Robert P. Siegel
Traub Eglin Lieberman Straus
Mid-Westchester Executive Park
Three Skyline Drive
Hawthorne, NY  10532
rsiegel@tels.com

William D. Sullivan
Elzufon Austin Reardon
  Tarlov & Mondell
300 Delaware Avenue
Suite 1700
P.O. Box 1630
Wilmington, DE  19899-1630
bsullivan@elzufon.com

W. Martin Tellegen
Gerald F. Ellersdorfer
Paul A. Peters
Kaufman & Logan LLP
100 Spear Street
12th Floor
San Francisco, CA  94105
mtellegen@kllaw.com
gellersdorfer@kllaw.com
ppeters@kllaw.com

Sheldon K. Rennie
Hal L. Baume
Teresa M. Dorr
Fox Rothschild LLP
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ  08648-2311
srennie@foxrothschild.com
hbaume@foxrothschild.com
tdorr@foxrothschild.com

Amie Pelletier
Morrison Mahoney & Miller, LLP
100 Maiden Lane
New York, NY  10038
apelleti@mail.mm-m.com

Tony M. Davis
Baker Botts LLP
One Shell Plaza
910 Louisiana
Houston, TX  77002-4995
tony.davis@bakerbotts.com