**<u>EXHIBIT 11</u>**

MEALEY'S™ LITIGATION REPORT

# Asbestos

## The Consolidation Effect: New York City Asbestos Verdicts, Due Process And Judicial Efficiency

*by*
*Peggy L. Ableman*
*McCarter & English*
*Wilmington, Delaware*

*and*

*Peter R. Kelso*
*Marc C. Scarcella*
*Bates White Economic Consulting*
*Washington, DC*

A commentary article
reprinted from the
May 6, 2015 issue of
Mealey's Litigation
Report: Asbestos


LexisNexis®

# Commentary

## The Consolidation Effect:  New York City Asbestos Verdicts, Due Process And Judicial Efficiency

By
**Peggy L. Ableman,**
**Peter R. Kelso**
and
**Marc C. Scarcella**

*[Editor's Note: Peggy L. Ableman is a former Delaware Superior Court Judge and now Special Counsel at McCarter & English, LLP in Wilmington, Delaware. Peter R. Kelso, Manager, and Marc C. Scarcella, Principal, are from the Washington, DC office of Bates White Economic Consulting. The views of the authors do not reflect the opinions of McCarter & English, LLP or Bates White Economic Consulting or LexisNexis, Mealey's. Copyright © 2015 by Peggy L. Ableman, Peter R. Kelso and Marc C. Scarcella. Responses are welcome.]*

### Introduction

The following commentary provides empirical evidence of how pronounced an impact the consolidation of asbestos cases has had upon the verdicts in the New York City Asbestos Litigation ("NYCAL").[1] The proliferation of case consolidations as the judicial response to burgeoning caseloads in NYCAL, with an emphasis on expediency and case management, has led to inequitable outcomes, which in turn have raised concerns over violations of defendant due process. The NYCAL data suggests that consolidated trial settings create administrative and jury biases that result in an artificially inflated frequency of plaintiff verdicts at abnormally large amounts. The existence of such biases has been validated by an extensive body of scientific and academic research, and has been shown to yield trial outcomes that undermine the broader settlement process. In short, the statistics do more than demonstrate the inflated amounts of damages that result when cases are combined. They also suggest that considerations of convenience and economy have apparently triumphed

over concepts of fundamental fairness and the right to an impartial trial. Whatever benefits to the NYCAL judiciary that has been derived from consolidation has come at a greater price than the numbers and charts can adequately measure.

As the following commentary demonstrates, the NYCAL Court's effort to manage a docket of asbestos cases by the use of "innovative" trial aggregations has resulted in high-value verdicts that are more than three times the national average. It is no longer just a matter of conjecture or speculation. The charts prepared for this commentary demonstrate that the practice of consolidating asbestos cases for trial has had such an inherently inequitable effect as to deprive defendants of a fair trial and due process.

### Summary of Analysis

On July 24, 2013, a jury in a consolidated trial in NYCAL returned a verdict of $190 million on behalf of five asbestos plaintiffs. The award is believed to be the largest verdict of its kind in U.S. history and is just one of several large jury awards in NYCAL consolidated trials since 2010. In fact, from 2010 through 2014, NYCAL jury awards in consolidated trials have totaled a staggering $324.5 million across 14 plaintiffs for an average of more than $23 million. These consolidated verdicts are 250% more per plaintiff than NYCAL awards in individual trial settings over that same span, and 315% more per plaintiff than the national average award.[2] Moreover, the jury bias caused by consolidation has also increased the frequency of plaintiff

1

victories in cases that go to verdict. Since 2010, 88% of plaintiffs (14 of 16) in NYCAL consolidated verdicts received jury awards, as compared to 50% of plaintiffs (4 of 8) in NYCAL individual trials, and approximately 60% nationwide.[3] Figure 1 summarizes jury awards from NYCAL consolidated and individual trials as compared to Non-NYCAL national awards.

It has been a common misconception in recent years by the NYCAL judiciary that the consolidation of cases into group trial settings is efficient in terms of judicial economy. However, too often the term "efficient" is mistakenly used synonymously with "expedient" when describing the effectiveness of a process or set of outcomes. In reality, efficiency is not just about speed, but also about equity. In the case of the $190 million jury award, there is little evidence that this result was equitable, and the courts agreed as the verdict amount was eventually reduced on remittitur to just under $30 million. In fact, 10 of the 14 NYCAL consolidated plaintiff awards since 2010 have been reduced on remittitur by an average of nearly 75%, with two

additional jury awards getting vacated on appeal.[4] In contrast, since 2010 none of the four plaintiff verdicts awarded in NYCAL individual trials have been remitted, with remittitur still pending in one case.

Such a pattern of inequity in NYCAL consolidated trials is clearly inefficient, and the post-trial attorney and judicial resources required to correct these initial outcomes erases any judicial economy that consolidated trial settings were intended to achieve. Moreover, while the remittitur process may correct for outlier jury awards, it does not correct for the aforementioned rate of plaintiff victory, which appears to be inflated in NYCAL consolidated trials. As illustrated in Figure 2, the average remitted plaintiff award in a NYCAL consolidated trial is actually lower than the average plaintiff award received in either NYCAL individual trials or those adjudicated in Non-NYCAL jurisdictions; however, the risk-adjusted average award (i.e., including defense verdicts and the two plaintiff awards vacated on appeal) is still higher in NYCAL consolidated trials due to the inflated rate of plaintiff verdicts.

**Figure 1: NYCAL mesothelioma jury awards to non-NYCAL jury awards (2010-2014)**



*Overall measure of defendant trial risk*
*\*\*Values do not include punitive portion of the verdict award*

**Figure 2: NYCAL mesothelioma verdicts compared to non-NYCAL verdicts post-remittitur or appeal (2010-2014)**



*Overall measure of defendant trial risk*
*\*\*Includes one plaintiff award that was subsequently vacated on appeal*
*\*\*\*Values do not include punitive portion of the verdict award*

Below we examine these issues by studying recent cases that were tried to verdict in NYCAL based on publically available data as well as the procedures that are in place governing the consolidation of cases. We will demonstrate that the practice of consolidation in NYCAL leads to (1) "runaway" jury verdicts that are multiples of the national average, (2) a bias against defendants when plaintiffs are grouped together in consolidated trial settings, (3) violations of legal due process, and (4) an unnecessary (and unsuccessful) attempt to preserve judicial time and resources.

## NYCAL

NYCAL has been a prominent asbestos jurisdiction for the greater part of the 40-plus year history of asbestos litigation. The judges that have presided over the NYCAL docket have witnessed many seminal changes in the litigation, including the non-malignant wave of unimpaired asbestos claims in the 1990s-2000s, the bankruptcy reorganization of more than 100 asbestos defendants, and most recently an increase in lung cancer filings. Historically, NYCAL was viewed as a national leader in instituting new rules to handle shifts in asbestos tort litigation. NYCAL became one of the first courts to institute a "first in, first out" ("FIFO") system of docket management to handle the waves of non-malignant claims that began to clog the court's docket in the 1990s.[5] In 2002, NYCAL led the way in New York by creating an inactive docket that precluded asbestos claimants from proceeding to trial until their alleged diseases met minimum medical criteria set forth by the court.[6]

Today, however, NYCAL lags other courts in terms of its administrative procedures and appears to be operating on principles that apply to litigation standards of decades ago. Despite other courts around the nation going away from practices such as consolidation and the consideration of punitive damages, NYCAL currently administers its docket with both of those practices in place, despite evidence that the application of each procedure has made NYCAL an outlier. In 2015, NYCAL operates under an amended 1996 Case Management Order ("CMO") that establishes the administrative and operating procedures of the court.[7] The current trial court justices presiding over NYCAL's docket include Justices Martin Shulman, Joan Madden, Barbara Jaffe, George J. Silver and Cynthia Kern.[8] Most recently on March 2, 2015, long-standing NYCAL Administrative Judge Sherry Klein Heitler was reassigned and replaced by incoming judge Peter H. Moulton.[9]

In terms of docket activity, claim filings in NYCAL have significantly subsided from the tens of thousands of unimpaired non-malignant claims that previously clogged the court's dockets.[10] Following the deferral of those claims in the 2000s through the court's inactive docket, mesothelioma claims dominated NYCAL's trial settings through much of the latter part of the decade. Most recently, however, lung cancer filings in NYCAL have risen as the recruitment of those claims has increased though TV and internet attorney advertising.[11] Figure 3 shows the filing rates for mesothelioma, lung cancer and other claims in NYCAL since 2004.

