UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                          .     Case No. 21-30589(MBK)
                                .     Chapter 11
LTL MANAGEMENT LLC,             .
                                .     Clarkson S. Fisher U.S.
          Debtor.               .        Courthouse
                                .     402 East State Street
                                .     Trenton, NJ 08608
                                .
                                .     Tuesday, March 8, 2022
. . . . . . . . . . . . . .      .     10:00 a.m.


TRANSCRIPT OF MOTION AND APPLICATION
FOR RETENTION HEARING
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:             Jones Day
                            By:  GREGORY M. GORDON, ESQ.
                                 DANIEL B. PRIETO, ESQ.
                            2727 North Harwood Street, Suite 500
                            Dallas, TX 75201

                            Otterbourg P.C.
                            By:  MELANIE L. CYGANOWSKI, ESQ.
                                 ADAM C. SILVERSTEIN, ESQ.
                            230 Park Avenue
                            New York, NY 10169-0075

For the Official            Cooley LLP
Committee of Talc           By:  CULLEN DRESCHER SPECKHART, ESQ.
Claimants 2:                1299 Pennsylvania Avenue, NW, Ste 700
                            Washington, DC  20004-2400

Audio Operator:             Luz Di Dolci

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

```
APPEARANCES (Cont'd):

For the Official          Sherman Silverstein
Committee of Talc         By:  ARTHUR ABRAMOWITZ, ESQ.
Claimants 2:              East Gate Corporate Center
                          308 Harper Drive, Suite 200
                          Moorestown, NJ  08057

For the Official          Brown Rudnik, LLP
Committee of Talc         By:  JEFF JONAS, ESQ.
Claimants 1:                   DAVID J. MOLTON, ESQ.
                          7 Times Square
                          New York, NY 10036

                          Genova Burns, LLC
                          BY:  DANIEL M. STOLZ, ESQ.
                          110 Allen Road, Suite 304
                          Basking Ridge, NJ 07920

                          Bailey & Glasser, LLP
                          By:  BRIAN GLASSER, ESQ.
                          105 Thomas Jefferson Street NW
                          Suite 540
                          Washington, DC 20007

For Johnson & Johnson:    White & Case LLP
                          By:  JESSICA LAURIA, ESQ.
                          1221 Avenue of the America
                          New York, NY  10020

For the U.S. Trustee:     U.S. Department of Justice
                          By:  LINDA RICHENDERFER, ESQ.
                          One Newark Center, Suite 2100
                          Newark, NJ  07102

                          Office of the U.S. Trustee
                          By:  JEFFREY M. SPONDER, ESQ.
                          One Newark Center
                          Newark, NJ  07102

For Arnold & Itkin, LLP:  Pachulski Stang Ziehl Young & Jones,
                             PC
                          By:  LAURA DAVIS JONES, ESQ.
                          919 Market Street
                          16th Floor, PO Box 8705
                          Wilmington, DE 19899
```

**WWW.JJCOURT.COM**

3

```
APPEARANCES (Cont'd):

For DeSanto Canadian       Lite DePalma Greenberg &
Class Action Plaintiffs:    Afanador, LLC
                            By:  ALLEN JOSEPH UNDERWOOD, II, ESQ.
                            570 Broad Street, Suite 1201
                            Newark, NJ 07102


For Aylstock, Witkin,      Klee, Tuchin, Bogdanoff & Stern, LLP
Kreiss & Overholtz,        By:  ROBERT J. PFISTER, ESQ.
PLLC:                      1801 Century Park East, 26th Floor
                           Los Angeles, CA 90067



              *  *  *  *  *
```

Case 23-01092-MBK   Doc 2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 4 of 132

4

1              THE COURT:  Allow me a couple of moments.

2              All right.  We're ready, Bruce, and loose.

3              THE CLERK:  Yeah.

4              THE COURT:  Off the privacy.

5              Okay, good morning, again.  This is Judge Kaplan.  We

6    have a filled courtroom, but for those who are appearing

7    through Court Solutions, as a reminder, please remain on mute.

8    But if you wish to be heard, please make use of the raise hand

9    function so that I can call on you.

10             And welcome, again, everyone.

11             We have several matters on the agenda for today.  I

12   want to start off on a personal note.  It's been brought to my

13   attention that a tongue-in-cheek reference that I made in my

14   opinion on the preliminary injunction regarding my infamous

15   retirement clock, this is it, that it has been viewed, and I

16   think understandably, as insensitive or hurtful for the

17   plaintiffs, the poor claimants in these cases, who obviously

18   live day to day by clocks and calendars.  Clearly, that wasn't

19   even within the realm of my thinking when making the comment.

20   It was to simply reinforce the Court's intention to let the

21   parties know that the Court's going to be on top of things, so

22   to speak, managing, or at least oversight, because I had

23   indicated that I would be carrying the preliminary injunction

24   for a few months and I didn't want the parties to think that

25   they could just, I think I used the phrase, "slow-walk the

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 5 of 132

5

1  case."

2        But it certainly meant -- I meant no disrespect.  And

3  I understand how it could -- certainly, how it came off.  And

4  so I wanted to give my apologies to the plaintiffs and anyone

5  who might've found it hurtful and insensitive.  As my wife will

6  explain, often enough, my lack of sensitivity is well-known at

7  times.  But it certainly wasn't intended.

8        Now, moving to today's agenda.  We have a number of

9  matters on, administrative and substantive.  I wanted to at

10 least do what I hoped would be the easy tasks first.  I wanted

11 to talk about future omnibus dates so we have an idea of

12 calendaring.  April is tight.  I am scheduled for some vacation

13 and speaking at some seminars.  After March 30th, which is our

14 next omnibus date, and my expectations for the omnibus dates

15 are that they will be in-person.  Dates in between can be

16 matters that are brought on shortened time.  Emergent matters

17 certainly could be handled by Court Solutions, so as to try to

18 reduce the time and expense for you all.

19       And even for the omnibus dates, certainly

20 appearances, we are streaming through Zoom, but for those who

21 want to be heard and argue, you're always welcome to

22 participate through Court Solutions.  The next date I have is

23 Tuesday, April 12th.  That would be the only April date.  Then,

24 Wednesday, May 4th; Tuesday, May 24th; and June, I believe

25 June 14th.  That certainly takes us out of the -- let me just

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 6 of 132

6

1  check on that June 14th date.

2         I obviously understand that there are other cases

3  that you all have in other jurisdictions, some small matter

4  going on in Delaware for the Boy Scouts and all is going to

5  take a few weeks.  So if these dates conflict, let me know,

6  we'll work on other dates.  But I'm also trying to fit them

7  into my schedule as well.

8         Yep, June 14th.  All right.

9         Let's turn to, if we may, the appointment of an FCR.

10  There's been a flurry of correspondence from the two Committees

11  and the debtor.  If my understanding is correct, the TCC1 and

12  the debtor, actually and TCC2 have agreed on the appointment of

13  Randi Ellis as an FCR.  So my first question would be, and I

14  know there's a request on behalf of TCC2 for a separate

15  appointment of an additional FCR.  But my first inquiry would

16  be, is there a need to delay that appointment of Ms. Ellis?

17         In other words, there was, I think in my initial

18  protocol it was to March 30th, but there seems to be a

19  consensus, and I want to grab whatever consensus I can.  If

20  there's a consensus on that individual, why not go forward and

21  have that one brought onboard.

22         Mr. Gordon?

23         MR. GORDON:  Your Honor, Greg Gordon, on behalf of

24  the debtor.

25         We see no reason to delay the appointment.  We

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 7 of 132

7

1  understand that both Committees support Ms. Ellis as the FTCR

2  and we think that appointment should be made as soon as

3  possible.

4          THE COURT:  Mr. Molton, good morning.

5          MR. MOLTON:  Good morning, Judge.  David Molton at

6  Brown Rudnick for Committee 1.  We join Mr. Gordon and I

7  presume Ms. Speckhart of Committee 2.  I just want to note

8  something that's important for the record, Your Honor.

9          THE COURT:  Yes.

10          MR. MOLTON:  Ms. Ellis, if appointed, will be the

11  first woman Future Claims Representative in the entire history

12  of Future Claims Representatives in the United States, and we

13  think it appropriate that it happened in this case.  And I

14  think it's important for Your Honor to know that.

15          THE COURT:  No, I appreciate that.  I didn't realize

16  that.  And I think that makes it worth a valid selection.

17          Ms. Speckhart.  Good morning.

18          MS. SPECKHART:  Good morning, Your Honor.  Cullen

19  Speckhart of Cooley appearing on behalf of TCC2.

20          Your Honor, we did file a letter indicating that we

21  support Ms. Ellis's appointment.  And we are certainly pleased

22  that there would be a female in the mix if that were to occur.

23  We also expressed our receptivity to the appointment of

24  Mr. Green.  I believe that was the Court's selection for an

25  FCR.

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8    2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 8 of 132

8

1           And just to step back, we have asked for a separate

2  FCR, largely in recognition that J&J's approach to resolving

3  mesothelioma cases is markedly different from its approach to

4  ovarian cancer claimants, and we want to ensure that the

5  representatives of the future claims for mesothelioma are able

6  to negotiate with the debtors in a way that is free of

7  conflict, free of restraints, and directed to pursuing a result

8  that is consistent with the reality of how mesothelioma claims

9  are different.

10          And, by way of example, J&J has pursued a materially

11 distinct litigation strategy with respect to mesothelioma

12 claimants that has resulted in settlements that are more robust

13 and comparatively higher.  There is no dispute that asbestos

14 causes mesothelioma.  The settlement ranges that the debtors

15 have demonstrated are markedly higher, and we included those

16 figures in our correspondence to the Court that in no way

17 reflects our ideas about the relative value of the claims.  It

18 is just reflecting the debtor's historical approach and the

19 debtor's behavior with respect to those claims.

20          And let's not forget about the people, Your Honor.

21 The survival rates for mesothelioma are much lower.  The

22 disease state is different.  And in light of the multitude of

23 differences, we believe that it would be much easier, more

24 fluid, more efficient if the future mesothelioma claims and the

25 future ovarian cancer claims are independently represented to

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8    2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 9 of 132

9

1 achieve fully consensual plan results.

2              And so that is the basis for our request for a

3 separate FCR.  And, again, we would support Ms. Ellis and

4 Mr. Green for either of those positions.

5              THE COURT:  All right.  Thank you.

6              Then finishing with Ms. Ellis, I see no reason not to

7 have her appointed.  And I want to discuss the possibility of a

8 second FCR, FTCR I think we're using an extra letter.  I also

9 received from Ms. Jones correspondence this morning, I believe,

10 taking issue with the timing of an appointment of the FTCR, for

11 a second FTCR.  So I'm going to turn to Ms. Jones for a moment.

12 But I will ask debtor's counsel to submit a form of order

13 appointing Ms. Ellis.  We might as well get that onboard and

14 started.

15              MR. GORDON:  We will do that, Your Honor, and we'll

16 share that with the other side before we submit it to the

17 Court.

18              THE COURT:  Thank you.

19              Ms. Jones.

20              MS. JONES:  Thank you, Your Honor.  Laura Davis

21 Jones, Pachulski Stang Ziehl and Jones, on behalf of Arnold and

22 Itkin.

23              Your Honor, we did see a letter filed by

24 Ms. Speckhart about 4:45 yesterday afternoon where she requests

25 a separate FTCR for TCC2, or for the meso claimants.  Your

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 10 of 132

10

1  Honor, our concern was it was very, it's very last minute, it's

2  less than, you know, 18 hours ago, and we need time to talk

3  with our client about it.  And also I think it's artificially

4  way too soon.  I understand that the TCC ceases to exist

5  tomorrow, and that was probably the last minute request.  But,

6  frankly, Your Honor, this is an emergency of their making.

7  This is, you know, the idea of there being two Committees or

8  one Committee is several months ago, and they've had at least

9  six weeks to bring this issue before the Court and for it now

10  to be a crisis, Your Honor, just seems a little, or is a bit

11  problematic.

12          So we'd ask Your Honor, as I detailed in the letter,

13  that you give Ms. Speckhart her day in Court, but we not do it

14  today.  That we give the parties a chance to review the

15  request, that we respond, and, Your Honor, I apologize, I don't

16  have the dates right in front of me that I suggested.  But

17  basically asking for us to have at least a week to get back to

18  the Court on our thoughts and have it taken up at the hearing

19  on the 30th, which was the date that Your Honor had set for

20  selecting the final FTCR, in any event.

21          Now, I do understand that the parties, we have not

22  been in this loop, but that the debtor has now agreed with the

23  Committees on their FTCR.  I just heard that one minute ago.

24  In fact, Your Honor, my request still remains that we be given

25  an opportunity to evaluate this, frankly, new motion that's

11

1  been done by letter, a substantively release having to FTCRs in

2  a case, I think it is unheard of.  I don't think it's -- I

3  don't recall any mass tort case that I've been involved in

4  where there's been two.  But in any event, Your Honor, not to

5  want to argue the substance, but rather to give us an

6  opportunity for notice and a hearing or at least notice and a

7  chance to respond by letter after we talk to our client.

8            THE COURT:  All right.  Thank you, Ms. Jones.

9            Ms. Cyganowski.

10           MS. CYGANOWSKI:  Thank you, Your Honor.  Melanie

11  Cyganowski, Otterbourg co-counsel to TCC1.

12           TCC1, as the Court is aware, has worked diligently in

13  connection with following the protocols set out in the original

14  January order.  We've worked closely with TCC2 and then with

15  the debtor in these latter days.

16           Having said that, I assume, unless the Court does

17  otherwise today, as of Wednesday, we're going to be back to

18  TCC0, TCC Original, TCC whatever we're going to call it.  And

19  at that point, it would absolutely be appropriate for that

20  Committee to consider the request and take it under

21  consideration.

22           THE COURT:  All right.  Thank you, Ms. Cyganowski.

23           Good morning.

24           MR. PFISTER:  Good morning, Your Honor.  Rob Pfister

25  from the Klee Tuchin firm on behalf of Aylstock Witkin.

12

1            I join both prior comments of Ms. Jones and

2  Ms. Cyganowski.  I do think this is a very important issue.  I

3  think the Court would benefit from hearing the views of the

4  parties -- the considered views of the parties on this issue.

5            Thank you.

6            THE COURT:  All right.  Thank you.

7            Mr. Gordon.

8            MR. GORDON:  Your Honor, Greg Gordon on behalf of the

9  debtor.

10            Our perspective is somewhat different.  We would ask

11  the Court simply to deny this today.  We don't think there's

12  any reason to consider this any further.  This in our mind is

13  basically a very late effort by TCC2 to relitigate the U.S.

14  Trustee's motion with respect to the two committees, raising

15  the same types of issues.  There is no precedent for two FCRs

16  like this in a mass tort case.  I think there's been a handful

17  of cases where there's been more than one FCR, but I think in

18  those cases, those were different products.  We're not aware,

19  at least, of any case where there's been multiple FCRs for just

20  because a disease is different emanating from the same product.

21  So we don't see a basis for that.

22            The other thing I would say, Your Honor, this issue

23  actually came up, I believe, in a hearing back in December

24  where I kind of forecasted for the Court the potential that if

25  we go down the road with two committees, then we're going to be

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 13 of 132

13

1 probably talking about two FCRs.  And I think Your Honor

2 responded at that time that you had in mind one FCR.  And I

3 think the protocol we've been operating under the last several

4 weeks or months contemplates one FCR.

5         And this is basically, in our view, a late filed

6 attempt to reconsider Your Honor's order on the whole FCR

7 process.  Are we now to go back and basically throw out the

8 protocol and come up with a different protocol where, you know,

9 maybe we don't have three proposals, maybe we each make five

10 and we have three strikes, or something like that?  It just

11 seems to us it's too late.  It's basically the same issues

12 you've heard before.  There's just no precedent for having

13 these multiple representatives for different disease types.

14         And, you know, the idea that we would now have a

15 further briefing and another hearing, which I guess effectively

16 would extend TCC2 out for several more weeks just because they

17 wait until the very last minute, that just seems inappropriate

18 to us.  And we would just ask that you deny that request today.

19         THE COURT:  All right.  Thank you, Mr. Gordon.

20         Anyone else wish to be heard?

21               (No audible response)

22         THE COURT:  Okay.  Let's also address the future of

23 TCC2 because it's a bit intertwined.  And my understanding is

24 that a motion was filed last night or sometime yesterday to

25 extend the existence of TCC2 for the limited purpose, as well,

14

1  of filing an appeal.  I know there have been appeals that have

2  been filed.  I believe TCC2 filed a notice of appeal.  I

3  believe the Aylstock firm filed a notice of appeal.  I just

4  couldn't keep up.  So I'm not sure who else has filed notices

5  of appeal.

6          But I believe there was a motion that was filed,

7  returnable on the 30th.  There are motions seeking

8  certifications of the circuit, but there's also a motion to

9  extend the TCC2 existence for the limited purpose of conducting

10 the appeal, and that's returnable on the 30th.

11         The Court's inclination, may come as a surprise, is

12 to wrap these issues together.  While I haven't endorsed or

13 considered the appointment of a separate committee, I

14 haven't -- a separate FCR, I haven't ruled it out.  And I think

15 it's important to at least hear the parties substantively as to

16 the merits of a second FCR, really to protect the interest of

17 the mesothelioma claimants.

18         I understand TCC2 wishes to pursue an appeal of the

19 Court's decisions.  They, in their papers, I think I glanced at

20 them, they raised issues.  They advocate that there were issues

21 raised during the trial which were separate and apart from

22 those that were pursued by TCC1.  In order to give all the

23 parties a sufficient time, and let me make clear, not to open

24 up the door for extensive additional briefings, hearings, and

25 discovery, my inclination is to schedule a hearing on the

Case 23-01092-MBK  Doc -2  Filed 05/29/23  Entered 05/29/23 18:03:43  Desc
Transcript March 8  2022 Hearing LTL Management  LLC  Ch. 11  Case No. 21-30589  Page 15 of 132

15

1  appointment of a second FCR for the 30th, itself.  Not to have

2  a -- I believe Ms. Jones had requested an opportunity and maybe

3  a hearing in advance of that.

4          I would ask that the parties, of course, meet and

5  confer.  It would involve TCC2 and the debtor at this point,

6  probably.  Well, actually, I shouldn't be presumptuous, maybe

7  TCC1 taking part.  I do not intend to go through a duplicate

8  protocol of three names and three names and strikes.  I would,

9  if the Court is going to appoint a second FTCR, which isn't by

10  any means definite, I would ask that each constituency, TCC1,

11  TCC2, and the debtor be prepared to provide a single name, and

12  the Court will have its own name.  And it will be short with.

13  I'm not allowing discovery.  I'm not going through strikes or

14  any of the other chess game that you've all been doing for the

15  last three weeks.

16          But in order to handle that, I think TCC2 will be

17  somewhat handcuffed if they are not in existence, leaving it to

18  the claimants, the individual claimants comprising -- or

19  committee members to take up the oar.  So I am prepared to

20  extend TCC2 -- irony of all ironies -- to April 12th, well, to

21  April 11th.  Our next hearing -- well, we'll call it the close

22  of April 12th.  That's the first date.  In other words, so

23  that'll all can argue on the 30th and then on April 12th, it

24  will be disbanded.  That will also allow for an argument on the

25  motion that's pending to allow it to exist for purposes of the

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 16 of 132

16

1    appeal, so.

2            And I need to hear from the parties on that.  So it's

3    it'll be disbanded or maybe it'll be disbanded in part or for a

4    limited purpose remaining, I don't know.  But that gives

5    sufficient time to at least address, and again, let me

6    emphasize, I'm not looking to open the door for TCC2 to

7    undertake a lot of work in the next 30 days to make up for

8    ground, just to allow these issues to be resolved.

9            Anybody have any concerns or issues?

10           MR. MOLTON:  Your Honor, David Molton, again, of

11   Brown Rudnick, for TCC1.  No issues or concerns regarding any

12   of that, but just in light of Your Honor's direction, which we

13   appreciate because one of the things coming in here with the

14   motion to have TCC2 extend for the limited purpose of

15   prosecuting the appeal put us in a very interesting position

16   regarding the notice of appeal that we might have to file,

17   either as TCC1 or tomorrow, what was going to be tomorrow as

18   TCC original.

19           So we came here.  One of the things you didn't see,

20   Your Honor, on the docket, was any activity by TCC1 --

21           THE COURT:  Correct.

22           MR. MOLTON:  -- regarding the appeal, and it was for

23   that very reason.  Needless to say, I'm very sensitive and

24   cautious when it comes to notices of appeal because they are

25   jurisdictional and many lawyers know what happens if you get

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8    2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 17 of 132

17

1   something wrong.  So your direction is really appreciated, Your

2   Honor.

3           One of the things I can tell you now, is that TCC1,

4   therefore, as TCC1, will be filing a notice of appeal from both

5   the preliminary injunction order as well as Your Honor's motion

6   to dismiss order.  We will also be filing certification up

7   petition for direct review to the Third Circuit.  And that will

8   probably be done within the next day or 24 hours.