**Figure 3:  NYCAL filings since 2004**



*Includes filings from NYCAL's 1) active docket unclustered, 2) extremis clusters, and 3) FIFO clusters*

### Figure 4: NYCAL percent filings by plaintiff law firm from 2011 through 2014



Traditionally, the filings in the NYCAL Court have been dominated by asbestos claimants represented by the plaintiff law firm Weitz & Luxenberg. As Figure 4 indicates, Weitz & Luxenberg plaintiffs still make up a majority of the filings in NYCAL, representing more than half of all mesothelioma claims and nearly three-quarters of lung cancer filings in recent years.

**NYCAL Consolidation**

The consolidation of cases in NYCAL, and in asbestos litigation in general, is not a new phenomenon. The practice primarily began in the 1990s due to the influx of tens of thousands of unimpaired, non-malignant claims and sought to stem the tide of asbestos claim filings by resolving the cases collectively. However, as the claims continued to mount, the mass and mini-consolidations of cases in many jurisdictions was viewed as a failure as the practice only seemed to invite more case filings, a greater number of tenuous claims, and produced outcomes that were inconsistent with traditional litigation resolution trends. In fact, most other courts around the nation that currently handle asbestos personal-injury claims have gone away from case consolidation, largely in part because of due process concerns and the decline of overall case filings in most jurisdictions. Consolidation is currently restricted in Michigan[12] and Ohio[13] by their respective state

supreme courts and banned by statute in Texas,[14] Kansas[15] and Georgia.[16] Additionally, consolidation is not utilized in Madison County, Il, the jurisdiction with the largest number of annual asbestos filings and resolutions, and is sharply limited in other prominent asbestos jurisdictions such as Delaware,[17] San Francisco,[18] Baltimore[19] and Philadelphia.[20]

In NYCAL, consolidation began in the 1990s with the grouping of cases involving workers from the Brooklyn Naval Shipyard.[21] At the time, this and other early consolidations by the court may have been better reasoned as the plaintiffs were allegedly exposed at the exact same site, with similar diseases, occupations and dates of employment. The consolidations similarly involved a group of like-defendants, most of whom were companies engaged in the manufacture and/or distribution of thermal insulation asbestos-containing products. In these early consolidations, both plaintiffs and defendants were often homogeneous and while the practice was not optimal, consolidation seemed to be efficient in terms of judicial economy given the influx of cases that the court was facing at the time.

Today, however, it is questionable as to whether the practice of consolidation should continue in NYCAL

given the reduced number of pending cases before the court, the national trend of phasing out the use of consolidation, and the abnormally high verdicts that the grouping of cases in NYCAL produces. This "consolidation effect" is summarized in Figure 5 and shows the disparity of jury awards in consolidated and individual cases in NYCAL from 2010 through 2014.

These verdict outcomes since 2010 would suggest that a jury bias is created against defendants in cases that are consolidated versus those that are tried individually. Much of the scientific and academic research in this area, which we will discuss below, concludes that such biases are inherent when multiple cases are adjudicated through consolidated trials. Moreover, such biases in NYCAL have likely been further magnified, as the once homogenous set of litigants from decades ago has been replaced in today's tort by a diverse set of defendants, representing a myriad of different product types and alleged exposures. The defendant naming patterns in lawsuits filed in NYCAL since the early 2000s illustrate the dramatic shift of defendants that have been sued in the NYCAL Court, especially following the bankruptcies of the primary thermal insulation defendants in the early part of this century. Similarly,

the profile of plaintiffs that file lawsuits in NYCAL and who have prevailed at trial has also shifted over time, going away from the insulators of the past to a more diverse set of plaintiffs today. In turn, the assorted fact pattern asserted by plaintiffs today against a heterogeneous pool of defendants makes it increasingly difficult to establish a reasonable level of commonality amongst cases from which consolidation is sought.

Procedurally, the judiciary in NYCAL consolidates cases pursuant to Section 602(a) of the New York Civil Code. Under Section 602(a):

> When actions involving a common question of law or fact are pending before a court, the court, upon motion, may order a joint trial of any or all the matters in issue, may order the actions consolidated, and may make such other orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Following a motion by plaintiff counsel to consolidate cases under Section 602(a), NYCAL judges traditionally apply commonality factors initially set forth in a 1983 Maryland federal court case[22] and later cited in 1993 by the U.S. Court of Appeals for the 2nd Circuit

**Figure 5: NYCAL individual and consolidated mesothelioma jury verdicts (2010-2014)**

| Verdict Year | Lead Plaintiff | Plaintiffs @ start of trial | Pre-Verdict Settlements | Plaintiff verdict | Defense verdict | Total Jury Award | Avg. Plaintiff Jury Award |
|---|---|---|---|---|---|---|---|
| 2010 | DIETZ | 1 | 0 | 0 | 1 | $0 | $0 |
| 2011 | BENTON | 1 | 0 | 1 | 0 | $2,500,000 | $2,500,000 |
| 2012 | ZAUGG | 1 | 0 | 0 | 1 | $0 | $0 |
| 2013 | VEGA | 1 | 0 | 0 | 1 | $0 | $0 |
| 2014 | CARLUCCI | 1 | 0 | 1 | 0 | $7,333,000 | $7,333,000 |
| 2014 | NORTH | 1 | 0 | 1 | 0 | $7,000,000 | $7,000,000 |
| 2014 | THIBODEAU | 1 | 0 | 0 | 1 | $0 | $0 |
| 2014 | HILLYER | 1 | 0 | 1 | 0 | $20,000,000 | $20,000,000 |
| | *Total Individual Trials* | *8* | *0* | *4* | *4* | *$36,833,000* | *$9,208,250* |
| 2011 | DUMMITT | 2 | 0 | 2 | 0 | $51,000,000 | $25,500,000 |
| 2012 | PAOLINI | 2 | 0 | 0 | 2 | $0 | $0 |
| 2013 | ASSENZIO | 5 | 0 | 5 | 0 | $190,000,000 | $38,000,000 |
| 2013 | PERAICA | 7 | 6 | 1 | 0 | $35,000,000 | $35,000,000 |
| 2014 | SWEBERG | 2 | 0 | 2 | 0 | $25,000,000 | $12,500,000 |
| 2014 | JUNI JR | 2 | 1 | 1 | 0 | $11,000,000 | $11,000,000 |
| 2014 | MCCLOSKEY | 3 | 0 | 3 | 0 | $12,500,000 | $4,166,667 |
| | *Total Consolidated Trials* | *23* | *7* | *14* | *2* | *$324,500,000* | *$23,178,571* |

in Malcolm v National Gypsum Co (*Malcolm*).[23] These *Malcolm* factors include (1) common work site; (2) similar occupation; (3) similar time of exposure; (4) type of disease; (5) whether plaintiffs are living or deceased; (6) status of discovery in each case; (7) whether all plaintiffs are represented by the same counsel; and (8) type of cancer alleged. Although the consolidation of NYCAL cases is not exclusively predicated on these criteria, *Malcolm* is highly influential and the factors are "guidelines" that NYCAL judges follow and consistently cite in consolidation orders. However, an examination of the cases consolidated in NYCAL from 2010 through 2014 shows that in many instances it appears that the judges who cited these criteria often failed to adhere to these factors in any systematic way. Similarly, it appears that the judiciary ignored other unique aspects of the individual cases that may have led to jury confusion and a potential bias against defendants.