9           One of the questions I have regarding the

10  certification issue, Your Honor, because I think it's important

11  for now both committees and for all of our constituents out

12  there who participated either by zoom, by listening, or in

13  person here a couple of weeks ago during our trial, is, you

14  know, how Your Honor wants to hear that or structure that.  Per

15  Bankruptcy Rule 8006, Your Honor, the bankruptcy court only

16  retains jurisdictions for 30 days from the first NOA, notice of

17  appeal, or we think taking from Ms. Speckhart's notice filing

18  yesterday, until April 6th.  And we assume that, therefore, the

19  Court will want to address the now two petitions, will be two

20  petitions, for direct appeal certification.

21          The question is, how you want to do that because

22  Rule 8006(f)(4), we can't request oral argument.  And we're not

23  entitled to oral argument unless Your Honor delivers it to us.

24  So one of the things, Your Honor, I know Ms. Speckhart filed

25  the motion returnable for the 30th.  We will try to get it on

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 18 of 132

18

1  in time for that.  We may have to do short notice, but it will

2  be only losing a day or so.  So I hope I don't get any issues

3  on that.

4          But I just wanted to let you know, you know, that,

5  you know, that will be the case as well.  And somebody gives me

6  an important note here.  And, Your Honor, pursuant to Your

7  Honor's order from January 26, that the original TCC be

8  reinstated as of March 9th.  Your Honor, today, directed that

9  TCC2 continue its existence.  Without a likewise order from

10 your Court regarding TCC1, we go out of existence at one second

11 past 12 midnight tonight.

12         So, in any event --

13         THE COURT:  I can wipe them all out.

14         MR. MOLTON:  You'll take us all out.

15         In any event, if Your Honor is going to do that, we

16 think a parallel, you know, order extending TCC1 until that

17 time and then having the reconstitution happened on the date

18 Your Honor suggested would be fine.

19         THE COURT:  All right.  For clarity, I'm prepared to

20 issue a bench order extending the existence of both TCC1 and

21 TCC2 through and including April 12th.

22         MR. MOLTON:  Thank you, Judge.

23         And I do want to -- I don't know if I'm going to get

24 a chance today.  Mr. Jonas, of course, is going to take the

25 rostrum soon.  But to extend our thanks for your comments at

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 19 of 132

19

1  the very beginning of today's Court session.  I think Your

2  Honor was right to note, you know, the sensitivities within our

3  constituency.  And I know it's going to be a meaningful

4  statement, you know, what you said first thing this morning to

5  all of our constituents, whether they be ovarian cancer

6  claimants or mesothelioma claimants.

7         And lastly, Your Honor, thank you for reminding

8  Ms. Lauria and myself that we have to spend the next three

9  weeks on Zoom in front of Judge Silvers.

10        THE COURT:  Good luck with that.

11        MR. MOLTON:  Thank you.

12                  (Laughter)

13        THE COURT:  I do want to address the issues on the

14  petitions for direct appeal.  But Mr. Gordon, did you want to

15  be heard?

16        MR. GORDON:  Thank you, Your Honor.  Greg Gordon

17  again.

18        Obviously, I heard well Your Honor's ruling and

19  respect it.  I do have a concern, and I'm just going to state

20  it for the record, which is, you know, the longer we have a

21  period in time where these two committees continue, it's almost

22  going to become like a fait accompli, I think, with respect to

23  the appeal because the next argument you're going to hear is

24  that, but we already filed notices of appeal.  We've already

25  started the certification process and the like.  And that to us

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 20 of 132

20

1  is just unfortunate because we thought your order was very

2  clear that absent something happening prior to March 9th,

3  things would revert back to where they are.  So again, totally

4  understand what you said, respect it, but it just seems to me

5  we're headed into a direction that's going to make this perhaps

6  even more complicated and difficult to address the longer it

7  goes.

8          And then, just one clarification with respect to

9  TCC2, we assume that it's continuing in effect for just the

10 purpose of addressing these two issues that Your Honor was

11 talking about.  At least that was my understanding.  I just

12 wanted to clarify that.

13         THE COURT:  That is my understanding.

14         MR. GORDON:  Okay.  Thank you, Your Honor.  And I

15 think Mr. Molton asked the question that we were going to ask,

16 which is what happens with TCC1, because that's the other

17 anomaly of this that TCC2 was asking for relief that has an

18 impact on TCC1 and it wasn't asking for the same relief, and

19 obviously, that issue has now been addressed.

20         THE COURT:  All right.  Thank you.

21         MR. GORDON:  Thank you.

22         THE COURT:  No, that's fine.

23         And the court is cognizant of the length of time TCC2

24 continues in spurts has an impact, and it hasn't been my

25 intention to keep it going unless the facts and law warrant it.

21

1          Ms. Speckhart?

2          MS. SPECKHART:  Yes, Your Honor.  Thank you.  Cullen

3  Speckhart, again.

4          Just on that broader topic, on the topic of TCC2's

5  continued existence in the case and our potential role in the

6  case between now and April 8th, I do want to just clarify.  We

7  filed a motion yesterday acknowledging the substance and the

8  import of Your Honor's original dissolution order, which

9  mandated that TCC0 be reinstated pursuant to Judge Whitley's

10  order in North Carolina.  And we set the motion seeking our

11  continued existence for limited purposes of the appeal for

12  March 30th.  I believe that objections are due on the 23rd.

13          And that does raise some issues that are timely and

14  topical for today, some of which Mr. Gordon and Mr. Molton have

15  referenced.  And just parenthetically, I'll note, because I

16  think I have too, that these are absolutely unusual

17  circumstances and we've all been faced with an incredibly novel

18  and difficult set of facts and case dynamics.  And we were,

19  frankly, very surprised and disappointed in the U.S. Trustee's

20  decision not to file the appropriate pleadings to present a

21  showing that Your Honor asked for on the topic of two

22  committees.

23          We did believe, then, at the time that the Committees

24  were split, and we continue to believe that, a two-committee

25  structure is the best result for the case.  We think that it is

22

1   one that will allow us to deal most expeditiously and minimizes

2   the probabilities for independent objections later on if

3   there's an estimation proceeding and a plan proceeding.  And it

4   will allow negotiations among the estate parties, the estate

5   fiduciaries, to proceed on parallel paths.  And, again, this is

6   a broader point than just the limited existence for purposes of

7   the appeal.

8          But the question for today is, what is right for the

9   case?  And we read your opinion on the motion to dismiss, and

10  we understand the mantra.  If this case is going to continue

11  for the purpose of achieving an equitable and efficient

12  resolution to the talc related claims, then, in our view, let's

13  get to the result through mediation or otherwise.  Let's

14  negotiate in parallel paths.  Let's have negotiations with the

15  debtors on a parallel track between OCs and the debtors and

16  mesothelioma, separately.  The debtors have demonstrated that

17  they can walk and chew gum at the same time.

18         So the question for us is, how can we help the case

19  over the next period of time to April 12th, or whenever the

20  next date is?  If that's in a mediation context, or it isn't,

21  we would like to assist the Court's vision for this case and be

22  a force for good in the meantime.

23         THE COURT:  Thank you.  I appreciate your comments.

24  I think they go a long way.

25         The request of the Court that I've seen in

23

1  correspondence was with the appeal and the request that has

2  been raised has been with the FTCR, so that's why I limited to

3  extend the courtesies.

4          MS. SPECKHART:  Yes, sir.

5          THE COURT:  I don't believe anything the Court can do

6  stops parties from talking, whether they are talking under the

7  purview of TCC2 or individual claimants.  So as we proceed

8  through April 12th, I appreciate the intent to try to engage

9  the debtor and TCC1, and I don't think the Court is placing any

10 impediments in that way.

11         Parties and lawyers can speak and agree and move

12 forward without any formality.  And we'll address the specific

13 formalities of the existence of these Committees by April 12th.

14 So I thank you.

15         MS. SPECKHART:  Thank you, Your Honor.

16         THE COURT:  Counsel?

17         MR. GLASSER:  Were you calling on me, Your Honor.

18         THE COURT:  Oh, I'm sorry.  Mr. Glasser, I'll get to

19 you in a moment.  I have Counsel in front of me.  Thank you.

20         MS. RICHENDERFER:  Good morning, Your Honor.  Linda

21 Richenderfer from the Office of the United States Trustee.

22 Mr. Sponder and I have been sitting over there hearing all of

23 this and waiting for the appropriate time to speak up.

24         Your Honor, one of our concerns is we don't want to

25 disenfranchise any of the claimants here.  And a concern is

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8    2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 24 of 132

24

1  that if TCC1 continues to exist and TCC2 only exists for

2  limited purposes, then we may possibly run into a scenario

3  where things will come up, parties will need to respond,

4  Committees will need to take positions, and the mesothelioma

5  claimants will not have a say if they are limited between now

6  and April 12th to only addressing the FCR issue, the appeal

7  issue, and I guess I just heard something about mediation.

8         And so that is our concern that in acknowledgment of

9  Your Honor's order, that there should be one Committee, but you

10  allow them to exist until such a date.  I think that Your

11  Honor's original ruling today was to extend that order, extend

12  the date from March 9th to April 12th, which would allow them

13  to exist for all purposes until April 12th.  And then I heard

14  it pulled back a bit after Mr. Gordon's comments.  So I guess,

15  in part, I'm seeking some sort of clarification, because again,

16  the U.S. Trustee's interest is to make sure that all claimants

17  have a voice in this and to make sure that the mesothelioma

18  claimants are not taken out of having their positions

19  represented for the next month.

20         Thank you, Your Honor.

21         THE COURT:  All right.  Thank you.

22         Mr. Glasser, you wish to be heard?

23         MR. GLASSER:  (No audible response)

24         THE COURT:  Mr. Glasser?

25         MR. GLASSER:  (Indiscernible) I had a different issue

25

1  raised than the U.S. Trustee just did, so if you want to finish

2  on that and then come back to me, that'd be fine.

3          THE COURT:  All right.

4          Well, let me hear your issue and I'll come back and

5  address all of it.

6                        (Laughter)

7          MR. GLASSER:  Yeah.  My issue, Your Honor, was simply

8  that if -- that I would like your order to stay, that whatever

9  is filed by TCC1 and TCC2 between now and April 12th will be

10 deemed to have also been filed by TCC0 should it be constituted

11 because the appeal time runs in mid-April and there will not

12 have been a notice of appeal filed by TCC0 based on how we're

13 doing this today, which is fine, if it's deemed to have been

14 filed by them if they do come back and (indiscernible).

15         THE COURT:  Who wants to draft that order?

16                       (Laughter)

17         MR. MOLTON:  Judge, we'll take a whack at it.

18         MS. SPECKHART:  I'm not volunteering.  I'm just

19 suggesting that there's probably a way to stipulate around the

20 appeal issues, and we'll be happy to work on that to arrive at

21 the correct result.

22         THE COURT:  Thank you.

23         MR. MOLTON:  Judge, David Molton.

24         When the two Committees were created out of the one

25 Committee, we actually did engage in a stipulation --

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 26 of 132

26

1            THE COURT:  Right.

2            MS. SPECKHART:  We did.

3            MR. MOLTON:  -- that made a successor status for each

4    of the two Committees from the movant status of the original

5    Committee.  I'm sure there's a way to deal with that, so thank

6    you.

7            THE COURT:  Mr. Gordon?

8            MR. GORDON:  Your Honor, Greg Gordon on behalf of the

9    debtor.

10           We don't oppose that.

11           THE COURT:  All right.

12           I'm going to --  I understand Mr. Gordon, your

13   comments initially about limiting to the appeal and the FCR,

14   and that was my inclination.  I've heard from the Of the U.S.

15   Trustee, because I cannot, sitting here at now, envision any

16   wayword pathway where somebody -- there's an issue out there

17   that TCC2 has to weigh in on but they're not authorized to do

18   so, I'm just going to make it easy.  I'm going to extend the

19   period for TCC2 through April 12th.  They can hear and appear

20   on all matters and I'll just implore you all to limit the

21   matters.

22           But otherwise, it just gets too complicated and all

23   of the sudden, we'll be here on order shortening time for

24   authorization to appear on one limited issue.  So let's just

25   continue *in toto* TCC2.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 27 of 132

27

1        Now it's my turn to throw out a wrinkle with

2   respect -- you can sit down or we can address it -- and that's

3   what the direct appeals to the Circuit because Mr. Molton, you

4   asked for guidance.

5        With respect to the preliminary injunction, the

6   decision and the order on a preliminary injunction in the

7   adversary proceeding, there's obviously a much stronger case

8   that it's a final judgment terminating the proceeding.  The

9   issue on the motion to dismiss is a bit more involved.

10       My understanding of the law in this Circuit, In re

11  Brown, I believe, 1990 decision, almost an outlier among

12  Circuits, to allow a denial of a motion to dismiss a Chapter 11

13  to be deemed a final judgment.  I think Third Circuit Judge

14  Jordan, in 2007, actually in a concurrence, challenged it, or

15  raised the question.  I forget which case.  But even that

16  decision was before the Ritzen Group and Bullock decisions by

17  the Supreme court, which call for a separate distinct

18  proceeding.

19       And I guess I'm going to find it difficult, unless

20  this issue was resolved, and I'm not saying I've reached a

21  decision on it, but it hasn't been briefed, how I can certify

22  an issue to the Third Circuit that is interlocutory and not a

23  final judgment.  Maybe I can, and you know, we're all facing

24  some new issues.  But it would seem to me that maybe the better

25  course would be to go before the district court and seek a

1  resolution of that issue, and then the district court can also

2  certify it to the circuit.  I'm not looking to avoid

3  responsibility, but I'm not prepared yet to say that it's

4  necessarily a final judgment or order.

5          And therefore, there's a right to appeal without

6  authorization to pursue an interlocutory appeal.  So I throw

7  that out.  And I don't know -- I'm not necessarily calling for

8  comment, but it's something I think you all collectively have

9  to address.  I'm not prepared to address it now, Counsel.

10 Maybe Counsel is.

11                          (Laughter)

12         MR. PFISTER:  Your Honor, apologies.  Rob Pfister

13 from Klee Tuchin.

14         We looked at this issue extensively.  I only rose

15 because I think it's clear from the statute.  Our understanding

16 is 158(a) is the jurisdiction for appeals from final judgments,

17 158(a)(1), the district courts of the United States have

18 jurisdiction to hear appeals from final judgments or orders.

19 And then (2) is from final -- or from interlocutory orders, and

20 (3) is with leave of the Court.  And under 158(d), which is the

21 certification statute, it grants court of appeals jurisdiction

22 to hear appeals under Subsection A and B.

23         So we thought it was clear that if Your Honor

24 certified it, that it could be certified even as an

25 interlocutory matter.  And I don't know that that's your

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 29 of 132

29

1  understanding.

2          THE COURT:  I don't know.  But you all have much more

3  brainpower at your disposal to let me know if that's the case.

4  But I think that's an initial threshold issue that has to be

5  addressed somewhere.  And I guess we'll address that on the

6  30th when these motions are returnable.  I just wanted to make

7  sure everybody's cognizant of at least an issue that was

8  gnawing at me.  All right.

9          Then, we are set.  Just to clarify, we have the two

10 Committees in existence through the 12th.  We have a hearing on

11 the appointment of a second FTCR on the 30th.  And I've also

12 asked that you all, if that is successful, to have names ready

13 for consideration.

14          Mr. Molton?

15          MR. MOLTON:  Yeah, Your Honor.  Just a clarification.

16 David Molton for TCC1.

17          So we will, notwithstanding the rule that I

18 mentioned, which of course can be modified by Your Honor's

19 ruling, we will be having argument then on the certification

20 issues --

21          THE COURT:  Yes.

22          MR. MOLTON:  -- on the 30th?

23          THE COURT:  Yes.

24          MR. MOLTON:  Okay.  I just wanted that to be clear.

25          Thank you.

30

1          THE COURT:  I anticipate argument.

2          Then, let's approach the issue of mediation.  And I'm

3     going to turn to Mr. Gordon, and I'm going to ask what the

4     debtor's position is.  I've seen there's been some discussions

5     among Counsel.  Let me, if you would apprise the Court.

6          MR. GORDON:  Greg Gordon, again, on behalf of the

7     debtor.

8          Our understanding, Your Honor, is that we had an

9     agreement with TCC1 on a co-mediator set-up, which are Mr. Gary

10    Russo and retired Judge Joel Schneider.  And our thought was --

11    and others will obviously be heard on this, but if Your Honor

12    would be inclined to approve that, we would then immediately

13    work with the other side to work up a mediation protocol that

14    we would then come back to the Court with and present it to

15    Your Honor for approval.  And if we can't reach an agreement on

16    the protocol, I think we could come back and explain what the

17    dispute is and ask Your Honor to weigh in to the extent there

18    is a dispute.

19         THE COURT:  All right.  Thank you.

20         I certainly don't have issues with the selections,

21    but let me hear from Counsel.

22         MS. SPECKHART:  Your Honor, Cullen Speckhart, again,

23    on behalf of TCC2.  Your Honor, I regret to inform the Court

24    that we were not consulted with respect to the identity of the

25    mediators, perhaps for reasons that could have been obvious and

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 31 of 132

31

1  had more to do with prior expectations of the existence of

2  TCC2.

3          But as I said earlier, we are very interested in

4  participating in the process.  We would like the ability to

5  talk to our clients about the identity of the mediators and to

6  have some meaningful discussion with the debtors and TCC1 about

7  that, and also to participate in drafting of the protocol.

8          THE COURT:  All right.  Thank you.

9          Mr. Molton?

10          MR. MOLTON:  I keep on getting my mask hooked up on

11  my glasses, Your Honor.  Another scourge of the times.

12          Listen, we welcome Ms. Speckhart's comments.  I think

13  they're very constructive.  I think her comments earlier about

14  going forward and seeking within a expedited period of time, to

15  use my word, with alacrity, we can move forward to a mediated

16  resolution of these issues is something that I know everyone

17  and all of the 38,000 ovarian cancer claimants that we

18  represent on TCC1 are very interested in.

19          We've been thinking a lot about it, and as you heard

20  from Mr. Gordon, that resulted in the proposal of a number of

21  mediators.  You know, clearly, Your Honor there's other parties

22  here and we welcome, you know, you know, the fact that they

23  join in us in wanting to move this case towards a resolution.

24          THE COURT:  Thank you, Mr. Molton.

25          Let me ask this, then, because I want to make

32

1  mediation and the process going forward a priority, and I

2  think, from what I'm hearing, I think that's shared by all

3  here.  If I were to schedule a hearing telephonic by Court

4  Solutions for a week from now to give you all a chance to

5  develop a protocol, see if you have input, is that doable?  In

6  other words, I want to authorize the mediators to feel

7  comfortable enough to start picking up the phone and dealing

8  with the parties.

9        So you tell me what's workable understanding that

10  there's -- ideally, it would be great to have it globally.  But

11  we have to start somewhere.

12        MR. MOLTON:  Yeah, Judge.  David Molton, again, for

13  TCC1.

14        We've been thinking about a protocol, and I think

15  we'd be able to meet and confer with the, you know, with the

16  debtor, you know, and other interested parties, you know,

17  including TCC2, to move that forward.

18        THE COURT:  Mr. Gordon, is that a schedule that works

19  or do you have other thoughts?

20        MR. GORDON:  In my mind, Your Honor, there's two

21  issues.  One is the mediators themselves.  And our view would

22  be that the Court, based on the agreement we have, should

23  appoint those two individuals as the mediators.  In terms of

24  the protocol, I obviously represented to Your Honor that that's

25  something we're prepared to meet and confer with the other

33

1  parties about.  If Ms. Speckhart wants to be involved in that,

2  we wouldn't, obviously, say no to that.  And I do think it's

3  reasonable to expect within a week we could come up with

4  something, or at least identify what the issues are to which we

5  can't agree.

6          THE COURT:  All right.

7          So you would be looking for the appointment as of

8  today?  Or --

9          MR. GORDON:  Yes.  As you know, Your Honor, we've

10  wanted to move forward with mediation for quite a while.  You

11  know, the big issues that we were facing that were impeding

12  that have been resolved and, you know, we know there's appeals

13  and those appeals will go forward, but we'd like to get

14  started.