For example, in the seven consolidated trials in NYCAL since 2010, four involved trials that included both living and deceased plaintiffs.[24] Similarly, there doesn't appear to be a high degree of commonality under *Malcolm* in the application of the "similar time of exposure" criterion across the consolidated claimants. The average collective time of exposure in the consolidated trials spanned more than 30 years of alleged exposure with some plaintiffs exposed decades earlier or later than their trial counterparts. A closer examination of the underlying facts of the individual NYCAL cases that were consolidated reveals multitudes of other inconsistencies among the plaintiffs that collectively fail to satisfy the *Malcolm* prongs of commonality cited by the NYCAL judiciary. For instance:

- In the *Assenzio* consolidated trial, the five plaintiffs worked at hundreds of uncommon work sites, both commercial and residential, and had a variety of occupations including plumber, steamfitter, painter, boilermaker and laborer. Two of the five plaintiffs alleged exposure to thermal insulation materials while working on U.S. naval ships at the Norfolk and Brooklyn naval shipyards while the other three plaintiffs alleged exposures to floor tiles, hot water heaters, HVACs and other related products while working primarily at residential sites. The time range of alleged exposure was substantial and extended over 50 years,

beginning in 1946 and ending in 1998. Additionally, the plaintiffs ranged in age from 61 to 83 years old. At the time of trial, two of the plaintiffs were living and three plaintiffs were deceased.

- In the *Dummitt* consolidated trial, the two plaintiffs had different occupations, sites of exposure, alleged product exposures and types of cancer. Ronald Dummit was a fireman, shipfitter and boiler technician and alleged exposures to asbestos insulation and related products on board ships and at shipyards during his service in the U.S. Navy. Dummit, 67, was diagnosed with mesothelioma of the pleura and alive at the time of the trial. David Konstantin, 55, worked as an attendant/helper at a gas station and later as a construction laborer. Konstantin alleged exposures to a different array of asbestos products including joint compound, floor and ceiling tiles, and wallpaper. Konstantin was diagnosed with testicular mesothelioma.

As illustrated by the facts of the cases in *Assenzio* and *Dummitt*, the consolidations failed to follow the commonality factors cited by the NYCAL judiciary in terms of occupation, work site, and time of exposure, as well as type of cancer in *Dummitt*. Moreover, the consolidation process in *Assenzio* ignored the life status of each plaintiff at time of trial. As the data summarized in Figure 6 show, the life status of a plaintiff at trial can have an emotional influence on jury awards, with NYCAL plaintiffs living at the time of trial receive more than double the average award than NYCAL plaintiffs not living at the time of trial. Similarly, the Non-NYCAL national average when punitive portions are included is more than double for plaintiffs that are living at trial. However, in both instances, when the averages include those awards that are reconsidered on appeal or remittitur, not only are the overall awards reduced, but the emotional influence of life status is significantly diminished as plaintiffs living at the time of trial are no longer awarded such a premium.

Although the emotional influence of life status appears to be muted during the appeal or remittitur process, the initial impact on jury awards does pose an increased trial risk for defendants. This risk can have a residual impact on plaintiffs not living at the time of trial when such plaintiffs are consolidated with a lead or target plaintiff

**Figure 6: Average mesothelioma plaintiff awards by life status (2010-2014)**



that is still living. Moreover, such a risk can rise exponentially when juries consider punitive damages for plaintiffs in a consolidated setting, as they are now allowed to do in NYCAL.

In addition to the demographics of the plaintiffs in a consolidated trial, the characteristics of multiple defendants also play a role in the ability of juries to distinguish the fact patterns of different cases in a consolidated setting. In NYCAL, each recent consolidation introduced multiple defendants and products into those trials that would have otherwise been unknown to the jury had the cases been tried on an individual basis. The addition of so many dissimilar products from different occupations and times of exposure raises questions as to a jury's capability to differentiate the facts of each case from one another and render decisions appropriately.[25] The disparity in the value of awards between plaintiffs in NYCAL consolidated and individual trials, as well as the rate of plaintiff victories in NYCAL consolidated trial settings, illustrates that a prejudice against NYCAL trial defendants is created during a consolidated trial despite whatever jury instructions, notebooks or other court devices are put in place to guard against confusion and bias.

**Consolidation and Jury Bias**

As evidenced by the NYCAL verdict outcomes, the practice of consolidation appears to have impacted jury behavior. This notion is supported by longstanding published scientific studies and literature by leading social psychologists and economists, and cited by prominent jurists.[26] These experts have published numerous peer-reviewed studies based on controlled experiments that statistically prove that the consolidation of personal-injury tort plaintiffs, and specifically asbestos plaintiffs, into a single action confuses juries and creates a bias against defendants.

According to a study published by Oregon psychology and law professor Dr. Irwin Horowitz, in which he analyzed juror behavior in a controlled setting for consolidated and individual trials, the "mere" practice of consolidation makes it significantly more likely on a statistical basis that a jury will find for the plaintiff and render a higher award than if the cases were tried individually.[27] Horowitz also found that the strength of any one of the consolidated cases can improve the value of the other cases by the process of grouping the allegations together. According to Dr. Horowitz:

> *"Juries' awards exhibited a highly significant "aggregation" bias when the "target" plaintiff was joined with more than one other plaintiff. That is, each individual plaintiff in a three plaintiff trial received average awards significantly greater than plaintiffs in one or two person trials. These awards were 3 and 4 times larger than those found in single plaintiff*

Case 23-01092-MBK    Doc -12    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 11 to Declaration of Daniel J. Merrett    Page 10 of 21

Vol. 30, #7  May 6, 2015                                                    MEALEY'S LITIGATION REPORT: Asbestos

*trials. The aggregation effect of 3-4 plaintiffs is not unique. Research in other areas has shown that people have difficulty distinguishing among four or more objects of any kind.*[28]

Horowitz's body of work is supported by other academic studies examining the effect that consolidation has on jury behavior and juror decisions in allocating liability and awarding damages. In controlled studies looking at jury behavior in individual and consolidated cases exclusive to just asbestos claimants, San Diego University economics professor Dr. Michelle White similarly found that consolidation creates a pro-plaintiff bias in the jury's consideration of damages. White also found that judges who offer the "innovation" of consolidation as a means to encourage settlement only invite more claims to the court because when claims are settled on terms favorable for the plaintiff, the plaintiff has an economic incentive to file more claims in the court where the "innovation" is in place. According to Dr. White:

> *"Because of the large numbers of claims filed in particular courts, judges in these courts adopt procedural innovations that are intended to reduce trial time and encourage large numbers of cases to settle. These procedural innovations also change trial outcomes in a pro-plaintiff direction. But when large numbers of asbestos claims are settled on favorable terms for plaintiffs, then plaintiffs' lawyers find it profitable to file additional claims in the same courts. This worsens the gridlock and pressures the judge to continue using the innovations."*[29]

Based on the disparity of results in the consolidated and individual trials in NYCAL, it would appear that the scientific studies on consolidated trial bias are applicable to the recent jury behavior in the NYCAL court. The findings may also explain, given the court's continued "innovation" of consolidation, the economic incentives behind why NYCAL remains such a prominent jurisdiction for plaintiffs to bring their cases. At the very least, the questions regarding consolidation's effect on jury behavior should prompt consideration by the New York judiciary and legislature to examine the issue to ensure that NYCAL's consolidation practice isn't tipping the scales of justice in one party's favor while infringing on the constitutional due process rights of other litigants.