15          THE COURT:  All right.

16          Ms. Speckhart?

17          MS. SPECKHART:  Your Honor, it is our perspective

18  that one week's time is a very short window, and an appropriate

19  period in which we should be able to have the conversations

20  with our clients about the very substantive mediation that

21  they're about to embark on, and at least be able to diligence

22  the identity of the mediator so that they can be comfortable

23  with who will be conducting the proceedings.  And we will be

24  prepared to move as fast as is necessary to facilitate a

25  consensual result at least on the protocol at this point.

34

1              THE COURT:  All right.  Thank you.

2              Okay.  Mr. Russo, was he one of the nominees for the

3  FCR?

4              MR. GORDON:  He was, Your Honor.  He was one of our

5  nominees.

6              THE COURT:  I think the Court is going accede to the

7  start of a consensus.  And we can build on that.  Certainly,

8  looking to have the mesothelioma group comfortable with the

9  mediation process.  But I see no prejudice as to getting

10 mediators onboard now.  Composition can change going forward.

11 Issues can change, protocols can be adopted.  But if we -- I'm

12 certainly comfortable with Judge Schneider.  I've reviewed

13 Mr. Russo's -- I have his resume here.  I reviewed him as a

14 potential FCR.  And if I have a group representing 38,000

15 claimants comfortable, I think that's a start.

16             So I'm going to authorize the appointment of those

17 individuals, Judge Joel Schneider and Gary Russo, as mediators

18 going forward, without prejudice and under reservation of

19 rights of others to weigh in if there are others or if there

20 are issues that arise with their appointments.  But I'll ask

21 the debtor to circulate an order.

22             All right.  Before we get to the contested retention

23 applications, are there any other issues?

24             MS. SPECKHART:  Your Honor, just one point of

25 clarification.  Consistent with the reservation of rights that

35

1 you just provided in respect to the identity of the

2 mediators --

3          THE COURT:  Yes.

4          MS. SPECKHART:  To the extent that there is a gating

5 issue after we have the chance to confer with our clients, is

6 that something that you would like us to raise with Your Honor

7 within the next seven days --

8          THE COURT:  Yes.

9          MS. SPECKHART:  -- so that you could conduct a

10 telephonic hearing on the one-week schedule?

11          THE COURT:  Yes.  I mean, if something is

12 problematic, not simply a preference, but a real problem, then

13 certainly, I want it brought to the Court's attention.

14          MS. SPECKHART:  Okay.  We'll do that as soon as

15 possible.

16          THE COURT:  All right.

17          MS. SPECKHART:  Thank you.

18          THE COURT:  Thank you.

19          Mr. Gordon?

20          MR. GORDON:  Your Honor, Greg Gordon, again, on

21 behalf of the debtor.

22          I think Mr. Defilippo just sent me this note, which

23 is a good one.  He wanted to ask me to clarify that in coming

24 up with these additional candidates for FCR, we're presuming it

25 doesn't really make sense for anybody to propose someone who's

Case 23-01092-MBK  Doc -2  Filed 05/29/23  Entered 05/29/23 18:03:43  Desc
Transcript March 8  2022 Hearing LTL Management  LLC  Ch. 11  Case No. 21-30589  Page 36 of 132

36

1 been stricken.

2        THE COURT:  Well, if one side or another has struck,

3 whatever the proper grammar is, a candidate, I think it -- I

4 can't see all of the sudden a revitalization in that candidate.

5 So I think we know who's been struck and I would say there are

6 sufficient quality candidates out there to consider.

7        MR. GORDON:  And then, the only other thing, Your

8 Honor, was we filed, I think relatively late last night, some

9 papers with respect to a securities action, and --

10        THE COURT:  Yes.

11        MR. GORDON:  I'm sorry.  Part of that request

12 included a TRO and a request to schedule a hearing in fairly

13 short order on that, so I did want to bring that up at some

14 point.

15        THE COURT:  My courtroom deputy is probably working

16 on sending out a scheduling for Thursday at 10:00 a.m.

17        MR. GORDON:  Okay.  Thank you, Your Honor.

18        THE COURT:  Thank you.  On the initial TRO.

19        All right.  Turning to the agenda, the following

20 matters are being, while contested, are being adjourned:  the

21 application of Houlihan Lokey -- These are all being adjourned

22 to the March 30th hearing. -- the application of FTI

23 Consulting, the application of The Brattle Group, as well as

24 the motions for stay relief or motion seeking confirmation that

25 the stay doesn't apply with respect to certain insurance

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 37 of 132

37

1  coverage.  So those matters are being carried to the 30th.

2        There is the issue -- before we get to the matters

3  going forward today, there are three contested retention

4  applications for Counsel for TCC2, the Sherman Silverstein

5  firm, which I think an order had been entered inadvertently,

6  the Cooley firm, and Waldrep Wall.  I guess my question is,

7  first of all, are the objections simply -- Mr. Sponder, are

8  they U.S. Trustee objections?

9        MR. SPONDER:  Thank you, Your Honor.  Jeff Sponder

10  from the Office of the United States Trustee.

11        Your Honor, we've worked out our issues with all of

12  the three law firms and certifications -- supplemental

13  certifications have been filed on the docket.

14        THE COURT:  So is there any reason not to approve

15  those retentions?

16        MR. SPONDER:  The United States Trustee doesn't have

17  reason, but I also think that the debtor had an objection on

18  file, so.

19        Thank you, Your Honor.

20        THE COURT:  Mr. Gordon?  I mean, we recognize that by

21  April 12th, there may not be a TCC2, but I hate to have these

22  just lingering out there because then, we have to extend and

23  protect them for any work done from now through April 12th, the

24  same issue we had before.

25        MR. GORDON:  That's right.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 38 of 132

38

1          Greg Gordon on behalf of the debtor.

2          We had objected, Your Honor may recall, and I can't

3   remember all the exact details.  Because of the uncertainty

4   with the Committees and the potential that based on the outcome

5   of the issue of the two Committees, that there was arguably

6   duplication among these Counsel.  At the same time, you know,

7   we recognize that these Committees have carried forward.  It's

8   certainly not, from our perspective, an issue of whether they

9   should be paid or not.

10          It's just a matter of what to do with them at a time

11   when the ultimate status of these Committees hasn't been

12   determined.  So I think we feel if there's separate Committees,

13   it's proper.  But, you know, the Court's -- this is sort of

14   metaphysical to me, you know.  The Court's ruling was it was

15   never proper to have these two Committees appointed in the

16   first place.

17          And so, it's a long way of saying, I guess from my

18   perspective, there would probably be a way to fashion an order

19   that fits the unusual circumstances we're in and doesn't

20   prejudice our position with respect to the two Committees or

21   the other side's position with respect to the two Committees.

22   I think if we could do that, at least speaking for me, we'd be

23   comfortable with that.

24          THE COURT:  Okay.  Thank you.

25          I think it does make sense to enter orders approving

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 39 of 132

39

1  the retention, maybe with a reservation of rights in the event

2  TCC2 no longer, if and when it no longer exists, that the

3  retention is discontinued, or something to that effect.

4  Unless, of course, and I understand there's appeals.  Nothing

5  is easy in this case.

6                    (Laughter)

7          MS. SPECKHART:  Nothing is easier, Your Honor.  But I

8  think, just as a logical consequence of TCC2's potential or

9  eventual dissolution, the order would terminate on its own and

10 we can make sure that that's clear.  But I think I speak for

11 all of the three referenced firms.  First of all, we appreciate

12 the debtor's accommodation and acknowledgment of reality and

13 also Mr. Sponder's work with us in resolving all the

14 outstanding objections.

15         But at the same time, I think that all three of us

16 have held off in filing any monthly fee statements, just

17 because we didn't want to be presumptuous or offend the Court

18 about the status of our retention.  So I appreciate that you've

19 taken this up today and we'll make sure that the order conforms

20 to your directive.

21         THE COURT:  Great.  So we're going -- those are

22 Docket Numbers 1079, 1080, and 1091, and the Court will await

23 language orders that have been circulated.

24                 (Counsel is conferring off record)

25         MS. SPECKHART:  Okay.  Thank you.

1           Your Honor, Mr. Abramowitz helpfully reminded me that

2    there is a related issue of the typical submission of

3    reimbursement of expenses for Committee members.  I think that

4    those are handled in a way that's usually connected to the

5    monthly fee statements of lead counsel or local counsel.  I'd

6    have to check the procedures in this Court.  But we just want

7    to make sure that we're okay to go ahead and process those in

8    connection with Your Honor's ruling on the retentions

9    themselves.

10           THE COURT:  Yes, you are.

11           MS. SPECKHART:  Thank you, Your Honor.

12           THE COURT:  Thank you.  Thank you, Mr. Abramowitz.

13           All right.  Let's get to the main event.

14           Jones Day fee application -- on the fee

15    application -- Jones Day retention application.  We're still at

16    that stage.

17           Mr. Gordon.

18           MR. GORDON:  Greg Gordon, on behalf of the debtor,

19    Your Honor.

20           So we are going completely digital today.  In other

21    words, we had a miscommunication in terms of hard copies of the

22    PowerPoint presentation, so we've emailed it around.  Everybody

23    has it.  We're happy to print it later for Your Honor, if you

24    want it.  You should have it by email as well.

25           THE COURT:  Is it --

41

1      MR. GORDON:  And of course, it's going to come up on

2 the screen.

3      THE COURT:  Is this different from the PowerPoint

4 that was initially provided?

5      MR. GORDON:  It's a little different because it's

6 been updated.

7      THE COURT:  All right.

8      MR. GORDON:  But it's --

9      THE COURT:  Well, then, I'll look at it on the

10 screen.

11      MR. GORDON:  But our apologies for that.  That was

12 just a bit of a miscommunication.

13      Okay.  Next slide please.

14      And the next.  And the next, please.  Okay.

15      So, Your Honor, these next couple of substantive

16 slides, just sort of, I think, establish the basics, or the

17 basic facts that, in our view, make clear that there's no

18 actual conflict.  There's no potential conflict and, in effect,

19 there's no reason to disqualify Jones Day.

20      So I think, and I know some of these things, maybe

21 all of them, the Court's already well aware of, but I think the

22 record is very clear that on October 12, 2021, our

23 representation of J&J in connection with the corporate

24 restructuring terminated, and at the same time, our

25 representation of the debtor began.  And, of course, as Your

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 42 of 132

42

1  Honor knows, the debtor did not even come into existence until

2  the time that the corporate restructuring was effectuated.

3       And this is an important fact, because when you look

4  at the standards under 327, the focus is, you know, the verbs

5  are in the current tense, the focus is on whether there's an

6  existing conflict.  And a lot of the focus of the objectors is

7  on the representation prior to the time when we became counsel

8  for LTL.  And so it's not a concurrent representation issue.

9       As the slide says, there was simply no overlap.

10  These were successive representations.  One ended, the next one

11  followed.  In terms of J&J, and we've heard a lot about our

12  supposed representation of J&J, I think the record's clear we

13  did not represent -- the firm does not represent J&J in

14  connection with this Chapter 11 case.  It does, however,

15  represent J&J and matters unrelated to the case, and I tried to

16  provide through my declarations in support of the application

17  some detail on that.  And, in part, I think that was in

18  response to the U.S. Trustee who had raised some questions

19  about the extent and some additional detail on the types of

20  matters.

21       And as my declaration reflected, those matters are

22  largely intellectual property matters.  And the other thing I

23  think my declarations made clear, that from the standpoint of

24  the firm, generally, the amount of fees was very, very small on

25  a relative basis.  Less than, I think one half of 1 percent of

43

1  the firm's fees in each of the 10 years leading up to the

2  bankruptcy filing.

3          Next slide please.

4          Next slide.

5          Now, again, I know Your Honor's very familiar with

6  the funding agreement.  I won't spend much time on this.  And,

7  in fact, Your Honor spent a fair amount of time on this in your

8  opinion.  But the funding agreement to us is very key, also for

9  purposes of the Jones Day retention application, because from

10 our perspective, it shows or establishes the alignment of the

11 parties that are involved here.  The alignment of LTL with New

12 JJCI, the alignment of LTL with J&J.

13          And I should say, by the way, that, again, I think

14 the record's clear, we don't represent JJCI.  We never have.

15 And that's another reason why there's not a concurrent

16 representation problem.  But, again, Your Honor is well

17 familiar with the funding agreement.  This is obviously a huge

18 benefit to this estate.

19          In fact, it seemed to go up in the minds of TCC2,

20 primarily during the dismissal hearing, when they argued that

21 there was an absence of financial distress at LTL, primarily

22 because of the funding agreement.  I mean, there's literally no

23 material conditions on the requirement of funding by both New

24 JJCI and J&J.

25          Of course, as Your Honor knows, it's not a loan.

44

1    There's no obligation to repay.  And, you know, I think it's

2    important what Your Honor concluded with respect to the funding

3    agreement, which is down at the bottom of the slide, which is

4    the funding agreement between the debtor on the one hand and

5    J&J and New JJCI on a joint and several basis on the other is

6    not intended to and is unlikely to impair the ability of talc

7    claimants to recover on their claims.  And, you know, that to

8    me undercuts many of the arguments the objectors have advanced

9    as to why Jones Day has an actual conflict that warrants

10   disqualification.

11          Next slide, please.

12          And next.

13          So just starting with some of the basics here, Your

14   Honor, you know, debtor's choice of counsel is entitled to the

15   great deference.  That comes from the Enron case.  The court

16   there also made clear that, you know, disqualification really

17   shouldn't be based on conjecture or speculation or perhaps

18   inferences about the situation.  And I would submit, Your

19   Honor, that much of what you're going to hear from the

20   objectors is speculation about things that could potentially

21   happen down the road and things, frankly, that there's no

22   reason to expect they would ever happen.

23          Next slide, please.

24          So the analysis, in our view, and this comes from the

25   Marvel case, which I know Your Honor is well familiar with,

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 45 of 132

45

1   really breaks down into three pieces in our minds.  One,

2   whether there's an actual conflict which would require

3   disqualification in the absence of some alternative to

4   disqualification.

5           The second is a potential conflict.  And there, I

6   think it's clear that courts have wide discretion to decide

7   what to do in the event of a potential conflict.  And they have

8   wide latitude to approve retentions, notwithstanding the

9   potential for a conflict.

10          And then there's this idea of an appearance of

11  conflict.  And I would suggest that much of the objections that

12  you've seen and will hear today really come down to an

13  appearance of conflict.  And we think it's clear in the Third

14  Circuit that's not a sufficient basis to disqualify counsel.

15          Next slide, please.

16          In the supplemental objection that was filed within

17  the last week or two, there was a suggestion that the standard

18  is something different than what we believe the Third Circuit

19  prescribes the standard to be.  And that was a standard to the

20  point of the counsel has to be aloof from all connection with

21  the debtor or its management.

22          So think about that, that you would represent a

23  debtor but have to be completely aloof from the debtor or its

24  management.  And then this other "like Caesar's wife," you have

25  to be above suspicion.  And Collier was cited for that, and the

46

1  Granite Partners case out of the Southern District of New York

2  was cited for that.

3      And if you take a look at Collier, you see that this

4  was taken completely out of context because the Collier cite is

5  talking about a situation where counsel is being retained by a

6  trustee, not by a debtor.  And the point that was being made

7  was, if you have a Chapter 11 trustee who's being brought in as

8  an independent party, then the counsel should be the same.  And

9  we would submit, that's not the situation here where you have a

10  debtor-in-possession.

11      And Granite Partners was the same thing.  It was also

12  counsel for a trustee.  And, moreover, in that case, the court

13  found that there was inadequate disclosure about the extent of

14  the council's involvement with a party that had a significant

15  relationship to the case.

16      Next slide, please.

17      We've had some back and forth.  I won't spend a lot

18  of time over whose burden it is.  We think the cases are clear

19  that there's a shifting of the burden if the debtor has

20  basically made its case through its filings.  And we submit

21  that we did that through the initial application with the

22  declaration that was appended to that, and then, of course,

23  also including the additional declarations that were submitted

24  as well.

25      And at that point, then the burden shifts to the

47

1   objectors who have a substantial burden to present evidence of

2   a disqualifying conflict.  And you can see that concept about

3   the shifting of the burden comes out of the Boy Scouts case,

4   and also out of the Caesars case as well in the Northern

5   District of Illinois.

6            Next slide, please.

7            So, this again, this slide, Your Honor, just

8   reinforces what I said before, which really focuses more

9   specifically on what Section 327 provides.  And the BSA quote,

10  I think, is significant where the court says "The Third Circuit

11  has instructed that professional holds a prohibited adverse

12  interest where that professional holds or represents interests

13  in competition with the debtor that would actually, as opposed

14  to speculatively, impair its service as an estate fiduciary."

15           So, again, there's that focus on a current

16  representation and one that's competing against the

17  representation of the debtor.  And then, of course, you can see

18  from the Section 327 language itself, it's written in the

19  current tense.  And, again, in this case, Jones Day has no

20  concurrent representations.  The debtor is the only party that

21  we represent in connection with the case.  The only other

22  representations we have are of J&J in matters that are

23  completely unrelated to this case.

24           Next slide, please.

25           So these are kind of stating some obvious points.

48

1  Obviously, LTL is not J&J.  It is important to recognize that

2  J&J has its own counsel on this case.  Ms. Lauria is here

3  today.  Your Honor acknowledged here earlier.  New JJCI has its

4  own counsel on this case.  That's Ms. Lauria, as well.

5         And the idea that you have successive

6  representations, where one terminated and another began, is not

7  a basis to find any kind of conflicting present interest.

8         And, you know, it's been suggested that the

9  representation of the debtor is a continuation of its

10 representation of J&J.  And we would submit that's not the

11 case.  We had a specific representation of J&J in connection

12 with the restructuring.  Once that was completed, the

13 restructuring occurred and we immediately then became counsel

14 for LTL in connection with the bankruptcy case.

15         Next slide, please.

16         The -- you know, our brief, particularly our reply

17 brief, I think all of them have many, many cases that we've

18 cited.  We've just highlighted a few cases we've cited in

19 support of our position.

20         But you can see in Enron, that was a situation where

21 there was an effort to disqualify, I think it was Milbank,

22 based on work it had done and transactions prior to the case.

23 And the Court found there that even though those transactions

24 were subject to investigation, there was no basis to

25 disqualify.

49

1          And in the <u>American International Refinery</u> case, it

2    was a similar situation based on pre-petition work and where

3    there was an allegation that, based on that work, there was an

4    inability to offer objective device -- advice, I'm sorry, to

5    the debtor in the bankruptcy case.  Next slide please.

6          You know, the <u>Marvel</u> case, just to go back over this,

7    it makes clear that disqualification is not appropriate based

8    on an appearance of impropriety.  And the Court, I think, was

9    very practical in reaching that ruling, finding, you know, if

10   we were to allow that, you can imagine what kinds of arguments

11   could be advanced in literally every case against counsel

12   retained by a debtor.

13          And of course, and I'll come back to this, where you

14   have a potential conflict, the question there, whether it's a

15   conflict that's likely to occur or whether it's remote, and if

16   it's remote, that's not a basis for disqualification either.

17   And that's -- that comes out of the <u>Jade</u> case, which is an

18   unreported Third Circuit case.

19          Next slide, please.

20          This slide just provides a little more detail on

21   potential conflict and when a potential conflict might get to

22   the point of -- of warranting a disqualification.  But the idea

23   here is that a potential conflict exists where an attorney does

24   hold or represent a conflicting interest.  So you're actually

25   representing somebody who has a conflicting interest, but the

50

1  attorney's not likely to be in a position to favor that

2  interest over the debtor's interest.

3        So you've actually identified something, a

4  representation that's potentially problematic, and then the

5  question turns to, okay, so I see there is a potential because

6  of the -- the different situations of the two parties, but is

7  that potential likely to occur or is it remote?  And again,

8  from <u>Marvel</u>, an apparent conflict isn't enough.

9        And again, if it's remote, that's not enough either,

10 again from the <u>Jade</u> case.

11       Next slide, please.

12       Okay.  These cases -- and again, there's others that

13 we've cited.  This is <u>Muma Services</u>, <u>22 Acquisition</u>, <u>Hurst</u>

14 <u>Lincoln Mercury</u>.  They all generally stand for the interest

15 that -- or the -- or for the proposition that disqualification

16 isn't appropriate where interests are aligned.

17       So even if you represent a third party outside of the

18 case, out of a Chapter 11 case, who has some interest in the

19 case, if the interests are aligned, there's no basis for

20 disqualification, there's no basis for concern.

21       And you can see here one involved a -- and by the

22 way, these were concurrent -- again, concurrent

23 representations, which we don't even have at this point.  You

24 have one with a shareholder, involving a shareholder,

25 concurrent representation, but the parties were united in

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 51 of 132

51

1   interest.  That's the Hurst case.