## Consolidation of Cases is a Manifest Denial of Due Process

In the civil justice system, nothing is more paramount than the principle of due process and the right of individuals to a fair and impartial trial by a jury of their peers. This tenet is the cornerstone of the US legal system and a principle that cannot be compromised. The Fourteenth Amendment to the United States Constitution mandates that no person be deprived "of life, liberty, or property, without due process of law."[30] This provision of the Fourteenth Amendment, commonly known as the due process clause, includes the right to a "fair trial" as a fundamental liberty. Indeed, so basic to our jurisprudence is the right to a fair trial that it has been called "the most fundamental of all freedoms."[31] Article 1, Section 6 of the New York State Constitution mirrors the Fourteenth Amendment's due process guarantee of life, liberty, or property without due process of law, which necessarily includes the right to a fair trial.[32]

The Uniform Rules of Court and Civil Practice Law & Rules were designed and enacted by the New York Legislature to provide due process to litigants. They speak to the importance of providing a neutral, dependable and fair judicial process that complies with the mandates of both the Constitutions of the United States of America and the State of New York. But employing these rules, specifically C.P.L.R. Section 602, to join asbestos cases for trial in order to reduce a backlog of old cases under the guise of efficiency and judicial economy has now been demonstrated empirically to deprive defendants of their due process rights guaranteed by the Constitutions of the United States and the State of New York. For instance, the rule was never intended as a means to join dissimilar actions together so as to provide greater negotiation and trial leverage to one party, any more than it would be deemed acceptable to join dissimilar matters in other areas of the law such as medical malpractice or automobile accident cases, simply because there is commonality in the burden of proof or standard of care inquiries.

Indeed, "The benefits of efficiency can never be purchased at the cost of fairness."[33] As the Second Circuit has cautioned:

> *The systemic urge to aggregate litigation must not be allowed to trump our dedication to*

*individual justice, and we must take care that each individual plaintiff's – and defendant's – cause not be lost in the shadow of the towering mass of litigation.*

As empirical evidence of the consolidations in the cases described herein has shown, the NYCAL Court's desire for expediency and convenience has had a serious impact on what should be its paramount concern of providing a fair and impartial trial for all litigants.[34] "Of all the discretionary rulings that a judge can make concerning the course of a trial, few are as pervasively prejudicial to a product liability defendant as deciding to consolidate cases if they bear little similarity other than that the same product resulted in an alleged injury in each case."[35]

One of the primary concerns leading to unfairness in the consolidation of these cases is juror confusion. Defendants themselves, or even their lawyers, should not be required to sift through a myriad of separate claims, parties, fact witnesses, expert witnesses and trial testimony to parse out the limited materials related to their individual claims and defenses in the hopes that jurors will be capable of keeping them straight. As difficult as it is for an unsuspecting jury to track the specific details required to evaluate the complex liability and damages issues in even one matter, the task of doing so for separate claims involving multiple defendants is even more daunting.

The impact of jury confusion that is created by a "maelstrom of facts, figures, and witnesses" can neither be ignored nor taken lightly. In *Malcolm*, the Second Circuit remanded for new trials 48 separate cases that had been consolidated. The Court explained that during the liability portion of the trial, "the jury was presented with a dizzying amount of evidence regarding each victim's work history,"[36] and "the cosmic sweep of the factual data that the jury had to absorb" compromised the fundamental fairness of the process. Despite the measures taken by the Court to assure each case maintained its own identity, "the sheer breadth of the evidence made these precautions feckless in preventing jury confusion."[37]

In *Malcolm*, the jury had apportioned the liability for plaintiff's damages equally among each of the defendants, corporations, and related individuals, including appellant corporations. Despite the precautions taken by the Court to assure that each case maintained its identity, the mountain of information presented in the case, with 48 plaintiffs, 25 direct defendants, numerous third-and fourth-party defendants, evidence regarding culpable non-parties, and over 250 worksites was likely to lead to juror confusion. The Court concluded that the equal apportionment of plaintiff damages was sufficiently unusual in light of the evidence to demonstrate jury confusion.[38]

The *Malcolm* Court addressed the foremost concern in consolidation, which is the importance of providing a fair and impartial trial to all litigants. To strike the appropriate balance, the NYCAL Court allegedly has used the criteria cited in *Malcolm* as a guideline in determining whether to consolidate asbestos cases. Focusing on only a handful of the criteria established in *Malcolm*, it is not at all difficult to appreciate the effects of aggregation from the perspective of a jury. It is also understandable why NYCAL verdicts have been inflated in comparison to those in other jurisdictions where individual justice is the norm.

Aside from the overwhelming mass of information and the impossible task of keeping the facts of each plaintiff's case separate and distinguishable, the significant prejudice resulting from lumping together different types of diseases cannot be underestimated. When plaintiffs suffer from the same disease, the judicial economy derived by not rehashing the etiology and pathology of the particular disease will be substantial, with minimal prejudice to the defendants. But when a jury is required to assimilate testimony about two or more different diseases, the results can be highly prejudicial to defendants. The *Dummitt* consolidation is a prime example of a NYCAL jury being asked to evaluate the medicine and science between two distinct types of cancer as one plaintiff was diagnosed with mesothelioma of the pleura while the other was diagnosed with testicular mesothelioma. Moreover, any judicial economy that consolidation was intended to achieve by grouping two "mesothelioma" cases together was erased by the fact that each case and distinct disease mandated a much different set of medical and scientific experts and testimony.

The impact of juror confusion, as well as the bolstering effect of pairing plaintiffs with different diseases or those living with those who are deceased, along with the other *Malcolm* factors in a consolidated trial, are

Case 23-01092-MBK   Doc -12   Filed 05/26/23   Entered 05/26/23 23:11:45   Desc
Exhibit 11 to Declaration of Daniel J. Merrett   Page 12 of 21

Vol. 30, #7   May 6, 2015                                                 MEALEY'S LITIGATION REPORT: Asbestos

not the only concerns that threaten the right to due process and fair trial. As experienced trial judges are fully aware, when a court consolidates multiple cases for trial, even the duration of the trial presents its own due process concerns. When potential jurors are advised that a trial will take six to eight weeks, or months, or even longer, rather than the typical one- or two-week civil jury trial, the potential jury pool itself is transformed by a "thinning of the herd." It is impossible to ignore the fact that a large number of individuals who have responsible jobs or who attend college or graduate school are unable to serve for such an extensive period of time. While jury selection should result in a jury that is truly representative of a fair cross-section of the community, the hope of obtaining one under these circumstances is lost. Once again, the due process rights of defendants, including the right to a jury of one's peers, cannot be guaranteed when entire segments of a community will be unable to serve.