2            You had another with a debtor and a secured lender

3   and also a consulting firm.  I think it was partially owned by

4   the secured lender, as I recall.  And again, the Court was okay

5   with that based on the -- based on the conclusion that the

6   parties' interests were aligned.

7            Next slide, please.

8            And here, we would submit, Your Honor, that the

9   record establishes that the interest of the debtor, J&J and New

10  JJCI, are fully aligned.  They all share an interest in an

11  equitable and efficient resolution of talc claims in this case

12  through a Chapter 11 plan.

13           You've got J&J and New JJCI are obligated to provide

14  backup funding under the funding agreement.  Your Honor is

15  aware of the fact that J&J and New JJCI have agreed to provide

16  a two -- provide $2 billion as a prepayment under the funding

17  agreement to go into a qualified settlement fund for the

18  exclusive benefit of -- of claimants in this case.

19           And there's just -- there's no dispute under the

20  funding agreement.  There's nothing the objectors can point to,

21  and there's no reason to believe that one will occur.  And I

22  thought Your Honor's opinion had a very commonsense point about

23  that.  It would just be nonsensical to accept the notion that

24  J&J and Old JJCI would bear the brunt of public and judicial

25  scrutiny, as well as the time and cost to implement this

52

1   integrated transaction simply to stall claimants or walk away

2   from its financial commitments under the funding agreement.

3          And I would submit that that practical observation

4   applies here, because, again, you're going to hear the other

5   side argue today that we're on the opposite sides of the

6   funding agreement, we're on opposite sides of the V, where

7   there's conflicts between the debtor -- or potential conflicts

8   between the debtor, J&J, and New JJCI that create problems for

9   our retention application.

10          And I would submit, Your Honor, there's just no basis

11  for any of that.  That's sheer speculation, and it's

12  speculation that, frankly, is not believable, based on where we

13  stand today and based on the fact that there have been no

14  defaults under the funding agreement.  Funding is being

15  provided as contemplated.  And we as counsel for the debtor see

16  no reason to believe that that will ever change.

17          Next slide, please.

18          So I kind of foreshadowed this point, I think.  The

19  other is, you know, obviously, we've had arguments like this

20  come up in other cases, not necessarily in the retention

21  context, but in the other cases in North Carolina, lots of

22  concerns raised by the Plaintiff's Bar about potential defaults

23  under the funding agreement and the like.  And there hasn't

24  been a single instance in any of those cases where there's ever

25  been a default either.

1          And you know, the last point, which I'll come back

2     to, it's not our intention, Jones Day's intention to ever be

3     involved if there is a dispute.  And the way I've always

4     thought about this is the concern that's fundamentally being

5     raised is that LTL is a subsidiary ultimately of J&J.  It's a

6     subsidiary of New JJCI.  And whether Jones Day is counsel, or

7     whether some other firm is counsel, it's always struck me as

8     highly unlikely that either a court or a committee would want

9     counsel for the debtor involved in suing its ultimate parent or

10    even its intermediate parent.  And that's one of the reasons I

11    made the offer I did in connection with the dismissal hearing.

12         And I think we even said it in our papers, that we

13    would expect if there was a breach at some point, that we

14    wouldn't be involved in that.  If there was some reason to

15    pursue litigation against the parent, or against any of the

16    affiliates, which we can't envision at this point, that we

17    wouldn't be involved in that.  I think everyone would agree to

18    that, I suspect.

19         Next slide, please.

20         So, Your Honor, this is just an attempt to capsulize

21    an issue that came up a little bit later in the briefing, which

22    was the move from 327 into, well, let's look at various rules

23    of professional conduct.  And the argument was made that this

24    representation violates various of those rules.

25         And from my reading of the cases, sometimes courts

54

1  look at these rules, sometimes they don't.  I don't think it's

2  mandated, as best I could tell, under the Third Circuit

3  authority, but it sort of doesn't matter in this case from our

4  perspective, because we don't think there's any violation of

5  any -- any of the rules.

6       And you've got -- the ones that are primarily raised,

7  yeah, these are model rules, and then you can take them across

8  to New Jersey and the like, and they're all pretty much the

9  same.  1.7(a), 1.8(b), and 1.9(a), in pretty much all of those,

10  the evidence shows that there's no issue because Jones Day is

11  not representing the debtor directly adverse to another client.

12  Jones Day is not representing any client in a matter directly

13  adverse to the debtor.

14       And there's no limitation on Jones Day's

15  representation of its work here based on work it's done for

16  other clients.  And again, that's largely because of the

17  alignment of interests of the parties.  And again, we don't

18  even represent New JJCI.  And then there's more detail

19  underneath which I won't go into, just taking these rule by

20  rule.

21       But again, if you look at these, they're -- they're

22  largely rules that are not surprising in the sense that they're

23  raising issues when you have an actual conflict.  They

24  literally, where you're actually on both sides of the same

25  issue with two clients at the same time, or you've put yourself

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 55 of 132

55

1 in a position where your representation of one client is

2 limited by your representation of the other.  You just can't go

3 there based on the services you're providing to the other.

4         And again, these are concurrent situations largely

5 other than a 1.9(a), which talks about a former client, which

6 really isn't applicable here because of the fact that we have

7 successive representations.  We've got successive

8 representations.

9         Okay, let's go to the next slide.

10         And I'm just going to go through these very quickly.

11 The only reason we have these slides from the record is there

12 was a suggestion in the latest supplemental brief that one of

13 the reasons we should be disqualified was the fact that there

14 was evidence in the dismissal hearing that suggested that our

15 board really was not given sufficient information even to make

16 the decision about a bankruptcy filing.

17         And I think that was sort of suggested it was

18 indicative all of this is Jones Day working for J&J and not for

19 the debtor.  And so these -- yeah, there was a focus on the

20 fact that the employees are secunded, but overlooking the fact

21 that Mr. Kim, for example, as you know, is secunded full-time

22 to the -- to the debtor.  Our client is LTL.  Our primary

23 representative we report to is Mr. Kim.

24         Next slide, please.

25         And again, I'm not going to spend much time on these,

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 56 of 132

56

1 but I think there was significant testimony during the

2 dismissal hearing that suggested that, in fact, the Board had

3 sufficient information to -- to decide -- make the decision to

4 file for bankruptcy.

5          Next slide, please.

6          Again, here's Mr. -- testimony from Mr. Kim talking

7 about the preparation he did and the information he conveyed to

8 the Board and what his intentions were.

9          Next slide, please.

10         And kind of more of the same here.  And this was

11 specifically responding to the comment that the Board were just

12 mushrooms and really had no will of their own, no information,

13 they were just kept in the dark and were being manipulated by

14 J&J.

15         Next slide, please.

16         The latest supplemental brief included some time

17 entries, which I think were included for the proposition of

18 showing that our real client is J&J, and we would just suggest,

19 having looked at those entries, they show no such thing.  They

20 just show that, in fact, unsurprisingly there have been

21 communications with J&J and affiliates in connection with the

22 case that will also show -- I think virtually every one showed

23 that White & Case was involved in those calls representing

24 those entities as well, and Mr. Kim was involved in most, if

25 not all, of those time entries as well.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 57 of 132

57

1        And again, I think you would expect that there would

2   be communications among parties whose interests are aligned or

3   have a common interest, and particularly ones that are part of

4   a corporate enterprise like we have here.

5        Next slide, please.  Next slide.

6        So I think ultimately, what much of the objections

7   devolve into is allegations that the restructuring essentially

8   effectuated a fraudulent transfer, which I would say, again, as

9   I pointed out a couple of weeks ago, it seems inconsistent with

10   their arguments that were being made about LTL not being

11   financially distressed.  But nonetheless, that's largely what

12   it -- that devolves into.

13        And again, I think the Court's rulings in its opinion

14   on dismissal basically belie those -- those arguments.  And to

15   us, you know, to suggest that -- that an allegation of

16   fraudulent transfer in the face of an opinion that would seem

17   to largely suggest there is no basis for a fraudulent transfer,

18   just can't be a basis to disqualify a law firm.

19        I mean, that's arguably at best a potential conflict

20   that is decidedly remote, based on the record.  You know, if

21   there's a risk at all, it's decidedly remote, based on the

22   record that we have.

23        Next slide, please.

24        The other side, obviously, for this point relies on

25   two of Judge Whitley's -- well, actually his findings of fact

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management  LLC   Ch. 11   Case No. 21-30589   Page 58 of 132

58

1  and conclusions of law in his two PI rulings in both <u>Aldrich</u>

2  and <u>DBMP</u>.  But it's important to keep in mind that Judge

3  Whitley made very clear that his findings were preliminary and

4  he even acknowledged they could just be considered as dicta.

5          And again, these in my mind become much less

6  significant in the wake of the ruling Your Honor made following

7  an extensive hearing and a substantial record.

8          Next slide, please.

9          Then Your Honor, again, I won't spend a lot of time

10  on this, because this is well briefed, but the cases that are

11  largely relied on to suggest that we have a disabling conflict

12  are cases involving a preference.  You've got the <u>First Jersey</u>

13  <u>Securities</u>, the <u>Fleming</u> case, and then <u>Pillowtex</u>, which I'm

14  embarrassed to say I was involved in that, even though it was a

15  really long time ago.

16          But all those -- I mean, to me, those were very

17  different cases where there was a determination that there was

18  a facially plausible claim, and it was a preference.  And as

19  Your Honor knows better than I do, a preference to me is a much

20  more objective situation than -- than actual or constructive

21  fraudulent transfer.

22          And you know, in <u>Pillowtex</u> in particular, the case

23  was remanded because the Third Circuit felt like that issue had

24  to be resolved.  And I think there, the Court had a concern

25  that we understand that the firm's willing to pay back a

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8  2022 Hearing LTL Management  LLC  Ch. 11  Case No. 21-30589  Page 59 of 132

59

1  preference if it's determined that way, but we also think, as

2  debtor's counsel, you're potentially in a position to determine

3  whether that litigation is even pursued.

4        And that to me is very different from the situation

5  here, particularly where we've already said that -- that we

6  wouldn't be involved if -- if there is a -- if this court were

7  to find that derivative standing is appropriate, that there are

8  colorable claims that could be asserted, again, we wouldn't --

9  we wouldn't stand in the way of that.  And Jones Day wouldn't

10  be involved.

11        And then the -- you have this New Jersey case, the

12  Banco Popular case, which is cited as really the only basis for

13  saying that Jones Day itself has liability for a fraudulent

14  transfer.  And I'm sure Your Honor has read the case by now,

15  but to us that's a very different case on a very egregious set

16  of facts and at a very early stage in the case, and just really

17  talking about what you could plead in the face of facts where

18  it seemed pretty clear the attorney was in that case complicit

19  in some misrepresentations that were made in connection with a

20  loan.

21        Next slide, please.

22        And again, I won't spend much time on this.  This

23  came up in the more recent briefing, this Plastronics case.

24  This was actually a Texas Divisional Merger case.  And again, I

25  think it's cited for the purpose of trying to establish that

60

1   Jones Day has a disabling conflict because we did something

2   where we were involved in a transaction that achieves something

3   similar.

4           And I would just submit that the <u>Plastronics</u> case is

5   easily distinguishable.  Again, a very egregious set of facts

6   where a contract was entered into with respect to payment of

7   royalties and a divisional merger was subsequently undertaken,

8   I think, to basically undercut the agreements in that contract,

9   to directly undercut them.

10          Next slide, please.

11          And then there was the suggestion that we have a

12  disabling conflict because we have a business interest in a

13  successful outcome.  And I would submit, even if that were

14  true, that's a positive, not a negative.  And we've cited to

15  the Rules of Professional Conduct that, you know, we're to

16  represent the debtor with commitment and dedication to its

17  interests and with zeal and advocacy on its behalf.

18          And this debtor strongly desires to resolve this case

19  as quickly as possible and to reach a trust that would pay out

20  -- pay out equitable amounts to similarly situated current and

21  future claimants.  And that's what our -- I hope our

22  representation has demonstrated to date, that that's what we're

23  -- that's not only what LTL is committed to, but what the

24  debtor -- I'm sorry, what Jones Day is committed to as well.

25          Next slide, please.

61

1          This is largely to show that the criticisms just

2   seemed to -- to devolve -- the criticisms in terms of actions

3   undertaken in the case to date just seemed to devolve down to

4   criticisms that we're not doing what the Plaintiffs want us to

5   do.

6          And so the fact that we supported a divisional

7   merger, well, I think as Your Honor found, that was a valid

8   state transaction.  No one's come up with a basis to argue that

9   it was done in violation of Texas law or any other law.  They

10  focused on the venue, but, you know, as we argued to Judge

11  Whitley in North Carolina without success, we thought that was

12  an appropriate forum based on efficiencies that would result

13  because of its prior knowledge and experience with these cases.

14         They've taken issue with the fact that we requested

15  the injunctive relief we did, which Your Honor granted, but

16  that's -- that's threshold relief in these mass tort cases.

17  It's been granted in most cases where it's been needed, if not

18  every case where it's been needed.

19         They took issue with the fact that we would argue

20  that there was an indemnity between the debtor and J&J and

21  JJCI, but as Your Honor knows again from the evidence, that

22  went all the way back to transactions that occurred in 1979.

23         They took issue with the fact that we moved to

24  appoint an individual as FCR.  Again, that was all in

25  furtherance of having this case move forward.  As Your Honor

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 62 of 132

62

1    knows from prior hearings, we -- our goal was to get an FCR in

2    place as soon as possible, get the mediation as soon as

3    possible.  And that's all consistent with the interests of the

4    debtor.

5            And then, of course, the qualified settlement fund,

6    there was criticism about that and there continues to be, as I

7    understand it, objections to that, even though from our

8    perspective, that's nothing but a benefit to the claimants and

9    that -- you know, that matter will be heard later.

10           Next slide, please.

11           So in some respects, I guess the -- you know, the

12   question is who's trying to gain an advantage here and what is

13   -- what is happening?  Again, we've made clear that in terms of

14   potential fraudulent transfer litigation, if there are any --

15   if there are any basis to do that, we won't be involved in

16   that.

17           The other side has already said very forcefully to

18   Your Honor that they intend to pursue derivative standing.

19   And so that issue will be teed up.  If -- if we were to choose

20   to object to that on the basis that the claims aren't

21   colorable, whatever they might be, Jones Day would not be

22   involved in that.  Mr. DeFilippo can handle that, and we'll

23   just stay out of it.

24           And so, you know, given that -- given those

25   circumstances, and given the fact there's not a concurrent

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 63 of 132

63

1 representation that creates a problem, given the fact there's

2 not a potential conflict that's anything other than completely

3 remote if it exists at all, then what is -- what purpose would

4 be served by disqualifying the firm?

5          And, you know, that in my mind raises the question of

6 whether this is just a litigation tactic to try to shunt the

7 firm aside and bring someone else in.

8          Next slide, please.

9          There was also an argument made under Rule of

10 Professional Conduct 3.7 that we should be disqualified

11 because we would be a witness.  And, you know, the one thing I

12 would say to this is, boy, if this were accepted as a basis for

13 disqualification, you could probably gen up an argument -- this

14 argument up in virtually every case, given the fact that

15 lawyers in every case pretty much are representing a debtor or

16 a party in connection with the bankruptcy prior to the filing.

17 And you just have to come up with some dispute and say, I would

18 plan to depose the law firm or take discovery from the law

19 firm, so I would submit this isn't an appropriate basis.

20          And it's particularly not because, you know, were we

21 representing J&J in connection with the restructuring?  Yes.

22 Would that make us a witness?  No.  I mean, we were serving as

23 counsel.  That's the role we were serving in.  Our advice would

24 be privileged or otherwise protected and not discoverable.

25          And to us that just would not be at all a basis to

64

1  argue that there should be a disqualifying -- or

2  disqualification of the firm.

3          Next slide, please.

4          Alternatives.  Next slide.

5          So, because of this concern about the corporate

6  restructuring, should we be disqualified?  The answer is no.  I

7  mean, this is effectively, again, an issue that's moot based on

8  the position we've taken.

9          And obviously, I've just -- we provided the quote of

10 part of what I said to Your Honor at the conclusion of the

11 dismissal hearing with respect to either an examiner or

12 derivative standing.

13         Next slide, please.

14         You know, Caesars, the Court recognized there were

15 better solutions than disqualification that should be

16 considered.  And obviously the reason for that is because I

17 think courts try to have the debtor -- or try to permit a

18 debtor to use the counsel of its choice, unless there's

19 something that's so egregious that that's not appropriate.

20         We -- we try to make clear, both in our pleadings and

21 in the additional declarations, one from Mr. Kim, one from Mr.

22 Haas on behalf of J&J, that all are basically supportive of or

23 in agreement that there could be conflicts counsel to step in,

24 in the event there's ever any kind of conflict that comes up in

25 the future, which again, we don't foresee.  But we just wanted

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 65 of 132

65

1   to cover that off that our client, LTL, and J&J has been the

2   focus of so much of the substance of the objections.  They've

3   both agreed that that's not an issue.  They're okay with that.

4           Next slide, please.

5           And, of course, a reservation of rights is also

6   appropriate.  And we've seen a reservation of rights used in

7   the Paddock case.  And it was used in the three North Carolina

8   cases as well, with basically the concept being that you have

9   the right to seek -- any appropriate relief in the future is

10  fully preserved, as are the debtor's corresponding rights.

11          So in other words, if something comes to light in the

12  future, you're not foreclosed from raising it in the future.

13  And part of that, you know, I think at least I can say in the

14  North Carolina cases, the debtors were willing to agree to

15  that, because we -- we could not foresee that ever happening.

16          In all of these cases, we've attempted to be very

17  transparent about what we've done.  We've tried to be very

18  fulsome with the disclosures we've made, not only in terms of

19  our representations, but also in terms of the transactions that

20  were done.

21          And so I think we're comfortable based on that, that

22  a reservation of rights is appropriate.  It's probably the law

23  anyway, that if something were to come to light later that

24  showed there was a problem that it could be brought up later,

25  but that could be utilized here as well.  And we're -- that's

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 66 of 132

66

1  -- that's perfectly acceptable to us to have similar language

2  in a retention order here.

3           Next slide, please.

4           So just to sum up, the debtor's choice of counsel is

5  entitled to deference.  We would submit the objectors have not

6  met their burden to show that we should be disqualified.  We

7  think the record is clear that the debtor has no actual or

8  potential conflict within the meaning of Section 327.  Among

9  other things, the interests of the debtor, J&J, New JJCI,

10 they're all aligned.

11          You know, in these other cases in North Carolina,

12 we've not been disqualified.  It hasn't even been argued

13 before.  And, you know, here, we try to make it clear that

14 conflicts counsel is available.  We're okay with that.  We'll

15 stay out of issues that we think potentially create a conflict

16 for us.

17          Also, as I've indicated, the reservation of rights, a

18 language we're comfortable with.  And so we would submit that

19 it makes sense and it would be beneficial to the debtor and for

20 the estates to have the company move forward with its chosen

21 counsel, Jones Day, and we would ask Your Honor to approve our

22 retention application.

23          THE COURT:  All right.  Thank you, Mr. Gordon.

24          MR. GORDON:  Thank you.

25          THE COURT:  Mr. Pfister.

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 67 of 132

67

1          MR. PFISTER:  Still morning.  So good morning again,
2    Your Honor.

3          THE COURT:  Still morning.

4          MR. PFISTER:  Rob Pfister from the Klee Tuchin firm
5    on behalf of Aylstock Witkin.

6          I have three preliminary points and then two main
7    points.  Preliminary notes, number one, I'm glad I lost back in
8    December and that Jones Day is getting paid for all the work
9    they've done through the trial.  This is not about whether
10   Jones Day should be paid for the work that they have done; they
11   certainly should.  And so that was a battle that I lost and --
12   and pleased I did.

13         Second, no issues certainly from me.  I won't speak
14   for the other objectors.  But regarding this, you know, sliver
15   of work that Jones Day has done on behalf of J&J regarding IP
16   and other matters where Jones Day was apparently their longtime
17   counsel in certain of those matters, I don't view those as --
18   as an issue.

19         And then the third preliminary point, I'm not going
20   to deny that this court's rulings on February 25 are something
21   of an earthquake in many respects, but at least as to this, in
22   terms of changing the landscape of what we're arguing.  So I'm
23   certainly not going to go into certain other points that had
24   they -- had the rulings come out differently that we might
25   otherwise be talking about.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 68 of 132

68

1          So with those preliminaries, let me make my two main

2   points.  Under any version of the facts here, this bankruptcy

3   case was filed for the benefit of Johnson & Johnson.  The

4   record is clear that Jones Day, which hadn't previously

5   represented Johnson & Johnson in talc litigation matters, that

6   was Skadden, Jones Day approached Johnson & Johnson with a

7   solution for the talc liability that Johnson & Johnson was

8   facing.