Not to be ignored is the less apparent but equally harmful effects upon the due process rights of defendants who are frequently left with no viable choice but to settle the case rather than risk a jackpot verdict. From a trial judge's perspective, the prospect that consolidation may encourage the settlement of a sizeable portion of a heavy caseload is tempting indeed, especially in jurisdictions with an emphasis on the speedy disposition of dockets. When leverage is applied to force defendants to settle weak or meritless cases, or pay inflated amounts to settle stronger cases, it is inevitable that plaintiffs will flock to take advantage of this circumstance.[39] What is more, exaggerated or unjustified payments to earlier filing claimants could threaten recoveries by future deserving claimants. Even small scale consolidations in NYCAL "significantly improve outcomes for plaintiffs."[40]

Furthermore, consolidation can bolster weak or novel claims, because jurors are likely to assume that if multiple plaintiffs allege injuries from a particular product, then the claims must have merit, even when they lack objective support. Jurors may also have difficulty differentiating asbestos products with different fiber types and potencies, thereby lumping them all together as just "asbestos."[41]

In a forceful dissent in the Virginia Supreme Court case of *In re Hopeman Brothers, Inc.*,[42] in which the majority

dismissed a petition for mandamus when the petitioners failed to establish that disaggregation was a clear and specific legal right, Justice Lemons best described through analogy the risks of the consolidation of asbestos cases:

> *Legal literature and appellate opinions are replete with examples of trial processes in asbestos litigation that take so long that some plaintiffs die before they might have benefited from an award. Defendants "die" as well, as evidenced by bankruptcies involving corporations sued in asbestos litigation nationwide. Where both plaintiffs and defendants oppose the consolidation, shall we wait for years for this litigation to result in an appeal that will most likely result in reversal and retrial? Here, the square peg of complex litigation is being forced into the round hole of expediency. The splinters that are flying are the statutory and Constitutional rights of both plaintiffs and defendants to a fair process for the adjudication of their claims.[43]*

NYCAL's practice of "bundling" asbestos-related cases for settlement or trial despite the vast disparities between them has been shown to have none of the positive results originally intended. The "square peg" has been shown only to confound juries and when forced into the "round hole," consolidation impedes rather than promotes judicial economy, and seriously compromises the due process rights of the parties.

## Consolidation Has Made NYCAL an Outlier

Proponents of the current NYCAL consolidation process may argue that there are other, non-procedural factors that justify the relatively high frequency and value of NYCAL consolidated jury awards. In an asbestos personal-injury trial, components such as plaintiff's age, and life status, as well as broader jurisdictional characteristics can influence the rationale of a jury's finding of fault and the amount of damages that they assess against culpable parties. To ensure that these factors were not individually or collectively the cause for the difference in NYCAL consolidated trial verdicts in any systematic manner, we examined these factors for NYCAL verdicts versus verdicts in other jurisdictions around the country. Additionally, to test whether the premium NYCAL asbestos plaintiffs receive at verdict relative to the rest of the county was restricted to just asbestos cases, we compared verdict

data from New York County to national verdicts in non-asbestos wrongful death cases.

### Age

During trial, juries are asked to consider the facts of the case and determine compensatory damages based on economic and non-economic factors. The economic factors are fairly easy to identify and typically calculate how much income will be lost over time due to injury, medical bills, loss of consortium and further damages calculations if there are dependants. The non-economic factors, however, are left open to more interpretation by the jury and include pain and suffering, physical impairment and other non-pecuniary injury. Traditionally in asbestos litigation, a principal factor that influences the value of both the economic and non-economic portions of jury awards has been the age of the claimant. Analysis conducted by Dr. Charles Bates as part of his affirmative estimation report in the Garlock Sealing Technologies bankruptcy reorganization, estimates that each additional year of age can impact a plaintiff verdict by 4%.[44] Therefore, a plaintiff that was 60 years old when diagnosed with mesothelioma would receive a 40% premium relative to a similarly situated plaintiff that was 70 years old when diagnosed. As the data shows, the ages of the plaintiffs in NYCAL consolidated trials are not materially different to those plaintiffs in either the NYCAL individual trials or other jurisdictions around the country. The 14

plaintiffs receiving jury awards in NYCAL consolidated trials since 2010 had an average age of 70.4 years, as compared to 71.3 years on average across the 4 plaintiffs receiving jury awards in NYCAL individual trials, and 68.4 years on average from plaintiff awards in Non-NYCAL jurisdictions.[45]

That is not to say that in certain instances age may not have been a contributing factor in raising the value of the awards for plaintiffs in the NYCAL consolidated trials. For example, in *Assenzio* there were three plaintiffs over the age of 80 that were consolidated with a fourth plaintiff in his 70s and a fifth plaintiff who was only 61-years old when he testified at trial. The fact that the three plaintiffs in their 80s each received jury awards of $20 million, $30 million, and $60 million respectively is indicative that age (and life-status) of the "target" plaintiff played a role in escalating the verdict awards for the entire consolidated group. Moreover, the *Assenzio* consolidation and subsequent outcome(s) for these plaintiffs correlates with Dr. Horowitz's findings that a lead or "target" plaintiff, determined by age, life status, or other factors, can raise the individual and collective values of the consolidated group.[46]

### Life Status

As previously mentioned, the life status of a plaintiff at trial can influence emotional decisions by jurors, often creating a premium for living plaintiffs related to non-economic and punitive awards. While the data

**Figure 7: Mesothelioma plaintiff awards for plaintiffs not living at the time of trial (2010-2014)**



Case 23-01092-MBK    Doc -12    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 11 to Declaration of Daniel J. Merrett    Page 14 of 21

Vol. 30, #7  May 6, 2015                                    MEALEY'S LITIGATION REPORT: Asbestos

previously summarized have shown that in most cases this premium is significantly reduced when awards are taken up on appeal or otherwise reconsidered under a process such as remittitur, life status can still create a material bias on jury awards in favor of living plaintiffs. That being said, since 2010, only 5 of the 14 (36%) plaintiffs that received awards in NYCAL consolidated trials were living at the time of trial, compared to 48% across plaintiff awards in other, Non-NYCAL jurisdictions. Therefore, it cannot be argued that NYCAL consolidated jury awards are justifiably high because a greater percentage of plaintiffs are living at the time of trial. In fact, as illustrated in Figure 7, even the average jury award in a NYCAL consolidated trial for deceased plaintiffs is significantly higher than non-NYCAL national averages.

### Jurisdiction

We also tested the notion that the NYCAL consolidated outcomes may be a product of an inherent set of procedural or jury biases towards large plaintiff verdicts in the broader New York County judicial system. To do so, we examined New York County wrongful death verdicts in medical malpractice cases as compared to medical malpractice wrongful death verdicts from other jurisdictions both within New York State and the broader United States from 2005 through 2014.[47] As Figure 8 illustrates, New York County procedures and juries do not appear to be inherently biased towards the type of outlier plaintiff awards observed in the NYCAL Court. Unlike NYCAL consolidated plaintiff awards, which tend to be much more frequent and larger as compared to other jurisdictions, the data from medical malpractice wrongful death cases suggest that non-asbestos verdicts in New York County yield a smaller, less frequent plaintiff award on average when compared to other New York and US Courts.

As the data indicate, the trial components that can affect the value of jury awards in asbestos cases, such as age, life status, and jurisdiction do not appear to be primary causes that have influenced the significant premium that plaintiffs have received under NYCAL consolidated trial settings. Instead, the data show that the impact on NYCAL jury awards is procedural and is created by the court-instituted practice of consolidating cases together for trial.

### Judicial Economy

According to the NYCAL judiciary, the primary basis for asbestos case consolidation has been a perceived notion of judicial savings that can be achieved through more expedient adjudication of cases in group settings relative to individual case resolutions. Such an explanation has been cited repeatedly by the NYCAL judges in consolidation orders, court opinions, and other public forums.[48] However, an examination of the trial duration for both individual and consolidated trial proceedings in NYCAL shows that the Court is not saving a material level of resources through consolidation. Figure 9 summarizes the average and median trial duration per plaintiff that reached verdict in NYCAL since 2010.