9          Jones Day came in with a proposal to do this Texas

10  Two Step or divisive merger, or however you want to call it,

11  and said, you know, here's a plan for how we can deal with

12  this.

13         They have then proceeded from that first approach

14  forward until, you know, through and including today, to

15  continue to execute that plan.  In doing so, I don't think

16  there's any doubt that the benefit or the entity that is being

17  benefitted ultimately is Johnson & Johnson.

18         That being the case -- and I don't think there's any

19  dispute as to any of those points -- you know, the Court -- the

20  Court in its February 25 opinion, you know, praised the

21  debtor's transparency in saying, look, everybody knows what's

22  going on here.  Nobody's trying to hide anything.  Mr. Gordon

23  is, you know, saying the debtors are transparent.

24         Well, if we're going to be transparent, let's be

25  completely transparent.  Why are we going through the charade

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 69 of 132

69

1  of saying that something happened on October 12th when Jones

2  Day allegedly got this letter from its now former client

3  Johnson & Johnson terminating the representation and another

4  law firm, White & Case, was hired by Johnson & Johnson and gets

5  dragged to court for every hearing, doesn't say anything, but

6  is here, you know, technically formally representing Johnson &

7  Johnson.

8          You know, why -- what is the point of doing any of

9  this?  And I'll just say, you know, parenthetically, if Jones

10 Day had approached Johnson & Johnson earlier in 2021 and said,

11 Let's do this great Texas Two Step, had proceeded to execute

12 everything and then had stayed counsel for J&J, this wouldn't

13 be an issue.  Then have the new debtor, the newly created, you

14 know, LTL entity hire White & Case and, you know, let White &

15 Case do the debtor work.

16         You know, I'm not saying the Two Step would be okay.

17 It certainly wouldn't from, you know, from my view, but again,

18 that's not what we're here arguing today, but there wouldn't be

19 an issue.  But what -- you know, it's just not credible to

20 assert that on October 12th, when LTL was created, Jones Day

21 took off its J&J hat and that is now a former representation

22 that has been concluded and that now Jones Day is here only

23 representing the debtor in this case and that White & Case,

24 which again, I mean, I've been to every hearing in this case, I

25 don't think I've ever heard them say anything, and that was the

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 70 of 132

70

1  party on whose behalf all of these proceedings are being

2  carried on.  That's the first main point.

3       Second and last point, this goes to Jones Day as a --

4  you know, as a business.  And we are, of course, a profession,

5  but lawyers are also -- there's a business of law.  And the

6  fact of the matter is, again, whatever you think of the Texas

7  Two Step, this is something new under the sun.

8       It may be as Mr. Gordon believes, you know, the

9  greatest thing for corporate America since sliced bread.  It

10 may be not the greatest thing since sliced bread.  I think Your

11 Honor's opinions recognize that, you know, this won't be the

12 last word on the topic and courts will continue to examine

13 this.  But nobody thinks, or nobody at least I've heard, has

14 failed to acknowledge the reality that this is something brand

15 new.

16      And this brand new thing has been developed by Jones

17 Day.  They have sold this to, you know, four prior courts -- or

18 four prior clients, rather.  And then again, they came to

19 Johnson & Johnson and said, Have we got a plan for you, you

20 know, let's do this.  No other law firm has done this.  No one

21 else is filing these cases.

22      I don't know, you know, what cases may be filed in

23 the future, but I wouldn't be surprised if Mr. Gordon's phone

24 is ringing off the hook these days.  And the fact of the matter

25 is that Jones Day as a business has a vested interest in this

71

1  Two Step itself working, not in the success of the debtor LTL,

2  but in the Two Step process itself.

3         So, you know, what does that mean?  That could mean

4  that if there are other options -- so -- so as long as

5  everything goes according to the playbook, right, and you know,

6  there's a settlement in the 524(g) trust, everything else

7  confirmed, everything has gone according to the Jones Day

8  playbook, they say, Great, it's all kosher.

9         What if at any point in the process someone wants to

10 go off the track a little bit?  What if on October 12th, after

11 the new LTL entity was created, then it wouldn't have happened,

12 because these are all former J&J people who are just secunded,

13 their ultimate loyalty, ultimate interest is to J&J, but what

14 if they did have independent advice?  What if they were

15 represented by somebody who was looking out solely for the

16 entities' interests, right?  Would the advice have been the

17 same?  I'm not sure it would have been,

18        Again, if you accept the Two Step construct that this

19 is a way for an entity to shed liability and that, of course,

20 the subsidiary is going to do what the parent entity wants,

21 then yes, what they did all makes sense.

22        What if you don't accept that construct?  What if you

23 say on October 12th, Hey, you know what, I have this new

24 entity, I have this unlimited funding commitment, you know,

25 commitment, maybe I'll start negotiations, maybe I'll do

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 72 of 132

72

1  something else.  The fact of the matter is we'll never know,

2  right?

3          Same point.  What if there comes a point in this case

4  when the debtor, which, you know, has significant rights under

5  this multi-billion dollar funding agreement, what if there

6  comes a point when it would be beneficial for the debtor to

7  take some position that, again, veers off the track that's been

8  created by the law firm?  Can we have any expectation that they

9  are going to get advice in that regard?  I don't think we can.

10          So again, I'm recognizing in my argument the impact

11  and effect of the Court's rulings on February 25.  But if we're

12  going to be transparent, let's be transparent.  Why are we

13  going through this charade?  And maybe in the next Texas Two

14  Step, Jones Day will just represent everybody throughout the

15  entire case.  It will represent the parent, it will represent

16  the debtor, it will represent, you know, settlement trustee.  I

17  mean, you know, who knows?  It could represent everybody.

18          But there's a reason that they at least tried to

19  paper the file with, On October 12th, your representation has

20  concluded and you are now a former client.

21          It's just not credible, Your Honor.  And that's all I

22  have.  Thank you.

23          THE COURT:  All right.  Thank you, Mr. Pfister.

24          Mr. Jonas.

25          MR. JONAS:  Good morning, Your Honor.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 73 of 132

73

1              THE COURT:  Good morning.

2              MR. JONAS:  Jeff Jonas from Brown Rudnick for TCC1.

3              Your Honor, let me just start by saying that I have

4   great respect for Mr. Gordon and Ms. Brown and their firms.

5   Our retention objections are not in any way attacks on those

6   firms.  Rather, they're based on the facts and the law as we

7   see it.  And we believe the retentions -- and I'll first

8   address of course only the Jones Day retention, but based on

9   the facts and the law, we believe the retentions are not

10  appropriate.

11             And Your Honor, I also appreciate the Court's ruling

12  on the motions to dismiss.  And that said, you know, the ends

13  don't justify the means.  That is, not withstanding your

14  rulings, these retentions have to be examined independently.

15             And with that, Your Honor, I'll just say there --

16  there's been -- I'll be brief today.  There have -- we've filed

17  a number of -- a number of pleadings, including some

18  substantial layout of the cases and the facts as we see it and

19  references to the trial and -- and the record.

20             And so I won't repeat any of that as set forth in our

21  papers, which we rely on as well.  But rather, I'd just

22  summarize and highlight a very few key points.

23             And most critically and fundamentally, Your Honor,

24  Jones Day -- Jones Day's representations now are -- it's a

25  little bit of what Mr. Pfister said in a slightly different

74

1  way.   They are continuations of the pre-petition work for

2  Johnson & Johnson and Old JJCI.

3          Jones Day spent months and earned millions of dollars

4  working for J&J and Old JJCI on the strategy and the structure

5  of this debtor and its bankruptcy case.   As demonstrated and I

6  think proven at the motion to dismiss trial, Jones Day was on

7  all sides of everything.   They developed and implemented this

8  bankruptcy strategy for Johnson & Johnson.   And again, I don't

9  think there's any question about that.   There was no

10 negotiation of anything, most notably the funding agreement,

11 and the bankruptcy's sole purpose is to address J&J and what

12 was Old JJCI's talc liability.

13         So it is really dancing on the head of a pin to say

14 that on October 12th, again, echoing Mr. Pfister's argument,

15 but to say that on October 12th, when the debtor was born,

16 Jones Day stopped working for Johnson & Johnson.   It's simply

17 not believable to expect that on October 12th and since then

18 Jones Day could set aside its allegiance to J&J and take on the

19 debtor's duties to talc claimants who are directly adverse to

20 J&J.

21         More concretely, it's neither reasonable nor fair to

22 expect that Jones Day could or would challenge, never mind

23 prosecute an action if necessary, the Texas Two Step as a

24 fraudulent transfer or otherwise, or the funding agreement,

25 including to bring claims in connection with the funding

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 75 of 132

75

1  agreement, if necessary.

2         And remember, Jones Day continues to work directly

3  for J&J on other matters.  As Judge Friendly in the <u>Matter of</u>

4  <u>Ira Haupt</u> case, Second Circuit case from 1966, said, quote, The

5  conduct of bankruptcy proceedings not only should be right, but

6  must seem right, close quote.

7         These retentions are neither right, nor seem right.

8  The motion to dismiss trial testimony, including that of Mr.

9  Wuesthoff, showed the debtor's lack of independence from

10 Johnson & Johnson.  And I appreciate again the Court's ruling,

11 and it is what it is, but I would repeat the fact that, in

12 effect, the debtor is not independent from J&J.  And the Court

13 and the world at large, watching the trial, witnessed J&J's

14 in-house litigation lawyer, Mr. Haas, sit in the well of the

15 courtroom and direct Jones Day and the debtor's personnel in

16 carrying out the motion to dismiss trial.

17        They are neither officers of the debtor, all of whom

18 are secunded from Johnson & Johnson, or lawyers who are truly

19 independent of Johnson & Johnson.  The Jones Day time records

20 we've seen to date indicate constant interaction with Mr.

21 Haas and other J&J lawyers, including regarding critical

22 strategic issues.

23        The Court has determined this debtor's bankruptcy was

24 not filed in bad faith and should remain in bankruptcy.  The

25 least that creditors, in this case talc claimants, should be

76

1  afforded is to be able to rely on the debtor and its

2  professionals meeting their duties to creditors so they -- so

3  that they can at best get a fair shake.  We think that's

4  impossible here.

5       As set forth in our papers, the foregoing facts

6  support denial of Jones Day's retention under 327(a), based on

7  both there being an adverse interest and Jones Day not being a

8  disinterested person.  And we believe that the record

9  demonstrates both actual and potential conflicts, requiring

10 that Jones Day's retention be denied.

11       Thank you, Your Honor.

12       THE COURT:  Thank you, Mr. Jonas.

13       Mr. Sponder.

14       MR. SPONDER:  Is it morning or afternoon?  Good

15 morning, Your Honor.

16       THE COURT:  It's still morning.

17       MR. SPONDER:  Good morning.  Jeff Sponder from the

18 Office of the United States Trustee.

19       Your Honor, the United States Trustee objects to the

20 retention of Jones Day because Jones Day's employment by the

21 debtor is a blatant and indisputable conflict of interest that

22 should disqualify it from service under even the most lenient

23 readings of the Bankruptcy Code and the ethical canons.

24       And to be clear, Your Honor, we're not talking here

25 about a mere appearance of conflict, a speculative future

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 77 of 132

77

1  conflict, or the possibility of a conflict.  The conflict here

2  is actual, present, and palpable.

3         As the Court is well aware, the divisive merger, also

4  referred to as the Texas Two Step, that led to the creation of

5  the debtor, is a central issue in this case.  Even though the

6  Court denied the motion to dismiss, the transactions by which

7  the debtor came into existence and the events leading up to the

8  October 4th -- October 14th, 2021, bankruptcy filing will

9  continue to loom large in this case.

10        Jones Day's prominent role in these events is the

11 reason why it should not be approved as counsel for the debtor.

12 Jones Day's pre-petition work for non-debtors J&J and JJCI that

13 led to the debtor's creation will continue to be under a

14 microscope in this case.

15        As the Court noted in your -- in the opinion on the

16 motions to dismiss, and I quote, Remedial creditor actions

17 addressing the pre-petition divisive merger and restructuring

18 remain available for creditors to pursue if necessary.  And

19 that's at page 32 of 56 of the opinion.

20        Your Honor, I'll first set the stage for the Court by

21 summarizing the evidence on Jones Day's involvement in the

22 divisive merger and its prior and continuing role on behalf of

23 J&J, JJCI, Old JJCI, and New JJCI.  I will then present how,

24 based on these details, Jones Day clearly does not meet 327(a)

25 standards as it represents an interest adverse to the estate

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 78 of 132

78

1 and is not disinterested.

2       Further, Your Honor, Jones Day's retention violates

3 applicable rules of professional responsibility, in particular

4 as counsel from that firm will certainly be key witnesses in

5 the inevitable fraudulent transfer litigation that is to come.

6       Jones Day admits it worked closely with J&J officers

7 to structure and implement the divisive merger.  And that's at

8 Docket 1190-1, Your Honor, at paragraph 6.  In paragraph 10 of

9 its reply, which was filed on January 18th, 2022, Jones Day

10 touts its prior representations of J&J and the now non-existent

11 Old JJCI in the restructuring and announces that the work it

12 performed for these other clients, and I quote, facilitated

13 Jones Day's knowledge of the assets and liabilities allocated

14 to the debtor and contributed to Jones Day's experience in this

15 complex area.  That's also at 1190, Your Honor.

16       Jones Day even cites its work assisting J&J and JJCI

17 to deposit their liabilities into the debtor as a basis for why

18 the Court should approve its retention.  Jones Day readily

19 admits that during the eight months immediately preceding the

20 bankruptcy filing, Jones Day represented J&J and JJCI in

21 formulating, structuring, documenting, and implementing this

22 bankruptcy case and the 2021 divisive merger that created the

23 debtor.

24       All but one of the directors and officers of the

25 debtor are long-standing J&J employees.  And that's from the

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 79 of 132

79

1  February 14th, 2022, hearing transcript at page 97, lines 7

2  through 10, and who have been secunded to the debtor.  The one

3  director that has not been secunded is Mr. Deyo, who is a

4  purported independent director and also a former J&J employee.

5        In its reply, filed before the motion to dismiss

6  trial, Jones Day stated that its professionals work closely

7  with individuals who now serve in the debtor's management, as

8  well as other professionals who had been advising J&J and Old

9  JJCI.  That as well is paragraph 6 in Docket Entry 1190-1.

10        Your Honor, the trial testimony, however, painted a

11  different picture.  Robert Wuesthoff, the debtor's president

12  and one of its three board members, was not approached about

13  becoming the debtor's president until a mere two weeks before

14  the debtor's formation, despite having no professional or other

15  experience with bankruptcy, talc litigation, litigation of any

16  kind, or the concept of fiduciary duties.

17        While Jones Day was working for eight months, Mr.

18  Wuesthoff wasn't offered the job until late September or early

19  October, and he didn't accept it until October 8th, 2021.

20        Clearly, Your Honor, he was not a member of debtor's

21  management with whom Jones Day worked closely.  In fact, at

22  trial, Mr. Wuesthoff did not know who Mr. Gordon was, and

23  Committee counsel had to explain he was lead attorney for the

24  debtor's bankruptcy case.

25        Important transactional documents, such as the

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8   2022 Hearing LTL Management    LLC   Ch. 11   Case No. 21-30589   Page 80 of 132

80

1    funding agreement, were not negotiated by the debtor or even

2    Old JJCI officers, including Wuesthoff and Goodridge.  Indeed,

3    the debtor's participation would have been impossible as it did

4    not exist at the time the agreements were finalized.

5            Jones Day argues in its reply that it is debtor's

6    chosen counsel and debtor's choice should be given great

7    deference.  And that's also at 1190.  However, Your Honor, the

8    debtor never chose Jones Day.  In his initial certification,

9    Mr. Gordon states the debtor was assigned the Jones Day

10   engagement with Old JJCI.  Clearly Jones Day was J&J's choice

11   of counsel for the debtor.  It was not a choice made by the

12   debtor.  And as with the rest of the transaction, Jones Day is

13   in place to benefit J&J.

14           Even the debtor's officers know LTL was created to

15   benefit J&J.  As testified to by the debtor's president, the

16   divisive merger was done to assume the J&J conglomerates talc

17   liabilities.  And that's the February 14, '22 hearing

18   transcript at pages 134, line 25, to page 135, line -- through

19   line 13.

20           Similarly, Your Honor, John Kim, the debtor's chief

21   legal officer, testified that the purpose of the debtor was to

22   assume all the talc liability of the J&J conglomerate, file for

23   bankruptcy, and use the debtor's filing to stay all talc-

24   related litigation against J&J.  And that's the -- from the

25   February 15, '22 hearing transcript at pages 194, lines 6

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 81 of 132

81

1 through 9, 196, lines 1 through 16, and 199, lines 15 through

2 23.

3          As I'm sure Your Honor knows, the requirements of

4 Section 327 cannot be taken lightly for, and I quote, they

5 serve the important policy of ensuring that all professionals

6 appointed pursuant to Section 327(a) tender undivided loyalty

7 and provide untainted advice and assistance in furtherance of

8 their fiduciary responsibilities.

9          And that quote comes from Rome v. Braunstein, 19 F.3d

10 54.   That's the First Circuit, 1994.

11          Here, Your Honor, Jones Day has a disqualifying

12 conflict.   It is not disinterested.   Pre-petition Jones Day

13 engineered and guided J&J and Old JJCI through the divisive

14 merger to limit exposure to present and future claimants.

15          As the Court noted in its opinion on the motions to

16 dismiss, and I quote, It is unsurprising that J&J and Old JJCI

17 management would seek to limit exposure to present and future

18 claims.   Their fiduciary obligations and corporate

19 responsibilities demands such actions.   And that's at page 31

20 of 56.

21          To protect the interest of J&J and Old JJCI, Jones

22 Day literally placed billions of dollars of talc liabilities

23 into the debtor to create an entity whose only significant

24 asset is the right to assert payment under a funding agreement

25 from Jones Day's former clients, J&J and JJCI, the same clients

82

1  that now have a fiduciary obligation to their shareholders to

2  pay as little as possible for a release.

3        Now Jones Day's fiduciary duty is owed to the

4  debtor's estate, the talc claimants, and its mandate is to

5  maximize their recovery.  Maximization, though, necessitates

6  aggressive action to obtain the maximum amount possible through

7  implementation of the very documents Jones Day drafted to

8  minimize J&J and JJCI's liability.

9        In the recent decision on the motions to dismiss,

10  Your Honor made some observations about the likely path forward

11  in these cases.  And Your Honor identified two specific matters

12  that are going to basically determine the outcome of this case.

13  These matters are first the question of what J&J's obligations

14  to the debtor are under the funding agreement and secondly,

15  what are the potential legal claims the debtor has against J&J

16  due to the divisional merger, whether under a theory of

17  fraudulent transfer or otherwise.

18        Now, Your Honor, it is significant that these are

19  both matters on which the debtor and J&J are absolutely adverse

20  to one another and on which Jones Day itself seems to be on

21  both sides at once.

22        Let's start with the funding agreement, which, as

23  many testified, is the most valuable asset owned by the debtor.

24  The funding agreement is the creation of Jones Day.  It was

25  paid for -- it was paid for this work by J&J.  The value of the

83

1  funding agreement asset is unknown as it was not quantified at

2  the time it was created.  This is certainly an area of dispute

3  and an issue for which Jones Day is -- Jones Day will be called

4  upon to provide testimony.

5        It's important to note that once the debtor filed for

6  bankruptcy, the backstop obligations of the funding agreement

7  went away and were replaced with a promise by J&J to fund the

8  debtor's bankruptcy trust.

9        Your Honor, how much does J&J need to pay and what

10 are they supposed to get in return?  The funding agreement

11 doesn't say.  And as the debtor has admitted, these are numbers

12 that are going to have to be decided through negotiation.  And

13 the debtor, as well as Jones Day as its counsel, will have a

14 fiduciary obligation to maximize the amount of funding the

15 debtor gets out of J&J at these negotiations.

16       The problem for Jones Day is that it would be

17 negotiating over a transaction that it designed when it was

18 working for J&J on the other side of the table.  Is Jones Day

19 really going to sit down and tell J&J that it needs to pay more

20 than it thought it was going to have to pay, regardless of what

21 its old lawyer assured?  Jones Day can't, Your Honor, and

22 won't, because Jones Day is that previous lawyer.