**Figure 8: Medical malpractice wrongful death verdicts**



*Overall measure of defendant trial risk*
**Values do not include punitve portion of the verdict award*

**Figure 9: NYCAL mesothelioma trial duration per plaintiff (2010-2014)**



The verdict data show that on average a consolidated trial lasts 21.2 days per plaintiff as compared to 22.9 days for a plaintiff in an individual trial. For example, the McCloskey trial consolidated three plaintiffs and lasted 113 days for an average of 38 days per plaintiff. This immaterial difference in trial durations between cases adjudicated in a consolidated versus individual trial setting dispels the notion that contemporaneous consolidation has been an effective cost-saving practice. Additionally, absent from the chart is the time that it took for subsequent judicial intervention by the NYCAL Courts to correct the inequitable consolidated trial awards through the remittitur process. Moreover, the trial durations do not take into account the amount of time that it takes to select a jury in consolidated trials relative to individual trials. Based on available appearance data maintained by NYCAL, the average number of days needed for jury selection in a NYCAL individual trial was 5.5 days,[49] while the average in a NYCAL consolidated trial was 8.8 days for jury selection.[50]

In addition to judicial economy, the NYCAL judges state that the consolidation of cases also helps to promote settlements between parties. However, if consolidation in NYCAL is producing large, outlier verdicts and violating the due process rights of defendants, then one could argue that consolidation is also adversely affecting the NYCAL settlement process. The risk of a verdict is often a primary driver affecting settlement values in mass tort litigation. In NYCAL, and in asbestos litigation in general, only a small percentage of cases

are resolved through verdict as most cases are settled prior to trial. Therefore, if the playing field is tilted in one party's favor due to a rule or procedural construct, such as trial consolidation, then the resulting settlements will be skewed based on risk factors that have been manufactured by the court rather than the legal merits of the individual case(s).

**Conclusion**

The vast disparity in NYCAL consolidated trial verdicts relative to NYCAL individual trial verdicts and verdicts observed in other jurisdictions across the country, provoke concern that such procedural interference is skewing the playing field between litigants. The atypical verdicts, which are currently more than three times the national average, shine a spotlight on constitutional questions of due process and the jury bias that the consolidation of asbestos cases seems to create against defendants in NYCAL. Such a biased playing field artificially increases defendant trial risk, which not only leads to inequitable outcomes on the small number of cases that go to trial, but also infects the entire pre-trial resolution process, and leads to defendants settling cases at an unfair premium in order to avoid a procedurally manufactured level of risk and costs.

In recent years, consolidation in NYCAL has led to a "carousel of justice" in which time and time again the judiciary creates an avenue for inequitable jury awards through consolidation, only to correct those outcomes later through the process of remittitur. The end result

is a system in which both plaintiffs and defendants are effectively denied their due process rights to a jury trial and the judge ultimately determines damages through a remittitur "bench trial." This circuitous path to justice highlights the inequitable treatment of NYCAL litigants, raises questions as to the constitutionality and efficiency of consolidation, and speaks to the misguided perception of judicial economy that is vested in the current reasons behind consolidation.

Ultimately, the practice of consolidation has made NYCAL an outlier in today's national asbestos litigation. Given how many consolidated jury awards have been remitted in the past five years and reduced to values more typical of national outcomes, it's easy to see that the practice of consolidation in NYCAL is simply not working as intended. In light of the empirical evidence, the continued use of consolidation begs the question: if consolidation is not saving material time and resources, then is consolidation worth continuing at the risk of violating due process and producing awards that don't conform to verdicts being rendered in the nation's other courts? This question will need to be answered by the NYCAL judiciary if the Court is to move back into the mainstream of today's civil tort system.

## Appendix 1: Mesothelioma NYCAL verdict case durations and remittitur (2010-2014)*

| Verdict Year | Trial Type | Lead Plaintiff | Plaintiff | Start of Trial | End of Trial | Trial Duration (days) | Trial Duration per Plaintiff | Jury Award | Remitted or Appeal Amount |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | I | DIETZ | DIETZ | 10/14/10 | 10/25/10 | 11 | 11 | $0 | n/a |
| 2011 | I | BENTON | BENTON | 10/07/11 | 10/20/11 | 13 | 13 | $2,500,000 | n/a |
| 2012 | I | ZAUGG | ZAUGG | 02/21/12 | 03/13/12 | 21 | 21 | $0 | n/a |
| 2013 | I | VEGA | VEGA | 04/18/13 | 05/01/13 | 13 | 13 | $0 | n/a |
| 2014 | I | CARLUCCI | CARLUCCI | 03/14/14 | 04/24/14 | 41 | 41 | $7,333,000 | n/a |
| 2014 | I | NORTH | NORTH | 09/11/14 | 09/29/14 | 18 | 18 | $7,000,000 | denied |
| 2014 | I | THIBODEAU | THIBODEAU | 01/21/14 | 02/26/14 | 36 | 36 | $0 | n/a |
| 2014 | I | HILLYER | HILLYER | 11/12/14 | 12/12/14 | 30 | 30 | $20,000,000 | pending |
| 2011 | C | DUMMITT | DUMMITT | 07/05/11 | 08/17/11 | 43 | 22 | $32,000,000 | $8,000,000 |
| 2011 | C | DUMMITT | KONSTANTIN | 07/05/11 | 08/17/11 | 43 | 22 | $19,000,000 | $8,000,000 |
| 2012 | C | PAOLINI | PAOLINI | 01/17/12 | 02/24/12 | 38 | 19 | $0 | n/a |
| 2012 | C | PAOLINI | MICHALSKI* | 01/17/12 | 02/24/12 | 38 | 19 | $0 | n/a |
| 2013 | C | ASSENZIO | ASSENZIO | 05/17/13 | 07/23/13 | 67 | 13 | $30,000,000 | $6,000,000 |
| 2013 | C | ASSENZIO | BRUNCK | 05/17/13 | 07/23/13 | 67 | 13 | $20,000,000 | $3,200,000 |
| 2013 | C | ASSENZIO | LEVY | 05/17/13 | 07/23/13 | 67 | 13 | $60,000,000 | $8,150,000 |
| 2013 | C | ASSENZIO | SERNA | 05/17/13 | 07/23/13 | 67 | 13 | $60,000,000 | $7,500,000 |
| 2013 | C | ASSENZIO | VINCENT | 05/17/13 | 07/23/13 | 67 | 13 | $20,000,000 | $5,000,000 |
| 2013 | C | PERAICA** | PERAICA | 12/11/12 | 03/01/13 | 80 | 11 | $35,000,000 | $18,000,000 |
| 2014 | C | MCCLOSKEY | MCCLOSKEY | 11/25/13 | 03/18/14 | 113 | 38 | $6,000,000 | $4,340,000 |
| 2014 | C | MCCLOSKEY | BROWN | 11/25/13 | 03/18/14 | 113 | 38 | $3,500,000 | $0 (vacated) |
| 2014 | C | MCCLOSKEY | TERRY | 11/25/13 | 03/18/14 | 113 | 38 | $3,000,000 | |
| 2014 | C | JUNI JR.*** | JUNI JR. | 03/28/14 | 05/27/14 | 60 | 30 | $11,000,000 | $0 (vacated) |
| 2014 | C | SWEBERG | SWEBERG | 05/12/14 | 06/16/14 | 35 | 18 | $15,000,000 | $10,000,000 |
| 2014 | C | SWEBERG | HACKSHAW | 05/12/14 | 06/16/14 | 35 | 18 | $10,000,000 | $6,000,000 |

*The Paolini trial consolidated a lead mesothelioma plaintiff (Paolini) with a lung cancer plaintiff (Michalski).
** The Peraica trial started with 6 other plaintiffs that settled prior to verdict.
***The Juni Jr. trial started with 1 other plaintiff (Darryl Middleton) that settled prior to verdict