23       This conflict becomes even more egregious when we

24 look at some of the potential claims of the debtor against J&J

25 outside of the funding agreement.  As we pointed out, as the

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 84 of 132

84

1  Committee has pointed out, as just about every commentator who

2  has been following this case has pointed out, and as Your Honor

3  yourself mentioned in your dismissal opinion, the divisional

4  merger and the possibility of avoidance actions arising from

5  that merger are issues that are going to need to be very

6  closely looked at.

7          And these are not trivial issues.  If the divisional

8  merger was a fraudulent transfer, which is the position that

9  the Committee has taken, then the estate may have as much as a

10  60 billion -- and that's billion with a "B" -- judgment against

11  J&J.  And it's the debtor's fiduciary duty and Jones Day's duty

12  as the debtor's proposed counsel to investigate those claims

13  and to recover whatever it can for the benefit of creditors.

14          But that's not what the debtor and Jones Day have

15  done, Your Honor.  Instead, from day one of this case, they

16  have loudly taken the position that these claims are worthless,

17  that they don't exist, that they have no intention of

18  litigating or even looking very closely at them.

19          In fact, the debtor sets forth that, and I quote, it

20  clearly would never investigate the restructuring as a possible

21  fraudulent transfer, let alone ask Jones Day to do so.  And

22  that's docket 1190-1 at paragraph 43.

23          As such, Your Honor, Jones Day can neither

24  investigate the divisive merger, which it orchestrated, nor can

25  Jones Day fulfill its fiduciary obligations to the estate

Case 23-01092-MBK  Doc -2  Filed 05/29/23  Entered 05/29/23 18:03:43  Desc
Transcript March 8  2022 Hearing LTL Management  LLC  Ch. 11  Case No. 21-30589  Page 85 of 132

85

1 without the ability to investigate fraudulent transfers,

2 including the divisive merger.

3       And it is frankly shocking and incredible that a

4 lawyer for a debtor-in-possession would simply walk away from a

5 potential multi-billion dollar asset like this.  Shocking, Your

6 Honor, but understandable, because the reality of the situation

7 is that Jones Day is not an impaired observer in this dispute.

8 Jones Day was the architect of the alleged fraudulent transfer,

9 and that makes Jones Day an obvious investigation target and

10 potential defendant.

11       If the transfer is invalidated, Jones Day may have

12 issues with J&J.  In any case, Your Honor, there is no question

13 that Jones Day's personal interests are so tied up with the

14 outcome of any fraudulent transfer action that they cannot be

15 expected to act as a fiduciary on behalf of the debtor.

16       Additionally, as a result of its integral involvement

17 with the divisive merger, Jones Day will most assuredly be a

18 primary fact witness, which will call into question such

19 ethical rules that prohibit attorneys from serving as counsel

20 in the case where they are likely to appear as a fact witness

21 on a significant issue.

22       Not only will Jones Day be a witness in such a case,

23 it may also be a defendant in the litigation.  Jones Day may

24 bear equal liability to the estate and its creditors.

25       Again, Your Honor, through its retention application,

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8   2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 86 of 132

86

1  Jones Day seeks to continue representing the debtor and

2  pursuing J&J, JJCI strategy that Jones Day developed and

3  orchestrated for the benefit of J&J and JJCI.

4         Although there is no doubt of Jones Day's capability,

5  as has been seen throughout this case, the Court and interested

6  parties are now being asked to believe that Jones Day is

7  beholden only to the debtor and not J&J and JJCI.  How can this

8  be?

9         As the strategy implemented by Jones Day on behalf of

10  J&J and JJCI commenced pre-petition and continues through this

11  bankruptcy, how can Jones Day not be beholden to J&J and JJCI?

12  Advice that Jones Day -- I'm sorry, Your Honor.  Advice that

13  Jones Day purportedly delivers to the debtors is actually

14  delivered to J&J, JJCI through secunded employees.

15         In fact, the monthly fee statements filed by Jones

16  Day provides that there was direct reporting to J&J from Jones

17  Day.  The monthly fee statements filed by certain other debtor

18  professionals also reveal multiple weekly calls with senior J&J

19  executives.

20         Your Honor, we would also like to respond to the

21  debtor's suggestion that if the Court finds that Jones Day is

22  conflicted on matters relating to the funding agreement and the

23  merger, it could cure that conflict by requiring the

24  appointment of conflicts counsel.

25         While that approach might have some merit in a case

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 87 of 132

87

1  where the conflict involved a minor or peripheral matter, it is

2  not an adequate solution in a case like this, where the

3  conflicts involve the largest contested matters in the case and

4  basically permeate the entire plan process.

5        And on this point, Your Honor, we would refer you to

6  the Bankruptcy Court for the Southern District of New York,

7  it's analysis in the <u>In re Project Orange Associates, LLC</u>, at

8  431 Bankruptcy Reporter 363, which found that conflicts counsel

9  is not a cure for disqualifying conflict where the conflict

10  involves a matter that is central to the case.

11        And that same analysis applies here, Your Honor, and

12  the results should be no different if the Court chooses to

13  grant the Committee derivative standing on some of these

14  matters, although we note that no such motion for standing has

15  been filed yet, and it's not clear if the debtor would even

16  support or resist that motion.

17        The U.S. Trustee understands the potential prejudice

18  to the debtor should its chosen counsel be denied and that case

19  law suggests that debtor should be allowed to choose their

20  specific counsel.  However, Your Honor, the Court should not be

21  persuaded by any prejudice the debtor may allege if Jones Day

22  is disqualified.  Even as recently as the trial and the motions

23  to dismiss, and as I've said before, the debtor's president

24  didn't even know who Mr. Gordon was.

25        Further, the U.S. Trustee was clear, Your Honor, from

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 88 of 132

88

1    the first hearing in his position that the retention issue

2    should have been decided at that time.  As set forth in the

3    interim retention orders entered in this case, Jones Day was

4    well aware of the retention issues and despite their existence

5    agreed to continue to represent the debtor voluntarily and

6    knowingly and assume the risk of the Court denying its

7    retention.

8          Jones Day's pursuit of its strategy developed in

9    representing J&J and JJCI pre-petition and its continuation of

10   such strategy post-petition renders Jones Day not disinterested

11   and adverse to the estate.

12         Litigation over what J&J's obligations to the debtor

13   are under the funding agreement and litigation of potential

14   claims by the debtor against J&J due to the divisional merger

15   place J&J and the debtor adverse to one another and on which

16   Jones Day itself seems to be on both sides.

17         Jones Day will also certainly be a fact witness in

18   any litigation, including fraudulent transfer litigation

19   arising from that divisional merger.

20         Your Honor, for the reasons set forth on the record

21   today, as well as the reasons set forth in the United States

22   Trustee's objection, as well as the other objections, the

23   United States Trustee respectfully requests that the Court

24   sustain its objection and enter an order denying the debtor's

25   retention of Jones Day.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 89 of 132

89

1          I thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Sponder.

3          Mr. Sponder, did the U.S. Trustee file any written

4    supplemental objection?

5          MR. SPONDER:  There was no supplemental objection

6    filed, Your Honor, just the regular objection.

7          THE COURT:  Back in November?

8          MR. SPONDER:  I don't know exactly when it was filed.

9          THE COURT:  Okay.  I raise the point only because you

10   obviously read through quite a bit of argument that included

11   citations, elements of the transcripts, and yet without having

12   a written in advance -- a written product, it kind of deprives

13   the Court of the ability to truly comprehend the meaning of the

14   citations or look at the precedent that has been cited.  It

15   somewhat handcuffs the Court, just for the future.

16         MR. SPONDER:  My apologies for that, Your Honor.  And

17   I try not to file too many things when there's no -- when --

18   when there's nothing that says you can file, can't file.  I did

19   see those that were filed.

20         THE COURT:  Clearly, nobody has been inhibited in

21   this case.

22                       (Laughter)

23         MR. SPONDER:  That's my point, Your Honor.  But, you

24   know, I typically stick to that point.

25         THE COURT:  And I appreciate the workload.  It's just

90

1 a matter of being able to absorb from -- from the oral argument

2 is somewhat difficult.

3          MR. SPONDER:  Understood, Your Honor.

4          THE COURT:  Thank you.

5          Anyone else as an objecting party?  I see no one on

6 Court Solutions.

7          Mr. Gordon, any reply?

8          MR. GORDON:  Just a few things, Your Honor, and I'll

9 work -- I'll work backwards here.

10         I think with respect to the United States Trustee,

11 largely the arguments devolve into a strong belief apparently

12 by the U.S. Trustee that the divisional merger harmed

13 Plaintiffs, that it effectuated a fraudulent transfer, and that

14 disqualification is obvious based on that.

15         And I would say there's nothing really in the record

16 that supports that.  Those are just arguments to me with --

17 with no substance.

18         The one thing I did want to react to though was this

19 idea that because we did work for J&J, there should be

20 skepticism about whether we would maximize assets.  And to me,

21 that's looking at this case the wrong way.

22         In light of the funding agreement, I would say that

23 there's no -- there should be no real concern that assets are

24 there and available.  And there's no reason to question that

25 Jones Day would do anything other than maximize assets.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management  LLC   Ch. 11   Case No. 21-30589   Page 91 of 132

91

1           The issue in the case isn't that.  The issue is what

2   is the extent of the liability?  And that's what we're going to

3   be mediating about.  That's what we would ultimately

4   potentially be estimating in the absence of a mediation.  And I

5   would submit that the interests of LTL, J&J, New JJCI are

6   completely in alignment on that.  And that's where the parties

7   have to ultimately reach a meeting of the minds.

8           So when Mr. Jonas suggests and the U.S. Trustee

9   suggests that we're in a position where we can't properly

10  observe our fiduciary duties or respect our duties to

11  claimants, I mean, what are we talking about?  I mean, is there

12  seriously a concern that Jones Day won't maximize or preserve

13  assets?

14          As I tried to say earlier, and I think Your Honor got

15  it right, there's no reason to expect there's going to be an

16  issue, but that's not really what the question is.  It's almost

17  like the arguments that are being made are you need to have

18  someone in place who will agree to a high number, and that

19  wouldn't be appropriate, obviously.

20          The issue in this case is what is the extent of the

21  liability?  And again, I think there's no conflict with respect

22  to that.  The interests are all aligned.

23          Obviously, Mr. Sponder said a number of times as well

24  it's obvious that Jones Day would have to be a witness in this

25  inevitable fraudulent transfer proceeding or attack on a

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8    2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 92 of 132

92

 1  divisional merger.  And for the reasons I argued earlier, I

 2  would submit that that's -- that should not be the case.

 3         The other thing I want to -- just wanted to remind

 4  everyone of is this argument that this Texas Two Step, this is

 5  all a new strategy, it's never been done before, it's a reason

 6  why Jones Day shouldn't be allowed to be counsel, but of

 7  course, we're forgetting again the Owens-Illinois case, the

 8  Paddock Enterprises that I talked to Your Honor about before.

 9         That's not a Jones Day case, by the way.  Mr. Pfister

10  said we've handled each of these cases.  That was a case filed

11  by Latham.  A very similar approach.  They called it something

12  different.  They didn't use the Texas divisional merger

13  strategy, but the transaction was effectively the same.

14         Garlock, same thing.  Another law firm there.  And,

15  of course, there was no disqualification of counsel in either

16  case, no determination that counsel was conflicted, actually

17  conflicted where it couldn't be involved.

18         And I wonder how far these arguments go, if counsel

19  was involved in some kind of restructuring prior to the

20  bankruptcy, whether on the eve of the bankruptcy or several

21  months before, is that disqualifying in every case?  That's

22  kind of what I'm hearing from the U.S. Trustee and potentially

23  Mr. Pfister, that because you're involved, that somehow there's

24  a taint that goes with that, and it's not appropriate for the

25  firm to also serve as counsel.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 93 of 132

93

1         Mr. Pfister also said a number of times that all of

2   this was a charade, it lacked credibility.  I think Mr. Jonas

3   has said the same thing.  I think what -- what the Committees

4   and the parties have lost sight of is the fact that we were

5   asked to represent the debtor.

6         And all the -- the facts that we provided with

7   respect to the successive representations just to me show how a

8   firm properly positions itself to be able to do the work, you

9   know, again, with the authorization and permission of all the

10  relevant parties that you have to terminate one representation

11  to take on the next.  That's -- that's not a charade.  I mean,

12  that's -- that's just the result of the fact that the decision

13  was made that the firm should represent LTL in connection with

14  the bankruptcy.  That was the choice that was made.

15        And then ultimately, I guess the last thing I would

16  say, with respect to Mr. Pfister, he made a number of sort of

17  general arguments about the significance of the merger and the

18  significance of this approach and how important this is to

19  Jones Day.  But I would say they didn't tie any of that back to

20  the actual standards under Section 327.

21        And all of that, even if it were true, to me did not

22  establish a basis to suggest either an actual conflict or a

23  potential conflict for all the reasons that I argued initially.

24        So again, Your Honor, I would ask that Your Honor

25  approve the retention application.

94

1          THE COURT:  All right.  Thank you, Mr. Gordon.  Well

2   argued on all sides.

3          The matter comes before the Court upon the

4   application for retention by the Jones Day law firm.  This

5   court has jurisdiction under 28 U.S.C. 1334.  This is a core

6   matter under 28 U.S.C. 157(b).

7          Let me first -- allow me first to just review some of

8   the basic applicable law from within our circuit.  The Third

9   Circuit has made clear that disqualification of a law firm is

10  an extreme remedy.  And under the Third Circuit's precedent,

11  disqualification depends on a review of the facts of the case,

12  and is not automatic by any means.

13         The courts within our circuit have been mindful of a

14  litigant and a debtor, in this case, right to counsel of its

15  choice, and have thus created a burden which is exceptionally

16  high, as motions to disqualify are viewed with significant

17  disfavor within the Third Circuit as a potential abuse of

18  litigation technique.

19         I'm not suggesting that that's the case here.  There

20  are obvious questions that have been raised and I believe

21  addressed.

22         As the -- as the Third Circuit has noted repeatedly,

23  my starting point for professional retention under Section

24  327(a) is, for the most part, a two-part test.  To be retained

25  as counsel, the applicant must not hold or represent an

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8    2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 95 of 132

95

1  interest adverse to the estate and must be a disinterested

2  person.  And a disinterested person is defined in relevant part

3  as someone without an interest that is materially adverse to

4  the interest of the estate.

5          Now, the purpose behind these requirements is to

6  ensure effective representation of the bankruptcy estate, not

7  any individual creditors, not any individual party.  But in

8  other words, they're designed to ensure that the professional

9  is able to act in the best interest of the estate and can

10 competently and vigorously represent the bankruptcy estate,

11 including the debtor-in-possession.

12         The Third Circuit advises or instructs that a

13 professional will be deemed to hold a prohibited adverse

14 interest where such professional holds or represents interests

15 that are in competition with the debtor and that would

16 actually, not speculatively, impair the service and its

17 obligations as an estate fiduciary.

18         The perspective is to be gleaned from the -- from

19 that of the estate, and counsel is disqualified under 327(a)

20 only if it presently holds an interest or represents an

21 interest.  And the -- its prior representation is not

22 necessarily disqualifying.

23         Turning to this case, the Court, of course, builds on

24 its findings of fact and conclusions of law in the opinions

25 resolving the motions to dismiss as well as the pending

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 96 of 132

96

1 adversary proceeding at the time seeking a preliminary

2 injunction.

3       The Court finds that Jones Day does not hold or

4 represent an interest that is directly adverse to another

5 client or to another party in this case, obviously apart from

6 the creditors themselves, and that the interests of the debtor

7 are fully aligned at this juncture with Johnson & Johnson and

8 New JJCI.

9       And those that -- that finding is important because

10 the alignment of the interests serve to ensure that Jones Day

11 is not going to be in competition or that its client, rather,

12 is not going to be in competition with what's in the interest

13 of these estate.

14       What are these aligned interests?  These are an

15 interest in reaching a global settlement of the talc

16 liabilities through a Chapter 11 process.

17       The Court does not find that the debtor is in

18 competition with Johnson & Johnson at this juncture or New JJCI

19 and that the prior representation of Johnson & Johnson which

20 ceased prior to the filing does not serve to disqualify Jones

21 Day at this juncture.

22       The Court does not find that Jones Day pre-petition

23 representation of J&J or Old J&J creates a situation where it

24 will favor the interest of those entities or New JJCI over that

25 of the debtor.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 97 of 132

97

1           The Court's findings with respect to the motion to

2    dismiss do not support a determination that there is an actual

3    disqualifying conflict.  Again, I would point out at this

4    juncture, at best or at worst, depending upon your perspective,

5    there is a potential conflict which this Court does believe can

6    be addressed through the retention of conflict counsel.  But at

7    this point in time, the Court has no record upon which it can

8    make a finding that there is a facially plausible claim against

9    the debtor or by the debtor or by the bankruptcy estate against

10   Johnson & Johnson.

11          It is clear that Jones Day will not be involved if

12   there is such a dispute that arises with respect to the funding

13   agreement or with respect to any potential claims that arise

14   out of the 2021 corporate restructuring.  It is undisputed, at

15   least in the Court's eyes, that the 2021 corporate

16   restructuring was an integrated transaction.  That's been

17   established.

18          But there has to be more than simply that

19   restructuring to disqualify Jones Day from representing the

20   debtor and only the debtor in this bankruptcy estate.  The

21   Court does not accept that Jones Day's representation

22   contravenes any of the applicable RPCs that have been cited:

23   1.7, 1.8, 1.9, or 3.7.

24          With respect to the lawyer as a witness, indeed, that

25   RPC only applies for situations at trial.  It was intended to

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 98 of 132

98

1  ensure that juries would not be confused by a lawyer's advocacy

2  versus factual testimony.  And it doesn't disqualify an entire

3  firm.  But the reality, and the Court accepts the reality that

4  it's unlikely that Jones Day will be testifying given the vast

5  majority of its information would fall under work product/

6  attorney-client privileges.  We already visited some of those

7  issues as part of the discovery with respect to the motions to

8  dismiss.

9       The Court certainly envisions or believes it would be

10  proper to include a reservation of rights for the parties,

11  should there be -- should the facts warrant taking issue with

12  their continued representation.

13       Going back to the conflicts issue, the Court is

14  comforted by the significant body of case law that allows the

15  retention of conflict counsel to address disputes that arise.

16  The Court differs with the U.S. Trustee, respectfully, as to

17  what is central in this case.

18       The Court does not believe the 2021 corporate

19  restructuring is central to this bankruptcy.  It was a vehicle

20  which enabled the bankruptcy.  It may give rise to claims that

21  are potential at this juncture.  But what is central to this

22  bankruptcy is resolving claims, claims of injured parties and

23  funding those claims.  That does not involve the corporate

24  restructuring.

25       There is also an overwhelming body of case law which

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 99 of 132

99

1    supports a court's ruling to permit retention even where there

2    is the existence of a disqualifying factor.  In other words,

3    courts have approved retention of law firms notwithstanding

4    certain conflicts with RPCs when doing so is in the best

5    interest of the bankruptcy estate.

6         Courts have looked to the time and money of getting

7    involved in getting new counsel up to speed, the delays that

8    would be reflected in replacing counsel, the amount of work

9    involved by counsel to date, the amount of time and effort

10   necessary to get new counsel up to speed.  And, certainly,

11   there's no question as to the complexity of this case to date.

12        And the Court questions whether replacing the firm of

13   Jones Day were it so required would truly be in the interest of

14   the bankruptcy estate.  But the Court doesn't need to get there

15   because it's not finding that there is a disqualifying basis to

16   preclude retention.

17        For those reasons, the Court overrules the objections

18   that have been raised and will approve Jones Day's retention

19   *nunc pro tunc* back to I guess October 14th and will ask counsel

20   to circulate a proposed form of order because the Court wants

21   to ensure that there is the proper reservation of rights.

22   Thank you.

23        Now we have both Weil Gotshal and Skadden.

24        MR. PRIETO:  Your Honor, I think it's afternoon now,

25   so good afternoon.  Dan Prieto of Jones Day on behalf of the

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management  LLC  Ch. 11  Case No. 21-30589  Page 100 of 132

100

1  debtor.  Your Honor, I'll start with Weil.

2          With respect to the Weil application, Your Honor, the

3  debtor is seeking to retain Weil as special counsel pursuant to

4  327(e) to continue to represent the debtor in the Imerys and

5  Cyprus cases.  And as Your Honor may be aware, Weil has been

6  representing parties in that case for almost three years now.

7  So the debtor desires to have the benefit of that extensive

8  knowledge and experience on a go-forward basis.  Weil will not

9  represent the debtor as general bankruptcy counsel, and its

10 role will be limited to, you know, the Imerys and Cyprus

11 matters.