### Appendix 2: Mesothelioma NYCAL verdict case profiles (2010-2014)

| Verdict Year | Trial Type | Lead Plaintiff | Plaintiff | Injury | Age* | Living @Trial | Occupation | General Work Sites |
|---|---|---|---|---|---|---|---|---|
| 2010 | I | DIETZ | DIETZ | MESO | 72 | No | Electrician | Commercial, Shipyard |
| 2011 | I | BENTON | BENTON | MESO | 56 | No | Pipefitter | Shipyard |
| 2012 | I | ZAUGG | ZAUGG | MESO | 73 | Yes | Bystander to residential DIY renovations | Residential |
| 2013 | I | VEGA | VEGA | MESO | 37 | Yes | Bystander/take-home to construction worker | Residential |
| 2014 | I | CARLUCCI | CARLUCCI | MESO | 80 | No | Truck Driver | Naval Yard, Powerhouse |
| 2014 | I | NORTH | NORTH | MESO | 78 | Yes | Laborer, Plumber, Welder | Commercial, Industrial |
| 2014 | I | THIBODEAU | THIBODEAU | MESO | 68 | Yes | Merchant Marine, Engineer | Shipyards, Industrial |
| 2014 | I | HILLYER | HILLYER | MESO | 71 | No | Shipfitter, Steamfitter, Welder | Shipyards, Commercial |
| 2011 | C | DUMMITT | DUMMITT | MESO | 67 | Yes | Fireman | Naval Yard, Navy |
| 2011 | C | DUMMITT | KONSTANTIN | MESO | 53 | Yes | Mechanic, Laborer, Carpenter | Commercial, Residential, Industrial |
| 2012 | C | PAOLINI | PAOLINI | LC | 67 | No | Laborer | Industrial, Commercial |
| 2012 | C | PAOLINI | MICHALSKI | MESO | 59 | No | Pipefitter | Industrial |
| 2013 | C | ASSENZIO | ASSENZIO | MESO | 82 | No | Plumber | Residential, Commercial, Naval Yard |
| 2013 | C | ASSENZIO | BRUNCK | MESO | 73 | No | Boilermaker, Steamfitter | Residential, Commercial, Powerhouse |
| 2013 | C | ASSENZIO | LEVY | MESO | 82 | Yes | Plumber | Residential, Naval Yard |
| 2013 | C | ASSENZIO | SERNA | MESO | 59 | Yes | Painter, Laborer | Commercial, Residential |
| 2013 | C | ASSENZIO | VINCENT | MESO | 86 | No | Steamfitter | Commercial, Residential, Industrial, Powerhouse |
| 2013 | C | PERAICA | PERAICA | MESO | 64 | No | Insulator | Commercial |
| 2014 | C | MCCLOSKEY | MCCLOSKEY | MESO | 67 | No | Steamfitter | Commercial, Industrial |
| 2014 | C | MCCLOSKEY | BROWN | MESO | 74 | No | Insulator | Commercial, Industrial, Powerhouse |
| 2014 | C | MCCLOSKEY | TERRY | MESO | 63 | No | Mechanic, Electrician, Construction Worker | Residential, Commercial, Industrial |
| 2014 | C | JUNI JR | JUNI JR | MESO | 72 | No | Mechanic, Courier | Commercial, Powerhouse |
| 2014 | C | SWEBERG | SWEBERG | MESO | 70 | Yes | Electrician | Commercial |
| 2014 | C | SWEBERG | HACKSHAW | MESO | 73 | No | Electrician, Pipefitter, Carpenter | Residential, Commercial, Industrial |

*Ages were compiled using age at diagnosis when data were available, supplemented with public disclosures of plaintiff age at trial.*

## Endnotes

1.  *In re New York Asbestos Litig.*, No. 40000/88 (N.Y. Sup. Ct., N.Y. Cnty.).

2.  Average plaintiff awards do not include punitive portions.

3.  Of the five plaintiff awards in the NYCAL individual trials, one was eventually vacated on appeal.

4.  Decision and Order, Juni v. A.O. Smith Water Prods. No. 190315/12 *In re* New York Asbestos Litigation Mot. Seq. no. 018 (Apr. 13, 2015); "N.Y. Justice Rejects Challenge to Opinion Overturning $3.5M Asbestos Verdict." Mealey's Asbestos Litigation Report 30, no. 5 (2015).

5.  Order to Amend Case Management Order, *In re* New York City Asbestos Litig., No. 40000/88 (Dec. 19, 2002).

6.  *Id.*

7.  The Amended Case Management Order is available via http://www.nycal.net/PDFs/cmo/CMO_revised_052611.pdf.

8.  The NYCAL docket is available via http://www.nycal.net/.

9.  New York State Unified Court System, "Hon. Peter Moulton Named Administrative Judge, New York County Supreme Court, Civil Term," News release, (Mar. 2, 2015). Available at https://www.nycourts.gov/press/PDFs/PR15_02.pdf.

10. Order to Amend Case Management Order, *In re* New York City Asbestos Litigation, No. 40000/88, (Dec. 19, 2002).

11. Scarcella, Marc C., Peter R. Kelso, and Joseph Cagnoli, Jr. "Asbestos Litigation, Attorney Advertising & Bankruptcy Trusts: The Economic Incentives Behind The New Recruitment Of Lung Cancer Cases." Mealey's Asbestos Litigation Report 13, no. 4 (2013).

12. Prohibition on "Bundling" Cases, Administrative Order No. 2006-6 (Mich. Aug. 9, 2006), available at http://courts.michigan.gov/SUPREMECOURT/Resources/Administrative/2003-47-080906.pdf.

13. Ohio R. Civ. P. 42(A)(2) ("In tort actions involving an asbestos claim,. . . [f]or purposes of trial, the court may consolidate pending actions only with the consent of all parties. Absent the consent of all parties, the court may consolidate, for purposes of trial, only those pending actions relating to the same exposed person and members of the exposed person's household.").

14. *See* Tex. Civ. Prac. & Rem. Code Ann. § 90.009 (West, Westlaw through 2011 Reg. Sess.).

15. *See* Kan. Stat. Ann. § 60-4902(j) (West, Westlaw through 2012 Reg. Sess.).

16. *See* Ga. Code Ann. § 51-14-11 (2009).

17. Standing Order No. 1, *In re* Asbestos Litig., No. 77C-ASB-2 (Del. Super. Ct. New Castle County, Dec. 21, 2007).

18. "*San Francisco Trial Judge Vacates His Own Consolidation Order*," HarrisMartin's Columns – Asbestos, May 2008, at 13, 13.

19. *In re:* Asbestos Personal Injury and Wrongful Death Litig. Global, No. 24-X-87-048500, (Md. Cir. Ct., Balt. City, Mar. 5, 2014).

20. General Court Regulation No. 2012-03, *In re Mass Tort and Asbestos Programs* (Ct. Com. Pl., Phila. Cnty., Feb. 15, 2012); General Court Regulation No. 2013-01, *In re Mass Tort and Asbestos Programs* (Ct. Com. Pl., Phila. Cnty. Feb. 7, 2013).

21. Brooklyn Naval Shipyard Cases, *In re* New York City Asbestos Litig., 188 A.D.2d 214, 225, 593 N.Y.S.2d 43, 50 [1st Dept.], aff'd 82 N.Y.2d 821, 605 N.Y.S.2d 3 (1993).

22. *In re* All Asbestos Cases Pending in the United States District Court for the District of Maryland, slip op. at 3 (D.Md. Dec. 16, 1983) (en banc).

23. *Malcolm v. National Gypsum Co.*, 995 F.2d 346 (2d Cir. 1993) quoting *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2nd Cir. 1990).