12         Your Honor, there was an objection filed by the

13 Committee.  We have had some meet and confers, maybe not

14 recently but in the past.  And I think based on those meet and

15 confers, my understanding is the issues are largely if not

16 entirely resolved.

17         There is one open issue, I believe, that the parties

18 may need Your Honor's input on and that was raised at the last

19 hearing.  And that relates to a statement made in the

20 supplemental certification of Ronit Berkovich in support of the

21 application, and that's Paragraph 16, Your Honor.  I'll go

22 ahead and just read it:

23             "Johnson & Johnson on occasion has sought Weil's

24             views on issues that are related to the debtor's

25             Chapter 11 case but are outside of the scope of

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 101 of 132

101

1        Weil's retention by the debtor under 327(e) of the

2        Bankruptcy Code."

3            So my understanding is I think the Committee does

4    have an issue with that, potentially.  I'm not sure from the

5    debtor perspective what the issue is because from the Debtor's

6    perspective, the fact that Weil wants to provide its views on

7    these issues to J&J doesn't really run afoul of the standards

8    of 327(e).

9            As Your Honor knows, special counsel only must not be

10   adverse to the debtor with respect to the matters for which

11   they're being retained.  And this advice to J&J has nothing to

12   do with the Imerys and Cyprus matters be definition.  It's

13   outside the scope of the retention.  And, of course, that

14   advice would not be paid for by the debtor.  It would be paid

15   for by J&J.

16           In addition, Your Honor, I did want to note that

17   while I don't believe it's required by 327(e), Weil has agreed,

18   and this is in their certification, that it will not represent

19   J&J in any matters adverse to the debtor or its estate.  So

20   it's taking it a step further.

21           So the debtor doesn't see an issue with this.

22   Obviously, if Your Honor has a concern, we're happy to address

23   it in any order approving Weil's retention.  But I wanted just

24   to address that issue.

25           THE COURT:  I assume Weil Gotshal wouldn't be paid by

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 102 of 132

102

1  the estate for advice being given to J&J.

2          MR PRIETO:  That's correct, Your Honor.  That would

3  be billed only to J&J.

4          THE COURT:  All right.  Let me hear from objectors.

5  Thank you.

6          MR. PRIETO:  Thank you, Your Honor.

7          MR. JONAS:  Your Honor, Jeff Jonas, Brown Rudnick,

8  for TCC1.  It is a very discrete issue, Your Honor, and I think

9  Mr. Prieto largely got it correct.  Our problem is we don't

10 think it's appropriate for Weil at one time or at the same

11 breach representing the debtor to also be providing advice

12 relating to the debtor's bankruptcy to Johnson & Johnson.  Just

13 too close for comfort, Your Honor.

14         Johnson & Johnson has plenty of bankruptcy lawyers,

15 including White & Case and others.  We don't think it was

16 appropriate for -- to be able to shave it right down the line

17 and be able to talk about on the one hand they say they won't

18 provide any advice adverse to the debtor.  I don't know what

19 that means in the context of if they're providing advice to

20 Johnson & Johnson about this bankruptcy, it very well could be

21 adverse, Your Honor.

22         So that was our only issue with the retention.

23         THE COURT:  I'm going to leave it to counsel to draft

24 the order.  But I believe Johnson & Johnson could clearly look

25 to White & Case for its advice relative to this bankruptcy.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 103 of 132

103

1   And I don't think it needs to look to the debtor's counsel for

2   it.  So I would agree with that limitation.  There are other --

3   Weil Gotshal's a great firm.  There are other firms that they

4   could provide advice to Johnson & Johnson.

5           MR. PRIETO:  Thank you, Your Honor.

6           THE COURT:  Thank you.

7           So the Court will approve the retention subject to

8   that limitation.

9           MR. JONAS:  Thank you, Your Honor.

10          THE COURT:  And that's going forward.

11          MR. PRIETO:  I appreciate it, Your Honor.  We'll

12  prepare that order.

13          THE COURT:  I'd like to take a ten-minute break.  I

14  think other people would like to take a ten-minute break.  So

15  we'll come back at a quarter of.

16          MR. PRIETO:  Thanks.

17          THE COURT:  Thank you.

18          (Recess at 12:35 p.m./Reconvened at 12:51 p.m.)

19          THE COURT:  It's good to see people in a better mood.

20          MR. PRIETO:  We're almost done, Your Honor.

21          THE COURT:  We're getting there.  All right, Counsel.

22          MR. PRIETO:  Your Honor, for the record, Dan Prieto

23  of Jones Day on behalf of the debtor.  Your Honor, I think the

24  next item on the agenda, hopefully the last one on the agenda,

25  is the Skadden application.

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8   2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 104 of 132

104

1          Your Honor, the debtor is seeking to retain Skadden

2 as special counsel because of its extensive experience and

3 knowledge gained as trial counsel and its national discovery

4 counsel of Old JJCI in the talc-related litigation.  Initially,

5 in these cases, the debtor planned to retain Skadden as

6 ordinary-course professional to be available to address issues

7 in the underlying state tort lawsuits in which they were

8 involved.

9          But it soon became apparent that the debtor required

10 Skadden's knowledge and expertise in these Chapter 11 cases.

11 So as a result in I think it was mid-December, the debtor filed

12 an application seeking to retain Skadden as special counsel.

13          The Talc Committee and the U.S. Trustee each filed

14 objections to the application.  And for the reasons Your Honor

15 set forth in our reply and in our supplemental reply, the

16 objections are misplaced and, we submit, should be overruled.

17 So I'm not going to repeat all the various things in the

18 pleadings, but I did want to address some of the key objections

19 that have been raised.

20          So, first, Your Honor, the objectors argue that the

21 scope of Skadden's retention is too broad.  And as Your Honor

22 is well aware, the standard for a 327(e) retention is that the

23 debtor is not permitted to employ counsel to assist in the

24 general administration of the estate.  Well, the debtor, Your

25 Honor, is not seeking to retain Skadden to do that.  We just

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8    2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 105 of 132

105

1  had the Jones Day retention application.  That's what Jones Day

2  is doing administering these cases.

3          As we stated in the application, the debtor is

4  seeking to retain Skadden for a limited and specific purpose

5  which is to advice the debtor on issues relating to the defense

6  of talc-related claims and to assist with discovery matters,

7  all based on their pre-petition experience.

8          So the objectors argue that the work that Skadden did

9  on matters in this case go beyond the scope of what we proposed

10 to retain them for, and what they point to are depositions that

11 Ms. Brown of Skadden, defendant in this case, as well as

12 Skadden's role that it played at trial on the motions to

13 dismiss.

14          And, Your Honor, as we explained in the reply as well

15 as in the supplemental reply, Skadden did that work precisely

16 because its experience and familiarity with the factual issues

17 relating to the talc litigation.

18          As Your Honor witnesses, the Committees repeatedly

19 raised talc issues in connection with the motions to dismiss

20 and, in fact, the talc litigation and related issues were major

21 topics of inquiry both in the depositions, Your Honor, as well

22 as at trial.

23          And I think more fundamentally, Your Honor, it's

24 simply not the case that Skadden's, you know, leading the

25 administration of these cases or even led the defense of the

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 106 of 132

106

1  motions to dismiss.  You know, Jones Day examined the expert

2  witnesses and did the opening and closing legal arguments.

3  What Skadden did was handle the examination of the fact

4  witnesses and the closing argument with respect to the fact

5  testimony, which I submit to Your Honor is consistent with

6  their expertise on talc matters.

7         So, Your Honor, with respect to the scope, the debtor

8  believes that the services Skadden has provided are appropriate

9  and do not demonstrate that its administering these Chapter 11

10 cases.

11        Next, Your Honor, the Committee argues that Skadden's

12 not even eligible for 327(e) retention here because it did not

13 represent the debtor prior to the petition date.  But, Your

14 Honor, that just ignores the 2021 corporate restructuring which

15 as we explained in the pleadings resulted in the allocation of

16 Skadden's representation of Old JJCI and talc-related

17 litigation, you know, the debtor.  So there's clearly technical

18 complaints with the statute, Your Honor.

19        And I would also submit that the Committee's position

20 is contrary to the purpose of the statute which is to permit a

21 debtor to obtain the benefit of pre-petition counsel's

22 experience and avoid the inefficiencies of having different

23 counsel which is exactly what we're trying to accomplish here.

24        And then, finally, on the point, Your Honor, I think

25 the Committee cites a couple of cases that they allege support

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8    2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 107 of 132

107

1    the proposition that, you know, there wasn't pre-petition

2    representation.  But I would submit to Your Honor those cases

3    are all in opposite based on this particular unique facts of

4    this case.  And as we explained in the reply, those cases don't

5    involve an engagement agreement that was allocated to the

6    debtor prior to the commencement of the debtor's Chapter 11

7    case or a situation like we have here where the proposed

8    counsel served for many years as counsel in the litigation

9    relating to the very liabilities that have been allocated to

10    the debtor.

11         Next, Your Honor, the objectors claim that Skadden

12    has a conflict because it represented both Old JJCI and then

13    the debtor and J&J in the defense of talc claims.  Your Honor,

14    Skadden does not hold the represented interest adverse to the

15    debtor or the estate with respect to the matters for which it

16    is employed, and that's fundamentally, Your Honor, similar to

17    what Your Honor just found with respect to Jones Day that the

18    debtor and J&J have an identity of interests with respect to

19    the defense of talc claims.  And that is because they have the

20    same interest in demonstrating the safety of the talc products

21    at issue and in virtually every case, as Your Honor heard at

22    the preliminary injunction hearing, the allegations against J&J

23    and Old JJCI, now the debtor, are identical.

24         And the Committee does point to the potential for

25    some kind of indemnity or contribution claim but, Your Honor,

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 108 of 132

108

1  with respect to those matters, those are simply outside the

2  scope of Skadden's proposed retention here.  They wouldn't be

3  handling those matters.

4        And then, finally, with respect to the last prong of

5  the 327(e) approval, you have the best interests of the

6  debtor's estate.  I don't think the objectors are really

7  questioning, as far as I've read their objections, whether this

8  is in the best interest of the estate.  I think that's a fairly

9  easy standard to satisfy, particularly where you have special

10 counsel with the extent of the experience on important issues

11 in the case that Skadden has.

12       And I would also underscore that, you know, Skadden's

13 expertise with respect to the discovery issues has been pretty

14 invaluable to the debtor's ability to respond efficiently and

15 timely to the various discovery requests that we've received in

16 the case.  So, Your Honor, I would submit there's no doubt that

17 retaining Skadden would be in the best interest of the debtor's

18 estate.

19       And, Your Honor, the final issue I wanted to address

20 that was raised by the objectors, I think this one was only

21 raised by the U.S. Trustee, is *nunc pro tunc* retention.  You

22 know, admittedly here, the application was filed a couple of

23 months into the case.  But, Your Honor, I would submit that

24 there's a reasonable basis for that relatively short delay in

25 filing the application.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 109 of 132

109

1          You know, as I mentioned earlier, the debtor

2    originally contemplated having Skadden act as ordinary-course

3    professional in the case.  And, you know, then it became

4    apparent early on in the case that we would need them to play a

5    larger role.  And I think, in fact, there was a request by the

6    Committee to take them off the ordinary-course professional

7    list and actually, you know, file an application.  But that was

8    right around the time the case was transferred, and there was

9    some disruption there and some delay in sort of putting

10   together an application and filing it which we did ultimately

11   in mid-December, December 15th.

12          And I would say in terms of the prejudice, I don't

13   think there is any here.  From October 14th, the petition date,

14   through November 14th, Skadden incurred about $30,000 in fees.

15   And then in the next 30 days following that before the

16   application was filed on December 15th, Skadden incurred a

17   little over 300,000 in fees.  So I think in the context of this

18   case, that's pretty modest amounts.

19          And I would note that, you know, the claimants and

20   the Committees aren't objecting to *nunc pro tunc* retention.  So

21   the parties in interest aren't opposing that.  So for all those

22   reasons, Your Honor, I would request that Your Honor approve

23   the retention of Skadden and special counsel and overrule the

24   objections.

25          THE COURT:  All right.  Thank you, Counsel.

Case 23-01092-MBK  Doc -2  Filed 05/29/23  Entered 05/29/23 18:03:43  Desc
Transcript March 8  2022 Hearing LTL Management  LLC  Ch. 11  Case No. 21-30589  Page 110 of 132

110

1          Mr. Jonas?

2          MR. JONAS:  Your Honor, Jeff Jonas, Brown Rudnick,

3    for TCC1.  I'll restate my respect in filing this for Ms. Brown

4    and, of course, respect for Skadden.  That's not what this is

5    about.  I think, Your Honor, also rely in our papers.  I won't

6    restate.  I'll keep this very, very discrete.

7          Your Honor, the application seeks to retain Skadden

8    under 327(e) for the following: A, assist the debtor in

9    connection with any issues of proceedings implicating the

10   factual and scientific basis supporting the defense of the

11   underlying talc-related meso and ovarian cancer claims; B,

12   assist the debtor with discovery relating to meso and ovarian

13   cancer claims; C, assist the debtor in connection with any

14   estimation proceeding for the debtor's talc-related claims; D,

15   assist the debtor in any issues of proceedings related to the

16   stay or other matters relating to talc-related claims in

17   non-bankruptcy forums; and E, provide such other specific

18   services as may be requested from time to time relating to

19   defense, estimate, resolution of debtor's talc-related claims

20   in the Chapter 11 case.

21         Your Honor, I won't belabor it.  You were here, as I

22   was, for the trial.  And I participated in the lead-up to the

23   trial and can tell you that Ms. Brown and Skadden, in my

24   opinion, really ran the trial and they really ran the debtor's

25   defense to the motion to dismiss.  I think that is far beyond

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 111 of 132

111

1  the scope of what I just read to you, what is the intended

2  retention of Skadden under 327(e).  And on that basis, I don't

3  think the retention can be approved.

4        That's really all I have to say, Your Honor.  Thank

5  you.

6        THE COURT:  All right.  Thank you, Mr. Jonas.

7        Other counsel?

8        MS. RICHENDERFER:  Good afternoon, Your Honor.

9        THE COURT:  Good afternoon.

10       MS. RICHENDERFER:  Linda Richenderfer, again, from

11  the Office of the United States Trustee.

12       I guess I'm going to pick up basically where Mr.

13  Jonas left off.  The United States Trustee objects to this

14  retention because Skadden, respectfully, does not fall within

15  the parameters of a Section 327(e) retention.  327(e) is only

16  for -- is a more lenient standard and only requires that the

17  professional or the attorneys who are going to be retained are

18  going to not have an interest adverse to the estate with

19  respect to the matter on which such attorney is to be employed.

20       In the documents, the debtor says they're being

21  employed basically to help us with the talc litigation like

22  they always did previously for JJCI.  Your Honor, I attended I

23  think 90 percent of the depositions, and I was here for the

24  entire trial.  And I will tell Your Honor that they were

25  defended, the fact witnesses were defended by counsel from

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management  LLC   Ch. 11   Case No. 21-30589   Page 112 of 132

112

1 Skadden.  And the fact witnesses included not only the officers

2 of LTL but also officers and employees of J&J and JJCI.

3 　　　　Ms. Brown represented JJCI's president, Michelle

4 Goodridge, J&J's Vice-President and Assistant Corporate

5 Controller Adam Lisman, the head of Worldwide Consumer Health

6 Thibaut Mongon.  And she also represented Ms. Ryan who was

7 formerly a treasurer of J&J.

8 　　　　Most importantly, Your Honor, and I think this is the

9 part that concerns us the most, it was Ms. Brown during those

10 depositions who instructed J&J and JJCI's witnesses not to

11 respond to certain questions on the grounds that it would

12 disclose attorney-client privileged information.  These were

13 privileges that didn't belong to the debtor.  These were

14 privileges that belonged to J&J and JJCI.

15 　　　　We've heard today from Mr. Gordon regarding the fact

16 that J&J has its own counsel, White & Case, and that is indeed

17 a fact.  And why they weren't the counsel for those witnesses

18 during the depositions remains unknown.  As counsel for

19 JJ/JJCI, they could have been asserting those privileges.  But,

20 no, it was Ms. Brown who asserted those privileges.

21 　　　　Your Honor was here and Your Honor heard the trial.

22 Your Honor noted in your February 25th opinion that the

23 labyrinth progression toward the creation of the debtor is

24 somewhat overwhelming, and that is on Page 5 of Your Honor's

25 February 25th opinion.  I don't think there's anybody in this

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management  LLC   Ch. 11   Case No. 21-30589   Page 113 of 132

113

1    room that would disagree with that conclusion, Your Honor.  But

2    the hearing on the motion to dismiss was to take us through

3    that labyrinth.  It was to go through that progression.  And it

4    was to focus on the funding agreement.

5           I heard Your Honor previously state that with respect

6    to Jones Day, you see the interest of J&J, JJCI, and the debtor

7    being aligned with respect to the liability.  But, Your Honor,

8    we have another issue here which is the funding, and it's the

9    funding agreement.  And Your Honor said also in your opinion on

10   February 25th at Page 31, frankly, it is unsurprising that J&J

11   and Old JJCI management would seek to limit exposure to present

12   and future claims.  Their fiduciary obligations and corporate

13   responsibilities demand such action.

14          And so we have a dichotomy here, Your Honor, where we

15   have Skadden going beyond the four corners of a 327(e)

16   retention and representing the debtor in connection with its

17   case through the work it did with respect to the motion to

18   dismiss and then we have also Skadden during its 327(a)

19   activities, Your Honor, representing J&J, JJCI, and the debtor

20   on fundamental issues such as the funding agreement.

21          And the funding agreement, again, Your Honor,

22   acknowledged it is management, J&J's management who would want

23   to limit exposure.  And it is the debtor, as the fiduciary for

24   the claimants, who has the obligation to ensure that the

25   funding is to the maximum extent in order to reconcile all of

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 114 of 132

114

1  the claims that are now facing the debtor.

2        Debtor has stated that they used Skadden at the trial

3  because of its prior talc-related experience.  Your Honor, no

4  doubt about it, there were questions during the depositions and

5  questions during the trial about talc liabilities, about the

6  history of J&J's talc litigation.  I think it is in Ms. Brown's

7  certification that she states that Skadden became counsel for

8  J&J and JJCI in 2019 on talc litigation.  So we don't have --

9  they didn't have the whole history of representing the debtor,

10  predecessors, J&J in talc litigation going back to the time of

11  the beginning.  They had been working with J&J for about two

12  years.

13        But more importantly, Your Honor, the subject matter

14  went far beyond that in terms of the discovery and in terms of

15  the testimony presented during the trial.  The subjects went

16  into in great detail the labyrinth process that Your Honor

17  stated and observed in your opinion on February 25th.  Skadden

18  is one of the few law firms representing the debtor who is

19  relatively up to date in terms of filing their monthly fee

20  statements.  So we did have the benefit of looking at those,

21  and they are on the docket at DI-1610, 1611, and 1612.

22        And they are replete with numerous, sometimes daily,

23  meetings between Ms. Brown, other attorneys from Skadden, Mr.

24  Haas, and Mr. White, Mr. Haas and Mr. White both being in-house

25  attorneys for J&J.  While White & Case occasionally appears in

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 115 of 132

115

 1  a description, they're not all the time in the descriptions.

 2          And I must say as someone that needs to review fee

 3  statements, I very much appreciated the very detailed nature of

 4  the Skadden fee statement because people were listing everyone

 5  who was on the telephone call, everyone who was at the meeting.

 6  And so if White & Case wasn't listed, one can presume White &

 7  Case wasn't there because if White & Case was on the phone

 8  call, they were listed and they were included.  And there were

 9  many such meetings and phone calls that didn't involve anyone

10  on behalf of the debtor.  Occasionally, Mr. Kim was also

11  listed.

12          I think, though, the striking thing, Your Honor, is

13  didn't see Skadden going back and reporting to the board of

14  directors or board of managers of the debtor regarding -- the

15  depositions or the trial came later in February.  We don't have

16  the advantage of that one yet.  But the reports on the

17  depositions were not going back to the board of directors of

18  the debtor, were not going back to Mr. Wuesthoff, the

19  president.  They were going back, the reports were being made

20  to Mr. Haas and Mr. White.

21          So, Your Honor, I think at the end of the day, in

22  conclusion, we think that the retention under 327(e) is, quite

23  frankly, a non-starter, that the scope of what Skadden has been

24  doing has expanded way beyond merely continuing in a

25  representation as talc counsel and providing advice with

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 116 of 132

116

1   respect to talc litigation.  It has gone into the 327(a) area.

2   For that, they would need to file another application.  There

3   is a different standard that needs to be met.  And there would

4   be different information that would need to be included in a

5   declaration to support that.