24. The four consolidated trials with at least one plaintiff living at the time of trial and one plaintiff deceased at the time of trial include *Asenzio, Peraica, Juni Jr, and Sweberg*. In addition, though the *Dummit* case involved two plaintiffs that were both living at the time of trial, only one was well enough to testify at trial.

25. Leibold, Jill. "The Case Against Case Consolidation at Trial." *Litigation Insights* (blog), Nov. 29, 2010, http://www.litigationinsights.com/case-strategies/the-case-against-case-consolidation-at-trial/.

26. *Alter v. Oppenheimer & Co. Inc.*, 801 N.Y.S. 2d 776 (N.Y. Sup. Ct. 2005).

27. Horowitz, Irwin A., and Kenneth S. Bordens. "The Consolidation of Plaintiffs: The Effects of Number of Plaintiffs on Jurors' Liability Decisions, Damage Awards, and Cognitive Processing of Evidence." Journal of Applied Psychology 85, no. 6 (2000): 90918.

28. Affidavit of Dr. Irwin Horowitz, Bailen v. Air & Liquid Systems Co., No. 190318\12 (In re New York City Asbestos Litig.).

29. White, Michelle J. "Explaining the Flood of Asbestos Litigation: Consolidation, Bifurcation, and Bouquet Trial." National Bureau of Economic Research

Case 23-01092-MBK    Doc -12    Filed 05/26/23    Entered 05/26/23 23:11:45    Desc
Exhibit 11 to Declaration of Daniel J. Merrett    Page 19 of 21

MEALEY'S LITIGATION REPORT: Asbestos

Vol. 30, #7  May 6, 2015

Working Paper No. 9362, Dec. 2002, available via http://www.nber.org/papers/w9362.

30.  U.S. Const. Amend. 14, § 1.

31.  *Bailey v. Systems Innovation, Inc.*, 852 F.2d 93, 98 (3d Cir. 1988) (citing *Estes v. Texas*, 381 U.S. 352, 340 (1965)).

32.  *12-16 Arden Assoc. v. Vasquez*, 168 Misc.2d 475, 479, 638 N.Y.S.2d 535 (1995) ("it is black letter law that a litigant in a civil action or proceeding is entitled to a fair trial.").

33.  *Curry v. Am. Standard*, 2010 WL 6501559, at *2 (S.D.N.Y. Dec. 13, 2010) (quoting *In Re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 853 (2d Cir 1992)).

34.  *In re Repetitive Stress Injury Litig.*, 11 F.3d 368 (2d Cir. 1993) ("Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial.") (*quoting, Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir.), *cert. denied*, 498 U.S. 926 (1990). *See also Kranz v. National Gypsum Co.*, 995 F2d 346, 353 (2d Cir. 1993).

35.  Beck, James M. "Little in Common: Opposing Trial Consolidation in Product Litigation." *DRI For the Defense*, Sept. 11, pp. 28–29.

36.  *Malcolm*, 995 F.2d 346, 349 (2d Cir. 1993).

37.  *Id.* at 352.

38.  *Cain v. Armstrong World Industries*, 785 F. Supp. 1448 (S.D. Ala. 1992); *Alter v. Oppenheimer & Co. Inc.*, 801 N.Y.S. 2d 776 (N.Y. Sup. Ct. 2005).

39.  *See* Faulk, Richard O., *Dispelling the Myths of Asbestos Litigation: Solutions for Common Law Courts*, 44 S. Tex. L. Rev. 945, 954 (2003) ("When plaintiffs learn that a particular forum will coerce settlement procedurally irrespective of the merits of their claims, one doubts whether that forum will remain unclogged for long."); *In re Asbestos Personal Injury and Wrongful Death Litig. Global*, 2014 WL 895441 (Md. Cir. Ct. Balt. City Mar. 5, 2014) (rejecting a mass trial proposal, in part, because it "could breed forum

shopping, thereby increasing the number of filings in this Court. . .").

40.  White, Michelle J., *Asbestos Litigation: Procedural Innovations and Forum Shopping*. 35 J. Legal Stud. 365, 385 (June 2006); *See also*, Hanlon, Patrick M. and Anne Smetak. "*Asbestos Changes*." 62 N.Y.U. Ann. Surv. Am. L. 525, 574 (2007).

41.  *See, In re Asbestos Litig.*, 911 A.2d 1176, 1181 (Del. Super. Ct. New Castle Cnty.) ("[I]t is generally accepted in the scientific community and among government regulators that amphibole fibers are more carcinogenic than serpentine (chrysotile) fibers."), *appeal refused*, 906 A.2d 806 (Del. 2006); *Bartel v. John Crane, Inc.*, 316 F. Supp. 2d 603, 605 (N.D. Ohio 2004) ("While there is debate in the medical community over whether chrysotile asbestos is carcinogenic, it is generally accepted that it takes a far greater exposure to chrysotile fibers than to amphibole fibers to cause mesothelioma."), *aff'd sub nom. Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488 (6th Cir. 2005).

42.  569 S.E. 409 (Va. Sup. Ct. 2002).

43.  *Id.*, at 427.

44.  *In re* Garlock Sealing Technologies, No. 10-31607, 2014 Bankr. LEXIS 157 (Bankr. WDNC. February 15, 2013), GST-0996, at 128.

45.  Ages were compiled using age at diagnosis when data were available, supplemented with public disclosures of plaintiff age at trial.

46.  Horowitz, Irwin A., and Kenneth S. Bordens. The Consolidation of Plaintiffs: The Effects of Number of Plaintiffs on Jurors' Liability Decisions, "Damage Awards, and Cognitive Processing of Evidence." *Journal of Applied Psychology* 85, no. 6 (2000): 909–18.

47.  Data includes 1,409 medical malpractice verdicts from 2005 through 2014, including 64 from New York County, 252 from other New York jurisdictions, and 1,093 from the other 49 states and the District of Columbia.

48.  *See, e.g.*, Decision/Order, *Assenzio v. A.O. Smith Water Products*, No. 190008/12 (N.Y. Sup. Ct. Oct. 2012 In

Extremis) (*In re New York City Asbestos Litigation*), states:

"In asbestos litigation, it has been stated that '[t]he joint trial format has the potential to reduce the cost of litigation, make more economical use of the trial court's time and speed the disposition of cases (see Matter of City of Rochester, 57 A.D.2d 700, 701) as well as to encourage settlements (see in Re: Joint E&S District Asbestos 20 Litigation [Findley v. Blinken], 129 Bankr 710, 815).'"

49.   Average is based on available data for 6 of the 8 NYCAL individual trials between 2010 and 2014;

*Carlucci (11 days), Dietz (2 days), Vega (3 days), North (2 days), Hillyer (9 days),* and *Zaugg (6 days)*. The appearances data maintained by NYCAL did not provide hearing days for jury selection for *Benton*, or *Thibodeau*.

50.   Average is based on available data for 5 of the 7 NYCAL consolidated trials between 2010 and 2014; *Dummitt (7 days), Juni Jr. (12 days), McCloskey (8 days), Paolini (4 days),* and *Peraica (13 days)*. The appearances data maintained by NYCAL did not provide hearing days for jury selection for *Assenzio*, or *Sweberg*. ∎

**MEALEY'S LITIGATION REPORT:  ASBESTOS**
*edited by Bryan Redding*
**The Report** is produced twice monthly by



1600 John F. Kennedy Blvd., Suite 1655, Philadelphia, PA 19103, USA
Telephone: (215)564-1788 1-800-MEALEYS (1-800-632-5397)
Email: mealeyinfo@lexisnexis.com
Web site: http://www.lexisnexis.com/mealeys
ISSN 0742-4647