6          I would point out, though, to Your Honor, in the

7   meantime that the role that we saw Skadden play during this

8   trial far exceeded mere allegiance to the debtor; went into the

9   area of also representing J&J and JJCI; and. in particular,

10  Your Honor, I would point out again to the Court the assertion

11  of a privilege on behalf of non-debtor entities during

12  depositions of employees and officers of those non-debtor

13  entities.

14         Thank you, Your Honor.

15         THE COURT:  All right.  Thank you, Counsel.

16         Anyone else before we go back to debtor's counsel?

17                (No audible response)

18         THE COURT:  All right, Counsel.

19         MR. PRIETO:  Thank you, Your Honor.  Dan Prieto of

20  Jones Day on behalf of the debtor.

21         Just a couple of things, Your Honor, starting with

22  the point about the time during which Skadden represented Old

23  JJCI in talc litigation.  I mean 2019 is still a significant

24  amount of experience, and I don't think anybody's questioning

25  that Skadden doesn't have the expertise.  But just so the

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589    Page 117 of 132

117

1  record's clear, that was referring to the time when Ms. Brown

2  joined Skadden from Weil.  And in her previous role at Weil, my

3  understanding is she did represent Old JJCI.  So the expertise

4  and experience goes back further, and that's in part why the

5  debtor wants to retain them under 327(e) to get the benefit of

6  that experience.

7          In terms of the criticism about the debtor having

8  Skadden defend depositions, Your Honor, in my experience, it's

9  not unusual for debtor's counsel to defend third-party

10 witnesses both in depositions and at trial if it relates to,

11 you know, an issue in the bankruptcy case.  And that's what we

12 had Skadden do because I think as people have acknowledged,

13 there were significant talc-related factual and other issues

14 raised.

15         And I would submit to Your Honor that it would have

16 been very inefficient for us to have Skadden address those

17 witness depositions and testimony at trial but then bifurcate

18 out the issues and have another lawyer come in and deal with

19 other questions relating to non-talc issues.  So, obviously,

20 there were some non-talc issues that were brought up with

21 respect to those witnesses, but we thought it was most

22 efficient based on what we anticipated would be asked at those

23 depositions and at trial to have somebody with her expertise be

24 involved.

25         And the way we bifurcated, as Your Honor saw, was

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 118 of 132

118

1  Jones Day took charge of all the legal arguments and the expert

2  witnesses.  And we thought that was an appropriate division of

3  labor under the circumstances.

4       Let's see, with respect to, you know, some

5  conferences that were referenced, Your Honor, I haven't had the

6  benefit of seeing what exact time entries she's referring to.

7  My understanding from conferring with Mr. Kim is that, you

8  know, we believe Mr. Kim was actually in all those conferences

9  or most of them.  And, again, it's not surprising, as Mr.

10 Gordon said in connection with the Jones Day application, that

11 the parties are talking among, you know, aligned parties in

12 this case.  So I don't think that's of any moment.

13      And then, finally, Your Honor, I just wanted to note

14 that, you know, this issue about scope, it seems to be the

15 primary objection still.  And, you know, I want to refer Your

16 Honor to a case that the Committee itself cited in its

17 objection which is the Woodworkers Warehouse case, 323 B.R.

18 403, because I think it's helpful here.  And that was a

19 situation where special counsel there was responsible for

20 handling cash collateral issues, responsible for dealing with

21 the sale of substantially all the assets of the debtor and,

22 also, for negotiating and preparing the KERP plan.

23      And you would have thought that with all that sort of

24 issues central to the case, there would be an issue.  But even

25 under those circumstances, Judge Farnan on appeal ruled that

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management  LLC   Ch. 11   Case No. 21-30589   Page 119 of 132

119

1 that was still appropriate to retain that counsel under 327(e)

2 because of the wide range of services left to general

3 bankruptcy counsel.

4        Well, Your Honor, that's the same thing here.  I mean

5 Jones Day is general bankruptcy counsel.  We're handling the

6 Chapter 11 case.  We've brought in Skadden to deal with

7 specific talc-related issues, and we think that was

8 appropriate.  And, Your Honor, we would ask that you overrule

9 the objections and approve Skadden's retention.

10        THE COURT:  All right.  Thank you, Mr. Prieto.

11        Yes?

12        MS. RICHENDERFER:  Your Honor, if I may?

13        THE COURT:  Yes.

14        MS. RICHENDERFER:  I rise -- Linda Richenderfer from

15 the Office of the United States Trustee.  I rise only hopefully

16 to take one issue off of Your Honor's plate.  I forgot to

17 mention when I was up there that the U.S. Trustee withdraws its

18 objection to the *nunc pro tunc*, if Your Honor decides that it

19 is appropriate that they be retained.  We withdraw our *nunc pro*

20 *tunc* objection.

21        THE COURT:  Thank you.

22        MS. RICHENDERFER:  Thank you, Your Honor.

23        THE COURT:  Thank you.  I appreciate that.

24        All right.  Again, this matter comes before the Court

25 on the application under 327(e) by the debtor seeking retention

120

1 of the Skadden Arps firm for a specified special purpose.

2                    (Dial tone)

3          THE COURT:  That's not good.  I didn't touch a thing.

4          Timed out?

5                 (Court and Clerk confer briefly)

6                    (Pause)

7          THE COURT:  All right.  Back on?  You can hear me,

8 Bruce?

9          THE CLERK:  I can hear you from here.  We just want

10 to make sure that on Court Solutions they can hear you.

11          THE COURT:  And can those on Court Solutions hear me,

12 if anybody would just respond.

13          MS. JONES:  Yes, Your Honor.  Thank you.

14          THE COURT:  Thank you.  Usually not hard to get

15 lawyers to talk.

16          All right.  Go back to where we are, this application

17 to retain Skadden Arps under 327(e) for a specified purpose.

18 The Court has jurisdiction over this matter under 28 U.S.C.

19 1334.  It is a core matter under 28 U.S.C. Section 157(b).

20          327(e) permits employment of a law firm or an

21 attorney for a special, a specified special purpose as apart

22 from conducting the case in general so long as the attorney

23 does not hold or represent an interest adverse to the debtor or

24 to the estate with respect for the matter on which he or she is

25 to be employed.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 121 of 132

121

1          At issue in this application is really whether the

2    nature of the specified purpose and the scope of the specified

3    purpose as well as whether or not Skadden is indeed adverse to

4    the debtor or holds any interest adverse to the debtor or to

5    the estate.

6          Let's talk about the scope.  There is no question

7    that Skadden was to be retained under a limited retention

8    arrangement intending to serve as special trial counsel and

9    discovery counsel to the debtor to advise the debtor on issues

10   relative to the defense of talc-related claims and their

11   resolution during the bankruptcy.  The intent was to draw on

12   Skadden's pre-petition history, experience, and conduct, also,

13   its extensive ECI experience.

14         Did that morph into a more general representation of

15   the debtor during the course of this bankruptcy?  Did it go

16   beyond that limited purpose?  The Court does not find that it

17   did so.

18         The bulk of the work handled to date by the Skadden

19   firm has been relative to the pending motions to dismiss and

20   the preliminary injunction adversary proceeding.  And those

21   issues, those matters involve issues that were relative to the

22   pending and past talc litigation.  And they were clearly

23   intertwined with the issues involved specifically with the

24   motion to dismiss.

25         I do not know how you examine or how the Court would

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8    2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 122 of 132

122

1  be expected to examine the proper bankruptcy purpose of the

2  underlying filing or the issue as to whether or not the debtor

3  was in financial distress without examining as well the issues

4  relative to the pre-petition talc litigation and its history.

5  By that, I mean an examination of the projections, the

6  valuations involved with the talc liabilities, the settlements

7  that had been undertaken, the verdicts and their history, the

8  indemnity cost, the estimation of the liabilities, the existing

9  MDL.

10        All of that played a part and was the subject of

11  extensive testimony and documentary evidence presented to the

12  Court and all of which has nothing truly to do with the

13  administration of the case under the Bankruptcy Code.  It is

14  not involved in conducting a Chapter 11 proceeding.

15        But for this Court to examine whether or not LTL had

16  a proper bankruptcy purpose in filing the bankruptcy or whether

17  it was clearly under distress at the time of the filing and

18  recognizing, again, that it was a unified transaction, so to

19  speak, so that we had to look at the history of Old JJCI and

20  examine the litigations that were pending, the verdicts that

21  have been reached, the projections going forward, the

22  discussions undertaken by the board or the examination

23  undertaken by the board in filing the Chapter 11 in light of

24  the pending talc litigation and the estimated liabilities,

25  involved the very issues that Skadden was retained to assist

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8   2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 123 of 132

123

1  the debtor in.

2        It is impractical to expect at a deposition for

3  lawyers to engage in a tag-team effort every time an issue

4  transcends beyond the specific talc litigation into the other

5  critical issue that was at play in the motion to dismiss,

6  meaning the funding agreement and the 2021 corporate

7  restructuring.  Those were critical, too, but they were

8  separate and apart from the history -- well, they're not

9  separate and apart, they were all intertwined, but those were

10  different issues.

11        But to expect Jones Day to interject questions in

12  that area and Skadden in the other areas during a single

13  examination of a single witness, whether at trial or in

14  pretrial discovery is unrealistic.  The Court is persuaded that

15  the debtor and J&J, as I said before, and Old JJCI and New JJCI

16  all have an identity of interests in defending and addressing

17  the pending talc litigation claims.

18        Therefore, the Court does not find that the Skadden

19  firm is current adverse to the debtor in this regard.  There is

20  no question that the Skadden firm's engagement agreement was

21  allocated to the debtor prior to the filing, so it meets the

22  explicit terms of the statute under 327(e).  I appreciate that

23  the U.S. Trustee has taken the *nunc pro tunc* issue off the

24  table.

25        But, again, in light of the interrelation between the

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management  LLC   Ch. 11   Case No. 21-30589   Page 124 of 132

124

1  talc litigation issues and the history of the talc litigation

2  and the estimation going forward of the indemnity and expenses

3  of the talc litigation with the issues that were litigated as

4  part of the motion to dismiss and the preliminary injunction

5  hearings, the Court finds that Skadden's representation of the

6  debtor to date falls well within 327(e) and is proper for

7  retention.

8          Going forward, I think the Court's going to admonish

9  the Skadden firm that those issues -- well, subject to the

10 appeals that are pending in other proceedings that I'm sure to

11 come down the road, but that the Court will be keeping an eye

12 on the services that are being rendered by the Skadden firm

13 versus Jones Day in the ordinary conduct of the case.

14         So the objections to date are overruled.  The Court

15 will enter an order approving the retention.  I think that

16 resolves that issue.

17         Mr. Stolz?

18         MR. STOLZ:  Your Honor, just a few housekeeping

19 matters.

20         THE COURT:  Yeah.  I was going to address a couple,

21 but go ahead.

22         MR. STOLZ:  Your Honor mentioned a call next week by

23 phone on the mediation protocol.

24         THE COURT:  Right.

25         MR. STOLZ:  I'm not sure that Your Honor had

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8   2022 Hearing LTL Management    LLC    Ch. 11    Case No. 21-30589    Page 125 of 132

125

1  indicated a date and a time.

2        THE COURT:  Well, the date was going to be March

3  15th, Tuesday.  The time would be 11:30.  I also -- well, do

4  you have anything else on your checklist?

5        MR. STOLZ:  I have a couple of other housekeeping

6  matters.  The three firms that are currently representing TCC1

7  were originally retained on behalf of TCC.  And Your Honor

8  indicated we didn't have to submit new applications.  Can we

9  presume that that will continue until April 12th, that we'll

10  still keep operating under the original retention that we had

11  from the TCC original?

12        THE COURT:  Yes.  To the extent you all want a

13  comfort order that clarifies it, I'm amenable to that.

14        MR. STOLZ:  We're submitting our monthlies and

15  getting paid.  That's all the comfort we really need, Your

16  Honor.

17                    (Laughter)

18        THE COURT:  That's all the comfort you need?  Okay.

19        MR. STOLZ:  The third thing is TCC 1 has not filed

20  its notice of appeal or its motion for certification yet.  We

21  wanted to see what was happening with the two committees today.

22  We want to address the interlocutory issue Your Honor raised.

23  Mr. Weinegrad (phonetic) tried to show me a case on his cell

24  phone, but my sight is not good enough to read that.  But we'll

25  address that in our motion, and we'll file it by Friday which

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 126 of 132

126

1  will bring us within 21 days.  And we'd ask just to be allowed

2  to have that filed by Friday and returnable on the 30th.

3      THE COURT:  That's fine.  And if it goes beyond and

4  if it goes to Monday, we'll do it on -- we'll just enter a

5  short -- an ordering shortening time.

6      THE CLERK:  Judge?

7      THE COURT:  Yes.

8      THE CLERK:  Can you just repeat that for the benefit

9  of people on Court Solutions and Zoom because they're not

10 picking up what Mr. Stolz said?

11      THE COURT:  Do you want to come up to the mic and

12 repeat it?

13      MR. STOLZ:  I'll go up to the (indiscernible).

14      So we'll file our motion by Friday for certification

15 on our notice of appeal.  And Your Honor has entered a bench

16 order essentially saying that it will be heard with the others

17 on the 30th.

18      THE COURT:  Correct.  And we'll address the

19 interlocutory nature as part of the briefing at that point in

20 time.

21      MR. STOLZ:  We'll address it in our brief and others

22 can do so, as well.  And just for the record, Your Honor, we

23 have requested that the debtor consent to certification.

24 They've advised us that they didn't consent in Bestwall and

25 that it's still under advisement as to whether the debtor will

127

1  consent.  So just wanted to let you know we met and conferred.

2              THE COURT:  All right.  Thank you.

3              Is that it on your checklist?

4              MR. STOLZ:  That's it on my checklist, Your Honor.

5              THE COURT:  The only other matter I wanted to touch

6  on was the appointment of an examiner.  We somehow skipped that

7  over -- skipped over that.  Since -- and I did -- I have

8  reviewed the correspondence from both TCC Committees that raise

9  objection to the appointment of an examiner at this point in

10  time.

11             I think this also goes hand in hand with prospective

12  derivative-standing motions that are being filed.  I'm going to

13  defer on the appointment of an examiner until someone makes it

14  clear to the Court by motion or otherwise what issues are to be

15  examined in light of my prior ruling or rulings.

16             And, obviously, the Court will entertain any motions

17  seeking derivative standing when filed.  I would hope and

18  expect that in those motions the parties or the movants will

19  identify the causes of actions to be pursued and the basis for

20  looking into those.  So at this juncture, I appreciate the

21  debtor's proposal made during the hearings on the motion to

22  dismiss, but I'll defer until a later point in time.

23             All right.  Mr. Gordon?

24             MR. GORDON:  I had a couple of things I'd like to

25  raise --

Case 23-01092-MBK    Doc -2    Filed 05/29/23    Entered 05/29/23 18:03:43    Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 128 of 132

128

1          THE COURT:  Yes.

2          MR. GORDON:  -- if I could, Your Honor.

3          The first is -- I always hate raising issues like

4  this but with respect to that scheduled phone call on the

5  mediation process, I'm actually going to be in a Third Circuit

6  argument at that time.  Now I suppose it's not critical that I

7  be available for that and, obviously, I'll be involved in meet

8  and confers with the other side.  But at this point -- and we

9  don't know exactly when the argument will go.  There's three

10  that are all set to start at 9:00 in the morning, but -- you

11  know, at some point during that morning.  So I may not be

12  available, so I did want the Court to know that.

13          THE COURT:  Well, I can adjust the schedule.  I just

14  picked that time.  And I don't want to start working over

15  everybody's schedule.  I could have it in the afternoon or I

16  could have it the next day.  Do you have a preference?

17          MR. GORDON:  I think Wednesday would be better if we

18  could do it Wednesday.

19          THE COURT:  Does that conflict with anybody?  This is

20  where I get into trouble.

21          UNIDENTIFIED SPEAKER:  I think that's Your Honor's

22  Chapter 13 day.

23          THE COURT:  It gives me plenty of time.

24                         (Laughter)

25          MR. GORDON:  That's perfect.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 129 of 132

129

1          THE COURT:  Becca, Alex, are we good on that date?

2          THE CLERK:  It's the 16th?

3          THE COURT:  Yeah.

4          THE CLERK:  Yeah, I think we're good.

5          THE COURT:  How about 11:30 at that point?

6          MR. GORDON:  That would work, Your Honor.  I

7    appreciate it.

8          THE COURT:  All right.  3/16.

9          MR. GORDON:  Thank you.

10         And then the second thing and the substantive one is

11   back to the FTCR issue that potential for a second FTCR, and

12   you obviously know our position on that.  But we were talking

13   on the break that we didn't really flesh that process out at

14   all.  So I just had some questions to raise --

15         THE COURT:  Sure.

16         MR. GORDON:  -- and maybe get some guidance from the

17   Court.  The first thing that I would say make as a comment, I

18   don't think the parties actually know which of the candidates

19   have been struck because those communications were submitted ex

20   parte to the Court.  And so I think under the prior protocol,

21   we assumed at some point Your Honor was going to tell us who

22   were left, but I think we're going to need that in advance of

23   that process.

24         THE COURT:  I assume those correspondences have been

25   docketed.

Case 23-01092-MBK   Doc -2   Filed 05/29/23   Entered 05/29/23 18:03:43   Desc
Transcript March 8  2022 Hearing LTL Management   LLC   Ch. 11   Case No. 21-30589   Page 130 of 132

130

1          MR. GORDON:  Not that I know of.  I think they were

2  ex parte.

3          MR. JONAS:  (Indiscernible) ex parte, Your Honor.

4  (Indiscernible) I conferred with the Court who advised us --

5          MR. GORDON:  Right.

6          MR. JONAS:  -- to set up an ex parte.

7          THE COURT:  Well, I'll clear that up momentarily.

8                        (Laughter)

9          MR. GORDON:  And then the, you know, the related

10  questions are basically how is this process going to work

11  exactly.  We're going to have another hearing.  We didn't talk

12  about whether there should be written submissions prior to that

13  hearing and, if so, when and so that's one issue; and, also, if

14  we're going to propose -- each of the constituents is going to

15  propose another candidate, when that should be done and how it

16  should be done.  Would that be done ex parte, would it be done

17  on the record, would it be a part of our written submissions?

18          So just some of the mechanics we realized that after

19  we had the conversation earlier, we hadn't pinned any of those

20  down.

21          THE COURT:  All right.  Thank you.  Let's clarify it

22  all.

23                        (Pause)

24          THE COURT:  So both TCC2 and TCC1 have struck, and I

25  think that's the correct grammar, Joseph Greer and R. Scott

1 Williams.  And the debtor has struck Marina Corodemus and Eric

2 Green.

3           MR. GORDON:  Okay.

4           THE COURT:  So that places everybody on even keel as

5 far as who's out there.  You all know the remaining names.

6           MR. GORDON:  Okay.

7           THE COURT:  As far as the process, if we're having a

8 hearing on 3/30, then I would ask for opposition papers to be

9 filed seven days in advance to the appointment of an second

10 FTCR and, as we've seen in this case, replies three days prior

11 to the hearing.

12           I also would ask that in the event the Court were to

13 agree upon the appointment -- well, actually, no.  Why don't --

14 let's have the hearing on 3/30 and see which way I decide and

15 then I could set a very short schedule on giving me --

16 providing me with names.

17           MR. GORDON:  Okay.

18           THE COURT:  You're welcome to talk about it in

19 advance if you want to predict how the Court rules or gauge one

20 way or the other, but apart from that, we'll wait until the

21 hearing before I ask for names.  All right?

22           MR. GORDON:  Thank you, Your Honor.  I appreciate

23 that.

24           THE COURT:  All right.  Any other questions?

25                          (No audible response)

132

1        THE COURT:  We're done.

2        MR. GORDON:  Thank you, Your Honor.

3        THE COURT:  Take care, folks.

4        MR. GORDON:  Thank you.

5            (Proceedings concluded at 1:36 p.m.)

6                    * * * * *

7

8            **C E R T I F I C A T I O N**

9        We, KAREN WATSON, LORI KNOLLMEYER, and DIPTI PATEL,

10 court approved transcribers, certify that the foregoing is a

11 correct transcript from the official electronic sound recording

12 of the proceedings in the  above-entitled matter, and to the

13 best of our ability.

14

15 /s/ Karen Watson

16 KAREN WATSON

17

18 /s/ Lori Knollmeyer

19 LORI KNOLLMEYER

20

21 /s/ Dipti Patel

22 DIPTI PATEL

23 J&J COURT TRANSCRIBERS, INC.      DATE:  March 9, 2022

24

25